JUDGE BUCHWALD

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MOTTI KAPLAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE and IMAX CORPORATION,<br><br>Defendants | 06 CV 6128<br>CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED**<br><br>"ECF CASE" |

RECEIVED
AUG 11 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, by his undersigned attorneys, for his class action complaint under the federal securities laws, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys:

## INTRODUCTION AND OVERVIEW

1. This is a class action lawsuit that seeks remedies under federal securities laws. The lawsuit arises out of material omissions and false and misleading statements issued by the IMAX Corporation ("IMAX" or the "Company"), whereby IMAX failed to inform its shareholders and the investing public at large that it had improperly recognized revenue for at least three financial quarters prior to June 2006.

2. The failure of the Defendants to inform Plaintiff and other proposed Class members of material information, and their efforts to conceal the truth, caused the

Company's stock price to trade at inflated prices, during which time IMAX sought investors to purchase the Company and therefore sought to maximize the perceived value of the Company.

3. On August 9, 2006, IMAX revealed the truth concerning its financial circumstances causing the price of the Company's common stock to fall by 40.6%, or $3.91. The crash of the Company's stock price caused significant harm to Plaintiff and IMAX's other public shareholders.

**JURISDICTION AND VENUE**

4. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

5. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) and (c).

6. Many of the acts and transactions alleged herein, including among others, the formulation of Company policy and the receiving by IMAX shareholders of consolidated IMAX financial statements during the Company's Annual Meeting of Shareholders occurred in this Judicial District. Moreover, Defendants' headquarters in the United States is located in this Judicial District at 110 East 59th Street, Suite 2100, New York, New York.

7. In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate

commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## THE PARTIES

8. Plaintiff Motti Kaplan ("Plaintiff"), purchased IMAX securities during the Class Period (defined below) and has been harmed by the false and misleading statements and material omissions as alleged herein.

9. Defendant IMAX is a corporation registered under the laws of the Country of Canada, with its corporate headquarters at 2525 Speakman Drive, Mississauga, Ontario, Canada, L5K 1B1. IMAX was founded in 1967 and is one of the world's leading entertainment technology companies and, via its chain of 'high-tech' cinemas, is a distribution entity for movies made in the United States. IMAX currently has 274 movie theaters operating in 38 countries.

10. Defendant Richard L. Gelfond ("Gelfond") has been Co-Chairman of IMAX since June 1999 and Co-Chief Executive Officer since May 1996. From March 1994 to June 1999, Gelfond served as Vice Chairman of the Company. Gelfond owns 2,722,900 IMAX shares or 6.6% of the Company's outstanding common stock. Gelfond is a resident of New York, New York.

11. Defendant Bradley J. Wechsler ("Weschler") has been Co-Chief Executive Officer of IMAX with Mr. Gelfond since May 1996. From March 1994 to June 1999, Wechsler served as Chairman of the Company and has served as IMAX's Co-Chairman with Mr. Gelfond since June 1999. Wechsler owns 2,632,800 IMAX shares or 6.4% of the Company's common stock. Wechsler is a resident of New York, New York.

12. Defendant Francis T. Joyce ("Joyce") has been the Company's Chief Financial Officer since 2001.

13. Defendants Gelfond, Wechsler and Joyce are at times in this complaint referred to as the "Individual Defendants".

**CLASS ALLEGATIONS**

14. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired IMAX common stock from February 17, 2006 through August 9, 2006 inclusive (the "Class"). The period from February 17, 2006 through August 9, 2006 inclusive is hereafter referred to as the Class Period. Excluded from the Class are: 1) IMAX, its subsidiary companies, officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns; and 2) the Individual Defendants, any member of their families and any entity in which they have a controlling interest.

15. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IMAX's common stock was actively traded on the Nasdaq Stock Exchange (the "Nasdaq") in a well-developed and efficient market. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum, thousands of members of the Class. As of February 21, 2006, IMAX had 40,214,242 Common Shares outstanding. Record owners and other members of the Class may be identified from records maintained by IMAX and may be notified of the pendency of this action by mail or otherwise, using a form of notice similar to that customarily used in securities class actions.

16. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

A. whether the federal securities laws were violated by Defendants' acts as alleged herein;

B. whether Defendants acted with scienter in omitting to inform investors of material facts and in issuing false and misleading financial statements;

C. whether the market price of the Company's common stock during the Class Period was artificially inflated because of the material nondisclosures and/or the false and misleading statements and/or Defendants' conduct complained of herein; and

D. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

17. Plaintiff's claims are typical of the claims of the proposed Class because Plaintiff and the proposed Class members each sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

18. Plaintiff will fairly and adequately protect the interests of the members of the proposed Class and has retained counsel competent and experienced in class action and securities litigation. Plaintiff has no interests antagonistic to, or in conflict with, those of the proposed Class members he seeks to represent.

19. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is

impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the proposed Class members individually to redress the wrongs done to them. Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

**FRAUD ON THE MARKET PRESUMPTION**

20. With respect to his claims Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the market doctrine in that:

A. Defendants made public misrepresentations or failed to disclose facts during the Class Period;

B. such omissions and misrepresentations were material;

C. the securities of the Company traded on the Nasdaq, an efficient market;

D. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

E. Plaintiff and the other members of the proposed Class, without knowledge of the omitted or misrepresented facts, purchased IMAX securities between the time the Defendants failed to disclose or misrepresented material facts, and the time truth was disclosed.

21. Based upon the factors set forth above, Plaintiff and the other members of the proposed Class are entitled to the presumption of reliance upon the integrity of the market.

## SUBSTANTIVE ALLEGATIONS

Background

22. IMAX cinema systems are popular with audiences. The quality and size of the 'high-tech' screens produce a unique cinematic experience. However, towards the end of 2005, IMAX was undergoing financial upheaval. The Company announced disappointing quarterly financial results in November 2005, negatively impacting the value of the Company's share price. Analysts attributed the poor financial results to the Company's inability to timely install its 'high-tech' cinema systems. Once installed, the cinema systems were a success, but IMAX installed just seven new systems in the third financial quarter of 2005, four less than anticipated.

False and Misleading Statements During the Class Period

23. On February 17, 2006, IMAX announced its anticipated financial results for the previous financial year and previous financial quarter. According to the Company's press release issued that day, the Company expected to meet or exceed the full year 2005 guidance it provided investors of $0.35 to $0.38 in net earnings per share on a fully diluted basis and expected to report revenues approximately in the guided range of $145 to $150 million for all of 2005. The Company claimed the financial results reflected "the strong tone and momentum of its business."

24. Defendants Gelfond and Wechsler were quoted in the Company's press release lauding the financial achievements of the Company. The February 17, 2006 press release quoted the Individual Defendants as follows:

> IMAX's momentum and growth potential is building", said IMAX Co-Chairmen and Co-CEOs Richard L. Gelfond and Bradley J. Wechsler. "IMAX set aggressive goals for theatre signings, film performance, installations and financial results for 2005, and we are extremely pleased

to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues.

25. The February 17, 2006 press release further stated:

IMAX also announced that in addition to completing 14 theatre installations, the Company signed deals for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40-45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.

26. In fact, the February 17, 2006 press release contained false and misleading statements of material fact. Unknown to IMAX's public shareholders, IMAX had improperly recognized revenue in the fourth quarter of 2005 on ten theater installations in theaters that did not open in that quarter.

27. Following the release of the February 17, 2006 press release, the price of IMAX common shares traded up from $7.82 per share to $8.60 per share. The price of IMAX shares would continue to rise over the following months.

28. On March 9, 2006, IMAX announced that its Board of Directors had begun a process to "explore strategic alternatives to enhance shareholder value", including the sale or merger of the Company with another entity offering strategic opportunities for growth. IMAX also announced that the Company had retained Allen & Company and UBS Investment Bank as financial advisors in this process.

29. The Individual Defendants were quoted in the March 9, 2006 press release, again touting the financial strength of the Company. The Individual Defendants were quoted in the press release as follows:

In order to fully realize the growth potential inherent in both the IMAX brand and the business we have built to date, we are

> evaluating strategic alternatives in order to expand our scale and maximize value for our shareholders. We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. We think this interest, coupled with our solid fiscal 2005 results and compelling growth opportunities, makes this an ideal time to explore our options," said IMAX Co-Chairmen and Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler.

30. Also on March 9, 2006, IMAX released its financial results for the fourth quarter 2005 and the full financial year 2005. The financial results released on March 9, 2006 substantially echoed the financial results the Company issued on February 17, 2006. In the March 9, 2006 press release IMAX claimed to have exceeded guidance and expectations for 2005, by reporting net earnings of $0.40 per share, versus guidance of $0.35-$0.38 per share. IMAX also claimed that for the three months ended December 31, 2005, the Company reported net earnings of $0.29 per diluted share, compared to net earnings of $0.19 per diluted share reported for the three months ended December 31, 2004, an increase of 54%.

31. Other financial successes IMAX touted on March 9, 2006 included the following:

> For the year ended December 31, 2005, total revenues of $144.9 million, as compared to $136.0 million reported for the prior year. Systems revenue of $97.8. million versus $86.6 million in the prior year. The Company recognized revenue on 38 theatre systems which qualified as either sales or sales-type leases in the fiscal 2005, versus 22 in 2004.
>
> For the three months ended December 31, 2005, total revenues of $49.3 million, as compared to $47.5 million reported for the prior year period. Systems revenue of $35.1 million versus $28.8 million in the prior year period. The Company recognized revenue on 18 theatre systems which qualified as either sales or sales-type leases in the fourth quarter of 2005, compared to nine in 2004.

32. Defendants Gelfond and Wechsler were quoted in the March 9, 2006, press release touting the financial success of the Company. The Individual Defendants were quoted as follows:

> Our 2005 results clearly reflect that IMAX's commercial strategy is working and that the momentum in our business is continuing to grow," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of IMAX as a commercial destination for mainstream entertainment.

33. In fact, the March 9, 2006 press release contained false and misleading statements of material fact. Unknown to IMAX's public shareholders, IMAX had improperly recognized revenue in the fourth quarter of 2005 on ten theater installations in theaters that did not open in that quarter.

34. On March 9 2006, IMAX filed with the SEC its report on Form 10-K for its year ended December 31, 2005. Defendants Gelfond, Wechsler and Joyce signed the Form 10-K. In addition, pursuant to pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, the Form 10-K contained the signed certifications of defendants Gelfond, Wechsler and Joyce stating that the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

35. The Form 10-K specifically stated that as of December 31, 2005, the Company had ten theater systems which have been installed in 2005 but scheduled to open in the first quarter and second quarter of 2006 and that these systems were not included in either the opened theater network base, or the backlog figures. The Company describes backlog as follows:

> The Company lists signed contracts for theater system sales and sales-type leases as sales backlog prior to the time of revenue recognition. Sales backlog represents the total value of all signed system sales and lease agreements that are expected to be recognized as revenue in the future and includes initial rental fees along with the present value of contractual minimum rents due over the lease term, but excludes maintenance revenues as well as rents in excess of contractual minimums that might be received in the future. (emphasis added)

36. The statements made on March 9, 2006 in the Company's press release and in its Form 10-K were materially false and misleading because knew that IMAX had improperly recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed.

37. Following March 9, 2006, the price of IMAX common shares traded up from $9.52 per share to $10.95 per share.

38. On May 9, 2006, IMAX issued a press release announcing the Company's first quarter financial results for 2006. In the May 9, 2006 press release, IMAX announced a net loss of $0.14 per diluted share for the quarter ended March 31, 2006, compared to net earnings of $0.03 per diluted share reported for the three months ended March 31, 2005. IMAX also announced that for the three months ended March 31, 2006, the Company's total revenues were $20.4 million, as compared to $31.4 million reported for the prior year period, and reported systems revenue of $9.4 million versus $22.1 million in the prior year period. The Company also indicated that for the second quarter of fiscal 2006, IMAX expected to record revenues of approximately $40 million and earnings per share of $0.05-$0.08.

39. Defendants Gelfond and Wechsler were quoted in the May 9, 2006 press release touting the financial success of the Company. The Individual Defendants were quoted as follows:

> "...we [IMAX] continued to make progress executing our core growth initiatives and implementing our commercial strategy during the first quarter. We remain optimistic that we will continue to improve upon our 2005 performance, where all of the Company's key metrics were up solidly."

40. On May 9, 2006 IMAX filed its Form 10-Q with the SEC for its first quarter ended March 31, 2006. In connection with such report, the Company submitted to the Securities and Exchange Commission the certifications of the principal executive officer and the principal financial officer of the Company as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Defendants Gelfond, Wechsler and Joyce signed the certifications for the March 31, 2006 Form 10-Q stating that the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

41. In fact, the May 9, 2006 press release and Form 10-Q contained false and misleading statements of material fact. Unknown to IMAX's public shareholders, IMAX had implemented improper revenue recognition procedures during the first financial quarter of 2006, that allowed the Company to segregate revenues from different elements of an IMAX theater system, and recognize those revenues in different quarters.

42. Following the release of the press release on May 9, 2006, the price of IMAX shares traded up from $9.45 per share to $9.67 per share.

The Truth is partially Revealed

43. On August 9, 2006, IMAX shocked the investment community by announcing the Company was under investigation by the Securities and Exchange Commission (the "SEC") and that it had uncovered a "material weakness' in the Company's accounting for a movie transaction.

44. Initially in its August 9, 2006 press release, IMAX described its purported financial results for the second quarter 2006. The Company stated that for the three months ended June 30, 2006, IMAX had recorded total revenues of $41.4 million, as compared to $30.9 million reported for the prior year period, and systems revenue of $24.0 million versus $20.3 million in the prior year period. These financial results were false and misleading because unknown to IMAX's public shareholders, IMAX had implemented improper revenue recognition procedures during the second financial quarter of 2006, that allowed the Company to segregate revenues from different elements of an IMAX theater system, and recognize those revenues in different quarters.

45. However, also in the August 9, 2006 press release, the Company stated that IMAX was under investigation from the SEC because of the Company's practice of segregating revenue and recognizing that revenue in different financial quarters. The Company's press release stated, in part, the following:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of

> the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed.

46. IMAX also reported on August 9, 2006 that it had uncovered a material weakness in its accounting for a certain movie transaction impacting revenues of $0.8 million. The Company's press release stated, in part, the following:

> The Company indicated that as part of its quarterly certification under Section 302 of the Sarbanes-Oxley Act, it has identified a material weakness in the internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of 2006. This control deficiency resulted in a negative adjustment of $0.8 million to its Consolidated Statement of Operations for the three months ended June 30, 2006 prior to its release in the financial statements filed today. This $0.8 million in film revenue is likely to instead be recognized in substantial part in the third quarter of 2006.

47. On August 9, 2006, IMAX also announced that it had yet to find an investor willing to purchase or merge with the Company for a price IMAX deemed acceptable.

48. Following the news issued by IMAX on August 9, 2006, the price of IMAX shares crashed, falling by 40.6%, or $3.91 on the following trading day. The decline in IMAX's stock price is a direct result of the nature and extent of defendants' false statements being revealed to investors and the market The crash of the Company's stock price caused significant harm to Plaintiff and IMAX's other public shareholders.

## SCIENTER ALLEGATIONS

49. During the Class Period, IMAX and the Individual Defendants actively sought to sell the Company or effect a merger with another entity so as to raise capital.

IMAX retained Allen & Company and UBS Investment Bank as financial advisors in this process. To effect a sale or merger of IMAX, and to gain as higher price as possible for IMAX in such a transaction, it was critical for the Defendants that the value of IMAX was perceived to be high. Therefore, IMAX and the Individual Defendants sought to bolster the share price of the Company by strategically recognizing revenue when it most suited the Company, even when such revenue recognition policies violated recognized accounting principles.

## NO STATUTORY SAFE HARBOR

50. The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the false statements pleaded herein because none of those statements are "forward-looking" statements nor were they identified as "forward-looking statements" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements, accompany those statements. In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein which are deemed to be forward-looking, Defendants are liable for those false forward-looking statements because at the time each of those statements was made the speaker actually knew those forward-looking statements were false and/or the statements were authorized and/or approved by an executive officer of IMAX who actually knew that the statements were false when made.

**COUNT I**

(For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

51. Plaintiff repeats and re alleges the foregoing paragraphs as if fully set forth herein.

52. The Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5 promulgated thereunder, on behalf of Plaintiff and members of the proposed Class, who were damaged thereby.

53. As alleged herein, Defendants, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mail, knowingly or recklessly engaged and participated in a continuous course of conduct to disseminate materially false and misleading information and to conceal adverse material information about IMAX, including the truth about the Company's revenue recognition procedures, as specified herein. Defendants knowingly or recklessly employed devices, schemes, and artifices to defraud Plaintiff and the proposed Class while in possession of material, adverse non-public information, and engaged in acts, practices, and a course of conduct that included the knowing and reckless making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about IMAX not misleading.

54. Defendants knew, or recklessly disregarded, that IMAX's public statements as identified herein, failed to disclosed material information concerning IMAX's revenue recognition policies. Defendants knew or recklessly disregarded that

the public statements complained of herein were materially false and misleading for the reasons alleged herein.

55. Defendants had the ability to, and did, cause the complained of public statements to contain material misstatements and omissions of material facts, as alleged herein.

56. Defendants' misrepresentations and omissions were intentional or reckless and done for the purposes of enriching themselves and concealing IMAX's true operating and financial condition from Plaintiff and the investing public to induce Plaintiff and members of the proposed Class to purchase IMAX securities at artificially high prices.

57. Defendants acted with scienter, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the truth, even though the truth was available to them. The Individual Defendants were directors and officers of IMAX, and therefore, were directly responsible for the material omissions and false and misleading statements disseminated to the public through financial statements, press releases, news reports, and filings with the SEC.

58. Defendants had the opportunity and motive to commit the wrongful acts alleged herein. The Individual Defendants by virtue of their positions as directors and senior executives of IMAX, controlled the reports, press releases, public filings, communications with analysts and other statements issued by the Company. Thus, Defendants controlled the public dissemination of the material omissions and false and misleading statements to the investing public.

59. As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and material omissions alleged herein, the price of IMAX securities were artificially inflated during the Class Period.

60. In ignorance of the false and misleading statements, the material omissions, and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiff and members of the proposed Class relied on the integrity of the market in IMAX securities, and/or the statements complained of herein, when purchasing IMAX securities. Had Plaintiff and members of the proposed Class known the truth, they would not have purchased the securities or would not have purchased them at the artificially inflated prices that were paid.

61. As a result of their purchases of IMAX securities at fraudulently inflated prices, Plaintiff and members of the proposed Class suffered damages in an amount to be proven at trial.

62. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Plaintiff and members of the proposed Class in connection with their purchases of IMAX securities.

**COUNT II**
(For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants)

63. Plaintiff repeats and re alleges the foregoing paragraphs as if fully set forth herein.

64. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t, on behalf of Plaintiff and all members of the proposed Class who was damaged thereby.

65. As alleged herein, the Individual Defendants acted as controlling persons of IMAX within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, and active participation in, and/or awareness of the Company's day-to-day operations, each Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff alleges are false and misleading. The Individual Defendants were provided with, or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of IMAX and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the violations of federal law as alleged herein, and exercised the same.

67. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act 15 U.S.C. §78t. As a direct and proximate result of the wrongful conduct, Plaintiff and the other members of the proposed Classed suffered damages in connection with their purchases of the Company's securities during the Class Period.

**DEMAND FOR JURY TRIAL**

68. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. determining that this action is a proper class action, designating himself as class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating his counsel as counsel for the Class;

B. awarding compensatory damages in favor of Plaintiff and the other members of the proposed Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. awarding rescission in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

D. awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. such other and further relief as is just and proper.

Dated: August 11, 2006

**ABBEY SPANIER RODD ABRAMS & PARADIS, LLP**

By: ______________________
Arthur N. Abbey
Nancy Kaboolian (NK-6346)
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700
Fax: 212-684-5191
Nkaboolian@abbeyspanier.com

**PASKOWITZ & ASSOICATES**
Laurence D. Paskowitz, Esq.
Roy L. Jacobs, Esq
60 East 42nd Street, 46th Floor
New York, New York 10016
Tel: (212) 685-0969
Fax: (212) 685-2306

Attorneys for Plaintiff

**PLAINTIFF'S CERTIFICATE**

The undersigned ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint against Imax Corp. ("IMAX") and certain other defendants.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5. Plaintiff made the following transactions during the Class Period in the common shares of IMAX:

**Purchases**

| Date(s) | Number of Shares | Price |
|---|---|---|
| 5/4/06 | 70 | $9.72 |
| | | |
| | | |
| | | |
| | | |
| | | |

**Sales**

| Date(s) | Number of Shares | Price |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

6. During the three years prior to the date of this Certification, Plaintiff has not moved to serve or served as a representative party for a class in an action filed under the federal securities laws.

7. I declare under penalty of perjury, this 11 day of August, 2006 that the information above is accurate.

[signature]