RECEIVED
OCT 02 2007
U.S.D.C. S.D.N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB)<br><br>JURY TRIAL DEMANDED |

# CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, by their undersigned attorneys, on behalf of themselves and the class they seek to represent, for their Consolidated Class Action Complaint (the "Complaint"), allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation made by Plaintiffs' counsel, which included the review and analysis of information obtained from numerous public sources including, inter alia: Securities and Exchange Commission ("SEC") filings by IMAX Corporation ("IMAX" or the "Company"), securities analysts reports about the Company, Company press releases, periodic Earnings Conference Calls held by the Company, media reports about the Company, interviews with former IMAX and PricewaterhouseCoopers LLP employees, and documents from Neil v. IMAX Corporation, et al., CV-06-3257-00, Ontario, Canada, Superior Court of Justice.

## JURISDICTION AND VENUE

1. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§78j and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.5.

2. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1331. Venue is proper in this

Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) and (c).

3. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District and the Company's U.S. headquarters is located in this Judicial District at 110 East 59th Street, Suite 2100, New York, New York.

4. In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## THE PARTIES

### A. Plaintiffs

5. Lead Plaintiff Westchester Capital Management, Inc. ("WCMI"), as the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL and SphinX Merger Arbitrage Fund ("Lead Plaintiff"), purchased IMAX common stock during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

6. By order dated January 17, 2007, WCMI was appointed Lead Plaintiff in accordance with the provisions of the Private Securities Litigation Reform Act of 1995. WCMI's certification was previously filed with the Court.

7. Plaintiff The Steelworkers Pension Trust ("TSPT") purchased IMAX common stock during the Class Period and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein. TSPT's certification was previously filed with the Court.

**B. Defendants**

8. Defendant IMAX is a corporation registered under the laws of the Country of Canada. The Company's United States headquarters is located at 110 East 59th Street, Suite 2100, New York, New York and its Canadian headquarters is located at 2525 Speakman Drive, Mississauga, Ontario, Canada, L5K 1B1. IMAX, together with its wholly-owned subsidiaries, is an entertainment technology company which specializes in large-format and three-dimensional ("3D") motion-picture systems. It is also engaged in the production, digital re-mastering and distribution of IMAX films, the operation of IMAX theaters and the provision of support for IMAX theaters and the IMAX theater network.

9. Defendant Richard L. Gelfond ("Gelfond") has been Co-Chairman of IMAX since June 1999 and Co-Chief Executive Officer since May 1996. He has been a director of the Company since 1994. From March 1994 to June 1999, Gelfond served as Vice Chairman of the Company. According to the Company's Form 14A filed with the SEC on August 10, 2007, Gelfond owns 2,722,900 IMAX shares, or 6.6% of the Company's outstanding common stock. He signed the Company's Forms 10-K for the years ended December 31, 2002 through 2006.

10. Defendant Bradley J. Wechsler ("Wechsler") has been Co-Chief Executive Officer of IMAX with Mr. Gelfond since May 1996. From March 1994 to June 1999, Wechsler served as Chairman of the Company and has served as IMAX's Co-Chairman with Mr. Gelfond since June 1999. He has been a director of the Company since 1994 and was a member of the Audit Committee of its Board of Directors between 2002 and 2003. According to the Company's Form 14A filed with the SEC on August 10. 2007, Wechsler owns 2,682,800 IMAX shares, or 6.5% of the Company's common stock. He signed the Company's Forms 10-K for the years ended December 31, 2002 through 2006.

11. Defendant Francis T. Joyce ("Joyce") was the Company's Chief Financial Officer ("CFO") from March 9, 2001 until he officially resigned from the Company on September 12, 2006. Mr. Joyce is a member of Financial Executive International and the American Institute of Certified Public Accountants. He signed the Company's Forms 10-Q and 10-K during his tenure at IMAX.

12. Defendant Kathryn A. Gamble ("Gamble") was the Company's Vice President of Finance, Controller and Principal Accounting Officer from July 2001 until her resignation on or about November 27, 2006. Ms. Gamble currently remains with the Company on a part-time basis in the role of Vice President, Finance and Special Projects. Ms. Gamble is a member of the Canadian Institute of Chartered Accountants. She signed each of the Company's Forms 10-Q and 10-K during the Class Period.

13. Throughout the Class Period, defendants Gelfond, Wechsler, Joyce and Gamble (the "Individual Defendants") were corporate insiders with direct involvement in the daily affairs of the Company. They reviewed, prepared, issued, authorized the press releases and financial statements that IMAX caused to be publicly disseminated at the end of each quarter, and which purported to accurately reflect IMAX's operating results. The Executive Employment Agreements pursuant to which defendants Gelfond and Wechsler were employed gave each substantial authority over the day-to-day management and operation of the Company. Defendants Gelfond and Wechsler were "hands on" executives who were directly involved in the Company's everyday business. During the Company's quarterly Earnings Conference Calls, Gelfond and Wechsler together with co-host Joyce, spoke in detail about the Company's financial condition, products and theater openings. Gelfond and Wechsler were consistently quoted in IMAX's press releases addressing the Company's quarterly financial results. The

Company's reported revenue and earnings figures were among the topics addressed in each of those public forums, as were the amount of revenue recognized from theater system signings and the number of theater systems installed in each of those quarters. Gelfond, Wechsler, Joyce and Gamble were responsible for preparing and presenting the Company's financial information and revenue recognition policies and understood that theater systems leases and sales were the core of IMAX's business and the largest single contributor to its income and revenue.

14. The Individual Defendants and IMAX are sometimes collectively referred to herein as "Defendants" or the "IMAX Defendants".

15. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false and misleading information conveyed in IMAX's public filings, press releases and other group-published documents addressed herein reflect the collective work of the Individual Defendants. Each of the Individual Defendants, by virtue of his or her position with the Company, was a corporate insider and directly participated in the day-to-day operations and affairs of the Company at the highest levels and was privy to confidential proprietary information regarding the Company and its business operations, products, growth, financial statements and financial condition, as alleged herein. During the Class Period, the Individual Defendants were involved in the drafting, preparation, review and/or dissemination of the various public, shareholder and investor reports and other communications which contained the materially false and misleading information alleged herein and were aware of, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws. The Individual Defendants signed numerous materially false statements filed with the SEC.

16. During the Class Period, the Individual Defendants participated in preparing, reviewing, approving and/or certifying consolidated financial statements for IMAX that purported to conform with applicable regulatory requirements and Generally Accepted Accounting Principles ("GAAP"). These financial statements were filed with the SEC, and disseminated to the public, through inter alia, Company press releases, quarterly reports on Forms 10-Q and annual reports on Forms 10-K, and in other communications with investors, credit rating agencies, bank lenders and securities analysts. The financial information contained therein misrepresented that IMAX's financial statements were accurate.

17. The Individual Defendants were aware of, or recklessly disregarded, the misstatements contained in the SEC filings, press releases and other public statements complained of herein, and their materially false and misleading nature. Because of their IMAX Board membership and/or executive and managerial positions, each of the Individual Defendants had access to the materially adverse undisclosed information about IMAX and its financial condition and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the representations made by them or IMAX materially false and misleading.

18. As officers and/or directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that were known to have become

materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information, but failed to do so.

19. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company discussed herein. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the SEC filings, press releases and other public statements detailed herein and is therefore liable for the representations contained therein.

### C. PricewaterhouseCoopers LLP

20. Defendant PricewaterhouseCoopers LLP is a Delaware limited liability partnership with its principal place of business located at 300 Madison Avenue, 24th Floor, New York, New York 10017. Its website states that "'PricewaterhouseCoopers' refers to PricewaterhouseCoopers LLP (a Delaware limited liability partnership) or, as the context requires, other member firms of PricewaterhouseCoopers International Limited, each of which is a separate legal entity." According to IMAX's publicly filed documents, PricewaterhouseCoopers LLP is the principal independent accountant of the Company. Each of its audit opinions issued during the Class Period is signed by PricewaterhouseCoopers LLP, Toronto, Canada, which is an Ontario limited liability partnership with its principal place of business located at Royal Trust Tower, Suite 3000, Toronto-Dominion Centre, 77 King Street West, Toronto Ontario MSK 1G8 Canada. As such, to the extent PricewaterhouseCoopers LLP, Toronto, Canada is deemed a separate entity, it is also named as a defendant, and is, together

with PricewaterhouseCoopers LLP, referred to herein as "PWC." PWC, at all relevant times, provided accounting and consulting services to IMAX. PWC and its predecessors have been IMAX's auditor for approximately 20 years (serving as the Company's auditor before, during and after the Class Period). During the Class Period, PWC issued unqualified audit opinion letters ("clean opinions") on the Company's annual financial statements which were included in IMAX's Forms 10-K, with the knowledge and express consent of PWC.

## CLASS ALLEGATIONS

21. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities who purchased or otherwise acquired IMAX common stock (the "Class") from February 27, 2003 through July 20, 2007, inclusive (the "Class Period"). Excluded from the Class are IMAX, the Individual Defendants, any member of the families of the Individual Defendants, any entity in which any Individual Defendant has a controlling interest, any other defendant or any entity which is a parent or subsidiary of, or which is controlled by, such defendant, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of Defendants.

22. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, IMAX's common stock was actively traded on the Nasdaq Stock Exchange (the "NASDAQ") and the Toronto Stock Exchange ("TSX") in a well-developed and efficient market. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are, at a minimum, thousands of members of the Class. There are over 40 million shares of IMAX common stock issued and outstanding. During the Class Period, there were hundreds of millions of shares of IMAX common stock traded on the NASDAQ and the TSX.

Approximately 90 percent of those shares were traded on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by IMAX.

23. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) Whether the SEC filings, press releases, reports and other public statements made by Defendants and disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information;

(c) Whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

(d) Whether PWC's audits of the Company's financial statements during the Class Period were conducted in accordance with generally accepted auditing standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB");

(e) Whether the market price of the Company's common stock during the Class Period was artificially inflated due to the materially misleading statements issued by Defendants;

(f) Whether Defendants acted with scienter in failing to inform investors of material facts and in issuing false and misleading financial statements;

(g) Whether reliance may be presumed pursuant to the fraud-on-the-market rule; and

(h) Whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, what is the proper measure of damages.

24. Plaintiffs' claims are typical of the claims of the proposed Class because Plaintiffs and the proposed Class members sustained damages arising out of Defendants' wrongful conduct in violation of federal law, as complained of herein.

25. Plaintiffs will fairly and adequately protect the interests of the members of the proposed Class and have retained counsel competent and experienced in class action and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the proposed Class members they seek to represent.

26. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the proposed Class members individually to redress the wrongs done to them. Plaintiffs anticipate no unusual difficulties in the management of this action as a class action.

**Applicability Of Presumption of Reliance**
**(Fraud-On-The-Market Doctrine)**

27. The market for IMAX common stock was open, well-developed and efficient at all relevant times. As a result of Defendants' materially false and misleading statements and failures to disclose the improper acceleration of revenue recognition for its theater systems, IMAX shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired IMAX stock relying upon the integrity of its market price and market information relating to IMAX, and have been damaged thereby.

28. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about IMAX's financial condition, business and operations. These material misleading misstatements created an unrealistically positive assessment of IMAX's financial condition and its business, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of IMAX common stock. Defendants' materially false and

misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's stock at such artificially inflated prices, and each of them has been damaged as a result.

29. At all relevant times, the market for IMAX stock was an efficient market for the following reasons, among others:

(a) IMAX common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ and the TSX, highly efficient and automated markets;

(b) As a regulated issuer, IMAX filed periodic public reports with the SEC and NYSE and the Ontario Securities Commission ("OSC");

(c) IMAX regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as quarterly Earnings Conference Calls, communications with the financial press and other similar reporting services; and

(d) IMAX was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

30. As a result of the foregoing, the market for IMAX stock promptly digested current information regarding IMAX from all publicly available sources and reflected such information in IMAX's common stock price. Under these circumstances, all purchasers of IMAX common stock during the Class Period suffered similar injury through their purchase of IMAX common stock at artificially inflated prices, and a presumption of reliance applies.

## SUBSTANTIVE ALLEGATIONS

### A. Historical Background Regarding IMAX

31. IMAX was founded by a small group of Canadian film makers in 1967 and is now one of the world's leading entertainment technology companies, specializing in large-format and 3D film presentations. The IMAX theater system has its roots in EXPO '67 in Montreal, Canada

where multi-screen films were the hit of the fair. A small group of Canadian filmmakers/entrepreneurs who had made some of those popular films decided to design a new system using a single, powerful projector, rather than the cumbersome multiple projectors used at that time. The result, the IMAX motion picture projection system, would revolutionize giant-screen cinema.

32. IMAX technology premiered at the Fuji Pavilion, EXPO '70 in Osaka, Japan. The first permanent IMAX projection system was installed at Ontario Place's Cinesphere in Toronto in 1971.

33. In March 1994, IMAX was sold by the original partners to defendants Wechsler and Gelfond, and Wasserstein Perella partners.

34. In June 1994, IMAX was taken public on the NASDAQ -- the stock debuted at $6.50 per share on a split adjusted basis -- and the Company used the $41 million it raised from the public offering for expansion. As of December, 2006, there were 284 IMAX theaters operating in 40 countries. The majority of IMAX theaters are operated by third parties under lease agreements with the Company.

35. The Company's principal business is the design, manufacture, sale and lease of what it terms "projection theater systems." The Company's 2005 Form 10-K filed with the SEC on March 9, 2006 ("2005 Form 10-K") disclosed that the Company's "*theater systems*" include *all* of the following elements: "specialized projection equipment, advanced sound systems, specialty screens, theater automation control systems and film handling equipment." These theater systems are operated by commercial and institutional customers located in 38 countries. IMAX's other business lines include the development, production, digital re-mastering, post-production and distribution of certain films shown throughout the IMAX theater network; the

operation of certain IMAX theaters located primarily in the United States and Canada; and the provision of other services to the IMAX theater network, including ongoing maintenance services for the IMAX projection and sound systems.

36. The Company's theater system leases generally have 10 to 20-year initial terms and are typically renewable by the customer for one or more additional 10-year terms. Under the terms of the typical lease agreement, the title to all theater system equipment (including the projection screen, the projector and the sound system) remains with the Company. IMAX licenses the use of its trademarks with the sale or lease of its equipment. If a system is sold (rather than being leased), IMAX has the right to re-purchase the system. The theater system components, theater design support training, installation supervision and trademark rights comprise a typical IMAX system arrangement. IMAX retains the right of ownership and control over the equipment and pursuant to its customer agreements, provides maintenance for the theater systems.

37. The IMAX theater systems include a unique rolling loop 15/70-format projector that offers superior image quality and stability. To complement the film technology and viewing experience, IMAX theater systems also feature unique digital sound systems. The sound systems are among the most advanced in the industry and help to heighten the sense of realism of a 15/70-format film. IMAX sound systems are specifically designed for IMAX theaters and provide an important competitive advantage. IMAX theater screens are as large as one hundred feet wide and eight stories high. The Company represents that they are the largest cinema screens in the world. Unlike standard cinema screens, IMAX screens extend to the edge of the viewer's peripheral vision to create the experience that the Company is seeking for its viewers. In addition, the Company produces and distributes films for IMAX theaters.

38. According to Confidential Source No. 1 (a projectionist at IMAX theaters in the U.S. since mid-2005), the key components of an IMAX theater, including the projector, sound system and screen, are only functional when collectively used to show an IMAX movie. In fact, Confidential Source No. 1, Confidential Source No. 2 (an IMAX employee in the Company's Canadian headquarters who worked in Research and Development from 2001 to 2005 and whose last position was as a DMR Production Supervisor) (DMR is the process used to transfer 35mm film to 70mm film) and Confidential Source No. 3 (a projectionist/booth manager for a Northeastern U.S. IMAX theater from 2004 to 2006), each confirmed that traditional movies cannot be shown on the IMAX system because they are incompatible. Traditional projectors use 35mm film, while IMAX projectors are designed to use only 70mm film. Similarly, IMAX's sound system can only be used with IMAX films because traditional 35mm films have the audio recorded directly on the film, whereas IMAX has its own separate "sound RAC" that can be used to show IMAX films. According to Confidential Source No. 3, the sound is stored as part of the RAC system so that only IMAX 70mm file can be used to create the sound portion of the IMAX system. The Company's sound systems are comprised of what IMAX describes as "proprietary and patented technology." With respect to screens, IMAX movies cannot be shown without the Company's special IMAX screen because a traditional 35mm screen would not be adequate for the IMAX larger image size. Consequently, an IMAX screen is an essential element of the functionality and operation of an IMAX theater.

## B. Defendants' Wrongdoing

39. During the Class Period, the Company reported, on a quarterly and annual basis, both its backlog (signed contracts) and theater system installations (also known as "installs") as a barometer of IMAX's financial health, the former showing what was in the pipeline and the latter

being a key source of information about the Company's current status. Every press release issued by the Company during the Class Period highlighted the Company's revenues, earnings and number of installs in the current quarter, and as compared to the same quarter of the prior year.

40. Throughout the Class Period, IMAX publicly stated that revenue from theater systems sales and sales-type leases was recognized upon installation of the theater system. However, as the Company was ultimately forced to disclose, this was not the case. Instead, the Company and the Individual Defendants were playing fast and loose with the applicable accounting principles, which resulted in the material overstatement of IMAX's reported financial results and year-over-year increases in total theater system installs. In order to meet its earnings targets, IMAX improperly accelerated its revenue recognition on theater systems and concomitantly, reported earnings thereon, when only certain elements of its systems were installed, sometimes not even waiting for installation of the screen, an obviously key component of a theater "system." This piecemeal revenue recognition violated GAAP, and neither the fact that the accounting treatment was inappropriate (since IMAX's theater systems were ineligible for multiple element accounting) nor the ramifications of the improper accounting were fully disclosed to the public until the Company announced its restatement on July 20, 2007.

1. **<u>Defendants' Revenue Recognition Policy for the Years 2002 through 2006</u>**

41. Prior to January 1, 2000, the Company recognized revenue from sales-type leases and sales of theater systems at the time of delivery of the theater system. As disclosed in the Company's December 31, 1999 Annual Report on Form 10-K filed with the SEC on March 30, 2000 ("1999 Form 10-K"):

> Revenues from the Company's theater system sale agreements and from theater system lease agreements which transfer substantially all of the

> benefits and risks of ownership ("sales-type leases") are recognized on the completed contract method (that is, upon delivery of the system).

42. The Company's policy of recognizing revenue upon delivery of the theater system changed in the year 2000. Beginning in 2000 and continuing thereafter, revenue from theater system sales and lease agreements (the latter sometimes being referred to as "sales-type leases") was purportedly recognized *at the time of the theater system installation* rather than delivery. The Company's Form 10-K for the year ended December 31, 2000, filed with the SEC on April 2, 2001 ("2000 Form 10-K"), explained that this change was made in "accordance with the interpretive guidance of the SEC Staff Accounting Bulletin No. 101, "Revenue Recognition in Financial Statements" ("SAB 101")."

43. Each of the Company's Forms 10-K for the years ended December 31, 2002 through 2005, filed with the SEC on March 7, 2003 ("2002 Form 10-K"), March 15, 2004 ("2003 Form 10-K"), March 11, 2005 ("2004 Form 10-K") and March 9, 2006 ("2005 Form 10-K") stated that IMAX only recognized revenue on its theater systems from sales type leases when all of the criteria set forth in SAB 101 were met.

44. IMAX's above-stated revenue recognition policy was required by, and reflects the principles stated in, SAB 101, which provides guidance on when revenue is realized or realizable and earned. Specifically, SAB 101 summarizes certain of the SEC staff's views in applying GAAP to revenue recognition in financial statements. Staff Accounting Bulletins represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure and accounting requirements of the Federal securities laws. In essence, they are the SEC's view of GAAP, and such guidance is required to be followed by registrants such as IMAX. SAB No. 101 specifically states:

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

a. Persuasive evidence of an arrangement exists,

b. Delivery has occurred or services have been rendered,

c. The seller's price to the buyer is fixed or determinable, and

d. Collectibility is reasonably assured.

(SAB 101, Top 13: A1) (Footnotes omitted)

45. Furthermore, Statement of Financial Accounting Concepts ("FASCON") No. 5: Recognition and Measurement in Financial Statements of Business Enterprises ("FASCON 5"), provides the relevant guidance on when it is appropriate to record revenue in financial statements. FASCON 5 states that in order for revenue to be recognized, it must be (1) "realized or realizable" and (2) "earned". (FASCON 5, ¶83) FASCON 5 is, in relevant part, the principle underlying GAAP that the SEC explicitly relied upon in formulating its view on revenue recognition, as expressed in SAB 101. FASCON 5 states in relevant part:

> ...Revenues and gains of an enterprise during a period are generally measured by the exchange values of the assets (goods or services) or liabilities involved, and recognition involves consideration of two factors (a) being realized or realizable and (b) being earned, with sometimes one and sometimes the other being the more important consideration.
>
> a. Realized or realizable. Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash...
>
> b. Earned. Revenues are not recognized until earned. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, *and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.* (Emphasis added) (Footnotes omitted)

FASCON 5 required that IMAX substantially complete the installment of the entire *theater system* before recognizing revenue for that system. (FASCON 5 ¶83)

46. In its post-1999 Forms 10-K, including those issued during the Class Period, IMAX explained that revenue from theater systems sales and sales-type leases would only be recognized in accordance with SAB 101:

> Revenue from sales of theater systems is recognized when all of the following criteria are met: persuasive evidence of an arrangement exists; the price is fixed or determinable; title passes to the customer; installation of the system is complete; and collection is reasonably assured.

The Company's Forms 10-K for the years ended December 31, 2003, 2004 and 2005, filed with the SEC, represented that this policy continued to apply.

47. For IMAX, revenue relating to its theater system (i.e. System Deliverable[1]) "sales" were not realizable and earned until *all* components were delivered and installed since all components of the System Deliverable were required before the system was substantially complete and functional. However, as the Defendants were forced to admit on July 20, 2007, beginning in fiscal year 2002, and continuing throughout the Class Period, the Company improperly segregated the individual components of the System Deliverable and recognized revenue on such individual components separately, thereby improperly accelerating its revenue recognition on the theater systems. As a result, IMAX issued materially false and misleading financial statements throughout the Class Period, in violation of GAAP (FASCON 5 and SAB 101), which resulted in the July 20, 2007 restatement thereof.

---

1 A "System Deliverable" is defined by IMAX as the projection system, sound system, screen system and, if applicable, the 3D glasses cleaning machine, theater design support, supervisions of installation, projectionist training and the use of the IMAX brand, generally to be a single deliverable and a single unit of accounting. (2006 Form 10-K, Footnote 2).

2. **EITF 00-21, Revenue Arrangements with Multiple Deliverables**

48. In May 2003, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB"), the private sector organization that establishes financial accounting and reporting standards, (i.e. GAAP), issued its conclusions, in the form of EITF 00-21, relating to the FASB's deliberations on the topic of recognition of revenue in arrangements with multiple deliverables. Conclusions of the EITF are published in the form of an "Abstract" and represent authoritative GAAP, which are required to be followed by all registrants, including IMAX.

49. EITF 00-21, *Revenue Arrangements with Multiple Deliverables* ("EITF 00-21"), addresses how to determine whether an arrangement involving multiple deliverables contains more than one unit of accounting and thus whether revenue recognition should be afforded to the various units separately or, alternatively, just once to the entire arrangement.

50. Pursuant to EITF 00-21, in an arrangement with multiple deliverables, the delivered item(s) may be considered separate units of accounting only if *all* of the following criteria are met:

> a. The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis;
>
> b. There is objective and reliable evidence of the fair value of the undelivered items; and
>
> c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probably and substantially in the control of the vendor. (Emphasis added)

### 3. IMAX's Misleading Discussions of "Multiple Element Arrangements"

51. The Company first disclosed its application of "Multiple Element Arrangements" in Item 7 of the Management Discussion and Analysis ("MD&A") section of its 2004 Form 10-K as follows:

> Multiple Element Arrangements
>
> *On occasion, the Company will include film licenses or other specified elements as part of system sales or lease agreements.* When separate prices are listed in a multiple element arrangement, these prices may not be indicative of the fair values of those elements because the prices of the different components of the arrangements may be modified through negotiation although the aggregate consideration may not. *Revenues under these arrangements are allocated based upon the estimated relative fair values of each element.*
>
> *In the normal course of its business, the Company will have customers who, for a number of reasons are unable to proceed with theater construction or wish to modify the terms of an existing arrangement.* There is typically deferred revenue involved with these arrangements representing initial cash payments in advance of the default, settlement or modification of the arrangement. Pursuant to the policies discussed above, the total consideration to be received in these situations is allocated to each individual element of the settlement or modification arrangement based on the relative fair values of each element.
>
> Upon allocation of value to each element, each element is accounted for based on applicable revenue recognition criteria. (Emphasis added)

52. A reasonable reader of the 2004 10-K is led to believe that multiple element accounting was being applied in only the limited circumstances indicated by the italicized language, such as separate payments for film licenses or when a customer chose not to proceed with an installation. However, IMAX's discussion fails to disclose that it was actually applying multiple element accounting inappropriately (to its theaters systems, which were ineligible for multiple element accounting treatment) and overstating its revenue and earnings thereby, particularly given the following language found in Note 2 of the 2004 Form 10-K:

> The Company recognizes revenues from sales-type leases *upon installation of the theater system* when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured. (Emphasis added)

53. During the October 28, 2004 Earnings Conference Call, Wechsler explained that under the accounting rules, certain theater systems revenue is booked if there is a significant amendment or termination to its lease agreements. He provided an example whereby a customer has paid cash for a system, but later decides to purchase a newer and less expensive system. He said that IMAX books the cash difference between what it already received and the lower price of the new system, but keeps the system in backlog until installation, at which point IMAX books the MPX revenue. Such treatment appeared to be consistent with the Company's revenue recognition policy.

54. In fact, however, during the Class Period, IMAX recognized revenue on components of numerous theater systems before they were installed. IMAX itself described and marketed its *theater systems* as its primary product; it was not a lessor or seller of individual system components. IMAX's theater systems were not comprised of multiple deliverables, and could not be treated as such, or revenue recognized on components thereof, under either SAB 101 or EITF 00-21. In fact, Confidential Source No. 8 (IMAX's Executive Vice President of Worldwide Sales from 1989 to 2003) explained that customers paid for the theater systems in installments, the first upon signing the contract, two more payments before shipping and a final payment upon delivery and installation. The fact that the theater system components were not paid for separately is further evidence of a Single Deliverable. Given the fact that the different theater components were the property of IMAX and/or licensed by IMAX, IMAX customers were unable to sell them. Thus, they had no standalone value. They also lacked standalone value because there was no market for them. They are proprietary to IMAX. In the event of a

sale by IMAX (far less common than a lease), the purchaser is committed to giving IMAX the right of first refusal. And, since the IMAX components are made to be compatible only with one another, they can not be viewed as independently saleable items. For all of these reasons, IMAX's theater systems were not comprised of multiple deliverables, and could not be treated as such or revenue recognized on components thereof under either SAB 101 or EITF 21.

55. The Company addressed multiple element arrangements in its 2005 Form 10-K as follows:

> Where these agreements ["Sales and Sales-Type Leases"] have multiple elements *meeting the criteria for treatment as separate units of accounting*, the total consideration to be received in these situations generally is allocated to each individual element based on the relative fair values of each element. Each element is then accounted for based on applicable revenue recognition criteria. (Emphasis added)

Similar to the 2004 MD&A disclosure above, this 2005 disclosure continued to mislead investors in that it failed to disclose that IMAX's application of multiple element accounting in situations where installation of the Systems Deliverable was incomplete violated GAAP, and that the Company's reported revenue and earnings were overstated thereby.

56. On July 20, 2007, IMAX filed its Form 10-K for the fiscal year ended December 31, 2006 ("2006 Form 10-K"), which included the restatement of its financial results for fiscal years 2002 through the first three quarters of 2006 (the "Restatement").

57. The 2006 Form 10-K explained how IMAX had in response to the SEC and OSC revised its revenue recognition policy:

> The Company's revenue recognition policy has been revised to: a) treat the theater system equipment (including the projector, sound system, screen system and, if applicable, 3D glasses cleaning machine) and certain initial services associated with the theater system equipment as *a single deliverable* and as *a single unit of accounting*, b) require specific delivery and performance conditions be met; and c) require specific customer acceptance requirements be met. *These revisions impact the timing of*

> *when the Company recognizes revenue from theater system sales and leases and resulted in revenue related to 14 transactions being moved to later years (revenue and net earnings impact of $27.1 million and $14.0 million, respectively).* As a consequence, revenue and net earnings of $5.1 million and $3.0 million, respectively, related to three transactions has been deferred to be recognized in years subsequent to 2006. *The most significant impact was in 2005, where revenue for 10 installations was moved to later years (revenue and net earnings impact of $17.5 million and $9.7 million, respectively).* Eight installations were moved to 2006 (with a revenue and net earnings impact of $14.1 million and $7.5 million, respectively) and two installations (with a revenue and net earnings impact of $3.4 million and $2.2 million, respectively) were moved to 2007. *An additional 16 transactions (revenue and net earnings impact of $25.4 million and $14.1 million, respectively) moved between quarters in the year they were originally reported.* These adjustments have been included in the restated "Quarterly Financial Data (Unaudited)" presented on page 132. Other adjustments related to theater systems include the misallocation of consideration to elements within certain multiple element arrangements, reclassification of certain transactions from sales to sales–type leases and from sales–type leases to operating leases given remaining lien rights or non–standard contractual provisions, inappropriate deferral and allocation of revenue to elements, and improperly recognized finance income on certain transactions. These adjustments resulted in a net decrease of income of $1.9 million for the period 2002 through 2006. (pages 32, 45, 90)(Emphasis added)

58. Footnote 4 of the 2006 10-K disclosed that IMAX had identified certain "errors", including the following, in relevant part:

> …revenue recognition resulting from the Company's review of its theater system arrangements over the past 5 years in response to comments received from the staff of both the SEC and Ontario Securities Commission ('OSC") which indicated insufficient analysis of various sales and lease transactions and the accounting effect of certain contractual provisions within them; and misallocations of considerations to elements within certain multiple element arrangements… (Footnote 4)

These errors occurred during the period from 2002 through September 30, 2006.

59. As ultimately revealed when IMAX issued its Restatement in July 2007, the Company had, throughout the Class Period, improperly recognized revenue on individual components of its theater systems prior to installation of the whole system. Because the

elements of an IMAX theater are actually a single unit of accounting (i.e. System Deliverable), it was improper to segregate the System Deliverable into its components for revenue recognition purposes under EITF 00-21 for fiscal 2004 through the end of the Class Period, and improper to do so throughout the Class Period under FASCON 5 and SAB No. 1. Rather, revenue should not have been recognized until the System Deliverable was complete in its entirety.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

60. In knowing or reckless disregard of the truth, Defendants issued and/or participated in the issuance of materially false and misleading statements about IMAX's theater systems installations, revenue recognition policy, revenue and earnings to the investing public during the Class Period, as particularized below. The Company's guidance is addressed in the allegations that follow in order to demonstrate the goals it sought to attain.

61. During the Class Period, the Defendants manipulated the Company's financial statements, in violation of GAAP, by improperly recognizing revenue for various elements of its theater systems installation transactions. PWC's failure to perform an audit in accordance with GAAS and the standards set forth by the PCAOB on IMAX's 2002, 2004 and 2005 financial statements, prevented the investing public from becoming aware thereof. As ultimately disclosed, a total of 16 theater systems installation transactions, with a total revenue impact of $25.4 million and margin impact of $14.1 million, were shifted between reported quarters in their originally reported years, (i.e. recognized too early) and 14 installation transactions, with a total revenue and margin impact of $27.1 million and $14 million, respectively, shifted between fiscal years. In each case, IMAX improperly recognized revenue, prematurely creating the appearance that its financial condition and business were healthier than they actually were.

62. Throughout the Class Period, the IMAX Defendants publicly highlighted the Company's Systems revenue (which reflects theater systems installed). Systems revenue comprised the single largest component of the Company's total reported revenues, representing 54% of 2002 reported revenue, 58% of 2003 reported revenue, 64% of 2004 reported revenue and 67% of 2005 reported revenue. For the first, second and third quarters of 2006, reported Systems revenue represented 47%, 58% and 35%, respectively, of total reported revenue.

63. The IMAX Defendants' focus on Systems revenue was clear, being described by Gelfond and Wechsler as one of the "two most important metrics of our growth." On October 28, 2004, Wechsler observed that the net contribution to IMAX for each MPX system is about $1 million, or $.02 to $.03 per share, "illustrating the significant impact just one system installation can have on our quarterly financial results."

## A. False and Misleading Statements Made During 2002

### <u>May 9, 2002 Press Release</u>

64. On May 9, 2002, IMAX issued a press release which reported on the first quarter 2002 results. The Company reported net earnings of $0.32 per share for the first quarter ended March 31, 2002. The earnings from continuing operations were $0.06 per share, versus a loss from continuing operations of $0.42 per share in the prior-year period. The Company also reported that in the first quarter:

- the Company's revenues were $31.3 million as compared to $28.7 million in the prior year; and
- Systems revenue was $20.4 million versus $16.3 million in the prior year as the Company recognized revenues on six theatre systems in the first quarter of 2002 versus three theatre systems in the first quarter of 2001.

Defendants Gelfond and Wechsler were quoted in the May 9, 2002 press release emphasizing the Company's improved financial results: "Our first quarter results reflect the continued improvement in our business and the effects of our lowered cost structure."

**August 7, 2002 Press Release**

65. On August 7, 2002, IMAX issued a press release which reported on the second quarter 2002 results. The Company reported net earnings of $0.09 per share for the second quarter ended June 30, 2002, versus net losses of $0.37 per share in the second quarter of 2001. The Company reported earnings from continuing operations were $0.10 per share, versus a loss from continuing operations of $0.29 per share in the prior-year period. The Company also reported that in the second quarter:

- the Company's revenues were $38.9 million as compared to $32.8 million in the prior year.
- Systems revenue was $20.7 million versus $22.0 million in the prior year as the Company recognized revenues on four theatre systems in the second quarter of 2002 versus five theatre systems in the second quarter of 2001.

**November 5, 2002 Press Release & Earnings Conference Call**

66. On November 5, 2002, IMAX issued a press release which reported on the third quarter 2002 results. The Company reported net losses of $0.07 per share for the third quarter ended September 30, 2002, versus net losses of $4.48 per share in the second quarter of 2001. The Company reported operating losses from continuing operations of $0.13 per share on a basic and fully diluted basis for the third quarter ended September 30, 2002, compared to net losses of $2.95 per share in the prior year third quarter period. The Company also reported that in the third quarter:

- the Company's revenues were $23.7 million as compared to $23.3 million in the prior year.

- IMAX systems revenue was $9.6 million versus $13.6 million in the prior year as the Company recognized revenues on one theatre system in the third quarter of 2002 versus three theatre systems in the third quarter of 2001, one of which was an operating lease.

In the November 5, 2002 press release, Defendants Gelfond and Wechsler also made the following positive comments relating to the Company's full year 2002 financial outlook:

> We are pleased that IMAX is on track to report a profit for full year 2002, said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. Our financial turnaround continues unabated notwithstanding the previously indicated loss, which was smaller than expected.
>
> ***
>
> Messrs. Gelfond and Wechsler continued, the improving momentum in our business that began earlier this year has continued through the third quarter and is showing up in our improved financial results. We expect this positive momentum to continue through the fourth quarter. We believe that this turn in our business will allow us to report a profit for 2003 and should translate into improved shareholder returns over time.

67. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q3 2002 Earnings Conference Call on November 5, 2002 and reported on inter alia IMAX's theater systems installations, revenue and earning. During the call, Defendants discussed the Company's loss for the quarter and the importance of theater installations:

> Based on our third quarter results and our outlook for the fourth quarter of 2002, we continue to believe that IMAX will be profitable for the fiscal year 2002.
>
> ***
>
> As we've stated in the past the variability and timing of installation, which are tied to our customers construction schedule can vary from quarter to quarter creating a lumpiness to our systems revenue line. The absence of meaningful installations in the quarter was, however, reflected in our guidance, which projected a third quarter loss.

During the call, Defendants Gelfond, Wechsler and Joyce also provided the analyst community with fiscal year 2002 revenue guidance of $120 million to $140 million and said that in 2003, the Company would equal or exceed the number of theater installations it had installed in 2002. The relevant portion follows:

> MIKE GALLANT, CIBC WORLD MARKETS: Good morning. It looks like all the backlog questions have been answered. In terms of the number of installs that you'll do in '03 -- I know you can -- you know you're not going to give specific guidance, but is it safe to say that you'll do at least 20 installs in '03?
>
> UNIDENTIFIED: I think we don't really comment on that. I think our installs in, you know, '03 should be equivalent or greater than our installs in '02.
>
> ***
>
> WINSTON SERVER: Okay. Two other quick questions. Guidance, Rich, I think the -- in the beginning of the year when -- I recall we had -- you gave revenue guidance for the year of 120 to 140. Is that still the range?
>
> RICHARD GELFOND: Yes.
>
> WINSTON SERVER: Can you give us any sort of -- I mean, obviously that was the -- almost a year ago. Now, we're sort of towards the end of the year. Can you give a sense of whether its going to be towards the higher end or lower end?
>
> RICHARD GELFOND: I think we'll be somewhere in the middle.

**<u>February 27, 2003 Press Release & Earnings Conference Call</u>**

68. On February 27, 2003, IMAX issued a press release which reported on the December 31, 2002 year-end and fourth quarter 2002 results. The Company reported operating profits from continuing operations of $0.05 per share and net profits of $0.36 per share, after extraordinary items, on a basic and fully diluted basis for the full year ended December 31, 2002. The Company reported net earnings of $0.02 per share for the quarter on a basic and fully diluted

basis, compared to net earnings of $0.63 per share on a basic and fully diluted basis in the prior year period. For the three months ended December 31, 2002, the Company reported net earnings from continuing operations of $0.02 per share on a basic and fully diluted basis, versus net losses from continuing operations of $0.62 per share on a basic and fully diluted basis in the prior year period. The Company also reported:

- In the fourth quarter, the Company's revenues were $37.3 million as compared to $33.9 million in the prior year period.

- IMAX systems revenue was $20.3 million versus $24.6 million in the prior year as the Company recognized revenues on five theatre systems in the fourth quarter of 2002 versus six theatre systems in the fourth quarter of 2001.

- For the full year ended December 31, 2002, the Company's revenues were $130.7 million as compared to $118.7 million in 2001.

- Systems revenue was $71.0 million versus $76.6 million in the prior year as the Company recognized revenues on 16 theatre systems in 2002, one of which was an operating lease, compared to 15 theatre systems in 2001, one of which was an operating lease.

IMAX's common stock price rose by 11.7% on this announcement.

69. In the February 27, 2003 press release, Defendants Gelfond and Wechsler lauded the 2002 financial achievements of the Company, as follows:

> IMAX completed its financial turnaround in 2002, and in 2003 we expect significant increases in profitability, said IMAX co-Chairmen and co-CEOs Richard L. Gelfond and Bradley J. Wechsler. We also ended the year with an improved balance sheet including cash of over $37 million.
>
> Given our current business momentum, Messrs. Gelfond and Wechsler continued, in 2003 we expect to achieve even greater profitability. With the overall progress in our commercial theatre strategy, lowered corporate cost structure and growth in our theatre system signings, we believe that we will earn between $0.10 and $0.15 per share for 2003. We remain very focused on translating this business success and improvement in earnings into significant returns for our shareholders over time.

70. Also on February 27, 2003, Defendants Gelfond, Wechsler and Joyce hosted the Company's Q4 2002 Earnings Conference Call. During the call, Defendant Wechsler touted the financial results of the Company for 2002 and highlighted the importance of new theater signings for the Company. The relevant portion follows:

> Let me begin with 2002 financial results, which were not only dramatically better than 2001, but also exceeded analysts expectations.
>
> ***
>
> For the year, our revenues increase over 10 percent over 2001 to $131 million, with IMAX system revenues decreasing by seven percent, revenues increasing 36 percent, and other revenues increasing by 57 percent.

71. The summary table below reflects certain Company 2002 quarterly financial information reported by IMAX:

| Quarter | Net Earnings (per share) | Earnings from Continuing Operations (per share) | IMAX's Revenue Guidance on 11/5/02 (millions) | IMAX's Theatre System Installation Guidance on 11/5/02 | Theatre System Installations | Theatre System Revenue (millions) | Total Company Revenue (millions |
|---|---|---|---|---|---|---|---|
| Q1 2002 | $0.32 | $0.06 | | | 6 | $20.4 | $31.3 |
| Q2 2002 | $0.09 | $0.10 | | | 4 | $20.7 | $38.9 |
| Q3 2002 | ($0.07) | ($0.13) | | | 1 | $9.6 | $23.7 |
| Q4 2002 | $0.02 | $0.02 | | | 5 | $20.3 | $37.3 |
| | | | | | | | |
| Total | $0.36 | $0.05 | $120-140 | Equal or greater than 2001 | 16 | $71.0 | $131.2 |

## B. Relevant Statements Made During 2003

**May 5, 2003 Press Release & Earnings Conference Call**

72. On May 5, 2003, IMAX issued a press release which reported on the first quarter 2003 results. The Company reported net earnings of $0.07 per share for the first quarter ended March 31, 2003, versus net earnings of $0.32 per share in the second first quarter of 2002. The Company reported net earnings from continuing operations of $0.07 per share on a basic and fully diluted basis for the first quarter ended March 31, 2003, compared to earnings from continuing operations of $0.06 per share in the prior-year period, which excluded a $0.26 per share gain from the Company's 2002 repurchase of certain of its subordinated notes. Including the gain on the repurchase of the subordinated notes, the Company reported net earnings of $0.07 per share on a basic and fully diluted basis, compared to net earnings of $0.32 per share in the first quarter of 2002. The Company also reported:

- In the first quarter, the Company's revenues were $34.0 million as compared to $31.3 million in the prior year period.
- IMAX systems revenue was $22.3 million versus $20.4 million in the prior year period, as the Company recognized revenues on eight theatre systems in the first quarter of 2003 versus six theatre systems in the first quarter of 2002.

In the May 5, 2003 press release, Defendants Gelfond and Wechsler said:

> The momentum in new theatre signings that began in the fourth quarter of 2002 has continued into the first quarter as we doubled the number of new theatre signings as compared to the first quarter of 2002. Given our strong first quarter and the developments in our commercial business, we are increasingly optimistic about our future and expect this momentum to continue in 2003.

73. On May 5, 2003. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q1 2003 Earnings Conference Call. During the call, Defendant Wechsler highlighted the Company's increased revenue from theater system installations. "Broken out, IMAX systems

revenues increased by 9% as we recognized revenues on 8 theater systems versus 6 in last year's first quarter."

**July 31, 2003 Press Release & Earnings Conference Call**

74. On July 31, 2003, IMAX issued a press release which reported on the second quarter 2003 results. The Company reported net earnings of $0.03 per share on a basic and fully diluted basis for the second quarter ended June 30, 2003, compared to net earnings of $0.09 per share in the prior year period. The Company reported net earnings from continuing operations of $0.02 per share on a basic and fully diluted basis for the second quarter ended June 30, 2003, compared to net earnings from continuing operations of $0.09 per share on a basic and fully diluted basis in the second quarter of 2002. Including a gain of $0.01 from discontinued operations, the Company reported net earnings of $0.03 per share on a basic and fully diluted basis for the quarter, compared to net earnings of $0.09 per share in the prior year period. The Company also said:

- In the second quarter, the Company's total revenues were $34.8 million as compared to $38.9 million in the prior year period.
- Systems revenue was $22.1 million versus $20.7 million in the prior year period, as the Company recognized revenues on six theatre systems in the second quarter of 2003 versus four theatre systems in the second quarter of 2002.

**November 10, 2003 Press Release & Earnings Conference Call**

75. On November 10, 2003, IMAX issued a press release which reported on the third quarter 2003 results. The Company reported net losses of $0.07 per share on a basic and fully diluted basis, including a gain of $0.01 from discontinued operations, for the quarter ended September 30, 2003, compared to net losses of $0.07 in the comparable period of 2002. The Company reported that net losses from continuing operations were $0.08 per share on a basic and

fully diluted basis for the third quarter ended September 30, 2003, as compared to losses from continuing operations of $0.13 per share for the three months ending September 30, 2002. The Company also reported that during the third quarter:

- In the third quarter, the Company's total revenues were $21.4 million as compared to $23.2 million in the prior year period.

- IMAX systems revenue was $11.5 million versus $9.6 million in the prior year period, as the Company recognized revenues on one theatre system in the third quarter of 2003, consistent with the one theatre system installed during the in the third quarter of 2002.

Defendants Gelfond and Wechsler indicated that the Company expects to earn between $0.25 and $0.35 per share in 2004, approximately double the Company's expected 2003 earnings.

76. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q3 2003 Earnings Conference Call on November 10, 2003. During the call, Defendant Wechsler further discussed the Company's guidance for 2004. The relevant portion follows:

> Moving onto guidance, for the fourth quarter we expect to install four to six systems, generate revenues in the low $40 million range, have gross margins of approximately 42 percent, and have slightly higher SG&A compared to this quarter offset by lower interest expense. That should translate into earnings of 10 to 15 cents per share for the quarter which excludes potential onetime cash and non-cash charges related to the retirement of our Senior Notes. For the full year, this translates into the 19 to 21 new theater system installations generating revenues in the low $130 million range and earnings of 10 to 15 cents per share, again excluding any onetime charges associated with the potential refinancing of our debt.
>
> To reflect our positive business momentum we are providing the following guidance for 2004. Based on our current outlook, we expect to install between 25 and 30 new theater systems, achieved total revenues of between $135 and $140 million with gross margins expected to increase to between 43 and 45 percent of revenue. We expect to spend approximately $37 million in SG&A, about 3 million in R&D and approximately 15 million in interest expense. We expect EBITDA to be in the range of $35 to $38 million.
>
> All of this should translate into earnings of between 25 cents and 35 cents per share. The company may report a loss in one quarter similar to the

> third-quarter of this year, due to the variability of installations which are dependent on our customers' construction schedules.

**March 9, 2004 Press Release & Earnings Conference Call**

77. On March 9, 2004, IMAX issued a press release that reported on the December 31, 2003 year-end and fourth quarter 2003 results. The Company reported earnings from continuing operations of $0.14 per share on a basic and fully diluted basis for the full year ended December 31, 2003 (before giving effect to the costs associated with the repurchase and refinancing of the Company's senior notes in 2003), compared to earnings from continuing operations of $0.09 per diluted share for fiscal year 2002, before giving effect to $0.25 per share in gains associated with the retirement of the Company's subordinated notes in 2002. When including costs of approximately $4.9 million, or $0.13 per share, associated with the repurchase and refinancing of the Company's senior notes during the year, IMAX reported earnings from continuing operations of $0.01 per diluted share in 2003. When including a gain of $0.25 per diluted share associated with the retirement of the Company's subordinated notes in 2002, IMAX reported earnings from continuing operations of $0.34 per diluted share in 2002. The Company previously reported earnings from continuing operations of $0.05 per diluted share for the year ended December 31, 2002. When including costs of approximately $4.6 million, or $.11 per share, associated with the refinancing of the Company's senior notes during the quarter, IMAX reported a net loss of $0.01 per diluted share in the quarter. As a result of a discontinued operation in December 2003, the loss from which has been included in discontinued operations for all comparative periods, the Company's 2002 reported earnings from continuing operations increased from $0.05 per diluted share to a reported $0.09 per diluted share. For the three months ended December 31, 2003, IMAX reported net earnings from continuing operations of

$0.09 per share on a diluted basis, compared to net earnings from continuing operations of $0.03 per share on a basic and diluted basis in the prior year period. The Company also reported:

- For the twelve-month period ended December 31, 2003, the Company's total revenues were $119.3 million as compared to $129.1 million in the prior-year period.

- Systems revenue was $75.8 million versus $71.0 million in the prior year period, as the Company recognized revenues on 20 theatre systems as compared to 16 theatre systems in the prior-year period.

- In the fourth quarter, the Company's total revenues were $29.9 million as compared to $37.0 million in the prior year period.

- IMAX Systems revenue was $19.9 million versus $20.3 million in the prior year period.

78. On March 9, 2004, Defendants Gelfond, Wechsler and Joyce hosted the Company's Q4 2003 Earnings Conference Call. During the call, Defendant Wechsler emphasized the Company's increased revenue from theater system installations. "For the year our revenues decreased by 8 percent to 119 million with IMAX system revenues increasing by nearly 7 percent as we recognized revenue on 20 theater systems consistent with guidance."

79. The table below reflects certain 2003 quarterly financial information reported by IMAX:

| Quarter | Net Earnings (per share) | Earnings from Continuing Operations (per share) | IMAX's Revenue Guidance on 2/27/03; and 11/10/03 (per share) | IMAX's Theatre System Installation Guidance On 11/5/02 | Theatre System Installations | Theatre System Revenue (million) | Total Company Revenue (million) |
|---|---|---|---|---|---|---|---|
| Q1 2003 | $0.07 | $0.07 | | | 8 | $22.3 | $34.0 |
| Q2 2003 | $0.03 | $0.02 | | | 6 | $22.1 | $34.8 |
| Q3 2003 | ($0.07) | ($0.08) | | | 1 | $11.5 | $21.4 |
| Q4 2003 | ($0.01) | ($0.02) | | | 6 | $19.9 | $29.9 |
| Total | $0.02 | ($0.01) | $0.10 - $0.15;<br><br>$0.125- $0.175 | Equal to or greater than 2002 | 21 | $75.8 | $120.1 |

## C. False and Misleading Statements Made During 2004

**<u>May 6, 2004 Press Release & Earnings Conference Call</u>**

80. On May 6, 2004, IMAX issued a press release with respect to its first quarter 2004 results. The Company reported net losses of $0.02 per share on a basic and fully diluted basis for the first quarter ended March 31, 2004, compared to net earnings of $0.07 per share in the prior year period. The Company reported a net loss from continuing operations of $0.01 per share on a fully diluted basis for the three months ended March 31, 2004, compared to earnings from continuing operations of $0.07 per share on a fully diluted basis in the prior year period. Including the costs associated with the refinancing of the Company's Senior Notes of approximately $0.8 million, IMAX reported net losses from continuing operations of $0.03 per diluted share in the first quarter. The Company also reported that in the first quarter:

- the Company's consolidated revenues were $24.9 million as compared to $33.6 million in the prior year period.

- IMAX systems revenue was $16.0 million versus $22.3 million in the prior year, as the Company recognized revenue on two theatre systems versus eight theatre systems in the first quarter of 2003. Systems revenue also included $4.5 million recognized as a result of terminated lease agreements.

Based on the Company's financial results for the first quarter of 2004, IMAX reaffirmed previously stated earnings guidance for full year 2004, as the Company expected to achieve earnings of between $0.25 and $0.35 cents per share before bond refinancing costs. The Company further stated that it expected to achieve revenues of between $130 million and $140 million for 2004. In the May 6, 2004 press release, Defendants Gelfond and Wechsler commented on the financial achievements of the Company, as follows, "In the first quarter, we met our financial goals and continued to hit our strategic marks in turning IMAX(R) theaters into the best place to see Hollywood blockbuster films."

**August 9, 2004 Press Release & Earnings Conference Call**

81. On August 9, 2004, IMAX issued a press release in which it reported on the second quarter 2004 results. The Company reported that it delivered on-target financial results for the second quarter of 2004 and that it presented strong evidence that its commercial strategy was taking hold. The Company also reported that earnings for the three months ended June 30, 2004 were $0.04 per share on a diluted basis as compared to $0.03 per share in the prior year period. The Company reported net earnings from continuing operations of $0.03 per share on a fully diluted basis for the three months ended June 30, 2004, compared to earnings from continuing operations of $0.03 per share on a fully diluted basis in the prior year period. The Company also reported that during the second quarter:

- The Company's consolidated revenues were $31.7 million for the quarter as compared to $34.5 million in the prior year period.

- IMAX systems revenue was $20.5 million versus $22.1 million in the prior year period, as the Company recognized revenue on five theatre systems versus six in the second quarter of 2003.

82. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q4 2002 Earnings Conference Call on August 9, 2004. During the call, Defendant Wechsler provided revenue guidance and earnings, including the following:

> For the full year, we remain confident that we will exceed the consensus estimate of 22 cents per share for the year, and believe we will come in at the low end of our previously guided range of 25 to 35 cents per share before bond refinancing costs.
>
> Specifically, we expect to install approximately 25 theater systems and generate revenues of $125 to $130 million. As I mentioned earlier, the component of our earnings relate to settlements adjusted or terminated lease contracts, which often involve changeovers, to our new MPX theater systems.
>
> Our guidance remains subject to the timing of these transactions and others, such as a few systems targeted to be signed and installed in fiscal 2004 which, like terminations and settlements, due to the factors I just discussed, can be difficult to predict.

**<u>October 28, 2004 Press Release & Earnings Conference Call</u>**

83. On October 28, 2004, IMAX issued a press release which reported on the third quarter 2004 results. The Company reported net earnings of $0.05 per diluted share for the three months ended September 30, 2004, significantly ahead of management's guidance for a breakeven quarter and the First Call mean of $0.01. This compared to a net loss of $0.07 per diluted share for the three months ended September 30, 2003. The Company reported net earnings from continuing operations of $0.04 per share on a fully diluted basis for the three months ended September 30, 2004, compared to losses from continuing operations of $0.07 per share on a fully diluted basis in the prior year period. The Company also reported that:

- The Company's consolidated revenues were $31.8 million for the third quarter 2004, compared to $21.2 million reported for the prior year period.

- IMAX Systems revenue was $21.3 million versus $11.5 million in the prior year period, as the Company recognized revenue on six theatre systems versus one in the third quarter of 2003.

In the October 28, 2004 press release, Defendants Gelfond and Wechsler lauded the financial achievements of the Company, as follows:

> In the third quarter, we not only met our financial goals, with net earnings, revenues and cash beating expectations, but we also continued to hit our strategic goals, demonstrating strong progress towards our objective of making IMAX theatres synonymous with a premium-priced destination in the commercial entertainment marketplace, said IMAX(R) Co-Chief Executive Officers Richard L Gelfond and Bradley J. Wechsler, Our financial results are now starting to reflect the traction we are seeing in the commercial exhibition marketplace and we believe we are on track to meet our previously stated earnings for the full year of $0.25 per share, before refinancing costs of $0.02 per share.

84. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q3 2004 Earnings Conference Call on October 28, 2004. Wechsler explained that 24 of the 66 theaters in backlog were for the Company's new MPX theater system and that the Company's "MPX strategy" was for MPX systems to comprise an increased portion of new theater signings. Wechsler said that five systems signed in the 2004 third quarter were expected to be installed by early November, with a three-month install period being far shorter than the 18 month window typical of IMAX's older systems, pointing to the importance and impact of each theater system installation on the Company's quarterly financial results, Wechsler said:

> Given our current share count, this translates to between 2 and 3 cents per share illustrating the significant impact just one system installation can have on our quarterly financial results.
>
> For the full year 2004, we are comfortable with between 30 and 35 signings and 20 to 25 installations. We expect total revenue of between 125 and $130 million for the year and net earnings per share of

> approximately 25 cents before a bond refinancing cost of 2 cents per share consistent with previous guidance.

During that call, Wechsler misrepresented that "we recognize revenue at the time of installation…".

**March 10, 2005 Press Release & Earnings Conference Call**

85. On March 10, 2005, IMAX issued a press release which reported the December 31, 2004 year-end and fourth quarter 2005 results, net earnings of $0.26 per diluted share for the year ended December 31, 2004 were ahead of the Company's previous guidance for net earnings of $0.23 per share (both after deducting $0.02 per share in bond refinancing costs), compared to net earnings of $0.01 per diluted share reported in 2004. Excluding bond refinancing costs of $0.02 per share, net earnings from continuing operations were $0.26 per diluted share for the year ended December 31, 2004, versus net earnings from continuing operations of $0.14 per diluted share for the year ended December 31, 2003 (excluding $0.13 per share of debt repurchase and refinancing costs). The Company also reported that for the three months ended December 31, 2004, it had net earnings of $0.19 per diluted share, compared to a net loss of $0.01 per diluted share for the year-ago period. Excluding bond refinancing costs, net earnings from continuing operations were $0.19 per diluted share for the three months ended December 31, 2004, as compared to $0.09 per diluted share for the three months ended December 31, 2003. The Company reported net earnings from continuing operations of $0.19 per share on a fully diluted basis for the three months ended December 31, 2004, compared to losses from continuing operations of $0.02 per share on a fully diluted basis in the prior year period. The Company also reported that:

- For the twelve months ended December 31, 2004, the Company's consolidated revenues were $136.0 million, a 14% increase from consolidated revenues of $119.3 million reported for 2003.

- IMAX systems revenue was $86.6 million versus $75.8 million for 2003, as the Company recognized revenue on 22 theatre systems versus 21 in 2003, one of which was an operating lease.

- In the fourth quarter, the Company's consolidated revenues were $47.5 million as compared to $29.9 million in the prior year period.

- Systems revenue was $28.8 million versus $19.9 million in the prior year period, with the Company recognizing revenue on nine theatre systems versus six theatre systems in the year-ago period.

In the March 10, 2005 press release, Defendants Gelfond and Wechsler lauded the 2004 financial achievements of the Company, as follows:

> The year 2004 was a watershed for IMAX, as we significantly grew the commercial IMAX(R) theatre network and established it as a valuable new distribution platform for Hollywood event films," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. Last year we achieved all of our key strategic goals, and that has started to translate into positive financial results, with 2004 earnings beating expectations and showing significant improvement over 2003. Given the strong start to the first quarter of 2005, we are increasingly confident that our growth will continue to accelerate, prompting today's upward revision to our 2005 estimates.

86. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q4 2004 Earnings Conference Call on March 10, 2005. During the call, Defendant Wechsler touted the Company's revenue from theater system installations. The relevant portion follows:

> Turning to our numbers I'll discuss the fourth quarter first followed by the full year. Net earnings per share for the fourth quarter were $0.19, which compares to a net loss $0.01 for the fourth quarter of 2003. Total revenue was $47.5 million, up from 29.9 million for the year-ago quarter as we recognize revenue on 9 systems in the fourth quarter. Systems revenue for the fourth quarter was $28.8 million, up from $19.9 million in the fourth quarter of 2003.
>
> For the full year 2004 net earnings were $0.26 per share after deducting bond refinancing costs of $0.02 per share, which compares to our guidance of $0.23 per share. Net earnings from continuing operations before bond refinancing costs were $0.26 per share as compared to $0.14 reported for 2003. That is an 86 percent year-over-year improvement.

> Total revenue for the year was $136 million as we recognized revenue on 22 systems. Systems revenue was 86.6 million, up from 75.8 million for 2003. Film revenue was 27.9 million versus 25.8 million in 2003.

87. The summary table below reflects certain 2004 quarterly financial information reported by IMAX:

| Quarter | Net Earnings (per share) | Earnings from Continuing Operations (per share) | IMAX's Revenue Guidance on 11/10/03; 8/9/04; and 10/28/04 (millions) | IMAX's Theatre System Installation Guidance on 11/10/03; 8/9/04; and 10/28/04 | Theatre System Installations | Theatre System Revenue (millions) | Total Company Revenue (millions) |
|---|---|---|---|---|---|---|---|
| Q1 2004 | ($0.02) | ($0.03) | | | 2 | $16.0 | $24.9 |
| Q2 2004 | $0.04 | $0.03 | | | 5 | $20.5 | $31.7 |
| Q3 2004 | $0.05 | $0.04 | | | 6 | $21.3 | $31.8 |
| Q4 2004 | $0.19 | $0.19 | | | 9 | $28.8 | $47.5 |
| | | | | | | | |
| Total | $0.26 | $0.23 | $135 - $140 total revenue;<br><br>$35-38 million EBITDA,<br><br>$0.25-$0.35 per share earnings | 25-30 (11/10/03;<br><br>25 (8/9/04); and<br><br>20-25 (10/28/04) | 22 | $86.6 | $135.9 |

**D. False and Misleading Statements During 2005**

**<u>May 5, 2005 Press Release & Earnings Conference Call</u>**

88. On May 5, 2005, IMAX issued a press release which reported on the first quarter 2005 results. The Company reported net earnings of $0.03 per diluted share, above the

Company's previously guided range of breakeven to $0.02 per diluted share. This compared to a net loss of $0.02 per diluted share reported for the three months ended March 31, 2004. The Company reported net earnings from continuing operations of $0.02 per share on a basic and fully diluted basis for the first quarter ended March 31, 2005, compared to net losses of $0.03 per share in the first quarter of 2004. The Company also reported that:

- For the three months ended March 31, 2005, the Company's total revenues were $31.4 million, up 26% from $24.9 million reported for the prior year period, and included cash received from the previously announced settlement of litigation with the former owners of UCI.

- Systems revenue was $22.1 million versus $16.0 million in the prior year period, as the Company recognized revenue on six theatre systems, one of which was an operating lease, versus two in the first quarter of 2004.

In the May 5, 2005 press release, Defendants Gelfond and Wechsler lauded the financial achievements of the Company, as follows:

> The momentum in our business is undeniable, as we just completed the best nine-month period for new theatre systems sales since 1997, said IMAX Co-Chief Executive Officers Richard L Gelfond and Bradley J. Wechsler. With double the number of signings and triple the number of installs versus the year-ago quarter, our first quarter results show that interest in IMAX continues to accelerate since the introduction of our multiplex-based theatre system last June.

89. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q1 2005 Earnings Conference Call on May 5, 2005. During the call, Defendant Wechsler highlighted the revenue the Company recognized from theater system installations. The relevant portion follows:

> For the first quarter of '05, we reported net earnings of $0.03 per share, above our guidant range of breakeven to $0.02 per share. This compares to a net loss of $0.02 per share for the first quarter in 2004. Total revenue was 31.4 million, up from 24.9 million for the year-ago quarter, as we recognized revenue on six systems in the first quarter, including two MPX installations versus two in the year-ago quarter.

> Systems revenue for the first quarter was 22.1 million, up from 16 million in the first quarter of last year.
>
> ***
>
> At this time, we're not going to change guidance but we feel very comfortable with the level of activity around our business. We still expect to install approximately 40 systems, including the five AMCs we announced yesterday, and we expect to generate total revenues of between $145 and $150 million for the year and forecast net earnings of between $0.35 and $0.38.

**<u>August 4, 2005 Press Release & Earnings Conference Call</u>**

90. On August 4, 2005, IMAX issued a press release which reported on the second quarter 2005 results. The Company reported earnings for the second quarter 2005, claiming that it was its best June quarter for theater systems signings since 1997. For the quarter ended June 30, 2005, IMAX reported net earnings of $0.03 per diluted share, as compared to the Company's guided range of breakeven to $0.02 per diluted share. This compares to net earnings of $0.04 per diluted share reported for the three months ended June 30, 2004. The Company reported net earnings from continuing operations of $0.02 per share on a basic and fully diluted basis for the second quarter ended June 30, 2005, compared to net earnings of $0.03 per share in the second quarter of 2004. The Company also reported that:

- For the three months ended June 30, 2005, the Company's total revenues were $30.9 million, as compared to $31.7 million reported for the prior year period.
- Systems revenue was $20.3 million versus $20.5 million in the prior year period. In the second quarter of 2005, the Company recognized revenue on nine theatre systems, which included five theatre systems installed under new sales or sales-type lease agreements. This compares to five new recognitions in the second quarter of 2004. In addition, the Company installed two systems under operating lease agreements in the second quarter of 2005 compared to nil in the second quarter of 2004.

91. Defendants Gelfond, Wechsler and Joyce hosted the Company's August 4, 2005 Q2 2005 Earnings Conference Call. During the call, Defendant Wechsler provided guidance for the third quarter 2005: "For the third quarter, we expect to recognize revenue on approximately 11 to 13 installations which includes the last three AMC theaters. We expect to report total revenues of approximately $35 to $40 million and net earnings of between $0.04 and $0.07 a share." They also said that the Company expected to generate total revenue of between $145 and 150 million for the year and forecast net earnings of between $.35 and $.38 per share. During the call, Defendant Wechsler also answered specific questions relating to the timing of the Company's theater installations. The relevant portion follows:

> TONY GIKAS: Okay. And then last question, on the Q4 installs, it sounds like you have the teams in place and the ability to get these installs. Are there any that are on the cusp of a quarter that just might be out of your control where an install just may not be ready yet from the other side?
>
> BRAD WECHSLER: Tony, I mean you're pointing to again the nuance in our business, which is let me overstate, it is probably never the way to do it. At the end of the day, an install -- I mean we have people on the ground. We have people monitoring. We have people looking at the construction. But if there's a cement strike in Spain, that can affect an install. We don't think that is happening. We will adjust our forecast if we thought something like that was going on, and we're giving you our absolutely best sense of what we think is going to occur in the fourth quarter.
>
> RICH GELFOND: And what we try and do is there are ones on the cusp but they go both ways. They are ones on the cusp that are being installed in early January, and there are ones on the cusp that are being installed in late December. And I think, can we accelerate some of those in January? We hope so. We think we might be able to. Are we going to lose some of those in late December? We plan -- we try and plan that that is going to happen. So we blend all that together and we try and come up with our best guess of reality.

92. Wechsler's and Gelfond's above-cited comments demonstrate that they kept abreast of the install progress during the Class Period via employees present at the installation

sites and periodic Company reports which provided ongoing, updated installation information, among other kinds of information.

93. Confidential Source No. 6 (an IMAX North America Service Manager between 1988 and March 2006), said that several monthly reports were distributed, via email, at IMAX which contained, inter alia, installation information. These reports included monthly sales reports sent by the Sales Department to the head office in New York and Senior Management in New York and to various departments in the Company. The sales reports were several pages long, and contained columns for various types of information including the theater and number assigned to it, the projection location, a production code, an IMAX salesperson's name, the commissioning date (date of completion), the installation date and date the client intends to open. The Production Department also generated a monthly report which reflected the same information as the sales report, the persons assigned to the theater system installation and timing. A combined calendar report prepared by IMAX's head of technology reflected all of the Production and Sales Information.

94. According to Confidential Source No. 7 (Purchasing Agent at IMAX Canadian headquarters from September 2001 to August 2004, who reported to the Production Manager. who, in turn, reported to Brian Bonnick, Exec. Vice President of Manufacturing, who reported to Gelfond and Wechsler), weekly meetings were held at the Canadian headquarters to address theater openings, the timeliness of each project and that all necessary equipment was on site and available for project completion. Other attendees at these meetings included Project Managers, IMAX's Production Manager and representatives from Production and Finance. Reports containing schedules for theater installations were sent by the Finance Department (overseen by Defendant Gamble) to the attendees at or prior to the meetings and discussed at the meetings.

The schedules included dates for equipment to be shipment-ready and installed since equipment was shipped to the theaters from various locales. These reports were widely distributed throughout IMAX's production side.

**November 3, 2005 Press Release & Earnings Conference Call**

95. On November 3, 2005, IMAX issued a press release which reported on the third quarter 2005 results. The Company reported net earnings of $0.05 per diluted share for the quarter ended September 30, 2005, in line with the Company's guided range of between $0.04 and $0.07 per diluted share, and compared to net earnings of $0.05 per diluted share reported for the three months ended September 30, 2004. The Company reported net earnings from continuing operations of $0.04 per share on a basic and fully diluted basis for the third quarter ended September 30, 2005 compared to net earnings of $0.04 per share in the third quarter of 2004. The Company also reported that:

- For the three months ended September 30, 2005, the Company's total revenues were $33.4 million, as compared to $31.8 million reported for the prior year period.

- Systems revenue was $20.2 million versus $21.3 million in the prior year period. The Company recognized revenue on six theatre systems which qualified as either sales or sales-type leases in the third quarters of both 2005 and 2004. In addition, the Company installed two theatre systems that qualified as operating leases, as part of the Company's joint venture arrangement with AMC Theatres, as compared to nil in the third quarter of 2004.

96. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q3 2005 Earnings Conference Call on November 3, 2005. During the call, Defendant Wechsler addressed the Company's slippage in theater installations in the 2005 fourth quarter:

> Several installations that were expected to occur in the third quarter have slipped into subsequent periods. As a result, systems revenue for the third quarter was below our expectations, at $20.2 million, owing to lower sales and lease revenue.

> This is an important point that we have often stressed in past calls. Because of significant revenues tied to theater installations, our P&L can be effected in a given quarter by customer delays, and in many instances, delays created by events out of control of our customers.

Wechsler remarked on the Company's decreased dependence on systems revenue as being evident in the quarter during which recurring revenue streams (i.e. maintenance, royalties and theater operations) all improved and helped IMAX make up for the "installs that slipped this quarter." Gelfond echoed Wechsler's point that "the biggest risk to our numbers is that we have seen some customers install more slowly than we had expected, most often due to factors beyond their control." Investors could not know that despite such seemingly reasonable explanations, IMAX was engaged in an ongoing violation of GAAP and its own stated revenue recognition policy with respect to theater systems installations.

97. During the Q3 2005 Earnings Conference Call, Gelfond said that IMAX expected to install approximately 35 systems for the full year 2005, and that they were not revising the previous August 4, 2005 guidance of $145 to $150 million for the year, and net earnings of $.35 to $.38 per share, because other revenue categories compensated for lower sales and lease revenue. Gelfond explained that "Sign and install means an agreement is signed and the installation occurs in the same year." He said that in 2005, IMAX expected "9 or 10 sign and installs, including 4 from AMC." He also said that there were currently 27 systems in backlog which were scheduled to install in 2006, 5 to 7 IMAX was in the process of firming up in the fourth quarter, and a number of systems we expect to sign and install next year.

98. In response to an analyst question during the Q3 2005 earnings call, Wechsler said IMAX expected more installs in 2006 than in 2005. Gelfond explained that with respect to

2005, there would be 31 installs (excluding 4 AMCs), and that there would be around 15 in the fourth quarter 2005.

99. In response to an analyst's question as to why Wechsler identified 7 installs during the Q3 2005 Conference Call but 8 were identified in IMAX's Nov. 3, 2005 press release announcing its third quarter press results, Gelfond responded as follows:

> One is actually physical installs and the other is a revenue recognition install. And that's what the press release referred to as a revenue recognition install rather than a physical install. And if you ask me to go into it in more detail, I suggest you call back because its highly technical.

While this statement does not reveal that the theater systems revenue was being improperly recognized, it does demonstrate that Defendants were drawing a distinction between "physical installation" and "revenue recognition installation." However, an investor could not know what the Defendants knew – that "installation" was being interpreted in a manner that would improperly inflate the amount of recognizable revenue in contravention of GAAP.

**February 17, 2006 Press Release**

100. On February 17, 2006, IMAX issued a pre-release of its financial results for the year ended December 31, 2005 (likely preparatory to its March 9, 2006 announcement that Company was for sale), and highlighted IMAX's fourth quarter theater systems installations as indicative of the Company's expansion.

> IMAX's momentum and growth potential is building, said IMAX Co-Chairmen and Co-CEOs Richard L. Gelfond and Bradley J. Wechsler. IMAX set aggressive goals for theatre signings, film performance, installations and financial results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues.

IMAX reported that it would meet or exceed its previously announced full year 2005 estimate of $0.35 to $0.38 in net earnings per share on a fully diluted basis, and expected revenues in the guided range of $145 to $150 million. The Company claimed its financial results reflected "the strong tone and momentum of its business." The February 17, 2006 press release further stated:

> IMAX also announced that in addition to completing 14 theatre installations, the Company signed deals for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40-45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.

101. Following the February 17, 2006 press release, which misled the investing public with respect to IMAX's 2005 fourth quarter and full year revenue theater installations, the financial results associated therewith and the Company's financial status and growth, the price of IMAX common shares traded up 10%. The price of IMAX shares remained above this level for approximately the next four months.

**<u>March 9, 2006 Press Release & Earnings Conference Call</u>**

102. On March 9, 2006, IMAX issued a press release which reported on the year-end and fourth quarter 2005 results. The financial results released on March 9, 2006 were substantially similar to the information provided by the Company in its press release dated February 17, 2006. The Company reported net earnings of $0.40 per diluted share for the year ended December 31, 2005. This compared to net earnings of $0.26 per diluted share reported for the year ended December 31, 2004, an increase of 62%. For the three months ended December 31, 2005, the Company reported net earnings of $0.29 per diluted share, compared to net earnings of $0.19 per diluted share reported for the three months ended December 31, 2004, an increase of 54%. The Company reported net earnings from continuing operations of $0.26 per share on a fully diluted basis for the three months ended December 31, 2005, compared to losses

from continuing operations of $0.19 per share on a fully diluted basis in the prior year period.

The Company also reported that during the fourth quarter:

- Them Company installed a *record* 14 theatre systems in the fourth quarter.

- For the year ended December 31, 2005, the Company's total revenues were $144.9 million, as compared to $136.0 million reported for the prior year.

- Systems revenue was $97.8. million versus $86.6 million in the prior year. The Company recognized revenue on 38 theatre systems which qualified as either sales or sales-type leases in the fiscal 2005, versus 22 in 2004.

- For the three months ended December 31, 2005, the Company's total revenues were $49.3 million, as compared to $47.5 million reported for the prior year period.

- Systems revenue was $35.1 million versus $28.8 million in the prior year period. The Company recognized revenue on 18 theatre systems which qualified as either sales or sales-type leases in the fourth quarter of 2005, compared to nine in 2004.

Defendants Gelfond and Wechsler said that IMAX had met the "aggressive" goals they had set for 2005 and observed that IMAX's performance was "steadily improving":

> Our 2005 results clearly reflect that IMAX's commercial strategy is working and that the momentum in our business is continuing to grow, said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of IMAX as a commercial destination for mainstream entertainment.
>
> We believe our steadily improving financial performance shows that our strategy and The IMAX Experience(R) have been embraced by consumers, major studios and leading film exhibitors around the world.

103. The market reacted positively to IMAX's press release describing its fourth quarter 2005 (including a "record" number of installs) and full year results, as reflected in its

2005 Form 10-K. On March 9, 2006, the day of the press release, the price of IMAX common shares traded up from $9.50 per share to $10.35 per share.

104. The March 9, 2006, IMAX press release also revealed that its Board of Directors had begun a process to explore strategic alternatives to enhance shareholder value, including the sale of the Company or its merger with another entity offering strategic opportunities for growth. IMAX said that it had retained Allen & Company and UBS Investment Bank as financial advisors in this process. Defendants Gelfond and Wechsler were quoted as follows:

> In order to fully realize the growth potential inherent in both the IMAX brand and the business we have built to date, we are evaluating strategic alternatives in order to expand our scale and maximize value for our shareholders. We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. We think this interest, coupled with our solid fiscal 2005 results and compelling growth opportunities, makes this an ideal time to explore our options.

105. Defendants Gelfond, Wechsler and Joyce hosted the Company's year-end and Q4 2005 Earnings Conference Call on March 9, 2006. During the call, Defendant Wechsler pointed to a record number of theater system installations and the realization of its 2005 goals:

> In many respects fiscal '05 optimizes the successful execution of every component of our strategy. At the beginning of the year we laid out several aggressive strategic and financial goals. We said we would earn $0.35 to $0.38 per diluted share for the year, and we are very pleased to have exceeded the high end of that range, posting $0.40 of earnings per share in fiscal '05.
>
> For the quarter we completed 14 theater installations which is a record for a single quarter. This was in line with our previous guidance and contributed to our total install number of 34 theater systems for the year, a 62% jump from '04. This highlights an important point as we continue to grow, our business is very scalable. That is to say to continue to grow manufacturing capacity we would need to add additional personnel but we would not have to commit significant amounts of capital to 6 plants or other items. The strong installation numbers also highlight the international nature of our business with nine of these theaters installing in multiplexes in four different countries; the U.S., South Korea, China and

> Russia. As installations continue to grow we are effectively securing the continued growth of the global IMAX network. And due to the steady stream of increase both domestically and abroad we're maintaining a high level of confidence going forward.

106. At the same time the Company announced its decision to seek a strategic partner or acquirer, it also reported purported record quarterly installs and a 62% increase in installs from 2004 to 2005. As discussed below, the largest portion of the Restatement occurred with respect to 2005 theater systems revenue. As also discussed below, the announcement of IMAX's 2005 results and the search for a strategic alternative coincided with the negotiation by Gelfond and Wechsler of a lucrative change of control agreement.

107. The summary table below reflects certain 2005 quarterly financial information reported by IMAX:

| Quarter | Net Earnings (per share) | Earnings from Continuing Operations (per share) | IMAX's Revenue Guidance on 8/4/05; and 11/3/05 | IMAX's Theatre System Installation Guidance on 8/4/05; and 11/3/05 | Theatre System Installations | Theatre System Revenue (millions) | Total Company Revenue (millions) |
|---|---|---|---|---|---|---|---|
| Q1 2005 | $0.03 | $0.02 | | | 6 | $22.1 | $31.4 |
| Q2 2005 | $0.03 | $0.02 | | | 9 | $20.3 | $30.9 |
| Q3 2005 | $0.05 | $0.04 | | | 6 | $20.2 | $33.4 |
| Q4 2005 | $0.29 | $0.26 | | | 18 | $35.1 | $49.3 |
| | | | | | | | |
| Total | $0.40 | $0.34 | $145-$150 million,<br><br>$0.35-0.38 per share net earnings | 35 | 39 | $97.7 | $145.0 |

## E. False and Misleading Statements During 2006

**May 9, 2006 Press Release & Earnings Conference Call**

108. On May 9, 2006, IMAX issued a press release which reported on its first quarter 2006 results. The Company reported a net loss of $0.14 per diluted share for the quarter ended March 31, 2006, compared to net earnings of $0.03 per diluted share reported for the three months ended March 31, 2005. The Company reported net losses from continuing operations of $0.20 per share on a basic and fully diluted basis for the first quarter ended March 31, 2006, compared to net earnings of $0.02 per share in the first quarter of 2005.

109. The Company also announced that for the second quarter of fiscal 2006:

- it expects to record revenues of approximately $40 million and earnings per share of $0.05-$0.08. The Company plans to install 10 theatre systems during the second quarter.
- For the three months ended March 31, 2006, the Company's total revenues were $20.4 million, as compared to $31.4 million reported for the prior year period. The decline in revenue is attributable to the projected decline in systems revenue due to the seasonally slow nature of first quarter installs and the fact that the company projected no consensual lease buyouts in the first quarter.
- Systems revenue was $9.4 million versus $22.1 million in the prior year period, when the company recognized revenue on five systems compared to three in the first quarter of 2006.

In the May 9, 2006 press release, the Company also announced that the process relating to the potential merger or sale of the Company was proceeding well. Commenting on this process, Messrs. Gelfond and Wechsler said:

> We have been very pleased with the amount of interest we have seen to date and how the process is proceeding to date. We just entered the second round and are pleased to be evaluating proposals from a broad range of interested parties. We remain confident that pursuing strategic alternatives for the business will enable us to expand the company's scale, accelerate its growth and enhance shareholder value.

110. Defendants Gelfond and Wechsler were also quoted in the May 9, 2006 press release as follows:

> We are pleased that we remain on track to grow IMAX's signings and installations - the two most important metrics of our growth - in 2006 above our exceptionally strong 2005 results...
>
> ...we [IMAX] continued to make progress executing our core growth initiatives and implementing our commercial strategy during the first quarter. We remain optimistic that we will continue to improve upon our 2005 performance, where all of the Company's key metrics were up solidly.

111. Defendants Gelfond, Wechsler and Joyce hosted the Company's Q1 2006 Earnings Conference Call on May 9, 2006, and said in relevant part:

> As expected, we completed one installation in the first quarter. As we've indicated previously, we expect 2006 installs to be heavily back-end loaded as they were in 2005. Q2 will be significantly better than Q1, with approximately 10 installations, but the dramatic uptick are scheduled for the second half of the year, and particularly Q4.
>
> ***
>
> We expect second quarter revenues to come in at about $40 million and report earnings in the range of $0.05-0.08 a share. As we indicated on our last call, we have not provided full-year guidance given the fact that we remain in the midst of our strategic alternative process. However, we can confirm that we are on track with regard to our objectives to both signings and installation, the company's most important indicators of growth and financial performance.

**<u>August 9, 2006 Press Release & Earnings Conference Call</u>**

112. On August 9, 2006, IMAX issued a press release in which it reported net earnings of $0.08 per diluted share for the second quarter ended June 30, 2006, compared to net earnings of $0.03 per diluted share reported for the three months ended June 30, 2005, and net earnings from continuing operations of $0.08 per share on a basic and fully diluted basis, compared to net earnings of $0.02 per share in the second quarter of 2005. The Company also reported that during the second quarter:

- The Company recognized revenue on 11 theatre systems which qualified as either sales or sales-type leases in the second quarter of 2006 compared to nine theatre systems in the second quarter of 2005. In addition, the Company installed and began recognizing revenue on one theatre system that qualified as an operating lease in the second quarter of 2006 versus two in the same period in 2005.

- For the three months ended June 30, 2006, the Company's total revenues were $41.4 million, as compared to $30.9 million reported for the prior year period.

- Systems revenue was $24.0 million versus $20.3 million in the prior year period, when the company recognized revenue on 11 systems compared to nine in the second quarter of 2006. There were no revenues associated with consensual lease buyouts, terminations by default and MPX conversion agreements in the second quarter. This compares to $3.9 million in settlement revenues in the second quarter of fiscal 2005.

Defendants Gelfond and Wechsler were quoted in the August 9, 2006 press release as follows: "We are pleased with our solid second quarter results, which reflect the ongoing success of our commercial strategy and the progress we are making executing our growth initiatives."

113. Also on August 9, 2006, Defendants Gelfond, Wechsler and Joyce hosted the Company's Q2 2006 Earnings Conference Call and stated in relevant part:

> Now to the financials; for the second quarter we recorded net income of $0.08 per diluted share, at the high end of our guided range of $0.05 to $0.08 per share. The second quarter saw ongoing progress in the execution of our core operating initiatives and commercial strategy. We signed 12 theater deals in the quarter, four of which are conditional, bringing total signings for the first half of 2006 to 20. Our backlog at the end of June consisted of 71 systems, with a value of $112 million, and as we've said in the past, signings remain the best indicator of our long term future financial performance.
>
> We completed 11 installs in the quarter. As we have indicated previously we expect 2006 installs to be heavily back end loaded, as they were in 2005. However, while we initially projected 40 to 45 installations for the year, for reasons both I and Rich will discuss later on, we are retracting all guidance for the year.

***

> For the second quarter total revenue was $41.4 million, as compared to $30.9 million for the second quarter of '05. We had 11 installs in the second quarter compared to 7 in the second quarter last year. There were no revenues associated with consensual lease buy outs, terminations by [bulk] and MDX conversion agreements included in system revenue this year, compared to $3.9 million in lease buy outs in the second quarter a year ago.

114. The summary table below reflects certain 2006 quarterly financial information reported by IMAX.

| Quarter | Net Earnings (per share) | Earnings from Continuing Operations (per share) | Theatre System Installations | Theatre System Revenue (million) | Total Company Revenue (millions) |
|---|---|---|---|---|---|
| Q1 2006 | ($0.14) | ($0.20) | 3 | $9.4 | $20.4 |
| Q2 2006 | $0.08 | $0.08 | 9 | $24.0 | $41.4 |
| Q3 2006 | ($0.30) | ($0.28) | 1 | $7.3 | $27.0 |

**<u>THE TRUTH BEGINS TO EMERGE</u>**

115. On August 9, 2006, IMAX shocked the investment community by announcing that IMAX was under investigation by the SEC regarding its timing of revenue recognition, including its application of multiple element arrangement accounting to its theater systems. The Company's August 9, 2006 press release stated, in part, the following:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. *The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of*

> *the system was deferred until the final screen was installed.* Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. (Emphasis added)

IMAX also expressed confidence that it had complied with generally accepted accounting principles and observed that those practices had been approved by PWC.

116. During the August 9, 2006 Q2 2006 Earnings Conference Call hosted by Gelfond, Wechsler and Joyce, Wechsler discussed the Company's application of multiple element accounting. The relevant portion follows:

> In lay terms under multiple element accounting, the *revenue associated with the different components of an IMAX theater system contract are segregated, and can be recognized in the quarter in which they are completed.* In such instances, although we typically have virtually all of the upfront cash from the clients in advance, we defer recognition of some of that revenue to the quarter when the final elements of the system are installed. Through our recent interaction with the SEC, the question has been posted to us whether multiple element arrangement accounting should apply to our theater system installations. (Emphasis added).

The italicized explanation of the Company's application of multiple element account misrepresents the propriety of its application here. Defendant Wechsler went on to say that: "…in each of those installations [the 7 theatres in which the Company had not installed a screen] the company deferred recognition of the value of the screen until the final screen was installed, and recorded the residual value associated with the other elements of the system that were installed within the quarter." According to Wechsler, "The very same accounting was applied to a system in the second quarter, where the revenue associated with the screen was deferred until the third quarter, when the screen was installed."

117. IMAX's failure to install theater systems while improperly recognizing revenue for those systems can be illustrated by several examples. According to Confidential Source No. 8 (who worked as an IMAX theater Chief Projectionist and Theater Director from 1984 to 2006 and as a Director of Cinema Operations from June 2006 to August 2006, where he oversaw the construction of an IMAX multiplex), when IMAX was notified that construction issues would delay the multiplex theater's completion from the 2006 second quarter to the third quarter, IMAX's President of Filmed Entertainment asked the theater's owner to accept a projector, reel unit and sound system because IMAX had planned on recognizing revenue in the second quarter and still wished to do so. The owner agreed in order to maintain his good relationship with IMAX. Confidential Source No. 8 said that although the theater was not operational, on the last day of the quarter, IMAX tested the projector and reel unit on a temporary screen that was essentially a big white sheet. It was not until several weeks later that the screen was installed and final equipment testing was done.

118. Similarly, Confidential Source No. 8 said that at the end of 2005, IMAX installed equipment in a Russian theater that did not yet have a roof. The equipment was subsequently ripped out and stored in a warehouse pending completion of the theater, but IMAX recorded revenue on the installation nonetheless. According to Confidential Source No. 8, during 2005 or the first two months of 2006, IMAX installed equipment and recorded revenue on one or two incomplete theaters in China, described by an IMAX Project Manager as "the newest crazy thing we pulled." Recognition of revenue under circumstances in which all of the Systems Deliverable had not been installed violated SAB 101 which requires the transfer of risks and rewards of ownership. A theater owner without a fully functional IMAX theater system would not be able to realize the rewards of the ownership of that system.

119. Following the Company's partial disclosure of its improper accounting practices and SEC inquiry on August 9, 2006, the price of IMAX shares crashed, falling by 40.4%, or $3.90, from $$9.63 per share to a closing price of $5.73 per share on the following trading day. IMAX's common stock closing price has remained below $5.73 per share on all trading days, except August 12, 2006, on which the stock closed at $6.03 per share. The Company's stock price continued its decline thereafter on the issuance of additional negative news relating to the SEC/OSC inquiry and IMAX's true financial condition. IMAX's stock price declined as a direct result of disclosure of Defendants' materially misleading wrongdoing and the disclosure relating to its accounting for theater system revenues and the SEC's questioning thereof.

120. After the announcement of the SEC inquiry, on August 10, 2006, analyst Eric Wold of Merriman Curhan Ford downgraded IMAX from a "buy" to a "sell". Mr. Wold's downgrade was based, in part, on the SEC investigation, as his report stated: "Although we still believe in the long-term prospects for IMAX due to its ability to provide a differentiated viewing experience, we believe there is a greater level of uncertainty for the shares due to near-term negative earnings impact of the shift to joint-venture deals and digital rollout, the SEC inquiry into revenue recognition methods, and the slowdown in signing trends due to box office performance. We are recommending that investors now move to the sidelines until a clearer picture emerges and are lowering our rating to Sell from Buy." Wold also observed, "As will most companies that receive inquiries from the SEC (especially those regarding revenue recognition issues), we believe there will likely be a cloud over the company's shares until this is resolved."

121. On August 9, 2006, the Company also reported that while it had received significant initial interest from multiple parties, it was of the view that there were presently no

buyers who were willing to acquire the Company at the price sought by the Board of Directors, but because interest remained from several parties at a lower valuation, the Board authorized the Company's bankers to explore these opportunities. Gelfond and Wechsler said: "While we are surprised that the high level of interest we initially saw has yet to result in a partnership or acquisition, we are committed to fully exploring all options open to the Company, including those offers that did not meet the Board's original valuation parameters....We remain committed to ensuring that any transaction is strategically or financially compelling and delivers the most value possible to our shareholders."

122. While formal discovery has not yet begun, there appears to be a link between the commencement of the SEC's informal inquiry and IMAX's failure to receive an offer at the hoped-for level. Such observation was made in the August 23, 2006 issue of the Wall Street Journal. And, while 30 companies reportedly initially expressed interest in IMAX, that number dwindled to 12 suitors in the second round. The securities regulators' questions came as prospective purchasers, rumored to have included Sony Corp. and private equity fund Elevation Partners, were looking at IMAX's books. The ultimate lack of offers appears to be a result of the information obtained by the potential suitors (reflecting the truth about the Company) while conducting their due diligence of the Company.

123. On August 21, 2006, the Company announced that Joyce had resigned from the Company and that Edward MacNeil would replace him on an interim basis.

124. On November 8, 2006, IMAX reported its results for the quarter ended September 30, 2006. Its press release said that "primarily because it did not install any theaters" in the quarter, it incurred a $.30 per diluted share net loss. The Company reported total revenues of $20.7 million, and systems revenue of $7.3 million "as the

Company recognized revenue on the sale of a theater system in the third quarter of 2006." According to the IMAX press release, it expected to install 5 to 8 theater systems during the 2006 fourth quarter. The November 8, 2006 press release also said that IMAX was still responding to SEC and OSC revenue recognition inquiries, including its application of multiple element arrangement accounting in its theater system revenue recognition, that it believed its application of the policy was in accordance with GAAP and that its position continued to be supported by PWC. IMAX's share price declined following the November 8, 2006 announcement, from $4.84 per share to $3.39 per share.

125. On December 15, 2006, IMAX issued a press release in which it stated its determination that a sale or merger of the Company would no longer achieve the Company's objective. Gelfond and Wechsler said, "While IMAX received interest from multiple parties in our process of exploring a potential sale or merger of the Company, none ultimately indicated a willingness to acquire the Company at an acceptable valuation."

126. On March 16, 2007, IMAX announced a delay in the filing of its 2006 Form 10-K, after finding errors in its accounting for certain expenses. The Company announced that it misclassified certain costs as capital expenditures rather than expensing them as they incurred. Gelfond admitted that it was "incorrect accounting" during the Company's March 16, 2007 Q4 Earnings Conference Call." The Company announced, in relevant part:

> Management and the Audit Committee of the Board of Directors are evaluating certain identified accounting errors with a currently expected impact of approximately $2.5 million over six years. As a result, the Company intends to file restated financial statements for certain periods during those years.

The Company also stated its intention to file its 2006 Form 10-K on or before March 30, 2007, and that until then, "management and the Audit Committee have stated that the Company's

prior-filed financial statements for the years and periods involved should not be relied upon." The Company went on to say:

> The Company and its auditors, PricewaterhouseCoopers LLP, remain in the process of analyzing the errors and the Company will make a subsequent announcement when it concludes this analysis. The estimated $2.5 million in errors that occurred during 2001-2006 relate to the accounting treatment of certain costs previously capitalized that should have been expensed as incurred and unrecorded branch-level interest taxes, as well as certain adjustments for errors determined to have been immaterial and previously identified in the related periods. The Company is also evaluating the effect of these matters on its internal control over financial reporting and expects to report material weaknesses with respect to certain of these matters.

127. On March 29, 2007, IMAX announced that it had delayed filing its 2006 Form 10-K for a second time to review its accounting for revenue from theater system installations, and that in the course of completing its previously announced restatement and year-end audit, and reviewing the comments it had received from the SEC and the Ontario Securities Commission ("OSC"), the Company determined to broaden its review to address certain issues related to these comments, "primarily in connection with its revenue recognition for certain theater system installations in previous periods, including the fourth quarter of 2005." Because of the "expanded review" being undertaken by IMAX and its auditor PWC, the Company stated that it "may determine that it is necessary to restate additional items beyond the previously identified errors." On March 29, 2007, the price of IMAX common stock fell by 6.1%, or $0.33 per share, closing at $5.04 per share.

128. On March 30, 2007, Moody's Investors Service announced that it had placed the ratings of IMAX on review for downgrade based on the Company's announcement that it would further delay filing of its 2006 Form 10-K, resulting in a technical default under the financial reporting covenant of the indentures of its senior notes.

129. On April 5, 2007, IMAX appointed Joseph Sparachio to the position of Executive Vice President of Finance. IMAX's April 5, 2007 press release stated that Mr. Sparachio would assume the duties of Chief Financial Officer of the Company in May 2007.

130. On April 9, 2007, IMAX received a delisting notice from NASDAQ because it had not filed its financial reports on time.

131. On April 12, 2007, IMAX provided a status update pursuant to the OSC's alternate information guidelines which contemplate bi-weekly filings until a company is current with its Canadian filing obligations. It said:

> The Company previously announced that it would delay the filing of its annual report on Form 10-K for fiscal 2006 due to the discovery of certain accounting errors and has since *broadened its accounting review to include certain other accounting matters based on comments received by the Company from the SEC and Ontario Securities Commission.* The Company is currently working diligently and devoting necessary resources to complete the report and filing as soon as practicable. For the reasons described in its prior news releases, the Company cannot predict when it will complete its review and file its financial statements, although it intends to do so as soon as practicable.
>
> The statements set forth in this press release are preliminary, reflect information currently known to the Company and are subject to change as a result of the accounting review and restatement process, subsequent events and the completion of the audit of the financial statements by the Company's independent auditors, PricewaterhouseCoopers, LLP. (Emphasis added).

132. On April 26, 2007, the Company provided an update on the status of its accounting review referred to in its April 12, 2007 press release.

133. On May 10, 2007, the Company provided further update on the status of its accounting review:

> The Company reported that that it had completed its initial gathering of relevant documents in regard to the transactions being reviewed, prepared summaries of the relevant facts of each transaction and reviewed, along with its auditors, each transaction and identified follow-up issues. The

> follow-up process is progressing. The Company has now begun the process of forming its initial accounting judgments under U.S. Generally Accepted Accounting Principles.

134. The Company's May 24, 2007 status update included the following:

> The Company reported that, with regard to its accounting review in connection with revenue recognition for the years 2002-2006, it had completed the process of initial gathering of relevant documents in regard to the transactions being reviewed and has followed up on identified issues related to the review. The Company has formed preliminary accounting judgments under U.S. Generally Accepted Accounting Principles as to the overall application of U.S. GAAP in connection with revenue recognition, and is now in the process of discussing those preliminary judgments with its Audit Committee, Board of Directors, auditors, counsel and independent consultants. The Company further reported that, after these discussions, due to the complexity of the issues involved and its desire to complete and file its financial statements as expeditiously as possible, it will consult with the U.S. Securities & Exchange Commission ("SEC") and the OSC before completing and filing such statements.

135. On June 7, 2007, the Company's status update again commented on the progress of its accounting review:

> The Company reported that, with regard to its accounting review in connection with revenue recognition for the years 2002-2006, it had formed preliminary accounting judgments under U.S. Generally Accepted Accounting Principles as to the overall application of U.S. GAAP in connection with revenue recognition, and is now in the process of drafting its policy and consulting with its Audit Committee, Board of Directors and auditors as it relates to the recognition of revenue on typical theatre system arrangements with its customers. The Company reiterated that it will consult with the U.S. Securities & Exchange Commission ("SEC") and the OSC before completing and filing its financial statements.

136. On June 21, 2007, the Company issued a press release and provided a status update with regard to its accounting review in connection with revenue recognition for the years 2002-2006:

> The Company reported that, with regard to its accounting review in connection with revenue recognition for the years 2002 through 2006, it has submitted a response to comments received from the staff of the U.S. Securities and Exchange Commission ("SEC") which included a revised

policy with regard to revenue recognition for theatre systems. *The revised policy treats the theatre system equipment (including the projection system, sound system and screen) and certain other services (including supervision of installation and use of the trademark) as a single unit of accounting and has the effect of shifting a portion of systems revenue between periods during the years 2002 through 2006.* In the majority of cases, the timing of revenue recognition is expected to shift by 90-180 days. The Company will provide significantly more detail with regard to this revised policy, which has also been provided to the OSC, when it files its 2006 Annual Report on Form 10-K. (Emphasis added)

137. On June 29, 2007, the Company issued another status update which included the following:

> In March 2007, the Company previously announced that it would delay filing its financial statements due to the discovery of certain accounting errors and subsequently broadened its accounting review to include certain other accounting matters based on comments received by the Company from the staff of the Securities and Exchange Commission ("SEC") and the Ontario Securities Commission ("OSC"). The Company believes that it has substantially addressed these comments by revising its accounting policy with regard to revenue recognition for theatre systems. The revised policy, which will be detailed in the Company's 10-K and 10-Q, has the effect of shifting a portion of systems revenue between periods during the years 2002 through 2006; in the majority of cases, the timing of revenue recognition shifts by 90-180 days.

138. The Company's July 5, 2007 status update included the following:

> The Company reported that, with regard to its accounting review in connection with revenue recognition for the years 2002 through 2006, it has submitted a response to comments received from the staff of the U.S. Securities and Exchange Commission ("SEC"), and believes that it has substantially addressed these comments by revising its accounting policy with regard to revenue recognition for theatre systems and by committing to incorporate certain other changes in its financial statements and other disclosures in the 2006 Annual Report on Form 10-K ("10-K"). Accordingly, the Company plans to file both its 10-K and Report on Form 10-Q for the fiscal quarter ended March 31, 2007 ("10-Q") shortly.
>
> *The principal changes to the Company's revenue recognition policy with regard to theatre systems are to reflect: a) the treatment of the theatre system equipment (including the projector, sound system, screen and, if applicable, 3D glasses cleaning machine) and certain services associated with the theatre system equipment as a single deliverable and a single unit*

> *of accounting, and b) the requirement to have a signed customer acceptance prior to revenue recognition. These revisions will be treated as a correction of an error.* The policy and the revisions will be discussed in greater detail in the Company's 10-K. (Emphasis added)

**The July 20, 2007 Restatement**

139. On July 20, 2007, the Company announced that it had completed its restatement of its financial results covering 2002 through 2005, and the first three quarters of 2006 (the "Restatement"), and was filing its previously unfilled 2006 Forms 10-K and 10-Q for the quarter ended March 31, 2007. The Company press release stated:

> For the full year 2006, the Company reported a net loss from continuing operations of $18.3 million, which includes several significant one-time items, such as a future tax valuation allowance, costs associated with its restatement, regulatory inquiries and attempted sales process, and other write-downs, compared to restated reported earnings from continuing operations of $5.8 million in 2005.
>
> In recent months we have been working very closely with the regulators, our auditors, counsel, Audit Committee and Board to manage this process, and are happy to be moving ahead unencumbered by the overhang of delayed filings. Most recently, we carefully evaluated our accounting practices in light of comments received from the staffs of the U.S. Securities and Exchange Commission ("SEC") and Ontario Securities Commission ("OSC"), and, during the course of our interaction with these regulators, decided that we should revise our accounting policy as it relates to revenue recognition of theatre systems.
>
> ***
>
> In March 2007, the Company announced that it would delay the filing of its annual report on Form 10-K for fiscal 2006 and its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2007 due to the discovery of certain accounting errors, mostly in the area of film accounting and inventory capitalization and taxes. The impact of these previously-disclosed errors resulted in a net overstatement of aggregate earnings previously reported for the periods 2002 through the third quarter of 2006 of $4.0 million. Of this $4.0 million, approximately $2.5 million was recognized in the fourth quarter of 2006, with the remaining $1.5 million expected to be recognized in future periods, the majority in 2007.

The Company subsequently broadened its accounting review to include certain other accounting matters, based on comments the Company received from the SEC and OSC. *Under the former method for recording revenues under multiple element arrangement accounting, as reflected in the Company's 2005 10-K, the Company recognized revenue when the projector and sound system were installed and deferred revenue recognition of components deemed to be separate deliverables until their subsequent installation, such as the screen. Because the projector and sound system are delivered together, wired together and coordinated to provide a synchronized audio-video experience, the Company considered these two components to be a single deliverable, with other deliverables, such as the glasses cleaning machine and the screen system, treated separately. After extensive review and consideration, the Company determined that the screen, 3-D glasses cleaning machine and initial services including projectionist training should be considered one single deliverable. In addition, the Company will now require receipt of a signed acceptance from each client before recognizing revenue, in the absence of which the Company will recognize revenue upon the opening of the theatre.*

Consequently, the Company concluded that errors occurred in its prior accounting for theatre systems, has revised its policy with regard to revenue recognition for theatre systems, and restated its financial results in accordance with the revised policy. The revised policy has the effect of shifting theatre systems revenues from the period in which they were previously reported to subsequent periods. The impact of these errors resulted in a net overstatement of aggregate earnings previously reported for the periods 2002 through 2005 of $10.4 million. The operating results for 2006 include the recognition of income resulting from the restatement of $7.4 million, meaning that the net earnings impact on future periods is $3.0 million. It is anticipated that, of that $3 million in net impact, the majority will be recognized in income in 2007. *Breaking it down further, a total of 16 installation transactions with a total revenue and margin impact of $25.4 million and $14.1 million, respectively, shifted between reported quarters in their originally reported years. In addition, a total of 14 installation transactions, with a total revenue and margin impact of $27.1 million and $14.0 million, respectively, shifted between fiscal years.*

As part of the Company's review of these transactions, certain other adjustments were identified, including misallocation of value

> to elements and accounting for finance income on certain leases that were previously reserved against. The net amount of these adjustments over the period 2002 through 2005 was a decrease in income of $1.9 million. Transactions and events related to these adjustments are expected to result in the majority of the income reversing into 2007. (Emphasis added)

140. The 2006 Form 10-K revealed that the Company's consolidated statements of operations, shareholders' equity (deficit) and cash flows for the years ended December 31, 2005 and 2004, and the consolidated balance sheet as of December 31, 2005, including the applicable footnotes, were restated. The Company also stated that it had included, in the 2006 Form 10-K, restated unaudited consolidated financial information for each of the first three quarters of 2006 and each of the quarters of 2005, together with restated summary and selected financial information for the years ended December 31, 2002 and 2003. The 2006 Form 10-K disclosed that previously, and throughout the Class Period, the installation and full working condition of the projector, sound system and screen was not completed prior to the Company recognizing revenue for a theater system. Going forward, however, their installation and full working condition, together with the client's written acceptance of each theater, would be required before revenue for a theater system could be recognized. In the absence of such acceptance, the Company would not recognize revenue until the theater opens.

141. IMAX identified its accounting errors after the SEC and OSC appeared on the scene and revised its theater system revenue recognition policy as a direct result of the comment letters it received from the SEC and OSC. The Company's excuse for its improper revenue recognition for 2002 through the first three quarters of 2006 was that it considered the projection and sound system as a "single deliverable" because they were "delivered together, wired together and coordinated to provide a synchronized audio-video experience" and that other deliverables "such as the glasses cleaning machine and the screen system" were "treated separately." All of

that ignores the very simple concept that the theater system is incomplete until its projection, sound and screen systems are installed and functioning, and that until such time, revenue recognition was improper. As Defendants ultimately admitted at page 46 of the 2006 Form 10-K, "the projection system, sound system, screen system and, if applicable, the 3D glasses cleaning machine, theater design support, supervision of installation, projectionist training and the use of the IMAX brand" are a single deliverable and a single unit of accounting.

142. IMAX's "explanation" is nonsensical, both in light of the revenue recognition requirements of EITF 00-21 (which applied at IMAX for revenue arrangements entered into in fiscal periods beginning after June 15, 2003 (i.e. third quarter 2003) and continuing thereafter), SAB 101 and FASCON 5, which applied prior to, during and after the adoption of EITF 00-21. SAB 101, like EITF-0021, required that the revenue be realizable and earned before it could be recognized. Given these requirements, it was improper for IMAX to recognize revenue for individual theater system components because the IMAX theater system could not function absent the installation of all components and the services, therefore, had not been fully rendered without the installation of the screen. SAB 101 provides that "If an arrangement… requires the delivery or performance of multiple deliverables, or "elements", the delivery of an individual element is considered not to be have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element." Here, because the theater system is an integrated system, the failure to deliver a component would be a failure of delivery.

143. As ultimately disclosed, a total of 16 theater systems installation transactions, with a total revenue impact of $25.4 million and margin impact of $14.1 million, shifted between