that ignores the very simple concept that the theater system is incomplete until its projection, sound and screen systems are installed and functioning, and that until such time, revenue recognition was improper. As Defendants ultimately admitted at page 46 of the 2006 Form 10-K, "the projection system, sound system, screen system and, if applicable, the 3D glasses cleaning machine, theater design support, supervision of installation, projectionist training and the use of the IMAX brand" are a single deliverable and a single unit of accounting.

142. IMAX's "explanation" is nonsensical, both in light of the revenue recognition requirements of EITF 00-21 (which applied at IMAX for revenue arrangements entered into in fiscal periods beginning after June 15, 2003 (i.e. third quarter 2003) and continuing thereafter), SAB 101 and FASCON 5, which applied prior to, during and after the adoption of EITF 00-21. SAB 101, like EITF-0021, required that the revenue be realizable and earned before it could be recognized. Given these requirements, it was improper for IMAX to recognize revenue for individual theater system components because the IMAX theater system could not function absent the installation of all components and the services, therefore, had not been fully rendered without the installation of the screen. SAB 101 provides that "If an arrangement… requires the delivery or performance of multiple deliverables, or "elements", the delivery of an individual element is considered not to be have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element." Here, because the theater system is an integrated system, the failure to deliver a component would be a failure of delivery.

143. As ultimately disclosed, a total of 16 theater systems installation transactions, with a total revenue impact of $25.4 million and margin impact of $14.1 million, shifted between

reported quarters in their originally reported years (i.e. recognized too early) to make it appear to investors that IMAX had an ongoing record of improving financials.

144. In addition, 14 installation transactions, with a total revenue and margin impact of $27.1 million and $14 million, respectively, shifted between fiscal years. For example:

- One transaction which was originally recorded in 2006 (revenue and net earnings impact of $1.7 million and $0.6 million respectively) was moved to 2007.
- Eight transactions which were originally recorded in 2005 (revenue and net earnings impact of $14.1 million and $7.5 million, respectively) were moved to 2006.
- Two transactions which were originally recorded in 2005 (revenue and net earnings impact of $3.4 million and $2.2 million, respectively) were moved to 2007.
- Two transactions which were originally recorded in 2004 (revenue and net earnings impact of $3.0 million and $1.6 million, respectively) were moved to 2005 and 2006.
- One transaction which was originally recorded in 2002 (revenue and net earnings impact of $4.9. million and $2.1 million respectively) was moved to 2007.

As with the quarter-to-quarter revenue shifting, Defendants purposely recognized revenue improperly from one fiscal year to another because they were determined to have the market believe that IMAX's financial picture was improving.

145. As disclosed in the 2006 Form 10-K:

> …the Company revised its policy to require that (i) the projector, sound system and screen system be installed and are in full working condition, the 3D glasses cleaning machine, if applicable, be delivered and projectionist training be completed, and (ii) written customer acceptance thereon received, or the public opening of the theater take place, before revenue can be recognized. In conjunction with these changes, the Company undertook an extensive review of all of its revenue arrangements for theater systems for the period from 2002 to 2006. One transaction that was originally recorded in 2002 (revenue and net earnings impact of $4.9 million and $2.1 million, respectively) was moved to 2005.

> There were no adjustments required in 2003 as a result of this revision to the policy. (Page 39) (Emphasis added)

The 2006 Form 10-K similarly provides:

> For sales–type leases, the revenue allocated to the System Deliverable is recognized when the lease term commences, which the Company deems to be when all of the following conditions have been met (i) the projector, sound system and screen system have been installed and are in full working condition, (ii) the 3D glasses cleaning machine, if applicable, has been delivered, (iii) projectionist training has been completed and (iv) the earlier of (a) receipt of the written customer acceptance certifying the completion of installation and run–in testing of the equipment and the completion of projectionist training or (b) public opening of the theater, provided collectibility is reasonably assured. (Page 47)

As admitted in the 2006 10-K, at page 91, it was only in conjunction with the changes to its theater systems revenue recognition policy (made after the SEC and OSC inquiry commenced) that IMAX undertook an "extensive review" of its revenue arrangements for 2002 to 2006 that, in turn, yielded the restated theater systems changes in the chart below. Notably, installation alone was not deemed a sufficient guide for revenue recognition by either IMAX or the SEC and OSC. Rather, the Company's revised revenue recognition policy requires customer certification or public opening of the theater, events that can be independently verified-before revenue is recognized. These changes indicate that the Company's previous policies were subject to manipulation.

146. The summary table below, found at page 33 of IMAX's 2006 Form 10-K, shows the impact of the restatement for fiscal years 2002 through 2005. The single largest restatement item is revenue recognition for theater systems:

| | 2005 | 2004 | 2003 | 2002 |
|---|---|---|---|---|
| Net earnings (loss), as previously reported | $16,598 | $10,244 | $231 | $11,972 |
| | | | | |
| Restatement items | | | | |
| Revenue recognition – Theater Systems | (6,802) | (1,562) | -- | (2,107) |
| Revenue recognition – Other | 901 | (556) | (218) | (2,198) |
| Inventory Costs | 295 | (227) | (296) | (245) |
| Film accounting | (2,759) | 318 | (12) | ----- |
| Branch level interest taxes | (298) | (276) | (234) | ----- |
| Other adjustments | (113) | (237) | 16 | (1,301) |
| | (8,776) | (2,540) | (744) | (5,851) |
| | | | | |
| Net earnings (loss), as restated | $7,822 | $7,704 | $ (513) | $6,121 |

147. Included in the chart above are two transactions originally recorded in 2004 (revenue and net earnings impact of $3.0 million and $1.6 million, respectively) which were moved to 2005 and 2006. One transaction recorded in 2002 was moved to 2005 (revenue and net earnings impact of $4.9 million and $2.1 million, respectively) and one transaction recorded in 2006 was moved to 2007 (revenue and net earnings impact of $1.7 million and $0.6 million, respectively). Most notable, however, given the Company's early 2006 intent to sell the Company, is the fact that eight transactions which were originally recorded in 2005 (revenue and net earnings impact of $14.1 million and $7.5 million, respectively) were moved to 2006 and two transactions originally recorded in 2005 were moved to 2007 (revenue and net earnings impact of $3.4 million and $2.2 million, respectively). Also notable is the very large 2005 adjustment of $2.7 million that was required for film accounting.

148. In its 2006 Form 10-K, the Company described its current "Critical Accounting Policies" with respect to Multiple Element Arrangements and Theater Systems as follows:

> *Multiple Element Arrangements*
>
> The Company's revenue arrangements with certain customers may involve multiple elements consisting of a theater system (projector, sound system, screen system and, if applicable, a 3D glasses cleaning machine); services associated with the theater system including theater design support, supervision of installation, and projectionist training; a license to use of the IMAX brand; 3D glasses; maintenance and extended warranty services; and licensing of films. The Company evaluates all elements in an arrangement to determine what are considered typical deliverables for accounting purposes and which of the deliverables represent separate units of accounting based on the applicable accounting guidance in Statement of Financial Accounting Standards No. 13, "Accounting for Leases" ("SFAS 13"); FASB Technical Bulletin No. 90−1, "Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts" ("FTB 90−1"); Statement of Position 00−2, "Accounting by Producers or Distributors of Films" ("SOP 00−2"); and Emerging Issues Task Force ("EITF") Issue No. 00−21, "Revenue Arrangements with Multiple Deliverables" ("EITF 00−21"). If separate units of accounting are either required under the relevant accounting standards or determined to be applicable under EITF 00−21, the total consideration received or receivable in the arrangement is allocated based on the applicable guidance in the above noted standards.
>
> *Theater Systems*
>
> The Company has identified the projection system, sound system, screen system and, if applicable, the 3D glasses cleaning machine, theater design support, supervision of installation, projectionist training and the use of the IMAX brand, generally to be a single deliverable and a single unit of accounting (the "System Deliverable"). The Company generally is not responsible for the physical installation of the equipment in the customer's facility; however, the Company supervises the installation by the customer. Generally, the customer has the right to use the IMAX brand from the date the Company and the customer enter into an arrangement. The Company's System Deliverable arrangements involve either a lease or a sale of the theater system.

A comparison of its 2006 policies, as compared to its policies during the Class Period, reveal that the Company changed its policies in 2006 and restated its previous policies in order to comply

with the GAAP requirement that all components of a theater system be installed before revenue may be recognized.

149. By filing the restated financials contained in the 2006 Form 10-K and issuing an unqualified opinion on such financial statements, Defendants admitted, and PWC concurred that, throughout the Class Period, the Company improperly treated components of its theaters systems as separate elements, and as a result, revenue was prematurely recognized. Thus, the statements made in the Company's press releases throughout the Class Period and in its Form 10-K's and 10-Q's were materially false and misleading because Defendants knew or were reckless in not knowing that IMAX had not complied with SAB 101, FASCON 5 and/or EITF 00-21 and failed to disclose that IMAX had recognized revenue on theater systems before installation of the System Deliverable, in contravention of GAAP. Because PWC failed to conduct an audit in accordance with GAAS and PCAOB standards, and issued clean opinions on IMAX's 2002-2005 financial statements, it is also responsible for the material misinformation disseminated to the investing public during the Class Period.

150. According to the 2006 Form 10-K, during the course of the year-end 2006 audit, the Company and defendant PWC identified a number of material weaknesses[2] in the Company's internal controls, including among others, weaknesses related to the Company's revenue recognition policies. In fact, the Company specifically concluded, and PWC concurred, in the Company's 2006 Form 10-K, that its internal control over financial reporting and its disclosure controls and procedures were *not effective*. Management is required by the Foreign Corrupt

---

[2] PCAOB Auditing Standard No. 2 ("AS 2") defines "material weakness" as a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. (¶10).

Practices Act of 1977[3] ("FCPA") to establish and maintain a system of internal controls sufficient to, among other things, permit the preparation of financial statements in accordance with GAAP. The FCPA states, in relevant part, that SEC registrants shall:

> (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > (i) transactions are executed in accordance with management's general or specific authorization;
> >
> > (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets...

151. At page 17 of the Company's 2006 Form 10-K, it is further stated that:

> The Company is in the process of implementing remedial measures and compensating procedures to address these material weaknesses. These material weaknesses, if left unaddressed, could result in accounting errors such as those underlying this restatement, which could adversely impact the accuracy and timing of future reports and filings the Company makes with the SEC and OSC.

152. GAAS sets forth management's responsibility with respect to the establishment and maintenance of internal controls. Specifically, AU § 110, *Responsibilities and Functions of the Independent Auditor* ("AU § 110") states, in relevant part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. *Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements*...Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility. (AU § 110.03) (Emphasis added) (Footnotes omitted)

---

[3] Anti-Bribery and Books & Records Provisions of The Foreign Corrupt Practices Act; United States Code; Title 15 – Commerce and Trade; Chapter 2B – Securities Exchanges; § 78m(b)(2)(B).

153. Beginning in 2002, an entity's management is required under Rule 302 of the Sarbanes-Oxley Act of 2002 ("the Sarbanes-Oxley Act") to provide certifications relating to the company's internal control over financial reporting, as described in PCAOB Auditing Standard ("AS") No. 2, *An Audit of Internal Control over Financial Reporting Performed in Conjunction With an Audit of Financial Statements* ("AS 2"). Additionally, section 404 of the Sarbanes-Oxley Act requires an entity's management to assess and report on the effectiveness of the company's internal control over financial reporting (as described in PCAOB AS 2):

> Section 404(a) of the Sarbanes-Oxley Act requires the management of a public company to assess the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year and to include in the company's annual report to shareholders management's conclusion, as a result of that assessment, about whether the company's internal control is effective. (AS 2, Section B)

AS 2 defines internal control over financial reporting in the following manner:

> A process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persona performing similar functions, and effected by the company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> 1. Pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company;
>
> 2. Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company, and;
>
> 3. Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or

> disposition of the company's assets that could have a material affect on the financial statements. (AS 2 ).

154. In its 2004 and 2005 Forms 10-K, IMAX's management concluded that the Company maintained effective internal controls over financial reporting. IMAX's *Management's Annual Report On Internal Control Over Financial Reporting*, as disclosed in its 2005 Form 10-K stated, in relevant part:

> Management has assessed the effectiveness of the Company's internal control over financial reporting, as at December 31, 2005, and has *concluded that such internal control over financial reporting was effective as of that date.* Additionally, based on the Company's assessment, the Company determined that there were no material weaknesses in internal control over financial reporting as of December 31, 2005[4]. (2005 Form 10-K) (Emphasis added)

155. In 2006, however, the Company admitted, by way of restatement of its 2002 through third quarter 2006 financial statements, that its internal control over financial reporting was *not effective*, particularly surrounding the Company's internal controls related to revenue recognition. IMAX's management's *Annual Report on Internal Control over Financial Reporting*, as disclosed in its 2006 Form 10-K stated, in relevant part:

> Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company.
>
> ***
>
> Based on this assessment, *management has concluded that such internal control over financial reporting was not effective as of December 31, 2006* due to the material weaknesses identified and discussed below.
>
> ***
>
> ...The following material weaknesses have been identified and included in management's assessment as of December 31, 2006:

4 Similar language appears in IMAX's 2004 Form 10-K

> *Application of U.S. GAAP*
>
> Five of the Company's material weaknesses relate to controls over the analysis and review of certain transactions to be able to correctly apply U.S. GAAP to record those transactions. The financial impact of these material weaknesses on the Company's restated financial results was principally related to the analysis and review of transactions which were complex or nonstandard. These material weaknesses are:
>
> 1. The Company did not maintain adequate controls, including period-end controls, over the analysis and review of revenue recognition for sales and lease transactions in accordance with U.S. GAAP. Specifically, effective controls were not maintained to correctly assess the identification of deliverables and their aggregation into units of accounting and in certain cases the point when certain units of accounting were substantially complete to allow for revenue recognition on a theater system.
>
>    After reviewing its revenue recognition policy in conjunction with the announced review of its theater system arrangements over the past 5 years in response to comments received from the staff of both the SEC and the OSC, *the Company concluded that it had incorrectly assessed the determination of deliverables in its theater systems arrangements.* The term "deliverables" is not explicitly defined in any accounting literature. The determination of a deliverable requires significant judgment and can be influenced by the terms of the arrangement between a vendor and its customer, the customer's perspective of the deliverables, the interaction of the separate elements that could make up a single deliverable and other facts and circumstances unique to a transaction. (Emphasis added).

156. The 2006 10-K also revealed that, in connection with its review of systems sale and lease transactions during the period 2002 through 2006, the Company identified the following additional errors resulting from ineffective controls relating to the following, among others:

> - Based on an analysis of fair values of elements within arrangements, the Company determined that fair value previously allocated to in certain multiple

element arrangements was not appropriate and has adjusted these amounts.

- The existence of certain non-standard contractual provisions resulted in: the reclassification of certain sales arrangements to sales-type lease transactions for accounting purposes when the customer was not granted title to the system until all payments were made, and certain sales-type leases to operating leases given substantially all of the benefits and risks of ownership had not passed to the customer; and the timing of recognition of the minimum annual payments under certain arrangements.

- Settlement revenue was recognized on a MPX upgrade which was conditional upon the Company meeting certain conditions which were ultimately not met during the year. The Company has deferred the amount of settlement revenue awaiting installation of an alternate theatre system configuration.

- Finance income continued to be recognized when the related financing receivables were impaired. The Company has revised its procedures and discontinued the recognition of finance income until the impairment issues were resolved.

2. The Company did not maintain effective controls, including period-end controls, over accounting for film transactions in accordance with U.S. GAAP. Specifically, effective controls were not maintained related to the classification and accurate recording of marketing and advertising costs of co-produced film productions, production fees on co-produced films and the application of the individual-film forecast computation method to film assets, participation liabilities and deferred production fees.

157. Each of the control deficiencies referred to above contributed to the restatement to the Company's consolidated financial statements for the years ended December 31, 2002 through 2005, its consolidated financial statements for each of the quarters in the year ended

December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30 and September 30, 2006, as well as an audit adjustment to the Company's 2006 annual consolidated financial statements, affecting revenues, accounts receivable and certain other items.

158. Two of the identified material weaknesses related to controls over the lines of communication between different departments, and were described as follows, in relevant part:

> The Company did not maintain adequate controls over the lines of communication between operational departments and the Finance Department related to revenue recognition for sales and lease transactions. Specifically, effective controls were not maintained to raise on a timely basis certain issues relating to observations of the installation process, any remaining installation or operating obligations, and concessions on contractual terms that may impact the accuracy and timing of revenue recognition. This control deficiency contributed to the restatement to the Company's consolidated financial statements for the years ended December 31, 2002 through 2005, its consolidated financial statements for each of the quarters in the year ended December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30 and September 30, 2006, and audit adjustments to the Company's 2006 annual consolidated financial statements, affecting principally revenues, costs of goods sold, selling, general, and administrative expenses, financing receivables, inventories, prepaid expenses, fixed assets, other assets, accounts payable, accrued liabilities and deferred revenue, and related disclosures.
>
> ***
>
> In addition to the restatements and audit adjustments referred to above, each of these control deficiencies above could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim financial statements that would not be prevented or detected. Management determined that each of these control deficiencies discussed above constitutes a material

> weakness at December 31, 2006. (2006 Form 10-K)(Emphasis added)

159. Each of the Forms 10-Q and 10-K filed by IMAX with the SEC during the Class Period included the signed certifications of its principal executive officers and the principal financial officer (Joyce, throughout his tenure) as required by the Sarbanes-Oxley Act of 2002. However, each such certification falsely stated that those filings fairly presented, in all material respects, the financial condition and results of operations of the Company. However, the 2006 10-K, at page 17, reported the conclusion of Defendants Gelfond, Wechsler and Joyce that, based on the material weaknesses identified in the Company's year-end audit, disclosure controls and procedures were "not effective to provide reasonable assurance that information required to be disclosed in the reports the Company submits is recorded, processed, summarized and reported appropriately." The Company's 2006 Form 10-K stated, in relevant part:

> The Company's management, with the participation of its Co-CEOs and its CFO have evaluated the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) or 15d-15(e)) as of December 31, 2006. Based on that evaluation and because of the identification of certain material weaknesses in the Company's internal control over financial reporting, as discussed in Management's Annual Report on Internal Control over Financial Reporting below, the Co-CEOs and the CFO have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2006.

160. Thus, the statements made by Gelfond, Wechsler and Joyce in their Sarbanes-Oxley certifications and included in the Company's SEC filings, were false when made because each attested to the adequacy and effectiveness of the Company's disclosure controls and procedure.

161. IMAX management's failure to identify such control deficiencies (i.e., material weaknesses) existing at the company prior to 2006 rendered management's 2004 and 2005

*Annual Reports on Internal Controls over Financial Reporting* materially false and misleading. Additionally, management's failure to identify such control deficiencies existing at the company prior to 2006, particularly relating to its internal controls surrounding recognition of revenue from the improper "identification of deliverables and their aggregation into units of accounting" contributed to the Company's issuance of materially false and misleading financial statements through Q3 2006 in violation of GAAP.

162. Additionally, as previously noted, the Company concluded, and PWC concurred in the 2006 Form 10-K, that the Company's internal control over financial reporting and its disclosure controls and procedures were not effective.

163. PWC was required under GAAS to obtain an understanding of an entity's internal controls as part of its audit procedures. Specifically, the second standard of field work required by AU § 150, *Generally Accepted Auditing Standards* ("AU 150"), provides that:

> A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed. (AU 150.02)

164. Additionally, beginning in 2004, auditors were required by section 404 of the Sarbanes-Oxley Act and the PCAOB to perform an audit of, and provide separate opinions on, the internal control over financial reporting in conjunction with its audit of a company's financial statements. PCAOB Auditing Standard AS 2, describes the responsibilities of the auditor relating to a Company's internal controls, in relevant part:

> Section 404(b) of the Act requires the company's auditor to attest to and report on the assessment made by the company's management. (AS 2, Section B) (Emphasis added)

***

> …the integrated audit results in two separate audit objectives: to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting and to express an opinion on whether the financial statements are fairly stated. (AS 2, Section E)

165. AS 2 describes the auditor's objective in performing an audit of internal control over financial reporting, in relevant part:

> The auditor's objective in an audit of internal control over financial reporting is to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting… Maintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain reasonable assurance that no material weaknesses exist as of the date specified in management's assessment. (AS 2)

166. In its clean audit opinions included in IMAX's 2004 and 2005 Forms 10-K, PWC concurred with IMAX management's conclusions that the Company maintained effective internal controls over financial reporting.

167. In 2006, however, the Company admitted that, along with the restatement of its 2002 through third quarter 2006 financial statements, its internal controls over financial reporting were *not effective*. In its 2006 Form 10-K, IMAX's *Management's Annual Report On Internal Control Over Financial Reporting* stated that "…internal control over financial reporting was *not effective* as of December 31, 2006 due to the material weaknesses identified", particularly surrounding the Company's internal controls related to revenue recognition. (Emphasis added). In its "Report of Independent Registered Public Accounting Firm" included in the 2006 Form 10-K, PWC concurred with managements assessment.

168. PWC's report, found at pages 70-72 of the 2006 10-K, said that a company's internal control over financial reporting is a process designed to provide reasonable assurance of

the reliability of its financial reporting and for the preparation of its financial statements for external purposes in accordance with GAAP. It explained, inter alia, that a company's internal control over financial reporting includes those policies and procedures relating to the maintenance of records that reflect the transactions and dispositions of the assets of the company; provide reasonable assurance that those transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and to provide reasonable assurance regarding prevention or timely detection of unauthorized disposition of the company's assets that could have a material effect on the financial statements.

***

> A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. As of December 31, 2006, the following material weaknesses have been identified and included in management's assessment:
>
> 1. *The Company did not maintain adequate controls, including period–end controls, over the analysis and review of revenue recognition for sales and lease transactions in accordance with U.S. GAAP. Specifically, effective controls were not maintained to correctly assess the identification of deliverables and their aggregation into units of accounting and in certain cases the point when certain units of accounting were substantially complete to allow for revenue recognition on a theater system.* In addition, the Company did not have effective controls over other aspects of such transactions including identifying the fair values of certain future deliverables, identifying certain clauses in arrangements that impact revenue recognition, accounting for warranty costs, the appropriate accounting for certain settlement agreements and the recognition of finance income on impaired receivables.
>
> 2. The Company did not maintain effective controls, including period–end controls, over accounting for film transactions in accordance with U.S. GAAP. Specifically, effective

> controls were not maintained related to the classification and accurate recording of marketing and advertising costs of co-produced film productions, production fees on co-produced films and the application of the individual-film forecast computation method to film assets, participation liabilities and deferred production fees.
>
> 3. *Each of the control deficiencies referred to above contributed to the restatement of the Company's consolidated financial statements for the years ended December 31, 2002 through 2005*, its consolidated financial statements for each of the quarters in the year ended December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30 and September 30, 2006, and audit adjustments to the Company's 2006 annual consolidated financial statements, affecting principally revenues...accounts receivable...and related disclosures...
>
> ***
>
> 4. *The Company did not maintain adequate controls over the lines of communication between operational departments and the Finance Department related to revenue recognition for sales and lease transactions. Specifically, effective controls were not maintained to raise on a timely basis certain issues relating to observations of the installation process, any remaining installation or operating obligations, and concessions on contractual terms that may impact the accuracy and timing of revenue recognition. This control deficiency contributed to the restatement of the Company's consolidated financial statements for the years ended December 31, 2002 through 2005*, its consolidated financial statements for each of the quarters in the year ended December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30 and September 30, 2006, and audit adjustments to the Company's 2006 annual consolidated financial statements....

(Emphasis added).

169. Despite all of the above, PWC provided its written consents to the inclusion of its audit opinions on the Company's financial statements for fiscal years 2002 through 2005, as reflected in IMAX's originally reported 2002 through 2005 Forms 10-K. In the audit opinions,

PWC certified that the Company's financial statements had been prepared in accordance with GAAP. Defendant PWC's statements that "the consolidated financial statements...present fairly, in all material respects, the financial position of IMAX Corporation (the "Company") and its subsidiaries at December 31, 2005, December 31, 2004, December 31, 2003 and December 31, 2002 and the results of their operations and their cash flows for each of those years in conformity with accounting principles generally accepted in the United States of America" constituted untrue statements of material facts, as evidenced by the Company's restatement, to which PWC concurred. PWC, as set forth more fully below, did not conduct its audits in accordance with GAAS.

170. Because PWC failed to conduct a GAAS audit and issued clean opinions on IMAX's 2002-2005 financials, it is also responsible for the material misinformation disseminated to the investing public during the Class Period.

## THE COMPANY'S VIOLATION OF GAAP

171. Defendants have directly participated in an accounting fraud that materially overstated the Company's financial results in violation of GAAP. The premature recognition of revenue on different elements of theater systems during the Class Period had a material impact on the Company's financial statements. Defendants not only falsely and materially overstated the Company's earnings figures but also failed to file financial statements with the SEC which conformed to the requirements of GAAP, such that the financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 CFR 210.4-01(a)(1).

172. The accounting profession and the SEC recognize GAAP as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. GAAP are the official and only principles accepted by the SEC and promulgated for the most

part by the Financial Accounting Standards Board ("FASB"). GAAP consists of a hierarchy of authoritative literature. The highest authority is comprised of FASB Statements of Financial Accounting Statements ("SFAS"), followed by FASB Interpretations ("FIN"), Accounting Principles Board Opinions ("APB Opinion"), and AICPA Accounting Research Bulletins ("ARB"). GAAP provides other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON").

173. As a result of its accounting improprieties surrounding the improper recognition of its theater system revenue, IMAX's reported financial results violated at least the following provisions of GAAP, for which each defendant is responsible:

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

- The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶ 40);

- The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

- The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

- The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant to a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

- The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶ 79); and

- The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

174. In addition to the GAAP provisions described above, the Company also prematurely recognized revenue in violation of SAB 101, FASCON 5 and EITF 00-21, as described in further detail above and below.

175. As previously discussed, the major elements of an IMAX theater (i.e. projector, sound system and screen) are only functional when used in combination to show an IMAX movie. As a result, the IMAX screen is an essential element that allows all other elements of an IMAX theater to function and operate. Therefore, the individual components of theater installation fails to meet the EITF 00-21 ¶9a requirement that delivered items have standalone value. As a result, prior to the restatement, IMAX management improperly segregated the completed installation into its components for revenue recognition purposes in violation of GAAP. Rather, revenue should not have been recognized until the theater installation was complete in its entirety in accordance with FASCON 5 and SAB 101.

**Management's Admission That It Issued Materially False**
**<u>and Misleading Financial Statements During the Class Period</u>**

176. As set forth in Statement of Financial Accounting Concepts ("SFAC") No. 1, *Objectives of Financial Reporting by Business Enterprises*, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. SFAC No. 1 states, in relevant part:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (¶ 42)

177. By failing to file financial statements with the SEC that conformed to GAAP (and the rules and regulations of the SEC), Defendants repeatedly disseminated financial statements that are "presumed to be misleading or inaccurate."[5] IMAX's actual financial performance was materially distorted and its Class Period financial statements were materially false and misleading, as Defendants knew or recklessly ignored.

178. Following the announcement of the SEC inquiry relating to multiple element arrangement accounting, the Company's formal announcement regarding its restatement served to reveal to the public its erroneous accounting relating to, among others matters, its theater system revenue recognition. IMAX's restatement of its financial statements is an admission that the accounting was erroneous and material, as described in GAAP. Specifically, APB Opinion

---

5 The SEC requires that public companies file quarterly and annual financial statements that are prepared in conformity with GAAP. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

No. 20 ("APB 20"): *Accounting Changes*, requires that corrections of errors be accounted for by restatement of the financial statements:

> The Board concludes that correction of an error in the financial statements of a prior period discovered subsequent to their issuance (paragraph 13) should be reported as a prior period adjustment... (APB 20, ¶ 36)

179. Furthermore, APB 20 provides that the retroactive restatement of previously-issued financial statements is appropriate only when those statements were materially misstated when used. APB No. 20 states, in relevant part:

> The Board concludes that a number of factors are relevant to the materiality of (a) accounting changes contemplated in this Opinion and (b) corrections of errors, in determining both the accounting treatment of these items and the necessity for disclosure. Materiality should be considered in relation to both the effects of each change separately and the combined effect of all changes. If a change or correction has a material effect on income before extraordinary items or on net income of the current period before the effect of the change, the treatments and disclosures described in this Opinion should be followed. Furthermore, if a change or correction has a material effect on the trend of earnings, the same treatments and disclosures are required. A change which does not have a material effect in the period of change but is reasonably certain to have a material effect in later periods should be disclosed whenever the financial statements of the period of change are presented. (APB No. 20, ¶ 38)

180. The principle of materiality, provides that the omission or misstatement of an item in a financial report is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item (FASCON 2, ¶132).

**Management's Failure to Properly Assess Internal Controls**

181. As mentioned above, GAAS states that *management* is responsible for preparing financial statements that conform with GAAP. AU § 110.03.

182. Furthermore, as mentioned above, since 2002, an entity's management has been required under Rule 302 of the Sarbanes-Oxley Act to provide certifications relating to the company's internal control over financial reporting. Additionally, section 404 of the Sarbanes-Oxley Act requires an entity's management to assess and report on the effectiveness of the company's internal control over financial reporting, as described in PCAOB AS 2. In its Forms 10-K, IMAX's management concluded that the Company maintained effective internal controls over financial reporting. In 2006, however, the Company admitted, by way of restatement of its 2002 through third quarter 2006 financial statements, that its internal controls over financial reporting were *not effective*, particularly surrounding the Company's internal controls related to revenue recognition.

183. IMAX management's failure to identify such control deficiencies (i.e., material weaknesses) existing at the company prior to 2006 rendered management's *Annual Reports on Internal Controls over Financial Reporting* materially false and misleading. Additionally, management's failure to identify and/or report such control deficiencies existing at the company prior to 2006, particularly relating to its internal controls surrounding recognition of revenue from the improper "identification of deliverables and their aggregation into units of accounting" contributed to the Company's issuance of materially false and misleading financial statements through the third quarter of 2006 in violation of GAAP.

**PRICEWATERHOUSECOOPERS' VIOLATIONS OF GAAS**

184. PWC served as the Company's auditor before, during and after the Class Period. PWC was required to perform its audits of IMAX's consolidated financial statements in conformity with the standards of the PCAOB, which adopted all of the GAAS that had previously been issued by the AICPA. The auditing standards issued and adopted by the

PCAOB, together with the auditing standards issued by the AICPA, are encompassed by and referred to herein as GAAS.

185. PWC issued unqualified audit opinions dated February 14, 2003, February 27, 2004, March 10, 2005 and March 9, 2006, relating to its audits of IMAX's consolidated financial statements for the years ended December 31, 2002 through 2005. PWC's audit opinions stated that the financial statements were presented fairly in accordance with GAAP and that PWC's audit had been performed in accordance with GAAS and the standards of the PCAOB.

186. GAAS represent the guidelines by which an audit must be planned and performed. The general, fieldwork, and reporting standards approved and adopted by the membership of the American Institute of Certified Public Accountants ("AICPA"), as amended by the Auditing Standards Board ("ASB"), and which must be followed throughout all audits, are as follows:

*General Standards*

> 1. The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.
>
> 2. In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.
>
> 3. Due professional care is to be exercised in the performance of the audit and the preparation of the report.

*Standards of Field Work*

> 1. The work is to be adequately planned and assistants, if any, are to be properly supervised.
>
> 2. A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

> 3. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

> 1. The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).
>
> 2. The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
>
> 3. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.
>
> 4. The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore [sic] should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking. (AU § 150.02)

187. IMAX's consolidated financial statements for the years-ended December 31, 2002, December 31, 2004, December 31, 2005, and the first three quarters of 2006 were materially false and misleading as a result of prematurely recognized revenue relating to certain components of its theater system installations. PWC's opinion that IMAX's consolidated financial statements complied with GAAP and that its audits complied with GAAS and the standards of the PCAOB were materially false and misleading when issued.

188. As the auditor of a public company, PWC was required by GAAS to understand IMAX's business and the industry that the Company operated in. GAAS, specifically AU § 311, *Planning and Supervision* ("AU § 311"), states, in relevant part:

> The auditor should obtain a knowledge of matters that relate to the nature of the entity's business, its organization, and its operating characteristics. Such matters include, for example, the type of business, types of products and services, capital structure, related parties, locations, and production, distribution, and compensation methods...(¶.07)

Furthermore, AU 311 states the following:

> Knowledge of an entity's business is ordinarily obtained through experience with the entity or its industry and inquiry of personnel of the entity...(¶.08)

189. As described herein, IMAX's theater systems represented the largest contributor to IMAX's reported revenues and earnings during the Class Period. As such, PWC was required under GAAS to understand the method by which theater systems revenue was recognized, and to satisfy themselves that the proper accounting principles were being applied for such revenue recognition. In violation of GAAS, PWC failed to exercise due professional care, properly plan the audit, obtain sufficient competent evidential matter, properly assess the internal controls, and either properly consider the risk of fraud or properly incorporate its consideration of the risk of fraud into its audit procedures in its audit of the Company's December 31, 2002 through December 31, 2005 consolidated financial statements.

**Due Professional Care**

190. The third general standard requires auditors to exercise due professional care in the performance of the audit and the preparation of the report. (AU § 150.02, AU § 230.01) The standard of due care also states, in relevant part:

> Due professional care requires the auditor to exercise *professional skepticism.* Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

> Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]
>
> The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.] (AU § 230.07 – .09)

**<u>Planning An Audit</u>**

191. As previously discussed, AU § 311 requires an auditor to obtain an understanding of the entity's business and its transactions. Furthermore, AU § 311 requires an auditor to obtain a level of knowledge that will enable him/her to properly plan an audit. AU § 311 states, in relevant part:

> The auditor should obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with generally accepted auditing standards. That level of knowledge should enable him to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements. The level of knowledge customarily possessed by management relating to managing the entity's business is substantially greater than that which is obtained by the auditor in performing his audit. Knowledge of the entity's business helps the auditor in:
>
> a) Identifying areas that may need special consideration.
> b) Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization.
> c) Evaluating the reasonableness of estimates, such as valuation of inventories, depreciation, allowance for doubtful accounts, and percentage of completion of long-term contracts.
> d) Evaluating the reasonable of management representations.
> e) Making judgments about the appropriateness of the accounting principles applied and the adequacy of disclosures. (¶.06)(Emphasis added)(Footnotes omitted)

192. PWC recklessly disregarded the Company's business operations and its improper application of multiple element arrangement accounting to theater system installations, in violation of GAAS and the standards of the PCAOB.

**Evidential Matter**

193. Further, AU § 326: *Evidential Matter*, requires that the auditor "...obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion." (AU § 326.22; AU § 150.02) The standard further states, in relevant part:

> ...The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, *he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles...* In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion. (AU § 326.25)(Emphasis added)(Footnotes removed)

**Consideration of Fraud**

194. Furthermore, AU § 316, Consideration of Fraud in a Financial Statement Audit, reiterates AU § 110,:

> The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud... (AU 316.01, AU § 110.02) (Footnote omitted)

195. AU § 316 states the following regarding the importance of exercising professional skepticism:

> Due professional care requires the auditor to exercise professional skepticism. See section 230, *Due Professional Care in the Performance of Work*, paragraphs .07 through .09. Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest. (AU § 316.13)

196. AU § 316 requires an auditor to consider whether fraud risk factors exist during the course of its audit procedures. (AU § 316.32) The appendix to AU § 316 provides an auditor with numerous examples of fraud risk factors to be considered during the course of an audit, including:

- Excessive pressure exists for management to meet the requirements or expectations of third parties due to the following:
  - Perceived or real adverse effects of reporting poor financial results on significant pending transactions, such as business combinations or contract awards

* * * * *

- Excessive interest by management in maintaining or increasing the entity's stock price or earnings trend

197. Furthermore, PWC failed to appropriately consider management's selection and application of significant accounting principles when performing its audit procedures in violation of AU § 316. Specifically, AU § 316 states, in relevant part:

> Judgments about the risk of material misstatement due to fraud have an overall effect on how the audit is conducted in the following ways:

***

> *Accounting principles.* The auditor should consider management's selection and application of significant accounting principles, particularly those related to subjective measurements and complex transactions. In this respect, the auditor may have a greater concern about whether the accounting principles selected and policies adopted are being applied in an inappropriate manner to create a material misstatement of the financial statements. In developing judgments about the quality of such principles..., the auditor should consider whether their collective application indicates a bias that may create such a material misstatement of the financial statements. (AU § 316.50)

198. As previously discussed, the Company utilized aggressive and inappropriate revenue recognition policies on the non-screen elements of certain theater systems prior to the installation of the screen and completion of the theater, thereby resulting in unearned revenue. Such aggressive and inappropriate revenue recognition policies were used to inflate the price of the Company's stock as a result of Defendants' desire to sell the company. PWC either failed to properly consider the risk of fraud relating to the perceived or adverse affects of reporting poor financial results on future transactions, such as business combinations, as well as management's interest to maintain or increase its stock price or earnings trend, or failed to properly incorporate its consideration of the risk of fraud into its audit procedures surrounding the Company's revenue recognition policies, in violation of AU § 316.

**Failure to Properly Assess Internal Controls**

199. GAAS requires an auditor to obtain an understanding of an entity's internal controls as part of its audit procedures. Specifically, the second standard of field work required by AU § 150, *Generally Accepted Auditing Standards* ("AU 150"), provides that:

> A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed. (AU 150.02)

200. Additionally, as mentioned above, beginning in 2004, auditors were required by section 404 of the Sarbanes-Oxley Act and the PCAOB to perform an audit of, and provide separate opinions on, the internal control over financial reporting in conjunction with its audit of a company's financial statements. PCAOB AS 2, describes the responsibilities of the auditor relating to a Company's internal controls, in relevant part:

> Section 404(a) of the Sarbanes-Oxley Act requires the management of a public company to assess the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year and to include in the company's annual report to shareholders management's conclusion, as a result of that assessment, about whether the company's internal control is effective...
>
> Section 404(b) of the Act requires the company's auditor to attest to and report on the assessment made by the company's management. (AS 2, Section B)
>
> ***
>
> ...the integrated audit results in two separate audit objectives: to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting and to express an opinion on whether the financial statements are fairly stated. (AS 2, Section E)

201. Furthermore, AS 2 describes the auditor's objective in performing an audit of internal control over financial reporting, in relevant part:

> The auditor's objective in an audit of internal control over financial reporting is to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting... Maintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain reasonable assurance that no material weaknesses exist as of the date specified in management's assessment. (AS 2)

202. In IMAX's 2004 and 2005 Forms 10-K, PWC concurred with IMAX management's conclusions that the Company maintained effective internal controls over financial reporting. In 2006, however, the Company admitted, by way of restatement of its 2002

through third quarter 2006 financial statements, that its internal controls over financial reporting were *not effective*, and PWC concurred with that assessment. In its 2006 Form 10-K, IMAX's *Management's Annual Report On Internal Control Over Financial Reporting* stated that "...internal control over financial reporting was *not effective* as of December 31, 2006 due to the material weaknesses identified", particularly surrounding the Company's internal controls related to revenue recognition.

203. PWC's failure to identify such control deficiencies (i.e., material weaknesses) existing at the company prior to 2006, and failure to properly assess and report on management's assessment of internal controls, was in violation of GAAS, specifically AU § 150 and AS 2, as described above. Additionally, PWC's failure to identify such control deficiencies existing at the Company prior to 2006, particularly relating to its internal controls surrounding recognition of revenue from the improper "identification of deliverables and their aggregation into units of accounting" contributed to the Company's issuance of materially false and misleading financial statements through the third quarter of 2006 in violation of GAAP.

## NO STATUTORY SAFE HARBOR

204. The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the false statements pleaded herein because none of those statements are "forward-looking" statements nor were they identified as "forward-looking statements" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements accompany those statements. In the alternative, to the extent that the Defendants successfully argue that the statutory safe harbor does apply to any statements pleaded herein which are deemed to be forward-looking, Defendants are liable for those false forward-looking

statements because at the time each of those statements was made, the speaker actually knew that those forward-looking statements were false and/or the statements were authorized and/or approved by an executive officer of IMAX who actually knew that the statements were false when made.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

205. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

206. This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5 promulgated thereunder, on behalf of Plaintiffs and members of the proposed Class, who were damaged thereby.

207. As alleged herein, throughout the Class Period, Defendants, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mail, knowingly or recklessly engaged and participated in a continuous course of conduct to disseminate materially false and misleading information and to conceal adverse material information about IMAX, including the truth about the Company's revenue recognition procedures, as specified herein. Defendants knowingly or recklessly employed devices, schemes and artifices to defraud Plaintiffs and the proposed Class, while in possession of material, adverse non-public information, and engaged in acts, practices and a course of conduct that included the knowing and reckless making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about IMAX not misleading. Defendants' materially false and

misleading statements were made in connection with the purchase or sale of IMAX's common stock.

208. Defendants knew or recklessly disregarded that IMAX's public statements, as identified herein, failed to disclosed material information concerning IMAX's revenue recognition policies, internal controls and /or disclosure controls. Defendants knew or recklessly disregarded that the public statements complained of herein were materially false and misleading for the reasons alleged herein.

209. Defendants had the ability to, and did, cause the complained of public statements to contain material misstatements and omissions of material facts, as alleged herein.

210. Defendants acted with scienter, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the truth about IMAX's finances and operations, even though the truth was available to them.

**<u>As to the Individual Defendants</u>**

211. The Individual Defendants were directors and officers of IMAX and, therefore, were directly responsible for the material omissions and false and misleading statements disseminated to the public through financial statements, Quarterly Earnings Conference Calls, press releases, news reports, and filings with the SEC which they prepared, reviewed and/or signed. They also signed Sarbanes-Oxley certifications falsely attesting to the adequacy of the Company's internal and disclosure controls. As the Chief Financial Officer, Joyce had direct responsibility for the preparation of the Company's financial statements, Annual Reports on Form 10-K, Forms 10-Q and budgets. Gamble, as Chief Accounting Officer, oversaw the accounting function. According to Confidential Source No. 7 who worked in IMAX's Canadian

headquarters during the second and third quarters of 2006 as an Accounts Receivable Analyst, the Accounting Department included the Director of Finance, revenue recognition personnel, financial analysts, the Accounts Receivable Supervisor and staff, the treasury function and the Controller. Based on her oversight of these functions, Gamble, like Gelfond, Wechsler and Joyce, had access to all of the material information relating to the Company's revenue recognition for theater systems.

212. One of the key aspects of the job of the Co-CEOs was to assess the Company's business and prospects. The 2006 10-K, at page 41, identified several of the factors Wechsler and Gelfond used to make that assessment, including the signing of new theater systems arrangements, revenue, gross margins from the Company's operating segments, earnings from operations, the success of strategic initiatives such as the securing of new film projects and the progress of the Company's development of a digital projector and related technologies. It was the responsibility of Joyce, as the Chief Financial Officer, and Gamble, as the Chief Accounting Officer, to help insure that theater systems installs were accurately reflected on the Company's books and records and accurately reported to the investing public.

213. During the Class Period, Joyce and Gamble received a portion of their annual compensation in the form of bonuses under the Management Incentive Plan. Bonuses were awarded to Joyce and Gamble under this plan if the Company achieved annual operating objectives targets and their personal performance.

214. The Company's Class Period Schedules 14A say that Gelfond's and Wechsler Class compensation was assessed based on certain quantitative and qualitative factors, including corporate financial results and the realization of business plan objectives (e.g. budgeted profit and loss) related to the Company's performance for the year.

215. The following table, which sets forth the compensation paid or granted by the Corporation to Gelfond, Wechsler and Joyce (Gamble's compensation is not publicly disclosed) during the Class Period, demonstrates the substantial portion of their yearly compensation represented by incentive pay related to Company performance, providing incentive to maintain IMAX's revenues and earnings at as a high level as possible:

| Name | Year ended December 31 | Salary ($) | Bonus ($) | Restricted Stock Awards ($) | Securities Under Options Granted | All other compensation ($) |
|---|---|---|---|---|---|---|
| Bradley J. Wechsler Co-Chairman and Co-Chief Executive Officer | 2006 | 500,000 | 50,000 | -- | --[6] | 34,429 |
| | 2005 | 500,000 | 250,000 | -- | -- | 6,514 |
| | 2004 | 500,000 | 750,000 | -- | 450,000 | 4,460 |
| | 2003 | 500,000 | 750,000 | -- | -- | 4,270 |
| | 2002 | 500,000 | 750,000 | -- | 700,000 | 4,077 |
| | | | | | | |
| Richard L. Gelfond Co-Chairman and Co-Chief Executive Officer | 2006 | 500,000 | 150,000 | -- | -- | 34,640 |
| | 2005 | 500,000 | 250,000 | -- | -- | 6,514 |
| | 2004 | 500,000 | 750,000 | -- | 450,000 | 4,460 |
| | 2003 | 500,000 | 750,000 | -- | -- | 4,414 |
| | 2002 | 500,000 | 750,000 | -- | 700,000 | 4,077 |
| | | | | | | |
| Francis T. Joyce (CFO 2001-9/12/2006) | 2006 | 222,962 | N/A | N/A | N/A | 4,652 |
| | 2005 | 310,000 | 70,000 | -- | 50,000 | 6,514 |
| | 2004 | 306,192 | 116,000 | -- | -- | 4,652 |
| | 2003 | 291,673 | 90,000 | -- | 66,000 | 4,414 |
| | 2002 | 275,000 | 84,219 | -- | -- | 3,692 |

6 On March 10, 2006, the Co-CEOs were each granted 75,000 options to purchase Common Shares, which options were subsequently cancelled by the Company on June 13, 2007 for no consideration.

**As to Defendants Gelfond and Wechsler**

216. Gelfond and Wechsler had the motive and opportunity to commit the wrongful acts alleged herein. To effectuate a sale or merger of IMAX, and obtain the highest price possible, it was critical that the valuation of the Company remained elevated. While management and the Board shared an interest in obtaining the most dollars possible, Gelfond and Wechsler had a financial stake in the outcome that others did not by virtue of their stock ownership and change of control agreements.

217. Defendants Gelfond and Wechsler knew they would gain concrete benefits and a substantial profit in the event of a change in control of the Company. Based on a provision contained in their original employment agreements, dated March 1, 1994, both Gelfond and Wechsler were each entitled to receive, upon a sale of the Company, a cash bonus in an amount equal to the product of (a) 0.375% and (b) the amount by which the sale or liquidation transaction imputes an equity value in excess of Cdn. $150,000,000 to the common shares originally issued by the Company (on a fully diluted basis but excluding the common shares issued upon the conversion of the Class B convertible preferred shares of the Company formerly outstanding which were converted into common shares on June 16, 1994 and the common shares issuable upon the exercise of warrants owned by each of Messrs. Gelfond and Wechsler).

218. According to documents filed as exhibits 10.8 and 10.14 to the Company's 2005 Form 10-K, on March 8, 2006, just one day before IMAX officially announced that it was for sale, the employment agreements of Gelfond and Wechsler were amended. The amended employment agreements provided further compensation to Gelfond and Wechsler in the event of a change of control of the Company. The employment agreements were described in IMAX's August 10, 2007 Schedule 14A as follows :

The 2006 Amendments provided that each of the Co-CEOs would be paid a base salary of $500,000 for 2006 and be considered for a bonus payable in 2007 based upon performance to December 31, 2006, with a guaranteed bonus of $750,000 paid for 2006 in the event of a change of control of the Company.

219. According to IMAX's Schedule 14A, filed with the SEC on March 9, 2006, Gelfond's and Wechsler's pension plan was amended to pay them out, in full, upon a change of control of the Company:

> The Company has a U.S. defined benefit pension plan covering its two Co-Chief Executive Officers. The plan provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings during the 120 months proceeding retirement. Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. The benefits were 50% vested as of the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55. The vesting percentage of a member whose employment terminates other than by voluntary retirement shall be 100%. Also, upon the occurrence of a change of control of the Company prior to termination of a member's employment, the vesting percentage shall become 100%. The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so. *On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and benefit payments are accelerated and paid out upon the occurrence of certain events, including a change of control of the Company. The Company currently estimates that the annual benefits upon retirement will be approximately $1.0 million for each of the Co-Chief Executive Officers, subject to the amended cost of living adjustment and surviving spouse benefits.* (Emphasis added).

220. The Company's August 10, 2007 Schedule 14A also explained that:

> If there had been a change of control and either Mr. Gelfond's or Mr. Wechsler's employment had been terminated involuntarily as at December

> 31, 2006, they would have been entitled to receive estimated lump sum payments of $21,186,570 and $20,417,834, respectively.
>
> ***
>
> If there had been a change of control and either Mr. Gelfond or Mr. Wechsler had elected voluntary retirement as at December 31, 2006, they would have been entitled to receive estimated payments of $16,173,742 and $18,949,834 respectively under the SERP.

221. The modifications to Gelfond's and Wechsler's employment agreements and pension plans were negotiated and made one day before the Company announced that it was being put up for sale. It was Gelfond's and Wechsler's goal to sell the Company at a price which was inflated by the fraud as described herein and reap the benefits of the change of control provision they negotiated. Ultimately, the Company was unable to find an investor willing to purchase or merge with the Company at a price IMAX deemed acceptable.

**<u>As to PWC</u>**

222. As the auditor of a public company, PWC has the responsibility to understand the subject company's business. As described herein, IMAX's theater systems represented the single largest contributor to IMAX's revenues and earnings during the Class Period. As such, before issuing an unqualified clean opinion on IMAX'S financial statements, PWC had a duty to understand the method by which theater systems revenue was recognized, and to satisfy itself that proper accounting principles were being applied for the recognition of revenue. PWC also had the obligation to do a sufficient investigation before opining on the adequacy of IMAX's internal controls.

223. PWC has been IMAX's auditor for approximately 20 years and performed numerous quarterly reviews and annual audits of the Company. PWC performed an integrated audit of the Company's consolidated financial statements and its internal controls over financial

reporting. PWC was regularly consulted by IMAX management and accounting issues and financial statements were always reviewed and opinions provided by PWC before the Company's financial statements were publicly disclosed. Included in the subjects discussed between IMAX management and PWC was IMAX's revenue recognition policy and the application of multiple element accounting to IMAX's theater systems. The Company's approach to revenue recognition was an ongoing subject of review by PWC, and PWC provided advice to management with respect to revenue recognition for theater systems. PWC approved the revenue recognition policies described publicly by IMAX and the reflection thereof in the Company's financial statements.

224. PWC and IMAX management discussed the application of EITF 00-21 and SAB 104 at or about the time they became effective and PWC provided advice on IMAX's application thereof. Given the nature of PWC's access to internal IMAX books and records and PWC's knowledge of the true nature of the theater systems (i.e. that they operated as a single System Deliverable) PWC knew or recklessly disregarded that: multiple element accounting could not properly be applied to IMAX's theater systems; was not properly being applied; that the Company's disclosures with respect to its revenue recognition for theater systems was materially misleading; and that the clean audit opinions PWC issued on IMAX's financial statements were materially misleading.

225. This is particularly true given PWC's knowledge or reckless disregard that the Company separately accounted for the following units of accounting for a typical theater system revenue arrangement: (a) the projection system, sound system and related equipment (excluding the screen) and the supervision of installation of these components; (b) the screen and the

supervision for the installation of the same; (c) maintenance services; and (d) projectionist training. A reasonable reader of IMAX's public disclosures was not alerted to any of these facts.

226. As part of its Report of Independent Registered Public Accounting Firm issued with respect to its yearly audits of IMAX during the Class Period and included in the Company's Forms 10-K, PWC represented that, in its opinion, IMAX's consolidated financial statements presented fairly, in all material respects, the financial condition of IMAX and its subsidiaries. The Restatement shows such representations to be untrue.

227. PWC also audited management's assessment of IMAX's internal controls over financial reporting, and its yearly Reports issued during the Class Period stated that PWC agreed with IMAX management that the Company "maintained effective internal control over financial reporting". However, those representations are belied by PWC's Report accompanying the Restatement, which states that such internal controls were not in place. PWC either knew or recklessly disregarded that fact when it performed its annual audits of IMAX, during which it was to have evaluated "management's assessment, testing and evaluating the design and operational effectiveness of internal control".

**As to All Defendants**

228. During the Class Period, as detailed herein, Defendants engaged in actions which deceived the market for IMAX common stock and a course of conduct that artificially inflated the price of IMAX common stock and operated as a fraud or deceit on purchasers of IMAX common stock by misrepresenting the Company's operating condition and financial results. Defendants achieved this by making the materially misleading statements set forth hereinabove.

229. As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and material omissions alleged herein, the price of IMAX common

stock was artificially inflated during the Class Period. The August 9, 2006 announcement of the SEC investigation and its subject matter partially disclosed what the Company's misrepresentation had concealed from the market and began to reveal what the July 20, 2007 disclosure confirmed.

230. In ignorance of the false and misleading statements, the material omissions and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiffs and members of the proposed Class relied on the integrity of the market in IMAX common stock, and/or the statements complained of herein, when purchasing IMAX common stock. Had Plaintiffs and members of the proposed Class known the truth, they would not have purchased IMAX common stock or would not have purchased them at the artificially inflated prices that were paid.

231. As a result of their purchases of IMAX common stock at fraudulently inflated prices, Plaintiffs and members of the proposed Class suffered substantial damages in an amount to be proven at trial.

232. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Plaintiffs and members of the proposed Class in connection with their purchases of IMAX common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

233. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

234. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t, on behalf of Plaintiffs and all members of the proposed Class who was damaged thereby.

235. As alleged herein, the Individual Defendants acted as controlling persons of IMAX within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions and the key roles each played in the Company's management, and active participation in, the Company's day-to-day operations including its financial reporting and accounting functions, each of them had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs allege are false and misleading. The Individual Defendants prepared and/or were provided with, or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

236. By virtue of their direct and supervisory involvement in the day-to-day operations of IMAX, the Individual Defendants are presumed to have had the power to control or influence the particular transactions giving rise to the violations of federal law as alleged herein, and exercised the same.

229. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act 15 U.S.C. §78t. As a direct and proximate result of the wrongful conduct, Plaintiffs and the other members of the proposed Classed suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**DEMAND FOR JURY TRIAL**

230. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. determining that this action is a proper class action, designating Westchester Capital Management, Inc. as class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating his counsel as counsel for the Class;

B. awarding compensatory damages in favor of Plaintiffs and the other members of the proposed Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. awarding rescission in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

D. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. such other and further relief as is just and proper.

Dated: October 2, 2007

**ABBEY SPANIER RODD & ABRAMS, LLP**

By: ______________________

Arthur N. Abbey, Esq. (AA-8074)
Jill S. Abrams, Esq. (JA-1578)
Richard B. Margolies (RM-9311)
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700
Fax: 212-684-5191

*Counsel for Lead Plaintiff Westchester Capital Management*

**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: 215-875-4604

*Counsel for The Steelworkers Pension Trust*

## CERTIFICATE OF SERVICE

This is to certify that on October 2, 2007 I caused a copy of the Consolidated Amended Class Action Complaint to be served via hand delivery to:

Lewis Limon, Esq.
Breon Peace, Esq.
CLEARY GOTTLIEB STEEN & HAMILTON, LLP
One Liberty Plaza
New York, New York 10006

Carolyn Davila