## IMAX CORPORATION

**Item 11. Executive Compensation** (cont'd)

**EMPLOYMENT AGREEMENTS AND POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE-IN-CONTROL** (cont'd)

**Messrs. Gelfond and Wechsler** (cont'd)

On March 8, 2006, the Company entered into amendments to the employment agreements of the Co-CEOs (the "2006 Amendments"). The 2006 Amendments provided that each of the Co-CEOs would be paid a base salary of $500,000 for 2006 and be considered for a bonus payable in 2007 based upon performance to December 31, 2006, with a guaranteed bonus of $750,000 paid for 2006 in the event of a change of control of the Company. Pursuant to the 2006 Amendments, on March 10, 2006 the Co-CEOs were each granted 75,000 options to purchase common shares, which options were subsequently cancelled by the Company on June 13, 2007 for no consideration. In addition, if there is a change of control of the Company on or before March 10, 2008, the Co-CEOs will each receive an incentive bonus equal to the product of (a) 225,000 and (b) the difference between the closing price of the Company's common shares upon such change of control and the closing price of the Company's shares on March 10, 2006. The 2006 Amendments provide that if a Co-CEO's employment is terminated without cause prior to the end of the employment term, or if his agreement is not renewed, the Company must continue to pay the Co-CEO his annual salary and bonus for twelve months. In conjunction with the 2006 Amendments, the Co-CEOs and the Company agreed to amend the SERP as more fully described above in "Compensation Discussion and Analysis – Retirement and Pension Plans ".

On February 15, 2007, the Company entered into amendments to the employment agreements of each of the Co-CEOs, which extended their respective employment terms through December 31, 2007 (the "2007 Amendments"). The 2007 Amendments provided that each of the Co-CEOs would be paid a base salary of $500,000 for 2007 and be considered for a bonus based upon performance to December 31, 2007. If the Co-CEO's employment is terminated without cause prior to the end of the term, he shall be entitled to no less than a pro-rata portion of his median bonus target (i.e. one times salary). Pursuant to the 2007 Amendments, on February 15, 2007 the Co-CEOs were each granted 300,000 stock appreciation rights ("SARs"), which shall entitle each Co-CEO to receive in cash from the Company any increase in the fair market value of the common shares of the Company from the fair market value thereof on February 15, 2007 to the date of exercise of the SARs. 50% of the SARs vested immediately and 50% shall vest on December 31, 2007. The SARs expire on February 15, 2017, and vesting accelerates on a change of control. The Company shall have the right but not the obligation to cancel at any time all, or from time to time any part, of the SARs and to replace the cancelled SARs with stock options, or in the Company's discretion, restricted shares. The restrictive covenants, including non-competition provisions, of the Co-CEOs' existing employment agreements, as well as other provisions not modified by the 2007 Amendments, remain in force.

If either Mr. Gelfond's or Mr. Wechsler's employment had been terminated without cause as at December 31, 2006, they would have been entitled to receive estimated payments of $18,238,312 and $17,373,482, respectively. Theses amounts include lump sum payments for salary and bonus, payments under the SERP, and provision of health benefits.

If either Mr. Gelfond or Mr. Wechsler elected voluntary retirement as at December 31, 2006, they would have been entitled to receive estimated lump sum payments of $13,971,372 and $16,155,482, respectively under the SERP.

If there had been a change of control and either Mr Gelfond's or Mr. Wechsler's employment had been terminated involuntarily as at December 31, 2006, they would have been entitled to receive estimated lump sum payments of $21,186,570 and $20,417,834, respectively. These amounts include lump sum payments for salary and bonus; payments under the SERP, and provision of health benefits, but not the Sale Bonus under the 1998 Agreements For each Co-CEO, such Sale Bonus is estimated to be between $nil and $37,000, depending upon the equity assumptions that go into the relevant calculations.

If there had been a change of control and either Mr. Gelfond or Mr Wechsler had elected voluntary retirement as at December 31, 2006, they would have been entitled to receive estimated payments of $16,173,742 and $18,949,834, respectively under the SERP.

In addition to the above payments, if there had been a change of control as at December 31, 2006, there would have been a payment obligation for each of Messrs. Gelfond and Wechsler of $64,500 in connection with the cancellation of certain stock options, however in June 2007, both Messrs. Gelfond and Wechsler voluntarily surrendered such stock options for no consideration.

**Mr. Joyce**

Francis T. Joyce served as Chief Financial Officer from May 9, 2001 to September 12, 2006. During that time, his employment agreements provided for an annual base salary and annual bonuses as well as a discretionary bonus based on a percentage of base salary throughout the employment term. Mr. Joyce had agreed to restrictive covenants, including confidentiality and non-competition covenants.

IMAX CORPORATION

**Item 11. Executive Compensation** (cont'd)

**EMPLOYMENT AGREEMENTS AND POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE-IN-CONTROL** (cont'd)

**Mr. MacNeil**

On August 21, 2006 the Company appointed Edward MacNeil as Chief Financial Officer, on an interim basis. On November 6, 2006, the Company and Edward MacNeil entered into an employment arrangement. During his term as Interim Chief Financial Officer, Mr. MacNeil will receive an annualized salary of Cdn$345,000. Under the arrangement, Mr. MacNeil was entitled to receive a guaranteed bonus of Cdn$50,000, in respect of the year ending December 31, 2006.

If Mr. MacNeil's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive an estimated payment of $322,705. This amount includes continuance or lump sum payment of salary, guaranteed bonus, perquisites, provision of benefits and a payment obligation in connection with the cancellation of certain stock options. If Mr. MacNeil resigned as of December 31, 2006, he would have been entitled to receive Cdn$50,000 in respect of the guaranteed bonus for 2006.

If there had been a change of control and Mr. MacNeil's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive an estimated payment of $404,977. This amount includes continuance or lump sum payment of salary, guaranteed bonus, retention bonus, perquisites; provision of benefits and a payment obligation in connection with the cancellation of certain stock options.

**Mr. Foster**

On March 9, 2006, the Company entered into an employment agreement with Mr. Foster, which replaced Mr. Foster's previous employment agreement with the Company. Under the agreement, Mr. Foster's employment term was extended to June 30, 2008, and Mr. Foster receives an annual salary of $700,000 effective March 1, 2006, which is, thereafter, subject to annual review. The agreement further provides that Mr. Foster is entitled to receive a minimum annual bonus of 50% of his base salary for the year ending December 31, 2006 and the year ending December 31, 2007, and a prorated bonus in respect of the year ending December 31, 2008. In addition, if there is a change of control of the Company on or before March 10, 2008, Mr Foster shall receive an incentive bonus equal to the product of (a) 75,000 and (b) the difference between the closing price of the Company's common shares upon such change of control and the closing price of the Company's shares on March 10, 2006, which shall be paid out in either a lump-sum or three installments, depending upon certain events. Pursuant to the agreement, Mr Foster was granted 225,000 options to purchase common shares on March 10, 2006, which options were subsequently cancelled by the Company on June 13, 2007 for an aggregate consideration of $193,500. All outstanding options held by Mr. Foster become immediately exercisable in the event of both a change of control and certain other enumerated events. In the event such these events had occurred on December 31, 2006, Mr. Foster would not have received any benefit as the fair market value of the common shares under option on that date was less than the exercise price. The agreement further provides that Mr. Foster is entitled to a term life insurance policy in the amount of $5,000,000 during the term If Mr. Foster's employment is terminated without cause prior to the end of the employment term, the Company must continue to pay Mr. Foster his annual base salary, minimum bonus and benefits for the greater of the remainder of his employment term and six months. Mr. Foster has agreed to restrictive covenants, including confidentiality and non-competition covenants.

If Mr. Foster's employment had been terminated without cause as of December 31, 2006, he would have been entitled to receive an estimated payment to Mr. Foster $1,980,790. This amount is inclusive of· salary continuance and bonus (both subject to mitigation), perquisites, and provision of benefits.

If there had been a change of control and Mr. Foster's employment had been terminated without cause as at December 31, 2006, the estimated payment would have been $2,174,290. This amount includes salary continuance and (bonus both subject to mitigation), perquisites, provision of benefits and a payment obligation in connection with the cancellation of certain stock options.

**Mr. Lister**

On May 17, 1999, the Company and Robert D. Lister entered into an employment agreement. The agreement contains restrictive covenants, including confidentiality and non-competition covenants.

On August 21, 2000, the Company entered into an agreement with Mr. Lister, under which Mr. Lister is entitled to receive a bonus of $107,500 in the event that Mr. Lister's employment is terminated without cause within two years of the completion of a change of control.

Table of Contents

**IMAX CORPORATION**

**Item 11. Executive Compensation** (cont'd)

**EMPLOYMENT AGREEMENTS AND POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE-IN-CONTROL** (cont'd)

**Mr. Lister** (cont'd)

On April 4, 2001, the Company entered into an amendment to the employment agreement with Mr. Lister. The amendment provided that if Mr. Lister's employment is terminated without cause prior to the end of the employment term, or his agreement is not renewed, the Company must continue to pay Mr. Lister his annual salary, target bonus and benefits for the greater of the remainder of his employment term and twelve months, subject to mitigation by Mr. Lister.

On January 1, 2004, the Company entered into an amendment to the employment agreement with Mr. Lister, under which Mr. Lister's employment term was extended until June 30, 2006. The amendment provided for an annual salary of $275,000, subject to an annual review.

On February 14, 2006, the Company entered into an amendment to the employment agreement with Mr. Lister, under which Mr. Lister's employment term was extended until January 1, 2008. The amendment provided for an annual salary of $365,700 and, effective January 1, 2007, an annual salary of $402,270. Pursuant to the amendment, Mr. Lister was granted 50,000 options to purchase common shares on February 20, 2006, which options were subsequently cancelled by the Company on June 13, 2007 for an aggregate consideration of $58,500. The amendment provided that if Mr. Lister's employment is terminated without cause prior to the end of the employment term, or if his agreement is not renewed, the Company must continue to pay Mr. Lister his annual salary, target bonus and benefits for the greater of the remainder of his employment term and either 12 or 18 months, depending upon whether there was a change in control. The amendment also provided that upon the occurrence of certain events Mr. Lister shall have no obligation to mitigate payments made to him upon the termination of his employment or re-renewal of his agreement.

On October 5, 2006, the Company entered into an amendment to the employment agreement with Mr. Lister providing for a retention bonus of $150,000 if Mr Lister is not terminated for cause and does not resign prior to December 31, 2007. In addition, the amendment provides for severance, including annual salary, target bonus and benefits, to be payable to Mr. Lister upon his departure after the occurrence of certain events, including the failure of the current Co-CEOs to continue in their positions and/or a change in control of the Company, provided that Mr. Lister remains with the Company for a defined period thereafter. The restrictive covenants, including confidentiality and non-competition provisions, of Mr. Lister's existing employment agreement remain in force.

If Mr. Lister's employment had been terminated without cause as of December 31, 2006, he would have been entitled to receive an estimated payment of $860,416. This amount includes salary, bonus, perquisites and provision of benefits (all subject to mitigation under certain circumstances), in either the form of continuance or lump sum at the election of the Company

If there had been a change of control as of December 31, 2006, Mr. Lister would have received a payment of $150,000 in connection with a retention bonus

If there had been a change of control and Mr. Lister's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive an estimated payment of $1,368,872. This amount includes salary, bonus, a special bonus, retention bonus, perquisites and provision of benefits and a payment obligation in connection with the cancellation of certain stock options.

**Mr. Keighley**

On July 15, 1997, the Company, David Keighley Productions 70MM Inc. (formerly 70MM Inc.) ("DKP/70MM"), a wholly-owned subsidiary of the Company and David B. Keighley entered into an employment agreement (the "1997 Agreement"). The agreement was for a five-year term and provided for an annual base salary, annual bonus and additional bonus of 10% of any excess of DKP/70MM audited profit before taxes over an enumerated pre-tax profit threshold. Under the agreement, Mr. Keighley has agreed to restrictive covenants, including confidentiality and non-competition covenants. The agreement provides that the employment of Mr. Keighley may be terminated at any time for cause or without cause The 1997 Agreement terminated on July 15, 2002, however Mr. Keighley has continued to be employed by the Company.

If Mr. Keighley's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive a payment of $1,616 in connection with the cancellation of certain stock options, together with such other compensation which Mr. Keighley might be entitled to under applicable law

If there had been a change of control and Mr. Keighley's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive a payment of $21,535 in connection with the a payment obligation in connection with the cancellation of certain stock options, together with such other compensation which Mr. Keighley might be entitled to under applicable law.

Table of Contents

IMAX CORPORATION

**Item 11. Executive Compensation** (cont'd)

## COMPENSATION OF DIRECTORS

Directors are reimbursed for expenses incurred in attending meetings of the Board of Directors and Committees of the Board of Directors. In addition, the independent members of the Board of Directors of the Company receive Cdn. $20,000 per year (or may elect to receive options to purchase common shares of the Company in lieu of this payment) plus Cdn. $1,500 for each meeting of the Board attended in person or by telephone and Cdn. $1,200 for each Committee of the Board meeting attended in person or by telephone. The Chairman of the Audit Committee receives Cdn. $8,000 per year. In addition, each of the directors who are not also employees of the Company are granted options annually to purchase 8,000 common shares, in accordance with the Stock Option Plan, at an exercise price equal to the market value of the common shares of the Company on the date of grant which vest on the date of grant and expire on the earlier of the date which is two years after the termination of the optionee's service as a director of the Company or seven years after the date of the grant. This policy has been reviewed by the Corporate Governance Committee at which time the Committee reviewed director compensation data for companies of a comparable size. This data was compiled by the Company's management from public sources and was reported to the Committee. Using such information, the Committee formulated a recommendation to the Board of Directors and the final decision was made by the Board of Directors.

The following table sets forth information relating to the compensation of the directors for the fiscal year ended December 31, 2006·

| Name | Fees Earned or Paid in Cash ($) (1) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Neil S. Braun | 39,197 | (2) | Nil | 39,197 |
| Kenneth G. Copland | 62,125(3) | (2) | Nil | 62,125 |
| Michael Fuchs | 1,318 | (2) | Nil | 1,318 |
| Garth M. Girvan | 74,466(3) | (2) | Nil | 74,466 |
| David W. Leebron | 18,448 | (2) | Nil | 18,448 |
| Marc A. Utay | 55,880(3) | (2) | Nil | 55,880 |

(1) Meeting Fees are generally earned in Canadian dollars. The Canadian compensation values have been converted to and reported in U.S. dollars using the Bank of Canada noon rate for the last day of the month preceding an actual payment date.

(2) Not included are options awarded to directors in 2006 which were subsequently cancelled by the Company.

(3) The fees earned by the director include a one-time fee for participation on the Special Committee during 2006.

## COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

During 2006, Mr. Girvan served as Chairman of the Compensation Committee. Messrs. Braun, Copland, Girvan, Leebron and Utay, all of the non-management/independent members of the Board of Directors, performed the functions of the Compensation Committee and participated in the deliberations concerning the Co-CEOs compensation in respect of 2006.

The law firm of McCarthy Tétrault, of which Mr. Girvan is a senior partner, provided legal services to the Company on several matters in 2006 and is expected to provide legal services in 2007.

Mr. Utay is the Managing Partner of Clarion Capital Partners, LLC, which leases office space from the Company for an annual rent of approximately $120,000.

During the fiscal year ended December 31, 2006, no executive officer of the Company served on compensation committees or boards of directors of any other entities that had or have had one or more of its executive officers serving as a member of the Company's Compensation Committee or Board of Directors.

Table of Contents

IMAX CORPORATION

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

## EQUITY COMPENSATION PLANS

The following table sets forth information regarding the Company's Equity Compensation Plan as of December 31, 2006:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 5,100,995 | $ 7.12 | 1,873,662 |
| Equity compensation plans not approved by security holders | nil | nil | nil |
| Total | 5,100,995 | $ 7.12 | 1,873,662 |

## SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

The Company is not aware of any persons who as of June 30, 2007, beneficially owned or exercised control or direction over more than 5% of the Company's common shares except:

| Name and Address of Beneficial Owner of Common Shares | Amount and Nature of Beneficial Ownership of Common Shares (1) | Percent of Outstanding Common Shares(2) |
|---|---|---|
| **Richard L. Gelfond**<br>Suite 2100, 110 East 59th Street, New York, New York | 2,722,900(3) | 6.6% |
| **Bradley J. Wechsler**<br>Suite 2100, 110 East 59th Street, New York, New York | 2,682,800(4) | 6 5% |
| **Douglas Group**<br>Kevin and Michelle Douglas<br>James E. Douglas, III<br>Douglas Family Trust<br>James & Jean Douglas Irrevocable Descendants' Trust<br>125 E. Sir Francis Drake Blvd., Suite 400, Larkspur, CA 94939 | 4,200,000(5) | 10.4% |
| **Manulife Financial Corporation Group**<br>John Hancock Advisers, LLC<br>MFC Global Investment Management (U.S.), LLC<br>200 Bloor Street, East, Toronto, Ontario Canada M4W 1E5 | 2,595,900(6) | 6.4% |
| **First Wilshire Securities Management, Inc.**<br>1224 East Green Street, Suite 200, Pasadena, CA 91106 | 2,153,903(7) | 5.3% |

Table of Contents

## IMAX CORPORATION

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters** (cont'd)

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS** (cont'd)

Statements as to securities beneficially owned by the above-mentioned beneficial owners, or as to securities over which they exercise control or direction, are based upon information obtained from such beneficial owners and from records available to the Company.

(1) Includes number of common shares owned at June 30, 2007 and common shares as to which each individual had at June 30, 2007, the right to acquire beneficial ownership through the exercise of vested options plus options that vest within 60 days of that date.

(2) Based on dividing the number of common shares beneficially owned by such person by 40,288,074 common shares outstanding as of June 30, 2007, adjusted for shares issuable through the exercise of vested options, held by such person, plus options, held by such person, that vest within 60 days of that date.

(3) Included in the amount shown are 1,150,000 common shares as to which Mr. Gelfond had the right to acquire beneficial ownership as of June 30, 2007, through the exercise of options.

(4) Included in the amount shown are 1,150,000 common shares as to which Mr. Wechsler had the right to acquire beneficial ownership as of June 30, 2007, through the exercise of options.

(5) Based on information contained in a Form 4, dated April 24, 2007, filed jointly by Kevin Douglas, Douglas Family Trust, James E. Douglas, III, and the James & Jean Douglas Irrevocable Descendants' Trust.

(6) Based on information contained in a Schedule 13G, dated February 6, 2007, filed by jointly by Manulife Financial Corporation, John Hancock Advisers, LLC and MFC Global Investment Management (U.S.), LLC.

(7) Based on information contained in a Schedule 13G, dated February 14, 2007, filed by First Wilshire Securities Management, Inc.

**SECURITY OWNERSHIP OF MANAGEMENT**

The following table sets forth information with respect to the beneficial ownership of the Company's common shares as of June 30, 2007 or as otherwise indicated in the notes below, including (i) all directors and the Named Executive Officers, individually, and (iii) all directors and executive officers as a group:

| Name of Beneficial Owner of Common Shares | Amount and Nature of Beneficial Ownership of Common Shares | Percent of Outstanding Common Shares |
|---|---|---|
| Richard L. Gelfond | 2,722,900(1) | 6.6% |
| Bradley J. Wechsler | 2,682,800(2) | 6.5% |
| Neil S. Braun | 24,000(3) | * |
| Kenneth G. Copland | 83,865(4) | * |
| Garth M Girvan | 87,636(5) | * |
| David W. Leebron | 25,892(6) | * |
| Marc A. Utay | 1,336,065(7) | 3.3% |
| Francis T. Joyce | 47,500(8) | * |
| Edward MacNeil | 16,750(9) | * |
| Greg Foster | 383,500(10) | * |
| Robert D. Lister | 160,000(11) | * |
| David B. Keighley | 10,650(12) | * |
| All directors and executive officers as a group (18 persons) | 7,789,884(13) | 17.8% |

* less than 1%

Statements as to securities beneficially owned by directors and by executive officers, or as to securities, over which they exercise control or direction, are based upon information obtained from such directors and executive officers and from records available to the Company.

The amount of common shares listed includes the number of common shares owned at June 30, 2007 and common shares to which each individual had at June 30, 2007 the right to acquire beneficial ownership through the exercise of vested options plus options that vest within 60 days of that date.

Table of Contents

IMAX CORPORATION

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters** (cont'd)

**SECURITY OWNERSHIP OF MANAGEMENT** (cont'd)

The percent of outstanding common shares is based on dividing the number of common shares beneficially owned by the individual by 40,288,074 common shares outstanding as of June 30, 2007 adjusted for shares issuable through the exercise of vested options held by such person, plus options held by such person that vest within 60 days of that date.

(1) Included in the amount shown are 1,150,000 common shares which Mr. Gelfond had the right to acquire beneficial ownership through the exercise of options.

(2) Included in the amount shown are 1,150,000 common shares which Mr. Wechsler had the right to acquire beneficial ownership through the exercise of options.

(3) Included in the amount shown are 24,000 common shares which Mr. Braun had the right to acquire beneficial ownership through the exercise of options.

(4) Included in the amount shown are 73,865 common shares which Mr. Copland had the right to acquire beneficial ownership through the exercise of options.

(5) Included in the amount shown are 61,738 common shares which Mr. Girvan had the right to acquire beneficial ownership through the exercise of options.

(6) Included in the amount shown are 24,592 common shares which Mr. Leebron had the right to acquire beneficial ownership through the exercise of options.

(7) Included in the amount shown are 90,000 common shares that are pledged as security and 211,738 common shares which Mr. Utay had the right to acquire beneficial ownership through the exercise of options.

(8) Included in the amount shown are 40,000 common shares which Mr. Joyce had the right to acquire beneficial ownership through the exercise of options.

(9) Included in the amount shown are 16,750 common shares which Mr. MacNeil had the right to acquire beneficial ownership through the exercise of options.

(10) Included in the amount shown are 367,500 common shares which Mr. Foster had the right to acquire beneficial ownership through the exercise of options.

(11) Included in the amount shown are 151,000 common shares which Mr. Lister had the right to acquire beneficial ownership through the exercise of options.

(12) Included in the amount shown are 10,250 common shares which Mr Keighley had the right to acquire beneficial ownership through the exercise of options.

(13) Included in the amount shown are 3,475,124 common shares as to which all directors and executive officers as a group had the right to acquire beneficial ownership through the exercise of options.

**Item 13. Certain Relationships and Related Transactions and Director Independence**

**CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

No director or executive officer of the Company, or any security holder of record as of the date of this Annual Report on Form 10-K who owned, of record or to the Company's knowledge, more than 5% of the Company's outstanding common shares, or any member of such person's immediate family, had any material interest, direct or indirect, in any transaction during the last fiscal year, or since the commencement of the current fiscal year, in any completed or proposed transaction except for the following:

The law firm of McCarthy Tétrault, of which Mr. Girvan is a senior partner, provided legal services to the Company on several matters in 2006 and is expected to provide legal services in 2007.

Mr. Utay is the Managing Partner of Clarion Capital Partners, LLC, which leases office space from the Company for an annual rent of approximately $120,000.

Patricia Keighley is the spouse of David Keighley who is an executive officer of the Company. Ms. Keighley has been employed as the Vice President and General Manager of David Keighley Productions 70MM Inc., a subsidiary of the Company, since February 1988. Ms. Keighley received compensation of approximately $142,664 in 2006.

IMAX CORPORATION

**Item 13. Certain Relationships and Related Transactions and Director Independence** (cont'd)

## REVIEW, APPROVAL OR RATIFICATION OF TRANSACTIONS WITH RELATED PERSONS

On a regular basis, the Company requires its directors, nominees for director, and executive officers to identify to the Board of Directors, transactions and/or relationships which could constitute a transaction with a related person as defined in Regulation S-K 404(a). For any potential transaction in which a director, executive officer or related person would have a material interest, such transaction is reviewed, in advance, by the Company's General Counsel and Chief Compliance Officer to ensure compliance with the Company's Code of Ethics and to evaluate the disclosure requirements under Regulation S-K 404(a). In addition, in the event any transaction or agreement occurs in respect of which a director or executive officer has a material interest, the director or executive officer must recuse himself from voting on that matter and remove himself from the meeting while the transaction at issue is being considered by the Board of Directors. The minutes of the Board of Directors' meeting would reflect the nature of the interest disclosed and the fact of the recusal.

## DIRECTOR INDEPENDENCE

A director is determined to be independent when he or she meets the requirements of Rule 4200(a)(15) of the NASDAQ Marketplace Rules and Section 1 4 of Multilateral Instrument 52-110 (an "Independent Director"). The following five board members are Independent Directors: Messrs. Braun, Copland, Girvan, Leebron and Utay. The remaining directors, Messrs. Gelfond and Wechsler, are executives of the Company. All members of the Compensation Committee and Audit Committee are considered "independent" under such committee's independence standards.

**Item 14. Principal Accounting Fees and Services**

## AUDIT FEES

For professional services rendered by PWC for the audit of the Company's financial statements, audit of internal control over financial reporting, and review of the quarterly financial statements included in the Company's Form 10-Ks and 10-Qs and services that are normally provided by the accountant in connection with statutory and regulatory filings or engagements in respect of the fiscal year ended December 31, 2006, PWC billed the Company $2,751,522 (2005 — $1,174,942).

## AUDIT-RELATED FEES

For professional services rendered by PWC for assurance and related services that are reasonably related to the performance of the audit or review of financial statements and which includes consultations concerning financial accounting and reporting standards and review of regulatory matters in respect of the fiscal year ended December 31, 2006, PWC billed the Company $390,739 (2005 — $51,920).

## TAX FEES

For professional services rendered by PWC for tax compliance, tax advice and tax planning in respect of the fiscal year ended December 31, 2006, PWC billed the Company $35,226 (2005 - $99,706).

## ALL OTHER FEES

PWC did not bill the Company for services rendered in respect of the fiscal year ended December 31, 2006 (2005 — nil), other than the services described above.

## AUDIT COMMITTEE'S PRE-APPROVAL POLICIES AND PROCEDURES

Section 10A(i)(1) of the Securities Exchange Act of 1934 and related SEC rules require that all auditing and permissible non-audit services to be performed by a company's principal accountants be approved in advance by the Audit Committee of the Board of Directors, subject to a de minimis exception set forth in the SEC rules (the "De Minimis Exception"). Pursuant to Section 10A(i)(3) of the Securities Exchange Act of 1934 and related SEC rules, the Audit Committee has established procedures by which the Chairman of the Audit Committee may pre-approve such services provided the pre-approval is detailed as to the particular service or category of services to be rendered and the Chairman reports the details of the services to the full Audit Committee at its next regularly scheduled meeting. None of the audit-related or non-audit services described above were performed pursuant to the De Minimis Exception.

Table of Contents

**IMAX CORPORATION**

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

**(a)(1)** **Financial Statements**

The consolidated financial statements filed as part of this Report are included under Item 8 in Part II.

Report of Independent Registered Public Accounting Firm, which covers both the financial statements and financial statement schedule in (a)(2), is included under Item 8 in Part II.

**(a)(2)** **Financial Statement Schedules**

Financial statement schedule for each year in the three-year period ended December 31, 2006.

**II. Valuation and Qualifying Accounts.**

**(a)(3)** **Exhibits**
The Items listed as Exhibits 10.1 to 10.21 relate to management contracts or compensatory plans or arrangements.

| Exhibit No. | Description |
|---|---|
| 3.1 | Articles of Amendment of IMAX Corporation, dated June 25, 2004. Incorporated by reference to Exhibit 3.2 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2004 (File No. 000-24216). |
| 3.2 | By-Law No. 1 of IMAX Corporation enacted on June 3, 2004. Incorporated by reference to Exhibit 3.3 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2004 (File No. 000-24216). |
| *4.1 | Shareholders' Agreement, dated as of January 3, 1994, among WGIM Acquisition Corporation, the Selling Shareholders as defined therein, Wasserstein Perella Partners, L.P., Wasserstein Perella Offshore Partners, L.P., Bradley J. Wechsler, Richard L. Gelfond and Douglas Trumbull (the "Selling Shareholders' Agreement"). |
| *4.2 | Amendment, dated as of March 1, 1994, to the Selling Shareholders' Agreement. |
| *4.3 | Registration Rights Agreement, dated as of February 9, 1999, by and among IMAX Corporation, Wasserstein Perella Partners, L P., Wasserstein Perella Offshore Partners, L.P, WPPN Inc , the Michael J. Biondi Voting Trust, Bradley J. Wechsler and Richard L. Gelfond. |
| 4.4 | Indenture, dated as of April 9, 1996, between IMAX Corporation and Chemical Bank, as Trustee, related to the issue of the 5.75% Convertible Subordinated Notes due April 1, 2003. Incorporated by reference to Exhibit 4.3 to Amendment No.1 to IMAX Corporation's Registration Statement on Form F-3 (File No. 333-5212). |
| 4.5 | Indenture, dated as of December 4, 1998, between IMAX Corporation and U.S. Bank Trust, N.A., as Trustee, related to the issue of the 7.875% Senior Notes due December 1, 2005. Incorporated by reference to IMAX Corporation's Exhibit 4.9 to Form 10-K for the year ended December 31, 1998 (File No. 000-24216). |
| 4.6 | Registration Rights Agreement, dated as of December 4, 2003, by and among IMAX Corporation, the Guarantors (as defined therein), Credit Suisse First Boston LLC, Jefferies & Company, Inc., Wachovia Capital Markets, LLC and U.S. Bancorp Piper Jaffray Inc., relating to the issuance of 9.625% Senior Notes due 2010. Incorporated by reference to Exhibit 4.2 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 4.7 | Indenture, dated as of December 4, 2003, by and among IMAX Corporation, the Guarantors (as defined therein) and U.S. Bank National Association, as Trustee, related to the issue of the 9.625% Senior Notes |

| | |
|---|---|
| | due December 1, 2010. Incorporated by reference to Exhibit 4.3 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 4.8 | Supplemental Indenture, dated as of April 1, 2004, among IMAX Corporation, the Existing Guarantors (as defined therein), the Guaranteeing Subsidiaries (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.8 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |



Source IMAX CORP, 10-K, July 20, 2007

Table of Contents

**IMAX CORPORATION**

**Item 15. Exhibits, Financial Statement Schedules** (cont'd)

**(a)(3)** **Exhibits** (cont'd)

| Exhibit No. | Description |
|---|---|
| 4.9 | Second Supplemental Indenture, dated as of July 14, 2004, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.9 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 4.10 | Fourth Supplemental Indenture, dated April 10, 2006, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Guaranteeing Subsidiaries (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.10 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2006 (File No. 000-24216). |
| 4.11 | Fifth Supplemental Indenture, dated June 19, 2006, among IMAX Corporation, the Existing Guarantors (as defined therein), First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantor named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.11 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2006 (File No. 000-24216). |
| * 4 12 | Sixth Supplemental Indenture, dated as of November 9, 2006, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. |
| * 4.13 | Seventh Supplemental Indenture, dated as of January 29, 2007, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. |
| *4 14 | Eighth Supplemental Indenture, dated as of March 26, 2007, among IMAX Corporation, the Existing Guarantors (as defined there in), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Seventh Supplemental Guarantors named in the Seventh Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture |
| *4.15 | Consent and Forbearance Agreement, dated April 2, 2007, by and between IMAX Corporation and Plainfield Special Situations Master Fund Limited |
| *4.16 | Ninth Supplemental Indenture, dated as of April 16, 2007, among IMAX Corporation, the Existing Guarantors (as defined there in), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Seventh Supplemental Guarantors named in the Seventh |

Supplemental Indenture, the Eighth Supplemental Guarantors named in the Eighth Supplemental Indenture and U.S. Bank National Association, as trustee under the Indenture.

Table of Contents

**IMAX CORPORATION**

**Item 15. Exhibits, Financial Statement Schedules** (cont'd)

**(a)(3)** **Exhibits** (cont'd)

| Exhibit No. | Description |
|---|---|
| *4.17 | Tenth Supplemental Indenture, dated as of March 30, 2007, among IMAX Corporation, the Existing Guarantors (as defined there in), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Seventh Supplemental Guarantors named in the Seventh Supplemental Indenture, the Eighth Supplemental Guarantors named in the Eighth Supplemental Indenture, the Ninth Supplemental Guarantors named in the Ninth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. |
| 10.1 | Stock Option Plan of IMAX Corporation, dated August 12, 2004. Incorporated by reference to Exhibit 10.1 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2004 (File No. 000-24216). |
| *10.2 | IMAX Corporation Supplemental Executive Retirement Plan, as amended and restated as of January 1, 2006. |
| *10.3 | Employment Agreement, dated July 1, 1998, between IMAX Corporation and Bradley J. Wechsler. |
| *10 4 | Amended Employment Agreement, dated July 12, 2000, between IMAX Corporation and Bradley J. Wechsler. |
| 10 5 | Amended Employment Agreement, dated March 8, 2006, between IMAX Corporation and Bradley J. Wechsler Incorporated by reference to Exhibit 10.8 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 10.6 | Amended Employment Agreement, dated February 15, 2007, between IMAX Corporation and Bradley, J. Wechsler. Incorporated by reference to Exhibit 10.31 to IMAX Corporation's Form 8-K dated February 16, 2007 (File No. 000-24216. |
| *10.7 | Employment Agreement, dated July 1, 1998, between IMAX Corporation and Richard L. Gelfond. |
| *10.8 | Amended Employment Agreement, dated July 12, 2000, between IMAX Corporation and Richard L. Gelfond |
| 10.9 | Amended Employment Agreement, dated March 8, 2006, between IMAX Corporation and Richard L. Gelfond. Incorporated by reference to Exhibit 10.14 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 10.10 | Amended Employment Agreement, dated February 15, 2007, between IMAX Corporation and Richard L. Gelfond. Incorporated by reference to Exhibit 10.30 to IMAX Corporation's Form 8-K dated February 16, 2007 (File No. 000-24216). |
| 10.11 | Employment Agreement, dated March 9, 2006, between IMAX Corporation and Greg Foster. Incorporated by reference to Exhibit 10.18 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 10.12 | Employment Agreement, dated May 9, 2001, between IMAX Corporation and Francis T. Joyce. Incorporated by reference to Exhibit 10.3 to IMAX Corporation's Form 10-K for the year ended December 31, 2002 (File No. 000-24216) |
| 10.13 | Amended Employment Agreement, dated May 14, 2003, between IMAX Corporation and Francis T. Joyce. Incorporated by reference to Exhibit 10.16 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2003 (File No. 000-24216). |

| | |
|---|---|
| 10.14 | Employment Agreement, dated May 17, 1999, between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.14 to IMAX Corporation's Form 10-K for the year ended December 31, 2002 (File No. 000-24216). |

Table of Contents

## IMAX CORPORATION

**Item 15. Exhibits, Financial Statement Schedules** (cont'd)

**(a)(3)** **Exhibits** (cont'd)

| Exhibit No. | Description |
|---|---|
| *10.15 | Letter Agreement, dated August 21, 2000 between IMAX Corporation and Robert D. Lister. |
| 10.16 | Amended Employment Agreement, dated April 4, 2001 between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.15 to IMAX Corporation's Form 10-K for the fiscal year ended December 31, 2002 (File No. 000-24216). |
| 10.17 | Amended Employment Agreement, dated January 1, 2004, between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.17 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 10.18 | Third Amending Agreement, dated February 14, 2006, between IMAX Corporation and Robert D Lister. Incorporated by reference to Exhibit 10.21 to IMAX Corporation's Form 8-K dated February 20, 2006 (File No. 000-24216) |
| 10.19 | Fourth Amending Agreement, dated October 5, 2006, between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.28 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2006 (File No. 000-24216). |
| 10.20 | Summary of Employment Arrangement, dated November 6, 2006, between IMAX Corporation and Edward MacNeil. Incorporated by reference to Exhibit 10.29 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2006 (File No. 000-24216). |
| 10.21 | Statement of Directors' Compensation, dated August 11, 2005. Incorporated by reference to Exhibit 10.20 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2005 (File No. 000-24216). |
| 10.22 | Loan Agreement, dated as of February 6, 2004 by and between Congress Financial Corporation (Canada) and IMAX Corporation. Incorporated by reference to Exhibit 10.22 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 10.23 | First Amendment to the Loan Agreement, dated June 30, 2005, between Congress Financial Corporation (Canada) and IMAX Corporation. Incorporated by reference to Exhibit 10.22 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2005 (File No. 000-24216). |
| 10.24 | Second Amendment to the Loan Agreement, as of and with effect May 16, 2006, between IMAX Corporation and Wachovia Capital Finance Corporation (Canada) (formerly, Congress Financial Corporation (Canada)). Incorporated by reference to Exhibit 10.27 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2006 (File No. 000-24216). |
| *21 | Subsidiaries of IMAX Corporation. |
| *23 | Consent of PricewaterhouseCoopers LLP. |
| *24 | Power of Attorney of certain directors. |
| *31.1 | Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002, dated July 20, 2007, by Bradley J. Wechsler. |
| *31.2 | Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002, dated July 20, 2007, by Richard L. Gelfond. |
| *31.3 | Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002, dated July 20, 2007, by Edward MacNeil |
| *32.1 | |

| | |
|---|---|
| | Certification Pursuant to Section 906 of the Sarbanes — Oxley Act of 2002, dated July 20, 2007, by Bradley J. Wechsler. |
| *32.2 | Certification Pursuant to Section 906 of the Sarbanes — Oxley Act of 2002, dated July 20, 2007, by Richard L. Gelfond. |
| *32.3 | Certification Pursuant to Section 906 of the Sarbanes — Oxley Act of 2002, dated July 20, 2007, by Edward MacNeil. |

* Filed herewith

Table of Contents

**IMAX CORPORATION**

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

IMAX CORPORATION

By /s/ EDWARD MACNEIL
Edward MacNeil
Chief Financial Officer

Date: July 20, 2007

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 16, 2007.

| | | |
|---|---|---|
| /s/ BRADLEY J. WECHSLER<br>Bradley J. Wechsler<br>Director and<br>Co-Chief Executive Officer<br>(Principal Executive Officer) | /s/ RICHARD L. GELFOND<br>Richard L. Gelfond<br>Director and<br>Co-Chief Executive Officer<br>(Principal Executive Officer) | /s/ EDWARD MACNEIL<br>Edward MacNeil<br>Chief Financial Officer<br>(Principal Financial Officer) |
| /s/ JEFFREY VANCE<br>Jeffrey Vance<br>Co-Controller<br>(Principal Accounting Officer) | /s/ VIGNA VIVEKANAND<br>Vigna Vivekanand<br>Co-Controller<br>(Principal Accounting Officer) | NEIL S. BRAUN*<br>Neil S. Braun<br>Director |
| KENNETH G. COPLAND*<br>Kenneth G. Copland<br>Director | GARTH M. GIRVAN*<br>Garth M. Girvan<br>Director | DAVID W. LEEBRON*<br>David W. Leebron<br>Director |
| MARC A. UTAY*<br>Marc A. Utay<br>Director | | |

By * /s/ EDWARD MACNEIL
Edward MacNeil (as attorney-in-fact)



Source: IMAX CORP, 10-K, July 20, 2007

Table of Contents

**IMAX CORPORATION**
**Schedule II**
**Valuation and Qualifying Accounts**
*(In thousands of U.S. dollars)*

| | Balance at beginning of year | Additions / (recoveries) charged to expenses | Other additions / (deductions) | Balance at end of year |
|---|---|---|---|---|
| **Allowance for net investment in leases** | | | | |
| Year ended December 31, 2004 — as restated | $ 6,743 | $ (628) | $ — | $ 6,115 |
| Year ended December 31, 2005 — as restated | $ 6,115 | $ (1,153) | $ (2,194)(1) | $ 2,768 |
| Year ended December 31, 2006 | $ 2,768 | $ (323) | $ — | $ 2,445 |
| **Allowance for doubtful accounts receivable** | | | | |
| Year ended December 31, 2004 — as restated | $ 7,278 | $ (860) | $ (841)(1) | $ 5,577 |
| Year ended December 31, 2005 — as restated | $ 5,577 | $ 144 | $ (3,248)(1) | $ 2,473 |
| Year ended December 31, 2006 | $ 2,473 | $ 1,389 | $ (609)(1) | $ 3,253 |
| **Deferred income tax valuation allowance** | | | | |
| Year ended December 31, 2004 — as restated | $ 47,408 | $ (3,335) | $ — | $ 44,073 |
| Year ended December 31, 2005 — as restated | $ 44,073 | $ (488) | $ — | $ 43,585 |
| Year ended December 31, 2006 | $ 43,585 | $ 8,408 | $ — | $ 51,993 |
| **Provision for loans receivable** | | | | |
| Year ended December 31, 2004 | $ 11,900 | $ (800) | $ — | $ 11,100 |
| Year ended December 31, 2005 | $ 11,100 | $ (1,699) | $ (9,401)(2) | $ — |
| Year ended December 31, 2006 | $ — | $ — | $ — | $ — |

(1) Deduction amounts represent write-offs of amounts previously charged to the provision.

(2) Loans were settled on December 29, 2005 in exchange for payments received in the first quarter of 2006.



Source IMAX CORP, 10-K, July 20, 2007

**IMAX CORPORATION**
EXHIBIT 4.1

SHAREHOLDERS' AGREEMENT

SHAREHOLDERS' AGREEMENT, dated as of January 3, 1994, by and among WGIM Acquisition Corporation, a corporation organized under the laws of Canada (the "Company"), the persons listed as "Selling Shareholders" on the signature pages hereof (collectively, the "Selling Shareholders"), Wasserstein Perella Partners, L.P., a Delaware limited partnership, Wasserstein Perella Offshore Partners, L.P., a Delaware limited partnership (the two immediately preceding parties referred to herein collectively as "WP"), Bradley J. Wechsler ("Wechsler"), Richard L. Gelfond ("Gelfond" and, together with Wechsler, the "GW Shareholders") and Douglas Trumbull ("Trumbull"); the Selling Shareholders and Trumbull being collectively referred to herein as the "Original Shareholders"; the Selling Shareholders, the GW Shareholders, Trumbull and WP sometimes being collectively referred to herein as the "Shareholders".

WITNESSETH:

WHEREAS, the Company has entered into a Share Purchase Agreement dated as of the date hereof (the "Acquisition Agreement") with the Selling Shareholders pursuant to which the Company has agreed, subject to the terms and conditions thereof, to purchase all of the outstanding shares of common stock of Imax Corporation, a corporation organized under the laws of Canada ("Imax") (the "Acquisition") from the Selling Shareholders;

WHEREAS, upon the Closing (as defined in the Acquisition Agreement), each of Gelfond and Wechsler will be the registered holder and beneficial owner of an aggregate of 323,728 common shares of the Company (the "Common Stock") and warrants (the "GW Warrants") to purchase 143,879 shares of Common Stock;

WHEREAS, upon the Closing, WP will be the registered holder and beneficial owner of 240,000 Class A Preferred Shares ("Class A Preferred Shares") of the Company and warrants ("Warrants") to purchase 3,107,786 shares of Common Stock;

WHEREAS, upon the Closing, each Selling Shareholder will be the registered holder and beneficial owner of such number of Class B Convertible Preferred Shares ("Class B

Preferred Shares") of the Company and of such number of Class C Preferred Shares ("Class C Preferred Shares" which, together with Class A Preferred Shares and Class D Preferred Shares, are referred to collectively herein as the "Preferred Stock" of the Company), in each case set forth opposite such shareholder's name on Schedule A hereto;

WHEREAS, Trumbull has entered into an Agreement (the "Agreement") to sell all the shares of the Trumbull Company, Inc., a Delaware corporation ("TCI") to the Company in return for 60,000 Class D Preferred Shares ("Class D Preferred Shares") of the Company and employee stock options ("Options") to purchase 129,491 shares of Common Stock.

WHEREAS, the Shareholders desire to enter into an agreement to provide for certain restrictions on the transferability of Shares (as hereinafter defined) held by the Original Shareholders, pursuant to which the Original Shareholders are granted registration rights with respect to their Shares in the manner and for the purposes specified herein, and to provide for certain other matters, all as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Section 1. Definitions

The terms set forth below shall have following definitions:

"Acquisition" has the meaning set forth in the Recitals hereto

"Acquisition Agreement" has the meaning set forth in the Recitals hereto

"Act" means the Securities Act of 1933, as amended.

"Advice" has the meaning set forth in Section 4(b) hereof.

"Affiliate" of any Person means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person. A Person shall be deemed to "control" (including the correlative meanings, the terms "controlling", "controlled by", and "under common control with") another Person if the

controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies, of the controlled Person, whether through ownership of voting securities, by contract or otherwise.

"Class A Preferred Shares" has the meaning set forth in the Recitals hereto.

"Class B Preferred Shares" has the meaning set forth in the Recitals hereto.

"Class C Preferred Shares" has the meaning set forth in the Recitals hereto.

"Class D Preferred Shares" has the meaning set forth in the Recitals hereto.

"Closing" has the meaning set forth in the Recitals hereto.

"Come Along Notice" has the meaning set forth in Section 2(e) hereof.

"Commission" has the meaning set forth in Section 4(b) hereof.

"Common Stock" has the meaning set forth in the Recitals hereto.

"Company" has the meaning set forth in the introductory paragraph hereto; provided that, after the effectiveness of the amalgamation referred to in Section 3, all references herein to the "Company" shall refer to the new corporation formed by such amalgamation.

"Exchange Act" has the meaning set forth in Section 4(e) hereof.

"GW Warrants" has the meaning set forth in the Recitals hereto.

"Imax" has the meaning set forth in the Recitals hereto.

"Inspectors" has the meaning set forth in Section 4(b) hereof.

"NASD" has the meaning set forth in Section 4(b) hereof.

"Original Shareholders" has the meaning set forth in the introductory paragraph hereto.

"Person" means any individual, corporation, partnership, joint venture, trust, unincorporated or governmental organization or any agency or political subdivision thereof.

"Piggyback Registration" has the meaning set forth in Section 4(a) hereof.

"Preferred Stock" has the meaning set forth in the Recitals hereto.

"Proposed Registration" has the meaning set forth in Section 4(a) hereof.

"Prospective Transferee" has the meaning set forth in Section 2(d) hereof.

"Records" has the meaning set forth in Section 4(b) hereof.

"Registration Expenses" has the meaning set forth in Section 4(d) hereof.

"Registrable Securities" means the shares of Common Stock issuable upon conversion of the Class B Preferred Shares, but with respect to any such share, only so long as such share continues to be a Restricted Security.

"Restricted Security" means a share of Common Stock or a share of Preferred Stock (or a share of Common Stock issuable upon conversion of Preferred Stock) until such time as such share (i) has been effectively registered under the Act and disposed of in accordance with the registration statement covering it, (ii) has been sold publicly pursuant to Rule 144 (or any similar provision then in force) under the Act, or (iii) has been otherwise transferred and the Company has delivered a new certificate or other evidence of ownership for it not subject to any legal or other restriction and not being a legend restricting its transfer without registration or an exemption therefrom.

"Second Anniversary" means the second anniversary of the Closing.

"Shares" means the Preferred Stock, the Warrants, the GW Warrants, and the Common Stock, including the Common Stock

issuable upon conversion of the Class B Preferred Shares and upon exercise of the Warrants, as the context requires.

"Shareholders" has the meaning set forth in the introductory paragraph hereto.

"Subsidiary" means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the Board of Directors of their equivalents of such Person shall, at the time as of which any determination is being made, be owned by the Company, either directly or through Subsidiaries.

"Take-Along Notice" has the meaning set forth in Section 2(d) hereof.

"transfer" has the meaning set forth in Section 2(a) hereof.

"Warrants" has the meaning set forth in the Recitals hereto.

"WP" has the meaning set forth in the introductory paragraph hereto.

Section 2. Restrictions on Transfers of Shares and Rights of Co-Sale; Financial Statements.

(a) Restrictions on Transfers of Shares. No transfer, sale, assignment, pledge or other hypothecation or disposition, voluntary or involuntary (each, a "transfer"), of Shares held by an Original Shareholder shall be valid unless the terms and conditions of this Agreement shall have been complied with Any attempted transfer in violation of the terms and conditions of this Agreement shall be abinitio void.

(b) Legends. (i) The Company shall be entitled to affix to each certificate evidencing Shares held by an Original Shareholder a legend in substantially the following form:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO REGISTRATION OF TRANSFER OF SUCH SECURITIES WILL BE MADE ON THE BOOKS OF THE ISSUER UNLESS SUCH TRANSFER IS MADE IN CONNECTION WITH AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT OR SUCH ACT DOES NOT APPLY.

THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET FORTH IN A SHAREHOLDERS' AGREEMENT, DATED AS OF JANUARY 3, 1994, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF THE ISSUER. NO REGISTRATION OF TRANSFER OF SUCH SECURITIES WILL BE MADE ON THE BOOKS OF THE ISSUER UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH."

(ii) In the event that any Shares held by an Original Shareholder shall cease to be Restricted Securities, the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such Shares without the first paragraph of the legend required by Section 2(b)(i) endorsed thereon. In the event that any Shares shall cease to be subject to the restrictions on transfer set forth in this Agreement, the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such Shares without the second paragraph of the legend required by Section 2(b)(i).

(c) Certain Restrictions on Transfer. Each Original Shareholder agrees that he will not, directly or indirectly, make or solicit any transfer of any Share held by such Shareholder other than (i) any transfer to a person (A) by will or the laws of descent and distribution or (B) by transfer of any kind for tax or estate planning purposes, provided, however, that such transferee is (I) the issue or spouse of an Original Shareholder, (II) a company controlled by any combination of an Original Shareholder, the issue or the spouse of an Original Shareholder (provided that such company continues to be so controlled), or (III) any trust established for the benefit of an Original Shareholder, the issue or the spouse of an Original Shareholder, or any combination thereof; (ii) any transfer that is made in compliance with the procedures, and subject to the limitations, set forth in Sections 2(d) and 2(e); (iii) any transfer pursuant to an effective registration statement under the Act or under Rule 144 under the Act (or any similar or successor rule) Notwithstanding the foregoing, except as otherwise expressly provided in this Agreement, all transfers permitted by the foregoing clause (i) shall be subject to, and shall not be made other than in compliance with, the provisions of Section 2(f)

(d) Take-Along Right. If any of WP, Gelfond or Wechsler, as the case may be, proposes to sell or transfer any of their Shares (other than Preferred Stock) in one or more related transactions which will result in a sale or transfer

by WP, Gelfond or Wechsler, as the case may be, of a majority of the aggregate number of Shares held by such parties, then WP, Gelfond or Wechsler, as the case may be, shall promptly give written notice thereof (a "Take-Along Notice") to the Original Shareholders at least 30 days prior to the closing of such sale or transfer. The Take-Along Notice shall specify the precise number of Shares or percentage of holdings to be sold or transferred and shall describe in reasonable detail the proposed sale or transfer including, without limitation, the name and address of the prospective purchaser or transferee of the Shares (such purchaser or transferee and any other purchaser or transferee of the Shares permitted under this Agreement being a "Prospective Transferee"), the number of and type of the Shares to be sold or transferred, the proposed amount and form of the conditions of payment thereof offered by the Prospective Transferee, that the Prospective Transferee has been informed of the take-along right in this Section 2(d) and has agreed to purchase Shares in accordance with the terms hereof and any other material terms or conditions of the sale or transfer. Each Original Shareholder shall have the right, exercisable upon written notice (the "Acceptance Notice") delivered to WP, Gelfond or Wechsler, as the case may be, within 15 days after such receipt of the Take-Along Notice, to participate in such sale or transfer on the same terms and conditions as set forth in the Take-Along Notice. The Acceptance Notice shall state that such Original Shareholder wishes to transfer Shares to the Prospective Transferee on the terms described in the Take-Along Notice, and shall state the number of Shares thereof that such Original Shareholder wishes to include in the proposed transfer. If such Original Shareholder has delivered a timely Acceptance Notice it shall have the right to sell a number of Shares equal to the product obtained by multiplying (i) the aggregate number of Shares covered by the Take-Along Notice by (ii) a fraction the numerator of which is the number of Shares owned by the Original Shareholders at the time of the sale or transfer and the denominator of which is the number of Shares owned by WP, the GW Shareholders and the Original Shareholders at the time of such sale or transfer. For purposes of this Section 2(d), the number of Shares owned by a party shall be the number of shares of Common Stock owned by such party assuming that such party exercises all of its exchange, conversion and subscription and similar rights with respect to all securities of the Company.

(e) Come-Along Right. If any of WP, Gelfond or Wechsler, as the case may be, determines to transfer all of their Shares in one or more related transactions which will result in a transfer by WP, Gelfond or Wechsler, as the case may be, of a majority of the aggregate number of Shares held

by such parties, and it wishes to require the Original Shareholders to sell their Shares in such sale, then WP, Gelfond or Wechsler, as the case may be, shall give written notice thereof (the "Come-Along Notice") to the Original Shareholders, at least 20 days prior to such transfer. Such notice shall describe in reasonable detail the proposed transfer by WP, Gelfond or Wechsler, as the case may be, including, without limitation, the name and address of the Prospective Transferee, the number and type of the Shares proposed to be transferred, the proposed amount and form of the consideration to be paid and the terms and conditions of payment thereof offered by the Prospective Transferee and any other material terms or conditions of the transfer. Each Original Shareholder shall be required to sell all of his Shares to such third party or parties concurrently with the sale by WP, Gelfond or Wechsler, as the case may be, of its Shares, on the terms and conditions approved by WP, Gelfond or Wechsler, as the case may be, subject to the consideration per Share to be received by such Original Shareholder being identical to the consideration per Share being received by WP, Gelfond or Wechsler, as the case may be.

(f) Transferees to Execute Agreement. Each Original Shareholder agrees that it will not directly or indirectly make any transfer of any Shares held by such Original Shareholder, unless, prior to the consummation of any such transfer, the Prospective Transferee (i) executes and delivers to the Company an agreement, in form and substance satisfactory to the Company, whereby such Prospective Transferee confirms that, with respect to the Shares that are the subject of such transfer, it shall be deemed to be an "Original Shareholder" for the purposes of this Agreement and agrees to be bound by all the terms of this Agreement and (ii) unless the Company otherwise agrees in writing, delivers to the Company an opinion of counsel, satisfactory in form and substance to the Company, to the effect that the agreement referred to above that is delivered by such Prospective Transferee is a legal, valid and binding obligation of such Prospective Transferee enforceable against such Prospective Transferee in accordance with its terms. Upon the execution and delivery by such Prospective Transferee of the agreement referred to in clause (i) of the next preceding sentence and, if required, the delivery of the opinion of counsel referred to in clause (ii) of the next preceding sentence, such Prospective Transferee shall be deemed an "Original Shareholder" for the purposes of this Agreement, and shall have the rights and be subject to the obligations of an Original Shareholder hereunder with respect to the Shares transferred to such Prospective Transferee. Notwithstanding the foregoing, the provisions of this Section 2(f) shall not

apply to transfers of Shares made pursuant to Section 2(c)(ii) or (iii) hereof.

(g) Financial Statements. The Company will furnish to the Shareholders, contemporaneously with holders of the Company's debt securities, audited consolidated financial statements of the Company, including a balance sheet, income statement, statement of surplus and statement of changes in financial position, together with notes thereto and setting forth the corresponding figures of the previous year in comparative form.

Section 3. Amalgamation. Each party hereto acknowledges that, immediately following the Closing, Imax, a wholly-owned subsidiary of the Company, will amalgamate with the Company, pursuant to which, among other things, all Shares shall be Shares of the corporation continuing following such amalgamation. Each party hereto agrees to vote all Shares, if any, held by such party entitled to a vote thereon, in favour of such amalgamation and to cause its respective directors to vote in favor of such amalgamation. From and after such amalgamation, all references herein to the "Company" shall refer to the new corporation continuing following such amalgamation.

Section 4. Registration Rights.

(a) Piggyback Registration Rights.

(1) Right to Piggyback. Subject to the last sentence of this paragraph (1), whenever the Company proposes to register any shares of Common Stock under the Act at any time after the Second Anniversary, other than (A) a registration statement on Form S-4 or S-8 (or any successor forms or comparable foreign forms) or filed in connection with an exchange offer or (B) an offering of securities solely to the Company's existing shareholders (a "Proposed Registration"), and the registration form to be used may be used for the registration of the Registrable Securities (a "Piggyback Registration"), the Company will give prompt written notice to each Original Shareholder of its intention to effect such a registration and will, subject to Section 4(a)(2) hereof, include in such Piggyback Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from each Original Shareholder within 15 days after receipt of the Company's notice, provided that if, at any time after giving written notice of its intention to register any shares of Common Stock and prior to the effective date of the registration statement filed in connection with such

registration, the Company shall determine for any reason not to register or to delay registration of such shares, the Company may, at its election, give written notice of such determination to each holder of Registrable Securities and, thereupon, (1) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Securities in connection with such registration, and (2) in the case of delay in registering, shall be permitted to delay registering any Registrable Securities for the same period as the delay in registering such other shares. Except as may otherwise be provided in this Agreement, Registrable Securities with respect to which such request for registration has been received will be registered by the Company and offered to the public pursuant to this Section 4 on the same terms and subject to the same conditions applicable to similar securities of the Company included in the Proposed Registration. No Original Shareholder will be entitled to include Registrable Securities pursuant to this Section 4(a) (1) in a registration statement relating to the initial public offering of shares of Common Stock (or securities exchangeable or exercisable for or convertible into Common Stock, or the Common Stock underlying such exchangeable or convertible securities).

If the Company proposes, in conjunction with a Piggyback Registration, to file a prospectus with any Canadian securities regulatory authority or otherwise to qualify the shares of Common Stock for distribution in any province of Canada (a "Canadian Offering"), the Original Shareholders shall be entitled to participate in such Canadian Offering to the same extent and on the same terms and conditions (before, during and after the Canadian Offering), mutatismutandis, as they are entitled to participate in the Piggyback Registration under this Agreement.

(2) Priority of Piggyback Registrations If the managing underwriter or underwriters advise the Company that in its or their opinion the number or type of securities proposed to be sold in a registration statement exceeds the number or type which can be sold in such offering (a) at a price reasonably related to the then current market value of such securities, or (b) without otherwise materially and adversely affecting the entire offering, then the Company will include in such registration the number or type of Registrable Securities which, in the opinion of such underwriter or underwriters, can be sold as follows without having the adverse effect referred to above: (i) first, all the securities that the Company proposed to sell for its own account or is required to register on behalf of any third party exercising demand registration rights and (ii) second,

to the extent that the number of securities described in clause (i) above is less than the number of securities that the Company has been advised can be sold in such offering without the adverse effect referred to above, the Registrable Securities which have been requested to be included in such registration under this Section 4(a) and all shares of Common Stock requested to be included by third parties exercising rights similar to those granted in this Section 4(a), on a pro rata basis (which shall be based on the number of shares of Common Stock then owned by each holder of Registrable Securities and each such other party, assuming exercise by them of all exchange, conversion, subscription and similar rights with respect to all securities of the Company).

(b) Registration Procedures. With respect to any Piggyback Registration, the Company will, as expeditiously as practicable:

(1) prepare and file with the Securities and Exchange Commission (the "Commission") a registration statement which includes the Registrable Securities and use all reasonable efforts to cause such registration statement to become effective;

(2) prepare and file with the Commission such amendments and post-effective amendments to the registration statement as may be necessary to keep the registration statement effective for a period of not less than 90 days (or such shorter period which will terminate when all Registrable Securities covered by such registration statement have been sold or withdrawn) cause the prospectus to be supplemented by any required prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 under the Act; and comply with the provisions of the Act applicable to it with respect to the disposition of all securities covered by such registration statement during the applicable period in accordance with intended methods of disposition by the sellers thereof set forth in such registration statement or supplement to the prospectus;

(3) furnish to any holder of Registrable Securities included in such registration statement and the underwriter or underwriters, if any, without charge, at least one confirmed copy of the registration statement and any post-effective amendment thereto, upon request, and such number of copies of the prospectus (including each preliminary prospectus) and any amendments or supplements thereto, and any documents incorporated by reference therein, as such holder or underwriter may

request in order to facilitate the disposition of the Registrable Securities being sold by such holder (it being understood that the Company consents to the use of the prospectus and any amendment or supplement thereto by each holder holding Registrable Securities covered by the registration statement and the underwriter or underwriters, if any, in connection with the offering and sale of the Registrable Securities covered by the prospectus or any amendment or supplement thereto);

(4) notify each holder of Registrable Securities included in such registration statement, at any time when a prospectus relating thereto is required to be delivered under the Act, when the Company becomes aware of the occurrence of any event as a result of which the prospectus included in such registration statement (as then in effect) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein (in the case of the prospectus or any preliminary prospectus, in light of the circumstances under which they were made) not misleading and, as promptly as practicable at the request of such holder, prepare and file with the Commission and furnish a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(5) use all reasonable efforts to cause all Registrable Securities included in such registration statement to be listed on each securities exchange on which the Common Stock is then listed, if any;

(6) make every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the registration statement at the earliest possible moment;

(7) on or prior to the date on which the registration statement is declared effective, use all reasonable efforts to register or qualify, and cooperate with the holders of Registrable Securities included in such registration statement, the underwriter or underwriters, if any, and their counsel, in connection with the registration or qualification of the Registrable Securities covered by the registration statement for

offer and sale under the securities or blue sky laws of each state and other jurisdiction as any such holder or underwriter reasonably requests in writing, to use all reasonable efforts to keep each such registration or qualification effective, including through new filings, or amendments or renewals, during the period such registration statement is required to be kept effective and to do any and all other acts or things necessary or advisable to enable the disposition in all such jurisdictions of the Registrable Securities covered by the applicable registration statement; provided, that the
Company will not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to general service of process in any such jurisdiction where it is not then so subject;

(8) cooperate with the holders of Registrable Securities covered by the registration statement and the managing underwriter or underwriters, if any, to facilitate the timely preparation and delivery of certificates (not bearing any restrictive legends) representing securities to be sold under the registration statement, and enable such securities to be in such denominations and registered in such names as the managing underwriter or underwriters, if any, or such holders may request;

(9) use all reasonable efforts to cause the Registrable Securities covered by the registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the seller or sellers thereof or the underwriter or underwriters, if any, to consummate the disposition of such securities;

(10) enter into such customary agreements (including, without limitation, an underwriting agreement in customary form) and take all such other actions as the holders of a majority of the Registrable Securities being sold or the underwriters retained by the holders participating in an underwritten public offering, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities;

(11) make available for inspection by any holder of Registrable Securities included in such registration statement, any underwriter participating in any disposition pursuant to such registration statement, and

any attorney, accountant or other agent retained by any such seller or underwriter (collectively, the "Inspectors") all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records") as shall be reasonably necessary to enable the Inspectors to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided that Records which the Company determines, in good faith, to be confidential and which it notifies the Inspectors are confidential shall not be disclosed to the Inspectors;

(12) use all reasonable efforts to obtain a "cold comfort" letter from the Company's independent public accountants and an opinion of outside counsel to the Company, each in customary form and covering matters of the type customarily covered by "cold comfort" letters or opinions of counsel; and

(13) cooperate with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the National Association of Securities Dealers, Inc. (the "NASD").

Each holder of Registrable Securities, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 4(b)(4) will forthwith discontinue disposition of the Registrable Securities until such holder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 4(b)(4) or until it is advised in writing (the "Advice") by the Company that the use of the prospectus may be resumed and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Company, such holder will, or will request the managing underwriter or underwriters, if any, to deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice. In the event the Company shall give any such notice, the time periods mentioned in Section 4(b)(2) shall be extended by the number of days during the period from and including the date of the giving of such notice to and including

the date when each seller of Registrable Securities covered by each registration statement shall have received the copies of the supplemented or amended prospectus contemplated by Section 4(b)(4) or the Advice.

(c) Holdback Arrangements.

(1) Restrictions on Public Sale by Holders of Registrable Securities. To the extent not inconsistent with applicable law, each holder whose Registrable Securities are included in an underwritten registration statement agrees not to effect any public sale or distribution of the securities being registered or a similar security of the Company, or any securities convertible into or exchangeable or exercisable for such securities, including a sale pursuant to Rule 144 under the Act, during the 14 days prior to, and during the 30-day period beginning on, the effective date of such registration statement, if and to the extent requested by the managing underwriter or underwriters of such underwritten public offering, other than pursuant to such underwritten public offering.

(2) Restrictions on Public Sale by the Company and Others The Company, WP, each of Gelfond and Wechsler and each Original Shareholder agree (i) not to effect any public sale or distribution of any securities similar to those being registered, or any securities convertible into or exchangeable or exercisable for such securities (other than any such sale or distribution of such securities pursuant to registration of such securities on Form S-4 or S-8 or any successor forms or comparable foreign forms or any such sale or distribution of such securities in connection with any merger, amalgamation or consolidation involving the Company or a Subsidiary or the acquisition by the Company or a Subsidiary of the capital equity or substantially all of the assets of any other Person) during the 14 days prior to, and during the 30-day period beginning on, the effective date of any registration statement except as part of such registration statement; and (ii) that any agreement entered into after the date of this Agreement pursuant to which the Company issues or agrees to issue any privately placed securities shall contain a provision under which holders of such securities agree not to effect any public sale or distribution of any such securities during the periods described in (i) above, in each case including a sale pursuant to Rule 144 (or any similar provision then in force) under the Act (except as part of any such registration, if permitted) provided, however, that the provisions of this Section 4(c)(2) shall

not prevent the conversion or exchange of any securities pursuant to their terms into or for other securities.

(3) Other Registrations. If the Company has previously filed a registration statement with respect to any of its Registrable Securities, and if such previous registration has not been withdrawn or abandoned, the Company will not file or cause to be effected any other registration of any of its Registrable Securities under the Act (except on Form S-4 or S-8 or any successor forms or comparable foreign forms) whether on its own behalf or at the request of any holder or holders of Registrable Securities, until a period of at least six months has elapsed from the effective date of such previous registration.

(d) Registration Expenses. All of the costs and expenses of each registration hereunder, including, without limitation, all registration and filing fees, all fees and expenses associated with filings required to be made with the NASD (including, if applicable, the fees and expenses of any "qualified independent underwriter" as such term is defined in Schedule E of the By-laws of the NASD, and of its counsel) as may be required by the rules and regulations of the NASD, fees and expenses of compliance with securities or blue sky laws of any jurisdiction (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities), printing expenses, messenger and delivery expenses, internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange, and fees and disbursements of counsel for the Company and its independent certified public accountants (including the expenses of any special audit or comfort letters required by or incident to such performance) securities act liability insurance (if the Company elects to obtain such insurance), the fees and expenses of any special experts retained by the Company in connection with such registration, fees and expenses of other persons retained by the Company (but not including any underwriting fees, discounts or commissions attributable to the sale of Registrable Securities or fees or expenses of counsel for holders of Registrable Securities, all of which shall be for the account of such holders) (all such expenses being herein called "Registration Expenses"), will be borne by the Company.

(e) Indemnification; Contribution.

(1) Indemnification by the Company. The Company agrees to indemnify and hold harmless each selling holder of Registrable Securities, its officers, directors, agents, employees, partners and Affiliates and each Person, if any, who controls such selling holder within the meaning of Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus relating to the Registrable Securities or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, liabilities or expenses arise out of, or are based upon, any such untrue statement or omission based upon information with respect to such selling holder furnished in writing to the Company by such selling holder expressly for use therein. The Company also agrees to indemnify any underwriters of the Registrable Securities, their officers, directors, agents, employees, partners and Affiliates and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the selling holders provided in this Section 4(e).

(2) Conduct of Indemnification Proceedings. If any action or proceeding (including any governmental investigation) shall be brought or asserted against any selling holder (or any of its officers, directors, agents, employees, partners or Affiliates) or any Person controlling any such selling holder in respect of which indemnity may be sought from the Company, the Company shall be permitted, unless in the reasonable judgment of such indemnified party a conflict of interest may exist between such indemnified party and the Company with respect to such claim, to assume the defense thereof, including the employment of counsel reasonably satisfactory to such selling holder, and shall assume the payment of all expenses. Whether or not such defense is assumed by the Company, the Company shall not be liable for any settlement of any such action or proceeding effected without its written consent. The Company will

not consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such claim or litigation. If the Company is not entitled to, or elects not to, assume the defense of a claim, it will not be obligated to pay the fees and expenses of more than one counsel with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the Company shall be obligated to pay the fees and expenses of such additional counsel or counsels. Any selling holder entitled to indemnification hereunder agrees to give prompt written notice to the Company after the receipt by such selling holder of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which such selling holder will claim indemnification or contribution pursuant to this Agreement.

(3) Indemnification by Holders of Registrable Securities. Each selling holder of Registrable Securities agrees to indemnify and hold harmless the Company, its officers, directors, agents, employees, partners and Affiliates, and each Person, if any, who controls the Company within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to the selling holders of Registrable Securities, but only with respect to information furnished in writing by such selling holder with respect to such selling holder expressly for use in any registration statement or prospectus relating to the Registrable Securities which contained a material misstatement of fact or omission of a material fact, or any amendment or supplement thereto, or any preliminary prospectus. In case any action or proceeding shall be brought against the Company or its officers, directors, agents, employees, partners or Affiliates, or any such controlling Person, in respect of which indemnity may be sought against any selling holder, such selling holder shall have the rights and duties given to the Company, and the Company or its officers, directors, agents, employees, partners or Affiliates, or such controlling Person shall have the rights and duties given to such selling holders by Section 4(e)(2).

Each selling holder of Registrable Securities also agrees to indemnify and hold harmless underwriters of the

Registrable Securities, their officers, directors, agents, employees, partners and Affiliates, and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the Company provided in this Section 4(e)(3).

(4) Contribution. If the indemnification provided for in this Section 4(e) is unavailable to the Company, the selling holders or the underwriters in respect of any losses, claims, damages, liabilities or judgments referred to herein, then each such indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities and judgments in such proportion as is appropriate to reflect the relative fault of the indemnifying parties and indemnified parties in connection with such statements or omissions which resulted in such losses, claims, damages, liabilities or judgments, as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified parties shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement of omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 4(e)(4) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable consideration referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or judgments referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 4(e)(4), no underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such underwriter has otherwise been required to pay by reason of such

untrue or alleged untrue statement or omission or alleged omission, and no selling holder shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities of such selling holder were offered to the public exceeds the amount of any damages which such selling holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(f) Participation in Underwritten Registrations. No holder of Registrable Securities may participate in any underwritten registration hereunder unless such holder (i) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the holders as provided herein and (ii) completes and executes all questionnaires, powers of attorneys, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and these registration rights.

(g) Participation under Rule 144. The Company covenants that it will file any reports required to be filed by it under the Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder (or, if the Company is not required to file such reports, it will, upon the request of any holder of Registrable Securities, make publicly available other information so long as necessary to permit sales under Rule 144 under the Act) and that it will take such further action as the holders of Registrable Securities may reasonably request, all to the extent required from time to time to enable the holders of Registrable Securities to sell Registrable Securities without registration under the Act within the limitation of the exemption provided by Rule 144, as it may be amended from time to time (or any similar rule or regulation hereafter adopted by the Commission).

(h) Termination. This Section 4 shall continue in full force and effect until none of the Shares are Registrable Securities, except that paragraph (e) shall survive any termination of this Section 4.

Section 5. Miscellaneous.

(a) Effectiveness. The provisions of this Agreement shall be effective as of the Closing Date (as defined in the Acquisition Agreement).

(b) Termination. The provision of Section 2(c) shall terminate on the Second Anniversary. The provisions of Section 2(d) and 2(e) shall terminate on the tenth anniversary of the Closing The provisions of Section 2(a) and (b) and Section 3 shall survive indefinitely. The provisions of Section 4 shall terminate as provided in Section 4(h).

(c) Entire Agreement. This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written of the parties.

(d) Amendments, etc This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(e) Severability. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in full force and effect and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(f) Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(g) Notices. All communications provided for under this Agreement shall be in writing and shall be delivered by hand or by first-class regular mail, postage prepaid, to the following addresses, or such other addresses as shall be given by notice delivered hereunder, and shall be deemed to have been given on the day of personal delivery thereof or the third business day after such mailing:

If to WP, to:

Wasserstein Perella & Co., Inc.
31 West 52nd Street
26th Floor
New York, New York 10019
Attention: W. Townsend Ziebold

Wasserstein Perella Partners, L.P.
31 West 52nd Street
26th Floor
New York, New York 10019
Attention: W. Townsend Ziebold

Wasserstein Perella Offshore Partners, L.P
31 West 52nd Street
26th Floor
New York, New York 10019
Attention: W. Townsend Ziebold

with a copy to:

Shea & Gould
1251 Avenue of the Americas
New York, New York 10020
Attention: Richard L. Smithline, Esq.

If to Gelfond or Wechsler, to:

Bradley J. Wechsler
88 East Middle Patent Road
Bedford, New York 10506

and

Richard L. Gelfond
4 Cheviot Road
Southampton, New York 11968

with a copy to.

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Attention: Peter D. Lyons, Esq.

If to the Company, to:

IMAX Corporation
John Davison
45 Charles Street
Toronto, Ontario M4Y1N1

If to Trumbull, to·

The Trumbull Company, Inc
P.O. Box 847

Riverview Road
Lenox, Massachusetts 01240
Attention: Douglas Trumbull

with a copy to:

Douglas Trumbull
P.O. Box 55
Southfield, Massachusetts 01259

If to a Selling Shareholder, to the address set forth in Exhibit A for such Shareholder,

or to such other Persons or at such other addresses as shall be furnished by any such party by like notice given to the other parties of this Agreement.

(h) Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Province of Ontario and to laws of Canada applicable therein.

(i) Benefit; Successors and Assigns. Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not inure to the benefit of any Prospective Transferee unless such Prospective Transferee shall have complied with the terms of Section 2(f). No Original Shareholder may assign any of its rights hereunder to any Person other than a transferee that has complied with the requirements of Section 2(f) in all respects to the extent required thereby. Nothing in this Agreement either express or implied is intended to confer on any person other than the parties hereto and their respective successors and permitted assigns, any rights, remedies or obligations under or by reason of this Agreement.

(j) Injunctive Relief. Each party recognizes that in the event such party fails to perform, observe or discharge any of such party's obligations or liabilities under this Agreement, no remedy at law will provide adequate relief to the injured parties, and agree that the injured parties shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without being required to post a bond or other security.

(k) Limitation of Liability. No personal liability or responsibility of either GW Shareholder shall at any time be enforceable against either GW Shareholder on account of any representation, warranty, undertaking, covenant or agreement

made by it hereunder, either express or implied, all such personal liability, if any, being expressly waived by each party to this Agreement and by all Persons claiming by, through or under any such party, provided that any party to this Agreement making claim hereunder may realize upon the Securities held by each GW Shareholder for satisfaction of the same.

(l) Execution in Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the day and year first above written.

WGIM ACQUISITION CORPORATION

By /s/ Bradley J. Wechsler
Name: Bradley J. Wechsler
Title: President

WASSERSTEIN PERELLA PARTNERS, L.P.
By Wasserstein Perella Management Partners, Inc.
its general partner

By ______________________
Name:
Title:

WASSERSTEIN PERELLA OFFSHORE PARTNERS, L.P.
By Wasserstein Perella Management Partners, Inc.
its general partner

By ______________________
Name.
Title:

/s/ Richard L. Gelfond
Richard L. Gelfond

/s/ Bradley J. Wechsler
Bradley J. Wechsler

/s/ Douglas Trumbull
Douglas Trumbull

| | | | |
|---|---|---|---|
| Jonathan Barker | by | *<br>Jonathan Barker | as attorney-in-fact |
| Nancy Bell | by | *<br>Nancy Bell | as attorney-in-fact |
| Gregory J. Breen | by | *<br>Gregory J. Breen | as attorney-in-fact |
| C.W. Breukelman | by | *<br>C.W. Breukelman | as attorney-in-fact |
| David Breukelman | by | *<br>David Breukelman | as attorney-in-fact |
| Elaine Breukelman | by | *<br>Elaine Breukelman | as attorney-in-fact |
| Marion Breukelman | by | *<br>Marion Breukelman | as attorney-in-fact |
| Tanya Breukelman | by | *<br>Tanya Breukelman | as attorney-in-fact |
| W.A. Breukelman | by | *<br>W A. Breukelman | as attorney-in-fact |
| Canmont Investment Corp. Ltd. | by | *<br>Canmont Investment Corp. Ltd. | as attorney-in-fact |
| James B. Cawthon, Jr. | by | *<br>James B Cawthon, Jr. | as attorney-in-fact |
| Elizabeth Chaplin | by | *<br>Elizabeth Chaplin | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Diana Chaplin | by | * <br> Diana Chaplin | as attorney-in-fact |
| Gordon Chaplin | by | * <br> Gordon Chaplin | as attorney-in-fact |
| 434786 Ontario Limited | by | * <br> 434786 Ontario Limited | as attorney-in-fact |
| 434787 Ontario Limited | by | * <br> 434787 Ontario Limited | as attorney-in-fact |
| James D. Chaplin | by | * <br> James D Chaplin | as attorney-in-fact |
| Janet Chaplin | by | * <br> Janet Chaplin | as attorney-in-fact |
| Richard Chaplin | by | * <br> Richard Chaplin | as attorney-in-fact |
| Charlford Investments Inc. | by | * <br> Charlford Investments Inc. | as attorney-in-fact |
| Ann Cochren | by | * <br> Ann Cochren | as attorney-in-fact |
| Doug Daymond | by | * <br> Doug Daymond | as attorney-in-fact |
| Stewart Daymond | by | * <br> Stewart Daymond | as attorney-in-fact |
| Daedalus Investments Ltd. | by | * <br> Daedalus Investments Ltd. | as attorney-in-fact |
| John M. Davison | by | * <br> John M. Davison | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Executronics Limited | by | * <br> Executronics Limited | as attorney-in-fact |
| Allison Ferguson | by | * <br> Allison Ferguson | as attorney-in-fact |
| Betty Ferguson | by | * <br> Betty Ferguson | as attorney-in-fact |
| Graeme Ferguson | by | * <br> Graeme Ferguson | as attorney-in-fact |
| Munro Ferguson | by | * <br> Munro Ferguson | as attorney-in-fact |
| Joan Fisk | by | * <br> Joan Fisk | as attorney-in-fact |
| Forden Investments Ltd. | by | * <br> Forden Investments Ltd. | as attorney-in-fact |
| Nancy Garrett | by | * <br> Nancy Garrett | as attorney-in-fact |
| Michael A. Gibbon | by | * <br> Michael A Gibbon | as attorney-in-fact |
| Graeholdings Ltd. | by | * <br> Graeholdings Ltd. | as attorney-in-fact |
| Jano Holdings Inc. | by | * <br> Jono Holdings Inc. | as attorney-in-fact |
| David Bedford Keighley | by | * <br> David Bedford Keighley | as attorney-in-fact |
| Patricia Anne Keighley | by | * <br> Patricia Anne Keighley | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Barbara Kerr | by | * <br> Barbara Kerr | as attorney-in-fact |
| Robert Kerr | by | * <br> Robert Kerr | as attorney-in-fact |
| Janet Kroitor | by | * <br> Janet Kroitor | as attorney-in-fact |
| Paul Kroitor | by | * <br> Paul Kroitor | as attorney-in-fact |
| Roman Kroitor | by | * <br> Roman Kroitor | as attorney-in-fact |
| Stephanie Kroitor | by | * <br> Stephanie Kroitor | as attorney-in-fact |
| Tanya Kroitor | by | * <br> Tanya Kroitor | as attorney-in-fact |
| Yvanna Kroitor | by | * <br> Yvanna Kroitor | as attorney-in-fact |
| Karen Kucera | by | * <br> Karen Kucera | as attorney-in-fact |
| Ian Maxwell | by | * <br> Ian Maxwell | as attorney-in-fact |
| Lynn A. McCroskey | by | * <br> Lynn A McCroskey | as attorney-in-fact |
| Andre Picard | by | * <br> Andre Picard | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Jennifer H. Rae | by | * <br> Jennifer H. Rae | as attorney-in-fact |
| G. Mary Ruby | by | * <br> G. Mary Ruby | as attorney-in-fact |
| Scocam Investment Corp. | by | * <br> Scocam Investment Corp. | as attorney-in-fact |
| Sero Sed Serio Inc. | by | * <br> Sero Sed Serio Inc. | as attorney-in-fact |
| James Scott Shaw | by | * <br> James Scott Shaw | as attorney-in-fact |
| William C. Shaw | by | * <br> William C. Shaw | as attorney-in-fact |
| Alexandra Shea | by | * <br> Alexandra Shea | as attorney-in-fact |
| Stephen Low Productions Inc. | by | * <br> Stephen Low Productions Inc. | as attorney-in-fact |
| Martha Turner | by | * <br> Martha Turner | as attorney-in-fact |
| Alvis P. Wales, Jr. | by | * <br> Alvis P. Wales, Jr. | as attorney-in-fact |
| Robert Andrew Warnock | by | * <br> Robert Andrew Warnock | as attorney-in-fact |
| James Warnock | by | * <br> James Warnock | as attorney-in-fact |
| Anne D. Watkinson | by | * <br> Anne D. Watkinson | as attorney-in-fact |

* William A. Breukelman, by signing his name hereto, does hereby sign this Shareholders Agreement on behalf of each of the Selling Shareholders after whose typed names asterisks appear pursuant to a power of attorney duly executed by each such Selling Shareholder.

By /s/ William A. Breukelman
Attorney-in-fact

/s/ William A. Breukelman
William A. Breukelman

Schedule A

| Selling Shareholder | Associated Group B Seller | Class B Convertible Preferred Shares | Class C Preferred Shares |
|---|---|---|---|
| Jonathan Barker | | 1,448 | 290 |
| Nancy Bell | | 666 | 133 |
| Gregory J. Breen | | 1,448 | 290 |
| C.W. Breukelman | | 1,293 | 259 |
| David Breukelman | | 376 | 75 |
| Elaine Breukelman | | 376 | 75 |
| Marion E. Breukelman | | 376 | 75 |
| Tanya Breukelman | | 376 | 75 |
| W. A. Breukelman | Executronics Limited | 1,546 | 309 |
| Canmont Investment Corp. Ltd. | | 1,940 | 388 |
| James B. Cawthon, Jr. | | 290 | 58 |
| Elizabeth Chaplin | | 405 | 81 |
| Diana Chaplin | | 405 | 81 |
| 434786 Ontario Limited | | 579 | 116 |
| 434787 Ontario Limited | | 5,417 | 1,083 |
| James D. Chaplin | 434787 Ontario Limited | 41 | 8 |
| Janet Chaplin | | 405 | 81 |
| Richard Chaplin | | 405 | 81 |
| Charlford Investments Inc. | | 985 | 197 |
| Ann Cochren | | 434 | 87 |
| Doug Daymond | | 145 | 29 |
| Daedalus Investments Ltd. | | 5,174 | 1,035 |
| John M. Davison | | 1,086 | 217 |
| Executronics Limited | | 19,961 | 3,992 |
| Allison Ferguson | | 1,361 | 272 |
| Betty Ferguson | | 16,912 | 3,382 |
| Graeme Ferguson | Graeholdings Ltd. | 1,059 | 212 |
| Munro Ferguson | | 1,361 | 272 |
| Joan Fisk | | 695 | 139 |
| Forden Investments Ltd. | | 956 | 191 |
| Nancy Garrett | | 550 | 110 |
| Michael A. Gibbon | | 1,014 | 203 |
| Graeholdings Ltd. | | 22,635 | 4,527 |
| Janro Holdings Inc. | | 16,668 | 3,334 |
| David Bedford Keighley | | 413 | 83 |
| Patricia Anne Keighley | | 413 | 83 |
| Barbara Kerr | | 666 | 133 |
| Robert Kerr | Sero Sed Serio Inc. | 1,332 | 266 |
| Janet Kroitor | Janro Holdings Inc. | 1,484 | 297 |
| Paul Kroitor | | 681 | 136 |
| Roman Kroitor | Janro Holdings Inc. | 1,149 | 230 |
| Stephanie Kroitor | | 681 | 136 |
| Tanya Kroitor | | 681 | 136 |
| Yvanna Kroitor | | 681 | 136 |

| Original Shareholder | Associated Group B Seller | Class B Convertible Preferred Shares | Class C Preferred Shares |
|---|---|---|---|
| Karen Kucera | | 666 | 133 |
| Ian Maxwell | | 290 | 58 |
| Lynn A. McCroskey | | 290 | 58 |
| Andre Picard | | 64 | 13 |
| Jennifer H. Rae | | 290 | 58 |
| G. Mary Ruby | | 507 | 101 |
| Scocam Investment Corp. | | 19,842 | 3,968 |
| Sero Sed Serio Inc. | | 22,564 | 4,513 |
| James Scott Shaw | | 666 | 133 |
| William C. Shaw | Scocam Investment Corporation | 1,332 | 266 |
| Alexander Shea | | 681 | 136 |
| Stephen Low Productions Inc. | | 579 | 116 |
| Martha Turner | | 290 | 58 |

| | | |
|---|---|---|
| Alvis F. Wales, Jr. | 290 | 58 |
| Andrew Warnock | 463 | 93 |
| James Warnock | 463 | 93 |
| Anne D. Watkinson | 290 | 58 |

Names and Addresses of Selling Shareholders

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Jonathan Barker | 28 Neville Park Boulevard<br>TORONTO, Ontario<br>M4E 3P6 |
| Nancy Bell | 178 Edgemont Street S.<br>HAMILTON, Ontario<br>L8K 2H9 |
| Gregory J. Breen | 64 Greencroft Crescent<br>UNIONVILLE, Ontario<br>L3R 3Y5 |
| C.W. Breukelman | 4104 Burkeridge Place<br>WEST VANCOUVER, British Columbia<br>V7V 3M9 |
| David Breukelman | 4138 Perivale Road<br>MISSISSAUGA, Ontario<br>L5C 3V6 |
| Elaine Breukelman | 1801 Stonepath Crescent<br>MISSISSAUGA, Ontario<br>L4X 1Y1 |
| Marion E. Breukelman | 46 Miranda Avenue<br>TORONTO, Ontario<br>M6E 4G4 |
| Tanya Breukelman | 1801 Stonepath Crescent<br>MISSISSAUGA, Ontario<br>L4X 1Y1 |
| W. A. Breukelman | 1801 Stonepath Crescent<br>MISSISSAUGA, Ontario<br>L4X 1Y1 |
| Canmont Investment Corp. Ltd. | 18A Hazelton Avenue<br>Apt 406 East<br>TORONTO, Ontario<br>M5R 2E2 |
| James B. Cawthon, Jr | 600 Stratton Court<br>BIRMINGHAM, Alabama<br>35209 |
| Diana Chaplin | c/o Mrs. Janet Young<br>2743 West First Avenue<br>VANCOUVER, British Columbia<br>V6K 1H2 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Elizabeth Chaplin | Sea to Sky Real Estate Ltd.<br>P.O. Box 1500<br>4202 Village Square<br>WHISTLER VILLAGE, British Columbia<br>V0N 1B0 |
| James D. Chaplin | R.R. # 4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Janet Chaplin | 58 Blair Road<br>CAMBRIDGE, Ontario<br>N1S 2J1 |
| Richard Chaplin | R.R. # 4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Charlford Investments Inc. | Suite 1055<br>Place du Canada<br>MONTREAL, Quebec<br>H3B 2N2 |
| Ann Cochren | 13 Cumminsville Road<br>Box 7<br>MILLGROVE, Ontario<br>L0R 1V0 |
| Daedalus Investments Ltd. | c/o Sontair Limited<br>2450 Derry Road East, Hanger # 9<br>MISSISSAUGA, Ontario<br>L5S 1B2 |
| John M. Davison | 64 Hanna Road<br>TORONTO, Ontario<br>M4G 3N1 |
| Doug Daymond | R. R. # 22<br>CAMBRIDGE, Ontario<br>N3C 2V2 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Executronics Limited | c/o 38 Isabella Street<br>TORONTO, Ontario<br>M4Y 1N1<br>Attention: W.A. Breukelman |
| Allison Ferguson | R.R. # 2<br>PUSLINCH, Ontario<br>N0B 2J0 |
| Betty Ferguson | R.R. # 2<br>PUSLINCH, Ontario<br>N0B 2J0 |
| Graeme Ferguson | R.R. # 1 Norway Point<br>BAYSVILLE, Ontario<br>P0B 1A0 |
| Munro Ferguson | 4622 Esplanade Avenue<br>MONTREAL, Quebec<br>H2T 2Y5 |
| Joan Fisk | 50 Charles Street<br>CAMBRIDGE, Ontario<br>N1S 2W8 |
| Forden Investments Ltd. | Suite 1055<br>Place du Canada<br>MONTREAL, Quebec<br>H3B 2N2 |
| Nancy Ellen Garrett | 50 Charles Street<br>CAMBRIDGE, Ontario<br>N1S 2W8 |
| Michael A. Gibbon | 1430 Monk's Passage<br>OAKVILLE, Ontario<br>L6M 1J5 |
| Graeholdings Ltd. | R.R. # 1 Norway Point<br>BAYSVILLE, Ontario<br>P0B 1A0 |
| Janro Holdings Inc. | 255 Chemin de la Rouge<br>R.R. # 3<br>DEL, Quebec<br>J0T 1A0 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| David Bedford Keighley | 7 McCarty Crescent<br>MARKHAM, Ontario<br>L3P 4R4 |
| Patricia Anne Keighley | 7 McCarty Crescent<br>MARKHAM, Ontario<br>L3P 4R4 |
| Barbara Kerr | 55A Avenue Road<br>Apartment 412<br>TORONTO, Ontario<br>M5R 2G3 |
| Robert Kerr | 55A Avenue Road<br>Apartment 412<br>TORONTO, Ontario<br>M5R 2G3 |
| Janet Kroitor | 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Paul Kroitor | c/o 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Roman Kroitor | 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Stephanie Kroitor | 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Tanya Kroitor | R.R. # 2<br>PUSLINCH, Ontario<br>N0B 2J0 |
| Yvanna Kroitor | 198 Arlington Avenue<br>Apartment # 2<br>OTTAWA, Ontario<br>K1R 5S9 |
| Karen Kucera | 7 Joycelyn Drive<br>STREETSVILLE, Ontario<br>L5M 1T5 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Ian Maxwell | 233 Vance Drive<br>OAKVILLE, Ontario<br>L6L 3K9 |
| Lynn A. McCroskey | 4912 Brandywood Drive<br>BIRMINGHAM, Alabama<br>35223 |
| Andre Picard | 2496 Route 125<br>NOTRE-DAME-DE-LA-<br>MERCI, Quebec<br>J0T 2A0 |
| Jennifer H. Rae | 470 Wellesley Street East<br>TORONTO, Ontario<br>M4X 1H9 |
| G. Mary Ruby | 113 Inglewood Drive<br>TORONTO, Ontario<br>M4T 1H6 |
| Scocam Investment Corp. | 300 West River Road<br>R.R. #4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Sero Sed Serio Inc. | 55A Avenue Road<br>Apartment 412<br>TORONTO, Ontario<br>M5R 2G3<br>ATTENTION: Robert Kerr |
| James Scott Shaw | 2418 Glenwood School Drive<br>Unit 42<br>BURLINGTON, Ontario<br>L7R 3S2 |
| William C. Shaw | 300 West River Road<br>R.R. #4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Alexander Shea | 1217 Northshore Drive<br>SUDBURY, Ontario<br>P3B 1E7 |

| NAMES OF SELLERS | ADDRESSES |
| --- | --- |
| Stephen Low Productions Inc. | 1015 Lakeshore Drive<br>DORVAL, Quebec<br>H9S 2C9<br>ATTENTION: Stephen Low |
| Martha Turner | R.R. # 4<br>7 Taylor Court<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Alvis F. Wales, Jr. | 4933 Stone Mill Road<br>BIRMINGHAM, Alabama<br>35223 |
| Andrew Warnock | 180 Salisbury Avenue<br>CAMBRIDGE, Ontario<br>N1S 1K4 |
| James Warnock | 31 Brant Road North<br>CAMBRIDGE, Ontario<br>N1S 2W3 |
| Anne D. Watkinson | 22 Southport Street<br>Apartment # 123<br>TORONTO, Ontario<br>M6S 4Y9 |
| 434786 Ontario Limited | Gordon Chaplin<br>Canadian General-Tower Ltd.<br>52 Middleton Street<br>CAMBRIDGE, Ontario<br>N1R 5T6 |
| 434787 Ontario Limited | James D. Chaplin<br>Canadian General-Tower Ltd<br>52 Middleton Street<br>CAMBRIDGE, Ontario<br>N1R 5T6 |

**IMAX CORPORATION**
**Exhibit 4.2**

[EXECUTION COPY]

AMENDMENT TO SHAREHOLDERS' AGREEMENT
(SELLING SHAREHOLDERS)

March 1, 1994

To the Parties Named on
the Signature Pages Hereto

Gentlemen:

We refer to the Shareholders Agreement dated as of January 3, 1994 (the "Shareholders Agreement") among the undersigned and you. Unless otherwise defined herein, the terms defined in the Shareholders Agreement shall be used herein as therein defined

The parties desire to amend the Shareholders Agreement as provided herein. Accordingly, it is hereby agreed by you and us that the second and third recitals of the Shareholders Agreement are, effective as of the date first above written, hereby amended and restated in their entirety to read as follows:

WHEREAS, upon the Closing (as defined in the Acquisition Agreement), each of Gelfond and Wechsler will be the registered holder and beneficial owner of an aggregate of 387,945 common shares of the Company (the "Common Stock") and warrants (the "GW Warrants") to purchase 143, 879 shares of Common Stock;

WHEREAS, upon the Closing, WP and certain of its partners and affiliates will be the registered holders and beneficial owners of an aggregate of 225,000 Class A Preferred Shares ("Class A Preferred Shares") of the Company and warrants ("Warrants") to purchase an aggregate of 3,562,060 shares of Common Stock;

On an after the effective date of this letter amendment, each reference in the Shareholders Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Shareholders Agreement shall mean and be a reference to the Shareholders Agreement as amended by this letter amendment. The Shareholders Agreement, as amended by this letter amendment, is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed.

If you agree to the terms and provisions hereof, please evidence such agreement by executing and returning a counterpart of this letter amendment to the undersigned.

This letter amendment may be executed and delivered (including by facsimile transmission) in any number of counterparts and by and combination of the parties hereto in separate counterparts, each of which counterparts shall be an original and all of which taken together shall constitute one and the same instrument.

Very truly yours,

WGIM ACQUISITION CORPORATION

By /s/ Peter D. Lyons
Name: Peter D. Lyons
Title: Vice President and Assistant Secretary

Agreed as of the date
first above written:

/s/ Richard L. Gelfond
Richard L. Gelfond

/s/ Bradley J. Wechsler
Bradley J. Wechsler

/s/ Douglas Trumbull
Douglas Trumbull

WASSERSTEIN PERELLA PARTNERS, L.P.

By WASSERSTEIN PERELLA MANAGEMENT PARTNERS, INC., its general partner

By W. Townsend Ziebold
Name. W. Townsend Ziebold
Title· Attorney-in-Fact

WASSERSTEIN PERELLA OFFSHORE PARTNERS, L.P.

By WASSERSTEIN PERELLA MANAGEMENT PARTNERS, INC., its general partner

By /s/ W. Townsend Ziebold
Name: W. Townsend Ziebold
Title: Attorney-in-Fact

| | | | |
|---|---|---|---|
| Jonathan Barker | by | * <br> Jonathan Barker | as attorney-in-fact |
| Nancy Bell | by | * <br> Nancy Bell | as attorney-in-fact |
| Gregory J. Breen | by | * <br> Gregory J. Breen | as attorney-in-fact |
| C.W. Breukelman | by | * <br> C.W. Breukelman | as attorney-in-fact |
| David Breukelman | by | * <br> David Breukelman | as attorney-in-fact |
| Elaine Breukelman | by | * <br> Elaine Breukelman | as attorney-in-fact |
| Marion Breukelman | by | * <br> Marion Brueukelman | as attorney-in-fact |
| Tanya Breukelman | by | * <br> Tanya Breukelman | as attorney-in-fact |

| | | | |
|---|---|---|---|
| W.A. Breukelman | by | *<br>W.A. Breukelman | as attorney-in-fact |
| Canmont Investment Corp. Ltd. | by | *<br>Canmont Investment Corp. Ltd. | as attorney-in-fact |
| James B. Cawthon, Jr. | by | *<br>James B. Cawthon, Jr. | as attorney-in-fact |
| Elizabeth Chaplin | by | *<br>Elizabeth Chaplin | as attorney-in-fact |
| Diana Chaplin | by | *<br>Diana Chaplin | as attorney-in-fact |
| Gordon Chaplin | by | *<br>Gordon Chaplin | as attorney-in-fact |
| 434786 Ontario Limited | by | *<br>434786 Ontario Limited | as attorney-in-fact |
| 434787 Ontario Limited | by | *<br>434787 Ontario Limited | as attorney-in-fact |
| James D. Chaplin | by | *<br>James D. Chaplin | as attorney-in-fact |
| Janet Chaplin | by | *<br>Janet Chaplin | as attorney-in-fact |
| Richard Chaplin | by | *<br>Richard Chaplin | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Charlford Investments Inc. | by | * <br> Charlford Investments Inc. | as attorney-in-fact |
| Ann Cochren | by | * <br> Ann Cochren | as attorney-in-fact |
| Doug Daymond | by | * <br> Doug Daymond | as attorney-in-fact |
| Stewart Daymond | by | * <br> Stewart Daymond | as attorney-in-fact |
| Daedalus Investments Ltd. | by | * <br> Daedalus Investments Ltd. | as attorney-in-fact |
| John M. Davison | by | * <br> John M. Davison | as attorney-in-fact |
| Executronics Limited | by | * <br> Executronics Limited | as attorney-in-fact |
| Allison Ferguson | by | * <br> Allison Ferguson | as attorney-in-fact |
| Betty Ferguson | by | * <br> Betty Ferguson | as attorney-in-fact |
| Graeme Ferguson | by | * <br> Graeme Ferguson | as attorney-in-fact |
| Munro Ferguson | by | * <br> Munro Ferguson | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Joan Fisk | by | * <br> Joan Fisk | as attorney-in-fact |
| Forden Investments Ltd. | by | * <br> Forden Investments Ltd. | as attorney-in-fact |
| Nancy Garrett | by | * <br> Nancy Garrett | as attorney-in-fact |
| Michael A. Gibbon | by | * <br> Michael A. Gibbon | as attorney-in-fact |
| Graeholdings Ltd. | by | * <br> Graeholdings Ltd. | as attorney-in-fact |
| Jano Holdings Inc. | by | * <br> Jano Holdings Inc. | as attorney-in-fact |
| David Bedford Keighley | by | * <br> David Bedford Keighley | as attorney-in-fact |
| Patricia Anne Keighley | by | * <br> Patricia Anne Keighley | as attorney-in-fact |
| Barbara Kerr | by | * <br> Barbara Kerr | as attorney-in-fact |
| Robert Kerr | by | * <br> Robert Kerr | as attorney-in-fact |
| Janet Kroitor | by | * <br> Janet Kroitor | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Paul Kroitor | by | * <br> Paul Kroitor | as attorney-in-fact |
| Roman Kroitor | by | * <br> Roman Kroitor | as attorney-in-fact |
| Stephanie Kroitor | by | * <br> Stephanie Kroitor | as attorney-in-fact |
| Tanya Kroitor | by | * <br> Tanya Kroitor | as attorney-in-fact |
| Yvanna Kroitor | by | * <br> Yvanna Kroitor | as attorney-in-fact |
| Karen Kurcera | by | * <br> Karen Kurcera | as attorney-in-fact |
| Ian Maxwell | by | * <br> Ian Maxwell | as attorney-in-fact |
| Lynn A. McCroskey | by | * <br> Lynn A. McCroskey | as attorney-in-fact |
| Andre Picard | by | * <br> Andre Picard | as attorney-in-fact |
| Jennifer H. Rae | by | * <br> Jennifer H. Rae | as attorney-in-fact |
| G. Mary Ruby | by | * <br> G. Mary Ruby | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Scocam Investment Corp. | by | * <br> Scocam Investment Corp. | as attorney-in-fact |
| Sero Sed Serio Inc. | by | * <br> Sero Sed Serio Inc. | as attorney-in-fact |
| James Scott Shaw | by | * <br> James Scott Shaw | as attorney-in-fact |
| William C. Shaw | by | * <br> William C. Shaw | as attorney-in-fact |
| Alexandra Shea | by | * <br> Alexandra Shea | as attorney-in-fact |
| Stephen Low Productions Inc. | by | * <br> Stephen Low Productions Inc. | as attorney-in-fact |
| Martha Turner | by | * <br> Martha Turner | as attorney-in-fact |
| Alvis P. Wales, Jr. | by | * <br> Alvis P. Wales, Jr. | as attorney-in-fact |
| Robert Andrew Warnock | by | * <br> Robert Andrew Warnock | as attorney-in-fact |
| James Warnock | by | * <br> James Warnock | as attorney-in-fact |

Anne D. Watkinson by __________*__________ as attorney-in-fact
Anne D. Watkinson

---

* William A. Breukelman, by signing his name hereto, does hereby sign this letter amendment on behalf of each of the Selling Shareholders after whose typed names asterisks appear pursuant to a power of attorney duly executed by each such Selling Shareholder.

By /s/ William A. Breukelman
Attorney-in-fact

By /s/ William A. Breukelman
William A. Breukelman

**IMAX CORPORATION**

**EXHIBIT 4.3**

EXECUTION COPY

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of February 9, 1999, by and among Imax Corporation, a corporation organized under the laws of Canada (the "Company"), Wasserstein Perella Partners, L.P., a Delaware limited partnership ("WPLP"), Wasserstein Perella Offshore Partners, L.P., a Delaware limited partnership ("WPOP"), WPPN, Inc., a Delaware corporation ("WPPN"), the Michael J. Biondi Voting Trust (together with WPLP, WPOP and WPPN, "WP"), Bradley J. Wechsler ("Wechsler") and Richard L. Gelfond ("Gelfond" and, together with Wechsler, the "GW Shareholders").

W I T N E S S E T H:

WHEREAS, WP is the beneficial holder of common shares of the Company ("Common Shares");

WHEREAS, the GW Shareholders are the beneficial holders of Common Shares and options to purchase Common Shares ("Options"); and

WHEREAS, contemporaneously herewith, the parties are entering into a Second Amended and Restated Shareholders' Agreement (the "1999 Shareholders' Agreement") and the parties are entering into an Amended and Restated Standstill Agreement (the "1999 Standstill Agreement").

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. Definitions.

The terms set forth below shall have the following definitions:

"1999 Shareholders' Agreement" has the meaning set forth in the Recitals hereto.

"1999 Standstill Agreement" has the meaning set forth in the Recitals hereto.

"Advice" has the meaning set forth in Section 3(c) hereof.

"Affiliate" of any Person means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person, and, in the case of a Person who is a natural person, such natural person's family, including any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, and shall include adoptive relationships, and any personal representatives. A Person shall be deemed to "control" (including the correlative meanings, the terms "controlling", "controlled by", and "under common control with") another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of voting securities, by contract or otherwise.

"Best Efforts" shall mean an undertaking by a party to perform or satisfy an obligation or duty or otherwise act in a manner reasonably calculated to obtain the intended result by action not disproportionate, unreasonably burdensome or otherwise unreasonable under the circumstances; provided, that the foregoing shall not include efforts which require the performing party to, among other things, expend any funds in an amount disproportionate, unreasonably burdensome or otherwise unreasonable under the circumstances or to institute litigation.

"Business Day" means a day of the year other than a day on which banks are authorized or obligated to be closed in New York, New York.

"Canadian Offering" has the meaning set forth in Section 3(a)(1) hereof.

"Commission" has the meaning set forth in Section 3(b)(1) hereof.

"Common Shares" has the meaning set forth in the Recitals hereto.

"Company" has the meaning set forth in the introductory paragraph hereto.

"Demand Notice" has the meaning set forth in Section 3(b)(1) hereof.

"Demand Registration" has the meaning set forth in Section 3(b)(1) hereof.

"Exchange Act" has the meaning set forth in Section 3(f)(1) hereof.

"Gelfond" has the meaning set forth in the introductory paragraph hereto.

"GW Shareholders" has the meaning set forth in the introductory paragraph hereto.

"Inspectors" has the meaning set forth in Section 3(c)(14) hereof.

"IPO Closing" means the closing of the Company's initial public offering of Common Shares.

"IPO Shares" means the Liquidation Shares and the Common Shares, including Common Shares subject to Options and warrants, beneficially owned by the parties on the date of the IPO Closing, subject to adjustment to reflect any stock dividend, stock split, reverse stock split, recapitalization or other similar transaction after the date of the IPO Closing.

"Liquidation Notice" has the meaning set forth in Section 2(c).

"Liquidation Shares" has the meaning set forth in the 1999 Shareholders' Agreement.

"Majority Amount" has the meaning set forth in Section 3(a) hereof.

"NASD" means the National Association of Securities Dealers, Inc.

"Note Purchase Agreement" means the Note Purchase Agreement, dated as of January 3, 1994, by and among WPOP, WPLP and the Company, as amended.

"Options" has the meaning set forth in the Recitals hereto.

"Person" means any individual, corporation, partnership, joint venture, trust, unincorporated or governmental organization or any agency or political subdivision thereof.

"Piggyback Registration" has the meaning set forth in Section 3(a) hereof.

"Proposed Registration" has the meaning set forth in Section 3(a) hereof.

"Records" has the meaning set forth in Section 3(c) hereof.

"Registrable Securities" means the Common Shares (including the Common Shares issuable upon exercise of options and all WP Shares), but with respect to any such Common Share, only so long as such Common Share continues to be a Restricted Security or the holder of such share is an Affiliate of the Company.

"Registration Expenses" has the meaning set forth in Section 3(e) hereof.

"Restricted Security" means a Common Share, (or a Common Share issuable upon exercise of an Option) until such time as such Common Share or Option (i) has been effectively registered under the Securities Act or qualified for distribution in Canada pursuant to Canadian law in circumstances exempt under the Securities Act or when the Securities Act does not apply and disposed of in accordance with the registration statement or prospectus, as the case may be, covering it, (ii) has been sold publicly pursuant to Rule 144 under the Securities Act (or any similar provision in force, including any similar provision under the Securities Act or under any relevant Canadian law), or (iii) has been otherwise transferred and the Company has delivered a new

certificate or other evidence of ownership for it not subject to any legal or other restriction and not bearing a legend restricting its transfer without registration or an exemption therefrom.

"Securities" means the Common Shares, including the Common Shares issuable upon exercise of the Options.

"Securities Act" means the Securities Act of 1933, as amended.

"Shareholders" means the GW Shareholders together with WP.

"Subsidiary" means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the Board of Directors of their equivalents of such Person shall, at the time as of which any determination is being made, be owned by the Company, either directly or through Subsidiaries.

"Wechsler" has the meaning set forth in the introductory paragraph hereto.

"Working Capital Facility" has the meaning set forth in the Note Purchase Agreement.

"WP" has the meaning set forth in the introductory paragraph hereto.

"WP Shares " has the meaning set forth in the 1999 Shareholders' Agreement.

"WPLP" has the meaning set forth in the introductory paragraph hereto.

"WPOP" has the meaning set forth in the introductory paragraph thereto.

Section 2. Issuance of Securities; Share Certificates; Miscellaneous Agreements

(a) Legend. (i) The Company shall be entitled to affix to each certificate evidencing Restricted Securities held by a party to this Agreement a legend in substantially the following form:

THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO TRANSFER OF SUCH SECURITIES MAY BE MADE UNLESS SUCH TRANSFER IS MADE IN CONNECTION WITH AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT OR SUCH ACT DOES NOT APPLY.

(ii) In the event that any Securities held by a party to this Agreement shall cease to be Restricted Securities, the Company shall, upon the written request of the holder

thereof, issue to such holder a new certificate evidencing such Securities without the legend required by Section 2(a) endorsed thereon.

(b) Exclusive Right to Negotiate. In the event that (i) the GW Shareholders own at least 25% of the IPO Shares owned by them at the time of the IPO Closing, (ii) WP has received cash distributions in an amount such that on a compounded annual basis it shall have received a return on its original investment in the Company (including amounts invested to purchase securities pursuant to the Working Capital Facility) as well as a 30% compounded annual return on such investment (and such distributions shall not be subject to return by it to the Company) and (iii) WP, rather than the Board of Directors of the Company, initiates the sale of the Company as an entirety, the Company shall give the GW Shareholders written notice thereof. WP agrees that for 60 days after receipt by the GW Shareholders of such written notice it will not solicit, initiate or encourage submission of inquiries, proposals or offers or negotiate with any party other than the GW Shareholders with regard to the sale of the Company and that for 120 days after receipt by the GW Shareholders of such written notice it will not enter into any agreement for any such sale to any party other than the GW Shareholders.

(c) Liquidating Rights of GW Shareholders. If the GW Shareholders desire to exercise the rights set forth in this Section 2(c), they shall send written notice of such desire to the Company and WP between March 1 and March 31 of any of 1999, 2000 or 2001 (the "Liquidation Notice"). The GW Shareholders shall only be entitled to send one Liquidation Notice pursuant to this Section 2(c). The Company shall then use its Best Efforts to cause at its option either (i) the sale of the Company within a period of 180 days from its receipt of such Liquidation Notice, which in the case of a sale to WP or an Affiliate of WP, or in the case of a sale in a transaction where the fees to be received by WP or an Affiliate of WP are not customary fees charged by comparable entities for similar services, shall be at a price per Common Share deemed to be fair by a nationally recognized investment banking firm that is not Affiliated with WP or any Person holding an interest in any fund of WP, (ii) the filing of a registration statement pursuant to the Securities Act within a period of 120 days from its receipt of such Liquidation Notice pursuant to which the GW Shareholders may sell all of their Securities; or (iii) subject to applicable Canadian law, the Company to purchase all of the GW Shareholders' Securities for cash within the time and at the fair market value thereof determined as set forth below. The Company shall have 30 days after receipt of such Liquidation Notice to notify the GW Shareholders in writing which of the foregoing provisions it will use Best Efforts to comply with.

If the Company elects to use Best Efforts to pursue the purchase of the Securities as set forth in clause (iii) above, the GW Shareholders shall have 10 days from their receipt of such notice from the Company to notify the Company in writing of what they believe to be the fair market value of such Securities. The Company shall have 10 days from its receipt of such notice from the GW Shareholders to notify the GW Shareholders in writing that it does not concur with their determination of the fair market value for such Securities. If the Company notifies the GW Shareholders in writing within such period that it objects to such valuation, the GW Shareholders shall have an additional 30 days to notify the Company of the fair market value of the Securities as determined by a nationally recognized investment banking firm selected by the GW Shareholders. The GW Shareholders shall include with such notification a

copy of the valuation opinion delivered to them by such investment banking firm. The Company shall have 10 days from the receipt of such notification and valuation opinion to notify the GW Shareholders in writing that it does not concur with the fair market value for such Securities as set forth in such opinion. If the Company notifies the GW Shareholders in writing within such period that it objects to such valuation, it shall have an additional 30 days to notify the GW Shareholders of the fair market value of the Securities as determined by a nationally recognized investment banking firm selected by the Company. The Company shall include with such notification a copy of the valuation opinion delivered to it by such investment banking firm. If the fair market value of the Securities as determined by the nationally recognized investment banking firm selected by the Company is greater than or equal to 95% of the fair market value of the Securities as determined by the nationally recognized investment banking firm selected by the GW Shareholders, the fair market value of the Securities shall be equal to half of the sum of the fair market values of such Securities as set forth in such opinions. If the provisions of the preceding sentence do not apply and if within 10 days of the GW Shareholders' receipt of notice from the Company of the fair market value of the Securities as determined by the nationally recognized investment banking firm selected by the Company, the GW Shareholders and the Company are still unable to agree on such fair market value, then the two investment banking firms will select a third investment banking firm who will have 30 days to deliver its opinion to the Company and the GW Shareholders as to its determination of the fair market value of the Securities. The determination by such third investment banking firm shall be conclusive and binding on the Company and the GW Shareholders; provided that in no event will such value be less than the value determined by the investment banking firm selected by the Company or more than the value determined by the investment banking firm selected by the GW Shareholders. All determinations of the value of the GW Shareholders' Securities made by investment banking firms in connection with the Company's election to purchase the GW Shareholders' Securities pursuant to this Section 2(c) shall value such Securities by reference to such Securities' pro rata portion of the going concern equity value of the Company as of the date of such determination, considered in the context of a hypothetical purchase of the Company negotiated between a willing buyer and a willing seller, neither of whom is under a compulsion to act, without any discount for a minority interest, transfer restrictions, illiquidity or other similar factors. The GW Shareholders shall bear the fees, costs and expenses of the investment banking firm retained by them and WP shall bear the fees, costs and expenses of the investment banking firm retained by the Company. The fees, costs and expenses of the third investment banking firm, if any, shall be borne 50% by WP, on the one hand, and 50% by the GW Shareholders, on the other hand. The Company shall be obligated to purchase the Securities on a date no later than 10 days after the fair market value thereof is agreed to as set forth above.

Section 3. Registration Rights.

(a) Piggyback Registration Rights.

(1) Right to Piggyback. Subject to the last sentence of this paragraph (1), whenever the Company proposes to register any Common Shares under the Securities Act, other than a registration statement on Form S-4 or S-8 (or any successor forms or comparable foreign forms) or filed in connection with an exchange offer or an offering of securities solely to the Company's existing stockholders (a "Proposed Registration") and the registration form to be used

may be used for the registration of the Registrable Securities (a "Piggyback Registration"), the Company will give prompt written notice to WP and the GW Shareholders of its intention to effect such a registration and will, subject to Section 3(a)(2) hereof, include in such Piggyback Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from WP and the GW Shareholders within 15 days after receipt of the Company's notice, provided that if, at any time after giving written notice of its intention to register any Common Shares and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of such shares, the Company may, at its election, give written notice of such determination to each holder of Registrable Securities and, thereupon, (a) in the case of a determination not to register, shall be relieved of its obligation to register any Registrable Securities in connection with such registration, and (b) in the case of delay in registering, shall be permitted to delay registering any Registrable Securities for the same period as the delay in registering such other shares. Except as may otherwise be provided in this Agreement, Registrable Securities with respect to which such request for registration has been received will be registered by the Company and offered to the public pursuant to this Section 3 on the same terms and subject to the same conditions applicable to similar securities of the Company included in the Proposed Registration.

If the Company proposes, in conjunction with a Piggyback Registration, to file a prospectus with any Canadian securities regulatory authority or otherwise to qualify the Common Shares for distribution in any province of Canada (a "Canadian Offering"), each holder of Registrable Securities shall be entitled, subject to applicable Canadian securities law, to participate in such Canadian Offering to the same extent and on the same terms and conditions (before, during and after the Canadian Offering), mutatismutandis, as such holder is entitled to participate in the Piggyback Registration under this Agreement.

(2) Priority of Piggyback Registrations. If the managing underwriter or underwriters advise the Company in writing that in its or their opinion the number or type of securities proposed to be sold in a registration statement exceeds the number or type which can be sold in such offering (a) at a price reasonably related to the then current market value of such securities, or (b) without otherwise materially and adversely affecting the entire offering, then the Company will include in such registration the number or type of Registrable Securities which, in the opinion of such underwriter or underwriters, can be sold as follows: (i) first, the securities that the Company proposes to sell for its own account or is required to register on behalf of any Person exercising demand registration rights, and (ii) second, to the extent that the number of securities described in clause (i) above is less than the number of securities that the Company has been advised can be sold in such offering without the adverse effect referred to above, the Registrable Securities of WP and the GW Shareholders which have been requested to be included in such registration under this Section 3(a) and all Common Shares requested to be included by third parties exercising rights similar to those granted in this Section 3(a), on a pro rata basis (which, in the case of Common Shares, shall be based on the number of shares of Common Shares then owned by each holder of Registrable Securities and each such other party assuming exercise of all of their exchange, conversion and subscription rights with respect to all securities of the Company).

(3) Selection of Underwriters. If any Piggyback Registration is an underwritten offering, the Company will select a managing underwriter or underwriters to administer the offering, which managing underwriter or underwriters will be of nationally recognized standing and which will be reasonably acceptable (A) to WP (after consultation with the GW Shareholders) if the Piggyback Registration is being made in connection with the exercise by WP of its Demand Registration Rights under Section 3(b), (B) to the GW Shareholders (after consultation with WP) if such Piggyback Registration is being made in connection with the exercise by the GW Shareholders of their Demand Registration rights under Section 3(b), (C) if the foregoing clauses (A) and (B) do not apply, to WP (after consultation with the GW Shareholders), so long as WP is a participant in such underwritten offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion or subscription rights with respect to all securities of the Company then held by it) than any other holder, or (D) if the foregoing clauses (A), (B) and (C) do not apply, to persons holding a majority of each type of the Registrable Securities to be included in such registration statement (a "Majority Amount").

(b) Demand Registration Rights.

(1) Right to Demand. WP or the GW Shareholders may make a written request to the Company for registration with the Securities and Exchange Commission (the "Commission") under and in accordance with the provisions of the Securities Act of all or part of its Registrable Securities. Within 10 days after receipt of any such request, the Company will serve written notice (the "Demand Notice") of such registration request to WP and the GW Shareholders and the Company will include in such registration all Registrable Securities of WP and the GW Shareholders with respect to which the Company has received written requests for inclusion therein within 15 Business Days after the receipt by the applicable holder of the Demand Notice. All requests made pursuant to this Section 3(b)(1) (each, a "Demand Registration") will specify the aggregate number and type of the Registrable Securities to be registered and will also specify the intended methods of disposition thereof. WP shall be entitled to four Demand Registrations and the GW Shareholders shall be entitled to two Demand Registrations.

(2) Priority on Demand Registrations. If the managing underwriter or underwriters of a Demand Registration (or, in the case of a Demand Registration not being underwritten, if (A) WP (after consultation with the GW Shareholders) if such Demand Registration is being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders (after consultation with WP) if such Demand Registration is being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) and (B) do not apply, WP so long as WP either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion and subscription rights with respect to all securities of the Company) than any other holder or (D) if the foregoing clauses (A), (B) and (C) do not apply, a Majority Amount of each type of holders registering Registrable Securities therein) advise the Company in writing that in its or their opinion the number or type of securities proposed to be sold in such Demand Registration exceeds the number which can be sold in such offering (a) at a price

reasonably related to the then current market value of such securities, or (b) without otherwise materially and adversely affecting the entire offering, then the Company will include in such registration only the number or type of securities which, in the opinion of such underwriter or underwriters (or holders, as the case may be) can be sold in such offering without the adverse effect referred to above, (x) first, Registrable Securities requested to be included in such offering by the party or parties exercising a right to a Demand Registration, and (y) second, other securities of the Company proposed to be included in such offering, in accordance with the priorities then existing among the Company and the holders of such other securities.

(3) Selection of Underwriters. If any Demand Registration is an underwritten offering, (A) WP (after consultation with the GW Shareholders) if such Demand Registration is being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders (after consultation with WP) if such Demand Registration is being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) and (B) do not apply, WP (after consultation with the GW Shareholders), so long as WP is a participant in such underwritten offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion and subscription rights with respect to all securities of the Company) than any other holder or (D) if the foregoing clauses (A), (B) and (C) do not apply, the holders of a Majority Amount of each type of the Registrable Securities to be included in such Demand Registration will select a managing underwriter or underwriters to administer the offering.

(c) Registration Procedures. With respect to any Piggyback or Demand Registration, the Company will, as expeditiously as practicable:

(1) prepare and file with the Commission a registration statement which includes the Registrable Securities and use its best efforts to cause such registration statement to become effective; provided that before filing a registration statement or prospectus or any amendments or supplements thereto, including documents incorporated by reference after the initial filing of the registration statement, the Company will furnish to the holders of the Registrable Securities covered by such Registration Statement and the underwriters, if any, draft copies of all such documents proposed to be filed at least five (5) business days prior thereto, which documents will be subject to the reasonable review of such holders and underwriters, and the Company will not file any registration statement or amendment thereto or any prospectus or any supplement thereto (including such documents incorporated by reference) to which (A) WP (after consultation with the GW Shareholders), if such registration is a Demand Registration being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders (after consultation with WP), if such registration is a Demand Registration being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) and (B) do not apply, WP so long as WP is a participant in such underwritten offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion and subscription rights with respect to all securities of the Company then held by it) than any other holder or (D) if the foregoing clauses (A), (B) and (C) do not apply, holders of a Majority Amount of each type of the Registrable Securities covered by such registration

statement or the underwriters, if any, shall reasonably object, and will notify each holder of the Registrable Securities of any stop order issued or threatened by the Commission in connection therewith and take all reasonable actions required to prevent the entry of such stop order or to remove it if entered;

(2) prepare and file with the Commission such amendments and post-effective amendments to the registration statement as may be necessary to keep the registration statement effective for a period of not less than 90 days (or such shorter period which will terminate when all Registrable Securities covered by such registration statement have been sold or withdrawn, but not prior to the expiration of the 90-day period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder, if applicable); cause the prospectus to be supplemented by any required prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 under the Securities Act; and comply with the provisions of the Securities Act applicable to it with respect to the disposition of all securities covered by such registration statement during the applicable period in accordance with intended methods of disposition by the sellers thereof set forth in such registration statement or supplement to the prospectus. The Company shall not be deemed to have used its best efforts to keep a registration statement effective during the applicable period if it voluntarily takes any action that would result in selling holders of the Registrable Securities covered thereby not being able to sell such Registrable Securities during that period unless such action is required under applicable law;

(3) furnish to any holder of Registrable Securities included in such registration statement and the underwriter or underwriters, if any, without charge, at least one signed copy of the registration statement and any post-effective amendment thereto, upon request, and such number of conformed copies thereof and such number of copies of the prospectus (including each preliminary prospectus) and any amendments or supplements thereto, and any documents incorporated by reference therein, as such holder or underwriter may request in order to facilitate the disposition of the Registrable Securities being sold by such holder (it being understood that the Company consents to the use of the prospectus and any amendment or supplement thereto by each holder holding Registrable Securities covered by the registration statement and the underwriter or underwriters, if any, in connection with the offering and sale of the Registrable Securities covered by the prospectus or any amendment or supplement thereto); provided that before filing a registration statement or prospectus or any amendment or supplements thereto, the Company will furnish to one counsel selected by (A) WP (after consultation with the GW Shareholders) if such registration is a Demand Registration being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders (after consultation with WP), if such registration is a Demand Registration being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) and (B) do not apply, WP so long as WP is a participant in such underwritten offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion and subscription rights with respect to all securities of the Company then held by it) than any other holder or (D) if the foregoing clauses (A), (B) or (C) do not apply, the holders of a Majority Amount of each type of the Registrable Securities covered by such registration

statement, copies of all documents proposed to be filed which documents will be subject to the review and comments of such counsel;

(4) notify each holder of Registrable Securities included in such registration statement, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, when the Company becomes aware of the occurrence of any event as a result of which the prospectus included in such registration statement (as then in effect) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein (in the case of the prospectus or any preliminary prospectus, in light of the circumstances under which they were made) not misleading and, as promptly as practicable thereafter, prepare and file with the Commission and furnish a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(5) use its Best Efforts to cause all Registrable Securities included in such registration statement to be listed, by the date of the first sale of Registrable Securities pursuant to such registration statement, on each securities exchange on which the Common Shares are then listed or proposed to be listed, if any;

(6) make generally available to its security holders an earnings statement satisfying the provisions of Section 11(a) of the Securities Act no later than 45 days after the end of the 12-month period beginning with the first day of the Company's first fiscal quarter commencing after the effective date of the registration statement, which earnings statement shall cover said 12-month period;

(7) make every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the registration statement at the earliest possible moment;

(8) if requested by the managing underwriter or underwriters or any holder of Registrable Securities covered by the registration statement, promptly incorporate in a prospectus supplement or post-effective amendment such information as the managing underwriter or underwriters or such holder requests to be included therein, including, without limitation, with respect to the number of Registrable Securities, being sold by such holder to such underwriter or underwriters, the purchase price being paid therefor by such underwriter or underwriters and with respect to any other terms of the underwritten offering of the Registrable Securities to be sold in such offering; and promptly make all required filings of such prospectus supplement or post-effective amendment;

(9) as promptly as practicable after filing with the Commission of any document which is incorporated by reference into a registration statement, deliver a copy of such document to each holder of Registrable Securities covered by such registration statement;

(10) on or prior to the date on which the registration statement is declared effective, use its Best Efforts to register or qualify, and cooperate with the holders of Registrable Securities included in such registration statement, the underwriter or underwriters, if any, and their counsel, in connection with the registration or qualification of the Registrable Securities covered by the registration statement for offer and sale under the securities or blue sky laws of each state and other jurisdiction as any such holder or underwriter reasonably requests in writing, to use its best efforts to keep each such registration or qualification effective, including through new filings, or amendments or renewals, during the period such registration statement is required to be kept effective and to do any and all other acts or things necessary or advisable to enable the disposition in all such jurisdictions of the Registrable Securities covered by the applicable registration statement; provided that the Company will not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to general service of process in any such jurisdiction where it is not then so subject;

(11) cooperate with the holders of Registrable Securities covered by the registration statement and the managing underwriter or underwriters, if any, to facilitate the timely preparation and delivery of certificates (not bearing any restrictive legends) representing securities to be sold under the registration statement, and enable such securities to be in such denominations and registered in such names as the managing underwriter or underwriters, if any, or such holders may request;

(12) use its Best Efforts to cause the Registrable Securities covered by the registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the seller or sellers thereof or the underwriter or underwriters, if any, to consummate the disposition of such securities;

(13) enter into such customary agreements (including, without limitation, an underwriting agreement in customary form) and take all such other actions (A) WP (after consultation with the GW Shareholders), if such registration is a Demand Registration being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders (after consultation with WP) if such registration is a Demand Registration being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) or (B) do not apply, WP so long as WP is a participant in such underwritten offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion and subscription rights with respect to all securities of the Company then held by it) than any other holder or (D) if the foregoing clauses (A), (B) and (C) do not apply, the holders of a Majority Amount of each type of the Registrable Securities being sold or the underwriters retained by the holders participating in an underwritten public offering, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities;

(14) make available for inspection by any holder of Registrable Securities included in such registration statement, any underwriter participating in any disposition

pursuant to such registration statement, and any attorney, accountant or other agent retained by any such seller or underwriter (collectively, the "Inspectors"), all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records") as shall be reasonably necessary to enable the Inspectors to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided that Records which the Company determines, in good faith, to be confidential and which it notifies the Inspectors are confidential shall not be disclosed to the Inspectors unless (i) the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or (ii) the release of such records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; providedfurther, however, that any decision not to disclose information pursuant to clause (i) shall be made after consultation with counsel for the Company and counsel for such Inspectors; and each holder of Registrable Securities included in such registration statement agrees that it will, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at the Company's expense to undertake appropriate action to prevent disclosure of the Records deemed confidential;

(15) use its Best Efforts to obtain a cold comfort letter from the Company's independent public accountants and an opinion of outside counsel to the Company, each in customary form and covering such matters of the type customarily covered by cold comfort letters or opinions of counsel, as the case may be, as (A) WP, if such registration is a Demand Registration being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders, if such registration is a Demand Registration being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) and (B) do not apply, WP so long as WP is a participant in such underwritten Offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion and subscription rights with respect to all securities of the Company then held by it) than any other holder or (D) if the foregoing clauses (A), (B) and (C) do not apply, the holders of a Majority Amount of each type of the Registrable Securities being sold reasonably request;

(16) cooperate with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the NASD; and

(17) use its reasonable efforts to take all other steps necessary to effect the registration of the Registrable Securities contemplated hereby.

Each holder of Registrable Securities, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(c)(4) will forthwith discontinue disposition of the Registrable Securities until such holder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(c)(4) or until it is advised in writing (the "Advice") by the Company that the use of the prospectus may be resumed and has

received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Company, such holder will, or will request the managing underwriter or underwriters, if any, to deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice. In the event the Company shall give any such notice, the time periods mentioned in Section 3(c)(2) shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by each registration statement shall have received the copies of the supplemented or amended prospectus contemplated by Section 3(c)(4) or the Advice.

(d) Holdback Arrangements.

(1) Restrictions on Public Sale by Holders of Registrable Securities To the extent not inconsistent with applicable law, each holder whose Registrable Securities are included in an underwritten registration statement agrees not to effect any public sale or distribution of the securities being registered or a similar security of the Company, or any securities convertible into or exchangeable or exercisable for such securities, including a sale pursuant to Rule 144 under the Securities Act, during the 14 days prior to, and during the 30-day period beginning on, the effective date of such registration statement, if and to the extent requested by the managing underwriter or underwriters of such underwritten public offering, other than pursuant to such underwritten public offering.

(2) Restrictions on Public Sale by the Company and Others. The Company and the Shareholders agree (i) not to effect any public sale or distribution of any securities similar to those being registered, or any securities convertible into or exchangeable or exercisable for such securities (other than any such sale or distribution of such securities pursuant to registration of such securities on Form S-4 or S-8 or any successor forms or comparable foreign forms or any such sale or distribution of such securities in connection with any merger or consolidation involving the Company or a Subsidiary or the acquisition by the Company or a Subsidiary of the capital equity or substantially all of the assets of any other Person), during the 14 days prior to, and during the 30-day period beginning on, the effective date of any registration statement except as part of such registration statement; and (ii) that any agreement entered into after the date of this Agreement pursuant to which the Company issues or agrees to issue any privately placed securities shall contain a provision under which holders of such securities agree not to effect any public sale or distribution of any such securities during the periods described in (i) above, in each case including a sale pursuant to Rule 144 (or any similar provision then in force) under the Securities Act (except as part of any such registration, if permitted); provided, however, that the provisions of this Section 3(d)(2) shall not prevent the conversion or exchange of any securities pursuant to their terms into or for other securities.

(3) Other Registrations. If the Company has previously filed a registration statement with respect to any of its Registrable Securities, and if such previous registration has not been withdrawn or abandoned, the Company will not file or cause to be effected any other registration of any of its Registrable Securities under the Securities Act (except on Form S-4 or S-8 or any successor forms or comparable foreign forms), whether on its own behalf or at the

request of any holder or holders of Registrable Securities, until a period of at least six months has elapsed from the effective date of such previous registration (provided that in the case of a Demand Registration such period shall commence on the date the Company is first served the Notice and shall continue until at least six months have elapsed from the effective date of such Demand Registration).

(e) Registration Expenses. All of the costs and expenses of each registration hereunder, including, without limitation, all registration and filing fees, all fees and expenses associated with filings required to be made with the NASD (including, if applicable, the fees and expenses of any "qualified independent underwriter" as such term is defined in Schedule E of the By-laws of the NASD, and of its counsel), as may be required by the rules and regulations of the NASD, fees and expenses of compliance with securities or blue sky laws of any jurisdiction (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities), printing expenses, messenger and delivery expenses, the Company's internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange, and fees and disbursements of counsel for the Company and its independent certified public accountants (including the expenses of any special audit or comfort letters required by or incident to such performance), Securities Act liability insurance (if the Company elects to obtain such insurance), the fees and expenses of any special experts retained by the Company in connection with such registration, fees and expenses of other persons retained by the Company, reasonable fees and expenses of one counsel for the holders of the Registrable Securities in connection with each registration hereunder (but not including any underwriting fees, discounts or commissions attributable to the sale of Registrable Securities which shall be for the account of such holders) and any reasonable out-of-pocket expenses of the holders of the Registrable Securities (or agents who manage their accounts) (all such expenses being herein called "Registration Expenses"), will be borne by the Company.

(f) Indemnification; Contribution.

(1) Indemnification by the Company. The Company agrees to indemnify and hold harmless each selling holder of Registrable Securities, its officers, directors, agents, employees, partners and Affiliates and each Person, if any, who controls such selling holder within the meaning of Section 15 of the Securities Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus relating to the Registrable Securities or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, liabilities or expenses arise out of, or are based upon, any such untrue statement or omission based upon information with respect to such selling holder furnished in writing to the Company by such selling holder expressly for use therein. The Company also agrees to indemnify any underwriters of the Registrable Securities, their officers, directors, agents,

employees, partners and Affiliates and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the selling holders provided in this Section 3(f).

(2) Conduct of Indemnification Proceedings. If any action or proceeding (including any governmental investigation) shall be brought or asserted against any selling holder (or any of its officers, directors, agents, employees, partners or Affiliates) or any Person controlling any such selling holder in respect of which indemnity may be sought from the Company, the Company shall be permitted, unless in the reasonable judgment of such indemnified party a conflict of interest may exist between such indemnified party and the Company with respect to such claim, to assume the defense thereof, including the employment of counsel reasonably satisfactory to such selling holder, and shall assume the payment of all expenses. Whether or not such defense is assumed by the Company, the Company shall not be liable for any settlement of any such action or proceeding effected without its written consent (but such consent will not be unreasonably withheld). The Company will not consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such claim or litigation. If the Company is not entitled to, or elects not to, assume the defense of a claim, it will not be obligated to pay the fees and expenses of more than one counsel with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the Company shall be obligated to pay the fees and expenses of such additional counsel or counsels. Any selling holder entitled to indemnification hereunder agrees to give prompt written notice to the Company after the receipt by such selling holder of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which such selling holder will claim indemnification or contribution pursuant to this Agreement.

(3) Indemnification by Holders of Registrable Securities. Each selling holder of Registrable Securities agrees to indemnify and hold harmless the Company, its officers, directors, agents, employees, partners and Affiliates, and each Person, if any, who controls the Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to the selling holders of Registrable Securities, but only with respect to information furnished in writing by such selling holder with respect to such selling holder expressly for use in any registration statement or prospectus relating to the Registrable Securities which contained a material misstatement of fact or omission of a material fact, or any amendment or supplement thereto, or any preliminary prospectus. In no event shall the liability of any selling holder hereunder be greater in amount than the dollar amount of the proceeds received by such selling holder upon the sale of the Registrable Securities giving rise to such indemnification obligation. In case any action or proceeding shall be brought against the Company or its officers, directors, agents, employees, partners or Affiliates, or any such controlling Person, in respect of which indemnity may be sought against any selling holder, such selling holder shall have the rights and duties given to the Company, and the Company or its officers, directors, agents, employees, partners or Affiliates, or such controlling Person shall have the rights and duties given to such selling holders by Section 3(f)(2). Each selling holder of Registrable Securities also agrees to

indemnify and hold harmless underwriters of the Registrable Securities, their officers, directors, agents, employees, partners and Affiliates, and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the Company provided in this Section 3(f)(3).

(4) Contribution. If the indemnification provided for in this Section 3(f) is unavailable to the Company, the selling holders or the underwriters in respect of any losses, claims, damages, liabilities or judgments referred to herein, then each such indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities and judgements in such proportion as is appropriate to reflect the relative fault of the indemnifying parties and indemnified parties in connection with such statements or omissions which resulted in such losses, claims, damages, liabilities or judgments, as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified parties shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 3(f)(4) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable consideration referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or, judgments referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 3(f)(4), no underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission, and no selling holder shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities of such selling holder were offered to the public exceeds the amount of any damages which such selling holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(g) Participation in Underwritten Registrations. No holder of Registrable Securities may participate in any underwritten registration hereunder unless such holder (a) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the holders as provided herein and (b) completes and executes all questionnaires, powers of attorneys, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and these registration rights.

(h) Rule 144 Etc. The Company covenants that it will file any reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder (or, if the Company is not required to file such reports, it will, upon the request of any holder of Registrable Securities, make publicly available other information so long as necessary to permit sales under Rule 144, Rule 144A and Regulation S under the Securities Act) that it will take such further action as the holders of Registrable Securities may reasonably request, all to the extent required from time to time to enable the holders of Registrable Securities to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144, Rule 144A or Regulation S under the Securities Act, as such Rules or such Regulation may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the Commission.

(i) Other Registration Rights. The Company will not grant any Person any demand or piggyback registration rights with respect to its securities other than registration rights that would not be inconsistent with the terms of this Section 3. The Company will not have the right to piggyback on any Demand Registration and the Company will not grant any registration rights that would permit any Person the right to piggyback on any Demand Registration.

(j) Termination. This Section 3 shall continue in full force and effect until none of the Securities are Registrable Securities, except that paragraph (f) shall survive any termination of this Section 3.

Section 4. Miscellaneous.

(a) Stop Transfer Order. The Company may enter a stop transfer order with the transfer agent or agents of voting securities against the transfer of voting securities except in compliance with the requirements of this Agreement. The Company agrees to remove promptly any stop transfer order with respect to certificates for any voting securities that are no longer subject to the restrictions contained in this Agreement.

(b) Binding Effect. Unless otherwise provided herein, the provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective successors, assigns and transferees.

(c) Entire Agreement. This Agreement, together with the 1999 Shareholders' Agreement and the 1999 Standstill Agreement, represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties, including, without limitation, the Amended and Restated Shareholders' Agreement, dated as of June 16, 1994, among WP, the GW Shareholders and the Company.

(d) Amendments, Etc. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(e) Severability. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in full force and effect and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(f) Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(g) Notices. All communications provided for under this Agreement shall be in writing and shall be delivered by hand, by telecopy, telegram or telex, or by mail (registered or certified mail, postage prepaid, return receipt requested) to the following addresses, or such other addresses as shall be given by notice delivered hereunder, and shall be deemed to have been given on the day of such hand delivery thereof or the third business day after such mailing:

If to WPLP, WPOP, WPPN or
the Michael J. Biondi Voting Trust, to such party:

c/o Wasserstein Perella Management Partners, Inc.
31 West 52nd Street
26th Floor
New York, New York 10019

Telecopier: (212) 969-7836
Attention: W. Townsend Ziebold

with a copy to:

Stikeman, Elliott
Suite 5300
Commerce Court West
Toronto, Ontario
M5L1B9
Telecopier: (416) 947-0866
Attention: Marvin Yontef/Mihkel Voore

and a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
919 Third Avenue
New York, NY 10022
Telecopier: (212) 735-2000
Attention: Robert Chilstrom/Avinash Ganatra

If to Wechsler, to:

Bradley J. Wechsler
88 East Middle Patent Road
Bedford, New York 10506

with a copy to:

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Telecopier: (212) 848-7179
Attention: Peter D Lyons

If to Gelfond, to:

Richard L. Gelfond
2 Squabble Lane
Southampton, New York 11969

with a copy to:

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022

Telecopier: (212) 848-7179
Attention: Peter D. Lyons

If to the Company, to:

Imax Corporation
110 East 59th Street
Suite 2100
New York, New York 10022
Telecopier: (212) 371-5510
Attention: Chief Executive Officer

With a copy to:

Imax Corporation
2525 Speakman Drive
Mississauga, Ontario
L5K 1B1 Canada
Telecopier: (905) 403-6468
Attention: Corporate Secretary

and a copy to:

McCarthy Tétrault
Suite 4700
Toronto Dominion Bank Tower
Toronto Dominion Centre
Toronto, Ontario
M5K 1E6 Canada
Telecopier: (416) 868-0673
Attention: Garth M Girvan

and a copy to:

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Telecopier: (212) 848-7179
Attention: Peter D. Lyons

or to such other Persons or at such other addresses as shall be furnished by any such party by like notice given to the other parties of this Agreement.

(h) Governing Law; Submission to Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws. Each of the parties hereto hereby irrevocably consents to personal jurisdiction and venue in any court of the State of New York or any Federal court sitting in the Southern District of New York for the purposes of any suit, action or other proceeding arising out of this Agreement or any of the agreements or transactions contemplated hereby, which is brought by or against such party, and hereby agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. Each of the parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party at its address set forth above, such service to become effective ten (10) days after such mailing. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS AGREEMENT OR CONDUCT IN CONNECTION WITH THIS AGREEMENT IS HEREBY WAIVED.

(i) Injunctive Relief. The Company and the Shareholders recognize that in the event they fail to perform, observe or discharge any of their respective obligations or liabilities under this Agreement, no remedy at law will provide adequate relief to the injured parties, and agree that the injured parties shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without being required to post a bond or other security.

(j) Termination. This Agreement shall terminate if at any time WP ceases to own at least 10% of the IPO Shares owned by them at the time of the IPO Closing, except that (i) the provisions of Section 2(c) shall terminate on April 1, 2001 and (ii) the provisions of Section 3 hereof shall terminate as provided in Section 3(j), except as otherwise provided therein.

(k) Limitation of Liability. No personal liability or responsibility of either GW Shareholder or any partner or shareholder of WP shall at any time be enforceable against either GW Shareholder or any partner or shareholder of WP on account of any representation, warranty, undertaking, covenant or agreement made by it hereunder, either express or implied, all such

personal liability, if any, being expressly waived by each party to this Agreement and by all Persons claiming by, through or under any such party, provided that any party to this Agreement making claim hereunder may realize upon the Securities held by either the GW Shareholder and each partner or shareholder of WP at such time for satisfaction of the same.

(l) Execution in Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the day and year first above written.

WASSERSTEIN PERELLA PARTNERS, L.P.

By WASSERSTEIN PERELLA MANAGEMENT CK PARTNERS, INC., its General Partner

By: /s/ W. Townsend Ziebold
Name: W. Townsend Ziebold
Title: Vice President

WASSERSTEIN PERELLA OFFSHORE PARTNERS, L.P. .

By WASSERSTEIN PERELLA MANAGEMENT CK PARTNERS, INC., its General Partner

By: /s/ W. Townsend Ziebold
Name: W. Townsend Ziebold
Title: Vice President

WPPN, INC.

By: /s/ James C. Kingsbury
Name: James C Kingsbury
Title: Treasurer and Secretary

MICHAEL J. BIONDI VOTING TRUST

By: /s/ James C. Kingsbury
Name: James C. Kingsbury
Title: Attorney-in-Fact

/s/ Richard L. Gelfond
Richard L. Gelfond

/s/ BradleyJ. Wechsler
Bradley J. Wechsler

IMAX CORPORATION

By: /s/ John M. Davison
Name: John M. Davison
Title: Director

By: /s/ Garth M. Girvan
Name: Garth M. Girvan
Title: Director

**IMAX CORPORATION**
Exhibit 4.12

**SIXTH SUPPLEMENTAL INDENTURE**

Sixth Supplemental Indenture (this "Sixth Supplemental Indenture"), dated as of November 9, 2006 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture referred to below, Walking Bones Pictures Ltd. (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), and as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture") providing for the issuance of 9?% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Sixth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms*. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee*. The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS SIXTH SUPPLEMENTAL INDENTURE.

4. *Counterparts.* The parties may sign any number of copies of this Sixth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings.* The Section headings herein are for convenience only and shall not affect the construction hereof.



Source IMAX CORP, 10-K, July 20, 2007

IN WITNESS WHEREOF, the parties hereto have caused this Sixth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

---

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Guaranteeing Subsidiary:**
**Walking Bones Pictures Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By: *"Raymond S Haverstock"*
Name: Raymond S. Haverstock
Title: Vice President

**IMAX CORPORATION**
Exhibit 4.13

**SEVENTH SUPPLEMENTAL INDENTURE**

Seventh Supplemental Indenture (this "Seventh Supplemental Indenture"), dated as of January 29, 2007 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, Raining Arrows Productions Ltd. (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), and as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006, among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture") providing for the issuance of 9 5/8% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Seventh Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms.* Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee.* The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee



Source IMAX CORP, 10-K, July 20, 2007

or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS SEVENTH SUPPLEMENTAL INDENTURE.

4. *Counterparts.* The parties may sign any number of copies of this Seventh Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings.* The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Seventh Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By ________________________
Name: G. Mary Ruby
Title. Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By *"G. Mary Ruby"*
Name. G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By *"G Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

**Walking Bones Pictures Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President, Finance

**Guaranteeing Subsidiary:**

**Raining Arrows Productions Ltd.**

By *"G Mary Ruby"*
Name: G. Mary Ruby
Title. Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By *"Raymond S. Haverstock"*
Name: Raymond S. Haverstock
Title: Vice President

**IMAX CORPORATION**

**Exhibit 4.14**

**EIGHTH SUPPLEMENTAL INDENTURE**

Eighth Supplemental Indenture (this "Eighth Supplemental Indenture"), dated as of March 26, 2007 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, the Seventh Supplemental Guarantor named in the Seventh Supplemental Indenture referred to below, Coral Sea Films Ltd. (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006, among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), and as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007, among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows

Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture") providing for the issuance of 95/8% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation Inc., one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Eighth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms*. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee*. The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS EIGHTH SUPPLEMENTAL INDENTURE.

4. *Counterparts*. The parties may sign any number of copies of this Eighth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings*. The Section headings herein are for convenience only and shall not affect the construction hereof.



Source IMAX CORP, 10-K, July 20, 2007

IN WITNESS WHEREOF, the parties hereto have caused this Eighth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

**Walking Bones Pictures Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Seventh Supplemental Guarantor:**

**Raining Arrows Productions Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Guaranteeing Subsidiary:**

**Coral Sea Films Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By *"Raymond S. Haverstock"*
Name. Raymond S. Haverstock
Title: Vice President

**IMAX CORPORATION**
**Exhibit 4.15**

**CONSENT AND FORBEARANCE AGREEMENT**

This Agreement (this "Agreement") is made and entered into as of April 2, 2007, by and between IMAX corporation, a Canadian corporation (the "Company"), and Plainfield Special Situations Master Fund Limited, a Cayman Islands corporation ("Plainfield").

WHEREAS, the Company issued its 9?% Senior Notes due 2010 (the "Notes") pursuant to the Indenture, dated as of December 4, 2003, among the Company, the Guarantors named therein (the "Guarantors") and U.S. Bank National Association, as trustee (the "Trustee"), as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Guarantors named therein, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Guarantors named therein, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, and Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture"), as further amended by the Eighth Supplemental Indenture dated as of March 26, 2007 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, Coral Sea Films Ltd. and the Trustee (such Indenture, as so amended, the "Indenture"), and

WHEREAS, Plainfield currently holds $53.685 million aggregate principal amount of Notes (the "Plainfield Notes") and desires to provide consents to the Proposed Amendment (defined below) with respect to the Plainfield Notes, subject to the terms and conditions set forth herein; and

WHEREAS, this Agreement sets forth the terms on which the Plainfield has agreed (i) to provide consents to the Proposed Amendment with respect to the Plainfield Notes and (ii) to forbear from taking certain actions;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1. The Consent Solicitation. The Company shall commence, promptly after the date hereof (but not later than April 6, 2007), a solicitation (the "Solicitation") of consents (the "Consents") of those holders of record (the "Holders") as of the close of business on March 28, 2007 (the "Record Date"), as reflected in the records of the Trustee, to the waiver under (the "Waiver"), and to certain proposed amendments to (the "Proposed Amendment"), the Indenture. The Proposed Amendment will provide that any failure of the Company to comply with Section 1019 of the Indenture (the "Reporting Covenant") or §314 of the Trust Indenture Act, as amended, during the period beginning on March 30, 2007 and ending at 5:30 p.m., New York City time, on (i) May 31, 2007 or (ii) if the Company elects to extend such date, June 30, 2007 (the "Covenant Reversion Date"), shall not constitute a Default under the Indenture or be the basis for any Event of Default under the Indenture. A Consent will also constitute Waiver of any and all Defaults and Events of Default arising from a failure to comply with the Reporting Covenant prior to the effective time of the Proposed Amendment (the "Effective Time"). On the business day following the expiration date of the Solicitation (the "Expiration Date"), or as promptly as practicable thereafter, the Company will pay to each Holder that provides and does not revoke its Consent prior to the Expiration Date $10.00 for each $1,000 in principal amount of the Notes to which such Consent relates. If the Company elects to extend the Covenant Reversion Date to June 30, 2007, promptly following notice of such election, the Company will pay to each Holder that provides and does not revoke its Consent prior to the Expiration Date an additional $5.00 for each $1,000 in principal amount of the Notes to which such Consent relates.

2. Agreement to Forebear. Plainfield hereby agrees that until the Covenant Reversion Date:

(a) it shall not, and shall not permit any of its affiliates to, or direct, solicit or encourage any other person to, exercise, or seek to exercise, whether individually or jointly with any other holder of Notes (the "Noteholders"), any rights or remedies, including any rights under Article V of the Indenture, that Noteholders or the Trustee may have under the Indenture or otherwise in connection with any Default or Event of Default (each as defined in the Indenture) that relate to the Company failing to comply with the Reporting Covenant and further agrees not to take, or permit any of its affiliates, or direct, solicit or encourage any other person, to take, any action, including the giving of any notice, under any other debt agreement or instrument of the Company that would be inconsistent with the foregoing agreements had such action been taken under the Indenture. Plainfield also agrees to the rescission of any declaration of acceleration which may be made by the Trustee or any Noteholders with respect to such Defaults or Events of Default that relate to the Company failing to comply with the Reporting Covenant during the term of this Agreement, and

(b) it shall not to take, or permit any of its affiliates, or direct, solicit or encourage any other person, to take, any action, that would be inconsistent with the consummation of the Solicitation.

3. Agreement to Consent. Promptly following commencement of the Solicitation, Plainfield will Consent (and shall cause its nominee to Consent) to the Proposed Amendment and Waiver with respect to the Plainfield Notes and any Additional Notes (defined below) in accordance with the consent solicitation statement and the related consent form to be prepared by the Company in connection with the Solicitation, each as may be amended and supplemented from time to time, and not revoke such Consent.

4. Certain Conditions. The obligations of Plainfield under this Agreement are conditioned upon the representations and warranties of the Company contained herein being true and correct in all material respects as of the date hereof and the obligations of the Company under this Agreement are conditioned upon the representations and warranties of Plainfield contained herein being true and correct in all material respects as of the date hereof.

5. Representations of Plainfield . Plainfield represents and warrants to the Company as follows:

(a) Plainfield has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to perform its obligations under this Agreement.

(b) The execution and delivery of this Agreement have been duly and validly authorized, and all necessary action has been taken to make this Agreement a legal, valid and binding obligation of Plainfield, enforceable in accordance with its terms.

(c) Plainfield (together with its affiliates) owns of record and/or beneficially, and/or has investment authority or discretion with respect to, the Plainfield Notes, (ii) as of the Record Date, owned of record and/or beneficially, and/or had investment authority or discretion with respect to, the Plainfield Notes, and (iii) such aggregate principal amount of Notes constitutes all of the Notes so owned or controlled by Plainfield and its affiliates as of the date hereof.

(d) Plainfield owns the Plainfield Notes free and clear of all claims, Liens, title defects and objections of any kind and nature whatsoever.

(e) This Agreement represents the only agreement or arrangement between the Company, on the one hand, and Plainfield on the other hand, with respect to the Solicitation.

6. Representations of the Company. The Company represents and warrants to Plainfield as follows:

(a) The Company has all requisite corporate, power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to perform its obligations under this Agreement.

(b) The execution and delivery of this Agreement have been duly and validly authorized, and all necessary action has been taken to make this Agreement a legal, valid and binding obligation of the Company, enforceable in accordance with its terms.

(c) As of the date hereof, the Company is not aware of any Defaults or Events of Defaults (each as defined in the Indenture) other than arising as a result of the Company's failure to comply with the Reporting Covenant.

7. Additional Notes Subject. Nothing in this Agreement shall be deemed to limit or restrict the ability or right of Plainfield from acquiring any additional Notes (the "Additional Notes") from and after the issuance of the press release referenced in Section 9 of this Agreement; provided, however, that in the event that Plainfield acquires any Additional Notes after such time and prior to the Effective Time, such Additional Notes shall immediately upon acquisition, and without further action on the part of the Company or Plainfield, become subject to the terms and conditions of this Agreement. Plainfield shall as promptly as practicable notify the Company of any such acquisition, and Plainfield agrees to execute and deliver within five (5) business days of the closing of such acquisition any additional documents that the

Company shall request to evidence that such Additional Notes are subject to the provisions of this Agreement as of the date of acquisition.

8. No Transfer. Except as set forth below, Plainfield agrees, without the prior written consent of the Company, not to sell, transfer, assign or otherwise dispose of any Notes, including any Additional Notes, on or prior to the Effective Time, unless the transferee accepts such Notes subject to the terms of this Agreement. In the event that Plainfield transfers Notes on or prior to the Effective Time, such transferee shall comply with and be subject to the terms of this Agreement, including but not limited to, Plainfield's obligations to consent to the Proposed Amendment and the Waiver and not revoke such consent, and as a condition precedent to the transfer, execute a signature page hereto upon which it shall become a party hereto. Any sale, transfer, assignment, or other disposition of any Notes in violation of this Section shall be void ab initio. Concurrently with any such transfer, Plainfield shall notify the Company pursuant to the notice provisions contained in Section 12 hereof, in writing, of such transfer and promptly thereafter provide the executed documents as provided for in this section.

9. Other Agreements of the Company. The Company will issue a press release or press releases announcing its intention to conduct the Solicitation, promptly after the date hereof; and will file or furnish such press release to the SEC on Form 8-K promptly thereafter, which Form 8-K will include as an exhibit this Agreement.

10. Termination of Agreement. (a) This Agreement may be terminated by the Company or Plainfield by notice by the Company or Plainfield, as applicable, to the other, (i) upon the material breach by the non-terminating party of any of the representations, warranties or covenants in this Agreement and (ii) at any time from and after May 1, 2007 in the event that the Effective Time has not occurred on or prior thereto.

(b) None of the representations, warranties and agreements contained herein shall survive the termination of this Agreement or the Effective Time, unless the termination pursuant to (a)(ii) above is being challenged by one of the parties hereto and specific performance is being pursued pursuant to Section 14 below.

11. Amendments and Waivers. This Agreement may not be modified, amended, or supplemented or any provision herein waived without the prior written consent of the Company and Plainfield.

12. Notices. All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth herein, or to such other address as a party may designate by written notice hereunder, and shall be either (i) delivered by hand, (ii) made by facsimile transmission, (iii) sent by overnight courier, or (iv) sent by registered or certified mail, return receipt requested, postage prepaid.

If to the Company, to·

IMAX Corporation
2525 Speakman Drive
Mississauga, Ontario
Canada, L5K 1B1
Attn: General Counsel

With a copy to:

Shearman & Sterling LLP
Commerce Court West
Suite 4495, P.O. Box 247
Toronto, Ontario
Canada, M5L 1E8
Attn: Jason Lehner

If to Plainfield, to:

Plainfield Special Situations Master Fund Limited
c/o Plainfield Asset Management LLC
55 Railroad Avenue, Plaza Level
Greenwich, CT 06830
Attn: Thomas X Fritsch

All notices, requests, consents and other communications hereunder shall be deemed to be received (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party, set forth herein, (ii) if made by facsimile transmission, at the time that the receipt thereof has been acknowledged by electronic confirmation or otherwise, (iii) if sent by overnight courier, on the next business day following the day such written notice is delivered to the courier service, or (iv) if sent by registered or certified mail, return receipt requested, postage prepaid, on the third business day following the day such mailing is mailed.

13. Governing Law, Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions. By its execution and delivery of this Agreement, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York. By execution and delivery of this Agreement, each of the parties hereto irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.

14. Specific Performance. It is understood and agreed by each of the parties hereto that any breach of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly, and the parties hereto agree that in addition to any other remedies, each party shall be entitled to enforce the terms of this Agreement by a decree of specific performance or injunctive relief without the necessity of proving the inadequacy of money damages as a remedy or posting a bond or other security, not to be unreasonably withheld.

15. Headings. The headings of the sections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

16. Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors, administrators and representatives.

17. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the parties with respect to the subject matter of this Agreement.



Source IMAX CORP, 10-K, July 20, 2007

18. Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

19. No Third-Party Beneficiaries. This Agreement shall be solely for the benefit of the parties hereto and no other person or entity shall be a third-party beneficiary of this Agreement.

20. Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction, shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

21. Public Announcements . Without the prior written consent of the Company, Plainfield shall not issue and shall instruct its officers, directors, affiliates, associates, employees, investment bankers, attorneys and other advisers or representatives not to issue, any press release to a non-affiliated third party with regard to this Agreement or any of the transactions contemplated herein, except to the extent disclosure may be required by applicable law or stock exchange or inter-dealer quotation system rules applicable to a party (subject to giving the Company written notice of the intention to make such disclosure prior to such disclosure) or except to the extent such information has already been publicly disclosed by a non-affiliated person. The Company shall not mention Plainfield in any press release, public announcement or SEC filing without the prior written consent of Plainfield.

22. Certain Terms. The term "affiliate" as used hereunder shall mean with respect to a specified person or entity, a person or entity that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the person or entity specified.

BEFORE EXECUTING THIS AGREEMENT, PLAINFIELD SHOULD CONSULT WITH ITS TAX AND LEGAL ADVISORS REGARDING THE CONSEQUENCES OF THE SOLICITATION.

***The balance of this page has been intentionally left blank.***

IN WITNESS WHEREOF, each of the partıes has caused thıs Agreement to be executed and delivered by ıts duly authorized officer as of the date first above written.

**COMPANY:**

**IMAX CORPORATION**

By: *"Bradley J. Wechsler*
Name· Bradley J. Wechsler
Title: Co-Chief Executıve Officer

**PLAINFIELD:**

**PLAINFIELD SPECIAL SITUATIONS MASTER FUND LIMITED**

By: *"Thomas X Frıtsch"*
Name: Thomas X. Frıtsch
Title: Authorized Indıvıdual

**IMAX CORPORATION**

**Exhibit 4.16**

**NINTH SUPPLEMENTAL INDENTURE**

Ninth Supplemental Indenture (this "Ninth Supplemental Indenture"), dated as of 12·01 p.m. April 16, 2007 (the "Effective Time") among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, the Seventh Supplemental Guarantor named in the Seventh Supplemental Indenture referred to below, the Eighth Supplemental Guarantor named in the Eighth Supplemental Indenture referred to below and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture"), and as further amended by the Eighth Supplemental Indenture dated as of March 26, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, Coral Sea Films Ltd. (the "Eighth

Supplemental Guarantor") and the Trustee (the "Eighth Supplemental Indenture") providing for the issuance of 95/8% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, Section 902 of the Indenture provides that, with the consent of the Holders of not less than a majority in principal amount of the Outstanding Securities, the Company and the Trustee may, subject to certain enumerated exceptions, enter into an indenture supplemental to the Indenture for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or of modifying in any manner the rights of the Holders under the Indenture;

WHEREAS, Section 513 of the Indenture provides that prior to the declaration of acceleration of the maturity of the Securities, the Holders of a majority in aggregate principal amount of the Outstanding Securities may waive on behalf of all Holders any default, except with respect to certain enumerated defaults, and upon any such waiver, such default shall cease to exist and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Indenture;

WHEREAS, pursuant to the Company's Consent Solicitation Statement dated April 3, 2007 and the accompanying Consent Form, the Company has obtained the written consent of the Holders of not less than a majority in principal amount of the Outstanding Securities to the amendments to the Indenture and to the waiver of Defaults and Events of Default under the Indenture as set forth herein

WHEREAS, the Board of Directors of the Company has by Board Resolution dated April 13, 2007 authorized the execution and delivery of this Ninth Supplemental Indenture;

WHEREAS, pursuant to Section 902 of the Indenture, the Trustee is authorized to execute and deliver this Ninth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

## ARTICLE 1
## AMENDMENTS TO THE INDENTURE

1. *Amendment to Section 101.* Section 101 of the Indenture is hereby amended by inserting the following terms:

"Covenant Reversion Date" means 5:30 p m., New York City time, on (1) May 31, 2007 or (2) if the Company elects to extend such date by giving notice of such extension to Holders of Outstanding Securities prior to May 31, 2007 in the manner set forth in Section 106, June 30, 2007; provided that the Company shall promptly pay the Additional Consent Fee (as defined in the Solicitation Documents) in accordance with the Solicitation Documents.

"Solicitation Documents" means the Consent Solicitation Statement dated as of April 3, 2007 and the related Consent Form."

2. *Amendment to Section 501* Section 501 of the Indenture is hereby amended by inserting the following sentence at the end of such Section:

"Notwithstanding any of the foregoing, any failure of the Company to comply with Section 1019 of this Indenture or §314 of the Trust Indenture Act during the period beginning on March 30, 2007 and ending on the Covenant Reversion Date shall not constitute a failure to comply with Section 1019 or otherwise constitute a Default or be the basis of an Event of Default."

## ARTICLE 2
## WAIVER

1. *Waiver* Any past Default or Event of Default arising from the Company's failure to comply with Section 1019 of the Indenture is hereby waived in accordance with Section 513 of the Indenture.

## ARTICLE 3
## EFFECTIVENESS

1. *Effectiveness.* This Ninth Supplemental Indenture is effective as of the Effective Time.

## ARTICLE 4
## MISCELLANEOUS

1. *Capitalized Terms.* Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Indenture Ratified..* Except as otherwise provided herein, the Indenture is in all respects ratified and confirmed, and all of the terms, provisions and conditions thereof shall be and remain in full force and effect.

3. *Successors and Assigns.* All covenants and agreements in this Ninth Supplemental Indenture by the Company and the Trustee shall bind its successors and assigns, whether so expressed or not.

4. *Separability Clause.* In case any provision in this Ninth Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

5. *Benefits of Indenture.* Nothing in this Ninth Supplemental Indenture, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Holders of Securities, any benefit or any legal or equitable right, remedy or claim under this Indenture

6. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS NINTH SUPPLEMENTAL INDENTURE.

7. *Counterparts.* The parties may sign any number of copies of this Ninth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8. *Effect of Headings.* The Article and Section headings herein are for convenience only and shall not affect the construction hereof

IN WITNESS WHEREOF, the parties hereto have caused this Ninth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name. Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

**Walking Bones Pictures Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President, Finance

**Seventh Supplemental Guarantor:**

**Raining Arrows Productions Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President, Finance

**Eighth Supplemental Guarantor:**

**Coral Sea Films Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U S Bank National Association,
As Trustee

By: /s/ Raymond S. Haverstock
Name: Raymond S. Haverstock
Title: Vice President

**IMAX CORPORATION**

**Exhibit 4.17**

**TENTH SUPPLEMENTAL INDENTURE**

Tenth Supplemental Indenture (this "Tenth Supplemental Indenture"), dated as of May 30, 2007 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, the Seventh Supplemental Guarantor named in the Seventh Supplemental Indenture referred to below, the Eighth Supplemental Guarantor named in the Eighth Supplemental Indenture referred to below, IMAX International Sales Corporation (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows

Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture"), as further amended by the Eighth Supplemental Indenture dated as of March 26, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, Coral Sea Films Ltd. (the "Eighth Supplemental Guarantor") and the Trustee (the "Eighth Supplemental Indenture"), and as further amended by the Ninth Supplemental Indenture dated as of April 16, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, the Eighth Supplemental Guarantor and the Trustee (the "Ninth Supplemental Indenture") providing for the issuance of 9 5/8% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation Inc., one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors;

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Tenth Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms.* Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee.* The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the

Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS TENTH SUPPLEMENTAL INDENTURE.

4. *Counterparts.* The parties may sign any number of copies of this Tenth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings.* The Section headings herein are for convenience only and shall not affect the construction hereof.



Source IMAX CORP, 10-K, July 20, 2007

IN WITNESS WHEREOF, the parties hereto have caused this Tenth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By: *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By: ______________________
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

Acorn Rain Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

Walking Bones Pictures Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Seventh Supplemental Guarantor:**

Raining Arrows Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Eighth Supplemental Guarantor:**

Coral Sea Films Ltd.

By *"G Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Guaranteeing Subsidiary:**

IMAX International Sales Corporation

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
`Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By: *"Raymond S. Haverstock"*
Name: Raymond S. Haverstock
Title: Vice President

**IMAX CORPORATION**

**Exhibit 10.2**

# IMAX CORPORATION
# SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN
As amended and Restated as of January 1, 2006

IMAX CORPORATION

SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

ARTICLE I

Definitions

For purposes of this IMAX Corporation Supplemental Executive Retirement Plan, the following words and phrases shall have the following meanings.

1.1 "Actuarial Equivalent" and "Actuarially Equal" mean a benefit of equal actuarial value to another benefit determined by using the following actuarial assumptions:

(a) Interest

The lesser of (x) 7% or (y) the interest rate used by the Pension Benefit Guaranty Corporation as of the first day of the Plan year in which falls the Annuity Starting Date to value a benefit upon termination of an insufficient trusteed single-employer plan.

(b) Mortality

The UP-1984 Mortality Table.

(c) Cost of Living

As of any Annuity Starting Date, a fraction, not less than one, the numerator of which shall be the Cost-of-Living Index for the October immediately preceding such Annuity Starting Date and the denominator of which shall be the Cost of Living Index for the immediately preceding October.

1.2 "Affiliate" means any partnership, association, corporation, trust, limited liability company or other business entity directly or indirectly controlling, controlled by or under common control with the Company.

1.3 "Annuity Starting Date" means the day specified in Article III hereof.

1.4 "Benefit" means (i) with respect to a Participating Executive, the benefit earned by such Participating Executive under the Plan, including without limitation, the spousal benefit described in Section 3.6 and (ii) with respect to a Surviving Spouse, the benefit to which such Surviving Spouse is entitled under Section 3.6 of the Plan.

1.5 "Cause" shall have the meaning ascribed to such term under the Participating Executive's employment agreement with the Company dated July 1, 1998, as extended on July 12, 2000.



Source IMAX CORP, 10-K, July 20, 2007

1.6 "Change in Control" shall have the meaning ascribed to such term under the Participating Executive's employment agreement with the Company dated July 1, 1998, as extended on July 12, 2000, provided that for purposes of Article III of the Plan only, a Change in Control will not have been deemed to have occurred unless such circumstances would constitute a change in control as defined by Section 409A of the Code.

1.7 "Code" means the Internal Revenue Code of 1986, as amended.

1.8 "Company" means IMAX Corporation and any successor thereto.

1.9 "Cost-of-Living Adjustment" means an adjustment to the Monthly Annuity , effective as of each January 1 following the Annuity Starting Date with respect to such Monthly Annuity, and continuing for as long as such Benefit continues to be payable, such that the amount of the monthly payment in respect of such Benefit shall be adjusted by adding 50% of the product of (i) the amount of such monthly payment as in effect immediately prior to such January 1 by (ii) a fraction, not less than one, the numerator of which shall be the Cost-of-Living Index for the October immediately preceding such Annuity Starting Date and the denominator of which shall be the Cost of Living Index for the immediately preceding October; provided, however, that with respect to the adjustment on the first January 1 following the Annuity Starting Date for each Benefit, the fraction described in the preceding clause (ii) shall be further multiplied by a fraction, the numerator of which is the number of full months from the applicable Annuity Starting Date through such January 1 and the denominator of which is twelve.

1.10 "Cost-of-Living Index" means the Consumer Price Index for All Urban Consumers (CPI-U) All Items Unadjusted published by the Bureau of Labor Statistics of the United States Department of Labor. In the event such Index ceases to be published, the Company and each Participating Executive (or upon the death of a Participating Executive, such Participating Executive's Surviving Spouse) shall agree on a comparable index to be used with respect to the Benefit of such Participating Executive or Surviving Spouse.

1.11 "Deferred Retirement" means a Termination of Employment after the Participating Executive's Normal Retirement Date other than by reason of death, Disability, or by the Company for Cause.

1.12 "Disability Retirement" means a Termination of Employment due to a "disability" entitling the Participating Executive to benefits under the long-term disability policy of the Company in which he is entitled to participate. If there is no such policy, then "disability" means a physical or mental condition which a physician selected by the Company determines has prevented the Participating Executive from substantially performing his responsibilities for the Company for a period of at least 180 consecutive days.

1.13 "Final Average Compensation" means the Participating Executive's average annual compensation from the Company and its Affiliates determined by considering the sixty (60) consecutive months which afford the highest such average during the Participating Executive's employment by the Company and its Affiliates. For this calculation, compensation shall include only base salary and regular annual bonus, including amounts deferred as before tax contributions to plans maintained under Sections 401(k) or 125 of the Code. Compensation does

not include the value of any awards under any long-term incentive plan, any benefits in the nature of severance pay, or any amounts of additional W-2 income representing taxable employee benefits and employer payments of additional withholding (commonly referred to as "grossed up" compensation). Final Average Compensation is determined without regard to transfers between or among the Company and any Affiliate.

1.14 "Involuntary Retirement" means a Termination of Employment that is directed by the Company or its Affiliates and is involuntary on the part of the Participating Executive prior to the Participating Executive's Normal Retirement Date for any reason other than for Cause or by reason of Disability Retirement or death.

1.15 "Lump Sum Payment" means, with respect to any Benefit, a payment which is the Actuarial Equivalent of all, or the remaining portion, of such Benefit (including, for a Participating Executive, the survivor portion of the Benefit earned by him), which payment shall serve to discharge any and all obligations of the Company to provide such Benefit. For purposes of clarity, (x) the value of a Participant's Benefit shall be determined at the Participant's Annuity Starting Date and shall not be redetermined thereafter (including following the death of the Participant) and (y) the Lump Sum Payment shall reflect the projected Cost-of-Living Adjustment.

1.16 "Monthly Annuity" means a monthly annuity payable for the life of the Participating Executive with a survivor benefit payable for the life of the Participating Executive's Surviving Spouse in monthly amounts initially equal to 50% of the amount payable to the Participating Executive immediately prior to his death (determined without regard to Section 3.3(c) hereof), such amounts to be adjusted to reflect the Cost of Living Adjustment.

1.17 "Normal Retirement" means a Termination of Employment on the Participating Executive's Normal Retirement Date other than by reason of death, Disability, or by the Company for Cause.

1.18 "Normal Retirement Date" means, with respect to each Participating Executive, the first day of the calendar month coincident with or next following such Participating Executive's 55th birthday.

1.19 "Participating Executive" means a key employee of the Company or any of its Affiliates who has been designated as a participant by the Company as provided in Section 2.1 hereof.

1.20 "Plan" means the IMAX Corporation Supplemental Executive Retirement Plan, as it may be amended from time to time.

1.21 "Rabbi Trust" means a trust in form and substance as agreed by the Company and the Participating Executives.

1.22 "Surviving Spouse" means the person to whom a Participating Executive is married on the earlier of the date of his death or his Annuity Starting Date. A spouse of a Participating Executive shall not be considered a Surviving Spouse if, at the time that spouse's right to a Benefit otherwise would be determined, it is established to the satisfaction of the

Committee that (a) the spouse cannot be located; or (b) the Participating Executive is legally separated or the Participating Executive has been abandoned (as determined in accordance with the local law) and the Participating Executive has a court order to such effect.

1.23 "Termination of Employment" means circumstances which would constitute a "separation from service" with the Company and its Affiliates for purposes of Section 409A of the Code. In the case of Disability Retirement, Termination of Employment shall be deemed to occur (i) upon the commencement of disability payments under the Company's long-term disability policy or (ii) upon the determination described in Section 1.12 hereof, as the case may be.

1.24 "Vesting Percentage" shall have the same meaning ascribed to it in Section 4.1 hereof.

1.25 "Voluntary Retirement" means a Termination of Employment that is directed by such Participating Executive and is voluntary on the part of the Participating Executive prior to his Normal Retirement Date other than by reason of his death or Disability.

## ARTICLE II

## Participants

2.1 Designation of Participating Executives.

The Company, in its sole discretion, shall designate those key employees of the Company or its Affiliates who are eligible to participate in the Plan.

2.2 Effectiveness.

The designation of an employee as a Participating Executive shall be effective from the date of such designation. A Participating Executive shall cease to be a Participating Executive (a) upon his death, (b) upon the payment of his entire nonforfeitable Benefit under the Plan or (c) upon his Termination of Employment for Cause.

## ARTICLE III

## Benefits

3.1 Normal Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Normal Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Normal Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive

the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Normal Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Normal Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be his Normal Retirement Date.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.2 Deferred Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Deferred Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him initially equal to the product of (i) 75% of his Final Average Compensation, and (ii) a fraction, not less than one, the numerator of which shall be the Cost-of-Living Index for the month that is two months prior to the Participating Executive's Annuity Starting Date and the denominator of which shall be the Cost-of-Living Index for the month that is two months prior to the month in which occurs the Participating Executive's Normal Retirement Date, and payments to his Surviving Spouse as set forth herein. Such annual payments shall be adjusted after the Annuity Starting Date by the Cost of Living Adjustment. If the Participating Executive's Deferred Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Deferred Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Deferred Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.



Source IMAX CORP, 10-K, July 20, 2007

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.3. Disability Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Disability Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment, and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Disability Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Disability Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007 If the Participating Executive's Disability Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) The amount of the payments payable pursuant to Section 3.3(a) shall be reduced on an after-tax basis by the Actuarially Equivalent value of the benefit payable to a Participating Executive pursuant to any disability insurance policy maintained by the Company or its Affiliates.

(d) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.4 Involuntary Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Involuntary Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment, and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Involuntary

Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Involuntary Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Involuntary Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.5 Voluntary Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Voluntary Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to the product of (x) his Vesting Percentage and (y) 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment, and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Voluntary Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Voluntary Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Voluntary Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.6 Death Benefit.

(a) The Surviving Spouse of a Participating Executive who dies while an employee of the Company or its Affiliates shall be entitled to receive a Benefit that has an Actuarially Equivalent value to the Monthly Annuity earned by such Participating Executive (including the survivor portion thereof) determined as if the Participating Executive had a Termination of Employment (treated as set forth in the following sentence) on the day preceding the date of his death (and determined without regard to the Participating Executive's actual death). For purposes of clarity, such Benefit shall be Actuarially Equivalent to the 50% joint and survivor annuity that constitutes the Monthly Annuity, determined as if the Participating Executive had a Termination of Employment on the day preceding the date of his death. If the Participating Executive's death occurs on or prior to his Normal Retirement Date, then such Termination of Employment shall be treated as if it was a Normal Retirement and otherwise such Termination of Employment shall be treated as if it was a Deferred Retirement.

(b) The Surviving Spouse of a Participating Executive who dies after a Termination of Employment and prior to the Participating Executive having received a Lump Sum Payment of his entire Benefit shall be entitled to receive a Benefit that has a value equal to the excess, if any, of (i) the Actuarially Equivalent value of the Monthly Annuity earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date (and determined without regard to the Participating Executive's actual death) over (ii) the value, adjusted for interest at the rate of 7% per annum, of the payments made pursuant to the Plan to the Participating Executive during his life.

(c) The benefits payable under this Section 3.6 shall be paid in the form of a Lump Sum Payment payable as soon as practicable, but not more than 30 days following, the Participating Executive's death.

3.7 Termination of Employment Due to Cause.

Upon a Participating Executive's Termination of Employment by the Company or its Affiliates for Cause prior to a Change in Control, the Participating Executive (and his Surviving Spouse) shall forfeit any and all Benefits to which he may have been entitled, whether or not vested.

3 8 Change in Control

(a) Notwithstanding anything to the contrary herein, in the event of a Change in Control coincident with or prior to the Participating Executive's Termination of Employment, the Participating Executive shall be entitled to receive a Benefit (payable in the form of a Lump Sum Payment as set forth below) that has an Actuarially Equivalent value to the sum of (i) the Actuarially Equivalent value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as if the Participating Executive had a Termination of Employment (treated as set forth in the following sentence) on the date of the Change in Control

(the "Adjusted Amount") and (ii) the Actuarially Equivalent value of 60% of the excess of the Prior Amount (as defined below) over the Adjusted Amount. If the Change in Control occurs on or prior to the Participating Executive's Normal Retirement Date, then such Termination of Employment shall be treated as if it was a Normal Retirement and if the Change in Control occurs after the Participating Executive's Normal Retirement Date then such Termination of Employment shall be treated as if it was a Deferred Retirement. For purposes of this paragraph, the term "Prior Amount" means the Adjusted Amount determined by replacing "50%" in the definition of the term "Monthly Annuity" herein with "100%" and by replacing "50%" in the definition of the term "Cost-of-Living Adjustment" herein with "100%." The Benefit shall be payable in the form of an Actuarially Equivalent Lump Sum Payment on the date of the Change in Control, provided that, if the Change in Control occurs prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed on January 2, 2007.

(b) Subject to Section 3.7 hereof, in the event of a Change in Control after the Participating Executive's Termination of Employment and prior to January 1, 2016, the Participating Executive (or if the Change in Control occurs after the Participating Executive's death, the Participating Executive's Surviving Spouse or her heirs or assigns) shall be entitled to receive an amount that is Actuarially Equivalent to the product of (x) amount determined under clause (ii) of paragraph (a) above, with the Prior Amount and Adjusted Amount determined as of the date of the Change in Control but based on the date of the Participating Executive's actual Termination of Employment and (y) the Participating Executive's Vesting Percentage. Such amount shall be payable in an Actuarially Equivalent Lump Sum Payment on the date of the Change in Control, provided that, if the Change in Control occurs prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed on January 2, 2007. The amount payable pursuant to this paragraph 3.8(b) shall be in addition to, and not in lieu of, any other amount payable under the Plan.

3.9 Section 409A Six Month Rule

Notwithstanding anything herein to the contrary, to the extent required by Section 409A(a)(2)(B) of the Code, in event that a Participating Executive is a "specified employee" within the meaning of such Section any distribution hereunder resulting from a Termination of Employment that is required to be made prior to six months following such Termination of Employment shall instead be made deferred and paid on the first day of the seventh month following such Termination of Employment, in which case the Participating Executive shall be entitled to receive interest on the deferred amount credited at the applicable federal rate for short-term obligations (determined pursuant to Section 7872 of the Code in effect as of the date of such Termination of Employment).

## ARTICLE IV

## Vesting

4.1 Vesting Percentage.

(a) The Vesting Percentage of a Participating Executive who undergoes a Termination of Employment other than by reason of Voluntary Retirement shall be 100%.

(b) The Vesting Percentage of a Participating Executive whose employment terminates by Voluntary Retirement shall be the sum of (i) 50% plus (ii) the product of (x) a fraction (not to exceed one), the numerator of which is the Participating Executive's number of whole years of service for the Company or its Affiliates from the date such Participating Executive became a Participating Executive in the Plan to the date of his Termination of Employment, and the denominator of which is the number of whole years from the date such Participating Executive became a Participating Executive in the Plan to such Participating Executive's Normal Retirement Date and (y) 50%; provided, that the Vesting Percentage shall be 100% if the Participating Executive's Termination of Employment occurs after the occurrence of a Change in Control.

## ARTICLE V

## Plan Administration

5.1 Amendment and Termination.

The Plan may be amended with respect to a Participating Executive only by an instrument in writing signed by such Participating Executive and the Company.

5.2 Funding.

The Company shall be solely responsible for the payment of such Participating Executive's or Surviving Spouse's Benefit. The Plan shall be unfunded. Benefits under the Plan shall be paid from the general assets of the Company and each Participating Executive's and Surviving Spouse's rights against the Company shall be those of an unsecured general creditor.

5.3 Benefits Not Assignable.

Benefits provided under the Plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process.

5.4 Plan Not a Contract of Employment.

The Plan is not a contract of employment, and the terms of employment of any Participating Executive shall not be affected in any way by the Plan or related instruments except as specifically provided in the Plan or such related instruments. The establishment of the Plan shall not be construed as conferring any legal rights upon any Participating Executive for a

continuation of employment, nor shall it interfere with the right of the Company to discharge any employee and to treat him without regard to the effect which such treatment might have upon him as a Participating Executive. Each Participating Executive and all persons who may have or claim any right by reason of his participation shall be bound by the terms of the Plan and all agreements entered into pursuant thereto.

5.5 Construction.

(a) The Plan is intended to qualify as a plan maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees as referred to in Section 201(2) of the Employee Retirement Income Security Act of 1974, as amended, and its terms shall be interpreted accordingly. Otherwise, the laws of the State of New York shall control the interpretation and performance of the terms of the Plan.

(b) If any provision of the Plan, or the application of any such provision to any person or circumstances, shall be invalid under any federal or state law, neither the application of such provision to persons or circumstances other than those as to which such provision is invalid nor any other provisions of the Plan shall be affected thereby.

(c) The headings and subheadings in the Plan have been inserted for convenience of reference only, and are to be ignored in any construction of the provisions thereof.

(d) The Plan is intended not to give rise to tax under Section 409A of the Code. In the event that the Company and a Participating Executive determine that any provision of the Plan would be expected to give rise to tax under Section 409A, then the Plan shall be construed (as to such Participating Executive) in a manner that the Company and such Participating Executive agree would avoid such tax, or the Plan shall be amended in a manner and to the extent that the Company and such Participating Executive agree is necessary to avoid such tax.

5.6 Taxes.

The Company shall not be responsible for the tax consequences under federal, state or local law of any election made by any Participating Executive under the Plan. All payments under the Plan shall be subject to withholding and reporting requirements to the extent applicable law requires.

**IMAX CORPORATION**

By: *"Garth M. Girvan"*
Garth M Girvan
Title: Director
Date: May 4, 2007

**IMAX CORPORATION**
**Exhibit 10.3**

EMPLOYMENT AGREEMENT dated and effective as of July 1, 1998 (the "Agreement"), between IMAX CORPORATION, a corporation organized under the laws of Canada ("Imax"), and BRADLEY J. WECHSLER (the "Executive").

WHEREAS, the Executive is currently the Chairman and Co-Chief Executive Officer of Imax and is employed pursuant to an Employment Agreement dated as of January 1, 1997, (the "1997 Agreement"); and

WHEREAS, the Imax Board of Directors (the "Board") has approved revised terms of employment, effective July 1, 1998, on August 26, 1998; and

WHEREAS, Imax wishes to enter into this Agreement to engage the Executive to continue to provide services to Imax, and the Executive wishes to be so engaged, pursuant to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. Employment. (a) Imax hereby employs the Executive, and the Executive hereby agrees to serve in accordance with the terms and conditions hereof.

(b) The Executive's continued employment as Co-Chief Executive Officer under this Agreement shall commence effective July 1, 1998, and shall continue until June 30, 2001 (the "Employment Term").

(c) During the Employment Term, the Executive shall perform such services with respect to Imax's business as may be reasonably requested from time to time by the Board and which are consistent with the Executive's status and the function performed by individuals holding a similar position with similarly situated companies, and agrees to act in accordance with the written instructions of the Board. It is anticipated that such services shall be performed primarily within the United States.

(d) The Executive shall devote that portion of his business time that is necessary to perform the services reasonably required of him hereunder, which portion shall constitute a significant majority of his business time. The Executive agrees that during the Employment Term (i) he will use reasonable efforts to resolve any conflicting engagements and (ii) he will remain actively involved in Imax's business.

(e) As compensation for the services to be performed by the Executive hereunder during the Employment Term, the Executive shall be entitled to receive a base salary ("Base Salary") of U.S. $500,000 per annum, payable no less frequently than monthly in accordance with Imax's payroll practices.

(f) In addition to the Base Salary, the Executive shall be eligible to participate during the Employment Term in the annual incentive bonus plan adopted by the Board. The Executive shall be paid a bonus in respect of each of 1998, 1999, 2000 and the period January 1, 2001 to June 30, 2001 at a level of U.S. $605,000, U.S. $500,000, U.S. $500,000, and U.S. $250,000 (subject to adjustment as described below), respectively, (the "Standard"). Based on certain qualitative and quantitative measures determined by the CEO Advisors (as defined in Imax's Articles of Incorporation), for so long as Imax continues to have CEO Advisors, and the Compensation Committee (the "Committee") of the Board, as set forth below, the Committee shall determine the actual bonus paid, which shall be a multiple of the Standard ranging from 0.0x — 2.0 x, provided, however, that the multiple shall be at least 1.0x if Imax's reported earnings per share (EPS) for the year (excluding any extraordinary charges approved by the Board), or the six months ended June 30, 2001, as the case may be, meet the approved budget target (except that, if in the sole discretion of the Committee, the achievement EPS target was at the expense of, or to the material detriment of, other(s) of the qualitative and quantitative measures set forth below, then such minimum shall not apply).

Among the various factors the Committee shall consider in determining the bonus to be paid for 1998, and, subject to amendment from year to year by the Committee, after good faith consultation with the Executive, for 1999, 2000 and 2001, are: (i) the actual financial performance of Imax versus the approved budget for EBITDA, EPS, revenue growth, and/or other financial targets; and (ii) the Committee shall also take into account other qualitative factors including (in no order of importance): (A) progress in theater signings, (B) development of an enhanced management team, (C) improved performance of the Ridefilm division (for 1998 only), (D) further advancement of Imax's film strategy, (E) progress in "owned and operated" strategy (this factor to have diminishing weighting beyond 1998, as Imax's "owned and operated" emphasis refocuses on theatre joint ventures with conventional cinema operators), (F) brand development, (G) continued growth of the business, and (H) other performance related issues including, but not limited to, other goals established in the budget process approved by the Board.

The bonus for 1998, 1999 and 2000 shall be paid within 50 days of the applicable year-end, and for the period January 1, 2001 to June 30, 2001 within 50 days of June 30, 2001.

(g) Pursuant to the 1997 Agreement, at the beginning of each of 1997 and 1998, Imax granted the Executive the right to receive 30,000 common shares (on a post-split basis) of Imax (the "Restricted Stock"), or, if such Restricted Stock may not be issued without shareholder approval, the 1997 Agreement provided it shall be issued as "phantom stock". The Executive has the right to request the Restricted Stock granted on January 1, 1997 and January 1, 1998 be issued to him (or, if "phantom stock" is utilized, have payment made to him in an amount equal to the fair market value of such number of common shares of Imax on the date of such request), at any time after January 1, 1998 and January 1, 1999, respectively. It is hereby agreed that one half (i.e. 15,000) of such Restricted Stock / "phantom stock" for 1998 shall be cancelled forthwith, and that the Executive shall continue to have the right to the 30,000 Restricted Stock / "phantom stock" that have vested, and the remaining 15,000 Restricted Stock / "phantom stock" that shall vest on January 1, 1999. The Restricted Stock / "phantom stock" shall be adjusted for stock splits and other similar events. Imax agrees to indemnify the Executive, on an after-tax basis, for any income taxes imposed by any taxing authority and resulting from any taxable benefits to the Executive with respect to the Restricted Stock / "phantom stock" which arises prior to the date of any such request (it being understood that this indemnity relates to the timing of the payment of such taxes and not the ultimate tax payable). Any request for payment with respect to "phantom stock" must be made on or before December 31, 2009, after which date such "phantom stock" shall lapse. The provisions of this Section 1(g) shall survive any termination of this Agreement.

(h) *Stock Options – Grant & Vesting.* The Executive has been granted effective August 26, 1998, in accordance with the terms of the Imax Stock Option Plan (the "SOP"), 378,000 options to purchase common shares, and effective January 1, 1999 shall be granted a further 400,000 options, as follows:

| Number of Options | Grant Date | Exercise Price | Vesting Date |
|---|---|---|---|
| 111,333 | August 26, 1998 | $ 22.38 | August 26, 1998 |
| 100,000 | August 26, 1998 | $ 22.38 | January 1, 1999 |
| 166,667* | August 26, 1998 | $ 22.38 | January 1, 1999 |
| 266,667* | January 1, 2000 | to be determined | January 1, 2000 |
| 133,333* | January 1, 2000 | to be determined | January 1, 2001 |
| 778,000 | | | |

* These options are subject to Imax obtaining any required regulatory and shareholder approvals.

The exercise price of all options granted on August 26, 1998 in accordance with the SOP is U.S. $22.38, and all such options shall expire on August 25, 2008. The exercise price of all options to be granted on January 1, 2000 shall be determined in accordance with the SOP, and all such options shall expire on December 31, 2009. Should any required

regulatory or shareholder approvals with respect to the granting of the 566,667 options subject thereto not be obtained by Imax, Imax shall make such adjustments to the Executive's compensation hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received. The provisions of this Section 1(h) shall survive any termination of this Agreement.

All of the Executive's stock options shall be adjusted for stock splits and other similar events after the effective date hereof and shall contain other terms no less favorable to the Executive than the management stock options of Imax's other senior level executives.

*Resignation / Termination.* If the Executive shall voluntarily resign prior to the end of the Employment Term, (i) all unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately upon such resignation, and (ii) all vested options shall remain exercisable for the duration of their original term.

If (i) the employment of the Executive is not continued after the end of the Employment Term, (ii) the Executive is terminated by Imax without "Cause" (as defined below), or (iii) the Executive suffers a "Permanent Disability" (as defined in the SOP), or dies: all options granted on or before August 26, 1998 shall remain exercisable for the duration of their original term.

*Change of Control.* Upon a "change of control" of Imax (i.e. any person or persons acting in concert acquiring greater than 50% of the outstanding common shares of Imax, whether by direct or indirect acquisition or as a result of a merger or reorganization), the vesting of the options granted on August 26, 1998 and/or January 1, 1999 shall be accelerated as follows:

| Change of Control Period | % of Options Subject to Accelerated Vesting |
|---|---|
| On or Prior to December 31, 1998 | 12.5% of options scheduled to vest on January 1, 1999 |
| January 1, 1999 to June 30, 1999 | 25% of options scheduled to vest on January 1, 2000 * |
| July 1, 1999 to December 31, 1999 | 50% of options scheduled to vest on January 1, 2000 * |
| January 1, 2000 to June 30, 2000 | 25% of options scheduled to vest on January 1, 2001 |
| July 1, 2000 to December 31, 2000 | 50% of options scheduled to vest on January 1, 2001 |

* If a "change of control" occurs prior to the grant of such options on January 1, 2000, stock appreciation rights ("SARs") equivalent in number to the options subject to accelerated vesting shall be granted, with a reference price of U S. $22.38, and an expiry date of December 31, 2009. The SARs shall be treated, in connection with a "change of control", in the same manner as if they were options (i.e. a cash offer for all shares and options would trigger a payout of the SARs; a "rollover" of options would result in the

continuation of the SARs, reflecting the relevant exchange ratio and with reference to the price of the substituted shares).

*Miscellaneous.* If the Executive is terminated with "Cause", the Executive's unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately, and all of the Executive's vested options must be exercised within 90 days of termination, after which date they shall be cancelled. "Cause" for purposes of this Section 1(g) only means any willful and material violation by the Executive of any law or regulation applicable to the business of Imax or one of its subsidiaries, or the Executive's conviction of a felony, or any willful perpetration by the Executive of a common law fraud. Imax's remedy for a "breach of restrictive covenants" shall be the specific enforcement thereof, and not the application of Section 14 of the SOP; and Imax shall be entitled to seek any other legal and equitable remedies it may have against the Executive. In the event of any conflict between the provisions of this Agreement and the provisions of the SOP, the provisions of this Agreement shall prevail.

(i) The Executive shall, during the Employment Term, be eligible to receive employee benefits at a level not less than those established by Imax for, or made available to, its other key employees.

(j) Imax agrees to reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in the performance of his obligations under this Agreement for which documentation reasonably satisfactory to Imax is provided, including expenses relating to the Executive's travel to, and performance of duties in, Toronto, Canada.

(k) Any amounts payable to the Executive under this Agreement shall be subject to applicable withholding taxes, and such other deductions as may be required under applicable law.

2. Restrictions on Competitive Employment. During the term of the Executive's employment hereunder, absent Imax's prior written approval, the Executive shall not (as principal, agent, employee, consultant or otherwise), directly or indirectly, engage in activities with, or render services to, any business engaged or about to become engaged in the business of producing or distributing projection and sound systems or films for large screen theaters or designing or supplying motion simulation theaters or producing or distributing films for movie rides (collectively, "Competitive Business"); provided, however, that, notwithstanding the foregoing, the Executive may (i) have equity interests in companies engaged in a Competitive Business so long as he is not employed by and does not consult with such companies in areas related to the Competitive Business, (ii) render consulting services to or be employed by a company

engaged in a Competitive Business so long as he is not employed in, or rendering services related to, the Competitive Business of such company or (iii) perform usual investment banking services for a company engaged in a Competitive Business.

3. Confidentiality. The Executive covenants and agrees with Imax that he will not at any time, except in performance of his obligations to Imax hereunder or with the prior written consent of Imax, directly or indirectly, disclose any secret or confidential information that he may learn or has learned by reason of his association with Imax or any of its subsidiaries. The term "confidential information" includes information not previously disclosed to the public or to the trade by Imax's management, or otherwise in the public domain, with respect to Imax's or any of its subsidiaries' products, facilities, applications and methods, trade secrets and other intellectual property, systems, procedures, manuals, confidential reports, product price lists, customer lists, technical information, financial information, business plans, prospects or opportunities, but shall exclude any information which (i) is or becomes available to the public or is generally known in the industry or industries in which Imax operates other than as a result of disclosure by the Executive in violation of his agreements under this Section 3 or (ii) the Executive is required to disclose under any applicable laws, regulations or directives of any government agency, tribunal or authority having jurisdiction in the matter or under the subpoena or other process of law.

4. Assignment. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by the Executive without the prior written consent of Imax. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by Imax without the prior written consent of the Executive, except that Imax may assign this Agreement or any such right, interest or obligation to an affiliate of Imax without consent of the Executive; provided, however, that no such assignment shall relieve Imax of any of its obligations hereunder.

5. Indemnification. (a) Imax shall hold the Executive harmless and indemnify the Executive, to the fullest extent permitted by applicable law, against any and all liabilities (and all expenses related thereto) incurred by the Executive as a result of, or in connection with, the services provided under this Agreement; provided, however, that such indemnification shall not apply with respect to any action taken by the Executive that (i) is contrary to the written instructions of the Board or (ii) constitutes gross negligence or willful misconduct. Imax shall maintain a director and officer's liability insurance policy covering the Executive and containing customary terms and conditions.

(b) Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any income taxes imposed by Revenue Canada, the United States Federal government or any state or local taxing

authority in Canada or the United States (collectively, "Taxes") with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such Taxes exceed the amount of Taxes that would have been imposed on such amounts had all of the services performed by the Executive under this Agreement been performed within the United States. Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any penalties or interest that are imposed on the Executive by Revenue Canada, the United States Federal government or any state or local taxing authority in Canada or the United States as a result of Imax's failure to properly withhold any tax with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such penalties or interest are not attributable to the failure of the Executive to file any required tax returns or pay any required taxes or any other willful act or omission of the Executive.

6. Binding Effect. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto, any successors to or permitted assigns of the parties hereto.

7. Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and either delivered in person or sent by first class certified or registered mail, postage prepaid, to the parties at the following address (or to such other address or addresses as either party shall have designated in writing to the other party hereto:)

(a) if to Imax:

2525 Speakman Drive
Mississauga, Ontario, Canada
L5K 1B1
Attention: General Counsel

(b) if to the Executive:

784 Park Avenue, Apt 7B
New York, NY, 10028

8. Severability; Waiver. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such provision nor the validity of any other provision of this Agreement shall in any way be affected thereby. Failure to insist upon strict compliance with any term, covenant or condition hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

9. Injunctive Relief. Without intending to limit the remedies available to Imax or the Executive, as the case may be, in the event of a breach or threatened breach of any of the covenants contained in this Agreement, Imax or the Executive, as the case my be, shall be entitled to seek such injunctive relief as may be required specifically to enforce any such covenant.

10. Miscellaneous. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and, from the effective date hereof, supersedes and terminates all prior agreements, oral and written, between the parties hereto with respect to the subject matter hereof. Notwithstanding the preceding sentence, nothing in this Agreement shall abrogate the Executive's entitlement to (i) the 45,000 (post-split) Restricted Stock / "phantom stock" granted pursuant to Section 1(g) of the 1997 Agreement, as reduced from 60,000 (post-split) pursuant to Section 1(g) of this Agreement, (ii) the 40,000 options (for 80,000 post-split shares) granted January 2, 1997 and the 80,000 options (for 80,000 post-split shares) granted January 2, 1998, or (iii) the Special Bonus (as defined in Section 1(g) of the Employment Agreement between Imax and the Executive dated as of March 1, 1994) payable after a sale of Imax or upon the exercise of the Executive's liquidation rights. Further, for so long as the Executive is the Co-CEO, Imax shall continue to use its best efforts to cause the Executive to be elected to the Board and, for so long as Imax continues to have CEO Advisors, to the designation as a CEO Advisor under Imax's by-laws, provided that nothing in this sentence shall abrogate any rights the Executive may have pursuant to any other agreement. This Agreement may be modified or amended only by an instrument in writing signed by both parties hereto. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Imax and the Executive have duly executed and delivered this Agreement, as of the day and year first above written, on this 3rd day of November, 1998.

IMAX CORPORATION

By: *"Garth M. Girvan"*
Garth M. Girvan
Director

By: *"John M. Davison"*
John M. Davison
Executive Vice President, Operations and Chief Financial Officer

EXECUTIVE

*"Bradley J Wechsler* *l.s.*
BRADLEY J. WECHSLER

**IMAX CORPORATION**

Exhibit 10.4

Amended Employment Agreement

Imax (the "Company") and Executive subject to Section 5(e) here, agree to cancel the last year of the term of employment of the Executive's employment agreement dated July 1, 1998 ("Original Employment Contract") and extend the employment term for three additional years with the new term from July 1, 2000 to June 30, 2003 (the "Amended Contract") on the same terms and conditions as set out in the Original Employment Contract, except as specified below. Terms used herein and not defined herein shall have the meanings assigned to them in the Original Employment Contract.

1. Cash Compensation – As set out in the Original Employment Contract.
2. Additional Option Grants – The Company agrees to issue Executive 800,000 ten-year options at a strike price equal to the closing price on the day the Board approves this agreement. Except as provided below, options will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.
3. Restricted Stock Grant – The Company agrees to issue 180,000 restricted shares (or their Phantom Stock equivalent) to Executive on the day the Board approves this agreement. Except as provided below, restricted stock will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.
4. Should any required regulatory or shareholder approvals with respect to the granting of the options or restricted stock not be obtained by the Company, the Company shall make such adjustments to the Executive's compensation hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received.
5. Change of Control Provisions

   (a) In the event of a Change of Control (without regard of any subsequent event) there will be accelerated vesting of the Executive's stock options and restricted stock.

   (b) In the event of a Change Of Control and subsequent termination (or constructive termination) of the Executive there will be an acceleration (without any discount to present value) of the cash component of Executive's compensation under the Amended Contract (and the Original Employment Agreement if the renewal term has not yet commenced) equal to the number of years left on the Executive's

agreements (including a fraction thereof) times the total cash compensation of the Executive for the full (i.e., 12 month) fiscal year preceding termination.

(c) If there is a Change of Control by way of stock merger the options will vest (as set out in 5(a) directly above) and be converted at the stock merger conversion ratio into options of the acquiring company (if it is public) or a cash-out of the options (if it is not public).

(d) A change of control is defined as any person or persons acting in concert acquiring beneficial ownership of greater than 50% of the outstanding common shares of the Company, whether by direct or indirect acquisition or as a result of a merger or reorganization or a sale of all or substantially all of the Company's assets and will not include sale of the WP block to one or more third parties.

(e) If there is no Change of Control by 12/31/00, the contract extension component of this Amended Contract shall become void but the options and restricted stock grants included in this Amended Contract become fully vested upon the earlier of a Change of Control subsequent to 12/31/00, termination, non-renewal, constructive termination or 6/30/01. In addition, if there is no change of Control by 12/31/00, the term of the Original Employment Agreement shall be reinstated whereby Executive shall continue to render services to Company until 6/30/01.

6. Voluntary Resignation, Termination, Etc.

(a) If the Executive shall voluntarily resign, all unvested options and restricted stock shall be cancelled immediately and all vested options shall remain exercisable for the duration of their original term.

(b) If the Executive shall be terminated without cause all unvested stock options, restricted stock and cash compensation (salary and bonus without any discount to present value as described in section 5(b) above) shall immediately vest and become due.

(c) If the Executive shall be terminated for Cause all unvested options and unvested restricted stock (including those granted pursuant to previous employment agreements between Company and Executive) shall be cancelled immediately and all of the Executive's options and restricted stock must be exercised within 90 days of termination, after which date they shall be cancelled.

7. Retirement and Long Term Health Coverage

(a) The Company agrees to create a retirement plan for the Executive as set out in Exhibit 1.

(b) Company agrees to maintain retiree health benefits for Executive upon termination of the Executive's employment equal to the benefits provided for active employees until the Executive becomes eligible for Medicare and, thereafter, Medicare supplement coverage selected by Executive.

8. Restrictions on Competitive Employment – As agreed upon in the Original Employment Contract; however, the term of the Non-Compete shall be extended to four (4) years beyond termination of employment.

9. Consultancy – At the end of Executive's employment (for whatever reason), Executive agrees to consult with Company for a period of three years on such issues and items as requested by Company, including but not limited to theater signings, management issues, film strategy issues, technological issues and/or issues with respect to management transition subject to the Executive's other commitments.

10. Incorporation by Reference – All clauses in the Original Employment Contract will remain in full force and effect unless specifically amended in this agreement. In the event of any conflict between the Original Employment Contract and the Amended Contract, the Amended Contract shall prevail.

11. Arbitration – All disputes under this agreement shall be subject to binding arbitration under the AAA rules and Company shall be required to cover Executive's legal costs and the cost of arbitration.

12. Long Form Agreement – Until such time as this agreement is superceded by a long form agreement, it will represent the binding agreement for both parties.

Bradley J. Wechsler

*"Bradley J. Wechsler"*

7/12/00
Date

Imax Corporation

*"Garth M. Girvan"*
By: Garth M. Girvan



Source IMAX CORP, 10-K, July 20, 2007

**EXHIBIT 1**

SERP Benefit Summary
Brad Wechsler
Imax Corporation

Retirement Age – Age 55

SERP Benefit – Retirement and Survivor Benefits

Retirement Benefit – 73.5% of final five-year average full cash compensation (including bonus)

Survivor Benefit – 100% of Retirement Benefit

Death Benefit – Survivor Benefit

Disability Benefit – SERP Benefit

Severance Benefits –

Change of Control — SERP Benefit

Termination – SERP Benefit

Resignation – SERP Benefit, according to the
Following Vesting Schedule:
50% vested, plus 50% spread over the remaining working years to age 55

For Cause – Loss of Benefits

Cost of Living Adjustment – Applies to the Retirement and Survivor Benefits At a rate according to the published Cost of Living Tables (For illustrative purposes at 3.0% per annum)



Source IMAX CORP, 10-K, July 20, 2007

**IMAX CORPORATION**
**Exhibit 10.7**

EMPLOYMENT AGREEMENT dated and effective as of July 1, 1998 (the "Agreement"), between IMAX CORPORATION, a corporation organized under the laws of Canada ("Imax"), and RICHARD L. GELFOND (the "Executive").

WHEREAS, the Executive is currently the Vice-Chairman and Co-Chief Executive Officer of Imax and is employed pursuant to an Employment Agreement dated as of January 1, 1997, (the "1997 Agreement"); and

WHEREAS, the Imax Board of Directors (the "Board") has approved revised terms of employment, effective July 1, 1998, on August 26, 1998; and

WHEREAS, Imax wishes to enter into this Agreement to engage the Executive to continue to provide services to Imax, and the Executive wishes to be so engaged, pursuant to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. Employment. (a) Imax hereby employs the Executive, and the Executive hereby agrees to serve in accordance with the terms and conditions hereof

(b) The Executive's continued employment as Co-Chief Executive Officer under this Agreement shall commence effective July 1, 1998, and shall continue until June 30, 2001 (the "Employment Term").

(c) During the Employment Term, the Executive shall perform such services with respect to Imax's business as may be reasonably requested from time to time by the Board and which are consistent with the Executive's status and the function performed by individuals holding a similar position with similarly situated companies, and agrees to act in accordance with the written instructions of the Board. It is anticipated that such services shall be performed primarily within the United States.

(d) The Executive shall devote that portion of his business time that is necessary to perform the services reasonably required of him hereunder, which portion shall constitute a significant majority of his business time. The Executive agrees that during the Employment Term (i) he will use reasonable efforts to resolve any conflicting engagements and (ii) he will remain actively involved in Imax's business.

(e) As compensation for the services to be performed by the Executive hereunder during the Employment Term, the Executive shall be entitled to receive a base salary ("Base Salary") of U.S. $500,000 per annum, payable no less frequently than monthly in accordance with Imax's payroll practices.

(f) In addition to the Base Salary, the Executive shall be eligible to participate during the Employment Term in the annual incentive bonus plan adopted by the Board. The Executive shall be paid a bonus in respect of each of 1998, 1999, 2000 and the period January 1, 2001 to June 30, 2001 at a level of U.S. $605,000, U.S. $500,000, U.S. $500,000, and U.S. $250,000 (subject to adjustment as described below), respectively, (the "Standard"). Based on certain qualitative and quantitative measures determined by the CEO Advisors (as defined in Imax's Articles of Incorporation), for so long as Imax continues to have CEO Advisors, and the Compensation Committee (the "Committee") of the Board, as set forth below, the Committee shall determine the actual bonus paid, which shall be a multiple of the Standard ranging from 0.0x — 2.0 x, provided, however, that the multiple shall be at least 1.0x if Imax's reported earnings per share (EPS) for the year (excluding any extraordinary charges approved by the Board), or the six months ended June 30, 2001, as the case may be, meet the approved budget target (except that, if in the sole discretion of the Committee, the achievement EPS target was at the expense of, or to the material detriment of, other(s) of the qualitative and quantitative measures set forth below, then such minimum shall not apply).

Among the various factors the Committee shall consider in determining the bonus to be paid for 1998, and, subject to amendment from year to year by the Committee, after good faith consultation with the Executive, for 1999, 2000 and 2001, are: (i) the actual financial performance of Imax versus the approved budget for EBITDA, EPS, revenue growth, and/or other financial targets; and (ii) the Committee shall also take into account other qualitative factors including (in no order of importance): (A) progress in theater signings, (B) development of an enhanced management team, (C) improved performance of the Ridefilm division (for 1998 only), (D) further advancement of Imax's film strategy, (E) progress in "owned and operated" strategy (this factor to have diminishing weighting beyond 1998, as Imax's "owned and operated" emphasis refocuses on theatre joint ventures with conventional cinema operators), (F) brand development, (G) continued growth of the business, and (H) other performance related issues including, but not limited to, other goals established in the budget process approved by the Board.

The bonus for 1998, 1999 and 2000 shall be paid within 50 days of the applicable year-end, and for the period January 1, 2001 to June 30, 2001 within 50 days of June 30, 2001.

(g) Pursuant to the 1997 Agreement, at the beginning of each of 1997 and 1998, Imax granted the Executive the right to receive 30,000 common shares (on a post-split basis) of Imax (the "Restricted Stock"), or, if such Restricted Stock may not be issued without shareholder approval, the 1997 Agreement provided it shall be issued as "phantom stock". The Executive has the right to request the Restricted Stock granted on January 1, 1997 and January 1, 1998 be issued to him (or, if "phantom stock" is utilized, have payment made to him in an amount equal to the fair market value of such number of common shares of Imax on the date of such request), at any time after January 1, 1998 and January 1, 1999, respectively. It is hereby agreed that one half (i.e. 15,000) of such Restricted Stock / "phantom stock" for 1998 shall be cancelled forthwith, and that the Executive shall continue to have the right to the 30,000 Restricted Stock / "phantom stock" that have vested, and the remaining 15,000 Restricted Stock / "phantom stock" that shall vest on January 1, 1999. The Restricted Stock / "phantom stock" shall be adjusted for stock splits and other similar events. Imax agrees to indemnify the Executive, on an after-tax basis, for any income taxes imposed by any taxing authority and resulting from any taxable benefits to the Executive with respect to the Restricted Stock / "phantom stock" which arises prior to the date of any such request (it being understood that this indemnity relates to the timing of the payment of such taxes and not the ultimate tax payable). Any request for payment with respect to "phantom stock" must be made on or before December 31, 2009, after which date such "phantom stock" shall lapse. The provisions of this Section 1(g) shall survive any termination of this Agreement.

(h) *Stock Options – Grant & Vesting.* The Executive has been granted effective August 26, 1998, in accordance with the terms of the Imax Stock Option Plan (the "SOP"), 378,000 options to purchase common shares, and effective January 1, 1999 shall be granted a further 400,000 options, as follows:

| Number of Options | Grant Date | Exercise Price | Vesting Date |
|---|---|---|---|
| 111,333 | August 26, 1998 | $ 22.38 | August 26, 1998 |
| 100,000 | August 26, 1998 | $ 22.38 | January 1, 1999 |
| 166,667* | August 26, 1998 | $ 22.38 | January 1, 1999 |
| 266,667* | January 1, 2000 | to be determined | January 1, 2000 |
| 133,333* | January 1, 2000 | to be determined | January 1, 2001 |
| 778,000 | | | |

* These options are subject to Imax obtaining any required regulatory and shareholder approvals.

The exercise price of all options granted on August 26, 1998 in accordance with the SOP is U.S. $22.38, and all such options shall expire on August 25, 2008. The exercise price of all options to be granted on January 1, 2000 shall be determined in accordance with the SOP, and all such options shall expire on December 31, 2009 Should any required

regulatory or shareholder approvals with respect to the granting of the 566,667 options subject thereto not be obtained by Imax, Imax shall make such adjustments to the Executive's compensation hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received. The provisions of this Section 1(h) shall survive any termination of this Agreement.

All of the Executive's stock options shall be adjusted for stock splits and other similar events after the effective date hereof and shall contain other terms no less favorable to the Executive than the management stock options of Imax's other senior level executives.

*Resignation / Termination.* If the Executive shall voluntarily resign prior to the end of the Employment Term, (i) all unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately upon such resignation, and (ii) all vested options shall remain exercisable for the duration of their original term.

If (i) the employment of the Executive is not continued after the end of the Employment Term, (ii) the Executive is terminated by Imax without "Cause" (as defined below), or (iii) the Executive suffers a "Permanent Disability" (as defined in the SOP), or dies: all options granted on or before August 26, 1998 shall remain exercisable for the duration of their original term

*Change of Control.* Upon a "change of control" of Imax (i.e. any person or persons acting in concert acquiring greater than 50% of the outstanding common shares of Imax, whether by direct or indirect acquisition or as a result of a merger or reorganization), the vesting of the options granted on August 26, 1998 and/or January 1, 1999 shall be accelerated as follows:

| Change of Control Period | % of Options Subject to Accelerated Vesting |
|---|---|
| On or Prior to December 31, 1998 | 12 5% of options scheduled to vest on January 1, 1999 |
| January 1, 1999 to June 30, 1999 | 25% of options scheduled to vest on January 1, 2000 * |
| July 1, 1999 to December 31, 1999 | 50% of options scheduled to vest on January 1, 2000 * |
| January 1, 2000 to June 30, 2000 | 25% of options scheduled to vest on January 1, 2001 |
| July 1, 2000 to December 31, 2000 | 50% of options scheduled to vest on January 1, 2001 |

* If a "change of control" occurs prior to the grant of such options on January 1, 2000, stock appreciation rights ("SARs") equivalent in number to the options subject to accelerated vesting shall be granted, with a reference price of U.S. $22.38, and an expiry date of December 31, 2009. The SARs shall be treated, in connection with a "change of control", in the same manner as if they were options (i e a cash offer for all shares and options would trigger a payout of the SARs; a "rollover" of options would result in the

continuation of the SARs, reflecting the relevant exchange ratio and with reference to the price of the substituted shares).

*Miscellaneous.* If the Executive is terminated with "Cause", the Executive's unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately, and all of the Executive's vested options must be exercised within 90 days of termination, after which date they shall be cancelled. "Cause" for purposes of this Section 1(g) only means any willful and material violation by the Executive of any law or regulation applicable to the business of Imax or one of its subsidiaries, or the Executive's conviction of a felony, or any willful perpetration by the Executive of a common law fraud. Imax's remedy for a "breach of restrictive covenants" shall be the specific enforcement thereof, and not the application of Section 14 of the SOP; and Imax shall be entitled to seek any other legal and equitable remedies it may have against the Executive. In the event of any conflict between the provisions of this Agreement and the provisions of the SOP, the provisions of this Agreement shall prevail.

(i) The Executive shall, during the Employment Term, be eligible to receive employee benefits at a level not less than those established by Imax for, or made available to, its other key employees.

(j) Imax agrees to reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in the performance of his obligations under this Agreement for which documentation reasonably satisfactory to Imax is provided, including expenses relating to the Executive's travel to, and performance of duties in, Toronto, Canada.

(k) Any amounts payable to the Executive under this Agreement shall be subject to applicable withholding taxes, and such other deductions as may be required under applicable law.

2. Restrictions on Competitive Employment. During the term of the Executive's employment hereunder, absent Imax's prior written approval, the Executive shall not (as principal, agent, employee, consultant or otherwise), directly or indirectly, engage in activities with, or render services to, any business engaged or about to become engaged in the business of producing or distributing projection and sound systems or films for large screen theaters or designing or supplying motion simulation theaters or producing or distributing films for movie rides (collectively, "Competitive Business"); provided, however, that, notwithstanding the foregoing, the Executive may (i) have equity interests in companies engaged in a Competitive Business so long as he is not employed by and does not consult with such companies in areas related to the Competitive Business, (ii) render consulting services to or be employed by a company

engaged in a Competitive Business so long as he is not employed in, or rendering services related to, the Competitive Business of such company or (iii) perform usual investment banking services for a company engaged in a Competitive Business.

3. Confidentiality. The Executive covenants and agrees with Imax that he will not at any time, except in performance of his obligations to Imax hereunder or with the prior written consent of Imax, directly or indirectly, disclose any secret or confidential information that he may learn or has learned by reason of his association with Imax or any of its subsidiaries. The term "confidential information" includes information not previously disclosed to the public or to the trade by Imax's management, or otherwise in the public domain, with respect to Imax's or any of its subsidiaries' products, facilities, applications and methods, trade secrets and other intellectual property, systems, procedures, manuals, confidential reports, product price lists, customer lists, technical information, financial information, business plans, prospects or opportunities, but shall exclude any information which (i) is or becomes available to the public or is generally known in the industry or industries in which Imax operates other than as a result of disclosure by the Executive in violation of his agreements under this Section 3 or (ii) the Executive is required to disclose under any applicable laws, regulations or directives of any government agency, tribunal or authority having jurisdiction in the matter or under the subpoena or other process of law.

4. Assignment. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by the Executive without the prior written consent of Imax. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by Imax without the prior written consent of the Executive, except that Imax may assign this Agreement or any such right, interest or obligation to an affiliate of Imax without consent of the Executive; provided, however, that no such assignment shall relieve Imax of any of its obligations hereunder.

5. Indemnification. (a) Imax shall hold the Executive harmless and indemnify the Executive, to the fullest extent permitted by applicable law, against any and all liabilities (and all expenses related thereto) incurred by the Executive as a result of, or in connection with, the services provided under this Agreement; provided, however, that such indemnification shall not apply with respect to any action taken by the Executive that (i) is contrary to the written instructions of the Board or (ii) constitutes gross negligence or willful misconduct. Imax shall maintain a director and officer's liability insurance policy covering the Executive and containing customary terms and conditions.

(b) Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any income taxes imposed by Revenue Canada, the United States Federal government or any state or local taxing

authority in Canada or the United States (collectively, "Taxes") with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such Taxes exceed the amount of Taxes that would have been imposed on such amounts had all of the services performed by the Executive under this Agreement been performed within the United States. Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any penalties or interest that are imposed on the Executive by Revenue Canada, the United States Federal government or any state or local taxing authority in Canada or the United States as a result of Imax's failure to properly withhold any tax with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such penalties or interest are not attributable to the failure of the Executive to file any required tax returns or pay any required taxes or any other willful act or omission of the Executive.

6. Binding Effect. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto, any successors to or permitted assigns of the parties hereto.

7. Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and either delivered in person or sent by first class certified or registered mail, postage prepaid, to the parties at the following address (or to such other address or addresses as either party shall have designated in writing to the other party hereto:)

(a) if to Imax:

2525 Speakman Drive
Mississauga, Ontario, Canada
L5K 1B1
Attention: General Counsel

(b) if to the Executive:

975 Park Avenue, Apt 6B
New York, NY, 10028

8. Severability; Waiver. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such provision nor the validity of any other provision of this Agreement shall in any way be affected thereby. Failure to insist upon strict compliance with any term, covenant or condition hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times

9. Injunctive Relief. Without intending to limit the remedies available to Imax or the Executive, as the case may be, in the event of a breach or threatened breach of any of the covenants contained in this Agreement, Imax or the Executive, as the case my be, shall be entitled to seek such injunctive relief as may be required specifically to enforce any such covenant.

10. Miscellaneous. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and, from the effective date hereof, supersedes and terminates all prior agreements, oral and written, between the parties hereto with respect to the subject matter hereof. Notwithstanding the preceding sentence, nothing in this Agreement shall abrogate the Executive's entitlement to (i) the 45,000 (post-split) Restricted Stock / "phantom stock" granted pursuant to Section 1(g) of the 1997 Agreement, as reduced from 60,000 (post-split) pursuant to Section 1(g) of this Agreement, (ii) the 40,000 options (for 80,000 post-split shares) granted January 2, 1997 and the 80,000 options (for 80,000 post-split shares) granted January 2, 1998, or (iii) the Special Bonus (as defined in Section 1(g) of the Employment Agreement between Imax and the Executive dated as of March 1, 1994) payable after a sale of Imax or upon the exercise of the Executive's liquidation rights. Further, for so long as the Executive is the Co-CEO, Imax shall continue to use its best efforts to cause the Executive to be elected to the Board and, for so long as Imax continues to have CEO Advisors, to the designation as a CEO Advisor under Imax's by-laws, provided that nothing in this sentence shall abrogate any rights the Executive may have pursuant to any other agreement. This Agreement may be modified or amended only by an instrument in writing signed by both parties hereto. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Imax and the Executive have duly executed and delivered this Agreement, as of the day and year first above written, on this 3rd day of November, 1998.

IMAX CORPORATION

By: *"Garth M. Girvan"*
Garth M. Girvan
Director

By: *"John M. Davison*
John M. Davison
Executive Vice President, Operations and
Chief Financial Officer

EXECUTIVE

*"Richard L. Gelfond"* *l.s.*
RICHARD L. GELFOND

**IMAX CORPORATION**

Exhibit 10.8

Amended Employment Agreement

Imax (the "Company") and Executive, subject to Section 5(e) hereof, agree to cancel the last year of the term of employment of the Executive's employment agreement dated July 1, 1998 ("Original Employment Contract") and extend the employment term for three additional years with the new term from July 1, 2000 to June 30, 2003 (the "Amended Contract") on the same terms and conditions as set out in the Original Employment Contract, except as specified below. Terms used herein and not defined shall have the meanings assigned to them in the Original Employment Contract.

1. Case Compensation – As set out in the Original Employment Contract.

2. Additional Option Grants – The Company agrees to issue Executive 800,000 ten-year options at a strike price equal to the closing price on the day the Board approves this agreement. Except as provided below, options will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.

3. Restricted Stock Grant – The Company agrees to issue 180,000 restricted shares (or their Phantom Stock equivalent) to Executive on the day the Board approves this agreement. Except, as provided below, restricted stock will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.

4. Should any required regulatory or shareholder approvals with respect to the granting of the options or restricted stock not be obtained by the Company, the Company shall make such adjustments to the Executive's compensation, hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received

5. Change of Control Provisions

   (a) In the event of a Change of Control (without regard to any subsequent event) there will be accelerated vesting of the Executive's stock options and restricted stock.

   (b) In the event of a Change of Control and subsequent termination (or constructive termination) of the Executive there will be an acceleration (without any discount to present value) of the cash component of Executive's compensation under the Amended Contract (and the Original Employment Agreement if the renewal term has not yet commenced) equal to the number of years left on the Executive's agreements (including a fraction thereof) times the total cash compensation of the Executive for the full (i.e., 12 month) fiscal year preceding termination.

(c) If there is a Change of Control by way of stock merger the options will vest (as set out in 5(a) directly above) and be converted at the stock merger conversion ratio into options of the acquiring company (if it is public) or a cash-out of the options (if it is not public).

(d) A change of control is defined as any person or persons acting in concert acquiring beneficial ownership of greater than 50% of the outstanding common shares of the Company, whether by direct or indirect acquisition or as a result of a merger or reorganization or a sale of all or substantially all of the Company's assets and will not include sale of the WP block to one or more third parties.

(e) If there is no Change of Control by 12/31/00, the contract extension component of this Amended Contract shall become void but the options and restricted stock grants included in this Amended Contract become fully vested upon the earlier of a Change of Control subsequent to 12/31/00, termination, non-renewal, constructive termination or 6/30/01. In addition, of there is no Change of Control by 12/31/00, the term of the Original Employment Agreement shall be reinstated whereby Executive shall continue to render services to Company until 6/30/01.

6. Voluntary Resignation, Termination, Etc.

(a) If the Executive shall voluntarily resign, all unvested options and restricted stock shall be cancelled immediately and all vested options shall remain exercisable for the duration of their original term.

(b) If the Executive shall be terminated without cause all unvested stock options, restricted stock and cash compensation (salary and bonus without any discount to present value as described in section 5(b) above) shall immediately vest and become due.

(c) If the Executive shall be terminated for Cause all unvested options and unvested restricted stock (including those granted pursuant to previous employment agreements between Company and Executive) shall be cancelled immediately and all of the Executive's options and restricted stock must be exercised within 90 days of termination, after which date they shall be cancelled.

7. Retirement and Long Term Health Coverage

(a) The Company agrees to create a retirement plan for the Executive as set out in Exhibit 1.

(b) Company agrees to maintain retiree health benefits for Executive upon termination of the Executive's employment equal to the benefits provided for active employees until the Executive becomes eligible for Medicare and, thereafter, Medicare supplement coverage selected by Executive.

8. Restrictions on Competitive Employment – As agreed upon in the Original Employment Contract; however, the term of the Non-Compete shall be extended to four (4) years beyond termination of employment.

9. Consultancy – At the end of Executive's employment (for whatever reason), Executive agrees to consult with Company for a period of three years on such issues and items as requested by Company, including but not limited to theatre signings, management issues, film strategy issues, technological issues and/or issues with respect to management transition subject to the Executive's other commitments.

10. Incorporation by Reference – All clauses in the Original Employment Contract will remain in full force and effect unless specifically amended in this agreement. In the event of any conflict between the Original Employment Contract and the Amended Contract, the Amended Contract shall prevail.

11. Arbitration – All disputes under this agreement shall be subject to binding arbitration under the AAA Rules and Company shall be required to cover Executive's legal costs and the cost of arbitration.

12. Long Form Agreement – Until such time as this agreement is superceded by a long form agreement, it will represent the binding agreement for both parties.

| | |
|---|---|
| Richard L. Gelfond | Imax Corporation |
| *"Richard L. Gelfond"* | *"Garth M. Girvan"* |
| | By: Garth M. Girvan |
| 7/12/00 | |
| Date | |



Source IMAX CORP, 10-K, July 20, 2007

**EXHIBIT 1**

SERP Benefit Summary
Richard Gelfond
Imax Corporation

Retirement Age – Age 55

SERP Benefit – Retirement and Survivor Benefits

Retirement Benefit – 76.5% of final five-year average full cash compensation (including bonus)

Survivor Benefit – 100% of Retirement Benefit

Death Benefit – Survivor Benefit

Disability Benefit – SERP Benefit

Severance Benefits –

Change of Control – SERP Benefit

Termination – SERP Benefit

Registration – SERP Benefit, according to the following Vesting Schedule;
50% vested, plus 50% spread over the remaining working years to age 55

For Cause – Loss of benefits

Cost of Living Adjustment – Applies to the Retirement and Survivor Benefits At a rate according to the published Cost of Living Tables (For illustrative purposes at 3.0% per annum)

IMAX®

Exhibit 10.15

IMAX CORPORATION
2525 Speakman Drive, Sheridan Park
Mississauga, Ontario, Canada L5K 1B1

To: Robert D. Lister
From: Rich Gelfond and Brad Wechsler
Date: August 21, 2000

As we discussed a few weeks back, among our top priorities as we go through the process of evaluating potential strategic options for the Company is the retention of our key staff members. Toward this end, we are providing our most valuable employees with incentives to remain with the Company during this process and to be committed to, and focused on, advancing the business and supporting our continued operations Thus, the Company is pleased to offer you the following package of incentive payments and benefits, on and subject to the terms and conditions set forth below. Please read these terms and feel free to call us or Mary Sullivan with any questions you may have.

**2000 Bonus:** We are committing that the Company's management bonus plan will be honored this year and bonuses for the calendar year 2000 will be paid in accordance with past practice. If there is a Change of Control of the Company during 2000, we will ensure that any successor commits to honoring the management bonus plan for your calendar year 2000 bonus.

**Retention Bonus:** You shall be eligible to receive a retention bonus of up to a total of US$215,000, based upon the following terms: (a) On July 1, 2001, you shall receive US$107,500, provided that you have not resigned from the Company or been terminated For Cause prior thereto, regardless of whether there has been a Transaction; (b) if there is a Transaction, and you are terminated Without Cause after July 1, 2001, but within two (2) years of the completion of the Transaction, you shall receive (in addition to the July 1 payment) an additional US$107,500; (c) if there is a Transaction and you are terminated Without Cause prior to July 1, 2001, you shall receive (in lieu of the July 1 payment) US$215,000.

**Severance:** If a Transaction occurs and you are terminated Without Cause by the Company within two (2) years after the completion of the Transaction, you will be entitled to a severance benefit at least equal to six (6) months of your base salary (at the time of such termination). This benefit will be payable, at the Company's option, in either a lump sum or by salary continuation in accordance with the Company's normal payroll procedures. This payment shall be in addition to any bonus that may be payable to you pursuant to the preceding paragraph. In the event you are entitled to other benefits in the nature of severance, whether under contract or law, the severance benefit payable under this paragraph shall be offset by the amount of such other severance benefits.

---

The Company will require any successor to expressly assume and agree to perform the obligations under this letter agreement.

Please make sure you have read the above and the attached terms and conditions and indicate your agreement with all of such terms and conditions by executing this letter agreement in the space provided below and returning it to Mary Sullivan.

Sincerely,

IMAX LTD.

*"Bradley J. Wechsler*

By: Bradley J. Wechsler
Title: Co-CEO

Agreed to and accepted,
this 23rd day of August 2000:

*"Robert D. Lister*

Robert D. Lister

Terms and Conditions of Retention Incentive Package

Definitions:

For purposes of this letter agreement, a **"Change of Control"** of the Company will be deemed to occur if (a) (i) there is a sale of more than 50% of the assets of the Company to a third party (other than to a person or group including Brad Wechsler or Rich Gelfond); or (ii) any person or group (other than a person or group including Brad Wechsler or Rich Gelfond) acquires 50% or more of the voting power of the outstanding stock of the Company or the shareholders of the Company immediately prior to any corporate transaction cease to own at least 50% of the voting power of the outstanding stock of the surviving entity (any of the above, a **"Transaction"**); and (b) immediately after the Transaction is completed, Brad Wechsler and Rich Gelfond either (i) are no longer co-CEOs of the Company or (ii) do not have the power to determine your year-end bonus for calendar year 2000.

For purposes of this letter agreement, termination **"Without Cause"** shall mean termination of your employment for any reason or no reason, including by virtue of the Company's decision not to renew or extend your employment agreement, other than For Cause

For purposes of this letter agreement, termination **"For Cause"** shall have the same meaning as defined in your employment agreement, and shall include as further grounds your breaching of the confidentiality provision of this letter agreement.

Legal Terms and Conditions

The payments and benefits referred to herein are one-time-only payments and benefits, applicable to just one (1) Transaction and not to any subsequent such event.

The terms of this letter agreement are strictly confidential. Your disclosure of these terms to any other person (aside from your immediate family, your legal, financial or other advisors or as required by law) shall subject you to the revocation of any or all of the payments and benefits provided herein, at the sole discretion of the Company.

This letter agreement, together with your employment agreement, shall constitute the entire agreement between the parties hereto with respect to the subject matter of benefits in connection with a Change of Control or Transaction, and all promises, representations, understandings, arrangements and prior arrangements relating to such subject matter are merged and superseded by such agreements.

Any payments made under this letter agreement shall be subject to all applicable federal, state, city or other taxes required under relevant law.

This letter agreement shall be binding on and inure to the benefit of the Company and its successors and permitted assigns. This agreement shall also be binding on and inure to the benefit of you and your heirs, executors, administrators and legal representatives.

**IMAX CORPORATION**
**Exhibit 21**
**Subsidiaries of IMAX Corporation**

Significant and other major subsidiary companies of the Registrant, as at December 31, 2006, comprise of the following:

| Name of Subsidiary | Jurisdiction of Organization | Percentage held by Registrant |
|---|---|---|
| 3D Sea II Ltd. | Ontario | 100% |
| Acorn Rain Productions Ltd. | Canada | 100% |
| Big Engine Films Inc. | Delaware | 100% |
| Conversion Films Ltd. | Canada | 100% |
| David Keighley Productions 70MM Inc. | Delaware | 100% |
| Feathered Films Ltd. | Canada | 100% |
| Great Ant Productions Ltd. | Canada | 100% |
| IMAX (Netherlands) B.V. | Netherlands | 100% |
| IMAX Chicago Theatre LLC | Delaware | 100% |
| IMAX II U S A Inc. | Delaware | 100% |
| IMAX Indianapolis LLC | Indiana | 100% |
| IMAX Japan Inc. | Japan | 100% |
| IMAX Minnesota Holding Co. | Delaware | 100% |
| IMAX Rhode Island Limited Partnership | Rhode Island | 100% |
| IMAX Scribe Inc. | Delaware | 100% |
| IMAX Space Ltd. | Ontario | 100% |
| IMAX Theatre Holding Co. | Delaware | 100% |
| IMAX Theatre Holdings (OEI) Inc. | Delaware | 100% |
| IMAX Theatre Management Company | Delaware | 100% |
| IMAX Theatre Services Ltd. | Ontario | 100% |
| IMAX U.S.A. Inc. | Delaware | 100% |
| Miami Theatre LLC | Delaware | 100% |
| Nyack Theatre LLC | New York | 100% |
| Parker Pictures Ltd (formerly Mitey Cinema Inc ) | Ontario | 100% |
| Ridefilm Corporation | Delaware | 100% |
| RPM Pictures Ltd. | Ontario | 100% |
| Sacramento Theatre LLC | Delaware | 100% |
| Sonics Associates, Inc. | Alabama | 100% |
| Starboard Theatres Ltd. | Canada | 100% |
| Tantus Films Ltd. | Canada | 100% |
| Tantus II Films Ltd. | Ontario | 100% |
| Taurus-Littrow Productions Inc. | Delaware | 100% |
| Walking Bones Pictures Ltd. | Canada | 100% |

**Exhibit 23**

**IMAX CORPORATION**

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in (i) the Registration Statements on Form S-8 (No. 333-2076; No. 333-5720; No. 333-30970; No. 333-44412), (ii) the Post-Effective Amendment No.1 to Form S-8 (No. 333-5720) as amended, and (iii) Registration Statement on Form S-8 (No. 333-134811) of IMAX Corporation of our report dated July 20, 2007, relating to the financial statements, financial statement schedules, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

PricewaterhouseCoopers LLP
Toronto, Ontario
July 20, 2007

## POWER OF ATTORNEY

Each of the persons whose signature appears below hereby constitutes and appoints Edward MacNeil and Robert D. Lister, and each of them severally, as his true and lawful attorney or attorneys with power of substitution and re-substitution to sign in his name, place and stead in any and all such capacities the 10-K, including the French language version thereof, and any and all amendments thereto and documents in connection therewith, and to file the same with the United States Securities Exchange Commission (the "SEC") and such other regulatory authorities as may be required, each of said attorneys to have power to act with and without the other, and to have full power and authority to do and perform, in the name and on behalf of each of the directors of the Corporation, every act whatsoever which such attorneys, or either of them, may deem necessary of desirable to be done in connection therewith as fully and to all intent and purposes as such directors of the Corporation might or could do in person.

Dated this 20th day of July, 2007

| Signature | Title |
|---|---|
| *"Richard L. Gelfond"*<br>Richard L Gelfond | Co-Chairman and Co-Chief Executive Officer<br>(Principal Executive Officer) |
| *"Bradley J. Wechsler"*<br>Bradley J. Wechsler | Co-Chairman and Co-Chief Executive Officer<br>(Principal Executive Officer) |
| *"Neil S. Braun"*<br>Neil S. Braun | Director |
| *"Kenneth G. Copland"*<br>Kenneth G. Copland | Director |
| *"Garth M. Girvan"*<br>Garth M. Girvan | Director |
| *"David W. Leebron"*<br>David W. Leebron | Director |
| *"Marc A Utay"*<br>Marc A. Utay | Director |
| *"Edward MacNeil"*<br>Edward MacNeil | Chief Financial Officer<br>(Principal Financial Officer) |
| *"Jeffrey Vance"*<br>Jeffrey Vance | Co- Controller<br>(Principal Accounting Officer) |
| *"Vigna Vivekanand"*<br>Vigna Vivekanand | Co- Controller<br>(Principal Accounting Officer) |

**IMAX CORPORATION**
Exhibit 31.1

**Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002**

I, Bradley J. Wechsler, Co- Chief Executive Officer of IMAX Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation, and

   (d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 20, 2007

By: *"Bradley J Wechsler"*
Name: Bradley J. Wechsler
Title Co-Chief Executive Officer

**IMAX CORPORATION**
Exhibit 31.2

**Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002**

I, Richard L. Gelfond, Co- Chief Executive Officer of IMAX Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;
2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation, and
   (d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 20, 2007

By. *"Richard L. Gelfond"*
Name. Richard L. Gelfond
Title Co-Chief Executive Officer

**IMAX CORPORATION**
Exhibit 31.3

**Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002**

I, Edward MacNeil, Chief Financial Officer of IMAX Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;
2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation, and
   (d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 20, 2007

By: *"Edward MacNeil"*
Name. Edward MacNeil
Title Chief Financial Officer

**IMAX CORPORATION**
Exhibit 32.1

**CERTIFICATIONS**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Bradley J. Wechsler, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2006 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 20, 2007

*"Bradley J Wechsler"*
Bradley J. Wechsler
Co-Chief Executive Officer

**IMAX CORPORATION**
Exhibit 32.2

## CERTIFICATIONS
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Richard L. Gelfond, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2006 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 20, 2007

*"Richard L. Gelfond"*
Richard L. Gelfond
Co-Chief Executive Officer

**IMAX CORPORATION**
Exhibit 32.3

**CERTIFICATIONS**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Edward MacNeil, Chief Financial Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2006 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 20, 2007

*"Edward MacNeil"*
Edward MacNeil
Chief Financial Officer

Created by 10KWizard www.10KWizard.com