# EXHIBIT D

U.S. Securities and Exchange Commission

# SEC Staff Accounting Bulletin: No. 101 – Revenue Recognition in Financial Statements

**Securities and Exchange Commission**

**17 CFR Part 211**

**[Release No. SAB 101]**

**Staff Accounting Bulletin No. 101**

**Agency:** Securities and Exchange Commission

**Action:** Publication of Staff Accounting Bulletin

**Summary:** This staff accounting bulletin summarizes certain of the staff's views in applying generally accepted accounting principles to revenue recognition in financial statements. The staff is providing this guidance due, in part, to the large number of revenue recognition issues that registrants encounter. For example, a March 1999 report entitled *Fraudulent Financial Reporting: 1987-1997 An Analysis of U. S. Public Companies,* sponsored by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission, indicated that over half of financial reporting frauds in the study involved overstating revenue.

**Date:** December 3, 1999

**For Further Information Contact:** Richard Rodgers, Scott Taub, or Eric Jacobsen, Professional Accounting Fellows (202/942-4400) or Robert Bayless, Division of Corporation Finance (202/942-2960), Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549; electronic addresses: RodgersR@sec.gov; TaubS@sec.gov; JacobsenE@sec.gov; BaylessR@sec.gov.

**Supplementary Information:** The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Jonathan G. Katz

Secretary

Date: December 3, 1999

Part 211 - (AMEND)

Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 101 to the table found in Subpart B.

**Staff Accounting Bulletin No. 101**

The staff hereby adds new major Topic 13, "Revenue Recognition," and Topic 13-A, "Views on Selected Revenue Recognition Issues," to the Staff Accounting Bulletin Series. Topic 13-A provides the staff's views in applying generally accepted accounting principles to selected revenue recognition issues. In addition, the staff hereby revises Topic 8-A to conform to FASB Statement No. 13, *Accounting for Leases* .

**Topic 13: Revenue Recognition**

A. Selected Revenue Recognition Issues

*1. Revenue Recognition - General*

The accounting literature on revenue recognition includes both broad conceptual discussions as well as certain industry-specific guidance. Examples of existing literature on revenue recognition include Financial Accounting Standards Board (FASB) Statements of Financial Accounting Standards (SFAS) No. 13, *Accounting for Leases*, No. 45, *Accounting for Franchise Fee Revenue*, No. 48, *Revenue Recognition When Right of Return Exists*, No. 49, *Accounting for Product Financing Arrangements*, No. 50, *Financial Reporting in the Record and Music Industry*, No. 51, *Financial Reporting by Cable Television Companies*, and No. 66, *Accounting for Sales of Real Estate* ; Accounting Principles Board (APB) Opinion No. 10, *Omnibus Opinion - 1966* ; Accounting Research Bulletin (ARB) Nos. 43 (Chapter 1a) and 45, *Long-Term Construction-Type Contracts* ; American Institute of Certified Public Accountants (AICPA) Statements of Position (SOP) No. 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts*, and No. 97-2, *Software Revenue Recognition* ; Emerging Issues Task Force (EITF) Issue No. 88-18, *Sales of Future Revenues*, No. 91-9, *Revenue and Expense Recognition for Freight Services in Process*, No. 95-1, *Revenue Recognition on Sales with a Guaranteed Minimum Resale Value*, and No. 95-4, *Revenue Recognition on Equipment Sold and Subsequently Repurchased Subject to an Operating Lease* ; and FASB Statement of Financial Accounting Concepts (SFAC) No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises* .[1] If a transaction is within the scope of specific authoritative literature that provides revenue recognition guidance, that literature should be applied. However, in the absence of authoritative literature addressing a specific arrangement or a specific industry, the staff will consider the existing authoritative accounting standards as well as the broad revenue recognition criteria specified in the FASB's conceptual framework that contain basic guidelines for revenue recognition.

Based on these guidelines, revenue should not be recognized until it is realized or realizable and earned.[2] SFAC No. 5, paragraph 83(b) states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues" [footnote reference omitted]. Paragraph 84(a) continues "the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)" [footnote reference omitted]. In addition, paragraph 84 (d) states that "If services are rendered or rights to use assets extend continuously over time (for example, interest or rent), reliable measures based on contractual prices established in advance are commonly available, and revenues may be recognized as earned as time passes."

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,[3]
- Delivery has occurred or services have been rendered,[4]
- The seller's price to the buyer is fixed or determinable,[5]

  and
- Collectibility is reasonably assured.[6]

*2. Persuasive Evidence of an Arrangement*

Question 1

**Facts:** Company A has product available to ship to customers prior to the end of its current fiscal quarter. Customer Beta places an order for the product, and Company A delivers the product prior to the end of its current fiscal quarter. Company A's normal and customary business practice for this class of customer is to enter into a written sales agreement that requires the signatures of the authorized representatives of the Company and its customer to be binding. Company A prepares a written sales agreement, and its authorized representative signs the agreement before the end of the quarter. However, Customer Beta does not sign the agreement because Customer Beta is awaiting the requisite approval by its legal department. Customer Beta's purchasing department has orally agreed to the sale and stated that it is highly likely that the contract will be approved the first week of Company A's next fiscal quarter.

**Question:** May Company A recognize the revenue in the current fiscal quarter for the sale of the product to Customer Beta when (1) the product is delivered by the end of its current fiscal quarter and (2) the final written sales agreement is executed by Customer Beta's authorized representative

within a few days after the end of the current fiscal quarter?

**Interpretive Response:** No. Generally the staff believes that, in view of Company A's business practice of requiring a written sales agreement for this class of customer, persuasive evidence of an arrangement would require a final agreement that has been executed by the properly authorized personnel of the customer. In the staff's view, Customer Beta's execution of the sales agreement after the end of the quarter causes the transaction to be considered a transaction of the subsequent period.[7] Further, if an arrangement is subject to subsequent approval (*e.g.*, by the management committee or board of directors) or execution of another agreement, revenue recognition would be inappropriate until that subsequent approval or agreement is complete.

Customary business practices and processes for documenting sales transactions vary among companies and industries. Business practices and processes may also vary within individual companies (*e.g.*, based on the class of customer, nature of product or service, or other distinguishable factors). If a company does not have a standard or customary business practice of relying on written contracts to document a sales arrangement, it usually would be expected to have other forms of written or electronic evidence to document the transaction. For example, a company may not use written contracts but instead may rely on binding purchase orders from third parties or on-line authorizations that include the terms of the sale and that are binding on the customer. In that situation, that documentation could represent persuasive evidence of an arrangement.

The staff is aware that sometimes a customer and seller enter into "side" agreements to a master contract that effectively amend the master contract. Registrants should ensure that appropriate policies, procedures, and internal controls exist and are properly documented so as to provide reasonable assurances that sales transactions, including those affected by side agreements, are properly accounted for in accordance with generally accepted accounting principles and to ensure compliance with Section 13 of the Securities Exchange Act of 1934 (*i.e.*, the Foreign Corrupt Practices Act). Side agreements could include cancellation, termination, or other provisions that affect revenue recognition. The existence of a subsequently executed side agreement may be an indicator that the original agreement was not final and revenue recognition was not appropriate.

Question 2

**Facts:** Company Z enters into an arrangement with Customer A to deliver Company Z's products to Customer A on a consignment basis. Pursuant to the terms of the arrangement, Customer A is a consignee, and title to the products does not pass from Company Z to Customer A until Customer A consumes the products in its operations. Company Z delivers product to Customer A under the terms of their arrangement.

**Question:** May Company Z recognize revenue upon delivery of its product to Customer A?

**Interpretive Response:** No. Products delivered to a consignee pursuant to a consignment arrangement are not sales and do not qualify for revenue

recognition until a sale occurs. The staff believes that revenue recognition is not appropriate because the seller retains the risks and rewards of ownership of the product and title usually does not pass to the consignee.

Other situations may exist where title to delivered products passes to a buyer, but the substance of the transaction is that of a consignment or a financing. Such arrangements require a careful analysis of the facts and circumstances of the transaction, as well as an understanding of the rights and obligations of the parties, and the seller's customary business practices in such arrangements. The staff believes that the presence of one or more of the following characteristics in a transaction precludes revenue recognition even if title to the product has passed to the buyer:

1. The buyer has the right to return the product and:
   a) the buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates.[8]
   b) the buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product or subsequently consumes or uses the product,[9]
   c) the buyer's obligation to the seller would be changed (e.g., the seller would forgive the obligation or grant a refund) in the event of theft or physical destruction or damage of the product,[10]
   d) the buyer acquiring the product for resale does not have economic substance apart from that provided by the seller,[11] or
   e) the seller has significant obligations for future performance to directly bring about resale of the product by the buyer.[12]
2. The seller is required to repurchase the product (or a substantially identical product or processed goods of which the product is a component) at specified prices that are not subject to change except for fluctuations due to finance and holding costs,[13] and the amounts to be paid by the seller will be adjusted, as necessary, to cover substantially all fluctuations in costs incurred by the buyer in purchasing and holding the product (including interest).[14] The staff believes that indicators of the latter condition include:
   a) the seller provides interest-free or significantly below market financing to the buyer beyond the seller's customary sales terms and until the products are resold,
   b) the seller pays interest costs on behalf of the buyer under a third-party financing arrangement, or
   c) the seller has a practice of refunding (or intends to refund) a portion of the original sales price representative of interest expense for the period from when the buyer paid the seller until the buyer resells the product.
3. The transaction possesses the characteristics set forth in EITF Issue No. 95-1, *Revenue Recognition on Sales with a Guaranteed Minimum Resale Value*, and does not qualify for sales-type lease accounting.
4. The product is delivered for demonstration purposes.[15]

This list is not meant to be a checklist of all characteristics of a consignment or a financing arrangement, and other characteristics may exist. Accordingly, the staff believes that judgment is necessary in assessing whether the substance of a transaction is a consignment, a financing, or other arrangement for which revenue recognition is not

appropriate. If title to the goods has passed but the substance of the arrangement is not a sale, the consigned inventory should be reported separately from other inventory in the consignor's financial statements as "inventory consigned to others" or another appropriate caption.

*3. Delivery and Performance*

Question 3

**Facts:** Company A receives purchase orders for products it manufactures. At the end of its fiscal quarters, customers may not yet be ready to take delivery of the products for various reasons. These reasons may include, but are not limited to, a lack of available space for inventory, having more than sufficient inventory in their distribution channel, or delays in customers' production schedules.

**Questions:** May Company A recognize revenue for the sale of its products once it has completed manufacturing if it segregates the inventory of the products in its own warehouse from its own products?

May Company A recognize revenue for the sale if it ships the products to a third-party warehouse but (1) Company A retains title to the product and (2) payment by the customer is dependent upon ultimate delivery to a customer-specified site?

**Interpretative Response:** Generally, no. The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

The Commission has set forth criteria to be met in order to recognize revenue when delivery has not occurred.[16] These include:

1. The risks of ownership must have passed to the buyer;
2. The customer must have made a fixed commitment to purchase the goods, preferably in written documentation;
3. The buyer, not the seller, must request that the transaction be on a bill and hold basis.[17] The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;
4. There must be a fixed schedule for delivery of the goods. The date for delivery must be reasonable and must be consistent with the buyer's business purpose (*e.g.*, storage periods are customary in the industry);
5. The seller must not have retained any specific performance obligations such that the earning process is not complete;
6. The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and
7. The equipment [product] must be complete and ready for shipment.

The above listed conditions are the important conceptual criteria which should be used in evaluating any purported bill and hold sale. This listing is

not intended as a checklist. In some circumstances, a transaction may meet all factors listed above but not meet the requirements for revenue recognition. The Commission also has noted that in applying the above criteria to a purported bill and hold sale, the individuals responsible for the preparation and filing of financial statements also should consider the following factors:[18]

1. The date by which the seller expects payment, and whether the seller has modified its normal billing and credit terms for this buyer;[19]
2. The seller's past experiences with and pattern of bill and hold transactions;
3. Whether the buyer has the expected risk of loss in the event of a decline in the market value of goods;
4. Whether the seller's custodial risks are insurable and insured;
5. Whether extended procedures are necessary in order to assure that there are no exceptions to the buyer's commitment to accept and pay for the goods sold (*i.e.*, that the business reasons for the bill and hold have not introduced a contingency to the buyer's commitment).

Delivery generally is not considered to have occurred unless the product has been delivered to the customer's place of business or another site specified by the customer. If the customer specifies an intermediate site but a substantial portion of the sales price is not payable until delivery is made to a final site, then revenue should not be recognized until final delivery has occurred.[20]

After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs.[21] Customer acceptance provisions may be included in a contract, among other reasons, to enforce a customer's rights to (1) test the delivered product, (2) require the seller to perform additional services subsequent to delivery of an initial product or performance of an initial service (*e.g.*, a seller is required to install or activate delivered equipment), or (3) identify other work necessary to be done before accepting the product. The staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement. Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

A seller should substantially complete or fulfill the terms specified in the arrangement in order for delivery or performance to have occurred.[22] When applying the substantially complete notion, the staff believes that only inconsequential or perfunctory actions may remain incomplete such that the failure to complete the actions would not result in the customer receiving a refund or rejecting the delivered products or services performed to date. In addition, the seller should have a demonstrated history of completing the remaining tasks in a timely manner and reliably estimating the remaining costs. If revenue is recognized upon substantial completion of the arrangement, all remaining costs of performance or delivery should be accrued.

If an arrangement (*i.e.*, outside the scope of SOP 81-1) requires the delivery or performance of multiple deliverables, or "elements," the delivery of an individual element is considered not to have occurred if there are

undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element.[23]

In licensing and similar arrangements (*e.g.*, licenses of motion pictures, software, technology, and other intangibles), the staff believes that delivery does not occur for revenue recognition purposes until the license term begins.[24] Accordingly, if a licensed product or technology is physically delivered to the customer, but the license term has not yet begun, revenue should not be recognized prior to inception of the license term. Upon inception of the license term, revenue should be recognized in a manner consistent with the nature of the transaction and the earnings process.

Question 4

**Facts:** Company R is a retailer that offers "layaway" sales to its customers. Company R retains the merchandise, sets it aside in its inventory, and collects a cash deposit from the customer. Although Company R may set a time period within which the customer must finalize the purchase, Company R does not require the customer to enter into an installment note or other fixed payment commitment or agreement when the initial deposit is received. The merchandise generally is not released to the customer until the customer pays the full purchase price. In the event that the customer fails to pay the remaining purchase price, the customer forfeits its cash deposit. In the event the merchandise is lost, damaged, or destroyed, Company R either must refund the cash deposit to the customer or provide replacement merchandise.

**Question:** In the staff's view, when may Company R recognize revenue for merchandise sold under its layaway program?

**Interpretive Response:** Provided that the other criteria for revenue recognition are met, the staff believes that Company R should recognize revenue from sales made under its layaway program upon delivery of the merchandise to the customer. Until then, the amount of cash received should be recognized as a liability entitled such as "deposits received from customers for layaway sales" or a similarly descriptive caption. Because Company R retains the risks of ownership of the merchandise, receives only a deposit from the customer, and does not have an enforceable right to the remainder of the purchase price, the staff would object to Company R recognizing any revenue upon receipt of the cash deposit. This is consistent with item two (2) in the Commission's criteria for bill-and-hold transactions which states that "the customer must have made a fixed commitment to purchase the goods."

Question 5

**Facts:** Registrants may negotiate arrangements pursuant to which they may receive nonrefundable fees upon entering into arrangements or on certain specified dates. The fees may ostensibly be received for conveyance of a license or other intangible right or for delivery of particular products or services. Various business factors may influence how the registrant and customer structure the payment terms. For example, in exchange for a greater up-front fee for an intangible right, the registrant may be willing to

receive lower unit prices for related products to be delivered in the future. In some circumstances, the right, product, or service conveyed in conjunction with the nonrefundable fee has no utility to the purchaser separate and independent of the registrant's performance of the other elements of the arrangement. Therefore, in the absence of the registrant's continuing involvement under the arrangement, the customer would not have paid the fee. Examples of this type of arrangement include the following:

- A registrant sells a lifetime membership in a health club. After paying a nonrefundable "initiation fee," the customer is permitted to use the health club indefinitely, so long as the customer also pays an additional usage fee each month. The monthly usage fees collected from all customers are adequate to cover the operating costs of the health club.

- A registrant in the biotechnology industry agrees to provide research and development activities for a customer for a specified term. The customer needs to use certain technology owned by the registrant for use in the research and development activities. The technology is not sold or licensed separately without the research and development activities. Under the terms of the arrangement, the customer is required to pay a nonrefundable "technology access fee" in addition to periodic payments for research and development activities over the term of the contract.

- A registrant requires a customer to pay a nonrefundable "activation fee" when entering into an arrangement to provide telecommunications services. The terms of the arrangement require the customer to pay a monthly usage fee that is adequate to recover the registrant's operating costs. The costs incurred to activate the telecommunications service are nominal.

**Question:** When should the revenue relating to nonrefundable, up-front fees in these types of arrangements be recognized?

**Interpretive Response:** The staff believes that registrants should consider the specific facts and circumstances to determine the appropriate accounting for nonrefundable, up-front fees. Unless the up-front fee is in exchange for products delivered or services performed that represent the culmination of a separate earnings process,[25] the deferral of revenue is appropriate.

In the situations described above, the staff does not view the activities completed by the registrants (*i.e.*, selling the membership, signing the contract, or enrolling the customer or activating telecommunications services) as discrete earnings events.[26] The terms, conditions, and amounts of these fees typically are negotiated in conjunction with the pricing of all the elements of the arrangement, and the customer would ascribe a significantly lower, and perhaps no, value to elements ostensibly associated with the up-front fee in the absence of the registrant's performance of other contract elements. The fact that the registrants do not sell the initial rights, products, or services separately (*i.e.*, without the registrants' continuing involvement) supports the staff's view. The staff believes that the customers are purchasing the on-going rights, products,

or services being provided through the registrants' continuing involvement. Further, the staff believes that the earnings process is completed by performing under the terms of the arrangements, not simply by originating a revenue-generating arrangement.

Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services. The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance[27] and generally should be deferred and recognized systematically over the periods that the fees are earned.[28]

Question 6

**Facts:** Company A provides its customers with activity tracking or similar services (*e.g.*, tracking of property tax payment activity, sending delinquency letters on overdue accounts, etc.) for a ten-year period. Company A requires customers to prepay for all the services for the term specified in the arrangement. The on-going services to be provided are generally automated after the initial customer set-up. At the outset of the arrangement, Company A performs set-up procedures to facilitate delivery of its on-going services to the customers.[29] Such procedures consist primarily of establishing the necessary records and files in Company A's pre-existing computer systems in order to provide the services. Once the initial customer set-up activities are complete, Company A provides its services in accordance with the arrangement. Company A is not required to refund any portion of the fee if the customer terminates the services or does not utilize all of the services to which it is entitled. However, Company A is required to provide a refund if Company A terminates the arrangement early. Assume Company A's activities are not within the scope of SFAS No. 91.

**Question:** When should Company A recognize the service revenue?

**Interpretive Response:** The staff believes that, provided all other revenue recognition criteria are met, service revenue should be recognized on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed,[30] whichever is longer. In this case, the customer contracted for the on-going activity tracking service, not for the set-up activities. The staff notes that the customer could not, and would not, separately purchase the set-up services without the on-going services. The services specified in the arrangement are performed continuously over the contractual term of the arrangement (and any subsequent renewals). Therefore, the staff believes that Company A should recognize revenue on a

straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer.

In this situation, the staff would object to Company A recognizing revenue in proportion to the costs incurred because the set-up costs incurred bear no direct relationship to the performance of services specified in the arrangement. The staff also believes that it is inappropriate to recognize the entire amount of the prepayment as revenue at the outset of the arrangement by accruing the remaining costs because the services required by the contract have not been performed.

*4. Fixed or Determinable Sales Price*

A company's contracts may include customer cancellation or termination clauses. Cancellation or termination provisions may be indicative of a demonstration period or an otherwise incomplete transaction. Examples of transactions that financial management and auditors should be aware of and where such provisions may exist include "side" agreements and significant transactions with unusual terms and conditions. These contractual provisions raise questions as to whether the sales price is fixed or determinable. The sales price in arrangements that are cancelable by the customer are neither fixed nor determinable until the cancellation privileges lapse.[31] If the cancellation privileges expire ratably over a stated contractual term, the sales price is considered to become determinable ratably over the stated term.[32] Short-term rights of return, such as thirty-day money-back guarantees, and other customary rights to return products are not considered to be cancellation privileges, but should be accounted for in accordance with SFAS No. 48.[33]

Question 7

**Facts:** Company M is a discount retailer. It generates revenue from annual membership fees it charges customers to shop at its stores and from the sale of products at a discount price to those customers. The membership arrangements with retail customers require the customer to pay the entire membership fee (*e.g.*, $35) at the outset of the arrangement. However, the customer has the unilateral right to cancel the arrangement at any time during its term and receive a full refund of the initial fee. Based on historical data collected over time for a large number of homogeneous transactions, Company M estimates that approximately 40% of the customers will request a refund before the end of the membership contract term. Company M's data for the past five years indicates that significant variations between actual and estimated cancellations have not occurred, and Company M does not expect significant variations to occur in the foreseeable future.

**Question:** May Company M recognize in earnings the revenue for the membership fees and accrue the costs to provide membership services at the outset of the arrangement?

**Interpretive Response:** No. In the staff's view, it would be inappropriate for Company M to recognize the membership fees as earned revenue upon

billing or receipt of the initial fee with a corresponding accrual for estimated costs to provide the membership services. This conclusion is based on Company M's remaining and unfulfilled contractual obligation to perform services (*i.e.*, make available and offer products for sale at a discounted price) throughout the membership period. Therefore, the earnings process, irrespective of whether a cancellation clause exists, is not complete.

In addition, the ability of the member to receive a full refund of the membership fee up to the last day of the membership term raises an uncertainty as to whether the fee is fixed or determinable at any point before the end of the term. Generally, the staff believes that a sales price is not fixed or determinable when a customer has the unilateral right to terminate or cancel the contract and receive a cash refund. A sales price or fee that is variable until the occurrence of future events (*other than* product returns that are within the scope of SFAS No. 48) generally is not fixed or determinable until the future event occurs. The revenue from such transactions should not be recognized in earnings until the sales price or fee becomes fixed or determinable. Moreover, revenue should not be recognized in earnings by assessing the probability that significant, but unfulfilled, terms of a contract will be fulfilled at some point in the future. Accordingly, the revenue from such transactions should not be recognized in earnings prior to the refund privileges expiring. The amounts received from customers or subscribers (*i.e.*, the $35 fee mentioned above) should be credited to a monetary liability account such as "customers' refundable fees."

The staff believes that if a customer has the unilateral right to receive both (1) the seller's substantial performance under an arrangement (*e.g.*, providing services or delivering product) and (2) a cash refund of prepaid fees, then the prepaid fees should be accounted for as a monetary liability in accordance with SFAS No. 125, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, paragraph 16. SFAS No. 125 provides that liabilities may be derecognized only if (1) the debtor pays the creditor and is relieved of its obligation for the liability (*paying the creditor* includes delivery of cash, other financial assets, goods, or services or reacquisition by the debtor of its outstanding debt securities) or (2) the debtor is legally released from being the primary obligor under the liability.[34] If a customer has the unilateral right to receive both (1) the seller's substantial performance under the arrangement and (2) a cash refund of prepaid fees, then the refund obligation is not relieved upon performance of the service or delivery of the products. Rather, the seller's refund obligation is relieved only upon refunding the cash or expiration of the refund privilege.

Some have argued that there may be a limited exception to the general rule that revenue from membership or other service transaction fees should not be recognized in earnings prior to the refund privileges expiring. Despite the fact that SFAS No. 48 expressly does not apply to the accounting for service revenue if part or all of the service fee is refundable under cancellation privileges granted to the buyer,[35] they believe that in certain circumstances a potential refund of a membership fee may be seen as being similar to a right of return of products under SFAS No. 48. They argue that revenue from membership fees, net of estimated refunds, may be recognized ratably over the period the services are performed whenever pertinent conditions of SFAS No. 48 are met, namely, there is a large

population of transactions that grant customers the same unilateral termination or cancellation rights and reasonable estimates can be made of how many customers likely will exercise those rights.

The staff believes that, because service arrangements are specifically excluded from the scope of SFAS No. 48, the most direct authoritative literature to be applied to the extinguishment of obligations under such contracts is SFAS No. 125. As noted above, because the refund privilege extends to the end of the contract term irrespective of the amount of the service performed, SFAS No. 125 indicates that the liability would not be extinguished (and therefore no revenue would be recognized in earnings) until the cancellation or termination and related refund privileges expire. Nonetheless, the staff recognizes that over the years the accounting for membership refunds evolved based on analogy to SFAS No. 48 and that practice did not change when SFAS No. 125 became effective. Reasonable people held, and continue to hold, different views about the application of the accounting literature. For the staff to prohibit such accounting in this SAB may result in significant change in practice that, in these particular circumstances, may be more appropriately addressed in a formal rulemaking or standards-setting project.

Pending further action in this area by the FASB, the staff will not object to the recognition of refundable membership fees, net of estimated refunds, as earned revenue over the membership term in the limited circumstances where all of the following criteria have been met:[36]

- The estimates of terminations or cancellations and refunded revenues are being made for a large pool of homogeneous items (*e.g.*, membership or other service transactions with the same characteristics such as terms, periods, class of customers, nature of service, etc.).

- Reliable estimates of the expected refunds can be made on a timely basis.[37] Either of the following two items would be considered indicative of an inability to make reliable estimates: (1) recurring, significant differences between actual experience and estimated cancellation or termination rates (*e.g.*, an actual cancellation rate of 40% versus an estimated rate of 25%) even if the impact of the difference on the amount of estimated refunds is not material to the consolidated financial statements[38] or (2) recurring variances between the actual and estimated amount of refunds that are material to either revenue or net income in quarterly or annual financial statements. In addition, the staff believes that an estimate, for purposes of meeting this criterion, would not be reliable unless it is remote[39] that material adjustments (both individually and in the aggregate) to previously recognized revenue would be required. The staff presumes that reliable estimates cannot be made if the customer's termination or cancellation and refund privileges exceed one year.

- There is a sufficient company-specific historical basis upon which to estimate the refunds,[40] and the company believes that such historical experience is predictive of future events. In assessing these items, the staff believes that estimates of future refunds should take into

consideration, among other things, such factors as historical experience by service type and class of customer, changing trends in historical experience and the basis thereof (*e.g.*, economic conditions), the impact or introduction of competing services or products, and changes in the customer's "accessibility" to the refund (*i.e.*, how easy it is for customers to obtain the refund).

- The amount of the membership fee specified in the agreement at the outset of the arrangement is fixed, other than the customer's right to request a refund.

If Company M does not meet all of the foregoing criteria, the staff believes that Company M should not recognize in earnings any revenue for the membership fee until the cancellation privileges and refund rights expire.

If revenue is recognized in earnings over the membership period pursuant to the above criteria, the initial amounts received from customer or subscribers (*i.e.*, the $35 fee mentioned above) should be allocated to two liability accounts. The amount of the fee representing estimated refunds should be credited to a monetary liability account, such as "customers' refundable fees," and the remaining amount of the fee representing unearned revenue should be credited to a nonmonetary liability account, such as "unearned revenues." For each income statement presented, registrants should disclose in the footnotes to the financial statements the amounts of (1) the unearned revenue and (2) refund obligations as of the beginning of each period, the amount of cash received from customers, the amount of revenue recognized in earnings, the amount of refunds paid, other adjustments (with an explanation thereof), and the ending balance of (1) unearned revenue and (2) refund obligations.

If revenue is recognized in earnings over the membership period pursuant to the above criteria, the staff believes that adjustments for changes in estimated refunds should be recorded using a retrospective approach whereby the unearned revenue and refund obligations are remeasured and adjusted at each balance sheet date with the offset being recorded as earned revenue.

Companies offering memberships often distribute membership packets describing and discussing the terms, conditions, and benefits of membership. Packets may include vouchers, for example, that provide new members with discounts or other benefits. The costs associated with the vouchers should be expensed when distributed. Advertising costs to solicit members should be accounted for in accordance with SOP 93-7, *Reporting on Advertising Costs* . Incremental direct costs incurred in connection with enrolling customers (*e.g.*, commissions paid to agents) should be accounted for as follows: (1) if revenue is deferred until the cancellation or termination privileges expire, incremental direct costs should be either (a) charged to expense when incurred if the costs are not refundable to the company in the event the customer obtains a refund of the membership fee, or (b) if the costs are refundable to the company in the event the customer obtains a refund of the membership fee, recorded as an asset until the earlier of termination or cancellation or refund; or (2) if revenue, net of estimated refunds, is recognized in earnings over the membership period, a like percentage of incremental direct costs should be deferred and recognized in earnings in the same pattern as revenue is recognized, and

the remaining portion should be either (a) charged to expense when incurred if the costs are not refundable to the company in the event the customer obtains a refund of the membership fee, or (b) if the costs are refundable to the company in the event the customer obtains a refund of the membership fee, recorded as an asset until the refund occurs.[41] All costs other than incremental direct costs (*e.g.*, indirect costs) should be expensed as incurred.

Question 8

**Facts:** Company A owns and leases retail space to retailers. Company A (lessor) renews a lease with a customer (lessee) that is classified as an operating lease. The lease term is one year and provides that the lease payments are $1.2 million, payable in equal monthly installments on the first day of each month, plus one percent of the lessee's net sales in excess of $25 million if the net sales exceed $25 million during the lease term (*i.e.*, contingent rental). The lessee has historically experienced annual net sales in excess of $25 million in the particular space being leased, and it is probable that the lessee will generate in excess of $25 million net sales during the term of the lease.

**Question:** In the staff's view, should the lessor recognize any rental income attributable to the one percent of the lessee's net sales exceeding $25 million before the lessee actually achieves the $25 million net sales threshold?

**Interpretive Response:** No. The staff believes that contingent rental income "accrues" (*i.e.*, it should be recognized as revenue) when the changes in the factor(s) on which the contingent lease payments is (are) based actually occur.[42]

SFAS No. 13, *Accounting for Leases*, paragraph 19(b) states that lessors should account for operating leases as follows: "Rent shall be reported in income over the lease term as it becomes receivable according to the provisions of the lease. However, if the rentals vary from a straight-line basis, the income shall be recognized on a straight-line basis unless another systematic and rational basis is more representative of the time pattern in which use benefit from the leased property is diminished, in which case that basis shall be used."

SFAS No. 29, *Determining Contingent Rentals*, amended SFAS No. 13 and clarifies that "lease payments that depend on a factor that does not exist or is not measurable at the inception of the lease, such as future sales volume, would be contingent rentals in their entirety and, accordingly, would be excluded from minimum lease payments and included in the determination of income as they accrue." [Summary] Paragraph 17 of SFAS No. 29 provides the following example of determining contingent rentals:

A lease agreement for retail store space could stipulate a monthly base rental of $200 and a monthly supplemental rental of one-fourth of one percent of monthly sales volume during the lease term. Even if the lease agreement is a renewal for store space that had averaged monthly sales of $25,000 for the past 2 years, minimum lease payments would include only the $200 monthly base rental; the supplemental rental is a contingent

rental that is excluded from minimum lease payments. The future sales for the lease term do not exist at the inception of the lease, and future rentals would be limited to $200 per month if the store were subsequently closed and no sales were made thereafter.

FASB Technical Bulletin (FTB) 85-3, *Accounting for Operating Leases with Scheduled Rent Increases*, addresses whether it is appropriate for lessors in operating leases to recognize scheduled rent increases on a basis other than as required in SFAS No. 13, paragraph 19(b). Paragraph 2 of FTB 85-3 states "using factors such as the time value of money, anticipated inflation, or *expected future revenues* [emphasis added] to allocate scheduled rent increases is inappropriate because these factors do not relate to the *time pattern* of the physical usage of the leased property. However, such factors may affect the periodic reported rental income or expense if the lease agreement involves contingent rentals, which are excluded from minimum lease payments and accounted for separately under Statement 13, as amended by Statement 29." In developing the basis for why scheduled rent increases should be recognized on a straight-line basis, the FASB distinguishes the accounting for scheduled rent increases from contingent rentals. Paragraph 13 states "There is an important substantive difference between lease rentals that are contingent upon some specified future event and scheduled rent increases that are unaffected by future events; the accounting under Statement 13 reflects that difference. If the lessor and lessee eliminate the risk of variable payments by agreeing to scheduled rent increases, the accounting should reflect those different circumstances."

The example provided in SFAS No. 29 implies that contingent rental income in leases classified as sales-type or direct-financing leases becomes "accruable" when the changes in the factors on which the contingent lease payments are based actually occur. FTB 85-3 indicates that contingent rental income in operating leases should not be recognized in a manner consistent with scheduled rent increases (*i.e.*, on a straight-line basis over the lease term or another systematic and rational allocation basis if it is more representative of the time pattern in which the leased property is physically employed) because the risk of variable payments inherent in contingent rentals is substantively different than scheduled rent increases. The staff believes that the reasoning in FTB 85-3 supports the conclusion that the risks inherent in variable payments associated with contingent rentals should be reflected in financial statements on a basis different than rental payments that adjust on a scheduled basis and, therefore, operating lease income associated with contingent rents would not be recognized as time passes or as the leased property is physically employed. Furthermore, prior to the lessee's achievement of the target upon which contingent rentals are based, the lessor has no legal claims on the contingent amounts. Consequently, the staff believes that it is inappropriate to anticipate changes in the factors on which contingent rental income in operating leases is based and recognize rental income prior to the resolution of the lease contingencies.

Because Company A's contingent rental income is based upon whether the customer achieves net sales of $25 million, the contingent rentals, which may not materialize, should not be recognized until the customer's net sales actually exceed $25 million. Once the $25 million threshold is met, Company A would recognize the contingent rental income as it becomes accruable, in this case, as the customer recognizes net sales. The staff does

not believe that it is appropriate to recognize revenue based upon the probability of a factor being achieved. The contingent revenue should be recorded in the period in which the contingency is resolved.

Question 9

**Facts:** Paragraph 8 of SFAS No. 48 lists a number of factors that may impair the ability to make a reasonable estimate of product returns in sales transactions when a right of return exists.[43] The paragraph concludes by stating "other factors may preclude a reasonable estimate."

**Question:** What "other factors," in addition to those listed in paragraph 8 of SFAS No. 48, has the staff identified that may preclude a registrant from making a reasonable and reliable estimate of product returns?

**Interpretive Response:** The staff believes that the following additional factors, among others, may affect or preclude the ability to make reasonable and reliable estimates of product returns: (1) significant increases in or excess levels of inventory in a distribution channel (sometimes referred to as "channel stuffing"), (2) lack of "visibility" into or the inability to determine or observe the levels of inventory in a distribution channel and the current level of sales to end users, (3) expected introductions of new products that may result in the technological obsolescence of and larger than expected returns of current products, (4) the significance of a particular distributor to the registrant's (or a reporting segment's) business, sales and marketing, (5) the newness of a product, (6) the introduction of competitors' products with superior technology or greater expected market acceptance, and other factors that affect market demand and changing trends in that demand for the registrant's products. Registrants and their auditors should carefully analyze all factors, including trends in historical data, that may affect registrants' ability to make reasonable and reliable estimates of product returns.

The staff reminds registrants that if a transaction fails to meet all of the conditions of paragraphs 6 and 8 in SFAS No. 48, no revenue may be recognized until those conditions are subsequently met or the return privilege has substantially expired, whichever occurs first.[44] Simply deferring recognition of the gross margin on the transaction is not appropriate.

*5. Income Statement Presentation*

Question 10

**Facts:** Company A operates an internet site from which it will sell Company T's products. Customers place their orders for the product by making a product selection directly from the internet site and providing a credit card number for the payment. Company A receives the order and authorization from the credit card company, and passes the order on to Company T. Company T ships the product directly to the customer. Company A does not take title to the product and has no risk of loss or other responsibility for the product. Company T is responsible for all product returns, defects, and disputed credit card charges. The product is typically sold for $175 of which Company A receives $25. In the event a

credit card transaction is rejected, Company A loses its margin on the sale (*i.e.*, the $25).

**Question:** In the staff's view, should Company A report revenue on a gross basis as $175 along with costs of sales of $150 or on a net basis as $25, similar to a commission?

**Interpretive Response:** Company A should report the revenue from the product on a net basis. In assessing whether revenue should be reported gross with separate display of cost of sales to arrive at gross profit or on a net basis, the staff considers whether the registrant:

1. acts as principal in the transaction,
2. takes title to the products,
3. has risks and rewards of ownership, such as the risk of loss for collection, delivery, or returns, and
4. acts as an agent or broker (including performing services, in substance, as an agent or broker) with compensation on a commission or fee basis.[45]

If the company performs as an agent or broker without assuming the risks and rewards of ownership of the goods, sales should be reported on a net basis.

B. Disclosures

Question 1

**Question:** What disclosures are required with respect to the recognition of revenue?

**Interpretive Response:** A registrant should disclose its accounting policy for the recognition of revenue pursuant to APB Opinion No. 22, *Disclosure of Accounting Policies* . Paragraph 12 thereof states that "the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue...." Because revenue recognition generally involves some level of judgment, the staff believes that a registrant should always disclose its revenue recognition policy. If a company has different policies for different types of revenue transactions, including barter sales, the policy for each material type of transaction should be disclosed. If sales transactions have multiple elements, such as a product and service, the accounting policy should clearly state the accounting policy for each element as well as how multiple elements are determined and valued. In addition, the staff believes that changes in estimated returns recognized in accordance with SFAS No. 48 should be disclosed, if material (*e.g.*, a change in estimate from two percent of sales to one percent of sales).

Regulation S-X requires that revenue from the sales of products, services, and other products each be separately disclosed on the face of the income statement.[46] The staff believes that costs relating to each type of revenue similarly should be reported separately on the face of the income statement.

Case 1:06-cv-06128-NRB Document 59-6 Filed 12/10/07 Page 20 of 31

Management's Discussion and Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.[47] This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."[48] Examples of such revenue transactions or events that the staff has asked to be disclosed and discussed in accordance with FRR 36 are:

- Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.
- Granting of extended payment terms that will result in a longer collection period for accounts receivable (regardless of whether revenue has been recognized) and slower cash inflows from operations, and the effect on liquidity and capital resources. (The fair value of trade receivables should be disclosed in the footnotes to the financial statements when the fair value does not approximate the carrying amount.)[49]
- Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.
- An increasing trend toward sales to a different class of customer, such as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users. Also, increasing service revenue that has a higher profit margin than product sales.
- Seasonal trends or variations in sales.
- A gain or loss from the sale of an asset(s).[50]

Question 2

**Question:** Will the staff expect retroactive changes by registrants to comply with the accounting described in this bulletin?

**Interpretive Response:** All registrants are expected to apply the accounting and disclosures described in this bulletin. The staff, however, will not object if registrants that have not applied this accounting do not restate prior financial statements provided they report a change in accounting principle in accordance with APB Opinion No. 20, *Accounting*

*Changes*, no later than the first fiscal quarter of the fiscal year beginning after December 15, 1999. In periods subsequent to transition, registrants should disclose the amount of revenue (if material to income before income taxes) recognized in those periods that was included in the cumulative effect adjustment. If a registrant files financial statements with the Commission before applying the guidance in this bulletin, disclosures similar to those described in Staff Accounting Bulletin Topic 11-M, *Disclosure of the Impact that Recently Issued Accounting Standards Will Have on the Financial Statements of a Registrant When Adopted in a Future Period*, should be provided. With regard to question 10 of Topic 13-A and Topic 8-A regarding income statement presentation, the staff would normally expect retroactive application to all periods presented unless the effect of applying the guidance herein is immaterial.

However, if registrants have not previously complied with generally accepted accounting principles, for example, by recording revenue for products prior to delivery that did not comply with the applicable bill-and-hold guidance, those registrants should apply the guidance in APB Opinion No. 20 for the correction of an error.[51] In addition, registrants should be aware that the Commission may take enforcement action where a registrant in prior financial statements has violated the antifraud or disclosure provisions of the securities laws with respect to revenue recognition.

## Topic 8: Retail Companies

A. Sales of Leased or Licensed Departments

**Facts:** Department stores and other retailers customarily include the sales of leased or licensed departments in the amount reported as "total revenues."

**Question:** Does the staff have any objection to this practice?

**Interpretive Response:** In November 1975 the staff issued staff accounting bulletin number 1 that addressed this issue. In that bulletin the staff did not object to retailers presenting sales of leased or licensed departments in the amount reported as "total revenues" because of industry practice. Subsequently, in November 1976 the FASB issued SFAS No. 13. In June 1995, the AICPA staff amended its Technical Practice Aid (TPA) section 5100.16, *Rental Revenue Based on Percentage of Sales*, based upon an interpretation of SFAS No. 13 that leases of departments within a retail establishment are leases of tangible assets within the scope of SFAS No. 13.[52] Consistent with the interpretation in TPA section 5100.16, the staff believes that SFAS No. 13 requires department stores and other retailers that lease or license store space to account for rental income from leased departments in accordance with SFAS No. 13. Accordingly, it would be inappropriate for a department store or other retailer to include in its revenue the sales of the leased or licensed departments. Rather, the department store or other retailer should include the rental income as part of its gross revenue. The staff would not object to disclosure in the footnotes to the financial statements of the amount of the lessee's sales from leased departments. If the arrangement is not a lease but rather a service arrangement that provides for payment of a fee or commission, the retailer should recognize the fee or commission as revenue

when earned. If the retailer assumes the risk of bad debts associated with the lessee's merchandise sales, the retailer generally should present bad debt expense in accordance with Regulation S-X article 5-03 (b)(5).

B. * * * * *

This Staff Accounting Bulletin is not intended to change current guidance in the accounting literature. For this reason, adherence to the principles described in this Staff Accounting Bulletin should not raise the costs associated with record-keeping or with audits of financial statements.

---

1 In February 1999, the AICPA published a booklet entitled "Audit Issues in Revenue Recognition." This booklet provides an overview of the current authoritative accounting literature and auditing procedures for revenue recognition and identifies indicators of improper revenue recognition.

2 SFAC No. 5, ¶83-84; ARB No. 43, Chapter 1A, ¶1; APB Opinion No. 10, ¶12. The citations provided herein are not intended to present the complete population of citations where a particular criterion is relevant. Rather, the citations are intended to provide the reader with additional reference material.

3 SFAC No. 2, *Qualitative Characteristics of Accounting Information*, ¶63 states "Representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent." The staff believes that evidence of an exchange arrangement must exist to determine if the accounting treatment represents faithfully the transaction. See also SOP 97-2, ¶8. The use of the term "arrangement" in this Staff Accounting Bulletin is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.

4 SFAC No. 5, ¶84(a), (b), and (d). Revenue should not be recognized until the seller has substantially accomplished what it must do pursuant to the terms of the arrangement, which usually occurs upon delivery or performance of the services.

5 SFAC No. 5, ¶83(a); SFAS No. 48, ¶6(a); SOP 97-2, ¶8. SOP 97-2 defines a "fixed fee" as a "fee required to be paid at a set amount that is not subject to refund or adjustment. A fixed fee includes amounts designated as minimum royalties." Paragraphs 26-33 of SOP 97-2 discuss how to apply the fixed or determinable fee criterion in software transactions. The staff believes that the guidance in paragraphs 26 and 30-33 is appropriate for other sales transactions where authoritative guidance does not otherwise exist. The staff notes that paragraphs 27 through 29 specifically consider software transactions, however, the staff believes that guidance should be considered in other sales transactions in which the risk of technological obsolescence is high.

6 ARB No. 43, Chapter 1A, ¶1 and APB Opinion No. 10, ¶12. See also SFAC No. 5, ¶84(g) and SOP 97-2, ¶8.

7 AICPA, Codification of Statements on Auditing Standards (AU) §560.05, *Subsequent Events* .

8 SFAS No. 48, ¶6(b) and 22.

9 SFAS No. 48, ¶6(b) and 22. The arrangement may not specify that payment is contingent upon subsequent resale or consumption. However, if the seller has an established business practice permitting customers to defer payment beyond the specified due date(s) until the products are resold or consumed, then the staff believes that the seller's right to receive cash representing the sales price is contingent.

10 SFAS No. 48, ¶6(c).

11 SFAS No. 48, ¶6(d).

12 SFAS No. 48, ¶6(e).

13 SFAS No. 49, ¶5(a). Paragraph 5(a) provides examples of circumstances that meet this requirement. As discussed further therein, this condition is present if (a) a resale price guarantee exists, (b) the seller has an option to purchase the product, the economic effect of which compels the seller to purchase the product, or (c) the buyer has an option whereby it can require the seller to purchase the product.

14 SFAS No. 49, ¶5(b).

15 See SOP 97-2, ¶25.

16 See In the Matter of Stewart Parness, Accounting and Auditing Enforcement (AAER) Release No. 108 (August 5, 1986); SEC v. Bollinger Industries, Inc., et al, Lit. Rel. No. 15093 (September 30, 1996); In the Matter of Laser Photonics, Inc., AAER No. 971 (September 30, 1997); In the Matter of Cypress Bioscience Inc., AAER No. 817 (September 19, 1996). Also see SFAC No. 5, ¶84(a). and SOP 97-2, ¶22.

17 Such requests typically should be set forth in writing by the buyer.

18 See Note 16, supra.

19 Such individuals should consider whether APB Opinion No. 21, *Interest on Receivables and Payables*, pertaining to the need for discounting the related receivable, is applicable. APB Opinion No. 21, ¶3(a), indicates that the requirements of that Opinion to record receivables at a discounted value are not intended to apply to "receivables and payables arising from transactions with customers or suppliers in the *normal course of business which are due in customary trade terms* not exceeding approximately one year" (emphasis added).

20 SOP 97-2, ¶22.

21 SOP 97-2, ¶20. Also, SFAC No. 5, ¶83(b) states "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." If an arrangement expressly requires customer acceptance, the staff generally believes that customer acceptance should occur before the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues, especially when the seller is obligated to perform additional steps.

22 SFAC No. 5, ¶83(b) states that "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled the benefits represented by the revenues."

23 SOP 97-2, ¶13, and 68-70.

24 SFAS No. 53, *Financial Reporting by Producers and Distributors of Motion Picture Films*, ¶6. The FASB has issued an Exposure Draft to rescind SFAS No. 53. The AICPA's Accounting Standards Executive Committee intends to issue a new SOP that would replace SFAS No. 53 and provide authoritative guidance on accounting for motion pictures. The Exposure Draft of the proposed new SOP contains a similar criterion for revenue recognition of a licensed film (*i.e.*, the license period of the arrangement has begun and the customer can begin its exploitation, exhibition, or sale).

25 See SFAC No. 5, footnote 51, for a description of the "earning process."

26 In a similar situation, lenders may collect nonrefundable loan origination fees in connection with lending activities. The FASB concluded in SFAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*, that loan origination is not a separate revenue-producing activity of a lender, and therefore, those nonrefundable fees collected at the outset of the loan arrangement are not recognized as revenue upon receipt but are deferred and recognized over the life of the loan (paragraphs 5 and 37).

27 The revenue recognition period should extend beyond the initial contractual period if the relationship with the customer is expected to extend beyond the

initial term and the customer continues to benefit from the payment of the up-front fee (*e.g.*, if subsequent renewals are priced at a bargain to the initial up-front fee).

28 A systematic method would be on a straight-line basis, unless evidence suggests that revenue is earned or obligations are fulfilled in a different pattern, in which case that pattern should be followed.

29 Footnote 1 of SOP 98-5, *Reporting on the Costs of Start-Up Activities*, states that "this SOP does not address the financial reporting of costs incurred related to ongoing customer acquisition, such as policy acquisition costs in Financial Accounting Standards Board (FASB) Statement No. 60, *Accounting and Reporting by Insurance Enterprises*, and loan origination costs in FASB Statement No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases* . The SOP addresses the more substantive one-time efforts to establish business with an entirely new class of customers (for example, a manufacturer who does all of its business with retailers attempts to sell merchandise directly to the public)." As such, the set-up costs incurred in this example are not within the scope of SOP 98-5. The staff believes that the incremental direct costs (SFAS No. 91 provides an analogous definition) incurred related to the acquisition or origination of a customer contract, unless specifically provided for in the authoritative literature, should be accounted for in accordance with paragraph 4 of FASB Technical Bulletin (FTB) 90-1, *Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts* or paragraph 5 of SFAS No. 91.

30 See Note 27, supra.

31 SOP 97-2, ¶31.

32 Ibid.

33 Ibid.

34 SFAS No. 125, ¶16.

35 SFAS No. 48, ¶4.

36 The staff will question further analogies to the guidance in SFAS No. 48 for transactions expressly excluded from its scope.

37 Reliability is defined in SFAC No. 2 as "the quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent." Paragraph 63 of SFAC No. 5 reiterates the definition of reliability, requiring that "the information is representationally faithful, verifiable, and neutral."

38 For example, if an estimate of the expected cancellation rate varies from the actual cancellation rate by 100% but the dollar amount of the error is immaterial to the consolidated financial statements, some would argue that the estimate could still be viewed as reliable. The staff disagrees with that argument.

39 The term "remote" is used here with the same definition as used in SFAS No. 5, *Accounting for Contingencies* .

40 Paragraph 8 of SFAS No. 48 notes various factors that may impair the ability to make a reasonable estimate of returns, including the lack of sufficient historical experience. The staff typically expects that the historical experience be based on the particular registrant's historical experience for a service and/or class of customer. In general, the staff typically expects a start-up company, a company introducing new services, or a company introducing services to a new class of customer to have at least two years of experience to be able to make reasonable and reliable estimates.

41 SFAS No. 91, paragraph 5 and FTB 90-1, paragraph 4 both provide for the deferral of incremental direct costs associated with acquiring a revenue-producing contract. Even though the revenue discussed in this example is refundable, if a registrant meets the aforementioned criteria for revenue recognition over the membership period, the staff would analogize to this guidance. However, if neither a nonrefundable contract nor a reliable basis for

estimating net cash inflows under refundable contracts exists to provide a basis for recovery of incremental direct costs, the staff believes that such costs should be expensed as incurred. See Note 29, supra.

42 Lessees should follow the guidance established in EITF Issue No. 98-9, *Accounting for Contingent Rent* .

43 These factors include "a) the susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand, b) relatively long periods in which a particular product may be returned, c) absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies and relationships with its customers, and d) absence of a large volume of relatively homogeneous transactions."

44 SFAS No. 48, ¶6.

45 See, for example, ARB 43, Chapter 11A, ¶20; SOP 81-1, ¶58-60; and SFAS No. 45, ¶16.

46 See Regulation S-X, Article 5-03 (b) (1) and (2).

47 See Regulation S-K, Article 303 and Financial Reporting Release No. 36.

48 FRR 36, also see In the Matter of Caterpillar Inc., AAER No. 363 (March 31, 1992).

49 SFAS No. 107, *Disclosures about Fair Values of Financial Instruments* .

50 Gains or losses from the sale of assets should be reported as "other general expenses" pursuant to Regulation S-X, Article 5-03 (b) (6). Any material item should be stated separately.

51 APB Opinion No. 20, ¶13 and ¶36-37 describe and provide the accounting and disclosure requirements applicable to the correction of an error in previously issued financial statements. Because the term "error" as used in APB Opinion No. 20 includes "oversight or misuse of facts that existed at the time that the financial statements were prepared," that term includes both unintentional errors as well as intentional fraudulent financial reporting and misappropriation of assets as described in Statement on Auditing Standards No. 82, *Consideration of Fraud in a Financial Statement Audit* .

52 SFAS No. 13, ¶1 defines a lease as "the right to use property, plant, or equipment (land or depreciable assets or both) usually for a stated period of time."

U.S. Securities and Exchange Commission

# SEC Staff Accounting Bulletin:
# No. 101A - Amendment:
# Revenue Recognition in Financial Statements

**Securities and Exchange Commission**

**17 CFR Part 211**

**[Release No. SAB 101A]**

**Staff Accounting Bulletin No. 101A**

**Agency:** Securities and Exchange Commission

**Action:** Publication of Staff Accounting Bulletin

**Summary:** Staff Accounting Bulletin No. 101 ("SAB 101") was released on December 3, 1999 (64FR68936 December 9, 1999) and provides the staff's views in applying generally accepted accounting principles to selected revenue recognition issues. Since the issuance of SAB 101, the staff received requests from a number of groups asking for additional time to study the guidance. Many registrants have calendar year-ends and may need more time to perform a detailed review of the SAB since its issuance on December 3, 1999. This staff accounting bulletin delays the implementation date of SAB 101 for registrants with fiscal years that begin between December 16, 1999 and March 15, 2000.

**Date:** March 24, 2000

**For Further Information Contact:** Richard Rodgers, Scott Taub, or Eric Jacobsen, Professional Accounting Fellows, Office of the Chief Accountant (202/942-4400) or Robert Bayless, Division of Corporation Finance (202/942-2960), Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549; electronic addresses: RodgersR@sec.gov; TaubS@sec.gov; JacobsenE@sec.gov; or BaylessR@sec.gov.

**Supplementary Information:** The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Jonathan G. Katz

Secretary

Date: March 24, 2000

---

Part 211 - (AMEND)

Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 101A to the table found in Subpart B.

**Staff Accounting Bulletin No. 101A**

The staff hereby amends Question 2 of Section B of Topic 13 of the Staff Accounting Bulletin Series.

**Topic 13: Revenue Recognition**

* * * * *

B. Disclosures

Question 1

* * * * *

Question 2

**Question:** Will the staff expect retroactive changes by registrants to comply with the accounting described in this bulletin?

**Interpretive Response:** All registrants are expected to apply the accounting and disclosures described in this bulletin. The staff, however, will not object if registrants that have not applied this accounting do not restate prior financial statements provided they report a change in accounting principle in accordance with APB Opinion No. 20, *Accounting Changes*, no later than the first fiscal quarter of the fiscal year beginning after December 15, 1999, except that registrants with fiscal years that begin between December 16, 1999 and March 15, 2000 may report a change in accounting principle no later than their second fiscal quarter of the fiscal year beginning after December 15, 1999 in accordance with FASB Statement No. 3, *Reporting Accounting Changes in Interim Financial Statements*. In periods subsequent to transition, registrants should disclose the amount of revenue (if material to income before income taxes) recognized in those periods that was included in the cumulative effect adjustment. If a registrant files financial statements with the Commission before applying the guidance in this bulletin, disclosures similar to those described in Staff Accounting Bulletin Topic 11-M, *Disclosure of the Impact that Recently Issued Accounting Standards Will Have on the Financial Statements of a Registrant When Adopted in a Future Period*, should be provided. With regard to question 10 of Topic 13-A and Topic 8-A regarding income statement presentation, the staff would normally expect retroactive application to all periods presented unless the effect of applying the guidance herein is immaterial.

However, if registrants have not previously complied with generally accepted accounting principles, for example, by recording revenue for products prior to delivery that did not comply with the applicable bill-and-hold guidance, those registrants should apply the guidance in APB Opinion No. 20 for the correction of an error.[1] In addition, registrants should be aware that the Commission may take enforcement action where a registrant in prior financial statements has violated the antifraud or disclosure provisions of the securities laws with respect to revenue recognition.

---

1 APB Opinion No. 20, ¶13 and ¶36-37 describe and provide the accounting and disclosure requirements applicable to the correction of an error in previously issued financial statements. Because the term "error" as used in APB Opinion No. 20 includes "oversight or misuse of facts that existed at the time that the financial statements were prepared," that term includes both unintentional errors as well as intentional fraudulent financial reporting and misappropriation of assets as described in Statement on Auditing Standards No. 82, *Consideration of Fraud in a Financial Statement Audit*.

Case 1:06-cv-06128-NRB Document 59-6 Filed 12/10/07 Page 29 of 31

U.S. Securities and Exchange Commission

# SEC Staff Accounting Bulletin:
# No. 101B - Second Amendment:
# Revenue Recognition in Financial Statements

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 211**

**[Release No. SAB 101B]**

**Staff Accounting Bulletin No. 101B**

**Agency:** Securities and Exchange Commission

**Action:** Publication of Staff Accounting Bulletin

**Summary:** Staff Accounting Bulletin No. 101 ("SAB 101") was released on December 3, 1999 (64 FR 68936 December 9, 1999) and provides the staff's views in applying generally accepted accounting principles to selected revenue recognition issues. SAB 101A was released on March 24, 2000 (65 FR 16811 March 30, 2000) and delayed for one fiscal quarter the implementation date of SAB 101 for registrants with fiscal years beginning between December 16, 1999 and March 15, 2000. Since the issuance of SAB 101 and SAB 101A, the staff has continued to receive requests from a number of groups asking for additional time to determine the effect, if any, on registrant's revenue recognition practices. This staff accounting bulletin delays the implementation date of SAB 101 until no later than the fourth fiscal quarter of fiscal years beginning after December 15, 1999.

**Date:** June 26, 2000

**For Further Information Contact:** Richard Rodgers, Scott Taub, or Eric Jacobsen, Professional Accounting Fellows, Office of the Chief Accountant (202/942-4400) or Robert Bayless, Division of Corporation Finance (202/942-2960), Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549; electronic addresses: RodgersR@sec.gov; TaubS@sec.gov; JacobsenE@sec.gov; or BaylessR@sec.gov.

**Supplementary Information:** The statements in the staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's official approval. They represent interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Jonathan G. Katz

Secretary

Date: June 26, 2000

---

Part 211 - (AMEND)

Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 101B to the table found in Subpart B.

**STAFF ACCOUNTING BULLETIN NO. 101B**

The staff hereby amends Question 2 of Section B of Topic 13 of the Staff Accounting Bulletin Series.

**TOPIC 13: REVENUE RECOGNITION**

* * * * *

B. Disclosures

Question 1

* * * * *

Question 2

**Question:** Will the staff expect retroactive changes by registrants to comply with the accounting described in this bulletin?

**Interpretive Response:** All registrants are expected to apply the accounting and disclosures described in this bulletin. The staff, however, will not object if registrants that have not applied this accounting do not restate prior financial statements provided they report a change in accounting principle in accordance with APB Opinion No. 20, *Accounting Changes*, and FASB Statement No. 3, *Reporting Accounting Changes in Interim Financial Statements*, no later than the fourth fiscal quarter of the fiscal year beginning after December 15, 1999. In periods subsequent to transition, registrants should disclose the amount of revenue (if material to income before income taxes) recognized in those periods that was included in the cumulative effect adjustment. If a registrant files financial statements with the Commission before applying the guidance in this bulletin, disclosures similar to those described in Staff Accounting Bulletin Topic 11-M, *Disclosure of the Impact that Recently Issued Accounting Standards Will Have on the Financial Statements of a Registrant When Adopted in a Future Period*, should be provided. With regard to question 10 of Topic 13-A and Topic 8-A regarding income statement presentation, the staff would normally expect retroactive application to all periods presented unless the effect of applying the guidance herein is immaterial.

However, if registrants have not previously complied with generally accepted accounting principles, for example, by recording revenue for

products prior to delivery that did not comply with the applicable bill-and-hold guidance, those registrants should apply the guidance in APB Opinion No. 20 for the correction of an error.[1] In addition, registrants should be aware that the Commission may take enforcement action where a registrant in prior financial statements has violated the antifraud or disclosure provisions of the securities laws with respect to revenue recognition.

---

1 APB Opinion No. 20, ¶13 and ¶36-37 describe and provide the accounting and disclosure requirements applicable to the correction of an error in previously issued financial statements. Because the term "error" as used in APB Opinion No. 20 includes "oversight or misuse of facts that existed at the time that the financial statements were prepared," that term includes both unintentional errors as well as intentional fraudulent financial reporting and misappropriation of assets as described in Statement on Auditing Standards No. 82, *Consideration of Fraud in a Financial Statement Audit*.

*http://www.sec.gov/interps/account/sab101b1.htm*