UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | Case No. 06 Civ. 6128 (NRB)<br>ECF Case |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE AND KATHRYN A. GAMBLE'S MOTION TO DISMISS**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble

Of Counsel:
Lewis J. Liman
Breon S. Peace
James C. Clark

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 1 |
| BACKGROUND | 3 |
| ARGUMENT | 6 |
| POINT I | |
| THE COMPLAINT'S SCIENTER ALLEGATIONS ARE INADEQUATE | 6 |
| A. The Relevant Legal Standards | 6 |
| B. Plaintiffs Fail To Plead A Strong Inference That The Defendants Acted With Scienter | 8 |
| C. Plaintiffs' Allegations Cannot Survive The Scrutiny Demanded By Tellabs | 17 |
| POINT II | |
| THE COMPLAINT FAILS ADEQUATELY TO ALLEGE LOSS CAUSATION | 20 |
| POINT III | |
| FORWARD-LOOKING STATEMENTS ARE NON-ACTIONABLE | 24 |
| POINT IV | |
| PLAINTIFFS' SECTION 20(a) CLAIM SHOULD BE DISMISSED | 25 |
| CONCLUSION | 25 |

# TABLE OF AUTHORITIES

Page(s)

## Rules and Statutes


15 U.S.C. § 78u-4(b)(4) .......... 20-21

15 U.S.C. § 78u-5(c) .......... 24-25


## Cases


Acito v. IMCERA Group, Inc.,
47 F.3d 47 (2d Cir. 1995) .......... 9, 25

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007) .......... 8, 17, 25

Chill v. Gen. Elec. Co.,
101 F.3d 263 (2d Cir. 1996) .......... 6

Davidoff v. Farina,
04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638 (S.D.N.Y. Aug. 22, 2005) .......... 8, 18, 20, 21-22

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005) .......... 3, 20, 22

Filler v. Hanvit Bank,
156 F. App'x 413 (2d Cir. 2005) .......... 20

Garfield v. NDC Health Corp.,
466 F.3d 1255 (11th Cir. 2006) .......... 20

Gavish v. Revlon, Inc.,
No. 00 Civ. 7291 (SHS), 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) .......... 16-17

In re Advanta Corp. Sec. Litig.,
180 F.3d 525 (3d Cir. 1999) .......... 19

In re Alston SA Sec. Litig.,
454 F. Supp. 2d 187 (S.D.N.Y. 2006) .......... 6

In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,
381 F. Supp. 2d 192 (S.D.N.Y. 2004) .......... 9, 13

In re AOL Time Warner Sec. Litig.,
No. 06 Civ. 0695 (SWK) 2007 U.S. Dist. LEXIS 45037(S.D.N.Y. June 20, 2007) .......... 22-23

Page(s)

In re Avista Corp. Sec. Litig.,
415 F. Supp. 2d 1214 (E.D. Wash. 2005) .......... 23-24

In re Bristol-Myers Squibb Sec. Litig.,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) .......... *passim*

In re DRDGold Ltd. Sec. Litig.,
472 F. Supp. 2d 562 (S.D.N.Y. 2007) .......... 17

In re eSpeed, Inc. Sec. Litig.,
457 F. Supp. 2d 266 (S.D.N.Y. 2006) .......... 22-23

In re IAC/InterActiveCorp Sec. Litig.,
478 F. Supp. 2d 574 (S.D.N.Y. 2007) .......... 25

In re Initial Pub. Offering Sec. Litig.,
399 F. Supp. 2d 298 (S.D.N.Y. 2005),
aff'd sub nom, Tenney v. Credit Suisse First Boston Corp.,
No. 05-3430-CV, 2006 U.S. App. LEXIS 13050 (2d Cir. May 19, 2006) .......... 21, 24

In re Interpublic Sec. Litig.,
02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844 (S.D.N.Y. May 29, 2003) .......... 17

In re JP Morgan Chase Sec. Litig.,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) .......... 6, 10

In re Keyspan Corp. Sec. Litig.,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) .......... 19

In re Merrill Lynch & Co., Inc.,
273 F. Supp. 2d 351 (S.D.N.Y. 2003) .......... 25-26

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) .......... 19

In re Merrill Lynch Tyco Research Sec. Litig.,
No. 03 CV 4080 (MP), 2004 U.S. Dist LEXIS 2247 (S.D.N.Y. Feb. 18, 2004) .......... 22-23

In re MSC Indus. Direct Co.,
283 F. Supp. 2d 838 (E.D.N.Y. 2003) .......... 13, 16-17

In re Nokia Oyj (Nokia Corp.) Sec. Litig.,
423 F. Supp. 2d 364 (S.D.N.Y. 2006) .......... 25

In re Omnicom Group, Inc. Sec. Litig.,
02 Civ. 4483 (RCC), 2005 U.S. Dist. LEXIS 5272 (S.D.N.Y. Mar. 30, 2005) .......... 19

Page(s)

In re Rhodia S.A. Sec. Litig.,
No. 1:05 Civ. 5389 (DAB), 2007 U.S. Dist. LEXIS 72758 (S.D.N.Y. Sept. 26, 2007)..... 20

In re Yukos Oil Co. Sec. Litig.,
04 Civ. 5243 (WHP), 2006 U.S. Dist. LEXIS 78067 (S.D.N.Y. Oct. 25, 2006) .............. 20

Ind. State Dist. Council of Laborers v. Omnicare, Inc.,
No. 2006-26 (WOB), 2007 U.S. Dist. LEXIS 76620 (E.D. Ky. Oct. 12, 2007) ............... 23-24

Joffee v. Lehman Bros. Inc.,
209 F. App'x 80 (2d Cir. 2006) .......................................................................... 21, 24

Kalnit v. Eichler,
264 F.3d 131 (2d Cir. 2001) .......................................................................6-7, 9-10, 12

Lentell v. Merrill Lynch & Co. Inc.,
396 F.3d 161 (2d Cir. 2005), cert. denied, 546 U.S. 935 (2005)......................................20-21, 24

Leykin v. AT&T Corp.,
423 F. Supp. 2d 229 (S.D.N.Y. 2006) .......................................................................... 22, 24

Markowski v. SEC,
34 F.3d 99 (2d Cir. 1994) .......................................................................................... 18

Mfrs. Life Ins. Co. (U.S.A.) v. Donaldson, Lufkin & Jenrette Sec. Corp.,
No. 99 Civ. 1944 (NRB), 2000 U.S. Dist. LEXIS 7444 (S.D.N.Y. June 1, 2000)............ 7

Nelson v. Stahl,
173 F. Supp. 2d 153 (S.D.N.Y. 2001) .......................................................................... 6

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000) ........................................................................................ 6-7

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004) ........................................................................................ 25

Rothman v. Gregor,
220 F.3d 81 (2d Cir. 2000) .......................................................................................... 6

SEC v. Caserta,
75 F. Supp. 2d 79 (E.D.N.Y. 1999) ............................................................................ 18

SEC v. DCI Telecomm., Inc.,
122 F. Supp. 2d 495 (S.D.N.Y. 2000) .......................................................................... 18

Page(s)

SEC v. First Jersey Sec., Inc.,
101 F.3d 1450 (2d Cir. 1996) .......... 25

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
127 S. Ct. 2499 (2007) .......... 1, 3, 7

Weiss v. Amkor Tech., Inc.,
No. CV 07-0278-PHX-PGR, 2007 U.S. Dist. LEXIS 71688 (N.D. Ariz. Sept. 25, 2007) 23-24

IMAX Corporation ("IMAX" or the "Company"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble (together, the "Defendants"), by counsel, respectfully submit this memorandum of law in support of their motion, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, to dismiss the Consolidated Amended Class Action Complaint (the "CAC" or "Compl.") filed by Lead Plaintiff Westchester Capital Management, Inc. and Plaintiff The Steelworkers Pension Trust (together, the "Plaintiffs").

## PRELIMINARY STATEMENT

On July 20, 2007, IMAX culminated an eleven-month evaluation of its revenue recognition policy by announcing a new accounting policy with regard to theater system revenue recognition, and issuing a restatement of certain financial statements. Plaintiffs reacted to the news by filing a putative class action complaint claiming that IMAX had made a mistake in its application of U.S. Generally Accepted Accounting Principles ("GAAP"). Plaintiffs' Complaint is deficient under established law and the Private Securities Litigation Reform Act ("PSLRA").

First, Plaintiffs fail to allege particularized factual allegations that establish the "strong inference" that IMAX acted with scienter, as required under the PSLRA. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007). Plaintiffs rely heavily on the fact that at the end of the four-year class period, and many years after IMAX allegedly began misapplying GAAP, IMAX announced a determination to explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business. By virtue of this announcement, they allege that each of IMAX's executives was motivated to commit fraud (purportedly beginning as early as 2002), because these executives would receive certain payments upon the sale of the Company or had received incentive bonuses. They neglect to cite a nexus to explain how the alleged fraud would improve the likelihood of a sale, or to mention that IMAX determined not to pursue the sale of the Company despite receiving

indications of interest. As a matter of law, the desire to achieve a high sale price for shareholders, and the change of control benefits that invariably accompany a sale, are insufficient to establish scienter.

Plaintiffs also do not allege facts to establish that Defendants acted recklessly, much less committed an intentional illegal act. Plaintiffs allege that since 2002 the Company mistakenly applied a particular type of accounting, multiple element arrangement accounting as established by EITF 00-21,[1] in its recognition of revenue for the manufacture of certain theater system parts. In particular, Plaintiffs claim that IMAX recognized revenue for certain parts of IMAX's theater systems upon installation (parts that were manufactured to the customer's satisfaction), rather than waiting to recognize such revenue until the remaining components of IMAX's theater system were installed. The very Form 10-K upon which Plaintiffs rely, as well as the accounting literature, however, make clear that the accounting determinations that IMAX made are ones that are "highly complex and involve subjective judgments." IMAX Corp., 2005 Annual Report (Form 10-K), at 21 (Mar. 9, 2006) (Clark Decl. Ex. B) [hereinafter 2005 Form 10-K]. Plaintiffs do not allege facts establishing that Defendants knew IMAX's judgments were wrong and instead affirmatively allege that IMAX's external auditors, PricewaterhouseCoopers LLP ("PwC"), firmly and consistently supported the Company's application of GAAP at all times.

Equally telling is what Plaintiffs do not allege. The CAC does not allege that: (i) the Individual Defendants sought to sell their own shares during the Class Period,[2] (ii) anyone

---

1 Documents attached as exhibits to the Declaration of James C. Clark dated December 10, 2007, are cited herein as "Clark Decl. Ex. __." A copy of the Emerging Issues Task Force Issue No. 00-21 ("EITF 00-21") is attached as Clark Decl. Ex. A.

2 On the contrary, over the course of the class period, three of the Individual Defendants continued to acquire the Company's stock and the fourth maintained the same level of stock ownership, a fact that negates, rather than supports, scienter.

indicated, either directly or indirectly, to any of the Individual Defendants at the relevant time that the accounting was incorrect, or (iii) the auditors disagreed in any way with the accounting.

Second, the CAC fails to allege loss causation, the causal link between IMAX's alleged misstatement and Plaintiffs' claimed losses that is required under the PSLRA and the Supreme Court decision in Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005). When IMAX announced its restatement, its stock price rose. There was no negative market reaction.

## BACKGROUND[3]

IMAX is an entertainment technology company, specializing in digital and film-based motion picture technologies. Compl. ¶¶ 8, 37. The Company's principal business is the design and manufacture of theater systems based on proprietary and patented technology for large-format, 15-perforation film frame, 70mm format theaters, which it then sells or leases to theater chains. Compl. ¶¶ 13, 35, 37.

IMAX manufactures specialized projection equipment, an advanced sound system, a theater automation control system, film handling equipment, and a 3D glasses-cleaning system (where applicable). IMAX Corp., 2006 Annual Report (Form 10-K), at 6 (July 20, 2007) (Clark Decl. Ex. C) [hereinafter 2006 Form 10-K]; Compl. ¶ 35. It also purchases a screen from a third party. 2006 Form 10-K at 14 (Clark Decl. Ex. C). It delivers those components to the theaters, and supervises their installation. IMAX's revenue is received principally from the sale or lease of its theater systems, not from box office revenues. Id. at 20, 41.

The CAC alleges that, starting as early as 2002, IMAX misapplied accounting rules to the recognition of revenue on the manufacture and sale or lease of components of its

[3] The Plaintiffs' allegations are accepted as true for the purposes of this motion to dismiss only. See Tellabs, 127 S. Ct. at 2509.

theater systems. The relevant accounting literature for most of the time, SAB 101[4] and EITF 00-21, provided that companies were required to recognize revenue for arrangements involving multiple deliverables when the earnings process was complete as to each separate unit of accounting. The CAC alleges that IMAX considered its projection and sound system to be a separate deliverable and recognized revenue for those items when the earnings process was completed (i.e., when they were installed), without waiting in all instances for installation of the other deliverables. The value of those other items, the glasses cleaning machine or screen, represented a miniscule portion of the total theater system.[5] IMAX deferred recognition of the revenue it received for those uncompleted deliverables. Compl. ¶ 115.

Based on IMAX's alleged misapplication of GAAP beginning in 2002, Plaintiffs conclude that every earnings press release and many forward-looking statements made during earnings conference calls were materially false or misleading. See Compl. ¶¶ 64-71.

Plaintiffs do not allege that any member of IMAX's finance team or its auditors believed or were told that the accounting was wrong. As Plaintiffs recognize, for fiscal years 2002 through 2005, PwC audited the Company's financial statements and for each of those years, PwC issued a "clean" audit opinion stating that the Company's financial statements, results of operations and cash flows were presented fairly and in accordance with GAAP.[6] Compl. ¶¶ 20, 169, 185. Given that, Plaintiffs are reduced to alleging that the SEC and the Ontario Securities Commission ("OSC") asked questions regarding IMAX's accounting and that the Company (after taking those questions seriously and conducting an 11-month evaluation)

---

4 A copy of SEC Staff Accounting Bulletin 101 ("SAB 101") is attached as Clark Decl. Ex. D.

5 For perspective, on a theater system installation with a value of approximately $1.5 million, the IMAX screen accounts for between $100,000 and $125,000 in revenue. IMAX Corp., Earnings Conference Call (July 20, 2007) (Clark Decl. Ex. E).

6 Indeed, as Bradley Wechsler stated during IMAX's August 9, 2006 earnings call, the Company's decision to use multiple element arrangement accounting was reached "with the guidance and support of our auditors, Price Waterhouse Cooper." IMAX Corp., Earnings Conference Call (Aug. 9, 2006) (Clark Decl. Ex. F).

concluded that, under EITF 00-21, the entire theater system should be treated as a single deliverable and a single unit of accounting such that IMAX would not recognize revenue upon completion of the earnings process with respect to any component of a theater system until it completed the earnings process with respect to all components of the theater system. Compl. ¶¶ 139, 145.

On July 20, 2007, following and as a direct result of the inquiries from the SEC and the OSC and the Company's detailed analysis, IMAX restated its financial statements for fiscal year 2002 through the third quarter of fiscal year 2006 and announced its revised revenue recognition policy for theater system installations. Compl. ¶¶ 57-58. The restatement had the effect of shifting certain theater systems revenues from the period in which they were previously reported to subsequent periods. Press Release, IMAX Corp. (July 20, 2007) (Clark Decl. Ex. G). A total of 16 installations were shifted between reported quarters within their originally reported years and 14 installations were shifted between fiscal years. Id. Following the issuance of its restatement, the Company's share price rose. On the day of the restatement, IMAX's stock closed up $0.45 from the previous day's closing and on the following day, it closed up another $0.13.[7]

On October 2, 2007, Plaintiffs filed their Amended Complaint asserting claims under Section 10(b), Rule 10b-5 thereunder, and Section 20(a) of the Exchange Act.

---

[7] A copy of the NASDAQ Stock Exchange trading data from February 3, 2003 through August 31, 2007 is attached as Clark Decl. Ex. H.

## ARGUMENT

## I. THE COMPLAINT'S SCIENTER ALLEGATIONS ARE INADEQUATE

### A. The Relevant Legal Standards

To state a claim for a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the CAC must allege "that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information" required to be disclosed, and that the plaintiff's injury was caused by plaintiff's reliance on the defendant's action or omission. Chill v. Gen. Elec. Co., 101 F.3d 263, 266 (2d Cir. 1996) (citation omitted and emphasis supplied).

"[T]o plead scienter in a securities fraud claim, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000) (citation omitted); see Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000). "Where motive is not apparent . . . circumstantial allegations [of conscious behavior] must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted); see also In re Alston SA Sec. Litig., 454 F. Supp. 2d 187, 198 n.7 (S.D.N.Y. 2006); In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005).

The standards for pleading scienter are stringent. Merely invoking the "magic words" of "motive and opportunity" is not enough for a complaint to survive a motion to dismiss. Rothman, 220 F.3d at 90 (quoting Novak, 216 F.3d at 311). Allegations of a defendant's motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Novak, 216 F.3d at 307; see also Nelson v. Stahl, 173 F. Supp. 2d 153, 168 (S.D.N.Y. 2001). Further, "[m]otives that are generally

possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit, 264 F.3d at 139 (citing Novak, 216 F.3d at 307-08).

Moreover, to satisfy the intent or recklessness prong of scienter, a complaint must allege at least that defendants engaged in conduct "'involving not merely simple, or even inexcusable negligence,' but rather 'an extreme departure from the standards of ordinary care'" to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Mfrs. Life Ins. Co. (U.S.A.) v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 99 Civ. 1944 (NRB), 2000 U.S. Dist. LEXIS 7444, at *9 (S.D.N.Y. June 1, 2000) (citations omitted). Only "'an egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness.'" Novak, 216 F.3d at 308 (quoting Chill 101 F.3d at 269).

The pleading standards also require a plaintiff to allege with particularity facts giving rise to a strong or powerful inference, and not merely a reasonable inference of scienter. Tellabs, 127 S. Ct. at 2510. First, the court must inspect plaintiff's allegations to determine whether, accepting the factual allegations as true, they permit an inference of the requisite state of mind. Second, the court must consider all plausible non-culpable explanations for the defendant's conduct to determine whether the inferences plaintiff seeks to draw are "cogent and at least as compelling as any opposing inference of non-fraudulent intent." Id. at 2505. It is only if a plaintiff passes this two-part test and only if the factual allegations viewed "collectively" establish an "inference of scienter at least as strong as any opposing inference" that a complaint may survive a motion to dismiss. Id. at 2511.

The court may not consider conclusory statements. It may only consider factual allegations, as well as "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "Allegations that are conclusory or unsupported by factual assertions are insufficient." Id. at 99.

## B. Plaintiffs Fail To Plead A Strong Inference That The Defendants Acted With Scienter

It is well-settled law that "a Restatement of financial results . . . without corresponding fraudulent intent [is] not sufficient to state a securities fraud claim." In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004) (quoting Chill, 101 F.3d at 270-71); see Davidoff v. Farina, 04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638, at *55 (S.D.N.Y. Aug. 22, 2005) (citation omitted) ("allegations of GAAP violations or accounting irregularities alone are insufficient to state a securities fraud claim without evidence of 'corresponding fraudulent intent'"). Aside from the insufficient fact of the restatement itself, Plaintiffs only allege three things with respect to scienter: 1) that Individual Defendants received performance-based bonuses, 2) that Defendants attempted to sell the Company and in the event of a sale Defendants Gelfond and Wechsler would receive a change of control bonus, and 3) that the Defendants had access to information about the timing of theater installations. None of these allegations, either alone or collectively, are sufficient to plead scienter.

First, the allegation that the Individual Defendants were motivated by the bonuses they received under the Management Incentive Plan, is insufficient. Compl. ¶¶ 213, 214, 221. The most that Plaintiffs could say about compensation is the anodyne fact that "[b]onuses are

awarded under this plan [to employees other than the Co-CEOs] based on the Company achieving annual operating objectives targets and the participating employee's achievement of personal performance standards." IMAX Corp., Proxy (Form 14A), at 11 (Aug. 10, 2007) (Clark Decl. Ex. I); see Compl. ¶ 213. Further, bonuses of the two co-CEOs were not based on a formula known to them in advance or by specific calculations determined after the fact. Rather, after the end of the year, the independent Compensation Committee took into account numerous factors including, inter alia, targeted theater signings, release of IMAX versions of Hollywood films, and cash flows (none of which were affected by the restatement), as well as budgeted profit and loss. IMAX Corp., Proxy (Form 14A) (Aug. 10, 2007) (Clark Decl. Ex. I); see Compl. ¶ 214.

The fact that an individual receives performance-based bonuses or other pecuniary benefits, however, is insufficient to establish scienter as a matter of law. See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig., 381 F. Supp. 2d 192, 218 (S.D.N.Y. 2004) (finding generalized allegations that a company sought to inflate the price of its stock to effectuate a merger were insufficient to allege motive, even when coupled with allegations of corporate officers' avaricious intentions to retain their positions of power and "access to corporate riches").

The Second Circuit has squarely held that "executive compensation dependent on stock value does not give rise to a strong inference of scienter." Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995). Indeed, "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." Kalnit, 264 F.3d at 140. Especially here, where plaintiffs allege no more than that earnings was one factor (among many) in compensation, the

allegation of performance-based bonuses does not, as a matter of law, suffice to establish a motive to commit fraud.

Second, Plaintiffs claim that Defendants acted with scienter extending back to 2002 because in 2006 they put the Company up for sale. See Compl. ¶¶ 213-221. In particular, on March 9, 2006, after the release of the annual results Plaintiffs claim were misstated, IMAX announced that, after receiving several unsolicited inquiries, its Board of Directors had begun a process to "explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business . . . ." Press Release, IMAX Corp. (Mar. 9, 2006) (Clark Decl. Ex. J); see Compl. ¶ 104. Several months later, on December 15, 2006, IMAX announced that it would no longer pursue a sale or merger. Compl. ¶ 125.

The allegation that IMAX was motivated to engage in incorrect accounting and "to inflate the price of the Company's stock as a result of Defendant's desire to sell the Company" (Compl. ¶¶ 198, 216, 221), however, is both fanciful on its face and insufficient to plead scienter. Once the pleadings are properly understood, Plaintiffs' theory collapses.

As a matter of law, the desire to sell a company and to attract a high sale price is not a legally sufficient motive because it is "a type of benefit that most corporations and corporate insiders seek." In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 620 (S.D.N.Y. 2005); see also Kalnit, 264 F.3d at 139. As the Second Circuit has stated, "the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired." Id. at 141 (holding such allegations do not establish scienter).

Just as important, while Plaintiffs suggest that "[i]t was [the] goal [of the two co-CEOs Richard Gelfond and Brad Wechsler] to sell the Company at a price which was inflated by the fraud as described herein and reap the benefits of the change of control provision they

negotiated" [in March 2006] (Compl. ¶ 221), the change of control provisions they cite do not support scienter but undermine it. In particular, through virtually all of the class period (and for all of the reporting periods in which an installation was restated save one) the "Sale Bonuses" in Gelfond and Wechsler's contracts were governed by agreements put in place in 1994. IMAX Corp., Proxy (Form 14A), at 15 (Aug. 10, 2007) (Clark Decl. Ex. I). Plaintiffs do not even allege that such provisions[8] had particular value and, in any event, there is no allegation that Defendants attempted to engage in a strategic transaction before those provisions were amended in March 2006. Plaintiffs fail even to explain why, if Defendants were motivated to commit fraud beginning in 2002, they would wait until four years later to first explore strategic alternatives.

Moreover, although Plaintiffs rely on the fact that Gelfond and Wechsler's employment agreements were amended on March 8, 2006,[9] the day before the Company announced it was for sale (Compl. ¶ 106), those amendments – if anything – would have given Gelfond and Wechsler a personal motive to drive IMAX's stock price lower, not higher, precisely the opposite motivation Plaintiffs claim they had. The new change of control bonus in Gelfond and Wechsler's March 2006 contract amendment was equal to "the product of (a) 225,000 and (b) the difference between the closing price of the Company's common shares upon such Change of Control and the closing price of the Company's shares on March 10, 2006." 2005 Form 10-K, at Exs. 10.8, 10.14 (Clark Decl. Ex. B). Under that formula, the lower IMAX's stock price on March 10, 2006, the greater the differential between that price and the

---

[8] According to IMAX's August 2007 proxy, those change of control provisions, calculated based on a hypothetical sale on December 31, 2006, would have yielded a value of at most $37,000, less than 10% of the Defendants' base salary. See IMAX Corp., Proxy (Form 14A), at 15-16 (Aug. 10, 2007) (Clark Decl. Ex. I). At other times during the class period when IMAX's stock was trading at a higher value, any sale bonus realized by Gelfond and Wechsler would still have amounted to only a fraction of their total annual compensation.

[9] Plaintiffs neglect to mention that the two Co-CEO's prior employment contracts expired on December 31, 2005 and thus had to be amended. See IMAX Corp., Proxy (Form 14A) (Mar. 9, 2006) (Clark Decl. Ex. K).

closing price, if and when the Company was sold, and the larger the change of control bonus. Thus, if anything, the amendments gave Wechsler and Gelfond an interest in IMAX having the lowest possible stock price on March 10, 2006 – the day after it issued its 2005 annual report and announced that it would explore strategic alternatives. The higher the stock price on March 10, 2006 the smaller the differential and the smaller the change in control bonus Gelfond and Wechsler would receive. And if, as happened, the stock price was very high on March 10, 2006[10] (as Plaintiffs suggest Defendants were motivated to make it) Gelfond and Wechsler would get little or nothing.[11]

The Second Circuit has held that an allegation of a desire to protect "lucrative compensation" is too generalized to support scienter because it could be imputed to all corporate officers. See Kalnit, 264 F.3d at 139-40 (rejecting claim of scienter where defendants had lucrative provisions in an acquisition agreement, including a large lump sum payment and vested pension benefits). Here, where the change in control amendments incented the Defendants, if anything, to lower IMAX's stock price, these allegations cannot establish scienter.

Plaintiffs' last allegation is that each of the Individual Defendants had access to "adverse facts [that] rendered the representations" by IMAX false and misleading (Compl. ¶ 17),

---

[10] On March 10, 2006 IMAX stock closed at $10.67. On the next trading day it rose by $0.18 to $10.85, which is the highest price the shares reached between March 10, 2006 and the end of the Class Period. Between March 10, 2006 and the end of the class period the stock closed higher than it did on March 10, 2006 on only three days – March 13, 2006, March 14, 2006 and July 28, 2006. Thus, it would have been only in the unlikely event that a sale closed on one of these three days that the provision would have had value; on every other day the change in control incentive bonus was worth $0. See Clark Decl. Ex. H.

[11] The lump sum payments of between $16.2 and $21.2 million cited by Plaintiff (Compl. ¶ 220) are particularly misleading because they include payments that Gelfond and Wechsler would have received upon retirement or termination even absent a change in control. These payouts are far from special bonuses and include all CEO benefits and provisions, including lump sum payments for salary and bonuses, Supplemental Executive Retirement Plan payments and health benefit provisions. As of December 31, 2006, in the event of a change in control prior to the retirement or termination of Gelfond or Wechsler, the amount by which their respective lump sum payments would have increased due to the change in control was between $2.2 and $3.0 million, much less than the total payment values cited by Plaintiffs and a fraction of the value that Gelfond and Wechsler possessed in IMAX stock and exercisable options which they held and did not sell throughout the class period. IMAX Corp., Proxy (Form 14A), at 16 (Aug. 10, 2007) (Clark Decl. Ex. I).

in particular, reports on the timing of theater installations. Compl. ¶¶ 92-94, 212. However, this allegation begs the "question . . . whether at the time of the sales at issue the Defendants knew or should have known that the revenue from those sales should have been treated differently and, thus, that the contemporaneous financials were incorrect." Bristol-Myers, 312 F. Supp. 2d at 566. The CAC fails to allege facts that "Defendants knew or were reckless in not knowing that the accounting for the sales at issue was wrong." Id. at 568 (emphasis added); see also AOL Time Warner Sec. & "ERISA" Litig., 381 F. Supp. 2d at 225 (holding "conclusory allegations of knowledge" regarding the Company's operations and business affairs are not sufficient to establish scienter with respect to defendants' statements denying alleged accounting improprieties); In re MSC Indus. Direct Co., 283 F. Supp. 2d 838, 848-49 (E.D.N.Y. 2003) (holding knowledge of facts concerning sales and inventory is insufficient to plead conscious misbehavior or recklessness).

Plaintiffs here allege a violation of a technical accounting standard – that, under EITF 00-21, IMAX should not have recognized the revenue that it earned with respect to the installation of the projection and sound system where the earnings process was completed within the reporting period, and instead should have deferred such revenue until the installation of other component parts was complete. Compl. ¶¶ 40, 139.

That accounting literature is complicated. Staff Accounting Bulletin ("SAB") 101, provided that a company should recognize revenue with respect to the sale of equipment when "it is realized or realizable and earned." SAB 101 (citing FASB Statement of Financial Accounting Concepts No. 5). The question of "how to determine whether an arrangement involving multiple deliverables contains more than one unit of accounting", however, is ostensibly addressed by EITF 00-21 which was issued in May 2003 by the Emerging Issues Task

Force ("EITF") of the Financial Accounting Standards Board ("FASB"). EITF 00-21 ¶ 2[12]; see Compl. ¶ 50.

The literature dictates that in an arrangement with multiple deliverables, the delivered item(s) should be considered a separate unit of accounting if all of the following criteria are met:

> a. The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s).
>
> b. There is objective and reliable evidence of the fair value of the undelivered item(s).
>
> c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.

EITF 00-21 ¶ 9; Compl. ¶ 50.[13] If multiple deliverables within a single arrangement are found to be separate units of accounting under EITF 00-21, a company is required to recognize revenue on each deliverable separately when the revenue recognition criteria for that deliverable is satisfied. In other words, in IMAX's case, if all of the criteria are met with respect to the sound or projection systems, the Company must recognize revenue for the sound and projection

---

[12] Notably, the EITF began discussing accounting treatment for multiple element arrangements in July 2000 but did not reach the consensus required to issue EITF 00-21 until May 2003.

[13] In December 2003, the SEC issued Staff Accounting Bulleting 104 ("SAB 104"). This release did not substantively change the controlling literature on revenue recognition. Rather, it updated SAB 101 by compiling and codifying frequently asked questions and answers relating to SAB 101 and the recent guidance from EITF 00-21. SAB 104 also went on to expressly reaffirm that revenue recognition requires a great deal of judgment. In the context of delivery and acceptance, SAB 104 stated "Determining whether the delivered equipment meets all of a product's criteria and specifications is a matter of judgment that must be evaluated in light of the facts and circumstances of a particular transaction." SAB 104 (Clark Decl. Ex. L).

systems without regard to whether the Company has completed its obligations with respect to other units of accounting.

As the very 10-K that Plaintiffs allege was materially false made clear to all investors, such accounting judgments (which have nothing to do with the underlying business or cash flows) are highly complex and require significant judgment:

> U.S. GAAP and accompanying accounting pronouncements, implementation guidelines and interpretations for many aspects of the Company's business, such as revenue recognition, multiple element arrangements, [and] film accounting . . . are highly complex and involve subjective judgments. Changes in these rules, their interpretation, management's estimate, or changes in the Company's products or business could significantly change its reported earnings and operating income and could add significant volatility to those measures, without a comparable underlying change in cash flow from operations.

2005 Form 10-K at 21 (Clark Decl. Ex. B) (emphasis added).

The restatement that Plaintiffs rely upon and incorporate by reference also establishes that these determinations of when to recognize revenue are highly complex and require significant judgment. 2006 Form 10-K at 147 (Clark Decl. Ex. C). As it stated:

> The term "deliverables" is not explicitly defined in any accounting literature. The determination of a deliverable requires significant judgment and can be influenced by the terms of the arrangement between a vendor and its customer, the customer's perspective of the deliverables, the interaction of the separate elements that could make up a single deliverable and other facts and circumstances unique to a transaction.

Id. (emphasis added); Compl. ¶ 155.

The accounting literature is dispositive of Plaintiffs' claim. Although Plaintiffs go to great lengths to argue that (i) the screen element is a "key component" (Compl. ¶¶ 38, 40,

47)[14], (ii) the different theater components had no standalone value (Compl. ¶ 54) and, therefore, (iii) "IMAX's theater systems were not comprised of multiple deliverables" (Compl. ¶ 54; see also, Compl. ¶¶ 142, 175), the CAC is conspicuous for its failure to even cursorily allege that any of the Individual Defendants knew or believed any of these conclusions, or realized they were relevant to IMAX's accounting during the relevant time periods.

Bristol-Myers is directly on point. There, as here, the plaintiffs alleged that the defendants knew all the facts upon which the restatement was based. The Court nonetheless dismissed the complaint for failure to allege a strong inference of scienter because plaintiffs failed to allege facts establishing that defendants knew the significance of those underlying facts and, thus, that they knew "that the contemporaneous financials were incorrect." Bristol-Myers, 312 F. Supp. 2d at 566.

In this case – just as in Bristol-Myers – even if certain of the Defendants were aware of some of the underlying business facts (here that the sound and projection systems were fully installed, but the screen element was not fully installed), there is no factual allegation that "Defendants knew or were reckless in not knowing that the accounting for the sales at issue was

[14] Assuming incorrectly that IMAX is a theater operator, Plaintiffs conclusorily assert that from an accounting standpoint, the screen was "an obviously key component of a theater 'system.'" Compl. ¶ 40; see Compl. ¶¶ 38, 47. The assertion that one needs a screen to watch a film, however, is irrelevant to the question of whether Defendants knew that multiple element arrangement accounting in IMAX's financial disclosures was incorrect. IMAX is not a theater operator and the ipse dixit that something is "obvious" (Compl. ¶ 40) is not a substitute for rigorous accounting analysis or an allegation that Defendants possessed knowledge that the accounting was incorrect. Bristol-Myers, 312 F. Supp. 2d at 566 (rejecting plaintiff's allegations of scienter based on the unsupported conclusion that the GAAP provisions at issue were "simple" and the violation was "obvious"). IMAX disclosed to its shareholders that ten of the systems for which it recognized revenue at the end of 2005 were installed in theaters that were not scheduled to open until 2006. 2005 Form 10-K at 7 (Clark Decl. Ex. B). The question under the literature is not whether a screen is necessary to watch a movie (it was obvious that no movies were going to be watched in theaters that were not open) but whether, inter alia, the delivered items have standalone value and the undelivered items have fair values that can be shown by objective and reliable evidence. Plaintiffs do not allege the relevant IMAX personnel knew the subtleties of the literature, much less the answers to these complicated questions. Plaintiffs themselves acknowledge that revenue recognition was an "ongoing subject of review" by PwC, perhaps the leading audit firm in the world, and that PwC approved IMAX's policies. Compl. ¶ 223. Plaintiffs' conclusory assertion that the accounting judgment was a "very simple concept" cannot overcome the strong nonculpable inference arising from PwC's analysis and IMAX's reliance thereon, and thus fails the balancing test required by Tellabs.

wrong and, therefore, that the financials recognizing revenue on those sales were wrong." Id. at 568; see also MSC Indus., 283 F. Supp. 2d at 848-49; Gavish v. Revlon, Inc., No. 00 Civ. 7291 (SHS), 2004 WL 2210269, at *14-15 (S.D.N.Y. Sept. 30, 2004) (holding that the knowing application of business practices that allegedly violated GAAP was insufficient to plead scienter "[a]bsent more particularized allegations of knowingly fraudulent conduct").[15]

**C. Plaintiffs' Allegations Cannot Survive The Scrutiny Demanded By Tellabs**

Indeed, Plaintiffs' own allegations provide a "plausible nonculpable explanation" for the Defendants' actions that is "more likely than any inference that the defendants intended to manipulate the market." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 104 (2d Cir. 2007) (citing Tellabs, 127 S.Ct. at 2510).

First, Plaintiffs themselves allege that "PWC has been IMAX's auditor for approximately 20 years . . . [,] PWC provided advice to management with respect to revenue recognition for theater systems" and "PWC approved the revenue recognition policies described publicly by IMAX and the reflection thereof in the Company's financial statements." Compl. ¶ 223. In fact, for each of the years in the Class Period, PwC issued "unqualified audit opinions" stating that each of IMAX's financial statements "were presented fairly in accordance with GAAP and that PwC's audit had been performed in accordance with GAAS and the standards of

[15] The fact that, in connection with the restatement, IMAX reported a material weakness (Compl. ¶¶ 150-158, 161) does not fill the gap in Plaintiffs' failure to plead scienter. Essentially, Plaintiffs allege that the mere fact that IMAX identified a material weakness retroactively rendered previous reports on internal controls materially misleading. Compl. ¶ 183. Given that the term "material weakness" refers to a deficiency in internal controls over financial reporting, (See Compl. ¶¶ 150 n.2, 168) when a company discovers an error in its financial statements and is required to restate, such an error will almost inevitably be a result of some level of material weakness in financial reporting. Thus, the allegation that IMAX reported a material weakness – like the allegation that IMAX restated its financial statements – adds nothing to Plaintiffs' claim of scienter. See In re DRDGold Ltd. Sec. Litig., 472 F. Supp. 2d 562, 574 (S.D.N.Y. 2007); In re Interpublic Sec. Litig., 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844, at *36 (S.D.N.Y. May 29, 2003) (holding that plaintiffs must allege defendant knew its description of internal controls was false). The relevant question is whether Defendants were aware at the time they issued the public statements of facts that indicated that those statements were false. Bristol-Myers, 312 F. Supp. 2d at 566. Significantly, from 2002-2006, PwC reviewed the Company's internal controls and procedures and confirmed that there were no material weaknesses. Compl. ¶¶ 166, 169, 185, 189, 202, 203, 223, 224, 227.

PCAOB." Compl. ¶ 185. PwC also affirmed that the Company did not have any material weaknesses. Compl. ¶¶ 166, 202. When IMAX announced the SEC inquiry, it reiterated that "[t]he Company believes its application of [multiple element arrangement accounting] policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP." Press Release, IMAX Corp. (Aug. 9, 2006) (Clark Decl. Ex. M); see SEC v. Caserta, 75 F. Supp. 2d 79, 94-95 (E.D.N.Y. 1999) ("[g]ood faith reliance on the advice of an accountant ... has been recognized as a viable defense to scienter in securities fraud cases"); SEC v. DCI Telecomm., Inc., 122 F. Supp. 2d 495, 500 n.2 (S.D.N.Y. 2000); Markowski v. SEC, 34 F.3d 99, 104-05 (2d Cir. 1994).[16] In the face of this consistent advice, it is implausible to assume without more that the Individual Defendants would recognize on their own – and disagree with PWC – that the projection and sound systems were not separate units of accounting.

Second, there is not even a suggestion that when IMAX allegedly first made the decision regarding multiple element accounting there was any motive to commit fraud. Indeed, none of the Individual Defendants actually decreased his or her stock holdings in IMAX during the class period. In particular, Defendants Wechsler, Gelfond, and Joyce increased their net totals of stock ownership by 75,000 shares, 50,000 shares, and 7500 shares respectively, while

[16] Plaintiffs also fail adequately to allege scienter based on the film accounting component of the restatement. Without any allegation of "'corresponding fraudulent intent,'" mere accounting errors or irregularities are insufficient to plead scienter. Davidoff, 2005 U.S. Dist. LEXIS 17638, at *55 (quoting Novak, 216 F.3d at 309). The CAC notes in passing that the Company's restatement includes a "very large 2005 adjustment of $2.7 million that was required for film accounting." Compl. ¶ 147. Plaintiffs fail completely to allege any facts that Defendants had the requisite scienter with respect to film accounting adjustments. Furthermore, in August 2006, the Company disclosed that it had "identified a material weakness in the internal controls surrounding the analysis and recording of a complex film accounting transaction." Press Release, IMAX Corp. (Aug. 9, 2006) (Clark Decl. Ex. M). Therefore, the Company did not attempt to conceal the accounting mistake surrounding this transaction and the prompt disclosure to the public demonstrates the obvious absence of scienter. Thus, Plaintiffs fail completely to allege that Defendants acted with scienter with respect to the film accounting transaction.

Defendant Gamble maintained her net holdings.[17] These facts are "wholly inconsistent with fraudulent intent", for why would the Individual Defendants acquire additional IMAX stock if they believed it was fraudulently overvalued. Bristol-Myers, 312 F. Supp. 2d at 561; see also In re Omnicom Group, Inc. Sec. Litig., 02 Civ. 4483 (RCC), 2005 U.S. Dist. LEXIS 5272, at *35 (S.D.N.Y. Mar. 30, 2005) (holding that motive and opportunity scienter is not sufficiently pled where Plaintiffs allege motive based on incentive compensation and fail to allege Defendants "sold any shares in connection with the alleged misrepresentations and omissions."); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003); In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 263 (S.D.N.Y. 2003) ("courts assume that defendants act in their 'informed self-interest"); In re Advanta Corp. Sec. Litig., 180 F.3d 525, 541 (3d Cir. 1999) (holding that where three of the individual defendants sold no stock at all during the class period, and where the two defendants who did trade stock sold only small percentages of their holdings, "[f]ar from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, these facts suggest they had every incentive to keep [the Company] profitable.")

Third, notwithstanding Plaintiffs' allegations that Gelfond and Wechsler would benefit financially from a change in control, Defendants declined to sell the Company even though they allegedly knew of the undisclosed misstatements and "received interest from multiple parties." Press Release, IMAX Corp. (Dec. 15, 2006) (Clark Decl. Ex. R); Compl. ¶ 125. The decision not to pursue a sale at a lower valuation shows that Defendants were not motivated to aggressively seek a change in control in order to realize personal financial gain and

[17] See SEC Form 4 Statements of Beneficial Ownership from February 23, 2003 through July 20, 2007 filed by Defendants Bradley J. Wechsler, Richard L. Gelfond, Francis T. Joyce and Kathryn A. Gamble, respectively Clark Decl. Exs. N, O, P, Q.

that Defendants remained committed to "'deliver[ing] the most value possible to our shareholders.'" Press Release, IMAX Corp. (Aug. 9, 2006) (Clark Decl. Ex. M).

Finally, according to the CAC itself, the determination to restate was not based on any doubt from within IMAX or PwC regarding the reasonableness of IMAX's accounting. The SEC and OSC asked questions about IMAX's revenue recognition beginning in 2006, and, stemming from and "as a direct result of the comment letters it received from the SEC and OSC" (Compl. ¶ 141), IMAX conducted a lengthy review of its accounting, with the assistance of independent consultants, PwC, its Board of Directors and Audit committee, culminating in the Company's determination to revise its accounting policy and issue a restatement. See Compl. ¶¶ 131, 134, 135. This is exactly what should happen, and is not fraud.[18]

## II. THE COMPLAINT FAILS ADEQUATELY TO ALLEGE LOSS CAUSATION

Equally deficient are Plaintiffs' allegations of "loss causation," an essential element of securities fraud. Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005) (holding that allegations of purchase price inflation are insufficient to plead loss causation; plaintiffs must plead that their loss was caused by defendant's alleged misstatements and not by other market factors); In re Rhodia S.A. Sec. Litig., No. 1:05 Civ. 5389 (DAB), 2007 U.S. Dist. LEXIS 72758, at *47 (S.D.N.Y. Sept. 26, 2007); see PSLRA, 15 U.S.C. § 78u-4(b)(4) ("[I]n any private action

---

[18] The CAC should be dismissed as to each Individual Defendant for the additional reason that Plaintiffs have failed to raise a cogent and compelling inference of scienter as to each Defendant. See Filler v. Hanvit Bank, 156 F. App'x 413, 415 (2d Cir. 2005); In re Yukos Oil Co. Sec. Litig., 04 Civ. 5243 (WHP), 2006 U.S. Dist. LEXIS 78067, at *53 (S.D.N.Y. Oct. 25, 2006) ("Plaintiffs must allege that each Defendant acted with an intent to deceive, manipulate or defraud.") (citations and internal quotations omitted).

Plaintiffs allege no more than that Gelfond, Wechsler, Joyce and Gamble were corporate insiders with access to material information and that they signed the Company's financial statements (in the case of Gelfond, Wechsler and Joyce, the SOX certifications as well). See, e.g., Compl. ¶¶ 11, 12, 13 15, 92, 94, 99, 159, 160. Such general allegations are insufficient to support an inference of scienter. See Davidoff, 2005 U.S. Dist. LEXIS 17638, at *58 (simply relying on individual defendants' positions within a company and failing to differentiate between them is insufficient to plead scienter); Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006) (holding "[i]f we were to accept [this] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA").

arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). The Second Circuit has described loss causation as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Lentell v. Merrill Lynch & Co. Inc., 396 F.3d 161, 172 (2d Cir. 2005) (citation omitted), cert. denied, 546 U.S. 935 (2005). Thus, the CAC must allege that the "subject of the fraudulent statement or omission was the cause of the actual loss suffered" by Plaintiffs. Id. at 173 (emphasis in original) (quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95-96 (2d Cir. 2001)).

Moreover, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." In re Initial Pub. Offering Sec. Litig., 399 F. Supp. 2d 298, 301 (S.D.N.Y. 2005) (citation omitted and emphasis added), aff'd sub nom, Tenney v. Credit Suisse First Boston Corp., No. 05-3430-CV, 2006 U.S. App. LEXIS 13050 (2d Cir. May 19, 2006). A plaintiff's failure to allege both that (1) the falsity was revealed to the public and that (2) the market reacted negatively to corrective disclosure is "fatal under Second Circuit precedent." Joffee v. Lehman Bros. Inc., 209 F. App'x 80, 81 (2d Cir. 2006) (quoting Lentell, 396 F.3d at 175).

IMAX adopts and incorporates by reference the arguments regarding loss causation in PwC's motion to dismiss. In particular, when IMAX ultimately released its restated financial statements for 2002 through the third quarter of 2006 (which primarily affected the periods in which revenue was recorded but not cash or whether the revenue was earned), the stock price rose. At the close of market that day, IMAX shares had increased by $0.25 to a price of $4.85. The next week, the stock price remained at or above $4.85 at closing each day, with a

high of $5.04. Because the market reacted positively to this disclosure, the alleged misstatements could not have caused Plaintiffs' losses as a matter of law. See Joffee, 209 F. App'x at 81 (citing Lentell, 396 F.3d at 175); see also Dura, 544 U.S. at 341-42 (requiring both an economic loss and a causal connection between the misrepresentations and the loss).[19]

Plaintiffs' failure to plead loss causation is not cured by the fact that when, on August 9, 2006, IMAX announced that the SEC had begun an informal inquiry into the Company's "timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theater systems" (Compl. ¶ 115), there was a drop in the value of the Company's stock. Compl. ¶ 119.

The release announcing the SEC inquiry, tellingly, did not state that any fact previously reported was incorrect. Rather, IMAX strongly affirmed that it "believes its application of [multiple element arrangement accounting] policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP." Press Release, IMAX Corp. (Aug. 9, 2006) (Clark Decl. Ex. M); see Compl. ¶ 115; Davidoff, 2005 U.S. Dist. LEXIS 17638, at *52 (plaintiffs failed to plead loss causation where the public statement to which they pointed actually denied the falsity of the alleged misstatement); Leykin v. AT&T Corp., 423 F. Supp. 2d 229, 243-44 (S.D.N.Y. 2006) (plaintiffs failed to plead loss causation where public statements they point to during the class period '"do not reveal to the market the falsity of the prior recommendations . . .'") (quoting Lentell, 396 F.3d at 175 n.4). Therefore, by definition, any stock drop caused as a result of the August 9 release could not have been caused by the alleged falsity of IMAX's prior disclosures.

---

[19] Similarly, on March 16, 2007 when IMAX announced that it would restate its financials, the Company's share price rose. See Press Release, IMAX Corp. (Mar. 16, 2007) (Clark Decl. Ex. S). IMAX stock closed up $0.01 at $5.00 on March 16, 2007, went up to $5.01 on the next trading day and continued to rise until reaching $5.47 on March 21, 2007. Clark Decl. Ex. H. This contradicts Plaintiffs' assertion that the "incorrect accounting" admitted during the conference call created a loss.

See In re Merrill Lynch Tyco Research Sec. Litig., No. 03 CV 4080 (MP), 2004 U.S. Dist LEXIS 2247, at *7 (S.D.N.Y. Feb. 18, 2004); In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 269 (S.D.N.Y. 2006) ("[I]t is axiomatic that a concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.") (internal quotations and citations omitted); see also In re AOL Time Warner Sec. Litig., No. 06 Civ. 0695 (SWK), 2007 U.S. Dist. LEXIS 45037, at **34-36 (S.D.N.Y. June 20, 2007) (holding purported "partial disclosures" occurring before public disclosure of falsity, such as news reports that touched on topic of alleged misstatements, were insufficient for pleading loss causation). Moreover, that very same press release announced that the Company had not found a buyer during its process of seeking strategic alternatives, including a possible sale or merger, an announcement that undoubtedly was viewed as bad news by the market.

In re Avista Corp. Sec. Litig., 415 F. Supp. 2d 1214 (E.D. Wash. 2005), is relevant here. In that case, the Federal Energy Regulatory Commission (FERC) publicly issued two orders with respect to the defendant corporation. First, allegedly in response to Avista's failure to comply with an investigation, the FERC issued an order to show cause why authority to sell electricity at market-based rates should not be revoked. Avista, 415 F. Supp. 2d at 1219. Then approximately two months later, FERC announced a possible enforcement action. Id. The court ruled that neither announcement was a corrective disclosure. Id. at 1219-20. "Since the orders did not reveal any factual information showing [defendant] illegally manipulated the energy market or made factual misrepresentations, the FERC Orders do not provide a basis for asserting a causal relationship between [defendant's] alleged failure to disclose it manipulated the energy markets and Plaintiffs' alleged economic loss." Id. at 1221. The court ruled, "the announcement by a regulatory agency that it intends to investigate is insufficient, on its own, to

plead loss causation." Id.; see also Weiss v. Amkor Tech., Inc., No. CV 07-0278-PHX-PGR, 2007 U.S. Dist. LEXIS 71688, at *16 (N.D. Ariz. Sept. 25, 2007) (holding that an announcement that a company's board had "formed a special Committee and hired outside counsel to investigate [defendant's] stock option practices" was insufficient to allege loss causation); Ind. State Dist. Council of Laborers v. Omnicare, Inc., No. 2006-26 (WOB), 2007 U.S. Dist. LEXIS 76620 (E.D. Ky. Oct. 12, 2007) (holding that a complaint alleging a stock price drop following announcement of a U.S. Attorney subpoena and federal criminal charges filed against the president of a defendant's subsidiary were insufficient to plead loss causation). Here, Plaintiffs merely allege that their losses were caused by an announcement of regulatory action; as in Avista, such announcements standing alone are insufficient to plead loss causation.[20]

## III. FORWARD-LOOKING STATEMENTS ARE NON-ACTIONABLE

Plaintiffs allege that a number of statements made by Defendants in their press releases and earnings calls were materially misleading because they projected a positive outlook and general corporate optimism. See, e.g., Compl. ¶¶ 66, 67, 72, 76, 82, 85, 89. Such statements are non-actionable forward-looking statements under the PSLRA. 15 U.S.C. § 78u-5(c). Every

---

[20] Plaintiffs must plead loss causation separately for each category of misstatements alleged. See Leykin, 423 F. Supp. 2d at 240-48 (analyzing plaintiffs' loss causation for different frauds separately where plaintiffs allege more than one type of fraud); see also Initial Pub. Offering Sec. Litig., 399 F. Supp. 2d at 307-10 (separately analyzing loss causation for two risks that plaintiffs alleged were concealed). Having failed completely to plead loss causation with respect to revenue recognition disclosure, Plaintiffs make the fanciful argument that the potential buyers' discovery of IMAX's use of multiple element accounting caused them to lose interest in acquiring IMAX, and ultimately resulted in the SEC inquiry. Compl. ¶ 122. Such conclusory allegations are insufficient to satisfy Plaintiffs' pleading requirements as a matter of law and Plaintiffs fail completely to allege any causal link between an alleged misstatement by IMAX and the failed sale of the Company. Plaintiffs must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Lentell, 396 F.3d at 173 (emphasis in original). The CAC makes no allegation that IMAX made any misstatement about the attempted sale of the Company.

Basing their assertions on the July 20, 2007 Restatement alone, Plaintiffs further allege that the certifications stating internal controls were effective made in the 2002-2005 10-Ks were false and materially misleading. Compl. ¶¶ 182, 183. As explained above, Plaintiffs have failed to allege loss causation with respect to the July 20, 2007 restatement, because following the announcement, IMAX's stock price went up. Plaintiffs' failure to allege a negative market reaction to corrective disclosure is "'fatal under Second Circuit precedent.'" Joffee, 209 F. App'x at 81 (quoting Lentell, 396 F.3d at 175).

IMAX press release and every earnings call during the class period was accompanied by meaningful cautionary language that: (1) indicated that the call or release contained forward-looking statements, (2) stated that due to certain risk factors and uncertainties, results could differ materially from those contemplated by the forward-looking statements, and (3) referred the reader or listener to the Company's SEC filings for further discussion of risk factors and uncertainties that could affect results.

When accompanied by meaningful cautionary language, forward-looking statements and expressions of corporate optimism are non-actionable. Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); In re Nokia Oyj (Nokia Corp.) Sec. Litig., 423 F. Supp. 2d 364, 398 (S.D.N.Y. 2006). Furthermore, earnings guidance given on quarterly earnings calls falls within the protection of the PSLRA safe harbor for forward-looking statements. In re IAC/InterActiveCorp Sec. Litig., 478 F. Supp. 2d 574, 586-87 (S.D.N.Y. 2007).

## IV. PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED

For reasons already discussed, Plaintiffs have failed to allege both that there was a primary violation of the securities laws and that the Individual Defendants culpably participated in any wrongdoing. Both are necessary elements of section 20(a) liability and therefore Plaintiffs' claims must be dismissed. See ATSI Commc'ns, Inc. v. Shaar Fund Ltd., 493 F.3d 87, 108 (2d Cir. 2007); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).

## CONCLUSION

Defendants respectfully request that the CAC be dismissed in its entirety, with prejudice. See Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995); see also In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351, 392-93 (S.D.N.Y. 2003) ("[R]equests for leave to amend must be denied because [Plaintiffs'] have given the Court no indication that they can amend their complaints to plead legally sufficient claims."). Plaintiffs cannot demonstrate that

the pleading defects demonstrated in this Amended Complaint, their second chance to satisfy the PSLRA, Rules 12(b)(6) and Rule 9(b) pleading requirements, will be cured by filing another complaint.

Dated: New York, New York
December 10, 2007

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ______________________
Lewis J. Liman (LL-9166)
Breon S. Peace (BP-8872)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble

Of Counsel:
James C. Clark (JC-9694)