UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB)<br>JURY TRIAL DEMANDED |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**ABBEY SPANIER RODD & ABRAMS, LLP**

Arthur N. Abbey, Esq. (AA-8074)
Jill S. Abrams, Esq. (JA-1578)
Richard B. Margolies, Esq. (RM-9311)
Grace E. Parasmo, Esq. (GP-8203)
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

*Counsel for Lead Plaintiff Westchester Capital Management*

**BERGER & MONTAGUE, P.C.**
Douglas Risen, Esq.
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: 215-875-4604

*Counsel for The Steelworkers Pension Trust*

January 22, 2008

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

SUMMARY OF FACTS ..... 3

A. IMAX, the Individual Defendants and PWC ..... 3

B. IMAX's Business and Revenue Recognition Policies ..... 4

C. Initial Disclosure of IMAX's Improper Revenue Recognition ..... 8

ARGUMENT ..... 10

I. LEGAL STANDARDS ON A MOTION TO DISMISS ..... 10

A. The Rule 12(b)(6) Standard ..... 10

B. Pleading Requirements under the Private Securities Litigation Reform Act and Rule 9(b) ..... 10

II. THE COMPLAINT STATES A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS ..... 12

A. The Complaint Adequately Alleges that Defendants Made Materially False and Misleading Statements and Omissions ..... 12

1. The IMAX Defendants Made Materially False and Misleading Statements ..... 12

2. PWC Made Materially False and Misleading Statements ..... 13

a. PWC is Primarily Liable for its Unqualified Audit Opinions ..... 13

b. PWC's Unqualified Audit Opinions ..... 14

B. Plaintiffs' Factual Allegations Give Rise to A Strong Inference of Defendants' Scienter ..... 15

1. IMAX's Accounting Restatement Supports A Strong Inference Of Scienter ..... 17

2. Defendants' Violations of GAAP and GAAS Support An Inference Of Scienter ..... 19

a. The IMAX Defendants ..... 22

b. PWC ..... 31

3. The Company's Lack of Internal Controls Supports a Strong Inference of Scienter ..... 35

a. IMAX Defendants ..... 35

b. PWC ..... 37

4. Violations of Company's Own Publicly Announced Accounting Policy Supports Inference of Scienter ..... 38

5. Additional Motive of Gelfond and Wechsler ..... 39

C. The Complaint Adequately Pleads Loss Causation ..... 42

D. The Complaint Adequately Alleges Control Person Liability ..... 47

III. PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND ..... 47

CONCLUSION ..... 48

# TABLE OF AUTHORITIES

**Cases**

*Ades v. Deloitte & Touche*,
799 F. Supp. 1493 (S.D.N.Y. 1992) .... 35

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) .... 12, 42

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1995 (2007) .... 10

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) .... 44

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
511 U.S. 164 (1994) .... 13

*Chalverus v. Pegasystems, Inc.*,
59 F. Supp. 2d 226 (D. Mass. 1999) .... 39

*Chill v. General Elec. Co.*,
101 F.3d 263 (2d Cir. 1996) .... 16

*Chu v. Sabratek Corp.*,
100 F. Supp. 2d 815 (N.D. Ill. 2000) .... 15

*Danis v. USN Commc'ns Inc.*,
73 F. Supp. 2d 923 (N.D. Ill. 1999) .... 28

*Davidoff v. Farina*,
2005 U.S. Dist. LEXIS 17638 (S.D.N.Y. Aug. 22, 2005) .... 45

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .... 42, 43, 44

*EP Medsystems, Inc. v. Echocath, Inc.*,
235 F.3d 865 (3d Cir. 2000) .... 47

*Epstein v. Itron, Inc.*,
993 F. Supp. 1314 (E.D. Wash. 1998) .... 28

*Felton v. Walston & Co.*,
508 F.2d 577 (2d Cir. 1974) .... 10

*Foman v. Davis*,
371 U.S. 178 (1962) ..... 47

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000) ..... 12

*Garfield v. NDC Health Corp.*,
466 F.3d 1255 (11th Cir. 2006) ..... 36

*Gold v. DCL Inc.*,
399 F. Supp. 1123 (S.D.N.Y. 1973) ..... 14

*Gruntal & Co. Inc. v. San Diego Bancorp.*,
901 F. Supp. 607 (S.D.N.Y. 1995) ..... 35

*Holmes v. Baker*,
166 F. Supp. 2d 1362 (S.D. Fla. 2001) ..... 15

*In re Aetna Inc. Sec. Litig.*,
34 F. Supp. 2d 935 (E.D. Pa. 1999) ..... 28

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
*381 F. Supp. 2d 192 (S.D.N.Y. 2004)* ..... 33

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007) ..... 45

*In re Atlas Air Worldwide Holdings, Inc., Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004) ..... 12, 28

*In re Avista Corp. Sec. Litig.*,
415 F. Supp. 2d 1214 (E.D. Wash. 2005) ..... 45

*In re Baan Co. Sec. Litig.*,
103 F. Supp. 2d 1 (D.D.C. 2000) ..... 29

*In re Bausch & Lomb, Inc. Sec. Litig.*,
2003 U.S. Dist. LEXIS 24062 (W.D.N.Y. Mar. 28, 2003) ..... 39

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ..... 43, 44

*In re Bristol-Myers Squibb Sec. Litig,*
312 F. Supp 2d 549 (S.D.N.Y.) ..... 24

*In re Burlington Coat Factory Sec. Litig.*,
114 F. 3d 1410 (3d Cir. 1997)........................................................................ 21, 47

*In re Campbell Soup Co. Sec. Litig.*,
145 F. Supp. 2d 574 (D.N.J. 2001)........................................................................ 21

*In re Complete Mgmt. Sec. Litig.*,
153 F. Supp 2d 314 (S.D.N.Y. 2001)........................................................................ 17

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)........................................................................ 45

*In re Gilat Satellite Networks, Ltd.*,
No. CV-02-1510 (CPS), 2005 U.S. Dist. LEXIS 41996(E.D.N.Y. Sept. 19, 2005)......... 29

*In re Glaxo SmithKline PLC Sec. Litig.*,
No. 05-CIV-3751(LAP), 2006 U.S. Dist. LEXIS 73893 (S.D.N.Y. Oct. 6, 2006) .......... 42

*In re Globalstar Secs. Litig.*,
No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496, (S.D.N.Y. Dec. 15, 2003)....... 17

*In re Hayes Lemmerz Int'l Inc.*,
271 F. Supp. 2d 1007 (E.D. Mich. 2003)........................................................................ 15

*In re Ibis Tech. Sec. Litig.*,
422 F. Supp. 2d 294 (D. Mass. 2005)........................................................................ 41

*In re IBM Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998)........................................................................ 12

*In re Lattice Semiconductor Corp. Sec. Litig.*,
No. CV-04-1255-AA, 2006 U.S. Dist. LEXIS 262 (D. Or. Jan 3, 2006)........................ 36

*In re Lernout & Hauspie Sec. Litig. v. Lernout*,
230 F. Supp. 2d 152 (D. Mass. 2002)........................................................................ 17

*In re Marsh & McLennan Cos. Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. July 2006)........................................................................ 27

*In re Merrill Lynch Tyco Research Sec. Litig.*,
No. 03 CV 4080 (MP), 2004 U.S. Dist. LEXIS 2247, (S.D.N.Y. Feb. 18, 2004)............ 45

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000)........................................................................ 20, 21

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003)....................17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
51 F. Supp. 2d 290 (S.D.N.Y. 1999)....................35

*In re Parmalat Sec. Litig.*,
501 F. Supp. 2d 560 (S.D.N.Y. 2007)....................31, 43

*In re Raytheon Sec. Litig.*,
157 F. Supp. 2d 131 (D. Mass. 2001)....................19

*In re Refco, Inc. Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007)....................10, 13, 27

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)....................11

*In re Scottish Re Group Secs. Litig.*,
No. 06 Civ. 5853 (SAS), 2007 U.S. Dist. LEXIS 81565
(S.D.N.Y. Nov. 1, 2007)....................10, 16, 17, 22, 46

*In re Tommy Hilfiger Sec. Litig.*,
No. 04-CIV-7678, 2007 U.S. Dist. LEXIS 55088 (S.D.N.Y. July 20, 2007)....................43, 44

*In re Turbodyne Techs., Inc. Sec. Litig.*,
No. CV 99 00697 MM (BDRx), 2002 U.S. Dist. LEXIS 25738
(C.D. Cal. Mar. 13, 2002)....................28

*In re Van Wagoner Funds, Inc. Sec. Litig.*,
382 F. Supp. 2d 1173 (N.D. Cal. 2004)....................33

*In re Veeco Instruments, Inc., Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006)....................28

*In re Winstar Comm.*,
No. 01-CV-3014 (GBD), 01-CV-11522, 2006 U.S. Dist. LEXIS 7618,
(S.D.N.Y. Feb. 24, 2006)....................passim

*In re WorldCom Inc. Sec. Litig.*,
2003 U.S. Dist. LEXIS 10863, (S.D.N.Y. June 25, 2003)....................32, 33

*In re Worldcom, Inc. Sec. Litig.*,
352 F. Supp. 2d 472 (S.D.N.Y. 2005)....................19

*In re Worldcom, Litig.*,
388 F. Supp. 2d 319 (S.D.N.Y. 2005)........................................................................ 44

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
No. 2006-26 (WOB), 2007 U.S. Dist. LEXIS 76620 (E.D. Ky 2007) ............................ 45

*Iqbal v. Hasty*,
490 F.3d 143 (2d Cir. 2007)........................................................................................ 10

*Jacobs v. Coopers & Lybrand, L.L.P.*,
No. 97 Civ. 3374 (RPP), 1999 U.S. Dist. LEXIS 2102 (S.D.N.Y. March 1, 1999)... 31, 38

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)........................................................................................ 16

*Leykin v. AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006)........................................................................ 45

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D. Conn. 2007)........................................................................ 41

*McCabe v. Ernst & Young, LLP*,
No. 01-5747 (WHW) 2006 U.S. Dist. LEXIS 524 (D.N.J. Jan. 6, 2006)........................ 47

*Napier v. Pricewaterhouse Coopers LLP*,
227 F. Supp. 2d 263 (D.N.J. 2002)............................................................................ 21

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)................................................................................ passim

*Overton v. Todman & Co.*,
478 F.3d 479 (2d Cir. 2007)........................................................................................ 14

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
142 F. Supp. 2d 589 (D.N.J. 2001)............................................................................ 15

*Rothman v. Gregor*,
220 F.3d at 81 (2d Cir. 2000)...................................................................................... 38

*Schlagel v. Learning Tree Int'l*,
No. CV 98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306
(C.D. Cal. Dec. 23, 1998) .......................................................................................... 41

*Schleicher v. Wendt*,
No. 1:02-CV-1332-DFH-TAB, 2007 U.S. Dist. LEXIS 67924
(D. Ind. Sept. 12, 2007)............................................................................................... 16

*SEC v Price Waterhouse*,
797 F. Supp. 1217 (S.D.N.Y. 1992) ..... 17, 34

*SEC v. Caserta*,
75 F. Supp. 2d 79 (E.D.N.Y. 1999) ..... 30

*Stevelman v. Alias Research, Inc.*,
174 F.3d 79 (2d Cir. 1999) ..... 10

*Sunterra Corp. Sec. Litig.*,
199 F. Supp. 2d 1308 (M.D. Fla. 2002) ..... 15

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499 U.S. (2007) ..... passim

*Van de Velde v. Coopers & Lybrand*,
899 F. Supp. 731 (D. Mass. 1995) ..... 35

*Weiss v. Amkor Tech., Inc.*
No. CV 07-0278-PHX-PGR, 2007 U.S. Dist. LEXIS 71688
(D. Ariz. Sept. 25, 2007) ..... 45

**Statutes**

15 U.S.C. § 78u-4(b)(2) ..... 11
Fed. R. Civ. P. 12(b)(6) ..... 10
Fed. R. Civ. P. 15(a) ..... 47

**Other Authorities**

Generally Accepted Auditing Standards

AU§150 ..... 33
AU§316 ..... 33
AU§311 ..... 32
Sarbanes-Oxley Act of 2002
Rule 302 ..... 35, 36

Lead Plaintiffs Westchester Capital Management, Inc. ("WCMI"), as the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL and SphinX Merger Arbitrage Fund and The Steelworkers Pension Trust ("TSPT") (collectively the "Plaintiffs"), respectfully submit this memorandum of law in opposition to dismiss Plaintiffs' Consolidated Class Action Complaint (the "Complaint") submitted by Defendants: (1) IMAX Corporation ("IMAX" or the "Company"); Richard L. Gelfond ("Gelfond"), Bradley J. Wechsler ("Wechsler"), Francis T. Joyce ("Joyce"), Kathryn A. Gamble ("Gamble")(the "Individual Defendants") (IMAX and the Individual Defendants are collectively referred to herein as the "IMAX Defendants")[1]; and (2) PricewaterhouseCoopers LLP's ("PWC")[2].

## PRELIMINARY STATEMENT

The lawsuit arises out of the improper accounting practices at IMAX and Defendants' materially false and misleading statements relating thereto. From February 27, 2003 through July 20, 2007, inclusive (the "Class Period"), IMAX prematurely and wrongly recognized revenue on theater system sales and sales-type leases by playing fast and loose with the applicable accounting principles and its own publicly stated accounting policies, thereby materially overstating the Company's publicly quarterly and annual reported earnings and revenue.

---

1 The Memorandum of Law In Support of the Motion to Dismiss the Consolidated Class Action Complaint filed by IMAX and the Individual Defendants on December 10, 2007 is referenced to herein as the "IMAX Br. __." IMAX and the Individual Defendants are referred to collectively herein as the IMAX Defendants.

2 PWC's Memorandum of Law in Support of its Motion to Dismiss the Consolidated Class Action Complaint filed on December 10, 2007 is referenced herein as "PWC Br. __."

IMAX's primary revenue generator during the Class Period was its theater systems business, and the number of theater systems installed for customers on a quarterly basis was publicly reported by the IMAX Defendants as a key metric of IMAX's financial condition.

On August 9, 2006, IMAX shocked investors with the announcement that it was under investigation by the SEC regarding the timing of its revenue recognition, including the application of multiple element arrangement accounting in its revenue recognition for theater systems. IMAX's stock price dropped over 40% following the August 9 announcement and remained at or below that level thereafter. The August 9 announcement of the SEC investigation and its subject matter partially disclosed what Defendants' misrepresentations had concealed from the market, and began to reveal what IMAX's July 20, 2007 restatement of its Class Period financial statements confirmed – that the Company had materially overstated its theater systems revenue beginning in 2002, and that its internal controls with respect to revenue recognition were severely deficient.

Plaintiffs specifically allege all Defendants' involvement in IMAX's false reporting of if its theater system revenue via the misapplication of the Company's publicly reported revenue recognition policy, as well as its failure to disclose, beginning in 2004, the improper application of multiple element accounting to its theater systems business. Despite these revenue recognition issues, PWC issued several unqualified opinions certifying that IMAX's financial statements had been prepared in accordance with GAAP. The Company's restatement (as further described herein) proved that to be false. Nonetheless, PWC claims that its unqualified audit opinions are not false statements.

While Plaintiffs alleged specific facts about how and why Defendants knew, or at the least were reckless in not knowing, that IMAX's theater systems revenue recognition was wrong,

the Defendants deny that Plaintiffs' scienter allegations are sufficient. Defendants also contend that Plaintiffs have failed to adequately plead causation because their August 9 announcement, which disclosed the very misrepresentations they made, was somehow inadequate. Such position ignores the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) and its progeny.

Defendants fail to address the bulk of Plaintiffs' detailed allegations and instead gloss over the allegations of the Complaint in the hope that the Court will gloss over these detailed facts as well. Defendants' failure to provide more plausible explanations for their scienter than Plaintiffs explanations provide means that their motions must be denied under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 U.S. (2007).

Plaintiffs respectively submit that the Complaint fully satisfies all of the relevant pleading requirements and should be sustained.

## SUMMARY OF FACTS

### A. IMAX, the Individual Defendants and PWC

Defendants Gelfond and Wechsler (Co-Chief Executive Officers of the Company since May 1996, after having purchased IMAX in March 1994 (¶¶9,10,33))[3], Joyce (IMAX's Chief Financial Officer from March 9, 2001 until his September 12, 2006 resignation, ¶11) and Gamble (IMAX's Vice President of Finance, Controller and Principal Accounting Officer from July 2001 until her November 27, 2006 resignation, ¶12) each signed the Company's Forms 10-K's during the Class Period. ¶¶9-13. Defendants Joyce and Gamble also signed the Company's Forms 10-Q during the Class Period. ¶¶11-12. Each of these Forms 10-Q and 10-K included the

[3] All references to "¶__" are to paragraphs of the Complaint.

signed certifications of Gelfond and Wechsler and Joyce (during his tenure), as required by the Sarbanes-Oxley Act of 2002. ¶159.

PWC has provided auditing, accounting and consulting services to IMAX for approximately 20 years, and issued unqualified "clean" audit opinions ("Audit Opinions") on the Company's annual financial statements which were included in IMAX's Forms 10-K during the Class Period. ¶20.

**B. IMAX's Business and Revenue Recognition Policies**

IMAX's principal business is the design, manufacture, sale and lease of what it terms projection "theater systems". Theater systems include all of the following elements: "specialized projection equipment, advanced sound systems, specialty screens, theater automation control systems and film handling equipment." ¶35 (quoting IMAX's 2005 Form 10-K filed with the SEC on March 9, 2006 ("2005 10-K"), ¶¶37-38 ("Components"). IMAX derives the majority of its revenues from the sale and lease of its theater systems to customers with large-format theaters. ¶62. Throughout the Class Period, the Company reported, on a quarterly and annual basis, both its backlog (which represented the Company's signed theatre system contracts) and theater system installations (also known as "installs"), as a barometer of IMAX's financial health, ¶39, and the IMAX Defendants publicly highlighted IMAX's theater systems revenue (which reflected theater systems that were installed by the Company). ¶62, *see also* ¶¶64-91,95-100,102,105-114. Theater systems revenue was the core of IMAX's business as it comprised the single largest component of the Company's total reported revenues, representing 54% of 2002 reported revenue, 58% of 2003 reported revenue, 64% of 2004 reported revenue and 67% of 2005 reported revenue. *Id.* For the first, second and third quarters of 2006, reported systems revenue represented 47%, 58% and 35%, respectively, of total reported revenue. *Id.* Because the

success of IMAX's business relied so heavily on theater systems revenue, the IMAX Defendants were very conscious of the "significant impact" of a single system installation in a single quarter. ¶63.

Prior to January 1, 2000, the Company recognized revenue from sales-type leases and sales of theater systems *at the time of delivery of the theater system*. ¶41. However, as a result of the interpretive guidance provided by the SEC Staff Accounting Bulletin ("SAB") No. 101, "Revenue Recognition in Financial Statements" ("SAB 101")[4], this policy changed in the year 2000, and throughout the Class Period, IMAX reported that the Company's revenue from theater system sales and sales-type leases was recognized on its books *at the time of the theater system installation* rather than delivery. ¶¶40, 42-46. Consequently, revenue relating to separate components of an IMAX theater system (e.g. the projection system, sound system and screen system) could not be "realized and earned" by the Company until IMAX delivered and installed *all* of the significant components of the theater system because all of the key components of an IMAX theater system are required before the theater system was substantially complete and functional. ¶¶38, 47.

Given that SAB 101 required that the revenue be realizable and earned before it could be recognized, it was improper for IMAX to recognize revenue for individual theater system components because the IMAX theater system could not function absent the installation of all components, including and most importantly the installation of the screen. SAB 101 provides

[4] SAB's are the SEC's view of GAAP and must be followed by registrants such as IMAX. ¶44. SAB 101 summarizes the SEC staff's view on the application of GAAP to revenue recognition in financial statements. SAB 101 specifically states: "The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met: a. Persuasive evidence of an arrangement exists, b. Delivery has occurred or services have been rendered, c. The seller's price to the buyer is fixed or determinable, and d. Collectibility is reasonably assured." (SAB 101, Top 13: A1). ¶44.

that "If an arrangement... requires the delivery or performance of multiple deliverables, or "elements", the *delivery of an individual element is considered not to be have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element.*" ¶142. Because the IMAX theater systems are integrated systems, the failure to install any significant component would be a failure of installation. ¶47.

Statement of Financial Accounting Concepts ("FASCON") No. 5: Recognition and Measurement in Financial Statements of Business Enterprises ("FASCON 5"), provides the relevant guidance on when it is appropriate to record revenue in financial statements. FASCON 5 states that in order for revenue to be recognized, it must be (1) "realized or realizable" and (2) "earned". (FASCON 5, ¶83). FASCON 5 is, in relevant part, the principal underlying GAAP that the SEC explicitly relied upon in formulating its view on revenue recognition, as expressed in SAB 101. ¶45.

IMAX's post-1999 Forms 10-K, including those issued during the Class Period, specifically stated that revenue from theater systems sales and sales-type leases would only be recognized in accordance with SAB 101. Thus, it was the Company's own internal policy that "sales" were not realizable and earned until all Components were delivered and installed, since all such Components of the System Deliverable were required before the system was substantially complete and functional. ¶¶46-47.

In May 2003, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB"), issued EITF 00-21 Revenue Arrangements with Multiple Deliverables ("EITF 00-21"). ¶48. EITF 00-21, addresses how to determine whether an arrangement involving multiple deliverables contains more than one unit of accounting and thus,

whether revenue recognition should be afforded to the various units separately or, alternatively, just once to the entire arrangement. ¶49. EITF codified existing proper practice, as it merely amplified the principles set out in SAB 101 and FASCON 5. ¶142.

Pursuant to EITF 00-21, in an arrangement with multiple deliverables, the delivered item(s) may be considered separate units of accounting *only* if *all* of the following criteria are met (¶50):

a. The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis;

b. There is objective and reliable evidence of the fair value of the undelivered items; and

c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probably and substantially in the control of the vendor.

EITF 00-21 like, SAB 101 and FASCON 5, required that revenue be realizable and earned before it could be recognized. Consequently, EITF 00-21 did not change the way IMAX was supposed to recognize revenue from its theater systems.

IMAX's first mention of multiple element accounting was in its 2004 Form 10-K (filed with the SEC on March 11, 2005)("2004 10-K"). ¶51. That document and the 2005 10-K indicated that multiple element accounting was being applied only in limited circumstances (such as separate payments for film licenses or when a customer chose not to proceed with an installation), but failed to disclose that it was applying multiple element accounting inappropriately to its theater systems because they were ineligible for such treatment. ¶¶51-55. Contrary to what the Company publicly disclosed, IMAX was wrongly applying multiple element accounting by recognizing

revenue on Components of numerous theater systems before all of the Components had been installed, overstating its revenue and earnings thereby. ¶52.

### C. Initial Disclosure of IMAX's Improper Revenue Recognition

On August 9, 2006, IMAX shocked investors and announced that it was under investigation by the SEC regarding its timing of revenue recognition, including its application of multiple element arrangement accounting to its theater systems. ¶115. The Company's August 9, 2006 press release stated, in part, the following:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. *The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed.* Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. (Emphasis added)

The Company also announced that there were no buyers who were willing to acquire the Company (it had previously announced its search for a strategic partner) and the sale or merger of the Company was called off on December 15, 2006. ¶121,125. The ultimate lack of a buyer appears to be a result of the information obtained by the potential suitors (reflecting the truth about the Company) while conducting their due diligence of the Company. ¶122. Thereafter, the Ontario Securities Commission ("OSC") also began an investigation into IMAX's revenue recognition policies. ¶124. Following the Company's partial disclosure of its improper

accounting practices and SEC inquiry on August 9, 2006, the price of IMAX shares crashed, falling by 40.4%, or $3.90, from $9.63 per share to a closing price of $5.73 per share on the following trading day. ¶119.

On March 16, 2007, IMAX announced a delay in the filing of its 2006 Form 10-K, after finding errors in its accounting for certain expenses, and that it misclassified certain costs as capital expenditures rather than expensing them as they were incurred. ¶126. On March 29, 2007, IMAX announced that it had delayed filing its 2006 Form 10-K for a second time to review its accounting for revenue from theater system installations, and that in the course of completing its previously announced restatement and year-end audit, and reviewing the comments it had received from the SEC and the OSC, the Company determined to broaden its review to address certain issues related to these comments, "primarily in connection with its revenue recognition for certain theater system installations in previous periods, including the fourth quarter of 2005." ¶127. Between April 12, 2007 and July 29, 2007, the Company provided various updates to the public on the status of its accounting review. ¶¶131-138. On July 20, 2007, IMAX filed its Form 10-K for the fiscal year ended December 31, 2006, which included the restatement of its financial results for fiscal years 2002 through the first three quarters of 2006 (the "Restatement"). ¶¶56,139. The Restatement ultimately disclosed that a total of 16 theater systems installation transactions, with a total revenue impact of $25.4 million and margin impact of $14.1 million, shifted between reported quarters in their originally reported years (i.e. recognized too early). ¶143. In addition, 14 of the theater installation transactions, with a total revenue and margin impact of $27.1 million and $14 million, respectively, shifted between fiscal years (i.e. recognized too early). ¶144.

## ARGUMENT

### I. LEGAL STANDARDS ON A MOTION TO DISMISS

#### A. The Rule 12(b)(6) Standard

When deciding a defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint, *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1995 (2007) and draw all inferences in the light most favorable to the nonmoving party." *In re NYSE Specialists*, 2007 WL 270, 341, at *5. The complaint need not provide detailed factual allegations but must amplify a claim with some factual allegations to render the claim plausible. *In re Scottish Re Group Secs. Litig.*, No. 06 Civ. 5853 (SAS), 2007 U.S. Dist. LEXIS 81565 (S.D.N.Y. Nov. 1, 2007) (*citing Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007)).

#### B. Pleading Requirements under the Private Securities Litigation Reform Act and Rule 9(b)

The Private Securities Litigation Reform Act (the "PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure impose particularity pleading requirements on Section 10(b) complaints, mandating that plaintiffs "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (*citing Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)). In applying the PSLRA and Rule 9(b), courts "must not lose sight of the fact that [the heightened pleading requirement] must be reconciled with Rule 8 which requires a short and concise statement of claims." *Felton v. Walston & Co.*, 508 F.2d 577, 581 (2d Cir. 1974). "Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act," the Second

Circuit "do[es] not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court recently clarified the strong inference of scienter requirement in *Tellabs,* 127 S. Ct. 2499. The Supreme Court held that three "prescriptions" apply when a court is determining the adequacy of scienter allegations on a Rule 12(b)(6) motion to dismiss a §10(b) complaint. *Id.* at 2509. Under *Tellabs*, the deciding court must: 1) accept all factual allegations in the complaint as true; 2) determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter". *Id.* at 27; and 3) after taking into account "plausible opposing inferences" (meaning "nonculpable explanations for defendants' conduct, as well as inferences favoring the plaintiff"), the complaint will survive if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2509-10. The inference of scienter need not, however, be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences.'" *Id.* at 2510. If the inferences are equally plausible, the complaint should be sustained. The *Tellabs* Court posed the relevant inquiry as being: "when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 2511.

Scienter can be pled either by (a) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (b) alleging facts to show that defendants had both motive and opportunity to commit fraud. *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d

87, 99 (2d Cir. 2007) (*citing Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000); *see also Novak v. Kasaks,* 216 F.3d 300, 310 (2d Cir. 2000).

## II. THE COMPLAINT STATES A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS

The Complaint is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants. It requires that Plaintiffs allege that Defendants (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the Plaintiffs relied, and (5) that the Plaintiff's reliance was the proximate cause of its injury. *See, e.g., In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998). The Complaint satisfies each of these requirements with respect to all Defendants.

### A. The Complaint Adequately Alleges that Defendants Made Materially False and Misleading Statements and Omissions

#### 1. The IMAX Defendants Made Materially False and Misleading Statements[5]

Given the Restatement, the IMAX Defendants do not challenge Plaintiffs' allegations that they made materially false and misleading statements. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Lit.*, 324 F. Supp. 2d 474, 486-87 (S.D.N.Y. 2004) ("the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made"); *In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 586 (D.N.J. 2005)(same); *Frank v. Dana Corp.*, No. 3:05CV7393, 2007 U.S. Dist. LEXIS 61307 (N.D. Ohio Aug. 21, 2007)("Plaintiff is correct that a Restatement, under Accounting Principles Board Opinion (APB)

[5] The IMAX Defendants claim that certain of their false and misleading statements are "non-actionable forward-looking statements under the PSLRA." IMAX Br. 24-25. The reason for their citations to certain paragraphs in the Complaint for this position is unclear. To the extent they believe Plaintiffs are asserting that projections of theater systems are false statements, they are wrong. Rather, these allegations are directed to the IMAX Defendants' focus on the importance of theater installations and the historic reporting thereof to the investing public.

No. 20, is a 'correction of errors in previously issued financial statements.'")(internal citations omitted).

The Restatement demonstrates that the IMAX Defendants' Sarbanes-Oxley Certifications were materially false and misleading. Throughout the Class Period, the Company had serious internal control problems. Despite these deficiencies, defendants Gelfond, Wechsler and Joyce concluded that IMAX maintained effective internal controls over financial reporting and repeatedly signed sworn Sarbanes-Oxley certifications stating that IMAX's internal controls were adequate. ¶¶154, 159-161. Plaintiffs have sufficiently pled that the IMAX Defendants admitted that IMAX's internal controls over financial reporting were not effective, particularly with respect to revenue recognition. ¶154-158.

### 2. <u>PWC Made Materially False and Misleading Statements</u>

#### a. PWC is Primarily Liable for its Unqualified Audit Opinions

PWC claims that it cannot be held liable under Section 10(b) for the misstatements of the IMAX Defendants and that Plaintiffs' allegations against PWC are barred by *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) because they amount to nothing more than aiding and abetting. PWC Br. 6-8. However, Plaintiffs have alleged that PWC is a primary violator whose liability arises from its improper issuance of unqualified Audit Opinions rendered with respect to IMAX's Class Period year-end financial statements. *See e.g.* ¶¶20, 149, 166 170, 184-203. In *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 191 (1994), the Supreme Court held:

> Any person or entity, including a lawyer, *accountant*, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met. (emphasis added).

*See e.g. In re Refco,* 503 F. Supp. 2d 611 (S.D.N.Y. 2007). Because PWC failed to conduct a GAAS audit, but nevertheless issued clean opinions on IMAX's Class Period year-end financial statements, it is responsible for the dissemination of material misinformation to the investing public during the Class Period. ¶170.

**b. PWC's Unqualified Audit Opinions**

PWC issued unqualified Audit Opinions dated February 14, 2003, February 27, 2004, March 10, 2005 and March 9, 2006, relating to its audits of IMAX's consolidated financial statements for the years ended December 31, 2002 through 2005. As set forth in the Complaint, PWC's Audit Opinions were materially misstated because they represented that IMAX's financial statements were presented fairly in accordance with GAAP and that PWC's audits had been performed in accordance with GAAS and the standards of the Public Accounting Oversight Board ("PCAOB"). ¶¶169,187. PWC's misstatements are evidenced by the Restatement with which PWC concurred, ¶149, and demonstrated by PWC's failure to conduct a GAAS audit.

Notwithstanding these facts, PWC appears to argue that its unqualified Audit Opinions cannot be deemed false unless Plaintiffs allege that it "deliberately misrepresented" its opinion. PWC Br. 8-9. However, in its recent opinion extending an accountant's liability under §10(b) to include a duty to update or correct prior audit opinions, the Second Circuit addressed the notion that one who issues a public audit opinion has a responsibility to those who rely on that opinion. *Overton v. Todman & Co.*, 478 F.3d 479, 485 (2d Cir. 2007).[6] The *Overton* Court observed that, among the obligations the issuance of a false certified opinion creates, is a duty to disclose. *Id.* at

[6] *See Gold v. DCL Inc.*, 399 F. Supp. 1123, 1127 (S.D.N.Y. 1973), cited in *Overton*, which held that where an auditor "gives an opinion or certifies statements, an auditing firm publicly assumes a role that carries a special relationship of trust vis-a-vis the public. The auditor in such a case holds itself out as an independent professional source of assurance that the audited company's financial presentations are accurate and reliable."

485. An auditor's unqualified opinion approving false financial statements and representing conformity with GAAP and GAAS is deemed to be a false and misleading statement by that auditor. *See, Lattanzio v. Deloitte & Touche LLP*, 476 F. 3d 147, 153-54 (2d. Cir. 2007) (accountant liable for false audit opinions certifying company's financial results); *see also In re Hayes Lemmerz Int'l Inc.*, 271 F. Supp. 2d 1007 (E.D. Mich. 2003); *Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1332-38 (M.D. Fla. 2002); *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 820-21 (N.D. Ill. 2000); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 609-10 (D.N.J. 2001); *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1375-76 (S.D. Fla. 2001). PWC's suggestion that Plaintiffs must meet a higher pleading standard for an unqualified audit opinion than §10(b) otherwise requires has no support in the law and PWC has cited no cases to support its position. In addition, PWC cites no authority for the proposition that an unqualified audit opinion is not deemed a false statement in the face of a restatement. Certainly, PWC representations that the Company's financial statements (subsequently restated) conformed with GAAP were false representations.

### B. Plaintiffs' Factual Allegations Give Rise to A Strong Inference of Defendants' Scienter

The IMAX Defendants and PWC each claim that the Complaint fails to meet the standards for pleading scienter under the PSLRA. *See generally*, IMAX Br. 8-16, PWC Br. 9-17. Defendants miss the point and seek to avoid Plaintiffs well pled allegations that their conduct was reckless and an extreme departure from the standards of ordinary care and that they knew or should have known of their improper conduct.

Many factors can be relevant in evaluating allegations of scienter, and no one factor is necessarily conclusive in isolation. *Tellabs,* 127 S. Ct. 2499. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509. "We reiterate . . . that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. . . . In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Schleicher v. Wendt*, No. 1:02-CV-1332-DFH-TAB, 2007 U.S. Dist. LEXIS 67924 (D. Ind. Sept. 12, 2007) (citing *Tellabs* at 2511).

Recklessness requires that the plaintiff allege that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Scottish Re*, 2007 U.S. Dist. LEXIS 81565 (*citing Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). Recklessness is adequately pled where plaintiffs "specifically allege[] defendants' knowledge of facts or access to information contradicting their public statements" or "where plaintiffs allege[] facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *In re Winstar Comm.*, No. 01-CV-3014 (GBD), 01-CV-11522, 2006 U.S. Dist. LEXIS 7618, at *21 (S.D.N.Y. Feb. 24, 2006) (*citing Novak*, 216 F.3d 308. "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness.") *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). This Court has stressed that:

> [s]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants *knew* or, more importantly, *should have known* that they were misrepresenting material facts related to the corporation.

*In re Globalstar Secs. Litig.*, No. 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496 at *17, (S.D.N.Y. Dec. 12, 2003) (citing *Novak*, 216 F.3d at 308; *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 631 (S.D.N.Y. 2003).

To allege recklessness with regard to accountants:

> [t]he plaintiff must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts.

*Scottish Re,* 2007 U.S. Dist. LEXIS 81565 at *30; *In re Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 160 (D. Mass. 2002); *see also In re Complete Mgmt. Sec. Litig.,* 153 F. Supp 2d 314, 333 (S.D.N.Y. 2001); (*SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). That is precisely what Plaintiffs allege here; no reasonable accountant would have made the same decision as PWC if presented with the same facts about the operation of IMAX's businesses. PWC knew or, just as important, should have known, that it was misrepresenting material facts related to IMAX's revenue recognition policy.[7]

**1. IMAX's Accounting Restatement <u>Supports A Strong Inference Of Scienter</u>**

Defendants' accounting manipulations materially impacted IMAX's quarterly and annual theater system revenue during the Class Period so that it appeared to continually trend upwards. ¶71 (<u>2002</u>: 16 theater systems, $71.0 million in revenue); ¶79 (<u>2003</u>: 21 theater systems, $75.8 million in revenue); ¶87 (<u>2004</u>: 22 theater systems, $86.6 million in revenue); ¶107 (<u>2005</u>: 39 theater systems, $97.7 million in revenue). Via the Restatement, IMAX disclosed that a total of

[7] PWC asserts (PWC Br. 6, 10) that Plaintiffs have failed to plead motive on the part of PWC, therefore "the strength of Plaintiffs' 'circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142. This argument has no merit here because the allegations of recklessness asserted against PWC satisfy the *Kalnit* standard.

16 theater systems installation transactions, with a total revenue impact of $25.4 million and margin impact of $14.1 million, shifted between reported quarters in their originally reported years (i.e. recognized too early). ¶143. In addition, 14 of the theater installation transactions, with a total revenue and margin impact of $27.1 million and $14 million, respectively, shifted between fiscal years (i.e. recognized too early). ¶144.

IMAX's attempted depiction of the Restatement as merely reflecting the voluntary application of an alternate appropriate accounting method (IMAX Br. 1) is not only wrong[8], but it is belied by both the sequence of events and its own public statements, about the change. ¶136-137,139,141. That it was not the Company's choice to revise its policy is evidenced by its admission that it addressed the SEC's and OSC's comments by revising its accounting policy and restating its financial results in accordance therewith. *Id.*

While in total dollars, the Restatement may not be in the category of recent front-page accounting scandals, its impact on this Company is significant, with the timing of revenue recognition shifting by quarters or years. For example, two transactions originally recorded in 2004 were moved to 2005 and 2006 and a transaction recorded in 2002 was moved to 2005. ¶145. Eight transactions originally recorded in 2005 (revenue and net earnings impact of $14.1 million and $7.5 million, respectively) were moved to 2006 and two were moved to 2007. *Id.* The Restatement of theater system revenue reduced the Company's 2005 originally reported net earnings by 47%. ¶146. Notably, as a result of the Restatement, installation of the theater systems will no longer be deemed a sufficient basis for revenue recognition. Instead, the Company's new revenue recognition policy requires customer certification, or public opening, of

[8] APB 20 provides that use of the wrong accounting principle equates to an error in accounting, the correction of which is accomplished by a restatement. It states that a restatement is made only when material, since restatements may dilute investor confidence and confuse investors.

the theater before revenue can be recognized. These are events that can be independently verified. This marked change indicates that the Company's previous policies were subject to manipulation. ¶145.

### 2. Defendants' Violations of GAAP and GAAS Support A Strong Inference Of Scienter

Defendants argue that this litigation is based on a dispute over the application of accounting principles (which IMAX contends are "complex" judgment calls) for which they cannot be held liable. *See e.g.* IMAX Br. 2, 13-16; PWC Br. 10, 13 The fact that the parties disagree is not sufficient to defeat Plaintiffs' cogent allegations that the IMAX Defendants and PWC were at least reckless in their gross disregard of simple revenue recognition principles. The Court in *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131, 148 (D. Mass. 2001) was faced with a similar argument by the defendants and held that:

> The fact that the application of GAAP tolerates a range of reasonable treatments does not, however, vindicate the defendants so easily. There are indeed numerous occasions for judgment calls in the application of GAAP. But GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays *beyond the boundaries of reasonableness* will provide evidence from which scienter can be inferred. (Emphasis added).

*See also, In re Worldcom, Inc. Sec. Litig.*, 352 F. Supp. 2d 472, 479 (S.D.N.Y. 2005) ("Although financial accounting is a 'process that involves continuous judgments and estimates,' it nevertheless has 'as its foundation the principle of conservatism, with its corollary that possible errors in measurement should be in the direction of understatement rather than overstatement of net income and net assets."). That the violations involve relatively simple and straightforward principles of GAAP (revenue cannot be recognized before it is earned) creates a strong inference

of scienter of the IMAX Defendants and PWC. As the court observed in *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638 (E.D. Va. 2000)[9] :

> The inference invited by the large magnitude of the misstated financials and the repetitiveness of the GAAP violations takes on added significance if, as the Complaint alleges, the violated GAAP rules and Company accounting policies are, in fact, relatively simple. This is so because violations of simple rules are obvious, and an inference of scienter becomes more probable as the violations become more obvious. Put another way, if the GAAP rules and MicroStrategy accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard. *See, e.g., In re Baan*, 103 F. Supp. 2d at 21. ("Violations involving the premature or inappropriate recognition of revenue suggest a conscious choice to recognize revenue in a manner alleged to be improper, and may therefore support a strong inference of scienter."); *Chavelrus*, 59 F. Supp. 2d at 234 ("Courts also have held that 'violation of a company's own policy supports an inference of scienter.'") (quoting *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996)) ... These common-sense observations compel the conclusion that the alleged simplicity of the GAAP rules violated here are relevant and contribute probative weight to an inference of scienter.

The *MicroStrategy* court found unpersuasive the defendants' argument that the accounting principles were complex, and further noted that their argument is inapposite at the motion to dismiss stage. *Id.* at 638, fn. 35.[10] In discussing PWC's liability, the *Microstrategy* court found that, given the complaint's allegation about the simplicity of the accounting principles:

> It is simply a matter of common sense and logic--particularly given the special expertise of accounting firms--that the less complex the rules violated, the greater the magnitude of the irregularities, and the more frequent the violations, the stronger is the inference that conscious fraud or recklessness is the explanation for the auditor's role in the violations.

[9] Although the magnitude of the overstatement in *MicroStrategy* is far larger than here, the principles espoused therein are equally applicable.

[10] The parties obviously disagree about the complexity of the relevant accounting principle, leaving Plaintiffs at a disadvantage because they are unable, at the pleading stage to introduce their own expert evidence.

*Id.* at 652. The *Microstrategy* court found that PWC's alleged access to company information further supported scienter because it served as the "lens through which PwC's specific GAAS and GAAP violations must be viewed." *Id.* at 653.

Here, as in *Microstrategy*, the main issue is "whether PwC misapplied GAAP to [IMAX's] obvious business practices". *Napier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 278 (D.N.J. 2002), citing *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 592 (D.N.J. 2001) and *In Re Burlington Coat Factory Sec. Litig.*, 114 F. 3d 1410, 1421, n.10 (3d Cir. 1997). The *Napier* court opined that the determination of what accounting practices comprise GAAP "is a question of fact best addressed through expert testimony and thus inappropriate for resolution on a motion to dismiss." *Id.* at 593. Given the procedural posture of the motion, i.e. a motion to dismiss, and plaintiffs' support for their contentions, the *Napier* court assumed, for the purposes of the motion to dismiss, that the company's accounting was improper. *Napier,* 227 F. Supp. 2d. at 276. Plaintiffs' allegations with respect to the improper GAAP application here should be treated accordingly.

Defendants' attempt to hide behind what they term a simple "misjudgment" is misplaced given that there is no leeway under GAAP for the Company's premature recognition of revenue. ¶¶174-175. Neither IMAX management nor PWC was required to make a judgment call in a "grey" area of GAAP. Rather, here, there was a right way and wrong way to recognize revenue on the Company's theater systems. Pursuant to GAAP and the Company's own stated revenue recognition policy, the IMAX Defendants ignored these straight forward accounting rules in order to portray better financial results. ¶40. Defendants' misapplication of GAAP is of the type that strays beyond the boundaries of reasonableness and is evidence of scienter. As clearly alleged in the Complaint, GAAP does not permit revenue to be recognized on the separate

components of a theater system prior to the installation of a Component, including the screen, because all of the Components of an IMAX theater (e.g. projector, sound system and screen) are only functional when used in combination to show an IMAX movie. ¶¶118,175. Defendants' practices were strictly forbidden under GAAP and that is why the SEC's investigation into the Company's accounting practices resulted in the Restatement. ¶¶136-139. Defendants have failed to provide a plausible, non-fraudulent explanation for their application of accounting practices that were so obviously wrong in light of the Company's business. *See Tellabs,* 127 S. Ct. 2499; *see also In re Scottish Re Group Sec. Litig.*, 2007 U.S. Dist. LEXIS 81565, at *55 (S.D.N.Y. Nov. 2, 2007) ("It is simply not a plausible opposing inference that the Company's officers --- sophisticated executives actively engaged in the planning of these transactions were ignorant of the transactions' consequences on the Company's deferred tax assets").

**a. The IMAX Defendants**

The IMAX Defendants posit that because the Form 2005 10-K (the 10-K that the IMAX Defendants themselves drafted) says that GAAP and various accounting pronouncements for aspects of the Company's business such as revenue recognition and multiple element arrangements are "highly complex and involve subjective judgments", any possibility of scienter is negated. Incredibly, Plaintiffs are faulted because they failed to "even cursorily allege that any of the Individual Defendants realized that the screen is a key component, that the different components had no standalone value and that the theater systems were not comprised of multiple deliverables were relevant to IMAX's accounting during the relevant time periods." IMAX Br. 16. In other words, it is the IMAX Defendants' position that they cannot possibly have comprehended the importance of the screen to an IMAX *theater system* (but *see*, for example ¶¶ 35,37,38, 40); that the components had no standalone value in the accounting sense because they

were proprietary to IMAX (but *see*, for example ¶¶36,38,43) and were not sold separately (but *see* ¶54); and that the simple concepts that revenue must be realizable and earned before it can be recognized and that multiple element accounting is only applicable if three criteria are met, are too complex for them to have understood. They take this position despite the fact that: the various SEC documents they themselves prepared and signed during the Class Period discussed the method for, and timing of, recognition of theater system revenue (*see*, for example, ¶¶ 43,46); that the Company's repeated policy of recognizing revenue changed in 2000 from delivery to installation (¶42); and they continually publicly addressed theater system installations as a key metric by which to review the Company's business and financial condition. ¶¶65-91,95-100,102,105-114.

The outlandishness of Defendants' position is also well illustrated by:

- Wechlser's October 28, 2004 observation of the "significant impact just one system installation" has on IMAX's quarterly financial results." ¶¶63, 84;
- The recognition, during an IMAX November 5, 2002 quarterly investor conference call, that the variability and timing of installation tied to customers' construction schedules creates a "lumpiness" in systems revenue. ¶67;
- Wechsler and Gelfond's August 4, 2005 responses to analyst questions about installations on the "cusp" of one quarter or another, with the explanation that they have employees on site so that they are always "monitoring" the progress of installs. ¶67[11]; and
- Wechsler and Gelfond's November 3, 2005 discussion about "significant revenues tied to theater installations", so that "our P&L can be effected in a given quarter by customer delays" (¶96) as well as the distinction they drew between "physical installs" and "revenue recognition installs". (¶99).

---

[11] As alleged in the Complaint, via the Restatement, the Company admitted that during the Class Period effective controls were not maintained to raise on a timely basis certain issues relating to observations of the installation process, that impacted the accuracy and timing of revenue recognition. ¶156.

The IMAX Defendants nowhere mention that several reports concerning installations were circulated, via email, on a monthly basis at IMAX. ¶93. These reports included monthly reports from the Sales Department to the New York headquarters and to Senior Management in New York (which included Wechsler and Gelfond), as well as the Production Department and a calendar report from the head of technology which combined the information in the Sales and Production reports. *Id.* Weekly meetings were held at IMAX's Canadian headquarters to address theater openings and the timeliness of each project. Reports containing the schedules for theater installations circulated by the Finance Department (overseen by defendant Gamble) were circulated and discussed at those meetings. ¶94.

Despite Plaintiffs' allegations described above, the IMAX Defendants contend that Plaintiffs failed "to allege facts establishing that defendants knew the significance of those underlying facts.[12] They say that Plaintiffs' allegations of access to adverse facts that rendered the representations false and misleading, begs the question "whether at the time of the sales at issue the Defendants knew or should have known that the revenue from those sales should have been treated differently, and, thus, that the contemporaneous financials were incorrect." IMAX Br. 13. Defendants cite *In re Bristol-Myers Squibb Sec. Litig,* 312 F. Supp 2d 549, 566 (S.D.N.Y.) for support.

*Bristol-Meyers* restated its previously issued financial statements to correct the time of revenue recognition for certain sales to customers that were erroneously recorded at the time of shipment, and which should have been accounted for using a consignment model. *Id.* At oral

---

[12] Wechsler and Gelfond's February 17, 2006 pre-announcement of its 2005 year-end and fourth quarter results included a "record" number of installs, 14 in the fourth quarter. ¶¶100-102. Wechsler's lauding of China and Russia installs (¶105) was bellied by the real facts i.e. that the incomplete nature of those theaters even included a Russian theater without a roof. ¶118.

argument on the motion to dismiss, the Court focused on whether the defendants should have known that the revenue from the subject sales should have been treated differently and thus, that Bristol-Meyers' financials were incorrect. Plaintiffs' counsel conceded that the sales at issue were not traditional consignment sales. *Id.* at 566. The court observed that, as opposed to cases with well-known, easily applied accounting rules (as here, where the revenue recognition concept was quite clear), there was no allegation that the accounting treatment adopted by Bristol-Meyers in its restatement was the subject of prior accounting rules or literature. It opined that "While there is no requirement that a defendant must know the precise accounting treatment that would have been applied before he can have the requisite scienter, it is agreed that the complaint must 'specifically allege defendants' knowledge of the facts or access to information contradicting their public statements.'" (citation omitted) *Id.* at 567-68. After discussing the number and type of complex judgments Bristol-Meyers' unusual consignment treatment entailed, the Court concluded that that there was no strong inference that the defendants knew or should have known that the sales should have been accounted for in some way other than Bristol-Meyers' historical revenue model. *Id.* at 568.

The instant Complaint is replete with allegations that the IMAX Defendants were aware of all of the facts relevant to IMAX's revenue recognition policy, including that the Company had consciously changed its revenue recognition policy well before the start of the Class Period from delivery to system installation ¶¶41-42, and that IMAX made certain to have personnel monitoring installations in order to know, *inter alia*, when revenue could be recognized in a particular reporting period. ¶91. In its SEC filings (signed by the Individual Defendants), IMAX's application of multiple element accounting was addressed as having been applied only in very specific and limited circumstances, yet a conscious choice was made to apply it to theater

system revenue, despite its clear inapplicability. ¶¶51-52. These were theater "systems" that only functioned with all of their parts, including the screen (an uncontrovertibly critical part of a moviegoer's viewing experience). The Complaint alleges that the Company's approach to revenue recognition and its application of multiple element accounting was specifically discussed with PWC. ¶224. While the IMAX Defendants attempt to hide behind PWC, the fact remains that the IMAX Defendants understood their business, understood the financial impact on IMAX of recognizing the revenue for a single theater system ¶63, discussed this specific accounting treatment with PWC ¶¶223-224, and included, in IMAX's SEC documents, the explanation that theater system revenue was recognized on installation with the exception of IMAX's specifically limited use of multiple element accounting.

The Complaint contains specific allegations that throughout the Class Period, the IMAX Defendants had a clear understanding of the operations of the business and were at least reckless in not knowing that they were improperly applying explicit accounting rules and their own internal policy which precluded the application of multiple element accounting under EITF 00-21 to the theater systems. The IMAX Defendants' knowledge of the Company's business operations is demonstrated by their public statements that revenue derived from theater *system* installations was the most important ingredient in the success of the Company's business, so critical that a single installation could materially impact IMAX's quarterly results. [13] ¶63

[13] Plaintiffs have also alleged that the Individual Defendants had direct involvement in the daily affairs of the Company and Gelfond and Wechsler held substantial authority over the day-to-day management and operation of the Company. ¶13. As the Chief Financial Officer, defendant Joyce had direct responsibility for the preparation of the Company's financial statements, Annual Reports on Form 10-K, Forms 10-Q and budgets and defendant Gamble, as Chief Accounting Officer, oversaw the accounting function. ¶211. It was the responsibility of Joyce and Gamble to help insure that theater systems installs were accurately reflected on the Company's books and records and accurately reported to the investing public. ¶212. Certainly, defendants Joyce (the Company's CFO) and Gamble (the Company's Principal Accounting

(Wechsler observed that the net contribution to IMAX for each MPX system is about $1 million, or $.02 to $.03 per share, "illustrating the significant impact just one system installation can have on our quarterly financial results"); *see also* ¶39 (Company reported that its backlog and theater system installations were the "barometer of IMAX's financial health"); ¶62 (systems revenue comprised the single largest component of the Company's total reported revenues, representing 54% of 2002 reported revenue; 58% of 2003 reported revenue; 64% of 2004 reported revenue; 67% of 2005 reported revenue; and 47%, 58% and 35% of total reported revenue for the first, second and third quarters, respectively); ¶64 (Gelfond and Wechsler described systems revenue as one of the "two most important metrics of our growth."). *see also* ¶¶65-91,95-100,102,105-114). In fact, as alleged in the Complaint *every* press release issued by the Company during the Class Period compared the "number of installs" in the current quarter to those in the same quarter of the prior year. Given their focus on "installations" as a barometer of the Company's health (a metric reflected in the Company's publicly disseminated oral and written quarterly and annual reports) and IMAX's stated revenue recognition policy reflected in the SEC filings of its financial statements, signed by the Individual Defendants, they cannot feign ignorance about the accounting treatment accorded to theater system installations.[14]

---

Officer), both of whom are certified public accountants, cannot claim that they were unaware that the accounting rules require that revenue needed to be realizable and earned before it could be recognized.

[14] It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false and misleading information conveyed in IMAX's public filings, press releases and other group-published documents addressed in the Complaint reflect the collective work of all of the Individual Defendants. *In re Marsh & McLennan Cos. Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 479 (S.D.N.Y. July 2006) (The majority rule in the Southern District of New York is that the group pleading doctrine has survived the Private Securities Litigation Reform Act.); *In re Refco, Inc. Sec. Litig.*, 503 F. supp. 2d at 642. ("the group pleading doctrine is alive and well").

Numerous courts have held that where the alleged fraud relates to the core business of the company, knowledge of the fraud can be imputed to its officers and directors. *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 233 (S.D.N.Y. 2006) ("where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company.") *See also In re Atlas Air Worldwide Holdings,* 324 F. Supp. 2d at 496 (S.D.N.Y. 2004) (same); *Winstar,* 2006 U.S. Dist. LEXIS 7618, at *24 (same).[15] In *Atlas*, the Court reasoned that:

> [I]f facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them. Accordingly, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent, an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions with the company. *Id.* at 489.

Since revenue from theater installations constituted the single largest component of IMAX's total reported revenues, theater systems and their associated revenue were critical Company operations establishing a strong inference that the IMAX Defendants knew, or at least should have known, that all significant components of a theater system were necessary for its operation (and thus, be deemed "installed") before the Company could recognize revenue from the sale of

[15] *See also*, *Tel-Save*, Master File No. 98-CV-3145, 1999 U.S. Dist. LEXIS 16800, 1999 WL 999427, at *5 ("Knowledge concerning a company's key businesses or transactions may be attributable to the company, its officers and directors"); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1325-26 (E.D. Wash. 1998) (facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers); *In re Turbodyne Techs., Inc. Sec. Litig.*, No. CV 99 00697 MM (BDRx), 2002 U.S. Dist. LEXIS 25738, at *77-79 (C.D. Cal. Mar. 13, 2002); *Danis v. USN Commc'ns Inc.*, 73 F. Supp. 2d 923, 939 (N.D. Ill. 1999); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (where medical claims processing was key aspect of Aetna's managed care business, knowledge of factors affecting processing imputed to CEO and CFO).

a theater system.[16] Moreover, GAAP violations that involve the premature recognition of revenue (as plaintiffs allege here) have been said to "suggest a conscious choice to recognize revenue in a manner improper, and may therefore support a stronger inference of scienter." *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS), 2005 U.S. Dist. LEXIS 41996, at *64 (E.D.N.Y. Sept. 19, 2005) and *Winstar*, 2006 U.S. Dist. LEXIS 7618 at *24. (*both citing In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000)). This is because premature revenue recognition, unlike other types of GAAP violations, is less likely to be an inadvertent mistake. *Gilat*, 2005 U.S. Dist Lexis 41996 at *64.

The Complaint asserts numerous additional facts giving rise to a strong inference of scienter against the IMAX Defendants. The IMAX Defendants failed to comply with GAAP (FASCON 5, SAB 101 and EITF 00-21) and inappropriately applied multiple element accounting to the sales of IMAX theaters *systems* (which were ineligible for multiple element accounting treatment) by recognizing revenue on components of theater *systems* before they were installed, notwithstanding that the IMAX Defendants:

- evidenced their knowledge of the relevant GAAP by explaining, in the Company's Form 10-K for the year ended December 31, 2000, that the Company's policy of recognizing revenue upon delivery of the theater system changed in the year 2000 and that beginning in 2000 and continuing thereafter, revenue from theater system sales and lease agreements should have been recognized at the time of the theater system installation rather than delivery ¶42;

- evidenced their knowledge of the relevant GAAP by repeatedly quoting, in the Company's Forms 10-K for the years ended December 31, 2002 through 2005, that IMAX only recognized revenue on its theater *systems* from sales type leases when all of the criteria set forth in SAB 101 were met. ¶43-46;

---

[16] The IMAX Defendants maintain that a theater system screen only represents a small portion of the revenue on the total value of a theater system. IMAX Br. 4 fn. 5. But the relevant point is that pursuant to its own stated policy, theater system revenue cannot be recognized without all of the Components. ¶¶47,142. The Restatement is confirmation thereof. ¶59.

- knew or should have known that customers paid for the theater *systems* in installments (the first upon signing the contract, two more payments before shipping and a final payment upon delivery and installation) as further evidence that they knew that the theater *system* was a single deliverable. ¶54;

- knew or should have known that the different theater components had no standalone value because they were the property of IMAX and/or licensed by IMAX therefore IMAX customers were unable to sell such components. ¶54;

- knew or should have known that the different theater components had no standalone value because there was no market for them (i.e. the theater components are the proprietary of IMAX and in the event of a sale by IMAX (far less common than a lease), the purchaser is committed to giving IMAX the right of first refusal, and since the IMAX components are made to be compatible only with one another, they cannot be viewed as independently saleable items). ¶54.

In an attempt to invoke the "auditor signed off on it" defense, the IMAX Defendants' also argue that scienter cannot be inferred from the alleged existence of accounting improprieties because they relied on PWC to ensure the accuracy of the Company's accounting practices. IMAX Br. 17-18. But since the Individual Defendants have "a well-defined obligation to ensure the accuracy of the information filed with the SEC," reliance on PWC does not absolve them of responsibility. *Winstar*, 2006 U.S. Dist. LEXIS 7618 at *26.[17] While even in the numerous, notable large frauds of the last ten years, e.g. Enron, WorldCom, Tyco, the auditors' "sign-off" failed to absolve the company defendants of their liability.

---

[17] The IMAX Defendants rely on *SEC v. Caserta*, 75 F. Supp. 2d 79, 95 (E.D.N.Y. 1999) for their position that a good faith reliance on an accountant's advice is a viable defense to scienter in securities fraud cases. However, the IMAX Defendants have failed to establish the defense as explained by the Court in *Caserta*. ("To establish the defense, the defendant should show that he/she/it made a complete disclosure, sought the advice as to the appropriateness of the challenged conduct, received advice that the conduct was appropriate, and relied on that advice in good faith.").

**b. PWC**

The Complaint properly pleads facts that give rise to a strong inference of scienter against PWC.[18] PWC does not argue, nor can it, that IMAX's published financial statements were prepared in accordance with GAAP. When IMAX filed its Form 10-K for the fiscal year ended December 31, 2006, which included the restatement of its financial results for fiscal years 2002 through the first three quarters of 2006, ¶202, IMAX admitted and PWC concurred that IMAX's financial statements were materially misstated and failed to comply with GAAP. ¶149. Plaintiffs have alleged specific facts underlying PWC's violations of GAAS as well as "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak*, 216 F.3d at 307 (citations omitted); *Winstar*, 2006 U.S. Dist. LEXIS 7618 at *20-21; *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 Civ. 3374 (RPP), 1999 U.S. Dist. LEXIS 2102, *44 (S.D.N.Y. March 1, 1999) (upholding allegation where alleged GAAP and GAAS violations were alleged in detail and suggested that auditor should have been aware of the underlying fraud).

Defendant PWC has been IMAX's principal independent accountant for approximately 20 years. ¶20. It performed numerous quarterly reviews and annual audits during that time, had ongoing discussions with IMAX about the Company's revenue recognition polices and approved them all. ¶223. As a result of its audit services and Company access, PWC had a complete picture of IMAX's finances, operations and business as well as extensive unfettered access to the internal documents and underlying books and records of the Company. ¶224. *See In re*

---

[18] Page 11 of PWC's brief seems to confuse the standards for pleading scienter. Contrary to PWC's implication, the term "fraudulent intent" is synonymous with the word "scienter" and therefore, Plaintiffs may rely on recklessness to satisfy the scienter pleading requirement as previously discussed herein. *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 585 (S.D.N.Y. 2007).

*WorldCom Inc. Sec. Litig.*, No. 02-CIV-3288 (DLC), 2003 U.S. Dist. LEXIS 10863, at *22 (S.D.N.Y. June 24, 2003) (plaintiffs adequately allege scienter with allegations that auditor had access to company's books and records and had an obligation to review records).[19] Specifically, PWC and IMAX management discussed the application of EITF 00-21 and SAB 101 at or about the time they became effective and PWC provided advice on IMAX's application thereof. ¶224.

GAAS requires that, as the auditor of a public company, PWC must understand IMAX's business, including "its products and services"…"and compensation methods." GAAS, §AU311, Planning and Supervision (¶ .07). ¶188. Because IMAX's theater systems represented the largest contributor to its reported earnings and revenues during the Class Period, PWC was required under GAAS to satisfy itself that the proper accounting principles were being applied for purposes of revenue recognition.

The Company utilized aggressive and inappropriate revenue recognition policies, including recognizing the non-screen elements of certain theater systems, before installation of all of the Systems Deliverables, thereby resulting in unearned revenue which inflated the Company's reported financial condition. This was true both before and after its adoption of EITF 00-21. Thus, knowing that a theater system could not be deemed "installed" without all of its Components, PWC either failed to properly consider the risk of fraud or failed to properly incorporate its consideration of the risk of fraud into its audit procedures with respect to the

---

19 Plaintiffs are not attempting to draw a parallel between the size and nature of the *WorldCom* fraud with the facts in this case. However, the principle here is the same --- that PWC had unfettered access to IMAX's financial documents and given PWC's 20 year history with IMAX, understood its business (or should have), as well as the revisions to its revenue recognition policy for theater systems.

Company's revenue recognition policies, in violation of AU§316. ¶198.[20] In violation of GAAS (AU§150 and AS2), PWC failed to identify the control weaknesses existing before 2006, and instead concurred with IMAX management that the internal controls over financial reporting were effective. ¶202. Such failure to identify control deficiencies, especially the "identification of deliverables and their aggregation into units of accounting" contributed to the Company's issuance of materially misleading statements in violation of GAAP. ¶203.[21]

The details of the way that IMAX was applying multiple element accounting under EITF 00-21 were not hidden from PWC. To the contrary, PWC was aware or recklessly disregarded that IMAX's theater systems were not comprised of multiple deliverables, and could not be treated as such, or revenue recognized on the Components under either SAB 101 or EITF 00-21. ¶¶192, 224. If PWC had properly audited the Company, it would have realized the improprieties on which the improper revenue recognition was based. *In re WorldCom*, 2003 U.S. Dist. LEXIS 10863, at *22 ("Had Andersen reviewed WorldCom's accounting systems and data, as it was obligated to do, it would have discovered the lack of documentation and the fraudulent

---

[20] As previously discussed, IMAX maintained records of the stage of installation of each theater which PWC either reviewed and disregarded or failed to review. A review of those records would have indicated, for example, the improper recognition of revenue on theaters in China and Russia, ¶118, as well as the "big white sheet" required for theater system testing in the 2006 second quarter. ¶117.

[21] PWC relies on *In re AOL Time Warner Sec. & "ERISA" Litig.*, in an attempt to imply that plaintiffs must allege specific red flags in order to establish scienter, 381 F. Supp. 2d 192 (S.D.N.Y. 2004), but "red flags" are only one way to establish an accountant's scienter. PWC's knowledge of IMAX's theater system business and the effect of the recognition of revenue for each theater system installation would have raised a question, via a GAAS audit about the satisfaction of the GAAP criteria. ¶175. Furthermore, PWC's reliance on *In re Van Wagoner Funds, Inc. Sec. Litig.*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004) is misplaced. In *Van Wagoner*, plaintiffs failed to properly plead scienter because the complaint contained "no specific allegations of overstatements of valuations." *Id.* at 1186. The complaint merely alleged that there were overstatements. *Id.* at 1186. By contrast, here plaintiffs explicitly allege the size of IMAX's overstatements. *See, e.g.* ¶61.

accounting treatment."). At the very least, PWC deliberately turned a blind eye to relevant information regarding IMAX's application of multiple element accounting despite GAAS' requirement that auditors look for this very type of conduct. ¶¶189, 223-225. By ignoring IMAX's improper application of EITF 00-21, and the Company's pre-EITF 00-21 improper revenue recognition, PWC actively participated in the dissemination of IMAX's admittedly false and misleading financial statements.

The totality of PWC's access to the finances, operations, businesses, internal documents and underlying books and records of IMAX and the true nature of the theater systems (i.e. that they operated as a single System Deliverable) leads to the conclusion that "no reasonable accountant would have made the same decisions if confronted with the same facts." *See SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). Because Plaintiffs allege that PWC disregarded the nature of IMAX's business in rendering its unqualified opinions, the cases it cites at pages 13-15 of its brief are inapposite. The issue here is that with access to all of the requisite information, PWC simply ignored the relevant accounting conventions and issued clean Audit Opinions nonetheless.

As a result, PWC's audits of IMAX were not performed in accordance with GAAS because, among other reasons, PWC failed to exercise due professional care, properly plan the audit, obtain sufficient competent evidential matter, properly assess the internal controls, and either properly consider the risk of fraud or properly incorporate its consideration of the risk of fraud into its audit procedures in its audit of the Company's December 31, 2002 through December 31, 2005 consolidated financial statements. ¶¶189-203.

In response to Plaintiffs' detailed allegations, PWC cites cases that stand for the position that an auditor would never overlook a client's fraud because "it would defy common sense" for

an auditor to place his or her reputation on the line in order to maintain a relationship with a client to collect fees. PWC Br. 4, 15-17. Notwithstanding its position, "motive" is not an essential component of scienter. *Gruntal & Co. Inc. v. San Diego Bancorp.*, 901 F. Supp. 607, 614 (S.D.N.Y. 1995) (motive is not an element of a Section 10(b) claim); *see also Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 737 (D. Mass. 1995) ("'[r]ecklessness does not require showing of motive'")(*quoting Ades v. Deloitte & Touche*, 799 F. Supp. 1493, 1499 n.6 (S.D.N.Y. 1992).

### 3. The Company's Lack of Internal Controls Supports a Strong Inference of Scienter

#### a. IMAX Defendants

The admitted shortcomings in IMAX's internal controls is evidence of more than simple negligence. In fact, based on the disclosures in the Restatement, it appears that during the Class Period, the Company lacked internal controls critical to its accounting for theater systems revenue, which also constitutes evidence of Defendants' scienter. ¶¶155-156, 158. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999) (a "complete lack of internal controls" can constitute evidence of recklessness).

Under Rule 302 of the Sarbanes-Oxley Act of 2002 ("SOX"), IMAX's management was required to provide sworn certifications relating to the company's internal control over financial reporting. ¶153. SOX requires a public company's management to assess the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year, and to include in the company's annual report to shareholders management's conclusion, as a result of that assessment, about whether the company's internal controls are effective. ¶153. Each of the Forms 10-Q and 10-K filed by IMAX with the SEC during the Class Period included the signed certifications of its principal executive officers and the principal

financial officer (Joyce, throughout his tenure), as required by SOX. ¶159. However, as the Individual Defendants admitted at the time of the Restatement, the Company lacked internal controls, demonstrating that the Defendants had not performed the required SOX evaluation. SOX certification is probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1267 (11th Cir. 2006); *see also In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV-04-1255-AA, 2006 U.S. Dist. LEXIS 262, at *48-55 (D. Or. Jan 3, 2006) (defendants' accounting manipulations revealed a lack of adequate internal controls and contradicted repeated Sarbanes-Oxley certifications, demonstrating scienter).

According to the Company's Restatement, IMAX and PWC identified numerous material weaknesses[22] in the Company's internal controls, including weaknesses related directly to the Company's theater systems revenue recognition policies. In fact, the Company specifically concluded, and PWC concurred, that IMAX's internal control over financial reporting and its disclosure controls and procedures were *not effective*. ¶¶161-162.

Among the material weakness identified were that:

- The Company did not maintain adequate controls, including period–end controls, over the analysis and review of revenue recognition for sales and lease transactions in accordance with U.S. GAAP. Specifically, effective controls were not maintained to correctly assess the identification of deliverables and their aggregation into units of accounting and in certain cases the point when certain units of accounting were substantially complete to allow for revenue recognition on a theater system; and

- The Company did not maintain adequate controls over the lines of communication between operational departments and the Finance Department related to revenue recognition for sales and lease transactions. Specifically, effective controls were not

[22] PCAOB Auditing Standard No. 2 ("AS 2") defines "material weakness" as a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. (¶10).

> maintained to raise on a timely basis certain issues relating to observations of the installation process, any remaining installation or operating obligations, and concessions on contractual terms that may impact the accuracy and timing of revenue recognition. This control deficiency contributed to the restatement of the Company's consolidated financial statements for the years ended December 31, 2002 through 2005, its consolidated financial statements for each of the quarters in the year ended December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30 and September 30, 2006, and audit adjustments to the Company's 2006 annual consolidated financial statements, affecting principally revenues, costs of goods sold, selling, general, and administrative expenses, financing receivables, inventories, prepaid expenses, fixed assets, other assets, accounts payable, accrued liabilities and deferred revenue, and related disclosures.

These material weaknesses identified in the Restatement run contrary to the public representations made by Defendants, which they knew to be false or the falsity of which they recklessly disregarded. Accordingly, the facts set forth in the Complaint, combined with the IMAX Defendants' false representations made in their certifications, lend additional support to the strong inference of scienter.

**b. PWC**

As specifically alleged in the Complaint, PWC concurred that the Company's internal control over financial reporting and its disclosure controls and procedures were not effective, ¶162-170, confirming its recklessness in failing to conduct GAAS audits and issuing clean opinions. GAAS required that PWC obtain an understanding of IMAX's internal controls as part of its audit procedures. ¶163. PWC was obligated to perform a sufficient investigation before opining on the adequacy of IMAX's internal controls. ¶222. During the Class Period, PWC audited management's assessment of IMAX's internal controls over financial reporting, and its Audit Opinions included in IMAX's 2004 and 2005 Forms 10-K stated that PWC agreed with IMAX management that the Company "maintained effective internal control over financial reporting". ¶¶166, 223, 227. Yet, the internal control deficiencies went straight to the heart of

the theater system accounting problem, as is clear from the Restatement excerpt on page 41 hereof.

PWC also consented to the incorporation by reference of its Audit Opinions regarding internal controls over financial reporting. ¶20. As IMAX's long time outside auditor, who helped design the Company's Class Period revenue recognition policies and had carte blanche access to the Company's documents and procedures, PWC knew of, or recklessly ignored the material weaknesses and control deficiencies in IMAX's internal accounting structure. *Jacobs*, 1999 U.S. Dist. LEXIS 2102, at *15, *33-34 (claims that auditor had knowledge of its client's internal workings and had history with company, but did not understand and/or recklessly disregarded weaknesses and deficiencies in clients' internal control structure, sufficient to state a claim under §10(b)). PWC's failure to take the appropriate steps, creates a strong inference that PWC recklessly conducted its audits. IMAX's internal control deficiencies, with respect to the revenue recognition on which this litigation is focused, were so great that they undermined the validity of its financial reporting. PWC's failure to investigate and/or identify these overtly deficient internal controls, amounts to an extreme departure from the standards of ordinary care sufficient to withstand a motion to dismiss.

**4. Violations of Company's Own Publicly Announced Accounting <u>Policy Supports a Strong Inference of Scienter</u>**

Scienter can also be inferred from the IMAX Defendants' violation of the Company's own publicly announced revenue recognition policies. ¶¶41-47, 51-55. *See Rothman v. Gregor*, 220 F.3d at 81, 90-91 (2d Cir. 2000) (plaintiffs adequately pleaded scienter where they alleged a reckless failure to follow an announced policy); *Winstar*, 2006 U.S. Dist. LEXIS 7618, at * 23-24 (violations of the company's own internal policies for reporting revenue and earnings may be considered in establishing scienter); *In re Bausch & Lomb, Inc. Sec. Litig.*, 2003 U.S. Dist.

LEXIS 24062, *15-16 (W.D.N.Y. Mar. 28, 2003) (company's alleged failure to disclose information in its financial statements, knowingly and in violation of its own accounting policies, is sufficient to meet the standard for recklessness); *Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) ("Courts have held that violation of a company's own policy supports an inference of scienter.") (*citing Provenz*, 102 F.3d at 1490). IMAX represented that its policy was to recognize revenue from theater systems upon installation. ¶¶40,52. That was untrue prior to and following its application of EITF 00-21. Even IMAX's description of its application of multiple element accounting was materially misleading because it led the reader to believe it was being applied in only very specific limited circumstances. ¶¶51-55. Until August 9, 2006, there was no indication of IMAX's failure to apply its own revenue recognition policy to theater systems revenue. ¶52.

### 5. Additional Motive of Gelfond and Wechsler

Plaintiffs have alleged that Gelfond and Wechsler had the motive to commit the improper accounting alleged in the Complaint by virtue of their incentive compensation and their change of control agreements. ¶¶215-221. "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, 216 F.3d at 307

During the period 2002 through 2004, Wechsler's and Gelfond's bonuses ($750,000) well exceeded their salaries ($500,000), and in 2005, their bonuses represented 50% of their salaries. Since theater systems revenue represented the single largest component of the Company's total reported revenues, inflating these revenues had a significant effect on

Wechsler's and Gelfond's compensation, as well as on the share prices for the 6.5% of IMAX's stock each owned. ¶¶9-10.

Based on the agreements in place before March 8, 2006, Gelfond and Wechsler would receive .375% times the amount the purchase price exceeded Cdn. $150,000, in the event of a change of control. ¶217. Thus, on March 8, 2006, when the IMAX stock price closed at $9.50 per share, they would have been entitled to a cash bonus of $862,5000 (measured in U.S. dollars), plus whatever they would have received for their 6.5% IMAX stock ownership.[23]

On March 8, 2006, after the Company, had already begun to "explore strategic alternatives" (unbeknownst to the public), Gelfond and Wechsler negotiated a new change of control agreement pursuant to which they would benefit in two ways.[24] First, they would receive an incentive bonus measured as the difference between the stock price on March 10, 2006 and the price paid by the third party, multiplied by 225,000. Second, in the event of their involuntary termination, Gelfond and Wechsler would receive $2,948,258 and $3,044,352 more, respectively, than if there were no change of control; and $2,202,372 and $2,794,352 more, respectively, if there was a change of control and they were terminated involuntarily. ¶220.[25] Given that IMAX's 2005 fourth quarter and year-end financials were announced on February 17,

---

[23] Pointing to employment agreements in place in 1994, Wechsler and Gelfond calculate their bonuses based on a hypothetical sale of the Company on December 31, 2006 (a date chosen for unknown reasons) and somehow arrive at $37,500 as the sum. IMAX Br. 11, fn 9.

[24] On March 9, 2006, IMAX announced that its Board of Directors had begun a process to explore strategic alternatives, including the sale or merger of the Company. ¶104. The March 8 agreements were negotiated in anticipation of this public announcement.

[25] The IMAX Defendants also demand an explanation for why, if Defendants were motivated to commit fraud in 2002, that they waited until 2006 to explore strategic alternatives. This argument also has no weight, because the fact that no motive was alleged by Plaintiffs at the beginning of the Class Period does not mean that Plaintiffs have failed to allege the Defendants' recklessness existed throughout the relevant period. The motive here supports the latter part of the Class Period.

2006[26], (presumably after the decision to pursue strategic alternatives had been made since the Company's March 9, 2006 announcement reflected actions already taken by the Company preparatory thereto and given that the largest single impact of the Restatement occurred in the fourth quarter of 2005), it is reasonable to believe that Gelfond and Wechsler were motivated to further inflate the 2005 financials in a last ditch effort to make the Company more appealing to an acquirer, and to negotiate a better change of control package. As the Complaint alleges, the announcement of IMAX's 2005 financials and the search for a strategic alternative "coincided" with the negotiation by Gelfond and Wechsler of a lucrative change of control agreement. ¶106.

The IMAX Defendants assert that the terms of the stock options Gelfond and Wechsler would receive under the March 8 agreement would have motivated them to drive IMAX's stock price lower, not higher, because the benefit to them was to be measured as the difference between the stock price on March 10, 2006 and the price paid by an acquirer, multiplied by 225,000. IMAX Br. 11. However, because a lower stock price would result from poor financial results (and make IMAX less attractive to a third party), Gelfond and Wechsler would not be incentivized to drive IMAX's stock price down. Nor do the IMAX Defendants explain how, in the two days between their March 8, 2006 agreement and the March 10, 2006 option measuring date, they could have driven the stock price.[27]

---

[26] As previously discussed, the Company reported "record" installs for the fourth quarter of 2005, at least half of which were improperly recorded in 2005.

[27] The IMAX Defendants also argue that the Complaint does not allege their motive because they did not sell any stock. IMAX Br. 2, 18-19. The absence of insider selling does not negate a finding of motive. *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 153 (D. Conn. 2007) (citing *Schlagel v. Learning Tree Int'l*, No. CV 98-6384 ABC (Ex), 1998 U.S. Dist. LEXIS 20306, at *51 & n.13 (C.D. Cal. Dec. 23, 1998); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 299 (D. Mass. 2005) (the absence of insider trading does not preclude an inference of scienter).

Plaintiffs' allegations of motive serve to supplement their recklessness allegations, the latter which, by themselves, satisfy the scienter requirement. Taken as a whole, the Complaint adequately pleads an inference of scienter as to each of the IMAX Defendants that is cogent and at least as compelling as any plausible opposing inference of non-fraudulent intent.

### C. The Complaint Adequately Pleads Loss Causation

Plaintiffs' allegations of loss causation easily satisfy the requirement established in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) that the plaintiff plead a "causal connection between the material misrepresentation and the loss." As explained in *In re Glaxo SmithKline PLC Sec. Litig.*, No. 05-CIV-3751 (LAP), 2006 U.S. Dist. LEXIS 73893, at *22 (S.D.N.Y. Oct. 6, 2006), the loss causation inquiry focuses on the link between dissemination of information about the alleged misrepresentation and a significant share price drop. Needless to say, the inquiry must also include whether the complaint alleges that plaintiff suffered a loss. In other words, the plaintiff's complaint must plead that the loss be foreseeable and caused by the "materialization of the concealed risk." *Lentell v. Merrill Lynch & Co.* 396 F.3d 161, 173 (2d Cir. 2005); *see also ATSI Commc'ns, Inc. v. Shaar Fund. Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007).

The Complaint alleges that Defendants' materially false and misleading Class Period statements regarding theater systems revenue and its recognition thereof caused Plaintiffs' losses. ¶¶27-28, 228-229. The Complaint further alleges that IMAX's August 9, 2006 partial disclosure of its improper accounting practices, i.e. that it was under investigation by the SEC regarding its timing of revenue recognition, including its application of multiple element arrangement accounting to its theater systems, *the very item that is the focus of this litigation,* sent its stock price down 40.4% to $5.73 per share. The August 9, 2006 announcement partially disclosed

what the Company's misrepresentation had concealed from the market, and began to reveal what the July 20, 2007 disclosure confirmed. ¶229.[28]

Each of Defendants' arguments ((1) that the August 9, 2006 press release announcing the SEC's revenue inquiry was not corrective because there was no admission of any previously reported fact was incorrect; (2) that they defended IMAX's accounting policies; and (3) IMAX's stock price increased by $0.25 on the July 20, 2007 announcement of IMAX's restated financials) have been rejected by courts. *See e.g. Parmalat*, 501 F. Supp. 2d at 587; *In re Tommy Hilfiger Sec. Litig.*, No. 04-CIV-7678, 2007 U.S. Dist. LEXIS 55088 (S.D.N.Y. July 20, 2007); and *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822 (D.N.J. 2006).

In *Bradley*, the company made a February 2005 announcement that the SEC had begun an informal inquiry "to determine whether there have been violations of the federal securities laws" having requested documents and information "with respect to revenue recognition and capitalization of certain payments." *Bradley*, 421 F. Supp. 2d at 824-25. On that news, Bradley's stock price fell 26%. Two months later, Bradley announced the expected restatement of its third quarter financials because a certain product transaction (Deconamine) failed to meet the revenue recognition criteria.

On the motion to dismiss, the Bradley defendants contended, citing *Dura*, that the February 2005 disclosure was not truly "corrective" because it did not specifically mention Deconamine, only disclosed a non-specific SEC inquiry, made clear that the SEC inquiry should not be construed as an indication a violation had occurred, and that the real corrective disclosure

---

28 Defendants' argument that the August 9, 2006 press release may have been viewed negatively because it also disclosed that IMAX had not found a buyer is an issue for experts and the trier of fact. Absolute precision about the contributors to damages is not required at this juncture. As the Supreme Court observed in *Dura*, it "should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection the plaintiff has in mind." *Id.*

was not made until April 27, 2005, at which point the stock price actually rose. *Id.* at 828. These arguments are analogous to Defendants' arguments here. Rejecting Defendant's "rigid and dogmatic interpretation of *Dura*" and sustaining the Complaint, the *Bradley* Court noted that *Dura* did not address what type of disclosure would reveal the truth, or how specific the disclosure must be, but only suggested that plaintiffs must allege "in some fashion that 'the truth became known' before the 'share price fell'". *Id.* at 828. (*citing In re Winstar Comm.*, No. 01-CV-3014 (GBD), 01-CV-11522, 2006 U.S. Dist. LEXIS 7618 (S.D.N.Y. Feb. 24, 2006); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 255-56 (D. Mass. 2006); and *In re Worldcom, Litig.*, 388 F. Supp. 2d 319, 347 (S.D.N.Y. 2005) (plaintiff must "establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information"). *Bradley's* rejection of Defendants' "dogmatic" interpretation of *Dura* was cited with approval in *Tommy Hilfiger*, 2007 U.S. Dist. LEXIS 55088, at *7-11.

Addressing the defendants' argument that the company's stock price rose on the April 27 disclosure, the *Bradley* Court noted that "our securities laws do not operate in a vacuum," and that by the time of Bradley's restatement, the market had already incorporated the relevant information. *Id.* at 829. Thus, the fact that IMAX's stock price did not decline on July 20, 2007 (the date of the Restatement) does not negate loss causation,[29] but rather indicates that the market had already absorbed the information that the Company would be restating its financial results. Indeed, after August 9, 2006, IMAX made further disclosures regarding its revenue recognition problems, including periodic updates about the SEC and OSC investigations (the OSC required

[29] Defendant PWC asserts that the fact IMAX's price did not decline on March 16, 2007 supports Defendants, but the March 16, 2007 announcement addressed the misclassification of certain costs, the impact of which it quantified as being only $2.5 million over six years. ¶126.

updates every two weeks), as well as the ultimate filing of its restated financial results. ¶¶123-124, 126-141. In order to accept Defendants' loss causation arguments, this Court would have to conclude that the August 9, 2006 disclosure is totally unrelated to Plaintiffs' allegations.

Citing *In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214 (E.D. Wash. 2005), Defendants argue that the August 9, 2006 announcement did not state that any previously reported fact was incorrect. IMAX Br. 22, PWC Br. 20. But *Avista* is not analogous. As the IMAX Defendants correctly point out, two orders issued by the Federal Energy Regulatory Commission ("FERC") with respect to Avista were not corrective disclosures because they were devoid of any factual information relating to the company's alleged misrepresentations. *Id.* at 1220 (the Avista plaintiffs alleged that Avista had misrepresented its intent to change its business focus from national energy trading to a regionally based trading effort backed by physical assets, however the FERC orders did not make these alleged misrepresentations public).[30] Here, however, IMAX disclosed that it was under investigation by the SEC for the precise information it is alleged to have misrepresented.

PWC contends that the August 9, 2006 and November 8, 2006 disclosures were "unrelated" to any false statement by PWC and therefore not revelatory of any truth about

---

[30] *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007), *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006), *Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 243-244 (S.D.N.Y. 2006), *Davidoff v. Farina*, 2005 U.S. Dist. LEXIS 17638, *52-53 (S.D.N.Y. Aug. 22, 2005) and *In re Merrill Lynch Tyco Research Sec. Litig.*, No. 03 CV 4080 (MP), 2004 U.S. Dist. LEXIS 2247 (S.D.N.Y. Feb. 18, 2004) are all distinguishable from the case at bar because unlike here, in those cases the purported corrective disclosures therein failed to provide factual information that was directly related to the alleged misrepresentations. *See also Weiss v. Amkor Tech., Inc.* No. CV 07-0278-PHX-PGR, 2007 U.S. Dist. LEXIS 71688, at *16 (D. Ariz. Sept. 25, 2007); *Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, No. 2006-26 (WOB), 2007 U.S. Dist. LEXIS 76620 (E.D. Ky 2007).

PWC's statements.[31] This position ignores the fact that PWC's Audit Opinions represented that IMAX's financial statements complied with GAAP, a "fact" directly contradicted by the announcements. If the Court were to accept Defendants' argument, every time a wrong is revealed by a source other than the company (i.e. the SEC investigation), the company would be able to avoid liability through a simple denial.

In *Scottish Re*, 2007 U.S. Dist. LEXIS 81565, the defendants moved to dismiss on the ground that the plaintiff failed to plead a causal connection between the company's failure to establish adequate internal controls and plaintiffs' losses. Finding that loss causation had been properly pled, the *Scottish Re* Court cited *Lentell*, 396 F.3d at 172, for the proposition that loss causation can be described "in terms of the tort-law concept of proximate cause", meaning that the "damages must be a foreseeable consequence of the misrepresentation." *Scottish Re*, at *59.

> This does not mean that the misrepresentation itself must "cause" the drop in value of the security, but rather that 'the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged.'" Therefore, in order to plead loss causation, the facts alleged must demonstrate that the misrepresentation was the true "cause" of the loss suffered (citations omitted).

*Id.*

Accordingly, the Complaint adequately alleges loss causation.[32]

---

[31] The cases cited by PWC to support its argument that these disclosures were unrelated to its audit opinion are too factually distinct to support it here. *See Lantanzio* 476 F. 3d at 157-158 (risk of impending bankruptcy was not concealed by audit opinion that raised going concern issue); *AOL*, 503 F., Supp. 2d. at 678 (no restatement and company's losses were predicated on factors beyond the scope of the audit opinion, including merger synergies and future prospects).

[32] The IMAX Defendants also argue that Plaintiffs have failed to plead loss causation because the August 9, 2006 announcement also revealed that the Company had not found a buyer or merger partner. Thus, the IMAX Defendants argue that a plausible nonculpable explanation for their accounting fraud is that they declined to sell the Company. IMAX Br. 19. However, the IMAX Board's ultimate decision not to pursue the sale of the Company at a lower valuation does not disprove Gelfond's and Wechsler's motive to seek a change in control for

### D. The Complaint Adequately Alleges Control Person Liability

Defendants do not challenge the Individual Defendants control over the Company for purposes of Section 20(a). They assert that Plaintiffs have not alleged the predicate primary violation of securities fraud. Since Plaintiffs have sufficiently pled a primary violation, their control person claims should also be sustained.

## III. PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND

Plaintiffs should be granted leave to amend in the event that the Court grants Defendants' motions in any respect. Fed. R. Civ. P. 15(a) provides that "leave [to amend] shall be freely given when justice so requires," and the Supreme Court has cautioned that although "the grant or denial of an opportunity to amend is within the discretion of the District Court, . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of that discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Burlington Coat Factory*, 114 F.3d at 1434, (*quoting Foman v. Davis*, 371 U.S. 178, 182 (1962)).

---

their financial gain. It is equally plausible that when interested parties learned of the SEC investigation, those potential buyers were either scared off by the asking price or the accounting problems. ¶122.

Whether or what effect that announcement had on IMAX's market price and on damages is not an issue to be determined on a motion to dismiss. Loss causation in a securities fraud case is fact intensive and typically the subject of expert testimony. Indeed, courts have noted that: "The causation issue becomes most critical at the proof stage. Whether the plaintiff has proven causation is usually reserved for the trier of fact." *See McCabe v. Ernst & Young, LLP*, No. 01-5747 (WHW), 2006 U.S. Dist. LEXIS 524 (D.N.J. Jan. 6, 2006); *EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000).

## CONCLUSION

For all the reasons set forth herein, Plaintiffs respectfully submit that Defendants' motions to dismiss should be denied. In the alternative, Plaintiffs request leave to serve an amended complaint to rectify any pleading deficiencies identified by the Court.

Dated: January 22, 2008

Respectfully submitted,

**ABBEY SPANIER RODD & ABRAMS, LLP**

By: ______________________ w/p RBH
Arthur N. Abbey, Esq. (AA-8074)
Jill S. Abrams, Esq. (JA-1578)
Richard B. Margolies, Esq. (RM-9311)
Grace E. Parasmo, Esq. (GP-8203)
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700
Fax: 212-684-5191

*Counsel for Lead Plaintiff Westchester Capital Management*

**BERGER & MONTAGUE, P.C.**
Douglas Risen, Esq.
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: 215-875-4604

*Counsel for The Steelworkers Pension Trust*