UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | Case No. 06 Civ. 6128 (NRB)<br>ECF Case |

**MEMORANDUM OF LAW**
**IN FURTHER SUPPORT OF DEFENDANTS IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE AND KATHRYN A. GAMBLE'S MOTION TO DISMISS**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble

Of Counsel:
Lewis J. Liman
Breon S. Peace
James C. Clark

# TABLE OF CONTENTS

| | Page |
|---|---|
| TABLE OF AUTHORITIES | ii |
| PRELIMINARY STATEMENT | 1 |
| ARGUMENT | 2 |
| POINT I | |
| THE COMPLAINT FAILS TO PLEAD SCIENTER | 2 |
| POINT II | |
| THE COMPLAINT FAILS ADEQUATELY TO ALLEGE LOSS CAUSATION | 9 |
| CONCLUSION | 10 |

# TABLE OF AUTHORITIES

Page(s)

## Cases

Davidoff v. Farina,
04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638 (S.D.N.Y. Aug. 22, 2005) .............. 4

Denny v. Barber,
576 F.2d 465 (2d Cir. 1978)........................................................................................ 5

Garfield v. NDC Health Corp.,
466 F.3d 1255 (11th Cir. 2006) .................................................................................. 7

In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.,
381 F. Supp. 2d 192 (S.D.N.Y. 2004).......................................................................... 4

In re Atlas Air Worldwide Holdings,
324 F. Supp. 2d 474 (S.D.N.Y. 2004).......................................................................... 4

In re Avista Corp. Sec. Litig.,
415 F. Supp. 2d 1214 (E.D. Wash. 2005) .................................................................... 9

In re BISYS Sec. Litig.,
397 F. Supp. 2d 430 (S.D.N.Y. 2005).......................................................................... 7

In re Bradley Pharms., Ins. Sec. Litig.,
421 F. Supp. 2d 822 (D.N.J. 2006) ............................................................................. 8-9

In re Bristol-Myers Squibb Sec. Litig.,
312 F. Supp. 2d 549 (S.D.N.Y. 2004).......................................................................... passim

In re Carter-Wallace, Inc., Sec. Litig.,
220 F.3d 36 (2d Cir. 2000).......................................................................................... 3

In re DRDGOLD Ltd. Sec. Litig.,
472 F. Supp. 2d 562 (S.D.N.Y. 2007).......................................................................... 5

In re Gilat Satellite Networks, Ltd.,
No. CV-02-1510 (CPS), 2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005)........................... 4

In re Interpublic Sec. Litig.,
02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844 (S.D.N.Y. May 29, 2003) ................. 5

In re Keyspan Corp. Sec. Litig.,
383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................................................... 8

Page(s)


In re Lattice Semiconductor Corp. Sec. Litig.,
No. CV04-1255-AA, 2006 WL 538756 (D. Or. Jan. 3, 2006) .......................................... 7

In re Microstrategy Inc. Sec. Litig.,
115 F. Supp. 2d 620 (E.D. Va. 2000) ..................................................................... 7

In re Omnicom Group, Inc. Sec. Litig.,
No. 02 Civ. 4483 (WHP), 2005 U.S. Dist. LEXIS 5272 (S.D.N.Y. Mar. 30, 2005).......... 8

In re Omnicom Group, Inc. Sec. Litig.,
No. 02 Civ. 4483 (WHP), 2008 WL 243788 (S.D.N.Y. Jan. 29, 2008) ............................ 9

In re Oxford Health Plans, Inc. Sec. Litig.,
51 F. Supp. 2d 290 (S.D.N.Y. 1999)........................................................................ 5

In re Raytheon Sec. Litig.,
157 F. Supp. 2d 131 (D. Mass 2001) ...................................................................... 4

In re Veeco Instruments, Inc. Sec. Litig.,
235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................... 4

In re Winstar Commc'ns,
No. 01 CV 3014 (GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) ............................ 4

Kalnit v. Eichler,
264 F.3d 131 (2d Cir. 2001)................................................................................... 3

Malin v. XL Capital Ltd.,
499 F. Supp. 2d 117 (D. Conn. 2007)...................................................................... 8

Mfrs. Life Ins. Co. (U.S.A.) v. Donaldson, Lufkin & Jenrette Sec. Corp.,
No. 99 Civ. 1944 (NRB), 2000 U.S. Dist LEXIS 7444 (S.D.N.Y. June 1, 2000)............. 3

SEC v. Caserta,
75 F. Supp. 2d 79 (E.D.N.Y. 1999) ........................................................................ 8

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
127 S. Ct. 2499 (2007)........................................................................................... 1

Weiss v. Amkor Tech., Inc.,
No. CV 07-0278-PHX-PGR, 2007 U.S. Dist. LEXIS 71688 (N.D. Ariz. Sept. 25, 2007). 9

IMAX Corporation ("IMAX" or the "Company"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble (together, the "Defendants"), by counsel, respectfully submit this memorandum of law in further support of their motion to dismiss the Consolidated Amended Class Action Complaint (the "CAC" or "Compl.") and in opposition to Plaintiffs' Opposition Brief ("Opp.").

## PRELIMINARY STATEMENT

Plaintiffs' Opposition Brief misquotes, and pays only lip service to, the rigorous scrutiny required by Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2510 (2007). Tellabs requires Plaintiffs to plead a "compelling" and "cogent" inference of fraud (not merely a "plausible" one (Opp. 11)). Plaintiffs offer no such compelling or cogent inference and do nothing to address the undisputed facts reflecting an absence of scienter. Plaintiffs do not explain why, if IMAX and its executives were knowingly falsifying the Company's financial statements:

- They would not sell a single share of IMAX stock on the market during the period that the share price was allegedly inflated and seek to profit (or at least avoid loss) from the fraud;
- Instead of privately selling shares, the executives would instead elect to wait years and pursue a public sale of the Company that could be accomplished only through the approval of the Board, would inure to the benefit of all shareholders if successful, and would disclose to buyers the very information Plaintiffs assert would have revealed a fraud;
- IMAX would have expressly and prominently disclosed in its 2005 Form 10-K both the fact that it applied multiple element arrangement accounting to its theater sales transactions, and that ten of the 12 theaters in which it installed systems would not open in the quarter; and
- PwC would have been given full access to IMAX's records, as Plaintiffs allege, and rendered clean audit opinions every year of the alleged fraud.

Further, Plaintiffs do not successfully distinguish In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549 (S.D.N.Y. 2004) – a case that, if anything, presented more

compelling inferences of scienter. Instead, Plaintiffs rely virtually exclusively on cases where officers knew of sham transactions or falsified documents – practices that are wrongful on their face, that do not turn on nuances in the application of accounting rules, and have nothing to do with the accounting issues regarding the timing of revenue recognition at issue here. Once the correct standard is applied, the case should be dismissed.

Finally, with respect to loss causation, Plaintiffs fail to explain how a press release that reaffirmed the confidence that the Company and PwC had in IMAX's accounting could somehow constitute a revelation that such accounting was faulty.

## ARGUMENT

## I. THE COMPLAINT FAILS TO PLEAD SCIENTER

Plaintiffs virtually concede, as they must, that the only claim here is one of recklessness. Opp. 15. There is no well-pled allegation of motive and opportunity. Three of the four Individual Defendants increased their ownership of IMAX stock during the class period; none sold a single share of stock. Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Br.") 18-19. Moreover, Plaintiffs do not even cite, much less distinguish, the Second Circuit cases holding that executive compensation dependent on stock value does not give rise to an inference of scienter. Br. 9. And, as to the sale of the Company, Plaintiffs fail to explain why, if the executives were seeking to profit from sale of their stock and knew of a fraud, they would do so in a way that required IMAX to (i) find a willing buyer, (ii) obtain Board approval, and (iii) reveal the Company's internal records to an adverse party, as opposed to selling their shares in a private transaction or on the open market.[1] The attempted public sale, if anything, negates scienter.

[1] In any event, Plaintiffs' argument that Defendants Gelfond and Wechsler "had the motive to commit the improper accounting" (Opp. 39) relies on legerdemain. Although Plaintiffs state that Gelfond's and Wechsler's

The standard for pleading extreme recklessness, moreover, is extremely high. It is not satisfied by allegations that a defendant "should have known" (Opp. 15) of faulty accounting, but requires allegations of "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000); see also Mfrs. Life Ins. Co. (U.S.A.) v. Donaldson, Lufkin & Jenrette Sec. Corp., No. 99 Civ. 1944 (NRB), 2000 U.S. Dist LEXIS 7444, at *9 (S.D.N.Y. June 1, 2000); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004). When, as here, motive is not established the "strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001). Plaintiffs do not allege that, over the years of allegedly improper accounting, any employee ever stated that the Company's accounting was wrong, any document ever suggested a preferable accounting policy that IMAX refused to investigate, or any of the red flags ordinarily seen in an extreme recklessness case ever occurred. And what Plaintiffs do allege is easily addressed.

---

annual bonuses of $750,000 exceeded their salaries from 2002 to 2004, they neglect to mention that those bonuses were discretionary, were calculated based on a number of qualitative and quantitative long and short-term factors, and were not directly tied to achieving earnings goals. IMAX Corp., Proxy (Form 14A), at 15 (March 9, 2006). Indeed, in 2005, when Plaintiffs allege that IMAX inflated the number of installations and its revenues the most, Gelfond and Wechsler's bonuses absolutely and as a percentage of salary were the lowest (half of their salary and far below bonuses of previous years). Id. at 9. In addition, the $862,500 that Plaintiffs calculate Wechsler and Gelfond would have received on a change in control would have depended on a sale of the Company for $9.50, which Plaintiffs elsewhere argue no buyer who engaged in due diligence would pay. Opp. 8. Moreover, this bonus represents less than the foregone income the two would have earned had they been paid consistent with previous years. In fact, Plaintiffs do not dispute that the March 2006 agreement would actually have provided Gelfond and Wechsler with the incentive to decrease IMAX's stock price (Br. 11-12) and, while Plaintiffs make much of the lump sum payments Gelfond and Wechsler would have received if their employment ended after a change in control (Opp. 40) they neglect to mention that, as part of that March 2006 agreement, the two agreed to give back far more in retirement benefits – the opposite conduct from that if their intent were to sell and cash out. IMAX Corp., Proxy (Form 14A), at 12 (August 10, 2007); 2005 Form 10-K, Exs. 10.8, 10.14. Finally, while Plaintiffs suggest that Gelfond and Wechsler did not have time to drive the stock price down in the two days before March 10, 2006 (Opp. 41), they do not dispute the fact that, at the time they reported IMAX's 2005 earnings, it would have been in Gelfond and Wechsler's interest to defer revenue instead of prematurely recognizing revenue because that would have kept the stock price lower on March 10, 2006 and would have kept more revenue in the pipeline to be recognized at a later date – both of which would have increased the value of their new change in control provision.

Plaintiffs argue that IMAX's restatement is itself evidence that Defendants were extremely reckless at the time with respect to their accounting. Opp. 17-19. But Plaintiffs admit that the "size and nature" of the restatement is not on par with those where the court has found fraud (Opp. 18, 20 n.9, 32 n.19), and numerous cases have held that "a [r]estatement of financial results [is] not sufficient to state a securities fraud claim." Bristol-Myers Squibb, 312 F. Supp. 2d at 565 (S.D.N.Y. 2004) (citing cases); Br. 8. On a related note, although Plaintiffs allege that IMAX's violation of GAAP "support[s] a strong inference of scienter" (Opp. 19), this Court and others have ruled (in holdings Plaintiffs do not address) that "allegations of GAAP violations or accounting irregularities alone are insufficient to state a securities fraud claim without evidence of 'corresponding fraudulent intent'." Davidoff v. Farina, 04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638, at *55 (S.D.N.Y. Aug. 22, 2005) (citing cases).[2] That conclusion is no different when the error results in premature revenue recognition.[3]

Likewise, it does not do to argue that "[t]heater systems revenue was the core of IMAX's business" and that "the IMAX Defendants had a clear understanding of the operations of the business." Opp. 4, 23-24, 26-28.[4] On this motion, the Court may assume Defendants had

---

[2] Contrary to Plaintiffs' assertion, Defendants never suggested that the Restatement was "voluntary." Opp. 18. In arguing that a GAAP violation itself supports an inference of scienter, Plaintiffs rely on cases involving either (i) sham transactions or backdated contracts, see In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 139-40 (D. Mass 2001), or (ii) "red flags" or stock sales combined with "numerous GAAS and GAAP violations." In re AOL Time Warner, Inc. Sec. and "ERISA" Litig., 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004); see In re Winstar Commc'ns, No. 01 CV 3014 (GBD), 2006 WL 473885, at *2 (S.D.N.Y. Feb. 27, 2006) (bogus, multi-million dollar transactions, over a several year period). Here, the GAAP violation is alleged to have resulted from a single accounting error continuously applied over the course of numerous fiscal quarters.

[3] The case that the Plaintiffs cite to argue otherwise (Opp. 29) does not hold that there are different standards for pleading scienter for different GAAP violations. Rather, that case turns on the strength of the factual allegations that: (i) a witness explicitly told an individual defendant that some of the challenged practices violated GAAP, (ii) defendants engaged in sham transactions without economic substance, and (iii) the defendants requested that documents be prepared without dates in order to facilitate premature revenue recognition. In re Gilat Satellite Networks, Ltd., No. CV-02-1510 (CPS), 2005 WL 2277476, at **20-21 (E.D.N.Y. Sept. 19, 2005). None of those allegations are made here.

[4] Although Plaintiffs argue that knowledge of "core operations" supports an inference of fraud, their cases hold otherwise. In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 231 (S.D.N.Y. 2006) (executives were told to falsify financials); In re Atlas Air Worldwide Holdings, 324 F. Supp. 2d 474, 489 n.7 (S.D.N.Y. 2004) (missing financial documents).

knowledge of the state of system installation. Opp. 24. But Plaintiffs must plead that Defendants knew or were reckless in not knowing that the accounting for the sales at issue was incorrect, and not just that they knew operationally of the status of system installations. Br. 13, 16-17; Bristol-Myers, 312 F. Supp. 2d at 568.[5]

Plaintiffs do not add anything with their allegations that IMAX reported a material weakness in internal controls in its restatement (Opp. 35-37) and that the Defendants violated the Company's publicly disclosed accounting policy (Opp. 38-39). As Defendants pointed out (Br. 17, n.15), a report of a material weakness almost invariably accompanies a restatement[6] and the nature of the material weakness here (i.e., insufficient timely communication between operations and finance and insufficient analysis and review of U.S. GAAP) (Opp. 36-37), if anything would negate scienter and not establish it. In any event, Plaintiffs do not allege that the Defendants knew of the material weakness at the time (Br. 17 n.15; see Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978)), a telling and fatal omission.[7]

As for IMAX's policy, Plaintiffs admit that such policy was to recognize revenue for installation of theater systems in accordance with SAB 101 – which in turn required analysis

---

5 Plaintiffs seek to make much of the fact that IMAX announced that it had installations in China and Russia, including in a theater with no roof. Opp. 24 n.12. However, IMAX explicitly disclosed that, while the installation was substantially complete, the theaters were not – and would not open in the fourth quarter. 2005 Form 10-K at 7, 31.

6 Thus, the existence of a material weakness cannot establish a strong inference of scienter without making all restatement cases fraud cases.

7 Compare In re Oxford Health Plans, Inc. Sec. Litig., 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (auditor defendants were aware of two previous reports specifically concluding that accounting practices and internal controls were ineffective). For similar reasons, Plaintiffs' claim that IMAX's internal controls SOX certifications were materially false (Opp. 13, 37) does not state a claim or plead fraud with particularity in the absence of any evidence Defendants knew of the material weaknesses at the time. Br. 17 n.15; In re DRDGOLD Ltd. Sec. Litig., 472 F. Supp. 2d 562, 574 (S.D.N.Y. 2007); In re Interpublic Sec. Litig., No. 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 8844, at *36 (S.D.N.Y. May 29, 2003) (holding that plaintiffs must allege defendant knew its description of internal controls was false).

of EITF 00-21. Opp. 6.[8] Because readers knew IMAX was applying SABs 101 and 104, they also knew that IMAX was following EITF 00-21. All the relevant accounting literature is available in the public domain, and therefore was available to readers of the Form 10-K. Thus, the assertion that IMAX violated its stated policy adds nothing without specific allegations that IMAX knew or was extremely reckless with respect to whether it was violating EITF 00-21.[9]

Ultimately, then, Plaintiffs' argument comes down to the conclusory assertion that the accounting was so "simple" and "straightforward" and IMAX's error so "obviously wrong," that Defendants had to have known IMAX's reports were false. Opp. 21-22; see Br. 13-16. It is striking then that, if the accounting was so obvious, Plaintiffs cannot allege a single person – inside the Company, at PwC, on its Board or Audit Committee – who at the time identified the accounting to be wrong. That is for good reason. To reach the conclusion that IMAX's originally reported revenues would need to be restated, one would have to know at least the following: (i) the interpretation and meaning of "substantially complete" under SAB 101; (ii) of the existence of EITF 00-21; and (iii) how to apply EITF 00-21's detailed provisions to the complex facts here. (Br. 14-16).[10] There is no allegation that anyone at IMAX (or, at PwC for

---

[8] Plaintiffs misleadingly state, "EITF 00-21 did not change the way IMAX was supposed to recognize revenue from its theater systems." Opp. 7. While EITF 00-21 did not change the "realizable and earned" standard, it did certainly clarify the components on which revenue had to be "realizable and earned."

[9] Plaintiffs curiously complain that IMAX's Form 10-Ks led the reader to believe that multiple element arrangement accounting was only applied to a small subset of transactions. Opp. 7, 39. But Plaintiffs have never alleged that the disclosures were actionable. (Plaintiffs do allege IMAX should have disclosed its multiple element accounting violated GAAP. Compl. ¶ 55.) IMAX did not disclose, nor was it required to disclose, every unit in a theater system installation that was not substantially complete. Moreover, while Plaintiffs suggest Defendants knew that their own practices contradicted their "public" disclosures, Plaintiffs are silent when it comes to identifying a public disclosure. Instead, they rely on an allegation about an alleged "internal" policy and even then a conclusory allegation. Opp. 6. IMAX did disclose that 10 of the theaters in which it made installations were not complete by the end of the fourth quarter of 2005. 2005 Form 10-K at 7, 31. There is no allegation that any of the Defendants knew of any facts different from those publicly disclosed.

[10] Plaintiffs repeat the bromide that it was improper for IMAX to recognize revenue on any components of the theater system because it was obvious "the IMAX theater system could not function absent the installation of all components, including and most importantly the installation of the screen." Opp. 5, 22, 26. However, Plaintiffs themselves admit (Opp. 5-6; Compl. ¶ 50) that the determination of how much revenue to recognize under the accounting literature depends not only on whether the screen is considered to be "perfunctory and inconsequential" (SAB 101 p. 7), but also on the answers to such questions as whether the delivered item (i.e., the projection and

that matter) knew 00-21 should be applied differently and a company and its executives should not be subjected to the extraordinary burden of a securities class action suit based on Plaintiffs' mere ipse dixit. Bristol-Myers, 312 F. Supp. 2d at 566; see Br. 16 n.14.[11] Indeed, Plaintiffs prove too much: if their position were to be adopted, all a plaintiff in a GAAP case would need to allege is that the accounting at issue is "simple" (without any explanation as to how) and claim that the complexity of accounting literature cannot be addressed at the pleading stage.[12]

In Bristol-Myers, as here, plaintiffs alleged that the defendants knew all the facts upon which the restatement was based and that "the GAAP provisions at issue [were] simple and their violation obvious." 312 F. Supp. 2d at 566. Nonetheless, the court held that "[w]hile in this case the applicable accounting principle might be simple . . . the application of that principle to the facts is complex." Id. at 567. In Bristol-Myers, plaintiffs alleged that the errors and inappropriate accounting corrected by the restatement were of extensive magnitude and duration, involved the company's "core business" including end of period sales to two of the company's largest customers, arose from unrealistic expectations set by senior management who were motivated by an unusual option program and engaged in stock sales, and violated the "most

---

sound systems) have value on a standalone basis and whether there is objective and reliable evidence of the fair value of the undelivered items. Thus, it does not answer any pertinent questions to simply state that a screen is necessary to watch a film – IMAX disclosed that no viewers would be watching films on these screens anytime soon. Br. 16 n.14; 2005 Form 10-K, at 7. Plaintiffs must allege that defendants knew IMAX failed the three-part EITF 00-21 test – something completely absent from the CAC. Likewise, the allegation that the Defendants may have been aware of the change in accounting from time of delivery to installation (Opp. 5, 25) does not create an inference (much less a compelling one) that Defendants knew IMAX was incorrectly applying the new standard.

11 Citing "group pleading" cases, Plaintiffs argue that Gelfond and Wechsler cannot "feign ignorance" regarding the accounting principles. Opp. 27. However, the group pleading doctrine has no effect on the PSLRA's scienter requirement. In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 440 (S.D.N.Y. 2005). Likewise, the fact that a defendant signed a SOX certification cannot itself establish scienter. Opp. 36; see Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006); compare In re Lattice Semiconductor Corp. Sec. Litig., No. CV04-1255-AA, 2006 WL 538756, at **3-4 (D. Or. Jan. 3, 2006) (allegations that finance department falsified operations results and revenue was recognized on shipments before they were sold).

12 Contrary to Plaintiffs' suggestion, the Microstrategy court did not rule that the alleged simplicity of accounting could itself support scienter, but rather held that scienter was present based on a number of factors not present here including: (i) the recognition of revenue on unsigned contracts; and (ii) insider stock sales by individual defendants generating over $90 million in profits. In re Microstrategy Inc. Sec. Litig., 115 F. Supp. 2d 620, 624-25 (E.D. Va. 2000). Moreover, what the court stated was "inapposite at the motion to dismiss stage" (Opp. 20) was the materiality of contract execution timing not the complexity of the accounting. Id. at 638 n.35, 656-68.

fundamental principles" of GAAP. This case, which involves at a minimum an after-the-fact reconsideration of EITF 00-21 and its complex three-part test to IMAX's unique systems, is a fortiori one for finding no inference of scienter.[13]

Not only do Plaintiffs fail to satisfy their burden, they fail even to address the non-culpable inferences raised in Defendants' brief. Although Plaintiffs assert that they do not need to allege insider sales, they do not dispute that the lack of insider stock sales or any other personal motive strongly refutes an inference of scienter as to the Individual Defendants. Br. 18-19.[14] Significantly, although Plaintiffs say that the IMAX Defendants have failed to establish the defense of reliance on auditors (Opp. 30 n.17), they spend five pages of their brief pointing out the allegations that establish just that defense. Opp. 31-34, 38.[15] Finally, Plaintiffs admit that it took questions from the SEC's Division of Corporation Finance and an eight-month inquiry for IMAX to conclude that it needed to change its accounting – hardly suggestive of a "simple" and obvious issue. Opp. 8-9; Compl. ¶¶ 124-138. All in all, the inferences support a conclusion of mistake, and not fraud.

## II. THE COMPLAINT FAILS ADEQUATELY TO ALLEGE LOSS CAUSATION

Plaintiffs argue that there is loss causation because IMAX's share price dropped following the Aug. 9 "partial disclosure of [IMAX's] improper accounting practices." Opp. 8-9; see In re Bradley Pharms., Ins. Sec. Litig., 421 F. Supp. 2d 822 (D.N.J. 2006) (loss causation

---

13 The court did not (as plaintiffs suggest) dispute that the accounting rules were "well-known [and] easily applied" and while it mentioned in passing that there was no allegation that the accounting treatment adopted in the BMS restatement was the subject of prior accounting rules or literature, the same could be said here, and the court did not rest its holding on that fact. (Opp. 24)

14 Plaintiffs cite cases holding that even small stock sales do not support an inference of scienter. See Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 153 (D. Conn. 2007). This case is a fortiori. See In re Omnicom Group, Inc. Sec. Litig., 02 Civ. 4483 (RCC), 2005 U.S. Dist. LEXIS 5272, at *35 (S.D.N.Y. Mar. 30, 2005); In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003); Br. 18-19.

15 When attacking PwC, Plaintiffs, through their own arguments, concede that all four elements of the reliance on auditors defense spelled out in SEC v. Caserta, 75 F. Supp. 2d 79 (E.D.N.Y. 1999), have been met: (1) IMAX made a complete disclosure to PwC, (2) IMAX sought the advice of PwC about the appropriateness of the challenged conduct, (3) IMAX received advice that the conduct was appropriate, and (4) IMAX relied on that advice. Opp. 31-34, 38.

where the company announced it would delay the release of its annual report). Plaintiffs' premise is wrong so the conclusion is faulty. The Aug. 9 release did not "'expos[e] . . . the falsity of the [alleged] fraudulent representation,'" In re Omnicom Group, Inc. Sec. Litig., No. 02 Civ. 4483 (WHP), 2008 WL 243788, at *5 (S.D.N.Y. Jan. 29, 2008) (quoting In re Winstar Comm'ns, No. 01 CV 3014 (GBD), 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006)): on August 9, IMAX strongly reaffirmed its confidence in the accuracy of its financials. The stock price fell nonetheless, likely because of the failed sale of IMAX.[16] When IMAX announced the restatement, its stock price rose. Accordingly, Plaintiffs have failed to plead loss causation. See, e.g., In re Avista Corp. Sec. Litig., 415 F. Supp. 2d 1214, 1219 (E.D. Wash. 2005); Weiss v. Amkor Tech., Inc., No. CV 07-0278-PHX-PGR, 2007 U.S. Dist. LEXIS 71688, at *16 (N.D. Ariz. Sept. 25, 2007).

[16] Plaintiffs conclusorily assert that "[t]he ultimate lack of a buyer appears to be the result of the information obtained by the potential suitors." Opp. 8. Aside from this being pure speculation, there is no allegation that IMAX made a false statement regarding the sale and, accordingly, the disclosure that the sale was not going forward is not a disclosure that reveals "the falsity of the alleged misstatements." Omnicom, 2008 WL 243788, at * 6.

## CONCLUSION

The CAC should be dismissed with prejudice.

Dated: New York, New York
February 11, 2008

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: Lewis J. Liman (J.C.)
Lewis J. Liman (LL-9166)
Breon S. Peace (BP-8872)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble

Of Counsel:
James C. Clark (JC-9694)