UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X

IN RE IMAX CORPORATION SECURITIES LITIGATION : Case No. 06 Civ. 6128 (NRB) ECF Case

---------------------------------------------------------------------- X

**DEFENDANTS IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE AND KATHRYN A. GAMBLE'S SUPPLEMENTAL SUBMISSION IN RESPONSE TO THE COURT'S LETTER DATED AUGUST 13, 2008**

Defendants IMAX Corporation ("IMAX"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble (together, the "Defendants") respectfully submit this memorandum to answer the Court's two questions dated August 13, 2008.

I. The parties shall list each allegedly misrepresentative statement and the corresponding allegation and record evidence indicating the falsity of that statement.

Plaintiffs might argue that the Complaint alleges three categories of statements that are false: (1) descriptions of IMAX's revenue recognition policies contained in the footnotes to its financial statements filed with the SEC for the years 2002 through 2005; (2) IMAX's reported financial statements for the years 2002 through 2005 and the first three quarters of 2006; and (3) miscellaneous additional statements. However, Plaintiffs either do not properly allege that these statements were false or, if they do, do not state the reasons why they are false or provide the basis of their allegations of scienter with respect to those statements.

A. The footnotes to the financial statements

The footnotes to IMAX's financial statements in the Form 10-Ks for the period 2002 through 2005 contained descriptions of its revenue recognition policies. Compl. ¶¶ 43, 46, 51, 55. Plaintiffs do not allege any respect in which IMAX's descriptions of its revenue

recognition policies were misleading. See Davidoff v. Farina, 04 Civ. 7617 (NRB), 2005 U.S. Dist. LEXIS 17638, at *39 (S.D.N.Y. Aug. 22, 2005) (under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" (quoting 15 U.S.C. § 78u-4(b)(1))).

2002 & 2003: Plaintiffs do not quote IMAX's 2002 and 2003 Form 10-Ks. The footnotes described its revenue recognition policy substantially as follows: "The Company recognizes revenues from sales-type leases upon installation of the theater system. Revenue associated with a sales-type lease is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured." 2002 Form 10-K, at 23; 2003 Form 10-K, at 24; See Compl. ¶¶ 43, 46. The 10-Ks did not refer to multiple element arrangement accounting, which did not even go into effect until fiscal periods beginning after June 15, 2003. See Clark Decl. Ex. A ¶ 19.[1] Plaintiffs do not allege the description was misleading.[2]

2004: IMAX's Form 10-K for 2004 is the first report in which IMAX described multiple element arrangement accounting. That report stated:

> Multiple Element Arrangements
>
> On occasion, the Company will include film licenses or other specified elements as part of system sales or lease agreements. When separate prices are listed in a multiple element arrangement, these prices may not be indicative of the fair

---

[1] Moreover, the Complaint does not allege that any theater system was recognized in 2003 that should have been recognized in a later year. See Compl. ¶¶ 144-146.

[2] GAAP (which IMAX followed) states: "A seller should substantially complete or fulfill the terms specified in the arrangement in order for delivery or performance to have occurred. When applying the substantially complete notion, the staff believes that only inconsequential or perfunctory actions may remain incomplete" SEC Staff Accounting Bulletin 101, at 7 (Clark Decl. Ex. D); see also SEC Staff Accounting Bulletin 104 (released Dec. 17, 2003), at 35 (Clark Decl. Ex. L.) ("A seller should substantially complete or fulfill the terms specified in the arrangement related to the unit of accounting at issue in order for delivery or performance to have occurred.")

> values of those elements because the prices of the different components of the arrangements may be modified through negotiation although the aggregate consideration may not. Revenues under these arrangements are allocated based upon the estimated relative fair values of each element.
>
> In the normal course of its business, the Company will have customers who, for a number of reasons are unable to proceed with theater construction or wish to modify the terms of an existing arrangement. There is typically deferred revenue involved with these arrangements representing initial cash payments in advance of the default, settlement or modification of the arrangement. Pursuant to the policies discussed above, the total consideration to be received in these situations is allocated to each individual element of the settlement or modification arrangement based on the relative fair values of each element.
>
> Upon allocation of value to each element, each element is accounted for based on applicable revenue recognition criteria.

2004 Form 10-K, at 26, 53-54; Compl. ¶ 51. The 2004 Form 10-K also contained disclosure similar to that in the 2002 and 2003 Forms – that revenue is recognized generally upon installation of the theater system and when the required GAAP revenue recognition criteria have been met. 2004 Form 10-K, at 25, 54.

The Complaint does not allege that, in 2004, IMAX's actual policy was different from its stated policy, but only alleges (and without specification, see Davidoff, 2005 U.S. Dist. LEXIS 17638, at **39-41) that the 10-K "fails to disclose that [IMAX] was actually applying multiple element accounting inappropriately" – in other words that IMAX allegedly violated GAAP. Compl. ¶ 52.

2005: Plaintiffs allege that the 2005 Form 10-K "failed to disclose that IMAX's application of multiple element accounting ... violated GAAP" (Compl. ¶ 55) and not that the Form 10-K failed accurately to describe IMAX's policy itself.

Plaintiffs allege that, in the fourth quarter of 2005 and the second quarter of 2006, IMAX recognized revenue prior to the installation of the screen system. Compl. ¶¶ 115-117. However, IMAX's 2005 Form 10-K disclosed both that it had recognized revenue with respect to

certain elements of the theater system before all of the elements of the theater system were installed and that it had recognized revenue in ten instances in which the theater was not open in 2005 and would not open until 2006. 2005 Form 10-K, at 7, 31. Specifically, for 2005, IMAX twice stated:[3]

> The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.
>
> . . .
>
> The Company recognizes revenue from sales and sales type leases when the installation of the respective theater system element is substantially complete and all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.

2005 Form 10-K at 34, 64 (emphasis added).[4] IMAX thus made it clear that there are several different elements of a theater system (including the projector, sound system and screen), that it applied multiple element arrangement accounting with respect to the elements, and that, in 2005, when GAAP permitted an element to be treated as a "unit of accounting" IMAX recognized the relative fair value when the revenue recognition criteria were satisfied with respect to that "unit of accounting" without regard to whether revenue recognition criteria were satisfied with respect to other elements. In other words, IMAX made clear that it did what Plaintiffs allege violated

---

3 At argument, Plaintiffs incorrectly stated that IMAX made this statement only once in the Form 10-K. (Tr. 44:16-17) ("What they tell you about it is buried in page 64 of the 10-K").

4 IMAX disclosed this practice a third time in the 2005 10-K at page 35, with slightly different wording, further clarifying the point that when theater system agreements met the criteria for separate units of accounting, revenue recognition criteria was applied separately to each component that was deemed to be a separate unit of accounting: "Each element is then accounted for based on applicable revenue recognition criteria." 2005 Form 10-K, at 35.

GAAP – it applied multiple element arrangement accounting to its theater systems and recognized revenue "when only certain elements of its systems were installed." Compl. ¶ 40.

In its July 2007 restatement, IMAX made two distinct changes to its accounting policy and restated its financial results to account for those two distinct changes. It changed the "deliverable" and "unit of accounting" as to which it recognized revenue from "elements" of the theater system to all components of the theater system, theater design support, supervision of installation, and use of the IMAX brand, including such items as the final screen and projectionist training. It also changed the point of recognition from the point of completion of IMAX's installation obligations (as reported in IMAX's Form 10-Ks and required by SEC Staff Accounting Bulletins 101 and 104) to the earlier of the time a certificate of acceptance was received from the theater owner or, if no certificate was received or retained, the time of theater opening.[5] Consequently, IMAX restated prior years' results to recognize revenue only when it had a certificate of acceptance or the theater had opened.

The restatement, however, does not provide support for a claim that in any year IMAX's description of its revenue recognition policies was misstated. Prior to the restatement, IMAX never said or suggested that it waited until theater opening or receipt of a certificate of acceptance to recognize revenue, or that it included all of the products and services listed above in a single deliverable. It stated that it recognized revenue upon installation of the theater system and then, in the only periods Plaintiffs allege IMAX accelerated revenue by recognizing the projector and sound system and deferring the screen, it disclosed it recognized revenue when

---

5 IMAX stated:

"[T]he Company revised its policy to require that (i) the projector, sound system and screen system be installed and are in full working condition, the 3D glasses cleaning machine, if applicable, be delivered and projectionist training be completed, and (ii) written customer acceptance thereon received, or the public opening of the theater take place, before revenue can be recognized."

2006 Form 10-K, at 39; see also id. at 91, 146; Compl. ¶ 145

elements of the theater system that constituted separate "units of accounting" were complete.[6] In short, IMAX's financial statements may have applied GAAP incorrectly, but they did not misdescribe IMAX's policies.

B. Reported financial statements.

The Complaint sufficiently alleges that IMAX's reported financial statements with respect to each of the quarters in the years 2002 through 2005 and the first three quarters of 2006 did not apply GAAP correctly and thus were false or misleading, i.e., IMAX restated those financials. See In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 564 (S.D.N.Y. 2004) ("the fact of the Restatement establishes that the prior financials were incorrect at the time and that the error was material"). However, "[t]he Complaint alleges that the Company's approach to revenue recognition and its application of multiple element accounting was specifically discussed with PWC." Pls. Br. 26 (citing Compl. ¶ 224); See also Pls. Br. 31-32.

C. Miscellaneous statements

Plaintiffs refer to numerous press releases and earnings conference calls from throughout the class period (See generally Compl. ¶¶ 64-114), but the only respect in which those statements are alleged to be false is that they contain financial figures that IMAX restated. See Pls. Br. 12 n.5.

---

6 Like the 2005 Form 10-K, IMAX's Quarterly Report for the second quarter of 2006 disclosed that the Company recognized revenue when elements of the theater system that constituted separate units of accounting were complete. IMAX Corp., Quarterly Report (Form 10-Q) (Aug. 9, 2006), at 33-34.

II. IMAX shall provide record support for counsel's representation at oral argument that the purpose of restating revenue for fiscal years 2002-2004 was not to correct a previous misstatement or accounting error, and moreover, the complaint does not allege the falsity of any statements made during that time period. See Oral Argument Transcript 25:2-30:3; id. 25:23-25 ("[T]he entire complaint . . . [is] focused on 2005.")

At oral argument, counsel did not intend to convey that the restatement was not a correction of a previous misstatement or accounting error. It was. See supra Part I.B; Def. Reply Br. 4 n.2. The record citations for the various ways in which IMAX revised its revenue recognition policy (and the various reasons that it restated revenue and earnings for 2002 through the third quarter of 2006) are: 2006 Form 10-K (Clark Decl. Ex. C), at 90-91, 146-47 (explaining the revisions to the Company's revenue recognition policy, which included: defining the applicable deliverable; requiring specific delivery and performance conditions be met; and requiring specific customer acceptance requirements be met); see also IMAX Corp., Earnings Conference Call (July 20, 2007) (Clark Decl. Ex. E), at 2; IMAX Corp., Press Release dated July 20, 2007, Form 8-K (Clark Decl. Ex. G), Ex. 99.1 at 3.

Counsel did state that with respect to scienter the entire focus of the Complaint is 2005. (Tr. 28:23-25). Plaintiffs' central complaint is that "[i]n order to meet its earnings targets, IMAX improperly accelerated its revenue recognition on theater systems and concomitantly, reported earnings thereon, when only certain elements of its systems were installed, sometimes not even waiting for installation of the screen, an obviously key component of a theater 'system.'" Compl. ¶ 40. Leaving aside its other defects (Def. Br. Part I.B), Plaintiffs allege that IMAX acted with scienter because the screen is "obviously" a "key component" and IMAX "ignore[d] the very simply concept that the theater system is incomplete until its projection, sound and screen systems are installed and functioning, and that until such time, revenue recognition was improper." Compl. ¶ 141; see also Compl. ¶ 175.

However, IMAX is only alleged to have recognized revenue on any part of its theater system without completing installation of the final screen in fourth quarter 2005 (when it deferred recognition on seven screens) (Compl. ¶¶ 115-116) and second quarter 2006 (when it deferred recognition on one screen) (Compl. ¶ 117).[7]

The Complaint alleges that IMAX misapplied GAAP from 2002 to 2006 by choosing the wrong point of recognition and/or defining the wrong deliverable. But there are no allegations that any defendant would have had an inkling of such misapplication (much less allegations that would create a "strong inference") and a restatement of financial results does not create an inference of scienter. See, e.g., Chill v. Gen. Elec. Co., 101 F.3d 263, 270-71 (2d Cir. 1996); Davidoff, 2005 U.S. Dist LEXIS 17638, at *55. In particular, there is no allegation whatsoever with respect to the particular reason why the revenue for any of those years was restated, i.e., whether it was because an element was not completed (and what elements might not have been completed), whether IMAX was missing paperwork, or whether theaters were not open. Nor is there any allegation that Defendants should have known prior to the restatement that the point of revenue recognition should have been the earlier of receipt of the certificate of acceptance or opening, or that they knew or recklessly failed to know the facts in 2002-2004 that made the installations fail the new policy adopted in July 2007. The questions of what is a deliverable and when an installation is complete are complicated ones and involve accounting judgments.[8] The Court cannot assume that Defendants knew the appropriate GAAP treatment at the time; Plaintiffs must plead it. See 15 U.S.C. § 78u-4(b)(2) (the Complaint must, "with

---

7 Plaintiffs also do not allege motive and opportunity for any period prior to 2005. See Pls. Br. 40 n.25.

8 In the Risk Factor section of its 2005 10-K, IMAX clearly disclosed that the application of GAAP to the Company's business is "highly complex and involve[s] subjective judgments." 2005 Form 10-K, at 21; see Def. Br. 15; see also 2006 Form 10-K, at 147 ("[t]he term 'deliverables is not explicitly defined in any accounting literature" and "[t]he determination of a deliverable requires significant judgment").

respect to each act or omission alleged to violate [the PSLRA], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind").

Dated: New York, New York
August 18, 2008

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ______________________________
Lewis J. Liman (LL-9166)
Breon S. Peace (BP-8872)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble