USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ____
DATE FILED: 9/16/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

In re IMAX SECURITIES LITIGATION

**MEMORANDUM AND ORDER**

Master File 06 Civ. 6128 (NRB)

----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs brought this securities fraud class action under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5, on behalf of all persons and entities who purchased or acquired common stock in IMAX Corporation ("IMAX" or the "Company") between February 27, 2003 and July 20, 2007 (the "class period"). The consolidated amended class action complaint (the "complaint") alleges that the defendants, IMAX, Richard L. Gelfond ("Gelfond"), Bradley J. Wechsler ("Wechsler"), Francis T. Joyce ("Joyce"), Kathryn A. Gamble ("Gamble" and collectively, the "IMAX defendants"), and Pricewaterhouse Coopers LLP ("PWC"), issued materially false and misleading statements concerning IMAX's accounting of theater system revenue. This opinion addresses the IMAX defendants' and PWC's motions to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, both motions are DENIED.

## BACKGROUND[1]

IMAX is an entertainment technology company specializing in the design and manufacture of large-format, two- and three-dimensional theater systems.[2] An IMAX theater system traditionally consists of: an advanced, high-resolution projection system, a digital sound system, a screen with proprietary coating technology, a digital theater control system, and extensive theater planning, design and installation services.[3]

Although IMAX marketed several product and service lines during the class period, such as the production and distribution of films and film products and the operation and management of IMAX theaters, the majority of IMAX's revenue was derived from the sale and lease of theater systems to third-party owners of large-format theaters.[4] Throughout the class period, IMAX reported relatively strong, upward-trending financial results: 16 theater system installations ("installs") and $71 million revenue for fiscal year 2002; 21 installs and $75.8 million revenue for 2003; 22 installs and $86.6 million revenue for 2004; and 39

---

[1] The following facts have been drawn from the Consolidated Amended Class Action Complaint ("Compl."), the declarations of James C. Clark ("Clark Decl.") and Jennifer L. Conn ("Conn Decl.") in support of defendants' motions to dismiss the complaint.

[2] Clark Ex. C at 5-6.

[3] Clark Ex. C at 6.

[4] Clark Ex. C at 6; Compl. ¶ 62.

installs and $97.7 million revenue for 2005.[5] On March 9, 2006, IMAX filed its Form 10-K for the fiscal year ending December 31, 2005 ("2005 10-K"), which described a "record" 14 theater system installations and $35.1 million revenue in the fourth quarter.[6] A press release issued on the same day revealed that IMAX's Board of Directors was exploring several avenues for maximizing shareholder value, including such strategic alternatives as a sale of the company or a merger with another entity.[7]

On August 9, 2006, IMAX announced that it was in the process of responding to an informal inquiry from the SEC concerning the timing of revenue recognition, and specifically, its application of multiple element arrangement accounting to revenue derived from theater system sales and leases.[8] Management also disclosed that discussions with potential buyers and strategic partners had faltered.[9] By the time of the closing bell on the following day, the price of IMAX shares had fallen from $9.63 to $5.73.[10]

Eleven months later, on July 20, 2007, IMAX filed its Form 10-K for the fiscal year ending December 31, 2006 ("2006 10-K"), which included a restatement of its financial results for fiscal

---

5 Compl. ¶¶ 71, 79, 87, 107.

6 Compl. ¶¶ 102, 107.

7 Compl. ¶ 104.

8 Compl. ¶¶ 115-116.

9 Compl. ¶¶ 121-122.

10 Compl. ¶¶ 115, 119.

years 2002 through the first three quarters of 2006. As disclosed in the 2006 Form 10-K:

> . . . the Company revised its policy to require that (i) the projector, sound system and screen system be installed and are in full working condition, the 3D glasses machine, if applicable, be delivered and projectionist training be completed, and (ii) written customer acceptance thereon received, or the public opening of the theater take place, before revenue can be recognized.[11]

Acknowledging that "errors had occurred in its prior accounting for theatre systems," IMAX "revised its policy with regard to revenue recognition for theatre systems" and "restated its financial results in accordance with the revised policy."[12] The restatement of IMAX's theater systems revenue had the effect of shifting revenue from the period in which it had been originally reported to subsequent periods. In total, 16 installation transactions representing $25.4 million in revenue shifted between quarters in their originally reported years, and 14 installation transactions representing $27.1 million in revenue shifted between fiscal years.[13] The first of these consolidated

---

[11] Compl. ¶ 145.

[12] Compl. ¶ 139.

[13] Compl. ¶ 139. According to the 2006 10-K: "Two transactions which were originally recorded in 2004 (revenue and net earnings impact of $3.0 million and $1.6 million, respectively) were moved to 2005 and 2006. Eight transactions which were originally recorded in 2005 (revenue and net earnings impact of $14.1 million and $7.5 million, respectively) were moved to 2006 and two transactions which were originally recorded in 2005 were moved to 2007 (revenue and net earnings impact of $3.4 million and $2.2 million, respectively). In addition, one transaction recorded in 2002 was moved to 2005 (revenue and net earnings impact of $4.9 million and $2.1 million, respectively) and one transaction recorded in 2006 was moved to 2007 (revenue and net earnings impact of $1.7 million and $0.6 million, respectively)." 2006 10-K at 91.

actions followed shortly after IMAX released its restated financial results.

The complaint alleges that, "beginning in fiscal year 2002, and continuing throughout the Class Period, the Company improperly segregated the individual components of the [theater system] and recognized revenue on such individual components separately, thereby improperly accelerating its revenue recognition on the theater systems."[14] The treatment of theater system revenue in this manner allegedly violated both Generally Accepted Accounting Principles ("GAAP") and IMAX's stated revenue recognition policy.[15] We briefly review the accounting standards at play in this case as well as the various revisions to IMAX's revenue recognition policy before turning to the merits of the defendants' motions.

**The Relevant Accounting Principles**

In December 1999, the SEC published Staff Accounting Bulletin No. 101 ("SAB 101"), which sets forth the general principle that revenue should not be recognized until it is "realized or realizable and earned," or, in other words, when:

---

[14] Compl. ¶¶ 40, 47, 54, 58; see also id. ¶ 187 ("IMAX's consolidated financial statements for the years-ended December 31, 2002, December 31, 2004, December 31, 2005, and the first three quarters of 2006 were materially false and misleading as a result of prematurely recognized revenue relating to certain components of its theater system installations.").

[15] Compl. ¶ 40 ("Throughout the Class Period, IMAX publicly stated that revenue from theater systems sales and sales-type leases was recognized upon installation of the theater system. . . . IMAX improperly accelerated its revenue recognition on theater systems and concomitantly, reported earnings thereon, when only certain elements of its systems were installed . . .").

(i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to the buyer is fixed or determinable; and (iv) collectibility is reasonably assured.[16] "Delivery," according to SAB 101, occurs when the seller has "substantially complete[d] or fulfill[ed] the terms specified in the arrangement."[17]

Although SAB 101 provided specific criteria for when revenue may be recognized, it did not directly address the precedent question of what is the unit of accounting -- a complicated issue in arrangements involving multiple elements. The extent of SAB 101's guidance in this regard is found in the interpretive response to one of the hypothetical questions meant to illustrate the application of revenue recognition principles:

> If an arrangement . . . requires the delivery or performance of multiple deliverables, or "elements," the delivery of an individual element is considered not to have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element.[18]

---

16 Clark Ex. D at 3; Compl. ¶ 44.

17 Clark Ex. D at 7-8. Similarly, Statement of Financial Accounting Concepts No. 5 ("FASCON 5") provides that revenue "recognition involves consideration of two factors (a) being realized or realizable and (b) being earned . . . . [R]evenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." Compl. ¶ 45.

18 Clark Ex. D at 7-8; see also Compl. ¶ 142; United States Securities and Exchange Commission, Office of the Chief Accountant: Staff Accounting Bulletin No. 101: Revenue Recognition in Financial Statements - Frequently Asked Questions and Answers, http://www.sec.gov/info/accountants/sab101faq.htm (last visited September 4, 2008) ("SAB 101 does not modify existing practice in accounting for multiple-element arrangements. . . . [T]he staff has stated that it will not object to a method that includes the following conditions": (i)"[t]o be considered a separate element, the product or service in question represents a separate earnings process"; (ii) "[r]evenue is allocated among the elements based on the fair value of the elements"; (iii) "[i]f an

Thus, the SEC's framework for revenue recognition required the deferral of theater system revenue until: (i) each element essential to the functionality of the theater system had been "delivered," and (ii) IMAX's obligations with respect to these elements were substantially complete.[19] IMAX allegedly recognized revenue on individual components without awaiting delivery of certain elements that were, according to plaintiffs, "required before the system was substantially complete and functional."[20]

In May 2003, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") attempted to resolve any uncertainty surrounding the applicable GAAP standards for determining when arrangements containing multiple revenue-generating elements must be treated as separate units of accounting. EITF 00-21, issued on that date, provided:

> In an arrangement with multiple deliverables, the delivered item(s) should be considered a separate unit of accounting if all of the following criteria are met:
>
> a. The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s).

---

undelivered element is essential to the functionality of a delivered element, no revenue allocated to the delivered element is recognized until that undelivered element is delivered.").

19 Compl. ¶¶ 46-47, 175.

20 Compl. ¶ 47.

b. There is objective and reliable evidence of the fair value of the undelivered item(s).

c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.[21]

Plaintiffs contend that these criteria never could have been satisfied as to IMAX's theater systems because (i) customers paid for the theater systems in installments, with the payment schedule calibrated to the progress of the delivery and installation of the entire system, and not its individual components; (ii) the theater components were either the property of IMAX or licensed by IMAX, and thus, buyers were unable to resell the components on the market; and (iii) the IMAX components were not independently saleable because they are only compatible with one another.[22]

**Evolution of IMAX's Theater System Accounting Policy**

IMAX's stated revenue recognition policy with respect to theater systems has undergone substantial revision since 1999.

Prior to January 1, 2000, theater system revenue was recognized "on the completed contract method (that is, upon

---

[21] Clark Decl. Ex. A at 7. SAB 104 provided guidance on when revenue could be recognized on each element: "A seller should substantially complete or fulfill the terms specified in the arrangement related to the unit of accounting at issue in order for delivery or performance to have occurred." Clark Decl. Ex. L at 35.

[22] Compl. ¶ 54.

delivery of the system)."[23] IMAX revised this policy in response to the promulgation of SAB 101 and, for fiscal years 2000 through 2003, stated that revenue would be recognized "at the time of the theater installation."[24] In 2004, after the EITF had issued its guidance on multiple element arrangements, IMAX disclosed that "[t]he Company recognizes revenues from sales and sales-type leases generally upon installation of the theater system."[25] Under a section titled "Multiple Element Arrangements," IMAX's Form 10-K for the fiscal year ending December 31, 2004, filed March 11, 2005 ("2004 10-K") further described how the policy had evolved such that revenue could be recorded on separate elements of the theater system under certain limited circumstances:

> On occasion, the Company will include film licenses or other specified elements as part of system sales or lease agreements. . . . Revenues under these arrangements are allocated based upon the estimated relative fair values of each element.[26]

---

[23] Compl. ¶ 41.

[24] Compl. ¶¶ 42-44; see also IMAX 10-K405 for fiscal year ending December 31, 2000, filed April 2, 2001 ("2000 10-K") at 15, 30, 31; IMAX 10-K405 for fiscal year ending December 31, 2001, filed March 25, 2002 ("2001 10-K") at 17, 36, 58; IMAX 10-K/A for fiscal year ending December 31, 2002, filed February 27, 2004 ("2002 10-K") at 21, 44; IMAX 10-K/A for fiscal year ending December 31, 2003, filed September 13, 2004 ("2003 10-K") at 20, 24, 50.

[25] 2004 10-K at 25 (emphasis added). The 2004 10-K omits the "generally" qualifier later in the filing, however. See 2004 10-K at 53 ("The Company recognizes revenues from sales-type leases upon installation of the theater system when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.").

[26] Compl. ¶ 51.

Thus, for this period through 2004, IMAX's stated accounting policy generally required all components of a "theater system"[27] to be installed before revenue was recognized, regardless of whether one or more of those components could be considered "perfunctory or inconsequential" or non-essential to the functionality of the system.

According to its Form 10-K for the fiscal year ending December 31, 2005, filed March 9, 2006 ("2005 10-K"), IMAX expanded its approach to multiple element accounting that year and began recognizing revenue "when the installation of the respective theater system element [was] substantially complete."[28] As the 2005 10-K explained:

> The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.[29]

---

27 From the beginning of the class period through 2005, IMAX defined the term "theater system" in its 10-Ks to "include specialized projection equipment, advanced sound systems, specialty screens, theater automation control systems and film handling equipment." See 2002 10-K at 5; 2003 10-K at 5; 2004 10-K at 5; Clark Decl. Ex. B at 5. The 2006 10-K states, "The Company theater systems include a specialized IMAX projector, advanced sound systems and specialty screens." 2006 10-K at 6.

28 2005 10-K at 34 (emphasis added).

29 2005 10-K at 34, 64; Compl. ¶ 55. Notably, the 2005 10-K also states,

Notwithstanding the fact that IMAX's stated understanding of the relevant unit of accounting appears to have drifted over time, from an initial focus on "theater systems" in 2000, 2001, 2002, 2003 and 2004 to "theater system elements" in 2005, plaintiffs insist that the application of multiple element accounting to theater systems at any point during the class period (including 2005) was contrary to the manner in which the company disclosed it was treating revenue derived from theater system sales and sale-type leases.[30]

**DISCUSSION**

## I. Legal Standards

In considering the defendants' 12(b)(6) motion to dismiss, we accept as true the facts alleged in the amended complaint, Bolt Elec., Inc. v. City of New York, 53 F.3d 465, 469 (2d Cir. 1995), and draw all reasonable inferences in favor of plaintiffs. Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004). Although the complaint "does not need detailed factual allegations" to survive a motion to dismiss, a "formulaic recitation of the elements of a cause of action" cannot suffice. Bell Atl. Corp. v. Twombly, -- U.S. --, 127 S. Ct. 1955, 1964-65 (2007). At a minimum, plaintiffs must plead the facts underlying

"Theater systems leases that transfer substantially all of the benefits and risks of ownership to customers are classified as sales-type leases. Revenue from sales-type leases is recorded at the time installation is complete and other revenue recognition conditions are satisfied." Id. at 16.

30 Compl. ¶¶ 40, 42, 51-55.

the claims sufficiently "to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true." Id. For purposes of a 12(b)(6) motion, the amended complaint "is deemed to include any written instrument attached to it as an exhibit," "statements or documents incorporated in it by reference," and any other document that is "integral" to the allegations. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

## II. Analysis

### A. Scienter

The PSLRA requires plaintiffs asserting securities fraud claims to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." See 15 U.S.C. § 78u-4(b)(2). The requisite intent may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995). Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." Tellabs, Inc. v. Makor Issues & Rights, Ltd., -- U.S. --, 127 S. Ct. 2499, 2510 (2007). For an inference of scienter to be strong, "a reasonable person would deem [it]

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.[31]

Plaintiffs have alleged that: (i) Gelfond and Wechsler were motivated to inflate fraudulently the share price of IMAX because of the incentive compensation and change-of-control payout provisions in their employment agreements; and (ii) all defendants were, at the very least, reckless in not knowing that theater system revenue was being recognized prematurely because they had knowledge of or access to adverse facts that rendered the representations regarding IMAX's core operations false and misleading. Notably, plaintiffs have not suggested that the motive and opportunity prong applies to PWC and rely solely on allegations of recklessness. We review the sufficiency of these allegations seriatim.

### 1. Motive and Opportunity

The motive-and-opportunity prong of scienter, which as noted above applies only to Gelfond and Wechsler, requires allegations of "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000); see also Rothman v.

[31] The failure to allege adequately the requisite state of mind of an officer or director named as an individual defendant does not necessarily compel the dismissal of like claims against the corporation. See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). To sustain a securities fraud claim against a corporate defendant, plaintiffs may plead facts creating "a strong inference that someone," other than a named defendant, "whose intent could be imputed to the corporation acted with the requisite scienter." Id. (emphasis added).

Gregor, 220 F.3d 81, 93 (2d Cir. 2000). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).

The motives ascribed to Gelfond and Wechsler are inadequate to plead scienter to the requisite level of specificity. It is well established that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." Acito, 47 F.3d at 54; see also Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004). The mere fact that an individual defendant's executive compensation is dependent on stock value or entails some other performance-based component cannot, by itself, support an inference of scienter. See, e.g., Acito, 47 F.3d at 54; Greene v. Hanover Direct, Inc., No. 06 Civ. 13308(NRB), 2007 WL 4224372, at *4 (S.D.N.Y. Nov. 19, 2007). Nor can plaintiffs establish motive by simply pointing to the lucrative change-of-control provisions in Gelfond and Wechsler's employment agreements. See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 945-46 (9th Cir. 2003) (rejecting the "golden parachute" argument); In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 201 n.9 (1st Cir. 2005) ("[W]e agree with the district court that . . . [the] change-in-control agreements did not provide a strong motive to engage in fraud."); see also Kalnit, 264 F.3d at 139 (holding insufficient the allegation that "significant change of control payments . . .

would be jeopardized if it became known that" the defendants were engaged in fraud). Incentives such as these may be imputed to most, if not all, corporate executives, and upholding their sufficiency would vitiate the purpose of the heightened pleading standards applicable to allegations of securities fraud. See id.

Plaintiffs make much of the fact that Gelfond and Wechsler negotiated new change-of-control agreements on or about March 8, 2006, when IMAX declared its intent to "explore strategic alternatives," such as a merger or acquisition.[32] The increased payout provisions and incentive bonuses under the revised agreements allegedly created a powerful motive to "inflate the 2005 financials in a last ditch effort to make the Company more appealing to an acquirer."[33] As a threshold matter, we see no reason why the amended change-of-control agreements would save plaintiffs' allegations from the ordinary rule that a desire to maintain or increase executive compensation, imputable to all corporate officers, is insufficient. While we would hesitate to find the allegations of motive sufficient even if the complaint had alleged that an acquisition was not just probable, but imminent, the fact that IMAX was merely in the exploratory phase of pursuing an acquisition only highlights the speculative and conclusory nature of any concrete benefit that could have been realized by the Gelfond and Wechsler. See, e.g., Kalnit, 264

---

[32] Compl. ¶¶ 104, 220.

[33] Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss ("Pl. Opp.") at 41.

F.3d at 139-40 (rejecting avoidance of personal liability as "too speculative and conclusory" an alleged motive to support scienter). Moreover, plaintiffs acknowledge that, at the time IMAX was seeking to be acquired, Gelfond and Wechsler were not in a position to falsify IMAX's financial results for fiscal years 2002 through 2004 and the first three quarters of 2005 and thus, the alleged motive "supports the [allegations of fraud occurring only in the] latter part of the Class Period."[34] The asserted motivation -- the increased payouts resulting from a change of control -- is considerably weakened by the suggestion that the defendants were engaged in fraudulent practices for the duration of the class period but developed a motive to commit the fraud only in early 2005. Finally, even assuming that the timing of such an agreement may be relevant to evaluating whether the two individual defendants had the requisite motive, plaintiffs have conveniently omitted any mention of the fact that Gelfond and Wechsler's prior employment contracts expired on December 31, 2005, and thus were subject to renegotiation when IMAX was seeking to be acquired.[35]

### 2. Conscious Disregard or Recklessness

A securities fraud claim predicated upon recklessness or conscious misbehavior must allege the defendants' knowledge of

---

[34] Pl. Opp. at 40 n.25.

[35] Clark Ex. K at 11.

facts contradicting their public statements, their failure to review information that they were obligated to monitor, or their ignorance of clear and obvious signs of fraud. See Novak, 216 F.3d at 308. In each case, the burden remains on the plaintiff to set forth the specific reports, information or other indicia of fraud that rendered the defendants' conduct "highly unreasonable, representing an extreme departure from the standards of ordinary care." In re Sotheby's Holdings, Inc., No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *6 (S.D.N.Y. Aug. 31, 2000); see also Novak, 216 F.3d at 309; Kalnit, 264 F.3d at 142.

**a. The IMAX Defendants**

Although the question is a close one, we believe that, with respect to the IMAX defendants, the complaint fairly pleads an inference of scienter based on recklessness or conscious disregard that is at least as compelling as the most compelling opposing inference -- namely that IMAX violated its own accounting policy by mistake and the application of multiple element accounting to theater system revenue was a considered judgment, reflecting the advice of PWC after open consultations.

The IMAX defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company. Theater system revenue was the single largest component of total revenue recognized during fiscal years 2002 through 2005, and, thus,

represented one of the "most important metrics" of IMAX's growth.[36] The installation of a single theater system had a "significant impact" on IMAX's quarterly financial results, contributing up to $.03 to IMAX's net earnings per share.[37] IMAX reported the number of installs and executed installation contracts ("backlogs") on a quarterly and annual basis, and repeatedly highlighted the number of installs and backlogs as a barometer of its financial health.[38] In fact, the July 2007 restatement of theater system revenue reduced IMAX's 2005 originally reported net earnings by forty-seven percent (47%).[39]

Plaintiffs also have alleged that IMAX executives had specific knowledge of the progress of each theater system installation. IMAX apparently had employees at each installation site who would report back to senior executives on its status.[40] Reports containing schedules for theater installations were sent by the Finance Department to the attendees of a weekly meeting held at IMAX's Canadian headquarters, the purpose of which was to discuss theater openings and address the timeliness of the projects.[41] The complaint further alleges that monthly sales

---

[36] Compl. ¶¶ 62, 64-91, 95-100, 102, 105-114.

[37] Compl. ¶ 63.

[38] Compl. ¶¶ 39, 62.

[39] Pl. Opp. 18; Compl. ¶ 146.

[40] Compl. ¶¶ 91-92.

[41] Compl. ¶¶ 93-94.

reports detailing the number of theater systems installations were circulated via e-mail.[42]

The complaint suggests that the IMAX defendants had a sophisticated understanding of the relevant accounting principles, yet employed aggressive (and on at least one occasion, questionable) tactics to meet their revenue targets. According to the complaint, IMAX executives appreciated the distinction between "physical installs" and "revenue recognition installs," the former being installations in the lay sense and the latter being the "installation" of a theater system element that would permit the revenue associated with the element to be recognized.[43] As discussed supra, IMAX's disclosed policy toward the accounting treatment of theater system revenue became increasingly aggressive during the six years preceding the restatement. Moreover, the complaint alleges that, in the second quarter of 2006, an IMAX executive asked a theater owner to accept a projector, reel unit and sound system, notwithstanding the fact that construction issues were going to delay the theater's completion, "because IMAX had planned on recognizing revenue in the second quarter and still wished to do so."[44] In the fourth quarter of 2005, according to the complaint, IMAX allegedly installed equipment in a theater without a roof but later removed the equipment so that it could be stored in a

[42] Compl. ¶¶ 67, 93-94.

[43] Compl. ¶ 99.

[44] Compl. ¶ 117.

warehouse pending completion of the theater, but IMAX recorded revenue on the installation nonetheless.[45]

Moreover, the allegation that IMAX was recognizing revenue on theater system elements in 2002 and 2004, when its stated policy was to await the installation of the entire theater system, is troublesome. Although the defendants maintain that IMAX's stated policy was simply to apply GAAP, and thus, an alleged violation of corporate accounting policy adds nothing to the analysis, the 2002 10-K and 2004 10-K expressly provide that revenue would be recognized "upon installation of the theater system."[46] Regardless of whether certain "theater system" elements were perfunctory or whether the application of multiple element accounting to theater system revenue was proper under GAAP, IMAX's 10-Ks could be read to create an obligation to abide by a more conservative accounting policy.

If this were merely a GAAP violation case, we might have been persuaded that the complaint fails to allege scienter with respect to the IMAX defendants because the applicable accounting

---

[45] Compl. ¶ 118.

[46] 2002 10-K at 44; 2004 10-K at 25, 53. At oral argument on the instant motions, counsel for the IMAX defendants suggested that the rationale for restating the 2002 and 2004 revenue figures was two-fold: (i) to create comparable revenue data for fiscal years 2002 through 2005; and (ii) to correct for the premature recognition of revenue on certain transactions where ambiguity existed as to whether IMAX's obligations were substantially complete and only perfunctory or inconsequential steps remained. See August 5, 2008 Oral Argument Transcript at 25:2-30:3. Setting aside the fact that the latter explanation may be consistent with plaintiffs' allegation that some portion of the 2002 and 2004 revenue was recognized on the pre-defined elements of a theater system, the IMAX defendants have been unable to adduce record evidence in support of their counsel's assertion. See IMAX Defendants' Supplemental Response at 7-9.

rules appear to be highly complex and to involve subjective judgments and because of the complaint's allegations about the participation of PWC, which could provide a basis for a reliance argument by IMAX.[47] See, e.g., In re Bristol-Meyers Squibb Sec. Litig., 312 F. Supp. 2d 549, 565 (S.D.N.Y. 2004) ("While in this case the applicable accounting principle might be simple . . . the application of that principle to the facts is complex."). Indeed, the violations alleged here are far more technical than those in other cases where the defendants faced civil liability for the premature recognition of revenue in contravention of GAAP. See, e.g., In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 139-40 (D. Mass. 2001) (backdated contracts); In re Veeco Instruments, Inc., Sec. Litig., 235 F.R.D. 220, 233 (S.D.N.Y. 2006) (high level accounting official told to book revenue and "bury" adjustments); In re Microstrategy, Inc. Sec. Litig., 115 F. Supp. 2d 620, 638 (E.D. Va. 2000) (revenue recorded on unexecuted contracts); see also In re AOL Time Warner, Inc. Sec. and ERISA Litig., 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (stock sales combined with numerous GAAP and GAAS violations). However, plaintiffs also have pleaded (i) the crucial contribution of theater system revenue to IMAX as a going concern; (ii) the IMAX defendants' understanding of the relevant accounting rules, their application to the facts before us, and the ramifications of selecting certain interpretations of the rules over others; (iii)

---

47 Clark Decl. Ex. B at 21.

the existence of extensive documentation indicating the progress of theater system installations and the IMAX defendants' knowledge of, or access to, those documents; (iv) the increasingly aggressive accounting of theater system revenue; (v) the failure of the IMAX defendants to conform the financial results to IMAX's own publicly disclosed accounting policy, which, for fiscal years 2002 through 2004, was arguably distinct from the applicable GAAP rules; and (vi) at least one alleged transaction that, even assuming the IMAX defendants' interpretation of SAB 101 and EITF 00-21 was correct at the time, appears to subvert the purpose of the applicable accounting rules. We therefore find that plaintiffs have adequately pleaded scienter with respect to the IMAX defendants.

**b. PWC**

The standard for pleading auditor scienter is demanding. "[T]he failure . . . to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." In re Doral Fin. Corp. Sec. Litig., 05 MD 1706(JSR), 2008 WL 2636864, at *2 (S.D.N.Y. July 7, 2008) (quoting Novak, 216 F.3d at 309). Likewise, allegations of GAAP violations "without corresponding fraudulent intent" are insufficient to state a securities fraud claim against an independent accountant. Rothman, 220 F.3d at 98; In re Doral, 2008 WL 2636864, at *2.

Rather, the recklessness required to a hold a non-fiduciary accountant liable for fraud "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." Rothman, 220 F.3d at 98. Put another way, a plaintiff must allege that the "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007) (quoting In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 657 (S.D.N.Y. 2007)).

A complaint might reach this "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." See, e.g., In re AOL Time Warner Sec. & "ERISA" Litig., 318 F. Supp. 2d 192, 240 n.51 (S.D.N.Y. 2004) (quoting In re Sunterra Corp. Sec. Litig., 199 F. Supp. 2d 1308, 1333 (M.D. Fla. 2002)). Alternatively, allegations of particularly large frauds might go far toward creating a compelling inference of auditor scienter based on recklessness even where actual knowledge of the fraud by the defendant auditor is not alleged. See, e.g., In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2003 U.S. Dist. LEXIS 10863, at *22-*23 (S.D.N.Y. June

25, 2003) (involving a $3.3 billion fraud). However, under this framework, merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient. See Rothman, 220 F.3d at 98; see also In re aaiPharma Inc. Sec. Litig., 521 F. Supp. 2d 507, 513 (E.D.N.C. 2007) (rejecting the theory that an auditor's access to information could support an inference of scienter, noting that "merely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library").

In arguing that they have adequately pleaded recklessness, plaintiffs here point to their allegations (i) that PWC violated GAAP and Generally Accepted Auditing Standards[48]; (ii) that PWC had unfettered access to internal IMAX reports[49] and press releases[50] containing detailed information regarding the progress of theater system installations; and (iii) that IMAX's "approach to revenue recognition was an ongoing subject of review by PWC, and PWC provided advice to management with respect to revenue recognition for theater systems."[51]

The first of these allegations, as explained above, would not itself be sufficient for plaintiffs to survive a motion to dismiss with respect to PWC. Indeed, plaintiffs' claims against

48 Compl. ¶¶ 202-203.

49 Compl. ¶¶ 91-93.

50 Compl. ¶ 39.

51 Compl. ¶¶ 223-24.

PWC would fail if not for IMAX's alleged decision to set forth and subsequently violate in 2002 and 2004 an accounting policy arguably more conservative than required under GAAP. Further, merely alleging that PWC had access to documents that would have revealed accounting violations would make this case quite similar to Rothman, which involved a Section 10(b) claim against a computer software company and its accounting firm for allegedly failing to expense the company's royalty advances after it became clear that the capitalized value of those advances was significantly overstated. Plaintiffs there alleged GAAP violations and that the defendant accounting firm recklessly disregarded product sales data that would have "made clear" the overvaluations. However, the Second Circuit found that an accountant would have been able to detect the overstatements only if it was aware that most software sales occurred within the first year of a particular program's release. Rothman, 220 F.3d at 98. Because plaintiffs in Rothman did not allege facts that would support the inference that the defendant accounting firm knew of this sales pattern, the Second Circuit concluded that plaintiffs had not sufficiently pleaded scienter with respect to the accountants. Id.

The feature that distinguishes this case from Rothman is plaintiffs' allegation that PWC was extensively involved in the process by which IMAX's revenue recognition policy developed and evolved during the class period. In addition to claiming that IMAX's "approach to revenue was an ongoing subject of review by

PWC," plaintiffs allege that "PWC was regularly consulted by IMAX management and accounting issues and financial statements were always reviewed and opinions provided by PWC before the Company's financial statements were publicly disclosed," and that "[i]ncluded in the subjects discussed between IMAX management and PWC was IMAX's revenue recognition policy and the application of multiple element accounting to IMAX's theater systems."[52] As such, PWC was not a typical outside auditor like the defendant accounting firm in Rothman, but instead was actively advising IMAX and participating in the crafting of its theater installation accounting policy -- a policy that had, as noted above, significant consequences for how IMAX's financial health was publicly portrayed.

As a result, although nowhere in plaintiffs' 114-page complaint do they allege that PWC actually reviewed any of the various documents tracking theater installation that could have revealed if IMAX was violating its own accounting policy, we find the inference that PWC reviewed such documentation and thus was reckless in not detecting the alleged violations strong enough for the case against PWC to proceed for now. If, however, discovery reveals that PWC's involvement in the development of IMAX's accounting policy was not so extensive as alleged, this inference of scienter will weaken substantially, leaving plaintiffs with allegations that, while perhaps suggesting negligence or even gross negligence by PWC, do not indicate

---

[52] Compl. ¶ 223.

recklessness or conscious misbehavior. Obviously, this discussion of PWC's potential liability is limited to the scienter issue that has been raised in this motion.

### B. Loss Causation

Under the PSLRA, plaintiffs have "the burden of proving" that the defendant's misrepresentations "caused the loss" for which they seek recovery. 15 U.S.C. §§ 78u-4(b)(4). The so-called "loss causation" element of a securities fraud claim is sufficiently pleaded when the complaint provides "notice of what the relevant economic loss might be" and "what the causal connection might be between that loss" and the alleged misrepresentations. See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 346-47 (2005); see also Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005) (describing loss causation as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff"). The essence of loss causation is the notion that the alleged "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Id. at 173; see also ATSI Commc'ns Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 107 (2d Cir. 2007) (noting that loss must be "caused by the materialization of the risk concealed by the fraudulent statement"). Accordingly, the complaint must allege that the "market reacted negatively to a corrective

disclosure regarding the falsity" of the defendant's statements. Lentell, 396 F.3d at 175.

Here, the complaint alleges that the price of IMAX's shares fell by almost forty-one percent (41%) when IMAX announced, on August 9, 2006, that the SEC was conducting an informal inquiry into the "Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems."[53] The defendants challenge the sufficiency of this allegation on two grounds: (i) the August 9, 2006 release was not truly "corrective" because, far from revealing the falsity of IMAX's prior statements concerning theater system revenue, it reassured the investing public that the "application of the above [multiple element] accounting policy is, and has historically been, in accordance with GAAP";[54] and (ii) IMAX simultaneously announced the collapse of its efforts to find a buyer for the company, which qualifies as negative information that adequately explains the ensuing drop in IMAX's share price. Neither of these arguments is particularly persuasive.

Although it is true that the disclosures at issue did not reveal the falsity of the defendants' earlier representations regarding IMAX's theater system revenue, we find the news of the informal inquiry a sufficient indication of "the relevant truth

---

53 Compl. ¶¶ 115, 119.

54 Clark Decl. Ex. M.

begin[ning] to leak out." Dura, 544 U.S. at 342. The SEC inquiry related directly to the misrepresentations alleged in this case -- the application of multiple element accounting to theater system revenue -- and culminated in the restatement of IMAX's earnings and revenues for fiscal years 2002 through 2005. After the announcement, IMAX shares traded at a discount to their price on the previous day, reflecting, in part, the probability and magnitude of a restatement of previously reported revenue. Although "the truth here was revealed not in a neat and tidy single disclosure," In re Tommy Hilfiger Securities Litigation, No. 04 Civ. 7678(RO), 2007 U.S. Dist. LEXIS 55088, at *8 (S.D.N.Y. July 20, 2007), it is sufficient that the SEC's informal inquiry and subsequent discussions with IMAX concerned the subject matter of the alleged fraud and eventually led to a restatement. Id.; see also In re Bradley Pharms., Inc. Sec. Litig., 421 F. Supp. 2d 822, 829 (D.N.J. 2006); Brumbaugh v. Wave Sys. Corp., 416 F. Supp. 2d 239, 255-56 (D. Mass. 2006). And, of course, IMAX's denial of accounting irregularities was irrelevant once the SEC inquiry had alerted the market to their possibility. Compare In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 297 (S.D.N.Y. 2006) ("[D]espite [the] specific denial, the market understood by the end of the putative class period what it did not before . . . .") with Davidoff v. Farina, 04 Civ. 7617(NRB), 2005 U.S. Dist. LEXIS 17638, at *52 (S.D.N.Y. Aug. 22, 2005) (noting that the public statement contained no indication of whether previously reported results were false).

As to the defendants' suggestion that the stock drop was precipitated by the contemporaneous announcement of the Board's inability to attract a suitable merger or acquisition proposal, and not the informal inquiry by the SEC, we find -- regardless of the plausibility of the argument -- that the issue is inappropriate for resolution at this time. To survive a motion to dismiss, a plaintiff need only provide "some indication of the loss and the causal connection [he or she] has in mind." Dura, 544 U.S. at 346-47. Accordingly, the defendants will be entitled to interpose their defense of intervening facts, such as the fact of the failed merger and acquisition discussions, at trial.

**CONCLUSION**

For the reasons stated above, the motions to dismiss are DENIED. The defendants shall answer the complaint within twenty (20) days of the date of this opinion.

Dated: New York, New York
September 15, 2008

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiffs

Arthur N. Abbey
Jill S. Abrams
Richard B. Margolies
Grace E. Parasmo
ABBEY SPANIER RODD & ABRAMS, LLP
212 E. 39th Street
New York, NY 10016

Counsel for IMAX Defendants

Lewis J. Liman
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006

Counsel for PricewaterhouseCoopers LLP

Jennifer L. Conn
M. Byron Wilder
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166