## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

**ABBEY SPANIER RODD
& ABRAMS, LLP**

Arthur N. Abbey, Esq.
Jill S. Abrams, Esq.
Richard B. Margolies, Esq.
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

*Counsel for Lead Plaintiff and
Proposed Class Representative
Westchester Capital Management, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................................ii

INTRODUCTION...........................................................................................1

PROCEDURAL HISTORY ...............................................................................3

ARGUMENT...................................................................................................3

A.    THE REQUIREMENTS OF RULE 23 ...............................................................3

B.    RULE 23(A) IS SATISFIED ...........................................................................5

    1.    The Class Is So Numerous That Joinder Of All Members Is Impracticable ...................5

    2.    There Are Questions Of Law Or Fact Common To Members Of The Class.................6

    3.    Plaintiffs' Claims Are Typical Of Those Of The Members Of The Class ......................8

    4.    Plaintiffs Will Fairly And Adequately Protect The Interests Of The Class ...................9

C.    THIS ACTION MEETS THE REQUIREMENTS OF RULE 23(B)(3) .............................10

    1.    Common Questions of Law Or Fact Predominate Over Any Individual Issues Given That Plaintiffs Have Established That IMAX's Securities Traded in an Efficient Market, And Are Therefore Entitled To A Presumption of Reliance ...........................11

        (a)    Weekly Trading Volume.....................................................15

        (b)    Number of Securities Analysts Covering IMAX...........................16

        (c)    Number of Market Makers/Arbitrageurs in IMAX Securities...............17

        (d)    Eligibility to File Form S-3..................................................17

        (e)    Causal Relationship Between Unexpected Corporate Events and Rapid Response in IMAX's Common Stock Price....................................18

        (f)    Addition Factors Indicating That the Market for IMAX Stock Was Efficient Throughout the Class Period.........................................19

    2.    A Class Action Is The Superior Method Of Adjudication ...........................................20

CONCLUSION................................................................................................22

## TABLE OF AUTHORITIES

**Cases** **Page**

*Abdul-Malik v. Coombe,*
  96 Civ. 1021 (DLC), 1996 U.S. Dist. LEXIS 18203 (S.D.N.Y. Dec. 5, 1996)...........................8

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997) .................................................................................................................11

*Barrie v. Intervoice Brite,*
  2006 U.S. Dist. LEXIS 69299 (N.D. 2006)............................................................................20

*Basic v. Levinson,*
  485 U.S. 224 (1988) .................................................................................................................13

*Cammer v. Bloom,*
  711 F. Supp. 1264 (D.N.J. 1989).................................................................................14, 17, 18

*Cent. States Se. & Sw. Areas Health Welfare Fund v. Merck-Medco Managed Care LLC,*
  504 F.3d 229 (2d Cir. 2007) ......................................................................................................8

*Cheney v. CyberGuard Corp.,*
  213 F.R.D. 484 (S.D. Fla. 2003)..................................................................................16, 19, 20

*DeMarco v. Robertson Stephens Inc.,*
  228 F.R.D. 468 (S.D.N.Y. 2005)..............................................................................................11

*Dietrich v. Bauer,*
  192 F.R.D. 119 (S.D.N.Y. 2000)................................................................................................6

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974) .................................................................................................................20

*Green v. Wolf Corp.,*
  406 F.2d 291 (2d Cir. 1968) ...............................................................................................12, 20

*Hevesi v. Citigroup, Inc.,*
  366 F.3d 70 (2d Cir. 2004) .......................................................................................................13

*In re Arakis Energy Corp. Sec. Litig.,*
  No. 95-CV-3431 (ARR), 1999 U.S. Dist. LEXIS 22246 (E.D.N.Y. Apr. 23, 1999) ...............12

*In re Ashanti Goldfields Sec. Litig.,*
  No. CV 00-0717 (DGT), 2004 U.S. Dist. LEXIS 5165 (E.D.N.Y. Mar. 30, 2004) ..................12

*In re Blech Sec. Litig.*,
  187 F.R.D. 97 (S.D.N.Y. 1999) .........................................................................................12, 21

*In re Crazy Eddie Sec. Litig.*,
  135 F.R.D. 39 (E.D.N.Y. 1991) ..................................................................................................9

*In re Deutsche Telekom AG Sec. Litig.*,
  229 F. Supp. 2d. 277 (S.D.N.Y. 2002) ...................................................................................7, 8

*In re Drexel Burnham Lambert Group, Inc.*,
  960 F.2d 285 (2d Cir. 1992) ......................................................................................................8

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  245 F.R.D. 147 (S.D.N.Y. 2007) ............................................................................................3, 9

*In re Gaming Lottery Sec. Litig*,
  58 F. Supp. 2d 62 (S.D.N.Y.1999) ..........................................................................................21

*In re Indep. Energy Holdings, PLC, Sec. Litig.*,
  210 F.R.D. 476 (S.D.N.Y. 2002) ..........................................................................................5, 12

*In re Initial Pub. Offering Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ...................................................................................................4, 14

*In re Lilco Sec. Litig.*,
  111 F.R.D. 663 (E.D.N.Y. 1986 ...............................................................................................11

*In re NASDAQ Market-Makers Antitrust Litig.*,
  172 F.R.D. 119 (S.D.N.Y. 1997) ...............................................................................................8

*In re Nortel Networks Corp. Sec. Litig.*,
  01 CIV. 1855 (RMB), 2003 U.S. LEXIS 15702 (S.D.N.Y. Sept. 5, 2003) ...............................21

*In re Oxford Health Plans, Inc. Sec. Litig.*,
  191 F.R.D. 369 (S.D.N.Y. 2000) ...........................................................................................6, 10

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005) ......................................................................................14

*In re Scor Holding (Switz.) AG Litig.*,
  537 F.Supp.2d 556 (S.D.N.Y. 2008) ........................................................................................14

*In re Vivendi Universal, S.A Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ...........................................................................................5, 7,10

*Krogman v. Sterritt,*
    202 F.R.D. 467 (N.D. Tex. 2001)................................................................................19

*Labbate-D'Alauro v. GC Servs. Ltd. P'ship,*
    168 F.R.D. 451 (E.D.N.Y. 1996)..................................................................................7

*Lapin v. Goldman Sachs & Co.,*
    No. 04 Civ. 2236 (RJS), 2008 U.S. Dist. LEXIS 69574  (S.D.N.Y. Sept. 15, 2008)....4, 5, 8, 13

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997) ........................................................................................6

*Mendoza v. Casa De Cambio Delgado, Inc.,*
    2008 U.S. Dist. LEXIS 61557 (S.D.N.Y. Aug. 12, 2008)............................................9

*Moore v. PaineWebber, Inc.,*
    306 F.3d 1247 (2d Cir. 2002) ....................................................................................11

*Robinson v. Metro-North Commuter R.R. Co.,*
    267 F.3d 147 (2d Cir. 2001) ........................................................................................8

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP,*
    222 F.3d. 63 (2d. Cir. 2000) ......................................................................................14

*Silver v. IMAX Corp.,*
    Superior Court of Ontario, CV-06-3257-00 .................................................................21

*Teamsters Local 445 Freight Division Pension Fund v. Bombadier, Inc.,*
    2008 U.S. App. LEXIS 21498 (2d Cir. Oct. 18, 2008) ....................................3, 14, 18

*Teamsters Local 445 Freight Div. Pension Fund v. Bombadier, Inc.,*
    05 CIV. 1898 (SAS), 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006).........4, 14, 15

*Trief v. Dun & Bradstreet Corp.,*
    144 F.R.D. 193 (S.D.N.Y. 1992)..................................................................................6

*Unger v. Amedisys, Inc.,*
    401 F.3d 316 (5th Cir. 2005) ......................................................................................19

**Statutes**
Private Securities Litigation Reform Act of 1995

Pub. L. No. 104-67, 109 Stat. 737 ....................................................................................2

The Securities Exchange Act of 1934

Section 10(b), 15 U.S.C. §78j(b)…………………………………………………………………… ….1

Section 20(a), 15 U.S.C. §78t…………………………………………………………………………..1

**Rules**
Fed. R. Civ. P. 23………………………………………………………………..………………..passim

## INTRODUCTION

Lead Plaintiff Westchester Capital Management, Inc. ("Westchester"), as the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL and SphinX Merger Arbitrage Fund, and The Steelworkers Pension Trust ("Steelworkers") (collectively, the "Plaintiffs" or "Proposed Class Representatives"), respectfully submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) for certification of a class for the prosecution of their federal securities claims against defendants IMAX Corporation ("IMAX" or the "Company"), its senior officers Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble (the "Individual Defendants") and the Company's auditor, PricewaterhouseCoopers LLP's ("PWC") (IMAX, the Individual Defendants and PWC are collectively referred to herein as the "Defendants").

As the Court is aware, this is a securities class action involving claims under Sections 10(b), and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1 (the "Exchange Act"). The litigation arises out of the alleged improper accounting practices at IMAX and Defendants' materially false and misleading statements relating thereto. Plaintiffs have alleged that Defendants' public statements during the Class Period (February 27, 2003 through July 20, 2007) were materially false and misleading because they failed to disclose, among other things, that IMAX had recognized revenue on theater systems before installation of the System Deliverable[1], in contravention of GAAP, and in violation of its own accounting policies. Since PWC failed to conduct an audit in accordance with GAAS and PCAOB standards, and issued clean opinions on IMAX's 2002-2005 financial statements, Plaintiffs allege that PWC

---

[1] *See* Complaint at ¶47 fn. 1 ("A 'System Deliverable' is defined by IMAX as the projection system, sound system, screen system and, if applicable, the 3D glasses cleaning machine, theater design support, supervisions of installation, projectionist training and the use of the IMAX brand, generally to be a single deliverable and a single unit of accounting.").

is also responsible for the material misinformation disseminated to the investing public during the Class Period.

Plaintiffs respectfully request certification of the following class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons and entities who purchased or otherwise acquired IMAX common stock from February 27, 2003 through July 20, 2007, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are PWC, IMAX, the Individual Defendants, any member of the families of the Individual Defendants, any entity in which any Individual Defendant has a controlling interest, any other defendant or any entity which is a parent or subsidiary of, or which is controlled by, such defendant, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of Defendants (the "Class").

Plaintiffs seek appointment of Westchester and Steelworkers as class representatives and Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier") as class counsel.

As set forth below, the requirements of Rule 23 are satisfied here. The Proposed Class Representatives and Lead Counsel will fairly and adequately protect the interests of the Class they seek to represent. The Proposed Class Representatives' claims are typical of the claims of the other class members. In this securities litigation, common questions predominate over any questions affecting only individual members of the Class since all members of the Class seek to prove the same misrepresentations and omissions. As demonstrated below, Plaintiffs have established all requirements of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 ("PSLRA") and Rule 23 and, as such, Plaintiffs respectfully request that this action be certified as a class action, that Westchester and Steelworkers be appointed class representatives and that Abbey Spanier be appointed as class counsel.[2]

---

[2] Plaintiffs submit herewith a [Proposed] Order that, among other things, defines the Class as required by Fed. R. Civ. P 23(c)(1)(B).

2

## PROCEDURAL HISTORY

Several complaints were filed by plaintiffs in this action in August 2006, shortly after IMAX stunned the market by announcing that it was being investigated by Securities and Exchange Commission regarding the Company's timing of revenue-recognition, and specifically, its application of multiple element arrangement accounting to revenue derived from theater system sales and leases. On January 17, 2007, the Court appointed Westchester as lead plaintiff, and approved their selection of counsel, the firm of Abbey Spanier, pursuant to the PSLRA. (Docket entry No. 41).

Plaintiffs' Consolidated Amended Complaint was filed on October 2, 2007. (Docket Entry No. 46). Each of the defendants moved to dismiss the Complaint on December 10, 2007. (Docket Entry No. 54). After briefing and oral argument, those motions were denied by the Court in its September 15, 2008 Order. (Docket Entry No. 75).

## ARGUMENT

### A.    The Requirements Of Rule 23

Federal Rule of Civil Procedure 23 governs class certification. In this case, as in most cases seeking monetary damages, the plaintiffs must demonstrate that the class meets the four requirements of Rule 23(a) – numerosity, commonality, typicality and adequacy, as well as the requirements of one of the three subsections of Rule 23(b). *Teamsters Local 445 Freight Div. Pension Fund v. Bombadier, Inc.*, ("Teamsters I"), 2008 U.S. App. LEXIS 21498 *13 (2d Cir. Oct. 18, 2008). As stated by the Court in *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 156 (S.D.N.Y. 2007):

> First, a plaintiff must establish that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

*Id.; see also Lapin v. Goldman Sachs & Co.*, 2008 U.S. Dist. LEXIS 69574, at *5-6 (S.D.N.Y. Sept. 15, 2008); Fed. R. Civ. P. 23(a).

Once a court determines that the Rule 23(a) requirements have been met, it may grant class certification if the plaintiffs demonstrate that they can satisfy Rule 23(b)(3) such that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Teamsters I*, 2008 U.S. App. LEXIS 21498, at * 13.

Rule 23(c)(1) mandates the determination of class certification at an "early practicable time." A motion for class certification is not an occasion for examination of the merits of the case unrelated to the requirements of Rule 23. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 40-41 (2d Cir. 2006) ("The Rule 23 requirements are threshold issues, similar in some respects to preliminary issues such as personal or subject matter jurisdiction" and "[t]o avoid the risk that a Rule 23 hearing will extend into a protracted mini-trial of substantial portions of the underlying litigation, a district judge must be accorded considerable discretion to limit both discovery and the extent of the hearing on Rule 23 requirements."). The Second Circuit has established the following standards for evaluating class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not

4

assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*Initial Pub. Offering*, 471 F.3d at 41; *see also Flag Telecom Holdings*, 245 F.R.D. at 157.

The preponderance of the evidence standard applies to evidence proffered to establish the requirements of Rule 23. *Teamsters I*, 2008 U.S. App. LEXIS 21498, at * 17.

### B.    Rule 23(a) Is Satisfied

As demonstrated below, the four prerequisites of Rule 23(a), numerosity, commonality, typicality, and adequacy of representation, are met here.

#### 1.    The Class Is So Numerous That Joinder Of All Members Is Impracticable

Rule 23 requires that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also Lapin*, 2008 U.S. Dist. LEXIS 69574, at *5-6. "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder." *In re Indep. Energy Holdings, PLC, Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y. 2002). Although a precise calculation of the number of class members is not required, and it is permissible for the court to rely on reasonable inferences drawn from available facts, numbers in excess of forty generally satisfy the numerosity requirement. *Lapin*, 2008 U.S. Dist. LEXIS 69574, at *6 ("Numerosity is generally presumed when the proposed class would have at least 40 members"). Moreover, "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007).

Throughout the Class Period, IMAX's common stock was actively traded on the Nasdaq Stock Exchange (the "NASDAQ") and the Toronto Stock Exchange ("TSX") in a well-developed and efficient market. Complaint at ¶22. As of October 2007, the Company had more than 40 million shares of IMAX common stock issued and outstanding held by shareholders of record. *Id.* During the Class Period, there were hundreds of millions of shares of IMAX common stock traded on the NASDAQ and the TSX (approximately 90 percent of those shares were traded on the NASDAQ). *Id.* Therefore, the numerosity of the Class cannot be disputed. *See, e.g., Flag Telecom Holdings,* 245 F.R.D. at 157 (numerosity satisfied where more than twenty million shares of common stock were sold during the Class Period); *Dietrich v. Bauer,* 192 F.R.D. 119, 123 (S.D.N.Y. 2000) (allegations in a securities action that the defendant company was traded on the NASDAQ National Market System, had 22.5 million shares outstanding held by approximately 582 record holders were facts reasonable to "infer that the class is sufficiently large to meet Rule 23(a)'s numerosity requirement"); *In re Oxford Health Plans, Inc. Sec. Litig.,* 191 F.R.D. 369, 374 (S.D.N.Y. 2000) ("Here, because Oxford stock was traded in high volume during the class period, the precise number of class members could be, and very likely is, numbered in the thousands . . . [t]he [n]umerosity requirement is satisfied.").

The numerosity requirement is satisfied here.

### 2.     There Are Questions Of Law Or Fact Common To Members Of The Class

Rule 23(a) requires a showing that common issues of fact or law affect all class members. Fed. R. Civ. P. 23(a)(2); *Trief v. Dun & Bradstreet Corp.,* 144 F.R.D. 193, 198 (S.D.N.Y. 1992). A single common question may be sufficient to satisfy the commonality requirement. *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact"). The commonality requirement is

generally considered a low hurdle that "has been applied permissively" by courts in the context of securities fraud litigation. *See Vivendi Universal*, 242 F.R.D. at 84. "The critical inquiry is whether the common questions are at the 'core' of the cause of action alleged." *Labbate-D'Alauro v. GC Servs. Ltd. P'ship*, 168 F.R.D. 451, 456 (E.D.N.Y. 1996). Plaintiff need not show that all arguments are identical, "only that common issues of fact or law affect all class members." *In re Deutsche Telekom AG Sec. Litig.*, 229 F. Supp. 2d. 277, 281 (S.D.N.Y. 2002) (quoting *Trief*, 144 F.R.D. at 198).

In this case, the following questions of fact or law are common to all members of the proposed Class include: (a) whether the federal securities laws were violated by Defendants' acts; (b) whether the SEC filings, press releases, reports and other public statements made by Defendants and disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information; (c) whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period; (d) whether PWC's audits of the Company's financial statements during the Class Period were conducted in accordance with generally accepted auditing standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB"); (e) whether the market price of the Company's common stock during the Class Period was artificially inflated due to the materially misleading statements issued by Defendants; (f) whether Defendants acted with scienter in failing to inform investors of material facts and in issuing false and misleading financial statements; (g) whether reliance may be presumed pursuant to the fraud-on-the-market rule; and (h) whether the members of the Class have sustained damages as a result of the Defendants misconduct and the proper measure of damages. Complaint at ¶23.

Accordingly, the commonality requirement is easily met.

3.  **Plaintiffs' Claims Are Typical Of Those Of The Members Of The
    Class**

Rule 23(a)(3) requires that the claims asserted by the proposed class representative be

typical of the claims of each member of the class. Fed. R. Civ. P. 23(a)(3). A representative's

claims are typical if they arise from the same event or practice or course of conduct that gives

rise to the claims of other class members and his or her claims are based on the same legal

theory. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). The

typicality requirement of Rule 23(a)(3) is not demanding. *Robinson v. Metro-North Commuter

R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001). "Typicality under Rule 23 requires that a class

representative have the incentive to prove all the elements of the cause of action which would be

presented by the individual members of the class were they initiating individualized actions."

*In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 126 (S.D.N.Y. 1997) (internal

citation omitted). "Typicality does not require that the situations of the named representatives

and the class members be identical." *Lapin*, 2008 U.S. Dist. LEXIS 69574, at *9, (citing *Oxford

Health Plans*, 191 F.R.D. at 375).

"[T]he claims of the class representatives [must] be typical of those of the class, and

[typicality] is satisfied when each class member's claim arises from the same course of events,

and each class member makes similar legal arguments to prove the defendant's liability."

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care L.L.C.* 504

F.3d 229, 245 (2d Cir. 2007) (quoting *Metro-North Commuter R.R.,*267 F.3d at 155. Moreover,

the "typicality requirement is not defeated by minor variations in the fact patterns of individual

class member's claims." *Deutsche Telekom*, 229 F. Supp. 2d at 281 (quoting *Abdul-Malik v.

Coombe*, 96 Civ. 1021 (DLC), 1996 U.S. Dist. LEXIS 18203, *6 (S.D.N.Y. Dec. 5, 1996)).

Accordingly, the commonality and typicality requirements "tend to merge ... because [b]oth

8

serve as guideposts for determining whether . . . the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Mendoza v. Casa De Cambio Delgado, Inc.*, No. 07CV2579 (HB), 2008 U.S. Dist. LEXIS 61557, at *15-16 (S.D.N.Y. Aug. 12, 2008).

The Proposed Class Representatives' claims in this case are clearly typical of the claims of the Class because they arise out of the same uniform pattern of conduct – i.e., Defendants' issuance of materially false and misleading statements concerning IMAX's accounting for theater system revenue.   Thus, the Proposed Class Representatives, who purchased IMAX common stock during the Class Period[3], stand in the same position as other investors who acquired IMAX common stock during the Class Period.   Here, Plaintiffs "have the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Flag Telecom*, 245 F.R.D. at 159.   Moreover, the Proposed Class Representatives and each of the Class members claim that, as a result of Defendants' actions, they have been financially injured. *See, e.g., In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39, 40-41 (E.D.N.Y. 1991) ("Plaintiffs' claims are typical of those of absent class members.   They allege injury resulting from the same course of conduct that injured the absent class members and are based on the same theories of recovery.").   Therefore, the typicality prerequisite is satisfied.

### 4.   Plaintiffs Will Fairly And Adequately Protect The Interests Of The Class

Plaintiffs must also show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To do so, a plaintiff must demonstrate

---

[3]   The certifications of Westchester and Steelworkers, previously filed with the Court with respect to the motions for lead plaintiff, are annexed as Exhibits 1 and 2 to the accompanying Affirmation of Jill S. Abrams ("Abrams Aff.").

that: (i) the plaintiff's interests are not antagonistic to the other members of the Class; and (ii) the representative party's attorney is qualified, experienced and generally able to conduct the litigation. *See Vivendi Universal,* 242 F.R.D. at 85; *Oxford Health Plans*, 191 F.R.D. at 376.

In the present case, the record shows that the interests of Plaintiffs and the putative class members are aligned. As discussed above, the Proposed Class Representatives' interests are co-extensive and do not conflict with class members' interests, and are typical of the claims of the other members. They and all class members have suffered losses due to their purchase of IMAX common stock. They have been injured by the same wrongful course of conduct of Defendants, and it is in the Proposed Class Representatives' interests to vigorously prosecute this action on behalf of the Class.

With regard to the second component, proposed class counsel Abbey Spanier is comprised of experienced class action attorneys who have litigated numerous complex securities class actions nationwide, including those involving securities fraud.[4]

### C.    This Action Meets the Requirements of Rule 23(b)(3)

Once the plaintiffs demonstrate that the proposed class satisfies the elements of Rule 23(a), they must establish that the action is "maintainable" as defined by Rule 23(b). Rule 23(b) provides that an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition one of three alternative definitions of maintainability is met. This proposed class action is maintainable under subsection (b)(3), which requires "that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

---

[4] Attached hereto as Exhibit 3 to the Abrams Affirmation is a firm resume demonstrating Abbey Spanier's experience and expertise.

10

adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) thus has two elements: "predominance" and "superiority."

The issues of predominance and superiority are not amenable to a bright line test. Rather, the relevant inquiry is whether class certification will ensure economies of time and money by allowing representatives to proceed on behalf of a larger whole so that a class action would be the most efficient method of proceeding. *In re Lilco Sec. Litig.*, 111 F.R.D. 663, 667-68 (E.D.N.Y. 1986).

1. **Common Questions of Law Or Fact Predominate Over Any Individual Issues Given That Plaintiffs Have Established That IMAX's Securities Traded in an Efficient Market, And Are Therefore Entitled To A Presumption of Reliance**

Under Rule 23(b)(3), "a court may certify a class only where common questions of law and fact predominate over questions that affect only individual class members." *DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468, 472 (S.D.N.Y. 2005). This inquiry "trains on the legal or factual questions that qualify each class member's case as a genuine controversy ...[and] tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). As the Supreme Court noted in *Amchem*, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud." *Id.* at 625. "Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). "In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues." No. 95-CV-3431

11

(ARR), *In re Arakis Energy Corp. Sec. Litig.*, 1999 U.S. Dist. LEXIS 22246, at *37 (E.D.N.Y. Apr. 23, 1999).

The Complaint specifically pleads that all Defendants violated the Exchange Act, Section 10(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5 and that the Individual Defendants violated Section 20(a). Because any Class member would need to establish the same facts to demonstrate violations of the Exchange Act, common questions will predominate at trial. As set forth above, Plaintiffs' allegations in this case constitute the type of common conduct that fits well within the Second Circuit's standards for class certification under Rule 23(b)(3). Moreover, whether any class member relied on a particular misstatement is not an issue in this case because reliance is presumed under the fraud on the market doctrine. Complaint at ¶¶27-30.

The Second Circuit favors the use of class actions for resolution of securities claims. *Green v. Wolf Corp.*, 406 F.2d 291, 296-97 (2d Cir. 1968) (Rule 23 "....illustrates the need for an effective use of class actions in securities act litigation"). "The requirements of Rule 23 are to be applied liberally, not restrictively." *Indep. Energy Holdings*, 210 F.R.D. at 479 (*citing In re Blech Sec. Litig.*, 187 F.R.D. 97, 102 (S.D.N.Y. 1999)). "Accordingly, in securities cases, 'when a court is in doubt as to whether or not to certify a class action, the court should err in favor of allowing the class to go forward.'" *In re Ashanti Goldfields Sec. Litig.*, C.A. No. CV 00-0717 (DGT), 2004 U.S. Dist. LEXIS 5165, at *33 (E.D.N.Y. Mar. 30, 2004) (*quoting Blech*, 187 F.R.D. at 102).

Despite the fact that there can be no question that common issues exist here, the issue of reliance is occasionally disputed. For that reason, Plaintiffs have submitted the affidavit of Michael A. Marek which confirms the efficiency of the markets on which IMAX traded during the Class Period, namely the NASDAQ and the TSX. As a result, the Class' reliance is

presumed under the fraud on the market theory established by the U.S. Supreme Court's decision

in *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988) and thus, reliance is a common issue that

predominates over possible individual issues. The Supreme Court opined:

> The fraud on the market theory is based on the hypothesis that, in an open and
> developed securities market, the price of a company's stock is determined by the
> available    material    information    regarding    the    company    and    its
> business...Misleading statements will therefore defraud purchasers of stock even
> if the purchasers do not directly rely on the misstatements...The causal
> connection between the defendants' fraud and the plaintiffs' purchase of stock in
> such a case is no less significant than in a case of direct reliance on
> misrepresentations.

*Id.* at 241-42 (citation omitted).

The fraud on the market doctrine dispenses with the requirement that an investor prove

that he or she was aware of a particular misstatement, or that he or she directly relied on it. *Id.* at

246-47. As explained by the Second Circuit, the fraud on the market doctrine "creates a

rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities

traded in the open market, and (2) investors rely on the market price of securities as an accurate

measure of their intrinsic value." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004); *Lapin*,

2008 U.S. Dist. LEXIS 69574, at *32. "[T]he *Basic* theory allows a plaintiff alleging securities

fraud to establish reliance simply by virtue of the defendant's public dissemination of misleading

information." *Lapin,* 2008 U.D. Dist. LEXIS 69574, at *32. Rebutting the presumption of

reliance is not extremely difficult. As stated by the Supreme Court, "[i]t has been noted that it is

hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who

would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47 (citations and

footnotes omitted). "Requiring a plaintiff to show a speculative state of facts, i.e., how he would

have acted if omitted material information had been disclosed . . . or if the misrepresentation had

not been made . . . would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Id.* at 245 (citations omitted).

The central inquiry in determining whether the fraud on the market presumption can be used to presume reliance is whether the securities at issue trade in an "open and developed" market. *Sec. Investor Prot. Corp. v. BDO Seidman*, LLP, 222 F.3d. 63, 72, n.76 (2d. Cir. 2000); *Teamsters Local I*, 2008 U.S. App. LEXIS 21498, at \*7. (Pursuant to the fraud on the market theory, a plaintiff ". . .is entitled to a rebuttable presumption of reliance based on the notion that 'in an open and developed securities market, the price of a company's stock is determined by the available material information.'"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombadier, Inc.*, ("Teamsters II"), 2006 U.S. Dist. LEXIS 52991, at \*21-22 (S.D.N.Y. Aug. 1, 2006) ("The fraud on the market presumption applies only if the market for the security is open and developed enough so that it quickly incorporates material information into the price of the security, i.e., the market must be efficient.").

When determining whether the market for a security is efficient, courts (including courts in this district) often analyze the following five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1276, 1286-87 (D.N.J. 1989): (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Id.; see In re Scor Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 n.162 (S.D.N.Y. 2005); *In re Initial Public Offering Sec. Litig.*,

14

227 F.R.D. at 107, n.323 (S.D.N.Y. 2004). Courts sometimes look at additional factors, based on economic literature, in assessing market efficiency, including: the company's market capitalization; float (the stock's trading volume without counting insider-owned stock); and the bid-ask spread for stock sales. *See Teamsters II*, 2006 U.S. Dist. LEXIS 52991, at *21-22. In *Teamsters II*, Judge Scheindlin, who applied the *Cammer* test, observed that courts "typically consult some or all" of those eight factors in determining market efficiency, but that they "should use these factors as an analytical tool rather than as a checklist". *Id.* at *22. On appeal, the Second Circuit Court of Appeals also referred to these eight factors as being "routinely applied", while observing that the Second Circuit has not adopted a particular test for market efficiency.. *Teamsters I*, 2008 U.S. App. LEXIS 21498, at *22, n.11.

As set forth in the accompanying Marek Declaration, each of the five *Cammer* and three economic literature factors are established here, thus confirming that IMAX common stock traded on efficient markets during the Class Period. *See* Marek Dec. at ¶86.

### (a)     Weekly Trading Volume

The *Cammer* court held that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1286. That benchmark was far exceeded here as the average weekly turnover of IMAX common stock during the Class Period on NASDAQ alone was 7.69%. Marek Dec. at ¶25. Based on the total NASDAQ and TSX reported volume and the maximum number of IMAX common shares outstanding during the Class Period, the average weekly turnover of IMAX common stock during the Class Period was 8.42%. *Id.* The heavy trading volume in IMAX common stock creates a "strong presumption" of market efficiency. Marek Dec. at ¶30.

### (b)     Number of Securities Analysts Covering IMAX

Extensive coverage of IMAX by securities analysts also indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis. *See Cammer*, 711 F. Supp. at 1286. Courts have found market efficiency where as few as four securities analysts issued reports on the stock during the relevant time period. *See, e.g., Cheney v. CyberGuard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (four securities analysts sufficient). Here, there were at least fourteen security analysts who issued research reports concerning IMAX during the Class Period. These reports were written by analysts at CRT Capital, Jefferies & Company, Inc., Merrill Lynch Research, Merriman Curhan Ford, New Constructs LLC, Paradigm Capital, Piper Jaffray, Roth Capital Partners, LLC, RTX Securities, Sidoti & Company, LLC, Soleil Capital, Sun Trust Robinson Humphrey Capital Markets, Susquehanna Financial Group and Westrock Advisors, Inc. Marek Dec. at ¶31. Some of these same analysts also participated in IMAX conference calls throughout the Class Period – yet another indication they were closely following the stock. Marek Dec. at ¶34.

In additional, Egan-Jones Ratings, KDP Investment Advisors, Inc., Moody's Investors Service and Standard & Poor's Ratings Services, issued reports on their ratings of IMAX's debt securities during the Class Period as well as the Company's overall financial structure and results. Marek Dec. at ¶33. The participation of these securities analysts and coverage of IMAX in analyst reports available to investors during the Class Period show that information about IMAX was publicly disseminated, all supporting an efficient market. The presence of a substantial number of analysts indicates that IMAX stock was closely reviewed by investment

professionals, who made buy/sell recommendations to client investors based on information publicly available about the company. *Cammer*, 711 F. Supp. at 1286.

### (c)    Number of Market Makers/Arbitrageurs in IMAX Securities

IMAX common shares were traded on the NASDAQ National Market System, and the Toronto Stock Exchange during the Class Period. Marek Dec. at ¶12.  Trading on the NASDAQ and TSX is facilitated by numerous market makers who are responsible for matching buy and sell orders, and their existence is necessary for an orderly market and is evidence of market efficiency. *See Cammer*, 711 F. Supp. at 1271; Marek Aff. at ¶¶39-41.  The presence of multiple market makers militates in favor of an efficient market. *Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers). IMAX had between twenty-four (24) market makers over the course of the Class Period compared to the average number of market makers for NASDAQ securities, which was 16.44 as of February 2003 and 21.22 as of May 2004.  Marek Dec. at ¶44.  Efficiency of the market for IMAX stock was facilitated by such market maker involvement.  Marek Dec. at ¶45. *Cammer*, 77 F. Supp. at 1286.

### (d)    Eligibility To File Form S-3

Another indicator of market efficiency is a company's eligibility to file an SEC Form S-3.  *Cammer*, 711 F. Supp. at 1287; Marek Dec. at ¶46.  According to SEC regulations, certain companies may use the Form S-3, rather than Form S-1 (a long form Registration Statement), to register securities if they are sufficiently large and have filed numerous reports with the SEC over a long period.  Marek Dec. at ¶¶46-47.  During the Class Period, IMAX was eligible to, and indeed, filed Form S-3 Registration Statements with the SEC as part of a "shelf" registration process.  IMAX's ability to file SEC Form S-3 short form Registration Statements for its public offerings (see e.g., Form-S-3 and Amendment No. 1) filed by IMAX with the SEC on July 15,

2003 and October 6, 2003 respectively, is thus further support that IMAX stock traded in an efficient market. Marek Dec. at ¶49.

### (e) Causal Relationship Between Unexpected Corporate Events and Rapid Response in IMAX's Common Stock Price

If a plaintiff can demonstrate that stock prices regularly rose or fell in prompt response to market information, this fact would be significant in establishing an efficient market. *Cammer*, 711 F. Supp. at 1287. In *Teamsters I*, the Second Circuit observed that "Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered 'the most important[] *Cammer* factor'…and the 'essence of an efficient market and the foundation for the fraud on the market theory.'" 2008 U.S. App. LEXIS 21498, at *31. In analyzing the fifth *Cammer* factor, the Marek Declaration sets forth, in great detail, a cause and effect relationship between unexpected corporate events and a rapid response in IMAX's common stock price. Marek Dec. at ¶¶68-85. Through media coverage of IMAX, the Company's press releases and SEC filings, and the reports of securities analysts who followed the stock and issued reports during the relevant period, there was a steady and widely disseminated flow of information concerning IMAX that was readily available to the investment community and to the market. Marek Dec. at ¶¶68-70. Mr. Marek conducted an "event study" and identified a total of 93 days (without any regard to the price movement of IMAX common stock) on which events occurred that were potentially likely to have been viewed as "material news dates." Marek Dec. at ¶72. He also classified 217 dates, on which only non-material information was disseminated to the market during the Class Period, as "non-material news dates." Marek Dec. at ¶73. Further, Mr. Marek classified dates during the Class Period, which fell into neither material news dates nor non-material news dates as "no-news dates" (finding 797 "no-news dates"). *Id*. Marek assessed IMAX's sensitivity to market-wide and industry factors

18

during the Class Period via statistical analyses.   Marek Dec. at ¶¶75-78.   As a result of this event study, Mr. Marek concluded that of the 1,107 NASDAQ trading days during the Class Period, a regression model returned 48 statistically significant days with abnormal returns at or above the 95% level, indicating "unequivocal statistical proof of market efficiency."   Marek Dec. at ¶¶80-85.   Such an event study has been viewed as *prima facie* evidence of an efficient market. *Teamsters I*, 2008 U.S. App. LEXIS 21498, at * 31.

**(f)     Additional Factors Indicating That the Market for IMAX Stock Was Efficient Throughout the Class Period**

Economic literature suggests the relevance of other factors that tend to demonstrate market efficiency, including market capitalization, percentage of stock not held by insiders (the "float") and bid-ask spread.   Accordingly, in addition to the five *Cammer* factors, Mr. Marek also analyzed these additional factors in support of his findings that the market for IMAX common stock was efficient[5]:

- IMAX's large market capitalization during the Class Period. "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations." *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001); *see also, Unger v. Amedisys, Inc.*, 401 F.3d 316, 325 (5th Cir. 2005). IMAX's equity market capitalization during the Class Period ranged from approximately $123 million to $470 million, which is sufficient to facilitate an efficient market. Marek Dec. at ¶¶50, 53.

- IMAX's public float. The percentage of stock not held by insiders or "float" is helpful regarding market efficiency as "insiders may have information that is not yet reflected in stock prices, the prices of stocks that have greater holdings by insiders are less likely to accurately reflect all available information." *CyberGuard*, 213 F.R.D. at 502; *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). Here, during almost the entirety of the Class Period, IMAX's float was approximately 90%, which classified it as "widely-held" under generally accepted definitions of that term. Marek Dec. at ¶¶56, 86(g).  IMAX's public float is additional evidence of an efficient market.

---

[5]   In *Unger*, the Fifth Circuit criticized, *inter alia*, the District Court's failure to consider these three factors.

- The Bid-Ask Spread for IMAX common shares. Court's have also looked to a stock's bid-ask spread in assessing the efficiency of its market. *CyberGuard* 213 F.R.D. at 501; *Barrie v. Intervoice Brite*, 2006 U.S. Dist. LEXIS, 69299, at *29 (N.D. 2006) The average quoted closing bid-ask spread for IMAX common stock during April 2005 was 0.34%, while the bid-ask spread for components of the Dow Jones Industrial Average ("DJIA") was modestly below that of IMAX during that same period. Marek Dec at ¶¶65-66. The relatively low bid-ask spread difference between IMAX common stock and the highly capitalized and substantially traded components of the DJIA is further support of the efficiency of the market for IMAX common stock. Marek Dec. at ¶66.

Each of these additional factors is further evidence that the market for IMAX's securities was efficient during the Class Period.    Marek Dec. at ¶¶53, 63, 67.    Accordingly, the predominance element of Rule 23(b) (3) is satisfied.

## 2.    A Class Action Is The Superior Method Of Adjudication

The superiority prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3); *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Rule 23(b)(3) lists the following factors to consider when determining whether a class action is superior: a) the interest of class members in individually controlling the prosecution or defense of separate actions; b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; c) whether it is desirable to concentrate litigation of claims in this forum; and d) the manageability of a class action.  *Id.* The class action device is particularly appropriate for addressing the claims at issue in this case. The claims involve a large number of investors who are geographically dispersed, and whose relatively small claims make it prohibitively expensive to seek recovery through individual litigation. *Green*, 406 F.2d at 301 ("the alternatives [to a class action] are either no recourse for thousands of [investors]" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake").

Here, the four factors specified in Rule 23(b)(3) favor class certification. Fed. R. Civ. P. 23(b)(3). First, individual members do not have an interest in controlling the action. Although a few Class members may have suffered damages substantial enough that might make it economically viable for them to bring their own suits, this fact does not warrant a finding that Class members have an interest in individually controlling the litigation so that the action may not be certified under Rule 23(b)(3). Second, while plaintiffs are aware of a securities class action that was commenced in Ontario, Canada following the institution of the U.S. securities class actions (*Silver v. IMAX Corp.*, Superior Court of Ontario, CV-06-3257-00), there is no reason that the instant case should not be certified. Certainly, this Court can certify a class that includes purchasers on the TSX and American stock exchanges. See *In re Nortel Networks Corp. Sec. Litig.*, 01 Civ. 1855(RMB) 2003 U.S. LEXIS 15702, *22 (S.D.N.Y. Sept. 5, 2003) (certifying class that included purchasers who traded on both the TSX and NYSE); *In re Gaming Lottery Sec. Litig*, 58 F. Supp. 2d 62, 76 (S.D.N.Y.1999) (certifying class of U.S. and Canadian purchasers of common stock in the American or Canadian securities markets).[6]   Third, it is clearly desirable to concentrate the litigation in one forum. Inconsistent adjudications will be avoided, thus promoting the fair and efficient use of the judicial system. Fourth, this case presents no unusual difficulties in the management of the action. Plaintiffs' counsel and the Court have handled numerous similar actions and the appropriate procedures and techniques for the management of such suits are well established. Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties if they should arise. Fed. R. Civ. P. 23(c); Fed. R. Civ. P. 23(d).

---

[6]   In addition, only 10% of the IMAX shares were traded on the TSX during the Class Period, the Canadian action seeks recovery for a far shorter Class Period (February 17, 2006 through August 9, 2006) than this case, and does not name PriceWaterhouse Coopers as a defendant. The Canadian action has not yet obtained the Canadian court's imprimatur to proceed.

Thus, it is clear that this case easily satisfies the superiority requirement of Rule 23. Moreover, the alternatives to a class action are either no recourse for thousands of investors or a multiplicity of scattered suits resulting in the inefficient administration of litigation that follows. *Green*, 406 F.2d at 296 ("[A] class action may well be the appropriate means for expeditious litigation of the issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf."); *Blech*, 187 F.R.D. at 107 (superiority requirement satisfied as "[m]ultiple lawsuits would be costly and inefficient" and "although a large number of individuals may have been injured, no one person may have been damaged to a degree which would induce him to institute litigation solely on his own behalf"). The superiority of the class action in such cases is beyond dispute.

## CONCLUSION

As demonstrated above, this action satisfies all the requirements of Rules 23(a) and 23(b)(3). Therefore, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for class certification, enter an order appointing Westchester Capital Management, Inc. and The Steelworkers Pension Trust as class representatives, and Abbey Spanier as class counsel.

Dated: October 31, 2008

Respectfully submitted,

ABBEY SPANIER RODD
& ABRAMS, LLP

_____
Arthur N. Abbey, Esq.
Jill S. Abrams, Esq.
Richard B. Margolies, Esq.
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700

Facsimile: (212) 684-5191

*Counsel for Lead Plaintiff and*
*Proposed Class Representative*
*Westchester Capital Management*

**BERGER & MONTAGUE, P.C.**
Douglas Risen, Esq.
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: 215-875-4604

*Counsel for Class Member and Proposed*
*Class Representative The Steelworkers*
*Pension Trust*