# Exhibit H

tsx group TSX

Text only Print

## Part III Original Listing Requirements

### A. General

#### Sec. 301.

To secure a listing of its securities on the Toronto Stock Exchange, a company that does not already have securities listed on the Exchange must complete a Listing Application form which, together with supporting data, must demonstrate that the company is able to meet the minimum listing requirements of the Exchange. The company must also sign a Listing Agreement to formally place on record the company's commitment to comply with Exchange requirements for the continuance of its listing.

#### Sec. 302.

Companies applying for listing on the Exchange must be able to show evidence of a successful operation, or, where the company is relatively new and its business record is limited, there must be other evidence of management experience and expertise. In all cases, the quality of management of an applicant company shall be an important factor in the consideration of a listing application.

#### Sec. 303.

Another important listing consideration is the distribution of a company's securities. Evidence must be supplied to the Exchange indicating that there are enough public security holders to ensure an adequate market.

#### Sec. 304.

The Exchange's Listings Committee is responsible for considering and approving original listing applications.

### Eligibility for Listing

#### Sec. 305.

Prior to filing a listing application, the Exchange recommends that prospective applicants obtain a preliminary opinion as to the eligibility of the listing. The Exchange will provide a confidential opinion based on informal discussions and a review of the applicant's recent financial and business information. Please contact the Toronto Stock Exchange at (416) 947-4533 or e-mail: listedissuers@tsx.com to set up an appointment.

For general information on the Exchange as well as specific information on services provided to listed companies, please call Business Development at (416) 947-4728, (888) 873-8392, or e-mail: listedissuers@tsx.com.

### B. Minimum Listing Requirements

#### Sec. 306.

The minimum listing requirements specifically contemplate the listing of equity securities of corporations. The Toronto Stock Exchange has historically been and continues to be a diversified marketplace, and consideration will be given to the listing of other types of securities and/or entities on request.

The criteria have been designed as guidelines, and the Exchange reserves the right to exercise its discretion in applying them. This discretion may well take into consideration facts or situations unique to a particular applicant, resulting in the granting or denial of a listing application notwithstanding the published criteria.

The Exchange will also take into consideration an applicant's status regarding compliance with the requirements of other regulatory agencies. In addition, the Exchange must be satisfied that an applicant is in compliance with Exchange policies applicable to listed companies, including those policies described in subsequent sections of this Part III of the Manual.

### Sec. 307.

Companies applying for a listing on the Exchange are placed in one of three categories: Industrial/(General), Mining or Oil and Gas. All special purpose issuers such as exchange traded funds, split share corporations, income trusts, investment funds and limited partnerships are listed under the Industrial/(General) category. If the primary nature of a business cannot be distinctly categorized, the Exchange will designate the company to a listing category after a review of the company's financial statements and other documentation.

### Sec. 308.

There are specific minimum listing requirements for each of the three categories of companies. These requirements are set out in the following sections:

| | |
|---|---|
| Industrial | Sections 309 to 313 |
| Mining | Sections 314 to 318 |
| Oil and Gas | Sections 319 to 323 |

The minimum listing requirements should be read in conjunction with the Exchange policy on quality of management, as set out in Section 325.

## Minimum Listing Requirements for Industrial Companies

### Sec. 309. Requirements for Eligibility for listing Subject to Section 501[1]

**a)** Profitable Companies;

**i)** net tangible assets[2] of $2,000,000[3];

**ii)** earnings from ongoing operations of at least $200,000 before taxes and extraordinary items in the fiscal year immediately preceding the filing of the listing application;

**iii)** pre-tax cash flow of $500,000 in the fiscal year immediately preceding the filing of the listing application; and

**iv)** adequate working capital to carry on the business and an appropriate capital structure.

OR

**b)** Companies Forecasting Profitability;

**i)** net tangible assets of $7,500,000[4];

**ii)** evidence, satisfactory to the Exchange, of earnings from ongoing operations for the current or next fiscal year of at least $200,000 before taxes and extraordinary items[5];

**iii)** evidence, satisfactory to the Exchange, of pre-tax cash flow for the current or next fiscal year of at least $500,000[6]; and

**iv)** adequate working capital to carry on the business and an appropriate capital structure.

OR

**c)** Technology Companies[7];

**i)** a minimum of $10,000,000 in the treasury, the majority of which has been raised by the issuance of securities qualified for distribution by a prospectus;

ii) adequate funds to cover all planned development and capital expenditures, and general and administrative expenses for a period of at least one year. A projection of sources and uses of funds including related assumptions covering the period (by quarter) signed by the Chief Financial Officer must be submitted[8];

iii) evidence, satisfactory to the Exchange, that the company's products or services are at an advanced stage of development or commercialization and that the company has the required management expertise and resources to develop the business[9];

iv) minimum market value of the issued securities that are to be listed of at least $50,000,000; and

v) minimum public distribution requirements as set out in Section 310, except that the minimum aggregate market value of the freely tradeable, publicly held securities to be listed should be $10,000,000.

OR

d) Research and Development Companies.

i) a minimum of $12,000,000 in the treasury, the majority of which has been raised by the issuance of securities qualified for distribution by a prospectus;

ii) adequate funds to cover all planned research and development expenditures, general and administrative expenses and capital expenditures, for a period of at least 2 years. A projection of sources and uses of funds covering the period (by quarter) signed by the Chief Financial Officer must be submitted[10];

iii) a minimum two-year operating history that includes research and development activities; and

iv) evidence, satisfactory to the Exchange, that the company has the technical expertise and resources to advance the company's research and development programme(s).[11]

Notwithstanding the above-mentioned requirements for eligibility for listing, exceptional circumstances may justify the granting of a listing to an applicant, in which case the application will be considered on its own merits. "Exceptional circumstances" for this purpose will normally be confined to an affiliation with a substantial established enterprise and/or an exceptionally strong financial position.

---

[1] Section 501 requires listed companies to obtain prior Exchange acceptance for filing of all proposed material changes, including changes which do not entail an issuance of securities, as detailed in Part V of this Manual.

[2] Consideration will be given to permitting the inclusion of deferred development charges or other intangible assets in the calculation of net tangible assets if in the opinion of the Exchange, the circumstances so warrant.

[3] Companies with less than $2,000,000 in net tangible assets may qualify for listing if they meet the earnings and cash flow requirements detailed in paragraphs 309.1 b) and c).

[4] See footnote 2.

[5] As a general rule, applicants should file a complete set of forecast financial statements covering the current and/or the next fiscal year (on a quarterly basis), accompanied by an independent auditor's opinion that complies with the CICA Auditing Standards for future oriented financial information. The applicant should have at least six months of operating history, including gross revenues at commercial levels for the last six months.

[6] See footnote 5.

[7] Generally would include innovative growth companies engaged in hardware, software, telecommunications, data communications information technology and new technologies.

[8] As a general rule, the projection should exclude uncommitted payments from third parties or other contingent cash receipts.

[9] As a general rule, evidence of "being at an advanced stage of development or commercialization" will be restricted to historical revenues from the company's current main business or contracts for future sales of products or services in such business. The Exchange will also consider all relevant factors in assessing the company's ability to develop its business including:

a) affiliations or strategic partnerships with major industry enterprises;

b) commercial or technical endorsements of the company's products or services from recognized industry participants;

c) existing or potential markets for the products or services and the company's marketing infrastructure and sales support dedicated to service these markets; and

d) the background and expertise of management including its record of raising funds.

[10] As a general rule, the projection should exclude cash flows from future revenues, uncommitted payments from third parties or contingent cash receipts.

[11] The Exchange will consider all relevant factors including:

a) the stage of development of the company's products or services and prospects for commercialization;

b) commercial or technical endorsements of the company's products or services from recognized academic institutions or industry participants;

c) the existing or potential markets for the company's products or services and the marketing infrastructure and sates support necessary to service these markets;

d) the background and expertise of management including its record of raising funds to finance research and development projects and ongoing operations;

e) the existence and composition of any scientific advisors board; and

f) affiliations with major industry enterprises or strategic partners.

## Sec. 309.1. Requirements for Eligibility for Exemption from Section 501[12]

net tangible assets of $7,500,00[13],

**a)** earnings from ongoing operations of at least $300,000 before taxes and extraordinary items, in the fiscal year immediately preceding the filing of the listing application;

**b)** pre-tax cash flow of $700,000 in the fiscal year immediately preceding the filing of the listing application and an average pre-tax cash flow of $500,000 for the two fiscal years immediately preceding the filing of the listing application; and

**c)** adequate working capital to carry on the business and an appropriate capital structure.

Exceptional circumstances may justify the granting of a listing to an applicant and/or an exemption from Section 501, in which case the application will be considered on its own merits. "Exceptional Circumstances" for this purpose will normally be confined to an affiliation with a substantial established enterprise and/or an exceptionally strong financial position.

**Special Purpose Issuers.**—The Exchange will generally consider the listing of exchange traded funds, split share corporations, income trusts, investment funds, limited partnerships and other special purpose issuers on an exceptional circumstances basis. The Exchange will consider all relevant factors in assessing these applicants including objectives and strategy, nature and size of the assets, anticipated operating and financial results, track record and expertise of managers and/or advisors, and level of investor and market support.

The Exchange encourages special purpose issuers and their advisors to contact Listings to discuss their specific circumstances.

---

[12] See footnote 1.

[13] See footnote 2.

## Sec. 310. Public Distribution

At least 1,000,000 freely tradeable shares having an aggregate market value of $4,000,000 ($10,000,000 for companies qualifying for listing under section 309(c)) must be held by at least 300 public holders, each holding one board lot or more. In circumstances where public distribution is achieved other than by way of a public offering, e.g. by way of a reverse take-over, share exchange offer, or other distribution, the Exchange may require evidence that a satisfactory market in the company's securities will develop. Prior trading on another market or sponsorship by a Participating Organization, which will assist in maintaining an orderly market, may satisfy this condition.

## Sec. 311. Management

The management of an applicant company shall be an important factor in the consideration of a listing application. In addition to the factors set out in Section 325, the Exchange will consider the background and expertise of management in the context of the business of the company. Management (including the company's board of directors) should have adequate experience and technical expertise relevant to the company's business and industry and adequate public company experience which demonstrates that they are able to satisfy all of their reporting and public company obligations. Companies will be required to have at least two independent directors[14], chief executive officer (CEO), a chief financial officer who is not also the CEO, and a corporate secretary.

---

[14] An independent director is defined as a person who:

a) is not a member of management and is free from any interest and any business or other relationship which in the opinion of the Exchange could reasonably be perceived to materially interfere with the director's ability to act in the best interest of the company; and

b) is a beneficial holder, directly or indirectly, or is a nominee or associate of a beneficial holder, collectively of 10% or less of the votes attaching to all issued and outstanding securities of the applicant.

The Exchange will consider all relevant factors in assessing the independence of the director. As a general rule. the following persons would not be considered an independent director

i) a person who is currently, or has been within the past three years, an officer, employee of or service provider to the company or any of its subsidiaries or affiliates; or

ii) a person who is an officer, employee or controlling shareholder of a company that has a material business relationship with the applicant.

## Sec. 312. Sponsorship or Affiliation

Sponsorship of an applicant company by a Participating Organization of the Exchange is required for companies applying to list under the paragraphs 309(a), 309(b), 309(c) and 309(d). Sponsorship, or affiliation with an established enterprise, can be a significant factor in the determination of the suitability of the company for listing, particularly where the company only narrowly meets the prescribed minimum listing requirements. Consideration will be given to the nature of the sponsorship or affiliation. In addition to the requirements detailed in Section 326 for Sponsorship of Companies Seeking Listing on The Exchange, sponsors for industrial applicants should also be responsible for reviewing and commenting on:

**a)** all visits to and/or inspections of the applicant's principal facilities and/or offices;

**b)** any future-oriented financial information that has been provided with the application;

**c)** management's experience and technical expertise relevant to the company's business; and

**d)** all other relevant factors including those listed in footnotes 7 and 8 applicable for technology companies and 10 and 11 applicable for research and development companies.

## Sec. 313. Other Factors

The Exchange may, in its discretion, take into account any factors it considers relevant in assessing the merits of a listing application and may refuse to grant an application notwithstanding that the prescribed minimum listing requirements are met.

## Minimum Listing Requirements for Mining Companies

### Sec. 314. Requirements for Eligibility for Listing Subject to Section 501[15]

**a)** Producing Mining Companies

**i)** proven and probable reserves to provide a mine life of at least three years, as calculated by an independent qualified person[16], together with evidence satisfactory to the Exchange indicating a reasonable likelihood of future profitability supported by a feasibility study or documented historical production and financial performance;

**ii)** either be in production or have made a production decision on the qualifying project or mine referred to in subparagraph 314(a)(i) above;

**iii)** sufficient funds to bring the mine into commercial production, adequate working capital to fund all budgeted capital expenditures and carry on the business and an appropriate capital structure. A management-prepared 18-month projection (by quarter) of sources and uses of funds detailing all planned and required expenditures signed by the Chief Financial Officer must be submitted; and

**iv)** net tangible assets[17] of $4000000.

**b)** Mineral Exploration and Development—Stage Companies

**i)** an Advanced Property, detailed in a report prepared by an independent qualified person[18]. The Exchange will generally consider a property to be sufficiently advanced if continuity of mineralization is demonstrated in three dimensions at economically interesting grades;

**ii)** a planned work programme of exploration and/or development, of at least $750,000[19] that is satisfactory to the Exchange, will sufficiently advance the property and is recommended by an independent qualified person[20];

**iii)** sufficient funds to complete the planned programme of exploration and/or development on the company's properties, to meet estimated general and administrative costs, anticipated property payments and capital expenditures for at least 18 months. A management-prepared 18 month projection (by quarter) of sources and uses of funds detailing all planned and required expenditures signed by the Chief Financial Officer must be submitted;

**iv)** working capital of at least $2,000,000[21] and an appropriate capital structure; and

**v)** net tangible assets[22] of $3000000.

**Property Ownership**—A company must hold or have a right to earn and maintain at least a 50% interest in the qualifying property. Companies holding less than a 50% interest, but not less than a 30% interest, in the qualifying property may be considered on an exceptional basis, based on programme size, stage of advancement of the property and strategic alliances. Where a company has less than a 100% interest in a qualifying property, the programme expenditure amounts attributable to the company will be determined based on its percentage ownership[23].

**Industrial Minerals**—Industrial mineral companies (those with properties containing minerals which are not readily marketable) not currently generating revenues from production will normally be required to submit commercial contracts and meet the requirements under paragraph 314(a).

---

[15] See footnote 1

[16] Reports prepared by independent qualified persons, and the acceptability of the authors, shall conform to National Instrument 42-101 and be acceptable to the Exchange. Reports prepared in conformity with other reporting systems deemed to be the equivalent of NI 43-101 will normally be acceptable also.

[17] Net Tangible Assets—Consideration will be given to including deferred exploration expenditures on a company's currently active mineral properties in the Net Tangible Asset calculation if, in the opinion of the Exchange, the evidence provided so

warrants.

18 See footnote 16

19 Work Programme—The Exchange will consider companies undertaking an exploration or development programme of at least $500,000 on a qualifying property if planned programme expenditures on all properties aggregate at least $750,000. The additional properties will be considered with the submission of appropriate technical documentation, conforming to National Instrument 43-101.

20 See footnote 16

21 Working Capital—Consideration may be given to companies with less than $2,000,000 in working capital if all or part of the company's minimum work programme expenditure requirement will be funded by a substantial industry partner, such that an equivalent working capital amount would be recognized.

22 See footnote 17

23 See footnote 19

## Sec. 314.1. Requirements for Eligibility for Listing exempt from Section 501[24]

a) net tangible assets[25] of $7,500,000;

b) pre-tax profitability from ongoing operations in the fiscal year immediately preceding the filing of the listing application;

c) pre-lax cash flow of $700,000 in the fiscal year immediately preceding the filing of the listing application and an average pre-tax cash flow of $500,000 for the two fiscal years immediately preceding the filing of the listing application;

d) proven and probable reserves to provide a mine life of at least 3 years, calculated by an independent qualified person[26] and

e) adequate working capital to carry on the business and an appropriate capital structure.

Exceptional circumstances may justify the granting of an exemption from Section 501, in which case the application will be considered on its own merits. "Exceptional circumstances" for this purpose will normally be confined to an affiliation with a substantial established enterprise and/or an exceptionally strong financial position.

---

24 See footnote 1

25 See footnote 17

26 See footnote 16

## Sec. 315. Public Distribution

At least 1,000,000 freely tradeable shares having an aggregate market value of $4,000,000 must be held by at least 300 public holders, each holding one board lot or more. In circumstances where public distribution is achieved other than by way of a public offering, e.g., by way of a reverse take-over, share exchange offer, or other distribution, the Exchange may require evidence that a satisfactory market in the company's securities will develop. Prior trading on another market or sponsorship by a Participating Organization, which will assist in maintaining an orderly market, may satisfy this condition.

## Sec. 316. Management

The management of an applicant company shall be an important factor in the consideration of a listing application. In addition to the factors set out in Section 325, the Exchange will consider the background and expertise of management in the context of the business of the company. Management (including the company's board of directors) should have adequate experience

and technical expertise relevant to a company's mining projects and adequate public company experience, which demonstrates that they are able to satisfy all of their reporting and public company obligations. Companies will be required to have at least two independent directors[27], a chief executive officer (CEO), a chief financial officer who is not also the CEO, and a corporate secretary.

---

[27] See footnote 14

### Sec. 317. Sponsorship or Affiliation

Sponsorship of an applicant company by a Participating Organization of the Exchange is required for companies applying to list under the paragraphs 314(a) and 314(b). Sponsorship, or affiliation with an established enterprise, can be a significant factor in the determination of the suitability of the company for listing, particularly where the company only narrowly meets the prescribed minimum listing requirements. Consideration will be given to the nature of the sponsorship or affiliation. In addition to the requirements detailed in Section 326 for Sponsorship Of Companies Seeking Listing On The Exchange, sponsors for mining applicants should also be responsible for reviewing and commenting on:

**a)** the company's management-prepared 18 month projection of sources and uses of funds to ensure that it reflects all of the company's planned and anticipated exploration and development programmes, general and administrative costs, property payments and other capital expenditures;

**b)** any site visits to the applicant's properties by the Sponsor;

**c)** issues and material agreements relating to land tenure for the company's principal properties, including the political risk, legal system, ability to mine, terms for maintaining mineral rights, legal impediments and any impediments to maintaining or securing the property: and

**d)** management's experience and technical expertise relevant to the company's mining projects.

### Sec. 318. Other Factors

The Exchange may, in its discretion, take into account any factors it considers relevant in assessing the merits of a listing application and may refuse to grant an application notwithstanding that the prescribed minimum listing requirements are met.

## Minimum Listing Requirements for Oil and Gas Companies

### Sec. 319. Requirements for Eligibility for Listing Subject to Section 501[28]

**a)** proved developed reserves[29] of $3,000,000[30]:

**b)** a clearly defined programme, satisfactory to the Exchange, which can reasonably be expected to increase reserves;

**c)** adequate funds to execute the programme and cover all other capital expenditures as well as general, administrative and debt service expenses, for a period of 18 months with an allowance for contingencies. A management-prepared 18-month projection (by quarter) of sources and uses of funds detailing all planned and required expenditures signed by the Chief Financial Officer must be submitted; and,

**d)** an appropriate capital structure.

---

[28] See footnote 1

[29] "Proved developed reserves" are defined as those reserves that are expected to be recovered from existing wells and installed facilities, or, if facilities have not been installed, that would involve a low expenditure, when compared to the cost of drilling a well, to put those reserves on production.

[30] The Company must submit a technical report prepared by an independent technical consultant that conforms to National Instrument 51-101 and be acceptable to the Exchange. Reports prepared in conformity with other reporting systems deemed

by the Exchange to be equivalent of National Instrument 51-101 will normally be acceptable also. The value of reserves should be calculated as the net present value of future cash flows before income taxes, prepared on a forecast basis, and discounted at a rate of 20%. The Exchange may, at its discretion, also require the provision of a price sensitivity analysis.

### Sec. 319.1. Requirements for Eligibility for Listing Exempt from Section 501[31]

**a)** proved developed reserves[32] of $7,500,000[33];

**b)** pre-tax profitability from ongoing operations in the fiscal year preceding the filing of the listing application;

**c)** pre-tax cash flow of $700,000 in the fiscal year preceding the filing of the listing application and an average annual pre-tax cash flow of $500,000 for the two fiscal years preceding the filing of the listing application; and,

**d)** adequate working capital[34] to carry on the business and an appropriate capital structure.

Exceptional circumstances may justify the granting of an exemption from Section 501, in which case the application will be considered on its own merits. "Exceptional circumstances" for this purpose will normally be confined to an affiliation with a substantial established enterprise and/or an exceptionally strong financial position.

---

[31] See footnote 1

[32] "Proved developed reserves" are defined as those reserves that are expected to be recovered from existing wells and installed facilities, or, of facilities have not been installed, that would involve a low expenditure, when compared to the cost of drilling a well, to put the reserves on production.

[33] See footnote 30

[34] In assessing the adequacy of funds, credit facilities with recognized financial institutions will be considered.

### Sec. 320. Public Distribution

At least 1,000,000 freely tradeable shares having an aggregate market value of $4,000,000 must be held by at least 300 public holders, each holding one board lot or more. In circumstances where public distribution is achieved other than by way of a public offering, e.g., by way of a reverse take-over, share exchange offer, or other distribution, the Exchange may require evidence that a satisfactory market in the company's securities will develop. Prior trading on another market or sponsorship by a Participating Organization, which will assist in maintaining an orderly market, may satisfy this condition.

### Sec. 321. Management

The management of an applicant company shall be an important factor in the consideration of a listing application. In addition to the factors set out in Section 325, the Exchange will consider the background and expertise of management in the context of the business of the company. Management (including the company's board of directors) should have adequate experience and technical expertise relevant to a company's oil and gas projects and adequate public company experience, which demonstrates that they are able to satisfy all of their reporting and public company obligations. Companies will be required to have at least two independent directors[35], a chief executive officer (CEO), a chief financial officer who is not also the CEO, and a corporate secretary.

---

[35] See footnote 14

### Sec. 322. Sponsorship or Affiliation

Sponsorship of an applicant company by a Participating Organization of the Exchange is required unless the company meets the requirements for listing under Section 319.1. Sponsorship, or affiliation with an established enterprise, can be a significant factor in the determination of the suitability of the company for listing, particularly where the company only narrowly meets the

prescribed minimum listing requirements. Consideration will be given to the nature of the sponsorship or affiliation. In addition to the requirements detailed in Section 326 for Sponsorship of Companies Seeking Listing on The Exchange, sponsors for oil and gas applicants should also be responsible for reviewing and commenting on:

**a)** the common issues specific to oil and gas companies;

**b)** the company's management-prepared 18-month projection of sources and uses of funds to ensure that it reflects all of the company's planned and anticipated general, administrative and capital expenditures, as well as debt service;

**c)** the company's price sensitivity analysis, if required;

**d)** any site visits to the applicant's properties by the sponsor; and

**e)** management's experience and technical expertise relevant to the company's oil and gas projects.

### Sec. 323. Other Factors

The Exchange may, in its discretion, take into account any factors it considers relevant in assessing the merits of a listing application and may refuse to grant an application notwithstanding that the prescribed minimum listing requirements are met.

## Minimum Listing Requirements for International Issuers

### Sec. 324.

International issuers are entities where the issuer is already listed on another recognized exchange, which is acceptable to the Exchange, and is incorporated outside of Canada. There are no unique requirements for the management or the financial requirements for international issuers. However, these issuers are generally required to have some presence in Canada and must be able to demonstrate, as with all issuers, that they are able to satisfy all of their reporting and public company obligations in Canada. This may be satisfied by having a member of the board of directors or management, an employee or a consultant of the issuer situated in Canada.

## C. Management of Listed Companies

### Sec. 325. Management

The Exchange seeks to provide the general public and its listed companies with a well-regulated, orderly, continuous auction market.

The Exchange reserves the right to exercise discretion in considering all factors related to the management of a company in order to determine the acceptability of that company for original listing and thereafter for continued listing. The Exchange's discretion will be exercised at all times in a manner, which is reasonable and consistent with regulatory and statutory requirements.

Without in any way limiting the generality of the foregoing, the Exchange, in pursuit of its goal of public protection and to promote integrity and honesty in the capital markets:

1. shall require that any document submitted to the Exchange constitutes full, true and plain disclosure; and
2. may review the conduct of an officer, director, promoter, major shareholder or any other person or company or a combination of any of the above who in the Exchange's opinion holds sufficient of the company's securities to materially affect control, in order to satisfy itself that:

    **a)** the business of the company is and will be conducted with integrity and the best interests of its security holders and the investing public; and

    **b)** the rules and regulations of the Exchange and all other regulatory bodies having jurisdiction are and will be complied with.

## D. Sponsorship of Companies Seeking Listing on the Exchange

### Sec. 326. Sponsorship

A company seeking listing on the Exchange must meet certain financial requirements. Management of the company is also important in the evaluation of a listing application by the Exchange. Sponsorship by a Participating Organization of the Exchange, as well as being a significant factor in the consideration of an applicant, is mandatory for all companies that are applying to list under the criteria for non-exempt companies.

The weight attached to sponsorship in any particular case depends upon the financial and managerial strength of an applicant. It may be a determining factor in some instances. While the terms of any sponsorship are to be a matter of negotiation between the sponsor and the applicant company, in the view of the Exchange, the sponsor is responsible for reviewing and providing comments in writing on the following, as applicable:

**a)** the company's qualifications for meeting all relevant listing criteria;

**b)** the listing application together with all supporting documentation filed with the application for adequacy and completeness;

**c)** all matters related to the applicant company and the adequacy of disclosure made to the Exchange;

**d)** the company, its financial position and history, its business plan, its managerial expertise, any material transactions and all business affiliations or partnerships, and the likelihood of future profitability or viability of any exploration programme;

**e)** any forecasts, projections, capital expenditure budgets, and independent technical reports, including the assumptions used in their development, submitted in support of the company's listing application;

**f)** the company's press releases and financial disclosures during at least the past twelve months to assess whether the company has complied with appropriate disclosure standards;

**g)** the past conduct of officers, directors, promoters and major shareholders of the company with a view' to ensuring that the business of the company will be conducted with integrity, in the best interests of its security holders and the investing public, and in compliance with the rules and regulations of the Exchange and all other regulatory bodies having jurisdiction. The sponsor should satisfy itself in particular, that:

> **i)** the company can be expected to prepare and publish all information required by the Exchange's policy on timely disclosure;
>
> **ii)** the company's directors appreciate the nature of the responsibilities they will be undertaking as directors of a listed company; and
>
> **iii)** the directors, officers, employees and insiders of the company appreciate the "insider trading" rules set out in the OSA;

**h)** matters applicable specifically to industrial, mining and oil and gas companies as detailed in Sections 312, 317 and 322; and

**i)** all other factors deemed relevant by the sponsor.

The Exchange also considers the sponsor's responsibilities to include acting as a source of information for the company's security holders, providing advisory assistance to the applicant company, and assisting in maintaining active and orderly trading in the market for the company's securities.

The Exchange considers sponsorship to involve a relationship between the Participating Organization and its client applicant company for the first part and the Exchange for the second part. The terms of a sponsorship must, therefore, be confirmed by letter notice to the Exchange from the sponsoring Participating Organization, as part of a listing application. The weight attached to a particular sponsorship by the Exchange in reviewing a listing application will depend upon the nature of the sponsorship.

## E. Escrow Requirements

### Sec. 327.

Reference should be made to Appendix C for the Exchange's requirements respecting securities issued by applicant companies prior to their first public distribution of securities.

## F. Restricted Shares

## Sec. 328.

Where a company applies to list a class of participating shares, which are:

**a)** non-voting;

**b)** voting, but the company has another class of voting shares; or

**c)** voting, but there is a restriction on the power of the holders of a majority of the shares to elect a majority of the company's directors (except where the restriction is applicable only to persons who are not Canadians or residents of Canada),

reference should be made to Section 624 and applicable securities laws.

## G. Outstanding Options and Employee Incentive Plans

## Sec. 329.

Stock options, stock option plans and employee stock purchase plans, which are in effect at the time a company is first listed on the Exchange, must be in compliance with the Exchange's requirements applicable to listed companies (but need not be approved by shareholders). See Section 613 regarding share compensation and incentive arrangements for employees and other persons who provide services for listed companies on an ongoing basis.

## H. Granting of Charitable Options or Warrants

## Introduction

## Sec. 330.

An issuer seeking a listing on the Exchange that has filed a preliminary prospectus for an IPO of its securities and has received conditional approval from the Exchange for the listing of such securities may be authorized to grant a charitable option and to list securities issuable upon its exercise. Listing approval will be conditional upon any such charitable options being in compliance with the Exchange's general requirements applicable to charitable options granted by listed companies as detailed in Section 612, as modified by the requirements set out below.

## Sec. 331.

Charitable options granted by an issuer seeking a listing, other than with a concurrent IPO of its securities, must be in compliance with the Exchange's general requirements applicable to charitable options granted by listed companies as detailed in Sections 637.4 to 637.11 (but need not be approved by shareholders).

## Definitions

## Sec. 332.

For the purposes of Sections 333 to 335:

**"Eligible Issuer"** means a company, corporation, trust or limited partnership which (a) is an Unlisted Issuer, (b) has filed a preliminary prospectus for its IPO, and (c) has received conditional approval from the Exchange for the listing of Eligible Securities.

**"Eligible Securities"** means securities issuable from the treasury of (a) an Eligible Issuer that are securities of the class or series being offered for sale to the public pursuant to the IPO Final Prospectus; or (h) a listed issuer that *are* securities of a listed class or series.

**"IPO"** means initial public offering of securities of the Eligible Issuer.

**"IPO Closing"** means the first date upon which any securities are issued or distributed pursuant to the IPO Final Prospectus.

**"IPO Final Prospectus"** means the Eligible Issuer's IPO (final) prospectus for which a receipt has been issued by the relevant Canadian securities regulatory authority.

**"IPO Price"** means the price to the public per security sold or distributed pursuant to the IPO Final Prospectus.

**"Unlisted Issuer"** means a company, corporation, trust or limited partnership which has no securities listed or quoted on any stock exchange nor has outstanding securities for which trading is reported to or through a stock exchange or public market.

## Requirements

### Sec. 333.

An Eligible Issuer may grant Charitable Options at any time before the IPO Closing and, prior to the IPO closing, must apply to the Exchange for approval to list all securities issuable upon exercise of such Charitable Options.

### Sec. 334.

The aggregate number of securities of the class or series that is issuable upon exercise of all Charitable Options granted by an Eligible Issuer must not at any time up to the issuer becoming a listed issuer exceed 2% of the total number of securities of that class or series (calculated on a non-diluted basis and adjusted for any stock splits and stock consolidations) outstanding immediately after the IPO Closing.

### Sec. 335.

No Charitable Option granted by an Eligible Issuer may:

a) be exercised until after the IPO Closing and the concurrent listing of the Eligible Securities on the Exchange, subject to Section 334 above; or

b) be exercised at a price per security that is less than the IPO Price.

*[The next section is Section 338.]*

## I. Listing Application Procedure

## The Formal Application

### Sec. 338.

The Listing Application form is set out in Appendix A. This Appendix also lists the required supporting documentation.

### Sec. 338.1.

Applicants listed on the TSX Venture Exchange may be exempted from some of the requirements relating to the filing of documentation, sponsorship and/or the application fee. Generally, the Exchange will waive the application fee as set out in Section 801 if, after completing an eligibility review as outlined in Section 305, the Exchange has determined that the company meets the listing criteria. For further details on documentation requirements and sponsorship, please consult the "Checklist of documents to be filed" that forms part of the listing application contained in Appendix A.

### Sec. 339.

Where a company proposes to apply for the listing of securities to be offered to the public by way of prospectus, the company may, prior to filing the Listing Application form, request that the Exchange conditionally approve the listing prior to the public offering. 24 copies of the preliminary prospectus must be filed with the Exchange for this purpose, together with completed Personal Information Forms (Appendix A). In the case of a natural resource company, the preliminary prospectus must also be accompanied by the requisite engineer or geologist's reports

### Sec. 340.

An approval of an application based on a preliminary prospectus will be subject to the following conditions:

**a)** There are no material changes in the final prospectus to the information disclosed in the preliminary prospectus.

**b)** All other required documentation and evidence of satisfactory distribution of the securities will be filed with the Exchange within 90 days, or such other date as the Exchange may stipulate.

### Sec. 341.

An application fee (see Section 801) must accompany the Listing Application form or preliminary prospectus, as the case may be.

### Sec. 342.

The number of securities to be listed must be the number of securities actually issued and outstanding, together with any securities, which have been authorized for issuance for a specific purpose.

### Sec. 343.

(Repealed.)

## Listing Application Procedure

### Sec. 344.

Following the receipt of an original listing application, the Exchange will notify the applicant within five business days, whether all required documentation to complete an assessment has been submitted in a form acceptable to the Exchange (the "Documentation"). Applicants will have 75 days to submit any outstanding Documentation. An applicants failure to submit any outstanding Documentation within the 75 day period will result in the deemed withdrawal of the application, further consideration of which will require resubmission and the payment of an additional application fee as set out in Section 801.

The Exchange will use its best efforts to assess the application and render a decision as soon as possible within 60 days from the date of receipt of all Documentation. The Exchange will also use its best efforts to accommodate an applicant's schedule for the filing of a prospectus and the closing of an offering of securities. At any time during the assessment, the Exchange may require additional information or documentation, which may extend the assessment period.

Following completion of the assessment, the Exchange will determine either to:

**i)** *grant conditional approval:*

the application for listing is conditionally approved, subject to meeting specified conditions within a 90 day period; or

**ii)** *defer:*

the application for listing is deferred pending resolution of specified issues within a 90 day period. Failure to address these issues to the satisfaction of the Exchange within the 90 day period will result in the application being declined; or

**iii)** *decline:*

the application for listing is declined and at least six months must pass before the applicant becomes eligible for reconsideration.

### Sec. 345.

Listings is available for consultation regarding the preparation of the Listing Application and the listing process. Contact Company Listings at (416) **947-4533** or e-mail: listedissuers@tsx.com.

## Notation on Face of Prospectus and in Advertising

### Sec. 346.

Subsection 38(3) of the OSA states that no person or company, with the intention of effecting a trade in a security, may make any representation, oral or written, that such security will be listed on any stock exchange or that application has been or will be made to list such security on any stock exchange except with the written permission of the Director of the OSC, unless: (i) application has been made to list the securities and securities of the same issuer are already listed on any stock exchange; or (ii) the stock exchange has granted approval to the listing, conditional or otherwise, or has consented to or indicated that it does not object to the representation. If consent is sought from the Director (which is normally evidenced by a final receipt in the case of a prospectus containing the representation), the Commission will require a communication from that stock exchange stating that the listing application has been conditionally approved before providing such consent.

A notation referring to listing on Toronto Stock Exchange must not be printed on a preliminary prospectus or a draft of a prospectus or other offering document. The notation may only appear on a final prospectus or in other offering documents or in advertising when the listing application has been conditionally approved by the Exchange, unless otherwise consented to by the Exchange.

When securities have been conditionally approved for listing, the following notation on the face of the final prospectus or other offering document is permissible, but may only be used in its entirety:

> Toronto Stock Exchange has conditionally approved the listing of these securities. Listing is subject to the Company fulfilling all of the requirements of the Exchange on or before (insert date[36]), including distribution of these securities to a minimum number of public shareholders.

An "offering document" for this purpose includes any prospectus, rights offering circular, offering memorandum, securities exchange takeover bid circular or information circular concerning a proposed corporate reorganization or amalgamation that would result in the issuance of new securities.

---

[36] Date to be 90 days from the date of conditional approval of the listing application by the Exchange or such other date as the Exchange may stipulate.

## Transfer and Registration of Securities

### Sec. 347.

Every listed company must maintain transfer and registration facilities in the City of Toronto, where all the issued securities of the listed classes must be directly transferable. Where transfer facilities are maintained in other cities, certificates must be interchangeably transferable and identical in colour and form with the Toronto certificates, except as to the names of the transfer agent and registrar. The combined amount of securities registered in all cities must not exceed the amount authorized by the Exchange to be listed. Certificates must name the cities where they are transferable.

### Sec. 348.

The transfer function involves keeping a ledger listing the security holders' names and addresses and the number of securities registered in the name of each security holder. The transfer agent issues new certificates and cancels old certificates. It may also provide such services to companies as the distribution of dividend cheques and proxy materials to shareholders and the administration of dividend reinvestment plans.

The registrar function involves receiving old cancelled certificates as well as new certificates from the transfer agent. The registrar then validates the transfer by signing and recording the new certificate. The registrar ensures that the number of securities issued in certificate form is consistent with the number of securities actually issued by the company.

The original appointment and any subsequent change of the transfer agent or registrar must be approved by the Exchange. Generally, no agent other than a trust company will be acceptable.

## Share Certificates

### Sec. 349.

The Exchange's requirements respecting share certificates are set out in Appendix D.

### Sec. 350.

Certificates must bear a CUSIP number, which can be obtained from The Canadian Depository for Securities Limited ("CDS") in Toronto. CUSIP is the standard securities numbering system for Canada and the United States.

In order to assign a CUSIP number, CDS will normally require a current prospectus of the applicant company or a similar document. Listing applicants must provide the Exchange with a copy of the written notice from CDS respecting the issuance of a CUSIP number before the company's securities are listed.

Information regarding the application for a CUSIP number may be obtained by calling CDS at (416) 365-3552.

## Listing Agreement

### Sec. 351.

Each listed company, by signing the Listing Agreement (Appendix A), makes itself subject to the rules and policies of the Exchange.

The procedures for complying with the requirements of the Listing Agreement are described more fully in the subsequent Parts of this Manual.

## J. Approval of Listing and Posting of Securities

### Sec. 352.

When the Toronto Stock Exchange is satisfied that the application documents are in order, the application is submitted to the Exchange's Listings Committee, which is comprised of members of Listings.

The Listings Committee may ask for additional information in order to clarify certain areas of the application.

Listing on the Exchange is considered to be a privilege, not a right. In some instances, the Listings Committee may decide that an applicant company does not merit the listing privilege notwithstanding that the company appears to meet the prescribed minimum listing requirements.

### Sec. 353.

If the Listings Committee approves the company's securities for listing, the Exchange will select a participating organization to act as the designated market maker for the securities. The designated market maker has responsibilities, which assist in maintaining an orderly market in the securities. The process of selecting the designated market maker usually takes two to three weeks.

### Sec. 354.

Once the listing application has been approved, the posting of the securities for trading may take place shortly thereafter, but, as a general rule, not more than 90 days after approval of the application for listing. During the period between listing approval and posting for trading, the securities are acceptable to Participating Organizations for margin purposes.

In the case of the listing of securities being offered to the public, the listing may take place prior to the closing of the offering, at the applicant company's request. Exchange staff will advise the company of the requirements in this regard, Any trading that takes place prior to closing will be on an "if, as, and when issued" basis.

### Sec. 354.1.

If the Listings Committee does not approve the applicant's securities for listing, the applicant may request that the matter be heard by the Listings Committee with the additional participation of the Senior Vice President of the Toronto Stock Exchange and/or his/her designate. If after being heard, the applicant remains dissatisfied with the decision, the applicant may appeal the decision to a three-person panel of the Toronto Stock Exchange's Board of Directors.

An applicant may request that the OSC review the Board's decision provided that the provisions of Section 21 of the OSA (or any replacement legislation) apply.

### Sec. 354.2.

Where a Conflict of Interest (as defined in the Special Provisions Respecting Conflict of Interest and Competitors of TSX Group Inc.) or potential Conflict of Interest arises relating to initial listing of a Competitor (as defined in the Special Provisions Respecting Conflict of Interest and Competitors of TSX Group Inc.), reference should be made to the Special Provisions Respecting Conflict of Interest and Competitors of TSX Group Inc.

## Stock Symbol

### Sec. 355.

The new listed issuer is assigned a stock symbol by Exchange staff. The stock symbol is an abbreviation of the issuing company's name, consisting of not more than three letters of the alphabet. A suffix is attached to the symbol to identify preferred shares, rights, warrants, or a specific class of shares.

A request for a specific trading symbol may be made to the Exchange by the company when applying for listing. Every effort will be made to reserve the symbol requested, but there is no guarantee that it will be available.

The stock symbol assigned by the Exchange will be unique to the company for all trading on Canadian exchanges. If the company is already listed on another Canadian exchange, its securities will trade on the Toronto Stock Exchange under the same symbol.

## Listing Day Programme

### Sec. 356.

The company is invited to attend a ceremony at the Exchange to celebrate the listing of the company's securities on the TSX. Company officials will have an opportunity to meet Exchange staff with whom they will deal as a listed company. The Exchange also provides a photographer to record the event for the company.

## K. Listing Statement

### Sec. 357.

(Repealed.)

## L. Public Availability of Documents

### Sec. 358.

Subject to Section 359, all documents filed in support of the listing of any securities on the Exchange shall be made available to the public on request after the listing application is given final approval, and such documents may be published, at the discretion of the Exchange.

### Sec. 359.

The Exchange may hold the documents in confidence so long as the Exchange is of the opinion that the documents so held disclose intimate financial, personal or other information and that the desirability of avoiding disclosure thereof in the interests of any person or company outweighs the desirability of adhering to the general principle that the documents be available to the

public for inspection.

## M. Provincial Securities Laws

### Sec. 360.

All listed companies are "reporting issuers" as defined in the *Securities Act* of Ontario, and must comply with the provisions of that Act, as well as all other applicable securities legislation.

tsx group TSX

Text only Print

# Part IV Maintaining a Listing — General Requirements

## A. General

### Sec. 401.

Once approval has been given for its securities to be listed, in order to maintain the listing privilege a company must fulfill a number of requirements on a continuing basis. These requirements are described in this and subsequent Parts.

### Sec. 402.

While agreeing to meet a number of specific requirements in order to maintain a listing on the Exchange, each listed company, in signing the Listing Agreement (Appendix A), accepts the authority of the Board of Directors of the Exchange (or its delegated committee) which, in its discretion, may at any time suspend from trading or delist the company's securities. (See also Part VII of this Manual.)

### Sec. 403.

Section 21.7(1) of the OSA provides that any person or company directly affected by any direction, order or decision of the Exchange may apply to the OSC for a hearing and review thereof.

### Sec. 404.

In general, to maintain its listing privilege a company must make public disclosures and keep the Exchange fully informed of both routine and unusual events and decisions affecting its security holders.

The purpose of these requirements is to ensure that the market has adequate time for consideration of and response to, corporate events. In addition, it is necessary that records be continuously maintained regarding the entitlement to various benefits as they accrue from time to time to the security holders of record.

In some matters, the prior consent of the Exchange to an intended course of action is required, in order to ensure that implementation of the corporate decision is consistent with Exchange requirements.

### Sec. 405.

All listed companies should be thoroughly familiar with the applicable federal and provincial statutory requirements respecting timely disclosure, financial statements, proxy materials and shareholders' meetings. The Exchange's requirements and the statutory requirements may vary, but they do not conflict. The Exchange enforces its own requirements. It retains the right to waive these requirements, but does not have the right to waive statutory requirements. The Exchange frequently draws the attention of a company to its multiple obligations, but the responsibility rests with the company to meet all sets of applicable requirements.

## B. Timely Disclosure

### Introduction

### Sec. 406.

It is a cornerstone policy of the Exchange that all persons investing in securities listed on the Exchange have equal access to information that may affect their investment decisions. Public confidence in the integrity of the Exchange as a securities market requires timely disclosure of material information concerning the business and affairs of companies listed on the Exchange,

thereby placing all participants in the market on an equal footing.

The timely disclosure policy of the Exchange is the primary timely disclosure standard for all TSX listed issuers. National Policy 51-201 *Disclosure Standards* of the CSA, "Disclosure Standards", assists issuers in meeting their legislative disclosure requirements. While the legislative and Exchange timely disclosure requirements differ somewhat, the CSA clearly state in National Policy 51-201 *Disclosure Standards* that they expect listed issuers to comply with the requirements of the Exchange.

To minimize the number of authorities that must be consulted in a particular matter, in the case of securities listed on the Exchange, the Exchange is the relevant contact. The issuer may, of course, consult with the government securities administrator of the particular jurisdiction. In the case of securities listed on more than one stock market, the issuer should deal with each market.

The requirements of the Exchange and National Policy 51-201 *Disclosure Standards* are in addition to any applicable statutory requirements. The Exchange enforces its own policy. Companies whose securities are listed on the Exchange are legally obligated to comply with the provisions on timely disclosure set out in section 75 of the OSA and the Regulation under the Act. Reference should also be made to National Instrument 71-102 *continuous Disclosure and Other Exemptions Relating to Foreign Issuers*, National Instrument 55-102 *System for Electronic Disclosure by Insiders*, and National Instrument 62-103 *The Early Warning System and Related Take-Over bid and Insider Reporting Issues*.

In addition to the foregoing requirements, companies whose securities are listed on the Exchange and who engage in mineral exploration, development and/or production, must follow the "Disclosure Standards for Companies Engaged in Mineral Exploration, Development and Production" as outlined in Appendix B of this Manual for both their timely and continuous disclosure.

The Market Surveillance Division monitors the timely disclosure policy on behalf of the Exchange.

## Material Information

### Definition

### Sec. 407.

Material information is any information relating to the business and affairs of a company that results in or would reasonably be expected to result in a significant change in the market price or value of any of the company's listed securities.

Material information consists of both material facts and material changes relating to the business and affairs of a listed company. In addition to material information, trading on the Exchange is sometimes affected by the existence of rumours and speculation. Where this is the case, Market Surveillance may require that an announcement be made by the company whether such rumours and speculation are factual or not. The policy of the Exchange with regard to rumours is set out more fully in Section 414.

The timely disclosure policy of the Exchange is designed to supplement the provisions of the OSA, which requires disclosure of any "material change" as defined therein. A report must be tiled with the OSC concerning any "material change" as soon as practicable and in any event within ten days of the date on which the change occurs. The Exchange considers that "material information" is a broader term than "material change" since it encompasses material facts that may not entail a "material change" as defined in the Act. It has long been the practice of most listed companies to disclose a broader range of information to the public pursuant to the Exchange's timely disclosure policy than a strict interpretation of the Act might require. Companies subject to securities legislation outside of Ontario should be aware of their disclosure obligations in other jurisdictions.

It is the responsibility of each listed company to determine what information is material according to the above definition in the context of the company's own affairs. The materiality of information varies from one company to another according to the size of its profits, assets and capitalization, the nature of its operations and many other factors. An event that is "significant" or "major" in the context of a smaller company's business and affairs is often not material to a large company. The company itself is in the best position to apply the definition of material information to its own unique circumstances. The Exchange recognizes that decisions on disclosure require careful subjective judgments, and encourages listed companies to consult Market Surveillance when in doubt as to whether disclosure should be made.

### Rule: Immediate Disclosure

### Sec. 408.

A listed company is required to disclose material information concerning its business and affairs forthwith upon the information becoming known to management, or in the case of information previously known, forthwith upon it becoming apparent that the information is material. Immediate release of information is necessary to ensure that it is promptly available to all investors and to reduce the risk of persons with access to the information acting upon undisclosed information. Unusual trading marked by significant changes in the price or trading volumes of any of a company's securities prior to the announcement of material information is embarrassing to company management and damaging to the reputation of the securities market, since the investing public may assume that certain persons benefited from access to material information which was not generally disclosed.

In restricted circumstances disclosure of material information may be delayed for reasons of corporate confidentiality. In this regard, see Sections 423.1 to 423.3.

## Developments to be Disclosed

### Sec. 409.

Companies are not required to interpret the impact of external political, economic and social developments on their affairs, but if the external development will have or has had a direct effect on their business and affairs that is both material in the sense outlined above and uncharacteristic of the effect generally experienced as a result of such development by other companies engaged in the same business or industry, companies are urged, where practical, to explain the particular impact on them. For example, a change in government policy that affects most companies in a particular industry does not require an announcement, but if it affects only one or a few companies in a material way, an announcement should be made.

The market price of a company's securities may be affected by factors directly relating to the securities themselves as well as by information concerning the company's business and affairs. For example, changes in a company's issued capital, stock splits, redemptions and dividend decisions may all impact upon the market price of a security.

### Sec. 410.

Other actual or proposed developments that are likely to give rise to material information and thus to require prompt disclosure include, but are not limited to, those listed below. Of course, any development must be material according to the definition of material information before disclosure is required.

Many developments must be disclosed at the proposal stage, or before an event actually occurs, if the proposal gives rise to material information at that stage. Announcements of an intention to proceed with a transaction or activity should be made when a decision has been made to proceed with it by the board of directors of the company, or by senior management with the expectation of concurrence from the board of directors. Subsequently, updates should be announced at least every 30 days, unless the original announcement indicates that an update will be disclosed on another indicated date. In addition, prompt disclosure is required of any material change to the proposed transaction, or to the previously disclosed information.

Examples of developments likely to require prompt disclosure as referred to above include the following:

**(a)** Changes in share ownership that may affect control of the company.

**(b)** Changes in corporate structure, such as reorganizations, amalgamations, etc.

**(c)** Take-over bids or issuer bids.

**(d)** Major corporate acquisitions or dispositions.

**(e)** Changes in capital structure.

**(f)** Borrowing of a significant amount of funds.

**(g)** Public or private sale of additional securities.

**(h)** Development of new products and developments affecting the company's resources, technology, products or market.

**(i)** Significant discoveries by resource companies.

**(j)** Entering into or loss of significant contracts.

**(k)** Firm evidence of significant increases or decreases in near-term earnings prospects.

**(l)** Changes in capital investment plans or corporate objectives.

**(m)** Significant changes in management.

**(n)** Significant litigation.

**(o)** Major labour disputes or disputes with major contractors or suppliers.

**(p)** Events of default under financing or other agreements.

**(q)** Any other developments relating to the business and affairs of the company that would reasonably be expected to significantly affect the market price or value of any of the company's securities or that would reasonably be expected to have a significant influence on a reasonable investor's investment decisions.

## Sec. 411.

Forecasts of earnings and other financial forecasts need not be disclosed, but where a significant increase or decrease in earnings is indicated in the near future, such as in the next fiscal quarter, this fact must be disclosed. Forecasts should not be provided on a selective basis to certain investors not involved in the management of the affairs of the company. If disclosed, they should be generally disclosed. Reference should be made to National Policy 48 *Future-Oriented Financial Information* of the Canadian Securities Administrators (*Future-oriented Financial Information*).

## Market Surveillance

## Monitoring Trading

## Sec. 412.

Market Surveillance maintains a continuous stock watch programme which is designed to highlight unusual market activity, such as unusual price and volume changes in a stock relative to its historical pattern of trading. Where unusual trading activity takes place in a listed security, Market Surveillance attempts to determine the specific cause of such activity. If the specific cause cannot be determined immediately, company management will be contacted. Should this contact result in Market Surveillance staff becoming aware of a situation which requires a news release, the company will be asked to make an immediate announcement. Should the company be unaware of any undisclosed developments, Market Surveillance staff will continue to monitor trading and, if concerns continue, may ask the company to issue a statement that it is not aware of any undisclosed devlopments that would account for the unusual trading pattern.

## Timing of Announcements

## Sec. 413.

Market Surveillance has the responsibility of receiving all timely disclosure news releases from listed companies detailing material information concerning their affairs. The overriding rule is that significant announcements are required to be released immediately. Release of certain announcements may be delayed until the close of trading, subject to the approval of Market Surveillance. Company officials are encouraged to seek assistance and direction from Market Surveillance as to when an announcement should be released and whether trading in the company's shares should be halted for dissemination of an announcement.

## Rumours

## Sec. 414.

Unusual market activity is often caused by the presence of rumours. The Exchange recognizes that it is impractical to expect management to be aware of, and comment on, all rumours, but when market activity indicates that trading is being unduly influenced by rumours Market Surveillance will request that a clarifying statement be made by the company. Prompt clarification or denial of rumours through a news release is the most effective manner of rectifying such a situation. A trading halt may be instituted pending a "no corporate developments" statement from the company. If a rumour is correct in whole or in part, immediate disclosure of the relevant material information must be made by the company and a trading halt will be instituted pending release and dissemination of the information.

## OSC Cease Trading Order

### Sec. 415.

In certain circumstances trading in a listed security may be stopped by Market Surveillance as a result of a cease trading order being issued by the OSC. Such an order may be issued by the OSC where it is of the opinion that a halt in trading is in the public interest. However, Market Surveillance generally handles halts for the dissemination of announcements of material information. Additional information with respect to trading halts is included in Sections 420 to 423.

## Announcements of Material Information

### Pre-Notification to Exchange

### Sec. 416.

The Exchange's policy requires immediate release of material information except in unusual circumstances. While Market Surveillance may permit certain news releases to be issued after the close of trading, the policy of immediate disclosure frequently requires that news releases be issued during trading hours, especially when an important corporate development has occurred. If this is the case, it is absolutely essential that company officials notify Market Surveillance prior to the issuance of a news release. Market Surveillance staff will then be in a position to determine whether trading in any of the company's securities should be temporarily halted. Also, if the Exchange is not advised of news releases in advance, any subsequent unusual trading activity will generate enquiries and perhaps a halt in trading.

Regardless of when an announcement involving material information is released, Market Surveillance must be advised of its content and supplied with a copy in advance of its release. Market Surveillance must also be advised of the proposed method of dissemination. Market Surveillance must be advised by telephone in advance if an announcement is ready to be made during trading hours, and submission of a written copy of the release should follow. Where an announcement is to be released after the Exchange has closed, Market Surveillance staff should be advised before trading opens on the next trading day. Copies may be faxed or hand delivered to Market Surveillance.

Market Surveillance coordinates trading halts with other exchanges and markets where a company's securities are listed or traded elsewhere. A convention exists that trading in a security traded in more than one market shall be halted and resumed at the same time in each market. Failing to pre-notify the Exchange of an imminent material announcement could disrupt this system.

### Dissemination

### Sec. 417.

After notifying Market Surveillance, a news release must be transmitted to the media by the quickest possible method, and by one that provides the widest dissemination possible. To ensure that the entire financial community is aware of the news at the same time, a wire service or combination of services) must be used which provides national and simultaneous coverage.

The Exchange accepts the use of any news services that meet the following criteria:

- dissemination of the full text of the release to the national financial press and to daily newspapers that provide regular coverage of financial news;
- dissemination to all Participating Organizations; and
- dissemination to all relevant regulatory bodies.

Companies are also expected to use services such as Dow Jones and Reuters that provide wide dissemination at no charge to the issuer. However, companies should be aware that these services do not carry all releases and may substantially edit releases they do carry. News services that guarantee that the full text of the release will be carried are required to be used.

Dissemination of news is essential to ensure that all investors trade on equal information. The onus is on the listed company to ensure appropriate dissemination of news releases, and any failure to properly disseminate news shall be deemed to be a breach of this policy and shall be grounds for suspension of trading or delisting of the company's securities. In particular, the Exchange will not consider relieving a company from its obligation to disseminate news properly because of cost factors.

## Content of Announcements

**Sec. 418.**

Announcements of material information should be factual and balanced, neither overemphasizing favourable news nor under-emphasizing unfavourable news. Unfavourable news must be disclosed just as promptly and completely as favourable news. It is appreciated that news releases may not be able to contain all the details that would be included in a prospectus or similar document. However, news releases should contain sufficient detail to enable media personnel and investors to appreciate the true substance and importance of the information so that investors may make informed investment decisions. The guiding principle should be to communicate clearly and accurately the nature of the information, without including unnecessary details, exaggerated reports or editorial commentary designed to colour the investment community's perception of the announcement one way or another, The company should be prepared to supply further information when appropriate, and the Exchange recommends that the name and telephone number of the company official to contact be provided in the release.

## Misleading Announcements

**Sec. 419.**

While the policy of the Exchange is that all material information must be released immediately, judgment must be exercised by company officials as to the timing and propriety of any news releases concerning corporate developments, since misleading disclosure activity designed to influence the price of a security is considered by the Exchange to be improper. Misleading news releases send signals to the investment community which are not justified by an objective examination of the facts, and may detract from the credibility of the company. Announcements of an intention to proceed with a transaction or activity should not be made unless the company has the ability to carry out the intent (although proceeding may be subject to contingencies) and a decision has been made to proceed with the transaction or activity by the board of directors of the company, or by senior management with the expectation of concurrence from the board of directors. Disclosure of corporate developments must be handled carefully and requires the exercise of judgment by company officials as to the timing of an announcement of material information, since either premature or late disclosure may result in damage to the reputation of the securities markets.

## Trading Halts

## When Trading May Be Halted

**Sec. 420.**

The Exchange's objective is to provide a continuous auction market in listed securities. The guiding principle is therefore to reduce the frequency and length of trading halts as much as possible.

Trading may be halted in the securities of a listed company upon the occurrence of a material change during normal trading hours, which requires immediate public disclosure. The determination that trading should be halted is made by Market Surveillance. Market Surveillance determines the amount of time necessary for dissemination in any particular case, which determination is dependent upon the significance and complexity of the announcement.

It is neither the intention nor practice of Market Surveillance to halt trading for all news releases from listed companies. A news release is discussed by Market Surveillance and the listed company prior to its release and a determination is made as to whether a trading halt is justified based upon the impact which the particular announcement is expected to have on the market for the company's securities.

A halt in trading does not reflect upon the reputation of management of a company nor upon the quality of its securities. Indeed, trading halts for material information announcements are usually made at the request of the listed company involved. Market Surveillance normally attempts to contact a company before imposing a halt in trading.

## Requests for Trading Halts

**Sec. 421.**

It is not appropriate for a listed company to request a trading halt in a security if a material announcement is not going to be made forthwith.

When a listed company (or its advisors) requests a trading halt for an announcement, the company must provide assurance to Market Surveillance that an announcement is imminent. The nature of this announcement and the current status of events shall be disclosed to Market Surveillance, in order the staff can assess the need for and appropriate duration of a trading halt.

## Length of Trading Halts

### Sec. 422.

When a halt in trading is necessary, trading is normally interrupted for a period of less than two hours. In the normal course, the announcement should be made immediately after the halt is imposed and trading will resume within approximately one hour of the dissemination of the announcement through major news wires.

A trading halt in a security shall not normally extend for a period longer than 24 hours from the time the halt was imposed. This is a maximum time period intended to address unusual situations. The only exception to the 24-hour time limit is where Market Surveillance determines that resumption of trading would have a significant negative impact on the integrity of the market.

## Failure to Make an Announcement Immediately

### Sec. 423.

If trading is halted but an announcement is not immediately forthcoming as expected, Market Surveillance will establish a reopening time, which shall not be later than 24 hours after the time that the halt was imposed (excluding nonbusiness days). If the company fails to make an announcement. Market Surveillance will issue a notice stating that trading was halted for dissemination of news or for clarification of abnormal trading activity, that an announcement was not immediately forthcoming, and that trading will therefore resume at a specific time.

When Market Surveillance advises a company in applying this Section 423 that it will announce the reopening of trading the company should reconsider, in light of its responsibility to make timely disclosure of all material information, whether it should issue a statement prior to the reopening becoming effective to clarify why it requested a trading halt (if this is the case) and why it is not able to make an announcement prior to the reopening of trading.

## Confidentiality

## When Information May Be Kept Confidential

### Sec. 423.1.

In restricted circumstances disclosure of material information concerning the business and affairs of a listed company may be delayed and kept confidential temporarily where immediate release of the information would be unduly detrimental to the interests of the company.

Examples of instances in which disclosure might be unduly detrimental to the company's interests are as follows:

**(a)** Release of the information would prejudice the ability of the company to pursue specific and limited objectives or to complete a transaction or series of transactions that are under way. For example, premature disclosure of the fact that a company intends to purchase a significant asset may increase the cost of making the acquisition.

**(b)** Disclosure of the information would provide competitors with confidential corporate information that would be of significant benefit to them. Such information may be kept confidential if the company is of the opinion that the detriment to it resulting from disclosure would outweigh the detriment to the market in not having access to the information. A decision to release a new product, or details on the features of a new product may be withheld for competitive reasons. Such information should not be withheld if it is available to competitors from other sources.

**(c)** Disclosure of information concerning the status of ongoing negotiations would prejudice the successful completion of those negotiations. It is unnecessary to make a series of announcements concerning the status of negotiations with another party concerning a particular transaction. If it seems that the situation is going to stabilize within a short period, public disclosure may be delayed until a definitive announcement can be made. Disclosure should be made once "concrete information" is available, such as a final decision to proceed with the transaction or, at a later point in time, finalization of the terms of the transaction.

### Sec. 423.2.

It is the policy of the Exchange that the withholding of material information on the basis that disclosure would be unduly detrimental to the company's interests must be infrequent and can only be justified where the potential harm to the company or

to investors caused by immediate disclosure may reasonably be considered to outweigh the undesirable consequences of delaying disclosure, keeping in mind at all times the considerations that have given rise to the Exchange's immediate disclosure policy. While recognizing that there must be a trade-off between the legitimate interests of a company in maintaining secrecy and the right of the investing public to disclosure of corporate information, the Exchange discourages delaying disclosure for a lengthy period of time, since it is unlikely that confidentiality can be maintained beyond the short term.

## Maintaining Confidentiality

### Sec. 423.3.

If disclosure of material information is delayed, complete confidentiality must be maintained. In the event that such confidential information, or rumours respecting the same, is divulged in any manner (other than in the necessary course of business), the company is required to make an immediate announcement on the matter, Market Surveillance must be notified of the announcement in advance in the usual manner. During the period before material information is disclosed, market activity in the company's securities should be closely monitored. Any unusual market activity probably means that news of the matter is being disclosed and that certain persons are taking advantage of it. In such case, Market Surveillance should be advised immediately, and a halt in trading will be imposed until the company has made disclosure on the matter.

At any time when material information is being withheld from the public, the company is under a duty to take precautions to keep such information completely confidential. Such information should not be disclosed to any officers or employees of the company, or to the company's advisors, except in the necessary course of business. The directors, officers and employees of a listed company should be reminded on a regular basis that confidential information obtained in the course of their duties must not be disclosed. It is contrary to law under the OSA for any person in a "special relationship" with a company to make use of undisclosed material information. This point is discussed in Section 423.4.

Listed companies must comply with the provisions of section 75 of the OSA requiring confidential disclosure to the OSC of any "material change" that is not immediately being disclosed to the public.

## Insider Trading

### Law

### Sec. 423.4.

Every listed company should have a firm rule prohibiting those who have access to confidential information from making use of such information in trading in the company's securities before the information has been fully disclosed to the public and a reasonable period of time for dissemination of the information has passed.

Insider trading is strictly regulated by Part XXI and sections 76 and 134 of the OSA and the Regulation under the Act. The securities laws of other provinces also regulate insider trading in their respective jurisdictions. Insider trading in the securities of companies incorporated under the ('*Canada Business Corporations Act* is also regulated by Part XI of that Act. The definition of an "insider" will vary from statute to statute, but in any case will include directors and senior officers of the company and large shareholders. In Ontario directors and senior officers of any company that is itself an insider of a second company are considered insiders of that second company. It is recommended that directors and officers of listed companies be fully conversant with all applicable legislation concerning insider trading.

The OSA requires insiders who own securities of a listed company to file an initial report with the OSC upon becoming insiders and to report all trades made in the securities of the company of which they are insiders within ten days after a trade is made.

In addition, section 76 of the OSA prohibits any person or company in a "special relationship" with a listed company from trading on the basis of undisclosed material information on the affairs of that company. Those considered to be in a "special relationship" with a listed company include those who are insiders, affiliates or associates of the listed company, a person or company proposing to make a take-over bid of the listed company, and a person or company proposing to become a party to a reorganization, amalgamation, merger or similar business arrangement with the listed company. A person or company in a "special relationship" also includes those involved, or which were involved, in the provision of business or professional services for the listed company, including employees.

An indefinite chain of "tippees" is created by including in the "special relationship" category persons or companies who acquire information from a source known to them to have a "special relationship" with the listed company.

In any situation where material information is being kept confidential because disclosure would be unduly detrimental to the best

interests of the company, management is under a duty to take every possible precaution to ensure that no trading whatsoever takes place by any insiders or persons in a "special relationship" with the company, such as lawyers, engineers and accountants, in which use is made of such information before it is generally disclosed to the public. Similarly, undisclosed material information cannot be passed on or "tipped" to others who may benefit by trading on the information.

In the event that Market Surveillance is of the opinion that insider or improper trading may have occurred before material information has been disclosed and disseminated, the Exchange requires an immediate announcement to be made disclosing the material information of which use is being made.

## Guidelines—Disclosure, Confidentiality Guidelines and Employee Trading

### Sec. 423.5.

Companies listed on the Exchange must comply with two sets of rules:

- securities law governing corporate disclosure, confidentiality and employee trading
- the Exchanges policy on timely disclosure (Sections 406 to 423.4), which expands on the requirements of securities law.

Collectively, these rules are referred to as the Disclosure Rules. Compliance with them is essential to maintaining investor confidence in the integrity of the Exchanges market and its listed companies.

Each listed company should establish a clear written policy to help it comply with the Disclosure Rules. The guidelines in Sections 423.6 to 423.8 are intended to help companies establish their policies. They should be viewed as a means to an end (compliance with the Disclosure Rules) and not as an end in themselves.

These guidelines are not hard and fast rules, and will not be appropriate for every listed company. The TSX recognizes that company policies will vary depending on the company's size and corporate culture.

Every company's policy, however, should:

- describe the procedures to be followed and spell out the consequences of violations
- be updated regularly
- be brought to the attention of employees regularly.

The policy should also give specific guidance in the following areas:

- disclosing material information
- maintaining the confidentiality of information
- restricting employee trading.

## Disclosing Material Information

### Sec. 423.6.

The Disclosure Rules state that material information is information about a company that has a significant effect, or would reasonably be expected to have a significant effect, on the market price of the company's securities. A company must disclose material information to the public immediately. For exceptions, please see Section 423.7, "Maintaining the Confidentiality of Information".

**Guidelines**

The Exchange suggests that the company's policy include provisions to assist management in determining:

- if the information is material and must therefore be disclosed

- when and how the material is to be disclosed
- the content of any press release disclosing the information.

Specific corporate officers should be made responsible for disclosing material information.

These officers would:

- be completely familiar with the company's operations
- be kept up to date on any pending material developments
- have a sufficient understanding of the disclosure rules to be able to decide whether or not a piece of information is material
- be responsible for communications with the media, shareholders and securities analysts
- have back-ups assigned, in case they are unavailable.

To assist these officers, it might be helpful for them to have access to a file containing all relevant public information about the company, including news releases, brokerage research reports and debriefing notes following analyst contacts.

Different corporate officers may be designated for different circumstances. For example, a specific employee might be designated as a corporate spokesperson for a particular area of operations or a particular press release. At the same time investor relations personnel might be designated as the contact for shareholders, the media and analysts, but not have the authority to issue a particular press release.

The names of the designated officers, the names of their hack-ups, and their areas of responsibility should be given to Market Surveillance. Market Surveillance may need to contact them in the event of unusual trading in the company's securities.

Avoid situations where:

- delays occur because the person responsible for disclosure is unavailable or cannot be located
- employees other than designated spokespersons comment on material corporate developments.

## Maintaining the Confidentiality of Information

## Sec. 423.7.

The Disclosure Rules allow that if the early disclosure of material information would be unduly detrimental to the company, that information may be kept confidential for a *limited* period of time. To keep material information completely confidential, companies should:

- not disclose the information to anybody, except in the necessary course of business
- make sure that if the information has been disclosed in the necessary course of business, everyone understands that it is to be kept confidential
- make sure that there is no selective disclosure of confidential information to third parties, for example, in a meeting with an analyst. This is *tipping*, which is prohibited under securities law.

In the event that selective disclosure of confidential information inadvertently occurs, the company must immediately disclose the information publicly by issuing a press release.

**Guidelines**

The Exchange suggests that a company's policy might:

- limit the number of people with access to confidential information
- require confidential documents to be locked up and code names to be used if necessary

- make sure that confidential documents cannot be accessed through technology such as shared servers
- educate all staff about the need to keep certain information confidential, not to discuss confidential information when they may be overheard, and not to discuss investment in the company, for example, in an investment club, when they are aware of confidential information (so that they don't influence the investments of other people, when they themselves are not allowed to trade).

## Restrictions on Employee Trading

## Sec. 423.8.

The Disclosure Rules require that employees with access to material information be prohibited from trading until the information has been fully disclosed and a reasonable period of time has passed for the information to be disseminated. This period may vary, depending on how closely the company is followed by analysts and institutional investors.

This prohibition applies not only to trading in company securities, but also to trading in other securities whose value might be affected by changes in the price of the company's securities. For example, trading in listed options or securities of other companies that can be exchanged for the company's securities is also prohibited.

In addition, if employees become aware of undisclosed material information about another public company such as a subsidiary, they may not trade in the securities of that other company.

In the case of pending transactions, the circumstances of each case should be considered in determining when to prohibit trading. In some cases, prohibition may be appropriate as soon as discussions about the transaction begin. The definition of materiality helps determine when trading should be prohibited in the case of pending transactions. Trading must be prohibited once the negotiations have progressed to a point where it reasonably could be expected that the market price of the company's securities would materially change if the status of the transaction were publicly disclosed. As the transaction becomes more concrete, it is more likely that the market will react. This prohibition on trading will often come into effect before the point in time when it must be disclosed publicly. In all situations, it is a judgment call as to when employee trading should be restricted.

**Guidelines**

The Exchange suggests that a company's policy address trading blackouts. Trading blackouts are periods of time during which designated employees cannot trade the company's securities or other securities whose price may be affected by a pending corporate announcement. A trading blackout:

- prohibits trading before a scheduled material announcement is made (such as the release of financial statements)
- may prohibit trading before an unscheduled material announcement is made, even if the employee affected doesn't know that the announcement will be made
- prohibits trading for a specific period of time after a material announcement has been made.

It is easiest to implement a policy on trading blackouts that applies to scheduled announcements, such as the release of financial statements. In this case the policy might:

- prohibit trading by employees for a certain number of days before and after the release of financial statements
- provide "open windows", which are limited periods of time following the release of financial statements during which employees may trade.

It is more problematic to implement a policy on trading blackouts for unscheduled announcements. A company should make the following decisions about its policy on trading blackouts according to its particular circumstances:

- should the policy apply to employees other than those already prevented from trading by insider trading rules (for example, senior employees not directly involved in the material transaction)?
- would telling an employee not to trade tip them off as to the content of the pending announcement?

If a company decides to implement a preannouncement blackout policy, it might want to consider one of the following options:

- without giving a reason, instruct employees not to trade until further notice if there is a pending undisclosed material development
- require employees to obtain approval before trading, on the understanding that this approval will be denied if any material information has not been disclosed.

A company policy on post-announcement trading blackouts should:

- state whether the blackout rules apply to all staff or only to those involved in the material transaction
- allow the market time to absorb the information before employees can resume trading. The amount of time that the market needs to absorb the information and set a new price level will depend upon the size of the company and to what extent it is tracked by analysts and investors.

The Exchange also suggests that a company:

- circulate some basic do's and don'ts about employee trading to all their staff
- designate a contact person who is familiar with the disclosure rules and who can help employees determine whether or not they may trade in a given circumstance
- set expiry dates for the exercise of stock options and other such compensation plans so that the expiry dates normally would fall after the release of financial statements
- educate employees about any additional specific trading restrictions that may apply to them (for example, section 130 of the *Canada Business Corporations Act* generally prohibits insiders of CBCA companies from selling that company's shares short, or from buying or selling put or call options on the shares. Insiders of companies which have to report under the U.S. *Securities Exchange Act of 1934* may be subject to other restrictions, such as liability to account (for short swing profits.)
- decide whether employees who are subject to more stringent trading restrictions, and who are not required by law to file insider trading reports, should have to report details of their trading to the company
- decide whether the company should review insider trading reports to make sure that employees have complied with company policy and disclosure rules.

## Electronic Communications Disclosure Guidelines

### Sec. 423.9.

For financial markets, the Internet may be the greatest leap forward in providing information and analysis since the advent of electronic communications. It is putting relevant information at investors' fingertips—instantaneously and simultaneously. But the Internet also poses regulatory challenges. In a world in which information is more readily available than ever, it is more important than ever that it be accurate, timely and up-to-date. With this in mind, TSX has developed these electronic communications guidelines to assist listed issuers to meet their investors' informational needs.

Part II reminds issuers that applicable disclosure rules apply to all corporate disclosure through electronic communications and must be followed by each issuer. Disclosure of information by an issuer through its web site or e-mail will not satisfy the issuer's disclosure obligations. The corporation must continue to use traditional means of dissemination. Part III sets out the guidelines that apply directly to the Internet and other electronic media. The overall objective of the guidelines is to encourage the use of electronic media to make investor information accessible, accurate and timely. The challenge of regulating electronic media is to ensure that regulatory concerns are addressed without impeding innovation.

### Sec. 423.10.

These guidelines should be read with TSX's Timely Disclosure requirements and related guidelines ("TSX Timely Disclosure Policy").

Web sites, electronic mail ("e-mail") and other channels available on the Internet are media of communication available to listed issuers for corporate disclosure. Each of these media provides opportunities for an issuer to broadly disseminate investor relations information. There are, however, a number of issues that an issuer must consider when it goes online. Investor relations information that is disclosed electronically using these new media should be viewed by the issuer as an extension of its formal corporate disclosure record. As such, these electronic communications are subject to securities laws and TSX standards

and should not be viewed merely as a promotional tool.

TSX strongly recommends that all listed issuers maintain a corporate web site to make investor relations information available electronically.

Current securities filings of listed issuers such as financial statements, AIFs, annual reports and prospectuses are maintained on the SEDAR web site operated by CDS. In addition, TSX maintains a profile page on each listed issuer on its web site ("tsx.com"). Further, many news wire services post listed issuer news releases on their web sites. Since these various sites are not all connected, it may be difficult and time consuming for an investor to search the Internet and obtain all relevant investor relations information about a particular issuer. If an issuer creates its own web site, it can ensure that all of its investor relations information is available through one site and can provide more information than is currently available online. For example, SEDAR contains only mandatory corporate filings, while an issuer's site may carry a wealth of supplemental information, such as fact sheets, fact books, slides of investor presentations, transcripts of investor relations conferences and webcasts.

Disclosure by the Internet alone will not meet an issuer's disclosure requirements and an issuer must continue to use traditional means of dissemination.

Electronic communications do not reach all investors. Investors who have access to the Internet will be unaware that new information is available unless the issuer notifies them of an update.

## Applicable Disclosure Standards

### Sec. 423.11.

Distribution of information via a web site, e-mail or otherwise via the Internet is subject to the same laws as traditional forms of dissemination such as news releases. In establishing electronic communications, an issuer should have special regard to disclosure requirements under all applicable securities laws. Issuers should refer to TSX Timely Disclosure Policy, National Policy No. 51-201, *Disclosure Standards*, National Policy 11-201, *Delivery of Documents by Electronic Means*, and National Policy 47-201, *Trading Securities Using the Internet and Other Electronic Means.* Issuers should be aware of disclosure requirements in all jurisdictions in which they are reporting issuers. Also, there are constant developments regarding electronic disclosure of material information by issuers and issuers must be aware of the impact of all such developments on their disclosure practices.

These standards apply to all corporate disclosure through electronic communications and must be followed by each issuer.

1. *Electronic communications cannot be misleading*—An issuer must ensure that material information posted on its web site is not misleading. Material information is misleading if it is incomplete, incorrect or omits a fact so as to make another statement misleading. Information may also be misleading if it is out of date.

    (a) *Duty to correct and update*—A web site should be a complete repository of current and accurate investor relations information. Viewers visiting a web site expect that they are viewing all the relevant information about an issuer and that the information provided to them by the issuer is accurate in all material respects. An issuer has the duty to include on its web site all material information and to correct any material information available on its web site that is misleading. It is not sufficient that the information has been corrected or updated elsewhere.

    It is possible for information to become inaccurate over time. An issuer must regularly review and update or correct the information on the site.

    (b) *Incomplete information or material omissions*—Providing incomplete information or omitting a material fact is also misleading. An issuer must include all material disclosed information. It must include all news releases, not just favourable ones. Similarly, documents should be posted in their entirety. If this is impractical for a particular document, such as a technical report with graphs, charts or maps, care must be taken to ensure that an excerpt is not misleading when read on its own. In such circumstances, it may be sufficient to post the executive summary.

    (c) *Information must be presented in a consistent manner*—Investor relations information that is disclosed electronically should be presented in the same manner online as it is offline. Important information should be displayed with the same prominence and a single document should not be divided into shorter, linked documents that could obscure or "bury" unfavourable information. While issuers may divide a lengthy document into sections for ease of access and downloading, issuers must ensure that the full document appears on the site, that each segment is easily accessible and that the division of the document has not altered the import of the document or any information contained in it.

2. Electronic communications cannot be used to *"tip" or leak material information*—An issuer's internal employee trading and confidentiality policies should cover the use of electronic forms of communication. Employees must not use the Internet to tip or discuss in any form undisclosed material information about the issuer.

An issuer must not post a material news release on a web site or distribute it by e-mail or otherwise on the Internet before it has been disseminated on a news wire service in accordance with TSX Timely Disclosure Policy.

3. *Electronic communications must comply with securities laws*—An issuer should have special regard to securities laws and, in particular, registration and filing requirements, which may be triggered if it posts any document offering securities to the general public on its web site. If a listed issuer is considering a distribution of securities, it should carefully review its web site in consultation with the issuer's legal counsel in advance of and during the offering. The Internet is increasingly becoming an important tool to communicate information about public offerings to shareholders and investors. Nevertheless, the release of information and promotional materials relating to a public offering before or during the offering is subject to restrictions under securities laws. Documents related to a distribution of securities should only be posted on a web site if they are filed with and receipted by the appropriate securities regulators in the applicable jurisdictions. All promotional materials related to a distribution of securities should be reviewed with the issuer's legal advisors before they are posted on a web site to ensure that such materials are consistent with the disclosure made in the offering documents and that the posting of such materials to a web site is permitted under applicable securities laws.

   Anyone, anywhere in the world can access a web site. Special regard should be made to foreign securities laws, some of which may be stricter than Ontario laws. Foreign securities regulators may take the view that posting offering documents on a web site that can be accessed by someone in their jurisdiction constitutes an offering in that jurisdiction unless appropriate disclaimers are included on the document or other measures are taken to restrict access. Reference should be made to the guidelines issued by other jurisdictions such as those issued by the U.S. Securities and Exchange Commission for issuers who use Internet web sites to solicit offshore securities transactions and clients without registering the securities in the United States.

## Electronic Communications Guidelines

### Sec. 423.12.

TSX recommends that listed issuers follow these guidelines when designing a web site, establishing an internal e-mail policy or disseminating information over the Internet.

Unlike the disclosure rules which are applicable to all electronic communications, these guidelines are not hard and fast rules which must be followed. Aspects of these guidelines may not be appropriate for every issuer. An issuer should tailor these guidelines to create an internal policy that is suitable to its particular needs and resources.

Each listed issuer should establish a clear written policy on electronic communications as part of its existing policies governing corporate disclosure, confidentiality and employee trading. Please refer to TSX Timely Disclosure Policy.

TSX suggests that the policy describe how its electronic communications are to be structured, supervised and maintained. The policy should be reviewed regularly and updated as necessary. To ensure that the policy is followed, it should be communicated to all individuals of the issuer to whom it will apply.

1. *Who should monitor electronic communications*—TSX recommends that one or more of the officers appointed under the issuer's disclosure policy be made responsible for maintaining, updating and implementing the issuer's policies on electronic communications. Reference should be made to TSX Timely Disclosure Policy. These officers should ensure that all investor relations information made available by the issuer on the web site, broadcast via e-mail or otherwise on the Internet complies with applicable securities laws and internal policies. This responsibility includes ensuring the issuer web site is properly reviewed and updated.

2. What should be on the Web site'?

   (a) *All corporate "timely disclosure" documents and other investor relations information*—TSX recommends that issuers take advantage of Internet technologies and make available through an issuer web site all corporate "timely disclosure" documents and other investor relations information that it deems appropriate. As stated, however, the posting of such documents and information on the web site does not fulfill the issuer's obligation to disseminate such information through a timely news release.

   An issuer may either post its own investor relations information or establish links, frequently called "hyper-links", to other web sites that also maintain publicly disclosed documents on behalf of the issuer such as news wire services, SEDAR and stock quote services. "Investor relations information" includes all material public documents such as: the annual report; annual and interim financial statements; the Annual Information Form; news releases; material change reports; declarations of dividends; redemption notices; management proxy circulars; and any other communications to shareholders.

   TSX recommends that an issuer post its investor relations information, particularly its news releases, as soon as

possible following dissemination. Documents that an issuer files on SEDAR should be posted concurrently on its web site, as suggested in National Policy 51-201, *Disclosure Standards* or the issuer could create a hyper-link to the SEDAR web site. If an issuer chooses to link to SEDAR or to a news wire web site, a link can be provided directly to the issuer's page on that site, provided that the terms and conditions of the site to which the link is provided do not place restrictions on "deep-linking" as this practice is sometimes referred to, or object to "framing"[1]. An issuer providing deep-linking from its web site to a third party web site should consult its legal advisors to assess the legal issues surrounding deep-linking and to ensure the proposed link is effected properly. The practice of deep-linking has given rise to a number of legal issues, including whether permission from the third party must be sought in order to access a web site other than through the homepage and whether the issuer may incur liability in sending a user to a third party site bypassing any disclaimers posted on the homepage of the third party site.

Links to other web sites should be checked regularly to ensure they still work, are up-to-date and accurate. In addition, a disclaimer should be included on the issuer's web site, preferably via a pop-up window, clearly stating that the viewer is leaving the issuer web site and that the issuer is not responsible for the content, accuracy or timeliness of the other site.

**(b)** *All supplemental information provided to analysts and other market observers but not otherwise distributed publicly*—TSX recommends that an issuer that distributes non-material investor relations information to analysts and institutional clients make such supplemental information available to all investors. Supplemental information includes such materials as fact sheets, fact books, slides of investor presentations and transcripts of management investor relations speeches and other materials distributed at investor presentations. Posting supplemental information on a web site is a very useful means of making it generally available.

Keeping in mind that an issuer should design its web site to meet its business needs, TSX recommends that an issuer post all supplemental information on its web site, unless the volume or format makes it impractical. If this is the case, the issuer should describe the information on the web site and provide a contact for the information so that an investor may contact the issuer directly either to obtain a copy of the information or to view the information at the issuer's offices.

In addition to any supplemental information provided by the issuer to analysts, TSX recommends that whenever an issuer is making a planned disclosure of material corporate information in compliance with TSX Timely Disclosure Policy and related guidelines, it should also consider providing dial-in and/or web replay or make transcripts of the related conference call available for a reasonable period of time after the call.

**(c)** *Investor relations contact information*—TSX suggests that an issuer provide an e-mail link on its web site for investors to communicate directly with an investor relations representative of the issuer. The issuer policy should specify who may respond to investor inquiries and should provide guidance as to the type of information that may be transmitted electronically. When distributing information electronically the issuer must adhere to TSX and legislative disclosure requirements in order to minimize the potential of selective disclosure of information.

To assure rapid distribution of material information to internet users who follow the issuer, an issuer may consider establishing an e-mail distribution list, permitting users who access its web site to subscribe to receive electronic delivery of news directly from the issuer. Alternatively, an issuer may consider using software that notifies subscribers automatically when the issuer's web site is updated. The issuer must note, however, that any electronic distribution of material information must be made after the information has been disseminated on a news wire service.

**(d)** *Online conferences*—TSX recommends that issuers hold analyst conference calls and industry conferences in a manner that enables any interested party to listen either by telephone and/or through a web cast, in accordance with s. 6.7(1) of National Policy No. 51-201, *Disclosure Standards*.

If an issuer chooses to participate in an online news or investor conference. TSX suggests that participation by the issuer in such online conferences should be governed by the same policy that the issuer has established in respect of its participation in other conferences such as analyst conference calls.

**3.** What should not be distributed via electronic communications

**(a)** *Employee misuse of electronic communications*—Access to e-mail and the Internet can be valuable tools for employees to perform their jobs; however, TSX recommends that clear guidelines should be established as to how employees may use these new media. These guidelines should be incorporated into the issuer's disclosure, confidentiality and employee trading policy. Employees should be reminded that their corporate e-mail address is an issuer address and that all correspondence received and sent via e-mail is to be considered corporate correspondence.

Appropriate guidelines should be established about the type of information that may be circulated by e-mail. An issuer should prohibit its employees from participating in Internet chat rooms[2] or newsgroups[3] in discussions relating to the issuer or its securities. As stated in s. 6.13 of National Policy 51-201, *Disclosure Standards*, an issuer should also consider requiring employees to report to a designated issuer official any discussion pertaining to the issuer

which they find on the Internet. Moreover, communications over the Internet via e-mail may not be secure unless the issuer has appropriate encryption technology. Employees should be warned of the danger of transmitting confidential information externally via unencrypted e-mail.

**(b)** *Analyst reports and third party information*—As a general practice, TSX recommends that an issuer not post any investor relations information on its web site that is authored by a third party, unless the information was prepared on behalf of the issuer, or is general in nature and not specific to the issuer. For example, if an issuer posts an analyst report or consensus report on its web site, it may be seen to be endorsing the views and conclusions of the report. By posting such information on its site, an issuer may become "entangled" with the report and be legally responsible for the content even though it did not author it. This could also give rise to an obligation to correct the report if the issuer becomes aware that the content is or has become misleading (for example, if the earnings projection is too optimistic).

While TSX recommends that issuers refrain from posting analyst and consensus reports on their web sites, it recognizes that some issuers take a different view. If an issuer chooses to post any third party reports on its web site, TSX recommends that extreme caution be exercised. An issuer's policy on posting analyst reports should address the following concerns:

- permission to reprint a report should be obtained in advance from the third party, since reports are subject to copyright protection;
- the information should clearly be identified as representing the views of the third party and not necessarily those of the issuer;
- the entire report should be reproduced so that it is not misleading;
- any updates, including changes in recommendations, should also be posted so the issuer's web site wilt not contain out-of-date and possibly misleading information;
- all third party reports should be posted.

Instead of posting third party reports on its web site, an alternative approach is for an issuer to provide a list of all analysts who follow the issuer or all consensus reports issued regarding the issuer together with contact information so that investors may contact the third party directly. If an issuer chooses to provide its investors with a list of analysts and other third party authors, the list should be complete and include all analysts and other third party authors that the issuer knows to follow it, regardless of the content of their reports. Since issuers are not obligated to keep track of every third party that follows them or develops a consensus report regarding the issuer, it may be onerous to compile an accurate and complete list that is not misleading to investors.

Concerns also exist regarding the posting of media articles, including radio, television and online news reports, about an issuer on the issuer's web site. TSX recommends that issuers refrain from posting media articles on their web sites as it is very difficult for an issuer to ensure that it is posting all relevant articles to its web site. If an issuer chooses to do so, it must make every effort to ensure that all significant articles concerning the issuer are posted to the web site and that negative and positive articles are given similar prominence. Also, given the frequency with which media articles may appear, the issuer will have to regularly update the articles posted on its web site.

**(c)** *Third party links*—As stated above, an issuer may establish hyperlinks between its web site and third party sites. If an issuer creates a hyperlink to a third party site, there is a risk that a viewer will not realize that be or she has left the issuer's web site. TSX recommends that the issuer include a disclaimer stating clearly that the viewer is leaving the issuer website and that the issuer is not responsible for the content, accuracy or timeliness of the other site.

**(d)** *The blurred line between investor and promotional information*—TSX recommends that an issuer clearly identify and separate its investor information from other information on its web site. In particular, promotional, sales and marketing information should not be included on the same web pages as investor relations information. An issuer's web site should clearly distinguish sections containing investor relations information from sections containing other information.

**4.** *When should information be removed from a web site?*—Care should be taken to make sure that information that is inaccurate or out-of-date no longer appears on the web site. The currency of information on a web site will vary depending on the nature of the information. An issuer may retain on its web site its annual financial statements for a full year while removing other information such as frequent product releases more quickly. An issuer should review the types of information it posts on its web site and develop a consistent policy for the posting and removal of such different types of information. Issuers may delete or remove inaccurate information from the web site, as long as a correction has been posted. In addition, TSX recommends that issuers establish an archiving system to store and provide access to information that is no longer current. An electronic archive is a repository of information which has been removed from the web site but which can still be accessed from the web site through a link. To assist investors in determining the currency of the information on the site, TSX recommends that an issuer date the first page of each document as it is posted on the web site.

TSX recommends that the issuer's policy establish a minimum retention period for material corporate information that it posts on its web site. Different types of information may be retained for a different period of time. For example, the issuer may decide to retain all news releases on the site for a period of one year from the date of issue. In contrast, the issuer may decide that investors would want to access its financials for a longer period (e.g., two years for quarterlies and five years for annuals).

Issuers should also maintain a log of the date and content of all material information that it has posted and removed from the web site. Issuers should also try to ensure that the information posted on their web site is made available in a manner that makes it accessible by others so that it can be used for subsequent reference and is capable of being retained (e.g., printer friendly versions and save/download buttons).

5. *Rumours on the Internet*—Rumours about the issuer may appear on chat rooms and newsgroups. Rumours may spread more quickly and more widely on the Internet than by other media. IIROC Market Surveillance monitors chat rooms and news groups on the Internet to identify rumours about TSX listed issuers that may influence the trading activity of their stocks. TSX Timely Disclosure Policy addresses how an issuer should respond to rumours. An issuer is not expected to monitor chat rooms or news groups for rumours about itself. Nevertheless, TSX recommends that the issuer's standard policy for addressing rumours apply to those on the Internet.

   Whether an issuer should respond to a rumour depends on the circumstances. TSX suggests that the issuer should consider the market impact of the rumour and the degree of accuracy and significance to the issuer. In general, TSX recommends against an issuer participating on a chat room or newsgroup to dispel or clarify a rumour as such action may give rise to selective disclosure concerns and may create the expectation that the issuer will always respond. Instead, the issuer should issue a news release to ensure widespread dissemination of its statement.

   If an issuer becomes aware of a rumour on a chat room, newsgroup or any other source that may have a material impact on the price of its stock, it should immediately contact Market Surveillance. If the information is false and is materially influencing the trading activity of the issuer's securities, it may consider issuing a clarifying news release. The issuer should contact Market Surveillance so that they can monitor trading in the issuer's securities. If Market Surveillance determines that trading is being affected by the rumour, it may require the issuer to issue a news release stating that there are no corporate developments to explain the market activity.

6. *Legal disclaimers*—Corporate disclosure by electronic communications gives rise to many legal issues. The use of legal disclaimers on corporate web sites is commonplace. It is in the best interests of an issuer to consult with its legal advisors to discuss the appropriateness and effectiveness of including legal disclaimers about the accuracy, timeliness and completeness of the information posted on its web site. Issuers should also review with their legal advisors the placement and wording of legal disclaimers on web sites. It is critical that disclaimers be easily visible to all users of the web site and that they be written in plain language such that the content of the disclaimer is easily and quickly read and understood.

---

[1] Displaying the content or page(s) of a third party web site within the overall design of an issuer's web site, which gives the impression that the third party content is part of the issuer's site.

[2] A chat room is a live electronic forum for discussion among Internet participants.

[3] A newsgroup is an electronic bulletin board on which internet participants may post information.

## Maintaining Site Integrity

### Sec. 423.13.

Electronic communications on the Internet are not always secure. TSX recommends that an issuer establish procedures to assure maximum security of its web site and email. As electronic technologies evolve, security measures also evolve. To ensure the security of its electronic communications, TSX suggests that an issuer:

- review and update its security systems regularly;
- be aware that it might be possible for unauthorized persons to alter the content of the site;
- monitor the integrity of its web site address to make sure that the site is accessible and has not been altered.

## TSX Monitoring of the Internet

### Sec. 423.14.

TSX regularly monitors listed issuer web sites as well as chat rooms and news groups on the Internet. TSX has the capability to review alterations to listed issuer web sites and to perform random searches of the Internet to identify active discussions relating to listed issuers. However, such monitoring can never be exhaustive. Issuers are responsible for maintaining their web site and should continue to make Market Surveillance aware of significant rumours or problems relating to Internet discussions.

## C. Company Reporting Forms

### Sec. 424.

On June 1, 2001, the Exchange discontinued its requirements for listed companies to complete and file an Annual Questionnaire. The Annual Questionnaire has been replaced by the following forms (collectively the "Company Reporting Forms"):

- FORM 1—Change in Outstanding and Reserved Securities
- FORM 2—Change in General Company Information
- FORM 3—Change in Officers/Directors/Trustees
- FORM 4—Personal Information Form
- FORM 5—Dividend/Distribution Declaration
- FORM 8—Change in Investor Relations Contact
- FORM 9—Request for Extension or Exemption for Financial Reporting/Annual Meeting
- FORM 10—Change in Principal Business (deleted and combined with FORM 2 as of May 29, 2006)
- FORM 11—Notice of Private Placement
- FORM 12—Notice of Intention to Make a Normal Course Issuer Bid (pending final approval of Sections 628–629 & 629.2–629.3)
- FORM 13—Notice of Intention to Make a Debt Substantial Issuer Bid (pending final approval of Sections 628–629 & 629.2–629.3)
- FORM 14 A&B—NCIB Monthly Reporting Forms (pending final approval of Sections 628–629 & 629.2–629.3)

See Appendix H: Company Reporting Forms for filing instructions.

### Sec. 425. (Repealed.)

*[The next section is Section 428]*

## D. Dividends and Other Distributions to Security Holders

## Notice to the Exchange

### Sec. 428.

All companies declaring a dividend on listed shares must promptly notify the Exchange's Listed Issuer Services of the particulars. Companies must complete and file a Form 5—Dividend/Distribution Declaration (Appendix H: Company Reporting Forms) with the Exchange. For the purposes of Exchange requirements, "dividends" also includes distributions to holders of listed securities other than shares, such as units.

The Exchange must have sufficient time to inform its Participating Organizations and the financial community of the details of each dividend declared. There must be a clear understanding in the market-place as to who is entitled to receive the dividend declared. Due to practical considerations, such as long holidays and weekends, the Exchange requires that at least seven trading days' notice be given to the Exchange in advance of the dividend record date, the record date being the date of closing

of the transfer hooks of the company. Companies with tentative dividend plans should schedule their board meetings well in advance of the proposed record date.

## Ex-Dividend Trading

### Sec. 429.

Determining whether the seller or the buyer is entitled to the dividend is accomplished through the procedure known as ex-dividend trading. On shares selling ex-dividend the seller retains the right to a pending dividend payment, and the opening bid quotation is usually reduced by the value of the dividend payable.

Since three trading days are allowed for the completion of the registration of a securities transaction, it is necessary that the shares commence trading on an ex-dividend basis at the opening of trading on the date which is two trading days prior to the record date for the dividend. For example, if the record date for a dividend is Friday, the shares will commence trading on an ex-dividend basis on the preceding Wednesday (in the absence of statutory holidays). If the record date is Monday, the shares will commence trading on an ex-dividend basis on Thursday of the previous week (in the absence of statutory holidays).

## Late Notification

### Sec. 430.

Failure of a company to give notice of a declared dividend at least seven trading days prior to the record date creates the possibility of unnecessary confusion at the last moment. Serious *bona fide* disputes may arise over who is entitled to the payment of the dividend, the market price of the stock may not reflect the amount of the dividend declared, and there may be delay and confusion in connection with the registration of new shareholders.

Obviously, such disputes and confusion interfere with the Exchange's main goal of providing an orderly market for listed securities. The Exchange's policy regarding a company which fails to follow the proper procedure is to hold such company liable for dividend claims made by both buyers and sellers of the shares involved.

## Notification Procedure

### Sec. 431.

Listed Issuer Services of the Exchange should be notified of a dividend declaration in writing by filing a Form 5—Dividend/Distribrution Declaration via SecureFile immediately following, or even during, the directors' meeting at which the decision to declare the dividend is made. All Form 5 filings must be followed by a telephone call to the Exchange to confirm that the Form 5 has been received by the Exchange.

## Dividend Omissions or Deferrals

### Sec. 432.

Listed companies should notify the Exchange's Listed Issuer Services immediately after any decision is made to omit or defer a dividend, if the omission or deferral constitutes a departure from the company's previously established dividend policy. This applies to all preferred shares as well as any other shares in respect of which the company has previously advised the Exchange of a dividend policy. Dividend omissions or deferrals may also give rise to timely disclosure obligations (see Sections 406 to 423.3).

## Separate Notices to the Exchange

### Sec. 433.

Separate notices should be filed by use of the applicable Company Reporting Form, in accordance with the corresponding filing instructions, with the Exchange regarding such corporate matters as dividends, notices of shareholders' meetings and quarterly or annual financial reports. Such diverse items often require immediate, or properly timed, action by the staff of the Exchange; therefore, such material, if filed together, should be properly itemized in the covering letter. The above procedure eliminates unforeseen and serious delays and ensures that the Exchange can provide accurate and quick routing of important information.

## Dividend Notice to Shareholders

### Sec. 434.

Every listed company is required to give its shareholders prompt notice of dividend declarations. A timely dividend notice gives share holders adequate time in which to consider their investment strategies. Press releases, advertisements carried in major newspapers or a shareholder form letter provide adequate notification to shareholders. The notification to shareholders of a dividend declaration should be made simultaneously with the notice to the Exchange. Special consideration should be given to non-resident shareholders who will not be reached by the press coverage.

## Stock Dividends

### Sec. 435.

In addition to the foregoing requirements relating to cash dividends, a listed company proposing a stock dividend is required to apply for the listing of the additional securities (See Sections 671 to 675).

In effecting a stock dividend, companies must make some provision for fractional share interests that may result from the dividend. Either cash or bearer form fractional certificates may be used to settle fractional share interests. The Exchange requires that all the relevant details concerning the settlement of fractional share interests be filed with the Exchange's Listed Issuer Services.

## Transfer Restrictions

### Sec. 435.1.

Any proposed restriction on the transfer of securities or other property to be distributed by a listed company to holders of its securities on a *pro rata* basis must receive the prior consent of the Exchange.

## Conditional Dividend or Distribution

### Sec. 435.2.

A listed company must not, without the prior consent of the Exchange, establish a firm record date for a dividend or other *pro rata* distribution to holders of listed securities if such dividend or distribution is subject to a condition which has not been met.

## E. Debenture Interest Changes

### Sec. 435.3.

Companies with debentures listed on the Exchange must notify the Exchange's Listed Issuer Services immediately after any determination is made that the amount of interest to be paid on the debentures will be changed, including a determination to cease or resume payments. This notification to the Exchange is essential to ensure that the information is disseminated in a timely manner to Participating Organizations and others involved in the accrued interest reporting process.

## F. Financial Statements

### Sec. 436.

Every listed company must forthwith file with Listed Issuer Services one copy of any annual or interim financial statements required to be published or filed for inspection by the law of incorporation, applicable securities legislation or the Exchange.

Statements filed publicly through SEDAR will satisfy this requirement.

## Annual Report and Annual Financial Statements

**Sec. 437.**

Every listed company must forward annually to each shareholder who has requested them its annual financial statements and its management discussion and analysis ("MD&A") in accordance with National Instrument 51-102 *Continuous Disclosure Obligations* or National Instrument 71-102 *Continuous Disclosure and Other Exemptions Relating to Foreign Issuers.*

If a listed company produces an annual report, it must be filed publicly through SEDAR.

One copy of the annual financial statements and MD&A must be filed with TSX, concurrently with the filing of these materials with the OSC. Public filings through SEDAR will satisfy this requirement.

See National Instrument 54-101 *Communications with Beneficial Owners of Securities of a Reporting Issuer*, which prescribes a procedure for determining which beneficial owners of securities registered in the names of financial intermediaries or clearing agencies wish to receive the annual financial statements.

**Sec. 438.**

Annual Financial Statements that comply with applicable securities laws will satisfy the requirements of TSX.

**Sec. 439. (Deleted.)**

**Sec. 440. (Deleted.)**

**Sec. 441.**

It is recommended that, where possible, a preliminary report on the results of the full year be released in advance of the annual financial statements, as is already done by some companies. Such a practice is particularly desirable where it appears that the annual financial statements will be released at approximately the same time that the first quarter results for the next fiscal year are released.

**Sec. 442.**

An extension of the time limit for filing or mailing the annual financial statements will be granted only under exceptional circumstances. A company wishing an extension should apply for it in advance to the Exchange's Listed Issuer Services by duly completing and filing a Form 9—Request for Extension or Exemption for Financial Reporting/Annual Meeting (Appendix H Company Reporting Forms).

## Interim Financial Statements

**Sec. 443.**

Every listed company must file with TSX one copy of its interim financial statements and MD&A concurrently with the filing of these materials with the OSC. Public filings through SEDAR will satisfy this requirement.

**Sec. 444. (Deleted.)**

**Sec. 445. (Deleted.)**

**Sec. 446. (Deleted.)**

**Sec. 447. (Deleted.)**

### Sec. 448. (Deleted.)

### Sec. 449. (Deleted.)

### Sec. 450.

Listed companies should be aware of the requirements of applicable securities legislation and policies respecting the dissemination of interim financial information among shareholders. In this connection, section 79 of the OSA and equivalent legislation of other jurisdictions should be read in conjunction with National Instrument 51-102 *Continuous Disclosure Obligations* and National Instrument 54-101 *Communication with Beneficial Owners of Securities of a Reporting Issuer*. The Exchange allows companies to make their interim statements public instead of sending them to shareholders; but this alternative is only available where it does not conflict with applicable securities legislation and policies. Where no such conflict exists, delivery of the interim statements to the Exchange satisfied by filing the statements publicly on SEDAR and to the press will be regarded by the Exchange as adequate distribution.

### Sec. 451.

The Exchange, in its discretion, may exempt a company or class of companies from any or all of the Exchange's requirements respecting interim financial statements.

Companies wishing to be exempted must apply for an exemption by duly completing and filing a Form 9—Request for Extension or Exemption for Financial Reporting/Annual Meeting (Appendix H: Company Reporting Forms).

### Sec. 452.

In deciding whether to grant an exemption, the Exchange may take into account, among other things:

**(a)** whether the company has received an exemption from quarterly reporting under the OSA;

**(b)** whether the main competitors of the applicant make similar disclosure;

**(c)** whether the relevant information is already available to the public in some other manner; or

**(d)** whether there are accounting problems in particular industries making quarterly reports difficult to prepare.

### Sec. 453.

The Exchange, in granting an exemption, may require the agreement of the company to:

**(a)** publish quarterly a part of the required financial data;

**(b)** publish the required data in a different form;

**(c)** adopt a particular cycle of reporting;

**(d)** introduce a quarterly reporting practice within a stipulated period of time; or

**(e)** publish interim statements reporting certain operating statistics which will serve to indicate the trend of the company's business.

### Sec. 454.

Companies anticipating a delay, however short, in the publication of their interim financial statements should notify the Exchange's Listed Issuer Services. The reason for the delay must be valid if an extension is to be allowed.

## G. Shareholders' Meetings and Proxy Solicitation

## Notice to Exchange of Meeting and Record Date

### Sec. 455.

National Instrument 54-101 *Communication with Beneficial Owners of Securities of a Reporting Issuer* requires all listed companies to give notice to the Exchange (and certain others), within a specified time period, of each shareholders' meeting and record date for the determination of those shareholders entitled to receive notice of the meeting. Notices filed publicly through SEDAR will satisfy this requirement.

## Distribution of Meeting Materials

### Sec. 456.

Every listed company must file with Listed Issuer Services one copy of all materials sent to its shareholders in connection with a meeting of shareholders (filed through SEDAR), concurrently with the sending of the materials to the shareholders.

Public filings through SEDAR will satisfy this requirement.

### Sec. 457.

The requirements for the distribution of materials to shareholders in connection with shareholders' meetings are prescribed by applicable corporate and securities legislation and certain policy statements of the CSA. National Instrument 54-101 *Communication with Beneficial Owners of Securities of a Reporting Issuer* of the CSA prescribes a procedure for the distribution of shareholders meeting-related materials to beneficial owners of securities registered in the names of financial intermediaries or clearing agencies.

### Sec. 458.

Companies with listed non-voting participating shares should refer to Section 624.

### Sec. 459.

The Exchange is deeply concerned that the rights and privileges of investors be observed and protected, it is essential that shareholders be allowed ample time in which to study corporate reports, so that by the time of the shareholders meeting they may be able to reach considered and informed decisions. If there is reason to believe that timely and adequate notice has not been given, the Exchange may require postponement of the meeting. In some circumstances, the Exchange may consider suspending trading in a company's securities if shareholders are not given proper notice of corporate activities in respect of which they have the right to participate in the decision-making process.

## Proxy Solicitation

### Sec. 460.

Proxy solicitation procedures are prescribed by applicable corporate and securities legislation. National Instrument 54-101 *Communication with Beneficial Owners of Securities of a Reporting Issuer* of the CSA requires financial intermediaries and clearing agencies to follow specified procedures to enable the securities registered in their names to be voted in accordance with the instructions of the beneficial owners.

## Contents of Meeting Materials

### Sec. 461.

The contents of the materials sent to shareholders in connection with shareholders' meetings are subject to the requirements of applicable corporate and securities legislation, and such materials are not generally required to be filed with the Exchange before they are sent to the shareholders. However, the Exchange may, in circumstances it considers appropriate, require that a draft information circular be reviewed by the Exchange prior to the mailing of the circular to the shareholders.

### Sec. 462.

Where a listed company proposes to seek approval of its shareholders to engage in a capital reorganization or to issue securities in connection with a major transaction, it is advisable that a draft copy of the information circular be filed with Listed Issuer Services for perusal prior to the mailing of the circular to the shareholders Among other things, this practice could avoid potential problems related to the trading of the securities involved.

### Sec. 463.

If a proposed transaction is to be submitted to shareholders for approval and also requires the prior acceptance of the Exchange pursuant to Exchange requirements, the acceptance of the Exchange should be obtained prior to the mailing of the meeting materials to the shareholders. If this is impracticable due to unavoidable time restrictions, the Exchange should be so advised in advance of the proposed mailing, and the information circular sent to shareholders must include a statement that the proposed transaction is subject to the acceptance of the Exchange (or regulatory approval).

## Annual Meeting

### Sec. 464.

Every company having securities listed on the Exchange must hold its annual meeting of shareholders within six months from the end of its fiscal year, or at such earlier time as is required by applicable legislation.

### Sec. 465.

Where a company wishes to delay its annual meeting beyond the stipulated six-month period, a duly completed Form 9—Request for Extension or Exemption for Financial Reporting/Manual Meeting (Appendix H: Company Reporting Forms) must be filed with Listed Issuer Services well in advance of the prescribed deadline for the meeting. A postponement may be permitted in justifiable circumstances.

## H. Notices and Reports to Security Holders

### Sec. 466.

Every listed company that sends a notice, report or other written correspondence to its holders of listed securities must concurrently file one copy of the correspondence with Listed Issuer Services of the Exchange.

Public filings through SEDAR will satisfy this requirement.

## I. Charter Amendments

### Sec. 467.

Every listed company must file with the Exchange's Listed Issuer Services one notarial or certified copy of any certificate giving effect to an amendment to the company's charter immediately upon issuance of such a certificate. Certain types of charter amendments must be pre-cleared with the Exchange pursuant to requirements set out in Part VI of this Manual.

## J. Change in Share Certificate

### Sec. 468.

Immediately after any change is made to a certificate representing listed securities, a definitive specimen of the new certificates must be filed with the Exchanges Listed Issuer Services. The new certificates must comply with all of the Exchange's requirements respecting share certificates, as set out in Appendix D.

## K. Proposed Issuance of Securities

### Sec. 469.

Listed companies proposing to issue securities (other than debt securities which are not convertible into equity securities), or to

enter into transactions which could involve the issuance of such securities in future, should refer to Part VI of this Manual.

### L. Secondary Distributions

### Sales from Control Blocks through the Facilities of the Exchange

#### Sec. 470.

The definition of "distribution" in the OSA includes:

> "a trade in previously issued securities of an issuer from the holdings of any person, company or combination of persons or companies holding a sufficient number of any securities of that issuer to affect materially the control of that issuer, but any holding of any person, company or combination of persons or companies holding more than 20 per cent of the outstanding voting securities of an issuer shall, in the absence of evidence to the contrary, be deemed to affect materially the control of that issuer" (section (1)).

Distributions of this type through the facilities of the Exchange are subject to special requirements of securities legislation and of the Exchange. The Exchange's requirements are set out in Appendix D.

### Off-the-Exchange Secondary Distributions

#### Sec. 471.

Secondary distributions of listed securities must take place on the Exchange if a Participating Organization of the Exchange participates in the distribution as principal or agent, unless certain requirements are met. The Exchange's Listed Issuer Services should be contacted in connection with any proposed off-the-Exchange secondary distribution.

### M. Corporate Governance

#### Sec. 472.

Each listed issuer subject to National Instrument 58-101 *Disclosure of Corporate Governance Practices*, or any replacement of that instrument, is required to disclose its corporate governance practices in accordance with that instrument, or any replacement of that instrument.

The Exchange will monitor corporate governance disclosure of listed issuers. The Exchange will contact listed issuers who have not complied with this Section 472 to assist them in complying with the disclosure requirement. Non-complying listed issuers will be required to publish amended disclosure in the listed issuer's next quarterly report.

The Exchange will publish the names of those listed issuers failing to comply with a request for amended disclosure. Continuing non-compliance could result in suspension and delisting.

Listed issuers who evidence a blatant and consistent disregard of the Exchange's disclosure requirement will be referred to the OSC and may be subject to other legal proceedings.

### Disclosure Requirement

#### Sec. 473. (Repealed.)

### Guidelines

#### Sec. 474. (Repealed.)

### Complete Disclosure

**Sec. 475. (Repealed.)**