UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | Master File No. 06 Civ. 6128 (NRB) |

**DEFENDANT PRICEWATERHOUSECOOPERS LLP'S, AN ONTARIO LIMITED LIABILITY PARTNERSHIP, MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**PUBLIC VERSION – PORTIONS REDACTED**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100
Facsimile: (214) 698-3400

**ATTORNEYS FOR DEFENDANT PRICEWATERHOUSECOOPERS LLP, AN ONTARIO LIMITED LIABILITY PARTNERSHIP**

## TABLE OF CONTENTS

I. Preliminary Statement ........ 1

II. Argument ........ 2

A. Standards Applicable to Class Certification ........ 2

B. Class Certification Should Be Denied Because Neither Westchester Nor Steelworkers Satisfies The Typicality And Adequacy Requirements of Rule 23(a) ........ 4

1. Westchester Lacks Article III Standing to Assert A Claim Under Section 10(b) and, Therefore, Fails The Typicality Requirement Of Rule 23(a)(3) ........ 4

2. Because Westchester Is Subject To A Unique Defense, Westchester's Claims Are Atypical Under Rule 23(a)(3) And Westchester Cannot Adequately Represent The Proposed Class ........ 6

3. Steelworkers Cannot Satisfy The Adequacy Requirements of Rule 23(a)(4) Because Its Economic Interests Conflict With Those of Absent Class Members ........ 8

C. Class Certification Must Be Denied Because Plaintiffs Fail to Prove that Common Issues Predominate Over Individual Issues As Required by Rule 23(b)(3) ........ 10

1. Because Plaintiffs Seek to Establish Predominance By The Fraud-on-The-Market Presumption, Plaintiffs Must Make A Showing of Loss Causation By A Preponderance Of All Admissible Evidence At The Class Certification Stage ........ 10

2. Plaintiffs Are Not Entitled To The Fraud On The Market Presumption Of Reliance Because They Fail To Make the Requisite Showing of Loss Causation ........ 12

D. If The Court Grants Certification, Foreign Purchasers of Shares Traded On A Foreign Exchange Must Be Excluded From The Class Because The Court Does Not Have Subject Matter Jurisdiction Over Such Claims ........ 16

III. Conclusion ........ 18

## TABLE OF AUTHORITIES

### CASES

*Access 4 All, Inc. v. G&T Consulting Co., LLC*,
No. 06 Civ. 13736, 2008 WL 851918 at *1 (S.D.N.Y. Mar 28, 2008) .......... 4
*Alfadda v. Fenn*, 935 F.2d 475 (2d Cir. 1991) .......... 17
*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .......... 8, 9
*Baffa v. Donaldson*, 222 F.3d 52 (2d Cir. N.Y. 2000) .......... 6
*Basic v. Levinson*, 485 U.S. 224 (1988) .......... 7, 10, 11
*Berger v. Weinstein*,
No. 07-994, 2008 WL 3183404 at *1 (E.D. Pa. Aug., 6, 2008) .......... 5
*Blair-Naughton , L.L.C. v. Diner Concepts, Inc.*,
No. 06-1183, 2007 WL 4463584 at *1 (D. Kan. Dec. 17, 2007) .......... 6
*Cardillo v. Shalala*,
No. 93 Civ. 2445, 1994 WL 263412 at *1 (S.D.N.Y. June 13, 1994) .......... 5
*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .......... 8, 10, 12, 15
*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006) .......... 3
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) .......... 6
*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) .......... 6
*Hallet v. Li & Fung, Ltd.*,
No. 95 Civ. 891, 1997 WL 621111 at *1 (S.D.N.Y. Oct. 6, 1997) .......... 7
*In re Adelphia Comm. Corp. Sec. Litig.*,
No. 03-1529, 2009 WL 73117 at *1 (S.D.N.Y. Jan. 6, 2009) .......... 6
*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) .......... 13
*In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62 (S.D.N.Y. 1999) .......... 17
*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008, as amended January 16, 2009) .......... 3
*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) .......... passim
*In re Nortel Networks Corp. Sec. Litig.*,
No. 01 Civ. 1855, 2003 WL 22077464 at *1 (S.D.N.Y. Sept. 8, 2003) .......... 17
*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .......... 8, 9
*In re Williams Sec. Litig.*,
No. 07-5119, 2009 WL 388048 at *1 (10th Cir. Feb. 18, 2009) .......... 15
*Itoba Ltd., v. LEP Group, PLC*, 54 F.3d 118 (2d Cir. 1995) .......... 16
*James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529 (1991) .......... 5
*Jobie O v. Spitzer*,
No. 03 Civ. 8331, 2007 WL 4302921 at *1 (S.D.N.Y. Dec. 5, 2007) .......... 4
*Jones v. Goord*, 435 F. Supp. 2d 221 (S.D.N.Y. 2006) .......... 4
*Landry v. Price Waterhouse*, 123 F.R.D. 474 (S.D.N.Y. 1989) .......... 7
*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) .......... 10
*Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161 (2d Cir. 2005) .......... 13
*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) .......... 17
*Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 176 (2d Cir. 2008) .......... 18
*Nathan Gordon Trust v. Northgate Exploration, Ltd.*,
148 F.R.D. 105 (S.D.N.Y. 1993) .......... 16, 17
*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir. 2007) .......... 10, 11

*Prado-Steinem ex rel Prado v. Bush*, 221 F.3d 1266 (11th Cir. 2000) .... 4
*Salsitz v. Peltz*, 210 F.R.D. 95 (S.D.N.Y. 2002) .... 4
*See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298 (S.D.N.Y. 2005) .... 11, 15
*Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976) .... 4
*Sobel v. Yeshiva University*, 839 F.2d 18 (2d Cir. 1988) .... 5
*Sosna v. Iowa*, 419 U.S. 393 (1975) .... 4
*Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 46 F.3d 196 (2d Cir. 2008) .... 3, 10, 11, 12
*United States Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) .... 4
*W.R. Huff Mgmt. Co., LLC v. Deloitte & Touche, LLP*, 549 F.3d 100 (2d Cir. 2008) .... 5, 6
*Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466 (S.D.N.Y. 1983) .... 8

**RULES**

Federal Rule of Civil Procedure 23 .... passim

**OTHER AUTHORITIES**

Henry P. Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L. J. 1363 (1973) .... 4

**PUBLIC VERSION – PORTIONS REDACTED**

Defendant PricewaterhouseCoopers LLP ("PwC-Canada"), an Ontario limited liability partnership, respectfully submits memorandum of law in opposition to Plaintiffs' Motion for Class Certification.[1]

## I.
## PRELIMINARY STATEMENT

Lead Plaintiff Westchester Capital Management, Inc. ("Westchester") and The Steelworkers Pension Fund Trust ("Steelworkers") (collectively, "Plaintiffs") seek the Court's certification of a single class of "[a]ll persons and entities who purchased or otherwise acquired IMAX common stock from February 23, 2003 through July 20, 2007, inclusive. . . and who were damaged thereby."[2] As the parties seeking class certification, Plaintiffs have the burden of demonstrating by a preponderance of the evidence that they meet all of the requirements of Federal Rule of Civil Procedure 23 ("Rule 23").

Plaintiffs have failed to meet their burden. First, Westchester and Steelworkers do not satisfy the typicality and adequacy requirements of Rule 23(a) because (i) Westchester did not obtain legal title to any of the claims it asserts until well after this litigation commenced, and thus, under binding Second Circuit authority, lacks constitutional standing to assert a claim under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") and is atypical of the class which it purports to represent; (ii) Westchester is further atypical and cannot adequately represent the proposed class because Westchester is subject to a unique defense [redacted]; and (iii) Steelworkers, due to the timing of its purchases of IMAX stock, has an

---

1 Defendants IMAX Corporation ("IMAX"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble (collectively, the "IMAX Defendants") have filed a separate opposition to Plaintiffs' Motion for Class Certification. PwC-Canada hereby joins in and incorporates that opposition in all respects.

2 Mem. of Law in Supp. of Plaintiffs' Mot. for Class Certification at p. 2.

economic incentive to minimize the impact of the vast majority of alleged misstatements, creating an intra-class conflict that renders Steelworkers an inadequate class representative.

Second, Plaintiffs cannot establish that common issues predominate over individual issues under Rule 23(b). Although Plaintiffs seek to establish the reliance element of their Section 10(b) claims through the "fraud-on-the-market" presumption, they cannot do so because they have not established the causal link between the alleged misstatements and their alleged losses by a preponderance of the evidence.

Finally, even if certification is granted, foreign purchasers of IMAX stock traded on the Toronto Stock Exchange (the "TSE") should be excluded from the class because the Court does not have subject matter jurisdiction over those claims.

For all of these reasons, class certification claim should be denied.

## II.
## ARGUMENT

### A. Standards Applicable to Class Certification

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006) ("*In re IPO*").[3] Rule 23(a) states that a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). A party seeking class certification must also satisfy at least one of the subparts of Rule 23(b). Plaintiffs here seek certification under Rule

---

[3] Unless otherwise indicated, all emphasis is added and all internal quotations and citations omitted.

23(b)(3) which requires a plaintiff to show "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

On a motion for class certification, Plaintiffs bear the burden of producing sufficient admissible evidence, beyond the mere allegations in the complaint, to satisfy all of the requirements of class certification under Fed. R. Civ. P. 23. *See In re IPO*, 471 F.3d at 41 ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006). It is insufficient for Plaintiffs merely to make "some showing" that the requirements of Rule 23 have been satisfied. *In re IPO*, 471 F.3d at 42. Rather, the Plaintiffs must prove by a **preponderance of the evidence** that the requirements of Rule 23 have been met. *Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc.*, 46 F.3d 196, 202 (2d Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008, as amended January 16, 2009).

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met." *In re IPO*, 471 F.3d at 27. "Such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *Id.* at 41. A district court's ruling on class certification must be the result of a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues." *Id.* "[T]he fact that a Rule 23 requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met." *Id.* at 27.

## B. Class Certification Should Be Denied Because Neither Westchester Nor Steelworkers Satisfies The Typicality And Adequacy Requirements of Rule 23(a)

### 1. Westchester Lacks Article III Standing to Assert A Claim Under Section 10(b) and, Therefore, Fails The Typicality Requirement Of Rule 23(a)(3)

When considering Plaintiffs' Motion for Class Certification, and in conjunction with the required Rule 23 analysis, the Court must consider whether a proposed class representative has individual standing to bring a Section 10(b) claim against the Defendants. Analysis of individual constitutional standing under Article III is necessary because "[a] litigant must be a member of a class which he or she seeks to represent" *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Salsitz v. Peltz*, 210 F.R.D. 95, 99 (S.D.N.Y. 2002); *see also Jobie O v. Spitzer*, No. 03 Civ. 8331, 2007 WL 4302921 at *3 (S.D.N.Y. Dec. 5, 2007) ("[I]n order to represent a class, the named plaintiff must personally have standing to litigate his own claim.") (*citing Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 40 n. 20 (1976)). "There cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class." *Prado-Steinem ex rel Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

In addition, a party seeking to represent a class must have standing at the outset of the litigation, and cannot use a later-acquired injury to meet this burden. Standing is "'the requisite personal interest that **must exist at the commencement** of the litigation.'" *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (quoting Henry P. Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L. J. 1363, 1384 (1973)). Thus, "standing is determined at the time a complaint is filed." *Jones v. Goord*, 435 F. Supp. 2d 221, 255 (S.D.N.Y. 2006); *see also Access 4 All, Inc. v. G&T Consulting Co., LLC*, No. 06 Civ. 13736, 2008 WL 851918 at *3 (S.D.N.Y. Mar 28, 2008) ("[A] plaintiff must have standing at the time a lawsuit is filed.").

The Second Circuit recently held that an investment advisor, seeking relief on behalf of its clients, must have "legal title or ownership of its clients' claims" in order to satisfy the injury-in-fact requirements of Article III standing. *W.R. Huff Mgmt. Co., LLC v. Deloitte & Touche, LLP*, 549 F.3d 100, 111 (2d Cir. 2008).[4] It is not sufficient that the investment advisor meet the test for statutory standing as a purchaser under Section 10(b) – these factors are "separate and apart from the elements of constitutional standing" and "cannot be used to avoid constitutional requirements." *Id.* at 106.

Here, Westchester did not obtain legal title or ownership of any of its clients' claims until January 16, 2009, a year and a half after the filing of this action, [redacted][5] The original complaint in this action was filed on August 11, 2006; Westchester filed a motion for appointment as lead plaintiff on October 10, 2006; and the Consolidated Amended Class Action Complaint (the "Complaint") was filed on October 2, 2007. All of these critical events occurred well before the assignment to Westchester of legal title to its clients' claims and come too late to provide a valid basis for Article III standing. *See, e.g., Berger v. Weinstein*, No. 07-994, 2008 WL 3183404 at *3, n. 4 (E.D. Pa. Aug., 6, 2008) ("[A]n assignment of legal rights which takes place after the commencement of litigation does not abdicate the constitutional requirement that standing 'must exist from the commencement of litigation.'")

---

[4] W.R. *Huff* applies to this case, notwithstanding that it was decided during the pendency of Plaintiffs' Motion for Class Certification. *See, e.g., Sobel v. Yeshiva University*, 839 F.2d 18, 29-30 (2d Cir. 1988) ("It is beyond question that a pending case must be decided under the law in effect at the time it is decided, as opposed to that governing when the case was tried, if the law changes in the interim"); *Cardillo v. Shalala*, No. 93 Civ. 2445, 1994 WL 263412 at *2 (S.D.N.Y. June 13, 1994) ("[W]hen an appellate court 'has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata.'") (*quoting James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 544 (1991)).

[5] A true and correct copy of [redacted] is attached as Exhibit A to the Declaration of M. Byron Wilder in Supp. of PricewaterhouseCoopers LLP's Mem. of Law in Opp. to Plaintiffs' Mot. for Class Certification (the "Wilder Dec."), filed herewith.

(quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)); *Blair-Naughton , L.L.C. v. Diner Concepts, Inc.*, No. 06-1183, 2007 WL 4463584 at *2 (D. Kan. Dec. 17, 2007) ("Standing is determined at the time an action is commenced . . . . Accordingly, the courts have rejected retroactive attempts to create standing by use of eleventh-hour assignments.").

Because Westchester Capital did not have legal title and, thus, had suffered no "injury-in-fact" at the commencement of this litigation, it did not have Article III standing and cannot serve as class representative. Further, since it is undisputed that Westchester did not have constitutional standing at the commencement of this litigation, Westchester's claims should be dismissed. *See In re Adelphia Comm. Corp. Sec. Litig.*, No. 03-1529, 2009 WL 73117 at *1 (S.D.N.Y. Jan. 6, 2009) (dismissing case on remand from *W.R. Huff* because investment advisor lacked constitutional standing).

### 2. Because Westchester Is Subject To A Unique Defense, Westchester's Claims Are Atypical Under Rule 23(a)(3) And Westchester Cannot Adequately Represent The Proposed Class

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement of Rule 23(a)(3) is not satisfied, and therefore class certification is inappropriate, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson*, 222 F.3d 52, 59 (2d Cir. N.Y. 2000) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

[redacted]

[redacted][6] [redacted][7] [redacted][8] [redacted][9] Consequently, Westchester did not make trading decisions based on the existence of an efficient market or the dissemination to the market of the alleged misstatements by PwC-Canada; [redacted][10]

In other words, it relied on the belief that the market for IMAX stock *did not* correctly incorporate information about the stock and that Westchester could profit from that market *inefficiency*. *See Basic v. Levinson*, 485 U.S. 224, 248 (1988) ("Any showing that severs the link between the alleged misrepresentation and . . . [plaintiff's] decision to trade at a fair market price will be sufficient to rebut the presumption of reliance.").[11] Further, Westchester's stance that the market is inefficient will color any argument that it makes that the market for IMAX stock

---

6 [redacted] A true and correct copy [redacted] is attached as Exhibit B to the Wilder Dec.

7 A true and correct copy [redacted] is attached as Exhibit C to the Wilder Dec. A true and correct copy [redacted] is attached as Exhibit D to the Wilder Dec.

8 [redacted]

9 [redacted]

10 [redacted]

11 "The defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to 'devote considerable time to rebut the unique defense.'" *Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 891, 1997 WL 621111 at *3 (S.D.N.Y. Oct. 6, 1997) (*quoting Landry v. Price Waterhouse*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989)).

immediately absorbs all public information – an argument that will need to be asserted on behalf of less sophisticated class members who intend to rely on the fraud-on-the-market presumption of reliance available under *Basic*.

This unique defense against Westchester, and the time Westchester will need to devote to attempting to rebut it, "may have the ultimate effect of prejudicing members of the proposed class." *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466, 1471 (S.D.N.Y. 1983). Because a unique defense makes Westchester's claims atypical under Rule 23(b)(3) and prevents Westchester from adequately representing the remainder of the class, Westchester cannot serve as class representative.

### 3. Steelworkers Cannot Satisfy The Adequacy Requirements of Rule 23(a)(4) Because Its Economic Interests Conflict With Those of Absent Class Members

Rule 23(a)(4) provides that, to obtain class certification, a plaintiff must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This rule requires courts to inquire whether the proposed class representative's interests "are antagonistic to the interest of other members of the class." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 142 (2d Cir. 2001) (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997)).

Plaintiffs allege in the Complaint that, as a result of inflation caused by the alleged misrepresentations, Plaintiffs purchased stock at artificially high prices.[12] At the damages stage, Plaintiffs will be required to show the inflationary impact of each of the alleged misstatements – and will only be able to recover damages for artificial inflation that was incorporated into the stock price at the time of purchase. S*ee generally Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-43 (2005).

---

12 Consol. Am. Class Action Compl. at ¶ 230.

[redacted][13] Steelworkers, therefore, will only be able to recover for damages suffered as a result of alleged misstatements made before September 14, 2005. Thus, Steelworkers has a strong incentive to pursue a legal strategy that maximizes the inflationary impact of pre-September 14, 2005 statements and minimizes the impact of post-September 14, 2005 statements. The Complaint, however, focuses heavily on the alleged misstatements regarding IMAX's 2005 financial statements – which were not announced until February 17, 2006.[14]

Because of Steelworkers' economic interests, its best legal strategy would be to downplay these later alleged, but proportionally significant, misrepresentations – embracing a weaker strategy for class members who purchased IMAX stock after February 17, 2006. Such economic conflicts are at the heart of the intraclass conflict problem described by *Amchem* and its progeny – "their anticipated recoveries depend on and are maximized by different theories and economic assumptions; those theories and assumptions are incompatible or (at best) incoherent when advanced at once; there are winners and losers in the class; and the distribution of those competing interests creates a problem that cannot be resolved by subclass representatives." *In re Visa Check/MasterMoney*, 280 F.3d at 158 (Jacobs, J. dissenting). Therefore, Steelworkers does not satisfy the adequacy requirements of Rule 23(a) and cannot be appointed as a class representative.

---

13 A true and correct copy [redacted] is attached as Exhibit E to the Wilder Dec.

14 Consol. Am. Class Action Compl. at ¶ 95-114. Plaintiffs seek certification of a class of "all persons and entities who purchased or otherwise acquired IMAX common stock from February 27, 2003 through July 20, 2007." Mem. of Law in Supp. of Plaintiffs' Mot. for Class Certification at p. 2. Such proposed class would necessarily include persons who purchased after September 14, 2005 and who would therefore be able to recover damages, if any, for artificial inflation as a result of post-September 14, 2005 alleged misstatements..

### C. Class Certification Must Be Denied Because Plaintiffs Fail to Prove that Common Issues Predominate Over Individual Issues As Required by Rule 23(b)(3)

#### 1. Because Plaintiffs Seek to Establish Predominance By The Fraud-on-The-Market Presumption, Plaintiffs Must Make A Showing of Loss Causation By A Preponderance Of All Admissible Evidence At The Class Certification Stage

To satisfy the predominance requirement of Rule 23(b)(3), Plaintiffs seek to rely on the "fraud-on-the-market" presumption of reliance set forth in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). The fraud-on-the-market theory creates a presumption that investors purchased stock in reliance on the integrity of the market, thus establishing reliance as a common issue as contemplated by Rule 23(b)(3). As the Fifth Circuit recently explained in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 266 (5th Cir. 2007), Plaintiffs are required to demonstrate loss causation, by a preponderance of the evidence, at the class certification stage before they can "trigger" the fraud-on-the-market presumption. Because the Fifth Circuit opinion in *Oscar* is based directly on the Supreme Court's ruling in *Basic* and is consistent with the principles set forth by the Second Circuit in *In re IPO* and *Teamsters Local*, *Oscar* is persuasive and should be followed here.

In *Oscar*, the Fifth Circuit held that loss causation is "a fraud on the market prerequisite" that "must be established at the class certification stage by a preponderance of all admissible evidence." 487 F.3d at 266, 269. This is because loss causation provides "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007). To establish loss causation, a securities fraud plaintiff must prove a direct causal connection between the alleged misrepresentation and the decline in the company's share price. *Dura Pharm.*, 544 U.S. at 341-43. Where the alleged misrepresentation is a false opinion, plaintiffs must prove that a corrective disclosure, and not some other contemporaneously released information, revealed the truth and resulted in the decline of the

company's share price. *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005) ("*In re IPO II*").

In holding that loss causation must be proven by a preponderance of the evidence at the class certification stage, the Fifth Circuit relied on the Supreme Court's holding in *Basic* that the fraud-on-the-market presumption could be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." *Oscar*, 487 F.3d at 265 (*quoting Basic*, 485 U.S. at 248). Specifically, the presumption would be rebutted if Defendants "could show . . . that the market price would have not have been affected by their misrepresentations." *Oscar*, 487 F.3d at 265. Thus, where, as here, Plaintiffs cannot establish that their losses were caused by any alleged misstatement by PwC-Canada, the *Basic* link is severed and the fraud-on-the-market presumption is rebutted. Because "Rule 23 mandates a complete analysis of fraud-on-the-market indicators" and a showing of loss causation is a prerequisite to the fraud-on-the-market theory, the Fifth Circuit held that plaintiffs must prove loss causation by a preponderance of the evidence at the class certification stage. *Id.* at 267.

The Fifth Circuit's holding in *Oscar* is consistent with the Second Circuit's holdings in *In re IPO*, 471 F.3d at 41-42, and *Teamsters Local*, 46 F.3d at 202, and is persuasive. Although recent decisions in the U.S. District Court for the Southern District of New York have rejected the reasoning of *Oscar* as non-binding precedent,[15] the Second Circuit itself has not addressed the issue of whether loss causation must be established to trigger the fraud on the market presumption. However, in line with *Oscar*, the Second Circuit specifically rejected the notion that inquiry into a merits-related issue, such as loss causation, would be inappropriate at the class certification stage. *In re IPO*, 471 F.3d at 41. Moreover, the Second Circuit's recent trend towards higher scrutiny at

---

[15] In addition, all such opinions, as of the time of this filing, were issued prior to the Second Circuit's ruling in *Teamsters Local*, which cemented the "preponderance of the evidence" standard at the class certification stage.

the class certification stage, as reflected in *In re IPO* and *Teamsters Local*, suggests that the Second Circuit would find the reasoning in *Oscar* persuasive and would likely adopt the preponderance of the evidence standard once presented with the opportunity to consider the issue.

### 2. Plaintiffs Are Not Entitled To The Fraud On The Market Presumption Of Reliance Because They Fail To Make the Requisite Showing of Loss Causation

Here, Plaintiffs cannot invoke *Basic's* fraud-on-the-market presumption because they have failed to establish loss causation by a preponderance of the evidence. Plaintiffs do not provide any evidence demonstrating that the price declines occurring on the alleged corrective disclosure dates resulted from the revelation of fraud as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other [non-litigation related] events." *Dura Pharm.*, 544 U.S. at 341-43. In contrast to Plaintiffs' lack of evidence supporting loss causation, the analysis of PwC-Canada's expert, Professor Christopher James, confirms that Plaintiffs cannot demonstrate that any of their alleged losses were caused by misstatements attributable to PwC-Canada.[16]

The only statements made by PwC-Canada that Plaintiffs allege were false and misleading were contained within PwC-Canada's audit opinions on IMAX's year-end financial statements for the years ended December 31, 2002-2005 (the "Audit Opinions").[17] Thus, to establish loss causation for class certification purposes, Plaintiffs must prove, by a preponderance of the evidence, that (1) the Audit Opinions were false when made and that falsity was concealed from the market; (ii) they purchased IMAX stock after such statements were made, (iii) the falsity of the statements

---

[16] A true and correct copy of Professor Christopher James' Report dated February 23, 2009 is attached as Exhibit A to the Declaration of Christopher James In Support of PricewaterhouseCoopers LLP's Mem. of Law in Opp. to Plaintiffs' Mot. for Class Certification, filed herewith.

[17] *See* Consol. Am. Class Action Compl. at ¶¶ 187, 226-227.

was revealed to the market; and (iv) the disclosure negatively affected the price of the stock. *See Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)

In the Complaint, Plaintiffs allege nineteen corrective disclosure dates.[18] Of those, only seven are associated with significant company-specific stock price movement.[19] Of those seven, four do not contain new information that would correct alleged prior misrepresentations by PwC-Canada.[20] Thus, only three alleged corrective disclosure dates remain that may contain new information that may have corrected the alleged misrepresentations by PwC-Canada: the August 9, 2006 Press Release by IMAX ("August 9 Press Release")[21], the March 29, 2007 Press Release by IMAX ("March 29 Press Release"),[22] and the July 20, 2007 press release by IMAX (the "July 20 Press Release.").[23]

The August 9 Press Release is not a corrective disclosure because it did not reveal the truth of the alleged misstatements attributable to PwC-Canada, as required by *Dura*. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 296 (S.D.N.Y. 2006) ("[I]t is axiomatic that a concealed fact cannot cause a decrease in the value of a stock before the concealment is made public."). The press release expressly stated, with respect to the application of multiple element accounting to theater system installations: "the Company believes its application of the above [multiple-element] accounting policy is, and has historically been, in accordance with GAAP and the Company's

---

18 Consol. Am. Class Action Compl. at ¶¶ 115-139; *see also* James Report at ¶ 45.

19 James Report at ¶ 46.

20 James Report at ¶ 46, 51-68, and 76-80.

21 A true and correct copy of the August 9 Press Release is attached as Exhibit F to the Wilder Dec.

22 A true and correct copy of the March 29 Press Release is attached as Exhibit G to the Wilder Dec.

23 A true and correct copy of the July 20 Press Release is attached as Exhibit H to the Wilder Dec.

position is supported by its auditors."[24] In addition, there is plenty of other negative, company-specific information contained in the August 9 Press Release to explain the decrease in IMAX's stock price following the release: (1) IMAX's announcement that no one was willing to buy the company at the valuation sought by the Board of Directors; (2) IMAX's decision to focus on potential joint ventures; (3) IMAX management's decision to focus on its conversion to digital technology; (4) IMAX's retraction of its guidance for the remainder of 2006; and (5) IMAX's announcement of financial results for the 2nd Quarter of 2006 and its retraction of guidance as to future earnings.[25]

Plaintiffs' expert, Michael Marek, made no effort to determine how much, if any, of the decrease in IMAX's stock price following its August 9, 2006 press release was caused by any alleged misstatement by PwC-Canada – as opposed to the multiple items of unrelated bad news released by IMAX that day.[26] [redacted][27] In contrast, Professor James' analysis suggests that the other bad news, specifically the "no-buyer" announcement, was largely responsible for the price decline following the August 9, 2006 ,[28] but concludes that separating the effects of each

---

24 August 9 Press Release at p. 2.

25 *Id.* at pp. 1-2.

26 [redacted] A true and correct copy [redacted] is attached hereto as Exhibit I.

27 Marek Dep. 83:08-14.

28 James Report at ¶¶ 106 ("The announcement that IMAX had not found a buyer at the desired valuation level was viewed very negatively by the market, which was expecting a converse announcement, namely the announcement of a potential buyer . . . . Correspondingly, the lack of a buyer announcement and announcement that IMAX would search for buyers at a lower price negatively impacted market expectations and likely triggered the majority of the stock price decline on August 10, 2006.").

negative announcement may well be impossible.[29] It is Plaintiffs, not Defendants, who bear the burden of proving that the correction of the alleged misrepresentation, and not "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events" was responsible for all or a significant portion of the decline in price. *See Dura Pharm.*, 544 U.S. at 343; *In re IPO II*, 399 F. Supp. 2d at 307; *see also In re Williams Sec. Litig.*, No. 07-5119, 2009 WL 388048 at *5 (10th Cir. Feb. 18, 2009) ("The plaintiff bears the burden of showing that his losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price. Without showing a causal connection that specifically links losses to misrepresentations, he cannot succeed."). Having provided no analysis regarding the allocation of the price decline among the multiple announcements contained in the August 9 Press Release, Plaintiffs have not met this burden.

In addition, neither the March 29 Press Release nor the July 20 Press Release were a corrective disclosure. Both were released by IMAX *after* the "truth" that IMAX's historical financial statements were in error had been revealed to the market. On March 16, 2007, before the markets opened, IMAX disclosed that its prior audited financial statements were in error and, therefore, revealed to the market that the Audit Opinions on those financial statements were false when issued.[30] The March 29 Press Release announced a delay in filing the restatement, but did not provide additional information about IMAX's restatement beyond that provided in the March 16 Press Release.[31] Rather, this announcement was made in compliance with Ontario requirements

---

29 James Report at ¶¶ 145.

30 A true and correct copy of the March 16, 2007 Press Releases by IMAX (the "March 16 Press Release") is attached as Exhibit J to the Wilder Dec. Plaintiffs, however, do not allege any market reaction to the March 16 Press Release That is not surprising. IMAX's closing stock price on March 15, 2007 on the NYSE was $4.99 per share. The stock closed on March 16, 2007 at $5.00 per share. A true and correct copy of the Lexis Nexis Historical Quote for IMAX's stock price on March 15 and 16, 2007 is attached as Exhibit K to the Wilder Dec.

31 James Report at ¶ 157.

that companies update investors every two weeks on the status of their filing delays.[32] The July 20 Press Release announced the completion of the restatement.[33] Because the relevant "truth" had been revealed in March 2007, the July 20 Press Release was not a corrective disclosure but merely a republication of what the market already knew.

Because Plaintiffs provide no evidence that the losses following the August 9 Press Release are, in whole or in part, attributable to the alleged misstatements of PwC-Canada, and because the "truth" was already disseminated in the market prior to the March 29 and July 20 Press Releases, Plaintiffs have not met their burden of proving loss causation by a preponderance of the evidence. Therefore, Plaintiffs are not entitled to the fraud-on-the-market presumption of reliance to meet the predominance requirement of Rule 23(b)(3) and the motion for class certification should be denied.

### D. If The Court Grants Certification, Foreign Purchasers of Shares Traded On A Foreign Exchange Must Be Excluded From The Class Because The Court Does Not Have Subject Matter Jurisdiction Over Such Claims.

The Securities Exchange Act, under which Plaintiffs bring this case, is silent as to its territorial application. Therefore, "courts have developed two tests for determining subject matter jurisdiction over foreign transactions." *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y. 1993). Under the conduct test, "a federal court has subject matter jurisdiction if: (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere . . . and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses." *Itoba Ltd., v. LEP Group, PLC*, 54 F.3d 118, 122 (2d Cir. 1995). Under the effects test, a federal court has subject matter jurisdiction over a foreign transaction "where illegal activity abroad causes a 'substantial

---

32 James Report at ¶ 151.

33 Not surprisingly, IMAX's stock price actually increased in response to the July 20 Press Release – an indication that the market had expected the restatement to have a larger impact on IMAX's future cash flows than, in fact, it had. James Report at ¶ 160.

effect' within the United States." *Nathan Gordon Trust*, 148 F.R.D. at 108 (*quoting Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Here, the activities forming the basis of the claims asserted in the Complaint satisfy neither the conduct nor effects test for subject matter jurisdiction over a foreign transaction. In the Motion for Certification, Plaintiffs provide no factual support for the inclusion of foreign purchasers who purchased IMAX shares on the TSE. As legal support, Plaintiffs refer to two cases that are factually distinct from the instant case.[34] In *In re Nortel Networks Corp. Sec. Litig.*, the Court found subject matter jurisdiction existed over the foreign transactions based on allegations that "[d]efendants were extending vendor financing to **numerous U.S. customers** that defendants knew to be uncreditworthy, so as to artificially inflate the Company's revenues." No. 01 Civ. 1855, 2003 WL 22077464 at *8 (S.D.N.Y. Sept. 8, 2003). In *In re Gaming Lottery Sec. Litig.*, the Court certified a class including foreign purchasers because the allegations in the complaint "revolve[d] around [defendant's] **acquisition of United States companies** [and]. . . its activities within [the U.S.] borders are the very factual predicates of fraud which lie at the heart of plaintiffs' case." 58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999).

In contrast, the Plaintiffs' allegations here do not revolve around fraudulent transactions with U.S. customers or U.S. acquisitions. Rather, the allegations in the Complaint focus on IMAX's revenue recognition on worldwide theater installations. The alleged misstatements – the release of financial results and related press releases – were all issued from the headquarters of IMAX in Ontario. PwC-Canada conducted its audits at IMAX's Ontario headquarters and at its own offices in Toronto so essentially all of its activities were extra-territorial as well. As in *Morrison v. Nat'l;*

---

[34] Mem. of Law in Supp. of Plaintiffs' Mot. for Class Certification at p. 21.

*Australia Bank, Ltd.*, the alleged "actions taken and actions not taken" by IMAX and PwC-Canada and the Individual Defendants outside of the United States are "significantly more central to the [allegations] and more directly responsible for the harm to investors" than any activity that occurred in the United States. 547 F.3d 167, 176 (2d Cir. 2008).[35]

Thus, Plaintiffs have not met and cannot meet their burden to prove subject matter jurisdiction over the foreign transactions and this Court should exclude foreign purchasers who purchased IMAX securities on the TSE from any certified class.

## III. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Class Certification should be denied in its entirety. Alternatively, should the Court grant Plaintiffs' Motion in whole or in part, the Court should certify a class that excludes foreign purchasers of IMAX securities on the Toronto Securities Exchange.

---

[35] Indeed, a purported class action against IMAX and certain of its officers and directors, brought by Canadian purchasers of IMAX stock, is pending in Ontario. PwC-Canada respectfully requests that the Court take judicial notice of the pendency of this action, *Silver v. IMAX Corporation, et al.*, Case No. CV-06-3257-000, in the Superior Court of Justice in Ontario.

Dated: February 23, 2009

Respectfully Submitted,

By: ______________________

M. Byron Wilder

Jennifer L. Conn (JC-5753)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

M. Byron Wilder (admitted *pro hac vice*)
M. Cory Nelson (admitted *pro hac vice*)
Samantha A. Lunn (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 698-3400

**ATTORNEYS FOR DEFENDANT PRICEWATERHOUSECOOPERS LLP, AN ONTARIO LIMITED LIABILITY PARTNERSHIP**

100603554_7.DOC