UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

IN RE IMAX CORPORATION SECURITIES LITIGATION

Case No. 06 Civ. 6128 (NRB)
ECF Case

---------------------------------------------------------------- X

**Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class Certification**

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble

Of Counsel:
Lewis J. Liman

THIS MEMORANDUM CONTAINS CONFIDENTIAL INFORMATION. PURSUANT TO ¶ 7 OF THE STIPLUATION AND ORDER GOVERNING CONFIDENTIAL MATERIAL, ENTERED NOVEMBER 3, 2008, PORTIONS OF THE ELECTRONICALLY-FILED MEMORANDUM HAVE BEEN REDACTED AND AN UNREDACTED COPY HAS BEEN FILED WITH THE COURT UNDER SEAL

# TABLE OF CONTENTS

Page(s)


TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 4

I. THE PROPOSED CLASS IS NOT "SUPERIOR" UNDER RULE 23(b)(3) ........ 5

II. WESTCHESTER IS NOT AN ADEQUATE CLASS REPRESENTATIVE AND ITS CLAIMS ARE NOT TYPICAL ........ 11

A. Westchester lacks standing ........ 12

B. Westchester's claims are not typical ........ 14

III. THE CLASS PERIOD SHOULD EXTEND NO LATER THAN AUGUST 9, 2006 ........ 16

IV. CLASS CERTIFICATION SHOULD BE DENIED FOR PURCHASERS PRIOR TO FEBRUARY 17, 2006 ........ 18

A. The pre-February 2006 class flunks the "commonality" and "superiority" tests ........ 19

1. Questions of market efficiency pertinent to pre-February 2006 and post-February 2006 purchasers are entirely distinct ........ 19

2. The questions of fact and law pertinent to pre-February 2006 and post-February 2006 purchasers are entirely distinct ........ 21

B. Steelworkers is an atypical and inadequate class representative ........ 25

V. THE CLASS SHOULD NOT INCLUDE IN-AND-OUT SHAREHOLDERS ........ 28

CONCLUSION ........ 29

# TABLE OF AUTHORITIES


| Rules & Statutes | Page(s) |
|---|---|
| Fed. R. Civ. P. 23(b)(3) | 5 |
| Fed. R. Civ. P. 23(b)(3)(A)-(D) | 5 |
| Fed. R. Evid. 404(b) | 24 |
| 28 U.S.C. § 2072(b) | 13 |
| 28 U.S.C. § 1359 | 14 |

**Cases**

| Case | Page(s) |
|---|---|
| Abert Trading, Inc. v. Kipling Belgium N.V. / S.A., No. 00 Civ. 0478, 2002 WL 272408 (S.D.N.Y. Feb. 26, 2002) | 10 |
| Alaska Elec. Pension Fund v. Pharmacia Corp., No. 03-1513, 2007 WL 276150 (D.N.J. Jan. 25, 2007) | 17 |
| Amchem Prods. Inc. v. Windsor, 521 U.S. 591 (1997) | 11, 18, 21 |
| Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52 (2d Cir. 2000) | 14-15 |
| Bascom Launder Corp. v. Telecoin Corp., 15 F.R.D. 277 (S.D.N.Y. 1953) | 22 |
| Basic Inc. v. Levinson, 485 U.S. 224 (1988) | 15, 19 |
| Baur v. Veneman, 352 F.3d 625 (2d Cir. 2003) | 13 |
| Berger v. Weinstein, No. 07-994, 2008 WL 3183404 (E.D. Pa. Aug. 6, 2008) | 13 |
| Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989) | 20 |
| Comer v. Cisneros, 37 F.3d 775 (2d Cir. 1994) | 13 |
| Comm. to Prevent Mun. Bankr. v. Renne, 77 F.3d 488 (9th Cir. 1996) | 14 |

Page(s)

DeYoung v. Beddome,
707 F. Supp. 132 (S.D.N.Y. 1989) .................... 10

Didrickson v. U.S. Dept. of Interior,
982 F.2d 1332 (9th Cir. 1992) .................... 14

Diorinou v. H.E. Mezitis,
237 F.3d 133, (2d Cir. 2001) .................... 7

DiRienzo v. Philip Servs. Corp.,
232 F.3d 49 (2d Cir. 2000) .................... 10

Dubuque Stone Prods. Co. v. Fred L. Gray Co.,
356 F.2d 718 (8th Cir. 1966) .................... 13

Dura Pharm., Inc. v. Broudo,
544 U.S. 336 (2005) .................... 28

ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009) .................... 23

Eisen v. Carlisle & Jacquelin,
479 F.2d 1005 (2d Cir. 1973),
remanded on other grounds, 417 U.S. 156 (1974) .................... 21

FDIC v. Suffolk Place Assocs.,
270 A.D.2d 304 (N.Y. App. Div. 2d Dep't 2000) .................... 13

Fleeger v. Clarkson Co. Ltd.,
86 F.R.D. 388 (N.D. Tex. 1980) .................... 10

Friedlander v. Barnes,
104 F.R.D. 417 (S.D.N.Y. 1984) .................... 17

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,
528 U.S. 168 (2000) .................... 13

Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith,
903 F.2d 176 (2d. Cir. 1990) .................... 16

Green v. Wolf Corp.,
406 F.2d 291 (2d Cir. 1968) .................... 24

Hevesi v. Citigroup Inc.,
366 F.3d 70 (2d Cir. 2003) .................... 24-25

Page(s)

Howe v. Goldcorp Invs. Ltd.,
946 F.2d 944 (1st Cir. 1991) ........................................ 10

In re Houbigant, Inc.,
914 F. Supp. 997 (S.D.N.Y. 1996) ........................................ 9-10

In re Initial Pub. Offering Sec. Litig.,
471 F.3d 24 (2d Cir. 2006) ........................................ 4, 5, 19

In re Lloyd's Am. Trust Fund Litig.,
No. 96 Civ. 1262, 1998 WL 50211 (S.D.N.Y. Feb. 6, 1998) ........................................ 26

In re Merrill Lynch Tyco Research Sec. Litig.,
249 F.R.D. 124 (S.D.N.Y. 2008) ........................................ 5-6

In re Prudential Sec. Inc. Ltd. P'ships Litig.,
163 F.R.D. 200 (S.D.N.Y. 1995) ........................................ 25

In re Repetitive Stress Injury Litig.,
11 F.3d 368 (2d Cir. 1993) ........................................ 22

In re Royal Group Techs. Sec. Litig.,
No. 04 Civ. 9809 (HB), 2005 WL 3105341 (S.D.N.Y. Nov. 21, 2005) ........................................ 10

In re Salomon Analyst Metromedia Litig.,
544 F.3d 474 (2d Cir. 2008) ........................................ 4

In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,
209 F.R.D. 353 (S.D.N.Y. 2002) ........................................ 12

In re Visa Check / MasterMoney Antitrust Litig.,
280 F.3d 124 (2d Cir. 2001) ........................................ 19

In re WorldCom, Inc. Sec. Litig.,
219 F.R.D. 267 (S.D.N.Y. 2003) ........................................ 9, 17

In re WorldCom, Inc.,
343 B.R. 412 (S.D.N.Y. 2006) ........................................ 21

In re Zyprexa Prods. Liab. Litig.,
253 F.R.D. 69 (E.D.N.Y. 2008) ........................................ 18

Inda v. United Air Lines, Inc.,
83 F.R.D. 1 (N.D. Cal. 1979) ........................................ 6

Page(s)

Infodek, Inc. v. Meredith-Webb Printing Co.,
830 F. Supp. 614 (N.D. Ga. 1993) .......... 13

J & R Ice Cream Corp. v. California Smoothie Licensing Corp.,
31 F.3d 1259 (3d Cir. 1994) .......... 24

Johnson v. Celotex Corp.,
899 F.2d 1281 (2d Cir. 1990) .......... 22

Kaplan v. Gelfond,
240 F.R.D. 88 (S.D.N.Y. 2007) .......... 17

Kirkpatrick v. J.C. Bradford & Co.,
827 F.2d 718 (11th Cir. 1987) .......... 26

Kramer v. Caribbean Mills, Inc.,
394 U.S. 823 (1969) .......... 14

Landis v. N. American Co.,
299 U.S. 248 (1936) .......... 7

Landry v. Price Waterhouse Chartered Accountants,
123 F.R.D. 474 (S.D.N.Y. 1989) .......... 15

Lapin v. Goldman Sachs & Co.,
254 F.R.D. 168 (S.D.N.Y. 2008) .......... 15, 26

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005) .......... 28

Lewis Tree Serv., Inc. v. Lucent Tech. Inc.,
211 F.R.D. 228 (S.D.N.Y. 2002) .......... 6, 22

Lexington Ins. Co. v. Unionam. Ins. Co.,
No. 85 Civ. 9181, 1987 WL 11684 (S.D.N.Y. May 28, 1987) .......... 10

Maywalt v. Parker & Parsley Petroleum Co.,
67 F.3d 1072 (2d Cir. 1995) .......... 26

McLaughlin v. Am. Tobacco Co.,
522 F.3d 215 (2d Cir. 2008) .......... 19

Mitchell v. Texas Gulf Sulphur Co.,
446 F.2d 90 (10th Cir. 1971) .......... 6

Page(s)

Paraschos v. YBM Magnex Int'l,
130 F. Supp. 2d 642 (E.D. Pa. 2000) .......... 6, 7, 8

Piper Aircraft Co. v. Reyno,
454 U.S. 235 (1981) .......... 8

Plekowski v. Ralston Purina Co.,
68 F.R.D. 443 (M.D. Ga. 1975) .......... 21

Reichert v. Bio-Medicus, Inc.,
70 F.R.D. 71 (D. Minn. 1974) .......... 11

Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,
466 F.3d 88 (2d Cir. 2006) .......... 10

Sirota v. Solitron Devices, Inc.,
673 F.2d 566 (2d Cir. 1982) .......... 17

Sprague v. Gen. Motors Corp.,
133 F.3d 388 (6th Cir. 1998) .......... 22

Sprint Commc'ns Co. L.P. v. APCC Servs., Inc.,
128 S. Ct. 2531 (2008) .......... 13

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,
No. 05 Civ. 1898, 2006 WL 2161887 (S.D.N.Y. Aug 1, 2006),
aff'd, 546 F.3d 196 (2d Cir. 2008) .......... 19, 20

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,
546 F.3d 196 (2d Cir. 2008) .......... 4, 5

W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP,
549 F.3d 100 (2d Cir. 2008) .......... 12

Weintraub v. Texasgulf, Inc.,
564 F. Supp. 1466 (S.D.N.Y. 1983) .......... 15

Zapka v. Coca-Cola Co.,
No. 99 CV 8239, 2000 WL 1644539 (N.D. Ill. Oct. 27, 2000) .......... 21

Zinser v. Accufix Research Inst., Inc.,
253 F.3d 1180 (9th Cir. 2001) .......... 21

Page(s)

Other Authorities

78 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure
§ 1798.1 (3d ed. 2008) .......... 6

IMAX Corporation ("IMAX" or the "Company"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble (together, the "IMAX Defendants"), by counsel, respectfully submit this memorandum of law in support of their opposition to the Motion for Class Certification filed by Westchester Capital Management, Inc. ("Westchester") and The Steelworkers Pension Trust ("Steelworkers") (together, the "Plaintiffs").

## PRELIMINARY STATEMENT

This is not a proper case for certification as a class action. At best, this case involves two distinct classes – those who purchased IMAX securities after February 17, 2006 (when IMAX published the financial statements containing the alleged misstatements regarding multiple element arrangement accounting that are pleaded by Lead Plaintiff and are at the heart of the Complaint) and those who purchased IMAX securities prior to February 17, 2006 (the vast majority of whom did not hold through a corrective disclosure). The claims of the first class of investors are already being pursued in a global class action lawsuit in Canada that is much further advanced than this action and that would provide an avenue for relief for all class members. A second opt-out class action would simply result in duplicative proceedings, burdens on the court systems, and additional costs to both parties with no discernible benefit to the IMAX investors.

In addition, the Lead Plaintiff, Westchester, does not have standing and is atypical (and class certification should be denied for those reasons alone). Moreover, if Westchester is not an appropriate class representative (because it lacks standing), Steelworkers – which sold rather than bought pursuant to the disclosures at the heart of this litigation – is just as atypical and cannot represent the class.

The second class of IMAX investors are those who purchased prior to February 17, 2006. Their claims are fundamentally inconsistent with – and atypical of – those who purchased after IMAX announced its year-end 2005 earnings. That purported class involves: (1) different claims involving (2) different accounting issues raising different issues of (3) materiality, (4) market efficiency, and (5) scienter brought on behalf of (6) a fundamentally different group of shareholders. Further, IMAX has substantial defenses to the named plaintiff (Steelworkers) who has emerged to assert a claim based on pre-February 2006 financials that are atypical of any other member of the class. The Court should permit IMAX to resolve or litigate any issues with Steelworkers not burdened by the onus of a class action lawsuit.

Finally, class certification should be denied to both groups for the reasons cited in the brief by codefendant PriceWaterhouseCoopers LLP – Canada ("PWC") (in which arguments the IMAX Defendants join) and because Plaintiffs cannot establish loss causation. Moreover, the class period should be shortened.

## BACKGROUND

This case involves two separate groups of plaintiffs with two inconsistent sets of claims. The first are those investors who purchased IMAX stock after IMAX announced its financial results for fiscal year 2005. Those investors allege that IMAX prematurely recognized $17.5 million in revenue in its 2005 financial results by misapplying a complicated type of accounting called multiple element arrangement accounting ("MEA accounting") to 10 of IMAX's theater systems.[1] They allege that, in connection with several theater systems in the

[1] See Consolidated Amended Class Action Complaint, dated Oct. 2, 2007 ("Compl.") ¶ 57 ("The most significant impact was in 2005, where revenue for 10 installations was moved to later years (revenue and net earnings impact of $17.5 million and $9.7 million, respectively)") (citing 2006 Form 10-K, at 32, 45, 90) (emphasis omitted).

fourth quarter of 2005 and one theater system in the second quarter of 2006, IMAX improperly recognized revenue on the projector and sound systems before the installation of the final screen (deferring the revenue associated with the screen component to the period in which the final screen was installed). Consolidated Amended Class Action Complaint, dated Oct. 2, 2007 (the "Complaint" or "Compl.") ¶¶ 116-118. Their claims rely on the fact that IMAX restated revenue on the theaters, the statement in IMAX's Securities and Exchange Commission ("SEC") filings that the Company did not maintain adequate internal controls to correctly assess the identification of deliverables and their aggregation into units of accounting, and the allegation that the IMAX Defendants "kept abreast of the install progress." Compl. ¶ 92; see also Compl. ¶¶ 93, 94, 155. The Court has noted that this case involves accounting rules which "appear to be highly complex and to involve subjective judgments . . ." and violations of which are "far more technical than those in other cases where the defendants faced civil liability for the premature recognition of revenue in contravention of [Generally Accepted Accounting Principles ("GAAP")]." Memorandum and Order, Sept. 16, 2008 ("Opinion") at 21. It has also noted the potential availability of a reliance on auditors defense. Id.

The second group of investors spans a longer time frame and presents far different claims. These persons purchased IMAX stock during the time period from February 27, 2003 (when IMAX announced its earnings for 2002) to February 17, 2006. Most of these investors did not hold through a corrective disclosure. See Report of Lucy P. Allen, Ph.D, dated February 23, 2009 ("Allen Report") at 27-28.[2] The claims of the early group of investors have nothing to do with MEA accounting. Rather, Plaintiffs allege that IMAX mis-described its accounting policy. In its 2006 Form 10-K, IMAX restated revenue from one theater (out of 16) from 2002

---

[2] Attached to the Declaration of Lucy Allen, Ph.D, dated February 23, 2009.

and two theaters (out of 22) from 2004, without restating any revenue from theater installations in 2003 – for reasons having nothing to do with MEA. Affidavit of Edward MacNeil, dated February 23, 2009 ("MacNeil Aff."), ¶¶ 44, 46. There are no allegations of fact in the Complaint with respect to scienter as to these claims.

## ARGUMENT

A plaintiff seeking to expand his individual lawsuit to represent – and bind – absent class members faces a high hurdle. See, e.g., In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 40 (2d Cir. 2006) ("[A] district court may not grant class certification without making a determination that all of the Rule 23 requirements are met."); see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201-02 (2d Cir. 2008) ("Teamsters II"); In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 486 (2d Cir. 2008). As the Second Circuit has noted:

> In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy. It may then consider granting class certification where it 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' Fed. R. Civ. P. 23(b)(3).
>
> . . .
>
> We set forth the following standards, among others, to govern class certification: '(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; [and] (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement.'

Teamsters II, 546 F.3d at 201-02 (quoting Initial Pub. Offering, 471 F.3d at 41). The burden on each of these elements rests with the plaintiff by a preponderance of the evidence. Teamsters II, 546 F.3d at 202; see also Initial Pub. Offering, 471 F.3d at 30.

## I. THE PROPOSED CLASS IS NOT "SUPERIOR" UNDER RULE 23(b)(3)

Plaintiffs offer no more than an ipse dixit to meet their burden that a class action in the United States is superior, asserting, without any elaboration or case law support, that the existence of a parallel proceeding in Canada addressing the same conduct at issue in the present case "is no[t] [a] reason that the instant case should not be certified." Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, dated Oct. 31, 2008 ("Pl. Cert. Br.") at 21. That argument completely disregards the efficiency rationale for class actions and is insufficient to justify the extraordinary relief of certifying a class.

Under Rule 23, an opt-out class may only be certified where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). Where an opt-out class action would be either more (1) unfair or (2) inefficient than some other method for adjudicating the dispute, class certification should be denied. The Court must consider, inter alia: (i) the extent to which class members have an interest in prosecuting their claims individually; (ii) the extent of litigation already pending by or against members of the class; (iii) the desirability of concentrating the claim in a particular forum; and (iv) potential difficulties in the management of a class. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Accordingly, a class should not be certified where "litigation concerning the controversy [has] already [been] commenced by . . . members of the class." In re Merrill Lynch

Tyco Research Sec. Litig., 249 F.R.D. 124, 132 (S.D.N.Y. 2008); see Lewis Tree Serv., Inc. v. Lucent Tech. Inc., 211 F.R.D. 228, 230 n.2 (S.D.N.Y. 2002) (noting that where plaintiffs are members of other classes "it cannot be said that certifying another class action would be a superior method of adjudicating any controversy"); Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 107 (10th Cir. 1971) (class action was not superior when litigation in another forum was further advanced); Inda v. United Air Lines, Inc., 83 F.R.D. 1, 6 (N.D. Cal. 1979) (because litigation was ongoing in another district which appeared to include the entire class involving the same plaintiffs and same claims, class certification was not appropriate until the parties addressed the issue of overlap). In those circumstances, certification of a second class action lawsuit would generate precisely the concerns about "unnecessary litigation and duplicative fees, . . . delay, . . . complicated problems of judicial coordination . . . [,] the risk of disparate verdicts raising serious questions of fairness, and . . . the unequal distribution of . . . funds" that Rule 23 itself was designed to avoid. 78 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1798.1 (3d ed. 2008); see Paraschos v. YBM Magnex Int'l, 130 F. Supp. 2d 642, 647 (E.D. Pa. 2000) (dismissing U.S. class action as duplicative of pending "class actions mirroring the same securities fraud . . . by virtually the same proposed class of plaintiffs" in Canada).

Here, each of the absent parties who purchased IMAX stock from February 17, 2006 to August 9, 2006 are already putative members of a class action suit which was filed in the Superior Court of Justice in Ontario (the "Canadian Action") long before Plaintiffs sought class certification in this case and which is the subject of a pending motion for class certification.[3] In

[3] The Motion for Class Certification pursuant to the Ontario Class Proceedings Act ("CPA") was fully briefed by December 15, 2008 (by contrast, the present motion will not be fully briefed until June 3, 2009), oral argument concerning the motion was heard from December 16-20, 2008, and the parties are currently awaiting decision on the motion. Assuming that the Canadian court grants class certification, that decision is entitled to

the Canadian Action, the IMAX Defendants are testing plaintiffs' eligibility for certification of a global class. Assuming, however, that the Canadian court certifies a global class, class proceedings in the United States would not be considered "superior" and this motion for class certification should be denied.

In particular, the Canadian Action alleges misrepresentations and fraud, under the Ontario Securities Act (the "OSA") and the common law, that are based on the same allegations that post-February 2006 purchasers rely on here – material misstatements in reported theater systems revenue for the fourth quarter of 2005. See, e.g., Ex. C ¶¶ 22-51 (Notice of Motion for Leave to Plead the Causes of Action Contained in Part XXIII.1 of the *Securities Act* and for Certification as a Class Proceeding dated Feb. 27, 2008); Ex. D at 9 (Canadian Plaintiffs' Factum: Motion for certification pursuant to the *CPA* and leave pursuant to the *OSA*, dated Nov. 24, 2008). The Canadian plaintiffs also allege, as the U.S. plaintiffs do, that certain IMAX executives[4] knowingly made misrepresentations in the public disclosures. Ex. C ¶¶ 69-72, 80. Similar to the present action, the plaintiffs in the Canadian Action seek damages for the drop in the price of IMAX's stock that was allegedly the result of the above conduct (under Canadian

---

comity. See Diorinou v. H.E. Mezitis, 237 F.3d 133, 139-40 (2d Cir. 2001) (outlining different situations where U.S. courts defer to foreign courts as a matter of comity); id. at 142 ("American courts will normally accord considerable deference to foreign adjudications as a matter of comity"); Paraschos, 130 F. Supp. 2d at 647 (dismissing U.S. class action "on grounds of international comity and . . . in deference to the Canadian courts"). See Exs. A (Canadian plaintiffs' supplementary Factum in support of Motion for Leave and Certification, dated Dec. 6, 2008) and B (Responding Factum of IMAX Defendants and Proposed Defendants).

All exhibits referred to herein are identified in the Declaration of James D. Mathews, Esq., dated Feb. 23, 2009.

[4] The three individual defendants in the Canadian Action are also named here (Gelfond, Weschler and Joyce). The fourth individual defendant here (Gamble) is a "proposed defendant" in the Canadian Action, along with some of IMAX's directors. PWC is not named as a Defendant in the Canadian action, but that does not render the Canadian court "inferior." This Court has recognized the exceedingly high burden the plaintiffs face in a case against PWC. Any plaintiff who wishes to pursue a potential action against PWC can choose to do so in the United States; they should not be forced to forego the more liberal recovery rules in Canada to do so. Cf. Landis v. N. American Co., 229 U.S. 248, 254 (1936) (holding that courts may stay proceedings in deference to foreign action even if parties and issues are not identical).

law, as here, the plaintiffs must prove an actual loss to recover any damages). See Report of Professor Poonam Puri, dated February 23, 2009 ("Puri Report"), ¶ 169.[5]

Moreover, while Canadian law to some extent poses hurdles to plaintiffs that are different and higher than U.S. law, in many respects it is more favorable. Under Canadian statutory law, the plaintiff need not prove reliance and a defendant is strictly liable for a misrepresentation. Puri Report ¶ 141. In addition, while Canadian law requires proof of actual knowledge of misrepresentations to recover full benefit of the bargain damages (unlike U.S. law which permits recovery on proof of recklessness), it permits the recovery of damages, subject only to a cap, on proof meeting a much lower standard than the U.S. scienter requirement – i.e., proof of a misstatement subject only to proof by the defendants (not plaintiffs) of due diligence or reliance on an expert.[6] See Puri Report ¶¶ 163-166, 171-172. In any event, the possibility that less favorable substantive law will be applied in the foreign forum is relevant only when the "remedy provided by [the] alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981); Paraschos, 130 F. Supp. 2d at 647 ("[A]ny relief afforded to plaintiffs under Canadian law by the Canadian courts would be adequate, albeit it may differ from any specific relief afforded by this [U.S.] Court [since] Canadian law clearly provides causes of action for securities fraud . . . .").

Plaintiffs do not argue, nor could they, that the Canadian Action is an unfair or inefficient method for adjudicating the controversy or that U.S. law is somehow "superior."[7]

---

5 Attached to the Declaration of Professor Poonam Puri, dated February 23, 2009.

6 In this case, the OSA would limit plaintiffs' recovery for misrepresentations to 5% of IMAX's market capitalization (approximately $20.7 million). Puri Report ¶ 171. The OSA also limits recovery from individual defendants to $25,000 each or 50% of their aggregate compensation. Id.

7

CONFIDENTIAL
FILED UNDER SEAL

CONFIDENTIAL
FILED UNDER SEAL

Moreover, the lawyers representing the members of the class there (which is virtually identical to the class here) have been prosecuting their lawsuit aggressively and that lawsuit is much further advanced than the lawsuit here. Because of the liberal pre-trial procedures in Canada (see Puri Report ¶¶ 89-98), plaintiffs in the Canadian Action have already conducted document discovery and taken the cross-examinations (depositions) of the 10 material IMAX witnesses, as well as the cross-examination of the PWC partner responsible for the 2005 IMAX audit. And, given the limitations on the ability of this Court to certify a global class (see Defendant PWC's Opposition to Motion for Class Certification, dated February 23, 2009), only the Canadian court is in a position to grant full relief to all purchasers of IMAX stock.

Thus, the certification of a class in this case would generate precisely those concerns of competing securities lawsuits identified in In re WorldCom, Inc. Securities Litigation, 219 F.R.D. 267 (S.D.N.Y. 2003), including that "such suits would risk disparate results, threaten to increase the costs of litigation for all parties exponentially, pose an enormous burden for courts throughout the land, and encourage a race to judgment to obtain the limited funds that are available to fund any recovery that plaintiffs may win here." Id. at 304. Indeed, as the WorldCom court recognized, litigation by two sets of plaintiffs' lawyers in parallel proceedings would only decrease the potential recovery by putative class plaintiffs. Id.

In forum non conveniens cases where a party has actually stepped forward and chosen a U.S. court for resolving a dispute, the courts have not hesitated where appropriate "to stay or dismiss an action based on the pendency of a related proceeding in a foreign jurisdiction."

In re Houbigant, Inc., 914 F. Supp. 997, 1003 (S.D.N.Y. 1996). Courts consider the similarity of parties and issues, judicial efficiency, adequacy of available relief in the foreign forum, fairness and prejudice to each party, the temporal order in which the cases were filed, the connection between the litigation and the foreign forum, and the connection between the litigation and the United States. Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 94 (2d Cir. 2006). Each of those factors would support a denial of class certification in this case. The parties and issues are virtually identical; the relief available in the foreign forum is more than adequate because "Canadian law provides causes of action that are the same in all significant respects as those available under United States law," DeYoung v. Beddome, 707 F. Supp. 132, 137 (S.D.N.Y. 1989); deference to the foreign proceeding would best promote judicial efficiency because the parallel Canadian suit was filed long before Plaintiffs sought class certification in this case; and the Canadian suit is further along the litigation timetable.[8] See Fleeger v. Clarkson Co. Ltd., 86 F.R.D. 388, 392-93 (N.D. Tex. 1980) (canvassing Canadian law on shareholder derivative suits and determining that Canadian law provided rights similar to those provided under U.S. law).[9] Finally, because IMAX is a Canadian corporation, organized under the laws of Canada with its principal place of business in Canada, the connection between

[8] In cases where parallel foreign litigation is further along the litigation timetable, courts are especially attuned to judicial economy concerns. See Lexington Ins. Co. v. Unionam. Ins. Co., No. 85 Civ. 918 (MFL), 1987 WL 11684, at **4-5 (S.D.N.Y. May 28, 1987) (finding that judicial economy will be served by continuing this case in a forum where a significant amount of litigation has already taken place); Abert Trading, Inc. v. Kipling Belgium N.V. / S.A., No. 00 Civ. 0478 (RMB), 2002 WL 272408, at *6 (S.D.N.Y. Feb. 26, 2002) (determining that "[t]he interests of judicial economy would best be served by resolving issues in this case" in prior pending action in a foreign forum "covering essentially the same dispute between the parties").

[9] Case law in the forum non conveniens context further illustrates that the Canadian court is the appropriate forum to adjudicate this dispute. "The Second Circuit has concluded that Ontario, Canada is an adequate forum to try class actions based on violations of federal securities laws." In re Royal Group Techs. Sec. Litig., No. 04 Civ. 9809 (HB), 2005 WL 3105341, at *2 (S.D.N.Y. Nov. 21, 2005) (citing DiRienzo v. Philip Servs. Corp., 232 F.3d 49, 57-60 (2d Cir. 2000) (vacated on other grounds)). This conclusion is bolstered by the First Circuit's finding that in securities litigation, "Canadian courts will either apply American law . . . or they will apply Canadian laws that offer shareholders somewhat similar protections . . . " Howe v. Goldcorp Invs. Ltd., 946 F.2d 944, 952 (1st Cir. 1991). If a court will dismiss an action filed individually in favor of a Canadian action, that is all the more reason why this Court should not force absent plaintiffs – who have not chosen this forum – to forego relief in Canada.

this dispute and Canada is at least as strong as the connection between this dispute and the United States.

A fortiori, where Westchester here seeks to make a forum choice not solely on its own behalf but also on behalf of absent class members who have not stepped forward and who have indicated no preference for a U.S. forum to resolve their dispute, class certification should be denied. To the extent that any putative class member desires to pursue litigation in the United States, "any purchaser of . . . stock who has been harmed probably has been alerted to the existence of th[is] [lawsuit] and could seek to intervene in . . . [this] action[] at relatively little expense." See Reichert v. Bio-Medicus, Inc., 70 F.R.D. 71, 77 (D. Minn. 1974). This Court should not make the choice for absentee shareholders.

## II. WESTCHESTER IS NOT AN ADEQUATE CLASS REPRESENTATIVE AND ITS CLAIMS ARE NOT TYPICAL

There are additional reasons why class certification should be denied: Westchester lacks standing and its claims are not typical of other post-February 2006 purchasers. Further, the only other candidate for class representative – Steelworkers – purchased prior to February 2006 and, if anything, has an interest in supporting IMAX's defenses with respect to the post-February 2006 time period.[10]

[10] Westchester and Steelworkers allege the same set of corrective disclosures, beginning in August 2006 and continuing until July 2007, and seek damages based on the stock price drop following those corrective disclosures. See Compl. ¶ 229 ("The August 9, 2006 announcement of the SEC investigation and its subject matter partially disclosed what the Company's misrepresentation had concealed from the market and began to reveal what the July 20, 2007 disclosure confirmed"). Accordingly, to the extent that Westchester or other similarly situated plaintiffs are unsuccessful in proving either that Defendants acted with scienter on or after February 2006 or that the stock was inflated by those disclosures, the recovery for Steelworkers would only be enhanced. The class is therefore not "sufficiently cohesive to warrant adjudication by representation," Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 623 (1997), and fails the predominance test, which is "far more demanding" than the commonality requirement of Rule 23(a). Id. at 623-24.

**A. Westchester lacks standing**

In W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008), the Second Circuit squarely held that an investment advisor who acts only as attorney-in-fact and does not "have legal title to, or a proprietary interest in, the claim" does not have constitutional standing under the Securities Exchange Act. Id. at 108. The Court stated: "an instrument that authorizes the grantee to act as an agent or an attorney-in-fact for the grantor . . . does not confer standing to sue in the holder's own right because a power-of-attorney does not confer an ownership interest in the claim." Id.

It is elementary that to pursue a claim on behalf of a class, a putative class representative must have standing to pursue the claim on behalf of itself. See In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig., 209 F.R.D. 353, 358 (S.D.N.Y. 2002) (declining to certify an investment manager as class representative where it did not have standing). Westchester's first attempt to address its lack of standing came only hours before its representative was scheduled to sit for deposition and only after the IMAX Defendants put Westchester on notice of its constitutional deficiency. On January 12, 2009, the IMAX Defendants requested that Westchester produce "any assignment of claims, rights or interests between Westchester and the Advisee Funds" (Ex. G (Letter from Lewis Liman to Jill Abrams dated January 12, 2009));

CONFIDENTIAL
FILED UNDER SEAL

11

CONFIDENTIAL
FILED UNDER SEAL

That assignment is insufficient to support class certification (and Westchester should be dismissed as a named plaintiff) for two reasons. First, the court has an obligation to assure itself that the plaintiff "had Article III standing at the outset of the litigation." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 168, 180 (2000); see Baur v. Veneman, 352 F.3d 625, 638 n.11 (2d Cir. 2003) (quoting Comer v. Cisneros, 37 F.3d 775, 787 (2d Cir. 1994)) ("a plaintiff's standing is 'assessed as of the time the lawsuit is brought'"). After-the-fact assignments cannot retroactively confer standing where none existed. See Berger v. Weinstein, No. 07-994, 2008 WL 3183404, at *3 n.4 (E.D. Pa. Aug. 6, 2008) ("an assignment of legal rights which takes place after the commencement of litigation does not abdicate the constitutional requirement that standing 'must exist from the commencement of litigation'") (citing Friends of the Earth, 528 U.S. at 190).[12]

Second, even if these belated assignments could be construed to confer constitutional standing, this case is markedly different from Sprint Communications Co. v. APCC Servs., Inc., 128 S. Ct. 2531 (2008), where "the assignments were made for ordinary business purposes." Id. at 2545.[13] Here, Westchester only attempted to secure assignments from its clients after the IMAX Defendants inquired as to the existence of any such assignments.

CONFIDENTIAL
FILED UNDER SEAL

[12] The IMAX Defendants expect Westchester to argue that it should be permitted to cure its standing defect by substituting itself as the real party in interest pursuant to Federal Rule of Civil Procedure 17(a). This argument fails because status as a real party in interest and Article III standing are conceptually distinct and, as a procedural rule, Rule 17(a) cannot "abridge, enlarge or modify any substantive right" (see Rules Enabling Act, 28 U.S.C. § 2072(b)), including constitutional standing. Further, a plaintiff may only proceed as the real party in interest based on a post-complaint assignment where – unlike here – the plaintiff is a real party in interest in at least one other claim. Infodek, Inc. v. Meredith-Webb Printing Co., 830 F. Supp. 614, 620 (N.D. Ga. 1993) (citing Dubuque Stone Prods. Co. v. Fred L. Gray Co., 356 F.2d 718, 724 (8th Cir. 1966)).

[13] See also FDIC v. Suffolk Place Assocs., 270 A.D.2d 304, 305 (N.Y. App. Div. 2d Dep't 2000) (distinguishing between assignments made for "a legitimate business purpose" and those made "for the very purpose of bringing suit . . . [to the] exclusion of any other purpose") (citing cases).

.[14] In effect,

the assignments in question were executed as a contrivance –

and to manufacture Article III

standing. See Comm. to Prevent Mun. Bankr. v. Renne, 77 F.3d 488, 488 (9th Cir. 1996) (Plaintiffs may not "retroactively create jurisdiction based on postcomplaint litigation conduct" to "manufacture standing where it did not exist") (quoting Didrickson v. U.S. Dep't of Interior, 982 F.2d 1332, 1339 (9th Cir. 1992)).[15]

**B. Westchester's claims are not typical**

Westchester's claims are also atypical and it is an inadequate class representative. At deposition,

CONFIDENTIAL
FILED UNDER SEAL

---

14

15 See also 28 U.S.C. § 1359 ("A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court"); Kramer v. Caribbean Mills, Inc., 394 U.S. 823, 825 (1969) (the purpose of 28 U.S.C. § 1359 is "to prevent the manufacture of Federal jurisdiction by the device of assignment") (internal citations omitted).

16

17

CONFIDENTIAL
FILED UNDER SEAL

Westchester's distinctive facts subject it to a unique defense, defeating typicality, and making it an inadequate class representative. See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000) (holding that class certification is inappropriate where a putative class representative is subject to unique defenses that threaten to become the focus of the litigation); Lapin v. Goldman Sachs & Co., 254 F.R.D. 168, 179 (S.D.N.Y. 2008) ("The defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to devote considerable time to rebut the unique defense") (internal quotations and citations omitted). In order for any class member to recover here (unlike in Canada), Plaintiffs will have to establish that at the time they purchased IMAX stock the market for such stock was efficient. See Basic Inc. v. Levinson, 485 U.S. 224, 242-49 (1988). IMAX was treated as a small-cap stock by a number of investors and Defendants intend to put Plaintiffs to their burden. Unlike other less-sophisticated investors who will have to allege that they relied on IMAX's market price and the efficiency of the market, however, Westchester has admitted it relied on IMAX's potential merger and the inefficiency of the market. See, e.g., Baffa, 222 F.3d at 59 (rejecting a proposed class representative based in part on her status as a sophisticated broker); Landry v. Price Waterhouse Chartered Accountants, 123 F.R.D. 474, 476-77 (S.D.N.Y. 1989) (rejecting proposed class representative who did not purchase based on the integrity of the market); Weintraub v. Texasgulf, Inc., 564 F. Supp. 1466, 1471 (S.D.N.Y. 1983) (denying class certification where proposed class representative was a sophisticated speculative trader whose trading strategies would give rise to unique defenses).

CONFIDENTIAL
FILED UNDER SEAL

Surely, a class would be better served by a representative who would not have to grapple with unique defenses that would threaten to become the focus of the litigation. See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d. Cir. 1990) ("Regardless of whether the issue is framed in terms of the typicality of the representative's claims, or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.") (internal citations omitted).

## III. THE CLASS PERIOD SHOULD EXTEND NO LATER THAN AUGUST 9, 2006

Even if a class is certified, on Plaintiffs' theory of a curative disclosure, the class period should end on August 9, 2006.[18] On that date, IMAX announced its second quarter earnings. In the same announcement, IMAX disclosed that it had not found a merger partner at the desired valuation and that it was in the process of responding to an informal SEC inquiry regarding revenue recognition, "including [IMAX's] application of multiple element arrangement accounting in its revenue recognition for theatre systems." Ex. L (IMAX Corp. Press Release, Aug. 9, 2006). IMAX further disclosed that it believed its revenue recognition was in accordance with GAAP and that PWC supported that position.[19] After this announcement, IMAX's stock price fell by $3.90, or approximately 40%.

---

[18] The IMAX Defendants join PWC's argument that Plaintiffs cannot show loss causation from the August 9 disclosure and submit the Allen Report in support thereof. The legal principles that preclude class certification for PWC – as outlined in Defendant PWC's Opposition to Motion for Class Certification – apply with equal force to the IMAX Defendants.

[19] IMAX went on to specify that its application of MEA accounting was related to theater systems installed in 2005 and 2006: "The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed . . . This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006." Ex. L (IMAX Corp. Press Release, Aug. 9, 2006).

Purchasers after that date cannot allege any damages, and, even if they could, issues of loss causation will predominate over any common questions. Originally, all plaintiffs and movants for lead plaintiff "agree[d] that the relevant class period ended on August 9, 2006." Kaplan v. Gelfond, 240 F.R.D. 88, 91 (S.D.N.Y. 2007). Only later did Plaintiffs allege a longer class period ending on July 20, 2007. See Compl. ¶ 21. The class period may not extend after curative information has been revealed. Alaska Elec. Pension Fund v. Pharmacia Corp., No. 03-1513 (RET), 2007 WL 276150, at *3 (D.N.J. Jan. 25, 2007) ("Curative information retracts or dispels the alleged misinformation, or puts the investor on inquiry notice of the alleged fraud, making further reliance on the original statements by investors unreasonable").[20]

Plaintiffs do not identify a single corrective disclosure that occurred after August 9, 2006 and caused a drop in IMAX's share price. After IMAX's July 20, 2007 restatement (the "Restatement"), which Plaintiffs claim was the real curative disclosure, the price of IMAX shares increased from $4.40 at close on July 19, 2007 to $4.85 at close on July 20, 2007, and then to $4.98 at close on July 23, 2007, the next trading day. Similarly, on March 16, 2007, when IMAX announced that it would restate certain prior financial statements and when Plaintiffs allege that "Gelfond admitted that it was 'incorrect accounting,'" (Compl. ¶ 126) the

---

[20] While courts have occasionally extended a class period beyond the first curative disclosure, such cases are inapposite. See, e.g., Sirota v. Solitron Devices, Inc., 673 F.2d 566, 572 (2d Cir. 1982) (a "substantial question of fact" existed over whether an allegedly curative press release had cured the market or was itself misleading); WorldCom, Inc. Sec. Litig., 219 F.R.D. at 307 (defendants could not point to a disclosure that addresses the conflict of interest alleged in plaintiffs' complaint and thus "significant questions of fact remain" as to when and how the market was informed of the alleged wrongdoing); Friedlander v. Barnes, 104 F.R.D. 417, 421 (S.D.N.Y. 1984) (allegedly curative press release regarding defendants' leveraged buy-out of the company was itself misleading and thus did not effect a cure). Such cases are inapplicable because they do not address the situation, as alleged here, where curative information was disseminated to the market and no reasonable person could dispute that the market had been warned by the disclosure.

share price rose from $5.00 at close on March 16, 2007 to $5.01 at close on March 19, 2007. Therefore, any class period certified should not extend beyond August 9, 2006.[21]

## IV. CLASS CERTIFICATION SHOULD BE DENIED FOR PURCHASERS PRIOR TO FEBRUARY 17, 2006

Perhaps recognizing the weakness of its claim, Westchester has sought to team up with a purchaser of IMAX stock prior to February 2006.[22] But, even if a class were to be certified for post-February 2006 purchasers, there is no basis to include in that class purchasers of IMAX stock going back to February 2003. The longer class period flunks the "commonality" and "superiority" tests, and the only party proposed to represent that group of investors – Steelworkers – does not satisfy the "typicality" or "adequacy" tests.[23] If Steelworkers wishes to pursue a claim against IMAX based on pre-2006 financials, the parties should be permitted to address that claim between themselves without the added burden of a class action.

---

[21] At a minimum, any class period should certainly not extend past August 11, 2006, when the first complaint was filed in this action. See In re Zyprexa Prods. Liab. Litig., 253 F.R.D. 69, 196 (E.D.N.Y. 2008) ("At the latest, once the suit was first commenced on June 20, 2005, all members of the class (or their representatives and advisors) knew or should have known of the claimed overcharge. No damages can be recovered for any purchases after that date."). The August 11, 2006 complaint informed potential purchasers that they were trading in a security that may have been overpriced. The complaint further informed potential purchasers that the earlier financial statements were under investigation and rendered any reliance on those statements unreasonable as a matter of law.

[22] See Steelworkers' Response to Competing Motions for Appointment as Lead Plaintiff, dated Oct. 27, 2006, at 5-6 ("Steelworkers does not contest Westchester Capital's appointment as lead plaintiff . . . Should the need arise, Steelworkers stands ready, willing and able to serve as either a class representative or lead plaintiff.").

[23] Absent Steelworkers, Westchester would never be qualified to represent – and could potentially compromise – the interests of pre-February 2006 investors. Its interests would be to establish that the full amount of any inflation in IMAX stock would be attributable to post-February 2006 announcements, and such interests render Westchester not sufficiently cohesive with pre-February 2006 investors. See Amchem, 521 U.S. at 623. Indeed, Westchester did not even know whether anyone reviewed any financial statements prior to IMAX's 2005 10-K filed in March 2006. Behren Tr. 157:4-22.

**A. The pre-February 2006 class flunks the "commonality" and "superiority" tests**

1. Questions of market efficiency pertinent to pre-February 2006 and post-February 2006 purchasers are entirely distinct

"'[A] plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof.'" Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05 Civ. 1898 (SAS), 2006 WL 2161887, at *4 (S.D.N.Y. Aug. 1, 2006) ("Teamsters I"), aff'd Teamsters II, 546 F.3d 196, 202 (quoting In re Visa Check / Master Money Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001)). Moreover, in an inefficient market, individual reliance inquiries predominate and the proposed class cannot be certified. See Teamsters I, 2006 WL 2161887, at *12; In re Initial Pub. Offering Sec. Litig., 471 F.3d at 43 ("Without the Basic presumption, individual questions of reliance would predominate over common questions."); McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 224 (2d Cir. 2008). Plaintiffs have not met their burden of showing that the rebuttable fraud-on-the-market presumption applies, particularly with respect to those investors who purchased before, and not in reliance on, the February 2006 statements.

CONFIDENTIAL
FILED UNDER SEAL

Accordingly, a plaintiff who purchased in February 2003, or 2004, or 2005 is not entitled to the same presumption of efficiency as a plaintiff who purchased in February 2006. He must prove it. See Basic, 485 U.S. at 242-49;

CONFIDENTIAL
FILED UNDER SEAL

However, here, Plaintiffs have not submitted any evidence with respect to the so-called Cammer factors (see Cammer v. Bloom, 711 F. Supp. 1264, 1285-87 (D.N.J. 1989))[24] from which the Court could conclude that the market was efficient prior to February 2006, relying instead on aggregate data including the period from February 2006 through July 2007.[25]

- Although Mr. Marek identified 14 analysts who covered IMAX at some point during the class period (Declaration of Michael A. Marek, dated Oct. 30, 2008 ("Marek Report") 14-15), he identified only two analysts who covered IMAX during the first six months of the alleged class period, Marek Report at Ex. F; Marek Tr. 115:8-23, and three analysts who covered IMAX during the first year of the alleged class period.[26] Marek Report at Ex. F; Marek Tr. 116:19-25, 117:8-13. These numbers disfavor a finding of efficiency. See Teamsters I, 2006 WL 2161887, at *6 (the existence of two analysts does not favor a finding of efficiency) (citations omitted).

- Mr. Marek analyzed only the bid-ask spread from April 2005, a date that is plainly insufficient to establish the efficiency of the market years before. Marek Report at 28; Marek Tr. 171:17-172:10.

- Mr. Marek was unable to identify a time period before April 2004 when insiders held less than 40% of IMAX stock (Marek Report at 23) – a factor that again suggests the market was inefficient in the earlier periods.

- Although Mr. Marek listed 24 market makers in his report (Marek Report at 18),

CONFIDENTIAL
FILED UNDER SEAL

- 

[24] The five Cammer factors are: (1) an active trading market, measured by share turnover rate; (2) the number of securities analysts following and reporting on the subject security; (3) the number of market makers; (4) whether the Company was eligible to file a Form S-3 registration statement; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events and financial releases and an immediate response in the stock price. In addition, Mr. Marek lists three additional factors used by some courts: (1) the Company's market capitalization; (2) the percentage of shares held by the public rather than insiders; and (3) the bid-ask spread for stock sales. See Declaration of Michael A. Marek, dated Oct. 30, 2008 ("Marek Report"), at 10-12.

[25]

CONFIDENTIAL
FILED UNDER SEAL

[26]

Finally, as supported by the Report of Lucy P. Allen, Ph.D, the turnover rate in IMAX stock during the class period demonstrates that the pre-February 2006 and post-Februrary 2006 classes of shareholders are comprised of different individuals and entities. See Allen Report at 27-29.[28] Thus, Plaintiffs have not proved that the market in which investors bought following the 2002, 2003 and 2004 10-Ks was efficient. They have simply asked the Court (improperly) to assume it.

2. The questions of fact and law pertinent to pre-February 2006 and post-February 2006 purchasers are entirely distinct

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997), a standard "far more demanding" than the commonality requirement of Rule 23(a). Id. at 623-24. Moreover, "when the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1192 (9th Cir. 2001). Complexity outweighs the benefits of class treatment where evidence admissible to support the claims of some class members is inadmissible to support the claims of other class members. See In re WorldCom, Inc., 343 B.R. 412, 427 (S.D.N.Y. 2006) (citing Zapka v. Coca-Cola Co., No. 99 CV 8239, 2000 WL 1644539, at *3 (N.D. Ill. Oct. 27, 2000)). In addition to complicating the class action's management, these evidentiary issues substantially prejudice the Defendants. See Plekowski v. Ralston Purina Co., 68 F.R.D. 443, 455 (M.D. Ga. 1975) (citing Eisen v. Carlisle &



27

28 See also Marek Report at 13-14 (finding an average weekly turnover of 5.22%).

Jacquelin, 479 F.2d 1005, 1013 (2d Cir. 1973), remanded on other grounds, 417 U.S. 156 (1974)) ("the utilization of the class action device does not justify disregarding the procedural safeguards established by the Constitution, by congressional mandate or by the Federal Rules of Civil Procedure"); Bascom Launder Corp. v. Telecoin Corp., 15 F.R.D. 277, 277 (S.D.N.Y. 1953) (finding a consolidation of actions inappropriate "where it may result in prejudice to one or more of the parties" or "would place upon a jury a difficult task of segregating testimony as applicable to one defendant and not to the others").[29]

Plaintiffs resort to no more than conclusory allegations of common questions of law and fact, generalized to the point of abstraction.[30] However, the allegations related to the 2002-2004 IMAX 10-Ks are significantly different from the allegations related to the 2005 10-K, and the proof that would be necessary to make out a claim for a securities violation in the period prior to February 2006 would be irrelevant to, and inadmissible in, a trial regarding the financial statements after February 2006. See Opinion at 20, 22 (drawing a distinction between 2002–2004 financial statements and 2005–2006 statements).

Revenue that was restated from fiscal years 2002–2004 was adjusted for completely different reasons than revenue from fiscal years 2005 and 2006. IMAX restated revenue for seven Q4 2005 theater system installations because the final silver screen was not installed at quarter-end. MacNeil Aff. ¶ 29. This restatement turned upon the application of

---

29 Even assuming arguendo that certifying a class would enhance judicial efficiency, "'[c]onsiderations of convenience and economy must yield to a paramount concern for a fair and impartial trial.'" In re Repetitive Stress Injury Litig., 11 F.3d 368, 373 (2d Cir. 1993) (citing Johnson v. Celotex Corp., 899 F.2d 1281, 1285 (2d Cir. 1990)).

30 See, e.g., Pl. Cert. Br. at 7 (listing questions, including "(a) whether the federal securities laws were violated by Defendants' acts; (b) whether the SEC filings, press releases, reports and other public statements made by Defendants and disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information; (c) whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period"). Asserting such non-specific and conclusory common questions is a gimmick that the Southern District of New York has rejected. Lewis Tree Serv., Inc. v. Lucent Tech. Inc., 211 F.R.D. 228, 232 (S.D.N.Y. 2002) ("'at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality'") (quoting Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998)).

MEA accounting under EITF 00-21, a principle the Court has recognized to be "complex" and that was not even in effect prior to 2004. Indeed, the first time IMAX recognized revenue on any part of a theater system before installing the final screen was in fiscal year 2005. Id. ¶ 41.

By contrast, Plaintiffs' claim with respect to the pre-February 2006 time period appears to be not that IMAX misapplied MEA accounting (none of the 2002-2004 installations raised questions regarding completion of the screen) but that IMAX misapplied different principles of accounting and mis-described its policies in its public filings. The one theater system installation that was restated from 2002 was adjusted because no certificate of acceptance could be located at the time of the Restatement. MacNeil Aff. ¶ 44. In accordance with the new policy, revenue for this theater was moved to the quarter in which the theater opened to the public. Id. No theater system revenue was adjusted for 2003. Id. ¶ 45. In 2004, the revenue for two theater system installations was shifted to a later fiscal year due, in one instance, to operational issues related to the projector following installation and in the other because of a relocation clause. Id. ¶ 46. There are no allegations in the Complaint with respect to scienter on these claims and there will be significant questions not only whether these judgments violated GAAP as it was understood at the time, but also whether any defendant had scienter or any errors were material.[31]

[31] Plaintiffs acknowledge – as they must – that the majority of the revenue restated came from fiscal year 2005. Compl. ¶¶ 144, 146, 147 (compare three total theater system installations restated from 2002-2004 with 10 theater system installations restated from the fourth quarter of 2005); .

CONFIDENTIAL
FILED UNDER SEAL

Pre-February 2006 purchasers could have only relied on audited year-end financial statements for 2002, 2003 and 2004. For 2002, the Restatement shifted only one theater (out of 16 originally recognized) into a later period. An investor who purchased after February 27, 2003 and before IMAX's Form 10-K for 2003 was filed in March of 2004 would thus have to show that this single installation was material. There is no allegation that IMAX misstated any theater

Thus, proof related to the pre-2005 installations would be entirely irrelevant and prejudicial in relation to the 2005 installations, just as proof with respect to the 2005 installations would be irrelevant and prejudicial with respect to pre-2005 installations.[32] Indeed, the only effect of the conflation of these two unrelated time periods would be the introduction into evidence in a single case evidence that would be inadmissible in a case involving the 2005 and 2006 financials alone. See Fed. R. Evid. 404(b); J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1269 (3d Cir. 1994) (holding that trial court's admission of evidence of prior misrepresentations that were not charged in complaint was abuse of discretion; reasoning that admitting such evidence where there is no common plan or scheme is "exactly the purpose Rule 404(b) declared to be improper").

The Courts have sometimes held that the "predominance," "commonality" and "superiority" tests are satisfied when there is evidence of a common scheme or plan, involving similar misrepresentations and similar allegations of fact. See, e.g., Green v. Wolf Corp., 406 F.2d 291, 299-300 (2d Cir. 1968) (finding that it would be "logical and efficient" for a plaintiff who purchased stock in reliance on one prospectus to represent those who purchased stock based on two other prospectuses because identical misrepresentations existed in all three prospectuses)

---

system revenue in 2003 and thus an investor who purchased prior to IMAX's Form 10-K for 2004 that was filed on March 10, 2005 would have to show that out of the total mix of information the information that was material was the single theater system installation in 2002. And, for 2004 (the period that would include Steelworkers), the only allegation is that IMAX's 2004 10-K was misleading in that it "fail[ed] to disclose that it was actually applying multiple element accounting inappropriately (to its theaters systems, which were ineligible for multiple element accounting treatment)." Compl. ¶ 52. Given that no theater systems revenue from 2002-2004 was restated because of errors in MEA accounting (MacNeil Aff. ¶ 47), materiality would be a very significant part of any case regarding the pre-2005 financial statements. See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) ("In order to determine whether a misleading statement is material, courts must engage in a fact-specific inquiry").

[32] The 10-K for 2005 and the 10-Qs for the first three quarters of 2006 did not contain the language from the 2002-2004 10-Ks about which Plaintiffs complain. See Ex. N (IMAX 2005 Form 10-K) at 34 ("The Company recognizes revenue from sales and sales type leases when the installation of the respective theater system element is substantially complete . . ."); see also Ex. O (IMAX Form 10-Q, May 9, 2006) at 30; Ex. P (IMAX Form 10-Q, Aug. 9, 2006) at 33; Ex. Q (IMAX Form 10-Q, Nov. 9, 2006) at 34 (same).

(emphasis added). In those instances, proof of the earlier misstatement helps establish proof of the later misstatement and the efficiencies that come from trying the entire dispute in one forum satisfy the efficiency and fairness goals of Rule 23. This case could not be more different. This is not a case in which "the defendants 'committed the same wrongful acts in the same manner against all members of the class.'" Hevesi v. Citigroup Inc., 366 F.3d 70, 82-83 (2d Cir. 2003) (quoting In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 208 (S.D.N.Y. 1995)).

In its opinion on the motion to dismiss, this Court noted "the applicable accounting rules appear to be highly complex and to involve subjective judgments and . . . the participation of PWC [] could provide a basis for a reliance argument by IMAX." Opinion at 20-21. That is the essence of this case. Ultimately, this Court will have to determine whether any evidence of pre-2005 conduct is relevant to those issues. The Court should not pretermit that determination – and effectively render it moot – by including in its class certification order purchasers who bought pursuant to different financial statements, involving different accounting issues, and who in most instances did not even hold until a curative statement.

**B. Steelworkers is an atypical and inadequate class representative**

CONFIDENTIAL
FILED UNDER SEAL

CONFIDENTIAL
FILED UNDER SEAL

[33] IMAX's restatement of theater system revenue for 2002 through the third quarter of 2006, however, resulted only in shifting revenue from one period to another and there was no material restatement of IMAX's cash flows. See Allen Report at 19.[34] The market understood that IMAX's restatement had no material impact on cash flows. Allen Report at 22-24. Therefore, Penn's investment strategy that it highlights to clients and that differentiates it from competitors was completely unaffected by the representations about installations and theater system revenue that Plaintiffs allege were misleading.

Moreover, based on Steelworkers' deposition, "the class representatives ha[d] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077-78 (2d Cir. 1995) (quoting Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th Cir. 1987)); see also Lapin, 254 F.R.D. at 176 ("A lead plaintiff must also possess 'a minimum threshold of knowledge about the case which, considering the nature of the claim, is sufficient to make reasonable decisions at critical stages of the litigation'") (quoting In re Lloyd's Am. Trust Fund Litig., No. 96 Civ. 1262 (RWS), 1998 WL 50211, at *11 (S.D.N.Y. Feb. 6, 1998)). Even the simplest questions to Steelworkers elicited a string of "I don't know" or "I'm not sure."[35]

---

33

CONFIDENTIAL
FILED UNDER SEAL

34 The price of a stock reflects the market's expectation of the discounted value of future cash flows. Allen Report at 19. Therefore in an efficient market, only cash flows – and not cash-neutral issues such as the timing of revenue recognition – matter to the price of a company's stock. Id.

35

CONFIDENTIAL
FILED UNDER SEAL

[36] Absent class members should not be bound and saddled by a class representative who fails to make even a minimal inquiry into the facts of the case. Steelworkers is not an "adequate" class representative for the pre-February 2006 class period, much less the longer class period it seeks to assert in the motion for class certification.

---

CONFIDENTIAL
FILED UNDER SEAL

36

## V. THE CLASS SHOULD NOT INCLUDE IN-AND-OUT SHAREHOLDERS[37]

As the class is currently pled, it could be read to include in-and-out shareholders who bought and sold prior to August 9, 2006. The first corrective disclosure alleged by Plaintiffs is the IMAX press release of August 9, 2006. Assuming, arguendo, that the press release was a corrective disclosure, purchasers who bought and sold before August 9, 2006 – even if they suffered a loss – did not hold over a corrective disclosure and therefore did not suffer a loss as a result of any alleged misrepresentation.[38] For such shareholders, any price inflation built into the stock price at the time of purchase was still present at the time of sale. Consequently, class members who sold prior to August 9, 2006 will not be able to show loss causation as a matter of law because the absence of a corrective disclosure is fatal to a plaintiff's claim. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342-43 (2005); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 (2d Cir. 2005).

CONFIDENTIAL
FILED UNDER SEAL

---

[37] The IMAX Defendants adopt and incorporate herein the additional loss causation arguments put forth by co-defendant PWC in its Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification.

[38] As detailed in the Allen Report, only approximately 10% of purchasers who bought IMAX common stock on NASDAQ and the TSX between February 27, 2003 and February 17, 2006 held the shares through August 9, 2006. Allen Report at 27-28. Because August 9, 2006 is the first corrective disclosure identified by Plaintiffs, any in-and-out shareholders who bought during the class period, but sold before the first corrective disclosure cannot show loss causation and cannot show damages as a matter of law.

## CONCLUSION

For the foregoing reasons and those in PWC's brief which IMAX explicitly adopts, the IMAX Defendants respectfully request that this Court deny Plaintiffs' Motion for Class Certification and dismiss Westchester as a named plaintiff. In the alternative, the IMAX Defendants respectfully request that this Court limit the class period to February 17, 2006 through August 9, 2006.

Dated: New York, New York
February 23, 2009

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:______________________________
Lewis J. Liman (LL-9166)

One Liberty Plaza
New York, New York 10006
(212) 225-2000
Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble