**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB)<br>ECF Case |

**DECLARATION OF PROFESSOR POONAM PURI**

I, Poonam Puri, declare as follows:

1. Annexed to this declaration is true and correct copy my report entitled Report of Professor Poonam Puri.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: Toronto, Ontario, Canada
February 23, 2009.

Poonam Puri

# REPORT OF PROFESSOR POONAM PURI


**A. QUALIFICATIONS AND BACKGROUND ........ 2**

**B. CLASS PROCEEDINGS IN ONTARIO, CANADA ........ 4**

1. BACKGROUND ON THE CLASS PROCEEDINGS ACT, 1992 (ONTARIO) ........ 4
2. CERTIFICATION ........ 5
   *2.1 The Pleadings Must Disclose a Cause of Action ........ 6*
   *2.2 There Must be an Identifiable Class ........ 6*
   *2.3 There must be Common Issues ........ 8*
   *2.4 A Class Action is the Preferable Procedure ........ 9*
   *2.5 The Representative Plaintiff must be Appropriate ........ 12*
3. PROCEDURAL AND STATUTORY SAFEGUARDS IN ONTARIO CLASS PROCEEDINGS ........ 14
   *3.1 Increased Judicial Involvement ........ 14*
   *3.2 Notice ........ 15*
   *3.3 Opt Out Rights and Class Member Ability to Pursue Individual Claims ........ 16*
   *3.4 Limitation Period ........ 17*
   *3.5 Evidence at Certification ........ 17*
   *3.6 The Use of Juries ........ 18*
   *3.7 Pretrial Discovery ........ 19*
   *3.8 Evidence at Trial ........ 20*
   *3.9 Settlement of a Class Action ........ 21*
   *3.10 Objecting to Settlement ........ 22*
   *3.11 Procedures to Allocate Recovery Among all Class Members ........ 22*
   *3.12 Remedies For Enforcement Of Judgments. ........ 23*
   *3.13 Framework for Appellate Review ........ 24*
   *3.14 Contingency Fee Arrangements in Ontario ........ 24*
   *3.15 Cost Regime in Ontario ........ 25*
   *3.16 Judicial Independence ........ 25*
4. CERTIFICATION OF A GLOBAL CLASS INCLUDING CANADIAN AND FOREIGN PLAINTIFFS ........ 26

**C. SUBSTANTIVE SECURITIES LAWS IN ONTARIO, CANADA ........ 29**

1. STATUTORY SCHEME ........ 29
   *1.1 Background ........ 29*
   *1.2 Leave of the Court ........ 30*
   *1.3 Liability for Documentary Misrepresentation ........ 30*
      1.3.1 Elements required to Establish Liability ........ 31
         1.3.1.1 Actions against Responsible Issuers ........ 31
         1.3.1.2 Actions against Directors ........ 32
         1.3.1.3 Actions against Officers ........ 32
      1.3.2 Defenses ........ 33
      1.3.3 Damages ........ 34
2. COMMON LAW ........ 36
   *2.1 Conspiracy ........ 36*
   *2.2 Negligent Misrepresentation ........ 37*
   *2.3 Fraudulent Misrepresentation ........ 37*
   *2.4 Damages ........ 38*

**EXHIBIT A ........ 40**

**EXHIBIT B ........ 57**

## A. QUALIFICATIONS AND BACKGROUND

1. I am an Associate Professor of Law with tenure at Osgoode Hall Law School of York University and Associate Director of the Hennick Centre for Business and Law, both in Toronto, Ontario. I was appointed to the faculty of Osgoode Hall Law School in 1997 and received tenure in 2002. My teaching and research expertise lies in securities law, corporate law, corporate governance and corporate and white collar crime.

2. I am also Head of Research and Policy at the Capital Markets Institute (CMI), Rotman School of Management, University of Toronto.[1] My role at the CMI involves developing, organizing and executing a research plan and strategy for the CMI.

3. As part of the CMI, I was co-research director for the Task Force to Modernize Securities Legislation (TFMSL) in 2005-2006. The TFMSL was established by the Investment Dealers Association of Canada (IDA) in June 2005. It had a mandate to make recommendations to maintain a dynamic, fair, efficient and competitive capital market in Canada. Among the research papers I designed and oversaw were those concerning (i) enhancing investor protection; (ii) maintaining a competitive capital market in Canada; and (iii) strengthening market credibility and integrity. Five of the papers focused on issues dealing with enforcement. In addition to directing the overall research agenda, I co-authored one of the enforcement studies.[2]

4. Also as a part of the CMI, I was co-research director for the Expert Panel on Securities Regulation (the Expert Panel). The Expert Panel was announced by the federal Minister of Finance in February 2008 to provide advice on the best way forward to improve securities regulation in Canada. In addition to directing the overall research program, I authored one paper on enforcement.[3]

5. At the CMI, I have also written two other studies on the topic of enforcement: A National Enforcement Agency for Canada (2008) and Enforcement Effectiveness in the Canadian Capital Markets (2005). At the CMI, I have organized and spoken at several significant conferences and roundtables on the topic of enforcement.

6. My teaching and research at Osgoode Hall Law School, as well as my work with the CMI, calls upon my in-depth knowledge of the legal and regulatory framework relating to Canadian securities laws, including public and private enforcement mechanisms. My work also requires me to be conversant with the interdisciplinary scholarly literature and policy studies on Canadian capital markets and their regulation.

---

[1] The CMI was established in 1998 through a donation from the Toronto Stock Exchange to the University of Toronto. See CMI website for more details. Online: CMI <http://www.rotman.utoronto.ca/cmi/>.
[2] P. Puri & M. Condon, "The Role of Compliance in Securities Regulatory Enforcement", online: (2006) 6 Task Force to Modernize Securities Legislation in Canada 1 <http://www.tfmsl.ca/#>.
[3] P. Puri, "A Model for Common Enforcement in Canada: The Canadian Capital Markets Enforcement Agency and the Canadian Securities Hearing Tribunal" (2009), Expert Panel on Securities Regulation.

7. From 2006-2008, I was President of the Canadian Law and Economics Association and from 2004-2006, I was Vice-President of the Association.

8. I have provided independent policy advice on issues relating to capital markets regulation, the regulation of business, and corporate governance to governmental bodies, regulators and policy makers in Canada and internationally, including the Ontario Securities Commission, Industry Canada, the Canadian Senate, and the International Finance Corporation of the World Bank.

9. In 2002, I prepared a study for the Ontario Securities Commission on the costs and benefits of the Multi-Jurisdictional Disclosure System (MJDS) between Canadian securities regulators and the U.S. Securities and Exchange Commission, and the impact of the Sarbanes-Oxley Act of 2002 on this mutual recognition agreement. My study, co-authored with Professor Anindya Sen, assisted in achieving consensus among Canadian securities regulators on the importance of conforming Canadian rules with the Sarbanes-Oxley Act, by quantifying the cost savings of MJDS to Canadian companies and by highlighting that the underlying premise of MJDS – a mutual recognition system – would be threatened if Canadian rules diverged significantly from U.S. rules without good reason.

10. In 2003, I was commissioned to write one of the research studies for the Wise Persons Committee (WPC) entitled "Local and Regional Interests in the Debate on Optimal Securities Regulatory Structure". The WPC was established by the Minister of Finance of Canada in 2003 to provide an independent assessment of the securities regulatory structure which would best serve Canada's interests.

11. Attached as Exhibit "A" is a copy of my current curriculum vitae, which sets out my background and qualifications in greater detail.

12. Attached as Exhibit "B" is a list of matters for which I have provided an expert opinion on securities regulation and/or securities class actions.

13. Unless otherwise stated, I have personal knowledge of the matters set forth below.

## B. CLASS PROCEEDINGS IN ONTARIO, CANADA

14. Below, I summarize the principles, laws and rules for class actions under the *Class Proceedings Act*, 1992 (Ontario) (the OCPA")[4] and the relevant *Rules of Civil Procedure*, 1990 (Ontario),[5] including the due process protections that are provided for, and the adequate protection accorded to foreign class members or potential class members under the class proceedings legal framework in Ontario.

### 1. Background on the Class Proceedings Act, 1992 (Ontario)

15. In 1982, the Ontario Law Reform Commission ("OLRC Report") recommended legislative reform to allow class proceedings in the province of Ontario.[6] The Report noted that the objectives of such reform would include promoting judicial economy and efficiency, providing better access to the court system to plaintiffs who claim to be aggrieved by wrongs that are susceptible to being effectively addressed by class proceedings, and modifying and/or deterring the behavior of those found responsible for those wrongs.[7]

16. In 1990, the Attorney General's Advisory Committee on Class Actions Reform released a report ("AG Report") that also recommended class proceedings legislation to achieve the goals outlined by the OLRC discussed above in paragraph 15.[8] The Advisory Committee also prepared a draft Bill for consideration.[9]

17. The OCPA was enacted on January 1, 1993.[10] Ontario was the first common law province in Canada to provide for class proceedings legislation.[11]

18. The OCPA allows for an action to be brought in a representative capacity by (usually) one individual in the proposed class who seeks to be named as the representative plaintiff on behalf of him/herself and other members of the class.[12]

---

[4] *Class Proceedings Act*, S.O. 1992, c. 6 [*OCPA*].
[5] *Rules Of Civil Procedure*, R.R.O. 1990, Reg. 194 [*ROCP*].
[6] Ontario Law Reform Commission, *Report on Class Actions* (Toronto: Queen's Printer, 1982), Vol. 1, at 117 [OLRC Report].
[7] *Ibid*. These goals are regularly invoked by Canadian courts in construing class action legislation. See *Western Canadian Shopping Centres Inc. v. Dutton*, [2001] 2 S.C.R. 534 at 27-29 [*Western Canadian Shopping Centres*]. See also Michael A. Eizenga *et al*, *Class Action Law and Practice*, looseleaf 2d ed. (Markham: LexisNexis Canada, 2008) at para. 1.5.
[8] Ontario, Ministry of the Attorney General, Policy Development Division, Report of the Attorney General's Advisory Committee on Class Action Reform (Toronto: Queen's Printer, February 1990) [*AG Report*]
[9] Eizenga, *supra* note 7 at para. 1.10.
[10] *OCPA*, *supra* note 4.
[11] *Class Proceedings Act*, R.S.B.C. 1996, c. 50. See also Eizenga, supra note 7 at para 1.13.
[12] *OCPA*, s. 2(1); see Eizenga, *supra* note 7, at para. 2-1.

19. The OCPA follows a fairly conventional structure that is based to a significant extent on class action legislation in the United States. As one commentator noted, Canadian class action legislation "has developed over years of experience and refinement in the United States."[13] Professor Watson wrote that "Canada has developed a vigorous class action regime and the Canadian criteria for certification of a proceeding as a class action are relatively undemanding."[14]

20. In order for a class to proceed, a court must approve of the class action as the appropriate mechanism for advancing the issues that are common to the class.[15] Professor Watson states that "[t]he procedures provided by the legislation in each of the three provinces [including Ontario] are structurally similar to those prescribed by Rule 23 of the U.S. Federal Rules of Civil Procedure, although in certain respects the Canadian legislation is more liberal in facilitating class actions than its American counterparts."[16]

**2. Certification**

21. The OCPA instructs courts to certify a plaintiffs' class action if the following five criteria are satisfied:[17]

    (a) the pleadings disclose a cause of action;
    (b) there is an identifiable class of two or more persons who would be represented by the representative plaintiff;
    (c) the claims or defences of the class members raise common issues;
    (d) a class proceeding would be the preferable procedure for the resolution of the common issues; and
    (e) there is a representative plaintiff who,
        (i) would fairly and adequately represent the interests of the class,
        (ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and
        (iii) does not have, on the common issues for the class, an interest in conflict with the interests of other class members.

    Each criteria is discussed below.

---

[13] W. Branch, *Class Actions in Canada*, looseleaf (Aurora: Canada Law Book, 2008) para. 4.10
[14] G. Watson, "Class Actions: The Canadian Experience" (2001) 11 Duke Journal of Comparative & International Law 269.
[15] Branch, *supra* note 15 para. 4.20.
[16] Watson, *supra* note 16 at 9.
[17] *OCPA*, s. 5(1). See Also *Branch*, supra note 15, at para. 4.20

### *2.1 The Pleadings Must Disclose a Cause of Action*

22. The first requirement for certification is that the pleadings disclose a cause of action.[18] This is a gate-keeping requirement that attempts to ensure that actions which are clearly frivolous are weeded out.[19]

23. The Supreme Court of Canada has articulated a "plain and obvious" test to determine if the class action pleadings disclose a cause of action.[20] The plain and obvious test is the same test that is used to determine if an individual claim should be dismissed on the basis that the pleading discloses no cause of action.

24. To determine if the "plain and obvious" test has been met, the court assumes that the facts in the statement of claim are true, and can be proven by the plaintiff. The potential of the defendant to present a strong defense does not act as a bar to meeting the "plain and obvious" test.

25. The "plain and obvious" threshold that the plaintiff must meet is a low one. The Supreme Court of Canada has adopted the English jurisprudence that it is low so as to avoid a plaintiff from being "driven from the judgment seat."[21] Similarly, Mr. Justice Winkler (as he then was)[22] stated that "the court should err on the side of protecting people who have right of access to the courts."[23]

### *2.2 There Must be an Identifiable Class*

26. The second requirement for certification is that there should be an identifiable class.[24] The Supreme Court of Canada has stated that "[c]lass definition is critical because it identifies the individuals entitled to notice, entitled to relief (if relief is awarded), and bound by the judgment." The class definition is particularly important in Ontario, which is an opt-out jurisdiction, meaning that an individual will be considered a member of the class if he or she meets the definition and does not take the steps necessary to opt out of the class.[25] The opt-out feature of Ontario class actions is discussed later.

27. The Supreme Court of Canada has stated that the class must be capable of clear definition at the outset of the litigation, and that the definition should state objective criteria by which members of the class can be identified. While it is not necessary

---

[18] *OCPA*, s. 5(1)(a).
[19] Branch, *supra* note 15 at para 4.40. See also Eizenga, *supra* note 7 at para. 3.9.
[20] Eizenga, *supra* note 7 at para 3.9. See also *Western Canadian Shipping Centres*, *supra* note 7 at para. 45. See also *Hollick v. Toronto (City)*, [2001] S.C.J. No. 67, [2001] 3 S.C.R. 158 at para. 25 [*Hollick*].
[21] *Western Canada Shopping Centres*, *supra* note 7 at para. 45.
[22] Chief Justice Warren Winkler, B.A., LL.B., LL.M. was appointed Chief Justice of Ontario in June 2007, following 14 years as a trial judge of the Superior Court of Justice of Ontario.
[23] *Edwards v. Law Society of Upper Canada* (1994), 36 C.P.C. (3d) 116 (Ont. Class Proceedings Committee).
[24] *OCPA*, s. 5(1)(b).
[25] *OCPA*, s. 9.

that every class member be named or known, the Supreme Court of Canada has clearly stated that any particular person's claim to membership in the class must be determinable by stated, objective criteria.[26]

28. Similarly, the class definition cannot be dependent on the merits of the case, or be restricted to only those who have valid claims.[27]

29. With respect to class definition, Canadian courts have quoted American sources with approval to expand upon the Canadian jurisprudence. In *Bywater v. Toronto Transit Commission*,[28] Mr. Justice Winkler (as he then was) quoted from the *American Manual for Complex Litigation*,[29] published by the American Judicial Institute:

> . . . Definitions . . . should avoid criteria that are subjective (e.g. a plaintiff's state of mind) or that depend upon the merits (e.g. persons who were discriminated against). Such definitions frustrate efforts to identify class members, contravene the policy against considering the merits of a claim in deciding whether to certify a class, and create potential problems of manageability.

30. Mr. Justice Winkler also quoted from the American text *Newberg on Class Actions*, for the following statement:[30]

> Care should be taken to define the class in objective terms capable of membership ascertainment when appropriate, without regard to the merits of the claim or the seeking of particular relief.

31. In requiring an identifiable class, a concern is that if a class is defined too broadly, the efficient resolution of common issues, a key rationale of class action proceedings, may be diluted.

32. The OCPA requires the representative plaintiff seeking certification to provide evidence on the certification motion that there is a class of more than one person.[31] Each party must also provide information, in affidavit form, to the court as to their best information on the number of members in the proposed class.[32] The OCPA requires a minimum of two members in the class, in contrast to *U.S. Federal Rule of Civil Procedure 23* ("US Federal Rule 23"), which requires that the class be "so

---

[26] *Western Canadian Shopping Centres*, *supra* note 7 at para. 38. See also Eizenga, *supra* note 7 at para. 3.31. See also *Hollick*, *supra* note 20 at paras. 17-18.
[27] See *Dumoulin v. Ontario*, [2005] O.J. No 3961 at para. 13; supp. Reasons [2006] O.J. No. 1233 (S.C.J.). See also *Hollick*, *supra* note 20 at para. 17, which states that "[w]hether a given person is a member of the class can be determined without reference to the merits of the action."
[28] *Bywater v. Toronto Transit Commission* (1998) 27 C.P.C. (4th) 172, [1998] O.J. No. 4913 at para. 11.
[29] Manual for Complex Litigation, Third, 1995, Federal Judicial Centre, Washington, D.C.
[30] Conte & Newberg, *Newberg on Class Actions*, Looseleaf 3d ed. (West Publishing) at 60-61.
[31] *OCPA*, s. 5(3).
[32] *Ibid*.

numerous that joinder of all members is impractical."[33] Nonetheless, certified class proceedings in Canada have generally, if not always, involved large numbers of people.[34] As well, the class definition and class size also have an impact on whether the class proceeding is the preferable procedure, another requirement for successful certification, which is discussed below.[35] The Ontario Court of Appeal has also noted that there may be an interrelationship between the identifiable class and the requirement for common issues, also discussed below.[36]

### *2.3 There must be Common Issues*

33. The fourth requirement for certification is the existence of common issues.[37] The rationale for needing common issues in class proceedings is to allow common concerns to be pursued in common litigation, thereby enhancing the efficiency of the litigation process, judicial economy and access to the courts.[38]

34. The OLRC Report stated that the test for determining whether common issues exist should not be too stringent or onerous. It further stated that the common issues requirement should be sufficient to ensure that every certified class action will provide for certain economies or provide access to the judicial system by those with small claims.[39]

35. The Supreme Court of Canada has stated that there must be issues of fact or law that are common to all class members, such that success for one class member means success for all on those issues.[40]

36. While issues need not be identical in order to satisfy the commonality test, the Supreme Court of Canada has stated that "class members' claims must share a substantial common ingredient to justify a class action."[41] An issue may be regarded as a substantial ingredient in the claim even if it makes up a limited aspect of the liability question and even though many individual issues may remain to be decided after its resolution.[42]

37. The Ontario Court of Appeal has described the common issues requirement as a "low bar."[43] While the statute refers to common issues in the plural form, the Ontario

---

[33] *Federal Rules of Civil Procedure* 4 U.S.C.A. § 23.
[34] Eizenga, *supra* note 7 at paras. 3.59 and 3.63.
[35] *Lau v. Bayview Landmark Inc.* (1999) 40 C.P.C. (4th) 301, [1999] O.J. No. 4060 at para. 26 (Ont. S.C.J.).
[36] *Cloud v. Canada (Attorney General)*, [2004] O.J. No. 4924, 73 O.R. (3d) 401 (C.A.) at 421 O.R. [*Cloud*].
[37] *OCPA*, s. 5 (1)(c).
[38] Eizenga, *supra* note 7 at para. 3.66.
[39] *OLRC Report, supra* note 6 at 345-346.
[40] See *Western Canadian Shopping Centres, supra* note 7.
[41] *Western Canadian Shoppping Centres, supra* note 7 at para. 40.
[42] *Cloud, supra* note 36 at para 53.
[43] *Cloud, supra* note 36 at p 414 O.R.; See also *Eizenga, supra* note 7 at para. 3.77.

Court of Appeal has established that a single common issue will satisfy the requirement of commonality.[44]

38. It is expected that individual issues may remain to be resolved at the conclusion of the common issues trial.[45] Common issues need not determine the issue of liability.[46]

### *2.4 A Class Action is the Preferable Procedure*

39. The fifth requirement in the OCPA is that a class action should be the preferable procedure.[47] The OCPA states that a class proceeding will be certified if it "would be the preferable procedure for the resolution of the common issues."[48] Some commentators have interpreted the case law as suggesting that certification is often granted or denied on the basis of the court's analysis of preferability.[49]

40. The preferable procedure requirement in Ontario is summarized in the following principles from *Pearson v. Inco Ltd.*:[50]

> a) The preferability requirement has two concepts at its core: first, whether the class action would be a fair, efficient and manageable method of advancing the claim; second, whether the class action would be preferable to other reasonably available means of resolving the claims of class members.
>
> b) The analysis must keep in mind the three principle advantages of class actions: judicial economy, access to justice, and behaviour modification.
>
> c) This determination requires an examination of the common issues in their context, taking into account the importance of the common issues in relation to the claim as a whole.
>
> d) The preferability requirement can be met even where there are substantial individual issues; the common issues need not predominate over the individual issues.

---

[44] Eizenga, *supra* note 7 at para. 3.78. See also *Harrington v. Dow Corning Corp.*, [1996] B.C.J. No. 734, 22 B.C.L.R. (3d) 97 (S.C.J.) at p 105 B.C.L.R. See also *Cloud*, *supra* note 36 at 415 O.R.
[45] *OCPA*, s. 11 (1). See also Eizenga, *supra* note 36 at para. 3.73.
[46] *Endean v. Canadian Red Cross Society*, [1997] B.C. J. No. 1209, 148 D.L.R. (4th 158 (S.C.J.), at para. 35; reversed on other grounds [1998] B.C.J. No. 724, 157 D.L.R. (4th) 465 (C.A.) [*Endean*].
[47] *OCPA*, s. 5(1)(d).
[48] *Ibid.*
[49] Eizenga, *supra* note 7 at para. 3.100.
[50] *Pearson v. Inco Ltd.* (2005), 267 D.L.R. (4th) 111 at para. 67 (Ont. C.A.) [*Pearson*].

41. Again, the class action does not need to resolve all of the matters in the litigation or all of the issues regarding liability. A resolution of the common issues through a class proceeding may be followed by separate litigation of individual issues in relation to liability and/or individual damage assessments.[51]

42. The Supreme Court of Canada has noted that the drafters of the legislation rejected requiring that common issues "predominate" over the individual issues, as is provided for in the American federal class action rule.[52]

43. Eizenga et al state that "on the basis of the wording of the statutes, Ontario offers the most liberal approach to class actions while the United States offers an approach which is somewhat more restrictive."[53]

44. In *Bendall v. McGhan Medical Corp.*, the first certified class proceeding in Ontario, the American class action experience was surveyed in great detail. The decision distinguished the "predominance" requirement in US Federal Rule 23 from the Ontario regime:[54]

> While the American cases are helpful as a reflection of a 30-year history of class actions one must not lose sight of vital differences. Predominant issue is not a factor in our Act. It is critical under Federal Rule 23. The Ontario legislature had the benefit of a draft bill prepared by the Law Reform Commission after lengthy study and reflection on the American history of class actions. Ontario chose to emphasize the common issues.

45. Similar to the other requirements for certification, the preferability test is grounded in the rationales underlying class proceedings legislation, including facilitating access to the courts, maximizing judicial economy, and modifying the behavior of those who have committed wrongs that can be addressed in class proceedings.

46. Class actions provide access to justice by allowing an aggregation of individual claims which would not be economically feasible on an individual basis. Viewed in this way, the cost of litigation is a factor in determining whether a class action is a preferable procedure. Where the costs associated with an individual pursuing an action are prohibitive or pose a significant financial burden, courts are more likely to view a class action as the preferable procedure, because it will allow for the fixed cost of litigation to be spread out amongst all the members of the class. [55]

---

[51] Eizenga, *supra* note 7 at para 3.102.
[52] See *Hollick*, *supra* note 20 at para. 29 and para. 30.
[53] Eizenga, *supra* note 7 at para. 3.120.
[54] *Bendall v. McGhan Medical Corp.*, [1993] O.J. No. 1948, 14 O.R. (3d) 734 (Gen. Div.) at pp 746-747.
[55] See *Nantais v. Telectronics Proprietary (Canada) Ltd* 25 O.R. (3d) 331 (Gen. Div.) at 349. (Leave to appeal refused [1995] O.J. No 3069, 25 O.R. (3d) 331 (Div. Ct) at 347 [*Nantais*].

47. Judicial economy is also a factor in determining whether a class action is the preferable procedure, because the courts wish to prevent separate actions from covering the same ground and/or achieving inconsistent results.

48. The underlying rationale of modifying the behavior of those who commit wrongs can be addressed in class proceedings is achieved by subjecting wrongdoers to the possibility of a class action suit where otherwise individuals may not have been willing to litigate for small amounts of recovery. This rationale is increasingly being referred to by the courts as a persuasive rationale for class certification.[56]

49. The damages claimed by each putative class member will also be a factor in determining whether a class action is a preferable procedure. Given the rationale of providing aggrieved claimants with access to justice, a class action is more likely to be preferable and therefore certified where there are many claims for small amounts, so that individual claims would be unlikely to be pursued.[57]

50. A requirement to allocate fault among more than one defendant does not necessarily mean that the class action is not preferable.[58]

51. The preferability analysis allows the court to determine the nature and extent of alternative means to adjudicate the dispute. The AG Report selected the word "preferable" over "reasonable" or "superior" because "it was thought that the word 'preferable' would best draw the court into a consideration of whether or not the class proceeding is a fair, efficient and manageable method of advancing the claim. The class proceeding should be preferable in the sense of "preferable to other procedures such as joinder, test cases, consolidation and so on."[59]

52. The requirement for a plan of litigation is also relevant to the preferability requirement for certification, [60] discussed below in paragraphs 63 to 64.

53. As an added protection to plaintiffs, the OCPA sets out a list of factors which individually are not sufficient for refusing to certify a class proceeding. These factors include:[61]

    1. The relief claimed includes a claim for damages that would require individual assessment after determination of the common issues.

    2. The relief claimed relates to separate contracts involving different class members.

    3. Different remedies are sought for different class members.

[56] See *Peter v. Medtronic Inc.*, [2008] O.J. No 1916 (Div. Court); See also Eizenga, *supra* note 7 at para. 3.106.
[57] Eizenga, *supra* note 7 at para. 3.111.
[58] Eizenga, *supra* note 7 at para 3.140.
[59] *AG Report*, *supra* note 8 at 32.
[60] *Healey v. Lakeridge Health Corp.* (2006) 38 C.P.C. (6th) 145 at para. 110 (Ont. S.C.J).
[61] *OCPA*, s. 6.

4. The number of class members or the identity of each class member is not known.
5. The class includes a subclass whose members have claims or defences that raise common issues not shared by all class members.

54. While the existence of one of these factors cannot be the sole basis for the denial of certification, the presence of two or more factors may render a class action the less preferable method for proceeding than alternative methods.[62]

***2.5 The Representative Plaintiff must be Appropriate***

55. The class proceedings legislation contains requirements in relation to the adequacy of the representative plaintiff. The representative plaintiff plays an important role in ensuring that class member interests are pursued with vigour.

56. The statute requires that the representative plaintiff:[63]

a. Will fairly and adequately represent the interests of the class;
b. Has produced a plan of proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding; and
c. Does not have, on the common issues for the class, an interest in conflict with the interests of other class members.

57. The pleading for a proposed class proceeding should contain sufficient particularity regarding the representative plaintiff's cause of action, including his/her individual facts relating to liability and damages. Particularity is not required for other class members.[64]

58. A representative plaintiff in a proposed class action must have a cause of action against each named defendant.[65] A proposed class action may therefore have several representative plaintiffs. In addition, on motion, courts have allowed additional representative plaintiffs to be added to a class action suit.[66]

59. In interpreting the first part of the test for the adequacy of the representative plaintiff, a putative class member whose interests differ from those of others in the class should not be the representative plaintiff. The test has also been articulated as whether the

---

[62] *Abdool v. Anaheim Management Ltd*. (1995), 21 O.R. (3d) 453 at 464, 121 D.L.R. (4th) 496 (Div. Ct.) [*Abdool*]; *Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63, 22 C.P.C. (4th) 198 (Gen. Div.) at 68 [*DeVry*].
[63] *OCPA*, s. 5(1)(e).
[64] Eizenga, *supra* note 7 at para. 3.162; See also *Blatt Holdings Ltd. v. Traders General Insurance Co.*, [2001] O.J. No. 949 (S.C.J.).
[65] *Hughes v. Sunbeam Corp. (Canada) Ltd.*, 2002 CanLII 45051 (ON C.A.), (2002), 61 O.R. (3d) 433 (C.A.) at para. 15.
[66] *Veley v. CGU Insurance Co. of Canada*, 2004 CanLII 24010 (ON S.C.) at para. 13.

proposed representative plaintiff can "vigorously and capably prosecute the interests of the class."[67]

60. Courts do exercise some flexibility in approving the representative plaintiff. For example, in *Abdool v. Anaheim Management Ltd.*, the proposed representative plaintiff could have been viewed as a more sophisticated investor than others in the class, and therefore inappropriate as a representative plaintiff. Nonetheless, Mr. Justice Montgomery of the Ontario Divisional Court was of the view that this did not preclude the proposed designee from acting as the representative plaintiff, on the basis that the representative plaintiff need not have typical experience with other plaintiffs, so long as the representative does not have a conflict of interest and is someone who will fairly and adequately advance the class claims.[68]

61. The case law requires that a representative plaintiff have an adequate understanding of the legal process and the issues in litigation. A representative should have a general understanding of the class action mechanism and be able to properly instruct legal counsel.[69]

62. The adequacy of the proposed representative plaintiff's counsel is another important consideration in determining whether the representative plaintiff is adequate. Eizenga *et al* note that "courts in the United States have made it clear that 'adequacy of counsel' is a key factor in determining whether the proposed representative plaintiff is adequate." While the Ontario class proceeding legislation does not refer to the suitability of the proposed class counsel, Canadian courts will consider, in their assessment of the ability of the proposed representative plaintiff to fairly and adequately represent the interests of the class, the competence of class counsel.[70] The rationale for the court's scrutiny of counsel that has been selected by the plaintiff is that upon certification, the court effectively imposes the selection of that counsel onto the members of the class.[71]

63. The OCPA requires the representative plaintiff to prepare a litigation plan of proceeding.[72] The purpose of this plan is to (i) assist the court in determining whether a class proceeding is the preferable procedure; and (ii) allow the court to determine whether the litigation itself is manageable (not just for the common issues trial, but for the entirety of the litigation.)[73]

---

[67] *Western Canadian Shopping Centers, supra* note 7 at para. 41.
[68] *Abdool, supra* note 62 at 465 O.R. See also *Larcade v. Ontario (Minister of Community and Social Services)*, [2005] O.J. No. 1924 (S.C.J.), at para. 22; However, see also *Sutherland v. Canadian Red Cross Society*, [1994] O.J. No. 315, 17 O.R. (3d) 645 (Gen. Div.) at 653 O.R., for a different approach to the appropriateness of a proposed representative plaintiff.
[69] *Tiboni v. Merck Frost Canada Ltd.*(28 July 2008), London 04-CV-45435CP (S.C.J.), at 113. See also Eizenga, *supra* note 7 at para. 3.170.
[70] *Western Canadian Shopping Centres, supra* note 7 at para. 41.
[71] *Ward-Price v. Marinders Haven Inc.*, [2004] O.J. No. 2308, 71 O.R. (3d) 664 (S.C.J.), at p 670 O.R.
[72] *OCPA*, s. 5 (1)(e)(ii).
[73] *Carom v. Bre-X Minerals Ltd.*, [1999] O.J. No. 1662, 44 O.R. (3d) 173 (S.C.J.) at 203-04 O.R [*Carom*].

64. The litigation plan can be modified, expanded, or "fine-tuned" as the class action progresses. The development of the plan is often a collaborative effort between the plaintiff and defendant, with the court playing a supervisory role.[74] The Ontario Court of Appeal takes a flexible approach to the litigation plan at the certification stage, viewing it as a work in progress that will undoubtedly have to be amended.[75] In some cases, the courts have permitted plaintiffs to submit revised litigation plans after finding the existing plan insufficient to meet the requirements of the OCPA. [76]

## 3. Procedural and Statutory Safeguards in Ontario Class Proceedings

65. The OCPA and common law in Ontario provide parties to the litigation with several procedural safeguards to ensure that their interests are protected. The following safeguards are discussed below:

3.1 Increased Judicial Involvement
3.2 Notice
3.3 Opt Out Rights and Class Member Ability to Pursue Individual Claims
3.4 Limitation Period
3.5 Evidence at Certification
3.6 The Use of Juries
3.7 Pretrial Discovery
3.8 Evidence at Trial
3.9 Settlement of a Class Action
3.10 Objecting to Settlement
3.11 Procedures to Allocate Recovery Among all Class Members
3.12 Remedies For Enforcement Of Judgments
3.13 Framework for Appellate Review
3.14 Contingency Fee in Ontario
3.15 Cost Regime in Ontario
3.16 Judicial Independence

### *3.1 Increased Judicial Involvement*

66. The OCPA requires "an active degree" of judicial involvement before the trial. This is evidenced by the following dicta:[77]

> … the feature which most distinguishes a class proceeding from a traditional proceeding is the degree and extent of case management and supervision exercised by the court pursuant to the Act. These are to ensure that the interests of absent class members are protected and that the efficiencies

[74] Eizenga, *supra* note 7 at para. 3.179.
[75] *Cloud*, *supra* note 36 at 425 OR.
[76] *Ibid.*
[77] *Smith v. Canadian Tire Acceptance Ltd.* (1995), 22 O.R. (3d) 433 at para. 41 [*Smith*].

> central to the purpose of the Act are indeed realized. The Act is replete with provisions or "judicial tools", which enable the court to assume a pro-active and continuing role in the litigation, as it progresses to the final determination …

67. In addition, the Supreme Court of Canada has affirmed that procedural complexities must be addressed on a case-by-case basis with a flexible and liberal approach aimed at balancing fairness and efficiency.[78]

68. In Ontario, courts may make any order considered appropriate with respect to the conduct of an action to ensure fairness and efficiency.[79]

### *3.2 Notice*

69. Notice to class members is an important component of the protections in the class proceedings framework. The purpose of the notice provisions is to maximize the potential for class members' participation, to maximize efficiency in the conduct of the litigation and to ensure fairness to absentee class members.[80]

70. The OCPA requires that notice be provided to class members at various stages in the course of a class action. These notices are aimed at informing them of their rights and of the steps that they must take to participate in or exclude themselves from the proceedings.

71. When certification is granted, the OCPA requires that class members be notified of the existence and nature of the class action and their right to opt out of it.[81] The OCPA specifies the content of such notice.[82] In addition, the OCPA also provides the court with discretion to provide class members with additional notice of developments in the class action proceeding.[83] Finally, when common issues have been decided in favour of the class, the OCPA requires notice to be provided to class members if their participation is required for the determination of individual issues.[84]

72. The form and contents of the notice must be approved by the court. This is to ensure that absent class member interests are protected.[85] In making its notice order, the legislation provides that the court shall consider:[86]

---

[78] *Smith, supra* note 77 at para. 41.
[79] *OCPA*, ss.12-13.
[80] See M. Cochrane, *Class Actions: A Guide to the Class Proceedings Act, 1992* (Aurora: Canada Law Book Inc.,1993).
[81] *OCPA*, s.17.
[82] *Ibid*., s.17(6).
[83] *Ibid*., s.19.
[84] *Ibid*., s.18.
[85] *Ibid*., s.20.
[86] *Ibid*., s. 17 (3).

a. The cost of giving the notice;
b. The nature of the relief sought;
c. The size of the individual claims of class members;
d. The number of class members;
e. The place of residences of class members; and
f. Any other relevant matter.

73. The legislation provides the court with significant discretion in determining how notice will be given. The court may order that notice be given personally, by mail, by advertisement, or publishing a leaflet, for example.[87] In addition, the court has the discretion to order different notice for different class members.[88]

74. In some cases, the names of all class members may be available to either the plaintiff or defendant, and the courts may require defendants or third parties to provide the names and last known addresses of class members, which assists in providing notice at reasonable expense.[89]

75. The legislation provides that the notice must be given,[90] and that it must include the following information, unless the court orders otherwise:[91]

(a) a statement that common issues have been determined in favour of the class;
(b) a statement that class members may be entitled to individual relief;
(c) a description of the steps to be taken to establish an individual claim;
(d) a statement that failure on the part of a class member to take those steps will result in the member not being entitled to assert an individual claim except with leave of the court;
(e) an address to which class members may direct inquiries about the proceeding; and
(f) any other information that the court considers appropriate

76. An Ontario court may make any order it considers appropriate as to the costs of any notice ordered,[92] including ordering a defendant to pay the cost of identifying and notifying class members.[93]

### *3.3 Opt Out Rights and Class Member Ability to Pursue Individual Claims*

77. The OCPA allows potential class members to opt-out from membership in the class and avoid the consequences of the proceeding.[94] Individuals who do not opt-out of a class proceeding are bound by the judgment on the common issues.

---

[87] *Ibid.*, s. 17 (4). See also Eizenga, *supra* note 7 at para. 5.64.
[88] *Ibid.*, s. 17 (5).
[89] *Markle v Toronto (City)*, [2004] O.J. No. 3024 (S.C.J.). See also Eizenga, *supra* note 7 at para. 5.66.
[90] *OCPA*, s. 18 (1).
[91] *OCPA*, s. 18 (3).
[92] *OCPA*, s. 22 (1).
[93] *Directright Cartage Ltd. v. London Life Insurance Co.*, [2001] O.J. No. 4073 (S.C.J.) at para. 59.
[94] *OCPA*, s. 9.

78. As discussed in paragraph 71, the notice after certification to class members will specify how class members may exercise their right to opt-out of the class and the time period within which this must be exercised.

79. The statute provides that a class member who opts out of the class proceeding is not bound by the determination of the common issues.[95]

### *3.4 Limitation Period*

80. The OCPA suspends the running of a limitation period applicable to a cause of action asserted in the class action for all class members.[96] The suspension comes into effect on the day that the class action is commenced.

### *3.5 Evidence at Certification*

81. The OCPA provides discretion and flexibility to the court to determine how the litigation should be conducted. The court can make such orders as it deems appropriate regarding the conduct of the class proceeding to allow for a fair and expeditious determination.[97]

82. The court has the power to limit the range of persons subject to pre-certification discovery and the scope of any examinations,[98] which are limited to issues that are relevant to the certification motion.

83. Discovery in a class proceeding in Ontario is conducted in the same way as it would be in an individual proceeding.[99] The general rules of court apply to the discovery of parties in class proceedings. The defendant has the right to examine for discovery the representative plaintiff, without the need to obtain leave of the court. Leave of the court must be obtained to discover other class members.[100] The court will consider the following factors in determining whether to grant leave:[101]

   g. The stage of the class proceeding and the issues to be determined at that stage;
   h. The presence of subclasses;
   i. Whether the discovery is necessary in view of the claims or defences of the party seeking leave;
   j. The approximate monetary value of individual claims;
   k. Whether discovery would result in oppression or undue annoyance, burden or expense for the class members sought to be discovered; and

[95] *OCPA*, s. 27(2)(a).
[96] *OCPA*, s. 28(1).
[97] *Ibid*., s. 12.
[98] *Ibid*., s.12, 16.
[99] *Ibid*., s. 15(1).
[100] *Ibid*., s. 15(2).
[101] *Ibid*., s. 15(3).

l. Any other matters the court considered relevant.

84. The evidence admitted at the certification motion is governed by Rule 39 of the Ontario Rules of Civil Procedure.[102] Evidence is generally provided by affidavits.[103] A plaintiff may cross-examine on the defendant's affidavits filed in support of the certification motion, subject to the court controlling the nature and extent to the cross-examination.[104] In the absence of affidavit evidence, the plaintiff may examine a party as a witness on a pending motion.[105] The transcript of that cross-examination may then be made available at the hearing. Attendance of a person to be examined may be compelled similar to a witness at a trial.[106]

85. Expert evidence is permitted and common at the certification stage. The court's "gatekeeper" role is the same for a certification motion as it is for trials.[107]

### *3.6 The Use of Juries*

86. The *Courts of Justice Act* specifically prohibits the use of jury trials in the following matters:[108]

1. Injunction or mandatory order.
2. Partition or sale of real property.
3. Relief in proceedings referred to in the Schedule to section 21.8.
4. Dissolution of a partnership or taking of partnership or other accounts.
5. Foreclosure or redemption of a mortgage.
6. Sale and distribution of the proceeds of property subject to any lien or charge.
7. Execution of a trust.
8. Rectification, setting aside or cancellation of a deed or other written instrument.
9. Specific performance of a contract.
10. Declaratory relief.
11. Other equitable relief.
12. Relief against a municipality.

87. Where not prohibited, a party may serve a Jury Notice or submit a motion for a court to order that the issues of fact be tried or the damages assessed, or both, by a jury.[109] While the *Courts of Justice Act* provides no guidance to the manner in which judges should exercise their discretion to dispense with a jury, the Ontario Court of Appeal recently stated that:[110]

---

[102] *ROCP*, Rule 39.
[103] *Ibid.*, Rule 39.01.
[104] *Caputo v. Imperial Tabacco Ltd.* (2003), 33 C.P.C. (5th) 214 (S.C.J.).
[105] *ROCP*, Rule 39.03.
[106] *Ibid.*, Rule 39.03(5).
[107] *Griffin v. Dell Canada Inc.*, 2009 CanLII 3557 (ON S.C.) at. para. 76.
[108] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 108(2).
[109] *Ibid.* at s. 108(1) - (3).
[110] *Cowles v. Balac* (2006), 83 O.R. (3d) 660 at paras. 35-38.

> It is settled law that the right to trial by jury in a civil case is a substantive right and should not be interfered with without just cause or cogent reasons
>
> …
>
> A party moving to strike a jury bears the onus of showing that there are features in the legal or factual issues to be resolved, in the evidence, or in the conduct of the trial which merit the discharge of the jury. In the end, a court must decide whether the moving party has shown that justice to the parties will be better served by the discharge of the jury.

88. While there is no statutory bar to the use of juries in class proceeding trials, they have not been employed to date. This is primarily because of the constitutional guarantee of judicial independence (see paragraphs 124 to 128) and the high level of confidence that the public has in judges to provide reasonable, efficient and consistent outcomes.

***3.7 Pretrial Discovery***

89. Pretrial discovery is governed by Rules 30-33 of Ontario's *Rules of Civil Procedure*.[111] Rule 30 requires the parties to disclose a list of all documents (an "Affidavit of Documents") relating to the matter at issue that are or have been in its possession, control or power.[112] In addition, the court may order disclosure of all relevant documents in the possession, control or power of a party's subsidiary or affiliated corporation or a corporation controlled, directly or indirectly, by the party.[113]

90. The Rules broadly define "documents" so as to include photographs, videotape and computer-stored data and information.[114]

91. Affidavits of documents must be exchanged within 10 days after the close of pleadings. The affidavit must describe documents to be produced, documents no longer in possession and documents over which privilege is claimed (and the basis for the privilege).[115] The affidavit also states that the party has never had possession, control or power over documents not disclosed.

92. There is a continuing disclosure obligation on each party to correct any omissions in the original Affidavit of Documents and to produce newly acquired non-privileged documents.[116]

---

[111] *ROCP*, Rule 30-33.
[112] *Ibid*., Rule 30.02.
[113] *Ibid*., Rule 30.02(4).
[114] *Ibid*., Rule 30.01(1).
[115] *Ibid*., Rule 30.03(2).
[116] *Ibid*., Rule 37.07.

93. The court may order the production of documents from non-parties where it is shown that the document is relevant and that it would be inequitable to allow the party to proceed to trial without access to the document.[117]

94. The court may make such order as is just to deal with situations where a party attempts to use at trial a relevant document that was not disclosed or produced.[118]

95. An examination for discovery (i.e., pretrial depositions) may be taken orally or by written question and answers. Both may be used with leave of the court.[119]

96. Parties have the right to examine any party adverse in interest,[120] and non-parties with leave.[121] Where a corporation may be examined for discovery, the examining party may examine any officer, director or employee of the corporation. This is subject to the court's discretion to order that a replacement officer, director or employee be examined.[122]

97. The finding, opinions or conclusions of an expert retained by a party are discoverable subject to litigation privilege or the discoverable party undertaking not to call the expert as a witness at trial.[123]

98. Parties that are examined are under a continuous obligation to update in writing all other parties if information disclosed is incomplete or incorrect when made or subsequent to the examination for discovery.[124]

### *3.8 Evidence at Trial*

99. Evidence at trial (common issues and individual issues) is governed by Rule 53 of the OROCP.[125] These rules are in addition to the common law of evidence and the Ontario *Evidence Act*.[126]

100. Affidavit evidence may be used at trial only with leave of the court.[127]

101. The rules allow the court to compel attendance at trial by issuing a summons to witness.[128]

---

[117] *Ibid*., Rule 30.01.
[118] *Ibid*., Rule 30.08(1).
[119] *Ibid*., Rule 31.02.
[120] *Ibid*., Rule 31.03.
[121] *Ibid*., Rule 31.10.
[122] *Ibid*., Rule 31.03(2).
[123] *Ibid*., Rule 31.06(3).
[124] *Ibid*., Rule 31.09(1)-(2).
[125] *ROCP*, Rule 53.
[126] *Evidence Act*, R.S.O. 1990, c. E.23.
[127] *ROCP*, Rule 53.02.
[128] *ROCP*, Rule 53.04(1).

102. Adverse parties may also be called as witness. This includes directors, officers, and employees of the adverse party.[129] Where a witness appears unwilling or unable to give responsive answers, judges have the discretion to allow leading questions.[130]

103. A party calling an expert witness must serve the other side with a copy of the expert's report and qualifications at least 90 days before trial. An expert report that merely responds to the other party's expert may be served 60 days before trial.[131]

104. Under the common law in Canada, each witness called is subject to cross-examination by opposing counsel.[132] The general rule is that cross-examination is not limited to matters raised during examination-in-chief.[133] The main limitations on the scope of cross examination at trial are relevance, questions to which the answers would be inadmissible during examination-in-chief and the judge's discretion to limit questions based on their probative value being outweighed by their prejudicial effect.[134]

### *3.9 Settlement of a Class Action*

105. When a class action is settled, the OCPA requires that the court approve the settlement.[135] This protects the interests of absent class members and prevents collusion between a representative plaintiff and a defendant. Even prior to certification, an action commenced under the OCPA cannot be resolved without the approval of the court.[136]

106. In approving the settlement, the court determines whether the settlement is fair, reasonable and in the best interests of the class as a whole.[137] The following factors are weighed by Ontario courts when determining whether a settlement is fair and reasonable:[138]

(a) likelihood of recovery or likelihood of success;
(b) amount and nature of discovery, evidence or investigation;
(c) settlement terms and conditions;
(d) recommendation and experience of counsel;

---

[129] *Ibid.*, Rule 53.07(1)2.
[130] *ROCP*, Rule 53.01(4).
[131] *Ibid.*, Rule 53.03.
[132] Steven Lubet, *Modern Trial Advocacy Canada* (National Institute for Trial Advocacy, 2000) at 80.
[133] *Ibid.*
[134] *Ibid.*
[135] *OCPA*, s. 29(1)-29(2).
[136] *Ibid.*
[137] *Dabbs v. Sun Life Assurance Co. of Canada* (1998), 7 C.C.L.I. (3d) 38, 27 C.P.C. (4th) 243 at para. 4.
[138] *Dabbs v. Sun Life Assurance Company of Canada*, [1998] O.J. No. 1598 (Gen. Div.) at para 13 and [1998] O.J. No. 2811 (Gen. Div.) at paras 7-30, aff'd [1998] O.J. No. 3622 (C.A.), leave to appeal to S.C.C. denied [1998] S.C.C.A. No. 372 [*Dabbs*]; and *Parsons v. Canadian Red Cross Society*, [1999] O.J. No. 3572 (S.C.J.) at paras. 71 and 72.

(e) future expense and likely duration of litigation and risk;
(f) recommendation of neutral parties, being the Trustee;
(g) number of objectors and nature of objections;
(h) the presence of good faith, arm's length bargaining and the absence of collusions; and
(i) information conveying to the court the dynamics of and the positions taken by the parties during the negotiations.

107. In Ontario, courts may require formal notice be given to class members in advance of the settlement hearing.[139] The form and content of such notice is left to the discretion of the court.

108. While courts will not rewrite the terms of a settlement agreement, a judge may flag "areas of concern" and allow the certification motion to be brought back for reconsideration after the parties address those concerns.[140]

### *3.10 Objecting to Settlement*

109. Objectors to a proposed settlement are permitted to participate in the settlement class certification proceeding and put forth evidence as to why the proposed settlement is neither reasonable nor in the best interests of class members.

### *3.11 Procedures to Allocate Recovery Among all Class Members*

110. The Courts are provided with broad discretion to direct the process of distribution of amounts owing to the class members.[141] Defendants may be required to make payments directly to class members; or the court may instead require that a third party to undertake the necessary distribution.[142] Regardless of the method of distribution selected by the court, the court must supervise the distribution.

111. The notice requirement is scrutinized carefully by Canadian courts in the context of cross-border or multi-national settlements. In *Parsons v. McDonald's Restaurants of Canada Ltd.*, the defendant attempted to enforce the release provisions of a U.S. settlement (which appeared to release world-wide claims) in order to dismiss a class proceeding in Ontario. The court concluded that it would be "substantially unjust" to find that Canadian members of the putative class had received "adequate notice of the proceedings and their rights to opt out."[143]

---

[139] *OCPA*, s. 29(4).
[140] *Dabbs*, *supra* note 138 at para. 10.
[141] *OCPA*, s. 26.
[142] *OCPA*, ss. 26(7-9).
[143] *Parsons v. MacDonald's Restaurants of Canada Ltd.*, [2004] 0.J. No. 83 (S.C.J.) at para. 58.

***3.12 Remedies For Enforcement Of Judgments.***

112. Established procedures exist to enforce court orders or judgments arising out of civil proceedings in Ontario. Enforcement is carried out by a sheriff .[144] Once an Ontario court renders a judgment, the procedures to have that judgment enforced are set out in the OROCP. An order for payment or recovery of money can be enforced by at least four processes in Ontario[145] including: a writ of seizure and sale[146], garnishment[147], a writ of sequestration[148] and the appointment of a receiver. Each of these processes is described below.

113. A judgment creditor is entitled to the issue of a writ of seizure and sale upon filing with the registrar. This is a court order that enables a sheriff to seize the judgment debtor's assets and sell them. It is available without leave.[149] The judgment creditor must then file documents with the sheriff to obtain a form which directs the sheriff to enforce the writ[150].

114. A judgment creditor may also enforce an order for the payment or recovery of money by garnishment of debts payable by other persons to the judgment debtor.[151] The rule contains a process whereby the creditor obtains a notice of garnishment by the registrar. [152] The registrar will then send a copy of each notice of garnishment to the sheriff of the county in which the debtor resides or, if the debtor resides outside Ontario, to the sheriff of the county in which the proceeding was commenced.[153] The creditor is then obligated to serve the order for garnishment on both the debtor and the garnishee.[154] Once the creditor has received its monies, the creditor must serve a notice of termination of garnishment on both the garnishee and the sheriff.[155]

115. If the above two remedies are ineffective[156], the judgment creditor has a third remedy, known as a Writ of Sequestration[157]. It directs a sheriff to take possession of (real and/or personal) property against the debtor and to collect any income from that property until the debtor complies with the order. This remedy is only available only when issued with leave of court on motion.[158]

---

[144] *Courts of Justice Act*, R.S.O. 1990, c. C.43.
[145] *ROCP*, Rule 60.02.
[146] *Ibid.*, Rule s.60.07.
[147] *Ibid.*, Rule 60.08.
[148] *Ibid.*, Rule 60.09.
[149] *Ibid.*, Rule 60.07(1).
[150] *Ibid.*, Rule 60.07(13).
[151] *Ibid.*, Rule 60.08. The enforcement of this rule falls under subsection 17. The creditor can make a motion to the court to have an order against garnishee for payment.
[152] *Ibid.*, Rule 60.08(4).
[153] *Ibid.*, Rule 60.08(6).
[154] *Ibid.*, Rule 60.08(7).
[155] *Ibid.*, Rule 60.08(20).
[156] *Ibid.*, Rule 60.09(2).
[157] *Ibid.*, Rule 60.09.
[158] *Ibid.*, Rule 60.09(4).

### *3.13 Framework for Appellate Review*

116. The OCPA establishes a specific framework for appeals of certification orders and of trial judgments on common and individual issues.[159] The OROCP and Ontario's *Courts of Justice Act* govern the general process for appeals in Ontario. However, the Ontario Court of Appeal has held that the specific statutory rights of appeal granted in the OCPA take precedence over principles of general application.[160]

117. The OCPA provides (with respect to a plaintiffs' proposed class action) that the plaintiff has the right to appeal an order *refusing* certification (or an order decertifying a previously certified proceeding) to the Divisional Court (the intermediate appellate court in Ontario).[161] In contrast, the defendant must seek leave to appeal an order *granting* certification to the Divisional Court as provided for in the Rules of Civil Procedure.[162]

118. Typically in Ontario, class actions are assigned to a judge experienced in such matters to be case-managed. The decisions of such judges on a certification motion are entitled to and are granted a high level of deference by appellate courts, in recognition of their special expertise and their particular familiarity with the factual context of the proceeding.[163]

119. In Ontario, a defendant may attempt to stay an ongoing action pending an appeal of the certification decision, but courts are wary of such stays on the basis that they may frustrate the goal of access to justice underlying the OCPA.[164]

120. A party has a right to appeal a trial judgment on the common issues in a class proceeding to the Ontario Court of Appeal (the final provincial appellate court).[165] A party also has a right to appeal an order on an aggregate assessment of damages.[166] A further and final appeal from a decision of the Ontario Court of Appeal can only could be made to the Supreme Court of Canada, with leave.

### *3.14 Contingency Fee Arrangements in Ontario*

121. The OCPA expressly permits and regulates contingency fee agreements for class proceedings to enable plaintiffs of modest means, or with modest claims, to have full access to the justice system.[167] In addition, class counsel may indemnify a

[159] *OCPA,* s. 30.
[160] *Dabbs*, supra note 138 at 488.
[161] *OCPA,* s. 30(1).
[162] *Ibid.*, s. 30(2).
[163] *Pearson*, *supra* note 50 at para. 43. See also *Cloud*, *supra* note 36 at para 39.
[164] Eizenga, *supra* note 7 at para. 10.4.
[165] *OCPA*, s. 30(3).
[166] *Ibid.*
[167] *Ibid.*, s. 33(1).

representative plaintiff against adverse cost awards. Such arrangements have been found to be acceptable for policy reasons.[168]

### *3.15 Cost Regime in Ontario*

122. While Ontario generally follows the English rule of fee shifting, under which the party who loses pays a portion of the other party's attorney's fees, the OCPA adopts a modified two-way cost rule. This means that the legislation can shield a representative plaintiff from cost liability if the proceeding is a test case, raises a novel point of law or involves a matter of public interest.[169] In addition, under the Ontario *Courts of Justice Act*, courts have broad discretion to vary cost awards.[170]

123. The courts have traditionally adopted a very liberal approach to the three factors for denying costs against plaintiffs. For instance, in *Williams v. Mutual Life Assurance Co. of Canada,*[171] the court shielded the losing plaintiff from an adverse costs award despite the fact that none of the three factors noted above was satisfied. However, in the Supreme Court of Canada's recent decision in *Kerr v. Danier Leather Inc,*[172] the court declined to shield a wealthy representative plaintiff from a substantial adverse cost award.

### *3.16 Judicial Independence*

124. The Supreme Court of Canada describes judicial independence as "the freedom to render decisions solely on the requirements of law and justice."[173] Further, "[t]he general test for the presence or absence of independence consists in asking whether a reasonable person who is fully informed of all the circumstances would consider whether that a particular court enjoyed the necessary independence status."[174] Thus judicial independence includes the need for actual independence and also conditions required to give rise to the perception of independence.

125. The Supreme Court of Canada's *Provincial Judges Reference*[175] is the leading opinion on the independence and impartiality of judges. In this case the court established judicial independence as a constitutional principle. There are three components of judicial independence: security of tenure, financial security and administrative independence.[176]

---

[168] *Holmes v. London Life Insurance Co.*, [2007] O.J. No. 158 at para. 2 (S.C.J.).
[169] *OCPA*, *s.* 31(1).
[170] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 131.
[171] *Williams v. Mutual Life Assurance Co. of Canada*, [2001] O.J. No. 445 (S.C.J.).
[172] *Kerr v. Danier Leather Inc.*, [2007] S.C.J. No. 44.
[173] *British Columbia v. Imperial Tobacco Canada Ltd.*, [2005] 2 SCR 473, at para. 45.
[174] *Mackin v. New Brunswick (Minister of Finance)*, [2002] 1SCR 405, at para. 38 [*Mackin*].
[175] *The Provincial Judges Reference*, [1997] 3 S.C.R. 3. [*The Provincial Judges Reference*].
[176] *Ibid.* at para. 118.

126. The principle of security of tenure guarantees that judges can only be removed for failing to perform judicial duties, not for political reasons.[177]

127. The second component of judicial independence is the need for financial security. The *Provincial Judges Reference* established that independent compensation commissions are required to help set salaries free of political manipulation.[178] This ensures that the judiciary does not negotiate remunerations directly with the executive or legislature branches of government.[179]

128. The third component of judicial independence calls for administrative independence, that is, the court system must have control over administrative decisions that bear direct and immediately on the exercise of judicial functions.[180] This includes the assignment of judges, sitting of the court, and court lists.[181]

**4. Certification of a Global Class including Canadian and Foreign Plaintiffs**

129. The Ontario Superior Court of Justice has the inherent power and jurisdiction to certify a global class that includes potential class members domiciled both in Canada and outside of Canada (e.g., Canadian shareholders who purchased securities on the TSX and foreign shareholders who purchased securities on a foreign exchange).

130. The power and jurisdiction of the Superior Court of Justice is set out generally in the *Courts of Justice Act* as follows:[182]

> The Superior Court of Justice has all the jurisdiction, power and authority historically exercised by courts of common law and equity in England and Ontario.

131. Ontario courts have extended their jurisdiction in civil matters, including class proceedings across provincial borders.[183] In fact, Ontario courts are more accepting of an expansive approach to jurisdiction where there needs to be a "real and substantial connection and a commonality of interest between non-resident class members and those who are resident in the forum and whose cause of action have sufficiently real and substantial connections to it to ground jurisdiction over their claims."[184]

132. National class actions have been certified in several Ontario cases.[185] In *Nantais v. Telectroncs Proprietary (Canada) Ltd.*, the class action was certified because of the

[177] *Mackin*, *supra* note 174 at paras. 42 and 43.
[178] *The Provincial Judges Reference*, *supra* note 175 at para. 166.
[179] *The Provincial Judges Reference*, *supra* note 175 at para. 170.
[180] *The Provincial Judges Reference*, *supra* note 175 at para. 117.
[181] *Ibid.*
[182] *Courts of Justice Act, R.S.O. 1990, c. C.*43, s. 11(2).
[183] *Morguard Investments Ltd. v. De Savoye*, [1990] S.C.J. No 135, 3 S.C.R. 1077.
[184] *McCutcheon v. The Cash Store Inc.*, [2006] O.J. No. 1860 (S.C.J.) at paras. 49-50.
[185] *Nantais*, *supra* note 55. *Carom*, *supra* note 73.

"modern need to deal nationally with problems". Choice of law problems and interprovincial sovereignty were addressed and overcome in that case.[186]

133. Mr. Justice Winkler (as he was then) in *Carom v. Bre-X Minerals Ltd.* provided a review of the legal basis for certifying non-resident classes on the basis that when the principles enunciated in *Morguard Investments Ltd. v. De Savoye*[187] (i.e. the real and substantial connection to the province) are applied to the OCPA, the certification of the non-resident class can be permitted.[188] In *Carom*, the defendants attempted to use the fact that the OCPA makes no mention of non-resident plaintiffs as a basis for arguing that it cannot apply to non-Ontario residents. In rejecting this argument, Mr. Justice Winkler (as he was then) stated, "[t]o the contrary, the absence of a provision limiting its application to Ontario residents permits the inclusion of any person with a right of action, regardless of the location of his or her residence, in the class, subject to [constitutional considerations]…"[189] Lastly, he concluded that the "extra-territorial application of legislation where the enacting province has a real and substantial connection with the subject matter of the action"[190] is permitted.

134. Ontario courts have certified class actions comprised of international class members,[191] including *CC&L Dedicated Enterprise Fund (Trustee of) v. Fisherman* which involved an international class of securities investors. In addition, the concept of inter-jurisdictional class actions has been accepted implicitly by appellate courts. In fact, there is jurisprudence from the Supreme Court of Canada authorizing an Alberta class proceeding comprising foreign investors.[192]

135. In *CC&L*, the plaintiffs brought a class action on behalf of Canadian investors who purchased/acquired shares in YBM in the secondary market which resulted in a loss. In fact, the motion to certify the class action was based on two class proceedings, both under the OCPA on behalf of all persons in Canada who purchased the shares. YBM was an Alberta corporation with a head office in Newtown, Pennsylvania. There was a class action commenced by American shareholders in the United States District Court,[193] which had been stayed upon motion by the defendants in that action on the basis of comity. In *CC&L*, Mr. Justice Cumming stated:

> [t]he proposed representative plaintiffs in the two Canadian class actions bring a motion …to approve the settlement… The agreement to settle includes a disposition of other

[186] Eizenger, *supra* note 7 at para. 4.28.
[187] *Morguard, supra* note 183.
[188] Eizenger, *supra* note 7 at para. 4-30.
[189] *Carom, supra* note 73 at para. 20.
[190] *Ibid.* at para. 33.
[191] *Robertson v. Thomson Corp.* (1999), 43 O.R. (3d) 161 (Gen. Div.); *Brimner v. Via Rail Canada Inc.* [2000] September, 2002. , 50 O.R. (3d) 114 (S.C.J.); *CC&L Dedicated Enterprise Fund (Trustee of) v. Fisherman*, [2002] O.J. No. 1855. See C.M. Wright & A.L. DeKay, "Issues in Cross Border Class Action Litigation", Toronto: The Second Annual Class Action Symposium, Osgoode Hall Continuing Legal Education, September 2002.
[192] See *Western Canadian Shopping Centres Ltd., supra* note 7.
[193] *Paraschos v. YBM Magnex International Inc.* (2000), 130 F. Supp.2d 642 (U.S. Dist. Ct. E.D. Penn.).

> YBM-related litigation in Ontario and the United States….The jurisdiction of this court is not contested. Indeed, Judge Clarence C. Newcomer in *Paraschos*, *supra*, held that because Canada has greater interest than the United States in the subject matter, the American action should be dismissed, "in deference to Canadian law and the Canadian courts on the basis of international comity."[194]

[194] *CC&L Dedicated Enterprise Fund (Trustee of) v. Fisherman*, *supra* note 191 at paras. 11 - 12.

## C. SUBSTANTIVE SECURITIES LAWS IN ONTARIO, CANADA

136. The plaintiffs in the Canadian Action ("Canadian Plaintiffs") allege a number of securities claims against IMAX and some individual defendants based principally on "the statement explicitly and/or implicitly contained in the February [17, 2006] Press Release and expressly repeated in the Form 10-K and Annual Report [for the fiscal year ended December 31, 2005], that IMAX's revenue for the 2005 fiscal year were prepared and reported in accordance with GAAP and that such revenues met or exceeded the earnings guidance previously issued" (the "Representation").[195] They allege that the Representation "was materially false and/or materially misleading when made."[196]

137. The Canadian Plaintiffs assert both statutory and common law causes of action. This section addresses the substantive Canadian securities laws, with specific emphasis on the claims asserted by the plaintiffs in the Canadian Action.[197]

### 1. Statutory Scheme

#### *1.1 Background*

138. The *Ontario Securities Act* of 1990[198] ("OSA") states that the purposes of securities regulation in Canada include: ensuring investor protection, promoting efficient capital markets and maintaining public confidence in the capital markets.[199] Full, fair and complete disclosure is the cornerstone of securities regulation in Canada.

139. The OSA, as amended, contains a statutory regime for civil liability for continuous disclosure violations. These provisions provide for liability against a range of defendants for breaches of the obligations set out below.

140. Investors have a right of action against a range of potential defendants when they purchase (or sell) securities from third parties in the secondary market in the event of an uncorrected misrepresentation made by or on behalf of a responsible issuer in its disclosure documents or in public oral statements; or a responsible issuer's failure to make timely disclosure of a material change.

[195] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim para. 1(y).
[196] Id. paras. 25, 40.
[197] Feb. 27, 2007 Notice of Motion para. 1(h).
[198] *Securities Act*, R.S.O. 1990, c. S.5 [*OSA*].
[199] *OSA*, s.1.1.

141. In contrast to the common law requirements for a cause of action based on negligent misrepresentations, the statutory civil liability provisions expressly state that the investor need not prove reliance on the alleged misrepresentations.[200]

***1.2 Leave of the Court***

142. The Canadian Plaintiffs seek leave of the Ontario Court to pursue statutory causes of action asserting "liability for secondary market misrepresentation pursuant to Part XXIII.1 of the [Ontario] Securities Act."[201]

143. A potential plaintiff can commence a proceeding under OSA only with leave of the court. The court will grant leave if it is satisfied that: the action is being brought in good faith and there is a reasonable possibility that the proposed causes of action will be resolved in favour of the plaintiff.[202]

144. A motion for leave of the court to initiate the statutory secondary market civil liability action is independent and separate from a plaintiff's motion for class certification. However, there is nothing prohibiting both the motion for leave and the certification motion for being heard at the same time.

145. It is unclear how onerous the OSA merit-based assessment will be because no Ontario court has interpreted this provision to date (and no Canadian court has considered analogous provisions in other jurisdictions).

146. The OSA leave requirement requires affidavit evidence from the plaintiffs and from the proposed defendants regarding the material facts they will rely on so that the judge can engage in a preliminary analysis of the merits of the case. The court can award costs against an unsuccessful plaintiff. In addition, the court must approve any settlement or other resolution of an action under these provisions.[203]

***1.3 Liability for Documentary Misrepresentation***

147. The requirements for attaching liability to the range of defendants under the statutory scheme vary depending on whether the misrepresentation is a misrepresentation in a document or a public oral misrepresentation. This affidavit focuses on documentary misrepresentations because that is the sole basis for the Canadian Plaintiffs' allegations.[204]

---

[200] *OSA*, s.138.3(1); Stikeman Elliott LLP, *Litigation Unleashed A Guide to Ontario's Secondary Market Liability Regime*, (Toronto: 2005) at 3-4 [*Securities Litigation Unleashed*].
[201] Feb. 27, 2007 Notice of Motion paras. 1(a), 1(h); see Dec. 9, 2008 Proposed Draft Fresh Statement of Claim paras. 76-81.
[202] *OSA*, s. 138.8(1).
[203] *OSA*, 138.10.
[204] See Dec. 9, 2008 Proposed Draft Fresh Statement of Claim para. 4 ("The Representation and such misstatements were made in, among other documents, the Annual Report, the Form 10-K, the February Press Release and the two IMAX press releases dated March 9, 2006.").

148. The term document is defined extremely broadly in the statute to not only include any written communication, including electronic communications, that is required to be filed (or is voluntarily filed) with the Ontario Securities Commission ("OSC"), a government or government agency under corporate or securities law, or a stock exchange or similar marketplace, but also any other written communication which could reasonably be expected to affect the market price or value of the security of the issuer.[205] The latter phrase could encompass press releases, material on websites and marketing materials.

149. A documentary misrepresentation takes place when a responsible issuer,[206] an influential person,[207] or their agent releases a document which contains a misrepresentation.

150. When this happens, anyone who buys or sells an issuer's securities between the release of the document and the public correction of the misrepresentation has a cause of action. This cause of action is available even if the misrepresentation did not influence the investor's decision to buy or sell as the case may be.[208] As such, an investor need not prove reliance.

151. Who the investor can sue, that is, the potential class of defendants depends on *who* released the document containing the misrepresentation.

152. Where the document was released by the responsible issuer or its agent, the investor can sue the responsible issuer, all of its directors at the time of the release, and any officers who authorized, permitted or acquiesced in the release. The investor can also sue each influential person and each director or officer of that influential person who knowingly influenced the responsible issuer or its agent to release the document or knowingly influenced a director/officer of the responsible issuer to authorize, permit or acquiesce in the release of the document.

*1.3.1 Elements required to Establish Liability*

153. An investor must establish several elements to establish liability, depending on the type of potential defendant and the nature of the claim.

*1.3.1.1 Actions against Responsible Issuers*

154. The Canadian Plaintiffs seek to hold IMAX liable as the responsible issuer for releasing "core documents" that contained the Representation.[209]

[205] *OSA*, s. 138.1.
[206] See definition of "responsible issuer" in *OSA*, s. 138.1.
[207] See definition of "influential person" in *OSA*, s. 138.1.
[208] Securities Litigation Unleashed, *supra* note 200 at 6.
[209] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim paras. 77-78.

155. If a responsible issuer makes a misrepresentation in a core document or fails to make timely disclosure of a material change, the responsible issuer is liable upon proof of the misrepresentation or the failure to make timely disclosure.

156. A core document includes a document filed with the securities regulator as required by securities laws, including a prospectus, a take-over bid circular, an issuer bid circular, a directors' circular, a rights offering circular, management's discussion and analysis, an annual information form, an information or proxy circular, annual financial statements, interim financial statements and most material change reports.[210]

*1.3.1.2 Actions against Directors*

157. In addition, the Canadian plaintiffs seek to hold a number of directors liable, including two of the Individual Defendants, Bradley Wechsler and Richard Gelfond.[211]

158. If the document was released by the responsible issuer, then directors of the responsible issuer at the time that the core document was released are responsible for misrepresentations in the core document.[212]

159. If the document was released by an influential person, then directors of the responsible issuer who authorized, permitted or acquiesced in the release of the core document are responsible for misrepresentations in the core document.[213]

*1.3.1.3 Actions against Officers*

160. The Canadian Plaintiffs also allege that all of the Individual Defendants (defined as Gelfond, Wechsler, and Francis Joyce) and Kathryn Gamble are officers that are liable for the actionable core documents since they each "authorized, permitted and/or acquiesced in the release of those documents" containing the Representation,[214] and that each signed the Form 10-K.[215] They also allege that each of the Individual Defendants either acted knowingly, "deliberately avoided acquiring knowledge," or were "guilty of gross misconduct" in connection with the alleged misrepresentations.[216]

161. If the document was released by the responsible issuer, then officers of the responsible issuer who authorized, permitted or acquiesced in the release of the document are responsible for misrepresentations in the core document.[217]

[210] Securities Litigation Unleashed, *supra* note 200 at 10.
[211] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim para. 79.
[212] *OSA*, s. 138.3(1)(b).
[213] *OSA*, s. 138.3(1)(c).
[214] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim para. 80; see also id. paras. 24, 28, 39, 43.
[215] Id. para. 29.
[216] Id. para. 80.
[217] *OSA*, s. 138.3(1)(d).

162. If the document was released by an influential person, then officers of the responsible issuer who authorized, permitted or acquiesced in the release of the document are responsible for misrepresentations in the core document.[218]

*1.3.2 Defenses*

163. The statutory framework also provides for a number of defenses that may limit liability or limit damages in some contexts. The liability defenses include:[219]

a) a due diligence defense,
b) a defense regarding properly qualified forward-looking information,
c) a defense that the plaintiff knew of the material change or misrepresentation,
d) a defense that the material change was confidentially disclosed to the OSC;
e) a defense that reasonable reliance was placed on an expert;
f) a defense that corrective action was taken;
g) a defense that there was reasonable reliance on representations contained in a third party's public disclosure filings.

164. IMAX and the Individual Defendants (and the other proposed defendants) have advanced two of the above statutory defenses against the Canadian Plaintiffs' leave motion: (a) the due diligence defense; and (b) the defense that reasonable reliance was placed on an expert.[220]

165. The due-diligence defense requires the defendants to prove that it conducted (or caused to be conducted) a reasonable investigation and that it had no reasonable grounds to believe that the document contained the misrepresentation. It thus places the burden of proof on the defendants. Courts determine the reasonableness of an investigation based on a number of factors set out in the OSA. These factors include:[221]

a) the nature of the responsible issuer;
b) the knowledge, experience and function of the person or company;
c) the office held, if the person was an officer;
d) the presence or absence of another relationship with the responsible issuer, if the person was a director;
e) the existence, if any, and the nature of any system designed to ensure that the responsible issuer meets its continuous disclosure obligations;
f) the reasonableness of reliance by the person or company on the responsible issuer's disclosure compliance system and on the responsible issuer's

---

[218] *OSA*, s. 138.3(3)(c).
[219] Securities Litigation Unleashed, *supra* note 200 at 4.
[220] Dec. 15, 2008 Factum of the Defendants and the Proposed Defendants.
[221] *OSA*, s. 138.4(7).

officers, employees and others whose duties would in the ordinary course have given them knowledge of the relevant facts;

g) the period within which disclosure was required to be made under the applicable law;

h) in respect of a report, statement or opinion of an expert, any professional standards applicable to the expert;

i) the extent to which the person or company knew, or should reasonably have known, the content and medium of dissemination of the document or public oral statement;

j) in the case of a misrepresentation, the role and responsibility of the person or company in the preparation and release of the document, in the making of the public oral statement containing the misrepresentation or in the ascertaining of the facts contained in that document or public oral statement; and

k) in the case of a failure to make timely disclosure, the role and responsibility of the person or company involved in a decision not to disclose the material change.

166. The other defense asserted is reliance on a report, statement or opinion made by an expert. The defense is not available to the expert on whom reliance was placed. This defense is not available for defendants who knew or had reasonable grounds to believe that there was a misrepresentation in the statement made on the authenticity of the expert, if the disclosure did not "fairly represent" the expert's report, statement or opinion, or if the information was used with the written consent of the expert.[222]

*1.3.3 Damages*

167. The Canadian Plaintiffs seek "damages calculated in accordance with § 138.5 of the Securities Act" against the issuer, its officers and its directors.[223]

168. The statute provides a formula for calculating damages that an investor can receive under the statutory scheme. The statute also provides for proportionate liability for defendants in certain instances and in other instances, requires the defendant to pay the full amount to the investor. Finally, a cap on damages is provided for the issuer, and also for some classes of other defendants in certain circumstances. Each of these issues is commented on below.

[222] Securities Litigation Unleashed, *supra* note 200 at 16.
[223] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim paras. 2(f)-2(h), 82.

169. The statute sets out a formula for investors who paid too much upon acquisition and as well as another formula for investors who received too little upon sale during the period of an uncorrected misrepresentation or failure to disclose a material change. Damages are based on the investor's actual loss or, alternatively, an objective test that has been set out in the statute. For example, damages in the context of an acquiring investor paying too much are determined by reference to the investor's actual loss based on the investor's purchase price less the actual disposition price. The more objective test in the statute would take the investor's purchase price less a benchmark price which the statute sets as the trading price during the ten day trading period immediately following the correction of the misrepresentation or failure to disclose a material change.

170. The statute generally provides for proportionate liability (as opposed to joint and several liability) such that each defendant is responsible for paying only that portion or percentage of the plaintiff's aggregate damages for which the court finds the defendant responsible.[224] However, any defendant (other than the responsible issuer) who knowingly authorized, permitted or acquiesced in the making of a misrepresentation is liable to pay the whole amount of damages to the plaintiff.[225]

171. The total extent of damages that can be recovered will depend on whether knowledge on the part of the defendant(s) can be established. Where there is no knowledge on the part of the defendant, the liability caps are as follows:[226]

a) Responsible issuer or influential person (organization) - $5% of their market capitalization
b) Directors and officers of responsible issuers and influential persons (individuals) – greater of $25,000 and 50% of prior 12 months compensation from the relevant party
c) Directors and officers of an influential person – greater of $25,000 and 50% of prior 12 months compensation received from influential person
d) Persons who made public oral statements as agents that attracted ability – greater of $25000 or 50% of the prior 12 months compensation
e) Experts – greater of $1,000,000 and prior 12 months revenues received from issuer.

172. Where the investor can establish knowledge of the misrepresentation or the failure to make disclosure of a material change by a defendant, there are no caps on recovery by the investor.[227]

[224] *OSA*, s. 138.6(1).
[225] *OSA*, s. 138.6(2) and (3).
[226] See definition of "liability limit" in *OSA*, s. 128.1.
[227] *OSA*, s. 138.7(2).

## 2. Common Law

173. The causes of action and remedies available to investors under the Ontario Securities Act are *in addition* to remedies available under the common law. The statutory provisions discussed above also do not prevent an investor from using any other basis that might be available under the common law or any other statutory scheme, such as the Canadian oppression remedy available under corporate law statutes.[228]

174. The Canadian Plaintiffs also assert common law causes of action sounding in "negligence; conspiracy; [and] negligent and reckless misrepresentation."[229]

175. There is no requirement to obtain the leave of the court when pursue an action in the common law torts of negligence, conspiracy, negligent and reckless misrepresentation.

### *2.1 Conspiracy*

176. The Canadian Plaintiffs allege that IMAX and the Individual Defendants "knowingly and intentionally" engaged in a conspiracy in which they, among other things, "wrongfully, unlawfully, maliciously and lacking bona fides, agreed together . . . [to] overstate revenues and net earnings."[230]

177. The Supreme Court of Canada has affirmed two possible bases on which a claim on the tort of conspiracy may be advanced:[231]

> (1) whether the means used by the defendants are lawful or unlawful, the predominant purpose of the defendants' conduct is to cause injury to the plaintiff; or,
>
> (2) where the conduct of the defendants is unlawful, the conduct is directed towards the plaintiff (alone or together with others), and the defendants should know in the circumstances that injury to the plaintiff is likely to and does result.

178. In addition, the Ontario Court of Appeal has detailed the requirements of a proper plea of the tort of conspiracy:[232]

---

[228] See *BCE Inc., Re*, 2008 CarswellQue 12595; *People's Department Stores Ltd. (1992) Inc*., Re, 2004 SCC 68, 244 D.L.R. (4th) 564.
[229] Feb. 27, 2007 Notice of Motion para. 1(h).
[230] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim paras. 52-56.
[231] *Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd*., [1983] 1 S.C.R. 452, 145 D.L.R. (3d) 385 at 471-72.
[232] *Normart Management Ltd. v. West Hill Redevelopment Co.* (1998), 37 O.R. (3d) 97 at 104.

> The statement of claim should describe who the several parties are and their relationship with each other. It should allege the agreement between the defendants to conspire, and state precisely what the purpose or what were the objects of the alleged conspiracy, and it must then proceed to set forth, with clarity and precision, the overt acts which are alleged to have been done by each of the alleged conspirators in pursuance and in furtherance of the conspiracy; and lastly, it must allege the injury and damage occasioned to the plaintiff thereby.

### *2.2 Negligent Misrepresentation*

179. The Canadian Plaintiffs allege that IMAX and the Individual Defendants each breached their duty of care to prospective investors in the secondary market because, among other things, "they knew or reasonably ought to have known that the documents contained the Representation which was false," "they failed to maintain appropriate internal policies, controls and procedures to ensure that the financial statements adequately and fairly presented the financial position of IMAX," and "they failed to comply with the principles of GAAP."[233]

180. The five elements of the tort of negligent misrepresentation were laid out in the leading Supreme Court of Canada case *Queen v. Cognos Inc.* as follows:[234]

(1) the existence of a duty of care based on a special relationship between the representor and the representee;
(2) that the representation in question was untrue, inaccurate or misleading;
(3) the representor must have acted negligently in making the misrepresentation;
(4) the representee must have relied, in a reasonable manner, on the negligent misrepresentation; and
(5) the reliance must have been detrimental to the representee in the sense that damages resulted:

181. In *Hercules Management Ltd. v. Ernst & Young*,[235] the Supreme Court confirmed that actual reliance was a requirement for the tort of negligent misrepresentation in Canada. Ontario has rejected the American "fraud on the market" theory as a means of meeting the requirement of actual reliance.[236]

### *2.3 Fraudulent Misrepresentation*

182. The Canadian Plaintiffs allege that IMAX and the Individual Defendants knew that "investors would rely upon the Representation in making their decisions to

---

[233] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim paras. 63-66.
[234] *Queen v. Cognos Inc*., [1993] 1 S.C.R. 87 (S.C.C.), at 110.
[235] *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165 (S.C.C.) at 184.
[236] *Ibid* at paras. 39-40.

purchase IMAX securities," and that they "made the Representation negligently, or, alternatively, recklessly, caring not whether it was true or false."[237]

183. The elements of a claim for fraudulent (or reckless) misrepresentation were enunciated by the Supreme Court of Canada in *Parna v. G. & S. Properties Ltd*. as follows:[238]

> [A fraudulent misrepresentation is] a false representation of fact, made with a knowledge of its falsehood, or recklessly, without belief in its truth, with the intention that it should be acted upon by the complaining party, and actually inducing him to act upon it.

184. The requirement for actual inducement has been strictly interpreted by courts on Ontario.

185. In Ontario, it has been held that the claim for reckless misrepresentation requires the plaintiffs to prove at trial that there have been representations of fact by each of the defendants upon which they relied.[239] In addition, "recklessness" is defined as "without caring whether it was true or not."[240]

***2.4 Damages***

186. The Canadian Plaintiffs seek "special damages, general damages" and other damages "in the sum of $200 million or such other sum as this court finds appropriate," and also seek "punitive damages in the amount of $10 million," as well as pre- and post-judgment interest and costs.[241]

187. In the award of damages at common law, the principle of *restitutio in integrum* applies, which means that the plaintiff should be made whole. This is achieved by the courts awarding a sum of money that will put the plaintiff in the position as though the wrong had not been committed.[242] If a plaintiff is able to prove the elements of the tort alleged then damages will be assessed on this basis, generally without a cap. This is in contrast to the limits imposed in some instances of the statutory scheme.[243]

188. In certain contexts, courts have awarded plaintiffs punitive damages to punish egregious conduct and to promote respect for the rule of law.[244] "Punitive

[237] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim paras. 67-75.
[238] *Parna v. G. & S. Properties Ltd.* (1970), 15 D.L.R. (3d) 336 (S.C.C.) at 344.
[239] *Canadian Imperial Bank of Commerce v. Deloitte & Touche*, 2003 CanLII 38170 (ON S.C.D.C.).
[240] *Gregory v. Jolley* (2001), 54 O.R. (3d) 481 (C.A.). See also *Ibid.* at para. 20.
[241] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim paras. 2(i), 2(j), 2(l) & 2(m).
[242] J. Cassels & E. Adjin-Tettey, *Remedies: The Law of Damages*, 2d ed. (Toronto: Irwin Law, 2008) at 14 [*Cassels*].
[243] As an example, see definition of "liability limit" in *OSA*, s. 128.1.
[244] Cassels, *supra* note 242.

damages…are designed to punish. In this, they constitute an exception to the general common law rule that damages are to compensate the injured…"[245]

189. Under the common law, defendants may be held jointly and severally liable for assessment of damages. Joint and several liability permits plaintiffs to execute a judgment against any one of multiple defendants.[246] While the court may apportion the responsibility of the plaintiff's damages among the defendants, this apportionment does not affect the plaintiff who may still seek 100 percent of the judgment against any of the defendants.[247]

[245] *Vorvis. V. Insurance Corp. of British Columbia*, [1989] 1 S.C.R. 1085 at 1098-99.
[246] Philip H. Osborne, *The Law of Torts* (Toronto: Irwin Law, 2003) at 61.
[247] *Ibid* at 62.

## EXHIBIT A

**POONAM PURI**
**Associate Professor of Law**
**Osgoode Hall Law School, York University**
**4700 Keele Street, Toronto, ON**
**ppuri@osgoode.yorku.ca**
**416.736.5542/416.417.2177**

BIOGRAPHY

Poonam Puri is one of Canada's most respected scholars and commentators on issues of corporate law, securities law, corporate governance, and corporate and white-collar crime.

Appointed to York University's Osgoode Hall Law School in 1997, and a recipient of its Teaching Excellence Award in 1999, Puri is a prolific scholar who has co-authored or edited three books and written numerous articles or reports. She has an LL.B. degree (JD equivalent) from the University of Toronto, where she was the Silver Medalist in her 1995 graduating law class, and she holds a Master of Laws (LLM) degree from Harvard Law School.

Her work is academically rigorous as well as firmly grounded in the real-time of policy-making. It is for this reason that governments and regulators in Canada and internationally, including Industry Canada, the Ontario Securities Commission (OSC), the Canadian Senate, the Wise Persons Committee on Securities Regulation and the International Finance Corporation of the World Bank, have sought her expertise.

In 2008, she was appointed as one of two research directors of the Canadian Ministry of Finance's Expert Panel on Securities Regulation, which is seeking input on the best way to develop and implement a model Common Securities Act for Canada. In 2005, she was co-research director of the Task Force to Modernize Securities Legislation and also served as a member of the OSC's Investor Advisory Committee from 2005 to 2007. She was President of the Canadian Law and Economics Association from 2006-2008.

Professor Puri is a 2005 recipient of Canada's Top 40 under 40™ award and a 2008 recipient of the Indo-Canada Chamber of Commerce Female Professional of the Year Award. In 2008, she was also appointed to the board of directors of the Greater Toronto Airports Authority. She is also on the board of directors of the Ontario Association of Food Banks, and is an inaugural member of the University of Toronto President's International Advisory Council.

## EDUCATION

**1997** **HARVARD LAW SCHOOL**
LL.M.

**1995** **UNIVERSITY OF TORONTO, FACULTY OF LAW**
LL.B. – Silver Medalist

**1990-92** **UNIVERSITY OF TORONTO, UNIVERSITY COLLEGE**
Bachelor of Commerce Program

## ACADEMIC APPOINTMENTS

**2002-present** **OSGOODE HALL LAW SCHOOL, YORK UNIVERSITY**
*Associate Professor of Law (*with tenure*)*

**2007-present** **CAPITAL MARKETS INSTITUTE**
**ROTMAN SCHOOL OF MANAGEMENT, UNIVERSITY OF TORONTO**
*Head of Research and Policy*

**2006-2007** **ROTMAN SCHOOL OF MANAGEMENT, UNIVERSITY OF TORONTO**
*Visiting Professor of Law*

**1997-2002** **OSGOODE HALL LAW SCHOOL, YORK UNIVERSITY**
*Assistant Professor of Law* (tenure-track)

**2000-2001** **CORNELL LAW SCHOOL**
*Visiting Assistant Professor of Law and Fulbright Scholar*

**1996-1997** **HARVARD LAW SCHOOL**
R*esearch Associate to Professor Philip Wellons for the Program on International Financial Systems:* Conducted research for a study on integration of stock markets in southern Africa commissioned by the U.S. Agency for International Development.

**1995-1997** **CANADIAN BUSINESS LAW JOURNAL**, Toronto
*Fellow:* Conducted research for paper on commercial reorganizations under the Canadian *Bankruptcy and Insolvency Act.*

**1993-1995** **UNIVERSITY OF TORONTO, FACULTY OF LAW**, Toronto
*Research Assistant to Former Dean and University Professor Martin Friedland:* Conducted research for report entitled, *A Place Apart: Judicial*

*Independence and Accountability in Canada,* commissioned by the Canadian Judicial Council.

**PROFESSIONAL APPOINTMENTS**

**2008-2009 EXPERT PANEL ON SECURITIES REGULATION, MINISTRY OF FINANCE (CANADA)**

*Co-Research Director*: Assisting expert panel with designing and executing research plan and strategy, in the context of proportionate, principles based regulation and comparisons between a common regulators and a passport system.

**2007 INDUSTRY CANADA, CORPORATIONS CANADA**

*Researcher: A Regulatory Burden Analysis of the Canadian Business Corporations Act and the Not-For-Profit Corporations Act*

**2006-2007 INVESTOR ADVISORY COMMITTEE, ONTARIO SECURITIES COMMISSION**

*Board Member*

**2005-2006 TASK FORCE TO MODERNIZE SECURITIES REGULATION**

*Co-Research Director*: Responsible for designing and overseeing research agenda for the task force, involving over 40 leading international law and finance academics from Canada, the U.S., the U.K., and Australia.

**2006 INDUSTRY CANADA, CORPORATIONS CANADA**

*Researcher*: "*Who Needs Paper Any*more? *Rationalizing an Allocation of Government Responsibility for the Transfer of Securities*"

**2004 INDUSTRY CANADA, CORPORATIONS CANADA**

*Researcher:* Analyzed the appropriate allocation of responsibility between corporate law and securities law regulators for topics including: corporate governance, takeover bids, insider trading, and shareholder communications and prepared report on same.

**2004 INTERNATIONAL FINANCE CORPORATION, WORLD BANK GROUP**

*Researcher:* Providing legal and regulatory expertise in respect of developing the local bond market in Nigeria; Reviewed existing laws and regulations of relevant government bodies and provided concrete recommendations for reform.

**2003 MINISTRY OF FINANCE, GOVERNMENT OF CANADA**

*Researcher:* Prepared report on local and regional interests in the debate on optimal securities regulatory structure for Canada for the Federally appointed Wise Persons Committee.

**2003** **INDUSTRY CANADA, CORPORATIONS CANADA**, Toronto
*Researcher*: Prepared a report on the policy objectives of good corporate law, the role of mandatory and enabling rules in corporate law and related reform to the *Canada Business Corporations Act*.

**2003** **ONTARIO SECURITIES COMMISSION,** Toronto
*Researcher*: Prepared cost-benefit analysis on the multi-jurisdictional disclosure system with the United States Securities and Exchange Commission and the Impact of the *Sarbanes-Oxley Act* on the same. (Co-authored with A.Sen)

**1997** **PAUL WEISS RIFKIND WHARTON & GARRISON**, New York
*Summer Associate:* Represented issuers and underwriters on domestic and international securities offerings, and merger and acquisition transactions.

**1995-1996** **TORY TORY DESLAURIERS & BINNINGTON,** Toronto
*Articling Student:* Performed legal work in the corporate, litigation, tax and insolvency departments.

**1990-1993** **ONTARIO TITLE SEARCH SERVICES,** Toronto
*Title-searcher:* Conducted real property title searches and closings.

## PROFESSIONAL QUALIFICATIONS

1999 Admitted to the Law Society of Upper Canada

## PROFESSIONAL HONOURS, AWARDS & PRIZES

1. Indo-Canada Chamber of Commerce Female Professional of the Year (2008)
2. Canada's Top 40 under 40 Award (2006)
3. Arbour Award, University of Toronto's highest award for alumni volunteers (2004)
4. Nominee, University-Wide Teaching Award, York University (2001)
5. Recipient, Osgoode Hall Law School Award for Excellence in Teaching (1999)
6. W.P.M. Kennedy Silver Medalist for Ranking Second in the Graduating Class, University of Toronto Faculty of Law (1995)
7. Gordon Cressy Student Leadership Award in Recognition of Academic Excellence and Extra-Curricular Involvement, University of Toronto (1995)
8. Davies, Ward and Beck Prize for Ranking First in Second Year, University of Toronto Faculty of Law (1994)

9. Carswell Prize for Ranking First in Second Year, University of Toronto Faculty of Law (1994)
10. Russell Baker Prize for Ranking First in Commercial Law Subjects, University of Toronto Faculty of Law (1994)
11. Gowling, Strathy and Henderson Prize for Ranking First in Bankruptcy and Insolvency Law, University of Toronto Faculty of Law (1994)
12. Rhodes Scholarship Finalist (2000)
13. Borden & Elliot Prize for Academic Excellence in First Year, University of Toronto Faculty of Law (1993)
14. Michael John Eccles Prize for Ranking First in Criminal Law and Procedure, University of Toronto Faculty of Law (1993)
15. Reuben Wells Leonard Scholarship in the Humanities, University College, University of Toronto (1992)
16. Ernst & Young Scholarship for Ranking First in Accounting, University of Toronto (1991)
17. Reuben Wells Leonard Scholarship in the Humanities, University College, University of Toronto (1991)
18. Dr. John Knowles Collin Scholarship in the Social Sciences, University of Toronto (1991)
19. Honourable Ray Lawson Scholarship in Commerce and Finance, University of Toronto (1991)
20. Faculty Scholar in Recognition of Academic Excellence, University of Toronto (1991)
21. Special University College Admission Scholarship, University College, University of Toronto (1990)

**SELECTED RESEARCH CONTRIBUTIONS**

**Books:**

1. *Cases and Materials on the Law of Partnerships and Business Organizations in Canada* (Toronto: Carswell, 4th edition, 2004)(with Doug Harris, Ron Daniels, Ian Lee, Edward Iaccobucci, Jeffrey MacIntosh, and Jacob Ziegel )

2. *Corporate Governance and Securities Regulation post-Enron* (Toronto: Butterworths, 2004)(with Jeffrey Larsen)

3. *Canadian Companies Guide to the Sarbanes-Oxley Act* (Toronto: Butterworths, 2004)(with Leslie McCallum)

**Book Chapters:**

4. *Proportionate Liability under the CBCA in the Context of Recent Corporate Governance Reform: Canadian Auditors in the Wrong Place at the Wrong Time?"* (with S.Ben-Ishai) Chapter in P.Puri & J. Larsen, editors, *Corporate*

*Governance and Securities Regulation in the 21st Century* (Toronto: Butterworths, 2004)

5. *Introduction to Debates on Corporate Governance*, Introductory chapter in P.Puri and J. Larsen, editors, *Corporate Governance and Securities Regulation in the 21st Century* (Toronto: Butterworths, 2004)

6. *Clean Dealing: The Governance and Organizational Structure of the Investment Dealers Association*, Chapter in Queen's Law School 2003 Annual Business Law Symposium on Conflicts of Interest in Capital Market Structures, (Toronto: Carswell, 2004)

7. *Converging Numbers: Harmonization of Accounting Standards with the context of the Role of the Auditor in Corporate Governance*, Chapter in Queen's Law School 2001 Annual Business Law Symposium on the Impact of Globalization (Carswell, 2002)

8. *Canadian Business Bankruptcy*, chapter in Theodore Eisenberg (editor), Treatise on Debtor-Creditor Law, (Mathew Bender, 2001)

**Articles:**

9. *Reflections on the Task Force to Modernize Securities Regulation: A Retail Investor Perspective,* (2008) 46:2 Canadian Business Law Journal at 199 (with P.Halpern)

10. *"Who Needs Paper Anymore? Rationalizing an Allocation of Government Responsibility for the Transfer of Securities"* (2007) 23.1 Banking and Finance Review (with G. Lan)

11. *"Canada Steps Up—Task Force to Modernize Securities Legislation in Canada: recommendations and discussion"* 2:3(2007) Capital Markets Law Journal(with P. Halpern)

12. *Improving Enforcement in the Canadian Capital Markets*, (Spring 2007) Canadian Investment Review

13. *Dual Class Shares: An Historical Analysis*, (2006) 29.1 Dalhousie Law Journal (with S. Ben-Ishai)

14. *The Canadian Oppression Remedy Judicially Considered: An Empirical Analysis* (2004) Queen's L.J. 79 (with Stephanie Ben-Ishai)

15. *Proportionate Liability under the CBCA in the Context of Recent Corporate Governance Reform: Canadian Auditors in the Wrong Place at the Wrong Time?"*, Canadian Business Law Journal (2003) (with S.Ben-Ishai)

16. *Employees as Corporate Stakeholders (with T. Borok), Issue on Corporate Transparency, Accountability and Governance (2002) 8 J. Corporate Citizenship 49-61*

17. *Sentencing the Criminal Corporation*, (2002) 39 Osgoode Hall Law Journal, 611-653

18. *Taking Stock of Taking Stock*, (2001) 87:1 Cornell Law Review, 99-157

19. *Judgement Proofing the Profession*, (2001) Georgetown Journal of Legal Ethics, 1-28

20. *The Promise of Certainty in the Law of Pre-Incorporation Contracts*, 80:3 (2001) Canadian Bar Review, 1051-1064

21. *Financing of Litigation by Investors: A Share of Justice?* (1998) 36:3 Osgoode Hall Law Journal 515-566

**Selected Commissioned Independent Research Reports:**

22. *National Enforcement Structures for the Canadian Capital Markets* (Hockin Panel)(October 2008)

23. *A National Enforcement Agency for Canada* (Capital Markets Institute) (June 2008)

24. *Pension Funds: Trends in Asset Allocation and Role in Capital Markets, Corporate Governance and Regulatory Policy* (Ontario Expert Commission on Pensions)(January 2008)

25. The *Canada Not-for-profit Corporations Act:* A Critical Analysis of Its Regulatory Burden (Industry Canada) (October 2007)

26. *The Canadian Business Corporations Act:* A Critical Analysis of its Regulatory Burden (Industry Canada) (September 2007)

27. *The Regulation of Public Accounting in Canada and the United States* (Commissioned by the Fraser Institute, February 2006)(With Adam Pritchard).

28. *The Role of Compliance in Securities Enforcement (with M.Condon)* (Commissioned by the Task Force to Modernize Securities Legislation in Canada, sponsored by the IDA, June 2006).

29. Enforcement Effectiveness in the Canadian Capital Markets, Capital Markets Institute (Toronto: December 2005).

30. *The Transfer of Securities Provisions in the CBCA* (Commissioned by the Government of Canada, Industry Canada, January 2004).

**31.** The Regulation of Public Accounting and Standard Setting under a Common Securities Regulator (Commissioned by CGA Canada, February 2007)

32. *A Study in Comparative Self-Regulation: The Regulation of Public Auditing in Canada and the U.S.* (Commissioned by the Fraser Institute, February 2006)(with Professor Adam Pritchard)

33. *Enforcement in the Canadian Capital Markets: A Policy Analysis* (Commissioned by the Capital Markets Institute, June 2005)

34. *A Policy and Technical Analysis of Various Corporate Governance Proposals* (Commissioned by the Senate of Canada, April 2005)(20 pages)

35. *A Rational Allocation of Responsibility Between Corporate & Securities Laws in Canada* (Commissioned by the Government of Canada, Industry Canada, 2004)(34 pages).

36. *The Hallmarks of Good Corporate Law: A Performance Evaluation of the Canadian Business Corporations Act* (Commissioned by the Government of Canada, Industry Canada, 2004) (39 pages)

37. *Developing Bond Markets: Regulatory and Market Challenges in Nigeria* (Commissioned by the International Finance Corporation of the World Bank Group, and funded by the Canadian International Development Agency, July 2004)

38. *The Role of Local and Regional Interests in the Design of Optimal Securities Regulatory Structure for Canada* (Ottawa: Commissioned by the Government of Canada, Ministry of Finance, Wise Persons Committee on Securities Regulation, published in Jan 2004)(68 pages)

39. *A Cost Benefit Analysis of the Multi-Jurisdictional Disclosure System between Canada and the U.S.* (Commissioned by the Ontario Securities Commission, published in June 2003)(with A. Sen)(35 pages)

40. *Competition and Fragmentation: Stock Exchanges in Canada* (1997) (on file with Program on International Financial Systems, Harvard Law School, Cambridge, MA)

**Editorial and Other Appointments and Memberships:**

Canadian Law and Economics Association
President (September 2006 – 2008)
Vice-President & President-Elect (September 2004-September 2006)
Member of Executive (May 2003 – September 2004)

Book Review Editor, Osgoode Hall Law Journal (2001-2002)

Book Review Editor, Banking and Finance Law Review (1998-1999; 2001-2002)

Canadian Association of Law Teachers, Member

Canadian Law and Society Association, Member

American Law and Economics Association, Member

American Law and Society Association, Member

**INVITED ACADEMIC CONFERENCES, LECTURES, PUBLIC AND SPEECHES (Selected)**

"Setting the Stage" at Managing the Increasing Risks of Advising the Board of Directors, Osgoode Professional Development (April 17, 2008)

"Enforcement Effectiveness and Structural Reforms to Enforcement Institutions", at the Canadian Coalition for Good Governance Annual General Meeting, Toronto (June 17, 2008)

"A National Enforcement Agency for Canada", at a Conference entitled, Advancing the Enforcement Agenda:
Part 2 – What is the Solution, Capital Markets Institute, Rotman School of Management, (May 2, 2008)

"Principles Based Securities Regulation", to the Expert Panel on Securities Regulation (February 29, 2008)

"Reflections on the Task Force to Modernize Securities Regulation: A Retail Investor Perspective", at the 37th Annual Workshop on Commercial and Consumer Law, Faculty of Law, U of T, (with Paul Halpern)(October 19, 2007)

A Common Securities Regulator for Canada, Peer to Peer Roundtable with the Hon. Minister of Finance Jim Flaherty, Purdy Crawford, etal, October 18, 2007

The Role of Compliance in Securities Enforcement, Capital Markets Institute Conference on Enforcement, June 2007

A Response to the Convergence Debate: A Canadian Perspective, Conference on Convergence in Corporate Governance, February 2007, Kyushu University, Fukuoka, Japan

Chair of Roundtable entitled, True Characteristics of Canada's Markets" Capital Markets Institute, Feb 7, 2006

Chair of Roundtable entitled, "Insurance for Misinformation in the Capital Markets", Capital Markets Institute, Feb 8, 2006

Chair of Roundtable on "Disclosure Issues and Issuer/Investor Balance in Securities Regulation" February 10, 2006

*A Focus on Enforcement* – IMET/RCMP Investigators, (with P. Halpern), Presentation to IMET/RCMP investigators, Toronto, June 5, 2006.

Models for Accounting and Auditing Standard Setting under a Common Securities Regulator, Presentation to Executive of CGA Canada, December 1, 2006.

Canada's Corporate Governance and International Regulatory Competition for panel on Corporate Law, Securities Regulation and the Pressure of Convergence, Comparative Research in Law and Political Economy Network Conference on The Corporate Governance Matrix, September 29-30, 2005.

Roundtable: The Good and the Bad Corporation: Current Discussions about Corporate Governance, at the Corporate Governance Matrix Conference, hosted by Comparative Research in Law and Political Economy at Comparative Research in Law and Political Economy Network Conference September 29-30, 2005.

Mutual Fund Governance: Next Steps and Implications, Langdon Hall Conference, October 18-19, 2005

The Supreme Court of Canada's decision in Peoples v. Wise: Effects and Implications, presented at the Law Society of Upper Canada Conference on Directors and Officers Liability, October 2005.

Governance Issues associated with Income Trusts: The Role of the Market and the Role of Regulators, Presented at the International Young Lawyers Conference on Income Trusts, October 28-29, 2005.

"The Role of Compliance in Securities Regulatory Enforcement" *Capital Markets Institute Roundtable* Toronto, February 3, 2006 [with Mary Condon]

"Enforcement Effectiveness in the Canadian Capital Markets: Policies, Principles and Practices", Presented at the Business Law at the Border Conference, at the University of Windsor Faculty of Law, Canadian-American Research Centre for Law and Policy, June 3-4, 2005.

"Enforcement Effectiveness in the Canadian Capital Markets" Capital Markets Institute, University of Toronto, June 17, 2005

Critical Issues in the Canadian Capital Markets, presentation to the Task Force to Modernize Securities Regulation, September 8, 2005

Chair, Corporate Governance Session I and Session II, Canadian Law and Economics Association Annual Meeting, September 23-24, 2005

*Of competition and convergence: Can a Distinctive Regime Survive of Canadian Corporate Governance Last?* The Corporate Governance Matrix: Unfolding the New Agenda, Comparative Research in Law and Political Economy, presented October 20-21, 2005.

*Corporate Governance and Insider Trading Issues*, at the Conference on International Finance Forum 2005: Business Trusts and Similar Financing Structures, International Association of Young Lawyers, presented October 27-29, 2005.

*Peoples and Other Recent Developments*, Directors and Officers' Liability, Law Society of Upper Canada Conference, presented on October 24, 2005

*A View from the Ivory Tower: Academics Opine on our Industry*, presented at 2005 Investment Funds Invitational Forum, Langdon Hall, October 17-19, 2005

*Legal Pluralism and Human Agency*, Chair and Moderator, Harry W. Arthurs Symposium, May 5, 2005

*Regulatory Policies, Pyramids and Principles: Enforcement in the Canadian Capital Markets*, University of Windsor Faculty of Law, Faculty Seminar, February 14, 2005

*Enforcement Effectiveness in the Canadian Capital Markets*, Presented at the Capital Markets Institute, University of Toronto, December 8, 2004.

*The Passport Model to Securities Regulation in Canada: The Role of Local and Regional Issues*, Presented at the Capital Markets Institute, University of Toronto, November 2004.

*The Governance of Income Trusts*, Presented at the Annual Consumer and Commercial Law Workshop, University of British Columbia, October 2004.

*Effective Governance of Family Controlled Corporations in Canada: A Behavioural and Structural Analysis*, Presented at the 2004 Meetings of the Canadian Law and Economics Association, University of Toronto, Faculty of Law, September 17-18, 2004).

*Dual Class Share Structures, the Role of the Regulator and the Role of the Judiciary,* Presented at the University of New Delhi Faculty of Law, August 15, 2004.

*Dual Class Share Structures and Global Competitive Advantage: Evidence from Canada*, Presented at the International Conference on Creating Global Competitive Advantage, Udaipur, India, August 7-8, 2004.

*Developing Bond Markets: Legal and Regulatory Challenges in Nigeria*, May 2004, Lagos Nigeria

*The Role of Local and Regional Interests in Designing the Optimal Securities Regulatory Structure*, Capital Markets Institute, Four Seasons Hotel, February 2004.

*Incubating Socially Responsible Behaviour in Small and Medium Sized Enterprises*, Conference on SMEs and CSR, Centre for Social Markets, Calcutta, India, November 2003.

*Clean Dealing: Governance and Conflicts of Interest at the Investment Dealers' Association*, Queens Annual Business Law Symposium, October 2003

*Factors Influencing Auditors' Negligence in Canada*, American Accounting Association's Annual Meeting, Hawaii, July 2003.

*Roundtable Discussion on Sarbanes-Oxley Act and Auditor Independence, University of Toronto Capital Markets Institute, November 2002*

*The Role of Gatekeepers to Securities Markets in Preventing Managerial Misconduct,* presented at the Conference on Corporate Governance: Crisis and Reform, Osgoode Hall Law School, November 6, 2002.

*Winners and Losers: Amendments to the Canadian Business Corporations Act*, to be presented at the 33rd Annual Consumer and Commerical Law Workshop, University of Toronto, Faculty of Law, October 18-19, 2002.

*Empirical Analysis of the Oppression Remedy*, presented at the Canadian Law and Economics Association's Annual Meeting, University of Toronto, Faculty of Law, September 28, 2002.

*The Role of the Auditor in Corporate Governance*, presented at Canadian and American Law and Society Annual Meetings, Vancouver, July 2002.

*Submission on Bill C-284 (Corporate Criminal Responsibility) to the Standing Committee on Justice and Human Rights*, Ottawa, May 2002

*The Role of the Auditor in Corporate Governance*, presented at City University of Hong Kong, March 2002.

*The Role of the Auditor in Corporate Governance*, presented at the National University of Hong Kong, March 2002.

*The Role of the Auditor in Corporate Governance*, presented at the University of Delhi National Law Centre, March 2002.

*The Role of the Auditor in Corporate Governance*, presented at the Annual Queen's Business Law Symposium, November 16-17, 2001.

*Taking Stock of Taking Stock*, presented at the Canadian Law and Economics Annual Meeting, September 28-29, 2001, Toronto.

*Chair*, Empirical Studies in Corporate Governance and Securities Regulation, *Canadian Law and Economics Association's Annual Meeting, September 28-29, 2001, Toronto*

Chair, *Securities Regulation*, Canadian Law and Economics Association's Annual Meeting, September 28-29, 2001, Toronto

Taking Stock of Lawyers Taking Stock as Legal Fees, *presented at the Law and Society Association's Annual Meeting, July 2001, Budapest, Hungary.*

Taking Stock of Lawyers Taking Stock as Legal Fees, *presented at W.G. Hart Workshop, Institute for Advanced Legal Studies, University of London, June 2001.*

*Taking Stock of Lawyers Taking Stock as Legal Fees*, presented at the Meeting of the Canadian Association of Law Teachers, Quebec City, May 2001.

The Death of Liability in the Law Firm: A Critical Analysis of Limited Liability Partnerships in Canada, presented at the Cornell Law School Feminism and Legal Theory Workshop entitled Corporations, Capitalism and Feminism: Policy and Protest, on April 20, 2001.

*Gatekeepers, Advisors and Investors: An Analysis of Lawyers Accepting Equity in Their Clients as Compensation for Legal Services*, presented at Case Western Reserve University School of Law, March 8, 2001.

*Gatekeepers, Advisors and Investors: An Analysis of Lawyers Accepting Equity in Their Clients as Compensation for Legal Services*, presented at Cornell Law School, February 16, 2001.

Chair of Panel on *Beyond Public Choice*, Conference at Cornell Law School, February 8-9, 2001

Chair of Panel on *Empirical Studies of the Legal System, Canadian Law and Economics Association Annual Meeting, University of Toronto Faculty of Law, September 22-23, 2000.*

*Chair of Panel on Empirical Studies of the Legal System, Canadian Law and Economics Association Annual Meeting, University of Toronto Faculty of Law, September 22-23, 2000.*

*An Empirical Analysis of the Costs and Benefits of Secured Credit: Evidence from Canada*, presented at the American Law and Society Association's Annual Meeting in Miami, May 2000.

*Corporate Law in its Political and Social Context* presented at a panel on Law, Social Justice and Development, at the Inaugural Conference, Global Alliance for Justice Education, Trivundrum, Kerela, India, December 9-13, 1999.

*The Death of Liability in the Law Firm* presented at Rutgers University School of Law, November 3, 1999.

*The Death of Liability in the Law Firm: A Critical Analysis of Limited Liability Partnerships* presented at the Canadian Law and Economics Association Annual Meeting, University of Toronto, Faculty of Law, September 25, 1999.

*Chair of Panel on Financial Regulation*, at the Canadian Law and Economics Association Annual Meeting, University of Toronto, Faculty of Law, September 25, 1999.

*Limiting the Liability of Professionals: A critical social, legal and economic analysis of limited liability partnerships* presented at the American Law and Society Association's Annual Meeting in Chicago, May 29, 1999.

*The Death of Liability in the Professional Firm: A critical social, legal and economic analysis of limited liability partnerships* presented at the Canadian Law and Society Association's Annual Meeting, University of Sherbrooke, June 7, 1999.

*The Death of Liability in the Law Firm* presented at the Osgoode Hall Law School Faculty Seminar Series, June 2, 1999.

*Institutional Investor Activism and Shareholder Activism in Canada and the U.S.*, presented at the Schulich School of Business, York University, April 28, 1999.

*Financing of Litigation by Third Party Investors: A Share of Justice?* presented at the University of Montreal Faculty de Droit, Montreal, December 7, 1998.

*Investor Financing of Class Actions* presented at Administration of Justice: Class Actions Seminar at Osgoode Hall Law School, November 25, 1998.

*Financing of Litigation by Third Party Investors: A Share of Justice?* presented at 28th Annual Consumer and Commercial Law Workshop at the University of Toronto, Faculty of Law, October 16, 1998.

*Institutional Investor Activism and Shareholder Activism: Canadian and U.S. Experiences*, presented at the Rotman School of Management, University of Toronto, January 25, 1999.

*The Costs of Justice: A Comparison of Legal Aid in Canada and South Africa*, presented to members of the Justice Committee of the South African Parliament, visiting Osgoode Hall Law School, January 1998.

*Does Canada Need a National Securities Commission?* presented at Osgoode Hall Law School, February 1997.

**OTHER PUBLIC LECTURES AND ADDRESSES**

The Business Law Curriculum at Osgoode Hall, Panelist at Options Fair for Upper Year Courses, Hosted by the Office of Student Services at Osgoode Hall, March 28, 2005

Careers in the Financial Markets, Chair and Moderator, Osgoode Hall Law School, Career Services Office, February 16, 2005

The Practice of Corporate Law in New York, presented at Osgoode Hall Law School, York University, September 2, 1999.

Demystifying the First Year Law School Experience, presented at the First Year Orientation Program, Osgoode Hall Law School, York University, August 30, 1999.

The Practice of Corporate Law in New York, presented at Osgoode Hall Law School, York University, September 1998.

Careers in Law, presented at the First Year Orientation Program, University of Toronto, Faculty of Law, September 1998.

Law, Law School, Race and Gender, presented at the High School Minority Outreach Program, University of Toronto, Faculty of Law, March 1998.

Succeeding at Law School presented at the First Year Orientation Program, University of Toronto, Faculty of Law, September 1997.

**CONFERENCES ORGANIZED (Selected)**

2006 As President (2006) and Vice-President (2005) of the Executive Committee of the Canadian Law and Economics Association.
- 2005 fall meeting (approx. 80 attendees, 24 panels over two days)
- 2006 fall meeting (approx. 90 attendees, 25 panels over two days)

2006 Advising the Public Company Board of Directors, Osgoode Hall Professional Development Programme, co-chair with Carole Hansell, October 2, 2006.

2006 Inaugural Osgoode Course Design Institute, May 2006

2006 Roundtable on Kerr v. Danier, Capital Markets Institute, November 2006

2006 7 Roundtables relating to Task Force Research in February 2006

2005 Canadian Law and Economics Association's Annual Meeting, Toronto, September 2005 (in planning)(as the President-Elect and Vice-President of the Executive of the Association).

2004 Canadian Law and Economics Association's Annual Meeting, Toronto, September 2004 (as the Secretary of the Executive of the Association).

2003 Canadian Law and Economics Association's Annual Meeting, Toronto, September 2003 (as the Secretary of the Executive of the Association).

2002 Conference on Corporate Governance: Crisis and Reform, Osgoode Hall Law School, York University, November 6, 2002 (with Carol Hansell, John Turner and Bill Braithwaite)

2002 Workshop on Corporations and Capitalism, held at Osgoode Hall Law School, September 2002, Co-sponsored by Cornell Law School and University of British Columbia Faculty of Law (with Mary Condon, Martha Fineman and Jannis Sarra)

2002 Canadian Association of Law Teachers Meeting, Toronto, May-June 2002 (as a member of the Executive Board of the Association).

2002 Canadian Law and Economics Association's Annual Meeting, Toronto, September, 2002 (as the Secretary of the Executive of the Association).

2001 Canadian Law and Economics Association's Annual Meeting, Toronto, September, 2001 (as a member of the Executive Board of the Association).

Canadian Law and Economics Association's Annual Meeting, Toronto, September, 2000 (as a member of the Executive Board of the Association).

1999 Conference on Lending Transactions, Osgoode Hall Law School, York University, September 29,1999 (Co-Chair with Celia Rhea).

## EXHIBIT B

1. Expert witness affidavit for Fischer etal v. IG Investment Management Ltd., CI Mutual Funds Inc., Franklin Templeton Investments Corp., AGF Funds Inc. and AIC Limited (Court file no. 06-CV-307599CP)(Ontario Superior Court of Justice), proceeding under the *Class Proceedings Act*, 1992.

2. Expert witness affidavit for Allen v. Aspen Group Resources Corporation, Jack E. Wheeler, James E. Hogue, Wayne T. Egan, Anne Holland, Randall B. Kahn, Lenard Briscoe, Peter Lucas, Lane Gorman Trubitt L.L.P. and Weirfoulds LLP (Court File No. 02-CV-241587CP) (Ontario Superior Court of Justice) Proceeding under the *Class Proceedings Act* 1992.

3. Expert witness affidavit for: In the Matter of the Securities Act (R.S.O. 1990, c. s.5, as amended) and Watt Carmichael Inc., Roger D. Rowan, Harry J. Carmichael and G. Michael Mckenney and the Attorney General of Ontario (Intervener)