# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
IN RE IMAX CORPORATION :
SECURITIES LITIGATION :

06 CIV. 6128 (NRB)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EXPERT REPORT OF PROFESSOR CHRISTOPHER M. JAMES**

## I. Qualifications

1. I am the William H. Dial / SunBank Eminent Scholar in Finance and Economics and Professor of Finance at the University of Florida. Prior to joining the faculty of the University of Florida, I taught at the University of Oregon and the University of Michigan. I have also held positions at the Federal Reserve Bank of San Francisco, the Federal Deposit Insurance Corporation, and the Treasury Department. My academic research has been in the areas of securities pricing, corporate finance, and financial institutions. I have published numerous articles on economic and financial topics including several articles on the relationship between securities prices and financial and accounting information. I served on the Board of Directors and the Advisory Board to SunTrust Bank of Florida between 1989 and 2005. I also serve on the editorial boards of four scholarly journals including the *Journal of Financial Economics*. I served as an associate editor of the *Journal of Finance* from 1988 through 2000 and as editor of the *Journal of Financial Intermediation* from 1988 through 1999. I have also provided consulting services to a number of government agencies and corporate entities. A copy of my curriculum vitae is attached as Exhibit 1. A list of my deposition and trial testimony over the past four years is included in Exhibit 2.

2. I am being compensated for my time and services on an hourly basis. I am charging my regular hourly rate of $750. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. Cornerstone Research provides me with compensation based generally on my services for and work with Cornerstone Research. My compensation in this matter, including my compensation from Cornerstone Research, is in no way contingent or based on the content of my opinion or outcomes of this or any other matter.

## II. Assignment

3. I have been retained by counsel ("Counsel") for PricewaterhouseCoopers LLP ("PwC") to examine IMAX Corporation's ("IMAX" or "Company") July 20, 2007 restatement ("restatement") and determine if the revisions to the timing of revenue recognition from theater system sales and leases and other accounting adjustments would have had a material impact on IMAX's stock price.

4. I also have been asked by Counsel to examine the information that was disclosed on the alleged corrective disclosure days and determine if this information caused Plaintiffs an economic loss.

## III. Documents Considered

5. As part of this engagement I have reviewed numerous materials, including the Plaintiffs' Complaint, analyst reports, SEC filings, public press, stock price data, and other information related to IMAX and industry peers. A list of data and other information that I have considered in forming the opinions set forth in my report is contained in Exhibit 3.

## IV. Summary of Opinions

### A. IMAX's financial restatement of the timing of revenue recognition from theater system sales and leases and other accounting adjustments would not be expected to have a material impact on future cash flows and it would not have had a material impact on IMAX's stock price.

### B. On the alleged corrective disclosure days, Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price.

1. **On August 23, 2006, November 8, 2006, December 15, 2006, April 9, 2007, and April 12, 2007, Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price.**

2. **On August 9, 2006, March 29, 2007, and July 20, 2007, Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price. In addition, Plaintiffs *cannot* parse out the impact of confounding news on August 9, 2006, March 29, 2007, and July 20, 2007.**

## V. Background and Event Study Methodology

### A. Background

6. IMAX is a Canadian corporation and its common stock is traded both on the Toronto Stock Exchange ("TSX") and the NASDAQ in the U.S. IMAX is "one of the world's leading entertainment technology companies, specializing in digital and film-based motion picture technologies and large-format two-dimensional ("2D") and three-dimensional ("3D") film presentations. The Company's principal business is the design, manufacture, sale, and lease of theater systems…for…theaters, including commercial theaters, museums and science centers, and destination entertainment sites. The majority of these theaters are operated by third parties. The Company

generally does not own IMAX theaters, but licenses the use of its trademarks along with the sale or lease of its equipment."[1]

7. IMAX had historically been considered a merger and acquisition target. IMAX was offered for sale in July 2000 in order to provide its largest investor, Wasserstein Perella & Co., additional liquidity and to maximize the Company's long term business potential.[2] Sony, Time Warner, and Walt Disney were considered potential buyers.[3] However, after a precipitous stock price decline in the midst of an industry downturn, the Company took itself off the market.[4] In 2003 and 2005, IMAX's shares traded higher on takeover speculation in the public press.[5] On March 9, 2006, IMAX officially announced that its Board of Directors had decided to start looking at strategic alternatives, including a possible sale or merger of the Company, after receiving unsolicited inquiries.[6]

8. Moreover, IMAX's business model had historically been impacted by technological changes. In March 2002, IMAX announced a "significant technology breakthrough" in the form of its Digital Re-Mastering ("DMR") technology, which converted live-action 35mm films to the IMAX format at an incremental cost. In 2003, IMAX launched a new lower cost theater system ("MPX") for exhibitors.[7] Both technologies facilitated IMAX's foray into commercial theater.[8] In 2006, IMAX

---

1 IMAX Corporation Form 10-K filed on July 20, 2007, p. 5.

2 "Imax Hires Advisers To Realize Value For Shareholders," *Dow Jones News Service*, July 13, 2000, 8:58 AM.

3 "A Close Look at the Big Picture; New Technology Drives Positive Momentum," Merrill Lynch, July 11, 2005, p. 6.

4 "Imax says no longer up for sale," *Reuters News*, October 13, 2000, 7:28 AM.

5 See, for instance: "IMAX CORP - IMAX Corp. Is Trading Higher On Takeover Speculation," Market News Publishing, October 17, 2003, No Time; "Imax shares jump on takeover speculation," Reuters News, February 4, 2005, 11:52 AM.

6 "IMAX to explore strategic alternatives," *PR Newswire*, March 9, 2006, 7:00 AM.

7 A Close Look at the Big Picture; New Technology Drives Positive Momentum," Merrill Lynch, July 11, 2005, p. 7.

8 A Close Look at the Big Picture; New Technology Drives Positive Momentum," Merrill Lynch, July 11, 2005, p. 3.

contemplated incorporating an additional technology, the IMAX Digital System. The technology would reduce print costs to permit shorter, more frequent, film runs on IMAX theater systems, but was also costlier to implement.[9]

9. In 2006, apart from technological changes, IMAX was also in the midst of a transition in its business model. In May 2005, IMAX first announced a joint venture deal with AMC, wherein both partners would contribute the upfront costs and then share recurring box office revenues.[10] The joint venture model was different from IMAX's standard model of theater systems sales and leases, wherein theater exhibitors were required to invest capital up front but then assume the risks and rewards of their investments.

10. On August 9, 2006 at 4:01 PM,[11] IMAX disclosed that it had received an informal inquiry from the SEC relating to its revenue recognition policies.[12] The Company also announced (1) quarterly earnings; (2) that there were no buyers for the Company at the desired valuation, but that it was continuing to consider lower offers; and (3) that it had identified a material weakness in its internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of 2006.[13] On the same day, at 4:30 PM, the Company reported that (1) it would focus on potential joint ventures and on converting to digital format; and (2) that management had retracted all guidance for the year.[14]

11. On July 20, 2007, IMAX announced the financial restatement. The majority of IMAX's financial restatement was related to the change in the revenue recognition

---

9 "Q2 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, August 9, 2006, No Time.

10 *Id.*

11 IMAX's announcement on August 9, 2006 was after market close. Thus, the relevant day to examine IMAX's stock price reaction is August 10, 2006.

12 "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

13 *Id*.

14 "Q2 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, August 9, 2006, No Time.

policy pertaining to theater system arrangements. The revisions to the timing of revenue recognition from theater system sales and leases shifted the revenue from 14 transactions from 2002 through 2005 to later years, with "revenue and net earnings impact of $27.1 million and $14.0 million, respectively."[15]

12. Plaintiffs allege that "throughout the Class Period, the Company improperly…[accelerated] its revenue recognition on the theater systems. As a result, IMAX issued materially false and misleading financial statements throughout the Class Period, in violation of GAAP."[16] Moreover, "[b]ecause PWC [which served as IMAX's independent accountant] failed to conduct a GAAS audit and issued clean opinions on IMAX's 2002-2005 financials, it is also responsible for the material misinformation disseminated to the investing public during the Class Period."[17]

### B. Materiality and Event Study Methodology

13. From an economic perspective, in order to determine whether Plaintiffs suffered an economic loss due to the alleged misrepresentations, one needs to examine how the securities prices of the company reacted to the release of the alleged disclosures of the alleged misrepresentations. In particular, one needs to isolate firm-specific price movements from economy and industry-related price effects. Then, one needs to isolate the impact of the alleged misrepresentations relative to the non-allegation related information. A common method used to test whether the securities prices of the company changed materially upon the release of information is an event study analysis.

---

15 IMAX Corporation Form 10-K filed on July 20, 2007, p. 32.

16 In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 47.

17 In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 170.

14. The event study methodology is widely employed in academic research on the behavior of securities prices.[18] The price of securities (such as common stock) in an efficient market reflects the total mix of information available in the marketplace about the company's future earnings prospects, and only *new* material information about a company's earnings prospects changes securities prices.

15. Securities prices respond to a variety of information that is *not* specific to the firm but nonetheless affects the value of future earnings, including information about the broad economy and information about the particular industry in which the firm operates. The goal of an event study analysis is to remove such broad economic and industry effects from daily price movements and develop a model to quantify the "normal" level of firm-specific price movements.

16. The first step in an event study analysis is to derive a relationship that explains security price movements based on broad economic and industry-specific factors. Once this relationship is modeled, a researcher can isolate the portion of daily security price movements that is firm-specific. Statistical tests can be applied to these daily firm-specific price movements to determine which movements are abnormal, or "statistically significant."

17. Statistically significant movements typically indicate that new, material, firm-specific information about the firm's future earnings prospects has reached the market on that trading day. The relatively smaller movements on other days are typically the result of normal volatility due to trading activity and do not represent the pricing effects of material, firm-specific information. Such small movements are not statistically distinguishable from zero firm-specific movement.

18. No economic loss should result from firm-specific price movements that are not statistically significant. This is because such normal movements cannot be causally

---

[18] See, for example, Campbell, John, Andrew W. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets*, Princeton University Press, 1997, Chapter 4, pp. 149-180.

tied to *any* firm-specific information, let alone to potentially corrective disclosures relating to Plaintiffs' allegations. These movements cannot be distinguished from the general market and industry trends or normal, volatile trading behavior.

19. For the purpose of selecting an appropriate market and industry index, I ran a regression to determine the statistical relation between IMAX's returns and the returns of the market and industry indices. I used the Class Period (February 27, 2003 – July 20, 2007) as the estimation time period. I ran a rolling regression, which is an econometric procedure in which the same linear regression is estimated separately for every day in the Class Period.[19] In my analysis, the linear regression for each day is estimated using data from the year prior to it; thus, the sample period's duration is kept constant by increasing the beginning and ending dates by the same increment. Additionally, the regression used to estimate the coefficients on a particular day excludes that same day's stock return from the model, making the estimated return more likely to be significant.

20. IMAX's common stock is traded on two exchanges, the NASDAQ and the TSX. The daily average trading volume was 91.2% and 8.6% on the NASDAQ and TSX, respectively.[20] As a proxy for economy-wide influences, I used the NYSE-Amex-NASDAQ ("NAN") index as the market index in my model. I also used the Bloomberg Hollywood Reporter Index ("BHRX") as the industry index. The BHRX includes IMAX as one member of the overall index.[21] (See Exhibit 4).

21. To determine if company-specific information had a material effect on IMAX's daily stock price during the potentially relevant period, I performed a statistical test to

[19] I excluded 37 days alleged by Plaintiffs as misrepresentation and/or corrective disclosure days from the time series used in the regression.

[20] During the Class Period, the average daily volume of IMAX's common shares listed on the NASDAQ and the TSX was 643,562 and 60,865, respectively. The average daily volume of certain IMAX equities traded in Germany was 927; these shares represent 0.1% of the total average daily volume of IMAX Corporation equities. Data obtained from *Bloomberg* and the Center for Research in Security Prices ("*CRSP*".)

[21] I used a value-weighted BHRX index and I excluded IMAX from my calculation of the value-weighted BHRX index.

determine if a stock price change is statistically significant, meaning that the price change falls outside the bounds of "normal" volatility for that stock. In this case the volatility of the stock returns is measured as the standard error of the residual returns, which is calculated using the spread of the residuals around the mean value of zero.[22]

22. In Section VI. B, I discuss IMAX's stock price movement on the alleged corrective disclosure days. I analyze the information released on days on which IMAX's stock price had a statistically significant change, in order to determine whether this information had a material impact on IMAX's stock price.

## VI. Basis for Opinions

### A. IMAX's financial restatement of the timing of revenue recognition from theater system sales and leases and other accounting adjustments would not be expected to have a material impact on future cash flows and it would not have had a material impact on IMAX's stock price.

23. On July 20, 2007 IMAX announced its financial restatement. In this restatement, IMAX's revenue recognition of theater system sales and leases were the main restatement items that may contain new information that may have corrected alleged previous misrepresentations.

24. A company's stock price is equal to the present value of all expected future economic earnings, or expected future cash flows. Current and past earnings or other information are relevant only insofar as they are informative about future economic earnings or cash flows. From an accounting perspective, a company reports financial results in accordance with Generally Accepted Accounting Principles ("GAAP"). In general, GAAP does not reflect cash flow transactions in earnings; rather it is based

[22] Standard statistical tests use a 95% confidence interval to identify residual returns that are statistically different from zero. The t-statistic of a residual return measures how far an estimate is from its expected value, relative to its standard error, and is calculated as the residual return divided by the standard error of prediction. Any residual return with a t-statistic greater in absolute terms than 1.96 in magnitude is outside the 95% confidence interval and is statistically significant. See Greene, William H., *Econometric Analysis*, 4th ed., Prentice-Hall, Inc., 2000, pp. 249-250.

on accrual accounting principles. Typically, accrual accounting dictates that a company should report earnings ("*accounting* earnings") when it sells goods or renders services and not when it receives cash.[23] Thus, a company typically records earnings before cash is received and records expenses before cash is paid. Therefore, changes that only affect reported *accounting* earnings do not generally affect the company's expected future cash flows. In other words, changes in the method and/or timing of reporting revenues and/or earnings for accounting purposes would not be expected to affect a company's value. Financial economics research confirms that only changes in future cash flows and not changes in *accounting* earnings can affect a company's equity value.

25. IMAX's restatement on July 20, 2007 only changed the timing of recognition of reported *accounting* earnings, and it did not have a material impact on future cash flows. As IMAX's restatement had no material impact on the Company's future cash flows, it would not be expected to affect the Company's valuation in a significant way. Contemporaneous research analyst commentary similarly confirms that the adjustments to the timing of revenue recognition from theater system sales and leases and other accounting adjustments was not a major concern to investors and that the revenue and net earnings impact of quarterly and annual revenue recognition did not decrease future cash flows. Thus, Plaintiffs *cannot* demonstrate that the revisions to the timing of revenue recognition from theater system sales and leases and other accounting revisions would have had a material impact on IMAX's stock price.

### 1. Financial economics research suggests that only changes in future cash flows, and not changes in *accounting* earnings, can affect a company's equity value.

26. Financial economics research has been conducted over the last 50 years to explain the effect of information, earnings information in particular, on stock prices. At any

---

[23] Stickney, Clyde P. and Roman L. Weil, *Financial Accounting, An Introduction to Concepts, Methods, and Uses*, 10th Edition, Thomson South-Western, pp. 114-116.

point in time, the price of a company's stock reflects the total mix of information available in the market about the company's future earnings prospects. Because future cash flows and earnings are uncertain, the price of a company' stock changes as new information arrives, causing changes in estimates of future cash flows and earnings. Future prospective information is also an important part of the total mix of information. Information such as management guidance with respect to future performance is one prominent example. An announcement of earnings that differs significantly from earnings forecasts—*i.e.*, "unexpected earnings"—will generally result in a change in stock price. Moreover, the relation between unexpected earnings and residual stock price changes is not the same for every company or for every earnings announcement for a particular company. Whether a company's stock price change is sensitive to earnings announcements and the extent of such sensitivity will depend on the degree to which the company's announcements of current earnings provide information about future expected cash flows and future earnings.

27. Earnings differences due to changes in accounting methods do not change stock prices when those differences do not cause a change in cash flows. Differing depreciation methods and differing methods of accounting for business combinations are two examples of different accounting treatments that typically do not affect cash flows and typically do not impact stock price.[24]

28. Financial economics research has shown that a wide variety of accounting changes have no effect on the market price of firms. For example, Archibald (1972) examines firms that reverted to a previously-used accounting methodology that increased reported net income by a median 8.64%, but shows that the switch "had no immediate substantial effect on stock market performance."[25] Similarly, Winsen and Ng (1976) consider whether or not investor trading behavior changed as a result of a change in

[24] Beaver, William H. and Roland E. Dukes, "Interperiod Tax Allocation and δ-Depreciation Methods: Some Empirical Results," *The Accounting Review*, July 1973, pp. 549-559; and Davis, Michael. L., "Differential Market Reaction to Pooling and Purchase Method," *The Accounting Review*, 65(3), 1990, pp. 696-709.

[25] Archibald, T. Ross, "Stock Market Reaction to the Depreciation Switch-Back," *The Accounting Review*, January 1972, pp. 22-30.

accounting methodology, and found no effect.[26] Fort (1997) looks at analysts' forecast error (*i.e.*, how well analysts are able to predict future earnings) for companies that choose different methods of income tax accounting, and finds that the presentation of accounting changes did not affect analysts' forecast error; this result underscores the ability of markets to identify the implications of accounting changes.[27] More generally, Linck et al. (2007) examine firms that adopted voluntary accounting changes, and find evidence that the market "recognizes the financial statement effects of alternative acceptable accounting methods and efficiently processes the valuation implications" of these changes.[28]

### 2. Analysis of IMAX's financial restatement

29. On July 20, 2007 IMAX announced its financial restatement. The majority of IMAX's financial restatement was related to the change in the revenue recognition policy pertaining to theater system arrangements. The revisions to the timing of revenue recognition from theater system sales and leases shifted the revenue from 14 transactions from 2002 through 2005 to later years, with "revenue and net earnings impact of $27.1 million and $14.0 million, respectively."[29]

30. Specifically, IMAX announced that:

> Two transactions which were originally recorded in 2004 (revenue and net earnings impact of $3.0 million and $1.6 million, respectively) were moved to 2005 and 2006. Eight transactions which were originally recorded in 2005 (revenue and net earnings impact of $14.1 million and $7.5 million, respectively) were moved to 2006 and two transactions which were originally recorded in 2005 were moved to 2007 (revenue

[26] Winsen, J. and D. Ng, "Investor Behavior and Changes in Accounting Methods," *The Journal of Financial and Quantitative Analysis*, Vol. 11, No. 5 (Dec., 1976), pp. 873-881.

[27] Fort, C. Patrick, "Analysts' Forecast Accuracy and the Presentation of a Mandated Accounting Change," *Journal of Applied Business Research*, Fall 1997, Vol. 13, Issue 4, pp. 93-106.

[28] Linck, James S., Thomas J. Lopez, and Lynn Rees, "The valuation consequences of voluntary accounting changes," *Review of Quantitative Finance & Accounting*, Vol. 28, No. 4 (2007), pp. 327-352.

[29] IMAX Corporation Form 10-K filed on July 20, 2007, p. 32.

> and net earnings impact of $3.4 million and $2.2 million, respectively). In addition, one transaction recorded in 2002 was moved to 2005 (revenue and net earnings impact of $4.9 million and $2.1 million, respectively) and one transaction recorded in 2006 was moved to 2007 (revenue and net earnings impact of $1.7 million and $0.6 million, respectively).[30]

31. The change in earnings due to the change in the recognition of revenue from theater systems was not only small, but was in fact positive: the restatement led to approximately $0.2 million in additional earnings for the period 2002 – 2007.[31] This was only a change in *accounting* earnings, and did not have a material impact on future cash flows.

32. In addition to shifting revenue related to theater system arrangements from past years to future time periods, the Company also disclosed adjustments for (1) other revenue recognition[32]; (2) inventory and films assets; (3) tax liabilities; and (4) other adjustments related to SG&A costs, asset impairments and depreciation, interest expenses, naming rights revenues, and stock option valuation.[33]

33. The change in earnings due to restatements of inventory costs, film accounting, and branch level interest taxes was also small and positive: including a "net decrease of income of $0.8 million in periods prior to 2002," the restatement led to less than $0.1

---

[30] IMAX Corporation Form 10-K filed on July 20, 2007, p. 91.

[31] Changes in revenue recognition for theater systems in the financial restatement reduced 2002 earnings by $2.107 million; had no effect on 2003 earnings; reduced 2004 earnings by $1.562 million; and reduced 2005 earnings by $6.802 million. (IMAX Corporation Form 10-K filed on July 20, 2007, p. 33) These changes increased 2006 earnings by $7.7 million and increased earnings for 2007 and after by $3 million. (IMAX Corporation Form 10-K filed on July 20, 2007, p. 91) The earnings impact for 2006 is calculated as the sum of transaction adjustments as per p. 91 of IMAX Corporation Form 10-K filed on July 20, 2007. However, according to IMAX Corporation Form 51-103F3, filed on July 20, 2007, the restatement of revenue recognition from theater systems increased 2006 earnings by $7.4 million. The $0.2 million net impact is calculated by summing the adjustments from 2002 through 2005, rounding the result, and adding it to the adjustments for 2006 and 2007 and after, using the calculated $7.7 million adjustment for 2006. Using the $7.4 million adjustment for 2006 from IMAX Corporation Form 51-103F3 would result in a net restatement impact of less than -$0.1 million for the years 2002 through 2007 and after.

[32] Other adjustments related to theater systems resulted in a net decrease of income of $1.9 million for the period 2002 through 2006. IMAX did not break down the effect of these adjustments on 2006 and 2007 earnings. (IMAX Corporation Form 10-K filed on July 20, 2007, p. 32)

[33] IMAX Corporation Form 10-K filed on July 20, 2007, p. 90.

million in additional earnings through 2007.[34] As with the change related to theater systems, this was only a change in *accounting* earnings, and did not have a material impact on future cash flows.

34. The overall net impact of the restatement on earnings through 2007 was to reduce net earnings by $0.9 million.[35] Again, the impact was only a change in the *accounting* earnings, and did not have a material impact on future cash flows.

35. In summary, the recognition of revenue with respect to theater system sales and leases was the main restatement item that may contain new information that may have corrected alleged previous misrepresentations. However, adjustments to the timing of revenue recognition from theater system sales and leases merely shifted revenues between quarters and fiscal years and changed *accounting* earnings by a small amount. Furthermore, the revenue and net earnings impact of quarterly and annual revenue shifting was relatively small. In fact, the total effect of the restatement on earnings through 2007 was to reduce net earnings by $0.9 million. Lastly, IMAX's restatement only shifted accounting earnings across periods and it did not have a material impact on the Company's future cash flows.

---

[34] The restatement of inventory costs, film accounting, and branch level interest taxes reduced earnings for periods prior to 2002 by $0.8 million; reduced 2002 earnings by $0.245 million; reduced 2003 earnings by $0.542 million; reduced 2004 earnings by $0.185 million; reduced 2005 earnings by $2.762 million; increased 2006 earnings by $3.1 million; and increased earnings for 2007 and after by $1.5 million. (IMAX Corporation Form 10-K filed on July 20, 2007, pp. 32-33) The $0.1 million net impact is calculated by summing the adjustments from 2002 through 2005, rounding the result, and adding it to the adjustments for 2006 and 2007 and after.

[35] The total effect of the restatement was to reduce 2002 earnings by $5.851 million; reduce 2003 earnings by $0.744 million; reduce 2004 earnings by $2.54 million; reduce 2005 earnings by $8.776 million; increase 2006 earnings by $10.6 million; and increase earnings for 2007 and after by $6.4 million. In addition, the total effect of the restatement was to reduce the shareholders' deficit as of December 31, 2001 by approximately $0.9 million. (IMAX Corporation Form 10-K filed on July 20, 2007, p. 33) The $0.9 million net impact is calculated by summing the adjustments from 2002 through 2005, rounding the result, and adding it to the adjustments for 2006 and 2007 and after.

### 3. Analysts viewed IMAX's financial restatement as small and without any impact on the Company's valuation

36. Research analysts generally did not view the recognition of revenue from theater system sales and leases and other accounting adjustments as a major concern. In fact, analysts commented that the potential restatement of prior earnings would be relatively small and would not have any significant impact on the Company's current valuation. Most of the analyst commentary focused on issues other than the financial restatement, including IMAX's announcement that it did not find a buyer and IMAX's announcement that it was retracting guidance.

37. After the announcement on August 9, 2006 at 4:01 PM that IMAX had received an informal inquiry from the SEC relating to its revenue recognition policies,[36] analysts did not express major concern about the potential restatement.

38. For example, on August 10, 2006, the Friedman Billings Ramsey analyst wrote:

> IMAX is cooperating fully with the SEC inquiry, and any adverse findings would not affect the company's cash flows, although it could result in a restatement of prior-period GAAP operating results. We do not expect that this will have a material adverse impact on the creditworthiness of the company but remain cautious regarding the matter, as any investigation of this nature carries material risk.[37]

39. Similarly, on the same day, the Merriman Curhan Ford analyst stated that "[e]ven though this would have no impact on the company's historical cash generation, it might move some revenues from prior quarters into more recent quarters throughout FY06."[38] On August 10, 2006, the Janco Partners analyst also reported that "[t]his [SEC] inquiry could lead to financial restatements. IMAX's revenue recognition

---

[36] "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

[37] "IMAX: 2Q06 Results Top Expectations; Sale Process Losing Momentum--Maintaining Market Perform on Senior Notes," Friedman Billings Ramsey, August 10, 2006, p. 2.

[38] "No Buyers Emerge; Shifts in Business Model to Negatively Impact Near-Term Results; Lowering Rating to Sell from Buy," Merriman Curhan Ford, August 10, 2006, p. 4.

policy has long been controversial but we feel that this issue is minor compared to the other elements at hand."[39] Additionally, the Roth Capital Partners analyst wrote, "[w]e expect this issue to be resolved with little to no material overall financial impact."[40]

40. On July 20, 2007, IMAX announced the financial restatement. The majority of IMAX's financial restatement was related to the change in the revenue recognition policy pertaining to theater system arrangements.[41] Again, analysts did not view the financial restatement as significant to IMAX especially since it was small in magnitude and because only *accounting* earnings shifted between different time periods, without any major impact on the Company's future cash flows.

41. For example, on July 25, 2007, the Research Associates analyst stated:

> There was little - if any - cash impact from the Company's restatement. Most of the restatement involved the timing of revenue previously recognized, and much of the revenue that was reversed has been recognized in subsequent quarters or will be recognized in future quarters.[42]

42. Similarly, on July 20, 2007, the Susquehanna Financial Group analyst wrote, "[a]lthough IMAX has shifted more than $27 million between fiscal years and over $25 million of revenue between quarters in the same year, we believe the size of IMAX's earnings restatements does not appear to be overly significant."[43] On July 23, 2007, the Merriman Curhan Ford analyst also stated that the restatement did not have a material impact on the Company's long term value: "[t]here seemed to be a

39 "No Buyout, No Guidance, New Business Mode," Janco Partners, August 10, 2006, p. 1.

40 "No Deal: Suitors Back Away, Weak Box Office Cools Near-Term Interest," Roth Capital Partners, August 10, 2006, p. 2.

41 IMAX Corporation Form 10-K filed on July 20, 2007, p. 90.

42 "Filing Lifts an Overhang," Research Associates, July 25, 2007, p. 1.

43 "The Numbers Are In . . .," Susquehanna Financial Group, July 20, 2007, p. 1.

concern that the earnings restatements would lead to a long-term reduction in or push-out of profitability — and that does not look to be the case."[44]

43. In sum, IMAX's announcement of its financial restatement on July 20, 2007 contained mainly adjustments to the timing of IMAX's revenue recognition of theater system sales and leases. These adjustments to the timing of revenue recognition from theater system sales and leases merely shifted revenues between quarters and fiscal years and changed *accounting* earnings by a small amount. Further, these timing adjustments did not have a material impact on future cash flows. Analyst commentary also suggests that the timing adjustments were not a major concern to investors.

44. To summarize, financial economics research confirms that only changes in future cash flows, and not changes in *accounting* earnings, can affect a company's equity value. IMAX's financial restatement of the timing of revenue recognition from theater system sales and leases and other accounting adjustments was small and it would not be expected to have a material impact on future cash flows. Analyst commentary also suggests that IMAX's financial restatement was not a major concern to investors and that the revenue and net earnings impact of quarterly and annual revenue recognition did not decrease future cash flows. Thus, Plaintiffs *cannot* demonstrate that the revisions to the timing of revenue recognition from theater system sales and leases and other accounting revisions would have had a material impact on IMAX's stock price.

[44] "Reports 4Q/1Q Results and Clears Overhang with Complete SEC Filings; Fundamentals Have Remained Strong; Upgrading to Buy," Merriman Curhan Ford, July 23, 2007, p. 1.

**B. On the alleged corrective disclosure days, Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price.**

45. Plaintiffs identify nineteen corrective disclosure days on which they allege IMAX shareholders suffered an economic loss related to the allegations.[45] These days are August 9, 2006; August 21, 2006; August 23, 2006; November 8, 2006; December 15, 2006; March 16, 2007; March 29, 2007; March 30, 2007; April 5, 2007; April 9, 2007; April 12, 2007; April 26, 2007; May 10, 2007; May 24, 2007; June 7, 2007; June 21, 2007; June 29, 2007; July 5, 2007; and July 20, 2007.

46. My analysis indicates that of the nineteen public disclosures alleged by Plaintiffs, only seven were associated with statistically significant changes in IMAX's stock price and only five were associated with statistically significant *declines* in IMAX's stock price.[46] Moreover, of the seven days on which IMAX's stock price changed in a significant way, four (August 23, 2006; November 8, 2006; December 15, 2006; and April 12, 2007) neither contained new information related to Plaintiffs' allegations, nor contained new information that corrected prior alleged misrepresentations. Similarly, the news released on April 9, 2007 neither contained new information related to Plaintiffs' allegations, nor contained new information that corrected prior alleged misrepresentations. In other words, there is no evidence that IMAX's shareholders suffered an economic loss due to the allegation related information released on these days. Therefore, these days should not be considered corrective disclosures and cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

---

[45] In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, pp. 57-72.

[46] Plaintiffs allege that April 9, 2007 is a corrective disclosure day as IMAX received a notice of delisting from the NASDAQ on that day. However, as the delisting notice was made public after market close, April 10, 2007 is the effective corrective disclosure day. As April 10, 2007 was associated with an insignificant company specific stock price movement, I do not count it as one of the seven significant days. However, as April 9, 2007 is associated with a significant company specific stock price movement, and to be conservative, I also analyzed the information released on that day.

47. Additionally, the three alleged corrective disclosure days (August 9, 2006; March 29, 2007; and, July 20, 2007) that may contain new information that potentially corrects alleged prior misrepresentations are not useful in proving that the alleged misrepresentations had a material impact on IMAX's stock. On these days, my analysis indicates that Plaintiffs *cannot* demonstrate that the alleged corrective information had a material impact on IMAX's stock price. In addition, Plaintiffs *cannot* parse out the impact of confounding news on these days.

48. On the remaining twelve alleged corrective days with insignificant stock price movement, the information released to the market was not considered new and/or material to investors.[47]

49. As I explained in Section V. B, standard statistical tests use a 95% confidence interval to identify residual returns that are statistically different from zero. The known or potential error rate in such tests is 5%. However, in tests of statistical significance, the likelihood of finding statistical significance is greater when multiple events are tested independently than when they are tested jointly, as the error rate of multiple independent tests is greater than the error rate of a single test.[48] Since I tested the nineteen alleged corrective disclosure days independently for statistical significance, my analysis had a greater likelihood of finding statistical significance on any one day than if I had performed a single test. Therefore, I also performed a customary adjustment for independent tests, the Sidak adjustment ("Sidak adjustment"), to ascertain the joint level of significance for each individual test that would yield an overall error rate of 5% for finding one or more statistically significant results.[49] After performing the Sidak adjustment, I found that only six of the alleged corrective

---

[47] I reviewed the news on the twelve alleged corrective disclosure days associated with insignificant stock price reactions and found that in general there was no news that could have had mitigating effects on IMAX's stock price. Since these days were associated with insignificant stock price movements, the information released to the market was not considered new and/or material to investors and therefore cannot be used to show that investors suffered an economic loss due to the alleged misrepresentations.

[48] Tabak, David, "Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics*, 19(2), 2006, pp. 231-236.

[49] *Id.*

disclosure days were statistically significant.[50] These days were August 9, 2006; August 23, 2006; November 8, 2006; December 15, 2006; April 12, 2007; and July 20, 2007. Additionally, April 9, 2007 was also statistically significant. In other words, March 29, 2007 no longer met the threshold for statistical significance under the Sidak adjustment. However, to be conservative in my analysis, I analyzed the information released on this day.

50. As a result of this analysis, I conclude that it is impossible to prove that any economic loss to shareholders was associated with the allegation related announcements. On the alleged corrective disclosure days, Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price.

### 1. On August 23, 2006, November 8, 2006, December 15, 2006, April 9, 2007, and April 12, 2007, Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price.

#### a. Analysis of August 23, 2006

51. Plaintiffs allege that August 23, 2006 is a corrective disclosure day and point to an August 23, 2006 *Wall Street Journal* article that discussed the difficulties that certain companies, including IMAX, faced in finding buyers.[51] Besides the *Wall Street Journal* article no new company-specific news pertaining to IMAX entered the market on August 23, 2006. IMAX's stock price closed at $4.85, down $0.59 from its previous close of $5.44. My analysis indicates that after adjusting for the market movement, IMAX's stock price closed down 10.37%, which is statistically significant.

---

[50] The Sidak adjustment yields a 5% critical z-value of 3.00, which is calculated using a significance level of $1 - 0.975^{1/19}$ and assuming a two-tailed test. Any residual return with a t-statistic greater in absolute terms than 3.00 in magnitude is outside the 95% confidence interval and is statistically significant.

[51] In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 122.

52. Plaintiffs attribute this decline to the *Wall Street Journal* article that discussed the difficulties that certain companies, including IMAX, faced in finding buyers.[52] The extent of the *Wall Street Journal*'s reference to IMAX was as follows:

> It's true that many… would-be sellers are plagued with vulnerable business models or regulatory problems… Earlier this month, on the same day IMAX said it hadn't found a buyer, the company announced that the Securities and Exchange Commission and Canadian authorities were looking into how the company recognized revenue.[53]

53. As noted in the Complaint, both IMAX's announcement of the SEC and Ontario Securities Commission ("OSC") inquiries and its acknowledgement that no buyers were willing to acquire the Company at the price sought by the Board of Directors had been revealed on August 9, 2006.[54] The news on August 23, 2006 was merely a re-characterization of what was previously known to the market. This news did not provide information that corrected a prior alleged misstatement. August 23, 2006 should not be considered as a corrective disclosure day and therefore cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

### b. Analysis of November 8, 2006

54. Plaintiffs assert that November 8, 2006 was also a corrective disclosure day. In particular, Plaintiffs state "IMAX was still responding to SEC and OSC revenue recognition inquiries… [and] that it believed its application of the [revenue

---

52 "'Buy My Company, Please': Why Some Companies Go Unsold in Merger Boom," *The Wall Street Journal*, August 23, 2006, No Time.

53 *Id*.

54 In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶¶ 115 and 121.

recognition] policy was in accordance with GAAP and that its position continued to be supported by PWC."[55]

55. On November 9, 2006, the effective day of the alleged November 8, 2006 disclosures, IMAX's stock price closed at $3.39, down $1.45 from its previous close of $4.84. After adjusting for the market movement, IMAX's stock price declined by 29.61%, which is statistically significant.

56. On November 8, 2006, after market close at 4:30 PM, IMAX reported financials results for Q3 2006, including a net loss of $0.30 per diluted share, primarily because it did not install any theater systems in the quarter.[56] IMAX also attributed its results to the unsatisfactory box office performance of *Ant Bully*, a movie that it had promoted, and to higher-than-anticipated SG&A expenses due to increased legal and strategy costs. IMAX announced that it expected to install five to eight theater systems in Q4 2006 and that six theaters that were supposed to be installed in Q4 2006 would instead be installed in 2007.

57. Additionally, IMAX reaffirmed that although it had not found a buyer at the terms initially sought by the Board of Directors, the Special Committee of the Board had authorized its investment banks to explore lower valuation options.[57] IMAX also announced that it was continuing to respond to the informal SEC and OSC inquiries. Lastly, IMAX revealed that the Company had begun the transition to a digital system and was accelerating its joint venture investment strategy. IMAX's management elaborated on this during a conference call the next morning, by announcing the

---

[55] In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 124.

[56] "IMAX Corporation Reports Third Quarter Financial Results; - Pursuing Key Initiatives Designed to Grow Business and Shareholder Value over Long Term," *PR Newswire*, November 8, 2006, 4:30 PM.

[57] *Id.*

Company's intention to deploy a high-end digital projector in the second half of 2008.[58]

58. Public press commentary indicated that IMAX's stock price decline was tied to non-allegation related disclosures. For example, the following articles attributed IMAX's stock price decline to its quarterly losses, dismal box-office performance, and lack of theater installations:

> Giant-screen movie system maker Imax Corp. unveiled details of its new business strategy on Thursday, but investors focused instead on its unexpected and steep quarterly loss and punished the stock… "I'm not shocked to see the stock trade off that way," said Soleil Research analyst Marla Backer. "The poor results raise questions about the company's future, while its strategy poses tough challenges," she said. The company blamed regular deal "slippage" and weak box office for Imax films for its poor performance, adding that it did sign five theater deals in the quarter. (*Reuters News*)[59]

> Box-office bomb "The Ant Bully" took much of the blame for the poor theatrical performance. (*Broadcast News*)[60]

> Imax Corp. stock (TSX:IMX) tumbled 29 per cent Thursday to its lowest level in more than four years after a US$12-million loss in a quarter when the company installed no new movie systems and financial results missed analyst estimates by a wide margin, (*The Canadian Press*)[61]

59. Analysts also discussed the problems that IMAX was facing with its business model and digital technology transition. For example, the BMO Capital Markets analyst pointed out that IMAX's business remained "fundamentally and structurally

---

[58] "Q3 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, November 9, 2006, No Time.

[59] "UPDATE 1-Investors shrug off Imax strategy, exit stock," *Reuters News*, November 9, 2006, 11:43 AM.

[60] "BIZ-Imax," *Broadcast News*, November 9, 2006, 12:54 PM.

[61] "Imax stock plummets after US$12M Q3 loss, no new cinema installations," *The Canadian Press*, November 9, 2006, 5:19 PM.

challenged," and that IMAX's transition to digital technology would create difficulties for the Company:

> Although co-CEO Gelfond suggests fundamentals are not to blame for the disastrous 3Q results, we beg to differ. We believe the business remains fundamentally and structurally challenged, and the move to digital projectors in late 2008 only adds to the difficulty of selling expensive film projectors that play expensive film prints (or alternatively the use of corporate capital to finance the installs in the interim). The deteriorating fundamental measures of 3Q cannot be blamed entirely on one-time events (i.e. "slippage" of theater installations from one quarter to the next), in our opinion. Indeed, gross margins have been on a noticeable downtrend for each trailing 12-month period since 3Q05.[62]

60. Likewise, the Susquehanna Financial Group analyst underscored the "earnings volatility" inherent in IMAX's transition to digital technology: "[w]hile we believe in the merits of its strategy, it is also likely to result in a lengthy transition period, with a high degree of earnings volatility."[63]

61. Based on my review of the public press on November 8, 2006 and November 9, 2006, IMAX's stock price declined on disappointing earnings and on revisions of future expectations. Moreover, there was no new news pertaining to the restatement allegations and there was no correction of a prior alleged misstatement. Thus, November 9, 2006 should not be considered a corrective disclosure day and therefore cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

---

[62] "IMAX Corporation: 3Q Results: A Fundamental Disaster, Financial Position Deteriorating," BMO Capital Markets *U.S.*, November 9, 2006, No Time.

[63] "IMAX Corp.: The Picture Remains Blurry," Susquehanna Financial Group, November 9, 2006, No Time.

### c. Analysis of December 15, 2006

62. Plaintiffs allege that on December 15, 2006, IMAX announced its determination that a "sale or merger of the Company would no longer achieve the Company's objective."[64]

63. On December 18, 2006, the effective day of the alleged December 15, 2006 disclosure, IMAX's stock price closed at $3.71, down $0.36 from its previous close of $4.07. After adjusting for the market movement, IMAX's stock price declined by 8.30%, which is statistically significant.

64. On December 15, 2006, after market hours, IMAX announced that it would no longer pursue a sale or merger of the Company and would instead focus on the growth of the worldwide IMAX network and strategic business initiatives.[65] First, it is not alleged by Plaintiffs that the Company should have been able to disclose this fact earlier at any point in time during the Class Period. Second, this news does not correct any earlier alleged misstatement.

65. The December 15, 2006 announcement was disclosed after market hours on a Friday. As a result, I reviewed press and analyst commentary on December 15, 2006 through December 18, 2006. Public press and analyst commentary confirmed that the decline on December 18, 2006 was in reaction to IMAX's announcement that it had not found a buyer as well as on the Company's decision to focus on its strategy and growth as a stand-alone entity. For example, the *Associated Press Newswires* reported the following:

> Shares of Imax Corp. plunged in premarket trading Monday after the digital entertainment company said it gave up trying to sell itself… Susquehanna Financial Group analyst Michael A. Kelman wrote in a research report IMAX's failure to find a buyer at a suitable price isn't

---

64 In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 125.

65 "IMAX Corporation announcement," *PR Newswire*, December 15, 2006, 5:25 PM.

> surprising because the company downplayed the prospects of a sale during the last earnings conference call. Nevertheless, the abandonment of a sale will result in a "lengthy transition period, with a high degree of uncertainty regarding earnings." Kelman said IMAX's long-term business model is unproven, making it difficult to find partners or acquirers.[66]

66. Moreover, a newswire by *Reuters News* titled, "Shares of IMAX Sink After No Suitor Found," stated the following:

> Shares of IMAX Corp lost ground on Monday as investors reacted to news that the maker of giant-screen movie systems had given up on its search for a buyer or merger partner. "I get the sense that there are a fair amount of people who own this stock solely for the potential of (IMAX) getting taken out, so if that's not going to happen, they're probably selling their shares today," said Eric Wold, managing director at Merriman Curhan Ford.[67]

67. Further, academic research also suggests that IMAX's stock price would have declined on the announcement that the Company was abandoning its pursuit of a sale or merger. Financial economics research has demonstrated that the public announcement of potential merger terminations negatively impacts the stock price of the target firm.[68]

68. In my opinion, IMAX's stock declined on news that the Company was abandoning its pursuit of a sale or merger as well as on the Company's decision to focus on its strategy and growth as a stand-alone entity. There was no new news pertaining to the restatement allegations and there was no correction of a prior alleged misstatement. Thus, I conclude that December 15, 2006 should not be considered a corrective

---

66 "Imax abandons quest to find a suitor over unacceptable bids, shares fall in premarket trading," *Associated Press Newswires*, December 18, 2006, 8:44 AM.

67 "UPDATE 1-Shares of Imax sink after no suitor found," *Reuters News*, December 18, 2006, 1:28 PM.

68 See, for example: Asquith, Paul, "Merger Bids, Uncertainty and Stockholder Returns," *Journal of Financial Economics*, 11 (1983) pp. 51-83; Dodd, Peter, "Merger Proposals, Management Discretion and Stockholder Wealth," *Journal of Financial Economics*, 8 (1980), pp. 105-137.

disclosure day and therefore cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

#### d. Analysis of April 9, 2007

69. Plaintiffs allege that April 9, 2007 should be considered a corrective disclosure day as on this day "IMAX received a delisting notice from NASDAQ because it had not filed its financial reports on time."[69] The announcement that IMAX had received a delisting notice from the NASDAQ was made public after market hours on April 9, 2007,[70] and was hence effectively impounded into IMAX's stock price on April 10, 2007.

70. On April 10, 2007, IMAX's stock price closed at $4.39, up $0.01 from the previous close of $4.38. After adjusting for the market movement, IMAX's stock price decreased by 0.12%, which is statistically insignificant.

71. As my analysis indicates that April 10, 2007 is associated with an insignificant company-specific stock price movement, I did not consider it as one of the seven significant alleged corrective disclosure days. Thus, April 10, 2007 should not be considered a corrective disclosure day and therefore cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

72. However, I found that April 9, 2007 is associated with a significant company-specific stock price movement. To be conservative in my analysis, I also reviewed news on that day. On April 9, 2007, IMAX's stock price closed at $4.38, down $0.49 from its previous close of $4.87. After adjusting for the market movement, IMAX's stock price declined by 10.38%, which is statistically significant.

---

69 In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 130.

70 "IMAX receives anticipated NASDAQ Staff Determination letter in connection with delayed filing," *Canada NewsWire*, April 9, 2007, 4:31 PM.

73. On April 9, 2007, Catalyst Fund Limited Partnership II ("Catalyst Fund"), a significant holder of IMAX's 9.625% Senior Notes due 2010, engaged the law firm Brown Rudnick Berlack Israels LLP to continue organizing "opposition to IMAX's consent solicitation seeking waiver of certain reporting defaults" as well as a related amendment of the bond indenture.[71] This waiver would permit IMAX to "extend until May 31, 2007 (or, at its election, until June 30, 2007) its deadline to file its annual report on Form 10-K for the year ended December 31, 2006, and other required reports."[72]

74. My review of public press commentary indicates that IMAX's stock price decline was tied to non-allegation related information. For example, the following April 9 and 10, 2007 public press articles attributed IMAX's stock price decline to the news that Catalyst Fund had enlisted a law firm to organize opposition to IMAX's solicitation seeking waiver of certain reporting defaults:

> Imax Corp. (TSX:IMX) stock plunged nearly 10 per cent Monday after Catalyst Fund announced a plan to rally other note holders in opposing the company's request for a waiver on debt covenants. (*The Canadian Press*)[73]

> Imax Corp. shares plunged 10 per cent yesterday after a private equity fund manager said it is seeking bondholder support to oppose the giant-screen film company's request for a waiver on its debt covenants. (*The Globe and Mail*)[74]

> Imax Corp. shares…fell 9.45 per cent, or 53 cents, to $5.08 on the Toronto Stock Exchange after Catalyst said it had hired law firm

71 "Catalyst Fund Limited Partnership II Continues to Organize Opposition to Consent Solicitation by IMAX Corporation," *Business Wire*, April 9, 2007, 9:28 AM.

72 *Id.*

73 "Imax stock plunges 10% as noteholder rallies opposition to proposed waiver," *The Canadian Press*, April 9, 2007, 5:48 PM.

74 "Imax faces more heat over its reporting delays; Bondholder to fight covenant waiver," *The Globe and Mail*, April 10, 2007, No Time.

> Brown Rudnick Berlack Israels LLP to help fight Imax's plan. (*The Toronto Star*)[75]

75. In sum, Plaintiffs allege that April 9, 2007 was a corrective disclosure day and that its stock price drop was tied to the NASDAQ delisting announcement. However, since that announcement occurred after market close, the effective day for that announcement was April 10, 2007, which is associated with an insignificant stock price movement. Therefore, April 10, 2007 should not be considered a corrective disclosure day and cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price. On April 9, 2007, IMAX's stock price likely declined on the news that Catalyst Fund had enlisted a law firm to organize opposition to IMAX's consent solicitation seeking waiver of certain reporting defaults. More importantly, on April 9, 2007, there was no new news pertaining to the restatement allegations and there was no correction of a prior alleged misstatement. Therefore, April 9, 2007 should not be considered a corrective disclosure day and cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

#### e. Analysis of April 12, 2007

76. Plaintiffs allege that April 12, 2007 should also be considered a corrective disclosure day as "IMAX provided a status update pursuant to the OSC's alternate information guidelines which contemplate bi-weekly filings until a company is current with its Canadian filing obligations."[76] In particular, Plaintiffs quote a press release released by IMAX on this day:

> The Company previously announced that it would delay the filing of its annual report on Form 10-K for fiscal 2006 due to the discovery of certain accounting errors and has since *broadened its accounting review to include certain other accounting matters based on comments*

---

75 "Fund set to battle Imax over debt waiver plans," *The Toronto Star*, April 10, 2007, No Time.

76 In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 131.

> *received by the Company from the SEC and Ontario Securities Commission.* The Company is currently working diligently and devoting necessary resources to complete the report and filing as soon as practicable. For the reasons described in its prior news releases, the Company cannot predict when it will complete its review and file its financial statements, although it intends to do so as soon as practicable. (Emphasis added [by Plaintiffs]).[77]

77. On April 13, 2007, the effective day of the alleged April 12, 2007 disclosures, IMAX's stock price closed at $4.59, up $0.43 from its previous close of $4.16. After adjusting for the market movement, IMAX's stock price increased by 9.79%, which is statistically significant.

78. On April 12, 2007, after market close, IMAX received a delinquent filer notice from the British Columbia Securities Commission.[78] Additionally, pursuant to the alternative information guidelines of the OSC that recommend biweekly updates until a company is current with its Canadian filing obligations, IMAX issued a status update on its filings and announced that it could not predict when it would complete its accounting review and file its financial statements.[79] On April 13, 2007, IMAX received consent from a majority of noteholders of its 9 5/8% Senior Notes due 2010 "to extend the deadline to file its Annual Report on Form 10-K" for fiscal year 2006 "and all other reports required to be filed by it...until May 31, 2007 or at its election until June 30, 2007."[80]

79. The positive stock price reaction on April 13, 2007 indicates that this day should not be considered a potential corrective disclosure day as the market viewed the news positively. More importantly, there was no new news pertaining to the restatement allegations nor was there new news that corrected prior alleged misstatements on

---

77 *Id.*

78 "Imax Corp – BCSC Delinquent Filer; Annual Financial Statements to Dec," *Market News Publishing*, April 12, 2007, 4:39 PM.

79 "IMAX provides status update in connection with delayed filing," *PR Newswire*, April 12, 2007, 10:00 PM.

80 "IMAX receives consent from majority of Senior Notes for its consent solicitation," *PR Newswire*, April 13, 2007, 7:30 AM.

April 12, 2007 and April 13, 2007. IMAX's April 12, 2007 biweekly update that it could not predict when it would complete its accounting review was a re-characterization of its previous disclosures. Additionally, IMAX's announcement that it had received consent from its noteholders to extend the deadline to file its financials is unrelated to the restatement allegations and did not correct any prior alleged misstatement. As no news related to allegations in this matter entered the marketplace or corrected prior alleged misstatements on April 13, 2007, this day should not be considered a corrective disclosure day and therefore cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

80. In summary, my analysis revealed that of the nineteen public disclosure days alleged by Plaintiffs, only seven were associated with statistically significant changes in IMAX's stock price. In addition, of the seven days on which IMAX's stock price changed in a significant way, four contained no new information related to Plaintiffs' allegations. On these days, and on April 9, 2007, although IMAX's stock price changed by a statistically significant amount, the public information released about IMAX was unrelated to the restatement allegations and did not correct for a prior alleged misstatement. In other words, there is no evidence that IMAX's shareholders suffered an economic loss due to the information released on these days. Therefore, these days should not be considered corrective disclosure days and cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

### 2. On August 9, 2006, March 29, 2007, and July 20, 2007, Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price. In addition, Plaintiffs *cannot* parse out the impact of confounding news on August 9, 2006, March 29, 2007, and July 20, 2007.

81. August 9, 2006, March 29, 2007, and July 20, 2007 are the only alleged corrective disclosure days that may contain new information that may have corrected alleged

previous misrepresentations. However, as my analysis of disclosures on these days in the following sections indicates, none of these days are useful in proving that the alleged misrepresentations had a material impact on IMAX's stock price. In addition, my analysis shows that Plaintiffs *cannot* parse out the impact of confounding news on August 9, 2006, March 29, 2007, and July 20, 2007.

### a. Analysis of August 9, 2006

82. Plaintiffs allege that "IMAX shocked the investment community by announcing that IMAX was under investigation by the SEC regarding its timing of revenue recognition, including its application of multiple element arrangement accounting to its theater systems."[81] On August, 10, 2006, the effective day of the alleged August 9, 2006 disclosures, IMAX's stock price closed at $5.73, down $3.90 from its previous close of $9.63. After adjusting for the market movement, IMAX's stock price declined by 40.67%, which is statistically significant.

83. On August 9, 2006, after market close at 4:01 PM, IMAX issued a press release in which it reported earnings for the quarter ended June 30, 2006 and disclosed information about the SEC informal investigation.[82] The Company also conducted a conference call after market close.[83]

84. In the Q2 2006 press release issued on that day, IMAX: reported Q2 2006 EPS of $0.08 per diluted share,[84] a penny above expectations[85]; disclosed it was responding to an informal SEC inquiry regarding the timing of its revenue recognition, including

---

81 In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 115.

82 "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

83 "Q2 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, August 9, 2006, No Time.

84 "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

85 "In the Money Forecast: Stocks to Watch Thursday," *MidnightTrader*, August 9, 2006, 6:37 PM.

its application of multiple element accounting to theater system installations; announced it had "identified a material weakness in the internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of 2006"; and announced there were no buyers for the Company at the desired valuation sought by the Board of Directors, but that it had authorized its bankers to explore offers at a lower valuation.[86]

85. During the conference call, executives announced IMAX would focus on potential joint ventures and on its conversion to a digital format.[87] Clarifying the news related to the no buyer announcement, Co-CEO Richard Gelfond stated that the SEC inquiry was not relevant to the sale process. Additionally, Co-CEO Wechsler stated that "the somewhat disappointing results of our films so far this year have made it more challenging...to meet our goals of signing installs in the short term."[88] Lastly, management retracted all guidance for the year, from an initial projection of 40-45 installs in 2006.[89]

86. In order to establish the materiality of the alleged misrepresentations on the stock price, one must be able to parse out and link the stock price decline on this day to the various allegations in this matter. Given the multitude of information released on August 9, 2006, such an analysis may not be possible. In order to conduct such an analysis, the impact of the following non-allegation related disclosures needs to be estimated: (a) announcement that a buyer had not been found at the desired valuation level; (b) management's decision to focus on potential joint ventures; (c) management's decision to focus on the conversion to digital technology; (d) retraction of guidance by management; and (e) quarterly financial results and expectations for future earnings. Furthermore, the impact of the following allegation

---

[86] "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

[87] "Q2 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, August 9, 2006, No Time.

[88] *Id*.

[89] *Id*.

related disclosures would need to be estimated as well: (a) announcement of the informal SEC inquiry; and (b) discussion of a material weakness in internal controls. It is difficult, if not impossible, to isolate the impact of these disclosures. Furthermore, as my analysis in Section VI demonstrates, IMAX's restatement would not be expected to move the stock price because it entailed a shift in accounting earnings.

87. In the following sections, I will analyze the allegation related and non-allegation related information that was released on August 9, 2006 and August 10, 2006. Although the non-allegation related disclosures were significant and had a material impact on IMAX's stock price, it is difficult, if not impossible, to isolate the impact of these disclosures. Hence, Plaintiffs cannot parse out the impact of confounding news on August 9, 2006 on IMAX's stock price on August 10, 2006 and establish that the disclosures related to the restatement had a material impact on IMAX's stock price.

### (1) Non-allegation related information

#### (a) Announcement that a buyer had not been found at the desired valuation level

88. On August 9, 2006, IMAX announced that there were no buyers for the Company at the desired valuation sought by the Board of Directors, and that it had authorized its bankers to explore offers at a lower valuation:

> On March 9, the Company announced it had retained Allen & Company and UBS to explore strategic alternatives. Today the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently no buyers who have indicated a willingness to acquire the Company at a valuation sought by the Board of Directors. Because interest remains

> from several parties at a lower valuation, however, the Board has authorized the Company's bankers to explore these opportunities.[90]

89. This announcement did not contain new news pertaining to Plaintiffs' allegations of improper revenue recognition. In addition, the announcement by the Company that it could not find a buyer at the desired valuation did not correct for any prior alleged misstatements. In my opinion, both IMAX's announcement that it had not found a buyer at the desired valuation level and IMAX's announcement that it was searching for buyers at lower valuation levels significantly and adversely impacted the Company's stock price.

90. The announcement that IMAX had not found a buyer at the desired valuation level was viewed very negatively by the market as the market was expecting a converse announcement, namely the actual announcement of a potential buyer, on August 9, 2006. IMAX's shares had been trading at a significant acquisition-related premium since March 9, 2006, when IMAX first publicly announced that it was searching for a buyer. Correspondingly, as evident from analyst commentary, the announcement of the lack of a buyer negatively impacted market expectations and triggered a large portion of the stock price decline on August 10, 2006.

91. IMAX had previously announced on March 9, 2006 that after receiving unsolicited inquiries, the Board of Directors decided to start looking at strategic alternatives, including a possible sale or merger of the company:

> IMAX Corporation today announced that its Board of Directors has decided to begin a process to explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business with another entity offering strategic opportunities for growth.[91]

---

[90] "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

[91] "IMAX to explore strategic alternatives," *PR Newswire*, March 9, 2006, 7:00 AM.

92. On March 9, 2006, IMAX's stock closed at $10.35, up $0.85 from the previous close of $9.50. After adjusting for the market movement, IMAX's stock price increased by 9.51%, which is statistically significant.[92] As evident from analyst commentary and in line with financial economics research, following the public announcement that IMAX was searching for an acquirer, IMAX's stock price began trading at an acquisition-related premium as the market expected a buyer to purchase IMAX's stock at a premium to its pre-announcement trading level.

93. Financial economics research demonstrates that announcements of future mergers cause positive movements in the stock price of target firms. However, while this effect is consistently found to be both positive and significant, the estimates of the excess stock price return[93] can vary considerably. As one example, Asquith (1983) concludes that target firms had a two-day excess return of 6.2% or 7.0% around the announcement date, depending upon the ultimate outcome of the merger.[94] In contrast to this finding, Akhigbe et al. (2000) find a cumulative abnormal return of 17.4% for the same two-day time period using a different sample.[95] Additionally, studies of mergers also find pre-announcement run-ups in price, suggesting that the announcement day return may understate acquisition premiums.[96]

94. Conversely, financial economics research also demonstrates that the public announcement of a merger termination negatively impacts the stock price of the target

---

[92] In addition to the announcement that IMAX was looking at strategic alternatives, the company also released its results for the quarter: earnings in line with analyst estimates and revenue slightly below estimates. IMAX also said that it expected a loss of $0.10 per share in the first quarter 2006, but did not provide any guidance beyond the first quarter. See: "Q4 2005 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, March 9, 2006, No Time; and "Imax 4Q profit up; plans to mull options," *Associated Press Newswires*, March 9, 2006, 8:10 AM.

[93] In general, excess (abnormal) stock price return is defined as the company's stock price return adjusted for the market and industry returns. Some of the studies mentioned in this section also adjust for other factors.

[94] Asquith, Paul, "Merger Bids, Uncertainty and Stockholder Returns," *Journal of Financial Economics*, 11 (1983), pp. 51-83.

[95] Akhigbe, Aigbe, Stephen F. Borde, and Ann Marie Whyte, "The Source of Gains to Targets and Their Industry Rivals: Evidence Based on Terminated Merger Proposals," *Financial Management*, Winter 2000, pp. 101-118.

[96] See, for example: Asquith, Paul, "Merger Bids, Uncertainty and Stockholder Returns," *Journal of Financial Economics*, 11 (1983), pp. 51-83; and Dodd, Peter, "Merger Proposals, Management Discretion and Stockholder Wealth," *Journal of Financial Economics*, 8 (1980), pp. 105-137.

firm. Asquith (1983) estimates the two-day excess stock price return for a target firm after a merger cancellation to be -6.4%.[97] Dodd (1980) finds an excess stock return decline of 4.5% on average on the announcement date, as well as a 4.3% decline on the preceding day. Dodd (1980) also investigates how the decline changes depending on which party cancels the merger. If a target cancels the merger, it experiences an abnormal two-day decline of 5.6%. However, in deals where the non-target management cancels the merger, including situations where the bidder "refuses to pay the incumbent's price," Dodd concludes that the target experiences a two-day decline of 9.8%.[98]

95. Overall, these studies suggest that there is a significant stock price reaction upon an announcement of a potential merger and/or acquisition, and there is also a significant stock price reaction upon an announcement of a cancellation of a potential merger and/or acquisition. In my opinion, IMAX's announcement on August 9, 2006 that it did not find a buyer had a material impact on IMAX's stock price.

96. Furthermore, a review of analyst commentary and valuations after the March 9, 2006 announcement that IMAX was in the market for a merger or acquisition also supports academic findings that target firms trade at a premium following the announcement of an acquisition or commencement of a search for an acquisition.

97. Following this announcement several analysts believed that IMAX would trade at a premium. For example, on March 9, 2006, the SunTrust Robinson Humphrey analyst commented that "IMAX shares will now trade primarily based on buy-out speculation, given management's announcement that it has retained investment bankers to explore 'strategic opportunities.'"[99]

---

97 Asquith, Paul, "Merger Bids, Uncertainty and Stockholder Returns," *Journal of Financial Economics*, 11 (1983), pp. 51-83.

98 Dodd, Peter, "Merger Proposals, Management Discretion and Stockholder Wealth," *Journal of Financial Economics*, 8 (1980), pp. 105–137.

99 "IMAX: Rating Cut to Neutral; Target Nearly Reached on Buyout Talk," SunTrust Robinson Humphrey, March 9, 2006, p. 1.

98. Likewise, on March 13, 2006, the Piper Jaffray analyst stated: "we think IMAX shares will trade higher near term on speculation surrounding a takeover - not on fundamentals."[100] The Research Associates analyst even ascribed a 5% to 20% range for a premium to the price target due to the potential acquisition.[101] In addition, following the March 9, 2006 public announcement that IMAX was in the market for a potential merger or acquisition, several analysts revised their price targets for IMAX upwards.[102]

99. As late as July 27, 2006, the marketplace was rife with speculation that a potential merger or acquisition deal was in the works, and that this deal would be announced on August 9, 2006:

> The entertainment players interested in Imax are said to include Sony Corp., owner of movie studio Sony Pictures Entertainment Inc., and a South Korean theatre chain…. The private equity bidders include San Francisco-based Elevation.... Imax executives have referred to the auction process as 'robust,'…. Analysts speculate Imax is trying to pick a partner by Aug. 9, when it is scheduled to release quarterly financial results.[103]

100. This article indicates that the market was expecting IMAX to announce its potential buyer on August 9, 2006. However, when IMAX instead announced that it had not found a buyer, the market viewed this surprising announcement negatively.

---

[100] "Solid Qtr; Weak Guidance; Up for Sale; PT To $11," Piper Jaffray, March 13, 2006, p. 1.

[101] "1Q Preview: Anticipate Update on Process," Research Associates, May 8, 2006, p. 1.

[102] For example, the Piper Jaffray analyst raised IMAX's price target from $9.00 on November 4, 2005 to $11.00 on March 13, 2006, an increase of 22.2%; and the Roth Capital Partners analyst raised IMAX's price target from $8.80 on November 4, 2005 to $9.50 on March 21, 2006, an increase of 8.0%. The Research Associates and Janco Partners analysts maintained IMAX's price target. *See*: "Soft September Quarter; Big Q4 on Deck; $9 PT," Piper Jaffray, November 4, 2005, p. 1; "Solid Qtr; Weak Guidance; Up For Sale; PT To $11," Piper Jaffray, March 13, 2006, p. 1; "Q3 Results Mixed, Q4 Bogey Gets Even Higher," Roth Capital Partners, November 4, 2005, p. 1; "Maintaining Neutral Rating on Prospect of Near-Term Strategic Buyer," Roth Capital Partners, March 21, 2006, p. 1; "Correction: Strong 2005 Bodes Well For Further Growth," Research Associates, February 17, 2006, p. 1; "2006 Film Slate Strong," Research Associates, March 9, 2006, p. 1; "Earnings Release Tomorrow," Janco Partners, March 8, 2006, p. 1; "On the Blocks," Janco Partners, March 10, 2006, p. 1.

[103] "Sony among four chasing Imax; Bono-backed equity fund Elevation also seen as one of the potential buyers," *The Globe and Mail*, July 27, 2006, No Time.

101. A review of analyst commentary after the August 9, 2006 announcement that IMAX had been unable to find a buyer at the desired valuation levels also supports (1) the major disappointment from IMAX's announcement that it had not been able to find a buyer; and (2) financial economics research's findings that target firms experience negative stock price returns following the announcement of a termination of an acquisition or a lack of a suitable buyer.

102. Several analysts commented on this disappointing announcement. For example, on August 10, 2006, the Roth Capital Partners analyst wrote:

> Judging by the market reaction to yesterday's press release, the quarter's results were obviously less important than the status of negotiations between Imax management and the Company's reported suitors. After five months of negotiations, we believed that anything less than a named buyer on a straightforward stock or stock-and-cash acquisition of IMAX shares (at a premium) would be interpreted negatively by investors. It was.[104]

103. On the same day, the Susquehanna Financial Group analyst stated:

> Although overall Q2 results were strong, IMAX's failure to secure an acceptable offer during its ongoing exploration of strategic alternatives sent the stock down more than 35% in after-hours trading. While the potential for a transaction still looms, especially since the board is continuing its discussions with some interested parties, we believe earnings momentum is likely to deteriorate as the company begins to implement its long-term growth strategy…. Although fundamental momentum has been strong over the last few years, we believe investor confidence is likely to be significantly reduced by yesterday's announcement about another unsuccessful sales process, especially in what is generally perceived to be a healthy M&A environment.[105]

104. The Research Associates analyst wrote that "IMAX reported strong 2Q06 results vs. 2Q05 but we believe the benefits are likely to be outweighed by the Company's

[104] "No Deal: Suitors Back Away, Weak Box Office Cools Near-Term Interest," Roth Capital Partners, August 10, 2006, pp. 2–3.

[105] "Too Much Uncertainty Ahead; Downgrading to Neutral," Susquehanna Financial Group, August 10, 2006, pp. 1–2.

announcement that no bidder has been willing to pay the valuation IMAX's board sought to acquire the Company."[106] The Friedman Billings Ramsey analyst also commented that "2Q results were overshadowed by IMAX's announcement that prospective buyers failed to submit bids at valuations sought by the company's board…. While the sale process will continue, any bids in the near term may be well shy of previous expectations."[107] In addition, the BMO Capital Markets analyst opined that the failure to find a buyer had damaged management's credibility and had negatively impacted both investor sentiment and IMAX's market valuation:

> Most importantly management's credibility is on the line, again. Lack of interested buyers at a price higher than $300 million damages investor sentiment, reduces market valuation of the Company, and poses questions about capital funding for growth.[108]

105. Public press commentary also indicated that IMAX's stock price decline on August 10, 2006 was related to IMAX's inability to find a buyer. For example, the *Dow Jones News Service* stated that "[s]hares of Imax Corp…were down sharply in after-hours trading Wednesday after the company said it was unable to find a buyer and unveiled changes to its business model."[109] Similarly, the *Associated Press Newswires* reported that "[s]hares of Imax Corp. sank in after-hours trading Wednesday, after the Canadian movie company said it has not found any suitable buyers since announcing in March it was exploring 'strategic alternatives.'"[110]

106. In summary, the announcement that IMAX had not found a buyer at the desired valuation level was viewed very negatively by the market, which was expecting a converse announcement, namely the actual announcement of a potential buyer, on August 9, 2006. IMAX's shares had been trading on a significant acquisition-related

---

[106] "Reducing Rating," Research Associates, August 10, 2006, p. 1.

[107] "IMAX: 2Q06 Results Top Expectations; Sale Process Losing Momentum-- Maintaining Market Perform on Senior Notes," Friedman Billings Ramsey, August 10, 2006, p. 1.

[108] "Second Quarter Update," BMO Capital Markets, August 10, 2006, p. 1.

[109] "Imax Reports Good 2Q, But Fails To Find Buyer," *Dow Jones News Service*, August 9, 2006, 5:56 PM.

[110] "Aftermarket Movers: Imax tanks," *Associated Press Newswires*, August 9, 2006, 6:19 PM.

premium since March 9, 2006, when IMAX first publicly announced that it was searching for a buyer. Correspondingly, the lack of a buyer announcement and the announcement that IMAX would search for buyers at a lower price negatively impacted market expectations and likely triggered the majority of the stock price decline on August 10, 2006. It is difficult, if not impossible, to parse out the impact of the no-buyer announcement and the announcement that IMAX would search for buyers at a lower price from the overall stock price decline on August 10, 2006.

**(b) Management's decision to focus on potential joint ventures**

107. During the conference call on August 9, 2006, management also announced that IMAX would focus on potential joint ventures.[111]

108. I reviewed analyst commentary and found that while analysts were generally positive about the long-term effects of the joint venture model, they also acknowledged the negative short-term ramifications of the transition on IMAX's stock price, citing "execution risk" and short-term reduction in cash flows due to capital investments up front. For example, on August 10, 2006 the Merriman Curhan Ford analyst stated:

> Significant business model shifts. As would have been done had the company gone private, management announced that it would seek more joint venture theater deals going forward. Also, it would accelerate the development of digital IMAX projectors. While both are positive for long-term growth and profitability, the near term impact should be a reduction in revenues and profits.[112]

109. On the same day, the BMO Capital Markets analyst wrote that IMAX's "[c]hange in strategy from a sales and sales-type leases [*sic*] to joint ventures presents execution

---

[111] "Q2 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, August 9, 2006, No Time.

[112] "No Buyers Emerge; Shifts in Business Model to Negatively Impact Near-Term Results; Lowering Rating to Sell from Buy," Merriman Curhan Ford, August 10, 2006, p. 1.

risk."[113] The analyst also commented on the valuation implications of IMAX's proposed strategy changes:

> Since management revealed that no buyers offered an acceptable price for IMAX and that the company was embarking on a new strategy with its existing resources, we believe the fundamental picture has changed so vastly that investor interest in the stock will be muted at best even after it's plummeted some 40% from Wednesday's closing price.[114]

110. The Janco Partners analyst also pointed to the impact of the "capital intensive" transition on near-term earnings: "[a] higher ROI joint venture structure…will reduce near-term net income by some indeterminate amount and is also more capital intensive upfront."[115] Similarly, the Paradigm Capital analyst stated that "IMAX is planning to target a JV structure more aggressively going forward, which will have a material short-term effect on financials."[116]

111. Moreover, public press commentary also reiterated the viewpoint that IMAX's business model transition would result in "increased costs" and would "hurt short-term" results:

> Shares of Imax Corp. (IMAX), known for its eight-story high film screens, were down sharply in after-hours trading Wednesday after the company said it was unable to find a buyer and unveiled changes to its business model…. It's [*sic*] decision not to issue guidance relates to uncertainty regarding the uptake of joint-venture theaters, how it will effect its existing sale/lease model, and what accounting charges will result from increased R&D costs associated with the digital transition. (*Dow Jones News Service*)[117]

---

[113] "Second Quarter Update," BMO Capital Markets, August 10, 2006, p. 1.

[114] "A Follow-Up to Today's Downgrade, Taking a Stab at Earnings Estimates," BMO Capital Markets, August 10, 2006, p. 1.

[115] "No Buyout, No Guidance, New Business Model," Janco Partners, August 10, 2006, p. 1.

[116] "Strong Q2 Results Highlight Strength of Business, No Buyer Found – Management Remains Focused on Growth," Paradigm Capital, August 10, 2006, p. 3.

[117] "Imax Reports Good 2Q, But Fails To Find Buyer," *Dow Jones News Service*, August 9, 2006, 5:56 PM.

> The bad news didn't end there. It also said that it would make changes to its business approach - aimed at accelerating the expansion of its theater network - that would hurt short-term financial results. (*Dow Jones News Service* )[118]

112. Although IMAX's decision to accelerate its transition to the joint venture model was viewed by the marketplace as beneficial to the Company in the long term, there was widespread consensus that it would negatively impact IMAX's earnings and cash flows in the near term. It is difficult, if not impossible, to parse out the impact of the joint venture transition announcement from the overall stock price decline on August 10, 2006.

**(c) Management's decision to focus on the conversion to digital technology**

113. During the conference call on August 9, 2006, executives also announced that IMAX would focus on its conversion to a digital format, aiming to introduce the first IMAX Digital System in 2008.[119] IMAX's decision to implement its digital model was viewed by the marketplace as being beneficial to the Company in the long term. However, as IMAX's Co-CEO Gelfond acknowledged, the transition to the digital model would negatively impact IMAX's cash flows in the near term due to the costs associated with the transition.[120]

114. A review of analyst commentary indicates that while analysts were generally positive about the long-term effects of the digital model, they also acknowledged the negative short-term ramifications of the transition on IMAX's stock price. For example, the Piper Jaffray analyst stated: "[w]e think IMAX faces enormous challenges as it

[118] "IMAX Dn 38% On News Of Informal SEC Inquiry, Strategic Process Update," *Dow Jones News Service*, August 10, 2006, 9:33 AM.

[119] "Q2 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, August 9, 2006, No Time.

[120] *Id*.

prepares to move to digital and expect current generation system sales are at considerable risk and may not be fully reflected in our earnings estimates."[121]

115. Similarly, the Susquehanna Financial Group analyst pointed to the "high degree of uncertainty" related to the transition:

> Lastly, we expect the company's stepped-up efforts in digital projection technology to require additional R&D spending, with the company expecting to receive virtual print fees from the studio, something with which we believe there is still a high degree of uncertainty.[122]

116. In summary, although IMAX's decision to implement its digital model was viewed by the marketplace as beneficial to the Company in the long term, it was expected to impact IMAX's financials negatively in the near term due to the costs and uncertainty associated with the transition. It is difficult, if not impossible, to parse out the impact of the digital systems transition announcement from the overall stock price decline on August 10, 2006.

**(d) Retraction of guidance by management**

117. During the conference call on August 9, 2006, management also retracted all guidance for the year, from an initial projection of 40-45 theater system installations in 2006. Specifically, Co-CEO Gelfond stated: "guidance projecting at this stage, including for the remainder of the year, is inappropriate and counter to our strategic focus and direction."[123]

118. Financial economics research has examined the stock price reaction to management's retraction of guidance. For example, Chen et al. (2006) find a mean cumulative

---

[121] "Sale Falls Apart; Downgrade To Underperform," Piper Jaffray, August 10, 2006, p. 1.

[122] "Too Much Uncertainty Ahead; Downgrading to Neutral," Susquehanna Financial Group, August 10, 2006, p. 1.

[123] "Q2 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, August 9, 2006, No Time.

abnormal market return of -4.8% for the three days surrounding companies' announcements that they will stop offering quarterly earnings guidance. This result controls for the market reaction to the earnings surprises, since the majority of firms in the sample announced they were ceasing guidance in the same statement that announced quarterly earnings.[124]

119. In addition to the financial economics research, I also reviewed analyst commentary and found that analysts were concerned about IMAX's earnings visibility following its retraction of guidance and "earnings volatility" associated with the strategic changes that the Company intended to implement. For example, on August, 10, 2006, the Susquehanna Financial Group analyst stated: "[w]ithout any guidance, we expect earnings volatility to increase significantly, particularly since this transition is not likely to occur immediately...."[125]

120. Similarly, the Janco Partners analyst tied the withdrawal of guidance to "mediocre" performance of IMAX's film signings:

> Furthermore, management is withdrawing its guidance for 45 to 50 signings this year as a result of mediocre overall performance for movies such as *V for Vendetta*, *Poseidon* and *Ant Bully*. IMAX continues to outperform relative to conventional 35mm screens for these movies as well as *Superman Returns* but the cost of conversions to DMR format implies a write-off at least on *Poseidon*. However, this is not enough to entice more domestic exhibitor signings for MPX conversions based on anticipated exhibitor ROIs.[126]

121. Additionally, public press commentary also confirmed that management's retraction of guidance was viewed negatively by investors. For instance, the *Dow Jones News*

---

[124] Chen, Shuping, Dawn Matsumoto, and Shiva Rajgopal, "Is Silence Golden? An Empirical Analysis of Firms that Stop Giving Quarterly Earnings Guidance," Working Paper, University of Washington, August 2007. See also: Houston, Joel F., Baruch Lev, and Jennifer W. Tucker, "To Guide or Not to Guide? Causes and Consequences of Stopping Quarterly Earnings Guidance," Working Paper, University of Florida and New York University, May 2008.

[125] "Too Much Uncertainty Ahead; Downgrading to Neutral," Susquehanna Financial Group, August 10, 2006, p. 1.

[126] "No Buyout, No Guidance, New Business Model," Janco Partners, August 10, 2006, p. 1.

*Service* reported that "changes forced Imax to revoke financial and system-installation guidance for 2006. Investors didn't take the news well, chopping the stock price in half and launching class-action lawsuits against the company."[127]

122. Financial economics research suggests that a company's stock price declines as a result of management retracting guidance. In addition, in IMAX's case, analysts perceived the retraction of guidance by management as negative news because it increased uncertainty and negatively affected earnings visibility. Thus, it is difficult, if not impossible, to parse out the impact of the announcement of retraction of guidance by management from the overall stock price decline on August 10, 2006.

**(e) Q2 financial results and expectations of future earnings**

123. In its Q2 2006 Press Release, IMAX also reported a Q2 2006 EPS of $0.08 per diluted share, a penny above expectations. The company also released the following information:

> During the second quarter, the Company signed agreements for 12 IMAX theatre systems, including four subject to certain conditions. This brings total signings for the first half of 2006 to 20. The Company recognized revenue on 11 theatre systems which qualified as either sales or sales-type leases in the second quarter of 2006 compared to nine theatre systems in the second quarter of 2005. In addition, the Company installed and began recognizing revenue on one theatre system that qualified as an operating lease in the second quarter of 2006 versus two in the same period in 2005.[128]

124. A review of analyst commentary suggests that while analysts generally seemed content with IMAX's prior earnings, their consensus was that IMAX's earnings had been overshadowed by the negative news of the lack of a potential acquirer, the transition to the joint venture systems and digital technology, the retraction of

---

127 "Imax To Give Detailed Investor Update in October," *Dow Jones News Service*, August 30, 2006, 9:00 AM.

128 "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

earnings guidance, and IMAX's inferior box office results. More importantly, analysts believed that IMAX's future earnings were likely to take substantial hits due to the factors mentioned above.

125. For example, on August, 10, 2006, the Merriman Curhan Ford analyst made "drastic reductions" for fiscal year 2006 and 2007 EPS estimates:

> Poor box office hurting signings… Due to a number of factors, including 1) the underperformance of *The Ant Bully* and potential underperformance of both *Open Season* and *Happy Feet* later this year; 2) the slowdown in signing trends recently; 3) the potential delay of 4Q installations into FY07; and 4) the increased number of future signings that may fall under the joint venture model, we are making drastic reductions in our revenue and EPS estimates for both FY06 and FY07.[129]

126. Additionally, the BMO Capital Markets analyst commented that "[i]mproved financials were completely marred by a slate of bad news,"[130] while the Friedman Billings Ramsay analyst wrote that, "2Q results were overshadowed by IMAX's announcement that prospective buyers failed to submit bids at valuations sought by the company's board."[131]

127. Later in the month, on August 25, 2006, the Paradigm Capital analyst predicted that earnings would be lower in fiscal year 2006 compared to fiscal year 2005:

> [O]ver the past 17 months, the company has missed some financial milestones and earnings are likely to be lower in FY06 then they were in FY05, not typically conducive to a rising share price.[132]

---

129 "No Buyers Emerge; Shifts in Business Model to Negatively Impact Near-Term Results; Lowering Rating to Sell from Buy," Merriman Curhan Ford, August 10, 2006, pp. 1-4.

130 "Second Quarter Update," BMO Capital Markets, August 10, 2006, p. 1.

131 "IMAX: 2Q06 Results Top Expectations; Sale Process Losing Momentum--Maintaining Market Perform on Senior Notes," Friedman Billings Ramsey, August 10, 2006, p. 1.

132 "Focus on Understanding JV Model," Paradigm Capital, August 25, 2006, p. 6.

128. In summary, although IMAX's Q2 2006 earnings were higher than the consensus estimates, most analysts were disappointed by the implications for future earnings and some analysts even revised the future EPS forecasts. It is difficult, if not impossible, to parse out the impact of the earning announcement from the overall stock price decline on August 10, 2006.

129. As mentioned earlier, in order to establish materiality of the alleged corrective disclosures, one must be able to parse out and link the stock price decline on this day to the various allegations in this matter. Given the multitude of non-allegation related information released on August 9, 2006, such an analysis may not be possible. In fact, to establish materiality of the alleged misrepresentations, the impact of the following allegation related disclosures needs to be estimated and isolated as well: (a) announcement of the informal SEC inquiry; and (b) discussion of material weakness in internal controls. The following sections will address the allegation related information that was disclosed on August 9, 2006.

**(2) Allegation related information**

130. In addition to the non-allegation information that was disclosed on August 9, 2006, IMAX also announced that it was responding to an informal SEC inquiry regarding the timing of its revenue recognition, including its application of multiple element accounting to theater system installations.[133] IMAX further announced it had "identified a material weakness in the internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of 2006."[134]

131. Furthermore, in the disclosures on August 9, 2006 there was no information suggesting that there would be a restatement of earnings related to the timing of revenue recognition or about the size of any potential restatement. Further, the

---

133 "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

134 *Id.*

announcement on August 9, 2006 did not correct for any prior alleged misstatements. The announcement of an SEC informal inquiry and the identification of internal control weaknesses on August 9, 2006 cannot substitute for the restatement announcement on July 20, 2007; these disclosures are not the same and substituting them would produce erroneous findings.

**(a) Announcement of the informal SEC inquiry**

132. In its Q2 2006 Press Release, IMAX also disclosed it was responding to an informal SEC inquiry regarding the timing of its revenue recognition accounting:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems.[135]

133. In general, a company's stock price declines as a result of the company being investigated by a regulatory body. The announcement of an SEC inquiry in itself has a separate and distinct effect, at times dubbed the "investigation effect,"[136] from the announcement of the violations that are the focus of the inquiry. The investigation effect is associated with costs to defend against and the potential for penalties, the "headline effect" associated with the SEC's inquiry, and the increased risks incumbent on the company, regardless of whether the inquiry is warranted. This effect is distinct from the effect that the alleged accounting violations may have had on IMAX's stock price.

134. Financial economics research indicates that following an announcement of SEC investigations, both formal and informal, there is a significant stock price decline.

---

135 *Id*.

136 Feroz, Ehsan H., Kyungjoo Park, and Victor S. Pastena, "The Financial and Market Effects of the SEC's Accounting and Auditing Enforcement Releases," *Journal of Accounting Research*, Volume 29 Supplement 1991, pp. 107-142.

Feroz et al. (1991) finds that an abnormal stock return of -10.0% is associated with the first trading day on which SEC actions are disclosed, either by the SEC or by the company itself. Furthermore, the study finds a -6.0% mean two-day cumulative abnormal return for SEC investigation announcements, even if the company had previously announced the disputed accounting.[137] This finding suggests that the fact of an investigation announcement has an impact, even when the announcement does not introduce new information into the market. Similarly, Nourayi (1994) examines the three days surrounding the announcement of SEC enforcement actions and finds a significant, negative stock price impact.[138]

135. Furthermore, academic research shows that announcements of informal and formal SEC investigations similarly yield negative market reactions. McDowell (2005) finds that mean cumulative abnormal returns for the three days surrounding an announcement are similar for informal investigations (-6.2%) and formal investigations (-6.2%). Moreover, this effect is larger for small capitalization companies, with mean cumulative abnormal returns of -12.14% and -7.83% for informal and formal investigations, respectively.[139]

136. Additionally, a review of analyst commentary indicates that analysts too highlighted the "overhang" and "cloud" that the SEC inquiry would likely place on IMAX's stock. They acknowledged that this effect was endemic to "most companies that receive inquiries from the SEC."

137. For example, on August 10, 2006, the Merriman Curhan Ford analyst wrote that the SEC inquiry would create a "cloud over the company's shares": "As with most companies that receive inquiries from the SEC (especially those regarding revenue recognition issues), we believe there will likely be a cloud over the company's shares

---

137 *Id.*

138 Nourayi, Mahmoud M., "Stock Price Responses to the SEC's Enforcement Actions," *Journal of Accounting and Public Policy*, Volume 13 (1994), pp. 333-347.

139 McDowell, John, "A Look at the Market's Reaction to the Announcements of SEC Investigations," The Leonard N. Stern School of Business, April 1, 2005.

until this is resolved."[140] The Susquehanna Financial Group analyst also stated that the SEC "inquiry is likely to be an overhang on the stock."[141]

138. Likewise, the BMO Capital Markets analyst pointed out that SEC inquiries exacerbate investor skepticism regardless of the outcome of the inquiries:

> The revelation of an informal inquiry from the SEC as well as weak internal controls under Sarbanes-Oxley only adds to the risk of trying to bottom fish for IMAX, in our view…. Although using balance sheet reserves and theater cancellations to grow earnings might not prove to be big issue [*sic*] with regulators, we do not think this examination goes away quickly. The SEC inquiries into revenue recognition only reinforce some investor skepticism over the company's accounting practices (whether right or wrong). At the very least, we see the risk of a prolonged inquiry or a potential escalation as reason enough to avoid the stock for now.[142]

139. In order to prove that the alleged misrepresentations had a material adverse impact on IMAX's stock price on August 10, 2006, one must isolate the "investigation effect" of the SEC inquiry from the alleged violations that were disclosed in this matter. The "investigation effect" is associated with costs to defend against and the potential for penalties, the "headline effect" associated with the SEC's inquiry, and the increased risks incumbent on the company, regardless of whether the inquiry is warranted. It is difficult, if not impossible, to parse out the impact of the SEC inquiry announcement from the overall stock price decline on August 10, 2006.

**(b) Discussion of material weakness in internal controls**

---

[140] "No Buyers Emerge; Shifts in Business Model to Negatively Impact Near-Term Results; Lowering Rating to Sell from Buy," Merriman Curhan Ford, August 10, 2006, p. 4.

[141] "Too Much Uncertainty Ahead; Downgrading to Neutral," Susquehanna Financial Group, August 10, 2006, p. 1.

[142] "A Follow-Up to Today's Downgrade, Taking a Stab at Earnings Estimates," BMO Capital Markets, August 10, 2006, pp. 1-3.

140. In its Q2 2006 Press Release, IMAX announced it had identified a material weakness in the internal controls:

> The Company indicated that as part of its quarterly certification under Section 302 of the Sarbanes-Oxley Act, it has identified a material weakness in the internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of 2006.[143]

141. The announcement of the identification of a material weakness in and of itself has a separate and distinct effect from the actual material weaknesses that are alleged in this matter. Identifications of material weaknesses create uncertainty about the reliability of all internal controls, not merely those that are announced. The effect of this uncertainty is different from the effect that the alleged material weaknesses may have had on IMAX's stock price.

142. I reviewed analyst commentary and found that analysts too highlighted the "negative sentiment" on IMAX's stock engendered by the announcement of the material weaknesses in its internal controls. For instance, the BMO Capital Markets analyst stated that the "weakness in accounting controls and withdrawal of guidance including no visibility on number of system signings and installs in the second half of 2006 and in 2007 all add to the negative sentiment."[144] In addition, the analyst wrote:

> The revelation of an informal inquiry from the SEC as well as weak internal controls under Sarbanes-Oxley only adds to the risk of trying to bottom fish for IMAX, in our view.[145]

143. Moreover, the Research Associates analyst wrote:

---

[143] "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives," *PR Newswire*, August 9, 2006, 4:01 PM.

[144] "Second Quarter Update," BMO Capital Markets, August 10, 2006, p. 1.

[145] "A Follow-Up to Today's Downgrade, Taking a Stab at Earnings Estimates," BMO Capital Markets, August 10, 2006, p. 1.

> We are reducing or [*sic*] rating on IMAX shares from Buy to Hold. Despite the strong 2Q06 performance reviewed in this report, a number of factors are likely to overhang the shares in the near-term, in our view. They include: … 3) a material deficiency identified during the Company's Sarbanes-Oxely process that IMAX hopes to cure before its annual certification.[146]

144. In order to prove that the alleged misrepresentations had a material adverse impact on IMAX's stock price on August 10, 2006, one must isolate the effect of the uncertainty engendered by the announcement of the material weaknesses in its internal controls from the alleged violations disclosed in this matter. It is difficult, if not impossible, to parse out the impact of this uncertainty from the overall stock price decline on August 10, 2006.

145. In summary, my analysis of the allegation and non-allegation related information released on August 9 and 10, 2006 demonstrates that one would not expect the disclosures related to the restatement to have a material impact on IMAX's stock price. Additionally, although the non-allegation related disclosures were significant and had a material impact on IMAX's stock price, it is difficult, if not impossible, to isolate the impact of these disclosures. Hence, Plaintiffs cannot parse out the impact of confounding news on August 9, 2006 on IMAX's stock price on August 10, 2006 and establish that the disclosures related to the restatement had a material impact on IMAX's stock price.

### b. Analysis of March 29, 2007

146. Plaintiffs allege that March 29, 2007 was also a corrective disclosure day, pointing to IMAX's announcement "that it had delayed filing its 2006 Form 10-K for a second time to review its accounting for revenue from theater system installations" and IMAX's determination "to broaden its review to address certain issues" related to comments it had received from the SEC and OSC "in connection with its revenue

[146] "Reducing Rating," Research Associates, August 10, 2006, p. 1.

recognition for certain theater system installations in previous periods, including the fourth quarter of 2005."[147]

147. On March 29, 2007, IMAX's stock price closed at $5.04, down $0.33 from its previous close of $5.37. After adjusting for the market movement, IMAX's stock price declined by 6.45%, which is statistically significant.

148. My analysis indicates that as these news disclosures did not correct any of the prior alleged misrepresentations, March 29, 2007 should not be considered a corrective disclosure day. In addition, my analysis indicates that it is difficult, if not impossible, to parse out the impact of each new disclosure on IMAX's stock price in order to establish that the allegation related misrepresentations had a material impact on IMAX's stock price.

149. Prior to the announcement on March 29, 2007, on March 16, 2007, IMAX announced that it would have to postpone the filing of its Form 10-K for fiscal year 2006, and that it would need to restate its financials for the past six years to account for errors unrelated to revenue recognition policies.[148] IMAX's stock closed at $5.00, up $0.01 from its previous close of $4.99. After adjusting for the market movement, IMAX's stock price rose by 0.3%, which is statistically insignificant.

150. On March 29, 2007, IMAX announced that it had delayed filing its 2006 Form 10-K and corresponding filings under Canadian provincial securities laws beyond the filing deadline for a second time, to review revenue recognition issues and to broaden its review of revenue recognition to prior periods.[149] IMAX also noted that while its expanded review might lead to the restatement of additional items beyond the

---

[147] In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 127.

[148] "IMAX to delay filing of 2006 10-K; Company is evaluating an estimated $2.5 million of identified accounting errors that occurred between 2001-2006; Company also announces 7 installs and 9 signings for fourth quarter," *PR Newswire*, March 16, 2007, 7:47 AM; and "Q4 2006 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, March 16, 2007, No Time.

[149] "IMAX to delay filing of 2006 10-K," *Canada NewsWire*, March 29, 2007, 7:30 AM.

previously identified errors, it did "not believe that a potential restatement resulting from changes to its revenue recognition accounting would have any impact on its previously reported or existing cash accounts."[150] Furthermore, IMAX disclosed that as a result of its filing delay, it expected to receive a delisting notice from the NASDAQ and that it would be in default of a financial reporting covenant governing its Senior Notes.

151. IMAX's announcement of its filing delay did not provide additional information about IMAX's financial restatement over and above its previous related disclosures. Furthermore, the announcement was in compliance with Canadian provincial securities alternate information guidelines that recommended companies to update investors every two weeks on the status of their filing delays. IMAX's update on its restatement and inquiry was mandatory and did not correct an alleged misstatement.

152. On March 29, 2007, public press and analyst commentary indicated that IMAX's stock price fell on the news that IMAX would need to obtain consent from its bondholders to extend its review of its financial statements. For example, an article by the *Associated Press Newswires* stated:

> Shares of Imax Corp. slid Thursday, after the giant-screen film company revealed that it needs more time to file its financial statements for 2006 and will miss the filing deadline… In its release, Imax said it may have to restate additional items, but it doesn't believe any changes would affect previously reported or existing cash accounts. Nevertheless, the filing delay will result in Imax being in default of a financial-reporting covenant under a borrowing agreement notes [*sic*], and the company will seek consent from bondholders to give it more time to complete its review.[151]

153. Analysts also maintained that the negative impact of the filing delay was that IMAX would be in default of its financial reporting covenants, would need to seek consent

---

[150] *Id*.

[151] "Imax shares fall on news of further delays, needs to seek consent from bondholders," *Associated Press Newswires*, March 29, 2007, 1:44 PM.

from its bondholders, and would likely receive a delisting notice from the NASDAQ. For instance, the Susquehanna Financial Group analyst wrote:

> While IMAX has already received a waiver under its bank credit agreement until June 30, 2007, the further delay in filing its 2006 10-K will put IMAX in default of the financial reporting covenant for its Senior Notes (which total $160 million). Additionally, IMAX will now likely receive a delisting notification from NASDAQ. Further, according to Canadian provincial securities laws, the OSC (Canada's equivalent of the SEC) could stop all trading of IMAX shares traded on the Toronto Stock Exchange if IMAX fails to file its 10-K by May 31, 2007 (or even earlier if the company fails to issue bi-weekly press releases that provide an update on the filing delay). While it is still unclear how bondholders will respond to the covenant violation as well as the timing and/or potential for a delisting from NASDAQ, it nonetheless raises some additional concerns for the company.[152]

154. The same analyst also discussed IMAX's filing delay and the broadening of its review to theater system installations from prior periods, and maintained that the "delayed filing of its 10-K, coupled with the ongoing SEC inquiry, are likely to remain an overhang on the stock, regardless of any fundamental improvements."[153]

155. Furthermore, in a report titled, "IMAX: Potential Restatement Likely Has No Cash Impact," the Research Associates analyst opined that the restatement would "essentially result in the shift of revenue that was originally recognized in 4Q05 into 1Q06."[154] The analyst wrote that the "more important barometer of IMAX's future business" would be its box office success, new theater signings, and installations.

156. IMAX's stock price fell on the realization that the filing delay would result in IMAX being in default of its financial reporting covenants, that IMAX would need to seek consent from its bondholders, and on IMAX's announcement that it expected to receive a delisting notice from the NASDAQ.

---

[152] "Delaying the 10-K . . . Again ," Susquehanna Financial Group, March 29, 2007, p. 1.

[153] *Id.*

[154] "IMAX: Potential Restatement Likely Has No Cash Impact," Research Associates, March 30, 2007.

157. In summary, IMAX's announcement on March 29, 2007 of its filing delay did not provide additional information about IMAX's financial restatement over and above its previous related disclosures. Moreover, analyst and press commentary indicated that the market did not expect any potential restatement to have an impact on IMAX's previously reported or existing cash accounts. In addition, my analysis indicates that it is difficult, if not impossible, to parse out the impact of each new disclosure on IMAX's stock price. Thus, Plaintiffs cannot parse out the impact of confounding news on IMAX's stock price on March 29, 2007 and establish that the allegation related news had a material impact on IMAX's stock price.

**c. Analysis of July 20, 2007**

158. Plaintiffs allege that July 20, 2007 was a corrective disclosure day on which information pertaining to the allegations was disclosed by IMAX. In particular, Plaintiffs allege that "[o]n July 20, 2007, the Company announced that it had completed its restatement of its financial results covering 2002 through 2005, and the first three quarters of 2006…and was filing its previously unfilled [*sic*] 2006 Forms 10-K and 10-Q for the quarter ended March 31, 2007."[155]

159. On July 20, 2007, IMAX's stock price closed at $4.85, up $0.45 from the previous close of $4.40. After adjusting for the market movement, IMAX's stock price *increased* by 10.68%, which is statistically significant.

160. As IMAX's stock price increased significantly on July 20, 2007, Plaintiffs cannot tie the Company's stock price movement to any economic loss suffered by IMAX's shareholders due to the alleged misrepresentations. Moreover, IMAX's financial restatement was viewed positively as it (1) affirmed that the revenue restatement was small and only shifted revenues across different time periods and (2) likely decreased some of the uncertainties surrounding IMAX's stock. There were also multiple

[155] In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007, ¶ 139.

negative news items on this day, including management's emphasis that IMAX's transition to joint venture deals and digital technology would negatively impact near-term results. Lastly, there was mixed commentary on this day related to IMAX's fiscal year 2006 and first quarter 2007 earnings.

161. On July 20, 2007, before market hours, IMAX announced the restatement of its financial results for the years 2002 through 2005.[156] As discussed in Section VI. A, the financial restatement was small, largely involving shifting of revenues across different time periods without any material impact on future cash flows. Analysts also did not view the financial restatement as significant to IMAX's valuation as it was small in magnitude and because only accounting earnings shifted between different time periods, without any major impact on the Company's cash flows. Moreover, financial economics research indicates that changes in accounting methodologies and shifting of revenues between prior periods typically do not affect cash flows and typically do not impact stock prices. Thus, IMAX's July 20, 2007 announcement affirmed that the revenue restatement was small and only shifted revenues across different time periods and likely decreased some of the uncertainties surrounding IMAX's stock.

162. On July 20, 2007, in addition to filing the financial restatement due to adjustments of timing in revenue recognition, IMAX also announced news that was both negative and mixed in nature. First, in a conference call beginning at 8:30 AM, IMAX announced that 2007 would likely be a transitional financial year, that it would likely encounter unique expenditures and charges, and that the digital technology transition would negatively impact financial progress.[157] Second, IMAX also reported that the SEC and OSC inquiries were ongoing.[158]

---

[156] "IMAX Corporation reports 2006 and first quarter 2007 financial results," *PR Newswire*, July 20, 2007, 6:00 AM.

[157] "Q4 2006 and Q1 2007 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, July 20, 2007, No Time.

[158] "IMAX Corporation reports 2006 and first quarter 2007 financial results," *PR Newswire*, July 20, 2007, 6:00 AM.

163. Apart from negative news items, mixed information related to IMAX also entered the marketplace on July 20, 2007. In particular, IMAX reported its financial results for the fiscal year 2006 and the first quarter of 2007. For the fiscal year 2006, IMAX's net loss from continuing operations was $18.3 million, compared to restated earnings from continuing operations of $5.8 million in 2005.[159] Additionally, for the first quarter of 2007, IMAX reported a net loss of $0.12 per share:

> Imax Corp. (IMAX), completing the restatement of financial results for reporting periods covering 2002 through 2005, said it had a net loss of $4.9 million, or 12 cents a share, for the first quarter of 2007, wider than the prior year's net loss of $3.7 million, or 9 cents a share. Revenue generated by the Toronto-based operator of wide-screen movie theaters totaled $27.3 million for the first three months of the year, up from $23.3 million a year earlier.[160]

164. IMAX's reported quarterly loss of $0.12 per share was lower than analyst expectations of a per share loss of $0.14.[161] It is unclear whether this information was viewed positively or negatively by the market. As the Susquehanna Financial Group analyst commented, "Importantly, given IMAX's restated historical results and change in revenue recognition policy, it is not meaningful to compare these results against our and consensus expectations; nonetheless, reported results appear to be generally in-line with the company's pre-announced expectations."[162]

165. Analyst commentary confirms that the information released on July 20, 2007 was mixed in nature. For instance, the Susquehanna Financial Group analyst wrote:

> A transitional year, with continued uncertainty ahead. Although management believes 2007 should show improvement over 2006, there are certain factors that could impede growth…. Perhaps more

---

[159] "IMAX Corporation reports 2006 and first quarter 2007 financial results," *PR Newswire*, July 20, 2007, 6:00 AM; and "Q4 2006 and Q1 2007 IMAX Corporation Earnings Conference Call – Final," *Voxant FD (Fair Disclosure) Wire*, July 20, 2007, No Time.

[160] "Imax Corp. 1Q Loss/Shr 12c Vs Loss 9c," *Dow Jones News Service*, July 20, 2007, 6:00 AM.

[161] *Id.*

[162] "The Numbers Are In . . .," Susquehanna Financial Group, July 20, 2007, p. 1.

> importantly, near-term revenue growth may also be impacted by the upgrade to digital….[163]

166. Moreover, the BMO Capital Markets analyst reported:

> This morning, IMAX announced its restated results for 2002-2006 and released 1Q07 earnings, having been delinquent in its filings as it worked through accounting issues. Although the stock has shown some strength as the market has reason to think the company is back in compliance with its bond indenture, we believe far too many questions and issues remain to change our outlook for the stock. We think some of our questions will be answered in the filings, but ongoing issues include shareholder and bondholder lawsuits, the continuing SEC and OSC inquiries, the slow pace of MPX installations, and the company's access to capital.[164]

167. IMAX's stock price on July 20, 2007 *increased* significantly. As IMAX's stock price increased significantly on July 20, 2007, Plaintiffs cannot tie the Company's stock price movement to any economic loss suffered by IMAX's shareholders due to the alleged misrepresentations.

168. To summarize, my analysis indicates that of the nineteen public disclosures alleged by Plaintiffs, only seven were associated with statistically significant changes in IMAX's stock price.[165] Of these seven days, only three might have contained new information that could have potentially corrected alleged prior misrepresentations. However, on these three days, I conclude that it is impossible to demonstrate that any stock price declines were associated with announcements related to Plaintiffs' allegations.

---

163 *Id.*

164 "Relief Rally Fueled by 10-K, 10-Q Filings; Cash Becomes Critical," BMO Capital Markets, July 20, 2007, p. 1.

165 I also analyzed the news released on April 9, 2007 and found that the news neither contained new information related to Plaintiffs' allegations, nor contained new information that corrected prior alleged misrepresentations.

## VII. Conclusion

169. My analysis of IMAX's July 20, 2007 restatement demonstrates that the revisions to the timing of revenue recognition from theater system sales and leases and other accounting adjustments did not have a material impact on the Company's future cash flows and would not be expected to affect the Company's stock price in a significant way. My conclusion is corroborated by the findings of financial economics research and the opinions of market participants, as well as IMAX's actual stock price reaction on July 20, 2007. Therefore, I find that Plaintiffs *cannot* demonstrate that IMAX's restatement would have had a material impact on IMAX's stock price.

170. Additionally, in my opinion, it is impossible to prove that IMAX's shareholders suffered any economic loss due to the allegation related announcements released on the alleged corrective disclosure days. IMAX's stock price did not change significantly on twelve of the nineteen alleged corrective disclosure days; these days cannot be used to prove the materiality of the alleged misrepresentations. On four of the seven alleged corrective disclosure days (August 23, 2006; November 8, 2006; December 15, 2006; and April 12, 2007), no new information related to the allegations entered the marketplace or corrected prior alleged misstatements. Likewise, the news released on April 9, 2007 neither contained new information related to Plaintiffs' allegations, nor contained new information that corrected prior alleged misrepresentations. Thus, these days also cannot be used to prove that the alleged misrepresentations had a material impact on IMAX's stock price.

171. On the three remaining alleged corrective disclosure days (August 9, 2006; March 29, 2007; and July 20, 2007), both allegation related and non-allegation related news entered the marketplace. However, I conclude that Plaintiffs *cannot* demonstrate that the alleged corrective information had a material adverse impact on IMAX's stock price and Plaintiffs *cannot* parse out the impact of confounding news on these days.

Respectfully submitted,

Christopher James

February 23, 2009

Date

# Exhibit 1

## VITA

**NAME:** Christopher M. James

**CURRENT POSITION:** William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida

Visiting Scholar for the San Francisco Federal Reserve Bank

**ADDRESS:** Department of Finance, Insurance, and Real Estate, Graduate School of Business, University of Florida, PO Box 117168, Gainesville, FL 32611-7168
E-mail: christopher.james@cba.ufl.edu

**TELEPHONE:**
Office: 352-392-3486
Home: 352-336-2765

**EDUCATION:**

| | |
|---|---|
| B.A. | Michigan State University, 1973 |
| M.B.A. | University of Michigan (Finance), 1977 |
| Ph.D. | University of Michigan (Economics: Industrial Organization, Finance), 1978 |

**RESEARCH/ TEACHING INTERESTS:** Corporate Finance, Private Equity and Financial Institutions

**TEACHING/ RESEARCH EXPERIENCE:**

William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida, 1989-present

Visiting Professor, University of New South Wales, 1995

Consultant, FDIC, 1988-1991

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988

Visiting Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

**PAPERS AND PUBLICATIONS:**

"The Technology of Risk and Return," American Economic Review, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," Journal of Financial and Quantitative Analysis, December, 1981.

"An Analysis of Bank Loan Rate Indexation," Journal of Finance, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann), Journal of Finance, December, 1982.

"Pricing Alternatives for Loan Commitments: A Note," Journal of Bank Research, Winter, 1983.

"An Analysis of Intra-Industry Differences in the Effect of Regulation: The Case of Deposit Rate Ceilings," Journal of Monetary Economics, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?" (with R.O. Edmister), Journal of Portfolio Management, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), Journal of Finance, September, 1983.

"Regulation and the Determination of Bank Capital Changes: A Note," (with J.K. Dietrich), Journal of Finance, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency: The Case of Bank Holding Company Acquisitions," Journal of Law and Economics, April 1984, Abstracted in Regulation as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery), Journal of Finance, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," (with M.J. Flannery), Journal of Money, Credit and Banking, November, 1984, Presented at the American Finance Association meetings in San Francisco, December, 1983.

"The Effects of Government Regulatory Agencies on Organizations in High Technology and Woods Products Industries," (with G. Ungson and B. Spicer), Academy of Management Journal, 1985.

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," (with S. Koreisha and M. Partch), Journal of Finance, December, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," (with J. Brickley), Journal of Financial Economics, July, 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure: The Case of Banking," (with J. Brickley), Journal of Law and Economics, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking," (with P. Wier), Journal of Political Economy, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier), Journal of Monetary Economics, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," Journal of Financial Economics, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," Journal of Monetary Economics, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," Carnegie Rochester Conference Series on Public Policy, April, 1989.

"Heterogeneous Creditors and the Market Value of Bank LDC Loan Portfolios," Journal of Monetary Economics, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), Journal of Financial Economics, November, 1990.

"The Losses Realized in Bank Failures," Journal of Finance, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," Journal of Finance, December, 1992.

"Management and Organizational Changes in Banking: A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), Carnegie Rochester Conference Series on Public Policy, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), Journal of Financial Economics, February, 1993.

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), Journal of Corporate Finance, April, 1994.

"When Do Banks Take Equity in Debt Restructurings?" Review of Financial Studies, Winter, 1995.

"CEO Compensation and Bank Risk: Is Compensation Structured in Banking Structured to Promote Risk-Taking?" (with J. Houston), Journal of Monetary Economics, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress," Journal of Finance, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims," (with J. Houston), Journal of Finance, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking," (with J. Houston and D. Marcus), Journal of Financial Economics, November, 1997.

"Do Bank Internal Capital Markets Promote Lending?" (with J. Houston), Journal of Banking and Finance, November, 1998.

"Where Do Merger Gains Come From? Bank Mergers from the Perspective of Insiders and Outsiders," (with J. Houston and M. Ryngaert), Journal of Financial Economics, May, 2001.

"Do Relationships Have Limits? Banking Relationships, Financial Constraints and Investment," (with J. Houston), Journal of Business, July, 2001.

"Do Banks Provide Financial Slack?" (with C. Hadlock), Journal of Finance, June, 2002.

"What a Difference a Month Makes: Stock Analyst Valuations Following Initial Public Offerings," (with J. Karceski and J. Houston), Journal of Financial and Quantitative Analysis, March 2006, Presented at Hong Kong Corporate Finance Conference, December, 2003.

"The Strength of Analyst Coverage Following IPO's," (with J. Karceski), Journal of Financial Economics, October 2006, Presented at 2005 American Finance Association Meetings.

"Investor Monitoring and Differences in Mutual Fund Performance," (with J. Karceski), Journal of Banking and Finance, 2006, Presented at 2001 American Finance Association Meetings.

"Banks and Bubbles: How Good are Bankers at Spotting Winners?" (with L. Gonzalez), Journal of Financial Economics, October 2007.

**CURRENT RESEARCH:**

"The Information Content of Bank Loan Covenants", (with C. Demiroglu) to be presented at American Finance Association Meetings 2008.

"Lender Control Rights and the Role of Private Equity Group Reputation in Buyout Financing", (with C. Demiroglu), working paper.

"Dogs that Bark: Why are Bank Loan Announcements News Worthy", (with J. Houston and L. Gonzalez), working paper.

"Liquidity and the Value of Private Equity Investments", (with C. Demiroglu), working paper.

"The Effects of Leverage on Operating Performance: An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown), working paper.

**OTHER PAPERS AND PUBLICATIONS:**

"Are Banks Still Special? New Evidence in the Corporate Capital-Raising Process," (with D. Smith), Journal of Applied Corporate Finance, Winter, 2000.

"Why Are Value Enhancing Mergers In Banking So Hard to Find? A Discussion of 'Is the Bank Merger Wave of the 90's Efficient? Lessons from Nine Case Studies,'" Kaplan, Steven (ed.), Mergers and Productivity, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano," Journal of Banking and Finance, 23, 1999, 286-290.

"Using Internal Capital Markets to Lower Capital Costs in Banking," (with J Houston), Journal of Applied Corporate Finance, Summer, 1998.

Discussion of "Financial Institutions and Regulations: The Dilemma in a Deregulated World," Proceedings from Riksbank Conference: Forces for and Implications of Structural Changes in the Financial Sector, June, 1997.

"Evolution of Extinction: Where are Banks Headed," (with J. Houston), Journal of Applied Corporate Finance, Summer, 1996.

"RAROC at Bank of America: From Theory to Practice, Journal of Applied Corporate Finance, Summer, 1996.

"Bank Equity Positions in Distressed Firms," Saunders, Anthony and Ingo Walter (ed.), Universal Banking: Financial System Design Reconsidered, (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One," (with C. Smith), Journal of Applied Corporate Finance, Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," (with D. Brown and M. Mooradian), Altman, Edward (ed.), Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), Journal of Applied Corporate Finance, 1994.

"Studies in Financial Institution," (with C. Smith), Commercial Banks, 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee on Banking, Housing and Urban Affairs – 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," Journal of Accounting, Auditing, and Finance, Spring, 1989.

"The Incidence of Mispriced Deposit Insurance," Presented at 1989 American Economic Association Meetings.

"Are Bank Loans Different? Some Evidence From the Stock Market," (with P. Wier), Journal of Applied Corporate Finance, Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

Discussion of "The Search for Financial Stability: The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," (with P. Wier), Proceedings of a Conference on Bank Structure and Competition, May, 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May, 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May, 1987.

"An Economic Analysis of Interindustry Acquisitions of Thrift Institutions," Report prepared for the Office of the Comptroller of the Currency, February, 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.

**SERVICE ACTIVITIES:**

Editor: Journal of Banking and Finance, 2007-present.

Editorial Board: Federal Reserve Bank of New York: Economic Review, 1997-present.

Associate Editor: Journal of Financial Economics, 1993-present.

Associate Editor: Journal of Financial Services Research, 1989-present.

Associate Editor: Journal of Managerial and Decision Economics, 1988-present.

Academic Board: Turnaround Management Association, 1990-2002.

Associate Editor: Journal of Banking and Finance, 1999-2001

Associate Editor: Journal of Finance, 1988-2000.

Co-Editor: Journal of Financial Intermediation, 1988-1999.

Associate Editor: Journal of Financial and Quantitative Analysis, 1982-1984.

Reviewer: Journal of Finance; Journal of Money, Credit and Banking; Journal of Financial Economics; Journal of Financial Management; Journal of Banking and Finance; Journal of Business and Economics; Journal of Monetary Economics; American Economic Review; Journal of Political Economy; Review of Financial Studies; Journal of Corporate Finance; Journal of Law and Economics; Journal of Accounting and Economics.

Program Committee: Financial Management Association, Western Finance Association, American Finance Association, European Finance Association and Utah Winter Finance Conference.

**CONSULTING/EXECUTIVE EDUCATION ACTIVITIES:**

Board of Directors/Chairman, $ID^2$, Inc.

Advisory Board and Board of Directors, SunTrust Banks of Florida 1989-2006.

Independent Distribution Consultant, Janus Funds

Advisory Board Big Brothers Big Sisters of North Central Florida 2000-present.

Consultant, Federal Reserve Bank of New York, 1997, 2004.

Consultant, Federal Reserve Board of Governors, 1995, 1998.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets, Workout Lending.

Instructor, Bank Board of Directors School: Workout Lending.

Instructor, Swiss National Bank, Gerzensee, Switzerland, Bank Safety and Soundness Regulation.

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

Expert Witness: Cases involving antitrust, portfolio management, securities valuation, bank management, valuation, and regulatory matters.

Consultant: Product pricing, valuation, portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management.

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds.

Consultant to the FDIC, Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member: Research Committee: Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.

**AWARDS:** Valedictorian, Michigan State University, 1973.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000.

# Exhibit 2

Prior Testimony of Dr. Christopher M. James
In the Previous Four Years

*Furstenau, et al. v. AT&T Corp., et al.,* No: 02-CV-5409, United States District Court for the District of New Jersey, deposition, 2005.

*Truserv Corporation v. Ernst & Young LLP*, American Arbitration Association, No. 51-Y-181-01333-02, deposition, 2004, arbitration testimony, 2005.

*Allegheny Health, Education and Research Foundation v. PriceWaterhouseCoopers*, No. 00-684, United States District Court for the Western District of Pennsylvania, deposition, 2005.

*Torchmark Corporation, v. KPMG Peat Marwick LLP, et al.,* No. CV-03-3315, Circuit Court of the Tenth Judicial Circuit, in and for Jefferson County Alabama, deposition, 2005.

*Cisco Systems, Inc*., No. C-01-20418-JW(HRL), United States District Court Northern District of California San Jose Division, deposition, 2006.

*Williams Securities Litigation*, No. 02-CV-72-SPF-FHM, United States District Court for the Northern District of Oklahoma, deposition, 2006.

*Asche Transportation Services v. Ernst & Young, LLP*, No. 51-107-Y-01237 04, American Arbitration Association, arbitration testimony, 2006.

*Granite Management Corporation v. United States of America,* No. 95-515C, United States Court of Federal Claims, trial testimony, 2006.

*Adams Golf, Inc. Securities Litigation*, C.A. No. 99-371 KAJ, United States District Court District of Delaware, deposition, 2006.

*Enron Corporation Securities Litigation,* MDL Docket No. 1446, United States District Court, Southern District of Texas, Houston Division, deposition, 2006.

*Regents of the University of California, et al. vs. Parsons, et al.*, LA Super. Ct. No. BC293848, deposition, 2007.

*California Public Employees' Retirement System vs. AOL Time Warner, Incorporated*, Sacramento Super. Ct. No. 03AS04015, deposition, 2007.

*California State Teachers' Retirement System, vs. AOL Time Warner, Incorporated,* S.F. Super. Ct. No. CGC-03-422609, deposition, 2007.

*Water and Power Employees' Retirement System, et al. v. AOL Time Warner Inc.*, et al., L.A. Super. Ct. No. BC346081, deposition, 2007.

*Ohio Public Employees' Retirement System, et al. vs. Richard D. Parsons, R.E. Ted Turner, et al.*, In the Common Pleas Court of Franklin County, Ohio, Case No. 03CVHO7-7932, deposition, 2007.

*J. Gregg Pritchard, as Trustee of the D.I.C. Creditors' Trust, vs. Ernst & Young LLP*, Case No. 71 107 Y 00572 05, deposition, 2007.

*AIG Retirement Services, Inc. (formerly known as SunAmerica Inc.), Plaintiff, vs. Altus Finance S.A., et al., Defendants*. No. CV 05-1035-JRW (CWx), United States District Court, Central District of California, deposition, 2007.

*Genzyme Corporation, et al.*, No. 03 Civ. 4014, United States District Court, Southern District of New York, deposition, 2007.

*Jerry Ryan v. Flowserve Corporation, et al.*, No. 3:03-CV-01769-B, United States District Court, Northern District of Texas Dallas Division, deposition, 2007.

*Sterling Savings Association, Sterling Financial Corporation v. United States of America*, No. 95-829C, United States Court of Federal Claims, deposition, 2001, 2002, and 2004, trial testimony, 2007.

*In re: Oracle Corporation Securities Litigation*, No. C001-0988-MJJ, United States District Court, Northern District of California, San Francisco Division, deposition, 2007.

*In the Matter of Arbitration Between Mike Kreidler, Insurance Commissioner of the State of Washington, as Receiver for Western United Life Assurance Company, and Ernst &Young, LLP*, Superior Court, State of Washington, County of Spokane, No. 04204737-9, trial testimony, 2007.

*Keri Evans vs. John F. Akers, et al; Lawrence W. Bunch, et al, vs. W.R. Grace & Co., et al*, Consolidated Case No. 04-11380-WGY, United States District Court for the District of Massachusetts, deposition, 2007.

*In re: Employee Retirement System of Texas Litigation*, No. 6N503755, District Court of Travis County, Texas, 200th Judicial District, deposition, 2007.

*In re: Joel S. Ario, Insurance Commissioner of the Commonwealth of Pennsylvania*, in her capacity as Liquidator of Reliance Insurance Company, No. 734 MD 2002, In the Commonwealth Court of Pennsylvania, deposition, 2007.

*American Express Travel Related Services Company, Inc., v. Visa U.S.A., Inc., et al.*, No. 04CV08967 (BSJ) (DFE), *Discover Financial Services, LLC, v. Visa U.S.A., Inc., et al.*, No. 04CV07844 (BSJ) (DFE), United States District Court, Southern District of New York, deposition, 2007.

*In re: EPDM Antitrust Litigation*, MDL 1542 and *In re Polychloroprene Antitrust Litig*ation, MDL 1642, deposition testimony, 2008.

*Morton P. Levine, as Trustee for the Estate of Flooring America, Inc. and Related Debtors, et al.*, In the Superior Court of Fulton County State of Georgia, No. 2002CV54331, deposition, 2008.

*ASARCO LLC et al. v. Americas Mining Corp.,* In the United States District Court for the Southern District of Texas Brownsville Division, Civil Action No. 1:07-cv-00018, deposition, 2008.

*Molecular Diagnostics Laboratories v. Hoffmann-LaRoche, Inc.*, United States District Court for the District of Columbia, Civil Action No. 1:04CV01649, deposition, 2008.
*Accredo Health, Inc. Securities Litigation*, United States District Court Western District of Tennessee Western Division, Civil Action No. 03-2216-BP, deposition, 2008.

*The Estate of George E. Batchelor and The Batchelor Foundation, Inc. v. Deloitte & Touche, LLP*, In the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 02-07135-CA-04, deposition, 2008.

*Alfred T. Giuliano, as Trustee of Nextcard, Inc. v. Ernst & Young, LLP*, AAA Arbitration San Francisco, CA., AAA No. 74 107 1248 05JRJ, deposition and trial testimony, 2008.

*Metropolitan Creditors' Trust v. Ernst & Young, LLP*, CPR File No. G-06-62N, deposition, 2008.

*Beverly Kanawi, et al. v. Bechtel Corporation, et al*., United States District Court Northern District of California, Case No. C 06-5566 CRB (EDL), deposition, 2008.

*Saint Francis Medical Center v. C.R. Bard, Inc.,* United States District Court for the Eastern District of Missouri Southeastern Division, Case No. 1:07-CV-0031, deposition, 2008.

*Healthsouth Corporation Securities Litigation*, United States District Court Northern District of Alabama Southern Division, Case No. CV-03-BE-1500-S, deposition, 2008, 2009.

# Exhibit 3
# Documents Considered

## LEGAL DOCUMENTS

- In re IMAX Corporation Securities Litigation, Consolidated Amended Class Action Complaint dated October 2, 2007.
- Declaration of Michael A. Marek in Support of Memorandum of Law in Support of Plaintiffs' Motion for Class Certification dated October 30, 2008.

## ACADEMIC PAPERS


- Akhigbe, Aigbe, Stephen F. Borde, and Ann Marie Whyte, "The Source of Gains to Targets and Their Industry Rivals: Evidence Based on Terminated Merger Proposals," *Financial Management*, Winter 2000, pp. 101 – 118.
- Archibald, T. Ross, "Stock Market Reaction to the Depreciation Switch-Back," *The Accounting Review*, January 1972, pp. 22 – 30.
- Asquith, Paul, "Merger Bids, Uncertainty and Stockholder Returns," *Journal of Financial Economics*, 11 (1983), pp. 51 – 83.
- Beaver, William H. and Roland E. Dukes, "Interperiod Tax Allocation and δ-Depreciation Methods: Some Empirical Results," *The Accounting Review*, July 1973, pp. 549 – 559
- Chen, Shuping, Dawn Matsumoto, and Shiva Rajgopal, "Is Silence Golden? An Empirical Analysis of Firms that Stop Giving Quarterly Earnings Guidance," Working Paper, University of Washington, August 2007.
- Davis, Michael L., "Differential Market Reaction to Pooling and Purchase Methods," *The Accounting Review*, Vol. 65, No. 3, July 1990, pp. 696 – 709.
- Dodd, Peter, "Merger Proposals, Management Discretion and Stockholder Wealth," *Journal of Financial Economics*, 8 (1980), pp. 105 – 137.
- Feroz, Ehsan H., Kyungjoo Park, and Victor S. Pastena, "The Financial and Market Effects of the SEC's Accounting and Auditing Enforcement Releases," *Journal of Accounting Research*, Volume 29 Supplement 1991, pp. 107 – 142.
- Fort, C. Patrick, "Analysts' Forecast Accuracy and the Presentation of a Mandated Accounting Change," *Journal of Applied Business Research*, Fall 1997, Vol. 13, Issue 4, pp. 93 – 106.
- Houston, Joel F., Baruch Lev, and Jennifer W. Tucker, "To Guide or Not to Guide? Causes and Consequences of Stopping Quarterly Earnings Guidance," Working Paper, University of Florida and New York University, May 2008.
- Linck, James S., Thomas J. Lopez, and Lynn Rees, "The valuation consequences of voluntary accounting changes," *Revue of Quantitative Finance & Accounting*, Vol. 28 No. 4 (2007), pp. 327 – 352.
- McDowell, John, "A Look at the Market's Reaction to the Announcements of SEC Investigations," The Leonard N. Stern School of Business, April 1, 2005.
- Nourayi, Mahmoud M., "Stock Price Responses to the SEC's Enforcement Actions," *Journal of Accounting and Public Policy*, Volume 13 (1994), pp. 333 – 347.
- Tabak, David, "Multiple Comparisons and the Known or Potential Error Rate," *Journal of Forensic Economics*, 19(2), 2006, pp. 231 – 236.

- Winsen, J. and D. Ng, "Investor Behavior and Changes in Accounting Methods," *Journal of Financial and Quantitative Analysis*, Vol. 11, No. 5 (Dec., 1976), pp. 873 – 881.


## TEXTBOOKS


- Brealey, Richard A. and Stewart C. Myers, *Principles of Corporate Finance,* 7th Edition, McGraw-Hill Irwin, 2003.
- Campbell, John, Andrew W. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets,* Princeton University Press, 1997.
- Greene, William H., *Econometric Analysis*, 4th Edition, Prentice-Hall, Inc., 2000.
- Stickney, Clyde P. and Roman L. Weil, *Financial Accounting, An Introduction to Concepts, Methods, and Uses,* 10th Edition, Thomson South-Western, 2003.


## ANALYST REPORTS

- Selected analyst reports from Investext, Multex, and received from client, for the period 2002 through 2007, from the following banks:
  - BMO Capital Markets/BMO Nesbitt Burns Inc./Harris Nesbitt
  - Friedman, Billings, Ramsey & Co. Inc.
  - Janco Partners, Inc.
  - Jeffries & Company, Inc.
  - Merrill Lynch
  - New Constructs LLC
  - Orion Securities
  - Paradigm Capital Inc.
  - Piper Jaffray Co./U.S. Bancorp Piper Jaffray
  - RTX Securities/Merriman Curhan Ford & Co.
  - Research Associates LLC/Soleil Media Team/Soleil Securities Corporation
  - Roth Capital Partners, LLC
  - SunTrust Robinson Humphrey
  - Susquehanna Financial Group, LLLP
  - W. Quillen Securities

## DATA SOURCES

- **The Center for Research in Security Prices ("*CRSP*")** Stock price, volume, shares outstanding, and returns data for the following companies: IMAX Corporation, NYSE/Amex/NASDAQ Composite Index, Standard and Poor's ("S&P") 500 Index, ACME Communications Inc., Adelphia Communications Corp., AMC Entertainment Inc., ARTISTdirect Inc., AT&T Corp., Blockbuster Inc., Belo Corp., British Sky Broadcasting Group PLC, CBS Corp., Charter Communications Inc., Carmike Cinemas Inc., Clear Channel, Comcast Corp., COX Communications Inc., Cablevision Systems Corp., CanWest Global communications Corp., The Walt Disney Co., DISH Network Corp., The DIRECTV Group, Inc., DreamWorks Animation SKG Inc., Emmis Communications Corp., Electronic Arts Inc., Fox Entertainment Group Inc., Granite Broadcasting Corp., Gannett Co. Inc., General Electric Co., General Motors Corp-Hughes Electronics, Hollywood Entertainment Corp., Hearst-Argyle Television Inc., IAC/InterActive Corp., Liberate Technologies, Lions Gate Entertainment Corp., Liberty Media A Shares, Liberty Media B Shares, Metro-

Goldwyn-Mayer Inc., Marvel Entertainment Inc., NetFlix Inc., News Corp., Pixar, PRIMEDIA Inc., RealNetworks Inc., Sinclair Broadcast Group Inc., Sirius XM Radio Inc., Shaw Communications Inc., Sony Corp., EW Scripps Co., TiVo Inc., Tribune Co., Grupo Televisa SA, Time Warner Inc., Univision Communications Inc., Vivendi, Warner Music Group Corp., Westwood One Inc., XM Satellite Radio Holdings Inc., Young Broadcasting Inc., Yahoo!

- ***Bloomberg*** Stock price and volume data for the following companies: Alliance Atlantis Communications Inc., ION Media Networks Inc., Movie Gallery Inc., Bloomberg Hollywood Reporter Index ("BHRX"), Russell 2000 Index, Standard and Poor's ("S&P") 500 Movies and Entertainment Index, Standard and Poor's ("S&P")/Toronto Stock Exchange Composite Index, IMAX Corporation (Canadian), IMAX Corporation (German).
- **The Trade and Quote Database ("TAQ")**
    - IMAX Corporation, February 27, 2003; May 5, 2003; July 31, 2003; November 10, 2003; March 9, 2004; May 6, 2004; August 9, 2004; October 28, 2004; March 10, 2005; May 5, 2005; August 4, 2005; November 3, 2005; February 17, 2006; March 9, 2006; May 9, 2006; August 10, 2006; August 23, 2006; November 9, 2006; December 18, 2006; March 29, 2007; April 9, 2007; April 13, 2007; and July 20, 2007.

**SECURITIES AND EXCHANGE COMMISSION ("SEC") FILINGS**

- Forms 10-K for periods ended December 31, 2002, December 31, 2003, December 31, 2004, December 31, 2005, December 31, 2006, and December 31, 2007; IMAX Corporation.
- Forms 10-Q for quarters ended March 31, 2002, June 30, 2002, September 30, 2002, March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004, September 30, 2004, March 31, 2005, June 30, 2005, September 30, 2005, March 31, 2006, June 30, 2006, September 30, 2006, and March 31, 2007; IMAX Corporation.
- Schedule 14A filed August 10, 2007; IMAX Corporation.

**ONTARIO SECURITIES COMMISSION ("OSC") FILINGS**

- Form 51-103F3 filed July 20, 2007; IMAX Corporation.

**PUBLIC PRESS**

- Selected public press articles from *Factiva* for the period January 1, 2000 through January 31, 2008

# Exhibit 4
# Summary of Significant Days
# Using 1 Year Rolling Regressions

Source: *Bloomberg*; *CRSP*; Consolidated Amended Class Action Complaint filed 10/2/07

| | IMAX | | | | Residual | |
|---|---|---|---|---|---|---|
| Date | Stock Price | Returns | NAN Returns [1] | BHRX Returns [2] | Returns [3] | t-statistic |
| 2/27/03 | $3.72 | 11.68% | 0.65% | 2.16% | 10.51% | 2.13 |
| 2/28/03 | $4.23 | 13.71% | 0.24% | 1.70% | 13.44% | 2.73 |
| 4/28/03 | $7.52 | 14.46% | 1.25% | 1.61% | 11.85% | 2.49 |
| 5/7/03 | $7.00 | -11.05% | 0.04% | -0.24% | -11.41% | -2.37 |
| 5/8/03 | $7.73 | 10.43% | -0.30% | -1.44% | 10.72% | 2.24 |
| 6/19/03 | $8.70 | 8.21% | -0.69% | -2.35% | 9.78% | 2.13 |
| 8/6/03 | $7.39 | -10.53% | -0.45% | -0.46% | -9.54% | -2.18 |
| 9/19/03 | $8.85 | 14.49% | 0.35% | -0.64% | 13.75% | 3.57 |
| 11/3/03 | $10.03 | 10.78% | 1.09% | 0.15% | 8.48% | 2.22 |
| 11/10/03 | $8.35 | -10.70% | -0.62% | -0.36% | -9.39% | -2.51 |
| 12/18/03 | $7.87 | 10.07% | 1.08% | 1.04% | 8.24% | 2.24 |
| 3/9/04 | $6.33 | -15.15% | -0.73% | -0.74% | -13.74% | -4.19 |
| 3/29/04 | $5.80 | -4.92% | 1.12% | 0.97% | -6.46% | -1.97 |
| 4/26/04 | $5.51 | 6.37% | -0.26% | -0.10% | 7.14% | 2.18 |
| 5/6/04 | $4.40 | -9.28% | -1.11% | -0.88% | -7.32% | -2.34 |
| 5/13/04 | $5.18 | 19.08% | -0.12% | -0.16% | 19.53% | 6.41 |
| 5/17/04 | $5.41 | 6.92% | -1.30% | -1.19% | 9.11% | 3.08 |
| 5/21/04 | $5.04 | -7.52% | 0.60% | 1.01% | -7.77% | -2.61 |
| 6/9/04 | $6.20 | 15.24% | -1.02% | -0.71% | 16.80% | 5.08 |
| 7/26/04 | $4.67 | -8.43% | -0.99% | -0.54% | -6.93% | -2.07 |
| 10/21/04 | $5.52 | 6.98% | 0.71% | 0.69% | 6.24% | 1.98 |
| 10/28/04 | $6.43 | 16.49% | 0.01% | 0.40% | 16.63% | 5.33 |
| 11/23/04 | $8.05 | 6.75% | 0.39% | 0.02% | 6.39% | 2.06 |
| 12/10/04 | $7.57 | -6.66% | 0.28% | 1.05% | -6.80% | -2.17 |
| 12/13/04 | $8.22 | 8.59% | 0.71% | 1.44% | 7.99% | 2.56 |
| 1/11/05 | $8.79 | 6.29% | -0.85% | -1.12% | 7.01% | 2.24 |
| 1/13/05 | $9.22 | 6.47% | -0.27% | -0.96% | 6.60% | 2.12 |
| 2/4/05 | $11.30 | 9.50% | 0.95% | 0.70% | 8.39% | 2.62 |
| 2/22/05 | $10.43 | -10.70% | -1.16% | -1.58% | -10.00% | -3.07 |
| 2/24/05 | $11.30 | 11.00% | 0.49% | 0.27% | 10.23% | 3.11 |
| 3/16/05 | $9.60 | -7.69% | -0.66% | -0.66% | -7.12% | -2.09 |
| 3/18/05 | $9.08 | -8.38% | -0.33% | 0.56% | -7.82% | -2.31 |
| 3/24/05 | $9.50 | 8.08% | 0.27% | 0.15% | 7.59% | 2.22 |
| 4/28/05 | $7.78 | -12.39% | -1.28% | -1.75% | -11.06% | -3.23 |
| 5/2/05 | $8.60 | 10.19% | 0.31% | 0.02% | 9.49% | 2.75 |
| 5/6/05 | $8.20 | -8.40% | 0.19% | -0.17% | -8.98% | -2.62 |
| 6/8/05 | $10.16 | 7.06% | -0.25% | -0.12% | 7.45% | 2.26 |
| 9/14/05 | $9.61 | 5.49% | -0.42% | -0.85% | 6.39% | 2.13 |
| 11/3/05 | $8.02 | -10.79% | 0.28% | -0.22% | -11.27% | -3.71 |
| 12/19/05 | $7.61 | -7.98% | -0.74% | -0.79% | -6.74% | -2.32 |
| 12/21/05 | $7.17 | -5.53% | 0.54% | -0.58% | -6.10% | -2.12 |
| 2/17/06 | $8.60 | 9.97% | 0.12% | -0.03% | 9.98% | 3.62 |
| 3/9/06 | $10.35 | 8.95% | -0.20% | -0.59% | 9.51% | 3.59 |
| 7/18/06 | $9.82 | 4.47% | 0.01% | 0.42% | 4.56% | 2.31 |
| 7/27/06 | $10.67 | 6.27% | -0.54% | 0.15% | 6.77% | 3.42 |
| 8/10/06 | $5.73 | -40.50% | 0.25% | 1.00% | -40.67% | -20.60 |
| 8/11/06 | $6.05 | 5.58% | -0.63% | -0.20% | 6.07% | 3.06 |
| 8/14/06 | $5.66 | -6.45% | 0.02% | 0.53% | -6.41% | -3.23 |
| 8/23/06 | $4.85 | -10.85% | -0.61% | -0.72% | -10.37% | -5.03 |

# Exhibit 4
# Summary of Significant Days
# Using 1 Year Rolling Regressions

Source: *Bloomberg*; *CRSP*; Consolidated Amended Class Action Complaint filed 10/2/07

| | IMAX | | | | Residual | |
|---|---|---|---|---|---|---|
| Date | Stock Price | Returns | NAN Returns [1] | BHRX Returns [2] | Returns [3] | t-statistic |
| 8/24/06 | $4.60 | -5.15% | 0.07% | 0.08% | -5.16% | -2.49 |
| 9/13/06 | $5.27 | 10.02% | 0.67% | 0.20% | 9.59% | 4.55 |
| 10/11/06 | $5.10 | 4.08% | -0.25% | -0.22% | 4.38% | 2.07 |
| 11/9/06 | $3.39 | -29.97% | -0.40% | -0.15% | -29.61% | -14.05 |
| 12/7/06 | $3.81 | 11.49% | -0.13% | 0.24% | 11.69% | 5.62 |
| 12/14/06 | $4.20 | 7.69% | 0.44% | 1.16% | 7.45% | 3.63 |
| 12/18/06 | $3.71 | -8.85% | -0.71% | 0.69% | -8.30% | -3.84 |
| 2/15/07 | $4.34 | 7.16% | 0.15% | -0.17% | 6.93% | 3.29 |
| 2/16/07 | $4.58 | 5.53% | 0.26% | -0.09% | 5.22% | 2.48 |
| 2/27/07 | $4.47 | -5.90% | -3.12% | -3.13% | -4.27% | -2.13 |
| 3/12/07 | $5.08 | 9.96% | 0.40% | 0.41% | 9.57% | 4.50 |
| 3/13/07 | $5.25 | 3.35% | -1.75% | -1.48% | 4.52% | 2.16 |
| 3/15/07 | $4.99 | -5.49% | 0.61% | 0.30% | -6.06% | -2.85 |
| 3/20/07 | $5.26 | 4.99% | 0.56% | 0.77% | 4.56% | 2.15 |
| 3/29/07 | $5.04 | -6.15% | 0.20% | 0.19% | -6.45% | -2.85 |
| 4/9/07 | $4.38 | -10.06% | 0.09% | -0.31% | -10.38% | -4.58 |
| 4/13/07 | $4.59 | 10.34% | 0.52% | 0.57% | 9.79% | 4.29 |
| 4/17/07 | $4.93 | 5.79% | -0.09% | -0.18% | 5.65% | 2.47 |
| 4/25/07 | $5.28 | 5.39% | 0.51% | 1.33% | 5.05% | 2.12 |
| 5/4/07 | $5.47 | 5.80% | 0.26% | 0.36% | 5.42% | 2.21 |
| 5/21/07 | $4.51 | -8.89% | 0.60% | 0.51% | -9.59% | -3.84 |
| 5/22/07 | $4.83 | 7.10% | 0.41% | 0.06% | 6.55% | 2.62 |
| 5/29/07 | $4.46 | -4.50% | 0.49% | -0.44% | -5.12% | -2.06 |
| 7/10/07 | $4.63 | 8.69% | -1.04% | -1.72% | 9.54% | 3.66 |
| 7/20/07 | $4.85 | 10.23% | -0.92% | -1.36% | 10.68% | 3.95 |

Note:

[1] The NAN Return for each day is the return on that day of the equal-weighted NYSE/Amex/NASDAQ Composite Index from *CRSP*.

[2] The BHRX Return for each day is the return on that day of the value-weighted Bloomberg Hollywood Reporter Index from *Bloomberg*, after IMAX's returns have been removed.

[3] Residual returns for each trading day t under the rolling regression model are calculated according to the equation $(\text{Residual})_t = (\text{IMAX Return})_t - [\beta_1(\text{NYSE/Amex/NASDAQ Return})_t + \beta_2(\text{Bloomberg Hollywood Reporter's Index Return})_t + \alpha]$, where $\alpha$, $\beta_1$ and $\beta_2$ are determined by a regression over a 250 trading day time period ending 7 trading days prior to each trading day t. Plaintiffs allege 37 days in the Consolidated Amended Class Action Complaint as misrepresentation and/or disclosure days; these days are excluded from the time series used in the regression.