**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB)<br>ECF Case |

**AFFIDAVIT OF EDWARD MACNEIL**

Edward MacNeil, being duly sworn, deposes and says:

**Work Experience and Background**

1. I joined IMAX in 1994 and I have been continuously employed at IMAX Corporation ("IMAX" or the "Company") or its subsidiary for over fourteen years in several capacities. I am currently the Senior Vice President of Finance, a position I have held since August 2007.

2. I was the interim Chief Financial Officer ("CFO") of IMAX from August 21, 2006 to August 10, 2007. During that period, I worked on the restatement of the Company's financials for the fiscal year 2002 through the third quarter of 2006 (the "IMAX Restatement"). I supervised all financial aspects of the IMAX Restatement process, and had an active role in the decisions made regarding the IMAX Restatement.

3. I served as IMAX's Vice President of Finance, Tax and Special Projects from September 2001 to September 2006.

4. Prior to joining IMAX, I worked at the accounting firm of Coopers and Lybrand (now PricewaterhouseCoopers LLP – Canada) for seven years, and my final position was as a Taxation Manager.

5. I hold a Bachelors Degree in Business Administration and I am a member of the Canadian Institute of Chartered Accountants.

**Background on IMAX's Business**

6. IMAX is an entertainment technology company, specializing in digital and film-based motion picture technologies and large-format film presentations, including both nature-style documentaries and Hollywood blockbusters. IMAX Corp., 2006 Annual Report (Form 10-K), at 5 (July 20, 2007) [hereinafter "2006 IMAX 10-K", attached hereto as Exhibit J]. The Company's principal business is the design, manufacture, sale and lease of theater systems based on proprietary and patented technology for large-format theaters. Id. IMAX generally does not own individual theaters. Instead, the Company sells, leases, or joint ventures its equipment to third parties, who assume responsibilities for theater operations. Id. As of December 31, 2006, the IMAX theater network existed of 284 theaters operating in 40 countries. Id. at 4.

7. IMAX theater systems either include a unique rolling loop film format projector or a proprietary new digital projector, each of which offers superior image quality. The systems also feature a digital sound system that delivers up to 12,000 watts and a screen with a proprietary 3D coating technology as well as 3D glasses cleaning equipment. Id.[1] Screens in IMAX theaters are as large as one hundred or more feet wide and eight stories tall and the Company believes they are the largest cinema screens in the world. Id. Unlike standard cinema screens, IMAX screens extend to the edge of a viewer's peripheral vision to create immersive

[1] IMAX movies can be tested and even viewed by the public on a white 2D screen. However, for theaters exhibiting 3D movies, the theater system will also include a proprietary screen designed for 3D presentations and a 3D glasses-cleaning system (where applicable). 2006 IMAX 10-K at 6.

experiences which, when combined with the Company's superior sound system components, make audiences feel as if they are a part of the on-screen action. Id. at 5.

8. As part of the arrangement for an IMAX theater system, the Company advises the customer on theater design, supervises the installation of the theater system equipment and provides training in using the equipment. Id. at 7. The Company's contractual obligations related to the installation are complete once IMAX fulfills these responsibilities. The theater owners are responsible for theater building construction, any necessary improvements, the installation of the theater components and the marketing and programming at the theater. Id.

9. IMAX's current revenue recognition policy treats the theater system equipment and associated obligations as a single deliverable and as a single unit of accounting. Id. at 32, 82. The policy requires that certain delivery and performance obligations be met. It also requires that the Company receive a certificate of acceptance from a theater certifying completion of installation and run-in testing, as well as the completion of projectionist training, before revenue is recognized. Id. In the absence of a certificate of acceptance, the Company relies on the public opening of the theater. Id.

**Relevant Accounting Literature for IMAX's Theater Systems – Revenue Recognition**

10. SEC Staff Accounting Bulletin ("SAB") No. 101: Revenue Recognition in Financial Statements ("SAB 101") was issued in 1999 to provide specific and comprehensive guidance on revenue recognition. IMAX applied SAB 101 beginning in 2000, and began recognizing revenue upon installation, rather than delivery, of the theater system.

11. SAB 101 provides that a company should recognize revenue with respect to the sale of equipment when "it is realized or realizable and earned."[2] SAB 101 noted four criteria for this determination:

a. Persuasive evidence of an arrangement exists;

b. Delivery has occurred or services have been rendered;

c. The seller's price to the buyer is fixed or determinable; and

d. Collectibility is reasonably assured.

As to the second prong, SAB 101 provided that "a seller should substantially complete or fulfill the terms specified in the arrangement in order for delivery or performance to have occurred," and that when applying this "substantially complete" notion, "only inconsequential or perfunctory" obligations of the seller may remain incomplete for revenue to be earned. A copy of SAB 101 is annexed hereto as Exhibit A.

12. While SAB 101 provided limited guidance for accounting for arrangements with "multiple deliverables, or 'elements,'" it did not provide guidance on whether an arrangement on to itself had multiple elements. As such, in May 2003, the Emerging Issues Task Force ("EITF") of the FASB released the Consensus Opinion on Issue No. EITF 00-21: Revenue Arrangements with Multiple Deliverables ("EITF 00-21") to determine whether arrangements consisted of one or more than one unit of accounting.[3] A copy of EITF 00-21 is annexed hereto as Exhibit B.

13. EITF 00-21 provides specific guidance on multiple element arrangement accounting ("MEA accounting"). Under the guidance, in an arrangement with multiple

---

2 SAB 101 cites to the Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts No. 5: Recognition and Measurement in Financial Statements of Business Enterprises ("FASCON 5").

3 While there was certain other specialized guidance on whether arrangements may have multiple elements, such as American Institute of Certified Public Accountants ("AICPA") Statement of Opinion 97-2, Software Revenue Recognition, the FASB deemed it necessary to issue specific guidance on this topic through EITF 00-21.

deliverables, the delivered item(s) should be considered a separate unit of accounting if all of the following criteria are met:

> a. The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s).
>
> b. There is objective and reliable evidence of the fair value of the undelivered item(s).
>
> c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.

EITF 00-21 ¶ 9.

14. EITF 00-21 "does not address when the criteria for revenue recognition are met," (emphasis added), which is still interpreted by SAB 101 (or SAB No. 104: Revenue Recognition, corrected copy ("SAB 104"), which updated SAB 101).[4] Therefore, the first step is to determine whether the deliverable is within the scope of EITF 00-21. If the deliverable is within the scope of EITF 00-21, the revenue recognition process is to apply EITF 00-21 to determine whether an arrangement consists of one or more than one unit of accounting. Ex. C at 11 (SAB 104: "The staff believes that the determination of the units of accounting within an arrangement should be made prior to the application of the guidance in this SAB Topic by reference to the applicable accounting literature.") (citing EITF 00-21). The second step is to look to SAB 104 for guidance as to each individual unit of accounting separately to determine

---

4 In December 2003, the SEC issued SAB 104, which updated SAB 101 by compiling and codifying frequently asked questions and answers relating to SAB 101 and the recent guidance from EITF 00-21. SAB 104 did not substantively change the controlling literature on revenue recognition, but it did address how EITF 00-21 interacts with SAB 101. SAB 104 expressly notes that revenue recognition requires a great deal of judgment. In the context of delivery and acceptance, SAB 104 stated "[d]etermining whether the delivered equipment meets all of a product's criteria and specifications is a matter of judgment that must be evaluated in light of the facts and circumstances of a particular transaction." A copy of SAB 104 is annexed hereto as Exhibit C.

whether that one unit meets the revenue recognition criteria (and repeat the SAB 104 test for each respective unit). Depending on the outcome of the SAB 104 test, the relative fair value of each individual unit is either recognized or deferred.

15. In other words, EITF 00-21 provides guidance on whether multiple deliverables exist within a single arrangement, whereas SAB 104 provides guidance on the revenue recognition for each deliverable (without regard to whether revenue recognition criteria have been fulfilled with respect to other deliverables within the arrangement).

16. The term "deliverable" is not explicitly defined in EITF 00-21, nor in any accounting literature. 2006 IMAX 10-K at 147. Instead, the determination of a deliverable requires significant judgment and can be influenced by a number of factors and circumstances, including the terms of the arrangement between a vendor and its customers, the perspective of customer, and the interaction of the elements in the arrangement. Id.

**Relevant Literature for the IMAX Restatement**

17. FASB's Statement of Financial Accounting Standards No. 154: Accounting Changes and Error Corrections ("SFAS 154"), issued in May 2005, "provides guidance on the accounting for and reporting of accounting changes and error corrections." A copy of SFAS 154 is annexed hereto as Exhibit D.

18. SFAS 154 provides disclosure guidelines that apply to, among other things, error corrections:

a. "Error in previously issued financial statements – an error in recognition . . . in financial statements resulting from . . . mistakes in the application of GAAP . . . that existed at the time the financial statements were prepared." SFAS 154 ¶ 2(h).

19. Accordingly, an entity must report any errors in financial statements through a restatement:[5] "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." SFAS 154 ¶ 25.

20. A public company that files an annual report – whether or not it contains restated financials – is also required to comply with the SEC requirements contained in Regulation S-K and Regulation S-X. SEC Regulation S-K provides guidance on information disclosed in Part II of Form 10-K and requires that a filing Company disclose, among other things, a financial summary covering the most recent five years, including quarterly information for the most recent two years. Reg. S-K, Items 301 & 302. SEC Regulation S-X also provides guidance on Part II of Form 10-K and requires that a filing Company prepare financial statements, which include, among other things, balance sheets for the most recent two years and income statements and cash flows for the most recent three years. Reg. S-X, Items 3-01 & 3-02. A copy each of SEC Regulation S-K and SEC Regulation S-X is annexed hereto as Exhibit E & Exhibit F, respectively.

21. As detailed more fully in the sections below, in July 2007, IMAX determined to correct certain errors in its past financial statements related to the revenue recognition of theater systems. As stated in its 2006 10-K, IMAX made "certain errors related to . . . revenue recognition resulting from the Company's review of its theater system arrangements over the past five years in response to comments received from the staff of both the SEC and

---

[5] "Restatement" for purposes of SFAS 154 is defined "as the revising of previously issued financial statements to reflect the correction of an error." SFAS 154 at FAS154-2. The term "IMAX Restatement" as defined herein is a term used for brevity only and is not meant to, and shall not be accorded, the specialized connotation as defined in SFAS 154.

OSC which indicated insufficient analysis of various sales and lease transactions and the accounting effect of contractual provisions within them." 2006 10-K at 45.

22. Accordingly, IMAX determined it should restate its financials to correct an error in its application of EITF 00-21. Separately, it also retroactively applied its revised accounting policy that it adopted in connection with the IMAX Restatement.[6] Thus, in order to comply with SFAS 154 and the SEC requirements when filing its 2006 10-K, and to present consistent and comparable financial information for the fiscal year 2002 through the third quarter of 2006 presented, IMAX undertook to separately:

a. Restate its financial information to correct for an error in MEA accounting in 2005; and

b. Restate its financial information based on the retroactive application of the revised policy to all theater systems dating back to 2002.

23. For each of the years for which revenue related to theater systems was restated, there were other errors such as "capitalization of costs into inventory and film assets and amortization of film assets," "income tax liabilities," and other items identified in the 2006 10-K. 2006 10-K at 45. In addition, IMAX "recorded other adjustments related to prior periods' unadjusted differences that had been deemed not to be material and adjustments related to prior periods recorded through 2004 opening retained earnings." Id. I understand that no allegations of fraud exist related to any of these other errors.

24. When an error is identified, the Company must assess whether that error is material to the affected financial statements, through consideration of SAB No. 99: Materiality ("SAB 99"). SAB 99 states: "[e]ven though a misstatement of an individual amount may not cause the financial statements taken as a whole to be materially misstated, it may nonetheless,

6 "Retroactive application" is defined "as the application of a different accounting principle to prior accounting periods as if that principle had always been used . . .." SFAS 154 at FAS154-2.

when aggregated with other misstatements, render the financial statements taken as a whole to be materially misleading. . . . The auditor should aggregate all misstatements that affect each subtotal or total and consider whether the misstatements in the aggregate affect the subtotal or total in a way that causes the registrant's financial statements taken as a whole to be materially misleading." A copy of SAB 99 is annexed hereto as Exhibit G.

25. In September 2006, the staff of the SEC released SAB No. 108: Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements ("SAB 108"), which established an approach that required quantification of financial statement errors based on the effects of the error on each of the Company's financial statements and related disclosures. A copy of SAB 108 is annexed hereto as Exhibit H.

26. Under SAB 99 and SAB 108, once a company reaches the conclusion that the cumulative effect of identified errors is material, then the company is expected to correct all identified errors. IMAX concluded that the cumulative errors and adjustments related to film assets, tax liabilities and other items referred to in the above paragraph 23 were deemed material such that IMAX was required to issue restated financial statements. Therefore, IMAX did not undertake any study to determine whether any of the errors or adjustments related to the revenue recognition of theater systems, interpreted in isolation, would in itself have been a material error that required a restatement.

**Theater System Investigation and the IMAX Restatement**

27. The remainder of this affidavit focuses only on the revenue recognition issues related to IMAX's theater systems.

28. In the course of its accounting assessment and analysis of the underlying facts and circumstances that culminated in the IMAX Restatement, IMAX undertook a theater-by-theater and document-by-document review for every theater installation over the entire period from the first quarter of 2002 through the third quarter of 2006. For each theater, IMAX comprehensively reviewed in detail all documents and evidence that related to revenue recognition.

29. IMAX concluded that it made accounting errors by misinterpreting EITF 00-21 as it relates to MEA accounting when, for seven theaters in the fourth quarter of 2005 and one theater in the second quarter of 2006, IMAX recognized the revenue related to the projection and sound system that IMAX had supervised the installation thereon before year-end, but deferred the revenue related to uninstalled components such as the painted screen sheet.[7] At year-end in 2005 (prior to the IMAX Restatement), IMAX determined that an IMAX theater system consisted of more than one unit of accounting and the projection and sound system was treated as a unit of accounting separate from the painted screen and frame, and other individual theater components that each comprised separate units of accounting.

30. IMAX ultimately determined that it had incorrectly assessed the determination of deliverables (a term not expressly defined in any accounting literature) and the resultant units of accounting under EITF 00-21. It instead should have treated the entire theater system as a single unit of accounting rather than as multiple units, and recognized revenue with respect to any component of the system only when the earnings process was complete for the system as a whole. 2006 Form 10-K at 46.

---

7 Revenue was recognized for a total of ten theaters that did not open to the public in the fourth quarter of 2005. In another instance, in connection with the Lark #1 theater in Hong Kong, IMAX deferred revenue recognition of a contingent obligation to reinstall the theater system in another location. See (Auditor's Preliminary Report to the Audit Committee dated Mar. 1, 2006 at 3 (attached hereto as Exhibit I). All revenue was recognized, and none was deferred, for the other two theaters, the Donggaun S&T and Winnipeg theaters.

31. IMAX also determined it was in error when it originally recognized the revenue from two additional theaters in the first and third quarters of 2005, for which IMAX also had installed the projection and sound system but had not installed the silver 3D screen before the respective quarter-end.

32. The MEA accounting errors related to the theater system being treated as a single unit of accounting under EITF 00-21 that IMAX identified were only applicable to the above nine theaters originally recognized in 2005, as well as one theater in 2006. Not one theater in the fiscal years 2002-2004 was affected by these errors.

33. Separate and apart from the correction of the above errors related to EITF 00-21, IMAX also made the determination in 2007 (after significant consultation with the SEC and OSC and its auditors) to adopt a revised internal accounting policy that would remove much of the subjective judgment required to determine deliverables in a contract, the related units of accounting and when installation of a theater system is "substantially complete" pursuant to the SAB 104 guidance. Under the revised policy, revenue recognition would not occur until IMAX received objective evidence of completion of the theater system – including the installation and run-in testing of the projector and sound system, and the screen, as well as confirmation that IMAX met its additional contractual obligations such as the delivery of the glasses cleaning machine ("GCM") and the completion of projectionist training. Recognition of revenue earned – and received – for a theater system would be deferred on the balance sheet, and not recorded as revenue until the earlier of the receipt of a written customer acceptance which also certified completion of the projectionist training, or the public opening date of the theater. 2006 Form 10-K at 46.

34. Because IMAX's previous policy (during 2002 through the third quarter of 2006) did not mandate specific written confirmation of projectionist training or an unqualified and executed certificate of acceptance, the retroactive application of this revised revenue recognition policy highlighted administrative deficiencies under the policy for past years. Thus, whereas the correction of accounting errors related to the theater system being treated as a single unit of accounting under EITF 00-21 had no effect on the fiscal years 2002-2004, the retroactive application of this revised revenue recognition policy did have an effect on those years.

35. On July 20, 2007, IMAX restated its financial statements and also retroactively applied its revised revenue recognition policy to theater system installations for fiscal year 2002 through the third quarter of fiscal year 2006. Consistent with SFAS 154, the IMAX Restatement consisted of two separate and distinct components with regard to the restated theater system revenue:

a. The correction to MEA accounting under EITF 00-21 (treating the entire theater system as a single component rather than as multiple elements), was considered a correction of an error that required the restatement of IMAX's financials. SFAS 154 ¶ 25; and

b. IMAX's changes to its revenue recognition policy based on the suggestions of the SEC (to record revenue only upon new objective criteria) separately required the restatement of certain transactions in the IMAX financials. Id.

36. A summary of the reasons for why revenue was moved for the individual theaters effected by the IMAX Restatement illuminates the differences between the issues regarding the MEA accounting issues encountered in fiscal year 2005 and the administrative requirements presented when IMAX retroactively applied its revised accounting policy for all other theater systems installed from fiscal year 2002 through the third quarter of 2005. Those differences are discussed in the following two sections.

**Results of the IMAX Restatement – Misapplication of Applicable Accounting Standards in 2005**

37. There were nine theater systems in the fiscal year 2005, and one in 2006, for which IMAX had installed and tested the projection and sound system for a theater but the installation of the 3D silver screen was not completed in the same quarter; seven of these were in the fourth quarter of 2005. As described above, for each of these theater systems, IMAX ultimately concluded that it incorrectly interpreted SAB 104 or MEA accounting pursuant to EITF 00-21. IMAX corrected the errors in its earlier financial statements for each of these ten theaters by moving the revenue for each of these theaters to the quarter in which the silver 3D screen was finally installed and all administrative requirements were also complete.

38. There were two theaters in the first three quarters of 2005 in which the silver 3D screen was not installed within the quarter; when restated, the associated revenue was shifted to the next quarter in 2005:[8]

| **Theater Location** | **Originally Recognized** | **Move To** |
|---|---|---|
| Poznan, Poland | Q1 2005 | Q2 2005 |
| AEZ – Delhi, India. | Q3 2005 | Q4 2005 |

[8] Note that IMAX did not apply separate units of accounting to these two theaters when it presented its un-audited financial statements in connection with its 2005 quarterly results. When PWC performed its audit for year-end 2005, it was not necessary to apply MEA accounting to these theaters because the deferred revenue would have stayed within the year and thus have no net effect on IMAX's year-end results for 2005.

39. There were seven theaters in the fourth quarter of 2005 in which the silver 3D screen was not installed within the quarter; when restated, the associated revenue shifted out of fiscal year 2005 to a future fiscal period:

| **Theater Location** | **Originally Recognized** | **Move To** | **Reason for restating revenue** |
|---|---|---|---|
| Beijing Radio, Film & TV | Q4 2005 | Q1 2006 | Silver screen was installed and unqualified customer acceptance occurred in Q1 2006. |
| Lodz, Poland | Q4 2005 | Q2 2006 | The silver screen was installed in March 2006; Customer provided for projectionist training independent of IMAX but Company could not locate documentation evidencing that training had been performed and accepted; recognition moved to opening date in Q2 2006. |
| Kazan, Russia | Q4 2005 | Q4 2006 | The silver screen was installed in Q4 2006; recognition moved accordingly. |
| Beijing SUC | Q4 2005 | Q2 2006 | Installation was completed (including silver screen) in 2005, but the Company agreed, as a courtesy, to provide a larger screen; recognition moved to Q2 2006 when larger screen was installed. |
| Santa Fe / Interlomas | Q4 2005 | Q3 2006 | Silver screen was installed in Q2 2006; Company could not locate documentation evidencing that training had been performed and accepted; recognition moved to public opening in Q3 2006. |
| Manila, Philippines | Q4 2005 | Q2 2006 | Silver screen was installed in Q1 2006; Company could not locate documentation evidencing that training was accepted by the customer; recognition moved to public opening in Q2 2006. |
| McMinnville, Oregon | Q4 2005 | Q2 2007 | Silver screen was installed in Q4 2006; Company could not locate documentation evidencing that training had been accepted by the customer; recognition was moved to public opening in Q2 2007. |

40. There was one theater in the second quarter of 2006 in which the silver 3D screen was not installed within the quarter; when restated, the associated revenue was shifted to the next quarter in 2006:

| Theater Location | Originally Recognized | Move To | Reason for restating revenue |
|---|---|---|---|
| Colleyville, Texas | Q2 2006 | Q3 2006 | The silver screen was installed in Q3 2006; recognition moved accordingly. |

**Results of the IMAX Restatement for years 2002 through 2004 – Application of IMAX's Revised Accounting Policy**

41. The above ten theaters are the only theaters for which IMAX did not complete the installation of the silver 3D screen prior to the end of the fiscal quarter in which it installed the projection and sound system.

42. On the other hand, the revenue associated with a total of three theaters from the fiscal years 2002 through 2004 was restated and moved to future fiscal periods as a result of the retroactive application of IMAX's revised revenue recognition policy that it adopted in connection with the IMAX Restatement.

43. Accordingly, the shifting of revenue of each theater in the 2002-2004 period was completely unrelated to the situations where IMAX misinterpreted EITF 00-21 MEA accounting to its theater systems. In fact, MEA accounting as established by EITF 00-21 was not even effective until June 2003, and thus EITF 00-21 could not have been applied to any installations in 2002.

44. Specifically, one theater (out of 16 installed in fiscal year 2002) was restated from fiscal year 2002. That theater was restated because IMAX could not locate the customer's certificate of acceptance and evidence of completion of projectionist training:

| **Theater Location** | **Originally Recognized** | **Move To** | **Reason for restating revenue** |
|---|---|---|---|
| Al Khobar | Q4 2002 | Q4 2005 | Customer purchased system for private viewing events, including events for local school groups, but did not open to the general public until 2005. No certificate of acceptance could be located; recognition moved to opening date. |

45. No revenue related to the installation of theater systems was adjusted for fiscal year 2003.

46. Two theaters (out of 22 installed in fiscal year 2004) were restated from fiscal year 2004. Those theaters were restated, out of an abundance of caution, because of technical issues related to the theater system that required judgment under SAB 104 in determining the "substantially complete" concept and were unrelated to the screen issue faced in 2005: (i) operational issues with a new film-based projector (the "MPX") that arose after installation was complete, and (ii) a customer's plan to relocate and reinstall the system to a different site.

| **Theater Location** | **Originally Recognized** | **Move To** | **Reason for restating revenue** |
|---|---|---|---|
| Yelmo–Oviedo | Q2 2004 | Q2 2005 | Issues with operation of projector (the new film-based MPX theater projector developed by the Company) encountered after acceptance; recognition moved to quarter when: (i) operational issues were resolved and (ii) an amendment was signed reducing price. |
| Brampton | Q3 2004 | Q4 2006 | Contract had a relocation and reinstallation clause that the customer exercised; recognition moved to the quarter of reinstallation. |

47. In sum, none of the theaters restated from 2002-2004 were restated because of MEA accounting errors related to the theater system being treated as a single unit of accounting under EITF 00-21 or the failure to install the silver 3D screen that was at issue in 2005.

48. The years 2002-2004, therefore, raise no issues that are comparable to the screen and other MEA accounting issues that arose for the first time in 2005.

Dated: Mississauga, Ontario, Canada
February 23, 2009

By: ______________________
Edward MacNeil

Sworn to before me
this 23rd day of February, 2009

______________________
Notary Public