# EXHIBIT C

SECURITIES AND EXCHANGE COMMISSION Corrected Copy

17 CFR Part 211

[Release No. SAB 104]

Staff Accounting Bulletin No. 104

AGENCY: Securities and Exchange Commission.

ACTION: Publication of Staff Accounting Bulletin.

SUMMARY: This staff accounting bulletin revises or rescinds portions of the interpretative guidance included in Topic 13 of the codification of staff accounting bulletins in order to make this interpretive guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations. The principal revisions relate to the rescission of material no longer necessary because of private sector developments in U.S. generally accepted accounting principles.

This staff accounting bulletin also rescinds the Revenue Recognition in Financial Statements Frequently Asked Questions and Answers document issued in conjunction with Topic 13. Selected portions of that document have been incorporated into Topic 13.

DATE: December 17, 2003

FOR FURTHER INFORMATION CONTACT: Chad Kokenge or Shelly Luisi in the Office of the Chief Accountant (202) 942-4400, Securities and Exchange Commission, 450 Fifth Street, NW, Washington, DC 20549-1103.

SUPPLEMENTARY INFORMATION: The statements in staff accounting bulletins are not rules or interpretations of the Commission, nor are they published as bearing the Commission's approval. They represent interpretations and practices followed by the

Division of Corporation Finance and the Office of Chief Accountant in administering the disclosure requirements of the Federal securities laws.

Margaret H. McFarland
Deputy Secretary

Date: December 17, 2003

Part 211 – (AMEND)

Accordingly, Part 211 of Title 17 of the Code of Federal Regulations is amended by adding Staff Accounting Bulletin No. 104 to the table found in Subpart B.

STAFF ACCOUNTING BULLETIN NO. 104

[Note: The text of SAB 104 will not appear in the Code of Federal Regulations.]

The staff hereby revises Topic 13 of the Staff Accounting Bulletin Series as follows:

1. Topic 13.A.1 is modified as follows:
    a. The examples of existing literature referenced in the first paragraph are deleted.
    b. The last paragraph, including footnote 7, is added to make reference to EITF Issue 00-21, "*Revenue Arrangements with Multiple Deliverables*," which governs how to determine if revenue arrangements contain more than one unit of accounting.
2. Topic 13.A.2 is modified as follows:
    a. Question 3 (formerly Question 1 of the staff's Revenue Recognition in Financial Statements Frequently Asked Questions and Answers document (FAQ)) is added.

3. Topic 13.A.3 is modified as follows:

    a. The subheading Bill and hold arrangements is added.

    b. Topic 13.A.3(a) Question is formerly Question 3.

    c. The subheading Customer acceptance is added.

    d. Topic 13.A.3(b) Question 1 (formerly Question 5 of the FAQ) is added. The question format is conformed.

    e. Topic 13.A.3(b) Question 2 (formerly Question 6 of the FAQ) is added. The facts, question and interpretive response are modified to reflect the evaluation of the arrangement in the context of separate units of accounting. In addition, the last paragraph of the interpretive response is deleted due to the issuance of EITF Issue 00-21.

    f. Footnote 29 is added to highlight that the changes to Topic 13.A.3(b) Question 2 are to facilitate an analysis of revenue recognition, not interpret EITF Issue 00-21.

    g. Topic 13.A.3(b) Question 3 (formerly Exhibit A Example 1 Scenario A of the FAQ) is added.

    h. Topic 13.A.3(b) Question 4 (formerly Exhibit A Example 1 Scenario B of the FAQ) is added.

    i. Topic 13.A.3(b) Question 5 (formerly Exhibit A Example 1 Scenario C of the FAQ) is added.

    j. The subheading Inconsequential or perfunctory performance obligations is added.

k. Topic 13.A.3(c) Question 1 (formerly Question 2 of the FAQ) is added. The question and interpretive response are modified from the FAQ to reflect the evaluation of the arrangement in the context of a single unit of accounting. The question format is conformed.

l. Topic 13.A.3(c) Question 2 (formerly Question 3 of the FAQ) is added. The question and interpretive response are modified from the FAQ to reflect the evaluation in the context of a single unit of accounting.

m. Topic 13.A.3(c) Question 3 (formerly Question 7 of the FAQ) is added. The facts, question and interpretive response are modified to reflect the evaluation of the arrangement in the context of combined deliverables, which result in a single unit of accounting. In addition, the interpretive response is modified to delete the last four sentences as this guidance is no longer necessary due to the issuance of EITF 00-21.

n. The segue sentence and related footnote discussing delivery or performance of multiple deliverables is deleted to eliminate redundancy.

o. The subheading License fee revenue is added.

p. Topic 13.A.3(d) Question (formerly Question 9 of the FAQ) is added. The interpretive response is modified to eliminate redundancy.

q. The subheading Layaway sales arrangements is added.

r. Topic 13.A.3(e) Question is formerly Question 4.

s. The subheading Nonrefundable up-front fees is added.

t. The examples in Topic 13.A.3(f) Question 1 (formerly Question 5) are modified to include the examples from what was formerly Question 10 of the FAQ. Guidance in the interpretive response is added and conformed from Question 10 of the FAQ which clarifies the incurrence of substantive costs does not necessarily indicate there is a separate earnings event, and that the determination of a separate earnings event should be evaluated on a case-by-case basis.

u. Footnote 36 is added to clarify the staff's view regarding the vendor activities associated with up-front fees.

v. Topic 13.A.3(f) Question 2 (formerly Question 6) is modified to reflect the evaluation in the context of a single unit of accounting.

w. Footnote 29 is deleted. The subject matter of footnote 29 is conformed and included in Topic 13.A.3(f) Question 3; accordingly, Topic 13.A.3(f) Question 3 reflects the guidance formerly located in footnote 29.

x. Topic 13.A.3(f) Question 4 (formerly Question 15 of the FAQ) is added. The question format is conformed.

y. Topic 13.A.3(f) Question 5 (formerly Question 16 of the FAQ) is added. The question format is conformed.

z. The subheading Deliverables within an arrangement is added.

aa. Topic 13.A.3(g) Question (formerly Question 8 of the FAQ) is added and is modified to reflect the evaluation of the question under EITF Issue 00-21.

bb. Footnote 45 is added to clarify the staff's view of the obligation described in Topic 13.A.3(g) Question under FIN 45.

4. Topic 13.A.4 is modified as follows:

    a. The subheading <u>Refundable fees for services</u> is added.

    b. Topic 13.A.4(a) Question 1 is formerly Question 7.

    c. Footnote 56 is added to include guidance from Question 23 of the FAQ.

    d. Topic 13.A.4(a) Question 2 (formerly Question 18 of the FAQ) is added.

    e. Topic 13.A.4(a) Question 3 (formerly Question 19 of the FAQ) is added. The question format is conformed.

    f. Topic 13.A.4(a) Question 4 (formerly Question 20 of the FAQ) is added.

    g. Topic 13.A.4(a) Question 5 (formerly Question 21 of the FAQ) is added. The question format is conformed.

    h. Topic 13.A.4(a) Question 6 (formerly Question 22 of the FAQ) is added.

    i. The subheading <u>Estimates and changes in estimates</u> is added.

    j. Topic 13.A.4(b) Question 1 is formerly Question 9.

k. Topic 13.A.4(b) Question 2 (formerly Question 24 of the FAQ) is added.

l. Topic 13.A.4(b) Question 3 (formerly Question 25 of the FAQ) is added. The question format is conformed. The last two sentences of the interpretive response are deleted to eliminate redundancy.

m. Topic 13.A.4(b) Question 4 (formerly Question 26 of the FAQ) is added.

n. Topic 13.A.4(b) Question 5 (formerly Question 27 of the FAQ) is added.

o. The subheading Contingent rental income is added.

p. Topic 13.A.4(c) Question is formerly Question 8.

q. The subheading Claims processing and billing services is added.

r. Topic 13.A.4(d) Question (formerly Question 28 of the FAQ) is added. The facts are modified to reflect to evaluation in the context of a single unit of accounting.

5. Topic 13.A.5 is deleted. This topic provided guidance on income statement presentation and whether transactions should be presented on a gross as a principal or net as an agent basis. EITF Issue 99-19, "*Reporting Revenue Gross as a Principal versus Net as an Agent*", which was issued subsequent to SAB 101, provides such guidance. Therefore, this guidance is no longer necessary.

6. Topic 13.B is modified as follows:

a. The interpretive response to Question 1 is modified to reference multiple units of accounting in lieu of multiple elements.

b. Question 2 is modified to delete the reference to Question 10 of Topic 13.A and Topic 8.A.

c. Question 3 (formerly Question 29 of the FAQ) is added.

d. Question 4 (formerly Question 30 of the FAQ) is added.

e. Question 5 (formerly Question 31 of the FAQ) is added.

## Topic 13: REVENUE RECOGNITION

### A. Selected Revenue Recognition Issues

### 1. <u>Revenue recognition - general</u>

The accounting literature on revenue recognition includes both broad conceptual discussions as well as certain industry-specific guidance.[1] If a transaction is within the scope of specific authoritative literature that provides revenue recognition guidance, that literature should be applied. However, in the absence of authoritative literature addressing a specific arrangement or a specific industry, the staff will consider the existing authoritative accounting standards as well as the broad revenue recognition criteria specified in the FASB's conceptual framework that contain basic guidelines for revenue recognition.

Based on these guidelines, revenue should not be recognized until it is realized or realizable and earned.[2] Concepts Statement 5, paragraph 83(b) states that "an entity's

---

[1] The February 1999 AICPA publication "Audit Issues in Revenue Recognition" provides an overview of the authoritative accounting literature and auditing procedures for revenue recognition and identifies indicators of improper revenue recognition.

[2] Concepts Statement 5, paragraphs 83-84; ARB 43, Chapter 1A, paragraph 1; Opinion 10, paragraph 12. The citations provided herein are not intended to present the complete population of citations where a particular criterion is relevant. Rather, the citations are intended to provide the reader with additional reference material.

revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues" [footnote reference omitted]. Paragraph 84(a) continues "the two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery)" [footnote reference omitted]. In addition, paragraph 84(d) states that "If services are rendered or rights to use assets extend continuously over time (for example, interest or rent), reliable measures based on contractual prices established in advance are commonly available, and revenues may be recognized as earned as time passes."

The staff believes that revenue generally is realized or realizable and earned when all of the following criteria are met:

- Persuasive evidence of an arrangement exists,[3]

[3] Concepts Statement 2, paragraph 63 states "Representational faithfulness is correspondence or agreement between a measure or description and the phenomenon it purports to represent." The staff believes that evidence of an exchange arrangement must exist to determine if the accounting treatment represents faithfully the transaction. See also SOP 97-2, paragraph 8. The use of the term "arrangement" in this SAB Topic is meant to identify the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.

- Delivery has occurred or services have been rendered,[4]
- The seller's price to the buyer is fixed or determinable,[5] and
- Collectibility is reasonably assured.[6]

Some revenue arrangements contain multiple revenue-generating activities. The staff believes that the determination of the units of accounting within an arrangement should be made prior to the application of the guidance in this SAB Topic by reference to the applicable accounting literature.[7]

---

[4] Concepts Statement 5, paragraph 84(a), (b), and (d). Revenue should not be recognized until the seller has substantially accomplished what it must do pursuant to the terms of the arrangement, which usually occurs upon delivery or performance of the services.

[5] Concepts Statement 5, paragraph 83(a); Statement 48, paragraph 6(a); SOP 97-2, paragraph 8. SOP 97-2 defines a "fixed fee" as a "fee required to be paid at a set amount that is not subject to refund or adjustment. A fixed fee includes amounts designated as minimum royalties." Paragraphs 26-33 of SOP 97-2 discuss how to apply the fixed or determinable fee criterion in software transactions. The staff believes that the guidance in paragraphs 26 and 30-33 is appropriate for other sales transactions where authoritative guidance does not otherwise exist. The staff notes that paragraphs 27 through 29 specifically consider software transactions, however, the staff believes that guidance should be considered in other sales transactions in which the risk of technological obsolescence is high.

[6] ARB 43, Chapter 1A, paragraph 1 and Opinion 10, paragraph 12. See also Concepts Statement 5, paragraph 84(g) and SOP 97-2, paragraph 8.

[7] See EITF Issue 00-21 paragraph 4 for additional discussion.

**2. Persuasive evidence of an arrangement**

Question 1

Facts: Company A has product available to ship to customers prior to the end of its current fiscal quarter. Customer Beta places an order for the product, and Company A delivers the product prior to the end of its current fiscal quarter. Company A's normal and customary business practice for this class of customer is to enter into a written sales agreement that requires the signatures of the authorized representatives of the Company and its customer to be binding. Company A prepares a written sales agreement, and its authorized representative signs the agreement before the end of the quarter. However, Customer Beta does not sign the agreement because Customer Beta is awaiting the requisite approval by its legal department. Customer Beta's purchasing department has orally agreed to the sale and stated that it is highly likely that the contract will be approved the first week of Company A's next fiscal quarter.

Question: May Company A recognize the revenue in the current fiscal quarter for the sale of the product to Customer Beta when (1) the product is delivered by the end of its current fiscal quarter and (2) the final written sales agreement is executed by Customer Beta's authorized representative within a few days after the end of the current fiscal quarter?

Interpretive Response: No. Generally the staff believes that, in view of Company A's business practice of requiring a written sales agreement for this class of customer, persuasive evidence of an arrangement would require a final agreement that has been executed by the properly authorized personnel of the customer. In the staff's view, Customer Beta's execution of the sales agreement after the end of the quarter causes the transaction to be considered a transaction of the subsequent period.[8] Further, if an arrangement is subject to subsequent approval (e.g., by the management committee or board of directors) or execution of another agreement, revenue recognition would be inappropriate until that subsequent approval or agreement is complete.

Customary business practices and processes for documenting sales transactions vary among companies and industries. Business practices and processes may also vary within individual companies (e.g., based on the class of customer, nature of product or service, or other distinguishable factors). If a company does not have a standard or customary business practice of relying on written contracts to document a sales arrangement, it usually would be expected to have other forms of written or electronic evidence to document the transaction. For example, a company may not use written contracts but instead may rely on binding purchase orders from third parties or on-line authorizations that include the terms of the sale and that are binding on the customer. In that situation, that documentation could represent persuasive evidence of an arrangement.

[8] AU Section 560.05.

The staff is aware that sometimes a customer and seller enter into "side" agreements to a master contract that effectively amend the master contract. Registrants should ensure that appropriate policies, procedures, and internal controls exist and are properly documented so as to provide reasonable assurances that sales transactions, including those affected by side agreements, are properly accounted for in accordance with GAAP and to ensure compliance with Section 13 of the Securities Exchange Act of 1934 (i.e., the Foreign Corrupt Practices Act). Side agreements could include cancellation, termination, or other provisions that affect revenue recognition. The existence of a subsequently executed side agreement may be an indicator that the original agreement was not final and revenue recognition was not appropriate.

Question 2

Facts: Company Z enters into an arrangement with Customer A to deliver Company Z's products to Customer A on a consignment basis. Pursuant to the terms of the arrangement, Customer A is a consignee, and title to the products does not pass from Company Z to Customer A until Customer A consumes the products in its operations. Company Z delivers product to Customer A under the terms of their arrangement.

Question: May Company Z recognize revenue upon delivery of its product to Customer A?

Interpretive Response: No. Products delivered to a consignee pursuant to a consignment arrangement are not sales and do not qualify for revenue recognition until a sale occurs. The staff believes that revenue recognition is not appropriate because the seller retains the risks and rewards of ownership of the product and title usually does not pass to the consignee.

Other situations may exist where title to delivered products passes to a buyer, but the substance of the transaction is that of a consignment or a financing. Such arrangements require a careful analysis of the facts and circumstances of the transaction, as well as an understanding of the rights and obligations of the parties, and the seller's customary business practices in such arrangements. The staff believes that the presence of one or more of the following characteristics in a transaction precludes revenue recognition even if title to the product has passed to the buyer:

1. The buyer has the right to return the product and:

(a) the buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates.[9]

(b) the buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is

[9] Statement 48, paragraphs 6(b) and 22.

contractually or implicitly excused until the buyer resells the product or subsequently consumes or uses the product,[10]

(c) the buyer's obligation to the seller would be changed (e.g., the seller would forgive the obligation or grant a refund) in the event of theft or physical destruction or damage of the product,[11]

(d) the buyer acquiring the product for resale does not have economic substance apart from that provided by the seller,[12] or

(e) the seller has significant obligations for future performance to directly bring about resale of the product by the buyer.[13]

2. The seller is required to repurchase the product (or a substantially identical product or processed goods of which the product is a component) at specified prices that are not subject to change except for fluctuations due to finance and

---

[10] Statement 48, paragraphs 6(b) and 22. The arrangement may not specify that payment is contingent upon subsequent resale or consumption. However, if the seller has an established business practice permitting customers to defer payment beyond the specified due date(s) until the products are resold or consumed, then the staff believes that the seller's right to receive cash representing the sales price is contingent.

[11] Statement 48, paragraph 6(c).

[12] Statement 48, paragraph 6(d).

[13] Statement 48, paragraph 6(e).

holding costs,[14] and the amounts to be paid by the seller will be adjusted, as necessary, to cover substantially all fluctuations in costs incurred by the buyer in purchasing and holding the product (including interest).[15] The staff believes that indicators of the latter condition include:

(a) the seller provides interest-free or significantly below market financing to the buyer beyond the seller's customary sales terms and until the products are resold,

(b) the seller pays interest costs on behalf of the buyer under a third-party financing arrangement, or

(c) the seller has a practice of refunding (or intends to refund) a portion of the original sales price representative of interest expense for the period from when the buyer paid the seller until the buyer resells the product.

---

[14] Statement 49, paragraph 5(a). Paragraph 5(a) provides examples of circumstances that meet this requirement. As discussed further therein, this condition is present if (a) a resale price guarantee exists, (b) the seller has an option to purchase the product, the economic effect of which compels the seller to purchase the product, or (c) the buyer has an option whereby it can require the seller to purchase the product.

[15] Statement 49, paragraph 5(b).

3. The transaction possesses the characteristics set forth in EITF Issue 95-1 and does not qualify for sales-type lease accounting.

4. The product is delivered for demonstration purposes.[16]

This list is not meant to be a checklist of all characteristics of a consignment or a financing arrangement, and other characteristics may exist. Accordingly, the staff believes that judgment is necessary in assessing whether the substance of a transaction is a consignment, a financing, or other arrangement for which revenue recognition is not appropriate. If title to the goods has passed but the substance of the arrangement is not a sale, the consigned inventory should be reported separately from other inventory in the consignor's financial statements as "inventory consigned to others" or another appropriate caption.

Question 3

Facts: The laws of some countries do not provide for a seller's retention of a security interest in goods in the same manner as established in the U.S. Uniform Commercial Code (UCC). In these countries, it is common for a seller to retain a form of title to goods delivered to customers until the customer makes payment so that the seller can recover the goods in the event of customer default on payment.

[16] See SOP 97-2, paragraph 25.

Question: Is it acceptable to recognize revenue in these transactions before payment is made and title has transferred?

Interpretive Response: Presuming all other revenue recognition criteria have been met, the staff would not object to revenue recognition at delivery if the only rights that a seller retains with the title are those enabling recovery of the goods in the event of customer default on payment. This limited form of ownership may exist in some foreign jurisdictions where, despite technically holding title, the seller is not entitled to direct the disposition of the goods, cannot rescind the transaction, cannot prohibit its customer from moving, selling, or otherwise using the goods in the ordinary course of business, and has no other rights that rest with a titleholder of property that is subject to a lien under the U.S. UCC. On the other hand, if retaining title results in the seller retaining rights normally held by an owner of goods, the situation is not sufficiently different from a delivery of goods on consignment. In this particular case, revenue should not be recognized until payment is received. Registrants and their auditors may wish to consult legal counsel knowledgeable of the local law and customs outside the U.S. to determine the seller's rights.

**3. Delivery and performance**

**a. Bill and hold arrangements**

Facts: Company A receives purchase orders for products it manufactures. At the end of its fiscal quarters, customers may not yet be ready to take delivery of the products for various reasons. These reasons may include, but are not limited to, a lack of available space for inventory, having more than sufficient inventory in their distribution channel, or delays in customers' production schedules.

Question: May Company A recognize revenue for the sale of its products once it has completed manufacturing if it segregates the inventory of the products in its own warehouse from its own products?

May Company A recognize revenue for the sale if it ships the products to a third-party warehouse but (1) Company A retains title to the product and (2) payment by the customer is dependent upon ultimate delivery to a customer-specified site?

Interpretative Response: Generally, no. The staff believes that delivery generally is not considered to have occurred unless the customer has taken title and assumed the risks and rewards of ownership of the products specified in the customer's purchase order or sales agreement. Typically this occurs when a product is delivered to the customer's delivery site (if the terms of the sale are "FOB destination") or when a product is shipped to the customer (if the terms are "FOB shipping point").

The Commission has set forth criteria to be met in order to recognize revenue when delivery has not occurred.[17] These include:

1. The risks of ownership must have passed to the buyer;

2. The customer must have made a fixed commitment to purchase the goods, preferably in written documentation;

3. The buyer, not the seller, must request that the transaction be on a bill and hold basis.[18] The buyer must have a substantial business purpose for ordering the goods on a bill and hold basis;

4. There must be a fixed schedule for delivery of the goods. The date for delivery must be reasonable and must be consistent with the buyer's business purpose (e.g., storage periods are customary in the industry);

5. The seller must not have retained any specific performance obligations such that the earning process is not complete;

---

[17] See In the Matter of Stewart Parness, AAER 108 (August 5, 1986); SEC v. Bollinger Industries, Inc., et al, LR 15093 (September 30, 1996); In the Matter of Laser Photonics, Inc., AAER 971 (September 30, 1997); In the Matter of Cypress Bioscience Inc., AAER 817 (September 19, 1996). Also see Concepts Statement 5, paragraph 84(a). and SOP 97-2, paragraph 22.

[18] Such requests typically should be set forth in writing by the buyer.

6. The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill other orders; and

7. The equipment [product] must be complete and ready for shipment.

The above listed conditions are the important conceptual criteria that should be used in evaluating any purported bill and hold sale. This listing is not intended as a checklist. In some circumstances, a transaction may meet all factors listed above but not meet the requirements for revenue recognition. The Commission also has noted that in applying the above criteria to a purported bill and hold sale, the individuals responsible for the preparation and filing of financial statements also should consider the following factors:[19]

1. The date by which the seller expects payment, and whether the seller has modified its normal billing and credit terms for this buyer;[20]

2. The seller's past experiences with and pattern of bill and hold transactions;

[19] See Note 17, supra.

[20] Such individuals should consider whether Opinion 21 pertaining to the need for discounting the related receivable, is applicable. Opinion 21, paragraph 3(a), indicates that the requirements of that Opinion to record receivables at a discounted value are not intended to apply to "receivables and payables arising from transactions with customers or suppliers in the normal course of business which are due in customary trade terms not exceeding approximately one year" (emphasis added).

3. Whether the buyer has the expected risk of loss in the event of a decline in the market value of goods;

4. Whether the seller's custodial risks are insurable and insured;

5. Whether extended procedures are necessary in order to assure that there are no exceptions to the buyer's commitment to accept and pay for the goods sold (i.e., that the business reasons for the bill and hold have not introduced a contingency to the buyer's commitment).

Delivery generally is not considered to have occurred unless the product has been delivered to the customer's place of business or another site specified by the customer. If the customer specifies an intermediate site but a substantial portion of the sales price is not payable until delivery is made to a final site, then revenue should not be recognized until final delivery has occurred.[21]

**b. Customer acceptance**

After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs.[22]

---

[21] SOP 97-2, paragraph 22.

[22] SOP 97-2, paragraph 20. Also, Concepts Statement 5, paragraph 83(b) states "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." If an arrangement expressly requires customer acceptance, the staff

Customer acceptance provisions may be included in a contract, among other reasons, to enforce a customer's rights to (1) test the delivered product, (2) require the seller to perform additional services subsequent to delivery of an initial product or performance of an initial service (e.g., a seller is required to install or activate delivered equipment), or (3) identify other work necessary to be done before accepting the product. The staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement. Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

Question 1

Question: Do circumstances exist in which formal customer sign-off (that a contractual customer acceptance provision is met) is unnecessary to meet the requirements to recognize revenue?

Interpretive Response:

Yes. Formal customer sign-off is not always necessary to recognize revenue provided that the seller objectively demonstrates that the criteria specified in the acceptance

---

generally believes that customer acceptance should occur before the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues, especially when the seller is obligated to perform additional steps.

provisions are satisfied. Customer acceptance provisions generally allow the customer to cancel the arrangement when a seller delivers a product that the customer has not yet agreed to purchase or delivers a product that does not meet the specifications of the customer's order. In those cases, revenue should not be recognized because a sale has not occurred. In applying this concept, the staff observes that customer acceptance provisions normally take one of four general forms. Those forms, and how the staff generally assesses whether customer acceptance provisions should result in revenue deferral, are described below:

(a) *Acceptance provisions in arrangements that purport to be for trial or evaluation purposes.*[23] In these arrangements, the seller delivers a product to a customer, and the customer agrees to receive the product, solely to give the customer the ability to evaluate the delivered product prior to acceptance. The customer does not agree to purchase the delivered product until it accepts the product. In some cases, the acceptance provisions lapse by the passage of time without the customer rejecting the delivered product, and in other cases affirmative acceptance from the customer is necessary to trigger a sales transaction. Frequently, the title to the product does not transfer and payment terms are not established prior to customer acceptance. These arrangements are, in substance, consignment arrangements until the customer accepts the product as set forth in the contract with the seller. Accordingly, in arrangements where products are delivered for trial or evaluation purposes, revenue should not be recognized until the earlier of when acceptance occurs or the acceptance provisions lapse.

[23] See, for example, SOP 97-2, paragraph 25.

In contrast, other arrangements do not purport to be for trial or evaluation purposes. In these instances, the seller delivers a specified product pursuant to a customer's order, establishes payment terms, and transfers title to the delivered product to the customer. However, customer acceptance provisions may be included in the arrangement to give the purchaser the ability to ensure the delivered product meets the criteria set forth in its order. The staff evaluates these provisions as follows:

(b) *Acceptance provisions that grant a right of return or exchange on the basis of subjective matters.* An example of such a provision is one that allows the customer to return a product if the customer is dissatisfied with the product.[24] The staff believes these provisions are not different from general rights of return and should be accounted for in accordance with Statement 48. Statement 48 requires that the amount of future returns must be reasonably estimable in order for revenue to be recognized prior to the expiration of return rights.[25] That estimate may not be made in the absence of a large volume of homogeneous transactions or if customer acceptance is likely to depend on conditions for which sufficient historical experience is absent.[26] Satisfaction of these requirements may vary from product-to-product, location-to-location, customer-to-customer, and vendor-to-vendor.

[24] Statement 48, paragraph 13.

[25] Statement 48, paragraph 6(f).

[26] Statement 48, paragraphs 8(c) and 8(d).

(c) *Acceptance provisions based on seller-specified objective criteria.* An example of such a provision is one that gives the customer a right of return or replacement if the delivered product is defective or fails to meet the vendor's published specifications for the product.[27] Such rights are generally identical to those granted to all others within the same class of customer and for which satisfaction can be generally assured without consideration of conditions specific to the customer. Provided the seller has previously demonstrated that the product meets the specified criteria, the staff believes that these provisions are not different from general or specific warranties and should be accounted for as warranties in accordance with Statement 5. In this case, the cost of potentially defective goods must be reliably estimable based on a demonstrated history of substantially similar transactions.[28] However, if the seller has not previously demonstrated that the delivered product meets the seller's specifications, the staff believes that revenue should be deferred until the specifications have been objectively achieved.

(d) *Acceptance provisions based on customer-specified objective criteria.* These provisions are referred to in this document as "customer-specific acceptance provisions" against which substantial completion and contract fulfillment must be evaluated. While formal customer sign-off provides the best evidence that these acceptance criteria have been met, revenue recognition also would be appropriate, presuming all other revenue recognition criteria have been met, if the seller reliably demonstrates that the delivered products or services meet all of the specified criteria prior to customer acceptance. For

---

[27] Statement 5, paragraph 24 and Statement 48, paragraph 4(c).

[28] Statement 5, paragraph 25.

example, if a seller reliably demonstrates that a delivered product meets the customer-specified objective criteria set forth in the arrangement, the delivery criterion would generally be satisfied when title and the risks and rewards of ownership transfers unless product performance may reasonably be different under the customer's testing conditions specified by the acceptance provisions. Further, the seller should consider whether it would be successful in enforcing a claim for payment even in the absence of formal sign-off. Whether the vendor has fulfilled the terms of the contract before customer acceptance is a matter of contract law, and depending on the facts and circumstances, an opinion of counsel may be necessary to reach a conclusion.

Question 2

Facts: Consider an arrangement that calls for the transfer of title to equipment upon delivery to a customer's site. However, customer-specific acceptance provisions permit the customer to return the equipment unless the equipment satisfies certain performance tests. The arrangement calls for the vendor to perform the installation. Assume the equipment and the installation are separate units of accounting under EITF Issue 00-21.[29]

Question: Must revenue allocated to the equipment always be deferred until installation and on-site testing are successfully completed?

[29] This fact is provided as an assumption to facilitate an analysis of revenue recognition in this fact pattern. No interpretation of Issue 00-21 is intended.

Interpretive Response: No. The staff would not object to revenue recognition for the equipment upon delivery (presuming all other revenue recognition criteria have been met for the equipment) if the seller demonstrates that, at the time of delivery, the equipment already meets all of the criteria and specifications in the customer-specific acceptance provisions. This may be demonstrated if conditions under which the customer intends to operate the equipment are replicated in pre-shipment testing, unless the performance of the equipment, once installed and operated at the customer's facility, may reasonably be different from that tested prior to shipment.

Determining whether the delivered equipment meets all of a product's criteria and specifications is a matter of judgment that must be evaluated in light of the facts and circumstances of a particular transaction. Consultation with knowledgeable project managers or engineers may be necessary in such circumstances.

For example, if the customer acceptance provisions were based on meeting certain size and weight characteristics, it should be possible to determine whether those criteria have been met before shipment. Historical experience with the same specifications and functionality of a particular machine that demonstrates that the equipment meets the customer's specifications also may provide sufficient evidence that the currently shipped equipment satisfies the customer-specific acceptance provisions.

If an arrangement includes customer acceptance criteria or specifications that cannot be effectively tested before delivery or installation at the customer's site, the staff believes

that revenue recognition should be deferred until it can be demonstrated that the criteria are met. This situation usually will exist when equipment performance can vary based on how the equipment works in combination with the customer's other equipment, software, or environmental conditions. In these situations, testing to determine whether the criteria are met cannot be reasonably performed until the products are installed or integrated at the customer's facility.

Although the following questions provide several examples illustrating how the staff evaluates customer acceptance, the determination of when customer-specific acceptance provisions of an arrangement are met in the absence of the customer's formal notification of acceptance depends on the weight of the evidence in the particular circumstances. Different conclusions could be reached in similar circumstances that vary only with respect to a single variable, such as complexity of the equipment, nature of the interface with the customer's environment, extent of the seller's experience with the same type of transactions, or a particular clause in the agreement. The staff believes management and auditors are uniquely positioned to evaluate the facts and arrive at a reasoned conclusion. The staff will not object to a determination that is well reasoned on the basis of this guidance.

Question 3

Facts: Company E is an equipment manufacturer whose main product is generally sold in a standard model. The contracts for sale of that model provide for customer acceptance to

occur after the equipment is received and tested by the customer. The acceptance provisions state that if the equipment does not perform to Company E's published specifications, the customer may return the equipment for a full refund or a replacement unit, or may require Company E to repair the equipment so that it performs up to published specifications. Customer acceptance is indicated by either a formal sign-off by the customer or by the passage of 90 days without a claim under the acceptance provisions. Title to the equipment passes upon delivery to the customer. Company E does not perform any installation or other services on the equipment it sells and tests each piece of equipment against its specifications before shipment. Payment is due under Company E's normal payment terms for that product 30 days after customer acceptance.

Company E receives an order from a new customer for a standard model of its main product. Based on the customer's intended use of the product, location and other factors, there is no reason that the equipment would operate differently in the customer's environment than it does in Company E's facility.

Question: Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

Interpretive Response**:** While the staff presumes that customer acceptance provisions are substantive provisions that generally result in revenue deferral, that presumption can be overcome as discussed above. Although the contract includes a customer acceptance

clause, acceptance is based on meeting Company E's published specifications for a standard model. Company E demonstrates that the equipment shipped meets the specifications before shipment, and the equipment is expected to operate the same in the customer's environment as it does in Company E's. In this situation, Company E should evaluate the customer acceptance provision as a warranty under Statement 5. If Company E can reasonably and reliably estimate the amount of warranty obligations, the staff believes that it should recognize revenue upon delivery of the equipment, with an appropriate liability for probable warranty obligations.

Question 4

Facts: Assume the same facts about Company E's equipment, contract terms and customary practices as in Question 3 above. Company E enters into an arrangement with a new customer to deliver a version of its standard product modified as necessary to fit into a space of specific dimensions while still meeting all of the published vendor specifications with regard to performance. In addition to the customer acceptance provisions relating to the standard performance specifications, the customer may reject the equipment if it does not conform to the specified dimensions. Company E creates a testing chamber of the exact same dimensions as specified by the customer and makes simple design changes to the product so that it fits into the testing chamber. The equipment still meets all of the standard performance specifications.

Question: Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

Interpretive Response: Although the contract includes a customer acceptance clause that is based, in part, on a customer specific criterion, Company E demonstrates that the equipment shipped meets that objective criterion, as well as the published specifications, before shipment. The staff believes that the customer acceptance provisions related to the standard performance specifications should be evaluated as a warranty under Statement 5. If Company E can reasonably and reliably estimate the amount of warranty obligations, it should recognize revenue upon delivery of the equipment, with an appropriate liability for probable warranty obligations.

Question 5

Facts: Assume the same facts about Company E's equipment, contract terms and customary practices as in Question 3 above. Company E enters into an arrangement with a new customer to deliver a version of its standard product modified as necessary to be integrated into the customer's new assembly line while still meeting all of the standard published vendor specifications with regard to performance. The customer may reject the equipment if it fails to meet the standard published performance specifications or cannot be satisfactorily integrated into the new line. Company E has never modified its equipment to work on an integrated basis in the type of assembly line the customer has

proposed. In response to the request, Company E designs a version of its standard equipment that is modified as believed necessary to operate in the new assembly line. The modified equipment still meets all of the standard published performance specifications, and Company E believes the equipment will meet the requested specifications when integrated into the new assembly line. However, Company E is unable to replicate the new assembly line conditions in its testing.

Question: Assuming all other revenue recognition criteria are met (other than the issue raised with respect to the acceptance provision), when should Company E recognize revenue from the sale of this piece of equipment?

Interpretive Response: This contract includes a customer acceptance clause that is based, in part, on a customer specific criterion, and Company E cannot demonstrate that the equipment shipped meets that criterion before shipment. Accordingly, the staff believes that the contractual customer acceptance provision has not been met at shipment. Therefore, the staff believes that Company E should wait until the product is successfully integrated at its customer's location and meets the customer-specific criteria before recognizing revenue. While this is best evidenced by formal customer acceptance, other objective evidence that the equipment has met the customer-specific criteria may also exist (e.g., confirmation from the customer that the specifications were met).

**c. Inconsequential or perfunctory performance obligations**

Question 1

Question: Does the failure to complete all activities related to a unit of accounting preclude recognition of revenue for that unit of accounting?

Interpretive Response: No. Assuming all other recognition criteria are met, revenue for the unit of accounting may be recognized in its entirety if the seller's remaining obligation is inconsequential or perfunctory.

A seller should substantially complete or fulfill the terms specified in the arrangement related to the unit of accounting at issue in order for delivery or performance to have occurred.[30] When applying the substantially complete notion, the staff believes that only inconsequential or perfunctory actions may remain incomplete such that the failure to complete the actions would not result in the customer receiving a refund or rejecting the delivered products or services performed to date. In addition, the seller should have a demonstrated history of completing the remaining tasks in a timely manner and reliably estimating the remaining costs. If revenue is recognized upon substantial completion of

[30] Concepts Statement 5, paragraph 83(b) states "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled the benefits represented by the revenues."

the terms specified in the arrangement related to the unit of accounting at issue, all related costs of performance or delivery should be accrued.

Question 2

Question: What factors should be considered in the evaluation of whether a remaining obligation related to a unit of accounting is inconsequential or perfunctory?

Interpretive Response: A remaining performance obligation is not inconsequential or perfunctory if it is essential to the functionality of the delivered products or services. In addition, remaining activities are not inconsequential or perfunctory if failure to complete the activities would result in the customer receiving a full or partial refund or rejecting (or a right to a refund or to reject) the products delivered or services performed to date. The terms of the sales contract regarding both the right to a full or partial refund and the right of return or rejection should be considered when evaluating whether a portion of the purchase price would be refundable. If the company has a historical pattern of granting such rights, that historical pattern should also be considered even if the current contract expressly precludes such rights. Further, other factors should be considered in assessing whether remaining obligations are inconsequential or perfunctory. For example, the staff also considers the following factors, which are not all-inclusive, to be indicators that a remaining performance obligation is substantive rather than inconsequential or perfunctory:

- The seller does not have a demonstrated history of completing the remaining tasks in a timely manner and reliably estimating their costs.

- The cost or time to perform the remaining obligations for similar contracts historically has varied significantly from one instance to another.

- The skills or equipment required to complete the remaining activity are specialized or are not readily available in the marketplace.

- The cost of completing the obligation, or the fair value of that obligation, is more than insignificant in relation to such items as the contract fee, gross profit, and operating income allocable to the unit of accounting.

- The period before the remaining obligation will be extinguished is lengthy. Registrants should consider whether reasonably possible variations in the period to complete performance affect the certainty that the remaining obligations will be completed successfully and on budget.

- The timing of payment of a portion of the sales price is coincident with completing performance of the remaining activity.

Registrants' determinations of whether remaining obligations are inconsequential or perfunctory should be consistently applied.

Question 3

Facts: Consider a unit of accounting that includes both equipment and installation because the two deliverables do not meet the separation criteria under EITF Issue 00-21. This may be because the equipment does not have value to the customer on a standalone basis, there is no objective and reliable evidence of fair value for the installation or there is a general right of return when the installation is not considered probable and in control of the vendor.

Question: In this situation, must all revenue be deferred until installation is performed?

Interpretive Response: Yes, if installation is essential to the functionality of the equipment.[31] Examples of indicators that installation is essential to the functionality of equipment include:

- The installation involves significant changes to the features or capabilities of the equipment or building complex interfaces or connections;
- The installation services are unavailable from other vendors.[32]

[31] See SOP 97-2, paragraph 13.

[32] See SOP 97-2, paragraphs 68-71 for analogous guidance.

Conversely, examples of indicators that installation is not essential to the functionality of the equipment include:

- The equipment is a standard product;
- Installation does not significantly alter the equipment's capabilities;
- Other companies are available to perform the installation.[33]

If it is determined that the undelivered service is not essential to the functionality of the delivered product but a portion of the contract fee is not payable until the undelivered service is delivered, the staff would not consider that obligation to be inconsequential or perfunctory. Generally, the portion of the contract price that is withheld or refundable should be deferred until the outstanding service is delivered because that portion would not be realized or realizable.[34]

**d. License fee revenue**

Facts: Assume that intellectual property is physically delivered and payment is received on December 20, upon the registrant's consummation of an agreement granting its

[33] Ibid.

[34] Concepts Statement 5, paragraph 83(a) and Statement 48, paragraph 6(b).

customer a license to use the intellectual property for a term beginning on the following January 1.

Question: Should the license fee be recognized in the period ending December 31?

Interpretive Response: No. In licensing and similar arrangements (e.g., licenses of motion pictures, software, technology, and other intangibles), the staff believes that delivery does not occur for revenue recognition purposes until the license term begins.[35] Accordingly, if a licensed product or technology is physically delivered to the customer, but the license term has not yet begun, revenue should not be recognized prior to inception of the license term. Upon inception of the license term, revenue should be recognized in a manner consistent with the nature of the transaction and the earnings process.

**e. Layaway sales arrangements**

Facts: Company R is a retailer that offers "layaway" sales to its customers. Company R retains the merchandise, sets it aside in its inventory, and collects a cash deposit from the customer. Although Company R may set a time period within which the customer must finalize the purchase, Company R does not require the customer to enter into an installment note or other fixed payment commitment or agreement when the initial deposit is received. The merchandise generally is not released to the customer until the

[35] SOP 00-2, paragraph 7.

customer pays the full purchase price. In the event that the customer fails to pay the remaining purchase price, the customer forfeits its cash deposit. In the event the merchandise is lost, damaged, or destroyed, Company R either must refund the cash deposit to the customer or provide replacement merchandise.

Question: In the staff's view, when may Company R recognize revenue for merchandise sold under its layaway program?

Interpretive Response: Provided that the other criteria for revenue recognition are met, the staff believes that Company R should recognize revenue from sales made under its layaway program upon delivery of the merchandise to the customer. Until then, the amount of cash received should be recognized as a liability entitled such as "deposits received from customers for layaway sales" or a similarly descriptive caption. Because Company R retains the risks of ownership of the merchandise, receives only a deposit from the customer, and does not have an enforceable right to the remainder of the purchase price, the staff would object to Company R recognizing any revenue upon receipt of the cash deposit. This is consistent with item two (2) in the Commission's criteria for bill-and-hold transactions which states "the customer must have made a fixed commitment to purchase the goods."

**f. Nonrefundable up-front fees**

Question 1

Facts: Registrants may negotiate arrangements pursuant to which they may receive nonrefundable fees upon entering into arrangements or on certain specified dates. The fees may ostensibly be received for conveyance of a license or other intangible right or for delivery of particular products or services. Various business factors may influence how the registrant and customer structure the payment terms. For example, in exchange for a greater up-front fee for an intangible right, the registrant may be willing to receive lower unit prices for related products to be delivered in the future. In some circumstances, the right, product, or service conveyed in conjunction with the nonrefundable fee has no utility to the purchaser separate and independent of the registrant's performance of the other elements of the arrangement. Therefore, in the absence of the registrant's continuing involvement under the arrangement, the customer would not have paid the fee. Examples of this type of arrangement include the following:

- A registrant sells a lifetime membership in a health club. After paying a nonrefundable "initiation fee," the customer is permitted to use the health club indefinitely, so long as the customer also pays an additional usage fee each month. The monthly usage fees collected from all customers are adequate to cover the operating costs of the health club.

- A registrant in the biotechnology industry agrees to provide research and development activities for a customer for a specified term. The customer needs to use certain technology owned by the registrant for use in the research and

development activities. The technology is not sold or licensed separately without the research and development activities. Under the terms of the arrangement, the customer is required to pay a nonrefundable "technology access fee" in addition to periodic payments for research and development activities over the term of the contract.

- A registrant requires a customer to pay a nonrefundable "activation fee" when entering into an arrangement to provide telecommunications services. The terms of the arrangement require the customer to pay a monthly usage fee that is adequate to recover the registrant's operating costs. The costs incurred to activate the telecommunications service are nominal.

- A registrant charges users a fee for non-exclusive access to its web site that contains proprietary databases. The fee allows access to the web site for a one-year period. After the customer is provided with an identification number and trained in the use of the database, there are no incremental costs that will be incurred in serving this customer.

- A registrant charges a fee to users for advertising a product for sale or auction on certain pages of its web site. The company agrees to maintain the listing for a period of time. The cost of maintaining the advertisement on the web site for the stated period is minimal.

- A registrant charges a fee for hosting another company's web site for one year. The arrangement does not involve exclusive use of any of the hosting company's servers or other equipment. Almost all of the projected costs to be incurred will be incurred in the initial loading of information on the host company's internet server and setting up appropriate links and network connections.

Question: Assuming these arrangements qualify as single units of accounting under EITF Issue 00-21[36], when should the revenue relating to nonrefundable, up-front fees in these types of arrangements be recognized?

Interpretive Response: The staff believes that registrants should consider the specific facts and circumstances to determine the appropriate accounting for nonrefundable, up-front fees. Unless the up-front fee is in exchange for products delivered or services performed that represent the culmination of a separate earnings process,[37] the deferral of revenue is appropriate.

In the situations described above, the staff does not view the activities completed by the registrants (i.e., selling the membership, signing the contract, enrolling the customer, activating telecommunications services or providing initial set-up services) as discrete

[36] The staff believes that the vendor activities associated with the up-front fee, even if considered a deliverable to be evaluated under EITF Issue 00-21, will rarely provide value to the customer on a standalone basis.

[37] See Concepts Statement 5, footnote 51, for a description of the "earning process."

earnings events.[38] The terms, conditions, and amounts of these fees typically are negotiated in conjunction with the pricing of all the elements of the arrangement, and the customer would ascribe a significantly lower, and perhaps no, value to elements ostensibly associated with the up-front fee in the absence of the registrant's performance of other contract elements. The fact that the registrants do not sell the initial rights, products, or services separately (i.e., without the registrants' continuing involvement) supports the staff's view. The staff believes that the customers are purchasing the on-going rights, products, or services being provided through the registrants' continuing involvement. Further, the staff believes that the earnings process is completed by performing under the terms of the arrangements, not simply by originating a revenue-generating arrangement.

While the incurrence of nominal up-front costs helps make it clear that there is not a separate earnings event in the telecommunications example above, incurrence of substantive costs, such as in the web hosting example above, does not necessarily indicate that there is a separate earnings event. Whether there is a separate earnings event should be evaluated on a case-by-case basis. Some have questioned whether revenue may be recognized in these transactions to the extent of the incremental direct costs incurred in the activation. Because there is no separable deliverable or earnings event,

[38] In a similar situation, lenders may collect nonrefundable loan origination fees in connection with lending activities. The FASB concluded in Statement 91 that loan origination is not a separate revenue-producing activity of a lender, and therefore, those nonrefundable fees collected at the outset of the loan arrangement are not recognized as revenue upon receipt but are deferred and recognized over the life of the loan (paragraphs 5 and 37).

the staff would generally object to that approach, except where it is provided for in the authoritative literature (e.g., Statement 51).

Supply or service transactions may involve the charge of a nonrefundable initial fee with subsequent periodic payments for future products or services. The initial fees may, in substance, be wholly or partly an advance payment for future products or services. In the examples above, the on-going rights or services being provided or products being delivered are essential to the customers receiving the expected benefit of the up-front payment. Therefore, the up-front fee and the continuing performance obligation related to the services to be provided or products to be delivered are assessed as an integrated package. In such circumstances, the staff believes that up-front fees, even if nonrefundable, are earned as the products and/or services are delivered and/or performed over the term of the arrangement or the expected period of performance[39] and generally should be deferred and recognized systematically over the periods that the fees are earned.[40]

Some propose that revenue should be recognized when the initial set-up is completed in cases where the on-going obligation involves minimal or no cost or effort and should,

[39] The revenue recognition period should extend beyond the initial contractual period if the relationship with the customer is expected to extend beyond the initial term and the customer continues to benefit from the payment of the up-front fee (e.g., if subsequent renewals are priced at a bargain to the initial up-front fee).

[40] A systematic method would be on a straight-line basis, unless evidence suggests that revenue is earned or obligations are fulfilled in a different pattern, in which case that pattern should be followed.

therefore, be considered perfunctory or inconsequential. However, the staff believes that the substance of each of these transactions indicates that the purchaser is paying for a service that is delivered over time. Therefore, revenue recognition should occur over time, reflecting the provision of service.[41]

Question 2

Facts: Company A provides its customers with activity tracking or similar services (e.g., tracking of property tax payment activity, sending delinquency letters on overdue accounts, etc.) for a ten-year period. Company A requires customers to prepay for all the services for the term specified in the arrangement. The on-going services to be provided are generally automated after the initial customer set-up. At the outset of the arrangement, Company A performs set-up procedures to facilitate delivery of its on-going services to the customers. Such procedures consist primarily of establishing the necessary records and files in Company A's pre-existing computer systems in order to provide the services. Once the initial customer set-up activities are complete, Company A provides its services in accordance with the arrangement. Company A is not required to refund any portion of the fee if the customer terminates the services or does not utilize all of the services to which it is entitled. However, Company A is required to provide a refund if Company A terminates the arrangement early. Assume Company A's activities

[41] Concepts Statement 5, paragraph 84(d).

are not within the scope of Statement 91 and that this arrangement qualifies as a single unit of accounting under EITF Issue 00-21.[42]

Question: When should Company A recognize the service revenue?

Interpretive Response: The staff believes that, provided all other revenue recognition criteria are met, service revenue should be recognized on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed,[43] whichever is longer. In this case, the customer contracted for the on-going activity tracking service, not for the set-up activities. The staff notes that the customer could not, and would not, separately purchase the set-up services without the on-going services. The services specified in the arrangement are performed continuously over the contractual term of the arrangement (and any subsequent renewals). Therefore, the staff believes that Company A should recognize revenue on a straight-line basis, unless evidence suggests that the revenue is earned or obligations are fulfilled in a different pattern, over the contractual term of the arrangement or the expected period during which those specified services will be performed, whichever is longer.

[42] See Note 36, supra.

[43] See Note 39, supra.

In this situation, the staff would object to Company A recognizing revenue in proportion to the costs incurred because the set-up costs incurred bear no direct relationship to the performance of services specified in the arrangement. The staff also believes that it is inappropriate to recognize the entire amount of the prepayment as revenue at the outset of the arrangement by accruing the remaining costs because the services required by the contract have not been performed.

**Question 3**

Facts: Assume the same facts as in Question 2 above.

Question: Are the initial customer set-up costs incurred by Company A within the scope of SOP 98-5?

Interpretive Response: Footnote 1 of SOP 98-5 states that "this SOP does not address the financial reporting of costs incurred related to ongoing customer acquisition, such as policy acquisition costs in Statement 60…and loan origination costs in Statement 91… The SOP addresses the more substantive one-time efforts to establish business with an entirely new class of customers (for example, a manufacturer who does all of its business with retailers attempts to sell merchandise directly to the public)." As such, the set-up costs incurred in this example are not within the scope of SOP 98-5.

The staff believes that the incremental direct costs (Statement 91 provides an analogous definition) incurred related to the acquisition or origination of a customer contract in a transaction that results in the deferral of revenue, unless specifically provided for in the authoritative literature, may be either expensed as incurred or accounted for in accordance with paragraph 4 of Technical Bulletin 90-1 or paragraph 5 of Statement 91. The staff believes the accounting policy chosen for these costs should be disclosed and applied consistently.

Question 4

Facts: Assume the same facts as in Question 2 above.

Question: What is the staff's view of the pool of contract acquisition and origination costs that are eligible for capitalization?

Interpretive Response: As noted in Question 3 above, Statement 91 includes a definition of incremental direct costs in its glossary. Paragraph 6 of Statement 91 provides further guidance on the types of costs eligible for capitalization as customer acquisition costs indicating that only costs that result from successful loan origination efforts are capitalized. The FASB staff has published an Implementation Guide on Statement 91 that provides additional guidance on the costs that qualify for capitalization as customer acquisition costs. Further, Technical Bulletin 90-1 also requires capitalization of incremental direct customer acquisition costs and requires that those costs be "identified

consistent with the guidance in paragraph 6 of Statement 91." Although the facts of a particular situation should be analyzed closely to capture those costs that are truly direct and incremental, the staff generally would not object to an accounting policy that results in the capitalization of costs in accordance with paragraph 6(a) and (b) of Statement 91 or Technical Bulletin 90-1. Registrants should disclose their policies for determining which costs to capitalize as contract acquisition and origination costs.

Question 5

Facts: Assume the same facts as in Question 2 above. Based on the guidance in Questions 2, 3 and 4 above, Company A has capitalized certain direct and incremental customer set-up costs associated with the deferred revenue.

Question: Over what period should Company A amortize these costs?

Interpretive Response: When both costs and revenue (in an amount equal to or greater than the costs) are deferred, the staff believes that the capitalized costs should be charged to expense proportionally and over the same period that deferred revenue is recognized as revenue.[44]

**g. Deliverables within an arrangement**

[44] Technical Bulletin 90-1, paragraph 4.

Question: If a company (the seller) has a patent to its intellectual property which it licenses to customers, the seller may represent and warrant to its licensees that it has a valid patent, and will defend and maintain that patent. Does that obligation to maintain and defend patent rights, in and of itself, constitute a deliverable to be evaluated under EITF Issue 00-21?

Interpretive Response: No. Provided the seller has legal and valid patents upon entering the license arrangement, existing GAAP on licenses of intellectual property (e.g., SOP 97-2, SOP 00-2, and SFAS No. 50) does not indicate that an obligation to defend valid patents represents an additional deliverable to which a portion of an arrangement fee should be allocated in an arrangement that otherwise qualifies for sales-type accounting. While this clause may obligate the licenser to incur costs in the defense and maintenance of the patent, that obligation does not involve an additional deliverable to the customer. Defending the patent is generally consistent with the seller's representation in the license that such patent is legal and valid. Therefore, the staff would not consider a clause like this to represent an additional deliverable in the arrangement.[45]

**4. Fixed or determinable sales price**

**a. Refundable fees for services**

[45] Note, however, the staff believes that this obligation qualifies as a guarantee within the scope of FIN 45, subject to a scope exception from the initial recognition and measurement provisions.

A company's contracts may include customer cancellation or termination clauses. Cancellation or termination provisions may be indicative of a demonstration period or an otherwise incomplete transaction. Examples of transactions that financial management and auditors should be aware of and where such provisions may exist include "side" agreements and significant transactions with unusual terms and conditions. These contractual provisions raise questions as to whether the sales price is fixed or determinable. The sales price in arrangements that are cancelable by the customer is neither fixed nor determinable until the cancellation privileges lapse.[46] If the cancellation privileges expire ratably over a stated contractual term, the sales price is considered to become determinable ratably over the stated term.[47] Short-term rights of return, such as thirty-day money-back guarantees, and other customary rights to return products are not considered to be cancellation privileges, but should be accounted for in accordance with Statement 48.[48]

Question 1

Facts: Company M is a discount retailer. It generates revenue from annual membership fees it charges customers to shop at its stores and from the sale of products at a discount price to those customers. The membership arrangements with retail customers require the

---

[46] SOP 97-2, paragraph 31.

[47] Ibid.

[48] Ibid.

customer to pay the entire membership fee (e.g., $35) at the outset of the arrangement. However, the customer has the unilateral right to cancel the arrangement at any time during its term and receive a full refund of the initial fee. Based on historical data collected over time for a large number of homogeneous transactions, Company M estimates that approximately 40% of the customers will request a refund before the end of the membership contract term. Company M's data for the past five years indicates that significant variations between actual and estimated cancellations have not occurred, and Company M does not expect significant variations to occur in the foreseeable future.

Question: May Company M recognize in earnings the revenue for the membership fees and accrue the costs to provide membership services at the outset of the arrangement?

Interpretive Response: No. In the staff's view, it would be inappropriate for Company M to recognize the membership fees as earned revenue upon billing or receipt of the initial fee with a corresponding accrual for estimated costs to provide the membership services. This conclusion is based on Company M's remaining and unfulfilled contractual obligation to perform services (i.e., make available and offer products for sale at a discounted price) throughout the membership period. Therefore, the earnings process, irrespective of whether a cancellation clause exists, is not complete.

In addition, the ability of the member to receive a full refund of the membership fee up to the last day of the membership term raises an uncertainty as to whether the fee is fixed or determinable at any point before the end of the term. Generally, the staff believes that a

sales price is not fixed or determinable when a customer has the unilateral right to terminate or cancel the contract and receive a cash refund. A sales price or fee that is variable until the occurrence of future events (other than product returns that are within the scope of Statement 48) generally is not fixed or determinable until the future event occurs. The revenue from such transactions should not be recognized in earnings until the sales price or fee becomes fixed or determinable. Moreover, revenue should not be recognized in earnings by assessing the probability that significant, but unfulfilled, terms of a contract will be fulfilled at some point in the future. Accordingly, the revenue from such transactions should not be recognized in earnings prior to the refund privileges expiring. The amounts received from customers or subscribers (i.e., the $35 fee mentioned above) should be credited to a monetary liability account such as "customers' refundable fees."

The staff believes that if a customer has the unilateral right to receive both (1) the seller's substantial performance under an arrangement (e.g., providing services or delivering product) and (2) a cash refund of prepaid fees, then the prepaid fees should be accounted for as a monetary liability. In consideration of whether the monetary liability can be derecognized, Statement 140 provides that liabilities may be derecognized only if (1) the debtor pays the creditor and is relieved of its obligation for the liability (paying the creditor includes delivery of cash, other financial assets, goods, or services or reacquisition by the debtor of its outstanding debt securities) or (2) the debtor is legally released from being the primary obligor under the liability.[49] If a customer has the

[49] Statement 140, paragraph 16.

unilateral right to receive both (1) the seller's substantial performance under the arrangement and (2) a cash refund of prepaid fees, then the refund obligation is not relieved upon performance of the service or delivery of the products. Rather, the seller's refund obligation is relieved only upon refunding the cash or expiration of the refund privilege.

Some have argued that there may be a limited exception to the general rule that revenue from membership or other service transaction fees should not be recognized in earnings prior to the refund privileges expiring. Despite the fact that Statement 48 expressly does not apply to the accounting for service revenue if part or all of the service fee is refundable under cancellation privileges granted to the buyer,[50] they believe that in certain circumstances a potential refund of a membership fee may be seen as being similar to a right of return of products under Statement 48. They argue that revenue from membership fees, net of estimated refunds, may be recognized ratably over the period the services are performed whenever pertinent conditions of Statement 48 are met, namely, there is a large population of transactions that grant customers the same unilateral termination or cancellation rights and reasonable estimates can be made of how many customers likely will exercise those rights.

The staff believes that, because service arrangements are specifically excluded from the scope of Statement 48, the most direct authoritative literature to be applied to the extinguishment of obligations under such contracts is Statement 140. As noted above,

[50] Statement 48, paragraph 4.

because the refund privilege extends to the end of the contract term irrespective of the amount of the service performed, Statement 140 indicates that the liability would not be extinguished (and therefore no revenue would be recognized in earnings) until the cancellation or termination and related refund privileges expire. Nonetheless, the staff recognizes that over the years the accounting for membership refunds evolved based on analogy to Statement 48 and that practice did not change when Statement 140 became effective. Reasonable people held, and continue to hold, different views about the application of the accounting literature.

Pending further action in this area by the FASB, the staff will not object to the recognition of refundable membership fees, net of estimated refunds, as earned revenue over the membership term in the limited circumstances where all of the following criteria have been met:[51]

- The estimates of terminations or cancellations and refunded revenues are being made for a large pool of homogeneous items (e.g., membership or other service transactions with the same characteristics such as terms, periods, class of customers, nature of service, etc.).

[51] The staff will question further analogies to the guidance in Statement 48 for transactions expressly excluded from its scope.

- Reliable estimates of the expected refunds can be made on a timely basis.[52] Either of the following two items would be considered indicative of an inability to make reliable estimates: (1) recurring, significant differences between actual experience and estimated cancellation or termination rates (e.g., an actual cancellation rate of 40% versus an estimated rate of 25%) even if the impact of the difference on the amount of estimated refunds is not material to the consolidated financial statements[53] or (2) recurring variances between the actual and estimated amount of refunds that are material to either revenue or net income in quarterly or annual financial statements. In addition, the staff believes that an estimate, for purposes of meeting this criterion, would not be reliable unless it is remote[54] that material adjustments (both individually and in the aggregate) to previously recognized revenue would be required. The staff presumes that reliable estimates cannot be made if the customer's termination or cancellation and refund privileges exceed one year.

[52] Reliability is defined in Concepts Statement 2 as "the quality of information that assures that information is reasonably free from error and bias and faithfully represents what it purports to represent." Paragraph 63 of Concepts Statement 5 reiterates the definition of reliability, requiring that "the information is representationally faithful, verifiable, and neutral."

[53] For example, if an estimate of the expected cancellation rate varies from the actual cancellation rate by 100% but the dollar amount of the error is immaterial to the consolidated financial statements, some would argue that the estimate could still be viewed as reliable. The staff disagrees with that argument.

[54] The term "remote" is used here with the same definition as used in Statement 5.

- There is a sufficient company-specific historical basis upon which to estimate the refunds,[55] and the company believes that such historical experience is predictive of future events. In assessing these items, the staff believes that estimates of future refunds should take into consideration, among other things, such factors as historical experience by service type and class of customer, changing trends in historical experience and the basis thereof (e.g., economic conditions), the impact or introduction of competing services or products, and changes in the customer's "accessibility" to the refund (i.e., how easy it is for customers to obtain the refund).

- The amount of the membership fee specified in the agreement at the outset of the arrangement is fixed, other than the customer's right to request a refund.

If Company M does not meet all of the foregoing criteria, the staff believes that Company M should not recognize in earnings any revenue for the membership fee until the cancellation privileges and refund rights expire.

If revenue is recognized in earnings over the membership period pursuant to the above criteria, the initial amounts received from customer or subscribers (i.e., the $35 fee

[55] Paragraph 8 of Statement 48 notes various factors that may impair the ability to make a reasonable estimate of returns, including the lack of sufficient historical experience. The staff typically expects that the historical experience be based on the particular registrant's historical experience for a service and/or class of customer. In general, the staff typically expects a start-up company, a company introducing new services, or a company introducing services to a new class of customer to have at least two years of experience to be able to make reasonable and reliable estimates.

mentioned above) should be allocated to two liability accounts. The amount of the fee representing estimated refunds should be credited to a monetary liability account, such as "customers' refundable fees," and the remaining amount of the fee representing unearned revenue should be credited to a nonmonetary liability account, such as "unearned revenues." For each income statement presented, registrants should disclose in the footnotes to the financial statements the amounts of (1) the unearned revenue and (2) refund obligations as of the beginning of each period, the amount of cash received from customers, the amount of revenue recognized in earnings, the amount of refunds paid, other adjustments (with an explanation thereof), and the ending balance of (1) unearned revenue and (2) refund obligations.

If revenue is recognized in earnings over the membership period pursuant to the above criteria, the staff believes that adjustments for changes in estimated refunds should be recorded using a retrospective approach whereby the unearned revenue and refund obligations are remeasured and adjusted at each balance sheet date with the offset being recorded as earned revenue.[56]

Companies offering memberships often distribute membership packets describing and discussing the terms, conditions, and benefits of membership. Packets may include vouchers, for example, that provide new members with discounts or other benefits from

[56] The staff believes deferred costs being amortized on a basis consistent with the deferred revenue should be similarly adjusted. Such an approach is generally consistent with the amortization methodology in Statement 91, paragraph 19.

third parties. The costs associated with the vouchers should be expensed when distributed. Advertising costs to solicit members should be accounted for in accordance with SOP 93-7. Incremental direct costs incurred in connection with enrolling customers (e.g., commissions paid to agents) should be accounted for as follows: (1) if revenue is deferred until the cancellation or termination privileges expire, incremental direct costs should be either (a) charged to expense when incurred if the costs are not refundable to the company in the event the customer obtains a refund of the membership fee, or (b) if the costs are refundable to the company in the event the customer obtains a refund of the membership fee, recorded as an asset until the earlier of termination or cancellation or refund; or (2) if revenue, net of estimated refunds, is recognized in earnings over the membership period, a like percentage of incremental direct costs should be deferred and recognized in earnings in the same pattern as revenue is recognized, and the remaining portion should be either (a) charged to expense when incurred if the costs are not refundable to the company in the event the customer obtains a refund of the membership fee, or (b) if the costs are refundable to the company in the event the customer obtains a refund of the membership fee, recorded as an asset until the refund occurs.[57] All costs other than incremental direct costs (e.g., indirect costs) should be expensed as incurred.

---

[57] Statement 91, paragraph 5 and Technical Bulletin 90-1, paragraph 4 both provide for the deferral of incremental direct costs associated with acquiring a revenue-producing contract. Even though the revenue discussed in this example is refundable, if a registrant meets the aforementioned criteria for revenue recognition over the membership period, the staff would analogize to this guidance. However, if neither a nonrefundable contract nor a reliable basis for estimating net cash inflows under refundable contracts exists to provide a basis for recovery of incremental direct costs, the staff believes that such costs should be expensed as incurred. See SAB Topic 13.A.3.f. Question 3.

Question 2

Question: Will the staff accept an analogy to Statement 48 for service transactions subject to customer cancellation privileges other than those specifically addressed in the previous question?

Interpretive Response: The staff has accepted the analogy in limited circumstances due to the existence of a large pool of homogeneous transactions and satisfaction of the criteria in the previous question. Examples of other arrangements involving customer cancellation privileges and refundable service fees that the staff has addressed include the following:

- a leasing broker whose commission from the lessor upon a commercial tenant's signing of a lease agreement is refundable (or in some cases, is not due) under lessor cancellation privileges if the tenant fails to move into the leased premises by a specified date.

- a talent agent whose fee receivable from its principal (i.e., a celebrity) for arranging a celebrity endorsement for a five-year term is cancelable by the celebrity if the celebrity breaches the endorsement contract with its customer.

- an insurance agent whose commission received from the insurer upon selling an insurance policy is refundable in whole for the 30-day period that state law permits the consumer to repudiate the contract and then refundable on a declining pro rata basis until the consumer has made six monthly payments.

In the first two of these cases, the staff advised the registrants that the portion of revenue subject to customer cancellation and refund must be deferred until no longer subject to that contingency because the registrants did not have an ability to make reliable estimates of customer cancellations due to the lack of a large pool of homogeneous transactions. In the case of the insurance agent, however, the particular registrant demonstrated that it had a sufficient history of homogeneous transactions with the same characteristics from which to reliably estimate contract cancellations and satisfy all the criteria specified in the previous question. Accordingly, the staff did not object to that registrant's policy of recognizing its sales commission as revenue when its performance was complete, with an appropriate allowance for estimated cancellations.

Question 3

Question: Must a registrant analogize to Statement 48, or may it choose to defer all revenue until the refund period lapses as suggested by Statement 140 even if the criteria above for analogy to Statement 48 are met?

Interpretive Response: The analogy to Statement 48 is presented as an alternative that would be acceptable to the staff when the listed conditions are met. However, a registrant may choose to defer all revenue until the refund period lapses. The policy chosen should be disclosed and applied consistently.

Question 4

Question: May a registrant that meets the above criteria for reliable estimates of cancellations choose at some point in the future to change from the Statement 48 method to the Statement 140 method of accounting for these refundable fees? May a registrant change from the Statement 140 method to the Statement 48 method?

Interpretive Response: The staff believes that Statement 140 provides a preferable accounting model for service transactions subject to potential refunds. Therefore, the staff would not object to a change from the Statement 48 method to the Statement 140 method. However, if a registrant had previously chosen the Statement 140 method, the staff would object to a change to the Statement 48 method.

Question 5

Question: Is there a minimum level of customers that must be projected not to cancel before use of Statement 48 type accounting is appropriate?

Interpretive Response: Statement 48 does not include any such minimum. Therefore, the staff does not believe that a minimum must apply in service transactions either. However, as the refund rate increases, it may be increasingly difficult to make reasonable and reliable estimates of cancellation rates.

Question 6

Question: When a registrant first determines that reliable estimates of cancellations of service contracts can be made (e.g., two years of historical evidence becomes available), how should the change from the complete deferral method to the method of recognizing revenue, net of estimated cancellations, over time be reflected?

Interpretive Response: Changes in the ability to meet the criteria set forth above should be accounted for in the manner described in paragraph 6 of Statement 48, which addresses the accounting when a company experiences a change in the ability to make reasonable estimates of future product returns.

**b. Estimates and changes in estimates**

Accounting for revenues and costs of revenues requires estimates in many cases; those estimates sometimes change. Registrants should ensure that they have appropriate internal controls and adequate books and records that will result in timely identification

of necessary changes in estimates that should be reflected in the financial statements and notes thereto.

Question 1

Facts: Paragraph 8 of Statement 48 lists a number of factors that may impair the ability to make a reasonable estimate of product returns in sales transactions when a right of return exists.[58] The paragraph concludes by stating "other factors may preclude a reasonable estimate."

Question: What "other factors," in addition to those listed in paragraph 8 of Statement 48, has the staff identified that may preclude a registrant from making a reasonable and reliable estimate of product returns?

Interpretive Response: The staff believes that the following additional factors, among others, may affect or preclude the ability to make reasonable and reliable estimates of product returns: (1) significant increases in or excess levels of inventory in a distribution channel (sometimes referred to as "channel stuffing"), (2) lack of "visibility" into or the

---

[58] These factors include "a) the susceptibility of the product to significant external factors, such as technological obsolescence or changes in demand, b) relatively long periods in which a particular product may be returned, c) absence of historical experience with similar types of sales of similar products, or inability to apply such experience because of changing circumstances, for example, changes in the selling enterprise's marketing policies and relationships with its customers, and d) absence of a large volume of relatively homogeneous transactions."

inability to determine or observe the levels of inventory in a distribution channel and the current level of sales to end users, (3) expected introductions of new products that may result in the technological obsolescence of and larger than expected returns of current products, (4) the significance of a particular distributor to the registrant's (or a reporting segment's) business, sales and marketing, (5) the newness of a product, (6) the introduction of competitors' products with superior technology or greater expected market acceptance, and (7) other factors that affect market demand and changing trends in that demand for the registrant's products. Registrants and their auditors should carefully analyze all factors, including trends in historical data, which may affect registrants' ability to make reasonable and reliable estimates of product returns.

The staff reminds registrants that if a transaction fails to meet all of the conditions of paragraphs 6 and 8 in Statement 48, no revenue may be recognized until those conditions are subsequently met or the return privilege has substantially expired, whichever occurs first.[59] Simply deferring recognition of the gross margin on the transaction is not appropriate.

<u>Question 2</u>

<u>Question</u>: Is the requirement cited in the previous question for "reliable" estimates meant to imply a new, higher requirement than the "reasonable" estimates discussed in Statement 48?

---

[59] Statement 48, paragraph 6.

Interpretive Response: No. "Reliability" of financial information is one of the qualities of accounting information discussed in Concepts Statement 2. The staff's expectation that estimates be reliable does not change the existing requirement of Statement 48. If management cannot develop an estimate that is sufficiently reliable for use by investors, the staff believes it cannot make a reasonable estimate meeting the requirements of that standard.

Question 3

Question: Does the staff expect registrants to apply the guidance in Question 1 of Topic 13.A.4(a) above to sales of tangible goods and other transactions specifically within the scope of Statement 48?

Interpretive Response: The specific guidance above does not apply to transactions within the scope of Statement 48. The views set forth in Question 1 of Topic 13.A.4(a) are applicable to the service transactions discussed in that Question. Service transactions are explicitly outside the scope of Statement 48.

Question 4

Question: Question 1 of Topic 13.A.4(a) above states that the staff would expect a two-year history of selling a new service in order to be able to make reliable estimates of

cancellations. How long a history does the staff believe is necessary to estimate returns in a product sale transaction that is within the scope of Statement 48?

Interpretive Response: The staff does not believe there is any specific length of time necessary in a product transaction. However, Statement 48 states that returns must be subject to reasonable estimation. Preparers and auditors should be skeptical of estimates of product returns when little history with a particular product line exists, when there is inadequate verifiable evidence of historical experience, or when there are inadequate internal controls that ensure the reliability and timeliness of the reporting of the appropriate historical information. Start-up companies and companies selling new or significantly modified products are frequently unable to develop the requisite historical data on which to base estimates of returns.

Question 5

Question: If a company selling products subject to a right of return concludes that it cannot reasonably estimate the actual return rate due to its limited history, but it can conservatively estimate the maximum possible returns, does the staff believe that the company may recognize revenue for the portion of the sales that exceeds the maximum estimated return rate?

Interpretive Response: No. If a reasonable estimate of future returns cannot be made, Statement 48 requires that revenue not be recognized until the return period lapses or a

reasonable estimate can be made.[60] Deferring revenue recognition based on the upper end of a wide range of potential return rates is inconsistent with the provisions of Statement 48.

**c. Contingent rental income**

Facts: Company A owns and leases retail space to retailers. Company A (lessor) renews a lease with a customer (lessee) that is classified as an operating lease. The lease term is one year and provides that the lease payments are $1.2 million, payable in equal monthly installments on the first day of each month, plus one percent of the lessee's net sales in excess of $25 million if the net sales exceed $25 million during the lease term (i.e., contingent rental). The lessee has historically experienced annual net sales in excess of $25 million in the particular space being leased, and it is probable that the lessee will generate in excess of $25 million net sales during the term of the lease.

Question: In the staff's view, should the lessor recognize any rental income attributable to the one percent of the lessee's net sales exceeding $25 million before the lessee actually achieves the $25 million net sales threshold?

Interpretive Response: No. The staff believes that contingent rental income "accrues" (i.e., it should be recognized as revenue) when the changes in the factor(s) on which the contingent lease payments is (are) based actually occur.[61]

[60] Statement 48, paragraph 6(f).

Statement 13 paragraph 19(b) states that lessors should account for operating leases as follows: "Rent shall be reported in income over the lease term as it becomes receivable according to the provisions of the lease. However, if the rentals vary from a straight-line basis, the income shall be recognized on a straight-line basis unless another systematic and rational basis is more representative of the time pattern in which use benefit from the leased property is diminished, in which case that basis shall be used."

Statement 29 amended Statement 13 and clarifies that "lease payments that depend on a factor that does not exist or is not measurable at the inception of the lease, such as future sales volume, would be contingent rentals in their entirety and, accordingly, would be excluded from minimum lease payments and included in the determination of income as they accrue." [Summary] Paragraph 17 of Statement 29 provides the following example of determining contingent rentals:

A lease agreement for retail store space could stipulate a monthly base rental of $200 and a monthly supplemental rental of one-fourth of one percent of monthly sales volume during the lease term. Even if the lease agreement is a renewal for store space that had averaged monthly sales of $25,000 for the past 2 years, minimum lease payments would include only the $200 monthly base rental; the supplemental rental is a contingent rental that is excluded from minimum lease payments. The future sales for the lease term

[61] Lessees should follow the guidance established in EITF Issue 98-9.

do not exist at the inception of the lease, and future rentals would be limited to $200 per month if the store were subsequently closed and no sales were made thereafter.

Technical Bulletin 85-3 addresses whether it is appropriate for lessors in operating leases to recognize scheduled rent increases on a basis other than as required in Statement 13, paragraph 19(b). Paragraph 2 of Technical Bulletin 85-3 states "using factors such as the time value of money, anticipated inflation, or expected future revenues [emphasis added] to allocate scheduled rent increases is inappropriate because these factors do not relate to the time pattern of the physical usage of the leased property. However, such factors may affect the periodic reported rental income or expense if the lease agreement involves contingent rentals, which are excluded from minimum lease payments and accounted for separately under Statement 13, as amended by Statement 29." In developing the basis for why scheduled rent increases should be recognized on a straight-line basis, the FASB distinguishes the accounting for scheduled rent increases from contingent rentals. Paragraph 13 states "There is an important substantive difference between lease rentals that are contingent upon some specified future event and scheduled rent increases that are unaffected by future events; the accounting under Statement 13 reflects that difference. If the lessor and lessee eliminate the risk of variable payments by agreeing to scheduled rent increases, the accounting should reflect those different circumstances."

The example provided in Statement 29 implies that contingent rental income in leases classified as sales-type or direct-financing leases becomes "accruable" when the changes in the factors on which the contingent lease payments are based actually occur. Technical

Bulletin 85-3 indicates that contingent rental income in operating leases should not be recognized in a manner consistent with scheduled rent increases (i.e., on a straight-line basis over the lease term or another systematic and rational allocation basis if it is more representative of the time pattern in which the leased property is physically employed) because the risk of variable payments inherent in contingent rentals is substantively different than scheduled rent increases. The staff believes that the reasoning in Technical Bulletin 85-3 supports the conclusion that the risks inherent in variable payments associated with contingent rentals should be reflected in financial statements on a basis different than rental payments that adjust on a scheduled basis and, therefore, operating lease income associated with contingent rents would not be recognized as time passes or as the leased property is physically employed. Furthermore, prior to the lessee's achievement of the target upon which contingent rentals are based, the lessor has no legal claims on the contingent amounts. Consequently, the staff believes that it is inappropriate to anticipate changes in the factors on which contingent rental income in operating leases is based and recognize rental income prior to the resolution of the lease contingencies.

Because Company A's contingent rental income is based upon whether the customer achieves net sales of $25 million, the contingent rentals, which may not materialize, should not be recognized until the customer's net sales actually exceed $25 million. Once the $25 million threshold is met, Company A would recognize the contingent rental income as it becomes accruable, in this case, as the customer recognizes net sales. The staff does not believe that it is appropriate to recognize revenue based upon the

probability of a factor being achieved. The contingent revenue should be recorded in the period in which the contingency is resolved.

**d. Claims processing and billing services**

Facts: Company M performs claims processing and medical billing services for healthcare providers. In this role, Company M is responsible for preparing and submitting claims to third-party payers, tracking outstanding billings, and collecting amounts billed. Company M's fee is a fixed percentage (e.g., five percent) of the amount collected. If no collections are made, no fee is due to Company M. Company M has historical evidence indicating that the third-party payers pay 85 percent of the billings submitted with no further effort by Company M. Company M has determined that the services performed under the arrangement are a single unit of accounting.

Question: May Company M recognize as revenue its five percent fee on 85 percent of the gross billings at the time it prepares and submits billings, or should it wait until collections occur to recognize any revenue?

Interpretive Response: The staff believes that Company M must wait until collections occur before recognizing revenue. Before the third-party payer has remitted payment to Company M's customers for the services billed, Company M is not entitled to any revenue. That is, its revenue is not yet realized or realizable.[62] Until Company M's

[62] Concepts Statement 5, paragraph 83(a).

customers collect on the billings, Company M has not performed the requisite activity under its contract to be entitled to a fee.[63] Further, no amount of the fee is fixed or determinable or collectible until Company Ms' customers collect on the billings.

B. Disclosures

Question 1

Question: What disclosures are required with respect to the recognition of revenue?

Interpretive Response: A registrant should disclose its accounting policy for the recognition of revenue pursuant to Opinion 22. Paragraph 12 thereof states that "the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue . . .." Because revenue recognition generally involves some level of judgment, the staff believes that a registrant should always disclose its revenue recognition policy. If a company has different policies for different types of revenue transactions, including barter sales, the policy for each material type of transaction should be disclosed. If sales transactions have multiple units of accounting, such as a product and service, the accounting policy should clearly state the accounting policy for each unit of accounting as well as how units of accounting are determined and valued. In addition, the staff believes that changes in estimated returns recognized in

[63] Concepts Statement 5, paragraph 83(b).

accordance with Statement 48 should be disclosed, if material (e.g., a change in estimate from two percent of sales to one percent of sales).

Regulation S-X requires that revenue from the sales of products, services, and other products each be separately disclosed on the face of the income statement.[64] The staff believes that costs relating to each type of revenue similarly should be reported separately on the face of the income statement.

MD&A requires a discussion of liquidity, capital resources, results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.[65] This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in FRR 36 that MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."[66]

---

[64]See Regulation S-X, Article 5-03(b)(1) and (2).

[65] See Regulation S-K, Article 303 and FRR 36.

[66] FRR 36, also see In the Matter of Caterpillar Inc., AAER 363 (March 31, 1992).

Examples of such revenue transactions or events that the staff has asked to be disclosed and discussed in accordance with FRR 36 are:

- Shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period.

- Granting of extended payment terms that will result in a longer collection period for accounts receivable (regardless of whether revenue has been recognized) and slower cash inflows from operations, and the effect on liquidity and capital resources. (The fair value of trade receivables should be disclosed in the footnotes to the financial statements when the fair value does not approximate the carrying amount.)[67]

- Changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns.

- An increasing trend toward sales to a different class of customer, such as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users. Also, increasing service revenue that has a higher profit margin than product sales.

[67] Statement 107.

- Seasonal trends or variations in sales.
- A gain or loss from the sale of an asset(s).[68]

Question 2

Question: Will the staff expect retroactive changes by registrants to comply with the accounting described in this bulletin?

Interpretive Response: All registrants are expected to apply the accounting and disclosures described in this bulletin. The staff, however, will not object if registrants that have not applied this accounting do not restate prior financial statements provided they report a change in accounting principle in accordance with Opinion 20 and Statement 3 no later than the fourth fiscal quarter of the fiscal year beginning after December 15, 1999. In periods subsequent to transition, registrants should disclose the amount of revenue (if material to income before income taxes) recognized in those periods that was included in the cumulative effect adjustment. If a registrant files financial statements with the Commission before applying the guidance in this bulletin, disclosures similar to those described in SAB Topic 11.M should be provided.

[68] Gains or losses from the sale of assets should be reported as "other general expenses" pursuant to Regulation S-X, Article 5-03(b)(6). Any material item should be stated separately.

However, if registrants have not previously complied with GAAP, for example, by recording revenue for products prior to delivery that did not comply with the applicable bill-and-hold guidance, those registrants should apply the guidance in Opinion 20 for the correction of an error.[69] In addition, registrants should be aware that the Commission may take enforcement action where a registrant in prior financial statements has violated the antifraud or disclosure provisions of the securities laws with respect to revenue recognition.

Question 3

Question: The previous question indicates that the staff will not object to cumulative effect-type transition so long as the prior accounting does not represent an error. Could a company whose prior accounting does not represent an error voluntarily adopt a new method consistent with this SAB Topic by restatement of prior periods, rather than through a cumulative catch-up adjustment?

Interpretive Response: In most instances, no. Opinion 20 does not permit restatement of financial statements for a change in accounting principle that does not represent

[69] Opinion 20, paragraph 13 and paragraphs 36-37 describe and provide the accounting and disclosure requirements applicable to the correction of an error in previously issued financial statements. Because the term "error" as used in Opinion 20 includes "oversight or misuse of facts that existed at the time that the financial statements were prepared," that term includes both unintentional errors as well as intentional fraudulent financial reporting and misappropriation of assets as described in SAS 99.

correction of an error, except in very rare circumstances.[70] An exception is a company that is filing publicly for the first time. As stated in paragraph 29 of Opinion 20, those companies are permitted to reflect the adoption of the new policy via a restatement, and the staff believes that approach is usually necessary to avoid confusing investors in an initial public offering.

Question 4

Question: Should a registrant reporting a change in accounting principle as a result of this SAB Topic file a preferability letter?

Interpretive Response: No preferability letter is required if an accounting change is made in response to a newly issued Staff Accounting Bulletin.

Question 5

Question: If a company had not previously adjusted sales revenues, but deferred recognition of the gross margin of estimated returns for a transaction subject to Statement 48, how should it present a current change in accounting to reduce revenue and cost of sales for estimated returns?

[70] See, for example, Opinion 20, paragraph 27.

Interpretive Response: Paragraph 7 of Statement 48 states that "sales revenue and cost of sales reported in the income statement ***shall be reduced*** to reflect estimated returns." Statement 48 does not provide for recognition of sales and costs of sales while deferring gross margin under any circumstance. This SAB Topic provides no new guidance on this point. If a registrant has failed to comply with GAAP, the registrant should retroactively revise prior financial statements in the manner set forth in Opinion 20 and Statement 16.