# EXHIBIT B

Court File No. CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
(Commenced at Brampton)

B E T W E E N :

MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and -

IMAX CORPORATION, RICHARD L. GELFOND,
BRADLEY J. WECHSLER and FRANCIS T. JOYCE

**Defendants**

Proceeding under the *Class Proceedings Act, 1992*

- and -

NEIL S. BRAUN, KENNETH G. COPLAND, MICHAEL FUCHS,
GARTH M. GIRVAN, DAVID W. LEEBRON, MARC A. UTAY
and KATHRYN A. GAMBLE

**Proposed Defendants**

Proposed proceeding under the *Securities Act*

# FACTUM of the Defendants and the Proposed Defendants #3

**• As Responding Parties: to the Motion for Certification •**

Returnable: December 15, 2008

**McCarthy Tétrault LLP**
Barristers and Solicitors
Suite 5300, TD Bank Tower,
Toronto ON M5K 1E6

R. Paul Steep

Dana M. Peebles
Tel: 416 601-7839
Fax: 416 868-0673

**Solicitors for the Defendants
and the Proposed Defendants**

# FACTUM #3: The Certification Motion
## of the DEFENDANTS and PROPOSED DEFENDANTS

## INDEX

PART I - THIS MOTION ... 1
A. No Cause of Action has been Adequately Pleaded ... 2
B. Alleged Common Issues ... 3
1. Most Issues are Not Common ... 3
2. Damages are Not a Common Issue ... 4
C. Preferable Procedure ... 6
1. Governing Law ... 6
2. Forum Non Conveniens ... 8
3. The U.S. Proceeding ... 9
D. Conclusion ... 10
PART II - THE FACTS ... 11
A. The IMAX Statements ... 11
B. The Various Claims ... 13
1. The Existing Common Law Action in Ontario ... 13
2. The Proposed Securities Act Action ... 14
3. The U.S. Proceeding ... 14
C. This Motion ... 14
PART III - THE ISSUES AND THE LAW ... 16
A. Section 5(1)(a): The Pleadings do not Disclose a Cause of Action ... 17
1. Section 5(1)(a) Submissions Incorporate Previous Rule 21 Submissions ... 17
2. A Claim for a Declaration is not truly a "Cause of Action" ... 18
3. The Plaintiffs' Reliance Pleadings Fatally Undermine their Tortious Misrepresentation Claim ... 19
**a) Fraud-on-the-market has been Rejected in Ontario and Cannot be Resurrected under Another Name** ... 22
**b) The Plaintiffs Do Not Plead Reliance (nor do they Deny the Necessity of Reliance) in the context of Fraudulent Misrepresentation** ... 27
**c) The Plaintiffs' Argument that Reliance is *Not* a Mandatory Element of Negligent Misrepresentation is Unsustainable** ... 29
**d) The Authorities Cited by the Plaintiffs Have No Relevance in the Context of the Present Claim:** ... 33
**e) The Plaintiffs' Alternative Argument that the IMAX Statements Ground a Claim in Negligence *Simpliciter*** ... 43
4. The Plaintiffs' Re-Constituted Arguments Based on Negligence Simpliciter Must Fail due to their Failure to Adequately Plead the Elements of Duty of Care required for this Cause of Action ... 47
**a) Overview** ... 47
**b) The Plaintiffs' Negligence *Simpliciter* Claim neither Falls within, nor is it Analogous to, a Recognized Category of Claim:** ... 48

**c) The Plaintiffs' Negligence *Simpliciter* Claim Cannot Survive s. 5(1)(a) Scrutiny as a "Novel" Category of Claim** ... 53
**d) Conclusions** ... 60
5. Additional Authorities Relevant to Duty of Care for Negligent Misrepresentation and Negligence Simpliciter ... 61
B. Section 5(1)(c): The Common Issues are Not Sufficiently Significant to Justify Certification ... 65
1. Whether the IMAX Statements were Made to All Class Members is Not a Common Issue ... 67
2. Reliance is Not a Common Issue ... 69
3. Damages are Not a Common Issue, and Aggregate Damages are clearly Not Available ... 80
**a) Aggregate Damages are Not Available (Overview)** ... 80
**b) Section 24(1)(b) of the CPA Cannot Be Satisfied in the Context of Tort Claims** ... 82
**c) Section 24(1)(c) of the CPA Cannot Be Satisfied because there is no Proof of Loss by Class Members** ... 86
4. Duty of Care is Not a Common Issue ... 87
5. Conclusion re Common Issues ... 89
C. Section 5(1)(d): A Class Action Is Not the Preferable Procedure ... 91
1. On the Basis of Both Traditional Factors, and Unique Multi-Jurisdictional Considerations, this Claim does not Satisfy the CPA's "Preferable Procedure" Principles ... 91
2. The Goals of the CPA do Not Render Certification Preferable ... 92
**a) Behaviour Modification** ... 93
**b) Certification Would be Unfair / Is Not Required for Access to Justice** 94
**c) Judicial Economy – A Class Proceeding Is Not A Fair, Efficient & Manageable Method of Advancing the Claim** ... 96
3. The Substantive "Governing Law" Applicable to each Claim of each Class Member must be Identified Prior to any Common Issues Trial(s) ... 101
**a) The Common Law Claims of a Worldwide Class will be Governed by a Worldwide Array of "Governing Laws"** ... 101
**b) The *Lex Loci Delicti* (Governing Law of the Place the Tort Occurred) and Multi-jurisdictional Wrongdoing** ... 103
**c) The Law Governing a Corporation's "Internal Management" in Not the Governing Law of Tort:** ... 108
**d) The Multitude of Governing Laws Presented by the Plaintiffs' Proposed Worldwide Class are Unprecedented** ... 111
**e) Ascertaining and Applying the Elements of Each Body of Governing Law to the Claims of Each Class Member:** ... 112
4. Individual Issues Related to Forum Conveniens ... 115
5. Individual Issues Related to the U.S. Proceeding ... 119
D. Section 5(1)(e): The Plaintiffs Cannot Properly Represent the Class ... 123
1. They Do Not Share a Common Interest with the Class ... 123
2. They Will Not Vigorously Prosecute the Action ... 124

3. They will not "Fairly and Adequately" Represent the Class ..................... 125
4. Conclusion ........................................................................................ 127
E. Section 5(1)(b): There Is No Identifiable Class ............................................ 128
1. The Class Does Not Share a Common (or Any) Cause of Action ............. 128
2. The Class Does Not Share a Common Issue............................................. 129
3. There Is No Class ......................................................................................... 130
4. Conclusion ........................................................................................ 131
PART IV - THE ORDER REQUESTED ......................................................... 132

# FACTUM #3: The Certification Motion
**of the DEFENDANTS and PROPOSED DEFENDANTS**

## PART I - THIS MOTION

1. The Plaintiffs are investors in the Defendant IMAX Corporation ("IMAX"). They allege that IMAX made an incorrect representation to investors in the secondary market about IMAX's projected, and then filed, 2005 financial results ("the Representation") in certain statements published in February – March 2006 ("the IMAX Statements").

2. In their current Statement of Claim, the Plaintiffs advance four common law causes of action against IMAX and three of its 2006 executives ("the Individual Defendants") on behalf of all individuals who purchased shares in IMAX between February 17, 2006 and August 9, 2006 (and held them until the close of the market on August 9, 2006). In addition, the Plaintiffs move for an Order for leave to serve a proposed Fresh Statement of Claim ("the Fresh Claim"),[1] allowing them to also proceed with the statutory cause of action for misrepresentation established under Part XXIII.1 of the Ontario Securities Act,[2] against the existing Defendants and seven further Directors and Officers of IMAX ("the Proposed Defendants").[3] Class Proceedings have also been commenced by other investors in the United States ("the U.S. Proceedings") on behalf of a class that subsumes the class as defined in this proceeding.

---

[1] All references herein to the Plaintiffs' pleadings, unless otherwise indicated, are to the Fresh Claim, which may be found in the Moving Parties' Motion Record for Leave to Plead the Causes of Action Contained in Part XXIII.1 of the *Securities Act* and for Certification (February 27, 2007) ("Plaintiffs' First Motion Record"), Tab 1, Schedule A.

[2] Securities Act, R.S.O. 1990, c. S.5

[3] The Defendants' responses to the Plaintiffs' claims under the Ontario Securities Act are found in a separate document, the "Factum of the Defendants and the Proposed Defendants #2: Response to Motion for Leave to Proceed" (the "Defendants' Leave to Proceed Factum")

3. This motion is brought by the Plaintiffs for an Order certifying all or part of the Claim, if and as amended, as a class action. The Defendants and Proposed Defendants deny that a duty of care was owed to the Plaintiffs, that the Representation was made as pleaded, or that it is actionable. In addition, they oppose the certification motion in this misrepresentation case because the Plaintiffs have failed to adequately plead the alleged causes of action, and because the common issues are of limited significance and the individual issues are both numerous and significant, rendering a class proceeding not the preferable procedure.

**A. No Cause of Action has been Adequately Pleaded**

4. The Plaintiffs assert common law claims sounding in negligence *simpliciter*, negligent and fraudulent misrepresentation, and conspiracy. In addition, they allege personal liability against the individual directors and officers of IMAX, and vicarious liability against IMAX itself. These claims are addressed by the Defendants in two separate documents: (1) the Defendants' Rule 21 Factum (described more fully below); and (2) submissions relating to s. 5(1)(a) of the CPA found in this Factum. The Court should read these documents together in assessing the Defendants' submissions on s. 5(1)(a).

5. The negligence *simpliciter* and negligent misrepresentation claims are not distinct, and the former is completely subsumed by the latter. Further, regardless of whether or not these claims are treated as separate causes of action, they suffer from the same fatal defect – the Defendants did not owe a duty of care to the Class Members, and the Plaintiffs have failed to plead any basis on which the Court could find a duty to exist. Such a duty is novel, would result in indeterminate liability for pure economic loss, and is inconsistent with the tests enunciated by the Supreme Court of Canada in the context of both negligence *simpliciter* and

negligent misrepresentation. Accordingly, as a matter of law, the pleading does not satisfy the requirements of s. 5(1)(a) of the Class Proceedings Act, 1992, (the "CPA")[4].

6. These and other common law claims must also fail because the Fresh Claim does not adequately plead the constituent elements of each tort. Indeed, the Fresh Claim does not plead that the representation complained of by the Plaintiffs was actually made in the impugned press releases. Further, it does not contain a proper pleading of reliance by any of the Plaintiffs or the class members, even though reliance is an essential element of both negligent and fraudulent misrepresentation. Instead, the Fresh Claim merely invokes the discredited "fraud-on-the-market" theory. The pleading of conspiracy is also incoherent, since it does not identify the Individual Defendants' overt conspiratorial acts; nor does it detail the laws which were said to have thereby violated (thereby rendering the conduct "unlawful"). It even asserts that IMAX's directors and officers conspired with IMAX itself, despite the fact that those directors and officers constitute the very directing mind of IMAX.

7. The Fresh Claim also fails to plead facts which support personal liability against the individual directors and officers, and similarly facts to plead a basis for imposing vicarious liability against IMAX itself.

## B. Alleged Common Issues

### *1. Most Issues are Not Common*

8. The Plaintiffs assert 14 separate proposed common issues. Even if the four common law causes of action had been properly pleaded, many of the proposed issues could only be determined individually. For instance, the Plaintiffs suggest that whether the Class Members

[4] Class Proceedings Act, 1992, R.S.O. 1992, c. 6 [Defendants' Authorities, Tab 1]

relied on the alleged misrepresentation is a common issue. However, this issue can only be determined after considering why each individual bought IMAX shares as well as the individual investment experience of each proposed class member, and cannot be decided merely by a trial of the proposed representative Plaintiffs' respective idiosyncratic decisions: their specific investment circumstances differ from one another in their personal knowledge, interpretations and circumstances.

9. The reliance hurdle is significant in this case given that there is not a single, unified "Representation" which was received and relied upon by the Plaintiffs. In fact, the Plaintiffs cite at least four representations which are alleged to have been made by IMAX over a period of six months. In addition, IMAX was also the subject of numerous other media statements, some of which did not originate with IMAX, all of which may have been relied upon by prospective purchasers to purchase IMAX shares (and indeed, were relied on by the proposed representative Plaintiffs).

***2. Damages are Not a Common Issue***

10. An aggregate assessment of damages is not available in this case because two of the three preconditions set out in s. 24 of the CPA are not met. First and most importantly, because of the nature of the Plaintiffs' common law tort claims, resolution of those issues that may be certified as common will not finally determine the issue of class-wide potential liability as is required by s. 24(1)(b) and the leading authorities. Unlike a claim for breach of contract, or a claim for restitution of the proceeds of a statutory breach, a claim in tort is not complete (and liability does not exist) unless and until it can be shown that damages were actually suffered. Thus, in a tort-based claim, a key prerequisite for aggregate damages -- the

establishing of class-wide potential liability -- can never be satisfied without first establishing liability on an individual basis.

11. Second, as conceded by the Plaintiffs' experts, any effort to quantify the relevant aggregate class-wide damages would only be an "estimate" or require "speculation"; therefore, this key question cannot "reasonably be determined without proof by individual class members" as is required by s. 24(1)(c). Even if liability is established (a possibility which is expressly denied by the Defendants in the present circumstances), the types of "estimates" or "speculation" proposed by the Plaintiffs' experts would still require individual inquiries as to the date or dates on which each putative class member purchased IMAX's shares, the number of shares purchased, the purchase price of the shares, the date or dates on which the putative class member sold the shares, the number of shares sold, and the sale price of the shares. This process is necessary, not to determine individual entitlement to the gross quantum found to constitute the aggregate damages -- as that is a matter that need not be established as a prerequisite to utilizing the aggregate damages approach -- but rather because cumulating the individual entitlements of each claimant on a class-wide basis is the only means of accurately determining the total amount of the aggregate damages in question. In the context of the present tort claims, there is no way to establish the total size of the damages "pie" without first establishing the size of each claimant's "slice" -- it is only by adding together each "slice" that you can reach an aggregate total, which defeats the justification for relying on s. 24 in the first place.

**C. Preferable Procedure**

12. Thus, as summarized above, the inherently individual nature of the Plaintiffs' claims confirms that a class proceeding is not the preferable procedure for resolving the factual and legal issues raised herein.

13. Moreover, unprecedented "conflict of laws" complexities arising from the Plaintiffs' proposed "worldwide class" fundamentally undermine the preferability of this action being certified as a class proceeding.

***1. Governing Law***

14. The Plaintiffs have proposed a worldwide class, which purports to include every investor who purchased an IMAX share within the relevant time frame. The Plaintiffs' claim on behalf of this proposed class is framed entirely without regard to: (i) the residence or domicile of each putative class member, (ii) the jurisdiction where that purchaser allegedly received and relied upon the IMAX Statements, (iii) the exchange (*i.e.*, the TSX or NASDAQ) on which that purchaser bought and/or sold the IMAX securities, and (iv) the place where that purchaser allegedly suffered the damages for which compensation is now sought.

15. The proposed class definition clearly includes class members who would have individually received and relied upon the misrepresentation, and/or have suffered the consequences of the misrepresentation, in multiple jurisdictions *other* than Ontario, including numerous jurisdictions outside Canada. Indeed, it appears that, for the vast majority of putative class members, the jurisdictional nexus described above will be entirely outside Canada, either in one of the United States or otherwise abroad.

16. The Plaintiffs' common law claims, as pleaded, fail to note the multi-jurisdictional nature of the tortious misconduct of which the Defendants are accused. If established, this misconduct will almost certainly be found to have occurred partially (and perhaps primarily) in New York, and partially in Ontario, with the tort in question being directed towards, or "completed" in, each and every jurisdiction (that is, in each province, state or foreign country) where an individual investor felt the consequences of the Defendants' alleged misconduct.

17. These realities underline a fundamental complication which the Plaintiffs have entirely ignored in asserting common law tort claims on behalf of this proposed worldwide investor class. This complication is the necessity for this Court -- ***following*** the certification of any of the Plaintiffs' tort-based "common issues," but ***before*** any common issue trial can be held -- to undertake individual determinations of which body of substantive law (*i.e.*, the laws of which province, state or foreign county) properly governs each of the causes of action (*i.e.*, negligence *simpliciter*, negligent misrepresentation, fraudulent misrepresentations, conspiracy, vicarious liability, *etc*.) being asserted on behalf of each putative class member, or on behalf of each of the numerous geographically-defined sub-classes which will need to be established.

18. As noted, this process -- which is mandated by, and will be undertaken in accordance with, Ontario's conflict of laws rules -- must occur ***prior*** to any trial of the certified common issues. It is obvious that, until the Court knows which body of law will govern the assessment of a particular common issue (*vis-à-vis* a particular class member), there can be no common issue trial.

19. After this initial process of identifying the relevant bodies of governing law applicable to the each claim of each class member or sub-class, the Court must begin the arduous task of

conducting a (potentially lengthy) series of parallel "common" issue trials, each of which will need to establish the substantive content of each relevant element of each of the applicable bodies of governing law (other than the law of Ontario, of course) through expert evidence proffered by duly qualified witnesses. Thereafter, the Court must apply the foreign law (thus proven) to the established facts, in order to assess these (supposedly) "common" issues *vis-à-vis* the claims of each class member whose claim is governed by that particular body of law.

20. The necessity for these heavily individualized processes directly contradicts the principles underlying the certification of "common" issues, and the holding of a single "common" issues trial. As such, it significantly undermines the preferability of a class proceeding in the present circumstances. It should also be noted that the Plaintiffs' Litigation Plan does not contemplate or address this fundamental issue, despite the fact that it is arises only because of their proposal of a worldwide class (the vast majority of whom are non-Canadian residents).

### ***2. Forum Non Conveniens***

21. Determining whether or not the governing law applicable to a particular cause of action is that of Ontario, or that of another jurisdiction, is one element of determining whether or not Ontario is a convenient forum for the determination of the parties' dispute. A variety of additional factors -- involving such issues as the location of evidence and witnesses, the avoidance of multiple proceedings, the existence of juridical advantages available to the plaintiffs in one jurisdiction or another -- are also legitimately raised in the context of a *forum conveniens* analysis.

22. There is a significant likelihood that -- after, or perhaps as part of, the process of identifying the relevant bodies of governing law applicable to the claims of the worldwide

class -- an assessment of Ontario as a convenient forum will be necessary. In such circumstances, individual inquiries will be required to determine whether the Ontario Court is a convenient forum to determine the discrete common law claims (governed by a multitude of foreign laws) on the part of individual class members and/or sub-classes.

23. By way of illustration, it can readily be imagined that some class members will be U.S. citizens, who were resident in a U.S. state when they allegedly received the IMAX Statements and when they made the decision to purchase IMAX's shares, which may have occurred on the advice of U.S. financial planners, and which may have involved the use of a U.S. brokerage to purchase and/or sell those securities over the U.S.-based NASDAQ, with a loss being suffered in the relevant U.S. state. Such class members would be pursuing a claim -- almost certainly governed by the laws of one or more U.S. states -- against Defendants, some of whom are themselves U.S. residents (and whose allegedly tortious conduct occurred in whole or in part in the U.S.). Would Ontario, in the face of such a combination of legal, factual and evidentiary factors, truly be considered a convenient forum (particularly in light of the parallel U.S. Proceeding)? This would be a matter which this Court would need to determine prior to the holding of any common issue trials.

24. As noted above, the likelihood of this assessment of individual issues in order to assess *forum conveniens* undermines the preferability of a class proceeding in the present circumstances. Again, it is a matter which is not contemplated or addressed by the Plaintiffs' Litigation Plan.

***3. The U.S. Proceeding***

25. Given the current overlapping classes proposed for this proceeding and for the U.S. Proceeding, an individual analysis may be required to determine whether any particular class

member is even entitled to seek relief in this proceeding. If the U.S. Proceeding is resolved (through settlement or otherwise) prior to this proceeding being resolved, a class member who has recovered in the U.S. Proceeding may be estopped from claiming in this proceeding as well.

**D. Conclusion**

26. As a result of these overwhelming individual issues, this case is not amenable to class certification. There are limited common issues and their resolution would not materially advance the litigation. Given the significant individual issues, some of which must be determined prior to the trial of any common issues, a class action is not a preferable procedure. Further the Plaintiffs are not representative of the proposed class of investors, and the Litigation Plan is not appropriate.

# PART II - THE FACTS

27. This action, and the statutory cause of action contained in the proposed Fresh Claim, arises from an accounting decision made by IMAX which, according to the Plaintiffs, led to an actionable misrepresentation being communicated to the investing public.

28. While IMAX did subsequently change the accounting decision made in respect of its financial statements for 2005, the impact of that innocent error on individuals who purchased IMAX shares over the seven months of the proposed Class Period in 2006 was either non-existent, or diffused within myriad other facts, opinions and information that inform purchasers' investment decisions; a conclusion most tellingly illustrated by the evidence of the two proposed representative Plaintiffs themselves as to why they purchased their shares.

## A. The IMAX Statements

29. In early 2006, IMAX, in consultation with its auditors, PriceWaterhouseCoopers ("PwC"), addressed how it should recognize revenue in its 2005 financial statements for certain sales transactions. IMAX followed the advice of PwC as to the proper judgement on this complex issue. PwC gave IMAX a clean audit opinion for that year. [5]

30. On February 17, 2006, IMAX issued a press release as to its projected 2005 financial results (the "February Press Release"). [6]

31. On March 9, 2006, IMAX issued a press release describing its 2005 financial results,[7] filed its audited financial statements as part of its Form 10-K and Annual Report,[8] and issued a second press release announcing that it was seeking a strategic buyer.[9]

---

5 IMAX Annual Report for 2005, at pp. 55-58: Rule 21 Motion Record of the Defendants, Tab 5
6 IMAX Press Release of February 17, 2006: Rule 21 Motion Record of the Defendants, Tab 2

32. These four statements made by IMAX in February-March 2006 to the secondary market regarding its projected and then final 2005 financial results were, according to the Fresh Claim of the Plaintiffs, either negligent or reckless misrepresentations, and further, were the product of the negligence of, and/or a conspiracy by, the Defendants.[10]

33. In late July of 2006 (some 4 to 5 months after the making of the IMAX Statements), each of the proposed representative Plaintiffs read an article in the *Globe and Mail* setting out a market rumour (not a statement by IMAX) that there were four potential buyers of IMAX, including Sony Corp. and Elevation, an investment vehicle founded by Bono and colleagues. That rumour caused each of the Plaintiffs to buy shares in IMAX immediately thereafter.[11]

34. On August 9, 2006, IMAX issued a press release (the "August Press Release"). Therein IMAX advised:

(a) that IMAX was subject to an informal inquiry by the SEC as to how it had recognized revenue;

(b) that IMAX remained of the view -- as did PwC -- that IMAX's 2005 accounting was in accordance with GAAP; and

(c) that its 5-month search for a buyer or strategic investor had been unsuccessful.[12]

---

[7] IMAX Press Release of March 9, 2006: Rule 21 Motion Record of the Defendants, Tab 3
[8] IMAX 10-K and Annual Report for 2005: Rule 21 Motion Record of the Defendants, Tab 5
[9] IMAX Press Release of March 9, 2006: Rule 21 Motion Record of the Defendants, Tab 4
[10] Fresh Claim, at paras. 52, 63, 67, 72: Plaintiffs' First Motion Record, Tab 1, Schedule A
[11] "Sony among four chasing IMAX; Bono-backed equity fund Elevation also seen as one of the potential buyers," Exhibit "II" to Affidavit of M. Livie, sworn September 11, 2007: Motion Record of the Responding Parties, Vol. II, Tab 11(II); Cross-Examination of C. Cohen, April 9, 2008, at p. 77 line 13 – p. 78, line 10; Cross-Examination of M. Silver, April 17, 2008, at p. 48, lines 13-26
[12] IMAX press release of August 9, 2006, Exhibit "JJ" to Affidavit of M. Livie, sworn September 11, 2007: Motion Record of the Responding Parties, Vol. II, Tab 11(JJ)

35. The following day, the share price of IMAX dropped approximately 40%.[13]

36. On July 20, 2007, IMAX announced, after consulting with PwC (as well as legal counsel and other accounting experts retained by counsel), that an error had been made in respect of past revenue recognition, and released restated financial statements for the years 2002 – 2005.[14] The same total amount of revenue was recognized by IMAX, but some of it was moved between quarters and years. (That is, IMAX had received real cash for real sales. IMAX is <u>not</u> accused of reporting false sales. Rather, the issue was the timing or "recognition" of the cash received as "revenue.")

**B. The Various Claims**

37. At the heart of this lawsuit is the complex decision-making process engaged in by purchasers on the stock markets and the effect, if any, the alleged misrepresentation had on that decision-making process.

***1. The Existing Common Law Action in Ontario***

38. In September 2006, the two proposed representative Plaintiffs' issued a joint Statement of Claim against IMAX, its two CEOs (Messrs. Gelfond and Wechsler), and its then-CFO (Mr. Joyce), alleging that the IMAX Statements were actionable at common law because of the accounting error in IMAX's 2005 financial results.[15] Both proposed representative Plaintiffs had commenced previous proceedings separately against IMAX.[16]

---

[13] Exhibit "B" to Affidavit of M. Livie, sworn September 11, 2007: Motion Record of the Responding Parties, Vol. II, Tab 11(B)

[14] IMAX Press Release July 20, 2007, Exhibit "J" to Affidavit of S. Selig, sworn August 2, 2007: Moving Parties' Second Supplementary Motion Record for Leave to Plead the Causes of Action Contained in Part XXIII.1 of the *Securities Act* and for Certification (Aug. 10, 2007) ("Plaintiffs' Second Supp. Motion Record"), Tab 1(J)

[15] Statement of Claim: Rule 21 Motion Record of the Defendants, Tab 9

[16] Notice of Action and Statement of Claim: Rule 21 Motion Record of the Defendants, Tabs 7, 8

### *2. The Proposed Securities Act Action*

39. In February 2007, the Plaintiffs served a Motion Record seeking leave from the Court to issue a Fresh Claim to also plead the Securities Act cause of action for misrepresentation in the secondary market against the Defendants, and against the remaining Directors and the Controller at the time, as added parties ("the Proposed Defendants").[17]

### *3. The U.S. Proceeding*

40. In 2006, a number of class proceeding were commenced in the United States. On January 17, 2007, the class proceedings were consolidated into one proceeding in New York as against IMAX and others alleging *inter alia* fraudulent and negligent misrepresentation.[18] The Class, as defined in the U.S. Proceeding is "all persons or entities who purchased or otherwise acquired IMAX common stock . . . from February 27, 2003 throughout July 20, 2007, inclusive."[19] The U.S. Proceeding is still pending. If it is certified without modification of its class definition -- and if this proceeding is also certified without modification of its class definition -- the class members as defined in this proceeding will be class members in two separate proceedings arising from the same or similar facts.

## C. This Motion

41. This motion seeks certification of this lawsuit, being the common law causes of action, and also, if leave is granted, of the Securities Act causes of action, as a class action.

---

17 Notice of Motion and Fresh Claim: Plaintiffs' First Motion Record, Tab 1 and Schedule A thereto
18 *Kaplan v. Gelfond*, 2007 U.S. Dist. LEXIS 4446 (S.D.N.Y.) [Defendants' Authorities, Tab 62]
19 Exhibit "C" to Affidavit of M. Robb, sworn February 12, 2008, Consolidated Amended Complaint, at para. 21: Moving Parties' Third Supplementary Motion Record for Leave to Plead the Causes of Action Contained in Part XXIII.1 of the *Securities Act* and for Certification (February 12, 2008) ("Plaintiffs' Sixth Supp. Motion Record"), Tab 1(C)

42. The facts are more fully set out in the companion Factum of the Defendants and Proposed Defendants opposing the Leave to Proceed motion, and relevant testimony and documents shall only be referred to herein as necessary.

# PART III - THE ISSUES AND THE LAW

43. The Plaintiffs have the burden of establishing that the proposed worldwide class should be certified as a class proceeding.

44. In order to discharge this burden, the Plaintiffs must establish that each of the five criteria set out in s. 5(1) of the CPA are satisfied. The Defendants oppose the certification motion because:

(a) there is no proper cause of action pleaded in the Fresh Claim (section 5(1)(a));

(b) the common issues amongst the proposed class members will not materially advance the litigation (section 5(1)(c));

(c) a class action is not the preferable procedure to address the allegations made (section 5(1)(d));

(d) the proposed representative Plaintiffs are not representative of the proposed class of investors, and neither Plaintiff has prepared an adequate Litigation Plan (section 5(1)(e)); and

(e) there is no properly defined class of persons (section 5(1)(b)).

45. The onus is on the Plaintiffs to prove each element of the test for certification,[20] including establishing the facts to support each element.[21] They have failed to do so for the

---

[20] *Hollick v. Toronto (City)*, [2001] 3 S.C.R. 158, [2001] S.C.J. No. 67 at paras. 22, 25 [Plaintiffs' Authorities, Tab 30]; *Hickey-Button v. Loyalist College of Applied Arts & Technology*, [2006] O.J. No. 2393 (C.A.) [Plaintiffs' Authorities, Tab 29]

[21] *Hollick v. Toronto (City)*, [2001] 3 S.C.R. 158, [2001] S.C.J. No. 67 at para. 25 [Plaintiffs' Authorities, Tab 30]

reasons set out below. To certify this class proceeding on the basis proposed by the Plaintiffs would only create a "monster of complexity and cost."[22]

## A. Section 5(1)(a): The Pleadings do not Disclose a Cause of Action

### *1. Section 5(1)(a) Submissions Incorporate Previous Rule 21 Submissions*

46. The Defendants deny that the Plaintiffs have satisfied the threshold criterion established by s. 5(1)(a) of the CPA. There is no proper common law cause of action pleaded in the Fresh Claim.

47. Many of the Defendants' submissions in support of this argument are contained in a separate document, the "Factum of the Defendants #1: Motion to Strike under Rule 21" (the "Rule 21 Factum"). In particular, the Rule 21 Factum enumerates various flaws in the Fresh Claim's pleading of (i) negligence, (ii) negligent misrepresentation, (iii) fraudulent misrepresentation, (iv) conspiracy, (v) liability against individual officers and directors, and (vi) vicarious liability.

48. Given that no separate Rule 21 motion will be heard by this court, the Defendants request that the submissions made, and the authorities cited, in the Rule 21 Factum be read together with, and if necessary incorporated by reference into, the present analysis under s. 5(1)(a) of the CPA. The present Factum expands and elaborates on those earlier submissions, and responds directly to issues raised in the Plaintiffs' Factum.

---

[22] *Chadha v. Bayer Inc.* (2001), 54 O.R. (3d) 520 at pp. 547-548 (para. 37) (Div. Ct.), *aff'd* (2003), 63 O.R. (3d) 22 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 106 [Defendants' Authorities, Tab 31]

### *2. A Claim for a Declaration is not truly a "Cause of Action"*

49. The Defendants agree entirely with the Plaintiffs' statement that "[a] declaratory judgment is an established <u>remedy</u> under Canadian law," and do not take issue with the proposition that a plaintiff may seek a declaration without the need to also seek consequential relief.[23] However, in their Factum, the Plaintiffs go on to assert that a claim for a declaration *also* constitutes a "cause of action."[24] In the Defendants' view, this bald statement is potentially misleading.

50. Properly understood, "the declaratory judgment does <u>not</u> involve a cause of action in the usual sense."[25] Rather, as acknowledged by the Plaintiffs themselves, a declaration is a "remedy."[26] More specifically, a declaration is a peculiar form of remedy which cannot be enforced in any traditional manner by a plaintiff against a defendant.[27]

51. The Plaintiffs cite two authorities in support of their assertion that a declaratory judgment is a cause of action.[28] While the unreported "Order" of Justice Hoy in *Smith v. National Money Mart* unquestionably "declares" that the "causes of action" asserted by the plaintiffs include "declarations," her Order (naturally) includes no discussion, analysis or explanation in support of this conclusory statement. In contrast, the more authoritative of the

---

[23] Plaintiffs' Factum, at para. 247 [Emphasis added]
[24] Plaintiffs' Factum, at para. 248
[25] Young, *Declaratory Orders*, 2d ed. (Sydney: Butterworths, 1984) at p. 9 [Defendants' Authorities, Tab 7] [Emphasis added]
[26] Plaintiffs' Factum, at para. 247
[27] Sarna, *The Law of Declaratory Judgments*, 3d ed. (Toronto: Thomson, 2007) at pp. 1, 3; Woolf, *The Declaratory Judgment*, 3d ed. (London: Sweet & Maxwell, 2002) at pp. 1-3 [Defendants' Authorities, Tab 5]
[28] Plaintiffs' Factum, at para. 248

cases cited by the Plaintiffs, the Court of Appeal's ruling in *Markson*, may support the opposite conclusion.[29]

### *3. The Plaintiffs' Reliance Pleadings Fatally Undermine their Tortious Misrepresentation Claim*

52. At the core of the Plaintiffs' various common law causes of action is the allegation that the Defendants made an actionable misrepresentation, either fraudulently or negligently, in the form of the IMAX Statements. At its most basic level, the Plaintiffs' allegation is that the Defendants made, or were responsible for, a misstatement which supposedly caused damage to members of the proposed class.

53. Unfortunately for the Plaintiffs, in cases like the present one, Canadian tort law unambiguously demands that *actual reliance* on an alleged misrepresentation must be pleaded and ultimately proven by any and all plaintiffs. This is a mandatory prerequisite which must be satisfied before liability, under the rubrics of either negligent or fraudulent misrepresentation, will be imposed on the maker of the alleged misrepresentation.[30]

54. This is a hurdle which the Plaintiffs cannot overcome. Even the most generous review of the pleadings contained in the Fresh Claim confirms that the absence of reliance leaves the Plaintiffs' tortious misrepresentation claims doomed to fail.

---

[29] The Plaintiffs specifically refer to *Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 at paras. 41, 49 (C.A.), *leave to appeal refused*, [2007] S.C.C.A. No. 346 [Plaintiffs' Authorities, Tab 41]. The two paragraphs identified by the Plaintiffs do nothing more than confirm that a declaration of statutory breach establishes a prerequisite to either restitutionary relief or damages for breach of contract. However, when these statements are considered in light of paras. 34 and 35 of the same ruling, it is clear that both the certification judge and the Court of Appeal agreed that the <u>relevant causes of action</u> were (i) unjust enrichment and (ii) breach of contract. In contrast, the claim for a declaration was <u>not</u> characterized as a separate cause of action, but merely as a form of relief relating to the actual causes of action -- namely, the plaintiffs' "claims for restitution and breach of contract."

[30] Leading authorities supporting this statement are cited and discussed below.

55. In this regard, it is highly relevant that the Fresh Claim expressly alleges that only one of the two proposed Representative Plaintiffs, Mr. Silver, actually "relied upon the Representation by reading and relying upon the [IMAX Statements]."[31] However, as discussed in the Rule 21 Factum, this bald allegation of reliance is wholly inadequate to meet the pleading standard imposed upon the plaintiffs. The Ontario courts have held that it is insufficient for a secondary market investor, who alleges negligent misrepresentation against a company and its directors *vis-à-vis* statements in its annual securities filings and related press releases, to simply plead that such documents induced him or her to purchase the company's shares. Instead, the plaintiff must plead that he or she relied upon a specific statement by the defendants in making a specific purchase of the company's shares.[32] The necessity of such a pleading is particularly apparent in this case, since the Fresh Claim discloses that Silver engaged in two separate purchases of IMAX shares, and did so after July, when the press coverage of Bono's potential interest in IMAX appeared.

56. The Fresh Claim utterly fails to meet this standard. Indeed, it does not even plead that Silver relied upon any of the IMAX Statements in making any purchases of shares. Instead, it alleges that he read and relied upon the documents which "contained" the IMAX Statements in the abstract.[33] When it comes to relying upon the IMAX Statements in connection with actual "act of purchasing or acquir[ing] Imax securities", the Fresh Claim merely pleads that such reliance occurred by virtue of the "relationship as pleaded between IMAX's financial

---

31 Fresh Claim, at para. 73: Plaintiffs' First Motion Record, Tab 1, Schedule A

32 *Deep v. M.D. Management* (2007), 35 B.L.R. (4th) 86 at paras. 21-26 (Ont. S.C.J.), *aff'd* [2008] O.J. No. 961 (C.A.) [Defendants' Authorities, Tab 42]. In affirming D.M. Brown's ruling in this case, the Court of Appeal specifically agreed with both his "analysis and conclusions".

33 Fresh Claim, at para. 73: Plaintiffs' First Motion Record, Tab 1, Schedule A

results and its publicly-traded securities", i.e., the fraud-on-the-market theory, not Silver's actual reading of the specific IMAX Statements themselves.[34]

57. This pleading failure also serves to undermine the Plaintiffs' broader misrepresentation claim, particularly when this bald allegation is contrasted with the Plaintiffs' failure to plead the fact of any reliance by Mr. Cohen, the second proposed Representative Plaintiff, or by the other class members. The Plaintiffs clearly recognize that an absence of any actual reliance by Mr. Cohen prevented them from pleading this necessary element of the parallel torts of negligent and fraudulent misrepresentation. More significantly for the Plaintiffs, this fundamental flaw in the claim of Mr. Cohen (*qua* proposed Representative Plaintiff) underscores the reality that, by extension, it would be impossible to plead or prove the existence of actual reliance on the misrepresentations by many (and perhaps most) of the putative class members.

58. In an effort to circumvent this fundamental and fatal flaw in their common law claims, the Plaintiffs have put forward a series of overlapping assertions and arguments which they hope are sufficient to overcome (or at least to obscure) the absence of actual reliance placed by all class members on the IMAX Statements. A review of the Fresh Claim, together with the Plaintiffs' Factum, reveals the outlines of the Plaintiffs' strategy in this regard:

(a) Utilizing an economic theory of "efficient markets," the Plaintiffs seek to resurrect and rehabilitate the foreign legal doctrine of "fraud-on-the-market";

---

[34] Fresh Claim, at para. 74: Plaintiffs' First Motion Record, Tab 1, Schedule A

(b) Interestingly, this attempt to assert a *de facto* fraud-on-the-market theory is the only attempt made by the Plaintiffs to satisfy their obligation to plead and prove reliance as an element of fraudulent misrepresentation;

(c) Turning to the parallel tort of negligent misrepresentation, the Plaintiffs argue -- as an alternative to their *de facto* fraud-on-the-market theory -- that reliance is not a mandatory element of the tort of negligent misrepresentation if causation can be otherwise proven;

(d) In support of this contention -- *i.e.*, that reliance is not a necessary element of negligence misrepresentation -- the Plaintiffs cite various (entirely irrelevant) judicial authorities; and

(e) As an alternative approach, the Plaintiffs attempt to re-cast their claim as one sounding in negligence *simpliciter* (albeit a negligence *simpliciter* claim predicated on the making of the IMAX Statements, perhaps as a form of "negligent performance of services").

Each of the foregoing issues is addressed in the paragraphs that follow. For the reasons outlined below, none of the Plaintiffs' common law tort pleadings are capable of surviving scrutiny under s. 5(1)(a).

### a) Fraud-on-the-market has been Rejected in Ontario and Cannot be Resurrected under Another Name

59. In the Fresh Claim, the Plaintiffs attempt to obscure their inability to plead actual reliance by Mr. Cohen (which stands in contrast to their pleadings *vis-à-vis* Mr. Silver) by

asserting that Mr. Cohen, along with all other members of the putative class, "relied upon the Representation by the act of purchasing or acquir[ing] IMAX securities."[35]

60. In essence, the Plaintiffs' argument is that -- because the market price of IMAX's shares inherently and inevitably reflected the IMAX Statements -- the very act of purchasing an IMAX share should be presumed to constitute "reliance" by the purchaser on the alleged misrepresentations, despite the absence of any actual reliance by that individual. This interpretation of the Plaintiffs' pleading is confirmed by the Plaintiffs' suggestion (contained in their Factum) that this court should conclude that, "[i]f the trading price of IMAX shares…reflected the Representation, …the purchase of shares constitutes reliance….."[36]

61. In the Fresh Claim, the Plaintiffs attempt to provide a theoretical framework for this assertion of deemed reliance through recourse to what might be described as "the efficient market theory":

> 57. The price of Imax's publicly-traded securities was directly affected by the periodic disclosures regarding Imax's financial results.….
> …..
> 59. Imax and the Individual Defendants routinely transmitted the documents referred to above to the financial press, financial analysts and certain prospective and actual holders of the Imax securities.
>
> 60. Imax and the Individual Defendants regularly communicated with the public investors and financial analysts via established market-communication mechanisms, including through regular dissemination of press releases on newswire services in Canada and the United States. The price of Imax's publicly-traded securities were directly affected each time Imax and the Individual Defendants

---

35 Fresh Claim, at para. 74 [Emphasis added]: Plaintiffs' First Motion Record, Tab 1, Schedule A. In the next paragraph of the Fresh Claim (para. 75), the Plaintiffs speak of the damages suffered by all class members "as a result of relying on the Representation and purchasing the Imax shares"; in this context, it is clear that the "reliance" in question is the "deemed reliance" referred to above.

36 Plaintiffs' Factum, at para. 292, where this assertion is used by the Plaintiffs to justify their assertion that reliance should be a common, rather than an individual, issue.

> communicated new, material information about its financial results to the public.
> .....
> 62. Imax's securities were traded on the TSX and NASDAQ, which are efficient and automated markets. The price at which Imax securities traded on the TSX and NASDAQ incorporated material information about Imax's financial results which was disseminated to the public through the documents referred to above, distributed by Imax and the Individual Defendants as well as by other means. [37] [Emphasis added]

This approach receives further elaboration in the Plaintiffs' Factum, where an economist's affidavit is quoted as support for the proposition that class members' purchase of IMAX shares constitutes "reliance" to the extent that share price reflects the IMAX Statements:

> 18. I believe that the price at which the shares of Imax traded during the Class Period incorporated and reflected information released by management concerning the financial performance of Imax, especially relating to the crucial subject of earnings. I base that belief on the efficiency of the TSX and the NASDAQ,…. I have therefore concluded that the prices at which the Class Members bought the shares of Imax during the Class Period incorporated the Representation. [38] [Emphasis added]

62. Thus, the Plaintiffs' "efficient market theory" is predicated on the principles that (i) in an efficient market, (ii) misrepresentations made by a corporation to both shareholders and third parties, (iii) are inevitably reflected in the trading price of shares, and (vi) when this fact is proved, a purchaser of those shares is presumed or deemed to have relied on the corporation's misrepresentations.

63. This set of principles is, for all intents and purposes, indistinguishable from the U.S. doctrine of fraud-on-the-market. A recent appellate ruling from the United States has described that doctrine as follows:

---

[37] Fresh Claim, at paras. 57, 59, 60, 62: Plaintiffs' First Motion Record, Tab 1, Schedule A

[38] Plaintiffs' Factum, at para. 292, where this assertion is used by the Plaintiffs to justify their argument that reliance should be a common, rather than an individual, issue.

> ….[T]his is not a traditional securities claim. It is a fraud-on-the-market claim. None of the plaintiffs asserts that he read any of Baxter's press releases or listened to an executive's oral statement. Instead the theory is that other people (professional traders, mutual fund managers, securities analysts) did the reading, and that they made trades or recommendations that influenced the price. In an efficient capital market, all information known to the public affects the price and thus affects every investor. *Basic Inc. v. Levinson*, 485 U.S. 224, 241-47.... (1988), holds that reliance on the accuracy of the price can substitute for reliance on the accuracy of particular written or oral statements, when the statements affect the price--as they do for large and well-followed firms such as Baxter, for which there is a liquid public market. This works only to the extent that markets efficiently reflect (and thus convey to investors the economic equivalent of) all public information. .... [39] [Emphasis added]

64. In the leading Canadian case responding to efforts to import fraud-on-the-market into this country, Justice Winkler described the doctrine as follows:

> Effectively, the fraud on the market theory creates a rebuttable presumption of reliance on certain misrepresentations, thus obviating the need to prove such reliance on an individual basis. As stated by the plaintiffs at para. 28 of their reply factum on the motion:
>
> > The "fraud-on-the-market" theory rebuttably presumes reliance when there is proof that the market price of the shares under consideration reflected the pleaded misrepresentations.
>
> Hence, the sought after amendments to the fresh statement of claim in the *Carom I* action provide:
>
> A. The markets are efficient. The day-to-day price of Bre-X shares represented all of the information . . . disseminated by Bre-X, the Insiders, Nesbitt Burns, Bianchini, First Marathon and Smith.
>
> B. The purchase or holding of shares of Bre-X by the Class Members was, in effect, an act of reliance on each and every statement made by Bre-X and the Insiders. [40] [Emphasis added]

---

[39] *Asher v. Baxter*, 377 F.3d 727 at pp. 731-732 (7th Cir. 2004), *cert denied*, 544 U.S. 920 (2005) [Defendants' Authorities, Tab 15]

[40] *Carom et al. v. Bre-X Minerals Ltd.* (1998), 41 O.R. (3d) 780, [1999] O.J. No. 1662 at pp. 785-786 (Gen. Div.) [Defendants' Authorities, Tab 28]

65. Thus, each of the elements making up the Plaintiffs' assertion of presumed reliance based on "efficient markets" is exactly mirrored in the standard description of the elements of the fraud-on-the-market doctrine. Thus, the "efficient market theory" is nothing more than the Plaintiffs' effort to "sell" this Court "old wine in new bottles."[41]

66. This conclusion is critical, given the well-established rejection of the fraud-on-the-market doctrine in Ontario, specifically in the context of common law negligent and fraudulent misrepresentation claims:

> The torts of fraudulent and negligent misrepresentation are neither novel nor undeveloped in Canada. Both have been canvassed by the Supreme Court of Canada and the pronouncements of that court on the elements of each must be considered to be settled law. In my view, the presumption of reliance created by the fraud on the market theory can have no application as a substitute for the requirement of actual reliance in either tort. In the context of the torts of fraudulent and negligent misrepresentation a presumption of the nature advocated for by the plaintiffs does not exist in Canadian common law. Indeed, to import such a presumption would amount to a redefinition of the torts themselves. [42] [Emphasis added]

67. It is notable that, even in its country of origin, the fraud-on-the-market doctrine has limited application, in the sense that it appears to be available only to support a claim predicated on the S.E.C.'s Rule 10b-5. In contrast, its has been rejected as a substitute for reliance in *common law* fraudulent and negligent misrepresentation claims governed by state law and relating to securities misrepresentations.[43]

68. Despite the obvious setback for class counsel in this province flowing from this judicial rejection of a favourable legal theory, the Plaintiffs in the present case have attempted

---

[41] And to do so in circumstances where the "old wine" in question has been declared "unfit for consumption" in this province.

[42] *Carom et al. v. Bre-X Minerals Ltd.* (1998), 41 O.R. (3d) 780, [1999] O.J. No. 1662 at p. 794 (Gen. Div.) [Defendants' Authorities, Tab 28]

[43] *Kaufman v. I-Stat Corp.*, 165 N.J. 94 at pp. 97-98, 109-110 and 113-117 (S.C., 2000) [Defendants' Authorities, Tab 63]

to "repackage" this discredited doctrine under a different rubric (that of the "efficient market"), and to thereby reintroduce it into Ontario law. This transparent attempt to rehabilitate a discredited doctrine cannot save the Plaintiffs' claims of negligent or fraudulent misrepresentation in the absence of pleadings disclosing actual reliance on the IMAX Statements.

69. Although no such argument appears in the Plaintiffs' Factum, and although no basis for such an argument is pleaded in the Fresh Claim, the Defendants anticipate that the Plaintiffs may seek to distinguish their "efficient market" theory from the fraud-on-the-market doctrine by characterizing their current theory as merely creating a rebuttable factual inference of reliance.[44] This is a misleading characterization of the argument actually asserted by the Plaintiffs, which could only be designed to disguise the true nature of their position. The Defendants also note that, even if such a characterization were to be accepted by this Court, it would represent a pyrrhic victory for the Plaintiffs, since such a rebuttable factual presumption of reliance has been definitively rejected as a common issue under s. 5(1)(c) of the CPA,[45] as will be discussed subsequently in the context of common issues.

### b) The Plaintiffs Do Not Plead Reliance (nor do they Deny the Necessity of Reliance) in the context of Fraudulent Misrepresentation

70. It is trite that the absence of actual reliance on a deceitful misstatement will preclude the imposition of liability under the tort of fraudulent misrepresentation:

---

44 *Mondor et al. v. Fisherman et al.* (2001), 18 B.L.R. (3d) 260, [2001] O.J. No. 4620 (S.C.J.) [Plaintiffs' Authorities, Tab 43]

45 *Serhan Estate v. Johnson & Johnson* (2004), 72 O.R. (3d) 296 at paras. 56-60, 63 (S.C.J.) [Defendants' Authorities, Tab 97], *aff'd on other grounds* (2006), 85 O.R. (3d) 665 (Div. Ct.) [Plaintiffs' Authorities, Tab 60], *leave to appeal to C.A. refused* (Oct. 16, 2006, Ont. C.A.), *leave to appeal S.C.C. refused*, [2006] S.C.C.A. No. 494

> The Supreme Court of Canada has held that actual reliance is an essential element of a common law cause of action in either fraudulent or negligent misrepresentation.
>
> In *Parna v. G. & S. Properties Ltd.*, [1971] S.C.R. 306..., a case dealing with an action in fraudulent misrepresentation, Spence J., writing for the court, stated at p. 316...:
>
> .....
>
> > "I am content to adopt these two short passages as being sufficient to dispose of this appeal. I am of the opinion that, first, the plaintiffs failed to prove false representation of fact made with a knowledge of its falsehood or recklessly, without belief in its truth and, *secondly, that the plaintiffs actually were induced by any such representation*." [46]

71. It follows that a pleading of fraudulent misrepresentation which fails to expressly claim that the plaintiff relied on the alleged misstatement will not be found to plead a valid cause of action.[47]

72. As noted above, the Fresh Claim contains no pleading that any Plaintiff or class member *other* than Mr. Silver actually relied on the IMAX Statements. The closest the Plaintiffs come to filling this gap in their pleadings is by lumping together their negligent and fraudulent misrepresentation claims, and asserting an argument based on a *de facto* fraud-on-the-market theory -- *i.e.*, in an efficient market, the misrepresentations were reflected in the share price, and each class members' purchase of an IMAX share should therefore be presumed to constitute reliance.

73. For reasons noted above, this blatant attempt to rely on a discredited foreign legal doctrine should be rejected, with the result that the Plaintiffs' allegations of fraudulent misrepresentation are fatally flawed and cannot survive scrutiny under s. 5(1)(a) of the CPA.

---

[46] *Carom et al. v. Bre-X Minerals Ltd.* (1998), 41 O.R. (3d) 780, [1999] O.J. No. 1662 at p. 790-791 (Gen. Div.) [Defendants' Authorities, Tab 28] [Emphasis added by Justice Winkler]

[47] *Balanyk v. University of Toronto* (1999), 1 C.P.R. (4th) 300 at paras. 104, 105, 107 (Ont. S.C.J.) [Defendants' Authorities, Tab 20]

74. The Plaintiffs make no effort to counter this conclusion. Nowhere in the Fresh Claim do the Plaintiffs assert that reliance is not a necessary element of fraudulent misrepresentation, beyond the unsupported and half-hearted assertion that reliance is only "generally" an element of the tort.[48] Notably, the Plaintiffs made no effort to extend any of the "alternative" arguments (discussed below) -- which they proffer in an effort to save their equally flawed claims of negligent misrepresentation -- to fraudulent misrepresentation.

**c) The Plaintiffs' Argument that Reliance is *Not* a Mandatory Element of Negligent Misrepresentation is Unsustainable**

75. Turning to the Plaintiffs' central allegation, it is notable that nowhere in the Fresh Claim do the Plaintiffs expressly assert that reliance is not a necessary element of the tort of negligent misrepresentation.

76. In contrast to the Fresh Claim itself, the Plaintiffs' Factum does make several assertions regarding the necessity of reliance in making out the tort of negligent misrepresentation. First, the Plaintiffs state that "[g]enerally, a defendant is liable in damages for negligent misrepresentation if…(d) the representee reasonably relied on the misrepresentation."[49] The Plaintiffs cite only one authority in support of this statement -- namely, the leading Supreme Court ruling in *Queen v. Cognos*. This ruling most certainly does not stand for the proposition that the element of reliance is only "generally" necessary in order to make out claims of negligent misrepresentation.[50] On the contrary, as is discussed

---

48 Plaintiffs' Factum, at para. 254, citing two cases, neither of which suggests that reliance is anything other than a mandatory element of the tort. See *Carom v. Bre-X Minerals Ltd.* (1998), 20 C.P.C. (4th) 163, [1998] O.J. No. 1428 at paras. 24-25 (Gen. Div.) [Plaintiffs' Authorities, Tab 13]; *Mondor v. Fisherman* (2001), 80 O.R. (3d) 222, [2001] O.J. No. 4620 at para. 33 (S.C.J.) [Plaintiffs' Authorities, Tab 43]

49 Plaintiffs' Factum, at para. 253 [Emphasis added]

50 *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 at para. 33 [Plaintiffs' Authorities, Tab 51]

below, there is abundant authority which, based on *Cognos*, has confirmed that reliance is a mandatory prerequisite to liability under this tort.

77. Secondly, several paragraphs later, the Plaintiffs assert more broadly that, if causation can otherwise be established, plaintiffs "can state a cause of action in negligent misrepresentation or, alternatively, negligence, even if they did not rely upon the misrepresentation in the traditional sense."[51] In alleged support of this proposition, the Plaintiffs cite a number of cases, the relevance of which will be discussed separately below. Also discussed separately below is the Plaintiffs' "alternative" reference suggesting that their claim could be re-cast to sound in negligence *simpliciter*.

78. The Plaintiffs' assertion that actual reliance is merely an "optional" component of the tort of negligent misrepresentation, which need not be pleaded or proven if causation can be established by other means, is simply false. Indeed, it is directly contradicted by the Plaintiffs' own unqualified description of the law (*i.e.*, "Reliance is a necessary ingredient of misrepresentation") found elsewhere in their Factum.[52]

79. The status of reliance as a "necessary ingredient" of this tort can be readily established by reference to abundant governing authority emanating from both the Supreme Court and the Ontario Court of Appeal. As the Supreme Court of Canada has confirmed in *Hercules Management Ltd. v. Ernst & Young*, the foremost authority addressing the tort of negligent misrepresentation:

---

[51] Plaintiffs' Factum, at para. 257 [Emphasis added], and also at para. 258, where the plaintiffs allege that "they state a cause of action in negligent misrepresentation or, alternatively, negligence whether or not they relied upon those misrepresentations" [Emphasis added]

[52] Plaintiffs' Factum, at para. 291 [Emphasis added]. In support, the Plaintiffs quite properly cite the leading authority, *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 at para. 33 [Plaintiffs' Authorities, Tab 51]

> Needless to say, actual reliance is a necessary element of an action in negligent misrepresentation and its absence will mean that the plaintiff cannot succeed in holding the defendant liable for his or her losses; see: *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, at p. 110.[53] [Emphasis added]

80. The Ontario Court of Appeal has repeatedly confirmed this point.[54] Indeed, as will be discussed below, even one of the authorities specifically cited by the Plaintiffs -- putatively in support of their proposition that reliance is not a mandatory element of negligent misrepresentation -- expressly confirms that "[i]t is clear that in Canada, actual reliance is a necessary element of an action in negligent misrepresentation and its absence will mean that the action cannot succeed…"[55] [Emphasis added]

81. Further, in addition to being one of the five constituent elements of the tort of negligent misrepresentation, reliance serves a critical and necessary role at another juncture of the test for negligent misrepresentation. More specifically, the Supreme Court of Canada has ruled that proof of reliance serves as the basis for establishing proximity, which in turn grounds the existence of a *prima facie* duty of care between the representor and representee (oftentimes referred to as a "special relationship" between the parties):

> ……[I]f "proximity" is meant to distinguish the cases where the defendant has a responsibility to take reasonable care of the plaintiff from those where he or she has no such responsibility, then in negligent misrepresentation cases, it must pertain to some aspect of the relationship of reliance. To my mind, proximity can be seen to inhere between a defendant-representor and a plaintiff-representee when two criteria relating to reliance may be said to exist on the facts: (a) the defendant ought

---

53 *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at para. 18 [Plaintiffs' Authorities, Tab 28]

54 *Red Carpet Inns Ltd. v. Ontario* (2004), 24 R.P.R. (4th) 62 at para. 20 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 417 ("…In the absence of detrimental reliance the tort of negligent misrepresentation is not made out….") [Defendants' Authorities, Tab 92]; *Hickey-Button v. Loyalist College of Applied Arts & Technology* (2006), 211 O.A.C. 301, [2006] O.J. No. 2393 at para. 43 (C.A.) ("….In my view, reliance... is a precondition to recovery in the negligent misrepresentation claim… .") [Plaintiffs' Authorities, Tab 29]; *Lucien Groulx & Son Planning & Saw Mill Ltd. v. Nipissing Forest Resource Management Inc.*, 2007 ONCA 801 at para. 4 (CanLII) ("...The requirements set out in *Cognos* are cumulative, meaning that a party must establish each of them to succeed in a claim of negligent misrepresentation…..") [Defendants' Authorities, Tab 73].

55 *Boulanger v. Johnson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218 at para. 11 (C.A.) [Plaintiffs' Authorities, Tab 6], which is cited in Plaintiffs' Factum, at para. 257.

> reasonably to ***foresee*** that the plaintiff will rely on his or her representation; and (b) reliance by the plaintiff would, in the particular circumstances of the case, be reasonable.[56] [Emphasis added]

82. The Supreme Court of Canada has also held that reliance serves as a basis for determining whether this *prima facie* duty of care should be negated by the residual policy concern of indeterminate liability:

> In light of this Court's endorsement of the *Anns/Kamloops* test, however, enquiries concerning (a) the defendant's knowledge of the identity of the plaintiff (or of the class of plaintiffs) and (b) the use to which the statements at issue are put may now quite properly be conducted in the second branch of that test when deciding whether or not policy considerations ought to negate or limit a prima facie duty that has already been found to exist… [L]ooking to factors such as "knowledge of the plaintiff (or an identifiable class of plaintiffs) on the part of the defendant" and "use of the statements at issue for the precise purpose or transaction for which they were prepared" really amounts to an attempt to limit or constrain the scope of the duty of care owed by the defendants. If the purpose of the *Anns/Kamloops* test is to determine (a) whether or not a *prima facie* duty of care exists and then (b) whether or not that duty ought to be negated or limited, then factors such as these ought properly to be considered in the second branch of the test once the first branch concerning "proximity" has been found to be satisfied.[57] [Emphasis added]

83. The absence of reliance, therefore, will lead to a failure to satisfy two crucial aspects of the tort of negligent misrepresentation, even if causation is otherwise present: (1) reliance as an independent element of the tort; and (2) the duty of care.

84. Given this universally accepted conclusion that reliance is a mandatory element of the tort of negligent misrepresentation, it follows that a pleading of negligent misrepresentation

---

[56] *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at para. 24 [Plaintiffs' Authorities, Tab 28]; see also *Fletcher v. Manitoba Public Insurance Co.*, [1990] 3 S.C.R. 191 at pp. 209-210, 211-212 [Defendants' Authorities, Tab 45]; *Avco Financial Services Realty Ltd. v. Norman* (2003), 64 O.R (3d) 239 at para. 24 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 300 [Defendants' Authorities, Tab 17]

[57] *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at paras. 30 and 37 [Plaintiffs' Authorities, Tab 28]

which fails to expressly claim that the plaintiff relied on the alleged misstatement does not plead a valid cause of action.[58]

85. Given that the Fresh Claim contains no (proper) pleading that any Plaintiff *other* than Mr. Silver actually relied on the IMAX Statements -- and given that the bald pleading of Mr. Silver's actual reliance is insufficient to meet the tests established by the law on point -- the Plaintiffs' allegations of negligent misrepresentation are fatally flawed and cannot satisfy the requirements of s. 5(1)(a) of the CPA.

**d) The Authorities Cited by the Plaintiffs Have No Relevance in the Context of the Present Claim:**

86. In support of their assertion that reliance is not mandatory in the context of negligent misrepresentation (provided that causation can be established in another manner), the plaintiffs cite a body of case law allegedly applicable to the current situation.[59] Three are rulings of the Ontario Court of Appeal, two are appellate rulings from other jurisdictions, and three are trial-level decisions (one of which is from Ontario).

87. Upon even a cursory analysis, and particularly when these rulings are assessed in the context of the current dispute, it becomes immediately apparent that none of them support the Plaintiffs' allegation that they can successfully make out their claim in negligent misrepresentation without pleading and proving actual reliance on the IMAX Statements.

88. In assessing the cases proffered by the Plaintiffs, the governing authorities must, of course, be borne in mind. As noted above, the Supreme Court and the Ontario Court of

---

[58] *Deep v. M.D. Management* (2007), 35 B.L.R. (4th) 86 at paras. 19-26 (Ont. S.C.J.), *aff'd* [2008] O.J. No. 961 at para. 1 (C.A.) [Defendants' Authorities, Tab 42]; *Balanyk v. University of Toronto* (1999), 1 C.P.R. (4th) 300 at paras. 64-67 (Ont. S.C.J.) [Defendants' Authorities, Tab 20]

[59] Plaintiffs' Factum, at para. 257.

Appeal have definitively established that actual reliance is a mandatory element of negligent misrepresentation.[60] Thus, any non-Supreme Court ruling which appears to reject the principles emanating from the country's highest court must be interpreted in one of two ways -- *either* such a case was incorrectly decided (or has been superseded by more authoritative developments in the law), *or* the court which issued such a decision did not intend it to stand for the proposition put forward by the Plaintiffs. Each of the authorities discussed below falls into one of these categories.

89. The most superficially supportive authorities cited by the Plaintiffs are two non-Ontario trial rulings. In the final analysis, however, neither case actually can be said to support the Plaintiffs' position:

(a) *Yorkshire Trust Co. v. Empire Acceptance Corp.*[61] is a 1986 British Columbia Supreme Court ruling of McLachlin J. (as she then was).[62] The issue before the court was whether mortgage investors could assert a claim in negligent misrepresentation against a property appraiser when the investors themselves had never relied on the appraisal. Based on the then-current state of the law, her Ladyship concluded that such a claim could be sustained on the basis of negligence *simpliciter* (see the separate discussion below), or based on "an extension of the [negligent misrepresentation] doctrine propounded by *Hedley*

---

60 *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at para. 18 [Plaintiffs' Authorities, Tab 28], citing *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 187 at para. 33 [Plaintiffs' Authorities, Tab 51]; *Boulanger v. Johnson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218 at para. 11 (C.A.) [Plaintiffs' Authorities, Tab 6]; *Hickey-Button v. Loyalist College of Applied Arts & Technology* (2006), 211 O.A.C. 301, [2006] O.J. No. 2393 at para. 43 (C.A.) [Plaintiffs' Authorities, Tab 29]; *Lucien Groulx & Son Planing & Saw Mill Ltd. v. Nipissing Forest Resource Management Inc.*, 2007 ONCA 801 at para. 4 (CanLII) (C.A.) [Defendants' Authorities, Tab 73]; *Red Carpet Inns Ltd. v. Ontario* (2004), 24 R.P.R. (4th) 62 at para. 20 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 417 [Defendants' Authorities, Tab 92]

61 *Yorkshire Trust Co. v. Empire Acceptance Corp.* (1986), 24 D.L.R. (4th) 140, [1986] B.C.J. No. 3254 (S.C.) [Plaintiffs' Authorities, Tab 73]

62 Contrary to the Plaintiffs' assertion, *Yorkshire Trust* is not a ruling of the Supreme Court of Canada.

*Byrne*."[63] In support of this "extended" approach to negligent misrepresentation, Justice McLachlin reasoned that reliance served only two purposes: (i) *vis-à-vis* duty of care, it served to restrict the class of potential plaintiffs (and her Ladyship suggested that this was now a matter governed principally by foreseeability), and (ii) it served to establish causation (which led her Ladyship to conclude that reliance need not be proven if causation could be otherwise established).[64] Even if we accept that one or both of these propositions was sustainable in 1986, the Supreme Court of Canada (including Justice McLachlin herself, following her elevation) subsequently established in *Cognos* and *Hercules* that (i) reliance, rather than merely foreseeability, lies at the centre of duty of care analysis,[65] and that (ii) reliance and causation are separate elements of the tort, each of which must be established by the plaintiff.[66] Thus, *Yorkshire Trust* is <u>no longer good law</u> on this particular point, and cannot be safely relied upon for this proposition.

(b) A second trial-level authority cited by the Plaintiffs is *Eaton v. HMS Financial Inc.*,[67] in which a certification judge considered the plaintiffs' argument that reliance need not be proven if causation could otherwise be established, but

---

[63] *Yorkshire Trust Co. v. Empire Acceptance Corp.* (1986), 24 D.L.R. (4th) 140, [1986] B.C.J. No. 3254 at para. 19 (S.C.) [Plaintiffs' Authorities, Tab 73]

[64] *Yorkshire Trust Co. v. Empire Acceptance Corp.* (1986), 24 D.L.R. (4th) 140, [1986] B.C.J. No. 3254 at paras. 15-19 (S.C.) [Plaintiffs' Authorities, Tab 73]

[65] *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at paras. 22-27 [Plaintiffs' Authorities, Tab 28]. This point was explicitly affirmed by the Ontario Court of Appeal in *Avco Financial Services Realty Ltd. v. Norman* (2003), 64 O.R. (3d) 239 at para. 18 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 300 [Defendants' Authorities, Tab 17]

[66] *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at para. 18 [Plaintiffs' Authorities, Tab 28]; *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 187 at para. 33 [Plaintiffs' Authorities, Tab 51]. The discrete and cumulative nature of (i) reliance and (ii) causation (*i.e.*, detrimental reliance leading to damage) as elements of negligent misrepresentation has been affirmed by the Ontario Court of Appeal *in, inter alia, Lucien Groulx & Son Planing & Saw Mill Ltd. v. Nipissing Forest Resource Management Inc.*, 2007 ONCA 801 at para. 4 (CanLII) [Defendants' Authorities, Tab 73]

[67] *Eaton v. HMS Financial Inc.* (2008), 26 B.C.L.R. (4th) 252, 2008 CarswellAlta 1400 at paras. 90-91 (Q.B.) [Plaintiffs' Authorities, Tab 22]

> ultimately deferred this issue until after the common issue trial. In *Eaton*, the authority cited by the plaintiffs in support of their reliance argument was the B.C. Court of Appeal ruling in *Collette* (discussed below), which in turn cited and relied upon *Yorkshire Trust*. Given that the court in *Eaton* did not fully grapple with the issue of reliance, the certification judge's guarded support for the plaintiffs' proposition was not tested by a more thorough analysis of *Collette* or *Yorkshire*.

Thus, for divergent reasons, it is clear that neither of these rulings provides support for the Plaintiffs' allegation that reliance is not a necessary element of negligent misrepresentation.

90. The Plaintiffs also cite and rely on two non-Ontario appellate rulings, both of which offer (at best) tenuous support for the principle at issue. The first of these cases is the ruling of the British Columbia Court of Appeal in *Collette v. Great Pacific Management Co.*, [68] referred to above. This class action was brought by aggrieved mortgage investors against financial advisors/investment brokers, and focused on the defendants' lack of due diligence (constituting both negligence *simpliciter* and breach of contract).[69] An alternative claim alleged that, by making the investments available, the defendants impliedly represented that such investments were meritorious, and that this constituted a negligent misrepresentation.[70] Although the negligent misrepresentation claim was of secondary relevance in the action, the Court of Appeal considered whether individual reliance on the misrepresentation was a necessary prerequisite to success ("particularly with respect to the claims for negligent

---

68 *Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

69 *Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 at paras. 2, 3, 11, 18 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

70 *Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 at para. 18, 28-32 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

misrepresentation"). Without reference to *Cognos* or *Hercules*, the B.C. Court of Appeal cited a House of Lords ruling (*Henderson*),[71] which addressed negligent performance of a service, as well as the *Yorkshire Trust* case, as support for the proposition that the role of reliance is to establish causation, and that reliance is therefore not required if causation can be otherwise established.[72] The Court of Appeal proceeded to find that a direct causal link could be established between the defendants' negligence *simpliciter* (*i.e.*, their lack of due diligence) and the damage suffered by investors. The court reasoned that, with due diligence on the part of the defendants, the mortgage would never have been marketed to the public and the investors would not have lost money -- thus, liability could be established "independently of proof of individual reliance." [73] Having thus accepted that liability in negligence *simpliciter* (as opposed to negligent misrepresentation) could potentially be established, the Court of Appeal certified the question of whether the defendants owed, and breached, a duty of care to exercise due diligence arising from tort (*i.e.*, negligence *simpliciter*) or contract, or both.[74] The plaintiffs' alternative claim in negligent misrepresentation was not certified, although this point is not explicitly acknowledged by the Court of Appeal.

91. The second non-Ontario appellate ruling cited by the Plaintiffs is *Spring v. Guardian Assurance plc*,[75] wherein the House of Lords considered whether liability should be imposed on a former employer who negligently gave a damaging reference about an employee to a prospective new employer. The four Law Lords forming the majority found against the

---

71 *Henderson v. Merrett Syndicates Ltd.*, [1995] 2 A.C. 145 [Defendants' Authorities, Tab 48] was discussed at some length by the Court in *Collette* at para. 28, where it was clearly identified as a negligence *simpliciter* ruling regarding the provision of professional services.

72 *Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 at paras. 33-34 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]. There appears to have been no recognition that the pre-*Hercules* ruling in *Yorkshire* had long since been overtaken by developments in the law.

73 *Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 at para. 34 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

74 *Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 at para. 38 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

75 *Spring v. Guardian Assurance plc.*, [1995] 2 A.C. 296 [Plaintiffs' Authorities, Tab 62]

employer, each writing separate reasons. In their Factum, the Plaintiffs specifically rely on the reasons of Lord Goff, wherein his Lordship concluded that the case should be determined based on an expanded version of the tort of negligent misrepresentation flowing from the seminal ruling in *Hedley Byrne*.[76] In understanding the passages from Lord Goff's ruling relied upon by the Plaintiffs, however, it is important to note the qualifications on his analysis acknowledged by Lord Goff himself at the outset of those reasons:

> As will appear hereafter, I have come to the conclusion that, on the facts of the present case, [the defendants] owed a duty of care to the plaintiff in respect of the preparation of the reference in question. In my opinion, the source of duty of care lies in the principle derived from *Hedley Byrne & Co. Ltd. v. Heller & Partners*…[1964] AC 465…. I am however concerned by the fact that the plaintiff's case was not advanced to the Appellate Committee on the basis of that principle. In these circumstances I would ordinary have proposed that, before the appeal could be decided on a point which had not been argued, the parties should be given the opportunity of making submissions upon it. In the present case, however, I understand that a majority of your Lordships are minded to allow the appeal in any event, proceeding on a broader basis than the principle in *Hedley Byrne*. …. I wish to stress that the view which I shall express in this opinion has been formed without the benefit of argument from counsel, and so to that extent must be regarded as being of limited authority.[77] [Emphasis added]

92. The fact that the ruling of the House of Lords in *Spring* cannot simply be equated with the individual reasons contributed by Lord Goff has been more recently acknowledged by the English Court of Appeal.[78]

---

[76] Plaintiffs' Factum, at para. 257, citing *Spring v. Guardian Assurance plc.*, [1994] 3 All E.R. 129 at pp. 146-147 *per* Lord Goff (H.L.) *Please Note:* Although the Plaintiffs' Factum cites *Spring* to the "All E.R.s," the Plaintiffs' Authorities actually reproduces an alternate version of the case, namely *Spring v. Guardian Assurance plc.*, [1995] 2 A.C. 296, where the equivalent page references are pp. 318-319 [Plaintiffs' Authorities, Tab 62]

[77] *Spring v. Guardian Assurance plc.*, [1995] 2 A.C. 296 at pp. 316-317 *per* Lord Goff [Plaintiffs' Authorities, Tab 62]

[78] *Legal & General Assurance Ltd v. Kirk*, [2001] EWCA Civ 1803 at para. 35 [Defendants' Authorities, Tab 71]:

> True it is that in *Spring* Lord Goff, who was one of the majority (the only dissenting speech being that of Lord Keith) rested his decision in that case on established *Hedley Byrne* principles, but Lord Slynn and Lord Woolf plainly regarded the decision as involving an extension of the common law so as to recognise a duty of care owed to the subject-matter of a reference, in addition to the duty of care owed to the recipient of the reference (as in *Hedley Byrne*). Moreover, as Lord Goff pointed out (at page 317A in *Spring*) it had not been argued by the

93. This is not the only reason why the Plaintiffs' reliance on *Spring* is misplaced. More important are the numerous and significant divergences between the facts of *Spring* and those of the case at bar. In *Spring*, the plaintiff was the subject of the representation rather than its recipient. For this reason, the identity of the plaintiff was specifically known to the defendant (thus negating concerns of indeterminacy), and the plaintiff's reliance on the defendant to prepare the reference in a non-negligent manner was both reasonable and foreseeable.

94. Some or all of these distinguishing characteristics are also present in the four Ontario cases cited by the Plaintiffs as support for the proposition that reliance is not a necessary element of a claim for negligent misrepresentation. While their distinguishing features undermine the relevance of these three appellate and one trial ruling, the more fundamental distinction is that all four of these Ontario cases involve claims for negligence *simpliciter*, and not for negligent misrepresentation. They simply do not stand for the proposition relied upon by the Plaintiffs:

(a) In *Haskett v. Equifax Canada Inc.*,[79] the plaintiff sued two credit rating agencies for negligently making misleading representations about him to potential granters of credit. Thus, once again, the defendant had made a misrepresentation about the plaintiff to a third party. It was agreed by all parties, before both levels of court, that the plaintiffs' claim was one sounding in negligence *simpliciter*, and not in negligent misrepresentation.[80] In reversing the motion judge's striking of the plaintiffs' negligence *simpliciter*

---

appellant in *Spring* that the case could be determined merely by the application of established *Hedley Byrne* principles. [Emphasis added]

79 *Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]

80 *Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 at para. 12 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]

claim under Rule 21, the Court of Appeal, as is required by the reformulated approach to duty of care mandated by the Supreme Court of Canada,[81] painstakingly considered whether or not the plaintiff's claim (i) was the same as an historically recognized relationship supporting a *prima facie* duty of care, or (ii) was analogous to such a recognized category, or (iii) was a new category for which a *prima facie* duty could be found to exist. It is absolutely clear that -- because of the absence of reliance -- the Court accepted that the case was not one of negligent misrepresentation, but rather one of negligence *simpliciter*, wherein a duty of care could be justified either because it was "an analogous category to negligent misrepresentation or [was] a new category."[82] Because of the complexity of the Court of Appeal duty of care analysis, the case must be read carefully to avoid misinterpretation.[83]

(b) Another case following this pattern is the subsequent ruling of the Court of Appeal in *Lowe v. Guarantee Co. of North America*.[84] The claim once again involved allegations of negligence *simpliciter* (and not negligent

---

81 See the more extensive discussion of this mandatory, multi-stage duty of care analysis, applicable in the context of negligence *simpliciter*, found later in this s-s. 5(1)(a) analysis.

82 *Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 at paras. 31, 41 (quotation), 43 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26] [Emphasis added]

83 For example, although the Court noted the existence of an academic analysis -- found in Feldthusen, *Economic Negligence*, 4th ed. (Toronto: Carswell, 2000) at p. 131 [Defendants' Authorities, Tab 4]-- and described it as standing for the proposition that "reliance on the representation by the plaintiff is not a necessary factor *per se*" (see para. 33), several observations must be made: First, the Court neither expressly endorsed nor rejected the *Feldthusen* analysis; and, secondly, the Court clearly intended Feldthusen's analysis to apply to a claim for negligence *simpliciter* (not negligent misrepresentation), a fact which is confirmed by a review of the actual passage from the *Feldthusen* text (at p. 131: "In misrepresentation cases, reliance is a necessary part of the causal sequence. In other cases not limited to negligent will drafting, reliance is not a necessary element in the causal sequence.") Similarly, the Court's quotation from Lord Goff in the *Spring* case (at para. 35) was clearly intended to be an analogy cited to support the Court's own analysis (see the confirmation of this point in *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 at para. 45 (C.A.) [Plaintiffs' Authorities, Tab 37]). It is in this context that the Court's *dicta* must be understood, including its statement that the plaintiff's claim "arguably [did] not fit exactly within negligent misrepresentation" (at para. 34).

84 *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 (C.A.) [Plaintiffs' Authorities, Tab 37]

misrepresentation)[85] flowing from statements made by the defendant to a third party, where the statements were about the plaintiff.[86] The Court of Appeal again applied the governing legal principles applicable to the existence or non-existence of a duty of care in negligence *simpliciter*, and concluded that the claim supported a *prima facie* duty of care on the basis that it was *either* a novel category of claim, *or* was a category of negligence *simpliciter* which was analogous to the recognized claim for negligent misrepresentation.[87] In this context, the Court of Appeal in *Lowe* explained its own earlier ruling in *Haskett*, confirming that that case had not been analyzed as a claim for negligent misrepresentation.[88]

(c) Obviously less authoritative, but nevertheless bearing a strong resemblance to the foregoing appellate rulings, is the trial-level decision in *Trizec Properties Inc. v. Citigroup Global Markets Inc.*.[89] Again, the case involved negative public statements made about the plaintiffs by the defendant, in circumstances where the plaintiff could not plead any reliance on the misrepresentations. In this context, the plaintiff framed the claim as one involving negligence *simpliciter* case, and it was the defendant who argued that it should instead be treated as a claim for negligent misrepresentation (which would fail, *inter alia*,

---

85 *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 at paras. 3, 7, 8, 38 (C.A.) [Plaintiffs' Authorities, Tab 37]

86 More specifically, the defendant in *Lowe* undertook independent medical examinations of injured insureds (including the plaintiff), and delivered a report to the relevant insurance company, pursuant to a legislative compensation scheme.

87 *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 at paras. 38, 50, 51 (C.A.) [Plaintiffs' Authorities, Tab 37]. The claim was nevertheless struck out on other grounds.

88 *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 at paras. 41, 43, 46, 50 (C.A.) [Plaintiffs' Authorities, Tab 37]

89 *Trizec Properties Inc. v. Citigroup Global Markets Inc.* (2004), 72 O.R. (3d) 265, [2004] O.J. No. 2906 (S.C.J.) [Plaintiffs' Authorities, Tab 65]

owing to the absence of reliance).[90] The motions judge appeared to ignore this argument, and instead applied the governing legal principles applicable to assessing the existence of a duty of care in negligence *simpliciter* (either as a novel category or because it was analogous to the established category of negligent misrepresentation).[91] He ultimately concluded that this was "a novel claim in negligence [*simpliciter*]," and noted the absence of proximity and reliance. He reluctantly declined to strike out the claim on this basis, owing to his interpretation of the guidance in *Haskett*.[92]

(d) The most recent Ontario case cited and relied upon by the Plaintiffs is *Boulanger v. Johnson & Johnson Corp.*,[93] wherein, the Court of Appeal struck out claims for negligent misrepresentation because the plaintiff did not, and could not, allege that she had relied on a statement made by the defendant manufacturer to a third party regulatory authority. The Court confirmed that "actual reliance is a necessary element of an action in negligent misrepresentation and its absence will mean that the action cannot succeed."[94] In place of this claim in negligent misrepresentation, the Court permitted the plaintiff to continue with their claim in negligence *simpliciter*, based on the defendant's negligence in designing, manufacturing, marketing and promoting its drug. It is important to note that, in *Boulanger* -- in contrast to the present

---

90 *Trizec Properties Inc. v. Citigroup Global Markets Inc.* (2004), 72 O.R. (3d) 265, [2004] O.J. No. 2906 at para. 10 (S.C.J.) [Plaintiffs' Authorities, Tab 65]

91 *Trizec Properties Inc. v. Citigroup Global Markets Inc.* (2004), 72 O.R. (3d) 265, [2004] O.J. No. 2906 at para. 16 (S.C.J.) [Plaintiffs' Authorities, Tab 65]

92 *Trizec Properties Inc. v. Citigroup Global Markets Inc.* (2004), 72 O.R. (3d) 265, [2004] O.J. No. 2906 at para. 22 (S.C.J.) [Plaintiffs' Authorities, Tab 65]. The claim was nevertheless struck out on other grounds.

93 *Boulanger v. Jonson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218 (C.A.) [Plaintiffs' Authorities, Tab 6]

94 *Boulanger v. Jonson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218 at para. 11 (C.A.) [Plaintiffs' Authorities, Tab 6]

> case and in contrast to those rulings noted above -- duty of care in negligence *simpliciter* was not controversial. The duty owed by the manufacturer to the consumer of its product was not contested, and in any event the plaintiffs had suffered physical harm (as opposed to purely economic loss). Turning to standard of care (as opposed to duty of care), the Court cited *Haskett*, and found that a manufacturer in these circumstances might be found liable in negligence *simpliciter* for the careless submission of its filings to Health Canada (which the Court noted might be characterized as a "negligent *misstatement*").[95] [Emphasis added]

95. Therefore, as noted, none of the cases cited by the Plaintiffs actually support their arguments relating to reliance and the tort of negligent misrepresentation. First, and most importantly, none of the *Ontario* rulings support the Plaintiffs' proposition that reliance is not a mandatory element in the tort of negligent misrepresentation; at best, these Ontario decisions find that a claim in negligence *simpliciter* may be made out in cases with unique facts that are not present in the current claim. Secondly, the *non-Ontario* rulings cited by the Plaintiffs (which are, of course, not binding authority) represent claims fundamentally based on negligence *simpliciter* (in wholly distinguishable situations), and/or appear to assert legal principles directly contrary to governing decisions of the Supreme Court of Canada.

### e) The Plaintiffs' Alternative Argument that the IMAX Statements Ground a Claim in Negligence *Simpliciter*

96. It is therefore clear that -- while the cases cited by the Plaintiffs in support of their claim in negligent misrepresentation cannot support that cause of action -- those same cases

---

95 *Boulanger v. Jonson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218 at paras. 12-14 (C.A.) [Plaintiffs' Authorities, Tab 6]

can legitimately be said to support a claim in negligence *simpliciter*, at least in very specific factual settings.[96]

97. The facts of the present case bear no resemblance to the circumstances at issue in any of the cases described above. The Plaintiffs' allegations of negligence *simpliciter* appear to be, essentially, that the Defendants negligently disseminated the IMAX Statements, and that this dissemination -- based on the Plaintiffs' "efficient market" theory -- immediately and automatically "caused" an inflation in the trading price of IMAX's shares, which were then purchased by the members of the proposed class (without any actual reliance on the IMAX Statements themselves), leading to the class members' subsequent loss.[97]

98. What is immediately apparent is the many fundamental ways in which the Plaintiffs' allegations of negligence *simpliciter* crucially diverge from the key elements of the cases cited by the Plaintiffs in support of their "alternative" claim in negligence *simpliciter*:

(a) As noted by the Plaintiffs themselves, the present action involves a claim for pure economic loss, in which there was no physical injury to persons or property.[98] As such it is fundamentally distinguishable from the situation in *Boulanger v. Johnson & Johnson Corp.*, where consumers of a pharmaceutical (who alleged that the drug had caused serious damage to their health) brought a traditional product liability claim against the manufacturer.[99] The allegation of negligence regarding misleading regulatory submissions made by the defendant to a third party was merely one novel element of a generic personal

---

[96] The exception is *Eaton v. HMS Financial Inc.* (2008), 26 B.C.L.R. (4th) 252, 2008 CarswellAlta 1400 (Q.B.) [Plaintiffs' Authorities, Tab 22], which does not address this issue, and is presumably not cited by the Plaintiffs for this purpose.
[97] Fresh Claim at paras. 57-66: Plaintiffs' First Motion Record, Tab 1, Schedule A; Plaintiffs' Factum, at paras. 249-251, 258
[98] Plaintiffs' Factum, at para. 296
[99] *Boulanger v. Jonson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218 at para. 2 (C.A.) [Plaintiffs' Authorities, Tab 6]

injury negligence claim, in which duty of care was not at issue. The Plaintiffs' claim is entirely distinguishable.

(b) Similarly, although the Plaintiffs' attempt to characterize their negligence *simpliciter* claim as one involving the "negligent performance of a service,"[100] their pleadings fail utterly to establish any of the attributes of this traditional category of recoverable pure economic loss.[101] In this regard, the Plaintiffs' claim against the Defendants can be sharply contrasted with the claims brought against the real estate appraisers in *Yorkshire Trust*[102] and against the financial advisor/investment broker in *Collette*.[103] Both cases focus on the obligation of professional advisors and providers of professional services to exercise adequate due diligence when carrying out tasks on behalf of clients (in *Collette*) and for the benefit of the clients-of-clients (in *Yorkshire*), who were reasonably and foreseeably relying upon the non-negligent performance of such services. The Plaintiffs' claim is entirely distinguishable.

(c) A crucial element which is common to each of *Haskett v. Equifax Canada Inc.*,[104] *Lowe v. Guarantee Co. of North America*,[105] and *Spring v. Guardian*

---

[100] Plaintiffs' Factum, at para. 296

[101] As is discussed in greater detail below, such claims for the negligent performance of a service involve the provision of services (usually of a professional nature and usually pursuant to a contract or other voluntary obligation) directly for, or for the indirect benefit of, the plaintiff. See *inter alia Lawrence v. Atlas Cold Storage Holdings* (2006), 34 C.P.C. (6th) 41 at para. 78 (Ont. S.C.J.), *supp. reasons*, [2007] O.J. No. 351 (S.C.J.) [Defendants' Authorities, Tab 70]; *Brooks v. Canadian Pacific Railway Ltd.* (2007), 283 D.L.R. (4th) 540 at paras. 67, 69 (Sask Q.B.) [Defendants' Authorities, Tab 25]; *Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147 at pp. 204-206 [Defendants' Authorities, Tab 30]; *Martel Building Ltd. v. Canada*, [2000] 2 S.C.R. 860 at para. 46 [Defendants' Authorities, Tab 74]; *Carriere v. Bell Canada*, [2006] O.J. No. 2360 at para. 20 (S.C.J.) [Defendants' Authorities, Tab 29]

[102] *Yorkshire Trust Co. v. Empire Acceptance Corp.* (1986), 24 D.L.R. (4th) 140, [1986] B.C.J. No. 3254 at paras. 19-21 (S.C.) [Plaintiffs' Authorities, Tab 73]

[103] *Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 at paras. 2, 3, 10-13, 18, 20-24, 28-32 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

[104] *Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]

[105] *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 (C.A.) [Plaintiffs' Authorities, Tab 37]

*Assurance plc*[106] -- and which is entirely absent in the Plaintiffs' claim -- is that the misstatement in question (upon which the plaintiff did not rely) was actually about the plaintiff.[107] In each of these rulings, the defendant made statements to one or more third parties, with full knowledge that the specific subject matter of the statements was the plaintiff. In such a case, it was entirely reasonable and predictable for the court to have found the defendant liable to -- or to owe a *prima facie* duty of care to -- the party about whom it had disseminated negligent and damaging statements. In such a situation, the defendant could hardly deny that there was a sufficient relationship of foreseeability and proximity (in both the relational and causal sense) to justify the imposition of a duty of care.[108] Furthermore, in such circumstances, concerns about potentially indeterminate liability -- which are of crucial importance in the context of a claim for pure economic loss -- are irrelevant when the defendant is fully aware of precisely who the negligent statements concern.[109] The Plaintiffs' claim is entirely distinguishable.

99. Thus, the negligence *simpliciter* alleged by the Plaintiffs (centering, of course, on the dissemination of the IMAX Statements) bears no resemblance to the key issues forming the foundation of the cases cited by the Plaintiffs in support of its claim. The Plaintiffs' claim is

---

[106] *Spring v. Guardian Assurance plc.*, [1995] 2 A.C. 296 [Plaintiffs' Authorities, Tab 62]

[107] The same analysis would logically apply, perhaps in attenuated form, to the more novel, "defamation-like" claim at issue in *Trizec Properties Inc. v. Citigroup Global Markets Inc.* (2004), 72 O.R. (3d) 265, [2004] O.J. No. 2906 (S.C.J.) [Plaintiffs' Authorities, Tab 65]. Confusingly -- although the court permitted the claim to go forward -- it clearly suggested (albeit without explanation) that the negligence allegations were unlikely to succeed because there was an absence of proximity between the maker of the negligent statement and the subject of the negligent statement (see paras. 4-7, 16-19, 22)

[108] *Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 at paras. 25-27, 36, 40-41 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]; *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 at paras. 38-40 (C.A.), 46-47, 51 [Plaintiffs' Authorities, Tab 37]; and *Spring v. Guardian Assurance plc.*, [1995] 2 A.C. 296 [Plaintiffs' Authorities, Tab 62]

[109] *Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 at paras. 44-49 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]; *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 at para. 55 (C.A.) [Plaintiffs' Authorities, Tab 37]

one for pure economic loss (and not personal injury); it does not involve the negligent performance of a service (as that concept has been legally characterized) by the Defendants; and the subject matter of the IMAX Statements was not the Plaintiffs themselves. As such, neither the facts nor the reasoning found in any of these cases are of use to the Plaintiffs in establishing that their pleading satisfies the threshold established by s. 5(1)(a) of the CPA.

100. The technical frailties of the Plaintiffs' pleading of their negligence *simpliciter* claim -- with particular reference to their pleadings of duty of care --are more fully analyzed below.

### *4. The Plaintiffs' Re-Constituted Arguments Based on Negligence* **Simpliciter** *Must Fail due to their Failure to Adequately Plead the Elements of Duty of Care required for this Cause of Action*

#### a) Overview

101. The Defendants' Rule 21 Factum enumerates various vulnerabilities inherent in the Plaintiffs' pleading of negligence *simpliciter*, such that these pleadings cannot satisfy the requirements of s. 5(1)(a). In light of the more fully developed negligence *simpliciter* claims set out in the Plaintiffs' Factum, the Defendants' challenge to the Fresh Claim found in the Rule 21 Factum require elaboration. In particular, it is clearly necessary to directly address the fatal deficiencies in the Plaintiffs' pleadings of the duty of care component of negligence *simpliciter*.

102. Regardless of how it is framed in the Plaintiffs' factum, the negligence *simpliciter* claim may not proceed to trial unless it is based upon a duty of care that was legitimately owed by the Defendants to the proposed class members. Such a duty may only arise if the claim:

(a) falls within a <u>recognized</u> category of negligence, *or*

(b) is <u>analogous</u> to a recognized category, *or*

(c) if this Court is willing to recognize a <u>novel</u> duty of care on the facts as pled in the Fresh Claim.[110]

103. The Plaintiffs' negligence *simpliciter* claims satisfy none of these criteria.

**b) The Plaintiffs' Negligence *Simpliciter* Claim neither Falls within, nor is it Analogous to, a Recognized Category of Claim:**

(1) It is <u>Not</u> a Recognized Negligence *Simpliciter* Category

104. The duty alleged by the Plaintiffs is a duty to promptly disseminate complete and accurate financial information, and to promptly correct previously-issued information, so that the price of IMAX's publicly traded securities is based upon complete and accurate information.[111] However, no such duty in negligence *simpliciter* has ever been imposed upon issuers, directors and officers in respect of secondary market investors. In fact, the Plaintiffs have not cited a single case in which such a duty has been found to exist. Further, in the one case in which such a duty has even been advanced, it was struck out in a Rule 21 motion.[112] Thus, the claim clearly does <u>not</u> fall within a <u>recognized</u> duty of care in negligence *simpliciter*.

---

[110] *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at paras. 35-36 (C.A.) [Defendants' Authorities, Tab 16]; *Paxton v. Ramji*, [2008] O.J. No. 3964 at paras. 30-31 (C.A.) [Defendants' Authorities, Tab 87]

[111] Fresh Claim, at para. 63: Plaintiffs' First Motion Record, Tab 1, Schedule A

[112] *Deep v. M.D. Management* (2007), 35 B.L.R. (4th) 86 at paras. 27-29 (Ont. S.C.J.), *aff'd* [2008] O.J. No. 961 (C.A.) [Defendants' Authorities, Tab 42]

(2) It is Not Analogous to a Recognized Negligence *Simpliciter* Category (Overview)

105. There is also no sense in which the Plaintiffs' claim is analogous to a recognized category in which recovery in negligence *simpliciter* has been permitted. As the Plaintiffs openly acknowledge in their Factum, they seek recovery for pure economic loss.[113] Accordingly, their claim cannot proceed under an analogous duty of care unless the analogy is with one of the five recognized categories of pure economic loss. As recently affirmed by the Supreme Court of Canada, these categories are:

1. The Independent Liability of Statutory Public Authorities;
2. Negligent Misrepresentation;
3. Negligent Performance of a Service;
4. Negligent Supply of Shoddy Goods or Structures;
5. Relational Economic Loss.[114]

106. Of these five categories, the only two which have been asserted by the Plaintiffs are negligent misrepresentation (in their Fresh Claim and Factum),[115] and negligent performance of a service (exclusively in their Factum).[116] However, as discussed below, neither of these established categories can support the finding of an analogous duty of care sufficient to justify the Plaintiffs' negligence *simpliciter* claim.

---

[113] Plaintiffs' Factum, at para. 296
[114] *Design Services Ltd. v. Canada* (2008), 293 D.L.R. (4th) 437 at para. 31 (S.C.C.) [Defendants' Authorities, Tab 43]
[115] Fresh Claim, at paras. 67-75: Plaintiffs' First Motion Record, Tab 1, Schedule A; Plaintiffs' Factum, at paras. 252, 253, 257-259
[116] Plaintiffs' Factum, at para. 296

(3) It does Not Fall within, nor is it Analogous to, the Recognized Category of Recovery for Negligent Misrepresentation

107. For the reasons separately set out in the Defendants' Rule 21 Factum and in the discussion found above, the Plaintiffs' negligence *simpliciter* claim cannot survive independently from the negligent misrepresentation claim if both are based upon a duty of care which arose through the Plaintiffs' alleged reliance on the Defendants' statements. Any such negligence *simpliciter* claim that is predicated upon the Plaintiffs' own alleged reliance must be merged with the negligent misrepresentation claim, and must fail for the same basis -- *i.e.*, its inability to satisfy the duty of care test from *Hercules Management*.

108. Nor can the Plaintiffs' negligence *simpliciter* claim be sustained on the basis that it is distinct from, but "analogous" to, negligent misrepresentation. The pure economic loss cases discussed above (notably *Haskett* and *Lowe*) -- which recognize that non-reliance-based negligence *simpliciter* claims for misstatement may be sufficiently analogous to negligent misrepresentation to permit the finding of a duty of care -- all involved the assumption of responsibility to the individual plaintiff by the defendant. This occurred through the defendant's decision to make a statement about the plaintiff. It was this same assumption of responsibility, via the defendant's foreseeability of the individual plaintiff's reliance, which underlay the duty of care in *Hedley Byrne*. As a result, the courts in *Haskett* and *Lowe* held that there was an analogy with negligent misrepresentation.[117] In the instant case, the plaintiffs were manifestly not the subjects of the statements under review.

---

117 *Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 at paras. 25-27, 31-41 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]; *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 at paras. 38-50 (C.A.) [Plaintiffs' Authorities, Tab 37]

### (4) It does Not Fall within, nor is it Analogous to, the Recognized Category of Recovery for Negligent Performance of a Service

109. Apparently recognizing the need to rehabilitate the bald negligence *simpliciter* claims found in the Fresh Claim, the Plaintiffs also submit, for the first time in their Factum, that the Defendants "negligently performed services" in filing the Form 10-K and issuing the Press Releases.[118]

110. The Plaintiffs do not cite a single case in which a similar claim by secondary market investors has ever been held to fall within, or even be broadly analogous to, the established category of "negligent performance of a service."

111. It is clear that the negligent performance of a service is a category that arises in factual circumstances entirely dissimilar to those in the case at bar. Recovery under this heading has been permitted where the defendant (usually a professional)[119] has voluntarily undertaken[120] (usually through a contract)[121] the performance of service for the plaintiff,[122] or for a third party in circumstances where the plaintiff is the intended beneficiary,[123] and the defendant's performance of that service causes economic loss. The classic example of the

---

[118] Plaintiffs' Factum, at para. 296

[119] *Lawrence v. Atlas Cold Storage Holdings* (2006), 34 C.P.C. (6th) 41 at para. 78 (Ont. S.C.J.), *supp. reasons*, [2007] O.J. No. 351 (S.C.J.) [Defendants' Authorities, Tab 70]

[120] *Brooks v. Canadian Pacific Railway Ltd.* (2007), 283 D.L.R. (4th) 540 at para. 67 (Sask Q.B.) [Defendants' Authorities, Tab 25]

[121] *Lawrence v. Atlas Cold Storage Holdings* (2006), 34 C.P.C. (6th) 41 at para. 78 (Ont. S.C.J.), *supp. reasons*, [2007] O.J. No. 351 (S.C.J.) [Defendants' Authorities, Tab 70]

[122] *Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147 at pp. 204-206 [Defendants' Authorities, Tab 30]

[123] *Lawrence v. Atlas Cold Storage Holdings* (2006), 34 C.P.C. (6th) 41 at para. 78 (Ont. S.C.J.), *supp. reasons*, [2007] O.J. No. 351 (S.C.J.) [Defendants' Authorities, Tab 70]; *Brooks v. Canadian Pacific Railway Ltd.* (2007), 283 D.L.R. (4th) 540 at para. 67 (Sask Q.B.) [Defendants' Authorities, Tab 25]. The performance of a service arising under a contractual relationship between the defendant and a third party was at issue in *B.D.C. v. Hofstrand Farms Ltd.*, [1986] 1 S.C.R. 228 [Defendants' Authorities, Tab 19], which is generally regarded as the leading case on the negligent performance of a service category for pure economic loss: *Martel Building Ltd. v. Canada*, [2000] 2 S.C.R. 860 at para. 46 [Defendants' Authorities, Tab 74]; *Haskett v. Equifax Canada Inc.* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 at fn1 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]

duty of care falling under this category is the duty owed by solicitors to their clients, or to the beneficiary of a negligently drafted will in circumstances where the solicitor was retained to draft the will by the testator.[124]

112. In the case before this court, the Defendants did not release the Form 10-K and the Press Releases because of a contractual or voluntary undertaking which they had assumed to any party. Instead, the Defendants released the documents because of their mandatory and statutory disclosure obligations under the Securities Act and other legislation. Further, unlike the auditors who certify such documents, none of the Defendants was acting in a professional capacity when the filings were made. The true beneficiaries of the documents were also the IMAX shareholders collectively, not individual investors.[125]

113. The Fresh Claim simply does not plead that the Defendants had entered into a professional services contract with any party whereby prospective investors were the intended beneficiaries of the Form 10-K and the Press Releases.[126] As a result, this is plainly not a case involving the negligent performance of a service, and is not analogous to such a case.

114. Thus, because the Plaintiffs' negligence *simpliciter* claim does not fall within -- and is not analogous to -- any of the recognized categories of pure economic loss, it cannot pass the s. 5(1)(a) threshold, unless this Court is willing to take the extraordinary step of recognizing a novel duty of care.

---

[124] *Carriere v. Bell Canada*, [2006] O.J. No. 2360 at para. 20 (S.C.J.) [Defendants' Authorities, Tab 29]

[125] *Hercules Managements Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at paras. 48-49, 56 [Plaintiffs' Authorities, Tab 28]; *NPV Management Ltd. v. Anthony* (2003), 231 D.L.R. (4th) 681 at paras. 57-64 (Nfld. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 436 [Defendants' Authorities, Tab 84]

[126] *Brooks v. Canadian Pacific Railway Ltd.* (2007), 283 D.L.R. (4th) 540 at para. 69 (Sask Q.B.) [Defendants' Authorities, Tab 25]

**c) The Plaintiffs' Negligence *Simpliciter* Claim Cannot Survive s. 5(1)(a) Scrutiny as a "Novel" Category of Claim**

(1) The *Anns/Kamloops* Test (Overview)

115. As affirmed by both the Supreme Court of Canada and the Ontario Court of Appeal, a judge assessing the tenability of a novel duty of care in the context of either s. 5(1)(a) or Rule 21 must engage in a review of both stages of the *Anns/Kamloops* test.[127] The mere fact that the claim is novel, and that that the Court does not have the benefit of a full factual record, is not a sufficient reason for deferring consideration of the duty of care until trial.[128] Instead, it is only once the Court has concluded -- as a matter of law -- that a new duty should be recognized that the claim is properly submitted for a protracted and expensive trial.[129]

116. As discussed in the Defendants' Rule 21 Factum, the *Anns/Kamloops* test requires the Court to consider the following two questions:

> (1) is there "a sufficiently close relationship between the parties" or "proximity" to justify imposition of a duty and, if so,
>
> (2) are there policy considerations which ought to negative or limit the scope of the duty, the class of persons to whom it is owed or the damages to which breach may give rise?[130]

117. The first stage of the *Anns/Kamloops* test involves a two-part inquiry into whether: (a) the harm that occurred was the reasonably foreseeable consequence of the defendant's act; and (b) sufficient proximity existed between the plaintiff and the defendant, based on factors arising from the relationship between the parties, to render the recognition of a duty just and

---

[127] *Holland v. Saskatchewan* (2008), 294 D.L.R. (4th) 193 at paras. 8-11 (S.C.C.) [Defendants' Authorities, Tab 50]; *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at para. 35 (C.A.) [Defendants' Authorities, Tab 16]

[128] *Bonaparte v. Canada (A.G.)* (2003), 64 O.R. (3d) 1 at p. 12 (C.A.) [Defendants' Authorities, Tab 23]; *Klein v. American Medical Systems Inc.* (2006), 84 O.R. (3d) 217 at paras. 18-21, 40, 43 (Div. Ct.) [Defendants' Authorities, Tab 66]

[129] *Syl Apps Secure Treatment Centre v. B.D.* (2007), 284 D.L.R. (4th) 682 at para. 19 (S.C.C.) [Defendants' Authorities, Tab 104]

[130] *Design Services Ltd. v. Canada* (2008), 293 D.L.R. (4th) 437 at para. 46 (S.C.C.) [Defendants' Authorities, Tab 43]

fair.[131] Where both of these requirements are met, a *prima facie* duty of care will arise. However, that duty may still be negated at the second stage of the *Anns/Kamloops* test, owing to residual policy considerations which reflect the broad social and legal implications of imposing a duty of care.[132]

(2) It does Not Satisfy the First Stage of the *Anns/Kamloops* Test

118. In this case, the Plaintiffs fail to pass even the first stage of the *Anns/Kamloops* test. Where the duty is alleged by secondary market investors against an issuer and its directors, and concerns the accuracy of its annual securities filings and related press releases, the close and direct relationship necessary to establish proximity is absent.[133] This follows for several reasons:

(a) There is no relational proximity between the Defendants and the members of the putative class (including the proposed representative Plaintiffs).[134] On the facts pled in the Fresh Claim, the Plaintiffs were not directly provided with the Form 10-K or the Press Releases by the Defendants. Rather, all of the documents were filed by the Defendants with securities regulators, or released to the public at large.[135] Further, the members of the putative class were not the subject of these documents, and cannot have relied upon them if the negligence *simpliciter* claim is to remain unmerged with the negligent misrepresentation claim. The members of the putative class were also not part

---

131 *Design Services Ltd. v. Canada* (2008), 293 D.L.R. (4th) 437 at paras. 48-50 (S.C.C.) [Defendants' Authorities, Tab 43]
132 *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at para. 73 (C.A.) [Defendants' Authorities, Tab 16]
133 *Paxton v. Ramji*, [2008] O.J. No. 3964 at para. 71 (C.A.) [Defendants' Authorities, Tab 87]
134 *Haskett v. Equifax Canada Inc.* (2993), 63 O.R. (3d) 577, [2003] O.J. No. 771 at paras. 39-40 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]
135 Fresh Claim, at paras. 58, 60

of any existing contractual or other relationship with the Defendants. Indeed, on the Plaintiffs' definition of the proposed class, the alleged beneficiaries of the duty of care need not even have been shareholders of IMAX at the time when the documents were released. Instead, they need only have been prospective investors.[136]

(b) There is also little causal proximity between the Defendants' release of the documents, and the Plaintiffs' loss.[137] The injury alleged by the Plaintiffs is a decline in the price of their IMAX shares on the open market. However, the courts have recognized that there are multiple factors which may precipitate a decline in share prices (*e.g.*, political factors).[138] Accordingly, the documents released by the Defendants were not the direct causal force behind the Plaintiffs' loss. Instead, it was the market itself, influenced by numerous forces and events that set the price of the IMAX shares. This type of indirect relationship between the Defendants' conduct and the proposed class members' losses is insufficient to ground a finding of proximity.[139]

(c) The proximity analysis must be grounded in the statutory scheme where one exists.[140] However, the statutory schemes of both the Securities Act and the CBCA would be frustrated if the Court were to recognize the duty alleged by the Plaintiffs. As discussed in the Defendants' Rule 21 Factum, the Securities Act was specifically amended in 2005 to create a civil liability to secondary

---

[136] Fresh Claim, at para. 1(d)
[137] *Haskett v. Equifax Canada Inc.* (2993), 63 O.R. (3d) 577, [2003] O.J. No. 771 at paras. 39-40 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]
[138] *Colborne Capital Corp. v. 542775 Alberta Ltd.* (1999), 45 B.L.R. (2d) 21 at paras. 266, 275 (Alta. C.A.) [Defendants' Authorities, Tab 36]
[139] *Paxton v. Ramji*, [2008] O.J. No. 3964 at paras. 71, 75-76 (C.A.) [Defendants' Authorities, Tab 87]
[140] *Syl Apps Secure Treatment Centre v. B.D.* (2007), 284 D.L.R. (4th) 682 at para. 27 (S.C.C.) [Defendants' Authorities, Tab 104]

market investors, and thus provides the putative class members with an adequate alternative remedy.[141] Further, imposing a duty of care upon the Defendants would play havoc with the scheme of Part XXIII.1 of the Securities Act.[142] It would potentially allow the plaintiffs to recover damages in excess of the damages stipulated under the "damages cap" established by s. 138.7(1) of the Securities Act, even where the misrepresentations were made negligently rather than fraudulently, contrary to s. 138.7(2).[143] It could also require the Defendants to make timely disclosure of material facts at common law, even though the Securities Act only requires that they make timely disclosure of material changes.[144] Finally, the duty could come into conflict with the Individual Defendants' statutory duties to IMAX under the CBCA.[145] This potential for conflicting duties is often a deciding factor in weighing a particular recognition of proximity.[146]

(d) There is no allegation that the Defendants knew that individual members of the putative class, as opposed to unknown members of the general public, would rely upon the Form 10-K and the Press Releases.[147] Instead, the Fresh Claim merely pleads that the Defendants were aware of the effect which the documents could have upon IMAX's publicly-traded securities, via their

[141] *Syl Apps Secure Treatment Centre v. B.D.* (2007), 284 D.L.R. (4th) 682 at para. 59 (S.C.C.) [Defendants' Authorities, Tab 104]

[142] *Menegon v. Philip Services Corp.* (2001), 23 B.L.R. (3d) 151 at para. 30 (Ont. S.C.J.), *aff'd* (2003), 31 B.L.R. (3d) 29 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 95 [Defendants' Authorities, Tab 77]

[143] *Syl Apps Secure Treatment Centre v. B.D.* (2007), 284 D.L.R. (4th) 682 at para. 29 (S.C.C.) [Defendants' Authorities, Tab 104]

[144] *Kerr v. Danier Leather Inc.*(2007), 286 D.L.R. (4th) 601 at paras. 35-42 (S.C.C.)

[145] *Alvi v. Misir* (2004), 73 O.R. (3d) 566 at paras. 56-57, 63 (S.C.J.) [Defendants' Authorities, Tab 13]; *Syl Apps Secure Treatment Centre v. B.D.* (2007), 284 D.L.R. (4th) 682 at para. 28 (S.C.C.) [Defendants' Authorities, Tab 104]

[146] *Paxton v. Ramji*, [2008] O.J. No. 3294 at para. 65 (C.A.) [Defendants' Authorities, Tab 87]

[147] *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at para. 68 (C.A.) [Defendants' Authorities, Tab 16]

inspection by "the public".[148] The Defendants provided no direct service to any of the individual members of the putative class, and are not alleged to have had personal contact with any of them.[149] As a result, reliance by the members of the putative class would have been upon their investment advisers, the financial press and financial analysts, not upon the Defendants themselves.[150]

(e) If the Defendants owed a duty at all, it was to the public and the IMAX shareholders, not to the individual members of the putative class.[151] The Defendants acted pursuant to a statutory duty to provide accurate financial information to a group of persons collectively.[152] Extending that duty to individual investors would result in obligations that may conflict with it.[153]

(f) The property and other interests involved in the Plaintiffs' claim are not of paramount importance.[154] Instead, they relate to pure economic losses, which have less significance than the interests engaged by other categories of negligence involving physical or property damage.[155]

119. Thus, the duty alleged by the Plaintiffs founders at the first stage of the *Anns/Kamloops* test.

---

148 Fresh Claim, at paras. 57-58.

149 *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at para. 69 (C.A.) [Defendants' Authorities, Tab 16]

150 *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at para. 70 (C.A.) [Defendants' Authorities, Tab 16]

151 *Cooper v. Hobart*, [2001] 3 S.C.R. 537 at para. 44 [Defendants' Authorities, Tab 39]

152 *Hercules Managements Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at paras. 48-49, 56 [Plaintiffs' Authorities, Tab 28]; *NPV Management Ltd. v. Anthony* (2003), 231 D.L.R. (4th) 681 at paras. 57-64 (Nfld. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 436 [Defendants' Authorities, Tab 84]

153 *Syl Apps Secure Treatment Centre v. B.D.* (2007), 284 D.L.R. (4th) 682 at para. 28 (S.C.C.) [Defendants' Authorities, Tab 104]

154 *Hill v. Hamilton-Wentworth Regional Police Services Board* (2007), 285 D.L.R. (4th) 620 at paras. 27, 34 (S.C.C.) [Defendants' Authorities, Tab 49]; *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at para. 53 (C.A.) [Defendants' Authorities, Tab 16]

155 *Martel Building Ltd. v. Canada*, [2000] 2 S.C.R. 860 at para. 37 [Defendants' Authorities, Tab 74]

### (3) It does Not Satisfy the Second Stage of the *Anns/Kamloops* Test

120. Even assuming that a *prima facie* duty of care of exists, it is definitively negatived by several residual policy factors at the second stage of the *Anns/Kamloops* test:

(a) Most importantly -- bearing in mind that these policy considerations are assessed at the time the allegedly negligent conduct occurred -- the duty would give rise to the spectre of indeterminate liability,[156] which is particularly acute in claims alleging pure economic loss.[157] Indeed, it was the concern of "liability in an indeterminate amount for an indeterminate time to an indeterminate class", first expressed by Cardozo J. in *Ultramares Corp. v. Touche*,[158] which led the Court in *Hercules* to limit the duty of care in negligent misrepresentation to cases where the defendant knows the identity of the specific plaintiff, and the document is used for the specific purpose for which it had been prepared.[159] The duty alleged by the Plaintiffs is in respect of an indeterminate class, since it would extend to the investing public at large, even though there is no contractual relationship, no reliance, and no requirement that defendants either be aware of the specific investors, or that documents be used for the specific purpose that they had been prepared. The duty would also give also rise to an indeterminate amount of liability, since the damages would depend upon the inherently uncertain fluctuations of the issuer's share price, which may be affected by numerous factors beyond the issuer's financial disclosures. Finally, the liability would exist for an

---

156 *Design Services Ltd. v. Canada* (2008), 293 D.L.R. (4th) 437 at paras. 59-60 (S.C.C.) [Defendants' Authorities, Tab 43]
157 *Design Services Ltd. v. Canada* (2008), 293 D.L.R. (4th) 437 at para. 62 (S.C.C.) [Defendants' Authorities, Tab 43]
158 *Ultramares Corp. v. Touche*, 174 N.E. 441 at p. 444 (1931) [Defendants' Authorities, Tab 108]
159 *Hercules Managements Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165 [1977] S.C.J. No. 51 at paras 31, 36-37 [Plaintiffs' Authorities, Tab 28].

indeterminate time since, the misrepresentation in question could take the form of a continuing statement or omission, and may not be discovered until several years after it was made.

(b) In addition to indeterminate liability, the duty would have a negative effect upon other constituencies.[160] It would effectively create an insurance scheme for short-term prospective investors, at the expense of the long-term stakeholders in IMAX. Indeed, it was precisely in order to avoid this prospect that the Legislature added the "damages cap" to Part XXIII.1 of the Securities Act.[161]

(c) The duty would also have a negative effect upon other legal obligations and the legal system.[162] As discussed above, the duty could conflict with the Defendants' statutory obligations under the Securities Act and the CBCA, and play havoc with the alternative remedy already provided for under Part XXIII.1 of the Securities Act. Further, because it affords a remedy for pure economic loss, it would also encourage a tidal wave of meritless claims,[163] which issuers would be forced to settle given the lack of any damages cap and any requirement for proof of fraud.

(d) Further, the duty would have a negative effect upon society more generally.[164] Imposing a duty upon issuers and directors to prospective secondary market investors would have a "chilling effect" upon the Canadian business sector,

---

160 *Cooper v. Hobart*, [2001] 3 S.C.R. 537 at para. 55 [Defendants' Authorities, Tab 39]

161 Part XXIII.1 of the Securities Act (2000), 23 O.S.C.B. 7383: CSA Notice 53-302 -- Proposal for a Statutory Civil Remedy for Investors in the Secondary Market and Responses to the Proposed Change to the Definitions of "Material Fact" and "Material Change", at p. 7383

162 *Odhavji Estate v. Woodhouse*, [2003] 3 S.C.R. 263 at para. 51 [Defendants' Authorities, Tab 85]

163 *Martel Building Ltd. v. Canada*, [2000] 2 S.C.R. 860 at para. 37 [Defendants' Authorities, Tab 74]

164 *Odhavji Estate v. Woodhouse*, [2003] 3 S.C.R. 263 at para. 51 [Defendants' Authorities, Tab 85]

and would dissuade companies from setting up business in Canada.[165] It would also severely limit the extent to which issuers disclose non-obligatory financial information in their securities filings (*e.g.*, forward-looking information).

(e) Finally, the duty would open a chasm between the Canadian and American securities systems, in an era where increased harmonization between Canadian and U.S. securities laws is necessitated by the international nature of the markets.[166] In the United States, the courts have grappled with claims in the nature of those advanced by the Plaintiffs for years. Tellingly, as shall now be discussed, U.S. courts have soundly rejected the submission that issuers and directors owe secondary market investors a duty of care in respect of their annual securities filings and related press releases.

121. For the reasons discussed in the Rule 21 Factum, these submissions relating to the second stage of the *Anns/Kamloops* test apply equally to the Plaintiffs' claim for negligent misrepresentation. As such, they are hereby incorporated into the Rule 21 Factum.

**d) Conclusions**

122. Thus, in summary, the Plaintiffs' claim of negligence *simpliciter* cannot be sustained, as it fails to survive scrutiny under s. 5(1)(a) of the CPA. *Inter alia*, the Plaintiffs have failed to plead a basis for imposing on the Defendants a duty of care which can be justified as falling within an established category of claim, or being analogous to an established category of claim, or constituting a supportable novel category of claim. In the absence of an adequate

---

165 *Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 at para. 75 (C.A.) [Defendants' Authorities, Tab 16]

166 *Global Securities Corp. v. British Columbia (Securities Commission)*, [2000] 1 S.C.R. 494 at paras. 27-28 [Defendants' Authorities, Tab 47]

pleading of duty of care, it is obvious that the Plaintiffs' pleadings fail to disclose a cause of action in negligence *simpliciter*.

### *5. Additional Authorities Relevant to Duty of Care for Negligent Misrepresentation and Negligence Simpliciter*

123. The Plaintiffs' failure to adequately plead the basis for a duty of care in negligent misrepresentation was already addressed, separately, in the Defendants' Rule 21 Factum. The following submissions represent an elaboration on and extension of that argument, in addition to the argument relating to negligence *simpliciter* made above, and should be read accordingly.

124. As with the Newfoundland Court of Appeal in *NPV*, [167] the American courts have rejected the submission that issuers and directors owe secondary market investors a common law duty of care in respect of their annual securities filings and related press releases. This ruling has been made, not only with respect to claims sounding in negligent misrepresentation, but <u>also</u> *vis-à-vis* claims sounding in negligence *simpliciter*.[168] Further, this conclusion has been made in multiple states, on the basis of varying facts, over a period of many years. With the exception of a few seemingly marginal states like New Jersey,[169] it appears that the vast majority of U.S. cases -- including those decided under the laws of New York,[170] Connecticut,[171] Michigan,[172] Colorado,[173] California,[174] Maryland,[175] Nevada,[176]

---

[167] *NPV Management Ltd. v. Anthony* (2003), 231 D.L.R. (4th) 681 (Nfld. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 436 [Defendants' Authorities, Tab 84]

[168] *Chanoff v. United States Surgical Corp.*, 857 F. Supp. 1011 at p. 1022 (D. Conn. 1994), *aff'd* 31 F. 3d 66 (2nd Cir.), *cert denied*, 513 U.S. 1058 [Defendants' Authorities, Tab 33]

[169] *In re Zenith Laboratories Securities Litigation*, 1993 U.S. Dist. LEXIS 18478 at *35-*37 (D.N.J. 1993) [Defendants' Authorities, Tab 61]

[170] *In re Coleco Securities Litigation*, 591 F. Supp. 1488 at p. 1491-1494 (S.D.N.Y. 1984) [Defendants' Authorities, Tab 52]; *Brickman v. Tyco Toys Inc.*, 722 F. Supp. 1054 at p. 1062 (S.D.N.Y. 1989) [Defendants' Authorities, Tab 24]; *In re Par Pharmaceutical Inc. Securities Litigation*, 733 F. Supp. 668 at p. 686 (S.D.N.Y. 1990) [Defendants' Authorities, Tab 57]

Delaware,[177] Pennsylvania,[178] and South Carolina[179] -- have denied that a duty of care is owed by issuers or directors in these circumstances. These rulings are all the more remarkable in that <u>every one</u> was made in the context of a motion to dismiss, and thus at a juncture which was analogous to a hearing under s. 5(1)(a) of the <u>CPA</u>.

125. In rejecting the duty of care, the principal factor seized upon by the U.S. courts has been the concern expressed in *Ultramares* -- namely, that of "liability in an indeterminate amount for an indeterminate time to an indeterminate class."[180] The courts have found that liability would be indeterminate in these circumstances because:

(a) Prospective investors represent an unparticularized, potentially infinite, and "faceless or unresolved class of persons".[181] As a result, the defendants cannot know the identity of the plaintiff before the alleged injury took place.[182] The

---

171 *Chanoff v. United States Surgical Corp.*, 857 F. Supp. 1011 at p. 1022 (D. Conn. 1994), *aff'd* 31 F. 3d 66 (2nd Cir.), *cert denied*, 513 U.S. 1058 [Defendants' Authorities, Tab 33]

172 *In re Consumers Power Company Securities Litigation*, 105 F.R.D. 583 at pp. 596-598 (E.D. Mich. 1985) [Defendants' Authorities, Tab 53]

173 *In re Storage Technology Corporation Securities Litigation*, 630 F. Supp. 1072 at p. 1081 (D. Colo. 1986) [Defendants' Authorities, Tab 58]

174 *Weinberger v. Schroeder*, 1986 U.S. Dist. LEXIS 18428 at *7-*11 (N.D. Cal. 1986) [Defendants' Authorities, Tab 111]; *In re Worlds of Wonder Securities Litigation*, 694 F. Supp. 1427 at p. 1436 (N.D. Cal. 1988) [Defendants' Authorities, Tab 59]; *Levy v. Eletr*, 724 F. Supp. 1269 at p. 1272 (N.D. Cal. 1989) [Defendants' Authorities, Tab 72]; *In re Wyse Technology Securities Litigation*, 744 F. Supp. 207 at p. 209 (N.D. Cal. 1990) [Defendants' Authorities, Tab 60]

175 *In re Cryomedical Services, Inc. Securities Litigation*, 884 F. Supp. 1001 at p. 1021 (S.D.M.D. 1995) [Defendants' Authorities, Tab 54]

176 *In re Jackpot Enterprises Securities Litigation*, 1991 U.S. Dist. LEXIS 16353 at *22-*23 (D. Nev. 1991) [Defendants' Authorities, Tab 56]

177 *In re Delmarva Securities Litigation*, 794 F. Supp. 1293 at pp. 1310-1311 (D. Del. 1992) [Defendants' Authorities, Tab 55]

178 *Wallace v. Systems & Computer Technology Corp.*, 1997 U.S. Dist. LEXIS 14677 at *91-*95 (E.D. Pa. 1997) [Defendants' Authorities, Tab 110]

179 *Pitten v. Jacobs*, 903 F. Supp. 937 at pp. 951-952 (D.S.C. 1995) [Defendants' Authorities, Tab 89]

180 *In re Coleco Securities Litigation*, 591 F. Supp. 1488 at pp. 1491-1494 (S.D.N.Y. 1984) [Defendants' Authorities, Tab 52]; *In re Worlds of Wonder Securities Litigation*, 694 F. Supp. 1427 at p. 1436 (N.D. Cal. 1988) [Defendants' Authorities, Tab 59]

181 *In re Coleco Securities Litigation*, 591 F. Supp. 1488 at p. 1493 (S.D.N.Y. 1984) [Defendants' Authorities, Tab 52]; *Brickman v. Tyco Toys Inc.*, 722 F. Supp. 1054 at p. 1062 (S.D.N.Y. 1989) [Defendants' Authorities, Tab 24]; *In re Par Pharmaceutical Inc. Securities Litigation*, 733 F. Supp. 668 at p. 686 (S.D.N.Y. 1990) [Defendants' Authorities, Tab 57]; *Pitten v. Jacobs*, 903 F. Supp. 937 at p. 952 (D.S.C. 1995) [Defendants' Authorities, Tab 89]

182 *Brickman v. Tyco Toys Inc.*, 722 F. Supp. 1054 at p. 1062 (S.D.N.Y. 1989) [Defendants' Authorities, Tab 24]; *Pitten v. Jacobs*, 903 F. Supp. 937 at p. 952 (D.S.C. 1995) [Defendants' Authorities, Tab 89]

limited group requirement (recognized in *Hercules*) would become meaningless if any member of the public who might choose to invest in a company's common stock could qualify as part of a protected class.[183]

(b) An issuer's securities filings and related press releases are not personally and directly communicated to prospective investors.[184] Instead, such documents are provided to regulatory authorities and the public at large, and are not directed at any specific group.[185]

(c) In contrast to primary market communications, such as prospectuses, the purpose of secondary market communications is only to inform existing shareholders of corporate developments, and to meet SEC reporting requirements.[186] It is not to create a market for the issuer's shares by inducing prospective investors to buy securities.[187]

126. Each of these rationales finds a parallel in *Hercules*.[188] As a result, the U.S. cases merely confirm what was decided in *NPV* -- that the safeguards against indeterminate liability established in *Hercules* preclude a duty of care on the facts of this case.[189]

127. This result is not surprising. Both *Hercules* and the U.S. jurisprudence share a common denominator in *Ultramares*. Indeed, the Supreme Court of Canada in *Hercules*

---

183 *Wallace v. Systems & Computer Technology Corp.*, 1997 U.S. Dist. LEXIS 14677 at *93 (E.D. Pa. 1997) [Defendants' Authorities, Tab 110]

184 *Brickman v. Tyco Toys Inc.*, 722 F. Supp. 1054 at p. 1062 (S.D.N.Y. 1989) [Defendants' Authorities, Tab 24]

185 *In re Par Pharmaceutical Inc. Securities Litigation*, 733 F. Supp. 668 at p. 686 (S.D.N.Y. 1990) [Defendants' Authorities, Tab 57]; *In re Delmarva Securities Litigation*, 794 F. Supp. 1293 at p. 1310 (D. Del. 1992) [Defendants' Authorities, Tab 55]; *Pitten v. Jacobs*, 903 F. Supp. 937 at p. 951 (D.S.C. 1995) [Defendants' Authorities, Tab 89]

186 *In re Wyse Technology Securities Litigation*, 744 F. Supp. 207 at p. 209 (N.D. Cal. 1990) [Defendants' Authorities, Tab 60]

187 *Weinberger v. Schroeder*, 1986 U.S. Dist. LEXIS 18428 at *10 (N.D. Cal. 1986) [Defendants' Authorities, Tab 111]; *In re Wyse Technology Securities Litigation*, 744 F. Supp. 207 at p. 209 (N.D. Cal. 1990) [Defendants' Authorities, Tab 60]

188 *Hercules Managements Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at paras. 28, 30, 37, 41, 45-49, 51-52, 56-57 [Plaintiffs' Authorities, Tab 28].

189 *NPV Management Ltd. v. Anthony* (2003), 231 D.L.R. (4th) 681 (Nfld. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 436 [Defendants' Authorities, Tab 84]

specifically relied upon the seminal U.S. ruling in *Ultramares*, and other U.S. case law, in finding that auditors owed no duty to investors in respect of the same category of documents at issue here.[190] There is accordingly no reason why this Court should not also follow the lead of the U.S. courts in rejecting the Plaintiffs' negligence *simpliciter* claim.

128. In addition to indeterminate liability, the U.S. courts have rejected the duty proposed by the Plaintiffs for the following further reasons:

(a) The existence of a statutory cause of action for secondary market misrepresentations under federal securities laws, which is similar to (but even less plaintiff-friendly than) Part XXIII.1 of the *Securities Act*, entails that recognizing a common law duty of care is unnecessary.[191]

(b) Imposing a common law duty to prospective investors upon directors and officers could conflict with their duties to the company.[192]

(c) The result of such a duty would be to expose those who commit a negligent misrepresentation to a broader universe of plaintiffs than if the same statements constituted fraud.[193]

129. As already discussed, these policy concerns strongly militate against recognizing a novel duty of care in either negligence *simpliciter* or negligent misrepresentation in this case. The fact that they have been applied by other courts, particularly from the jurisdiction which gave birth to *Ultramares*, and which has the greatest experience in adjudicating securities litigation, should weigh heavily in this Court's assessment of the Plaintiffs' claims.

---

[190] *Hercules Managements Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at paras. 31, 38 [Plaintiffs' Authorities, Tab 28].

[191] *Weinberger v. Schroeder*, 1986 U.S. Dist. LEXIS 18428 at *11 (N.D. Cal. 1986) [Defendants' Authorities, Tab 111]; *In re Worlds of Wonder Securities Litigation*, 694 F. Supp. 1427 at p. 1436 (N.D. Cal. 1988) [Defendants' Authorities, Tab 59]

[192] *Levy v. Eletr*, 724 F. Supp. 1269 at p. 1272 (N.D. Cal. 1989) [Defendants' Authorities, Tab 72]

[193] *In re Delmarva Securities Litigation*, 794 F. Supp. 1293 at p. 1311 (D. Del. 1992) [Defendants' Authorities, Tab 55]

**B. <u>Section 5(1)(c)</u>: The Common Issues are Not Sufficiently Significant to Justify Certification**

130. The Plaintiffs suggest 14 separate proposed common issues in their Amended Notice of Motion, but only seven of the listed issues are relevant to this motion.

131. The issues regarding liability under the <u>Securities Act</u> – issues (i.a), (ii) and (iii) – will, if leave to proceed is granted, be properly the subject of a class action, and issue (xiii) (relating to the costs of that proceeding) would follow.

132. However, as to the Plaintiffs' common law allegations, issues (xiii) [costs], (xi) [corporate vicarious liability], (xii) [punitive damages], (ix) [directions for the procedure to assess damages], and (xiv) [directions necessary to establish individual participation in hearings], are either strictly procedural, or are only ancillary to the main allegations of liability. They each depend on another common issue of liability being properly determined, and in favour of the Plaintiffs, to have any meaning. These issues will not, and could not, individually or together, be the subject of a class action if the main alleged common law common issues are rejected.

133. That leaves only a few potential common issues for consideration by this Court, *each of which arises solely from the alleged Representation:*

(a) Did the Defendants owe a duty of care to the class members (issue (v))?

(b) Did any of the IMAX Statements contain a misrepresentation at common law (issue (i)(b))?

(c) If so, did the class members rely on the alleged Representation (issue vii)?

(d) If so, are the Defendants liable in negligence *simpliciter* [through making the Representation] (issue (vi))? and/or are the Defendants liable in negligent or

fraudulent misrepresentation (issue viii)? and/or did the Defendants conspire [to publish the Representations to the class members] (issue iv)?

(e) If so, is an aggregate assessment of damages appropriate (issue x)?[194]

134. In order for an issue to be sufficiently "common" for the purpose of class certification, its determination must be definitive for all class members and must substantially advance the litigation. The Supreme Court of Canada explained this critical aspect of the certification test as follows:

> The commonality question should be approached purposively. The underlying question is whether allowing the suit to proceed as a representative one will avoid duplication of fact-finding or legal analysis. Thus an issue will be "common" only where its resolution is necessary to the resolution of each class member's claim. It is not essential that the class members be identically situated vis-à-vis the opposing party. Nor is it necessary that common issues predominate over non-common issues or that the resolution of the common issues would be determinative of each class member's claim. However, the class members' claims must share a substantial common ingredient to justify a class action. Determining whether the common issues justify a class action may require the court to examine the significance of the common issues in relation to individual issues.[195] [Emphasis added]

135. The Plaintiffs seek to have the elements of **negligent misrepresentation** certified as common issues. For the class to succeed against the Defendants, the Plaintiffs will have to prove all five elements of the tort, as defined by the Supreme Court of Canada in *Queen v. Cognos*:[196]

---

[194] Common Issues List, Amended Notice of Motion, at para. 1(j): Moving Parties' Supplementary Motion Record for Leave to Plead the Causes of Action Contained in Part XXIII.1 of the *Securities Act* and for Certification (May 31, 2007) ("Plaintiffs' Supp. Motion Record"), Tab 1

[195] *Western Canadian Shopping Centres Inc. v. Dutton* (2000), [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63 at paras. 39 [Plaintiffs' Authorities, Tab 69]

[196] *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 [Plaintiffs' Authorities, Tab 51]; *Lucien Groulx & Son Planing & Saw Mill Ltd. v. Nipissing Forest Resource Management Inc.*, 2007 ONCA 801 at para. 4 (CanLII) [Defendants' Authorities, Tab 73] makes it clear that the elements articulated by the Supreme Court of Canada in *Cognos* must all be proven.

(a) a common untrue, inaccurate or misleading statement made to each and every class members by IMAX;

(b) a duty of care owed to each and every class member by IMAX;

(c) negligence by IMAX in making the statement(s) which affected each and every class members;

(d) reasonable reliance by each and every class member on the same IMAX statement(s); and

(e) damage caused to each class member arising from each class member's reliance on the same IMAX statement(s).

136. Of the five elements of the tort enumerated by the Supreme Court of Canada, only one -- the "negligence" of the Defendants -- is potentially amenable to certification as a common issue. But even this concession is subject to the application of numerous potentially different governing laws to this element of the tort.

### *1. Whether the IMAX Statements were Made to All Class Members is <u>Not</u> a Common Issue*

137. Although the following discussion is framed in the context of the Plaintiffs' negligent misrepresentation claims, it would apply equally to the Plaintiffs' parallel allegations of fraudulent misrepresentation, and would likely have relevance to their alternative claims based on negligence *simpliciter* (through the making of misstatements).

138. An issue is "common" if it is an issue of fact common to all members of the proposed class, or a common issue of law arising from common facts.[197] However, it is insufficient for the Plaintiffs simply to suggest that common issues are always raised by pleading an (allegedly) single Representation. Instead, as Nordheimer J. observes in *Pearson v. Inco*:

> . . . [T]he issue is whether the resolution of the proposed common issues sufficiently advances the overall determination of liability so as to justify the certification of the action as a class proceeding. An important consideration in this regard is whether any individual issues that will remain for determination after the common issues are resolved are limited or whether what remains to be determined is sufficiently extensive that the determination of the common issues essentially marks the commencement as opposed to the completion of the liability inquiry.[198]

139. The Plaintiffs' bear the onus of demonstrating that the IMAX Statements (four statements in total) were made to each and every class member. There is neither evidence that this is true nor any way to prove this without individual evidence from each class member as to whether they received the IMAX Statements. Therefore, it follows that the issue of whether IMAX made the IMAX Statements to each and every class member cannot be a common issue.

140. In *Pearson v. Inco*, where the Plaintiffs based their allegations of negligent misrepresentation on thirteen Ministry of the Environment reports, Nordheimer J. stated:

> Given the different publication dates, different distribution, and different media coverage of the various MOE reports over time, there is no reason to assume that all, most or even any, members of the proposed class either read the reports or heard media reports about them. Indeed the plaintiff himself admits that he has not read any of the reports. While the issue as to whether any given statement was negligent could be determined on a class-wide basis, the utility of this exercise appears highly doubtful in light of the other elements of the cause of action that could only be determined by an examination of each class member. The circumstances which underlie this cause of action are so inherently individualized that I cannot find

---

[197] ss. 1, 5(1)(c), 8(i)(e) of the Class Proceedings Act [Defendants' Authorities, Tab 1]

[198] *Pearson v. Inco* (2002), 33 C.P.C. (5th) 264 at para. 104 (Ont. S.C.J.) [Defendants' Authorities, Tab 88], *aff'd* (2004), 183 O.A.C. 168 (Div. Ct.), *rev'd on other grounds* (2005), 78 O.R. (3d) 641 (C.A.), *leave to appeal to S.C.C. refused*, [2006] S.C.C.A. No. 1 [Plaintiffs' Authorities, Tab 50], citing *Abdool v. Anaheim Management Ltd.* (1995), 21 O.R. (3d) 453 at p. 475 *per* Moldaver, J. (Div. Ct.) [Defendants' Authorities, Tab 11]

that the issue of alleged negligent misrepresentation satisfies the necessary requirements to be a common issue.[199]

141. Further, since the Plaintiffs' claim is predicated on four publications by IMAX -- three of which were press releases and one of which was a complex financial document -- it is unlikely that any (let alone all) of these documents reached the mass market other than through the varied filter of news articles, with or without comment or analysis and/or by any number of investment advisors and/or reporters. Such information would have been received (if at all) by each proposed class member in a different context at a different time, with different individual effects and outcomes.[200]

142. To the same point, the fact that the restatement by IMAX of its Annual Report contained errors is hardly supportive of the Plaintiffs' suggestion that the Representation is a common issue. Even if IMAX's Annual Report (and, allegedly, one or more of the other documents) were inaccurate, such a finding would be meaningless outside of a full examination of each shareholder's factual matrix: each person may or may not have **received** or read any portion of, much less any erroneous portion of, the Annual Report or any of the Company's press releases.[201]

### *2. Reliance is <u>Not</u> a Common Issue*

143. Again, although the following discussion is framed in the context of the Plaintiffs' negligent misrepresentation claims, it would apply equally to the Plaintiffs' parallel allegations of fraudulent misrepresentation (which also requires reliance). To the extent that

---

[199] *Pearson v. Inco* (2002), 33 C.P.C. (5th) 264 at paras. 111, 113 (Ont. S.C.J.), *aff'd* (2004), 183 O.A.C. 168 (Div. Ct.), *rev'd without reference to this issue* (2005), 78 O.R. (3d) 641 (C.A.), *leave to appeal to S.C.C. refused*, [2006] S.C.C.A. No. 1 [Defendants' Authorities, Tab 88]

[200] *McKay v. CDI Career Development Institutes Ltd.* (1999), 30 C.P.C. (4th) 101 at paras. 24-28 (B.C.S.C.) [Defendants' Authorities, Tab 76]

[201] *Moyes v. Fortune Financial Corp.* (2002), 61 O.R. (3d) 770 at para. 32 (S.C.J.), *aff'd* (2003), 67 O.R. (3d) 795 (Div. Ct.), *leave to appeal to C.A. refused*, (2004), 44 C.P.C. (5th) 85 (C.A.) [Defendants' Authorities, Tab 81]

reliance undergirds the duty of care analysis applicable to negligence *simpliciter*, this discussion will logically be relevant to the Plaintiffs' alternative arguments regarding the latter tort as well.

144. As has already been discussed at some length above (in the context of s. 5(1)(a)), the Plaintiffs have attempted to characterize the issue of reliance as a common issue -- and also to salvage their inadequate pleadings of reliance for purposes of s. 5(1)(a) -- by relying on a *de facto* fraud-on-the-market argument. This transparent stratagem has already been fully critiqued above, and that critique will not be repeated here. As was also noted above, should this Court opt to characterize the Plaintiffs' "efficient market" theory as something other than an effort to resurrect fraud-on-the-market -- and, more specifically, if this Court decides that the Plaintiffs' arguments are reasonably characterized as asserting a rebuttable factual inference of reliance -- the Defendants repeat their observation that the certification of such an inference as a common issue has been conclusively rejected by Justice Cullity in the *Serhan v. Johnson and Johnson* ruling.[202]

145. As was also discussed above at some length, Canadian law is clear that proof of actual reliance is a fundamental constituent aspect of the tort of negligent misrepresentation.[203] Accordingly, the issue of reliance must necessarily be canvassed by the Court. Because reliance is an inescapably individual concept, it does not give rise to a common issue, and overwhelms the other common issues that may attend a negligent misrepresentation claim.

---

[202] *Serhan Estate v. Johnson & Johnson* (2004), 72 O.R. (3d) 296 at paras. 56-60, 63 (S.C.J.) [Defendants' Authorities, Tab 97], *aff'd on other grounds* (2006), 85 O.R. (3d) 665 (Div. Ct.) [Plaintiffs' Authorities, Tab 60], *leave to appeal to C.A. refused* (Oct. 16, 2006, Ont. C.A.), *leave to appeal S.C.C. refused*, [2006] S.C.C.A. No. 494

[203] *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1977] S.C.J. No. 51 at para. 18 [Plaintiffs' Authorities, Tab 28]; *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 at para. 33 [Plaintiffs' Authorities, Tab 51]

146. This proposition has been recognized, repeatedly, by the Canadian judiciary. Absent "exceptional" situations of a single or standard misrepresentation made to all class members,[204] class actions premised on negligent misrepresentations are not amenable to certification. This is because each class member's claim depends upon a "myriad of individual evidentiary factors." Therefore an inquiry into the two proposed representative Plaintiffs' particular circumstances will not "suffice and stand in the stead of an inquiry into the circumstances of all class members."[205]

147. As stated in *Collette v. Great Pacific Management Co.*:

> It follows from my earlier discussion of reliance that commonality is much more limited than the plaintiff suggested. This is not a case of a single offering made to a homogenous class**.** Different investors will have learned of the investment opportunity in different ways and at different times, whether through discussion with advisors or by reviewing promotional materials or both. Some investors may have purchased based on information or advice received from other sources. Different investors will have differing risk tolerances according to their personal circumstances and the structure of their investment portfolio. Some, but not all will likely have reviewed other contractual documents relating to the two projects as recommended in the promotional material.[206] [Emphasis added]

---

[204] *Collette v. Great Pacific Management Co.*, 2001 BCSC 237 at paras. 88-89 (CanLII), *rehearing ordered on contract claim* 2002 BCCA 195 (CanLII), *supp. reasons*, 2003 BCSC 332 (CanLII) [Defendants' Authorities, Tab 37], *rev'd on other grounds* [2004] B.C.J. No. 381 (C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]; *Williams v. Mutual Life Assurance Company of Canada* (2000), 51 O.R. (3d) 54 at paras. 21-23 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 (Div. Ct.) [Defendants' Authorities, Tab 113], *aff'd* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada*, *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]; *Samos Investments Inc. v. Pattison* (2001), 22 B.L.R. (3d) 46 at paras. 75-107 (B.C.S.C.) [Defendants' Authorities, Tab 96], *aff'd* (2003), 30 B.L.R. (3d) 177 (C.A.) at paras. 39, 41 (B.C.C.A.) [Defendants' Authorities, Tab 96]

[205] *Kelly v. J.J. Lacey Insurance Ltd.* (1997), 15 C.P.C. (4th) 114 at para. 61 (Nfld. S.C.(T.D.)) [Defendants' Authorities, Tab 64]; see also *Kumar v. Mutual Life Assurance Company of Canada* (2003), 226 D.L.R. (4th) 112 at paras. 47-48 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]; *Millgate Financial Corp. v. B.F. Realty Holdings Ltd.* (1998), 28 C.P.C. (4th) 72 at paras. 51-52 (Ont. Gen. Div.) [Defendants' Authorities, Tab 78]; *Huras v. Com Dev. Ltd.* (1999), 36 C.P.C. (4th) 31 at para. 19 (Ont. S.C.J.), *aff'd* (2001), 8 C.P.C. (5th) 277 (Ont. Div. Ct.) [Defendants' Authorities, Tab 51]; *Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63 at pp. 70-71 (Gen. Div.) [Defendants' Authorities, Tab 80]; *R.(L) v. British Columbia* (1999), 48 C.C.L.T. (2d) 1 at para. 45 (B.C. C.A) [Defendants' Authorities, Tab 91], *aff'd on other grounds* (2001), 205 D.L.R. (4th) 39 at paras. 20 and 25 (S.C.C.) sub nom. *Rumley v. British Columbia* [Plaintiffs' Authorities, Tab 57]

[206] *Collette v. Great Pacific Management Co.*, 2001 BCSC 237 at para. 65 (CanLII), *rehearing ordered on contract claim* 2002 BCCA 195 (CanLII), *supp. reasons*, 2003 BCSC 332 (CanLII) [Defendants' Authorities, Tab 37], *rev'd on other grounds* [2004] B.C.J. No. 381 (C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

148. The same point was made in *Samos v. Pattison*.[207] There, the court assessed an allegation by the former minority shareholder in Westar (initially a widely-traded public company) that the company had made certain misrepresentations in various prospectuses, circulars and other materials filed in support of a series of transactions.[208] In considering a certification motion, Mr. Justice Bauman reviewed various commercial misrepresentation cases and concluded that:

> In light of the active trading of Westar common shares during this period, what emerges is a scenario where different representations were made to different shareholders, potentially inducing wholly different reactions, that is, encouraging some to sell, others to buy and still others to stand pat.
>
> The contrast with what effectively was a single misrepresentation in *Carom* is striking.
>
> …
>
> <u>To my mind it underlines the fact that the plaintiff's case calls for numerous individual enquiries as to shareholder reliance within each period in the proposed class and this tends to belie the submission that there are, in reality, common issues which if resolved will advance this litigation in a material way.</u>
>
> The fact of different representations at different times within each period also leads to actual conflicts between shareholders within the same period. It may be in the interests of one shareholder to say that those representations upon which he or she relied were causative of loss while those made to others were neutral.
>
> The lack of a single misrepresentation to a homogenous group which characterizes this claim, recalls the facts in *Collette, Millgate Financial Corp.* and *Rosedale Motors Inc.* where that consideration, amongst others, led to a refusal to certify the proceedings.
>
> …
>
> [I have] concluded that when analyzed, what superficially might appear as common issues are distinctly uncommon between members of the proposed class … .[209] [Emphasis added]

---

[207] *Samos Investments Inc. v. Pattison* (2001), 22 B.L.R. (3d) 46 (B.C.S.C.) [Defendants' Authorities, Tab 95], *aff'd* (2003), 30 B.L.R. (3d) 177 (B.C.C.A.) [Defendants' Authorities, Tab 96]

[208] *Samos Investments Inc. v. Pattison* (2001), 22 B.L.R. (3d) 46 at paras. 13-49 (B.C.S.C.) [Defendants' Authorities, Tab 95], *aff'd* (2003), 30 B.L.R. (3d) 177 at paras. 4, 7-9, 13 (B.C.C.A.) [Defendants' Authorities, Tab 96]

[209] *Samos Investments Inc. v. Pattison* (2001), 22 B.L.R. (3d) 46 at paras. 122-123, 128-129, 149 (B.C.S.C.) [Defendants' Authorities, Tab 95], *aff'd* (2003), 30 B.L.R. (3d) 177 (B.C.C.A.); *Samos Investments Inc. v. Pattison* (2003), 30 B.L.R. (3d) 177 at paras. 33-34, 41, 45-46 (B.C.C.A.) [Defendants' Authorities, Tab 96]

149. Accordingly, to justify certification, the Plaintiffs would need to demonstrate that the IMAX Statements created, over time, a single conclusion for every class member -- that is, that all class members were aware of the IMAX Statements and that they all bought their IMAX shares because of the IMAX Statements. [210]

150. The impossibility of the Plaintiffs' theory of "common" experience arising out of the IMAX Statements is laid bare by the cross-examinations of the two Plaintiffs themselves: they did not see the same documents (indeed, their pleadings, their affidavits and their transcripts tell different stories of what they each received and knew), and neither of them bought their IMAX shares because of the IMAX Statements.

151. With respect to the proposed representative Plaintiff, Cohen, he has asserted the following:

(a) In his Original Statement of Claim he pleaded that he relied upon the IMAX Statements in purchasing his shares. No other factors or statements are alleged to have informed his decision to purchase;[211]

(b) In his Second Statement of Claim he pleaded that he relied on the IMAX Statements when he purchased his shares;[212]

(c) In the Fresh Statement of Claim he does not assert that he read and relied upon the IMAX Statements in purchasing his shares. No other factors or statements are alleged to have informed his decision to purchase;[213]

---

[210] The Plaintiffs have attempted to re-characterize the pleading to allege a single Representation to overcome these hurdles. However, in the present case, there is not a single, unified Representation as suggested by the Plaintiffs. In fact, the Plaintiffs rely on at least four separate and distinct representations, including various press releases and the Form 10-K. Fresh Claim, at para. 70: Plaintiffs' First Motion Record, Tab 1, Schedule A

[211] Statement of Claim, at para. 44: Rule 21 Motion Record of the Defendants, Tab 8

[212] Statement of Claim, at para. 68: Rule 21 Motion Record of the Defendants, Tab 8

[213] Fresh Claim, at para. 74: Plaintiffs' First Motion Record, Tab 1, Schedule A

(d) In the Amended Fresh Statement of Claim he asserts that he read and relied on the Form 10-K and a Globe and Mail article dated February 17, 2006 reporting on the February Press Release;[214]

(e) In his Affidavit, his evidence is that his decision to purchase was informed by:

(i) news reports in December 2005 and January 2006 in the *National Post*;[215]

(ii) reporting of the IMAX Statements in the *National Post* in February, March and May of 2006[216]; and

(iii) some additional reporting in the days just before he purchased his shares.[217]

(f) Finally, in his cross-examination he stated that while he read the *National Post* daily,[218] the *Globe and Mail* business section,[219] Financial Reports,[220] and Google Finance,[221] watched RDTV and BNN,[222] called and spoke to individuals in Investor Relations at IMAX (to get a sense of how positively they spoke of the Company),[223] spoke to a colleague at work[224] and flipped through the 2005 Annual Report for five minutes,[225] in the end he testified that his decision to purchase was made based on a July 27, 2006 *Globe* story regarding potential purchasers of IMAX (including Bono's private equity

---

214 Amended Fresh Statement of Claim, at para. 73
215 Affidavit of C. Cohen, sworn February 21, 2007, at para. 8: Plaintiffs' First Motion Record, Tab 4
216 Affidavit of C. Cohen, sworn February 21, 2007, at para. 9: Plaintiffs' First Motion Record, Tab 4
217 Affidavit of C. Cohen, sworn February 21, 2007, at para. 9: Plaintiffs' First Motion Record, Tab 4. Presumably this is the article of July 27, 2006 related to the potential purchase of IMAX.
218 Cross-Examination of C. Cohen, April 9, 2008, at p. 17, lines 18-24
219 Cross-Examination of C. Cohen, April 9, 2008, at p. 18, lines 1-2
220 Cross-Examination of C. Cohen, April 9, 2008, at p. 19, lines 19-20
221 Cross-Examination of C. Cohen, April 9, 2008, at p. 18, line 2
222 Cross-Examination of C. Cohen, April 9, 2008, at p. 18, lines 3-4
223 Cross-Examination of C. Cohen, April 9, 2008, at p. 19, lines 20-21, p. 23, lines 7-15, p. 24 lines 7-13
224 Cross-Examination of C. Cohen, April 9, 2008, at p. 20, lines 20-25
225 Cross-Examination of C. Cohen, April 9, 2008, at p. 52 line 5 - p. 56, line 23

fund), which purchase he anticipated would result in a share price increase.[226] Most importantly he admitted that he did not rely on the media reports of the IMAX Statements in deciding to purchase his shares.[227]

152. With respect to the proposed representative Plaintiff, Silver, he has asserted the following:

(a) In his Original Notice of Action he pleaded that he read the Buyer March Statement, the Annual Report and a May press release; however, there is no explicit pleading of his reliance on these documents in the purchase of his IMAX shares;[228]

(b) In his Second Statement of Claim he pleaded that he relied on the IMAX Statements when he purchased his shares;[229]

(c) In both the Fresh Statement of Claim and the Amended Fresh Statement of Claim he pleads that he read and relied upon the IMAX Statements, in purchasing his shares;[230]

(d) In his Affidavit, his evidence is that read and relied on each of the quarterly statements for the 2005 fiscal year and the Annual Report in making his decision to purchase IMAX shares;[231] and

(e) Finally, in his cross-examination he stated that, while he read the *Financial Post*, *Globe and Mail*, TD Waterhouse website and the internet,[232] the factors

---

226 Cross-Examination of C. Cohen, April 9, 2008, at p. 44, line 9 – p. 45, line 5
227 Cross-Examination of C. Cohen, April 9, 2008, at p. 45, lines 1-5
228 Notice of Action, at para. 25: Rule 21 Motion Record of the Defendants, Tab 7
229 Statement of Claim, at para. 68: Rule 21 Motion Record of the Defendants, Tab 9
230 Fresh Claim, at para. 74: Plaintiffs' First Motion Record, Tab 1, Schedule A and Amended Fresh Statement of Claim at para. 73
231 Exhibits "B"-"E" to Affidavit of M. Silver, sworn February 26, 2007, at para. 9: Plaintiffs' First Motion Record, Tabs 3 B–E

important to him were the backlog of theatres to be built,[233] the number of installations that had occurred,[234] and the fact that the company was looking for a buyer.[235] In the end, his decision to purchase was also made based on the July 27, 2006 *Globe* story regarding potential purchasers of IMAX (including Bono's private equity fund), which he anticipated would result in a share price increase.[236]

153. In other words, in addition to the credibility issues arising from the internal disparities in their own stories (which issues of credibility may also arise with other class members as to why they bought and sold when they did), the evidence demonstrates that the Plaintiffs bought their IMAX shares because of a rumour reported by the media which was <u>not</u> released by or attributed to IMAX or any of the Defendants. Further, that media report did <u>not</u> contain the Representation which is the foundation of the Plaintiffs' claim. Indeed, although that market rumour was the single most important element in the purchase decisions of each Plaintiff, the article is not even mentioned in the Claim, or in their Affidavits (except implicitly in Cohen's).[237]

154. Therefore, on the evidence before the Court, it is not at all apparent that each and every class member (or any of them) read and relied on the IMAX Statements themselves rather than on media or analysts' interpretations of those IMAX Statements. During the proposed class period, IMAX was the focus of numerous other media segments and analyst reports. The focus of these media segments was not confined to the IMAX Statements and indeed more often related to the

---

[232] Cross-Examination of M. Silver, April 17, 2008, at p. 12, lines 13-16
[233] Cross-Examination of M. Silver, April 17, 2008, at p. 25, lines 7-16. Notably, if the revenue had not been recognized in 2005, there would have been a far larger backlog; therefore, it is not at all certain that the failure to recognize this revenue in 2005 would have been viewed negatively by Mr. Silver or other class members.
[234] Cross-Examination of M. Silver, April 17, 2008, at p. 35, line 20 – p. 36, line 10
[235] Cross-Examination of M. Silver, April 17, 2008, at p. 49, lines 22-25, p. 51, lines 20-25
[236] Cross-Examination of M. Silver, April 17, 2008, at p. 38, line 8 – p. 39, line 5
[237] Paragraphs 151 and 152, *supra*

possibility of IMAX being purchased.[238] In these circumstances, the issue of whether every Class Member relied upon the IMAX Statements raises a quintessentially individual issue.

155. Further, in addition to proving actual reliance, the Plaintiffs must demonstrate that this reliance was reasonable.[239] This will require an inquiry into each investor's individual interpretation of whatever information he had in hand attributable to IMAX at any given time in light of every piece of information received by him or her about IMAX from all sources.[240] For instance, the Plaintiffs' expert, Robert Comment, conceded that sophisticated investors may have had the ability to determine whether the financial statements were, in fact, prepared in accordance with U.S. GAAP.[241] For such investors, it may not have been reasonable for them to rely on the IMAX Statements in purchasing their shares.[242]

156. Indeed, the determination of the reasonableness of reliance would change constantly as an investor received new information about IMAX (from IMAX, from a broker, from news reports and from every other source), day by day over a period of six months. As illustrated by the Plaintiffs, even if an investor's interest in investing in IMAX arose from receipt, understanding and reliance on IMAX's financial results during the period of February 17 to March 9, the question of why they bought stock on any given day in March, April, May, June, July or early August may be entirely dependent on additional information received about IMAX (including potentially from sources other than IMAX) over that period of time.

---

238 Exhibits "C"-"II" to Affidavit of M. Livie, sworn September 11, 2007: Motion Record of the Responding Parties, Vol. II, Tab 11

239 *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 at para. 33 [Plaintiffs' Authorities, Tab 51]

240 *Collette v. Great Pacific Management Co.*, 2001 BCSC 237 at paras. 38, 93 (CanLII), *rehearing ordered on contract claim* 2002 BCCA 195 (CanLII), *supp. reasons,* 2003 BCSC 332 (CanLII) [Defendants' Authorities, Tab 37], *rev'd on other grounds* [2004] B.C.J. No. 381 (C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]; *Williams v. Mutual Life Assurance Company of Canada* (2000), 51 O.R. (3d) 54 at paras. 30-31 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 (Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 113], *aff'd* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

241 Cross-Examination of R. Comment, April 7, 2008, at p. 48, line 4 – p. 49, line 16

242 *Kelly v. J.J. Lacey Insurance Ltd.* (1997), 15 C.P.C. (4th) 114 at paras. 59-66 (Nfld. S.C.(T.D.)) [Defendants' Authorities, Tab 64]

157. A Judge simply could not make any determination with respect to the purchases by Cohen and Silver and then on that basis alone reach any conclusion as to: what information about IMAX, from all sources, was heard or read, individually or in combination, by every other class member over a period of 6 months (or more); and then whether those persons relied, and reasonably relied on that information, from time to time; and then what consequences, if any, flowed therefrom for each and all of the proposed class members.[243] Instead, individual inquiries will be necessary to determine whether reliance by individual class members was reasonable in the unique circumstances of that class member's case.[244]

158. Accordingly, the questions of reliance -- and the reasonableness of such reliance -- by any given IMAX investor on the IMAX Statements (if received) will have to be considered over the full length of their particular interest in IMAX. In this regard, it is notable that the proposed representative Plaintiff Cohen was certainly reading about and evaluating IMAX before February 17, 2006.[245]

159. Here, the Court would have to determine what opinion (if any) individual class members had of IMAX before February 17 and whether that assessment arose originally from IMAX statements or otherwise, the duration and evolution of that assessment in relation to further events and information the individual class member received from all sources, and the effect of that changing assessment on the class member's day-to-day investing decisions.

---

[243] *Pearson v. Inco* (2002), 33 C.P.C. (5th) 264 at para. 113 (Ont. S.C.J.), *aff'd* (2004), 183 O.A.C. 168 (Div. Ct.), *rev'd on other grounds* (2005), 78 O.R. (3d) 641 (C.A.), *leave to appeal to S.C.C. refused*, [2006] S.C.C.A. No. 1 [Defendants' Authorities, Tab 88]; *Moyes v. Fortune Financial Corp.* (2002), 61 O.R. (3d) 770 at para. 32 (S.C.J.), *aff'd* (2003), 67 O.R. (3d) 795 (Div. Ct.), *leave to appeal to C.A. refused* (2004), 44 C.P.C. (5th) 85 (C.A.) [Defendants' Authorities, Tab 81]; *Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63 at pp. 72-73 (Gen. Div.) [Defendants' Authorities, Tab 80]

[244] *Moyes v. Fortune Financial Corp.* (2002), 61 O.R. (3d) 770 at paras. 32-33 (S.C.J.), *aff'd* (2003), 67 O.R. (3d) 795 (Div. Ct.), *leave to appeal to C.A. refused*, (2004), 44 C.P.C. (5th) 85 (C.A.) [Defendants' Authorities, Tab 81]; *Shaw v. BCE Inc.*, [2003] O.J. No. 2695 at para. 11 (S.C.J.) [Defendants' Authorities, Tab 99]

[245] Cross-Examination of C. Cohen, April 9, 2008, at p. 20, line 18 – p. 21, line 3

160. This is particularly so given that the Class Period coincided exactly with the period during which IMAX was seeking a merger or acquisition partner. The evidence of both proposed representative Plaintiffs establishes that they were tracking the likelihood of a successful transaction, and that their purchase was triggered by their own assessment of the likelihood of a particular acquisition. In this regard, it is revealing that the newspaper article upon which each Plaintiff relied did not describe any such acquisition as "completed" or even as "certain to be completed," but merely as "potential."[246]

161. These problems are not merely theoretical. Instead, the courts have recognized that individual investors may purchase shares on the basis of several different factors. Such a principle is made clear in oppression cases, where a Judge must consider the reasonableness of a pleaded "shareholder expectation" arising from corporate representations. Courts have recognized that such expectations will not remain "static" over time,[247] but can "evolve" as relevant events or announcements accumulate,[248] and that investment decisions can be made based on an individual's "wish list", "unilateral expectations",[249] or even a stock speculator's "wild hopes" regarding the prospects of a stock.[250]

---

[246] "Sony among four chasing IMAX; Bono-backed equity fund Elevation also seen as one of the potential buyers" Exhibit "II" to Affidavit of M. Livie, sworn September 11, 2007: Motion Record of the Responding Parties, Vol. II, Tab 11 II;

[247] *820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 123 at para. 135 (Ont. Gen. Div.), *aff'd* (1991), 3 B.L.R. (2d) 113 (Ont. Div. Ct.) [Defendants' Authorities, Tab 9]; *Themadel Foundation v. Third Canadian General Investment Trust Ltd.* (1998), 38 O.R. (3d) 749 at p. 755 (C.A.) [Defendants' Authorities, Tab 106]; *Krynen v. Bugg* (2003), 64 O.R. (3d) 393 at para. 74, 97-99 (S.C.J.) [Defendants' Authorities, Tab 67]

[248] *820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 123 at para. 135 (Ont. Gen. Div.), *aff'd* (1991), 3 B.L.R. (2d) 113 (Ont. Div. Ct.) [Defendants' Authorities, Tab 9]; *Themadel Foundation v. Third Canadian General Investment Trust Ltd.* (1998), 38 O.R. (3d) 749 at p. 755 (C.A.) [Defendants' Authorities, Tab 106]

[249] *820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 123 at para. 129 (Ont. Gen. Div.), *aff'd* (1991), 3 B.L.R. (2d) 113 (Ont. Div. Ct.) [Defendants' Authorities, Tab 9]; *Naneff v. Con-Crete Holdings Ltd.* (1995), 23 B.L.R. (2d) 286 at para. 28 (Ont. C.A.) [Defendants' Authorities, Tab 83]; *Themadel Foundation v. Third Canadian General Investment Trust Ltd.* (1998), 38 O.R. (3d) 749 at pp. 753-754 (C.A.) [Defendants' Authorities, Tab 106]; *Gazit (1997) Inc. v. Centrefund Realty Corp.* (2000), 8 B.L.R. (3d) 81 at para. 85 (Ont. S.C.J.) [Defendants' Authorities, Tab 46]

[250] *Westfair Foods Ltd. v. Watt* (1991), 79 D.L.R. (4th) 48 at p. 59 (Alta. C.A.) [Defendants' Authorities, Tab 112]

162. As such, the degree to which Class Members relied upon the IMAX Statements in purchasing their shares cannot be approached through a unified, class-wide inquiry. The question of their reliance represents the very archetype of an individual issue.

### *3. Damages are Not a Common Issue, and Aggregate Damages are clearly Not Available*

163. Although the following discussion is framed in the context of the Plaintiffs' negligent misrepresentation claims, it would apply equally to the Plaintiffs' parallel allegations of fraudulent misrepresentation, negligence *simpliciter,* and conspiracy.

164. The question of the damages suffered by any particular class member is inherently individualistic, and requires consideration of such issues as the rationale for the class member's purchase of the shares, the trading price of the shares when the class member purchased them, the price of the shares when the class member sold the shares (if they have been sold), why the class member sold the shares and whether the class member ought to have sold the shares sooner than he or she did. Thus, the quantum of damages to which any successful class member could be entitled will depend upon facts specific to each individual's own investment experience. The expectations of each class member, and any decisions based on any specific IMAX "representation" they received and relied upon, will require an individual determination.

#### a) Aggregate Damages are Not Available (Overview)

165. Although the determination of the quantum of damages available to any particular class member is entirely personal -- and thus not amenable to certification as a common issue

-- the Plaintiffs have attempted to overcome this obstacle by asserting that the availability of aggregate damages is an appropriate common issue (*i.e.*, issue (x)).

166. There is no reasonable prospect of such an award being made in the present circumstances.

167. Aggregate damages are governed by s. 24 of the CPA, which provides as follows:

> 24. (1) The court may determine the aggregate or a part of a defendant's liability to class members and give judgment accordingly where,
>
> (a) monetary relief is claimed on behalf of some or all class members;
>
> (b) <u>no questions of fact or law other than those relating to the assessment of monetary relief remain to be determined</u> in order to establish the amount of the defendant's monetary liability; and
>
> (c) <u>the aggregate or a part of the defendant's liability to some or all class members can reasonably be determined without proof by individual class members</u>. [Emphasis added]

168. On this certification motion, the Plaintiffs must establish that there is a "reasonable likelihood that the preconditions in section 24(1) of the <u>CPA</u> would be satisfied and an aggregate assessment made if the Plaintiffs are otherwise successful at a trial for common issues."[251] The Plaintiffs cannot discharge this onus because the preconditions set out in s. 24(1)(b) and 24(1)(c) are <u>not</u> met, and <u>cannot</u> be met.

---

[251] *Vezina v. Loblaw Companies Ltd.* (2005), 17 C.P.C. (6th) 307, [2005] O.J. No. 1974 (S.C.J.) [Plaintiffs' Authorities, Tab 66], cited with approval in *Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 at para. 44 (C.A.), *leave to appeal to S.C.C. refused*, [2007] S.C.C.A. No. 346 [Plaintiffs' Authorities, Tab 41]

### b) Section 24(1)(b) of the CPA Cannot Be Satisfied in the Context of Tort Claims

169. The Plaintiffs cannot establish that there is a reasonable likelihood that s. 24(1)(b) will be satisfied because of the nature of the common law tort claims that have been advanced against the Defendants. It is trite that each of (i) negligent misrepresentation, (ii) fraudulent misrepresentation, (iii) negligence *simpliciter*, and (iv) conspiracy, requires as a mandatory element of the cause of action that damages be proven by the plaintiff.[252]

170. In the absence of such proven damages, the tort in question has not been made out, and no liability can be imposed. This is very significant in the context of a possible award of aggregate damages under s. 24(1)(b) of the CPA. The Court of Appeal for Ontario has confirmed that "[section 24] is applicable only once liability has been established, and provides a method to assess the quantum of damages on a global basis, but not the fact of damage."[253]

171. As a result, aggregate assessments of damages have only been found to be appropriate in cases where liability attaches on a class-wide basis, such as in claims for breach of contract or restitutionary claims for disgorgement of profits flowing from a statutory breach:

---

[252] With regard to **negligent misrepresentation**, see *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 at para. 33 ("[T]he reliance must have been detrimental to the representee in the sense that damages resulted") [Plaintiffs' Authorities, Tab 51]; With regard to **fraudulent misrepresentation**, see *Amertek Inc. v. Canadian Commercial Corp.* (2005), 76 O.R. (3d) 241 at para. 63 (C.A.), *leave to appeal refused*, [2005] S.C.C.A. No. 439 ("the plaintiff [must have] suffered a loss" by acting on the representation) [Defendants' Authorities, Tab 14]. With regard to **negligence *simpliciter***, see *Hill v. Hamilton-Wentworth Regional Police Services Board*, [2007] 3 S.C.R. 129 at para. 90 ("To establish a cause of action in negligence, the plaintiff must show that he or she suffered compensable damage.") [Defendants' Authorities, Tab 49]. With regard to **conspiracy**, see *Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd.*, [1983] 1 S.C.R. 452 at 471-472 ("[I]n both situations, there must be actual damages suffered by the plaintiff.") [Defendants' Authorities, Tab 27].

[253] *Chadha v. Bayer* (2003), 63 O.R. (3d) 22 at para. 49 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 106 [Defendants' Authorities, Tab 32] [Emphasis added], cited with approval in *Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 at para. 40 (C.A.), *leave to appeal to S.C.C. refused*, [2007] S.C.C.A. No. 346 [Plaintiffs' Authorities, Tab 41]

(a) In *Markson v. MBNA Canada Bank*, the plaintiff claimed that the defendant bank had charged a usurious interest rate on credit card cash advances and sought damages and restitution for breach of contract.[254] Justice Rosenberg, writing for the Court of Appeal for Ontario, held that the requirement in s. 24(1)(b) of the CPA would be satisfied because liability for breach of contract could be determined on a class-wide basis once the fact of the breach was demonstrated, and the only remaining issue was the individual entitlement of each plaintiff to a share of such damages.[255]

(b) In *Cassano v. The Toronto Dominion Bank*, the plaintiff claimed that the defendant bank had breached its contract with its credit card holders by charging unauthorized foreign currency transaction fees. As in *Markson*, the central claim was founded in contract and the plaintiff essentially sought disgorgement of the amounts that had been collected by the bank in violation of the *Criminal Code*. Chief Justice Winkler concluded that an aggregate assessment of damages would be appropriate because "the determination of the common issue relating to the breach of contract question will determine liability to all members of the class, with the only possible remaining issue being that of damages. … The finding that there had been a breach of contract would make all such fees improper. Accordingly, the only assessment necessary would be to quantify the amount of the fees charged."[256] [Emphasis added.]

---

[254] *Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 (C.A.), *leave to appeal to S.C.C. refused*, [2007] S.C.C.A. No. 346 [Plaintiffs' Authorities, Tab 41]

[255] *Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 at paras. 48-49 (C.A.), *leave to appeal to S.C.C. refused*, [2007] S.C.C.A. No. 346 [Plaintiffs' Authorities, Tab 41]

[256] *Cassano v. Toronto Dominion Bank* (2007), 87 O.R. (3d) 401 at para. 42 & 47 (C.A.), *leave to appeal to S.C.C. refused*, [2008] S.C.C.A. No. 15 [Plaintiffs' Authorities, Tab 15]

172. It was thus critical to the findings in both *Markson* and *Cassano* that liability based on breach of contract could be established on a class-wide basis without the need for resolving individual issues. As a result, an aggregate assessment of damages could be conducted.

173. In contrast, when aggregate damages have been sought in cases in which the plaintiffs have asserted common law torts and/or statutory causes of action -- *i.e.*, claims which require proof of actual damages having been suffered by the plaintiffs -- the court has refused to certify the issue of aggregate damages:

(a) In *Quizno's*, Justice Perell made it clear that s. 24 of the CPA could not be used to "fill in gaps" in the plaintiffs' case. Because s. 24 required the plaintiffs to demonstrate at least the potential for class-wide liability before aggregate damages could be sought, it was not permissible for the plaintiffs to attempt to use the aggregate damages mechanism to itself establish such potential liability. The flaw in the plaintiffs' argument was that the claims they asserted -- based in tort and statutory causes of action -- all required proof of actual damages as a necessary precondition to liability.[257] The plaintiffs' efforts to rely on expert economic evidence to establish such losses were rejected.[258] Thus, without proof of individual damages, there was no potential class-wide liability, and without class-wide liability, there could be no recourse to aggregate damages. The plaintiffs were attempting to put the cart before the horse by improperly purporting to use s. 24 to establish "the fact of the

---

257 *2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp.* (2008), 89 O.R. (3d) 252 at paras. 105-107 (S.C.J.) [Defendants' Authorities, Tab 8]

258 *2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp.* (2008), 89 O.R. (3d) 252 at paras. 108-115 (S.C.J.) [Defendants' Authorities, Tab 8]

damage," rather than properly using it to "assess the quantum of such damages." [259]

(b) Similarly, in *Steele v. Toyota Canada Inc.*, the plaintiffs sought class certification for a claim -- again based on tort and statutory causes of action, each of which required proof of actual damages as a precursor to liability -- and sought aggregate damages. The B.C. court rejected the request for an aggregate assessment of damages because liability could not be found on a class-wide basis. Again, the reason flowed from the nature of the plaintiffs' claims:

> As the defendants point out, Markson was a contract case, and as such, liability could be established without proof of loss. Even though some cardholders did not suffer a loss, it was potentially possible to prove that MBNA had breached each of their contracts. In contrast, the claims in the present case are not based in contract, and without proof of loss, there is no proof of liability. ….. Thus, I would distinguish Markson on the ground that it did not deal with a claim based in tort. […] As the plaintiffs' claims in the case at bar are not based in contract, and as proof of liability for the causes of action which they have pleaded require proof of loss or damage, I do not agree with their submission that the defendants' liability can be established by proving loss on a class-wide basis through econometric evidence."[260] [Emphasis added]

174. Thus both *Markson* and *Cassano* can be distinguished from such cases as *Quizno's* and *Steele* on the basis that the causes of action at issue in the former cases permitted liability

[259] *2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp.* (2008), 89 O.R. (3d) 252 at paras. 119, 121-123, quotation at para. 121 (S.C.J.) [Defendants' Authorities, Tab 8]. See also *Axiom Plastics Inc. v. Dupont Canada Co.* (2007), 87 O.R. (3d) 352 (S.C.J) , *leave to appeal refused without reference to this issue* (2008), 90 O.R. (3d) 782 (Div. Ct.), which implicitly adopted a similar approach in refusing aggregate damages *vis-à-vis* tort and statutory claims requiring proof of actual damages [Defendants' Authorities, Tab 18]

[260] *Steele v. Toyota Canada Inc.* (2008), 295 D.L.R. (4th) 653 at paras. 119-122 (B.C.S.C.) [Defendants' Authorities, Tab 102]. Similarly, the B.C. Superior Court in *Pro-Sys Consultants Ltd. v. Infineon Technologies AG*, [2008] B.C.J. No. 831 at paras. 167-170, 172 & 177 (S.C.) [Defendants' Authorities, Tab 90], concluded that aggregate damages were not available in the context of tort and statutory causes of action where actual damages were a prerequisite to liability.

to be found in the absence of damage, whereas the latter cases centred on causes of action where liability was a necessary prerequisite to liability. For this reason, aggregate damages were available in the former cases, but not in the latter cases.

175. The Plaintiffs' claim is, in this regard, identical to the claims at issue in cases like *Quizno's* and *Steele*. On the same basis identified in those rulings, the Plaintiffs in the present case have no reasonable possibility of claiming aggregate damages. The very nature of the common law tort claims they have put forward preclude such recourse.

**c) Section 24(1)(c) of the CPA Cannot Be Satisfied because there is no Proof of Loss by Class Members**

176. In the present case, an aggregate assessment is also precluded by s. 24(1)(c) of the CPA. That provision confirms that aggregate damages are only available if the total liability of the Defendants can "reasonably be determined without proof by individual class members." That test is not met in the present circumstances.

177. It is not possible to determine the precise quantum of the losses suffered by past shareholders' without individual inquiries because it is necessary to determine when the shares were purchased, the allegedly inflated value of the date of purchase, the "actual" value on the date of purchase, the day the shares were sold (if at all) and the value of the shares on the date of sale. The Plaintiffs' expert, Robert Comment, has conceded that his approach to calculating the "actual" value on the date of purchase requires him to "speculate".[261] The Plaintiffs' other expert, Dr. Kryzanowski only provides a method for "estimating"

---

[261] Cross-Examination of R. Comment, at p. 61, line 5 – p. 62, line 4

damages.[262] In short, neither of the approaches advocated by the Plaintiffs' experts satisfy the requirement of section 24(1)(c) requiring damages to be "determined".

178. This stands in contrast to a case like *Cassano*, where "the aggregate of TD's liability may reasonably be expected to be capable of proof by resort to TD's records of the amount of fee income it collected during the relevant time frame."[263] In contrast, the present case involves no alleged interest, fee or profit capable of being quantified and disgorged. IMAX did not profit from the alleged misrepresentations in this case.[264]

#### ***4. Duty of Care is Not a Common Issue***

179. The concept of duty of care is common to both the Plaintiffs' negligent misrepresentation claims, and their parallel allegations of negligence *simpliciter*. As has been discussed in both the Defendants' Rule 21 Factum and in the Defendants' s. 5(1)(a) submissions (above), the Plaintiffs' duty of care allegations are flawed.

180. There are also grounds to dispute the possibility of characterizing the existence of a duty of care as an appropriate common issue. As previously noted, a *prima facie* duty of care will only be found in relation to a novel claim of negligence where the Court is willing to find that the necessary proximity inheres between the parties based upon their own special relationship. Thus, any duty of care analysis will require an inquiry into the individual issues

---

[262] Affidavit of L. Kryzanowski, sworn May 30, 2007, at paras. 28-46: Plaintiffs' Supp. Motion Record, Tab 1

[263] *Cassano v. Toronto Dominion Bank* (2007), 87 O.R. (3d) 401 at para. 45 (C.A.), *leave to appeal to S.C.C. refused,* [2008] S.C.C.A. No. 15 [Plaintiffs' Authorities, Tab 15]

[264] Even assuming the Plaintiffs' theory of the case, the only persons that profited from the alleged misrepresentations were those shareholders that sold their securities during the alleged inflationary period. In effect, what the Plaintiffs are seeking is damages to be paid by IMAX's current shareholders (through IMAX) to some of IMAX's past and present shareholders.

which characterize the relationship between the Defendants and each of the proposed class members, such as the expectations, representations and reliance involved.[265]

181. The individualized nature of this inquiry is particularly acute in cases of negligent misrepresentation. As outlined earlier, it will require assessing: (1) whether a *prima facie* duty should be recognized on the basis that the plaintiff's reliance was foreseeable; (2) whether a *prima facie* duty should be recognized on the basis that the plaintiff's reliance was reasonable; and (3) whether any such *prima facie* duty should be negated on the basis that the plaintiff's reliance did not occur while using the IMAX Statements for the specific purpose or transaction in relation to which they had been prepared.

182. A Court simply could not, upon hearing only the proposed representative Plaintiffs' evidence, extrapolate a "special relationship" giving rise to a duty of care owed by the Defendants to thousands of prospective and actual IMAX shareholders, including individuals and institutions, over almost six months. If an investor came to see IMAX as an investment opportunity only through a news story commenting on the likelihood of a merger, without any reference to IMAX's 2005 financial results, IMAX could hardly owe that person a duty of care or be said to have made a representation that caused that person damage. As noted above, the duty of care arises from the proximity created by an individual's actual reliance on the alleged misrepresentation, and exists only when the proximity is not negated by the specific circumstances surrounding that reliance. Therefore, the duty of care analysis is necessarily as individual as the reasonable reliance analysis.

183. As noted in *Moyes*, where the plaintiff investors asserted that the defendant investment advisers owed them a duty of care:

---

265 *Design Services Ltd. v. Canada* (2008), 293 D.L.R. (4th) 437 at para. 50 (S.C.C.) [Defendants' Authorities, Tab 43]

> …. [The proposed common issue as to duty of care] cannot be determined in isolation to the connection which the conduct had with each and every putative class member. Whether a duty of care was owed to the putative class members by any of the defendants depends very much on the relationship which each putative class member had with the defendants. Further, whether that duty was breached is equally dependent on the individual interactions which any given class member had with each of the defendants. In other words, the issues surrounding any duty of care owed do not allow a blanket determination.[266] [Emphasis added]

### *5. Conclusion re Common Issues*

184. Accordingly the Plaintiffs have failed to demonstrate, on their evidence, a rational relationship between the class and the proposed common issues.[267] When the proposed issues are not a substantial ingredient of and necessary to the resolution of each class member's claim, they are not common issues for the purposes of s. 5 of the CPA[268]

> The causes of action are asserted by all class members. But the fact of a common cause of action does not in itself give rise to a common issue. A common issue cannot be dependent upon findings of fact which have to be made with respect to each individual claimant. While the theories of liability can be phrased commonly, the actual determination of liability for each class member can only be made upon an examination of the unique circumstances with respect to each member's purchase…[269]

185. Their evidence does not – and cannot -- demonstrate any "common nucleus or operative fact" sufficient to bind the thousands of IMAX's shareholders into a single group

---

[266] *Moyes v. Fortune Financial Corp.* (2002), 61 O.R. (3d) 770 at para. 28 780-781 (S.C.J.), *aff'd* (2003), 67 O.R. (3d) 795 (Div. Ct.), *leave to appeal to C.A. refused*, (2004), 44 C.P.C. (5th) 85 (C.A.) [Defendants' Authorities, Tab 81]

[267] *Kumar v. Mutual Life Assurance Company of Canada* (2003), 226 D.L.R. (4th) 112 at para. 38 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

[268] *Kumar v. Mutual Life Assurance Company of Canada* (2003), 226 D.L.R. (4th) 112 at para. 46 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

[269] *Williams v. Mutual Life Assurance Company of Canada* (2000), 51 O.R. (3d) 54 at para. 39 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 (Div. Ct.) sub. nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 113], *aff'd* (2003), 226 D.L.R. (4th) 112 at para. 48 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

whose issues are capable of resolution "in a general trial applicable to everyone."[270] As Sharpe, J. (as he then was) stated in *Controltech*:

> While there is a common factual core to the claims of the various bidders, I am not persuaded that this common core amounts to a common issue for the purposes of s. 5. . . This is not a case that lends itself to determination of the discrete issues of misrepresentation and negligence or recklessness, leaving cleanly for individual consideration the issue of reliance on the specific statement dealt with at the common issue stage. Here, the facts and issues cannot be broken down into appropriate and distinct categories that would allow the case to proceed in that manner. No single or common statement can be identified as having been made at the same time, or in a sufficiently similar context, and because different statements were made to various class members at various stages of the bidding process and in relation to various proposals, it would be necessary to determine on an individual basis precisely what the individual bidder was told. <u>The plaintiff simply cannot escape the consequences of the fact that claims do not all flow from the same misrepresentation. I conclude, accordingly, that there is no common issue with respect to the claims for misrepresentation.</u>[271] [Emphasis added]

186. Whatever the outcome of a common issues trial, each member of the class would have to prove, in a separate trial, the statement(s) that the class member received, the fact that the class member understood the Representation and relied upon it (reasonably, in the context of all information they had in hand), and that the class member was thereby adversely affected. Further, each such class member would have to establish that any such statement was negligently made by IMAX in breach of any duty of care owed – a determination which must be made in the context of the recipient's particular circumstances.[272]

187. As stated in *McKay*:

> The factual matrix depicted by Mr. McKay appears to be personal and I anticipate that each member of the class would have to individually establish their

---

[270] *Sutherland v. Canadian Red Cross Society* (1994), 17 O.R. (3d) 645 at p. 652 (Gen. Div.) [Defendants' Authorities, Tab 103]

[271] *Controltech Engineering Inc. v. Ontario Hydro*, [1998] O.J. No. 5350 at para. 16 (Gen. Div.), *aff'd* (2000), 130 O.A.C. 367 at para. 2 (Div. Ct.) [Defendants' Authorities, Tab 38]

[272] *Williams v. Mutual Life Assurance Company of Canada* (2000), 51 O.R. (3d) 54 at paras. 28-29 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 (Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 113], *aff'd* (2003), 226 D.L.R. (4th) 112 at para. 58 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

> claim against CDI for negligent misrepresentation, as described in *Queen v. Cognos Inc* … .[273]

188. As noted, much of the foregoing analysis also applies to the alleged common issue of fraudulent misrepresentation, negligence *simpliciter* (relating to the IMAX Statements), and to the alleged conspiracy to publish those Representations. None of these causes of action can stand as a common issue for determination across a class of investors based on the anomalous stories of the two proposed representative Plaintiffs.

## C. Section 5(1)(d): A Class Action Is Not the Preferable Procedure

### ***1. On the Basis of Both Traditional Factors, and Unique Multi-Jurisdictional Considerations, this Claim does not Satisfy the CPA's "Preferable Procedure" Principles***

189. Even if the Plaintiffs' claim is found to satisfy the threshold s. 5(1)(a) criteria, the *small number* and *relative unimportance* of the only common issues potentially capable of being certified means that any ensuing common issue trial would be "but the beginning, not the end of the liability inquiry."[274] As such, a common issues trial cannot be the **preferable procedure** for meaningfully advancing the class members' claims.

190. This concern -- which is potentially true for any class action predicated on heterogeneous misrepresentations received by individual class members -- is magnified in the present case, given the Plaintiffs' efforts to certify a worldwide class of investors, each of whom asserts common law tort claims governed by different bodies of governing law.

---

[273] *McKay v. CDI Career Development Institutes Ltd.* (1999), 30 C.P.C. (4th) 101 at para. 24 (B.C.S.C.) [Defendants' Authorities, Tab 76]; *Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63 at p. 73 (Gen. Div.) [Defendants' Authorities, Tab 80]

[274] *Abdool v. Anaheim Management Ltd.* (1995), 21 O.R. (3d) 453 at p. 475 *per* Moldaver, J. (Div. Ct.) [Defendants' Authorities, Tab 11]

### *2. The Goals of the CPA do Not Render Certification Preferable*

191. Even if one or more common issue is amenable to certification by this Court, it is still necessary to determine if a trial of that common issue is justified. The essential determination of whether a class action is the preferable systemic choice for resolution of a dispute does not turn on whether any common issues can be decided in a class action, but whether they should be decided by that procedure. The key consideration is: Will resolving the common issues within a class action achieve the goals of the CPA?

192. In *Markson*, Rosenberg J.A. summarized the principles relating to the determination of whether a class proceeding is the preferable procedure as follows:

> (1) The preferability inquiry should be conducted through the lens of the three principal advantages of a class proceeding: judicial economy, access to justice and behaviour modification;
>
> (2) "Preferable" is to be construed broadly and is meant to capture the two ideas of whether the class proceeding would be a fair, efficient and manageable method of advancing the claim and whether a class proceeding would be preferable to other procedures such as joinder, test cases, consolidation and any other means of resolving the dispute; and,
>
> (3) The preferability determination must be made by looking at the common issues in context, meaning, the importance of the common issues must be taken into account in relation to the claims as a whole.[275]

193. Those goals, are typically described concisely as follows:

(a) Judicial Economy/Efficiency and Manageability

(b) Access to Justice/Fairness

(c) Behaviour Modification.

---

[275] *Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 at para. 69 (C.A.), *leave to appeal to S.C.C. refused*, [2007] S.C.C.A. No. 346 [Plaintiffs' Authorities, Tab 41]

194. None of these goals justify the certification of any common issues in the present claim. We propose to deal with the second and third of these goals prior to discussing the first issue (*i.e.*, judicial economy and efficiency)

### a) Behaviour Modification

195. This factor is clearly irrelevant in the unusual circumstances of this case. On its own initiative, IMAX undertook a painstaking, time-consuming and intense review of its accounting procedures in response to the inquiry letters from the SEC and the OSC. It hired outside accounting and legal experts, and required its auditors to review numerous transactions undertaken between 2002 and 2005 by IMAX.

196. In the end, of its own volition, IMAX decided to admit the error, and to restate its financial statements for the period 2002 to 2005.[276] It did not do so to settle regulatory proceedings (indeed, it has not been charged with any offence). It did not do so conditional upon the resolution of this proceeding. It did not delay the admission until after the completion of this or any other litigation, in order to more effectively defend itself. On the contrary, IMAX took the foregoing steps with full knowledge that its admission would be used against it in this proceeding.

197. Clearly it is not necessary for this Court to approve a class action -- or to grant Judgment against IMAX and award damages to each individual investor -- in order to modify the corporate behaviour of IMAX.[277]

---

[276] IMAX Press Release July 20, 2007, Exhibit "J" to Affidavit of S. Selig, sworn August 2, 2007: Plaintiffs' Second Supp. Motion Record, Tab 1(J)

[277] *Abdool v. Anaheim Management Ltd.* (1995), 21 O.R. (3d) 453 at p. 476 (Div. Ct.) [Defendants' Authorities, Tab 11]

### b) Certification Would be Unfair / Is Not Required for Access to Justice

198. The Court must strike a balance between systemic efficiency, and fairness to the particular parties.[278] Is certification of this lawsuit "truly necessary" to provide investors with access to justice?[279]

199. In examining **fairness**, the Court hearing a certification motion must consider whether certification would unduly compromise the Defendants' right to secure information vital to the conduct of its defence. Particularly in cases founded upon individual representations, where a finding as to one Plaintiff's reliance upon the specific information he received will not prove the case of the other Plaintiff and class members, the Defendants must have an opportunity to conduct an individual assessment of liability, causation and damages.[280]

200. This issue is particularly problematic in a large proposed class of investors. As Cumming, J. stated in *Millgate Financial Corp.*:

> The proposed class contains a large number of individuals and corporations who purchased their debentures at different times for varying prices. Some of the members did not own some or all of the debentures now the subject of their claims when the alleged misrepresentations were made. The information that each class member possessed, as a basis to make a decision to take steps to oppose the Conveyance, varied. Individual discovery is required to determine the contents of any representations made, as well as whether reliance was placed upon any given statement to the detriment of the debenture holder. The proposed class will contain members who did not detrimentally rely upon any statements made by the defendants.[281]

---

[278] *Western Canadian Shopping Centres Inc. v. Dutton* (2000), [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63 at paras. 44-46 [Plaintiffs' Authorities, Tab 69]

[279] *Abdool v. Anaheim Management Ltd.* (1995), 21 O.R. (3d) 453 at p. 473 *per* Moldaver, J. (Div. Ct.) [Defendants' Authorities, Tab 11]

[280] *Abdool v. Anaheim Management Ltd.* (1993), 15 O.R. (3d) 39 at pp. 49-50 (Gen. Div.), *aff'd* (1995), 21 O.R. (3d) 453 at pp. 461-462, 474-475 (Div. Ct.) [Defendants' Authorities, Tab 1]; *Williams v. Mutual Life Assurance Company of Canada* (2000), 51 O.R. (3d) 54 at para. 45 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 (Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 113], *aff'd* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

[281] *Millgate Financial Corp. v. B.F. Realty Holdings Ltd.* (1998), 28 C.P.C. (4th) 72 at para. 51 (Ont. Gen. Div.) [Defendants' Authorities, Tab 78]

201. This potential unfairness is well illustrated by the inaccurate and incomplete (and therefore misleading) Affidavits filed by the Plaintiffs. The Affidavits contain assertions which the proposed representative Plaintiffs then contradicted or revised on cross-examination, and left out evidence vital to the determination of the case which was only discovered on cross-examination.[282]

202. Those wide cracks in the foundation of the Plaintiffs' case as pleaded uncovered only by cross-examination (and the credibility issue they raise), amply demonstrate the injustice of denying the Defendants their normal pre-trial procedural rights to test the credibility and candour of each shareholder.

203. As to **access to justice**, there is no evidence (beyond bald assertions) that the means of the proposed class members are so limited, or that their assessable losses are so meagre, that it would be "economically unfeasible" for them to pursue their individual claims.[283] Indeed, the proposed representative Plaintiffs refused, on cross-examination to advise of their net worth, or of the value of their IMAX investments in relation to the remainder of their portfolio – the very evidence required for this Court to determine this point.[284]

204. Further, there is no evidence that counsel would refuse to proceed with the litigation as a test case for other investors, if this action is not certified.

205. Finally, this class is currently contemplated by the U.S. Proceeding and could receive a remedy through that process.

---

282 Paragraphs 151 and 152, *supra*

283 *Abdool v. Anaheim Management Ltd.* (1995), 21 O.R. (3d) 453 at p. 472 *per* Moldaver, J. (Div. Ct.) [Defendants' Authorities, Tab 11]; *Huras v. Com Dev. Ltd.* (1999), 36 C.P.C. (4th) 31 at paras. 26-28 (Ont. S.C.J.), *aff'd* (2001), 8 C.P.C. (5th) 277 (Ont. Div. Ct.) [Defendants' Authorities, Tab 51]

284 Cross-Examination of C. Cohen, April 9, 2008, at p. 82 line 13 – p. 83, line 5; Cross-Examination of M. Silver, April 17, 2008, at p. 16, line 11 – p. 17, line 27, p. 71, line 28 – p. 72, line 17

**c) Judicial Economy – A Class Proceeding Is Not A Fair, Efficient & Manageable Method of Advancing the Claim**

(1) Will Certification of Some Common Issues Advance the Entire Litigation Sufficiently?

206. In deciding the issue of preferable procedure, the Court "will necessarily need to engage in an examination of the significance of the common issues in relation to any individual issues."[285] Here, the diverse individual issues would completely overwhelm any advantage to be derived from a trial of any common issue in this case. As stated in *Mutual Life*:

> The individual issues in the case at hand would include causation, contributory negligence, affirmative defences such as limitation periods, possible third party claims, damages and mitigation. The defendants would argue that they should be given leave to gain the normal pre-trial entitlement to oral and documentary discovery of claimants given that the liability issue turns upon what representations were made, whether they were accurate and whether there was detrimental reliance. The inevitable individual inquiries would significantly increase the time, cost and complexity of the proceeding such that the CPA's objectives of access to justice and judicial efficiency would be impeded if not frustrated. [286]

207. Broadly speaking: *"there is no point in pursuing a complicated procedure for little or no benefit*."[287] As Winkler J. observed in *DeVry*, while "virtually every class action contains individual issues to some extent", in some cases they are overwhelming:

> In the instant case, however, what common issues there may be are completely subsumed by the plethora of individual issues, which would necessitate individual trials for virtually each class member. Each student's experience is idiosyncratic, and liability would be subject to numerous variables for each class member. Such an [*sic*] class action would be completely unmanageable.[288]

---

[285] *Fehringer v. Sun Media Corp.* (2002), 27 C.P.C. (5th) 155 at para. 16 (S.C.J.), *aff'd* (2003), 39 C.P.C. (5th) 151 (Div. Ct.) [Defendants' Authorities, Tab 44]

[286] *Williams v. Mutual Life Assurance Company of Canada* (2000), 51 O.R. (3d) 54 at para. 45 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 at para. 23 (Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 113], *aff'd* (2003), 226 D.L.R. (4th) 112 at paras. 52-53 (Ont. C.A.), *leave to appeal to S.C.C. refused,* [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

[287] *Chadha v. Bayer Inc.* (2001), 54 O.R. (3d) 520 at p. 548 (para. 38) (Div. Ct.), *aff'd* (2003), 63 O.R. (3d) 22 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 106 [Defendants' Authorities, Tab 31]

[288] *Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63 at p. 73 (Gen. Div.) [Defendants' Authorities, Tab 80]

208. Thus, the question is not whether a decision on a common issue will "advance" the litigation, but whether the "advancement" will be sufficient (when considering the distance left to be traveled in the case of each individual investor) to be worthwhile.

209. In *Huras*, for example, where about 50 people received information about a company stock plan from both oral and written sources, the Court concluded:

> This is not a case where there has been a single representation to a group of people, and litigation can be moved forward by a determination whether the representation was misleading, as in *Peppiatt*. Rather, this is a case more similar to *Rosedale* or *Mouhteros*, where there have been a number of representations made to different individuals in different contexts. Most significantly, there is no common issue with respect to the content of the employment contract that will move the litigation forward in a legally meaningful way, as the Employee Handbook cannot be considered in isolation from the larger factual context.[289] [Citations removed]

210. Accordingly, where the trial of common issues will not achieve judicial efficiency by moving the action as a whole forward to a useful degree, a class action will not be the preferable manner in which to proceed. As Sharpe J. observed in *Controltech*:

> It seems to me that when one considers the claims advanced in this action as a whole, and the variety and importance of the individual issues that would be left to be resolved after determination of any possible common issue, the inevitable conclusion is that a class proceeding would not be the preferable procedure [to] resolve any common issue.[290]

211. Thus, as in *Collette*, "the unfortunate reality" is that since there was no single common representation to a homogenous class, "individualized transactional inquiries" would still be required to resolve each class member's case:

> I do not see how the prudent nature of the investment can be established without taking into consideration other evidence available only on an individual inquiry. That evidence includes, at least, the specific information provided to the individual investor; whether it was reasonable for the individual investor to rely on the information; and whether the individual investor relied in fact on the information.

---

[289] *Huras v. Com Dev. Ltd.* (1999), 36 C.P.C. (4th) 31 at para. 19 (Ont. S.C.J.), *aff'd* (2001), 8 C.P.C. (5th) 277 (Ont. Div. Ct.) [Defendants' Authorities, Tab 51]

[290] *Controltech Engineering Inc. v. Ontario Hydro*, [1998] O.J. No. 5350 at para. 26 (Gen. Div.), *aff'd* (2000), 130 O.A.C. 367 (Div. Ct.) [Defendants' Authorities, Tab 38]

> Without the additional evidence, the court will be unable, in my view, to finally determine whether any duty of care was breached. Any benefit proposed to be gained by trying the issue of the defendant's knowledge and conduct in offering the investment for sale as a common issue must be considered in the overall context of the issues to be tried. [291]

212. Here, the multitude of complex individual issues which would be left to be resolved would completely overwhelm any advantage derived from a trial of any remaining common issue. After the Plaintiffs' trial, the Court would need to conduct an individualized factual investigation of the pre-investment information known to each shareholder to determine their individual cases in tort. As Nordheimer J. said in *Moyes*:

> As I have said in dealing with whether there are common issues, while the determination of the common issues will undoubtedly have relevance to the individual class member's claims, the degree to which they will assist in the overall determination of those claims is uncertain. Assuming for the moment that the defendants were to be found to have a duty of care, and to have engaged in conduct that was potentially a breach of that duty of care, the impact of those determinations would be very much abstract in the result until the particular circumstances of each individual claimant are considered. In other words, answers to the proposed common issues are of no more than theoretical interest until the particular factual circumstances of each individual claimant is established, especially the state of knowledge of each claimant regarding the proposed investment. [292]

213. As a result little, if any, judicial economy will result from certifying this action as a class proceeding. As discussed above, numerous issues raised by the Plaintiffs' claim are simply too inherently individualistic to realistically proceed as common issues. They must each, instead, be assessed by the Court on behalf of each individual member of the class in a series of individual issue trials.

---

[291] *Collette v. Great Pacific Management Co.*, 2001 BCSC 237 at para. 93 (CanLII), *rehearing ordered on contract claim* 2002 BCCA 195 (CanLII), *supp. reasons,* 2003 BCSC 332 (CanLII) [Defendants' Authorities, Tab 37], *rev'd on other grounds* [2004] B.C.J. No. 381 (C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

[292] *Moyes v. Fortune Financial Corp.* (2002), 61 O.R. (3d) 770 at para. 38 (S.C.J.), *aff'd* (2003), 67 O.R. (3d) 795 (Div. Ct.), *leave to appeal to C.A. refused*, (2004), 44 C.P.C. (5th) 85 (C.A.) [Defendants' Authorities, Tab 81]

214. The list of issues which must thus be the subject-matter of a lengthy series of time-consuming individual trials include duty of care, receipt of the IMAX Statements, causation, damages and, of course, reasonable reliance. In order to illustrate how laboriously individualistic the assessment of such issues will be -- and therefore to demonstrate the minimal incremental benefit of certifying <u>any</u> common issues -- it is useful to consider what will be required of the Court in adjudicating the individual issues raised by the fundamental question of a class member's alleged reliance on the IMAX Statements:

(a) A case-by-case examination of the claims of each class member will be required to determine whether the IMAX securities were acquired in reliance upon one or more of the impugned representations, or in reliance upon some unrelated influence.

(b) If the class member did rely on one of the impugned representations, individual inquiries are also necessary to determine whether such reliance was reasonable in the unique circumstances of that class member's case.

215. Each putative class member will have gone through an idiosyncratic process to determine whether to purchase IMAX shares. Each putative class member may have relied, to greater or lesser degrees, on different disclosures, made at different times about different things. Each putative class member will have purchased and sold his or her shares at different times, had different types of investment portfolios, and received different information from various investment advisors and other sources. One or all or some combination of the totality of information and releases may have motivated the putative class members to purchase and/or sell shares. Alternatively, it is equally plausible that the class members did not pay attention to any releases at any time.

216. The complex of individual issues thus raised by the reliance requirement clearly confirms that certification of the negligent and fraudulent misrepresentation claims would not advance the litigation in a meaningful way.

(2) The Possibility of Third Party Claims

217. Further exacerbating the overwhelmingly individualistic nature of the claims of the proposed class is the virtual certainty that each individual issues trial will require the involvement of third parties. It is highly probable that many of the class member's individual claims will involve "claims over" being made by the Defendants against brokers and other financial advisors who provided services to each class member at the time of the purchase and/or sale of IMAX shares. Such steps will be necessary to ensure that these third parties are bound by the findings at the individual issues trial, and that the apportionment of damages can be made amongst the investor, the advisor(s) and the Defendants, if necessary.

218. As this Court has noted, such third party proceedings would compromise the "efficiency and fairness" of a class action, would require significant individual inquiries if only to determine the third parties to be added, and would create the potential for sprawling and unwieldy additional proceedings:

> Individual claims require the defendants to third party doctors, hospitals and laboratories for contribution and indemnity. With hundreds of members in the class, such a multitude of disparate third parties would make this proceeding unduly complicated and unmanageable. It would be highly prejudicial to deny the defendants full right of discovery and opportunity to get at potential indemnitors.[293]

(3) The Unique Complications of the Proposed Worldwide Class

---

[293] *Sutherland v. Canadian Red Cross Society* (1994), 17 O.R. (3d) 645 at p. 652 (Gen. Div.) [Defendants' Authorities, Tab 103]; *Bittner v. Louisiana-Pacific Corp.* (1997), 43 B.C.L.R. (3d) 324, 1997 CanLII 2904 at paras. 42-44 (B.C.S.C.) [Defendants' Authorities, Tab 22]

219. In addition to each of the foregoing reasons why a class action in the present circumstances would not be the preferable procedure -- from the perspective of judicial economy and efficiency -- this Court must also be cognizant of the unique complications introduced into this litigation by the Plaintiffs' proposed worldwide class of investors.

220. The inevitable outcome of this issue is an array logistical complexities which are wholly inconsistent with any notion of certification as a vehicle to achieve judicial economy and efficiency. *Inter alia*, the proposed certification of the claims of a worldwide class will force this Court to undertake individual assessments of such issues as (i) the proper governing law applicable to each claim of each class member, (ii) the convenience of Ontario as a forum for resolving the claims of each class member in light of multi-jurisdictional factors auguring to the contrary, and (iii) the relevance of the ongoing U.S. Proceeding *vis-à-vis* the claims and entitlements of each class member.

221. So significant are these "worldwide class issues" to the propriety of certification that they are addressed separately under the next series of headings.

### *3. The Substantive "Governing Law" Applicable to each Claim of each Class Member must be Identified Prior to any Common Issues Trial(s)*

#### a) The Common Law Claims of a Worldwide Class will be Governed by a Worldwide Array of "Governing Laws"

222. It will be recalled that the worldwide class of investors proposed by the Plaintiffs is intended to be unlimited by any geographical restrictions, and to potentially include persons and entities from any jurisdiction in the world. The available evidence suggests that up to 85% of the shareholders of IMAX are non-Canadian residents (*i.e.*, residents of various U.S.

states, or of other countries).[294] There is no reason to doubt that the proposed worldwide class will reflect a similar geographical diversity. It can reasonably be assumed that the Canadian minority of the proposed worldwide class reside in a number of (and perhaps in all of) the provinces and territories of Canada, and not merely in Ontario. Plaintiffs' counsel is only aware of 13 putative class members and they counsel have shared no information about where those class members reside, where they received and relied upon the IMAX Statements, or where their consequent damages were suffered.[295] It therefore appears virtually certain that numerous putative class members reside outside of Ontario, and indeed outside Canada.

223. As framed by the Plaintiffs themselves in their Fresh Claim, it is clear that the various elements of the tortious causes of action alleged against the Defendants took place in and between <u>multiple</u> jurisdictions:

(a) The initial impugned conduct of the Defendants took place partially (and perhaps primarily) in the U.S., where many of IMAX's directors and officers resided and worked;

(b) Such alleged misconduct on the part of the Defendants may also have taken place partially in Ontario, where IMAX's head office is located; and

(c) Most importantly, the culmination of this impugned conduct (*i.e.*, the dissemination in Canada and the U.S. of the IMAX Statements) was far more geographically diverse, with individual members of the proposed class presumably receiving and relying upon the IMAX Statements in multiple

---

294 Affidavit of K. Copland, sworn September 8, 2007, at para. 107: Motion Record of the Responding Parties, Vol. III-VIII

295 Answers to Undertakings from Cross-Examination of C. Cohen, April 9, 2008, p. 106, Q. 502: Motion Record of the Responding Parties, Vol. IX, Tab 14

provinces and multiple states (and perhaps in multiple additional countries), and with such individuals allegedly suffering damages in their home jurisdictions as a result.

224. When identifying the multiple bodies of law which governs the disparate common law claims of the proposed worldwide class -- an onerous task which cannot be avoided by this Court, should any common issues be certified -- the jurisdictional factors noted above (including the geographical make-up of the class) will inevitably play a crucial role.

### b) The *Lex Loci Delicti* (Governing Law of the Place the Tort Occurred) and Multi-jurisdictional Wrongdoing

225. In its ground-breaking *Tolofson v. Jensen* ruling, the Supreme Court established new principles dictating the manner in which Canadian courts must identify the substantive law (foreign or domestic) governing any common law tort claim. After decades of uncertainty, the Court authoritatively confirmed that the law governing such claims is the *lex loci delicti* (*i.e.*, the law of the place where the tort was committed).[296]

226. As the Supreme Court in *Tolofson* correctly noted, in cases where the alleged wrongdoing crossed (or was felt beyond) provincial or national borders, the court's task in thus identifying "the place" where the tort occurred or was committed (thereby permitting the identification of the governing law, or *lex loci delicti*) -- raises "thorny issues." The Supreme Court's conclusion was that, in such cases, the most appropriate solution was to identify the

[296] *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 at p. 1049-1050 ("From the general principle that a state has exclusive jurisdiction within its own territories and that other states must under principles of comity respect the exercise of its jurisdiction within its own territory, it seems axiomatic to me that, at least as a general rule, the law to be applied in torts is the law of the place where the activity occurred, i.e., the *lex loci delicti*.)") [Defendants' Authorities, Tab 107]

jurisdiction where the consequences of the tortious wrongdoing were felt, and to treat the laws of that jurisdiction as the *lex loci delicti* or governing law of the tort:

> There are situations, of course, notably where an act occurs in one place but the consequences are directly felt elsewhere, when the issue of where the tort takes place itself raises thorny issues. In such a case, it may well be that the consequences would be held to constitute the wrong. Difficulties may also arise where the wrong directly arises out of some transnational or interprovincial activity. There territorial considerations may become muted; they may conflict and other considerations may play a determining role.[297]

227. The Plaintiffs' claim is precisely such a case, and the Plaintiffs' various tort allegations -- *i.e.*, (i) negligent misrepresentation, (ii) fraudulent misrepresentation, (iii) negligence *simpliciter* (inextricably linked to the preparation and dissemination of the IMAX Statements), and (iv) conspiracy (likewise inextricably linked to the preparation and dissemination of the IMAX Statements) -- are all directly affected as a result. Furthermore, the identification of the substantive law governing each such cause of action will have further ramifications for such related issues as the imposition of vicarious liability, and the availability of particular remedies.

228. Canadian conflict of laws principles -- following *Tolofson v. Jensen* -- clearly accept that claims for negligent or fraudulent misrepresentation are governed by the substantive law of the place where the representation is received and relied or acted upon, and where the injury is felt.[298] This approach is eminently reasonable, given that both forms of misrepresentation tort require damage to have been suffered before the tort can be said to have "occurred."[299]

---

[297] *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 at p. 1050 [Defendants' Authorities, Tab 107]

[298] *Kvaerner U.S. Inc. v. Amec E&C Services Ltd.*, 2004 BCSC 635 at para. 26 (CanLII) [Defendants' Authorities, Tab 69]; *ABN Amro Bank N.V. v. BCE Inc.*, [2003] O.J. No. 5418 at para. 22(3.) (S.C.J.) [Defendants' Authorities, Tab 12]

[299] *Amertek Inc. v. Canadian Commercial Corp*. (2005), 76 O.R. (3d) 241 at para. 63 (C.A.), *leave to appeal to S.C.C. refused* [2005] S.C.C.A. No. 439 ("the plaintiff [must have] suffered a loss" by acting on the representation) [Defendants' Authorities, Tab 14]; and *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 at para. 33 ("the reliance must have been detrimental to the representee in the sense that damages resulted") [Plaintiffs' Authorities, Tab 51].

229. As a result, in the current case, the Plaintiffs' tortious misrepresentation claims (both negligent and fraudulent) will be governed by the substantive law of each jurisdiction in which any given member of the proposed class received, relied upon, and suffered damage as a result of, the IMAX Statements. This will inevitably require the Court to undertake a lengthy process (involving individual investigations of the unique jurisdictional attributes of each class member's claim) culminating in the Court's determination of which bodies of law apply to which claims asserted by which individual class members or sub-classes. (As discussed below, the actual application of the relevant bodies of law is yet another complicating factor.)

230. Similarly, applying the *Tolofson v. Jensen* approach, negligence *simpliciter* claims having a multi-jurisdictional aspect will be governed by the place where the tort occurred. In the present case, this might be the law of either New York or Ontario (where the Defendants' initial impugned conduct occurred), but it is more likely that the governing laws will be the laws of the various jurisdiction where the harm from the alleged negligence was suffered.[300] This conclusion is supported by the fact that the tort of negligence *simpliciter* is not complete (*i.e.*, it has not "occurred") until damage is actually suffered.[301] Furthermore, given the specific (and novel) nature of the Plaintiffs' negligence *simpliciter* claim -- based as it is on the allegedly negligent preparation and distribution of the IMAX Statements in both Canada and the U.S., where such statements allegedly had the effect of inflating IMAX's share price, thereby causing loss to be suffered by the class members in multiple jurisdictions -- it follows

---

[300] *Shane v. JCB Belgium N.V.*, [2003] O.J. No. 4497 at paras. 50-51 (S.C.J.) [Defendants' Authorities, Tab 98]
[301] *Hill v. Hamilton-Wentworth Regional Police Services Board*, [2007] 3 S.C.R. 129 at para. 90 ("To establish a cause of action in negligence, the plaintiff must show that he or she suffered compensable damage.") [Defendants' Authorities, Tab 49]

that the identification of the *lex loci delicti* should follow principles analogous to those applicable to negligent and fraudulent misrepresentation (see above).

231. Thus, once again, detailed analyses will be required -- prior to any common issue trial addressing negligence *simpliciter* -- in order to identify the relevant body of law governing the negligence claims of each class member or sub-class.

232. Turning to the Plaintiffs' allegations of civil conspiracy, the allegedly conspiratorial agreement arguably took form both in the U.S. and in Canada, and some of the accompanying "overt acts" in furtherance of the conspiracy would have occurred in both jurisdictions.[302] At the same time -- and more significantly -- the alleged conspiracy was "directed at persons" in various jurisdictions, it "caused injury to such persons" in those jurisdictions, and to some extent was therefore "implemented" in each of those jurisdictions. The application of the *Tolofson* principles may very well lead to the conclusion that the governing law of the tort is the substantive law of the jurisdiction where each class member resided and suffered harm.[303] Once again, this approach is doctrinally supportable since -- in the absence of actual damage suffered by the plaintiff -- the tort of conspiracy has not occurred.[304]

233. Again, individual assessments will be required, with regard to each member of the class, in order to determine where that person suffered the prerequisite harm flowing from the conspiracy which is said to have been "directed against" that person by the Defendants.

---

302 Since the Defendants who are alleged to have participated in the conspiracy with IMAX are resident in New York. Fresh Claim, at para. 52: Plaintiffs' First Motion Record, Tab 1, Schedule A and paragraph 223, *supra*;

303 *Yordanes et al. v. The Bank of Nova Scotia et al.* (2006), 78 O.R. (3d) 590 at para. 111 (S.C.J.) [Defendants' Authorities, Tab 116]

304 *Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd*., [1983] 1 S.C.R. 452 at 471-472 ("[I]n both situations, there must be actual damages suffered by the plaintiff.") [Defendants' Authorities, Tab 27]

234. This class-member-by-class-member, claim-by-claim identification of the applicable *lex loci delicti* also has significant ramifications for a variety of crucial secondary issues raised by the Plaintiffs in their claims. *Inter alia*, the governing law found to be applicable to a particular tort claim will also provide the substantive legal principles governing such key issues as: (i) the availability of vicarious liability, (ii) the limitation period applicable to each claim, (iii) the availability of pre-judgment interest, *etc*.[305] Each of these issues is potentially governed by the specific body of (domestic or foreign) law found to apply to each discrete cause of action put forward by each class member. The implication for the individualistic nature of the resulting inquiries is obvious.

235. Thus, with regard to each of the Plaintiffs' pleaded common law causes of action -- assuming that some element of any or all of them is certified as a common issue -- the Court will have no option, **prior** to the hearing of any common issues trial, but to apply the foregoing principles in order to identify the substantive law that applies to each class member. Once the choice of laws question is raised -- as has now been done by both the Plaintiffs[306] and Defendants -- Ontario's domestic conflict of laws principles require that the *lex loci delicti* be identified for each claim and for each claimant. In some cases, these conflict of law principles may lead to the conclusion that the governing law is that of Ontario, and in other cases, the analysis may identify a foreign law as the law governing a particular claim. For reasons noted above, these outcomes will be driven, in large part, by the individual

[305] *Yeung (Guardian ad litem of) v. Au* (2006), 269 D.L.R. (4th) 727 at paras. 15-17 (B.C.C.A.) *aff'd on other grounds* [2007] 3 S.C.R. 371 [Defendants' Authorities, Tab 115]; *Yordanes et al. v. The Bank of Nova Scotia et al.* (2006), 78 O.R. (3d) 590 at paras. 121-122 (S.C.J.) [Defendants' Authorities, Tab 116]; *Somers v. Fournier* (2002), 60 O.R. (3d) 225 at paras. 30-31 (C.A.) [Defendants' Authorities, Tab 101]; *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 at pp. 1073-1074 [Defendants' Authorities, Tab 107]

[306] Plaintiffs' Factum, at paras. 271-272

circumstances of a particular class member, most notably by where that individual received and relied upon the IMAX statements (whether directly or indirectly).[307]

**c) The Law Governing a Corporation's "Internal Management" in Not the Governing Law of Tort:**

236. The Plaintiffs have rightly acknowledged in their Factum that identifying the "governing law" applicable to their various common law causes of action is a live issue.[308] However, the Plaintiffs' suggestion that the body of law governing their claims must be that of Canada -- on the specious grounds that the pleaded tort claims can be equated with the "internal management" of IMAX, which is a Canadian corporation domiciled in Ontario -- is absurd.

237. It is uncontroversial that the "internal management" (properly understood) of a Canadian corporation must be governed by Canadian law. The issuance of shares, the payment of dividends, the calling of shareholder meetings, the election of directors, the power of directors and officers to manage the corporation, and the fiduciary and other duties owed by such individuals to the corporation, are the sorts of matters legitimately falling within the rubric of a corporation's "internal management."

238. In contrast, the Plaintiffs' causes of action are not matters of IMAX's "internal management," but are allegations of tortious misconduct by IMAX and its senior officers and

---

307 As noted, under *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 at p. 1049-1050 [Defendants' Authorities, Tab 107], multi-jurisdictional tort claims will presumptively be governed by the law of the place where the injury was suffered. As such. if an action in Ontario involved a plaintiff who received, relied upon and suffered damages as a result of a misrepresentation in Ontario, the *lex loci delicti* will be the substantive law of Ontario, which would also be the law of the forum. If, on the other hand, a plaintiff in an Ontario action received, relied upon and suffered damages as a result of a misrepresentation in New York (or in New Brunswick), the *lex loci delicti* would be the law of New York (or of New Brunswick), and the Ontario court would apply the law of the relevant jurisdiction in hearing that portion of the action.

308 Plaintiffs' Factum, at paras. 271-272

directors, said to have caused injury to investors in a variety of jurisdictions (in Canada and beyond).

239. The Defendants take no issue with the inherent correctness of the authorities relied upon by the Plaintiffs,[309] but deny that any aspect of either authority is relevant when identifying the proper governing law applicable to the torts alleged to have been committed by the Defendants:

(a) In *National Trust Co. v. Ebro Irrigation and Power*,[310] a Spanish court applying Spanish law purported to declare bankrupt a Canadian corporation, and further purported to authorize certain functionaries to seize control over the assets of two other Canadian corporations, to thereafter appoint new boards of directors of these latter Canadian corporations, to cause the Canadian corporations to issue new securities, and to transfer the assets of these Canadian corporations to a Spanish company. The Ontario court quite properly found that the actions taken by the functionaries pursuant to the Spanish court's order were matters falling within the scope of the Canadian corporations' internal management, and, as such, were matters which could only be effected in accordance with Canadian law.

(b) Similarly, in *Churchill Pulpmill v. Manitoba*,[311] a shareholder of a Manitoba corporation was not permitted to bring a claim in the name of that corporation against a third party because he had not complied with the mandatory derivative action provisions of the governing Manitoba *Corporations Act*. The

---

[309] Plaintiffs' Factum, at paras. 271-272
[310] *National Trust Co. v. Ebro Irrigation and Power*, [1954] O.R. 463 (H.C.) [Plaintiffs' Authorities, Tab 46], esp. at pp. 463-465, 478-482
[311] *Churchill Pulpmill v. Manitoba*, [1977] 6 W.W.R. 109, [1977] M.J. No. 4 (Man. C.A.), esp. at paras. 21-26 [Plaintiffs' Authorities, Tab 16]

case involved no consideration of "governing law" *per se*. Rather, it provides confirmation of the uncontroversial principle that a party seeking to exercise a statutory right must comply with the statutory prerequisites.

240. Thus, the cases cited by the Plaintiffs usefully illustrate the sorts of matters which do fall under the rubric of "internal management," and it will be seen that neither case relates to the manner (tortious or otherwise) in which a corporation carries out its business. As recently found by the Ontario court, "[t]he right to requisition a meeting of shareholders and the right to receive a list of shareholders are clearly matters of the internal affairs or governance of a [foreign] corporation and are determined in accordance with the laws of the jurisdiction of incorporation." In affirming this ruling, the Court of Appeal noted that relief sought by a party which related to matters of internal governance should be "distinguished" from any "relief [which] related to any business carried on by [the foreign corporation] in Ontario."[312] [Emphasis added.]

241. As noted above, *Tolofson v. Jensen*, confirmed the fundamental importance of the *lex loci delicti* or the law of the place of the tort, which must be determined even where the wrongdoing spans several jurisdictions.[313] This rule applies to corporations in the same manner as it does to individuals. To cite but one illustration, in the *Yordanes* case, a Canadian Bank was alleged to have committed various torts (partially in Canada and partially in Argentina, but which caused injury to plaintiffs in Argentina).[314] Applying *Tolofson v.*

---

312 The two quotations are from, respectively, *Cira v. Rico Resources Inc.* (2004), 41 B.L.R. (3d) 206 at para. 6 (Ont. S.C.J.)], and the *affirming ruling*, [2006] O.J. No. 436 at para 2 (C.A.)

313 *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 at p. 1049-1050 [Defendants' Authorities, Tab 107]

314 *Yordanes et al. v. The Bank of Nova Scotia et al.* (2006), 78 O.R. (3d) 590 (S.C.J.) [Defendants' Authorities, Tab 116]

*Jensen*, the Ontario court rejected the application of Canadian law, and confirmed that the governing law applicable to each of the torts was that of Argentina.[315]

242. As a direct result of identifying the governing law of the torts to be the law of a foreign country, the court in *Yordanes* explicitly refused to consider certain "internal management" provisions found in the Canadian Bank's governing corporate legislation, the *Bank Act* (Canada).[316] The two issues were separate and distinct, and the domestic legislative principles (addressing "internal management") were deemed to be irrelevant when assessing the foreign-law-governed tort claims.

**d) The Multitude of Governing Laws Presented by the Plaintiffs' Proposed Worldwide Class are Unprecedented**

243. The Plaintiffs suggest that -- since worldwide classes have been previously certified by this Court -- it follows that a worldwide class is permissible. In appropriate circumstances, the Defendants agree that a worldwide class is capable of being certified.

244. To note three examples cited by the Plaintiffs in their Factum,[317] this Court has previously certified a worldwide class for settlement purposes.[318] In a different context, a worldwide class was certified in the case of a breach of contract claim, where all claims were governed exclusively by a single body of law -- that of Barbados.[319] In another case

---

315 *Yordanes et al. v. The Bank of Nova Scotia et al.* (2006), 78 O.R. (3d) 590 at paras. 96-99 & 111 (S.C.J.) [Defendants' Authorities, Tab 116]

316 *Yordanes et al. v. The Bank of Nova Scotia et al.* (2006), 78 O.R. (3d) 590 at para. 76 (S.C.J.) [Defendants' Authorities, Tab 116]

317 Plaintiffs' Factum, at para. 270. The cases certifying Canadian "national classes" cited by the Plaintiffs are irrelevant in this context.

318 *Mondor et al. v. Fisherman et al.* (2001), 80 O.R. (3d) 222 [2001] O.J. No. 4620 (S.C.J.) [Plaintiffs' Authorities, Tab 43]

319 *Mandeville v. Manufacturers Life Insurance Co.* (2002), 40 C.P.C. (5th) 182, [2002] O.J. No. 5386 (S.C.J.) [Plaintiffs' Authorities, Tab 39] & *Mandeville v. Manufacturers Life Insurance Co.*, [2002] O.J. No. 5387 (S.C.J.) [Plaintiffs' Authorities, Tab 40]

involving a potentially international class of plaintiffs (albeit, the vast majority residing in Canada), the claims of the class were uniquely and purely "Canadian" in that they arose from copyright in Canadian publications.[320] The Plaintiffs do not point to a single judicial precedent where certification of a worldwide class, for the purposes of a common issues trial, would require an investigation into potentially dozens of different bodies of applicable foreign law.

245. There is good reason why no such authority exists -- namely, the unmanageable logistical chaos which would dwarf any conceivable benefits of certification. As noted above, this Court would be required by Ontario's conflict of laws rules to undertake a laborious determination (prior to any common issue trial) of which body (or bodies) of law govern the various common law causes of action put forward by each individual class member and/or by each (geographically defined) sub-class of members. Such a process would be inherently and inevitably unmanageable.

**e) Ascertaining and Applying the Elements of Each Body of Governing Law to the Claims of Each Class Member:**

246. The outcome of this exercise will almost certainly be the conclusion that dozens of different bodies of "foreign" law (*i.e.*, tort law principles from other provinces, from U.S. states, and perhaps from other countries) must be individually assessed and applied to the common law causes of action asserted by different class members. The principal ramification of this conclusion will likely be the need to hold dozens of separate common issues trial, each one applying a different body of foreign law to the claims of those class members to which that body of law is found to be applicable.

---

[320] *Robertson v. Thomson Corp*, (1999), 43 O.R. (3d) 161 (Gen. Div.) [Plaintiffs' Authorities, Tab 56]

247. Once it is determined that a foreign law applies to a particular class member's claim, the substance of this foreign law will be proven, as a matter of fact, through expert evidence. If the evidence tendered by one party is uncontradicted, the court will generally accept it. Otherwise, the court must determine as a question of fact, based on the (possibly conflicting) expert evidence before it, the substantive content of the governing foreign law.[321]

248. Only in the absence of satisfactory expert evidence as to the substance of foreign law will the court apply the domestic law of Ontario to a claim otherwise found to be properly governed by foreign law. This step is taken, not on the basis of any presumption that the foreign law is identical in substance to the domestic law, but rather because the domestic law is the only law available to the court.[322]

249. The present hearing is, of course, not the appropriate forum for establishing the similarities and differences which may exist between Ontario tort law principles, and the parallel common law principles applicable under the laws of each of the dozens of "foreign" jurisdictions relevant to the claims of individual class members. As noted above, this is a matter which can only be determined by this Court -- on the basis of expert evidence tendered by qualified witnesses from the relevant jurisdiction -- at or prior to the common issue trials where these matters are assessed.

250. The Defendants nevertheless note, in an entirely non-evidentiary and inconclusive way, the following *possibilities*:

---

321 Castel & Walker, *Canadian Conflict of Laws*, 6th ed. (Toronto: LexisNexis, 2005+), Vol. 1 at para. 7§3 [Defendants' Authorities, Tab 3]
322 Castel & Walker, *Canadian Conflict of Laws*, 6th ed. (Toronto: LexisNexis, 2005+), Vol. 1 at para. 7§4 [Defendants' Authorities, Tab 3]

(a) As set out the Defendants' s. 5(1)(a) submissions (above), and in the Defendants' Rule 21 Factum, it is highly debatable that Canadian tort law recognizes a duty of care owed by an issuer or its officers/directors to participants in the secondary market. [323]

(b) It appears that this conclusion is also supported by the laws of numerous U.S. states -- although, of course, this is a matter to be established by expert evidence at a hypothetical common issues trial.[324]

(c) It is therefore fascinating to note -- again, subject to confirmation by a qualified expert -- that at least one U.S. jurisdiction appears to have taken the opposite approach, and has determined that a duty of care <u>does</u> apply in such circumstances. [325]

Thus, depending on whether the tort claims of a particular sub-class of U.S. investors is found to be governed by the laws of New Jersey or by the laws of New York, the sustainability of

---

[323] *NPV Management Ltd. v. Anthony* (2003), 231 D.L.R. (4th) 681 (Nfld. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 436 [Defendants' Authorities, Tab 84]

[324] Under the laws of **<u>New York</u>** see *In re Zenith Laboratories Securities Litigation*, 1993 U.S. Dist. LEXIS 18478 at *35-*37 (D.N.J. 1993) [Defendants' Authorities, Tab 61]; under the laws of **<u>Connecticut</u>** see *Chanoff v. United States Surgical Corp.*, 857 F. Supp. 1011 at p. 1022 (D. Conn. 1994), *aff'd* 31 F. 3d 66 (2nd Cir.), *cert denied*, 513 U.S. 1058 [Defendants' Authorities, Tab 33], under the laws of **<u>Michigan</u>** see *In re Consumers Power Company Securities Litigation*, 105 F.R.D. 583 at pp. 596-598 (E.D. Mich. 1985) [Defendants' Authorities, Tab 53], under the laws of **<u>Colorado</u>** see *In re Storage Technology Corporation Securities Litigation*, 630 F. Supp. 1072 at p. 1081 (D. Colo. 1986) [Defendants' Authorities, Tab 58], under the laws of **<u>California</u>** see *Weinberger v. Schroeder*, 1986 U.S. Dist. LEXIS 18428 at *7-*11 (N.D. Cal. 1986) [Defendants' Authorities, Tab 111]; *In re Worlds of Wonder Securities Litigation*, 694 F. Supp. 1427 at p. 1436 (N.D. Cal. 1988) [Defendants' Authorities, Tab 59]; *Levy v. Eletr*, 724 F. Supp. 1269 at p. 1272 (N.D. Cal. 1989) [Defendants' Authorities, Tab 72]; *In re Wyse Technology Securities Litigation*, 744 F. Supp. 207 at p. 209 (N.D. Cal. 1990) [Defendants' Authorities, Tab 60], under the laws of **<u>Maryland</u>** see *In re Cryomedical Services, Inc. Securities Litigation*, 884 F. Supp. 1001 at p. 1021 (S.D.M.D. 1995) [Defendants' Authorities, Tab 54], under the laws of **<u>Nevada</u>** see *In re Jackpot Enterprises Securities Litigation*, 1991 U.S. Dist. LEXIS 16353 at *22-*23 (D. Nev. 1991) [Defendants' Authorities, Tab 56], under the laws of **<u>Delaware</u>** see *In re Delmarva Securities Litigation*, 794 F. Supp. 1293 at pp. 1310-1311 (D. Del. 1992) [Defendants' Authorities, Tab 55], under the laws of **<u>Pennsylvania</u>** see *Wallace v. Systems & Computer Technology Corp.*, 1997 U.S. Dist. LEXIS 14677 at *91-*95 (E.D. Pa. 1997) [Defendants' Authorities, Tab 110], and under the laws of **<u>South Carolina</u>** see *Pitten v. Jacobs*, 903 F. Supp. 937 at pp. 951-952 (D.S.C. 1995) [Defendants' Authorities, Tab 89]

[325] Under the laws of **<u>New Jersey</u>**, see *In re Zenith Laboratories Securities Litigation*, 1993 U.S. Dist. LEXIS 18478 at *35-*37 (D.N.J. 1993) [Defendants' Authorities, Tab 61]

their negligence and negligent misrepresentation claims would be assessed in entirely different ways, and would lead to diametrically opposed results.[326]

251. This (speculative) example of the apparent divergences existing in the laws of different foreign jurisdictions underlines both the need for this Court to undertake the preliminary exercise of identifying the appropriate governing law applicable to each class member's claim, and also the potentially inconsistent outcomes which will flow from the application of these diverse bodies of governing law.

#### *4. Individual Issues Related to* **Forum Conveniens**

252. Individual inquiries may also be required to determine whether the Ontario Court is a convenient forum in view of the worldwide class proposed by the Plaintiffs.

253. Assuming that this Court is found to have jurisdiction *simpliciter* over the individual and collective claims of the various members of the worldwide class,[327] further analysis must be conducted to determine whether there are any reasons for this Court to decline to exercise such jurisdiction. In *Muscutt*, Sharpe J.A. stated:

> It is important to distinguish the real and substantial connection test from the discretionary *forum non conveniens* doctrine. In *Tolofson* [*v. Jensen*, [1994] 3 S.C.R. 1022], at p. 1049, La Forest J. explained the distinction as follows:
>
> > [The real and substantial connection] test has the effect of preventing a court from unduly entering into matters in which the jurisdiction in which it is located has little interest. *In addition*, through the doctrine of *forum non conveniens* a court may refuse to exercise jurisdiction where, under the rule

[326] Similarly, it appears that the law of New York may not recognizes a civil conspiracy to commit a tort as an independent cause of action -- see *Salvatore v. Kumar*, 45 A.D.3d 560, 563 (N.Y.A.D. 2007) [Defendants' Authorities, Tab 94]. Whether this is the law in other U.S. and Canadian jurisdictions could be a crucial factor in the success of some class members and not others.

[327] The Ontario Court's jurisdiction *simpliciter* over such a worldwide class is not addressed in the present submissions of the Defendants

> elaborated in *Amchem* [*Products Incorporated v. British Columbia (Workers' Compensation Board)*, [1993] 1 S.C.R. 897] … there is a more convenient or appropriate forum elsewhere.[328]" [Emphasis in original]

254. In *Muscutt*, the Court of Appeal listed the following factors that courts typically consider in assessing *forum non conveniens*:

(a) the location of the majority of the parties;

(b) the location of key witnesses and evidence;

(c) contractual provisions that specify applicable law or accord jurisdiction;

(d) the avoidance of a multiplicity of proceedings;

(e) the applicable law and its weight in comparison to the factual questions to be decided;

(f) geographical factors suggesting the natural forum;

(g) whether declining jurisdiction would deprive the plaintiff of a legitimate juridical advantage available in the domestic court.[329]

255. If this Court were to apply the foregoing list to the precise facts and legal issues at play in the Plaintiffs' proposed worldwide class action, the result might well be as follows:

(a) *The location of the majority of the parties* -- As noted above, IMAX is domiciled in Ontario, as are some of the individual defendants. Other defendants are in the U.S. While the two proposed representative Plaintiffs are both resident in Ontario, it appears that the vast majority of the worldwide class is located outside of Canada. It must be borne in mind that each of these

---

[328] *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 at para. 42 (C.A.) [Defendants' Authorities, Tab 82]
[329] *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 at para. 41 (C.A.) [Defendants' Authorities, Tab 82]

foreign parties will be required ultimately to come to Ontario to individually litigate the numerous individual issues that will be left uncertified;

*(b)* *The location of key witnesses and evidence* -- In terms of key witnesses and evidence relating to the conduct of the Defendants, it is likely that both Ontario and New York would be the site of important material and individuals. Evidence relevant to the claims of the representative Plaintiffs is likely in Ontario. With regard to the individual class members, however, the necessary evidence and witnesses are likely to be found in numerous foreign jurisdictions. Again, it must be borne in mind that the foreign class members will be required ultimately to come to Ontario (with evidence and witnesses brought from their home jurisdictions) to litigate numerous individual issues.

*(c)* *Contractual provisions that specify applicable law or accord jurisdiction* -- This would appear to be irrelevant.

(d) *The avoidance of a multiplicity of proceedings* -- As discussed below, the U.S. Proceeding is in existence and already encompasses the entire proposed class. One of the most important factors in assessing *forum conveniens* is the existence of a parallel proceeding which the plaintiff has commenced in another jurisdiction.[330]

*(e)* *The applicable law and its weight in comparison to the factual questions to be decided* -- For the reasons noted above, this Court will likely be required to apply foreign tort law principles to both the common and individual claims of

---

330 *Ruggeberg v. Bancomer, S.A.*, [1998] O.J. No. 538 at para. 41 (Gen. Div.), *aff'd* (1999), 122 O.A.C. 310 at para. 2 (C.A.), *leave to appeal to S.C.C. refused*, [1999] S.C.C.A. No. 289 [Defendants' Authorities, Tab 109]

the vast majority of class members. Ontario substantive law will have extremely limited application.

(f) *Geographical factors suggesting the natural forum* -- It is not clear that this is relevant.

(g) *Whether declining jurisdiction would deprive the plaintiff of a legitimate juridical advantage available in the domestic court* -- Since the Ontario Court will apply the substantive laws of whatever foreign jurisdiction govern the individual class member's claim, it is not clear that any substantive juridical advantage would apply. Only if a procedural benefit unique to Ontario can be identified would this factor be relevant.

256. In no case in which the Ontario Court has considered *forum conveniens* in the context of a class action has the proceeding in question involved an international class in which the substantive law of dozens of jurisdictions will need to be assessed by the Ontario Court, and where an existing class action in the home jurisdiction of the majority of the class members already exists.[331] Thus, this will be a matter of first impression when the issue of *forum conveniens* is inevitably raised following any certification of one or more common issues in this case.

---

[331] See, for example, *Vitapharm Canada Ltd. v. F. Hoffman-La Roche Ltd.* (2002), 20 C.P.C. (5th) 351 at paras. 103-120 (Ont. S.C.J.) [where all class members were Canadian and there was no alternative class proceeding, or even class mechanism, available] [Defendants' Authorities, Tab 109]; *Wilson v. Servier* (2000), 50 O.R. (3d) 219 at paras. 19-37 (S.C.J.), *leave to appeal refused* (2000), 143 O.A.C. 279 (Div. Ct.), leave to appeal refused, [2001] S.C.C.A. No. 88 [where all class members were Canadian, with 43% resident in Ontario and no alternative class proceeding was available elsewhere]; and *Ontario New Home Warranty Program v. General Electric Co.* (1998), 36 O.R. (3d) 787 at pp. 795-797 (Gen. Div.) [where all class members were resident in Ontario, and related litigation was being conducted by the same parties in Ontario, and where the only alternative class proceeding was in the U.S., which was not the class members' home jurisdiction] [Defendants' Authorities, Tab 86]

### *5. Individual Issues Related to the U.S. Proceeding*

257. Should this Court decide to certify as common issues any of the matters identified by the Plaintiffs, it will necessitate individual inquiries to determine whether the claims of members of the putative Ontario class are barred as a result of the pending U.S. Proceeding.

258. The U.S. Proceeding includes all purchasers of IMAX shares between February 23, 2003 and July 20, 2007.[332]

259. The extent to which the U.S. Proceeding and any judgment or settlement will operate to bar the claims of members of the putative class in this proceeding depends not only upon whether the judgment would be given *res judicata* effect in Ontario,[333] but also upon whether it would be recognized and enforced in Ontario based on the factors set out by the Supreme Court of Canada in *Morguard v. De Savoye* and *Beals v. Saldanha*, and by the Ontario Court of Appeal in *Currie v. McDonald's*. These factors include:

(a) Whether the foreign Court has a real and substantial connection to the litigation;

(b) Whether the rights of the non-resident class members have been adequately represented; and

(c) Whether the non-resident class members have been accorded procedural fairness, including adequate notice and the right to opt out.[334]

---

[332] Exhibit "C" to Affidavit of M. Robb, sworn February 12, 2008, Consolidated Amended Complaint at para. 21: Plaintiffs' Sixth Supp. Motion Record, Tab 1(C)

[333] *McCallum v. Ryan Estate*, [2002] O.J. No. 1088 at paras. 27-28 (S.C.J.) [Defendants' Authorities, Tab 75]; *CLE Owners Inc. v. Wanlass* (2004), 44 C.P.C. (5th) 175 at paras. 34-36 (Man. Q.B.), *aff'd* [2005] 8 W.W.R. 559 (Man. C.A.), *leave to appeal to S.C.C. refused*, [2005] S.C.C.A. No. 224 [Defendants' Authorities, Tab 75]

[334] *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 [Defendants' Authorities, Tab 79]; *Beals v. Saldanha*, [2003] 3 S.C.R. 416 [Defendants' Authorities, Tab 21]; *Currie v. McDonald's Restaurants of Canada Ltd.* (2005), 74 O.R. (3d) 321 (C.A.) [Defendants' Authorities, Tab 40]

260. Given the preliminary nature of this proceeding and the U.S. Proceeding, it is too early to make a final determination as to the implications of the U.S. Proceeding on this proceeding; however, it is certainly possible that a U.S. Judgment or Settlement would be binding on the entirety of the class as defined in this proceeding.

261. The principles set out in these cases require a careful consideration of the facts of the case. Some of the relevant facts are known. For example:

**Real & Substantial Connection to the U.S.**

(a) IMAX's common shares were tradable over the NASDAQ, and the vast majority of shareholders are non-Canadian residents.[335]

(b) The majority of IMAX's Directors and Officers are resident in the U.S.[336]

(c) The various U.S. Proceedings were consolidated in New York.

**Adequate Representation**

(a) U.S. Class Counsel are well respected and experienced in representing plaintiffs in class actions cases.

(b) U.S. Class counsel was accepted as Class Counsel by the New York court from amongst numerous law firms desiring to be Class Counsel.[337]

**Adequate Notice & Right to Opt Out**

(a) The U.S. Proceeding will no doubt result in a court sanctioned notice program, which will includes notice to Canadian class members.

---

335 Affidavit of K. Copland, sworn September 8, 2007, at para. 107: Motion Record of the Responding Parties, Vol. III-VIII
336 Fresh Claim, at p. 2: Plaintiffs' First Motion Record, Tab 1, Schedule A
337 *Kaplan v. Gelfond*, 2007 U.S. Dist. LEXIS 4446 (S.D.N.Y.) [Defendants' Authorities, Tab 62]

(b) Putative Class members will be entitled to opt out of the U.S. Settlement.

262. Nevertheless, there are still a significant number of facts which would require an individual assessment of the putative class member's knowledge and involvement in these matters to determine if a resolution of the U.S. Proceeding is enforceable. For instance, the Court of Appeal for Ontario has indicated that the "question of jurisdiction should be viewed from the perspective" of the putative class member.[338] The Court must consider their subjective expectation regarding where their legal claims may properly be litigated. As held by Sharpe J.A. in *Currie*:

> In many cases, the actions of the non-resident class member will assist in determining jurisdiction. Take, for example, the case of an Ontario resident who orders goods from a foreign mail order merchant or who buys securities on a foreign stock exchange. The Ontario resident has engaged in a cross-border transaction with a foreign entity. The cause of action arises at least in part in the foreign jurisdiction. It would not be unreasonable, from the perspective of the Ontario resident, to expect that legal claims arising from the transaction could be properly litigated in the foreign jurisdiction. Nor is it unreasonable, whether from the perspective of the foreign defendant or from that of the Ontario plaintiff, to expect that class action litigation in the foreign jurisdiction should dispose finally of the Ontario plaintiff's claim.[339]

263. In addition, even if the U.S. judgment is not itself recognized and enforced against individual class members pursuant to the three factors from *Currie*, it may still bar certain class members from proceeding with their claims if they stand in a relationship of privity, sufficient to engage the doctrine of *res judicata*, with persons who are bound by the U.S. judgment (e.g., American residents or those who attorned to the jurisdiction of the U.S.

---

338 *Currie v. McDonald's Restaurants of Canada Ltd.* (2005), 74 O.R. (3d) 321 at para. 21 (C.A.) [Defendants' Authorities, Tab 40]

339 *Currie v. McDonald's Restaurants of Canada Ltd.* (2005), 74 O.R. (3d) 321 at para. 18 (C.A.) [Defendants' Authorities, Tab 40].

court).[340] This will require further individual inquiries into the relationship between each of the proposed class members and the class members in the U.S. Proceeding.

264. In addition, if the U.S. proceeding results in a judgment, or a settlement that is approved through a judgment, individual inquiries will be needed in order to determine the amount of benefits that each of the proposed class members receive as a result. This is because the principle against double recovery will prohibit the Court from awarding damages in the proposed proceeding unless it first sets off any amounts that the proposed class members receive from the U.S. judgment. This will be the case even if the U.S. judgment is not actually recognized and enforced in Ontario, based on the three-part test established in *Currie*. Indeed, this was expressly recognized in *Currie* itself, where Sharpe J.A., speaking of the effect that a U.S. settlement judgment would have upon a proposed Ontario class action, stated that:

> I would add this observation. Even if the Boland judgment is not accorded recognition and enforcement, it may still have some impact upon Currie's proposed class action in Ontario because of the principle against double recovery**.** As a result of the Boland judgment, certain benefits were conferred upon Canadian McDonald's patrons. If the Currie action succeeds on the merits, then the trial judge will likely take into account the benefits already received by the plaintiff class in order to determine the appropriate remedy and prevent over-compensation.[341] [Emphasis added]

265. Clearly, the complexities arising from the existence of the U.S. Proceeding -- particularly in circumstances like the present ones, where the vast majority of members of the putative Ontario class are resident outside Canada -- is a complex issue mitigating against the collective benefits of certification in this province.

---

[340] *Currie v. McDonald's Restaurants of Canada Ltd.* (2005), 74 O.R. (3d) 321 at paras. 44-51 (C.A.) [Defendants' Authorities, Tab 40]
[341] *Currie v. McDonald's Restaurants of Canada Ltd.* (2005), 74 O.R. (3d) 321 at para. 32 (C.A.) [Defendants' Authorities, Tab 40]

**D. Section 5(1)(e): The Plaintiffs Cannot Properly Represent the Class**

266. Silver and Cohen bear the onus of proving that they are each an appropriate representative Plaintiffs. Each of them falls short:

(a) They do not share a common interest with other investors;

(b) They have not demonstrated an intention to "vigorously and capably prosecute" this matter; and

(c) They cannot "fairly and adequately" represent the interests of the absent members of the proposed class, as required by s.5(1)(e)(i), because:

(i) they have not filed an adequate Litigation Plan in accordance with s.5(1)(e)(ii); and

(ii) they have offered no proof that their interests are not in conflict with the interests of those persons, contrary to s.5(1)(e)(iii).[342]

***1. They Do Not Share a Common Interest with the Class***

267. The fundamental function of a "representative" plaintiff for a class action is satisfied if an inquiry into his circumstances will "suffice and stand in the stead of an inquiry into the circumstances of" each of the unidentified members of the proposed class.[343]

268. Neither proposed representative Plaintiff is capable of meeting that requirement. Every investor has an individual transaction assessment process dependent upon a myriad of factors, including their personal characteristics, goals and knowledge.[344] The Plaintiffs have filed no evidence to demonstrate that either their personal investment strategies or their

---

[342] s. 5(1)(e) of the Class Proceedings Act, 1992 [Defendants' Authorities, Tab 1]
[343] *Kelly v. J.J. Lacey Insurance Ltd.* (1997), 15 C.P.C. (4th) 114 at para. 61 (Nfld. S.C.(T.D.)) [Defendants' Authorities, Tab 64]
[344] The Plaintiffs' expert, R. Comment, has conceded this point: Comment Transcript, at p. 47, line 2 – p. 48, line 3

specific IMAX investment decisions were representative of the strategies or decision-making process of even one other IMAX shareholder.

269. On their own evidence, there are certainly examples of a divergence between them, and, by necessary extension, between them and members of their proposed class, such as:

(a) Silver had bought and sold IMAX shares before Cohen had not;[345]

(b) Silver bought more shares on August 9, 2006, immediately before an impending announcement regarding the search for a buyer; Cohen did not;[346]; and

(c) Cohen elected to sell his IMAX shares after the August Press Release; Silver has still not sold his IMAX shares.[347]

270. The divergence in the proposed representative Plaintiffs' stories compellingly demonstrates that they cannot reasonably bind potentially thousands of class members to the outcome of their individual case(s).

### *2. They Will Not Vigorously Prosecute the Action*

271. As proposed representative Plaintiffs, Cohen and Silver control the litigation fate of potentially thousands of individuals and institutions within the class. This carries with it significant responsibility, particularly in large, complex litigation.[348] The Plaintiffs must demonstrate to the Court their commitment and capability to "vigorously and capably prosecute"[349] the claims of those as yet unidentified investors.

---

[345] Cross-Examination of C. Cohen, April 9, 2008, at p. 20, line 11 – p. 21, line 8; Cross-Examination of M. Silver, p. 18, line 17 – p. 19, line 14

[346] Cross-Examination of C. Cohen, April 9, 2008, at p. 87, line 1 – p. 91, line 18; Cross-Examination of M. Silver, April 17, 2008, at p. 51, lines 20-25

[347] Cross-Examination of C. Cohen, April 9, 2008, at p. 95, lines 5-11; Cross-Examination of M. Silver, April 17, 2008, at p. 53, line 20 – p. 54, line 13

[348] *Bruno v. Canada*, [1999] F.C.J. No. 914 at para. 7 (T.D.) [Defendants' Authorities, Tab 26]

[349] *Western Canadian Shopping Centres Inc. v. Dutton* (2000), [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63 at para. 41 [Plaintiffs' Authorities, Tab 69]

272. Their failure to invest a reasonable degree of care and attention to date amply demonstrates that they are not willing or able to do so:

(a) they have not attempted to identify or contact other class members;[350]

(b) their admissions on cross-examination showed their pleadings and Affidavit evidence to be rife with non-disclosure, errors, inconsistencies and contradictions;[351]

(c) they either did not read or did not remember reading IMAX's September 2007Affidavit evidence at any time prior to their cross-examinations in April 2008, and they did not read the transcripts of the Defendants;[352] and

(d) they did not take the opportunity to admit the errors in their own Affidavits prior to their own cross-examination.[353]

### *3. They will not "Fairly and Adequately" Represent the Class*

273. The Plaintiffs have also failed to demonstrate an intention and ability to represent the interests of the absent members of the proposed class "fairly" and "adequately".

274. First, with respect to the **adequacy** of their efforts, despite the complexity and volume of the contemplated proceedings, they have filed a Litigation Plan[354] which is decidedly "sparse and lacking in detail". It would be inappropriate for the Court to accept such a plan:

> The production of a workable litigation plan serves a twofold purpose: it assists the court in determining whether the class proceeding is indeed the preferable procedure; and, it allows the court to determine whether the litigation itself is manageable in its constituted form. The manageability must be assessed in the context of the entirety of the litigation, not just a common issue trial.
>
> A workable plan must be comprehensive and provide sufficient detail which corresponds to the complexity of the litigation proposed for certification. In this case, the national scope, the nature of the defendants, the uncertainty of the class size and

---

350 *Bruno v. Canada*, [1999] F.C.J. No. 914 at para. 8 (T.D.) [Defendants' Authorities, Tab 26]

351 Cross-Examination of C. Cohen, April 9, 2008, p. 104, lines 14-21; Cross-Examination of M. Silver, April 12, 2008, p. 75, lines 11-15

352 Cross-Examination of C. Cohen, April 9, 2008, p. 5, lines 14-22; Cross-Examination of M. Silver, April 12, 2008, p. 3, lines 12-22

353 Cross-Examination of C. Cohen, April 9, 2008, p. 3, lines 3-15; Cross-Examination of M. Silver, April 12, 2008, p. 2, lines 5-16.

354 Litigation Plan, Exhibit "O"to First Affidavit of M. Robb, sworn February 22, 2007: Plaintiffs' First Motion Record, Tab 2(O)

> the number of causes of action alleged mark this as litigation of the most complex nature and kind. Accordingly, a comprehensive and detailed litigation plan is required.[355]

275. The proposed Litigation Plan is inadequate because it does not even contemplate the threshold individual issues of *forum conveniens* and the applicable governing law, let alone propose a workable method for resolving those issues. As indicated, these threshold individual issues must be determined before any common issues trial.

276. As to the **fairness** of their efforts, the Court is entitled to examine the "motivation" of the representatives.[356]

277. Each proposed representative Plaintiff professed on cross-examination to have concluded, in August 2006, in the absence of any confirmatory evidence, that the Executives of IMAX were engaged in fraudulent behavior, even though the discretionary accounting policy of IMAX was endorsed by IMAX's independent auditors[357], and in the absence of any regulatory charge even being laid against any IMAX Executive (much less a conviction).[358]

278. Further, each of the Plaintiffs is so sure of his beliefs that neither of them bothered to even read the affidavits and transcripts of the ten men and one woman they so blithely continue to condemn.[359] The Court does not have the benefit of their views on their September 2006 allegations now that oral and documentary examinations of all the IMAX

---

355 *Carom v. Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173, [1999] O.J. No. 1662 at pp. 30-31 (S.C.J.) [Plaintiffs' Authorities, Tab 11], *aff'd* (1999), 46 O.R. (3d) 315 (Div. Ct.) [Defendants' Authorities, Tab 28], *rev'd on other grounds* (2000), 51 O.R. (3d) 236 (C.A.) [Plaintiffs' Authorities, Tab 12], *leave to appeal to S.C.C. refused*, [2000] S.C.C.A. No. 660

356 *Western Canadian Shopping Centres Inc. v. Dutton* (2000), [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63 at para. 41 [Plaintiffs' Authorities, Tab 69]

357 See Cross-Examination of M. Silver, April 17, 2008, at p. 62, line 14 – p. 64, line 22; Answers to Undertakings from Cross-Examination of C. Cohen, April 9, 2008, p. 100, Q. 479: Motion Record of the Responding Parties, Vol. IX, Tab 14

358 Notably, Mr. Cohen advised that he concluded that IMAX had acted deliberately when he learned that IMAX had recognized revenue in 2005 on ten theatres that did not open until 2006: Cohen Undertaking Answers, p.100, Q.479: Defendant Record, Vol. IX. However, this fact was disclosed in IMAX's annual report for 2005, one of the IMAX Documents relied upon by the Plaintiffs.

359 *Bruno v. Canada*, [1999] F.C.J. No. 914 at para. 8 (T.D.) [Defendants' Authorities, Tab 26]

Executives and the PwC audit partner have been completed, without any admission or any confirmatory evidence of any deliberate act of fraud having been obtained.

279. While every individual is entitled to his or her own opinion, without regard to its factual support, that rush to judgment demonstrates an unwillingness to make a considered and thoughtful evaluation of any fact, document, offer or strategic choice in this litigation.

280. It is unwise to require every other shareholder in IMAX to put their litigation fate in the hands of these two investors.

### *4. Conclusion*

281. The views of these Plaintiffs, as set out above, demonstrate that they cannot advance a measured, rational, and competent case for a class of persons with basic claims and concerns, because there is no evidence that the class shares their circumstances and perceptions.

282. Further, they have failed to demonstrate any intention or ability to "vigorously", "fairly" or "adequately" prosecute a class action for the benefit of those unknown and absent class members. They should not, simply by virtue of being willing to advance such allegations in a rush after the August 2006 press release, and without any ongoing interest or energy to assess their truthfulness in the light of the actual evidence, be permitted to carry forward any other person's case against IMAX and the other Defendants and Proposed Defendants.

**E. Section 5(1)(b): There Is No Identifiable Class**

283. Pursuant to s. 5(1)(b) of the CPA, the Plaintiffs are required to show that "there is an **identifiable** class of two or more persons." The CPA requires the interweaving of three elements: the definition of the class; the cause of action the class asserted; and the common issue the class wishes to litigate.

284. The necessity of a working relationship amongst those three elements is readily apparent in the conceptual nature of a class proceeding: a class cannot exist absent a core of commonality, and that core must be the cause of action pleaded.[360]

285. The class definition is unworkable. By equating membership with the ownership of shares, it excludes the necessary "core element of commonality":

(a) the class as defined does not share a common cause of action; and

(b) the class does not share a common issue of law

286. In addition, the proposed representative Plaintiffs have failed to identify any other member of their proposed class.

***1. The Class Does Not Share a Common (or Any) Cause of Action***

287. Even if all IMAX shareholders who bought after February 17, 2006 and held their shares until the close of the markets on August 9, 2006 were identified and standing together in the Courtroom, that group of persons would still not be an "identifiable class" because they would not (could not) necessarily share the same (or any) cause of action.

288. It is improper to propose a class which "bears no resemblance to any group that was on the evidence likely injured" by the alleged actionable events.[361] Yet here, the Plaintiffs

---

[360] *Lau v. Bayview Landmark Inc.* (1999), 40 C.P.C. (4th) 301, [1999] O.J. No. 4060 at paras. 21-22 (S.C.J.), *leave to appeal to Div. Ct. refused*, [2000] O.J. Nos. 1946/1947/1948/1949 (Div. Ct.) [Plaintiffs' Authorities, Tab 36]

simply sweep up every person who bought and held shares within certain dates, regardless of any timely knowledge of -- much less material reliance on – the IMAX Statements. (This of course describes the two Plaintiffs, who each acquired their shares based on a statement *about* IMAX, not because of a statement *by* IMAX.)

289. As in *DeVry*, such an over-inclusive definition is clearly improper:

> The essence of the claim is that members of the proposed class relied to their detriment on misrepresentations of the defendant as to the quality of a DeVry education and its marketability to prospective employers. However, the class, as presently defined, includes all students of DeVry, including those who successfully completed their programs, were satisfied with the education they received, and went on to obtain employment related to their field of study. As well, the proposed class includes all students who enrolled, regardless of whether they heard or relied upon any of the alleged misrepresentations. Such persons might well have no claim against DeVry for any of the relief pleaded, let alone a claim which raises a common issue.[362] [Emphasis added]

290. The Plaintiffs have clearly failed to define a "sufficiently narrow" proposed class, comprised only of members who share a common cause of action.[363]

### *2. The Class Does Not Share a Common Issue*

291. If a limited group of IMAX investors could be identified as having received one of more of the IMAX Statements (a screening exercise which clearly cannot be done on any objective basis), such persons could each allege the same cause of action. However, the issues of fact or law raised by their claims would still not be common:

> For the purposes of a class proceeding, common issues are not synonymous with common causes of action. Multiple plaintiffs may assert similar claims against a common defendant or defendants without raising common issues. The necessary nexus for certification is that the claims asserted raise "common, though not

---

361 *Hollick v. City of Toronto*, [2001] 3 S.C.R. 158; [2001] S.C.J. No. 67 at paras. 8 (quotation), 19-20, 32 [Plaintiffs' Authorities, Tab 30]
362 *Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63 at p. 68 (Gen. Div.) [Defendants' Authorities, Tab 80]
363 *Western Canadian Shopping Centres Inc. v. Dutton* (2000), [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63 at paras. 38-39 [Plaintiffs' Authorities, Tab 69]; *Hollick v. City of Toronto*, [2001] 3 S.C.R. 158, [2001] S.C.J. No. 67 at paras. 20-21 [Plaintiffs' Authorities, Tab 30]

> necessarily identical" issues of fact or law. Hence, the claims, and the circumstances in which they are raised, must be analyzed to determine whether common issues are present.[364] [Emphasis added]

292. Here, the dates of share purchase and shareholding are objectively ascertainable, but the primary basis for each class member's claim (reliance upon the alleged misrepresentation) is inherently subjective. By their very nature, those causes of action "may or may not be shared by all, or for that matter, any of the persons so described". As a result, the class therefore cannot be defined "with sufficient precision".[365]

### *3. There Is No Class*

293. Finally, the Plaintiffs have failed to satisfy what should be the most fundamental feature of any proposed class proceeding -- the statutory requirement to identify "two or more" class members. 366 As the Court held in *Lau*, the Plaintiffs must demonstrate, not just suggest, the existence of a class:

> … a class proceeding cannot be created by simply shrouding an individual action with a proposed class. That is to say, it is not sufficient to make a bald assertion that a class exists. The record before the court must contain a sufficient evidentiary basis to establish the existence of the class.[367]

294. Indeed, the Plaintiffs are required by s. 5(3) of the CPA to file their best evidence as to the members of the class. They identified no other shareholders in any of the six Motion Records they filed between January of 2006 and January of 2007, and although they

---

[364] *Carom v. Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173, [1999] O.J. No. 1662 at pp. 22, 24 (S.C.J.) [Plaintiffs' Authorities, Tab 11], *aff'd* (1999), 46 O.R. (3d) 315 (Div. Ct.) [Defendants' Authorities, Tab 28], *rev'd on other grounds* (2000), 51 O.R. (3d) 236 (C.A.) [Plaintiffs' Authorities, Tab 12], *leave to appeal to S.C.C. refused*, [2000] S.C.C.A. No. 660

[365] *Lau v. Bayview Landmark Inc.* (1999), 40 C.P.C. (4th) 301, [1999] O.J. No. 4060 at paras. 29-30 (S.C.J.), *leave to appeal to Div. Ct. refused*, [2000] O.J. Nos. 1946/1947/1948/1949 (Div. Ct.) [Plaintiffs' Authorities, Tab 36]

[366] *Zicherman v. Equitable Life Insurance Co. of Canada*, [2000] O.J. No. 5144 at paras. 7-10 (S.C.J), *aff'd* (2001), 17 C.P.C. (5th) 103 at paras. 17-19 (Ont. Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 117], *aff'd* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]. See, in contrast, *Dabbs v. SunLife Assurance Co. of Canada* (1998), 40 O.R. (3d) 429 at pp. 434, 443 (Gen. Div.) [Defendants' Authorities, Tab 41], in which "hundreds" of potential class members had been interviewed, and the "sincere and genuine effort" of the Plaintiff to represent the interests of the proposed class was noted.

[367] *Lau v. Bayview Landmark Inc.* (1999), 40 C.P.C. (4th) 301, [1999] O.J. No. 4060 at paras. 29-30 (S.C.J.), *leave to appeal to Div. Ct. refused*, [2000] O.J. Nos. 1946/1947/1948/1949 (Div. Ct.) [Plaintiffs' Authorities, Tab 36]; *Taub v. Manufacturers Life Insurance Co.* (1998), 40 O.R. (3d) 379 at p. 381 (Gen. Div.), *aff'd* (1999), 42 O.R. (3d) 576 (Div. Ct.) [Defendants' Authorities, Tab 105]

eventually stated that 13 unnamed persons had identified themselves to counsel, no evidence was given that any of those persons fall within the class as currently defined.[368]

295. Even if it is assumed (without evidence) that these purported class members bought IMAX shares, there is no evidence as to (i) whether they did so within the class period; (ii) whether (or when) they received any representation by IMAX; or (iii) whether (or when) they relied on such representations. Indeed, in view of the fact that both of the proposed representative Plaintiffs decided to buy only on the spur of the market rumour[369], there is currently no evidence before the Court of two or more people who bought IMAX shares in reliance on the alleged misrepresentation. [370]

### *4. Conclusion*

296. In this case, the only possible class definition would inevitably, and improperly, be "circular": the Court would need to conduct an individual examination of each shareholder's idiosyncratic shareholding experience in order to prove or disprove the person's membership in the class. It is not appropriate to define the class by a finding on the merits.[371]

297. There is simply no identifiable class appropriate to justify certification.

---

[368] Answers to Undertakings from Cross-Examination for C. Cohen, April 9, 2008, p. 106, q. 502: Motion Record of the Responding Parties, Vol. IX, Tab 14. Indeed, Plaintiffs' counsel refused to share any particulars about even the class members they are aware of which Cross-Examination of C. Cohen, April 9, 2008, p. 109, line 21 – p. 111, line 7

[369] Neither Silver nor Cohen made their purchase based on a belief in the sufficiency of the accounting of IMAX. They bought as a pure matter of speculation, anticipating the short-term benefit of a share price spike on a possible acquisition. Further, they do not know, and have not taken any steps to identify other class members. Cross-Examination of C. Cohen, April 9, 2008, p. 104, lines 14-21; Cross-Examination of M. Silver, April 12, 2008, p. 75, lines 11-15

[370] *Samos Investments Inc. v. Pattison* (2001), 22 B.L.R. (3d) 46 at paras. 165-178 (B.C.S.C.) [Defendants' Authorities, Tab 96], *aff'd* (2003), 30 B.L.R. (3d) 177 (B.C.C.A.) [Defendants' Authorities, Tab 96]; *Zicherman v. Equitable Life Insurance Co. of Canada*, [2000] O.J. No. 5144 at para. 7 (S.C.J), *aff'd* (2001), 17 C.P.C. (5th) 103 at paras. 17-19 (Ont. Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 117], *aff'd* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

[371] *Lau v. Bayview Landmark Inc.* (1999), 40 C.P.C. (4th) 301, [1999] O.J. No. 4060 at paras. 29-30 (S.C.J.), *leave to appeal to Div. Ct. refused*, [2000] O.J. Nos. 1946/1947/1948/1949 (Div. Ct.) [Plaintiffs' Authorities, Tab 36]; *Chadha v. Bayer* (2001), 54 O.R. (3d) 520 at paras. 47-49 (Div. Ct.), *aff'd* (2003), 63 O.R. (3d) 22 at para. 69 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 106 [Defendants' Authorities, Tab 31]; *Western Canadian Shopping Centres Inc. v. Dutton* (2000), [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63 at para. 38 [Plaintiffs' Authorities, Tab 69]

## PART IV - THE ORDER REQUESTED

298. The Defendants respectfully request that the Plaintiffs' motion for certification be dismissed, with costs to the Defendants.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED**, this 10th day of December, 2008.

R. Paul Steep

Anthony M.C. Alexander

Erica J. Baron
of counsel for the Defendants

SCHEDULE A

Class Proceedings Act, 1992, R.S.O. 1992, c. 6 [Defendants' Authorities, Tab 1]

Securities Act (Ontario), R.S.O. 1990, c.S.5, s. 138 [Defendants' Authorities, Tab 2]

Castel & Walker, *Canadian Conflict of Laws*, 6th ed. (Toronto: LexisNexis, 2005+), Vol. 1 [Defendants' Authorities, Tab 3]

Feldthusen, *Economic Negligence*, 4th ed. (Toronto: Carswell, 2000) [Defendants' Authorities, Tab 4]

Sarna, *The Law of Declaratory Judgments*, 3d ed. (Toronto: Thomson, 2007) [Defendants' Authorities, Tab 5]

Woolf, *The Declaratory Judgment*, 3d ed. (London: Sweet & Maxwell, 2002) [Defendants' Authorities, Tab 6]

Young, *Declaratory Orders*, 2d ed. (Sydney: Butterworths, 1984) [Defendants' Authorities, Tab 7]

*2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp.* (2008), 89 O.R. (3d) 252 (S.C.J.) [Defendants' Authorities, Tab 8]

*820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 123 (Ont. Gen. Div.), *aff'd* (1991), 3 B.L.R. (2d) 113 (Ont. Div. Ct.) [Defendants' Authorities, Tab 9]

*Abdool v. Anaheim Management Ltd.* (1993), 15 O.R. (3d) 39 (Gen. Div.), aff'd (1995), 21 O.R. (3d) 453 [Defendants' Authorities, Tab 10]

*Abdool v. Anaheim Management Ltd.* (1995), 21 O.R. (3d) 453 (Div. Ct.) [Defendants' Authorities, Tab 11]

*ABN Amro Bank N.V. v. BCE Inc.*, [2003] O.J. No. 5418 (S.C.J.) [Defendants' Authorities, Tab 12]

*Alvi v. Misir* (2004), 73 O.R. (3d) 566 (S.C.J.) [Defendants' Authorities, Tab 13]

*Amertek Inc. v. Canadian Commercial Corp.* (2005), 76 O.R. (3d) 241 (C.A.), *leave to appeal to S.C.C. refused*, [2005] S.C.C.A. No. 439 [Defendants' Authorities, Tab 14]

*Asher v. Baxter*, 377 F.3d 727 (7th Cir. 2004), cert. denied, 544 U.S. 920 (2005) [Defendants' Authorities, Tab 15]

*Attis v. Canada (Minister of Health)*, [2008] O.J. No. 3766 (C.A.) [Defendants' Authorities, Tab 16]

*Avco Financial Services Realty Ltd. v. Norman* (2003), 64 O.R (3d) 239 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 300 [Defendants' Authorities, Tab 17]

*Axiom Plastics Inc. v. DuPont Canada Co.* (2007), 87 O.R. (3d) 352 (S.C.J.), *leave to appeal refused without express reference to this issue* (2008), 90 O.R. (3d) 782 (Div. Ct.) [Defendants' Authorities, Tab 18]

*B.D.C. v. Hofstrand Farms Ltd.*, [1986] 1 S.C.R. 228 [Defendants' Authorities, Tab 19]

*Balanyk v. University of Toronto* (1999), 1 C.P.R. (4th) 300 (Ont. S.C.J.) [Defendants' Authorities, Tab 20]

*Beals v. Saldanha*, [2003] 3 S.C.R. 416 [Defendants' Authorities, Tab 21]

*Bittner v. Louisiana-Pacific Corp.*, 1997 CanLII 2904 (B.C.S.C.) [Defendants' Authorities, Tab 22]

*Bonaparte v. Canada (A.G.)* (2003), 64 O.R. (3d) 1 (C.A.) [Defendants' Authorities, Tab 23]

*Boulanger v. Johnson & Johnson Corp.* (2003), 174 O.A.C. 44, [2003] O.J. No. 2218 (C.A.) [Plaintiffs' Authorities, Tab 6]

*Brickman v. Tyco Toys Inc.*, 722 F. Supp. 1054 (S.D.N.Y. 1989) [Defendants' Authorities, Tab 24]

*Brooks v. Canadian Pacific Railway Ltd.* (2007), 283 D.L.R. (4th) 540 (Sask Q.B.) [Defendants' Authorities, Tab 25]

*Bruno v. Canada*, [1999] F.C.J. No. 914 (T.D.) [Defendants' Authorities, Tab 26]

*Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd.*, [1983] 1 S.C.R. 452 [Defendants' Authorities, Tab 27]

*Carom et al. v. Bre-X Minerals Ltd.* (1998), 41 O.R. (3d) 780 (Gen. Div.) [Defendants' Authorities, Tab 28]

*Carom v. Bre-X Minerals Ltd.* (1998), 20 C.P.C. (4th) 163, [1998] O.J. No. 1428 (Gen. Div.) [Plaintiffs' Authorities, Tab 13]

*Carom v. Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173, [1999] O.J. No. 1662 (S.C.J.) [Plaintiffs' Authorities, Tab 11], *aff'd* (1999), 46 O.R. (3d) 315 (Div. Ct.), *rev'd on other grounds* (2000), 51 O.R. (3d) 236 (C.A.) [Plaintiffs' Authorities, Tab 12], *leave to appeal to S.C.C. ref'd*, [2000] S.C.C.A. No. 660

*Carriere v. Bell Canada*, [2006] O.J. No. 2360 (S.C.J.) [Defendants' Authorities, Tab 29]

*Cassano v. Toronto Dominion Bank* (2007), 87 O.R. (3d) 401 (C.A.), [1977] M.J. No. 4, *leave to appeal to S.C.C. refused*, [2008] S.C.C.A. No. 15 [Plaintiffs' Authorities, Tab 15]

*Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147 [Defendants' Authorities, Tab 30]

*Chadha v. Bayer* (2001), 54 O.R. (3d) 520 (Div. Ct.), aff'd (2003), 63 O.R. (3d) 22 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 106 [Defendants' Authorities, Tab 31]

*Chadha v. Bayer* (2003), 63 O.R. (3d) 22 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 106 [Defendants' Authorities, Tab 32]

*Chanoff v. United States Surgical Corp.*, 857 F. Supp. 1011 (D. Conn. 1994), *aff'd* 31 F. 3d 66 (2nd Cir.), *cert denied*, 513 U.S. 1058 [Defendants' Authorities, Tab 33]

*Churchill Pulpmill v. Manitoba*, [1977] 6 W.W.R. 109 (Man. C.A.) [Plaintiffs' Authorities, Tab 16]

*Cira v. Rico Resources Inc.* (2004), 41 B.L.R. (3d) 206 (Ont. S.C.J.), *aff'd* [2006] O.J. No. 436 (C.A.) [Defendants' Authorities, Tab 34]

*CLE Owners Inc. v. Wanlass* (2004), 44 C.P.C. (5th) 175 (Man. Q.B.), *aff'd* [2005] 8 W.W.R. 559 (Man. C.A.), *leave to appeal to S.C.C. refused*, [2005] S.C.C.A. No. 224 [Defendants' Authorities, Tab 35]

*Colborne Capital Corp. v. 542775 Alberta Ltd.* (1999), 45 B.L.R. (2d) 21 (Alta. C.A.) [Defendants' Authorities, Tab 36]

*Collette v. Great Pacific Management Co.* (2004), 42 B.L.R. (3d) 161, [2004] B.C.J. No. 381 (B.C.C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

*Collette v. Great Pacific Management Co.*, 2001 BCSC 237 (CanLII), *rehearing ordered on contract claim* 2002 BCCA 195 (CanLII), *supp. reasons* 2003 BCSC 332 (CanLII) [Defendants' Authorities, Tab 37], *rev'd on other grounds* [2004] B.C.J. No. 381 (C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 174 [Plaintiffs' Authorities, Tab 18]

*Controltech Engineering Inc. v. Ontario Hydro*, [1998] O.J. No. 5350 (Gen. Div.), *aff'd* (2000), 130 O.A.C. 367 (Div. Ct.) [Defendants' Authorities, Tab 38]

*Cooper v. Hobart*, [2001] 3 S.C.R. 537 [Defendants' Authorities, Tab 39]

*Currie v. McDonald's Restaurants of Canada Ltd.* (2005), 74 O.R. (3d) 321 (C.A.) [Defendants' Authorities, Tab 40]

*Dabbs v. SunLife Assurance Co. of Canada* (1998), 40 O.R. (3d) 429 (Gen. Div.) [Defendants' Authorities, Tab 41]

*Deep v. M.D. Management* (2007), 35 B.L.R. (4th) 86 (Ont. S.C.J.), *aff'd* [2008] O.J. No. 961 (C.A.) [Defendants' Authorities, Tab 42]

*Design Services Ltd. v. Canada* (2008), 293 D.L.R. (4th) 437 (S.C.C.) [Defendants' Authorities, Tab 43]

*Eaton v. HMS Financial Inc.* (2008), 26 B.C.L.R. (4th) 252, 2008 CarswellAlta 1400 (Q.B.) [Plaintiffs' Authorities, Tab 22]

*Fehringer v. Sun Media Corp.* (2002), 27 C.P.C. (5th) 155 (S.C.J.), *aff'd* (2003), 39 C.P.C. (5th) 151 (Div. Ct.) [Defendants' Authorities, Tab 44]

*Fletcher v. Manitoba Public Insurance Co.*, [1990] 3 S.C.R. 191 [Defendants' Authorities, Tab 45]

*Gazit (1997) Inc. v. Centrefund Realty Corp.* (2000), 8 B.L.R. (3d) 81 (Ont. S.C.J.) [Defendants' Authorities, Tab 46]

*Global Securities Corp. v. British Columbia (Securities Commission)*, [2000] 1 S.C.R. 494 [Defendants' Authorities, Tab 47]

*Haskett v. Equifax Canada Inc* (2003), 63 O.R. (3d) 577, [2003] O.J. No. 771 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 208 [Plaintiffs' Authorities, Tab 26]

*Henderson v. Merrett Syndicates Ltd.*, [1995] 2 A.C. 145 [Defendants' Authorities, Tab 48]

*Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, [1997] S.C.J. No. 51 [Plaintiffs' Authorities, Tab 28]

*Hickey-Button v. Loyalist College of Applied Arts & Technology* (2006), 211 O.A.C. 301, [2006] O.J. No. 2393 (C.A.) [Plaintiffs' Authorities, Tab 29]

*Hill v. Hamilton-Wentworth Regional Police Services Board* (2007), 285 D.L.R. (4th) 620 (S.C.C.) [Defendants' Authorities, Tab 49]

*Holland v. Saskatchewan* (2008), 294 D.L.R. (4th) 193 (S.C.C.) [Defendants' Authorities, Tab 50]

*Hollick v. City of Toronto*, [2001] 3 S.C.R. 158, [2001] S.C.J. No. 67 [Plaintiffs' Authorities, Tab 30]

*Huras v. Com Dev. Ltd.* (1999), 36 C.P.C. (4th) 31 (Ont. S.C.J.), *aff'd* (2001), 8 C.P.C. (5th) 277 (Ont. Div. Ct.) [Defendants' Authorities, Tab 51]

*In re Coleco Securities Litigation*, 591 F. Supp. 1488 (S.D.N.Y. 1984) [Defendants' Authorities, Tab 52]

*In re Consumers Power Company Securities Litigation*, 105 F.R.D. 583 (E.D. Mich. 1985) [Defendants' Authorities, Tab 53]

*In re Cryomedical Services, Inc. Securities Litigation*, 884 F. Supp. 1001 (S.D.M.D. 1995) [Defendants' Authorities, Tab 54]

*In re Delmarva Securities Litigation*, 794 F. Supp. 1293 (D. Del. 1992) [Defendants' Authorities, Tab 55]

*In re Jackpot Enterprises Securities Litigation*, 1991 U.S. Dist. LEXIS 16353 (D. Nev. 1991) [Defendants' Authorities, Tab 56]

*In re Par Pharmaceutical Inc. Securities Litigation*, 733 F. Supp. 668 (S.D.N.Y. 1990) [Defendants' Authorities, Tab 57]

*In re Storage Technology Corporation Securities Litigation*, 630 F. Supp. 1072 (D. Colo. 1986) [Defendants' Authorities, Tab 58]

*In re Worlds of Wonder Securities Litigation*, 694 F. Supp. 1427 (N.D. Cal. 1988) [Defendants' Authorities, Tab 59]

*In re Wyse Technology Securities Litigation*, 744 F. Supp. 207 (N.D. Cal. 1990) [Defendants' Authorities, Tab 60]

*In re Zenith Laboratories Securities Litigation*, 1993 U.S. Dist. LEXIS 18478 (D.N.J. 1993) [Defendants' Authorities, Tab 61]

*Kaplan v. Gelfond*, 2007 U.S. Dist. LEXIS 4446 (S.D.N.Y.) [Defendants' Authorities, Tab 62]

*Kaufman v. I-Stat Corp.*, 165 N.J. 94 (S.C., 2000) [Defendants' Authorities, Tab 63]

*Kelly v. J.J. Lacey Insurance Ltd.* (1997), 15 C.P.C. (4th) 114 (Nfld. S.C.(T.D.)) [Defendants' Authorities, Tab 64]

*Kerr v. Danier Leather Inc.*(2007), 286 D.L.R. (4th) 601 (S.C.C.) [Defendants' Authorities, Tab 65]

*Klein v. American Medical Systems Inc.* (2006), 84 O.R. (3d) 217 (Div. Ct.) [Defendants' Authorities, Tab 66]

*Krynen v. Bugg* (2003), 64 O.R. (3d) 393 (S.C.J.) [Defendants' Authorities, Tab 67]

*Kumar v. Mutual Life Assurance Company of Canada* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 sub nom. *Zicherman v. Equitable Life Insurance Co. of Canada* [Defendants' Authorities, Tab 68]

*Kvaerner U.S. Inc. v. Amec E&C Services Ltd.*, 2004 BCSC 635 (CanLII) [Defendants' Authorities, Tab 69]

*Lau v. Bayview Landmark Inc.* (1999), 40 C.P.C. (4th) 301, [1999] O.J. No. 4060 (S.C.J.), *leave to appeal to Div. Ct. refused*, [2000] O.J. Nos. 1946/1947/1948/1949 (Div. Ct.) [Plaintiffs' Authorities, Tab 36]

*Lawrence v. Atlas Cold Storage Holdings* (2006), 34 C.P.C. (6th) 41 (Ont. S.C.J.), *supp. reasons* [2007] O.J. No. 351 (S.C.J.) [Defendants' Authorities, Tab 70]

*Legal & General Assurance Ltd v. Kirk*, [2001] EWCA Civ 1803 [Defendants' Authorities, Tab 71]

*Levy v. Eletr*, 724 F. Supp. 1269 (N.D. Cal. 1989) [Defendants' Authorities, Tab 72]

*Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222, 2005 CarswellOnt 3072 (C.A.) [Plaintiffs' Authorities, Tab 37]

*Lucien Groulx & Son Planing & Saw Mill Ltd. v. Nipissing Forest Resource Management Inc.*, 2007 ONCA 801 (CanLII) [Defendants' Authorities, Tab 73]

*Mandeville v. Manufacturers Life Insurance Co.* (2002), 40 C.P.C. (5th) 182, [2002] O.J. No. 5386 (S.C.J.) [Plaintiffs' Authorities, Tab 40]

*Mandeville v. Manufacturers Life Insurance Co.*, [2002] O.J. No. 5387 (S.C.J.) [Plaintiffs' Authorities, Tab 39]

*Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 (C.A.), *leave to appeal to S.C.C. refused*, [2007] S.C.C.A. No. 346 [Plaintiffs' Authorities, Tab 41]

*Martel Building Ltd. v. Canada*, [2000] 2 S.C.R. 860 [Defendants' Authorities, Tab 74]

*McCallum v. Ryan Estate*, [2002] O.J. No. 1088 (S.C.J.) [Defendants' Authorities, Tab 75]

*McKay v. CDI Career Development Institutes Ltd.* (1999), 30 C.P.C. (4th) 101 (B.C.S.C.) [Defendants' Authorities, Tab 76]

*Menegon v. Philip Services Corp.* (2001), 23 B.L.R. (3d) 151 (Ont. S.C.J.), *aff'd* (2003), 31 B.L.R. (3d) 29 (C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 95 [Defendants' Authorities, Tab 77]

*Millgate Financial Corp. v. B.F. Realty Holdings Ltd*. (1998), 28 C.P.C. (4th) 72 (Ont. Gen. Div.) [Defendants' Authorities, Tab 78]

*Mondor et al. v. Fisherman et al.* (2001), 18 B.L.R. (3d) 260, [2001] O.J. No. 4620 (S.C.J.) [Plaintiffs' Authorities, Tab 43]

*Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 [Defendants' Authorities, Tab 79]

*Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63 (Gen. Div.) [Defendants' Authorities, Tab 80]

*Moyes v. Fortune Financial Corp.* (2002), 61 O.R. (3d) 770 (S.C.J.), *aff'd* (2003), 67 O.R. (3d) 795 (Div. Ct.), *leave to appeal to C.A. refused*, (2004), 44 C.P.C. (5th) 85 (C.A.) [Defendants' Authorities, Tab 81]

*Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 (C.A.) [Defendants' Authorities, Tab 82]

*Naneff v. Con-Crete Holdings Ltd.* (1995), 23 B.L.R. (2d) 286 (Ont. C.A.) [Defendants' Authorities, Tab 83]

*National Trust Co. v. Ebro Irrigation and Power*, [1954] O.R. 463 (H.C.) [Plaintiffs' Authorities, Tab 46]

*NPV Management Ltd. v. Anthony* (2003), 231 D.L.R. (4th) 681 (Nfld. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 436 [Defendants' Authorities, Tab 84]

*Odhavji Estate v. Woodhouse*, [2003] 3 S.C.R. 263 [Defendants' Authorities, Tab 85]

*Ontario New Home Warranty Program v. General Electric Co.* (1998), 36 O.R. (3d) 787 (Gen. Div.) [Defendants' Authorities, Tab 86]

*Paxton v. Ramji*, [2008] O.J. No. 3964 (C.A.) [Defendants' Authorities, Tab 87]

*Pearson v. Inco* (2002), 33 C.P.C. (5th) 264 (Ont. S.C.J.), *aff'd* (2004), 183 O.A.C. 168 (Div. Ct.) [Defendants' Authorities, Tab 88], *rev'd on other grounds* (2005), 78 O.R. (3d) 641 (C.A.), *leave to appeal to S.C.C. refused*, [2006] S.C.C.A. No. 1 [Plaintiffs' Authorities, Tab 50]

*Pitten v. Jacobs*, 903 F. Supp. 937 (D.S.C. 1995) [Defendants' Authorities, Tab 89]

*Pro-Sys Consultants Ltd. v. Infineon Technologies AG*, [2008] B.C.J. No. 831 (S.C.) [Defendants' Authorities, Tab 90]

*Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87, [1993] S.C.J. No. 3 [Plaintiffs' Authorities, Tab 51]

*R.(L) v. British Columbia* (1999), 48 C.C.L.T. (2d) 1 (B.C. C.A) [Defendants' Authorities, Tab 91], *aff'd on other grounds* (2001), 205 D.L.R. (4th) 39 (S.C.C.) sub nom. *Rumley v. British Columbia* [Plaintiffs' Authorities, Tab 57]

*Red Carpet Inns Ltd. v. Ontario* (2004), 24 R.P.R. (4th) 62 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2004] S.C.C.A. No. 417 [Defendants' Authorities, Tab 92]

*Robertson v. Thomson Corp.* (1999), 43 O.R. (3d) 161 (Gen. Div.) [Plaintiffs' Authorities, Tab 56]

*Ruggeberg v. Bancomer, S.A.*, [1998] O.J. No. 538 (Gen. Div.), *aff'd* (1999), 122 O.A.C. 310 (C.A.), *leave to appeal to S.C.C. refused*, [1999] S.C.C.A. No. 289 [Defendants' Authorities, Tab 93]

*Salvatore v. Kumar*, 45 A.D.3d 560 (N.Y.A.D. 2007) [Defendants' Authorities, Tab 94]

*Samos Investments Inc. v. Pattison* (2001), 22 B.L.R. (3d) 46 (B.C.S.C.), *aff'd* (2003), 30 B.L.R. (3d) 177 (B.C.C.A.) [Defendants' Authorities, Tab 95]

*Samos Investments Inc. v. Pattison* (2003), 30 B.L.R. (3d) 177 (B.C.S.C.) [Defendants' Authorities, Tab 96]

*Serhan Estate v. Johnson & Johnson* (2004), 72 O.R. (3d) 296 (S.C.J.) [Defendants' Authorities, Tab 97], *aff'd on other grounds* (2006), 85 O.R. (3d) 665 (Div. Ct.), *leave to appeal to C.A. refused* (Oct. 16, 2006, Ont. C.A.), *leave to appeal S.C.C. refused* [2006] S.C.C.A. No. 494 [Plaintiffs' Authorities, Tab 60]

*Shane* v. *JCB Belgium N.V.*, [2003] O.J. No. 4497 (S.C.J.) [Defendants' Authorities, Tab 98]

*Shaw v. BCE Inc.*, [2003] O.J. No. 2695 (S.C.J.) [Defendants' Authorities, Tab 99]

*Silber v. DDJ Canadian High Yield Fund* (2006), 20 B.L.R. (4th) 134 (S.C.J.), *aff'd* (2007) 27 B.L.R. (4th) 171 (Ont. C.A.) [Defendants' Authorities, Tab 100]

*Somers* v. *Fournier* (2002), 60 O.R. (3d) 225 (C.A.) [Defendants' Authorities, Tab 101]

*Spring v. Guardian Assurance plc.* (1994), [1995] A.C. 2196 (H.L.) [Plaintiffs' Authorities, Tab 62]

*Steele v. Toyota Canada Inc.* (2008), 295 D.L.R. (4th) 653 (B.C.S.C.) [Defendants' Authorities, Tab 102]

*Sutherland v. Canadian Red Cross Society* (1994), 17 O.R. (3d) 645 (Gen. Div.) [Defendants' Authorities, Tab 103]

*Syl Apps Secure Treatment Centre v. B.D.* (2007), 284 D.L.R. (4th) 682 (S.C.C.) [Defendants' Authorities, Tab 104]

*Taub v. Manufacturers Life Insurance Co.* (1998), 40 O.R. (3d) 379 (Gen. Div.), *aff'd* (1999), 42 O.R. (3d) 576 (Div. Ct.) [Defendants' Authorities, Tab 105]

*Themadel Foundation v. Third Canadian General Investment Trust Ltd.* (1998), 38 O.R. (3d) 749 (C.A.) [Defendants' Authorities, Tab 106]

*Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 [Defendants' Authorities, Tab 107]

*Trizec Properties Inc. v. Citigroup Global Markets Inc.* (2004), 72 O.R. (3d) 265, [2004] O.J. No. 2906 (S.C.J.) [Plaintiffs' Authorities, Tab 65]

*Ultramares Corp. v. Touche*, 174 N.E. 441 (1931) [Defendants' Authorities, Tab 108]

*Vezina v. Loblaw Companies Ltd.* (2005), 17 C.P.C. (6th) 307, [2005] O.J. No. 1974 (S.C.J.) [Plaintiffs' Authorities, Tab 66]

*Vitapharm Canada Ltd. v. F. Hoffman-La Roche Ltd.* (2002), 20 C.P.C. (5th) 351 (Ont. S.C.J.) [Defendants' Authorities, Tab 109]

*Wallace v. Systems & Computer Technology Corp.*, 1997 U.S. Dist. LEXIS 14677 (E.D. Pa. 1997) [Defendants' Authorities, Tab 110]

*Weinberger v. Schroeder*, 1986 U.S. Dist. LEXIS 18428 (N.D. Cal. 1986) [Defendants' Authorities, Tab 111]

*Western Canadian Shopping Centres Inc. v. Dutton* (2000), [2001] 2 S.C.R. 534, [2000] S.C.J. No. 63 [Plaintiffs' Authorities, Tab 69]

*Westfair Foods Ltd. v. Watt* (1991), 79 D.L.R. (4th) 48 (Alta. C.A.) [Defendants' Authorities, Tab 112]

*Williams v. Mutual Life Assurance Company of Canada* (2000), 51 O.R. (3d) 54 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 (Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 113], *aff'd* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

*Wilson v. Servier* (2000), 50 O.R. (3d) 219 (S.C.J.), leave to appeal refused (2000), 143 O.A.C. 279 (Div. Ct.), leave to appeal refused, [2001] S.C.C.A. No. 88 [Defendants' Authorities, Tab 114]

*Yeung (Guardian ad litem of) v. Au* (2006), 269 D.L.R. (4th) 727 (B.C.C.A.) *aff'd on other grounds* [2007] 3 S.C.R. 371 [Defendants' Authorities, Tab 115]

*Yordanes et al. v. The Bank of Nova Scotia et al.* (2006), 78 O.R. (3d) 590 (S.C.J.) [Defendants' Authorities, Tab 116]

*Yorkshire Trust Co. v. Empire Acceptance Corp* (1986), 24 D.L.R. (4th) 140, [1986] B.C.J. No. 3254 (S.C.) [Plaintiffs' Authorities, Tab 73]

*Zicherman v. Equitable Life Insurance Co. of Canada*, 47 C.C.L.I. (3d) 39 (S.C.J.), *aff'd* (2001), 17 C.P.C. (5th) 103 (Ont. Div. Ct.) sub nom. *Kumar v. Mutual Life Assurance Company of Canada* [Defendants' Authorities, Tab 117], *aff'd* (2003), 226 D.L.R. (4th) 112 (Ont. C.A.), *leave to appeal to S.C.C. refused*, [2003] S.C.C.A. No. 280 [Defendants' Authorities, Tab 68]

SCHEDULE B
**Securities Act**

R.S.O. 1990, CHAPTER S.5

**Consolidation Period:** From November 27, 2008 to the e-Laws currency date.

Last amendment: 2008, c. 19, Sched. R.

## PART XXIII.1
## CIVIL LIABILITY FOR SECONDARY MARKET DISCLOSURE

INTERPRETATION AND APPLICATION

**Definitions**

**138.1** In this Part,

"compensation" means compensation received during the 12-month period immediately preceding the day on which the misrepresentation was made or on which the failure to make timely disclosure first occurred, together with the fair market value of all deferred compensation including, without limitation, options, pension benefits and stock appreciation rights, granted during the same period, valued as of the date that such compensation is awarded; ("rémunération")

"core document" means,

(a) a prospectus, a take-over bid circular, an issuer bid circular, a directors' circular, a notice of change or variation in respect of a take-over bid circular, issuer bid circular or directors' circular, a rights offering circular, management's discussion and analysis, an annual information form, an information circular, annual financial statements and interim financial statements of the responsible issuer, where used in relation to,

(i) a director of a responsible issuer who is not also an officer of the responsible issuer,

(ii) an influential person, other than an officer of the responsible issuer or an investment fund manager where the responsible issuer is an investment fund, or

(iii) a director or officer of an influential person who is not also an officer of the responsible issuer, other than an officer of an investment fund manager,

(b) a prospectus, a take-over bid circular, an issuer bid circular, a directors' circular, a notice of change or variation in respect of a take-over bid circular, issuer bid circular or directors' circular, a rights offering circular, management's discussion and analysis, an annual information form, an information circular, annual financial statements, interim financial statements and a material change report required by subsection 75 (2) or the regulations of the responsible issuer, where used in relation to,

(i) a responsible issuer or an officer of the responsible issuer,

(ii) an investment fund manager, where the responsible issuer is an investment fund, or

(iii) an officer of an investment fund manager, where the responsible issuer is an investment fund, or

(c) such other documents as may be prescribed by regulation for the purposes of this definition; ("document essentiel")

"document" means any written communication, including a communication prepared and transmitted only in electronic form,

(a) that is required to be filed with the Commission, or

(b) that is not required to be filed with the Commission and,

(i) that is filed with the Commission,

(ii) that is filed or required to be filed with a government or an agency of a government under applicable securities or corporate law or with any stock exchange or quotation and trade reporting system under its by-laws, rules or regulations, or

(iii) that is any other communication the content of which would reasonably be expected to affect the market price or value of a security of the responsible issuer; ("document")

"expert" means a person or company whose profession gives authority to a statement made in a professional capacity by the person or company including, without limitation, an accountant, actuary, appraiser, auditor, engineer, financial analyst, geologist or lawyer, but not including an entity that is an approved rating organization for the purposes of National Instrument 44-101 of the Canadian Securities Administrators; ("expert")

"failure to make timely disclosure" means a failure to disclose a material change in the manner and at the time required under this Act or the regulations; ("non-respect des obligations d'information occasionnelle")

"influential person" means, in respect of a responsible issuer,

(a) a control person,

(b) a promoter,

(c) an insider who is not a director or officer of the responsible issuer, or

(d) an investment fund manager, if the responsible issuer is an investment fund; ("personne influente")

"issuer's security" means a security of a responsible issuer and includes a security,

(a) the market price or value of which, or payment obligations under which, are derived from or based on a security of the responsible issuer, and

(b) which is created by a person or company on behalf of the responsible issuer or is guaranteed by the responsible issuer; ("valeur mobilière d'un émetteur")

"liability limit" means,

(a) in the case of a responsible issuer, the greater of,

(i) 5 per cent of its market capitalization (as such term is defined in the regulations), and

(ii) $1 million,

(b) in the case of a director or officer of a responsible issuer, the greater of,

(i) $25,000, and

(ii) 50 per cent of the aggregate of the director's or officer's compensation from the responsible issuer and its affiliates,

(c) in the case of an influential person who is not an individual, the greater of,

(i) 5 per cent of its market capitalization (as defined in the regulations), and

(ii) $1 million,

(d) in the case of an influential person who is an individual, the greater of,

(i) $25,000, and

(ii) 50 per cent of the aggregate of the influential person's compensation from the responsible issuer and its affiliates,

(e) in the case of a director or officer of an influential person, the greater of,

(i) $25,000, and

(ii) 50 per cent of the aggregate of the director's or officer's compensation from the influential person and its affiliates,

(f) in the case of an expert, the greater of,

(i) $1 million, and

(ii) the revenue that the expert and the affiliates of the expert have earned from the responsible issuer and its affiliates during the 12 months preceding the misrepresentation, and

(g) in the case of each person who made a public oral statement, other than an individual referred to in clause (d), (e) or (f), the greater of,

(i) $25,000, and

(ii) 50 per cent of the aggregate of the person's compensation from the responsible issuer and its affiliates; ("limite de responsabilité")

"management's discussion and analysis" means the section of an annual information form, annual report or other document that contains management's discussion and analysis of the financial condition and results of operations of a responsible issuer as required under Ontario securities law; ("rapport de gestion")

"public oral statement" means an oral statement made in circumstances in which a reasonable person would believe that information contained in the statement will become generally disclosed; ("déclaration orale publique")

"release" means, with respect to information or a document, to file with the Commission or any other securities regulatory authority in Canada or a stock exchange or to otherwise make available to the public; ("publication", "publier")

"responsible issuer" means,

(a) a reporting issuer, or

(b) any other issuer with a real and substantial connection to Ontario, any securities of which are publicly traded; ("émetteur responsable")

"trading day" means a day during which the principal market (as defined in the regulations) for the security is open for trading. ("jour de Bourse") 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 10; 2006, c. 33, Sched. Z.5, s. 14; 2007, c. 7, Sched. 38, s. 11.

**Application**

**138.2** This Part does not apply to,

(a) the purchase of a security offered by a prospectus during the period of distribution;

(b) the acquisition of an issuer's security pursuant to a distribution that is exempt from section 53 or 62, except as may be prescribed by regulation;

(c) the acquisition or disposition of an issuer's security in connection with or pursuant to a take-over bid or issuer bid, except as may be prescribed by regulation; or

(d) such other transactions or class of transactions as may be prescribed by regulation. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 11.

LIABILITY

**Liability for secondary market disclosure**

**Documents released by responsible issuer**

**138.3** (1) Where a responsible issuer or a person or company with actual, implied or apparent authority to act on behalf of a responsible issuer releases a document that contains a misrepresentation, a person or company who acquires or disposes of the issuer's security during the period between the time when the document was released and the time when the misrepresentation contained in the document was publicly corrected has, without regard to whether the person or company relied on the misrepresentation, a right of action for damages against,

(a) the responsible issuer;

(b) each director of the responsible issuer at the time the document was released;

(c) each officer of the responsible issuer who authorized, permitted or acquiesced in the release of the document;

(d) each influential person, and each director and officer of an influential person, who knowingly influenced,

(i) the responsible issuer or any person or company acting on behalf of the responsible issuer to release the document, or

(ii) a director or officer of the responsible issuer to authorize, permit or acquiesce in the release of the document; and

(e) each expert where,

(i) the misrepresentation is also contained in a report, statement or opinion made by the expert,

(ii) the document includes, summarizes or quotes from the report, statement or opinion of the expert, and

(iii) if the document was released by a person or company other than the expert, the expert consented in writing to the use of the report, statement or opinion in the document. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 12 (1, 2).

**Public oral statements by responsible issuer**

(2) Where a person with actual, implied or apparent authority to speak on behalf of a responsible issuer makes a public oral statement that relates to the business or affairs of the responsible issuer and that contains a misrepresentation, a person or company who acquires or disposes of the issuer's security during the period between the time when the public oral statement was made and the time when the misrepresentation contained in the public oral statement was publicly corrected has, without regard to whether the person or company relied on the misrepresentation, a right of action for damages against,

(a) the responsible issuer;

(b) the person who made the public oral statement;

(c) each director and officer of the responsible issuer who authorized, permitted or acquiesced in the making of the public oral statement;

(d) each influential person, and each director and officer of the influential person, who knowingly influenced,

(i) the person who made the public oral statement to make the public oral statement, or

(ii) a director or officer of the responsible issuer to authorize, permit or acquiesce in the making of the public oral statement; and

(e) each expert where,

(i) the misrepresentation is also contained in a report, statement or opinion made by the expert,

(ii) the person making the public oral statement includes, summarizes or quotes from the report, statement or opinion of the expert, and

(iii) if the public oral statement was made by a person other than the expert, the expert consented in writing to the use of the report, statement or opinion in the public oral statement. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 12 (3).

**Influential persons**

(3) Where an influential person or a person or company with actual, implied or apparent authority to act or speak on behalf of the influential person releases a document or makes a public oral statement that relates to a responsible issuer and that contains a misrepresentation, a person or company who acquires or disposes of the issuer's security during the period between the time when the document was released or the public oral statement was made and the time when the misrepresentation contained in the document or public oral statement was publicly corrected has, without regard to whether the person or company relied on the misrepresentation, a right of action for damages against,

(a) the responsible issuer, if a director or officer of the responsible issuer, or where the responsible issuer is an investment fund, the investment fund manager, authorized,

permitted or acquiesced in the release of the document or the making of the public oral statement;

(b) the person who made the public oral statement;

(c) each director and officer of the responsible issuer who authorized, permitted or acquiesced in the release of the document or the making of the public oral statement;

(d) the influential person;

(e) each director and officer of the influential person who authorized, permitted or acquiesced in the release of the document or the making of the public oral statement; and

(f) each expert where,

(i) the misrepresentation is also contained in a report, statement or opinion made by the expert,

(ii) the document or public oral statement includes, summarizes or quotes from the report, statement or opinion of the expert, and

(iii) if the document was released or the public oral statement was made by a person other than the expert, the expert consented in writing to the use of the report, statement or opinion in the document or public oral statement. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 12 (4).

**Failure to make timely disclosure**

(4) Where a responsible issuer fails to make a timely disclosure, a person or company who acquires or disposes of the issuer's security between the time when the material change was required to be disclosed in the manner required under this Act or the regulations and the subsequent disclosure of the material change has, without regard to whether the person or company relied on the responsible issuer having complied with its disclosure requirements, a right of action for damages against,

(a) the responsible issuer;

(b) each director and officer of the responsible issuer who authorized, permitted or acquiesced in the failure to make timely disclosure; and

(c) each influential person, and each director and officer of an influential person, who knowingly influenced,

(i) the responsible issuer or any person or company acting on behalf of the responsible issuer in the failure to make timely disclosure, or

(ii) a director or officer of the responsible issuer to authorize, permit or acquiesce in the failure to make timely disclosure. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 12 (5); 2006, c. 33, Sched. Z.5, s. 15.

**Multiple roles**

(5) In an action under this section, a person who is a director or officer of an influential person is not liable in that capacity if the person is liable as a director or officer of the responsible issuer. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 12 (6).

**Multiple misrepresentations**

(6) In an action under this section,

(a) multiple misrepresentations having common subject matter or content may, in the discretion of the court, be treated as a single misrepresentation; and

(b) multiple instances of failure to make timely disclosure of a material change or material changes concerning common subject matter may, in the discretion of the court, be treated as a single failure to make timely disclosure. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 12 (7).

**No implied or actual authority**

(7) In an action under subsection (2) or (3), if the person who made the public oral statement had apparent authority, but not implied or actual authority, to speak on behalf of the issuer, no other person is liable with respect to any of the responsible issuer's securities that were acquired

or disposed of before that other person became, or should reasonably have become, aware of the misrepresentation. 2004, c. 31, Sched. 34, s. 12 (8).

**Burden of proof and defences**

**Non-core documents and public oral statements**

**138.4** (1) In an action under section 138.3 in relation to a misrepresentation in a document that is not a core document, or a misrepresentation in a public oral statement, a person or company is not liable, subject to subsection (2), unless the plaintiff proves that the person or company,

(a) knew, at the time that the document was released or public oral statement was made, that the document or public oral statement contained the misrepresentation;

(b) at or before the time that the document was released or public oral statement was made, deliberately avoided acquiring knowledge that the document or public oral statement contained the misrepresentation; or

(c) was, through action or failure to act, guilty of gross misconduct in connection with the release of the document or the making of the public oral statement that contained the misrepresentation. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (1).

**Same**

(2) A plaintiff is not required to prove any of the matters set out in subsection (1) in an action under section 138.3 in relation to an expert. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (2).

**Failure to make timely disclosure**

(3) In an action under section 138.3 in relation to a failure to make timely disclosure, a person or company is not liable, subject to subsection (4), unless the plaintiff proves that the person or company,

(a) knew, at the time that the failure to make timely disclosure first occurred, of the change and that the change was a material change;

(b) at the time or before the failure to make timely disclosure first occurred, deliberately avoided acquiring knowledge of the change or that the change was a material change; or

(c) was, through action or failure to act, guilty of gross misconduct in connection with the failure to make timely disclosure. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (3).

**Same**

(4) A plaintiff is not required to prove any of the matters set out in subsection (3) in an action under section 138.3 in relation to,

(a) a responsible issuer;

(b) an officer of a responsible issuer;

(c) an investment fund manager; or

(d) an officer of an investment fund manager. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (4).

**Knowledge of the misrepresentation or material change**

(5) A person or company is not liable in an action under section 138.3 in relation to a misrepresentation or a failure to make timely disclosure if that person or company proves that the plaintiff acquired or disposed of the issuer's security,

(a) with knowledge that the document or public oral statement contained a misrepresentation; or

(b) with knowledge of the material change. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (5).

**Reasonable investigation**

(6) A person or company is not liable in an action under section 138.3 in relation to,

(a) a misrepresentation if that person or company proves that,

(i) before the release of the document or the making of the public oral statement containing the misrepresentation, the person or company conducted or caused to be conducted a reasonable investigation, and

(ii) at the time of the release of the document or the making of the public oral statement, the person or company had no reasonable grounds to believe that the document or public oral statement contained the misrepresentation; or

(b) a failure to make timely disclosure if that person or company proves that,

(i) before the failure to make timely disclosure first occurred, the person or company conducted or caused to be conducted a reasonable investigation, and

(ii) the person or company had no reasonable grounds to believe that the failure to make timely disclosure would occur. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (6).

**Factors to be considered by court**

(7) In determining whether an investigation was reasonable under subsection (6), or whether any person or company is guilty of gross misconduct under subsection (1) or (3), the court shall consider all relevant circumstances, including,

(a) the nature of the responsible issuer;

(b) the knowledge, experience and function of the person or company;

(c) the office held, if the person was an officer;

(d) the presence or absence of another relationship with the responsible issuer, if the person was a director;

(e) the existence, if any, and the nature of any system designed to ensure that the responsible issuer meets its continuous disclosure obligations;

(f) the reasonableness of reliance by the person or company on the responsible issuer's disclosure compliance system and on the responsible issuer's officers, employees and others whose duties would in the ordinary course have given them knowledge of the relevant facts;

(g) the period within which disclosure was required to be made under the applicable law;

(h) in respect of a report, statement or opinion of an expert, any professional standards applicable to the expert;

(i) the extent to which the person or company knew, or should reasonably have known, the content and medium of dissemination of the document or public oral statement;

(j) in the case of a misrepresentation, the role and responsibility of the person or company in the preparation and release of the document or the making of the public oral statement containing the misrepresentation or the ascertaining of the facts contained in that document or public oral statement; and

(k) in the case of a failure to make timely disclosure, the role and responsibility of the person or company involved in a decision not to disclose the material change. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (7, 8).

**Confidential disclosure**

(8) A person or company is not liable in an action under section 138.3 in respect of a failure to make timely disclosure if,

(a) the person or company proves that the material change was disclosed by the responsible issuer in a report filed on a confidential basis with the Commission under subsection 75 (3) or the regulations;

(b) the responsible issuer had a reasonable basis for making the disclosure on a confidential basis;

(c) where the information contained in the report filed on a confidential basis remains material, disclosure of the material change was made public promptly when the basis for confidentiality ceased to exist;

(d) the person or company or responsible issuer did not release a document or make a public oral statement that, due to the undisclosed material change, contained a misrepresentation; and

(e) where the material change became publicly known in a manner other than the manner required under this Act or the regulations, the responsible issuer promptly disclosed the material change in the manner required under this Act or the regulations. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (9); 2006, c. 33, Sched. Z.5, s. 16 (1, 2).

**Forward-looking information**

(9) A person or company is not liable in an action under section 138.3 for a misrepresentation in forward-looking information if the person or company proves all of the following things:

1. The document or public oral statement containing the forward-looking information contained, proximate to that information,

   i. reasonable cautionary language identifying the forward-looking information as such, and identifying material factors that could cause actual results to differ materially from a conclusion, forecast or projection in the forward-looking information, and

   ii. a statement of the material factors or assumptions that were applied in drawing a conclusion or making a forecast or projection set out in the forward-looking information.

2. The person or company had a reasonable basis for drawing the conclusions or making the forecasts and projections set out in the forward-looking information. 2004, c. 31, Sched. 34, s. 13 (10).

**Same**

(9.1) The person or company shall be deemed to have satisfied the requirements of paragraph 1 of subsection (9) with respect to a public oral statement containing forward-looking information if the person who made the public oral statement,

(a) made a cautionary statement that the oral statement contains forward-looking information;

(b) stated that,

   (i) the actual results could differ materially from a conclusion, forecast or projection in the forward-looking information, and

   (ii) certain material factors or assumptions were applied in drawing a conclusion or making a forecast or projection as reflected in the forward-looking information; and

(c) stated that additional information about,

   (i) the material factors that could cause actual results to differ materially from the conclusion, forecast or projection in the forward-looking information, and

   (ii) the material factors or assumptions that were applied in drawing a conclusion or making a forecast or projection as reflected in the forward-looking information,

is contained in a readily-available document or in a portion of such a document and has identified that document or that portion of the document. 2004, c. 31, Sched. 34, s. 13 (10).

**Same**

(9.2) For the purposes of clause (9.1) (c), a document filed with the Commission or otherwise generally disclosed shall be deemed to be readily available. 2004, c. 31, Sched. 34, s. 13 (10).

**Exception**

(10) Subsection (9) does not relieve a person or company of liability respecting forward-looking information in a financial statement required to be filed under this Act or the regulations or forward-looking information in a document released in connection with an initial public offering. 2004, c. 31, Sched. 34, s. 13 (10); 2006, c. 33, Sched. Z.5, s. 16 (3).

**Expert report, statement or opinion**

(11) A person or company, other than an expert, is not liable in an action under section 138.3 with respect to any part of a document or public oral statement that includes, summarizes or quotes from a report, statement or opinion made by the expert in respect of which the responsible

issuer obtained the written consent of the expert to the use of the report, statement or opinion, if the consent had not been withdrawn in writing before the document was released or the public oral statement was made, if the person or company proves that,

(a) the person or company did not know and had no reasonable grounds to believe that there had been a misrepresentation in the part of the document or public oral statement made on the authority of the expert; and

(b) the part of the document or oral public statement fairly represented the report, statement or opinion made by the expert. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (11).

**Same**

(12) An expert is not liable in an action under section 138.3 with respect to any part of a document or public oral statement that includes, summarizes or quotes from a report, statement or opinion made by the expert, if the expert proves that the written consent previously provided was withdrawn in writing before the document was released or the public oral statement was made. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (12).

**Release of documents**

(13) A person or company is not liable in an action under section 138.3 in respect of a misrepresentation in a document, other than a document required to be filed with the Commission, if the person or company proves that, at the time of release of the document, the person or company did not know and had no reasonable grounds to believe that the document would be released. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (13).

**Derivative information**

(14) A person or company is not liable in an action under section 138.3 for a misrepresentation in a document or a public oral statement, if the person or company proves that,

(a) the misrepresentation was also contained in a document filed by or on behalf of another person or company, other than the responsible issuer, with the Commission or any other securities regulatory authority in Canada or a stock exchange and was not corrected in another document filed by or on behalf of that other person or company with the Commission or that other securities regulatory authority in Canada or stock exchange before the release of the document or the public oral statement made by or on behalf of the responsible issuer;

(b) the document or public oral statement contained a reference identifying the document that was the source of the misrepresentation; and

(c) when the document was released or the public oral statement was made, the person or company did not know and had no reasonable grounds to believe that the document or public oral statement contained a misrepresentation. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (14).

**Where corrective action taken**

(15) A person or company, other than the responsible issuer, is not liable in an action under section 138.3 if the misrepresentation or failure to make timely disclosure was made without the knowledge or consent of the person or company and, if, after the person or company became aware of the misrepresentation before it was corrected, or the failure to make timely disclosure before it was disclosed in the manner required under this Act or the regulations,

(a) the person or company promptly notified the board of directors of the responsible issuer or other persons acting in a similar capacity of the misrepresentation or the failure to make timely disclosure; and

(b) if no correction of the misrepresentation or no subsequent disclosure of the material change in the manner required under this Act or the regulations was made by the responsible issuer within two business days after the notification under clause (a), the person or company, unless prohibited by law or by professional confidentiality rules, promptly and in writing notified the Commission of the misrepresentation or failure to make timely disclosure. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 13 (15); 2006, c. 33, Sched. Z.5, s. 16 (4).

DAMAGES

**Assessment of damages**

**138.5** (1) Damages shall be assessed in favour of a person or company that acquired an issuer's securities after the release of a document or the making of a public oral statement containing a misrepresentation or after a failure to make timely disclosure as follows:

1. In respect of any of the securities of the responsible issuer that the person or company subsequently disposed of on or before the 10th trading day after the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the difference between the average price paid for those securities (including any commissions paid in respect thereof) and the price received upon the disposition of those securities (without deducting any commissions paid in respect of the disposition), calculated taking into account the result of hedging or other risk limitation transactions.
2. In respect of any of the securities of the responsible issuer that the person or company subsequently disposed of after the 10th trading day after the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the lesser of,
    i. an amount equal to the difference between the average price paid for those securities (including any commissions paid in respect thereof) and the price received upon the disposition of those securities (without deducting any commissions paid in respect of the disposition), calculated taking into account the result of hedging or other risk limitation transactions, and
    ii. an amount equal to the number of securities that the person disposed of, multiplied by the difference between the average price per security paid for those securities (including any commissions paid in respect thereof determined on a per security basis) and,
        A. if the issuer's securities trade on a published market, the trading price of the issuer's securities on the principal market (as those terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or
        B. if there is no published market, the amount that the court considers just.
3. In respect of any of the securities of the responsible issuer that the person or company has not disposed of, assessed damages shall equal the number of securities acquired, multiplied by the difference between the average price per security paid for those securities (including any commissions paid in respect thereof determined on a per security basis) and,
    i. if the issuer's securities trade on a published market, the trading price of the issuer' securities on the principal market (as those terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or
    ii. if there is no published market, the amount that the court considers just. 2002, c. 22, s. 185; 2006, c. 33, Sched. Z.5, s. 17; 2007, c. 7, Sched. 38, s. 12 (1-4).

**Same**

(2) Damages shall be assessed in favour of a person or company that disposed of securities after a document was released or a public oral statement made containing a misrepresentation or after a failure to make timely disclosure as follows:

1. In respect of any of the securities of the responsible issuer that the person or company subsequently acquired on or before the 10th trading day after the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the difference between the average price received upon the disposition of those securities (deducting any commissions paid in respect of the disposition) and the price paid for those securities (without including any commissions paid in respect thereof), calculated taking into account the result of hedging or other risk limitation transactions.
2. In respect of any of the securities of the responsible issuer that the person or company subsequently acquired after the 10th trading day after the public correction of the

misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, assessed damages shall equal the lesser of,

i. an amount equal to the difference between the average price received upon the disposition of those securities (deducting any commissions paid in respect of the disposition) and the price paid for those securities (without including any commissions paid in respect thereof), calculated taking into account the result of hedging or other risk limitation transactions, and

ii. an amount equal to the number of securities that the person disposed of, multiplied by the difference between the average price per security received upon the disposition of those securities (deducting any commissions paid in respect of the disposition determined on a per security basis) and,

A. if the issuer's securities trade on a published market, the trading price of the issuer's securities on the principal market (as those terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or

B. if there is no published market, the amount that the court considers just.

3. In respect of any of the securities of the responsible issuer that the person or company has not acquired, assessed damages shall equal the number of securities that the person or company disposed of, multiplied by the difference between the average price per security received upon the disposition of those securities (deducting any commissions paid in respect of the disposition determined on a per security basis) and,

i. if the issuer's securities trade on a published market, the trading price of the issuer's securities on the principal market (as such terms are defined in the regulations) for the 10 trading days following the public correction of the misrepresentation or the disclosure of the material change in the manner required under this Act or the regulations, or

ii. if there is no published market, then the amount that the court considers just. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 14; 2006, c. 33, Sched. Z.5, s. 17; 2007, c. 7, Sched. 38, s. 12 (5-8).

**Same**

(3) Despite subsections (1) and (2), assessed damages shall not include any amount that the defendant proves is attributable to a change in the market price of securities that is unrelated to the misrepresentation or the failure to make timely disclosure. 2002, c. 22, s. 185.

**Proportionate liability**

**138.6** (1) In an action under section 138.3, the court shall determine, in respect of each defendant found liable in the action, the defendant's responsibility for the damages assessed in favour of all plaintiffs in the action, and each such defendant shall be liable, subject to the limits set out in subsection 138.7 (1), to the plaintiffs for only that portion of the aggregate amount of damages assessed in favour of the plaintiffs that corresponds to that defendant's responsibility for the damages. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 15 (1).

**Same**

(2) Despite subsection (1), where, in an action under section 138.3 in respect of a misrepresentation or a failure to make timely disclosure, a court determines that a particular defendant, other than the responsible issuer, authorized, permitted or acquiesced in the making of the misrepresentation or the failure to make timely disclosure while knowing it to be a misrepresentation or a failure to make timely disclosure, the whole amount of the damages assessed in the action may be recovered from that defendant. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 15 (2).

**Same**

(3) Each defendant in respect of whom the court has made a determination under subsection (2) is jointly and severally liable with each other defendant in respect of whom the court has made a determination under subsection (2). 2002, c. 22, s. 185.

**Same**

(4) Any defendant against whom recovery is obtained under subsection (2) is entitled to claim contribution from any other defendant who is found liable in the action. 2002, c. 22, s. 185.

**Limits on damages**

**138.7** (1) Despite section 138.5, the damages payable by a person or company in an action under section 138.3 is the lesser of,

(a) the aggregate damages assessed against the person or company in the action; and

(b) the liability limit for the person or company less the aggregate of all damages assessed after appeals, if any, against the person or company in all other actions brought under section 138.3, and under comparable legislation in other provinces or territories in Canada in respect of that misrepresentation or failure to make timely disclosure, and less any amount paid in settlement of any such actions. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 16.

**Same**

(2) Subsection (1) does not apply to a person or company, other than the responsible issuer, if the plaintiff proves that the person or company authorized, permitted or acquiesced in the making of the misrepresentation or the failure to make timely disclosure while knowing that it was a misrepresentation or a failure to make timely disclosure, or influenced the making of the misrepresentation or the failure to make timely disclosure while knowing that it was a misrepresentation or a failure to make timely disclosure. 2002, c. 22, s. 185.

PROCEDURAL MATTERS

**Leave to proceed**

**138.8** (1) No action may be commenced under section 138.3 without leave of the court granted upon motion with notice to each defendant. The court shall grant leave only where it is satisfied that,

(a) the action is being brought in good faith; and

(b) there is a reasonable possibility that the action will be resolved at trial in favour of the plaintiff. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 17.

**Same**

(2) Upon an application under this section, the plaintiff and each defendant shall serve and file one or more affidavits setting forth the material facts upon which each intends to rely. 2002, c. 22, s. 185.

**Same**

(3) The maker of such an affidavit may be examined on it in accordance with the rules of court. 2002, c. 22, s. 185.

**Same**

(4) A copy of the application for leave to proceed and any affidavits filed with the court shall be sent to the Commission when filed. 2002, c. 22, s. 185.

**Notice**

**138.9** A person or company that has been granted leave to commence an action under section 138.3 shall,

(a) promptly issue a news release disclosing that leave has been granted to commence an action under section 138.3;

(b) send a written notice to the Commission within seven days, together with a copy of the news release; and

(c) send a copy of the statement of claim or other originating document to the Commission when filed. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 18.

**Restriction on discontinuation, etc., of action**

**138.10** An action under section 138.3 shall not be discontinued, abandoned or settled without the approval of the court given on such terms as the court thinks fit including, without limitation, terms as to costs, and in determining whether to approve the settlement of the action, the court shall consider, among other things, whether there are any other actions outstanding under section

138.3 or under comparable legislation in other provinces or territories in Canada in respect of the same misrepresentation or failure to make timely disclosure. 2004, c. 31, Sched. 34, s. 19.

**Costs**

**138.11** Despite the *Courts of Justice Act* and the *Class Proceedings Act, 1992*, the prevailing party in an action under section 138.3 is entitled to costs determined by a court in accordance with applicable rules of civil procedure. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 20.

**Power of the Commission**

**138.12** The Commission may intervene in an action under section 138.3 and in an application for leave under section 138.8. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 21.

**No derogation from other rights**

**138.13** The right of action for damages and the defences to an action under section 138.3 are in addition to, and without derogation from, any other rights or defences the plaintiff or defendant may have in an action brought otherwise than under this Part. 2004, c. 31, Sched. 34, s. 22.

**Limitation period**

**138.14** No action shall be commenced under section 138.3,

(a) in the case of misrepresentation in a document, later than the earlier of,

(i) three years after the date on which the document containing the misrepresentation was first released, and

(ii) six months after the issuance of a news release disclosing that leave has been granted to commence an action under section 138.3 or under comparable legislation in the other provinces or territories in Canada in respect of the same misrepresentation;

(b) in the case of a misrepresentation in a public oral statement, later than the earlier of,

(i) three years after the date on which the public oral statement containing the misrepresentation was made, and

(ii) six months after the issuance of a news release disclosing that leave has been granted to commence an action under section 138.3 or under comparable legislation in another province or territory of Canada in respect of the same misrepresentation; and

(c) in the case of a failure to make timely disclosure, later than the earlier of,

(i) three years after the date on which the requisite disclosure was required to be made, and

(ii) six months after the issuance of a news release disclosing that leave has been granted to commence an action under section 138.3 or under comparable legislation in another province or territory of Canada in respect of the same failure to make timely disclosure. 2002, c. 22, s. 185; 2004, c. 31, Sched. 34, s. 23.

B E T W E E N :

MARVIN NEIL SILVER, et al - and - IMAX CORPORATION, et al
Plaintiffs Defendants Court File No. CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

Commenced at Brampton

**FACTUM #3**
**of the Defendants and Proposed Defendants**
**(as Responding Parties)**
**• to the Motion for Certification •**

**McCarthy Tétrault LLP**
Barristers & Solicitors
Box 48, Suite 4700
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep
Tel: 416 601-7998

Dana M. Peebles
Tel: 416 601-7839
Fax: 416 868-0673

**Solicitors for the Defendants**
**and the Proposed Defendants**

#4240828