# EXHIBIT D

Court File No. CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

B E T W E E N :

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

- and -

IMAX CORPORATION, RICHARD L. GELFOND,
BRADLEY J. WECHSLER and FRANCIS T. JOYCE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

# PLAINTIFFS' FACTUM

**(Motion for certification pursuant to the *CPA* and leave pursuant to the *OSA*)**

November 24, 2008

**SUTTS, STROSBERG LLP**
Lawyers
600 - 251 Goyeau Street
Windsor, ON N9A 6V4

**HARVEY T. STROSBERG, Q.C.**
LSUC#: 12640O
**PATRICIA A. SPEIGHT**
LSUC Number: 26380C
**JAY STROSBERG**
LSUC Number: 47288F

Tel: 519.561.6228
Fax: 519.561.6203
Email: hts@strosbergco.com

**SISKINDS LLP**
Barristers & Solicitors
680 Waterloo Street
London, ON N6A 3V8

**A. DIMITRI LASCARIS**
LSUC Number: 50074A

Tel: 519.672.2121
Fax: 519.672.6065
Email: dimitri.lascaris@siskinds.com

Lawyers for the Plaintiffs

TO:
**MCCARTHY TETRAULT LLP**
Suite 4700
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

**R. PAUL STEEP**
LSUC Number: 21869L
**DANA PEEBLES**
LSUC Number: 30820V

Tel: 416.601.7998
Fax: 416.868.0673

Lawyers for the Defendants and Proposed Defendants

# TABLE OF CONTENTS


INTRODUCTION ..... 1

PART I—THE FACTS ..... 9

IMAX'S BUSINESS ..... 13
THE IMAX THEATRE SYSTEM ..... 15
THE ACCOUNTING PRINCIPLES APPLICABLE TO THE SALE AND LEASE OF IMAX THEATRE SYSTEMS ..... 17
IMAX'S HISTORICAL REVENUE RECOGNITION PRACTICES ..... 19
THE DELHI POST ..... 31
THE Q4/05 INSTALLATION CAMPAIGN ..... 36
BEIJING SUC #1 ..... 42
HONG KONG LARK ..... 44
KAZAN, RUSSIA ..... 46
MCMINNVILLE, OREGON ..... 48
INTERLOMAS, MEXICO ..... 50
IMAX MADE CONCESSIONS TO ITS CLIENTS TO EMBELLISH ITS REPORTED EARNINGS ..... 52

CLASS PERIOD DISCLOSURES ..... 57

THE EXPLORATION OF STRATEGIC ALTERNATIVES ..... 64
THE SEC INQUIRY LETTER ..... 67
THE CORRECTIVE DISCLOSURE ..... 68

THE RESTATEMENT ..... 70

THE AFFIRMATIVE DEFENCES ..... 72

DUE DILIGENCE & THE AUDIT OPINION ..... 73
INTERNAL CONTROLS ..... 74

U.S. GAAP ..... 76

INTERACTIONS WITH PWC ..... 78
THE ACTUAL KNOWLEDGE OF THE DEFENDANTS AND PROPOSED DEFENDANTS ..... 82
LOSS CAUSATION ..... 83

CERTIFICATION ..... 84

PROCEDURAL FACTS ..... 85

PART II—ARGUMENT ..... 87

THE PURPOSES UNDERLYING CLASS ACTION LEGISLATION ..... 87

THE S. 5(1) REQUIREMENTS ..... 87

ONLY A MINIMUM EVIDENTIARY BASIS IS REQUIRED TO ACHIEVE CERTIFICATION ..... 88

(1) THE SUBSECTION 5(1)(A) REQUIREMENT: THE PLEADINGS DISCLOSE A CAUSE OF ACTION ..... 89

THE PRINCIPLES ..... 89

APPLICATION OF THE PRINCIPLES TO THIS CASE ..... 89

CAUSE OF ACTION: DECLARATIONS ..... 90
CAUSE OF ACTION: NEGLIGENCE ..... 91
CAUSES OF ACTION: NEGLIGENT AND FRAUDULENT MISREPRESENTATION ..... 91
CAUSE OF ACTION: CONSPIRACY ..... 94

(2) THE SUBSECTION 5(1)(B) REQUIREMENT: THERE IS AN IDENTIFIABLE CLASS OF TWO OR MORE PERSONS WHO WOULD BE REPRESENTED BY THE REPRESENTATIVE PLAINTIFF ..... 96

(3) THE SUBSECTION 5(1)(C) REQUIREMENT: THE CLAIMS OF THE CLASS MEMBERS AND SUBCLASS MEMBERS RAISE COMMON ISSUES ..... 98

THE LIST OF COMMON ISSUES ..... 98

THE PRINCIPLES ..... 100

APPLICATION OF THE PRINCIPLES TO THIS CASE ..... 103

COMMON ISSUE 1: DID IMAX OR THE INDIVIDUAL DEFENDANTS, OR ANY OF THEM, REPRESENT THAT IMAX'S REVENUE FOR THE 2005 FISCAL YEAR WERE REPORTED IN ACCORDANCE WITH GAAP AND THAT SUCH REVENUES MET OR EXCEEDED EARNINGS GUIDANCE PREVIOUSLY ISSUED BY IMAX? IF SO, WHO MADE THE REPRESENTATION, WHEN, WHERE AND HOW? ..... 103
COMMON ISSUE 2: DID IMAX OR THE INDIVIDUAL DEFENDANTS, OR ANY OF THEM, MAKE THE REPRESENTATION NEGLIGENTLY OR FRAUDULENTLY, KNOWING IT WAS FALSE, OR RECKLESSLY, CARING NOT WHETHER IT WAS TRUE OR FALSE? IF SO, WHO MADE THE REPRESENTATION, WHEN AND HOW? 103
COMMON ISSUE 3: DID THE IMAX OR THE INDIVIDUAL DEFENDANTS, OR ANY OF THEM, MAKE THE REPRESENTATION INTENDING THAT THE CLASS MEMBERS RELY UPON IT AND ACQUIRE TRUST UNITS?103
COMMON ISSUE 4: DID SOME OR ALL OF IMAX'S FEBRUARY 17, 2006 PRESS RELEASE, ANNUAL REPORT FOR THE YEAR ENDING DECEMBER 31, 2005 OR ITS TWO MARCH 9, 2006 PRESS RELEASES CONTAIN A MISREPRESENTATION WITHIN THE MEANING OF THE OSA? ..... 107
COMMON ISSUE 5: IF THE ANSWER TO (4) IS YES, ARE THE DEFENDANTS, OR SOME OF THEM, LIABLE TO THE CLASS MEMBERS PURSUANT TO SECTION 138.3 OF THE OSA? ..... 107
COMMON ISSUE 6: DID THE TRADED PRICE OF IMAX SHARES DURING THE CLASS PERIOD INCORPORATE AND REFLECT THE REPRESENTATION? ..... 107
COMMON ISSUE 7: IF THE ANSWER TO (6) IS YES, DID THE ACQUISITION OF IMAX SHARE BY THE CLASS MEMBERS, ON THE TSX AND NASDAQ, DURING THE CLASS PERIOD, CONSTITUTE RELIANCE UPON THE REPRESENTATION? ..... 107
COMMON ISSUE 8: DID IMAX AND THE INDIVIDUAL DEFENDANTS, OR SOME OF THEM, OWE THE CLASS MEMBERS A DUTY OF CARE? IF SO, WHAT WAS THE STANDARD OF CARE? DID ANY OF THE DEFENDANTS BREACH THE STANDARD OF CARE? ..... 109
COMMON ISSUE 9: IF THE ANSWER TO (8) IS YES, WERE IMAX AND THE INDIVIDUAL DEFENDANTS, OR SOME OF THEM, NEGLIGENT? IF SO, WHO, WHEN AND WHY? ..... 109
COMMON ISSUE 10: DID IMAX AND THE INDIVIDUAL DEFENDANTS, OR SOME OF THEM, CONSPIRE ONE WITH THE OTHER, AND WITH PERSONS UNKNOWN TO DECEIVE THE CLASS MEMBERS FOR THE PURPOSE OF MAINTAINING AND INCREASING THE PRICE OF IMAX SECURITIES? IF SO, WHO CONSPIRED WITH WHOM, WHEN, WHERE, WHY AND FOR WHAT PURPOSE? ..... 110
COMMON ISSUE 11: IF IMAX AND THE INDIVIDUAL DEFENDANTS, OR SOME OF THEM, ARE LIABLE TO THE CLASS FOR CONSPIRACY, NEGLIGENCE, NEGLIGENT OR FRAUDULENT MISREPRESENTATION, WHAT IS THE PROCEDURE FOR ASSESSING DAMAGES? ..... 111

COMMON ISSUE 12: CAN THE COURT ASSESS DAMAGES IN THE AGGREGATE, IN WHOLE OR IN PART, FOR THE CLASS? IF SO, WHAT IS THE AMOUNT OF THE AGGREGATE DAMAGE ASSESSMENT AND WHO SHOULD PAY IT TO THE CLASS? ..... 112

COMMON ISSUE 13: IS IMAX VICARIOUSLY LIABLE OR OTHERWISE RESPONSIBLE FOR THE ACTS OF THE OTHER DEFENDANTS? ..... 114

COMMON ISSUE 14: SHOULD ONE OR MORE OF THE DEFENDANTS PAY PUNITIVE DAMAGES TO THE CLASS? IF SO, WHO, WHY, IN WHAT AMOUNT AND TO WHOM? ..... 115

COMMON ISSUE 17: SHOULD THE DEFENDANTS, OR ANY OF THEM, PAY PREJUDGMENT AND POSTJUDGMENT INTEREST, AT WHAT ANNUAL INTEREST RATE, AND SHOULD THE INTEREST BE COMPOUND INTEREST? 117

(4) THE SUBSECTION 5(1)(D) REQUIREMENT: A CLASS PROCEEDING WOULD BE THE PREFERABLE PROCEDURE FOR THE RESOLUTIONS OF THE COMMON ISSUES ..... 117

THE PRINCIPLES ..... 117

(5) THE SUBSECTION 5(1)(E) REQUIREMENT: THE PROPOSED REPRESENTATIVE PLAINTIFFS WOULD FAIRLY AND ADEQUATELY REPRESENT THE INTERESTS OF THE CLASS AND DO NOT HAVE, ON THE COMMON ISSUES, AN INTEREST IN CONFLICT WITH THE INTERESTS OF OTHER CLASS MEMBERS ..... 124

(6) THE SUBSECTION 5(1)(E)(II) REQUIREMENT: A WORKABLE PLAN ..... 125

PART III—THE *OSA* TEST FOR LEAVE ..... 128

COMMON ISSUE 4: DID SOME OR ALL OF IMAX'S FEBRUARY 17, 2006 PRESS RELEASE, ANNUAL REPORT FOR THE YEAR ENDING DECEMBER 31, 2005 OR ITS TWO MARCH 9, 2006 PRESS RELEASES CONTAIN A MISREPRESENTATION WITHIN THE MEANING OF THE OSA? ..... 137

COMMON ISSUE 5: IF THE ANSWER TO (4) IS YES, ARE THE DEFENDANTS, OR SOME OF THEM, LIABLE TO THE CLASS MEMBERS PURSUANT TO SECTION 138.3 OF THE OSA? ..... 137

PART IV—ORDER SOUGHT ..... 138

SCHEDULE A—LIST OF AUTHORITIES ..... 1

SCHEDULE B—TEXT OF STATUTORY PROVISIONS ..... 5

**INTRODUCTION**

1. In this motion, the Plaintiffs seek an order: (1) granting them leave under s. 138.8(1) of the Ontario *Securities Act*, R.S.O. 1990, c. S.5 (the "*OSA*") to assert the cause of action available under Part XXIII.1 of the *OSA*; and (2) certifying this action as a class proceedings pursuant to s. 5(1) of the *Class Proceedings Act, 1992*, S.O. 1992, c.6 ("*CPA*").

2. The defendant, Imax Corporation ("Imax"), is a corporation formed under *Canada Business Corporations Act*, R.S. 1985, c. C-44 (the "*CBCA*"), with headquarters in Mississauga, Ontario. At all times material to this action, Imax was a "reporting issuer" under the *OSA*, and its shares were listed for trading on the Toronto Stock Exchange ("TSX"). They were also listed for trading on the NASDAQ exchange in the United States.

3. The remaining Defendants (the "Individual Defendants") and the proposed Defendants (the "Proposed Defendants") are all current and former officers and/or directors of Imax.

4. IMAX is an entertainment technology company, specializing in large-format and three-dimensional ("3D") film presentations. Its principal business is the design, manufacture, sale and lease of projection systems based on proprietary and patented technology for large-format, 15-perforation film frame, 70mm format ("15/70-format") theaters including commercial theaters, museums and science centers, and

destination entertainment sites. Historically, between 55% and 67% of Imax's revenues have been derived from the sale and lease of its large-format theater systems.

5. Imax markets its large-format systems as a unique movie-going experience. Virtually every aspect of an Imax theater system is unique and proprietary. Imax has developed and patented and markets the following theater system components: (1) the camera; (2) the projector; (3) the screen; (4) the sound system; and (5) the physical layout of the theater. Each component is specifically designed to work as a unit to produce the "Imax Experience", an immersion of the spectator in the movie by the use of sight and sound. Imax 3D systems are designed to further heighten the immersive effect of the Imax system.

6. On March 10, 2005, Imax issued a press release disclosing, among other things, its updated earnings guidance for 2005. In that press release, Imax projected 2005 net earnings per share ("EPS") of $0.35-$0.38. This constituted an increase from Imax's initial earnings guidance.

7. In the first half of 2005, Imax retained two investment banks to explore strategic alternatives, including a possible sale or merger of the company. Imax did not disclose the retention of these investment banks to the public, or even to its own auditors, until March 2006, when Imax issued its annual audited financial statements for 2005.

8. As significant shareholders of Imax with lucrative golden parachute provisions in their employment contracts, the Defendants Gelfond, Weschler and Joyce, who were, respectively, the co-CEO, co-CEO and CFO of Imax, stood to profit handsomely from a sale of the company.

9. As of the close of the third quarter of 2005 ("Q3/05"), Imax had generated EPS of only $0.11 for 2005, meaning that in order to achieve the lower end of the 2005 EPS guidance that it had published in March 2005 ($0.35-$0.38), Imax would have to generate more than twice as much EPS in Q4/05 as it had generated in the first three quarters of 2005 combined.

10. The way that Imax could recognize its revenue, and thus boost its earnings, was by completing the installation of theatre systems. Imax's internal policies and public disclosures throughout the period from 2000 to the beginning of the Class Period[1] were clear that recognition of revenue on a theatre system sale or lease occurred when the installation of the theatre system was complete.

11. On November 10, 2005, as the Defendants and their subordinates were engaged in a furious effort to complete enough Q4/05 installations to achieve Imax's guidance for 2005, an unidentified individual posted accusations of fraud against Imax on Yahoo! Finance. The post was entitled "SEC To Investigate Fraud at Imax" (the "Delhi Post").

---

[1] Capitalized terms not defined herein have the meanings attributed to them in the Proposed Fresh Statement of Claim, Schedule A to the Notice of Motion, Plaintiff's February 27, 2007 Motion Record ("PMR1"), Tab 1, p. 9.

12. The contents of the Delhi Post, which were emailed anonymously to Wechsler and Gelfond, included accusations that Imax was "shipping to warehouses and back to storage at the end of quarters when customers wouldn't pick up there (sic) system to make company numbers", that in order to achieve its "numbers", Imax was "faking installations before quarter ends pressuring with money and contracts for customers to sign install documents for the auditors and then going back after quarter end to really do the work", and that this had been done specifically with respect to a Q3/05 installation in Delhi, India.

13. Imax's Audit Committee, general counsel and Manager, Business Operations purported to conduct investigations into these accusations in November and December 2005. Despite their conclusions that the accusations were unfounded, Imax management proceeded in December 2005 to do essentially what the author of the Delhi Post had accused Imax of having done, namely: (1) claiming that installations were complete at the end of Q4/05 even though an integral part of the Imax theatre system, the silver screen, had not been installed at quarter-end; (2) pressuring the lessees of Imax theatre systems to "accept" installation prior to quarter-end, and/or offering those lessees inducements to do so, at significant cost to Imax; and (3) completing the installation of theatre systems after the end of the fourth quarter.

14. These activities occurred with the direct knowledge of Gelfond, Wechsler and Joyce. Indeed, in December 2005 alone, they received no less than 12 email updates on the status of Q4/05 installations from the Imax employee with principal responsibility for ensuring the "completion" of Q4/05 installations. Those updates confirmed that

inducements were being offered and pressure was being applied to certain lessees in order to secure their "acceptance" of an Imax theatre system before the end of 2005.

15. On February 17, 2006 (the first day of the Class Period), Imax issued a press release in which it stated in part:

> IMAX Corp. announced today that, reflecting the strong tone and momentum of its business, it expects to meet or exceed the full year 2005 guidance it provided investors of $0.35 to $0.38 in net earnings per share on a fully diluted basis.
> During the fourth quarter the Company completed 14 theatre installations, which is a record for a single quarter, and consistent with the guidance the Company provided. As a result, the Company installed a total of 34 theatre systems for the full year versus 21 for 2004. The Company also expects to report revenues approximately in the guided range of $145 to $150 million for all of 2005.
>
> These results are based on preliminary financial data and subject to the final closing of the Company's books and records. "IMAX's momentum and growth potential is building," said IMAX Co-Chairmen and Co-CEOs Richard L. Gelfond and Bradley J. Wechsler. "IMAX set aggressive goals for theatre signings, film performance, installations and financial results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues."

16. On August 9, 2006 (the last day of the Class Period), the shine came off of Imax's rose. On that day, investors learned that Imax's press release of February 17, 2006 was materially false and misleading. Imax's August 9, 2006 press release disclosed that, although Imax had recognized revenue in the fourth quarter of 2005 ("Q4/05") on 14 theatre installations, Imax had *not* completed 14 installations in that quarter. Rather, with respect to 7 of those 14 theatre systems, Imax had not installed the silver screen.

17. In it August 9, 2006 press release, Imax also disclosed that it was:

> in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP […].

18. Upon the issuance of the August 9, 2006 press release, Imax's share price on the TSX and the NASDAQ plummeted approximately 40% from its closing price on the prior trading day.

19. Following the filing of this action, and after Imax management insisted publicly and repeatedly that Imax had properly recorded revenues on its Q4/05 theatre installations, Imax announced that it would restate its audited financial statements for the years 2002 through 2006, in large part because Imax had determined that it had improperly recognized revenue on its theatre installations, and that it was required under GAAP to treat its theatre systems, including their screens, as a single deliverable.

20. Under GAAP, revenue should not be recognized until it is "realized or realizable and earned". Revenue is realized or realizable and earned when: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred or services have been rendered; (c) the seller's price to the buyer is fixed or determinable; and (d) collectibility is reasonably assured. Moreover, in order for delivery to have occurred or services to have been rendered, any remaining obligations of the vendor must be inconsequential and perfunctory.

21. In the first quarter of 2006, Imax management initially proposed to Imax's auditors, PricewaterhouseCoopers ("PwC"), that all revenue allocable to Q4/05 theatre installations, including those theatres that lacked a silver screen at quarter-end, be recognized in Q4/05. Indeed, Imax had recognized all revenue allocable to the Delhi installation in Q3/05, even though Delhi lacked a silver screen at the end of Q3/05.

22. PwC, however, could not concur with Imax's aggressive accounting treatment, and suggested that Imax management consider whether it would be appropriate to apply revenue accounting for multiple deliverables ("RAMD") to the sale/lease of Imax theatre systems. Under RAMD, the revenues generated by products consisting of multiple components are recognized on a piecemeal basis. In order for RAMD to be available, however, various conditions must be fulfilled, including that the obligations remaining to be fulfilled by the vendor must be inconsequential and perfunctory. Critically, a remaining obligation is not inconsequential or perfunctory if

the undelivered component is essential to the functionality of the delivered component(s).

23. The Defendants now acknowledge that the 3D theatre systems to which Imax applied RAMD in Imax's 2005 financial statements, and which Imax's customers contracted to purchase, cannot be operated commercially without a silver screen. The silver screens were therefore essential to the functionality of the components delivered in Q4/05 (i.e. Imax's projector and Imax's sound system), and hence the installation of the silver screen could not have been inconsequential and perfunctory. Imax's application of RAMD to its Q4/05 theatre installations was therefore plainly inappropriate.

24. Moreover, the application of RAMD to Imax's Q4/05 theatre system installations was a material departure from Imax's prior accounting practices. However, Imax's 2005 audited financial statements did not disclose this change. Thus, those financial statements falsely created an impression of increasing revenues and profits relative to prior periods, and did so at a time when Imax's senior officers were seeking to sell the company, which would have profited them handsomely.

25. Thus, the case for granting leave under Part XXIII.1 of the *OSA* is overwhelming. In order to be granted leave, good faith Plaintiffs need only demonstrate that they have a reasonable possibility of success at trial. The record plainly establishes that:

(a) Imax materially misstated its GAAP earnings and revenue for 2005. Indeed, Imax effectively admitted as much by restating its financial statements for 2005 and other years;

(a) Imax materially misstated the status of its Q4/05 theatre installations. Indeed, Imax effectively admitted as much when it disclosed on August 9, 2006 that the final screen had not been installed in 7 of the 14 theatre installations it initially claimed to have "complete" in Q4/05;

(b) Imax's material misstatements were included in its audited and interim financial statements and MD&A, which are "core documents", as that term is defined in s. 138.1(a) of the *OSA*;

(c) In Q4/05, faced with a severe earnings shortfall for fiscal 2005, the Defendants knowingly or negligently disregarded that the conditions for the application of RAMD were not satisfied; they therefore improperly recognized revenue on the installed components of incomplete theatre installations, and failed to disclose that Imax had changed its revenue recognition policy and practices. This had the effect of misleading the market into believing that Imax's revenues and earnings were improving relative to prior reporting periods.

26. Accordingly, the Plaintiffs respectfully request that leave be granted under Part XXIII.1 of the *OSA*.

27. Part XXIII.1 is plainly meant to facilitate class actions in the context of secondary market misrepresentation cases. This case, packaged either as a Part XXIII.1 case or otherwise, has a substantial core of commonality and connection to this jurisdiction that renders certification of this proceeding for a global class the most sensible and efficient way to proceed.

## PART I—THE FACTS

### THE PARTIES

28. The plaintiff Cliff Cohen is an individual residing in Toronto, Ontario.[2] He invested C$3,638.00 in 300 shares of Imax's common stock, which he purchased over the TSX for C$12.03 per share on August 1, 2006. On August 28, 2006, Mr. Cohen sold his Imax shares for C$5.47 per share, for total proceeds of C$1612.00. Mr. Cohen accordingly suffered a loss of $2026.00 on his investment in Imax shares.[3]

29. The plaintiff Marvin Neil Silver purchased 500 shares of Imax on August 3, 2006, at $11.87 per share, for a total cost of $5961.10.[4]

30. Each of Mssrs. Cohen and Silver affirms that his purposes in bringing this action are to:

(a) recover the losses he and other Class Members have suffered as a result of their investments in Imax shares during the Class Period;

(b) ensure that the Defendants are held accountable for their behaviour, and to send a message to the officers and directors of public companies that they will be held accountable for their misrepresentations.[5]

31. The defendant Imax is a corporation formed under the *CBCA*, with head offices in Mississauga, Ontario. It also has executive offices in New York City. It is a reporting issuer within the meaning of s. 1(1) of the *OSA*. At all material times, its shares were listed for trading on the TSX and the NASDAQ.[6]

---

[2] Transcript of the Cross Examination of Cliff Cohen ("Cohen Examination"), p. 6, q. 18.
[3] Affidavit of Cliff Cohen ("Cohen Affidavit"), para 10, Plaintiffs' Initial Record, tab 4, pp. 640-641.
[4] Affidavit of Marvin Neil Silver ("Silver Affidavit"), para 8, Plaintiffs Initial Record, tab 3, p. 278.
[5] Cohen Affidavit, paras 7, 14 & 15, Plaintiffs' Initial Record, tab 4, pp 640-642; Silver Affidavit, paras 7, 14 & 15, Plaintiffs' Initial Record, tab 3, pp. 278-280.
[6] Affidavit of Michael Robb sworn February 22, 2007 ("First Robb Affidavit"), paras 14-15, Plaintiffs' Initial Record, tab 2, p. 43.

32. At all material times, Imax's annual financial statements were audited by auditors based in PwC's Toronto offices.[7]

33. The defendant Gelfond is the co-Chief Executive Officer of Imax. At all material times, he has also been co-chair of Imax's board of directors.[8]

34. The defendant Wechsler is the other co-Chief Executive Officer of Imax. At all material times, he has also been co-chair of Imax's board of directors.[9]

35. The defendant Joyce was Imax's Chief Financial Officer from March 2001 to August 2006. Mr. Joyce was qualified as a certified public accountant throughout the relevant period.[10]

36. Kenneth C. Copland is a proposed defendant to the claim under Part XXIII.1 of the *OSA*. He has been a director of Imax since 1999, and the chair of its Audit Committee since 2004.[11]

---

[7] Transcript of the Rule 39.03 Examination of Lisa Coulman taken January 31, 2008 ("Coulman Transcript"), pp. 9-10, 108, 110; Imax Corporation's Annual Report on Form 10-K for the year ended December 31, 2005 ("2005 10-K"), Exhibit F to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 169.

[8] Affidavit of Richard Gelfond sworn September 10, 2007 ("Gelfond Affidavit"), paras 2-3, Responding Parties' Motion Record, Vol 1, tab 1, p. 1.

[9] Affidavit of Bradley Wechsler sworn September 10, 2007 ("Wechsler Affidavit"), paras 2-3, Responding Parties' Motion Record, Vol 1, tab 2, p. 7.

[10] Affidavit of Francis T. Joyce sworn September 10, 2007 ("Joyce Affidavit"), para 2. Responding Parties' Motion Record, Vol 1, tab 9, p. 49.

[11] Affidavit of Kenneth Copland sworn September 8, 2007 ("Copland Affidavit"), para 2, Responding Parties' Motion Record, Vol. 3, Tab 12, p. 335.

37. Kathryn Gamble is a proposed defendant to the claim under Part XXIII.1 of the *OSA*. She was Imax's Vice President, Finance and Controller from July 2001 until November 27, 2006.[12]

38. Neil S. Braun is a proposed defendant to the claim under Part XXIII.1 of the *OSA*. He has been a director of Imax since 2003, and was, during the Class Period, a member of the Audit Committee.[13]

39. Michael Fuchs is a proposed defendant to the claim under Part XXIII.1 of the *OSA*. He was a director of Imax from May of 1996 to June 1999, and from October, 2002 until April 2006.[14] He did not stand for re-election to Imax's board of directors in April 2006.[15]

40. Garth M. Girvan is a proposed defendant to the claim under Part XXIII.1 of the *OSA*. He has been a director of Imax since 1994.[16] Between 1994 and 2004 he was a member of the Audit Committee. Although he was not formally a member of the Audit Committee during the Class Period, he regularly attended Audit Committee meetings.[17] He is also a partner in the law firm acting for the Defendants and proposed

---

[12] Affidavit of Kathryn Gamble sworn September 10, 2007 ("Gamble Affidavit"), para 2, Responding Parties' Motion Record, Volume 1, Tab 8, p. 43.

[13] Affidavit of Neil S. Braun sworn September 10, 2007 ("Braun Affidavit"), para 3, Responding Parties' Motion Record, Vol. 1, tab 7, p. 37.

[14] Affidavit of Michael Fuchs sworn September 10, 2007 ("Fuchs Affidavit"), para 3, Responding Parties' Motion Record, Vol. 1, tab 5, p. 25.

[15] Transcript of the Cross Examination of Michael Fuchs taken February 26, 2008, pp. 17-18.

[16] Affidavit of Garth M. Girvan sworn September 10, 2007 ("Girvan Affidavit"), para 3, Responding Parties' Motion Record, Vol. 1, tab 3, p. 13.

[17] Transcript of the Cross Examination of Garth M. Girvan taken February 18, 2008, p. 62.

Defendants in this proceeding, which law firm regularly acted for Imax during the period he has served on its board.[18]

41. David W. Leebron is a proposed defendant to the claim under Part XXIII.1 of the *OSA*. He has been a director of Imax since 2003, and was, during the Class Period, a member of its Audit Committee.[19]

42. Marc Utay is a proposed defendant to the claim under Part XXIII.1 of the *OSA*. He has been a director of Imax since 1996.[20]

***Imax's business***

43. Imax bills itself as one of the world's leading entertainment technology companies, specializing in large format and 3D film presentations. Its principal business is the design, manufacture, sale and lease of projection systems based on proprietary and patented technology. Imax theatre systems combine advanced, high resolution projection systems, sound systems and screens as large as eight stories high that extend to the edge of a viewer's peripheral vision to create an immersive audio-visual experience marketed as "The Imax Experience".[21]

---

[18] Transcript of the Cross Examination of Garth M. Girvan taken February 18, 2008, p. 24.
[19] Affidavit of David Leebron sworn September 10, 2007 ("Leebron Affidavit"), para 3, Responding Parties' Motion Record, Vol 1, tab 6, p. 31.
[20] Affidavit of Marc Utay sworn September 10, 2007 ("Utay Affidavit"), para 3, Responding Parties Motion Record, Vol 1, tab 4, p. 19.
[21] 2005 10-K, Exhibit F to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 117.

44. Imax markets its large-format systems as a unique movie-going experience. Virtually every aspect of an Imax theater system is unique and proprietary. Imax has developed and patented and markets the following theater system components: (1) the camera; (2) the projector; (3) the screen; (4) the sound system; and (5) the physical layout of the theater. Each component is specifically designed to work as a unit to produce the "Imax Experience", an immersion of the spectator in the movie by the use of sight and sound. Imax 3D systems are designed to further heighten the immersive effect of the Imax system. In the words of the defendant Gelfond, this immersive experience is Imax's "secret sauce".[22]

45. Imax derives revenue from the sale and lease of its theatre systems, film production, distribution and post-production services, digital re-mastering of films, and theatre operations.[23] The sale and lease of theatre systems is by far Imax's most important line of business. In the years between 2001 and 2005 (prior to restatement), revenue from theatre systems accounted for between 55% and 67% of Imax's reported revenue.[24]

46. Imax typically provides its theatre systems to customers on a long-term lease basis, generally with initial lease terms of 10-20 years. Lease agreements typically provide for three major sources of revenue: initial payments, ongoing rental payments, and maintenance fees. Initial payments vary depending on the type and location of the system, and are generally paid to the company in instalments commencing on the

---

[22] Transcript of the Cross Examination of Richard Gelfond taken February 27, 2008 ("First Gelfond Transcript"), p. 93.
[23] 2005 10-K, Exhibit F to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, pp. 118-124.
[24] 2005 10-K, Exhibit F to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 141.

signing of the agreement. Ongoing rental payments are paid monthly over the term of the contract, commencing after system installation and are generally equal to the greater of a fixed minimum amount per annum and a percentage of box office receipts.[25]

***The Imax Theatre System***

47. Under Imax's lease agreements, Imax's customers generally contracted to acquire a "System", which was defined in those agreements to consist of:

(a) a Projection System (sometimes referred to as the "Unit");
(b) a Sound System;
(c) a Screen; and
(d) a Glasses Cleaning Machine.

48. Imax's contracts with its customers generally also required Imax to fine tune and align the projection and sound systems, and to train the customer's staff in the operation of the Imax equipment at the time of installation.[26]

---

[25] 2005 10-K, Exhibit F to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 144.

[26] Agreement between Imax Corporation and Beijing Radio, Film and Television Group dated December 18, 2002, Plaintiffs' Fourth Supplementary Motion Record – Answers to Undertakings ("Plaintiffs' Sixth Record"), Vol. 2, tab 75-1, pp. 743-744, 770; Agreement between Imax Corporation and Orient International Holding Shanghai Foreign Trade Co., Ltd. and Shanghai United Cinema Line Co., Ltd.; Plaintiffs' Sixth Record, Vol. 2, tab 75-2-A, pp. 791-793, 822-824; Agreement between Imax Corporation and Dongguan City Infrastructure & Construction Department and Dongguan Machinery & Equipment Import & Export Company of Guangdong dated December 26, 2002, Plaintiffs' Sixth Record, tab 75-3-A, pp. 870-872, 896-897; Agreement between Imax Corporation and Lark International Multimedia Limited dated December 22, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-4-A, pp. 927-929, 956-958; Agreement between Imax Corporation and Suvar-Kazan Company Ltd. dated October 20, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-A, pp. 975-977, 1002-1004; Agreement between Imax Corporation and I.T. International Theatres Ltd. dated September 25, 1998, Plaintiffs' Sixth Record, Vol. 3, tab 75-6-A, pp.1045-1046 ; Agreement between Imax Corporation and SM Prime Holdings Inc. dated March 16, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-7-A, pp. 1080-1081, 1120; Agreement between Imax Corporation and Evergreen Vintage Aircraft Inc. dated September 7, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-8-A, pp. 1135-1136, 1161-1163; Agreement between Imax Corporation and Jafif Penhos Elias dated June 30, 2003, Plaintiffs' Sixth Record, Vol. 3, tab 75-9-A, pp. 1184-1185, 1210-1212; Agreement between Imax Corporation and North Portage Theatre Corporation dated December 22, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-10-A, pp. 1241-1243, 1269-1271.