49. The Projection Systems included a projector, lamphouse, lens, projector transporter base, control panel and other ancillary equipment.

50. The Sound Systems included a sound source, amplification equipment, speakers, and other ancillary equipment.

51. The Screen Systems included a "high gain coated non-depolarizing perforated vinyl screen sheet" and a supporting structure for the screen sheet. "Perforated" refers to numerous tiny holes in the screen sheet which allow sound from the speakers behind the screen to pass through the screen. "High gain" refers to the fact that the silver screen reflects a high proportion of the light projected on it back to the viewer. "Coated" refers to the proprietary silver paint used to achieve the "high gain". "Non-depolarizing" refers to the properties of the silver screen which tend not to scatter the light projected on it (which is polarized as it leaves the projector).[27]

52. Imax's 3D theatre systems cannot be operated commercially without a *silver* screen sheet, as opposed to the *white* screen sheet used in 2D theatre systems. [28]

53. Generally, Imax's lease contracts also oblige Imax to supply and install a glasses cleaning machine to clean the special eyeglasses used to view the 3D films shown by the Imax system.

---

[27] Answer to Undertaking #183, Plaintiffs' Sixth Record, Vol. 1, tab I-B, p. 45.
[28] Transcript of the Cross Examination of Bradley Wechsler taken February 25, 2008 ("First Wechsler Transcript"), pp. 38-39, 210; Coulman Transcript, pp. 52-57.

*The Accounting Principles Applicable to the Sale and Lease of Imax Theatre Systems*

54. During and after the Class Period, Imax purported to prepare its financial statements in accordance with accounting principles generally accepted in the United States ("U.S. GAAP"). In general, U.S. GAAP stresses the importance of revenue as a measure used to evaluate an entity's performance. Recognition of revenue in the appropriate period is important because:

> The amount of revenue generated by an enterprise during the period is an important indicator of the level of the enterprise's activity. This information assists the users of financial statements in assessing the enterprises' performance.[29]

55. In order to measure the performance of an entity as consistently and accurately as possible, accounting principles concern themselves with identifying the "complete business cycle" associated with particular revenues, on the premise that revenues should be recognized when they are realized or realizable, and when they have been earned, generally by way of the revenue producing entity having done what it is being paid to do.[30]

56. Generally, therefore, U.S. GAAP permits the recognition of revenue when:

- (a) Persuasive evidence of an arrangement exists;
- (b) Delivery has occurred or services have been rendered;
- (c) The seller's price to the buyer is fixed or determinable; and
- (d) Collectibility is reasonably assured.[31]

---

[29] Report of Rosen & Associates Limited, Exhibit A to the Affidavit of Lawrence Rosen sworn February 23, 2007 ("First Rosen Report"), Plaintiffs' Initial Record, tab 5-A, p. 675.
[30] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 676.
[31] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 677.

57. Generally, U.S. GAAP provides that revenue should not be recognized until the product is delivered to the customer. Where a product is composed of elements that are interdependent and only operate when installed together, delivery does not occur until all elements are installed and operating cohesively.[32]

58. Finally, U.S. GAAP emphasizes the importance of the timing of revenue recognition. It is a central principle of GAAP that earnings and revenue should be attributed to the period in which they are earned. Where transactions straddle reporting periods, U.S. GAAP advocates scepticism in assessing the prospects that uncompleted portions will be concluded successfully. Partially completed transactions bridging reporting periods warrant careful examination to determine when they are completed.[33]

59. In some circumstances, U.S. GAAP permits sale arrangements involving the delivery or performance of multiple components at different times to be broken down into separate units of accounting and recognized in revenue when the respective unit is delivered. This is known as "RAMD", or revenue accounting for multiple deliverables.

[32] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 678.
[33] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 678.

***Imax's Historical Revenue Recognition Practices***

60. Prior to 2000, Imax recognized revenue on its theatre systems "upon delivery of the system" to the customer.[34]

61. In 2000, Imax announced that it was revising its revenue recognition policy to accord with the SEC's Staff Accounting Bulletin 101 ("SAB 101") such that it began recognizing revenue related to the sale and lease of theatre systems at the time when the theatre system "installation is complete".[35] That change in accounting resulted in Imax taking a US$54.5 million charge against its earnings in its financial statements for the year 2000.[36]

62. In its 2000 10-K, Imax stated that it recognized revenue on theatre system sales and leases when "installation is complete".[37]

63. In its 2001 10-K, Imax stated that it recognized revenue on theatre system sales and leases when, among other things, the "installation process is complete" and the "installation of the theatre system is complete".[38]

---

[34] Copland Affidavit, para 43, Respondents' Motion Record, Vol III, tab 12, p. 345; Imax Corporation's Annual Report for the Fiscal Year ended December 31, 1997 ("1997 10-K"), Respondents' Motion Record, Vol III, tab 12-A, p. 378; Imax Corporation's Annual Report for the Fiscal Year ended December 31, 1998 ("1998 10-K"), Respondents' Motion Record, Vol III, tab 12-B, p. 464; Imax Corporation's Annual Report on Form 10-K for the Fiscal Year ended December 31, 1999 ("1999 10-K"), Respondents' Motion Record, Vol III, tab 12-C, p. 521.

[35] Imax Corporation's Annual Report for the Fiscal Year ended December 31, 2000 on Form 10-K ("2000 10-K"), Exhibit D to the Copland Affidavit, Respondents' Motion Record, Vol. III, tab 12-D, pp. 592 & 607.

[36] Copland Affidavit, para 46, Responding Parties' Motion Record, Vol. III, tab 12, p. 346.

[37] 2000 10-K, Exhibit "D" to the Copland Affidavit, Responding Parties' Motion Record, Vol. III, tab 12-D, pp. 592 & 607.

64. In Imax's Annual Report for 2002, Imax reported that it recognized revenue when "the installation process is complete" and "upon installation of the theatre system".[39]

65. In 2003, the Emerging Issues Task Force of the Financial Accounting Standards Board adopted Issue No. 0021, *Revenue Arrangements with Multiple Deliverables* ("EITF 0021"). EITF 0021 provides guidance on the circumstances in which this treatment is appropriate.[40]

66. In order to divide an arrangement into multiple units of accounting, EITF 0021 requires that:

(a) the delivered item have value to the customer on a standalone basis;

(b) there be objective and reliable evidence of the fair value of the undelivered item; and

(c) if the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) be considered probable and substantially in control of the vendor.[41]

67. EITF 0021 is subordinate to higher level accounting literature, including Staff Accounting Bulletin 104 ("SAB 104") of the staff of the United States Securities and Exchange Commission ("SEC"), and Statement of Financial Accounting Concepts

---

[38] Imax Corporation's Annual Report for the Fiscal Year ended December 31, 2001 on Form 10-K ("2001 10-K"), Exhibit "E" to the Copland Affidavit, Responding Parties' Motion Record, Vol IV, tab 12-E, pp. 666 & 684.

[39] Imax Corporation's Annual Report for the Fiscal Year ended December 31, 2002 on Form 10-K ("2002 10-K"), Exhibit "F" to the Copland Affidavit, Respondents' Motion Record, Vol IV, tab 12-F, pp. 785 & 787.

[40] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, pp. 678-679.

[41] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 679.

No. 5 ("SFAC No. 5") of the United States Financial Accounting Standards Board ("FASB").[42]

68. Under SAB 104 and SFAC No. 5, revenues may not be recognized until they are: (a) realized and realizable; and (b) earned.[43]

69. Further, under SAB 104, revenue is realized or realizable and earned when: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred or services have been rendered; (c) the seller's price to the buyer is fixed or determinable; and (d) collectibility is reasonably assured.[44] In order for delivery to have occurred or services to have been rendered, any remaining obligations of the vendor must be inconsequential and perfunctory.[45] A remaining obligation is not inconsequential or perfunctory if the undelivered component is essential to the functionality of the delivered component(s).[46] Further, in order for delivery to have occurred, the customer must have received the rewards of ownership of the products specified in the sales agreement.[47]

70. In 2003, Imax reported that it recognized revenue on the sale or lease of a theatre system "at the time of installation" and "upon installation of the theatre

---

[42] Report of Rosen & Associates dated August 2, 2007 ("Second Rosen Report"), Exhibit "A" to the Affidavit of Lawrence S. Rosen sworn August 2, 2007, Plaintiffs' Second Supplementary Motion Record dated August 10, 2007 ("Plaintiffs' Second Record"), tab 2-A, p. 1413.
[43] Second Rosen Report, Plaintiffs' Second Record, tab 2-A, p. 1410.
[44] Staff Accounting Bulletin 104 ("SAB 104"), Exhibit "M" to the Copland Affidavit, Responding Parties' Motion Record, Vol. VII, tab 12-M, p. 1593.
[45] SAB 104, Exhibit "M" to the Copland Affidavit, Responding Parties' Motion Record, Vol VII, tab 12-M, p. 1617.
[46] SAB 104, Exhibit "M" to the Copland Affidavit, Responding Parties' Motion Record, Vol. VII, tab 12-M, p. 1618.
[47] Second Rosen Report, Plaintiffs' Second Record, tab 2-A, p. 1411.

system".[48] Although EITF 0021 came into effect on July 1, 2003, and although both Imax's former CFO, the defendant Joyce, and the chair of its Audit Committee Copland claim that Imax "adopted" EITF 0021 at that time, the 2003 10-K makes no mention of the application of EITF 0021 to theatre system sales or leases.[49] Moreover, Imax's former controller, the defendant Gamble, specifically acknowledged under cross-examination that Imax did not apply EITF 0021 to the Delhi installation in Q3/05 even though the silver screen was not installed at Delhi at the end of that quarter, and further acknowledged that, prior to Q4/05, Imax had never applied EITF 0021 to a theatre installation.[50]

71. In 2004, Imax reported in its Annual Report that it recognized revenue on the sale or lease of a theatre system "at the time of installation" and "upon installation of the theatre system"[51]. Although the 2004 10-K does mention revenue recognition on "Multiple Element Arrangements", it appears to do so only in relation to film licenses and settlement revenue (occasions on which Imax negotiates the termination of an agreement with a customer who is unable to proceed with the installation of a contracted theatre).[52]

---

[48] Imax Corporation Annual Report for the Fiscal Year ended December 31, 2003 on Form 10-K ("2003 10-K"), Exhibit "G" to the Copland Affidavit, Respondents' Motion Record, Vol. IV, tab 12-G, pp. 879 & 881.

[49] Copland Affidavit, para 52, Respondents' Motion Record, Vol. III, tab 12, p. 347; Transcript of the Cross Examination of Francis Joyce taken March 7, 2008 ("First Joyce Transcript"), pp. 137-138.

[50] Transcript of the Cross Examination of Kathryn Gamble taken October 9, 2008 ("Second Gamble Transcript"), pp. 334-336; Transcript of the Cross Examination of Francis T. Joyce taken October 2, 2008 ("Second Joyce Transcript"), p. 244.

[51] Imax Corporation Annual Report for the Fiscal Year ended December 31, 2004 on Form 10-K ("2004 10-K"), Exhibit "H" to the Copland Affidavit, Respondents' Motion Record, Vol. V, tab 12-H, pp. 990 & 994.

[52] 2004 10-K, Exhibit H to the Copland Affidavit, Respondents' Motion Record, Vol. V, Tab 12-H, p. 995.

72. In each of the year 2001-2004 Annual Reports, Imax disclosed that revenue recognition was also subject to the following conditions:

(a) persuasive evidence of an agreement exists,
(b) the price is fixed or determinable; and
(c) collection is reasonably assured.[53]

73. These pronouncements were consistent with the existing written internal recognition policies and guidelines, to the extent there were such written policies and guidelines in place at Imax during the period.[54] In December of 2004, Imax produced an internal document titled "Policy No. 19: Revenue – Systems". That document provided as follows:

> The Company recognizes revenues from sales-type leases upon installation of the theatre system. Revenue associated with a sales-type lease is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.[55]

74. This document does not reference EITF 0021 or the possibility of accounting for Imax theatre systems as arrangements with multiple deliverables.

75. A document titled "Policy No. 19-B Revenue - System Sales", dated December 1, 2004, described Imax's revenue recognition policy with respect to revenue recognition for sales of theatre systems as follows:

---

[53] 2001 10-K, Exhibit "E" to the Copland Affidavit, Respondents' Motion Record, Vol IV, tab 12-E, p. 684; 2002 10-K, Exhibit "F" to the Copland Affidavit, Respondents' Motion Record, Vol IV, tab 12-F, p. 787; 2003 10-K, Exhbit "G" to the Copland Affidavit, Respondents' Motion Record, Vol IV, tab 12-G, p. 881; 2004 10-K, Exhibit "H" to the Copland Affidavit, Respondents' Motion Record, Vol. V, tab 12-H, p. 994.

[54] Answer to Undertaking #44, Plaintiffs' Sixth Record, tab I-A, p. 11.

[55] "Revenue – Systems", Plaintiffs' Sixth Record, Vol. 2, tab 44-A, p. 628.

> Revenue from sales of theatre systems is recognized when all of the following criteria are met: persuasive evidence of an agreement exists, the price is fixed or determinable; title passes to the customer, installation of the system is complete; and collection is reasonably assured.
>
> In determining that installation is complete for purposes of recognizing revenue for sales of Imax theatre systems, the Company requires that the following criteria be met:
>
> - Imax technology department concludes that the installation is complete, meeting full working standards according to contract provisions and system specifications.
> - All substantial issues which were raised by the client and which Imax acknowledges and is in agreement with have been resolved.
> - The installed theatre system complies with all material terms of the contract, including the installation of the:
>     - Projection unit;
>     - Sound system;
>     - Screen system; and
>     - 3D glasses system and cleaning system.[56]

76. Although Policy No. 19-B listed other "U.S. GAAP and SEC References" such as SAB 101, it did not refer to EITF 0021, nor did it contemplate the possibility of accounting for Imax theatre systems as arrangements with multiple deliverables.[57]

77. In November 2005, Imax apparently revisited certain of these policies. It produced a document titled "Policy 19-A Revenue - System Leases", dated November 16, 2005,[58] the stated purpose of which was as follows:

> This Policy establishes the Company's position on the revenue recognition applicable to leases signed by the Company with its customers.[59]

78. Policy 19-A summarized the Company's policy for the timing of revenue recognition as follows:

---

[56] "Revenue – System Sales", Plaintiffs' Sixth Record, Vol. 2, tab 44-C, p. 633.
[57] "Revenue – System Sales", Plaintiffs' Sixth Record, Vol. 2, tab 44-C, p. 634.
[58] Answer to Undertaking #44, Plaintiffs' Sixth Record, Vol. 1, tab I-A, p. 11.
[59] "Revenue – System Leases", Plaintiffs' Sixth Record, Vol. 2, tab 44-B, p. 631.

> The Company recognizes revenues from sales-type leases upon installation of the theatre system. Revenue associated with a sales-type lease is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.[60]

79. Although Policy 19-A listed various other accounting documents as sources for "Definitions" and "U.S. GAAP and SEC References", it did not refer to EITF 0021 nor did it mention the possibility of accounting for Imax theatre systems as arrangements with multiple deliverables.[61]

80. On December 1, 2005, Kathryn Gamble wrote a memo to Frank Joyce entitled "Revenue recognition policy compliance". That memo was produced in response to a request for any memo written for circulation by any member of Imax's finance team between December of 2005 and January of 2006 on the issue of whether revenue should be recognized on an entire theatre system prior to the completion of each and every aspect of Imax's obligations pursuant to a customer contract.[62]

81. That memo described Imax's revenue recognition policy as follows:

> The Company recognizes revenue from sales-type leases upon installation of the theatre system when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed and determinable; and collection is reasonably assured.[63]

---

[60] "Revenue – System Leases", Plaintiffs' Sixth Record, Vol. 2, tab 44-B, p. 631.
[61] "Revenue – System Leases", Plaintiffs' Sixth Record, Vol. 2, tab 44-B, p. 632.
[62] Answer to Undertaking #151.
[63] Imax Corporation Memorandum dated December 1, 2005 from Kathryn to Frank, Plaintiffs' Sixth Record, Vol. 6, tab 151, p. 1812.

82. The memo goes on to describe guidelines for determining whether installation of a particular theatre installation is "complete", including installation of the projection system, sound system, screen system, and 3D glasses system and cleaning system.[64]

83. The December 1, 2005 memo does not mention EITF 0021 or the possibility of accounting for Imax theatre system sales as arrangements with multiple elements.

84. In December 2005, in the course of an allegedly detailed review of Imax's revenue recognition policies arising from allegations of premature revenue recognition in relation to the Delhi, India installation in Q3/05, Imax's general counsel determined that Policy 19-B appeared to have a small number of inaccuracies, making it inconsistent with Imax's actual policy articulated in its public filings. Imax's general counsel identified those inaccuracies as follows:

(a) a requirement that installation is deemed to have been "complete" to recognize revenue, when Company policy – and the language of the Certificate of Acceptance that the client signs calls for "substantial completion"

(b) a requirement that an "installed theatre system" include a "screen system," when company policy and practice suggests only the screen frame is a material part of the system agreement, not the actual screen skin; and

(c) a requirement that an installed theatre system include a "3D glasses system and cleaning system" when Company policy and practice suggest these are perfunctory or routine items not a material part of the system agreement.[65]

[64] Imax Corporation Memorandum dated December 1, 2005 from Kathryn to Frank, Plaintiffs' Sixth Record, Vol. 6, tab 151, pp. 1812-1814.
[65] Memorandum from Robert D. Lister to Imax Corporation Audit Committee dated December 7, 2005, Plaintiffs' Sixth Record, Vol. 2, tab 55, p. 637D.

85. This portion of Mr. Lister's memo was apparently intended to point out areas in which Imax's written revenue recognition policy diverged from its actual policy and practice. It contains no reference, however, to EITF 0021 or the possibility that theatre system installations may be accounted for as arrangements with multiple deliverables.

86. Apparently in response to this report, in January 2006, Imax prepared and circulated new "Revenue Recognition Guidelines" for inclusion in Imax's policy binder.[66] This new guideline, which appears to have been approved by PwC, provided among other things, as follows:

> Imax Corporation (the "Company") recognizes revenue when the theatre system installation process is substantially complete and all of the following criteria have been met:
> - Persuasive evidence of an arrangement exists
> - Delivery has occurred and services have been rendered;
> - The sellers price to the buyer is fixed or determinable; and
> - Collectability is reasonably assured.

87. These guidelines then go on to provide guidance apparently intended to determine whether the installation is "substantially complete".[67]

---

[66] Memorandum from Kathryn A. Gamble to Frank Joyce & Edward McNeil dated January 23, 2006, Plaintiffs' Sixth Record, Vol. 2, tab 44-D, p. 635.
[67] Memorandum from Kathryn A. Gamble to Frank Joyce & Edward McNeil dated January 23, 2006, Plaintiffs' Sixth Record, Vol. 2, tab 44-D, p. 636.

88. It is clear, therefore, that Imax's official position through and including Q3/05 was that it should only recognize revenue on theatre systems sales and leases upon installation of the theatre system, including the screen.

89. Furthermore, contrary to the bald assertion contained at paragraph 52 of the Copland Affidavit that Imax adopted EITF 0021 in 2003, there is no indication in any of the contemporaneous documents that Imax considered the application of EITF 0021 to any theatre system installation prior to Q4/05, when Imax management was confronted by a potentially large earnings shortfall.

90. The SEC was apparently struck by this change as well. As stated by the SEC's Division of Corporate Finance in a September 20, 2006 letter to Imax's Interim CFO:

> Confirm that you are now accounting for these [theatre system sales and lease] arrangements pursuant to EITF 0021, Revenue Arrangements for Multiple Deliverables and, as we do not see similar disclosure in your 2004 10-K, **tell us the period in fiscal 2005 when you changed your revenue recognition policy**.[68] [emphasis added]

**CONDITIONS IN 2005**

91. In 2005, a number of events conditions arose that:

(a) created a managerial incentive to manipulate Imax's 2005 financial results;

(b) ought to have put the Defendants and Proposed Defendants on notice as to the correct accounting treatment for theatre system installations; and

---

[68] Letter from the SEC to Imax Corporation dated September 20, 2006, para. 7, Plaintiffs' Sixth Record, Vol. 1, tab 19-I-B, p. 101.

(c) ought to have prompted Imax's outside directors to apply heightened scrutiny to the accounting judgments of Imax's management.

**THE COMMENCEMENT OF IMAX'S "EXPLORATION OF STRATEGIC INITIATIVES"**

92. In the spring of 2005, Imax's Board decided to explore various strategic alternatives, including a possible sale of the company to an acquirer. Imax did not, however, disclose this fact to the public until March 2006.[69]

93. In April 2005, Imax's board met with representatives of two investment banks, UBS and Allen & Co., to discuss the exploration of strategic alternatives.[70] In July 2005, Imax executed retainers with both UBS and Allen & Co. for advice on a potential sale, merger, or other capital transaction.[71]

94. In mid-2005, Imax received the first of four or five "unsolicited" proposals received by Imax prior to the beginning of the Class Period.[72]

95. Imax's management and board recognized that stronger financial results would be a positive factor that would make Imax more attractive to a potential acquirer or merger partner.[73]

---

[69] Transcript of the Cross Examination of Bradley Wechsler taken February 25, 2008 ("First Wechsler Transcript"), p. 145-146.
[70] First Wechsler Transcript, pp. 125-126.
[71] Transcript of the Cross Examination of Richard Gelfond taken February 27, 2008 ("First Gelfond Transcript"), pp. 130-131; Answer to Undertaking #81, Plaintiffs' Sixth Record, Vol. 1, tab I-A, pp. 21-22.
[72] First Gelfond Transcript, pp. 126-127.
[73] Transcript of the Cross Examination of Garth M. Girvan taken February 18, 2008 ("Girvan Transcript"), pp. 128-129; First Wechsler Transcript, p. 143.

96. Despite their knowledge about the importance of Imax's financial results to the sale or merger process, over nearly 11 months from the time that Imax first consulted with its investment bankers, management failed to advise Imax's auditors that it was contemplating such a transaction. The auditors were first apprised of this fact in March 2006, following their completion of the audit of the company's 2005 financial statements.[74]

97. Indeed, even in late 2005, when Wechsler and Gelfond met with PwC to discuss the Company's business strategy, and to assist in the design of PwC's audit, no mention was made of the prospect of a sale or merger involving Imax.[75]

---

[74] Coulman Transcript, pp. 106-107.

[75] Coulman Transcript, pp. 149-154.

*The Delhi Post*

98. On about November 10, 2005, an unidentified person posted the Delhi Post on a Yahoo! Finance internet page related to Imax. The contents of the Delhi Post, which was entitled "SEC To Investigate Fraud at Imax", were also emailed anonymously to Mssrs. Wechsler and Gelfond.[76]

99. The Delhi Post stated:

> I remember shipping to warehouses and back to storage at the end of quarters when customers wouldn't pick up there (sic) system to make company numbers. Now there (sic) at it again. In order to reach its numbers what (sic) it told its analysts they are now faking installations before quarter ends pressuring with money and contracts for customers to sign install documents for the auditors and then going back after quarter end to really do the work. If you do not believe me ask someone in Delhi India to visit the theatre Imax has counted as installed in the third quarter. I was told its still not finished without a screen and water and permanent wiring and Imax people are still there working to install it in a still unfinished building. It was in its boxes on October 1. (sic) I understand. The next place I send this note is to the papers and the stock exchange officials. I was also told Imax is signing contracts for theatres that it knows will never open or no money paid and is not reducing them from its numbers of future theatres to be built. Expenses are now being hidden to the new year because it is scared it won't make its numbers again!!! He said there (sic) now paying customers to fake installs and sign documents for auditors in far off countries only away from auditors. I know they did it before and would do it again. They hid it last time when things fell apart and had large losses which hid the faked deliveries and signings with bad companies. They just think its employees are stupid and will keep their mouth shut so to keep there (sic) jobs. We are actually good and honest and hard working and we care passionately for what we do and the company. Its (sic) not only about money for the employees. Every day I hear more and will tell it all at the end of each month so keep posted. If I don't tell all the people who run this company will ruin this wonderful Canadian company.[77]

---

[76] Coulman Transcript, pp. 34-39; Girvan Transcript, pp. 79-81.
[77] Delhi Post, Plaintiffs' Sixth Record, Vol. 1, tab 12, p. 89.

100. Upon receipt of this message, Wechsler and Gelfond referred the matter to the Audit Committee. The Audit Committee then tasked Rob Lister, the Company's General Counsel, and Jeffrey Vance, a chartered accountant and member of the Company's internal finance department, to investigate. Each of Messrs. Lister and Vance prepared a written report.[78]

101. Mr. Lister was asked to investigate the allegations contained in the Delhi Post, to report to the Board and the Audit Committee concerning his conclusions, and to make recommendations arising out of his investigation.[79] He was told by Girvan and Copland to focus his attention on whether

(a) there was anything "fake" or misleading about the Q3 2005 Delhi installation;

(b) there were any clients placed into backlog despite Imax knowing they would never open theatres;

(c) expenses were being hidden; and

(d) any installations recognized in 2005 were achieved by paying customers to fake installs and sign documents for auditors.[80]

102. Mr. Lister prepared a report, dated December 7, 2005, in which he summarized the investigation he conducted, his factual findings, and stated his conclusions on the above issues.

---

[78] Memo from Rob Lister to the Audit Committee of Imax Corporation dated December 7, 2005 ("Lister Memo"), Plaintiffs' Sixth Record, Vol. 2, tab 55; Presentation to Imax Corporation Audit Committee ("Vance Report"), Plaintiffs' Sixth Record, Vol.4, tab 145.
[79] Lister Memo, Plaintiffs' Sixth Record, Vol. 2, tab 55, p. 637B.
[80] Lister Memo, Plaintiffs' Sixth Record, Vol. 2, tab 55, p. 637B.

103. In his report, Mr. Lister found that, at the end of Q3/05, the Delhi theatre was not complete for purposes of opening, the final screen had not been erected, the screen frame was erected on scaffolding, the projection room was incomplete, and the heating and power connections were only temporary. Despite all of the foregoing, he concluded that all revenue allocable to the Delhi theatre installation was properly recognized in revenue in Q3/05.[81]

104. As discussed above at paragraph 85, Mr. Lister noted certain deficiencies in Imax's written revenue recognition policies. Mr. Lister accordingly recommended that "improvements" be made to Policy 19-B in order to reflect the Company's purported existing practices. The policy was apparently revised in accordance with Mr. Lister's recommendations.[82] Notably absent from Mr. Lister's analysis and recommendations is any reference to multiple element accounting or EITF 0021, despite the Defendants' claim in this motion that Imax adopted EITF 0021 with respect to theatre installations in 2003.[83]

105. As stated above, Mr. Vance, who was an internal auditor and head of the Company's Sarbanes Oxley program, was asked by the Audit Committee to conduct a separate investigation into the financial accounting issues arising from the allegations in the Delhi Post.

106. Mr. Vance prepared a report, dated December 7, 2005, in which he "Summarized Findings in Relation to the Investigation of Allegations made on Yahoo!

---

[81] Lister Memo, Plaintiffs' Sixth Record, Vol. 2, tab 55, p. 637B-637C.
[82] "Imax Revenue Recognition Guidelines", Plaintiffs' Sixth Record, Vol. 2, tab 44-D, p. 636.
[83] Copland Affidavit, para 52, Responding Parties' Motion Record, Vol. III, tab 12, p. 347.

Bulletin Board".[84] Mr. Vance divided his report into three sections, each relating to a particular allegation made in the Delhi Post:

(a) Theatres prematurely considered installed for revenue recognition purposes;

(b) Contracts in backlog that will never be realized; and

(c) 2005 expenses concealed to be booked in 2006.[85]

107. With respect to all of these allegations, Mr. Vance's review appears to have been limited to the Company's own documents. He did not visit the Delhi theatre, nor did he ask anyone else to do so.[86] He did not speak to any non-Imax personnel, including the customer leasing the Delhi theatre, nor did he ask anyone else to do so, in the course of his investigation.[87] There is no suggestion in his report that Mr. Vance went beyond the Company's internal documentation in his attempt to ascertain whether theatres had been declared installed prematurely. [88]

108. Mr. Vance's review of those documents revealed that although all of the theatres he looked at had signed customer acceptances within the quarter in which they were recognized in revenue, eight of 21 of those theatres did not open in the quarter in which they were declared installed. Of those eight, six had "installation issues noted on the installation close-out summary, high estimated costs to complete, or both". He noted with respect to the Delhi theatre that the projection system required rewiring, as it had been installed on a temporary basis, the Glasses Cleaning Machine was not installed,

---

[84] "Presentation to the Imax Audit Committee: Summarized Findings in Relation to the Investigation of Allegations Made on Yahoo! Bulletin Board, December 7, 2005", Cross Examination Brief #2, Vol. 2, tab 145.
[85] Vance Report, Plaintiffs' Sixth Record, Vol. 6, tab 145, p. 1470.
[86] Answer to Undertaking #15, Plaintiffs' Sixth Record, Vol. 1, tab I-A, p. 3.
[87] Answer to Undertaking #16 & # 58, Plaintiffs' Sixth Record, Vol. 1, tab I-A, pp. 3 & 13.
[88] Vance Report, Plaintiffs' Sixth Record, Vol. 6, tab 145, p. 1471.

the 3D screen was not yet installed, some speaker cables needed to be rerun, and the system would need to be partially disassembled and reinstalled, because the theatre was not fully complete when it was commissioned.[89]

109. Mr. Vance's report also contained a summary of "Key US GAAP Literature/Guidance". In particular, Mr. Vance's report states:

> EITF 0021 provides guidance on when revenue can be recognized when there are multiple revenue generating activities. Specifically to Imax, EITF 0021 rules that the manufacture and installation of the projection/sound/screen system is linked, and revenue can only be recognized upon installation.[90]

110. Although Mr. Vance does not appear to render his own conclusion as to whether the theatre installation he scrutinized were appropriately recognized into revenue, his report does raise the spectre of what would transpire were PwC to disagree with management's decision to recognize all revenue allocable to incomplete theatre installations in the quarter in which they were partially completed:

> Final determination of appropriateness of GAAP interpretation rests with PricewaterhouseCoopers LLP, the Company's external auditors. A contrary interpretation from PwC would result in quarterly restatement, as well as have implications to the Company's ongoing Sarbanes-Oxley compliance project.

111. PwC was asked to review the findings of these investigations and to confirm its original view that the Delhi theatre was appropriately recognized in revenue in Q3/05. It did so, based upon the reports produced by Messrs. Lister and Vance. PwC did not do its own investigation into the allegations made in the Delhi Post. It simply

---

[89] Vance Report, Plaintiffs' Sixth Record, Vol. 6, tab 145, p. 1471.
[90] Vance Report, Plaintiffs' Sixth Record, Vol. 6, tab 145, p. 1476.