reviewed the accounting position taken based on the factual information provided to it by Imax.[91]

112. All of the members of Imax's Audit Committee accepted the reports provided by Messrs. Lister and Mr. Vance, apparently without questioning the scope of their investigations. They do not appear to have been troubled by the failure of Messrs. Vance and Lister to look beyond Imax's own personnel or internal documents.[92]

113. Imax did not provide a copy of the Delhi Post to the SEC until June 26, 2006, approximately one week after Imax's receipt of the initial inquiry letter from the SEC's Division of Enforcement.[93]

***The Q4/05 Installation Campaign***

114. Because Imax recognized revenue on the sale and lease of theatre systems when theatre systems were installed, Imax would fall below budget if installations were not completed according to schedule. Imax's management understood this and, accordingly, carefully monitored the progress of installations.[94] Indeed, in Q4/05,

---

[91] Coulman Transcript, pp. 44-45.

[92] Transcript of the Cross Examination of Kenneth Copland taken February 29, 2008 ("Copland Transcript"), pp. 87-90; Transcript of the Cross Examination of Neil Braun taken February 28, 2008 ("Braun Transcript"), p. 46; Transcript of the Cross Examination of David Leebron taken March 5, 2008 ("Leebron Transcript"), p. 52; Girvan Transcript, p. 88.

[93] Answer to Undertaking #180, Plaintiffs' Sixth Record, Vol. 1, tab I-B, p. 43.

[94] Second Gelfond Transcript, p. 290.

budget updates received by Imax management directly translated theatre installations into revenue and earnings per share.[95]

115. The status of pending installations was something that Imax's senior management, including the co-CEOs, monitored regularly. In particular, they received frequent email updates from Mark Welton, the head of Business Affairs, on the status of various installations that were identified as potentially recognizable in revenue in the quarter. In Q4/05, the purpose of receiving that information was to inform the co-CEOs as to whether Imax was going to meet its budget for financial results for Q4/05 and for 2005.[96]

116. Senior management also received updates from the Company's finance department that specifically identified the impact on the Company's financial statements that would result from particular installations falling to later periods, and how those results compared to Imax's earnings guidance to investors. Those updates also compared Imax's most up-to-date forecasts to the earnings guidance Imax had given.[97]

117. The updates circulated in Q4/05 indicated that, in order for Imax to make its budgeted numbers for 2005, it needed to install almost as many theatres in Q4/05 as it had in the first three quarters of 2005 combined.[98]

---

[95] Reports on Installations provided by Business Affairs unit to Gelfond and Wechsler in the fourth quarter of 2005 and in January of 2006 ("Business Affairs Reports"), Plaintiffs' Sixth Record, Vol. 4, tab 76-A, pp. 1282-1284.
[96] Second Gelfond Transcript, pp. 275-278.
[97] Business Affairs Reports, Plaintiffs' Sixth Record, Vol. 4, tab 76-A, p. 1288.
[98] Second Gelfond Transcript, pp. 338-339; Business Affairs Reports, Plaintiffs' Sixth Record, Vol. 4, tab 76-A, p. 1282.

118. The emails updates transmitted to Wechsler, Gelfond and Joyce regularly updated the co-CEOs and the CFO with the latest information on the status of particular installations and the issues faced in getting them installed by quarter-end, and outlined the steps that were being taken to ensure that they were in fact installed by quarter-end.[99] With respect to each theatre to which these emails referred, the amount of gross margin that Imax could expect to recognize on its 2005 financial statements was specified.[100]

119. These emails document the pressure tactics and inducements that Imax employed and offered in order to cause its clients to cooperate. Specifically, these emails document that:

(a) Imax's legal department was asked to review the contracts relating to installations at Dongguan South China Mall and Dongguan Dome to determine whether Imax had any legal leverage, because these installations were "extremely needed for Q4";[101]

(b) $25,000 was offered for "marketing of launch of theatre" in Kazan, Russia, which prompted the client to respond that it would do "everything in one's power for installation the (sic) equipment in December, 2005"[102];

(c) $50,000 was offered to the operators of the McMinnville theatre as "marketing launch contribution" coincident with the client's communicating that it would be able to get the theatre ready for "your [Imax's] December 31 timeline";[103]

(d) Imax's client in relation to a then-unsigned agreement to install a theatre in Winnipeg understood that "we [Imax] need it done";[104]

(e) Imax was "pushing [its] client extremely hard including threatening default if client does not go forward… offered client $25k towards

---

[99] Email updates provided by Mark Welton (Business Affairs) to Wechsler Gelond, Joyce and others on the status of Installations in the Fourth Quarter of 2005 and January of 2006 ("Welton Emails"), Plaintiffs' Sixth Record, Vol. 4, tab 76-B, pp. 1304-1325.
[100] Second Wechsler Transcript, p. 297.
[101] Welton Emails, Plaintiffs' Sixth Record, Vol. 4, tab 76-B, pp. 1306.
[102] Welton Emails, Plaintiffs' Sixth Record, Vol. 4, tab 76-B, pp. 1307.
[103] Welton Emails, Plaintiffs' Sixth Record, Vol. 4, tab 76-B, pp. 1307.
[104] Welton Emails, Plaintiffs' Sixth Record, Vol. 4, tab 76-B, pp. 1307.

opening launch of theatre" in relation to a potential installation at Interlomas, Mexico;[105] and

(f) Imax had "offered to provide subtitling system for $9K and per Rich [Gelfond] have agreed to ensure all DMR films distributed in China would be distributed to" the client installing the Beijing/Shanghai United Cinema theatre.[106]

120. Under cross-examination, the co-CEOs were asked directly if the purpose of paying "marketing bonuses" like those described above was to persuade Imax's customers to accept an installation earlier than it might otherwise be achieved. They were equivocal in their answers, agreeing only that such a purpose would be one of the reasons that such an incentive might be offered. In the Lister Memo, however, Mr. Lister specifically notes that the incentives mentioned above, in relation to Interlomas, Kazan, and Portland (McMinnville), were expressly offered for the purpose of incenting clients to "accept" installations before year end.[107]

121. Indeed, by the end of the quarter, Imax had entered into a series of undocumented agreements to provide various benefits to its clients. At the insistence of Imax's auditors, these agreements were formalized after December 31, 2005.[108] In particular, Imax entered the following amending agreements with existing customers Q4/05:

(a) A letter agreement dated October 25, 2005 with Shanghai United Cinema Line Co., Ltd, in relation to a theatre to be installed in Beijing, extends the customer's last two payments to October 28, 2005 (from March 15,

---

[105] Welton Emails, Plaintiffs' Sixth Record, Vol. 4, tab 76-B, pp. 1309.
[106] Welton Emails, Plaintiffs' Sixth Record, Vol. 4, tab 76-B, pp. 1309.
[107] Lister Memo, Plaintiffs' Sixth Record, Vol. 2, tab 55, p. 637D; Second Wechsler Transcript, pp. 207-209; Second Gelfond Transcript, pp. 309-310.
[108] Coulman Transcript, p. 82.

2005 and September 15, 2005[109]), and states that "Imax requires the system to be installed" by December 30, 2005[110];

(b) An agreement titled "Amending Agreement No. 1" between Imax and Lark International Multimedia Limited, in relation to a theatre to be installed in Hong Kong, extended the date of Imax's outstanding initial payments, totalling $720,000, from October 15, 2005 and December 15, 2005 to June 1, 2006, extinguished the client's obligation to provide Imax with a letter of credit in respect of its obligations, imposed an obligation on Imax to pay the client $39,490 as "theatre closing compensation" by January 31, 2006, and required Imax to supervise the re-installation of the system at its own cost at another location at a later date[111];

(c) An agreement titled "Amending Agreement No. 2" between Imax and Suvar-Kazan Company Ltd. dated October 12, 2005, in relation to a theatre to be installed at Kazan, Russia, deferred the client's last two initial payment instalments, and incorporated an obligation on both parties to "use their respective best efforts to ensure that the installation and commissioning of the system in the Theatre is complete by no later than December 31, 2005"[112];

(d) An agreement titled "Amending Agreement No. 4" between Imax and Suvar-Kazan Company Ltd., dated December 31, 2005, deferred the client's final payment of $180,000 to April 30, 2006 (from the earlier of the date the system installed or February 28, 2006), and imposed on Imax an obligation to pay US$31,000 in "marketing support" to assist the client with the launch of the theatre;[113]

(e) An agreement titled "Amending Agreement No. 2" between Imax Corporation and Evergreen Vintage Aircraft Inc., in respect of the McMinnville, Oregon installation, deferred the client's final initial payment of $340,000 from September 30, 2005 to April 1, 2006, and imposed on Imax an obligation to pay US$50,000 in "marketing support" to the client;[114]

(f) An agreement titled "Amending Agreement No. 2" between Imax Corporation and Jafif Penhos Elias dated November 29, 2005, in respect

---

[109] Agreement between Imax and Shanghai United Cinema Line Co., Ltd dated June 30, 2004, Plaintiffs' Sixth Record, Vol. 2, tab 75-2-C, p. 861.

[110] Letter from Imax to Shanghai United Cinema Co., Ltd. dated October 25, 2005, Plaintiffs' Sixth Record, Vol. 2, tab 75-2-D, p. 867.

[111] Amending Agreement No. 1 between Imax Corporation and Lark International Multimedia Limited dated December 31, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-4-B, pp. 972-973.

[112] Amending Agreement No. 2 between Imax Corporation and Suvar-Kazan Company Ltd. dated October 12, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-B, pp. 1021-1022.

[113] Amending Agreement No. 4 between Imax Corporation and Suvar-Kazan Company Ltd. dated December 31, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-C, p. 1024.

[114] Amending Agreement No. 2 between Imax Corporation and Evergreen Vintage Aircraft Inc., dated December 31, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-8-C, pp. 1178-1179.

of a theatre to be installed at Interlomas, Mexico, deferred the client's final two initial payments from the delivery date and the acceptance date of the system to February 28, 2006 and June 1, 2006, respectively, and imposed on both parties an obligations to "use their respective best efforts to install the system in the Theatre by no later than December 23, 2005".[115]

122. The email reports transmitted to Wechsler, Gelfond and Joyce identified each of the above installations as installs "with issues" in Q4/05. The combined testimony of Wechsler, Gelfond and Joyce was that the urgency evidenced in those emails for the installation of these theatres arose from important business purposes that completing those installations would achieve, aside from the recognition of revenue. In particular, it was suggested that the installation of those theatres would trigger initial payments and/or monthly rental revenue streams[116], and that in pressing to have these theatres installed, Imax was simply "working with" its clients to meet the clients' contractual obligations to accept installation of the theatres in Q4 2005.[117]

123. Those explanations, however, cannot withstand rational scrutiny. With respect to a number of the installations that Imax cajoled and incented its clients to "accept" before the end of Q4/05, a review of the contractual terms, and circumstances surrounding each such installation reveals that:

(a) no initial payments came due on the completion of the installation of those theatres; and

(b) no monthly rent stream became payable by the client on the installation of the theatres.

---

[115] Amending Agreement No. 2 between Imax Corporation and Jafif Penhos Elias dated November 29, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-9-C, pp. 1237-1238.
[116] Second Joyce Transcript, pp. 272-274.
[117] Second Gelfond Transcript, pp. 290-291.

***Beijing SUC #1***

124. The installation known as Beijing SUC #1 was performed pursuant to an original contract dated June 30, 2003, as amended on August 26, 2003, June 30, 2004, and October 25, 2005.[118] By Q4/05, the client's outstanding initial payment obligations were $600,000, payable in two instalments as follows:

(a) the first, US$480,000, payable on the earlier of March 15, 2005 (which had obviously passed) and the Shipment Date (the date on which the system leaves Imax premises); and

(b) the second, US$120,000 was payable on the earlier of September 15, 2005 and the Date of Acceptance.[119]

125. On October 25, 2005, almost one month into Q4/05, the terms were further amended such that the client was given until October 28, 2005 to pay the final US$600,000 in initial payments, while instalment of the theatre was contemplated to occur by December 30, 2005.[120] As such, no initial payment was premised on installation of the theatre system.

126. The client became liable to commence paying a licence fee of US$25,000 biannually (US$50,000 annually) in arrears six months after the date the client and Imax agreed that the theatre was installed and operational, and that testing and training were

---

[118] Contracts between Imax Corporation and Shanghai United Cinema Line Co. Ltd., Plaintiffs' Sixth Record, Vol. 2, tabs 75-2-A,B,C,D.

[119] Letter Agreement between Imax Corporation and Shanghai United Cinema Line Co. Ltd. dated June 30, 2004, Plaintiffs' Sixth Record, Vol. 2, tab 75-2- C, p. 861.

[120] Letter from Imax Corporation to Shanghai United Cinema Line Co. Ltd. dated October 25, 2005, Plaintiffs' Sixth Record, Vol. 2, tab 75-2-D, p. 867.

complete.[121] As such, the mere installation of the theatre, without completion of all other obligations, including theatre system alignment and training of staff, did not trigger the client's ongoing payment obligations.

127. Until Q4/05, none of the agreements relating to this installation contains a provision requiring the client to either permit or accept installation by any particular date. Rather, the main agreement in respect of this installation provides that Imax only becomes required to install the theatre once the client has completed its theatre and prepared it for installation. The agreement contemplates that the client might want Imax to commence installation prior to the theatre being fully prepared, in which case the client is responsible for any repairs required as a result of the early installation.[122]

128. In this case, the email updates that Wechsler, Gelfond, Joyce and Gamble received on December 12, 2005 made clear that neither Imax nor the client was prepared for the installation and testing of the Imax system when Imax purported to complete the installation. In order to "complete" the installation at that time, Imax had to erect the Imax screen and take it down in a single night. Given that the theatre was being used for other purposes at the time the purported installation occurred, that the opening of the Imax theatre was scheduled for the end of January 2006, and that the final Imax screen was not going to be available for installation until shortly before that time, it seems clear

---

[121] Agreement between Imax Corporation and Orient Holding Shanghai Foreign Trade Co., Ltd. and Shanghai United Cinema Line Co. Ltd. dated June 30, 2003, Plaintiffs' Sixth Record, Vol. 2, tab 75-2-A, p. 791.

[122] Agreement between Imax Corporation and Orient Holding Shanghai Foreign Trade Co., Ltd. and Shanghai United Cinema Line Co. Ltd. dated June 30, 2003, section 7.02, Plaintiffs' Sixth Record, Vol. 2, tab 75-2-A, p. 804.

that the only reason for rushing to install the theatre in December of 2005 was so that Imax could claim that the conditions for revenue recognition had been fulfilled.[123]

***Hong Kong Lark***

129. The Q4/05 installation for Lark International Multimedia Limited at Hong Kong was performed pursuant to an original agreement dated December 22, 2004[124], as amended by an amending agreement dated December 31, 2005.[125]

130. The original agreement required the final two instalments of the purchase price of the first system under the agreement to be paid as follows:

(a) US$610,000 on the earlier of the delivery date (no later than October 15, 2005) and October 15, 2005; and

(b) US$110,000 on the earlier of the date the theatre opens to the public, and December 15, 2005.[126]

131. The Amending Agreement extended those payment obligations such that both amounts became payable on June 1, 2006. As such, no purchase price payment was contractually dependant on the installation of the theatre system.

132. The ongoing payments under these agreements were to be calculated based in part on theatre admissions. In addition, the obligation to make those payments

---

[123] Welton Emails (December 12, 2005), Plaintiffs' Sixth Record, Vol. 4, tab 76-B, p. 1318.
[124] Agreement between Imax Corporation and Lark International Multimedia Limited dated December 22, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-4-A, p. 914.
[125] Amending Agreement No. 1 between Imax Corporation and Lark International Multimedia Limited dated December 22, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-4-B, p. 956.
[126] Agreement between Imax Corporation and Lark International Multimedia Limited dated December 22, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-4-A, pp. 915-916.

appears to begin with the execution of the agreement itself, rather than with the installation.[127] As such, no cash flow arising from monthly payments appears to have been triggered by the installation of this theatre.

133. Neither of these agreements appears to oblige the client to accept or permit installation by any particular deadline. Rather, the agreement appears to oblige Imax to install the system, but only after the theatre is completed and ready for the installation of the system.[128]

134. Since it appears that the theatre was not ready for full installation of the system (as the theatre was still too dirty to install the screen as of December 19, 2005), it was at least arguable that Imax's obligation to install was not yet triggered.[129]

135. Further, since this client had no intention of opening this theatre to the public, there was no apparent urgency or pressure from the client to have this theatre installed in Q4/05.[130] In fact, Imax had to agree to compensate the client for being closed over Christmas in order to fit the theatre for the installation of the Imax system.[131]

---

[127] Agreement between Imax Corporation and Lark International Multimedia Limited dated December 22, 2004, sections 3.02, 3.03, 4.02, Plaintiffs' Sixth Record, Vol. 3, tab 75-4-A, pp. 930-931.
[128] Agreement between Imax Corporation and Lark International Multimedia Limited dated December 22, 2004, section 5.02, Plaintiffs' Sixth Record, Vol. 3, tab 75-4-A, p. 933.
[129] Welton Emails (December 19, 2005) Plaintiffs' Sixth Record, Vol. 4, tab 76-B, p. 1322.
[130] Welton Emails (November 23, 2005) Plaintiffs' Sixth Record, Vol. 4, tab 76-B, p. 1318.
[131] Welton Emails (December 19, 2005) Plaintiffs' Sixth Record, Vol. 4, tab 76-B, p. 1322.

***Kazan, Russia***

136. The payment obligations outstanding in respect of the Kazan, Russia theatre in Q4/05 were as follows:

(a) Pursuant to an amending agreement, dated October 12, 2005, Kazan was required to make initial payments of
   (i) US$720,000 no later than October 25, 2005; and
   (ii) US$180,000 on February 28, 2006;[132] and

(b) pursuant to a further amending agreement dated December 31, 2005, the obligation to pay the US$180,000 instalment was deferred to April 30, 2006.[133]

137. Thus, no purchase price instalment was contractually dependent on the installation of the Kazan theatre in Q4/05.

138. The client's ongoing payment obligations were calculated as a percentage of admissions revenue for the theatre, less a fixed credit on which no such periodic amounts were payable.[134] As such, the installation itself of the theatre in Q4/05 triggered no new revenue or cash flow. Revenue would start to flow when the client began selling tickets and earning revenue on the theatre.

139. The theatre into which the system was "installed" had no acoustical treatment, no seats, no doors, and the projection room into which the projector was put had no ceiling, no finishes, and no HVAC at the time that the system was supposedly

---

[132] Amending Agreement No. 2 between Imax Corporation and Suvar-Kazan Company Ltd. dated October 12, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-B, pp. 1021-1022.
[133] Amending Agreement No. 4 between Imax Corporation and Suvar-Kazan Company Ltd. dated December 31, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-C, p. 1024.
[134] Agreement between Imax Corporation and Suvar-Kazan Company Ltd. dated October 20, 2004, section 4.02, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-A, p. 979.

installed.[135] This theatre did not open until October 20, 2006, after Imax installers had made a second trip to complete the installation[136].

140. In Q4/05, Imax and the Kazan lessee executed Amending Agreement No. 2, which appears to oblige both Imax and the client to make best efforts to accept or permit installation by December 31, 2005.[137] Prior to that amendment, however, the original agreement obliges Imax to install the system, but only after the theatre is completed and ready for the installation of the system.[138] It does not impose a deadline on the client for installation of the theatre.

141. Notably, the terms of the final amending agreement appear to have been under negotiation well into 2006, when there was still dialogue between Imax and the client concerning the amount of the marketing incentive to be provided by Imax. The client's position in that dialogue appears to be that it had done a significant service for Imax by taking steps to have the theatre system cleared through customs quickly, failing which the installation would have been substantially delayed, and thus not installed in Q4/05.[139]

142. It is therefore clear that there was no legitimate business purpose for Imax to push for the "completion" of this installation in Q4/05.

---

[135] Welton Emails (December 19, 2005) Plaintiffs' Sixth Record, Vol. 4, tab 76-B, p. 1322.

[136] Imax Theatre Installation Close-Out dated October 19, 2006, Plaintiffs' Sixth Record, Vol. 5, tab 147-5-H, p. 1669; Answer to Undertaking #219, Plaintiffs' Sixth Record, Vol. 1, tab I-B, p. 52.

[137] Amending Agreement No. 2 between Imax Corporation and Suvar-Kazan Company Ltd. dated October 12, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-B, p. 1021.

[138] Agreement between Imax Corporation and Suvar-Kazan Company Ltd. dated October 20, 2004, section 5.02, Plaintiffs' Sixth Record, Vol. 3, tab 75-5-A, p. 981.

[139] Letter from Vadim Aleksashin to Imax Corporation (John Schreiner, James A. Skinner), Plaintiffs' Sixth Record, Vol. 5, tab 147-5-Q, p. 1740; Email from John Schreiner to kino@suvar.ru, dated January 26, 2006, Plaintiffs' Sixth Record, Vol. 5, tab 147-5-R, p. 1741.

*McMinnville, Oregon*

143. The agreements governing the installation of the theatre system to be installed at McMinnville Oregon required the following initial payments during Q4/05:

(a) Amending Agreement No. 1 dated February 8, 2005 provided that the client would make the following payments:
   (i) US$595,000 on the earlier of the Delivery Date (projected to be August 20, 2005) and August 20, 2005; and
   (ii) US$340,000 on the earlier of the Date of Acceptance and September 30, 2005;[140]

(b) By further amending agreement dated December 31, 2005, the client's final initial payment of US$340,000 was extended to April 1, 2006.[141]

144. As such, no purchase price instalment payment was triggered by the completion of the installation in Q4 2005.

145. The client's ongoing payment obligations ("Additional Rent") was triggered by the "Date of Acceptance", which, according to the latest amendment of the agreement, was the earlier of the date on which the parties agree the theatre is installed and operational, with all training and tuning complete and September 30, 2005.[142]

146. As such, no contractual obligation to make payments was triggered on the completion of the installation of the theatre.

---

[140] Amending Agreement No. 1 between Imax Corporation and Evergreen Vintage Aircraft Inc. dated February 8, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-8-B, pp. 1175-1176.
[141] Amending Agreement No. 2 between Imax Corporation and Evergreen Vintage Aircraft Inc. dated December 31, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-8-C, p. 1178.
[142] Agreement between Imax Corporation and Evergreen Vintage Aircraft Inc. dated September 7, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-8-A, p. 1134 & 1137; Amending Agreement No. 1 between Imax Corporation and Evergreen Vintage Aircraft Inc. dated February 8, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-8-B, pp. 1175-1176.

147. None of the agreements governing Imax's relationship with this client appears to oblige the client to accept or permit installation by any particular deadline. Rather, the agreement appears to oblige Imax to install the system, but only after the theatre is completed and ready for the installation of the system.[143]

148. When the McMinnville theatre was purportedly installed, the installation, to the extent it was done, was done with temporary electrical hookups.[144] The training of projectionists was deferred because the installation occurred too far in advance of the public opening for the theatre for the training to be useful. Final alignment of the system could not be completed because there was too much interference in the theatre from scaffolding and building equipment.[145] It was intended that, when the screen sheet was hung for the purposes of "completing" the installation, it would be immediately taken down, because it was sure to be damaged or destroyed as construction of the theatre itself was completed.[146] The theatre did not open to the public until April 14, 2007.[147]

149. It is apparent that there was no legitimate business imperative from either the client or Imax to have this theatre installed in Q4/05. Imax's management wanted only to be able to claim that the conditions for revenue recognition had been fulfilled.

---

[143] Agreement between Imax Corporation and Evergreen Vintage Aircraft Inc. dated September 7, 2004, section 5.02, Plaintiffs' Sixth Record, Vol. 3, tab 75-8-A, p. 1141.
[144] Welton Emails (December 19, 2005), Plaintiffs' Sixth Record, Vol. 4, tab 76-B, p. 1322.
[145] Imax Theatre System Presentation Quality, Plaintiffs' Sixth Record, Vol. 5, tab 147-8-G, p. 1788.
[146] December 21, 2005 Email from Mark Welton to Glenn Pederson & Marnie Hamilton, Plaintiffs' Sixth Record, Vol. 5, tab 147-8-K, p. 1792.
[147] Answer to Undertaking #219, Plaintiffs' Sixth Record, Vol. 1, tab I-B, p. 52.

***Interlomas, Mexico***

150. At the beginning of Q4/05, the agreements governing the installation of this theatre required the following initial payment instalments to be made in Q4/05:

(a) US$145,000 on the Delivery Date (August 15, 2005, or such other date as agreed by the parties) ; and

(b) US$290,000 on the Date of Acceptance (the earlier of the date on which the parties agree the installation is complete, the date the theatre opens to the public, and October 15, 2005).[148]

151. In an amending agreement reached on November 29, 2005, Imax agreed to extend the client's final initial payment obligations as follows:

(a) US$145,000 payable by February 28, 2006; and
(b) US$290,000 payable by June 1, 2006.[149]

152. In that same agreement, the parties agreed:

(a) that Imax would provide the client with a $25,000 in "marketing support";

(b) that the client would no longer be required to post a letter of credit in respect of any initial payments; and

(c) to use their best efforts to install the Imax system in the theatre by no later than December 22, 2005.

153. The most logical interpretation of this agreement is that Imax agreed to extend payment obligations, provide the "marketing support", and drop the requirement for a letter of credit in exchange for the client's agreement to try to install the theatre

---

[148] Amending Agreement No. 1 between Imax Corporation and Jafif Penhos Elias, Plaintiffs' Sixth Record, Vol. 3, tab 75-9-B, p. 1236.
[149] Amending Agreement No. 2 between Imax Corporation and Jafif Penhos Elias dated November 29, 2005, Plaintiffs' Sixth Record, Vol. 3, tab 75-9-C, p. 1238.

before the end of Q4/05. On these terms, no payment of initial rent was triggered by the installation of the theatre.

154. The additional rent obligation in this agreement was based in part on the client's box office receipts. The client's obligation to pay additional rent arose from the "Date of Acceptance", defined in the last agreement that refers to it as the earlier of the date the theatre is installed, the date the theatre opens to the public, and October 15, 2005.[150] As such, the obligation to make additional rent payments was not contractually dependent on the installation of the theatre system in Q4/05.

155. Prior to the November 29, 2005 agreement, there were no particular time constraints placed on either party to either install or accept installation of the theatre system, subject to the following. Imax was required to install the system in the client's theatre only once the client's theatre was "complete" and "ready for the installation of the System with all required services for the System". The client had the option of requesting early installation, in which case Imax had the discretion (but not the obligation) to begin installation prior to the completion of the theatre.[151]

156. At the time the theatre was installed, there were no finishes on the walls or floors of the projection room, and no finishes or seats in the theatre itself. The final

---

[150] Amending Agreement No. 1 between Imax Corporation and Jafif Penhos Elias dated August 24, 2004, Plaintiffs' Sixth Record, Vol. 3, tab 75-9-B, p. 1236; Agreement between Imax Corporation and Jafif Penhos Elias dated June 30, 2003, Plaintiffs' Sixth Record, Vol. 3, tab 75-9-A, p. 1188.
[151] Agreement between Imax Corporation and Jafif Penhos Elias dated June 30, 2003, Plaintiffs' Sixth Record, Vol. 3, tab 75-9-A, pp. 1190-1191.

3D screen sheet was not installed.[152] Training of the client's projectionists was deferred to a date closer to the opening of the theatre, which did not occur until July 7, 2006.[153]

157. It thus seems clear that the only purpose in rushing the Q4/05 installation of this theatre was to enable Imax to claim that the conditions for revenue recognition had been fulfilled in Q4/05.

***Imax Made Concessions to its Clients to Embellish its Reported Earnings***

158. In summary, the written iterations of these agreements serve no legitimate business purpose for Imax.

159. Indeed, with respect to the "marketing support" payments required by certain of these amending agreements, Imax stated in its June 20, 2007 response letter to the SEC:

> The Company considers marketing credits to be a reduction in the overall arrangement consideration, as the Company does not receive any identifiable benefits in exchange for these types of incentives.[154]

**THE 2005 AUDIT PROCESS**

160. Having pushed its clients to "complete" these and other theatre system installations specifically for the purpose of being able to claim that the conditions for

---

[152] Imax Theatre System Summary, Outstanding Issues dated December 21, 2005, Plaintiffs' Sixth Record, Vol. 6, tab 147-9-C, p. 1798.

[153] Imax Basic Operator Training Checklist, Plaintiffs' Sixth Record, Vol. 6, tab 147-9-D, p. 1799.; Answer to Undertaking #219, Plaintiffs' Sixth Record, Vol. 1, tab I-B, p. 52.

[154] June 20, 2007 Letter from Imax Corporation to the SEC, Plaintiffs' Sixth Record, Vol. 1, tab 19-1-E, p. 176.

revenue recognition had been fulfilled, Imax then began to push its auditors. In January 2006, Imax management sought to persuade PwC that it would be appropriate for Imax to recognize in Q4/05 all of the revenue allocable to the sale or lease of the 14 theatre systems it claimed to have installed in that quarter.

161. Imax took that position despite the fact that the final screens for seven of those 14 theatres were not installed at the end of 2005.[155] In addition, there remained numerous other unfulfilled obligations.

162. With respect to the Beijing/Shanghai United Cinema installation:

(a) image testing remained to be completed;
(b) the sound system remained to be tuned; and
(c) projectionist training remained to be completed.[156]

163. With respect to the Hong Kong Lark installation:

(a) the system was to be uninstalled and reinstalled entirely at another location, as the location to which it had been installed was for demonstration purposes only[157];
(b) optical alignment of the projector remained to be completed;
(c) the CTRU matrix required final positioning;
(d) the projector lamp light levels required to be set;
(e) the sound system required final tuning;
(f) the speakers remained to be aimed;
(g) screen sheet remained to be tensioned; and
(h) the glasses cleaning machine remained to be installed.[158]

---

[155] Imax Corporation's August 9, 2006 Press Release, Plaintiffs' Initial Record, tab 2-M, p. 251.
[156] Imax Theatre System Summary, Outstanding Issues, Plaintiffs' Sixth Record, Vol. 4, tab 147-1-C, p. 1480.
[157] November 23, 2005 Email from Mark Welton to Marnie Hamilton, Plaintiffs' Sixth Record, Volume 4, tab 147-4-I, p. 1535.
[158] Imax Theatre System Summary, Outstanding Issues, Plaintiffs' Sixth Record, Vol. 4, tab 147-4-F, p. 1527.

164. With respect to the McMinnville/Portland installation:

(a) projectionist training remained to be completed;
(b) 3D offset and alignment remained to be completed due to building materials and equipment in the theatre; and
(c) the sound system tuning was deferred, as the theatre construction was incomplete.[159]

165. With respect to the Kazan, Russia installation:

(a) the projector and 3D alignment remained to be completed;
(b) projectionist training remained to be completed;
(c) the polarizers remained to be installed;
(d) the rear speakers remained to be hung;
(e) all speakers remained to be aimed;
(f) the sound system remained to be tuned; and
(g) the glasses cleaning machine still to be installed.[160]

166. With respect to the Interlomas, Mexico installation:

(d) the 3D alignment and masking was not complete;
(e) projectionist training was not complete;
(f) rear speakers were not hung;
(g) audio system remained to be tuned;
(h) all speakers remained to be aimed;[161] and
(i) glass cleaning machine remained to be installed.[162]

167. With respect to the Lodz, Poland installation:

(a) final image setup remained to be completed;
(b) final sound system tuning remained to be completed;
(c) glasses cleaning machine to be installed;[163] and
(d) projectionist training remained outstanding.[164]

---

[159] Imax Theatre System Summary, Outstanding Issues, Plaintiffs' Sixth Record, Vol. 5, tab 147-8-F, p. 1787.
[160] Imax Theatre System Summary, Outstanding Issues, Plaintiffs' Sixth Record, Vol. 5, tab 147-5-E, p. 1656.
[161] Imax Theatre System Summary, Outstanding Issues, Plaintiffs' Sixth Record, Vol. 6, tab 147-9-C, p. 1798.
[162] Imax Installation Report Review, Plaintiffs' Sixth Record, Vol. 6, tab 147-9-E, p. 1807.
[163] Imax Theatre System Summary, Outstanding Issues, Plaintiffs' Sixth Record, Vol. 5, tab 147-6-C, p. 1747.
[164] Imax Installation Report Review, Plaintiffs' Sixth Record, Vol. 5, tab 147-6-E, p. 1765.

168. The Beijing Film & Radio Museum theatre was the 7th theatre at which the screen had not been installed as of December 31, 2005.

169. At the beginning of the audit of the 2005 financial statements, Imax's management took the position that the installations of these theatres were "complete", that the remaining obligations were "perfunctory and inconsequential", and that all of the revenue associated with the sale or lease of these 14 theatres should be recognized in Q4/05.[165]

170. Internally at Imax, Mr. Vance raised serious questions about how the facts surrounding these installations might be perceived. For example,

(a) Mr. Vance pointed out that SAB 104 precludes recognition of revenue where the product is delivered for demonstration purposes (as was the case for the Hong Kong Lark installation recognized in Q4/05). He wondered how Imax would justify recognizing revenue in those circumstances. He also pointed out that the compensation Imax had agreed to pay the Hong Kong client was not a normal Imax business practice, and appeared to be an incentive to get the system in a temporary location for revenue recognition purposes.[166]

---

[165] Imax Installation – Revenue Recognition Summaries, Plaintiffs' Sixth Record, Vol. 2, tabs 29-C, D, E, F, G, H and I; Imax Installation Report Reviews, Plaintiffs' Sixth Record, Vol 4, tab 147-1-E, tab 147-2-D, tab 147-3-L, Vol. 5, tab 147-5-J, tab 147-6-F, tab 147-7-D, tab 147-8-I, Vol. 6, tab 147-9-E, tab 147-10-D.

[166] Answer to Undertaking #214, Plaintiffs Sixth Record, Vol. 1, tab I-B, p. 50; DEF-UT-147-000307, Plaintiffs' Sixth Record, Vol. 4, tab 147-4-Q, p. 1548.