(b) He queried whether the fact that, even in early 2006, the screen at Kazan was not expected to be installed before March, 2006 violated the "reasonable period of time" concept built into SAB 104, as well as the basis for the marketing support payment paid to this client. In particular, it was his view that this payment raised the prospect of the customer falsely signing the customer acceptance, since no payment turned on the execution of the acceptance.[167]

(c) On the McMinnville, Oregon installation, he questioned the five month waiting period between installation and the finishing of the outstanding obligations in the context of SAB 104, and queried what evidence existed to support the existence of "Amending Agreement No. 2" made as of December 31, 2005.[168]

(d) On the Manila, Philippines installation, he queried whether the outstanding payment obligations were contingent in any way on Imax's completion of its work in January, 2006, and why the opening of the theatre was not scheduled until March if everything was in fact completed. He also noted a high number of budgeted hours to complete outstanding tasks, and queried the materiality of the outstanding hours.[169]

There is no evidence that Mr. Vance's queries were responded to or addressed.

171. Upon learning of management's initial position, PwC asked management for an explanation of its position. Upon consideration of the nature of the obligations

---

[167] DEF-UT-147-000307, Plaintiffs' Sixth Record, Vol. 4, tab 147-4-Q, p. 1548.
[168] Answer to Undertaking #214, Plaintiffs Sixth Record, Vol. 1, tab I-B, p. 50; DEF-UT-147-001254, Plaintiffs' Sixth Record, Vol. 5, tab 147-8-M, p. 1794.
[169] DEF-UT-147-001254, Plaintiffs' Sixth Record, Vol. 5, tab 147-8-M, p. 1794.

remaining to be fulfilled by Imax in relation to numerous of the Q4/05 installations, PwC decided that it could not accept Imax's position that the remaining obligations were perfunctory and inconsequential.[170]

172. Ultimately, management persuaded PwC, with strenuous effort, to approve a less aggressive accounting treatment than recognition in Q4/05 of all revenues allocable to the sale/lease of the theatres "installed" in Q4/05. The less aggressive accounting treatment was RAMD, which would require Imax to defer to later periods a limited portion of the revenues allocable to the sale/lease of those theatres. PwC's concurrence, however, was achieved only after the provision of incomplete information to PwC. This is discussed more fully below.

## CLASS PERIOD DISCLOSURES

173. On February 17, 2006, prior to the completion of PwC's audit of Imax's financial statements, Imax issued a press release in which it stated:

> Imax Corp. announced today that, reflecting the strong tone and momentum of its business, it expects to meet or exceed the full year 2005 guidance it provided investors of $0.35-$0.38 in net earnings per share on a fully diluted basis.
>
> During the fourth quarter the Company completed 14 theatre installations, which is a record for a single quarter, and consistent with the guidance the Company provided. As a result, the Company installed a total of 34 theatre systems for the full year versus 21 for 2004. The Company also expects to report revenues approximately in the guided range of $145-150 million for all of 2005.
>
> These results are based on preliminary financial data and subject to the final closing of the Company's books and records.

[170] Coulman Transcript, pp. 74, 98-99.

> "Imax's momentum and growth potential is building," said Imax Co-Chairmen and Co-CEOs Richard L. Gelfond and Bradley J. Wechsler. "Imax set aggressive goals for theatre signings, film performance, installations, and financial results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the Imax network, an expansion that should continue to grow our recurring revenues."
>
> Imax also announced that in addition to completing 14 theatre installations, the Company signed deals for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40-45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.
>
> "In addition to delivering on our financial and operational goals, we continued to deliver on our strategy of positioning Imax as a profitable release window for Hollywood films, providing the Company with a strong platform with which to fulfill its long term potential," Gelfond and Wechsler continued. "We are very excited to enter 2006 with our strongest film slate ever, with five IMAX DMR titles already secured for day and date release, and *Deep Sea 3D* set for release in March. With the probable addition of another title in the fourth quarter of 2006, we expect to have a film release every six to eight weeks in 2006, which we believe, should be a major factor in driving theatre sales as well as recurring revenues.[171]

174. The Plaintiffs allege that the February 17 Press Release, 2006 was false and/or materially misleading in that:

(a) Imax had <u>not</u> "completed" 14 theatre installations in Q4/05;
(b) Imax did <u>not</u> install 34 theatre systems in 2005;
(c) Imax would <u>not</u> achieve its 2005 guidance of 0.35-$0.38 in EPS;
(d) Imax had <u>not</u> generated revenues of $140-$150 million for 2005.[172]

---

[171] Imax Corporation Press Release dated February 17, 2006, Exhibit "I" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-I, p. 233.

[172] Proposed Fresh Statement of Claim, para 25, Schedule "A" to the Notice of Motion, Plaintiffs' Initial Record, tab 1, p. 19.

175. On March 9, 2006, Imax issued two more press releases, as well as its 2005 10-K. The 2005 10-K was filed with SEDAR and with the SEC.[173] In the 2005 10-K, Imax stated that:

(a) it had installed 10 theatre systems in 2005 that were scheduled to open in the first and second quarters of 2006;[174]

(b) it had earned revenue of US$144.9 million, of which US$97.8 million was attributable to theatre system sales and leases;[175]

(c) it had "recognized revenue on 38 theatre systems which qualified as either sales or sales type leases in 2005 versus 22 theatre systems in 2004";[176]

(d) the Company's management had assessed the effectiveness of its internal controls over financial reporting, as at December 31, 2005, and had concluded that such internal control over financial reporting was effective as of that date. Additionally, based on the company's assessment, the Company determined that there were no material weaknesses in its internal control over financial reporting as of December 31, 2005;[177] and

(e) its financial statements had been prepared in accordance with U.S. GAAP.[178]

176. Imax's first March 9, 2006 Press Release (the "Earnings Release") incorporated the misrepresentations contained in the 2005 10-K, and made the following additional misrepresentations, all derivative or repetitive of those misrepresentations already made:

> - Company exceeds guidance and expectations for 2005, reporting net earnings of $0.40 per share, versus guidance of $0.35-$0.40 per share.
>
> […]

---

[173] First Robb Affidavit, para 28, Plaintiffs' Initial Record, tab 2, p. 45.
[174] 2005 10-K, Exhibit "F" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 120.
[175] 2005 10-K, Exhibit "F" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 141.
[176] 2005 10-K, Exhibit "F" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 153.
[177] 2005 10-K, Exhibit "F" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 213
[178] 2005 10-K, Exhibit "F" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 170-212.

Company completes record number of theatre installations in the fourth quarter with 14, and a total of 34 theatre installations for the full year.

Imax Corporation today reported net earnings of $0.40 per diluted share for the year ended December 31, 2005. This compares to net earnings of $0.26 per diluted share reported for the year ended December 31, 2004, an increase of 62%.

For the three months ended December 31, 2005, the Company reported net earnings of $0.29 per diluted share, compared to net earnings of $0.19 per diluted share reported for the three months ended December 31, 2004, an increase of 54%.

"Our 2005 results clearly reflect that Imax's commercial strategy is working and that the momentum in our business is continuing to grow," said Imax Co-Chief Executive Officers Richard J. Gelfond and Bradley J. Wechsler. "We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of Imax as a commercial destination for mainstream entertainment. We believe our steadily improving financial performance shows that our strategy and The Imax Experience® have been embraced by consumers, major studios and leading film exhibitors around the world.

[...]

The Company installed a record 14 theatre systems in the fourth quarter.

[...]

For the year ended December 31, 2005, the Company's total revenues were $144.9 million, as compared to $136.0 million reported for the prior year. Systems revenue was $97.8 million versus $86.6 million in the prior year. The Company recognized revenue on 38 theatre systems which qualified as either sales or sales-type leases in the fiscal 2005 (sic), versus 22 in 2004.

[...]

For the three months ended December 31, 2005, the Company's total revenues were $49.3 million, as compared to $47.5 million reported for the prior year period. Systems revenue was $35.1 million versus $28.8 million in the prior year period. The Company recognized revenue on 18 theatre systems which qualified as either sales or sales type leases in the fourth quarter of 2005, compared to nine in 2004.[179]

---

[179] Imax Corporation Press Release dated March 9, 2006, Exhibit "J" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-J, pp. 235-240.

177. The Earnings Release also attached Imax's Condensed Consolidated Statements of Earnings for both 2005 and Q4/05, and Consolidated Balance Sheets as at December 31, 2005.[180]

178. The financial results reported by Imax in the 2005 10-K and in the earnings release were a function of the revenue recognition policy applied in the 2005 10-K to theatre system sales and leases, which was markedly different in its terms from that disclosed in previous years, and inadequately disclosed. The 2005 10-K contained the following language relating to revenue recognition on theatre system sales and lease transactions:

> The Company's system sales and lease transactions typically involve the delivery of several products and services including the projector, projection screen, sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When the elements of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognize when revenue recognition criteria for that element is met.
>
> […]
>
> The Company recognizes revenue from sales and sales type leases when the installation of the respective theatre system element is substantially complete and all of the following criteria are met: persuasive evidence of an agreement exists, the price is fixed or determinable, and collection is reasonably assured.[181]

---

[180] Imax Corporation Press Release dated March 9, 2006, Exhibit "J" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-J, pp. 239-240.
[181] 2005 10-K, p. 34, Plaintiffs' Initial Record, tab 2-F, p. 147.

179. This revenue recognition policy represented a marked departure from the policy Imax had previously disclosed, which was that revenue was recognized on theatre systems sales and leases at the time of installation, or when installation was complete.[182] The effect of this departure was that Imax recognized revenue in 2005 relating to 10 theatre systems it would not have been able to recognize had it followed the revenue recognition policy that it had disclosed in prior years.

180. Imax's application of RAMD did not accord with U.S. GAAP. It was not appropriate for Imax to treat the final screen elements of the theatre systems as separate units of accounting.[183] In order to apply RAMD, it was necessary to first establish that a revenue arrangement has "multiple deliverables". The following facts require the contrary conclusion, namely that the theatre system, including the screen, was a single deliverable:

(a) The components that Imax delivered prior to the end of Q4/05, namely the projector and sound system, did not have value to Imax's customers on a stand-alone basis.

(b) The clients in question contracted to acquire a complete 3D Imax theatre system, and could not operate those theatres without the silver screens; their purpose in contracting to acquire an Imax theatre system was not to sell the system's components on a piecemeal basis, nor to generate revenue by operating the system's components separately and independently from each other (which in any case they could not do). Rather, they sought to operate an Imax theatre, and to generate revenue and profits by offering the unique Imax experience to movie-goers;[184]

(c) Prior to the end of Q4/05, no Imax customer had ever operated a 3D system commercially with the temporary, white screen that Imax had used to test seven incomplete theatre systems in Q4/05;[185]

---

[182] See paras 60-90 above.
[183] First Rosen Report, Plaintiffs' Initial Record, tab 4-A, p. 680.
[184] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, pp. 680-681
[185] Answer to Undertaking #87, Plaintiffs' Sixth Record, Vol. 1, tab I-A, p. 23.

(d) Imax's contracts with its customers do not assign value to individual system components;[186]

(e) Imax claims in its 2005 10-K that its primary line of business is the sale and lease of theatre systems;[187]

(f) Prior to the end of Q4/05, Imax customers had purchased silver screens on a stand-alone basis on only 3 occasions, in all cases as replacements for existing Imax theatres, and there is no evidence that any customer had purchased projectors and sound systems on a stand-alone basis;[188]

(g) There is no real secondary market for Imax theatre system components. As such, it cannot be said that there is objective and reliable evidence of the fair value of the components that had been installed at the end of Q4/05.[189]

181. It is the opinion of the accounting experts retained by the Plaintiffs, based on publicly available information, that the application of RAMD to Imax's theatre system sales and leases resulted in revenues being reported by Imax before those revenues had been earned, with the result that Imax prematurely recognized revenue on theatre system sales and leases in Q4/05.[190] Professor Rosen's opinion is that, until Imax completed the installation of a theatre, including testing and acceptance by the customer, the basic requirements for revenue recognition in accordance with U.S. GAAP had not been fulfilled.[191]

182. Professor Rosen also opines that Imax's adoption of RAMD for fiscal 2005 was a change in accounting policy that itself ought to have been disclosed.[192]

---

[186] Imax's contracts with customers applicable to the relevant installations are produced at tab 75 of the Plaintiffs' Sixth Record.
[187] 2005 10-K, Exhibit "F" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-F, p. 118.
[188] Answer to Undertaking #86, Plaintiffs' Fourth Record, Vol. I, tab I-A, p. 22; Answer to Undertaking #192, Plaintiffs' Sixth Record, Vol. 1, tab I-B, p. 45.
[189] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 683.
[190] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 684.
[191] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 686.
[192] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 688.

Whatever the date on which Imax purported to have adopted EITF 0021, Imax never disclosed the application of RAMD to theatre system sales and leases prior to the 2005 10-K, and even within the 2005 10-K, did not adequately disclose the import of its application to theatre system sales and leases. It is Professor Rosen's view that the change was motivated by Imax's reporting objectives, rather than changes in the substance of Imax's business.[193]

183. In its 2005 10-K, Imax did not disclose that it had recognized revenue on systems with respect to which installation was not complete, nor did it disclose that it had deferred revenue relating to the screen elements of those 7 theatres because the installations of those screen elements were not complete. Instead, it simply indicated that it was recognizing revenue on 38 theatre systems. The 2005 10-K was, therefore, materially false and misleading.

***The Exploration of Strategic Alternatives***

184. Both the Earnings Release, and a second March 9, 2009 press release issued by Imax (the "Strategic Alternatives Release"), contained a statement by Imax that it intended to explore a possible sale or merger of the Company. The Strategic Alternatives Release stated as follows:

> Imax Corporation today announced that its Board of Directors has decided to begin a process to explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business with another entity offering to strategic opportunities for growth. The company has retained Allen & Company and UBS Investment Bank as financial advisors in this process.

---

[193] First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 688.

> "In order to fully realize the growth potential in both the Imax brand and the business we have built to date, we are evaluating strategic alternatives in order to expand our scale and maximize value for our shareholders. We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. We think this interest, coupled with our solid fiscal 2005 results and compelling growth opportunities, makes this an ideal time to explore our options," said Imax Co-Chairmen and Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler.[194]

185. Imax began the process of putting itself up for sale nearly a year before this announcement was made. However, its auditors were not made aware of Imax's consideration of such a transaction until the day before it was announced to the public, by which time the audit of Imax's 2005 financial statements was complete.[195]

186. On February 23, 2006, UBS and Allen & Company, the investment bankers retained by Imax to assist with the sale process, made a presentation to Imax's Board of Directors wherein they presented a plan to market Imax to potential investors.[196] At some point in the process, between April of 2005 and March 9, 2006, UBS and Allen & Company had provided guidance to the Company as to the value that might be obtained in any transaction.[197] Although the specifics of that guidance have not been disclosed, it seems certain that the guidance provided indicated to the Defendants and Proposed Defendants that offers exceeding the then current market price of Imax might be anticipated.[198]

---

[194] Imax Corporation Press Release dated March 9, 2006, Exhibit "K" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-K, p. 241.
[195] Coulman Transcript, p. 106.
[196] First Gelfond Transcript, p. 124-126.
[197] Answer to Undertaking #84, Plaintiffs' Sixth Record, Vol. 1, tab I-A, p. 22.
[198] First Gelfond Transcript, p. 167.

187. A number of the Individual Defendants and Proposed Defendants stood to profit significantly from the sale of Imax, particularly in the event that Imax was sold at a premium to the trading price of its shares. In particular,

(a) Wechsler owned (jointly and on his own) 2,682,800 shares and 1,150,000 options to purchase Imax shares;

(b) Gelfond owned roughly 2 million shares and options to purchase Imax shares;[199] and

(c) Utay owned over 1 million shares;[200]

(d) Fuchs held between 46,000 and 58,000 options in 2005;[201] and

(e) Francis Joyce owned approximately 150,000 options to purchase Imax shares.

188. In the period following the March 9, 2006 announcement, Imax's financial advisers prepared a package to be delivered to potential acquirers, containing non-confidential, non-proprietary information. From the group of persons who receive that package, a smaller group of approximately 40 or 50 potential investors expressed interest, signed a confidentiality agreement and received a Confidential Information Memorandum on Imax.[202]

189. Of the forty to fifty potential investors who expressed an interest, approximately 12 made "non-binding expressions of interest" in or around early May 2006. Most of those interested parties undertook a preliminary due diligence process beginning in mid-May. Some of those parties brought accounting advisors with them to

---

[199] First Gelfond Transcript, p. 243.
[200] Transcript of the Cross Examination of Marc Utay taken February 28, 2008 ("Utay Transcript"), p. 12.
[201] Answer to Undertaking #64, Plaintiffs' Sixth Record, Vol. 1, tab I-A, p. 15.
[202] First Wechsler Transcript, pp. 150-157.

the due diligence sessions and specifically sought to speak to Imax's auditors. Others wished to discuss Imax's accounting with Mr. Joyce and other finance staff.[203]

190. A representative of at least one potential investor took the steps necessary to actually review PwC's working papers in relation to Imax, which contained, among other things, the Delhi Post. That potential acquirer asked PwC specific questions about Imax's revenue recognition policy.[204]

191. Ultimately, the process came down to approximately 3 potential acquirers in July and early August. These parties made conditional offers, subject to due diligence, but by early August 2006, it had become apparent to the Company's Board of Directors that the interest expressed was not going to translate into a deal at the price that the Board was seeking.[205]

***The SEC Inquiry Letter***

192. On June 20, 2006, Imax received a letter from the SEC. The letter followed a telephone conversation between the SEC and Imax's general counsel, Robert Lister. In the letter, the SEC advised that it wished to conduct separate telephone interviews with Frank Joyce and Ed MacNeil, to discuss the following:

> the Company's revenue recognition policies and practices,
> whether there were any changes to those policies and practices

---

[203] First Wechsler Transcript, pp. 151-152.
[204] Coulman Transcript, pp. 108-110.
[205] First Wechsler Transcript, pp. 152-154.

> in the fourth quarter of 2005, and, if so, what was the nature of those changes and the reason(s) for them.[206]

193. The telephone interviews requested by the SEC were conducted in or about the first half of July 2006.[207] The June 20 letter was also provided to the 12 or so potential investors who remained interested in acquiring Imax at the time it was received.[208]

***The Corrective Disclosure***

194. On August 9, 2006, Imax issued a press release which stated, in relevant part, as follows:

> […]
>
> Separately, the Company provided an update regarding its exploration of strategic alternatives, including the possible sale or merger of the company. On March 9, the Company announced it had retained Allen & Company and UBS to explore strategic alternatives. Today, the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently no buyers who have indicated a willingness to acquire the Company at a valuation sought by the Board of Directors. Because interest remains from several parties at a lower valuation, however, the Board has authorized the Company's bankers to explore these opportunities. This process is ongoing.
>
> "While we are surprised that the high level of interest we initially saw has yet to result in a partnership or acquisition, we are committed to fully exploring all options open to the Company, including those offers that did not meet the Board's original valuation parameters," said Imax Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "We remain committed to ensuring that any transaction is strategically or financially compelling and delivers the most value possible to our shareholders.

---

[206] June 20, 2006 Letter from Christopher J. Stewart (SEC) to Robert D. Lister (Imax Corporation), Plaintiffs' Sixth Record, Vol. 1, tab 19-I-A, p. 91.
[207] First Gelfond Transcript, p. 156
[208] First Wechsler Transcript, p. 155.

> […]
>
> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated different elements of an Imax theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.[209]

195. The August 9, 2006 Press Release thus disclosed for the first time that:

(a) The final screens of 7 of the 14 theatres recognized in revenue in Q4/05 were not installed by the end of Q4/05, and thus the related installations were not "complete" at quarter-end;

(b) Imax had applied RAMD in order to recognize revenue in Q4/05 relating to the delivered components of incomplete installations; and

(c) The SEC had made an informal inquiry into the timing of Imax's revenue recognition, and its use of RAMD in relation to theatre system installations.

---

[209] Imax Corporation Press Release dated August 9, 2006, Exhibit "M" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-M, pp. 250-251.

196. The August 9, 2006 Press Release also disclosed that the Company had not succeeded in finding a buyer at the price sought by the Board, but also disclosed that efforts to sell the Company continued.

197. There is some evidence that Imax's improper revenue recognition practices were related to the Board's failure to secure an acquirer at the desired price, including the following:

(a) at least one potential investor had access to all of PwC's working papers, which included the Delhi Post and the details of PwC's review of the investigation of that transaction;[210] and

(b) the June 20, 2006 letter from the SEC was provided to the 10 or 12 parties who engaged in the due diligence process as a precursor to a potential acquisition of Imax.[211]

198. Following issuance of the August 9, 2006 Press Release, the trading price of Imax's securities declined precipitously. On August 9, 2006, the closing price for Imax's securities was US$9.63 on the NASDAQ and C$10.77 on the TSX. On August 10, Imax's securities closed at US$5.73 on the NASDAQ and C$6.44 on the TSX, representing a single day decline of approximately 40%. Over the next 10 trading days, Imax's stock closed at between US$4.85 and US$6.05 on the NASDAQ, and between C$5.43 and $6.51 on the TSX.[212]

**THE RESTATEMENT**

---

[210] Coulman Transcript, pp. 108-110.
[211] First Wechsler Transcript, p. 155; Answer to Undertaking #102, Plaintiffs' Sixth Record, tab I-A, p. 25.
[212] Exhibits "U" and "V" to the Copland Affidavit, Responding Parties' Record, Vol VIII, pp 1909 & 1948.

199. The June 20, 2006 letter from the SEC marked the beginning of a process, described in more detail below, that ultimately resulted in the restatement of Imax's financial statements for the years between 2002 and 2005, including the 2005 10-K.

200. Ultimately, the Company revised its revenue recognition policy such that the projector, sound system, screen system, glasses cleaning machine and the initial services associated with the theatre system would be treated as a single deliverable and a single unit of accounting.[213] The effect of these and the other changes to Imax's revenue recognition policy was essentially a reversion to Imax's pre-2005 policy, that revenue would be recognized on installation of the entire theatre system.

201. These changes resulted in revenue relating to 14 theatre system installations being moved to later periods. Most significantly, in 2005, 10 installations on which revenue was recognized in the 2005 10-K were moved to later years – 8 to 2006, and 2 to subsequent periods.[214] All 10 of those theatres were Q4/05 installations.[215]

202. The result was that Imax's EPS for 2005 went from $0.40, as reported in the 2005 10-K, to US$0.20 following the restatement. Further, the 2006 10-K contained

[213] 2006 10-K, Exhibit K to the Affidavit of Scott Selig sworn August 2, 2007 ("Selig Affidavit"), Plaintiffs' Second Supplementary Motion Record dated August 10, 2007 ("Plaintiffs' Third Record"), tab 1-K, p. 1075.
[214] 2006 10-K, Exhibit K Selig Affidavit, Plaintiffs' Third Record, tab 1-K, p. 1075.
[215] Answer to Undertaking #29, Plaintiffs' Sixth Record, Vol. 1, tab I-A, p. 7.

an admission that the application of RAMD in the 2005 10-K was an "error" under U.S. GAAP.[216]

203. Imax told the OSC that the 10 theatres were deferred to later periods because each had outstanding obligations as of December 31, 2005 as follows:

(a) Dongguan S&T was deferred because there was no signed acceptance and projectionist training was not complete;

(b) Lark Hong Kong was deferred until after the reinstallation of the theatre in 2007;

(c) Winnipeg was deferred because there was no signed acceptance of projectionist training;

(d) Beijing Radio, Film & TV was deferred because of lack of acceptance of projectionist training and pending installation of the screen;

(e) Manila was deferred because of lack of acceptance of projectionist training and pending installation of the screen;

(f) Lodz, Poland was deferred because of lack of signed acceptance of projectionist training, and pending installation of the screen;

(g) Beijing SUC was deferred because of pending installation of the screen;

(h) Interlomas was deferred because of lack of acceptance of projectionist training, and pending installation of the screen;

(i) Kazan, Russia was deferred because of lack of signed acceptance of projectionist training and pending installation of the screen; and

(j) McMinnville was deferred because of lack of acceptance of projectionist training, and pending installation of the screen.[217]

## THE AFFIRMATIVE DEFENCES

---

[216] Imax Corporation Press Release dated March 9, 2006, Exhibit "J" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-J, p. 235; 2006 10-K, Exhibit K to the Selig Affidavit, Plaintiffs' Third Record, tab 1-K, p. 1077.

[217] September 28, 2007 Letter from Imax (G. Mary Ruby) to the OSC (Jodie Hancock), Plaintiffs' Sixth Record, Vol. 1, tab 19-I-I, p. 255.

204. In their materials, the Defendants and Proposed Defendants assert generally that:

(a) they acted with due diligence in making the statements set out in the February 17 Press Release, the 2005 10-K, and the Earnings Release, particularly in that they relied on the audit opinion provided by PwC; and

(b) the decline in Imax's share price following the August 9, 2006 Press Release was the result of Imax's failure to locate a sale or merger partner, and unrelated to any new information regarding its accounting treatment.[218]

***Due Diligence & The Audit Opinion***

205. The Defendants and Proposed Defendants have relied on the following general assertions in support of their "due diligence" defence:

(a) they had in place adequate internal controls to ensure that accurate information was gathered and reported through Imax's internal processes;

(b) they conducted, or caused to be conducted a thorough analysis of the relevant accounting principles in order to ensure that Imax's revenue recognition policies complied with U.S. GAAP;

(c) they consulted with and obtained the approval of PwC with respect to the application of RAMD, and with respect to the financial statements included in the 2005 10-K generally; and

(d) they had no reasonable grounds upon which to conclude that the statements made in Imax's disclosure documents were false.[219]

206. Each of these assertions fails for the reasons described below.

---

[218] Affidavit of Denise Neumann Martin sworn September 7, 2007 ("Martin Affidavit"), Responding Parties' Motion Record, Vol. I, tab 10.

[219] See, for example, Gelfond Affidavit at paras 8, 9, 13, 14, 15, 16, 17, 18, 19, Responding Parties' Motion Record, Vol I, tab 1, pp. 2-4.

***Internal Controls***

207. Imax has now admitted that its internal controls as of December 31, 2005 had material weaknesses and were not effective. Imax's 2006 10-K, which restated Imax's 2005 financial statements, contained the following statements related to Imax's internal controls:

> Based on this assessment, management has concluded that such internal control over financial reporting was not effective as of December 31, 2006 due to the material weaknesses identified and discussed below.
>
> [...]
>
> A material weakness is a control deficiency, or a combination of control deficiencies that results in more than a remote likelihood that a material misstatement of the annual or interim consolidated financial statements will not be prevented or detected. The following material weaknesses have been identified in management's assessment as of December 31, 2006:
>
> [...]
>
> The Company did not maintain adequate controls, including period-end controls, over the analysis and review of revenue recognition for sales and lease transactions in accordance with U.S. GAAP. Specifically, effective controls were not maintained to correctly assess the identification of deliverables and their aggregation into units of accounting and in certain cases the point when certain units of accounting were substantially complete to allow for revenue recognition on a theatre system.
>
> After reviewing its revenue recognition policy in conjunction with the announced review of its theatre system arrangements over the past 5 years in response to comments received from the staff of both the SEC and the OSC, the Company concluded that it had incorrectly assessed the determination of deliverables in its theatre systems arrangements. The term "deliverables" is not explicitly defined in any accounting literature. The determination of a deliverable requires significant judgment and can be influenced by the terms of the arrangement between a vendor and its customer, the customer's perspective of the deliverables, the interaction of the separate elements that could make up a single deliverable and other facts and circumstances unique to a transaction.

> […]
>
> The Company did not maintain adequate controls over the lines of communication between operational departments and the Finance Department related to revenue recognition for sales and lease transactions. Specifically, effective controls were not maintained to raise on a timely basis certain issues relating to observations of the installation process, any remaining installation or operating obligations, and concessions on contractual terms that may impact the accuracy and timing of revenue recognition. This control deficiency contributed to the restatement to the Company's consolidated financial statements for the years ended December 31, 2002 through 2005 and its consolidated financial statements for each of the quarters in the year ended December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30, and September 30, 2006, and audit adjustments to the Company's 2006 annual consolidated financial statements, affecting principally revenues, costs of goods sold, selling, general and administrative expenses, financing receivables, inventories, prepaid expenses, fixed assets, other assets, accounts payable, accrued liabilities and deferred revenues and related disclosures.[220]

208. Both the 2005 10-K and the 2006 10-K contained the following statement relating to the inherent limitations of internal controls generally:

> Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.[221]

209. The 2006 10-K thus admits that Imax's internal controls were materially deficient in a manner that had a direct impact on the Company's and the Board's ability to assess the recognition of revenue on theatre system sales and leases. Notwithstanding

---

[220] Imax Annual Report on Form 10-K for the Year ended December 31, 2006 ("2006 10-K"), Exhibit "K" to the Affidavit of Scott Selig sworn August 2, 2007 (the "Selig Affidavit"), Plaintiffs' August 10, 2007 Second Supplementary Motion Record (Plaintiffs' Third Record"), tab 1-K, pp. 1190-1194.

[221] 2006 10-K, Exhibit "K" to the Selig Affidavit, Plaintiffs' Third Record, tab 1-K, p. 1190.