the position that internal controls were not expected to prevent all misstatements, the Company, and Wechsler, Gelfond, Braun, Copland, Girvan, Leebron and Utay, all of whom signed the 2006 10-K, admit that there were weaknesses in Imax's internal controls which, if not corrected, would have prevented the making of the misrepresentations in the 2005 10-K.[222]

**U.S. GAAP**

210. In the course of the audit of Imax's 2005 annual financial statements, Imax, through its finance department, which contained at least 2 qualified accountants, proposed that all of the revenue relating to the 10 theatres with respect to which revenue was ultimately deferred, should be recognized. Imax took the position that the remaining obligations pertaining to those installations, including the installations of the final screens in 7 of those theatres, were "perfunctory and inconsequential", that installation was substantially complete, and that Imax was therefore entitled to recognize the revenue on these theatres.[223]

211. PwC, however, would not agree with that position. Having evaluated the outstanding obligations of which it was aware, and seeking a compromise that would permit Imax to recognize significant revenue on these installations, as it fervently wanted to, PwC suggested that Imax consider applying RAMD. [224]

---

[222] 2006 10-K, Exhibit "K" to the Selig Affidavit, Plaintiffs' Third Record, tab 1-K, p. 1217.
[223] Coulman Transcript, p. 58; Imax Installation – Revenue Recognition Summaries, Plaintiffs' Sixth Record, Vol. 1, tabs 29-C,D,E,G,H,J.
[224] Coulman Transcript, pp. 66-74.

212. By applying RAMD, Imax was able to recognize all revenue allocable to the sale/lease of the 14 theatre systems claimed to have been installed in Q4/05, except for the revenue that was purportedly allocable to the uninstalled components of the theatre systems, including the seven screens that had not been fully installed by quarter-end. This apparently represented a compromise that Imax management could tolerate, because it resulted in the deferral of only $767,000 in revenue to periods subsequent to Q4/05, and permitted Imax to record revenue numbers that met its published guidance.[225]

213. The application of RAMD ought to have raised serious questions, particularly for Mr. Joyce, a CPA, and Ms. Gamble, who reported to Mr. Joyce in Imax's finance department. It also ought to have raised serious questions for the Audit Committee and Mr. Girvan. Indeed, as directors and officers of Imax, these individuals had far better access to pertinent information than the auditors upon whom they purported to rely.

214. There is no evidence that Imax ever applied, or even considered applying EITF 0021 to theatre system installations before Q4/05. Imax's written revenue recognition policies to that time, while listing various accounting literature relevant to the recognition of revenue, do not mention EITF 0021 or RAMD. Even in his revisions to Imax's revenue recognition written policies in Q4/05, Imax's General Counsel did not include any mention of mention EITF 0021 or RAMD.

---

[225] Copland Affidavit, para 63, Responding Parties' Motion Record, Vol. III, tab 12, p. 352.

215. Further, the Audit Committee and Mr. Girvan were the audience for a presentation made by Jeffrey Vance in Q4/05 relating to the investigation into the Delhi Post. In his presentation, Mr. Vance, himself an accountant, expressly pointed out the following:

> Specifically to Imax, EITF 0021 rules that the manufacture and installation of the projection/sound/screen system is linked, and revenue can only be recognized upon installation.[226]

216. Despite this express direction that EITF 0021 could not be used to separate the revenue relating to Imax projectors, sound systems and screens, which was proffered in the course of a contemporaneous investigation into allegations of fraudulent revenue recognition, it appears that no member of Imax's Audit Committee, or Mr. Girvan, thought to raise the Vance concern with Imax's auditors.

217. The reason no one challenged the application of RAMD is obvious: the accounting alternative would have posed a serious impediment to Imax's plan to sell itself at a premium, and would likely have generated the market backlash that is frequently provoked by a severe earnings shortfall.

***Interactions with PwC***

218. While PwC initially provided a clean audit opinion in respect of Imax's 2005 financial statements, it is clear from Lisa Coulman's testimony that PwC did so with less than all of the relevant facts before it.

---

[226] Vance Report, Plaintiffs' Sixth Record, Vol. 4, tab 145, p. 1476.

219. Ms. Coulman was the audit partner in charge of Imax's 2005 financial statements. She was examined under rule 39.03 on this motion. In preparing for the 2005 audit, Ms. Coulman testified that she explicitly advised Imax, through the chair of its Audit Committee, Copland, that PwC needed to be made apprised of, and to understand, all of the outstanding obligations remaining with respect to each of the theatre installations Imax proposed to take into revenue in Q4/05.[227]

220. Ms. Coulman testified, however, that there were a number of facts of which she became aware after the completion of the 2005 audit that might have impacted her opinion regarding revenue recognition for theatre installations in Q4/05. She testified that some or all of the theatre installations in Q4/05 were not as complete as PwC had been led to believe. For example,

(a) she became aware that at the theatre in Kazan, Russia, it was "snowing in the theatre", and the temperature was below zero;

(b) she became aware of a potential side letter relating to the Lark, Hong Kong installation which relieved the client from having to make its ongoing lease payments until the theatre had been reinstalled at a second location;

(c) she testified that although she is sure there were other items of which she became aware during the restatement process, she could not, at the time of her testimony recall what those were.[228]

221. Ms. Coulman testified that she became aware of these other obligations in the course of reviewing the data collected in the course of the Company's restatement of its financial statements in 2007.[229] While the Plaintiffs endeavoured to identify and seek

---

[227] Coulman Transcript, pp. 59-60.
[228] Coulman Transcript, pp. 87-93.
[229] Coulman Transcript, p. 93.

production of this evidence in their cross examinations of the Defendants and Proposed Defendants, they were not able to do so.

222. Ms. Coulman was, however, unequivocal in her testimony that there was other information of which she became aware in the course of the restatement process in 2007 that might have impacted her audit opinion on the 2005 financial statements had she been aware of it when asked to give the 2005 audit opinion.[230]

223. PwC has since effectively rescinded its audit opinion on the 2005 10-K.[231]

224. The extent to which Imax and the Individual Defendants and Proposed Defendants were entitled to rely upon PwC must be considered in light of the stated parameters of the Imax-PwC relationship. In particular, Copland agreed on Imax's behalf that:

> The Company's management is responsible for the financial statements and information referred to above including establishing and maintaining an effective system of internal control over financial reporting. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in Canada and/or the United States of America.[232]

---

[230] Coulman Transcript, p. 114-116.
[231] Coulman Transcript, p. 138.
[232] PwC Engagement Letter dated April 25, 2005, Plaintiffs' Sixth Record, Vol. 2, tab 26, p. 373.

225. Further, in its "Management Representation Letter" in respect of the 2005 audit, Gelfond, Wecshler, Joyce and Gamble represented to PwC, on Imax's behalf, that:

> We confirm that we are responsible for the fair presentation in the consolidated financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles, for establishing and maintaining effective internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting based on criteria established in *Internal Control – Integrated Framework* issued by the COSO.
>
> [...]
>
> We confirm, to the best of our reasonable knowledge and belief, as of March 9, the date of your report, the following all (sic) representations made to you during your audit(s):
>
> 1. The consolidated financial statements referred to above are fairly presented in conformity with accounting principles
>
> 2. We have made available to you all:
>     a. Financial records and related data.
>
> [...]
>
> 4. There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.
>
> 66. For a sales-type lease or a direct sale, we have consistently recognized revenue when: persuasive evidence of an arrangement exists (signed lease agreement); the price is fixed or determinable; for sales type leases, the lease term commences; for sales transactions, title passes; collection is reasonably assured; and installation of the theatre system is complete. As criteria for completion of installation, the Company requires the following to be complete: the technology department has confirmed that the installation has been completed in accordance with the terms of the contract, significant issues raised by the customer, that Imax management is in agreement with, have been satisfactorily resolved; and the installed system complies with all material terms of the contract.[233]

---

[233] Imax Management Representation Letter delivered to PwC dated March 9, 2006, Plaintiffs' Sixth Record, Vol. 2, tab 27, p. 492.

*The Actual Knowledge of the Defendants and Proposed Defendants*

226. The evidence is clear that each of Gelfond, Wechsler, Joyce, Copland, Leebron, Braun, Girvan and Gamble had grounds to believe that the February 17 Press Release, the Earnings Press Release, and the 2005 10-K contained a misrepresentation.

227. Wechsler, Gelfond, and Joyce each regularly received email updates on the status of installations in Q4/05. Those emails contained information concerning some of the obligations with respect to particular installations that would remain outstanding as of December 31, 2005. Specifically, those emails informed Wechsler, Gelfond and Joyce that:

(a) The screen at the Lodz, Poland installation would be taken down (and thus need to be re-installed) once the system was tested, and that the system would be installed with temporary power sources;[234]

(b) The screen at the Beijing SUC theatre would be installed and then taken down (and thus need to be re-installed) once the system was tested so that the client could finish running another theatre system, and that the final screen would not likely be available for installation until the last week of January, 2006;[235]

(c) The Hong Kong Lark theatre would not be opened to the public, but rather would operate as a demonstration theatre;[236]

(d) The buildings around the Kazan, Interlomas, Portland (McMinnville) and Lodz, Poland theatres would not be complete when the theatres were installed, and that the installations would be "completed" with temporary screens and power supplies;[237] and

---

[234] Welton Emails (December 6, 2005), Plaintiffs' Sixth Record Record, Vol. 4, tab 76-B, p.1316.
[235] Welton Emails (December 6, 2005), Plaintiffs' Sixth Record Record, Vol. 4, tab 76-B, p. 1316; Welton Emails (December 12, 2005), Plaintiffs' Sixth Record Record, Vol. 4, tab 76-B, p. 1318.
[236] Welton Emails (December 6, 2005), Plaintiffs' Sixth Record Record, Vol. 4, tab 76-B, p. 1316; Welton Emails (December 12, 2005), Plaintiffs' Sixth Record Record, Vol. 4, tab 76-B, p. 1318.
[237] Welton Emails (December 12, 2005), Plaintiffs' Sixth Record Record, Vol. 4, tab 76-B, p. 1318 Welton Emails (December 15, 2005), Plaintiffs' Sixth Record Record, Vol. 4, tab 76-B, p. 1320.

(e) The screen at Beijing CFM would not be painted for the opening of the theatre because the theatre was too dirty.[238]

228. Moreover, the members of the Audit Committee (Copland, Leebron and Braun), as well as Girvan, also had direct knowledge that there remained various outstanding obligations on the Q4/05 installs, and that those theatre installations were therefore not "complete" at the end of Q4/05. That knowledge was obtained in the course of discussions between Imax management, who had taken the position that those outstanding obligations were perfunctory and inconsequential, and PwC, who would not accept that position, and proposed the application of RAMD. [239]

229. The members of the Audit Committee, as well as Girvan, had good reason to doubt the correctness of the application of RAMD to separate the revenue associated with Imax projectors and sound systems from the screen elements. In Particular, they received the report of Jeffrey Vance relating to the Delhi Post investigation on December 7, 2005, wherein he expressly noted that EITF 0021 required the projection system, sound system, and screen to be installed and recognized in revenue together. This, of course, was correct.[240]

***Loss Causation***

230. The plaintiffs' experts have opined that:

(a) the decline in the price of Imax's securities following the August 9, 2006 announcement was at least in part attributable to the disclosures

---

[238] Welton Emails (December 15, 2005), Plaintiffs' Sixth Record, Vol. 4, tab 76-B, p. 1320.
[239] Girvan Transcript, p. 122-123.
[240] Girvan Transcript, pp. 83-84; Vance Report, Plaintiffs' Sixth Record, Vol. 4, tab 145, p. 1476.

concerning Imax's accounting policies, and that the announcement that Imax had not to date been successful in completing an acquisition or merger accounted for, at most, approximately 25% of the shareholder value lost following the August 9 Press Release;[241] and

(b) it is plausible that the reason that no acquirer was willing to pay the premium to market price sought by Imax's Board of Directors was that, in the course of their due diligence on Imax's compliance and accounting practices, the potential acquirers examined the correspondence from the SEC, reviewed Imax's application of RAMD, decided that Imax had or may have overstated its earnings and revenue under GAAP, and concluded that Imax may have exposed itself thereby to regulatory action.[242]

231. The Defendants and Proposed Defendants have proffered no evidence to refute the latter position. Rather, the expert evidence proffered by the Defendants is that the stock drop was primarily associated with the failure of the sale/merger process. The Defendants' expert merely assumes that the failure of the sales/merger process was not related to the alleged misrepresentations.[243]

**CERTIFICATION**

232. The Plaintiffs rely on the facts and evidence set out above in respect of their motion for certification of this action as a class proceeding.

---

[241] Affidavit of Laurence Kryzanowski sworn May 30, 2007, para 37, Plaintiffs' First Supplementary Motion Record ("Plaintiffs' Second Record"), tab 2, p. 723.

[242] Affidavit of Robert Comment, paras 22-25, Plaintiffs' Reply Motion Record, tab 1, pp. 1450-452.

[243] Transcript of the Cross Examination of Denise Neumann Martin taken October 6, 2008 ("Second Martin Transcript"), pp. 109-110.

***Procedural Facts***

233. The plaintiffs' action was commenced by statement of claim on September 20, 2006.[244] The Plaintiffs served their notice of motion for leave and certification in November of 2006, and their Initial Record on February 27, 2007.

234. There is a class proceeding pending against Imax, Wechsler, Gelfond, Joyce and Gamble in the United States District Court for the Southern District of New York ("SDNY").[245] Imax's auditor, PwC, is also a defendant to that action (the "U.S. Action").[246]

235. In August 2008, the SDNY dismissed a motion brought by the Defendants in the U.S. Action to dismiss the action for failure to state a cause of action under U.S. law. To the plaintiffs' knowledge, that action has yet to proceed beyond the Defendants' pleadings motion, and no discovery has occurred in the U.S. Action.

236. The Plaintiffs propose to certify a class defined as follows:

> All persons (other than Imax and its subsidiaries, officers, directors, senior employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, the Individual Defendants, the Proposed Defendants, their family members, and any entity in which any of them has or had any legal or de facto controlling interest) who acquired securities of Imax between the opening of trading on the TSX and NASDAQ on February 17, 2006 and the close of trading on the TSX and NASDAQ on August 9, 2006 and continued to hold some or all

---

[244] Statement of Claim, Exhibit "A" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-A, p. 52.
[245] Consolidated Amended Complaint "*In Re Imax Corporation Securities Litigation*", Plaintiffs' Third Supplementary Motion Record dated February 12, 2008 ("Plaintiffs' Fifth Record"), tab 1-C, p. 68.
[246] Consolidated Amended Complaint "*In Re Imax Corporation Securities Litigation*", para 20, Plaintiffs' Fifth Record, tab 1-C, p. 74.

of those securities at the close of trading on the TSX and NASDAQ on August 9, 2006.

237. The Plaintiffs have apprised plaintiffs' counsel in the U.S. Action of the scope of the class they seek to have certified in this action, and have also apprised them that the hearing of the plaintiffs' leave and certification motions is scheduled to commence on December 15, 2008.[247]

238. The Defendants have provided evidence that there is a registry of Imax shareholders for the relevant period containing personal shareholder information. Thus, they appear to have access to information by which these persons, or at least persons who may qualify as Class Members, can be identified.[248]

239. According to Imax, there were approximately 39,511,959 shares of Imax common stock issued and outstanding as of February 14, 2005.[249] Although the Defendants and Proposed Defendants owned a substantial portion of these shares during the Class Period, it is uncontroversial that there is a substantial number of persons who qualify for membership in the Class.

240. Plaintiffs' counsel has estimated that the cost of litigating this matter through to a trial of the common issues will exceed $750,000, exclusive of disbursements.[250]

---

[247] Affidavit of Michael Robb sworn November 24, 2008 ("Fourth Robb Affidavit").
[248] Answer to Undertaking #115, Plaintiffs' Sixth Record, Vol. 1, tab I-A, p. 27.
[249] Copland Affidavit, para 107, Responding Parties Motion Record, Vol. III, tab 12, p. 361.
[250] First Robb Affidavit, para 48, Plaintiffs' Initial Record, tab 2, p. 49.

## PART II—ARGUMENT

### THE PURPOSES UNDERLYING CLASS ACTION LEGISLATION

241. The *CPA* is remedial legislation. It is to be given a generous, broad, liberal and purposive interpretation to meet the three goals of Ontario's class action regime: judicial economy, access to the courts and, thus, justice, and behaviour modification. These objectives are met by certifying this action as a class proceeding:

- there is "a goal of facilitating access to justice for claimants" – in this case, the amounts of money lost by most Class Members are disproportionably small compared to the costs of prosecuting an individual action;

- the *CPA* "seeks to provide for common issues to be litigated in a single proceeding involving many claimants" for reasons of judicial economy – in this case, there are common issues that can be litigated in a single proceeding involving thousands of Class Members; and

- by facilitating access to justice, the *CPA* deters wrongful conduct. "A class proceeding can be a mode of regulating business conduct in aid of public policies through the private sector seeking the remedy."

*Hollick* v. *Toronto (City),* [2001] 3 S.C.R. 158 at p. 170, para. 15.

*Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.), leave to appeal to the S.C.C. refused May 12, 2005 at p. 411, para. 37.

### THE S. 5(1) REQUIREMENTS

242. The language of section 5 of the *CPA* is mandatory. The court is required to certify the action as a class proceeding where the following five-part test for certification is met:

(a) the pleadings disclose a cause of action;

(b) there is an identifiable class of two or more persons that would be represented by the representative plaintiff;

(c) the claims of the class members raise common issues;

(d) a class proceeding would be the preferable procedure for the resolution of the common issues; and

(e) there is a representative plaintiff who,

(i) would fairly and adequately represent the interests of the class,

(ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and

(iii) does not have, on the common issues for the class, an interest in conflict with the interests of other class members

*Class Proceedings Act, 1992*, S.O. 1992, c.6, s. 5(1), Plaintiffs' Factum, Schedule B, Tab 1.

**ONLY A MINIMUM EVIDENTIARY BASIS IS REQUIRED TO ACHIEVE CERTIFICATION**

243. The certification motion is not meant to be a test of the merits of the action. It is a procedural motion focusing on the form of the action rather than on whether the action is likely to succeed on the merits.

*Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at para. 16.

244. The Plaintiffs must establish "a minimum evidential basis for a certification order." It is necessary that the Plaintiffs "show some basis in fact for each of the certification requirements," other than the requirement in s. 5(1)(a). The "adequacy of the record will vary in the circumstances of each case." On this certification motion, there is before the court a substantial evidentiary basis touching on all requirements of s. 5(1)(b) to s. 5(1)(e).

*Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at paras. 24-25.

## (1) THE SUBSECTION 5(1)(A) REQUIREMENT: THE PLEADINGS DISCLOSE A CAUSE OF ACTION

### THE PRINCIPLES

245. The test under s. 5(1)(a) is well settled and identical to the test under rule 21.01(1)(b). The following principles apply to the determination of the issue of whether the pleadings disclose a cause of action under s. 5(1)(a):

(a) no evidence is admissible for the purposes of determining the s. 5(1)(a) criterion;

*Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at para. 25.

(b) all allegations of fact pleaded, unless patently ridiculous or incapable of proof, must be accepted as proved and thus assumed to be true;

(c) the pleading will be struck out only if it is plain, obvious and beyond doubt that the plaintiff cannot succeed and only if the action is certain to fail because it contains a radical defect;

*Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.), leave to appeal to the S.C.C. refused May 12, 2005 at para. 41.

(d) the novelty of the cause of action will not militate against the plaintiff;

(e) matters of law not fully settled in the jurisprudence must be permitted to proceed; and

*VitaPharm Canada Ltd.* v. *F. Hoffmann-LaRoche Ltd.* (2005), 74 O.R. (3d) 758 (S.C.J.) at para. 17(e).

(f) the pleading must be read generously to allow for inadequacies due to drafting frailties and the plaintiffs' lack of access to key documents and discovery information.

*Hunt* v. *Carey Canada Inc.*, [1990] 2 S.C.R. 959 at 990, 991.

*Anderson* v. *Wilson* (1999), 44 O.R. (3d) 673 (C.A.) at 679.

### APPLICATION OF THE PRINCIPLES TO THIS CASE

***Cause of Action: Declarations***

246. In the statement of claim, the Plaintiffs seek the following declarations:

(a) a declaration that some the Defendants made the Representation, and that the Representation was untrue, inaccurate and misleading when made;

(b) a declaration that the Defendants made the Representation negligently or, alternatively, recklessly, caring not whether it was true or false;

(c) a declaration that the Defendants conspired each with the other, and with persons unknown, to deceive Neil, Cliff and the other Class Members for the purposes of maintaining and increasing the price of the Imax Shares; and

(d) a declaration that Imax is vicariously liable for the acts and/or omissions of the Individual Defendants.

Statement of Claim, paras 2(b), (c) and (d), Exhibit "B" to the First Robb Affidavit, Plaintiffs' Initial Record, tab 2-A, p. 56.

Proposed Fresh Statement of Claim, paras. 2(b), (c) and (d), Plaintiffs' Initial Record, tab 1, p. 13.

247. A declaratory judgment is an established remedy under Canadian law. Section 97 of the *Courts of Justice Act* has its roots in the *Chancery Act* of 1850. The substance of s. 97 first appeared in Upper Canada in 1853. It is now beyond doubt that a plaintiff may maintain an action in Ontario for a declaration *simpliciter*.

*Courts of Justice Act*, R.S.O. 1990, c. C.43, ss. 96(3), 97.

Sarna, Lazar *The Law of Declaratory Judgments*, 2nd ed. (Toronto: Carswell, 1988) at pp. 5-9.

Woolf, *The Declaratory Judgment*, 3rd ed. (London: Steel & Maxwell, 2002) at p. 3.

248. A claim for a declaration is a cause of action. The Plaintiffs may obtain a judgment for a declaration.

*Smith* v. *National Money Mart Co.*, Order dated January 5, 2007 at p. 4, para. 4.

*Markson* v. *MBNA Canada Bank* (2007), 85 O.R. (3d) 321 (C.A.), at pp. 335-336, paras

41 and 49.

*Cause of Action: Negligence*

249. In paragraphs 58 to 61 of the Statement of Claim (and paras 63-66 of the Proposed Fresh Statement of Claim), the Plaintiffs plead that the Defendants owed them and the Class Members a duty of care, and that they breached the standard of care in the circumstances.

250. The Plaintiffs plead in paragraphs 70 and 71 of the Statement of Claim (and paras 82-83 of the Proposed Fresh Statement of Claim) that they and the Class Members suffered damages as a result of the Defendants' negligence.

251. The Plaintiffs submit that they have properly pleaded negligence as a cause of action.

*Causes of Action: Negligent and Fraudulent Misrepresentation*

252. The Plaintiffs plead that there was a single "Representation" that "Imax's revenue for the 2005 fiscal year were reported in accordance with GAAP and that such revenues met or exceeded the earnings guidance previously issued by Imax." The Plaintiffs also plead that the "Representation" was false and, therefore, a misrepresentation.

Statement of Claim, , paras. 1(T) and 2(B), Plaintiffs' Initial Record, tab 2-A, pp. 55-56.

Proposed Fresh Statement of Claim, paras 1(y) and 2(b), Plaintiffs' Initial Record, tab 1,

pp. 12-13.

253. Generally, a defendant is liable in damages for negligent misrepresentation if:

(a) the defendant owed a duty of care based on a "special relationship" between the representor and the representee;

(b) the Defendants made an untrue, inaccurate or misleading representation;

(c) the misrepresentation was made negligently;

(d) the representee reasonably relied on the misrepresentation; and

(e) the representee suffered damages as a result of the misrepresentation.

*Queen* v. *Cognos Inc.*, [1993] 1 S.C.R. 87 at 110.

254. Generally, a defendant is liable in damages for fraudulent misrepresentation if:

(a) the defendant made the misrepresentation knowing that the representation was false, or recklessly, caring not whether it was true or false;

(b) the defendant intended that the plaintiff, or a class of persons including the plaintiff, rely upon the representation; and

(c) the plaintiff and the other Class Members relied upon the representation to their detriment and suffered loss or damage.

*Carom* v. *Bre-X Minerals Ltd.*, [1998] O.J. No. 1428 at p. 8, paras. 24-25.

*Mondor et al.* v. *Fisherman et al.*, [2001] O.J. No. 4620 (S.C.J.) at p. 6, para. 33.

255. As demonstrated in the previous paragraph, fraudulent misrepresentation has two branches, either the making of a representation knowing it was false, or the making of a representation recklessly. The Plaintiffs plead only the reckless branch of fraudulent misrepresentation in paragraphs 62 to 71 of the Statement of Claim (and paragraphs 67-75 of the Proposed Fresh Statement of Claim).

256. "The concern as to indeterminate liability expressed in *Hercules* has no application to a claim of fraudulent misrepresentation." The *Hercules* principle applies only to negligent misrepresentation. If the Defendants acted recklessly in making the Representation and intended that the Class Members rely upon the Representation, there is no policy reason to limit liability.

> *Mondor et al.* v. *Fisherman et al.*, [2001] O.J. No. 4620 (S.C.J.) at p. 12, para. 70.
>
> *Hercules Management Ltd.* v. *Ernst & Young* (1997), 146 D.L.R. (4th) 577 (S.C.C.) at p. 597, paras. 40-41.

257. If the plaintiff can establish by some means other than reliance that the Defendants' misrepresentations caused him injury, then they can state a cause of action in negligent misrepresentation or, alternatively, negligence, even if they did not rely upon the misrepresentations in the traditional sense.

> *Yorkshire Trust Co.* v. *Empire Acceptance Corp. Ltd.*, [1986] B.C.J. No. 3254 (S.C.C.), at 19.
>
> *Spring* v. *Guardian Assurance plc*, [1994] 3 All E.R. 129 (H.L.), at 146-7.
>
> *Haskett* v. *Equifax Canada Inc.*, [2003] O.J. No. 771 (C.A.), at paras. 32-37 & 40.
>
> *Lowe* v. *Guarantee Co. of North America*, 2005 CarswellOnt 3072 (C.A.), at paras. 41-50.
>
> *Boulanger* v. *Johnson & Johnson Corp.*, [2003] O.J. No. 2218 (C.A.).
>
> *Trizec Properties Inc.* v. *Citigroup Global Markets Inc.* [2004] O.J. No. 2906 (Ont. S.C.J.).
>
> *Collette v. Great Pacific Management Co.*, [2004] B.C.J. No. 381 (C.A.), at para. 33-34.
>
> *Eaton v. HMS Financial Inc.*, 2008 CarswellAlta 1400 (Q.B.) at paras. 90-91

258. The Plaintiffs here allege that the Defendants' misrepresentations caused the price of Imax's shares to become inflated, that they purchased Imax shares at inflated

prices at a time when they did not know that the Defendants' statements regarding Imax's 2005 revenues and earnings were false, and that they sustained damages when that inflation was removed from Imax's share price by the correction of the Defendants' misrepresentations. Thus, although the Plaintiffs allege that they and other Class Members relied upon the Defendants' misrepresentations, they state a cause of action in negligent misrepresentation or, alternatively, negligence whether or not they relied upon those misrepresentations.

> Statement of Claim, paras 52-71, Plaintiffs' Initial Record, tab 2-A, pp. 71-76
>
> Proposed Fresh Statement of Claim, paras 57-75, Plaintiffs' Initial Record, tab 1, pp. 30-35.

259. The Plaintiffs have properly pleaded negligent and fraudulent misrepresentation.

> Statement of Claim, paras. 62-71, Plaintiffs' Initial Record, tab 2-A, pp. 74-76.
>
> Proposed Fresh Statement of Claim, paras 67-75, Plaintiffs' Initial Record, tab 1, pp. 33-35.

***Cause of Action: Conspiracy***

260. The Plaintiffs plead a conspiracy against the Defendants in paragraphs 47 to 51 of the Statement of Claim. They assert damages in paragraphs 70 and 71. The same allegations are made in paras 52-56 and 82-83 of the Proposed Fresh Statement of Claim.

261. The Supreme Court of Canada's definition of the tort of conspiracy is found in the following statement by Estey J.:

> … the law of torts does recognize a claim…as the tort of conspiracy if:
>
> (1) whether the means used by the Defendants are lawful or unlawful, the predominant purpose of the Defendants' conduct is to cause injury to the plaintiff; or
>
> (2) where the conduct of the Defendants is unlawful, the conduct is directed towards the plaintiff (alone or together with others), and the Defendants should know in the circumstances that injury to the plaintiff is likely to and does result.
>
> In situation (2) it is not necessary that the predominant purpose of the Defendants' conduct be to cause injury to the plaintiff but, in the prevailing circumstances, it must be a constructive intent derived from the fact that the Defendants should have known that injury to the plaintiff would ensue. In both situations, however, there must be actual damage suffered by the plaintiff.
>
> *Canada Cement LaFarge Ltd.* v. *British Columbia Lightweight Aggregate Ltd.* (1983), 145 D.L.R. (3d) 385 (S.C.C.) at pp. 398-399.

262. The pleading requirements for the tort of conspiracy are as follows:

> [t]he statement of claim should describe who the several parties are and their relationship with each other. It should allege the agreement between the Defendants to conspire, and state precisely what the purpose or what were the objects of the alleged conspiracy, and it must then proceed to set forth, with clarity and precision, the overt acts which are alleged to have been done by each of the alleged conspirators in pursuance and in furtherance of the conspiracy; and lastly, it must allege the injury and damage occasioned to the plaintiff thereby
>
> *Normart Management Limited* v. *West Hill Redevelopment Company Limited et al.* (1998), 37 O.R. (3d) 97 at p.104

263. An action may proceed against employees and officers of a corporation, for acts and omissions which occurred in the course of their employment, if the conduct alleged falls within a number of broad categories, including "fraud, deceit, dishonesty or want of authority on the part of employees or officers."

> *ScotiaMcLeod Inc.* v. *Peoples Jewellers Ltd.*, [1995] O.J. No. 3556 (C.A.) at para 25.

264. The Plaintiffs submit that they have properly pleaded a conspiracy.