### (2) THE SUBSECTION 5(1)(B) REQUIREMENT: THERE IS AN IDENTIFIABLE CLASS OF TWO OR MORE PERSONS WHO WOULD BE REPRESENTED BY THE REPRESENTATIVE PLAINTIFF

265. The Plaintiffs propose the following worldwide class definition:

> "Class" or "Class Members" means all persons, other than Excluded Persons, who acquired securities of Imax during the Class Period on the TSX and on NASDAQ and held some or all of those securities at the close of trading on August 9, 2006.

or such other definition as may be approved by the court.

266. McLachlin C.J.C. wrote that "in securities fraud actions" … "the class is usually composed of those who owned the stock."

> *Hollick* v. *Toronto (City)* [2001] 3 S.C.R. 158 at p. 173, para. 20.

267. Class definition is critical because it identifies the persons who are entitled to notice, to relief if awarded, and who will be bound by any judgment or settlement. A class definition must be "defined … by reference to objective criteria." There must be "some rational relationship between the class and the common issues. …[I]n the usual case, the relationship is clear from the facts." "In a single-incident mass tort case (for example an airplane crash), the scope of the appropriate class is not usually in dispute. The same is true in … securities fraud actions (where the class is usually composed of those who owned the stock) …"

> *Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at pp. 171-173, paras. 17, 19-20.
>
> *Bywater* v. *Toronto Transit Commission,* [1998] O.J. No. 4913 (Gen Div.) at para. 10.

268. While the number and identity of the Class Members are not yet known, the records kept by the Class Members will identify them.

269. It is not necessary to identify every or even most of the Class Members at the certification stage:

> The fact that it would be difficult at the certification stage to list by name every member of the class is not fatal. The *CPA* contemplates situations where it may be difficult to identify by name precisely every member of the class … It is sufficient if the class is identified in terms that would allow one to determine on an objective basis whether or not any given individual fits within it…
>
> *Robertson* v. *Thomson Corp*. (1999), 43 O.R. (3d) 161 (Gen. Div.) at p. 169.
>
> *Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 412, para. 45, leave to appeal to the S.C.C. refused May 12, 2005.

270. The Ontario Court has certified actions with class members who were non-residents in other provinces and other countries. In *YBM*, in the context of a settlement, the Ontario Court certified a worldwide class. In *Mandeville*, on a contested certification motion, a worldwide class was certified.

> *Nantais* v. *Telectronics Proprietary (Canada) Ltd.* (1995), 25 O.R. (3d) 331 (Gen. Div.).
>
> *Mandeville v. Manufacturers Life Insurance Co.*, [2002] O.J. No. 5387 (S.C.J.) at para 3(2).
>
> *Mandeville v. Manufacturers Life Insurance Co.*, [2002] O.J. No. 5386 (S.C.J.) at para. 47
>
> *Robertson v. The Thomson Corp.* (1999), 43 O.R. (3d) 161 (Gen. Div.) at p. 176.
>
> *Mondor v. Fisherman* (2002), 22 C.P.C. (5th) 346 (S.C.J.) at para. 12.
>
> *In re Nortel Networks Corp. Securities Litigation,* No. 01 Civ. 1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003).

271. Imax is a Canadian corporation with its registered office in Mississauga. It is domiciled in Ontario. The misconduct alleged relates to the accuracy of Imax's financial statements which were prepared and audited in Ontario. The accuracy of

Imax's financial statements and its press releases, all of which were issued from Ontario, are a matter of Imax's internal management.

> Robb Affidavit, Plaintiffs' Initial Record, tabs 2-G, H, I, J, K and M.
>
> *National Trust Company* v. *Ebro* [1954] O.R. 463 at pp. 465, 476.

272. It is well established that matters of internal management of a corporation and questions affecting a corporation's status are to be determined by the courts of the corporation's domicile:

> The instrument of incorporation and the law of the corporation's domicile govern not only its creation and continuing existence, but also **all matters of internal management**, the creation of share capital, and related matters so as to determine **questions affecting the status of a Canadian company and matters relating to its internal management**.
>
> *National Trust Company* v. *Ebro*, [1954] O.R. 463 (H.C.) per Schroeder J. (as he then was] [emphasis added]. See also *Churchill Pulpmill Ltd.* v. *Manitoba*, [1977] 6 W.W.R. 109 (Man. C.A.) at para. 32.

273. The Plaintiffs have met the section 5(1)(b) requirement and the Class should be defined to include all persons, including non-residents, who acquired Imax securities on the TSX and the NASDAQ.

## (3) THE SUBSECTION 5(1)(C) REQUIREMENT: THE CLAIMS OF THE CLASS MEMBERS AND SUBCLASS MEMBERS RAISE COMMON ISSUES

## THE LIST OF COMMON ISSUES

274. The Plaintiffs propose the following list of common issues:

1. Did Imax or the Individual Defendants, or any of them, represent that Imax's revenue for the 2005 fiscal year were reported in accordance with GAAP and that such revenues

met or exceeded earnings guidance previously issued by Imax? If so, who made the Representation, when, where and how?

2. Did Imax or the Individual Defendants, or any of them make the Representation negligently, or recklessly, caring not whether it was true or false? If so, who made the Representation, when and how?

3. Did the Imax or the Individual Defendants, or any of them, make the Representation intending that the Class Members rely upon it and acquire Imax Shares?

4. Did some or all of Imax's February 17, 2006 Press Release, Annual Report for the year ending December 31, 2005 or its two March 9, 2006 press releases contain a misrepresentation within the meaning of the *OSA*?

5. If the answer to (4) is yes, are the Defendants (including the Proposed Defendants), or some of them, liable to the Class Members pursuant to section 138.3 of the *OSA*?

6. Did the traded price of Imax shares during the Class Period incorporate and reflect the Representation?

7. If the answer to (6) is yes, did the acquisition of Imax shares by the Class Members, on the TSX and NASDAQ, during the Class Period, constitute reliance upon the Representation?

8. Did the Imax or the Individual Defendants, or some of them, owe the Class Members a duty of care? If so, what was the standard of care? Did any of the Defendants breach the standard of care?

9. If the answer to (8) is yes, were Imax or the Individual Defendants, or some of them, negligent? If so, who, when and why?

10. Did the Imax or the Individual Defendants, or some of them, conspire one with the other, and with persons unknown to deceive the Class Members for the purpose of maintaining and increasing the price of Imax securities? If so, who conspired with whom, when, where, why and for what purpose?

11. If the Imax or the Individual Defendants s, or some of them, are liable to the Class for conspiracy, negligence, negligent or fraudulent misrepresentation, what is the procedure for assessing damages?

12. Can the court assess damages in the aggregate, in whole or in part, for the Class? If so, what is the amount of the aggregate damage assessment and who should pay it to the Class?

13. Is Imax vicariously liable or otherwise responsible for the acts of the other Defendants?

14. Should one or more of the Defendants pay punitive damages to the Class? If so, who, why, in what amount and to whom?

15. Should the Defendants, or any of them, pay the costs of administering and distributing any monetary judgment and/or the cost of determining eligibility and/or the individual issues? If so, who should pay what costs, why, in what amount and to what extent?

16. If the court determines that the Defendants are liable to the Class, and if the court considers that participation of individual Class members is required to determine individual issues:
    (a) are any directions necessary?
    (b) should any special procedural steps be authorized?
    (c) should any special rules relating to admission of evidence and means of proof be made?
    (d) what directions, procedural steps or evidentiary rules ought to be given or authorized?

17. Should the Defendants, or any of them, pay prejudgment and postjudgment interest, at what annual interest rate, and should the interest be compounded interest?

**THE PRINCIPLES**

275. Section 1 of the *Class Proceedings Act, 1992* defines "common issues" as:

(a) common but not necessarily identical issues of fact, or

(b) common but not necessarily identical issues of law that arise from common but not necessarily identical facts.

276. This definition "represents a conscious attempt by the Ontario legislature to avoid setting the bar for certification too high." The common issues need only "advance the litigation." "Resolution through the class proceeding of the entire action, or even resolution of particular legal claims … is not required." This requirement has been described by the Court of Appeal "as a low bar."

> *Carom v. Bre-X Minerals Ltd.* (2000), 51 O.R. (3d) 236 (C.A.) at pp. 248-249, paras. 40-42.
>
> *Cloud v. Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 414, para. 52.

277. The common issues question should be approached purposively. There is no formulaic approach that determines this requirement. The underlying question is whether, if the action continues as a class proceeding, will "duplication of fact-finding or legal analysis" be avoided.

> *Western Canadian Shopping Centres Inc.* v. *Dutton,* [2001] 2 S.C.R. 537 at p. 554, para. 39.
>
> *Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 414, para. 51.

278. If necessary, the list of common issues can be further refined as the litigation moves forward.

> *Robertson* v. *Thomson Corp.* (1999), 43 O.R. (3d) 161 (Gen. Div.) at p. 173.

279. The court may look to the statement of claim to discern common issues. Since the Defendants have not delivered statements of defence, they cannot argue what they "will plead" in response to the common issues.

> *Lau* v. *Bayview Landmarks Inc.*, [1999] O.J. No. 4060 (S.C.J.) at paras. 21, 22, 24.

280. The common issues are rationally connected to the Class Members' claims but their resolution is independent of them. The focus of the common issues is on the conduct of the Defendants. The determination of the common issues may be dispositive of some of the Defendants' liability for some of the claims or a substantial component of the claims of each Class Member. As such, they are necessary to the resolution of each Class Member's claim. Determination of the common issues would eliminate the need for each Class Member to separately have these issues adjudicated.

> *Carom* v. *Bre-X Minerals Ltd.* (2000), 51 O.R. (3d) 236 (C.A.) at p. 252, para. 51-62.
>
> *Rumley* v. *British Columbia*, [2001] 3 S.C.R. 184 at pp. 199-204, paras. 27 and 34.
>
> *Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at pp. 414-415, 417-419; paras. 51-53, 65.
>
> *Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at pp. 171-172, para. 18.
>
> *Cassano* v. *The Toronto-Dominion Bank* (2008), 87 O.R. (3d) 401 (C.A.) at para. 42.

281. The question of liability need not be completely determined through a decision on the common issues. In this action, a determination of some of the key common issues may determine liability and, potentially, leave only the issue of part of the damages to be determined against some Defendants. The common issues overwhelm any individual issues. In any event, an action may meet the common issue requirement even though "many individual issues remain to be decided after … resolution" of the common issues such as issues of liability, causation and damages. As Goudge J.A. wrote:

> In other words, an issue can constitute a substantial ingredient of the claims and satisfy s. 5(1)(c) even if it makes up a very limited aspect of the liability question and even though many individual issues remain to be decided after its resolution. In such a case the task posed by s. 5(1)(c) is to test whether there are aspects of the case that meet the commonality requirement rather than to elucidate the various individual issues which may remain after the common trial. This is consistent with the

positive approach to the *CPA* urged by the Supreme Court as the way to best realize the benefits of that legislation as foreseen by its drafters.

*Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 415, para. 53.

*Andersen* v. *St. Jude Medical Inc.* (2003), 67 O.R. (3d) 136 (S.C.J.) at p. 148, paras. 39, 49.

282. The possibility that some members of the Class may have suffered different adverse consequences from others does not detract from the commonality of issues, such as the Defendants' breach of a standard of care.

*Andersen* v. *St. Jude Medical Inc.* (2003), 67 O.R. (3d) 136 (S.C.J.) at pp. 148-149, paras. 40-42, leave to appeal denied, [2005] O.J. No. 269 (Div. Ct.).

**APPLICATION OF THE PRINCIPLES TO THIS CASE**

***Common Issue 1: Did Imax or the Individual Defendants, or any of them, represent that Imax's revenue for the 2005 fiscal year were reported in accordance with GAAP and that such revenues met or exceeded earnings guidance previously issued by Imax? If so, who made the Representation, when, where and how?***

***Common Issue 2: Did Imax or the Individual Defendants, or any of them, make the Representation negligently or fraudulently, knowing it was false, or recklessly, caring not whether it was true or false? If so, who made the Representation, when and how?***

***Common Issue 3: Did the Imax or the Individual Defendants, or any of them, make the Representation intending that the Class Members rely upon it and acquire Trust Units?***

283. The Plaintiffs allege that Imax and the Individual Defendants (Wechsler, Gelfond and Joyce) made a Representation that "Imax's revenue for the 2005 fiscal year were reported in accordance with GAAP and that such revenues meet of exceed earnings guidance previously issued by Imax."

Statement of Claim, para. 1(t), Plaintiffs' Initial Record, tab 2(A), p.55.

Proposed Fresh Statement of Claim, para 1(y), Plaintiffs' Initial Record, tab 1, p. 12.

284. Because of the facts particularized in the paragraphs above and, in particular, the restatement of Imax's financial statements and the opinion of Dr. Rosen, summarized below, the Plaintiffs have established a minimum evidentiary basis for alleging that the Representation was materially false and was therefore a misrepresentation.

First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p.666.

285. In the First Rosen Report of February 12, 2007, Dr. Rosen opined as follows:

> Based upon our review of the information available to us as of the date of this report, and pursuant to the analysis that is set out herein, it is our opinion that:
>
> A. Imax's sale accounting results in the recognition of revenue prior to the substantial completion of theatre system sale transactions. Hence, it would appear that key conditions under GAAP for the recording of revenue for accounting and financial reporting purposes are not satisfied, including:
>
> 1. The delivery of the contracted goods and services to the customer;
> 2. The transfer of the risks and rewards of ownership to the customer;
> 3. The measurability of the sales and costs of the sale transaction; and
> 4. The collectibility of sale proceeds.
>
> Imax's revenue recognition practices tend to accelerate the timing of when sales are recorded for financial reporting purposes. **In our opinion, there is a strong likelihood that Imax's accounting for theatre system sales is not consistent with generally accepted accounting principles in the United States of America ("U.S. GAAP")**. Consequently, IMAX's 2005 financial statements would not fairly present its financial results in accordance with U.S. GAAP, and would be materially misstated.
>
> B. IMAX's application of Revenue Accounting for Multiple Deliverables ("RAMD") appears to be inconsistent with the terms and conditions of its theatre system sales transactions. RAMD is intended to account for separate

> and distinct components of multi-part transactions, or parts of a series of transactions. Under RAMD, revenue is recognized on a piecemeal basis for individual components of a larger transaction(s). In our view, the sale of IMAX theatre systems is more fairly characterized as a single transaction involving multiple sub-components. Consequently, it is not appropriate to recognize revenue on a piecemeal basis.
>
> We further note that IMAX's application of RAMD to theatre systems in 2005 was not reported as a change in accounting policy (as required by GAAP). RAMD was introduced into GAAP in 2003 but was not adopted by IMAX until 2005. IMAX chose to employ RAMD in fiscal 2005 on a prospective basis, without retroactively restating its prior years' results (or disclosing the net income effect on retained earnings). All else being equal, IMAX's 2005 reported results inappropriately appeared to be improved relative to prior year's earnings (which did not employ RAMD). We note that IMAX's adoption of RAMD coincided with its need to report improved financial results (to meet previously announced earnings targets and because the company was seeking potential merger partners).
>
> **Overall, we believe that the IMAX's revenue accounting (RAMD), and the manner in which it was applied (prospectively and without adequate disclosure), is not consistent with U.S. GAAP**. The effects of the misapplied revenue accounting include overstated revenues, profits, earnings per share and possibly accounts receivable and retained earnings for the period ended December 31, 2005, and as of December 31, 2005."
>
> First Rosen Report, Plaintiffs' Initial Record, tab 5-A, p. 666.

286. On August 2, 2007, Dr. Rosen delivered an expanded report after reviewing Imax's restated financial statements from 2002 to 2005. Dr. Rosen opined as follows:

> IMAX's restatements include the adjustment of 2002 and 2004 theater system sales for multiple element revenue accounting[251]. (Theatre system revenues for 2003 have not been recast by IMAX.) The application of multiple element revenue

---

[251] It is not known whether IMAX used RAMD in 2002 and 2004. RAMD is one possible framework for accounting for sales with multiple elements. The specific revenue policies that were applied by the Company in those years, which now require revision, have not been disclosed. Based upon the 2006 restatement information, some type of multiple element sales accounting was used. (See page 32 of IMAX's 2006 Form 10-K.) We refer broadly to IMAX's 2002 and 2004 theatre system accounting as "multiple element accounting".

> accounting was not disclosed in the Company's original 2002 and 2004 financial statements. We note that IMAX's apparent use of multiple element revenue accounting prior to fiscal 2005 is not consistent with the Company's financial statement note disclosure for theatre system revenue accounting policies for 2002 and 2004.
>
> Overall, we believe that IMAX's revenue accounting (RAMD, or a similar multiple element sales accounting), and the manner in which it was applied (prospectively and without adequate disclosure), was not consistent with U.S. GAAP. The effects of the misapplied revenue accounting include overstated revenues, profits, retained earnings, earnings per share and possibly accounts receivable and retained earnings for the period ended December 31, 2005, and as of December 31, 2005.
>
> IMAX's recently-released 2006 Form 10-K corroborates our initial analysis. In particular, the Company has acknowledged that its construction of "multiple elements" in its theatre sales transactions was not appropriate. Each theatre sale ought to have been viewed as a single deliverable, and revenues deferred until the entire system had been installed and was fully operational. According to IMAX's 2006 Form 10-K disclosure, theatre system revenues of US$17.5 million (and net earnings of US$9.7 million) were prematurely recorded in fiscal 2005.
>
> IMAX's 2006 financial statements also acknowledged other accounting errors, and that such U.S. GAAP violations existed throughout the 2002 to 2005 period. The Company's disclosed contraventions of U.S. GAAP include additional revenue accounting discrepancies (beyond multiple element accounting), as well as the inappropriate treatment of various costs. With very minor exceptions, IMAX's now-admitted errors had the effect of overstating the Company's reported profits during the period 2002 to 2005.
>
> Second Rosen Report, Plaintiffs' Third Record, tab 2-A, pp. 1396-1397.

287. Common issue 1 focuses on whether Imax's financial statements were prepared in accordance with GAAP and whether the Defendants made the Representation. Common issue 1 is rationally connected to each Class Member's claim but independent thereof. It is necessary to the resolution of each Class Member's claim.

> *Rumley* v. *British Columbia* [2001] 3 S.C.R. 184 at paras. 24 and 34.

288. Common issues 2 and 3 focus on ingredients of negligent and fraudulent misrepresentation. The determination of these issues are independent of the conduct of Class Members. They too are rationally connected to and a substantial component of each Class Members' claims in negligent and fraudulent misrepresentation.

> *Rumley* v. *British Columbia* [2001] 3 S.C.R. 184 at paras. 24 and 34.

289. Fraudulent and negligent misrepresentation have been recognized as common issues in other class actions. In Bre-X, the fraudulent and negligent misrepresentation common issue was stated as:

> Were the representations identified by issue (g) made knowing that they were false or recklessly, caring not whether they were false or without exercising reasonable care and attention?
>
> *Carom* v. *Bre-X Minerals Ltd.*, June 23, 1999 Order, para 8(h), as amended by Order of the Court of Appeal dated October 31, 2000.

***Common Issue 4: Did some or all of Imax's February 17, 2006 Press Release, Annual Report for the year ending December 31, 2005 or its two March 9, 2006 press releases contain a misrepresentation within the meaning of the OSA?***

***Common Issue 5: If the answer to (4) is yes, are the Defendants, or some of them, liable to the Class Members pursuant to section 138.3 of the OSA?***

290. These common issues are addressed at paragraph 350 and following.

***Common Issue 6: Did the traded price of Imax shares during the Class Period incorporate and reflect the Representation?***

***Common Issue 7: If the answer to (6) is yes, did the acquisition of Imax share by the Class Members, on the TSX and NASDAQ, during the Class Period, constitute reliance upon the Representation?***

291. Reliance is a necessary ingredient of misrepresentation.

> *Queen* v. *Cognos Inc.* [1993] 1 S.C.R. at 110.

292. If the trading price of Imax shares during the Class Period reflected the Representation, the Court may conclude that the purchase of the shares constitutes reliance and an individual issue is eliminated.

293. The Plaintiffs retained Dr. Kryzanowski to opine on whether the traded price of Imax shares incorporated and reflected corporate and financial information released publicly by Imax. Dr. Kryzanowski opined as follows:

> 18. I believe that the price at which the shares of Imax traded during the Class Period incorporated and reflected information released by management concerning the financial performance of Imax, especially relating to the crucial subject of earnings. I base that belief on the efficiency of the TSX and the NASDAQ, and management credibility until August 9, 2006. I have therefore concluded that the prices at which the Class Members bought the shares of Imax during the Class Period incorporated the Representation.
>
> 19. As a check on this opinion, I looked to see if there was a significant negative abnormal return on the first trading day after the Imax press release following the close of the market on August 9, 2006 that disclosed the matters listed at paragraphs 41 and 42 of the Statement of Claim. After the issuance of that press release, trading in Imax shares first occurred on August 10, 2006, which I therefore conclude to be the announcement date for this event.
>
> 20. An estimate of the impact of Imax's announcement on August 10, 2006 can be arrived at by finding the difference between the total market value of all the shares outstanding at the close of the markets on August 9, 2006 and the market value at the close of the markets on August 10, 2006. The market value of the 40,285,574 outstanding shares on these dates is C$433,875,632 and C$259,439,097, respectively. Therefore, the announcement alone eliminated approximately C$174 million of total equity value for shareholders of Imax.
>
> Kryzanowski Affidavit, paras 18-20, Plaintiffs' Second Record, tab 2, pp. 717.

294. Dr. Kryzanowski opined that the price at which Class Members purchased the shares on the TSX and NASDAQ reflected the Representation. These common issues will be decided on the basis of expert economic evidence without the need for evidence from Class Members.

Kryzanowski Affidavit, paras 11-12, 21, Plaintiffs' Second Record, tab 2, pp. 715, 717 - 718.

295. The determination of these key factual common issues will impact each Class Member and are an important ingredient of each Class Member's claim of negligent and fraudulent representation. As such, this is a common issue.

***Common Issue 8: Did Imax and the Individual Defendants, or some of them, owe the Class Members a duty of care? If so, what was the standard of care? Did any of the Defendants breach the standard of care?***

***Common Issue 9: If the answer to (8) is yes, were Imax and the Individual Defendants, or some of them, negligent? If so, who, when and why?***

296. The Class Members seek recovery of a pure economic loss. They assert that the Defendants negligently performed services. They also assert that they can recover their pure economic losses because of the proximity between the Class Members' losses and the negligence.

297. Because of the facts referred to above, the Plaintiffs have established a minimum evidentiary basis for alleging that the Defendants were negligent.

298. Whether any of the Defendants owed a duty of care, breached the applicable standard and were negligent are questions that involve a determination of issues of mixed fact and law. This common issue is rationally connected to the Class Members. The decision on each component part of this common issue will be resolved without the Class Members giving evidence and will apply to all Class Member.

299. Whether the Defendants owed a duty of care can be determined on a class-wide basis.

> *Hickey-Button v. Loyalist College of Applied Arts & Technology*, [2006] O.J. No. 2393 (C.A.) at para 51.

300. Whether a duty of care exists, whether a defendant has breached a standard of care and whether a defendant was negligent have been recognized as common issues by the courts. For example, in *Rumley* the court stated the common issue as:

> Was the defendant negligent or in breach of fiduciary duty in failing to take reasonable measures in the operation or management of the school to protect students from misconduct of a sexual nature by employees, agents or other students at the school?
>
> *Rumley* v. *British Columbia*, [2001] 3 S.C.R. 184 at p. 196, para. 21.
>
> *Cloud* v. *Attorney General of Canada,* (2004), 73 O.R. (3d) 401 at p. 419, para. 72 (C.A.).
>
> *Taylor* v. *Canada (Minister of Health),* [2007] O.J. No. 3312 (S.C.J.), pp. 20-21, paras. 67, 69.

***Common Issue 10: Did Imax and the Individual Defendants, or some of them, conspire one with the other, and with persons unknown to deceive the Class Members for the purpose of maintaining and increasing the price of Imax securities? If so, who conspired with whom, when, where, why and for what purpose?***

301. The facts summarized above are "some basis in fact" that a common issue exists as to whether the Defendants engaged in a conspiracy.

302. This common issue is also rationally connected to the Class Members' claims but independent of them. The determination of whether or not these Defendants conspired with each other will be resolved without the involvement of the Class Members. The determination of this issue will be dispositive of the Defendants' liability

to the Class Members and will apply equally to each Class Member, irrespective of any possible individual issues.

303. Whether or not some Defendants conspired was recognized as a common issue in other class actions. In *Money Mart*, the common issue relating to conspiracy was stated as:

> Have Money Mart, Dollar Financial and the Franchisees conspired one with the other? If so, who conspired with whom, when, where, why and for what purpose?
>
> *Smith* v. *National Money Mart Company*, January 5, 2007 Order, p. 5, para. 6, issue 7.

304. In *Bre-X*, the common issue relating to conspiracy was stated as:

> Did Bre-X, Bresea and the Insiders or any of them conspire to inflate the price of Bre-X and Bresea shares on the Markets? If they did, what are the particulars of the conspiracy?
>
> *Carom* v. *Bre-X Minerals Ltd.*, June 23, 1999 Order, para. 8(e).

***Common Issue 11: If Imax and the Individual Defendants, or some of them, are liable to the Class for conspiracy, negligence, negligent or fraudulent misrepresentation, what is the procedure for assessing damages?***

305. Dr. Kryzanowski and Dr. Comment opined on the question of whether the Class Members' damages can be calculated.

306. Dr. Kryzanowski opined that the effect of the Representation is calculable by using an index approach to estimate the price path of the Imax shares. Dr. Comment said that the effect of the misrepresentation is calculable by using the "constant-ribbon" approach and that an "event study is the only methodology needed to implement the constant-ribbon approach to modeling per share damages". The evidence of Dr.

Kryzanowski and Dr. Comment demonstrate that the effect of the Representation and the amount of the Class Members' losses are calculable.

> Kryzanowski Affidavit, paras 25 - 46, Plaintiffs Second Record, tab 2, pp. 719-727.
>
> Comment Affidavit, paras 28-34, Plaintiffs' Reply Record, tab 1, pp. 1452-1455.

307. Dr. Martin stated that Dr. Kryzanowski's methodology – the index approach – has been widely discredited. Yet, Dr. David Tabak, a Senior Vice President at NERA, the firm at which Dr. Martin is employed, authored an article on September 25, 2007 in which he stated that there "are three common approaches to measuring stock price inflation: the index method, the constant percentage method, and the constant dollar method.".

> "Inflation and Damages in a Post-*Dura* World" by David Tabak, Exhibit "B" to the Affidavit of Michael Robb sworn January 25, 2008 ("Third Robb Affidavit"), Plaintiffs' Second Supplementary Motion Record dated January 25, 2008 ("Plaintiffs' Fourth Record"), tab 2-B, p. 119.

308. Dr. Martin criticized Dr. Kryzanowski's methodology, but did not suggest an alternative approach to calculating damages. Regardless, Dr. Comment responded to Dr. Martin's criticisms.

309. The determination of this common issue will impact each Class Member. It will be decided on the basis of expert economic evidence without the involvement of any Class Members.

***Common Issue 12: Can the court assess damages in the aggregate, in whole or in part, for the Class? If so, what is the amount of the aggregate damage assessment and who should pay it to the Class?***

310. Section 24 of the *CPA* provides that a court may determine the aggregate or a part of a defendant's liability to Class Members if monetary relief is claimed, if no questions of fact or law other than the assessment of monetary relief remain to be determined, and if the "aggregate or a part of the defendant's liability can reasonably be determined without proof by individual class members." An assessment of the aggregate or part thereof of the damages owing is particularly appropriate when the damages are liquidated. As Goudge, J.A. said in *Cloud*:

> I also agree with Cullity J. that in a trial of these common issues the claims for an aggregate assessment of damages and punitive damages are properly included as common issues. The trial judge should be able to make an aggregate assessment due to the breaches found, if this can reasonably be done without proof of loss by each individual member. Indeed this is consistent with s. 24 of the *Class Proceedings Act, 1992*.

> *Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 419, para. 70.

> *Markson* v. *MBNA Canada Bank* (2007), 85 O.R. (3d) 321 (C.A.).

311. Where there is a reasonable likelihood that the preconditions of section 24(1) of the *CPA* would be satisfied an aggregate assessment should be considered as a common issue. Whether aggregate damages are ultimately to be awarded is for the trial judge to determine.

> *Serhan Estate* v. *Johnson & Johnson et al.*, (2006), 85 O.R. (3d) 665 at p. 698, para. 139, also relying on *Vezina* v. *Loblaw Companies Ltd.*, [2005] O.J. No. 1974 (S.C.J.) per Cullity J.

> *Vezina* v. *Loblaw Companies Ltd.*, [2005] O.J. No. 1974 (S.C.J.) at para. 25.

> *Kranjcec* v. *Ontario* (2004), 69 O.R. (3d) 231 (S.C.J.) at p. 253, paras. 63-64.

312. Sections 23 and 24 of the *CPA*, which permit the efficient determination and distribution of damages, bolster the underlying purposes of the *CPA*. In *Markson*, Rosenberg J.A. stated that "Sections 23 and 24 provide a means of avoiding the

potentially unconscionable result of a wrong eluding an effective remedy." In particular, subsection 24(3) "contemplates that an aggregate award will be appropriate notwithstanding that identifying the individual class members entitled to damages and determining the amount cannot be done except on a case-by-case basis, which may be impractical or inefficient."

*Markson* v. *MBNA Canada Bank* (2007), 85 O.R. (3d) 321 (C.A.) at pp. 335-336, paras. 42, 48.

313. Both Dr. Kryzanowski and Dr. Comment opined that they could calculate the inflation in the market price of Imax shares during the Class Period had the Representation not have been made or been rectified by restatement prior to the Class Period. Given the market efficiency of the TSX which absorbed the publicly disclosed information, aggregate damages may be a reasonable and reliable method of calculating damages suffered by the Class Members.

***Common Issue 13: Is Imax vicariously liable or otherwise responsible for the acts of the other Defendants?***

314. This common issue deals with Imax's potential responsibility for the acts and omissions of its employees, officers and directors. The answer to this question is a matter of mixed fact and law. The answer will depend, for example, on the activities of Imax's employees, officers and directors and is independent of the conduct of the Class Members. The court must, among other things, decide "whether the wrongful conduct is sufficiently related to conduct authorized by the employer to justify the imposition of vicarious liability."

*Bazley* v. *Curry,* [1999] 2 S.C.R. 534 at pp. 26-27, para. 41.

> *Jacobi* v. *Griffiths,* [1999] 2 S.C.R. 570.
>
> *EB* v. *Order of Oblates of Mary Immaculate in the Province of British Columbia,* [2005] 3 S.C.R. 45 at p. 20, para. 23.

315. The determination of the vicarious liability will be decided without the need of evidence from Class Members. But it is common to and rationally connected to all Class Members. The determination of this issue may be entirely dispositive of Imax's liability to the Class.

316. Whether or not a defendant was vicariously liable was recognized as a common issue in *Money Mart* and was stated as:

> Is Dollar Financial vicariously liable or otherwise responsible for the acts of its subsidiary Money Mart? If so, why?
>
> *Smith* v. *National Money Mart Company*, January 5, 2007 Order, p. 5, para. 6, issue 8.

***Common Issue 14: Should one or more of the Defendants pay punitive damages to the Class? If so, who, why, in what amount and to whom?***

317. A claim for punitive damages may properly form a common issue and is particularly well-suited to determination by way of a class proceeding. The quantum of punitive damages can be determined on a class-wide basis because the issue depends on the conduct of the Defendants and will not be affected by individual issues. The Supreme Court of Canada stated:

> In this case resolving the primary common issue – whether JHS breached a duty of care or fiduciary duty to the complainants – will require the court to assess the knowledge and conduct of those in charge of JHS over a long period of time. This is exactly the kind of fact-finding that will be necessary to determine whether punitive damages are justified: see, e.g., *Endean, supra*, at para. 48 (An award of punitive damages is founded on the conduct of the defendant, unrelated to its effect on the plaintiff).

*Rumley* v. *British Columbia*, [2001] 3 S.C.R. 184 at p. 203, para. 34.

*Andersen* v. *St. Jude Medical Inc.* (2003), 67 O.R. (3d) 136 (S.C.J.) at p. 155, para. 61, leave to appeal denied, [2005] O.J. No. 269 (Div. Ct.).

*Carom* v. *Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173 (S.C.J.) at p. 199.

*Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 419, para. 70.

318. The Plaintiffs have properly pleaded a claim for punitive damages in paragraph 76 of the statement of claim. "All Class Members share an interest in the question of whether" the Defendants ought to pay punitive damages. The resolution of this common issue will determine the issue of the Defendants' liability for punitive damages to the Class as a whole.

*Whiten* v. *Pilot Insurance*, [2002] 1 S.C.R. 595 at pp. 617, 635, 636, paras. 36, 68, 72.

*Rumley* v. *British Columbia*, [2001] 3 S.C.R. 184 at p. 203, para. 34.

319. In *Bre-X*, the court stated the punitive damages common issue as:

> Was the conduct of the Defendants, or any of them, such that they ought to pay globally to the Class Members exemplary or punitive damages?

*Carom* v. *Bre-X Minerals Ltd.*, June 23, 1999 Order, issue (o).

320. In *Money Mart*, the court stated the punitive damages common issue as:

> Should Money Mart and/or Dollar Financial pay punitive damages to the Class? If so, what is the amount of the aggregate damage assessment and who should pay it to the Class?

*Smith* v. *National Money Mart Company*, January 5, 2007 Order, p. 5, para. 6, issue 12.

***Common Issue 17: Should the Defendants, or any of them, pay prejudgment and postjudgment interest, at what annual interest rate, and should the interest be compound interest?***

321. This common issue is applicable to all Class Members who are awarded a judgment. This issue is commonly included as a common issue.

> *Smith* v. *National Money Mart Company*, January 5, 2007 Order, p. 5, para. 6, issue 12.
>
> *Carom* v. *Bre-X Minerals Ltd.*, June 23, 1999 Order, para. 8(e).

**(4) THE SUBSECTION 5(1)(D) REQUIREMENT: A CLASS PROCEEDING WOULD BE THE PREFERABLE PROCEDURE FOR THE RESOLUTIONS OF THE COMMON ISSUES**

**THE PRINCIPLES**

322. "… [T]he preferability requirement has two concepts at its core. The first is whether or not the class action would be a fair, efficient and manageable method of advancing the claim. The second is whether the class action would be preferable to other reasonably available means of resolving the claims of class members."

> *Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 420, para. 73.

323. In *Carom* v. *Bre-X Ltd.*, Justice Winkler (as he then was) outlined the conditions present whenever a class proceeding is the preferable procedure:

> A class proceeding is the preferable procedure where it presents a fair, efficient and manageable method of determining the common issues which arise from the claims of multiple Plaintiffs and where such determination will advance the proceeding in accordance with the goals of judicial economy, access to justice and the modification of behaviour of wrongdoers.
>
> *Carom* v. *Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173 (S.C.J.) at p. 239.

324. It is necessary "to assess the litigation as a whole" and "to adopt a practical cost-benefit approach to" the s. 5(1)(d) requirement. It is "essential to assess the importance of the common issues in relation to the claim as a whole." This action should be certified if the resolution of the common issues will significantly advance the litigation even if substantial individual issues are left to be resolved.

> *Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at pp. 176-177, paras. 27-29.
>
> *Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at p. 420, paras. 73-75.

325. In other words, success by the Plaintiffs on the common issues will equate to success for all Class Members. The focus of the common issues trial in this class action will be solely on the conduct of the Defendants. No other procedure can achieve this result and the Defendants have not suggested an alternative procedure. "Arguments that no litigation is preferable to a class proceeding cannot be given effect."

> *Western Canadian Shopping Centres Inc.* v. *Dutton* [2001] 2 S.C.R. 534, at para. 40.
>
> *1176560 Ontario Limited et al.* v. *The Great Atlantic and Pacific Company of Canada Limited*, (2002) 62 O.R. (3d) 535 (S.C.J.), aff'd (2004) 70 O.R. (3d) 182 (Div. Ct.), at p. 550, para. 45.

326. The Defendants bear the burden of proving a preferable alternative process for resolving the common issues:

> In order for counsel to be persuasive in developing a submission that another procedure is to be preferred, it is essential that the defendant provide the court with a concrete, workable, alternative litigation proposal which demonstrates the Plaintiffs will not be deprived of their day in court.
>
> The Honourable Justice W. Winkler, "*Managing the Class Action Lawsuit: The Judicial Perspective*", Canadian Institute Conference on Class Actions, (October 4, 1996) at p. 11.
>
> *1176560 Ontario Limited et al.* v. *The Great Atlantic and Pacific Company of Canada Limited*, (2002) 62 O.R. (3d) 535 (S.C.J.) at para. 45, aff'd (2004) 70 O.R. (3d) 182 (Div. Ct.).

327. The preferability requirement can be met, even if there are substantial individual issues to be resolved after the common issues trial. The common issues need not predominate over the individual issues in order for the class proceeding to be the preferable procedure. *Rumley* and *Cloud* were certified as class proceedings even though individual damage assessments were required for thousands of class members who suffered physical, sexual or emotional abuse over many decades.

> *Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at para. 30.
>
> *Rumley* v. *British Columbia* [2001] 3 S.C.R. 184 at para. 36.
>
> *Cloud* v. *Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.) at paras. 69 and 75, leave to appeal to the S.C.C. denied May 12, 2005.

328. The scheme of the *CPA* provides for the resolution of common issues and any individual issues that remain. The statute also provides for the assessment of damages on an individual or aggregate basis, as well as a series of options for the distribution of individual and aggregate damages. The statute is a powerful procedural mechanism that permits the court to take a variety of approaches in resolving the claims of Class Members.

> *Cassano* v. *The Toronto-Dominion Bank* (2008), 87 O.R. (3d) 401 (C.A.) at paras. 58, 60.

329. In this case, a class proceeding is the preferable procedure even though individual issues may possibly remain after the common issues trial. As Winkler C.J.O. wrote in *Cassano*:

> [62] What is sometimes overlooked in the focus on the common issues at the certification stage is that the *CPA* includes provisions permitting the use of modified procedures for conducting individual assessments of damages. The thrust of these provisions is to ensure that the court has the means to conduct cost-effective and timely determinations of individual

> issues following the common issues trial. As a result, the fact that damages may not be amenable to aggregate assessment at the conclusion of a common issues trial is not fatal to certification of a class proceeding.
>
> [63] Indeed, the resolution of individual issues is an essential element of many class proceedings and is crucial if there is to be an advancement of the goal of access to justice. ... An action may well be certified as a class proceeding even in cases where individual assessments of damages in small amounts may be necessary. Absent this possibility, the purposes of the *CPA* would be seriously eroded.
>
> [64] Therefore, what is called for in addressing the preferable procedure requirement is to look not just at the common issues trial, but at the other procedural options for conducting the class action litigation pursuant to the *CPA*. In this regard, I note that s. 25 of the *CPA* confers broad jurisdiction on the common issues trial judge to fashion procedures to be followed where, among other things, damages cannot be assessed in the aggregate. This section deals specifically with individual participation in a class proceeding following a favourable determination on the common issues. Under its various subsections, the common issues trial judge has, *inter alia*, the authority to: direct a further trial (s. 25(1)(a)); appoint "one or more persons to conduct a reference" (s. 25(1)(b)); and give directions on the procedures to be followed (s. 25(2)). The broad jurisdiction of the common issues judge is amplified by s. 25(3), which provides that:
>
> 25. (3) In giving directions under [s. 25(2)], the court shall choose the least expensive and most expeditious method of determining the issues that is consistent with justice to the class members and the parties, and in so doing, the court may,
>
> (a) dispense with any procedural step that it considers unnecessary; and
>
> (b) authorize any special procedural steps, including steps relating to discovery, and any special rules, including rules relating to admission of evidence and means of proof, that it considers appropriate.
>
> *Cassano* v. *The Toronto-Dominion Bank* (2008), 87 O.R. (3d) 401 (C.A.) at paras. 62-64.

330. Individual actions will require the repetition of the same expert economic evidence in numerous individual actions. In addition to being repetitive and wasteful of scarce judicial resources, multiple individual actions may result in inconsistent findings