# EXHIBIT O

10kWIZARD
SEC POWER SEARCH

# FORM 10-Q

## IMAX CORP - IMAX

**Filed: May 09, 2006 (period: March 31, 2006)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

10-Q - 10-Q

PART I.

**Item 1.** Financial Statements........................................ 3

PART I.

**Item 2.** Management's Discussion and Analysis of
**Item 3.** Quantitative and Qualitative Factors about Market Risk......... 43
**Item 4.** Controls and Procedures...................................... 44

PART II.

**Item 1.** Legal Proceedings............................................ 45

PART II.

**Item 1A.** Risk Factors.................................................. 46

PART II.

**Item 4.** Submission of Matters to a Vote of Security Holders............ 47

PART II.

**Item 6.** Exhibits...................................................... 47

PART I

**ITEM 1.** FINANCIAL STATEMENTS
**ITEM 2.** MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
**ITEM 3.** QUANTITATIVE AND QUALITATIVE FACTORS ABOUT MARKET RISK
**ITEM 4.** CONTROLS AND PROCEDURES

PART II

**ITEM 1.** LEGAL PROCEEDINGS
**ITEM 1A.** RISK FACTORS
**ITEM 4.** SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

**ITEM 6.** EXHIBITS

SIGNATURES

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-31.3 (EX-31.3)

EX-32.1 (EX-32.1)

EX-32.2 (EX-32.2)

EX-32.3 (EX-32.3)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D C 20549

FORM 10-Q

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2006

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 0-24216

IMAX CORPORATION
(Exact name of registrant as specified in its charter)

| Canada | 98-0140269 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

| 2525 Speakman Drive, Mississauga, Ontario, Canada | L5K 1B1 |
|---|---|
| (Address of principal executive offices) | (Postal Code) |

Registrant's telephone number, including area code (905) 403-6500

N/A

(Former name or former address, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days

Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12B-2 of the Exchange Act

Large Accelerated Filer [ ] Accelerated Filer [X] Non-Accelerate Filer [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act)

Yes [ ] No [X]

Indicate the number of shares of each of the issuer's classes of common stock, as of the latest practicable date:

| Class | Outstanding as of April 21, 2006 |
|---|---|
| Common stock, no par value | 40,285,574 |

IMAX CORPORATION

TABLE OF CONTENTS


| | | PAGE |
|---|---|---|
| PART I | FINANCIAL INFORMATION | |
| Item 1 | Financial Statements . . . . . . . . . . . | 3 |

| | | |
|---|---|---|
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations.. .. . ... . | 30 |
| Item 3 | Quantitative and Qualitative Factors about Market Risk . | 43 |
| Item 4 | Controls and Procedures. .. . . .. . | 44 |
| PART II | OTHER INFORMATION | |
| Item 1 | Legal Proceedings. . . . . .. . ......... .. . | 45 |
| Item 1A | Risk Factors .. .. .... ...... .. .. ..................... . | 46 |
| Item 4 | Submission of Matters to a Vote of Security Holders.......... . | 47 |
| Item 6. | Exhibits........ ............................................ | 47 |
| Signatures.... | ...................................................... . | 48 |


SPECIAL NOTE REGARDING FORWARD-LOOKING INFORMATION

Certain statements included in this annual report may constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, references to future capital experditures (including the amount and nature thereof), business and technology strategies and measures to implement strategies, competitive strengths, goals, expansion and growth of business and operations, plans and references to the future success of IMAX Corporation together with its wholly-owned subsidiaries (the "Company") and expectations regarding the Company's future operatirg results. These forward-looking statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances. However, whether actual results and developments will conform with the expectations and predictions of the Company is subject to a number of risks and uncertainties, including, but not limited to, general economic, market or business conditions; the opportunities (or lack thereof) that may be presented to and pursued by the Company, competitive actions by other companies; conditions in the in-home and out-of-home entertainment industries; changes in laws or regulations; conditions and developments in the commercial exhibition industry; the acceptance of the Company's new technologies, risks associated with investments and operations in foreign jurisdictions and any future international expansion, including those related to economic, political and regulatory policies of local governments and laws and policies of the United States and Canada; the potential impact of increased competition in the markets the Company operates within; and other factors, many of which are beyond the control of the Company Consequently, all of the forward-looking statements made in this quarterly report are qualified by these cautionary statements, and actual results or anticipated developments by the Company may not be realized, and even if substantially realized, may not have the expected consequences to, or effects on, the Company. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking information, whether as a result of new information, future events or otherwise.

---

IMAX(R), IMAX(R) Dome, IMAX(R) 3D, IMAX(R) 3D Dome, The IMAX Experience(R), An IMAX Experience(R), IMAX DMR(R), IMAX MPX(R), IMAX think big(R) and think big(R) are trademarks and trade names of the Company or its subsidiaries that are registered or otherwise protected under laws of various jurisdictions.





PAGE

PART I FINANCIAL INFORMATION

ITEM 1 FINANCIAL STATEMENTS

The following Condensed Consolidated Financial Statements are filed as part of this Report

Condensed Consolidated Balance Sheets as at March 31, 2006 and December 31, 2005 . . . . . .. .. . . . .. .. ........ . 4

Condensed Consolidated Statements of Operations for the three month periods ended March 31, 2006 and 2005...................... 5

Condensed Consolidated Statements of Cash Flows for the three month periods ended March 31, 2006 and 2005....... 6

Notes to Condensed Consolidated Financial Statements.. . . . 7



IMAX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U.S. dollars)

| | MARCH 31, 2006 (UNAUDITED) | DECEMBER 31, 2005 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 22,023 | $ 24,324 |
| Short-term investments | 8,257 | 8,171 |
| Accounts receivable, net of allowance for doubtful accounts of $6,057 (2005 - $5,892) | 24,382 | 26,165 |
| Financing receivables (note 3) | 62,281 | 63,006 |
| Inventories (note 4) | 31,050 | 28,294 |
| Prepaid expenses | 3,996 | 3,825 |
| Film assets | 3,578 | 3,329 |
| Fixed assets | 25,777 | 26,780 |
| Other assets | 7,873 | 11,618 |
| Deferred income taxes (note 11) | 7,558 | 6,171 |
| Goodwill | 39,027 | 39,027 |
| Other intangible assets | 2,600 | 2,701 |
| Total assets | $ 238,402 | $ 243,411 |
| LIABILITIES | | |
| Accounts payable | $ 5,586 | $ 6,935 |
| Accrued liabilities (note 7(c)) | 50,818 | 55,122 |
| Deferred revenue | 47,487 | 44,397 |
| Senior Notes due 2010 (note 5) | 160,000 | 160,000 |
| Total liabilities | 263,891 | 266,454 |
| COMMITMENTS AND CONTINGENCIES (notes 7 and 8) | | |
| SHAREHOLDERS' EQUITY (DEFICIT) | | |
| Capital stock (note 12) Common shares -- no par value Authorized -- unlimited number Issued and outstanding -- 40,280,075 (2005 -- 40,213,542) | 121,928 | 121,674 |
| Other equity | 2,127 | 1,758 |
| Deficit | (150,168) | (144,347) |
| Accumulated other comprehensive income (loss) | 624 | (2,128) |
| Total shareholders' deficit | (25,489) | (23,043) |
| Total liabilities and shareholders' equity (deficit) | $ 238,402 | $ 243,411 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U.S. dollars, except per share amounts)
(UNAUDITED)

THREE MONTHS ENDED
MARCH 31,

| | 2006 | 2005 |
|---|---|---|
| REVENUE | | |
| IMAX systems (note 9(a)) | $ 9,398 | $ 22,113 |
| Films | 6,521 | 4,947 |
| Theater operations | 3,657 | 3,816 |
| Other | 842 | 492 |
| | 20,418 | 31,368 |
| COSTS OF GOODS AND SERVICES | 14,393 | 15,223 |
| GROSS MARGIN | 6,025 | 16,145 |
| Selling, general and administrative expenses (note 9(b)) | 10,505 | 10,243 |
| Research and development | 915 | 653 |
| Amortization of intangibles | 192 | 157 |
| Receivable provisions, net of (recoveries) (note 10) | 143 | 212 |
| EARNINGS (LOSS) FROM OPERATIONS | (5,730) | 4,880 |
| Interest income | 253 | 214 |
| Interest expense | (4,174) | (4,197) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (9,651) | 897 |
| Recovery of income taxes (note 11) | 1,530 | 59 |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | (8,121) | 956 |
| Net earnings from discontinued operations (note 14) | 2,300 | 240 |
| NET EARNINGS (LOSS) | (5,821) | 1,196 |
| EARNINGS (LOSS) PER SHARE (note 12(b)) | | |
| Earnings (loss) per share -- basic and diluted | | |
| Net earnings (loss) from continuing operations | $ (0 20) | $ 0 02 |
| Net earnings from discontinued operations | $ 0 06 | $ 0 01 |
| Net earnings (loss) | $ (0 14) | $ 0 03 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U S. dollars)
(UNAUDITED)

| | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|
| | 2006 | 2005 |
| CASH PROVIDED BY (USED IN) | | |
| OPERATING ACTIVITIES | | |
| Net earnings (loss) | $ (5,821) | $ 1,196 |
| Net (earnings) from discontinued operations | (2,300) | (240) |
| Items not involving cash: | | |
| Depreciation and amortization | 3,901 | 3,584 |
| Write-downs | 143 | 212 |
| Change in deferred income taxes | (1,387) | (140) |
| Stock and other non-cash compensation | 1,603 | 1,231 |
| Non-cash foreign exchange (gain) loss | (29) | 201 |
| Interest on short-term investments | (85) | (23) |
| Investment in film assets | (2,292) | (2,151) |
| Changes in other non-cash operating assets and liabilities | 625 | (3,773) |
| Net cash provided by (used in) operating activities | (5,642) | 97 |
| INVESTING ACTIVITIES | | |
| Purchases of short-term investments | (4,098) | (14,995) |
| Proceeds from maturities of short-term investments | 4,097 | -- |
| Purchase of fixed assets | (92) | (271) |
| Increase in other assets | (187) | (187) |
| Increase in other intangible assets | (91) | (167) |

| | | |
|---|---|---|
| Net cash used in investing activities | (371) | (15,620) |
| FINANCING ACTIVITIES | | |
| Common shares issued | 254 | 1,267 |
| Net cash provided by financing activities | 254 | 1,267 |
| Effects of exchange rate changes on cash | (35) | 71 |
| DECREASE IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (5,794) | (14,185) |
| Cash provided by investing activities from discontinued operations | 3,493 | -- |
| DECREASE IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (2,301) | (14,185) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 24,324 | 28,964 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 22,023 | $ 14,779 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

1 BASIS OF PRESENTATION

The Condensed Consolidated Financial Statements include the accounts of IMAX Corporation together with its wholly-owned subsidiaries (the "Company"), except subsidiaries which the Company has identified as variable interest entities ("VIE's") where the Company is not the primary beneficiary ("PB") (note 2). The nature of the Company's business is such that the results of operations for the interim periods presented are not necessarily indicative of results to be expected for the fiscal year. In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations.

The Company reports its results under United States Generally Accepted Accounting Principles ("U.S. GAAP"). Significant differences between United States and Canadian Generally Accepted Accounting Principles are described in note 17.

These financial statements should be read in conjunction with the financial statements included in the Company's most recent annual report on Form 10-K for the year ended December 31, 2005 which should be consulted for a summary of the significant accounting policies utilized by the Company These interim financial statements are prepared following accounting policies consistent with the Company's financial statements for the year ended December 31, 2005.

EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted Financial Accounting Standards No 123, "Share-Based Payment," ("FAS 123R") which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values. In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No 107 ("SAB 107") relating to FAS 123R. The Company has applied the provisions of SAB 107 in its adoption of FAS 123R.

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006 In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R

FAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model The

value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations. Prior to the adoption of FAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("FAS 123"). Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant





1 BASIS OF PRESENTATION (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the three months ended March 31, 2006 included compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method. Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line single-option method As stock-based compensation expense recognized in the Consolidated Statement of Operations for the first quarter of 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods.

The Company utilizes a lattice-binomial option-pricing model ("binomial model") to determine the fair value of share-based payment awards.

Prior to January 1, 2006, the Company followed the intrinsic value method of accounting for employee stock options as prescribed by Accounting Principles Board Opinion No. 25 Accounting for Stock Issued to Employees, (APB 25). If the fair value methodology prescribed by FASB Statement, Accounting for Stock-Based Compensation (FAS 123) had been adopted by the Company, pro forma results for the quarter ended March 31, would have been as follows.

| | 2005 |
|---|---|
| Net earnings as reported | $ 1,196 |
| Stock-based compensation expense, if the methodology prescribed by FAS 123 had been adopted | (700) |
| Adjusted net earnings | $ 496 |
| Earnings per share -- basic and diluted. | |
| Net earnings as reported | $ 0 03 |
| FAS 123 stock-based compensation expense | (0 02) |
| Adjusted net earnings | $ 0 01 |

1 BASIS OF PRESENTATION (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

Stock-based compensation expense recognized under FAS 123R for the three months ended March 31, 2006 was $0.3 million. There was no stock-based compensation expense related to employee stock options recognized during the three months ended March 31, 2005.

The weighted average fair value of common share options granted to employees for the three months ended March 31, 2006 at the time of grant was $3.81 (2005 - $nil). The Company uses a binomial model to determine the fair value of common share options at the grant date. For the three months ended March 31, 2006 the following assumptions were used

| | THREE MONTHS ENDED MARCH 31, 2006 |
|---|---|
| Risk-free interest rate | 4.83% |
| Market risk premium | 5.33% - 5.60% |
| Beta | 1.11 - 1 28 |
| Expected option life (in years) | 3.86 - 5 33 |
| Volatility | 60% |
| Annual termination probability | 8 06% |
| Dividend yield | 0% |

As the Company stratifies its employees into two groups in order to calculate fair value under the Binomial model, ranges of assumptions used are presented for equity risk premium, Beta, expected option life and annual termination probability. The Company uses the historical data to estimate option exercise and employee termination within the valuation model, separate groups of employees that have similar historical exercise behaviour are considered separately for valuation purposes.

The Company's policy is to issue new shares to satisfy stock options which are exercised.

Total stock-based compensation expense related to non-vested employee stock options not yet recognized at March 31, 2006 and the weighted average period over which the awards are expected to vest is $4.5 million and 3.5 years, respectively.





2 VARIABLE INTEREST ENTITIES

In January 2003, the FASB issued Financial Interpretation 46 ("FIN 46"), Consolidation of Variable Interest Entities ("VIEs"), in an effort to expand and clarify existing accounting guidance that addresses when a company should include in its financial statements the assets, liabilities and activities of another entity. FIN 46 was effective immediately for all enterprises with variable interests in VIEs created after January 31, 2003 and on January 1, 2004 for all previously existing variable interest entities. Under FIN 46, if an entity is determined to be a variable interest entity, it must be consolidated by the enterprise that absorbs the majority cf the

entity's expected losses if they occur, receives a majority of the entity's expected residual returns if they occur, or both. On December 24, 2003, the FASB issued a revised FIN 46, defined as FIN 46R Commencing January 1, 2004, the Company was required to consolidate the accounts of all VIEs for which it is the primary beneficiary ("PB"), as required by FIN 46R The Company has evaluated its various variable interests to determine whether they are in VIE's. The Company reviewed its management agreements relating to theaters which the Company manages, and has no equity interest, and concluded that such arrangements were not variable interests since the Company's fees are commensurate with the level of service and the theater owner retains the right to terminate the service The Company has also reviewed its financial arrangements with theaters where it shares in the profit or losses of the theater. The Company has not considered these arrangements under FIN 46R as the arrangements meet the scope exceptions defined in the pronouncement. The Company has determined that certain of its film production companies are VIEs. Since in one case the Company absorbs a majority of the VIE's losses, the Company has determined that it is the PB of the entity The Company continues to consolidate this entity with no material impact on the operating results or financial condition of the Company as the production company has total assets of $nil and total liabilities of $nil as at March 31, 2006. The Company also has interests in three other film production companies which are VIEs, however the Company did not consolidate these film entities since it does not bear the majority of the expected losses or expected residual returns. As of March 31, 2006, these three VIEs have total assets of $0.2 million (December 31, 2005 - $0 3 million) and total liabilities of $0.2 million (December 31, 2005 - $0.3 million).

3. FINANCING RECEIVABLES

The Company generally provides its theater systems to customers on a long-term lease basis, typically with initial lease terms of 10 to 20 years Financing receivables consisting of net investment in leases and long term receivables are comprised of the following:

| | MARCH 31, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Gross minimum lease amounts receivable | $ 85,471 | $ 88,894 |
| Residual value of equipment | 597 | 635 |
| Unearned finance income | (32,185) | (33,933) |
| Present value of minimum lease amounts receivable | 53,883 | 55,596 |
| Accumulated allowance for uncollectible amounts | (1,478) | (1,478) |
| Net investment in leases | $ 52,405 | $ 54,118 |
| Long-term receivables | 9,876 | 8,888 |
| Total financing receivables | $ 62,281 | $ 63,006 |





4 INVENTORIES

| | MARCH 31, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Raw materials | $ 10,570 | $ 10,464 |
| Work-in-process | 7,172 | 6,893 |
| Finished goods | 13,308 | 10,937 |
| | $ 31,050 | $ 28,294 |

5 SENIOR NOTES DUE 2010

In November 2004, the Company completed an exchange offer wherein $159.0 million of the Company's 9.625% senior notes due December 1, 2010 (the "Unregistered Senior Notes") were exchanged for 9.625% senior notes registered under the Securities Act of 1933, as amended (the "Registered Senior Notes"), pursuant to a registration statement on Form S-4 that had been declared effective by the Securities and Exchange Commission on September 30, 2004. Apart from the fact that the Registered Senior Notes have been registered under the Securities Act, the Unregistered Senior Notes and the Registered Senior Notes are substantially identical and are referred to herein as the "Senior Notes". The Senior Notes are unconditionally guaranteed, jointly and severally, by certain of the Company's wholly-owned subsidiaries

As at March 31, 2006, the Company had outstanding $159.0 million aggregate principal of Registered Senior Notes and $1.0 million aggregate principal of Unregistered Senior Notes

6 CREDIT FACILITY

On February 6, 2004, the Company entered into a loan agreement for a secured revolving credit facility (the "Credit Facility"). The Credit Facility is a three-year revolving credit facility with yearly renewal options thereafter, permitting maximum aggregate borrowings of $20 0 million, subject to a borrowing base calculation which includes the Company's financing receivables, and certain reserve requirements and further reduced by outstanding letters of credit. The Credit Facility bears interest at Prime + 0.50% per annum or Libor + 2.25% per annum and is collateralized by a first priority security interest in all of the current and future assets of the Company. The Credit Facility contains typical affirmative and negative covenants, including covenants that restrict the Company's ability to: incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales; incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions. In addition, the Credit Facility contains customary events of default, including upon an acquisition or a change of control that has a material adverse effect on the Company's financial condition The Credit Facility also requires the Company to maintain a minimum level of earnings before interest, taxes, depreciation and amortization, and cash collections. As at March 31, 2006, the Company has not drawn down on the Credit Facility, and has letters of credit for $9.2 million secured by the Credit Facility arrangement





7 COMMITMENTS

(a) The Company's total minimum annual rental payments to be made under operating leases for premises as of March 31, 2006 for each of the years ended December 31, are as follows:

| | |
|---|---|
| 2006 (nine months remaining) | $ 3,938 |
| 2007 | 5,001 |
| 2008 | 4,939 |
| 2009 | 4,929 |
| 2010 | 5,119 |
| Thereafter | 18,982 |
| | $ 42,908 |

(b) As at March 31, 2006, the Company has letters of credit of $9.2 million (December 31, 2005 - $7 6 million) secured by the Company's Credit Facility arrangement (see note 6)

(c) In March 2004, the Company received $5 0 million in cash under a film financing arrangement which was included in accrued liabilities During

2005, the Company received another $5.1 million under the same film financing arrangement. The Company was required to expend these funds towards the production and distribution of a motion picture title. The film was released in the third quarter of 2005. During the first quarter of 2006, the Company spent $0.3 million towards the distribution of the film. As at March 31, 2006, the Company has recorded $0 1 million (December 31, 2005 - $0.4 million) in accrued liabilities for future distribution expenses to be incurred on the film

8 CONTINGENCIES

The Company is involved in lawsuits, claims, and proceedings, including those identified below, which arise in the ordinary course of business. In accordance with SFAS 5, "Accounting for Contingencies," the Company will make a provision for a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. The Company believes it has adequate provisions for any such matters. The Company reviews these provisions in conjunction with any related provisions on assets related to the claims at least quarterly and adjusts these provisions to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other pertinent information related to the case. Should developments in any of these matters outlined below cause a change in our determination as to an unfavorable outcome and result in the need to recognize a material provision, or, should any of these matters result in a final adverse judgement or be settled for significant amounts, they could have a material adverse effect on our results of operations, cash flows, and financial position in the period or periods in which such a change in determination, settlement or judgement occurs.

(a) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement and seeking injunctive relief and damages. In April 2005, In-Three filed an answer denying infringement and asserting counterclaims that seek a declaratory judgment of non-infringement, invalidity and unenforceability of the patent in suit, and damages for alleged false advertising, false designation of origin, breach of contract, interference with prospective economic advantage and/or unfair competition On March 13, 2006, the Company and In-Three entered into a settlement agreement, resolving all matters between the parties. On March 29, 2006, the Company and In-Three filed a joint motion for an order dismissing with prejudice all claims and counterclaims between the parties.





8 CONTINGENCIES (cont'd)

(b) In November 2001, the Company filed a complaint with the District Court of Munich against Big Screen, a German large-screen cinema owner in Berlin ("Big Screen"), demanding payment of rental payments and certain other amounts owed to the Company. Big Screen raised a defense based on alleged infringement of German antitrust rules, relating mainly to an allegation of excessive pricing Big Screen had brought a number of motions for restraining orders in this matter relating to the Company's provision of films and maintenance, all of which have been rejected by the courts, including the Berlin Court of Appeals, and for which all appeals have been exhausted. On November 8, 2005, the District Court of Munich rendered a judgment in favor of the Company on all accounts Big Screen has appealed the judgment to the Munich Court of Appeals and at the same time asked for an order to stay the execution under the judgment of the District Court. On November 30, 2005, Big Screen filed an application for the opening of insolvency proceedings While the appeal on the merits is pending, by order of January 12, 2006, the Court of Appeals has rejected Big Screen's application regarding a stay of execution so that the judgment remains executable.

(c) In May 2002, the Company filed a complaint with the District Court of Nuremberg-Furth, Germany against Siewert Holding in Wuerzburg ("Siewert"), demanding payment of rental obligations and other amounts owed to the Company Siewert raised a defense based on alleged infringement of German antitrust rules. By judgement of December 20, 2002, the District Court rejected the defense and awarded judgement in documentary proceedings in favor of the Company and added further amounts that had fallen due. Siewert applied for leave to appeal to the German Supreme Court on matters of law, which was rejected by the

German Supreme Court in March 2004. Siewert subsequently made a partial payment of amounts awarded to the Company. Siewert has filed follow up proceedings to the documentary proceedings in the District Court, essentially repeating the claims rejected in the documentary proceeding. On September 30, 2004, Siewert filed for insolvency with the Local Court in Wuerzburg.

(d) In January 2004, the Company and IMAX Theater Services Ltd , a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3.7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company. In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17.8 million as a result of E-Citi's breach of a September 2000 lease agreement. The arbitration hearing on both claims took place on November 16-18, 2005 On January 31, 2006, the ICC informed the parties that the liability stage of the proceedings was closed, and on February 1, 2006, the ICC issued an award finding unanimously in the Company's favor on all claims. The amount of damages awarded to the Company will be decided after a hearing scheduled for July 2006, and no amount has yet been recorded for these damages.





8 CONTINGENCIES (cont'd)

(e) In June 2004, Robots of Mars, Inc. ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract. Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages. The Company filed a cross claim for indemnity against a third party, SIMEX, Inc. ("SIMEX"). In response, SIMEX filed an application in Toronto, Ontario, Canada, seeking a declaration that it is not subject to the arbitration provision or payment obligations in the production agreement. The Ontario Superior Court dismissed SIMEX's application, with costs. SIMEX appealed part of this decision to the Ontario Court of Appeal which found that SIMEX was not subject to some of the obligatiors which the Company contended were set forth the production agreement, including, specifically, the obligation to pay Robots directly based on the receipts of proceeds from the distribution of the films produced under the production agreement. The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration.

(f) In addition to the matters described above and in note 14(a) in respect of the Miami theater, the Company is currently involved ir other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings.

9 CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS SUPPLEMENTAL INFORMATION

(a) The Company generally enters into multi-year theater system lease agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the theater system During the period of time between lease signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing. Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual lease buyout, whereby the parties are released from their future obligations under the lease and the geographic territory granted to the customer reverts to the Company. Once an agreement is reached by both parties, the initial lease payments that the customer previously made to the Company are typically

recognized as revenue In addition, since the introduction of its new IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their original agreements and to sign new system agreements for the MPX system Upon finalizing the new agreement, the total consideration received under both the terminated agreements and the new MPX arrangement is allocated first to the MPX system and the residual amount to settlement revenue. During the first quarter of 2006, the Company did not recognize any settlement revenue. Included in IMAX systems revenue for the three months ended March 31, 2005 are the following types of settlement arrangements: $0.2 million related to MPX conversion agreements and $6 9 million related to consensual lease buyouts. In aggregate the Company recognized $7.1 million in settlement revenue in the first quarter of 2005.

(b) Included in selling, general and administrative expenses for the quarter ended March 31, 2006 is a gain of less than $0.1 million (2005 - $0.3 million loss) for net foreign exchange gains or losses related to the translation of foreign currency denominated monetary assets, liabilities and integrated subsidiaries.





10 RECEIVABLE PROVISIONS, NET OF (RECOVERIES)

| | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|
| | 2006 | 2005 |
| Accounts receivable provisions | $ 143 | $ 262 |
| Financing receivables provisions | -- | (50) |
| Receivable provisions (recoveries), net | $ 143 | $ 212 |

11 INCOME TAXES

The effective tax rate on earnings differs significantly from the Canadian statutory rate due to the effect of permanent differences, income taxed at differing rates in foreign and other provincial jurisdictions, tax recoveries and charges relating to favcurable or unfavourable tax examinations, and changes in the Company's valuation allowance on deferred tax assets The income tax expense for the quarter is calculated by applying the estimated average annual effective tax rate of approximately 10% for the 2006 year to quarterly pre-tax income. The Company also favorably resolved a provincial income tax audit resulting in the release of related tax reserves of $0.5 million to the income tax recovery for the quarter.

As at March 31, 2006, the Company has net deferred income tax assets of $7 6 million (December 31, 2005 - $6.2 million), comprised of tax credit carryforwards, net operating loss and capital loss carryforwards and other deductible temporary differences, which can be utilized to reduce either taxable income or taxes otherwise payable in future years As of March 31, 2006, the Company had a gross deferred income tax asset of $48.4 million, against which the Company is carrying a $40.8 million valuation allowance.

12. CAPITAL STOCK

(a) STOCK-BASED COMPENSATION

As at March 31, 2006, the Company has reserved a total 6,980,156 (December 31, 2005 -- 7,046,689) common shares for future issuance under the Stock Option Plan, of which options in respect cf 5,949,159 common shares are outstanding at March 31, 2006. The opticns granted under the Stock Option Plan generally vest between one and five years and expire 10 years or less from the date granted At March 31, 2006,

options in respect of 4,238,422 common shares were vested and exercisable

Under the terms of certain employment agreements dated July 12, 2000, the Company is required to issue either 360,000 restricted common shares or pay their cash equivalent. The restricted shares or the related cash obligation were fully vested effective July 1, 2002 In May 2003, the Company paid approximately $1.6 million in cash to settle the equivalent of 200,000 of the total 360,000 restricted common shares under these agreements. The remaining 160,000 restricted shares are required to be issued, or payment of their cash equivalent, upon request by the employees The Company has recorded an additional expense of $0 5 million for the quarter ended March 31, 2006 (2005 - $0 2 million), due to the changes in the fair value of these restricted shares in the period.





12 CAPITAL STOCK

(a) STOCK-BASED COMPENSATION (cont'd)

The following table summarizes certain information in respect of option activity under the Stock Option Plan for the periods ended March 31,:

| | NUMBER OF SHARES | | WEIGHTED AVERAGE EXERCISE PRICE PER SHARE | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Options outstanding, beginning of year | 5,504,324 | 5,593,101 | $ 7 26 | $ 6 82 |
| Granted | 535,835 | 13,335 | 10 34 | 10 56 |
| Exercised | (66,533) | (229,879) | 3 81 | 5 51 |
| Forfeited or expired | (24,467) | -- | 18 46 | -- |
| Cancelled | -- | (6,600) | -- | 13 82 |
| Options outstanding, end of quarter | 5,949,159 | 5,369,957 | 7 53 | 6 88 |
| Options exercisable, end of quarter | 4,238,422 | 3,589,427 | 7 12 | 7 39 |

In the first quarter of 2006, the Company cancelled nil stock options (2005 - less than 0.1 million).

The weighted average exercise price per share and number of unvested common share options granted to employees as at March 31, 2006 is $8.55 and 1,710,737, respectively.

The following table summarizes certain information in respect of options outstanding under the Stock Option Plan at March 31, 2006

| RANGE OF EXERCISE PRICES PER SHARE | NUMBER OF SHARES OUTSTANDING | NUMBER OF SHARES VESTED | WEIGHTED AVERAGE EXERCISE PRICE PER SHARE | AVERAGE REMAINING TERM |
|---|---|---|---|---|
| $ 0 00 - $ 2 99 | 172,746 | 170,746 | $ 2 73 | 2.6 Years |
| $ 3 00 - $ 4 99 | 1,981,189 | 1,981,189 | 4 39 | 3 2 Years |
| $ 5 00 - $ 9 99 | 2,854,152 | 1,577,915 | 6 88 | 5 3 Years |
| $ 10 00 - $ 14 99 | 459,170 | 26,670 | 10 68 | 6 3 Years |
| $ 15 00 - $ 19 99 | 55,600 | 55,600 | 17 58 | 0 7 Years |
| $ 20 00 - $ 24 99 | 271,302 | 271,302 | 21 86 | 3 1 Years |
| $ 25 00 - $ 28 04 | 155,000 | 155,000 | 27 17 | 3 9 Years |
| Total | 5,949,159 | 4,238,422 | 7 53 | 4 5 Years |

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S dollars unless otherwise stated)
(UNAUDITED)

12 CAPITAL STOCK

(a) STOCK-BASED COMPENSATION (cont'd)

In the first quarter of 2006, an aggregate of 23,335 (2005 - 13,335) options with an average exercise price of $8.75 (2005 - $10.56) to purchase the Company's common stock were issued to certain advisors and strategic partners of the Company. The Company has calculated the fair value of these options to non-employees on the date of grant to be $0.1 million (2005 - $0.1 million), using a Binomial option-pricing model with the following underlying assumptions:

| | THREE MONTHS ENDED MARCH 31, 2006 | 2005 |
|---|---|---|
| Risk-free interest rate | 4.60% | 3.89% |
| Expected option life | 5 - 7 years | 5 years |
| Volatility | 60% | 62% |
| Dividend yield | 0% | 0% |

In the first quarter of 2006, the Company has recorded a charge of $0.1 million (2005 - $0 1 million) to film cost of sales related to these non-employee stock options

There were no warrants issued in the first quarter of 2006 (2005 - nil) 550,000 warrants were issued in 2003. In the first quarter of 2005, 80,872 common shares were issued upon exercise of 200,000 warrants All remaining warrants have either expired or have been cancelled.

(b) EARNINGS (LOSS) PER SHARE

Reconciliations of the numerators and denominators of the basic and diluted per-share computations, are comprised of the following:

| | THREE MONTHS ENDED MARCH 31, 2006 | 2005 |
|---|---|---|
| Net earnings applicable to common shareholders | | |
| Net earnings (loss) | $ (5,821) | $ 1,196 |
| Weighted average number of common shares (000's) | | |
| Issued and outstanding, beginning of period | 40,213 | 39,447 |
| Weighted average number of shares issued during the period | 12 | 110 |
| Weighted average number of shares used in computing basic earnings (loss) per share | 40,225 | 39,557 |
| Assumed exercise of stock options, net of shares assumed repurchased | -- | 2,363 |
| Weighted average number of shares used in computing diluted earnings (loss) per share | 40,225 | 41,920 |

The calculation of diluted earnings per share for the first quarter of 2006 excludes common shares issuable upon exercise of options as the impact of these exercises and conversions would be antidilutive

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

13 SEGMENTED INFORMATION

The Company has four reportable segments: IMAX systems, films, theater operations and other.

There has been no change in the basis of measurement of segment profit or loss from the Company's most recent annual report on form 10-K for the year ended December 31, 2005. Inter-segment transactions are not significant.

| | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|
| | 2006 | 2005 |
| REVENUE | | |
| IMAX systems | $ 9,398 | $ 22,113 |
| Films | 6,521 | 4,947 |
| Theater operations | 3,657 | 3,816 |
| Other | 842 | 492 |
| TOTAL | $ 20,418 | $ 31,368 |
| EARNINGS (LOSS) FROM OPERATIONS | | |
| IMAX systems | $ 2,387 | $ 12,559 |
| Films | (1,052) | (871) |
| Theater operations | 66 | (246) |
| Corporate and other | (7,131) | (6,562) |
| TOTAL | $ (5,730) | $ 4,880 |

14. DISCONTINUED OPERATIONS

(a) MIAMI THEATER LLC

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater. The Company completed its abandonment of assets and removal of its projection system from the theater in the first quarter of 2004, with no financial impact The Company is involved in an arbitration proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations The amount of loss to the Company has been estimated at between $0.8 million and $2.3 million. The Company paid out $0.8 million with respect to amounts owing to the landlord during 2003 and 2004 As the Company is uncertain as to the outcome of the proceeding, no additional amount has been recorded.

(b) DIGITAL PROJECTION INTERNATIONAL

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management. As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12.7 million previously advanced by the Company, and reorganized the remaining $12.7 million of debt owing to the Company into two separate loan agreements. The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3.5 million During the first quarter of 2006, the Company recognized $2.3 million (2005 - $0 2 million) in income from discontinued operations The other tranche of $1 2 million had previously been recognized in 2005

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

14 DISCONTINUED OPERATIONS (cont'd)

(c) CONSOLIDATED STATEMENT OF OPERATIONS FOR DPI

The net earnings from discontinued operations summarized in the Consolidated Statements of Operations, for the periods ended March 31, were comprised of the following

| | THREE MONTHS ENDED MARCH 31, | |
|---|---|---|
| | 2006 | 2005 |
| Net earnings from discontinued operations | $ 2,300 | $ 240 |

15 DEFINED BENEFIT PLAN

The Company has an unfunded U.S. defined benefit pension plan covering its two Co-Chief Executive Officers. The plan provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings during the 120 months preceding retirement.

Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company The benefits were 50% vested as of July 2000, the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55 The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon a change in control shall be 100%, though, as of March 31, 2006, one of the Co-Chief Executives was approximately 78% vested and the other Co-Chief Executive was approximately 96% vested The fiscal 2006 expense was remeasured as of March 8, 2006 to reflect the plan changes adopted

The following assumptions were used in determining the obligation and cost status of the Company's defined benefit pension plan at the plan measurement dates of:

| | MARCH 8, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Discount rate | 5.18% | 5.50% |
| Lump sum interest rate | | |
| First 20 years | 5.70% | N/A |
| Thereafter | 4.75% | N/A |
| Form of payment | Modified lump sum | 100% Joint and survivor annuity |
| Cost of living adjustment on benefits | 1.20% | 2.40% |
| Rate of increase in qualifying compensation levels | nil% | nil% |



Source IMAX CORP, 10-Q, May 09, 2006

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

15 DEFINED BENEFIT PLAN (cont'd)

The amounts accrued for the plan are determined as follows:

| | THREE MONTHS ENDED MARCH 31, 2006 |
|---|---|
| Projected benefit obligation: | |
| Obligation, beginning of period | $ 31,064 |
| Service cost | 457 |
| Interest cost | 362 |
| Actuarial gain | (8,645) |
| Obligation, end of period | $ 23,238 |
| Unfunded status: | |
| Obligation, end of period | $ 23,238 |
| Unrecognized gain relating to prior service cost | 2,411 |
| Unrecognized actuarial (loss) | (21) |
| Accrued pension liability | $ 25,628 |

The following table provides disclosure of pension expense for the defined benefit plan for the periods ended March 31:

| | THREE MONTHS ENDED MARCH 31, 2006 | 2005 |
|---|---|---|
| Service cost | $ 457 | $ 604 |
| Interest cost | 362 | 390 |
| Amortization of prior service cost | 153 | 349 |
| Pension expense | $ 972 | $ 1,343 |

The accumulated benefit obligation for the defined benefit plan was $23.2 million at March 31, 2006 and $31.1 million at December 31, 2005

No contributions are expected to be made for the plan during 2006.

As a result of the pension plan amendment, an adjustment to the unrecognized actuarial losses of $2.8 million and unrecognized prior service cost of $3 4 million was recorded in comprehensive income (loss) and other assets.

The following benefit payments are expected to be made as per the current plan assumptions and the terms of the Plan in each of the next five years, and in the aggregate over the five years thereafter.

| | |
|---|---|
| 2006 | $ -- |
| 2007 | 995 |
| 2008 | 1,007 |
| 2009 | 1,019 |
| 2010 | 29,505(1) |
| 2011 to 2015 | -- |

(1) One of the Co-Chief Executive Officers is currently entitled to benefit payments subsequent to 2010 as a life annuity, subject to an elective right to a lump sum payment in 2010 The pension plan assumptions assume the election of a lump sum payment.





15 DEFINED BENEFIT PLAN (cont'd)

At the time the Company established the defined benefit pension plan, it also took out life insurance policies on its two Co-Chief Executive Officers with coverage amounts of $21.5 million in aggregate The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so At March 31, 2006, the cash surrender value of the insurance policies is $3.5 million (December 31, 2005 - $3.3 million) and has been included in other assets.

16 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION

The Company's Senior Notes are fully and unconditionally guaranteed, jointly and severally by specific wholly-owned subsidiaries of the Company (the "Guarantor Subsidiaries"). The main Guarantor Subsidiaries are David Keighley Productions 70 MM Inc., Sonics Associates Inc , and the subsidiaries that own and operate certain theaters These guarantees are full and unconditional The information under the column headed "Non-Guarantor Subsidiaries" relates to the following subsidiaries of the Company: IMAX Japan Inc. and IMAX B.V (the "Non-Guarantor Subsidiaries") which have not provided any guarantees of the Senior Notes

Investments in subsidiaries are accounted for by the equity method for purposes of the supplemental consolidating financial data. Some subsidiaries may be unable to pay dividends due to negative working capital.





16 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Balance Sheets as at March 31, 2006:

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash and cash equivalents | $ 13,167 | $ 8,651 | $ 205 | $ -- | $ 22,023 |
| Short-term investments | 8,257 | -- | -- | -- | 8,257 |
| Accounts receivable | 21,965 | 2,154 | 263 | -- | 24,382 |
| Financing receivables | 60,226 | 2,055 | -- | -- | 62,281 |
| Inventories | 30,734 | 237 | 79 | -- | 31,050 |
| Prepaid expenses | 3,310 | 600 | 86 | -- | 3,996 |
| Intercompany receivables | 15,664 | 34,836 | 11,129 | (61,629) | -- |
| Film assets | 3,578 | -- | -- | -- | 3,578 |
| Fixed assets | 24,476 | 1,299 | 2 | -- | 25,777 |
| Other assets | 7,873 | -- | -- | -- | 7,873 |
| Deferred income taxes | 7,554 | 4 | -- | -- | 7,558 |
| Goodwill | 39,027 | -- | -- | -- | 39,027 |
| Other intangible assets | 2,600 | -- | -- | -- | 2,600 |
| Investments in subsidiaries | 32,284 | -- | -- | (32,284) | -- |
| Total assets | $ 270,715 | $ 49,836 | $ 11,764 | $ (93,913) | $ 238,402 |
| LIABILITIES | | | | | |
| Accounts payable | 2,452 | 3,134 | -- | -- | 5,586 |

| | | | | | |
|---|---|---|---|---|---|
| Accrued liabilities | 48,727 | 1,891 | 200 | -- | 50,818 |
| Intercompany payables | 43,801 | 39,792 | 6,566 | (90,159) | -- |
| Deferred revenue | 42,142 | 5,295 | 50 | -- | 47,487 |
| Senior Notes due 2010 | 160,000 | -- | -- | -- | 160,000 |
| Total liabilities | 297,122 | 50,112 | 6,816 | (90,159) | 263,891 |
| SHAREHOLDER'S DEFICIT | | | | | |
| Common stock | 121,928 | -- | 117 | (117) | 121,928 |
| Other equity/Additional paid in capital/Contributed surplus | 1,093 | 46,960 | -- | (45,926) | 2,127 |
| Deficit | (150,666) | (46,622) | 4,831 | 42,289 | (150,168) |
| Accumulated other comprehensive income (loss) | 1,238 | (614) | -- | -- | 624 |
| Total shareholders' equity (deficit) | $ (26,407) | $ (276) | $ 4,948 | $ (3,754) | $ (25,489) |
| Total liabilities & shareholders' equity (deficit) | $ 270,715 | $ 49,836 | $ 11,764 | $ (93,913) | $ 238,402 |

In certain Guarantor Subsidiaries, accumulated losses have exceeded the original investment balance. As a result of applying equity accounting, the parent company has consequently reduced intercompany receivable balances with respect to these Guarantor Subsidiaries in the amounts of $28.6 million as at March 31, 2006.





16. SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Balance Sheets as at December 31, 2005:

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash and cash equivalents | $ 17,402 | $ 6,728 | $ 194 | $ -- | $ 24,324 |
| Short-term investments | 8,171 | -- | -- | -- | 8,171 |
| Accounts receivable | 23,828 | 2,045 | 292 | -- | 26,165 |
| Financing receivables | 60,950 | 2,056 | -- | -- | 63,006 |
| Inventories | 27,973 | 239 | 82 | -- | 28,294 |
| Prepaid expenses | 3,162 | 575 | 88 | -- | 3,825 |
| Inter-company receivables | 14,057 | 31,929 | 11,043 | (57,029) | -- |
| Film assets | 3,329 | -- | -- | -- | 3,329 |
| Fixed assets | 25,403 | 1,374 | 3 | -- | 26,780 |
| Other assets | 11,618 | -- | -- | -- | 11,618 |
| Deferred income taxes | 6,171 | -- | -- | -- | 6,171 |
| Goodwill | 39,027 | -- | -- | -- | 39,027 |
| Other intangible assets | 2,701 | -- | -- | -- | 2,701 |
| Investments in subsidiaries | 31,833 | -- | -- | (31,833) | -- |
| Total assets | $ 275,625 | $ 44,946 | $ 11,702 | $ (88,862) | $ 243,411 |
| LIABILITIES | | | | | |
| Accounts payable | 4,915 | 2,017 | 3 | -- | 6,935 |
| Accrued liabilities | 52,978 | 1,965 | 179 | -- | 55,122 |
| Inter-company payables | 42,766 | 36,088 | 6,466 | (85,320) | -- |
| Deferred revenue | 38,927 | 5,330 | 140 | -- | 44,397 |
| Senior Notes due 2010 | 160,000 | -- | -- | -- | 160,000 |
| Total liabilities | 299,586 | 45,400 | 6,788 | (85,320) | 266,454 |
| SHAREHOLDER'S DEFICIT | | | | | |
| Capital stock | 121,674 | -- | 117 | (117) | 121,674 |
| Other equity/Additional paid in capital/Contributed surplus | 724 | 46,960 | -- | (45,926) | 1,758 |
| Deficit | (144,845) | (46,800) | 4,797 | 42,501 | (144,347) |
| Accumulated other comprehensive income (loss) | (1,514) | (614) | -- | -- | (2,128) |
| Total shareholders' equity (deficit) | $ (23,961) | $ (454) | $ 4,914 | $ (3,542) | $ (23,043) |
| Total liabilities & shareholders' equity (deficit) | $ 275,625 | $ 44,946 | $ 11,702 | $ (88,862) | $ 243,411 |

In certain Guarantor Subsidiaries accumulated losses have exceeded the original investment balance. As a result of applying equity accounting, the parent company has consequently reduced inter-company receivable balances with respect to these Guarantor Subsidiaries in the amounts of $28.4 million

Page 23

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S. dollars unless otherwise stated)
(UNAUDITED)

16 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the three months ended March 31, 2006

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $ 9,024 | $ 259 | $ 194 | $ (79) | $ 9,398 |
| Films | 5,336 | 1,984 | 1 | (800) | 6,521 |
| Theater operations | 224 | 3,462 | -- | (29) | 3,657 |
| Other | 840 | -- | 2 | -- | 842 |
| | 15,424 | 5,705 | 197 | (908) | 20,418 |
| COST OF GOODS AND SERVICES | 9,872 | 5,349 | 80 | (908) | 14,393 |
| GROSS MARGIN | 5,552 | 356 | 117 | -- | 6,025 |
| Selling, general and administrative expenses | 10,245 | 78 | 82 | -- | 10,505 |
| Research and development | 915 | -- | -- | -- | 915 |
| Amortization of intangibles | 192 | -- | -- | -- | 192 |
| Loss (income) from equity-accounted investees | (212) | -- | -- | 212 | -- |
| Receivable provisions, net of (recoveries) | 143 | -- | -- | -- | 143 |
| EARNINGS (LOSS) FROM OPERATIONS | (5,731) | 178 | 35 | (212) | (5,730) |
| Interest income | 253 | -- | -- | -- | 253 |
| Interest expense | (4,174) | -- | -- | -- | (4,174) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (9,652) | 178 | 35 | (212) | (9,651) |
| Recovery of (provision for) income taxes | 1,531 | -- | (1) | -- | 1,530 |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | (8,121) | 178 | 34 | (212) | (8,121) |
| Net earnings from discontinued operations | 2,300 | -- | -- | -- | 2,300 |
| NET EARNINGS (LOSS) | $ (5,821) | $ 178 | $ 34 | $ (212) | $ (5,821) |

Page 24

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S. dollars unless otherwise stated)
(UNAUDITED)

16 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the three months ended March 31, 2005

| IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR | ADJUSTMENTS AND | CONSOLIDATED TOTAL |
|---|---|---|---|---|

| | | | SUBSIDIARIES | ELIMINATIONS | |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $ 21,688 | $ 305 | $ 228 | $ (108) | $ 22,113 |
| Films | 3,651 | 1,790 | 9 | (503) | 4,947 |
| Theater operations | 226 | 3,617 | -- | (27) | 3,816 |
| Other | 468 | -- | 24 | -- | 492 |
| | 26,033 | 5,712 | 261 | (638) | 31,368 |
| COST OF GOODS AND SERVICES | 10,249 | 5,522 | 90 | (638) | 15,223 |
| GROSS MARGIN | 15,784 | 190 | 171 | -- | 16,145 |
| Selling, general and administrative expenses | 9,871 | 214 | 158 | -- | 10,243 |
| Research and development | 653 | -- | -- | -- | 653 |
| Amortization of intangibles | 157 | -- | -- | -- | 157 |
| Loss (income) from equity-accounted investees | 13 | -- | -- | (13) | -- |
| Receivable provisions (recoveries), net | 212 | -- | -- | -- | 212 |
| EARNINGS (LOSS) FROM OPERATIONS | 4,878 | (24) | 13 | 13 | 4,880 |
| Interest income | 214 | -- | -- | -- | 214 |
| Interest expense | (4,195) | (2) | -- | -- | (4,197) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 897 | (26) | 13 | 13 | 897 |
| Recovery of income taxes | 59 | -- | -- | -- | 59 |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | 956 | (26) | 13 | 13 | 956 |
| Net earnings from discontinued operations | 240 | -- | -- | -- | 240 |
| NET EARNINGS (LOSS) | $ 1,196 | $ (26) | $ 13 | $ 13 | $ 1,196 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S dollars unless otherwise stated)
(UNAUDITED)

16. SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Cash Flows for the three months ended March 31, 2006:

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) | | | | | |
| OPERATING ACTIVITIES | | | | | |
| Net earnings (loss) | $ (5,821) | $ 178 | $ 34 | $ (212) | $ (5,821) |
| Net (earnings) from discontinued operations | (2,300) | -- | -- | -- | (2,300) |
| Items not involving cash | | | | | |
| Depreciation and amortization | 3,768 | 132 | 1 | -- | 3,901 |
| Write-downs | 143 | | -- | -- | 143 |
| Loss (income) from equity-accounted investees | (212) | -- | -- | 212 | -- |
| Change in deferred income taxes | (1,383) | (4) | -- | -- | (1,387) |
| Stock and other non-cash compensation | 1,603 | -- | -- | -- | 1,603 |
| Non-cash foreign exchange loss | (29) | -- | -- | -- | (29) |
| Interest on short-term investments | (85) | -- | -- | -- | (85) |
| Investment in film assets | (2,292) | -- | -- | -- | (2,292) |
| Changes in other non-cash operating assets and liabilities | (1,022) | 1,658 | (11) | -- | 625 |
| Net cash provided by (used in) operating activities | (7,630) | 1,964 | 24 | -- | (5,642) |
| INVESTING ACTIVITIES | | | | | |
| Purchases of short-term investments | (4,098) | -- | -- | -- | (4,098) |
| Proceeds from maturities of short-term investments | 4,097 | | | | 4,097 |
| Purchase of fixed assets | (35) | (57) | -- | -- | (92) |
| Increase in other assets | (187) | -- | -- | -- | (187) |
| Increase in other intangible assets | (91) | -- | -- | -- | (91) |
| Net cash used in investing activities | (314) | (57) | -- | -- | (371) |
| FINANCING ACTIVITIES | | | | | |
| Common shares issued | 254 | -- | -- | -- | 254 |
| Net cash provided by financing activities | 254 | | -- | -- | 254 |

| | | | | | |
|---|---|---|---|---|---|
| Effects of exchange rate changes on cash | (38) | 16 | (13) | -- | (35) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (7,728) | 1,923 | 11 | -- | (5,794) |
| Cash provided by investing activities from discontinued operations | 3,493 | -- | -- | -- | 3,493 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (4,235) | 1,923 | 11 | -- | (2,301) |
| Cash and cash equivalents, beginning of period | 17,402 | 6,728 | 194 | -- | 24,324 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 13,167 | $ 8,651 | $ 205 | $ -- | $ 22,023 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

16 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Cash Flows for the three months ended March 31, 2005.

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) | | | | | |
| OPERATING ACTIVITIES | | | | | |
| Net earnings (loss) | $ 1,196 | $ (26) | $ 13 | $ 13 | $ 1,196 |
| Net (earnings) from discontinued operations | (240) | -- | -- | -- | (240) |
| Items not involving cash | | | | | |
| Depreciation and amortization | 3,453 | 131 | -- | -- | 3,584 |
| Write-downs | 212 | -- | -- | -- | 212 |
| Loss (income) from equity-accounted investees | 13 | -- | -- | (13) | -- |
| Change in deferred income taxes | (136) | (4) | -- | -- | (140) |
| Stock and other non-cash compensation | 1,231 | -- | -- | -- | 1,231 |
| Non-cash foreign exchange loss | 201 | -- | -- | -- | 201 |
| Interest on short-term investments | (23) | -- | -- | -- | (23) |
| Investment in film assets | (2,151) | -- | -- | -- | (2,151) |
| Changes in other non-cash operating assets and liabilities | (2,508) | (1,364) | 99 | -- | (3,773) |
| Net cash provided by (used in) operating activities | 1,248 | (1,263) | 112 | -- | 97 |
| INVESTING ACTIVITIES | | | | | |
| Purchases of short-term investments | (14,995) | -- | -- | -- | (14,995) |
| Purchase of fixed assets | (107) | (164) | -- | -- | (271) |
| Increase in other assets | (187) | -- | -- | -- | (187) |
| Increase in other intangible assets | (167) | -- | -- | -- | (167) |
| Net cash used in investing activities | (15,456) | (164) | -- | -- | (15,620) |
| FINANCING ACTIVITIES | | | | | |
| Common shares issued | 1,267 | -- | -- | -- | 1,267 |
| Net cash provided by financing activities | 1,267 | -- | -- | -- | 1,267 |
| Effects of exchange rate changes on cash | 103 | (39) | 7 | -- | 71 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (12,838) | (1,466) | 119 | -- | (14,185) |
| Cash and cash equivalents, beginning of period | 23,683 | 5,058 | 223 | -- | 28,964 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 10,845 | $ 3,592 | $ 342 | $ -- | $ 14,779 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17 SUMMARY OF SIGNIFICANT DIFFERENCES BETWEEN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) IN THE UNITED STATES AND CANADA

The accounting principles followed by the Company conform with U S. GAAP Significant differences affecting the Company between U.S. GAAP and Canadian Generally Accepted Accounting Principles ("Canadian GAAP") are summarized below.

(a) STOCK-BASED COMPENSATION

Under U.S. GAAP, prior to January 1, 2006, the Company accounted for stock-based compensation under the intrinsic value method set out in APB 25 and has made pro forma disclosures of net earnings (loss) and earnings (loss) per share as if the methodology prescribed by FAS 123 had been adopted. Under Canadian GAAP, the Company adopted the fair value provisions of CICA Section 3870, "Stock-based Compensation and Other Stock-based Payments" ("CICA Section 3870"), effective January 1, 2003 As of this date, stock options granted to employees or directors are recorded as an expense in the consolidated statement of operations and credited to other equity.

Effective January 1, 2006, under U S. GAAP, the Company adopted FAS 123R using the modified prospective transition method. The Company's Consolidated Financial Statements as of and for the three months ended March 31, 2006 reflect the impact of FAS 123R. In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R. Stock-based compensation expense recognized under FAS 123R and under CICA Section 3870 for the three months ended March 31, 2006 is now aligned with each other and will be identical for all periods after January 1, 2006.

(b) PENSION ASSET AND LIABILITIES

Under U.S GAAP, included in accrued liabilities is an unrecognized gain related to prior service costs resulting from the plan amendment of $2 4 million as at March 31, 2006 and unrecognized prior service costs of $6 4 million as at December 31, 2005. An amount of $nil as at March 31, 2006, and $3.6 million as at December 31, 2005 is included in other assets, representing unrecognized prior service costs. In addition, under U.S GAAP, an amount of less than $0.1 million as at March 31, 2006 and $2 8 million as at December 31, 2005 is recorded against accumulated other comprehensive income, resulting from an unrecognized actuarial loss Under Canadian GAAP, the minimum pension liability, and the corresponding amounts recorded in other assets and accumulated other comprehensive income are not recorded





17. SUMMARY OF SIGNIFICANT DIFFERENCES BETWEEN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) IN THE UNITED STATES AND CANADA (cont'd)

RECONCILIATION TO CANADIAN GAAP

CONSOLIDATED STATEMENTS OF OPERATIONS

The following is a reconciliation of net earnings (loss) reflecting the differences between U S and Canadian GAAP:

| | THREE MONTHS ENDED MARCH 31, 2006 | THREE MONTHS ENDED MARCH 31, 2005 |
|---|---|---|
| Net earnings (loss) in accordance with U S GAAP | $ (5,821) | $ 1,196 |
| Stock-based compensation(a) | -- | $ (529) |
| Net earnings (loss) in accordance with Canadian GAAP | $ (5,821) | $ 667 |
| Earnings (loss) per share (note 12) | | |
| Earnings (loss) per share -- basic and diluted· | | |
| Net earnings (loss) from continuing operations | $ (0 20) | $ 0 02 |

Source IMAX CORP, 10-Q, May 09, 2006

| | | |
|---|---|---|
| Net earnings from discontinued operations | $ 0 06 | $ -- |
| Net earnings (loss) | $ (0 14) | $ 0.02 |

CONSOLIDATED SHAREHOLDERS' EQUITY (DEFICIT)

The following is a reconciliation of shareholders' equity (deficit) reflecting the difference between Canadian and U S. GAAP.

| | MARCH 31, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Shareholders' equity (deficit) in accordance with U S GAAP | $ (25,489) | $ (23,043) |
| Unrecognized actuarial loss(b) | 21 | 2,773 |
| Shareholders' equity (deficit) in accordance with Canadian GAAP | $ (25,468) | $ (20,270) |

18. FINANCIAL STATEMENT PRESENTATION

Certain comparative figures have been reclassified to conform with the presentation adopted in the current year.





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company's principal business is the design, manufacture, sale and lease of projector systems for giant screen theaters for customers including commercial theaters, museums and science centers, and destination entertainment sites. In addition, the Company designs and manufactures high-end sound systems and produces and distributes large format films There are 266 IMAX theaters operating in 36 countries worldwide as of March 31, 2006. IMAX Corporation is a publicly traded company listed on both the TSX and NASDAQ

ACCOUNTING POLICIES AND ESTIMATES

The Company reports its results under United States Generally Accepted Accounting Principles ("U.S GAAP") Significant differences between United States and Canadian Generally Accepted Accounting Principles are summarized in note 17 of the Consolidated Financial Statements.

The preparation of these financial statements requires management to make estimates and judgements that affect the reported amounts of assets, liabilities, revenues and expenses. On an ongoing basis, management evaluates its estimates, including those related to accounts receivable, net investment in leases, inventories, fixed and film assets, investments, intangible assets, income taxes, contingencies and litigation Management bases its estimates on historical experience, future expectations and other assumptions that are believed to be reasonable at the date of the financial statements. Actual results may differ from these estimates due to uncertainty involved in measuring, at a specific point in time, events which are continuous in nature The Company's significant accounting policies are discussed in note 2 of the Consolidated Financial Statements in the Company's most recent annual report on Form 10-K for the year ended December 31, 2005, and are summarized below.

CRITICAL ACCOUNTING POLICIES

The Company considers the following critical accounting policies to have the most significant effect on its estimates, assumptions and judgements:

REVENUE RECOGNITION

The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.

When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.

SALES-TYPE LEASES OF THEATER SYSTEMS

Theater system leases that transfer substantially all of the benefits and risks of ownership to customers are classified as sales-type leases as a result of meeting the criteria established by FASB Statement of Financial Accounting Standards No 13, "Accounting for Leases" ("FAS 13") When revenue is recognized, the initial rental fees due under the contract, along with the present value of minimum ongoing rental payments, are recorded as revenues for the period, and the related theater system costs including installation expenses are recorded as cost of goods and services Additional ongoing rentals in excess of minimums are recognized in future periods as revenue when reported by the theater operator, provided that collection is reasonably assured Maintenance revenues are recognized when the services are rendered.





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

OVERVIEW (cont'd)

CRITICAL ACCOUNTING POLICIES (cont'd)

REVENUE RECOGNITION (cont'd)

SALES AND SALES-TYPE LEASES OF THEATER SYSTEMS (cont'd)

The Company recognizes revenue from sales and sales type leases when the installation of the respective theater system element is substantially complete and all of the following criteria are met. persuasive evidence of an agreement exists, the price is fixed or determinable, and collection is reasonably assured.

The timing of installation of the theater system is largely dependent on the timing of the construction of the customer's theater. Therefore, while revenue for theater systems is generally predictable on a long-term basis, it can vary from quarter to quarter or year to year depending on the timing of installations

The critical estimates that the Company considers with respect to the Company's lease accounting are the determination of economic useful life and the fair value of the projection equipment, including its residual value. These estimates are based upon historical experience with all of its projection systems Residual values are established at lease inception using estimates of fair value at the end of the lease term with consideration for forecasted supply and demand for various systems, future product launch plans, end of lease customer behavior, refurbishment strategies and changes in technology

The Company monitors the performance of the theaters to which it has leased equipment When facts and circumstances indicate that it may need to change the terms of a lease, which had previously been recorded as a sales-type lease, the Company evaluates the likely outcome of such negotiations using the criteria under FAS 13. A provision is recorded against the net investment in leases if the Company believes that it is probable that the negotiation will result in a reduction in the minimum lease payments such that the lease will be reclassified as an operating lease. The provision is equal to the excess of the carrying value of the net investment in lease over the fair value of the equipment. Any adjustments which result from a change in classification from a sales-type lease to an operating lease are reported as a charge to income during the period the change occurs

In the normal course of its business, the Company will from time to time determine that a provision it had previously taken against the net investment in leases in connection with a customer's lease agreement should be reversed due to a change in the circumstances that led to the original provision

The Company generally enters into multi-year system lease agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system. During the period of time between lease signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons including business considerations, or the inability to obtain certain consents, approvals or financing. Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual lease buyout, whereby the parties are released from all their future obligations under the lease and the geographic territory granted to the customer reverts to the Company. Once an agreement is reached by both parties, the initial lease payments that the customer previously made to the Company are typically recognized as revenue. For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through the installation of a theater system or a consensual lease buyout In addition, since the introduction of its new IMAX MPX theater system

in 2003, the Company has agreed with several customers to terminate their existing lease agreements, which were in the Company's backlog, and sign new MPX system agreements.

Where these agreements have multiple elements meeting the criteria for treatment as separate units of accounting, the total consideration to be received in these situations generally is allocated to each individual element based on the relative fair values of each element. Each element is then accounted for based on applicable revenue recognition criteria.





OPERATING LEASES OF THEATER SYSTEMS

Leases that do not transfer substantially all of the benefits and risks of ownership to the customer are classified as operating leases. For these leases, initial rental fees and minimum lease payments are recognized as revenue on a straight-line basis over the lease term Additional rentals in excess of minimum annual amounts are recognized as revenue when reported by theater operators, provided that collection is reasonably assured.

SHORT-TERM INVESTMENTS

The Company has short-term investments, which generally have maturities of more than three months and less than one year from the date of purchase. The short-term investments are classified as held to maturity based on the Company's positive intent and ability to hold the securities to maturity The Company invests primarily in Canadian and U S government securities and commercial paper rated "A1+" by Standard & Poor's and these investments are stated at amortized cost, which approximates fair market value. Income related to these securities is reported as a component of interest income. At March 31, 2006, the Company had $2 0 million (2005 - $2.1 million) invested in U.S. government securities, $6.3 million (2005 - $6.1 million) in Canadian government securities

ACCOUNTS RECEIVABLE AND FINANCING RECEIVABLES

The allowance for doubtful accounts receivable and provision against the financing receivables are based on the Company's assessment of the collectibility of specific customer balances and the underlying asset value of the equipment under lease where applicable If there is a deterioration in a customer's credit worthiness or actual defaults under the terms of the leases are higher than the Company's historical experience, the Company's estimates of recoverability for these assets could be adversely affected.

The evaluation of collectibility of customer accounts is typically done on an individual account basis. If, based on an evaluation of accounts, the Company concludes that it is probable that a customer will not be able to pay all amounts due, the Company estimates the expected loss. In developing the estimates for an allowance, the Company considers general and industry economic and market conditions as well as other credit information available for the customer. The Company only records recoveries of provisions when objective verifiable evidence supports the change in the original provision.

INVENTORIES

In establishing the appropriate provisions for theater systems inventory, management must make estimates of future events and conditions including the anticipated installation dates for the current backlog of theater system contracts, potential future signings, general economic conditions, technology factors, growth prospects within the customers' ultimate marketplace and the market acceptance of the Company's current and pending projection systems and film library If management estimates of these events and conditions prove to be incorrect, it could result in inventory losses in excess of the provisions determined to be adequate as at the balance sheet date.

FILM ASSETS

Estimates of ultimate revenues are prepared on a title by title basis and reviewed regularly by management and revised where necessary to reflect the most current information Ultimate revenue for films includes estimates of revenues over a period not to exceed 10 years following the date of initial release.

IMAX CORPORATION

ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

OVERVIEW (cont'd)

CRITICAL ACCOUNTING POLICIES (cont'd)

GOODWILL

The Company performs an impairment test on at least an annual basis and additionally, whenever events or changes in circumstances suggest that the carrying amount may not be recoverable Impairment of goodwill is tested at the reporting unit level by comparing the reporting unit's carrying amount, including goodwill, to the fair value of the reporting unit. The fair values of the reporting units are estimated using a discounted cash flows approach If the carrying amount of the reporting unit exceeds its fair value, then a second step is performed to measure the amount of impairment loss, if any. Any impairment loss would be expensed in the statement of operations.

FIXED ASSETS

Management reviews the carrying values of its fixed assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset might not be recoverable. In performing its review for recoverability, management estimates the future cash flows expected to result from the use of the asset and its eventual disposition If the sum of the expected future cash flows is less than the carrying amount of the asset, an impairment loss is recognized. Measurement of impairment losses is based on the excess of the carrying amount of the asset over the fair value calculated using discounted expected future cash flows. If the actual future cash flows are less than the Company's estimates, future earnings could be adversely affected.

PENSION PLAN ACTUARIAL ASSUMPTIONS

The Company's pension benefit obligations and related costs are calculated using actuarial concepts, within the framework of Statement of Financial Accounting Standards No. 87, "Employer's Accounting for Pensions". A critical assumption, the discount rate, is an important element of expense and/or liability measurement The Company evaluates this critical assumption annually or when otherwise required to by accounting standards. Other assumptions include factors such as expected retirement, mortality, rate of compensation increase, and estimates of inflation.

The discount rate enables the Company to state expected future cash payments for benefits as a present value on the measurement date. The guideline for setting this rate is a high-quality long-term corporate bond rate. A lower discount rate increases the present value of benefit obligations and increases pension expense The Company's discount rate was determined by considering the average of pension yield curves constructed of a large population of high-quality corporate bonds. The resulting discount rate reflects the matching of plan liability cash flows to the yield curves.

Page 33

IMAX CORPORATION

ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

OVERVIEW (cont'd)

CRITICAL ACCOUNTING POLICIES (cont'd)

TAX ASSET VALUATION

As at March 31, 2006, the Company had net deferred income tax assets of $7.6 million, comprised of tax credit carryforwards, net operating loss and capital loss carryforwards and other deductible temporary differences, which can be utilized to reduce either taxable income or taxes otherwise payable in future years The Company's management assesses realization of these net deferred income tax assets based on all available evidence and has concluded that it is more likely than not that these net deferred income tax assets will be realized. Positive evidence includes, but is not limited to, the Company's historical earnings, projected future earnings, contracted sales backlog at March 31, 2006, and the ability to realize certain deferred income tax assets through loss and tax credit carryback strategies. If and when the Company's operations in some jurisdictions were to reach a requisite level of profitability or where the Company's future profitability estimates increase due to changes in positive evidence, the Company would reduce all or a portion of the applicable valuation

allowance in the period when such determination is made. This would result in an increase to reported earnings and a decrease to the Company's effective tax rate in such period However, if the Company's projected future earnings do not materialize, or if the Company operates at a loss in certain jurisdictions, or if there is a material change in actual effective tax rates or time period within which the Company's underlying temporary differences become taxable or deductible, the Company could be required to increase the valuation allowance against all or a significant portion of the Company's deferred tax assets resulting in a substantial increase to the Company's effective tax rate for the period of the change and a material adverse impact on its operating results for the period

The Company is subject to ongoing tax examinations and assessments in various jurisdictions. Accordingly, the Company may incur additional tax expense based upon the outcomes of such matters. In addition, when applicable, the Company adjusts tax expense to reflect both favorable and unfavorable examination results The Company's ongoing assessments of the probable outcomes of examinations and related tax positions require judgement and can materially increase or decrease its effective rate as well as impact operating results.

RESULTS OF OPERATIONS

THREE MONTHS ENDED MARCH 31, 2006 VERSUS THREE MONTHS ENDED MARCH 31, 2005

The Company reported net loss from continuing operations before income taxes of $9 7 million or $0.24 per share on a diluted basis and net loss from continuing operations after taxes of $8.1 million or $0.20 per share on a diluted basis for the first quarter of 2006. For the first quarter of 2005 the Company reported net earnings from continuing operations before income taxes of $0.9 million or $0 02 per share on a diluted basis and net earnings from continuing operations after taxes of $1.0 million or $0.02 per share on a diluted basis.

REVENUE

The Company's revenues for the first quarter of 2006 decreased 34.9% to $20 4 million from $31 4 million in the same period last year.

Systems revenue decreased to $9 4 million in the first quarter of 2006 from $22.1 million in the first quarter of 2005, a decrease of 57.5%. The Company recognized revenue on three theater systems which qualified as either sales or sales-type leases in the first quarter of 2006 compared to five theater systems in the first quarter of 2005. Revenue from sales and leases decreased to $3.8 million in the first quarter of 2006 from $16 5 million in 2005, a decrease of 76 7% This decrease was due to the decrease in the number and mix of system recognitions and a decrease in settlement revenues. The Company recognized $nil in settlement revenue during the first quarter of 2006, compared to $7.1 million in the same period in 2005.





RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED MARCH 31, 2006 VERSUS THREE MONTHS ENDED MARCH 31, 2005 (cont'd)

REVENUE (cont'd)

Two of the systems recognized in the first quarter of 2006 related to the sale of used theater systems to two customers which exercised an option to convert their leases into outright purchases compared to nil used systems in the same period of 2005

Average revenue per sales and sales-type systems decreased due to the two used systems sold in the first quarter of 2006, compared to nil in the same period of 2005 and due to a difference in the mix of systems

| | THREE MONTHS ENDED MARCH 31, 2006 | 2005 |
|---|---|---|
| Sales and Sales-type leases | | |
| IMAX 3D | 3 | 1 |
| IMAX 3D SR | -- | 3 |
| IMAX MPX | -- | 1 |
| | 3 | 5 |

========== ==========

In addition, the Company installed and began recognizing revenue on one theater system that qualified as an operating lease in the first quarter of 2005 versus nil in the same period in 2006 The Company recognizes revenue on operating leases over the term of the leases

The Company generally enters into multi-year system lease agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system. During the period of time between lease signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing. Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual lease buyout, whereby the parties are released from their future obligations under the lease, the initial lease payments that the customer previously made to the Company are typically recognized as revenue and the geographic territory granted to the customer reverts to the Company. For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through the installation of a theater system or a consensual lease buyout. In addition, since the introduction of its new IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their existing lease agreements, which were in the Company's backlog, and sign new MPX system agreements. The Company did not recognize any settlement revenue during the first quarter of 2006 compared to $7 1 million for the same period in 2005. The settlement amounts recognized in the first quarter of 2005 are detailed as follows. $0.2 million related to MPX conversion agreements and $6 9 million related to consensual lease buyouts The Company anticipates that, while MPX conversion agreements may continue as MPX systems continue to prove popular with commercial customers, overall revenue from consensual lease buyouts and terminations of agreements by customer default will likely continue to decrease throughout 2006 in comparison to 2005.





RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED MARCH 31, 2006 VERSUS THREE MONTHS ENDED MARCH 31, 2005 (cont'd)

REVENUE (cont'd)

Ongoing rental revenue decreased slightly by 1.7% in the first quarter of 2006 compared to the same period in 2005 Maintenance revenue remained consistent at $3.5 million in both the first quarters of 2006 and 2005. The Company expects to see an increase throughout 2006 compared to 2005 in both ongoing rent and maintenance revenue as the Company's theater network continues to grow in 2006

Film revenues increased to $6.5 million in the first quarter of 2006 from $4.9 million in the first quarter of 2005, due primarily to an increase in film distribution and film production revenues. Film distribution revenues increased to $3 4 million in the first quarter of 2006 from $2.1 million in the first quarter of 2005, an increase of 66.7%, and film production revenues increased to $0 5 million in the first quarter of 2006 from $0 1 million in the first quarter of 2005, both increases primarily due to the production and release of Deep Sea 3D in March 2006 and the continued performance of Magnificent Desolation Walking on the Moon 3D released in September 2005 Film post-production revenues increased slightly to $1.5 million in the first quarter of 2006 from $1 4 million in the first quarter of 2005. IMAX DMR revenues, which are revenues to the Company generated from the gross box office performance of IMAX DMR films, decreased by 26 9% in the first quarter of 2006 The decrease in DMR revenue is due primarily to the success of The Polar Express: The IMAX 3D Experience, released in November 2004, which led to a stronger box office performance in the first quarter of 2005 compared to the same period in 2006, and due to the March 2005 release of Robots The IMAX Experience. This decrease is partially offset by the success of Harry Potter and the Goblet of Fire: The IMAX Experience released in November 2005.

The Company believes it will continue to see higher film revenues in 2006 due to the increase in the number of new films expected to be released during the year. The Company intends to release in conjunction with studios at least seven new films in 2006 including the already released V for Vendetta: The IMAX Experience (March 2006) and Deep Sea 3D (March 2006), and the still to be released Poseidon· The IMAX Experience (May 2006), Superman Returns: An IMAX 3D Experience (June 2006), The Ant Bully: An IMAX 3D Experience (August 2006), Open Season An IMAX 3D Experience (September 2006), and Happy Feet: An IMAX 3D Experience (November 2006)

Theater operations revenue decreased slightly to $3.7 million in the first quarter of 2006 from $3.8 million in the first quarter of 2005, due to a decrease in average ticket prices of 3.0% and a slight decrease in attendance of 3 3% due primarily to the success of the IMAX 3D version of The Polar Express: The IMAX 3D Experience, in the first quarter of 2005. Although a decrease in the first quarter of 2006, the Company believes it will see higher attendance rates in 2006 compared to the prior year due to the Company's 2006 film slate.

Other revenue increased to $0.8 million in the first quarter of 2006 compared to $0.5 million in the same period in 2005, largely due to an increase in the Company's after market sales. Other revenue primarily includes revenue generated from the Company's camera and rental business and after market sales of projection system parts.

Based on the Company's expectation of the remaining 2006 system installations and its films to be released throughout the remainder of 2006, the Company believes it will see higher revenues in 2006 in comparison to 2005.

GROSS MARGIN

Gross margin in the first quarter of 2006 was $6.0 million, or 29 5% of total revenue, compared to $16 1 million, or 51 5% of total revenue in the first quarter of 2005





RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED MARCH 31, 2006 VERSUS THREE MONTHS ENDED MARCH 31, 2005 (cont'd)

GROSS MARGIN (cont'd)

Systems margins declined in the first quarter of 2006 by $10.0 million or 66 2%. Average gross margin on sales and sales-type lease of projection systems decreased in the first quarter of 2006 versus the same period in 2005 by 43 6%, primarily due to the decline in the number of system recognitions and a change in the mix of recognitions as two customers exercised an option to convert their leases into outright purchases compared to nil in the same period of 2005. In addition, the Company recognized $nil in settlement gross margin in the first quarter of 2006 compared to $7 1 million in the same period of 2005 The settlement amounts recognized in 2005 are detailed as follows: $0.2 million related to MPX conversion agreements and $6.9 million related to consensual lease buyouts

The Company's film gross margin decreased in the first quarter of 2006 by $0 1 million Film distribution margin decreased by $0.1 million primarily due to decreased activity from the Company's 15/70 library to which the Company has distribution rights The Company's DMR gross margin decreased slightly by $0 3 million due to a lower performance of DMR pictures in the current year and post-production gross margin increased slightly by $0 3 million

The Company's owned and operated theater gross margin increased by $0 3 million in the first quarter of 2006 compared to the same period in 2005 primarily as a result of lower rental fees for films in 2006.

Other gross margin decreased by $0 3 million in the first quarter of 2006, primarily due to a sales tax refund received in the first quarter of 2005

The Company anticipates higher gross margins for the full year of 2006 in comparison to 2005, due to a combination of higher system installations and DMR film releases, as commercial exhibitors continue to install new projection systems in their multiplexes.

OTHER

Selling, general and administrative expenses were $10.5 million in the first quarter of 2006 versus $10.2 million in the same period of 2005. Legal fees for the first quarter of 2006 decreased by $0 4 million due to a reduction in the number of outstanding legal matters in which the Company is involved. Professional fees increased by $0 3 million as the Company incurred costs to implement the accounting for Financial Accounting Standards No 123, "Share-Based Payment," ("FAS 123R") to pay the fees of the independent compensation and legal advisers that advised the Company on the modification of its pension plan Moreover, additional professional fees and other expenses were incurred in connection with the Company's process of seeking strategic alternatives, including a potential sale. In addition, the Company expensed $0.3 million for stock options granted in accordance with the adoption of FAS 123R Other non-cash stock-based compensation increased by $0.3 million in the first

quarter of 2006 due to changes in the Company's share price. Offsetting these increases, the Company also amended its executive pension plan on March 8, 2006 to reduce certain benefits, resulting in a savings of $0.4 million in compensation expense for the first quarter of 2006 compared to the previous year quarter. The Company recorded a foreign exchange gain of less than $0 1 million in the first quarter of 2006 compared to a loss of $0.3 million in the first quarter of 2005 The Company records foreign exchange translation gains and losses primarily on a portion of its financing receivable balances which are denominated in Canadian dollars, Euros and Japanese Yen.





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED MARCH 31, 2006 VERSUS THREE MONTHS ENDED MARCH 31, 2005 (cont'd)

OTHER (cont'd)

Receivable provisions net of recoveries for accounts receivable amounted to a net provision of $0.1 million in the first quarter of 2006 compared to a net provision of $0.3 million in the first quarter of 2005. The Company recorded a net recovery of $0.1 million in the first quarter of 2005 on financing receivables due to favorable outcomes on lease amendments.

Interest income increased to $0.3 million in the first quarter of 2006 from $0.2 million in the first quarter of 2005, primarily due to higher average short-term investments balance and overall higher yields.

Interest expense remained consistent at $4 2 million in the first quarters of 2006 and 2005 Included in interest expense is the amortization of deferred finance costs in the amount of $0 2 million in the first quarters of 2006 and 2005 relating to the Senior Notes due 2010. The Company's policy is to defer and amortize all the costs relating to a debt financing over the life of the debt instrument

INCOME TAXES

The Company's effective tax rate differs from the statutory tax rate and will vary from year to year primarily as a result of numerous permanent differences, investments and other tax credits, the provision for income taxes at different rates in foreign and other provincial jurisdictions, enacted statutory tax rate increases or reductions in the year, changes in the Company's valuation allowance based on the Company's recoverability assessments of deferred tax assets, and favorable or unfavorable resolution of various tax examinations. The income tax expense for the quarter is calculated by applying the estimated average annual effective tax rate of approximately 10% for the 2006 year to quarterly pre-tax income As of March 31, 2006, the Company had a gross deferred income tax asset of $48.4 million, against which the Company is carrying a $40.8 million valuation allowance. In the quarter the Company favorably resolved a provincial income tax audit resulting in the release of related tax reserves of $0 5 million to the income tax recovery for the period.

RESEARCH AND DEVELOPMENT

Research and development expenses increased to $0.9 million in the first quarter of 2006, compared to $0 7 million in 2005 The expenses primarily reflect research and development activities pertaining to the Company's new IMAX digitally-based theater projection system. Through research and development, the Company continues to design and develop cinema-based equipment, software and other technologies to enhance its product offering, including the continued enhancement of a method of generating stereoscopic (3D) imaging data from a monoscopic (2D) source. The Company believes that the motion picture industry will be affected by the development of digital technologies, particularly in the areas of content creation (image capture), post-production (editing and special effects), digital re-mastering distribution and display. Consequently, the Company has made significant investments in digital technologies, including the development of proprietary, patent-pending technology such as a digitally-based projection system, as well as technologies to digitally enhance image resolution and quality of motion picture films, and convert monoscopic (2D) to stereoscopic (3D) images The Company also holds a number of patents, patents pending and intellectual property rights in these areas. In addition, the Company holds numerous digital patents in the large-format field of use.



Source IMAX CORP, 10-Q, May 09, 2006

ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED MARCH 31, 2006 VERSUS THREE MONTHS ENDED MARCH 31, 2005 (cont'd)

DISCONTINUED OPERATIONS

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater The Company abandoned or removed all of its assets from the theater in the first quarter of 2004. The Company is involved in a legal proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations. The amount of loss to the Company has been estimated as between $0.8 million and $2.3 million. The Company paid out $0 8 million with respect to amounts owing to the landlord during 2003 and 2004. As the Company is uncertain as to the outcome of the proceeding, no additional amount has been recorded. The Company recorded $nil in net earnings from discontinued operations related to Miami IMAX theater in the first quarters of 2006 and 2005

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management. As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12.7 million previously advanced by the Company, and reorganized the remaining $12.7 millicn of debt owing to the Company into two separate loan agreements. The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3 5 million During the first quarter of 2006, the Company recognized $2 3 million (2005 - $0 2 million) in income from discontinued operations. The other tranche of $1 2 million had previously been recognized in 2005

PENSION PLAN AMENDMENT

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the unfunded U S defined benefit pension plan covering its two Co-Chief Executive Officers Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced benefit payments is accelerated and paid out upon a change of control of the Company The benefits were 50% vested as of July 2000, the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55 The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon change of control shall be 100%, though, as of March 31, 2006, one of the Co-Chief Executives was approximately 78% vested and the other Co-Chief Executive was approximately 96% vested.

EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted Financial Accounting Standards No. 123, "Share-Based Payment," ("FAS 123R") which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No 107 ("SAB 107") relating to FAS 123R. The Company has applied the provisions of SAB 107 in its adoption of FAS 123R.





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED MARCH 31, 2006 VERSUS THREE MONTHS ENDED MARCH 31, 2005 (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006. In accordance with the modified prospective transition method, the Company's

Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R. Stock-based compensation expense recognized under FAS 123R for the three months ended March 31, 2006 was $0 3 million There was no stock-based compensation expense related to employee stock options recognized during the three months ended March 31, 2005

FAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations. Prior to the adoption of FAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("FAS 123"). Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant.

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the three months ended March 31, 2006 included compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R. In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line single-option method. As stock-based compensation expense recognized in the Consolidated Statement of Operations for the first quarter of 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods.

The Company utilizes a lattice-binomial option-pricing model ("binomial model") to determine the fair value of share-based payment awards. The fair value determined by the binomial model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables These variables include, but are not limited to, the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors. Option-pricing models were developed for use in estimating the value of traded options that have no vesting or hedging restrictions and are fully transferable. Because the Company's employee stock options have certain characteristics that are significantly different from traded options, and because changes in the subjective assumptions can materially affect the estimated value, in management's opinion, the binomial model best provides an accurate measure of the fair value of the Company's employee stock options Although the fair value of employee stock options is determined in accordance with FAS 123R and SAB 107 using an option-pricing model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

LIQUIDITY AND CAPITAL RESOURCES

CREDIT FACILITY

On February 6, 2004, the Company entered into a loan agreement for a secured revolving credit facility (the "Credit Facility") The Credit Facility is a three-year revolving credit facility with yearly renewal options thereafter, permitting maximum aggregate borrowings of $20 0 million, subject to a borrowing base calculation which includes the Company's financing receivables, and certain reserve requirements and further reduced by outstanding letters of credit. The Credit Facility bears interest at Prime + 0 50% per annum or Libor + 2.25% per annum and is collateralized by a first priority security interest in all of the current and future assets of the Company The Credit Facility contains typical affirmative and negative covenants, including covenants that restrict the Company's ability to. incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales, incur certain liens or other encumbrances, conduct certain transactions with affiliates and enter into certain corporate transactions. In addition, the

Credit Facility contains customary events of default, including upon an acquisition or a change of control that has a material adverse effect on the Company's financial condition. The Credit Facility also requires the Company to maintain a minimum level of earnings before interest, taxes, depreciation and amortization, and cash collections.

CASH AND CASH EQUIVALENTS

As at March 31, 2006, the Company's principal sources of liquidity included cash and cash equivalents of $22.0 million, short-term investments of $8.3 million, the Credit Facility, trade accounts receivable of $24.4 million and anticipated collection from net investment in leases due in the next 12 months of $8 2 million. As at March 31, 2006, the Company has not drawn down on the Credit Facility, and has letters of credit for $9.2 million secured by the Credit Facility arrangement.

The Company believes that cashflow from operations together with existing cash and borrowing available under the Credit Facility will be sufficient to meet operating needs for the foreseeable future However, the Company's operating cashflow can be impacted if management's projections of future signings and installations are not realized The Company forecasts its short-term liquidity requirements on a quarterly and annual basis Since the Company's future cashflows are based on estimates and there may be factors that are outside of the Company's control, there is no guarantee the Company will continue to be able to fund its operations through cash flows from operations. Under the terms of the Company's typical theater system lease agreement, the Company receives substantial cash payments before the Company completes the performance of its obligations. Similarly, the Company receives cash payments for some of its film productions in advance of related cash expenditures.

The Company's net cash provided by (used in) operating activities is impacted by a number of factors, including the proceeds associated with new signings of theater system lease and sale agreements in the year, the box office performance of large format films distributed by the Company and/or exhibited in the Company's theaters, increases or decreases in the Company's operating expenses, and the level of cash collections received from its customers.

Cash used in operating activities amounted to $5 6 million for the period ended March 31, 2006 Changes in other non-cash operating assets as compared to December 31, 2005 include an increase of $2 8 million in inventories, a decrease of $0 8 million in financing receivables, a $0.4 million decrease in accounts receivable and a $0 2 million increase in prepaid expenses, which mostly relates to prepaid film print costs that will be expensed over the period to be benefited Changes in other non-cash operating liabilities as compared to December 31, 2005 include an increase in deferred revenue of $3.1 million, a decrease in accounts payable of $1 3 million and an increase of $0 6 million in accrued liabilities. Included in accrued liabilities for the period ended March 31, 2006 were $23 2 million in respect of accrued pension obligations which are mostly long-term in nature.





LIQUIDITY AND CAPITAL RESOURCES (cont'd)

CASH AND CASH EQUIVALENTS (cont'd)

Cash used in investing activities amounted to $0.4 million in the first three months of 2006, which includes purchases of short-term investments of $4 1 million, proceeds from maturities of short-term investments of $4 1 million, purchases of $0 1 million in fixed assets, an increase in other assets of $0.2 million and an increase in other intangible assets of $0.1 million

Cash provided by financing activities in the first three months of 2006 amounted to $0.3 million, due to the issuance of common shares through the exercise of stock options

The Company also received $3.5 million in cash on a note receivable from a discontinued operation.

Capital expenditures including the purchase of fixed assets and investments in film assets were $2.4 million for the first quarter of 2006.

Cash provided by operating activities amounted to $0.1 million for the period ended March 31, 2005 Changes in other non-cash operating assets and liabilities included an increase in deferred revenue of $3.7 million, and a decrease of $4 1 million in accrued liabilities Cash used by investing activities for the first quarter of 2005 amounted to $15.6 million, primarily consisting of $15.0 million invested in short-term investments and $0.3 million invested in fixed assets Cash provided by financing activities amounted to $1.3 million primarily due to the issuance of common shares through the exercise of stock options. Capital

expenditures including the purchase of fixed assets net of sales proceeds and investments in film assets were $2.4 million for the first quarter of 2005

LETTERS OF CREDIT AND OTHER COMMITMENTS

As at March 31, 2006, the Company has letters of credit of $9.2 million outstanding, of which the entire balance has been secured by the Credit Facility.

SENIOR NOTES DUE 2010

In November 2004, the Company completed an exchange offer wherein $159.0 million of the Company's 9.625% senior notes due December 1, 2010 (the "Unregistered Senior Notes") were exchanged for 9.625% senior notes registered under the Securities Act of 1933, as amended (the "Registered Senior Notes"), pursuant to a registration statement on Form S-4 that had been declared effective by the Securities and Exchange Commission on September 30, 2004. Apart from the fact that the Registered Senior Notes have been registered under the Securities Act, the Unregistered Senior Notes and the Registered Senior Notes are substantially identical and are referred to herein as the "Senior Notes". The Senior Notes are unconditionally guaranteed, jointly and severally, by certain of the Company's wholly-owned subsidiaries

The terms of the Company's Senior Notes impose certain restrictions on its operating and financing activities, including certain restrictions on the Company's ability to incur certain additional indebtedness; make certain distributions or certain other restricted payments; grant liens; create certain dividend and other payment restrictions affecting the Company's subsidiaries, sell certain assets or merge with or into other companies; and enter into certain transactions with affiliates The Company believes these restrictions will not have a material impact on its financial condition or results of operations.

As at March 31, 2006, the Company had outstanding $159 0 million aggregate principal of Registered Senior Notes and $1.0 million aggregate principal of Unregistered Senior Notes





LIQUIDITY AND CAPITAL RESOURCES (cont'd)

PENSION OBLIGATIONS

The Company has a defined benefit pension plan covering its two Co-Chief Executive Officers. As at March 31, 2006, the Company had an unfunded and accrued projected benefit obligation of approximately $23.2 million (2005 - $31.1 million) in respect of this defined benefit pension plan. At the time the Company established the defined benefit pension plan, it also took out life insurance policies on its two Co-Chief Executive Officers with coverage amounts of $21 5 million in aggregate The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so As at March 31, 2006, the cash surrender value of the insurance policies is $3 5 million (December 31, 2005 - $3 3 million)

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company The benefits were 50% vested as of the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55. The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon change in control shall be 100%, though, as of March 31, 2006, one of the Co-Chief Executives was approximately 78% vested and the other Co-Chief Executive was approximately 96% vested

OFF-BALANCE SHEET ARRANGEMENTS

There are currently no off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on the Company's financial condition

ITEM 3. QUANTITATIVE AND QUALITATIVE FACTORS ABOUT MARKET RISK

The Company is exposed to market risk from changes in foreign currency rates.

The Company does not use financial instruments for trading or other speculative purposes

A majority of the Company's revenue is denominated in U.S. dollars while a significant portion of its costs and expenses is denominated in Canadian dollars A portion of the Company's net U.S. dollar flows is converted to Canadian dollars to fund Canadian dollar expenses through the spot market In Japan, the Company has ongoing operating expenses related to its operations Net Japanese yen flows are converted to U.S dollars through the spot market. The Company also has cash receipts under leases denominated in Japanese yen, Euros and Canadian dollars. The Company plans to convert Japanese yen and Euros lease cash flows to U.S. dollars through the spot markets on a go-forward basis.





ITEM 4 CONTROLS AND PROCEDURES

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

The Company's Co-Chief Executive Officers and Chief Financial Officer, after evaluating the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d- 15(e)) as of the end of the period covered by this report, have concluded that, as of the end of the period covered by this report, the Company's disclosure controls and procedures were adequate and effective. The Company will continue to periodically evaluate its disclosure controls and procedures and will make modifications from time to time as deemed necessary to ensure that information is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms

CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

As of the end of the period covered by this report there was no change in the Company's internal control over financial reporting that occurred during the period covered by this report that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting





PART II OTHER INFORMATION

ITEM 1 LEGAL PROCEEDINGS

(a) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement and seeking injunctive relief and damages In April 2005, In-Three filed an answer denying infringement and asserting counterclaims that seek a declaratory judgment of non-infringement, invalidity and unenforceability of the patent in suit, and damages for alleged false advertising, false designation of origin, breach of contract, interference with prospective economic advantage and/or unfair competition. On March 13, 2006, the Company and In-Three entered into a settlement agreement, resolving all matters between the parties On March 29, 2006, the Company and In-Three filed a joint motion for an order dismissing with prejudice all claims and counterclaims between the parties.

(b) In November 2001, the Company filed a complaint with the District Court of Munich against Big Screen, a German large-screen cinema owner in Berlin ("Big Screen"), demanding payment of rental payments and certain other amounts owed to the Company Big Screen raised a defense based on alleged infringement of German antitrust rules, relating mainly to an allegation of excessive pricing. Big Screen had brought a number of motions for restraining orders in this matter relating to the Company's provision of films and maintenance, all of which have been rejected by the courts, including the Berlin Court of Appeals, and for which all appeals have been exhausted On November 8, 2005, the District Court of Munich rendered a judgment in favor of the Company on all accounts. Big Screen has appealed the judgment to the Munich Court of Appeals and at the same time asked for an order to stay the execution under the judgment of the District Court. On November 30, 2005, Big Screen filed an application for the opening of insolvency proceedings While the appeal on the merits is pending, by order of January 12, 2006, the Court of Appeals has rejected Big Screen's application regarding a stay of execution so that the judgment remains executable

(c) In May 2002, the Company filed a complaint with the District Court of Nuremberg-Furth, Germany against Siewert Holding in Wuerzburg ("Siewert"), demanding payment of rental obligations and other amounts owec to the Company Siewert raised a defense based on alleged infringement of German antitrust rules By judgement of December 20, 2002, the District Court rejected the defense and awarded judgement in documentary proceedings in favor of the Company and added further amounts that had fallen due Siewert applied for leave to appeal to the German Supreme Court on matters of law, which was rejected by the German Supreme Court in March 2004. Siewert subsequently made a partial payment of amounts awarded to the Company Siewert has filed follow up proceedings to the documentary proceedings in the District Court, essentially repeating the claims rejected in the documentary proceeding. On September 30, 2004, Siewert filed for insolvency with the Local Court in Wuerzburg.

(d) In January 2004, the Company and IMAX Theater Services Ltd., a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3 7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17.8 million as a result of E-Citi's breach of a September 2000 lease agreement. The arbitration hearing on both claims took place on November 16-18, 2005 On January 31, 2006, the ICC informed the parties that the liability stage of the proceedings was closed, and on February 1, 2006, the ICC issued an award finding unanimously in the Company's favor on all claims. The amount of damages awarded to the Company will be decided after a hearing scheduled for July 2006, and no amount has yet been recorded for these damages.





PART II OTHER INFORMATION (cont'd)

ITEM 1 LEGAL PROCEEDINGS (cont'd)

(e) In June 2004, Robots of Mars, Inc. ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages The Company filed a cross claim for indemnity against a third party, SIMEX, Inc. ("SIMEX") In response, SIMEX filed an application in Toronto, Ontario, Canada, seeking a declaration that it is not subject to the arbitration provision or payment obligations in the production agreement The Ontario Superior Court dismissed SIMEX's application, with costs. SIMEX appealed part of this decision to the Ontario Court of Appeal which found that SIMEX was not subject to some of the obligations which the Company contended were set forth the production agreement, including, specifically, the obligation to pay Robots directly based on the receipts of proceeds from the distribution of the films produced under the production agreement. The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration

(f) In addition to the matters described above, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings.

ITEM 1A RISK FACTORS

There have been no material changes to the factors disclosed in Item 1A. Risk Factors in our Annual Report on Form 10-K for the year ended December 31, 2005.

PART II OTHER INFORMATION (cont'd)

ITEM 4 SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

At the Annual Meeting of the Company's shareholders held on April 11, 2006, shareholders represented at the meeting: voted on the following matters·

Election of Directors

By a vote by way of show of hands, Neil S. Braun, Kenneth G. Copland and Garth M. Girvan were elected as Class I directors of the Company for a term expiring in 2009 Management received proxies from the shareholders to vote for the three directors nominated for election as follows:

| Director | Votes For | Votes Withheld |
|---|---|---|
| Neil S Braun | 33,527,658 | 403,615 |
| Kenneth G. Copland | 33,524,867 | 406,406 |
| Garth M Girvan | 28,959,943 | 4,970,730 |

In addition to the foregoing directors, the following directors cortinued in office David W Leebron, Richard L Gelfond, Bradley J. Wechsler and Marc A Utay

Appointment of Auditor

By a vote by way of show of hands, PricewaterhouseCoopers, LLP ("PWC") were appointed auditors of the Company to hold office until the next anrual meeting of shareholders and authorizing the directors to fix their remuneration Management received proxies from the shareholders to vote for the re-appointment of PWC as follows·

| | Votes For | Votes Withheld |
|---|---|---|
| Appointment of Auditor | 33,629,178 | 55,677 |

ITEM 6 EXHIBITS

(a) EXHIBITS

31 1 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated May 9, 2006, by Bradley J. Wechsler.

31 2 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated May 9, 2006, by Richard L. Gelfond.

31 3 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated May 9, 2006, by Francis T Joyce

32 1 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated May 9, 2006, by Bradley J. Wechsler

32 2 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated May 9, 2006, by Richard L Gelfond.

32.3 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated May 9, 2006, by Francis T Joyce



IMAX CORPORATION

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

IMAX CORPORATION

Date May 9, 2006 By: /s/ Francis T Joyce

Francis T. Joyce

Chief Financial Officer
(Principal Financial Officer)

Date: May 9, 2006

By /s/ Kathryn A. Gamble

Kathryn A. Gamble
Vice President, Finance, Controller
(Principal Accounting Officer)



Source IMAX CORP, 10-Q, May 09, 2006

IMAX CORPORATION

Exhibit 31.1

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES - OXLEY ACT OF 2002

I, Bradley J. Wechsler, Co- Chief Executive Officer of IMAX Corporation, certify that

1 I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation,

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have·

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; ard

5 The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions).

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information, and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Dated: May 9, 2006

By "Bradley J Wechsler"

Name: Bradley J. Wechsler
Title: Co-Chief Executive Officer

IMAX CORPORATION

Exhibit 31.2

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES - OXLEY ACT OF 2002

I, Richard L. Gelfond, Co- Chief Executive Officer of IMAX Corporation, certify that:

1. I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have.

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

   (d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Dated. May 9, 2006

By· "Richard L. Gelfond"

---

Name: Richard L. Gelfond
Title Co-Chief Executive Officer

IMAX CORPORATION

Exhibit 31 3

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES - OXLEY ACT OF 2002

I, Francis T Joyce, Chief Financial Officer of IMAX Corporation, certify that

1 I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation,

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report,

4 The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have.

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation, and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information, and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Dated: May 9, 2006

By: "Francis T. Joyce"

Name: Francis T. Joyce
Title: Chief Financial Officer

IMAX CORPORATION

Exhibit 32.1

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18,
UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Bradley J Wechsler, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that.

The Quarterly Report on Form 10-Q for the quarter ended March 31, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated. May 9, 2006

"Bradley J Wechsler"
-----------------------------------
Bradley J. Wechsler
Co-Chief Executive Officer

IMAX CORPORATION

Exhibit 32.2

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18,
UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Richard L Gelfond, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended March 31, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: May 9, 2006

"Richard L. Gelfond"
-----------------------------------
Richard L. Gelfond
Co-Chief Executive Officer

IMAX CORPORATION

Exhibit 32.3

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18,
UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Francis T Joyce, Chief Financial Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that

The Quarterly Report on Form 10-Q for the quarter ended March 31, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated. May 9, 2006

"Francis T Joyce"
-----------------------------------
Francis T. Joyce
Chief Financial Officer

Created by 10KWizard www.10KWizard.com