# EXHIBIT P

10kWIZARD
SEC POWER SEARCH

# FORM 10-Q

## IMAX CORP - IMAX

**Filed: August 09, 2006 (period: June 30, 2006)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

10-Q - 10-Q

PART I.

**Item 1.** Financial Statements........................................ 3

PART I.

**Item 2.** Management's Discussion and Analysis of Financial Condition
**Item 3.** Quantitative and Qualitative Factors about Market Risk.......... 54
**Item 4.** Controls and Procedures........................................ 54

PART II.

**Item 1.** Legal Proceedings.............................................. 55

PART II.

**Item 1A.** Risk Factors.................................................. 56

PART II.

**Item 5.** Other Information.............................................. 56

PART II.

**Item 6.** Exhibits....................................................... 57

PART I

**ITEM 1.** FINANCIAL STATEMENTS
**ITEM 2.** MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
**ITEM 3.** QUANTITATIVE AND QUALITATIVE FACTORS ABOUT MARKET RISK
**ITEM 4.** CONTROLS AND PROCEDURES

PART II

**ITEM 1.** LEGAL PROCEEDINGS
**ITEM 1A.** RISK FACTORS
**ITEM 5.** OTHER INFORMATION

**ITEM 6.** EXHIBITS

SIGNATURES

EX-4.10 (EX-4.10)

EX-4.11 (EX-4.11)

EX-10.27 (EX-10.27)

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-31.3 (EX-31.3)

EX-32.1 (EX-32.1)

EX-32.2 (EX-32.2)

EX-32.3 (EX-32.3)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended June 30, 2006

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 0-24216

IMAX CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Canada<br>(State or other jurisdiction of incorporation or organization) | 98-0140269<br>(I.R S. Employer Identification Number) |
| 2525 Speakman Drive, Mississauga, Ontario, Canada<br>(Address of principal executive offices) | L5K 1B1<br>(Postal Code) |

Registrant's telephone number, including area code (905) 403-6500

N/A
(Former name or former address, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days

Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer See definition of "accelerated filer" and "large accelerated filer" in Rule 12B-2 of the Exchange Act.

Large Accelerated Filer [ ] Accelerated Filer [X] Non-Accelerate Filer [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes [ ] No [X]

Indicate the number of shares of each of the issuer's classes of common stock, as of the latest practicable date·

| Class | Outstanding as of July 14, 2006 |
|---|---|
| Common stock, no par value | 40,285,574 |



IMAX CORPORATION

TABLE OF CONTENTS

PAGE

Source IMAX CORP, 10-Q, August 09, 2006

| | | |
|---|---|---|
| PART I. | FINANCIAL INFORMATION | |
| Item 1 | Financial Statements........................ .. . .. .. | 3 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations. . ....... .......... ...... | 33 |
| Item 3. | Quantitative and Qualitative Factors about Market Risk.. ... .. | 54 |
| Item 4 | Controls and Procedures . ... ............... . . | 54 |
| PART II | OTHER INFORMATION | |
| Item 1. | Legal Proceedings ......................... . . .. ... ... | 55 |
| Item 1A. | Risk Factors .. ............... .. ..... . ......... ... ... | 56 |
| Item 5. | Other Information ...................... ... ............ ....... | 56 |
| Item 6. | Exhibits ............... .. ... ... . ... ....... | 57 |
| Signatures...... | . ..................................... ....... | 58 |


</TABLE>

SPECIAL NOTE REGARDING FORWARD-LOOKING INFORMATION

Certain statements included in this annual report may constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, references to future capital expenditures (including the amount and nature thereof), business and technology strategies and measures to implement strategies, competitive strengths, goals, expansion and growth of business and operations, plans and references to the future success of IMAX Corporation together with its wholly-owned subsidiaries (the "Company") and expectations regarding the Company's future operating results. These forward-looking statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances. However, whether actual results and developments will conform with the expectations and predictions of the Company is subject to a number of risks and uncertainties, including, but not limited to, general economic, market or business conditions; the opportunities (or lack thereof) that may be presented to and pursued by the Company, competitive actions by other companies, conditions in the in-home and out-of-home entertainment industries; changes in laws or regulations; conditions and developments in the commercial exhibition industry; the acceptance of the Company's new technologies; risks associated with investments and operations in foreign jurisdictions and any future international expansion, including those related to economic, political and regulatory policies of local governments and laws and policies of the United States and Canada; the potential impact of increased competition in the markets the Company operates within; and other factors, many of which are beyond the control of the Company. Consequently, all of the forward-looking statements made in this quarterly report are qualified by these cautionary statements, and actual results or anticipated developments by the Company may not be realized, and even if substantially realized, may not have the expected consequences to, or effects on, the Company. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking information, whether as a result of new information, future events or otherwise.

IMAX(R), IMAX(R) Dome, IMAX(R) 3D, IMAX(R) 3D Dome, The IMAX Experience(R), An IMAX 3D Experience(R), IMAX DMR(R), IMAX MPX(R), IMAX think big(R) and think big(R) are trademarks and trade names of the Company or its subsidiaries that are registered or otherwise protected under laws of various jurisdictions






| | | PAGE |
|---|---|---|
| PART I | FINANCIAL INFORMATION | |
| ITEM 1 | FINANCIAL STATEMENTS | |
| | The following Condensed Consolidated Financial Statements are filed as part of this Report· | |
| | Condensed Consolidated Balance Sheets as at June 30, 2006 and December 31, 2005..... .... ... . . . . ... | 4 |
| | Condensed Consolidated Statements of Operations for the three and six month periods ended June 30, 2006 and 2005..... .. | 5 |
| | Condensed Consolidated Statements of Cash Flows for the six month periods ended June 30, 2006 and 2005..... ... . . ...... | 6 |
| | Notes to Condensed Consolidated Financial Statements... ... ... | 7 |


</TABLE>

IMAX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U.S. dollars)

| | JUNE 30, 2006 (UNAUDITED) | DECEMBER 31, 2005 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 21,574 | $ 24,324 |
| Short-term investments | 8,351 | 8,171 |
| Accounts receivable, net of allowance for doubtful accounts of $6,598 (2005 - $5,892) | 27,314 | 26,165 |
| Financing receivables (note 3) | 65,355 | 63,006 |
| Inventories (note 4) | 29,680 | 28,294 |
| Prepaid expenses | 4,159 | 3,825 |
| Film assets | 4,597 | 3,329 |
| Fixed assets | 25,797 | 26,780 |
| Other assets | 7,943 | 11,618 |
| Deferred income taxes (note 11) | 7,775 | 6,171 |
| Goodwill | 39,027 | 39,027 |
| Other intangible assets | 2,686 | 2,701 |
| Total assets | $ 244,258 | $ 243,411 |
| LIABILITIES | | |
| Accounts payable | $ 7,024 | $ 6,935 |
| Accrued liabilities (note 7(c)) | 51,329 | 55,122 |
| Deferred revenue | 47,147 | 44,397 |
| Senior Notes due 2010 (note 5) | 160,000 | 160,000 |
| Total liabilities | 265,500 | 266,454 |
| COMMITMENTS AND CONTINGENCIES (notes 7 and 8) | | |
| SHAREHOLDERS' EQUITY (DEFICIT) | | |
| Capital stock (note 12) Common shares - no par value Authorized - unlimited number. Issued and outstanding - 40,285,574 (2005 - 40,213,542) | 121,960 | 121,674 |
| Other equity | 2,808 | 1,758 |
| Deficit | (146,634) | (144,347) |
| Accumulated other comprehensive income (loss) | 624 | (2,128) |
| Total shareholders' deficit | (21,242) | (23,043) |
| Total liabilities and shareholders' equity (deficit) | $ 244,258 | $ 243,411 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U S dollars, except per share amounts)
(UNAUDITED)

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| REVENUE | | | | |
| IMAX systems (note 9(a)) | $23,952 | $20,308 | $33,350 | $42,421 |
| Films | 12,171 | 5,301 | 18,692 | 10,248 |
| Theater operations | 4,051 | 4,198 | 7,708 | 8,014 |
| Other | 1,224 | 1,071 | 2,066 | 1,563 |
| | 41,398 | 30,878 | 61,816 | 62,246 |

| | | | | |
|---|---|---|---|---|
| COSTS OF GOODS AND SERVICES | 23,538 | 15,009 | 37,931 | 30,232 |
| GROSS MARGIN | 17,860 | 15,869 | 23,885 | 32,014 |
| Selling, general and administrative expenses (note 9(b)) | 9,451 | 9,812 | 19,956 | 20,055 |
| Research and development | 664 | 886 | 1,579 | 1,539 |
| Amortization of intangibles | 132 | 160 | 324 | 317 |
| Receivable provisions, net of (recoveries) (note 10) | (252) | (370) | (109) | (158) |
| EARNINGS FROM OPERATIONS | 7,865 | 5,381 | 2,135 | 10,261 |
| Interest income | 280 | 284 | 533 | 498 |
| Interest expense | (4,231) | (4,202) | (8,405) | (8,399) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 3,914 | 1,463 | (5,737) | 2,360 |
| Recovery of (provision for) income taxes (note 11) | (380) | (538) | 1,150 | (479) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | 3,534 | 925 | (4,587) | 1,881 |
| Net earnings from discontinued operations (note 14) | -- | 186 | 2,300 | 426 |
| NET EARNINGS (LOSS) | $ 3,534 | $ 1,111 | $(2,287) | $ 2,307 |
| EARNINGS (LOSS) PER SHARE (note 12(b)): | | | | |
| Earnings (loss) per share - basic: | | | | |
| Net earnings (loss) from continuing operations | $ 0.09 | $ 0.02 | $ (0.11) | $ 0.05 |
| Net earnings from discontinued operations | $ -- | $ 0.01 | $ 0.05 | $ 0.01 |
| Net earnings (loss) | $ 0.09 | $ 0.03 | $ (0.06) | $ 0.06 |
| Earnings (loss) per share - diluted: | | | | |
| Net earnings (loss) from continuing operations | $ 0.08 | $ 0.02 | $ (0.11) | $ 0.05 |
| Net earnings from discontinued operations | $ -- | $ 0.01 | $ 0.05 | $ 0.01 |
| Net earnings (loss) | $ 0.08 | $ 0.03 | $ (0.06) | $ 0.06 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U S. dollars)
(UNAUDITED)

| | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|
| | 2006 | 2005 |
| CASH PROVIDED BY (USED IN): | | |
| OPERATING ACTIVITIES | | |
| Net earnings (loss) | $ (2,287) | $ 2,307 |
| Net (earnings) from discontinued operations | (2,300) | (426) |
| Items not involving cash: | | |
| Depreciation and amortization | 8,761 | 7,249 |
| Write-downs (recoveries) | (109) | (158) |
| Change in deferred income taxes | (1,604) | (283) |
| Stock and other non-cash compensation | 2,549 | 2,406 |
| Non-cash foreign exchange loss (gain) | (436) | 515 |
| Interest on short-term investments | (179) | (150) |
| Investment in film assets | (6,613) | (4,795) |
| Changes in other non-cash operating assets and liabilities | (2,637) | (3,057) |
| Net cash provided by (used in) operating activities | (4,855) | 3,608 |
| INVESTING ACTIVITIES | | |
| Purchase of short-term investments | (10,322) | (23,118) |
| Proceeds from maturities of short-term investments | 10,321 | 8,125 |

| | | |
|---|---|---|
| Purchase of fixed assets | (739) | (467) |
| Increase in other assets | (566) | (375) |
| Increase in other intangible assets | (309) | (290) |
| Net cash used in investing activities | (1,615) | (16,125) |
| FINANCING ACTIVITIES | | |
| Common shares issued | 286 | 2,052 |
| Net cash provided by financing activities | 286 | 2,052 |
| Effects of exchange rate changes on cash | (59) | 90 |
| DECREASE IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (6,243) | (10,375) |
| Cash provided by investing activities from discontinued operations | 3,493 | 236 |
| DECREASE IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (2,750) | (10,139) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 24,324 | 28,964 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 21,574 | $ 18,825 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S dollars unless otherwise stated)
(UNAUDITED)

1 BASIS OF PRESENTATION

The Condensed Consolidated Financial Statements include the accounts of IMAX Corporation together with its wholly-owned subsidiaries (the "Company"), except subsidiaries which the Company has identified as variable interest entities ("VIE's") where the Company is not the primary beneficiary ("PB") (note 2) The nature of the Company's business is such that the results of operations for the interim periods presented are not necessarily indicative of results to be expected for the fiscal year In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations.

The Company reports its results under United States Generally Accepted Accounting Principles ("U.S. GAAP"). Significant differences between United States and Canadian Generally Accepted Accounting Principles are described in note 18.

These financial statements should be read in conjunction with the financial statements included in the Company's most recent annual report on Form 10-K for the year ended December 31, 2005 which should be consulted for a summary of the significant accounting policies utilized by the Company. These interim financial statements are prepared following accounting policies consistent with the Company's financial statements for the year ended December 31, 2005.

EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted Financial Accounting Standards No. 123, "Share-Based Payment," ("FAS 123R") which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values. In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 107 ("SAB 107") relating to FAS 123R. The Company has applied the provisions of SAB 107 in its adoption of FAS 123R.

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006 In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R.

FAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations Prior to the adoption of FAS 123R,

the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with Accounting Principles Board Opinion No. 25 Accounting for Stock Issued to Employees, ("APB 25") as allowed under Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("FAS 123"). Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant.





1. BASIS OF PRESENTATION (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the three and six months ended June 30, 2006 includes compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method. Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line single-option method. As stock-based compensation expense recognized in the Consolidated Statement of Operations for the three and six months ended June 30, 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods.

The Company utilizes a lattice-binomial option-pricing model ("binomial model") to determine the fair value of share-based payment awards

Prior to January 1, 2006, the Company followed the intrinsic value method of accounting for employee stock options as prescribed by APB 25. If the fair value methodology prescribed by FAS 123 had been adopted by the Company, pro forma results for the three and six months ended June 30, 2005 would have been as follows

| | THREE MONTHS ENDED JUNE 30, 2005 | SIX MONTHS ENDED JUNE 30, 2005 |
|---|---|---|
| Net earnings as reported | $1,111 | $ 2,307 |
| Stock based compensation expense, if the methodology prescribed by FAS 123 had been adopted | (824) | (1,524) |
| Adjusted net earnings | $ 287 | $ 783 |
| Earnings per share - basic and diluted: | | |
| Net earnings as reported | $ 0.03 | $ 0.06 |
| FAS 123 stock based compensation expense | (0.02) | (0.04) |
| Adjusted net earnings | $ 0.01 | $ 0.02 |

1 BASIS OF PRESENTATION (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

Stock-based compensation expense recognized under FAS 123R for the three and six months ended June 30, 2006 was $0.5 million and $0.8 million respectively

The weighted average fair value of common share options granted to employees for the three and six months ended June 30, 2006 at the time of grant was $2 95 and $3.74 respectively (2005 - $2.85 and $2.85 per share). The Company uses a binomial model to determine the fair value of common share options at the grant date For the three and six months ended June 30, the following assumptions were used:

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Average risk-free interest rate | 5.13% | 4.15% | 4.85% | 4.15% |
| Market risk premium | 5.24% | 5.57% - 7.38% | 5.24 - 5.60% | 5.57% - 7.38% |
| Beta | 1.06 | 1.06 - 1.31 | 1.06 - 1.28 | 1.06 - 1.31 |
| Expected option life (in years) | 2.47 - 3.03 | 2.23 - 5.23 | 2.47 - 5.33 | 2.23 - 5.23 |
| Average expected volatility | 60% | 62% | 60% | 62% |
| Annual termination probability | 8.06% | 8.06% | 8.06% | 8.06% |
| Dividend yield | 0% | 0% | 0% | 0% |

As the Company stratifies its employees into two groups in order to calculate fair value under the Binomial model, ranges of assumptions used are presented for equity risk premium, Beta, expected option life and annual termination probability The Company uses the historical data to estimate option exercise and employee termination within the valuation model, separate groups of employees that have similar historical exercise behavior are considered separately for valuation purposes

The Company's policy is to issue new shares to satisfy stock options which are exercised

Total stock-based compensation expense related to non-vested employee stock options not yet recognized at June 30, 2006 and the weighted average period over which the awards are expected to vest is $4.1 million and 3 4 years, respectively.





2. VARIABLE INTEREST ENTITIES

In January 2003, the FASB issued Financial Interpretation 46 ("FIN 46"), Consolidation of Variable Interest Entities ("VIEs"), in an effort to expand and clarify existing accounting guidance that addresses when a company should include in its financial statements the assets, liabilities and activities of another entity FIN 46 was effective immediately for all enterprises with variable interests in VIEs created after January 31, 2003 and on January 1, 2004 for all previously existing variable interest entities. Under FIN 46, if an entity is determined to be a variable interest entity, it must be consolidated by the enterprise that absorbs the majority of the entity's expected losses if they occur, receives a majority of the entity's expected residual returns if they occur, or both. On December 24, 2003, the FASB issued a revised FIN 46, defined as FIN 46R. Commencing January 1, 2004, the Company was required to consolidate the accounts of all VIEs for which it is the primary beneficiary ("PB"), as required by FIN 46R The Company has evaluated its various variable interests to determine whether they are in VIE's The Company reviewed its management agreements relating to theaters which the Company manages, and has no equity interest, and concluded that such arrangements were not variable interests since the Company's fees are commensurate with the level of service and the theater owner retains the right to terminate the service. The Company has also reviewed its financial arrangements with

theaters where it shares in the profit or losses of the theater. The Company has not considered these arrangements under FIN 46R as the arrangements meet the scope exceptions defined in the pronouncement. The Company has determined that certain of its film production companies are VIEs Since in one case the Company absorbs a majority of the VIE's losses, the Company has determined that it is the PB of the entity. The Company continues to consolidate this entity with no material impact on the operating results or financial condition of the Company as the production company has total assets of $nil and total liabilities of $nil as at June 30, 2006. The Company also has interests in four other film production companies which are VIEs, however the Company did not consolidate these film entities since it does not bear the majority of the expected losses or expected residual returns. As of June 30, 2006, these four VIEs have total assets of $3.2 million (December 31, 2005 - $0.3 million) and total liabilities of $3.2 million (December 31, 2005 - $0 3 million)

3 FINANCING RECEIVABLES

The Company generally provides its theater systems to customers on a long-term lease basis, typically with initial lease terms of 10 to 20 years. Financing receivables consisting of net investment in leases and long term receivables are comprised of the following:

| | JUNE 30, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Gross minimum lease amounts receivable | $ 87,286 | $ 88,894 |
| Residual value of equipment | 563 | 635 |
| Unearned finance income | (31,934) | (33,933) |
| Present value of minimum lease amounts receivable | 55,915 | 55,596 |
| Accumulated allowance for uncollectible amounts | (995) | (1,478) |
| Net investment in leases | $ 54,920 | $ 54,118 |
| Long-term receivables | 10,435 | 8,888 |
| Total financing receivables | $ 65,355 | $ 63,006 |





4. INVENTORIES

| | JUNE 30, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Raw materials | $11,837 | $10,464 |
| Work-in-process | 8,078 | 6,893 |
| Finished goods | 9,765 | 10,937 |
| | $29,680 | $28,294 |

5 SENIOR NOTES DUE 2010

As at June 30, 2006, the Company had outstanding $159.0 million aggregate principal of Registered Senior Notes and $1.0 million aggregate principal of Unregistered Senior Notes.

6 CREDIT FACILITY

On February 6, 2004, the Company entered into a Loan Agreement for a secured revolving credit facility as amended on June 30, 2005 and as further amended by the Second Amendment to the Loan Agreement which was entered into with effect from May 16, 2006 (the "Credit Facility"). The Credit Facility is a revolving credit facility expiring on October 31, 2009 with an optional one year renewal thereafter contingent upon approval by the lender, permitting maximum aggregate borrowings of $40.0 million, subject to a borrowing base calculation which includes the Company's financing receivables, operating leases, finished goods inventory and capital assets with certain reserve requirements and deductions for

outstanding letters of credit. The Credit Facility bears interest at the applicable prime rate per annum or Libor plus a margin as specified therein per annum and is collateralized by a first priority security interest in all of the current and future assets of the Company The Credit Facility contains typical affirmative and negative covenants, including covenants that restrict the Company's ability to incur certain additional indebtedness, make certain loans, investments or guarantees; pay dividends; make certain asset sales; incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions In addition, the Credit Facility contains customary events of default, including upon an acquisition or a change of control that may have a material adverse effect on the Company or a guarantor The Credit Facility also requires the Company to maintain a minimum level of earnings before interest, taxes, depreciation and amortization, and cash collections As at June 30, 2006, the Company has not drawn down on the Credit Facility other than in respect of letters of credit for $9.8 million





7 COMMITMENTS

(A) The Company's total minimum annual rental payments to be made under operating leases for premises as of June 30, 2006 for each of the years ended December 31, are as follows

| | |
|---|---|
| 2006 (six months remaining) | $ 2,548 |
| 2007 | 5,109 |
| 2008 | 5,023 |
| 2009 | 4,965 |
| 2010 | 5,122 |
| Thereafter | 18,982 |
| | $41,749 |

(B) As at June 30, 2006, the Company has letters of credit of $9.8 million (December 31, 2005 - $7 6 million) secured by the Company's Credit Facility arrangement (see note 6)

(C) In March 2004, the Company received $5.0 million in cash under a film financing arrangement which was included in accrued liabilities During 2005, the Company received another $5 1 million under the same film financing arrangement The Company was required to expend these funds towards the production and distribution of a motion picture title The film was released in the third quarter of 2005. During the first half of 2006, the Company spent $0 2 million towards the distribution of the film. As at June 30, 2006, the Company has recorded $0.1 million (December 31, 2005 - $0 4 million) in accrued liabilities for future distribution expenses to be incurred on the film.

8 CONTINGENCIES

The Company is involved in lawsuits, claims, and proceedings, including those identified below, which arise in the ordinary course of business. In accordance with SFAS 5, "Accounting for Contingencies," the Company will make a provision for a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated The Company believes it has adequate provisions for any such matters The Company reviews these provisions in conjunction with any related provisions on assets related to the claims at least quarterly and adjusts these provisions to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other pertinent information related to the case Should developments in any of these matters outlined below cause a change in our determination as to an unfavorable outcome and result in the need to recognize a material provision, or, should any of these matters result in a final adverse judgment or be settled for significant amounts, they could have a material adverse effect on our results of operations, cash flows, and financial position in the period or periods in which such a change in determination, settlement or judgement occurs.

(A) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement and seeking injunctive relief and damages In April 2005, In-Three filed an answer denying infringement and asserting counterclaims that seek a declaratory judgement of non-infringement, invalidity and unenforceability of the patent in suit,

and damages for alleged false advertising, false designation of origin, breach of contract, interference with prospective economic advantage and/or unfair competition On March 13, 2006, the Company and In-Three entered into a settlement agreement, resolving all matters between the parties. On March 29, 2006, the Company and In-Three filed a joint motion for an order dismissing with prejudice all claims and counterclaims between the parties. The U S District Court for the Central District of California, Western Division has stayed a determination on the joint motion at the joint request of the Company, 3DMG, and In-Three pending a resolution of an arbitration proceeding between the Company and 3DMG before the International Centre for Dispute Resolution relating to rights under agreements between the Company and 3DMG.





8. CONTINGENCIES (cont'd)

(B) In November 2001, the Company filed a complaint with the District Court of Munich against Big Screen, a German large-screen cinema owner in Berlin ("Big Screen"), demanding payment of rental payments and certain other amounts owed to the Company. Big Screen raised a defense based on alleged infringement of German antitrust rules, relating mainly to an allegation of excessive pricing Big Screen had brought a number of motions for restraining orders in this matter relating to the Company's provision of films and maintenance, all of which have been rejected by the courts, including the Berlin Court of Appeals, and for which all appeals have been exhausted On November 8, 2005, the District Court of Munich rendered a judgment in favor of the Company on all accounts. Big Screen has appealed the judgment to the Munich Court of Appeals and at the same time asked for an order to stay the execution under the judgment of the District Court, which order was denied by the Court so that the judgement remains executable On November 30, 2005, Big Screen filed an application for the opening of insolvency proceedings which were formally opened on May 2, 2006 As a consequence of Big Screen's insolvency, the appeal proceeding has been put on hold and it is uncertain whether it will continue

(C) In May 2002, the Company filed a complaint with the District Court of Nuremberg-Furth, Germany against Siewert Holding in Wuerzburg ("Siewert"), demanding payment of rental obligations and other amounts owed to the Company. Siewert raised a defense based on alleged infringement of German antitrust rules. By judgement of December 20, 2002, the District Court rejected the defense and awarded judgement in documentary proceedings in favor of the Company and added further amounts that had fallen due Siewert applied for leave to appeal to the German Supreme Court on matters of law, which was rejected by the German Supreme Court in March 2004 Siewert subsequently made a partial payment of amounts awarded to the Company Siewert has filed follow up proceedings to the documentary proceedings in the District Court, essentially repeating the claims rejected in the documentary proceeding. On September 30, 2004, Siewert filed for insolvency with the Local Court in Wuerzburg Following the opening of formal insolvency proceedings, the litigation has been put on hold and it is unlikely that it will continue.

(D) In January 2004, the Company and IMAX Theater Services Ltd , a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3 7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company. In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17.8 million as a result of E-Citi's breach of a September 2000 lease agreement. The arbitration hearing on both claims took place in November, 2005. On February 1, 2006, the ICC issued an award finding unanimously in the Company's favor on all claims. The ICC hearing to determine the amount of damages to be awarded to the Company took place on July 26 - 28, 2006 The ICC panel has not yet rendered its decision with respect to such damages and no amount has yet been recorded for these damages

8 CONTINGENCIES (cont'd)

(E) In June 2004, Robots of Mars, Inc. ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration.

(F) In addition to the matters described above and in note 14(a) in respect of the Miami theater, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings.

9 CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS SUPPLEMENTAL INFORMATION

(A) The Company generally enters into multi-year theater system lease agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the theater system. During the period of time between lease signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual lease buyout, whereby the parties are released from their future obligations under the lease and the geographic territory granted to the customer reverts to the Company. Once an agreement is reached by both parties, the initial lease payments that the customer previously made to the Company are typically recognized as revenue. In addition, since the introduction of its new IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their original agreements and to sign new system agreements for the MPX system Upon finalizing the new agreement, the total consideration received under both the terminated agreements and the new MPX arrangement is allocated first to the MPX system and the residual amount to settlement revenue During the first half of 2006, the Company did not recognize any settlement revenue. Included in IMAX systems revenue for the three and six months ended June 30, 2005 are the following types of settlement arrangements: $nil and $0 2 million related to MPX conversion agreements and $3.9 million and $10.8 million related to consensual lease buyouts. In aggregate the Company recognized $3 9 million and $11.0 million in the three and six months ended June 30, 2005, respectively.

(B) Included in selling, general and administrative expenses for both the three and six months ended June 30, 2006 is a gain of $0.4 million (2005 - $0.5 million loss, $0 7 million loss) for net foreign exchange gains or losses related to the translation of foreign currency denominated monetary assets, liabilities and integrated subsidiaries.





10 RECEIVABLE PROVISIONS, NET OF (RECOVERIES)

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Accounts receivable provisions, net of (recoveries) | $ 232 | $(370) | $ 375 | $(108) |
| Financing receivables provisions, net of (recoveries) | $(484) | $ -- | $(484) | $ (50) |
| Receivable provisions, net of (recoveries) | $(252) | $(370) | $(109) | $(158) |

11 INCOME TAXES

The effective tax rate on earnings differs significantly from the Canadian statutory rate due to the effect of permanent differences, income taxed at differing rates in foreign and other provincial jurisdictions, tax recoveries and charges relating to favourable or unfavourable tax examinations, and changes in the Company's valuation allowance on deferred tax assets The income tax expense for the quarter is calculated by applying the estimated average annual effective tax rate of approximately 11% for the 2006 year to quarterly pre-tax income. On June 22, 2006, the Canadian Federal government passed into law the elimination of the Large Corporations Tax retroactively as of January 1, 2006. Further, long-term tax rate reductions were also affirmed for taxation years 2008 through 2010 The Company's tax provision for the quarter reflects both the retroactive elimination of the Large Corporations Tax and the result of the long term reductions in the corporate tax rates. The Company has reduced its gross deferred tax asset with an equal reduction in its gross valuation allowance to reflect the reduction in long term income tax rates

As at June 30, 2006, the Company has net deferred income tax assets of $7.8 million (December 31, 2005 - $6.2 million), comprised of tax credit carryforwards, net operating loss and capital loss carryforwards and other deductible temporary differences, which can be utilized to reduce either taxable income or taxes otherwise payable in future years. As of June 30, 2006, the Company had a gross deferred income tax asset of $45.3 million, against which the Company is carrying a $37.5 million valuation allowance.

12 CAPITAL STOCK

(A) STOCK-BASED COMPENSATION

As at June 30, 2006, the Company has reserved a total 6,974,657 (December 31, 2005 - 7,046,689) common shares for future issuance under the Stock Option Plan, of which options in respect of 5,916,461 common shares are outstanding at June 30, 2006. The options granted under the Stock Option Plan generally vest between one and five years and expire 10 years or less from the date granted. At June 30, 2006, options in respect of 4,383,947 common shares were vested and exercisable.

Under the terms of certain employment agreements dated July 12, 2000, the Company is required to issue either 360,000 restricted common shares or pay their cash equivalent The restricted shares or the related cash obligation were fully vested effective July 1, 2002. In May 2003, the Company paid approximately $1.6 million in cash to settle the equivalent of 200,000 of the total 360,000 restricted common shares under these agreements The remaining 160,000 restricted shares are required to be issued, or payment of their cash equivalent, upon request by the employees. The Company has recorded an additional $0 2 million recovery and $0.3 million expense for the three and six months ended June 30, 2006, respectively (2005 - $0.1 million expense, and $0 3 million expense), due to the changes in the fair value of these restricted shares in the period





12 CAPITAL STOCK

(A) STOCK-BASED COMPENSATION (cont'd)

The following table summarizes certain information in respect of option activity under the Stock Option Plan for the periods ended June 30·

| | NUMBER OF SHARES | | WEIGHTED AVERAGE EXERCISE PRICE PER SHARE | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Options outstanding, beginning of year | 5,504,324 | 5,593,101 | $ 7.26 | $ 6.82 |
| Granted | 607,770 | 97,446 | 10 28 | 9 73 |
| Exercised | (72,032) | (388,149) | 3 96 | 5 29 |
| Forfeited or expired | (107,768) | (2,000) | 9 56 | 6.48 |
| Cancelled | (15,833) | (24,402) | 21 33 | 20 32 |
| Options outstanding, | | | | |

| | | | | |
|---|---|---|---|---|
| end of quarter | 5,916,461 | 5,275,996 | 7 53 | 6.93 |
| Options exercisable, end of quarter | 4,383,947 | 3,958,416 | 7 11 | 7.15 |

The weighted average exercise price per share and number of unvested common share options granted to employees as at June 30, 2006 is $8.74 and 1,532,514, respectively.

The following table summarizes certain information in respect of options outstanding under the Stock Option Plan at June 30, 2006:

| RANGE OF EXERCISE PRICES PER SHARE | NUMBER OF SHARES OUTSTANDING | NUMBER OF SHARES VESTED | WEIGHTED AVERAGE EXERCISE PRICE PER SHARE | AVERAGE REMAINING TERM |
|---|---|---|---|---|
| $ 0 00 - $ 2 99 | 172,746 | 172,746 | $ 2 73 | 2 3 Years |
| $ 3 00 - $ 4 99 | 1,979,522 | 1,979,522 | 4 39 | 3.0 Years |
| $ 5 00 - $ 9 99 | 2,785,390 | 1,690,662 | 6 86 | 5.1 Years |
| $10 00 - $14 99 | 508,901 | 71,115 | 10 62 | 6.2 Years |
| $15 00 - $19 99 | 43,600 | 43,600 | 17 48 | 0.7 Years |
| $20 00 - $24 99 | 271,302 | 271,302 | 21.86 | 2 9 Years |
| $25.00 - $28 04 | 155,000 | 155,000 | 27 17 | 3 6 Years |
| Total | 5,916,461 | 4,383,947 | 7 53 | 3 4 Years |





12. CAPITAL STOCK

(A) STOCK-BASED COMPENSATION (cont'd)

In the three and six months ended June 30, 2006, an aggregate of 26,649 and 49,984 respectively, (2005 - 13,335 and 26,670) options with an average exercise price of $9.35 and 9 07 respectively, (2005 - $9 44 and $10 00) to purchase the Company's common stock were issued to certain advisors and strategic partners of the Company The Company has calculated the fair value of these options to non-employees on the date of grant to be $0.1 million and $0 2 million (2005 - $0.1 million and $0.1 million), using a Binomial option-pricing model with the following underlying assumptions·

| | THREE MONTHS ENDED JUNE 30, 2006 | THREE MONTHS ENDED JUNE 30, 2005 | SIX MONTHS ENDED JUNE 30, 2006 | SIX MONTHS ENDED JUNE 30, 2005 |
|---|---|---|---|---|
| Risk-free interest rate | 5.0% | 3.9% | 4.8% | 3 9% |
| Expected option life | 5 - 7 years | 5 years | 5 - 7 years | 5 years |
| Volatility | 60% | 62% | 60% | 62% |
| Dividend yield | 0% | 0% | 0% | 0% |

In the three and six months ended June 30, 2006, the Company has recorded a charge of $ 0.1 million and $0 2 million respectively (2005 - $0 1 million and $0 1 million) to film cost of sales related to these non-employee stock options

There were no warrants issued in the three and six months ended June 30, 2006 (2005 - nil and nil) 550,000 warrants were issued in 2003. In the first quarter of 2005, 80,872 common shares were issued upon exercise of 200,000 warrants. All remaining warrants have either expired or have been cancelled.

IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S dollars unless otherwise stated)
(UNAUDITED)

12 CAPITAL STOCK

(B) EARNINGS (LOSS) PER SHARE

Reconciliations of the numerators and denominators of the basic and diluted per-share computations are comprised of the following:

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Net earnings applicable to common shareholders: | | | | |
| Net earnings (loss) | $ 3,534 | $ 1,111 | $(2,287) | $ 2,307 |
| Weighted average number of common shares (000's): | | | | |
| Issued and outstanding, beginning of period | 40,280 | 39,758 | 40,213 | 39,447 |
| Weighted average number of shares issued during the period | 5 | 60 | 42 | 240 |
| Weighted average number of shares used in computing basic earnings per share | 40,285 | 39,818 | 40,255 | 39,687 |
| Assumed exercise of stock options, net of shares assumed repurchased | 1,919 | 2,123 | -- | 2,243 |
| Weighted average number of shares used in computing diluted earnings per share | 42,204 | 41,941 | 40,255 | 41,930 |

The calculation of diluted earnings per share for the six months ended June 30, 2006 excludes 1 0 million common shares issuable upon exercise of options as the impact of these exercises would be antidilutive.





13 SEGMENTED INFORMATION

The Company has four reportable segments IMAX systems, films, theater operations and other

There has been no change in the basis of measurement of segment profit or loss from the Company's most recent annual report on form 10-K for the year ended December 31, 2005 Inter-segment transactions are not significant

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| REVENUE | | | | |
| IMAX systems | $23,952 | $20,308 | $ 33,350 | $ 42,421 |
| Films | 12,171 | 5,301 | 18,692 | 10,248 |
| Theater operations | 4,051 | 4,198 | 7,708 | 8,014 |
| Other | 1,224 | 1,071 | 2,066 | 1,563 |
| TOTAL | $41,398 | $30,878 | $ 61,816 | $ 62,246 |
| EARNINGS (LOSS) FROM OPERATIONS | | | | |
| IMAX systems | $11,444 | $11,183 | $ 13,832 | $ 23,742 |
| Films | 1,882 | 308 | 831 | (563) |
| Theater operations | 623 | 190 | 689 | (56) |
| Corporate and other | (6,084) | (6,300) | (13,217) | (12,862) |

| | | | | |
|---|---|---|---|---|
| TOTAL | $ 7,865 | $ 5,381 | $ 2,135 | $ 10,261 |

14 DISCONTINUED OPERATIONS

(A) MIAMI THEATER LLC

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater. The Company completed its abandonment of assets and removal of its projection system from the theater in the first quarter of 2004, with no financial impact The Company is involved in an arbitration proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations. The amount of loss to the Company has been estimated at between $0.8 million and $2.3 million. The Company paid out $0.8 million with respect to amounts owing to the landlord during 2003 and 2004. As the Company is uncertain as to the outcome of the proceeding, no additional amount has been recorded.

(B) DIGITAL PROJECTION INTERNATIONAL

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12 7 million previously advanced by the Company, and reorganized the remaining $12 7 million of debt owing to the Company into two separate loan agreements The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties. One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3 5 million During the first quarter of 2006, the Company recognized $2 3 million (2005 - $0 2 million) in income from discontinued operations. The other tranche of $1 2 million had previously been recognized in 2005





14 DISCONTINUED OPERATIONS (cont'd)

(C) CONSOLIDATED STATEMENT OF OPERATIONS FOR DPI

The net earnings from discontinued operations summarized in the Consolidated Statements of Operations, for the periods ended June 30, were comprised of the following·

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Net earnings from discontinued operations | $-- | $186 | $2,300 | $426 |

15 DEFINED BENEFIT PLAN

The Company has an unfunded U S. defined benefit pension plan covering its two Co-Chief Executive Officers. The plan provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings during the 120 months preceding retirement

Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company. The benefits were 50% vested as of July 2000, the plan initiation date The vesting percentage increases on a straight-line basis from inception until age 55. The vesting

percentage of a member whose employment terminates other than by voluntary retirement or upon a change in control shall be 100%. As of June 30, 2006, one of the Co-Chief Executives was approximately 98.0% vested and the other Co-Chief Executive was approximately 79.3% vested. The actuarial liability was remeasured as of March 8, 2006 to reflect the plan changes adopted.

The following assumptions were used in determining the obligation and cost status of the Company's defined benefit pension plan at the plan measurement dates of

| | MARCH 8, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Discount rate | 5.18% | 5.50% |
| Lump sum interest rate: | | |
| First 20 years | 5.70% | N/A |
| Thereafter | 4.75% | N/A |
| Form of payment: | Modified lump sum | 100% Joint and survivor annuity |
| Cost of living adjustment on benefits | 1.20% | 2.40% |
| Rate of increase in qualifying compensation levels | nil% | nil% |





15 DEFINED BENEFIT PLAN (cont'd)

The amounts accrued for the plan are determined as follows

| | SIX MONTHS ENDED JUNE 30, 2006 |
|---|---|
| Projected benefit obligation: | |
| Obligation, beginning of period | $31,064 |
| Service cost | 821 |
| Interest cost | 659 |
| Actuarial gain | (8,645) |
| Obligation, end of period | $23,899 |
| Unfunded status | |
| Obligation, end of period | $23,899 |
| Unrecognized gain relating to prior service cost | 2,173 |
| Unrecognized actuarial (loss) | (21) |
| Accrued pension liability | $26,051 |

The following table provides disclosure of pension expense for the defined benefit plan for the periods ended June 30

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Service cost | $ 364 | $ 604 | $ 821 | $1,208 |
| Interest cost | 297 | 390 | 659 | 780 |
| Amortization of prior service cost | (237) | 349 | (83) | 698 |
| Pension expense | $ 424 | $1,343 | $1,397 | $2,686 |

The accumulated benefit obligation for the defined benefit plan was $26.1 million at June 30, 2006 and $31 1 million at December 31, 2005

No contributions are expected to be made for the plan during 2006

As a result of the pension plan amendment, an adjustment to the unrecognized actuarial losses of $2.8 million and unrecognized prior service cost of $3.4 million was recorded in comprehensive income (loss) and other assets.

The following benefit payments are expected to be made as per the current plan assumptions and the terms of the Plan in each of the next five years, and in the aggregate over the five years thereafter:

| | |
|---|---|
| 2006 | $ -- |
| 2007 | 995 |
| 2008 | 1,007 |
| 2009 | 1,019 |
| 2010 | 29,505(1) |
| 2011 to 2015 | -- |

(1) One of the Co-Chief Executive Officers is currently entitled to benefit payments subsequent to 2010 as a life annuity, subject to an elective right to a lump sum payment in 2010 The pension plan assumptions assume the election of a lump sum payment.





15 DEFINED BENEFIT PLAN (cont'd)

At the time the Company established the defined benefit pension plan, it also took out life insurance policies on its two Co-Chief Executive Officers with coverage amounts of $21.5 million in aggregate. The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so. At June 30, 2006, the cash surrender value of the insurance policies is $3 7 million (December 31, 2005 - $3.3 million) and has been included in other assets.

16 IMPACT OF RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (an interpretation of FASB Statement No 109), ("FIN 48"), which clarifies the relevant criteria and approach for the recognition, de-recognition and measurement of uncertain tax positions FIN 48 will be effective for the Company beginning January 1, 2007 The Company is currently in the process of assessing the effects of the provisions on FIN 48

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION

The Company's Senior Notes are fully and unconditionally guaranteed, jointly and severally by specific wholly-owned subsidiaries of the Company (the "Guarantor Subsidiaries"). The main Guarantor Subsidiaries are David Keighley Productions 70 MM Inc., Sonics Associates Inc., and the subsidiaries that own and operate certain theaters These guarantees are full and unconditional. The information under the column headed "Non-Guarantor Subsidiaries" relates to the following subsidiaries of the Company IMAX Japan Inc and IMAX B.V (the "Non-Guarantor Subsidiaries") which have not provided any guarantees of the Senior Notes

Investments in subsidiaries are accounted for by the equity method for purposes of the supplemental consolidating financial data Some subsidiaries may be unable to pay dividends due to negative working capital





17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Balance Sheets as at June 30, 2006

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash and cash equivalents | $ 13,132 | $ 8,213 | $ 229 | $ -- | $ 21,574 |
| Short-term investments | 8,351 | -- | -- | -- | 8,351 |
| Accounts receivable | 23,235 | 3,817 | 262 | -- | 27,314 |
| Financing receivables | 63,305 | 2,050 | -- | -- | 65,355 |
| Inventories | 29,365 | 239 | 76 | -- | 29,680 |
| Prepaid expenses | 3,430 | 619 | 110 | -- | 4,159 |
| Inter-company receivables | 19,129 | 30,406 | 11,406 | (60,941) | -- |
| Film assets | 4,597 | -- | -- | -- | 4,597 |
| Fixed assets | 24,517 | 1,276 | 4 | -- | 25,797 |
| Other assets | 7,943 | -- | -- | -- | 7,943 |
| Deferred income taxes | 7,771 | 4 | -- | -- | 7,775 |
| Goodwill | 39,027 | -- | -- | -- | 39,027 |
| Other intangible assets | 2,686 | -- | -- | -- | 2,686 |
| Investments in subsidiaries | 33,357 | -- | -- | (33,357) | -- |
| Total assets | $ 279,845 | $ 46,624 | $12,087 | $(94,298) | $ 244,258 |
| LIABILITIES | | | | | |
| Accounts payable | 3,704 | 3,235 | 85 | -- | 7,024 |
| Accrued liabilities | 49,415 | 1,657 | 257 | -- | 51,329 |
| Inter-company payables | 47,353 | 35,599 | 6,496 | (89,448) | -- |
| Deferred revenue | 41,533 | 5,418 | 196 | -- | 47,147 |
| Senior Notes due 2010 | 160,000 | -- | -- | -- | 160,000 |
| Total liabilities | 302,005 | 45,909 | 7,034 | (89,448) | 265,500 |
| SHAREHOLDER'S DEFICIT | | | | | |
| Capital stock | 121,960 | -- | 117 | (117) | 121,960 |
| Other equity/Additional paid in capital/Contributed surplus | 1,774 | 46,960 | -- | (45,926) | 2,808 |
| Deficit | (147,132) | (45,631) | 4,936 | 41,193 | (146,634) |
| Accumulated other comprehensive income (loss) | 1,238 | (614) | -- | -- | 624 |
| Total shareholders' equity (deficit) | $ (22,160) | $ 715 | $ 5,053 | $ (4,850) | $ (21,242) |
| Total liabilities & shareholders' equity (deficit) | $ 279,845 | $ 46,624 | $12,087 | $(94,298) | $ 244,258 |

In certain Guarantor Subsidiaries, accumulated losses have exceeded the original investment balance. As a result of applying equity accounting, the parent company has consequently reduced intercompany receivable balances with respect to these Guarantor Subsidiaries in the amounts of $28 6 million as at June 30, 2006.





17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Balance Sheets as at December 31, 2005

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash and cash equivalents | $ 17,402 | $ 6,728 | $ 194 | $ -- | $ 24,324 |
| Short-term investments | 8,171 | -- | -- | -- | 8,171 |
| Accounts receivable | 23,828 | 2,045 | 292 | -- | 26,165 |
| Financing receivables | 60,950 | 2,056 | -- | -- | 63,006 |
| Inventories | 27,973 | 239 | 82 | -- | 28,294 |
| Prepaid expenses | 3,162 | 575 | 88 | -- | 3,825 |
| Inter-company receivables | 14,057 | 31,929 | 11,043 | (57,029) | -- |
| Film assets | 3,329 | -- | -- | -- | 3,329 |
| Fixed assets | 25,403 | 1,374 | 3 | -- | 26,780 |
| Other assets | 11,618 | -- | -- | -- | 11,618 |
| Deferred income taxes | 6,171 | -- | -- | -- | 6,171 |
| Goodwill | 39,027 | -- | -- | -- | 39,027 |
| Other intangible assets | 2,701 | -- | -- | -- | 2,701 |
| Investments in subsidiaries | 31,833 | -- | -- | (31,833) | -- |

| | | | | | |
|---|---|---|---|---|---|
| Total assets | $ 275,625 | $ 44,946 | $11,702 | $(88,862) | $ 243,411 |
| LIABILITIES | | | | | |
| Accounts payable | 4,915 | 2,017 | 3 | -- | 6,935 |
| Accrued liabilities | 52,978 | 1,965 | 179 | -- | 55,122 |
| Inter-company payables | 42,766 | 36,088 | 6,466 | (85,320) | -- |
| Deferred revenue | 38,927 | 5,330 | 140 | -- | 44,397 |
| Senior Notes due 2010 | 160,000 | -- | -- | -- | 160,000 |
| Total liabilities | 299,586 | 45,400 | 6,788 | (85,320) | 266,454 |
| SHAREHOLDER'S DEFICIT | | | | | |
| Capital stock | 121,674 | -- | 117 | (117) | 121,674 |
| Other equity/Additional paid in capital/Contributed surplus | 724 | 46,960 | -- | (45,926) | 1,758 |
| Deficit | (144,845) | (46,800) | 4,797 | 42,501 | (144,347) |
| Accumulated other comprehensive income (loss) | (1,514) | (614) | -- | -- | (2,128) |
| Total shareholders' equity (deficit) | $ (23,961) | $ (454) | $ 4,914 | $ (3,542) | $ (23,043) |
| Total liabilities & shareholders' equity (deficit) | $ 275,625 | $ 44,946 | $11,702 | $(88,862) | $ 243,411 |

In certain Guarantor Subsidiaries accumulated losses have exceeded the original investment balance. As a result of applying equity accounting, the parent company has consequently reduced inter-company receivable balances with respect to these Guarantor Subsidiaries in the amounts of $28.4 million





17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the three months ended June 30, 2006

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $23,609 | $ 253 | $181 | $ (91) | $23,952 |
| Films | 9,803 | 3,306 | 4 | (942) | 12,171 |
| Theater operations | 204 | 3,877 | -- | (30) | 4,051 |
| Other | 1,224 | -- | -- | -- | 1,224 |
| | 34,840 | 7,436 | 185 | (1,063) | 41,398 |
| COST OF GOODS AND SERVICES | 18,299 | 6,219 | 83 | (1,063) | 23,538 |
| GROSS MARGIN | 16,541 | 1,217 | 102 | -- | 17,860 |
| Selling, general and administrative expenses | 9,229 | 224 | (2) | -- | 9,451 |
| Research and development | 664 | -- | -- | -- | 664 |
| Amortization of intangibles | 132 | -- | -- | -- | 132 |
| Loss (income) from equity-accounted investees | (1,094) | -- | -- | 1,094 | -- |
| Receivable provisions, net of (recoveries) | (252) | -- | -- | -- | (252) |
| EARNINGS (LOSS) FROM OPERATIONS | 7,862 | 993 | 104 | (1,094) | 7,865 |
| Interest income | 280 | -- | -- | -- | 280 |
| Interest expense | (4,228) | (3) | -- | -- | (4,231) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 3,914 | 990 | 104 | (1,094) | 3,914 |
| Recovery of (provision for) income taxes | (380) | -- | -- | -- | (380) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | 3,534 | 990 | 104 | (1,094) | 3,534 |
| Net earnings from discontinued operations | -- | -- | -- | -- | -- |
| NET EARNINGS (LOSS) | $ 3,534 | $ 990 | $104 | $(1,094) | $ 3,534 |

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the six months ended June 30, 2006

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $32,631 | $ 512 | $376 | $ (169) | $33,350 |
| Films | 15,138 | 5,290 | 5 | (1,741) | 18,692 |
| Theater operations | 428 | 7,339 | -- | (59) | 7,708 |
| Other | 2,064 | -- | 2 | -- | 2,066 |
| | 50,261 | 13,141 | 383 | (1,969) | 61,816 |
| COST OF GOODS AND SERVICES | 28,169 | 11,568 | 163 | (1,969) | 37,931 |
| GROSS MARGIN | 22,092 | 1,573 | 220 | -- | 23,885 |
| Selling, general and administrative expenses | 19,474 | 402 | 80 | -- | 19,956 |
| Research and development | 1,579 | -- | -- | -- | 1,579 |
| Amortization of intangibles | 324 | -- | -- | -- | 324 |
| Loss (income) from equity-accounted investees | (1,308) | -- | -- | 1,308 | -- |
| Receivable provisions, net of (recoveries) | (109) | -- | -- | -- | (109) |
| EARNINGS (LOSS) FROM OPERATIONS | 2,132 | 1,171 | 140 | (1,308) | 2,135 |
| Interest income | 533 | -- | -- | -- | 533 |
| Interest expense | (8,403) | (2) | -- | -- | (8,405) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (5,738) | 1,169 | 140 | (1,308) | (5,737) |
| Recovery of income taxes | 1,151 | -- | (1) | -- | 1,150 |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | (4,587) | 1,169 | 139 | (1,308) | (4,587) |
| Net earnings from discontinued operations | 2,300 | -- | -- | -- | 2,300 |
| NET EARNINGS (LOSS) | $(2,287) | $ 1,169 | $139 | $(1,308) | $(2,287) |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17. SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the three months ended June 30, 2005·

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $19,911 | $1,647 | $209 | $(1,459) | $20,308 |
| Films | 4,193 | 1,399 | 5 | (296) | 5,301 |
| Theater operations | 216 | 4,009 | -- | (27) | 4,198 |
| Other | 1,070 | -- | 1 | -- | 1,071 |
| | 25,390 | 7,055 | 215 | (1,782) | 30,878 |
| COST OF GOODS AND SERVICES | 10,764 | 5,913 | 114 | (1,782) | 15,009 |
| GROSS MARGIN | 14,626 | 1,142 | 101 | -- | 15,869 |
| Selling, general and administrative expenses | 9,463 | 196 | 153 | -- | 9,812 |
| Research and development | 886 | -- | -- | -- | 886 |
| Amortization of intangibles | 160 | -- | -- | -- | 160 |
| Loss (income) from equity-accounted investees | (899) | -- | -- | 899 | -- |
| Receivable provisions, net of (recoveries) | (370) | -- | -- | -- | (370) |
| EARNINGS (LOSS) FROM OPERATIONS | 5,386 | 946 | (52) | (899) | 5,381 |

| | | | | | |
|---|---|---|---|---|---|
| Interest income | 282 | -- | 2 | -- | 284 |
| Interest expense | (4,203) | 1 | -- | -- | (4,202) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 1,465 | 947 | (50) | (899) | 1,463 |
| Provision for income taxes | (538) | -- | -- | -- | (538) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | 927 | 947 | (50) | (899) | 925 |
| Net earnings from discontinued operations | 186 | -- | -- | -- | 186 |
| NET EARNINGS (LOSS) | $ 1,113 | $ 947 | $ (50) | $ (899) | $ 1,111 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the six months ended June 30, 2005:

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $41,599 | $ 1,952 | $437 | $(1,567) | $42,421 |
| Films | 7,844 | 3,189 | 14 | (799) | 10,248 |
| Theater Operations | 442 | 7,626 | -- | (54) | 8,014 |
| Other | 1,538 | -- | 25 | -- | 1,563 |
| | 51,423 | 12,767 | 476 | (2,420) | 62,246 |
| COST OF GOODS AND SERVICES | 21,014 | 11,434 | 204 | (2,420) | 30,232 |
| GROSS MARGIN | 30,409 | 1,333 | 272 | -- | 32,014 |
| Selling, general and administrative expenses | 19,335 | 410 | 310 | -- | 20,055 |
| Research and development | 1,539 | -- | -- | -- | 1,539 |
| Amortization of intangibles | 317 | -- | -- | -- | 317 |
| Loss (income) from equity-accounted investees | (886) | -- | -- | 886 | -- |
| Receivable provisions, net of (recoveries) | (158) | -- | -- | -- | (158) |
| EARNINGS (LOSS) FROM OPERATIONS | 10,262 | 923 | (38) | (886) | 10,261 |
| Interest income | 496 | -- | 2 | -- | 498 |
| Interest expense | (8,398) | (1) | -- | -- | (8,399) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 2,360 | 922 | (36) | (886) | 2,360 |
| Provision for income taxes | (479) | -- | -- | -- | (479) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | 1,881 | 922 | (36) | (886) | 1,881 |
| Net earnings from discontinued operations | 426 | -- | -- | -- | 426 |
| NET EARNINGS (LOSS) | $ 2,307 | $ 922 | $(36) | $ (886) | $ 2,307 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Cash Flows for the six months ended June 30, 2006

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | | | | | |
| Net earnings (loss) | $ (2,287) | $1,169 | $139 | $(1,308) | $ (2,287) |
| Net (earnings) from discontinued operations | (2,300) | -- | -- | -- | (2,300) |
| Items not involving cash | | | | | |
| Depreciation and amortization | 8,493 | 267 | 1 | -- | 8,761 |
| Write-downs (recoveries) | (109) | -- | -- | -- | (109) |
| Loss (income) from equity-accounted investees | (1,308) | -- | -- | 1,308 | -- |
| Change in deferred income taxes | (1,600) | (4) | -- | -- | (1,604) |
| Stock and other non-cash compensation | 2,549 | -- | -- | -- | 2,549 |
| Non-cash foreign exchange gain | (436) | -- | -- | -- | (436) |
| Interest on short-term investments | (179) | -- | -- | -- | (179) |
| Investment in film assets | (6,613) | -- | -- | -- | (6,613) |
| Changes in other non-cash operating assets and liabilities | (2,762) | 215 | (90) | -- | (2,637) |
| Net cash provided by (used in) operating activities | (6,552) | 1,647 | 50 | -- | (4,855) |
| INVESTING ACTIVITIES | | | | | |
| Purchases of short-term investments | (10,322) | -- | -- | -- | (10,322) |
| Proceeds from maturities of short-term investments | 10,321 | -- | -- | -- | 10,321 |
| Purchase of fixed assets | (568) | (169) | (2) | -- | (739) |
| Increase in other assets | (566) | -- | -- | -- | (566) |
| Increase in other intangible assets | (309) | -- | -- | -- | (309) |
| Net cash used in investing activities | (1,444) | (169) | (2) | -- | (1,615) |
| FINANCING ACTIVITIES | | | | | |
| Common shares issued | 286 | -- | -- | -- | 286 |
| Net cash provided by financing activities | 286 | -- | -- | -- | 286 |
| Effects of exchange rate changes on cash | (53) | 7 | (13) | -- | (59) |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (7,763) | 1,485 | 35 | -- | (6,243) |
| Cash provided by investing activities from discontinued operations | 3,493 | -- | -- | -- | 3,493 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (4,270) | 1,485 | 35 | -- | (2,750) |
| Cash and cash equivalents, beginning of period | 17,402 | 6,728 | 194 | -- | 24,324 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 13,132 | $8,213 | $229 | $ -- | $ 21,574 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Cash Flows for the six months ended June 30, 2005

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | | | | | |
| Net earnings (loss) | $ 2,307 | $ 922 | $(36) | $(886) | $ 2,307 |
| Net (earnings) from discontinued operations | (426) | -- | -- | -- | (426) |
| Items not involving cash | | | | | |
| Depreciation and amortization | 6,982 | 267 | -- | -- | 7,249 |
| Write-downs (recoveries) | (158) | -- | -- | -- | (158) |
| Loss (income) from equity-accounted investees | (886) | -- | -- | 886 | -- |
| Change in deferred income taxes | (275) | (8) | -- | -- | (283) |
| Stock and other non-cash compensation | 2,406 | -- | -- | -- | 2,406 |
| Non-cash foreign exchange loss | 515 | -- | -- | -- | 515 |
| Interest on short-term investments | (150) | -- | -- | -- | (150) |
| Investment in film assets | (4,795) | -- | -- | -- | (4,795) |
| Changes in other non-cash operating assets | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| and liabilities | (1,061) | (2,054) | 58 | -- | (3,057) |
| Net cash provided by (used in) operating activities | 4,459 | (873) | 22 | -- | 3,608 |
| INVESTING ACTIVITIES | | | | | |
| Purchases of short-term investments | (23,118) | -- | -- | -- | (23,118) |
| Proceeds from maturities of short-term investments | 8,125 | -- | -- | -- | 8,125 |
| Purchase of fixed assets | (255) | (212) | -- | -- | (467) |
| Increase in other assets | (375) | -- | -- | -- | (375) |
| Increase in other intangible assets | (290) | -- | -- | -- | (290) |
| Net cash used in investing activities | (15,913) | (212) | -- | -- | (16,125) |
| FINANCING ACTIVITIES | | | | | |
| Common shares issued | 2,052 | -- | -- | -- | 2,052 |
| Net cash provided by financing activities | 2,052 | -- | -- | -- | 2,052 |
| Effects of exchange rate changes on cash | 131 | (48) | 7 | -- | 90 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (9,271) | (1,133) | 29 | -- | (10,375) |
| Cash provided by investing activities from discontinued operations | 236 | -- | -- | -- | 236 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (9,035) | (1,133) | 29 | -- | (10,139) |
| Cash and cash equivalents, beginning of period | 23,683 | 5,058 | 223 | -- | 28,964 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 14,648 | $ 3,925 | $252 | $ -- | $ 18,825 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

18 SUMMARY OF SIGNIFICANT DIFFERENCES BETWEEN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) IN THE UNITED STATES AND CANADA

The accounting principles followed by the Company conform with U S. GAAP. Significant differences affecting the Company between U.S. GAAP and Canadian Generally Accepted Accounting Principles ("Canadian GAAP") are summarized below

(A) STOCK-BASED COMPENSATION

Under U S GAAP, prior to January 1, 2006, the Company accounted for stock-based compensation under the intrinsic value method set out in APB 25 and has made pro forma disclosures of net earnings (loss) and earnings (loss) per share as if the methodology prescribed by FAS 123 had been adopted Under Canadian GAAP, the Company adopted the fair value provisions of CICA Section 3870, "Stock-based Compensation and Other Stock-based Payments" ("CICA Section 3870"), effective January 1, 2003. As of this date, stock options granted to employees or directors are recorded as an expense in the consolidated statement of operations and credited to other equity

Effective January 1, 2006, under U.S GAAP, the Company adopted FAS 123R using the modified prospective transition method. The Company's Consolidated Financial Statements as of and for the three six months ended June 30, 2006 reflect the impact of FAS 123R In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R. Stock-based compensation expense recognized under FAS 123R and under CICA Section 3870 for the three and six months ended June 30, 2006 is aligned with each other and will be identical for all periods after January 1, 2006.

(B) PENSION ASSET AND LIABILITIES

Under U S GAAP, included in accrued liabilities is an unrecognized gain related to prior service costs resulting from the plan amendment of $2.2 million as at June 30, 2006 and unrecognized prior service costs of $6.4 million as at December 31, 2005 An amount of $nil as at June 30, 2006, and $3 6 million as at December 31, 2005 is included in other assets, representing unrecognized prior service costs. In addition, under U S GAAP, an amount of less than $0 1 million as at June 30, 2006 and $2 8 million as at December 31, 2005 is recorded against accumulated other comprehensive income, resulting from an unrecognized actuarial loss. Under Canadian GAAP, the minimum pension liability, and the corresponding amounts recorded in other assets and accumulated other comprehensive income are not

recorded.



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

18. SUMMARY OF SIGNIFICANT DIFFERENCES BETWEEN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) IN THE UNITED STATES AND CANADA (cont'd)

RECONCILIATION TO CANADIAN GAAP

CONSOLIDATED STATEMENTS OF OPERATIONS

The following is a reconciliation of net earnings (loss) reflecting the differences between U S. and Canadian GAAP:

| | THREE MONTHS ENDED JUNE 30, | | SIX MONTHS ENDED JUNE 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Net earnings (loss) in accordance with U.S. GAAP | $3,534 | $1,111 | $(2,287) | $ 2,307 |
| Stock-based compensation(a) | -- | (653) | -- | (1,182) |
| Net earnings in accordance with Canadian GAAP | $3,534 | $ 458 | $(2,287) | $ 1,125 |
| Earnings (loss) per share: | | | | |
| Earnings (loss) per share - basic: | | | | |
| Net earnings (loss) from continuing operations | $ 0.09 | $ 0.01 | $ (0.11) | $ 0.02 |
| Net earnings from discontinued operations | $ -- | $ -- | $ 0.05 | $ 0.01 |
| Net earnings (loss) | $ 0.09 | $ 0.01 | $ (0.06) | $ 0.03 |
| Earnings (loss) per share - diluted: | | | | |
| Net earnings (loss) from continuing operations | $ 0.08 | $ 0.01 | $ (0.11) | $ 0.02 |
| Net earnings from discontinued operations | $ -- | $ -- | $ 0.05 | $ 0.01 |
| Net earnings (loss) | $ 0.08 | $ 0.01 | $ (0.06) | $ 0.03 |

CONSOLIDATED SHAREHOLDERS' EQUITY (DEFICIT)

The following is a reconciliation of shareholders' equity (deficit) reflecting the difference between Canadian and U.S. GAAP:

| | JUNE 30, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Shareholders' equity (deficit) in accordance with U.S. GAAP | $(21,242) | $(23,043) |
| Unrecognized actuarial lossb | 21 | 2,773 |
| Shareholders' equity (deficit) in accordance with Canadian GAAP | $(21,221) | $(20,270) |

19 FINANCIAL STATEMENT PRESENTATION

Certain comparative figures have been reclassified to conform with the presentation adopted in the current year.



IMAX CORPORATION

ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS

OF OPERATIONS

OVERVIEW

The Company's principal business is the design, manufacture, sale and lease of projector systems for giant screen theaters for customers including commercial theaters, museums and science centers, and destination entertainment sites. In addition, the Company designs and manufactures high-end sound systems and produces and distributes large format films. There are 274 IMAX theaters operating in 38 countries worldwide as of June 30, 2006 IMAX Corporation is a publicly traded company listed on both the TSX and NASDAQ

ACCOUNTING POLICIES AND ESTIMATES

The Company reports its results under United States Generally Accepted Accounting Principles ("U S GAAP"). Significant differences between United States and Canadian Generally Accepted Accounting Principles are summarized in note 18 of the Consolidated Financial Statements.

The preparation of these financial statements requires management to make estimates and judgements that affect the reported amounts of assets, liabilities, revenues and expenses. On an ongoing basis, management evaluates its estimates, including those related to accounts receivable, net investment in leases, inventories, fixed and film assets, investments, intangible assets, income taxes, contingencies and litigation. Management bases its estimates on historical experience, future expectations and other assumptions that are believed to be reasonable at the date of the financial statements. Actual results may differ from these estimates due to uncertainty involved in measuring, at a specific point in time, events which are continuous in nature The Company's significant accounting policies are discussed in note 2 of the Consolidated Financial Statements in the Company's most recent annual report on Form 10-K for the year ended December 31, 2005, and are summarized below

CRITICAL ACCOUNTING POLICIES

The Company considers the following critical accounting policies to have the most significant effect on its estimates, assumptions and judgements.

REVENUE RECOGNITION

The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions

When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each individual element based on the relative fair values of each element. Where objective and reliable evidence of the fair values of the undelivered items in a multiple element arrangement is available but no such evidence is available for the delivered items, the Company will use the residual method of allocation in those instances. Under the residual method, the amount of consideration allocated to the delivered items equals the total arrangement consideration less the aggregate fair value of the undelivered items. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.

SALES-TYPE LEASES OF THEATER SYSTEMS

Theater system leases that transfer substantially all of the benefits and risks of ownership to customers are classified as sales-type leases as a result of meeting the criteria established by FASB Statement of Financial Accounting Standards No. 13, "Accounting for Leases" ("FAS 13"). When revenue is recognized, the initial rental fees due under the contract, along with the present value of minimum ongoing rental payments, are recorded as revenues for the period, and the related theater system costs including installation expenses are recorded as cost of goods and services Additional ongoing rentals in excess of minimums are recognized in future periods as revenue when reported by the theater operator, provided that collection is reasonably assured Maintenance revenues are recognized when the services are rendered.

SALES AND SALES-TYPE LEASES OF THEATER SYSTEMS (cont'd)

The Company recognizes revenue from sales and sales type leases when the installation of the respective theater system element is substantially complete and all of the following criteria are met persuasive evidence of an agreement exists, the price is fixed or determinable; and collection is reasonably assured

The timing of installation of the theater system is largely dependent on the timing of the construction of the customer's theater. Therefore, while revenue for theater systems is generally predictable on a long-term basis, it can vary from quarter to quarter or year to year depending on the timing of installations.

The critical estimates that the Company considers with respect to the Company's lease accounting are the determination of economic useful life and the fair value of the projection equipment, including its residual value. These estimates are based upon historical experience with all of its projection systems. Residual values are established at lease inception using estimates of fair value at the end of the lease term with consideration for forecasted supply and demand for various systems, future product launch plans, end of lease customer behavior, refurbishment strategies and changes in technology.

The Company monitors the performance of the theaters to which it has leased equipment. When facts and circumstances indicate that it may need to change the terms of a lease, which had previously been recorded as a sales-type lease, the Company evaluates the likely outcome of such negotiations using the criteria under FAS 13. A provision is recorded against the net investment in leases if the Company believes that it is probable that the negotiation will result in a reduction in the minimum lease payments such that the lease will be reclassified as an operating lease. The provision is equal to the excess of the carrying value of the net investment in lease over the fair value of the equipment Any adjustments which result from a change in classification from a sales-type lease to an operating lease are reported as a charge to income during the period the change occurs.

In the normal course of its business, the Company will from time to time determine that a provision it had previously taken against the net investment in leases in connection with a customer's lease agreement should be reversed due to a change in the circumstances that led to the original provision.

The Company generally enters into multi-year system lease agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system During the period of time between lease signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons including business considerations, or the inability to obtain certain consents, approvals or financing. Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual lease buyout, whereby the parties are released from all their future obligations under the lease and the geographic territory granted to the customer reverts to the Company. Once an agreement is reached by both parties, the initial lease payments that the customer previously made to the Company are typically recognized as revenue. For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through the installation of a theater system or a consensual lease buyout In addition, since the introduction of its new IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their existing lease agreements, which were in the Company's backlog, and sign new MPX system agreements





SALES AND SALES-TYPE LEASES OF THEATER SYSTEMS (cont'd)

Where these agreements have multiple elements meeting the criteria for treatment as separate units of accounting, the total consideration to be received in these situations generally is allocated to each individual element based on the relative fair values of each element. Where objective and reliable evidence of the fair values of the undelivered items in a multiple element arrangement is available but no such evidence is available for the delivered items, the Company will use the residual method of allocation in those instances. Under the residual method, the amount of consideration allocated to the delivered items equals the total arrangement consideration less the aggregate fair value of the undelivered items. Each element is then accounted for based on applicable

revenue recognition criteria

OPERATING LEASES OF THEATER SYSTEMS

Leases that do not transfer substantially all of the benefits and risks of ownership to the customer are classified as operating leases. For these leases, initial rental fees and minimum lease payments are recognized as revenue on a straight-line basis over the lease term Additional rentals in excess of minimum annual amounts are recognized as revenue when reported by theater operators, provided that collection is reasonably assured

FILM LICENSING

Revenue from licensing of films is recognized when a contractual licensing arrangement exists, the film has been completed and delivered, the license period has begun, the fee is fixed or determinable and collection is reasonably assured Where the license fees are based on a share of the customer's revenue, and all other revenue recognition criteria stated in the preceding sentence are met, the Company recognizes revenue as the customer exhibits the film

DMR FILM REVENUE

Revenues from digitally re-mastering film where third parties own the related film rights are derived in the form of processing fees and recoupments calculated as a percentage of box office receipts from the re-mastered films Processing fees are recognized as revenues as the related re-mastering service is performed Recoupments as a percentage of box office receipts are recognized as revenue when the contracted portions of box office receipts due to the Company are reported by theater operators, provided that collection is reasonably assured

SHORT-TERM INVESTMENTS

The Company has short-term investments, which generally have maturities of more than three months and less than one year from the date of purchase The short-term investments are classified as held to maturity based on the Company's positive intent and ability to hold the securities to maturity. The Company invests primarily in Canadian and U.S. government securities and commercial paper rated "A1+" by Standard & Poor's and these investments are stated at amortized cost, which approximates fair market value. Income related to these securities is reported as a component of interest income. At June 30, 2006, the Company had $8 4 million (December 31, 2005 - $6 1 million) invested in Canadian government securities and $nil (December 31, 2005 - $2.1 million) invested in U S government securities





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

OVERVIEW (cont'd)

CRITICAL ACCOUNTING POLICIES (cont'd)

ACCOUNTS RECEIVABLE AND FINANCING RECEIVABLES

The allowance for doubtful accounts receivable and provision against the financing receivables are based on the Company's assessment of the collectibility of specific customer balances and the underlying asset value of the equipment under lease where applicable If there is a deterioration in a customer's credit worthiness or actual defaults under the terms of the leases are higher than the Company's historical experience, the Company's estimates of recoverability for these assets could be adversely affected.

The evaluation of collectibility of customer accounts is typically done on an individual account basis. If, based on an evaluation of accounts, the Company concludes that it is probable that a customer will not be able to pay all amounts due, the Company estimates the recoverable amount. In developing the estimates for an allowance, the Company considers general and industry economic and market conditions as well as other credit information available for the customer. The Company only records recoveries of provisions when objective verifiable evidence supports the change in the original provision.

INVENTORIES

In establishing the appropriate provisions for theater systems inventory, management must make estimates of future events and conditions including the anticipated installation dates for the current backlog of theater system contracts, potential future signings, general economic conditions, technology factors, growth prospects within the customers' ultimate marketplace and the market acceptance of the Company's current and pending projection systems and film library. If management estimates of these events and conditions prove to be incorrect, it could result in inventory losses in excess of the provisions determined to be adequate as at the balance sheet date.

FILM ASSETS

Estimates of ultimate revenues are prepared on a title by title basis and reviewed regularly by management and revised where necessary to reflect the most current information Ultimate revenue for films includes estimates of revenues over a period not to exceed 10 years following the date of initial release

GOODWILL

The Company performs an impairment test on at least an annual basis and additionally, whenever events or changes in circumstances suggest that the carrying amount may not be recoverable. Impairment of goodwill is tested at the reporting unit level by comparing the reporting unit's carrying amount, including goodwill, to the fair value of the reporting unit. The fair values of the reporting units are estimated using a discounted cash flows approach. If the carrying amount of the reporting unit exceeds its fair value, then a second step is performed to measure the amount of impairment loss, if any. Any impairment loss would be expensed in the statement of operations.

FIXED ASSETS

Management reviews the carrying values of its fixed assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset might not be recoverable In performing its review for recoverability, management estimates the future cash flows expected to result from the use of the asset and its eventual disposition If the sum of the expected future cash flows is less than the carrying amount of the asset, an impairment loss is recognized. Measurement of impairment losses is based on the excess of the carrying amount of the asset over the fair value calculated using discounted expected future cash flows. If the actual future cash flows are less than the Company's estimates, future earnings could be adversely affected.





PENSION PLAN ACTUARIAL ASSUMPTIONS

The Company's pension benefit obligations and related costs are calculated using actuarial concepts, within the framework of Statement of Financial Accounting Standards No 87, "Employer's Accounting for Pensions". A critical assumption, the discount rate, is an important element of expense and/or liability measurement The Company evaluates this critical assumption annually or when otherwise required to by accounting standards. Other assumptions include factors such as expected retirement, mortality, rate of compensation increase, and estimates of inflation

The discount rate enables the Company to state expected future cash payments for benefits as a present value on the measurement date. The guideline for setting this rate is a high-quality long-term corporate bond rate. A lower discount rate increases the present value of benefit obligations and increases pension expense The Company's discount rate was determined by considering the average of pension yield curves constructed of a large population of high-quality corporate bonds The resulting discount rate reflects the matching of plan liability cash flows to the yield curves.

TAX ASSET VALUATION

As at June 30, 2006, the Company had net deferred income tax assets of $7 8 million, comprised of tax credit carryforwards, net operating loss and capital loss carryforwards and other deductible temporary differences, which can be utilized to reduce either taxable income or taxes otherwise payable in future years The Company's management assesses realization of these net deferred income tax assets based on all available evidence and has concluded that it is more likely than not that these net deferred income tax assets will be realized Positive evidence includes, but is not limited to, the Company's historical earnings, projected future earnings, contracted sales backlog at June 30, 2006, and the ability to realize certain deferred income tax assets through loss and tax credit carryback strategies If and when the Company's operations in some jurisdictions were to reach a requisite level of profitability or where the Company's future profitability estimates increase due to changes in positive evidence, the Company would reduce all or a portion of the applicable valuation allowance in the period when such determination is made This would result in an increase to reported earnings and a decrease to the Company's effective tax rate in such period However, if the Company's projected future earnings do not materialize, or if the Company operates at a loss in certain jurisdictions, or if there is a material change in actual effective tax rates or time period within which the Company's underlying temporary differences become taxable or

deductible, the Company could be required to increase the valuation allowance against all or a significant portion of the Company's deferred tax assets resulting in a substantial increase to the Company's effective tax rate for the period of the change and a material adverse impact on its operating results for the period.

The Company is subject to ongoing tax examinations and assessments in various jurisdictions. Accordingly, the Company may incur additional tax expense based upon the outcomes of such matters. In addition, when applicable, the Company adjusts tax expense to reflect both favorable and unfavorable examination results The Company's ongoing assessments of the probable outcomes of examinations and related tax positions require judgement and can materially increase or decrease its effective rate as well as impact operating results.

IMPACT OF RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In June 2006, the FASB issued Interpretation No 48, "Accounting for Uncertainty in Income Taxes" (an interpretation of FASB Statement No 109), ("FIN 48"), which clarifies the relevant criteria and approach for the recognition, de-recognition and measurement of uncertain tax positions FIN 48 will be effective for the Company beginning January 1, 2007. The Company is currently in the process of assessing the effects of the provisions on FIN 48





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS

THREE MONTHS ENDED JUNE 30, 2006 VERSUS THREE MONTHS ENDED JUNE 30, 2005

The Company reported net earnings from continuing operations before income taxes of $3 9 million or $0 09 per share on a diluted basis and net earnings from continuing operations after taxes of $3.5 million or $0 08 per share on a diluted basis for the second quarter of 2006 For the second quarter of 2005, the Company reported net earnings from continuing operations before income taxes of $1.5 million or $0 03 per share on a diluted basis and net earnings from continuing operations after taxes of $0.9 million or $0.02 per share on a diluted basis

REVENUE

The Company's revenues for the second quarter of 2006 increased 34.1% to $41.4 million from $30.9 million in the same period last year.

Systems revenue increased to $24 0 million in the second quarter of 2006 from $20 3 million in the second quarter of 2005, an increase of 17.9%. The Company recognized revenue on 11 theater systems which qualified as either sales or sales-type leases in the second quarter of 2006 compared to nine theater systems in the second quarter of 2005 Revenue from sales and leases increased to $17 6 million in the second quarter of 2006 from $13 9 million in 2005, an increase of 26 4% This increase was due to the increase in the number and mix of system recognitions and partially offset by a decrease in settlement revenues. The Company recognized $3 9 million in settlement revenue during the second quarter of 2005, compared to $nil in the same period in 2006.

Four of the systems recognized in the second quarter of 2005 related to the sale of used theater systems compared to nil used systems in the same period of 2006.

Average revenue per sales and sales-type systems increased in the second quarter of 2006 compared to 2005 due to the four used systems sold in the second quarter of 2005, compared to nil in the same period of 2006, and due to a difference in the mix of systems.

| | THREE MONTHS ENDED JUNE 30, 2006 | THREE MONTHS ENDED JUNE 30, 2005 |
|---|---|---|
| Sales and Sales-type lease systems recognized | | |
| IMAX 2D GT . . ............. | -- | 1 |
| IMAX 3D ............... | 3 | 4 |
| IMAX 3D SR ................................ | 3 | 1 |
| IMAX MPX . . . . . ............... | 5 | 3 |
| | 11 | 9 |

In addition, the Company installed and began recognizing revenue on one theater

system that qualified as an operating lease in the second quarter of 2006 versus two in the same period in 2005 The Company recognizes revenue on operating leases over the term of the leases

The Company believes that it is possible that its installation of theater systems in 2006 could be negatively impacted by (a) the difficulty it is experiencing in effecting "sign and install" transactions, which are agreements for theater systems that are installed in the same calendar year in which they are signed, which difficulty it believes is due in part to the disappointing performance of the films V for Vendetta The IMAX Experience, Poseidon: The IMAX Experience and The Ant Bully An IMAX 3D Experience and (b) the potential slipping of some installations scheduled for the fourth quarter of 2006 into 2007 If this occurs, and there are not sufficient offsets to such installations in other areas of the Company's business, the Company could potentially be required to increase the valuation allowance against a portion of the Company's deferred tax assets resulting in an increase to the Company's effective tax rate for the period of the change in the estimate





RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED JUNE 30, 2006 VERSUS THREE MONTHS ENDED JUNE 30, 2005 (cont'd)

REVENUE (cont'd)

The Company generally enters into multi-year system lease agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system During the period of time between lease signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual lease buyout, whereby the parties are released from their future obligations under the lease, the initial lease payments that the customer previously made to the Company are typically recognized as revenue and the geographic territory granted to the customer reverts to the Company. For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through the installation of a theater system or a consensual lease buyout In addition, since the introduction of its new IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their existing lease agreements, which were in the Company's backlog, and sign new MPX system agreements. During the second quarter of 2006, the Company did not recognize any settlement revenue Included in IMAX systems revenue for the three months ended June 30, 2005 is $3.9 million related to consensual lease buyouts The Company anticipates that, while MPX conversion agreements may continue as MPX systems continue to prove popular with commercial customers, overall revenue from consensual lease buyouts and terminations of agreements by customer default will likely decrease throughout 2006 in comparison to 2005.

Ongoing rental revenue increased to $2.8 million in the second quarter of 2006 from $2 1 million in 2005 an increase of 35.3%. Maintenance revenue remained consistent at $3 6 million in both second quarters of 2006 and 2005

Film revenues increased to $12.2 million in the second quarter of 2006 from $5.3 million in the second quarter of 2005, due primarily to an increase in film distribution, film post-production and DMR revenues. Film distribution revenues increased to $5 0 million in the second quarter of 2006 from $2.7 million in the second quarter of 2005, an increase of 88 0% The increase is primarily due to the production and release of Deep Sea 3D in March 2006 and the continued performance of Magnificent Desolation. Walking on the Moon 3D, released in September 2005 Film post-production revenues increased to $3 0 million in the second quarter of 2006 from $1 1 million in the second quarter of 2005, mainly due to an increase in third party business relating to Superman Returns An IMAX 3D Experience at the Company's post-production unit IMAX DMR revenues, which are revenues to the Company generated from the gross box office performance and conversion services performed on IMAX DMR films, increased to $4 1 million in the second quarter of 2006 from $1 4 million in the prior year quarter The increase in DMR revenue is due primarily to the releases of Superman Returns: The IMAX 3D Experience in June 2006 and Poseidon: The IMAX Experience, in May 2006 Film production revenues remained consistent at $0 1 million in both the second quarters of 2006 and 2005

The Company believes it may see lower film revenues in 2006 due to the disappointing performance of the films V for Vendetta. The IMAX Experience, Poseidon. The IMAX Experience, and The Ant Bully: An IMAX 3D Experience The Company intends to release in conjunction with studios at least seven new films in 2006 including the already released V for Vendetta The IMAX Experience

(March 2006), Deep Sea 3D (March 2006), Poseidon: The IMAX Experience (May 2006), Superman Returns: An IMAX 3D Experience (June 2006) and The Ant Bully: An IMAX 3D Experience (July 2006) and the still to be released Open Season. An IMAX 3D Experience (September 2006) and Happy Feet: An IMAX 3D Experience (November 2006).

Theater operations revenue decreased slightly to $4.1 million in the second quarter of 2006 from $4 2 million in the second quarter of 2005. The Company believes that it may see lower attendance rates in 2006 compared to the prior year due to the disappointing performance of the films V for Vendetta: The IMAX Experience, Poseidon: The IMAX Experience and The Ant Bully: An IMAX 3D Experience.





REVENUE (cont'd)

Other revenue increased slightly to $1 2 million in the second quarter of 2006 compared to $1 1 million in the same period in 2005. Other revenue primarily includes revenue generated from the Company's camera and rental business and after market sales of projection system parts

GROSS MARGIN

Gross margin in the second quarter of 2006 was $17.9 million, or 43.1% of total revenue, compared to $15.9 million, or 51.4% of total revenue in the second quarter of 2005.

Systems margins increased slightly in the second quarter of 2006 by $0.3 million or 2 0% Average gross margin on sales and sales-type lease of projection systems increased in the second quarter of 2006 versus the same period in 2005 by 42 3%, primarily due to the mix of recognitions as four customers exercised an option to convert their existing leases into outright purchases in the second quarter of 2005, compared to none in the same period of 2006. The increase was partially offset by a decrease in settlement revenue. The Company recognized $3 9 million in settlement gross margin in the second quarter of 2005, compared to $nil in the same period of 2006 The settlement amounts recognized in 2005 are related to consensual lease buyouts.

The Company's film gross margin increased in the second quarter of 2006 by $1 7 million The Company's DMR gross margin increased by $1.6 million due primarily to the gross box office performance and conversion services performed on Superman Returns An IMAX 3D Experience, and film post-production gross margin increased by $0.3 million also primarily due to the level of third party business resulting from Superman Returns: An IMAX 3D Experience. Film distribution margin decreased by $0 2 million primarily due to lower margins earned on the mix of films in release during the current quarter

The Company's owned and operated theater gross margin increased by $0.4 million in the second quarter of 2006 compared to the same period in 2005, primarily as a result of lower rental fees for films in 2006.

Other gross margin decreased by $0 4 million in the second quarter of 2006, primarily as result of the Company's decision to subsidize some of its after market components and upgrades to a number of theaters showing Superman Returns: An IMAX 3D Experience





OTHER

Selling, general and administrative expenses were $9.5 million in the second

quarter of 2006 versus $9.8 million in the same period of 2005. Legal fees for the second quarter of 2006 decreased by $0.7 million due to a reduction in the number of outstanding legal matters in which the Company is involved. The Company also amended its executive pension plan on March 8, 2006 to reduce certain benefits, resulting in a savings of $0.9 million in compensation expense for the second quarter of 2006 compared to the previous year quarter Other non-cash stock-based compensation decreased by $0.3 million in the second quarter of 2006, due to changes in the Company's share price Offsetting these decreases, were $0.8 million of costs in connection with the Company's process of seeking strategic alternatives, including a potential sale. Salaries and benefits expense also increased by $0.6 million compared to the prior year quarter due to the strengthening of the Canadian dollar. In addition, the Company expensed $0 5 million for stock options granted in accordance with the adoption of FAS 123R In addition, the Company recorded a capital tax expense of $0 1 million in the second quarter of 2006, compared to a $0.5 million recovery in the prior year quarter. The Company recorded a foreign exchange gain of $0 4 million in the second quarter of 2006, compared to a loss of $0.5 million in the second quarter of 2005 The Company records foreign exchange translation gains and losses primarily on a portion of its financing receivable balances which are denominated in Canadian dollars, Euros and Japanese Yen.

Receivable provisions net of recoveries for accounts receivable amounted to a net provision of $0.2 million in the second quarter of 2006, compared to a net recovery of $0 4 million in the second quarter of 2005 The Company recorded a net recovery of $0 5 million in the second quarter of 2006 compared to $nil in the second quarter of 2005 on financing receivables due to favorable outcomes on lease amendments

Interest income remained consistent at $0 3 million for both second quarters of 2006 and 2005.

Interest expense remained consistent at $4.2 million in the second quarters of 2006 and 2005. Included in interest expense is the amortization of deferred finance costs in the amount of $0 2 million in the second quarters of 2006 and 2005 relating to the Senior Notes due 2010. The Company's policy is to defer and amortize all the costs relating to a debt financing over the life of the debt instrument

INCOME TAXES

The Company's effective tax rate differs from the statutory tax rate and will vary from year to year primarily as a result of numerous permanent differences, investments and other tax credits, the provision for income taxes at different rates in foreign and other provincial jurisdictions, enacted statutory tax rate increases or reductions in the year, changes in the Company's valuation allowance based on the Company's recoverability assessments of deferred tax assets, and favorable or unfavorable resolution of various tax examinations. The income tax expense for the quarter is calculated by applying the estimated average annual effective tax rate of approximately 11% for the 2006 year to quarterly pre-tax income. As of June 30, 2006, the Company had a gross deferred income tax asset of $45.3 million, against which the Company is carrying a $37.5 million valuation allowance. On June 22, 2006, the Canadian Federal government passed into law the elimination of the Large Corporations Tax retroactively as of January 1, 2006 Further, long-term tax rate reductions were also affirmed for taxation years 2008 through 2010. The Company's tax provision for the quarter reflects both the retroactive elimination of the Large Corporations Tax and the result of the long term reductions in the corporate tax rates The Company has reduced its gross deferred tax asset with an equal reduction in its gross valuation allowance to reflect the reduction in long term income tax rates

Page 41

IMAX CORPORATION

ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED JUNE 30, 2006 VERSUS THREE MONTHS ENDED JUNE 30, 2005 (cont'd)

RESEARCH AND DEVELOPMENT

Research and development expenses decreased to $0 7 million in the second quarter of 2006, compared to $0 9 million in 2005. The expenses primarily reflect research and development activities pertaining to the Company's new IMAX digitally-based theater projection system Through research and development, the Company continues to design and develop cinema-based equipment, software and other technologies to enhance its product offering. The Company believes that the motion picture industry will be affected by the development of digital technologies, particularly in the areas of content creation (image capture), post-production (editing and special effects), distribution and display. Consequently, the Company has made significant investments in digital technologies, including the development of proprietary, patent-pending

technology such as a digitally-based projection system, as well as technologies to digitally enhance image resolution and quality of motion picture films, and convert monoscopic (2D) to stereoscopic (3D) images. The Company also holds a number of patents, patents pending and intellectual property rights in these areas.

DISCONTINUED OPERATIONS

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater The Company abandoned or removed all of its assets from the theater in the first quarter of 2004. The Company is involved in a legal proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations. The amount of loss to the Company has been estimated as between $0.8 million and $2.3 million. The Company paid out $0.8 million with respect to amounts owing to the landlord during 2003 and 2004 As the Company is uncertain as to the outcome of the proceeding, no additional amount has been recorded The Company recorded $nil in net earnings from discontinued operations related to Miami IMAX theater in the second quarters of 2006 and 2005.

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12.7 million previously advanced by the Company, and reorganized the remaining $12.7 million of debt owing to the Company into two separate loan agreements. The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties. One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans. On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3 5 million During the first quarter of 2006, the Company recognized $2.3 million (2005 - $0 2 million) in income from discontinued operations The other tranche of $1 2 million had previously been recognized in 2005.

PENSION PLAN AMENDMENT

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the unfunded U S defined benefit pension plan covering its two Co-Chief Executive Officers Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced benefit payments is accelerated and paid out upon a change of control of the Company The benefits were 50% vested as of July 2000, the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55 The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon change of control shall be 100% As of June 30, 2006, one of the Co-Chief Executives was approximately 98.0% vested and the other Co-Chief Executive was approximately 79 3% vested





EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted Financial Accounting Standards No 123, "Share-Based Payment," ("FAS 123R") which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No 107 ("SAB 107") relating to FAS 123R The Company has applied the provisions of SAB 107 in its adoption of FAS 123R.

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006. In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R Stock-based compensation expense recognized under FAS 123R in the second quarter of 2006 was $0 5 million

FAS 123R requires companies to estimate the fair value of share-based payment

awards on the date of grant using an option-pricing model The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations Prior to the adoption of FAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under Financial Accounting Standards No 123, "Accounting for Stock-Based Compensation" ("FAS 123"). Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant.

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the three months ended June 30, 2006 included compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R. In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line single-option method As stock-based compensation expense recognized in the Consolidated Statement of Operations for the second quarter of 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods.





RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED JUNE 30, 2006 VERSUS THREE MONTHS ENDED JUNE 30, 2005 (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

The Company utilizes a lattice-binomial option-pricing model ("binomial model") to determine the fair value of share-based payment awards. The fair value determined by the binomial model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables These variables include, but are not limited to, the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors Option-pricing models were developed for use in estimating the value of traded options that have no vesting or hedging restrictions and are fully transferable. Because the Company's employee stock options have certain characteristics that are significantly different from traded options, and because changes in the subjective assumptions can materially affect the estimated value, in management's opinion, the binomial model best provides an accurate measure of the fair value of the Company's employee stock options Although the fair value of employee stock options is determined in accordance with FAS 123R and SAB 107 using an option-pricing model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction

SIX MONTHS ENDED JUNE 30, 2006 VERSUS SIX MONTHS ENDED JUNE 30, 2005

The Company reported net loss from continuing operations before income taxes of $5 7 million or $0 14 per share on a diluted basis and net loss from continuing operations after taxes of $4.6 million or $0.11 per share on a diluted basis for the first half of 2006 For the first half of 2005 the Company reported net earnings from continuing operations before income taxes of $2 4 million or $0.06 per share on a diluted basis and net earnings from continuing operations after taxes of $1.9 million or $0 05 per share on a diluted basis.

REVENUE

The Company's revenues for the first half of 2006 decreased 1.0% to $61.8 million from $62 2 million in the same period last year.

Systems revenue decreased to $33.4 million in the first half of 2006 from $42 4 million in the first half of 2005, a decrease of 21.4% The Company recognized revenue on 14 theater systems which qualified as either sales or sales-type leases in each of the first halves of 2006 and 2005. Revenue from sales and

leases decreased to $21 4 million in the first half of 2006 from $30.4 million in 2005, a decrease of 29.6% This decrease was due to the decrease in settlement revenues from $11 0 million in the first half of 2005 compared to $nil in the same period in 2006.

Two of the systems recognized in the first half of 2006 related to the sale of used theater systems compared to four used systems in the same period of 2005.

Average revenue per sales and sales-type systems increased due to a difference in the mix of systems recognized as outlined in the table below:

| | SIX MONTHS ENDED JUNE 30, 2006 | SIX MONTHS ENDED JUNE 30, 2005 |
|---|---|---|
| Sales and Sales-type lease systems recognized | | |
| IMAX 2D GT | -- | 1 |
| IMAX 3D | 6 | 5 |
| IMAX 3D SR | 3 | 4 |
| IMAX MPX | 5 | 4 |
| | 14 | 14 |





In addition, the Company installed and began recognizing revenue on one theater system that qualified as an operating lease in the first half of 2006 versus three in the same period in 2005 The Company recognizes revenue on operating leases over the term of the leases

The Company generally enters into multi-year system lease agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system During the period of time between lease signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual lease buyout, whereby the parties are released from their future obligations under the lease, the initial lease payments that the customer previously made to the Company are typically recognized as revenue and the geographic territory granted to the customer reverts to the Company For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through the installation of a theater system or a consensual lease buyout. In addition, since the introduction of its new IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their existing lease agreements, which were in the Company's backlog, and sign new MPX system agreements. During the first half of 2006, the Company did not recognize any settlement revenue. Included in IMAX systems revenue for the six months ended June 30, 2005 are the following types of settlement arrangements: $0.2 related to MPX conversion agreements and $10.8 million related to consensual lease buyouts In aggregate the Company recognized $11 0 million in the six months ended June 30, 2005. The Company anticipates that, while MPX conversion agreements may continue as MPX systems continue to prove popular with commercial customers, overall revenue from consensual lease buyouts and terminations of agreements by customer default will likely continue to decrease throughout 2006 in comparison to 2005

Ongoing rental revenue decreased slightly by 1 4% in the first half of 2006 compared to the same period in 2005 Maintenance revenue remained consistent at $7 1 million in both the first halves of 2006 and 2005

Film revenues increased to $18 7 million in the first half of 2006 from $10 2 million in the first half of 2005, due primarily to an increase in film distribution, film post-production and DMR revenues. Film distribution revenues increased to $8 4 million in the first half of 2006 from $4.7 million in the first half of 2005, an increase of 78 7%, and film production revenues increased to $0 6 million in the first half of 2006 from $0 1 million in the first half of 2005, both increases primarily due to the production and release of Deep Sea 3D,

in March 2006 and the continued performance of Magnificent Desolation Walking on the Moon 3D released in September 2005 Film post-production revenues increased to $4 5 million in the first half of 2006 from $2.5 million in the first half of 2005, mainly due to an increase in third party business at the Company's post-production unit IMAX DMR revenues, which are revenues to the Company generated from the gross box office performance of IMAX DMR films, increased by 76 7% in the first half of 2006 The increase in DMR revenue is due primarily to the gross box office performance and conversion services performed on Superman Returns: The IMAX 3D Experience, released in June 2006, and revenue from the March 2006 release of V for Vendetta· The IMAX Experience, the May 2006 release of Poseidon. The IMAX Experience, and the continued success of Harry Potter and the Goblet of Fire The IMAX Experience re-released in November 2005 This increase is partially offset by the performance of Robots: The IMAX Experience released in March 2005, Batman Begins: The IMAX Experience released in June 2005 and The Polar Express The IMAX 3D Experience released in November 2004





RESULTS OF OPERATIONS (cont'd)

SIX MONTHS ENDED JUNE 30, 2006 VERSUS SIX MONTHS ENDED JUNE 30, 2005 (cont'd)

REVENUE (cont'd)

The Company believes it may see lower film revenues in 2006 due to the disappointing performance of the films V for Vendetta. The IMAX Experience, Poseidon The IMAX Experience and The Ant Bully An IMAX 3D Experience. The Company intends to release in conjunction with studios at least seven new films in 2006 including the already released V for Vendetta: The IMAX Experience (March 2006), Deep Sea 3D (March 2006), Poseidon· The IMAX Experience (May 2006), Superman Returns: An IMAX 3D Experience (June 2006) and The Ant Bully· An IMAX 3D Experience (July 2006) and the still to be released Open Season. An IMAX 3D Experience (September 2006) and Happy Feet An IMAX 3D Experience (November 2006).

Theater operations revenue decreased slightly to $7 7 million in the first half of 2006 from $8.0 million in the first half of 2005, due to a decrease in average ticket prices of 2 3% and a slight decrease in attendance of 2.8% due primarily to the success of the IMAX 3D version of The Polar Express· The IMAX 3D Experience in the first half of 2005 The Company believes it may see lower attendance rates in 2006 compared to the prior year due to the disappointing performance of the films V for Vendetta The IMAX Experience, Poseidon The IMAX Experience and The Ant Bully An IMAX 3D Experience.

Other revenue increased to $2 1 million in the first half of 2006 compared to $1 6 million in the same period in 2005, largely due to an increase in the Company's after market sales. Other revenue primarily includes revenue generated from the Company's camera and rental business and after market sales of projection system parts.

GROSS MARGIN

Gross margin in the first half of 2006 was $23.9 million, or 38.6% of total revenue, compared to $32 0 million, or 51.4% of total revenue in the first half of 2005

Systems margins declined in the first half of 2006 by $9 7 million or 34.4%. Average gross margin on sales and sales-type lease of projection systems increased by 7 9% in the first half of 2006 versus the same period in 2005, primarily due to the difference in the mix of recognitions and to the sale of two used systems in 2006, compared to four used systems in the same period of 2005 Partially offsetting this increase, the Company recognized $11 0 million in settlement gross margin in the first half of 2005, compared to $nil in the same period of 2006 The settlement amounts recognized in the first half of 2005 are detailed as follows $0.2 million related to MPX conversion agreements and $10 8 million related to consensual lease buyouts.

The Company's film gross margin increased in the first half of 2006 by $1 6 million The Company's DMR gross margin increased by $1.4 million, due primarily to the gross box office performance and conversion services performed on Superman Returns· An IMAX 3D Experience, and post-production gross margin increased by $0 5 million, also primarily due to the level of third party business resulting from Superman Returns: An IMAX 3D Experience. Film distribution margin decreased by $1.0 million, primarily due to lower margins earned on the mix of films in release during the year.

The Company's owned and operated theater gross margin increased by $0.7 million in the first half of 2006 compared to the same period in 2005, primarily as a result of lower rental fees for films in 2006.

Other gross margin decreased by $0.8 million in the first half of 2006,

primarily as result of the Company's decision to subsidize some of its after market components and upgrades to a number of theaters showing Superman Returns: An IMAX 3D Experience





RESULTS OF OPERATIONS (cont'd)

SIX MONTHS ENDED JUNE 30, 2006 VERSUS SIX MONTHS ENDED JUNE 30, 2005 (cont'd)

OTHER

Selling, general and administrative expenses were $20.0 million in the first half of 2006 versus $20 1 million in the same period of 2005. Legal fees for the first half of 2006 decreased by $0.9 million due to a reduction in the number of outstanding legal matters in which the Company is involved The Company also amended its executive pension plan on March 8, 2006 to reduce certain benefits, resulting in a savings of $1.3 million in compensation expense for the first half of 2006 compared to the same period in 2005. Partially offsetting these decreases, the Company incurred expenses of $0.9 million in connection with the Company's process of seeking strategic alternatives, including a potential sale. Professional fees also increased by $0 4 million as the Company incurred costs to implement the accounting for Financial Accounting Standards No 123, "Share-Based Payment" ("FAS 123R"), and to amend the Company's pension plan In addition, the Company expensed $0 8 million for stock options granted in accordance with the adoption of FAS 123R Salaries and benefits expense also increased by $0 8 million during the first half of 2006 due to a higher Canadian dollar denominated salary expense on the strengthening of the Canadian dollar compared to the same period in the prior year. In addition, the Company recorded a capital tax expense of $0 3 million in the first half of 2006, compared to a $0.3 million recovery in the same period in 2005. The Company recorded a foreign exchange gain of $0 4 million in the first half of 2006, compared to a loss of $0 7 million in the first half of 2005. The Company records foreign exchange translation gains and losses primarily on a portion of its financing receivable balances which are denominated in Canadian dollars, Euros and Japanese Yen

Receivable provisions net of recoveries for accounts receivable amounted to a net provision of $0 4 million in the first half of 2006, compared to a net recovery of $0 1 million in the first half of 2005. The Company recorded a net recovery of $0 5 million and $0.1 million in the first halves of 2006 and 2005, respectively, on financing receivables due to favorable outcomes on lease amendments.

Interest income remained consistent at $0.5 million in the first halves of 2006 and 2005

Interest expense remained consistent at $8 4 million in the first halves of 2006 and 2005. Included in interest expense is the amortization of deferred finance costs in the amount of $0 4 million in the first halves of 2006 and 2005 relating to the Senior Notes due 2010 The Company's policy is to defer and amortize all the costs relating to a debt financing over the life of the debt instrument.

INCOME TAXES

The Company's effective tax rate differs from the statutory tax rate and will vary from year to year primarily as a result of numerous permanent differences, investments and other tax credits, the provision for income taxes at different rates in foreign and other provincial jurisdictions, enacted statutory tax rate increases or reductions in the year, changes in the Company's valuation allowance based on the Company's recoverability assessments of deferred tax assets, and favorable or unfavorable resolution of various tax examinations The income tax expense for the quarter is calculated by applying the estimated average annual effective tax rate of approximately 11% for the 2006 year to quarterly pre-tax income As of June 30, 2006, the Company had a gross deferred income tax asset of $45 3 million, against which the Company is carrying a $37.5 million valuation allowance. In the six month period the Company favorably resolved a provincial income tax audit resulting in the release of related tax reserves of $0.5 million to the income tax recovery for the period Also, on June 22, 2006, the Canadian Federal government passed into law the elimination of the Large Corporations Tax retroactively as of January 1, 2006. Further, long-term tax rate reductions were also affirmed for taxation years 2008 through 2010 The Company's tax provision for the quarter reflects both the retroactive elimination of the Large Corporations Tax and the result of the long term reductions in the corporate tax rates The Company has reduced its gross deferred tax asset with an equal reduction in its gross valuation allowance to reflect the reduction in long term income tax rates.

RESEARCH AND DEVELOPMENT

Research and development expenses remained consistent at $1 6 million in the first halves of 2006 and 2005. The expenses primarily reflect research and development activities pertaining to the Company's new IMAX digitally-based theater projection system. Through research and development, the Company continues to design and develop cinema-based equipment, software and other technologies to enhance its product offering. The Company believes that the motion picture industry will be affected by the development of digital technologies, particularly in the areas of content creation (image capture), post-production (editing and special effects), distribution and display. Consequently, the Company has made significant investments in digital technologies, including the development of proprietary, patent-pending technology such as a digitally-based projection system, as well as technologies to digitally enhance image resolution and quality of motion picture films, and convert monoscopic (2D) to stereoscopic (3D) images The Company also holds a number of patents, patents pending and intellectual property rights in these areas

DISCONTINUED OPERATIONS

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater The Company abandoned or removed all of its assets from the theater in the first quarter of 2004. The Company is involved in a legal proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations The amount of loss to the Company has been estimated as between $0.8 million and $2.3 million The Company paid out $0.8 million with respect to amounts owing to the landlord during 2003 and 2004 As the Company is uncertain as to the outcome of the proceeding, no additional amount has been recorded The Company recorded $nil in net earnings from discontinued operations related to Miami IMAX theater in the first halves of 2006 and 2005

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management. As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12.7 million previously advanced by the Company, and reorganized the remaining $12.7 million of debt owing to the Company into two separate loan agreements The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties. One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans. On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3 5 million. During the first quarter of 2006, the Company recognized $2 3 million (2005 - $0 2 million) in income from discontinued operations. The other tranche of $1 2 million had previously been recognized in 2005.





PENSION PLAN AMENDMENT

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the unfunded U S defined benefit pension plan covering its two Co-Chief Executive Officers. Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced benefit payments is accelerated and paid out upon a change of control of the Company The benefits were 50% vested as of July 2000, the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55 The vesting percentage of a member whose employment terminates other

than by voluntary retirement or upon change of control shall be 100%. As of June 30, 2006, one of the Co-Chief Executives was approximately 98.0% vested and the other Co-Chief Executive was approximately 79.3% vested.

EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted Financial Accounting Standards No 123, "Share-Based Payment," ("FAS 123R") which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values. In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 107 ("SAB 107") relating to FAS 123R. The Company has applied the provisions of SAB 107 in its adoption of FAS 123R.

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006. In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R Stock-based compensation expense recognized under FAS 123R for the six months ended June 30, 2006 was $0.8 million

FAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations. Prior to the adoption of FAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under Financial Accounting Standards No 123, "Accounting for Stock-Based Compensation" ("FAS 123") Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant.





EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the first half of 2006 includes compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line single-option method. As stock-based compensation expense recognized in the Consolidated Statement of Operations for the first quarter of 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods.

The Company utilizes a lattice-binomial option-pricing model ("binomial model") to determine the fair value of share-based payment awards. The fair value determined by the binomial model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables These variables include, but are not limited to, the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors. Option-pricing models were developed for use in estimating the value of traded options that have no vesting or hedging restrictions and are fully transferable. Because the Company's employee stock options have certain characteristics that are significantly different from traded options, and because changes in the subjective assumptions can materially affect the estimated value, in management's opinion, the binomial model best provides an accurate measure of the fair value of the Company's employee stock options. Although the fair value of employee stock options is determined in accordance with FAS 123R and SAB 107 using an option-pricing

model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction.

OTHER

The Company is in the process of responding to an informal inquiry from the U S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theater systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theater system contract are segregated and can be recognized in different periods. (See "Critical Accounting Policies," above, for a more detailed explanation of its accounting policies with regard to theater system installations) As reported in the Company's 2005 10-K, the Company recognized revenue in the fourth quarter of 2005 on 10 theater installations in theaters which did not open in that quarter. In three of the ten installations, all of the constituent elements of the projection systems were installed in the fourth quarter. Of the remaining seven installations, revenue associated with the screen element of the system was deferred until the final screen was installed Of these seven installations, three theaters had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theaters have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. Finally, on one of these ten installations, the Company has an obligation to de-install and move the theater system. The fair value of this obligation of $0.1 million has not been recognized into income The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theater installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry





LIQUIDITY AND CAPITAL RESOURCES

CREDIT FACILITY

On February 6, 2004, the Company entered into a Loan Agreement for a secured revolving credit facility as amended on June 30, 2005 and as further amended by the Second Amendment to the Loan Agreement which was entered into with effect from May 16th, 2006 (the "Credit Facility"). The Credit Facility is a revolving credit facility expiring on October 31, 2009 with an optional one year renewal thereafter contingent upon approval by the lender, permitting maximum aggregate borrowings of $40.0 million, subject to a borrowing base calculation which includes the Company's financing receivables, operating leases, finished goods inventory, and capital assets with certain reserve requirements and deductions for outstanding letters of credit The Credit Facility bears interest at the applicable prime rate per annum or Libor plus a margin as specified therein per annum and is collateralized by a first priority security interest in all of the current and future assets of the Company The Credit Facility contains typical affirmative and negative covenants, including covenants that restrict the Company's ability to incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales; incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions. In addition, the Credit Facility contains customary events of default, including upon an acquisition or a change of control that may have a material adverse effect on the Company or a guarantor The Credit Facility also requires the Company to maintain a minimum level of earnings before interest, taxes, depreciation and amortization, and cash collections.

CASH AND CASH EQUIVALENTS

As at June 30, 2006, the Company's principal sources of liquidity included cash and cash equivalents of $21 6 million, short-term investments of $8 4 million, the Credit Facility, trade accounts receivable of $27 3 million and anticipated collection from net investment in leases due in the next 12 months of $6.5 million As at June 30, 2006, the Company has not drawn down on the Credit Facility, and has letters of credit for $9 8 million secured by the Credit Facility arrangement.

The Company believes that cashflow from operations together with existing cash and borrowing available under the Credit Facility will be sufficient to meet operating needs for the foreseeable future. However, the Company's operating cashflow can be impacted if management's projections of future signings and installations are not realized The Company forecasts its short-term liquidity requirements on a quarterly and annual basis Since the Company's future cashflows are based on estimates and there may be factors that are outside of the Company's control, there is no guarantee the Company will continue to be

able to fund its operations through cash flows from operations Under the terms of the Company's typical theater system lease agreement, the Company receives substantial cash payments before the Company completes the performance of its obligations. Similarly, the Company receives cash payments for some of its film productions in advance of related cash expenditures.

The Company's net cash provided by (used in) operating activities is impacted by a number of factors, including the proceeds associated with new signings of theater system lease and sale agreements in the year, the box office performance of large format films distributed by the Company and/or exhibited in the Company's theaters, increases or decreases in the Company's operating expenses and the level of cash collections received from its customers.





LIQUIDITY AND CAPITAL RESOURCES (cont'd)

CASH AND CASH EQUIVALENTS (cont'd)

Cash used in operating activities amounted to $4 9 million for the period ended June 30, 2006 Changes in other non-cash operating assets as compared to December 31, 2005 include an increase of $1.9 million in inventories, an increase of $1.4 million in financing receivables, a $2 7 million increase in accounts receivable and a $0 3 million increase in prepaid expenses, which mostly relates to prepaid film print costs that will be expensed over the period to be benefited. Changes in other non-cash operating liabilities as compared to December 31, 2005 include an increase in deferred revenue of $2.7 million, an increase in accounts payable of $0 1 million and an increase of $0.9 million in accrued liabilities Included in accrued liabilities for the period ended June 30, 2006 were $26.1 million in respect of accrued pension obligations which are mostly long-term in nature.

Cash used in investing activities amounted to $1.6 million in the first half of 2006, which includes purchases of short-term investments of $10.3 million, proceeds from maturities of short-term investments of $10 3 million, purchases of $0 7 million in fixed assets, an increase in other assets of $ 0.6 million and an increase in other intangible assets of $0.3 million

Cash provided by financing activities in the first half of 2006 amounted to $0 3 million, due to the issuance of common shares through the exercise of stock options

The Company also received $3 5 million in cash on a note receivable from a discontinued operation

Capital expenditures including the purchase of fixed assets and investments in film assets were $7 4 million for the first half of 2006

Cash provided by operating activities amounted to $3.6 million for the period ended June 30, 2005 Changes in other non-cash operating assets and liabilities included an increase in deferred revenue of $6.0 million, and a decrease of $3.4 million in accrued liabilities. Cash used by investing activities for the first half of 2005 amounted to $16.1 million, primarily consisting of $23.1 million invested in short-term investments and $8.1 million received from proceeds of short-term investments Cash provided by financing activities amounted to $2.1 million due to the issuance of common shares through the exercise of stock options. Capital expenditures including the purchase of fixed assets net of sales proceeds and investments in film assets were $5 3 million for the first half of 2005

LETTERS OF CREDIT AND OTHER COMMITMENTS

As at June 30, 2006, the Company has letters of credit of $9.8 million outstanding, of which the entire balance has been secured by the Credit Facility

SENIOR NOTES DUE 2010

As at June 30, 2006, the Company had outstanding $159.0 million aggregate principal of Registered Senior Notes and $1.0 million aggregate principal of Unregistered Senior Notes.

LIQUIDITY AND CAPITAL RESOURCES (cont'd)

PENSION OBLIGATIONS

The Company has a defined benefit pension plan covering its two Co-Chief Executive Officers As at June 30, 2006, the Company had an unfunded and accrued projected benefit obligation of approximately $26.1 million (2005 - $31 1 million) in respect of this defined benefit pension plan. At the time the Company established the defined benefit pension plan, it also took out life insurance policies on its two Co-Chief Executive Officers with coverage amounts of $21.5 million in aggregate The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so. As at June 30, 2006, the cash surrender value of the insurance policies is $3 7 million (December 31, 2005 - $3 3 million)

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company The benefits were 50% vested as of the plan initiation date The vesting percentage increases on a straight-line basis from inception until age 55 The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon change in control shall be 100% As of June 30, 2006, one of the Co-Chief Executives was approximately 98 0% vested and the other Co-Chief Executive was approximately 79 3% vested

OFF-BALANCE SHEET ARRANGEMENTS

There are currently no off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on the Company's financial condition





ITEM 3 QUANTITATIVE AND QUALITATIVE FACTORS ABOUT MARKET RISK

The Company is exposed to market risk from changes in foreign currency rates. The Company does not use financial instruments for trading or other speculative purposes

A majority of the Company's revenue is denominated in U.S. dollars while a significant portion of its costs and expenses is denominated in Canadian dollars A portion of the Company's net U.S. dollar flows is converted to Canadian dollars to fund Canadian dollar expenses through the spot market In Japan, the Company has ongoing operating expenses related to its operations. Net Japanese yen flows are converted to U S. dollars through the spot market. The Company also has cash receipts under leases denominated in Japanese yen, Euros and Canadian dollars. The Company plans to convert Japanese yen and Euros lease cash flows to U.S dollars through the spot markets on a go-forward basis

ITEM 4 CONTROLS AND PROCEDURES

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

The Company maintains disclosure controls and procedures designed to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time periods.

The Company's management, with the participation of its Co-Chief Executive Officers and its Chief Financial Officer, evaluated the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) or 15d-15(e)) as of June 30, 2006 Based on that evaluation, the Company's Co-Chief Executive Officers and Chief Financial Officer have concluded that, as of that date, the Company's disclosure controls and procedures required by paragraph (b) of Exchange Act Rules 13a-15 or 15d-15 were not effective at the reasonable assurance level because of the identification of a material weakness in the Company's internal control over financial reporting, which management views as an integral part of the Company's disclosure controls and procedures. This material weakness related to the controls surrounding the analysis and recording of complex film accounting transactions in the three months ended June 30, 2006. This control deficiency resulted in an adjustment to the Company's Consolidated Statement of Operations for the three months ended June 30, 2006 of approximately $0.8 million.

As of the third quarter of 2006, management is implementing controls to strengthen the analysis of complex film accounting transactions, including engaging independent third party experts to analyze the Company's proposed

accounting treatment of such transactions.

CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

Other than indicated above, there were no changes in the Company's internal control over financial reporting that occurred during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.





PART II OTHER INFORMATION

ITEM 1 LEGAL PROCEEDINGS

(A) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement and seeking injunctive relief and damages. In April 2005, In-Three filed an answer denying infringement and asserting counterclaims that seek a declaratory judgment of non-infringement, invalidity and unenforceability of the patent in suit, and damages for alleged false advertising, false designation of origin, breach of contract, interference with prospective economic advantage and/or unfair competition. On March 13, 2006, the Company and In-Three entered into a settlement agreement, resolving all matters between the parties. On March 29, 2006, the Company and In-Three filed a joint motion for an order dismissing with prejudice all claims and counterclaims between the parties. The U.S. District Court for the Central District of California, Western Division has stayed a determination on the joint motion at the joint request of the Company, 3DMG, and In-Three pending a resolution of an arbitration proceeding between the Company and 3DMG before the International Centre for Dispute Resolution relating to rights under agreements between the Company and 3DMG.

(B) In November 2001, the Company filed a complaint with the District Court of Munich against Big Screen, a German large-screen cinema owner in Berlin ("Big Screen"), demanding payment of rental payments and certain other amounts owed to the Company. Big Screen raised a defense based on alleged infringement of German antitrust rules, relating mainly to an allegation of excessive pricing. Big Screen had brought a number of motions for restraining orders in this matter relating to the Company's provision of films and maintenance, all of which have been rejected by the courts, including the Berlin Court of Appeals, and for which all appeals have been exhausted. On November 8, 2005, the District Court of Munich rendered a judgment in favor of the Company on all accounts. Big Screen has appealed the judgment to the Munich Court of Appeals and at the same time asked for an order to stay the execution under the judgment of the District Court, which order was denied by the Court so that the judgement remains executable On November 30, 2005, Big Screen filed an application for the opening of insolvency proceedings which were formally opened on May 2, 2006 As a consequence of Big Screen's insolvency, the appeal proceeding has been put on hold and it is uncertain whether it will continue.

(C) In May 2002, the Company filed a complaint with the District Court of Nuremberg-Furth, Germany against Siewert Holding in Wuerzburg ("Siewert"), demanding payment of rental obligations and other amounts owed to the Company. Siewert raised a defense based on alleged infringement of German antitrust rules. By judgement of December 20, 2002, the District Court rejected the defense and awarded judgement in documentary proceedings in favor of the Company and added further amounts that had fallen due. Siewert applied for leave to appeal to the German Supreme Court on matters of law, which was rejected by the German Supreme Court in March 2004 Siewert subsequently made a partial payment of amounts awarded to the Company Siewert has filed follow up proceedings to the documentary proceedings in the District Court, essentially repeating the claims rejected in the documentary proceeding. On September 30, 2004, Siewert filed for insolvency with the Local Court in Wuerzburg. Following the opening of formal insolvency proceedings, the litigation has been put on hold and it is unlikely that it will continue.

(D) In January 2004, the Company and IMAX Theater Services Ltd., a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3 7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17.8 million as a result of E-Citi's breach of a September 2000 lease agreement The arbitration hearing on both claims took place in November 2005 On February 1, 2006, the ICC issued an award finding unanimously in the Company's favor on all claims The ICC hearing to determine the amount of damages to be awarded to the Company took place on July 26 - 28, 2006. The ICC panel has not yet rendered its decision with

respect to such damages and no amount has yet been recorded for these damages





PART II OTHER INFORMATION (cont'd)

ITEM 1 LEGAL PROCEEDINGS (cont'd)

(E) In June 2004, Robots of Mars, Inc. ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration.

(F) In addition to the matters described above, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings

(G) The Company is in the process of responding to informal inquiries from the U S Securities and Exchange Commission and the Ontario Securities Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theater systems. The Company believes its application of its accounting policies is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP The Company is cooperating in these inquiries

ITEM 1A. RISK FACTORS

There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2005

ITEM 5 OTHER INFORMATION

On May 11, 2006, a special committee of the Board was formed to review the terms of possible transactions in connection with the Company's exploration of strategic alternatives, including the possible sale or merger of the business (the "Special Committee") On August 8, 2006, the Board of Directors approved the following compensation for the Directors who were appointed to the Special Committee The Chairman of the Special Committee shall receive a one-time payment of $35,000 and other Special Committee members shall receive a one-time payment of $30,000 Any expenses incurred in connection with participation in Special Committee meetings shall be reimbursed.





PART II OTHER INFORMATION (cont'd)

ITEM 6 EXHIBITS

(A) EXHIBITS

4 10 Fourth Supplemental Indenture dated April 10, 2006 among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, Conversion Films Ltd , Feathered Films Ltd. and Great Ant Productions Ltd and U.S Bank National Association, as trustee under the Indenture

4.11 Fifth Supplemental Indenture dated June 19, 2006 among IMAX Corporation, the Existing Guarantors (as defined therein), First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantor named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, Acorn Rain Productions Ltd. (the "Guaranteeing Subsidiary") and U S.

Bank National Association, as trustee under the Indenture

10.27 Second Amendment to the Loan Agreement as of and with effect May 16, 2006, between IMAX Corporation and Wachovia Capital Finance Corporation (Canada) (formerly, Congress Financial Corporation (Canada)).

31 1 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated August 9, 2006, by Bradley J Wechsler.

31.2 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated August 9, 2006, by Richard L. Gelfond.

31 3 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated August 9, 2006, by Francis T. Joyce

32 1 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated August 9, 2006, by Bradley J. Wechsler

32 2 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated August 9, 2006, by Richard L. Gelfond

32 3 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated August 9, 2006, by Francis T. Joyce

Page 57

IMAX CORPORATION

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

IMAX CORPORATION

Date: August 9, 2006

By: /s/ Francis T. Joyce

Francis T. Joyce
Chief Financial Officer
(Principal Financial Officer)

Date August 9, 2006

By /s/ Kathryn A Gamble

Kathryn A. Gamble
Vice President, Finance, Controller
(Principal Accounting Officer)

Page 58

IMAX CORPORATION

EXHIBIT 4 10

FOURTH SUPPLEMENTAL INDENTURE

Fourth Supplemental Indenture (this "Fourth Supplemental Indenture"), dated as of April 10, 2006 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (each a "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee")

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), and as further amended by the Third Supp emental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), providing for the issuance of 9 5/8% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sanddle Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Fourth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Secur ties as follows·

1. Capitalized Terms Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. Agreement to Guarantee. Each Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise

The obligations of each Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of either of the Guaranteeing Subsidiaries (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon each Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof This is a Guarantee of payment and not of collectibility.

The obligations of each Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE

3 NEW YORK LAW TO GOVERN. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS THIRD SUPPLEMENTAL INDENTURE.

4. Counterparts The parties may sign any number of copies of this Fourth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.



5. Effect of Headings The Section headings herein are for convenience only and shall not affect the construction hereof



IN WITNESS WHEREOF, the parties hereto have caused this Fourth Supplemental Indenture to be duly executed and attested, all as of the date first above written

IMAX Corporation

By "G Mary Ruby"

Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By "Edward MacNeil"

Name: Edward MacNeil
Title: Vice President Finance, Tax and Special Projects

EXISTING GUARANTORS:

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding
(California I) Co.
IMAX Minnesota Holding Co
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding
(California I) Co
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd
Ridefilm Corporation

Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding
(California I) Co.

Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.
1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc
IMAX Music Ltd
IMAX Film Holding Co
IMAX Indianapolis LLC
IMAX Providence General Partner Co
IMAX Providence Limited Partner Co
IMAX Theatre Holding (California I) Co
IMAX Theatre Holding (California II) Co
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management
(Scottsdale), Inc
Strategic Sponsorship Corporation
Tantus II Films Ltd
RPM Pictures Ltd.

By "G. Mary Ruby"
-------------------------------------
Name: G. Mary Ruby
Title: Secretary

By "Edward MacNeil"
-------------------------------------
Name: Edward MacNeil
Title: Vice President

FIRST SUPPLEMENTAL GUARANTORS

Taurus-Littrow Productions Inc
3D Sea II Ltd.

By "G. Mary Ruby"
-------------------------------------
Name G. Mary Ruby
Title Secretary

By "Edward MacNeil"
-------------------------------------
Name Edward MacNeil
Title: Vice President

SECOND SUPPLEMENTAL GUARANTOR:

Big Engine Films Inc

By "G. Mary Ruby"
-------------------------------------
Name: G Mary Ruby
Title. Secretary

By "Edward MacNeil"
-------------------------------------
Name: Edward MacNeil
Title: Vice President

GUARANTEEING SUBSIDIARIES:

Conversion Films Ltd
Feathered Films Ltd
Great Ant Productions Ltd.

By "G. Mary Ruby"
-------------------------------------
Name: G. Mary Ruby
Title Secretary

By "Edward MacNeil"
---------------------------------------
Name Edward MacNeil
Title: Vice President

TRUSTEE:

U.S. Bank National Association,
As Trustee

By."Raymond S Haverstock"
---------------------------------------
Name: Raymond S. Haverstock
Title· Vice President

IMAX CORPORATION

EXHIBIT 4.11

FIFTH SUPPLEMENTAL INDENTURE

Fifth Supplemental Indenture (this "Fifth Supplemental Indenture"), dated as of June 19, 2006 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, Acorn Rain Productions Ltd. (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee")

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), and as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture") providing for the issuance of 9 5/8% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sanddle Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Fifth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. Capitalized Terms Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture

2 Agreement to Guarantee. The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary

(or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE



3. NEW YORK LAW TO GOVERN. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS FIFTH SUPPLEMENTAL INDENTURE

4 Counterparts. The parties may sign any number of copies of this Fifth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. Effect of Headings. The Section headings herein are for convenience only and shall not affect the construction hereof



IN WITNESS WHEREOF, the parties hereto have caused this Fifth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By "G. Mary Ruby"

Name: G. Mary Ruby
Title. Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By "Edward MacNeil"

Name. Edward MacNeil
Title: Vice President Finance, Tax and Special Projects

EXISTING GUARANTORS:

David Keighley Productions 70MM Inc
IMAX II U.S.A Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding
(California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding
(California I) Co.

Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co
Parker Pictures Ltd
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding
(California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.

Tantus Films Ltd.
1329507 Ontario Inc.
924689 Ontario Inc
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc
IMAX Music Ltd.
IMAX Film Holding Co
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co
IMAX Theatre Holding (California II) Co
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management
(Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By "G Mary Ruby"
-------------------------------------
Name. G. Mary Ruby
Title· Secretary

By "Edward MacNeil"
-------------------------------------
Name: Edward MacNeil
Title: Vice President

FIRST SUPPLEMENTAL GUARANTORS.

Taurus-Littrow Productions Inc.
3D Sea II Ltd

By "G. Mary Ruby"
-------------------------------------
Name. G. Mary Ruby
Title· Secretary

By "Edward MacNeil"
-------------------------------------
Name Edward MacNeil
Title. Vice President

SECOND SUPPLEMENTAL GUARANTOR:

Big Engine Films Inc

By "G Mary Ruby"
-------------------------------------
Name: G. Mary Ruby
Title· Secretary

By "Edward MacNeil"
-------------------------------------
Name: Edward MacNeil
Title· Vice President

FOURTH SUPPLEMENTAL GUARANTORS:

Conversion Films Ltd
Feathered Films Ltd
Great Ant Productions Ltd.

By "G. Mary Ruby"
-------------------------------------
Name: G. Mary Ruby
Title: Secretary

By "Edward MacNeil"
-------------------------------------
Name Edward MacNeil
Title: Vice President

GUARANTEEING SUBSIDIARY

ACORN RAIN PRODUCTIONS LTD

By "G Mary Ruby"
-------------------------------------
Name: G. Mary Ruby
Title Secretary

By "Edward MacNeil"
-------------------------------------
Name. Edward MacNeil
Title Vice President

TRUSTEE:

U.S. Bank National Association,
As Trustee

By "Raymond S. Haverstock"
-------------------------------------
Name. Raymond S. Haverstock
Title. Vice President

IMAX CORPORATION

EXHIBIT 10.27

THIS SECOND AMENDMENT TO THE LOAN AGREEMENT is made as of and with effect from the 16th day of May, 2006.

BETWEEN:

IMAX CORPORATION

("BORROWER")

- and -

WACHOVIA CAPITAL FINANCE CORPORATION (CANADA)

(FORMERLY, CONGRESS FINANCIAL CORPORATION (CANADA))

("LENDER")

WHEREAS Borrower and Lender entered into a loan agreement dated February 6, 2004 as amended by a first amendment to the loan agreement made as of June 30, 2005 (collectively, the "LOAN AGREEMENT"), pursuant to which certain credit facilities were established in favour of Borrower;

AND WHEREAS the parties hereto wish to extend the term of the Loan Agreement to October 31, 2009, and amend certain other terms and conditions of the Loan Agreement,

NOW THEREFORE THIS AGREEMENT WITNESSES THAT in consideration of the covenants and agreements contained herein and for other good and valuable consideration, the parties hereto agree to amend the Loan Agreement as provided herein.

SECTION 1 GENERAL

In this Second Amendment to the Loan Agreement, unless otherwise defined or the context otherwise requires, all capitalized terms shall have the respective meanings specified in the Loan Agreement.

SECTION 2 TO BE READ WITH LOAN AGREEMENT

This Second Amendment to the Loan Agreement is an amendment to the Loan Agreement and amends, restates and replaces in its entirety the Second Amendment to the Loan Agreement made as of and executed on May 16, 2006. Unless the context of this Second Amendment to the Loan Agreement otherwise requires, the Loan Agreement and this Second Amendment to the Loan Agreement shall be read together and shall have effect as if the provisions of the Loan Agreement and this Second Amendment to the Loan Agreement were contained in one agreement The term "AGREEMENT" when used in the Loan Agreement means the Loan Agreement as amended by this Second Amendment to the Loan Agreement, together with all amendments, supplements, restatements and replacements thereto or therefor from time to time



SECTION 3 NO NOVATIONS

Nothing in this Second Amendment to the Loan Agreement, nor in the Loan Agreement when read together with this Second Amendment to the Loan Agreement, shall constitute a novation, payment, re-advance or reduction or termination in respect of any Obligations of Borrower.

SECTION 4 AMENDMENTS TO THE LOAN AGREEMENT

(a) Schedule 1.11 to the Loan Agreement (FORM OF BORROWING BASE CERTIFICATE), is deleted in its entirety and replaced with Schedule 1.11 attached hereto

(b) A new Schedule 1 1(A) is added to the Loan Agreement called "CONTRACTS IN BACKLOG/FINISHED GOODS INVENTORY" in the form attached to the Disclosure Letter

(c) A new Schedule 1 1(B) is added to the Loan Agreement called "LONG TERM RECEIVABLES CONTRACTS", in the form attached to the Disclosure Letter.

(d) Schedule 8 4 to the Loan Agreement (EXISTING LIENS), is deleted in its entirety and replaced with Schedule 8.4 attached hereto.

(e) A new Schedule 8.9(B) is added to the Loan Agreement called "RESTRICTIONS ON ASSIGNABILITY WITHIN CONTRACTS IN BACKLOG AND LONG TERM RECEIVABLES CONTRACTS" in the form attached to the Disclosure Letter.

(f) Schedule 9.9 to the Loan Agreement (EXISTING INDEBTEDNESS), is deleted in its entirety and replaced with Schedule 9.9 attached hereto

(g) Schedule 9.10 to the Loan Agreement (EXISTING LOANS, ADVANCES AND GUARANTEES), is deleted in its entirety and replaced with Schedule 9 10 attached hereto

(h) Section 1 of the Loan Agreement (DEFINITIONS), is amended by adding the following definitions (in their respective alphabetical order):

(A) ""AMENDMENT EFFECTIVE DATE" shall mean the date upon which all of the conditions contained in the renewal and amending agreement dated May 16, 2006, between Borrower and Lender, have been satisfied in full (in the sole discretion of Lender) or have been waived in writing (in whole or in part) by Lender, in its sole discretion;

(B) "APPRAISAL" shall have the meaning attributed to it in Section 2 1(a)(v);

(C) "ASSIGNMENT OF CONTRACTS IN BACKLOG AND LONG TERM RECEIVABLES CONTRACTS" shall mean the Assignment of Contracts in Backlog and Long Term Receivables Contracts between Borrower, as assignor, and Lender, as assignee, dated as of May 16, 2006, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced;



(D) "CONTRACTS IN BACKLOG" shall mean, collectively, contracts designated by the Borrower internally as "contracts in backlog" as listed on Schedule 1 1(A), as may be amended, updated and/or restated from time to time in accordance with the requirements set out in Section 7.1(a) hereof;

(E) "CONTRACTS AND LEASES" shall mean, collectively, any one or all of the Capital Leases, the Operating Leases, the Contracts in Backlog and the Long Term Receivables Contracts;

(F) "DISCLOSURE LETTER" means the Disclosure Letter of even date herewith executed by the Borrower and the Lender to which are attached Schedule 1 1(A), Schedule 1 1(B) and Schedule 8.9(B)

(G) "ELIGIBLE CONTRACTS IN BACKLOG" shall mean Contracts in Backlog, from time to time, which are and continue to be acceptable to Lender based on the general criteria set forth below which Lender, in good faith, may revise from time to time. In general, a Contract in Backlog shall be an Eligible Contract in Backlog if.

(i) it is with a Client deemed creditworthy at all times by Lender, as determined by Lender in good faith;

(ii) it is with a Client that has not asserted a bona fide counterclaim, defence or dispute (other than as to a de minimus amount) under the applicable Contract in Backlog and if so, the value of such Contract in Backlog Inventory shall be reduced by the amount of such counterclaim, defense or dispute;

(iii) it is with a Client that does not have, and does not engage in transactions which may give rise to, any right of set-off against the Contract in Backlog Inventory; provided that the existence of any such right of set-off shall not by itself cause such Contract in Backlog Inventory to cease to continue to be Eligible Contract in Backlog Inventory but its appraised value, for purposes of Section 2 1 hereof, will be reduced by Lender by an amount determined by Lender in good faith;

(iv) there are no facts, events or occurrences which would impair the validity, enforceability or collectability of the Contract in Backlog or materially reduce the amount payable or delay payment thereunder, including without limitation, any event of default or event which would, with notice or the passage of time, constitute an event of default under the Contract in Backlog;

(v) it is subject to the first priority, valid and perfected security interest of Lender and is not subject to any prior ranking liens or other liens except Permitted Encumbrances,



Source IMAX CORP, 10-Q, August 09, 2006

(vi) it is with a Client which is not itself, nor any officer or employee thereof, an officer, employee or agent of or affiliated with Borrower, directly or indirectly, by virtue of family membership, ownership, control, management or otherwise;

(vii) there are no proceedings or actions which are threatened or pending against the Client which could reasonably be expected to result in any material adverse change in such Client's financial condition;

(viii) unless otherwise permitted by Lender, it is not with a Client which, together with its affiliates, constitutes, without duplication, more than ten (10%) percent of all otherwise Eligible Contracts, Leases and Inventory (but the portion of the Finished Goods Inventory not in excess of such applicable percentage continues to be Eligible Finished Goods Inventory); and

(ix) notwithstanding that there are restrictions on assignability in respect of such Contracts in Backlog

Any Contract in Backlog Inventory which is not considered to be Eligible Contract in Backlog Inventory in accordance with the foregoing requirements, is nevertheless considered to form part of the Collateral;

(H) "ELIGIBLE CONTRACTS, LEASES AND INVENTORY" shall mean, collectively, any one of or all of the Eligible Capital Leases, Eligible Operating Leases, Eligible Finished Goods Inventory and Eligible Long Term Receivables Contracts;

(I) "ELIGIBLE FINISHED GOODS INVENTORY" means Finished Goods Inventory that has been assigned by the Borrower to Eligible Contracts in Backlog;

(J) "ELIGIBLE LONG TERM RECEIVABLES CONTRACTS" shall mean those contracts of the Borrower, from time to time, which are and continue to be acceptable to Lender based on the general criteria set forth below which Lender, in good faith, may revise from time to time. In general, a Long Term Receivables Contract shall be an Eligible Long Term Receivables Contract if:

(i) it is with a Client deemed creditworthy at all times by Lender, as determined by Lender in good faith;

(ii) it is with a Client that has not asserted a bona fide counterclaim, defence or dispute (other than as to a de minimus amount) under the applicable Long Term Receivables Contract and if so, the value of such Long Term Receivables Contract shall be reduced by the amount of such counterclaim, defense or dispute;

(iii) it is with a Client that does not have, and does not engage in transactions which may give rise to, any right of set-off against the Long Term Receivables Contract, provided that the existence of any



such right of set-off shall not by itself cause such Long Term Receivables Contract to cease to continue to be an Eligible Long Term Receivables Contract but its appraised value, for purposes of Section 2 1 hereof, will be reduced by Lender by an amount determined by Lender in good faith;

(iv) there are no facts, events or occurrences which would impair the validity, enforceability or collectability of the Long Term Receivables Contract or materially reduce the amount payable or delay payment thereunder, including without limitation, any event of default or event which would, with notice or the passage of time, constitute an event of default under the Long Term Receivables Contract;

(v) it is subject to the first priority, valid and perfected security interest of Lender and is not subject to any prior ranking liens or other liens except Permitted Encumbrances;

(vi) it is with a Client which is not itself, nor any officer or employee thereof, an officer, employee or agent of or affiliated with Borrower, directly or indirectly, by virtue of family membership, ownership, control, management or otherwise;

(vii) there are no proceedings or actions which are threatened or pending against the Client which could reasonably be expected to result in any material adverse change in such Client's financial condition;

(viii) unless otherwise permitted by Lender, it is not with a Client which, together with its affiliates, constitutes more than ten (10%) percent of all otherwise Eligible Contracts, Leases and Inventory (but the portion of the Long Term Receivables Contracts not in excess of such applicable percentage continue to be Eligible Long Term Receivables Contracts), and

(ix) notwithstanding that there are restrictions on the assignability in respect of such Long Term Receivables Contracts

Any Long Term Receivables Contract, which is not considered to be an Eligible Long Term Receivables Contract in accordance with the foregoing requirements, is nevertheless considered to form part of the Collateral;

(K) "ELIGIBLE REAL PROPERTY" shall mean the Real Property and any other real property of Borrower that has been deemed to be acceptable as Eligible Real Property by Lender,

(L) "FINISHED GOODS INVENTORY" means the finished goods Inventory of the Borrower that has been designated by the Borrower as a Contract in Backlog;



(M) "FINISHED GOODS INVENTORY LENDING FORMULA" shall have the meaning set forth in Section 2.1(a) hereof;

(N) "LONG TERM RECEIVABLES CONTRACTS" shall mean, collectively, all of the contracts listed on Schedule 1 1(B), as may be amended, updated and/or restated from time to time in accordance with the requirements set out in Section 7.1(a) hereof, each of which are contracts that relate to the sale of theatre equipment by the Borrower;

(O) "LONG TERM RECEIVABLES CONTRACTS LENDING FORMULA" shall have the meaning set forth in Section 2 1(a) hereof;

(P) "ORDERLY LIQUIDATION VALUE" shall mean the amount, expressed in terms of currency in US Dollars, it is estimated would be realized from any orderly liquidation of the Finished Goods Inventory and Long Term Receivables Contracts, as applicable, net of the amount of deductions for all commissions, taxes and other Liquidation Expenses, which, as of the Amendment Effective Date, is the orderly liquidation value attributed to Finished Goods Inventory and Long Term Receivables Contracts in the Hilco Appraisal and at any future date will be the estimated amount similarly calculated as of the date of calculation attributed to the Finished Goods Inventory and Long Term Receivables Contracts by the Appraiser;

(Q) "REAL PROPERTY" means the property of Borrower municipally known as 2525 Speakman Drive, Mississauga, Ontario L5K 1B1; and

(R) "REAL PROPERTY LENDING FORMULA" shall have the meaning set forth in Section 2.1(a)(v) hereof "

(i) Section 1 1 of the Loan Agreement, being the definition of "ACCOUNTS", is hereby amended by deleting the reference to "Capital Leases and/or Operating Leases" in the third line thereof and replacing it with a reference to "Contracts and Leases".

(j) Section 1 19 of the Loan Agreement, being the definition of "CASH DOMINION EVENT", is hereby amended by deleting the reference to "$7,500,000" in the second line thereof and replacing it with a reference to "$5,000,000"

(k) Section 1 23 of the Loan Agreement, being the definition of "CLIENT", is hereby deleted in its entirety and replaced with the following:

""CLIENT" shall mean any Person, other than Borrower, who is now or hereafter a party to a Capital Lease, Operating Lease, Contract in Backlog and/or a Long Term Receivables Contract, as applicable, and "Clients" means all such Persons."

(l) Section 1.24 of the Loan Agreement, being the definition of "COLLATERAL", is hereby amended by inserting ", collectively, the Real Property and" immediately before the words "Collateral as such term" in the first line thereof.

(m) Each of Section 1.28 and 1.29 of the Loan Agreement, being the definition of "ELIGIBLE CAPITAL LEASES" and "ELIGIBLE OPERATING LEASES", respectively, is hereby amended by deleting subparagraph (g) thereof

(n) Section 1.36 of the Loan Agreement, being the definition of "FINANCING AGREEMENTS", is hereby amended by inserting "Assignment of Contracts in Backlog and Long Term Receivables Contracts," following the words "Assignment of Capital Leases and Operating Leases," in the second line thereof

(o) Section 1.38 of the Loan Agreement, being the definition of "GENERAL SECURITY AGREEMENT", is hereby amended by inserting "as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced" immediately following "the Obligations" in the third line thereof.

(p) Section 1 40 of the Loan Agreement, being the definition of "HILCO APPRAISAL", is hereby deleted in its entirety and replaced with the following

""HILCO APPRAISAL" shall mean the most recently dated appraisal conducted by the Appraiser that has been delivered to Lender, as may be amended, updated or supplemented from time to time "

(q) Subsection (b) of Section 1.42 of the Loan Agreement, being the definition of "INTEREST RATE", is hereby amended as follows:

(A) Subsection (i) is hereby amended by deleting the words "a rate of one quarter of one (0 25%) percent per annum in excess of the Applicable Prime Rate or a rate of two (2%)" in the first and second lines thereof and replacing them with "the Applicable Prime Rate or a rate of one and one quarter of one (1.25%)";

(B) Subsection (ii) is hereby amended by deleting the words "a rate of one half of one (0.50%) percent per annum in excess of the Applicable Prime Rate or a rate of two and one quarter (2.25%)" in the first and second lines thereof and replacing them with "a rate of one quarter of one (0.25%) percent per annum in excess of the Applicable Prime Rate or a rate of one and one half of one (1 5%)",

(C) Subsection (iii) is hereby amended by deleting the words "a rate of three quarters of one (0.75%) percent per annum in excess of the Applicable Prime Rate or a rate of two and one half (2.5%)" in the first and second lines thereof and replacing them with "a rate of one half of one (0.50%) percent per annum in excess of the Applicable Prime Rate or a rate of two (2%)".

(r) Section 1.47 of the Loan Agreement, being the definition of "LENDING FORMULAS", is hereby deleted in its entirety and replaced with the following:

""LENDING FORMULAS" shall mean, collectively, the Operating Leases Lending Formula, the Capital Leases Lending Formula, the Finished Goods Inventory



Lending Formula, the Long Term Receivables Lending Formula and the Real Property Lending Formula."

(s) Section 1.54 of the Loan Agreement, being the definition of "MAXIMUM CREDIT" is hereby amended by deleting the reference to "$20,000,000" therein and replacing it with a reference to "$40,000,000".

(t) Section 1.71 of the Loan Agreement, being the definition of "RENEWAL DATE", is deleted in its entirety.

(u) Section 2 1 of the Loan Agreement (REVOLVING LOANS), is hereby amended as follows

(A) Subparagraph (a)(ii)(A) is hereby amended by deleting the reference to "thirty-four (34%)" in the first line thereof and replacing it with "forty-nine (49%)",

(B) Subparagraph (a)(ii)(B) is hereby amended by deleting the " " at the end of this Subsection and replacing it with ", plus";

(C) the following new Paragraph (a)(iii) is added:

"(iii) the lesser of:

(A) thirty-one (31%) percent of the aggregate net book value of Eligible Finished Goods Inventory; or

(B) eighty-five (85%) percent of the appraised value of such Eligible Finished Goods Inventory expressed as a percentage of cost value, net of estimated Liquidation Expenses, with appraisals conducted on an Orderly Liquidation Value basis at the expense of Borrower by the Appraiser (the "FINISHED GOODS INVENTORY LENDING FORMULA"), plus";

(D) the following new Paragraph (a)(iv) is added

"(iv) the lesser of:

(A) forty (40%) percent of the aggregate net book value of Eligible Long Term Receivables Contracts; or

(B) eighty-five (85%) percent of the appraised value of such Eligible Long Term Receivables Contracts expressed as a percentage of cost value, net of estimated Liquidation Expenses, with appraisals conducted on an Orderly Liquidation Value basis at the expense of Borrower by the Appraiser (the "LONG TERM RECEIVABLES CONTRACTS LENDING FORMULA"), plus";



(E) the following new Paragraph (a)(v) is added.

"(v) the lesser of:

(A) $10,000,000; or

(B) Y-[(Y / 120) x N]

(the "REAL PROPERTY LENDING FORMULA").

For purposes of this Subsection 2 1(a)(v) "Y" means FMV multiplied by 65% and "N" means the number of months (or any part thereof) elapsed since the most recent of (i) the Amendment Effective Date, and (ii) the date of the most recent Re-appraisal (as defined below) and "FMV" means the fair market value of the Real Property as indicated in the most recent of (i) the appraisal (the "APPRAISAL") of Royal LePage Advisors Inc dated July 19, 2005; and (ii) the most recent Re-appraisal. The Borrower will be entitled, not more than once in any twelve month period, to have the Real Property Lending Formula recalculated based on a new appraisal (a "RE-APPRAISAL") of the Real Property, provided any such appraisal shall be in form and scope that is in accordance with typical commercial practice for the determination of fair market value of real property at the time and in the circumstances and conducted by an appraiser satisfactory to the Lender, acting reasonably;"

(F) Subsection (b) is hereby deleted in its entirety and replaced with the following.

"(b) Lender may, in its discretion, from time to time reduce or otherwise revise the Lending Formulas to the extent that Lender, in good faith, determines that: (i) the general creditworthiness of the Clients has declined; or (ii) the liquidation value of any of the Eligible Contracts and Leases or Eligible Real Property, or any category thereof, has decreased; (iii) the nature and quality of the Eligible Contracts and Leases and/or the Eligible Real Property has deteriorated; or (iv) the fair market value of the Eligible Real Property has decreased. In determining whether to reduce or otherwise revise the Lending Formulas, Lender may consider events, conditions, contingencies or risks which are also considered in determining Eligible Contracts and Leases or the Eligible Real Property or in establishing Availability Reserves "

(v) Section 2 2 of the Loan Agreement (LETTER OF CREDIT ACCOMMODATIONS), is amended as follows:

(A) Subsection (d) is hereby amended by deleting the reference to "$12,000,000" and replacing it with "$20,000,000"; and

(B) Subsection (e) is hereby amended by deleting the words "or non-renewal" in the last line thereof.

(w) Section 6 3(c) of the Loan Agreement (COLLECTION OF ACCOUNTS), is hereby amended by deleting the words "or non-renewal" in the last line thereof.

(x) Section 6.4 of the Loan Agreement (PAYMENTS), is hereby amended by deleting the words "or non-renewal" in the last line thereof.

(y) The following new Section 7.5(B) is added to the Loan Agreement:

"7.5(B) REAL PROPERTY COVENANTS

With respect to the Real Property: (a) Borrower shall, at its expense, at any time or times as Lender may request on or after an Event of Default has occurred and is continuing, deliver or cause to be delivered to Lender written reports or appraisals as to the Real Property in form, scope and methodology acceptable to Lender and by an appraiser acceptable to Lender, (b) Borrower shall keep the Real Property in good order, repair and marketable condition (ordinary wear and tear excepted); (c) Borrower shall use the Real Property in accordance with applicable requirements of any insurance and in conformity with all applicable laws, unless the failure to conform would not reasonably be expected singly or when aggregated with any other nonconformity to have a materially adverse effect on its business or undertaking or its ability to fulfil its obligations hereunder; (d) the Real Property is and shall be used in Borrower's business and not for personal, family, household or farming use; (e) Borrower shall defend its title to the Real Property against any adverse claims unless the failure to defend would not reasonably be expected, singly or when aggregated with any other failure to defend, to have a materially adverse effect on its business or undertaking or its ability to fulfil its obligations hereunder; (f) Borrower shall not surrender, quit claim or grant any easement, right-of-way or other right or servitude benefiting or burdening the Real Property without the prior consent of Lender, such consent not to be unreasonably withheld; and (g) Borrower assumes all responsibility and liability arising from the use and occupation of the Real Property."

(z) Section 7 6(a)(i) of the Loan Agreement (POWER OF ATTORNEY), is hereby amended by deleting the reference to "Capital Leases, the Operating Leases" and replacing it with a reference to "Contracts and Leases"

(aa) Section 8.7 of the Loan Agreement (COMPLIANCE WITH OTHER AGREEMENTS AND APPLICABLE LAWS), is hereby amended by deleting the reference to "Capital Leases and the Operating Leases" and replacing it with a reference to "Contracts and Leases".

(bb) Section 8 9 of the Loan Agreement (ACCURACY AND COMPLETENESS OF INFORMATION), is hereby amended by deleting the second sentence thereof in its entirety and replacing it with the following



"Borrower represents and warrants that none of the Contracts and Leases include contractual provisions restricting the assignability thereof to Lender or to an assignee of Lender upon exercise of any of the Financing Agreements, with the exception of those restrictive provisions set out on Schedules 8.9 and 8.9(B) hereof "

(cc) Section 9 3(e) of the Loan Agreement (COMPLIANCE WITH LAWS, REGULATIONS, ETC.), is hereby amended by deleting the words "or non-renewal" in the last line thereof

(dd) Section 9 4 of the Loan Agreement (PAYMENT OF TAXES AND CLAIMS), is hereby amended by deleting the words "or non-renewal" in the last line thereof

(ee) Section 9.21 of the Loan Agreement (COSTS AND EXPENSES), is hereby amended by deleting the reference to "$750" in Subsection 9.21(g) and replacing it with a reference to "$800".

(ff) Section 10.2 of the Loan Agreement (REMEDIES), is hereby amended as follows·

(A) Subsection (b)(xi) is hereby amended by deleting the reference to "Eligible Capital Leases and Eligible Operating Leases" and replacing it with a reference to "Eligible Contracts and Leases"; and

(B) Subsection (c)(iii) is hereby amended by deleting the reference to "Capital Leases and Operating Leases" and replacing it with a reference to "Contracts and Leases".

(gg) Section 11 5 of the Loan Agreement (INDEMNIFICATION), is hereby amended by deleting the words "or non-renewal" in the last line thereof.

(hh) Section 12.1(a) of the Loan Agreement (TERM), is hereby amended by deleting the following

"the earlier of: (i) the date which is three (3) years from the date hereof (the "RENEWAL DATE"), and from year to year thereafter, unless sooner terminated pursuant to the terms hereof; provided, that, each of Lender and Borrower may, provided mutually agreed, extend the original Renewal Date to the date three hundred sixty-five (365) days from the Renewal Date by giving the other party, as applicable, notice at least sixty (60) days prior to the Renewal Date and in the event such option to extend the original Renewal Date to the date three hundred sixty-five (365) days from the original Renewal Date is exercised by Lender or Borrower, Borrower shall pay to Lender, upon the date such option is exercised, a fully earned additional commitment fee in the amount of $50,000.00. Lender or Borrower may terminate the Financing Agreements effective on the Renewal Date or on the anniversary of the Renewal Date in any year by giving to the other party at least sixty (60) days prior written notice, provided, that, all Financing Agreements must be terminated simultaneously. Upon the effective date of termination or non-renewal",

and replacing it with the following:



"October 31, 2009; provided that the Borrower may request that the Lender extend the term to October 31, 2010 by giving the Lender notice in writing at least sixty (60) days prior to October 31, 2009. If the Lender agrees to such extension by notice in writing to the Borrower on or before October 31, 2009, the term will thereby be extended to October 31, 2010 "

(ii) Section 12.1(c) of the Loan Agreement (TERM) is hereby amended by deleting the following in its entirety.

| "Amount | | Period |
|---|---|---|
| (i) 1 5% of Maximum Credit | - | From the date hereof to and including the first anniversary of the date hereof |
| (ii) 1 0% of Maximum Credit | - | After the first anniversary of the date hereof to and including the second anniversary of the date hereof |
| (iii) 0.5% of Maximum Credit | - | After the second anniversary of the date hereof to and including the third anniversary of the date hereof and if the term of this Agreement is extended for an additional year, then to and including the end of the then current term." |

and replacing it with the following:

| "Amount | | Period |
|---|---|---|
| (i) 1 5% of Maximum Credit | - | From the date hereof to and including October 30, 2006 |
| (ii) 1 0% of Maximum Credit | - | From October 31, 2006 to and including October 30, 2007. |
| (iii) 0 5% of Maximum Credit | - | From October 31, 2007 to and including October 30, 2009 and if the term of this Agreement is extended in accordance with the terms hereof then to and including the end of the then current term." |

SECTION 5 REPRESENTATIONS AND WARRANTIES

In order to induce Lender to enter into this Second Amendment to the Loan Agreement, Borrower represents and warrants to Lender the following, which representations and warranties shall survive the execution and delivery hereof·

(a) all necessary action, corporate or otherwise, has been taken to authorize the execution, delivery and performance of this Second Amendment to the Loan Agreement by Borrower,

(b) Borrower has duly executed and delivered this Second Amendment to the Loan Agreement,



(c) this Second Amendment to the Loan Agreement is a legal, valid and binding obligation of Borrower, enforceable against it by Lender in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, moratorium, reorganization and other laws of general application limiting the enforcement of creditor's rights generally and the fact that the courts may deny the granting or enforcement of equitable remedies,

(d) the representations and warranties set forth in Section 8 of the Loan Agreement, as amended by this Second Amendment to the Loan Agreement, continue to be true and correct as of the date hereof; and

(e) no Event of Default, or event which, with the passage of time or giving of notice or both, would constitute an Event of Default, exists

SECTION 6 RENEWAL FEE

Borrower shall pay to Lender a one-time renewal fee in the amount of USD $150,000, which shall be fully earned as of and payable upon the execution of this Second Amendment to the Loan Agreement.

SECTION 7 EXPENSES

Borrower shall pay to Lender on demand all reasonable fees and expenses, including, without limitation, legal fees, incurred by Lender in connection with the preparation, negotiation, completion, execution, delivery and review of this Second Amendment to the Loan Agreement and all other documents, registrations and instruments arising therefrom and/or executed in connection therewith.

SECTION 8 CONDITIONS PRECEDENT

This Second Amendment to the Loan Agreement shall not be effective until the Amendment Effective Date and until each of the following conditions has been satisfied, or has been waived in writing (in whole or in part) by Lender in its sole discretion. The execution of this Second Amendment to the Loan Agreement by Lender shall constitute evidence of the satisfaction and/or waiver of each of the following conditions by Lender·

(a) Lender has received, in form and substance satisfactory to Lender, an original copy of each of the following documents.

(i) this Second Amendment to the Loan Agreement duly executed and delivered by Borrower;

(ii) a certificate of compliance issued by Industry Canada in respect of Borrower;

(iii) an officer's certificate or certificates issued by an authorized officer of Borrower relating to Borrower and, inter alia, matters of corporate status, incumbency of officers and corporate power and authority;



(iv) a certified copy of a resolution of the board of directors of Borrower authorizing the execution, delivery and performance of this Second Amendment to the Loan Agreement; and

(v) an updated Borrowing Base Certificate;

(b) Borrower has paid all fees and disbursements incurred by Lender in accordance with Section 7 hereof and the renewal fee in the amount of USD $150,000 payable to Lender in accordance with Section 8 hereof;

(c) Lender shall have received evidence from Borrower (including, without limitation, any subordinations or releases of any other liens in the Collateral required by Lender), in form and substance satisfactory to

Lender, that Lender has valid perfected and first priority liens upon the Collateral, subject only to the liens permitted in the Financing Agreements;

(d) Lender shall have received, in form and substance satisfactory to Lender, an opinion letter of Borrower's counsel, McCarthy Tetrault LLP, with respect to this Second Amendment to the Loan Agreement;

(e) all consents, waiver, acknowledgements and other agreements from third persons which Lender may deem necessary or desirable in order to give effect to the provisions or purposes of this Agreement and the other Financing Agreements; and

(f) Lender and its counsel, acting reasonably, must be satisfied with the form and content of all of the Contracts in Backlog and the Long Term Receivables Contracts of Borrower and must be reasonably satisfied that the benefits received by Borrower under each of the Contracts in Backlog and the Long Term Receivables Contracts are assignable to Lender and any future assignees without the consent of any of the Clients

SECTION 9 CONTINUANCE OF THE LOAN AGREEMENT AND SECURITY

The Loan Agreement, as changed, altered, amended or modified by this Second Amendment to the Loan Agreement, shall be and continue in full force and effect and is hereby confirmed and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically provided for herein It is agreed and confirmed that after giving effect to this Second Amendment to the Loan Agreement, all security delivered by Borrower and/or any Obligor secures the payment of all of the Obligations including, without limitation, the obligations arising under the Loan Agreement, as amended by the terms of this Second Amendment to the Loan Agreement

SECTION 10 COUNTERPARTS & FACSIMILE

This Second Amendment to the Loan Agreement may be executed in any number of counterparts, by original or facsimile signature, each of which shall be deemed an original and all of such counterparts taken together shall be deemed to constitute one and the same instrument.



SECTION 11 GOVERNING LAW

The validity, interpretation and enforcement of this Second Amendment to the Loan Agreement and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the laws of the Province of Ontario and the federal laws of Canada applicable therein.

IN WITNESS WHEREOF the parties hereto have executed this Second Amendment to the Loan Agreement as of and with effect from the day and year first above written.

| LENDER | BORROWER | |
|---|---|---|
| WACHOVIA CAPITAL FINANCE CORPORATION (CANADA) | IMAX CORPORATION | |
| By "Carmela Massari" | By. "G Mary Ruby" | "Edward MacNeil" |
| Title First Vice President | Title Sr VP Legal Affairs | VP Finance, Special Projects |
| Address<br>141 Adelaide Street West, Suite 1500<br>Toronto, Ontario, M5H 3L5<br>Fax· (416) 364-6068 | Address of Chief Executive Office·<br>110 East 59th Street<br>New York, New York, 10022<br>Fax. (212) 371-7584 | |

Each of IMAX U S A. INC , IMAX II U S A INC. and 1329507 ONTARIO INC (collectively, the "GUARANTORS" and each a "GUARANTOR") hereby acknowledges, consents and confirms as follows·

For good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by the Guarantors), each of the Guarantors hereby acknowledges, confirms and consents that

(a) it has reviewed and understands the terms of this Second Amendment to the Loan Agreement and consents to the amendment of the Loan Agreement as contemplated herein,

(b) its liability under the guarantee to which it is a party dated February 6, 2004 (each hereinafter referred to as a "GUARANTEE"), is affected by this Second Amendment to the Loan Agreement;

(c) the "GUARANTEED OBLIGATIONS" (as respectively defined in each Guarantee, as applicable) shall extend to and include all of the obligations of the Borrower under the Loan Agreement as amended by this Second Amendment to the Loan Agreement;

(d) each of the Guarantees shall continue in full force and effect, enforceable against each of the Guarantors, as applicable, in accordance with its terms; and



(e) each of the security documents or instruments creating a security interest, assignment, hypothec, lien, pledge or other charge granted by the Guarantors to Lender together with all amendments, supplements, restatements or replacements thereto or therefore from time to time remains in full force and effect as at the date hereof, in respect of each of the Guarantors' obligations under the Loan Agreement, as amended by this Second Amendment to the Loan Agreement.

DATED as of and with effect from the 16th day of May, 2006

IMAX U.S.A. INC.

Per: "G Mary Ruby"

Name: G Mary Ruby
Title: Secretary

Per "Edward MacNeil"

Name Edward MacNeil
Title Vice President

IMAX II U.S.A. INC

Per: "G Mary Ruby"

Name: G. Mary Ruby
Title. Secretary

Per "Edward MacNeil"

Name: Edward MacNeil
Title: Vice President

1329507 ONTARIO INC

Per "G Mary Ruby"

Name· G Mary Ruby
Title Secretary

Per· "Edward MacNeil"

Name Edward MacNeil
Title· Vice President

SCHEDULE 1.11
FORM OF BORROWING BASE CERTIFICATE

TO: WACHOVIA CAPITAL FINANCE CORPORATION (CANADA) (formerly, CONGRESS FINANCIAL CORPORATION (CANADA))(the "LENDER")

RE. Loan Agreement dated February 6, 2004, between the Lender and Imax Corporation (the "BORROWER"), as amended, modified, supplemented, extended, renewed, restated or replaced from time to time (the "LOAN AGREEMENT")

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement

The undersigned ____________________ being the ____________________ and ____________________ being the ____________________ of the Borrower, each hereby certifies, as of the date hereof, in that capacity and without personal liability, as follows.

1 This certificate is being delivered to the Lender by the Borrower pursuant to the terms of the Loan Agreement.

2 I have made, or caused to be made, such examinations or investigations as are, in my belief, necessary to enable me to make the statements or give the opinions contained or expressed in this certificate

3 The availability of Eligible Operating Leases is $- (the "ELIGIBLE OPERATING LEASES AVAILABILITY"), and has been determined as follows:

| | |
|---|---|
| Value of Operating Leases as set our in Exhibit 1 hereto | $- |
| Less the Value of Operating Leases set out on Exhibit 1 | -$- |

| | |
|---|---|
| which are not Eligible Operating Leases | |
| Value of Eligible Operating Leases | $- |
| Multiplied by the advance rate on Eligible Operating Leases | x 85% |
| Eligible Operating Leases Availability | $- |



4 The availability of Eligible Capital Leases is $- (the "ELIGIBLE CAPITAL LEASES AVAILABILITY"), and has been determined as follows

| | |
|---|---|
| Value of Capital Leases as set out in Exhibit 2 hereto | $- |
| Less the Value of Capital Leases set out on Exhibit 2 which are not Eligible Capital Leases | -$- |
| Value of Eligible Capital Leases | $- |
| Multiplied by the advance rate on Eligible Capital Leases | [X 49% OR X 85%][NTD: DETERMINE IN ACCORDANCE WITH SECTION 2.1] |
| Eligible Capital Leases Availability | $- |

5 The availability of Eligible Finished Goods Inventory is $- (the "ELIGIBLE FINISHED GOODS INVENTORY"), and has been determined as follows

| | |
|---|---|
| Value of Finished Goods Inventory as set out in Exhibit 3 hereto | $- |
| Less the Value of Finished Goods Inventory set out on Exhibit 3 which are not Eligible Finished Goods Inventory | -$- |
| Value of Eligible Finished Goods Inventory | $- |
| Multiplied by the advance rate on Eligible Finished Goods Inventory | [X 31% OR X 85%][NTD· DETERMINE IN ACCORDANCE WITH SECTION 2.1] |
| Eligible Finished Goods Inventory Availability | $- |



6 The availability of Eligible Long Term Receivables Contracts is $- (the "ELIGIBLE LONG TERM RECEIVABLES CONTRACTS AVAILABILITY"), and has been determined as follows·

| | |
|---|---|
| Value of Long Term Receivables Contracts as set out in Exhibit 4 hereto | $- |
| Less the Value of Long Term Receivables Contracts set out on Exhibit 4 which are not Eligible Long Term Receivables Contracts | -$- |

| | |
|---|---|
| Value of Eligible Long Term Receivables Contracts | $- |
| Multiplied by the advance rate on Long Term Receivables Contracts | [X 40% OR X 85%][NTD: DETERMINE IN ACCORDANCE WITH SECTION 2.1] |
| Eligible Long Term Receivables Contracts Availability | $- |

7. The availability of Eligible Real Property is $- (the "ELIGIBLE REAL PROPERTY AVAILABILITY"), and has been determined as follows:

| | |
|---|---|
| Fair Market Value of Real Property based on most recent of Appraisal or Re-Appraisal | $- ("FMV") |
| FMV multiplied by 65% | [-] ("Y") |
| Number of months (or part thereof) elapsed since the most recent of (i) May 16, 2006, and (ii) the date of the most recent Re-Appraisal | [-] ("N") |
| Application of Real Property Lending Formula of Y-[(Y/120) x N] | [-] ("Formula Amount") |
| Eligible Real Property Availability being the lesser of $10,000,000 and the Formula Amount | $- |

8. Attached hereto as Exhibit 5 is an analysis of residual values for the Operating Leases

9 Attached hereto as Exhibit 6 is an analysis of the Capital Leases reserves



10 Based on the Lending Formulas, the aggregate amount of Revolving Loans and Letter of Credit Accommodations available to the Borrower ("AVAILABLE REVOLVING LOANS AND LETTER OF CREDIT ACCOMMODATIONS") is.

| | |
|---|---|
| Eligible Operating Leases Availability per Section 3 above | $- |
| Plus Eligible Capital Leases Availability per Section 4 above | +$- |
| Plus Eligible Backlog Contracts Availability per Section 5 above | +$- |
| Plus Eligible Long Term Receivables Contracts Availability per Section 6 above | +$- |
| Plus Eligible Real Estate Availability per Section 7 above | +$- |
| Less the Availability Reserves set out in Exhibit 7 hereto | -$- |
| Total | $- |

11 The aggregate amount of Revolving Loans and Letter of Credit Accommodations outstanding is $- ("OUTSTANDING LOANS"), and has been determined as follows

| | |
|---|---|
| Principal amount of | $- |

| | |
|---|---|
| outstanding Revolving Loans and Letter of Credit Accommodations indicated in paragraph 11 of the Borrowing Base Certificate delivered prior to this Certificate (the "PRIOR CERTIFICATE") | |
| Less the net cash collections made by the Lender since the date of the Prior Certificate, as set out in Exhibit 8 hereto | -$- |
| Plus the principal amount of Revolving Loans made by Lender and other charges payable to Lender (including adjustments or returned cheques and other remittances, fees, interest, costs and expenses) made and/or incurred since the date of the Prior Certificate, as set out in Exhibit 9 hereto. | +$- |



| | |
|---|---|
| Plus current undrawn amount of outstanding Letter of Credit Accommodations, as set out in Exhibit 10 hereto. | +$- |
| Aggregate amount of Outstanding Loans | $- |

12. The Excess Availability is $-, and has been determined as follows:

| | |
|---|---|
| The Lessor of (a) Available Loans; (b) Maximum Credit; and (c) Trailing Cash Collections as set out in Exhibit 11 hereto | $- |
| Less Outstanding Loans | -$- |
| Less the aggregate amount of due but unpaid tax obligations (as set out in Exhibit 12 hereto) and trade payables which are unpaid 90 days after the original invoice date for them (as set out in Exhibit 13 hereto) | -$- |
| Excess Availability | $- |

13. No Event of Default exists or has occurred and is continuing.

14 The representations and warranties of the Borrower contained in the Loan Agreement are true and correct with the same effect as though such representations and warranties had been made or given at and as of the date hereof

15 Nothing in this Certificate will limit the right of the Lender to establish or revise criteria of eligibility or Availability Reserves or otherwise limit, impair, or affect in any manner whatsoever the rights of Lender under the Loan Agreement

16 In the event of any conflict or inconsistency between the determination of the Lender of the amount of Available Loans (as made in accordance with the terms of the Loan Agreement) and the determination by the Borrower of the amount of Available Loans, the determination of the Lender shall govern

Dated this ___ day of ____________, _____.

Name: -

Title -

Name. -

Title: -



LIST OF EXHIBITS

Exhibit 1 - Operating Leases Schedule

Exhibit 2 - Capital Leases Schedule

Exhibit 3 - Backlog Contracts Schedule

Exhibit 4 - Long Term Receivables Contracts Schedule

Exhibit 5 - Analysis of Residual Values

Exhibit 6 - Analysis of Capital Leases Reserves

Exhibit 7 - Availability Reserves Schedule

Exhibit 8 - Listing of cash collections received by Borrower and remitted or to be remitted to Lender since last certificate

Exhibit 9 - Listing of dollar amount of loans made by Lender and other charges payable (including adjustments for returned cheques and other remittances, fees, interest, costs and expenses) to Lender since last Certificate.

Exhibit 10 - Listing of dollar amount of current undrawn amounts of outstanding Letter of Credits Accommodations

Exhibit 11 - Trailing Cash Collections

Exhibit 12 - Tax Obligations

Exhibit 13 - Accounts Payable Aging

SCHEDULE 8.4

EXISTING LIENS

SCHEDULE 9.9

EXISTING INDEBTEDNESS

1. 9 5/8% Senior Notes due December 1, 2010, as at January 30, 2004 amount outstanding is $160,000,000;

2 Loan Agreement dated February 6, 2004 between Congress Financial Corporation (Canada) as amended by a first amendment to the loan agreement made as of June 30, 2005 pursuant to which certain credit facilities were established in favour of the Borrower

SCHEDULE 9 10

EXISTING LOANS, ADVANCES AND GUARANTEES

None

Source IMAX CORP, 10-Q, August 09, 2006

IMAX CORPORATION
Exhibit 31.1

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Bradley J. Wechsler, Co-Chief Executive Officer of IMAX Corporation, certify that:

1. I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation,

2 Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4 The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared,

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5 The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)·

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information, and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting

Dated August 9, 2006

By "Bradley J. Wechsler"

Name Bradley J. Wechsler
Title Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 31.2

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Richard L Gelfond, Co-Chief Executive Officer of IMAX Corporation, certify that·

1 I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report,

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting, and

5 The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated August 9, 2006 By "Richard L Gelfond"

---------------------------------

Name· Richard L Gelfond
Title Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 31.3

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Francis T Joyce, Chief Financial Officer of IMAX Corporation, certify that.

1 I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have.

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5 The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)·

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated August 9, 2006

By: "Francis T. Joyce"

Name: Francis T Joyce
Title Chief Financial Officer

IMAX CORPORATION
Exhibit 32.1

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18,
UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Bradley J. Wechsler, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended June 30, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated August 9, 2006

"Bradley J. Wechsler"
-----------------------------------
Bradley J. Wechsler
Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 32.2

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18,
UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Richard L. Gelfond, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended June 30, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company

Dated August 9, 2006

"Richard L Gelfond"

-----------------------------------

Richard L Gelfond
Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 32 3

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Francis T. Joyce, Chief Financial Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended June 30, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated· August 9, 2006

"Francis T Joyce"
-----------------------------------
Francis " Joyce
Chief Financial Officer

Created by 10KWizard www.10KWizard.com