# EXHIBIT Q

10kWIZARD
SEC POWER SEARCH

# FORM 10-Q

## IMAX CORP - IMAX

**Filed: November 09, 2006 (period: September 30, 2006)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

10-Q - 10-Q

PART I.

**Item 1.** Financial Statements........................................... 3

PART I.

**Item 2.** Management's Discussion and Analysis of Financial Condition and
**Item 3.** Quantitative and Qualitative Factors about Market Risk.......... 58
**Item 4.** Controls and Procedures......................................... 58

PART II.

**Item 1.** Legal Proceedings............................................... 59

PART II.

**Item 1A.** Risk Factors.................................................... 61

PART II.

**Item 6.** Exhibits......................................................... 61

PART I

**ITEM 1.** FINANCIAL STATEMENTS
**ITEM 2.** MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
**ITEM 3.** QUANTITATIVE AND QUALITATIVE FACTORS ABOUT MARKET RISK
**ITEM 4.** CONTROLS AND PROCEDURES

PART II

**ITEM 1.** LEGAL PROCEEDINGS
**ITEM 1A.** RISK FACTORS
**ITEM 6.** EXHIBITS
SIGNATURES
EX-10.28 (EX-10.28)

EX-10.29 (EX-10.29)

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-31.3 (EX-31.3)

EX-32.1 (EX-32.1)

EX-32.2 (EX-32.2)

EX-32.3 (EX-32.3)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 10-Q

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended September 30, 2006

OR

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 0-24216

IMAX CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Canada<br>(State or other jurisdiction of incorporation or organization) | 98-0140269<br>(I.R.S. Employer Identification Number) |

| | |
|---|---|
| 2525 Speakman Drive, Mississauga, Ontario, Canada<br>(Address of principal executive offices) | L5K 1B1<br>(Postal Code) |

Registrant's telephone number, including area code (905) 403-6500

N/A
(Former name or former address, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days

Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer See definition of "accelerated filer" and "large accelerated filer" in Rule 12B-2 of the Exchange Act.

Large Accelerated Filer [ ] Accelerated Filer [X] Non-Accelerate Filer [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act) Yes [ ] No [X]

Indicate the number of shares of each of the issuer's classes of common stock, as of the latest practicable date.

| Class | Outstanding as of October 26, 2006 |
|---|---|
| Common stock, no par value | 40,285,574 |



IMAX CORPORATION

TABLE OF CONTENTS

PAGE

PART I FINANCIAL INFORMATION

| | | |
|---|---|---|
| Item 1. | Financial Statements. ... . ............... . | 3 |
| Item 2 | Management's Discussion and Analysis of Financial Condition and Results of Operations. .. ............................ | 34 |
| Item 3. | Quantitative and Qualitative Factors about Market Risk. .... | 58 |
| Item 4 | Controls and Procedures ........ .... ... ...... | 58 |
| PART II | OTHER INFORMATION | |
| Item 1 | Legal Proceedings.......... .. ............... . ........... | 59 |
| Item 1A. | Risk Factors . ... ................. ........... ... ....... | 61 |
| Item 6 | Exhibits . ................ .............. . ....... | 61 |
| Signatures.. | . . ........ . . ............. .. ....... | 62 |


</TABLE>

SPECIAL NOTE REGARDING FORWARD-LOOKING INFORMATION

Certain statements included in this quarterly report may constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, references to future capital expenditures (including the amount and nature thereof), business and technology strategies and measures to implement strategies, competitive strengths, goals, expansion and growth of business and operations, plans and references to the future success of IMAX Corporation together with its wholly-owned subsidiaries (the "Company") and expectations regarding the Company's future operating results These forward-looking statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances However, whether actual results and developments will conform with the expectations and predictions of the Company is subject to a number of risks and uncertainties, including, but not limited to, general economic, market or business conditions, the opportunities (or lack thereof) that may be presented to and pursued by the Company, competitive actions by other companies; conditions in the in-home and out-of-home entertainment industries, changes in laws or regulations; conditions and developments in the commercial exhibition industry, the acceptance of the Company's new technologies, risks associated with investments and operations in foreign jurisdictions and any future international expansion, including those related to economic, political and regulatory policies of local governments and laws and policies of the United States and Canada; the potential impact of increased competition in the markets the Company operates within, and other factors, many of which are beyond the control of the Company. Consequently, all of the forward-looking statements made in this quarterly report are qualified by these cautionary statements, and actual results or anticipated developments by the Company may not be realized, and even if substantially realized, may not have the expected consequences to, or effects on, the Company. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking information, whether as a result of new information, future events or otherwise

IMAX(R), IMAX(R) Dome, IMAX(R) 3D, IMAX(R) 3D Dome, The IMAX Experience(R), An IMAX 3D Experience(R), IMAX DMR(R), IMAX MPX(R), IMAX think big(R) and think big(R) are trademarks and trade names of the Company or its subsidiaries that are registered or otherwise protected under laws of various jurisdictions.



IMAX CORPORATION


| | | PAGE |
|---|---|---|
| PART I | FINANCIAL INFORMATION | |
| ITEM 1 | FINANCIAL STATEMENTS | |
| | The following Condensed Consolidated Financial Statements are filed as part of this Report· | |
| | Condensed Consolidated Balance Sheets as at September 30, 2006 and December 31, 2005........... ...................... | 4 |
| | Condensed Consolidated Statements of Operations for the three and nine month periods ended September 30, 2006 and 2005............. .. | 5 |
| | Condensed Consolidated Statements of Cash Flows for the nine | |

month periods ended September 30, 2006 and 2005. ... . 6

Notes to Condensed Consolidated Financial Statements..... . . 7
</TABLE>



IMAX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U.S. dollars)

| | SEPTEMBER 30, 2006 (UNAUDITED) | DECEMBER 31, 2005 |
|---|---|---|
| ASSETS | | |
| Cash and cash equivalents | $ 22,001 | $ 24,324 |
| Short-term investments | 4,219 | 8,171 |
| Accounts receivable, net of allowance for doubtful accounts of $7,201 (2005 - $5,892) | 32,092 | 26,165 |
| Financing receivables (note 3) | 62,529 | 63,006 |
| Inventories (note 4) | 33,110 | 28,294 |
| Prepaid expenses | 4,389 | 3,825 |
| Film assets | 2,946 | 3,329 |
| Fixed assets | 25,619 | 26,780 |
| Other assets | 8,023 | 11,618 |
| Deferred income taxes (note 11) | 6,171 | 6,171 |
| Goodwill | 39,027 | 39,027 |
| Other intangible assets | 2,619 | 2,701 |
| Total assets | $ 242,745 | $ 243,411 |
| LIABILITIES | | |
| Accounts payable | $ 9,469 | $ 6,935 |
| Accrued liabilities (note 7(c)) | 54,808 | 55,122 |
| Deferred revenue | 51,258 | 44,397 |
| Senior Notes due 2010 (note 5) | 160,000 | 160,000 |
| Total liabilities | 275,535 | 266,454 |
| COMMITMENTS AND CONTINGENCIES (notes 7 and 8) | | |
| SHAREHOLDERS' EQUITY (DEFICIT) | | |
| Capital stock (note 12) Common shares - no par value. Authorized - unlimited number. Issued and outstanding - 40,285,574 (2005 - 40,213,542) | 121,960 | 121,674 |
| Other equity | 3,249 | 1,758 |
| Deficit | (158,623) | (144,347) |
| Accumulated other comprehensive income (loss) | 624 | (2,128) |
| Total shareholders' deficit | (32,790) | (23,043) |
| Total liabilities and shareholders' equity (deficit) | $ 242,745 | $ 243,411 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U S dollars, except per share amounts)
(UNAUDITED)

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |

| | | | | |
|---|---|---|---|---|
| REVENUE | | | | |
| IMAX systems (note 9(a)) | $ 7,319 | $20,236 | $ 40,669 | $ 62,657 |
| Films | 7,671 | 8,047 | 26,363 | 18,295 |
| Theater operations | 4,726 | 4,311 | 12,434 | 12,325 |
| Other | 1,010 | 780 | 3,076 | 2,343 |
| | 20,726 | 33,374 | 82,542 | 95,620 |
| COSTS OF GOODS AND SERVICES | 14,537 | 17,600 | 52,468 | 47,832 |
| GROSS MARGIN | 6,189 | 15,774 | 30,074 | 47,788 |
| Selling, general and administrative expenses (note 9(b)) | 9,998 | 8,966 | 29,954 | 29,021 |
| Research and development | 878 | 890 | 2,457 | 2,429 |
| Amortization of intangibles | 132 | 164 | 456 | 481 |
| Receivable provisions, net of (recoveries) (note 10) | 359 | (310) | 250 | (468) |
| EARNINGS (LOSS) FROM OPERATIONS | (5,178) | 6,064 | (3,043) | 16,325 |
| Interest income | 227 | 243 | 760 | 741 |
| Interest expense | (4,379) | (4,185) | (12,784) | (12,584) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (9,330) | 2,122 | (15,067) | 4,482 |
| Provision for income taxes (note 11) | (1,784) | (202) | (634) | (681) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | (11,114) | 1,920 | (15,701) | 3,801 |
| Net earnings (loss) from discontinued operations (note 14) | (875) | 360 | 1,425 | 786 |
| NET EARNINGS (LOSS) | $(11,989) | $ 2,280 | $(14,276) | $ 4,587 |
| EARNINGS (LOSS) PER SHARE (note 12(b)) | | | | |
| Earnings (loss) per share - basic. | | | | |
| Net earnings (loss) from continuing operations | $ (0.28) | $ 0.05 | $ (0 39) | $ 0.10 |
| Net earnings (loss) from discontinued operations | $ (0.02) | $ 0.01 | $ 0 04 | $ 0.02 |
| Net earnings (loss) | $ (0 30) | $ 0 06 | $ (0 35) | $ 0.12 |
| Earnings (loss) per share - diluted: | | | | |
| Net earnings (loss) from continuing operations | $ (0 28) | $ 0 04 | $ (0.39) | $ 0 09 |
| Net earnings (loss) from discontinued operations | $ (0 02) | $ 0 01 | $ 0.04 | $ 0 02 |
| Net earnings (loss) | $ (0.30) | $ 0.05 | $ (0 35) | $ 0.11 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
IN ACCORDANCE WITH UNITED STATES GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(in thousands of U.S. dollars)
(UNAUDITED)

| | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 2006 | 2005 |
| CASH PROVIDED BY (USED IN): | | |
| OPERATING ACTIVITIES | | |
| Net earnings (loss) | $(14,276) | $ 4,587 |
| Net (earnings) from discontinued operations | (1,425) | (786) |
| Items not involving cash: | | |
| Depreciation and amortization | 13,888 | 11,490 |
| Write-downs (recoveries) | 250 | (468) |
| Change in deferred income taxes | -- | (299) |
| Stock and other non-cash compensation | 2,730 | 3,554 |
| Non-cash foreign exchange loss (gain) | (383) | 167 |
| Interest on short-term investments | (281) | (250) |
| Investment in film assets | (8,699) | (7,315) |
| Changes in other non-cash operating assets and liabilities | 846 | (7,239) |
| Net cash provided by (used in) operating activities | (7,350) | 3,441 |
| INVESTING ACTIVITIES | | |
| Purchases of short-term investments | (14,506) | (27,157) |
| Proceeds from maturities of short-term investments | 18,739 | 15,175 |
| Purchase of fixed assets | (1,712) | (1,194) |
| Increase in other assets | (753) | (562) |

| | | |
|---|---|---|
| Increase in other intangible assets | (374) | (412) |
| Net cash provided by (used in) investing activities | 1,394 | (14,150) |
| FINANCING ACTIVITIES | | |
| Common shares issued | 286 | 3,219 |
| Net cash provided by financing activities | 286 | 3,219 |
| Effects of exchange rate changes on cash | (46) | 149 |
| DECREASE IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (5,716) | (7,341) |
| Increase in cash and cash equivalents from discontinued operations | 3,393 | 429 |
| DECREASE IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (2,323) | (6,912) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 24,324 | 28,964 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 22,001 | $ 22,052 |

(the accompanying notes are an integral part of these condensed consolidated financial statements)



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

1. BASIS OF PRESENTATION

The Condensed Consolidated Financial Statements include the accounts of IMAX Corporation together with its wholly-owned subsidiaries (the "Company"), except subsidiaries which the Company has identified as variable interest entities ("VIE's") where the Company is not the primary beneficiary ("PB") (note 2) The nature of the Company's business is such that the results of operations for the interim periods presented are not necessarily indicative of results to be expected for the fiscal year In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations

The Company reports its results under United States Generally Accepted Accounting Principles ("U S GAAP") Significant differences between U S. GAAP and Canadian Generally Accepted Accounting Principles ("Canadian GAAP") are described in note 18.

These financial statements should be read in conjunction with the financial statements included in the Company's most recent Annual Report on Form 10-K for the year ended December 31, 2005 which should be consulted for a summary of the significant accounting policies utilized by the Company. These interim financial statements are prepared following accounting policies consistent with the Company's financial statements for the year ended December 31, 2005, except as noted below.

EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted Financial Accounting Standards No. 123, "Share-Based Payment," ("FAS 123R") which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No. 107 ("SAB 107") relating to FAS 123R. The Company has applied the provisions of SAB 107 in its adoption of FAS 123R

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006 In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R

FAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's

Consolidated Statement of Operations Prior to the adoption of FAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with Accounting Principles Board Opinion No 25 Accounting for Stock Issued to Employees, ("APB 25") as allowed under Financial Accounting Standards No 123, "Accounting for Stock-Based Compensation" ("FAS 123"). Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant.





1 BASIS OF PRESENTATION (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the three and nine months ended September 30, 2006 includes compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R. In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method. Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line single-option method As stock-based compensation expense recognized in the Consolidated Statement of Operations for the three and nine months ended September 30, 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods

The Company utilizes a lattice-binomial option-pricing model ("Binomial Model") to determine the fair value of share-based payment awards

Prior to January 1, 2006, the Company followed the intrinsic value method of accounting for employee stock options as prescribed by APB 25 If the fair value methodology prescribed by FAS 123 had been adopted by the Company, pro forma results for the three and nine months ended September 30, 2005 would have been as follows:

| | THREE MONTHS ENDED SEPTEMBER 30, 2005 | NINE MONTHS ENDED SEPTEMBER 30, 2005 |
|---|---|---|
| Net earnings as reported | $2,280 | $ 4,587 |
| Stock based compensation expense, if the methodology prescribed by FAS 123 had been adopted | (723) | (2,247) |
| Adjusted net earnings | $1,557 | $ 2,340 |
| Earnings (loss) per share - basic: | | |
| Net earnings as reported | $ 0.06 | $ 0.12 |
| FAS 123 stock based compensation expense | $(0.02) | $ (0.06) |
| Adjusted net earnings | $ 0.04 | $ 0.06 |
| Earnings (loss) per share - diluted: | | |
| Net earnings as reported | $ 0.05 | $ 0.11 |
| FAS 123 stock based compensation expense | $(0.01) | $ (0.05) |

| | | |
|---|---|---|
| Adjusted net earnings | $ 0.04 | $ 0.06 |
| | ====== | ======= |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S dollars unless otherwise stated)
(UNAUDITED)

1 BASIS OF PRESENTATION (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

Stock-based compensation expense recognized under FAS 123R for the three and nine months ended September 30, 2006 was $0.4 million and $1.2 million respectively

The weighted average fair value of common share options granted to employees for the three and nine months ended September 30, 2006 at the time of grant was $3 28 and $3 70 respectively (2005 - $3.70 and $3 60 per share). The Company uses a Binomial Model to determine the fair value of common share options at the grant date. For the three and nine months ended September 30, the following assumptions were used·

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Average risk-free interest rate | 5.00% | 4.14% | 4.86% | 4.14% |
| Market risk premium | 5.35% | 6.79% - 6.93% | 5.24% - 5.60% | 5.57% - 7.38% |
| Beta | 0.99 | 1.27 | 0.99 - 1.28 | 1.06 - 1.31 |
| Expected option life (in years) | 4.45 - 5.46 | 5.37 - 5.43 | 2.47 - 5.46 | 2.23 - 5.43 |
| Average expected volatility | 60% | 62% | 60% | 62% |
| Annual termination probability | 8.06% | 8.06% - 9.62% | 8.06% | 8.06% - 9.62% |
| Dividend yield | 0% | 0% | 0% | 0% |

As the Company stratifies its employees into two groups in order to calculate fair value under the Binomial Model, ranges of assumptions used are presented for equity risk premium, Beta, expected option life and annual termination probability. The Company uses the historical data to estimate option exercise and employee termination within the valuation model, separate groups of employees that have similar historical exercise behavior are considered separately for valuation purposes

The Company's policy is to issue new shares to satisfy stock options which are exercised

Total stock-based compensation expense related to non-vested employee stock options not yet recognized at September 30, 2006 and the weighted average period over which the awards are expected to vest is $3.9 million and 3.3 years, respectively



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

2 VARIABLE INTEREST ENTITIES

The Company has evaluated its various variable interests to determine whether they are Variable Interest Entities ("VIEs") in accordance with the revised FASB issued Financial Interpretation 46 ("FIN 46R") The Company reviewed its management agreements relating to theaters which the Company manages, and has no equity interest, and concluded that such arrangements were not variable interests since the Company's fees are commensurate with the level of service and the theater owner retains the right to terminate the service The Company has also reviewed its financial arrangements with theaters where it shares in the profit or losses of the theater The Company has not considered these arrangements under FIN 46R as the arrangements meet the scope exceptions defined in the pronouncement. The

Company has determined that certain of its film production companies are VIEs Since in two cases the Company absorbs a majority of the VIE's losses, the Company has determined that it is the primary beneficiary ("PB"), of these entities The Company continues to consolidate these entities with no material impact on the operating results or financial condition of the Company as the production companies have total assets of less than $0 1 million and total liabilities of less than $0.1 million as at September 30, 2006 The Company also has interests in four other film production companies which are VIEs, however the Company did not consolidate these film entities since it does not bear the majority of the expected losses or expected residual returns. As of September 30, 2006, these four VIEs have total assets of $4.3 million (December 31, 2005 - $0.3 million) and total liabilities of $4.3 million (December 31, 2005 - $0 3 million).

3 FINANCING RECEIVABLES

The Company generally provides its theater systems to customers on a long-term lease basis, typically with initial lease terms of 10 to 20 years. Financing receivables consisting of net investment in leases and long term receivables are comprised of the following.

| | SEPTEMBER 30, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Gross minimum lease amounts receivable | $ 83,483 | $ 88,894 |
| Residual value of equipment | 496 | 635 |
| Unearned finance income | (30,302) | (33,933) |
| Present value of minimum lease amounts receivable | 53,677 | 55,596 |
| Accumulated allowance for uncollectible amounts | (995) | (1,478) |
| Net investment in leases | $ 52,682 | $ 54,118 |
| Long-term receivables | 9,847 | 8,888 |
| Total financing receivables | $ 62,529 | $ 63,006 |





4 INVENTORIES

| | SEPTEMBER 30, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Raw materials | $13,000 | $10,464 |
| Work-in-process | 8,469 | 6,893 |
| Finished goods | 11,641 | 10,937 |
| | $33,110 | $28,294 |

5 SENIOR NOTES DUE 2010

As at September 30, 2006, the Company had outstanding $159 0 million aggregate principal of Registered Senior Notes and $1.0 million aggregate principal of Unregistered Senior Notes.

6 CREDIT FACILITY

On February 6, 2004, the Company entered into a Loan Agreement for a secured revolving credit facility as amended on June 30, 2005 and as further amended by the Second Amendment to the Loan Agreement which was entered into with effect from May 16, 2006 (the "Credit Facility"). The Credit Facility is a revolving credit facility expiring on October 31, 2009 with an optional one year renewal thereafter contingent upon approval by the lender, permitting maximum aggregate borrowings of $40.0 million, subject to a borrowing base calculation which includes the Company's financing receivables, operating leases, finished goods inventory and capital assets with certain reserve requirements and deductions for outstanding letters of credit The Company's current borrowing capacity

under such calculation is $26.1 million after deduction for outstanding letters of credit of $8.1 million. The Credit Facility bears interest at the applicable prime rate per annum or Libor plus a margin as specified therein per annum and is collateralized by a first priority security interest in all of the current and future assets of the Company. The Credit Facility contains typical affirmative and negative covenants, including covenants that restrict the Company's ability to: incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales; incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions In addition, the Credit Facility contains customary events of default, including upon an acquisition or a change of control that may have a material adverse effect on the Company or a guarantor. The Credit Facility also requires the Company to maintain a minimum level of earnings before interest, taxes, depreciation and amortization, and cash collections As at September 30, 2006, the Company has not drawn down on the Credit Facility other than in issuing letters of credit for $8.1 million.





7 COMMITMENTS

(A) The Company's total minimum annual rental payments to be made under operating leases for premises as of September 30, 2006 for each of the years ended December 31, are as follows

| | |
|---|---|
| 2006 (three months remaining) | $ 1,257 |
| 2007 | 5,184 |
| 2008 | 5,086 |
| 2009 | 4,965 |
| 2010 | 5,122 |
| Thereafter | 18,985 |
| | $40,599 |

(B) As at September 30, 2006, the Company has letters of credit of $8 1 million (December 31, 2005 - $7 6 million) secured by the Company's Credit Facility arrangement (see note 6)

(C) In March 2004, the Company received $5 0 million in cash under a film financing arrangement which was included in accrued liabilities During 2005, the Company received another $5 1 million under the same film financing arrangement The Company was required to expend these funds towards the production and distribution of a motion picture title. The film was released in the third quarter of 2005 During the first nine months of 2006, the Company spent $0.2 million towards the distribution of the film. As at September 30, 2006, the Company still has $0 1 million (December 31, 2005 - $0.4 million) remaining in accrued liabilities from this financing for future distribution expenses to be incurred on the film.

8 CONTINGENCIES

The Company is involved in lawsuits, claims, and proceedings, including those identified below, which arise in the ordinary course of business. In accordance with SFAS 5, "Accounting for Contingencies," the Company will make a provision for a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated The Company believes it has adequate provisions for any such matters The Company reviews these provisions in conjunction with any related provisions on assets related to the claims at least quarterly and adjusts these provisions to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other pertinent information related to the case. Should developments in any of these matters outlined below cause a change in our determination as to an unfavorable outcome and result in the need to recognize a material provision, or, should any of these matters result in a final adverse judgement or be settled for significant amounts, they could have a material adverse effect on our results of operations, cash flows, and financial position in the period or periods in which such a change in determination, settlement or judgement occurs.

8 CONTINGENCIES (cont'd)

(A) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd. ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc ("In-Three") alleging patent infringement and seeking injunctive relief and damages In April 2005, In-Three filed an answer denying infringement and asserting counterclaims that seek a declaratory judgement of non-infringement, invalidity and unenforceability of the patent in suit, and damages for alleged false advertising, false designation of origin, breach of contract, interference with prospective economic advantage and/or unfair competition On March 13, 2006, the Company and In-Three entered into a settlement agreement, resolving all matters between the parties. On March 29, 2006, the Company and In-Three filed a joint motion for an order dismissing with prejudice all claims and counterclaims between the parties The U.S. District Court for the Central District of California, Western Division has stayed a determination on the joint motion at the joint request of the Company, 3DMG, and In-Three pending a resolution of an arbitration proceeding between the Company and 3DMG before the International Centre for Dispute Resolution relating to rights under agreements between the Company and 3DMG. The Company believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such proceedings.

(B) In January 2004, the Company and IMAX Theater Services Ltd , a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3 7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17 8 million in damages as a result of E-Citi's breach of a September 2000 lease agreement The arbitration hearing on both claims took place in November, 2005. On February 1, 2006, the ICC issued an award finding unanimously in the Company's favor on all claims. The ICC hearing to determine the amount of damages to be awarded to the Company took place on July 26 - 28, 2006 The ICC panel has not yet rendered its decision with respect to such damages and no amount has yet been recorded for these damages

(C) In June 2004, Robots of Mars, Inc ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract. Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages. The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration





8 CONTINGENCIES (cont'd)

(D) The Company and certain of its officers and directors were named as defendants in eight purported class action lawsuits filed between August 11, 2006 and September 18, 2006, alleging violations of U S federal securities laws These eight actions were filed in the U.S. District Court for the Southern District of New York These lawsuits, brought on behalf of shareholders who purchased the Company's common stock between February 17, 2006 and August 9, 2006, allege primarily that the defendants engaged in securities fraud by disseminating materially false and misleading statements during the class period regarding their revenue recognition of theater system installations, and failing to disclose material information concerning the Company's revenue recognition practices. Currently there are motions for consolidation, assignment of lead plaintiff, and appointment of lead plaintiff counsel pending before the Court. These lawsuits are in very

early stages and seek unspecified compensatory damages, costs, and expenses The Company believes the allegations made against it in the complaints are meritless and will vigorously defend the matter. The Company believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such proceedings

(E) A purported class action lawsuit was filed on September 20, 2006 in the Ontario Superior Court of Justice against the Company and certain of its officers and directors, alleging violations of Canadian securities laws This lawsuit was brought on behalf of shareholders who acquired the Company's securities from February 17, 2006 to August 9, 2006 This lawsuit is in a very early stage and seeks unspecified compensatory and punitive damages, as well as costs and expenses The Company believes the allegations made against it in the complaint are meritless and will vigorously defend the matter. The Company believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such proceedings

(F) In addition to the matters described above and in note 14(a) in respect of the Miami theater, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings.





9 CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS SUPPLEMENTAL INFORMATION

(A) The Company generally enters into multi-year theater system agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the theater system. During the period of time between signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing. Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual buyout, whereby the parties are released from their future obligations under the agreement and the geographic territory granted to the customer reverts to the Company Once an agreement is reached by both parties, the initial payments that the customer previously made to the Company are typically recognized as revenue. In addition, since the introduction of its IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their original agreements and to sign new system agreements for the MPX system Upon finalizing the new agreement, the total consideration received under both the terminated agreements and the MPX arrangement is allocated first to the MPX system and the residual amount to settlement revenue. During the first nine months of 2006, the Company did not recognize any settlement revenue Included in IMAX systems revenue for the three and nine months ended September 30, 2005 are the following types of settlement arrangements. $0 4 million and $0.6 million respectively related to MPX conversion agreements, $0 6 million and $11.4 million respectively related to consensual buyouts, and $1 4 million for both three and n ne months ended September 30, 2005 related to termination of agreements after customer default In aggregate. three and nine months ended September 30, 2005 - $2 4 million and $13 4 million respectively.

(B) Included in selling, general and administrative expenses for the three and nine months ended September 30, 2006 is a loss of $0.1 million and a gain of $0.3 million, respectively (2005 - $0.2 million gain, $0.5 million loss) for net foreign exchange gains or losses related to the translation of foreign currency denominated monetary assets, liabilities and integrated subsidiaries

10 RECEIVABLE PROVISIONS, NET OF (RECOVERIES)

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Accounts receivable provisions, net | | | | |

| | | | | |
|---|---|---|---|---|
| of (recoveries) | $359 | $(185) | $ 733 | $(293) |
| Financing receivables provisions, net of (recoveries) | -- | (125) | (483) | (175) |
| Receivable provisions, net of (recoveries) | $359 | $(310) | $ 250 | $(468) |





11 INCOME TAXES

The effective tax rate on earnings differs significantly from the Canadian statutory rate due to the effect of permanent differences, income taxed at differing rates in foreign and other provincial jurisdictions, tax recoveries and charges relating to favourable or unfavourable tax examinations, and changes in the Company's valuation allowance on deferred tax assets The Company has reduced its net deferred tax asset by an amount of $1 6 million to reflect revisions in the Company's estimates of projected future earnings and the recoverability of its deferred tax assets based on an analysis of both positive and negative evidence.

As at September 30, 2006, the Company has net deferred income tax assets of $6 2 million (December 31, 2005 - $6.2 million), comprised of tax credit carryforwards, net operating loss and capital loss carryforwards and other deductible temporary differences, which can be utilized to reduce either taxable income or taxes otherwise payable in future years. As of September 30, 2006, the Company had a gross deferred income tax asset of $49.0 million, against which the Company is carrying a $42 8 million valuation allowance

12 CAPITAL STOCK

(A) STOCK-BASED COMPENSATION

As at September 30, 2006, the Company has reserved a total 6,974,657 (December 31, 2005 - 7,046,689) common shares for future issuance under the Stock Option Plan, of which options in respect of 5,927,196 common shares are outstanding at September 30, 2006. The options granted under the Stock Option Plan generally vest between one and five years and expire 10 years or less from the date granted. At September 30, 2006, options in respect of 4,557,476 common shares were vested and exercisable.

Under the terms of certain employment agreements dated July 12, 2000, the Company is required to issue either 360,000 restricted common shares or pay their cash equivalent The restricted shares or the related cash obligation were fully vested effective July 1, 2002. In May 2003, the Company paid approximately $1 6 million in cash to settle the equivalent of 200,000 of the total 360,000 restricted common shares under these agreements. The remaining 160,000 restricted shares are required to be issued, or payment of their cash equivalent, upon request by the employees. The Company has recorded a $0 7 million recovery and $0 3 million recovery for the three and nine months ended September 30, 2006, respectively (2005 - $0 1 million expense, and $0 3 million expense), due to the changes in the fair value of these restricted shares in the period. As at September 30, 2006 an amount of $0 8 million has been recorded in accrued liabilities with respect to the restricted shares





12 CAPITAL STOCK (cont'd)

(A) STOCK-BASED COMPENSATION (cont'd)

The following table summarizes certain information in respect of option activity under the Stock Option Plan for the periods ended September 30.

WEIGHTED AVERAGE

| | NUMBER OF SHARES | | EXERCISE PRICE PER SHARE | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Options outstanding, beginning of year | 5,504,324 | 5,593,101 | $ 7.26 | $ 6.82 |
| Granted | 671,105 | 633,531 | 10.06 | 9.62 |
| Exercised | (72,032) | (600,823) | 3.96 | 5.36 |
| Forfeited or expired | (160,368) | (2,000) | 10.23 | 6.48 |
| Cancelled | (15,833) | (28,402) | 21.33 | 20.70 |
| Options outstanding, end of quarter | 5,927,196 | 5,595,407 | 7.50 | 7.23 |
| Options exercisable, end of quarter | 4,557,476 | 4,046,279 | 7.11 | 7.23 |

The weighted average exercise price per share and number of unvested common share options granted to employees as at September 30, 2006 is $8 80 and 1,369,720, respectively

The following table summarizes certain information in respect of options outstanding under the Stock Option Plan at September 30, 2006·

| RANGE OF EXERCISE PRICES PER SHARE | NUMBER OF SHARES OUTSTANDING | VESTED | WEIGHTED AVERAGE EXERCISE PRICE PER SHARE | AVERAGE REMAINING TERM |
|---|---|---|---|---|
| $ 0 00 - $ 2 99 | 172,746 | 172,746 | $ 2.73 | 2 0 years |
| $ 3 00 - $ 4 99 | 1,999,522 | 1,979,522 | 4.39 | 4 2 years |
| $ 5 00 - $ 9 99 | 2,771,725 | 1,878,471 | 6.83 | 5 9 years |
| $10.00 - $14 99 | 528,901 | 72,435 | 10 63 | 7.2 years |
| $15 00 - $19 99 | 28,000 | 28,000 | 18 45 | 0.6 years |
| $20 00 - $24.99 | 271,302 | 271,302 | 21.86 | 2 5 years |
| $25 00 - $28 04 | 155,000 | 155,000 | 27.17 | 2.6 years |
| Total | 5,927,196 | 4,557,476 | 7.50 | 5.0 years |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S dollars unless otherwise stated)
(UNAUDITED)

12 CAPITAL STOCK (cont'd)

(A) STOCK-BASED COMPENSATION (cont'd)

In the three and nine months ended September 30, 2006, an aggregate of 13,335 and 63,319 respectively, (2005 - 13,335 and 40,005) options with an average exercise price of $6 61 and $8.55 respectively, (2005 - $10.10 and $10 03) to purchase the Company's common stock were issued to certain advisors and strategic partners of the Company The Company has calculated the fair value of these options to non-employees on the date of grant to be less than $0 1 million and $0 3 million (2005 - $0 1 million and $0 2 million), using a Binomial Model with the following underlying assumptions:

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Average risk-free interest rate | 4.90% | 4 05% | 4.8% | 3 96% |
| Expected option life | 5 years | 5 years | 5 - 7 years | 5 years |
| Average expected volatility | 60% | 62% | 60% | 62% |
| Dividend yield | 0% | 0% | 0% | 0% |

In the three and nine months ended September 30, 2006, the Company has recorded a charge of less than $0 1 million and $0 3 million respectively (2005 - $0 1 million and $0 2 million) to film cost of sales related to these non-employee stock options.

Source IMAX CORP, 10-Q, November 09, 2006

There were no warrants issued in the three and nine months ended September 30, 2006 (2005 - nil and nil) 550,000 warrants were issued in 2003. In the first quarter of 2005, 80,872 common shares were issued upon exercise of 200,000 warrants All remaining warrants have either expired or have been cancelled.





12 CAPITAL STOCK (cont'd)

(B) EARNINGS (LOSS) PER SHARE

Reconciliations of the numerators and denominators of the basic and diluted per-share computations are comprised of the following:

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Net earnings applicable to common shareholders: | | | | |
| Net earnings (loss) | $(11,989) | $ 2,280 | $(14,276) | $ 4,587 |
| Weighted average number of common shares (000's): | | | | |
| Issued and outstanding, beginning of period | 40,286 | 39,916 | 40,213 | 39,447 |
| Weighted average number of shares issued during the period | -- | 109 | 52 | 353 |
| Weighted average number of shares used in computing basic earnings per share | 40,286 | 40,025 | 40,265 | 39,800 |
| Assumed exercise of stock options, net of shares assumed repurchased | -- | 2,193 | -- | 2,226 |
| Weighted average number of shares used in computing diluted earnings per share | 40,286 | 42,218 | 40,265 | 42,026 |

The calculation of diluted earnings per share for the nine months ended September 30, 2006 excludes 5.9 million common shares issuable upon exercise of options as the impact of these exercises would be antidilutive.





13 SEGMENTED INFORMATION

The Company has four reportable segments: IMAX systems, films, theater operations and other

There has been no change in the basis of measurement of segment profit or loss from the Company's most recent Annual Report on Form 10-K for the year ended December 31, 2005 Inter-segment transactions are not significant

| THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|
| 2006 | 2005 | 2006 | 2005 |

| | | | | |
|---|---|---|---|---|
| REVENUE | | | | |
| IMAX systems | $ 7,319 | $20,236 | $ 40,669 | $ 62,657 |
| Films | 7,671 | 8,047 | 26,363 | 18,295 |
| Theater operations | 4,726 | 4,311 | 12,434 | 12,325 |
| Other | 1,010 | 780 | 3,076 | 2,343 |
| TOTAL | $20,726 | $33,374 | $ 82,542 | $ 95,620 |
| EARNINGS (LOSS) FROM OPERATIONS | | | | |
| IMAX systems | $ 903 | $10,481 | $ 14,734 | $ 34,223 |
| Films | (436) | 1,084 | 394 | 521 |
| Theater operations | 221 | 3 | 910 | (53) |
| Corporate and other | (5,866) | (5,504) | (19,081) | (18,366) |
| TOTAL | $(5,178) | $ 6,064 | $ (3,043) | $ 16,325 |

14 DISCONTINUED OPERATIONS

(A) MIAMI THEATER LLC

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater The Company completed its abandonment of assets and removal of its projection system from the theater in the first quarter of 2004, with no financial impact. The Company is involved in an arbitration proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations. The amount of loss to the Company has been estimated at between $0.9 million and $2 3 million Prior to 2006, the Company paid out $0.8 million with respect to amounts owing to the landlord. The Company paid out an additional $0 1 million and also accrued an additional $0.8 million in net loss from discontinued operations related to Miami IMAX theater in the third quarter of 2006

(B) DIGITAL PROJECTION INTERNATIONAL

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12.7 million previously advanced by the Company, and reorganized the remaining $12.7 million of debt owing to the Company into two separate loan agreements The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3.5 million. During the first quarter of 2006, the Company recognized $2.3 million (2005 - $0 2 million) in income from discontinued operations The other tranche of $1.2 million had previously been recognized in 2005





14 DISCONTINUED OPERATIONS (cont'd)

(C) CONSOLIDATED STATEMENT OF OPERATIONS FOR MIAMI THEATER LLC AND DPI

The net earnings from discontinued operations summarized in the Consolidated Statements of Operations, for the periods ended September 30, were comprised of the following

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Revenue from DPI | $ -- | $360 | $2,300 | $ 786 |
| Loss from Miami Theater LLC | (875) | -- | (875) | -- |
| Net earnings (loss) from discontinued operations | $(875) | $360 | $1,425 | $ 786 |

15 DEFINED BENEFIT PLAN

The Company has an unfunded U.S. defined benefit pension plan covering its two Co-Chief Executive Officers. The plan provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings during the 120 months preceding retirement.

Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company. The benefits were 50% vested as of July 2000, the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55. The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon a change in control shall be 100%. As of September 30, 2006, one of the Co-Chief Executives was 100% vested and the other Co-Chief Executive was approximately 81% vested The actuarial liability was remeasured as of March 8, 2006 to reflect the plan changes adopted

The following assumptions were used in determining the obligation and cost status of the Company's defined benefit pension plan at the plan measurement dates of

| | MARCH 8, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Discount rate | 5.18% | 5.50% |
| Lump sum interest rate | | |
| First 20 years | 5 70% | N/A |
| Thereafter | 4 75% | N/A |
| Form of payment. | Modified lump sum | 100% Joint and survivor annuity |
| Cost of living adjustment on benefits | 1 20% | 2.40% |
| Rate of increase in qualifying compensation levels | nil% | nil% |





15 DEFINED BENEFIT PLAN (cont'd)

The amounts recorded in accrued liabilities for the plan are determined as follows:

| | NINE MONTHS ENDED SEPTEMBER 30, 2006 |
|---|---|
| Projected benefit obligation. | |
| Obligation, beginning of period | $31,064 |
| Service cost | 1,185 |
| Interest cost | 956 |
| Actuarial gain | (8,645) |
| Obligation, end of period | $24,560 |
| Unfunded status | |
| Obligation, end of period | $24,560 |
| Unrecognized gain relating to prior service cost | 1,936 |
| Unrecognized actuarial (loss) | (21) |
| Accrued pension liability | $26,475 |

The following table provides disclosure of pension expense for the defined benefit plan for the periods ended September 30:

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Service cost | $ 364 | $ 604 | $1,185 | $1,812 |
| Interest cost | 297 | 390 | 956 | 1,169 |
| Amortization of prior service cost | (237) | 349 | (320) | 1,048 |
| Pension expense | $ 424 | $1,343 | $1,821 | $4,029 |

The accumulated benefit obligation for the defined benefit plan was $26 5 million at September 30, 2006 and $31.1 million at December 31, 2005

No contributions are expected to be made for the plan during 2006

As a result of the pension plan amendment, an adjustment to the unrecognized actuarial losses of $2.8 million and unrecognized prior service cost of $3 4 million was recorded in comprehensive income (loss) and other assets

The following benefit payments are expected to be made as per the current plan assumptions and the terms of the Plan in each of the next five years, and in the aggregate over the five years thereafter:

| | |
|---|---|
| 2006 | $ -- |
| 2007 | 995 |
| 2008 | 1,007 |
| 2009 | 1,019 |
| 2010 | 29,505(1) |
| 2011 to 2015 | -- |

(1) One of the Co-Chief Executive Officers is currently entitled to benefit payments subsequent to 2010 as a life annuity, subject to an elective right to a lump sum payment in 2010 The pension plan assumptions assume the election of a lump sum payment.





15 DEFINED BENEFIT PLAN (cont'd)

At the time the Company established the defined benefit pension plan, it also took out life insurance policies on its two Co-Chief Executive Officers with coverage amounts of $21.5 million in aggregate. The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so. At September 30, 2006, the cash surrender value of the insurance policies is $4 1 million (December 31, 2005 - $3.3 million) and has been included in other assets.

16 IMPACT OF RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (an interpretation of FASB Statement No. 109), ("FIN 48"), which clarifies the relevant criteria and approach for the recognition, de-recognition and measurement of uncertain tax positions. FIN 48 will be effective for the Company beginning January 1, 2007. The Company is currently in the process of assessing the effects of the provisions of FIN 48

In September 2006, the FASB issued Statement of Financial Accounting Standards No 157, "Fair Value Measurements", which is effective for fiscal years beginning after November 15, 2007 and for interim periods within those years This statement defines fair value, establishes a framework for measuring fair value and expands the related disclosure requirements The Company is currently evaluating the potential impact of this statement.

The FASB also issued in September 2006 Statement of Financial Accounting Standards No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (an amendment of FASB Statement No. 87, 88, 106 and 132R), ("FAS 158"). This Standard requires recognition of the funded status of a benefit plan in the statement of financial position. The Standard also requires recognition in other comprehensive income certain gains and losses that arise during the period but are deferred under pension accounting rules, as well as modifies the timing of reporting and adds certain disclosures. FAS 158 provides recognition and disclosure elements to be effective as of the end of the fiscal year after December 15, 2006 and measurement elements to be effective for fiscal years ending after December 15, 2008 The Company does not believe that the adoption of FAS 158 will have a material impact on its results of operations or financial position.

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION

The Company's Senior Notes are fully and unconditionally guaranteed, jointly and severally by specific wholly-owned subsidiaries of the Company (the "Guarantor Subsidiaries"). The main Guarantor Subsidiaries are David Keighley Productions 70 MM Inc., Sonics Associates Inc., and the subsidiaries that own and operate certain theaters. These guarantees are full and unconditional. The information under the column headed "Non-Guarantor Subsidiaries" relates to the following subsidiaries of the Company· IMAX Japan Inc. and IMAX B.V. (the "Non-Guarantor Subsidiaries") which have not provided any guarantees of the Senior Notes

Investments in subsidiaries are accounted for by the equity method for purposes of the supplemental consolidating financial data Some subsidiaries may be unable to pay dividends due to negative working capital



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Balance Sheets as at September 30, 2006.

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash and cash equivalents | $ 13,400 | $ 8,499 | $ 102 | $ -- | $ 22,001 |
| Short-term investments | 4,219 | -- | -- | -- | 4,219 |
| Accounts receivable | 29,621 | 2,109 | 362 | -- | 32,092 |
| Financing receivables | 60,501 | 2,028 | -- | -- | 62,529 |
| Inventories | 32,804 | 236 | 70 | -- | 33,110 |
| Prepaid expenses | 3,720 | 643 | 26 | -- | 4,389 |
| Inter-company receivables | 24,152 | 32,441 | 11,196 | (67,789) | -- |
| Film assets | 2,946 | -- | -- | -- | 2,946 |
| Fixed assets | 24,356 | 1,245 | 18 | -- | 25,619 |
| Other assets | 8,023 | -- | -- | -- | 8,023 |
| Deferred income taxes | 6,163 | 8 | -- | -- | 6,171 |
| Goodwill | 39,027 | -- | -- | -- | 39,027 |
| Other intangible assets | 2,619 | -- | -- | -- | 2,619 |
| Investments in subsidiaries | 33,704 | -- | -- | (33,704) | -- |
| Total assets | $ 285,255 | $ 47,209 | $11,774 | $(101,493) | $ 242,745 |
| LIABILITIES | | | | | |
| Accounts payable | 4,119 | 5,347 | 3 | -- | 9,469 |
| Accrued liabilities | 51,797 | 2,803 | 208 | -- | 54,808 |
| Inter-company payables | 57,163 | 33,236 | 6,339 | (96,738) | -- |
| Deferred revenue | 45,884 | 5,177 | 197 | -- | 51,258 |
| Senior Notes due 2010 | 160,000 | -- | -- | -- | 160,000 |
| Total liabilities | 318,963 | 46,563 | 6,747 | (96,738) | 275,535 |
| SHAREHOLDER'S DEFICIT | | | | | |
| Capital stock | 121,960 | -- | 117 | (117) | 121,960 |
| Other equity/Additional paid in capital/Contributed surplus | 2,215 | 46,960 | -- | (45,926) | 3,249 |
| Deficit | (159,121) | (45,700) | 4,910 | 41,288 | (158,623) |
| Accumulated other comprehensive income (loss) | 1,238 | (614) | -- | -- | 624 |
| Total shareholders' equity (deficit) | $ (33,708) | $ 646 | $ 5,027 | $ (4,755) | $ (32,790) |

| | | | | | |
|---|---|---|---|---|---|
| Total liabilities & shareholders' equity (deficit) | $ 285,255 | $ 47,209 | $11,774 | $(101,493) | $ 242,745 |

In certain Guarantor Subsidiaries, accumulated losses have exceeded the original investment balance. As a result of applying equity accounting, the parent company has consequently reduced intercompany receivable balances with respect to these Guarantor Subsidiaries in the amounts of $29 1 million as at September 30, 2006





17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Balance Sheets as at December 31, 2005

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Cash and cash equivalents | $ 17,402 | $ 6,728 | $ 194 | $ -- | $ 24,324 |
| Short-term investments | 8,171 | -- | -- | -- | 8,171 |
| Accounts receivable | 23,828 | 2,045 | 292 | -- | 26,165 |
| Financing receivables | 60,950 | 2,056 | -- | -- | 63,006 |
| Inventories | 27,973 | 239 | 82 | -- | 28,294 |
| Prepaid expenses | 3,162 | 575 | 88 | -- | 3,825 |
| Inter-company receivables | 14,057 | 31,929 | 11,043 | (57,029) | -- |
| Film assets | 3,329 | -- | -- | -- | 3,329 |
| Fixed assets | 25,403 | 1,374 | 3 | -- | 26,780 |
| Other assets | 11,618 | -- | -- | -- | 11,618 |
| Deferred income taxes | 6,171 | -- | -- | -- | 6,171 |
| Goodwill | 39,027 | -- | -- | -- | 39,027 |
| Other intangible assets | 2,701 | -- | -- | -- | 2,701 |
| Investments in subsidiaries | 31,833 | -- | -- | (31,833) | -- |
| Total assets | $ 275,625 | $ 44,946 | $11,702 | $(88,862) | $ 243,411 |
| LIABILITIES | | | | | |
| Accounts payable | 4,915 | 2,017 | 3 | -- | 6,935 |
| Accrued liabilities | 52,978 | 1,965 | 179 | -- | 55,122 |
| Inter-company payables | 42,766 | 36,088 | 6,466 | (85,320) | -- |
| Deferred revenue | 38,927 | 5,330 | 140 | -- | 44,397 |
| Senior Notes due 2010 | 160,000 | -- | -- | -- | 160,000 |
| Total liabilities | 299,586 | 45,400 | 6,788 | (85,320) | 266,454 |
| SHAREHOLDER'S DEFICIT | | | | | |
| Capital stock | 121,674 | -- | 117 | (117) | 121,674 |
| Other equity/Additional paid in capital/Contributed surplus | 724 | 46,960 | -- | (45,926) | 1,758 |
| Deficit | (144,845) | (46,800) | 4,797 | 42,501 | (144,347) |
| Accumulated other comprehensive income (loss) | (1,514) | (614) | -- | -- | (2,128) |
| Total shareholders' equity (deficit) | $ (23,961) | $ (454) | $ 4,914 | $ (3,542) | $ (23,043) |
| Total liabilities & shareholders' equity (deficit) | $ 275,625 | $ 44,946 | $11,702 | $(88,862) | $ 243,411 |

In certain Guarantor Subsidiaries accumulated losses have exceeded the original investment balance As a result of applying equity accounting, the parent company has consequently reduced inter-company receivable balances with respect to these Guarantor Subsidiaries in the amounts of $28 4 million

(UNAUDITED)

17. SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the three months ended September 30, 2006

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $ 7,043 | $ 265 | $ 176 | $ (165) | $ 7,319 |
| Films | 7,204 | 1,058 | -- | (591) | 7,671 |
| Theater operations | 220 | 4,536 | -- | (30) | 4,726 |
| Other | 1,049 | -- | 5 | (44) | 1,010 |
| | 15,516 | 5,859 | 181 | (830) | 20,726 |
| COST OF GOODS AND SERVICES | 10,458 | 4,829 | 80 | (830) | 14,537 |
| GROSS MARGIN | 5,058 | 1,030 | 101 | -- | 6,189 |
| Selling, general and administrative expenses | 9,646 | 224 | 128 | -- | 9,998 |
| Research and development | 878 | -- | -- | -- | 878 |
| Amortization of intangibles | 132 | -- | -- | -- | 132 |
| Loss (income) from equity-accounted investees | 95 | -- | -- | (95) | -- |
| Receivable provisions, net of (recoveries) | 359 | -- | -- | -- | 359 |
| EARNINGS (LOSS) FROM OPERATIONS | (6,052) | 806 | (27) | 95 | (5,178) |
| Interest income | 227 | -- | -- | -- | 227 |
| Interest expense | (4,380) | 1 | -- | -- | (4,379) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (10,205) | 807 | (27) | 95 | (9,330) |
| Provision for income taxes | (1,784) | -- | -- | -- | (1,784) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | (11,989) | 807 | (27) | 95 | (11,114) |
| Net (loss) from discontinued operations | -- | (875) | -- | -- | (875) |
| NET EARNINGS (LOSS) | $ (11,989) | $ (68) | $ (27) | $ 95 | $ (11,989) |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the nine months ended September 30, 2006:

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $ 39,674 | $ 777 | $552 | $ (334) | $ 40,669 |
| Films | 22,342 | 6,348 | 5 | (2,332) | 26,363 |
| Theater operations | 648 | 11,875 | -- | (89) | 12,434 |
| Other | 3,112 | -- | 8 | (44) | 3,076 |
| | 65,776 | 19,000 | 565 | (2,799) | 82,542 |
| COST OF GOODS AND SERVICES | 38,627 | 16,397 | 243 | (2,799) | 52,468 |
| GROSS MARGIN | 27,149 | 2,603 | 322 | -- | 30,074 |
| Selling, general and administrative expenses | 29,120 | 626 | 208 | -- | 29,954 |
| Research and development | 2,457 | -- | -- | -- | 2,457 |
| Amortization of intangibles | 456 | -- | -- | -- | 456 |
| Loss (income) from equity-accounted investees | (1,213) | -- | -- | 1,213 | -- |
| Receivable provisions, net of (recoveries) | 250 | -- | -- | -- | 250 |
| EARNINGS (LOSS) FROM OPERATIONS | (3,921) | 1,977 | 114 | (1,213) | (3,043) |

| | | | | | |
|---|---|---|---|---|---|
| Interest income | 760 | -- | -- | -- | 760 |
| Interest expense | (12,782) | (2) | -- | -- | (12,784) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | (15,943) | 1,975 | 114 | (1,213) | (15,067) |
| Provision for income taxes | (633) | -- | (1) | -- | (634) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | (16,576) | 1,975 | 113 | (1,213) | (15,701) |
| Net earnings (loss) from discontinued operations | 2,300 | (875) | -- | -- | 1,425 |
| NET EARNINGS (LOSS) | $(14,276) | $ 1,100 | $113 | $(1,213) | $(14,276) |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U S dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the three months ended September 30, 2005.

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $19,885 | $ 244 | $205 | $ (98) | $20,236 |
| Films | 6,650 | 1,634 | 2 | (239) | 8,047 |
| Theater operations | 192 | 4,147 | -- | (28) | 4,311 |
| Other | 780 | -- | -- | -- | 780 |
| | 27,507 | 6,025 | 207 | (365) | 33,374 |
| COST OF GOODS AND SERVICES | 12,119 | 5,742 | 104 | (365) | 17,600 |
| GROSS MARGIN | 15,388 | 283 | 103 | -- | 15,774 |
| Selling, general and administrative expenses | 8,602 | 256 | 108 | -- | 8,966 |
| Research and development | 890 | -- | -- | -- | 890 |
| Amortization of intangibles | 164 | -- | -- | -- | 164 |
| Loss (income) from equity-accounted investees | 954 | -- | -- | (954) | -- |
| Receivable provisions, net of (recoveries) | (1,287) | 977 | -- | -- | (310) |
| EARNINGS (LOSS) FROM OPERATIONS | 6,065 | (950) | (5) | 954 | 6,064 |
| Interest income | 243 | -- | -- | -- | 243 |
| Interest expense | (4,186) | 1 | -- | -- | (4,185) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 2,122 | (949) | (5) | 954 | 2,122 |
| Provision for income taxes | (202) | -- | -- | -- | (202) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | 1,920 | (949) | (5) | 954 | 1,920 |
| Net earnings from discontinued operations | 360 | -- | -- | -- | 360 |
| NET EARNINGS (LOSS) | $ 2,280 | $ (949) | $ (5) | $ 954 | $ 2,280 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Operations for the nine months ended September 30, 2005

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| REVENUE | | | | | |
| IMAX systems | $ 61,483 | $ 2,197 | $642 | $(1,665) | $ 62,657 |
| Films | 14,494 | 4,823 | 16 | (1,038) | 18,295 |
| Theater Operations | 634 | 11,773 | -- | (82) | 12,325 |
| Other | 2,318 | -- | 25 | -- | 2,343 |
| | 78,929 | 18,793 | 683 | (2,785) | 95,620 |
| COST OF GOODS AND SERVICES | 33,133 | 17,176 | 308 | (2,785) | 47,832 |
| GROSS MARGIN | 45,796 | 1,617 | 375 | -- | 47,788 |
| Selling, general and administrative expenses | 27,937 | 666 | 418 | -- | 29,021 |
| Research and development | 2,429 | -- | -- | -- | 2,429 |
| Amortization of intangibles | 481 | -- | -- | -- | 481 |
| Loss (income) from equity-accounted investees | 67 | -- | -- | (67) | -- |
| Receivable provisions, net of (recoveries) | (1,445) | 977 | -- | -- | (468) |
| EARNINGS (LOSS) FROM OPERATIONS | 16,327 | (26) | (43) | 67 | 16,325 |
| Interest income | 739 | -- | 2 | -- | 741 |
| Interest expense | (12,584) | -- | -- | -- | (12,584) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS BEFORE INCOME TAXES | 4,482 | (26) | (41) | 67 | 4,482 |
| Provision for income taxes | (681) | -- | -- | -- | (681) |
| NET EARNINGS (LOSS) FROM CONTINUING OPERATIONS | 3,801 | (26) | (41) | 67 | 3,801 |
| Net earnings from discontinued operations | 786 | -- | -- | -- | 786 |
| NET EARNINGS (LOSS) | $ 4,587 | $ (26) | $(41) | $ 67 | $ 4,587 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17 SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Cash Flows for the nine months ended September 30, 2006:

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) | | | | | |
| OPERATING ACTIVITIES | | | | | |
| Net earnings (loss) | $(14,276) | $1,100 | $ 113 | $(1,213) | $(14,276) |
| Net (earnings) loss from discontinued operations | (2,300) | 875 | -- | -- | (1,425) |
| Items not involving cash | | | | | |
| Depreciation and amortization | 13,485 | 402 | 1 | -- | 13,888 |
| Write-downs (recoveries) | 250 | -- | -- | -- | 250 |
| Loss (income) from equity-accounted investees | (1,213) | -- | -- | 1,213 | -- |
| Change in deferred income taxes | 8 | (8) | -- | -- | -- |
| Stock and other non-cash compensation | 2,730 | -- | -- | -- | 2,730 |
| Non-cash foreign exchange gain | (383) | -- | -- | -- | (383) |
| Interest on short-term investments | (281) | -- | -- | -- | (281) |
| Investment in film assets | (8,699) | -- | -- | -- | (8,699) |
| Changes in other non-cash operating assets and liabilities | 1,262 | (237) | (179) | -- | 846 |
| Net cash provided by (used in) operating activities | (9,417) | 2,132 | (65) | -- | (7,350) |
| INVESTING ACTIVITIES | | | | | |
| Purchases of short-term investments | (14,506) | -- | -- | -- | (14,506) |
| Proceeds from maturities of short-term investments | 18,739 | -- | -- | -- | 18,739 |
| Purchase of fixed assets | (1,423) | (273) | (16) | -- | (1,712) |
| Increase in other assets | (753) | -- | -- | -- | (753) |
| Increase in other intangible assets | (374) | -- | -- | -- | (374) |
| Net cash provided by (used in) investing activities | 1,683 | (273) | (16) | -- | 1,394 |
| FINANCING ACTIVITIES | | | | | |
| Common shares issued | 286 | -- | -- | -- | 286 |
| Net cash provided by financing activities | 286 | -- | -- | -- | 286 |
| Effects of exchange rate changes on cash | (47) | 12 | (11) | -- | (46) |

| | | | | | |
|---|---|---|---|---|---|
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (7,495) | 1,871 | (92) | -- | (5,716) |
| Increase (decrease) in cash and cash equivalents from discontinued operations | 3,493 | (100) | -- | -- | 3,393 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (4,002) | 1,771 | (92) | -- | (2,323) |
| Cash and cash equivalents, beginning of period | 17,402 | 6,728 | 194 | -- | 24,324 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 13,400 | $8,499 | $ 102 | $ -- | $ 22,001 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S. GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

17. SUPPLEMENTAL CONSOLIDATING FINANCIAL INFORMATION (cont'd)

Supplemental Consolidating Statements of Cash Flows for the nine months ended September 30, 2005:

| | IMAX CORPORATION | GUARANTOR SUBSIDIARIES | NON-GUARANTOR SUBSIDIARIES | ADJUSTMENTS AND ELIMINATIONS | CONSOLIDATED TOTAL |
|---|---|---|---|---|---|
| CASH PROVIDED BY (USED IN) | | | | | |
| OPERATING ACTIVITIES | | | | | |
| Net earnings (loss) | $ 4,587 | $ (26) | $ (41) | $ 67 | $ 4,587 |
| Net (earnings) from discontinued operations | (786) | -- | -- | -- | (786) |
| Items not involving cash | | | | | |
| Depreciation and amortization | 11,086 | 403 | 1 | -- | 11,490 |
| Write-downs | (1,445) | 977 | -- | -- | (468) |
| Loss (income) from equity-accounted investees | 67 | -- | -- | (67) | -- |
| Change in deferred income taxes | (287) | (12) | -- | -- | (299) |
| Stock and other non-cash compensation | 3,554 | -- | -- | -- | 3,554 |
| Unrealized foreign exchange loss | 167 | -- | -- | -- | 167 |
| Interest on short-term investments | (250) | -- | -- | -- | (250) |
| Investment in film assets | (7,315) | -- | -- | -- | (7,315) |
| Changes in other non-cash operating assets and liabilities | (5,593) | (1,542) | (104) | -- | (7,239) |
| Net cash provided by (used in) operating activities | 3,785 | (200) | (144) | -- | 3,441 |
| INVESTING ACTIVITIES | | | | | |
| Purchases of short-term investments | (27,157) | -- | -- | -- | (27,157) |
| Proceeds from maturities of short-term investments | 15,175 | -- | -- | -- | 15,175 |
| Purchase of fixed assets | (877) | (317) | -- | -- | (1,194) |
| Increase in other assets | (562) | -- | -- | -- | (562) |
| Increase in other intangible assets | (412) | -- | -- | -- | (412) |
| Net cash used in investing activities | (13,833) | (317) | -- | -- | (14,150) |
| FINANCING ACTIVITIES | | | | | |
| Common shares issued | 3,219 | -- | -- | -- | 3,219 |
| Net cash provided by financing activities | 3,219 | -- | -- | -- | 3,219 |
| Effects of exchange rate changes on cash | 132 | 3 | 14 | -- | 149 |
| DECREASE IN CASH AND CASH EQUIVALENTS FROM CONTINUING OPERATIONS | (6,697) | (514) | (130) | -- | (7,341) |
| Increase in cash and cash equivalents from discontinued operations | 429 | -- | -- | -- | 429 |
| DECREASE IN CASH AND CASH EQUIVALENTS, DURING THE PERIOD | (6,268) | (514) | (130) | -- | (6,912) |
| Cash and cash equivalents, beginning of period | 23,683 | 5,058 | 223 | -- | 28,964 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 17,415 | $ 4,544 | $ 93 | $ -- | $ 22,052 |



IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
IN ACCORDANCE WITH U.S GENERALLY ACCEPTED ACCOUNTING PRINCIPLES
(Tabular amounts in thousands of U.S. dollars unless otherwise stated)
(UNAUDITED)

18. SUMMARY OF SIGNIFICANT DIFFERENCES BETWEEN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) IN THE UNITED STATES AND CANADA

The accounting principles followed by the Company conform with U.S. GAAP Significant differences affecting the Company between U.S. GAAP and Canadian GAAP are summarized below

(A) STOCK-BASED COMPENSATION

Under U S. GAAP, prior to January 1, 2006, the Company accounted for stock-based compensation under the intrinsic value method set out in APB 25 and has made pro forma disclosures of net earnings (loss) and earnings (loss) per share as if the methodology prescribed by FAS 123 had been adopted Under Canadian GAAP, the Company adopted the fair value provisions of CICA Section 3870, "Stock-based Compensation and Other Stock-based Payments" ("CICA Section 3870"), effective January 1, 2003. As of this date, stock options granted to employees or directors are recorded as an expense in the consolidated statement of operations and credited to other equity

Effective January 1, 2006, under U.S. GAAP, the Company adopted FAS 123R using the modified prospective transition method. The Company's Consolidated Financial Statements as of and for the three and nine months ended September 30, 2006 reflect the impact of FAS 123R. In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R. Stock-based compensation expense recognized under FAS 123R and under CICA Section 3870 for the three and nine months ended September 30, 2006 is aligned with each other and will be identical for all periods after January 1, 2006.

(B) PENSION ASSET AND LIABILITIES

Under U S GAAP, included in accrued liabilities is an unrecognized gain related to prior service costs resulting from the plan amendment of $1.9 million as at September 30, 2006 and unrecognized prior service costs of $6 4 million as at December 31, 2005. An amount of $nil as at September 30, 2006, and $3.6 million as at December 31, 2005 is included in other assets, representing unrecognized prior service costs In addition, under U S GAAP, an amount of less than $0 1 million as at September 30, 2006 and $2 8 million as at December 31, 2005 is recorded against accumulated other comprehensive income, resulting from an unrecognized actuarial loss. Under Canadian GAAP, the minimum pension liability, and the corresponding amounts recorded in other assets and accumulated other comprehensive income are not recorded.





18. SUMMARY OF SIGNIFICANT DIFFERENCES BETWEEN GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (GAAP) IN THE UNITED STATES AND CANADA (cont'd)

RECONCILIATION TO CANADIAN GAAP

CONSOLIDATED STATEMENTS OF OPERATIONS

The following is a reconciliation of net earnings (loss) reflecting the differences between U S GAAP and Canadian GAAP:

| | THREE MONTHS ENDED SEPTEMBER 30, | | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2006 | 2005 | 2006 | 2005 |
| Net earnings (loss) in accordance with U S GAAP | $(11,989) | $2,280 | $(14,276) | $ 4,587 |
| Stock-based compensation(a) | -- | (552) | -- | (1,734) |
| Net earnings (loss) in accordance with Canadian GAAP | $(11,989) | $1,728 | $(14,276) | $ 2,853 |
| Earnings (loss) per share· | | | | |
| Earnings (loss) per share - basic and diluted: | | | | |
| Net earnings (loss) from continuing operations | $ (0 28) | $ 0 03 | $ (0.39) | $ 0.05 |
| Net earnings (loss) from discontinued operations | $ (0 02) | $ 0 01 | $ 0.04 | $ 0.02 |
| Net earnings (loss) | $ (0 30) | $ 0 04 | $ (0.35) | $ 0.07 |

CONSOLIDATED SHAREHOLDERS' EQUITY (DEFICIT)

The following is a reconciliation of shareholders' equity (deficit) reflecting the difference between U.S. GAAP and Canadian GAAP:

| | SEPTEMBER 30, 2006 | DECEMBER 31, 2005 |
|---|---|---|
| Shareholders' equity (deficit) in accordance with U.S. GAAP | $(32,790) | $(23,043) |
| Unrecognized actuarial loss(b) | 21 | 2,773 |
| Shareholders' equity (deficit) in accordance with Canadian GAAP | $(32,769) | $(20,270) |

19 FINANCIAL STATEMENT PRESENTATION

Certain comparative figures have been reclassified to conform with the presentation adopted in the current year.





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

OVERVIEW

The Company's principal business is the design, manufacture, sale and lease of projector systems for giant screen theaters for customers including commercial theaters, museums and science centers, and destination entertainment sites. In addition, the Company designs and manufactures high-end sound systems and produces and distributes large format films. There are 280 IMAX theaters operating in 40 countries worldwide as of September 30, 2006. IMAX Corporation is a publicly traded company listed on both the TSX and NASDAQ.

ACCOUNTING POLICIES AND ESTIMATES

The Company reports its results under United States Generally Accepted Accounting Principles ("U S. GAAP") Significant differences between U S. GAAP and Canadian Generally Accepted Accounting Principles ("Canadian GAAP") are summarized in note 18 of the Consolidated Financial Statements.

The preparation of these financial statements requires management to make estimates and judgements that affect the reported amounts of assets, liabilities, revenues and expenses On an ongoing basis, management evaluates its estimates, including those related to accounts receivable, net investment in leases, inventories, fixed and film assets, investments, intangible assets, income taxes, contingencies and litigation. Management bases its estimates on historical experience, future expectations and other assumptions that are believed to be reasonable at the date of the financial statements. Actual results may differ from these estimates due to uncertainty involved in measuring, at a specific point in time, events which are continuous in nature The Company's significant accounting policies are discussed in note 2 of the Consolidated Financial Statements in the Company's most recent Annual Report on Form 10-K for the year ended December 31, 2005, and are summarized below.

CRITICAL ACCOUNTING POLICIES

The Company considers the following critical accounting policies to have the most significant effect on its estimates, assumptions and judgements:

REVENUE RECOGNITION

The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions

When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each individual element based on the relative fair values of each element Where objective and reliable evidence of the fair values of the undelivered items in a multiple element arrangement is available but no such evidence is available for the delivered items, the Company will use the residual method of allocation in those instances Under the residual method, the amount of consideration allocated to the delivered items equals the total arrangement consideration less the aggregate fair value of the undelivered items. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.

SALES AND SALES-TYPE LEASES OF THEATER SYSTEMS

Theater system leases that transfer substantially all of the benefits and risks

of ownership to customers are classified as sales-type leases as a result of meeting the criteria established by FASB Statement of Financial Accounting Standards No 13, "Accounting for Leases" ("FAS 13"). When revenue is recognized, the initial rental fees due under the contract, along with the present value of minimum ongoing rental payments, are recorded as revenues for the period, and the related theater system costs including installation expenses are recorded as cost of goods and services. Additional ongoing rentals in excess of minimums are recognized in future periods as revenue when reported by the theater operator, provided that collection is reasonably assured Maintenance revenues are recognized when the services are rendered.





OVERVIEW (cont'd)

CRITICAL ACCOUNTING POLICIES (cont'd)

REVENUE RECOGNITION (cont'd)

SALES AND SALES-TYPE LEASES OF THEATER SYSTEMS (cont'd)

The Company recognizes revenue from sales and sales type leases when the installation of the respective theater system element is substantially complete and all of the following criteria are met persuasive evidence of an agreement exists, the price is fixed or determinable; and collection is reasonably assured

The timing of installation of the theater system is largely dependent on the timing of the construction of the customer's theater. Therefore, while revenue for theater systems is generally predictable on a long-term basis, it can vary from quarter to quarter or year to year depending on the timing of installations

The critical estimates that the Company considers with respect to the Company's lease accounting are the determination of economic useful life and the fair value of the projection equipment, including its residual value. These estimates are based upon historical experience with all of its projection systems Residual values are established at lease inception using estimates of fair value at the end of the lease term with consideration for forecasted supply and demand for various systems, future product launch plans, end of lease customer behavior, refurbishment strategies and changes in technology

The Company monitors the performance of the theaters to which it has leased equipment When facts and circumstances indicate that it may need to change the terms of a lease, which had previously been recorded as a sales-type lease, the Company evaluates the likely outcome of such negotiations using the criteria under FAS 13 A provision is recorded against the net investment in leases if the Company believes that it is probable that the negotiation will result in a reduction in the minimum lease payments such that the lease will be reclassified as an operating lease. The provision is equal to the excess of the carrying value of the net investment in lease over the fair value of the equipment. Any adjustments which result from a change in classification from a sales-type lease to an operating lease are reported as a charge to income during the period the change occurs

In the normal course of its business, the Company will from time to time determine that a provision it had previously taken against the net investment in leases in connection with a customer's lease agreement should be reversed due to a change in the circumstances that led to the original provision

The Company generally enters into multi-year system agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system During the period of time between signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons including business considerations, or the inability to obtain certain consents, approvals or financing. Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual buyout, whereby the parties are released from all their future obligations under the agreement and the geographic territory granted to the customer reverts to the Company Once an agreement is reached by both parties, the initial payments that the customer previously made to the Company are typically recognized as revenue. For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through the installation of a theater system or a consensual buyout In addition, since the introduction of its IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their existing agreements, which were in the Company's backlog, and sign new MPX system agreements



Source IMAX CORP, 10-Q, November 09, 2006

ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

OVERVIEW (cont'd)

CRITICAL ACCOUNTING POLICIES (cont'd)

REVENUE RECOGNITION (cont'd)

SALES AND SALES-TYPE LEASES OF THEATER SYSTEMS (cont'd)

Where these agreements have multiple elements meeting the criteria for treatment as separate units of accounting, the total consideration to be received in these situations generally is allocated to each individual element based on the relative fair values of each element. Where objective and reliable evidence of the fair values of the undelivered items in a multiple element arrangement is available but no such evidence is available for the delivered items, the Company will use the residual method of allocation in those instances. Under the residual method, the amount of consideration allocated to the delivered items equals the total arrangement consideration less the aggregate fair value of the undelivered items Each element is then accounted for based on applicable revenue recognition criteria.

OPERATING LEASES OF THEATER SYSTEMS

Leases that do not transfer substantially all of the benefits and risks of ownership to the customer are classified as operating leases. For these leases, initial rental fees and minimum lease payments are recognized as revenue on a straight-line basis over the lease term. Additional rentals in excess of minimum annual amounts are recognized as revenue when reported by theater operators, provided that collection is reasonably assured.

FILM LICENSING

Revenue from licensing of films is recognized when a contractual licensing arrangement exists, the film has been completed and delivered, the license period has begun, the fee is fixed or determinable and collection is reasonably assured Where the license fees are based on a share of the customer's revenue, and all other revenue recognition criteria stated in the preceding sentence are met, the Company recognizes revenue as the customer exhibits the film

DMR FILM REVENUE

Revenues from digitally re-mastering film where third parties own the related film rights are derived in the form of processing fees and recoupments calculated as a percentage of box office receipts from the re-mastered films. Processing fees are recognized as revenues as the related re-mastering service is performed. Recoupments as a percentage of box office receipts are recognized as revenue when the contracted portions of box office receipts due to the Company are reported by theater operators, provided that collection is reasonably assured.

THEATER OPERATIONS REVENUE

The Company recognizes revenue from its owned and operated theaters resulting from box office ticket and concession sales as tickets are sold, films are shown and upon the sale of various concessions In addition, the Company enters into commercial arrangements with theaters resulting in sharing of profits and losses The Company also provides management services to certain theaters and recognizes revenue as services are provided







SHORT-TERM INVESTMENTS

The Company has short-term investments, which generally have maturities of more than three months and less than one year from the date of purchase. The short-term investments are classified as held to maturity based on the Company's positive intent and ability to hold the securities to maturity. The Company invests primarily in Canadian and U S government securities and commercial paper rated "A1+" by Standard & Poor's and these investments are stated at amortized cost, which approximates fair market value Income related to these

securities is reported as a component of interest income. At September 30, 2006, the Company had $4 2 million (December 31, 2005 - $6.1 million) invested in Canadian government securities and $nil (December 31, 2005 - $2.1 million) invested in U.S. government securities

ACCOUNTS RECEIVABLE AND FINANCING RECEIVABLES

The allowance for doubtful accounts receivable and provision against the financing receivables are based on the Company's assessment of the collectibility of specific customer balances and the underlying asset value of the equipment under lease where applicable. If there is deterioration in a customer's credit worthiness or actual defaults under the terms of the leases are higher than the Company's historical experience, the Company's estimates of recoverability for these assets could be adversely affected.

The evaluation of collectibility of customer accounts is typically done on an individual account basis If, based on an evaluation of accounts, the Company concludes that it is probable that a customer will not be able to pay all amounts due, the Company estimates the recoverable amount. In developing the estimates for an allowance, the Company considers general and industry economic and market conditions as well as other credit information available for the customer The Company only records recoveries of provisions when objective verifiable evidence supports the change in the original provision.

INVENTORIES

In establishing the appropriate provisions for theater systems inventory, management must make estimates of future events and conditions including the anticipated installation dates for the current backlog of theater system contracts, potential future signings, general economic conditions, technology factors, growth prospects within the customers' ultimate marketplace and the market acceptance of the Company's current and pending projection systems and film library If management estimates of these events and conditions prove to be incorrect, it could result in inventory losses in excess of the provisions determined to be adequate as at the balance sheet date

FILM ASSETS

Estimates of ultimate revenues are prepared on a title by title basis and reviewed regularly by management and revised where necessary to reflect the most current information Ultimate revenue for films includes estimates of revenues over a period not to exceed 10 years following the date of initial release.

GOODWILL

The Company performs an impairment test on at least an annual basis and additionally, whenever events or changes in circumstances suggest that the carrying amount may not be recoverable. Impairment of goodwill is tested at the reporting unit level by comparing the reporting unit's carrying amount, including goodwill, to the fair value of the reporting unit. The fair values of the reporting units are estimated using a discounted cash flows approach. If the carrying amount of the reporting unit exceeds its fair value, then a second step is performed to measure the amount of impairment loss, if any. Any impairment loss would be expensed in the statement of operations.





FIXED ASSETS

Management reviews the carrying values of its fixed assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset might not be recoverable. In performing its review for recoverability, management estimates the future cash flows expected to result from the use of the asset and its eventual disposition. If the sum of the expected future cash flows is less than the carrying amount of the asset, an impairment loss is recognized. Measurement of impairment losses is based on the excess of the carrying amount of the asset over the fair value calculated using discounted expected future cash flows If the actual future cash flows are less than the Company's estimates, future earnings could be adversely affected.

PENSION PLAN ACTUARIAL ASSUMPTIONS

The Company's pension benefit obligations and related costs are calculated using actuarial concepts, within the framework of Statement of Financial Accounting Standards No. 87, "Employer's Accounting for Pensions". A critical assumption, the discount rate, is an important element of expense and/or liability measurement. The Company evaluates this critical assumption annually or when

otherwise required to by accounting standards. Other assumptions include factors such as expected retirement, mortality, rate of compensation increase, and estimates of inflation

The discount rate enables the Company to state expected future cash payments for benefits as a present value on the measurement date The guideline for setting this rate is a high-quality long-term corporate bond rate. A lower discount rate increases the present value of benefit obligations and increases pension expense The Company's discount rate was determined by considering the average of pension yield curves constructed of a large population of high-quality corporate bonds. The resulting discount rate reflects the matching of plan liability cash flows to the yield curves.

TAX ASSET VALUATION

As at September 30, 2006, the Company had net deferred income tax assets of $6.2 million, comprised of tax credit carryforwards, net operating loss and capital loss carryforwards and other deductible temporary differences, which can be utilized to reduce either taxable income or taxes otherwise payable in future years The Company's management assesses realization of these net deferred income tax assets based on all available evidence and has concluded that it is more likely than not that these net deferred income tax assets will be realized. Positive evidence includes, but is not limited to, the Company's historical earnings, projected future earnings, contracted sales backlog at September 30, 2006, and the ability to realize certain deferred income tax assets through loss and tax credit carryback strategies If and when the Company's operations in some jurisdictions were to reach a requisite level of profitability or where the Company's future profitability estimates increase due to changes in positive evidence, the Company would reduce all or a portion of the applicable valuation allowance in the period when such determination is made. This would result in an increase to reported earnings and a decrease to the Company's effective tax rate in such period However, if the Company's projected future earnings do not materialize, or if the Company operates at a loss in certain jurisdictions, or if there is a material change in actual effective tax rates or time period within which the Company's underlying temporary differences become taxable or deductible, the Company could be required to increase the valuation allowance against all or a significant portion of the Company's deferred tax assets resulting in a substantial increase to the Company's effective tax rate for the period of the change and a material adverse impact on its operating results for the period





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

OVERVIEW (cont'd)

CRITICAL ACCOUNTING POLICIES (cont'd)

TAX ASSET VALUATION (cont'd)

The Company is subject to ongoing tax examinations and assessments in various jurisdictions Accordingly, the Company may incur additional tax expense based upon the outcomes of such matters In addition, when applicable, the Company adjusts tax expense to reflect both favorable and unfavorable examination results The Company's ongoing assessments of the probable outcomes of examinations and related tax positions require judgement and can materially increase or decrease its effective rate as well as impact operating results

IMPACT OF RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (an interpretation of FASB Statement No. 109), ("FIN 48"), which clarifies the relevant criteria and approach for the recognition, de-recognition and measurement of uncertain tax positions FIN 48 will be effective for the Company beginning January 1, 2007 The Company is currently in the process of assessing the effects of the provisions of FIN 48.

In September 2006, the FASB issued Statement of Financial Accounting Standards No 157, "Fair Value Measurements", which is effective for fiscal years beginning after November 15, 2007 and for interim periods within those years. This statement defines fair value, establishes a framework for measuring fair value and expands the related disclosure requirements. The Company is currently evaluating the potential impact of this statement

The FASB also issued in September 2006 Statement of Financial Accounting Standards No 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (an amendment of FASB Statement No 87, 88, 106 and 132R), ("FAS 158") This Standard requires recognition of the funded status of a benefit plan in the statement of financial position. The Standard also requires recognition in other comprehensive income certain gains and losses that arise during the period but are deferred under pension accounting rules, as well as modifies the timing of reporting and adds certain disclosures. FAS 158 provides

recognition and disclosure elements to be effective as of the end of the fiscal year after December 15, 2006 and measurement elements to be effective for fiscal years ending after December 15, 2008. The Company does not believe that the adoption of FAS 158 will have a material impact on its results of operations or financial position.

RESULTS OF OPERATIONS

THREE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS THREE MONTHS ENDED SEPTEMBER 30, 2005

The Company reported a net loss from continuing operations before income taxes of $9 3 million or $0 23 per share on a diluted basis and a net loss from continuing operations after taxes of $11.1 million or $0.28 per share on a diluted basis for the third quarter of 2006. For the third quarter of 2005, the Company reported net earnings from continuing operations before income taxes of $2 1 million or $0 05 per share on a diluted basis and net earnings from continuing operations after taxes of $1 9 million or $0.05 per share on a diluted basis.





REVENUE

The Company's revenues for the third quarter of 2006 decreased 37 9% to $20.7 million from $33.4 million in the same period last year.

Systems revenue decreased to $7 3 million in the third quarter of 2006 from $20 2 million in the third quarter of 2005, a decrease of 63.8%. Revenue from sales and leases decreased to $1.2 million in the third quarter of 2006 from $13 5 million in 2005, a decrease of 91 0% This decrease was due to the decrease in the number of system recognitions and a decrease in settlement revenues The Company recognized revenue on one theater system which qualified as either a sale or sales-type lease in the third quarter of 2006 compared to six systems in the third quarter of 2005 The Company also recognized $2 4 million in settlement revenue during the third quarter of 2005, compared to $nil in the same period of 2006

The system recognized in the third quarter of 2006 related to the sale of a used theater system There was also a sale of one used system in the third quarter of 2005

The table below illustrates the mix of systems recognized in the third quarter of 2006 compared to the same period in 2005

| | THREE MONTHS ENDED SEPTEMBER 30, 2006 | THREE MONTHS ENDED SEPTEMBER 30, 2005 |
|---|---|---|
| Sales and Sales-type lease systems recognized | | |
| IMAX 2D | 1 | 1 |
| IMAX 3D | -- | 4 |
| IMAX 3D SR | -- | -- |
| IMAX MPX | -- | 1 |
| | 1 | 6 |

In addition, the Company installed and began recognizing revenue on two theater systems that qualified as operating leases in the third quarter of 2005 versus none in the same period in 2006 The Company recognizes revenue on operating leases over the term of the lease

OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS THREE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

REVENUE (cont'd)

The Company generally enters into multi-year system agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system. During the period of time between signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual buyout, whereby the parties are released from their future obligations under the arrangement, the initial payments that the customer previously made to the Company are typically recognized as revenue and the geographic territory granted to the customer reverts to the Company. For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through the installation of a theater system or a consensual buyout In addition, since the introduction of its IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their existing agreements, which were in the Company's backlog, and sign new MPX system agreements During the third quarter of 2006, the Company did not recognize any settlement revenue Amounts relating to settlement revenue for the third quarter in 2005 total $2 4 million The settlement amounts are detailed as follows $0 4 million related to MPX conversion agreements, $0 6 million related to consensual buyouts, and $1.4 million related to terminations of agreements after customer default Overall settlement revenue will likely decrease for the full year of 2006 in comparison to 2005

Ongoing rental revenue decreased to $2.5 million in the third quarter of 2006 from $3 2 million in 2005 a decrease of 21.8%. Maintenance revenue remained consistent at $3 6 million in both third quarters of 2006 and 2005.

Film revenues decreased to $7.7 million in the third quarter of 2006 from $8 0 million in the third quarter of 2005, due primarily to a decrease in film production and film post-production revenues, slightly offset by an increase in DMR and film distribution revenues. Film post-production revenues decreased to $0 7 million in the third quarter of 2006 from $1.5 million in the third quarter of 2005, mainly due to a decrease in third party business at the Company's post-production unit. Film production revenues decreased to less than $0.1 million in the third quarter of 2006 compared to $0.3 million in the third quarter of 2005. IMAX DMR revenues, which are revenues to the Company generated from the gross box office performance and conversion services performed on IMAX DMR films, increased to $3.4 million in the third quarter of 2006 from $3 0 million in the prior year quarter. The increase in DMR revenue is due primarily to the gross box office performance of Superman Returns: The IMAX 3D Experience, released in June 2006 and The Ant Bully: The IMAX 3D Experience, released in July 2006 which together performed better than the 2005 releases of Batman Begins The IMAX Experience, released in June 2005, and Charlie and the Chocolate Factory: The IMAX Experience, released in July 2005. Film distribution revenues increased to $3.6 million in the third quarter of 2006 from $3.3 million in the third quarter of 2005, an increase of 8.4%. The increase is primarily due to the release of Deep Sea 3D in March 2006 which performed better than the combination of Magnificent Desolation: Walking on the Moon 3D, and Space Station 3D, in the third quarter of 2005





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS THREE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

REVENUE (cont'd)

The Company believes it may see lower overall film revenues in 2006 than planned due to the disappointing performance of the films V for Vendetta: The IMAX Experience, Poseidon· The IMAX Experience, and The Ant Bully: An IMAX 3D Experience The Company intends to release in conjunction with studios at least eight new films in 2006 including the already released V for Vendetta: The IMAX Experience (March 2006), Deep Sea 3D (March 2006), Poseidon: The IMAX Experience (May 2006), Superman Returns: An IMAX 3D Experience (June 2006), The Ant Bully· An IMAX 3D Experience (July 2006) and Open Season: An IMAX 3D Experience (September 2006), and the still to be released Happy Feet: The IMAX Experience (November 2006) and Night at the Museum: The IMAX Experience (December 2006).

Theater operations revenue increased to $4 7 million in the third quarter of 2006 from $4.3 million in the third quarter of 2005, due to an increase in attendance and average ticket prices of approximately 8% and 2%, respectively. The Company believes that it may see lower overall attendance rates in 2006 than planned due to the disappointing performance of the films V for Vendetta· The IMAX Experience, Poseidon· The IMAX Experience and The Ant Bully: An IMAX 3D Experience

Other revenue increased slightly to $1 0 million in the third quarter of 2006 compared to $0.8 million in the same period in 2005. Other revenue primarily includes revenue generated from the Company's camera and rental business and after market sales of projection system parts

OUTLOOK

System installations slip from period to period in the course of the Company's business, and the Company has seen a significant number of system installations originally anticipated for the third and fourth quarters of 2006 move to anticipated installations for 2007. The Company now has 24 systems in its backlog that are currently scheduled for installation in 2007 and an additional eight systems that could be installed as early as December of that year, however it cautions that slippages remain a recurring and unpredictable part of its business

The Company has signed agreements with Sony Pictures and Warner Bros. Pictures, respectively, for the release of IMAX DMR versions of Spider Man 3: The IMAX Experience in May of 2007 and Harry Potter and the Order of the Phoenix. The IMAX Experience in July of 2007

The Company is planning to supplement its sale and lease of theatre systems by offering clients joint box office sharing arrangements, whereby the Company contributes its theatre system at its cost of goods sold, the client contributes its retrofitted auditorium and there is a negotiated split of box office revenues The Company believes that by offering such arrangements where exhibitors do not need to pay the initial capital required in a lease or a sale, the Company's theatre network can be expanded more rapidly, and provide the Company with a significant part of the IMAX box office from its theatres, as well as greater revenue from the studios releasing IMAX DMR films, for which the Company typically receives a percentage of the studio's box office receipts

The Company believes that digital technology has evolved sufficiently that it can develop an IMAX digital projection system to deliver to theatres by the middle to end of 2008 that delivers high quality imagery consistent with the Company's brand The Company believes that the dramatic print cost savings that would result from an IMAX digital system could lead to more profitability for the Company by increasing the number of films released to the IMAX network, which in turn could result in more theatres in the Company's network, more profits per theatre and more profits for studios amortizing their films over the network There are a number of risks inherent in the Company's digital strategy including the risk of exhibitors delaying theatre system purchases during the transition period and the need to finance the Company's investments necessary for implementing this strategy





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS THREE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

GROSS MARGIN

Gross margin in the third quarter of 2006 was $6.2 million, or 29.9% of total revenue, compared to $15 8 million, or 47 3% of total revenue in the third quarter of 2005

Systems margins decreased in the third quarter of 2006 by $8 5 million or 68.0%. Average gross margin on sales and sales-type lease of projection systems decreased in the third quarter of 2006 versus the same period in 2005 by 31 4%, primarily due to the change in number and mix of systems. In addition, the Company recognized $2 3 million in settlement gross margin in the third quarter of 2005, compared to $nil in the same period of 2006 The settlement amounts are detailed as follows· $0 4 million related to MPX conversion agreements, $0.6 million related to consensual buyouts, and $1 3 million related to terminations of agreements after customer default

The Company's film gross margin decreased in the third quarter of 2006 by $1 4 million The Company's DMR gross margin decreased by $1 1 million due primarily to the disappointing gross box office performance of The Ant Bully: An IMAX 3D Experience and Open Season An IMAX 3D Experience. The Company recorded impairments on these two films in the third quarter of 2006 for a total of $0.8

million The decrease in DMR margin was partially offset by the strong performance of Superman Returns An IMAX 3D Experience. Film distribution margin decreased by $0.9 million primarily due to lower margins earned on the mix of films in release during the current quarter versus the prior year quarter Offsetting the decrease in film gross margin was the increase in film post-production gross margin, which increased by $0.7 million primarily due to a change in mix between internal and third party business.

The Company's owned and operated theater gross margin increased by $0.2 million in the third quarter of 2006 compared to the same period in 2005, primarily as a result of lower rental fees for films in 2006.

Other gross margin increased slightly by $0.1 million in the third quarter of 2006, primarily as a result of increased activity from the Company's camera and rental business.

OTHER

Selling, general and administrative expenses were $10 0 million in the third quarter of 2006 versus $9.0 million in the same period of 2005. During the third quarter of 2006, the Company incurred $0 3 million in expenses related to the Company's process of seeking strategic alternatives Professional fees increased by $0 8 million for the third quarter of 2006 compared to the previous year quarter as the Company is in the process of responding to inquiries made by the Securities and Exchange Commission and the Ontario Securities Commission. Salaries and benefits expense also increased by $0 2 million during the third quarter of 2006 due to a higher Canadian dollar denominated salary expense on the strengthening of the Canadian dollar compared to the same period in the prior year. The Company expensed $0 4 million for stock options granted compared to $nil in the same period of 2005 in accordance with the adoption of accounting for Financial Accounting Standards No. 123, "Share-Based Payment" ("FAS 123R"). Offsetting these increases the Company amended its executive pension plan on March 8, 2006 to reduce certain benefits, resulting in a savings of $0 9 million in compensation expense for the third quarter of 2006 compared to the previous year quarter. Other non-cash stock-based compensation also decreased by $0.8 million in the third quarter of 2006, due to changes in the Company's share price The Company recorded a foreign exchange loss of $0 1 million in the third quarter of 2006, compared to a gain of $0 2 million in the third quarter of 2005. The Company records foreign exchange translation gains and losses primarily on a portion of its financing receivable balances which are denominated in Canadian dollars, Euros and Japanese Yen.





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS THREE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

OTHER (cont'd)

Receivable provisions net of recoveries for accounts receivable amounted to a net provision of $0.4 million in the third quarter of 2006, compared to a net recovery of $0 2 million in the third quarter of 2005 The Company did not record any charges or recoveries related to financing receivables in the third quarter of 2006 compared to a $0.1 million recovery in the third quarter of 2005 due to favorable outcomes on lease amendments.

Interest income remained consistent at $0.2 million for both third quarters of 2006 and 2005

Interest expense increased to $4.4 million in the third quarter of 2006 compared to $4.2 million in the prior year quarter. Included in interest expense is the amortization of deferred finance costs in the amount of $0.2 million in the third quarters of 2006 and 2005 relating to the Senior Notes due 2010 The Company's policy is to defer and amortize all the costs relating to a debt financing over the life of the debt instrument.

INCOME TAXES

The Company believes that its installation of theater systems in 2006 will be negatively impacted by (a) effecting fewer "sign and install" transactions than it had anticipated, which are agreements for theater systems that are installed in the same calendar year in which they are signed, which difficulty the Company believes is due in part to the disappointing performance of the films V for Vendetta: The IMAX Experience, Poseidon:The IMAX Experience and The Ant Bully An IMAX 3D Experience, and (b) the slipping of some installations scheduled for the fourth quarter of 2006 into 2007. Since the Company does not anticipate that there will be sufficient offsets to such installations in other areas of the Company's business, the Company has increased the valuation allowance by an amount of $1 6 million in the quarter against a portion of the Company's

deferred tax assets resulting in a significant increase to the Company's effective tax rate for the period

The Company's effective tax rate differs from the statutory tax rate and will vary from year to year primarily as a result of numerous permanent differences, investments and other tax credits, the provision for income taxes at different rates in foreign and other provincial jurisdictions, enacted statutory tax rate increases or reductions in the year, changes in the Company's valuation allowance based on the Company's recoverability assessments of deferred tax assets, and favorable or unfavorable resolution of various tax examinations. As of September 30, 2006, the Company had a gross deferred income tax asset of $49.0 million, against which the Company is carrying a $42 8 million valuation allowance. Further, long-term tax rate reductions were also affirmed last quarter for taxation years 2008 through 2010





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

THREE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS THREE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

RESEARCH AND DEVELOPMENT

Research and development expenses remained consistent at $0.9 million in both the third quarters of 2006 and 2005. The expenses primarily reflect research and development activities pertaining to a new digitally-based theater projection system Through research and development, the Company continues to design and develop cinema-based equipment, software and other technologies to enhance its product offering. The Company believes that the motion picture industry will be affected by the development of digital technologies, particularly in the areas of content creation (image capture), post-production (editing and special effects), distribution and display Consequently, the Company has made significant investments in digital technologies, including the development of proprietary, patent-pending technology relating to a digitally-based projection system, as well as technologies to digitally enhance image resolution and quality of motion picture films, and convert monoscopic (2D) to stereoscopic (3D) images. The Company also holds a number of patents, patents pending and intellectual property rights in these areas.

DISCONTINUED OPERATIONS

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater The Company abandoned or removed all of its assets from the theater in the first quarter of 2004 The Company is involved in a legal proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations The amount of loss to the Company has been estimated as between $0 9 million and $2 3 million Prior to 2006, the Company paid out $0 8 million with respect to amounts owing to the landlord. The Company paid out an additional $0.1 million and also accrued an additional $0 8 million in net loss from discontinued operations related to Miami IMAX theater in the third quarter of 2006.

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12.7 million previously advanced by the Company, and reorganized the remaining $12.7 million of debt owing to the Company into two separate loan agreements The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans. On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3.5 million. During the first quarter of 2006, the Company recognized $2 3 million (2005 - $0.2 million) in income from discontinued operations. The other tranche of $1 2 million had previously been recognized in 2005.

PENSION PLAN AMENDMENT

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the unfunded U.S. defined benefit pension plan covering its two Co-Chief Executive Officers Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced benefit payments is accelerated and paid out upon a change of control of the

Company The benefits were 50% vested as of July 2000, the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55 The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon change of control shall be 100%. As of September 30, 2006, one of the Co-Chief Executives was 100% vested and the other Co-Chief Executive was approximately 81% vested.





EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted FAS 123R, which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values In March 2005, the Securities and Exchange Commission issued Staff Accounting Bulletin No 107 ("SAB 107") relating to FAS 123R. The Company has applied the provisions of SAB 107 in its adoption of FAS 123R.

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006. In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R. Stock-based compensation expense recognized under FAS 123R in the third quarter of 2006 was $0.4 million.

FAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations. Prior to the adoption of FAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with Financial Option No. 25 Accounting for Stock Issued to Employees, ("APB 25") as allowed under Financial Accounting Standards No. 123, "Accounting for Stock-Based Compensation" ("FAS 123"). Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant.

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the three months ended September 30, 2006 included compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line single-option method As stock-based compensation expense recognized in the Consolidated Statement of Operations for the third quarter of 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods.

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

The Company utilizes a lattice-binomial option-pricing model ("Binomial Model") to determine the fair value of share-based payment awards The fair value determined by the Binomial Model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to, the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors Option-pricing models were developed for use in estimating the value of traded options that have no vesting or hedging restrictions and are fully transferable. Because the Company's employee stock options have certain characteristics that are significantly different from traded options, and because changes in the subjective assumptions can materially affect the estimated value, in management's opinion, the Binomial Model best provides an accurate measure of the fair value of the Company's employee stock options Although the fair value of employee stock options is determined in accordance with FAS 123R and SAB 107 using an option-pricing model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction.

NINE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS NINE MONTHS ENDED SEPTEMBER 30, 2005

The Company reported a net loss from continuing operations before income taxes of $15 1 million or $0.37 per share on a diluted basis and a net loss from continuing operations after taxes of $15 7 million or $0.39 per share on a diluted basis for the first nine months of 2006 For the first nine months of 2005 the Company reported net earnings from continuing operations before income taxes of $4 5 million or $0.11 per share on a diluted basis and net earnings from continuing operations after taxes of $3.8 million or $0 09 per share on a diluted basis.

REVENUE

The Company's revenues for the first nine months of 2006 decreased 13 7% to $82 5 million from $95 6 million in the same period last year

Systems revenue decreased to $40 7 million in the first nine months of 2006 from $62 7 million in the first nine months of 2005, a decrease of 35.1%. The Company recognized revenue on 15 theater systems which qualified as either sales or sales-type leases in the first nine months of 2006 compared to 20 theater systems in the same period last year. Revenue from sales and leases decreased to $22 6 million in the first nine months of 2006 from $43.9 million in 2005, a decrease of 48 5% This decrease was due primarily to the decrease in settlement revenues from $13.4 million in the first nine months of 2005 compared to $nil in the same period in 2006

Three of the systems recognized in the first nine months of 2006 related to the sale of used theater systems compared to five used systems in the same period of 2005





NINE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS NINE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

REVENUE (cont'd)

Average revenue per system sales and sales-type leases decreased slightly due to a difference in the mix of systems recognized as outlined in the table below

| | NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|
| | 2006 | 2005 |
| Sales and Sales-type lease systems recognized | | |
| IMAX 2D GT | 1 | 1 |
| IMAX 2D SR | -- | 1 |
| IMAX 3D GT | 6 | 9 |
| IMAX 3D SR | 3 | 4 |
| IMAX MPX | 5 | 5 |
| | 15 | 20 |

In addition, the Company installed and began recognizing revenue on one theater system that qualified as an operating lease in the first nine months of 2006 versus five in the same period in 2005. The Company recognizes revenue on operating leases over the term of the leases.

The Company generally enters into multi-year system agreements with customers that typically contain customer payment obligations prior to the scheduled installation of the system. During the period of time between signing and system installation, certain customers each year generally are unable, or elect not, to proceed with system installation for a number of reasons, including business considerations, or the inability to obtain certain consents, approvals or financing Once the determination is made that the customer will not proceed with installation, the customer and the Company may enter into a consensual buyout, whereby the parties are released from their future obligations under the arrangement, the initial payments that the customer previously made to the Company are typically recognized as revenue and the geographic territory granted to the customer reverts to the Company. For this reason, the Company has a high degree of certainty of collecting a substantial value of a signed contract, either through a consensual buyout or the installation of a theater system In addition, since the introduction of its IMAX MPX theater system in 2003, the Company has agreed with several customers to terminate their existing agreements which were in the Company's backlog and sign new MPX system agreements During the first nine months of 2006, the Company did not recognize any settlement revenue Amounts relating to settlement revenue for the first nine months in 2005 total $13 4 million The settlement amounts for the first nine months of 2005 are detailed as follows: $0.6 million related to MPX conversion agreements; $11 4 million related to consensual buyouts; and $1 4 million related to termination of agreements after customer default. Overall settlement revenue will likely decrease for the full year of 2006 in comparison to 2005.

Ongoing rental revenue decreased by 9 5% in the first nine months of 2006 compared to the same period in 2005. Maintenance revenue increased slightly to $10 8 million in the first nine months of 2006 compared to $10.7 million for the same period in 2005





Film revenues increased to $26 4 million in the first nine months of 2006 from $18 3 million in the same period of 2005, as all segments of film increased Film distribution revenues increased to $12 0 million in the first nine months of 2006 from $8 0 million in the first nine months of 2005, an increase of 49 9%, and film production revenues increased to $0.6 million in the first nine months of 2006 from $0 5 million in the same period of 2005. Both increases were primarily due to the production and release of Deep Sea 3D, in March 2006 and the continued gross box office performance of Magnificent Desolation. Walking on the Moon 3D released in September 2005. Film post-production revenues increased to $5 2 million in the first nine months of 2006 from $3 9 million in the first nine months of 2005, mainly due to an increase in third party business at the Company's post-production unit. IMAX DMR revenues, which are revenues to the Company generated from the gross box office performance and conversion services performed on IMAX DMR films, increased by 45.4% in the first nine months of 2006. The increase in DMR revenue is due primarily to better gross box office performance and conversion services performed on films in the first nine months of 2006 compared to same period in 2005. The films contributing to the increased DMR revenue include Superman Returns· The IMAX 3D Experience, released in June 2006, the July 2006 release of The Ant Bully: An IMAX 3D Experience, the March 2006 release of V for Vendetta· The IMAX Experience, the May 2006 release of Poseidon· The IMAX Experience, and the continued success of Harry Potter and the Goblet of Fire The IMAX Experience released in November 2005. Films contributing to the DMR revenue for the nine months ended 2005 include Robots. The IMAX Experience, released in March 2005, Batman Begins: The IMAX Experience, released in June 2005, Charlie and the Chocolate Factory· The IMAX Experience, released in July 2005 and The Polar Express: The IMAX 3D Experience released in November 2004.

The Company believes it may see lower overall film revenues in 2006 than planned due to the disappointing performance of the films V for Vendetta: The IMAX Experience, Poseidon· The IMAX Experience and The Ant Bully. An IMAX 3D Experience. The Company intends to release in conjunction with studios at least eight new films in 2006 including the already released V for Vendetta. The IMAX Experience (March 2006), Deep Sea 3D (March 2006), Poseidon: The IMAX Experience (May 2006), Superman Returns. An IMAX 3D Experience (June 2006), The Ant Bully. An IMAX 3D Experience (July 2006) and Open Season. An IMAX 3D Experience (September 2006) and the still to be released Happy Feet: The IMAX Experience

(November 2006) and Night at the Museum: The IMAX Experience (December 2006).

Theater operations revenue increased to $12.4 million in the first nine months of 2006 from $12 3 million in the first nine months of 2005. Attendance and average ticket prices in the first nine months of 2006 were comparable to the same period in 2005 The Company believes it may see lower overall attendance rates in 2006 than planned due to the disappointing performance of the films V for Vendetta The IMAX Experience, Poseidon. The IMAX Experience and The Ant Bully An IMAX 3D Experience.

Other revenue increased to $3.1 million in the first nine months of 2006 compared to $2.3 million in the same period in 2005, largely due to an increase in the Company's after market sales. Other revenue primarily includes revenue generated from the Company's camera and rental business and after market sales of projection system parts.

OUTLOOK

System installations slip from period to period in the course of the Company's business, and the Company has seen a significant number of system installations originally anticipated for the third and fourth quarters of 2006 move to anticipated installations for 2007. The Company now has 24 systems in its backlog that are currently scheduled for installation in 2007 and an additional eight systems that could be installed as early as December of that year, however it cautions that slippages remain a recurring and unpredictable part of its business





ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

NINE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS NINE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

OUTLOOK (cont'd)

The Company has signed agreements with Sony Pictures and Warner Bros. Pictures, respectively, for the release of IMAX DMR versions of Spider Man 3: The IMAX Experience in May of 2007 and Harry Potter and the Order of the Phoenix: The IMAX Experience in July of 2007

The Company is planning to supplement its sale and lease of theatre systems by offering clients joint box office sharing arrangements, whereby the Company contributes its theatre system at its cost of goods sold, the client contributes its retrofitted auditorium and there is a negotiated split of box office revenues. The Company believes that by offering such arrangements where exhibitors do not need to pay the initial capital required in a lease or a sale, the Company's theatre network can be expanded more rapidly, and provide the Company with a significant part of the IMAX box office from its theatres, as well as greater revenue from the studios releasing IMAX DMR films, for which the Company typically receives a percentage of the studio's box office receipts.

The Company believes that digital technology has evolved sufficiently that it can develop an IMAX digital projection system to deliver to theatres by the middle to end of 2008 that delivers high quality imagery consistent with the Company's brand The Company believes that the dramatic print cost savings that would result from an IMAX digital system could lead to more profitability for the Company by increasing the number of films released to the IMAX network, which in turn could result in more theatres in the Company's network, more profits per theatre and more profits for studios amortizing their films over the network. There are a number of risks inherent in the Company's digital strategy including the risk of exhibitors delaying theatre system purchases during the transition period and the need to finance the Company's investments necessary for implementing this strategy.

GROSS MARGIN

Gross margin in the first nine months of 2006 was $30.1 million, or 36 4% of total revenue, compared to $47 8 million, or 50 0% of total revenue in the first nine months of 2005

Systems margins declined in the first nine months of 2006 by $18.2 million or 44 8% Average gross margin on sales and sales-type lease of projection systems decreased by 3 6% in the first nine months of 2006 versus the same period in 2005, primarily due to the difference in the mix of recognitions. In addition, the Company recognized $13 2 million in settlement gross margin in the first nine months of 2005, compared to $nil in the same period of 2006. The settlement amounts recognized in the first nine months of 2005 are detailed as follows: $1 3 million related to termination of agreements after customer default, $0.6 million related to MPX conversion agreements and $11.3 million related to consensual buyouts

The Company's film gross margin increased in the first nine months of 2006 by $0 2 million Post-production gross margin increased by $1 3 million, primarily due to the level of third party business resulting from Superman Returns: An IMAX 3D Experience and the Company's DMR gross margin increased by $0 2 million, also due primarily to the gross box office performance and conversion services performed on Superman Returns: An IMAX 3D Experience. Film production gross margin increased by $0.5 million in the first nine months of 2006 compared to the same period in 2005 primarily due to Deep Sea 3D, released in March 2006. Film distribution margin decreased by $1 8 million, primarily due to lower margins earned on the mix of films in release during the year.

The Company's owned and operated theater gross margin increased by $1.0 million in the first nine months of 2006 compared to the same period in 2005, primarily as a result of lower rental fees for films in 2006.

Other gross margin decreased by $0 6 million in the first nine months of 2006, primarily as result of the Company's decision to subsidize some of its after market components and upgrades to a number of theaters showing Superman Returns: An IMAX 3D Experience.





OTHER

Selling, general and administrative expenses were $30 0 million in the first nine months of 2006 versus $29.0 million in the same period of 2005 During the first nine months of 2006, the Company incurred expenses of $1.1 million in connection with the Company's process of seeking strategic alternatives Professional services excluding legal fees increased by $1.0 million as the Company incurred costs to implement FAS 123R, to amend the Company's pension plan and to respond to inquiries made by the Securities and Exchange Commission and the Ontario Securities Commission Expenses relating to legal fees for the first nine months of 2006 decreased by $1 0 million as the Company incurred legal costs in the first nine months of 2005 related to patent infringement matters and settled certain litigation matters. In addition, the Company expensed $1 2 million in the first nine months of 2006 for stock options granted in accordance with the adoption of FAS 123R. Salaries and benefits expense also increased by $1 8 million during the first nine months of 2006 due to a higher Canadian dollar denominated salary expense on the strengthening of the Canadian dollar compared to the same period in the prior year The Company also recorded a capital tax expense of $0.5 million in the first nine months of 2006, compared to a $0 1 million recovery in the same period in 2005. Offsetting these increases, the Company amended its executive pension plan on March 8, 2006 to reduce certain benefits, resulting in a savings of $2 2 million in compensation expense for the first nine months of 2006 compared to the same period in 2005 In addition, other non-cash stock-based compensation decreased by $0.7 million during the first nine months of 2006, due to changes in the Company's share price The Company recorded a foreign exchange gain of $0.3 million in the first nine months of 2006, compared to a loss of $0.5 million in the first nine months of 2005 The Company records foreign exchange translation gains and losses primarily on a portion of its financing receivable balances which are denominated in Canadian dollars, Euros and Japanese Yen.

Receivable provisions net of recoveries for accounts receivable amounted to a net provision of $0 7 million in the first nine months of 2006, compared to a net recovery of $0 3 million in the first nine months of 2005 The Company recorded a net recovery of $0 5 million in the first nine months of 2006 and $0 2 million in the first nine months of 2005, on financing receivables due to favorable outcomes on lease amendments.

Interest income amounted to $0.8 million in the first nine months of 2006 compared to $0.7 million in the same period of 2005.

Interest expense amounted to $12.8 million in the first nine months of 2006 compared to $12 6 million in the same period in 2005. Included in interest expense is the amortization of deferred finance costs in the amount of $0.7 million in the first nine months of 2006 and 2005 relating to the Senior Notes due 2010 The Company's policy is to defer and amortize all the costs relating to a debt financing over the life of the debt instrument.

ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

NINE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS NINE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

INCOME TAXES

The Company's effective tax rate differs from the statutory tax rate and will vary from year to year primarily as a result of numerous permanent differences, investments and other tax credits, the provision for income taxes at different rates in foreign and other provincial jurisdictions, enacted statutory tax rate increases or reductions in the year, changes in the Company's valuation allowance based on the Company's recoverability assessments of deferred tax assets, and favorable or unfavorable resolution of various tax examinations. As of September 30, 2006, the Company had a gross deferred income tax asset of $49.0 million, against which the Company is carrying a $42.8 million valuation allowance Further, long-term tax rate reductions were also affirmed last quarter for taxation years 2008 through 2010 In the nine month period the Company favorably resolved a provincial income tax audit resulting in the release of related tax reserves of $0.5 million to the income tax recovery for the period. Also, on June 22, 2006, the Canadian Federal government passed into law the elimination of the Large Corporations Tax retroactively as of January 1, 2006 Further, long-term tax rate reductions were also affirmed for taxation years 2008 through 2010 The Company's tax provision for the nine month period reflects both the retroactive elimination of the Large Corporations Tax and the result of the long term reductions in the corporate tax rates. The Company has reduced its gross deferred tax asset with an equal reduction in its gross valuation allowance to reflect the reduction in long term income tax rates

RESEARCH AND DEVELOPMENT

Research and development expenses amounted to $2.5 million in the first nine months of 2006 compared to $2 4 million in the same period of 2005 The expenses primarily reflect research and development activities pertaining to a new digitally-based theater projection system Through research and development, the Company continues to design and develop cinema-based equipment, software and other technologies to enhance its product offering. The Company believes that the motion picture industry will be affected by the development of digital technologies, particularly in the areas of content creation (image capture), post-production (editing and special effects), distribution and display Consequently, the Company has made significant investments in digital technologies, including the development of proprietary, patent-pending technology related to a digitally-based projection system, as well as technologies to digitally enhance image resolution and quality of motion picture films, and convert monoscopic (2D) to stereoscopic (3D) images. The Company also holds a number of patents, patents pending and intellectual property rights in these areas.

DISCONTINUED OPERATIONS

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater The Company abandoned or removed all of its assets from the theater in the first quarter of 2004 The Company is involved in a legal proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations. The amount of loss to the Company has been estimated as between $0.9 million and $2 3 million. Prior to 2006, the Company paid out $0 8 million with respect to amounts owing to the landlord The Company paid out an additional $0 1 million and also accrued an additional $0.8 million in net loss from discontinued operations related to Miami IMAX theater in the third quarter of 2006





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

RESULTS OF OPERATIONS (cont'd)

NINE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS NINE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

DISCONTINUED OPERATIONS (cont'd)

Effective December 11, 2001, the Company completed the sale of its wholly-owned subsidiary, Digital Projection International, including its subsidiaries (collectively, "DPI"), to a company owned by members of DPI management As part of the transaction, the Company restructured its advances to DPI, releasing DPI from obligations to repay any amounts in excess of $12.7 million previously advanced by the Company, and reorganized the remaining $12 7 million of debt

owing to the Company into two separate loan agreements. The loans receivable were collateralized by fixed and floating charges over all DPI assets including intellectual properties. One of the loans was convertible, upon the occurrence of certain events, into shares representing 49% of the total share capital of DPI related to these loans On December 29, 2005, the Company and DPI entered into an agreement to settle the remaining loans in exchange for a payment of $3 5 million During the first quarter of 2006, the Company recognized $2.3 million (2005 - $0 2 million) in income from discontinued operations. The other tranche of $1 2 million had previously been recognized in 2005.

PENSION PLAN AMENDMENT

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the unfunded U.S. defined benefit pension plan covering its two Co-Chief Executive Officers. Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced benefit payments is accelerated and paid out upon a change of control of the Company The benefits were 50% vested as of July 2000, the plan initiation date The vesting percentage increases on a straight-line basis from inception until age 55 The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon change of control shall be 100%. As of September 30, 2006, one of the Co-Chief Executives was 100% vested and the other Co-Chief Executive was approximately 81% vested.

EMPLOYEE STOCK-BASED COMPENSATION

On January 1, 2006, the Company adopted FAS 123R which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values. In March 2005, the Securities and Exchange Commission issued SAB 107 relating to FAS 123R The Company has applied the provisions of SAB 107 in its adoption of FAS 123R

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006 In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R Stock-based compensation expense recognized under FAS 123R for the nine months ended September 30, 2006 was $1 2 million.





RESULTS OF OPERATIONS (cont'd)

NINE MONTHS ENDED SEPTEMBER 30, 2006 VERSUS NINE MONTHS ENDED SEPTEMBER 30, 2005 (cont'd)

EMPLOYEE STOCK-BASED COMPENSATION (cont'd)

FAS 123R requires companies to estimate the fair value of share-based payment awards on the date of grant using an option-pricing model. The value of the portion of the award that is ultimately expected to vest is recognized as expense over the requisite service periods in the Company's Consolidated Statement of Operations. Prior to the adoption of FAS 123R, the Company accounted for stock-based awards to employees and directors using the intrinsic value method in accordance with APB 25 as allowed under FAS 123. Under the intrinsic value method, no stock-based compensation expense had been recognized in the Company's Consolidated Statement of Operations because the exercise price of the Company's stock options granted to employees and directors equaled the fair market value of the underlying stock at the date of grant

Stock-based compensation expense recognized in the Company's Consolidated Statement of Operations for the first nine months of 2006 includes compensation expense for share-based payment awards granted prior to, but not yet vested as of January 1, 2006 based on the grant date fair value estimated in accordance with the pro forma provisions of FAS 123 and compensation expense for the share-based payment awards granted subsequent to January 1, 2006 based on the grant date fair value estimated in accordance with the provisions of FAS 123R. In conjunction with the adoption of FAS 123R, the Company changed its method of attributing the value of stock-based compensation to expense from a method which recognized the expense as the options vest to the straight-line single option method Compensation expense for all share-based payment awards granted on or prior to January 1, 2006 will continue to be recognized using the historic method while compensation expense for all share-based payment awards granted subsequent to January 1, 2006 is recognized using the straight-line

single-option method. As stock-based compensation expense recognized in the Consolidated Statement of Operations for the first quarter of 2006 is based on awards ultimately expected to vest, it has been reduced for estimated forfeitures. FAS 123R requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. In the Company's pro forma information required under FAS 123 for the periods prior to 2006, the Company also estimated forfeitures at the time of grant and revised, if necessary, in subsequent periods.

The Company utilizes a lattice-binomial option-pricing model ("Binomial Model") to determine the fair value of share-based payment awards. The fair value determined by the Binomial Model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to, the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors. Option-pricing models were developed for use in estimating the value of traded options that have no vesting or hedging restrictions and are fully transferable. Because the Company's employee stock options have certain characteristics that are significantly different from traded options, and because changes in the subjective assumptions can materially affect the estimated value, in management's opinion, the Binomial Model best provides an accurate measure of the fair value of the Company's employee stock options. Although the fair value of employee stock options is determined in accordance with FAS 123R and SAB 107 using an option-pricing model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

OTHER

The Company is in the process of responding to an informal inquiry from the U S Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theater systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theater system contract are segregated and can be recognized in different periods (see "Critical Accounting Policies" above, for a more detailed explanation of its accounting policies with regard to theater system installations) In the fourth quarter of 2005, seven theatre systems were installations, where revenue associated with the screen element of the system was deferred until the final screen was installed Of these seven installations, three theaters had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and one screen was installed subsequent to the end of the third quarter The screen element in the remaining theater is expected to be completed by the end of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. Finally, on one of these ten installations, the Company has an obligation to de-install and move the theater system and the fair value of this obligation of $0.1 million has not been recognized into income. The Company believes its application of the above accounting policy is, and has historically been, in accordance with U.S GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP This accounting policy has similarly been applied to one theater installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The screen element was completed in the third quarter for this installation. The Company is continuing to cooperate in this inquiry

LIQUIDITY AND CAPITAL RESOURCES

CREDIT FACILITY

On February 6, 2004, the Company entered into a Loan Agreement for a secured revolving credit facility as amended on September 30, 2005 and as further amended by the Second Amendment to the Loan Agreement which was entered into with effect from May 16th, 2006 (the "Credit Facility") The Credit Facility is a revolving credit facility expiring on October 31, 2009 with an optional one year renewal thereafter contingent upon approval by the lender, permitting maximum aggregate borrowings of $40.0 million, subject to a borrowing base calculation which includes the Company's financing receivables, operating leases, finished goods inventory, and capital assets with certain reserve requirements and deductions for outstanding letters of credit. The Company's current borrowing capacity under such calculation is $26 1 million after deduction for outstanding letters of credit of $8.1 million, although continued availability of this facility in the future is dependent upon improvements over current financial performance. The Credit Facility bears interest at the applicable prime rate per annum or Libor plus a margin as specified therein per annum and is collateralized by a first priority security interest in all of the current and future assets of the Company The Credit Facility contains typical affirmative and negative covenants, including covenants that restrict the

Company's ability to: incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales, incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions. In addition, the Credit Facility contains customary events of default, including upon an acquisition or a change of control that may have a material adverse effect on the Company or a guarantor. The Credit Facility also requires the Company to maintain a minimum level of earnings before interest, taxes, depreciation and amortization, and cash collections.





ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

LIQUIDITY AND CAPITAL RESOURCES (cont'd)

CASH AND CASH EQUIVALENTS

As at September 30, 2006, the Company's principal sources of liquidity included cash and cash equivalents of $22.0 million, short-term investments of $4.2 million, the Credit Facility, trade accounts receivable of $32 1 million and anticipated collection from net investment in leases due in the next 12 months of $7 9 million As at September 30, 2006, the Company has not drawn down on the Credit Facility, and has letters of credit for $8.1 million secured by the Credit Facility arrangement

The Company believes that cash flow from operations together with existing cash and borrowing available under the Credit Facility will be sufficient to meet operating needs for the foreseeable future. However, the Company's operating cash flow can be impacted if management's projections of future signings and installations are not realized The Company forecasts its short-term liquidity requirements on a quarterly and annual basis. Since the Company's future cash flows are based on estimates and there may be factors that are outside of the Company's control, there is no guarantee the Company will continue to be able to fund its operations through cash flows from operations. Under the terms of the Company's typical theater system agreement, the Company receives substantial cash payments before the Company completes the performance of its obligations. Similarly, the Company receives cash payments for some of its film productions in advance of related cash expenditures.

The Company's net cash provided by (used in) operating activities is impacted by a number of factors, including the proceeds associated with new signings of theater system lease and sale agreements in the year, the box office performance of large format films distributed by the Company and/or exhibited in the Company's theaters, increases or decreases in the Company's operating expenses and the level of cash collections received from its customers

Cash used in operating activities amounted to $7.3 million for the period ended September 30, 2006 Changes in other non-cash operating assets as compared to December 31, 2005 include an increase of $5.3 million in inventories, a decrease of $1 3 million in financing receivables, a $7 9 million increase in accounts receivable and a $0.6 million increase in prepaid expenses, which mostly relates to prepaid film print costs that will be expensed over the period to be benefited. Changes in other non-cash operating liabilities as compared to December 31, 2005 include an increase in deferred revenue of $6.9 million, an increase in accounts payable of $2 5 million and an increase of $3.8 million in accrued liabilities. Included in accrued liabilities for the period ended September 30, 2006 were $26 5 million in respect of accrued pension obligations which are mostly long-term in nature

Cash provided by investing activities amounted to $1.4 million in the first nine months of 2006, which includes purchases of short-term investments of $14 5 million, proceeds from maturities of short-term investments of $18.7 million, purchases of $1 7 million in fixed assets, an increase in other assets of $0 8 million and an increase in other intangible assets of $0.4 million

Cash provided by financing activities in the first nine months of 2006 amounted to $0 3 million, due to the issuance of common shares through the exercise of stock options

The Company also received $3.5 million in cash on a note receivable from a discontinued operation and made a $0 1 million payment on discontinued operations related to Miami IMAX Theater

Capital expenditures including the purchase of fixed assets and investments in film assets were $10 4 million for the first nine months of 2006

ITEM 2 MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS (cont'd)

LIQUIDITY AND CAPITAL RESOURCES (cont'd)

CASH AND CASH EQUIVALENTS (cont'd)

Cash provided by operating activities amounted to $3.4 million for the period ended September 30, 2005 Changes in other non-cash operating assets and liabilities included an increase in deferred revenue of $6 7 million, and a decrease of $4.7 million in accrued liabilities. Cash used by investing activities for the first nine months of 2005 amounted to $14.1 million, primarily consisting of $27 2 million invested in short-term investments and $15.2 million received from proceeds of short-term investments. Cash provided by financing activities amounted to $3 2 million due to the issuance of common shares through the exercise of stock options Capital expenditures including the purchase of fixed assets net of sales proceeds and investments in film assets were $8 5 million for the first nine months of 2005

LETTERS OF CREDIT AND OTHER COMMITMENTS

As at September 30, 2006, the Company has letters of credit of $8.1 million outstanding, of which the entire balance has been secured by the Credit Facility.

SENIOR NOTES DUE 2010

As at September 30, 2006, the Company had outstanding $159 0 million aggregate principal of Registered Senior Notes and $1 0 million aggregate principal of Unregistered Senior Notes.

PENSION OBLIGATIONS

The Company has a defined benefit pension plan covering its two Co-Chief Executive Officers. As at September 30, 2006, the Company had an unfunded and accrued projected benefit obligation of approximately $26.5 million (2005 - $31 1 million) in respect of this defined benefit pension plan At the time the Company established the defined benefit pension plan, it also took out life insurance policies on its two Co-Chief Executive Officers with coverage amounts of $21 5 million in aggregate The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so As at September 30, 2006, the cash surrender value of the insurance policies is $4 1 million (December 31, 2005 - $3 3 million)

On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company. The benefits were 50% vested as of the plan initiation date The vesting percentage increases on a straight-line basis from inception until age 55. The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon change in control shall be 100% As of September 30, 2006, one of the Co-Chief Executives was 100% vested and the other Co-Chief Executive was approximately 81% vested.

OFF-BALANCE SHEET ARRANGEMENTS

There are currently no off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on the Company's financial condition.





ITEM 3 QUANTITATIVE AND QUALITATIVE FACTORS ABOUT MARKET RISK

The Company is exposed to market risk from changes in foreign currency rates. The Company does not use financial instruments for trading or other speculative purposes.

A majority of the Company's revenue is denominated in U S. dollars while a significant portion of its costs and expenses is denominated in Canadian dollars A portion of the Company's net U S dollar flows is converted to Canadian dollars to fund Canadian dollar expenses through the spot market In Japan, the Company has ongoing operating expenses related to its operations. Net Japanese yen flows are converted to U.S. dollars through the spot market The Company also has cash receipts under leases denominated in Japanese yen, Euros and Canadian dollars The Company plans to convert Japanese yen and Euros lease cash flows to U S dollars through the spot markets on a go-forward basis

ITEM 4 CONTROLS AND PROCEDURES

EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

The Company maintains disclosure controls and procedures designed to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time periods.

As discussed in the Company's June 30, 2006 Form 10-Q filing, the Company's management, with the participation of its Co-Chief Executive Officers and its Chief Financial Officer, evaluated the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) or 15d-15(e)) as not effective at the reasonable assurance level because of the identification of a material weakness in the Company's internal control over financial reporting, which management views as an integral part of the Company's disclosure controls and procedures. This material weakness related to the controls surrounding the analysis and recording of complex film accounting transactions in the three months ended June 30, 2006. This control deficiency resulted in an adjustment to the Company's Consolidated Statement of Operations for the three months ended June 30, 2006 of approximately $0.8 million, which adjustment was identified and made prior to the release of the Company's June 30, 2006 Form 10-Q.

As of the third quarter of 2006, management is implementing controls to strengthen the analysis of complex film accounting transactions and to remediate the identified material weakness, including engaging independent third party experts to analyze the Company's proposed accounting treatment of such transactions.

CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

Other than indicated above, there were no changes in the Company's internal control over financial reporting that occurred during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.





PART II OTHER INFORMATION

ITEM 1 LEGAL PROCEEDINGS

(A) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement and seeking injunctive relief and damages In April 2005, In-Three filed an answer denying infringement and asserting counterclaims that seek a declaratory judgement of non-infringement, invalidity and unenforceability of the patent in suit, and damages for alleged false advertising, false designation of origin, breach of contract, interference with prospective economic advantage and/or unfair competition. On March 13, 2006, the Company and In-Three entered into a settlement agreement, resolving all matters between the parties. On March 29, 2006, the Company and In-Three filed a joint motion for an order dismissing with prejudice all claims and counterclaims between the parties. The U S District Court for the Central District of California, Western Division has stayed a determination on the joint motion at the joint request of the Company, 3DMG, and In-Three pending a resolution of an arbitration proceeding between the Company and 3DMG before the International Centre for Dispute Resolution relating to rights under agreements between the Company and 3DMG. The Company believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such proceedings.

(B) In January 2004, the Company and IMAX Theater Services Ltd., a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3 7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17 8 million in damages as a result of E-Citi's breach of a September 2000 lease agreement. The arbitration hearing on both claims took place in November 2005. On February 1, 2006, the ICC issued an award finding unanimously in the Company's favor on all claims. The ICC hearing to determine the amount of damages to be awarded to the Company took place on July 26 - 28, 2006 The ICC panel has not yet rendered its decision with respect to such damages and no amount has yet been recorded for these damages

(C) In June 2004, Robots of Mars, Inc ("Robots") initiated an arbitration

proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract. Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages. The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration





PART II OTHER INFORMATION (cont'd)

ITEM 1. LEGAL PROCEEDINGS (cont'd)

(D) The Company and certain of its officers and directors were named as defendants in eight purported class action lawsuits filed between August 11, 2006 and September 18, 2006, alleging violations of U.S. federal securities laws. These eight actions were filed in the U.S. District Court for the Southern District of New York These lawsuits, brought on behalf of shareholders who purchased the Company's common stock between February 17, 2006 and August 9, 2006, allege primarily that the defendants engaged in securities fraud by disseminating materially false and misleading statements during the class period regarding their revenue recognition of theater system installations, and failing to disclose material information concerning the Company's revenue recognition practices. Currently there are motions for consolidation, assignment of lead plaintiff, and appointment of lead plaintiff counsel pending before the Court. These lawsuits are in very early stages and seek unspecified compensatory damages, costs, and expenses The Company believes the allegations made against it in the complaints are meritless and will vigorously defend the matter. The Company believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such proceedings.

(E) A purported class action lawsuit was filed on September 20, 2006 in the Ontario Superior Court of Justice against the Company and certain of its officers and directors, alleging violations of Canadian securities laws. This lawsuit was brought on behalf of shareholders who acquired the Company's securities from February 17, 2006 to August 9, 2006. This lawsuit is in a very early stage and seeks unspecified compensatory and punitive damages, as well as costs and expenses The Company believes the allegations made against it in the complaint are meritless and will vigorously defend the matter. The Company believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such proceedings.

(F) In addition to the matters described above, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or results of operations, although no assurance can be given with respect to the ultimate outcome of any such proceedings.

(G) The Company is in the process of responding to informal inquiries from the U S. Securities and Exchange Commission and the Ontario Securities Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theater systems The Company believes its application of its accounting policies is, and has historically been, in accordance with U S GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP The Company is cooperating in these inquiries





PART II OTHER INFORMATION (cont'd)

ITEM 1A RISK FACTORS

There have been no material changes to the factors disclosed in Item 1A Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2005

ITEM 6 EXHIBITS

(A) EXHIBITS

10.28 Fourth Amending Agreement dated October 5, 2006 between IMAX Corporation and Robert D Lister

10.29 Summary of Employment Arrangement dated November 6, 2006 between IMAX Corporation and Edward MacNeil.

31 1 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated November 9, 2006, by Bradley J. Wechsler.

31.2 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated November 9, 2006, by Richard L. Gelfond.

31.3 Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated November 9, 2006, by Edward MacNeil.

32.1 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated November 9, 2006, by Bradley J. Wechsler

32 2 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated November 9, 2006, by Richard L. Gelfond.

32.3 Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated November 9, 2006, by Edward MacNeil.

Page 61

IMAX CORPORATION

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

IMAX CORPORATION

Date. November 9, 2006

By: /s/ Edward MacNeil

Edward MacNeil
Chief Financial Officer
(Principal Financial Officer)

Date November 9, 2006

By: /s/ Kathryn A Gamble

Kathryn A. Gamble
Vice President, Finance, Controller
(Principal Accounting Officer)

Page 62

IMAX CORPORATION
Exhibit 10.28

FOURTH AMENDING AGREEMENT

This Amendment to Employment Agreement dated as of October 5, 2006 (the "Amending Agreement") is made between:

IMAX CORPORATION, a corporation incorporated under the laws of Canada (hereinafter referred to as the "Company"),

and

ROBERT D LISTER (the "Executive")

WHEREAS, the Company wishes to enter into this Amending Agreement to amend and extend the Employment Agreement dated as of May 17, 1999 between Imax Ltd, the Company and Executive, as modified and amended by those Amending Agreements dated as of April 4, 2001, January 1, 2004 and February 14, 2006 (together, the "Agreement"), whereunder the Executive provides services to the Company, and the Executive wishes to so continue such engagement, as hereinafter set forth;

AND WHEREAS, on January 1, 2001 Imax Ltd. assigned all of its rights and obligations pursuant to the Agreement to the Company, and the Executive has consented to such assignment,

NOW, THEREFORE, in consideration of good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows.

1 Section 4(b) of the Agreement shall be amended by adding the following.

"Without Cause" shall also mean the termination of Executive's employment at Executive's election in the event that each of Bradley J. Wechsler and Richard L Gelfond cease to be CEO of the Company (an "Elective Termination"), provided, however, that Executive may not make such Elective Termination prior to six (6) months following the date that each of Messrs Wechsler and Gelfond have ceased to be CEO of the Company In the event of an Elective Termination, Executive shall have no obligation to mitigate the amounts provided in Section 4.1 1

2 Section 6 of the Agreement shall be amended by adding the following·

Notwithstanding anything herein to the contrary, in the event that (a) there is a change in control of the Company i.e. any person, or group of persons acting in concert, other than Bradley J. Wechsler and Richard L Gelfond, acquiring greater than fifty percent (50%) of the outstanding common shares of the Company, whether by direct or indirect acquisition or as a result of a merger or reorganization (a "Change in Control") and (b) each of Bradley J. Wechsler and Richard L. Gelfond cease to be CEO of the Company, then Executive may elect to terminate his employment and such termination will be deemed to be a termination Without Cause (a "Change in Control Election"), provided, however, that Executive may not make such Change in Control Election prior to three (3) months following the date that each of Messrs. Wechsler and Gelfond have ceased to be CEO of the Company A Change of Control Election shall be deemed to be a Non-Mitigation Event as described in this Section 6, and in the event of a Change of Control Election, (i) Executive shall have no obligation to mitigate the amounts provided in Section 4 1 1, and (ii) the Severance Period (as defined in Section 4 1.1) shall be a minimum of eighteen (18) months in duration.

3. The Executive shall receive a US$ 150,000 retention bonus (the "Retention Bonus"), payable as follows· (a) US$ 75,000 paid on June 1, 2007 if Executive has not resigned or been terminated for Cause prior to such date, and (b) US$ 75,000 paid on December 31, 2007 if Executive has not resigned or been

terminated for Cause prior to such date In the event that there is a Change in Control, any portion of the Retention Bonus not yet paid shall immediately accelerate and be paid to Executive

Except as amended herein, all other terms of the Agreement shall remain in full force, unamended

IN WITNESS WHEREOF, the Company and the Executive have duly executed and delivered this Amending Agreement on this 5th day of October, 2006.

IMAX CORPORATION

By. "Richard L. Gelfond"
-----------------------------------
Name: Richard L. Gelfond
Title: Co-Chief Executive Officer

SIGNED, SEALED AND DELIVERED in the presence of

EXECUTIVE

| "Pamela Brown" | "Robert D. Lister" |
|---|---|
| Witness | Robert D Lister |

IMAX CORPORATION
Exhibit 10.29

Summary of Employment Arrangement
November 6, 2006

On August 21, 2006, IMAX Corporation (the "Company") announced the appointment of Mr Edward MacNeil, as Interim Chief Financial Officer. On November 6, 2006 the Company reached an arrangement with Mr. MacNeil. During his term as Interim CFO, Mr. MacNeil will receive an annualized salary of Cdn$345,000. Under the arrangement, Mr. MacNeil will receive a guaranteed bonus of Cdn$50,000 payable in March 2007, in respect of the year ending December 31, 2006.

IMAX CORPORATION
Exhibit 31.1

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES - OXLEY ACT OF 2002

I, Bradley J Wechsler, Co- Chief Executive Officer of IMAX Corporation, certify that

1 I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2 Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4 The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have.

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financia reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated· November 9, 2006

By: "Bradley J Wechsler"
-----------------------------------
Name: Bradley J Wechsler
Title Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 31.2

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES - OXLEY ACT OF 2002

I, Richard L Gelfond, Co- Chief Executive Officer of IMAX Corporation, certify that

1. I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2 Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles,

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

   (d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated November 9, 2006

By: "Richard L. Gelfond"

Name: Richard L Gelfond
Title Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 31 3

CERTIFICATION PURSUANT TO SECTION 302 OF THE SARBANES - OXLEY ACT OF 2002

I, Edward MacNeil, Chief Financial Officer of IMAX Corporation, certify that·

1. I have reviewed this quarterly report on Form 10-Q of the registrant, IMAX Corporation;

2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;

3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;

4 The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles,

(c) Evaluated the effectiveness of the registrart's disclosure controls and procedures and presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this quarterly report based on such evaluation; and

(d) Disclosed in this quarterly report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5 The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated November 9, 2006

By: "Edward MacNeil"

Name. Edward MacNeil
Title Chief Financial Officer

IMAX CORPORATION
Exhibit 32.1

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Bradley J Wechsler, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that

The Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated November 9, 2006

"Bradley J. Wechsler"

Bradley J. Wechsler
Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 32.2

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Richard L. Gelfond, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: November 9, 2006

"Richard L Gelfond"
----------------------------------------
Richard L. Gelfond
Co-Chief Executive Officer

IMAX CORPORATION
Exhibit 32.3

CERTIFICATIONS
PURSUANT TO SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002
(SUBSECTIONS (A) AND (B) OF SECTION 1350, CHAPTER 63 OF TITLE 18, UNITED STATES CODE)

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Edward MacNeil, Chief Financial Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended September 30, 2006 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated. November 9, 2006

"Edward MacNeil"

---------------------------------------

Edward MacNeil
Chief Financial Officer

Created by 10KWizard www.10KWizard.com