UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re IMAX CORPORATION SECURITIES LITIGATION | : | Civil Action No. 1:06-cv-06128-NRB |
| | : | |
| | : | <u>CLASS ACTION</u> |
| | : | |
| This Document Relates To: | : | MEMORANDUM OF LAW IN SUPPORT |
| | : | OF PLAINTIFF'S MOTION FOR CLASS |
| ALL ACTIONS. | : | CERTIFICATION |
| | : | |

**TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ..................................................................1

II.   ARGUMENT ........................................................................................3

    A.   The Class Satisfies the Rule 23 Requirements ........................................3

        1.   The Standards for Class Certification ............................................3

        2.   Securities Cases Are Particularly Well Suited for Class Action
            Treatment ................................................................................5

        3.   The Proposed Class Satisfies Rule 23(a) ......................................5

            a.   The Proposed Class Is so Numerous that Joinder of All
                Members Is Impracticable..................................................5

            b.   Questions of Law and Fact Common to the Members of the
                Class Exist.....................................................................6

            c.   The Claims of the Proposed Class Representative Are
                Typical of the Class .........................................................8

            d.   The Proposed Class Representative and Its Counsel Will
                Fairly and Adequately Prosecute the Case on Behalf of the
                Proposed Class ...............................................................10

        4.   The Proposed Class Representative Satisfies the Rule 23(b)(3)
            Requirements ........................................................................12

            a.   Common Questions of Law or Fact Predominate..........................12

                 (1)   IMAX's shares traded at a large average weekly
                      volume.................................................................17

                 (2)   A significant number of analysts followed and
                      reported on IMAX's stock ................................17

                 (3)   IMAX's stock had numerous market makers ...................18

                 (4)   The Company was eligible to file SEC Form S-3 (or
                      Form F-3)...........................................................19

                 (5)   There is a causal relationship between unexpected
                      events and an immediate response in IMAX's stock
                      price...................................................................20

**Page**

(6)    IMAX had a large market capitalization............................21

(7)    The relative size of the bid-ask spread for IMAX's stock was small .................................................................21

(8)    A substantial portion of IMAX's stock was widely-held..........................................................................................22

b.    A Class Action Is Superior to Other Available Methods for the Efficient Adjudication of This Controversy............................23

III.    CONCLUSION...............................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997)..................................................................................1, 13

*Baffa v. Donaldson*,
222 F.3d 52 (2d Cir. 2000)..............................................................................10

*Barrie v. Intervoice-Brite, Inc.*,
No. 3:01-cv-1071-K, 2009 WL 3424614
(N.D. Tex. Oct. 26, 2009) ...............................................................................22

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).................................................................................14, 15

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ............................................................ *passim*

*Cent. States Se. & Sw. Areas Health & Welfare Fund v.*
*Merck-Medco Managed Care, LLC*,
504 F.3d 229, 244-45 (2d Cir. 2007) ...........................................................5, 7

*Cheney v. Cyberguard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003)...............................................................22, 23

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473, 483 (2d Cir. 1995).......................................................................5

*Darquea v. Jarden Corp.*,
No. 06 Civ. 722 (CLB), 2008 U.S. Dist. LEXIS 17747
(S.D.N.Y. Mar. 6, 2008) .......................................................................7, 11, 13

*Dietrich v. Bauer*,
192 F.R.D. 119 (S.D.N.Y. 2000) ............................................................ *passim*

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)..........................................................................................4

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir. 1985)..............................................................................4

*Ellenburg v. JA Solar Holdings Co. Ltd.*,
262 F.R.D. 262 (S.D.N.Y. 2009) .....................................................................12

**Page**

*Escott v. Barchris Constr. Corp.*,
    340 F.2d 731 (2d Cir. 1965)..........................................................................5

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)..................................................................................9

*Gerber v. Computer Assocs. Int'l, Inc.*,
    No. 91 CV 3610 (SJ), 1995 U.S. Dist. LEXIS 21142
    (E.D.N.Y. Apr. 14, 1995)...................................................................7, 9, 24

*Green v. Wolf Corp.*,
    406 F.2d 291 (2d Cir. 1968)...........................................................1, 24, 25

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) .....................................................................15

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) .........................................................12, 13

*In re Am. Int'l Group, Inc. Sec. Litig.*,
    No. 04 Civ 8141 (DAB), 2010 U.S. Dist. LEXIS 15453
    (S.D.N.Y. Feb. 22, 2010) ................................................................. *passim*

*In re AMF Bowling Sec. Litig.*,
    No. 99 Civ. 3023 (DC), 2002 U.S. Dist. LEXIS 4949
    (S.D.N.Y. Mar. 26, 2002) ......................................................................10

*In re Arakis Energy Corp. Sec. Litig.*,
    No. 95-CV-3431 (ARR), 1999 U.S. Dist. LEXIS 22246
    (E.D.N.Y. Apr. 30, 1999).......................................................................13

*In re Baldwin-United Corp. Litig.*,
    122 F.R.D. 424 (S.D.N.Y. 1986) .............................................................9

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) ..........................................................6, 23

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) .....................................................23

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
    586 F. Supp. 2d 732 (S.D. Tex. 2008) .....................................................12

**Page**

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    245 F.R.D. 147 (S.D.N.Y. 2007) ...............................................................................6, 13

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009)........................................................................................3, 8

*In re Frontier Ins. Group Sec. Litig.*,
    172 F.R.D. 31 (E.D.N.Y. 1997) .......................................................................................7

*In re IMAX Sec. Litig.*,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008)..........................................................................2, 7

*In re Initial Pub. Offering Sec. Litig.*,
    227 F.R.D. 65 (S.D.N.Y. 2004) ....................................................................................16

*In re Initial Pub. Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ....................................................................................16

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).............................................................................................4

*In re Interpublic Sec. Litig.*,
    No. 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 19784
    (S.D.N.Y. Nov. 7, 2003) ................................................................................................8

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
    No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953
    (S.D.N.Y. 2009) ...........................................................................................................24

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493, 508 (S.D.N.Y. 1996) .............................................................................5

*In re Netbank, Inc. Sec. Litig.*,
    259 F.R.D. 656 (N.D. Ga. 2009)..............................................................................22, 23

*In re NYSE Specialists Sec. Litig.*,
    260 F.R.D. 55 (S.D.N.Y. 2009) ............................................................................. *passim*

*In re Orion Sec. Litig.*,
    No. 08 Civ. 1328 (RJS), 2008 U.S. Dist. LEXIS 55368
    (S.D.N.Y. July 8, 2008) ...............................................................................................12

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    182 F.R.D. 42 (S.D.N.Y. 1998) ....................................................................................10

**Page**

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    191 F.R.D. 369 (S.D.N.Y. 2000) ..........................................................................6, 9, 10

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ..................................................................16

*In re Salomon Analyst Metromedia Litig.*,
    544 F.3d 474 (2d Cir. 2008) ...........................................................................3, 15, 16

*In re Scientific-Atlanta, Inc. Sec. Litig.*,
    571 F. Supp. 2d 1315 (N.D. Ga. 2007) ..................................................................23

*In re SCOR Holding (Switz.) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008) ..................................................................16, 20

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ...............................................................................6

*Kelleher v. ADVO, Inc.*,
    No. 3:06CV01422 (AVC), 2009 U.S. Dist. LEXIS 68914
    (D. Conn. Mar. 30, 2009) ......................................................................................12

*Korn v. Franchard Corp.*,
    456 F.2d 1206 (2d Cir. 1972) ..................................................................................3

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ......................................................................17, 22

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) .......................................................................9, 14, 15

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ...............................................................................3

*Mendoza v. Casa De Cambio Delgado, Inc.*,
    No. 07CV2579 (HB), 2008 U.S. Dist. LEXIS 61557
    (S.D.N.Y. Aug. 12, 2008) ........................................................................................9

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002) ................................................................................13

*Port Auth. Police Benevolent Ass'n v. Port Auth.*,
    698 F.2d 150 (2d Cir. 1983) ....................................................................................7

**Page**

*Robinson v. Metro-North Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001)........................................................................................9

*Stoneridge Inv. Partners LLC v. Sci. Atlanta*,
    128 S. Ct. 761 (2008)..............................................................................................14

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    546 F.3d 196 (2d Cir. 2008)............................................................................ *passim*

*Vanamringe v. Royal Group Techs., Ltd.*,
    237 F.R.D. 55 (S.D.N.Y. 2006) ..........................................................................12

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)....................................................................................2


**STATUTES RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 23 ....................................................................................................... *passim*

17 C.F.R.
    §239.33....................................................................................................................20
    §239.13....................................................................................................................20
    §240.10b-5 ...............................................................................................1, 14, 15, 16

Lead Plaintiff Snow Capital Investment Partners, L.P. ("Snow Capital," "Lead Plaintiff," "Plaintiff" or "Proposed Class Representative") respectfully submits this memorandum of law in support of its Motion for Class Certification, Certification of Class Representative, and Appointment of Class Counsel pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.[1]

## I.    PRELIMINARY STATEMENT

Class certification in this securities fraud class action is consistent with long-established precedent in the Second Circuit and the United States Supreme Court. *See, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997); *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir. 1968). Indeed, as this Court has noted, "the Second Circuit has traditionally favored the use of class actions for the resolution of securities law claims, in particular those brought under Rule 10b-5." *Dietrich v. Bauer*, 192 F.R.D. 119, 122 (S.D.N.Y. 2000);[2] *see also In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) ("[C]ourts have long recognized that [c]lass actions are a particularly appropriate and desirable means to resolve claims based on the securities laws.").

Here, Plaintiff, like all other putative Class members, seeks to prove a consistent and common course of wrongful conduct with respect to Defendants' materially false and misleading statements and omissions during the Class Period concerning, among other things, improper

---

[1]    Specifically, Plaintiff seeks an Order: (i) certifying this action as a class action on behalf of those who acquired the common stock of defendant IMAX Corporation ("IMAX" or the "Company") between February 27, 2003 and July 20, 2007, inclusive (the "Class Period"), and were damaged thereby (the "Class"); (ii) certifying it as Class Representative; and (iii) appointing its counsel, Lead Counsel Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or "Lead Counsel"), as Class Counsel. Excluded from the Class are defendants IMAX, its senior officers Richard L. Gelfond ("Gelfond"), Bradley J. Wechsler ("Wechsler"), Francis T. Joyce ("Joyce") and Kathryn A. Gamble ("Gamble") (collectively, the "Individual Defendants"), and the Company's auditor, PricewaterhouseCoopers LLP ("PWC") (IMAX, the Individual Defendants and PWC are collectively referred to herein as "Defendants"), as well as, among others, the members of their immediate families and their affiliates or agents.

[2]    Here, and throughout this memorandum, internal citations and quotations omitted unless otherwise specified.

- 1 -

accounting practices at IMAX.  Plaintiff alleges that these statements failed to disclose, among

other things, that IMAX recognized revenue on its theater systems before installation of the entire

"System Deliverable"[3] in contravention of Generally Accepted Accounting Principles ("GAAP"),

and in violation of the Company's own accounting policies.  Moreover, Defendant PWC failed to

conduct an audit in accordance with Generally Accepted Auditing Standards ("GAAS") and the

standards of the Public Company Accounting Oversight Board ("PCAOB").  Nevertheless, PWC

issued false and misleading clean audit opinions on IMAX's financial statements between 2002 and

2005.

Thus far, this action has been successfully litigated on behalf of the proposed Class and the

interests of the Class have been paramount to Plaintiff's prosecution of this case.[4]  *See In re IMAX*

*Sec. Litig.*, 587 F. Supp. 2d 471 (S.D.N.Y. 2008).  Plaintiff is now engaging in merits discovery.

Because Plaintiff is vigorously prosecuting this litigation, the benefits of this litigation shall apply

equally to the Class as a whole, and this open-market securities fraud action satisfies all applicable

---

[3]     *See* Consolidated Amended Class Action Complaint, dated October 2, 2007 (the "AC," cited herein as "¶__") at ¶47 n.1, alleging that IMAX defined a "System Deliverable" as "the projection system, sound system, screen system and, if applicable, the 3D glasses cleaning machine, theater design support, supervisions of installation, projectionist training and the use of the IMAX brand, generally to be a single deliverable and a single unit of accounting."

[4]     On December 3, 2008, the United States Court of Appeals for the Second Circuit issued its decision in *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), in which it held that an investment advisor lacks Article III standing to assert claims under the federal securities laws on behalf of its investor clients, even if those clients have granted power-of-attorney and unrestricted decision-making authority to the investment advisor.  *See W.R. Huff*, 549 F.3d at 111.  In light of the Second Circuit's decision in *W.R. Huff*, and in the interest of protecting the claims of the Class, on February 18, 2009, Snow Capital submitted a letter to the District Court outlining its intention to seek relief from the January 17, 2007 order appointing Westchester Capital Management, Inc. ("Westchester Capital") as lead plaintiff and requesting that briefing on class certification be adjourned.  Snow Capital filed its motion for reconsideration on April 3, 2009, and this Court subsequently allowed Steelworkers Pension Trust to file its own opposition brief, which was submitted on May 1, 2009.  Both motions were fully briefed and, on June 29, 2009, this Court entered an order granting Snow Capital's motion for reconsideration and appointing it as lead plaintiff in the action.  *See* docket # 120.  On July 14, 2009, Westchester Capital filed a petition for a writ of mandamus with the Second Circuit.  On October 1, 2009, the Second Circuit denied Westchester Capital's petition for writ of mandamus.

requirements under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff respectfully requests that this Court certify the Class, with it as Class Representative, and appoint Lead Counsel as Class Counsel.

## II.    ARGUMENT[5]

### A.    The Class Satisfies the Rule 23 Requirements

#### 1.    The Standards for Class Certification

Class certification requires "numerosity, commonality, typicality, and adequacy of representation under Rule 23(a)(1) through (4), and predominance and superiority under Rule 23(b)(3)." *In re Am. Int'l Group, Inc. Sec. Litig.*, No. 04 Civ 8141 (DAB), 2010 U.S. Dist. LEXIS 15453, at *20-*21 (S.D.N.Y. Feb. 22, 2010) ("*AIG*"); *see also In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 (2d Cir. 2008).

The "standard of proof applicable to evidence proffered to meet the requirements of Rule 23 [is] a preponderance of the evidence." *AIG*, 2010 U.S. Dist. LEXIS 15453, at *20 (citing *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). In determining whether class certification is appropriate in a securities action, the Second Circuit has "directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation." *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 54 (S.D.N.Y. 1993); *see also Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir. 1972) (holding that in determining class certification, courts must be "mindful of the admonition of liberality towards demands for class suit status in securities litigation"). Thus, "[t]he interests of justice require that in a doubtful case . . . any error, if there is to

---

[5] The facts set forth in the opposition to Defendants' motions to dismiss (*see* docket #62) are incorporated herein.

be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985).

In considering a class certification motion, a court will focus on whether the prerequisites of Rule 23 are met. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). In doing so, a court may resolve factual issues concerning the prerequisites of Rule 23 only when those issues overlap with issues relating to the merits. *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006) (holding that "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement" and "has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits"). Here, however, there are no merits-based issues that impact the Court's consideration of class certification.

As demonstrated below, the Proposed Class Representative satisfies all of the prerequisites of Rule 23(a)[6] as well as the requirement of Rule 23(b)(3).[7] Accordingly, class certification is appropriate and the Court should grant this motion.

---

[6]    Rule 23 provides that an action may be maintained as a class action if each of the four prerequisites of Rule 23(a) is met and, in addition, the action qualifies under one of the subdivisions of Rule 23(b). The four prerequisites of Rule 23(a) are as follows:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

[7]    Once a court determines that the Rule 23(a) requirements have been met, it may grant class certification if the plaintiffs demonstrate that they can satisfy Rule 23(b)(3) such that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).

### 2. Securities Cases Are Particularly Well Suited for Class Action Treatment

Rule 23 allows for the effective enforcement of the securities laws for large numbers of individual investors who have suffered injuries, but who do not have a sufficient economic interest to incur the expense or inconvenience of an individual lawsuit.  *See, e.g., Escott v. Barchris Constr. Corp.*, 340 F.2d 731, 733 (2d Cir. 1965).  As a result, securities law claims are routinely found to be appropriate for class treatment.  *See, e.g.*, *NYSE Specialists*, 260 F.R.D. at 80; *Dietrich*, 192 F.R.D. at 122.

### 3. The Proposed Class Satisfies Rule 23(a)

#### a. The Proposed Class Is so Numerous that Joinder of All Members Is Impracticable

For class certification to be appropriate, the proposed class must be so numerous that joinder of all of its individual members would be impracticable.  *See* Fed. R. Civ. P. 23(a)(1); *NYSE Specialists,* 260 F.R.D. at 69-70.  "The numerosity requirement of Rule 23(a)(1) does not mandate that joinder of all parties be impossible – only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate."  *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC,* 504 F.3d 229, 244-45 (2d Cir. 2007); *see also In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 508 (S.D.N.Y. 1996); *AIG,* 2010 U.S. Dist. LEXIS 15453, at *32.  In demonstrating that numerosity is satisfied, plaintiffs may rely on reasonable inferences drawn from available facts to estimate the size of the proposed class.  *See Blech,* 187 F.R.D. at 103.  As the Second Circuit has held, "[n]umerosity is presumed when a class consists of forty members or more."  *NYSE Specialists,* 260 F.R.D. at 70 (citing *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir. 1995)).  The proposed Class far exceeds 40 members.  *See* ¶22.

Moreover, "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76, 84 (S.D.N.Y. 2007). During the Class Period, IMAX had at least 40 million shares outstanding, owned by hundreds, if not thousands, of persons, with such stock actively trading on the NASDAQ National Market ("NASDAQ"), an open and efficient market. *See, e.g.,* ¶22. As such, Plaintiff alleges – and Defendants cannot dispute – that there are at least hundreds, if not thousands, of members of the proposed Class (*see* ¶22), easily satisfying the numerosity requirement. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000).

Further, throughout the Class Period, IMAX's common stock was actively traded on the NASDAQ and the Toronto Stock Exchange ("TSX") in a well-developed and efficient market. ¶22. And, during the Class Period, hundreds of millions of IMAX shares were traded on the NASDAQ and the TSX (with approximately 90% of those shares being traded on the NASDAQ). *Id.*; *see, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 157 (S.D.N.Y. 2007) (finding numerosity element was satisfied when more than twenty million shares of common stock were traded during the Class Period); *see also Oxford Health Plans*, 191 F.R.D. at 374. Accordingly, Plaintiff has satisfied the numerosity requirement of Rule 23(a)(1).

### b.     Questions of Law and Fact Common to the Members of the Class Exist

Rule 23(a)(2) requires there to be questions of law or fact common to the Class. "The commonality requirement has been applied permissively by courts in the context of securities fraud litigation, and minor variations in the class members' positions will not suffice to defeat certification." *Dietrich*, 192 F.R.D. at 124; *see also AIG*, 2010 U.S. Dist. LEXIS 15453, at *33 ("The commonality requirement is met if plaintiffs' grievances share a common question of law or

of fact.") (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund*, 504 F.3d at 245).  Thus, in determining whether common questions exist, Rule 23(a)(2) "requires only that there be 'a common nucleus of operative fact,' not that there be an absolute identity of facts."  *Gerber v. Computer Assocs. Int'l, Inc.*, No. 91 CV 3610 (SJ), 1995 U.S. Dist. LEXIS 21142, at *7 (E.D.N.Y. Apr. 14, 1995) (quoting *Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 153-54 (2d Cir. 1983)).

    This court already sustained the allegations of the AC and upheld the sufficiency of the alleged public misstatements.  *See IMAX*, 587 F. Supp. 2d at 39-40 (denying motions to dismiss).  Evidentiary proof of the claims that have been sustained will necessarily be common to all members of the Class.

    Common questions of law and fact are present where, as here, the alleged fraud involves material misrepresentations and omissions in documents circulated to the investing public, press releases and statements provided to the investment community and the media, and investor conference calls.  *See, e.g., Darquea v. Jarden Corp.*, No. 06 Civ. 722 (CLB), 2008 U.S. Dist. LEXIS 17747, at *6 (S.D.N.Y. Mar. 6, 2008) ("The alleged misrepresentation leading to artificially inflated stock prices relate to all the investors and the existence and materiality of such misstatements or omissions present important common issues."); *see also In re Frontier Ins. Group Sec. Litig.*, 172 F.R.D. 31, 40 (E.D.N.Y. 1997).  Among the many questions of fact or law common to members of the Class are:

    (a)    Whether the federal securities laws were violated by Defendants' acts as alleged in the AC;

    (b)    Whether Defendants' statements issued during the Class Period were materially false and misleading when issued;

    (c)    Whether and to what extent the Company's financial statements failed to comply with GAAP during the Class Period;

(d)     Whether PWC's audits of the Company's financial statements during the Class Period were conducted in accordance with GAAS;

(e)     Whether PWC's audits of the Company's financial statements during the Class Period were conducted in accordance with the standards of the PCAOB;

(f)     Whether the market price of the Company's common stock during the Class Period was artificially inflated due to the materially misleading statements issued by Defendants; and

(g)     whether Defendants acted with scienter in failing to inform investors of material facts and in issuing false and misleading financial statements.  ¶23.

The repeated misrepresentations and omissions alleged here are of the sort that courts routinely hold to satisfy the "common question" requirement.  *See, e.g., In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2003 U.S. Dist. LEXIS 19784, at *7-*8 (S.D.N.Y. Nov. 7, 2003) (plaintiffs raised common issues of law and fact, including whether defendants' "public filings and statements contained material misstatements, whether the defendants acted knowingly or with reckless disregard for the truth in misrepresenting material facts in [defendants'] public filings and press releases, and whether the damages to the investors were caused by the defendants' misstatements").

Accordingly, the commonality requirement is satisfied.

### c.     The Claims of the Proposed Class Representative Are Typical of the Class

To demonstrate "typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability."  *AIG*, 2010 U.S. Dist. LEXIS 15453, at *35, quoting *Flag Telecom Holdings*, 574 F.3d at 35.[8]

---

[8]     Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class."

To meet the typicality requirement, "[t]he claims need not be identical but must derive from the same general, over-all course of fraudulent conduct." *Gerber*, 1995 U.S. Dist. LEXIS 21142, at *8-*9. A court in this District specifically stated:

> Because this [typicality] inquiry focuses on the nature of the claims asserted, factual differences involving the date, type and manner of the purchase, the investor's perception of the transaction, or even the information furnished to him at the time will not destroy typicality if each class member was the victim of the same material omissions and the same consistent course of conduct.

*In re Baldwin-United Corp. Litig.*, 122 F.R.D. 424, 428 (S.D.N.Y. 1986); *see also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 176 (S.D.N.Y. 2008) ("Typicality does not require that the situations of the named representatives and the class members be identical.") (citing *Oxford Health Plans*, 191 F.R.D. at 375). As the Supreme Court has observed, the commonality and typicality requirements "tend to merge. Both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Mendoza v. Casa De Cambio Delgado, Inc.*, No. 07CV2579 (HB), 2008 U.S. Dist. LEXIS 61557, at *15-*16 (S.D.N.Y. Aug. 12, 2008).

The claims here satisfy the typicality requirement because they "arise[] from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Dietrich*, 192 F.R.D. at 124; *NYSE Specialists*, 260 F.R.D. at 70 (citing *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)). As demonstrated in Lead Plaintiff's Certification, dated September 27, 2006 (previously filed as Exhibit A to the Declaration of David A. Rosenfeld in Support of the Motion of Snow Capital for Appointment as Lead Plaintiff and for Approval of Selection of Lead Counsel ("Rosenfeld Decl."), dated October 10, 2006), Lead Plaintiff purchased IMAX securities during the Class Period. Plaintiff's claims are, therefore, not only similar to those of the other members of the Class; they are virtually identical. The Class members

- 9 -

seek to prove that Defendants made materially false and misleading statements during the Class Period relating to improper accounting practices at IMAX.  As a result, Plaintiff and the other members of the Class have been injured by the same course of conduct by Defendants.  Likewise, the damages they seek arise from the purchase of IMAX shares at prices that were artificially inflated as a result of Defendants' false and misleading statements and omissions, and the subsequent decline in the price of the Company's stock when aspects of the fraud were revealed.  Thus, Plaintiff stands in the same position as other purchasers of the Company's shares during the Class Period. *See In re Oxford Health Plans, Inc. Sec. Litig.,* 182 F.R.D. 42, 50 (S.D.N.Y. 1998) (finding typicality where the claims of the putative class representatives "arise from the same conduct from which the other class members' claims and injuries arise").  As such, the typicality requirement is satisfied here.

### d.    The Proposed Class Representative and Its Counsel Will Fairly and Adequately Prosecute the Case on Behalf of the Proposed Class

"Adequacy entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation."  *AIG*, 2010 U.S. Dist. LEXIS 15453, at *48.[9]  The Proposed Class Representative satisfies both prongs of the adequacy test.

First, the Proposed Class Representative has already successfully represented the interests of the proposed Class and demonstrated its adequacy and assertiveness to prosecute this action (*see,*

---

[9]    Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  This requirement is met if a plaintiff does not have interests that are antagonistic to those of the class, and its chosen counsel is qualified, experienced, and generally able to conduct the litigation.  *See NYSE Specialists*, 260 F.R.D. at 73 (citing *Baffa v. Donaldson*, 222 F.3d 52, 50 (2d Cir. 2000)); *In re AMF Bowling Sec. Litig.*, No. 99 Civ. 3023 (DC), 2002 U.S. Dist. LEXIS 4949, at *21 (S.D.N.Y. Mar. 26, 2002); *Oxford Health Plans*, 191 F.R.D. at 376; *Dietrich*, 192 F.R.D. at 126.

*supra,* at p. 2).  In addition, none of the Proposed Class Representative's interests are antagonistic to those of the Class.  As discussed above, all members of the Class allege claims arising from the same wrongful conduct that are based on the same legal theories as Plaintiff's claims.  *See Darquea*, 2008 U.S. Dist. LEXIS 17747, at *9 ("All claims alleged arise from the same wrongful conduct, and thus, Plaintiff's interests, recouping money invested, are similar to those of the proposed class.  As such, named Plaintiffs will fairly and adequately protect the interests of the class.").  Plaintiff is clearly committed to the vigorous prosecution of this action, as reflected in the course of litigation to date.  Therefore, the interests of the other members of the Class will be more than adequately protected by Plaintiff.

Second, Plaintiff has retained the law firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller")[10] to represent it and the proposed Class in this matter.  As Courts in this District and across the country have consistently found, "Given [Robbins Geller]'s substantial experience in securities class action litigation . . . [the] element of adequacy has also been satisfied."  *NYSE Specialists*, 260 F.R.D. at 74.  Among other noteworthy securities fraud cases, Robbins Geller has served as lead counsel in *In re Enron Corp. Securities Litigation*, No. H-01-3624 (MH) (S.D. Tex.), in which it secured the largest recovery ever obtained in a shareholder class action.  Commenting on counsel's "clearly superlative litigating and negotiating skills" and the firm's "outstanding reputation, experience, and success in securities litigation nationwide," the *Enron* court stated:

> The experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.

---

[10]    Robbins Geller was previously known as Coughlin Stoia Geller Rudman & Robbins LLP.  The firm's name change was effective on March 31, 2010.  Lead Counsel's firm resume was previously filed as Exhibit D to the Rosenfeld Decl.  An updated version of the firm's resume is attached as Exhibit A to the Declaration of Mark S. Reich in Support of Plaintiff's Motion for Class Certification, dated April 22, 2010 and submitted herewith.

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008). Indeed, courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purposes of litigating class action lawsuits.[11]  Thus, Robbins Geller is qualified to represent the Class and, along with Plaintiff, will vigorously protect the interests of those shareholders.  Accordingly, the requirements of Rule 23(a)(4) are satisfied.

### 4.    The Proposed Class Representative Satisfies the Rule 23(b)(3) Requirements

In addition to meeting the requirements of Rule 23(a), the present action also satisfies the requirements of Rule 23(b).  Rule 23(b)[12] requires a proposed class representative to establish that common questions of law or fact predominate over any questions affecting only individual members, and that a class action is superior to other available means of adjudication.  *See AIG*, 2010 U.S. Dist. LEXIS 15453, at *50.  Here, common questions of law and fact predominate, and a class action is the superior (if not the only) method available to fairly and efficiently litigate this securities fraud lawsuit.

### a.    Common Questions of Law or Fact Predominate

In determining whether common questions predominate, a court's inquiry should be directed primarily toward whether the issue of liability is common to members of the class.  In essence,

---

[11]    *See, e.g., Ellenburg v. JA Solar Holdings Co. Ltd.*, 262 F.R.D. 262, 268 (S.D.N.Y. 2009); *Kelleher v. ADVO, Inc.*, No. 3:06CV01422 (AVC), 2009 U.S. Dist. LEXIS 68914, at *15 (D. Conn. Mar. 30, 2009). *See, e.g., In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 278 (S.D.N.Y. 2008); *In re Orion Sec. Litig.*, No. 08 Civ. 1328 (RJS), 2008 U.S. Dist. LEXIS 55368, at *17-*18 (S.D.N.Y. July 8, 2008); *Vanamringe v. Royal Group Techs., Ltd.*, 237 F.R.D. 55, 58 (S.D.N.Y. 2006).

[12]    Rule 23(b)(3) provides that an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

> (3) the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

"[c]lass-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

Indeed, the predominance requirement "is a test readily met in certain cases alleging . . . securities fraud." *NYSE Specialists*, 260 F.R.D. at 75 (citing *Amchem Prods.*, 521 U.S. at 625). Further, courts have recognized that common issues of law and fact will generally predominate in actions alleging that materially false representations were made to large groups of investors. *See, e.g., In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431 (ARR), 1999 U.S. Dist. LEXIS 22246, at *37 (E.D.N.Y. Apr. 30, 1999) ("In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues"). Where, as here, a complaint alleges that defendants have made false and misleading representations and omissions, the issues of law and fact that flow from that conduct predominate over any individual issues, rendering class treatment appropriate. *See, e.g., Alstom SA*, 253 F.R.D. at 281 (finding "questions of law and fact common to the Proposed Class predominate over any questions affecting only individual members" where plaintiffs alleged that defendants had "artificially inflated the price of [defendant]'s securities by making materially false and misleading statements"); *see also AIG*, 2010 U.S. Dist. LEXIS 15453, at *51-*54; *Darquea*, 2008 U.S. Dist. LEXIS 17747, at *13; *Flag Telecom Holdings*, 245 F.R.D. 147.

As noted in the discussion of commonality (*see, supra*, pp. 6-8), the nature of this case and the elements of Plaintiff's claims involve issues primarily relating to Defendants' misrepresentations and omissions – or, Defendants' liability to the proposed Class. *See Darquea*, 2008 U.S. Dist.

LEXIS 17747, at *13 (observing that "each class member, if they were to bring individual actions, would be required to prove the existence of the alleged activities of the Defendants in order to prove liability").

The AC specifically pleads that Defendants violated the Exchange Act, Section 10(b) and Rule 10b-5, 17 C.F.R. §240.10b-5, and that the Individual Defendants violated Section 20(a).  Because any Class member would need to establish the same facts to demonstrate violations of the Exchange Act, common questions will predominate at trial.  As set forth above, Plaintiff's allegations in this case constitute the type of common conduct that fits well within the Second Circuit's standards for class certification under Rule 23(b)(3).

Reliance is also a question common to all proposed Class members.  The claims asserted under §10(b) and Rule 10b-5 rely on the fraud on the market doctrine, according to which reliance is presumed (*see* ¶¶27-30), and plaintiffs are not required to prove awareness of any particular misstatement or omission. *See Basic Inc. v. Levinson*, 485 U.S. 224, 227 (1988); *see also Salomon Analyst*, 544 F.3d at 481 (citing *Stoneridge Inv. Partners LLC v. Sci. Atlanta*, 128 S. Ct. 761, 769 (2008)).  Courts in this Circuit apply the fraud-on-the market doctrine's presumption of reliance when the company's securities traded in an efficient market.[13]  *See Lapin*, 254 F.R.D. at 182.

The fraud on the market doctrine dispenses with the requirement that an investor prove that he or she was aware of a particular misstatement, or that he or she directly relied on it.  As explained by the Second Circuit, the fraud on the market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their

---

[13]    If Defendants attempt to rebut the presumption of market efficiency, Plaintiff reserves its right to submit supplemental evidence on this issue.

intrinsic value." *Hevesi v. Citigroup Inc.,* 366 F.3d 70, 77 (2d Cir. 2004); *Lapin,* 254 F.R.D. at 182. "[T]he *Basic* theory allows a plaintiff alleging securities fraud to establish reliance simply by virtue of the defendant's public dissemination of misleading information." *Lapin,* 254 F.R.D. at 182.

As stated by the Supreme Court, "[i]t has been noted that it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic,* 485 U.S. at 246-47; *see also AIG*, 2010 U.S. Dist. LEXIS 15453, at *56 (stating that an "investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price," and that "an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a §10(b) and Rule 10b-5 action") (quoting *Basic,* 485 U.S. at 247). "Requiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed . . . or if the misrepresentation had not been made . . . would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Id.* at 245.

According to the Second Circuit, Plaintiff need not demonstrate a material effect on market price to invoke the fraud on the market presumption. *See Salomon Analyst*, 544 F.3d at 482-83. Indeed, "plaintiffs do not bear the burden of showing an impact on price. The point of *Basic* is that an effect on market price is *presumed* based on the materiality of information and a well-developed market's ability to readily incorporate that information into the price of securities." *Id*. at 483 (emphasis in original); *see also Teamsters Local 445*, 2006 U.S. Dist. LEXIS 52991, at *43 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) ("At the class certification stage, the securities' trading record may create certain rebuttable legal presumptions about market efficiency. If, for example, a security is listed on the NYSE, AMEX, NASDAQ, or a similar national market,

the market for that security is presumed to be efficient."). Here, because the Company's stock traded on the NASDAQ, Plaintiff is entitled to the presumption of market efficiency.

Although the efficiency of the market for IMAX shares during the Class Period cannot be seriously disputed, Plaintiff has nevertheless submitted evidence of this efficiency in the accompanying Declaration of Michael A. Marek ("Marek Declaration" or "Marek Decl."). Marek completed a comprehensive event study, a financial and economic analysis, and a detailed review of IMAX's news and disclosures, which additionally demonstrate market efficiency.

In *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), the court analyzed five company specific factors to determine market efficiency.[14] The factors considered in *Cammer* are as follows:

- Whether the security traded at a large average weekly volume;

- Whether a significant amount of analysts followed and reported on the security;

- Whether the security had numerous market makers;

- Whether the company was eligible to file SEC Form S-3; and

- Whether there are empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial information releases, and an immediate response in the security's price.

*Id*. at 1286-87; *see also In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 574 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 n.162 (S.D.N.Y. 2005); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 107 n.323 (S.D.N.Y. 2004).

---

[14]    As the Second Circuit and, specifically, courts in this District have noted, the *Cammer* factors "are frequently used to determine whether a market is efficient." *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 94 (S.D.N.Y. 2009); *see also SCOR Holding*, 537 F. Supp. 2d at 574 ("To determine whether a market for a security is efficient, courts often look to the five factors described in *Cammer v. Bloom*. . . .").

In addition to the five *Cammer* factors, courts also look at three factors enumerated in *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) for market efficiency.  *See, e.g., Teamsters Local 445*, 2006 U.S. Dist. LEXIS 52991, at *24.  These three *Krogman* factors are:

- The company's market capitalization;

- The relative size of the bid-ask spread for the security; and

- The company's float – *i.e.*, the degree to which shares of the security are held by the public, rather than by insiders.

As demonstrated below, all of the *Cammer* and *Krogman* factors are satisfied here.

### (1)    IMAX's shares traded at a large average weekly volume

IMAX's shares were actively traded throughout the Class Period, which is an indication of efficiency.  *See* Marek Decl. at ¶¶24-30.  The *Cammer* court found that, "[t]urnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." *Cammer*, 711 F. Supp. at 1293.  During the Class Period, the average weekly turnover of IMAX shares on NASDAQ was 7.69% (*see* Marek Decl. at ¶25), and the average weekly turnover of the combination of IMAX shares on NASDAQ and TSX, and the maximum number of shares of IMAX, was 8.42% (*see* Marek Decl. at ¶30) – in essence, approximately four times the amount required to "justify a strong presumption" of market efficiency under *Cammer*.  *See* Marek Decl. at ¶¶25, 29-30.  Thus, the market for IMAX's shares should be afforded a "strong presumption" of efficiency for the Class Period.  *See id.* at ¶30.

### (2)    A significant number of analysts followed and reported on IMAX's stock

During the Class Period, IMAX was followed by numerous securities analysts employed by major brokerage firms.  Specifically, during the Class Period, more than 14 analysts issued reports

about IMAX.  *See id.* at ¶31.  Further, several additional firms participated in investor conference calls hosted by IMAX during the Class Period.  *See id.* at ¶34.  Also, Egan-Jones Ratings, KDP Investment Advisors, Inc., Moody's Investors Service and Standard & Poor's Ratings Services issued reports on their ratings of IMAX's debt securities during the Class Period, as well as the Company's overall financial structure and results.  *See id.* at ¶33.  The participation of these securities analysts, and coverage of IMAX in analyst reports available to investors during the Class Period, demonstrates that information about IMAX was publicly disseminated, supporting an efficient market.  The presence of a substantial number of analysts indicates that IMAX stock was closely reviewed by investment professionals, who made buy/sell recommendations to client investors based on information publicly available about the Company.  *See Cammer*, 711 F. Supp. at 1286.

### (3)    IMAX's stock had numerous market makers

IMAX's shares, at all pertinent times, traded on the NASDAQ, which makes use of multiple competing market makers.  *See* Marek Decl. at ¶¶37, 39.  A large number of market makers results in a higher degree of liquidity of a stock.  *See Cammer,* 711 F. Supp. at 1271; *see also* Marek Decl. at ¶¶39, 45.  The presence of multiple market makers weighs in favor of an efficient market.  *See Cammer,* 711 F. Supp. at 1283 n.30 (11 market makers).  IMAX had at least 24 companies serving as market makers for its stock during the Class Period.  *See* Marek Decl. at ¶44.  This number of market makers was more than the average number of market makers for all NASDAQ securities during the same time period, and further supports a finding of market efficiency.[15]  *See id.*

---

[15]    Over the course of the Class Period, the average number of market makers for NASDAQ securities was 16.44 as of February 2003, and 21.22 as of May 2004.  *See* Marek Decl. at ¶44.

Efficiency of the market for IMAX stock was facilitated by such market maker involvement.  iSee Marek Decl. at ¶45; *see also Cammer,* 711 F. Supp. at 1286.

**(4)     The Company was eligible to file SEC Form S-3
(or Form F-3)**

The Court in *Cammer* noted that S-3 registration is indicative of market efficiency.  *See Cammer*, 711 F. Supp. at 1284-85.  For a company to be eligible for an abbreviated S-3 registration – as opposed to the more onerous S-1 or S-2 registration – it must have filed reports with the SEC for a minimum length of time and met certain public "float" (*i.e.*, combined value of shares held by the public) minimums.[16]  The SEC has explained that the market tends to operate efficiently for companies that meet the minimum reporting and float requirements, and thus these companies are permitted to file abbreviated registration statements by incorporating old SEC documents into registration statements by reference.  *See id.* at 1284-85 (the abbreviated integrated registration statement concept "proceeds from the observation that information is regularly being furnished to the market through periodic reports under the Exchange Act. . . .  Form S-3 recognizes the applicability of the efficient market theory . . . with respect to those registrants . . . whose corporate information is widely disseminated, because such companies are widely followed. . . .").  *See also Teamsters Local 445*, 2006 U.S. Dist. LEXIS 52991, at *35 ("Courts have found that the SEC permits an S-3 Registration Statement only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary.").

---

[16]     When *Cammer* was decided, companies could use the S-3 Registration Form only if they had filed SEC reports continuously for 36 months and had at least $150 million in public float.  *See Teamsters Local 445*, 2006 U.S. Dist. LEXIS 52991, at *35 n.95.  Since *Cammer*, the SEC reduced these minimums.  Now, a company must only have $75 million in public float and have filed reports with the SEC for 12 consecutive months.  *See id.* at *35.

IMAX was eligible to file, and on July 15, 2003 and October 6, 2006 did file, a Form F-3, the foreign entity's functional equivalent of the Form S-3. *See, e.g., SCOR Holding*, 537 F. Supp. 2d at 578 n.35 ("as a foreign issuer, the equivalent [of a Form S-3] would have been a Form F-3 . . ."); Marek Decl. at ¶48; *see also* Form S-3, 17 C.F.R. §239.13; Form F-3, 17 C.F.R. §239.33 (both requiring a 12 month reporting history and $75 million in market capitalization). This further supports the inference that the market for IMAX's securities was efficient.

**(5)  There is a causal relationship between unexpected events and an immediate response in IMAX's stock price**

As demonstrated in the Marek Declaration, there was a correlative relationship between new, relevant, widely disseminated information regarding IMAX and a response in IMAX's share price. *See, e.g.,* Marek Decl. at ¶¶68-85. Where a plaintiff can demonstrate that stock prices regularly rose or fell in prompt response to market information, this fact would be significant in establishing an efficient market. *See Cammer,* 711 F. Supp. at 1287. In *Teamsters Local 445,* the Second Circuit observed that "[e]vidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered the most important[] *Cammer* factor . . . and the essence of an efficient market and the foundation for the fraud on the market theory." 546 F.3d at 207.

The Marek Declaration sets forth, in great detail, a cause and effect relationship between unexpected corporate events and a rapid response in IMAX's common stock price. *See* Marek Decl. at ¶¶68-85. There was a steady and widely disseminated flow of information concerning IMAX that was readily available to the investment community and the market, including, for example, media coverage of IMAX, the Company's own press releases and SEC filings, and the reports of securities analysts who followed the stock and issued reports during the Class Period. *See* Marek Decl. at ¶¶68-70. Marek conducted an "event study" and identified a total of 93 days (without any

- 20 -

regard to the price movement of IMAX common stock) on which events occurred that were potentially likely to have been viewed as "material news dates." Marek Decl. at ¶72.  He also classified 217 dates, on which only non-material information was disseminated to the market during the Class Period, as "non-material news dates." Marek Decl. at ¶73.  Further, Marek classified dates during the Class Period, which fell into neither material news dates nor non-material news dates, as "no-news dates" (finding 797 "no-news dates").  *Id.*  Marek assessed IMAX's sensitivity to market-wide and industry factors during the Class Period via statistical analyses.  *See* Marek Decl. at ¶¶75-78.  As a result of this event study, Marek concluded that of the 1,107 NASDAQ trading days during the Class Period, a regression model returned 48 statistically significant days with abnormal returns at or above the 95% level, indicating "unequivocal statistical proof of market efficiency." Marek Decl. at ¶¶80-85.

The results of the described event study, therefore, clearly demonstrate that IMAX shares traded in an efficient market.  *See Teamsters Local 445,* 546 F.3d at 207; *see also* Marek Decl. at ¶85.

### (6)     IMAX had a large market capitalization

IMAX had a relatively large market capitalization during the Class Period.  As noted in the Marek Declaration, during the Class Period, IMAX's market capitalization ranged between approximately $123 million and $470 million.  *See* Marek Decl. at ¶¶50, 53.  This market capitalization far exceeded the market capitalization required to file a Form S-3 or F-3 Registration Statement, and was more than sufficient to generate an efficient market.

### (7)     The relative size of the bid-ask spread for IMAX's stock was small

During the Class Period, IMAX's share bid-ask spread was narrow.  The bid-ask spread for a security is the difference between the highest price at which an investor is willing to buy a security

(the bid) and the lowest price at which a current holder is willing to sell that security (the ask). "A large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202 F.R.D. at 478; *see also* Marek Decl. at ¶¶64-67. During the Class Period, and, specifically, in the April 2005 time-frame, the average bid-ask spread for IMAX was .34%. *See id.* at ¶¶65-66. This spread is far narrower than the spread which courts have found sufficient to demonstrate market efficiency. *See, e.g., Barrie v. Intervoice-Brite, Inc.*, No. 3:01-cv-1071-K, 2009 WL 3424614, at *12 (N.D. Tex. Oct. 26, 2009) (bid-ask spread of 0.5% "supports the conclusion that the market for [the security] was efficient"); *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 501 (S.D. Fla. 2003) (average bid-ask spread of 2.44% "weighs in favor of market efficiency. . . ."); *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009) (spread of 0.29% "weighs in favor of market efficiency").

While the average quoted closing bid-ask spread for IMAX common stock during April 2005 was 0.34%, the bid-ask spread for components of the Dow Jones Industrial Average ("DJIA") was modestly below that of IMAX during that same time-frame. *See* Marek Decl. at ¶¶65-66. The relatively low bid-ask spread difference between IMAX common stock and the highly capitalized and substantially traded components of the DJIA is further support of the efficiency of the market for IMAX common stock. *See* Marek Decl. at ¶66.

In sum, IMAX's low bid-ask spread did not impose any restrictions on the trading of IMAX's shares and further establishes the efficiency of their market. *See* Marek Decl. at ¶¶66-67.

### (8) A substantial portion of IMAX's stock was widely-held

During the Class Period, IMAX's public "float" – *i.e.*, the percentage of IMAX's shares that were held by the public, rather than by insiders – was a substantial 90%. *See* Marek Decl. at ¶58. This float classifies IMAX shares as widely-held, thereby supporting Marek's finding that the

market for IMAX's shares was efficient during the Class Period.  Indeed, IMAX's float during the

Class Period was akin to the percentage required to "strongly support" a finding of an efficient

market."  *See, e.g., In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 753

(S.D. Tex. 2006) (a float of 92% "strongly supports a finding of an efficient market").[17]

In sum, Plaintiff has unquestionably provided more than sufficient evidence that the market

for IMAX's shares during the Class Period was impersonal, open, well developed, and efficient, in

that the market price of the Company's shares during this time period reflected the publicly available

information concerning IMAX.  Accordingly, reliance is presumed and Plaintiff satisfies the

"predominance" requirement.

Thus, all members of the Class are substantially – if not identically – situated with respect to

those claims.  In fact, it is difficult (if not impossible) to discern any liability issues that are not

common to the claims of each member of the Class and, once common questions of liability are

resolved, all that remains is the ministerial act of computing the amount of damages suffered by each

Class member.  Thus, the predominance requirement is satisfied.

> **b.    A Class Action Is Superior to Other Available Methods
> for the Efficient Adjudication of This Controversy**

As this Court has repeatedly held, "securities cases 'easily satisfy the superiority requirement

of Rule 23.'"  *NYSE Specialists*, 260 F.R.D. at 80 (citing *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107

(S.D.N.Y. 1999)).  Not only do common questions predominate in the present litigation, but, as

further required by Rule 23(b)(3), "a class action is superior to other available methods for the fair

and efficient adjudication of the controversy."  Rule 23(b)(3) sets forth the following factors to be

---

[17]    Other cases have found similarly.  *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d
1315, 1339 (N.D. Ga. 2007) (float in excess of 96% "weighs heavily in favor of a finding of market
efficiency"); *Netbank*, 259 F.R.D. at 673 (float of 92.63% to 93.68% "weighs in favor of market efficiency");
*Cheney*, 213 F.R.D. at 502 (float of 95% "suggests market efficiency").

considered in making a "superiority" determination: (A) the interest of members of the class individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by . . . members of the class; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.  Fed. R. Civ. P. 23(b)(3).

In this litigation, the interest of members of the Class in individually controlling the prosecution of separate actions is minimal, because the costs and expenses of individual actions, when weighed against the individual recoveries potentially obtainable, would be prohibitive.  Indeed, as this Court observed in finding a class action superior to the "fair and efficient adjudication" of another securities case, "[t]housands of investors may have claims against the Defendants.  To force each [ ] shareholder to litigate separately would be unfair to each of them, as well as to Defendants. It would risk disparate results among those that sought redress and be an inefficient use of judicial resources." *Gerber,* 1995 U.S. Dist. LEXIS 21142, at *13; *see also In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. 2009) ("Superiority is readily found where, as here, 'the alternatives [to a class action] are either no recourse for thousands of stockholders … or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'") (quoting *Green,* 406 F.2d at 301).  Thus, the first superiority factor is satisfied.

Next, Plaintiff does not envision that any significant difficulties will likely be encountered in managing this case as a class action.  This action is appropriate for class treatment, embodying all of the hallmarks, both in form and in substance, of the types of securities actions that are routinely certified in this Circuit and elsewhere.

It is unquestionable that the parties (and this Court) have an interest in this litigation proceeding in a single forum. By doing so, inconsistent rulings will be avoided, thereby promoting the fair and efficient use of the judicial system. Finally, this case presents no unusual difficulties in the management of the action. Plaintiff's counsel and the Court have handled numerous similar actions, and the appropriate procedures and techniques for the management of such suits are well established. *See, supra,* at pp. 11-12. Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties if they should arise. *See* Fed. R. Civ. P. 23(c); Fed. R. Civ. P. 23(d).

Thus, as the Second Circuit has recognized, a class action is superior to other available methods for the fair and efficient adjudication of a controversy affecting a large number of securities holders injured by violations of the federal securities laws, *i.e.*, precisely this case:

> [A] class action [in a federal securities action] may well be the appropriate means for expeditious litigation of the issues, because a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.

*Green*, 406 F.2d at 296.

## III.    CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant its motion for class certification and, in doing so, certify the Class defined herein, designate it as Class Representative, and appoint Lead Counsel as Class Counsel.

DATED:  April 22, 2010          ROBBINS GELLER RUDMAN
                                   & DOWD LLP
                                SAMUEL H. RUDMAN
                                ROBERT M. ROTHMAN
                                DAVID A. ROSENFELD
                                MARK S. REICH


                                        */s/ Robert M. Rothman*
                                ROBERT M. ROTHMAN

                                58 South Service Road, Suite 200
                                Melville, NY  11747
                                Telephone:  631/367-7100
                                631/367-1173 (fax)

                                *Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Mark S. Reich, hereby certify that on April 22, 2010, I caused a true and correct

copy of the attached:

Notice of Motion for Class Certification;

Memorandum of Law in Support of Plaintiff's Motion for Class Certification;

Declaration of Mark S. Reich in Support of Plaintiff's Motion for Class
Certification; and

Declaration of Michael A. Marek, dated October 30, 2008,

to be served electronically on all counsel registered for electronic service for this case.


_____*/s/ Mark S. Reich*_____
Mark S. Reich