UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE IMAX CORPORATION
SECURITIES LITIGATION

06 CIV. 6128 (NRB)

JURY TRIAL DEMANDED

## DECLARATION OF MICHAEL A. MAREK

### I.    Background and Qualifications

1.    I have been retained in connection with this matter by Plaintiff's Lead Counsel.    In particular, Plaintiff's Lead Counsel requested that I review and discuss the efficiency of the market for IMAX Corporation ("IMAX" or the "Company") common stock between February 27, 2003 and July 20, 2007, inclusive (the "Class Period").

2.    I am a founding member of Financial Markets Analysis, LLC ("FMA").  FMA is a securities analysis firm with offices in Princeton, New Jersey and San Diego, California.  FMA provides financial analysis and related consulting to its clients.  FMA personnel have frequently been called upon to prepare reports and to testify as securities valuation experts in class actions under Federal and State securities laws.  Such testimony has included testifying to matters including: (1) market efficiency; (2) the materiality of information; (3) loss and damage causation; (4) the valuation of publicly traded securities based upon the hypothetical absence of alleged misstatements and the disclosure of alleged omissions and misrepresentations; and (5) damage calculations.

3.    I have achieved the professional designation of Chartered Financial Analyst (CFA) and am a member in good standing of the CFA Institute (formerly the Association for Investment

Management and Research (AIMR)). The CFA program is a globally recognized standard for measuring the competence and integrity of financial analysts. Its curriculum develops and reinforces a fundamental knowledge of investment principles. The curriculum includes Ethical and Professional Standards, Quantitative Methods, Economics, Financial Statement Analysis, Corporate Finance, Analysis of Debt Investments, Analysis of Equity Investments, Analysis of Derivatives, Analysis of Alternative Investments, Portfolio Management and Performance Measurement and Attribution. A candidate's ability to apply these principles at a professional level is measured through three levels of examination which must be passed in succession. I passed each examination on my first effort. I participate in the CFA Institute's continuing education program and I am a member of the New York Society of Securities Analysts (NYSSA). A copy of my curriculum vitae is attached as Exhibit A.

　　　　4.　　　　My opinions and testimony regarding the subject matters listed above have been accepted in numerous United Stated Federal District Court matters, including: (1) *In Re: Ross Cosmetics Securities Litigation*, United States District Court, District of South Carolina, Spartanburg Division; Master File No. 7-92-1706-3; (2) *In Re Envoy Corporation Securities Litigation*, United States District Court, Middle District of Tennessee, Nashville Division; C.A. No. 3-98-0760; (3) *In Re: Nice Systems Ltd. Securities Litigation*, United States District Court, District of New Jersey; Civil Action No. 01-737; and (4) *In Re: Pozen Securities Litigation*, United States District Court, Middle District of North Carolina; Master File No. 1:04CV00505. In addition, I was determined at trial to be qualified as an expert with regard to these issues in *In Re Cysive, Inc. Shareholders Litigation*, Delaware Chancery Court; Consolidated Civil Action No. 20341-NC. I was retained as the plaintiffs' expert in *In re Executive Telecard, Ltd. Secs. Litig.*, 979 F. Supp. 1021, 1026-26 (S.D.N.Y. 1997), after plaintiffs' original expert was precluded from

rendering testimony regarding these issues. That litigation was settled after my report was produced but before my deposition was taken. A complete list of matters in which I have testified at deposition and/or trial is attached as Exhibit B.

5.    FMA is being compensated in this matter based on the number of hours expended at the rates charged for personnel, which range from $75 to $450 per hour, plus out-of-pocket expenses. My current hourly rate is $400. Neither my nor FMA's compensation is in any way contingent upon the outcome of this matter.

## II.    Summary of Opinions

6.    Based upon my professional knowledge and experience, as well as my review and analyses of the documents and data listed below, it is my opinion that during the Class Period: (1) the market in which IMAX common stock traded was open, well-developed, active and impersonal; (2) IMAX common stock was widely owned and traded by numerous market participants; (3) information about IMAX was readily available and disseminated; and (4) the price of IMAX common stock rapidly reflected new, relevant publicly available information concerning the Company, including misrepresentations alleged by Plaintiffs in this matter. Therefore, it is my opinion that the market for IMAX common stock during the Class Period can be characterized as efficient. As discussed below, the market for IMAX common stock during the Class Period met each of the specific factors relied upon by a number of courts to determine whether a particular security traded in an efficient market.

## III.    Bases for Opinions

7.    My opinions are based upon my professional knowledge and experience, as well as my review and analysis of documents and data including the following:

3

A.    the Consolidated and Amended Class Action Complaint;

B.    Memorandum of Law In Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Motion to Dismiss;

C.    Memorandum of Law In Support of Defendant PricewaterhouseCoopers LLP's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint;

D.    Plaintiffs' Memorandum of Law In Opposition to Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint;

E.    Memorandum of Law In Further Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Motion to Dismiss;

F.    Reply Memorandum of Law In Further Support of Defendant PricewaterhouseCoopers LLP's Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint;

G.    Plaintiffs' Response to IMAX Defendants' Supplemental Submission;

H.    the September 15, 2008 Memorandum and Order issued by the Court in this matter;

I.    Filings made by IMAX with the Securities and Exchange Commission ("SEC") before, during and after the Class Period, including Forms 10-K, Forms 10-Q, Forms 8-K, Proxy Statements and Registration Statements;

J.    Press releases issued by IMAX before, during and after the Class Period;

K.    News articles about IMAX published in the general and financial press before, during and after the Class Period;

L.    Reports about IMAX published by securities analysts;

M.    Daily reported price, volume and quote data for the common stock of IMAX, other companies and stock price indices before, during and after the Class Period; and

N.    Other documents and data cited in this Declaration.

## IV.    Defining An Efficient Market

8.     The concept of an "efficient" market evolved from the Ph.D. dissertation of Eugene

Fama.[1] Dr. Fama made the argument that, in an active market that includes many well-informed

and intelligent investors, securities prices will reflect all available information.  If the market is

efficient, an investment methodology for choosing a portfolio of securities cannot be expected to

consistently outperform an appropriate comparative benchmark – for example, a randomly selected

portfolio of securities with a similar risk profile.

9.     The Efficient Market Hypothesis (the "EMH") postulates there are three forms of

market efficiency -- weak, semi-strong and strong.  The three forms of efficient markets are

distinguished by the degree of information reflected in securities prices.

10.     The weak form postulates that stock prices reflect information about their past

prices, and is widely accepted by market participants.  If markets are weak-form efficient, it is

impossible to earn consistent profits by studying past returns, alone.  The market is said to "have

no memory" regarding past stock prices.  One common methodology for determining whether the

market for a security is weak-form efficient is to graphically and statistically analyze price changes

on successive days.  As shown below, during the Class Period, there was no significant

relationship between IMAX's common stock price returns on successive days.  That is, the

movement in IMAX's common stock on one day was not predictive of its movement on the next

day.

11.     To illustrate this, the graph attached as Exhibit C contains a pattern of paired

returns for a hypothetical security which exhibits "autocorrelation", that is, a statistical relationship

between the price changes on successive trading dates.  If the price of this hypothetical security

---

[1] Fama, Eugene F., "Random Walks in Stock Market Prices," *Financial Analysts Journal*, September/October 1965

rose on Tuesday, it was extremely likely that the price would rise on Wednesday as well. If the price of this security fell on Tuesday, it was extremely likely that the price would fall on Wednesday as well. This predictability is a sign of market inefficiency.

12.    During the Class Period, IMAX common stock was traded on the NASDAQ National Market System (which was renamed the NASDAQ Global Market on July 1, 2006) ("NASDAQ") under the ticker symbol IMAX, and on the Toronto Stock Exchange ("TSX") under the symbol IMX. The graphs attached as Exhibit D contain "paired returns"[2] for: (1) NASDAQ and (2) TSX trading of IMAX common stock during the Class Period. As can be seen in these graphs, there is no discernable pattern in the price changes of IMAX common stock on successive trading days on either market. If the price of IMAX common stock rose (or fell) on Tuesday, it was as likely to fall (or rise) on Wednesday. In other words, IMAX's stock price followed a "random walk", and unlike the inefficient hypothetical market depicted in Exhibit C, IMAX's Wednesday's price change could not be predicted based on Tuesday's price change.

13.    Statistically, results of the regression analysis of these two variables (the "Y", or "dependent" variable set equal to the daily percentage changes in the price of IMAX common stock during the Class Period; and "X" or "independent" variable set equal to the prior trading date's daily percentage changes) indicate insignificant correlation, as shown in the following statistical summary:

---

[2] Each data point in this type of graph is the intersection of a pair of values. The pair consists of: (1) % change on day t (for example, Tuesday); and (2) % change on day t+1 (Wednesday).

| SUMMARY OUTPUT: NASDAQ | | | | | | | |
|---|---|---|---|---|---|---|---|
| Y Variable = IMAX Common Stock Percentage Change on Day t | | | | | | | |
| X Variable = IMAX Common Stock Percentage Change on Day t-1 | | | | | | | |

| *Regression Statistics* | |
|---|---|
| Multiple R | 0.143% |
| R Square | 0.0002% |
| Adjusted R Square | -0.090% |
| Standard Error | 3.767% |
| Observations | 1107 |

Analysis of Variance (ANOVA)

| | df | SS | MS | F | Significance F | | |
|---|---|---|---|---|---|---|---|
| Regression | 1 | 0.0000 | 0.0000 | 0.0023 | 0.9622 | | |
| Residual | 1105 | 1.5684 | 0.0014 | | | | |
| Total | 1106 | 1.5684 | | | | | |

| | Coefficients | Standard Error | t Stat | P-value | Lower 95% | Upper 95% | Lower 95.0% | Upper 95.0% |
|---|---|---|---|---|---|---|---|---|
| Intercept | 0.0003 | 0.0011 | 0.3000 | 0.7642 | (0.0019) | 0.0026 | (0.0019) | 0.0026 |
| X Variable 1 | (0.0014) | 0.0302 | (0.0474) | 0.9622 | (0.0606) | 0.0578 | (0.0606) | 0.0578 |

14.     The "R-square" shown in the preceding table is the measure of the "goodness of fit" of the model, and defines how much of the variation in IMAX's stock price return each day is explained by the variation in the preceding trading date's returns. It assumes a value between 0, indicating no predictive value in the equation, and 1, indicating perfect predictive value. In this case, the R-square was 0.000002, or 0.0002%, indicating that only 0.0002% of the variability in IMAX's NASDAQ daily stock price returns was explained by its previous date's return during the Class Period. Inversely, this means that more than 99.9998% of the variability in IMAX's NASDAQ common stock daily returns was not accounted for by its one-day lagged returns.[3] A low R-square, such as this one, means that the regression equation based on the one-day lagged returns would not likely be an accurate predictor of today's returns and could not be practically exploited to generate above-market returns. There is, therefore, a sufficient empirical basis to

---

[3] Results are very similar for the same statistical analysis of IMAX common stock trading on the TSX. The TSX r-square was 0.000014, or 0.0014%, indicating that only 0.0014% of the variability in IMAX's TSX daily stock price returns was explained by its previous date's returns during the Class Period. Inversely, this means that more than 99.9986% of the variability in IMAX's NASDAQ common stock daily returns was not accounted for by its one-day lagged returns.

conclude that the market for IMAX common stock was weak-form efficient during the Class Period.

15.     As demonstrated by the evidence above, both of the markets (NASDAQ and TSX) for IMAX common stock were weak-form efficient during the Class Period. Additionally, the correlation between NASDAQ and TSX daily price returns during the Class Period was 97.6%.[4] The correlation between these two variables was "statistically significant" at a 99%+ level of confidence, meaning that there is almost no probability that this strong positive relationship occurred simply by chance alone.

16.     The high correlation between changes in IMAX's NASDAQ and TSX prices is strongly indicative of the inability of market participants to arbitrage – profit by exploiting price differences between the two markets – during the Class Period. Exhibit E graphically illustrates that IMAX's NASDAQ closing prices and its $US-$CAD exchange-rate-adjusted TSX closing prices were indistinguishable during the Class Period. When adjusted for the $US-$CAD exchange rate, the difference in daily closing prices averaged only $0.004 per share during the Class Period. The statistically strong relationship between IMAX's NASDAQ and TSX common stock trading prices and price changes means that relevant analyses that demonstrate the efficiency of either market during the Class Period would suffice to demonstrate the efficiency of both markets during that time. Because NASDAQ trading comprised approximately 90% of total

---

[4] Correlation is a statistical measure that describes the degree of relationship between two variables. The two variables analyzed here are: (1) daily IMAX NASDAQ price % changes during the Class Period; and (2) daily IMAX TSX price % changes during the Class Period. The correlation between two variables can range from -1.0 to +1.0. A correlation of -1.0 means that there is a perfect negative relationship between two variables, that is, when one variable increases, the other decreases. A correlation of +1 means that there is a perfect positive relationship between two variables, that is, when one variable increases, so does the other. A correlation of 0.0 means that there is no relationship between two variables.

IMAX common stock trading during the Class Period, my analyses and discussion below mainly reference NASDAQ data, although I have reviewed and refer to relevant TSX data as well.

17.    At the other end of the spectrum from weak-form efficiency is strong-form efficiency. In a strong-form efficient market, stock prices reflect all information about a stock, including *non-public* information. According to one leading academic on the subject, strong-form efficiency "…is an extreme form which few people have ever treated as anything other than a logical completion of the set of possible hypotheses."[5]    I will therefore turn my attention to the issue of whether the market for IMAX common stock was semi-strong form efficient, the applicable standard for purposes of this type of litigation.

18.    The semi-strong form of efficiency postulates that stock prices reflect all *publicly available* information. In markets that are semi-strong efficient, stock prices adjust rapidly to public information. The speed with which security prices adjust to new information depends upon the nature of the new information and how quickly investors are able to digest the implications of the information. I agree with Dr. Fama and others that the rapid inclusion of new, relevant information in the price of a security is a reliable indication of market efficiency:

> The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements. The result is so common that this work now devotes little space to market efficiency. The fact that quick adjustment is consistent with efficiency is noted, and then the studies move on to other issues.[6]

19.    The remainder of my discussions and opinions regarding the efficiency of the market for IMAX common stock during the Class Period refer to efficiency in the semi-strong

---

[5] Jensen, Michael C. "Some Anomalous Evidence Regarding Market Efficiency." Journal of Financial Economics, Vol. 6, Nos. 2/3 (1978) 95-101.

[6] Fama, Eugene F. "Efficient Capital Markets II." Journal of Finance 46, no. 5 (1991): 1575–1617.

form. As discussed in detail below, during the Class Period, the market for IMAX common stock met the criteria for semi-strong efficiency.

20.     Financial economists and analysts typically examine a number of factors when examining market efficiency, including the number and depth of market participants, the availability of information about the security, and, perhaps most importantly, the responsiveness of the security price to the disclosure of new information. These factors are indicative of efficiency because they speak to whether the market for a security is impersonal, open, active, developed and well-informed and to whether information is readily disseminated and fully and accurately incorporated into the price of a security.

21.     A number of courts have relied upon the existence of specific factors to determine whether a particular security traded in an efficient market. For example, the court in Cammer v. Bloom, 711 F. Supp. 1264, (D.N.J. 1989), a seminal and often-cited case on the issue of market efficiency, discussed five characteristics that were positively related to an inference of market efficiency:

   a.     an active trading market; turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption;

   b.     a significant number of securities analysts following and reporting on the subject security;

   c.     the presence of numerous marketmakers;

   d.     the ability of the Company to file a Form S-3 Registration Statement in connection with public offerings; and

   e.     the existence of empirical facts showing a cause and effect relationship between unexpected corporate events and financial releases and an immediate response in the stock price.

22.     Various courts have considered three more factors in addition to the five <u>Cammer</u> factors when determining efficiency:[7]

a.      the Company's market capitalization;

b.      float, the percentage of shares held by the public rather than insiders; and

c.      the bid-ask spread for stock sales.

23.     The remainder of my Declaration will discuss the efficiency of the market for IMAX common stock during the Class Period in the context of these eight factors. As it is my opinion that the fifth <u>Cammer</u> factor, the existence of a cause and effect relationship between events and stock price movements, is most dispositive of market efficiency, I will discuss that factor last.

## V.      Review Of Market Efficiency Factors for IMAX Common Stock During the Class Period

## A.      IMAX Common Stock Was Actively Traded During the Class Period

24.     Empirical studies have found that turnover is a significant contributor to market efficiency. For example:

> We find two such factors that systematically differentiate between efficiently and inefficiently priced stocks, namely, the volume of trade and the number of analysts following the security.[8]

---

[7] In <u>Teamsters Local 445 Freight Division Pension Fund v. Bombadier, Inc.</u>, 2006 U.S. Dist. LEXIS 52991,at *22-24 (S.D. N.Y. Aug. 1, 2006), Judge Scheindlin observed that courts "typically consult some or all" of the 5 Cammer factors and 3 additional factors from the economic literature in determining market efficiency. On appeal, the Second Circuit Court of Appeals also referred to these 8 factors as being "routinely applied," while pointing out that it has not adopted a particular test for market efficiency. <u>Teamsters Local 445 Freight Division Pension Fund v. Bombadier, Inc.</u>, 2008 U.S. App. LEXIS 21498.

25.    I examined the trading volume of IMAX common stock during the Class Period in order to ascertain whether the market could properly be characterized as active.  NASDAQ reported trading volume of IMAX common stock during the Class Period was 710,504,004 shares,[9] or a weekly average of 3,098,771 shares.[10]  Based on NASDAQ reported volume and the maximum number of IMAX common shares outstanding during the Class Period (40,288,074 as of July 20, 2007),[11] the average weekly turnover of IMAX common stock during the Class Period on NASDAQ alone was 7.69% (3,098,771 / 40,288,074).  Based on average weekly NASDAQ + TSX reported volume (3,393,894 shares) and the maximum number of IMAX common shares outstanding during the Class Period (40,288,074),  the average weekly turnover of IMAX common stock during the Class Period was 8.42% (3,393,894 / 40,288,074).

26.    Both the NASDAQ and NASDAQ + TSX figures are more than ample to satisfy Cammer's conclusions: that turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; and that one percent would justify a substantial presumption.

27.    Weekly turnover of IMAX common stock on the TSX by itself averaged less than the lower Cammer substantial presumption of efficiency threshold of 1%.  IMAX's TSX turnover was 0.73% based on IMAX's highest shares outstanding.  However, as noted above in ¶15, there was a statistically strong relationship between IMAX's NASDAQ and TSX common stock trading

---

[8] Brad M. Berber, Paul A. Griffin, and Baruch Lev, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, The Journal of Corporation Law (Winter 1994).

[9] Source for NASDAQ and TSX figures: Bloomberg.  NASDAQ and TSX figures are for the period February 27, 2003 through and including July 20, 2007, inclusive.

[10] Calculated as 710,504,004 shares divided by 229 and 2/7 weeks (1,605 days divided by 7).  TSX reported trading volume of IMAX common stock during the Class Period was 67,438,182 shares, or a weekly average of 294,123 shares.  Total NASDAQ and TSX ("NASDAQ + TSX") reported trading volume of IMAX common stock during the Class Period was 777,942,186 shares, or a weekly average of 3,392,894 shares.  TSX and NASDAQ + TSX weekly average figures were also calculated by dividing total reported volume by 229 2/7.

[11] Source: IMAX's June 30, 2007 Form 10-Q, filed on or about August 10, 2007.  Use of the maximum number of shares outstanding returns the lowest possible, and therefore most conservatively calculated, turnover figure.

prices and price changes during the Class Period. The existence of this relationship means that if auxiliary efficiency criteria, such as weekly average trading turnover, met the threshold for efficiency in either one of the markets for IMAX common stock (NASDAQ, in this case), the efficiency of the other market (the TSX, in this case) can also be presumed.

28.    According to one published paper (the "Dyl Study"),[12] NASDAQ trading volume was historically roughly double-counted compared to New York Stock Exchange ("NYSE"), and so an adjustment factor of about 50% would have been required to make the trading volumes reported by the two exchanges comparable. The Dyl Study demonstrates that the duplicative reporting of share volume had subsided as of 2002 as a greater percentage of NASDAQ shares were being traded on electronic communications networks ("ECNs"). ECNs essentially match buyers and sellers and thereby eliminate market maker intervention. In addition, certain regulations put into place in 2001 which were intended to streamline the NASDAQ reporting mechanism have been effective in reducing duplicative reporting. The Dyl Study, which included data through 2002, supports a reduction of NASDAQ reported volume of approximately 38%. It is likely that a reduction less than 38% of NASDAQ reported volume would be necessary to render it comparable to the NYSE during the Class Period in this matter because, for example, ECN's have garnered even a greater market share of trading since 2002.

29.    I performed the same calculations of IMAX share turnover discussed above, but reduced both NASDAQ and TSX reported trading volume by the 38% figure cited in the Dyl Study. Based on 62% of NASDAQ reported volume and the maximum number of IMAX common shares outstanding during the Class Period the average weekly turnover of IMAX common stock during the Class Period on NASDAQ alone was 4.77% (1,921,238 / 40,288,074). Based on 62%

---

[12] Anderson, Anne-Marie and Dyl, E.A. (2003). Market Structure and Trading Volume. Retrieved May 26, 2006, from http://207.26.165.114/Denver/Papers/MarketStructureandtradingvolume.pdf.

of NASDAQ + TSX reported volume and the maximum number of IMAX common shares outstanding during the Class Period, the average weekly turnover of IMAX common stock during the Class Period was 5.22% (2,103,594 / 40,288,074).

30.      Both the NASDAQ and NASDAQ + TSX adjusted figures are more than ample to satisfy Cammer's conclusions: that turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; and that one percent would justify a substantial presumption. Once again, IMAX's TSX-only figure, at 0.45%, falls short of Cammer's substantial presumption threshold. However, the strong statistical relationship between IMAX's NASDAQ and TSX prices and price changes allows for the conclusion that because IMAX's NASDAQ common stock trading itself met the threshold for a strong presumption of efficiency under this Cammer factor, IMAX common stock was also traded efficiently on the TSX.

**B.      A Significant Number of Securities Analysts Followed and Reported On IMAX Common Stock During the Class Period**

31.      At least the following investment banking and research firms issued reports regarding IMAX during the Class Period:

CRT Capital
Jefferies & Company, Inc.
Merrill Lynch Research
Merriman Curhan Ford
New Constructs LLC
Paradigm Capital
Piper Jaffray
Roth Capital Partners, LLC
RTX Securities
Sidoti & Company, LLC

Soleil Capital
Sun Trust Robinson Humphrey Capital Markets
Susquehanna Financial Group
Westrock Advisors, Inc.

32.     A partial list of reports issued on IMAX during the Class Period, as compiled by
Thomson Financial and sorted by date, is attached hereto as Exhibit F.

33.     Several additional firms, including Egan-Jones Ratings, KDP Investment Advisors,
Inc., Moody's Investors Service and Standard & Poor's Ratings Services, issued reports on their
ratings of IMAX's debt securities during the Class Period, as well as the Company's overall
financial structure and results.

34.     The Company also hosted regular conference calls for analysts and other investors
in conjunction with the release of its quarterly financial results throughout the Class Period.  In
addition, IMAX made numerous presentations at investment analyst and industry conferences,
including conferences hosted by Bear Stearns, Friedman Billings Ramsey, Jeffries & Co., Roth
Capital Partners and U.S. Bancorp Piper Jaffray.  Finally, IMAX personnel participated in
interviews which were broadcast on investor-focused venues such as CNBC and Bloomberg.

35.     Neither the Cammer decision nor its progeny specifically quantify what constitutes
a "significant" number of analysts.  It is my opinion, however, that the multitude of Company-
specific activities and reports issued by the firms listed and discussed above constituted significant
coverage of IMAX and its common stock during the Class Period.

**C.    IMAX Common Stock Traded Through Numerous Market Makers During The Class Period**

36.    As summarized in one academic paper:

> A well functioning securities market relies on the availability of accurate information, a broad base of investors who can process this information, legal protection of these investors' rights, and a liquid secondary market unencumbered by excessive transaction costs or constraints.[13]

37.    During the Class Period, the NASDAQ Stock Market remained the world's largest electronic stock market and evolved into the largest U.S. equities exchange. With between approximately 3,100 and 3,300 companies, it listed more companies and, on average, traded more shares per day than any other U.S. market during the Class Period.[14]

38.    Like NASDAQ, the TSX is also an electronic trading environment, rather than a physical building.  In 1999, the TSX became Canada's sole exchange for the trading of senior equities, that is, stocks of larger, established companies with operating and financial histories.[15] According to the TSX Group, Inc.[16] 2005 Annual Report:

> Toronto Stock Exchange and TSX Venture Exchange … are the primary venues for capital formation and liquidity in Canada. The total market capitalization of the 3,758 issuers listed on our equity exchanges at December 31, 2005 was almost $1.9 trillion, making our combined equity exchanges the third largest in North America and the seventh largest in the world. The total value of securities traded on our two equity exchanges in 2005 was approximately $1.1 trillion.

---

[13] Gene D'Avolio, Efi Gildor, and Andrei Shleifer, Technology, Information Production, and Market Efficiency, (Unpublished Harvard University).

[14] Sources: NASDAQ February 10, 2004 press release (NASDAQ Announces Year-End Market Statistics), NASDAQ January 13, 2005 press release (NASDAQ Announces Market Year-end Statistics for 2004), NASDAQ January 30, 2006 press release (NASDAQ Announces Fourth Quarter 2005 Results), NASDAQ January 12, 2007 press release (NASDAQ Announces December Market Performance Statistics), NASDAQ January 3, 2008 press release ((NASDAQ Announces Year-End Index Performance Statistics).

[15] The TSX Venture Exchange was established for the benefit of emerging companies wishing access to public venture capital.

[16] Source: TSX Group, Inc. 2005 Annual Report, p. 7.  TSX Group, Inc. is the Canadian public company which operates the TSX.

39.    Trading on NASDAQ and the TSX is facilitated by numerous market makers, as opposed to the mechanism of trading on specialist exchanges such as the New York Stock Exchange.[17]    According to the NASD website,[18] a market maker is:

> A firm that maintains a firm bid and offer price in a given security by standing ready to buy or sell at publicly-quoted prices. The Nasdaq Stock Market is a decentralized network of competitive Market Makers. Market Makers process orders for their own customers, and for other NASD broker/dealers; all NASD securities are traded through Market Maker firms. Market Makers also will buy securities from issuers for resale to customers or other broker/dealers. About 10 percent of NASD firms are Market Makers; a broker/dealer may become a Market Maker if the firm meets capitalization standards set down by NASD.

40.    Similarly, as set forth on the TSX  website:[19]

> The role of the Market Maker on Toronto Stock Exchange (TSX) is to augment liquidity, while maintaining the primacy of an order-driven continuous auction market based on price-time priority. TSX's Market Maker system maximizes market efficiency and removes the interfering influence of a traditional specialist. In the TSX environment, a Market Maker manages market liquidity through a passive role. Market Makers are visible only when necessary to provide a positive influence when natural market forces cannot provide sufficient liquidity.

41.    One text summarizes the difference between the market maker (i.e. NASDAQ and TSX) and specialist (i.e. NYSE) trading systems as follows:[20]

> The central problem of any market is to bring buyers and sellers together so that a seller has a chance to deal with the buyer making the highest bid, and a buyer has a chance to deal with the seller making the lowest offer. The NYSE solves this problem by having all bids and offers come together at specialist posts. "Specialists" are persons or firms who are given franchises, which in practice have amounted to monopolies, to match orders to buy and sell specified stocks. Brokers with orders from customers converge at the posts

---

[17] On August 1, 2006, NASDAQ became operational as an exchange in NASDAQ-listed securities.  Exchange Registration was primarily a change in legal status for NASDAQ as opposed to a change in the way NASDAQ operated. It allowed NASDAQ to operate its trading facilities independently without being subject to control by the NASD. (Sources: NASDAQ August 1, 2006 press release (NASDAQ Becomes Operational As a National Securities Exchange) and NASDAQ Trader website (http://www.nasdaqtrader.com/trader/er/er_faqs.pdf)

[18] http://www.nasd.com/Resources/Glossary/NASDW_011116

[19] http://www.tsx.com/en/trading/products_services/market_system.html

[20] The NASDAQ Handbook, Probus Publishing Company, 1992.

of specialists and either deal with each other or with the specialist, who can act as a
dealer and buy or sell for his own account or act as a broker on behalf of a customer.

In exchange for their monopoly, specialists take on affirmative and negative obligations
designed to protect the public investor. Perhaps the most important of these obligations
is to provide instant liquidity by buying or selling for their own accounts when the flow of
public orders to buy and sell is imbalanced. Other obligations are to preserve an "orderly"
market, maintain reasonable spreads between bids and offers, and to execute public
orders ahead of their own.

The Nasdaq Stock Market solves the problem of bringing buyers and sellers together in a
totally different way. Instead of relying on monopolists with obligations designed to
protect the public, Nasdaq relies on competition. The competition is between dealers,
called market makers, who buy for and sell from their own inventories.

42.    Academic research has confirmed that listing on NASDAQ confers a relative

liquidity advantage on a security.[21]

43.    In order to be listed on the NASDAQ NMS and NASDAQ Global Market during

the Class Period, IMAX was required to meet the standards attached as Exhibit G.[22]   In addition,

NASDAQ-listed companies are required to comply with SEC rules and regulations and regularly

file financial and other information with the SEC and to disseminate financial and other

information to investors.  Current TSX initial and ongoing listing requirements are attached as

Exhibit H.[23]

44.    Over the course of the Class Period, twenty-four (24) market makers each

accounted for at least 1% of the NASDAQ activity in IMAX common stock. This figure compares

---

[21] See, for example, Gregory C. Sanger and John J. McConnell, Stock Exchange Listings, Firm Value, and Security
Market Efficiency: The Impact of NASDAQ; Journal of Financial and Quantitative Analysis, Vol. 21, No. 1 March
1986.
[22] In March of 2003, the NASDAQ NMS minimum bid price requirement for continued listing under Standard 2 was
reduced from $3 to $1, the same amount as for continued listing under Standard 1.  The listing standards shown in the
exhibit remained the same as of August 2008, the latest date for which I was able to find current requirements.
(http://www.nasdaq.com/about/nasdaq_listing_req_fees.pdf)
[23] http://tsx.complinet.com/en/display/display_viewall.html?rbid=2072&element_id=1&record_id=1

favorably with the average number of market makers for NASDAQ securities, which was 16.44 as of February 2003 and 21.22 as of May 2004.[24]  A list of the IMAX common stock market makers who accounted for at least 1% of IMAX NASDAQ trading activity during the Class Period is attached as Exhibit I.

45.    The significance of numerous competing market makers with respect to the establishment of an efficient market was summarized in one academic paper as follows:

> Without the benefit of competing market makers, investors will ultimately pay higher prices and will suffer from lower quality executions.

> We strongly believe that competition results in superior pricing and improves the efficiency and quality of any market and particularly our securities markets.[25]

**D.    IMAX Was Eligible to File, and Filed, Form S-3 Registration Statements In Connection With Public Offerings During The Class Period**

46.    An often-cited indicator of sufficient information about a company being available to the market is the company's ability to file a Form S-3 Registration Statement when it effects a public offering of its securities.  In 1982, the Securities and Exchange Commission adopted a comprehensive revision to the rules and forms governing the registration of securities under the Securities Act of 1933:

> Forms S-1, S-2 and S-3 provide the basic framework for the registration of securities under the Securities Act.  These Forms establish three categories for registration statements. The same information will be required to be part of Securities Act registration statements in all categories, either presented in, or delivered with, the prospectus or incorporated by reference from another document. Differences among the three Forms reflect the Commission's determination as to (1)

---

[24] These averages include market makers which account for less than 1% of activity.  In addition to the 24 market makers which each accounted for 1% or more of IMAX NASDAQ reported trading over the course of the Class Period, an additional 239 market makers each accounted for less than 1% of reported trading.

[25] John Rust and George Hall, Middle Men versus Market Makers: A Theory of Competitive Exchange, Revised February 2002.

when this required information must be presented in full in the prospectus delivered to investors, (2) when certain of the delivered information may be presented on a streamlined basis and supplemented by documents incorporated by reference, and (3) when certain information may be incorporated by reference from documents in the Exchange Act continuous reporting system without delivery to investors.[26]

47.    Under the registration framework established in 1982 and in effect during the Class

Period:

The registration statement for the first category is Form S-1. It requires complete disclosure to be set forth in the prospectus and permits no incorporation by reference. Form S-1 is to be used by registrants in the Exchange Act reporting system for less than three years and also may be used by any registrants who choose to do so or for whom no other form is available.

The second category of registration statement is Form S-2, which combines reliance on incorporating Exchange Act reports by reference with delivery to investors of streamlined information. Registrants in the Exchange Act reporting system for three years may use this Form, which allows them to choose to either: (1) Deliver a copy of their annual report to security holders along with the prospectus describing the offering or (2) present registrant-oriented information comparable to that of the annual report in the prospectus along with the description of the offering. In either case, the more complete information in the Form 10-K is incorporated by reference into the prospectus.

Form S-3, *in reliance on the efficient market theory,* allows maximum use of incorporation by reference of Exchange Act reports and requires the least disclosure to be presented in the prospectus and delivered to investors. Generally, the Form S-3 prospectus will present the same transaction-specific information as will be presented in a Form S-1 or S-2 prospectus.  Information concerning the registrant will be incorporated by reference from Exchange Act reports. The prospectus will not be required to present any information concerning the registrant unless there has been a material change in the registrant's affairs which has not been reported in an Exchange Act filing or the Exchange Act reports incorporated by reference do not reflect certain restated financial statements or other financial information.[27]

(Emphasis added)

---

[26] SEC Release No. 33-6383 (March 3, 1982) [47 FR 11380].
[27] Ibid.

48.    During the Class Period, IMAX was eligible to, and indeed, filed Form S-3

Registration Statements with the SEC.[28]  As part of a "shelf" registration process, IMAX filed a

Form S-3 Registration Statement with the SEC on July 15, 2003 for up to $250 million of debt

securities, common shares, preferred shares, warrants, stock purchase contracts and/or units.

IMAX filed Amendment No. 1 to this Form S-3 on October 6, 2003.

49.    In summary, by virtue of the Company's eligibility to file a Form S-3 Registration

Statement when effecting public offerings of its securities, IMAX common stock traded in reliance

on the efficient market theory according to the framework established by the SEC.


**E.    IMAX's Equity Market Capitalization During the Class Period Ranged from Approximately $123 Million to $470 Million**

50.    There were 32,973,366 shares of IMAX common stock outstanding at the

beginning of the Class Period.[29]  The number of IMAX common shares outstanding rose between

the beginning and the end of the Class Period.  By July 20, 2007, there were 40,288,074 common

shares outstanding.[30]  IMAX's equity market capitalization (shares outstanding times market price)

was approximately $122.7 million at the beginning of the Class Period,[31] reached a high of

---

[28] On June 20, 2007, the SEC issued Release No. 33-8812, proposing revisions to the eligibility requirements for primary securities offerings on Forms S-3 and F-3.

[29] Sources: IMAX Form 10-K filed on March 7, 2003, p. 1 and IMAX Form 10-Q filed on May 6, 2003, p. 1. The Company's shares outstanding figure was stated as 32,973,366 on both February 14, 2003 and April 30, 2003.

[30] Source: IMAX Form 10-K filed on July 20, 2007, p. 1.

[31] Calculation is the multiplication of IMAX's February 27, 2003 NASDAQ closing price ($3.72 per share) by the number of shares outstanding on that date (32,973,366).

approximately $469.8 million during the Class Period[32] and stood at approximately $195.4 million at the end of the Class Period.[33]

51.    To place these figures in context, as of the beginning of the Class Period, IMAX's market capitalization would have placed it within the tenth decile of the universe of all companies trading on the NYSE, the American Stock Exchange ("AMEX") and NASDAQ at about this time. Within this construct, created by the Center for Research in Security Prices ("CRSP") at the University of Chicago, IMAX's market capitalization placed it as a "Micro-Cap", along with 2,696 of the other 4,730 companies (61.7%) included in CRSP's NYSE/AMEX/NASDAQ universe as of September 30, 2002.[34]

52.    At its high point (February 2005), IMAX's market capitalization placed it within the ninth decile of CRSP's construct and among the top 2,494 of the 4,276 companies included in CRSP's NYSE/AMEX/NASDAQ universe as of September 30, 2004.[35]

53.    In summary, while Courts have cited market capitalization as an indicator of market efficiency, an objective threshold has not been quantified. IMAX's market capitalization ranged from approximately $122.7 million to $469.8 million during the Class Period. It is my opinion that IMAX's market capitalization was sufficient, especially in conjunction with the ownership characteristics discussed in the following paragraphs below, to facilitate an efficient market.

---

[32] Calculation is the multiplication of IMAX's February 7, 2005 NASDAQ closing price ($11.91 per share) by the number of shares outstanding on December 31, 2004 (39,446,964).

[33] Calculation is the multiplication of IMAX's July 20, 2007 NASDAQ closing price ($4.85 per share) by the number of shares outstanding on that date (40,288,074).

[34] Source: Ibbotson Associates, Stocks, Bonds, Bills, and Inflation Valuation Edition 2003 Yearbook, pp. 118-119.

[35] Source: Ibbotson Associates, Stocks, Bonds, Bills, and Inflation Valuation Edition 2005 Yearbook, pp. 128-129.

**F.    IMAX's Common Stock Was Widely Held**

54.    IMAX's then-current directors and executive officers owned approximately 10% of the Company's common shares throughout the vast majority of the Class Period, as shown in the following table:[36]

| Named Executive Officers and Director | Common Shares Owned as of | | | | |
| --- | --- | --- | --- | --- | --- |
| | 4/25/2003 | 4/23/2004 | 3/9/2005 | 2/21/2006 | 7/27/2007 |
| Wasserstein Management Partners, LP | 10,195,384 | - | - | - | - |
| Richard L. Gelfond | 1,522,900 | 1,522,900 | 1,572,900 | 1,572,900 | 1,572,900 |
| Bradley J. Wechsler | 1,407,800 | 1,407,800 | 1,482,800 | 1,482,800 | 1,532,800 |
| Neil S. Braun | - | - | - | - | - |
| Kenneth G. Copland | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| J. Trevor Eyton | - | - | - | - | - |
| Michael Fuchs | - | - | - | - | - |
| Garth M. Girvan | 25,898 | 25,898 | 25,898 | 25,898 | 25,898 |
| Ellis B. Jones | - | - | - | - | - |
| G. Edmund King | - | - | - | - | - |
| Murray B. Koffler | 4,200 | - | - | - | - |
| David W. Leebron | - | 1,300 | 1,300 | 1,300 | 1,300 |
| Marc A. Utay | 240,000 | 1,024,327 | 1,124,327 | 1,124,327 | 1,124,327 |
| W. Townsend Ziebold | 35,000 | - | - | - | - |
| Greg Foster | 3,000 | 11,000 | 16,000 | 16,000 | 16,000 |
| Francis T. Joyce | - | - | 2,500 | 7,500 | 7,500 |
| Edward MacNeil | - | - | - | - | - |
| Robert D. Lister | 3,000 | 5,000 | 9,000 | 9,000 | 9,000 |
| David B. Keighley | 10,000 | 200 | 4,800 | 400 | 400 |
| Non-Named Executive Officers and Director | 7,002 | 7,602 | 24,135 | 24,135 | 14,635 |
| All Executive Officers and Directors as a Group | 13,464,184 | 4,016,027 | 4,273,660 | 4,274,260 | 4,314,760 |
| Public "Float" | 19,509,182 | 35,288,964 | 35,307,169 | 35,939,982 | 35,973,314 |
| Total Shares Outstanding | 32,973,366 | 39,304,991 | 39,580,829 | 40,214,242 | 40,288,074 |
| **% Ownership** | | | | | |
| All Executive Officers and Directors as a Group | 40.83% | 10.22% | 10.80% | 10.63% | 10.71% |
| Public "Float" | 59.17% | 89.78% | 89.20% | 89.37% | 89.29% |

[36] Source for data table: IMAX Forms 14-A filed 04/30/2003, 04/29/2004, 04/13/2005, 03/02/2006 and 08/10/2007, May 6, 2003 and July 31, 2003 IMAX press releases.

55.    On May 6, 2003, IMAX issued a press release announcing that it had been notified by Wasserstein Partners, LP that the firm had distributed to its limited partners the approximately 8.2 million shares of IMAX common stock that investment funds it managed held on their behalf, excluding shares owned by the firm directly. On July 31, 2003, IMAX issued a press release which noted that "…the vast majority of those shares, as well as the shares that Wasserstein held directly, have been successfully absorbed into the market." Early in the Class Period, therefore, (by July 31, 2003 at the latest), IMAX common stock "insider" ownership had fallen to approximately 10% of shares outstanding. This low level of "insider" ownership clearly classifies IMAX common stock as widely held. As described in one research paper:[37]

> LLS consider two definitions of widely held firms. With their first definition, a firm is widely held if there is no controlling blockholder who owns more than 20% of the votes. Rather than focusing on the largest blockholder, we consider the holdings of the officers and directors of the firm, whom we call insiders as is common practice, so that a firm meets the 20% standard when its insiders own less than 20% of the shares. We find with our dataset that insiders control less than 20% of the cash flow rights in half the firms ten years after their IPO. With this measure, therefore, the road to diffuse ownership is quick for the typical firm. The more restrictive definition of diffuse ownership used by LLS is that there is no controlling blockholder who owns more than 10% of the votes. Strikingly, insiders own less than 10% of the shares in roughly a quarter of the firms five years after their IPO. However, the 10% standard is one that is not met by the typical firm in our sample in any year within thirty years of its IPO.

56.    A very high level of public common stock ownership, approximately 90%, such as was the case with IMAX during almost all of the Class Period, contributes to market efficiency due to the notion that the non-public set of all available information, which is assumed not yet assimilated into a security's price, is in the hands of insiders only. Thus, the price of a publicly traded security with high insider ownership might be less likely to accurately reflect all available information about the security.

---

[37] Jean Helwege, Christo Pirinsky and René M. Stulz, Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership, NBER Working Paper No. 11505, July 2005; JEL No. G30, G32, D0.

57.    In terms of the number of holders of its common stock, the Company disclosed the following during the Class Period:[38]

|  Date | Approximate Number of Registered Shareholders |
|---|---|
| 12/31/2002 | 285 |
| 02/20/2004 | 294 |
| 02/21/2005 | 307 |
| 02/21/2006 | 304 |
| 06/30/2007 | 340 |

58.    Generally, a substantial percentage of a publicly-held company's common shares are held by depositories, brokerage firms and financial institutions in "street name." Many brokerage firms will automatically put an investor's securities into street name unless the owner gives specific instructions to the contrary. Under street name registration, the brokerage firm will keep records showing the investor as the real or "beneficial" owner, but the investor will not be listed directly on the issuer's (i.e. IMAX's) books as the registered shareholder.    Instead, the brokerage firm (or some other nominee) will appear as the owner on the issuer's books as the registered shareholder.    In my experience, companies with hundreds of registered shareholders, such as IMAX, are likely to have thousands of actual beneficial owners.

59.    Having thousands of unrelated holders unquestionably created an impersonal market for IMAX common stock during the Class Period.    In *Basic Inc. v. Levinson,* the United States Supreme Court used just such language while asserting a rebuttable presumption to the finding that the market for a particular stock was "impersonal [and] well-developed."[39]

---

[38] Source: Forms 10-K filed on 03/07/2003, 03/15/2004, 03/11/2005, 03/09/2006 and 07/20/2007.

[39] See *Basic,* 485 U.S. 224 (1988) at 241,249 n.28.

60.    The reported ownership of IMAX shares by institutional investors[40], including pension funds, mutual funds, banks, and other professional investors varied between 21.3% and 70.5% of the Company's common shares outstanding during the Class Period, as shown in the following table.  Exhibit J contains a list of these institutions' share ownership.

**IMAX Corporation Common Stock**
Summary of Institutional Investor Ownership

| Date | Shares Outstanding | -- Institutional Investor -- Ownership | % of S/O |
|---|---|---|---|
| 3/31/2003 | 32,973,366 | 7,010,918 | 21.3% |
| 6/30/2003 | 36,426,282 | 18,912,373 | 51.9% |
| 9/30/2003 | 37,353,298 | 19,439,856 | 52.0% |
| 12/31/2003 | 39,301,758 | 21,453,972 | 54.6% |
| 3/31/2004 | 39,304,491 | 21,030,004 | 53.5% |
| 6/30/2004 | 39,314,991 | 18,318,908 | 46.6% |
| 9/30/2004 | 39,315,491 | 18,537,070 | 47.1% |
| 12/31/2004 | 39,446,964 | 21,734,792 | 55.1% |
| 3/31/2005 | 39,757,715 | 25,161,196 | 63.3% |
| 6/30/2005 | 39,915,985 | 27,035,885 | 67.7% |
| 9/30/2005 | 40,128,659 | 27,500,844 | 68.5% |
| 12/31/2005 | 40,213,542 | 24,382,327 | 60.6% |
| 3/31/2006 | 40,280,075 | 28,383,857 | 70.5% |
| 6/30/2006 | 40,285,574 | 27,485,156 | 68.2% |
| 9/30/2006 | 40,285,574 | 19,525,177 | 48.5% |
| 12/31/2006 | 40,285,574 | 15,327,785 | 38.0% |
| 3/31/2007 | 40,285,574 | 14,590,683 | 36.2% |
| 6/30/2007 | 40,288,074 | 12,942,601 | 32.1% |

61.    Institutional investors deploy significant resources, employing analysts, researchers and other specialists to closely monitor and analyze economic and industry conditions as well as

---

[40] Excluding Wasserstein Partners LP and associated entities, as discussed above.

individual companies and securities.    As such, institutional investors are often referred to as

"smart money."   Large institutional equity investors are required to file quarterly reports listing

their holdings with the Securities and Exchange Commission ("SEC").[41]   According to a report

issued by The Conference Board[42], during the 2003 – 2005 time period institutional investors held

between 56.0% and 61.2% of the U.S. equity market.    These broad market figures are in line with

the ownership of IMAX common stock during the Class Period.

62.    One academic paper concludes that institutional ownership results in greater market

efficiency by demonstrably facilitating more rapid incorporation of available information into the

prices of securities:

> This paper presents evidence that prices of firms followed by sell-side
> analysts and favored by institutional investors incorporate future earnings
> earlier than prices of other firms.  Our tests are based on regressions of year
> t abnormal returns on earnings changes from years t -1, t, and t+1.  We find
> that lead coefficients for firms most heavily followed by analysts or favored
> by institutions are greater than lead coefficients for firms with little analyst
> following or institutional holdings.  In contrast, contemporaneous
> coefficients for analyst and institutional favorites are less than
> contemporaneous coefficients for other firms.  Furthermore, the results for
> analysts and institutions are incremental to each other.  In addition, neither
> effect is due to the fact that price leads are an increasing function of firm
> size.[43]

---

[41] Institutional investment managers that use the United States mail (or other means or instrumentality of interstate commerce) in the course of their business and that exercise investment discretion over $100 million or more in Section 13(f) securities (generally exchange-traded (e.g., NYSE, AMEX) or NASDAQ-quoted stocks, equity options and warrants, shares of closed-end investment companies, and certain convertible debt securities) must file Form 13F. See Section 13(f)(1) of the Securities Exchange Act.

[42] Source: The 2007 Institutional Investment Report; Report #1400, The Conference Board.  According to its website, "The Conference Board is the world's preeminent business membership and research organization" and is "... (b)est known for the Consumer Confidence Index and the Leading Economic Indicators."  http://www.conference-board.org/aboutus/about.cfm

[43] Benjamin C. Ayers, Robert N. Freeman, Evidence that Price Leads of Earnings Increase with Analyst Following and Institutional Ownership, July 11, 2001; Social Science Research Network Electronic Library; http://papers.ssrn.com\paper.taf?abstract_id=279556.

63.     In summary, based upon its float and other ownership statistics, it is clear that

IMAX stock was widely held by numerous informed market participants. These are characteristics

which are strongly indicative of market efficiency.


G.    **IMAX's Bid-Ask Spread Was Narrow**

64.     The bid-ask spread is the difference between the highest price at which an investor

is willing to buy a security (the bid) and the lowest price at which a current holder is willing to sell

that security (the ask). A large bid-ask spread might be indicative of an inefficient, relatively

illiquid market because it is a cost which makes a security relatively expensive to trade. As a

hypothetical simplified example, an investor who placed a market order to buy a security with a

then-current bid-ask spread of $9.75 per share (bid price) to $10.25 per share (ask price) would pay

$10.25 per share, the lowest price at which a seller was currently willing to sell that security. If

that investor was forced to immediately sell those shares in an unchanged market, he would

receive $9.75 per share pursuant to a market order, the highest price at which a buyer was willing

to buy that security. The $0.50 difference between the bid and the ask, 5% of the $10.00 bid-ask

price average, exacts an high cost of trading which potentially diminishes the efficiency of the

market for this security.

65.     I obtained bid and ask prices for IMAX common stock during the month of April

2005 from the New York Stock Exchange Trade and Quote Database ("TAQ"). [44] As shown in

Exhibit K, on a dollar basis, the average quoted closing bid-ask spread for IMAX common stock

---

[44] April 2005 represents the approximate chronological middle of the Class Period in this matter. As retrieval and analysis of TAQ data is fairly expensive ($800 per month) and time-consuming, I have limited my analysis of IMAX's bid-ask spread to this month, which our firm already had in our possession. IMAX common stock's April 2005 NASDAQ reported trading volume and volume-weighted average closing price were both within one standard deviation of their respective Class Period monthly averages, indicative of the fact that April 2005 data is likely to be representative of the Class Period as a whole.

during this period of time was $0.031 per share.  Measured as a percent of the midpoint of the

closing bid and ask prices, the average quoted closing bid-ask spread for IMAX common stock

during April 2005 was 0.34%.[45]  In my opinion, the low magnitude of this spread did not impair

trading of IMAX common stock, which was highly active as discussed above.

       66.      By way of further reference, as can be seen in Exhibit L, closing the bid-ask spread

during April 2005 for components of the Dow Jones Industrial Average ("DJIA") was almost

identical to that of IMAX, at $0.032 per share.  This figure represented 0.08% of these stocks'

closing bid-ask midpoint.[46]  The DJIA is comprised of thirty of the most highly capitalized and

substantially traded common stocks in the United States.  As such, one would expect these

securities to exhibit bid-ask spreads at below that of IMAX common stock.  Measured as a percent

of the midpoint of the closing bid and ask prices, the average quoted closing bid-ask spread for

these securities during April 2005 ranged from 0.04% to 0.19%.  In my opinion, the relatively low

bid-ask spread difference between IMAX common stock and the highly capitalized and

substantially traded components of the DJIA is indicative of the efficiency of the market for IMAX

common stock.

       67.      In summary, my analysis and research confirms the fact that the closing bid-ask

spread for IMAX common stock during April 2005 was comparable in magnitude to the thirty

common stocks which constituted the Dow Jones Industrial Average during the same time period.

As such, it is my opinion that IMAX's bid-ask spread may be properly characterized as an

indicator of the efficiency of the market in which it traded.

---

[45] In terms of the hypothetical $10.00 security discussed above, 0.34% amounts to $0.034 per share, so that a typical bid-ask spread would have been approximately $9.99 - $10.02.  IMAX's April 2005 average closing bid and ask prices were approximately $9.21 and $9.24, respectively.

[46] The average closing bid and ask prices for the thirty DJIA stocks were approximately $46.22 and $46.25, respectively.

**H.    Empirical Facts Show a Cause and Effect Relationship Between Unexpected Corporate Events and a Rapid Response in IMAX's Common Stock Price**

68.    During the Class Period, IMAX took affirmative steps to inform the investing public about its business activities.  The Company issued numerous press releases reporting various activities, including its financial results, theater system installments and product developments.  These press releases were made available to the investing public upon release through newswire services such as Bloomberg News, PR Newswire, Business Wire, Dow Jones News Service, Reuters News, Associated Press Newswires and Canada Newswire.  In addition, numerous newspapers, magazines and industry publications, including, but not limited to, *The Wall Street Journal, Barron's, Forbes, Investor's Business Daily, Business Week, The New York Times, The Globe and Mail, The Toronto Star, The Calgary Herald, Amusement Business, Hollywood Reporter and Daily Variety* carried these news releases and otherwise reported on developments at the Company.

69.    In addition to these sources of information, IMAX, like all companies with securities listed on NASDAQ, was required to make filings with the SEC.  Filings made by IMAX provided important information to the market, including its financial statements, theater system installations, business prospects and other matters affecting the value of its securities.  These filings were available on-line upon submission to the SEC through the EDGAR system.[47]

70.    In addition, IMAX was subject to the reporting requirements of the Canadian Securities Administrators ("CSA"), a council of Canada's thirteen provincial and territorial

---

[47] According to the SEC's web site (http://www.sec.gov/edgar/aboutedgar.htm): EDGAR, the Electronic Data Gathering, Analysis, and Retrieval system, performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the U.S. Securities and Exchange Commission (SEC). Its primary purpose is to increase the efficiency and fairness of the securities market for the benefit of investors, corporations, and the economy by accelerating the receipt, acceptance, dissemination, and analysis of time-sensitive corporate information filed with the agency.

securities regulatory authorities. IMAX's CSA filings were available on-line upon submission through the SEDAR system.[48] In summary, there was a steady and widely disseminated flow of information concerning the Company that was readily available to the investment community and to the market.

71.    In my opinion, the most telling indication of market efficiency is whether the price of a security responds rapidly to new, relevant information. In 1969, Fama, Fisher, Jensen and Roll pioneered the use of "event studies" in their paper regarding the adjustment of stock prices to announcements of stock splits.[49] Event studies involve the examination of stock price behavior following announcements of relevant events. The subject stock price return is typically compared to a "normal" or "expected" return, which might be the defined function of a regression equation, or simply the return of a market index or peer company basket of stocks. Regarding event studies, and the use of daily stock price data, Fama concluded, "When the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of the stock-price response – the central issue for market efficiency."[50]

72.    Generally, the first step of an "event study" involves identification of the events of interest and definition of the event window. In this matter, I first retrieved and reviewed databases

---

[48] According to its web site (http://www.sedar.com/sedar/faq_en.htm), SEDAR is the System for Electronic Document Analysis and Retrieval, the electronic filing system for the disclosure documents of public companies and investment funds across Canada. All Canadian public companies and investment funds are generally required to file their documents in the SEDAR system. Most of the documents which are legally required to be filed with the Canadian Securities Administrators and many documents which may be filed with the Canadian exchanges (market centres) are included in the SEDAR system.

[49] Fama, Eugene F., Fisher, Lawrence, Jensen, Michael C., and Roll, Richard, "The Adjustment of Stock Prices to New Information," *International Economic Review*, Vol. 10, No. 1, February 1969.

[50] Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance*, Vol. XLVI, No. 5, December 1991. This paper provided a brief review of several event studies published in the interim between 1969 and its publication date. Fama wrote: "We had no clue that event studies would become a research industry." Published literature regarding the event-study methodology is indeed voluminous. Event study results have been used in hundreds of scholarly articles in leading academic finance journals. For an example of how this type of analysis is applied to securities litigation, see Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson, Virginia Law Review, Volume 77, No. 5, August 1991.

of publicly available information regarding IMAX. Without any regard to the price movement of IMAX common stock, I identified a total of 93 days on which, in my opinion, events occurred which were potentially likely to have been viewed as material news at the time they occurred. These events included disclosures made directly by IMAX as well as other Company-specific events including significant analyst rating changes and/or notable media coverage. I have classified these as "material news dates." I have used a one-day window to measure significance. For example, if the Company issued a press release during or before market hours (an event date), the measurement of significance was the difference between the previous trading date's closing price and the event date's closing price. If a press release or other information became available only after the close of trading, the next trading date is effectively the "material news date."

73.    In addition to the occurrences of material news dates, there were numerous other dates on which IMAX issued press releases and/or other Company-specific events occurred during the Class Period. Based on my review of this information, in my opinion it was not likely that those disclosures and events would have been significant enough to cause a material change in the Company's market valuation. I have classified 217 such dates, on which only non-material information was disseminated to the market during the Class Period, as "non-material news dates." Finally, I have classified dates during the Class Period which fell into neither material news dates nor non-material news dates as "no-news dates." There are 797 such no-news dates.

74.    In summary, as regarding the dissemination of information regarding IMAX, the Class Period can be classified as follows:

32

| | |
|---|---|
| Total material news dates: | 93 |
| Total non-material news dates: | 217 |
| Total no news dates: | 797 |
| Total NASDAQ trading dates: | 1,107 |

75.     The next step involves assessment of IMAX's sensitivity to market-wide and industry factors during the Class Period in this matter.  Simply put, in this case, this is the creation of a "market model" which quantifies the mathematical and statistical relationships between changes in the price of IMAX common stock and changes in the general stock market and/or stocks of companies whose primary business is movie/entertainment-related.  I estimated various "market models" during the Class Period – using different combinations of market and industry indices as shown in Exhibit M.  I compared these models' statistical properties and the extent to which they captured the effect of general market and industry forces on IMAX's common stock price.  I used adjusted R-square, a standard measure of statistical relationship, as my decisive measurement in using the model which included daily returns on the Russell 2000 Index and the Bloomberg Hollywood Reporter Index as independent variables.[51]

76.     Next, an event study involves prediction of a normal return during the event window in the absence of the event and estimation of the "residual" or "abnormal" return within the event window, where the abnormal return is defined as the difference between the actual and predicted returns.  A market model such as the one that I employed in this matter is a generally accepted, widely used method to obtain estimates of abnormal returns. The approach of this methodology is to use the statistical method of linear regression to extract market-wide and

---

[51] The Russell 2000 Index is comprised of the smallest 2000 companies in the Russell 3000 Index, representing approximately 8% of the Russell 3000 total market capitalization. The Russell 3000 comprises approximately 98% of the investable U.S. equity market. The Bloomberg Hollywood Reporter Index is a price-weighted index of companies with a large presence in Hollywood and the entertainment business.  Source: Bloomberg.

industry effects from overall Company-specific effects of events, for example, the disclosure of information. I employed standard statistical tests to test for significant Company-specific price changes (commonly referred to as "residuals") on a daily basis. Finally, statistical testing is performed in order to determine whether the abnormal return is statistically different from zero.

77.    Using the regression equation described above, I calculated daily predicted and abnormal (residual) returns for IMAX common stock during the Class Period. If the residual return was statistically significant at the 95% two-tailed level,[52] having a t-statistic of 1.96 or greater, then I concluded that a company-specific event may have occurred on that day, independent of changes in the market and industry indexes.[53]

78.    It is my opinion that the market for IMAX common stock was efficient in absorbing the disclosure of Company-specific information. The following paragraphs describe the bases for that opinion.

79.    Exhibit N is a daily summary of IMAX common stock trading during the Class Period, and includes (1) actual levels and returns for IMAX common stock, the Russell 200 Index and the Bloomberg Hollywood Reporter Index; (2) IMAX's predicted and residual stock price returns; (3) determination of the level of statistical significance of IMAX's residual return; (4) my classification of each NASDAQ trading date as either a material news date, non-material news date or no-news date; and (5) for material news dates, a abbreviated brief listing of associated news and/or events.

---

[52] This refers to the two "tails" of data under the far left and far right of a bell-shaped, or bell curve. Simply put, 95% of the area under the bell curve occurs within approximately 2 standard deviations of the average value, with 2.5% remaining on the far left and 2.5% remaining on the far right.

[53] A t-statistic of 1.96 or greater indicates that such a residual return was independent of the benchmark indices with 95 percent confidence.

80.    Of the 1,107 NASDAQ trading days during the Class Period, the regression model described above returned 48 days with abnormal returns at or above the 95% level, often referred to as "statistically significant dates." These 48 statistically significant dates are broken down as follows:

| | |
|---|---|
| Total material news dates: | 29 (of 93 potential dates) |
| Total non-material news dates: | 5 (of 217 potential dates) |
| Total no-news dates: | 14 (of 797 potential dates) |
| Total statistically significant dates: | 48 (of 1,107 potential dates) |

81.    In my opinion, these results constitute unequivocal statistical proof of market efficiency. For example, my regression model found that 29 of 93 potential material news dates were statistically significant dates. On 93 randomly selected non-material news dates or no-news dates, one would expect to find only between 4 and 5 statistically significant dates.[54] The fact that there were 29 such occurrences constitutes empirical evidence that the price of IMAX common stock indeed responded rapidly to the dissemination of new, relevant information during the Class Period. In summary, compared to what one would expect on dates on which no important news about IMAX disseminated, when important news about IMAX was released to the market, the price of its common stock was 6.2 times more likely to change by a statistically significant amount.

82.    Further, the fact that the price of IMAX common stock changed by a statistically significant amount on only 19 of the total of 1,014 non-material news dates (217 such dates) plus no-news dates (797 such dates) is also highly indicative of market efficiency. One would expect to

---

[54] One would expect to find 5 such occurrences out of each 100 dates that were not "material news days." Out of 93 random non-"material news days", therefore, one would expect to find 5 x (93 / 100) = 4.65 price movements statistically significant at the 95% confidence level.

find between 50 and 51 such dates.[55]  That is, the price of IMAX common stock did not exhibit large price changes, or unexplained volatility, in the absence of new information regarding the Company and its prospects, beyond what one would expect by statistical probability alone.

83.    A comparative analysis of IMAX common stock Class Period price movements on the 93 material news dates with the 1,014 remaining dates indicates that the average absolute residual price return on material news dates was 6.05%, 2.9 times that of the 2.10% figure for non-material new dates and 3.25 times that of the 1.86% figure for no-news dates.  It is my opinion that this large discrepancy is also indicative of an efficiently-traded security, that is, one which exhibited a cause and effect relationship between unexpected corporate events and a rapid response in price.

84.    Finally, I reviewed results of my analyses for the dates on which Plaintiffs allege that Defendants made misrepresentations.  The Complaint lists 16 such dates.  All 16 of these dates were earnings announcements and were included as potential "material news dates" when I reviewed the publicly available information concerning IMAX.  My regression model found that 9 of the 16 misrepresentation dates were statistically significant dates.  On 16 random non-material news dates or no-news dates, one would expect to find between 0 and 1 statistically significant dates.[56]

85.    A comparative analysis of IMAX common stock Class Period price movements on the 16 misrepresentation dates with the 1,014 non-material news dates and no-news dates indicates that the average absolute residual price return on misrepresentation dates was 10.99%, 5.2 times that of the 2.10% figure for non-material new dates and 5.9 times that of the 1.86% figure for no-

---

[55] Out of 1,014 non-"material news days", one would expect to find 5 x (1,014 / 100) = 50.7 price movements statistically significant at the 95% confidence level.

[56] One would expect to find 5 x (16 / 100) = 0.8 price movements statistically significant at the 95% confidence level.

news dates. It is my opinion that not only is this large discrepancy indicative of an efficiently-traded security, but it is also indicative of the materiality of the alleged misrepresentations in this matter.

## VI.    Summary and Conclusion

86.    It is my opinion that during the Class Period the market for IMAX common stock, which included trading on NASDAQ and the TSX, was efficient. The bases for my opinion include the empirical evidence that:

    a.    the price of IMAX common stock followed a "random walk" and was not predictable by past prices alone;

    b.    IMAX common stock was actively traded during the Class Period;

    c.    a significant number of securities analysts followed and reported on IMAX common stock during the Class Period;

    d.    IMAX common stock was listed and traded on the NASDAQ National Market System and the TSX during the Class Period;

    e.    information regarding IMAX and its common stock was widely and readily available to market participants, so much so that IMAX was qualified to issue securities by incorporating that information simply by reference in Form S-3 filings;

    f.    IMAX's equity market capitalization during the Class Period ranged from approximately $122.7 million to $469.8 million, placing it within the majority of

publicly held companies trading in the United States as classified by market capitalization;

g.    IMAX's  common stock float during almost the entirety of the Class Period was approximately 90%, which classified it as "widely-held" under generally accepted definitions of that term;

h.    IMAX's common stock was held by at least hundreds, and most likely, thousands of unrelated shareholders during the Class Period;

i.    a significant number of institutional investors maintained majority ownership of IMAX's common stock during most of the Class Period;

j.    a sample of bid-ask spreads for IMAX common stock during the Class Period demonstrates that those spreads were narrow and, on a per share basis, comparable to thirty of the most highly capitalized and substantially traded companies in the United States;

k.    based on analyses of the results of my event study, an empirically proven cause and effect relationship existed between material news and events and a rapid response in IMAX's common stock price; During the Class Period, the price of IMAX common stock rapidly reflected new, relevant publicly available information concerning the Company, while exhibiting volatility well within a statistically expected range; and finally

l.    analyses of the results of my event study indicate that the alleged misrepresentations in this matter were material to investors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Michael A. Marek

October 30, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, Mark S. Reich, hereby certify that on April 22, 2010, I caused a true and correct

copy of the attached:

Notice of Motion for Class Certification;

Memorandum of Law in Support of Plaintiff's Motion for Class Certification;

Declaration of Mark S. Reich in Support of Plaintiff's Motion for Class
Certification; and

Declaration of Michael A. Marek, dated October 30, 2008,

to be served electronically on all counsel registered for electronic service for this case.


_____*/s/ Mark S. Reich*_____
Mark S. Reich