# EXHIBIT H

Court File No. CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

B E T W E E N :

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs/Moving Parties

- and -

IMAX CORPORATION, RICHARD L. GELFOND,
BRADLEY J. WECHSLER and FRANCIS T. JOYCE

Defendants/Respondents

Proceeding under the *Class Proceedings Act, 1992*

**NOTICE OF MOTION FOR LEAVE TO PLEAD THE CAUSES OF ACTION CONTAINED IN PART XXIII.1 OF THE *SECURITIES ACT* AND FOR CERTIFICATION AS A CLASS PROCEEDING**

The PLAINTIFFS will make a motion to the class action case management Judge, on a date and time to be fixed, at the courthouse, 7755 Hurontario Street, Brampton, Ontario.

PROPOSED METHOD OF HEARING:

The motion is to be heard orally.

THE MOTION IS FOR:

1. an order:

   (a) granting leave to plead the causes of action contained in Part XXIII.1 of the *Securities Act*, R.S.O. 1990, c. S. 5, as amended;

(b) granting leave to add Neil S. Braun, Kenneth G. Copland, Michael Fuchs, Garth M. Girvan, David W. Leebron, Marc A. Utay and Katherine A. Gamble (collectively, the "Proposed Defendants") as defendants in the action;

(c) granting leave to amend the title of proceedings to read as follows:

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

and

IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE, KATHRYN A. GAMBLE, NEIL S. BRAUN, KENNETH G. COPLAND, MICHAEL FUCHS, GARTH M. GIRVAN, DAVID W. LEEBRON and MARC A. UTAY

Defendants

(d) granting leave to amend the statement of claim and file a fresh statement of claim, without underlining, generally in accordance with the form attached as Schedule "A" to this Notice of Motion;

(e) certifying the action as a class proceeding under the *Class Proceedings Act, 1992;*

(f) appointing the plaintiffs as the representative plaintiffs;

(g) defining the "Class" as:

> All persons, (other than Imax and its subsidiaries, officers, directors, senior employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, the Individual Defendants, the Proposed Defendants, their family members and any entity in which any of them has or had any legal or *de facto* controlling interest) who acquired securities of Imax between the opening of trading on the TSX and NASDAQ on February 17, 2006 and the close of the trading on the TSX and NASDAQ on August 9, 2006 and held some or all of the securities at the close of trading on the TSX and NASDAQ on August 9, 2006;

(h) stating the nature of the claims asserted on behalf of the Class to be negligence; conspiracy, negligent and fraudulent misrepresentation, and if leave is granted, liability for secondary market misrepresentation pursuant to Part XXIII.1 of the *Securities Act*;

(i) stating that the relief sought by the Class is as set out in paragraph 2 in the statement of claim;

(j) stating the common issues, assuming leave is granted, to be the following list of common issues or such amendments thereto or such other common issues that counsel may advise:

(i) Do any or all of Imax Corporation's February 17, 2006 Press Release, Annual Report for the year ended December 31, 2005 or its two March 9, 2006 press releases contain a misrepresentation at common law or within the meaning of the *Securities Act*, R.S.O. 1990, c. S.6, as amended?

(ii) If the answer to (i) is yes, are the defendants, or any of them, liable to the plaintiffs and Class members pursuant to section 138.3 of the *Securities Act*, R.S.O. 1990, c. S.6, as amended?

(iii) If the answer to (ii) is yes, what damages are payable by the defendants in respect of that liability?

(iv) Should the court assess damages in the aggregate, in whole or in part, for the Class? If so, what is the amount of the aggregate damage assessment and who should pay it to the Class?

(v) During the relevant period, did the defendants, or some of them, owe the plaintiffs and the Class Members a duty of care? If so, who owed a duty of care to whom?

(vi) If the answer to (v) is yes, were the defendants, or some of them, negligent? If so, who was negligent and how?

(vii) Have the defendants conspired one with the other? If so, who conspired with whom, when, where, why and for what purpose?

(viii) Are the defendants, or some of them, liable in negligent or fraudulent misrepresentation? If so, who is liable?

(ix) If the defendants, or some of them, are liable to the Class for conspiracy, negligence, negligent or fraudulent misrepresentation, how should damages be assessed?

(x) Is Imax Corporation vicariously liable or otherwise responsible for the acts of the other defendants?

(xi) Should the defendants pay punitive damages to the Class? If so, who, why, in what amount and to whom?

(xii) Should the defendants pay the costs of administering and distributing the recovery? If so, who should pay and how much?

(xiii) If the court determines that the defendants are liable to the Class, and if the court considers that participation of individual Class members is required to determine individual issues:

(a) are any directions necessary?

(b) should any special procedural steps be authorized?

(c) should any special rules relating to admission of evidence and means of proof be made?

(d) what directions, procedural steps or evidentiary rules ought to be given or authorized?

(k) settling the form and content of the notice of and the notice program for the certification of the action;

(l) specifying that:

(i) a person may opt out of this class proceeding by sending a written election by regular mail to be received on or before a time and a date to be fixed by the court to Howie & Partners, Chartered Accountants, 3036 Walker Road, Windsor, ON N8W 3R4, Attention: Imax Class Action;

(ii) no person may opt out of this class proceeding after a fixed date; and

(iii) by a fixed date, Howie & Partners shall report to the court the names of persons who have opted out of this class proceeding;

(m) requiring the defendants to pay for the costs of the notice program;

(n) staying any other proceeding relating to this proposed class proceeding; and

(o) declaring that no other proceeding relating to this action may be commenced without leave of the class action case management judge;

2. costs of this motion on a substantial indemnity basis, or in an amount that provides full indemnity, plus any applicable taxes; and

3. such further and other order and relief as counsel may request and this Honourable Court may deem just.

THE GROUNDS FOR THE MOTION ARE:

(a) the causes of action under Part XXIII.1 of the *Securities Act*, R.S.O. 1990, c. S.6, as amended are being asserted in good faith;

(b) there is a reasonable possibility that the action under Part XXIII.1 of the *Securities Act* will be resolved at trial in favour of the plaintiffs;

(c) the court should certify this action as a class proceedings because the section 5(1) criteria of the *Class Proceedings Act, 1992* are met;

(d) the notice program is a reasonable method of notifying the putative Class;

(e) it is fair, just and reasonable that the defendants should pay the costs of the notice program;

(f) sections 77 and 78, and Part XXIII.1 of the *Securities Act*, R.S.O. 1990, c. S.5, as amended;

(g) the *Class Proceedings Act, 1992*, S.O. 1992, c. 6, and, in particular, sections 1, 2, 5, 6, 8(1), 9, 12, 17, 20, 21, 22, 24, 34(1);

(h) Rules 1.04(1), 12, 26.01, 26.02(3) of the *Rules of Civil Procedure*; and

(i) such further and other grounds as counsel may advise and this Honourable Court may deem just.

THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

(a) the affidavit of Michael G. Robb, to be filed;

(b) the affidavit of Marvin Neil Silver, to be filed;

(c) the affidavit of Cliff Cohen, to be filed;

(d) the affidavit of L.S. (Al) Rosen, to be filed;

(e) the statement of claim; and

(f) such further and other evidence as counsel may advise and this Honourable Court may deem just.

November 28, 2006

**SUTTS, STROSBERG LLP**
Lawyers
600 - 251 Goyeau Street
Windsor, ON N9A 6V4

HARVEY T. STROSBERG, Q.C.
LSUC Number: 12640O
PATRICIA A. SPEIGHT
LSUC Number: 26380C
JAY STROSBERG
LSUC Number: 47288F

Tel: 519.561.6285
Fax: 866.316.5308

**SISKINDS LLP**
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8

CHARLES M. WRIGHT

LSUC Number: 36599Q
A. DIMITRI LASCARIS
LSUC Number: 50074A
MICHAEL G. ROBB
LSUC Number: 45787G

Tel: 519.672.2121
Fax: 519.672.6065

Solicitors for the Plaintiffs

**TO:**

**McCARTHY TETRAULT LLP**
Suite 4700,
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. PAUL STEEP
LSUC Number: 21869L
Tel: 416.601.7998
Fax: 416.868.0673

Solicitors for the Defendants Imax Corporation, Gelfond, Wechsler and Joyce

**AND TO:**

**NEIL S. BRAUN**
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

**AND TO:**

**MICHAEL FUCHS**
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

**AND TO:**

**KENNETH G. COPLAND**
c/o Imax Corporation
525 Speakman Drive
Mississauga, ON L5K 1B1

**AND TO:**

**DAVID W. LEEBRON**
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

**AND TO:**

**GARTH M. GIRVAN**
c/o Imax Corporation
2525 Speakman Drive
Mississauga, ON L5K 1B1

**AND TO:**

**KATHRYN A. GAMBLE**
c/o Imax Corporation
2525 Speakman Drive
Mississauga, ON L5K 1B1

**AND TO:**

**MARC A. UTAY**
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

NEIL SILVER and CLIFF COHEN
Plaintiffs

and

IMAX CORPORATION et al.
Defendants

Court File No: CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICI**

Proceeding commenced at Brampton

**NOTICE OF MOTION**

**SUTTS, STROSBERG LLP**
Lawyers
600 - 251 Goyeau Street
Windsor, ON N9A 6V4
HARVEY T. STROSBERG, Q.C. LSUC# 1264C
PATRICIA A. SPEIGHT LSUC# 26380C
JAY STROSBERG LSUC# 47288F

**SISKINDS LLP**
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8
CHARLES M. WRIGHT LSUC# 36599Q
A. DIMITRI LASCARIS LSUC# 50074A
MICHAEL G. ROBB LSUC# 45787G
Tel: 519.672.2121
Fax: 519.672.6065

Solicitors for the Plaintiffs

**SCHEDULE "A"**

Court file #CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

BETWEEN

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

and

IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE, NEIL S. BRAUN, KENNETH G. COPLAND, MICHAEL FUCHS, GARTH M. GIRVAN, DAVID W. LEEBRON, MARC A. UTAY and KATHRYN A. GAMBLE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**FRESH STATEMENT OF CLAIM**

TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiffs. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiffs' lawyers or, where the plaintiffs do not have a lawyer, serve it on the plaintiffs, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your statement of defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date: October , 2006

Issued by: ______________________
Registrar

Address of Court Office:
7755 Hurontario Street
Brampton, ON L6W 4T6

TO:
IMAX CORPORATION
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
BRADLEY J. WECHSLER
784 Park Avenue, Apt. 7B
New York, NY 10021

AND TO:
NEIL S. BRAUN
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

AND TO:
MICHAEL FUCHS
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

AND TO:
DAVID W. LEEBRON
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

AND TO:
KATHRYN A. GAMBLE
c/o Imax Corporation
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
RICHARD L. GELFOND
1120-5th Avenue, Apt. 11A
New York, NY 10128

AND TO:
FRANCIS T. JOYCE
110 East 59th Street, Suite 2100
New York, NY 10022

AND TO:
KENNETH G. COPLAND
c/o Imax Corporation
525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
GARTH M. GIRVAN
c/o Imax Corporation
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
MARC A. UTAY
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

## CLAIM

**DEFINITIONS**

1. The following definitions apply for the purpose of this statement of claim:

(a) "*Act*" means the *Securities Act*, R.S.O. 1990 c. S.5, as amended;

(b) **"Annual Report"** means **Imax's** annual report for the year ended December 31, 2005, which contained **Imax**'s management's discussion and analysis and audited annual financial statements for the same period;

(c) **"Braun"** means the defendant, Neil S. Braun;

(d) "*CJA*" means the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended;

(e) "**Class**" or "**Class Members**" means all persons, other than **Excluded Persons**, who acquired securities of **Imax** during the **Class Period** and held some or all of the securities at the close of trading on the **TSX** and **NASDAQ** on August 9, 2006, or such other definition as may be approved by the court;

(f) "**Class Period**" means the period from and including the opening of trading on the **TSX** and **NASDAQ** on February 17, 2006 to and including the close of trading on the **TSX** and **NASDAQ** on August 9, 2006;

(g) "**Cliff**" means the plaintiff, Cliff Cohen;

(h) "**Copland**" means the defendant, Kenneth G. Copland;

(i) "*CPA*" means the *Class Proceedings Act, 1992*, S.O. 1992 c. 6, as amended;

(j) "**Excluded Persons**" means **Imax's** subsidiaries, officers, directors, senior employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any member of the **Individual Defendants'** families and any entity in which any of them has or had any legal or *de facto* controlling interest;

(k) **"February Press Release"** means the press release dated and released on February 17, 2006 by **Imax;**

(l) **"Form 10-K"** means **Imax's** Form 10-K for the fiscal year ended December 31, 2005, which was required to be filed with the **SEC** under *the United States Securities and Exchange Act of 1934*, and which included the **Annual Report;**

(m) **"Fuchs"** means the defendant, Michael Fuchs;

(n) **"GAAP"** means United States generally accepted accounting principles;

(o) **"Gamble"** means the defendant, Kathryn A. Gamble;

(p) **"Gelfond"** means the defendant, Richard L. Gelfond;

(q) **"Girvan"** means the defendant, Garth M. Girvan;

(r) **"Imax"** means the defendant, Imax Corporation;

(s) **"Individual Defendants"** means **Gelfond, Wechsler, Joyce, Gamble, Braun, Copland, Fuchs, Girvan, Leebron** and **Utay**;

(t) **"Joyce"** means the defendant, Francis T. Joyce;

(u) **"Leebron"** means the defendant, David W. Leebron;

(v) **"NASDAQ"** means the electronic screen-based equity securities market that is based in New York, New York;

(w) **"Neil"** means the plaintiff, Neil Silver;

(x) **"OSC"** means the Ontario Securities Commission, the regulator of the capital markets in Ontario;

(y) **"Representation"** means the statement explicitly and/or implicitly contained in the **February Press Release** and expressly repeated in the **Form 10-K** and **Annual Report**, that **Imax's** revenue for the 2005 fiscal year were prepared and reported in accordance with **GAAP** and that such revenues met or exceeded the earnings guidance previously issued by **Imax;**

(z) **"SEC"** means the Securities and Exchange Commission, the principal regulator of the United States capital markets;

(aa) **"SEDAR"** means the system for electronic document analysis and retrieval of the Canadian Securities Administrators;

(bb) **"TSX"** means the Toronto Stock Exchange;

(cc) **"Utay"** means the defendant, Marc A. Utay; and

(dd) **"Wechsler"** means the defendant, Bradley J. Wechsler.

2. NEIL and CLIFF claim on their own behalf and on behalf of the other Class Members:

(a) an order pursuant to the *CPA* certifying this action as a class proceeding and appointing Neil and Cliff as the representative plaintiffs;

(b) a declaration that Imax and the Individual Defendants made and/or authorized, permitted or acquiesced in the making of the Representation, and that the Representation contained a misrepresentation within the meaning of the *Act* when made;

(c) a declaration that Imax and the Individual Defendants made the Representation negligently or alternatively, recklessly, caring not whether it was true or false;

(d) a declaration that Imax, Gelfond, Wechsler and Joyce conspired each with the other, and with persons unknown, to deceive the Class Members for the purposes of maintaining and increasing the price of the Imax shares;

(e) a declaration that Imax is vicariously liable for the acts and/or omissions of the Individual Defendants;

(f) a declaration that Wechsler, Gelfond, Braun, Copland, Fuchs, Girvan, Leebron and Utay, as Imax directors, are liable to the Class for damages calculated in accordance with s. 138.5 of the *Act*;

(g) a declaration that Imax is liable to the Class for damages calculated in accordance with s. 138.5 of the *Act*;

(h) a declaration that Wechsler, Gelfond, Joyce and Gamble, as Imax officers who authorized, permitted or acquiesced in the release of documents referred to below that contained a misrepresentation and are liable to Class Members for damages calculated in accordance with s. 138.5 of the *Act*;

(i) special damages, general damages, and the costs of administering the plan of distribution of the recovery in this action in the sum of $200 million or such other sum as this court finds appropriate at the trial of the common issues or at a reference or references;

(j) punitive damages in the amount of $10 million;

(k) an order directing a reference or giving such other directions as may be necessary to determine issues not determined in the trial of the common issues;

(l) prejudgment interest and postjudgment interest, compounded, or pursuant to ss. 128 and 129 of the *CJA*;

(m) costs of this action on a substantial indemnity basis or in an amount that provides full indemnity plus, pursuant to s. 26(9) of the *CPA*, the costs of notice and of administering the plan of distribution of the recovery in this action plus applicable taxes; and

(n) such further and other relief as to this Honourable Court seems just.

**THE NATURE OF THE ACTION**

3. Imax is a publicly-traded company. Its shares trade on the TSX and the NASDAQ under the symbols IMX.TO and IMAX, respectively.

4. Throughout the Class Period, the defendants made the Representation. The Representation was made in, among other documents, the Annual Report, the February Press Release and the two Imax press releases dated March 9, 2006.

5. Neil and Cliff seek damages in an amount equal to the losses they and the other Class Members suffered as a result of purchasing or acquiring Imax securities during the Class Period, including damages pursuant to s. 138.5 of the *Act*.

**THE PLAINTIFFS**

6. Neil resides in the City of Windsor, in the Province of Ontario. Neil continues to hold the 1000 shares of Imax he purchased on the TSX. Particulars of his purchases follow:

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| July 31, 2006 | 500 | Purchase | $11.87 | $5961.10 |
| August 9, 2006 | 500 | Purchase | $10.84 | $5446.10 |

7. Cliff resides in the City of Toronto, in the Province of Ontario. Cliff sold the 300 shares of Imax he purchased on the TSX after the Class Period. Cliff lost $1968. Particulars of his trades follow:

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| August 1, 2006 | 300 | Purchase | $12.03 | $3638.00 |
| August 28, 2006 | 300 | Sale | $5.47 | $1670.00 |

**THE DEFENDANTS**

8. Imax is a corporation incorporated pursuant to the laws of Canada. It is headquartered in Mississauga, Ontario, but it also has offices in New York, New York. Imax is a reporting issuer in British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, Quebec, New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland.

9. Gelfond was at all material times, and continues to be, the Co-Chairman of Imax's Board of Directors, and its Co-Chief Executive Officer. Gelfond held, at all material times, a significant number of Imax's securities.

10. Wechsler was at all material times, and continues to be, the Co-Chief Executive Officer of Imax and a member of its Board of Directors. Wechsler held, at all material times, a significant number of Imax's securities.

11. At all material times, Braun, Copland, Fuchs, Girvan, Leebron and Utay were directors of Imax and each held, at all material times, a significant number of Imax's securities.

12. Joyce was at all material times Imax's Chief Financial Officer. He resigned from that position on August 21, 2006. Joyce held, at all material times, a significant number of Imax's securities.

13. Gamble was at all material times Imax's Vice President, Finance and Controller. Gamble held, at all material times, a significant number of Imax's securities.

14. By virtue of their positions as senior officers and/or directors of Imax, the Individual Defendants had actual, implied or apparent authority to act and speak on Imax's behalf prior to and during the Class Period.

**IMAX'S BUSINESS**

15. Imax was founded in Toronto in 1967. Since then, it has carried on business in the large-format film industry as a manufacturer of specialty projection and sound systems and a significant producer and distributor of 15/70-format films for large-format theatres around the world.

16. A large part of Imax's revenues comes from the sale, lease and installation of theatre systems, which include multiple technical elements, including specialized projection equipment, specialty screens, theater automation control systems and film handling equipment. Each of these elements, while technically distinct, is essential to the functionality of the end product that Imax contracts to deliver to its customers. Without each of those elements, Imax's customers do not have the use of the product that Imax has contracted to deliver.

17. Imax also derives revenues from the licensing of related film products to the IMAX theatre network, post-production services for large-format films and from its owned and operated theatre operations. Imax conducts business from its headquarters in Mississauga, Ontario and its offices in New York, New York.

**IMAX'S DISCLOSURE OBLIGATIONS**

18. Imax is a reporting issuer in Ontario and as such, is required to file and deliver to its shareholders audited, annual, comparative financial statements prepared in

accordance with GAAP. Pursuant to s. 78 of the *Act*, these statements must be filed with the OSC and delivered each year within 140 days of the end of the year to which the statements relate.

19. Pursuant to s. 77 of the *Act*, Imax is required to file with SEDAR and deliver to its shareholders quarterly interim financial statements prepared in accordance with GAAP. These statements must include a comparative statement to the corresponding period in the previous year.

**THE BACKGROUND**

20. On March 10, 2005, Imax published a press release in which it estimated that its 2005 earnings, calculated in accordance with GAAP, would be $0.35 to $0.38 per share, an increase from its earlier estimates of $0.32 per share.

21. In November 2005, Imax reported its financial results for the third quarter of fiscal 2005. The results did not meet the expectations of Imax's then current and potential security-holders, and the price of Imax shares declined accordingly. The poor financial results arose in part from Imax's inability to install its high-tech cinemas on a timely basis. The financial results disclosed that Imax had only installed seven new systems during that quarter, which was less than had been anticipated.

**THE RELEASE OF THE MISLEADING REPRESENTATION**

***THE FEBRUARY PRESS RELEASE***

22. On February 17, 2006, Imax issued the February Press Release and filed it with SEDAR and the SEC.

23. In the February Press Release, Imax announced that:

(a) it expected to meet or exceed its previously issued guidance of $0.35-$0.38 US in net earnings per share for fiscal 2005; and

(b) it had successfully completed 14 theatre system installations in the fourth quarter of 2005, and that the installation of those systems *"underlines the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues."*

24. Each of the Individual Defendants and Gamble authorized, permitted and/or acquiesced in the publication of the February Press Release and thereby participated in the making of the Representation contained therein.

25. The February Press Release was materially false and/or materially misleading when made. Imax's statement that it expected to meet or exceed 2005 earnings guidance was premised upon its recognition of revenue in relation to ten theatre installations that were not scheduled to open until the first or second quarter of 2006, seven of which were not even completed until 2006. As alleged more particularly below, the practice of recognizing revenue in relation to those unopened and

uncompleted theatre installations violated GAAP and failed to fairly present the financial performance of Imax.

26. On the day the February Press Release was issued, Imax's share price increased by 9%. Imax's share price continued to rise dramatically after the February Press Release was issued. On March 8, 2006, at the close of the financial markets, Imax's share price closed at $11.00 CDN and $9.50 USD on the TSX and NASDAQ, respectively, an increase of 20% and 21.5% from February 16, 2006.

***THE ANNUAL REPORT***

27. On March 9, 2006, Imax issued its Annual Report. On or about March 9, 2006, in accordance with its obligation pursuant to s. 78 of the *Act*, Imax filed its Form 10-K with SEDAR, and with the SEC.

28. Each of the Individual Defendants authorized, permitted and/or acquiesced in the publication of the Annual Report and thereby participated in the making of the Representation contained therein.

29. The Individual Defendants signed the Form 10-K certifying that the Annual Report contained therein presented fairly, in all material respects, Imax's financial condition and results of operations and thereby participated in the making of the Representation contained therein.

30. Imax claimed in the Annual Report that it had exceeded its 2005 financial guidance. In particular, Imax stated that it had:

(a) revenue of $49,310,000 for the fourth quarter of fiscal 2005;

(b) revenue of $144,930,000 for the fiscal year 2005;

(c) diluted net earnings of $0.29 per share for the fourth quarter of fiscal 2005 (a purported increase of 54% compared to the same period in the previous fiscal year);

(d) diluted net earnings of $0.40 per share for fiscal 2005 (a purported increase of 62% compared to the previous fiscal year); and

(e) revenues from Imax systems of $97,753,000.

31. The management's discussion and analysis contained in the Annual Report also stated that ten theatre systems installed by Imax in 2005 were scheduled to open in the first and second quarters of 2006. These ten theatre systems were among fourteen reported in revenue for 2005. It further stated that these systems were not included in either the open theatre network base or Imax's backlog figures. The Annual Report described Imax's sales backlog as follows:

> The Company lists signed contracts for theatre system sales and sale-type leases as sales backlog prior to the time of revenue recognition. *Sales backlog represents the total value of all signed system sales and lease agreements that are expected to be recognized as revenue in the future* and includes initial rental fees along with the present value of contractual minimum rents due over the lease term, but excludes maintenance revenues as well as rents in excess of contractual minimums that might be received in the future. [Emphasis added.]

32. For accounting purposes, Imax treats its sales and installations of theatres as "multiple element arrangements". The financial statements and management's discussion and analysis contained in the Annual Report included the following statement as to Imax's revenue recognition practices:

> The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When the elements of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.
>
> [...]
>
> The Company recognizes revenue from sales and sales type leases when the installation of the respective theatre system element is substantially complete and all of the following criteria are met: persuasive evidence of an agreement exists, the price is fixed or determinable; and collection is reasonably assured.

33. GAAP defines multiple element arrangements and specifies when revenue may be recognized in respect of such arrangements. Revenue arising from multiple element arrangements can only be recognized when:

(a) revenue arrangements with multiple deliverables can be divided into separate units of accounting;

(b) persuasive evidence of an arrangement exists;

(c) the risks and rewards of ownership have been transferred to the buyer of the goods;

(d) delivery has occurred or services have been rendered;

(e) the seller's price to the buyer is fixed or determinable; and

(f) collection is reasonably assured.

34. GAAP provides that revenue arrangements with multiple deliverables can be divided into separate units of accounting where:

(a) the delivered element has value to the customer without the undelivered element such that it could be sold by or generate revenue for the customer without the undelivered element;

(b) where the undelivered element is not essential to the function of the delivered element;

(c) there is objective and reliable evidence of the fair value of the undelivered item or items; and,

(d) if the arrangement includes a general right of return of the delivered item, the delivery or performance of the undelivered item is probable and substantially within the control of the vendor.

35. If, under the foregoing rules, revenue may be recognized in relation to delivered elements, GAAP also requires the supplier to consider whether the value of the delivered elements allocable to the delivered item(s) is contingent upon the delivery of additional items, or meeting other specified performance conditions.

36. The Individual Defendants' certifications and the revenue statements and figures contained in the Annual Report were false and/or materially misleading. In violation of GAAP, Imax had improperly recognized revenue in the fourth quarter of fiscal 2005 on ten theatre installations in theatres that did not open in that quarter and, in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Insofar as Imax sold complete theatre systems, which comprised separate but integrated components, revenues should not have been recorded until the completion of each system. Imax's application of multiple element revenue accounting did not fairly present Imax's 2005 financial results and was not consistent with prior years' accounting practices. The application of multiple

element revenue accounting resulted in overstated revenues, gross earnings, net earnings, retained earnings and earnings per share as report in Imax's 2005 annual financial statements.

***THE MARCH 9, 2006 PRESS RELEASES***

37. On March 9, 2006, in conjunction with the release of the Annual Report, Imax and the Individual Defendants issued and filed a press release with SEDAR and the SEC.

38. Each of the Individual Defendants authorized, permitted and/or acquiesced in the publication of the press releases issued by Imax on March 9, 2006 and thereby participated in the making of the Representation contained therein.

39. The March 9, 2006 press release repeated the materially false and/or materially misleading financial results reported in the February Press Release and in the Annual Report. In particular, the March 9, 2006 press release repeated Imax's artificially inflated 2005 earnings per share of US$0.40.

40. In addition, Gelfond and Wechsler stated in the March 9, 2006 press release that they "*believe our performance in 2005 demonstrates the increasing acceptance of Imax as a commercial destination for mainstream entertainment.*"

41. The foregoing statements were false and or materially misleading when made, inasmuch as Imax's "*performance in 2005*" had been materially overstated due to the improper recognition of revenues in violation of GAAP.

42. On March 9, 2006, Imax issued a second press release announcing that:

(a) its board of directors had begun a process to "*explore strategic alternatives to enhance shareholder value*," including the sale or merger of the company with another entity offering strategic opportunities for growth;

(b) it had retained Allen & Company and UBS Investment Bank as financial advisors in this process; and

(c) Gelfond and Wechsler thought that as a result of "*solid fiscal 2005 results and compelling growth opportunities*" it was an ideal time to explore options.

43. The second March 9, 2006 press release was false and/or materially misleading when made, inasmuch as Imax's "*solid fiscal 2005 results*" had been materially overstated due to the improper recognition of revenues in violation of GAAP.

44. On March 9, 2006, Imax's share price closed on the TSX at $11.94 CDN and $10.35 USD on the NASDAQ, an 8% increase from the previous day's closing price. Imax's share price increased further in the following days. On March 13, 2006, Imax's share price closed on the TSX at $12.56 CDN and $10.85 USD on the NASDAQ, a 14% increase from March 8, 2006.

**THE TRUTH IS REVEALED**

45. On August 9, 2006, after the financial markets closed, Imax issued a press release announcing for the first time that:

> (a) it was in the process of responding to an informal inquiry from the SEC regarding its revenue recognition practices, including its application of multiple element arrangement revenue accounting to the sale of theatre systems;
>
> (b) it had been unsuccessful to date in its efforts to find an acquirer or merger partner; and
>
> (c) it had identified a material weakness in its internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of fiscal 2006, resulting in a negative adjustment of $0.8 million to its consolidated statement of operations for second quarter of fiscal 2006.

46. The August 9, 2006 press release also revealed that, under Imax's multiple element arrangement accounting, revenues associated with different elements of a theatre system contract are segregated and can be recognized in different periods. That press release also stated that Imax had:

> recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of system was deferred until the final screen was installed." Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006 and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed.

47. The August 9, 2006 press release was filed with SEDAR and the SEC.

48. On August 10, 2006, as a result of the announcement in the August 9, 2006 press release, the price of Imax's shares plummeted and closed at $6.44 CDN on the TSX and $5.73 USD on the NASDAQ, a drop of 40.2% and 40.5%, respectively, from the previous day.

**THE SUBSEQUENT EVENTS**

49. On August 21, 2006, Imax issued a press release announcing that Joyce was resigning from his position as Chief Financial Officer of Imax in order "*to pursue other professional opportunities*".

50. The average closing price of Imax's shares over the ten trading days following the issuance of the August 9, 2006 press release was $6.25 CDN on the TSX and $5.58 USD on the NASDAQ. This constituted a decrease of 41% and 42%, respectively, from the August 9, 2006 closing price of Imax shares on the TSX and the NASDAQ.

**THE CONSPIRACY**

51. From on or about October 1, 2005 to on or about August 9, 2006, at Mississauga, Ontario, New York, New York and elsewhere, Imax, Gelfond, Wechsler and Joyce, wrongfully, unlawfully, maliciously and lacking bona fides, agreed together,

the one with the other and with persons unknown, to, among other things, overstate the revenues and net earnings of Imax for the fourth quarter and fiscal year ended on December 31, 2005.

52. Some, but not all of Imax's, Gelfond's, Wechsler's and Joyce's predominant purposes, concerns and motivation were to:

(a) attract an acquirer or merger partner;

(b) inflate the price of Imax's shares;

(c) obtain an artificially high purchase price of Imax; and

(d) increase the value of their own holdings in Imax.

53. In furtherance of the conspiracy, the following are some, but not all of the acts carried out or caused to be carried out by Imax, Gelfond, Wechsler and Joyce, or some of them:

(a) they caused Imax to recognize revenue in the fourth quarter of 2005 on ten theatre systems even though sufficient and appropriate evidence did not exist that such systems had been substantially installed as operational Imax facilities, that Imax had fulfilled its obligations as vendor or that revenues had been "earned" in accordance with GAAP;

(b) they caused Imax to inappropriately implement revenue recognition procedures that allowed Imax to segregate revenues from different elements of an Imax theatre system, and recognize those revenues in different quarters, even though the customer transactions were not suited to such accounting treatment;

(c) they deviated from GAAP in the preparation of the financial statements;

(d) they deviated from the accounting principle of consistency in the preparation of financial statements;

(e) they authorized statements, announcements, press releases, filings and other public documents containing the Representation;

(f) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when the location was not fit for installation;

(g) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when essential components of the Imax system were absent;

(h) they permitted Imax and the Individual Defendants to make the Representation which was false;

(i) they made, or failed to take any steps to prevent Imax from making, the Representation in statements, announcements, press releases, filings and other public documents;

(j) they made, or caused Imax to make, announcements about its revenue and net earnings when they knew there was no reasonable foundation, in fact, for these net earnings;

(k) they falsely stated that Imax had revenue of $49,310,000 for the fourth quarter of the fiscal year ended 2005;

(l) they falsely stated that Imax had revenue of $144,930,000 for the fiscal year ended 2005;

(m) they prepared and issued the February Press Release falsely stating that it expected to meet or exceed 2005 earnings guidance;

(n) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's revenue was $49,310,000 for the fourth quarter of fiscal 2005; and

(o) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's net earning was $0.29 per share for the fourth quarter of fiscal 2005 and $0.40 per share for the fiscal year 2005.

54. The conspiracy was unlawful because Imax, Gelfond, Wechsler and Joyce knowingly and intentionally overstated the revenue and net earnings of Imax and

in doing so violated the *Act* and similar regulatory legislation in other jurisdictions and the reporting requirements of the TSX and the NASDAQ.

55. The conspiracy was directed towards Neil, Cliff and the other Class Members. Imax, Gelfond, Wechsler and Joyce knew in the circumstances that the conspiracy would, and it did, cause loss to Neil, Cliff and the Class Members.

**THE EFFICIENT MARKETS**

56. The price of Imax's publicly-traded securities is directly impacted by Imax's periodic disclosures regarding its business and affairs. The defendants were at all material times aware of the effect of Imax's disclosures upon the price of its publicly-traded securities.

57. The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases, each of which contained the Representation, were filed with SEDAR, the SEC, the TSX and NASDAQ and thereby became immediately available to and were reproduced for inspection by the Class Members, the public and the financial press through the internet and financial publications.

58. Imax routinely transmitted the documents referred to in paragraph 57 above to the financial press and certain prospective and actual security-holders of Imax.

59. Imax regularly communicated with the public investors via established market-communication mechanisms, including through regular disseminations of press releases on newswire services in Canada and the United States. The price of Imax's publicly-traded securities were directly impacted each time Imax communicated to public investors.

60. Imax was the subject of analysts' reports that incorporated the material elements of the documents referred to in paragraph 57 above, with the effect that any recommendation in such reports was based, in whole or in part, upon material over-statements of Imax's financial results. Each analyst report written about Imax and released to the public directly impacted the price of Imax's publicly-traded securities.

61. Imax securities were and are traded on the TSX and the NASDAQ, both of which are highly efficient and automated markets that promptly incorporate into the price of Imax's shares all material information disseminated to the public, including the documents referred to in paragraph 57 above, by Imax and/or its officers, directors and employees.

**NEGLIGENCE**

62. The defendants owed a duty to Neil, Cliff and the Class Members, at law and under the provisions of the *Act*, to disseminate promptly, or to ensure the prompt dissemination of complete and accurate statements regarding Imax's business and affairs, and promptly to correct previously-issued, materially inaccurate information, so

that the price of Imax's publicly-traded securities was based upon complete and accurate information.

63. The reasonable standard of care expected in the circumstances required the defendants to act fairly, reasonably, honestly, candidly and in the best interests of Neil, Cliff and the other Class Members.

64. The defendants failed to meet the standard of care required for the reasons particularized in the following paragraphs.

65. The defendants were negligent in that:

(a) they failed to exercise the degree of care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances as required by law;

(b) they signed the Form 10-K and the Annual Report when they knew or reasonably ought to have known that the documents contained the Representation which was false;

(c) they authorized statements, announcements, press releases, filings and other public documents containing the Representation;

(d) they failed to maintain appropriate internal policies and procedures to ensure that the financial statements adequately and fairly presented the financial position of Imax;

(e) they knew or ought to have known that the 2006 reported revenue, gross earnings, net earnings, retained earnings and earnings per share of Imax were not fairly stated;

(f) they failed to properly consider all available information and reports respecting the revenue and net earnings of Imax; and

(g) they failed to comply with the principles of GAAP which provide among other things, that:

(i) interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements;

(ii) financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions;

(iii) financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources;

(iv) financial reporting should provide information about an enterprise's financial performance during a period;

(v) completeness should be sought in financial reporting, meaning that relevant information necessary to ensure the fair presentation of underlying events and conditions is provided;

(vi) consistency should be applied in the application of financial accounting and reporting policies;

(vii) financial reporting should be reliable in that it represents what it purports to represent; and

(viii) conservatism should be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.

**NEGLIGENT AND FRAUDULENT MISREPRESENTATION**

66. The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases were prepared, in part, for the purpose of attracting investment and with the intention that members of the investing public would rely upon the documents in making the decision to purchase Imax securities.

67. Each of the documents referred to in paragraph 66 above contained the Representation. The Representation was untrue, inaccurate and misleading.

68. The defendants knew that by making the Representation, the price of Imax's publicly-traded securities would rise and remain at artificially high levels and that investors would rely upon the Representation in making their decisions to purchase Imax shares.

69. Imax made the Representation by issuing the:

(a) February Press Release;

(b) Form 10-K;

(c) Annual Report; and

(d) March 9, 2006 press releases.

70. The Individual Defendants made the Representation by:

(a) authorizing, permitting and/or acquiescing in the February Press Release;

(b) authorizing, permitting and/or acquiescing in and signing the Form 10-K;

(c) authorizing, permitting and/or acquiescing in the Annual Report; and

(d) authorizing, permitting and/or acquiescing in the March 9, 2006 press releases.

71. The defendants made the Representation negligently or, alternatively, recklessly, caring not whether it was true or false, intending that Neil, Cliff and the other Class Members would rely upon it, which they did to their detriment by purchasing Imax securities during the Class Period and holding the securities beyond the Class Period.

72. Neil relied upon the Representation by reading and relying upon the documents referred to in paragraph 70 above, which contained the Representation.

73. Neil, Cliff and each other Class Member relied upon the Representation by the act of purchasing or acquired Imax securities.

74. Neil, Cliff and each other Class Member suffered damages and loss, as particularized below, as a result of relying on the Representation and purchasing the Imax shares.

**PART XXIII.1 OF THE *ACT***

75. The plaintiffs plead and rely on Part XXIII.1 of the *Act*.

76. Each of the February Press Release, the Annual Report, and the two March 9, 2006 Press Releases were documents released by Imax, which is a responsible issuer. As set out above, each of those documents contained the Representation, which was a misrepresentation within the meaning of the *Act*.

77. The Annual Report contained core documents within the meaning of the *Act* in relation to all of the defendants, including annual financial statements and management's discussion and analysis.

78. Each of Wechsler, Gelfond, Braun, Copland, Fuchs, Girvan, Leebron and Utay were directors of Imax at the time the documents containing the Representation were released.

79. Each of Wechsler, Gelfond, Joyce and Gamble were officers of Imax at the time the documents containing the Representation were released, and authorized, permitted or acquiesced in the release of those documents. Further, Wechsler, Gelfond, Joyce and Gamble:

(a) knew, at the time that the February Press Release and the March 9, 2006 press releases were released that they contained the misrepresentation;

(b) at or before the time that the February Press Release and the March 9, 2006 press releases were released, deliberately avoided acquiring knowledge that the documents contained the misrepresentation; or

(c) were, through action or failure to act, guilty of gross misconduct in connection with the release of the February Press Release and the March 9, 2006 press releases.

80. The plaintiffs and the other Class Members purchased or acquired Imax's securities during the period between when Representation was first made in the February Press Release, and before the Representation was publicly corrected.

**DAMAGES**

81. Pursuant to section 138.3 of the *Act*, therefore:

(a) Imax is liable to the plaintiffs and the other Class Members for damages calculated in accordance with section 138.5 of the *Act,* as the responsible issuer;

(b) each of Wechsler, Gelfond, Braun, Copland, Fuchs, Girvan, Leebron and Utay is liable to the plaintiffs and Class Members for the damages calculated in accordance with section 138.5 of the *Act* as the directors of Imax when the documents containing the Representation were released;

(c) each of Wechsler, Gelfond, Joyce and Gamble is liable to the plaintiffs and Class Members for the damages calculated in accordance with section 138.5 of the *Act* as officers of Imax who authorized, permitted or acquiesced in the release of the documents containing the Representation.

82. In addition, Neil, Cliff and the other Class Members have suffered damages compensable at common law. Had Imax's financial position been fairly disclosed, Neil, Cliff and the other Class members would not have purchased Imax securities at the price paid, or alternatively, at all.

83. Neil, Cliff and the other Class Members are also entitled to recover, as damages or costs in accordance with the *CPA*, the costs of administering the plan to distribute the recovery in this action.

**VICARIOUS LIABILITY OF IMAX**

84. Imax is vicariously liable for the acts and omissions of the Individual Defendants.

85. The acts or omissions particularized and alleged in this statement of claim to have been done by Imax were authorized, ordered and done by the Individual Defendants and Imax's other agents, employees and representatives while engaged in

the management, direction, control and transaction of its business affairs and are, therefore, acts and omissions for which Imax is vicariously liable.

86. At all material times, the Individual Defendants were officers and/or directors of Imax. As their actions are independently tortious, they are personally liable for same to Neil, Cliff and the other Class Members.

**PUNITIVE DAMAGES**

87. Neil and Cliff plead that Imax, Gelfond, Wechsler and Joyce's conduct was high-handed, outrageous, reckless, wanton, entirely without care, deliberate, callous, disgraceful, willful, in intentional disregard of their rights, indifferent to the consequences and motivated by economic considerations. Such conduct renders them liable to pay punitive damages.

**THE LEGISLATION**

88. Neil and Cliff plead and rely upon the *Act*, the *CJA* and the *CPA*, all as amended.

**PLACE OF TRIAL**

89. Neil and Cliff propose that this action be tried in the City of Mississauga, in the Province of Ontario.

**SERVICE**

90. This originating process may be served without court order outside Ontario because the action is:

(a) in respect of a tort committed in Ontario (rule 17.02(g));

(b) in respect of damages sustained in Ontario arising from a tort or breach of contract however committed (rule 17.02(h));

(c) against a person outside Ontario who is a necessary and proper party to this proceeding properly brought against another person served in Ontario (rule 17.02(o)); and

(d) against a person carrying on business in Ontario (rule 17.02(p)).

Amended , 2006

**SUTTS, STROSBERG LLP**
Lawyers
600 - 251 Goyeau Street
Windsor, ON N9A 6V4

HARVEY T. STROSBERG, Q.C.
LSUC Number: 12640O
PATRICIA A. SPEIGHT
LSUC Number: 26380C
JAY STROSBERG
LSUC Number: 47288F

Tel: 519.561.6285
Fax: 866.316.5308

**SISKINDS LLP**
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8

CHARLES M. WRIGHT
LSUC Number: 36599Q
A. DIMITRI LASCARIS
LSUC Number: 50074A
MICHAEL G. ROBB
LSUC Number: 45787G

Tel: 519.672.2121
Fax: 519.672.6065

Solicitors for the Plaintiffs