**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE IMAX CORPORATION
SECURITIES LITIGATION

06 CIV. 6128 (NRB)

# REPORT OF
# LUCY P. ALLEN

June 10, 2010

## CONTENTS

I.  Scope of Assignment .................................................................................... 1

II. Qualifications and Remuneration ............................................................... 1
   A. Qualifications ......................................................................................... 1
   B. Remuneration ......................................................................................... 2

III. Materials Considered ................................................................................. 2

IV. Summary of Price Decline and Revenue Recognition Issue ..................... 3

V.  Analysis of the Price Decline .................................................................... 4
   A. Summary of the price movement between August 9, 2006 and July 20, 2007 ................. 4
   B. Negative news released on August 9, 2006 ............................................ 5
   C. The market reacted negatively to the announcement that IMAX had found no buyers ...... 7
       1. IMAX stock price had risen substantially in expectation of takeover ......................... 7
       2. Market had been anticipating search before formal announcement ............................ 7
       3. Intervening indications were made to the market that the search was proceeding
          well ...................................................................................................... 9
       4. Extensive negative commentary regarding the lack of success in search for buyer
          followed August 9, 2006 announcement .................................................. 10
       5. Failed auction can be worse than no suitor .......................................... 11
       6. IMAX stock price had fallen dramatically in 2000 after announcement of failure
          of prior attempt to sell ...................................................................... 12
   D. The market reacted negatively to the announcement of a new business model based
      on joint ventures ................................................................................. 13
   E. The uncertainty surrounding IMAX increased ..................................... 15
   F. The SEC investigation and the possibility that the SEC investigation could expand to
      other issues, rather than the revenue recognition issues themselves, was a negative
      factor on the stock price ...................................................................... 16
   G. Between August 10, 2006 and the end of the alleged class period, other negative
      developments affected IMAX's stock price .......................................... 17

VI. Analysis of the Revenue Recognition Issue ............................................. 18
   A. Summary of the revenue recognition issue ......................................... 18
   B. There was no material restatement of IMAX's cash flows .................. 19
   C. In an efficient market, only cash matters ............................................ 20
   D. We found no evidence that the change in accounting caused analysts to change their
      understanding of the past or future business of IMAX ....................... 21
   E. Analysts reiterate that the restatement has no material cash impact ... 23
   F. The net shift of revenues across years did not substantially change the revenue pattern . 25
   G. Theater signings provided reliable information about future cash flows and the
      prospects of the company ................................................................... 26
   H. The alleged August 9, 2006 disclosure was not curative of revenue recognition
      problems existing during the period when the lead plaintiff purchased IMAX shares ..... 28

VII. Analysis of Institutional Trading for Period 1 and Period 2 ................... 30

# I.    SCOPE OF ASSIGNMENT

We were asked by counsel for IMAX Corporation ("IMAX") to analyze whether the cause for IMAX's stock price decline between August 9, 2006, the first alleged curative disclosure, and July 20, 2007, the end of the alleged class period, was the curative disclosure of prior problems with the revenue recognition of IMAX's theater systems. We were asked to focus on the price decline after the first alleged curative disclosure, August 9, 2006, and on whether this price decline was caused by the curative disclosure of the alleged misinformation related to revenue recognition during the alleged class period, including an analysis of the period in which the lead plaintiff Snow Capital purchased IMAX shares.

In addition, we were asked to use public data on institutional trading of IMAX to examine two periods during the alleged class period:

§    Period 1 4Q 2004 through 4Q 2005 – a period in which the lead plaintiff Snow Capital purchased IMAX shares;

§    Period 2 1Q 2006 through 2Q 2006 – a period which includes IMAX's announcement to pursue strategic alternatives.

In particular, we were asked to estimate the number of shares purchased by institutions during each period and held through 3Q 2006, the quarter in which the alleged August 9, 2006 curative disclosure was made. (We were asked to also note the number of shares purchased by institutions in Period 1 and held through 3Q07, the quarter in which the alleged class period ends.) We were further asked to examine the institutional holdings data for evidence of trading by merger arbitrage investors during the two periods.

# II.    QUALIFICATIONS AND REMUNERATION

## A.    Qualifications

I am a Senior Vice President of NERA Economic Consulting ("NERA"), a firm with over 500 professionals who operate out of more than 20 offices worldwide. I am a member of NERA's Securities and Finance Practice, which dates from the early 1970s and employs a research staff of about 200 professionals with economics, finance and mathematics degrees. The practice

counts as its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

I have a B.A. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. In my 15 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on the stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

## B.    Remuneration

NERA is being compensated for time spent by staff members at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $645 per hour.

## III.    MATERIALS CONSIDERED

In preparing this report, we considered the following documents and data:

1. Consolidated Amended Class Action Complaint;

2. Memorandum of Law in Support of Plaintiffs' Motion for Class Certification;

3. Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Motion to Dismiss;

4. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss The Consolidated Class Action Complaint;

5. Memorandum of Law in Further Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Motion to Dismiss;

6. Letter from Jill S. Abrams to Judge Buchwald dated August 18, 2008 with attachments (Plaintiffs' Supplemental Submission);

7. Affirmation of Jill S. Abrams with exhibits dated October 31, 2008;

8. Declaration of Michael A. Marek dated October 30, 2008;

9. Transcript of the Hearing on August 5, 2008;

10. Defendants Imax Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Supplemental Submission in Response to the Court's Letter Dated August 13, 2008;

11. Memorandum and Order dated September 15, 2008;

12. Fax from Omar A. Khan, Law Clerk to the Hon. Naomi Reice Buchwald, with questions from the Court to Arthur N. Abbey, Nancy Kaboolian, Lewis Liman, and Jennifer L. Conn, with enclosure dated August 12, 2008;

13. Corrected Certification of Named Plaintiff Pursuant to Federal Securities Laws dated April 29, 2010;

14. Stock price and trading volume data for IMAX and market indices from FactSet Research Systems, Inc.;

15. IMAX filings with the Securities and Exchange Commission ("SEC");

16. Data on holdings of IMAX institutional holdings from Thomson Financial ShareWorld;

17. Data on IMAX insider transactions from Thomson Research;

18. IMAX short interest data from Bloomberg L.P.;

19. News articles and press releases relating to IMAX from Factiva and Bloomberg L.P.;

20. Analyst reports covering IMAX;

21. Conference call transcripts; and

22. Academic literature on securities and finance.

## IV.    SUMMARY OF PRICE DECLINE AND REVENUE RECOGNITION ISSUE

We reviewed IMAX's stock price movement, as well as market commentary, analyst reports and other publicly available information about the company and its industry during the alleged class period. We found that the curative disclosure of prior revenue recognition problems

related to IMAX's theater systems was not the cause of IMAX's stock price decline during the alleged class period or following the alleged curative disclosures, including the alleged disclosure on August 9, 2006. We found no evidence that these revenue recognition issues caused a material change in the analysts' view of IMAX's past or future business. Instead, we found substantial other negative news that was likely impacting IMAX stock price over this time period, including a failed sale of the company, a shift to a new and risky business model and a retraction of guidance by the company.

In addition to finding that the price decline after the alleged August 9, 2006 curative disclosure was not caused by the curative disclosure of prior revenue problems, we found that this alleged curative disclosure was not curative of  revenue recognition problems existing during the period when lead plaintiff Snow Capital purchased IMAX shares.


## V.    ANALYSIS OF THE PRICE DECLINE

## A.    Summary of the price movement between August 9, 2006 and July 20, 2007

Plaintiffs allege a class period beginning on February 27, 2003 and ending on July 20, 2007.[1] It is our understanding that Plaintiffs allege the following curative disclosures.

§   August 9, 2006 – IMAX announced that it "was under investigation by the SEC regarding its timing of revenue recognition, including its application of multiple element arrangement accounting to its theater systems." [Complaint ¶115].[2] On August 10, IMAX's stock price declined from $9.63 to $5.73.[3]

§   November 8, 2006 – IMAX's "press release said that 'primarily because it did not install any theaters' in the quarter, it incurred a $.30 per diluted share net loss" [Complaint ¶124]. On November 9, IMAX's stock price declined from $4.84 to $3.39.

---

[1]   Consolidated Amended Class Action Complaint ¶21.

[2]   IMAX also announced that it had to date failed to find a buyer at the price sought by the Board, that it was changing its business strategy and that it was no longer providing guidance. PR Newswire, 8/9/2006 4:01 pm, *IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives*. And Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call*.

[3]   Price movements following the alleged disclosure dates listed in this section are measured from the closing day trading price prior to the announcement.

§   March 29, 2007 – IMAX announced that it "determined to broaden its review to address certain issues […] 'primarily in connection with its revenue recognition for certain theater system installations.'" [Complaint ¶127].
    On March 29, IMAX's stock price declined from $5.37 to $5.04.

§   July 5, 2007 – IMAX "revis[ed] its accounting policy with regard to revenue recognition for theatre systems" [Complaint ¶138].
    On July 6, IMAX's stock price increased from $4.25 to $4.26.

§   July 20, 2007 – IMAX "announced that it had completed its restatement of its financial results covering 2002 through 2005, and the first three quarters of 2006" [Complaint ¶139].[4]
    On July 20, IMAX's stock price increased from $4.40 to $4.85.



**IMAX Corporation**
Alleged curative disclosures
November 27, 2002 to October 22, 2007

**Notes and Sources:**
Data from FactSet Research Systems, Inc. Price and volume data are split-adjusted.
Alleged curative disclosures dates and descriptions from the Consolidated Amended Class Action Complaint.

## B.    Negative news released on August 9, 2006

On August 9, 2006, just after the market closed, IMAX issued a press release titled

---

4    Portions of the 10-K form filed on July 20, 2007 were amended by the form 10-K/A filed on November 6, 2007.

"IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives."[5]  Half an hour later, IMAX had a conference call with analysts detailing the announcement.[6] The press release and the conference call contained substantial new information that the market viewed as negative. The new negative news announced by IMAX included the following:

§  The company announced that its 5 month search for a buyer had been unsuccessful.

Today the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently **no buyers who have indicated a willingness to acquire the Company** at a valuation sought by the Board of Directors. [PR Newswire, 8/9/2006, emphasis added]

§  The company planned to start a new business model based on joint ventures that the market viewed as risky and lacking in visibility.

**Significant business model shifts.** As would have been done had the company gone private, management announced that it would seek more joint venture theater deals going forward. […]
We would recommend moving completely to the sidelines until more clarity can be gained regarding the revenue and expense level trends following the shift to the new business model and when the benefits from this shift are likely to be realized. For these reasons, we are lowering our rating on IMAX to Sell from Buy. [Merriman Curhan Ford, 8/10/2006, emphasis in original]

§  The company announced an informal SEC investigation.

The Company indicated that it is in the process of responding to an **informal inquiry from the U.S. Securities and Exchange Commission** regarding the Company's timing of **revenue recognition**, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. [PR Newswire, 8/9/2006, emphasis added]

§  The company announced that it was no longer giving guidance and was retracting its prior guidance.

[W]e are **retracting all guidance** for the year. [IMAX conference call, 8/9/2006,

---

[5]    PR Newswire, 8/9/2006 4:01 pm, *IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives.*

[6]    Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call.* Time of conference call based on above-mentioned PR Newswire, 8/9/2006 4:01 pm press release.

emphasis added] [7]


## C.    The market reacted negatively to the announcement that IMAX had found no buyers

### 1.    IMAX stock price had risen substantially in expectation of takeover

On March 9, 2006, IMAX publicly announced that it was looking for a buyer by telling the market that it had decided to "explore strategic alternatives."[8]  On the day of the announcement, the stock price rose 9% from $9.50 to $10.35.

### 2.    Market had been anticipating search before formal announcement

The market had been anticipating the search even before the formal announcement. For example,

> Shares of Imax Corp. (IMX.TO) climbed nearly 8 percent on Friday after the big-screen movie theater systems maker was cited as a potential takeover target in a BusinessWeek article. [Reuters News, 2/4/2005]

> Following a very good financial year, the Toronto, Canada-based Imax Corp. is considering putting itself up for sale. [Video Age International, 3/1/2006]

The market commentary in the months preceding August 9, 2006 indicated that IMAX's stock was driven by the expectation that a buyer would acquire the company at a premium. For example,

> [W]e believe IMAX shares will now **trade primarily based on buy-out speculation**, given management's announcement that it has retained investment bankers to explore "strategic opportunities." [SunTrust Robinson Humphrey, 3/9/2006, emphasis added]

> We have viewed IMAX as a glamour cyclical stock, with investor focus on new theater signings and event film releases in the DMR format as opposed to near-term fundamentals. The proposal of a potential transaction involving the sale, merger, partnership, or capital infusion of the company has given many investors further positive sentiment about IMAX's equity. The stock's valuation now **includes a speculation premium**, which may or may not prove judicious. [Harris

---

[7]   Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call.*

[8]   PR Newswire, 3/9/2006, 7:00 am, *IMAX to explore strategic alternatives.*

Nesbitt, 3/10/2006, emphasis added]

Concurrent with the reporting of its 2005 results on March 9, 2006, Imax announced it had hired two investment banks to explore strategic alternatives to "enhance shareholder value, including…the sale or merger of the business with another entity offering strategic opportunities for growth." After a review of its 2005 10-K, we believe Imax *requires* a partner with access to capital in order to grow its business. For the following reasons, we believe Imax's business fundamentals might be weaker than 2004 and 2005 earnings results otherwise suggest. Further, without access to capital that would allow Imax to offer a new installation proposition to commercial-theater operators (one that reduces upfront capital commitments from theater operators and shifts a meaningful portion of the risk of the business model to Imax), we think **fundamentals cannot sustain a stock price that has appreciated nearly 50% thus far in 2006**. In our opinion, the stock has migrated from a "glamour cyclical" to a **speculative/arbitrage driven price**. [Harris Nesbitt, 3/16/2006, emphasis added]

While we are still uncertain as to why the company is pursuing this initiative, we believe this process can help increase shareholder value in a shorter time frame than the market would likely have granted through the prolonged execution of its strategy. As a result, we believe the **stock price will now be dictated by the outcome of this process**... [Susquehanna Financial Group, 3/10/2006, emphasis added]

8



**IMAX Corporation**
**News stories on IMAX search for buyers**
**November 27, 2002 to October 22, 2007**

Notes and Sources:
Data from FactSet Research Systems, Inc. Price and volume data are split-adjusted.
News stories from Factiva.

3.    **Intervening indications were made to the market that the search was proceeding well**

Between March 9, 2006 and August 9, 2006, it was indicated to the market on several occasions that IMAX's search for a buyer was proceeding well. For example,

We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. [PR Newswire, 3/9/2006]

We have been very pleased with the amount of interest we have seen to date and how the process is proceeding to date. We just entered the second round and are pleased to be evaluating proposals from a broad range of interested parties. [PR Newswire, 5/9/2006]

Imax Corp., the giant movie screen maker that has put itself on the auction block, is getting closer to tying the knot with a big-money partner. [The Globe and Mail, 5/29/2006]

Our examination of holdings by merger arbitrage investors after the March 9, 2006 announcement that IMAX was exploring a potential sale or merger, showed a substantial

increase in the number of IMAX shares owned by merger arbitrage investors. See section VII for more details.

**4.    Extensive negative commentary regarding the lack of success in search for buyer followed August 9, 2006 announcement**

IMAX's announcement on August 9, 2006, five months after the formal announcement of the sale process, that the search to date had not been successful and no buyer had been found at the valuation sought by the Board was regarded as surprising negative news. The market commentary on IMAX's failure to find a buyer was negative and extensive. For example,

> Shares of Imax Corp. **sank in after-hours trading** Wednesday, **after the Canadian movie company said it has not found any suitable buyers** since announcing in March it was exploring "strategic alternatives." [Associated Press Newswires, 8/9/2006, emphasis added]

> Imax Corp. **shocked investors** yesterday, saying it was **unable to find a buyer** after a five-month auction. [National Post, 8/10/2006, emphasis added]

> **IMAX FALLS AS BIDS COME IN TOO CHEAP** Movie chain Imax Corp. gave its shareholders a workout worthy of the big screen yesterday after it announced that offers for the company - including one from rocker Bono's private equity firm - were too cheap. Imax stock **jumped as high as $10.24 early in the day as speculators bet the company would announce a deal**. After ending the regular trading day down more than 2 percent, **shares were hammered in after-hours falling as low as $6.15 as investors scrambled to cut their losses**. [New York Post, 8/10/2006, emphasis added]

> Although overall Q2 results were strong, **IMAX's failure to secure an acceptable offer** during its ongoing exploration of strategic alternatives **sent the stock down more than 35% in after-hours trading**. [Susquehanna Financial Group, 8/10/2006, emphasis added]

> Sale Falls Apart; Downgrade To Underperform. [Piper Jaffray, 8/10/2006]

> **No Deal: Suitors Back Away, Weak Box Office Cools Near-Term Interest.** Judging by the market reaction to yesterday's press release, the quarter's results were obviously less important than the status negotiations between Imax management and the Company's reported suitors. After five months of negotiations, we believed that **anything less than a named buyer on a straightforward stock or stock-and-cash acquisition of IMAX shares (at a premium) would be interpreted negatively by investors. It was**. [Roth Capital Partners, 8/10/2006, emphasis added]

Lack of interested buyers at a price higher than $300 million **damages investor sentiment**, **reduces market valuation of the Company**, and poses questions about capital funding for growth. [BMO Capital Markets, 8/10/2006, emphasis added]

In a flood of downgrades on Imax stock, analysts **primarily focused on the company's inability to find a buyer** after five months of negotiations with a dozen potential suitors. They also noted weak box-office performance for films like Poseidon and The Ant Bully, which is slowing demand for new theatres, and a joint-venture strategy involving revenue sharing with theatre operators that will cut profit in upcoming quarters. [National Post, 8/11/2006, emphasis added]

**CATALYSTS FOR DOWNGRADE:**
**We are downgrading shares of IMAX** from Market Perform to Underperform **based on the following catalysts**: 1) visibility on fundamentals is limited; 2) **sale of company was misguided**; 3) new signings have slowed; 4) poor performance of recent films; 5) reduced earnings expectations for CY06/CY07; 6) vast change to strategy presents execution risk; and 7) IMAX may not be able to meet capital requirements necessary to develop and launch new digital IMAX systems. [Piper Jaffray, 8/10/2006, emphasis added]

5.    **Failed auction can be worse than no suitor**

The inability of the company to find buyers after an extensive search was considered by some to be more negative than not having had unsolicited offers of acquisition initially. On this point, a Wall Street Journal article covering several companies that had failed to find a buyer (including IMAX) stated:

Alas as companies are finding out in droves, **the stock price craters if the auction comes up empty**. Better to be resolutely single than publicly rejected. [The Wall Street Journal, 08/23/2006, emphasis added]

A similar comment had been made after the March 9, 2006 announcement that IMAX was up for sale.

A company will often disclose that it's looking at options such as a sale if there is concern that the details may leak, or that some shareholders may have a better idea than others that the company could be sold. [...] "From a legal perspective, disclosing is always the easy answer, but boards have to weigh all the negative impacts from disclosure, and there are so many," said Sharon Geraghty, a mergers and acquisitions lawyer at Torys in Toronto. "It's disruptive to their business, to their employees, to their customers, to their suppliers. It can be devastating." Once the disclosure is made that a company is seeking strategic alternatives and the stock pops in anticipation (Imax jumped 8.6% yesterday) the pressure is on to

make something happen. **Taking down the for-sale sign is hard on a company's reputation as investors, competitors and customers all may wonder what's wrong with the business that it couldn't find a match. And investors can be furious when the stock gives up those gains. "It is very damaging,"** Ms. Geraghty said. "**Imagine also what happens the next time you look for a buyer, because now the whole world knows you tried to sell and failed."** [National Post, 3/10/2006, emphasis added]

6.    **IMAX stock price had fallen dramatically in 2000 after announcement of failure of prior attempt to sell**

The 2006 attempt to find a buyer was not IMAX's first attempt. The company had tried to find a buyer in 2000. News stories attributed a dramatic fall in the stock price in 2000 (from $27 to $4) largely to the fact that IMAX's search for a buyer was unsuccessful. For example, in 2000, the Canadian newspaper, The Globe and Mail reported that [9]

**Uncertainty over the future sale of Imax has led to a 40-per-cent decline** in the value of the company's share this month. [The Globe and Mail, 9/28/2000, emphasis added]

On October 11, 2000, IMAX reported that its earnings were falling short of analysts' estimates and that "**it cannot predict** how the uncertainty in the commercial exhibition market or its earnings outlook will impact **the ultimate outcome of the process [of searching for a buyer]**."[10] IMAX stock declined 70% the following day. On October 13, 2000, The Globe and Mail reported

Imax Corp. shares lost nearly three-quarters of their value yesterday after an unexpected profit warning sparked **fears about the giant film screen company's search for a buyer**. [The Globe and Mail, 10/13/2000, emphasis added]

In August 2006, market commentary indicated that another failure by IMAX to find a buyer had a negative impact on investor's confidence in management.

Yesterday's announcements have clearly **damaged management's credibility**, in our view. Since this is **not the first time** management has failed to consummate a sale of the company and it has not created terminal shareholder value now, we

---

[9]    Similarly, a New York Post article on the same day reported that "Shares in the large movie screen producer dropped to a 52-week low yesterday - extending its 30 percent dive of the past week and a half - as the company continued to feel the effect of a bad bruising of the theater-chain business and a **string of reports claiming a buyer cannot be found**."

[10]   PR Newswire, 10/11/2000, *IMAX Corporation Announcement*, emphasis added.

think it will take considerable time to rebuild credibility. [BMO Capital Markets, 8/10/2006, emphasis added]

Although fundamental momentum has been strong over the last few years, we believe **investor confidence is likely to be significantly reduced** by yesterday's announcement about **another unsuccessful sales process**, especially in what is generally perceived to be a healthy M&A environment. [Susquehanna Financial Group, 8/10/2006, emphasis added]

The chart below illustrates the reaction of IMAX stock after the failed attempts to sell the company.



## D.    The market reacted negatively to the announcement of a new business model based on joint ventures

On August 9, 2006 the company announced a substantial change in its strategic direction. Specifically, it announced that it would focus its business development model on entering into

joint ventures with exhibitors.[11]

Under IMAX's traditional sales-type lease agreement, exhibitors who wanted to use IMAX projection systems for their theaters had to pay IMAX in advance to obtain the systems under a sales-type lease and pay IMAX other sums, including a percentage of their movie sales, as long as they operated under the IMAX brand. Under the joint venture model, IMAX would contribute the projection system and cost of installation, and then recoup its investment with a bigger share of the movie sales.

Many of the analysts viewed the transition to the new joint venture based model as difficult, requiring more capital than IMAX had available, generating insufficient funds to make the company attractive to investors and increasing the overall uncertainty surrounding the company.

> Since management revealed that no buyers offered an acceptable price for IMAX and that the company was embarking on a **new strategy** with its existing resources, we believe **the fundamental picture has changed so vastly** that **investor interest in the stock will be muted** at best even after it's plummeted some 40% from Wednesday's closing price. […]
> The stated strategy of forming joint ventures to relieve theater operators from the large upfront cost of an Imax system is, in our view, going to **require greater financial resources than the company has presently**, especially if it wishes to grow at a rate that might draw investor interest. The joint venture structure **limits first- and second-year earnings**, which in our view is **not as enticing to public shareholders**. […] [W]e think it is likely the company will have to renegotiate terms given the **dramatic shift in company strategy** and what will likely be a prolonged cash conversion cycle under the new joint-venture strategy.   [BMO Capital Markets, 8/10/2006, emphasis added]

> **Significant business model shifts**. As would have been done had the company gone private, management announced that it would seek more joint venture theater deals going forward. […]
> We would recommend moving completely to the sidelines until more clarity can be gained regarding the revenue and expense level trends following the shift to the new business model and when the benefits from this shift are likely to be realized. For these reasons, we are lowering our rating on IMAX to Sell from Buy. [Merriman Curhan Ford, 8/10/2006, emphasis in original]

> Despite the strength in Q2 results, we are **lowering our full-year revenue estimate** by $6 million to $154 million (+6% Y/Y), **mostly due to the potential**

---

[11]   Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call.*

**near-term impact from JV-structured deals**, and to a lesser degree, the underperformance of *The Ant Bully*. [Susquehanna Financial Group, 8/10/2006, emphasis added]

## E.     The uncertainty surrounding IMAX increased

On August 9, 2006 the uncertainty regarding the future of IMAX increased substantially. Stock prices are negatively affected by increased uncertainty.[12] The uncertainty increased not only because of the new strategic direction focused on joint ventures but also because the company announced that it was retracting all guidance for the year and declining to answer questions about the value of the company.

> [ANALYST ASKS]: …**in terms of** going back to, or at least, you know, **continuing to work with some of the bidders that have come in at lower** prices, floor **valuations than what you originally wanted, is that an indication that you think the company is worth less now,** or you're less optimistic in terms of if you stayed a publicly traded company that the value would be, you know, more realized, you remaining public, as vs. taking a lower offer to go private?
> [IMAX MANAGEMENT]: …**I don't think we want to comment on value at this point.**
> […]
> [ANALYST ASKS]: But I mean, is there any way you guys **-- I don't really understand fully why you're getting out of the guidance business,** particularly in light of the potential end of the sales process here. Why are you guys, **if you have all these numbers, why don't you put them out and tell the market** where you think your numbers should come out?
> [IMAX MANAGEMENT]: Because I think the answer is, we don't know how quick the uptake is going to be in JVs. We don't know what impact the JV business will have on existing sale [leap] business. We don't have fully nailed down the accounting charges related to the digital transition. So, I think in light of those moving pieces, it just doesn't make sense to do that. [IMAX conference call,[13] 8/9/2006, emphasis added]

> **Too Many Uncertainties on the Horizon; Lowering Rating to Sell from Buy**
> […]in the near term we believe IMAX shares are likely to remain under significant pressure (the shares were trading around $6.00 after the market close last night) due to the uncertainties surrounding 1) the near-term impact of

---

[12]   See, for example, Richard A. Brealey and Stewart Myers, *Principles of Corporate Finance*, McGraw Hill, 5th ed., 1996. See Section 0 below on the determinants of the stock price in an efficient market.

[13]   Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call*.

management's decision to switch to more of a joint venture theater model; 2) the expense and revenue deferment associated with the acceleration of a digital system rollout; 3) the slowdown in theater signings due to recent box office underperformance; 4) the inquiry by the SEC regarding the company's revenue recognition methods; and 5) the disappointing results from management's efforts to sell the company. [Merriman Curhan Ford, 8/10/2006, emphasis in original]

Uncertainty continued to be a focus of negative analyst commentary later on during the alleged class period.

We believe the **uncertainty** of IMAX's delayed 2006-10K and 1Q07 filings are **overhanging the shares** and **offsetting any of the benefits** of what we believe are **the improving underlying strength in the Company's core business**. [Soleil Securities Group, 5/21/2007, emphasis added]

## F.    The SEC investigation and the possibility that the SEC investigation could expand to other issues, rather than the revenue recognition issues themselves, was a negative factor on the stock price

Fear of the possibility that the SEC's informal investigation could expand to other issues was considered a negative factor on the stock price.

The SEC inquiries into revenue recognition only reinforce some investor skepticism over the company's accounting practices (whether right or wrong). At the very least, we see the **risk of a prolonged inquiry or a potential escalation** as reason enough to **avoid** the stock for now. [BMO Capital Markets, 8/10/2006, emphasis added]

IMAX is cooperating fully with the SEC inquiry, and any adverse findings would not affect the company's cash flows, although it could result in a restatement of prior-period GAAP operating results. We do not expect that this will have a material adverse impact on the creditworthiness of the company but **remain cautious** regarding the matter, as any investigation of this nature **carries material risk**. [Friedman Billings Ramsey, 8/10/2006, emphasis added]

The overhang generated by the SEC inquiry was not due to the revenue recognition issues themselves but to the fear of some other problem being uncovered. The overhang was reported to continue even after the restatement addressing the revenue recognition issues.

Although IMAX conferred with the regulators during the review process, the **SEC and OSC inquiries remain ongoing**, which is likely to **remain an overhang** on IMAX shares. [Susquehanna Financial Group, 7/20/2007, emphasis added]

16

The **inquiries continue** and, in our view, **represent a significant risk** to shareholders via restatements, sanctions, or fines. [BMO Capital Markets, 7/24/2007, emphasis added]

## G.     Between August 10, 2006 and the end of the alleged class period, other negative developments affected IMAX's stock price

Between August 10, 2006 and the end of the alleged class period on July 20, 2007, other negative information contributed to negative price pressure according to analysts:

§    Weak box office – weak box office results for IMAX movies, including *The Ant Bully*; [14]

§    Delays in signings – there were reported delays in signings for new theater systems; [15]

§    Fewer than expected installations – only one system was installed in the third quarter of 2006 and the slippage of backlog was more pervasive than expected; [16]

§    Losing technological ground – IMAX was reported to be losing technological ground as its projectors were rapidly becoming obsolete in a market increasingly focused on digital projectors; [17]

§    No buyout revenues – on November 8, 2006, IMAX announced that it had no revenues associated with consensual buyouts, a high margin item for IMAX;[18]

§    Increasing SG&A expenses – news that sale, general and administrative expenses were increasing were reported through the alleged disclosure period;[19]

---

[14]   "We believe that poorer-than-anticipated box office results from all but one of the IMAX movies released this year has had a negative impact not only on overall system signing trends, but also on theater operators' desire to rush open theaters for which they have already contracted to open (which may account for some of the installation slippage in 3Q and 4Q)." [Merriman Curhan Ford, 11/10/2006]. "Film revenues were soft at $8M due to poor box office performance of Ant Bully." [Piper Jaffray, 11/9/2006]

[15]   Merriman Curhan Ford, 11/10/2006; Roth Capital Partners, 11/15/2006.

[16]   "Only one system was installed in the quarter and slippage of backlog is far more pervasive than we had expected." [BMO Capital Markets, 11/9/2006]

[17]   "In our view, the company is losing technological ground and doesn't possess the capital to grow its business."[BMO Capital Markets, 12/18/2006]

[18]   "Other operating highlights in the quarter: […] Zero lease buyout/change revenues (part of Systems) vs. $2.4 million in 3Q05." [Roth Capital Partners, 11/15/2006]. "high-margin consensual lease buyout" [Harris Nesbitt 5/9/2006]

[19]   See, for example, Susquehanna Financial Group, 8/10/2006; Piper Jaffray 11/9/2006; and Susquehanna Financial Group 3/13/2007.

§   Buyer sought at lower valuation – on November 8, 2006 IMAX announced that it was now searching for a buyer at a lower valuation;[20]

§   Search for buyer ended – on December 15, 2006 IMAX announced that it had abandoned its search for a buyer;[21]

§   Delay of 10-K filing – on March 16, 2007 IMAX announced that it would delay the filing of its Form 10-K for fiscal 2006 beyond the filing deadline; [22]

§   Further delay of 10-K filing – on March 29, 2007 IMAX announced that it would further delay the filing of its Form 10-K for fiscal 2006 and the corresponding filings under Canadian securities law; [23] and

§   Fear of delisting – on April 9, 2007 IMAX announced that it had received a letter from the Nasdaq stock exchange saying that its shares could be delisted. [24]

Although we found that these issues (along with the ones mentioned above including the lack of a buyer) may have had a negative impact on the stock price movement from August 9, 2006 through July 20, 2007, the end of alleged class period, we did not find that the revenue recognition issues themselves were the cause of the price decline during this period.

## VI.   ANALYSIS OF THE REVENUE RECOGNITION ISSUE

### A.   Summary of the revenue recognition issue

Prior to fiscal year 2000, theater system revenue was recognized upon delivery of the system.[25] For the fiscal years 2000 through 2003, IMAX stated that revenue would be recognized at the time of the theater installation. [26] In fiscal year 2004, IMAX stated that the company recognized revenues on sales and sales-type leases generally upon installation of the theater system; it also disclosed that revenues could be recorded on separate elements in certain

---

[20]   PR Newswire, 11/8/2006, *IMAX Corporation Reports Third Quarter Financial Results; - Pursuing Key Initiatives Designed to Grow Business and Shareholder Value over Long Term.*

[21]   PR Newswire, 12/15/2006, *IMAX Corporation announcement*

[22]   Dow Jones News Service, 3/16/2007, *Imax: Errors Not Related To Theater System Rev Recognition.*

[23]   PR Newswire, 3/29/2007, *IMAX to delay filing of 2006 10-K.*

[24]   Reuters, 4/9/2007, *Imax says shares could be delisted from Nasdaq.*

[25]   Memorandum and Order dated September 15, 2008, pp. 8-9.

[26]   Memorandum and Order dated September 15, 2008, p. 9.

circumstances. [27] In its 10-K for fiscal year 2005, IMAX stated that it recognized revenue when the installation of the respective theater system element was substantially complete. [28]

> In its July 20, 2007 press release the company stated that:[29]
>
> Under the former method for recording revenues under multiple element arrangement accounting, as reflected in the Company's 2005 10-K, the Company recognized revenue when the projector and sound system were installed and deferred revenue recognition of components deemed to be separate deliverables until their subsequent installation, such as the screen.

During its review of its accounting policies the company determined that:[30]

> the screen, 3-D glasses cleaning machine and initial services including projectionist training should be considered one single deliverable. In addition, the Company will now require receipt of a signed acceptance from each client before recognizing revenue, in the absence of which the Company will recognize revenue upon the opening of the theatre. Consequently, the Company concluded that errors occurred in its prior accounting for theatre systems, has revised its policy with regard to revenue recognition for theatre systems, and restated its financial results in accordance with the revised policy.

## B.    There was no material restatement of IMAX's cash flows

Yearly cash flows were not restated.[31] The restatement did not materially affect historical cash flows, and there is no indication it would materially affect expectations of future cash.

The cash that the company received over time from its installations of theater systems was not changed by the restatement; that means that investors had been correctly informed all

---

[27]  Memorandum and Order dated September 15, 2008, p. 9.

[28]  Memorandum and Order dated September 15, 2008, p. 10.

[29]  PR Newswire, 7/20/2007, *IMAX Corporation reports 2006 and first quarter 2007 financial results; ...*

[30]  PR Newswire, 7/20/2007, *IMAX Corporation reports 2006 and first quarter 2007 financial results [...].* Additionally, in its form 10-K filed on July 20, 2007, IMAX states at p. 82: "the revenue allocated to the System Deliverable is recognized when the lease term commences, which the Company deems to be when all of the following conditions have been met: (i) the projector, sound system and screen system have been installed and are in full working condition, (ii) the 3D glasses cleaning machine, if applicable, has been delivered, (iii) projectionist training has been completed and (iv) the earlier of (a) receipt of the written customer acceptance certifying the completion of installation and run-in testing of the equipment and the completion of projectionist training or (b) public opening of the theater, provided collectibility is reasonably assured."

[31]  Yearly "net cash provided by (used in) operating activities" were not restated. See 2006 10-K p. 93. Also compare 2006 10-K p. 75 with 2005 10-K p. 59 and 2004 10-K p. 48.

along about the timing with which the company received the cash in exchange for its theater systems. The revenue recognition system applied by IMAX before the restatement was a system that essentially distributed the cash IMAX expected to receive from the theater systems across fiscal years, while the revenue recognition system adopted by IMAX for the restatement started with *the same* cash and distributed it across fiscal years somewhat differently. Because both revenue recognition schemes distributed the very same cash, the change as a result of the restatement did not impact the cash.

## C.    In an efficient market, only cash matters

Finance theory tells us that in an efficient market, the price of a stock reflects the market's expectation of the discounted value of future cash flows.[32]  The only information that affects the stock price is information that affects the expectation of the discounted value of future cash flows. That is, the cash flows themselves and the riskiness of achieving them are ultimately the only factors affecting the stock price.[33]

Empirical finance research has found that, as the theory of efficient markets predicts, when cash flows and accounting changes diverge, it is only the change in cash flows, not accounting numbers, that matters to the investors. For example Bradford Cornell's book, *Corporate Valuation*, discusses the empirical findings as follows: [34]

> The argument that "only [future] cash [flow] matters" has more than theoretical backing; it is also supported by extensive research. This research focuses on listed companies for which it is possible to conduct direct tests of the relation between value and various measures of income, including cash flow and accounting earnings[…] The results of these tests overwhelmingly support the view that corporate value is based on cash flow. When cash flow and earnings diverge, changes in value are associated with changes in cash flow, not changes in earnings. Though the literature is too extensive to review here, summaries of a few studies are presented to illustrate the general nature of the findings.

---

[32]   See, for example, Richard A. Brealey and Stewart Myers, *Principles of Corporate Finance*, McGraw Hill, 5th ed., 1996.

[33]   The riskiness of the cash flows affects the stock price via the discount factor. See, for example, Richard A. Brealey and Stewart Myers, *Principles of Corporate Finance*, McGraw Hill, 5th ed., 1996.

[34]   Bradford Cornell, *Corporate Valuation* (New York: McGraw-Hill, 1993), p. 104-106, 108.

A 1975 study by Sunder examines the LIFO and FIFO inventory accounting decision discussed previously. Sunder notes that if value is based on cash flow, the stock prices of companies switching from FIFO to LIFO should rise, while the stock prices of companies switching from LIFO to FIFO should drop. Conversely, Sunder observes, if value is based on earnings, the reverse should be true. Consistent with the cash flow theory, Sunder finds that on average, the stock prices of companies switching to LIFO rise, net of general market movements, and that the stock prices of those companies switching to FIFO fall. [...]

A 1985 study by the Office of the Chief Economist of the Securities and Exchange Commission (SEC) speaks not only to the question of earnings versus cash flow but also the question of "market myopia." Some critics argue that security markets are myopic in the sense that they focus on current earnings and cash flow and, as a result, discount future cash flow more sharply than the present value relation implies. To test the myopia hypothesis, the SEC study examined the stock price reaction to announcements of new research and development projects by 62 companies. Increased research and development reduces both current earnings and current cash flow because R&D expenditures are expensed. Nonetheless, if managers are rational, the present value of the expected long-run cash inflows produced by the research should exceed current R&D expenses. Thus, the cash flow valuation model predicts that stock prices should rise, on average, when new R&D spending is announced, despite the associated decline in current earnings. (The stock price will not necessarily rise in response to every announcement of new R&D spending because the market may disagree with management and conclude that some projects are dogs.) This is exactly what the SEC study finds. The average stock price reaction to the announcement of new R&D projects by the 62 companies is significantly positive. Similar results are reported by McConnell and Muscarella and also Woolridge, who find that announcements of long-term strategic investments, which reduce current earnings, are associated with rising stock prices.[…]

It is worth noting that these studies also provide support for the view that markets are efficient and rationally price securities. …[E]conomic theory predicts that investor value is derived from cash flow. If market prices reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient.

**D.    We found no evidence that the change in accounting caused analysts to change their understanding of the past or future business of IMAX**

We found no evidence that the change in accounting of revenue for the theater systems caused the analysts or other market participants to change their understanding of the past or future business of IMAX. For example, after the SEC's informal investigation was announced,

the analysts described their understanding of the revenue recognition issue but made no mention that the accounting issue would cause them to rethink their prior understanding of how the business of IMAX worked, how cash flowed into IMAX, or how it would flow in the future.

> IMAX has received an informal inquiry from the SEC regarding its revenue recognition practices, mostly associated the revenues generated from 10 theater installations in 4Q05. For those installations, the company utilized multiple element arrangement accounting, where the revenues associated with different elements of a particular installation are segregated and recognized when each particular piece is completed. This leads to some revenues being recognized earlier than others. Although management would not elaborate on the SEC's focus with respect to the application of that accounting, we believe it would entail the company's recognition of any of the revenues associated with an installation that is not entirely complete — where the SEC might want IMAX to defer all of the revenues (no matter how they are segregated) until all can be recognized at once. So, even though this would have **no impact on the company's historical cash generation**, it might move some revenues from prior quarters into more recent quarters throughout FY06. [Merriman Curhan Ford, 8/10/2006, emphasis added]

> In yesterday's press release, Imax also announced it had been notified by the SEC of a potential accounting irregularity related to "multiple-element accounting" for theater systems. [...] We **expect this issue to be resolved with little to no material overall financial impact**. [Roth Capital Partners, 8/10/2006, emphasis added]

> The SEC has launched an informal inquiry into IMAX's accounting practices regarding multiple element arrangement accounting in its revenue recognition for theatre systems. [...] IMAX is cooperating fully with the SEC inquiry, and **any adverse findings would not affect the company's cash flows**, although it could result in a restatement of prior-period GAAP operating results. We **do not expect that this will have a material adverse impact on the creditworthiness of the company** but remain cautious regarding the matter, as any investigation of this nature carries material risk. [Friedman Billings Ramsey, 8/10/2006, emphasis added]

> IMAX's revenue recognition policy has long been controversial but we feel that this issue is minor compared to the other elements at hand. [Janco Partners, 8/10/2006]

Similarly, after the restatement of revenue, the analysts described the restatement, but we found no evidence that the magnitude of the restatement or any of the particulars of the restatement caused analysts to change their understanding of the past or future business of IMAX, or its expected cash flows.

Due to the changes in the company's revenue recognition policy, numerous quarterly and annual restatements were completed, which mostly moved revenue and income forward from prior periods. […] For the most part, the company took a more conservative approach with the revenue recognition of its theatre installations. Specifically, instead of attempting to separate some of the elements of the installation and recognize the associated revenue separately (sometimes in different periods), the company will now hold off on the recognition of the installation's revenue until all elements — focusing on the screen and glasses cleaning machines and customer training — have been completed. In the review process, the company reviewed the installations associated with 127 theatres between 2002 and 2006 and adjusted the revenue recognition of those installations accordingly.

For 1Q07, IMAX reported revenues of $27.2 million, EBITDA of $2.4 million and a net loss from continuing operations of ($0.12), which compared to our estimates of $24.5 million in revenues, $3.1 million in EBITDA, and a net loss per share from continuing operations of ($0.11).

**Fundamentals Have Remained Strong Throughout the Delay**. Even though IMAX has not been reporting full quarterly results and did not file its 10-K and 10-Q in a timely fashion earlier this year, it has been clearly visible from our channel checks and from the company's various press releases that the fundamentals (signings, installs and box office results) have remained strong. [Merriman Curhan Ford, 7/23/2007, emphasis in original]

As a result of the adoption of this new revenue recognition policy, IMAX has restated its historical results for the last few years. Although IMAX has shifted more than $27 million between fiscal years and over $25 million of revenue between quarters in the same year, we believe the size of IMAX's earnings restatements **does not appear to be overly significant**, particularly given that overstatements on the revenue side totaled approximately $10.4 million in aggregate from 2002 through 2005, and overstatements on the cost side totaled approximately $4 million in aggregate from 2002 through 3Q06. […] **Neutral Factor**. [Susquehanna Financial Group, 7/20/2007, emphasis added]

## E.    Analysts reiterate that the restatement has no material cash impact

Analysts did not expect the revenue recognition issues to have a material cash impact on IMAX. They maintained this expectation from the time when the SEC investigation was first announced until the restatements were actually made. When the restatements were filed, analysts reiterated that they had no material cash effect.

IMAX is cooperating fully with the SEC inquiry, and **any adverse findings would not affect the company's cash flows,** although it could result in a restatement of prior-period GAAP operating results. [Friedman Billings Ramsey, 8/10/2006, emphasis added]

… the company utilized multiple element arrangement accounting, where the revenues associated with different elements of a particular installation are segregated and recognized when each particular piece is completed. This leads to some revenues being recognized earlier than others. Although management would not elaborate on the SEC's focus with respect to the application of that accounting, we believe it would entail the company's recognition of any of the revenues associated with an installation that is not entirely complete — where **the SEC might want IMAX to defer all of the revenues** (no matter how they are segregated) until all can be recognized at once. **So, even though this would have no impact on the company's historical cash generation, it might move some revenues from prior quarters into more recent quarters throughout FY06.** [Merriman Curhan Ford, 8/10/2006, emphasis added]

**Potential Restatement Likely Has No Cash Impact** […]
IMAX expects to make some restatements once the expanded review is completed. We believe this would essentially result in the shift of revenue that was originally recognized in 4Q05 into 1Q06. In our opinion, the more important barometer of IMAX's future business is: 1) the current performance of its film slate (300 currently, Spiderman3 and Harry Potter 5 upcoming), 2) new theater signings and 3) installations. Moreover, the Company does not believe that a potential restatement "would have any impact on its previously reported or existing cash accounts". [Soleil Securities, 3/30/2007, emphasis added]

**Importantly, there is likely no cash impact** if IMAX restates previous period results (specifically 4Q05 and 1Q06). [Soleil Securities, 4/10/2007, emphasis added]

The Company believes it will satisfy SEC comments about its accounting review of 2002-2006 revenue recognition by revising its accounting treatment… We do **not anticipate a significant cash impact from these revisions** and believe that the filings will enable the shares to begin to reflect the outperformance of the IMAX film slate (with 300, Spider-Man, and Harry Potter, which opens next week day-and-date in IMAX with about 20 minutes of episodic 3D content). [Soleil Securities, 7/6/2007, emphasis added]

There was **little - if any - cash impact from the Company's restatement**. Most of the restatement involved the timing of revenue previously recognized, and much of the revenue that was reversed has been recognized in subsequent quarters or will be recognized in future quarters. [Soleil Securities, 7/25/2007, emphasis added]

 **[R]estatements to cash flow were not material** [BMO Capital Markets, 7/24/2007, emphasis added]

24

**F.    The net shift of revenues across years did not substantially change the revenue pattern**

As noted above, the restatement did not affect the company's cash flows – it only affected the timing with which certain cash payments were reflected on the company's income statement.  More specifically, the restatement shifted certain revenues that had initially been recorded in a given quarter to a subsequent quarter. In the majority of cases, revenues were shifted forward between 90 to 180 days.[35] Below, we chart the impact of the restatement on the annual and quarterly revenues.[36] We find the restatements did not substantially change the revenue pattern.




**Impact of the Restatement on Annual Revenues**
**(Years 2002 through 2006)**

**Notes and Sources:**
Data from 2006 10K, filed July 20, 2007.
Year 2006 "Revenues as Restated" based on restatements for Q1-Q3 and actuals for Q4.

---

[35]    PR Newswire, 6/29/2007, *IMAX announces that it plans to file financial statements shortly; Company does not intend to seek any further extensions.*

[36]    The charts compare the revenues "as previously reported" with the revenues "as restated." The revenues as restated account both for effect of the theater systems restatement and for the effect of the other items restated.



**Impact of the Restatement on Quarterly Revenues**
(Q1 2005 through Q4 2006)

**Notes and Sources:**
Data from 2006 10K, filed July 20, 2007.
"Revenues as Restated" for Q4 2006 based on actuals for Q4 2006.

## G.    Theater signings provided reliable information about future cash flows and the prospects of the company

Throughout the alleged class period, theater signings provided important information to the market about IMAX's expected future cash flows. Signings revealed the "pipeline" of theater systems the company had sold or leased. Additionally, the signings corresponded to the time in which (under most circumstances) IMAX began to receive cash for a particular theater system.[37] The number of signings was available to investors throughout the alleged class period and was not restated. The following are examples of the importance accorded to signings by the analysts.

> **In our opinion, theater system signings is a better metric for measuring the ongoing health of IMAX's business, as installations and revenue (and subsequently, earnings) are highly susceptible to timing issues, whereas signings more closely reflect the current state of affairs.** [Susquehanna Financial Group 2/21/2006, emphasis added]

---

[37]    IMAX Corporation Form 10K for the period ending 12/31/2006, p. 20: "initial fees, which are paid in installments generally commencing upon the signing of the agreement until installation of the theater systems."

While IMAX has demonstrated strong momentum in theatre signings, we believe much of this positive news is reflected in the valuation. [Merrill Lynch, 7/11/2005]

The stock has enjoyed a "glamour cyclical" type valuation, **being valued primarily on theater signings** and film release announcements. In our opinion, the stock has now moved to a speculative valuation based on new, unidentified, and non-quantifiable strategic alternatives. [Harris Nesbitt, 3/16/2006, emphasis added]

4Q Earnings Preview […] **Recent signings likely to be the focal point**. [Susquehanna Financial Group, 3/13/2007, emphasis added]

We believe the more important factor, however, is the **outlook for future business**. The underlying momentum in the Company's business is strong, in our view, **as is shown by the nine new theaters the Company has signed in 1Q07**, the dramatic outperformance of 300 in IMAX theaters, the upcoming film slate, and the 'buzz' at Showest about IMAX. [Soleil Securities, 3/16/2007, emphasis added]

"The **positive outlook** [in credit rating] **reflects solid system signings** in the first quarter and good box office performance of IMAX films this year, which could **lead to new system signings**," said Standard & Poor's credit analyst Tulip Lim. [Market News Publishing, 7/25/2007, emphasis added]

***

In summary, our review of IMAX's stock price movement, market commentary, analyst reports and other publicly available information about the company and its industry during the alleged class period revealed that the curative disclosure of prior revenue recognition problems related to IMAX's theater systems was not the cause of the IMAX's stock price decline following the alleged curative disclosures. We found no evidence that these revenue recognition issues caused a material change in the analysts' view of IMAX's past or future business. Instead, we found substantial other negative news that was likely impacting IMAX stock price over this time period, including a failed sale of the company, a shift to a new and risky business model and a retraction of guidance by the company.

### H.    The alleged August 9, 2006 disclosure was not curative of revenue recognition problems existing during the period when the lead plaintiff purchased IMAX shares

In addition to finding that the price decline after the alleged August 9, 2006 curative disclosure was not caused by the curative disclosure of prior revenue problems, we found that this alleged curative disclosure was not curative of revenue recognition problems existing during the period when lead plaintiff Snow Capital purchased IMAX shares. Snow Capital's last purchase of IMAX stock occurred on November 3, 2005,[38] while the revenue recognition issues revealed in the August 9, 2006 alleged curative disclosure related to revenue figures announced by IMAX on February 17, 2006 or later.

The August 9, 2006, announcement that the SEC was conducting an informal inquiry regarding revenue recognition applied to revenue recognized for the fourth quarter of 2005 and later periods. In particular, IMAX announced that the inquiry involved the revenue recognition for the installation of 10 theater systems in the fourth quarter of 2005 and one system in the second quarter of 2006.[39]

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems… The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed… This accounting policy has similarly applied to one theater installation in the second quarter of 2006… [PR Newswire, 8/9/2006]

> In our earnings release this afternoon we stated that the company is responding to an informal inquiry from the SEC regarding the company's timing of revenue recognition, including the application of multiple element arrangement accounting in our revenue recognition…
> As we previously reported, the company recognized revenue in the fourth quarter of 2005 on 10 theater installations in theater which did not open in that quarter, and the revenue recognition was under multiple element arrangement accounting. In three of the 10 installations all of the elements of the theater systems were

---

[38] Corrected Certification of Named Plaintiff Pursuant to Federal Securities Laws dated April 29, 2010.

[39] PR Newswire, 8/9/2006, *IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives --*.

installed in the fourth quarter. Of the remaining 7 installations revenue associated with the screen of the theater system was deferred until the final screen was installed. Three of these theaters had their screens completed in the first quarter of 2006, two in the second quarter of 2006, one in the third quarter, and one will be completed during the remainder of 2006.

In other words, in each of those installations the company deferred recognition of value of the screen until the final screen was installed, and recorded the residual value associated with the other elements of the system that were installed within the quarter. [IMAX Conference Call, 8/9/2006]

Analyst and news commentary indicated that the market understood the SEC inquiry to apply to revenue reported for the fourth quarter of 2005. For example,

**The specific instance in question relates to the Company's 4Q05 revenues**. We expect this issue to be resolved with little to no material overall financial impact. To our knowledge, Imax has not changed this accounting treatment during the period of our coverage, and PricewaterhouseCoopers has supported the methodology in multiple audits. [Roth Capital Partners, 8/10/2006, emphasis added]

The SEC has initiated an informal inquiry about the timing of revenue recognition and use of multiple element arrangement accounting associated with 10 theatre installations recognized in 4Q05. The Company cannot determine how long the inquiry process may last. [Soleil Securities, 8/10/2006]

IMAX has received an informal inquiry from the SEC regarding its revenue recognition practices, mostly associated the [sic] revenues generated from 10 theater installations in 4Q05. [Merriman Curhan Ford, 8/10/2006]

Late Wednesday, the company said it is responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the timing of revenue recognition. The concern involves revenue recognized during the fourth quarter of 2005 for 10 Imax installations in theatres that did not open in that quarter. [The Canadian Press, 8/10/2006]

The extent of revenue recognition problems revealed in the alleged August 9, 2006 curative disclosure only affected the period starting on February 17, 2006, when IMAX announced preliminary financial results for the fourth quarter of 2005.[40] Snow Capital did not purchase any IMAX shares after the results for the fourth quarter of 2005 were announced. (Snow Capital purchased 50,000 shares on December 14, 2004, 35,000 shares on October 3,

---

[40] PR Newswire, 2/17/06 7:00AM, *IMAX Expects to Meet or Exceed Full Year 2005 Guidance.*

2005 and 75,000 shares in November 3, 2005.[41]) Thus, the alleged August 9, 2006 curative disclosure was not curative of revenue recognition problems existing during the period when Snow Capital purchased IMAX shares.

## VII.  ANALYSIS OF INSTITUTIONAL TRADING FOR PERIOD 1 AND PERIOD 2

We were asked to use public data on institutional trading to examine two periods during the alleged class period:

§   Period 1 4Q 2004 through 4Q 2005 – a period in which the lead plaintiff Snow Capital purchased IMAX shares;

§   Period 2 1Q 2006 through 2Q 2006 – a period which includes IMAX's announcement to pursue strategic alternatives.

The chart below shows Snow Capital's purchases and sales of IMAX shares. Snow Capital purchased a total of 160,000 shares during Period 1 and sold all of its holdings on August 10, 2006.

---

[41] Corrected Certification of Named Plaintiff Pursuant to Federal Securities Laws dated April 29, 2010.



**Notes and Sources:**
Data from FactSet Research Systems, Inc. Price and volume data are split-adjusted. Data on Snow Capital holdings from Corrected Certification of Named Plaintiff Pursuant to Federal Securities Laws. Alleged curative disclosures dates and descriptions from the Consolidated Amended Class Action Complaint.

We were asked to estimate the number of shares purchased by institutions during each period and held through 3Q 2006, the quarter in which the alleged August 9, 2006 curative disclosure was made.

Institutional investors, companies that manage over $100 million in assets, are required to disclose their holdings through public 13-F forms filed with the SEC.[42]  Using data collected by Thomson Financial Shareworld from the 13-F filings, we found that throughout Period 1 and Period 2, institutions held a majority of IMAX shares.[43] Institutions held 60% to 76% of IMAX's float (shares outstanding less insider holdings) in Period 1 and 73% to 76% of IMAX's float in Period 2.  We examined how many shares were purchased by institutions during Period 1 and Period 2 and held through 3Q 2006 assuming LIFO (last-in, first-out).[44]

---

[42] See, for example, Frequently Asked Questions About Form 13F, Division of Investment Management, U.S. Securities and Exchange Commission.

[43] Based on institutional holdings data from Thomson Financial Shareworld along with data on shares outstanding and insider holdings from IMAX's SEC filings.

[44] Unlike institutions and insiders, the ownership or trading of non-institutional investors is not publicly available.

The table below summarizes the results. We found that 7% of the institutional shares purchased during Period 1 were retained through 3Q 2006, while 52% of the shares purchased during Period 2 were retained through 3Q 2006.

**Shares Retained by Institutional Investors Through 3Q06**

| Purchase Period (1) | Shares Purchased (2) | Shares Retained Through 3Q06 (3) | % Retained (4) [ = (3) / (2) ] |
|---|---|---|---|
| Period 1: 4Q04 - 4Q05 | 36,316,989 | 2,590,299 | 7% |
| Period 2: 1Q06 - 2Q06 | 17,977,477 | 9,310,919 | 52% |

**Notes and Sources:**

Institutional holdings data from Thomson Financial Shareworld.

Analysis assumes LIFO (last-in first-out) for shares purchased by institutional investors.

We were asked to also note the number of shares purchased by institutions in Period 1 and held through 3Q07, the quarter in which the alleged class period ends. We found 4.5% of the shares purchased by institutions in Period 1 were retained through 3Q 2007.

To investigate the question of whether there was evidence of trading by merger arbitrage investors during the two periods, we examined the holdings of reported top merger arbitrage institutional investors.[45] Merger arbitrage is an investment strategy that attempts to profit from the arbitrage spread, the difference between the current stock price and the offer price.[46] The chart below shows the quarterly holdings of IMAX shares for the reported top merger arbitrage firms. During Period 1 the merger arbitrage investors purchased a total of approximately 57,000 shares of IMAX, while in Period 2, the merger arbitrageurs purchased almost 3 million shares of IMAX.

---

[45] List of top merger arbitrageurs from "The Better IR Newsletter," Ipreo Holdings LLC, April 2010. List includes "pure-play," "occasional," and "traditional investors with an arb tilt."

[46] See, for example, Richard A. Brealey, Stewart Myers and Franklin Allen, *Principles of Corporate Finance*, McGraw Hill, 9th ed., 2008 or Mitchell, Mark and Todd Pulvino, "Characteristics of Risk and Return in Risk Arbitrage," *The Journal of Finance*, Vol. LVI, No. 6, December 2001.



**IMAX Corporation's Shares Held by Merger Arbitrage Investors**
October 1, 2004 to December 29, 2006

**Notes and Sources:**
Data from Thomson Shareworld. List of merger arbitrage investors from "The Better IR Newsletter," Ipreo Holdings LLC, April 2010.

33