UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

IN RE IMAX CORPORATION SECURITIES
LITIGATION

Master File No. 06 Civ. 6128 (NRB)

---

**DEFENDANT PRICEWATERHOUSECOOPERS LLP'S, AN ONTARIO LIMITED
LIABILITY PARTNERSHIP, MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**


**PORTIONS REDACTED**


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile:  (212) 351-4035


GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100
Facsimile:  (214) 698-3400

**ATTORNEYS FOR DEFENDANT
PRICEWATERHOUSECOOPERS LLP, AN
ONTARIO LIMITED LIABILITY
PARTNERSHIP**

THIS MEMORANDUM CONTAINS CONFIDENTIAL INFORMATION.  PURSUANT TO ¶ 7 OF THE
STIPLUATION AND ORDER GOVERNING CONFIDENTIAL MATERIAL, ENTERED NOVEMBER 3, 2008,
PORTIONS OF THE ELECTRONICALLY-FILED MEMORANDUM HAVE BEEN REDACTED AND
AN UNREDACTED COPY HAS BEEN FILED WITH THE COURT UNDER SEAL

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   ARGUMENT .........................................................................................................2

      A.    Standards Applicable To Class Certification....................................................2
      B.    Class Certification Should Be Denied Because Snow Capital Does
            Not Satisfy The Typicality And Adequacy Requirements Of
            Rule 23(a)..........................................................................................................4
            1.    Because Snow Capital Is Subject To A Unique Defense,
                  Snow Capital's Claims Are Atypical Under Rule 23(a)(3)
                  And Snow Capital Cannot Adequately Represent The
                  Proposed Class.........................................................................................4
            2.    Snow Capital Cannot Satisfy The Adequacy Requirements
                  Of Rule 23(a)(4) Because Its Economic Interests Conflict
                  With Those Of Absent Class Members ........................................................5
                  a.    Snow Capital's Economic Interests With Respect
                        To Its Individual Claim Impermissibly Conflict
                        With Those Of Absent Class Members ...............................................6
                  b.    Snow Capital's Relationship With Its Counsel
                        Creates An Impermissible Economic Interest That
                        Conflicts With Those Of Absent Class Members.............................7
            3.    Snow Capital Cannot Satisfy The Adequacy Requirements
                  Of Rule 23(a)(4) Because It Has Failed To Vigorously
                  Prosecute The Class Claims.......................................................................9
      C.    Class Certification Must Be Denied Because Snow Capital Fails
            To Prove That Common Issues Predominate Over Individual
            Issues As Required By Rule 23(b)(3) .........................................................10
            1.    Because Snow Capital Seeks To Establish Predominance
                  By The Fraud-on-the-Market Presumption, It Must Make A
                  Showing of Loss Causation By A Preponderance Of All
                  Admissible Evidence At The Class Certification Stage .............................10
            2.    Snow Capital Is Not Entitled To The Fraud-on-the-Market
                  Presumption Of Reliance Because It Fails To Make The
                  Requisite Showing Of Loss Causation ......................................................12
      D.    If The Court Grants Certification, The Class Period Should Extend
            No Later Than August 9, 2006. ......................................................................17
      E.    If The Court Grants Certification, In-and-Out Shareholders Who
            Bought Prior To August 9, 2006 Should Be Excluded From The
            Class Because They Cannot Prove Loss Causation As A Matter Of
            Law .................................................................................................................18
      F.    If The Court Grants Certification, Foreign Purchasers Of Shares
            Traded On A Foreign Exchange Must Be Excluded From The
            Class Because The Court Does Not Have Subject Matter
            Jurisdiction Over Such Claims........................................................................19

III.  CONCLUSION......................................................................................................20

PORTIONS REDACTED

## TABLE OF AUTHORITIES

### CASES

*Alaska Elec. Pension Fund v. Pharmacia, Corp.*,
No. 03-1513 (AET), 2007 WL 276150 (D.N.J. Jan. 25, 2007) .................................................. 17
*Alfadda v. Fenn*, 935 F.2d 475 (2d Cir. 1991) .................................................................................. 19
*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ......................................................................... 5, 6
*Baffa v. Donaldson*, 222 F.3d 52 (2d Cir. N.Y. 2000) ........................................................................ 4
*Basic v. Levinson*, 485 U.S. 224 (1988) ............................................................................... 5, 10, 11
*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001) ................................................. 7, 9
*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) ................................................................. passim
*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006) ................................................................ 3
*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990) .............................................................................................................. 4
*Hallet v. Li & Fung, Ltd.*,
No. 95 Civ. 8917, 1997 WL 621111 (S.D.N.Y. Oct. 6, 1997) ......................................................... 5
*In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157 (S.D.N.Y. 2010) ........................................................... 12
*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) ............................................... 14
*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) ........................ 11, 12, 18
*In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999) ....................................... 20
*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008, as amended January 16, 2009) ........................................................... 3
*In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298 (S.D.N.Y. 2005) ........................... 11, 15
*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) ............................................ passim
*In re Nortel Networks Corp. Sec. Litig.*,
No. 01 Civ. 1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) .................................................. 19
*In re Quintus Sec. Litig.*, 201 F.R.D. 475 (N.D. Cal. 2001) .............................................................. 8
*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .............................. 5, 7
*In re Williams Sec. Litig.*, 558 F.3d 1130 (10th Cir. 2009) ............................................................. 15
*In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69 (E.D.N.Y. 2008) ................................................. 18
*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization*,
616 F. Supp. 2d 461 (S.D.N.Y. 2009) .......................................................................................... 8, 10
*Itoba Ltd., v. LEP Group, PLC*, 54 F.3d 118, (2d Cir. 1995) .......................................................... 19
*Jaroslawicz v. Safety Kleen Corp.*, 151 F.R.D. 324 (N.D. Ill. 1993) ................................................ 8
*Kaplan v. Gelfond*, 240 F.R.D. 88 (S.D.N.Y. 2007) ....................................................................... 17
*Landry v. Price Waterhouse*, 123 F.R.D. 474 (S.D.N.Y. 1989) ........................................................ 5
*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ................................................. 11
*Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161 (2d Cir. 2005) ............................................ 13, 18
*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) ................................................................ 19
*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1995) ..................................... 9
*Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 176 (2d Cir. 2008) ............................................. 20
*Nathan Gordon Trust v. Northgate Exploration, Ltd.*,
148 F.R.D. 105 (S.D.N.Y. 1993) .................................................................................................... 19
*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir. 2007) .................................................................................................... 10, 11
*Rolex Employees Ret. Trust v. Mentor Graphics Corp.*,
163 F.R.D. 658 (D. Or. 1991) .......................................................................................................... 9
*Shields v. Washington BanCorp.*,
No. 90-1101, 1991 WL 221940 (D.D.C. Oct. 10, 1991) .............................................................. 7, 8

**PORTIONS REDACTED**

*Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307 (E.D. Va. 2007) ............................................... 10

*Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7th Cir. 1977) ...................................................... 8

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
  546 F.3d 196 (2d Cir. 2008) ............................................................................... 3, 10, 11, 12

*Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466 (S.D.N.Y. 1983) ...................................... 5

## RULES

Federal Rule of Civil Procedure 23 ...................................................................... 1, 3, 4, 6

**PORTIONS REDACTED**

Defendant PricewaterhouseCoopers LLP ("PwC-Canada"), an Ontario limited liability partnership, respectfully submits this memorandum of law in opposition to Plaintiff's Motion for Class Certification.[1]

## I.
## PRELIMINARY STATEMENT

Lead Plaintiff Snow Capital Investment Partners, L.P. ("Snow Capital") seeks the Court's certification of a single class of "those persons who acquired the common stock of defendant IMAX Corporation ("IMAX or the "Company") between February 27, 2003 and July 20, 2007, inclusive (the "Class Period"), and were damaged thereby." (Dkt. 125 at p. 1.) As the party seeking class certification, Snow Capital has the burden of demonstrating by a preponderance of the evidence that it meets all of the requirements of Federal Rule of Civil Procedure 23 ("Rule 23").

Snow Capital has failed to meet its Rule 23 burden. First, Snow Capital does not satisfy the typicality and adequacy requirements of Rule 23(a) because (i) Snow Capital is atypical and cannot adequately represent the proposed class because Snow Capital is subject to a unique defense based on its investment strategy; (ii) Snow Capital, due to the timing of its purchases of IMAX stock, has an economic incentive to minimize the impact of the majority of alleged misstatements, creating an intra-class conflict that renders Snow Capital an inadequate class representative; (iii) Snow Capital's relationship with its counsel, Al Yates, creates an impressible economic interest that conflicts with those of the absent class members; and (iv) Snow Capital has failed to monitor and vigorously prosecute this class action.

Second, Snow Capital cannot establish that common issues predominate over individual issues under Rule 23(b). Although Snow Capital seeks to establish the reliance element of its

---

[1] Defendants IMAX Corporation ("IMAX"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble (collectively, the "IMAX Defendants") have filed a separate opposition to Plaintiffs' Motion for Class Certification (the "IMAX Opp."). PwC-Canada hereby joins in and incorporates the IMAX Opp. in all respects.

**PORTIONS REDACTED**

claims under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") through the "fraud-on-the-market" presumption, it cannot do so because Snow Capital has not established the causal link between the alleged misstatements and their alleged losses by a preponderance of the evidence.

Third, if certification is granted, the class period should end no later than August 9, 2006 because the curative disclosure alleged by Snow Capital was made on that date and, indeed, Snow Capital sold all its IMAX stock the following day.

Fourth, if certification is granted, in-and-out shareholders who bought and sold prior to August 9, 2006 should be excluded because such shareholders will not be able to show loss causation as a matter of law because of the absence of any alleged corrective disclosure prior to August 9, 2006.

Finally, if certification is granted, foreign purchasers of IMAX stock traded on the Toronto Stock Exchange (the "TSE") should be excluded from the class because the Court does not have subject matter jurisdiction over those claims.

## II.
## ARGUMENT

### A.    Standards Applicable To Class Certification

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006) ("*In re IPO*").[2]  Rule 23(a) states that a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect

---

[2]  Unless otherwise indicated, all emphasis is added and all internal quotations and citations omitted.

**PORTIONS REDACTED**

the interests of the class." Fed. R. Civ. P. 23(a).  A party seeking class certification must also satisfy at least one of the subparts of Rule 23(b).  Snow Capital seeks certification here under Rule 23(b)(3) which requires a plaintiff to show "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

On a motion for class certification, a plaintiff bears the burden of producing sufficient admissible evidence, beyond the mere allegations in the complaint, to demonstrate that it satisfies all of the requirements of class certification under Rule 23.  *See In re IPO*, 471 F.3d at 41 ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006).  It is insufficient for a plaintiff merely to make "some showing" that the requirements of Rule 23 have been satisfied.  *In re IPO*, 471 F.3d at 42.  Rather, a plaintiff must prove by a preponderance of the evidence that the requirements of Rule 23 have been met. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008, as amended January 16, 2009).

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met."  *In re IPO*, 471 F.3d at 27.  "Such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established."  *Id.* at 41.  A district court's ruling on class certification must be the result of a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues."  *Id.*  "[T]he fact that a Rule 23

**PORTIONS REDACTED**

requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met."  *Id*. at 27.

**B.**      **Class Certification Should Be Denied Because Snow Capital Does Not Satisfy The Typicality And Adequacy Requirements Of Rule 23(a)**

      **1.**      **Because Snow Capital Is Subject To A Unique Defense, Snow Capital's Claims Are Atypical Under Rule 23(a)(3) And Snow Capital Cannot Adequately Represent The Proposed Class**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality requirement of Rule 23(a)(3) is not satisfied, and therefore class certification is inappropriate, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Baffa v. Donaldson*, 222 F.3d 52, 59 (2d Cir. N.Y. 2000) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

Snow Capital's distinctive investment strategy gives rise to a unique defense, thus defeating typicality. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

---

3  Unless otherwise indicated, references to Exhibits ("Exh.") refer to Exhibits to the Lunn Decl.

**PORTIONS REDACTED**

In other words, Snow Capital relied on the belief that the market for IMAX stock *did not* correctly incorporate information about the stock and that Snow Capital could profit from that market *inefficiency*. *See Basic v. Levinson*, 485 U.S. 224, 248 (1988) ("Any showing that severs the link between the alleged misrepresentation and . . . [plaintiff's] decision to trade at a fair market price will be sufficient to rebut the presumption of reliance.").[4]  Further, Snow Capital's stance that the market is inefficient will color any argument that it makes that the market for IMAX stock immediately absorbs all public information – an argument that will need to be asserted on behalf of less sophisticated class members who intend to rely on the fraud-on-the-market presumption of reliance available under *Basic*.

This unique defense against Snow Capital, and the time Snow Capital will need to devote to attempting to rebut it, "may have the ultimate effect of prejudicing members of the proposed class." *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466, 1471 (S.D.N.Y. 1983).  Because a unique defense makes Snow Capital's claims atypical under Rule 23(a) and prevents Snow Capital from adequately representing the remainder of the class, Snow Capital cannot serve as class representative.

2.  **Snow Capital Cannot Satisfy The Adequacy Requirements Of Rule 23(a)(4) Because Its Economic Interests Conflict With Those Of Absent Class Members**

Rule 23(a)(4) provides that, to obtain class certification, a plaintiff must show that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This rule requires courts to inquire whether the proposed class representative's interests "are antagonistic to the interest of other members of the class."  *In re Visa Check/MasterMoney*

---

4  "The defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to 'devote considerable time to rebut the unique defense.'"  *Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 8917, 1997 WL 621111 at *3 (S.D.N.Y. Oct. 6, 1997) (*quoting Landry v. Price Waterhouse*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989)).

**PORTIONS REDACTED**

*Antitrust Litig.*, 280 F.3d 124, 142 (2d Cir. 2001) (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997)).

      a.      **Snow Capital's Economic Interests With Respect To Its Individual Claim Impermissibly Conflict With Those Of Absent Class Members**

Snow Capital alleges in the Complaint that, as a result of inflation caused by the alleged misrepresentations, the purported class members purchased stock at artificially high prices. (Dkt. 46 at ¶ 230.) At the damages stage, Snow Capital will be required to show the inflationary impact of each of the alleged misstatements—and will only be able to recover damages for artificial inflation that was incorporated into the stock price at the time of purchase. S*ee generally Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-43 (2005).

Snow Capital purchased all of its IMAX stock between December 14, 2004 and November 3, 2005. (Exh. B to the Lunn Dec. (Corrected Certificate of Named Plaintiff).) Snow Capital, therefore, will only be able to recover for damages suffered as a result of alleged misstatements made before November 3, 2005. Thus, Snow Capital has a strong incentive to pursue a legal strategy that maximizes the inflationary impact of pre-November 3, 2005 statements and minimizes the impact of post-November 3, 2005 statements. The Complaint, however, focuses heavily on the alleged misstatements regarding IMAX's *2005* financial results – which were not announced until February 17, 2006.[5] (Dkt. 46 at ¶¶ 95-114.)

Because of Snow Capital's economic interests, its best legal strategy would be to downplay these later, but proportionally significant, alleged misrepresentations – embracing a weaker strategy for class members who purchased IMAX stock after February 17, 2006. Such economic conflicts

---

[5] Snow Capital seeks certification of a class of "all persons and entities who purchased or otherwise acquired IMAX common stock from February 27, 2003 through July 20, 2007." (Dkt. 125 at 2.) Such proposed class would necessarily include persons who purchased after November 3, 2005 and who, unlike Snow Capital, would be able to recover damages, if any, for artificial inflation as a result of post-November 3, 2005 alleged misstatements..

**PORTIONS REDACTED**

are at the heart of the intraclass conflict problem described by *Amchem* and its progeny – "their anticipated recoveries depend on and are maximized by different theories and economic assumptions; those theories and assumptions are incompatible or (at best) incoherent when advanced at once; there are winners and losers in the class; and the distribution of those competing interests creates a problem that cannot be resolved by subclass representatives." *In re Visa Check/MasterMoney*, 280 F.3d at 158 (Jacobs, J. dissenting).  Therefore, Snow Capital does not satisfy the adequacy requirements of Rule 23(a) and cannot be appointed as a class representative.

> **b.    Snow Capital's Relationship With Its Counsel Creates An Impermissible Economic Interest That Conflicts With Those Of Absent Class Members**

The Private Securities Reform Act of 1995 (the "PSLRA") demands that "competent plaintiffs, rather than lawyers, direct" a securities class action.  *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001).  "[T]he possibility that plaintiff may benefit when his attorneys benefit—either directly by receiving business from [its counsel] or indirectly by helping a business associate at the expense of the class—casts doubts on whether plaintiff will fairly and adequately protect the interests of the class."  *Shields v. Washington BanCorp.*, No. 90-1101, 1991 WL 221940, at *2 (D.D.C. Oct. 10, 1991).[6]

In October 2006, Snow Capital represented to this Court that it "ha[d] selected [Robbins Geller's predecessor firm] to represent it and the class."  (Dkt. 14 at 3.) ███████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[6]  *See also* IMAX Opp. at pp. 7-12.

**PORTIONS REDACTED**

[REDACTED]

Snow Capital's selection of Mr. Yates as counsel creates an impermissible conflict with the interest of other members of the class, [REDACTED]

[REDACTED]

[REDACTED] The class' interests are in maximizing recovery while minimizing costs; Richard Snow, however, as Mr. Yates business associate and friend, has an interest in "maximizing the return to his counsel," even if that comes out of the pockets of the other class members. *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 95 (7th Cir. 1977).  Under such circumstances, Snow Capital is not an adequate class representative and the motion to certify should be denied. *See Susman*, 561 F.2d at 93; *Shields*, 1991 WL 221940, at *2; *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009); *Jaroslawicz v. Safety Kleen Corp.*, 151 F.R.D. 324, 329-30 (N.D. Ill. 1993); *In re Quintus Sec. Litig.*, 201 F.R.D. 475, 481-82 (N.D. Cal. 2001).

**PORTIONS REDACTED**

3.    **Snow Capital Cannot Satisfy The Adequacy Requirements Of Rule 23(a)(4) Because It Has Failed To Vigorously Prosecute The Class Claims**

A court should deny class certification "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995); *see also Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 163 F.R.D. 658, 665 (D. Or. 1991) (plaintiff "must check the otherwise unfettered discretion of counsel in prosecuting the suit"); *Berger*, 257 F.3d at 484; *Jaroslawicz*, 151 F.R.D. at 328 (class representative must "vigorously pursue the litigation").

Here, Snow Capital has not been monitoring the progress of this case, has not been vigorously prosecuting this case and has effectively abdicated its fiduciary role in this litigation to its counsel, Al Yates and Robbins Geller, from the very start of this litigation.[7] ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[7]  *See also* IMAX Opp. at pp. 12-15.

**PORTIONS REDACTED**

████████████████████████████████████████████████████

Three weeks later, and only after defendants requested the identifying information, counsel for

Snow Capital admitted that they did not have the information.  (Ex. D (Reich May 26, 2010

Letter).)  Given that Snow Capital has demonstrated that it has neither the interest or ability to

"monitor counsel's performance,"  *Iron Workers*, 616 F.Supp.2d at 464, Snow Capital is an

inadequate class representative and its motion to certify should be denied.  *See Shiring v. Tier*

*Technologies, Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007) (denying class certification in part because

plaintiff "effectively abdicated his supervisory role . . . in contravention of the PSLRA's stated

goals.").


C.    **Class Certification Must Be Denied Because Snow Capital Fails To Prove That
      Common Issues Predominate Over Individual Issues As Required By Rule
      23(b)(3)**

      1.    **Because Snow Capital Seeks To Establish Predominance By The Fraud-
            on-the-Market Presumption, It Must Make A Showing of Loss Causation
            By A Preponderance Of All Admissible Evidence At The Class
            Certification Stage**

To satisfy the predominance requirement of Rule 23(b)(3), Plaintiffs seek to rely on the

"fraud-on-the-market" presumption of reliance set forth in *Basic, Inc. v. Levinson*, 485 U.S. 224

(1988).  The fraud-on-the-market theory creates a presumption that investors purchased stock in

reliance on the integrity of the market, thus establishing reliance as a common issue as

contemplated by Rule 23(b)(3).  As the Fifth Circuit recently explained in *Oscar Private Equity*

*Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 266 (5th Cir. 2007), a lead plaintiff is required to

demonstrate loss causation, by a preponderance of the evidence, at the class certification stage

before it can "trigger" the fraud-on-the-market presumption.  Because the Fifth Circuit opinion in

*Oscar* is based directly on the Supreme Court's ruling in *Basic* and is consistent with the principles

set forth by the Second Circuit in *In re IPO* and *Teamsters Local*, *Oscar* is persuasive and should be

followed here.

**PwC-CANADA'S MEMORANDUM OF LAW IN**                                              **Page 10**
**OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

**PORTIONS REDACTED**

In *Oscar*, the Fifth Circuit held that loss causation is "a fraud on the market prerequisite" that "must be established at the class certification stage by a preponderance of all admissible evidence." 487 F.3d at 266, 269. This is because loss causation provides "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007). To establish loss causation, a securities fraud plaintiff must prove a direct causal connection between the alleged misrepresentation and the decline in the company's share price. *Dura Pharm.*, 544 U.S. at 341-43. Where the alleged misrepresentation is a false opinion, plaintiffs must prove that a corrective disclosure, and not some other contemporaneously released information, revealed the truth and resulted in the decline of the company's share price. *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005) ("*In re IPO II*").

In holding that loss causation must be proven by a preponderance of the evidence at the class certification stage, the Fifth Circuit relied on the Supreme Court's holding in *Basic* that the fraud-on-the-market presumption could be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." *Oscar*, 487 F.3d at 265 (*quoting Basic*, 485 U.S. at 248). Specifically, the presumption would be rebutted if Defendants "could show . . . that the market price would not have been affected by their misrepresentations." *Oscar*, 487 F.3d at 265. Thus, where, as here, Snow Capital cannot establish that its losses were caused by any alleged misstatement by PwC-Canada, the *Basic* link is severed and the fraud-on-the-market presumption is rebutted. Because "Rule 23 mandates a complete analysis of fraud-on-the-market indicators" and a showing of loss causation is a prerequisite to the fraud-on-the-market theory, the Fifth Circuit held that plaintiffs must prove loss causation by a preponderance of the evidence at the class certification stage. *Id.* at 267.

**PORTIONS REDACTED**

The Fifth Circuit's holding in *Oscar* is consistent with the Second Circuit's holdings in *In re IPO*, 471 F.3d at 41-42, *Teamsters Local*, 46 F.3d at 202, and *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 39-40 (2d Cir. 2009), and is persuasive.  Although recent decisions in the U.S. District Court for the Southern District of New York have rejected the reasoning of *Oscar* as non-binding precedent,[8] the Second Circuit itself has not addressed the issue of whether loss causation must be established by a preponderance of the evidence at the class certification stage to trigger the fraud-on-the-market presumption.  However, in line with *Oscar*, the Second Circuit specifically rejected the notion that inquiry into a merits-related issue, such as loss causation, would be inappropriate at the class certification stage.  *In re IPO*, 471 F.3d at 41.  The Second Circuit's recent trend towards higher scrutiny at the class certification stage, as reflected in *In re IPO* and *Teamsters Local*, suggests that the Second Circuit would find the reasoning in *Oscar* persuasive and would likely adopt the preponderance of the evidence standard once presented with the opportunity to consider the issue.  Furthermore, having now held, in *In re Flag Telecom*, 574 at 39-40, that a plaintiff must make a showing of loss causation, by a preponderance of the evidence, to establish typicality and adequacy of the class representative at the class certification stage, it stands to reason that the Second Circuit will require this same standard when it squarely addresses the loss causation requirement for predominance under Rule 23(b)(3).

2.    **Snow Capital Is Not Entitled To The Fraud-on-the-Market Presumption Of Reliance Because It Fails To Make The Requisite Showing Of Loss Causation**

Here, Snow Capital cannot invoke *Basic's* fraud-on-the-market presumption because they have failed to establish loss causation by a preponderance of the evidence.  Snow Capital does not

---

8    In addition, all such opinions, as of the time of this filing, except for *In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157 (S.D.N.Y. 2010), were issued prior to the Second Circuit's ruling in *Teamsters Local* and *In re Flag Telecom*, both of which cemented the "preponderance of the evidence" standard at the class certification stage.

**PORTIONS REDACTED**

provide any evidence demonstrating that the price declines occurring on the alleged corrective disclosure dates resulted from the revelation of fraud as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other [non-litigation related] events." *Dura Pharm.*, 544 U.S. at 343. In addition to Snow Capital's lack of evidence supporting loss causation, the analysis of PwC-Canada's expert, Professor Christopher James, confirms that Snow Capital cannot demonstrate that any of the alleged losses were caused by misstatements attributable to PwC-Canada. (*See* Exh. A ("James Report") to Dkt. 99.)

The only statements made by PwC-Canada that Snow Capital alleges were false and misleading were contained within PwC-Canada's audit opinions on IMAX's year-end financial statements for the years ended December 31, 2002-2005 (the "Audit Opinions"). (*See* Dkt. 46 at ¶¶ 187, 226-227.) Thus, to establish loss causation for class certification purposes, Snow Capital must prove, by a preponderance of the evidence, that (1) the Audit Opinions were false when made and that falsity was concealed from the market; (ii) it purchased IMAX stock after such statements were made; (iii) the falsity of the statements was revealed to the market; and (iv) the disclosure negatively affected the price of the stock. *See Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161, 173 (2d Cir. 2005)

In the Complaint, Snow Capital alleges nineteen corrective disclosure dates. (Dkt. 46 at ¶¶ 115-139; *see also* James Report at ¶ 45.) Of those, only seven are associated with significant company-specific stock price movement. (James Report at ¶ 46.) Of those seven, four do not contain new information that would correct alleged prior misrepresentations by PwC-Canada. (James Report at ¶ 46, 51-80.) Thus, only three alleged corrective disclosure dates remain that may contain new information that may have corrected alleged misrepresentations by PwC-Canada: the

**PORTIONS REDACTED**

August 9, 2006 Press Release by IMAX ("August 9 Press Release")[9], the March 29, 2007 Press

Release by IMAX ("March 29 Press Release"),[10] and the July 20, 2007 press release by IMAX (the

"July 20 Press Release.").[11]

       The August 9 Press Release is not a corrective disclosure because it did not reveal the truth

of any alleged misstatements attributable to PwC-Canada, as required by *Dura.  See In re eSpeed,*

*Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 296 (S.D.N.Y. 2006) ("[I]t is axiomatic that a concealed fact

cannot cause a decrease in the value of a stock before the concealment is made public.").  The press

release expressly stated, with respect to the application of multiple element accounting to theater

system installations:  "the Company believes its application of the above [multiple-element]

accounting policy is, and has historically been, in accordance with GAAP and the Company's

position is supported by its auditors."  (August 9 Press Release at p. 2.)  In addition, there is plenty

of other negative, company-specific information contained in the August 9 Press Release to explain

the decrease in IMAX's stock price following the release:  (1) IMAX's announcement that no one

was willing to buy the company at the valuation sought by the Board of Directors; (2) IMAX's

decision to focus on potential joint ventures; (3) IMAX's decision to focus on its conversion to

digital technology; (4) IMAX's retraction of its guidance for the remainder of 2006; (5) IMAX's

announcement that the SEC had commenced an investigation of the company; and (6) IMAX's

announcement of financial results for the 2nd Quarter of 2006 and its retraction of guidance as to

future earnings.  (*Id*. at pp. 1-2.)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

  9  Exhibit E to the Lunn Dec.

  10  Exhibit F to the Lunn Dec.

  11  Exhibit G to the Lunn Dec.

████████████    ████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████                     In contrast, Professor

James' analysis suggests that the other bad news, specifically the "no-buyer" announcement, was

largely responsible for the price decline following the August 9, 2006 (James Report at ¶ 106),[13]

but concludes that separating the effects of each negative announcement may well be impossible

(James Report at ¶ 145).  It is Snow Capital, not Defendants, who bears the burden of proving that

the correction of alleged misrepresentation, and not "changed economic circumstances, changed

investor expectations, new industry-specific or firm-specific facts, conditions or other events" was

responsible for all or a significant portion of the decline in price.  *Dura Pharm.*, 544 U.S. at 343; *In

re IPO II*, 399 F. Supp. 2d at 307; *see also In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir.

2009) ("The plaintiff bears the burden of showing that his losses were attributable to the revelation

of the fraud and not the myriad other factors that affect a company's stock price.  Without showing a

causal connection that specifically links losses to misrepresentations, he cannot succeed.").  Having

provided no analysis regarding the allocation of the price decline among the multiple

announcements contained in the August 9 Press Release, Snow Capital has not met that burden.

In addition, neither the March 29 Press Release nor the July 20 Press Release were a

corrective disclosure.  Both were released by IMAX *after* the "truth" that IMAX's historical

financial statements were in error had been revealed to the market.  On March 16, 2007, before the

markets opened, IMAX disclosed that its prior audited financial statements were in error and,

---

12   ████████████████████████████████████████████████████████████
     ████████████████

13   "The announcement that IMAX had not found a buyer at the desired valuation level was viewed
     very negatively by the market, which was expecting a converse announcement, namely the
     announcement of a potential buyer . . . .  Correspondingly, the lack of a buyer announcement and
     announcement that IMAX would search for buyers at a lower price negatively impacted market
     expectations and likely triggered the majority of the stock price decline on August 10, 2006."

**PORTIONS REDACTED**

therefore, revealed to the market that the Audit Opinions on those financial statements were false when issued.  (Exhibit I to the Lunn Dec.)  Snow Capital, however, does not allege any market reaction to the March 16 Press Release  That is not surprising, given that IMAX's closing stock price on March 15, 2007 on the NYSE was $4.99 per share and the stock closed on March 16, 2007 at $5.00 per share.  (Exhibit J to the Lunn Dec. (Lexis Nexis Historical Quotes).)  Subsequently, the March 29 Press Release announced a delay in filing the restatement, but did not provide additional information about IMAX's restatement beyond that provided in the March 16 Press Release.  (James Report at ¶ 157.)  Rather, that announcement was made in compliance with Ontario requirements that companies update investors every two weeks on the status of their filing delays.  (James Report at ¶ 151.)  The July 20 Press Release announced the completion of the restatement.[14]  Because the relevant "truth" had been revealed on March 16, 2007, the July 20 Press Release was not a corrective disclosure but merely a republication of what the market already knew.

Because Snow Capital provides no evidence that the losses following the August 9 Press Release are, in whole or in part, attributable to the alleged misstatements of PwC-Canada, and because the "truth" was already disseminated in the market prior to the March 29 and July 20 Press Releases, Snow Capital has not met its burden of proving loss causation by a preponderance of the evidence.  Therefore, Snow Capital is not entitled to the fraud-on-the-market presumption of reliance and the motion for class certification should be denied.  *See, e.g., In re IPO*, 471 F.3d at 43 ("Without the *Basic* presumption, individual questions of reliance would predominate over common questions. ")

---

14  Not surprisingly, IMAX's stock price actually increased in response to the July 20 Press Release – an indication that the market had expected the restatement to have a larger impact on IMAX's future cash flows than, in fact, it had.  (James Report at ¶ 160.)

**D.    If The Court Grants Certification, The Class Period Should Extend No Later Than August 9, 2006.**

Even if a class is certified, the class period should end no later than August 9, 2006.  On that date IMAX announced its second quarter earnings.  In that same announcement, IMAX disclosed that it had not found a merger partner at the desired valuation and that it was in the process of responding to an informal SEC inquiry regarding revenue recognition, "including [IMAX's] application of multiple element arrangement accounting in its revenue recognition for theatre systems." (Aug. 9 Press Release.)  IMAX further disclosed that it believed its revenue recognition was in accordance with GAAP and that PwC-Canada supported that position.[15]  (*Id.*)  After this announcement, IMAX's stock price fell by $3.90, or approximately 40%.

As a result, those who purchased IMAX shares after August 9, 2006 cannot allege any damages, and, even if they could, issues of loss causation would predominate over any common questions.  Originally, all plaintiffs and movants for lead plaintiff "agree[d] that the relevant class period ended on August 9, 2006." *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007).  Only later did Snow Capital allege a longer class period ending on July 20, 2007.  (Dkt. 46 at ¶ 21.)  It is well established that in a securities class action, the class period may not extend after curative information has been revealed.  *Alaska Elec. Pension Fund v. Pharmacia, Corp.*, No. 03-1513 (RET), 2007 WL 276150, at *3 (D.N.J. Jan. 25, 2007) ("Curative information retracts or dispels the alleged misinformation, or puts the investor on inquiry notice of the alleged fraud, making further reliance on the original statements by investors unreasonable.").

---

[15]  IMAX went on to specify that its application of MEA accounting was related to theater systems installed in 2005 and 2006:  "The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed . . . . This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006."  (Aug. 9 Press Release)

**PORTIONS REDACTED**

In the Complaint, Snow Capital does not identify a single corrective disclosure that occurred after August 9, 2006 *and* caused a drop in IMAX's share price—because there is none. After IMAX's July 20, 2007 restatement (the "Restatement"), the price of IMAX shares increased from $4.40 at close on July 19, 20007 to $4.85 at close on July 20, 2007 and then to $4.98 at close on July 23, 2007, the next trading day. (Exh. J to the Lunn Dec.) Therefore, if a class is certified, the class period should not extend beyond August 9, 2006.[16]

**E.  If The Court Grants Certification, In-and-Out Shareholders Who Bought Prior To August 9, 2006 Should Be Excluded From The Class Because They Cannot Prove Loss Causation As A Matter Of Law**

As the class is currently pled, it could be read to include in-and-out shareholders who bought and sold prior to August 9, 2006. The first corrective disclosure alleged by Plaintiff is the IMAX press release of August 9, 2006. Thus, purchasers who bought and sold before August 9, 2006 – even if they suffered a loss – did not hold over any corrective disclosure pled in the Complaint and therefore there is no allegation in the Complaint that such shareholders suffered a loss *as a result* of any alleged misrepresentation. For such shareholders, any alleged price inflation built into the stock price at the time of purchase was still present at the time of sale. Consequently, class members who sold prior to August 9, 2006 will not be able to show loss causation as a matter of law because the absence of a prior corrective disclosure pled in the Complaint is fatal to a plaintiff's claim. *See Dura*, 544 U.S. at 342-43; *Lentell*, 396 F.3d at 175. Nor does Snow Capital allege that information available before August 9, 2006 "exposed the public to the truth about [the alleged] misstatements." *In re Flag Telecom*, 574 F.3d at 41. Thus, the in-and-out shareholders should be excluded from the class.

---

[16]  At a minimum, the class period certainly should not extend past August 11, 2006, when the first complaint was filed in this action. *See In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 196 (E.D.N.Y. 2008).

F.      **If The Court Grants Certification, Foreign Purchasers Of Shares Traded On A Foreign Exchange Must Be Excluded From The Class Because The Court Does Not Have Subject Matter Jurisdiction Over Such Claims**

The Securities Exchange Act, under which Snow Capital brings this case, is silent as to its territorial application. Therefore, "courts have developed two tests for determining subject matter jurisdiction over foreign transactions." *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y. 1993). Under the conduct test, "a federal court has subject matter jurisdiction if: (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere . . . and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses." *Itoba Ltd., v. LEP Group, PLC*, 54 F.3d 118, 122 (2d Cir. 1995). Under the effects test, a federal court has subject matter jurisdiction over a foreign transaction "where illegal activity abroad causes a 'substantial effect' within the United States." *Nathan Gordon Trust*, 148 F.R.D. at 108 (*quoting Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Here, the activities forming the basis of the claims asserted in the Complaint satisfy neither the conduct nor effects test for subject matter jurisdiction over a foreign transaction. In the Motion for Certification, Snow Capital provides no legal of factual support for the inclusion of foreign purchasers who purchased IMAX shares on the TSE. Although a handful of courts have certified securities class actions whose class members included foreign purchasers, such cases were predicated on fraudulent transactions with U.S. customers or U.S. acquisitions,[17] neither of which

---

17   In *In re Nortel Networks Corp. Sec. Litig.*, the Court found subject matter jurisdiction existed over the foreign transactions based on allegations that "[d]efendants were extending vendor financing to **numerous U.S. customers** that defendants knew to be uncreditworthy, so as to artificially inflate the Company's revenues." No. 01 Civ. 1855, 2003 WL 22077464 at *8

[Footnote continued on next page]

**PORTIONS REDACTED**

are alleged here.  Rather, the allegations in the Complaint focus on IMAX's revenue recognition on worldwide theater installations.  The alleged misstatements—the release of financial results and related press releases—were all issued from the headquarters of IMAX in Ontario.  PwC-Canada conducted the bulk of its audit work at IMAX's Ontario headquarters and at its own offices in Toronto so essentially all of its activities were extra-territorial as well.  As in *Morrison v. Nat'l Australia Bank, Ltd.*, the alleged "actions taken and actions not taken" by IMAX and PwC-Canada and the Individual Defendants outside of the United States are "significantly more central to the [allegations] and more directly responsible for the harm to investors" than any activity that occurred in the United States.  547 F.3d 167, 176 (2d Cir. 2008).[18]

Thus, Snow Capital has not met and cannot meet its burden to prove subject matter jurisdiction over the foreign transactions and this Court should exclude foreign purchasers who purchased IMAX securities on the TSE from any certified class.

## III.
## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Class Certification should be denied in its entirety.  Alternatively, should the Court grant Plaintiff's Motion in whole or in part, the Court should certify a class that excludes foreign purchasers of IMAX securities on the Toronto Securities Exchange and a class period ending on August 9, 2006.

---

[Footnote continued from previous page]
(S.D.N.Y. Sept. 8, 2003).  In *In re Gaming Lottery Sec. Litig.*, the Court certified a class including foreign purchasers because the allegations in the complaint "revolve[d] around [defendant's] **acquisition of United States companies** [and]. . . its activities within [the U.S.] borders are the very factual predicates of fraud which lie at the heart of plaintiffs' case."  58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999).

[18] Indeed, a purported class action against IMAX and certain of its officers and directors, brought by Canadian purchasers of IMAX stock, is pending in Ontario.  PwC-Canada respectfully requests that the Court take judicial notice of the pendency of that action, *Silver v. IMAX Corporation, et al.*, Case No. CV-06-3257-000, in the Superior Court of Justice in Ontario.

**PORTIONS REDACTED**

Dated:  June 10, 2010

                              Respectfully Submitted,

                              By:   /s/ Samantha A. Lunn
                                  Samantha A. Lunn

                                  Jennifer L. Conn (JC-5753)
                                  GIBSON, DUNN & CRUTCHER LLP
                                  200 Park Avenue
                                  New York, New York 10166
                                  Telephone:  (212) 351-4000
                                  Facsimile:  (212) 351-4035

                                  M. Byron Wilder (admitted *pro hac vice*)
                                  Samantha A. Lunn (admitted *pro hac vice*)
                                  GIBSON, DUNN & CRUTCHER LLP
                                  2100 McKinney Avenue, Suite 1100
                                  Dallas, Texas  75201
                                  Telephone:  (214) 698-3100
                                  Facsimile:  (214) 698-3400

                                  **ATTORNEYS FOR DEFENDANT
PRICEWATERHOUSECOOPERS LLP, AN
ONTARIO LIMITED LIABILITY
PARTNERSHIP**

100884351_1.DOC

PORTIONS REDACTED

## CERTIFICATE OF SERVICE

I, Samantha A. Lunn, hereby certify that a true and correct copy of the foregoing was sent

via this Court's CM/ECF system on June 10, 2010 to the following counsel of record:

Samuel H. Rudman
Robert M. Rothman
David A. Rosenfeld
Mark S. Reich
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone:  (631) 367-7100
Facsimile:  (631) 367-1173

Lewis J. Liman
James D. Mathews
David Oliwenstein
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone:  (212) 225-2550
Facsimile:   (212) 225-3999


　　/s/ Samantha A. Lunn
Samantha A. Lunn