UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re IMAX CORPORATION SECURITIES LITIGATION | : | Civil Action No. 1:06-cv-06128-NRB |
| | : | CLASS ACTION |
| This Document Relates To: | : | REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION |
| ALL ACTIONS. | : | |

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ....... 1

II. ARGUMENT ....... 1

A. Snow Capital Has Standing and Is a Typical and Adequate Representative ....... 1

1. Snow Capital, a Sophisticated Investor That is Knowledgeable About the Case and Understands Its Fiduciary Responsibilities, Is Well Qualified to Be a Class Representative ....... 1

2. Defendants' Hodgepodge of Criticisms Do Not Defeat Plaintiff's Standing, Typicality, or Representativeness ....... 3

(a) Snow Capital's retention of Al Yates ....... 3

(b) Plaintiff's prosecution of this case ....... 7

(c) Snow Capital's purchase dates ....... 9

(d) Reliance on the alleged misrepresentations ....... 12

(e) The August 9, 2006 disclosure ....... 12

(f) Market efficiency ....... 14

B. Common Questions of Law or Fact Predominate ....... 16

1. Second Circuit Law Does Not Require Plaintiff To Establish Loss Causation on a Motion for Class Certification ....... 16

C. A Class Action in This Court Is Superior to the Pending Class Action in Canada ....... 19

D. The Court Should Reject PWC's Efforts to Change the Class Definition ....... 24

III. CONCLUSION ....... 25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997) .......... 11, 19

*Baffa v. Donaldson, Lufkin & Jenrette*,
222 F.3d 52 (2d Cir. 2000) .......... 2, 9

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 14, 15, 17, 18

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......... 16, 18

*Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*,
Civ. No. 06-3800 (GEB), 2007 WL 1726565
(D.N.J. June 13, 2007) .......... 23

*Darquea v. Jarden Corp.*,
No. 06 Civ. 722(CLB), 2008 WL 622811
(S.D.N.Y. Mar. 6, 2008) .......... 18

*DeYoung v. Beddome*,
707 F. Supp. 132 (S.D.N.Y. 1989) .......... 24

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 17

*Fleeger v. Clarkson Co. Ltd.*,
86 F.R.D. 388 (N.D. Tex. 1980) .......... 24

*In re AIG, Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) .......... 18

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) .......... 18

*In re Cavanaugh*,
306 F.3d 726 (9th Cir. 2002) .......... 6

*In re CitiGroup Inc. Bond Litig.*,
--- F. Supp. 2d ---, 2010 WL 2772439
(S.D.N.Y. July 12, 2010) .......... 10

**Page**

*In re Connetics Corp. Sec. Litig.*,
257 F.R.D. 572 (N.D. Cal. 2009)....................18

*In re Copper Mountain Sec. Litig.*,
305 F. Supp. 2d 1124 (N.D. Cal. 2004)....................6

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
586 F. Supp. 2d 732 (S.D. Tex. 2008)....................7

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
574 F.3d 29 (2d Cir. 2009)....................18

*In re Initial Pub. Offering Sec. Litig.*,
260 F.R.D. 81 (S.D.N.Y. 2009)....................14, 17, 18

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
No. 04 Civ. 8144(CM), 2009 WL 5178546
(S.D.N.Y. Dec. 23, 2009)....................11

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008)....................25

*In re Micron Techs., Inc. Sec. Litig.*,
247 F.R.D. 627 (D. Idaho 2007)....................18

*In re Mills Corp. Sec. Litig.*,
257 F.R.D. 101 (E.D. Va. 2009)....................18

*In re Monster Worldwide, Inc. Sec. Litig.*,
251 F.R.D. 132 (S.D.N.Y. 2008)....................2, 3, 9

*In re Nature's Sunshine Product's [sic] Inc. Sec. Litig.*,
251 F.R.D. 656 (D. Utah 2008)....................18

*In re Netbank, Inc. Sec. Litig.*,
259 F.R.D. 656 (N.D. Ga. 2009)....................18

*In re PolyMedica Corp. Sec. Litig.*,
432 F.3d 1 (1st Cir. 2005)....................15, 16

*In re Razorfish, Inc. Sec. Litig.*,
143 F. Supp. 2d 304 (S.D.N.Y. 2001)....................6

**Page**

*In re Red Hat Sec. Litig.*,
261 F.R.D. 83 (E.D.N.C. 2009) ....................................................................................18

*In re Safeguard Scientifics*,
216 F.R.D. 577 (E.D. Pa. 2003)......................................................................................8

*In re Salomon Analyst Metromedia Litig.*,
544 F.3d 474 (2d Cir. 2008)....................................................................................17, 18

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570 (S.D.N.Y. 2008).........................................................................11

*In re Visa Check/Mastermoney Anti-Trust Litig.*,
280 F.3d 124 (2d Cir. 2001)..................................................................................... 11-12

*In re Vivendi Universal, S.A. Sec. Litig.*,
242 F.R.D. 76 (S.D.N.Y. 2007) ..................................................................................2, 10

*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*,
616 F. Supp. 2d 461 (S.D.N.Y. 2009)...........................................................................6

*Jaroslawicz v. Safeway Kleen Corp.*,
151 F.R.D. 324 (N.D. Ill. 1993)......................................................................................6

*Kline v. Wolf*,
702 F.2d 400 (2d Cir. 1983)............................................................................................9

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ............................................................... 16-17, 18

*Malone v. Microdyne Corp.*,
148 F.R.D. 153 (E.D. Va. 1993), *rev'd on other grounds*, 26 F.3d 471 (4th Cir. 1994) ................................................................................................................16

*Morrison v. National Australia Bank Ltd.*,
130 S. Ct. 2869 (2010)..................................................................................................1, 22

*Nicholas v. Poughkeepsie Sav. Bank/FSB*,
No. 90 Civ. 1607 (RWS), 1990 WL 145154 (S.D.N.Y. Sept. 27, 1990).........................................................................................10

*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir. 2007) ....................................................................................17, 18

**Page**

*Paraschos v. YBM Magnex Int'l, Inc.*,
130 F. Supp. 2d 642 (E.D. Pa. 2000) ....................................................................24

*Rosen v. Textron*,
369 F. Supp. 2d 204 (D.R.I. 2005)........................................................................16

*Ross v. Abercrombie & Fitch Co.*,
257 F.R.D. 435 (S.D. Ohio 2009).........................................................................18

*Schleicher v. Wendt*,
No. 1:02-cv-1332-DFH-TAB, 2009 WL 761157
(S.D. Ind. Mar. 20, 2009)......................................................................................18

*Shields v. Wash. BanCorp*,
No. 90-1101 (RCL), 1991 WL 221940
(D.D.C. Oct. 10, 1991)...........................................................................................5

*Susman v. Lincoln Am. Corp.*,
561 F.2d 86 (7th Cir. 1977) ...................................................................................6

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
546 F.3d 196 (2d Cir. 2008)..................................................................................14

*VictoriaTea.com, Inc. v. Cott Beverages Canada*,
239 F. Supp. 2d 377 (S.D.N.Y. 2003)...................................................................24

*Wagner v. Barrick Gold Corp.*,
251 F.R.D. 112 (S.D.N.Y. 2008) ...................................................................2, 9, 18

*Weisman v. Darneille*,
78 F.R.D. 669 (S.D.N.Y. 1978) ........................................................................3, 4

**STATUTES, RULES AND REGULATIONS**

15 U.S.C. §78u-4(a)(3)(B)(v) ........................................................................................7

Federal Rules of Civil Procedure

Rule 21 ....................................................................................................................21
Rule 23 ............................................................................................................. *passim*

Ontario Securities Act..................................................................................................23

## I. PRELIMINARY STATEMENT[1]

Defendants purport to identify two broad reasons why this Court should deny class certification: Snow Capital purportedly lacks standing and is neither typical of the Class nor an adequate class representative, and this class action is purportedly inferior to a class action pending in Canada. PWC argues, in addition, that common issues do not predominate over individual issues (because the fraud-on-the-market doctrine purportedly does not apply), and makes other, miscellaneous arguments.[2] As demonstrated below, none of these arguments is meritorious.[3]

## II. ARGUMENT

### A. Snow Capital Has Standing and Is a Typical and Adequate Representative

#### 1. Snow Capital, a Sophisticated Investor That is Knowledgeable About the Case and Understands Its Fiduciary Responsibilities, Is Well Qualified to Be a Class Representative

In its opening papers, Snow Capital – with more than $3.5 billion under management (Millkey Exh. 1 [Snow Tr.] at 190:13-15)[4] – established itself as a sophisticated investor well

---

[1] All capitalized terms in this memorandum are defined in the opening Memorandum of Law in Support of Plaintiff's Motion for Class Certification, dated April 22, 2010 ("Pl. Opening Mem."). Throughout this memorandum, all emphasis in quotations is added unless otherwise indicated.

[2] The IMAX Defendants (IMAX and the Individual Defendants) and PWC explicitly adopt each other's arguments. *See* IMAX Defendants' Memorandum of Law ("IMAX Mem.") at 3 n.3; PWC's Memorandum of Law ("PWC Mem.") at 1 n.1.

[3] On June 24, 2010, the Supreme Court decided *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), rejecting worldwide classes under the U.S. securities laws. Although Lead Plaintiff believes, even in light of *Morrison*, there are meritorious arguments for continuing to assert claims on behalf of at least some potential Class members who purchased their IMAX securities in Ontario, Lead Plaintiff has determined to limit the Class to purchasers on the NASDAQ, who in any event represent at least 85% of IMAX shareholders worldwide. Thus, Lead Plaintiff submits the following, revised Class definition: "All those who acquired the common stock of defendant IMAX Corporation on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive (the "Class Period"), and were damaged thereby. Excluded from the Class are defendants IMAX, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, as well as, among others, the members of their immediate families and their affiliates or agents."

[4] "Millkey Exh. __" refers to exhibits attached to the Declaration of Mark T. Millkey in Further Support of Plaintiff's Motion for Class Certification, dated July 30, 2010 and submitted herewith.

qualified to act as a lead plaintiff and class representative. Snow Capital's principal, Richard Snow, is a registered investment advisor (*see id.* at 38:10-22) who personally made the decision to purchase Snow Capital's IMAX stock. *See id.* at 68:14-16. At his deposition, Mr. Snow understood that it was the role of the lead plaintiff to "act as a fiduciary and to consult with and guide counsel" (*id.* at 33:8-9), and was knowledgeable about the lawsuit: he identified the Defendants, the Class Period, and the substance of Plaintiff's allegations, and knew the contents of a critical August 9, 2006 press release issued by IMAX constituting a partial disclosure of the truth. *See id.* at 89:2-10; 143:5-145:25. Mr. Snow also testified about the numerous communications he had had with Lead Counsel Robbins Geller. *See id.* at 154:7-15.

These facts more than satisfy the requirements of Rule 23. *See, e.g.*, *Baffa v. Donaldson, Lufkin & Jenrette*, 222 F.3d 52, 61 (2d Cir. 2000) (class representative status may be denied only "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys") (citation and internal quotation marks omitted); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008) ("'[I]t is well established that in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected.'") (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 88 (S.D.N.Y. 2007)); *Vivendi*, 242 F.R.D. at 88 (proposed class representative adequate even though he could not recall the year complaint was filed, the dates of the class period, how he decided to become a class representative, the details of his purchases and sales of Vivendi securities, or ever meeting or speaking with representatives of one of the plaintiff firms involved in the case). As one court recently put it, the adequacy requirement is "modest." *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 135 (S.D.N.Y. 2008).

Given the sophistication, knowledge, and participation of Snow Capital and its representative, Mr. Snow, this case is a far cry from the case law on which Defendants rely in opposing class certification. *See, e.g.*, *Monster*, 251 F.R.D. at 135 (rejecting proposed class representative who did not know "the name of the stock at issue in [the] case," "the name of either individual defendant," whether the plaintiff "ever owned Monster stock," whether an amended complaint had been filed, whether he had ever seen any complaint in the action, whether a motion to dismiss had been filed, and whether a pre-discovery motion to dismiss had been filed); *Weisman v. Darneille*, 78 F.R.D. 669, 670-71 (S.D.N.Y. 1978) (rejecting proposed class representative who had a felony conviction under Section 10(b), tried to conceal the conviction, and later falsely described it as a misdemeanor).

**2. Defendants' Hodgepodge of Criticisms Do Not Defeat Plaintiff's Standing, Typicality, or Representativeness**

Despite Snow Capital's qualifications to act as class representative,[5] Defendants cite a hodgepodge of purported criticisms to argue that Snow Capital lacks standing and is neither a typical nor representative plaintiff. Those meritless criticisms, and Plaintiff's responses, are set forth below:

(a) Snow Capital's retention of Al Yates: The IMAX Defendants devote five pages of their opposition to Snow Capital's retention of attorney Al Yates, Mr. Snow's trusted advisor and neighbor for at least 20 years (*see* Millkey Exh. 1 [Snow Tr.] at 154:22-155:3; 160:25-161:6), in addition to lead counsel Robbins Geller. *See generally* IMAX Mem. at 7-12; *see also* PWC Mem. at 7-8. It was through Yates that Snow Capital was introduced to, and retained, Robbins Geller, after discussing the "pluses and minuses of certain firms." Millkey Exh. 1 [Snow Tr.] at 165:9-16. Mr. Snow testified that Yates conducted some preliminary work on the case and acted as his liaison with

[5] Although Defendants suggest, in a footnote, that Snow Capital is a "professional plaintiff" (IMAX Mem. at 9 n.6), Snow Capital has acted as a lead plaintiff in only one other case. *See* Millkey Exh. 1 [Snow Tr.] at 7:6-10.

Robbins Geller, "keeping me up to date on the strategy and what's kind of going on with the case and [transmitting] a number of the legal documents to me." *Id.* at 153:18-154:6. Mr. Snow also testified that he believed his contacts with Robbins Geller and Yates had been approximately equal, although he had had more with Robbins Geller later in the case.[6] *See id.* at 154:7-15.

Defendants contend that Snow Capital's retention of Yates was improper. Specifically, Defendants suggest that Snow Capital did not retain Robbins Geller in this case, but instead retained a "different lawyer" – Yates. IMAX Mem. at 7. That is absolutely untrue. Mr. Snow explicitly testified that Snow Capital retained Robbins Geller (*see* Millkey Exh. 1 [Snow Tr.] at 165:9-16), and the engagement letter Mr. Snow signed on behalf of Snow Capital makes it clear that Snow Capital was represented by Robbins Geller ***and*** Yates. *See* Millkey Exh. 2 [9/26/06 Yates letter]. Although Defendants argue that Snow Capital's retention of Yates, in addition to Robbins Geller, "usurped" the Court's discretion to approve or disapprove the plaintiff's choice of counsel (IMAX Mem. at 9), that is untrue. This Court approved Snow Capital's selection of the predecessor of Robbins Geller as Lead Counsel (*see* Order dated June 29, 2009 (Dkt. No. 120)), and Robbins Geller – and Robbins Geller alone – has exercised the responsibilities of Lead Counsel ever since.

In an effort to reduce costs and enhance efficiency, Robbins Geller, which does not have an office in Pittsburgh (where Snow Capital and Yates are located), has used Yates as a liaison with Snow Capital. This practice is entirely in keeping with this Court's Order dated February 7, 2007 (Dkt. No. 42), authorizing the original lead counsel in this case to "direct the preparation for the trial of this matter and to delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplicative or

[6] Thus, the fact that Mr. Snow met representatives of Robbins Geller in person for the first time the day before the deposition (*see* IMAX Mem. at 8) is irrelevant. Robbins Geller had had numerous direct communications (though not in person) with Mr. Snow (*see* Millkey Exh. 1 [Snow Tr.] at 154:7-15), and had had numerous other contacts through Yates. This case is, therefore, very different from *Weisman*, on which Defendants rely (*see* IMAX Mem. at 8), in which the court found that the plaintiff, a convicted felon with virtually no knowledge of the case whatsoever, had a "superfluous role" in the litigation. 78 F.R.D. at 671.

unproductive effort." *See* Millkey Exh. 3 at 1-2. Thus, Defendants have no basis for accusing Lead Plaintiff of a "lack of candor." IMAX Mem. at 9.

Defendants also suggest, without basis, that there are improper financial motives at play because Yates is a client of Snow Capital, and Yates ***might*** invest any fee he receives as a result of this case through Snow Capital. At his deposition, however, Mr. Snow explicitly stated that there had been ***no discussions*** with Yates about the possibility of Yates' investing any fee he receives through Snow Capital. *See* Millkey Exh. 1 [Snow Tr.] at 189:20-190:2. To the contrary, he stated that, while he hopes Yates would invest any fee he receives through Snow Capital, "I assume I'm not his only investment advisor, just kind of doing one strategy."[7] *Id.* at 170:6-11. Thus, Defendants' suggestion that Snow Capital's interests are antagonistic to the Class – because a larger attorneys' fee would purportedly benefit Snow Capital – is pure speculation with no basis in evidence. Moreover, taking into consideration Mr. Snow's testimony that Snow Capital has more than $3.5 billion under management (*see id.* at 190:13-15), any amount of a fee award Yates could invest with Snow Capital would be relatively infinitesimal.[8]

The cases Defendants cite are distinguishable because in each there was a pre-existing financial relationship between the lead plaintiff and lead counsel concerning the sharing of legal fees by serving as co-counsel or working at the same firm. *See, e.g., Shields v. Wash. BanCorp*, No. 90-1101 (RCL), 1991 WL 221940, at *2 (D.D.C. Oct. 10, 1991) (proposed class representative had not only acted as lead plaintiff in "numerous" class actions for the same lead counsel, but had acted as

---

[7] Defendants misrepresent this testimony as follows: "Snow does not know of any other [investment] managers used by Yates . . . ." IMAX Mem. at 8.

[8] Misleadingly suggesting that Lead Plaintiff has something to hide, Defendants write: "Tellingly, immediately upon the disclosure of Snow's relationship with Yates, Plaintiff's counsel designated the deposition transcript as Confidential." IMAX Mem. at 8 n.5. In fact, Lead Counsel designated the transcript confidential ***not*** after Snow's relationship with Yates was disclosed (which had occurred 144 transcript pages earlier (*see* Millkey Exh. 1 [Snow Tr.] at 11:4-18)), but after defense counsel asked for, and received testimony on, confidential, personal information – the amount of money Yates has invested through Snow Capital. *Id.* at 155:24-156:7.

co-counsel with them, sharing in attorneys' fees); *Jaroslawicz v. Safeway Kleen Corp.*, 151 F.R.D. 324, 328 (N.D. Ill. 1993) (class representative had been represented by lead counsel in 42 other cases, and had acted as co-counsel in 17 cases); *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 92 (7th Cir. 1977) (in one case on appeal, plaintiff and his attorney were members of same firm; in the other, plaintiff's brother was member of firm representing plaintiff). Here, by contrast, the unequivocal evidence is that there is ***no*** such relationship that would place Lead Plaintiff's financial interests above those of the proposed Class.[9] *See* Millkey Exh. 1 [Snow Tr.] at 189:20-190:2.

Finally, even though this Court approved Snow Capital's choice of Robbins Geller as Lead Counsel (*see* Dkt. No. 120), and must ultimately approve any fee award, Defendants contend that Snow Capital would be an inadequate class representative because it did not conduct a "beauty contest or competitive bidding contest" to choose counsel. IMAX Mem. at 8. Defendants cite no case in the Second Circuit requiring such a contest, and there is case law rejecting such a requirement. *See, e.g., In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 310 (S.D.N.Y. 2001) (rejecting sealed bids for selecting lead counsel as inconsistent with PSLRA); *In re Copper Mountain Sec. Litig.*, 305 F. Supp. 2d 1124, 1127 (N.D. Cal. 2004) ("Courts have no business engaging in a 'beauty contest' . . . . [T]he largest stakeholder's selection of counsel must be approved unless that selection is either mad or crooked.") (quoting *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002)).

Mr. Snow retained Yates because he had known him for at least 20 years as a prominent securities lawyer and trusted him. *See* Millkey Exh. 1 [Snow Tr.] at 31:10-11; 154:22-155:3;

[9] *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461 (S.D.N.Y. 2009), on which Defendants also rely (*see* IMAX Mem. at 9-10), is irrelevant because the firm purportedly had the conflict of interest, not the client. *See id.* at 464-65 (holding that a conflict of interest could arise if a client was ***required*** to retain the firm that monitored its securities portfolio). Here there is no portfolio monitoring and no requirement that Snow use any particular firm. *See, e.g.*, Millkey Exh. 1 [Snow Tr.] at 184:19-185:2 (Snow Capital had no monitoring relationship with either Yates or Robbins Geller).

160:25-161:6. He retained Robbins Geller, a renowned securities class action firm, after discussing the "pluses and minuses" of various firms with Yates. *Id.* at 165:9-16; *see also In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008) ("The experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country."). The PSLRA entitles the lead plaintiff to select lead counsel, and that is what Snow Capital did. *See* 15 U.S.C. §78u-4(a)(3)(B)(v) (most adequate plaintiff selects class counsel, subject to court approval). There is no basis for suggesting Snow Capital's selection of Robbins Geller, approved by the Court, disqualifies it from acting as a class representative.

(b) Plaintiff's prosecution of this case: Citing a simple error, Defendants claim Plaintiff has failed to vigorously prosecute this case. In its initial certification, Snow Capital mistakenly cited a purchase of 40,000 shares of IMAX stock on December 14, 2004, when in fact it had purchased 50,000 shares that day, and shortly thereafter (on February 7, 2005) sold 10,000 shares. *See* Millkey Exh. 1 [Snow Tr.] at 42:21-43:3. Defendants complain that, although "Snow knew of the error by June 2009," he "did not submit a corrected certification until April 29, 2010." IMAX Mem. at 14.

That is a wholly misleading account of events. Defendants fail to mention that in June 2009, more than a year ago (and immediately upon learning of the error), Robbins Geller wrote the Court to apprise it of the error, explain how it occurred, and underscore that, despite the mistake, Snow Capital had still suffered the largest loss among the movants for appointment as Lead Plaintiff. *See* Millkey Exh. 4 [June 29, 2009 letter]. Because the Court and all the parties were already aware of

the error,[10] which did not alter the Court's decision to appoint Snow Capital as Lead Plaintiff, there was no immediate need to file a further certification with the Court.[11]

Defendants also criticize Lead Plaintiff for a statement made in a 2009 reply memorandum of law opposing another movant's motion for appointment as lead plaintiff – that "'Snow Capital and its counsel have been closely monitoring this litigation.'" IMAX Mem. at 14 (quoting reply memorandum). To be clear, this statement referred ***not*** to the period after Snow Capital was appointed Lead Plaintiff, but rather to the more than two-year period ***after*** its first motion for appointment had been denied in 2007, and ***before*** its actual appointment in 2009 – a period when Snow Capital's only role in the litigation was as a potential class member. Although Mr. Snow testified that he "might have had a few discussions with my counsel" about the litigation during this period (Millkey Exh. 1 [Snow Tr.] at 37:23-24), and there is no question about Robbins Geller's having monitored the litigation on his behalf, Defendants contend that the statement in question is sufficiently inconsistent with Mr. Snow's testimony that Snow Capital should be disqualified from representing the Class. Lead Plaintiff believes the facts speak for themselves.

Defendants' other examples of Snow Capital's purported failure to prosecute this case likewise make it clear how thin their argument really is. PWC, for example, claims that Mr. Snow "did not recall which complaint he had allegedly read or the class period alleged in the complaint." PWC Mem. at 9. But the question Mr. Snow was asked related ***not*** to the operative complaint or Class Period in this case, but to the non-operative, ***superseded*** complaints that were originally filed in this action (and the class periods asserted therein). When asked about the ***operative*** Class Period,

---

[10] The former lead plaintiff, Westchester Capital Management, Inc., was aware of the error when it sought a writ of mandamus from the Second Circuit, seeking to reverse this Court's decision appointing Snow Capital to be lead plaintiff. The Second Circuit denied the petition for a writ on October 1, 2009.

[11] Thus, this case differs from *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 n.4 (E.D. Pa. 2003), on which Defendants rely (*see* IMAX Mem. at 15), where the court concluded that the omission of "a significant number of trades" might be attributable to "more than mere clerical mishap."

Mr. Snow did not even hesitate: "Approximately February of '03 through July of '07." Millkey Exh. 1 [Snow Tr.] at 143:17-18.

In sum: although Snow Capital is a sophisticated investor of the type Congress intended to act as lead plaintiff; is knowledgeable about the facts, allegations, and theories of the case; and understands its fiduciary responsibility to the Class, Defendants contend, based on a series of trivial, meritless, and even misleading criticisms, that it is not qualified to act as a class representative. As discussed above, that is plainly inconsistent with the law of this Circuit. *See, e.g.*, *Baffa*, 222 F.3d at 61; *Wagner*, 251 F.R.D. at 118; *Monster*, 251 F.R.D. at 135.

(c) Snow Capital's purchase dates: Defendants contend that Mr. Snow is an atypical investor because he purportedly "purchased his IMAX shares prior to the representations at the heart of this case" (IMAX Mem. at 16), which Defendants contend occurred on February 17, 2006 (when IMAX issued a pre-release of its financial results for the year ended December 31, 2005). *See* ¶¶100-01.[12] Thus, Defendants contend that "Snow Capital has a strong incentive to pursue a legal strategy that maximizes the inflationary impact of pre-November 3, 2005 statements and minimizes the impact of post-November 3, 2005 statements."[13] PWC Mem. at 6. This argument, which neither the IMAX Defendants nor PWC supports with case law citation,[14] fails for a number of reasons.

As an initial matter, the IMAX Defendants rely on their expert economist, Lucy P. Allen , for the proposition that "few investors who held IMAX stock on August 9, 2006 . . . purchased their stock prior to February 17[, 2006]." IMAX Mem. at 16. In fact, Allen's deposition testimony makes it clear that she did not review the available information necessary to come to such a conclusion. She admitted at her deposition that her analysis considered only institutional investors, and that

[12] "¶__" refers to paragraphs in the Consolidated Amended Class Action Complaint (the "Complaint").

[13] November 3, 2005 is the date of Lead Plaintiff's last Class Period purchase of IMAX securities.

[14] The IMAX Defendants only cite case law for the boilerplate proposition that a unique defense may defeat class certification. *See* IMAX Mem. at 17 (citing *Kline v. Wolf*, 702 F.2d 400, 402 (2d Cir. 1983)).

counsel did not ask her to look at individual trading data, even though it was readily available to her. *See* Millkey Exh. 5 [Allen Tr.] at 190:24-191:3; 192:14-21; 194:14-16. Moreover, she admitted that she reviewed only quarter-end trading data rather than the daily data available to her. *See id.* at 195:2-7; 197:17-198:19; 199:15-19. So, for example, she could not determine whether someone purchased their shares on February 2 or February 22, and could not determine whether they sold their shares on August 8 or August 28. Accordingly, Allen's analysis could not have resulted in the conclusions about shares purchased and sold on the dates set forth in her report.

In any event, the purported conflict of interest does not exist. First, although Defendants strive to differentiate the earlier part of the Class Period from the later part, in fact the restatement Defendants announced on July 20, 2007 covered the period from 2002 through the first three quarters of 2006. *See* ¶139. Thus, Defendants engaged in accounting manipulations ***throughout*** the Class Period, and there is no logical justification for dividing the Class Period into two separate sections.

Second, Defendants' argument, which is really a standing argument, has been consistently rejected by courts in this Circuit. When a plaintiff alleges that "losses were the result of a sustained course of conduct that propped up defendant's stock price throughout the class period," the class need not be represented by an investor who purchased at each point during the class period. *Vivendi*, 242 F.R.D. at 87. Thus, when a common scheme to defraud exists, an investor who purchased shares at certain points during the class period can represent class members who purchased at other times. *See also In re CitiGroup Inc. Bond Litig.*, --- F. Supp. 2d ---, 2010 WL 2772439, at *14 (S.D.N.Y. July 12, 2010) (in Section 11 case, plaintiffs need not have bought bonds in every offering as long as long as all class members have "suffered from the same alleged injury"); *Nicholas v. Poughkeepsie Sav. Bank/FSB*, No. 90 Civ. 1607 (RWS), 1990 WL 145154, at *5-6 (S.D.N.Y. Sept. 27, 1990).

Third, taking Defendants' argument to its logical conclusion, and to avoid the theoretical conflicts of interest that are present in every class action, there would have to be a separate class representative for every time period in which there is any variation in the inflation in the security – potentially every day of the Class Period. That, plainly, is not a practical result. Nor is it a necessary result since, as the case law above indicates, individual plaintiffs may represent the rest of the class, even when they purchased their shares only during a particular portion of the class period.

Fourth, should the proposed Class ultimately succeed in this case, either at trial or upon settlement, differences in the amount of inflation at different points in time will be addressed in the governing plan of allocation. *See, e.g.*, *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 581 (S.D.N.Y. 2008) ("The Plan [of Allocation] ensures an equitable *pro rata* distribution of the Net Settlement Fund . . . , taking into account the relative amounts of artificial inflation prevailing during certain segments of the Class Period."). Class members are entitled to object to the plan of allocation if they are unhappy with it. *See, e.g.*, *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM), 2009 WL 5178546, at *22 (S.D.N.Y. Dec. 23, 2009).

Finally, even if there ***were*** a conflict between Class members who purchased their securities early in the Class Period and those who purchased later, the conflict would, in the words of Judge (now Justice) Sotomayor, have to be "fundamental" to defeat class certification:

> Even if a level of conflict may exist among the three groups, ***that potential for conflict need not defeat certification***. While Rule 23(a)(4) is designed to ferret out potential conflicts between representatives and other class members, *see Amchem*, 521 U.S. at 625-26, 117 S.Ct. 2231, "not every potential disagreement between a representative and the class members will stand in the way of a class suit." 1 Newberg & Conte, *supra*, § 3.26, at 3-143. "***The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental***," *id.* § 3.26, at 3-143 to -144, and "speculative conflict should be disregarded at the class certification stage." *Id.* § 3.25, at 3-136; *see also* 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.25[4][b][ii], at 23-119 (3d ed.1998) (stating that to find inadequacy of representation "most courts hold that the conflict must be more than merely speculative or hypothetical").

*In re Visa Check/Mastermoney Anti-Trust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001). The Court also held that, if it were ultimately found that such conflicts exist, "there are a variety of devices available to resolve the problem": "Of particular relevance here are the possibilities of bifurcating liability and damage trials, decertifying the class after the liability trial, and creating subclasses. The availability of this range of options sufficiently addresses the dissent's concerns regarding the adequacy of representation." *Id.* Similarly here, were the Court to conclude that there were difficult conflicts of interest among the Class, the Court could employ the same type of tools identified by the Second Circuit in *Visa Check* for addressing those concerns.

(d) Reliance on the alleged misrepresentations: Defendants contend there are "material contradictions" between the Complaint's allegations and Mr. Snow's deposition testimony. IMAX Mem. at 17. The Complaint alleges that the "reasonable reader of the 2004 10-K is led to believe that multiple element accounting was being applied in only . . . limited circumstances." ¶52. Citing testimony in which Mr. Snow was giving his ***current*** understanding of Defendants' Class Period practices, not his contemporaneous understanding from 2005, Defendants contend that Mr. Snow had a contemporaneous understanding that IMAX was engaging in multiple element accounting in the manner ultimately disclosed. *See* IMAX Mem. at 17 (citing Millkey Exh. 1 [Snow Tr.] at 87:23-88:7). Mr. Snow clarified the misunderstanding later in his deposition, testifying that he had no contemporaneous understanding that IMAX was engaging in the practice. *See* Millkey Exh. 1 [Snow Tr.] at 195:3-196:11 (stating that he learned the true extent that the Company was engaging in multiple element accounting from the transcript of IMAX's August 9, 2006 conference call).

(e) The August 9, 2006 disclosure: Defendants contend that their August 9, 2006 disclosure, in which IMAX disclosed an SEC investigation into its revenue recognition practices, "only related to theater systems recognized in or after the fourth quarter of 2005," and so "cannot" have been a corrective disclosure for Snow and others who purchased their stock before February 17, 2006. IMAX Mem. at 17 (emphasis in original). Because Lead Plaintiff sold its shares on August

10, 2006 – purportedly before a corrective disclosure for the earlier period – Defendants argue that he cannot establish loss causation. *See id.* at 18. Once again, Defendants are wrong.

First, although Defendants contend that the August 9, 2006 disclosure "cannot" have acted as a corrective disclosure as to investors like Snow Capital, which purchased before February 17, 2006, Mr. Snow's deposition testimony is directly to the contrary. He specifically testified that the August 9, 2006 announcement put him on notice of problems and potential problems that convinced him to sell Snow Capital's IMAX securities the following day:

> Q. And would you describe, sir, what the factors were in your decision to sell the remaining portions of Snow Capital holdings of IMAX [on August 10, 2006]?
>
> A. Yes. From my experience, management had lost credibility. What I was specifically concerned about is they had a great deal of debt on the balance sheet, and I was concerned that it would be possible that maybe, with the inquiry, they somehow could have some sort of a technical loan default which would have endangered the company's ability to ultimately reap the benefits of their purported optimistic future, so I exited the position.

Millkey Exh. 1 [Snow Tr.] at 90:8-20; *see also* the Declaration of Lead Plaintiff's expert economist, John D. Finnerty, submitted herewith ("Finnerty Decl."), ¶25 ("securities analysts following IMAX . . . also remarked that the disclosures in the [August 9, 2006] press release had adversely affected the credibility of management").

Second, IMAX's own expert, Lucy P. Allen, concedes that the August 9, 2006 announcement of an SEC investigation created the "[f]ear of the possibility that the SEC's informal investigation could expand to other issues . . . ." Report of Lucy P. Allen (Dkt. No. 132; "Allen Report") at 16; *see also* Millkey Exh. 5 [Allen Tr.] at 136:8-10 ("the SEC inquiry had a cloud, a negative impact, for the risk of something bad being uncovered"). Although Allen tries to imply that the cloud of uncertainty did not extend to the possibility of revenue recognition problems in earlier periods,[15] she gives no reason why that should be true. Indeed, one of the very analyst reports she cites, which

[15] Specifically, she states that the "overhang generated by the SEC inquiry was not due to the revenue recognition issues themselves but to the fear of some other problem being uncovered." Allen Report at 16.

specifically addresses the SEC's investigation into IMAX's revenue recognition practices, refers to the "'risk of a prolonged inquiry or a ***potential escalation*** as reason enough to avoid the stock for now.'" Allen Report at 16 (quoting BMO Capital Markets report). That the uncertainty raised by the August 9, 2006 announcement extended to revenue recognition problems in prior periods was borne out by subsequent events: IMAX's ultimate restatement extended back to 2002. ¶139. *See also* Finnerty Decl. ¶24 (discussing uncertainty concerning the "size and scope of the SEC investigation"); ¶¶56 ("the outcome of the SEC inquiry disclosed on August 9, 2006 was then unknown, which likely caused uncertainty regarding a potential escalation of the investigation").

Finally, as discussed in detail in Section II.B.1 below, a plaintiff need not establish loss causation on a motion to certify a class. *See, e.g., In re Initial Pub. Offering Sec. Litig.* ("*IPO*"), 260 F.R.D. 81, 106 n.214 (S.D.N.Y. 2009) ("At the class certification stage, plaintiffs need not demonstrate loss causation. It is sufficient for plaintiffs to prove only that loss causation can be shown on a class-wide basis."). However, even if Lead Plaintiff did bear the burden of establishing loss causation on this motion, it has done so through the declaration of its expert, John D. Finnerty. *See generally* Finnerty Decl. ¶¶18-49.

(f) Market efficiency: Defendants argue that Snow Capital is atypical because Mr. Snow "firmly rejects market efficiency, the central premise upon which class reliance is based." IMAX Mem. at 18; *see also* PWC Mem. at 4-5. Many courts have considered and rejected this argument.

In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the U.S. Supreme Court recognized a rebuttable presumption of reliance in the case of securities traded in an efficient market. *See id.* at 241-48. According to the Second Circuit, the presumption is "premised on the existence of an ***informationally*** efficient market, in which 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock prices.'" *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 199 n.4 (2d Cir. 2008) (quoting *Basic*, 485 U.S. at 247 n.24). Thus, for "purposes of establishing the fraud-on-the-market

presumption of reliance, investors need only show that the market was ***informationally*** efficient," not "whether the stock price paid or received by investors was 'correct' in the fundamental value sense." *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005).

Plaintiff submitted the detailed analysis of Michael A. Marek to establish that IMAX's stock traded in an informationally efficient market during the Class Period. *See* Declaration of Michael A. Marek, dated October 30, 2008 ("Marek Decl."), at 11-37 (Dkt. No. 127). Neither Defendants nor their experts contest market efficiency. *See* Millkey Exh. 6 [James Tr.] at 10:13-17 (according to PWC's expert, Christopher M. James: "So I assumed [that IMAX stock was trading in an efficient market] for purposes of writing my report and didn't see any evidence that would . . . be contrary to that view."). As such, Plaintiff and the proposed Class are entitled to the *Basic* presumption.

Unable to refute that IMAX trades on an informationally efficient market, Defendants argue that Mr. Snow's testimony that he does not believe in market efficiency undermines Plaintiff's ability to trigger the *Basic* presumption. *See* IMAX Mem. at 18. In fact, Mr. Snow – who neither is nor purports to be an economist or a securities lawyer[16] – does ***not*** contest the concept of informational efficiency. In response to the question, "Do you believe that the market takes into account public information released by the company?" he responded: "Yes, the market certainly takes into consideration the public information as it comes out." Millkey Exh. 1 [Snow Tr.] at 191:5-7, 11-13. When asked what he meant when he opined that the market was not efficient, he clarified that he was discussing value efficiency and ***not*** informational efficiency: "I mean, clearly there are enough studies that the market as a whole is efficient, but in Snow Capital's case, that doesn't mean we don't think that we have the ability to identify a very, very small subset of securities that will be viewed more or less favorably in the future than other people believe, and my

[16] Indeed, as Mr. Snow observed at his deposition, Plaintiff's attorneys have retained an expert in market efficiency (Marek) to address that very subject. *See* Millkey Exh. 1 [Snow Tr.] at 149:15-21.

guess is that's the value added of active management." *Id.* at 192:20-193:7. *See, e.g.*, *PolyMedica*, 432 F.3d at 15-16 ("one thing is clear: a market can be information efficient without also being fundamental value efficient") (citation omitted).

Thus, Mr. Snow's belief that he could make money by spotting value in the market does not mean he believes the market is not informationally efficient. Ultimately, "virtually every investment transaction is entered on the belief that a particular investment is undervalued by the market relative to other comparable investments."[17] *Malone v. Microdyne Corp.*, 148 F.R.D. 153, 159 (E.D. Va. 1993), *rev'd on other grounds*, 26 F.3d 471 (4th Cir. 1994). But that "does not mean that all investors motivated by the desire to make an above average return on their investment are not relying on the integrity of the marketplace." *Id.* Rather, such investors "hold the conviction that the marketplace has inaccurately predicted the earning potential of a company, and yet still enter a transaction relying, in part, on the assumption that the market has not been artificially inflated or depressed by material, false information disseminated by corporate insiders." *Id.* As such, Plaintiff is not subject to a unique defense simply because Mr. Snow believed that the market may not have valued IMAX correctly. *See, e.g.*, *Rosen v. Textron*, 369 F. Supp. 2d 204, 212 (D.R.I. 2005).

### B. Common Questions of Law or Fact Predominate

#### 1. Second Circuit Law Does Not Require Plaintiff To Establish Loss Causation on a Motion for Class Certification

To establish that common issues of law or fact predominate over individual issues under Rule 23(b)(3), Plaintiff has demonstrated, *inter alia*, that the fraud-on-the market doctrine applies in this case, relieving Class members of the need to prove individual reliance on (or even awareness of) any particular misstatement or omission. Because, as Plaintiff has shown, the factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D.

[17] As Mr. Snow testified when asked about his "investment philosophy": "We try to buy undervalued securities." Millkey Exh. 1 [Snow Tr.] at 38:23-25.

467, 477-78 (N.D. Tex. 2001), establish market efficiency, there is a rebuttable presumption of reliance that supports the satisfaction of the predominance requirement. *See generally* Pl. Opening Mem. at 16-23; Marek Decl. at 11-37; *see also IPO*, 260 F.R.D. 81, 94-95 (S.D.N.Y. 2009).

To try to undermine the presumption, Defendants argue – in the face of clear and uniform Second Circuit case law to the contrary – that this Court should adopt the Fifth Circuit's holding in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007). *Oscar* holds that to justify the fraud-on-the-market presumption, a plaintiff must, at the class certification stage, establish the existence of loss causation[18] by a preponderance of the admissible evidence: "we require proof that the misstatement *actually moved* the market." *Id.* at 265 (emphasis in original). Absent such proof, the Fifth Circuit reasoned, the link between the misrepresentation and the plaintiff's loss is severed, and with it the justification for the presumption. *See* PWC Mem. at 10-12.

But the Fifth Circuit's decision reverses the burden of proof plainly established by the Supreme Court's decision establishing the presumption: *Basic*, 485 U.S. at 248 (defendants can rebut the fraud-on-the-market presumption only if they "***could show*** . . . that the market price ***would not have been affected by their misrepresentations***"). Moreover, in a decision that PWC does not cite, the Second Circuit rejected the very argument PWC makes here (and that the Fifth Circuit accepted in *Oscar*) – that, in granting class certification, the district court "erred by not placing the burden on plaintiffs to prove that the alleged misrepresentations 'moved the market.'" *Salomon*, 544 F.3d at 482. The Second Circuit unambiguously stated:

> [P]laintiffs do not bear the burden of showing an impact on price. The point of *Basic* is that an effect on market price is *presumed* based on the materiality of the information and a well-developed market's ability to readily incorporate that information into the price of securities.

[18] Loss causation is "'a causal connection between the material misrepresentation and the loss.'" *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 n.1 (2d Cir. 2008) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005)).

*Id.* at 483 (emphasis in original); *see also In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157, 181 (S.D.N.Y. 2010) ("the Second Circuit's decision in *In re Salomon* . . . rejected the holding in *Oscar*").[19]

Here, Plaintiff established market efficiency, and the fraud-on-the-market presumption, by demonstrating the satisfaction of the *Cammer* and *Krogman* factors. *See generally* Pl. Opening Mem. at 16-23; Marek Decl. at 11-37. Defendants do not contest market efficiency or even attempt to rebut the presumption; indeed, they do not contest Plaintiff's satisfaction of the predominance requirement. *See generally* IMAX Mem. (contesting only the typicality, adequacy, and superiority requirements). Although PWC does contest the existence of predominance, it does so simply by attempting to thrust the burden of proof upon Plaintiff, as discussed above, and nowhere purports to rebut the presumption (or contests market efficiency). For example, although PWC's expert, Christopher M. James, concedes a statistically significant price drop in the wake of corrective disclosures on August 9, 2006, March 29, 2007 and July 20, 2007, James argues that Plaintiff

[19] Even before *Salomon* was decided, the courts of this District had recognized that a plaintiff need not prove loss causation at the class certification stage, in some cases rejecting *Oscar* explicitly. *See, e.g., IPO*, 260 F.R.D. at 106 n.214 ("At the class certification stage, plaintiffs need not demonstrate loss causation. It is sufficient for plaintiffs to prove only that loss causation can be shown on a class-wide basis."); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280-81 (S.D.N.Y. 2008) ("At the class certification stage, plaintiffs need only establish that they may be able to . . . prove loss causation at trial.") (citation and internal quotation marks omitted); *Wagner*, 251 F.R.D. at 118; *Darquea v. Jarden Corp.*, No. 06 Civ. 722(CLB), 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008); *see also In re Micron Techs., Inc. Sec. Litig.*, 247 F.R.D. 627, 634 (D. Idaho 2007) ("*Oscar* . . . misreads *Basic*."); *In re Red Hat Sec. Litig.*, 261 F.R.D. 83, 93 (E.D.N.C. 2009) (declining to adopt *Oscar*); *In re Mills Corp. Sec. Litig.*, 257 F.R.D. 101, 107-08 (E.D. Va. 2009) (same); *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 454-55 (S.D. Ohio 2009) (same); *Schleicher v. Wendt*, No. 1:02-cv-1332-DFH-TAB, 2009 WL 761157, at *11-12 (S.D. Ind. Mar. 20, 2009) (same); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578-79 (N.D. Cal. 2009) (same); *In re Nature's Sunshine Product's [sic] Inc. Sec. Litig.*, 251 F.R.D. 656, 665 (D. Utah 2008) (same); *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 676 n.14 (N.D. Ga. 2009) (same).

Defendants argue that *Oscar* is "consistent with" the Second Circuit's decision in *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 574 F.3d 29 (2d Cir. 2009). *See* PWC Mem. at 12. In *Flag Telecom*, however, the issue was not predominance, but whether the class representative – an "in-and-out trader" who had both purchased and sold his shares during the class period – was atypical because he personally (as opposed to the class) might not be able to demonstrate loss causation. The Court explicitly declined to address *Oscar*, holding: "whether or not Plaintiffs here have met their burden in establishing that the in-and-out traders will be able to show loss causation is relevant to Rule 23(a) ***for reasons that do not implicate either predominance or Basic***." 574 F.3d at 39-40. Here, by contrast, the issue before the Court is not adequacy or typicality, but predominance. Therefore, *Flag Telecom* is inapplicable.

"*cannot* parse out the impact of confounding news" on those dates. Expert Report of Professor Christopher M. James (Dkt. No. 99-1; "James Report") ¶81 (emphasis in original). By contrast, Lucy Allen, IMAX's expert, states: "[I]n general I think it's possible to parse stock price declines." Millkey Exh. 5 [Allen Tr.] at 185:2-4.[20] As demonstrated above, however, it is not Plaintiff's burden to establish loss causation. Thus, because none of the Defendants claim to have rebutted the fraud-on-the-market presumption, Plaintiff has satisfied the predominance requirement of Rule 23(b)(3).

Even if Defendants had attempted to rebut the presumption, however, that attempt would fail. As established by the expert declaration of John D. Finnerty, submitted herewith, "changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized." Finnerty Decl. ¶62; *see also id.* ¶¶18-49.

### C. A Class Action in This Court Is Superior to the Pending Class Action in Canada

Defendants argue that Plaintiff cannot satisfy the superiority requirement of Rule 23(b)(3) because an already certified class action in Canada against just some of the same defendants (the "Ontario Action" in the "Ontario Court") is purportedly superior to this one. *See* IMAX Mem. at 18-25. Defendants are wrong for a host of reasons.

As an initial matter, the focus of Rule 23(b)(3)'s predominance and superiority inquiry is on whether a class action is preferable to an individual action or other type of adjudication, not on the superiority of one class action to another. *See, e.g.*, *Amchem Prods. v. Windsor*, 521 U.S. 591, 616 (1997) (Rule 23(b)(3) factors address the interests of individual class members in controlling their

[20] Similarly, Plaintiff's expert, John D. Finnerty, states (concerning the August 9, 2006 disclosure): "[I]t is possible to parse out the collective price effect of the disclosures made before the earnings conference call." Finnerty Decl. ¶31.

own litigation). By arguing for the purported superiority of the Ontario Action over this one, Defendants actually ***concede*** the superiority of the class action vehicle.

Assuming, however, it is appropriate to compare two pending class actions in evaluating the superiority requirement, this action is plainly superior to the Ontario Action for resolving Plaintiff's claims. First, although both the U.S. and Canadian cases address IMAX's accounting practices, they are far from identical. While the Class Period in this case runs from February 27, 2003, through July 20, 2007 (*see* ¶21) – more than four ***years*** – the class period in the Ontario Action runs from February 17, 2006, through August 9, 2006 (*see* IMAX Mem. at 19) – less than six ***months***. Moreover, while Plaintiff here named PWC as a defendant, the Canadian plaintiffs did not. Finally, while this case seeks relief for violations of the U.S. securities laws, no such claims are made in the Ontario Action. Because that action neither asserts claims on behalf of all of the Class members in this action, seeks relief against all of the Defendants named here, nor asserts the U.S. securities law claims asserted here, the Ontario Action cannot resolve all the claims of Plaintiff here, and therefore cannot be a superior vehicle for adjudicating the controversy.[21]

[21] In an effort to discount the significant disparity between the two class periods, the IMAX Defendants argue, first, that "[t]here is no reason to believe any substantial number of persons who purchased prior to February 2006 still held after August 9." IMAX Mem. at 23-24. But Defendants' own expert, Lucy Allen – who, as discussed above, considered only institutional trading data, ignoring data for individual investors, and used only quarter-end trading data, not available daily trading data – estimates that institutional investors that bought their shares between the fourth quarter of 2004 and the fourth quarter of 2005 retained 7% of those shares (or more than 2.5 million shares) through the third quarter of 2006. *See* Allen Report at 32. Second, the IMAX Defendants contend that pre-February 2006 purchasers may not be able to prove loss causation. *See* IMAX Mem. at 24. Although Plaintiff strongly disagrees, loss causation is not a requirement for class certification, as discussed above at Section II.B.1. Third, the IMAX Defendants contend that "Snow faces substantial questions regarding market efficiency prior to February 2006." IMAX Mem. at 24. In fact, Plaintiff's expert, Michael Marek, made it very clear that he considered evidence from "before, during and after the Class Period" in determining market efficiency. *See* Marek Decl. ¶7. Thus, his purported "admission" that market efficiency during one period "does not mean that it was efficient earlier" (IMAX Mem. at 24) is meaningless; Marek specifically concluded that the market for IMAX stock was efficient during the whole Class Period. *See* Marek Decl. ¶6 ("it is my opinion that the market for IMAX common stock during the Class Period can be characterized as efficient"). Finally, the IMAX Defendants attempt to discount PWC's absence as a defendant in the Ontario Action by saying Plaintiff has "an exceedingly high burden" in its case against PWC. IMAX Mem. at 25. Whether or not that is true, the Ontario Action cannot be a superior vehicle for adjudicating claims against a defendant that is not even named in that suit.

Second, IMAX stock trades on only two stock exchanges, the NASDAQ exchange in the U.S. and the Toronto Stock Exchange ("TSX") in Canada. Defendants admit that the vast majority of IMAX stock trades on the NASDAQ, not the TSX. According to PWC's expert economist, Christopher M. James, the daily average trading volume of IMAX stock during the Class Period was "91.2% and 8.6% on the NASDAQ and TSX, respectively." James Report ¶20. As the IMAX Defendants admit in their motion for leave to appeal the certification order of the Ontario Court: "The uncontradicted evidence was that the holders of up to 85% of IMAX shareholders are U.S. residents who purchased their shares on a U.S. exchange." Millkey Exh. 7 [FACTUM of the Moving Parties, Motion for Leave to Appeal] ¶223.

Thus, Defendants are taking the untenable position that the Ontario Court is the superior venue for resolving the claims of those IMAX shareholders who reside in the U.S. – even though those shareholders represent the vast majority (at least 85%) of ***all*** IMAX shares held worldwide. Significantly, in opposing class certification in the Ontario Action, the IMAX Defendants took exactly the opposite position – that the Ontario Court should ***not*** certify a global class, but should defer to ***this*** Court, at least for purposes of the stock that traded in the U.S. *See* Millkey Exh. 8 [FACTUM of the Defendants and the Proposed Defendants #3] ¶¶257-65. The inconsistency of these positions was not lost on the Ontario Court:

> The inconsistency in the defendants' submissions in the two jurisdictions suggests that their opposition to certification of a global class in Ontario is not in fact based on *bona fide* concerns about the appropriateness of this court determining the claims of non-residents. Rather, their objective appears to be to limit the size of the class and so reduce their potential liability for damages.

Millkey Exh. 9 [Reasons for Decision: Rule 21 Motion and Motion for Certification] ¶116. Similarly, one has to question the *bona fides* of Defendants' position that the claims of U.S. shareholders, who purchased their shares on the NASDAQ and own at least 85% of all IMAX stock, are best litigated in Ontario.

Third, although the Ontario Court has certified a worldwide class (over IMAX's strenuous opposition), it left open the possibility of revisiting that decision depending on what this Court decides to do: "***At this stage***, the prospect that a similar proceeding ***might*** be certified in another jurisdiction is not sufficient to prevent the court from certifying a global class in Ontario." Millkey Exh. 9 [Reasons for Decision] ¶134.[22] Moreover, even if the Ontario Court declines to decertify the global class at some later stage, it is far from clear that it will be able to resolve the U.S. securities law claims of U.S. investors who purchased their shares in the U.S. The IMAX Defendants have requested leave to appeal that certification, including that portion of the order certifying a worldwide class, and their motion papers rely on recent Ontario case law refusing to certify global classes. *See* Millkey Exh. 7 [FACTUM of the Moving Parties, Motion for Leave to Appeal] ¶¶223-46.[23] Particularly in light of the U.S. Supreme Court's recent decision in *Morrison*, 130 S. Ct. 2869, rejecting worldwide classes under the U.S. securities laws, as well as the huge percentage of non-Canadian shares in the certified Ontario class, IMAX's appeal could easily be granted and succeed.

Fourth, although the IMAX Defendants contend the Ontario Court is a superior forum because plaintiffs there purportedly "have to satisfy a standard lesser than the scienter required here" (IMAX Mem. at 20), they decline to disclose their position that Ontario law does not recognize the fraud-on-the-market presumption, which applies in the U.S. *See* Millkey Exh. 10 [Fresh Notice of Motion for Leave to Appeal] ¶11 ("As to the 'efficient market' theory of presumed reliance, it is not a principle of Canadian law, and cannot create a class of persons who share a common cause of

---

[22] Thus, should this Court certify a class of investors who purchased their shares in the U.S., it is unlikely that there will be "overlapping" classes. It is far more likely that there will be a Canadian class of all persons who purchased their shares on the TSX, and a U.S. class of all those who purchased their shares on the NASDAQ. To the extent the two cases address overlapping issues, plaintiffs' counsel in the U.S. and Ontario (who have already been in touch) can coordinate their efforts to avoid duplication and promote efficiency.

[23] As IMAX's expert on Canadian law, Prof. Poonam Puri, admits, there are "conflicting decisions in Ontario on the issue of whether U.S. investors who purchased their shares in the U.S. should be certified as members in an Ontario class action." Report of Professor Poonam Puri (Dkt. No. 133-1) ¶142.

action."). Should a Canadian appellate court agree, certain claims may not be susceptible to class treatment in Ontario, even for Canadian shareholders.

Fifth, the Ontario Securities Act, unlike the U.S. securities laws, has a provision capping damages. In the case of an issuer of securities, that cap (in the ordinary case) is the greater of 5 percent of its market capitalization or $1 million. *See* Ontario Securities Act §§138.1 (definition of "liability limit" for a "responsible issuer") & 138.7 ("Limits on damages"). *See* Millkey Exh. 11.

In other words, to conclude that this class action is inferior to the Ontario Action for the fair and efficient adjudication of the controversy before the Court, one has to reason as follows: ***even though*** the Class Period here is more than three and a half years longer than the one alleged in the Ontario Action; and ***even though*** PWC is a defendant in this action but not in the Ontario Action; and ***even though*** U.S. securities represent at least ***85 percent*** of the IMAX securities at issue in the Ontario Action (and 100 percent of the securities in this lawsuit); and ***even though*** the correctness of the Ontario Court's certification of a worldwide class is in serious doubt (and indeed is the subject of IMAX's request for appeal); and ***even though*** the U.S. securities laws afford advantages, such as the fraud-on-the-market presumption and an absence of caps, not available in Canada; and ***even though*** the Ontario Action does not allege claims under the U.S. securities laws; ***nonetheless***, the Ontario Action is a superior vehicle for adjudicating the claims of those persons who purchased their securities in the U.S. That position is nonsensical.

Finally, the case law on which Defendants rely is distinguishable from the situation here, in which the two lawsuits allege vastly different class periods and different defendants, and in which the vast majority of the securities at issue were purchased on a U.S., not Canadian, stock exchange. *See Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, Civ. No. 06-3800 (GEB), 2007 WL 1726565, at *8-9 (D.N.J. June 13, 2007) (in private, non-class action concerning the arbitration of a reinsurance dispute (not securities), the court stayed the U.S. action where the U.S. and Canadian actions "involve[d] the same parties and the same issues," and based

on principles of international comity not raised in this action); *Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642, 645 (E.D. Pa. 2000) ("this is a securities fraud action pertaining to Canadian registered securities, brought by a purported class of investors who are virtually all Canadian, against predominantly Canadian defendants, concerning a Canadian corporation whose stock was sold only on Canadian stock exchanges"); *VictoriaTea.com, Inc. v. Cott Beverages Canada*, 239 F. Supp. 2d 377, 382 (S.D.N.Y. 2003) (in private, non-class action involving commercial dispute, the court dismissed the case on forum non conveniens grounds, finding: "at all relevant times, under any theory of recovery grounded on either contract or tort, when all the operative facts upon which this action is based took place, there was no entity involved in the relationships, transactions or operative events that established any significant connection of the action to the U.S."); *DeYoung v. Beddome*, 707 F. Supp. 132, 135 (S.D.N.Y. 1989) (dismissing on grounds of comity lawsuit seeking to challenge a transaction the fairness of which had previously been approved by a Canadian court); *Fleeger v. Clarkson Co. Ltd.*, 86 F.R.D. 388, 390-91, 392-94 (N.D. Tex. 1980) (court dismissed shareholder derivative case on basis of comity (as well as on the merits) when plaintiff tried to challenge settlement entered into by a Canadian receiver for a Canadian company in bankruptcy, when the settlement had been approved by a Canadian court).

### D. The Court Should Reject PWC's Efforts to Change the Class Definition

PWC makes two arguments urging the Court to alter the Class definition, which runs from February 27, 2003, through July 20, 2007. It argues, first, that the Class Period should extend no later than August 9, 2006 – almost a year before the end of the actual Class Period – and second, that the Court should exclude investors who bought and sold their shares before August 9, 2006 – so called "in-and-out" shareholders. *See* PWC Mem. at 17-18. The Court should reject both arguments.

Defendants contend that the Class Period should end on August 9, 2006 because Lead Plaintiff purportedly cannot prove loss causation as to any post-August 9, 2006 disclosure. *See id.* at 18. The Court should reject this argument for two reasons. As discussed above, it is not Lead Plaintiff's burden to establish loss causation on a class certification motion. *See supra* at Section II.B.1. Even if it were, however, the expert declaration of John D. Finnerty, submitted herewith, demonstrates the existence of loss causation related to IMAX's announcements on March 29, 2007 and July 20, 2007 (the last day of the Class Period). *See* Finnerty Decl. ¶¶35-42 (3/29/07 disclosure); ¶¶43-49 (7/20/07 disclosure).

Defendants' justification for excluding in-and-out shareholders is that they purportedly did not suffer any loss resulting from an alleged misrepresentation. *See* PWC Mem. at 18. Class certification, however, does not concern itself with damages, which are not even mentioned in Fed. R. Civ. P. 23. Even in the context of a typicality and predominance analysis under Rule 23, courts do not generally consider the subject of damages. *See, e.g.*, *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 131 (S.D.N.Y. 2008) ("Differences in the damages sustained by individual class members does not . . . defeat class certification.") (citation and internal quotation marks omitted). Thus, there is no reason for the Court to alter the Class definition to exclude in-and-out investors.

## III. CONCLUSION

For the reasons set forth above and in its opening memorandum of law, Lead Plaintiff respectfully requests that the Court certify the Class defined herein, designate it as Class Representative, and appoint Robbins Geller as Class Counsel.

DATED: July 30, 2010

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
ROBERT M. ROTHMAN
DAVID A. ROSENFELD
MARK T. MILLKEY
MARK S. REICH

*/s/ Robert M. Rothman*
ROBERT M. ROTHMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel*

**CERTIFICATE OF SERVICE**

I, Robert M. Rothman, hereby certify that on July 30, 2010, I caused a true and correct copy of the attached:

> Reply Memorandum of Law in Further Support of Plaintiff's Motion for Class Certification;
>
> Declaration of Mark T. Millkey in Further Support of Plaintiff's Motion for Class Certification (redacted version); and
>
> Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification

to be served electronically on all counsel registered for electronic service for this case.

*/s/ Robert M. Rothman*
Robert M. Rothman