# EXHIBIT 1

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------- X

IN RE: IMAX CORPORATION
SECURITIES LITIGATION
06 CIV. 6128 (NRB)

-------------------------------- X

CONFIDENTIAL

* * * C O N F I D E N T I A L * * *

2100 Georgetown Drive
Sewickley, Pennsylvania

May 6, 2010
9:30 a.m.

DEPOSITION OF RICHARD SNOW, a witness, called by the Defendant IMAX Corporation, for examination, in accordance with the Federal Rules of Civil Procedure, held at the offices of Snow Capital Management, taken by and before JoAnn M. Brown, RMR, CRR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania.

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
Ref: 93151

MAY 14 2010

P R O C E E D I N G S

R I C H A R D S N O W,

having been duly sworn, was examined and testified as follows:

- - - -

MR. LIMAN: Why don't we introduce ourselves.

My name is Lewis Liman. I'm here with my colleague, Jim Mathews. We're from the law firm of Cleary Gottlieb, and we represent IMAX Corporation and the IMAX defendants, and introduce yourself.

MS. LUNN: I'm Samantha Lunn with Gibson, Dunn & Crutcher. I'm here representing PricewaterhouseCoopers Canada.

THE WITNESS: Okay.

- - - -

EXAMINATION

- - - -

BY MR. LIMAN:

Q. Mr. Snow, you understand we're here for your deposition?

A. Correct.

Q. Have you had your deposition taken before in any case?

SNOW - CONFIDENTIAL

A. Yes.
Q. In how many cases have you had your deposition taken?
A. One.
Q. What case was that?
A. It involved an employment matter for a previous employer. It would have been 15, 20 years ago.
Q. But were you a party in that case?
A. Not personally, but corporately.
Q. What did the case involve?
A. It was an employee that took an investment opportunity for himself and not for the company.
Q. Okay. And you were with the company?
A. Correct.
Q. Was that your company?
A. I was an employee.
Q. What was the company?
A. Intermodal Distribution.
Q. When did that deposition take place?
A. In the mid to late 1980's.
Q. Have you had your testimony taken in any other proceedings?

A. No.

Q. Have you ever been a plaintiff in any case before other than this case?

A. Yes.

Q. Okay. In how many cases have you been a plaintiff?

A. One.

Q. Is that the Par Pharmaceuticals case?

A. Correct.

Q. Prior to your appointment in the Par Pharmaceuticals case, have you ever served as a plaintiff in any other litigation?

MR. ROTHMAN: Other than this case?

MR. LIMAN: Other than this case.

A. I had attempted in another matter involving BellSouth to become the lead plaintiff but was unsuccessful.

Q. When was that?

A. Probably about seven or eight years ago.

Q. Now, have you ever been a defendant in any case before?

A. Not individually, no.

Q. Okay. Now, do you understand that you are under oath in this proceeding?

A. Yes.
Q. Okay. And do you understand that during the deposition, I'm going to be asking you questions, I take it?
A. Yes.
Q. And if you -- and the Court Reporter is going to be taking everything down that I say to you.
Do you understand that?
A. Yes.
Q. Okay. And now if there is any point in time that you don't understand one of my questions, would you please tell me that you don't understand the question?
A. Yes.
Q. If you proceed to answer the question and you don't tell me you don't understand it, I'll assume that you understand the question. Is that okay?
A. Yes.
Q. Okay. Now, from time to time, if you need to take a break, we can take a break. Just let me know that, okay?
A. Okay.

SNOW - CONFIDENTIAL

Q. The one thing that I would ask is that if we are in the middle of a question and answer, in other words I've asked a question, that you answer the question before we take a break. Is that okay?

A. Yes.

Q. Okay. Is there any reason today that you cannot sit for this deposition and give full and complete answers?

A. No.

MR. LIMAN: I'd like to have the Court Reporter mark as Exhibit 1 a document entitled Notice of 30(b)(6) Deposition of Lead Plaintiff Snow Capital Investment Partners, L.P.

- - - -

(Exhibit No. 1 was marked for identification.)

- - - -

BY MR. LIMAN:

Q. Mr. Snow, the Court Reporter has placed before you a document entitled Exhibit 1.

Do you recognize that document?

A. Yes, I do.

Q. And have you seen the document before?

A. Yes.
Q. Okay. Do you recognize this as the notice of deposition for your deposition here today?
A. Yes.
Q. Now, would you describe for us, sir, what you did to prepare yourself for the deposition today?
A. I met with -- I reviewed my litigation file on IMAX and met with counsel, and I skimmed the transcript of the IMAX conference call of, I believe, August 9th of 2006.
Q. Now, did you -- can you describe for us what's in your litigation file of IMAX?
A. Just all the various documents that I have reviewed and have filed or others have filed involving this case.
Q. Does that file include certain filings in connection with this case?
A. Correct.
Q. Does it include materials other than court filings in connection with this case?
A. No.
Q. Have all of the materials that are in the litigation file been produced to the

defendants in this case, to your knowledge?
A. Yes.
Q. Now, you said you met with counsel. Which counsel did you meet with?
A. The representatives from the Robbins group, and Al Yates.
Q. I'm sorry, who else?
A. Al Yates.
Q. Who is Al Yates?
A. He is my attorney.
Q. Is that your personal attorney?
A. No.
Q. Is he the attorney for Snow Capital?
A. No.
Q. Who does he represent?
A. He represents Snow Capital Investment Partners in this litigation.
Q. Okay. And who did you meet with from the Robbins firm?
A. Rob and Mark.
Q. When did you meet with them to prepare for this deposition?
A. Late yesterday afternoon.
Q. How much time did you spend with them?

SNOW - CONFIDENTIAL

A. A few hours.

Q. Did you do anything else to prepare for this deposition besides the items that you mentioned?

A. No.

Q. Had you met with Mr. Rothman before your meeting last night -- yesterday afternoon?

A. Not in person.

Q. When was your first meeting in person with any member of the Robbins firm or its predecessor?

A. In person?

Q. Correct.

A. Yesterday.

Q. When was your first meeting over the phone or in person with any member of the Robbins firm or its predecessor?

A. Over a year ago.

Q. Okay. When, approximately, sir?

A. I can't recall.

Q. Who initiated the contact?

A. Probably Al Yates.

Q. And who did he initiate the contact with?

A. I believe it was Mark Reich, but I'm not certain.

SNOW - CONFIDENTIAL

Q. What was the purpose of reaching out to the Robbins firm?

MR. ROTHMAN: Objection. I don't want you to reveal the substance of anything that was said. If he wants to know the purpose --

A. Yeah. I mean, at some point, we contacted them to engage them for counsel.

Q. Was that prior to 2008?

A. I believe so.

MR. LIMAN: I'm going to ask the Court Reporter to mark as -- should we have these marked as Snow Exhibit --

MR. ROTHMAN: I think that's probably better.

MR. LIMAN: Okay. We agree that Exhibit 1 should be treated as Snow Exhibit 1.

BY MR. LIMAN:

Q. Is that okay with you, Mr. Snow?

A. Yeah, that's fine.

MR. LIMAN: Okay. I'm going to ask the Court Reporter to mark as Snow Exhibit 2 a document entitled Declaration of David A.

realized it was inaccurate?
A. No, I don't recall.
Q. Now -- well, was it weeks before it was amended or years before it was amended?
A. I don't recall.
Q. Was it days before it was amended?
A. I don't recall.
Q. Now, sir, is it correct that you were not originally -- but you're sure it was amended?
A. I believe so, since it's been amended.
Q. Now, sir, you were not appointed lead plaintiff originally in this case; is that right?
A. That's correct.
Q. And do you recall -- withdrawn.
MR. LIMAN: Can I see the document I'm going to mark as Exhibit 3.
Q. How did you learn that you were not going to be the lead plaintiff in this case?
A. I believe I received a call from Al Yates.
Q. Okay. Is it fair to say Mr. Yates was your primary contact with respect to this case?
A. Correct.
Q. Okay. And is Mr. Yates being paid a fee in

connection with his work on this case?
A. I assume he'll be paid a fee if successful.
Q. You're not paying him a fee; is that right?
A. Correct.
Q. Is your arrangement that it's on a contingency basis?
A. Correct.
Q. Do you have an arrangement for what Mr. Yates will receive if the case is successful?
A. No.
Q. Have you had any discussions with him about what fees he would receive if the case is successful?
A. Yes.
Q. Okay. Would you describe what conversations you've had with respect to fees. I'm not interested in any privileged information.
A. Just a general discussion as to how fees are determined by the court.
Q. Did you discuss with him what percentage of any recovery he would obtain?
A. No.
Q. Do you have any understanding with him with respect to what recovery he would -- what fees

he would receive if there's a recovery in this case?
A. No.
Q. Do you have any arrangement with him about how his costs will be handled in this case?
A. No.
Q. Are you reimbursing him for his costs?
A. No.
Q. What kind of practice does Mr. Yates have?
A. I believe he focuses on security litigation.
Q. All right. Now, Mr. Yates informed you that you were not going to be the lead plaintiff in this case?
A. Initially.
Q. Okay. And do you recall approximately when that was?
A. No, I can't recall.
Q. Was it in January of 2007?
A. It possibly could have been. I don't recall.

MR. LIMAN: I'm going to ask the Court Reporter to mark as Snow Exhibit 3 a Memorandum and Order in the IMAX cases dated January 17, 2007.

- - - -

(Exhibit No. 3 was marked for identification.)

- - - -

BY MR. LIMAN:

Q. Do you recognize Snow Exhibit 3?

A. No, I don't recognize this.

Q. Have you ever seen this document before?

A. I don't believe so.

Q. Regardless of whether you have seen it before, does Snow -- well, withdrawn.

Did you know that Westchester Capital Management was appointed -- originally appointed as lead plaintiff in connection with this case?

A. Yes.

Q. Does Snow Exhibit 3 refresh your recollection that it was in January of 2007 that Westchester Capital Management was appointed lead plaintiff?

A. Yes.

MR. ROTHMAN: Objection.

A. Sorry.

Q. Now, sir, did you understand what the responsibilities were of the lead plaintiff in a securities class action?

A. Yes.
Q. And what was your understanding as of January 2007 of the responsibilities of a lead plaintiff in a securities class action?
A. Which I was not the lead plaintiff.
Q. I understand that.
A. Okay. To act as a fiduciary and to consult with and guide counsel.
Q. And that was your understanding back in January of 2007; is that right?
A. Correct.
Q. And did you understand back in January of 2007 that one of the responsibilities of the lead plaintiff was to act as a contact with counsel with respect to the framing of a complaint --
A. Yes.
Q. -- and the filing of the complaint?
A. Yes.
Q. And did you understand that one of the other responsibilities of lead plaintiff was to handle the litigation on behalf of the absent class members?
A. Yes.
Q. And did you understand that those were

responsibilities that Westchester Capital was assigned to perform as of January 2007?

A. Yes.

Q. Now, sir, after -- withdrawn.

Did there come a time that you asked the court to reconsider its order appointing Snow Capital as -- withdrawn.

Did there come a time that you asked the court to reconsider its order appointing Westchester Capital lead plaintiff?

A. Yes.

Q. When was that, sir?

A. A little over a year ago.

Q. Was it in approximately February of '09?

A. Approximately.

Q. I can show you the letter if you want.

A. No, no.

Q. Would you accept my representation that it was February 18th of 2009?

A. If my lawyer will accept that, I'll accept it.

MR. LIMAN: Will you accept that representation?

MR. ROTHMAN: I think the record shows what it shows.

SNOW - CONFIDENTIAL

MR. LIMAN: I'll mark the letter.

MR. ROTHMAN: We have no reason to disbelieve you. I just don't know the exact date either.

MR. LIMAN: Okay. That's fine. We'll mark the document.

I'm handing the Court Reporter a letter dated February 18, 2009 on the letterhead of Coughlin Stoia Geller Rudman & Robbins, asking her to mark it as Exhibit -- Snow Exhibit 4.

- - - -

(Exhibit No. 4 was marked for identification.)

- - - -

BY MR. LIMAN:

Q. Do you recognize Snow Exhibit 4?

A. Yes.

Q. What do you recognize it to be, sir?

A. A letter from my attorney to the judge.

Q. Have you seen this document before today?

A. No.

Q. Now, will you accept the representation -- withdrawn.

Does this -- is it correct that it

was February 18, of 2009 that you asked the court to reconsider its order appointing Westchester Capital as lead plaintiff?

A. I mean, without studying it, yeah, I'll accept that.

Q. What were the circumstances under which you determined to ask the court to reconsider its order appointing Westchester Capital lead plaintiff?

A. It's my understanding that Westchester was disqualified or was unable to serve as lead plaintiff.

Q. How did you come to that understanding?

A. From discussions with my counsel.

Q. When in relationship to the date of this letter, February 18, did you first come to that understanding?

A. I assume -- I don't remember. A few weeks, a few months.

Q. Well, did counsel contact you or did you contact counsel?

A. Counsel contacted me.

Q. And do you believe that counsel contacted you within a few weeks of this letter?

SNOW - CONFIDENTIAL

A. That sounds reasonable, but I don't recall.

Q. Let me ask the question this way: Do you recall coming to the understanding that Westchester Capital was disqualified from acting as counsel and waiting several months before you asked to be appointed lead plaintiff?

A. I don't recall. I don't believe it was that long.

Q. Is it correct that it was a period of days -- weeks if not days?

MR. ROTHMAN: Objection.

A. I don't recall.

Q. Okay. During the period of time after the appointment of Westchester Capital until your application to be -- to have the court reconsider the order, would you describe, sir, what if anything you did in connection with the IMAX case?

A. I don't believe I did anything.

Q. Did you do anything to monitor the litigation?

A. No. I might have had a few discussions with my counsel.

Q. Did you review any papers?

SNOW - CONFIDENTIAL

A. No.

Q. What caused you to decide that you wanted to become involved in the case again?

A. The reasons didn't seem any different at that point than they had initially.

Q. And what were those reasons?

A. I felt that there had been a fraud perpetrated.

Q. What made you think that you were capable of acting as fiduciary for the absent class members?

A. Because I've got an above-average level of understanding in regards to security matters and fiduciary matters.

Q. What do you mean by an above-average understanding of securities matters?

A. I'm a registered investment advisor.

Q. Do you believe that you have a better understanding of the securities markets than the average investor?

A. Yes.

Q. In fact, would you describe what your investment philosophy is, sir?

A. We try to buy undervalued securities.

SNOW - CONFIDENTIAL

Q. And how do you go about identifying undervalued securities?

A. Through analysis.

Q. What kind of analysis?

A. Risk/reward analysis, balance sheet analysis.

Q. Isn't it correct that those kinds of items are already reflected in the stock price of a security?

A. I don't believe so, no.

Q. Why don't you believe so?

A. I don't believe the market is efficient.

Q. Now, sir, can I show you -- how long have you had that belief that the market is not efficient?

A. 30 plus years.

Q. Is it fair to say it's a firmly-held view?

MR. ROTHMAN: Objection.

THE WITNESS: Does that mean I can answer?

MR. ROTHMAN: You can answer.

A. That's my personal opinion.

Q. Is it a firmly-held view of yours?

MR. ROTHMAN: Objection.

A. Yes.

SNOW - CONFIDENTIAL

Q. And is it a view that guides how you make investment decisions?
A. Yes.
Q. And is it a view that guided how you made the investment decisions with respect to IMAX securities?
A. Yes.
MR. LIMAN: Now, I'm going to ask the Court Reporter to mark as Snow Exhibit 5 a document entitled Corrected Certification Of Named Plaintiff Pursuant To Federal Securities Laws?

- - - -

(Exhibit No. 5 was marked for identification.)

- - - -

BY MR. LIMAN:

Q. Do you have Snow Exhibit 5 in front of you?
A. Yes.
Q. Do you recognize the document, sir?
A. Yes.
Q. Did you sign this document?
A. Yes.
Q. Did you sign it on April 29th of 2010?
A. Yes.

SNOW - CONFIDENTIAL

Q. And do you see, sir, that you said -- you declared under penalty of perjury that the foregoing is true and correct?

A. Yes.

Q. And by foregoing, you meant the body of the information that you had in your certification; is that right?

A. Yes.

Q. Now, would you tell us, sir, who actually prepared Snow Exhibit 5?

A. Legal counsel.

Q. Do you know which legal counsel prepared it?

A. I believe the Robbins group, but I'm not sure.

Q. Well, how did you receive Snow Exhibit 5?

A. Electronically.

Q. It was e-mailed to you; is that right?

A. I believe so.

Q. Were there different drafts before you executed this document?

A. I'm not aware if there were.

Q. Okay. When did you receive a copy of Snow Exhibit -- well, withdrawn.

Was Snow Exhibit 5 sent to you by the Robbins firm for you to sign?

A. Either the Robbins firm or Al Yates sent it to me. I don't recall who.
Q. Do you recall when in relationship to your signing it you first saw a draft of Snow Exhibit 5?
A. That day or the day before. I know it was shortly prior.
Q. Was it your idea to file a corrected certification?
A. No.
Q. Do you know whose idea it was?
A. I do not.
Q. When in relationship to your signing the document did you decide to file a corrected certification?
MR. ROTHMAN: Objection.
A. Yeah, I don't recall.
Q. Well, why did you file the corrected certification?
A. Somewhere along the line, I had realized or somebody had realized that we had entered a lot of stock and that the first filing showing 40,000 shares was erroneous, and it actually was a purchase of 50,000 shares and then a

subsequent sale in February of '05 of 10,000 shares.

Q. Do you recall how much before you actually executed this document you first learned that information?

A. No.

Q. When you learned that information, did you understand that the certification that was submitted to the court as part of Snow Exhibit 2 was incorrect?

A. Yes.

Q. Okay. And did you feel that it was important to correct the record?

MR. ROTHMAN: Objection.

A. Yes.

Q. And did you feel that it was important to correct the record quickly?

A. I left that up to legal counsel.

Q. Do you recall there being a period of weeks after you learned that Snow Exhibit 2 was incorrect before you corrected the record before the court?

A. No, it would have been longer than that.

Q. It would have been longer than that?

A. Correct.
Q. How much longer than a period of weeks was it during which you knew that Snow Exhibit 2 was incorrect and you failed to correct the record?
MR. ROTHMAN: I object to the characterization of the question.
A. I don't recall.
Q. Now, before you signed Snow Exhibit 5, did you read the document?
A. Yes.
Q. Did you review it in its entirety?
A. Yes.
Q. How much time did you spend reviewing it?
A. A minute or two.
Q. Okay. And, sir, what is it that Snow Exhibit 5 corrected?
A. It corrected the initial quantity purchase on 12-14 of '04, making that 50,000 shares instead of 40,000 shares, and then it shows a sale on February 7th of '05 of 10,000 shares that was previously omitted.
Q. Do you believe that those numbers are correct?
A. Yes, I do.

SNOW - CONFIDENTIAL

Q. How did you check them -- withdrawn.
Did you check them to make sure they were correct?
A. Not with this filing, no.
Q. Well, how do you know that they are correct?
A. I believe they now match the statements or the actual transactions.
Q. How did you -- how did you learn that the 40,000 share figure in the first certification to the court was incorrect?
A. I believe something caused me to look at the 2005 gain and loss schedule for the partnership, and I saw a lot of IMAX that had been sold.
Q. What is the 2005 gain and loss schedule for the partnership?
A. It would have been a part of the tax form.
Q. And what did that tax form reflect with respect to IMAX securities?
A. It would have reflected a sale of 10,000 shares and, in this case, a gain of approximately $30,000 during the tax year of 2005.
Q. Did you review that document prior to the

counsel's representation to the Court on this point.

Did I read that accurately?

A. Yes.

Q. Okay. And is it fair to say that as of the time of this order in June of '09, you knew that the amount of Snow Capital's financial interest in the case was a matter of dispute before the court?

MR. ROTHMAN: Objection.

A. I don't remember the exact time when I knew.

Q. Well, did you know that it was a matter of dispute at the time of the application --

A. No.

Q. -- to be lead plaintiff?

A. No.

Q. Are you saying you don't recall that or are you saying you didn't know that?

A. I don't recall that.

Q. Did you do anything at the time of the lead plaintiff motion to check to make sure that the representations to the court were accurate?

A. No.

SNOW - CONFIDENTIAL

Q. Would you describe, sir, how you supervised your counsel in making these representations to the court?
A. I don't understand the question.
Q. Did you supervise your counsel in making these representations to the court?
A. Yes.
Q. What did you do to supervise your counsel in making these representations to the court?
A. We had various discussions about the various issues.
Q. Did you do anything to make sure that the representations they were making about your financial interest was correct?
MR. ROTHMAN: Objection. Asked and answered.
THE WITNESS: Do I go ahead and answer?
MR. ROTHMAN: Mm-hmm. Just don't reveal anything that you said to counsel.
A. I'm sorry. Can you restate the question?
Q. Did you do anything to make sure that the representations your lawyers were making in these letters to the court were accurate?

A. No.

Q. Now, sir, I want to take you back to your actual decision to purchase IMAX stock, and is it correct, sir, that -- I've been referring to Snow Capital. Generally, the purchases that were made were made by a fund -- well, who made the purchases of IMAX stock?

A. They were made on behalf of Snow Capital Investment Partners, L.P.

Q. That's the fund?

A. Correct. That's a partnership. It's not a fund.

Q. And were you the one who made the decision to purchase the IMAX stock?

A. Correct.

Q. And if I refer to Snow Capital Investment Partnership, L.P. as Snow Capital from here on, you'll understand that I'm referring to Snow Capital Investment Partnership, L.P. Is that okay?

A. Okay.

Q. If you want me to use a different term, I'll be happy to do so.

A. No, no, that's fine.

SNOW - CONFIDENTIAL

Q. Okay. Now, is it -- turn to your corrected certification which is Snow Exhibit 5, is it correct that the first time that Snow Capital purchased IMAX stock was December 14th of 2004?

MR. ROTHMAN: Just a second. He's looking for the exhibit.

A. That's correct, December 14th of '04.

Q. Now, had Snow Capital considered purchasing IMAX stock prior to December 14, 2004?

A. Yeah, there would have been a process leading up to the purchase. I didn't wake up that day and decide to buy the stock.

Q. Could you just describe to me what the purchase would have entailed -- what the process would have entailed?

MR. ROTHMAN: Objection.

A. In general, it would have involved looking at the prior year's 10-K, one, maybe two quarters of 10-Qs, and then one or maybe two conference call transcripts.

Q. Do you recall what first got you interested in IMAX?

A. I do not.

SNOW - CONFIDENTIAL

Q. How many different securities does Snow Capital follow at any particular time?

MR. ROTHMAN: Objection.

A. Now or back in --

Q. Fair question.

Back in 2004?

A. Probably about 30 or 35.

Q. Okay. And do you recall how much before the actual purchase on December 14th of '04 you started to look at IMAX to potentially buy?

A. Not the specifics, no.

Q. What would be the typical length of time that you would look at a company before deciding to buy its stock?

MR. ROTHMAN: Objection.

A. Anywhere from three or four months.

Q. Okay. And do you believe that you looked at IMAX for about three to four months before you purchased its stock?

A. I would typically, but I don't recollect in this case.

Q. Now, besides the 10-Ks and the -- withdrawn.

Do you recall reviewing IMAX's 10-Ks and 10-Qs before you purchased IMAX stock on

SNOW - CONFIDENTIAL

A. Well, I mean, you're not -- the security is one in a portfolio of securities, and if they're based on maybe other opportunities that presented themselves in February of '05, I might needed to have cut back the stock. It seemed to have done fairly well from the inception and maybe just want to rebalance it to a certain percentage of the overall portfolio.

Q. Now, I notice, sir, in reviewing some of your materials, that Snow Capital occasionally takes short positions in certain stocks; is that right?

A. Yes.

Q. And is it also correct that Snow Capital engages in hedging strategies?

A. Occasionally.

Q. Would you describe what kinds of hedging strategies Snow Capital engages in?

A. Generally, shorting ETFs or shorting S&P 500 futures or other such indexes.

MR. ROTHMAN: Lewis, when you get to a convenient breaking point.

MR. LIMAN: Okay.

BY MR. LIMAN:

Q. Did Snow Capital engage in any hedging strategies with respect to IMAX?

A. Not specifically, no.

Q. Did it generally engage in hedging strategies with respect to other securities?

MR. ROTHMAN: Objection.

A. I'm sorry. I can't recall during that period.

Q. Did Snow Capital do any short transactions for IMAX securities?

A. No.

Q. It did not sell IMAX stock short?

A. Correct.

Q. And are the securities transactions listed in Schedule A for IMAX stock the only transactions that Snow Capital has engaged in for IMAX stock?

A. Yes.

Q. What about you personally, have you purchased or sold IMAX stock?

A. No.

Q. Have you purchased or sold IMAX stock on behalf of any entities other than Snow Capital?

A. No.

Q. Now, Snow Capital sold 150,000 shares of IMAX stock on August 10th of 2006; is that right?

A. Yes.

Q. And does that represent a -- withdrawn.

At the time of the February 7, 2005 sale, do you recall if you knew anything more about IMAX's application of multiple element arrangement accounting than what we saw reflected in the 10-K for 2003?

A. No, unless it had possibly been disclosed in a Q along the way.

Q. And do you recall knowing anything more about the application of multiple element arrangement accounting to IMAX's securities?

A. No.

Q. Do you know that ultimately IMAX announced that it applied multiple element arrangement accounting to its theater system installations?

A. Yes.

Q. And do you recall, sir, that IMAX announced that it -- one way in which it applied multiple element arrangement accounting was to

SNOW - CONFIDENTIAL

recognize revenue on the installation of certain portions of the theater system even if the screen on the IMAX system was not fully installed?

MR. ROTHMAN: Objection.

A. Yeah, I understand that's what they do.

Q. Do you recall when you first learned that?

A. That, I don't recall.

Q. Do you recall that IMAX, on August 9th of '06, issued a press release?

A. Yes.

Q. Okay.

MR. ROTHMAN: Is this a good breaking point, because it seems like we're going into a new area?

MR. LIMAN: I should be done on this and at a convenient breaking point in a moment.

MR. ROTHMAN: Okay.

BY MR. LIMAN:

Q. Do you recall what that press release reflected?

A. Generally, yes.

Q. What do you recall of the press release?

SNOW - CONFIDENTIAL

A. They reported earnings, which I believe actually were a little bit better than expected. They said that the company was basically no longer for sale, that that had been a failed effort, and they said that they were -- had, I guess, informal inquiries from both the U.S. Securities & Exchange Commission and the Canadian Security Commission concerning their revenue recognition count.
Q. And do you recall anything further?
A. From the press release?
Q. Correct.
A. No.
Q. And you also referenced earlier in your testimony that you had reviewed the transcript of an earnings call?
A. Correct, I reviewed that call that evening.
Q. Okay. And do you recall -- and was that a call that you listened to that evening?
A. Yes, I remember listening to that live.
Q. And do you recall learning any additional information from that call beyond what you've described from the earnings call -- from the earnings release?

SNOW - CONFIDENTIAL

A. No, there just were lots of questions.

Q. Now, the follow day, August 10, 2006, you made the decision to sell the remaining holdings that Snow Capital had of IMAX stock; is that right?

A. Correct.

Q. And would you describe, sir, what the factors were in your decision to sell the remaining portions of Snow Capital holdings of IMAX?

A. Yes. From my experience, management had lost credibility. What I was specifically concerned about is they had a great deal of debt on the balance sheet, and I was concerned that it would be possible that maybe, with the inquiry, they somehow could have some sort of a technical loan default which would have endangered the company's ability to ultimately reap the benefits of their purported optimistic future, so I exited the position.

Q. Do you recall, at the time that you sold, knowing any material non-public information about IMAX?

MR. ROTHMAN: Objection. Asked and answered.

SNOW - CONFIDENTIAL

A. No, I think the day before, the evening before they started to reveal that there was an issue in the revenue recognition account, but, no, I knew nothing that was non-public.

Q. And in particular, did you know that IMAX's 10-Ks for the fiscal year 2003 mis-reported its revenue under GAAP at the time you sold the position?

A. No, I did not know what the restatement was.

Q. Did you know that there would be a restatement?

A. No, only that there was a possibility of a restatement.

Q. And did you know, sir, that IMAX's financial statements for the year 2004 were misstated under GAAP at the time you made the decision to sell the remaining position?

A. No.

MR. ROTHMAN: Objection.

Q. Let me ask it again.

A. Okay.

Q. At the time that you made the decision to sell Snow Capital's remaining position in IMAX stock, did you know that IMAX had mis-reported

its revenue for the fiscal year 2004?
A. I didn't know it, but I assumed it.
Q. And what did you assume it based on, sir?
A. I assumed it based on, if they had a revenue recognition problem, then the work I had previously done, the assumptions could no longer be relied upon.
Q. Sir, what was it in particular that you believed was wrong about IMAX's financial statements for 2004?
MR. ROTHMAN: Objection.
A. I can't speak specifically to 2004, but, clearly, there had been -- at that point, without knowing the amount, that there had been a mismatching of revenue, that it was not in the correct period and some revenue had the opportunity and maybe an inconsistent basis to have been pulled forward.
Q. And you knew that, with respect to IMAX's financial statements for 2004, you're saying, as of August 10th of 2006?
MR. ROTHMAN: Objection.
A. No, I didn't know that. I assumed that, that all of those time periods were not correct.

SNOW - CONFIDENTIAL

A. Not for a hundred percent.
Q. Have you asked your counsel?
A. Yeah, I think we discussed that yesterday. I believe they said that they did have access to that information.
Q. Okay.

MR. LIMAN: Now, I'm going to ask the Court Reporter to mark as Exhibit 16 Defendants' First Request for Documents.

- - - -

(Exhibit No. 16 was marked for identification.)

- - - -

BY MR. LIMAN:

Q. Do you recognize Defendants' Exhibit -- sorry, Snow Exhibit 16?
A. Yes.
Q. Is this the request for documents that you were referring to earlier in your testimony?
A. Yes.
Q. And this is the request for documents that you reviewed in searching for documents and giving them to your counsel; is that right?
A. Correct.
Q. Sir, do you recall, when you reviewed -- when

SNOW - CONFIDENTIAL

you searched for documents, seeing a copy of the complaint that you said you reviewed?
A. I don't.
MR. ROTHMAN: Objection.
A. Yeah, I'm not clear on the question.
Q. Okay. You mentioned before we broke for lunch that you had a recollection of reviewing a complaint prior to the complaint that was marked as Exhibit 15.
Do you recall that testimony?
A. Is that the amended complaint?
Q. That's the amended complaint.
A. Yes, I remember that.
Q. Okay. And your testimony was that prior to reviewing the amended complaint, there was a complaint that you did review; is that correct?
A. Correct.
Q. My question, sir, is have you -- do you have a copy of that complaint that you said that you reviewed?
A. I believe I do in the litigation file.
MR. LIMAN: That has not been produced. We'd ask that that be produced.

MR. ROTHMAN: We'll take your request under advisement.

BY MR. LIMAN:

Q. Now, sir, I want to ask you a few questions about your claims in this case?

A. Okay.

Q. Sir, do you know who the defendants are who you've named in the complaint?

A. Yes.

Q. Who are the defendants?

A. IMAX, PricewaterhouseCoopers, Gelfond, Joyce, Campbell, and Wechsler.

Q. Okay. And what is the class period that you are bringing this -- the class that you are representing?

A. Approximately February of '03 through July of '07.

Q. And do you know how that class period was chosen?

A. Well, the beginning period, I assume, was the filing of the K for 2002, and the end of the class period, I believe, was the restatement for IMAX.

Q. Do you know how the defendants who were named

SNOW - CONFIDENTIAL

were chosen?

A. Just based, I guess, on their position within the firm.

Q. Now, have you had any contact with the other class members, the class that you're representing?

A. No.

Q. Do you know what statements the complaint alleges to be false?

MR. ROTHMAN: Objection.

A. I'm sorry, can you repeat -- repeat the question.

Q. Sure.

What statements does the complaint allege to be false?

A. Of the defendants?

Q. Correct.

A. That basically they misstated revenue because they misused an accounting principle that basically they weren't entitled to use.

Q. In what respects do you contend the statements were false of the defendants?

MR. ROTHMAN: Objection.

A. Based on the investigation of my counsel.

SNOW - CONFIDENTIAL

Q. But in what respects are the statements false that the defendants made? What about them is false?

A. They stated that -- first of all, they stated that the use of the type of accounting, let's call it a percentage of completion because I don't remember the technical name, was used occasionally, and clearly was used more than occasionally, and then based on, I guess, the Sarbanes-Oxley statements, they had said that they were in compliance with generally accepted accounting principles which, I guess in hindsight, they clearly were not in compliance.

Q. And what is your basis for saying that the form of accounting that you've described as percentage of completion accounting was used more than occasionally?

A. Well, I'm not an accountant, I'm not a CPA, but based on my understanding, they weren't entitled to use it because it was, in essence, deemed to be kind of one complete system, and that there were, in fact, no-stand alone or salable products within that system.

Q. My question is a little bit different.
You said that this form of accounting, you believe, to have been used more than occasionally.
Is that your testimony?
MR. ROTHMAN: Objection.
A. Correct.
Q. Okay. What is your basis for believing that the form of accounting was used more than occasionally?
A. I think based on the restatement.
Q. Do you have any other basis besides the restatement?
A. Not -- I don't, but I assume that my counsel does.
Q. Do you have any basis for saying that the form of accounting was used more than occasionally in the years 2003 and 2004?
MR. ROTHMAN: Objection.
A. No.
Q. Now, you testified earlier that you are aware that in order to prevail in this case, you would need to establish scienter?
THE REPORTER: I'm sorry, you would

need to establish?

MR. LIMAN: Scienter, S-C-I-E-N-T-E-R.

MR. ROTHMAN: Objection.

A. Can you please define that term?

Q. Sure.

Do you understand the concept of scienter?

A. No.

Q. Do you understand that in order to prevail in this case, you would have to establish scienter?

MR. ROTHMAN: Objection.

A. Obviously, I don't if I don't know what the definition is.

Q. Do you understand, sir, that in order to prevail in this case, you would have to establish either that the defendants knew that the statements they were making were false or were reckless as to whether they were false?

A. No, I did not know that.

Q. Then the answer may follow up if I ask you what investigation you've done to ascertain that the defendants knew their statements were

SNOW - CONFIDENTIAL

false, what would your answer be?
A. I'm relying on the investigation of my counsel.
Q. And what investigation have you directed your counsel to do as to that issue?
MR. ROTHMAN: Objection. To the extent that it concerns legal advice and discussions of the litigation and our strategy in the litigation, I'm going to instruct you not to answer that question.
Q. Can you answer that question?
A. No.
Q. What have you -- do you have an understanding -- just do you have an understanding as to whether your attorneys have done anything to ascertain whether the defendants acted with scienter?
MR. ROTHMAN: That's a yes or no question.
A. Yes, I believe they have.
Q. And you believe that even though you don't know what scienter means?
MR. ROTHMAN: Objection.
A. I now understand what it means.

SNOW - CONFIDENTIAL

Q. Can you tell me what your understanding is as to what your counsel have done as to discover whether the defendants have acted with scienter?

MR. ROTHMAN: Again, to the extent it concerns conversations that we've had regarding the prosecution of the litigation or advice given to you in connection with the litigation, I'm going to instruct you not to answer that question.

A. Okay. I will not answer the question.

Q. Have you hired an expert in this case?

A. I personally have not.

Q. Do you know whether your attorneys have hired an expert?

A. I believe that they have.

Q. And what do you know about that?

A. I know they have hired somebody to file a brief or some other legal document pertaining to market efficiency.

Q. Who do you believe your attorneys have hired as an expert in this case?

A. I cannot recall his name.

Q. Do you know when your attorneys hired that

expert?
A. I do not.
Q. Do you know what financial arrangements your attorneys have made with that expert?
A. No.
Q. Did you ask any questions about the financial arrangement your attorneys have made with that expert?
A. No.
Q. Have you received any documents about the financial arrangement your attorneys have made with that expert?
A. No.
Q. Do you know how that expert will end up being paid?
A. No, I do not know.
Q. Okay. Have you coordinated with Westchester Capital in the prosecution of this case?
A. I have not.
Q. Do you know whether your attorneys have coordinated with Westchester Capital in the prosecution of this case?
A. I do not know.
Q. Have you ever coordinated with Westchester

Capital in the prosecution of this case?

MR. ROTHMAN: Objection.

A. No.

Q. Do you know if your attorneys have ever coordinated with Westchester Capital in the prosecution of this case?

MR. ROTHMAN: Objection.

A. No.

Q. Now, I asked you about conversations that you had with your attorneys about their compensation arrangements.

Have you had any conversations about any additional compensation you will receive as -- for acting as lead plaintiff in this case?

MR. ROTHMAN: Objection.

A. Only that there will be none.

Q. Do you have any understanding as to whether you will receive any extra compensation for acting as lead plaintiff in this case?

MR. ROTHMAN: Objection.

A. Yeah, I understand I will not.

Q. Do you have an understanding as to whether any of your expenses will be paid that you incur

by acting as lead plaintiff in this case?
A. Yes.
Q. What is that understanding?
A. That I possibly could be reimbursed for certain out-of-pocket expenses.
Q. And do you have an understanding as to at what rate you could be reimbursed for your out-of-pocket expenses?
A. No.
Q. Do you have an understanding as to whether you will be compensated for the time that you spend as lead plaintiff in this case?
A. I don't know.
Q. Now, you mentioned somebody by the name of Al Yates.
He's one of the lawyers for Snow Capital; is that right?
A. Yes.
Q. Do you have an engagement letter with him?
A. Yes.
Q. And who is that -- which corporate entity is that engagement letter with?
A. Snow Capital Investment Partners, I believe, or possibly Snow Capital Management, LLC as

SNOW - CONFIDENTIAL

general partner for that entity. I don't have that document.

Q. And when did a Snow Capital entity first sign an engagement letter with Mr. Yates?

A. I believe it was in the fall of 2007. I'm sorry, 2006.

Q. And what did Snow Capital engage Mr. Yates to do?

A. To provide counsel with regard to the IMAX matter.

Q. Is there -- does the engagement letter set forth any kind of financial arrangements that you're to have with Mr. Yates?

A. I don't believe it specifies, only maybe that he would be compensated if there were any proceeds from this case.

Q. And what is your understanding about what Mr. Yates is doing in connection with the prosecution of this case?

A. He did some of the preliminary work, and he's part of the counsel team.

Q. When you say some "preliminary work," what preliminary work did Mr. Yates do?

A. That, I can't recall, but Mr. Yates and myself

would have had a number of conversations kind of keeping me up to date on the strategy and what's kind of going on with the case and has transmitted a number of the legal documents to me.

Q. Is it accurate to say you've had more conversations with Mr. Yates than you've had with any representative of the Robbins law firm?

MR. ROTHMAN: Objection.

A. I don't know if it's more or less. I know that earlier on, it was more with Mr. Yates and more with the Robbins group as we approached this thing.

Q. Do you know whether Mr. Yates is with the Robbins group?

A. I don't believe he is.

Q. Okay. Now, did you know Mr. Yates before you retained him in connection with the IMAX case?

A. Yes.

Q. How did you know Mr. Yates?

A. He's my neighbor.

Q. How long has he been your neighbor?

A. Approximately 20, 25 years.

SNOW - CONFIDENTIAL

Q. Are you friendly with him?
A. Yes.
Q. Are your families friendly?
A. Somewhat.
Q. Do you have kids?
A. Yes.
Q. Does he have kids?
A. Yes.
Q. Are your respective kids friendly with each other?
A. Yes.
Q. Have you had any financial dealings with Mr. Yates over the years?
A. Yes.
Q. What are those financial dealings?
A. Mr. Yates is a client of the firm.
Q. How long has he been a client of the firm?
A. Six, maybe seven years.
Q. And how did he come to be a client of the firm?
A. Just called me one day and asked if I could help him with an investment portfolio.
Q. And approximately how much money do you manage for Mr. Yates?

SNOW - CONFIDENTIAL

A. I don't know. I'm guessing

REDACTED

MR. ROTHMAN: And we'd like to designate the transcript as confidential under the terms of the Protective Order.

MR. LIMAN: That's fine.

BY MR. LIMAN:

Q. Approximately how much do you receive on an annual basis in fees from Mr. Yates?

MR. ROTHMAN: Objection.

A. Approximately 10, 12 thousand.

Q. What are the fees based on that you receive from Mr. Yates?

A. It's a fee schedule based on assets under management.

Q. And what percentage of the -- what is the fee schedule based on assets under management?

A. Probably, for Mr. Yates, it's probably about 75 basis points, maybe on the first million, and then sliding after that.

Q. And have you had discussions with -- is that the standard fee structure for all clients?

A. Correct, all direct clients.

Q. Do any clients get a better rate than that?

A. Sure.
Q. Do any clients get a worse rate than that?
A. Yes.
Q. Do most clients get a worse rate than that?
A. No.
MR. ROTHMAN: Objection.
Q. How did you decide on the particular fee structure you have for Mr. Yates?
MR. ROTHMAN: Objection.
A. The standard fee schedule for a direct client.
Q. When did you put that into effect?
A. Inception of the firm, 2001.
Q. Okay. Now, have you had any discussions with Mr. Yates about putting more assets with the firm?
A. No.
Q. When was the last time he gave the firm more assets to manage?
A. I would have no idea.
Q. Do you know whether, after he first vested with Snow Capital, he added to the assets under management he had with Snow Capital Management?
MR. ROTHMAN: Objection.

SNOW - CONFIDENTIAL

A. To be honest, I don't know.

Q. Have you had discussions with him about adding more assets?

A. No.

Q. Has he asked you to take more assets?

A. Not me directly, no.

Q. Do you know whether he's asked any member of the firm?

A. He might have. I don't know.

Q. Who is it who has the most direct dealings with Mr. Yates?

MR. ROTHMAN: Objection.

A. Probably somebody in operations.

Q. How many -- and is there a particular person within operations who would have --

A. No.

Q. Do you have a client group?

MR. ROTHMAN: Objection.

A. Please define that.

Q. Do you have anybody who -- well, what kind of contacts would operations have with Mr. Yates?

A. If he had any questions directly about his account, it would not be a sales effort, it would just be an operational issue if he had.

SNOW - CONFIDENTIAL

Q. Who has the -- are there people engaged in sales besides you at Snow Capital?

MR. ROTHMAN: Objection.

A. Oh, yes.

Q. How many people?

A. Approximately eight or nine.

Q. And are particular clients assigned to particular sales people?

A. Yes, generally by category.

Q. Who is Mr. Yates assigned to?

A. He's not assigned to anybody. He's considered one of maybe two or three dozen house accounts that are just people that have come in almost like -- kind of like friends, family.

Q. Do the sales people for a particular client get additional compensation based on the fact that they're the sales people for that client?

MR. ROTHMAN: Objection.

A. Yes, but, again, Mr. Yates is not assigned -- yes, sales people are compensated on generally some sort of a base, and then based on the amount of revenue that they bring in.

Q. And because Mr. Yates is not assigned to a specific sales person, there is no such

payment to the other sales people; is that right?
A. Correct.
Q. Now, at the time that you engaged Mr. -- withdrawn.
Have you -- do you have any other business relationships with Mr. Yates?
A. He's handling the Par Pharmaceutical litigation.
Q. Okay. And when did you engage him to handle the Par Pharmaceutical litigation?
A. I believe it was also in 2006.
Q. At the time that you -- any other business relationships with him?
A. No.
Q. At the time that you engaged Mr. Yates for the IMAX litigation, did you interview any other attorneys?
A. No.
Q. At the time that you engaged him for the Par Pharmaceutical litigation, did you interview any other attorneys?
A. No.
Q. How did you decide to engage Mr. Yates for the

IMAX matter?

A. We discussed it. I knew, in general, that this is what his specialty was, and I felt comfortable with him as an individual and engaged him.

Q. How long of conversations did you have with him before you engaged him about IMAX?

A. Oh, maybe two or three, four separate conversations about the matter --

Q. Okay.

A. -- over a couple weeks.

Q. And that started in or around August 9th of '06?

A. Yeah, but certainly after.

Q. Does Mr. Yates have -- was Mr. Yates an investor in IMAX?

A. No.

Q. Did the -- when you say he was a direct account, what do you mean by that?

A. We have a large separate account business where we maintain -- we don't commingle funds. We maintain a separate account for an individual or an entity so that they have their own date and dollar basis, and we would

trade a portfolio of securities for, you know, thousands of accounts.

Q. And is that portfolio identical to the Snow Capital portfolio?

MR. ROTHMAN: Objection.

A. No, it is not identical to the Snow Capital Investment Partners portfolio, no.

Q. Now, how many direct accounts does Snow Capital Management have?

A. I believe about 4,200.

Q. And what is the average size of the accounts --

MR. ROTHMAN: Objection.

Q. -- in terms of assets under management?

MR. ROTHMAN: Objection.

Q. Do you know?

A. Yeah, the average size of a separate account here would be around three quarters of a million dollars.

Q. Is Mr. Yates' account one of the larger separate accounts?

A. No.

Q. Is it larger than the average?

A. Yes.

SNOW - CONFIDENTIAL

Q. Now, when did you first meet any representative of the Robbins firm or its predecessor?

A. I don't recall.

Q. Did you meet any -- who was the first member of the Robbins firm or its predecessor that you first had contact with?

A. I don't recall.

Q. When did you first speak with any representative of the Robbins firm?

A. Again, I don't recall.

Q. Did you speak with any representative of the Robbins firm prior to October of 2006?

A. No.

Q. Did you speak to any member of the Robbins firm -- you understand I'm referring to the Robbins firm or its predecessor?

A. I understand.

Q. Did you speak to any representative of the Robbins firm or its predecessor prior to the end of 2007?

A. I believe I did. Whether it was on this matter or maybe the Par Pharmaceutical matter that they're also handling, I don't recall the

SNOW - CONFIDENTIAL

specifics.

Q. Okay. I'll remind you that the letter that the predecessor to the Robbins firm, the Coughlin Stoia firm, submitted in support of the motion for reconsideration request for the conference is February 18, 2009. That's Snow Exhibit 4.

Do you have that in front of you?

A. Right. Clearly, it was prior to February of '09. I do see that letter.

Q. Do you know how much prior to February of '09?

A. I'm thinking it might be a couple years prior to February of '09 my contact with somebody there.

Q. Now, it says -- first sentence of the letter that's Snow Exhibit 4 says: We represent Snow Capital Investment Partners.

Do you see that?

A. Yes.

Q. And you understand that to mean that Snow Capital Partners had engaged the Robbins firm or its predecessor?

A. Correct.

Q. Okay. Prior to engaging the Robbins firm or

SNOW - CONFIDENTIAL

its predecessor, did you interview any other firms?

A. No.

Q. Did you receive any marketing materials from the Robbins firm or its predecessor prior to engaging them?

A. I had heard of them.

Q. Okay. Did you consider hiring any firms other than the Robbins firm before you engaged the Robbins firm?

MR. ROTHMAN: Objection.

A. I had had a conversation with Al about who we should engage and, you know, pluses and minuses of certain firms and went with Mr. Yates' --

MR. ROTHMAN: I don't want you to go into what Mr. Yates told you.

THE WITNESS: I'm sorry.

BY MR. LIMAN:

Q. Did you discuss the time that you first engaged the Robbins firm or -- withdrawn.

If I refer to the Robbins firm, will you understand I'm referring to either the Robbins form or its predecessor, Coughlin

Stoia?
A. Yes.
Q. So at the time that you first engaged the Robbins firm, did you have any discussions with that firm about the type of attorneys' fee it would request out of any recovery for the class?
A. No.
Q. Did you have any discussions with any other firm about whether they would be prepared to accept a lower percentage fee than the 30 to 35 percent rates that you discussed earlier today?
MR. ROTHMAN: Objection.
A. No.
Q. Now, does Mr. Yates -- do you have a monitoring relationship with Mr. Yates?
A. In regard to securities?
Q. Correct.
A. No.
Q. Does he know, for example, what securities you're invested in?
A. He would know only because he obviously has a portfolio of Snow Capital securities that are

SNOW - CONFIDENTIAL

not all of the securities owned by Snow Capital Management clients because of different products, and then he would have access, as anybody would, to our 13F filings.

Q. Okay. Have you discussed with him -- and I don't want to have the contents -- litigation against any companies other than IMAX or Par Pharmaceuticals?

A. Yes.

Q. How many other companies have you discussed?

A. Three, maybe four over, you know, a long period of time.

Q. And in any of those cases, have you sought to be lead plaintiff?

A. Not that we didn't previous -- not any previously referenced.

MR. LIMAN: Now, I'm going to ask the Court Reporter to mark as Snow Exhibit 17 a document entitled Memorandum of Law in Support of Plaintiff's Motion for Class Certification.

- - - -

(Exhibit No. 17 was marked for identification.)

- - - -

SNOW - CONFIDENTIAL

MR. ROTHMAN: Did you say this is 17?

MR. MATHEWS: Yes.

BY MR. LIMAN:

Q. Sir, before I ask you to go through Snow Exhibit 17, which is a lengthy document, I've got a simple question. Look through as many pages as you need to.

Have you ever seen this before?

A. No.

Q. That makes that simple. You can put it to the side.

One further question -- are you still reviewing it, sir?

MR. ROTHMAN: Well, I think he's starting in the middle of the pack which is a separate document.

A. Yeah, I'm looking at -- yeah, I certainly don't have a document that is 350 pages in my file. Whether I've seen the document without maybe an exhibit or two, I don't -- let's go with I don't recollect.

MR. ROTHMAN: Why don't you start in the front.

SNOW - CONFIDENTIAL

A. Okay. I cannot recall seeing this document.

Q. A couple of final questions, sir, and then I'm going to turn it over to my colleague.

I take it your understanding is that Mr. Yates will receive compensation if the class in this case is successful in getting the revenue; is that right?

MR. ROTHMAN: Objection.

A. Right.

Q. And is it -- do you have an understanding as to whether Mr. Yates has an attorney-client relationship with anybody else who is seeking to be lead plaintiff in this case?

MR. ROTHMAN: Objection.

A. I don't know for sure, but I assume he does not have.

Q. Okay. And, sir, do you have an understanding as to whether Mr. Yates has relationships with any other investment managers?

A. I don't know.

Q. Do you know of any other investment managers that he puts money with?

A. No.

Q. And, sir, is it your understanding that if he

SNOW - CONFIDENTIAL

does recover money in this case and puts it with an investment manager, he would put it with you?

MR. ROTHMAN: Objection.

A. I assume I'm not his only investment advisor, just kind of doing one strategy.

Q. Is it your -- would it be your hope that he puts any additional assets with you?

A. We're all in business to make money. I would rather have more money than less.

MR. LIMAN: I told you those were the final questions. Unfortunately, they're not, but this should be easy.

Snow Exhibit 18 a document entitled Confidential Private Offering Memorandum Limited Partnership Interests of Snow Capital Investment Partners, L.P.

- - - -

(Exhibit No. 18 was marked for identification.)

- - - -

BY MR. LIMAN:

Q. Would you identify this document after you've reviewed it?

A. Yes, I have the document, and I'm familiar

SNOW - CONFIDENTIAL

with it.

Q. And what is it?

A. It's the Confidential Private Offering Memorandum of Limited Partnership Interests of the Snow Capital Investment Partners.

Q. And Snow Capital Investment Partners is the entity that purchased IMAX stock; is that right?

A. That's correct.

Q. And is this the offering memorandum that was in place at the time of Snow Capital's purchase of the IMAX stock?

A. Correct.

MR. LIMAN: Nothing further.

MS. LUNN: Can I have about five minutes?

MR. ROTHMAN: Okay.

- - - -

(There was a recess in the proceedings.)

- - - -

MR. LIMAN: You want to mark this?

- - - -

(Exhibit No. 19 was marked for identification.)

- - - -

SNOW - CONFIDENTIAL

BY MR. LIMAN:

Q. Back on the record.

During the break, Mr. Snow, your attorneys produced to us a document that they have hand Bates as Snow 17 through 95. Snow 77 through 95. Is that correct?

A. Yeah, if you count backwards, that's right.

MR. ROTHMAN: I think those numbers may be wrong. We'll worry about the Bates numbering after.

BY MR. LIMAN:

Q. Let me start again.

During the break, your attorneys produced to us a document that is headed Snow Capital Investments Partners Valuation Analysis. It looks to be dated December 30, 2005, and it's been marked as Snow Exhibit 19.

Do you have it in front of you?

A. Yes.

Q. Do you recognize this document with the redactions?

A. Yes, I do.

Q. What is this -- what is the document?

A. Probably.
Q. Would you have looked at the cash flows in evaluating IMAX?
MR. ROTHMAN: Objection.
A. Yes.
Q. Would it be accurate to say that you regularly consider and evaluate future cash flows -- expectations of future cash flows in determining whether to invest in a stock?
MR. ROTHMAN: Objection.
A. It's part -- it's one of many considerations.
Q. Do you think that the evaluation of future cash flows is important in determining the market value of the stock?
MR. ROTHMAN: Objection.
A. Again, it's one of many considerations, but, yes, yes.
Q. What type of information, company information would impact Snow Capital's evaluation of expected future cash flows for a company?
MR. ROTHMAN: Objection.
A. Just those documents, those public documents that the company, or IMAX in this case, would have filed, the Qs and the Ks, and then

SNOW - CONFIDENTIAL

obviously my assumptions as to future business opportunities.

Q. Could there be material information in the market about a company that wouldn't have any impact on the expected future cash flows?

MR. ROTHMAN: Objection.

A. Well, sure, there could be material information that really -- that has nothing to do with cash flows.

Q. Certainly, there would be information in the 10-Qs and 10-Ks that wouldn't have any impact on your expectation of cash flows?

A. Correct.

MR. ROTHMAN: Objection.

Q. I want to go back quickly to the questions that Mr. Liman asked you about Al Yates.

You had previously mentioned that you had talked casually with Mr. Yates about the potential for him earning a fee if the litigation was successful; is that correct?

A. Correct.

Q. Have you ever spoken with Mr. Yates about any arrangement he might have with the Robbins law firm or their predecessor of a fee-sharing

arrangement?
A. Yes.
Q. And what is your understanding of that fee-sharing arrangement?
A. He didn't know. It was not in regards to this matter when I asked him about that, it was -- the answer I got is it was -- it had not been established as to what their fee-sharing arrangement would be. It would be something they would look at later based on, I guess, relative time that the two law firms had put in in regards to this matter.
Q. So there was an understanding that there was some arrangements, but maybe there was some uncertainty about the exact parameters?
MR. ROTHMAN: Objection.
A. Correct, that was my understanding.
Q. Do you have any type of monitoring agreement with Mr. Yates?
MR. ROTHMAN: Objection. Asked and answered.
A. No.
Q. Do you have any type of monitoring arrangement with the Robbins law firm?

SNOW - CONFIDENTIAL

A. No.

Q. Do you have any type of monitoring arrangement with any other law firm?

A. No.

Q. Has Mr. Yates approached you about being the lead plaintiff in any other litigation other than the IMAX or the Par Pharmaceuticals?

MR. ROTHMAN: Objection. Asked and answered.

A. Yeah, over the years, he has inquired about, you know, securities that I may or may not have owned and if I would be interested in possibly being considered -- if I'd be interested in being a lead plaintiff.

Q. Par Pharmaceuticals and IMAX, are those the only two cases where you've actively sought to be the lead plaintiff?

MR. ROTHMAN: Objection.

A. I called out BellSouth as something that I attempted 7, 8, maybe 10 years ago.

Q. Have you had any communication or contact with any current or former employees of IMAX Corporation?

A. No.

SNOW - CONFIDENTIAL

Q. Are you familiar with any peer companies or competitors to IMAX?

MR. ROTHMAN: Objection.

A. No.

Q. Does Snow Capital regularly invest in media, entertainment or technology companies?

MR. ROTHMAN: Objection.

A. We have, but, generally, it's not an equal weight -- we tend to be underweight in the technology sector.

Q. So you wouldn't say that you specialize in media or entertainment investments?

A. Correct.

Q. Is there a particular person at Snow Capital who is responsible for conducting research in the areas of media, entertainment or technology companies?

MR. ROTHMAN: Objection.

A. No.

Q. Are you familiar with the Canadian firm of PricewaterhouseCoopers?

A. Not to differentiate the Canadian firm from the U.S. firm, so I'm not -- to answer your question, no, I'm not familiar with the

Canadian.

Q. So you're familiar with -- you've heard the name PricewaterhouseCoopers before?

A. Yes.

Q. And you understand that there are separate entities functioning in separate countries?

MR. ROTHMAN: Objection.

A. I assume that by some of the court documents that have been filed, yes.

Q. Have you ever spoken with any current or former PWC Canada partners or employees regarding IMAX or IMAX securities?

MR. ROTHMAN: Objection.

A. No.

Q. Do you have any experience with any other public accounting firm in the U.S. or Canada?

A. Yes.

Q. Which firms are those?

A. We're users of a number of accounting firms locally. Alpern Rosenthal, Stelmach, I think, are the two primary accounting firms that we've used internally.

Q. Have you ever had any dealings with KPMG?

A. I don't believe. Not that I recollect.

SNOW - CONFIDENTIAL

Are you talking about as a firm or as an individual?

Q. Are you generally with KPMG?

A. Yes.

Q. And you also heard of Deloitte?

A. Yes.

Q. And just to complete the circle, are you familiar with Ernst & Young?

A. Yes.

Q. But you haven't had any specific dealings with any of those three accounting firms on behalf of Snow Capital?

A. We have interviewed them, but I don't believe we've ever engaged them.

Q. I believe you said earlier you are not trained as an accountant?

A. Correct.

Q. And you are not a CPA?

A. Correct.

Q. Are you familiar with generally accepted accounting principles?

A. To the extent that a lay person or investment advisor would be, yes.

Q. Are you familiar with generally accepted

SNOW - CONFIDENTIAL

auditing standards?
A. No.
Q. Are you familiar with FASB standards?
A. Some.
Q. Do you have any understanding as to how the FASB standards differ from GAAP principles?
A. No.
Q. Other than relying on the investigation made by your counsel, do you have any personal basis for stating that the accounting practices alleged in this case were improper?
A. Well, I think the fact that it was restated is an admission that there was something materially wrong or there wouldn't have been a restatement.
Q. Nothing else?
A. Not that I can think of right now.
Q. And back to Mr. Yates.
Any discussions that you -- any of the discussions that you had with Mr. Yates that if you agreed to serve as lead counsel in Par Pharmaceuticals or BellSouth and he obtained fees, that he would invest those fees with you?

SNOW - CONFIDENTIAL

A. No.

MS. LUNN: I think that's all that I have, but, again, I'd like to reserve my right to keep the deposition open pending additional document production.

MR. ROTHMAN: I just have a few follow-up questions.

- - - -

EXAMINATION

- - - -

BY MR. ROTHMAN:

Q. How much money does Snow Capital Management have under management?

A. A little over $3.5 billion.

Q. Are you aware that the court was advised in June of '09 that the --

- - - -

(There was a recess in the proceedings.)

- - - -

BY MR. ROTHMAN:

Q. Are you aware that the court was advised in June of 2009 that the information that was contained on your certification was incorrect?

A. Yes.

SNOW - CONFIDENTIAL

Q. Who decides if Mr. Yates gets compensation in this case?

A. The court will ultimately decide.

Q. Do you believe that the market takes into account public information released by the company?

MR. LIMAN: Objection to the form.

A. Can I still answer?

Q. Yes, you can still answer.

A. Yes, the market certainly takes into consideration the public information as it comes out.

Q. Does public information released by a company affect the price of the security?

MR. LIMAN: Objection to the form.

A. Yes. Yes, it would.

Q. If a company releases good news, in your experience, what happens to the price of the stock?

MR. LIMAN: Objection to the form.

A. If the news is good or better than expected, then the stock price will go up.

Q. If the company releases news that's not as good as expected, what happens to the price of

SNOW - CONFIDENTIAL

the stock?

A. Then the stock will go down.

Q. Did the price of IMAX stock react in a way that accounted for the news that was released about IMAX?

MR. LIMAN: Objection to form. Foundation.

A. While the price of stock reacted in a severely negative fashion, I thought that the reaction maybe did not take everything into account, and that's basically why I sold my position.

Q. Do certain traders give more weight to certain information than other traders do?

MR. LIMAN: Objection.

A. Yes. I mean, everybody kind of focuses -- everybody has their own process, if you will, to kind of determine the underlying value of a security.

Q. Earlier, you testified that you do not believe that the market was efficient.

What did you mean by that?

A. I mean, clearly, there are enough studies that the market as a whole is efficient, but in Snow Capital's case, that doesn't mean we

don't think that we have the ability to identify a very, very small subset of securities that will be viewed more or less favorably in the future than other people believe, and my guess is that's the value added of active management.

Q. I want to direct your attention to Exhibit 13 which was the 2004 form 10-K.

A. I have the document.

MR. LIMAN: Can you give us a moment?

Q. Do you have the document in front of you?

A. Yes.

Q. I'm going to direct your attention to page 26 under the heading of Multiple Element Arrangements.

Do you see that?

A. Yes.

Q. The first line says: On occasion, the Company will include film licenses or other specified elements as part of the system sales or lease agreements.

Let me reread that because I got it wrong.

SNOW - CONFIDENTIAL

It says: On occasion, the Company will include film licenses or other specified elements as part of system sales or lease agreements.

Do you see that?

A. Yes.

Q. Do you know what those other specified elements are?

A. Not particularly, no.

Q. Did you, at the time you read this, know specifically what the other specified elements were?

A. Not specifically. I knew there certainly were different aspects to a delivery or an installation.

Q. Did you have any opinion as to whether or not it was appropriate to treat certain of those elements separately?

A. No, I did not.

Q. When you read this, did you assume that the company would be treating those elements properly under the accounting guidelines?

MS. LUNN: Objection.

A. Yes.

SNOW - CONFIDENTIAL

Q. Did you have -- strike that.
Did you have any understanding at the time whether the other specified elements referred to in this first sentence of the Multiple Element Arrangement category on page 26 included the screen?
MR. LIMAN: Objection. Asked and answered.
A. I don't recall.
Q. In response to one of Mr. Liman's questions, you said -- I believe you testified that one of those separate elements actually included the screen.
Do you remember that testimony?
A. Yes. That was an assumption that I would have made, because it doesn't specify here the breakdown of the components.
Q. Do you recall at the time making that assumption about the screen?
A. No, I don't. I don't recollect.
Q. Do you recall making that assumption about any specific element?
A. No, not at that time.
Q. Did you learn later that the company may have

SNOW - CONFIDENTIAL

been accounting separately for the screens?

MR. LIMAN: Objection to the form.

A. Yes, I believe that the confusion or my ability to name components is something that came out of, I believe, the conference call transcript of August 9th of 2006 when there was obviously a very thorough discussion as to the nuts and bolts of how this multiple element accounting arrangement worked specifically.

Q. I just wanted to go over one more area with respect to your search of documents -- search for documents in response to the defendants' document request.

Did you conduct a search for documents?

A. Yes.

Q. Earlier, you testified that you did not search your individual 16 file drawers.

Do you remember that?

A. Yes.

Q. Why didn't you search those file drawers?

A. All of the -- the reason I didn't search all of them is that all of the files pertaining to

SNOW - CONFIDENTIAL

Snow Capital Investment Partners are contained in just five or six file drawers, and I personally retrieved all of the hard copy documents myself.

Q. So did you search those five or six file drawers?

A. Yes, while looking for answers to the request for documents.

MR. ROTHMAN: I have no further questions.

MR. LIMAN: Nothing further from us.

MS. LUNN: Nothing further.

\- - - -

(Thereupon, the deposition was concluded at 3:03 p.m.)

\- - - -

A C K N O W L E D G M E N T

STATE OF )

) ss.:

COUNTY OF )

I, RICHARD SNOW, hereby certify that I have read the transcript of my testimony taken under oath in my deposition; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

______________________________

RICHARD SNOW

Signed and subscribed to before me, this day of , 20__.

____________________________________

Notary Public, State of ____________

COMMONWEALTH OF PENNSYLVANIA) CERTIFICATE
COUNTY OF ALLEGHENY ) SS:

I, JoAnn M. Brown, RMR, CRR, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, do hereby certify that the witness, RICHARD SNOW, was by me first duly sworn to testify to the truth; that the foregoing deposition was taken at the time and place stated herein; and that the said deposition was recorded stenographically by me and then reduced to printing under my direction, and constitutes a true record of the testimony given by said witness.

I further certify that the inspection, reading and signing of said deposition were NOT waived by counsel for the respective parties and by the witness.

I further certify that I am not a relative or employee of any of the parties, or a relative or employee of either counsel, and that I am in no way interested directly or indirectly in this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office this 12th day of May, 2010.

JoAnn Brown

JoAnn M. Brown, RMR, CRR
Notary Public