# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | | Master File |
| IN RE IMAX CORPORATION | ) | No. 1:06:-cv- |
| SECURITIES LITIGATION | ) | 06128-NRB |
| | ) | |
| ------------------------- | ) | |

July 27, 2010
9:37 a.m.

Deposition of LUCY P. ALLEN, held at the offices of Cleary Gottlieb Steen & Hamilton, One Liberty Plaza, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

ROBBINS GELLER RUDMAN & DOWD, LLP
Attorneys for Plaintiffs
58 South Service Road
Suite 200
Melville, New York 11747
BY: ROBERT M. ROTHMAN, ESQ.
MARK S. REICH, ESQ.

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
Attorneys for Defendant IMAX
One Liberty Plaza
New York, New York 10006-1470
BY: LEWIS J. LIMAN, ESQ.
JORGE G. TENREIRO, ESQ.

GIBSON, DUNN & CRUTCHER, LLP
Attorneys for Defendant
PricewaterhouseCoopers
2100 McKinney Avenue
Dallas, Texas 75201-6912
BY: JOHN FRANKLIN GUILD, ESQ.

Allen

it says, Taking down the "for sale" sign is hard on a company's reputation as investors, competitors, and customers all may wonder what's wrong with the business that it cannot find a match.

Do you see that?

A. Yes.

Q. Could concerns by potential suitors that the company was engaged in fraud explain why that company does not find a match?

A. I think if potential acquirers are discovering fraud at a company that could have a negative impact on that acquirer's interest in a company.

I think in this IMAX situation I didn't see any evidence that, as we said, that anything related to the revenue -- the accounting issues regarding revenue recognition were responsible for acquirers not having an interest in the company.

Q. When buyers decide not to acquire a company after reviewing due diligence, do you believe that sends a message to the market?

A. Again, that's a general question. I think I've just reported a couple instances here

Allen

that discussions that -- that for a company to publicly announce that they are looking for a suitor and then for that to fall through is considered bad news and worse than if it had never happened to begin with.

So in the IMAX situation prior to the company announcing that they were publicly announcing that they were pursuing strategic alternatives, the market already believed that IMAX was looking for some kind of a suitor.

And when the company announced in March of '06 that they were -- publicly announced they were pursuing strategic alternatives, a number of the analysts said a potential negative risk in the future is that this doesn't work out and after this very public announcement that this is what they're trying to do, that would be very bad news.

And that's consistent with these quotes from the Wall Street Journal and the National Post.

Q. Do you believe that IMAX's announcement of the informal SEC inquiry on August 9th, 2006, caused at least a portion of the company's stock price decline on August 10th, 2006?

Allen

A. Can you ask me that again.

Q. Do you believe that IMAX's announcement of the informal SEC inquiry on August 9th, 2006, caused at least a portion of the company's stock price decline on August 10th, 2006?

A. I think that the -- as I stated and as I say in my report, the commentary is that the SEC inquiry had a cloud, a negative impact, for the risk of something bad being uncovered. And I think that cloud continues to overhang, you know, and that's what the market commentary is as the SEC investigation is still ongoing.

So I think the announcement of an SEC inquiry was not a -- was not positive and is a negative piece of news and continues to be a negative.

Q. Do you believe that the announcement of the SEC inquiry caused a portion of the company's stock price to decline on August 10th, 2006?

A. I don't know if it caused a material portion of the stock decline, so I haven't segmented or parsed the pieces of the decline. I don't think it's -- I don't think it was positive. I think it was a negative piece of news. Whether

Allen

that had a material impact relative to the other negative news that's being announced, I have not done an analysis of that.

Q. Do you think that it was responsible for a portion of the stock price decline on August 10th, 2006?

MR. LIMAN: Objection, asked and answered.

A. Yeah, that's the question I just meant to answer. So in order to do that -- so you asked me earlier, you know, on -- based on the August announcement did I have an idea that the news that was announced in August contributed to the price decline.

Yeah, I didn't need to do a statistical analysis to say that, you know, here's a whole bunch of bad news that's being announced and there's a really big drop. So I can confidently say that that entire drop was not due to market and industry, that the news that was announced in that time period was negative and causing some stock price decline.

But whether the announcement of the SEC inquiry alone had a material impact or a material

Allen

portion of that price decline is not an analysis that I've done.

Q. Do you know whether the announcement of the SEC inquiry had any portion -- responsible for any portion of the stock price decline?

A. Well, that's what we mean by like a material amount. If you can't tell that it's different from zero, then you can't say for sure that it had any portion. So from a sort of statistical standpoint what it means to say I'm confident it had a portion is that I can tell it's different from zero. Zero would be no portion; right? And I haven't done an analysis to say whether I could reliably say it was different from zero.

I don't think it's positive, and I know it's described by the commentary as negative and continuing to have a negative impact on the stock price. Whether that's material or whether it's in -- it's materially different from zero I couldn't tell you as I sit here. I have not done that analysis.

Q. Do you believe that it's nonzero?

A. I'm just saying I don't know. I think

Allen

A. My attention's on the brownie right now. Okay. Yeah.

Q. I'm not on the right page. Sorry, directing your attention to page 43 of Professors James' expert report. I guess we have to go back to put some context in this.

In Section 3 on page 43, Professor James discusses management's decision to focus on the conversion to digital technology.

Do you see that?

A. Yes.

Q. And in paragraph 114 he discusses negative short-term ramifications for the transition on IMAX's stock price.

Do you see that?

A. Yes.

Q. Do you attribute any portion of the August 10th stock price decline to management's decision to focus on the conversion to digital technology, in your report?

A. You know, I don't think I specifically mention the conversion to digital technology. I talk about a change in strategic direction, which includes the increased emphasis on joint ventures.

Allen

That change in strategic direction is also described as an increased focus on digital technology.

So I think the -- some of the quotes and discussion that are in my report are referring not only to the joint venture but also to the focus on digital.

So I think Professor James has separated those two things distinctly, and I think they're somewhat combined in the commentary from analysts in the market. And I haven't explicitly listed the new focus on digital.

Q. In paragraph 139 of Professors James' report on page 51 --

A. Yeah.

Q. -- the last sentence says, It is difficult if not impossible to parse out the impact of the SEC inquiry announcement from the overall stock price decline on August 10th, 2006.

Do you see that?

A. I see that.

Q. Do you believe that it's impossible to parse out what caused the stock price decline on August 10th, 2006?

Allen

A. I think it's possible to -- in general I think it's possible to parse stock price declines.

Q. Do you think it's possible to parse out the impact of the SEC inquiry?

A. I haven't tried to do this -- I haven't tried to do this, but I wouldn't say something is impossible without myself -- and I'm not saying that's what Professor James did either. He may have spent more time trying to decide. And I don't think he said it isn't possible; I think he says it's difficult if not impossible.

I haven't made an attempt to do that.

(Allen Exhibit 9, press release dated 7/20/07, marked for identification.)

MR. ROTHMAN: For the record, I've just shown the witness what's been marked as Exhibit 9. It's a press release entitled "IMAX Corporation Reports 2006 and First Quarter 2007 Financial Results," and it's dated July 20th, 2007.

(Pause.)

Q. Have you had a chance to review the press release?

Allen

A. Just now? I haven't. It's very lengthy.

Q. Do you know what period of time the restatement covered?

A. No, I think that's in my report. I believe it should say it in here, though; right?

Q. Maybe in the first bullet point.

A. Yeah, for reporting periods covering 2002 through 2005. Well, and will file. Yeah, I think the restatement covers, though, parts of 2006, three quarters of 2006, I think.

Q. Was the restatement curative of prior revenue-recognition issues at the company?

MR. LIMAN: Objection to the form.

A. Yeah, I'm not understanding that. I mean...

Q. Did the restatement correct prior revenue -- strike that.

Did the restatement correct previously incorrectly reported revenues at the company?

A. According to the company, it restated revenue that they had decided -- they were treating it as an error in -- at the time of this press release. At the time of the restatement,

Allen

they're treating -- I believe they're saying the prior revenue numbers were in error, or an error.

Q. Following the release of the July 20th, 2007, press release, do you know what happened to the price of IMAX stock?

A. I think I have that in my report, so I believe it goes up. Increase from $4.40 to $4.85.

Q. Was that stock price increase a reversal of a prior stock price decline?

A. I don't know how to answer that. What does that mean?

Q. Did that stock price increase reverse a decline that had previously been -- that the decline in the stock price had previously been experienced by the company?

MR. LIMAN: Objection to the form.

A. I haven't analyzed what portion of that stock price increase is, you know, company specific or market or industry or -- I haven't done that kind of analysis.

Q. Going back to Exhibit 1, which is --

A. Although I would note that plaintiffs' expert, Marek, has done an analysis of stock price movements.

Allen

Q. And you reviewed Mr. Marek's report?

A. I did look at his report.

Q. Based on that report, do you believe that the stock price increase on July 20th, 2007, was a reversal of any prior stock price decline?

A. I couldn't say. I have not analyzed that.

Q. Go back to your report, which we've marked as Exhibit 1. On the first page of your report, you discussed that you were asked to use public data on institutional trading of IMAX to examine two periods during the class period. Do you see that?

A. Yes.

Q. Were you asked to use public data?

A. As opposed to private data or...

Q. Who instructed you to use public data?

A. Are you saying rather than trying to get private data? I'm just not understanding.

Q. I'm saying as part of your assignment did someone come to you and say, I want you to use public data to analyze the two periods.

A. We had a discussion about what the assignment was about. So in my first report we

Allen

used a model of share turnover to analyze shares purchased at one point and held through another point, which included nonpublic information.

So this analysis is just based on public information.

Q. When you say you used nonpublic information, was that NERA's multisector-multitrader model?

A. Yes. So part of that information goes into NERA's multisector-multitrader model.

Q. Why did you not use NERA's multisector-multitrader model in connection with this expert report?

A. So in this one we were asked to use what is more transparent and replicable, which is use public information that's available that any other expert can also use rather than our own proprietary information and model.

Q. Does your proprietary information or model provide a more complete picture of the trading of IMAX stock than just using public data alone?

A. It includes an analysis of noninstitutional trading. It is less transparent.

Allen

So this is a more transparent and easily replicated analysis.

Q. Which is more complete?

A. I don't know what you mean by "complete." Certainly the answer to the question of what's happening with the institutions, and this is -- this answers that question. The other answer is a question about all of the shares.

One way of doing it uses information that is proprietary, whereas -- and not as easily replicated. So NERA has a model. Other people have other ways of --

(Recess taken from 4:05 to 4:11.)

(Record read.)

A. Other people have other ways of estimating share turnover that are not institutional shares, so noninstitutional share trading. Most other analysts would use -- would come up with exactly the same results that we have for the institutional trading and would come up with different results for the combination of institutions and noninstitutions.

Q. Did you make any attempt to examine the trading of noninstitutions in the two periods that

Allen

are set forth on page 1 of the expert report?

A. Not for this record, no.

Q. You say you used the public data. Was that public data obtained from Thomson Financial Share World?

A. Yes.

Q. How was is the data compiled in Thomson Financial Share World?

A. It's compiled from the 13Fs. So we also looked at the 13Fs themselves to ensure that the Thomson data was consistent with the 13Fs.

Q. Did you use any of IMAX internal nonpublic data in trying to analyze the trading in the two periods set forth on page 1 of your expert report?

A. No.

Q. Did you use any data obtained from IMAX's transfer agent in trying to analyze the trading set forth in the two -- strike that.

Did you use any data obtained from IMAX's transfer agent in trying to analyze the trading during the two periods set forth on page 1 of your report?

A. No, I don't believe so.

Allen

Q. Would the company's transfer agent have information concerning the trading that occurred in the two periods set forth on page 1 of your report?

A. They would have some information -- the transfer agent would have some information. It's hard to use that information without the shares that are held -- the transfer agent -- there are shares that are held in street name, and there are shares that are not held in street name. Without having some information about both, it's hard to have just one end of that.

Q. Could you have used both the public data and information contained in NERA's multisector-multitrader model when you analyzed the trading in the two periods set forth on page 1 of your report?

A. Yes, that's possible to do.

Q. Why didn't you do that?

A. One, because we weren't asked; and two, I think just for the reasons I described before, that this analysis is very straightforward and replicable. The other analysis is not as replicable.

Allen

Q. Who chose the two periods set forth on page 1 of your report?

A. Counsel.

Q. Other than what you did in connection with your earlier expert report that we marked as Exhibit 2, did you analyze any other time periods?

A. Well, not in this period one and period two. We did look at -- so we're looking at how many periods were -- how many shares were purchased during this -- each of these two periods and held through a different period. So we did look at a couple alternatives of those other periods, the hold-through period.

Q. Are those results set forth in your report?

A. So some of those results are set forth in my report. We did an additional -- you see in my report we looked at shares that were purchased in period one --

Q. I'm sorry, just for the record --

A. I'm on page 32. If you look at the table on page 32, we looked at shares purchased in period one and held through third quarter '06, as well as shares that were purchased in period two

Allen

and held through third quarter '06.

And then you'll see in the paragraph right below that table we also have a calculation here about the percent of shares that were purchased in period 1 and retained through the third quarter of 2007, the 4.5 percent.

So we did an additional calculation, which is that same number but purchased in period two, the complement number. And we also did these numbers you see in the table. Instead of being retained through 3Q '06, we saw what the numbers would be if you retained through 2Q '06.

Q. And this analysis focuses solely on institutional investors?

A. That's right.

Q. What's an institutional investor?

A. Well, so as it's defined, these are the institutions that have to -- are required to file 13F forms with the SEC. So their companies that manage over 100 million in assets, and I think there may be a couple other specifics to what makes a company have to file a 13F.

Q. Were you asked to note the number of shares purchased by noninstitutional investors?

Allen

A. We don't know the number of shares purchased by noninstitutional investors. So what we have are net -- what we basically have, the public data are the quarterly holdings, so the holdings of the institutions at the end of the quarter.

So you can determine that institution's net purchases or sales over the quarter by comparing their holding from one quarter to their holdings in another quarter. But you don't really know -- then we have the volume that trades on every day.

But from those pieces you can't say how many shares were purchased by noninstitutions without additional information.

Q. Could you have estimated the number of shares purchased by noninstitutions in those periods?

A. Well, that's what our multisector-multitrader model does; right? So our multisector-multitrader model takes this public data and then takes other information and puts it into the model and can give those estimates.

Q. Did you perform the analysis of these

Allen

two periods using the multisector-multitrader model?

A. Not these exact periods. The reasons we're using periods here that end at quarter-end dates is because that's when the publicly available information -- those are the dates on which you have publicly available information.

What's probably -- you know, these quarter-end dates may not be the most relevant dates. So in my -- you may be more interested in a date within a quarter. And so my report in the prior case had dates within a sector, because the multisector-multitrader model were modeling what happens on every single day.

So it doesn't -- there's no particular reason to stick to the end of a quarter.

Q. And this report doesn't tell you the number of shares traded on any specific day?

A. No, it does not -- oh, the number of shares traded? The volume that trades on a day, sure, that's publicly available. You don't know how many of the shares that trade on a given day are purchased by, you know, the -- you don't know what extent the same investor and you don't know

Allen

what extent someone is buying and selling and buying and selling; right?

Q. So does your analysis tell you anything about the trading in these periods on any specific day?

A. Well, the trading on a specific day would be the volume that trades on that day, which is -- which is shown in some of my charts. The total volume that trades on a given day is shown on -- I think I have a couple of charts that show that on page 5. That shows the daily trading volume.

Q. In your analysis were you able to determine whether or not any particular -- strike that.

In your analysis were you able to determine whether institutions sold their stock on August 9th as opposed to August 10th, 2006?

A. So for this report we didn't -- we didn't do that. We looked at shares held by institutions according to their 13F filings. We didn't do an estimation on modeling the daily trades. In using the multisector-multitrader analysis, which is what I did on the first report,

Allen

we're modeling the trading every day.

Q. So in the report that you submitted in connection with Snow Capital's motion, are you able to determine whether an institution sold its shares on August 8th as opposed to August 11th, 2006?

A. We're not able to determine that. We're not able to determine that. We're able to -- we can estimate that using a model. I did not estimate the daily turnover using the model for this report. I only looked at the actual holdings, the reported holdings by institutions.

So all I've done here is say if a given institution held, you know, 100 shares at the end of the first quarter and they held 200 shares at the end of the second quarter, I know they bought 100 shares over the quarter. That's all I'm doing.

The other -- in the other report, I'm doing a model saying, okay, I know they bought 100 shares over the quarter, and I'm going to try to model on which day they bought those shares.

Q. Can you tell on what date they sold the shares in this report?

Allen

A. So it's similar. If an institution had 200 shares at the end of one quarter and 100 shares at the end of the next quarter, we can conclude that they sold 100 shares during the quarter.

And that's what we're doing here. We're just merely making those kind of deductions. We're looking at the end-of-quarter holdings and saying that the difference -- if it goes up, they must have bought shares; if it goes down, they must have sold shares. And that's the number they must have on that -- bought or sold during the quarter. That's all there is to it.

Q. You cannot conclude when during a quarter something was purchased or sold; correct?

A. That's correct. The public data does not allow you to determine specifically which day they bought or sold.

Q. Are the trading patterns of institutional investors the same as noninstitutional investors?

A. Generally, no, I would say they're not the same.

Q. How do they differ?

Allen

A. I think that can depend. So in our multisector-multitrader model we're actually modeling some differences.

Q. This analysis doesn't take into account any of those differences?

A. This analysis doesn't look at the noninstitutional trading at all. It's an analysis of the institutions which hold the majority of shares of IMAX during the alleged class period.

Q. In your analysis you calculated the shares held by institutional shareholders using LIFO; is that correct?

A. That's correct.

Q. Did you also calculate the holdings using FIFO?

A. No.

Q. Why not? Why didn't you calculate the holdings of institutional investors using FIFO?

A. LIFO is the method that the courts have tended to adopt, and my experience of reasoned cases is that the courts have said that LIFO is the more appropriate method.

Q. Other than your understanding of what the courts may have said, do you have any

Allen

theoretical or financial basis for using LIFO instead of FIFO?

A. No.

Q. Do you know what allocation method the specific institutions use regarding their IMAX shares during the class period?

A. Allocation method for what?

Q. Allocation method for examining their basis in --

A. Their tax basis?

Q. Yes.

A. I don't know, but I don't see what the relevance of that would be.

Q. If the approved allocation of damages in this case during the claims process was FIFO, would your analysis be wrong?

A. It wouldn't make my analysis wrong.

MR. LIMAN: Objection to form.

A. My analysis is using LIFO these are what these numbers are. The FIFO numbers would be different. It wouldn't make my analysis wrong.

Q. Would your analysis be relevant if the court decided to use FIFO in the claims process for allocating damages?