UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------X



In re IMAX SECURITIES LITIGATION

**MEMORANDUM AND ORDER**


----------------------------------X          06 Civ. 6128 (NRB)

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**


    This is a securities fraud class action under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, brought on behalf of all persons who purchased or acquired common stock in IMAX Corporation ("IMAX" or "the Company") on the NASDAQ between February 27, 2003 and July 27, 2007 ("the Class Period").[1]

---

[1] In its motion for class certification, filed on April 22, 2010, Lead Plaintiff Snow Capital Investment Partners, L.P. ("Snow Capital" or "Lead Plaintiff") proposed a Class that included all those who acquired IMAX stock during the proposed Class Period (i.e., not just those who acquired IMAX stock on the NASDAQ). See Memorandum of Law in Support of Plaintiff's Motion for Class Certification ("Pl. Mem.") at 1 n.1. On June 24, 2010, the U.S. Supreme Court decided Morrison v. National Australia Bank Ltd., 130 S. Ct. 2869 (2010), adopting a "transactional" test for determining whether a plaintiff has a claim under § 10(b).

Plaintiffs allege that the defendants, IMAX, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble (collectively, the "IMAX defendants"), and PricewaterhouseCoopers LLP ("PWC") (collectively, the "defendants"), issued materially false and misleading statements concerning IMAX's accounting of theater system revenue. On September 16, 2008, we denied defendants' motions to dismiss plaintiffs' Consolidated Class Action Complaint ("Complaint"). In re IMAX Sec. Litig., 587 F.Supp.2d 471 (S.D.N.Y. 2008). Familiarity with that opinion is assumed.

By Memorandum and Order dated June 29, 2009, we appointed Snow Capital lead plaintiff in this class action.[2] Snow Capital

---

Under Morrison, the relevant question is "whether the purchase or sale [of the security] is made in the United States, or involves a security listed on a domestic exchange . . . ." Id. at 2886. In light of Morrison, Snow submitted a revised definition of the proposed Class that only includes those who purchased IMAX shares on the NASDAQ, and thus excludes those who purchased IMAX securities on the Toronto Stock Exchange. Reply Memorandum of Law in Further Support of Plaintiff's Motion for Class Certification ("Pl. Reply Mem.") at 1 n.3.

[2] Snow Capital is the second lead plaintiff in this case. After we originally appointed Westchester Capital Management, Inc. ("Westchester Capital") lead plaintiff on January 17, 2007, the Second Circuit decided W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008), holding that an investment advisor lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact. Relying on Huff, Snow Capital moved for reconsideration of our Order appointing Westchester Capital lead plaintiff. On June 29, 2009, we granted Snow Capital's motion for reconsideration, appointed it lead plaintiff, and designated

2

now moves for an order (1) certifying this action as a class action on behalf of those who acquired the common stock of IMAX on the NASDAQ during the Class Period, (2) certifying it as Class Representative, and (3) appointing Robbins Geller as class counsel.[3]   For the following reasons, Snow Capital's motion is DENIED.

## BACKGROUND

IMAX is an entertainment technology company specializing in digital and film-based motion picture technologies and large-format film presentations.[4]   The Company's main business is the design, manufacture, sale and lease of theater systems.[5]   As of December 31, 2006, the IMAX theater network included 284 theaters operating in 40 countries.[6]

The majority of IMAX's revenue during the class period was derived from the sale and lease of theater systems to third-party owners of large-format theaters.[7]   Throughout the class

---

Robbins Geller Rudman & Dowd LLP ("Robbins Geller") lead counsel. In re IMAX Sec. Litig., 2009 WL 1905033 (S.D.N.Y. June 29, 2009).   Snow Capital then filed the present motion for class certification.
[3] Robbins Geller was previously known as Coughlin Stoia Geller Rudman & Robbins LLP. The firm's name change was effective March 31, 2010. See Pl. Mem. at 11 n. 10.
[4] Affidavit of Edward Macneil ("Macneil Aff."), ¶ 6.
[5] Id.
[6] Id.
[7] See Compl. ¶ 62.

period, IMAX reported upward-trending financial results: 16 theater system installations ("installs") and $71 million revenue for fiscal year 2002; 21 installs and $75.8 million revenue for 2003; 22 installs and $86.6 million revenue for 2004; and 39 installs and $99.7 million revenue for 2005.[8]

On February 17, 2006, IMAX issued a press release announcing its 2005 financials and reporting that the Company had completed 14 theater system installations during the fourth quarter of 2005.[9] On March 9, 2006, IMAX filed its Form 10-K for fiscal year 2005 ("2005 10-K"), describing a "record" 14 theater system installations and $35.1 million revenue in the fourth quarter.[10]

Five months later, on August 9, 2006, IMAX announced that it was responding to an informal inquiry from the Securities and Exchange Commission ("SEC") concerning the timing of revenue recognition and, specifically, its application of multiple element arrangement ("MEA") accounting derived from theater system sales and leases.[11] The August 9th press release included the following information concerning the SEC investigation and the Company's accounting of theater revenue:

---

[8] Id. ¶¶ 71, 79, 87, 107.
[9] Id. ¶ 100.
[10] Id. ¶¶ 102, 107.
[11] Id. ¶¶ 115-16.

The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting to its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.[12]

In addition to disclosing the SEC investigation, the August 9th announcement stated that the Company's discussions with

---

[12] Id. ¶ 115; Declaration of James D. Matthews in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class Certification ("Matthews Decl."), Ex. F.

potential buyers and strategic partners had faltered.[13]   The following day, the price of IMAX shares fell from $9.63 to $5.73.[14]

On March 29, 2007, IMAX announced that, based on comments it had received from the SEC and the Ontario Securities Commission, it was expanding its review, "primarily in connection with its revenue recognition for certain theater system installations in previous periods, including the fourth quarter of 2005."[15]   Because of this "expanded review," IMAX stated that it "may determine that it is necessary to restate additional items beyond the previously identified errors."[16]

Four months later, on July 20, 2007, IMAX filed its Form 10-K for fiscal year 2006 ("2006 10-K"), which included a restatement of its financial results for fiscal years 2002 through the first three quarters of 2006.   The 2006 10-K stated:

> [T]he Company revised its policy to require that (i)
> the projector, sound system and screen system be
> installed and are in fully working condition, the 3D
> glasses cleaning machine, if applicable, be delivered
> and projectionist training be completed, and (ii)
> written customer acceptance thereon received, or the

---

[13] Matthews Decl., Ex. F.
[14] Id. ¶¶ 115, 119.
[15] Id. ¶ 127.
[16] Id.

public opening of the theater take place, before
revenue can be recognized.[17]

The press release announcing the restatement also described the

Company's previous method of revenue accounting:

> Under the former method for recording revenues under
> multiple element arrangement accounting, as reflected
> in the Company's 2005 10-K, the Company recognized
> revenue when the projector and sound system were
> installed and deferred revenue recognition of
> components deemed to be separate deliverables until
> their subsequent installation, such as the screen. . .
> . After extensive review and consideration, the
> Company determined that the screen, 3-D glasses
> cleaning machine and initial services including
> projectionist training should be considered one single
> deliverable. In addition, the Company will now
> require receipt of a signed acceptance from each
> client before recognizing revenue upon the opening of
> the theatre.[18]

As a result of the restatement of theater system revenue, 16

installation transactions representing $25.4 million in revenue

shifted between quarters in their originally reported years, and

14 installation transactions representing $27.1 million in

revenue shifted between fiscal years.[19]  Of the 14 transactions

for which revenue shifted between fiscal years, one was

originally recorded as revenue in fiscal year 2002, two were

---

[17] _Id._ ¶ 145.
[18] _Id._ ¶ 139.
[19] _Id._

recorded in fiscal year 2004, ten in fiscal year 2005, and one in fiscal year 2006.[20]

The essence of plaintiffs' Complaint is that, throughout the class period, the IMAX defendants issued materially false and misleading statements concerning IMAX's accounting of theater system revenue:

> Throughout the Class Period, IMAX publicly stated that revenue from theater systems sales and sales-type leases was recognized upon installation of the theater system. However, as the Company was ultimately forced to disclose, this was not the case . . . . In order to meets its earnings targets, IMAX improperly accelerated its revenue recognition on theater systems and concomitantly, reported earnings thereon, when only certain elements of its systems were installed . . . . This piecemeal revenue recognition violated GAAP . . . .[21]

With regard to PWC, the Complaint alleges that PWC's audit opinions, issued in connection with IMAX's 10-Ks for 2002 through 2005 were materially misleading[22], and that:

> Because PWC failed to conduct an audit in accordance with [Generally Accepted Auditing Standards ("GAAS")] and [Public Company Accounting Oversight Board ("PCAOB")] standards, and issued clean opinions on IMAX's 2002-2005 financial statements, it is also responsible for the material misinformation disseminated to the investing public during the Class Period.[23]

---

[20] 2006 10-K at 91.
[21] Compl. ¶ 40.
[22] _Id._ ¶ 124.
[23] _Id._ ¶ 149.

**Relevant Accounting Principles and IMAX's Theater System Accounting Policy**

IMAX's publicly stated revenue recognition policy evolved significantly since 1999.  To some extent, the changes in IMAX's policy reflected changes in the relevant accounting standards governing revenue recognition.[24]

### 1. Pre-2000

Before January 1, 2000, IMAX recognized theater system revenue "on the completed contract method (that is, upon delivery of the system)."[25]

### 2. Fiscal Years 2000-2003

From fiscal year 2000 through 2003, IMAX stated that revenue would be recognized "at the time of the theater installation."[26]  This revenue recognition policy was in response to the SEC Staff Accounting Bulletin No. 101 ("SAB 101"), which stated that revenue should not be recognized until it is

---

[24] For a more detailed summary of the evolution of IMAX's theater system accounting policy, as well as a discussion of the relevant accounting principles, see In re IMAX Sec. Litig., 587 F. Supp. 2d at 475-78.

[25] Compl. ¶ 41.

[26] Id. ¶¶ 42-44; see also IMAX 10-K405 for fiscal year ending December 31, 2000, filed April 2, 2001 ("2000 10-K") at 15, 30, 31; IMAX 10-K405 for fiscal year ending December 31, 2001, filed March 25, 2002 ("2001 10-K") at 17, 36, 58; IMAX 10-K/A for fiscal year ending December 31, 2002, filed February 27, 2004 ("2002 10-K") at 21, 44; IMAX 10-K/A for fiscal year ending December 31, 2003, filed September 13, 2004 ("2003 10-K") at 20, 24, 50.

"realized or realizable and earned," which generally occurs
when: (1) persuasive evidence of an agreement exists, (2)
delivery has occurred or services have been rendered, (3) the
seller's price to the buyer is fixed or determinable, and (4)
collectability is reasonably assured.[27]  As we previously noted,
"although SAB 101 provided specific criteria for *when* revenue
may be recognized, it did not directly address the precedent
question of *what* is the unit of accounting – a complicated issue
in arrangements involving multiple elements."[28]

### 3. Fiscal Year 2004

In its Form 10-K for fiscal year 2004, filed March 11,
2005, IMAX disclosed that "[t]he Company recognizes revenues
from sales and sales-type leases generally upon installation of
the theater-system."[29]  In a section titled "Multiple Element
Arrangements," IMAX stated that "[o]n occasion, the Company will
include film licenses or other specified elements as part of
system sales or lease agreements . . . . Revenues under these

---

[27] See Macneill Aff., Ex. A, at 3.  In addition to SAB 101,
Statement of Financial Accounting Concepts No. 5 ("FASCON 5")
provides that revenue "recognition involves consideration of two
factors (a) being realized or realizable and (b) being earned
.... [R]evenues are considered to have been earned when the
entity has substantially accomplished what it must do to be
entitled to the benefits represented by the revenues." Compl. ¶
45.
[28] In re IMAX Sec. Litig., 587 F.Supp.2d at 476.
[29] 2004 10-K at 25.

arrangements are allocated based upon the estimated relative fair values of each element."[30]

IMAX's accounting policy for fiscal year 2004 in part reflected new guidance on revenue recognition from the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB"). In May 2003, the EITF issued EITF 00-21, which states that "[i]n an arrangement with multiple deliverables, the delivered item(s) should be considered a separate unit of accounting if all of the following criteria are met:

> (a) The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s);
>
> (b) There is objective and reliable evidence of the fair value of the undelivered item(s);
>
> (c) If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.[31]

While EITF 00-21 addressed the question of *what* should constitute a separate unit of accounting, it explicitly did not

---

[30] Compl. ¶ 51.
[31] See Macneill Aff., Ex. B, at 7.

address the determination of *when* the criteria for revenue recognition are met -- the question considered in SAB 101.[32]

## 4. Fiscal Year 2005

IMAX disclosed a more expansive application of multiple element accounting in its 2005 Form 10-K, filed on March 9, 2006. As stated in the Form 10-K, the Company recognized revenue "when the installation of the respective theater system element [was] substantially complete."[33] The 2005 Form 10-K further stated:

> The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.[34]

As we previously observed, "IMAX's stated understanding of the relevant unit of accounting appears to have drifted over time, from an initial focus on 'theater systems' in 2000, 2001, 2002,

---

[32]See Id., Ex. B, at 2. (EITF 00-21 "does not address when the criteria for revenue recognition are met.").
[33] 2005 10-K at 34.
[34] Id. at 34, 64.

2003, and 2004, to 'theater system elements' in 2005." In re IMAX Sec. Litig., 587 F.Supp.2d at 478.

## DISCUSSION

### I. Legal Standards

In order to qualify for certification as a class action, a proposed class must meet the requirements of Federal Rule of Civil Procedure 23(a) -- numerosity, commonality, typicality, and adequacy -- and one of the subsections of Rule 23(b). See In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 478 (2d Cir. 2008). A district court can only certify a class action if, "after a rigorous analysis," it is satisfied that the Rule 23 requirements have been met. In re Initial Pub. Offerings Sec. Litig., ("In re IPO"), 471 F.3d 24, 33 (2d Cir. 2006) (internal quotation marks omitted). The court's obligation to conduct a rigorous analysis of whether the Rule 23 requirements have been met "is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." Id. at 41. "In re IPO makes clear that courts may resolve contested factual issues where necessary to decide on class certification." McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 228 (2d Cir. 2008) (quotation and citation omitted).

13

Snow Capital brings this motion for class certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements. <u>Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.</u>, 546 F.3d 196, 201-02 (2d Cir. 2008).

## II. Analysis

### a. Rule 23(a) Requirements

#### 1. Numerosity

In order to meet Rule 23(a)(1)'s numerosity requirement, a plaintiff must establish that the proposed "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible - only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." <u>Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC</u>, 504 F.3d 229, 244-45 (2d Cir. 2007). "In securities fraud class actions relating to publicly owned and nationally

14

listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period."  In re Vivendi Universal, S.A. Sec. Litig., 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (internal quotations and citation omitted).  Numerosity is presumed when a class consists of forty members or more.  Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).

Given that the proposed Class amply exceeds forty members, IMAX had at least 40 million shares outstanding and traded on the NASDAQ during the proposed Class Period, hundreds of millions of IMAX shares were traded on the NASDAQ during the proposed Class Period, and defendants have not challenged numerosity, it is clear that the proposed class satisfies Rule 23(a)(1)'s numerosity requirement.[35]

### 2. Commonality

Rule 23 (a)(2) requires that a plaintiff establish that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The "commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."  Cent. States Se. & Sw. Areas Health & Welfare Fund, 504 F.3d at 245.  It "tend[s] to merge" with the Rule 23(a)(3)

---

[35] See Pl. Mem. at 5-6.

requirement of typicality, discussed below, because "both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." <u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 158 n.13 (1982).

Snow Capital asserts that there are a number of common questions of law and of fact, including, but not limited to whether defendants' statements issued during the Class Period were materially false and misleading when issued, whether IMAX's financial statements failed to comply with GAAP during the Class Period, and whether PWC's audits of IMAX's financial statements during the Class Period were conducted in accordance with GAAS.[36] While defendants do not appear to challenge the commonality requirement in their papers, a number of their arguments concerning typicality, addressed below, also touch upon commonality. However, in light of the multiple common questions of law and of fact, and the fact that defendants have not challenged the commonality requirement, we find that Rule 23(a)(2)'s commonality requirement has been satisfied.

### 3. Typicality

---

[36] <u>See</u> Pl. Mem. at 7-8.

In order to be named Class Representative, Snow Capital must show, by a preponderance of the evidence, that its claims are typical of the claims of the class, and that it is "not subject to any unique defenses which threaten to become the focus of the litigation."  In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40 (2d Cir. 2009) (internal quotation omitted).

In In re Flag Telecom Holdings, 574 F.3d at 37-41, the Second Circuit considered whether an "in-and-out" trader, who sold his stock prior to an alleged corrective disclosure, could be named a class representative.  Rejecting the district court's finding that it was "conceivable" that the in-and-out trader could prove loss causation, the Second Circuit stated that "the district court's 'conceivable' standard of proof does not satisfy the preponderance of the evidence standard set forth in In re IPO and its progeny."  Id. at 38.  The Court stated that whether or not the proposed class representative could show loss causation was "relevant to Rule 23(a)" because the district court "was required to find by a preponderance of the evidence that [the proposed class representative] is both an adequate and typical representative of the class and not subject to any unique defenses which threaten to become the focus of the litigation."  Id. at 39-40 (internal quotation omitted).

17

Defendants argue that Snow Capital cannot satisfy Rule 23(a)(3)'s typicality requirement because, amongst other reasons, it cannot establish loss causation.[37]  While defendants present some of their loss causation arguments in the context of Rule 23(a)'s typicality requirement, and others in the context of Article III standing[38], we need not necessarily find that Snow Capital lacks standing to bring a claim in its individual capacity in order for it to be an atypical lead plaintiff. Rather, a plaintiff fails to meet Rule 23(a)'s typicality requirement if its claims are "subject to unique defenses which threaten to become the focus of the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000).  However, "[i]t is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class.").  In re Merrill Lynch & Co. Research Reports Secs. Litig., 272 F.Supp.2d 243, 255 (S.D.N.Y. 2003) Furthermore, "[a] plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by

---

[37] IMAX Mem. at 17-18.

[38] Id. at 7 (arguing that Snow Capital sold prior to a potential curative disclosure and thus lacks standing); id. at 17-18 (arguing that Snow Capital cannot show loss causation and thus is "not a typical investor").

him." Ramos v. Patrician Equities Corp., 765 F.Supp. 1196, 1199 (S.D.N.Y. 1991). For the reasons discussed below, we find that, at a minimum, Snow Capital is subject to unique defenses and thus cannot satisfy Rule 23(a)'s typicality requirement.

In order to plead a violation of §10(b) of the Securities Exchange Act, a plaintiff must allege (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341 (2005).

Under the Private Securities Litigation Reform Act, plaintiffs have "the burden of proving" that the defendant's misrepresentations "caused the loss" for which they seek recovery. 15 U.S.C. §§ 78u-4(b(4). "[T]o establish loss causation, 'a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 173 (2d Cir. 2005)(quoting Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001). The loss causation element of a securities fraud claim is sufficiently pleaded when

the complaint provides "notice of what the relevant economic loss might be" and "what the causal connection might be between that loss" and the alleged misrepresentations.  See Dura, 544 U.S. at 346-47; see also In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 478 n.1 (2d Cir. 2008) (loss causation is "a causal connection between the material misrepresentation and the loss"); Lentell, 396 F.3d at 172 (2d Cir. 2005)(describing loss causation as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff") (internal citation omitted).   Thus, the complaint must allege that the "market reacted negatively to a corrective begin[ning] to leak out." Dura, 544 U.S. at 342.

While we previously held that the Complaint adequately pleads loss causation for a putative class of plaintiffs, In re IMAX Sec. Litig., 587 F.Supp.2d at 485-86, we were not presented with the question, and thus did not address, whether Snow Capital can adequately plead loss causation in its individual capacity.  Defendants argue that Snow Capital cannot show loss causation because

> [Snow Capital] purchased IMAX stock on three dates, each prior to the close of IMAX's fourth quarter of 2005: December 14, 2004 (40,000 shares), October 3, 2005 (35,000), and November 3, 2005 (75,000); and only sold on two dates: February 7, 2005 (10,000) and August 10, 2006 (150,000 and extinguishing its IMAX position). The Complaint seeks damages based on IMAX's

stock price drop following alleged corrective disclosures beginning in August 2006 and continuing until July 2007. However, IMAX's August 9, 2006 disclosure only related to theater systems recognized in or after the fourth quarter of 2005, and thus cannot have been a corrective disclosure for Snow, who purchased all of its IMAX stock before IMAX's financials for the fourth quarter of 2005 were released on February 17, 2006. Moreover, Snow sold its entire remaining interest in IMAX on August 10, 2006 – before any statements alleged to be curative in the Complaint were made regarding the alleged misrepresentations upon which Snow could have relied for its purchase of IMAX stock. Thus, Snow cannot establish loss causation.[39]

It must be recognized that defendants' argument is grounded on the proposition that IMAX's August 9, 2006 disclosure only related to theater systems recognized in or after the fourth quarter of 2005, and thus cannot be a corrective disclosure for Snow Capital. Therefore, we turn to the issue of the scope of the August 9, 2006 disclosure.

## August 9, 2006 Disclosure

The August 9th disclosure of the SEC investigation addressed IMAX's application of MEA accounting in the fourth quarter of 2005 and second quarter of 2006, an application that differed from IMAX's revenue recognition policy in earlier fiscal years,

---

[39] Letter from IMAX defendants to the Court (Aug. 2, 2010), at 2 (emphasis removed). See also Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Snow Capital Investment Partners, L.P.'s Motion for Class Certification ("IMAX Mem."), at 17-18; Matthews Decl., Ex. D.

and that was described differently in IMAX's 2005 10-K.   See
supra.   While the August 9th disclosure stated that the SEC was
conducting an informal inquiry "regarding the Company's timing
of revenue recognition," the announcement, issued in the third
quarter of 2006, *only* mentioned theater systems installed in the
fourth quarter of 2005, and second quarter of 2006:

> The Company recognized revenue in the fourth quarter
> of 2005 on 10 theater installations in theaters which
> did not open in that quarter, and in seven of those
> cases, revenue associated with the screen element of
> the system was deferred until the final screen was
> installed. . . . The value associated with the
> elements other than the screen elements of those
> system installations was recognized in the fourth
> quarter when they were substantially completed. . . .
> This accounting policy has similarly been applied to
> one theatre installation in the second quarter of
> 2006, where revenue associated with the screen element
> has been deferred to a future period.[40]

As discussed below, no pre-fiscal year 2005 theater system for
which revenue was ultimately restated involved the recognition
of revenue for a theater in which the screen element had not
been installed, or was caused by a misapplication of the
accounting principles under EITF-0021.[41]

Furthermore, the August 9th disclosure's description of
IMAX's MEA accounting policy was consistent with the more
expansive application of the accounting policy first disclosed

---

[40] Compl. ¶ 115; Matthews Decl., Ex. F.
[41] Macneil Aff. at ¶ 34.

in the Company's 2005 10-K.  The disclosure stated that "[u]nder multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods."[42]  As we noted above, this application of the Company's revenue recognition policy differed from that which was both applied and disclosed in earlier fiscal years.

While a disclosure of a government investigation may be sufficient to adequately plead loss causation (see In re Take-Two Interactive Sec. Litig., 551 F.Supp.2d 247, 286-87 (S.D.N.Y. 2008); Police and Fire Ret. Sys. of the City of Detroit v. Safenet, Inc., 645 F.Supp.2d 210, 230 (S.D.N.Y. 2009)), a corrective disclosure for the purposes of loss causation should place investors on notice of the "type of specific fraudulent accounting practices that [p]laintiffs allege."  Safenet, 645 F.Supp.2d at 231.  Here, while the disclosure of the SEC investigation specifically addressed IMAX's MEA accounting policy that was applied in 4Q 2005, and disclosed in the Company's 2005 10-K, it did not address, or suggest an

---

[42] See 2005 10-K at 64 ("When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value.  Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.").

investigation into, IMAX's accounting practices in earlier periods.

We find that the August 9th announcement's specificity with regard to the subject of the SEC investigation, identification of a particular number of theater systems for which, and fiscal quarters in which, revenue was recognized under the application of the accounting policy at issue, and description of an application of MEA accounting that focused on the timing of revenue recognition as it relates to the installation of the screen element of a theater system, all suggest that the announcement was not a corrective disclosure for alleged misstatements beyond those that fall within both the temporal (4Q 2005 and later) and topical (the application of MEA accounting described in the announcement) limitations of the disclosure itself.  This interpretation is supported by the market's understanding of the announcement, as evidenced by analyst reports issued the following day:

- "The specific instance in question relates to the Company's 4Q05 revenues." *Roth Capital Partners*, August 10, 2006.[43]

- "The SEC has initiated an informal inquiry about the timing of revenue recognition and use of multiple element arrangement accounting associated with 10 theatre

---

[43] Declaration of Lucy P. Allen ("Allen Decl."), at 29.

installations recognized in 4Q05." *Soleil Securities,*
August 10, 2006.[44]

- "Late Wednesday, the company said it is responding to an
  informal inquiry from the U.S. Securities and Exchange
  Commission regarding the timing of revenue recognition.
  The concern involves revenue recognized during the fourth
  quarter of 2005 for 10 Imax installations in theaters
  that did not open in that quarter." *The Canadian Press*,
  August 10, 2006.[45]

- A potential restatement of IMAX's financials "might move
  some revenue from prior quarters into more recent
  quarters throughout FY 06." *Merriman Curhan Ford*, August
  10, 2006.[46]

### Snow Capital's Arguments

Snow Capital presents seven arguments in response to
defendants' loss causation position.  We consider each in turn.

First, Snow Capital argues that the August 9th disclosure
put it "on notice of problems and potential problems that
convinced [Richard Snow, the founder and president of Snow
Capital] to sell Snow Capital's IMAX securities the following
day."[47]  Snow Capital quotes from the deposition of Richard Snow,
in which he testified about the factors that led to his decision
to sell the remaining portions of Snow Capital's holding of IMAX
stock on August 10, 2006:

---

[44] <u>Id.</u>
[45] <u>Id.</u>
[46] <u>Id.</u> at 24.
[47] Pl. Reply Mem. at 13.

> From my experience, management had lost credibility. What I was specifically concerned about is they had a great deal of debt on the balance sheet, and I was concerned that it would be possible that maybe, with the inquiry, they somehow could have some sort of a technical loan default which would have endangered the company's ability to ultimately reap the benefits of their purported optimistic future, so I exited the position.[48]

Mr. Snow's testimony does not support Snow Capital's argument that the August 9th announcement was a corrective disclosure of alleged misstatements made prior to IMAX's release of its fourth quarter financials.  The fact that Snow believed that IMAX might have had a technical loan default, and that it had lost credibility and might not be able to reap the benefits of its optimistic future, has little bearing on whether the August 9th announcement revealed a misstatement or omission upon which Snow relied when purchasing IMAX stock.[49]   The conclusion of Lead

---

[48] Pl. Reply Mem. at 13 (quoting Millkey Decl., Ex. 1 at 90:8-20).

[49] In response to additional questions about whether he knew, on August 10, 2006, that there were mistakes in IMAX's financials for 2004 and earlier years, Mr. Snow testified that he "assumed [there were problems] based on, if they had a revenue recognition problem, then the work I had previously done, the assumptions could no longer be relied upon . . . . I can't speak specifically to 2004, but, clearly, there had been – at that point, without knowing the amount, that there had been a mismatching of revenue, that it was not in the correct period and some revenue had the opportunity and maybe an inconsistent basis to have been pulled forward . . . . I assumed that . . . all of those time periods were not correct."  Millkey Decl., Ex 1 at 92:5-25.  For the reasons stated above, we disagree that IMAX's August 9th disclosure was an indication that all pre-fiscal year 2005 financials may have been incorrect.

Plaintiff's expert economist, John D. Finnerty, that "securities analysts following IMAX . . . also remarked that the disclosures in the [August 9, 2006] press release had adversely affected the credibility of management,"[50] is similarly unavailing.

Second, Snow Capital contends that the August 9th announcement raised a cloud of uncertainty that the SEC's investigation might extend back to revenue recognition problems before the fourth quarter of 2005.  Snow Capital cites an analyst report that, after the August 9th announcement, described the "risk of a prolonged inquiry or a potential escalation as reason enough to avoid the stock for now."[51]  While the announcement of an SEC investigation inevitably raises some questions about its length and/or scope, in this case we do not view such general questions as evidence of "the relevant truth begin[ning] to leak out."  Dura, 544 U.S. at 342.  The August 9th announcement specifically addressed IMAX's revenue recognition practices for theaters in the fourth quarter of 2005 (and the second quarter of 2006), and, as described above, analysts focused on that aspect of the announcement.  Snow Capital does not cite to one analyst report that stated that the

---

[50] Id. at 13 (quoting Declaration of John D. Finnerty, Ph.D., In Support of Lead Plaintiff's Motion for Class Certification ("Finnerty Decl."), ¶ 25).
[51] Id. at 13-14.

investigation might extend to pre-4Q 2005 financials, either within fiscal year 2005, or earlier. Furthermore, Snow Capital's argument about a fear of a potential expansion of the SEC investigation appears to implicitly acknowledge that the market viewed the August 9, 2006 disclosure as an announcement of an SEC investigation that was limited in its temporal scope.

Third, Snow Capital argues that the prospect that the SEC investigation disclosed in the August 9th announcement would extend to revenue recognition problems in earlier periods was borne out by the fact that IMAX's ultimate restatement extended back to 2002.[52]  This argument fails to show loss causation for two reasons.

In the first instance, the fact that IMAX restated its financials almost a year after the August 9th disclosure does not affect either what the disclosure said or how it was interpreted at the time.  See, e.g., In re Take-Two Interactive Sec. Litig., 551 F.Supp.2d at 285 ("the pertinent inquiry [for loss causation purposes] trains on the most plausible understanding of a given disclosure *at the time it was made*")(emphasis added); see also Lentell, 396 F.3d at 173 (to show loss causation, plaintiff must allege that "the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the

---

[52] Pl. Reply Mem. at 13.

value of the security")(emphasis added).  As discussed above, the most plausible understanding of the August 9th disclosure was that the SEC's investigation focused on IMAX's financial accounting in the fourth quarter of 2005 (and later).

Moreover, on March 29, 2007, IMAX announced that, based on comments it had received from the SEC and the Ontario Securities Commission, it was expanding its review, "primarily in connection with its revenue recognition for certain theater system installations in previous periods, including the fourth quarter of 2005."[53]  Because of this "expanded review," IMAX stated that it "may determine that it is necessary to restate additional items beyond the previously identified errors."[54]  Ultimately, the restatements for fiscal years 2002 and 2004 were prompted by different applications of accounting practices than those that caused the restatements in fiscal years 2005 and 2006.  The theater system revenue that was shifted from fiscal years 2005 and 2006 primarily involved theater systems in which revenue was recognized before a screen had been fully installed.[55]  IMAX's revenue recognition policy for the seven theater systems in fiscal year 2005 for which revenue on an

---

[53] Compl. ¶ 127.
[54] Id.
[55] See Macneil Aff. at ¶¶ 38-40 (providing reasons for restating revenue for each theater system in fiscal years 2005 and 2006).

29

uninstalled screen was deferred involved a misapplication of EITF 00-21, which addresses the question of the question of *what* should constitute a separate unit of accounting. None of the shifted revenue in fiscal years 2002 or 2004 involved revenue recognition related to the timing of screen installations, or was caused by a misapplication of EITF 00-21.[56] We note the reasons for the restatements in July 2007 not because they are determinative of our loss causation analysis -- as stated above, they are not. But rather, we observe that none of the three pre-fiscal year 2005 theater systems for which revenue was restated involved the particular application of the accounting policy that was at the core of IMAX's MEA accounting in fiscal year 2005, was largely responsible for the Company's "record" results in the fourth quarter of 2005 and, most significantly, was the subject of IMAX's August 9, 2006 press release disclosing the SEC investigation.

---

[56] In 2002, revenue was shifted for one theater system which a customer purchased for private events, but that did not open to the general public until 2005. No certificate of acceptance was located, and thus revenue recognition was moved to the opening date. Macneil Aff. at ¶ 44. In 2004, revenue was shifted for two theater systems: first, a customer encountered an issue with a projector after installation was complete, and thus revenue recognition was shifted to when the issues were resolved and when an amendment was signed reducing the price; and second, a customer exercised a relocation and reinstallation provision and thus recognition was moved to the quarter of reinstallation. Id. at 46.

Fourth, Snow Capital argues that a plaintiff need not establish loss causation on a motion to certify a class, and that it is sufficient for plaintiffs to establish that loss causation can be shown on a class-wide basis.[57] However, as Snow Capital itself notes, its argument about establishing loss causation on a motion to certify a class is directed to the question of predominance under Rule 23(b) -- not a proposed lead plaintiff's typicality, adequacy, or standing.[58] Cf. In re Flag Telecom Holdings, 574 F.3d at 39-40 (whether proposed class representative can show loss causation is relevant for Rule 23(a)'s typicality and adequacy requirements, and does not implicate the predominance analysis under Rule 23(b)). None of the cases that Snow Capital cites address the here-relevant questions of whether a class can be certified with a proposed class representative who may lack standing to bring a claim under § 10(b) in its individual capacity, or may, at a minimum, be subject to unique defenses.[59] If Snow Capital is atypical, or

---

[57] Pl. Reply Mem. at 14, 16-19.

[58] See Id. at 18, n.19.

[59] See In re Initial Pub. Offering Sec. Litig., 260 F.R.D. 81, 106 n.214 (S.D.N.Y. 2009) (approving proposed settlement where defendants stipulated to class certification, and considering loss causation in the context of Rule 23(b) predominance); In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 478 n.1 (2d Cir. 2008) (addressing loss causation in context of Rule 23(b) predominance analysis)"; Darquea v. Jarden Corp., No 06 Civ. 722 (CLB), 2008 WL 622811, at *4 (S.D.N.Y. 2008)(same); In re Alstom SA Sec. Litig., 253 F.R.D. 266, 279 (S.D.N.Y. 2008) (addressing

lacks standing, it cannot be designated class representative, irrespective of any predominance analysis.[60]

Fifth, Snow Capital argues that where a plaintiff alleges that losses were the result of a sustained course of conduct, a "class need not be represented by an investor who purchased at each point during the class period."[61] While we agree with this general proposition, it does not apply to the situation at bar. The cases cited by Snow Capital generally address the question of whether a proposed class representative who purchased his stock before the end of a class period can represent subsequent purchases within the class[62] -- not whether a proposed class

---

loss causation in context of Rule 23(b) predominance analysis, after a separate determination of lead plaintiff's standing).

[60] Here, we find In re Impax Labs., Inc. Sec. Litig., 2008 WL 1766943 (N.D. Cal. Apr. 17, 2008) instructive. In Impax Labs, the lead plaintiff in a securities fraud class action purchased all of its shares in defendant Impax before Impax made an alleged misstatement concerning its financial results in the first quarter of 2004. The lead plaintiff then sold all of its shares *after* Impax issued a disclosure that the court found only addressed the second quarter of 2004, and *before* there was any corrective disclosure concerning Impax's first quarter financial statements. The court thus found that the lead plaintiff lacked standing because it could not demonstrate that it suffered an injury in fact. Impax Labs, 2008 WL 1766943, at *7.

[61] Pl. Reply Mem. at 10.

[62] In re Vivendi Universal, S.A., 242 F.R.D. 76, 87 (S.D.N.Y. 2007) (class can be represented by plaintiff who purchased shares prior to close of the class period); Nicholas v. Poughkeepsie Sav. Bank/FSB, No.90 Civ 1607 (RWS), 1990 WL 145154, at *5-6 (S.D.N.Y. Sept. 27 1990)(same). Snow Capital also cites In re CitiGroup Inc. Bond Litig., 2010 WL 2772439, at

representative either lacks standing to bring a claim in its individual capacity, or is subject to unique defenses on loss causation grounds.  Cf. Impax Labs, 2008 WL 1766943, at *7 (case law holding that lead plaintiff can represent a class regardless of the timing of its individual transactions does not apply when lead plaintiff cannot demonstrate individual standing).  None of the cases that Snow Capital cites involve a situation comparable to that with which we are faced here: a Complaint in which the central allegation involves financial results *in a single quarter*; a proposed class representative who made his final purchase of shares *prior to the announcement of financial results in that quarter*; an alleged corrective disclosure that specifically discloses an SEC investigation into financial results *in that quarter* (and later); and an alleged accounting fraud that evolved in significant ways -- especially when viewed

---

*14 (S.D.N.Y. July 12, 2010), which held that named plaintiffs who purchased securities in only some of 48 offerings had standing to represent other purchasers where all purchasers "suffered from the same alleged injury."  In that case, the court found that purchasers suffered from the "same alleged injury" where actionable statements or omissions in an initial "shelf registration statement" were incorporated in all subsequent registration statements.  Snow Capital cannot make a similar claim with respect to alleged actionable misstatements in IMAX's financials and other statements.

in the context of the August 9th disclosure -- throughout the proposed class period.

In this context, we disagree that the alleged fraud was the standard "sustained course of conduct," or "common scheme to defraud,"[63] to the limited extent that those terms are generally used to justify the appointment of a class representative who purchased prior to the end of the class period.  Clearly, the claims in this case all involve alleged fraud relating to IMAX's recognition of theater system revenue, and thus there is a common thread throughout the allegations in the Complaint.  But the application of IMAX's revenue recognition policy changed throughout the class period, and the first corrective disclosure addressed alleged misstatements issued after Snow's purchases. Snow Capital claims that because it "purchased IMAX securities during the Class Period," its "claims are, therefore, not only similar to those of the other members of the Class; they are virtually identical."[64]   This conclusion assumes that which a proposed class representative must prove.

We recognize that Snow Capital is likely not the only potential class member whose final purchase was prior to the February 17, 2006 announcement and who sold shortly after the

---

[63] Pl. Reply Mem. at 10.
[64] Pl. Mem. at 9.

August 9th disclosure and thus, in that respect, its claims are not completely "unique." Nevertheless, under In re Flag Telecom Holdings we find it appropriate to consider whether certain loss causation defenses -- including those that may apply to more potential class members than just Snow Capital -- may, at a minimum, threaten to become the focus of this litigation. The proposed class representative in In re Flag Telecom Holdings was certainly not the only "in and out" shareholder in the class, and the Second Circuit ultimately excluded all in and out traders from the definition of the class. Here, it is worth noting that in seven of the eight complaints originally filed in this action, the class period began on February 17, 2006 and thus would not have even included Snow Capital.[65] Of the seven movants who sought to be named lead plaintiff, only Snow Capital's claims appear to raise these particular loss causation issues. Five of the six other movants purchased shares after IMAX announced its 4Q 2005 financials on February 17, 2006.[66]

---

[65] Kaplan v. Gelfond, 240 F.R.D. 88, 91 (S.D.N.Y. 2007). Seven of those eight complaints proposed a class period from February 17, 2006 through August 9, 2006. The eighth complaint proposed a class period of October 28, 2004 through August 9, 2006. As we noted at the time, "had we relied upon the shorter class period . . . Snow Capital would have purchased zero shares during the period, and consequently would not have had any losses." Id. at 93 n.6.

[66] See Id. at 90 n.2; Dkt. No. 7, Ex. B, at 3-6, Dkt. No. 12, Ex. A, at 5-9, Dkt. No. 22 at 10-13, Dkt. No. 26, Attachment A, at

Sixth, Snow Capital argues that it has established loss causation through the declaration of its expert, John D. Finnerty.[67]  But Dr. Finnerty's declaration adds little to the question of whether the August 9th announcement served as a corrective disclosure for Snow Capital, which bought all of its shares prior to the February 17th announcement of the fourth quarter 2005 financials.  Dr. Finnerty devotes much of his loss causation analysis to the question of whether the August 10th drop in IMAX's stock price can be attributed to the disclosure of the alleged fraud (as opposed to the disclosure of other negative information in the August 9th announcement),[68] and concludes that the August 10th drop "was substantially caused by the disclosures in IMAX's press release issued just after the close of trading on August 9, 2006 that were related to plaintiff's allegations."[69]  Thus, Dr. Finnerty's analysis supports the argument that there is a class of IMAX purchasers for whom the August 9th announcement served as a corrective disclosure -- something we already held when we denied defendants' motion to dismiss the Complaint.  See In re IMAX Sec. Litig., 587 F.Supp.2d at 485-86.

---

3-4.  The sixth movant, Steelworkers Pension Trust, purchased its shares before August 9, 2006, but it is unclear when it sold. See Dkt. No. 18 at 4.

[67] Pl. Reply Mem. at 14.

[68] See Finnerty Decl., ¶¶ 27-34.

[69] Id. at ¶ 9.

Seventh, in a June 14, 2010 letter submission to the Court, Snow Capital argues that the defendants' loss causation argument "has already been considered and rejected by the Court."[70]    We disagree.   In our opinion denying defendants' motion to dismiss the Complaint, we held that "the SEC inquiry related directly to the misrepresentations alleged in this case-the application of multiple element accounting to theater system revenue-and *culminated* in the restatement of IMAX's earnings and revenues for fiscal years 2002 through 2005."   In re IMAX Sec. Litig., 587 F.Supp.2d at 486 (emphasis added).   As discussed above, the fact that the SEC investigation ultimately culminated in a restatement dating back to fiscal year 2002 does not change what the August 9, 2006 disclosure actually revealed at the time.[71]

---

[70] See Snow Capital's June 14, 2010 Ltr., at 3.

[71] Furthermore, we were presented with different loss causation issues at the motion to dismiss stage, including (1) whether the disclosure of the SEC investigation was a corrective disclosure for loss causation purposes; (2) whether IMAX's denial of accounting irregularities negated loss causation; (3) whether an increase in stock price following IMAX's restatement on July 2007 negated loss causation; and, more broadly, (4) how the set of alleged corrective disclosures, viewed together, affected the loss causation analysis.   See In re IMAX Sec. Litig., 587 F.Supp.2d at 485.   None of these issues affect the present analysis: (1) we have already held that the announcement of the SEC investigation can be a partial disclosure of an alleged fraud -- the relevant issue now is whether it partially disclosed fraud committed prior to Snow Capital's purchases; (2) as we previously held, "IMAX's denial of accounting irregularities was irrelevant once the SEC inquiry had alerted the market to their possibility" (Id.) -- IMAX's denial plays no

In our view, the August 9, 2006 disclosure revealed an investigation into IMAX's accounting for the fourth quarter of 2005 and the second quarter of 2006 -- not earlier periods. This view is supported by: (1) the text of the disclosure; (2) the most plausible understanding of the disclosure at the time it was made, as evidenced by both the defendants' statements concerning its accounting policies *before* the disclosure, and analyst reports issued *after* the disclosure; and (3) the fact that IMAX's application of its MEA accounting policy in fiscal year 2005 differed from its application of accounting policies in earlier years and that the new application of the 2005 policy was the subject of the August 9, 2006 announcement disclosing the SEC investigation.

---

role in the present loss causation analysis; (3) while our previous opinion did not address whether the July 20, 2007 restatement was a corrective disclosure, that restatement has no impact on Snow Capital, which sold all of its IMAX shares almost a year earlier; and (4) our finding that "the truth here was revealed not in a neat and tidy single disclosure" (Id. (quoting In re Tommy Hilfiger Sec. Litig., 2007 U.S. Dist. LEXIS 55088, at *8 (S.D.N.Y. July 20, 2007))) again does not impact the question of whether the August 9th announcement -- the only alleged corrective disclosure for Snow Capital -- was a partial corrective disclosure for alleged fraud prior to the fourth quarter of 2005. Cf. Safenet, 645 F.Supp.2d at 230 n.6 (noting that cases in which loss causation is found based on a series of disclosing events are not directly on point when loss causation is alleged based on a single disclosure of a government investigation).

Furthermore, even if we were to view the August 9th disclosure as corrective of alleged misstatements issued by IMAX throughout fiscal year 2005 (and thus prior to Snow Capital's final purchase), which we do not, Snow Capital would still not be able to show loss causation against PWC, whose alleged misstatements prior to Snow Capital's final purchase were in its audit opinions issued in connection with IMAX's 10-Ks for 2002 through 2004.[72] The August 9th announcement, which only mentioned theater installations in the fourth quarter of 2005 and second quarter of 2006, and which focused on an application of MEA accounting that was not applied prior to 2005, is not a corrective disclosure for statements issued by PWC in connection with IMAX's 2004 10-K.   See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP, 475 F.3d 824, 842-43 (7th Cir. 2007) (no loss causation where alleged corrective disclosure revealed misstatements in company's financial statements for years *after*

---

[72] In addition to alleging misstatements in PWC's audit opinion, the Complaint also alleges that PWC "is . . . responsible for the material misinformation disseminated to the investing public during the Class period." Compl. ¶ 149. PWC cannot be liable under § 10(b) for the alleged misstatements made by the IMAX defendants that were not attributed to it at the time of their issuance (Lattanzio v. Deloitte & Touche, 476 F.3d 147, 153 (2d Cir. 2007) ("to state a § 10(b) claim against an issuer's accountant, a plaintiff must allege a misstatement that is attributed to the accountant 'at the time of its dissemination' . . . ." (quoting Wright v. Ernst & Young, 152 F.3d 169, 175 (2d Cir. 1998))), and the Complaint does not make such an allegation of attribution.

plaintiff's acquisition of stock, but not for financial statement upon which plaintiff allegedly relied).

In sum, because we find that Snow Capital cannot establish loss causation -- and, at a minimum, is subject to unique defenses which may threaten to become the focus of the litigation (and which would not be the focus of the litigation for class members who either purchased shares after February 17, 2006, or who purchased prior to February 17, 2006 and held through a subsequent alleged corrective disclosure[73]) -- we cannot certify a class with it as class representative.

---

[73] The IMAX defendants rely on the expert report of Lucy P. Allen to argue that "few investors who held IMAX stock on August 9, 2006 . . . purchased their stock prior to February 17." IMAX Mem. at 16.   In her report, Allen examined public data on institutional trading of IMAX shares and concluded that only 7% of institutional investors who purchased IMAX stock between 4Q 2004 and 4Q 2005, as Snow Capital did, held their stock through 3Q 2006.   Allen Decl. at 32.   As Snow Capital rightly points out, Allen's analysis is incomplete because it fails to consider either (1) individual trading data (according to Allen, institutional investors held between 60% and 76% of IMAX's float (shares outstanding less insider holdings) from 4Q 2004 through 4Q 2005 (Allen Decl. at 31)), or (2) daily trading data (Allen relied on quarter-end trading data (See id. at 31-32.).   See Pl. Reply Mem. at 10.   While we agree with Snow Capital's criticisms, we note that in the previous round of briefing on class certification, Allen submitted a different expert report that did review institutional and individual trading data, as well as daily trading data.   Declaration of Lucy P. Allen, Feb. 23, 2009, at 27.   In that report, Allen found that 12% of all IMAX shares purchased on the NASDAQ between February 23, 2003 (the start of the class period) and February 17, 2006 were retained through August 9, 2006; 6% of the pre-February 17, 2006 shares were retained through July 20, 2007, when IMAX issued its

### 4. Adequacy

Because a proposed class representative must satisfy all of the Rule 23(a) requirements (and one of the Rule 23(b) requirements), it is not necessary that we consider the remaining requirements for certification. Nevertheless, we find as an independent ground to deny class representative status that Snow Capital has also failed to show, by a preponderance of the evidence, that it is an adequate representative for the proposed class.

In evaluating whether a proposed class representative has met rule 23(a)(4)'s adequacy requirement, we consider whether "1) plaintiff's interests are antagonistic to the interest of other members of the class, and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." In Re Flag Telecom Holdings, 574 F.3d at 35 (internal quotation omitted).

A key element in the determination of whether a plaintiff's interests are antagonistic to those of other members of the class is the relationship between the class representative and class counsel. See, e.g. In re Discovery Zone Sec. Litig., 169

restatement. Id. at 28-29. Purchasers of the 88% of pre-February 17, 2006 shares that were sold prior to the August 9, 2006 disclosure are "in and out" shareholders who sold prior to an alleged corrective disclosure.

F.R.D. 104, 109 (N.D. Ill. 1996) ("[e]ven where the named plaintiff does not expect to share directly in the attorneys' fees, his business relationship with counsel may leave him more interested in maximizing the return to his counsel than in aggressively presenting the proposed class' action") (internal quotation marks omitted); Jaroslawicz v. Safety Kleen Corp., 151 F.R.D. 324, 328-30 (N.D. Ill. 1993) (certification denied where plaintiff's interest in the goodwill of his counsel creates a conflict of interest); 5 James W.M. Moore et al., Moore's Federal Practice, § 23.25[2][b][vi] (3d ed.)("a conflict . . . may exist if the class representative stands to benefit directly or indirectly from the goodwill of class counsel created through the class action"). The rationale behind cases in which class certification has been denied because of the relationship between the class representative and class counsel is clear: courts are concerned that "when a class representative is closely associated with class counsel, he or she may permit a settlement less favorable to the interests of absent class members." In re Discovery Zone Sec. Litig., 169 F.R.D. at 108.

When we appointed Snow Capital lead plaintiff in this class action, we also appointed its counsel, Robbins Geller, lead

counsel.[74]   Little did we know, because it was never disclosed to this Court, that Snow Capital was also represented by another attorney, Alfred G. Yates, Jr.   Even to this day, Yates has not filed a notice of appearance, despite have a retainer agreement with Snow.

The following facts about the relationship between Snow and Yates, and Yates' role in the present litigation, are taken from Snow's deposition, and the engagement letter between Snow Capital, Yates, and Robbins Geller for representation in this case: (1) Snow and Yates have been neighbors and friends for between 20 and 25 years[75]; (2) Yates has been one of Snow Capital's clients for six or seven years[76]; (3) Snow Capital manages a significant amount of Yates' money[77]; (4) Snow Capital receives approximately $10,000 to $12,000 a year in fees from Yates[78]; (5) Yates is one of approximately two or three dozen "house accounts" at Snow Capital that, according to Snow, "are just people that have come in almost like – kind of like friends, family"[79]; (6) Yates is also representing Snow in the

---

[74] In re IMAX Sec. Litig., 2009 WL 1905033 (S.D.N.Y. 2009), at *4.
[75] Matthews Decl., Ex. A at 39.
[76] Id.
[77] Id.
[78] Id.
[79] Id. at 40.

other securities litigation in which Snow is lead plaintiff[80]; (7) Yates has "over the years . . . inquired about . . . securities that [Snow] may or may not have owned and if [Snow] would be interested in possibly being considered – if [he]'d be interested in being a lead plaintiff."[81]  (8) Snow Capital's engagement letter for legal representation by both Yates and Robbins Geller in the present litigation is on Yates' letterhead, and is only signed by Yates[82]; (9) The engagement letter states that if Snow Capital is "designated as a lead plaintiff and we are designated class counsel for the class, we will pursue the claims on a class wide basis"[83]; (10) There is apparently no separate engagement letter for Robbins Geller.

Snow Capital's relationship with Yates raises substantial concerns about its ability to adequately represent absent class members.  Snow Capital tries to distinguish the line of cases in which courts have declined to certify a class based on similar claims of inadequate representation by claiming that "in each there was a pre-existing financial relationship between the lead plaintiff and lead counsel concerning the sharing of legal fees by serving as co-counsel or working at the same firm . . . .

---

[80] Id.
[81] Id. at 47.
[82] Matthews Decl., Ex. C.
[83] Id.

[h]ere, by contrast, the unequivocal evidence is that there is no such relationship that would place Lead Plaintiff's financial interests above those of the proposed Class."[84]  Snow Capital's reading of the case law is too narrow.  The concern is not limited to relationships between attorneys working at the same firm, but rather is rooted in a "fear that a class representative who is *closely associated* with the class attorney would allow settlement on terms less favorable to the interests of absent class members."  Susman v. Lincoln Am. Corp., 561 F.2d 86, 91 (7th Cir. 1977) (emphasis added).[85]  In In re Discovery Zone Sec. Litig., 169 F.R.D. 104, 109 (N.D. Ill. 1996), the court found that proposed class representatives who served as their counsels' stock brokers were inadequate because the "sufficiently close business relationships . . . create a possible conflict of interest."  The court noted that the "*possibility* of receiving more investment business from class counsel" provided the plaintiffs with "more incentive to maximize fees for the attorneys than to ensure adequate recovery for the class."  Id. (emphasis added).  Emphasizing that the appearance of impropriety was the "primary factor mandating

---

[84] Pl. Reply Mem. at 5-6.
[85] In Susman, the Seventh Circuit prohibited a lead plaintiff from being named class representative because it rented office space from the law firm seeking to be named class counsel.  Susman, 561 F.2d at 95.

judicial inquiry," the court noted that it was not suggesting that the class representatives and counsel "would turn appearance into reality." Id. But, given that there was "a wealth of disinterested investors who could serve as class representatives . . . the Court deem[ed] it proper to eliminate any possible conflict of interest between the named plaintiffs and the class." Id.

Faced with a similar concern about the appearance of impropriety, and a similarly large pool of disinterested investors who could serve as class representatives, we too find it appropriate to eliminate any possible conflict between the class representative and the class. We do not suggest that Snow Capital's representation would in fact be inadequate —- but the possibility of inadequacy and the appearance of impropriety are sufficient for us to deny certification of a class with Snow Capital as its representative.[86]

---

[86] Snow Capital argues that Snow and Yates had "no discussions . . . about the possibility of Yates' investing any fee he receives through Snow Capital," and thus that defendants' arguments are "pure speculation with no basis in evidence." Pl. Reply Mem. at 5. We disagree: the close business and personal relationship between Snow and Yates, and the incentives for Snow to receive additional investments from Yates, as well as goodwill, are sufficient to warrant a finding of inadequacy under the circumstances of this case. We find that this is particularly so in light of lead plaintiff's failure to disclose the role of Yates in this litigation.

Snow Capital argues that Robbins Geller has utilized Yates in a manner that "is entirely in keeping with this Court's Order dated February 7, 2007 (Dkt. No. 42), authorizing the original lead counsel in this case to 'direct the preparation for the trial of this matter and to delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort."[87]   We disagree. This Court did not authorize a personal lawyer to a plaintiff. There is no need for a lawyer in Pittsburgh, which has no relation to this case beyond being the hometown of Snow.[88]

### b. Rule 23(b) Requirements

Because a plaintiff must satisfy all of the Rule 23(a) requirements in order for a class to be certified, we need not consider the Rule 23(b) requirements.   Nevertheless, in order to streamline potential future submissions in this action, we advise the parties of our views on some of the arguments that

---

[87] Pl. Reply Mem. at 4.

[88] We also find troubling Snow Capital's failure to disclose its retention of Yates until now.   While we do not question that Robbins Geller has prosecuted this case vigorously since its appointment as lead counsel by this Court, or its contention that it alone has exercised the responsibilities of lead counsel, we note that the relationship between Snow and Yates, and Yates' role in this litigation, is one that should have been brought to the attention of the Court at an earlier stage.

have been raised concerning Rule 23(b)(3)'s predominance and superiority requirements.

### 1. Predominance

In order to be certified as a Rule 23(b)(3) class action, plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement is satisfied "if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 108-09 (2d Cir. 2007)(internal quotation marks omitted).

Defendants' primary challenge to the predominance requirement is that lead plaintiff cannot benefit from the fraud-on-the-market presumption of reliance (the presumption that investors relied on misrepresentations when the market for securities is open and developed (see Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1998)) because it has not shown loss causation by a preponderance of the evidence. Relying on the Fifth Circuit's decision in Oscar Private Equity Invs. v. Allegiance Telecom, Inc., 487 F.3d 261 (5th Cir. 2007),

48

defendants contend that in order to "trigger" the fraud-on-the-market presumption, a plaintiff must show loss causation by a preponderance of the evidence. [89]   Defendants argue that the Circuit's recent decisions in In re Initial Pub. Offering Sec. Litig., 471 F.3d 24 (2d Cir. 2006), Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196 (2d Cir. 2008), and In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29 (2d Cir. 2009) suggest that it "would likely adopt the preponderance of the evidence standard" for establishing loss causation in order to trigger the fraud on the market presumption at the class certification stage.[90]   In In re Initial Pub. Offering, 471 F.3d at 41, the Second Circuit held that a district court's "obligation to make [Rule 23] determinations is not lessened by overlap between a Rule 23 requirement and a merits issue."   In Teamsters Local, 546 F.3d at 202, the Second Circuit held that "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements."   And in In re Flag Telecom Holdings, 574 F.3d at 39-40, which we discussed above, the Second Circuit applied the preponderance of the evidence standard in holding that an in-

---

[89] Defendant PricewaterhouseCoopers LLP's, An Ontario Limited Liability Partnership, Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("PWC Mem."), at 10-12.
[90] Id. at 12.

and-out trader could not be lead plaintiff because it could not show loss causation.   The Court, however, noted that its analysis did not implicate the issue of whether a plaintiff need show loss causation by a preponderance of the evidence at the class certification stage in order to satisfy Rule 23(b)'s predominance requirement.   See id. at 39.

While the above cases certainly reflect a shift toward greater consideration of the merits at the class certification stage, we agree with the other courts in this district that have considered this issue and held that loss causation need not be proven by a preponderance of the evidence in order to trigger the fraud on the market presumption at the class certification stage.   See, e.g., In re AIG, Inc. Sec. Litig., 265 F.R.D. 157, 181 (S.D.N.Y. 2010); Wagner v. Barrick Gold Corp., 251 F.R.D. 112, 118-19 (S.D.N.Y. 2008).

Defendants' other argument with regard to predominance is that common issues do not predominate between those who purchased prior to February 17, 2006 and those who purchased between February 17, 2006 and August 9, 2006.[91]   While this argument might be more appropriately directed toward the commonality inquiry under Rule 23(a)(2), our holding that Snow

---

[91] IMAX Mem. at 25.

Capital cannot be class representative negates the need to address this argument at this time.

## 2. Superiority

Under Rule 23(b)(3)'s superiority requirement, plaintiffs must show that:

> a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to this inquiry include: (A) class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

The IMAX defendants argue that plaintiffs cannot meet Rule 23(b)'s superiority requirement because this class action is not "superior" to the class action that has already been certified in Canada.[92] We decline to deny certification on these grounds because, amongst other reasons, PWC is not a named defendant in the Canadian class action, the consolidated complaint here alleges a significantly longer class period, the class as currently defined only includes purchasers on the NASDAQ (and thus excludes purchases of IMAX stock on the Toronto Stock Exchange), and the IMAX defendants have requested leave to

---

[92] Id. at 18-24.

appeal the certification of the global class in Canada[93] -- an issue that is the subject of conflicting decisions in Ontario.[94] At bottom, a class action in a foreign jurisdiction, applying that jurisdiction's securities laws, to which a named defendant in the United States action is not a party, in which the first complaint in the foreign jurisdiction was filed after the first complaint in this case, is not a "superior" way of adjudicating plaintiffs' claims against that party for alleged violations of U.S. securities laws -- claims which we already have upheld against defendants' motions to dismiss.  While the IMAX defendants state that we have "already recognized the exceedingly high burden the plaintiffs face in a case against PWC,"[95] any such burden does not affect our superiority analysis.[96]

Defendants cite to a number of cases to support their argument that the Canadian class action is superior.  None of

---

[93] See Millkey Decl., Ex 10.

[94] As Professor Poonam Puri, IMAX's expert on Canadian law, stated, there are currently "conflicting decisions in Ontario on the issue of whether U.S. investors who purchased their shares in the U.S. should be certified as members in an Ontario class action."  Declaration of Professor Poonam Puri, ¶ 142.

[95] IMAX Mem. at 25.

[96] While PWC has not asserted its own "superiority" argument, it has incorporated the arguments of the IMAX defendants.  PWC Mem. at 1 n.1.  We do not see how PWC can claim that the Canadian class action, to which it is not a party, is a superior method of adjudicating any claims against it.

these cases involve a situation in which a class was not certified because a court, applying Rule 23(b), found that it was not "superior" to a different class action in a foreign country.[97]   Defendants' reliance on Paraschos v. YBM Magnex Int'l., 130 F.Supp.2d 642, 646 (E.D.Pa. 2000), highlights some of the problems with their superiority argument.   In Paraschos, the court originally allowed plaintiffs to maintain their securities class action but ultimately reversed course, finding that it was "apparent that this is a securities fraud action pertaining to Canadian registered securities, brought by a purported class of investors who are virtually all Canadian, against predominantly Canadian defendants, concerning a Canadian corporation whose stock was sold only on Canadian stock exchanges."   The court further noted that "application of United States securities laws were not contemplated by [defendant corporation] or its investors."   Id. at 647.   In contrast, here we are faced with a case where all of the securities in this action, and at least 85 percent of the securities in the

_____

[97] We note that the IMAX defendants' brief was submitted prior to the Supreme Court's decision in Morrison v. National Australia Bank, Ltd, 130 S. Ct. 2869 (2010), and prior to lead plaintiff's revision of the proposed class to only include purchasers on the NASDAQ.   Thus, while much of the IMAX defendants argument opposes the possibility of "certified overlapping global classes," see, e.g., IMAX Mem. at 21, any class certified by this Court would not lead to "overlapping global classes," but rather would only include those purchasers in the United States.

Canadian action[98], were sold in the United States (on the NASDAQ), and application of the U.S. securities law was clearly contemplated by both the Company and its investors.

Furthermore, the proposed class period in this action is significantly longer than that which has been certified in the Canadian class action.[99] Defendants argue that this difference is "irrelevant" and contend that "there are ample reasons why the Canadian plaintiffs would have chosen not to allege a class period earlier than February 17, 2006 or later than August 9, 2006.[100] Whatever potentially meritorious reasons the Canadian plaintiffs had for choosing their class period, we disagree with defendants that the substantial difference in class periods is irrelevant to the determination of whether this class action satisfies Rule 23's superiority requirement.

## CONCLUSION

Because we find that Snow Capital cannot be named class representative, the motion for class certification is denied.

---

[98] See Pl. Reply Mem. at 23.

[99] Because we cannot certify a class, we decline to address defendants' remaining arguments concerning the scope of a proposed class at this time. However, we note that, with regard to in and out shareholders who purchased prior to August 9, 2006, the Complaint does not allege that any information available prior to the August 9, 2006 disclosure "exposed the public to the truth about [defendants'] misstatements." In re Flag Telecom Holdings, 574 F.3d at 41.

[100] IMAX Mem. at 23.

All applications to be appointed lead plaintiff must be filed within twenty-one (21) days.


Dated:     New York, New York

           December 20, 2010


           NAOMI REICE BUCHWALD
           UNITED STATES DISTRICT JUDGE

55