UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------X

In re IMAX SECURITIES LITIGATION

                                            **MEMORANDUM AND ORDER**

-----------------------------------X        06 Civ. 6128 (NRB)

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

By Memorandum and Order dated December 20, 2010, we denied former lead plaintiff Snow Capital Investment Partners, L.P.'s ("Snow Capital") motion for class certification and directed the filing of motions by any entity seeking to be named new lead plaintiff in this securities class action.  Presently before the Court are motions from The Merger Fund and Ironworkers St. Louis District Counsel Pension Fund ("Ironworkers") to be named lead plaintiff.  For the reasons set forth below, The Merger Fund is named lead plaintiff and its counsel, Abbey Spanier Rodd & Abrams LLP ("Abbey Spanier"), is named lead counsel.

## BACKGROUND

1

This is the third time that this Court has been presented with a motion to select a lead plaintiff in this five-year old securities class action.  Familiarity with this Court's prior orders and opinions in this case are assumed, and we do not repeat them here.  The procedural background relevant for the present motions is as follows:

- On January 17, 2007 we named Westchester Capital Management, Inc. ("Westchester") lead plaintiff, and its counsel, Abbey Spanier, lead counsel.

- On December 3, 2008, the Second Circuit decided W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008), holding that an investment adviser lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact.

- On January 17, 2009, Westchester entered into an Assignment Agreement with The Merger Fund (and other funds for which Westchester served as an investment advisor), under which The Merger Fund assigned to Westchester "all rights, legal title and interest in its claims relating to IMAX securities."  See Dkt. No. 109, Ex. C.

- Relying on the Second Circuit's decision in Huff, on April 3, 2009, Snow Capital moved for reconsideration of our January 17, 2007 Order appointing Westchester lead plaintiff.

- On June 29, 2009, we granted Snow Capital's motion for reconsideration and appointed it lead plaintiff and it is counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller") lead counsel.

- On December 20, 2010 we denied Snow Capital's motion for class certification, held that this case could not proceed with Snow Capital as class representative, and directed that new applications to be named lead plaintiff be filed within twenty-one days.

- On January 5, 2011, Westchester reassigned its interest in its legal claims against IMAX back to The Merger Fund.  See Decl. of Richard B. Margolies in Support of The Merger Fund's Reply Mem. of Law to Ironworkers St. Louis District Counsel Pension Fund's Opp'n to its Mot. for Appointment of Lead Pl. and Lead Counsel ("Margolies Reply Decl."), Ex. A.[1]

- On January 10, 2011, The Merger Fund filed its motion to be named lead plaintiff, and for Abbey Spanier to be named lead counsel.

- On January 12, 2011, Ironworkers filed its competing motion to be named lead plaintiff, and for Robbins Geller to be named lead counsel.

### DISCUSSION

Our previous orders in this case have set forth the legal framework for selecting a lead plaintiff under the Private Securities Litigation Reform Act ("PSLRA").  See, e.g., In re IMAX Sec. Litig., 2009 WL 1905033, at *3 (S.D.N.Y. 2009).  As we have stated, a plaintiff is presumed to be the most adequate plaintiff if it: (1) has either filed a complaint or made a motion in response to the publication of notice; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.  Id. (citing 15 U.S.C. § 78-4(a)(3)(B)(iii)(I)).

### I.   Filing Requirement

---

[1] Westchester Capital Management, LLC, which acquired substantially all of the business and assets of Westchester on December 31, 2010, was the assignor in the January 5, 2011 agreement.  See Margolies Reply Decl., Ex A.

With regard to the first requirement, both The Merger Fund and Ironworkers have filed motions in response to this Court's December 20, 2010 Order.  While The Merger Fund's motion was filed on January 10, 2011, twenty-one days after the December 20, 2010 Order was dated, and Ironworkers' motion was filed on January 12, 2011, twenty-one days after the December 20, 2010 was docketed, we consider both motions timely.

We recognize that while both The Merger Fund and Ironworkers filed timely motions in response to the December 20, 2010 Order, neither moved to be named lead plaintiff in response to the initial notice of pendency filed in this action in 2006. Thus, both appear not to be in compliance with 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa), which requires that a potential lead plaintiff either file a complaint or make a motion to serve as lead plaintiff within sixty days of having received notice of the suit.  Nevertheless, under the circumstances of this case in which we denied the second lead plaintiff's motion for class certification and there was no other lead plaintiff, we determined that the best course of action was to re-open the lead plaintiff application process for a twenty-one day period.

There is support for allowing a plaintiff who did not seek lead plaintiff status at the outset to seek such status after the withdrawal of the original lead plaintiff.  Indeed, courts

4

have re-opened the application process in situations where lead plaintiffs have withdrawn (see, e.g., Order on Pending Motions, In re HealthSouth Sec. Litig., Civ-03-BE-1500-S (N.D. Ala. Dec. 1, 2004); In re Neopharm, Inc. Sec. Litig., 02 C 2967, 2004 WL 742084, at *2-3 (N.D. Ill. Apr. 7, 2004)), and granted a motion to substitute a new lead plaintiff who did not file an application within sixty days of the original notice of pendency. In re Initial Pub. Offering Sec. Litig., 214 F.R.D. 117, 120 (S.D.N.Y. 2003). In In re Initial Pub. Offering Sec. Litig., a court in this district considered any movant timely who either (a) filed a complaint, (b) moved to be appointed lead plaintiff in response to the initial notice of pendency, or (c) moved to be appointed lead plaintiff within sixty days of the withdrawal of the previous lead plaintiff. 214 F.R.D. at 120. The court noted that while there was a "colorable argument" that the entire lead plaintiff process should have been re-opened, it was unnecessary in that case because all putative class members were given notice of the opportunity to move to be named lead plaintiff when the original notice was published, and none did so. Id. at 120, n.5. Here, unlike in In re Initial Pub. Offering Sec. Litig., there were a number of movants who sought to be named lead plaintiff when the original notice was published. See Kaplan v. Gelfond, 240 F.R.D. 88, 90 (S.D.N.Y. 2007). To the extent that any of the original movants (who have

not withdrawn their applications or previously been removed by this Court) sought to be named lead plaintiff at this stage of the litigation, they received notice of this Court's December 20, 2010 Order, but did not submit an application.  In any event, The Merger Fund's claimed losses far exceed the losses of any of the original movants who could have renewed an application at this time.  Thus, even if we were to consider the remaining movants from the first lead plaintiff application process, The Merger Fund, for the reasons discussed below, would still be named lead plaintiff.

## II.  Largest Financial Interest

With regard to the financial interest requirement, there is no dispute that The Merger Fund has a significantly greater financial interest in the relief sought by the class: The Merger Fund claims losses of between $3,254,827.20 and $3,633,937 during the Class Period (February 27, 2003 through July 20, 2007) (Mem. of Law in Support of The Merger Fund's Mot. to be Appointed Lead Pl. and for Approval of Lead Counsel ("The Merger Fund Mem.") at 6) and Ironworkers claims losses of $65,297.21 (Mem. of Law in Support of Ironworkers St. Louis District

Counsel Pension Fund's Mot. For Appointment of Lead Pl. and Lead Counsel ("Ironworkers Mem.") at 7).[2]

### III. Rule 23 Analysis

We thus turn to the third inquiry, namely whether the proposed lead plaintiff satisfies Rule 23's typicality and adequacy requirements.  Here, Ironworkers argues that The Merger Fund is subject to two unique defenses that prevent it from serving as lead plaintiff.  First, Ironworkers argues that The Merger Fund's reassignment of its legal claims subjects it to a unique defense because the reassignment violates New York's anti-champerty statute, N.Y. Jud. Ct. Acts Law § 489(1).  Mem. of Law in Opp'n to The Merger Fund's Mot. for Appointment of Lead Pl. and Lead Counsel ("Ironworkers Opp'n Mem.") at 4-5. Second, Ironworkers contends that "The Merger Fund's purchases and sales of IMAX common stock were pursuant to a merger arbitrage investment strategy, and were not influenced by the misleading statements at the heart of this action."  Id. at 1.[3] We consider each argument in turn.

---

[2] The Merger Fund argues that Ironworkers' claimed losses of $65,297.21 should be reduced pursuant to this Court's loss causation analysis in its December 20, 2010 opinion.  See The Merger Fund's Mem. of Law in Opp'n to Ironworkers St. Louis District Pension Fund's Mot. for Appointment of Lead Pl. and Lead Counsel ("The Merger Fund Opp'n") at 2, n.1.  For purposes of the present motions, it is sufficient to find that, under any analysis, The Merger Fund's financial interest substantially exceeds that of Ironworkers.  Ironworkers has not suggested otherwise.

[3] Ironworkers also argues that because The Merger Fund previously assigned its causes of action against IMAX to Westchester, it "is not even entitled to

## A. Anti-Champerty

New York's anti-champerty statute provides, in relevant part:

> [N]o corporation or association . . . shall . . . take
> an assignment of . . . a . . . thing in action, or any
> claim or demand, with the intent and for the purpose
> of bringing an action or proceeding thereon . . . .
> Any corporation or association violating the
> provisions of this section shall be liable to a fine
> of not more than five thousand dollars; any person or
> co-partnership, violating the provisions of this
> section, and any officer, trustee, director, agent or
> employee of any . . . co-partnership, corporation or
> association violating this section who, directly or
> indirectly, engages or assists in such violation, is
> guilty of a misdemeanor.

N.Y. Jud. Ct. Acts Law § 489(1).  Ironworkers contends that The Merger Fund's reassignment of its legal rights to its claims against IMAX "appears to [be] in violation of § 489," and thus that The Merger Fund could be subject to misdemeanor criminal liability under the statute.  Ironworkers Opp'n Mem. at 5.  As a result, Ironworkers claims, The Merger Fund is subject to a unique defense.  We disagree.  An analysis of the history of New York's anti-champerty law, the courts' consistently narrow interpretation of that law, and, most significantly, the circumstances of the reassignment in this case all lead to the

---

assert claims against IMAX on its own behalf, much less to act as lead plaintiff on behalf of a proposed class of investors."  Ironworkers Opp'n at 1.  Ironworkers appears to have advanced this argument prior to having received notice of Westchester's reassignment of its claims against IMAX back to The Merger Fund.  See id. at 3 ("The Merger Fund has failed to produce any documentation indicating that . . . it has regained legal title to its claims against IMAX.")

conclusion that The Merger Fund's reassignment of its legal claims does not implicate the anti-champerty statute and does not subject it to a unique defense that could threaten to become the focus of this litigation.

### 1. Background on the Statute

In order to assess Ironworkers' champerty argument, it is useful to consider the history of the doctrine, as explained by the New York Court of Appeals:

> The "champerty" concept is based on a type of French feudal tenure in land, a "champart," in which the fee for use of the land was neither in money nor ordinary service in kind. The tenant-by-champart was a partial owner of the land bound to share any rents and profits with the grantor, but the grantor took the risk that the crops might fail and that there would be no return. Anyone who then obtained a legal interest in that grant of land would also take a share of the profits in champart.
>
> "Champerty," as a term of art, grew out of this practice to describe the medieval situation where someone bought an interest in a claim under litigation, agreeing to bear the expenses but also to share the benefits if the suit succeeded. The most important litigation of that era was over land, and a person who bought lawsuits could acquire a partial interest in landed estates -- an estimable power play. The taint on the process arose because the purchase price was usually far below the value of the potential land acquisition--a transaction suffused with speculation related to the "sin" of usury and its concomitant legal prohibitions. The champerty transaction, however, evaded the strict prohibitive laws involving usury.
>
> Even as the feudal system faded, English law retained the word "champart" as a metaphor to indicate a disapproval of lawsuits brought "for part of the profits" of the action.  Because lawyers were usually

9

the instruments of such practices, "champertors [were] nearly always lawyers."

Indeed, early New York cases indicate that the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs, which, at the time, included attorneys' fees. Consistent with this limited purpose, New York's early statutory prohibitions against champerty, found in the Revised Statutes and then in the Code of Civil Procedure, were specifically addressed to lawyers. However, in 1907, the prohibitions were extended to nonlawyers and corporations.

Bluebird Partners, L.P. v. First Fid. Bank, N.A., 94 N.Y.2d 726, 733-34, 709 N.Y.S.2d 865 (N.Y. 2000)(internal citations omitted).

In light of this historical background, New York courts have consistently emphasized that the anti-champerty doctrine should be applied narrowly. In a recent analysis of the champerty statute, the New York Court of Appeals observed that "[t]he doctrine of champerty developed to prevent or curtail the commercialization of or trading in litigation," and stated that "the prohibition of champerty has always been limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs." Trust for the Certification of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp., 13 N.Y.3d 190, 198, 890 N.Y.S.2d 377, 918 N.E.2d 889, 893 (N.Y. 2009).  See also Richbell Info. Servs., Inc. v.

10

Jupiter Partners, 280 A.D.2d 208, 215, 723 N.Y.S.2d 134, 139 (N.Y. App. Div. 1st Dep't 2001) ("The courts historically have interpreted the proscription of § 489 as a narrow one.").

Addressing the question of whether a party's purchase of the rights to bring a lawsuit in order to collect damages for losses on a debt instrument in which the purchaser held a pre-existing proprietary interest violated the anti-champerty law, the Court of Appeals in Love Funding Corp. held that the statute "does not apply when the purpose of an assignment is the collection of a legitimate claim." Id., 13 N.Y.3d at 201, 890 N.Y.S.2d 377, 918 N.E.2d at 889. Rather, "if a party acquires a debt instrument for the purpose of enforcing it-that is not champerty simply because the party intends to do so by litigation." Id., 13 N.Y.3d at 200, 890 N.Y.S.2d 377, 918 N.E.2d at 889. The Court of Appeals further emphasized the distinction between acquiring a right in order to make money from litigating it and acquiring a right in order to enforce it, with the former acquisition being the kind that implicates the anti-champerty statute. See id., 13 N.Y.3d at 200, 890 N.Y.S.2d 377, 918 N.E.2d at 894. The court explained that "[t]he champerty statutes are directed at preventing the 'strife, discord and harassment' that would be likely to ensue 'from permitting attorneys and corporations to purchase claims for the purpose of bringing actions thereon.'" Id., 13 N.Y.3d at 199,

11

918 N.E.2d at 893 (quoting Fairchild Hiller Corp. v. McDonnell Douglas Corp., 28 N.Y.2d 325, 329, 321 N.Y.S.2d 857, 270 N.E.2d 691 (N.Y. 1971)).   "In short, the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim.   What the statute prohibits, as the Appellate Division stated over a century ago, 'is the purchase of claims with the intent and for the purposes of brining an action that [the purchaser] may involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up . . . in [an] effort to secure costs."   Id., 13 N.Y.3d at 201, 918 N.E.2d at 895 (quoting Wightman v. Catlin, 113 A.D. 24, 28, 98 N.Y.S. 1071 (N.Y. App. Div. 2d Dep't 1906)).

In light of the history and purpose of the anti-champerty statute, courts have often looked to the relationship between the assignor and assignee when considering whether an assignment falls within the statute's purview.   For example, in Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co., Inc., 652 F.2d 231, 236 (2d Cir. 1981), the Second Circuit stated that where an assignment had been "made between two closely affiliated business enterprises, both of which had been parties to the transaction upon which suit was brought," New York courts would not apply the anti-champerty statute.   See also Sygma Photo News, Inc. v. Global Int'l Inc., 616 F.Supp. 1153, 1157 (S.D.N.Y. 1985) (defining champerty as a "bargain

12

between a stranger and a party to a lawsuit by which the stranger pursues the party's claim in consideration of receiving part of any judgment proceeds")(quoting Alexander v. Unification Church of America, 634 F.2d 673, 677 n.5 (2d Cir. 1980); American Hemisphere Marine Agencies, Inc. v. Kreis, 244 N.Y.S.2d 602, 603, 40 Misc.2d 1090, 1091 (Sup.Ct.N.Y.Cty. 1963) ("[I]t is uncontradicted that plaintiff and its assignor are interrelated corporations, and it is clear that plaintiff itself was involved in the transactions alleged from the very beginning. In such circumstance, the assignment was not in the purview of Section 275 of the Penal Law (predecessor of current section 489).").

**2. The Reassignment To The Merger Fund**

Under the circumstances of the reassignment at issue in this case, we find that The Merger Fund's reassignment of its legal rights to it claims against IMAX is not one that implicates New York's anti-champerty statute, and does not subject it to unique defenses that may threaten to become the focus on the litigation.

As a preliminary matter, both the relationship between The Merger Fund and Westchester and the history of this litigation strongly counsel against an application of champerty principles. When Westchester originally applied to be lead plaintiff in 2006, it did so on behalf of The Merger Fund (and other funds). See Margolies Reply Decl., Ex. C.  At that time, Westchester

13

served as The Merger Fund's investment advisor and controlled all investments made in the Fund. See id., Ex. D at ¶ 2.  After the Second Circuit's decision in Huff, The Merger Fund assigned its rights to Westchester in an attempt to allow Westchester to continue as the lead plaintiff in this case.  The Merger Fund Opp'n at 3.  While that attempt was ultimately unsuccessful, there can be no serious argument (and Ironworkers does not suggest) that the reassignment was the "acquisition of a cause of action by a stranger to the underlying dispute."  Richbell Info. Servs., 280 A.D.2d 208, 723 N.Y.S.2d 134, 139 (N.Y. App. Div. 2001) (quoting Jamaica Pub. Serv. Co. v. La Interamericana Compania De Seguros Generales, S.A., 262 A.D.2d 73, 693 N.Y.S.2d 6,7 (N.Y. App. Div. 1999)).  Here, the Merger Fund is certainly not a "stranger[] to the dispute merely speculating on the suit."  Id.  Rather, it has been involved in this suit from the beginning.

Furthermore, it is undisputed that The Merger Fund had a legitimate claim against IMAX prior to the onset of this litigation.[4]  The reacquisition of its legal rights to those claims does not suggest a "commercialization of litigation" or

---

[4] In addition, it is clear that The Fund had Article III standing at the time this action was commenced—-a factor that we considered when deciding that Westchester should not remain lead plaintiff in spite of its acquisition of the legal rights to The Merger Fund's claims against IMAX.  See In re IMAX Sec. Litig. 06 Civ. 6128 (NRB), 2009 WL 1905033, at *2-3 (S.D.N.Y. June 29, 2009); see also In re SLM Corp. Sec. Litig., 08 Civ. 1029 (WHP), 2009 WL 969934, at *3 (S.D.N.Y. Apr. 1, 2009).

involve the bringing of a claim to "involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up . . . in [an] effort to secure costs." Love Funding Corp., 13 N.Y.3d at 199, 918 N.E.2d at 893.   Applying the New York Court of Appeals' recent opinion emphasizing the "difference between one who acquires a right in order to make money from litigating it and one who acquires a right in order to enforce it," it is apparent that, under the circumstances of this case, The Merger Fund's reacquisition falls within the latter category and thus is beyond the scope of the champerty statute.   Indeed, it would be an odd result if the reacquisition of a legal right that had been assigned to an assignee for the express purpose of seeking to maintain a claim on behalf of the assignor were to violate a statute designed to curtail the commercialization of litigation.

Thus, in light of the purpose of New York's anti-champerty statute, New York courts' interpretation of that statute, and the circumstances of the reassignment at issue in this case, we find that The Merger Fund's reassignment does not implicate the anti-champerty statute and does not subject it to a unique defense that could threaten to become the focus on this litigation.[5]

---

[5] Furthermore, we note that in all three cases cited by Ironworkers in support of its champerty argument, the courts found that the assignments did not violate the anti-champerty statute.

### B. The Merger Fund's Investment Strategies

Ironworkers contends that The Merger Fund is subject to a second unique defense because it utilized a merger arbitrage investment strategy.   Ironworkers Opp'n at 5-6.   Similar arguments concerning sophisticated investment strategies have been rejected by a number of courts, and we reject the contention here.   See, e.g., Burch v. SLM Corp., 08 Civ. 2463 (WHP), 2008 WL 2945348 (S.D.N.Y. July 23, 2008) (rejecting argument that merger arbitrage strategy rendered lead plaintiff (Westchester) atypical); In re Flag Telecom Holdings, Ltd. Sec. Litig., 245 F.R.D. 147, 164 (S.D.N.Y. 2007), aff'd in relevant part, 574 F.3d 29 (2d Cir. 2009)("[I[t is well-established that an investor's sophistication does not preclude him from relying on the integrity of the market and asserting the fraud-on-the-market presumption."); In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 109 (S.D.N.Y. 2004) (stating, in the context of Rule 23(b)'s predominance analysis, that "[i]t can be stated without fear of gainsay that the shareholders of every large, publicly traded corporation includes [sic] institutional investors, short-sellers, arbitragers, etc.   The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played no part whatsoever in their decision

16

making.")(quoting  Moskowitz v. Lopp, 128 F.R.D. 624, 630-31 (E.D. Pa. 1989)).

Ironworkers further argues that The Merger Fund is subject to a unique defense because its merger arbitrage investment strategy relies on the proposition that the market is inefficient.  To support its argument, Ironworkers cites to the testimony of Roy Behren, the portfolio manager of The Merger Fund, taken during a deposition in connection with Westchester's motion for class certification in this case.  A review of that testimony, which is subject to a protective order, leads to the conclusion that The Merger Fund's investment strategy was both sophisticated and based upon merger arbitrage—but was not "reliant upon the proposition that the market is inefficient," as Ironworkers claims.  Ironworkers Opp'n Mem. at 6.  In sum, Ironworkers has not shown that The Merger Fund's investment strategy subjects it to unique defenses and thus has not rebutted the presumption that The Merger Fund should be named lead plaintiff.[6]

---

[6] Separately, Ironworkers contends that it is better able to represent the entire class because it purchased IMAX stock both before and after February 17, 2006, whereas The Merger Fund only purchased stock after that date. Ironworkers Reply Mem. at 4. While our December 20, 2010 opinion held that Snow Capital could not be class representative because its purchased all of its shares prior to February 17, 2006 and sold all of its shares prior to August 9, 2006 (and thus could not show loss causation), we did not hold that a lead plaintiff must purchase shares throughout a class period.  That is not the law in this Circuit.  See, e.g., Hevesi v. Citigroup Inc., 366 F.3d 70,

## IV.  Co-Lead Plaintiffs

Ironworkers argues that if it is not named sole lead plaintiff, it should be named co-lead plaintiff with The Merger Fund (and Abbey Spanier and Robbins Geller should be named co-lead counsel).  Ironworkers argues that, due to the length of time that this case has been pending, this Court should appoint Ironworkers as co-lead plaintiff "in the interests of 'stability'" and in order to avoid further delay.  Ironworkers Reply Mem. at 6.  Having found that The Merger Fund is not subject to unique defenses that threaten to become the focus of this litigation, we see no benefit to naming Ironworkers, which has not been involved in any aspect of this five-year old case, co-lead plaintiff.

## V.   Lead Counsel

The PSLRA directs the lead plaintiff to select and retain counsel to represent the class, subject to the Court's approval. 15 U.S.C. §78u-4(3)(B)(v).  We approve of The Merger Fund's selection of the law firm of Abbey Spanier, which previously

---

82 (2d Cir. 2004) ("[B]ecause the PSLRA mandates that courts must choose a party who has, among other things, the largest financial state in the outcome of the case, it is inevitable that, in some cases, lead plaintiff will not have standing to sue on every claim.").  See also id. ("Moreover, the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

18

served as lead counsel for Westchester in this litigation, and whose familiarity with this case will benefit the class members.

Recognizing the unlikelihood of Ironworkers' appointment as lead plaintiff, Robbins Geller has argued that, even if Ironworkers is not named lead plaintiff, Robbins Geller should continue to serve as class counsel or, at a minimum, as co-class counsel.   The essence of Robbins Geller's argument is that it should remain as counsel because it has invested significant time and expense in the prosecution of this case, and thus that its continued involvement will benefit the class.   Ironworkers Mem. at 11.   Even though The Merger Fund has selected Abbey Spanier as its counsel, Robbins Geller emphasizes that, under the PSLRA, a lead plaintiff's selection of lead counsel is subject to court approval.   Id.   Under the unique circumstances of this case, Robbins Geller contends, the class is best suited by its continued involvement.

It is certainly true that a lead plaintiff's selection of lead counsel is subject to the court's approval.   Nevertheless, the "court should generally employ a deferential standard in reviewing the lead plaintiff's choices."   In re Smith Barney Transfer Agent Litig., 05 Civ. 7538 (WHP), 2006 WL 991003, at *6 (S.D.N.Y. Apr. 17, 2006)(internal quotation marks and citation omitted).   While Robbins Geller cites to a number of cases that recite the general proposition that the appointment of lead

19

counsel is within the court's discretion, none of those cases support the proposition that Robbins Geller should remain as counsel at this stage of the litigation, after its previous motion to be named class counsel was denied, and now that a new lead plaintiff has been named.[7]

At the same time that it emphasizes this Court's discretion to name lead counsel, Robbins Geller contends that "[t]he Second Circuit has refused to permit class plaintiffs to substitute counsel," and thus that Robbins Geller should remain lead counsel. Ironworkers Mem. at 12. But, again, none of the cases Robbins Geller cites apply to the circumstances of this case. For example, Robbins Geller relies on Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072 (2d Cir. 1995), in which the Second Circuit upheld a district court's denial of a motion brought by class representatives to discharge class counsel after a proposed settlement had been reached. Id. at 1076. The Second Circuit agreed with the district court's "characterization of [the class representatives] attempt to discharge class counsel as a 'hasty' move 'on the eve of the Settlement Hearing.'" Id. at 1079. The facts and procedural

---

[7] See In re Cree, Inc., Sec. Litig., 219 F.R.D. 369, 372 (M.D.N.C. 2003)(approving a lead plaintiff's choice of lead counsel, and holding that multiple lead plaintiffs were not necessary); In re Lucent Techs. Inc. Sec. Litig., 221 F.Supp.2d 472, 489 (D.N.J. 2001) (holding that lead co-counsel should be selected through a sealed bid auction); In re Milestone Scientific Sec. Litig., 183 F.R.D. 404, 419 (D.N.J. 1998)(rejecting an application for the appointment of multiple lead counsel).

posture in Maywalt are hardly comparable to those presently before this Court. Indeed, if the designation of new lead counsel were impermissible, Robbins Geller would never have been named lead counsel in this case. Rather, when this Court granted Snow Capital's motion for reconsideration and named it lead plaintiff, it would have ordered that Abbey Spanier remain lead counsel. That, of course, did not happen.[8]

We do not doubt that Robbins Geller has invested significant time and effort into the prosecution of this case. However, in light of the long history of this case, The Merger Fund and Abbey Spanier's prior involvement in this case, the fact that this Court just denied a motion for class certification in which Robbins Geller was moving to be named class counsel and, not insignificantly, the reasoning underlying our denial of the motion for class certification, which was

---

[8] In its brief, The Merger Fund cites to a recent decision from the Central District of California, Maine State Ret. Sys. v. Countrywide Fin. Corp., No. 10 Civ. 00302 (C.D. Cal. May 14, 2010), in which the court denied the motion of a group of institutional investors to be named lead plaintiff in a federal securities class action because they did not have the largest financial interest in the case. Even though those lead plaintiffs, who were represented by Robbins Geller, had spent over two years prosecuting the case in state court (before it was dismissed for lack of subject matter jurisdiction), and, as the court recognized "a considerable number of attorney hours [had] been expanded by counsel," the court held that the movant with the largest financial interest should be named lead plaintiff, and its selected counsel lead counsel. Id. at 11. While Maine State Ret. Sys. addressed the question of whether a party's prior experience with a case rebutted the presumption that the party with the largest financial interest should be named counsel (and not the question of whether lead counsel should remain on a case regardless of who the named lead plaintiff is), we find the court's analysis instructive and note that the court in that case appointed as lead counsel a firm that presumably did not have the familiarity with the case that Abbey Spanier has here.

21

critical of Robbins Geller, we find that the best interests of the class will be met through the appointment of a sole lead plaintiff, The Merger Fund, and a sole lead counsel, Abbey Spanier, both of whom have already had significant involvement with this case. Robbins Geller can provide Abbey Spanier with its work product accumulated in this case and, ultimately, if the case ever does reach a successful result for the class, Robbins Geller can make a fee application to this Court at the appropriate time.

## CONCLUSION

For the reasons set forth above, The Merger Fund is named lead plaintiff and Abbey Spanier Rodd & Abrams LLP is named lead counsel. The parties are directed to appear for a conference on April 26, 2011 at 4:15 p.m at the United States Courthouse, 500 Pearl Street, New York, New York, in Courtroom 21A.

Dated:    New York, New York
          April 14, 2011


                                    NAOMI REICE BUCHWALD

                                    UNITED STATES DISTRICT JUDGE

22