# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

IN RE IMAX CORPORATION
SECURITIES LITIGATION

06 CIV. 6128 (NRB)

---

## MEMORANDUM OF LAW IN SUPPORT OF THE MERGER FUND'S MOTION FOR CLASS CERTIFICATION

**ABBEY SPANIER RODD & ABRAMS, LLP**
Arthur N. Abbey, Esq.
aabbey@abbeyspanier.com
Jill S. Abrams, Esq.
jabrams@abbeyspanier.com
Richard B. Margolies, Esq.
rmargolies@abbeyspanier.com
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

*Counsel for Lead Plaintiff and Proposed Class Representative The Merger Fund*

June 3, 2011

THIS MEMORANDUM CONTAINS CONFIDENTIAL INFORMATION.  PURSUANT TO ¶7 OF THE STIPULATION AND ORDER GOVERNING CONFIDENTIAL MATERIAL, ENTERED NOVEMBER 3, 2008, PORTIONS OF THE ELECTRONICALLY-FILED MEMORANDUM HAVE BEEN REDACTED AND AN UNREDACTED COPY HAS BEEN FILED WITH THE COURT UNDER SEAL

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PROCEDURAL HISTORY.................................................................................................. 2

ARGUMENT ....................................................................................................................... 4

   A.   The Requirements of Rule 23 ................................................................................. 4

   B.   Rule 23(a) Is Satisfied............................................................................................. 5

      1.   Numerosity and Commonality......................................................................... 6

      2.   Typicality ......................................................................................................... 6

      3.   Adequacy ......................................................................................................... 9

   C.   This Action Meets the Requirements of Rule 23(b)(3) ...................................... 11

      1.   Common Questions of Law Or Fact Predominate Over Any Individual Issues........... 11

         (a)   Weekly Trading Volume.......................................................................... 15

         (b)   Number of Securities Analysts Covering IMAX.................................... 16

         (c)   Number of Market Makers/Arbitrageurs in IMAX Securities............................. 17

         (d)   Eligibility To File Form S-3 ................................................................... 17

         (e)   Causal Relationship Between Unexpected Corporate Events and Rapid Response in IMAX's Common Stock Price........................................................... 18

         (f)   Additional Factors Indicating That the Market for IMAX Stock Was Efficient Throughout the Class Period........................................................ 19

      2.   A Class Action Is The Superior Method Of Adjudication............................. 20

   CONCLUSION.............................................................................................................. 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Barrie v. Intervoice Brite, Inc.*,
    No. 3:01-CV-1071-K, 2006 U.S. Dist. LEXIS, 69299 (N.D. Tex. Sept. 25, 2006) ................ 20

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)........................................................................................................ 13

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ............................................................................ passim

*Cheney v. CyberGuard Corp.*,
    213 F.R.D. 484 (S.D. Fla. 2003)..................................................................................... 16

*Cordes & Co. Finl Services, Inc. v. A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007)............................................................................................ 12

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)....................................................................................................... 20

*Green v. Wolf Corp.*,
    406 F.2d 291 (2d Cir. 1968)........................................................................................... 21

*Hevesi v. Citigroup Inc.*,
    366 F.3d 70 (2d Cir. 2004) ............................................................................................ 13

*In re AIG, Inc. Sec. Litig.*,
    265 F.R.D. 157 (S.D.N.Y. 2010) ................................................................................... 13

*In re Arakis Energy Corp. Sec. Litig.*,
    No. 95-CV-3431 (ARR), 1999 U.S. Dist. LEXIS 22246 (E.D.N.Y. Apr. 23, 1999) .............. 12

*In re Flag Telecom Holdings, Ltd. Securities Litigation*,
    245 F.R.D. 147 (S.D.N.Y. 2007) ..................................................................... 4, 5, 6, 10

*In re IMAX Sec. Litig.*
    272 F.R.D. 138 (S.D.N.Y. 2010) ............................................................................ passim

*In re Initial Pub. Offering Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006)..................................................................................... 5, 7, 15

*In re Lilco Sec. Litig.*,
    111 F.R.D. 663 (E.D.N.Y. 1986) .................................................................................. 11

*In re Parmalat Sec. Litig.,*
   375 F. Supp. 2d 278 (S.D.N.Y. 2005)................................................................................ 15

*In re Salomon Analyst Metromedia Litig.,*
   544 F.3d 474 (2d Cir. 2008).............................................................................................. 4

*In re Scor Holding (Switz.) AG Litig.,*
   537 F. Supp. 2d 556 (S.D.N.Y. 2008)............................................................................. 15

*In re Vivendi Universal, S.A. Sec. Litig.,*
   242 F.R.D. 76 (S.D.N.Y. 2007) .................................................................................. 10, 11

*Krogman v. Sterritt,*
   202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................... 19, 20

*Lapin v. Goldman Sachs & Co.,*
   254 F.R.D. 168 (S.D.N.Y. 2008) ................................................................................. 5, 13

*Morrison v. National Australia Bank Ltd.,*
   130 S. Ct. 2869 (2010).................................................................................................... 3

*Oscar Private Equity Investments v. Allegiance Telecom, Inc.,*
   487 F.3d 261 (5th Cir. 2007) ........................................................................................ 12

*Sec. Investor Prot. Corp. v. BDO Seidman, LLP,*
   222 F.3d. 63 (2d. Cir. 2000)........................................................................................... 14

*Silver v. IMAX Corporation,*
   [2009] O.J. No. 5585, 2009 ON.C. LEXIS 4847 (December 14, 2009, Sup. Ct. J.) .......... 21, 22

*Teamsters Local 445 Freight Div. Pension Fund v. Bombadier, Inc.* ("Teamsters II"),
   No. 05 Civ. 1898 SAJ), 2006 U.S. Dist. LEXIS 52991 (S.D.N.Y. Aug. 1, 2006) ............. 14, 15

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Capital Inc.* ("Teamsters I"),
   546 F.3d 196 (2d Cir. 2008)................................................................................... 5, 14, 15

*Unger v. Amedisys Inc.,*
   401 F.3d 316 (5th Cir. 2005) ......................................................................................... 19

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP,*
   549 F.3d 100 (2d Cir. 2008)........................................................................................... 3

**Statutes**

15 U.S.C. § 78j(b) ............................................................................................................ 1

15 U.S.C. § 78t(a) ................................................................................................ 1

15 U.S.C. § 78t-1 ................................................................................................ 1

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... passim

17 C.F.R. § 240.10b-5 ....................................................................................... 13

**INTRODUCTION**

Lead Plaintiff, The Merger Fund ("Plaintiff" or "the Fund"), respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), for certification of a class of purchasers of common stock against IMAX Corporation ("IMAX" or the "Company"), its senior officers Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble (the "Individual Defendants") and the Company's auditor, PricewaterhouseCoopers, LLP ("PWC") (IMAX, the Individual Defendants and PWC are sometimes collectively referred to herein as the "Defendants") during the period between February 27, 2003 through July 20, 2007 (the "Class Period").

As the Court is aware, this is a securities class action involving claims under Sections 10(b), and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), 78t-1 (the "Exchange Act"). The litigation arises out of the alleged improper revenue recognition accounting practices at IMAX and Defendants' materially false and misleading statements made with respect thereto.

On February 17, 2006, IMAX issued a press release in which it announced its fiscal year 2005 financial results and reported that it had completed 14 theater system installations during the 2005 fourth quarter ("4Q2005"). *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 142 (S.D.N.Y. 2010) (the "Decision"). Its Form 10-K for fiscal year 2005, filed with the Securities and Exchange Commission ("SEC") on March 9, 2006, described a "record" 14 theater system installations and $35.1 million in fourth quarter revenue. *Id.* On August 9, 2006, IMAX issued a press release which, announced that it was responding to an informal inquiry from the SEC concerning the timing of its revenue recognition, *including* its application of multiple element arrangement ("MEA") accounting to its theater systems sales and leases, and addressed revenue

that was recognized for theater system installations in the fourth quarter of 2005 and second quarter of 2006. *Id.* (emphasis added). IMAX made subsequent announcements related to the pending SEC revenue recognition inquiries, *including* the application of MEA accounting, and the expansion of the SEC's investigation. Ultimately, on July 20, 2007, IMAX filed its 2006 Form 10-K which included the Company's restated financial results for fiscal year 2002 through the first three quarters of 2006. *Id.* at 143.

Plaintiff respectfully requests certification of the following class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons and entities who purchased or otherwise acquired IMAX common stock on the NASDAQ from February 27, 2003 through July 20, 2007, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are PWC, IMAX, the Individual Defendants, any member of the families of the Individual Defendants, any entity in which any Individual Defendant has a controlling interest, any other defendant or any entity which is a parent or subsidiary of, or which is controlled by, such defendant, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of Defendants (the "Class").

Plaintiff seeks appointment as the class representative and appointment of its counsel Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier"), as class counsel.

## **PROCEDURAL HISTORY**

On January 17, 2007, the Court appointed Westchester Capital Management, Inc. (the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL and SphinX Merger Arbitrage Fund) ("Westchester"), as lead plaintiff, and approved its selection of counsel, Abbey Spanier, pursuant to the PSLRA.

Plaintiffs' Consolidated Amended Complaint ("Complaint") was filed on October 2, 2007. Defendants' motions to dismiss the Complaint were denied by the Court in its September 15, 2008 Order. *See In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471 (S.D.N.Y. 2008).

On December 3, 2008, the Second Circuit decided *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP,* 549 F.3d 100 (2d Cir. 2008), holding that an investment adviser lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact.  As a result of the holding in *Huff,* on January 17, 2009, Westchester entered into an Assignment Agreement with the Fund (and other funds for which Westchester served as an investment advisor), under which the Fund assigned to Westchester "all rights, legal title and interest in its claims relating to IMAX securities."

Relying on the Second Circuit's decision in *Huff,* on April 3, 2009, Snow Capital Investment Partners, L.P.'s ("Snow") moved for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff.  On June 29, 2009, the Court granted Snow Capital's motion and appointed it lead plaintiff and it is counsel, Robbins Geller Rudman & Dowd LLP as lead counsel.

On April 22, 2010, Snow filed its motion for class certification and proposed a Class that included all persons who acquired IMAX stock during the proposed Class Period. On June 24, 2010, the U.S. Supreme Court decided *Morrison v. National Australia Bank Ltd.,* 130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010). Under *Morrison,* the relevant question is "whether the purchase or sale [of the security] is made in the United States, or involves a security listed on a domestic exchange . . . ." *Id.* at 2886. In light of *Morrison,* Snow submitted a revised definition of the proposed Class limited to persons who purchased IMAX shares on the NASDAQ, and excluded from the class definition persons who purchased IMAX shares on the Toronto Stock Exchange.

On December 20, 2010, this Court issued a Memorandum and Order that denied Snow's motion for class certification, held that this case could not proceed with Snow as class representative, and directed that new applications to be named lead plaintiff be filed.  On April

3

15, 2011, the Court issued an Order naming the Fund as lead plaintiff and its counsel, Abbey Spanier as lead counsel.

Despite its rejection of Snow as class representative because it did not satisfy 23(a)'s numerosity and commonality requirements, this Court determined that the proposed class satisfied Rule 23(a)'s numerosity and commonality requirements, *IMAX*, 272 F.R.D. 138. The Court also advised the parties of its views on some of the arguments that were raised concerning Rule 23(b)(3)'s predominance and superiority requirements.

For the reasons set forth below, the Fund has satisfied the requirements of Rule 23(a) and (b)(3). It is respectfully submitted that it should be appointed as the class representative and Abbey Spanier as class counsel.[1]

## ARGUMENT

### A.     The Requirements of Rule 23

Federal Rule of Civil Procedure 23 governs class certification. "In order to qualify for certification as a class action, a proposed class must meet the requirements of Federal Rule of Civil Procedure 23(a) -- numerosity, commonality, typicality, and adequacy -- and one of the subsections of Rule 23(b)." Decision, 272 F.R.D. at 145 (citing *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 478 (2d Cir. 2008). As stated by the Court in *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 245 F.R.D. 147, 156 (S.D.N.Y. 2007):

> First, a plaintiff must establish that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

---

[1]     Plaintiff submits herewith a [Proposed] Order that, among other things, defines the Class as required by Fed. R. Civ. P 23(c)(1)(B).

4

*Id.; see also Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 174 (S.D.N.Y. 2008); Fed. R. Civ. P. 23(a).

Once a court determines that the Rule 23(a) requirements have been met, it may grant class certification if the plaintiffs demonstrate that they can satisfy Rule 23(b)(3) such that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Capital Inc.* ("*Teamsters I*"), 546 F.3d 196, 201-02 (2d Cir. 2008).

The Second Circuit has established the following standards for evaluating class certification:

> (1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement; (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement; and (5) a district judge has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits.

*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *see also Flag Telecom Holdings*, 245 F.R.D. at 157.

**B.    Rule 23(a) Is Satisfied**

As demonstrated below, the four prerequisites of Rule 23(a), numerosity, commonality, typicality, and adequacy of representation, are met here.

1.      **Numerosity and Commonality**

Because the Court has already found that the requirements of numerosity have been satisfied they will not be addressed again here. *See* Decision, 272 F.R.D at 146-47. [2]

2.      **Typicality**

In order to be named a class representative, Plaintiff "must show, by a preponderance of the evidence, that its claims are typical of the claims of the class, and that it is 'not subject to any unique defenses which threaten to become the focus of the litigation.'"  Decision at 147 (*citing In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009)).

In its Decision, this Court ruled that Snow, which purchased its IMAX shares before the Company's release of its fourth quarter 2005 financial results, and sold those shares prior to an August 9, 2006 curative disclosure of misrepresentation associated therewith, did not satisfy Rule 23(a)(3)'s typicality requirement because it was unable to establish loss causation "and, at a minimum, is subject to unique defenses which may threaten to become the focus of the litigation (and which would not be the focus of the litigation for class members who either purchased shares after February 17, 2006, or who purchased prior to February 17, 2006 and held through a subsequent alleged corrective disclosure)..." Decision at 155.

Unlike Snow, the Fund began purchasing IMAX common stock on March 14, 2006 (following the release of IMAX's 2005 fourth quarter and full year results and PWC's unqualified opinion dated March 9, 2006 and included in the Company's Form 10-K filed with the SEC on March 9, 2006), and continued to hold IMAX shares until February 2007, after the

---

[2]      The Court's Decision also noted that some of the Defendants' previous arguments against Snow's motion for class certification touched upon commonality. *See* Decision at 158 (noting Defendants' arguments that common issues do not predominate between those who purchased prior to February 17, 2006 and those who purchased between February 17, 2006 and August 9, 2006 might be more appropriately directed toward the commonality inquiry under Rule 23(a)(2)).  Plaintiff addresses those arguments below.

**REDACTED**

corrective disclosures on August 9, 2006 (i.e. February 9, 2007).[3]  Consistent with the Decision, the Fund can establish loss causation given its post-fourth quarter 2005 IMAX share purchases and post-August 9, 2006 sales.[4]  Thus, it has standing to bring a claim in its individual capacity and is subject to no unique defenses.

Plaintiff recognizes that this Court has previously accepted Defendants' argument that the August 9, 2006 disclosure of the SEC investigation only related to IMAX's MEA accounting policy that was applied in 4Q2005 and the second quarter of 2006 ("2Q2006") and did not address, or suggest an investigation into, IMAX's accounting practices in earlier periods. Decision 149-50.  Plaintiff respectfully submits that this may be too narrow a reading, particularly to the extent it raises the issue whether the Fund may represent pre-February 17, 2006 purchasers.



---

[3]  *See* Certification filed by the Fund attached as Ex. A to the Affirmation of Jill S. Abrams (the "Abrams Aff.")

[4]  A plaintiff need not establish loss causation on a motion to certify a class. *See, e.g., In re Initial Pub. Offering Sec. Litig.* ("IPO"), 260 F.R.D. 81, 106 n.214 (S.D.N.Y. 2009) ("At the class certification stage, plaintiffs need not demonstrate loss causation. It is sufficient for plaintiffs to prove only that loss causation can be shown on a class-wide basis."). However, even if Plaintiff did bear the burden of establishing loss causation on this motion, it has done so through the Declaration of Plaintiff's expert economist, John D. Finnerty, submitted herewith.

[5]  *See* Ex. B ▬▬▬▬▬▬▬ to the Abrams Aff.

**REDACTED**

The August 9, 2006 press release does not state, or discuss in detail, ██████████ ████████████████████████████████████████████████████ Instead, the Company said that the SEC's investigation related to the Company's "timing of revenue recognition," which "included" MEA accounting in the 4Q2005 and 2Q2006. The press release stated, in relevant part:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's *timing of revenue recognition, including* its application of multiple element arrangement accounting in its revenue recognition for theatre systems. (Emphasis added).[6]

Plaintiff does not dispute the fact that the press release focuses on MEA accounting in the 4Q2005 and 2Q2006. However, a reasonable investor could assume that the "including" language suggests that the SEC inquiry was not so limited.

This broader view is supported by defendant Gelfond's response to a question by Tony Gikas, an analyst from Piper Jaffray, during the Company's August 9, 2006 Q2 2006 Earnings Conference Call. Mr. Gikas specifically asked defendants Wechsler and Gelfond whether the SEC's investigation was limited to the 4Q2005 or would include earlier periods. Gelfond responded and confirmed that the SEC's investigation was actually broader. The relevant portion of the transcript is as follows[7]:

> Tony Gikas:  But the SEC's issue is just with one quarter, *or are they looking at potentially previous years as well?*
>
> Brad Wechsler:  One really doesn't like to comment and speculate on what the SEC is doing. *From our perspective I think broadly speaking they're looking at revenue recognition right now.* On a more narrow basis they recently have been emphasizing this notion of multiple element arrangement accounting and focusing on the fourth quarter. But nothing is to really restrict, the SEC does what it wants to do.

---

[6]   *See* Ex. C to the Abrams Aff.

[7]   *See* Ex. D at p. 14 to the Abrams Aff.

On March 29, 2007, IMAX disclosed that it was expanding its accounting review. The press release stated, in relevant part:[8]

> As previously announced, management and the Audit Committee of the Board of Directors are evaluating certain accounting errors over a six-year period. As a result, the Company expects to file restated financial statements for certain periods during those years. In the course of completing this restatement and the year-end audit, and in recently reviewing certain comments received from the U.S. Securities and Exchange Commission (SEC) and the Ontario Securities Commission (OSC), the Company has determined to *broaden* its review to address certain issues related to these comments, *primarily* in connection with its revenue recognition for certain theatre system installations in previous periods, *including* the fourth quarter of 2005. As a result of this expanded review, which is ongoing by the Company and its auditors, Pricewaterhouse Coopers LLP, the Company may determine that it is necessary to restate additional items beyond the previously identified errors. (Emphasis added).[9]

The "broadening" of the review does not necessarily speak to the time period, but to the issues being addressed in light of the regulators' comments. The March 29, 2007 press release, like the August 6, 2006 press release, uses the same "including" language with respect to the fourth quarter of 2005.

Given the foregoing, and the discussion below, the Fund should be appointed as class representative for the entire class period.

### 3.   Adequacy

Plaintiff must also show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To do so, a plaintiff must demonstrate that: (i) the plaintiff's interests are not antagonistic to the other members of the Class; and (ii) the representative party's attorney is qualified, experienced and generally able to conduct the litigation. *See Flag Telecom Holdings,* 574 F.3d at 35; *In re Vivendi Universal, S.A. Sec. Litig.,*

---

[8]     *See* Ex. E to the Abrams Aff.

[9]     The "previously identified errors" referenced in the March 29, 2007 press release relate to accounting errors that are not the subject of this litigation. On March 16, 2007, IMAX announced a delay in the filing of its 2006 Form 10-K, after finding errors in its accounting for certain expenses (with an expected impact of approximately $2.5 million over six years). Complaint ¶126.

242 F.R.D. 76, 85 (S.D.N.Y. 2007); *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 376 (S.D.N.Y. 2000).

The record shows that the interests of Plaintiff and the putative class members are aligned. Plaintiff is clearly committed to the vigorous prosecution of this action, and has demonstrated its adequacy and assertiveness throughout the litigation. Roy Behren, who was Westchester's Chief Compliance Officer and a portfolio manager for the Fund is now Co-President and Chairman of the Board of the Fund. He provided deposition testimony in connection with Westchester's motion for class certification and has been involved in this case from its inception. During his stewardship, the Complaint was prepared and Defendants' motion to dismiss were defeated. The Fund has produced documents in response to IMAX's document requests.

Plaintiff's interests are not antagonist to, and do not conflict with, the other class members' interests. Plaintiff, like all other class members, has suffered losses due to its purchases of IMAX common stock. It has been injured by the same wrongful course of conduct of Defendants, and it is in the Plaintiff's interest to vigorously prosecute this action on behalf of the Class.[10]

Plaintiff has retained the law firm of Abbey Spanier to represent it and the proposed Class in this action. Abbey Spanier is comprised of experienced class action attorneys who have litigated numerous complex securities class actions nationwide, including those involving securities fraud. For example, Abbey Spanier is lead counsel in *In re Vivendi Universal, S.A.*

---

[10]     In their February 23, 2009 opposition briefing, the IMAX Defendants argued that Westchester should be disqualified from acting as a class representative because its merger arbitrage investing strategy relies on the proposition that the market is inefficient and therefore subjects it to a unique defense. Br. at 14-16. After reviewing that testimony this Court opined that Plaintiff's "investment strategy was both sophisticated and based upon merger arbitrage --- but was not 'reliant upon the proposition that the market is inefficient.'" *In re IMAX Sec. Litig.*, No. 06 Civ. 6128 (NRB), 2011 U.S. Dist. LEXIS 41709, at *23 (S.D.N.Y. Apr. 14, 2011). Accordingly, Plaintiff's investment strategies do not subject it to a unique defense that would threaten to become the focus of the litigation.

*Securities Litigation*, 02 Civ. 5571 (RJH)(HNP) (S.D.N.Y.) which culminated in a January 2010 jury verdict finding Vivendi liable on 57 material misstatements after a three month trial.[11]  It is respectfully requested that Abbey Spanier be appointed class counsel.

### C.   This Action Meets the Requirements of Rule 23(b)(3)

Rule 23(b) provides that an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition, one of three alternative requirements of maintainability is met.  This proposed class action is maintainable under subsection (b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) thus has two elements: "predominance" and "superiority."

The issues of predominance and superiority are not amenable to a bright line test.  Rather, the relevant inquiry is whether class certification will ensure economies of time and money by allowing representatives to proceed on behalf of a larger whole so that a class action would be the most efficient method of proceeding.  *In re Lilco Sec. Litig.*, 111 F.R.D. 663, 667-68 (E.D.N.Y. 1986).

### 1.   Common Questions of Law Or Fact Predominate Over Any Individual Issues

In order to be certified as a Rule 23(b)(3) class action, Plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  "The predominance requirement is satisfied 'if the plaintiff can establish that the issues in the class action that are subject to generalized proof,

---

[11]      Attached hereto as Ex. F to the Abrams Aff. is a firm resume demonstrating Abbey Spanier's experience and expertise.

and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" Decision at 157 (citing *Cordes & Co. Fin. Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108-09 (2d Cir. 2007). "In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues." *In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431 (ARR), 1999 U.S. Dist. LEXIS 22246, at *37 (E.D.N.Y. Apr. 23, 1999).

The Complaint specifically pleads that all Defendants violated the Exchange Act, Section 10(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, and that the Individual Defendants violated Section 20(a). Because any Class member would need to establish fraud relating to IMAX's recognition of theater system revenue, the predominant common thread throughout the Class period, common questions will predominate at trial. As set forth above, Plaintiff's allegations in this case constitute the type of common conduct that fits well within the Second Circuit's standards for class certification under Rule 23(b)(3). Moreover, whether any class member relied on a particular misstatement is not an issue in this case because reliance is presumed under the fraud-on-the-market doctrine. Complaint at ¶¶27-30.

In their prior class certification briefing, Defendants' primary challenge to the predominance requirement was that Snow could not benefit from the fraud-on-the-market presumption of reliance. Defendants relied on the Fifth Circuit's decision in *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007) and argued that in order to "trigger" the fraud-on-the-market presumption, a plaintiff must show loss causation by a preponderance of the evidence. The *Oscar* test was rejected by this Court because the courts in this district have held that, "loss causation need not be proven by a preponderance of the

evidence in order to trigger the fraud on the market presumption at the class certification stage." Decision at 158 (citing *In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157, 181 (S.D.N.Y. 2010)).

Despite the fact that there can be no question that common issues exist here, Plaintiff anticipates that the issue of reliance may be disputed by the Defendants. For that reason, Plaintiff has submitted the Declaration of Michael A. Marek which confirms the efficiency of the market on which IMAX traded during the Class Period, namely the NASDAQ. As a result, the Class' reliance is presumed under the fraud-on-the-market theory established by the U.S. Supreme Court's decision in *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988) and thus, reliance is a common issue that predominates over possible individual issues. The Supreme Court opined:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Id*. at 241-42 (citation omitted).

The fraud-on-the-market doctrine dispenses with the requirement that an investor prove that he or she was aware of a particular misstatement, or that he or she directly relied on it. *Id*. at 246-47. As explained by the Second Circuit, the fraud-on-the-market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004); *Lapin*, 254 F.R.D. at 182. "[T]he *Basic* theory allows a plaintiff alleging securities fraud to establish reliance simply by virtue of the defendant's public dissemination of misleading information." *Lapin*, 254 F.R.D. at 182. Rebutting the presumption of reliance is not extremely difficult. As

stated by the Supreme Court, "[i]t has been noted that it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity.  Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47 (citations and footnotes omitted).  "Requiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed . . . or if the misrepresentation had not been made . . . would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Id.* at  245 (citations omitted).

The central inquiry in determining whether the fraud-on-the-market presumption can be used to presume reliance is whether the securities at issue trade in an "open and developed" market.  *Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d. 63, 72, n.76 (2d. Cir. 2000).  (Pursuant to the fraud on the market theory, a plaintiff "...is entitled to a rebuttable presumption of reliance based on the notion that 'in an open and developed securities market, the price of a company's stock is determined by the available material information.'"); *Teamsters I*, 546 F.3d at 200; *Teamsters Local 445 Freight Div. Pension Fund v. Bombadier, Inc.* ("*Teamsters II*"), No. 05 Civ. 1898 SAS), 2006 U.S. Dist. LEXIS 52991, at *21-22 (S.D.N.Y. Aug. 1, 2006) ("The fraud on the market presumption applies only if the market for the security is open and developed enough so that it quickly incorporates material information into the price of the security, i.e., the market must be efficient.").

When determining whether the market for a security is efficient, courts (including courts in this district) often analyze the following five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1276, 1286-87 (D.N.J. 1989): (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock;

(4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. *Id.; see In re Scor Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 n.162 (S.D.N.Y. 2005); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 107, n.323 (S.D.N.Y. 2004). Courts sometimes look at additional factors, based on economic literature, in assessing market efficiency, including: the company's market capitalization; float (the stock's trading volume without counting insider-owned stock); and the bid-ask spread for stock sales. *See Teamsters II*, 2006 U.S. Dist. LEXIS 52991, at *21-22. In *Teamsters II*, Judge Scheindlin, who applied the *Cammer* test, observed that courts "typically consult some or all" of those eight factors in determining market efficiency, but that they "should use these factors as an analytical tool rather than as a checklist." *Id.* at *22. On appeal, the Second Circuit Court of Appeals observed that the Second Circuit has not adopted a particular test for market efficiency. *Teamsters I*, 546 F.3d at 204 n.11.

As set forth in the accompanying Marek Declaration, each of the five *Cammer* and three economic literature factors are established here, thus confirming that IMAX common stock traded on efficient markets during the Class Period. *See* Marek Dec. at ¶86.

(a)   Weekly Trading Volume

The *Cammer* court held that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1286. That benchmark was far exceeded here as the average weekly turnover of IMAX common stock during the Class Period on NASDAQ alone was 7.69%. Marek Dec. at ¶25. Based on the total NASDAQ and TSX

reported volume and the maximum number of IMAX common shares outstanding during the Class Period, the average weekly turnover of IMAX common stock during the Class Period was 8.42%. *Id.* The heavy trading volume in IMAX common stock creates a "strong presumption" of market efficiency. Marek Dec. at ¶30.

(b)     Number of Securities Analysts Covering IMAX

Extensive coverage of IMAX by securities analysts also indicates market efficiency, since the price of a company's security is often affected by analysts' reports of information learned through their own investigation and analysis. *See Cammer*, 711 F. Supp. at 1286. Courts have found market efficiency where as few as four securities analysts issued reports on the stock during the relevant time period. *See, e.g., Cheney v. CyberGuard Corp.*, 213 F.R.D. 484, 499 (S.D. Fla. 2003) (four securities analysts sufficient). Here, there were at least fourteen security analysts who issued research reports concerning IMAX during the Class Period. These reports were written by analysts at CRT Capital, Jefferies & Company, Inc., Merrill Lynch Research, Merriman Curhan Ford, New Constructs LLC, Paradigm Capital, Piper Jaffray, Roth Capital Partners, LLC, RTX Securities, Sidoti & Company, LLC, Soleil Capital, Sun Trust Robinson Humphrey Capital Markets, Susquehanna Financial Group and Westrock Advisors, Inc. Marek Dec. at ¶31. Some of these same analysts also participated in IMAX conference calls throughout the Class Period – yet another indication they were closely following the stock. Marek Dec. at ¶34.

In additional, Egan-Jones Ratings, KDP Investment Advisors, Inc., Moody's Investors Service and Standard & Poor's Ratings Services, issued reports on their ratings of IMAX's debt securities during the Class Period as well as the Company's overall financial structure and results. Marek Dec. at ¶33. The participation of these securities analysts and coverage of IMAX

16

in analyst reports available to investors during the Class Period show that information about IMAX was publicly disseminated, all supporting an efficient market. The presence of a substantial number of analysts indicates that IMAX stock was closely reviewed by investment professionals, who made buy/sell recommendations to client investors based on information publicly available about the company. *Cammer*, 711 F. Supp. at 1286.

(c)     Number of Market Makers/Arbitrageurs in IMAX Securities

IMAX common shares were traded on the NASDAQ National Market System, during the Class Period. Marek Dec. at ¶12. Trading on the NASDAQ is facilitated by numerous market makers who are responsible for matching buy and sell orders, and their existence is necessary for an orderly market and is evidence of market efficiency. *See Cammer*, 711 F. Supp. at 1271; Marek Aff. at ¶¶39-41. The presence of multiple market makers militates in favor of an efficient market. *Cammer*, 711 F. Supp. at 1283 n.30 (11 market makers). IMAX had between twenty-four (24) market makers over the course of the Class Period compared to the average number of market makers for NASDAQ securities, which was 16.44 as of February 2003 and 21.22 as of May 2004. Marek Dec. at ¶44. Efficiency of the market for IMAX stock was facilitated by such market maker involvement. Marek Dec. at ¶45. *Cammer*, 77 F. Supp. at 1286.

(d)     Eligibility To File Form S-3

Another indicator of market efficiency is a company's eligibility to file an SEC Form S-3. *Cammer*, 711 F. Supp. at 1287; Marek Dec. at ¶46. According to SEC regulations, certain companies may use the Form S-3, rather than Form S-1 (a long form Registration Statement), to register securities if they are sufficiently large and have filed numerous reports with the SEC over a long period. Marek Dec. at ¶¶46-47. During the Class Period, IMAX was eligible to, and filed, Form S-3 Registration Statements with the SEC as part of a "shelf" registration process.

17

IMAX's ability to file SEC Form S-3 short form Registration Statements for its public offerings (see e.g., Form-S-3 and Amendment No. 1) filed by IMAX with the SEC on July 15, 2003 and October 6, 2003 respectively, is thus further support that IMAX stock traded in an efficient market. Marek Dec. at ¶49.

(e)     Causal Relationship Between Unexpected Corporate Events and
Rapid Response in IMAX's Common Stock Price

If a plaintiff can demonstrate that stock prices regularly rose or fell in prompt response to market information, this fact would be significant in establishing an efficient market. *Cammer*, 711 F. Supp. at 1287. In *Teamsters I*, the Second Circuit observed that "Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered 'the most important[] *Cammer* factor'...and the 'essence of an efficient market and the foundation for the fraud on the market theory.'" 546 F.3d at 207.   In analyzing the fifth *Cammer* factor, the Marek Declaration sets forth, in great detail, a cause and effect relationship between unexpected corporate events and a rapid response in IMAX's common stock price.   Marek Dec. at ¶¶68-85.   Through media coverage of IMAX, the Company's press releases and SEC filings, and the reports of securities analysts who followed the stock and issued reports during the relevant period, there was a steady and widely disseminated flow of information concerning IMAX that was readily available to the investment community and to the market.  Marek Dec. at ¶¶68-70.  Mr. Marek conducted an "event study" and identified a total of 93 days (without any regard to the price movement of IMAX common stock) on which events occurred that were potentially likely to have been viewed as "material news dates." Marek Dec. at ¶72.   He also classified 217 dates, on which only non-material information was disseminated to the market during the Class Period, as "non-material news dates." Marek Dec. at ¶73.  Further, Mr. Marek classified dates during the Class Period, which

18

fell into neither material news dates nor non-material news dates as "no-news dates" (finding 797

"no-news dates"). *Id.* Marek assessed IMAX's sensitivity to market-wide and industry factors

during the Class Period via statistical analyses.   Marek Dec. at ¶¶75-78.   As a result of this

event study, Mr. Marek concluded that of the 1,107 NASDAQ trading days during the Class

Period, a regression model returned 48 statistically significant days with abnormal returns at or

above the 95% level, indicating "unequivocal statistical proof of market efficiency."   Marek

Dec. at ¶¶80-85.   Such an event study has been viewed as *prima facie* evidence of an efficient

market. *Teamsters I*, 546 F.3d at 207.

(f)   Additional Factors Indicating That the Market for IMAX Stock
Was Efficient Throughout the Class Period

Economic literature suggests the relevance of other factors that tend to demonstrate

market efficiency, including market capitalization, percentage of stock not held by insiders (the

"float") and bid-ask spread.   Accordingly, in addition to the five *Cammer* factors, Mr. Marek

also analyzed these additional factors in support of his findings that the market for IMAX

common stock was efficient[12]:

- IMAX's large market capitalization during the Class Period. "Market capitalization,
  calculated as the number of shares multiplied by the prevailing share price, may be an
  indicator of market efficiency because there is a greater incentive for stock purchasers
  to invest in more highly capitalized corporations." *Krogman v. Sterritt*, 202 F.R.D.
  467, 478 (N.D. Tex. 2001); *see also, Unger v. Amedisys Inc.*, 401 F.3d 316, 325 (5th
  Cir. 2005).   IMAX's equity market capitalization during the Class Period ranged from
  approximately $123 million to $470 million, which is sufficient to facilitate an
  efficient market.   Marek Dec. at ¶¶50, 53.

- IMAX's public float. The percentage of stock not held by insiders or "float" is
  helpful regarding market efficiency as "insiders may have information that is not yet
  reflected in stock prices, the prices of stocks that have greater holdings by insiders are
  less likely to accurately reflect all available information." *CyberGuard*, 213 F.R.D. at
  502; *Krogman*, 202 F.R.D. at 478. Here, during almost the entirety of the Class
  Period, IMAX's float was approximately 90%, which classified it as "widely-held"

---

[12]   In *Unger*, the Fifth Circuit criticized, *inter alia*, the District Court's failure to consider these three factors.

under generally accepted definitions of that term. Marek Dec. at ¶¶56, 86(g). IMAX's public float is additional evidence of an efficient market.

- <u>The Bid-Ask Spread for IMAX common shares.</u> Courts have also looked to a stock's bid-ask spread in assessing the efficiency of its market. *CyberGuard* 213 F.R.D. at 501; *Barrie v. Intervoice Brite, Inc.*, No. 3:01-CV-1071-K, 2006 U.S. Dist. LEXIS, 69299, at *29 (N.D. Tex. Sept. 25, 2006) The average quoted closing bid-ask spread for IMAX common stock during April 2005 was 0.34%, while the bid-ask spread for components of the Dow Jones Industrial Average ("DJIA") was modestly below that of IMAX during that same period. Marek Dec at ¶¶65-66. The relatively low bid-ask spread difference between IMAX common stock and the highly capitalized and substantially traded components of the DJIA is further support of the efficiency of the market for IMAX common stock. Marek Dec. at ¶66.

Each of these additional factors is further evidence that the market for IMAX's securities was efficient during the Class Period. Marek Dec. at ¶¶53, 63, 67. Accordingly, the predominance element of Rule 23(b) (3) is satisfied.

## 2.   A Class Action Is The Superior Method Of Adjudication

The superiority prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3); *see Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). "Under Rule 23(b)(3)'s superiority requirement, plaintiffs must show that:

> [A] class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to this inquiry include: (A) class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

Decision, 272 F.R.D. at 158.

The class action device is particularly appropriate for addressing the claims at issue in this case. The claims involve a large number of investors who are geographically dispersed, and whose relatively small claims make it prohibitively expensive to seek recovery through

individual litigation. *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968) ("the alternatives [to a class action] are either no recourse for thousands of [investors]" or "a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake"). Here, the four factors specified in Rule 23(b)(3) favor class certification. Fed. R. Civ. P. 23(b)(3).

First, individual members do not have an interest in controlling the action. Although a few Class members may have suffered damages substantial enough that might make it economically viable for them to bring their own suits, this fact does not warrant a finding that Class members have an interest in individually controlling the litigation so that the action may not be certified under Rule 23(b)(3).

The Defendants previously argued that Plaintiff cannot meet Rule 23(b)'s superiority requirement because this class action is not superior to the Canadian class action that was certified by Justice van Rensburg on behalf of a global class of investors who purchased IMAX stock between February 17, 2006 and August 9, 2006. *See Silver v. IMAX Corporation*, [2009] O.J. No. 5585, 2009 ON.C. LEXIS 4847 (December 14, 2009, Sup. Ct. J.).[13] While Justice van Rensburg certified a global class, she left open the possibility of revising that decision by recognizing that the Canadian Court would need to take a "wait and see" approach because it was uncertain about how it would proceed with conflict of law issues if and when a U.S. class was certified. *Id.* at *108-10 ("I have concluded that it would be appropriate to certify the global class as proposed by the plaintiffs. The prospect that the claims of non-resident class members may be subject to different laws adds complexity to the litigation, but does not weigh against certification. The appropriate approach in this litigation is to 'wait and see' how the conflict of

---

[13]      Attached as Ex. G to the Abrams Aff.

law issues may develop."). On February 14, 2011, Justice Corbett denied IMAX's motion for leave to appeal the Canadian class certification decision. *Silver v. Imax Corp.*, [2011] O.J. No. 656, 2011 ON.C. LEXIS 981 (February 14, 2011, Sup. Ct. J.).[14] In his opinion, Justice Corbett agreed with Justice van Rensburg's "wait and see" approach:

> Global Class
>
> The defendants' submissions on this point are undermined significantly by their approach to class proceedings brought against them in the United States of America. In those proceedings, these defendants have taken the position that Ontario is the proper jurisdiction for all claims respecting the impugned statements.
>
> IMAX is listed on both the TSE and NASDAQ exchanges. IMAX is subject to the regulatory regimes in both Ontario and the U.S.A.
>
> van Rensburg J. was alive to issues of judicial comity and conflict of laws when certifying a global class. Her Honour specifically noted that some issues arising from certification of a global class would have to be addressed as proceedings unfold in both Canada and the United States.
>
> I see no reason to doubt the correctness of van Rensburg J.'s decision respecting these issues. It would be wrong, of course, to compel foreign investors to be bound by Canadian proceedings if they prefer to have their claims adjudicated elsewhere. But similarly, it would be wrong to preclude them from participating in Canadian proceedings if they wish their claims to be pursued in Ontario.

*Id.* at *34-35.

Shortly after being re-appointed as lead counsel, on the morning of May 2, 2011, Abbey Spanier became aware that, in a teleconference to be held on May 3, 2011, Justice van Rensburg would consider the class notice in the Canadian Action. In its capacity as counsel to the Fund, Abbey Spanier wrote a May 2, 2011 letter to Justice van Rensburg advising her of its concerns regarding the class notice proposed by the plaintiffs in the Canadian Action and suggested that the notice in the Canadian Action, be delayed until certification is decided here.[15]

---

[14]     *See* Ex. H to the Abrams Aff.

[15]     *See* Ex. I to the Abrams Aff.

The Fund retained Canadian counsel for the purpose of moving to intervene in the Canadian Action for the limited purpose of addressing the notice.   In a May 3, 2011 telephonic hearing, Justice van Rensburg decided to delay the motion for the approval of the Canadian notice to allow the Fund to bring its intervention motion.  The Fund filed its motion on May 12, 2011.[16]   The Motion asserts, inter alia, that the Canadian Court should apply its "wait and see" approach until this Court has ruled on the Fund's motion for class certification because of the procedural morass that would result from sending the Canadian notice now.  The Canadian Court will hear oral argument by the parties on August 15, 2011.

Plaintiff respectfully asserts that this Court should follow its previous analysis and find that this action is superior to the Canadian Action. *See* Decision, 272 F.R.D. at 158-59 (finding that the Canadian class action should not affect the courts superiority analysis because PWC is not a named defendant in the Canadian class action, the consolidated complaint here alleges a significantly longer class period and "a class action in a foreign jurisdiction, applying that jurisdiction's securities laws, to which a named defendant in the United States action is not a party, in which the first complaint in the foreign jurisdiction was filed after the first complaint in this case, is not a 'superior' way of adjudicating plaintiffs' claims against that party for alleged violations of U.S. securities laws -- claims which we already have upheld against defendants' motions to dismiss.").[17]

Management of this action presents no unusual difficulties with respect to the U.S. Action.  Plaintiff's counsel and the Court have handled numerous similar actions and the

---

[16]    *See* Ex. J to the Abrams Aff.

[17]    In addition, at noted by this Court in the Decision, "here we are faced with a case where all of the securities in this action, and at least 85 percent of the securities in the Canadian action were sold in the United States (on the NASDAQ), and application of the U.S. securities law was clearly contemplated by both the Company and its investors." Decision at 159.

appropriate procedures and techniques for the management of such suits are well established. Moreover, the flexibility provided to the Court under Rule 23 will enable it to address and resolve any management difficulties, if they should arise. Fed. R. Civ. P. 23(c); Fed. R. Civ. P. 23(d).

## **CONCLUSION**

As demonstrated above, this action satisfies all the requirements of Rules 23(a) and 23(b)(3). Therefore, Plaintiff respectfully requests that the Court grant Plaintiff's motion for class certification, enter an order appointing The Merger Fund as class representative, and Abbey Spanier as class counsel.

Dated: June 3, 2011

Respectfully submitted,

**ABBEY SPANIER RODD & ABRAMS, LLP**

Arthur N. Abbey, Esq.
aabbey@abbeyspanier.com
Jill S. Abrams, Esq.
jabrams@abbeyspanier.com
Richard B. Margolies, Esq.
rmargolies@abbeyspanier.com
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile:  (212) 684-5191

*Counsel for Lead Plaintiff and Proposed Class Representative The Merger Fund*