# EXHIBIT G

Between Marvin Neil Silver and Cliff Cohen, Plaintiffs, and Imax Corporation, Richard L. Gelfond, Bradley J. Wechsler and Francis T. Joyce, Defendants PROCEEDING UNDER the Class Proceedings Act, 1992

**INDEXED AS:** Silver v. Imax Corp.

Court File No. CV-06-3257-00

Ontario Superior Court of Justice

**JUDGES:** K.M. van Rensburg J.

*[2009] O.J. No. 5585; 2009 ON.C. LEXIS 4847*

**DATE INFORMATION:** December 14, 2009.

**JUDGMENT DATE:** December 14, 2009

**COUNSEL:**
**[*1]**

A.D. Lascaris, W. Sasso, M. Robb and J. Strosberg, for the Plaintiffs.

R.P. Steep and D.M. Peebles for the Defendants and Proposed Defendants.

**JUDGMENT:**
**TABLE OF CONTENTS**

**The Motions and The Proceedings**

A. The Test for Certification B. The Principal Issues on the Certification Motion C. Section 5(1)(a) of the CPA: Do the Pleadings Disclose a Cause of Action?

1. The Misrepresentation Claims

(a) Negligent Misrepresentation and the Duty of Care

(b) Reliance as an Element of Misrepresentation

(c) "Reckless" Misrepresentation

2. Negligence *Simpliciter*
3. Conspiracy
4. Vicarious Liability

D. Section 5(1)(b) of the CPA: Is there an Identifiable Class Represented by the Representative Plaintiffs?

1. The Proposed Class Definition

2. The "Identifiable Class" Requirement

3. Is the Proposed Class Over-Inclusive as Including Claims of Persons Who May Have No Claims?

4. Certification of a Global Class

(a) Positions of the Parties

(b) The Court's Authority to Certify National and International Classes

(c) Considerations of "Order and Fairness" -- Should a Global Class be Certified in this Case?

(i) The Relevance of the U.S. Proceedings

**[*2]**

(ii) Conflict of Laws and Complexity

E. Section 5(1)(c) of the CPA: Do the Claims of the Class Members Raise Common Issues?

1. General Principles

2. The Proposed Common Issues

3. Proposed Common Issues -- Common Law and Statutory Misrepresentation

4. Proposed Common Issues -- Negligence *Simpliciter*

5. Proposed Common Issue -- Conspiracy

6. Proposed Common Issues -- Damages

7. Other Proposed Common Issues

F. Section 5(1)(d) of the CPA: Is a Class Proceeding the Preferable Procedure for the Resolution of the Common Issues?

G. Section 5(1)(e) of the CPA: Are the Representative Plaintiffs Appropriate? Have they Produced a Workable Litigation Plan?

**Conclusion**

**REASONS FOR DECISION:**
**Rule 21 Motion and Motion for Certification**

K.M. van RENSBURG J.:--

**The Motions and The Proceedings**

[1] The plaintiffs have commenced a proposed class proceeding for misrepresentation in the secondary market. The defendant IMAX Corporation ("IMAX" or the "Company") is a reporting issuer whose securities are listed on the TSX and NASDAQ. The action arises out of the statement of IMAX's financial results for 2005 in its Form 10-K (which included its **[*3]** audited financial statements) released and filed with the Ontario Securities Commission ("OSC") and the U.S. Securities and Exchange Commission ("SEC") in March 2006. It is alleged that the Form 10-K, as well as press releases issued by IMAX in February and March 2006, contained misrepresentations as to IMAX's compliance with GAAP [See Note 1 below] and that its revenues for 2005 met or exceeded IMAX's previously issued earnings guidance.

Note 1: IMAX adopted U.S. GAAP; all references to GAAP in these reasons relate to U.S. GAAP.

[2] On August 9, 2006, IMAX issued another press release in which it noted in part that the Company was in the process of responding to an informal inquiry from the SEC regarding the timing of its revenue recognition, and in particular its use of multiple element arrangement accounting to recognize revenue on theatre systems that were not yet open, including theatres where the 3D screen had not yet been installed. The following day IMAX's share price dropped 40%.

[3] In 2007 IMAX restated **[*4]** its financial statements for a number of years, including 2005 (the "Restatement"). The Restatement acknowledged that the Company had erred in recognizing revenue for theatre systems that were not completely installed, and that the Company had not complied with GAAP in prematurely recording theatre system revenues in fiscal 2005.

[4] The plaintiffs are Ontario residents who purchased shares in IMAX on the TSX. They are suing for the devaluation in their shares which they allege was due to the alleged misrepresentations. They allege that the defendants IMAX, its chief executive officers Richard Gelfond ("Gelfond") and Bradley Wechsler ("Wechsler") and its chief financial officer at the relevant time, Francis Joyce ("Joyce") (together the "Individual Defendants") are liable for common law damages.

[5] The plaintiffs also sought leave to pursue a statutory claim under Part XXIII.1 of the Ontario *Securities Act*, R.S.O. 1990, c. S. 5 (the "OSA") against the defendants and certain proposed defendants (the remaining members of the board of directors of IMAX at the relevant time and Kathryn Gamble, who was Vice-President, Finance and Controller). This is the first action to proceed **[*5]** under these provisions, which came into force on December 31, 2005, [See Note 2 below] and leave of the Court is required under s. 138.8 of the OSA to pursue the statutory claim (the "Leave Motion").

Note 2: While all of the other provincial and territorial jurisdictions in Canada have now incorporated the statutory cause of action into their securities legislation, Ontario was the only province to have such provisions in force when these proceedings were commenced.

[6] The plaintiffs seek certification of this action (including the common law and the statutory claims) as a class proceeding pursuant to s. 5(1) of the *Class Proceedings Act, 1992*, S.O. 1992, c. 6 (the "CPA"). The plaintiffs propose a global class, consisting of persons who acquired securities of IMAX on the TSX and on NASDAQ on or after February 17, 2006 and held some or all of those securities at the close of trading on August 9, 2006.

[7] The defendants also brought a motion under Rule 21 of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194, **[*6]** as amended, seeking to strike parts of the common law claims as pleaded by the plaintiffs. This motion is properly considered part of the determination of the sufficiency of the pleading of the cause of action under s. 5(1)(a) of the CPA in the certification motion.

[8] All three motions (the Leave Motion and the motions for class action certification and under Rule 21) were argued together. These reasons address the certification and Rule 21 motions. Separate reasons have been released contemporaneously with these reasons, granting leave to the plaintiffs to proceed with the statutory claims against all defendants and all but two of the proposed defendants. [See Note 3 below] Reference should be made to the reasons on the Leave Motion for the background and context of the action, including a detailed description of the facts giving rise to these motions and the statutory cause of action.

Note 3: Leave was granted to proceed with the s. 138.3 claim against IMAX Corporation, Gelfond, Wechsler, Joyce and Gamble, as well as members of the IMAX audit committee at the time (Copland, Leebron and Braun) and board member Girvan, but not against the two remaining external directors, Utay and Fuchs.

**[*7]**

**A. The Test for Certification**

[9] Section 5(1) of the CPA requires the court to certify a proceeding as a class proceeding if:

(a) the pleadings or the notice of application discloses a cause of action;

(b) there is an identifiable class of two or more persons that would be represented by the representative plaintiff;

(c) the claims or defences of the class members raise common issues;

(d) a class proceeding would be the preferable procedure for the resolution of the common issues; and

(e) there is a representative plaintiff who:

(i) would fairly and adequately represent the interests of the class,

(ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and

(iii) does not have, on the common issues for the class, an interest in conflict with the interests of other class members.

[10] Class actions offer three important advantages. They serve judicial economy by avoiding unnecessary duplication in fact-finding and legal analysis. By allowing fixed litigation costs to be divided over a large number of plaintiffs, access to justice is improved **[*8]** by making economical the prosecution of claims that would otherwise be too costly to prosecute individually. Class actions serve efficiency and justice by ensuring that actual and potential wrongdoers do not ignore their obligations to the public (this is the "behaviour modification" element) (*Western Canadian Shopping Centres v. Dutton, [2001] 2 S.C.R. 534,* paras. 27-29). See also *Hollick v. Toronto (City), [2001] 3 S.C.R. 158* at paras. 14-16.

[11] The certification motion is a procedural motion focusing on the form of the action rather than on whether the action is likely to succeed on the merits. The plaintiffs must establish a minimum evidentiary basis for a certification order. It is necessary that the plaintiffs show some basis in fact for each of the certification requirements, other than the requirement in s. 5(1)(a) to plead a proper cause of action (*Hollick*, paras. 16 and 25). On this motion, which was argued with the Leave Motion (in which the preliminary merits of the statutory claim were examined), there was before the court substantial evidence touching on all requirements of ss. 5(1)(b) to 5(1)(e). **[*9]**

**B. The Principal Issues on the Certification Motion**

[12] There was little argument in this case directed toward the question of certification of the statutory cause of action. Rather, the focus was on whether leave should be granted to advance such a claim. In respect of the statutory claims, there is clearly a cause of action pleaded, and an identifiable class consisting of IMAX shareholders during the proposed class period. There are common issues as to the making of the misrepresentations in the Form 10-K and press releases, the personal involvement of the defendants and the application of the statutory defences (which, if available, would defeat the statutory claims of the entire class). A class proceeding is the preferable procedure, particularly where there is no requirement for the participation of individual class members in establishing liability, as reliance on the misrepresentation is not an element of the statutory claim. In oral argument counsel for the defendants indicated that they would not be opposing certification of the statutory claims subject to the court granting leave under the OSA to pursue such claims.

[13] The acknowledgment that the statutory claims **[*10]** are suitable for certification is an important concession in this case. The remaining issues facing the court are the scope of the claims to be certified as a class action and the identification of the class members; that is, whether the claims will include common law claims relating to misrepresentation on the secondary market by IMAX and the Individual Defendants, and whether it is appropriate to certify a global class.

[14] The defendants assert that there are fatal deficiencies in the alleged causes of action that should prevent the court from certifying a common law claim for misrepresentation in the secondary market in this case. In particular they take issue with the recognition of a duty of care between IMAX, its directors and officers and the investing public. They also argue that reliance is an essential element of a misrepresentation claim, and that the claim as pleaded is deficient for not alleging individual reliance by each member of the proposed class.

[15] The defendants contend that the common issues are of limited significance (i.e. they will not significantly advance the action) and that the individual issues (which they contend should include the question of **[*11]** reliance by each class member) are both numerous and significant, rendering a class proceeding not the preferable procedure. They argue against the certification of a global class where there are parallel proceedings pending in a U.S. Court [See Note 4 below] (the "U.S. Proceedings") and based on potential conflict of laws concerns (anticipating that the substantive laws of different jurisdictions may apply to the common law claims of various class members. The defendants also contend that the proposed representative plaintiffs are not in fact representative of the proposed class of investors and that their litigation plan is inadequate.

Note 4: There is a parallel proceeding pending against IMAX, Gelfond, Wechsler, Joyce and Gamble, as well as PriceWaterhouseCoopers (both the Delaware and Ontario limited liability partnerships) in the United States District Court, Southern District of New York (the "U.S. Proceedings"). Initially several proceedings were commenced in the U.S., which were consolidated. A Consolidated Amended Class Action Complaint was filed in October 2007. The amended complaint, while alleging substantially the same facts as are pleaded in the Ontario proceedings, is broader in scope, dealing with IMAX's revenue recognition on theatre systems from 2002 to 2006. The defendants' motion to dismiss the claim was dismissed in *September 2008 (587 F. Supp. 2d 471 (S.C.N.Y. 2008).*

The proposed class in the U.S. Proceedings is shareholders who purchased the Company's common stock between February 27, 2003 and July 20, 2007 on both NASDAQ and the TSX. In the U.S. Proceedings, the lead plaintiff Westchester Capital Management, Inc. ("Westchester") filed a motion seeking certification of a class encompassing both NASDAQ and TSX purchasers of IMAX securities, which motion was opposed by the defendants. By order dated March 13, 2009, the U.S. court denied the certification motion without prejudice, pending the resolution of the proposed motion of another purported class member, Snow Capital Investment Partners, L.P. ("Snow") for the court to reconsider its January 17, 2007 order appointing Westchester Capital Management, Inc. as lead plaintiff in the U.S. Proceedings. By order dated June 30, 2009, Snow replaced Westchester as the lead plaintiff. The certification issue remains to be determined in the U.S. Proceedings.

**[*12]**

[16] For the reasons that follow I have decided to certify these proceedings, including the statutory claims as pleaded and certain of the common law claims, as a class proceeding. I have also decided that the case is appropriate for a global class.

[17] These reasons will address each of the five parts of the test for certification under the CPA, although as will become apparent, and, as is often the case in certification motions, some of the arguments of the parties applied to more than one part of the test.

**C. Section 5(1)(a) of the CPA: Do the pleadings disclose a cause of action?**

[18] It is acknowledged that the pleadings disclose a cause of action under s. 138.3 of the OSA, that is for the statutory claim of misrepresentation in the secondary market. The focus for the application of section 5(1)(a) and the Rule 21 motion was on the common law claims. Whether the pleadings disclose a cause of action was addressed by the parties in their facta on certification as well as separate facta filed in support of the defendants' Rule 21 motion. The issues addressed in the Rule 21 motion are relevant to s. 5(1)(a) of the CPA and accordingly are addressed in this section of the reasons. **[*13]**

[19] In their Fresh Statement of Claim (the "Claim") [See Note 5 below], the plaintiffs assert common law claims sounding in negligence *simpliciter*, negligent and "reckless" misrepresentation and conspiracy, against IMAX and the Individual Defendants. They also claim that IMAX is vicariously liable for the acts and omissions of the Individual Defendants.

Note 5: The Statement of Claim was issued in September 2006. There have been several changes to the pleading, resulting in a Fresh Statement of Claim (the "Claim") that was delivered shortly before the hearing of the motions. While the Claim has not been formally amended (an amendment is part of the relief sought in the motions), the allegations in the proposed pleading, that include both the common law claims against the named defendants and the statutory claims against the defendants and proposed defendants, were considered for the purpose of the leave, Rule 21 and certification motions.

[20] In determining whether pleadings disclose a cause of action, the **[*14]** court is required to examine the allegations in the Claim, which are assumed to be true. The test is whether it is plain, obvious and beyond doubt that the plaintiff cannot succeed with the claim (*Hunt v. Carey Canada Inc., [1990] 2 S.C.R. 959).* A cause of action which is novel may nevertheless be permitted to proceed, however the claim must "have some elements of a cause of action recognized in law and be a reasonably logical and arguable extension of established law" (*Silber v. DDJ Canadian High Yield Fund, [2006] O.J. No. 2503* (S.C.).

[21] If there is a deficiency in the pleading, the court may grant leave to amend (*Normart Management Ltd. v. West Hill Redevelopment Co. (1998), 37 O.R. (3d) 97* (C.A.)).

[22] The defendants argue the following with respect to the "cause of action" issue:

> 1. The pleadings of negligence and negligent misrepresentation are not distinct, and the former is completely subsumed by the latter. Regardless of whether or not these claims are treated as separate causes of action, they suffer from the same fatal defect, that the defendants did not owe a duty of **[*15]** care to the class members, and the plaintiffs have failed to plead any basis on which the court could find a duty to exist. Such a duty is novel, would result in indeterminate liability for pure economic loss, and is inconsistent with the tests enunciated by the Supreme Court of Canada in the context of both negligence *simpliciter* and negligent misrepresentation;
>
> 2. The Claim fails to properly plead reliance by any of the plaintiffs or the class members, although reliance is an essential element of misrepresentation. Instead, the Claim invokes the "fraud on the market" theory, which has been rejected by Ontario courts;
>
> 3. The pleading of conspiracy cannot succeed since the plaintiffs assert that IMAX's directors and officers conspired with IMAX itself, despite the fact that those directors and officers constitute the very directing mind of IMAX; and
>
> 4. The Claim also fails to plead facts which support personal liability against the individual directors and officers, and similarly facts to plead a basis for imposing vicarious liability against IMAX itself.

**1. The Misrepresentation Claims**

[23] The plaintiffs plead that there was a "Representation" that "Imax's revenues **[*16]** for the 2005 fiscal year were reported in accordance with GAAP and that such revenues met or exceeded the earnings guidance previously issued by Imax." The Plaintiffs also plead that the Representation was false and, therefore, a misrepresentation (Claim, paras. 1(y) and 2(b)).

[24] Negligent misrepresentation and "reckless" misrepresentation are pleaded in paras. 67 to 75 of the Claim as follows:

> 67. The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases were prepared, in part, for the purpose of attracting investment and with the intention that members of the investing public would rely upon the documents in making the decision to purchase Imax securities.
>
> 68. Each of the documents referred to in paragraph 67 above contained the Representation. The Representation was untrue, inaccurate and misleading.
>
> 69. Imax and the Individual Defendants knew that by making the Representation, the price of Imax's publicly-traded securities would rise and remain at artificially high levels and that investors would rely upon the Representation in making their decisions to purchase Imax shares.
>
> 70. Imax made the Representation by issuing the:
>
> (a) **[*17]** February Press Release;
>
> (b) Form 10-K;
>
> (c) Annual Report; and
>
> (d) March 9, 2006 press releases.
>
> 71. The Individual Defendants made the Representation by authorizing, permitting and/or acquiescing in:
>
> (a) the February Press Release; and
>
> (b) signing the Form 10-K, the Annual Report and the March 9, 2006 press releases.
>
> 72. Imax and the Individual Defendants made the Representation negligently or, alternatively, recklessly, caring not whether it was true or false, intending that Neil, Cliff and the other Class Members

would rely upon it, which they did to their detriment by purchasing Imax securities during the Class Period and holding the securities beyond the Class Period.

73. Neil relied upon the Representation by reading and relying upon the documents referred to in paragraph 70 above, which contained the Representation. Cliff relied upon the Representation by reading the Form 10-K and an article published by the Globe and Mail dated February 17, 2006 which stated that, "*Imax Corp. jumped 83 cents or 9.13 per cent to 9.92. Large screen movie maker said Friday it expects to meet or beat its 2005 earnings forecast between 35 and 38 cents a share after a record number* **[*18]** *of installations in the fourth quarter. In the quarter, the company completed 14 theatre installations.*" Cliff also understood and relied on the fact that in preparing its financial statements, Imax was required to follow the applicable rules of accounting, in this, GAAP.

74. Given the relationship as pleaded between Imax's financial results and its publicly-traded securities, Neil, Cliff and each other Class Member relied upon the Representation and the other misstatements alleged herein by the act of purchasing or [acquiring] Imax securities.

75. Neil, Cliff and each other Class Member suffered damages and loss, as particularized below, as a result of relying on the Representation and purchasing the Imax shares.

**(a) Negligent Misrepresentation and The Duty of Care**

[25] Generally, a defendant is liable in damages for negligent misrepresentation if (a) the defendant owed a duty of care to the plaintiff based on a "special relationship"; (b) the defendant made an untrue, inaccurate or misleading representation; (c) the misrepresentation was made negligently; (d) the plaintiff reasonably relied on the misrepresentation; and (e) the plaintiff suffered damages as a result **[*19]** of the misrepresentation (*Queen v. Cognos Inc., [1993] 1 S.C.R. 87 at 110).*

[26] The defendants contend that there is no proper cause of action in negligent misrepresentation in this case. They ask the court to find that the Company and the Individual Defendants did not owe a duty of care to the plaintiffs, where this would be an improper extension of the existing law of misrepresentation. Whether or not a duty of care is pleaded, the existence of a duty of care is a question of law; if it is plain and obvious that no such duty of care can be recognized, the cause of action must be struck.

[27] In *Hercules Managements Ltd. v. Ernst & Young, [1997] 2 S.C.R. 165,* the Supreme Court of Canada held that the two part test in *Anns v. Merton London Borough Council*, [1978] A.C. 728 (H.L.) applies in the context of all negligence actions, including claims for different forms of economic loss, such as negligent misrepresentation. The first step is to determine whether a *prima facie* duty of care could be owed and the second is to consider whether that duty, if it exists, is negatived or limited by policy considerations **[*20]** (*Hercules Managements* at para. 21).

[28] The defendants acknowledge for the purpose of the motion, that the first part of the *Anns* test is satisfied. They assert that the court should strike the negligent misrepresentation claims on the second part of the test, based on the policy considerations that (a) to recognize a duty of care between the Company and the Individual Defendants and the investing public would lead to indeterminate liability to an unlimited number of persons, and (b) the recognition of a statutory duty of care is unnecessary in light of the statutory remedy for secondary market misrepresentation, and may conflict with that remedy.

[29] While earlier cases suggested that a full factual record would be necessary to engage in the second part of the *Anns* test, such that its determination was inappropriate in a Rule 21 motion, (see, for example, *Anger v. Berkshire Investment Group Inc. (2001), 141 O.A.C. 301* (C.A.)), the Supreme Court in *Cooper v. Hobart, [2001] 3 S.C.R. 537* had no difficulty considering the second part of the *Anns* test in the appeal of a pleadings motion. The issue to be **[*21]** determined at this stage in the present case accordingly is whether it is plain and obvious that there are policy reasons for refusing to recognize a duty of care between IMAX, its directors and officers and the investing public in respect of negligent misrepresentations in secondary market disclosure.

[30] In *Cooper*, at issue was whether a statutory regulator (the registrar of mortgage brokers) would owe a private law duty of care to members of the investing public for negligence in failing to properly oversee the conduct of an investment company licensed by the regulator.

[31] McLachlin C.J. and Major J., for a unanimous Court, noted (at para. 36) the categories in which proximity has been recognized, including liability for negligent misstatement. With respect to the second stage of the *Anns* test, they stated (at para. 37):

> These [residual policy considerations] are not concerned with the relationship between the parties, but with the effect of recognizing a duty of care on other legal obligations, the legal system and society more generally. Does the law already provide a remedy? Would recognition of the duty of care create the spectre of unlimited liability to an **[*22]** unlimited class? Are there other reasons of broad policy that suggest that the duty of care should not be recognized?

[32] The Supreme Court noted that the second stage of *Anns* generally arises only in cases where the duty of care asserted does not fall within an established or analogous category of recovery. Where a duty of care in a novel situation is alleged, it is necessary to consider both stages of the *Anns* test to ensure that before a duty of care is imposed in a new situation, not only are foreseeability and relational proximity present, but there are no broader considerations that would make the imposition of a duty of care unwise (*Cooper* at para. 37).

[33] In *Cooper* the Court disposed of the issue under the first branch of the *Anns* test, but went on to conclude that policy considerations would also preclude the recognition of a duty of care by the mortgage brokers regulators, under the second branch of the test.

[34] In *Haskett v. Equifax Canada Inc. (2003), 63 O.R. (3d) 577* (C.A.), the plaintiff, who was the subject of an inaccurate credit report, asserted a claim of negligence against the credit agency that had prepared **[*23]** the report. The defendant moved successfully before the motions judge to have the action dismissed for failure to disclose a cause of action.

[35] On appeal Feldman J.A. (for a unanimous court) noted that in *Cooper* (and *Edwards v. The Law Society of Upper Canada, [2001] 3 S.C.R. 562,* a decision released the same day), the Supreme Court had restricted the application of the second part of the *Anns* test to situations where a new category is asserted. The second stage would not apply where the case falls within either an established or analogous category (*Haskett* at para. 42).

[36] Although she viewed the cause of action pleaded in that case as analogous to the recognized category of negligent misrepresentation, so that it was unnecessary to consider the second part of the *Anns* test, Feldman J.A. considered and weighed the policy issues that concerned the motions judge, on the basis that the circumstances could be viewed as a new category.

[37] Feldman J.A. concluded that recognizing a duty of care by a credit agency to the subject of a credit report would not create the spectre of unlimited liability to an unlimited class, that the legislation **[*24]** did not already provide an effective alternative remedy, and that at this stage of the proceedings, the recognition of such a duty would not encroach on the law of defamation (paras. 44 to 54). The negligence claim was permitted to proceed.

[38] Applying the principle in *Cooper* and *Haskett*, that the second part of the *Anns* test applies only to truly novel categories of negligence and not to "analogous" categories, it may not be necessary in the present case to engage in the second stage of the *Anns* test in considering the common law claim of misrepresentation in the secondary market as pleaded against IMAX and the Individual Defendants.

[39] The claim is based on negligent misrepresentation, which is a recognized cause of action, although the plaintiffs propose to extend the claim in circumstances the defendants contend are novel. The representations in question are alleged to have been contained in press releases and the Company's Form 10-K, documents that are prepared under the Company's continuous disclosure obligations, for the purpose of informing the investing public and to put into the public domain the information that permits sellers and buyers to have equal **[*25]** information on which to properly trade in the securities marketplace. It is alleged that the members of the class (who are shareholders who acquired and held their shares in IMAX during a defined period) relied on the representations through their actions in purchasing their shares on an efficient market (Claim, para. 74).

[40] While there are no reported cases in Ontario where a common law claim of misrepresentation in the secondary market has been considered at trial, such claims have been permitted to proceed under a Rule 21 or class proceeding certification motion in *Carom v. Bre-X Minerals Ltd. (2000), 51 O.R. (3d) 236* (C.A.) ("*Carom [Rule 21-C.A.]*"); *Mondor v. Fisherman, [2001] O.J. No. 4620* (S.C.) ("*Mondor [Rule 21]*"), *Lawrence v. Atlas Cold Storage Holdings Inc., [2006] O.J. No. 3748* (S.C.J.) and *McCann v. CP Ships Limited, [2009] O.J. No. 5182,* (3 June 2009) London 46098 (S.C.). [See Note 6 below] These cases will be considered below, together with certain authorities argued by the defen-

dants in support of their argument that the court should **[*26]** refuse to recognize a duty of care or special relationship between the Company and the Individual Defendants and the investing public.

Note 6: Class proceedings based on misrepresentation to the secondary market have also been certified for the purpose of settlement in *Mondor v. Fisherman; CC&L Dedicated Enterprise Fund (Trustee of) v. Fisherman, [2002] O.J. No. 1855* (S.C.), *Frohlinger v. Nortel Networks Corp., [2007] O.J. No. 148* (S.C.), *Gould v. BMO Nesbitt Burns Inc., [2007] O.J. No. 1095* (S.C.), *Marcantonio v. TVI Pacific Inc. [2009] O.J. No. 3409* (S.C.) and *Charles Trust (Turstees of) v. Atlas Cold Storage Holdings Inc., [2009] O.J. No. 4271.*

[41] In *Mondor [Rule 21]*, the proposed representative plaintiffs brought a class proceeding against a number of defendants, including auditors and financial advisors (the "intermediaries"), for losses suffered through **[*27]** the purchase of shares of YBM Magnex International Inc. on the TSE. The claim, among other matters, alleged negligent misrepresentation at common law, including, as against the auditors, in respect of Bre-X's audited financial statements. The defendants moved to strike the claim on the ground that it failed to disclose a reasonable cause of action. Cumming J. applied the two stage analysis from *Hercules Managements* and refused to strike the claim against the intermediaries.

[42] The defendants rely on *Menegon v. Philip Services Corp., [2001] O.J. No. 5547* (S.C.) as authority that a duty of care to the secondary market should not be recognized on the second part of the *Anns* test where it would result in the prospect of indeterminate liability, and conflict with an existing statutory remedy.

[43] In *Menegon,* Gans J. dismissed a motion to certify a shareholder class action and allowed the defendants' Rule 21 motion to strike, finding that there was no cause of action by purchasers in the secondary market against underwriters and auditors for negligent misrepresentation for errors and omissions contained in a prospectus.

[44] The Court held **[*28]** that there was no "special relationship" between the underwriters and investors in the secondary market in circumstances where the underwriters had agreed specifically to assume liability to those who purchased shares offered under the prospectus. Applying the second branch of the *Anns* test, Gans J. found that the recognition of a duty of care in the circumstances would result in the exposure of the underwriters and auditors to liability of an indeterminate amount, for an indeterminate time, in respect to, theoretically, an indeterminate class. He also held that the extension of a duty of care to purchasers of shares in the secondary market would extend liability beyond what was recognized (at that time) in the OSA, and would accordingly be inconsistent with the statutory remedy already provided.

[45] *Menegon* was appealed to the Court of Appeal (reported at *[2003] O.J. No. 8).* The appellant asserted that the respondents' duty of care should not have been ruled out at the pleadings stage on the basis of policy concerns, relying on the reasoning of Cumming J. in *Mondor [Rule 21].* In dismissing the appeal, the Court of Appeal explained the decision **[*29]** in *Mondor* as follows at paras. 13 and 14:

> Cumming J. noted that whether a duty of care does or does not exist is a factual enquiry and concluded that "the plaintiff has pleaded material facts in support of the claim of proximity such as to give rise to a prima facie duty of care." On the second branch of the test in Anns, Cumming J. recognized that something more had to be shown, before imposing a duty on one party to care for the purely economic interest of another, than simply foreseeability that the conduct might cause loss or damage to those interests. He was satisfied, in the case at hand, that the case was sufficiently pleaded. Among other things, he noted that it was pleaded that the defendants intended that the public would rely upon the audited financial statements when making investment decisions.
>
> On the issue of reliance, Cumming J. referred to the American "fraud on the market theory" which "has been described as a legal fiction which has the effect of overcoming the need to prove reliance." He noted that this theory was not part of the law of Canada and that proof of reliance is a necessary ingredient of actions based upon negligent misrepresentation. He noted **[*30]** further that the question of whether a plaintiff has actually relied upon a misrepresentation is a question of fact that may be inferred from all the circumstances and, hence, concluded that "it would be premature to foreclose the consideration of this issue in the case at hand beyond the pleading stage." Consequently, Cumming J. dismissed the motion to strike the pleading.

[46] The Court of Appeal concluded that the motions judge in *Menegon* had followed essentially the same analytical framework as the court in *Mondor.* The different results in the two cases were warranted by differences in the pleadings, in particular, the absence of a proper pleading of negligent misrepresentation in *Menegon* against the underwriters

and auditors, as opposed to other allegations of misrepresentation against the issuer and its directors, which were not the subject of the certification and Rule 21 motions. (In fact, certification of the action as a class proceeding as against the issuer for settlement purposes had already taken place: *Menegon v. Philip Services Corp., [1999] O.J. No. 4080* (S.C.)).

[47] The present case is similar to *Mondor [Rule 21]* **[*31]** and can be distinguished from *Menegon*. The Claim concerns representations made as part of a reporting issuer's continuous disclosure obligations, and not, as in *Menegon,* representations intended for the primary market that were made in a prospectus. The continuous disclosure obligations of a reporting issuer are prescribed by and under the OSA, and the intended recipients of such disclosure are the investing public.

[48] Section 138.3 of the OSA provides for liability of issuers, their directors and in certain circumstances their officers and intermediaries to persons who acquired or disposed of an issuer's securities between the time a material misrepresentation in secondary market disclosure was made and its correction. While there is a specific statutory remedy, s. 138.13 of the OSA provides that the statutory right of action for damages and the defences to an action "are in addition to and without derogation from, any other rights or defences the plaintiff or defendant may have in an action brought otherwise than under this Part."

[49] There is no inconsistency or conflict between the pursuit of a statutory remedy for secondary market misrepresentation that imposes liability **[*32]** without proof of reliance but subject to a damages cap and other limitations, and a claim alleging a common law duty of care for negligent misrepresentation arising out of the same circumstances, where reliance is an element of the tort. The public policy concern of conflict with an existing statutory regime or remedy does not arise in this case.

[50] Concerns about potential indeterminate liability are also not obvious at the pleadings stage of this case. In both *Mondor* and *Menegon* the plaintiffs were suing intermediaries. It is such claims that typically raise the prospect of indeterminate liability to an indeterminate class of persons. In *Hercules Managements*, the Court found that the purpose of an auditor's report was typically to assist the collectivity of shareholders in overseeing management. Any duty of care was owed to the corporation, and not to individual shareholders. The Court refused to extend a duty of care to individual shareholders in respect of their investment decisions (at para. 54) as this would raise the spectre of indeterminate liability. The Court specifically anticipated however that a duty to shareholders in their individual capacity in respect **[*33]** of their investment decisions could arise in circumstances where an auditor knowingly provided to shareholders a negligent report for a specified purpose (at para. 63).

[51] In the present case the allegation is that the issuer and the Individual Defendants made the Representation to the investing public with the intention that it would be relied upon to make decisions to purchase IMAX securities. That is, the plaintiffs allege that the intended recipients of the documents containing the Representation, were in fact the investing public, which would include the plaintiffs and the class members.

[52] The defendants relied on two other cases that are not directly applicable. In *Alvi v. Misir (2004), 73 O.R. (3d) 566* (S.C.), claims by shareholders against certain directors of a corporation were based on fiduciary and statutory duties owed to the corporation. This was not a case involving allegations of misrepresentation; rather the shareholders alleged that certain decisions of the directors on behalf of the corporation had devalued their shares. The Court concluded that the claims were derivative (that is a claim of the corporation that could only be **[*34]** pursued by a shareholder or other party with leave under the applicable corporations statute).

[53] In *NPV Management Ltd. v. Anthony, 2003 NLCA 41,* the Newfoundland Court of Appeal reversed the decision of a motions judge and struck a number of claims against individual directors of a corporation, Conpak. Again, the principal reason for striking the claims was that they were derivative and involved harm to the corporation as a result of alleged breaches of fiduciary and other duties owed by the directors to the corporation. With respect to an alleged personal claim (that NPV had purchased more shares in Conpak in reliance on certain representations by its directors) the Court of Appeal held that there was a prospect of indeterminate liability, where the statements had been made to the public at large, presumably pursuant to continuous disclosure obligations. The Court noted (at para. 57) that the statement of claim had not alleged that the representations were made for the purpose of providing information on which personal investment decisions could be made. The absence of such a pleading was fatal (para. 61).

[54] In the present case there is no **[*35]** question of a derivative claim. The allegations in the Claim are with respect to duties alleged to have been owed by the Company and the Individual Defendants directly to the investing public. In contrast to the pleading in *NPV Management,* the Claim specifically alleges at para. 67 that the IMAX press releases, the Form 10-K and the Annual Report "were prepared in part for the purpose of attracting investment and with

the intention that members of the investing public would rely upon the documents in making the decision to purchase IMAX securities".

[55] I am not satisfied that it is plain and obvious that the claim of negligent misrepresentation against IMAX and the Individual Defendants would fail to meet the second part of the *Anns* test. Again, the defendants do not argue that there is no duty of care under the first stage of the test; rather they assert that there are policy reasons for not recognizing a duty of care by the Company and its directors with respect to a misrepresentation to the secondary market. In my view, it is not plain and obvious that the policy reasons asserted by the defendants should preclude the common law claims of misrepresentation in the secondary **[*36]** market from being pursued at this stage in the litigation.

**(b) Reliance as an Element of Misrepresentation**

[56] The Claim pleads individual reliance on the Representation by the representative plaintiffs Silver and Cohen, in the case of Silver by reading and relying upon the Form 10-K and press releases and in the case of Cohen by reading the 10-K and a newspaper article (at para. 73). There is no allegation that other class members individually relied upon the alleged misrepresentations after reading documents in which they were contained. The Claim pleads however that Silver, Cohen and each other class member relied upon the Representation and the other misstatements "by the act of purchasing or [acquiring] IMAX securities" (at para. 74).

[57] The defendants assert that the failure to plead individual and direct reliance by each of the plaintiffs is fatal to the claims of misrepresentation. The plaintiffs submit that they have properly pleaded reliance by each class member through the act of purchasing or acquiring IMAX securities, and that paras. 57 to 62 of the Claim are a pleading of the "efficient market theory", which has been accepted as a sufficient pleading of reliance **[*37]** in securities cases alleging misrepresentation to the investing public.

[58] The defendants assert that the "efficient market" theory as pleaded by the plaintiffs is the same as the fraud on the market theory which was rejected by Winkler J. in *Carom v. Bre-X Minerals Ltd. (1998), 41 O.R. (3d) 780* (S.C.) *"Carom [Motion to Amend]"* and in subsequent cases.

[59] *Paras. 57* to 62 and 74 of the Claim are as follows:

> 57. The price of Imax's publicly-traded securities was directly affected by the periodic disclosures regarding Imax's financial results. Imax and the individual Defendants were at all material times aware of the effect of Imax's disclosures about its financial results upon the price of its publicly-traded securities.
>
> 58. The February Press Release, the Form 10-K, the Annual Report, the March 9, 2006 press releases, each of which contained the Representation, were filed with SEDAR, the TSX and the NASDAQ and thereby became immediately available to, were reproduced for inspection by and were used by the Class Members, the public, financial analysts and the financial press through the internet and financial publications. **[*38]**
>
> 59. Imax and the Individual Defendants routinely transmitted the documents referred to above to the financial press, financial analysts and certain prospective and actual holders of the Imax securities.
>
> 60. Imax and the Individual Defendants regularly communicated with the public investors and financial analysts via established market-communication mechanisms, including through regular dissemination of press releases on newswire services in Canada and the United States. The price of Imax's publicly-traded securities were directly affected each time Imax and the Individual Defendants communicated new, material information about its financial results to the public.
>
> 61. Imax was the subject of analysts' reports that incorporated the material financial information in the documents referred to above, with the effect that any recommendation in such reports during the Class Period were based, in whole or in part, upon material over-statements of Imax's financial results.
>
> 62. Imax's securities were traded on the TSX and NASDAQ, which are efficient and automated markets. The price at which Imax securities traded on the TSX and NASDAQ incorporated material information about Imax's financial **[*39]** results which was disseminated to the public through the documents referred to above, distributed by Imax and the Individual Defendants as well as by other means.
>
> ...

74. Given the relationship as pleaded between Imax's financial results and its publicly-traded securities, Neil, Cliff and each other Class Member relied upon the Representation and the other misstatements alleged herein by the act of purchasing or [acquiring] Imax securities.

[60] In *Carom [Motion to Amend],* Winkler J. dismissed a motion by the plaintiffs, shareholders in Bre-X Minerals Ltd. ("Bre-X"), seeking to amend their statements of claim in seven intended class proceedings to add the "fraud on the market" theory from American law to their claims. The causes of action were framed in negligence, negligent and fraudulent misrepresentation, conspiracy, breach of fiduciary duty, and breach of the *Competition Act.*

[61] Winkler J. described the fraud on the market theory as creating a rebuttable presumption of reliance on certain misrepresentations, thus obviating the need to prove such reliance on an individual basis. Reliance is presumed when there is proof that the market price of the shares under **[*40]** consideration reflected the pleaded misrepresentations (at pp. 785-786). Winkler J. extensively reviewed the development of the fraud on the market theory in U.S. jurisprudence, and found that the conditions for recognizing such a theory in certain U.S. cases (procedural restrictions of limitations and the class action certification test requiring a "predominance of common issues") did not apply in Ontario.

[62] Winkler J. held (at p. 790) that it is settled law in Canada that actual reliance is essential to a common law cause of action in fraudulent or negligent misrepresentation (citing *Parna v. G. & S. Properties Ltd., [1971] S.C.R. 306, at 316; Queen v. Cognos Inc.*, at 110 and *Hercules Managements* at para. 18). He noted (at p. 792) that the fraud on the market theory was rejected by the British Columbia Supreme Court in *Kripps v. Touche Ross & Co.* (1990), 52 B.C.L.R. (2d) 291, at 307 (although the Court of Appeal left the issue open at (1992), 69 B.C.L.R. (2d) 62), and that the common law provides no examples of the application of the fraud on the market theory in Canadian law.

[63] *Carom [Motion to Amend]* was followed in *Shaw v. BCE Inc., [2003] O.J. No. 2695* **[*41]** (S.C.), striking out a claim for negligent misrepresentation in a prospectus where the plaintiff had not pleaded reliance on any public document issued by the defendants, and in *Deep v. M.D. Management, [2007] O.J. No. 2392* (S.C.), aff'd *[2008] O.J. No. 961* (C.A.) where the Court dismissed a misrepresentation claim by a Nortel shareholder where reliance on the alleged statements had not been pleaded.

[64] *Carom* was also followed in *Mondor [Rule 21]*. In that case, Cumming J. held in *obiter* that the fraud on the market theory is not recognized under Canadian securities law, and that actual reliance is a necessary component under Canadian law concerning negligent and fraudulent misrepresentation.

[65] In *Mondor [Rule 21]*, however, Cumming J. permitted the claims for negligent and fraudulent misrepresentation to proceed, notwithstanding the defendants' argument that individual reliance could not be proven. He referred to case law to the effect that whether or not a person relied on a misrepresentation may be inferred from all the circumstances (*NBD Bank, Canada. v. Dofasco Inc. (1999), 46 O.R. (3d) 514* **[*42]** (C.A.) and *Kripps v. Touche* (C.A.)), and noted at para. 68:

> The plaintiffs claim that if one were to assume for the purposes of this motion that the market price of YBM shares, from time to time, reflected the "Representation", it is open to a trial judge to infer that as a question of fact a putative class member relied on the "Representation" made by Parente, Deloitte and others when a class member purchased YBM shares in the secondary market.

[66] Cumming J. concluded that it would be premature to foreclose the consideration of this issue at the pleadings stage. While rejecting the "deemed reliance" approach of the fraud on the market theory, Cumming J. permitted the claim to proceed. It would be open to the plaintiffs to attempt at trial to establish reliance by class members as a fact by reference to the efficient market theory. Later, when certifying the class for settlement in *Mondor v. Fisherman, [2002] O.J. No. 1855* (S.C.), at para. 22 ("*Mondor [Settlement]*"), Cumming J. noted, as part of his analysis in approving the certification and proposed settlement, that there was uncertainty whether reliance could be established "by the **[*43]** simple act of purchase of the shares or whether each shareholder would have to establish individually that he or she relied upon a misrepresentation".

[67] In *Lawrence v. Atlas Cold Storage,* Hoy J. permitted an "efficient market" misrepresentation claim to proceed in a pleadings motion in a proposed class proceeding. The action was based on allegations of misrepresentation in prospectuses under which units of Atlas Cold Storage Income Trust were sold to the public and in financial statements and a press release.

[68] Hoy J. noted that the plaintiffs did not specifically plead that they received, read or relied on any of the prospectuses, the financial statements or a related press release. Instead, they pleaded that each class member relied on cer-

tain reports, opinions and statements by their conduct in purchasing units. These allegations were supplemented by various particulars in support of a direct factual inference of reliance.

[69] Relying on Cumming J.'s analysis in *Mondor [Rule 21]*, Hoy J. concluded that whether or not a plaintiff has reasonably relied on a misrepresentation is a question of fact. The pleading that units were purchased and the plaintiffs' position **[*44]** that they would prove reliance by satisfying the trial judge that in all of the circumstances actual reliance on the alleged misrepresentation should be inferred, were sufficient to save the reliance-based claims.

[70] In the present case, following the decisions of Cumming J. in *Mondor [Rule 21]* and Hoy J. in *Lawrence*, I find that the Claim discloses a cause of action in negligent misrepresentation against the Company and the Individual Defendants, notwithstanding the absence of a pleading of direct individual reliance by each class member. As Wilson J. stated in *Hunt v. Carey* at pp. 990-991:

> The fact that a pleading reveals "an arguable, difficult or important point of law" cannot justify striking out part of the statement of claim. Indeed, I would go so far as to suggest that where a statement of claim reveals a difficult and important point of law, it may well be critical that the action be allowed to proceed. Only in this way can we be sure that the common law in general, and the law of torts in particular, will continue to evolve to meet the legal challenges that arise in our modern industrial society.

[71] I do not find it necessary to consider in detail **[*45]** the plaintiffs' alternative argument that negligent misrepresentation may be made out without proof of reliance where the plaintiff can prove that the defendants' conduct caused the plaintiff damages by some means other than reliance.

[72] The plaintiffs rely on a number of cases, beginning with a statement of McLachlin J. (as a trial judge) in *Yorkshire Trust Co. v. Empire Acceptance Corp. Ltd.* (1986), 24 D.L.R. (4th) 140 (B.C.S.C.), at p. 147:

> It is my view that in the appropriate case, where proximity and the necessary causal connection between the negligence and the loss can be established apart from reliance, recovery may be had for a negligent statement without reliance whether on the basis of simple negligence or an extension of the doctrine propounded by *Hedley Byrne*.

[73] Other cases where claims were permitted to proceed without the element of reliance involving what might be characterized as a negligent misstatement, are more properly examples of negligence and not negligent misrepresentation claims: In *Spring v. Guardian Assurance plc and others, [1994] 3 All E.R. 129* (H.L.) and *Haskett,* the courts recognized that a duty **[*46]** of care could be owed by the defendants to the subjects of inaccurate reference letters and credit checks, notwithstanding that the statements contained in the documents were intended for other audiences and not to be relied upon by the plaintiffs. In *Lowe v. Guarantee Co. of North America (2005), 80 O.R. (3d) 222* (C.A.) the court recognized a duty of care owed by health care professionals in a designated assessment centre to the subject of an evaluation. In *Collette v. Great Pacific Management Co., 2004 BCCA 110,* leave to appeal to S.C.C. refused *[2004] S.C.C.A. No. 174,* the B.C. Court of Appeal held that reliance was not a necessary element in establishing a duty of care of financial advisers/investment brokers in respect of the plaintiffs' investments, where the tort alleged was a breach of duty in undertaking due diligence before offering the units for sale, and ultimately the claims in negligence (and not negligent misrepresentation) were certified.

[74] Rady J. followed this line of cases in permitting claims of negligent misrepresentation and negligence to proceed in her certification **[*47]** decision in *McCann*, also involving common law claims for misrepresentation in the secondary market following a restatement of the defendant corporation's financial results. Rady J. held that it was not plain and obvious that the plaintiff had to plead reliance in order to advance a claim in negligent misrepresentation. She adopted the same approach as Rooke J. adopted in *Eaton v. HMS Financial Inc., 2008 ABQB 631,* where he held that a trial on the common issues would be necessary to determine whether, and to what extent, individual reliance would need to be proven.

[75] While I do not find the cases relied on by the plaintiffs persuasive as to the ability of a court to find liability for negligent misrepresentation without proof of reliance in light of the repeated statements by our courts (including the Supreme Court of Canada in *Queen v. Cognos Inc.*) that reliance is an essential element of negligent misrepresentation, it is unnecessary to specifically rule on this issue at this stage in the proceedings. For the purpose of certification, the question is whether the Claim discloses a cause of action in negligent misrepresentation. I have concluded **[*48]** that it does disclose such a cause of action, notwithstanding the absence of a pleading of direct individual reliance by each class member. In the event that the plaintiffs are unable to prove reliance, it will remain open for them to argue at trial that reliance is not required.

**(c) "Reckless" Misrepresentation**

[76] Liability for fraudulent misrepresentation requires that (a) the defendant made the misrepresentation knowing that it was false, or recklessly, caring not whether it was true or false, (b) the defendant intended the plaintiff, or a class of persons including the plaintiff, to rely upon the misrepresentation, (c) the plaintiff and the other class members relied upon the representation to their detriment, suffering loss or damage (*Carom v. Bre-X Minerals Ltd., [1998] O.J. No. 1428* (Gen. Div.) ("*Carom [Rule 21-Gen. Div.]*") at paras. 24-25 and *Mondor [Rule 21]* at para. 33).

[77] The Claim pleads all of the required elements for fraudulent misrepresentation. Although the plaintiffs assert a claim for "reckless" misrepresentation, it is in substance a pleading of fraudulent misrepresentation, alleging the second branch of the knowledge **[*49]** element, that the defendants made the misrepresentation recklessly, not caring whether it was true or false.

[78] In *Canadian Imperial Bank of Commerce v. Deloitte and Touche, [2003] O.J. No. 2069* (Div. Ct.), the Divisional Court concluded that the motions judge had erred in dismissing a claim for reckless misrepresentation (which was in substance a claim of fraudulent misrepresentation) on the grounds that the claim was bald, the plaintiff had failed to plead fraud with particularity, and where negligent and reckless misrepresentation were pleaded disjunctively on the same allegations of fact. The Court concluded that, given the low threshold to sustain a pleading at this stage, the motions judge erred in striking the claim for reckless misrepresentation (at para. 23). In *Mondor [Rule 21]* at para. 70, Cumming J. considered a claim of "reckless misrepresentation" to be tantamount to fraudulent misrepresentation, and permitted that claim to proceed. Rady J. adopted the same approach in *McCann* (at para. 43).

[79] The concern as to indeterminate liability expressed in *Hercules Managements* has no application to a claim of fraudulent misrepresentation. **[*50]** If the defendants acted recklessly in making the Representation, with the intention that class members rely upon it, there is no policy reason to limit liability (*Mondor [Rule 21],* at para. 70; *Hercules Managements,* at paras. 40-41).

[80] Accordingly, the Claim discloses a cause of action which is properly pleaded in fraudulent misrepresentation.

**2. Negligence *simpliciter***

[81] Negligence is pleaded in paras. 63 to 66 of the Claim as follows:

> 63. Imax and the Individual Defendants owed a duty to Neil, Cliff and the Class Members, at law and under the provisions of the *Securities Act*, to disseminate promptly, or to ensure the prompt dissemination of complete and accurate statements regarding Imax's business and affairs, and promptly to correct previously-issued, materially inaccurate information, to permit, Imax's publicly-traded securities to trade upon complete and accurate information.
>
> 64. The reasonable standard of care expected in the circumstances required Imax and the Individual Defendants to act fairly, reasonably, honestly, and candidly in fulfilling the duty described in paragraph 63.
>
> 65. Imax and the Individual Defendants failed to meet the standard **[*51]** of care required for the reasons particularized in the following paragraphs.
>
> 66. Imax and the Individual Defendants were negligent in that:
>
> (a) they failed to exercise the degree of care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances as required by law;
>
> (b) they signed the Form 10-K and the Annual Report when they knew or reasonably ought to have known that the documents contained the Representation which was false;
>
> (c) they authorized statements, announcements, press releases, filings and other public documents containing the Representation;
>
> (d) they failed to maintain appropriate internal policies, controls and procedures to ensure that the financial statements adequately and fairly presented the financial position of Imax;
>
> (e) they knew or ought to have known that the 2005 reported revenue, gross earnings, net earnings, retained earnings and earnings per share of Imax were not fairly stated;

(f) they failed to properly consider all available information and reports respecting the revenue and net earnings of Imax; and

(g) they failed to comply with the principles of GAAP, including the following:

(i) interim financial **[*52]** reporting should be based upon the same accounting principles and practices used to prepare annual financial statements;

(ii) financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions;

(iii) financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources;

(iv) financial reporting should provide information about an enterprise's financial performance during a period;

(v) completeness, meaning that relevant information necessary to ensure the fair presentation of underlying events and conditions is provided;

(vi) consistency in the application of financial accounting and reporting policies;

(vii) financial reporting should be reliable in that it represents what it purports to represent; and

(viii) conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.

[82] The defendants **[*53]** contend that there is no proper cause of action for negligence based on the pleadings in the Claim. The allegations of negligence are in relation to the same alleged disclosure of false information that underlies the misrepresentation claims. The pleading cannot proceed as a claim of negligence, as that would avoid the requirement in a negligent misrepresentation claim to prove reliance.

[83] In *Deep,* D. Brown J. struck out pleadings of negligent misrepresentation and negligence by the plaintiff, a Nortel shareholder, for damages for losses sustained in his registered retirement investment plan resulting from the decline in the price of Nortel stock. Allegations in the statement of claim had already been struck, with leave to amend, and the Divisional Court had provided specific direction as to the pleading of misrepresentation and the need to assert reliance (*Deep v. M.D. Management, [2006] O.J. No. 221* (Div. Ct.)). The claim was amended and expanded, and the Nortel defendants moved again to strike the pleading.

[84] The negligence pleading was that the Nortel defendants owed a duty of care based on a special relationship between the parties -- **[*54]** "they stood in a special relationship of proximity between the purchaser and holders of Nortel securities". The duty of care was "to accurately represent Nortel's financial situation and disclose any material changes promptly and truthfully". The alleged nature of the breach of this duty was twofold: (i) misrepresentation of Nortel's situation by the non-disclosure of facts and (ii) misrepresentations "by way of lack of disclosure in the second and third quarter and statements which were forward looking or projections were made for the specific purpose of inducing shareholders and investors to purchase shares, hold their shares and/or acquire more shares". The amended claim also relied in support of the negligence claim on the obligation imposed by s. 75(1) of the OSA on a reporting issuer to report material changes.

[85] D. Brown J. struck the pleading of negligent misrepresentation, based on the failure of the plaintiff once again to plead reliance. He also struck the claim of negligence, finding that such pleading was in fact an alternative pleading of the same cause of action, negligent misrepresentation.

[86] In *McCann,* Rady J. permitted claims of negligence and negligent **[*55]** misrepresentation to proceed notwithstanding that there was overlap in the pleadings. In that case, she found that a duty of care had been pleaded that was distinct from the duty to provide accurate information (that the defendants failed to properly integrate CP Ships' disparate lines and failed to acquire and use appropriate information technology). Rady J. would also have permitted the negligence claim to proceed in any event, as a novel claim.

[87] In the present case I find that the pleadings of negligence are in substance a pleading of negligent misrepresentation. The duty of care is framed as a duty at law and under the OSA owed by IMAX and the Individual Defendants to

the plaintiffs and class members to "disseminate promptly, or to ensure the prompt dissemination of complete and accurate statements regarding IMAX's business and affairs, and promptly to correct previously issued, materially inaccurate information, to permit IMAX's publicly-traded shares to trade upon complete and accurate information" (para. 63). The standard of care is pleaded as requiring IMAX and the Individual Defendants "to act fairly, reasonably, honestly, and candidly" in fulfilling the aforesaid duty. **[*56]** While some of the seven particulars of negligence pleaded in para. 66 appear to cast the net more broadly beyond negligent misrepresentation (for example, the pleading of a failure to maintain appropriate internal policies and procedures to ensure that the financial statements adequately and fairly presented the financial position of IMAX), they nevertheless are pleaded as particulars of the breach of duty of care to disseminate accurate information to the securities market.

[88] The negligence pleading in this case is in substance a pleading of negligent misrepresentation without the ingredient of reliance. There is also no pleading that the alleged negligence caused damage to the plaintiffs and no separate claim for a remedy based on negligence. Accordingly, the claims sounding in negligence *simpliciter* (paras. 63 to 66 of the Claim) will not be permitted to proceed and the Claim shall be amended accordingly.

**3. Conspiracy**

[89] Conspiracy is pleaded in paras. 52 to 56 of the Claim as follows:

> 52. From on or about October 1, 2005 to on or about August 9, 2006, at Mississauga, Ontario, New York, New York and elsewhere Imax, Gelfond, Wechsler and Joyce, wrongfully, unlawfully, **[*57]** maliciously and lacking bona fides, agreed together, the one with the other and with persons unknown, to, among other things, overstate the revenues and net earnings of Imax for the fourth quarter and fiscal year ending on December 31, 2005.
>
> 53. Some, but not all of Imax's, Gelfond's, Wechsler's and Joyce's predominant purposes, concerns and motivation were to:
>
> (a) injure the plaintiffs and the Class Members by causing them to purchase Imax shares at inflated prices;
>
> (b) attract an acquirer or merger partner;
>
> (c) inflate the price of Imax's shares;
>
> (d) obtain an artificially high purchase price for Imax; and
>
> (e) increase the value of their own holdings in Imax.
>
> 54. In furtherance of the conspiracy, the following are some, but not all of the acts carried out or caused to be carried out by Imax, Gelfond, Wechsler and Joyce, or some of them:
>
> (a) they recognized revenue in the fourth quarter of 2005 on ten theatre systems even though sufficient and appropriate evidence did not exist that such systems had been substantially installed as operational Imax facilities, that Imax had fulfilled its obligations as vendor or that revenues had been "earned" in accordance with GAAP; **[*58]**
>
> (b) they inappropriately implemented revenue recognition procedures that allowed Imax to segregate revenues from different elements of an Imax theatre system, and recognize those revenues in different quarters, even through the customer transactions were not suited to such accounting treatment;
>
> (c) they deviated from GAAP in the preparation of the financial statements;
>
> (d) they deviated from the accounting principle of consistency in the preparation of financial statements;
>
> (e) they authorized statements, announcements, press releases, filings and other public documents containing the Representation;
>
> (f) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when the location was not fit for installation;
>
> (g) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when essential components of the Imax system were absent;

(h) they permitted Imax and the Individual Defendants to make the Representation which was false;

(i) they made, or failed to take any steps to prevent Imax from making the Representation in statements, announcements, press releases, filings and other public documents; **[*59]**

(j) they made, or caused Imax to make, announcements about its revenue and net earnings when they knew there was no reasonable foundation, in fact, for these net earnings;

(k) they falsely stated that Imax had revenue of US$ 49,310,000 for the fourth quarter of the fiscal year ended 2005;

(l) they falsely stated that Imax had revenue of US$ 144,930,000 for the fiscal year ended 2005;

(m) they prepared and issued the February Press Release falsely stating that it expected to meet or exceed 2005 earnings guidance;

(n) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's revenue was US$ 49,310,000 for the fourth quarter of fiscal 2005; and

(o) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's net earning was US$ 0.29 per share for the fourth quarter of fiscal 2005 and US$ 0.40 per share for the fiscal year 2005.

55. The conspiracy was unlawful because Imax, Gelfond, Wechsler and Joyce knowingly and intentionally overstated the revenue and net earnings of Imax and in doing so violated ss. 77(1) and 78(1) of the *Securities Act* and similar regulatory legislation in other jurisdictions, including **[*60]** ss. 12, 13 and 18 of the [U.S. *Securities Exchange Act of 1934*], and the reporting requirements of the NASDAQ and the TSX including Part IV(F) of the TSX Company Manual and Rule 4-201 of the TSX Rule Book.

56. The conspiracy was directed towards Neil, Cliff and the other Class Members. Imax, Gelfond, Wechsler and Joyce knew in the circumstances that the conspiracy would, and it did, cause loss to Neil, Cliff and the Class Members.

[90] In *Normart Management Limited v. West Hill Redevelopment Company Limited et al. (1998), 37 O.R. (3d) 97* (C.A.), at p. 98, Finlayson J.A. for the Court of Appeal described the requirements for pleading the tort of conspiracy (citing *Bullen & Leake and Jacob's Precedents of Pleadings* [See Note 7 below]) as follows:

Note 7: *Bullen & Leake and Jacob's Precedents of Pleadings*, 12th ed. (London: Sweet & Maxwell, 1975).

[T]he statement of claim should describe who the several parties are and their relationship with each other. It should **[*61]** allege the agreement between the defendants to conspire, and state precisely what the purpose or what were the objects of the alleged conspiracy, and it must then proceed to set forth, with clarity and precision, the overt acts which are alleged to have been done by each of the alleged conspirators in pursuance and in furtherance of the conspiracy; and lastly, it must allege the injury and damage occasioned to the plaintiff thereby.

[91] The defendants' principal objection with respect to the pleading of conspiracy [See Note 8 below] is that the conspiracy is alleged to have occurred between IMAX and the Individual Defendants, each of which is identified as a director and/or officer at the time. It is impossible for a person (in this case the Company) to conspire with itself. See *Accord Business Credit Inc. v. Bank of Nova Scotia, [1997] O.J. No. 2562* (Gen. Div.), at para. 34, where Cumming J. noted:

Note 8: Other objections (outlined at paras. 107 to 116 of the Respondents' Rule 21 Factum) appear to have been addressed by the plaintiffs' most recent changes to their pleadings which have been incorporated in the Claim.

**[*62]**

> When an officer is acting within the scope of his authority in the best interests of the corporation such that the actions complained of are the actions of the corporation itself and not the actions of the officer, then it is not logical to say that there can be a civil conspiracy between the officer and his corporation.

[92] The plaintiffs contend that the conspiracy allegations in the Claim are against IMAX and the Individual Defendants acting in an independently tortious manner; that is, for which they would be held personally liable. In *Normart Management* at p. 102, Finlayson J.A. set out the test for civil liability of directing minds as follows:

> It is well established that the directing minds of corporations cannot be held civilly liable for the actions of the corporations they control and direct unless there is some conduct on the part of those directing minds that is either tortious in itself or exhibits a separate identity or interest from that of the corporations such as to make the acts or conduct complained of those of the directing minds.

[93] An action may proceed against employees and officers of a corporation, for acts and omissions which occurred **[*63]** in the course of their employment, if the conduct alleged amounts to "fraud, deceit, dishonesty or want of authority on the part of [the] employees or officers.": *ScotiaMcLeod Inc. v. Peoples Jewellers Ltd. (1995), 26 O.R. (3d) 481* (C.A.), at para. 25.

[94] In the present case, while the plaintiffs have alleged that the acts or omissions alleged in the Claim were authorized, ordered and done by the Individual Defendants while engaged in the management, direction, control and transaction of its business affairs and are therefore acts and omissions for which IMAX is vicariously liable (paras. 85 and 86), the plaintiffs have also alleged that the actions of the Individual Defendants are independently tortious and that such defendants are personally liable (para. 87).

[95] The allegations against the Individual Defendants in the Claim include the assertion that they were acting "wrongfully, unlawfully, maliciously and lacking bona fides" (para. 52) and that they were motivated to increase the value of their own holdings in IMAX (para. 53(e)).

[96] The Claim pleads all of the necessary elements of the cause of action of conspiracy. There are allegations **[*64]** in the Claim that may, if true, give rise to personal liability on the part of the Individual Defendants. Their conduct is at issue both as agents for the Corporation and in their personal capacities. It is not therefore plain and obvious that the conspiracy claim is deficient, and accordingly such claim will not be struck.

**4. Vicarious Liability**

[97] In paragraphs 85 and 86 of the Claim, the plaintiffs plead that IMAX is vicariously liable for the acts and omissions of the Individual Defendants, that were authorized, ordered and done by the Individual Defendants and IMAX's other agents, employees and representatives while engaged in the management, direction, control and transaction of its business affairs. This pleading, when read within the Claim as a whole, is a sufficient pleading of vicarious liability, and accordingly such claim will not be struck.

**D. Section 5(1)(b) of the CPA: Is there an identifiable class represented by the representative plaintiffs?**

**1. The Proposed Class Definition**

[98] The plaintiffs propose the following worldwide class definition:

> "Class" or "Class Members" means all persons, other than Excluded Persons, who acquired securities of Imax **[*65]** during the Class Period on the TSX and on NASDAQ and held some or all of those securities at the close of trading on August 9, 2006.

"Class Period" is defined in the Claim as "the period from and including the opening of trading on the TSX and NASDAQ on February 17, 2006 to and including the close of trading on the TSX and NASDAQ on August 9, 2006".

**2. The "Identifiable Class" Requirement**

[99] Class definition "identifies the individuals entitled to notice, entitled to relief (if relief is awarded), and bound by the judgment." The definition should state objective criteria by which members of the class can be identified and should not depend on the outcome of the litigation (*Western Canadian Shopping Centres* at para. 38).

[100] A class may be identifiable even if the identities of all of the prospective members are unknown to the representative plaintiffs. Indeed, s. 6 of the CPA provides that the court shall not refuse to certify a proceeding as a class proceeding solely on the ground that "the number of class members or the identity of each class member is not known".

[101] Section 5(3) of the CPA requires each party to provide by affidavit its best information on **[*66]** the number of members in the class. I was unable to find any such statements in the affidavit materials filed in this case. The identity of IMAX shareholders as at specific dates may be ascertained from the Company's records, recognizing that shares may be held by brokers or other intermediaries. [See Note 9 below]

Note 9: IMAX has already identified the number of shares outstanding as of February 14, 2005, and was able to estimate the percentage of non-resident shareholders based on addresses contained in the shareholder register: Copland Affidavit, para. 107; Answers to Undertakings, Q. 115, Moving Parties' Fourth Supplementary Motion Record, Vol. 1, Tab 1-A.

[102] There is no question that the proposed class meets the requirement for an identifiable class under s. 5(1)(b). The proposed class members are identified by objective and readily verifiable criteria; that is, that they purchased on the TSX and on NASDAQ and held IMAX shares during the Class Period.

**3. Is the proposed class over-inclusive as including [*67] claims of persons who may have no claims?**

[103] The defendants assert that the proposed class is over-inclusive because the class as proposed, of all shareholders of IMAX who acquired and held their shares during the Class Period, may include persons who have no claim because they may not have known of or relied upon the alleged misrepresentation or they may not have suffered damages as a result.

[104] The defendants rely on *Mouhteros v. DeVry Canada Inc. (1998), 41 O.R. (3d) 63* (Gen. Div.). In that case, Winkler J. refused to certify a proposed class consisting of all students who had attended the defendant's college within a period of six years in part because it would include people who had no claim against the defendant as they had not received or relied upon the alleged misrepresentations that formed the basis of the action. Underlying the court's decision however was the fact that there were numerous alleged representations published in a variety of different television commercials and newspaper advertisements, and communicated verbally by admissions officers during the six year period. The nature of the representations and whether they were **[*68]** made negligently or fraudulently would vary with the individual students' programs and the conditions existing at each campus. As such, there were no common issues respecting misrepresentation.

[105] In this case, by contrast, the core of the common law misrepresentation claim is that a single misrepresentation (the "Representation") was made by the Defendants (albeit through four communications) that affected the market price of all IMAX securities during the Class Period, and that in all of the circumstances, reliance by all class members should be inferred as a question of fact. This is not a case where multiple misrepresentations in varied circumstances are alleged. There is clearly a commonality of interests between the class members in this case, that is shared by the proposed representative plaintiffs.

[106] In any event, a proposed class will not be overbroad simply because it may include persons who ultimately will not have a claim against the defendants (*Bywater v. Toronto Transit Commission, [1998] O.J. No. 4913* (Gen. Div.), at paras. 10-11; *Boulanger v. Johnson & Johnson Corp., [2007] O.J. No. 179* (S.C.), **[*69]** at para. 22, leave to appeal to the Divisional Court refused *[2007] O.J. No. 1991* (S.C.)).

[107] The submission by the defendants in this case that the class is overbroad because some of the class members may not have claims depends on their contention that there will be individual issues (such as reliance and damages) to be decided after the common issues have been determined. While the plaintiffs assert that reliance (based on the efficient market theory) and damages (contending that an aggregate assessment will be appropriate) will not be individual issues in this case, even if they are wrong and individual issues remain after the determination of the common issues, this is not an impediment to certification. As Cullity J. noted in *Heward v. Eli Lilly & Co., [2007] O.J. No. 404* (S.C.), at para. 69, "whenever, because of the existence of individual issues, a judgment on the common issues in favour of the plaintiffs will not determine a defendant's liability, it will always be possible -- and invariably likely -- that an acceptable class will include persons who will not have valid claims".

**4. Certification of a Global Class [*70]**

[108] The principal challenge by the defendants to the proposed class definition is that it is overbroad because it includes non-residents of Canada, the resolution of whose claims may depend on the application of the laws of other jurisdictions. The question of whether a global class should be certified raises issues of the jurisdiction that may be exercised by an Ontario court over non-resident class members, and whether, as a matter of discretion, such jurisdiction should be exercised by certifying a global class. The defendants argued the question as part of the "preferable procedure" analysis [See Note 10 below], and indeed the discussion that follows addresses the considerations relevant to both ss. 5(1)(a) and (d) of the CPA. For convenience, the issue of whether a global class can and should be certified will be addressed at this point in these reasons.

Note 10: Factum of the Defendants and the Proposed Defendants #3 as Responding Parties: to the Motion for Certification, paras. 219-265.

**(a) Positions of [*71] the Parties**

[109] The plaintiffs assert that the Ontario court has clear jurisdiction over the subject matter of the litigation. IMAX is a Canadian corporation with its registered office in Mississauga. The alleged misconduct relates to the accuracy of the Company's financial statements which were prepared and audited in Ontario. The claims of all class members are related to claims that are properly asserted by the representative plaintiffs in Ontario. The class proceedings objectives of judicial economy, access to justice and behaviour modification would best be met by certifying a class defined to include all persons, including non-residents, who acquired IMAX securities on the TSX and NASDAQ and held such securities during the class period.

[110] The defendants, while acknowledging the authority of the court to certify a class with non-resident members, submit that it would be wrong to certify a global class in the present case. According to IMAX's records as of February 14, 2005, there were 39,511,959 shares outstanding. Approximately 10-15% of the shareholders were Canadian residents, with the balance of outstanding common shares held by American or other non-Canadian residents. **[*72]** [See Note 11 below] From this, the defendants infer that the proposed global class would contain a similar percentage of non-Canadian resident shareholders. The defendants suggest that it would be extraordinary for the court to recognize a class where most members are from outside the jurisdiction.

Note 11: Copland Affidavit, para. 107; Answers to Undertakings, Q. 115, Moving Parties' Fourth Supplementary Motion Record, Vol. 1, Tab 1-A.

[111] The defendants propose that if a class is certified, it should consist of TSX purchasers of IMAX shares resident in Canada, and that it would be premature to certify a worldwide class, particularly where there is an existing proceeding in the U.S. They argue that it would be better to certify the Canadian class only, with leave to the plaintiffs to return to the court, depending on what may occur in the U.S. Proceedings (presumably if the U.S. court refuses certification).

[112] The final argument of the defendants in opposition to the certification of a global class is based **[*73]** on anticipated conflict of laws concerns. A worldwide class would include class members who individually would have received and relied upon the misrepresentation, and suffered the consequences of the misrepresentation, in places other than Ontario. Their claims may be subject to the laws of various jurisdictions, adding complexity to the proceedings. As a result, a class proceeding including U.S. residents would not be the "preferable procedure".

[113] The position taken by the defendants in this motion with respect to certification of a global class contradicts their arguments made in opposition to certification in the U.S. Proceedings. [See Note 12 below] (IMAX's brief and other documents in the U.S. Proceedings were filed on consent in these proceedings, and were the subject of argument in April 2009).

Note 12: Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class Certification ("IMAX Brief in U.S. Proceedings"), Affidavit of Michael G. Robb, sworn April 1, 2009 ("Fourth Robb Affidavit"), Exhibit "B", Moving Parties' Sixth Supplementary Motion Record, Tab "B".

**[*74]**

[114] Relying on the fact that IMAX is a Canadian corporation organized under the laws of Canada with its principal place of business in Canada, IMAX asserted in the U.S. Proceedings that the Ontario court would have jurisdiction over the claims of a global class, and that the connection between the dispute and this jurisdiction is at least as strong as the connection between the dispute and the United States. [See Note 13 below] IMAX argued that it would be preferable to litigate the issues in dispute in the pending Ontario proceedings. IMAX asserted, "only the Canadian court is in a position to grant full relief to all purchasers of IMAX stock", implying that the statutory claim under the OSA, which does not require proof of reliance, would be available to all class members. [See Note 14 below]

Note 13: IMAX Brief in U.S. Proceedings, pp. 9-11.

Note 14: IMAX Brief in U.S. Proceedings, p. 9.

[115] IMAX appended to its argument against certification in the U.S. Proceedings the expert report of Professor Poonam Puri, **[*75]** of Osgoode Hall Law School [See Note 15 below], that addressed among other things, the inherent authority of the Ontario court to certify a global class, and cited examples of cases where Ontario courts had exercised such jurisdiction to certify class actions comprising international class members. Professor Puri's report also detailed the statutory claim available to plaintiffs under the OSA, without discussion of whether the remedy would be available to class members resident outside Ontario or those who had purchased their shares on NASDAQ. [See Note 16 below]

Note 15: Report of Professor Poonam Puri, Fourth Robb Affidavit, Exh. "C".

Note 16: IMAX Brief in U.S. Proceedings, pp. 7 and 8.

[116] While the contradiction in the positions taken by IMAX in responding to the certification motions in the two jurisdictions is not determinative of whether this court should certify a global class in these proceedings, it is nonetheless revealing. If IMAX is successful in the position it has taken in the U.S. Proceedings, **[*76]** the U.S. court may decide not to certify a global class or may decline certification altogether on the basis that a more effective remedy is available to the class in the Ontario proceedings. The inconsistency in the defendants' submissions in the two jurisdictions suggests that their opposition to certification of a global class in Ontario is not in fact based on *bona fide* concerns about the appropriateness of this court determining the claims of non-residents. Rather, their objective appears to be to limit the size of the class and so reduce their potential liability for damages.

**(b) The Court's Authority to Certify National and International Classes**

[117] When national or international classes are proposed in class actions, the certifying court must consider whether it has jurisdiction *simpliciter* and whether it would be appropriate to assume jurisdiction over the claims of class members who reside outside the province. This issue has attracted significant attention in recent years and remains contentious. In a recent decision of the Supreme Court of Canada, *Canada Post Corporation v. Lépine, [2009] 1 S.C.R. 549* (at para. 57), LeBel J. **[*77]** urged the provinces to address through legislation the jurisdictional issues raised by national and international class actions [See Note 17 below].

Note 17: The case involved an application to stay class proceedings in Québec and to recognize the preclusive effect of a settlement in a parallel Ontario class action that included in the class Québec residents. The Court's decision refusing to recognize the Ontario judgment was ultimately based on deficiencies in notice given to the Quebec residents which was insufficient and confusing in that it did not properly explain the impact of the judgment certifying the class proceeding on Québec members of the national class (para. 45).

[118] Class proceedings involving non-resident class members present challenges for both the assumption of jurisdiction (that is the decision to certify a class that includes non-residents) and the recognition and enforcement of judgments of other courts where jurisdiction over non-resident class members has been assumed. The issue has been **[*78]** described by Craig Jones and Angela Baxter as follows:

The unique aspect of opt-out class actions is that courts purport to take jurisdiction over absent *plaintiffs.* A certification binds a class of such persons to a decision of the court, or a settlement approved by the court, and it does it according to provincial law. In an opt-out action, it does so without their active consent, and in many cases without their actual knowledge that a proceeding affecting their rights is underway. [See Note 18 below] (Emphasis in original.)

Note 18: Craig Jones and Angela Baxter, "Fumbling Toward Efficacy: Interjurisdictional Class Actions after *Currie v. McDonald's*", (2006) 3 *The Canadian Class Action Review* 405, p. 407.

[119] The decision to certify a class with non-residents does not of course determine whether a settlement or other disposition within Ontario will be recognized outside the jurisdiction to bind non-resident class members. As Brockenshire J. noted at first instance in *Nantais v. Teletronics Proprietary (Canada) Ltd. (1995), 25 O.R. (3d) 331* **[*79]** (Gen. Div.), in certifying a class proceeding against a pacemaker manufacturer on behalf of a national class, the "potential problem" of recognition was "something to be resolved in another action [by a non-resident class member] before another court in another jurisdiction": at p. 346. In dismissing the application for leave to appeal, at, *[1995] O.J. No. 3069, 25 O.R. (3d) 347* (Div. Ct.), Zuber J. noted at p. 350: "whether the result reached in an Ontario court in a class proceeding will bind members of the class in other provinces who remained passive and simply did not opt out, remains to be seen".

[120] Nevertheless, as recent decisions in Ontario demonstrate, the issues of certification and recognition of class proceedings including non-resident members involve consideration of the same factors. The court must have jurisdiction over the class members (through a "real and substantial connection" between the jurisdiction and their claims) and the court must find that the assertion of jurisdiction is consistent with the principles of "order and fairness".

[121] Numerous national classes have been certified in Ontario. In *Carom v. Bre-X Minerals Ltd. (1999), 44 O.R. (3d) 173* **[*80]** (S.C.) ("*Carom [Certification]*"), aff'd *46 O.R. (3d) 315* (Div. Ct.), rev'd on other grounds *51 O.R. (3d) 236* (C.A.)., Winkler J. certified a national class consisting of shareholders and former shareholders of various corporate defendants whose investment value had declined after it was revealed that the defendants had disseminated false information. The Court applied the "real and substantial connection" test from *Morguard Investments Ltd. v. DeSavoye, [1990] 3 S.C.R. 1077,* finding that such a connection to Ontario existed on the basis of the incorporation and/or operation of the various corporate defendants in Ontario, the trading of their shares on the TSE, and the generation, public dissemination, and allegedly negligent verification of the false information in Ontario. Winkler J. also found that the notice requirements and opt-out provisions of the CPA prevented any prejudice to non-resident class members, thus making the assumption of jurisdiction consistent with the principles of order and fairness.

[122] In *Wilson v. Servier Canada Inc. et al. (2000), 50 O.R. (3d) 219,* **[*81]** Cumming J. certified a national class of patients who suffered from heart disease after being prescribed a weight loss drug. He cited, at para. 92, Professor Castel's *Canadian Conflict of Laws*, 4th ed.: [See Note 19 below]

Note 19: Castel's *Canadian Conflict of Laws*, 4th ed. (Toronto: Butterworths, 1997).

[T]he test for determining whether a real and substantial connection exists is not demanding or rigid. The court needs to find only a real and substantial connection, not the *most* real and substantial connection, to assume jurisdiction." [Emphasis in original].

[123] Even in cases where the only connection between a non-resident class member and the jurisdiction is the sharing of common issues with resident class members, jurisdiction may be assumed. In *McCutcheon v. The Cash Store Inc., (2006), 80 O.R. (3d) 644* (S.C.), Cullity J. certified a national class of claimants in a payday loan class action, after conducting a comprehensive review of the authorities. Cullity J. **[*82]** observed that Ontario courts (in contrast to the courts of Saskatchewan and Québec) have taken an expansive approach to jurisdiction, even in cases where non-resident class members had no connection to the jurisdiction except their sharing of common issues with resident class members. His decision was consistent with a number of Ontario authorities, including *Baxter v. Canada (Attorney General), [2005] O.J. No. 2165* (S.C.), where Winkler J. observed that where a class action involving intra-provincial plaintiffs could be certified, and the common issues forming the basis for the certification are shared by both the resident class

and extra-provincial non-residents against the defendant, the existence of such common issues provides a "real and substantial connection" of the non-residents to the forum in relation to the action.

[124] Classes including international members have been certified by Ontario courts without any detailed consideration of the jurisdictional issues in *Bendall v. McGhan Medical Corp. (1993), 14 O.R. (3d) 734* (Gen. Div.) (breast implant case -- no territorial limitation on class members); *Robertson v. Thomson Corp. (1999), 43 O.R. (3d) 161* **[*83]** (S.C.) (class comprised of creators and/or owners of copyright in and to certain works published in Canada in print media); *Cheung v. Kings Land Development Inc. (2002), 55 O.R. (3d) 747* (S.C.), leave to appeal refused *[2002] O.J. No. 336* (Div. Ct.) (class included Hong Kong residents); *Brimner v. Via Rail Canada Inc. (2002), 50 O.R. (3d) 114* (S.C.) (class comprised of all persons traveling on a Windsor-Toronto train). International classes have been certified for settlement purposes in *Nutech Brands Inc. v. Air Canada, [2008] O.J. No. 1065* (S.C.) and *Mondor [Settlement].*

[125] While there are no reported Ontario appeal court decisions reviewing a decision to certify a global class, the issue of when a domestic court can assert jurisdiction over the claims of non-residents was addressed by the Court of Appeal in the context of the recognition and enforcement in Ontario of a foreign judgment incorporating a settlement of a class action: *Currie v. McDonald's Restaurants of Canada Ltd. (2005), 74 O.R. (3d) 321* (C.A.).

[126] *Currie* **[*84]** involved the enforcement in Ontario of a settlement of an international class proceeding from Illinois. The defendants moved to stay parallel class proceedings in Ontario based on the settlement that included Ontario residents. Sharpe J.A. affirmed the importance of national and international classes at paras. 14 and 15:

> Ontario residents frequently engage in cross-border activities that may become the subject of class action litigation in Ontario, in another province or in a foreign jurisdiction. Several Ontario trial courts have authorized national and international classes: *Robertson v. Thomson Corp. (1999), 43 O.R. (3d) 161* (S.C.J.) (international class), *Carom v. Bre-X Minerals Ltd. (1999), 44 O.R. (3d) 173* (S.C.J.) (national class) and *Wilson v. Servier (2000), 50 O.R. (3d) 219* (S.C.J.) (national class). In *Mondor v. Fisherman; CC & L Dedicated Enterprise Fund (Trustee of) v. Fisherman, [2002] O.T.C. 317,* Cumming J. approved a settlement in a class action where the class included American and other foreign plaintiffs. Legislation in several provinces **[*85]** specifically contemplates the inclusion of non-resident class members: *Class Proceedings Act*, S.A. 2003, c. C-16.5, ss. 7(1)(3) and 17(1)(b); *Class Proceedings Act*, R.S.B.C. 1996, c. 50, ss. 6(2) and 16(2); *Class Proceedings Act,* C.C.S.M., c. C130, s. 6(3); Newfoundland and Labrador Class Actions Act, S.N.L 2001, c. C-18.1, ss. 7(2) and 17(2)-(5); *Class Actions Act*, S.S. 2001, c. C-12.01, ss. 8(2) and 18(2).

There are strong policy reasons favouring the fair and efficient resolution of interprovincial and international class action litigation: *Vitapharm Canada Ltd. v. F. Hoffman-LaRoche Ltd.* (2001), 6 C.P.C. (5th) 245 at para. 27 (Ont. S.C.J.), aff'd (2002), 20 C.P.C. (5th) 65 (Ont. Div. Ct.), aff'd (2003), 30 C.P.C. (5th) 107 (Ont. C.A.); *Wilson v. Servier Canada Inc.*, above at 243-4 (S.C.J.); *Wilson v. Servier Canada Inc. (2002), 59 O.R. (3d) 656* (S.C.J.) at 664-670. Conflict of law rules should recognize, in appropriate cases, the importance of having claims finally resolved in one jurisdiction. In some cases, Ontario courts will render judgments affecting the rights of non-residents and in other cases, Ontario residents **[*86]** will be affected by class action proceedings elsewhere. Ontario expects its judgments to be recognized and enforced, provided its courts assert jurisdiction in a proper manner and comity requires that, in appropriate cases, Ontario law should give effect to foreign class action judgments.

[127] Sharpe J.A. went on to recognize three pre-conditions for the recognition of a judgment binding an unnamed plaintiff who has not opted out of an international class: (a) the existence of a real and substantial connection linking the cause of action to the foreign jurisdiction, (b) adequate representation of the rights of non-resident class members, and (c) procedural fairness to non-resident class members, including adequate notice (at para. 30).

[128] The Court found that a "real and substantial connection" to the Illinois jurisdiction existed by reason of the facts that the defendant's head office was located in that state and that the alleged wrongful conduct, the manipulation of the random selection of winners of high-value prizes to ensure that no such prizes would be awarded to contestants in Canada, had occurred there. Recognition of the Illinois judgment failed however on the third **[*87]** part of the test, procedural fairness, by reason of inadequacies in the notice given to the Canadian resident class members.

[129] There is accordingly no doubt that this court has the authority to certify an international class if there is a "real and substantial connection" between the claims asserted on behalf of the foreign class members and this jurisdiction.

[130] Such connection exists in this case. IMAX is a CBCA corporation with its head office in Ontario. It is a reporting issuer under the OSA and its shares are traded on the TSX. The alleged Representation was made in Ontario through the issuance of the Company's Form 10-K and press releases from IMAX's Mississauga head office (although arguably it may have been made in IMAX's offices in New York as well). The alleged wrongful actions of the Individual Defendants in connection with the preparation and reporting of IMAX's financial statements are alleged to have taken place in Ontario as well as New York. The proposed common issues respecting liability that concern the conduct of the defendants accordingly have a substantial connection to this jurisdiction.

**(c) Considerations of "Order and Fairness" -- Should a global [*88] class be certified in this case?**

[131] The next question is whether the principles of "order and fairness" would weigh against the certification of a global class in the present case. These factors are also relevant to the question of whether certification of a global class would be the "preferable procedure", that is "a fair, efficient and manageable method of advancing the claim" that is "preferable to other reasonably available means of resolving the claims of class members" (*Markson v. MBNA Canada Bank (2007), 85 O.R. (3d) 321* (C.A.), at para. 69, leave to appeal to S.C.C. refused *[2007] S.C.C.A. No. 346).*

[132] The defendants assert in opposition to certification of a global class: (1) that a comprehensive proceeding has been commenced in the U.S. that would be more appropriate for the pursuit of claims by U.S. residents and (2) that a global class should not be certified because of the likelihood that different laws will apply to the claims of class members depending on where they acquired their shares and where they reside, which will make the proceedings unduly complex and inefficient.

**(i) The Relevance of the [*89] U.S. Proceedings**

[133] The fact that there is a pending application for certification in another jurisdiction is not an obstacle to certification of a class that includes non-resident members. It is not unusual for class proceedings to be commenced contemporaneously in different jurisdictions. Even where a class proceeding has been certified elsewhere, parallel proceedings may be permitted to continue. In *Mignacca et al. v. Merck Frosst Canada Ltd. et al. (2009), 95 O.R. (3d) 269* the Divisional Court dismissed an appeal from an order of Cullity J. refusing to stay a class action that had been certified in Ontario, where an action involving the same claims and the same class had been certified in Saskatchewan. The Court concluded that it would not be an abuse of process to permit two multi-jurisdictional class actions to proceed. The Court recognized that certification orders are not final judgments, but "interlocutory procedural orders that may be amended at any time as the cases proceed" (at para. 39).

[134] There has been no determination to date of the certification issue in the U.S. Proceedings, and if the defendants are successful in their opposition, **[*90]** the U.S. Proceedings may never be certified. At this stage, the prospect that a similar proceeding might be certified in another jurisdiction is not sufficient to prevent the court from certifying a global class in Ontario.

**(ii) Conflict of Laws and Complexity**

[135] The defendants argue that the claims of the various non-resident class members may be subject to the laws of various jurisdictions, and as such a global class proceeding will be unduly complex. In their Certification Factum, the defendants identify the problems that may arise in the following terms at paras. 16 and 17:

> The Plaintiffs' common law claims, as pleaded, fail to note the multi-jurisdictional nature of the tortious misconduct of which the Defendants are accused. If established, this misconduct will almost certainly be found to have occurred partially (and perhaps primarily) in New York, and partially in Ontario, with the tort in question being directed towards, or "completed" in, **each** and **every** jurisdiction (that is, in **each** province, state or foreign country) where an individual investor felt the consequences of the Defendants' alleged misconduct.
>
> These realities underline a fundamental **[*91]** complication which the Plaintiffs have entirely ignored in asserting common law tort claims on behalf of this proposed worldwide investor class. This complication is the necessity for this Court -- ***following*** the certification of any of the Plaintiffs' tort-based "common issues," but ***before*** any common issue trial can be held -- to undertake individual determinations of **which** body of substantive law (*i.e.*, the laws of **which** province, state or foreign county) properly governs **each** of the causes of action (*i.e.*, negligence *simpliciter*, negligent misrepresentation, fraudulent misrepresentation, conspiracy, vicarious liability, *etc.*) being asserted on behalf of **each** puta-

tive class member, or on behalf of **each** of the numerous geographically-defined sub-classes which will need to be established. [Emphasis in original.]

[136] The defendants are correct in observing that the plaintiffs at the certification stage have not addressed the potential for conflict of laws issues. Indeed the defendants ignored such issues in their own submissions on certification in the U.S. Proceedings, and all parties appear to have proceeded on the assumption **[*92]** that the OSA statutory claim will be available to all class members in the Ontario proceedings.

[137] There is authority that a court may refuse to certify a class containing non-resident members where the resolution of their claims would clearly involve the application of the statutory laws of multiple jurisdictions.

[138] *McNaughton Automotive Ltd. v. Co-Operators General Insurance Co. (2003), 66 O.R. (3d) 466* (S.C.) involved a proposed class proceeding by the plaintiff insureds against defendant insurers alleging breach of a statutory condition in their policies of automobile insurance concerning the calculation of salvage costs. In refusing certification, Haines J. observed that the claims of the proposed members of the class would entail the consideration of statutory provisions that differed between provinces, including different processes prescribed thereunder for the resolution of claims. While acknowledging that it would be open to an Ontario court to interpret and apply the laws of other jurisdictions, Haines J. concluded that the administration of justice would not be served by certifying a national class where: (1) the contract was made **[*93]** outside of Ontario pursuant to the laws of another jurisdiction that are materially different; (2) the defendant is licensed under and subject to the laws of the other jurisdiction; (3) the alleged breach occurred outside Ontario; (4) the claimants reside outside of Ontario; (5) the events which gave rise to the claim occurred outside Ontario; and (6) the damages were sustained outside Ontario. As such, he concluded that there was a demonstrated absence of any real connection between potential out-of-province class members and the Ontario forum and that order and fairness would not be served by assuming jurisdiction over claims of persons in those provinces and territories where the relevant statutory provisions were materially different from those in Ontario.

[139] In *McNaughton* the claims asserted by the representative plaintiffs clearly relied on statutory provisions. It was manifest from the outset of the action (that is in the way that the plaintiffs had pleaded their action in reliance on statutory terms) that the statutes of the various provinces differed in material ways that would affect the resolution of the claims of various members of a national class.

[140] *Risorto v. State Farm Mutual Automobile Insurance Company, [2007] O.J. No. 676,* **[*94]** (S.C.) was also a case involving different provincial statutory regimes. Although he ultimately refused certification of the class proceeding for other reasons, Cullity J. would have addressed differences between provincial statutory defences by identifying subclasses of persons insured in New Brunswick and Alberta and including as an additional common issue the question whether the claims of such persons are precluded by the statutory conditions incorporated in their policies pursuant to the laws of those provinces. The existence of the special defence that the defendant insurer might have to the claims of such persons would not outweigh the values of order, fairness and access to justice that would militate in favour of the inclusion of non-resident members in the class.

[141] *Pearson v. Boliden Ltd., 2002 BCCA 624,* is a case where the conflict of laws question, that is, what statutes would apply to the determination of class members' claims, was considered at the certification stage in order to properly define the class.

[142] In *Pearson*, the defendant corporation appealed the class definition in a shareholder class action. The plaintiffs alleged **[*95]** misrepresentation in a prospectus which had been filed with provincial securities regulators across Canada, asserting claims on behalf of shareholders who had purchased shares in the initial distribution as well as in the secondary market. By the time the case reached the Court of Appeal the plaintiffs had abandoned their common law claims, relying only on a statutory claim for prospectus misrepresentation.

[143] At issue was whether the class should include (a) purchasers of shares from Alberta, where the securities legislation contained a limitation period, New Brunswick, which had no statutory cause of action, and the Territories, which had no securities legislation; and (b) persons resident outside Canada or who purchased their shares abroad not on the basis of the prospectus filed in Canada but on the basis of a different document prepared in accordance with U.S. or European securities laws.

[144] The B.C. Court of Appeal held that the claims of shareholders for prospectus misrepresentation would be determined under the statutory laws that applied where the "distribution" of securities had occurred. Shareholders who purchased their shares pursuant to distributions occurring **[*96]** in New Brunswick, the Territories, Alberta and outside Canada were excluded. Since the prospectus misrepresentation provisions of the Manitoba legislation might permit

claims by purchasers on the secondary market in that province, such persons would be included in the class, but other shareholders who had acquired their shares on the secondary market were excluded. The Court placed the secondary market purchasers in a separate subclass.

[145] In contrast to the challenge by the defendants in *Pearson*, which was based on arguments respecting the proper law applicable to the claims of non-resident class members, the defendants in the present case did not argue for a narrower class or for a subclass of plaintiffs who might rely on the statutory cause of action under the OSA. As previously noted, the parties did not address any arguments as to whether and to what extent only Ontario residents or persons who had purchased IMAX shares on the TSX could properly assert such a claim. [See Note 20 below]

> Note 20: Philip Anisman and Garry Watson have suggested that, on the authority of the *Pearson* case, the statutory cause of action for secondary market misrepresentation under the OSA would be available only to investors who traded on the TSX in Ontario. (P. Anisman and G. Watson, "Some Comparisons Between Class Actions in Canada and the U.S.: Securities Class Actions, Certification and Costs", 3 *The Canadian Class Action Review* 467 at 522). *Pearson* however clearly depended on the court's finding that prospectus requirements are tied to the place of distribution, and that the shareholder's statutory right of action depended on the law of the province where the prospectus obligations arose. The "distribution" took place in each province where the prospectus was filed. The determination of the scope of persons who might assert a claim under s. 138.3 of the OSA does not fit neatly into the *Pearson* analysis.

**[*97]**

[146] The defendants' submissions about potential differences in the applicable laws, and the anticipated complexity that would result in this litigation, were confined to the common law claims of the class members. They argued that the common law claims would be subject to the laws of different jurisdictions depending on where the Representation was received and acted upon.

[147] The potential for the application of different common law principles to the determination of class member claims has received little attention in class action proceedings where national or international classes are proposed. As Patricia Jackson notes in "The National Class under the *Class Proceedings Act, 1992*: Unsettled Issues", The Law Society of Upper Canada, *Special Lectures 2004*, pp. 471-479, at p. 478:

> One of the circumstances in which there has been restraint in the willingness to certify a national class is where significantly different statutory regimes apply to the questions raised by the proposed class proceeding [noting *McNaughton*]. However, there has been no evidence of such restraint in the face of potential differences in the common law. This is especially significant because **[*98]** of the extent to which class actions are frequently brought in respect of matters where the law is significantly in transition.

[148] According to the Supreme Court decision in *Tolofson v. Jensen, [1994] 3 S.C.R. 1022* as a general rule, the substantive law governing a common law tort claim is the law of the place where the wrongful conduct occurred, that is, the *lex loci delicti*. *Tolofson* recognizes that the determination of the place of the wrongful conduct can present challenges in cross-border litigation. At p. 1050 LaForest J. for the majority of the Court noted:

> There are situations, of course, notably where an act occurs in one place but the consequences are directly felt elsewhere, when the issue of where the tort takes place itself raises thorny issues. In such a case, it may well be that the consequences would be held to constitute the wrong. Difficulties may also arise where the wrong directly arises out of some transnational or interprovincial activity. There territorial considerations may become muted; they may conflict and other considerations may play a determining role.

[149] The defendants submit that, following *Tolofson* **[*99]** , where the alleged wrongdoing crossed borders the "most appropriate solution" is to identify the jurisdiction where the consequences of the wrongdoing were felt, and to apply the laws of that jurisdiction. They argue that where there are multiple plaintiffs who suffered harm in different jurisdiction, there are accordingly multiple governing laws.

[150] The defendants also rely on certain cases in which the courts have found that the *lex loci delicti* for the tort of misrepresentation is the place where the representation was received and caused harm to the plaintiff (*ABN Amro Bank N.V. v. BCE Inc., [2003] O.J. No. 5418* (S.C.) and *Kvaerner U.S. Inc. v. AMEC E&C Services Ltd., 2004 BCSC 635).*

[151] Rather than supporting the defendants' position, *Tolofson* clearly recognizes the complexities of trans-border torts and refrains from making a definitive statement that the place of the tort is always where the harm was suffered. As for the two cases relied upon by the defendants, these simply illustrate the willingness of Canadian courts to find that the place of the tort is the place where the representation was received **[*100]** and relied upon, in order to assert jurisdiction over a non-resident defendant, in the context of a *forum non conveniens* motion.

[152] It is not obvious, in the context of a class action involving a global class and misrepresentations communicated from a single source, that the applicable law will be that of the place where each individual class member sustained damage. Such an approach would ignore the fact that a class proceeding is an aggregate action and not a collection of individual claims. [See Note 21 below] It is also not obvious that the applicable common law principles and defences would vary from place to place such that the court would have to consider the potential application of multiple laws.

Note 21: Jones and Baxter, note 18, at p. 420. In a critique of the decision of the Québec Superior Court in *HSBC Bank Canada v. Hocking*, [2006] J.Q. no 9806, refusing to bind Québec residents to a settlement reached on their behalf in Ontario, the authors comment on an "all-too-familiar application to the class action context of rules established in individual civil litigation", where "the court treats the class as a collection of individual claims, not as a truly aggregate action; as a result it does not consider the consequences of parsing the class into smaller and smaller units, and gives no weight to the real advantages that accrue to individual class members from participation in a larger, more efficient action."

**[*101]**

[153] The choice of law issue in any event is premature. Unless or until the defendants plead the laws of other jurisdictions in their statement of defence, the assumption at this stage of the proceedings is that the law of Ontario will apply to the determination of the common law claims. As T. Ducharme J. noted in *Caglar v. Moore, [2005] O.J. No. 4606* (S.C.), at para. 15:

> The approach of the courts to foreign law is well established. The existence of a foreign law is treated as a fact and the party seeking to rely upon it must both plead it and prove it. If the foreign law is not pleaded or not properly proven, the court will apply the lex fori as "it is the only law available." The existence of an applicable foreign law is a material fact, which must be pleaded under rule 25.06(1). Moreover, where, as in this case, the foreign law is the basis for an affirmative defence, rule 25.07(4) also requires that it be pleaded. The need to plead foreign law is a requirement of longstanding in Ontario that has been consistently applied. [Footnotes omitted.]

[154] The defendants may well assert in their statement of defence that the laws of jurisdictions **[*102]** other than Ontario apply to the determination of the claims of various class members. At this stage however one can only speculate as to what arguments may be made and toward the claims of which class members they may be directed. For example, is the statutory cause of action restricted to Ontario shareholders? Does it apply to non-resident shareholders who purchased their shares on the TSX? Does it apply to Ontario shareholders who purchased their shares on NASDAQ? As for the common law claims, what law would apply to the misrepresentation claims of class members residing outside of Ontario, or Canada? Would this depend on where they purchased their shares, reside or suffered damages? What particular defences would the defendants rely upon that would not be available to them under Ontario law? Are there in fact substantial differences between the common law principles and defences applicable in the other jurisdictions?

[155] There is certainly the potential for greater complexity in this litigation as a result of potential conflicts of laws issues. This need not however constitute a bar to certification.

[156] Our courts have identified similar challenges in cases where different **[*103]** standards of care may apply over time to members of a class which has been broadly defined. In *Cloud v. Canada (Attorney General) (2004), 73 O.R. (3d) 401* (C.A.), leave to appeal to the S.C.C. refused at *[2005] S.C.C.A. No. 50,* the proposed class was comprised of former students of residential schools over a period of 16 years. The Court of Appeal, in determining that certification was appropriate, concluded that the class action proceeding was sufficiently flexible to deal with whatever variation in the applicable standard of care over the 16 year period might arise on the evidence (at para. 59).

[157] The Court in *Cloud* referred to the decision of the Supreme Court of Canada in *Rumley v. British Columbia, [2001] 3 S.C.R. 184,* where an analogous claim covered a period of 42 years. In *Rumley*, McLachlin C.J. for a unani-

mous court concluded (at para. 31) that the fact that the relevant standard of care would have varied over time was not an obstacle to the suit proceeding as a class action: "That the standard of care may have varied over the relevant time period simply means that the **[*104]** court may find it necessary to provide a nuanced answer to the common question" (at para. 32). McLachlin C.J. noted that class proceedings legislation, in contemplating the possibility of subclasses and permitting the amendment of the certification order at any time, "provides the court with ample flexibility to deal with limited differentiation amongst the class members as and if such differentiation becomes evident".

[158] In *Nantais,* the first Ontario case in which a national class was certified, there was no existing certification in another jurisdiction, although certification motions were pending elsewhere. The defendants argued that a court attempting to try the class proceeding would face a multiplicity of laws from all of the provinces, which might confuse the matter. While Zuber J. discounted the likelihood of differences between the applicable provincial laws, he observed at p. 350:

> It is also argued that other class proceedings may be certified in other provinces relating to the matter which is the subject of this class proceeding. In my respectful view any of these practical difficulties which may develop as the matter proceeds can be met by amending the order **[*105]** in question to adjust the size of the class. If it is shown that the law of another province is so substantially different as to make the trial with respect to class members from that province very difficult, the class can be redefined. Additionally, if a class is certified in another province that group can be deleted form the Ontario class.

[159] The approach in *Nantais* has been described as "wait and see" in relation to potential conflict of laws concerns. [See Note 22 below]

Note 22: M.A. Eizenga and M.T. Poland, "Conflict of Laws and National Class Actions", The Canadian Institute, The 2nd Annual National Forum on Litigating Class Actions, September 2001.

[160] In the present case it is far from certain that a multiplicity of laws will apply to the determination of class members' claims or that any conflicting laws will affect the determination of the common issues. While the defendants have suggested that varying laws will apply, creating complexity, until they plead to the Claim, their position remains **[*106]** speculative. In respect of the one issue where the court might have been invited to make a determination limiting the scope of the class or to identify a subclass, that is in connection with the statutory claim, the defendants have not yet taken a position that the scope of the statutory remedy should be limited.

[161] The decision to certify a global class requires the court to ensure fair treatment of non-resident class members in the litigation. This is part of the "order and fairness" requirement, which can be enhanced by paying careful attention to the notice and communications with non-resident class members, and to the potential need for subclasses as the action proceeds.

[162] As Jones and Baxter have observed:

> When asserting jurisdiction over a defendant, either in an individual or class proceeding, "order and fairness" will usually be satisfied by the demonstration of a "real and substantial" connection with the forum. But in the interjurisdictional class action context, "order and fairness" towards foreign plaintiffs imports further requirements. Just as defendants cannot be bound by a court's process and decision unless served and given an opportunity to answer the **[*107]** case against them, so too plaintiffs cannot be bound unless they also have an opportunity to "participate", at least as that word is understood in the world of opt-out class actions; that is, that there be notice adequate to serve the interests of justice. [See Note 23 below]

Note 23: Jones and Baxter, note 18, p. 417.

[163] LeBel J. in *Canada Post Corporation v. Lépine*, emphasized the importance of protection for the rights and interests of non-resident class members both through the notice procedure and through the recognition of subclasses where appropriate at paras. 42 and 56:

A class action takes place outside the framework of the traditional duel between a single plaintiff and a single defendant. In many class proceedings, the representative acts on behalf of a very large class. The decision that is made not only affects the representative and the defendants, but may also affect all claimants in the classes covered by the action. For this reason, adequate information is necessary to satisfy the requirement **[*108]** that individual rights be safeguarded in a class proceeding. The notice procedure is indispensable in that it informs members about how the judgment authorizing the class action or certifying the class proceeding affects them, about the rights -- in particular the possibility of opting out of the class action -- they have under the judgment, and sometimes, as here, about a settlement in the case.

...

The formation of a national class can lead to the delicate problem of creating subclasses within it and determining what legal system will apply to them. In the context of such proceedings, the court hearing an application also has a duty to ensure that the conduct of the proceeding, the choice of remedies and the enforcement of the judgment effectively take account of each group's specific interests, and it must order them to ensure that clear information is provided.

[164] Accordingly, I have concluded that it would be appropriate to certify the global class as proposed by the plaintiffs. The prospect that the claims of non-resident class members may be subject to different laws adds complexity to the litigation, but does not weigh against certification. The appropriate approach **[*109]** in this litigation is to "wait and see" how the conflict of law issues may develop, and as noted below in the discussion under "common issues", the court can deal with any differences in the law that might arise by adjusting the common issues or recognizing subclasses as appropriate.

[165] The court will also need to ensure that the interests of non-resident class members are protected by the form, content and distribution of the notice that is provided to them (this issue is addressed later in these reasons in considering the plaintiffs' proposed litigation plan.)

**E. Section 5(1)(c) of the CPA: Do the claims of the class members raise common issues?**

**1. General Principles**

[166] Section 1 of the CPA defines "common issues" as "(a) common but not necessarily identical issues of fact, or (b) common but not necessarily identical issues of law that arise from common but not necessarily identical facts". Common issues, whether of law or fact, are those issues to be decided through the vehicle of the common issues trial such that the findings in the trial on such issues will be binding on all class members.

[167] This definition "represents a conscious attempt by the Ontario legislature **[*110]** to avoid setting the bar for certification too high." The common issues need only "advance the litigation." "Resolution through the class proceeding of the entire action, or even resolution of particular legal claims ... is not required." (*Carom [Rule 21 -- C.A.]* at paras. 40-42).

[168] The common issues question should be approached purposively. There is no formulaic approach that determines this requirement. The underlying question is whether, if the action continues as a class proceeding, will "duplication of fact-finding or legal analysis" be avoided? (*Western Canadian Shopping Centres* at para. 39). If necessary, the list of common issues can be further refined as the litigation moves forward (*Robertson* v. *Thomson Corp.*, at p. 173).

[169] A class proceeding resolution of the common issues need not be determinative of the issue of liability for some or even all class members. As Goudge J.A. observed in *Cloud* (at para. 53):

[A]n issue can constitute a substantial ingredient of the claims and satisfy s. 5(1)(c) even if it makes up a very limited aspect of the liability question and even though many individual issues remain to be decided after its resolution. **[*111]** In such a case the task posed by s. 5(1)(c) is to test whether there are aspects of the case that meet the commonality requirement rather than to elucidate the various individual issues which may remain after the common trial. This is consistent with the positive approach to the *CPA* urged by the Supreme Court as the way to best realize the benefits of that legislation as foreseen by its drafters.

[170] There is a requirement for a minimal evidentiary foundation for the proposed common issues. In the present case, where the certification motion proceeded together with the Leave Motion (in which the parties filed voluminous affidavits and transcripts), there is no question that the evidentiary basis for the common issues is present.

**2. The Proposed Common Issues**

[171] The plaintiffs have proposed a list of common issues as follows:

[1]. Did IMAX or the Individual Defendants, or any of them, represent that IMAX's revenues for the 2005 fiscal year were reported in accordance with GAAP and that such revenues met or exceeded earnings guidance previously issued by Imax? If so, who made the Representation, when, where and how?

[2]. Did IMAX or the Individual Defendants, or **[*112]** any of them make the Representation negligently, or recklessly, caring not whether it was true or false? If so, who made the Representation, when and how?

[3]. Did IMAX or the Individual Defendants, or any of them, make the Representation intending that the class members rely upon it and acquire IMAX shares?

[4]. Did some or all of IMAX's February 17, 2006 Press Release, Annual Report for the year ending December 31, 2005 or its two March 9, 2006 press releases contain a misrepresentation within the meaning of the OSA?

[5]. If the answer to (4) is yes, have the defendants (including the proposed defendants), or some of them, established a reasonable investigation or expert reliance defence under the OSA?

[6]. Did the traded price of IMAX shares during the Class Period incorporate and reflect the Representation?

[7]. If the answer to (6) is yes, did the acquisition of IMAX shares by the class members, on the TSX and NASDAQ, during the Class Period, constitute reliance upon the Representation?

[8]. Did IMAX or the Individual Defendants, or some of them, owe the class members a duty of care? If so, what was the standard of care? Did any of the defendants breach the standard of **[*113]** care?

[9]. If the answer to (8) is yes, were IMAX or the Individual Defendants, or some of them, negligent? If so, who, when and why?

[10]. Did IMAX or the Individual Defendants, or some of them, conspire one with the other, and with persons unknown to deceive the class members for the purpose of maintaining and increasing the price of Imax securities? If so, who conspired with whom, when, where, why and for what purpose?

[11]. If IMAX or the Individual Defendants, or some of them, are liable to the class for conspiracy, negligence, negligent or fraudulent misrepresentation, what is the procedure for assessing damages?

[12]. Can the court assess damages in the aggregate, in whole or in part, for the class? If so, what is the amount of the aggregate damage assessment and who should pay it to the class?

[13]. Is IMAX vicariously liable or otherwise responsible for the acts of the other defendants?

[14]. Should one or more of the defendants pay punitive damages to the Class? If so, who, why, in what amount and to whom?

[15]. Should the defendants, or any of them, pay the costs of administering and distributing any monetary judgment and/or the cost of determining eligibility and/or **[*114]** the individual issues? If so, who should pay what costs, why, in what amount and to what extent?

[16]. If the court determines that the defendants are liable to the class, and if the court considers that participation of individual class members is required to determine individual issues:

(a) are any directions necessary?

(b) should any special procedural steps be authorized?

(c) should any special rules relating to admission of evidence and means of proof be made?

(d) what directions, procedural steps or evidentiary rules ought to be given or authorized?

[17]. Should the defendants, or any of them, pay prejudgment and post-judgment interest, at what annual interest rate, and should the interest be compounded interest?

[172] The defendants acknowledge that the issues regarding liability and damages under the OSA, if leave to proceed with such claims is granted, are properly the subject of a class action that is, that issues 1 and 2, only in so far as they relate to the statutory claim, and issues 4 and 5 would be properly certified as common issues.

[173] The defendants also acknowledge that issues 11 and 13 to 17 as they relate to the common law claims are either strictly **[*115]** procedural or ancillary to the main allegations of liability. Such issues should be certified as common issues if the court is satisfied that other main issues respecting liability are properly certified.

[174] The defendants assert that the balance of the common issues are "not sufficiently significant" to justify certification, and raise certain specific arguments in opposition to the recognition of such issues as common issues.

**3. Proposed Common Issues -- Common Law and Statutory Misrepresentation**

[175] The defendants oppose the certification of issues 1, 2 and 3, as they relate to the common law claims of misrepresentation, as common issues. They submit that, since the plaintiffs have pleaded a number of statements in which the misrepresentations are alleged to have occurred, individual inquiries will be required to determine which of the class members received each individual representation. Some class members may not have read any of the representations; some may have received the information contained in the representations through sources other than IMAX.

[176] In *Carom [Rule 21 -- C.A.]* the court was faced with 160 alleged representations. It was recognized that **[*116]** individual determinations of which representations were received and relied upon by class members would be required. Nevertheless, it was appropriate to certify the negligent misrepresentation claims, including the issues of whether the defendants had made the alleged representations. MacPherson J.A., for the Court of Appeal, held that it was a mistake to overemphasize the number and diversity of the defendant's representations, and that resolution of the common issues would "move the litigation forward" and might serve to significantly reduce the number of relevant representations that the court would have to consider in the individual determinations (at para. 49). He stated (at para. 51): "The focus of these common issues is the knowledge and conduct of the defendants ... the conduct, especially the reliance, of the plaintiffs stays on the sidelines at this juncture in the litigation."

[177] In the present case, the plaintiffs' common law claims concern a single defined Representation that is alleged to have occurred in each of the February and March press releases and in the Company's Form 10-K. This is not a case where numerous different misrepresentations are alleged; rather, **[*117]** the plaintiffs allege a single misrepresentation, that was communicated to the public in different ways. The fact that class members may have received the misrepresentation in different ways, or may not have relied on the misrepresentation, is not relevant to whether issues 1, 2 and 3 would be common to the class.

[178] Another concern raised by the defendants in opposition to the certification of the misrepresentation issues as common issues is the prospect that different legal regimes may apply to the determination of the common law claims of various class members.

[179] As discussed above (at paras. 135 to 165), the potential for the application of different statutory regimes or varying standards of care applying to the claims of different class members is not an impediment to certification. In *Rumley* the potential for varying standards of care did not prevent the Court from certifying whether the defendants were negligent as a common issue. The Court anticipated the identification of subclasses later in the proceedings to address such issues as they might arise (at para. 32). See also *Tiboni v. Merck Frosst Canada Ltd., [2008] O.J. No. 2996* **[*118]** (S.C.) (at paras. 84 and 92) where Cullity J. in a product liability case certified common issues that included whether the defendants owed a duty of care, the standard of care and whether the defendants were negligent, noting the potential for subclasses later in the proceedings if the defendants were to establish that different laws might apply to various members of the class.

[180] More recently, in *Glover v. City of Toronto, [2009] O.J. No. 1523* (S.C.), concerning a class proceeding arising out of an outbreak of Legionnaires' disease at a City-owned and operated care facility, the proposed class included those who lived in, worked at, or visited the facility, as well as those living near the facility that contracted the disease.

Lax J. rejected the defendants' arguments that questions of duty and standard of care could not be addressed on a class-wide basis. Citing *Rumley*, Lax J. noted at para. 46:

> [The defendants] say that different duties may be owed at different times to different class members or may not be owed at all. I do not find this argument persuasive. Common issues include common but not necessarily identical issues of law that **[*119]** arise from common but not necessarily identical facts. The Class Proceedings Act gives the court the flexibility to deal with differentiation among class members. The trial judge has the power to adopt a nuanced approach and create subclasses when this is necessary.

[181] Lax J. observed that the focus of the common issues respecting duty and standard of care was on the conduct of the defendants, which would not depend on evidence specific to each class member. She certified the common issues to include a reference to whether a duty of care was owed to the class members "or any subclass or subclasses" (at para. 61).

[182] Ultimately, the question when determining the common issues is to distinguish between issues that might be common to the class (or a subclass) and individual issues, and to ensure that issues that will require individual determinations are not included in the list of common issues. The fact that not all members of the class may be affected in the same way by the determination does not prevent the issue from being included as a common issue. Again, the cases emphasize that a common issue is not necessarily one where success for one member of the class necessarily **[*120]** results in success for all members. An issue may still be a common issue, although the defendants may argue that the claims of some members of the class are subject to a different legal regime. The list of common issues may have to be amended to accommodate such a development, and subclasses may need to be identified.

[183] Common issues 1 through 4 deal with the circumstances in which the alleged misrepresentations were made and the knowledge and participation of the various defendants. An evaluation of the conduct of the defendants is common to the class members, whether they are able to rely on the statutory cause of action (which is pleaded as applying to all members) or whether the common law causes of action are available to them. These issues will accordingly be included in the list of issues certified for the common issues trial.

[184] In addition, I would include as common issues in relation to the misrepresentation claims the following common issues:

> 1(a). Was the Representation false?
>
> 1(b). Was the Representation publicly corrected? If so, when?
>
> 2(a). Did the Individual Defendants or any of them authorize, permit or acquiesce in the making of the Representation while **[*121]** knowing it to be a misrepresentation?
>
> 4(a). Did the defendants Joyce and Gamble or either of them authorize, permit or acquiesce in the release of any or all such documents?

[185] Common issue 5 involves a consideration of whether the statutory defences to the OSA claim are made out. While the courts will often not certify defences as common issues, out of a concern that this would be premature and potentially limit the defences a defendant might assert (see for example the decision of the Court of Appeal in *Cassano et al. v. Toronto-Dominion Bank (2007), 87 O.R. (3d) 401;* leave to appeal to the SCC refused *[2008] S.C.C.A. No. 15),* in the present case, it would be appropriate to certify this question, where the OSA has prescribed the statutory defence and it is clear that this will be a common issue to be determined if issue 4 is answered in the affirmative.

[186] The plaintiffs propose as common issues 6 and 7 whether the traded price of IMAX shares during the Class Period incorporated and reflected the Representation, and, if so, whether the acquisition of IMAX shares by the class members, on the TSX and NASDAQ, during **[*122]** the Class Period, constituted reliance on the Representation. These issues deal with the "efficient market" theory that has been pleaded by the plaintiffs as part of their common law misrepresentation claims.

[187] The defendants oppose the certification of these issues, even if the court accepts that such a claim may proceed at the pleadings stage. They rely on the decision of Cullity J. in *Serhan (Estate Trustee) v. Johnson & Johnson (2004), 72 O.R. (3d) 296* (S.C.). *Serhan* was a products liability case in which the plaintiffs proposed to certify the question of whether the members of the class relied upon a misrepresentation by acquiring the products in question. Plaintiffs' counsel had argued that this was a proper common issue as *Mondor [Settlement]* stood for the principle that reli-

ance could be inferred from the conduct of a class member in making a purchase. Cullity J. properly noted that the inference of reliance could be rebutted through an inquiry into the circumstances of each individual, so that reliance would of necessity remain an individual and not a common issue.

[188] In my view the reasoning in *Serhan* would not preclude **[*123]** the certification of proposed issues 6 and 7 in this case. *Serhan* did not involve an "efficient market" claim; that is, there was no allegation that the price of the product incorporated the misrepresentations and that accordingly the act of purchasing constituted reliance.

[189] In *Ontario Public Service Employees Union v. Ontario, [2005] O.J. No. 1841* (S.C.), it was argued in a case involving alleged misrepresentations by the province to individuals whose employment had been transferred to Community Care Access Centre resulting in the loss of pensionable service, that of necessity reliance would be an individual issue, so that liability for negligent misrepresentation could not be determined in a trial of the common issues. Cullity J. (at para. 68), relying on *Mondor [Rule 21]* referred to the possibility that "group reliance" might in some circumstances be inferred from the facts. The question of whether reliance occurred could, on the facts alleged, be dealt with at a trial of the common issues.

[190] In the present case the plaintiffs have pleaded that the individual class members relied on the Representation through their conduct in purchasing **[*124]** shares. It should be open to the plaintiffs to attempt to establish in the common issues trial that, as a factual matter, reliance has been established for all members of the class through proof of the common action of purchasing shares. It may be that the defendants will persuade the court that at best any inference of reliance is rebuttable through evidence that is individual to each class member. It may be that any inference of reliance is rebuttable through evidence applicable to the class at large. The question I need to determine is not whether the issues will be determined in the plaintiffs' favour, but whether they are "common" and not "individual" issues. I find that the issues as framed are common issues, and will be certified as such for the common issues trial.

**4. Proposed Common Issues -- Negligence *Simpliciter***

[191] Proposed common issues 8 and 9 relate to the claim of negligence *simpliciter* which I have already determined is not a cause of action on the facts pleaded in this case. Accordingly, they will not be certified as common issues in this case.

**5. Proposed Common Issue -- Conspiracy**

[192] Proposed common issue 10 deals with the pleading of conspiracy. **[*125]** No objection was taken to the certification of this issue as a common issue. Similar formulations of the issue were certified as common issues in *Smith v. National Money Mart Company, [2007] O.J. No. 46* (S.C.), Appendix A, para. 7 and *Carom Certification]* at p.195. Common issue 10 will be certified in the terms proposed by the plaintiffs.

**6. Proposed Common Issues -- Damages**

[193] Proposed common issue 11 deals with the procedure for determining damages if common law liability is established. This issue will be certified as a common issue, removing the reference to "negligence".

[194] Common issue 12 addresses the question of whether aggregate damages should be assessed. Section 24 of the CPA provides for an aggregate assessment of damages as follows:

> (1) The court may determine the aggregate or a part of a defendant's liability to class members and give judgment accordingly where,
>
> (a) monetary relief is claimed on behalf of some or all class members;
>
> (b) no questions of fact or law other than those relating to the assessment of monetary relief remain to be determined in order to establish the amount of the defendant's monetary liability; **[*126]** and
>
> (c) the aggregate or a part of the defendant's liability to some or all class members can reasonably be determined without proof by individual class members.
>
> (2) The court may order that all or a part of an award under subsection (1) be applied so that some or all individual class members share in the award on an average or proportional basis.
>
> (3) In deciding whether to make an order under subsection (2), the court shall consider whether it would be impractical or inefficient to identify the class members entitled to share in the award or to determine the exact shares that should be allocated to individual class members.

[195] Whether aggregate damages should be assessed and their determination is a typical common issue in class proceedings, which should be certified in the absence of compelling evidence that aggregate damages would not be available in a given case. The court must be satisfied only that there is a "reasonable likelihood" that the conditions specified in s. 24(1) of the CPA will be satisfied (*Markson* at paras. 44 and 45. See also *Cassano* at paras. 39-53.) Provided that there is evidence that an aggregate assessment would be warranted, the determination **[*127]** of whether this should occur is for the trial judge. It is not for the judge hearing the certification motion to weigh conflicting expert evidence on this issue (*2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp. (2009), 96 O.R. (3d) 252* (Div. Ct.), at para. 102.

[196] As Cullity J. noted in *Vezina v. Loblaw Companies Ltd., [2005] O.J. No. 1974* (S.C.), at para. 25:

> As the question of an aggregate assessment is one for the trial judge to decide, it is not the function of a motions judge to determine whether an aggregate award would be made. It is, I believe, sufficient at this stage if there is a reasonable likelihood that the preconditions in section 24(1) of the CPA would be satisfied and an aggregate assessment made if the plaintiffs are otherwise successful at a trial for common issues. I believe that is the case here. The appropriate methods of distributing any such award are, again, for the trial judge to determine pursuant to section 26.

[197] In the present case, if the plaintiffs are successful in their statutory claim, damages will be assessed according to the formulas provided in s. 138.5 of the **[*128]** OSA. The OSA provides a relatively straightforward approach to the determination of damages and individual assessments are contemplated. A plaintiff is not required to prove that the misrepresentation caused a decline in the share value; rather the defendant may prove that all or part of a change in the market price of securities is unrelated to the misrepresentation (OSA, s. 138.5(3)). In their litigation plan, the plaintiffs propose a procedure for the efficient determination of such claims using a court-appointed administrator who will calculate the damages of each class member who makes a claim by reference to his or her share purchase and sale data. [See Note 24 below]

Note 24: Plaintiffs' Litigation Plan, Affidavit of Michael Robb sworn February 22, 2007, Exh. "O", Moving Parties' (First) Motion Record, Tab "2-O".

[198] In contrast to the statutory measure of damages, the assessment of damages for common law misrepresentation on the secondary market is more complex. The parties have filed competing expert reports **[*129]** prepared by financial economists. The plaintiffs rely on the expert reports of Lawrence Kryzanowski [See Note 25 below] and Robert Comment [See Note 26 below], while the defendants rely on the expert opinion of Denise Neumann Martin [See Note 27 below]. The experts offer opinions as to the extent to which the Representation affected the price of IMAX shares. The Kryzanowski report proposes an approach to the assessment of damages that is critiqued by the Neumann Martin report. The Comment report offers an alternative approach. Both of the plaintiffs' experts are of the opinion that an assessment of the class members' aggregate losses is feasible.

Note 25: Affidavit of Lawrence Kryzanowski sworn May 30, 2007, Moving Parties' Supplementary Motion Record, Tab 2.

Note 26: Affidavit of Robert Comment sworn September 17, 2007, Moving Parties' Reply Motion Record, Tab 1.

Note 27: Affidavit of Denise Neumann Martin sworn September 7, 2007, Motion Record of the Responding Parties, Vol. I, Tab 10.

[199] The defendants contend **[*130]** that there is no reasonable likelihood that the plaintiffs will satisfy s. 24 (1)(b) of the CPA. They argue that, after the determination of the common issues, individual issues will in fact remain to be determined, even if reliance is determined on a class basis, as to whether individual class members suffered any damage or loss.

[200] An authority relied upon by the defendants (*2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp. (2008), 89 O.R. (3d) 252)* was reversed on appeal to the *Divisional Court 95 O.R. (3d) 252* (Div. Ct.), Swinton J. dissenting; leave to appeal to the Court of Appeal granted September 24, 2009. At first instance certification was denied, in

part on the basis that the determination of whether class members who were franchise owners had suffered damages would of necessity be an individual issue.

[201] In their discussion of whether aggregate damages could be available, Hennessey and Karakatsanis JJ., for the majority of the Divisional Court, stated at para. 102:

> A motions judge is entitled to review the evidentiary foundation to determine whether there is some basis in fact to find that proof **[*131]** of aggregate damages on a class wide basis is a common issue. While that might require some review of the evidence, the assessment should not relate to the merits of the claim or the resolution of conflicting expert reports.

[202] The motions judge had concluded that the plaintiffs could not rely on expert reports respecting aggregate damages to establish the fact of loss, which would of necessity be an individual issue. He rejected aggregate damages as a common issue primarily because he concluded that s. 24(1)(b) would not be met in that, after determination of the common issues, the question of whether each member of the class had suffered a loss would need to be determined on an individual basis.

[203] The Divisional Court disagreed with this analysis, concluding that the motions judge erred in principle in failing to consider whether, quite apart from the expert opinion evidence, there was some basis in fact in the record that the fact of loss, if not the quantum of loss, could be a common issue with respect to liability. The majority noted at para. 95:

> The relationship between the franchisor, the distributor and each class member was the same; the class members purchased **[*132]** the same products, at the same prices within each region, pursuant to the same franchise contracts and distribution agreement. The class members did not have separate individual relationships with the respondents. Although there will be a differential impact on the class members depending on the specific products each ordered, if the plaintiffs ultimately prove overcharging, the fact of loss or damage must be common to all.

[204] In the present case, there is also "some basis in fact in the record" that the fact of loss could be a common issue with respect to liability. As in *Quizno's*, each class member is similarly situated in relation to the defendants. The loss or damage that is alleged is a devaluation of their shares on the secondary market. There is evidence that the price of IMAX's shares fell on the TSX and NASDAQ on August 9, 2006 when the Representation was allegedly corrected. As in *Quizno's,* if the plaintiffs prove the misrepresentation, the fact of loss or damage will be common to all, although the impact on individual shareholders will differ.

[205] Accordingly, there is a reasonable likelihood that s. 24(1)(b) will be met, that is that no questions of fact **[*133]** or law other than those relating to the assessment of monetary relief will remain to be determined after the common issues trial in order to establish the amount of the defendants' monetary liability.

[206] With respect to s. 24(1)(c), the requirement that the aggregate or a part of the defendants' liability to some or all class members can reasonably be determined without proof by individual class members, I am satisfied that the plaintiffs' expert reports provide a sufficient evidentiary foundation to conclude that there is a "reasonable likelihood" that such an aggregate determination may be made without proof by individual class members.

[207] Accordingly proposed common issue 12 will be certified as a common issue in these proceedings.

**7. Other Proposed Common Issues**

[208] Issues 13 (vicarious liability) and 14 (punitive damages) involve considerations of the conduct of the defendants and will not entail evidence from individual class members. They are properly certified as common issues in these proceedings.

[209] Issues 15 and 16 deal with the procedure for determining individual issues. Such issues have been certified recently in other cases as common issues, and in **[*134]** my view are proper common issues to be certified in this case. Similarly, issue 17 concerning prejudgment and post-judgment interest flows from the determination of any damages award and is a proper common issue for certification.

**F. Section 5(1)(d) of the CPA: Is a class proceeding the preferable procedure for the resolution of the common issues?**

[210] The preferability requirement has two concepts at its core -- the first is whether or not the class action would be a fair, efficient and manageable method of advancing the claim and the second is whether the class action would be preferable to other reasonably available means of resolving the claims of class members (*Markson* at para. 69).

[211] The determination of whether a proposed class action is a fair, efficient and manageable method of advancing the claim requires an examination of the common issues in their context, taking into account the importance of the common issues in relation to the claim as a whole. The preferability requirement can be met even where there are substantial individual issues and it is not necessary that the common issues predominate over the individual issues in order for the class action to **[*135]** be the preferable procedure. Nevertheless, the common issues cannot be negligible. The critical question is whether, viewing the common issues in the context of the entire claim, their resolution will significantly advance the action (*Hollick* and *Cloud).*

[212] In *Carom [Certification]]*, Winkler J. outlined the conditions present whenever a class proceeding is the preferable procedure at p. 239:

> A class proceeding is the preferable procedure where it presents a fair, efficient and manageable method of determining the common issues which arise from the claims of multiple plaintiffs and where such determination will advance the proceeding in accordance with the goals of judicial economy, access to justice and the modification of behaviour of wrongdoers.

[213] The defendants have the burden of proving a preferable alternative process for resolving the common issues. They have not done so in this case, except to argue that litigation of the non-Ontario claims should proceed in the U.S. Proceedings, which is addressed above. "Arguments that no litigation is preferable to a class proceeding cannot be given effect." (*1176560 Ontario Limited et al.* v. *The Great Atlantic and Pacific Company of Canada Limited, (2002), 62 O.R. (3d) 535* **[*136]** (S.C.), at para. 45, aff'd *70 O.R. (3d) 182* (Div. Ct.).

[214] The plaintiffs contend that, if this action is not certified as a class proceeding, access to justice for many potential claimants will be thwarted because the costs to prosecute an individual action will be prohibitively expensive and is beyond the reach of virtually all class members. According to Mr. Cohen's affidavit, the plaintiffs' counsel has estimated that the cost of litigating this matter through to a trial of the common issues will exceed $ 750,000, exclusive of disbursements. [See Note 28 below]

Note 28: Cohen Affidavit paras. 7, 14 and 15, Moving Parties' First Motion Record, Tab 4.

[215] In *Marcantonio v. TVI Pacific Inc., [2009] O.J. No. 3409* (S.C.), Lax J., in certifying a class action for the purpose of settlement (which included claims under s. 138.8 of the OSA) noted the advantages of class proceedings in cases involving secondary market misrepresentation at para. 9:

> Individual **[*137]** litigation of securities cases can be difficult, time-consuming and expensive. Many claims would never be advanced because they are uneconomic for an individual investor to pursue. A class action is the optimal method of procuring a remedy for a group of investors who allege they have been harmed in similar ways as a single determination of the defendants' liability eliminates duplication of fact-finding and legal analysis. Further, a class action has the potential to act as an essential and useful supplement to the deterrent effects of regulatory oversight. It enhances the incentive for directors and officers to ensure that their disclosures to the investing public are materially accurate, thereby enhancing investor protection. Consequently, a class proceeding is the preferable procedure because it provides a fair, efficient and manageable method of determining the common issue, and advances the proceeding in accordance with the goals of access to justice, judicial economy and behaviour modification.

[216] Such observations apply in the present case. Certifying the class proceeding, including a global class, would serve judicial economy by permitting common issues to be determined **[*138]** on a single occasion, thereby avoiding duplication of fact-finding and legal analysis, as well as the potential for inconsistent results if litigation were pursued individually or by groups of investors in various jurisdictions. The goal of behaviour modification (in this case to deter misrepresentations in public company disclosures) is enhanced by permitting aggregated claims to proceed. As evidenced by the proceedings to date, including the exchange of expert reports, the voluminous materials exchanged in the Leave Motion and various complex issues that have been raised by the defence even at this stage, the anticipated costs and time required to litigate individual claims would greatly exceed the potential individual recoveries. A class proceeding is the only viable method of advancing the claims in this action.

**G. Section 5(1)(e) of the CPA: Are the representative plaintiffs appropriate? Have they produced a workable litigation plan?**

[217] Under s. 5(1)(e) of the CPA, the court must consider whether the proposed representative plaintiff (i) would fairly and adequately represent the interests of the class, (ii) has produced a plan for the proceeding that sets out a workable **[*139]** method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding; and (iii) does not have, on the common issues for the class, an interest in conflict with interests of other class members.

[218] The court must be satisfied that the representative plaintiff will vigorously and capably prosecute the interests of the class, although he need not be "typical" of the class or the "best" possible representative (*Western Canadian Shopping Centres* at para. 41). The representative plaintiff does not have to have claims that are identical to those of all other members of the class; it is sufficient if the representative plaintiff has a cause of action against the defendant and that the causes of action all share a common issue of law or fact (Lax J. in *Griffin v. Dell Canada Inc., [2009] O.J. No. 418* (S.C.), at para. 97, citing *Healey v. Lakeridge Health Corp., [2006] O.J. No. 4277* (S.C.) and *Boulanger v. Johnson & Johnson Corp., [2002] O.J. No. 1075* (S.C.), aff'd (2003), *64 O.R. (3d) 208* (Div. Ct.)).

[219] There is no merit **[*140]** to the submission of the defendants that the plaintiffs Silver and Cohen would not adequately represent the interests of the class, and would have a conflict of interest because they do not share a common interest with the class. Silver and Cohen share the attributes of the proposed class in that they purchased shares in IMAX after February 17, 2006 and continued to hold shares on August 9, 2006. There are a number of issues that have been approved as common issues, the disposition of which will affect Silver and Cohen as well as the other class members.

[220] At this stage the potential differences between the legal regimes applicable to the common law claims of representative plaintiffs and other class members, as well as the question of the application of the statutory claim to non-resident members do not constitute a disabling "conflict of interest". If the defendants assert in their statement of defence that the laws of different legal jurisdictions apply to class members depending on where they purchased their shares or where they live, the court can consider the need for subclasses and additional representative plaintiffs at that time.

[221] Accordingly, Marvin Neil Silver **[*141]** and Cliff Cohen shall be appointed representative plaintiffs in these proceedings.

[222] The final requirement under this part of the certification test is that the plaintiffs have produced a plan that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding.

[223] In *Griffin v. Dell Canada Inc.*, Lax J. identified the purposes and requirements for a workable litigation plan (at para. 100):

> The production of a workable litigation plan serves a two-fold purpose: (a) it assists the court in determining whether the class proceeding is the preferable procedure; and (b) it allows the court to determine if the litigation is manageable: *Carom v. Bre-X Minerals Ltd. (1999), 44 O.R. (3d) 173* (Sup. Ct.), aff'd (1999), *46 O.R. (3d) 315* (Div. Ct.), rev'd on other grounds (2000), *51 O.R. (3d) 236* (C.A.). The plan must provide sufficient detail that corresponds to the complexity of the litigation. The litigation plan will not be workable if it fails to address how the individual issues that remain after the determination of the common **[*142]** issues are to be addressed: *Caputo v. Imperial Tobacco Ltd.* (2004), 236 D.L.R. (4th) 348 (Sup. Ct.) at para. 76.

[224] At the certification motion, the litigation plan must necessarily be preliminary. Not all procedural details need to be particularized. The purpose of the litigation plan at the certification motion is to assist the motions judge to determine whether the action is manageable and whether the goals of the *CPA* will be served by certification of the action as a class proceeding. As the litigation progresses, the litigation plan can be modified as required (*Andersen v. St. Jude Medical Inc., [2004] O.J. No. 132* (S.C.)).

[225] "The finding that a litigation plan is satisfactory for the purpose of certification does not bind the defendants to accept it after a trial of the common issues and, of course, it does not in any way bind the trial judge. Nor is it cast in stone before the trial as it can be amended from time to time with the approval of the court." (*Healey* v. *Lakeridge*, at para. 4).

[226] The plaintiffs' proposed litigation plan [See Note 29 below] was prepared as of February 22, 2007 and has not been revised. **[*143]** The plan details the proposed steps in the litigation, including the leave and certification motions, notice to class members, the opt-out procedure, and the trial of the common issues. The plan proposes a method to determine any remaining individual issues, including specifically the determination of damages under the OSA claim.

Note 29: Plaintiffs' Litigation Plan, Affidavit of Michael Robb sworn February 22, 2007, Exh. "O", Moving Parties' (First) Motion Record, Tab 2-O.

[227] The defendants contend that the litigation plan is inadequate because it does not propose a mechanism for determining the governing law applicable to individual members' claims, or even contemplate that such determinations will be required.

[228] In *Carom [Certification],* Winkler J. rejected a litigation plan that was not sufficiently comprehensive and detailed, in particular where the plan did not disclose a method for dealing with the claims of extra-provincial plaintiffs (at para. 101).

[229] I agree that the litigation plan is **[*144]** not sufficient because it fails to address issues specific to a global class. The plan, while reasonably detailed, is *pro forma*, except for the provisions dealing with the statutory claim. The plan does not advert to any steps that might need to be taken or measures that should be put in place in the litigation to address the interests of non-resident class members, and in this regard, lacks detail in particular in the area of the form, substance and distribution of notice to non-resident class members.

[230] Until the defendants have pleaded, it will likely not be possible for the potential conflict of law issues to be fully explored, and for the parties and the court to consider whether subclasses and additional representative plaintiffs will be necessary. While the determination of these issues, including the specific procedures to be followed, is something that will need to be addressed between counsel and the court as the matter proceeds, the litigation plan should provide a roadmap of how the plaintiffs propose to proceed with all aspects of the proceedings. The litigation plan requires amendment to indicate how the plaintiffs propose to address the global aspects of the **[*145]** class certification. In particular, the plaintiffs should address the form and substance of notice to both resident and non-resident class members, the proposed time periods for opting out of the proceedings, as well any additional measures or steps in the litigation that may be contemplated to address the interests of non-resident class members.

[231] Accordingly, the certification of these proceedings will be subject to the plaintiffs' delivery of an acceptable amended litigation plan.

**Conclusion**

[232] I have concluded that the plaintiffs have met the test for certification of a global class to assert the claims under s. 138.3 of the OSA, as well as certain of the common law claims as pleaded in the Claim.

[233] Leave is granted to the plaintiffs to amend the Statement of Claim in the form of the Fresh as Amended Statement of Claim, without underlining, subject to the qualifications provided for in these reasons.

[234] Subject to the submission of a revised litigation plan by the plaintiffs, this action will be certified as a class proceeding. The specific terms of the order (to be consistent with these reasons) and of the form, content and method of notice to class members, **[*146]** as well as any directions necessary to implement the orders in this motion and the Motion for Leave, shall be settled at an attendance of counsel to be arranged with the trial co-ordinator. If the parties are unable to agree on costs, this can also be addressed in the attendance.

K.M. van RENSBURG J.