# EXHIBIT H

LexisNexis®

Between Marvin Neil Silver and Cliff Cohen, Plaintiffs, and Imax Corporation, Richard L. Gelfond, Bradley J. Wechsler and Francis T. Joyce, Defendants

**INDEXED AS:** Silver v. Imax Corp.

Court File No. CV-06-3257-00

Ontario Superior Court of Justice
Divisional Court - Brampton, Ontario

**JUDGES:** D.L. Corbett J.

*[2011] O.J. No. 656; 2011 ON.C. LEXIS 981;* 2011 ONSC 1035

**DATE INFORMATION:** February 14, 2011.

**JUDGMENT DATE:** February 14, 2011

**CATCHWORDS: [*1]**

Civil litigation -- Civil procedure -- Appeals -- Leave to appeal -- Motion by the defendant Imax for leave to appeal to the Divisional Court dismissed -- The decision at issue granted leave to the plaintiffs to pursue class proceeding claims of misrepresentation -- As this was the first case brought under the new statutory misrepresentation cause of action under the Ontario Securities Act, there were no conflicting decisions -- Furthermore, there was an ample basis to conclude that the proposed representatives could satisfactorily represent the proposed class and there was no reason to doubt the correctness of the decision that the onus was on Imax to make out its affirmative defences -- Rules of Civil Procedure, Rule 62.02(4).

**SUMMARY:** Motion by the defendant Imax Corp for leave to appeal to the Divisional Court. Imax was seeking to appeal decisions which granted leave to the plaintiffs to pursue statutory and common law claims of misrepresentation in a class proceeding. In early 2006, Imax released public statements which overstated its 2005 revenues. In the fall of 2006, Imax issued restated financial statements for 2005. The plaintiffs purchased Imax shares after the initial statements **[*2]** and sold them after the subsequent statements, losing money as a result. Imax took the position that the judge erred by setting too low a threshold for establishing good faith by the plaintiffs and by reversing the onus respecting the statutory defences. Imax further objected to the certification decision.

HELD: Motion dismissed. As this was the first case brought under the new statutory cause of action in misrepresentation under the Ontario Securities Act, there were no conflicting decisions. There was ample evidence on which the judge could conclude that more than a mere accounting error had occurred. The judge accurately stated and applied the test for defining classes in class proceedings and there was an ample basis for the conclusion that the proposed representatives could satisfactorily represent the proposed class. Furthermore, there was no reason to doubt the correctness of the decision that the onus was on Imax to make out its affirmative defences.

**OTHER-REFS:**

Statutes, Regulations and Rules Cited:

Courts of Justice Act, R.S.O. 1990, c. C.43, s. 19(1)(b)

Ontario Securities Act, s. 138.8(1)

Rules of Civil Procedure, Rule 21, Rule 62.02(4)(a), Rule 62.02(4)(b), Rule 62.02(7)

**COUNSEL:**

Counsel: **[*3]**

William Sasso, Jay Strosberg, A. Dimitri Lascaris and Michael G. Robb for the plaintiffs/responding parties.

Dana M. Peebles, for the defendants/moving parties.

**JUDGMENT:**

**DECISION ON MOTION FOR LEAVE TO APPEAL TO THE DIVISIONAL COURT**

[1] D.L. CORBETT J.:-- The moving parties seek leave to appeal to the Divisional Court [See Note 1 below] from decisions of van Rensburg J., granting leave to the plaintiffs to pursue statutory and common law claims of misrepresentation in a class proceeding. [See Note 2 below] For the reasons that follow, the motion is dismissed.

Note 1: The defendants initially appealed to the Court of Appeal from van Rensburg J.'s decision to grant leave under the *OSA*. The Court of Appeal quashed that appeal (unreported, May 18, 2010, per MacPherson, Gillese and Blair JJ.A.) on the basis that the order is interlocutory, not final, and the proper appeal route is by leave to the Divisional Court.

Note 2: *Silver v. IMAX et al. (2009) 66 B.L.R. (4th) 222* [leave to commence proceedings under the *Ontario Securities Act* ], (2009), 86 C.P.C. (6th) 273 [certification of class proceedings; refusal to dismiss claims of common law misrepresentation], *2010 CarswellOnt 5663,* 2010 ONSC 4017 [costs].

**[*4]**

**The Test for Leave to Appeal**

[2] Leave to appeal may be granted under Rule 62.02(4)(a) or (b) where:

(a) there is a conflicting decision by another judge or court in Ontario or elsewhere on the matter involved in the proposed appeal and it is, in the opinion of the judge hearing the motion, desirable that leave to appeal be granted; or

(b) there appears to the judge hearing the motion good reason to doubt the correctness of the order in question and the proposed appeal involves matters of such importance that, in his or her opinion, leave to appeal should be granted, [See Note 3 below]

Note 3: Rule 62.02(4). See also *Courts of Justice Act*, s. 19(1)(b).

[3] The test under either branch of the Rule is conjunctive. [See Note 4 below]

Note 4: *Greslik v. Ontario Legal Aid Plan (1988), 65 O.R. (2d) 110 at 112-3* (Div. Ct.), *Lee Sand and Gravel v. Lee, [2007] O.J. No. 227 at para. 30* (S.C.J.), *Daher v. Daher, [2002] O.J. No. 3671 at para. 4* (S.C.J.).

**[*5]**

[4] The moving parties argue that the threshold is "low" for finding that the correctness of an order is in doubt. They say that if the decision is "open to serious debate" this test is met. [See Note 5 below] And they argue that this may be shown where a decision appears to be "a significant extension of the law", where the reasoning is "novel", or where there is a "lack of clarity in the law". [See Note 6 below]

Note 5: *Watt v. Classic Leisure Wear Inc. (2008), 43 M.P.L.R. (4th) 274 at para. 33* (Ont. S.C.J.), *1176560 Ontario Ltd. v. Great Atlantic & Pacific Co. (2003), 64 O.R. (3d) 42 at para. 39* (Div. Ct.).

Note 6: *CSFY Inc.* v. *Creit Management Ltd.* (2004) 43 B.L.R. (3d) 303 at para. 10, (Ont. Div. Ct.), *1642279 Ontario Ltd. v. SCE Construction Management, [2009] O.J. No. 4432 at para. 8* (Div. Ct.), *Barry* v. *Ollerenshaw* (2003), 47 R.F.L. (5th) 254 at para. 6 (Ont. S.C.J.).

[5] In general, **[*6]** I accept these arguments, though they do not encompass the whole of the exercise of discretion on an application for leave to appeal. And I note that this analysis applies to the decision from which leave is sought, and not to specific aspects of the reasons for that decision. If there is neither "good reason to doubt the correctness" of a decision, nor a "conflicting decision", leave will not be granted to address debatable aspects of the reasons.

**Reasons Decisions On Motions for Leave to Appeal**

[6] Rule 62.02(7) provides that the court "shall give brief reasons in writing" when leave to appeal is granted. This requirement is mandatory. [See Note 7 below] The Rules are silent about reasons when leave to appeal is refused.

Note 7: *Comtrade Pet. Inc.* v. *490300 Ontario Ltd.* (1992), 6 *C.P.C. (3d) 271, 7 O.R. (3d) 542, 55 O.A.C. 316* (Div. Ct.). No doubt the acerbic tone in the case was informed by the court's conclusion that it did not come close to meeting the test for leave to appeal in R.62.02(4).

**[*7]**

[7] Practice in the mid-1980's was generally consistent: reasons were not provided when leave was not granted. The "brief" reasons required by R.62.02(7) usually went no further than identifying the branch of the Rule under which leave was granted, and one or two paragraphs to explain why it applied.

[8] Perhaps it is the influence of *R.* v. *Sheppard*, [See Note 8 below] but whatever the cause, reasons in leave applications to the Divisional Court are now the rule, rather than the exception, when leave is denied. And reasons, whether granting or denying leave, have become increasingly elaborate. In my respectful view, this trend ought to be curtailed.

Note 8: *[2002] 1 S.C.R. 869, 162 C.C.C. (3d) 298* (S.C.C.).

[9] The Court of Appeal and the Supreme Court of Canada do not give reasons in leave decisions. There are many justifications for this. Where leave is not granted, the parties already have reasons from the court below and no purpose is served by giving them a **[*8]** second set of reasons coming to the same conclusion. Where leave is granted, the appeal panel will provide reasons on the appeal itself. Little purpose is served by elaborate reasons on leave decisions.

[10] There are other reasons to exercise restraint. When leave is not granted, reasons that call into question some aspect of the decision below may increase uncertainty in the law and cause difficulties for the parties as their case moves forward. Where leave is granted, the court granting leave should not constitute itself an additional member of the appeal panel, weighing in, in detail, on the merits of the appeal.

[11] Further considerations come to mind on leave applications to the Divisional Court from interlocutory decisions of a judge. Where there is an interlocutory decision, the case lives on and the final rights of the parties are determined at trial. There is a right of appeal from the trial decision, usually to the Court of Appeal. One reason to refuse to grant leave to appeal to the Divisional Court is that appellate review is available later, on a full record, after trial. Often it will be neither "important" nor "desirable" to consider an issue on an interlocutory **[*9]** appeal when that same issue may be appealed on a final basis. In criminal cases, where personal liberty may be at stake, there are no interlocutory appeals, and yet justice is still done. Extensive interlocutory appeals in civil cases inevitably cause further delay and cost in a system that is already slow and expensive.

[12] Finally, as the effects of *Sheppard* are felt in the full range of judicial decisions, it is important to bear in mind again that the focus of a motion for leave to appeal an interlocutory decision to the Divisional Court is on the decision,

and not the reasons. If the decision is correct, even if there may be concerns about aspects of the reasons, leave ought not to be granted. Interesting legal questions raised by reasons, but not by decisions, can await other cases.

**Application to This Motion for Leave to Appeal**

[13] The defendants raise more than a score of issues and sub-issues in this motion. Many are interesting and complex. Justice van Rensburg's reasons run some 445 paragraphs in the *OSA* leave decision and 222 paragraphs in the certification and common law misrepresentation decision. Reasons of comparable length could be written to address **[*10]** in detail the learned and scholarly arguments raised on this leave motion.

[14] I decline to do that. I am denying leave to appeal, and my reasons will be brief, relative to the range and complexity of the arguments on this motion: I accept the current practice, informed by *Sheppard* and generally followed in this court, that there should be some explanation to the losing party as to why leave has not been granted. I restrict my reasons to the principle arguments. And I go no further than to indicate why particular arguments have not succeeded. Where I conclude that a position is arguable and can be addressed at trial, I do not venture into the debate.

**The Facts**

[15] In summary:

a. IMAX is a public issuer on both the TSE and NASDAQ stock exchanges;

b. As a public issuer, IMAX has a duty to make regular disclosure of information material to its business and affairs, including disclosing its annual financial statements in accordance with generally accepted accounting principles ("GAAP");

c. IMAX builds and sells or leases large screen theatre systems and their components;

d. On February 17 and March 9, 2006, IMAX released five public statements about its 2005 **[*11]** financial results;

e. These communications contained false statements that overstated IMAX's revenues for the 2005 financial year;

f. Revenues were overstated by taking into 2005 revenue payments that had not yet been made to IMAX under contracts IMAX had not yet performed fully. This revenue recognition was justified by IMAX on the basis of accounting principles it purported to apply to contingent receivables;

g. There were two problems with this revenue recognition by IMAX: (a) this was a changed approach to recognizing contingent receivables, and this change, itself, was not disclosed in the financial statements. Thus, a reader would not understand that the 2005 financial statements were presented on a different basis than the financial statements for prior years. And thus, year-to-year comparisons could not be made with confidence: to do so would have been, to some extent, comparing "apples to oranges"; and (b) this approach to revenue recognition was not in accordance with GAAP;

h. The change in revenue recognition in the 2005 financial statements was driven by management at IMAX;

i. Management's motives for reporting increased revenue included (a) reaching or exceeding **[*12]** IMAX's projections for revenue and earnings per share for 2005; and (b) presenting IMAX as an attractive target for take-over or merger;

j. In management's desire to bring future income into 2005 revenue, IMAX mischaracterized progress on ongoing projects. van Rensburg J. gives several examples in her reasons. They amply support Her Honour's conclusion that the plaintiffs have a reasonable possibility to show misrepresentation or fraud;

k. In around March 2006, following IMAX's statements about its 2005 financial results, and its desire for a purchaser or merger partner, IMAX's stock price jumped significantly;

l. On August 9, 2006, IMAX announced that it had not found a buyer or merger partner, and that it was responding to an informal inquiry from the SEC about revenue recognition in its 2005 financial results. Following this, IMAX's share price fell sharply;

m. In the fall of 2006, IMAX acknowledged that its 2005 statements had not conformed with GAAP, and it issued restated financial statements for 2005;

n. The proposed plaintiffs purchased shares after IMAX's initial statements and sold them after IMAX's August press release. They lost money as a result.

[16] **[*13]** The plaintiffs seek to sue the defendants for the statutory cause of action in misrepresentation provided in the *Ontario Securities Act* ("*OSA*"), for negligent and "reckless" misrepresentation at common law, and to pursue these claims in a class proceeding.

[17] van Rensburg J. was required to answer three general questions on the motions before her:

(a) should the plaintiffs be granted leave pursuant to s. 138.8(1) of the *OSA* to pursue the statutory causes of action?

(b) are the common law claims in misrepresentation, as pleaded, arguable in law?

(c) should these claims be certified as a class proceeding?

van Rensburg J. answered all three of these questions "yes". [See Note 9 below]

Note 9: van Rensburg J. also decided various other issues that flowed from her decision to certify class proceedings. I address these other issues after dealing with the primary issues.

[18] van Rensburg J. also had to address various other issues that flowed from her decision to certify class proceedings, **[*14]** which I address briefly after dealing with the primary issues.

**Leave To Pursue Statutory Claims Under the *OSA***

[19] This was the first case brought under the new statutory cause of action in misrepresentation found in the *OSA*. The history of this provision is set out in detail in van Rensburg J.'s reasons. As found by Her Honour, the new causes of action are part of a comprehensive scheme that requires plaintiffs to obtain leave from the court before pursuing a claim. van Rensburg J. had to construe the leave requirement for the first time and then apply her statement of the test to the facts of this case to decide whether leave to proceed should be granted.

[20] The defendants argue that van Rensburg J. set too low a threshold for leave under s. 138.8(1) of *OSA*. They say the legislature intended a more substantial "gatekeeper" role for the courts.

[21] van Rensburg J. applied a test that is similar to the new test for summary judgment, and concluded that this is not a high burden to meet for plaintiffs. Her Honour found that the purpose of the provision was to protect defendants from "strike suits", that is, actions brought with little or no apparent merit for the **[*15]** purpose of wringing settlements from defendants. The parties acknowledged (fairly) that this action is not a "strike suit", a point noted by van Rensburg J.

[22] Since this is the first decision under s. 138.8(1), there are no "conflicting decisions" within the meaning of R.62.02(4)(a), and thus leave may only be granted under 62.02(4)(b) in respect to the *OSA* leave issue. [See Note 10 below]

Note 10: The defendants argue that *Ainslie v. CV Technologies Inc., [2009] O.J. No. 730* (S.C.J.), per Lax J., is a "conflicting decision". It is not. Lax J. found that the leave provision is for the benefit of defendants, not plaintiffs, and does not permit early discovery. van Rensburg J. does not hold otherwise. Her Honour does not find that the leave provision benefits plaintiffs, or ought to be construed to benefit plaintiffs. Rather, Her Honour finds that the leave provision, which benefits defendants, ought to be construed to permit apparently meritorious claims to proceed. Lax J. does not hold otherwise.

**[*16]**

[23] No doubt the test under s. 138.8(1) is a matter of general "importance". And this is not an issue that can await the trial process before appellate review. These factors meet the second branch of the test under 62.02(4)(b) - they are matters of sufficient "importance" that they would ground granting leave to appeal.

[24] That said, the defendants cannot satisfy the first branch of the test under R.62.02(4)(b). On the facts, as found by van Rensburg J., this was not a close call that turned on the precise test used to grant leave. The trial judge could conclude that there was recklessness or deceit. Disclosure of a change in accounting policies, to alert the market that principles are not consistent on a year-to-year basis, is not a subtle point. Mischaracterizing the state of progress of some projects to bring them within new and aggressive accounting principles, is rather more than a "mere accounting error", the characterization suggested by the defendants to van Rensburg J.

[25] I pause to emphasize: these findings are interlocutory and do not bind the trial judge, who may come to different findings of fact on the basis of the record presented at trial. [See Note 11 below] **[*17]** But, given van Rensburg J.'s finding that these facts are available to the plaintiffs, whether one emphasizes the deterrence or compensatory goals of the statutory cause of action, this is the sort of claim that ought to be permitted to proceed.

Note 11: "This decision... does not amount to a final determination of the facts... and should not be interpreted as such." [*Imax OSA* leave decision, at para. 25, incorporated by reference into the *IMAX* Rule 21 and *CSA* certification decision at para. 8 of that decision]

[26] van Rensburg J.'s decision is the first word on the test for leave under s. 138.8(1) of the *OSA*. Doubtless it is not the last. But that is no reason to push these interesting questions up to the appellate level where there is no good reason to doubt the correctness of the decision.

**Additional Specific Arguments Respecting Leave Under the *OSA***

[27] The moving parties argue that van Rensburg J. erred by:

(1) setting too low a threshold for establishing good faith by the plaintiffs, **[*18]** thus undermining the gatekeeper function;

(2) approving the claim against the defendant Gamble, though the claim fails to plead statutory elements;

(3) reversing the onus respecting the statutory defences;

(4) refusing to consider whether there was evidence (i) to satisfy statutory criteria to establish recovery beyond the statutory damages cap, or (ii) to establish liability for "non-core documents";

(5) misinterpreting and misapplying the expert reliance defence. [See Note 12 below]

Note 12: I have omitted from this list the argument that the general test for leave establishes too low a threshold, since that argument is already addressed above.

**The Good Faith Requirement**

[28] van Rensburg J. found that Mr. Silver and Mr. Cohen purchased shares in IMAX at the material times, that they had no oblique motive in doing so, and that they wished to assert their claims to recover for their losses and to deter other public issuers from behaving as IMAX did in future. There was ample evidence on which to base **[*19]** these conclusions. The defendants argue that more rigorous scrutiny of the sufficiency of each aspect of the claim is required to satisfy the "gatekeeper" function envisioned by the legislature. To go down that route would restrict the class of plaintiffs to those who are sophisticated in the law. Plaintiffs are entitled to rely upon their expert counsel to frame their claims. Any higher requirement could work serious injustice against potential plaintiffs. [See Note 13 below]

Note 13: The defendants argue that van Rensburg J. erred in failing to apply a test for "good faith" analogous to that used when leave is sought to bring a derivative action on behalf of a corporation (see *Chandler v. Sun Life Financial Inc., [2006] O.J. No. 451* at paras. 25-26 (S.C.J.), per C. Campbell J.). I see no merit to that argument. The deference owed to the directors of a company in the management of that company's affairs has no application where, as here, the plaintiffs allege that the company committed a legal wrong against them for which they wish redress.

**[*20]**

[29] The defendants argue that "an allegation of fraud against respected corporate executives of a public company based on unsupported personal opinion, rather than any factual foundation, does not demonstrate even minimal adherence to standards of good faith". [See Note 14 below] I tend to agree with this statement, minus its more exuberant adjectives. However this does not require the plaintiffs to adduce direct evidence of the state of mind of the defendants. That may be inferred from all of the circumstances. Indeed, that is a common way of determining knowledge and intention. The circumstances amply justify the conclusion of van Rensburg J. that advertent wrongdoing may be established, a conclusion as available to the plaintiffs, acting in good faith, as it was to van Rensburg J.

Note 14: Defendants' Factum, para. 60.

**Claim Against Ms. Gamble**

[30] This is a discrete pleadings issue. It is not a matter of general importance. There are no conflicting authorities on the point.

**Reversing the Onus for Statutory [*21] Defences**

[31] This is a sub-argument concerning the application of the general test for leave to proceed with the claims. van Rensburg J. found that the plaintiffs bear the onus of establishing a "reasonable possibility" of success. The onus shifts, Her Honour found, in respect to affirmative defences asserted by defendants.

[32] In addition, van Rensburg J. applied a different standard of proof for defendants in respect to their affirmative defences than she applied for plaintiffs to proceed with their claims. Plaintiffs have to meet the "relatively low" standard of showing a "reasonable possibility of success". Where plaintiffs meet this standard, defendants must establish their affirmative defences to a standard sufficient to grant summary judgment dismissing a claim.

[33] I see no reason to doubt the correctness of the proposition that the onus lies on the defendants to make out their affirmative defences. Whether the standard of proof is that required on a motion for summary judgment to defeat a claim, or whether it is something less, to negative the "reasonable possibility of success", is a question of importance and is "debatable".

[34] There is no conflicting decision **[*22]** on this issue.

[35] Again, I see no reason to doubt the correctness of van Rensburg J.'s decision, whatever the precise formulation of the onus, standard of proof, and test to be applied in respect to affirmative defences. On the basis of the expert opinion evidence adduced by the plaintiffs, it is arguable that (a) the failure to alert readers of IMAX's financial statements of a change in accounting principles in 2005 over those used in prior years is indefensible; (b) IMAX's use of multiple element arrangement accounting for theatre sales and leases was not in accordance with GAAP; and (c) IMAX failed to provide its accountants with candid and complete information relevant to the application of its new revenue recognition principles.

[36] van Rensburg J. found that the following factual findings are also available to the plaintiffs;

(a) IMAX management badly wanted to show revenue and earnings per share at least consistent with its projections for 2005;

(b) IMAX was not on track to achieve these results, and management was very concerned about this;

(c) IMAX took extraordinary steps to recognize as much income as possible in 2005. These extraordinary steps included (i) **[*23]** entering into arrangements with customers where, in exchange for financial incentives, the customers certified levels of completion of projects. These financial incentives cost

IMAX money, and produced no benefit to IMAX (aside from bringing revenue that would have accrued in 2006, or later, into 2005 revenue); and (ii) mischaracterizing the state of progress of some projects to IMAX's accountants.

(d) IMAX initially sought to bring all of the revenue associated with various partially completed projects into 2005 income. IMAX's external auditor demurred on the basis that the balance of the work to be completed did not meet the test to permit the project to be recognized at the end of 2005. IMAX took a very firm position with its accountants on this issue, and the response from the accountants, perhaps a compromise, was to suggest multiple element arrangement accounting. The accountants may be criticized for bowing to pressure from their client. And this may help the defendants in making out an affirmative defence of reliance on their expert accountants. But the overall circumstances may lead the trier of fact to conclude that IMAX cannot insulate itself from liability because it **[*24]** successfully pressured its accountants to render an ill-advised audit opinion.

[37] It is axiomatic, perhaps trite, to note that management has an interest in protecting and enhancing shareholder value. Meeting earnings projections, and increasing productivity and earnings are certainly consistent with this interest. Distorting financial results, to make results appear better than they are, is not. The overall constellation of facts, as found to be available by van Rensburg J., may well preclude the defendants' affirmative defences. Taking both the merits of the plaintiffs' case, and the difficulties with the defendants' defences into account, it seems that the plaintiffs have a good arguable case, one that is worthy of moving forward. This is the gist of van Rensburg J.'s decision, and I see no good reason to doubt that she is correct.

**The Damages Cap And Liability for "Non-Core" Documents**

[38] The defendants argue that van Rensburg J. erred in failing to assess the merits of the claims respecting non-core documents, once she had determined that the claims respecting core documents should proceed. They also argue that Her Honour erred in permitting claims for damages above **[*25]** the damages cap to proceed against certain defendants where, the plaintiffs say, there is no evidence respecting the mental elements as against some of them.

[39] With respect, on facts available to the plaintiffs, management seemed determined to present financial results in a manner that overstated IMAX's performance in 2005. This could be construed as a form of tunnel-vision or excess of zeal, or as something worse. But either interpretation may be sufficient to establish the mental elements of the claims respecting the non-core documents.

[40] It is neither "important" nor "desirable" to grant leave to appeal in respect to these issues on an interlocutory basis. There is a factual basis for inferring intent. The same factual ground will be covered in respect to the common law claims Appellate review will be available on a full record, after trial.

**Expert Reliance Defence**

[41] The defendants raise several interesting arguments about the scope and application of the expert reliance defence, which are canvassed in some detail by van Rensburg J. I see no error in Her Honour's conclusion that these are debatable issues, on the facts. This conclusion obtains whether one accepts **[*26]** van Rensburg J.'s analysis of this defence, or whether one favours the interpretation placed upon it by the defendants: either way it is debatable that the defence will succeed.

**Common Law Claims of Misrepresentation**

[42] The defendants sought to strike the common law claims of misrepresentation under Rule 21 of the *Rules of Civil Procedure*. van Rensburg J. dismissed this motion. The defendants argue that Her Honour erred in so doing because:

(1) The defendants owed no duty of care to the plaintiffs;

(2) The plaintiffs failed to plead actual reliance by each class member, which is necessary to establish causation between the statements and the plaintiffs' alleged losses;

(3) The conspiracy pleadings are improper.

**Duty of Care**

[43] The defendants argue, with some force, that there is no duty of care owed by reporting issuers to the "investing public" in respect to statements made in continuous disclosure documents.

[44] van Rensburg J. was alive to the complexities of the law in this area, and the novel nature of these claims. Her Honour noted that "there are no reported cases in Ontario where a common law claim of misrepresentation in the secondary market **[*27]** has been considered at trial." [See Note 15 below] Her Honour considered that these claims could be available, in the right circumstances, and cited four cases in support of this conclusion. [See Note 16 below]

Note 15: *IMAX* certification reasons, at para. 40.

Note 16: *Carom v. Bre-X Minerals Ltd. (2000) 51 O.R. (3d) 236* (Ont. C.A.), *Mondor* v. *Fisherman* (2001), 18 B.L.R. (3d) 260 (Ont. S.C.J.), *Lawrence* v. *Atlas Cold Storage Holdings Inc.* (2006) 34 C.P.C. (6th) 41 (Ont. S.C.J.), add'n reasons *[2007] O.J. No. 351* (S.C.J.), *McCann v. CP Ships, [2009] O.J. No. 5182* (S.C.J.).

[45] The defendants challenge van Rensburg J.'s use of coordinate authority, which, they argue, does not overcome the clear legal principles that apply to establish that no duty is owed by a public issuer to the general "investing public" in respect to statements made in continuous disclosure documents.

[46] The defendants rely **[*28]** upon *Menegon* [See Note 17 below] as authority to the contrary. *Menegon* concerned claims against underwriters and auditors, not as against management and directors. van Rensburg J. found that there are stronger policy reasons for precluding liability for third party intermediaries under the second branch of the *Anns* [See Note 18 below] test than there are for precluding liability on the part of a public issuer and its officials. I see no reason to doubt the correctness of Her Honour's reasoning on these issues. I agree that these issues are important, complex and controversial. In my view, appellate courts will be in a better position to address them on a full factual record, after trial.

Note 17: *Menegon v. Philip Services Corp., [1999] O.J. No. 4080* (S.C.J.) per Gans J.

Note 18: *Anns* v. *Merton London Borough Council*, [1978] A.C. 728 (H.L.), adopted in *Hercules Management Ltd. v. Ernst & Young, [1997] 2 S.C.R. 165.*

**Detrimental [*29] Reliance**

[47] Under Canadian law, common law claims of misrepresentation require plaintiffs to show that they relied on a misrepresentation to their detriment, and that this detrimental reliance caused their losses. [See Note 19 below]

Note 19: See *The Queen v. Cognos Inc., [1993] 1 S.C.R. 87, Hercules Management v. Ernst & Young, [1997] 2 S.C.R. 165 at 184, Deep v. M.D. Management (2007), 35 B.L.R. (4th) 86* (S.C.J.) at para. 20, per *Brown J., affd. [2008] O.J. No. 961* (C.A.).

[48] Some American courts have accepted the "fraud on the market" or "efficient market" theory to deem that misrepresentations made to the marketplace are relied upon by the investing public. This is not the law in Canada. [See Note 20 below]

Note 20: *Carom v. Bre-X Minerals Ltd. (1998), 41 O.R. (3d) 780* (Gen. Div.). See also *Ainslie v. C.V. Technologies Inc. (2008), 93 O.R. (3d) 200* (S.C.J.), at paras. 12-13, per Lax J., *Charles Trust (Trustees of) v. Atlas Cold Storage, [2009] O.J. No. 4271* (S.C.J.), at paras. 8-9, per Lax J., affd. 2009 ONCA 690, and *Gammon Gold*, *infra*, at n.22, per Strathy J., at para. 159.

**[*30]**

[49] The requirement to prove detrimental reliance has been a significant impediment to pursuing common law misrepresentation claims in securities law. Individual investors in the secondary market may be influenced by a broad range of factors, and the "reliance issue" is not usually seen as held in common among investors.

[50] Individual investors in the secondary market may lack the resources or the financial incentive to pursue misrepresentation claims. The plaintiffs in this case are a good example: each made an investment of a few thousand dollars, and allegedly lost a portion as a result of the alleged misrepresentations. Few investors would sue a public issuer over losses so small. But total losses to all such investors may justify the risks and costs of suing.

[51] The *OSA* cause of action was enacted, in part, to provide a potential remedy in these circumstances. This cause of action removes the requirement to prove individual detrimental reliance, but this is balanced by other provisions, such as the leave requirement and the damages cap.

[52] The plaintiffs plead that the "efficient market theory" or the "fraud on the market theory" applies to their common law claims **[*31]** as a matter of fact. Thus they seek to have the issue of detrimental reliance tried as a common issue, rather than proving individual detrimental reliance.

[53] It could be thought ironic if the first case to go to trial under the new *OSA* cause of action could also be a case dispensing with the requirement for individual reliance for common law misrepresentation. However, there is a distinction between deemed reliance by operation of law and a factual finding that the "efficient market" theory applies to the specific statements allegedly made by this public issuer to the market in this case. van Rensburg J. found that there is authority for the proposition that class reliance may be proved as a matter of fact, even where it will not be deemed as a matter of Canadian law. There is coordinate authority to support this analysis [See Note 21 below] and no appellate authority to the contrary. I see no reason to doubt the correctness of this analysis, and thus leave cannot be granted pursuant to R.62.02(4)(b).

Note 21: *Mondor* (S.C.J.), supra., at n.16, per Cumming J. See also *Lawrence* (Ont. S.C.J.), supra., at n.16, per Hoy J..

**[*32]**

[54] The defendants argue that the decision of Strathy J. in *Gammon Gold* [See Note 22 below] is authority to the contrary, and that leave should be granted under R.62.02(4)(a). Sachs J. rejected this argument on the motion for leave to appeal from Strathy J. [See Note 23 below] I agree with Sachs J. and with her reasons on this point. [See Note 24 below] On the particular facts of the case in *Gammon Gold*, Strathy J. concluded that numerous statements were made, in different contexts, and an inference of class reliance could not be made in that case. van Rensburg J. concluded that the statements that are the subject-matter of this case are confined and that class reliance could be inferred in this case. *IMAX* and *Gammon Gold* turn on different and distinguishable facts and are not contradictory.

Note 22: *McKenna* v. *Gammon Gold Inc.* (2010), 88 C.P.C. (6th) 83, 2010 ONSC 1591 (S.C.J.), per Strathy J.

Note 23: *McKenna v. Gammon Gold Inc. (2010), 266 O.A.C. 314* (S.C.J.), per Sachs J.

Note 24: *Ibid.*, para. 57.

**[*33]**

[55] The relationship between common law and statutory claims of misrepresentation is important, and merits appellate consideration. However, the decision of van Rensburg J. does no more than permit the plaintiffs to proceed to trial. The Court of Appeal will be able to give full consideration to these issues if and when the case is appealed after a trial judgment.

**Conspiracy Pleadings**

[56] I see no reason to doubt the correctness of van Rensburg J.'s analysis of the conspiracy issues. The defendants argue that Her Honour failed to address arguments concerning the validity of certain portions of these pleadings. These are discrete pleadings issues that do not transcend the interests of the parties. They are not matters of "importance", and it is not "desirable" that leave to appeal be granted on this point.

**Certification As A Class Proceeding**

[57] The defendants raise specific objections to the certification decision of van Rensburg J.:

1. The class of persons identified by van Rensburg J. is defined on the faulty premise of "rebuttable presumed reliance";

2. van Rensburg J. certified a global class and should not have done so.

3. The representative plaintiffs **[*34]** cannot properly represent the class.

**Class Definition**

[58] Given my conclusions on the *OSA* leave issue and the common law misrepresentation issue, the premise of "inferred reliance" [See Note 25 below] is not "faulty".

Note 25: The defendants' characterization, "deemed rebuttable reliance" is not consistent with van Rensburg J.'s findings, and so I have substituted the phrase "inferred reliance". Of course, in respect to the claim under the *OSA*, reliance is not necessary in any event.

**Global Class**

[59] The defendants' submissions on this point are undermined significantly by their approach to class proceedings brought against them in the United States of America. In those proceedings, these defendants have taken the position that Ontario is the proper jurisdiction for all claims respecting the impugned statements.

[60] IMAX is listed on both the TSE and NASDAQ exchanges. IMAX is subject to the regulatory regimes in both Ontario and the U.S.A.

[61] van Rensburg J. was alive to issues of judicial **[*35]** comity and conflict of laws when certifying a global class. Her Honour specifically noted that some issues arising from certification of a global class would have to be addressed as proceedings unfold in both Canada and the United States.

[62] I see no reason to doubt the correctness of van Rensburg J.'s decision respecting these issues. It would be wrong, of course, to compel foreign investors to be bound by Canadian proceedings if they prefer to have their claims adjudicated elsewhere. But similarly, it would be wrong to preclude them from participating in Canadian proceedings if they wish their claims to be pursued in Ontario.

[63] As a matter of common sense, there is integration of Canadian and American capital markets, and there are legitimate bases for enforcement to be possible in both Canada and the U.S.A., both by regulatory action and by civil claims. The manner in which this integration takes place will vary from case to case. Certainly integration does not imply a prohibition on overlapping class proceedings in different jurisdictions. [See Note 26 below]

Note 26: *Mignacca v. Merck-Frosst Canada Ltd., [2008] O.J. No. 4731* (S.C.J.) at paras. 23, 29-40; *Mignacca (2009), 95 O.R. (3d) 269* (Div. Ct.) at paras. 92-93, leave to appeal to C.A. denied May 15, 2009, leave to appeal to S.C.C. denied *October 22, 2009, [2009] S.C.C.A. No. 261; Mignacca, [2009] O.J. No. 5233* (S.C.J.) at para. 31.

**[*36]**

[64] van Rensburg J. accurately stated and applied the test for defining classes in class proceedings. The implementation of Her Honour's decision, in a manner harmonious with proper respect for the exercise of jurisdiction by the American courts will, no doubt, unfold over time as the two cases proceed. Such an approach in respect to a public issuer who chooses to trade on public stock exchanges in both Ontario and the U.S.A. is entirely in keeping with the "principles of order and fairness" to be applied in determining the proper class.

[65] The defendants conclude their written argument on this point with the following submission: "the implications arising from competing proposed class actions in different countries should meet the standard for leave [to appeal to the Divisional Court]". Perhaps the lawyers view the proceedings as "competing". The courts do not. The proceedings are and should be complementary, to achieve a proper vindication of the rights of plaintiffs, fair process for the defendants and plaintiffs, respect for the autonomous jurisdictions involved, and an integrated and efficient resolution of claims. This requires common sense, judicial comity, and fair process. **[*37]** It does not require balkanization of class proceedings, but rather sensitive integration of them.

**Representative Plaintiffs**

[66] The defendants argue that the proposed representative plaintiffs cannot represent a class of possibly hundreds or thousands of potential claimants. The defendants say that van Rensburg J.'s analysis was restricted to noting that the proposed representative plaintiffs meet the definition of the proposed class. [See Note 27 below]

Note 27: Defendants' Factum, para. 279.

[67] The learned motions judge, in her voluminous reasons, reviewed the position of the proposed representative plaintiffs when Her Honour considered the "good faith" requirement under the *OSA* test for leave. The reasons were released separately, but on the same day, and should be read together. When both sets of reasons are read together, there is an ample basis for concluding that the proposed representatives can represent the proposed class "vigorously and capably".

[68] It may emerge, of course, that "different **[*38]** subgroups of investors have different rights against the defendants". But, "if material differences emerge, the court can deal with them when the time comes," [See Note 28 below] a point emphasized by van Rensburg J.

Note 28: *Western Canada Shopping Centres Inc. v. Dutton, [2001] 2 S.C.R. 534 at para. 54.*

[69] The common issues in this case focus on the conduct of the defendants. As argued at length before van Rensburg J., and again before me, these issues are complex. They have been expensive to litigate. They will continue to be so. Access to justice requires that these common issues be adjudicated in class proceedings. [See Note 29 below]

Note 29: *Anderson v. Wilson (1999), 44 O.R. (3d) 673* (C.A.).

**Costs**

[70] The parties settled the costs of the Rule 21 and certification **[*39]** motions and agreed that the costs for the *OSA* leave motion are $ 385,000. The disagreed on when and on what basis these costs should be paid to the plaintiffs.

[71] van Rensburg J. ordered costs of the *OSA* leave motion paid to the plaintiffs within thirty days.

[72] There are no conflicting decisions respecting this costs order.

[73] I see no reason to doubt the correctness of this order. The ordinary rule is that costs follow the event of a motion. van Rensburg J. concluded that a leave motion under the *OSA* could be seen as analogous to motions to certify class proceedings, rather than motions for summary judgment or for injunctive relief. This approach seems sensible. And using this approach, the following language from Sharpe J. (as he then was) seems apposite:

> The defendants strenuously resisted certification in an attempt to effectively end the action. That strategy put the plaintiff to very considerable expense (not to mention the risk of a substantial adverse costs award had the strategy been successful). While the defendant was certainly entitled to advance the arguments it did on the certification motion, I do not think it appropriate to require the plaintiff **[*40]** to carry the financial burden of the certification motion until the conclusion of the action, and then, only to be awarded costs if successful. If the goal of enhanced access to justice is to be met, some account must be taken in a case such as the present one of the financial burden of carrying on litigation against a wealthy and determined opponent. [See Note 30 below]

Note 30: *Robertson v. Thomson Corp. (1999), 43 O.R. (3d) 389* (Gen. Div.), quoted with approval by van Rensburg J. in para. 29 of her costs decision.

**Conclusion**

[74] The motion for leave to appeal from the decisions of van Rensburg J. are entirely dismissed. The plaintiffs are entitled to their costs of this motion. If the parties cannot agree on these costs they shall seek directions from me by teleconference no later than February 28, 2011.

D.L. CORBETT J.