**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re IMAX CORPORATION SECURITIES LITIGATION** | | **Civil Action No. 1:06-cv-06128-NRB** |
| | | **CLASS ACTION** |
| **This Document Relates To:** | | |
| **ALL ACTIONS.** | | |

**DECLARATION OF JOHN D. FINNERTY, Ph. D. IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I, John D. Finnerty, declare pursuant to 28 U.S.C. § 1746, as follows:

## I. Qualifications

1. I am a Professor of Finance and the former Director of the Master of Science in Quantitative Finance Program in the Graduate School of Business Administration at Fordham University. I was awarded early tenure in 1991, and I received the Gladys and Henry Crown Award for Faculty Excellence in 1997. I have published 14 books, including *Corporate Financial Management*, 4th ed. (Wohl Publishing, 2011), *Project Financing: Asset-Based Financial Engineering,* 2nd ed. (Wiley, 2007), and *Debt Management* (Harvard Business School Press, 2001), and more than 90 articles and professional papers with respect to corporate finance, fixed income, and business and securities valuation. I am the former editor of *Financial Management*, one of the five leading finance journals in the United States, and I am also a former editor of *FMA Online*, an online journal sponsored by the

Financial Management Association. I am also a member of the Editorial Advisory Board of the *Journal of Portfolio Management*. I was inducted into the *Fixed Income Analysts Society Hall of Fame* in 2011.

2. My teaching and research deal mainly with corporate finance, investment banking, and fixed income securities valuation and portfolio management. I have previously published a paper on the calculation of damages in securities fraud cases entitled, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," which was published in the Spring 2003 issue of the *Stanford Journal of Law, Business & Finance*, and a paper on the determinants of the settlement amount in securities fraud class actions entitled, "Determinants of the Settlement Amount in Securities Fraud Class Action Litigation," which was published in the Summer 2006 issue of the *Hastings Business Law Journal*. I have extensive experience calculating damages in securities fraud cases.

3. I have served as the Chair of the Trustees, President, and a Director, and I am currently a Trustee, of the Eastern Finance Association, an academic finance organization. I have also served as the President and Director of the Fixed Income Analysts Society, an association of finance professionals based in New York City.

4. I am a Managing Principal at Finnerty Economic Consulting, LLC (FinnEcon®), an economic consulting firm that provides consulting and valuation services to law firms, corporations, industry associations, and government agencies. I have served as an expert in numerous cases involving financial analysis, business valuation, and due diligence, and I have provided expert testimony on a variety of financial issues in federal courts, state courts, and before arbitration panels.

5. Prior to forming FinnEcon® in 2003, I was a Managing Principal at Analysis Group, Inc., an economic consulting firm. Prior to joining Analysis Group, I was a Partner (non-audit) in the PricewaterhouseCoopers Financial Advisory Services Group for five years, and previously held investment banking positions at Morgan Stanley, Lazard Frères, McFarland Dewey, and Houlihan Lokey Howard & Zukin.

6. I received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University where I was a Marshall Scholar, and a B.A. in Mathematics from Williams College. Attached as Appendix A is a true and correct copy of my current resume, which lists all publications I have written or co-authored and includes a brief description of my trial and deposition testimony within the past four years.

7. My firm is being compensated at my customary billing rate of $695 per hour for my work on this matter. My opinions are my own, and my compensation is not contingent on my findings or on the outcome of the litigation in connection with which I have prepared this declaration. Some of the analyses in this declaration have been performed by staff of Compass Lexecon working under my direction.

## II. Assignment and Summary of Opinion

8. Abbey Spanier Rodd & Abrams, LLP, counsel for the plaintiff in this matter, has asked me to opine on whether changes in the price of IMAX Corporation ("IMAX" or "Company") common stock on various dates from August 9, 2006 through July 20, 2007 were directly related to and caused by certain disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized

for financial reporting purposes. Ultimately, the Company changed its revenue recognition policy and restated its reported figures for fiscal years 2002 through 2005 and the first three quarters of 2006.

9. It is my opinion that changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes, which are discussed below.

10. Appendix B lists the materials I considered in coming to my opinions in this matter.

## III. Event Study Analysis

11. I performed an "event study" to investigate the responsiveness of IMAX's common stock price to the Company's announcements on August 9, 2006, March 29, 2007, and July 20, 2007. An event study is a standard analytical technique that financial economists use to determine whether a security's price reaction to a news announcement (or some other event) is statistically significant. In order to focus on the impact of the company-specific news on the price of a security, one calculates a security's abnormal return around the time of the announcement. A security's abnormal return is the difference between the security's actual return and its expected return. A common stock's expected return is the return one would expect based on certain market and industry factors, which is estimated based on a financial model that includes these factors. Once one has calculated a stock's

abnormal returns, one can use standard statistical techniques to test whether these abnormal returns are statistically significantly different from zero.

**A. Description of the Event Study Methodology**

12. I calculated the expected return of IMAX's common stock by applying the widely accepted Fama-French Three-Factor Model.[1] Eugene Fama and Kenneth French developed what is now known as the Fama-French Three-Factor Model in 1993.[2] The Fama-French Three-Factor Model "has become widely known and adapted."[3] This model identifies three factors that explain excess stock returns:

- The excess return on the market portfolio over treasury bills ($R_m - R_f$ where $R_m$ is the return on the market portfolio of stocks and $R_f$ is the risk-free rate of return);
- SMB ("small minus big") – the difference between the returns on small-cap stocks and large-cap stocks; and
- HML (high minus low") – the difference between returns on high book-to-market stocks (value stocks) and low book-to-market stocks (growth stocks).

13. The regression formula for the Fama-French Three-Factor Model, which is fitted to daily data for the excess return on the stock ($R_i$ - $R_f$), is:

$$R_i - R_f = \alpha + \beta(R_m - R_f) + s\ SMB + h\ HML + e$$

[1] Fama, Eugene F. and Kenneth R. French, "Common Risk Factors in the Returns on Stocks and Bonds," *Journal of Financial Economics*, 33 (1993), pages 3-56.

[2] *Ibid.*

[3] Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 191.

This model has become widely accepted for event study analysis.[4] The Fama-French Three-Factor Model is a significant improvement on the (unadjusted) Capital Asset Pricing Model ("CAPM") because it prices the risks associated with small firm size and financial distress, as reflected in the stock's book-to-market ratio.[5] Morningstar's *Cost of Capital Yearbook*, formerly produced by Ibbotson Associates, uses the Fama-French Three-Factor Model, among others, to calculate the cost of equity capital for firms in various industries.[6]

14. I modified the Fama-French Three-Factor Model to include the returns of an entertainment industry index to take into account the sensitivity of IMAX's stock price to movements in other entertainment companies' stock prices. Controlling for industry factors that can affect the price of a company's stock is appropriate in an event study, as several articles in the academic and professional literature have previously noted.[7] Indeed, academic research has pointed out the importance of

---

[4] See for example, Boehme, Rodney D. and Sorin M. Sorescu, "The Long-run Performance Following Dividend Initiations and Resumptions: Underreaction or Product of Change," *Journal of Finance,* 57, 2002, pages 871-900, and Ang, James S. and Shaojun Zhang, "An Evaluation of Testing Procedures for Long Horizon Event Studies," *Review of Quantitative Finance and Accounting*, 23, 2004, pages 251-274.

[5] Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 4th ed., Wohl Publishing, Morristown, NJ, 2011, page 192.

[6] Morningstar, *Cost of Capital 2007 Yearbook*, 2007, page 23.

[7] Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, eds., Litigation Services Handbook, 3rd ed., Wiley, New York, 2001, chapter 19. *See* also Alexander, Janet C., "The Value of Bad News," *UCLA Law Review*, Vol. 41, August , 1994, pp. 1421-69; Jonathan R. Macey, Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 *Virginia Law Review Association* 1017 (August 1991), pp. 1021-28; A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, March 1997, pp. 13-39; Mark L. Mitchell and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, February 1994, pp. 545-90; and Bradford Cornell and R. Gregory Morgan, "Using Finance Theory To Measure Damages In Fraud On The Market Cases," *UCLA Law Review,* Vol. 37, June, 1990, pp. 883-923.

making sure that estimates of returns to investors on securities are free of bias when using a market model, such as the Capital Asset Pricing Model or the Fama-French Three-Factor Model, to conduct an empirical study.[8]

15. To avoid the bias that would result from using a standard stock index that includes IMAX, I created a market-weighted custom index (the "Custom Index") consisting of the stock returns of all the members of the Bloomberg Hollywood Reporter Index that were in the index throughout the Class Period, excluding IMAX.[9] This sample included a total of 33 firms. The regression formula for my Modified Fama-French Three-Factor Model is:

$$R_i - R_f = \alpha + \beta(R_m - R_f) + s\ SMB + h\ HML + i\ Custom\,Index + e$$

16. In its opinion on loss causation in *Dura*, the Supreme Court noted that a stock price decline is not necessarily related to an earlier misrepresentation (or omission) and could be the result of "changed economic circumstances," "new industry-specific

---

[8] Bartholdy, Jan and Paula Peare, "Unbiased Estimation of Expected Return Using CAPM," *International Review of Financial Analysis*, 2003, pages 69-81. The article specifically mentions the CAPM but its analysis applies equally to the Fama-French Three-Factor Model because that model is really just an extended version of the CAPM. Referring to Equation 1, the CAPM can be interpreted as the Fama-French Three-Factor Model without the SMB and HML terms. *See* Richard A. Brealey, Stewart C. Myers, and Franklin Allen, Principles of Corporate Finance, 9th ed., McGraw-Hill, New York, 2008, pages 225-227.

[9] IMAX compared its stock price performance to the Bloomberg Hollywood Reporter Index in its Form 10-K for the fiscal year ended December 31, 2006 at 30. I excluded stocks that did not have return data available in the Center for Research in Security Prices (CRSP) database for the entire Class Period. The companies included in the Custom Index are Acme Communications Inc., Belo Corp., Blockbuster Inc., British Sky Broadcasting Group PLC, Cablevision Systems Corp., CBS Corp., Charter Communications Inc., Clear Channel Communications Inc., Comcast Corp., DISH Network Corp., Electronic Arts Inc., Emmis Communications Corp., EW Scripps Co., Gannett Co. Inc., General Electric Co., Grupo Televisa SA, Hearst-Argyle Television Inc., IAC/InterActive Corp., ION Media Networks Inc., Lions Gate Entertainment Corp., News Corp., RealNetworks Inc., Sinclair Broadcasting Group Inc., Sirius XM Radio Inc., Sony Corp., Time Warner Inc., TiVo Inc., Tribune Co., The Walt Disney Co., Westwood One Inc., XM Satellite Radio Holdings Inc., Yahoo Inc., and Young Broadcasting Inc.

facts" or new "firm-specific facts."[10] Accordingly, in evaluating whether the August 9, 2006, March 29, 2007, and July 20, 2007 disclosures about IMAX were firm-specific, fraud-related, and a substantial cause of IMAX's stock price declines on those dates, I applied the Modified Fama-French Three-Factor Model, which controls for the potential impact of general economic conditions on the price of IMAX's stock, as captured by the $R_m - R_f$, *SMB*, and *HML* terms in the model, and the potential impact of industry-specific factors on the price of IMAX's stock, as captured by the *Custom Index* term in the model. I then analyzed the impact of the company-specific factors on IMAX's common stock abnormal returns on August 9-10, 2006, March 29, 2007, and July 20, 2007, as well as the disclosures themselves for each date, as discussed below.

**B. August 9, 2006 Disclosures**

17. On August 9, 2006, just after the market closed, IMAX issued a press release announcing (a) second quarter financial results, (b) an informal inquiry from the U.S. Securities and Exchange Commission ("SEC") regarding "the Company's timing of revenue recognition, including its application of multiple element arrangement accounting …", (c) a material weakness in internal controls related to revenue recognition in its 2006 second quarter, and (d) failure to find any buyers of the Company at a valuation sought by the Board.[11] Approximately half an hour later, at 4:30 p.m., the Company hosted a conference call with analysts and

---

[10] *Dura*, 544 U.S. at 342-43.

[11] *PR Newswire*, IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives --," August 9, 2006 (4:01 p.m.).

investors.[12] According to a transcript of the call, IMAX officials discussed the above disclosures and also announced that the Company was (a) focusing on a more aggressive rollout of its joint venture initiative, (b) accelerating introduction of its Digital Projection product, and (c) retracting all guidance for the year as a result.[13] The abnormal return on August 9-10, 2006 (i.e., from the market close on August 9, 2006 through the market close on August 10, 2006) was -40.44%.[14] This abnormal return is significant at better than the 1% level, which means there is less than a 1% chance that this abnormal return happened by mere chance.[15]

**C. March 29, 2007 Disclosures**

18. On March 29, 2007, before the market opened, IMAX issued a press release announcing that "it will further delay the filing of its annual report on Form 10-K for fiscal 2006 and the corresponding filings under Canadian provincial securities laws beyond the filing deadline, in each case, of March 31, 2007."[16] The Company also stated:

> As previously announced, management and the Audit Committee of the Board of Directors are evaluating certain accounting errors over a six-year period. As a result, the Company expects to file restated financial statements for certain periods during those years. In the course of completing this restatement and the year-end audit, and in recently reviewing certain comments received from the U.S.

[12] *PR Newswire*, "IMAX Corporation announces new time for quarterly conference call, August 9, 2006 (7:00 a.m.), stating that "its conference call to discuss second quarter 2006 results originally scheduled for 8:30 AM ET has been postponed until 4:30 PM ET."

[13] Voxant FD (Fair Disclosure) Wire, "Q2 2006 IMAX Corporation Earnings Conference Call - Final," August 9, 2006.

[14] Exhibit 1.

[15] *Ibid.*

[16] *PR Newswire*, "IMAX to delay filing of 2006 10-K," March 29, 2007 (7:30 a.m.).

> Securities and Exchange Commission (SEC) and the Ontario Securities Commission (OSC), the Company has determined to broaden its review to address certain issues related to these comments, primarily in connection with its revenue recognition for certain theatre system installations in previous periods, including the fourth quarter of 2005. As a result of this expanded review, which is ongoing by the Company and its auditors, Pricewaterhouse Coopers LLP, the Company may determine that it is necessary to restate additional items beyond the previously identified errors. The Company does not believe that a potential restatement resulting from changes to its revenue recognition accounting would have any impact on its previously reported or existing cash accounts. While the Company cannot predict when it will complete this review and file its 10-K, it is working to do so as soon as practicable.
>
> As previously disclosed by the Company, it has been the subject of informal inquiries by the SEC and the OSC since 2006, particularly with regard to its revenue recognition policies. The primary focus of the SEC and OSC inquiries has been the Company's application of multiple element arrangement accounting to its theatre installations and system agreements.[17]

IMAX "also noted that the filing delay will result in the Company being in default of a financial reporting covenant under the indenture governing its Senior Notes" and disclosed that it "expects to receive a notice of delisting from NASDAQ."[18] The abnormal return on March 29, 2007 was -6.47%.[19] This abnormal return is significant at better than the 1% level, which means there is less than a 1% chance that this abnormal return happened by mere chance.[20]

---

[17] *Ibid.*

[18] *Ibid.*

[19] Exhibit 1.

[20] *Ibid.*

**D. July 20, 2007 Disclosures**

19. On July 20, 2007, before the market opened, IMAX issued a press release containing several announcements:

- Company completes restatement of financial results for reporting periods covering 2002 through 2005 and will file Form 10-K for fiscal 2006 and Form 10-Q for the first quarter of fiscal 2007 today. Company revises accounting policy regarding revenue recognition for theatre system installations. The SEC and OSC inquiries remain ongoing.

- Company enjoys a record opening week for Harry Potter and the Order of the Phoenix … with $11.6 million in worldwide IMAX box office on 126 screens, building on the strong performance of 2007 film slate to date, including 300 … and Spider-Man 3.

- Company continues to advance its joint venture initiative, with joint venture agreements for five theatres signed since January, and multiple discussions ongoing.

- Company remains on track to introduce its digital projection system on time and within budget.

- Company announces 13 theatre system signings in the first quarter of fiscal 2007 … and six … in the second quarter.

- Company reports 2006 and first quarter 2007 financial results.[21]

20. Also on the morning of July 20, the Company held a conference call with analysts and investors, in which co-CEO Richard Gelfond stated that "2007 is likely to be somewhat of a transitional year from a financial perspective …. [T]here will be some unique expenditures and charges …. To begin with, the SEC's and OSC's informal [investigation] relating to the Company's timing of revenue recognition continue to increase our legal and accounting fees in 2007. Second, R&D costs

---

[21] IMAX Press Release, "IMAX Corporation reports 2006 and first quarter 2007 financial results," July 20, 2007; *Dow Jones News Service*, "Imax Corp. 1Q Loss/Shr 12c Vs Loss 9c," July 20, 2007 (6:00 a.m.).

related to the launch of digital are also going to impact our financial results in fiscal 2007."[22] Also during the conference call, IMAX's General Counsel, Rob Lister, stated that "the Company is quite confident that it is in compliance with all of its covenants under both its indenture and under its credit facility."[23]

21. The stock's abnormal return on July 20, 2007 was 11.52%.[24] This abnormal return is significant at better than the 1% level, which means there is less than a 1% chance that this abnormal return happened by mere chance.[25]

## IV. Loss Causation

22. I performed a "loss causation" analysis to determine whether the statistically significant changes in IMAX's common stock price on the various dates analyzed above could be attributed to disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. This analysis involves examining the results of the event study described above in the light of all available company news and intra-day stock price movements on the relevant dates to determine whether other announcements might account for part or even all of the price changes. In particular, I reviewed IMAX's and its management's disclosures,

---

[22] Voxant FD (Fair Disclosure) Wire, "Q4 2006 and Q1 2007 IMAX Corporation Earnings Conference Call - Final," July 20, 2007.

[23] *Ibid.*

[24] Exhibit 1.

[25] *Ibid.*

press articles, and securities analyst commentary around the disclosures between August 9, 2006 and July 20, 2007 described above.

23. General changed economic circumstances, stock market-wide factors, and entertainment-industry-specific events do not fully explain IMAX's stock price declines following the disclosures on August 9, 2006, March 29, 2007, and July 20, 2007 because in each case the abnormal returns are statistically significantly different from zero. I controlled for all these external factors at the same time when applying the Modified Fama-French Three-Factor Model. Consequently, the abnormal returns on IMAX's stock I calculated are measured net of these effects. The next step is to analyze how IMAX's stock price declines on August 9-10, 2006, March 29, 2007, and July 20, 2007 were affected by IMAX's firm-specific disclosures on these dates.

24. My analysis of the effects of IMAX's firm-specific disclosures demonstrates that the declines in the Company's stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 are directly related to and substantially caused by the disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes.

**A. IMAX's August 9-10, 2006 Stock Price Decline**

25. It is my opinion that the statistically significant -40.44% abnormal return on August 9-10, 2006 was substantially caused by the disclosures in IMAX's press release issued just after the close of trading on August 9, 2006 that were related to Plaintiff's allegations. The bases for my opinion are: (a) the fact that 75% of the

total stock price decline between the market close (at 4:00 p.m.) on August 9, 2006 and the market close on August 10, 2006 occurred *before* the 4:30 p.m. conference call on August 9, 2006 began,[26] (b) market commentators specifically attributed the decline in IMAX's stock price largely to the disclosure of the SEC inquiry, (c) securities analysts reacted negatively to the disclosure of the SEC inquiry, (d) other negative information disclosed on August 9, 2006, in particular, IMAX's failure to find a buyer, is likely related to Plaintiff's allegations, (e) the remaining disclosures on August 9, 2006 likely had a positive effect on IMAX's stock price, especially since IMAX's revenue and earnings beat stock analysts' forecasts, and (f) the fact that there is less than a 1% chance that the -40.44% abnormal return happened by mere chance.

26. Exhibit 2 is a chart of IMAX's intra-day stock prices on NASDAQ from 4 p.m. on August 9, 2006 through 4 p.m. on August 10, 2006. The chart shows that the Company's stock price declined sharply immediately following the issuance of the press release at 4:01 p.m. on August 9, 2006 and remained substantially below the prior day's close throughout August 10, 2006. This trading pattern reflects the impact of the news announced in the press release.

27. Market commentators specifically attributed the stock price decline largely to the disclosure of the SEC investigation. For example, CBC News reported that "[s]hares of Imax Corp. fell by more than 40 per cent Thursday after Canada's

[26] IMAX's closing prices on NASDAQ were $9.63 and $5.73 on August 9 and 10, 2006, respectively, a decline of $3.90. Source: ©201003 CRSP®, Center for Research in Security Prices. Graduate School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu. According to the NYSE TAQ database, IMAX's stock price as of 4:30 pm on August 9, 2006 was $6.70, a decline of $2.93 from the close. $2.93 is 75.1% of $3.90.

wide-screen filmmaker announced it was being investigated by U.S regulators."[27] Another financial publication wrote that "IMAX Corp. was crushed for a 36.9% decline (at 6.07) Wednesday night after the company's better-than-expected Q2 results were overshadowed by an SEC inquiry."[28]

28. After IMAX's announcements and conference call, several securities analysts lowered their ratings on the Company's stock, citing the SEC inquiry. For example, *Reuters News* reported: "Merriman Curhan Ford & Co. downgraded Imax to a 'sell' from a 'buy' after the earnings report, in part because of the SEC inquiry. Richard Ingrassia at Roth Capital Partners cut the shares to 'sell' from 'hold', also noting the SEC inquiry, weak box office performance and the lack of a deal for the company."[29]

29. Because the size and scope of the SEC investigation were still uncertain, securities analysts warned about the "material risk" to the share price. For example, on August 10, 2006:

- Analysts at Friedman Billings Ramsey stated: "IMAX is cooperating fully with the SEC inquiry, and any adverse findings would not affect the company's cash flows, although it could result in a restatement of prior-period GAAP operating results. We do not expect that this will have a material adverse impact on the creditworthiness of the company but remain cautious regarding the matter, as any investigation of this nature carries material risk."[30]

---

[27] *CBC News*, "Imax stock plummets on SEC investigation," August 10, 2006 (4:45 p.m.).

[28] *Midnight Trader*, "In the Money Forecast: Stocks to Watch Thursday," August 9, 2006 (6:37 p.m.).

[29] *Reuters News*, "Imax plunges on lack of sale deal, SEC inquiry," August 10, 2006 (11:12 a.m.).

[30] Friedman Billings Ramsey, "2Q06 Results Top Expectations; Sale Process Losing Momentum – Maintaining Market Perform on Senior Notes," August 10, 2006. In fact, these fears were later borne out in March 2007 when the Company was required to address comments from the SEC and OSC, causing delays in filing its 2006 10-K, bond covenant defaults, and potential delisting from NASDAQ. *See infra* §IV.b.

- Analysts at BMO Capital Markets wrote: "The SEC inquiries into revenue recognition only reinforce some investor scepticism over the company's accounting practices (whether right or wrong). At the very least, we see the risk of a prolonged inquiry or a potential escalation as reason enough to avoid the stock for now."[31]

- Analysts at Merriman Curhan Ford reported: "As with most companies that receive inquiries from the SEC (especially those regarding revenue recognition issues), we believe there will likely be a cloud over the company's shares until this is resolved."[32]

- An analyst at Susquehanna Financial Group opined: "Overhang from SEC investigation .... [T]his inquiry is likely to be an overhang on the stock. Negative Factor."[33]

30. In addition, securities analysts following IMAX at Paradigm Capital also remarked that the disclosures in the press release had adversely affected the credibility of management. For example, an analyst stated that "[m]anagement credibility has also taken a turn for the worse because of the failed buy-out and the SEC investigation."[34]

**B. March 29, 2007 Stock Price Decline**

31. It is my opinion that the statistically significant -6.47% abnormal return on March 29, 2007 was caused by IMAX's announcement before the market opened that it was further delaying the filing of its 2006 10-K and corresponding Canadian

---

[31] BMO Capital Markets, "A Follow-Up to Today's Downgrade, Taking a Stab at Earnings Estimates," August 10, 2006.

[32] Merriman Curhan Ford, "No Buyers Emerge; Shifts in Business Model to Negatively Impact Near-term Results; Lowering Rating to Sell from Buy," August 10, 2006.

[33] Susquehanna Financial Group, "Too Much Uncertainty Ahead; Downgrading to Neutral," August 10, 2006.

[34] Paradigm Capital, "Focus on Understanding the JV Model," August 25, 2006.

filings, that it was broadening its review of its revenue recognition accounting for certain theatre system installations in previous periods, including the fourth quarter of 2005, in response to comments received from the SEC and OSC, that the Company may determine that it is necessary to restate additional items beyond the previously identified errors, and that, because of the filing delay, the Company was in default of a debt covenant and expected to receive a notice of delisting from the NASDAQ Stock Market. The bases for my opinion are (a) the fact that IMAX's stock price opened substantially below its closing price on the prior day and remained below this level throughout the trading day, (b) the attribution in press articles and securities analyst reports of the decline to the news and its relation to the Company's revenue recognition issues, (c) the absence of any other significant news announcements concerning IMAX on this day, and (d) the fact that there is less than a 1% chance that the -6.47% abnormal return happened by mere chance.

32. Exhibit 3 is a chart of IMAX's intra-day stock prices on NASDAQ on March 29, 2007. The chart shows that the opening stock price on this day was substantially lower than the closing price on the prior day and that the price remained substantially below the prior day's close throughout the trading day. This trading pattern reflects the negative impact of the news announced before the market opened.

33. Market commentators confirmed that the further filing delay and the immediate consequences of that further delay caused IMAX's stock price to fall. For example, just after the market opened, *Reuters News* reported that "Imax Corp. lost 34 Canadian cents, or 5.5%, to C$5.83 after the giant-screen theatre maker said it

will further delay the filing of its annual report for fiscal 2006 beyond the deadline of March 31, 2007, as it broadened its review to address issues related to revenue recognition for certain theatre systems installations."[35] The next day, March 30, 2007, *The Wall Street Journal* explicitly detailed the causes of the stock price decline:

> Imax Corp. said it needs more time to file its financial statements for 2006 and will miss the filing deadline. Shares of the Canadian big-screen movie company fell 33 cents, or 6.2%, to $5.04 in 4 p.m. Nasdaq Stock Market composite trading. Imax has been evaluating accounting errors made over a six-year period. It had hoped to be able to finish the review by today, however it broadened its review process as it has factored in comments from the U.S. [SEC] and the [OSC], which have been conducting informal inquiries into its revenue-recognition practices. The filing delay will result in Imax being in default of a financial-reporting covenant under a borrowing agreement, and the company will seek consent from bondholders to give it more time to complete its review.[36]

34. A Susquehanna Financial Group securities analyst discussed the implications of IMAX's disclosure:

> This morning, IMAX announced it will further delay the filing of its 2006 10-K beyond its previously requested 15-day extension, as it has expanded the review of its financial statements. As such, the company has not provided a timeframe in which it will file its 2006 10-K, which in addition to the lack of transparency, also raises some additional concerns (i.e., debt covenant violation, potential delisting from NASDAQ, cease trade order on the Toronto Stock Exchange, etc.). Therefore, despite our belief in the underlying potential of IMAX's JV and digital strategy, we would remain on the sidelines with this stock, at least until some of these overhangs

---

[35] *Reuters News*, "Toronto stocks rise as BCE surges on M&A report," March 29, 2007 (9:40 a.m.).

[36] *The Wall Street Journal*, "Business Brief – Imax Corp.: Additional Time Needed To File Financial Report," March 30, 2007.

> are removed and we have better visibility on the commercial acceptance of its long-term growth initiatives.[37]

35. The March 29, 2007 disclosure and its ramifications were a direct result of IMAX's revenue recognition errors and the attendant SEC and OSC inquiries.

**C. IMAX's July 20, 2007 Stock Price Increase**

36. It is my opinion that IMAX's announcement on July 20, 2007 of its completed restatement was a substantial cause of the statistically significant 11.52% abnormal return on that day. The bases for my opinion are (a) the fact that IMAX's stock price opened substantially above its closing price on the prior day and remained above this level throughout the trading day, (b) the attribution in press articles and securities analyst reports of the increase to the IMAX announcement and its relation to the Company's revenue recognition accounting issues, and (c) the fact that there is less than a 1% chance that the 11.52% abnormal return happened by mere chance.

37. Exhibit 4 is a chart of IMAX's intra-day stock prices on NASDAQ on July 20, 2007. The chart shows that the opening stock price on this day was substantially above the closing price on the prior day and that the price remained substantially above the prior day's close throughout the trading day. This trading pattern reflects the positive impact of the news announced before the market opened.

38. Market commentators attributed the increase in IMAX's stock price following the press release to the news regarding the restatement. For example, *The Toronto Star* reported that "[s]hares of Imax Corp. shot up nearly 11 per cent yesterday

---

[37] Susquehanna Financial Group, "Delaying the 10-K ... Again," March 29, 2007.

after the operator of big-screen movie theatres posted a first-quarter loss and restated its financial results for previous years, lowering the curtain on its accounting debacle."[38]

39. Securities analysts reacted positively to the news of IMAX's restatement, 10-K and 10-Q filings, and likely compliance with its bond indenture. For example, a securities analyst at Susquehanna Financial Group stated: "In our opinion, the filing of its financial statements should be viewed positively, as the company was able to do so without (again) violating its financial reporting covenants. Positive Factor."[39] Another securities analyst at BMO Capital Markets wrote that "… the stock has shown some strength as the market has reason to think the company is back in compliance with its bond indenture."[40] In a report titled "Filing Lifts an Overhang," a securities analyst at Soleil Securities Corp. stated: "With the accounting issues behind it, we believe IMAX can finally begin to benefit from the strength of its film slate this year…. We believe it's not coincidental that the Company announced a new theatre system today, now that it has finally filed. We believe many exhibitors interested in an IMAX system have probably been waiting for the Company to resolve the accounting issues before pulling the trigger."[41]

---

[38] *The Toronto Star*, "Imax cleanses financial slate; Big-screen company's shares soar nearly 11%, on earnings restatement," July 21, 2007.

[39] Susquehanna Financial Group, "The Numbers Are In ...," July 20, 2007.

[40] BMO Capital Markets, "Relief Rally Fueled by 10-K, 10-Q Filings; Cash Becomes Critical," July 20, 2007.

[41] Soleil Securities Corp., "Filing Lifts an Overhang," July 25, 2007.

40. Securities analyst commentary following IMAX's July 20, 2007 announcement demonstrates that these analysts viewed the earnings news released on that day as neutral. For example, one commented that: "Overall, results were generally in-line with the company's previously announced expectations, though much of the focus was on the restatement of earnings, which resulted from a change in its revenue recognition policy (as it pertains to theatre system installations)."[42]

## V. Conclusion

41. It is my opinion that changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes. My opinion is based on the statistical significance of the abnormal returns on these dates, my analysis of other Company news and intra-day stock price movements on these dates, and my review of IMAX's and its management's disclosures, press articles, and securities analyst commentary around these dates, all as described in the preceding paragraphs of this declaration. The cumulative abnormal return in IMAX's stock price following the disclosures I analyzed is -37.88%, which is significant at better than the 1% level, which means there is less than a 1% chance that this cumulative abnormal return happened by mere chance.[43]

[42] Susquehanna Financial Group, "The Numbers Are In ...," July 20, 2007.

[43] Exhibit 1.

42. My analysis is based on the materials I have reviewed to date. I reserve the right to amend my opinion and file a supplemental declaration in this matter should I obtain any other significant information that leads me to change any of the opinions expressed in this declaration. To the extent this matter is adjourned for any reason, I further reserve the right to supplement this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed: June 3, 2010

John D. Finnerty, Ph.D.