# EXHIBIT A

**COURT FILE NO.: CV-06-3257-00**
**DATE: 20091214**

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

| | | |
|---|---|---|
| **BETWEEN:** | ) | |
| MARVIN NEIL SILVER and CLIFF COHEN | ) | A.D. Lascaris, W. Sasso, M. Robb and J. Strosberg, for the Plaintiffs |
| Plaintiffs | ) | |
| **- and -** | ) | |
| IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER and FRANCIS T. JOYCE | ) | R.P. Steep and D.M. Peebles for the Defendants and Proposed Defendants |
| Defendants | ) | |

Proceeding under the *Class Proceedings Act, 1992*

**REASONS FOR DECISION:**
**Rule 21 Motion and Motion for Certification**

**TABLE OF CONTENTS**


**<u>The Motions and The Proceedings</u>**

A. The Test for Certification
B. The Principal Issues on the Certification Motion
C. Section 5(1)(a) of the CPA: Do the Pleadings Disclose a Cause of Action?

1. The Misrepresentation Claims
   (a) Negligent Misrepresentation and the Duty of Care
   (b) Reliance as an Element of Misrepresentation
   (c) "Reckless" Misrepresentation

2. Negligence *Simpliciter*
3. Conspiracy
4. Vicarious Liability

D. Section 5(1)(b) of the CPA: Is there an Identifiable Class Represented by the Representative Plaintiffs?

1. The Proposed Class Definition
2. The "Identifiable Class" Requirement
3. Is the Proposed Class Over-Inclusive as Including Claims of Persons Who May Have No Claims?
4. Certification of a Global Class
   (a) Positions of the Parties
   (b) The Court's Authority to Certify National and International Classes
   (c) Considerations of "Order and Fairness" – Should a Global Class be Certified in this Case?
      (i) The Relevance of the U.S. Proceedings
      (ii) Conflict of Laws and Complexity

E. Section 5(1)(c) of the CPA: Do the Claims of the Class Members Raise Common Issues?

1. General Principles
2. The Proposed Common Issues
3. Proposed Common Issues – Common Law and Statutory Misrepresentation
4. Proposed Common Issues – Negligence *Simpliciter*
5. Proposed Common Issue – Conspiracy
6. Proposed Common Issues – Damages
7. Other Proposed Common Issues

F. Section 5(1)(d) of the CPA: Is a Class Proceeding the Preferable Procedure for the Resolution of the Common Issues?

G. Section 5(1)(e) of the CPA: Are the Representative Plaintiffs Appropriate? Have they Produced a Workable Litigation Plan?

<u>Conclusion</u>

**K. van RENSBURG J.**

**The Motions and The Proceedings**

[1] The plaintiffs have commenced a proposed class proceeding for misrepresentation in the secondary market. The defendant IMAX Corporation ("IMAX" or the "Company") is a reporting issuer whose securities are listed on the TSX and NASDAQ. The action arises out of the statement of IMAX's financial results for 2005 in its Form 10-K (which included its audited financial statements) released and filed with the Ontario Securities Commission ("OSC") and the U.S. Securities and Exchange Commission ("SEC") in March 2006. It is alleged that the Form 10-K, as well as press releases issued by IMAX in February and March 2006, contained misrepresentations as to IMAX's compliance with GAAP[1] and that its revenues for 2005 met or exceeded IMAX's previously issued earnings guidance.

[2] On August 9, 2006, IMAX issued another press release in which it noted in part that the Company was in the process of responding to an informal inquiry from the SEC regarding the timing of its revenue recognition, and in particular its use of multiple element arrangement accounting to recognize revenue on theatre systems that were not yet open, including theatres where the 3D screen had not yet been installed. The following day IMAX's share price dropped 40%.

[3] In 2007 IMAX restated its financial statements for a number of years, including 2005 (the "Restatement"). The Restatement acknowledged that the Company had erred in recognizing revenue for theatre systems that were not completely installed, and that the Company had not complied with GAAP in prematurely recording theatre system revenues in fiscal 2005.

[4] The plaintiffs are Ontario residents who purchased shares in IMAX on the TSX. They are suing for the devaluation in their shares which they allege was due to the alleged misrepresentations. They allege that the defendants IMAX, its chief executive officers Richard Gelfond ("Gelfond") and Bradley Wechsler ("Wechsler") and its chief financial officer at the relevant time, Francis Joyce ("Joyce") (together the "Individual Defendants") are liable for common law damages.

[5] The plaintiffs also sought leave to pursue a statutory claim under Part XXIII.1 of the Ontario *Securities Act*, R.S.O. 1990, c. S.5 (the "OSA") against the defendants and certain proposed defendants (the remaining members of the board of directors of IMAX at the relevant time and Kathryn Gamble, who was Vice-President, Finance and Controller). This is the first action to proceed under

these provisions, which came into force on December 31, 2005,[2] and leave of the Court is required under s. 138.8 of the OSA to pursue the statutory claim (the "Leave Motion").

[6] The plaintiffs seek certification of this action (including the common law and the statutory claims) as a class proceeding pursuant to s. 5(1) of the *Class Proceedings Act, 1992*, S.O. 1992, c. 6 (the "CPA"). The plaintiffs propose a global class, consisting of persons who acquired securities of IMAX on the TSX and on NASDAQ on or after February 17, 2006 and held some or all of those securities at the close of trading on August 9, 2006.

[7] The defendants also brought a motion under Rule 21 of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194, as amended, seeking to strike parts of the common law claims as pleaded by the plaintiffs. This motion is properly considered part of the determination of the sufficiency of the pleading of the cause of action under s. 5(1)(a) of the CPA in the certification motion.

[8] All three motions (the Leave Motion and the motions for class action certification and under Rule 21) were argued together. These reasons address the certification and Rule 21 motions. Separate reasons have been released contemporaneously with these reasons, granting leave to the plaintiffs to proceed with the statutory claims against all defendants and all but two of the proposed defendants.[3] Reference should be made to the reasons on the Leave Motion for the background and context of the action, including a detailed description of the facts giving rise to these motions and the statutory cause of action.

**A. The Test for Certification**

[9] Section 5(1) of the CPA requires the court to certify a proceeding as a class proceeding if:

(a) the pleadings or the notice of application discloses a cause of action;

(b) there is an identifiable class of two or more persons that would be represented by the representative plaintiff;

(c) the claims or defences of the class members raise common issues;

(d) a class proceeding would be the preferable procedure for the resolution of the common issues; and

(e) there is a representative plaintiff who:

(i) would fairly and adequately represent the interests of the class,

(ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and

(iii) does not have, on the common issues for the class, an interest in conflict with the interests of other class members.

[10] Class actions offer three important advantages. They serve judicial economy by avoiding unnecessary duplication in fact-finding and legal analysis. By allowing fixed litigation costs to be divided over a large number of plaintiffs, access to justice is improved by making economical the prosecution of claims that would otherwise be too costly to prosecute individually. Class actions serve efficiency and justice by ensuring that actual and potential wrongdoers do not ignore their obligations to the public (this is the "behaviour modification" element) (*Western Canadian Shopping Centres v. Dutton*, [2001] 2 S.C.R. 534, paras. 27-29). See also *Hollick* v. *Toronto (City)*, [2001] 3 S.C.R. 158 at paras. 14-16.

[11] The certification motion is a procedural motion focusing on the form of the action rather than on whether the action is likely to succeed on the merits. The plaintiffs must establish a minimum evidentiary basis for a certification order. It is necessary that the plaintiffs show some basis in fact for each of the certification requirements, other than the requirement in s. 5(1)(a) to plead a proper cause of action (*Hollick*, paras. 16 and 25). On this motion, which was argued with the Leave Motion (in which the preliminary merits of the statutory claim were examined), there was before the court substantial evidence touching on all requirements of ss. 5(1)(b) to 5(1)(e).

**B. The Principal Issues on the Certification Motion**

[12] There was little argument in this case directed toward the question of certification of the statutory cause of action. Rather, the focus was on whether leave should be granted to advance such a claim. In respect of the statutory claims, there is clearly a cause of action pleaded, and an identifiable class consisting of IMAX shareholders during the proposed class period. There are common issues as to the making of the misrepresentations in the Form 10-K and press releases, the personal involvement of the defendants and the application of

the statutory defences (which, if available, would defeat the statutory claims of the entire class). A class proceeding is the preferable procedure, particularly where there is no requirement for the participation of individual class members in establishing liability, as reliance on the misrepresentation is not an element of the statutory claim. In oral argument counsel for the defendants indicated that they would not be opposing certification of the statutory claims subject to the court granting leave under the OSA to pursue such claims.

[13] The acknowledgment that the statutory claims are suitable for certification is an important concession in this case. The remaining issues facing the court are the scope of the claims to be certified as a class action and the identification of the class members; that is, whether the claims will include common law claims relating to misrepresentation on the secondary market by IMAX and the Individual Defendants, and whether it is appropriate to certify a global class.

[14] The defendants assert that there are fatal deficiencies in the alleged causes of action that should prevent the court from certifying a common law claim for misrepresentation in the secondary market in this case. In particular they take issue with the recognition of a duty of care between IMAX, its directors and officers and the investing public. They also argue that reliance is an essential element of a misrepresentation claim, and that the claim as pleaded is deficient for not alleging individual reliance by each member of the proposed class.

[15] The defendants contend that the common issues are of limited significance (i.e. they will not significantly advance the action) and that the individual issues (which they contend should include the question of reliance by each class member) are both numerous and significant, rendering a class proceeding not the preferable procedure. They argue against the certification of a global class where there are parallel proceedings pending in a U.S. Court[4] (the "U.S. Proceedings") and based on potential conflict of laws concerns (anticipating that the substantive laws of different jurisdictions may apply to the common law claims of various class members. The defendants also contend that the proposed representative plaintiffs are not in fact representative of the proposed class of investors and that their litigation plan is inadequate.

[16] For the reasons that follow I have decided to certify these proceedings, including the statutory claims as pleaded and certain of the common law claims, as a class proceeding. I have also decided that the case is appropriate for a global class.

[17] These reasons will address each of the five parts of the test for certification under the CPA, although as will become apparent, and, as is often the case in certification motions, some of the arguments of the parties applied to more than one part of the test.

**C. Section 5(1)(a) of the CPA: Do the pleadings disclose a cause of action?**

[18] It is acknowledged that the pleadings disclose a cause of action under s. 138.3 of the OSA, that is for the statutory claim of misrepresentation in the secondary market. The focus for the application of section 5(1)(a) and the Rule 21 motion was on the common law claims. Whether the pleadings disclose a cause of action was addressed by the parties in their facta on certification as well as separate facta filed in support of the defendants' Rule 21 motion. The issues addressed in the Rule 21 motion are relevant to s. 5(1)(a) of the CPA and accordingly are addressed in this section of the reasons.

[19] In their Fresh Statement of Claim (the "Claim")[5], the plaintiffs assert common law claims sounding in negligence *simpliciter*, negligent and "reckless" misrepresentation and conspiracy, against IMAX and the Individual Defendants. They also claim that IMAX is vicariously liable for the acts and omissions of the Individual Defendants.

[20] In determining whether pleadings disclose a cause of action, the court is required to examine the allegations in the Claim, which are assumed to be true. The test is whether it is plain, obvious and beyond doubt that the plaintiff cannot succeed with the claim (*Hunt v. Carey Canada Inc.*, [1990] 2 S.C.R. 959). A cause of action which is novel may nevertheless be permitted to proceed, however the claim must "have some elements of a cause of action recognized in law and be a reasonably logical and arguable extension of established law" (*Silber v. DDJ Canadian High Yield Fund*, [2006] O.J. No. 2503 (S.C.).

[21] If there is a deficiency in the pleading, the court may grant leave to amend (*Normart Management Ltd. v. West Hill Redevelopment Co.* (1998), 37 O.R. (3d) 97 (C.A.)).

[22] The defendants argue the following with respect to the "cause of action" issue:

> 1. The pleadings of negligence and negligent misrepresentation are not distinct, and the former is completely subsumed by the latter. Regardless of whether or not these claims are treated as separate causes of action, they suffer from the same fatal defect, that the defendants did not owe a duty of care to the class members, and the plaintiffs have failed to plead any basis on which the court could find a duty to exist. Such a duty is novel, would result in indeterminate liability for pure economic loss, and is inconsistent with the tests enunciated by the Supreme Court of Canada in the context of both negligence *simpliciter* and negligent misrepresentation;
>
> 2. The Claim fails to properly plead reliance by any of the plaintiffs or the class members, although reliance is an essential element of misrepresentation. Instead, the Claim invokes the "fraud on the market" theory, which has been rejected by Ontario courts;
>
> 3. The pleading of conspiracy cannot succeed since the plaintiffs assert that IMAX's directors and officers conspired with IMAX itself, despite the fact that those directors and officers constitute the very directing mind of IMAX; and
>
> 4. The Claim also fails to plead facts which support personal liability against the individual directors and officers, and similarly facts to plead a basis for imposing vicarious liability against IMAX itself.

<u>**1. The Misrepresentation Claims**</u>

[23] The plaintiffs plead that there was a "Representation" that "Imax's revenues for the 2005 fiscal year were reported in accordance with GAAP and that such revenues met or exceeded the earnings guidance previously issued by Imax." The Plaintiffs also plead that the Representation was false and, therefore, a misrepresentation (Claim, paras. 1(y) and 2(b)).

[24] Negligent misrepresentation and "reckless" misrepresentation are pleaded in paras. 67 to 75 of the Claim as follows:

> 67. The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases were prepared, in part, for the purpose of attracting investment and with the intention that members of the investing public would rely upon the documents in making the decision to purchase Imax securities.

68. Each of the documents referred to in paragraph 67 above contained the Representation. The Representation was untrue, inaccurate and misleading.

69. Imax and the Individual Defendants knew that by making the Representation, the price of Imax's publicly-traded securities would rise and remain at artificially high levels and that investors would rely upon the Representation in making their decisions to purchase Imax shares.

70. Imax made the Representation by issuing the:

(a) February Press Release;

(b) Form 10-K;

(c) Annual Report; and

(d) March 9, 2006 press releases.

71. The Individual Defendants made the Representation by authorizing, permitting and/or acquiescing in:

(a) the February Press Release; and

(b) signing the Form 10-K, the Annual Report and the March 9, 2006 press releases.

72. Imax and the Individual Defendants made the Representation negligently or, alternatively, recklessly, caring not whether it was true or false, intending that Neil, Cliff and the other Class Members would rely upon it, which they did to their detriment by purchasing Imax securities during the Class Period and holding the securities beyond the Class Period.

73. Neil relied upon the Representation by reading and relying upon the documents referred to in paragraph 70 above, which contained the Representation. Cliff relied upon the Representation by reading the Form 10-K and an article published by the Globe and Mail dated February 17, 2006 which stated that, "*Imax Corp. jumped 83 cents or 9.13 per cent to 9.92. Large screen movie maker said Friday it expects to meet or beat its 2005 earnings forecast between 35 and 38 cents a share after a record number of installations in the fourth quarter. In the quarter, the company completed 14 theatre installations.*" Cliff also understood and relied on the fact that in preparing its financial

statements, Imax was required to follow the applicable rules of accounting, in this, GAAP.

74. Given the relationship as pleaded between Imax's financial results and its publicly-traded securities, Neil, Cliff and each other Class Member relied upon the Representation and the other misstatements alleged herein by the act of purchasing or [acquiring] Imax securities.

75. Neil, Cliff and each other Class Member suffered damages and loss, as particularized below, as a result of relying on the Representation and purchasing the Imax shares.

**(a) Negligent Misrepresentation and The Duty of Care**

[25] Generally, a defendant is liable in damages for negligent misrepresentation if (a) the defendant owed a duty of care to the plaintiff based on a "special relationship"; (b) the defendant made an untrue, inaccurate or misleading representation; (c) the misrepresentation was made negligently; (d) the plaintiff reasonably relied on the misrepresentation; and (e) the plaintiff suffered damages as a result of the misrepresentation (*Queen* v. *Cognos Inc.*, [1993] 1 S.C.R. 87 at 110).

[26] The defendants contend that there is no proper cause of action in negligent misrepresentation in this case. They ask the court to find that the Company and the Individual Defendants did not owe a duty of care to the plaintiffs, where this would be an improper extension of the existing law of misrepresentation. Whether or not a duty of care is pleaded, the existence of a duty of care is a question of law; if it is plain and obvious that no such duty of care can be recognized, the cause of action must be struck.

[27] In *Hercules Managements Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165, the Supreme Court of Canada held that the two part test in *Anns v. Merton London Borough Council*, [1978] A.C. 728 (H.L.) applies in the context of all negligence actions, including claims for different forms of economic loss, such as negligent misrepresentation. The first step is to determine whether a *prima facie* duty of care could be owed and the second is to consider whether that duty, if it exists, is negatived or limited by policy considerations (*Hercules Managements* at para. 21).

[28] The defendants acknowledge for the purpose of the motion, that the first part of the *Anns* test is satisfied. They assert that the court should strike the negligent misrepresentation claims on the second part of the test, based on the

policy considerations that (a) to recognize a duty of care between the Company and the Individual Defendants and the investing public would lead to indeterminate liability to an unlimited number of persons, and (b) the recognition of a statutory duty of care is unnecessary in light of the statutory remedy for secondary market misrepresentation, and may conflict with that remedy.

[29] While earlier cases suggested that a full factual record would be necessary to engage in the second part of the *Anns* test, such that its determination was inappropriate in a Rule 21 motion, (see, for example, *Anger v. Berkshire Investment Group Inc.* (2001), 141 O.A.C. 301 (C.A.)), the Supreme Court in *Cooper v. Hobart*, [2001] 3 S.C.R. 537 had no difficulty considering the second part of the *Anns* test in the appeal of a pleadings motion. The issue to be determined at this stage in the present case accordingly is whether it is plain and obvious that there are policy reasons for refusing to recognize a duty of care between IMAX, its directors and officers and the investing public in respect of negligent misrepresentations in secondary market disclosure.

[30] In *Cooper*, at issue was whether a statutory regulator (the registrar of mortgage brokers) would owe a private law duty of care to members of the investing public for negligence in failing to properly oversee the conduct of an investment company licensed by the regulator.

[31] McLachlin C.J. and Major J., for a unanimous Court, noted (at para. 36) the categories in which proximity has been recognized, including liability for negligent misstatement. With respect to the second stage of the *Anns* test, they stated (at para. 37):

> These [residual policy considerations] are not concerned with the relationship between the parties, but with the effect of recognizing a duty of care on other legal obligations, the legal system and society more generally. Does the law already provide a remedy? Would recognition of the duty of care create the spectre of unlimited liability to an unlimited class? Are there other reasons of broad policy that suggest that the duty of care should not be recognized?

[32] The Supreme Court noted that the second stage of *Anns* generally arises only in cases where the duty of care asserted does not fall within an established or analogous category of recovery. Where a duty of care in a novel situation is alleged, it is necessary to consider both stages of the *Anns* test to ensure that before a duty of care is imposed in a new situation, not only are foreseeability and relational proximity present, but there are no broader considerations that would make the imposition of a duty of care unwise (*Cooper* at para. 37).

[33] In *Cooper* the Court disposed of the issue under the first branch of the *Anns* test, but went on to conclude that policy considerations would also preclude the recognition of a duty of care by the mortgage brokers regulators, under the second branch of the test.

[34] In *Haskett v. Equifax Canada Inc.* (2003), 63 O.R. (3d) 577 (C.A.), the plaintiff, who was the subject of an inaccurate credit report, asserted a claim of negligence against the credit agency that had prepared the report. The defendant moved successfully before the motions judge to have the action dismissed for failure to disclose a cause of action.

[35] On appeal Feldman J.A. (for a unanimous court) noted that in *Cooper* (and *Edwards v. The Law Society of Upper Canada*, [2001] 3 S.C.R. 562, a decision released the same day), the Supreme Court had restricted the application of the second part of the *Anns* test to situations where a new category is asserted. The second stage would not apply where the case falls within either an established or analogous category (*Haskett* at para. 42).

[36] Although she viewed the cause of action pleaded in that case as analogous to the recognized category of negligent misrepresentation, so that it was unnecessary to consider the second part of the *Anns* test, Feldman J.A. considered and weighed the policy issues that concerned the motions judge, on the basis that the circumstances could be viewed as a new category.

[37] Feldman J.A. concluded that recognizing a duty of care by a credit agency to the subject of a credit report would not create the spectre of unlimited liability to an unlimited class, that the legislation did not already provide an effective alternative remedy, and that at this stage of the proceedings, the recognition of such a duty would not encroach on the law of defamation (paras. 44 to 54). The negligence claim was permitted to proceed.

[38] Applying the principle in *Cooper* and *Haskett*, that the second part of the *Anns* test applies only to truly novel categories of negligence and not to "analogous" categories, it may not be necessary in the present case to engage in the second stage of the *Anns* test in considering the common law claim of misrepresentation in the secondary market as pleaded against IMAX and the Individual Defendants.

[39] The claim is based on negligent misrepresentation, which is a recognized cause of action, although the plaintiffs propose to extend the claim in circumstances the defendants contend are novel. The representations in question are alleged to have been contained in press releases and the

Company's Form 10-K, documents that are prepared under the Company's continuous disclosure obligations, for the purpose of informing the investing public and to put into the public domain the information that permits sellers and buyers to have equal information on which to properly trade in the securities marketplace. It is alleged that the members of the class (who are shareholders who acquired and held their shares in IMAX during a defined period) relied on the representations through their actions in purchasing their shares on an efficient market (Claim, para. 74).

[40] While there are no reported cases in Ontario where a common law claim of misrepresentation in the secondary market has been considered at trial, such claims have been permitted to proceed under a Rule 21 or class proceeding certification motion in *Carom v. Bre-X Minerals Ltd.* (2000), 51 O.R. 236 (C.A.) ("*Carom [Rule 21-C.A.]*"); *Mondor v. Fisherman*, [2001] O.J. No. 4620 (S.C.) ("*Mondor [Rule 21]*"), *Lawrence v. Atlas Cold Storage Holdings Inc.*, [2006] O.J. No. 3748 (S.C.J.) and *McCann v. CP Ships Limited* (3 June 2009) London 46098 (S.C.).[6] These cases will be considered below, together with certain authorities argued by the defendants in support of their argument that the court should refuse to recognize a duty of care or special relationship between the Company and the Individual Defendants and the investing public.

[41] In *Mondor [Rule 21]*, the proposed representative plaintiffs brought a class proceeding against a number of defendants, including auditors and financial advisors (the "intermediaries"), for losses suffered through the purchase of shares of YBM Magnex International Inc. on the TSE. The claim, among other matters, alleged negligent misrepresentation at common law, including, as against the auditors, in respect of Bre-X's audited financial statements. The defendants moved to strike the claim on the ground that it failed to disclose a reasonable cause of action. Cumming J. applied the two stage analysis from *Hercules Managements* and refused to strike the claim against the intermediaries.

[42] The defendants rely on *Menegon v. Philip Services Corp.*, [2001] O.J. No. 5547 (S.C.) as authority that a duty of care to the secondary market should not be recognized on the second part of the *Anns* test where it would result in the prospect of indeterminate liability, and conflict with an existing statutory remedy.

[43] In *Menegon,* Gans J. dismissed a motion to certify a shareholder class action and allowed the defendants' Rule 21 motion to strike, finding that there was no cause of action by purchasers in the secondary market against

underwriters and auditors for negligent misrepresentation for errors and omissions contained in a prospectus.

[44] The Court held that there was no "special relationship" between the underwriters and investors in the secondary market in circumstances where the underwriters had agreed specifically to assume liability to those who purchased shares offered under the prospectus. Applying the second branch of the *Anns* test, Gans J. found that the recognition of a duty of care in the circumstances would result in the exposure of the underwriters and auditors to liability of an indeterminate amount, for an indeterminate time, in respect to, theoretically, an indeterminate class. He also held that the extension of a duty of care to purchasers of shares in the secondary market would extend liability beyond what was recognized (at that time) in the OSA, and would accordingly be inconsistent with the statutory remedy already provided.

[45] *Menegon* was appealed to the Court of Appeal (reported at [2003] O.J. No. 8). The appellant asserted that the respondents' duty of care should not have been ruled out at the pleadings stage on the basis of policy concerns, relying on the reasoning of Cumming J. in *Mondor [Rule 21]*. In dismissing the appeal, the Court of Appeal explained the decision in *Mondor* as follows at paras. 13 and 14:

> Cumming J. noted that whether a duty of care does or does not exist is a factual enquiry and concluded that "the plaintiff has pleaded material facts in support of the claim of proximity such as to give rise to a prima facie duty of care." On the second branch of the test in Anns, Cumming J. recognized that something more had to be shown, before imposing a duty on one party to care for the purely economic interest of another, than simply foreseeability that the conduct might cause loss or damage to those interests. He was satisfied, in the case at hand, that the case was sufficiently pleaded. Among other things, he noted that it was pleaded that the defendants intended that the public would rely upon the audited financial statements when making investment decisions.
>
> On the issue of reliance, Cumming J. referred to the American "fraud on the market theory" which "has been described as a legal fiction which has the effect of overcoming the need to prove reliance." He noted that this theory was not part of the law of Canada and that proof of reliance is a necessary ingredient of actions based upon negligent misrepresentation. He noted further that the question of whether a plaintiff has actually relied upon a misrepresentation is a question of fact that may be inferred from all the circumstances and, hence, concluded that "it would be premature to foreclose the consideration of this issue in the case at hand beyond the pleading stage." Consequently, Cumming J. dismissed the motion to strike the pleading.

[46] The Court of Appeal concluded that the motions judge in *Menegon* had followed essentially the same analytical framework as the court in *Mondor*. The different results in the two cases were warranted by differences in the pleadings, in particular, the absence of a proper pleading of negligent misrepresentation in *Menegon* against the underwriters and auditors, as opposed to other allegations of misrepresentation against the issuer and its directors, which were not the subject of the certification and Rule 21 motions. (In fact, certification of the action as a class proceeding as against the issuer for settlement purposes had already taken place: *Menegon v. Philip Services Corp.*, [1999] O.J. No. 4080 (S.C.)).

[47] The present case is similar to *Mondor [Rule 21]* and can be distinguished from *Menegon*. The Claim concerns representations made as part of a reporting issuer's continuous disclosure obligations, and not, as in *Menegon*, representations intended for the primary market that were made in a prospectus. The continuous disclosure obligations of a reporting issuer are prescribed by and under the OSA, and the intended recipients of such disclosure are the investing public.

[48] Section 138.3 of the OSA provides for liability of issuers, their directors and in certain circumstances their officers and intermediaries to persons who acquired or disposed of an issuer's securities between the time a material misrepresentation in secondary market disclosure was made and its correction. While there is a specific statutory remedy, s. 138.13 of the OSA provides that the statutory right of action for damages and the defences to an action "are in addition to and without derogation from, any other rights or defences the plaintiff or defendant may have in an action brought otherwise than under this Part."

[49] There is no inconsistency or conflict between the pursuit of a statutory remedy for secondary market misrepresentation that imposes liability without proof of reliance but subject to a damages cap and other limitations, and a claim alleging a common law duty of care for negligent misrepresentation arising out of the same circumstances, where reliance is an element of the tort. The public policy concern of conflict with an existing statutory regime or remedy does not arise in this case.

[50] Concerns about potential indeterminate liability are also not obvious at the pleadings stage of this case. In both *Mondor* and *Menegon* the plaintiffs were suing intermediaries. It is such claims that typically raise the prospect of indeterminate liability to an indeterminate class of persons. In *Hercules Managements*, the Court found that the purpose of an auditor's report was typically to assist the collectivity of shareholders in overseeing management.

Any duty of care was owed to the corporation, and not to individual shareholders. The Court refused to extend a duty of care to individual shareholders in respect of their investment decisions (at para. 54) as this would raise the spectre of indeterminate liability. The Court specifically anticipated however that a duty to shareholders in their individual capacity in respect of their investment decisions could arise in circumstances where an auditor knowingly provided to shareholders a negligent report for a specified purpose (at para. 63).

[51] In the present case the allegation is that the issuer and the Individual Defendants made the Representation to the investing public with the intention that it would be relied upon to make decisions to purchase IMAX securities. That is, the plaintiffs allege that the intended recipients of the documents containing the Representation, were in fact the investing public, which would include the plaintiffs and the class members.

[52] The defendants relied on two other cases that are not directly applicable. In *Alvi v. Misir* (2004), 73 O.R. (3d) 566 (S.C.), claims by shareholders against certain directors of a corporation were based on fiduciary and statutory duties owed to the corporation. This was not a case involving allegations of misrepresentation; rather the shareholders alleged that certain decisions of the directors on behalf of the corporation had devalued their shares. The Court concluded that the claims were derivative (that is a claim of the corporation that could only be pursued by a shareholder or other party with leave under the applicable corporations statute).

[53] In *NPV Management Ltd. v. Anthony*, 2003 NLCA 41, the Newfoundland Court of Appeal reversed the decision of a motions judge and struck a number of claims against individual directors of a corporation, Conpak. Again, the principal reason for striking the claims was that they were derivative and involved harm to the corporation as a result of alleged breaches of fiduciary and other duties owed by the directors to the corporation. With respect to an alleged personal claim (that NPV had purchased more shares in Conpak in reliance on certain representations by its directors) the Court of Appeal held that there was a prospect of indeterminate liability, where the statements had been made to the public at large, presumably pursuant to continuous disclosure obligations. The Court noted (at para. 57) that the statement of claim had not alleged that the representations were made for the purpose of providing information on which personal investment decisions could be made. The absence of such a pleading was fatal (para. 61).

[54] In the present case there is no question of a derivative claim. The allegations in the Claim are with respect to duties alleged to have been owed by the Company and the Individual Defendants directly to the investing public. In contrast to the pleading in *NPV Management*, the Claim specifically alleges at para. 67 that the IMAX press releases, the Form 10-K and the Annual Report "were prepared in part for the purpose of attracting investment and with the intention that members of the investing public would rely upon the documents in making the decision to purchase IMAX securities".

[55] I am not satisfied that it is plain and obvious that the claim of negligent misrepresentation against IMAX and the Individual Defendants would fail to meet the second part of the *Anns* test. Again, the defendants do not argue that there is no duty of care under the first stage of the test; rather they assert that there are policy reasons for not recognizing a duty of care by the Company and its directors with respect to a misrepresentation to the secondary market. In my view, it is not plain and obvious that the policy reasons asserted by the defendants should preclude the common law claims of misrepresentation in the secondary market from being pursued at this stage in the litigation.

<u>(b) Reliance as an Element of Misrepresentation</u>

[56] The Claim pleads individual reliance on the Representation by the representative plaintiffs Silver and Cohen, in the case of Silver by reading and relying upon the Form 10-K and press releases and in the case of Cohen by reading the 10-K and a newspaper article (at para. 73). There is no allegation that other class members individually relied upon the alleged misrepresentations after reading documents in which they were contained. The Claim pleads however that Silver, Cohen and each other class member relied upon the Representation and the other misstatements "by the act of purchasing or [acquiring] IMAX securities" (at para. 74).

[57] The defendants assert that the failure to plead individual and direct reliance by each of the plaintiffs is fatal to the claims of misrepresentation. The plaintiffs submit that they have properly pleaded reliance by each class member through the act of purchasing or acquiring IMAX securities, and that paras. 57 to 62 of the Claim are a pleading of the "efficient market theory", which has been accepted as a sufficient pleading of reliance in securities cases alleging misrepresentation to the investing public.

[58] The defendants assert that the "efficient market" theory as pleaded by the plaintiffs is the same as the fraud on the market theory which was rejected by

Winkler J. in *Carom v. Bre-X Minerals Ltd.* (1998), 41 O.R. (3d) 780 (S.C.) *"Carom [Motion to Amend]"* and in subsequent cases.

[59] Paras. 57 to 62 and 74 of the Claim are as follows:

> 57. The price of Imax's publicly-traded securities was directly affected by the periodic disclosures regarding Imax's financial results. Imax and the Individual Defendants were at all material times aware of the effect of Imax's disclosures about its financial results upon the price of its publicly-traded securities.
>
> 58. The February Press Release, the Form 10-K, the Annual Report, the March 9, 2006 press releases, each of which contained the Representation, were filed with SEDAR, the TSX and the NASDAQ and thereby became immediately available to, were reproduced for inspection by and were used by the Class Members, the public, financial analysts and the financial press through the Internet and financial publications.
>
> 59. Imax and the Individual Defendants routinely transmitted the documents referred to above to the financial press, financial analysts and certain prospective and actual holders of the Imax securities.
>
> 60. Imax and the Individual Defendants regularly communicated with the public investors and financial analysts via established market-communication mechanisms, including through regular dissemination of press releases on newswire services in Canada and the United States. The price of Imax's publicly-traded securities were directly affected each time Imax and the Individual Defendants communicated new, material information about its financial results to the public.
>
> 61. Imax was the subject of analysts' reports that incorporated the material financial information in the documents referred to above, with the effect that any recommendation in such reports during the Class Period were based, in whole or in part, upon material over-statements of Imax's financial results.
>
> 62. Imax's securities were traded on the TSX and NASDAQ, which are efficient and automated markets. The price at which Imax securities traded on the TSX and NASDAQ incorporated material information about Imax's financial results which was disseminated to the public through the documents referred to above, distributed by Imax and the Individual Defendants as well as by other means.
>
> ...
>
> 74. Given the relationship as pleaded between Imax's financial results and its publicly-traded securities, Neil, Cliff and each other Class Member relied upon

the Representation and the other misstatements alleged herein by the act of purchasing or [acquiring] Imax securities.

[60] In *Carom [Motion to Amend]*, Winkler J. dismissed a motion by the plaintiffs, shareholders in Bre-X Minerals Ltd. ("Bre-X"), seeking to amend their statements of claim in seven intended class proceedings to add the "fraud on the market" theory from American law to their claims. The causes of action were framed in negligence, negligent and fraudulent misrepresentation, conspiracy, breach of fiduciary duty, and breach of the *Competition Act*.

[61] Winkler J. described the fraud on the market theory as creating a rebuttable presumption of reliance on certain misrepresentations, thus obviating the need to prove such reliance on an individual basis. Reliance is presumed when there is proof that the market price of the shares under consideration reflected the pleaded misrepresentations (at pp. 785-786). Winkler J. extensively reviewed the development of the fraud on the market theory in U.S. jurisprudence, and found that the conditions for recognizing such a theory in certain U.S. cases (procedural restrictions of limitations and the class action certification test requiring a "predominance of common issues") did not apply in Ontario.

[62] Winkler J. held (at p. 790) that it is settled law in Canada that actual reliance is essential to a common law cause of action in fraudulent or negligent misrepresentation (citing *Parna v. G. & S. Properties Ltd.*, [1971] S.C.R. 306, at 316; *Queen v. Cognos Inc.*, at 110 and *Hercules Managements* at para. 18). He noted (at p. 792) that the fraud on the market theory was rejected by the British Columbia Supreme Court in *Kripps v. Touche Ross & Co.* (1990), 52 B.C.L.R. (2d) 291, at 307 (although the Court of Appeal left the issue open at (1992), 69 B.C.L.R. (2d) 62), and that the common law provides no examples of the application of the fraud on the market theory in Canadian law.

[63] *Carom [Motion to Amend]* was followed in *Shaw v. BCE Inc.*, [2003] O.J. No. 2695 (S.C.), striking out a claim for negligent misrepresentation in a prospectus where the plaintiff had not pleaded reliance on any public document issued by the defendants, and in *Deep v. M.D. Management*, [2007] O.J. No. 2392 (S.C.), aff'd [2008] O.J. No. 961 (C.A.) where the Court dismissed a misrepresentation claim by a Nortel shareholder where reliance on the alleged statements had not been pleaded.

[64] *Carom* was also followed in *Mondor [Rule 21]*. In that case, Cumming J. held in *obiter* that the fraud on the market theory is not recognized under

Canadian securities law, and that actual reliance is a necessary component under Canadian law concerning negligent and fraudulent misrepresentation.

[65] In *Mondor [Rule 21]*, however, Cumming J. permitted the claims for negligent and fraudulent misrepresentation to proceed, notwithstanding the defendants' argument that individual reliance could not be proven. He referred to case law to the effect that whether or not a person relied on a misrepresentation may be inferred from all the circumstances (*NBD Bank, Canada. v. Dofasco Inc.* (1999), 46 O.R. (3d) 514 (C.A.) and *Kripps v. Touche* (C.A.)), and noted at para. 68:

> The plaintiffs claim that if one were to assume for the purposes of this motion that the market price of YBM shares, from time to time, reflected the "Representation", it is open to a trial judge to infer that as a question of fact a putative class member relied on the "Representation" made by Parente, Deloitte and others when a class member purchased YBM shares in the secondary market.

[66] Cumming J. concluded that it would be premature to foreclose the consideration of this issue at the pleadings stage. While rejecting the "deemed reliance" approach of the fraud on the market theory, Cumming J. permitted the claim to proceed. It would be open to the plaintiffs to attempt at trial to establish reliance by class members as a fact by reference to the efficient market theory. Later, when certifying the class for settlement in *Mondor v. Fisherman*, [2002] O.J. No. 1855 (S.C.), at para. 22 ("*Mondor [Settlement]*"), Cumming J. noted, as part of his analysis in approving the certification and proposed settlement, that there was uncertainty whether reliance could be established "by the simple act of purchase of the shares or whether each shareholder would have to establish individually that he or she relied upon a misrepresentation".

[67] In *Lawrence v. Atlas Cold Storage*, Hoy J. permitted an "efficient market" misrepresentation claim to proceed in a pleadings motion in a proposed class proceeding. The action was based on allegations of misrepresentation in prospectuses under which units of Atlas Cold Storage Income Trust were sold to the public and in financial statements and a press release.

[68] Hoy J. noted that the plaintiffs did not specifically plead that they received, read or relied on any of the prospectuses, the financial statements or a related press release. Instead, they pleaded that each class member relied on certain reports, opinions and statements by their conduct in purchasing units. These allegations were supplemented by various particulars in support of a direct factual inference of reliance.

[69] Relying on Cumming J.'s analysis in *Mondor [Rule 21]*, Hoy J. concluded that whether or not a plaintiff has reasonably relied on a misrepresentation is a question of fact. The pleading that units were purchased and the plaintiffs' position that they would prove reliance by satisfying the trial judge that in all of the circumstances actual reliance on the alleged misrepresentation should be inferred, were sufficient to save the reliance-based claims.

[70] In the present case, following the decisions of Cumming J. in *Mondor [Rule 21]* and Hoy J. in *Lawrence*, I find that the Claim discloses a cause of action in negligent misrepresentation against the Company and the Individual Defendants, notwithstanding the absence of a pleading of direct individual reliance by each class member. As Wilson J. stated in *Hunt v. Carey* at pp. 990-991:

> The fact that a pleading reveals "an arguable, difficult or important point of law" cannot justify striking out part of the statement of claim. Indeed, I would go so far as to suggest that where a statement of claim reveals a difficult and important point of law, it may well be critical that the action be allowed to proceed. Only in this way can we be sure that the common law in general, and the law of torts in particular, will continue to evolve to meet the legal challenges that arise in our modern industrial society.

[71] I do not find it necessary to consider in detail the plaintiffs' alternative argument that negligent misrepresentation may be made out without proof of reliance where the plaintiff can prove that the defendants' conduct caused the plaintiff damages by some means other than reliance.

[72] The plaintiffs rely on a number of cases, beginning with a statement of McLachlin J. (as a trial judge) in *Yorkshire Trust Co. v. Empire Acceptance Corp. Ltd.* (1986), 24 D.L.R. (4th) 140 (B.C.S.C.), at p. 147:

> It is my view that in the appropriate case, where proximity and the necessary causal connection between the negligence and the loss can be established apart from reliance, recovery may be had for a negligent statement without reliance whether on the basis of simple negligence or an extension of the doctrine propounded by *Hedley Byrne*.

[73] Other cases where claims were permitted to proceed without the element of reliance involving what might be characterized as a negligent misstatement, are more properly examples of negligence and not negligent misrepresentation claims: In *Spring v. Guardian Assurance plc and others*, [1994] 3 All E.R. 129 (H.L.) and *Haskett*, the courts recognized that a duty of care could be owed by the defendants to the subjects of inaccurate reference letters and credit checks,

notwithstanding that the statements contained in the documents were intended for other audiences and not to be relied upon by the plaintiffs. In *Lowe v. Guarantee Co. of North America* (2005), 80 O.R. (3d) 222 (C.A.) the court recognized a duty of care owed by health care professionals in a designated assessment centre to the subject of an evaluation. In *Collette v. Great Pacific Management Co.*, 2004 BCCA 110, leave to appeal to S.C.C. refused [2004] S.C.C.A. No. 174, the B.C. Court of Appeal held that reliance was not a necessary element in establishing a duty of care of financial advisers/investment brokers in respect of the plaintiffs' investments, where the tort alleged was a breach of duty in undertaking due diligence before offering the units for sale, and ultimately the claims in negligence (and not negligent misrepresentation) were certified.

[74] Rady J. followed this line of cases in permitting claims of negligent misrepresentation and negligence to proceed in her certification decision in *McCann*, also involving common law claims for misrepresentation in the secondary market following a restatement of the defendant corporation's financial results. Rady J. held that it was not plain and obvious that the plaintiff had to plead reliance in order to advance a claim in negligent misrepresentation. She adopted the same approach as Rooke J. adopted in *Eaton v. HMS Financial Inc.*, 2008 ABQB 631, where he held that a trial on the common issues would be necessary to determine whether, and to what extent, individual reliance would need to be proven.

[75] While I do not find the cases relied on by the plaintiffs persuasive as to the ability of a court to find liability for negligent misrepresentation without proof of reliance in light of the repeated statements by our courts (including the Supreme Court of Canada in *Queen v. Cognos Inc.*) that reliance is an essential element of negligent misrepresentation, it is unnecessary to specifically rule on this issue at this stage in the proceedings. For the purpose of certification, the question is whether the Claim discloses a cause of action in negligent misrepresentation. I have concluded that it does disclose such a cause of action, notwithstanding the absence of a pleading of direct individual reliance by each class member. In the event that the plaintiffs are unable to prove reliance, it will remain open for them to argue at trial that reliance is not required.

<u>(c) "Reckless" Misrepresentation</u>

[76] Liability for fraudulent misrepresentation requires that (a) the defendant made the misrepresentation knowing that it was false, or recklessly, caring not whether it was true or false, (b) the defendant intended the plaintiff, or a class of

persons including the plaintiff, to rely upon the misrepresentation, (c) the plaintiff and the other class members relied upon the representation to their detriment, suffering loss or damage (*Carom v. Bre-X Minerals Ltd.*, [1998] O.J. No. 1428 (Gen. Div.) ("*Carom [Rule 21-Gen. Div.]*") at paras. 24-25 and *Mondor [Rule 21]* at para. 33).

[77] The Claim pleads all of the required elements for fraudulent misrepresentation. Although the plaintiffs assert a claim for "reckless" misrepresentation, it is in substance a pleading of fraudulent misrepresentation, alleging the second branch of the knowledge element, that the defendants made the misrepresentation recklessly, not caring whether it was true or false.

[78] In *Canadian Imperial Bank of Commerce v. Deloitte and Touche*, [2003] O.J. No. 2069 (Div. Ct.), the Divisional Court concluded that the motions judge had erred in dismissing a claim for reckless misrepresentation (which was in substance a claim of fraudulent misrepresentation) on the grounds that the claim was bald, the plaintiff had failed to plead fraud with particularity, and where negligent and reckless misrepresentation were pleaded disjunctively on the same allegations of fact. The Court concluded that, given the low threshold to sustain a pleading at this stage, the motions judge erred in striking the claim for reckless misrepresentation (at para. 23). In *Mondor [Rule 21]* at para. 70, Cumming J. considered a claim of "reckless misrepresentation" to be tantamount to fraudulent misrepresentation, and permitted that claim to proceed. Rady J. adopted the same approach in *McCann* (at para. 43).

[79] The concern as to indeterminate liability expressed in *Hercules Managements* has no application to a claim of fraudulent misrepresentation. If the defendants acted recklessly in making the Representation, with the intention that class members rely upon it, there is no policy reason to limit liability (*Mondor [Rule 21]*, at para. 70; *Hercules Managements,* at paras. 40-41).

[80] Accordingly, the Claim discloses a cause of action which is properly pleaded in fraudulent misrepresentation.

**<u>2. Negligence *simpliciter*</u>**

[81] Negligence is pleaded in paras. 63 to 66 of the Claim as follows:

> 63. Imax and the Individual Defendants owed a duty to Neil, Cliff and the Class Members, at law and under the provisions of the *Securities Act*, to disseminate promptly, or to ensure the prompt dissemination of complete and accurate statements regarding Imax's business and affairs, and promptly to correct

previously-issued, materially inaccurate information, to permit, Imax's publicly-traded securities to trade upon complete and accurate information.

64. The reasonable standard of care expected in the circumstances required Imax and the Individual Defendants to act fairly, reasonably, honestly, and candidly in fulfilling the duty described in paragraph 63.

65. Imax and the Individual Defendants failed to meet the standard of care required for the reasons particularized in the following paragraphs.

66. Imax and the Individual Defendants were negligent in that:

(a) they failed to exercise the degree of care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances as required by law;

(b) they signed the Form 10-K and the Annual Report when they knew or reasonably ought to have known that the documents contained the Representation which was false;

(c) they authorized statements, announcements, press releases, filings and other public documents containing the Representation;

(d) they failed to maintain appropriate internal policies, controls and procedures to ensure that the financial statements adequately and fairly presented the financial position of Imax;

(e) they knew or ought to have known that the 2005 reported revenue, gross earnings, net earnings, retained earnings and earnings per share of Imax were not fairly stated;

(f) they failed to properly consider all available information and reports respecting the revenue and net earnings of Imax; and

(g) they failed to comply with the principles of GAAP, including the following:

(i) interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements;

(ii) financial reporting should provide information that is useful to present to potential investors and creditors and other

users in making rational investment, credit, and similar decisions;

(iii) financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources;

(iv) financial reporting should provide information about an enterprise's financial performance during a period;

(v) completeness, meaning that relevant information necessary to ensure the fair presentation of underlying events and conditions is provided;

(vi) consistency in the application of financial accounting and reporting policies;

(vii) financial reporting should be reliable in that it represents what it purports to represent; and

(viii) conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.

[82] The defendants contend that there is no proper cause of action for negligence based on the pleadings in the Claim. The allegations of negligence are in relation to the same alleged disclosure of false information that underlies the misrepresentation claims. The pleading cannot proceed as a claim of negligence, as that would avoid the requirement in a negligent misrepresentation claim to prove reliance.

[83] In *Deep*, D. Brown J. struck out pleadings of negligent misrepresentation and negligence by the plaintiff, a Nortel shareholder, for damages for losses sustained in his registered retirement investment plan resulting from the decline in the price of Nortel stock. Allegations in the statement of claim had already been struck, with leave to amend, and the Divisional Court had provided specific direction as to the pleading of misrepresentation and the need to assert reliance (*Deep v. M.D. Management*, [2006] O.J. No. 221 (Div. Ct.)). The claim was amended and expanded, and the Nortel defendants moved again to strike the pleading.

[84] The negligence pleading was that the Nortel defendants owed a duty of care based on a special relationship between the parties - "they stood in a special relationship of proximity between the purchaser and holders of Nortel securities". The duty of care was "to accurately represent Nortel's financial situation and disclose any material changes promptly and truthfully". The alleged nature of the breach of this duty was twofold: (i) misrepresentation of Nortel's situation by the non-disclosure of facts and (ii) misrepresentations "by way of lack of disclosure in the second and third quarter and statements which were forward looking or projections were made for the specific purpose of inducing shareholders and investors to purchase shares, hold their shares and/or acquire more shares". The amended claim also relied in support of the negligence claim on the obligation imposed by s. 75(1) of the OSA on a reporting issuer to report material changes.

[85] D. Brown J. struck the pleading of negligent misrepresentation, based on the failure of the plaintiff once again to plead reliance. He also struck the claim of negligence, finding that such pleading was in fact an alternative pleading of the same cause of action, negligent misrepresentation.

[86] In *McCann,* Rady J. permitted claims of negligence and negligent misrepresentation to proceed notwithstanding that there was overlap in the pleadings. In that case, she found that a duty of care had been pleaded that was distinct from the duty to provide accurate information (that the defendants failed to properly integrate CP Ships' disparate lines and failed to acquire and use appropriate information technology). Rady J. would also have permitted the negligence claim to proceed in any event, as a novel claim.

[87] In the present case I find that the pleadings of negligence are in substance a pleading of negligent misrepresentation. The duty of care is framed as a duty at law and under the OSA owed by IMAX and the Individual Defendants to the plaintiffs and class members to "disseminate promptly, or to ensure the prompt dissemination of complete and accurate statements regarding IMAX's business and affairs, and promptly to correct previously issued, materially inaccurate information, to permit IMAX's publicly-traded shares to trade upon complete and accurate information" (para. 63). The standard of care is pleaded as requiring IMAX and the Individual Defendants "to act fairly, reasonably, honestly, and candidly" in fulfilling the aforesaid duty. While some of the seven particulars of negligence pleaded in para. 66 appear to cast the net more broadly beyond negligent misrepresentation (for example, the pleading of a failure to maintain appropriate internal policies and procedures to ensure that the financial statements adequately and fairly presented the financial position of IMAX), they

nevertheless are pleaded as particulars of the breach of duty of care to disseminate accurate information to the securities market.

[88] The negligence pleading in this case is in substance a pleading of negligent misrepresentation without the ingredient of reliance. There is also no pleading that the alleged negligence caused damage to the plaintiffs and no separate claim for a remedy based on negligence. Accordingly, the claims sounding in negligence *simpliciter* (paras. 63 to 66 of the Claim) will not be permitted to proceed and the Claim shall be amended accordingly.

**3. Conspiracy**

[89] Conspiracy is pleaded in paras. 52 to 56 of the Claim as follows:

> 52. From on or about October 1, 2005 to on or about August 9, 2006, at Mississauga, Ontario, New York, New York and elsewhere Imax, Gelfond, Wechsler and Joyce, wrongfully, unlawfully, maliciously and lacking bona fides, agreed together, the one with the other and with persons unknown, to, among other things, overstate the revenues and net earnings of Imax for the fourth quarter and fiscal year ending on December 31, 2005.
>
> 53. Some, but not all of Imax's, Gelfond's, Wechsler's and Joyce's predominant purposes, concerns and motivation were to:
>
> (a) injure the plaintiffs and the Class Members by causing them to purchase Imax shares at inflated prices;
>
> (b) attract an acquirer or merger partner;
>
> (c) inflate the price of Imax's shares;
>
> (d) obtain an artificially high purchase price for Imax; and
>
> (e) increase the value of their own holdings in Imax.
>
> 54. In furtherance of the conspiracy, the following are some, but not all of the acts carried out or caused to be carried out by Imax, Gelfond, Wechsler and Joyce, or some of them:
>
> (a) they recognized revenue in the fourth quarter of 2005 on ten theatre systems even though sufficient and appropriate evidence did not exist that such systems had been substantially installed as operational Imax

facilities, that Imax had fulfilled its obligations as vendor or that revenues had been "earned" in accordance with GAAP;

(b) they inappropriately implemented revenue recognition procedures that allowed Imax to segregate revenues from different elements of an Imax theatre system, and recognize those revenues in different quarters, even through the customer transactions were not suited to such accounting treatment;

(c) they deviated from GAAP in the preparation of the financial statements;

(d) they deviated from the accounting principle of consistency in the preparation of financial statements;

(e) they authorized statements, announcements, press releases, filings and other public documents containing the Representation;

(f) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when the location was not fit for installation;

(g) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when essential components of the Imax system were absent;

(h) they permitted Imax and the Individual Defendants to make the Representation which was false;

(i) they made, or failed to take any steps to prevent Imax from making the Representation in statements, announcements, press releases, filings and other public documents;

(j) they made, or caused Imax to make, announcements about its revenue and net earnings when they knew there was no reasonable foundation, in fact, for these net earnings;

(k) they falsely stated that Imax had revenue of US$49,310,000 for the fourth quarter of the fiscal year ended 2005;

(l) they falsely stated that Imax had revenue of US$144,930,000 for the fiscal year ended 2005;

(m) they prepared and issued the February Press Release falsely stating that it expected to meet or exceed 2005 earnings guidance;

(n) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's revenue was US$49,310,000 for the fourth quarter of fiscal 2005; and

(o) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's net earning was US$0.29 per share for the fourth quarter of fiscal 2005 and US$0.40 per share for the fiscal year 2005.

55. The conspiracy was unlawful because Imax, Gelfond, Wechsler and Joyce knowingly and intentionally overstated the revenue and net earnings of Imax and in doing so violated ss. 77(1) and 78(1) of the *Securities Act* and similar regulatory legislation in other jurisdictions, including ss. 12, 13 and 18 of the [U.S. *Securities Exchange Act of 1934*], and the reporting requirements of the NASDAQ and the TSX including Part IV(F) of the TSX Company Manual and Rule 4-201 of the TSX Rule Book.

56. The conspiracy was directed towards Neil, Cliff and the other Class Members. Imax, Gelfond, Wechsler and Joyce knew in the circumstances that the conspiracy would, and it did, cause loss to Neil, Cliff and the Class Members.

[90] In *Normart Management Limited v. West Hill Redevelopment Company Limited et al.* (1998), 37 O.R. (3d) 97 (C.A.), at p. 98, Finlayson J.A. for the Court of Appeal described the requirements for pleading the tort of conspiracy (citing *Bullen & Leake and Jacob's Precedents of Pleadings*[7]) as follows:

> [T]he statement of claim should describe who the several parties are and their relationship with each other. It should allege the agreement between the defendants to conspire, and state precisely what the purpose or what were the objects of the alleged conspiracy, and it must then proceed to set forth, with clarity and precision, the overt acts which are alleged to have been done by each of the alleged conspirators in pursuance and in furtherance of the conspiracy; and lastly, it must allege the injury and damage occasioned to the plaintiff thereby.

[91] The defendants' principal objection with respect to the pleading of conspiracy[8] is that the conspiracy is alleged to have occurred between IMAX and the Individual Defendants, each of which is identified as a director and/or officer at the time. It is impossible for a person (in this case the Company) to conspire with itself. See *Accord Business Credit Inc. v. Bank of Nova Scotia*, [1997] O.J. No. 2562 (Gen. Div.), at para. 34, where Cumming J. noted:

> When an officer is acting within the scope of his authority in the best interests of the corporation such that the actions complained of are the actions of the

> corporation itself and not the actions of the officer, then it is not logical to say that there can be a civil conspiracy between the officer and his corporation.

[92] The plaintiffs contend that the conspiracy allegations in the Claim are against IMAX and the Individual Defendants acting in an independently tortious manner; that is, for which they would be held personally liable. In *Normart Management* at p. 102, Finlayson J.A. set out the test for civil liability of directing minds as follows:

> It is well established that the directing minds of corporations cannot be held civilly liable for the actions of the corporations they control and direct unless there is some conduct on the part of those directing minds that is either tortious in itself or exhibits a separate identity or interest from that of the corporations such as to make the acts or conduct complained of those of the directing minds.

[93] An action may proceed against employees and officers of a corporation, for acts and omissions which occurred in the course of their employment, if the conduct alleged amounts to "fraud, deceit, dishonesty or want of authority on the part of [the] employees or officers.": *ScotiaMcLeod Inc.* v. *Peoples Jewellers Ltd.* (1995), 26 O.R. (3d) 481 (C.A.), at para. 25.

[94] In the present case, while the plaintiffs have alleged that the acts or omissions alleged in the Claim were authorized, ordered and done by the Individual Defendants while engaged in the management, direction, control and transaction of its business affairs and are therefore acts and omissions for which IMAX is vicariously liable (paras. 85 and 86), the plaintiffs have also alleged that the actions of the Individual Defendants are independently tortious and that such defendants are personally liable (para. 87).

[95] The allegations against the Individual Defendants in the Claim include the assertion that they were acting "wrongfully, unlawfully, maliciously and lacking bona fides" (para. 52) and that they were motivated to increase the value of their own holdings in IMAX (para. 53(e)).

[96] The Claim pleads all of the necessary elements of the cause of action of conspiracy. There are allegations in the Claim that may, if true, give rise to personal liability on the part of the Individual Defendants. Their conduct is at issue both as agents for the Corporation and in their personal capacities. It is not therefore plain and obvious that the conspiracy claim is deficient, and accordingly such claim will not be struck.

**<u>4. Vicarious Liability</u>**