[97] In paragraphs 85 and 86 of the Claim, the plaintiffs plead that IMAX is vicariously liable for the acts and omissions of the Individual Defendants, that were authorized, ordered and done by the Individual Defendants and IMAX's other agents, employees and representatives while engaged in the management, direction, control and transaction of its business affairs. This pleading, when read within the Claim as a whole, is a sufficient pleading of vicarious liability, and accordingly such claim will not be struck.

**D. Section 5(1)(b) of the CPA: Is there an identifiable class represented by the representative plaintiffs?**

**1. The Proposed Class Definition**

[98] The plaintiffs propose the following worldwide class definition:

> "Class" or "Class Members" means all persons, other than Excluded Persons, who acquired securities of Imax during the Class Period on the TSX and on NASDAQ and held some or all of those securities at the close of trading on August 9, 2006.

"Class Period" is defined in the Claim as "the period from and including the opening of trading on the TSX and NASDAQ on February 17, 2006 to and including the close of trading on the TSX and NASDAQ on August 9, 2006".

**2. The "Identifiable Class" Requirement**

[99] Class definition "identifies the individuals entitled to notice, entitled to relief (if relief is awarded), and bound by the judgment." The definition should state objective criteria by which members of the class can be identified and should not depend on the outcome of the litigation (*Western Canadian Shopping Centres* at para. 38).

[100] A class may be identifiable even if the identities of all of the prospective members are unknown to the representative plaintiffs. Indeed, s. 6 of the CPA provides that the court shall not refuse to certify a proceeding as a class proceeding solely on the ground that "the number of class members or the identity of each class member is not known".

[101] Section 5(3) of the CPA requires each party to provide by affidavit its best information on the number of members in the class. I was unable to find any such statements in the affidavit materials filed in this case. The identity of

IMAX shareholders as at specific dates may be ascertained from the Company's records, recognizing that shares may be held by brokers or other intermediaries.[9]

[102] There is no question that the proposed class meets the requirement for an identifiable class under s. 5(1)(b). The proposed class members are identified by objective and readily verifiable criteria; that is, that they purchased on the TSX and on NASDAQ and held IMAX shares during the Class Period.

**3. Is the proposed class over-inclusive as including claims of persons who may have no claims?**

[103] The defendants assert that the proposed class is over-inclusive because the class as proposed, of all shareholders of IMAX who acquired and held their shares during the Class Period, may include persons who have no claim because they may not have known of or relied upon the alleged misrepresentation or they may not have suffered damages as a result.

[104] The defendants rely on *Mouhteros v. DeVry Canada Inc.* (1998), 41 O.R. (3d) 63 (Gen. Div.). In that case, Winkler J. refused to certify a proposed class consisting of all students who had attended the defendant's college within a period of six years in part because it would include people who had no claim against the defendant as they had not received or relied upon the alleged misrepresentations that formed the basis of the action. Underlying the court's decision however was the fact that there were numerous alleged representations published in a variety of different television commercials and newspaper advertisements, and communicated verbally by admissions officers during the six year period. The nature of the representations and whether they were made negligently or fraudulently would vary with the individual students' programs and the conditions existing at each campus. As such, there were no common issues respecting misrepresentation.

[105] In this case, by contrast, the core of the common law misrepresentation claim is that a single misrepresentation (the "Representation") was made by the Defendants (albeit through four communications) that affected the market price of all IMAX securities during the Class Period, and that in all of the circumstances, reliance by all class members should be inferred as a question of fact. This is not a case where multiple misrepresentations in varied circumstances are alleged. There is clearly a commonality of interests between the class members in this case, that is shared by the proposed representative plaintiffs.

[106] In any event, a proposed class will not be overbroad simply because it may include persons who ultimately will not have a claim against the defendants

(*Bywater v. Toronto Transit Commission*, [1998] O.J. No. 4913 (Gen. Div.), at paras. 10-11; *Boulanger v. Johnson & Johnson Corp.*, [2007] O.J. No. 179 (S.C.), at para. 22, leave to appeal to the Divisional Court refused [2007] O.J. No. 1991 (S.C.)).

[107] The submission by the defendants in this case that the class is overbroad because some of the class members may not have claims depends on their contention that there will be individual issues (such as reliance and damages) to be decided after the common issues have been determined. While the plaintiffs assert that reliance (based on the efficient market theory) and damages (contending that an aggregate assessment will be appropriate) will not be individual issues in this case, even if they are wrong and individual issues remain after the determination of the common issues, this is not an impediment to certification. As Cullity J. noted in *Heward v. Eli Lilly & Co.*, [2007] O.J. No. 404 (S.C.), at para. 69, "whenever, because of the existence of individual issues, a judgment on the common issues in favour of the plaintiffs will not determine a defendant's liability, it will always be possible - and invariably likely - that an acceptable class will include persons who will not have valid claims".

## 4. Certification of a Global Class

[108] The principal challenge by the defendants to the proposed class definition is that it is overbroad because it includes non-residents of Canada, the resolution of whose claims may depend on the application of the laws of other jurisdictions. The question of whether a global class should be certified raises issues of the jurisdiction that may be exercised by an Ontario court over non-resident class members, and whether, as a matter of discretion, such jurisdiction should be exercised by certifying a global class. The defendants argued the question as part of the "preferable procedure" analysis[10], and indeed the discussion that follows addresses the considerations relevant to both ss. 5(1)(a) and (d) of the CPA. For convenience, the issue of whether a global class can and should be certified will be addressed at this point in these reasons.

### (a) Positions of the Parties

[109] The plaintiffs assert that the Ontario court has clear jurisdiction over the subject matter of the litigation. IMAX is a Canadian corporation with its registered office in Mississauga. The alleged misconduct relates to the accuracy of the Company's financial statements which were prepared and audited in Ontario. The claims of all class members are related to claims that are properly asserted by the representative plaintiffs in Ontario. The class proceedings objectives of judicial economy, access to justice and behaviour modification

would best be met by certifying a class defined to include all persons, including non-residents, who acquired IMAX securities on the TSX and NASDAQ and held such securities during the class period.

[110] The defendants, while acknowledging the authority of the court to certify a class with non-resident members, submit that it would be wrong to certify a global class in the present case. According to IMAX's records as of February 14, 2005, there were 39,511,959 shares outstanding. Approximately 10-15% of the shareholders were Canadian residents, with the balance of outstanding common shares held by American or other non-Canadian residents.[11] From this, the defendants infer that the proposed global class would contain a similar percentage of non-Canadian resident shareholders. The defendants suggest that it would be extraordinary for the court to recognize a class where most members are from outside the jurisdiction.

[111] The defendants propose that if a class is certified, it should consist of TSX purchasers of IMAX shares resident in Canada, and that it would be premature to certify a worldwide class, particularly where there is an existing proceeding in the U.S. They argue that it would be better to certify the Canadian class only, with leave to the plaintiffs to return to the court, depending on what may occur in the U.S. Proceedings (presumably if the U.S. court refuses certification).

[112] The final argument of the defendants in opposition to the certification of a global class is based on anticipated conflict of laws concerns. A worldwide class would include class members who individually would have received and relied upon the misrepresentation, and suffered the consequences of the misrepresentation, in places other than Ontario. Their claims may be subject to the laws of various jurisdictions, adding complexity to the proceedings. As a result, a class proceeding including U.S. residents would not be the "preferable procedure".

[113] The position taken by the defendants in this motion with respect to certification of a global class contradicts their arguments made in opposition to certification in the U.S. Proceedings.[12] (IMAX's brief and other documents in the U.S. Proceedings were filed on consent in these proceedings, and were the subject of argument in April 2009).

[114] Relying on the fact that IMAX is a Canadian corporation organized under the laws of Canada with its principal place of business in Canada, IMAX asserted in the U.S. Proceedings that the Ontario court would have jurisdiction over the claims of a global class, and that the connection between the dispute

and this jurisdiction is at least as strong as the connection between the dispute and the United States.[13] IMAX argued that it would be preferable to litigate the issues in dispute in the pending Ontario proceedings. IMAX asserted, "only the Canadian court is in a position to grant full relief to all purchasers of IMAX stock", implying that the statutory claim under the OSA, which does not require proof of reliance, would be available to all class members.[14]

[115] IMAX appended to its argument against certification in the U.S. Proceedings the expert report of Professor Poonam Puri, of Osgoode Hall Law School[15], that addressed among other things, the inherent authority of the Ontario court to certify a global class, and cited examples of cases where Ontario courts had exercised such jurisdiction to certify class actions comprising international class members. Professor Puri's report also detailed the statutory claim available to plaintiffs under the OSA, without discussion of whether the remedy would be available to class members resident outside Ontario or those who had purchased their shares on NASDAQ.[16]

[116] While the contradiction in the positions taken by IMAX in responding to the certification motions in the two jurisdictions is not determinative of whether this court should certify a global class in these proceedings, it is nonetheless revealing. If IMAX is successful in the position it has taken in the U.S. Proceedings, the U.S. court may decide not to certify a global class or may decline certification altogether on the basis that a more effective remedy is available to the class in the Ontario proceedings. The inconsistency in the defendants' submissions in the two jurisdictions suggests that their opposition to certification of a global class in Ontario is not in fact based on *bona fide* concerns about the appropriateness of this court determining the claims of non-residents. Rather, their objective appears to be to limit the size of the class and so reduce their potential liability for damages.

<u>(b) The Court's Authority to Certify National and International Classes</u>

[117] When national or international classes are proposed in class actions, the certifying court must consider whether it has jurisdiction *simpliciter* and whether it would be appropriate to assume jurisdiction over the claims of class members who reside outside the province. This issue has attracted significant attention in recent years and remains contentious. In a recent decision of the Supreme Court of Canada, *Canada Post Corporation v. Lépine*, [2009], 1 S.C.R. 549 (at para. 57), LeBel J. urged the provinces to address through legislation the jurisdictional issues raised by national and international class actions[17].

[118] Class proceedings involving non-resident class members present challenges for both the assumption of jurisdiction (that is the decision to certify a class that includes non-residents) and the recognition and enforcement of judgments of other courts where jurisdiction over non-resident class members has been assumed. The issue has been described by Craig Jones and Angela Baxter as follows:

> The unique aspect of opt-out class actions is that courts purport to take jurisdiction over absent *plaintiffs*. A certification binds a class of such persons to a decision of the court, or a settlement approved by the court, and it does it according to provincial law. In an opt-out action, it does so without their active consent, and in many cases without their actual knowledge that a proceeding affecting their rights is underway.[18] (Emphasis in original.)

[119] The decision to certify a class with non-residents does not of course determine whether a settlement or other disposition within Ontario will be recognized outside the jurisdiction to bind non-resident class members. As Brockenshire J. noted at first instance in *Nantais v. Teletronics Proprietary (Canada) Ltd.* (1995), 25 O.R. (3d) 331 (Gen. Div.), in certifying a class proceeding against a pacemaker manufacturer on behalf of a national class, the "potential problem" of recognition was "something to be resolved in another action [by a non-resident class member] before another court in another jurisdiction": at p. 346. In dismissing the application for leave to appeal, at 25 O.R. (3d) 347 (Div. Ct.), Zuber J. noted at p. 350: "whether the result reached in an Ontario court in a class proceeding will bind members of the class in other provinces who remained passive and simply did not opt out, remains to be seen".

[120] Nevertheless, as recent decisions in Ontario demonstrate, the issues of certification and recognition of class proceedings including non-resident members involve consideration of the same factors. The court must have jurisdiction over the class members (through a "real and substantial connection" between the jurisdiction and their claims) and the court must find that the assertion of jurisdiction is consistent with the principles of "order and fairness".

[121] Numerous national classes have been certified in Ontario. In *Carom v. Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173 (S.C.) ("*Carom [Certification]*"), aff'd 46 O.R. (3d) 315 (Div. Ct.), rev'd on other grounds 51 O.R. (3d) 236 (C.A.)., Winkler J. certified a national class consisting of shareholders and former shareholders of various corporate defendants whose investment value had declined after it was revealed that the defendants had disseminated false information. The Court applied the "real and substantial connection" test from *Morguard Investments Ltd. v. DeSavoye*, [1990] 3 S.C.R. 1077, finding that such

a connection to Ontario existed on the basis of the incorporation and/or operation of the various corporate defendants in Ontario, the trading of their shares on the TSE, and the generation, public dissemination, and allegedly negligent verification of the false information in Ontario. Winkler J. also found that the notice requirements and opt-out provisions of the CPA prevented any prejudice to non-resident class members, thus making the assumption of jurisdiction consistent with the principles of order and fairness.

[122] In *Wilson v. Servier Canada Inc. et al.* (2000), 50 O.R. (3d) 219, Cumming J. certified a national class of patients who suffered from heart disease after being prescribed a weight loss drug. He cited, at para. 92, Professor Castel's *Canadian Conflict of Laws*, 4th ed.:[19]

> [T]he test for determining whether a real and substantial connection exists is not demanding or rigid. The court needs to find only a real and substantial connection, not the *most* real and substantial connection, to assume jurisdiction." [Emphasis in original].

[123] Even in cases where the only connection between a non-resident class member and the jurisdiction is the sharing of common issues with resident class members, jurisdiction may be assumed. In *McCutcheon v. The Cash Store Inc.*, (2006), 80 O.R. (3d) 644 (S.C.), Cullity J. certified a national class of claimants in a payday loan class action, after conducting a comprehensive review of the authorities. Cullity J. observed that Ontario courts (in contrast to the courts of Saskatchewan and Québec) have taken an expansive approach to jurisdiction, even in cases where non-resident class members had no connection to the jurisdiction except their sharing of common issues with resident class members. His decision was consistent with a number of Ontario authorities, including *Baxter v. Canada (Attorney General)*, [2005] O.J. No. 2165 (S.C.), where Winkler J. observed that where a class action involving intra-provincial plaintiffs could be certified, and the common issues forming the basis for the certification are shared by both the resident class and extra-provincial non-residents against the defendant, the existence of such common issues provides a "real and substantial connection" of the non-residents to the forum in relation to the action.

[124] Classes including international members have been certified by Ontario courts without any detailed consideration of the jurisdictional issues in *Bendall v. McGhan Medical Corp.* (1993), 14 O.R. (3d) 734 (Gen. Div.) (breast implant case – no territorial limitation on class members); *Robertson v. Thomson Corp.* (1999), 43 O.R. (3d) 161 (S.C.) (class comprised of creators and/or owners of copyright in and to certain works published in Canada in print media); *Cheung v. Kings Land Development Inc.* (2002), 55 O.R. (3d) 747 (S.C.), leave to appeal refused [2002]

O.J. No. 336 (Div. Ct.) (class included Hong Kong residents); *Brimner v. Via Rail Canada Inc.* (2002), 50 O.R. (3d) 1145 (S.C.) (class comprised of all persons traveling on a Windsor-Toronto train). International classes have been certified for settlement purposes in *Nutech Brands Inc. v. Air Canada*, [2008] O.J. No. 1065 (S.C.) and *Mondor [Settlement]*.

[125] While there are no reported Ontario appeal court decisions reviewing a decision to certify a global class, the issue of when a domestic court can assert jurisdiction over the claims of non-residents was addressed by the Court of Appeal in the context of the recognition and enforcement in Ontario of a foreign judgment incorporating a settlement of a class action: *Currie v. McDonald's Restaurants of Canada Ltd.* (2005), 75 O.R. (3d) 321 (C.A.).

[126] *Currie* involved the enforcement in Ontario of a settlement of an international class proceeding from Illinois. The defendants moved to stay parallel class proceedings in Ontario based on the settlement that included Ontario residents. Sharpe J.A. affirmed the importance of national and international classes at paras. 14 and 15:

> Ontario residents frequently engage in cross-border activities that may become the subject of class action litigation in Ontario, in another province or in a foreign jurisdiction. Several Ontario trial courts have authorized national and international classes: *Robertson v. Thomson Corp.* (1999), 43 O.R. (3d) 161 (S.C.J.) (international class), *Carom v. Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173 (S.C.J.) (national class) and *Wilson v. Servier* (2000), 50 O.R. (3d) 219 (S.C.J.) (national class). In *Mondor v. Fisherman; CC & L Dedicated Enterprise Fund (Trustee of) v. Fisherman*, [2002] O.T.C. 317, Cumming J. approved a settlement in a class action where the class included American and other foreign plaintiffs. Legislation in several provinces specifically contemplates the inclusion of non-resident class members: *Class Proceedings Act*, S.A. 2003, c. C-16.5, ss. 7(1)(3) and 17(1)(b); *Class Proceedings Act*, R.S.B.C. 1996, c. 50, ss. 6(2) and 16(2); *Class Proceedings Act*, C.C.S.M., c. C130, s. 6(3); Newfoundland and Labrador Class Actions Act, S.N.L 2001, c. C-18.1, ss. 7(2) and 17(2)-(5); *Class Actions Act*, S.S. 2001, c. C-12.01, ss. 8(2) and 18(2).
>
> There are strong policy reasons favouring the fair and efficient resolution of interprovincial and international class action litigation: *Vitapharm Canada Ltd. v. F. Hoffman-LaRoche Ltd.* (2001), 6 C.P.C. (5th) 245 at para. 27 (Ont. S.C.J.), aff'd (2002), 20 C.P.C. (5th) 65 (Ont. Div. Ct.), aff'd (2003), 30 C.P.C. (5th) 107 (Ont. C.A.); *Wilson v. Servier Canada Inc.*, above at 243-4 (S.C.J.); *Wilson v. Servier Canada Inc.* (2002), 59 O.R. (3d) 656 (S.C.J.) at 664-670. Conflict of law rules should recognize, in appropriate cases, the importance of having claims finally resolved in one jurisdiction. In some cases, Ontario courts will render

> judgments affecting the rights of non-residents and in other cases, Ontario residents will be affected by class action proceedings elsewhere. Ontario expects its judgments to be recognized and enforced, provided its courts assert jurisdiction in a proper manner and comity requires that, in appropriate cases, Ontario law should give effect to foreign class action judgments.

[127] Sharpe J.A. went on to recognize three pre-conditions for the recognition of a judgment binding an unnamed plaintiff who has not opted out of an international class: (a) the existence of a real and substantial connection linking the cause of action to the foreign jurisdiction, (b) adequate representation of the rights of non-resident class members, and (c) procedural fairness to non-resident class members, including adequate notice (at para. 30).

[128] The Court found that a "real and substantial connection" to the Illinois jurisdiction existed by reason of the facts that the defendant's head office was located in that state and that the alleged wrongful conduct, the manipulation of the random selection of winners of high-value prizes to ensure that no such prizes would be awarded to contestants in Canada, had occurred there. Recognition of the Illinois judgment failed however on the third part of the test, procedural fairness, by reason of inadequacies in the notice given to the Canadian resident class members.

[129] There is accordingly no doubt that this court has the authority to certify an international class if there is a "real and substantial connection" between the claims asserted on behalf of the foreign class members and this jurisdiction.

[130] Such connection exists in this case. IMAX is a CBCA corporation with its head office in Ontario. It is a reporting issuer under the OSA and its shares are traded on the TSX. The alleged Representation was made in Ontario through the issuance of the Company's Form 10-K and press releases from IMAX's Mississauga head office (although arguably it may have been made in IMAX's offices in New York as well). The alleged wrongful actions of the Individual Defendants in connection with the preparation and reporting of IMAX's financial statements are alleged to have taken place in Ontario as well as New York. The proposed common issues respecting liability that concern the conduct of the defendants accordingly have a substantial connection to this jurisdiction.

**(c) Considerations of "Order and Fairness" – Should a global class be certified in this case?**

[131] The next question is whether the principles of "order and fairness" would weigh against the certification of a global class in the present case. These

factors are also relevant to the question of whether certification of a global class would be the "preferable procedure", that is "a fair, efficient and manageable method of advancing the claim" that is "preferable to other reasonably available means of resolving the claims of class members" (*Markson v. MBNA Canada Bank* (2007), 85 O.R. (3d) 321 (C.A.), at para. 69, leave to appeal to S.C.C. refused [2007] S.C.C.A. No. 346).

[132] The defendants assert in opposition to certification of a global class: (1) that a comprehensive proceeding has been commenced in the U.S. that would be more appropriate for the pursuit of claims by U.S. residents and (2) that a global class should not be certified because of the likelihood that different laws will apply to the claims of class members depending on where they acquired their shares and where they reside, which will make the proceedings unduly complex and inefficient.

**(i) The Relevance of the U.S. Proceedings**

[133] The fact that there is a pending application for certification in another jurisdiction is not an obstacle to certification of a class that includes non-resident members. It is not unusual for class proceedings to be commenced contemporaneously in different jurisdictions. Even where a class proceeding has been certified elsewhere, parallel proceedings may be permitted to continue. In *Mignacca et al. v. Merck Frosst Canada Ltd. et al.* (2009), 95 O.R. (3d) 269 the Divisional Court dismissed an appeal from an order of Cullity J. refusing to stay a class action that had been certified in Ontario, where an action involving the same claims and the same class had been certified in Saskatchewan. The Court concluded that it would not be an abuse of process to permit two multi-jurisdictional class actions to proceed. The Court recognized that certification orders are not final judgments, but "interlocutory procedural orders that may be amended at any time as the cases proceed" (at para. 39).

[134] There has been no determination to date of the certification issue in the U.S. Proceedings, and if the defendants are successful in their opposition, the U.S. Proceedings may never be certified. At this stage, the prospect that a similar proceeding might be certified in another jurisdiction is not sufficient to prevent the court from certifying a global class in Ontario.

**(ii) Conflict of Laws and Complexity**

[135] The defendants argue that the claims of the various non-resident class members may be subject to the laws of various jurisdictions, and as such a global class proceeding will be unduly complex. In their Certification Factum, the

defendants identify the problems that may arise in the following terms at paras. 16 and 17:

> The Plaintiffs' common law claims, as pleaded, fail to note the multi-jurisdictional nature of the tortious misconduct of which the Defendants are accused. If established, this misconduct will almost certainly be found to have occurred partially (and perhaps primarily) in New York, and partially in Ontario, with the tort in question being directed towards, or "completed" in, <u>each</u> and <u>every</u> jurisdiction (that is, in <u>each</u> province, state or foreign country) where an individual investor felt the consequences of the Defendants' alleged misconduct.
>
> These realities underline a fundamental complication which the Plaintiffs have entirely ignored in asserting common law tort claims on behalf of this proposed worldwide investor class. This complication is the necessity for this Court -- ***following*** the certification of any of the Plaintiffs' tort-based "common issues," but ***before*** any common issue trial can be held – to undertake individual determinations of <u>which</u> body of substantive law (*i.e.*, the laws of <u>which</u> province, state or foreign county) properly governs <u>each</u> of the causes of action (*i.e.*, negligence *simpliciter*, negligent misrepresentation, fraudulent misrepresentation, conspiracy, vicarious liability, *etc.*) being asserted on behalf of <u>each</u> putative class member, or on behalf of <u>each</u> of the numerous geographically-defined sub-classes which will need to be established. [Emphasis in original.]

[136] The defendants are correct in observing that the plaintiffs at the certification stage have not addressed the potential for conflict of laws issues. Indeed the defendants ignored such issues in their own submissions on certification in the U.S. Proceedings, and all parties appear to have proceeded on the assumption that the OSA statutory claim will be available to all class members in the Ontario proceedings.

[137] There is authority that a court may refuse to certify a class containing non-resident members where the resolution of their claims would clearly involve the application of the statutory laws of multiple jurisdictions.

[138] *McNaughton Automotive Ltd. v. Co-Operators General Insurance Co.* (2003), 66 O.R. (3d) 466 (S.C.) involved a proposed class proceeding by the plaintiff insureds against defendant insurers alleging breach of a statutory condition in their policies of automobile insurance concerning the calculation of salvage costs. In refusing certification, Haines J. observed that the claims of the proposed members of the class would entail the consideration of statutory provisions that differed between provinces, including different processes prescribed thereunder for the resolution of claims. While acknowledging that it would be open to an Ontario court to interpret and apply the laws of other

jurisdictions, Haines J. concluded that the administration of justice would not be served by certifying a national class where: (1) the contract was made outside of Ontario pursuant to the laws of another jurisdiction that are materially different; (2) the defendant is licensed under and subject to the laws of the other jurisdiction; (3) the alleged breach occurred outside Ontario; (4) the claimants reside outside of Ontario; (5) the events which gave rise to the claim occurred outside Ontario; and (6) the damages were sustained outside Ontario. As such, he concluded that there was a demonstrated absence of any real connection between potential out-of-province class members and the Ontario forum and that order and fairness would not be served by assuming jurisdiction over claims of persons in those provinces and territories where the relevant statutory provisions were materially different from those in Ontario.

[139] In *McNaughton* the claims asserted by the representative plaintiffs clearly relied on statutory provisions. It was manifest from the outset of the action (that is in the way that the plaintiffs had pleaded their action in reliance on statutory terms) that the statutes of the various provinces differed in material ways that would affect the resolution of the claims of various members of a national class.

[140] *Risorto v. State Farm Mutual Automobile Insurance Company*, [2007], O.J. No. 676, (S.C.) was also a case involving different provincial statutory regimes. Although he ultimately refused certification of the class proceeding for other reasons, Cullity J. would have addressed differences between provincial statutory defences by identifying subclasses of persons insured in New Brunswick and Alberta and including as an additional common issue the question whether the claims of such persons are precluded by the statutory conditions incorporated in their policies pursuant to the laws of those provinces. The existence of the special defence that the defendant insurer might have to the claims of such persons would not outweigh the values of order, fairness and access to justice that would militate in favour of the inclusion of non-resident members in the class.

[141] *Pearson v. Boliden Ltd.*, 2002 BCCA 624, is a case where the conflict of laws question, that is, what statutes would apply to the determination of class members' claims, was considered at the certification stage in order to properly define the class.

[142] In *Pearson*, the defendant corporation appealed the class definition in a shareholder class action. The plaintiffs alleged misrepresentation in a prospectus which had been filed with provincial securities regulators across

Canada, asserting claims on behalf of shareholders who had purchased shares in the initial distribution as well as in the secondary market. By the time the case reached the Court of Appeal the plaintiffs had abandoned their common law claims, relying only on a statutory claim for prospectus misrepresentation.

[143] At issue was whether the class should include (a) purchasers of shares from Alberta, where the securities legislation contained a limitation period, New Brunswick, which had no statutory cause of action, and the Territories, which had no securities legislation; and (b) persons resident outside Canada or who purchased their shares abroad not on the basis of the prospectus filed in Canada but on the basis of a different document prepared in accordance with U.S. or European securities laws.

[144] The B.C. Court of Appeal held that the claims of shareholders for prospectus misrepresentation would be determined under the statutory laws that applied where the "distribution" of securities had occurred. Shareholders who purchased their shares pursuant to distributions occurring in New Brunswick, the Territories, Alberta and outside Canada were excluded. Since the prospectus misrepresentation provisions of the Manitoba legislation might permit claims by purchasers on the secondary market in that province, such persons would be included in the class, but other shareholders who had acquired their shares on the secondary market were excluded. The Court placed the secondary market purchasers in a separate subclass.

[145] In contrast to the challenge by the defendants in *Pearson*, which was based on arguments respecting the proper law applicable to the claims of non-resident class members, the defendants in the present case did not argue for a narrower class or for a subclass of plaintiffs who might rely on the statutory cause of action under the OSA. As previously noted, the parties did not address any arguments as to whether and to what extent only Ontario residents or persons who had purchased IMAX shares on the TSX could properly assert such a claim.[20]

[146] The defendants' submissions about potential differences in the applicable laws, and the anticipated complexity that would result in this litigation, were confined to the common law claims of the class members. They argued that the common law claims would be subject to the laws of different jurisdictions depending on where the Representation was received and acted upon.

[147] The potential for the application of different common law principles to the determination of class member claims has received little attention in class action proceedings where national or international classes are proposed. As

Patricia Jackson notes in "The National Class under the *Class Proceedings Act, 1992*: Unsettled Issues", The Law Society of Upper Canada, *Special Lectures 2004*, pp. 471-479, at p. 478:

> One of the circumstances in which there has been restraint in the willingness to certify a national class is where significantly different statutory regimes apply to the questions raised by the proposed class proceeding [noting *McNaughton*]. However, there has been no evidence of such restraint in the face of potential differences in the common law. This is especially significant because of the extent to which class actions are frequently brought in respect of matters where the law is significantly in transition.

[148] According to the Supreme Court decision in *Tolofson v. Jensen*, [1994] 3 S.C.R. 1022 as a general rule, the substantive law governing a common law tort claim is the law of the place where the wrongful conduct occurred, that is, the *lex loci delicti*. *Tolofson* recognizes that the determination of the place of the wrongful conduct can present challenges in cross-border litigation. At p. 1050 LaForest J. for the majority of the Court noted:

> There are situations, of course, notably where an act occurs in one place but the consequences are directly felt elsewhere, when the issue of where the tort takes place itself raises thorny issues. In such a case, it may well be that the consequences would be held to constitute the wrong. Difficulties may also arise where the wrong directly arises out of some transnational or interprovincial activity. There territorial considerations may become muted; they may conflict and other considerations may play a determining role.

[149] The defendants submit that, following *Tolofson*, where the alleged wrongdoing crossed borders the "most appropriate solution" is to identify the jurisdiction where the consequences of the wrongdoing were felt, and to apply the laws of that jurisdiction. They argue that where there are multiple plaintiffs who suffered harm in different jurisdiction, there are accordingly multiple governing laws.

[150] The defendants also rely on certain cases in which the courts have found that the *lex loci delicti* for the tort of misrepresentation is the place where the representation was received and caused harm to the plaintiff (*ABN Amro Bank N.V. v. BCE Inc.*, [2003] O.J. No. 5418 (S.C.) and *Kvaerner U.S. Inc. v. AMEC E&C Services Ltd.*, 2004 BCSC 635).

[151] Rather than supporting the defendants' position, *Tolofson* clearly recognizes the complexities of trans-border torts and refrains from making a definitive statement that the place of the tort is always where the harm was

suffered. As for the two cases relied upon by the defendants, these simply illustrate the willingness of Canadian courts to find that the place of the tort is the place where the representation was received and relied upon, in order to assert jurisdiction over a non-resident defendant, in the context of a *forum non conveniens* motion.

[152] It is not obvious, in the context of a class action involving a global class and misrepresentations communicated from a single source, that the applicable law will be that of the place where each individual class member sustained damage. Such an approach would ignore the fact that a class proceeding is an aggregate action and not a collection of individual claims.[21] It is also not obvious that the applicable common law principles and defences would vary from place to place such that the court would have to consider the potential application of multiple laws.

[153] The choice of law issue in any event is premature. Unless or until the defendants plead the laws of other jurisdictions in their statement of defence, the assumption at this stage of the proceedings is that the law of Ontario will apply to the determination of the common law claims. As T. Ducharme J. noted in *Caglar v. Moore*, [2005] O.J. No. 4606 (S.C.), at para. 15:

> The approach of the courts to foreign law is well established. The existence of a foreign law is treated as a fact and the party seeking to rely upon it must both plead it and prove it. If the foreign law is not pleaded or not properly proven, the court will apply the lex fori as "it is the only law available." The existence of an applicable foreign law is a material fact, which must be pleaded under rule 25.06(1). Moreover, where, as in this case, the foreign law is the basis for an affirmative defence, rule 25.07(4) also requires that it be pleaded. The need to plead foreign law is a requirement of longstanding in Ontario that has been consistently applied. [Footnotes omitted.]

[154] The defendants may well assert in their statement of defence that the laws of jurisdictions other than Ontario apply to the determination of the claims of various class members. At this stage however one can only speculate as to what arguments may be made and toward the claims of which class members they may be directed. For example, is the statutory cause of action restricted to Ontario shareholders? Does it apply to non-resident shareholders who purchased their shares on the TSX? Does it apply to Ontario shareholders who purchased their shares on NASDAQ? As for the common law claims, what law would apply to the misrepresentation claims of class members residing outside of Ontario, or Canada? Would this depend on where they purchased their shares, reside or suffered damages? What particular defences would the defendants

rely upon that would not be available to them under Ontario law? Are there in fact substantial differences between the common law principles and defences applicable in the other jurisdictions?

[155] There is certainly the potential for greater complexity in this litigation as a result of potential conflicts of laws issues. This need not however constitute a bar to certification.

[156] Our courts have identified similar challenges in cases where different standards of care may apply over time to members of a class which has been broadly defined. In *Cloud v. Canada (Attorney General)* (2004), 73 O.R. (3d) 401 (C.A.), leave to appeal to the S.C.C. refused at [2005] S.C.C.A. No. 50, the proposed class was comprised of former students of residential schools over a period of 16 years. The Court of Appeal, in determining that certification was appropriate, concluded that the class action proceeding was sufficiently flexible to deal with whatever variation in the applicable standard of care over the 16 year period might arise on the evidence (at para. 59).

[157] The Court in *Cloud* referred to the decision of the Supreme Court of Canada in *Rumley v. British Columbia*, [2001], 3 S.C.R. 184, where an analogous claim covered a period of 42 years. In *Rumley*, McLachlin C.J. for a unanimous court concluded (at para. 31) that the fact that the relevant standard of care would have varied over time was not an obstacle to the suit proceeding as a class action: "That the standard of care may have varied over the relevant time period simply means that the court may find it necessary to provide a nuanced answer to the common question" (at para. 32). McLachlin C.J. noted that class proceedings legislation, in contemplating the possibility of subclasses and permitting the amendment of the certification order at any time, "provides the court with ample flexibility to deal with limited differentiation amongst the class members as and if such differentiation becomes evident".

[158] In *Nantais*, the first Ontario case in which a national class was certified, there was no existing certification in another jurisdiction, although certification motions were pending elsewhere. The defendants argued that a court attempting to try the class proceeding would face a multiplicity of laws from all of the provinces, which might confuse the matter. While Zuber J. discounted the likelihood of differences between the applicable provincial laws, he observed at p. 350:

> It is also argued that other class proceedings may be certified in other provinces relating to the matter which is the subject of this class proceeding. In my respectful view any of these practical difficulties which may develop as the matter

> proceeds can be met by amending the order in question to adjust the size of the class. If it is shown that the law of another province is so substantially different as to make the trial with respect to class members from that province very difficult, the class can be redefined. Additionally, if a class is certified in another province that group can be deleted form the Ontario class.

[159] The approach in *Nantais* has been described as "wait and see" in relation to potential conflict of laws concerns.[22]

[160] In the present case it is far from certain that a multiplicity of laws will apply to the determination of class members' claims or that any conflicting laws will affect the determination of the common issues. While the defendants have suggested that varying laws will apply, creating complexity, until they plead to the Claim, their position remains speculative. In respect of the one issue where the court might have been invited to make a determination limiting the scope of the class or to identify a subclass, that is in connection with the statutory claim, the defendants have not yet taken a position that the scope of the statutory remedy should be limited.

[161] The decision to certify a global class requires the court to ensure fair treatment of non-resident class members in the litigation. This is part of the "order and fairness" requirement, which can be enhanced by paying careful attention to the notice and communications with non-resident class members, and to the potential need for subclasses as the action proceeds.

[162] As Jones and Baxter have observed:

> When asserting jurisdiction over a defendant, either in an individual or class proceeding, "order and fairness" will usually be satisfied by the demonstration of a "real and substantial" connection with the forum. But in the interjurisdictional class action context, "order and fairness" towards foreign plaintiffs imports further requirements. Just as defendants cannot be bound by a court's process and decision unless served and given an opportunity to answer the case against them, so too plaintiffs cannot be bound unless they also have an opportunity to "participate", at least as that word is understood in the world of opt-out class actions; that is, that there be notice adequate to serve the interests of justice.[23]

[163] LeBel J. in *Canada Post Corporation v. Lépine*, emphasized the importance of protection for the rights and interests of non-resident class members both through the notice procedure and through the recognition of subclasses where appropriate at paras. 42 and 56:

> A class action takes place outside the framework of the traditional duel between a single plaintiff and a single defendant. In many class proceedings, the representative acts on behalf of a very large class. The decision that is made not only affects the representative and the defendants, but may also affect all claimants in the classes covered by the action. For this reason, adequate information is necessary to satisfy the requirement that individual rights be safeguarded in a class proceeding. The notice procedure is indispensable in that it informs members about how the judgment authorizing the class action or certifying the class proceeding affects them, about the rights – in particular the possibility of opting out of the class action – they have under the judgment, and sometimes, as here, about a settlement in the case.
>
> ...
>
> The formation of a national class can lead to the delicate problem of creating subclasses within it and determining what legal system will apply to them. In the context of such proceedings, the court hearing an application also has a duty to ensure that the conduct of the proceeding, the choice of remedies and the enforcement of the judgment effectively take account of each group's specific interests, and it must order them to ensure that clear information is provided.

[164] Accordingly, I have concluded that it would be appropriate to certify the global class as proposed by the plaintiffs. The prospect that the claims of non-resident class members may be subject to different laws adds complexity to the litigation, but does not weigh against certification. The appropriate approach in this litigation is to "wait and see" how the conflict of law issues may develop, and as noted below in the discussion under "common issues", the court can deal with any differences in the law that might arise by adjusting the common issues or recognizing subclasses as appropriate.

[165] The court will also need to ensure that the interests of non-resident class members are protected by the form, content and distribution of the notice that is provided to them (this issue is addressed later in these reasons in considering the plaintiffs' proposed litigation plan.)

## E. Section 5(1)(c) of the CPA: Do the claims of the class members raise common issues?

### 1. General Principles

[166] Section 1 of the CPA defines "common issues" as "(a) common but not necessarily identical issues of fact, or (b) common but not necessarily identical issues of law that arise from common but not necessarily identical facts".

Common issues, whether of law or fact, are those issues to be decided through the vehicle of the common issues trial such that the findings in the trial on such issues will be binding on all class members.

[167] This definition "represents a conscious attempt by the Ontario legislature to avoid setting the bar for certification too high." The common issues need only "advance the litigation." "Resolution through the class proceeding of the entire action, or even resolution of particular legal claims ... is not required." (*Carom [Rule 21 – C.A.]* at paras. 40-42).

[168] The common issues question should be approached purposively. There is no formulaic approach that determines this requirement. The underlying question is whether, if the action continues as a class proceeding, will "duplication of fact-finding or legal analysis" be avoided? (*Western Canadian Shopping Centres* at para. 39). If necessary, the list of common issues can be further refined as the litigation moves forward (*Robertson* v. *Thomson Corp.*, at p. 173).

[169] A class proceeding resolution of the common issues need not be determinative of the issue of liability for some or even all class members. As Goudge J.A. observed in *Cloud* (at para. 53):

> [A]n issue can constitute a substantial ingredient of the claims and satisfy s. 5(1)(c) even if it makes up a very limited aspect of the liability question and even though many individual issues remain to be decided after its resolution. In such a case the task posed by s. 5(1)(c) is to test whether there are aspects of the case that meet the commonality requirement rather than to elucidate the various individual issues which may remain after the common trial. This is consistent with the positive approach to the *CPA* urged by the Supreme Court as the way to best realize the benefits of that legislation as foreseen by its drafters.

[170] There is a requirement for a minimal evidentiary foundation for the proposed common issues. In the present case, where the certification motion proceeded together with the Leave Motion (in which the parties filed voluminous affidavits and transcripts), there is no question that the evidentiary basis for the common issues is present.

<u>**2. The Proposed Common Issues**</u>

[171] The plaintiffs have proposed a list of common issues as follows:

1. Did IMAX or the Individual Defendants, or any of them, represent that IMAX's revenues for the 2005 fiscal year were reported in accordance

with GAAP and that such revenues met or exceeded earnings guidance previously issued by Imax? If so, who made the Representation, when, where and how?

2. Did IMAX or the Individual Defendants, or any of them make the Representation negligently, or recklessly, caring not whether it was true or false? If so, who made the Representation, when and how?

3. Did IMAX or the Individual Defendants, or any of them, make the Representation intending that the class members rely upon it and acquire IMAX shares?

4. Did some or all of IMAX's February 17, 2006 Press Release, Annual Report for the year ending December 31, 2005 or its two March 9, 2006 press releases contain a misrepresentation within the meaning of the OSA?

5. If the answer to (4) is yes, have the defendants (including the proposed defendants), or some of them, established a reasonable investigation or expert reliance defence under the OSA?

6. Did the traded price of IMAX shares during the Class Period incorporate and reflect the Representation?

7. If the answer to (6) is yes, did the acquisition of IMAX shares by the class members, on the TSX and NASDAQ, during the Class Period, constitute reliance upon the Representation?

8. Did IMAX or the Individual Defendants, or some of them, owe the class members a duty of care? If so, what was the standard of care? Did any of the defendants breach the standard of care?

9. If the answer to (8) is yes, were IMAX or the Individual Defendants, or some of them, negligent? If so, who, when and why?

10. Did IMAX or the Individual Defendants, or some of them, conspire one with the other, and with persons unknown to deceive the class members for the purpose of maintaining and increasing the price of Imax securities? If so, who conspired with whom, when, where, why and for what purpose?

11. If IMAX or the Individual Defendants, or some of them, are liable to the class for conspiracy, negligence, negligent or fraudulent misrepresentation, what is the procedure for assessing damages?

12. Can the court assess damages in the aggregate, in whole or in part, for the class? If so, what is the amount of the aggregate damage assessment and who should pay it to the class?

13. Is IMAX vicariously liable or otherwise responsible for the acts of the other defendants?

14. Should one or more of the defendants pay punitive damages to the Class? If so, who, why, in what amount and to whom?

15. Should the defendants, or any of them, pay the costs of administering and distributing any monetary judgment and/or the cost of determining eligibility and/or the individual issues? If so, who should pay what costs, why, in what amount and to what extent?

16. If the court determines that the defendants are liable to the class, and if the court considers that participation of individual class members is required to determine individual issues:
    (a) are any directions necessary?
    (b) should any special procedural steps be authorized?
    (c) should any special rules relating to admission of evidence and means of proof be made?
    (d) what directions, procedural steps or evidentiary rules ought to be given or authorized?

17. Should the defendants, or any of them, pay prejudgment and post-judgment interest, at what annual interest rate, and should the interest be compounded interest?

[172] The defendants acknowledge that the issues regarding liability and damages under the OSA, if leave to proceed with such claims is granted, are properly the subject of a class action that is, that issues 1 and 2, only in so far as they relate to the statutory claim, and issues 4 and 5 would be properly certified as common issues.

[173] The defendants also acknowledge that issues 11 and 13 to 17 as they relate to the common law claims are either strictly procedural or ancillary to the main allegations of liability. Such issues should be certified as common issues if the court is satisfied that other main issues respecting liability are properly certified.

[174] The defendants assert that the balance of the common issues are "not sufficiently significant" to justify certification, and raise certain specific arguments in opposition to the recognition of such issues as common issues.

**3. Proposed Common Issues - Common Law and Statutory Misrepresentation**

[175] The defendants oppose the certification of issues 1, 2 and 3, as they relate to the common law claims of misrepresentation, as common issues. They submit that, since the plaintiffs have pleaded a number of statements in which the misrepresentations are alleged to have occurred, individual inquiries will be required to determine which of the class members received each individual representation. Some class members may not have read any of the representations; some may have received the information contained in the representations through sources other than IMAX.

[176] In *Carom [Rule 21 – C.A.]* the court was faced with 160 alleged representations. It was recognized that individual determinations of which representations were received and relied upon by class members would be required. Nevertheless, it was appropriate to certify the negligent misrepresentation claims, including the issues of whether the defendants had made the alleged representations. MacPherson J.A., for the Court of Appeal, held that it was a mistake to overemphasize the number and diversity of the defendant's representations, and that resolution of the common issues would "move the litigation forward" and might serve to significantly reduce the number of relevant representations that the court would have to consider in the individual determinations (at para. 49). He stated (at para. 51): "The focus of these common issues is the knowledge and conduct of the defendants...the conduct, especially the reliance, of the plaintiffs stays on the sidelines at this juncture in the litigation."

[177] In the present case, the plaintiffs' common law claims concern a single defined Representation that is alleged to have occurred in each of the February and March press releases and in the Company's Form 10-K. This is not a case where numerous different misrepresentations are alleged; rather, the plaintiffs allege a single misrepresentation, that was communicated to the public in different ways. The fact that class members may have received the misrepresentation in different ways, or may not have relied on the misrepresentation, is not relevant to whether issues 1, 2 and 3 would be common to the class.

[178] Another concern raised by the defendants in opposition to the certification of the misrepresentation issues as common issues is the prospect that different legal regimes may apply to the determination of the common law claims of various class members.

[179] As discussed above (at paras. 135 to 165), the potential for the application of different statutory regimes or varying standards of care applying to the claims of different class members is not an impediment to certification. In *Rumley* the potential for varying standards of care did not prevent the Court from certifying whether the defendants were negligent as a common issue. The Court anticipated the identification of subclasses later in the proceedings to address such issues as they might arise (at para. 32). See also *Tiboni v. Merck Frosst Canada Ltd.*, [2008] O.J. No. 2996 (S.C.) (at paras. 84 and 92) where Cullity J. in a product liability case certified common issues that included whether the defendants owed a duty of care, the standard of care and whether the defendants were negligent, noting the potential for subclasses later in the proceedings if the defendants were to establish that different laws might apply to various members of the class.

[180] More recently, in *Glover v. City of Toronto*, [2009] O.J. No. 1523 (S.C.), concerning a class proceeding arising out of an outbreak of Legionnaires' disease at a City-owned and operated care facility, the proposed class included those who lived in, worked at, or visited the facility, as well as those living near the facility that contracted the disease. Lax J. rejected the defendants' arguments that questions of duty and standard of care could not be addressed on a class-wide basis. Citing *Rumley*, Lax J. noted at para. 46:

> [The defendants] say that different duties may be owed at different times to different class members or may not be owed at all. I do not find this argument persuasive. Common issues include common but not necessarily identical issues of law that arise from common but not necessarily identical facts. The Class Proceedings Act gives the court the flexibility to deal with differentiation among class members. The trial judge has the power to adopt a nuanced approach and create subclasses when this is necessary.

[181] Lax J. observed that the focus of the common issues respecting duty and standard of care was on the conduct of the defendants, which would not depend on evidence specific to each class member. She certified the common issues to include a reference to whether a duty of care was owed to the class members "or any subclass or subclasses" (at para. 61).

[182] Ultimately, the question when determining the common issues is to distinguish between issues that might be common to the class (or a subclass) and individual issues, and to ensure that issues that will require individual determinations are not included in the list of common issues. The fact that not all members of the class may be affected in the same way by the determination does not prevent the issue from being included as a common issue. Again, the cases emphasize that a common issue is not necessarily one where success for one member of the class necessarily results in success for all members. An issue may still be a common issue, although the defendants may argue that the claims of some members of the class are subject to a different legal regime. The list of common issues may have to be amended to accommodate such a development, and subclasses may need to be identified.

[183] Common issues 1 through 4 deal with the circumstances in which the alleged misrepresentations were made and the knowledge and participation of the various defendants. An evaluation of the conduct of the defendants is common to the class members, whether they are able to rely on the statutory cause of action (which is pleaded as applying to all members) or whether the common law causes of action are available to them. These issues will accordingly be included in the list of issues certified for the common issues trial.

[184] In addition, I would include as common issues in relation to the misrepresentation claims the following common issues:

> 1(a). Was the Representation false?
>
> 1(b). Was the Representation publicly corrected? If so, when?
>
> 2(a). Did the Individual Defendants or any of them authorize, permit or acquiesce in the making of the Representation while knowing it to be a misrepresentation?
>
> 4(a). Did the defendants Joyce and Gamble or either of them authorize, permit or acquiesce in the release of any or all such documents?

[185] Common Issue 5 involves a consideration of whether the statutory defences to the OSA claim are made out. While the courts will often not certify defences as common issues, out of a concern that this would be premature and potentially limit the defences a defendant might assert (see for example the decision of the Court of Appeal in *Cassano et al. v. Toronto-Dominion Bank* (2007), 87 O.R. (3d) 401; leave to appeal to the SCC refused [2008] S.C.C.A. No. 15), in the present case, it would be appropriate to certify this question,

where the OSA has prescribed the statutory defence and it is clear that this will be a common issue to be determined if issue 4 is answered in the affirmative.

[186] The plaintiffs propose as common issues 6 and 7 whether the traded price of IMAX shares during the Class Period incorporated and reflected the Representation, and, if so, whether the acquisition of IMAX shares by the class members, on the TSX and NASDAQ, during the Class Period, constituted reliance on the Representation. These issues deal with the "efficient market" theory that has been pleaded by the plaintiffs as part of their common law misrepresentation claims.

[187] The defendants oppose the certification of these issues, even if the court accepts that such a claim may proceed at the pleadings stage. They rely on the decision of Cullity J. in *Serhan (Estate Trustee) v. Johnson & Johnson* (2004), 72 O.R. (3d) 296 (S.C.). *Serhan* was a products liability case in which the plaintiffs proposed to certify the question of whether the members of the class relied upon a misrepresentation by acquiring the products in question. Plaintiffs' counsel had argued that this was a proper common issue as *Mondor [Settlement]* stood for the principle that reliance could be inferred from the conduct of a class member in making a purchase. Cullity J. properly noted that the inference of reliance could be rebutted through an inquiry into the circumstances of each individual, so that reliance would of necessity remain an individual and not a common issue.

[188] In my view the reasoning in *Serhan* would not preclude the certification of proposed issues 6 and 7 in this case. *Serhan* did not involve an "efficient market" claim; that is, there was no allegation that the price of the product incorporated the misrepresentations and that accordingly the act of purchasing constituted reliance.

[189] In *Ontario Public Service Employees Union v. Ontario*, [2005] O.J. No. 1841 (S.C.), it was argued in a case involving alleged misrepresentations by the province to individuals whose employment had been transferred to Community Care Access Centre resulting in the loss of pensionable service, that of necessity reliance would be an individual issue, so that liability for negligent misrepresentation could not be determined in a trial of the common issues. Cullity J. (at para. 68), relying on *Mondor [Rule 21]* referred to the possibility that "group reliance" might in some circumstances be inferred from the facts. The question of whether reliance occurred could, on the facts alleged, be dealt with at a trial of the common issues.

[190] In the present case the plaintiffs have pleaded that the individual class members relied on the Representation through their conduct in purchasing shares. It should be open to the plaintiffs to attempt to establish in the common issues trial that, as a factual matter, reliance has been established for all members of the class through proof of the common action of purchasing shares. It may be that the defendants will persuade the court that at best any inference of reliance is rebuttable through evidence that is individual to each class member. It may be that any inference of reliance is rebuttable through evidence applicable to the class at large. The question I need to determine is not whether the issues will be determined in the plaintiffs' favour, but whether they are "common" and not "individual" issues. I find that the issues as framed are common issues, and will be certified as such for the common issues trial.

**4. Proposed Common Issues – Negligence *Simpliciter***

[191] Proposed common issues 8 and 9 relate to the claim of negligence *simpliciter* which I have already determined is not a cause of action on the facts pleaded in this case. Accordingly, they will not be certified as common issues in this case.

**5. Proposed Common Issue - Conspiracy**

[192] Proposed common issue 10 deals with the pleading of conspiracy. No objection was taken to the certification of this issue as a common issue. Similar formulations of the issue were certified as common issues in *Smith* v. *National Money Mart Company*, [2007] O.J. No. 46 (S.C.), Appendix A, para. 7 and *Carom Certification]* at p.195. Common issue 10 will be certified in the terms proposed by the plaintiffs.

**6. Proposed Common Issues – Damages**

[193] Proposed common issue 11 deals with the procedure for determining damages if common law liability is established. This issue will be certified as a common issue, removing the reference to "negligence".

[194] Common issue 12 addresses the question of whether aggregate damages should be assessed. Section 24 of the CPA provides for an aggregate assessment of damages as follows:

> (1) The court may determine the aggregate or a part of a defendant's liability to class members and give judgment accordingly where,

> (a) monetary relief is claimed on behalf of some or all class members;
>
> (b) no questions of fact or law other than those relating to the assessment of monetary relief remain to be determined in order to establish the amount of the defendant's monetary liability; and
>
> (c) the aggregate or a part of the defendant's liability to some or all class members can reasonably be determined without proof by individual class members.

> (2) The court may order that all or a part of an award under subsection (1) be applied so that some or all individual class members share in the award on an average or proportional basis.
>
> (3) In deciding whether to make an order under subsection (2), the court shall consider whether it would be impractical or inefficient to identify the class members entitled to share in the award or to determine the exact shares that should be allocated to individual class members.

[195] Whether aggregate damages should be assessed and their determination is a typical common issue in class proceedings, which should be certified in the absence of compelling evidence that aggregate damages would not be available in a given case. The court must be satisfied only that there is a "reasonable likelihood" that the conditions specified in s. 24(1) of the CPA will be satisfied (*Markson* at paras. 44 and 45. See also *Cassano* at paras. 39-53.) Provided that there is evidence that an aggregate assessment would be warranted, the determination of whether this should occur is for the trial judge. It is not for the judge hearing the certification motion to weigh conflicting expert evidence on this issue (*2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp.* (2009), 95 O.R. (3d) 252 (Div. Ct.), at para. 102.

[196] As Cullity J. noted in *Vezina v. Loblaw Companies Ltd.*, [2005] O.J. No. 1974 (S.C.), at para. 25:

> As the question of an aggregate assessment is one for the trial judge to decide, it is not the function of a motions judge to determine whether an aggregate award would be made. It is, I believe, sufficient at this stage if there is a reasonable likelihood that the preconditions in section 24(1) of the CPA would be satisfied and an aggregate assessment made if the plaintiffs are otherwise successful at a trial for common issues. I believe that is the case here. The appropriate methods

of distributing any such award are, again, for the trial judge to determine pursuant to section 26.

[197] In the present case, if the plaintiffs are successful in their statutory claim, damages will be assessed according to the formulas provided in s. 138.5 of the OSA. The OSA provides a relatively straightforward approach to the determination of damages and individual assessments are contemplated. A plaintiff is not required to prove that the misrepresentation caused a decline in the share value; rather the defendant may prove that all or part of a change in the market price of securities is unrelated to the misrepresentation (OSA, s. 138.5(3)). In their litigation plan, the plaintiffs propose a procedure for the efficient determination of such claims using a court-appointed administrator who will calculate the damages of each class member who makes a claim by reference to his or her share purchase and sale data.[24]

[198] In contrast to the statutory measure of damages, the assessment of damages for common law misrepresentation on the secondary market is more complex. The parties have filed competing expert reports prepared by financial economists. The plaintiffs rely on the expert reports of Lawrence Kryzanowski[25] and Robert Comment[26], while the defendants rely on the expert opinion of Denise Neumann Martin[27]. The experts offer opinions as to the extent to which the Representation affected the price of IMAX shares. The Kryzanowski report proposes an approach to the assessment of damages that is critiqued by the Neumann Martin report. The Comment report offers an alternative approach. Both of the plaintiffs' experts are of the opinion that an assessment of the class members' aggregate losses is feasible.

[199] The defendants contend that there is no reasonable likelihood that the plaintiffs will satisfy s. 24 (1)(b) of the CPA. They argue that, after the determination of the common issues, individual issues will in fact remain to be determined, even if reliance is determined on a class basis, as to whether individual class members suffered any damage or loss.

[200] An authority relied upon by the defendants (*2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp.* (2008), 89 O.R. (3d) 252) was reversed on appeal to the Divisional Court 95 O.R. (3d) 252 (Div. Ct.), Swinton J. dissenting; leave to appeal to the Court of Appeal granted September 24, 2009. At first instance certification was denied, in part on the basis that the determination of whether class members who were franchise owners had suffered damages would of necessity be an individual issue.

[201] In their discussion of whether aggregate damages could be available, Hennessey and Karakatsanis JJ., for the majority of the Divisional Court, stated at para. 102:

> A motions judge is entitled to review the evidentiary foundation to determine whether there is some basis in fact to find that proof of aggregate damages on a class wide basis is a common issue. While that might require some review of the evidence, the assessment should not relate to the merits of the claim or the resolution of conflicting expert reports.

[202] The motions judge had concluded that the plaintiffs could not rely on expert reports respecting aggregate damages to establish the fact of loss, which would of necessity be an individual issue. He rejected aggregate damages as a common issue primarily because he concluded that s. 24(1)(b) would not be met in that, after determination of the common issues, the question of whether each member of the class had suffered a loss would need to be determined on an individual basis.

[203] The Divisional Court disagreed with this analysis, concluding that the motions judge erred in principle in failing to consider whether, quite apart from the expert opinion evidence, there was some basis in fact in the record that the fact of loss, if not the quantum of loss, could be a common issue with respect to liability. The majority noted at para. 95:

> The relationship between the franchisor, the distributor and each class member was the same; the class members purchased the same products, at the same prices within each region, pursuant to the same franchise contracts and distribution agreement. The class members did not have separate individual relationships with the respondents. Although there will be a differential impact on the class members depending on the specific products each ordered, if the plaintiffs ultimately prove overcharging, the fact of loss or damage must be common to all.

[204] In the present case, there is also "some basis in fact in the record" that the fact of loss could be a common issue with respect to liability. As in *Quizno's*, each class member is similarly situated in relation to the defendants. The loss or damage that is alleged is a devaluation of their shares on the secondary market. There is evidence that the price of IMAX's shares fell on the TSX and NASDAQ on August 9, 2006 when the Representation was allegedly corrected. As in *Quizno's*, if the plaintiffs prove the misrepresentation, the fact of loss or damage will be common to all, although the impact on individual shareholders will differ.

[205] Accordingly, there is a reasonable likelihood that s. 24(1)(b) will be met, that is that no questions of fact or law other than those relating to the assessment of monetary relief will remain to be determined after the common issues trial in order to establish the amount of the defendants' monetary liability.

[206] With respect to s. 24(1)(c), the requirement that the aggregate or a part of the defendants' liability to some or all class members can reasonably be determined without proof by individual class members, I am satisfied that the plaintiffs' expert reports provide a sufficient evidentiary foundation to conclude that there is a "reasonable likelihood" that such an aggregate determination may be made without proof by individual class members.

[207] Accordingly proposed common issue 12 will be certified as a common issue in these proceedings.

**7. Other Proposed Common Issues**

[208] Issues 13 (vicarious liability) and 14 (punitive damages) involve considerations of the conduct of the defendants and will not entail evidence from individual class members. They are properly certified as common issues in these proceedings.

[209] Issues 15 and 16 deal with the procedure for determining individual issues. Such issues have been certified recently in other cases as common issues, and in my view are proper common issues to be certified in this case. Similarly, issue 17 concerning prejudgment and post-judgment interest flows from the determination of any damages award and is a proper common issue for certification.

**F. Section 5(1)(d) of the CPA: Is a class proceeding the preferable procedure for the resolution of the common issues?**

[210] The preferability requirement has two concepts at its core – the first is whether or not the class action would be a fair, efficient and manageable method of advancing the claim and the second is whether the class action would be preferable to other reasonably available means of resolving the claims of class members (*Markson* at para. 69).

[211] The determination of whether a proposed class action is a fair, efficient and manageable method of advancing the claim requires an examination of the common issues in their context, taking into account the importance of the common issues in relation to the claim as a whole. The preferability requirement

can be met even where there are substantial individual issues and it is not necessary that the common issues predominate over the individual issues in order for the class action to be the preferable procedure. Nevertheless, the common issues cannot be negligible. The critical question is whether, viewing the common issues in the context of the entire claim, their resolution will significantly advance the action (*Hollick* and *Cloud)*.

[212] In *Carom [Certification]]*, Winkler J. outlined the conditions present whenever a class proceeding is the preferable procedure at p. 239:

> A class proceeding is the preferable procedure where it presents a fair, efficient and manageable method of determining the common issues which arise from the claims of multiple plaintiffs and where such determination will advance the proceeding in accordance with the goals of judicial economy, access to justice and the modification of behaviour of wrongdoers.

[213] The defendants have the burden of proving a preferable alternative process for resolving the common issues. They have not done so in this case, except to argue that litigation of the non-Ontario claims should proceed in the U.S. Proceedings, which is addressed above. "Arguments that no litigation is preferable to a class proceeding cannot be given effect." (*1176560 Ontario Limited et al.* v. *The Great Atlantic and Pacific Company of Canada Limited*, (2002) 62 O.R. (3d) 535 (S.C.), at para. 45, aff'd 70 O.R. (3d) 182 (Div. Ct.).

[214] The plaintiffs contend that, if this action is not certified as a class proceeding, access to justice for many potential claimants will be thwarted because the costs to prosecute an individual action will be prohibitively expensive and is beyond the reach of virtually all class members. According to Mr. Cohen's affidavit, the plaintiffs' counsel has estimated that the cost of litigating this matter through to a trial of the common issues will exceed $750,000, exclusive of disbursements.[28]

[215] In *Marcantonio v. TVI Pacific Inc.*, [2009] O.J. No. 3409 (S.C.), Lax J., in certifying a class action for the purpose of settlement (which included claims under s. 138.8 of the OSA) noted the advantages of class proceedings in cases involving secondary market misrepresentation at para. 9:

> Individual litigation of securities cases can be difficult, time-consuming and expensive. Many claims would never be advanced because they are uneconomic for an individual investor to pursue. A class action is the optimal method of procuring a remedy for a group of investors who allege they have been harmed in similar ways as a single determination of the defendants' liability eliminates

> duplication of fact-finding and legal analysis. Further, a class action has the potential to act as an essential and useful supplement to the deterrent effects of regulatory oversight. It enhances the incentive for directors and officers to ensure that their disclosures to the investing public are materially accurate, thereby enhancing investor protection. Consequently, a class proceeding is the preferable procedure because it provides a fair, efficient and manageable method of determining the common issue, and advances the proceeding in accordance with the goals of access to justice, judicial economy and behaviour modification.

[216] Such observations apply in the present case. Certifying the class proceeding, including a global class, would serve judicial economy by permitting common issues to be determined on a single occasion, thereby avoiding duplication of fact-finding and legal analysis, as well as the potential for inconsistent results if litigation were pursued individually or by groups of investors in various jurisdictions. The goal of behaviour modification (in this case to deter misrepresentations in public company disclosures) is enhanced by permitting aggregated claims to proceed. As evidenced by the proceedings to date, including the exchange of expert reports, the voluminous materials exchanged in the Leave Motion and various complex issues that have been raised by the defence even at this stage, the anticipated costs and time required to litigate individual claims would greatly exceed the potential individual recoveries. A class proceeding is the only viable method of advancing the claims in this action.

<u>G. Section 5(1)(e) of the CPA: Are the representative plaintiffs appropriate? Have they produced a workable litigation plan?</u>

[217] Under s. 5(1)(e) of the CPA, the court must consider whether the proposed representative plaintiff (i) would fairly and adequately represent the interests of the class, (ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding; and (iii) does not have, on the common issues for the class, an interest in conflict with interests of other class members.

[218] The court must be satisfied that the representative plaintiff will vigorously and capably prosecute the interests of the class, although he need not be "typical" of the class or the "best" possible representative (*Western Canadian Shopping Centres* at para. 41). The representative plaintiff does not have to have claims that are identical to those of all other members of the class; it is sufficient if the representative plaintiff has a cause of action against the defendant and that the causes of action all share a common issue of law or fact

(Lax J. in *Griffin v. Dell Canada Inc.*, [2009] O.J. No. 418 (S.C.), at para. 97, citing *Healey v. Lakeridge Health Corp.*, [2006] O.J. No. 4277 (S.C.) and *Boulanger v. Johnson & Johnson Corp.*, [2002] O.J. No. 1075 (S. C.), aff'd (2003), 64 O.R. (3d) 208 (Div. Ct.)).

[219] There is no merit to the submission of the defendants that the plaintiffs Silver and Cohen would not adequately represent the interests of the class, and would have a conflict of interest because they do not share a common interest with the class. Silver and Cohen share the attributes of the proposed class in that they purchased shares in IMAX after February 17, 2006 and continued to hold shares on August 9, 2006. There are a number of issues that have been approved as common issues, the disposition of which will affect Silver and Cohen as well as the other class members.

[220] At this stage the potential differences between the legal regimes applicable to the common law claims of representative plaintiffs and other class members, as well as the question of the application of the statutory claim to non-resident members do not constitute a disabling "conflict of interest". If the defendants assert in their statement of defence that the laws of different legal jurisdictions apply to class members depending on where they purchased their shares or where they live, the court can consider the need for subclasses and additional representative plaintiffs at that time.

[221] Accordingly, Marvin Neil Silver and Cliff Cohen shall be appointed representative plaintiffs in these proceedings.

[222] The final requirement under this part of the certification test is that the plaintiffs have produced a plan that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding.

[223] In *Griffin v. Dell Canada Inc.*, Lax J. identified the purposes and requirements for a workable litigation plan (at para. 100):

> The production of a workable litigation plan serves a two-fold purpose: (a) it assists the court in determining whether the class proceeding is the preferable procedure; and (b) it allows the court to determine if the litigation is manageable: *Carom v. Bre-X Minerals Ltd.* (1999), 44 O.R. (3d) 173 (Sup. Ct.), aff'd (1999), 46 O.R. (3d) 315 (Div. Ct.), rev'd on other grounds (2000), 51 O.R. (3d) 236 (C.A.). The plan must provide sufficient detail that corresponds to the complexity of the litigation. The litigation plan will not be workable if it fails to address how the individual issues that remain after the determination of the common issues are to

be addressed: *Caputo v. Imperial Tobacco Ltd.* (2004), 236 D.L.R. (4th) 348 (Sup. Ct.) at para. 76.

[224] At the certification motion, the litigation plan must necessarily be preliminary. Not all procedural details need to be particularized. The purpose of the litigation plan at the certification motion is to assist the motions judge to determine whether the action is manageable and whether the goals of the *CPA* will be served by certification of the action as a class proceeding. As the litigation progresses, the litigation plan can be modified as required (*Andersen* v. *St. Jude Medical Inc.*, [2004] O.J. No. 132 (S.C.)).

[225] "The finding that a litigation plan is satisfactory for the purpose of certification does not bind the defendants to accept it after a trial of the common issues and, of course, it does not in any way bind the trial judge. Nor is it cast in stone before the trial as it can be amended from time to time with the approval of the court." (*Healey* v. *Lakeridge*, at para. 4).

[226] The plaintiffs' proposed litigation plan[29] was prepared as of February 22, 2007 and has not been revised. The plan details the proposed steps in the litigation, including the leave and certification motions, notice to class members, the opt-out procedure, and the trial of the common issues. The plan proposes a method to determine any remaining individual issues, including specifically the determination of damages under the OSA claim.

[227] The defendants contend that the litigation plan is inadequate because it does not propose a mechanism for determining the governing law applicable to individual members' claims, or even contemplate that such determinations will be required.

[228] In *Carom [Certification]*, Winkler J. rejected a litigation plan that was not sufficiently comprehensive and detailed, in particular where the plan did not disclose a method for dealing with the claims of extra-provincial plaintiffs (at para. 101).

[229] I agree that the litigation plan is not sufficient because it fails to address issues specific to a global class. The plan, while reasonably detailed, is *pro forma*, except for the provisions dealing with the statutory claim. The plan does not advert to any steps that might need to be taken or measures that should be put in place in the litigation to address the interests of non-resident class members, and in this regard, lacks detail in particular in the area of the form, substance and distribution of notice to non-resident class members.

[230] Until the defendants have pleaded, it will likely not be possible for the potential conflict of law issues to be fully explored, and for the parties and the court to consider whether subclasses and additional representative plaintiffs will be necessary. While the determination of these issues, including the specific procedures to be followed, is something that will need to be addressed between counsel and the court as the matter proceeds, the litigation plan should provide a roadmap of how the plaintiffs propose to proceed with all aspects of the proceedings. The litigation plan requires amendment to indicate how the plaintiffs propose to address the global aspects of the class certification. In particular, the plaintiffs should address the form and substance of notice to both resident and non-resident class members, the proposed time periods for opting out of the proceedings, as well any additional measures or steps in the litigation that may be contemplated to address the interests of non-resident class members.

[231] Accordingly, the certification of these proceedings will be subject to the plaintiffs' delivery of an acceptable amended litigation plan.

<u>**Conclusion**</u>

[232] I have concluded that the plaintiffs have met the test for certification of a global class to assert the claims under s. 138.3 of the OSA, as well as certain of the common law claims as pleaded in the Claim.

[233] Leave is granted to the plaintiffs to amend the Statement of Claim in the form of the Fresh as Amended Statement of Claim, without underlining, subject to the qualifications provided for in these reasons.

[234] Subject to the submission of a revised litigation plan by the plaintiffs, this action will be certified as a class proceeding. The specific terms of the order (to be consistent with these reasons) and of the form, content and method of notice to class members, as well as any directions necessary to implement the orders in this motion and the Motion for Leave, shall be settled at an attendance of counsel to be arranged with the trial co-ordinator. If the parties are unable to agree on costs, this can also be addressed in the attendance.

K. van Rensburg J.

K. van Rensburg J.

**DATE:** December 14, 2009.

---

[1] IMAX adopted U.S. GAAP; all references to GAAP in these reasons relate to U.S. GAAP.

[2] While all of the other provincial and territorial jurisdictions in Canada have now incorporated the statutory cause of action into their securities legislation, Ontario was the only province to have such provisions in force when these proceedings were commenced.

[3] Leave was granted to proceed with the s. 138.3 claim against IMAX Corporation, Gelfond, Wechsler, Joyce and Gamble, as well as members of the IMAX audit committee at the time (Copland, Leebron and Braun) and board member Girvan, but not against the two remaining external directors, Utay and Fuchs.

[4] There is a parallel proceeding pending against IMAX, Gelfond, Wechsler, Joyce and Gamble, as well as PriceWaterhouseCoopers (both the Delaware and Ontario limited liability partnerships) in the United States District Court, Southern District of New York (the "U.S. Proceedings"). Initially several proceedings were commenced in the U.S., which were consolidated. A Consolidated Amended Class Action Complaint was filed in October 2007. The amended complaint, while alleging substantially the same facts as are pleaded in the Ontario proceedings, is broader in scope, dealing with IMAX's revenue recognition on theatre systems from 2002 to 2006. The defendants' motion to dismiss the claim was dismissed in September 2008 (587 F. Supp. 2d 471 (S.C.N.Y. 2008).

The proposed class in the U.S. Proceedings is shareholders who purchased the Company's common stock between February 27, 2003 and July 20, 2007 on both NASDAQ and the TSX. In the U.S. Proceedings, the lead plaintiff Westchester Capital Management, Inc. ("Westchester") filed a motion seeking certification of a class encompassing both NASDAQ and TSX purchasers of IMAX securities, which motion was opposed by the defendants. By order dated March 13, 2009, the U.S. court denied the certification motion without prejudice, pending the resolution of the proposed motion of another purported class member, Snow Capital Investment Partners, L.P. ("Snow") for the court to reconsider its January 17, 2007 order appointing Westchester Capital Management, Inc. as lead plaintiff in the U.S. Proceedings. By order dated June 30, 2009, Snow replaced Westchester as the lead plaintiff. The certification issue remains to be determined in the U.S. Proceedings.

[5] The Statement of Claim was issued in September 2006. There have been several changes to the pleading, resulting in a Fresh Statement of Claim (the "Claim") that was delivered shortly before the hearing of the motions. While the Claim has not been formally amended (an amendment is part of the relief sought in the motions), the allegations in the proposed pleading, that include both the common law claims against the named defendants and the statutory claims against the defendants and proposed defendants, were considered for the purpose of the leave, Rule 21 and certification motions.

[6] Class proceedings based on misrepresentation to the secondary market have also been certified for the purpose of settlement in *Mondor v. Fisherman; CC&L Dedicated Enterprise Fund (Trustee of) v. Fisherman*, [2002] O.J. No. 1855 (S.C.), *Frohlinger v. Nortel Networks Corp.*, [2007] O.J. No. 148 (S.C.), *Gould v. BMO Nesbitt Burns Inc.*, [2007] O.J. No. 1095 (S.C.), *Mercantonio v. TVI Pacific Inc.* [2009] O.J. No. 3409 (S.C.) and *Charles Trust (Turstees of) v. Atlas Cold Storage Holdings Inc.*, [2009] O.J. No. 4271.

[7] *Bullen & Leake and Jacob's Precedents of Pleadings*, 12th ed. (London: Sweet & Maxwell, 1975).

[8] Other objections (outlined at paras. 107 to 116 of the Respondents' Rule 21 Factum) appear to have been addressed by the plaintiffs' most recent changes to their pleadings which have been incorporated in the Claim.

[9] IMAX has already identified the number of shares outstanding as of February 14, 2005, and was able to estimate the percentage of non-resident shareholders based on addresses contained in the shareholder register: Copland Affidavit, para. 107; Answers to Undertakings, Q. 115, Moving Parties' Fourth Supplementary Motion Record, Vol. 1, Tab 1-A.

[10] Factum of the Defendants and the Proposed Defendants #3 as Responding Parties: to the Motion for Certification, paras. 219-265.

[11] Copland Affidavit, para. 107; Answers to Undertakings, Q. 115, Moving Parties' Fourth Supplementary Motion Record, Vol. 1, Tab 1-A.

[12] Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class

Certification ("IMAX Brief in U.S. Proceedings"), Affidavit of Michael G. Robb, sworn April 1, 2009 ("Fourth Robb Affidavit"), Exhibit "B", Moving Parties' Sixth Supplementary Motion Record, Tab "B".

[13] IMAX Brief in U.S. Proceedings, pp. 9 - 11.

[14] IMAX Brief in U.S. Proceedings, p. 9.

[15] Report of Professor Poonam Puri, Fourth Robb Affidavit, Exh. "C".

[16] IMAX Brief in U.S. Proceedings, pp. 7 and 8.

[17] The case involved an application to stay class proceedings in Québec and to recognize the preclusive effect of a settlement in a parallel Ontario class action that included in the class Québec residents. The Court's decision refusing to recognize the Ontario judgment was ultimately based on deficiencies in notice given to the Quebec residents which was insufficient and confusing in that it did not properly explain the impact of the judgment certifying the class proceeding on Québec members of the national class (para. 45).

[18] Craig Jones and Angela Baxter, "Fumbling Toward Efficacy: Interjurisdictional Class Actions after *Currie v. McDonald's*", (2006) 3 *The Canadian Class Action Review* 405, p. 407.

[19] Castel's *Canadian Conflict of Laws*, 4th ed. (Toronto: Butterworths, 1997).

[20] Philip Anisman and Garry Watson have suggested that, on the authority of the *Pearson* case, the statutory cause of action for secondary market misrepresentation under the OSA would be available only to investors who traded on the TSX in Ontario. (P. Anisman and G. Watson, "Some Comparisons Between Class Actions in Canada and the U.S.: Securities Class Actions, Certification and Costs", 3 *The Canadian Class Action Review* 467 at 522). *Pearson* however clearly depended on the court's finding that prospectus requirements are tied to the place of distribution, and that the shareholder's statutory right of action depended on the law of the province where the prospectus obligations arose. The "distribution" took place in each province where the prospectus was filed. The determination of the scope of persons who might assert a claim under s. 138.3 of the OSA does not fit neatly into the *Pearson* analysis.

[21] Jones and Baxter, note 18, at p. 420. In a critique of the decision of the Québec Superior Court in *HSBC Bank Canada v. Hocking*, [2006] J.Q. no 9806, refusing to bind Québec residents to a settlement reached on their behalf in Ontario, the authors comment on an "all-too-familiar application to the class action context of rules established in individual civil litigation", where "the court treats the class as a collection of individual claims, not as a truly aggregate action; as a result it does not consider the consequences of parsing the class into smaller and smaller units, and gives no weight to the real advantages that accrue to individual class members from participation in a larger, more efficient action."

[22] M.A. Eizenga and M.T. Poland, "Conflict of Laws and National Class Actions", The Canadian Institute, The 2nd Annual National Forum on Litigating Class Actions, September 2001.

[23] Jones and Baxter, note 18, p. 417.

[24] Plaintiffs' Litigation Plan, Affidavit of Michael Robb swom February 22, 2007, Exh. "O", Moving Parties' (First) Motion Record, Tab "2-O".

[25] Affidavit of Lawrence Kryzanowski sworn May 30, 2007, Moving Parties' Supplementary Motion Record, Tab 2.

[26] Affidavit of Robert Comment sworn September 17, 2007, Moving Parties' Reply Motion Record, Tab 1.

[27] Affidavit of Denise Neumann Martin sworn September 7, 2007, Motion Record of the Responding Parties, Vol. I, Tab 10.

[28] Cohen Affidavit paras. 7, 14 and 15, Moving Parties' First Motion Record, Tab 4.

[29] Plaintiffs' Litigation Plan, Affidavit of Michael Robb sworn February 22, 2007, Exh. "O", Moving Parties' (First) Motion Record, Tab 2-O.

**COURT FILE NO.:** CV-06-3257-00
**DATE:** 20091214

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

**B E T W E E N:**

MARVIN NEIL SILVER and CLIFF COHEN
Plaintiffs

- **and –**

IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER and FRANCIS T. JOYCE
Defendants

---

**REASONS FOR DECISION: RULE 21 MOTION AND MOTION FOR CERTIFICATION**

---

K. van Rensburg J.

**Released:** December 14, 2009