# EXHIBIT E

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

MARTIN NEIL SILVER and CLIFF COHEN

Plaintiffs

- and -

IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY WECHSLER, FRANCIS T. JOYCE, NEIL S. BRAUN, KENNETH G. COPLAND, GARTH M. GIRVAN, DAVID W. LEBRON and KATHRYN A. GAMBLE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**AFFIDAVIT OF PATRICK J. BORCHERS**

I, Patrick J. Borchers, of the City of Omaha, in the State of Nebraska,[1] in the United States, MAKE OATH AND SAY:

## I. Introduction and Qualifications

1. I have been retained by the firm of Siskinds LLP to offer opinions within my areas of expertise with regard to the reasons being offered by Jill S. Abrams, Esq. of the law firm of Abbey Spanier Rodd & Abrams, LLP (hereinafter "Abbey Spanier") for requesting that this Court delay the proposed Notice Program in this action. Abbey Spanier currently represents The Merger Fund (hereinafter "Merger Fund") in a putative class action (hereinafter "the U.S. action") in the United States District Court for the Southern District of New York (hereinafter "Southern District"). The U.S. action, as discussed more fully below, has some overlap with this action, though each action is significantly

1 I am currently visiting the State of Florida and for that reason this Affidavit is executed there. Omaha, Nebraska is my home.

different from the other. In particular, each action names different (but overlapping) sets of defendants, this action is currently certified as a class proceeding while the U.S. action is not certified, even if the U.S. action were ever to be certified, the class members in each action would merely overlap with each action representing a significant number of members not included in the other, and the U.S. action alleges liability-creating acts by the IMAX Corporation and its agents (hereinafter "IMAX") over a considerably longer period of time than does this action. Moreover, the U.S. action principally prays for relief under Section 10(b) of the U.S. Securities Exchange Act of 1934 (hereinafter "U.S. Exchange Act") while this action principally prays for relief under Ontario's *Securities Act* as well as the common law of Ontario.

2. Ms. Abrams's reasons for requesting that this Court delay the proposed Notice Program are set out most fully in an Affidavit sworn by her on May 12, 2011 and filed with this Court (hereinafter "Abrams Affid.") but also in a May 2, 2011 letter addressed to this Court and copied to the counsel of the other parties (hereinafter "Abrams Letter"). In summary, Ms. Abrams urges this Court to delay the Notice Program as, in her view, giving notice to the class members in this action before the certification issue in the U.S. action is finally and conclusively resolved will prejudice the interests of the class members. As discussed more extensively below, in my opinion she is quite mistaken in this view and further delay of this action will frustrate the interests of justice.

3. In preparing this Affidavit, I have reviewed the Abrams Letter, the Abrams Affidavit as well as pertinent exhibits thereto, all five of the extensive written opinions issued by the Southern District in the U.S. action, as well as the Statement of Claim and the proposed Notice Program in this action. To the extent that I have referred to other materials they

are cited in this Affidavit. I have knowledge of the matters to which I depose in this Affidavit. Where that knowledge is based on information obtained from others, I have so indicated, and I believe that information to be true.

4. My credentials are set forth in my résumé attached hereto as Exhibit "A", although a more thorough explanation of some of them is necessary for present purposes. I am a co-author (and have been for the last three editions) of what I believe to be the most widely cited and circulated United States treatise on the conflict of laws. *See* Peter Hay, Patrick J. Borchers & Symeon C. Symeonides, Conflict of Laws (5th ed. 2010) (hereinafter Hay, Borchers & Symeonides). This work and its prior editions have been cited widely by U.S. courts and commentators. Of note here, the United States Supreme Court cited a prior edition in its most recent important case on judgment recognition, *Baker v. General Motors, Inc.*, 522 U.S. 222, 236 (1998). In Hay, Borchers & Symeonides, we cover extensively (pp. 258-84) the question of extraterritorial application of U.S. law as well as issues of judgment recognition (Chapter 24). I have also written on these and related topics in law review articles. Additionally, I have written on class actions and have recently published an article on the United States Supreme Court's class action opinion in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431 (2010). I am also a co-author (and have been for the last several editions and supplements) of one of the oldest and most widely used casebooks on the conflict of laws. *See* Peter Hay, Russell Weintraub & Patrick J. Borchers, Conflict of Laws: Cases and Materials (13th ed. 2009). I have served on the Board of Directors of the American Society of Comparative Law and on the Board of Editors of the American Journal of Comparative Law. My law review articles on conflict of laws, comparative law, jurisdictional and procedural topics

have been cited by numerous state appellate and federal courts. Two of my articles are listed as reference materials in the most recent edition of the Annotated Manual for Complex Litigation.

5. I am currently the Vice President for Academic Affairs, a Professor of Law, and an Adjunct Professor of Philosophy at Creighton University in Omaha, Nebraska.[2] I continue to be an active member of the law faculty (I teach a course in either federal courts or the conflict of laws each year) and served as Dean of the Creighton Law School from 1999-2007. During my 20 years in academia, I have taught courses in the conflict of laws, complex federal litigation, transnational arbitration, federal courts and related areas. I am a member of the New York, California[3] and Nebraska bars. In practice, I was a civil litigator handling a wide variety of labor, business and commercial cases. I have tried cases to juries and been involved in class action litigation. I have successfully argued appeals to the United States Court of Appeals for the Ninth Circuit and the California Supreme Court. After law school and before entering practice, I served as a law clerk to then U.S. Circuit Judge (and now U.S. Supreme Court Justice) Anthony M. Kennedy.

6. I have been called on as an expert witness or consultant in approximately a dozen cases over my career. Because of the heavy demands on my time, I am selective regarding my involvement in private practice matters. In the case of *Tolliver v. Naor*, 115 F. Supp. 2d 697 (E.D. La. 2000), I gave expert testimony in the form of an affidavit on a conflict-of-laws issue that was accepted by the court and which the court found persuasive. I have

2 I make this Affidavit in my personal capacity and not as a representative of Creighton University.

3 I have been on inactive status in California since 1994 as I no longer actively practice in California courts, though I would be eligible to return to active status at any time.

several times testified before federal bodies and state legislatures on issues within my areas of expertise. I and two other U.S. experts on the conflict of laws were invited by M.E.P. Diana Walls to come to Brussels to offer our opinions on the E.U.'s then-draft "Rome II" Regulation on choice of law in non contractual (tort, delictual and quasi-delictual) matters. I have served as Chair of the Association of American Law Schools section on the Conflict of Laws and also on the Executive Committee of its section on Federal Courts. I recently co-authored with Prof. Arthur Miller of New York University Law School an *amicus curiae* brief before the New York Court of Appeals (that state's highest court) in the important commercial law case of *ABN AMRO Bank, N.V. v MBIA Inc.*, 2011 N.Y. Slip Op. 71668 (granting leave to file). I have previously served as an expert witness in a case involving parallel U.S. and Ontario securities class actions. I will organize the rest of this Affidavit along the lines of the issues raised by Ms. Abrams in her Affidavit and Letter. I regret that this Affidavit is as long as it is, but the somewhat scattershot nature of the issues raised by the Abrams Affidavit and Letter requires a detailed response. I address more collateral issues in footnotes.

## II. The Notice Program and the Mutually Preclusive Effect of Ontario and U.S. Actions

7. In both her Letter and Affidavit Ms. Abrams raises concerns regarding the proposed Notice Program in this action. However, in my opinion, the Notice Program as currently set forth meets U.S. due process standards. Nevertheless, the attorneys at Siskinds asked me to offer my opinion as to any clarifications that might strengthen the Notice Program so as to make even clearer that it would meet U.S. due process standards. Below I offer some proposed clarifications and the attorneys at Siskinds have represented to me that they will seek this Court's approval to implement those clarifications. Moreover, these

clarifications will address the most substantial of Ms. Abrams's concerns and ensure that should this Court render a judgment it will have preclusive (or "*res judicata*") effect in the U.S.

8. To understand both the notice and preclusion issues, it is important to recognize that there are three significant groups of actual or potential class members. First, there are the "Ontario-action-only class members." Those are the class members who fell within the class period of this action (February 17, 2006 to August 9, 2006) and traded on the Toronto Stock Exchange (hereinafter "TSX"). The Ontario-action-only class members would not be covered by the U.S. action even if it were certified, because under current U.S law -- as decided by the U.S. Supreme Court in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010) -- the U.S. Exchange Act applies only the securities traded in the U.S.[4] Second, there are potential "U.S.-action-only class members." If the U.S. action is ever certified, and retains its current proposed period, that group would consist of class members who fell within the U.S. action's period, but outside this action's period, and traded on the NASDAQ. Third are the "potential-overlap class members." The potential-overlap class members are those who fell within the period covered by this action and traded on the NASDAQ.

9. It is important to clarify what is and is not at stake with regard to the mutually preclusive effect of Ontario and U.S. judgments. The issue on which I have been asked to opine does not relate directly to the enforcement of a judgment in the sense of compelling the defendants to pay to class members any monetary judgment that ultimately might be

4 This Court has wisely chosen to take a "wait and see" approach on the choice-of-law questions in this action. This Court is obviously not bound by *Morrison*, and accepted international norms of choice of law would allow this Court to apply Ontario law to claims covering all class members (both the Ontario-action-only and the potential-overlap class members) because IMAX is an Ontario-based corporation, a significant number of the liability-creating acts took place in the forum and the effects of those acts were felt in a substantial way in the forum

rendered. As discussed below, both this Court and the Southern District have judicial power over the defendants and, as I understand it, the defendants have not contested jurisdiction in either court. The fairness concern rests in ensuring that whatever judgment is rendered – whether by this Court, the Southern District or a coordinated judgment between the two – will garner for the defendants global peace with regard to the underlying acts alleged in both actions. In other words, no class member should get "two bites at the apple" against any defendant.[5]

10. Two bodies of U.S. law arguably might be relevant to the preclusive effect of an Ontario court's judgment: New York state law and United States federal common law.[6] Fortunately for present purposes, the two are functionally identical and lead to the conclusion that a U.S. court would enforce an Ontario judgment in this case with respect to the potential-overlap class members.[7] New York has adopted the Uniform Foreign-Money Judgments Act (hereinafter "Uniform Act")[8] in Article 53 of its Civil Practice Law and Rules. *See, e.g., Nippon Emo-Trans Co. v. Emo-Trans, Inc.*, 744 F. Supp. 1215,

5 Of course, a judgment from this Court would only affect claims stemming from the period of this class. The differences in the grouping of the defendants in the two actions present no significant risk of unfairness. The most notable difference is that IMAX's auditor Pricewaterhouse Coopers is not a party to this action but is in the U.S. action. However, should this Court render a judgment against IMAX and its agents, they would be able to pursue a separate U.S. action for contribution or indemnity against Pricewaterhouse Coopers in the place of any third-party claim under Federal Rule of Civil Procedure 14 that IMAX and its agents might raise in the U.S. action.

6 Forum law governs the recognition of a foreign judgment, though it is an open question in the U.S. as to whether in a federal question case, where a foreign judgment is pled as a defense, "forum law" means state (here New York) law or federal common law. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 2010 U.S. Dist. Lexis 69863, at pp. *27-28 (S.D.N.Y.) ("there is some uncertainty as to whether federal or state comity law applies here"). This issue, however, is irrelevant here as a judgment of this Court would be recognized under either New York or federal common law.

7 Recall again that this is the only group of interest for these purposes. The Ontario-action-only class members have no claim under the U.S. Exchange Act in light of *Morrison* because they traded on the TSX. The potential U.S.-action-only class members fall outside the period of this class proceeding and thus their rights are obviously unaffected by the outcome of this action.

8 A majority of states have adopted the Uniform Act. *See* Hay, Borchers & Symeonides, p. 1493. About a dozen have adopted its 2005 successor, entitled the "Uniform Foreign-Country Money Judgments Recognition Act" – which slightly updates the original Uniform Act (the version in force in New York). *Id.* at p. 1495. The two versions of the Uniform Act are identical for all material purposes here. For clarity, I cite to the Uniform Act as adopted by New York.

1219 (E.D.N.Y. 1990) (discussing New York's liberal policy towards foreign judgment recognition and adoption of the Uniform Act). New York courts routinely enforce foreign judgments. *See, e.g., CIBC Mellon Trust Co. (as Trustee of Chrysler Canada Ltd.'s Benefits Plan) v. Mora Hotel Corp.*, 100 N.Y. 2d 215, *cert. denied*, 540 U.S. 948 (2003) (enforcing English judgment); *Kitchens Int'l, Inc. v. Evans Cabinet Corp.*, 2009 N.Y. Slip Op. 33032U, 2009 N.Y. Misc. Lexis 6365 (N.Y. County) (enforcing Quebec judgment). Federal common law has also long taken a liberal stance towards the recognition of foreign country judgments. In the early leading case of *Ritchie v. McMullen*, 159 U.S. 235 (1895), the U.S. Supreme Court held that an Ontario money judgment must be recognized by U.S. courts.[9] More recently, courts applying the federal common law of foreign judgment recognition have looked for guidance to Section 482 of the United States Restatement (Third) of Foreign Relations (hereinafter "Third Restatement"). *See, e.g., Diorinou v. Mezitis*, 237 F.3d 133, 143 (2nd Cir. 2001); *Universal Trading & Investment Co.*, 2007 U.S. Dist. Lexis 66317, at pp. *35-36 (N.D. Cal.), *affirmed*, 346 Fed. Appx. 232 (9th Cir. 2009), *cert. denied*, 130 S. Ct. 3504 (2010).

11. Thus, a judgment "which is final, conclusive and enforceable where rendered," *see* N.Y. C.P.L.R. § 5302, is generally enforceable "to the extent that it grants or denies recovery of a sum of money." *See* N.Y. C.P.L.R. § 5303(a). The Uniform Act provides only two

---

9 Early common law cases imposed a very limited reciprocity requirement on recognition of foreign judgments. See *Hilton v. Guyot*, 159 U.S. 113 (1895) (refusing to recognize a French money judgment). It is doubtful that a reciprocity requirement still exists, *see* Hay, Borchers & Symeonides, p. 1493, *see also Alfadda v. Fenn*, 966 F. Supp. 1317, 1326 (S.D.N.Y. 1997) ("the reciprocity requirement has not recently been recognized by the Second Circuit or by the New York state courts"), but even if it does it would be of no moment in this case. *Hilton*'s reciprocity requirement was limited to circumstances in which a citizen of a foreign country attempts to collect on a judgment against a non-citizen. *See* Hay, Borchers & Symeonides, p. 1491. Moreover, there is no want of reciprocity in this case. U.S. courts have certified securities class actions involving Canadians because they believe Canadian courts would respect their judgments in such matters. *See, e.g., In re Alstom S.A. Securities Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008). This belief is well-founded as Canadian courts have clearly signalled their willingness to recognize judgments in U.S. class actions assuming that basic notice and jurisdictional requirements are met. *See, e.g., Currie v. McDonald's Restaurants of Canada Ltd.*, [2005] 74 O.R. (3d) 321.

basic requirements for recognition: 1) the courts of the foreign country rendered the judgment "under a system which . . . provide[s] impartial tribunals [and] procedures compatible with the requirements of due process of law," and 2) the foreign country's court had "personal jurisdiction over the defendant." *See* N.Y. C.P.L.R. § 5304(a);[10] *see also* Third Restatement § 482(1) (U.S. courts "may not" recognize a judgment rendered by tribunals that are not impartial or under procedures not "compatible with due process of law" or if the rendering court lacked jurisdiction under its own law or jurisdiction was unreasonable); Hay, Borchers & Symeonides, pp. 1511-14. The Uniform Act and the common law allow for a discretionary refusal to enforce a foreign judgment in the event of a failure of notice or lack of subject matter jurisdiction, a judgment obtained by fraud, a judgment repugnant to the recognizing court's public policy, a judgment that conflicts with another final judgment, a judgment rendered contrary to a forum-selection clause, a judgment where jurisdiction is based solely on in-forum personal service, or a defamation judgment incompatible with U.S. free speech principles. *See* N.Y. C.P.L.R. § 5304(b); *see also* Third Restatement § 482 (2) (listing lack of subject matter jurisdiction, failure of notice, fraud, public policy, conflicting judgments and violation of a forum-selection clause as discretionary defenses to a judgment).

12. None of these grounds for non-recognition applies here. The Canadian courts are beyond

---

10 The common law requirements as applied by U.S. courts are essentially identical to those in the Uniform Act. For instance, in *Universal Trading & Investment Co.*, 2007 U S. Dist. Lexis 66317, at pp. *35-36 (N.D Cal.), the court relied on the Third Restatement to find that the basic requirements are that the foreign tribunal was "impartial" and that "the court that rendered the judgment [had] jurisdiction in accordance with the law of the rendering state" and under internationally accepted principles. The Third Restatement also provides a list of discretionary defenses to the enforcement of judgments such as notice, fraud and public policy which are substantially similar to those in the Uniform Act. *Id.* at p. *36 (citing § 482 of the Third Restatement). Other courts have treated the common law and the Uniform Act requirements as being interchangeable. *See, e g., Society of Lloyd's v. Reinhart*, 402 F.3d 982, 1000 (10th Cir. 2005); *Society of Lloyd's v. Turner*, 303 F.3d 325, 330 (10th Cir. 2002); *Wimmer Canada, Inc. v Abele Tractor & Equipment Co.*, 299 A D.2d 47, 49, 750 N.Y.S.2d 331, 333 (2002), *review denied*, 99 N.Y.2d 507 (2003); *see also Roy v. Buckley*, 698 A.2d 497, 502 (Maine 1997) (applying the common law to enforce Canadian judgment)

reproach for their fairness and U.S. courts have routinely enforced Canadian judgments even in extremely complex cases. *See, e.g., In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010) (giving effect to Canadian bankruptcy judgment, including a non-debtor release and world-wide injunction). "Jurisdiction" as used in the sense of recognition is often referred to as "jurisdiction in the international sense." *See* Hay, Borchers & Symeonides, p. 1511. However, as a practical matter in New York this means that the assertion of jurisdiction comports with U.S. due process standards. *See, e.g., Wimmer Canada, Inc. v. Abele Tractor & Equipment Co.*, 299 A.D.2d 47, 750 N.Y.S.2d 331 (2002), *review denied*, 99 N.Y.2d 507 (2003) (Quebec judgment recognized because Quebec Court would have had jurisdiction under New York standards). Because IMAX is incorporated under Canadian law and headquartered in Ontario and IMAX and its agents carried on substantial business in Ontario, as well as in New York, no serious argument could be made under U.S. notions of due process (or indeed under any rational jurisdictional scheme) that this Court or the Southern District lacks jurisdiction over the defendants named respectively in each action.[11] Because the U.S. and Ontario both extensively regulate securities, no serious argument could be made

11 The jurisdictional law of both the United States, *see, e.g., Perkins v. Benguet Consolidated Mining Co.*, 342 U S 437 (1952), *Bryant v. Finnish Nat'l Airlines*, 15 N Y.2d 426 (1965) and, as I understand it, Ontario, *see, e.g., Incorporated Broadcasters, Ltd. v Canwest Global Communications Corp*, [2003] 63 O.R (3d) 431, at pp. 444, 446 ("real and substantial connection" between the claim and Ontario not necessary for jurisdiction where defendant corporations are physically present in Ontario); *see also Smith v. National Money Mart Co*, [2006] 80 O.R. (3d) 81 (applying the "real and substantial connection" test Ontario had jurisdiction over an Ontario corporation and its U S parent for allegedly providing payday loans at excessive interest rates in Ontario), provide that a corporation is subject to personal jurisdiction in its home or where it has a substantial presence. I am not familiar with the law of any nation that would preclude its courts from taking jurisdiction over a corporation both incorporated and having its principal executive offices in the forum. *See, e.g.*, Mathias Reimann, Conflict of Laws in Western Europe: A Guide Through the Jungle 75 (1995) ("As a basic rule in Europe, the courts in the defendant's home state have . general jurisdiction "). *See also* Third Restatement § 421(2) (listing "incorporation" and "carrying on business" in the forum as among the list of reasonable grounds for an assertion of jurisdiction by a court) The individual IMAX defendants would also be subject to jurisdiction under the standards of the U S., Ontario (as I understand its law) or any other rational regime. *See, e.g., Kreutter v McFadden Oil Corp*, 71 N.Y.2d 460 (1986) (investor entitled to sue out-of-state individual actors who acted through a New York office of a corporation); *Incorporated Broadcasters, Ltd. v. Canwest Global Communications Corp.*, [2003] 63 O.R. (3d) 431, at pp. 447-49 (out-of-province defendant working through corporations who did business in Ontario subject to jurisdiction in Ontario under the "real and substantial connection" test).

that a judgment of this Court would violate U.S. public policy. *See* Hay, Borchers & Symeonides, p. 1517 (noting trend toward narrow use of public policy defense); *see also Society of Lloyd's v. Reinhart*, 402 F.3d 982, 987 (10th Cir. 2005) (rejecting public policy challenge to enforcement of English judgment); *Arab Monetary Fund v. Hashim (In re Hashim)*, 213 F.3d 1169, 1172 (9th Cir. 2000) (rejecting public policy challenge to award of $10 million in costs against the judgment debtor). The claim in this Court in no way involves a prohibited category of causes of action nor any of the other discretionary grounds for non-recognition.

13. Although I am not aware of any reported case in the U.S. addressing directly the preclusive effect of a Canadian class proceeding, it is my opinion that the U.S. courts would give preclusive effect to a judgment regarding the potential-overlap class members, assuming that the jurisdictional bases and the methods of notice comport with U.S. due process standards, as they would here. A class proceeding such as this is simply a large aggregation of claims for money and thus the result of this case would be a judgment that either "grants or denies recovery of a sum of money." *See* N.Y. C.P.L.R. § 5303(a). To the extent that courts on each side of the border have addressed recognition issues in class litigation, they have not deviated from the usual assumptions about recognition. In *In re Alstom S.A. Securities Litig.*, 253 F.R.D. 266, 282 (S.D.N.Y. 2008), the court certified a class action involving Canadian class members in part because it found that the Canadian courts would likely give preclusive effect to its class judgment. In *Currie v. McDonald's Restaurants of Canada Ltd.*, [2005] 74 O.R. (3d) 321, the court stated in paragraph 15 of its judgment that "Ontario expects its judgments to be recognized and enforced, provided its courts assert jurisdiction in a proper manner and comity requires that, in appropriate cases, Ontario law should give effect to foreign class

action judgments." The *Currie* court cited with approval in paragraph 20 of its judgment English commentary that the "duty to ensure that the interests of the plaintiff class members are adequately represented and protected . . . is a factor favouring recognition against unnamed class members: see John C.L. Dixon, 'The Res Judicata Effect in England of a U.S. Class Action Settlement' (1997) I.C.L.Q. 134 at 136, 150-51."[12]

14. The complexity of a proceeding is not a reason for U.S. courts to refuse recognition. U.S. courts have shown great respect for, and given deference to, their Canadian counterparts. A recent example is *In re Metcalfe & Mansfield Alternative Investments*, 421 B.R. 685 (Bankr. S.D.N.Y. 2010). That case involved a Canadian bankruptcy order involving restructuring of assets of over $32 billion and was "said to be the largest restructuring in Canadian history." *Id.* at 687. The petitioners in the U.S. proceeding objected to what the court described as a "very broad third-party non-debtor release and injunction." *Id.* at 688. Despite substantial objections having been lodged against the Canadian court's order, the U.S. court "conclude[d] the Canadian orders – including the non-debtor release and injunction should be enforced in the United States." *Id; see also id* at 695 (citing § 482 of the Third Restatement). Similarly in *Alfadda v. Fenn*, 966 F. Supp. 1317, 1330-31 (S.D.N.Y. 1997), *affirmed*, 159 F.3d 41 (2nd Cir. 1998), the court found that a French judgment, which found a lack of fraud by the defendants, was sufficient to preclude the plaintiffs from prevailing on a securities fraud action in the United States. In my opinion, there are no good practical or legal reasons for a U.S. court to refuse to give preclusive effect to a judgment in the case at bar and I conclude that a U.S. court would give faith and credit to a judgment of this Court in this action respecting the potential overlap class

12 The court in *Currie* found that the U S. class judgment was based upon a "real and substantial connection," but only refused to enforce the judgment because the court found, in paragraphs 34 through 43, that the notice to the Canadian class members was woefully inadequate and based upon faulty data regarding the breadth of Canadian circulation of the publications in which the notice appeared.

members.[13]

15. Ms. Abrams's concerns seem to be addressed mainly to the adequacy of the Notice Program, which she appears to argue would not suffice for U.S. purposes and thus defeat the preclusive effect of this Court's judgment in the U.S. I address her concerns in turn.[14]

16. United States concepts of due process do not require that each affected party be guaranteed to get actual notice. Rather, the fundamental due process rule is that notice be "*reasonably calculated*, under all the circumstances, to apprise interested parties of the pendency of the action. . . ." *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (emphasis added). If affected parties cannot be located with reasonable effort, substitute notice by publication is constitutionally sufficient. *Id.* at 317 ("This Court has not hesitated to approve of resort to publication as a customary substitute . . . where it is not reasonably possible or practicable to give more adequate warning."). It is by this standard that the concerns regarding the Notice Program must be measured. Ms. Abrams, both in her Affidavit and in her Letter, expresses concern that the proposed Notice Program merely "asks" the broker dealers to bring the notice to the attention of their clients who purchased IMAX stock within the class period rather than "requiring" them to do so as U.S. notices purport to do. *See* Abrams Affid. ¶ 47; Abrams Letter, p. 2. This is a matter of semantics. United States courts cannot require brokers who have not been brought before the court – either as parties by summons or as

13 For purposes of the preclusive effect of the judgment of this Court, it does not matter whether the Court decides to apply U S. or Ontario law. In the event of a foreign judgment being recognized in the United States, most U.S. federal courts have applied the federal common law of preclusion (or "*res judicata*") to determine the effect of the judgment. *See Alfadda v. Fenn*, 966 F. Supp., 1317, 1327 (S.D.N.Y. 1997). U.S. federal common law applies a "transactional" test. *See, e.g., Okoro v. Bohman*, 164 F.3d 1059, 1062 (7th Cir. 1999) ("Under the federal common law of *res judicata*, a subsequent suit is barred if the claim on which it is based arises from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit that had gone to final judgment."). Thus, this Court's judgment would preclude re-litigation in any U.S. court by any plaintiff remaining in the class of any claim based on the underlying facts of this case.

14 Ms. Abrams rightly does not quarrel with some aspects of the proposed Notice Program. For example, publication of notice in *The Wall Street Journal* is, for obvious reasons, the preferred outlet for publication of class action notices of this sort.

witnesses by subpoena – to distribute the notice to their clients. A U.S. court's "stick" of holding non-compliant parties in civil contempt only extends to persons within the court's reach. Thus as the leading U.S. commentary on class actions notes, when brokers fail to distribute the notice the parties to the suit must obtain a subpoena *duces tecum* to discover the identity of the clients so that notice can be effected. *See* Herbert Newberg et. al., 7 Newberg on Class Actions § 22.84 (2009). This Court would be in essentially the same position with regard to any non-compliant U.S. brokers. Under the U.S.'s extremely liberal statute aiding foreign court discovery, *see* 28 U.S.C. § 1782, the parties to this action would be able to obtain the aid of the appropriate United States District Court to take discovery of the names of the potential class members.[15] However, to make this clear for brokers inclined not to notify their clients, I suggest that the following sentence be added to the notices sent to the U.S. brokers. "If you choose not to bring this notice to the attention of your clients who purchased shares within the class period, please be advised that the parties to this Action will apply to the appropriate United States District Court under Section 1782 of Title 28 of the United States Code for an order allowing them to discover the identity and e-mail and/or mailing addresses of your clients who purchased shares within the class period." The Notice Program should be further clarified that with regard to non-compliant brokers the parties will undertake to obtain discovery of the identity of potential class members and will then notify the class members by e-mail or first class mail, as appropriate and as discussed in the next paragraph. I am informed by the attorneys at Siskinds that they will request that this Court make this clarification to the Notice Program. Because the brokers are not defendants in this action, they will be incented as a matter of customer service to ensure

15 The foreign discovery statute is discussed extensively in Hay, Borchers & Symeonides and I will not repeat all that is writer there. Suffice it to say that an application for such discovery under Section 1782 would be a paradigmatic use of the statute.

that their clients are fully apprised of their legal rights. That incentive, coupled with a natural desire to avoid the formal discovery process of Section 1782, will very likely yield a high rate of compliance by the brokers.

17. Ms. Abrams also seems to express concern regarding the possibility of e-mail notice to the brokers and potential class members and seems to imply that first class mail is the constitutional norm.[16] *See* Abrams Affid. ¶ 47; Abrams Letter, p. 2. It is well established in the United States that notice by e-mail to a working e-mail address is sufficient to meet the "reasonably calculated" constitutional test. *See, e.g., McCluskey v. Belford High School*, 2010 U.S. Dist. Lexis 62608 (E.D. Mich. 2010) (authorizing alternative service by e-mail on a defendant); *Gaffigan v. Does 1-10*, 689 F.Supp.2d 1332, 1342 (S.D. Fla. 2010) ("[I]n this case, email was the method of communication used by Defendants in confirming orders placed on its websites, and thus, e-mail should be calculated to provide Defendants with notice."); *Chanel, Inc. v. Song Xu*, 2010 U.S. Dist. Lexis 6734 (W.D. Tenn.) (permitting alternate service by e-mail where e-mails sent to the defendant were not returned as "undeliverable"); *Popular Enters., LLC v. Webcom Media Group, Inc.*, 225 F.R.D. 560, 562 (E.D. Tenn. 2004) (permitting alternate service by e-mail where the plaintiff located several of the defendant's e-mail addresses, and e-mails sent to those addresses did not "bounce back"). Electronic notice to potential class members is being used with increasing frequency. *See, e.g., Lane v. Facebook, Inc.*, 2010 U.S. Dist. Lexis. 24762 (N.D. Cal.) (notice to class members by e-mail and Facebook update constitutionally sufficient); *Todd v. Retail Concepts, Inc.*, 2008 U.S. Dist. Lexis 117126 (M.D. Tenn.) (notice by posting on defendant's web page, physical posting near cash

16 I do not take either her Letter or Affidavit to object to distributing the notice through the broker dealers, which is extremely common in the United States.

registers at defendant's stores and one e-mail to all customers for which defendant had e-mail addresses deemed sufficient notice to class). Recently, I was given notice by a U.S. court, only by way of e-mail, that I was a member of a plaintiff class in an action brought against the manufacturer of antivirus software that I had purchased. Given that the NASDAQ is an on-line trading platform and the general ubiquity of e-mail communication, one can predict with a high degree of confidence that most brokers will have working e-mail addresses for potential class members. Nevertheless, in an abundance of caution, I recommend that the proposed Notice Program be clarified in the following way. The instructions to the brokers should indicate that for clients who purchased IMAX shares within the class period, for which the brokers have a working e-mail address, the class notice should be distributed by e-mail and that the parties to this action will pay the associated administrative costs. For clients for whom the brokers do not have a working e-mail address, but have a mailing address, the parties to this action will provide physical notice packets to the brokers and will pay the administrative and postage costs of transmitting the notice packets by first-class mail. Clarifying the Notice Program to make clear that the brokers should employ a mixture of e-mail and physical communications as appropriate -- an approach commonly used in the United States, *see, e.g., In re AT&T Mobility Wireless Data Services Litig.*, 270 F.R.D. 339, 352 (N.D. Ill. 2010) -- should end any rational debate as to whether the Notice Program suffices for U.S. due process purposes. I am informed by the attorneys at Siskinds that they will request that this clarification be made to the proposed Notice Program.

18. Finally, in her Letter Ms. Abrams suggests that any notice to the class in this action should make mention of the putative class action in the Southern District. *See* Abrams Letter, p. 2. In her Affidavit she abandons this position and instead opposes any notice to

the class until the certification issue is finally resolved in the Southern District. *See* Abrams Affid. ¶ 41. This latter position, as discussed below, appears to rest upon the mistaken fear that class members who fail to opt out of this action will be precluded from becoming part of any class that is certified in the Southern District. As to the concern that she seemed to raise in her Letter, this can be resolved by appropriate wording of the notice *in the U.S. action*, if indeed it is ever certified. It would be unwise to insert anything into the notice to class members *in this action* regarding the U.S. action. First, any reference would be of pertinence only to the potential-overlap class members. Second, even as to them, it would be impossible to say anything helpful. The possible existence of a U.S. class action is unknown and unknowable at this point and is irrelevant to the potential-overlap class members. Regardless of any possible future U.S. action, they face the same question that every potential class member faces as whether to join the class and have one's fate determined by its outcome or to opt-out and go it alone. Rationally, only class members with a large personal stake, such as institutional investors, choose the opt-out route.

19. If the U.S. action is ever certified, the potential-overlap class members might receive a notice that includes language along the following lines: "You may be part of a class proceeding in Ontario Superior Court titled *Silver v. IMAX Corporation* involving similar allegations against some of the defendants in this action. If you are a member of the Ontario class proceeding you do NOT need to opt out of this action. It is permissible for you to be a class member in both matters." Such wording in the notice would allow all potential class members to act rationally. Class members with small claims in the potential-overlap group rationally would choose not to opt out and remain in both actions with their fate to be decided by whichever action reaches judgment first or await the

possibility of coordinated settlement and entry of judgment in both actions. Large investors who wish to go it alone will simply be put to the trivial burden of having to opt out of two actions.

**III. The Effect of Going Forward with the Notice Program in this Action**

20. Central to Ms. Abrams's objection to proceeding with the Notice Program in this action is her assertion that going forward "at this pre-certification stage of the U.S. Action ha[s] a very real potential to significantly prejudice the ability of class members who purchased their IMAX securities through the NASDAQ to make an informed decision about whether to opt out of the Canadian Action." *See* Abrams Affid. ¶ 42. This is so, Ms. Abrams believes, because going forward with the Notice Program will "compel[] U.S. class members to make [a] choice [as to whether to opt out of this action] without knowing whether there are in fact two real possibilities to choose between. . . ." *See* Abrams Affid. ¶ 44. This dilemma arises, she says, because "there will be an issue as to whether or not that class member would be precluded from participating in the U.S. action, if subsequently certified." *See* Abrams Affid. ¶ 45. In my opinion, however, this issue is a non-issue. It is perfectly obvious that class members who do not opt out of this action will be free to participate in any U.S. class action that covers them -- assuming there ever is such a U.S. class action.

21. Properly understood, Ms. Abrams's concern is directed only to the potential-overlap class members. But even so restricted, her concern rests on the unfounded fear that failure to opt out of one class action could preclude a class member from being part of another action. Essentially her concern appears to be that a class member cannot simultaneously be part of two or more class actions seeking relief for the same underlying acts.

22. In the important U.S. Supreme Court case of *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996), the Court faced parallel state and federal class actions, the latter brought under rules promulgated under the U.S. Exchange Act, though (as in this matter) not yet certified. The state action settled and went to judgment while the federal action was on appeal after the trial court denied certification. *Id.* at 370. The issue was then raised as to whether the judgment in the state case could preclude further litigation of federal action, even though the state case did not (and could not) include federal law causes of action that were included in the putative federal class action. Those arguing against preclusion of the federal action were, according to the Supreme Court, "members of both the state and federal plaintiff classes." *Id.* at 372. The Supreme Court held that preclusion principles apply with the same force to class actions as they do to ordinary actions. *Id.* at 373-74. Because "the [state court] settlement judgment would be *res judicata* under" the rendering state's law, it precluded the federal action. *Id.* at 380. *Matsushita*'s analysis of the preclusive effect of the *judgment* would have been entirely unnecessary if it were impossible for class members to be members of two or more overlapping or parallel actions.[17] The Supreme Court's nonchalant observation that the respondents before it "were members of both the state and federal classes" would have described an impossibility if participation in the state action precluded their potential participation in a later federal action.[18]

17 In *Matsushita* the plaintiffs in the state court action did receive notice of the *judgment* which informed them that the stipulated judgment in that case would extinguish any other rights they might have arising out of the underlying transaction, including in the putative federal class action. *Matsushita*, 516 U.S. at 371. This was the result of the fairly common U.S. practice of class actions being certified for purposes only of setting the case and entering a judgment. However, this simply reinforces the point that the true day of reckoning is when a judgment is entered, not when notice that the action is merely pending is disseminated.

18 The international nature of this case does not affect the analysis because, as discussed above, the first of the U.S. and Ontario actions to reach judgment would preclude the other, assuming that fundamental rules of jurisdiction and notice are met, as they are here. Thus this case presents exactly the same situation as would exist if there were overlapping U.S. actions.

23. It is an often-made observation that parallel or overlapping class actions come about because identical or overlapping groups of class members are represented in multiple actions. Some U.S. commentators refer to these as "dueling" class actions, though, as discussed below, the judicial administration of this action and the putative U.S. class action need not devolve into a "duel." *See, e.g.*, Rhonda Wasserman, *Dueling Class Actions*, 80 B.U. L. Rev. 461 (2000). United States federal courts have noted that the *Matsushita* rule of preclusion creates an incentive to reach judgment first, because winning the race allows preclusion of the claims of overlapping class members and the lawyers bringing first case to judgment are able to collect fees. *See, e.g., Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282-83 (7th Cir. 2002). The U.S. Congress has attempted to coordinate a greater number of parallel and overlapping class actions by passing the Class Action Fairness Act of 2005, Pub. L. 109-2, 119 Stat. 4-14 (codified 28 U.S.C. §§ 1332(d), 1453, 1711-15) which creates federal jurisdiction over a large number of class actions that would have formerly remained in state court and thus been allowed to "duel" with each other. By creating federal jurisdiction over many formerly state class actions, Congress empowered the federal judiciary to transfer and consolidate class actions in a single venue. *See, e.g.*, 28 U.S.C. § 1407. However, the Class Action Fairness Act allows large numbers of state court class actions to remain in state venues where they can and do continue to overlap with each other. *See* 28 U.S.C. § 1332 (d) (creating a group of state class actions that cannot be removed to federal court and a second group for which removal to federal court is discretionary). Moreover, the United States Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.) (hereinafter "PSLRA") creates elaborate procedures for U.S. securities actions, such as the one at issue here, to

coordinate parallel actions with a lead plaintiff and avoid "dueling." All of this worry about, and reform concerning, "dueling" class actions would be entirely unnecessary if it were impossible for overlapping class members to be members of more than one action. If, as Ms. Abrams worries, the notice of pendency had *de facto* preclusive effect, the race to judgment problem could never occur in actions such as this one because once a class member failed to opt out of the first action, he or she would be ineligible to become a class member in any later action.[19]

24. Of course, there will be a day of reckoning, because nobody plausibly maintains that a class member is entitled to multiple recoveries for the same underlying acts. But that day comes at judgment, not at the notice stage. As discussed below, it is quite clear that the U.S. and Canadian courts would each give each others' judgments preclusive effect assuming that fundamental due process standards are satisfied, as they would be here. Herein lies, one suspects, Ms. Abrams's and Abbey Spanier's real concern. With the U.S. action stuck in the mud, this action is now opening up a substantial lead on its potential U.S. (partial) counterpart. Powerless to push the U.S. action along, one suspects that Ms. Abrams and the Abbey Spanier firm fear losing settlement leverage (assuming there ever is a U.S. class action) if the potential-overlap members first become part of a judgment of this Court. Unable to speed up the U.S. action, their hope now is to slow

19 I am unable to conjure a plausible legal theory by which a class plaintiff who fails to opt out of the first action would be found to be ineligible to participate in a later action. The only two theories that seem even remotely tenable are waiver and estoppel, but each obviously fails. Waiver is "the intentional abandonment or relinquishment of a known right." *See Kontrick v. Ryan*, 540 U.S. 443, 458 (2003) (internal quotation marks omitted). It is doubtful that benign, passive activity such as ignoring an opt-out notice could ever qualify as a waiver, but it is completely impossible to effect a waiver here where any rights under the U.S. action are unknown and unknowable. Estoppel requires one's adversary to act in reasonable reliance on one's action.. *See Heckler v. Community Health Servs.*, 467 U.S. 51, 59 (1984). Here the defendants could not possibly claim to do or refrain from doing something depending on whether a particular party decides to opt out or not of this action.

down this action to give the U.S. action time to catch up.[20]

25. Moreover, there is the possibility of real prejudice to the Ontario-action-only and potential-overlap class members by delaying the Notice Program. The relevant trades took place roughly five years ago. Class members change brokers, making it harder with each passing day to notify them through their brokers that they fall into the class. As time goes on, class members who traded are less and less likely to have the records to know whether they traded or not within the relevant period. Moreover, unfortunately, with the passage of time, more and more class members will pass on meaning that their estates must make any claims, further complicating matters. Delaying the Notice Program to allow the U.S. action time to (perhaps) catch up will benefit nobody, except perhaps Abbey Spanier. The Ontario-action-only and the potential-overlap members will be subject to further delay in a case that involves allegations of conduct that occurred roughly five years ago. The potential U.S.-action-only members are unaffected either way as they must await certification of the U.S. action to have any hope of recovery. This Court is well equipped to move the matter forward and reach a just resolution for the Ontario-action-only and potential-overlap class members and further delay will only prejudice their interests for no good reason. Indeed, despite repeated concerns about prejudice to Abbey Spanier's client, the Merger Fund, that entity will suffer no cognizable prejudice (and in fact may benefit) by moving forward the Notice Program in

20 Ms Abrams disclaims any "desire to impede the progress" of this action, suggesting that in the meanwhile the parties to this action can take "other steps to advance the proceedings, such as completing pleadings or conducting discovery." *See* Abrams Affid ¶ 52. With all due respect, this is naive While discovery and pleadings are undoubtedly essential, resolution of this action cannot happen without notice to the class In an action such as this in which notice is typically passed through brokers of the securities, the notice effort itself will require substantial monitoring and resources. It is worth noting that when the shoe was on the other foot, the Southern District did not hesitate to certify and then later issue notice in a U.S class action that overlapped with Canadian actions. See *In re Nortel Networks Corp Sec. Litig*, 2003 U S Dist Lexis 15702 (S.D.N.Y ).

this action.[21]

26. This matter need not, however, devolve into a "duel." I am informed by the attorneys at Siskinds that they have substantial experience with such cross border class proceedings and that in the vast majority of them a joint settlement with the U.S. action has been reached. If indeed, as Ms. Abrams asserts, U.S. class certification is just around the corner, *see* Abrams Affid. ¶ 40, then the time gap between the two actions will be fairly small and coordination ought not be a difficult matter and likely to the mutual benefit of both Canadian and U.S. plaintiffs' counsel. However, as I explain below, I believe Ms. Abrams's estimate of the time of the likely resolution of the class certification issue in the U.S. action is highly optimistic.

### IV. Timing and Potential U.S. Certification

27. Ms. Abrams's Affidavit does a fair job of recounting the convoluted history of the U.S. action. It is worth noting, however, that after five years and five carefully written opinions from the Southern District, the various lead counsel in the U.S. action have made no significant progress other than to beat back IMAX's argument that the U.S. complaint failed to allege specifically the scienter necessary for recovery under the U.S. Exchange Act. To summarize the U.S. litigation thus far: in *Kaplan v. Gelfond,* 240

21 This Court has wisely decided to delay resolution of the choice-of-law issues. As to the Ontario-action-only class members, it seems likely that they will be subject to the Ontario *Securities Act* and related common law claims. As I understand matters, this Court has deferred consideration of what law to apply to the potential-overlap class members. If this Court decides to apply the U.S. Exchange Act to them, they will be simply getting the same law that would be applied in the Southern District. If the Court decides to apply the Ontario *Securities Act* and related common law claims to the potential-overlap class members, then – as this Court is well aware – the potential-overlap members will, for representations contained in core documents, actually be subject to a less rigorous threshold of liability than the required showing of scienter under the U.S. Exchange Act, though the Ontario *Securities Act* does impose some liability limits not present under the U.S. Exchange Act The Merger Fund is apparently a potential-overlap class member. Thus, despite Ms. Abrams's representation that the Merger Fund would prefer a U.S. forum, *see* Abrams Affid. ¶ 48, her client will not suffer any legally cognizable prejudice. If the U.S. action is never certified, this action will be her client's only chance to participate in a class proceeding. If her client is truly insistent on a U.S. forum, the Merger Fund can opt out of this class proceeding and go it alone in a U.S. forum, as apparently it realistically could given the substantial size of its investment in IMAX stock.

F.R.D. 88 (S.D.N.Y. 2007) (hereinafter "*U.S. IMAX I*") the Southern District consolidated eight related putative class actions filed against IMAX. The opinion in *U.S. IMAX I* appointed Abbey Spanier as lead counsel and the firm's client Westchester Capital as the lead plaintiff. In *In re IMAX Securities Litig.*, 587 F. Supp. 2d 471 (S.D.N.Y. 2008) (hereinafter "*U.S. IMAX II*") the Southern District denied IMAX's motion to dismiss (as well as the companion motion of IMAX's auditor Pricewaterhouse Coopers) under Federal Rule of Civil Procedure 12(b)(6), finding that the complaint sufficiently alleged the scienter necessary to recover under the U.S. Exchange Act. In *In re IMAX Securities Litig.*, 2009 U.S. Dist. Lexis (S.D.N.Y.) (hereinafter "*U.S. IMAX III*") the Southern District found that Abbey Spanier's client Westchester Capital lacked standing because it was merely a broker of IMAX shares and thus had no beneficial interest in them when the U.S. litigation began. The opinion in *U.S. IMAX III* thus replaced Westchester Capital with Snow Capital as the lead plaintiff and removed Abbey Spanier as lead counsel in favor of Snow Capital's lawyers. In *In re IMAX Securities Litig.*, 272 F.R.D. 138 (S.D.N.Y. 2010) (hereinafter "*U.S. IMAX IV*") the Southern District denied Snow Capital's motion to certify the class. The Southern District in *U.S. IMAX IV* held that Snow Capital could not establish that it was typical of class members. The fatal lack of typicality stemmed from the timing of Snow Capital's trades. Snow Capital had sold all of its shares by August 10, 2006, before many of the curative disclosures alleged in the U.S. action took place. Thus Snow Capital was potentially subject to a "unique defense" of not being able to prove loss causation and thus not in a position to represent the class. *U.S. IMAX IV*, of course, inflicted a fatal wound on Snow Capital's position as lead plaintiff, so in *In re IMAX Securities. Litig.*, 2011 U.S. Dist. Lexis 41709 (S.D.N.Y.) (hereinafter "*U.S. Imax V*"), decided approximately a month ago,

the Southern District refereed another contest for the positions of lead plaintiff and counsel. This time the winners were the Merger Fund (apparently the beneficial owner of the shares traded by the original lead plaintiff Westchester Capital) and the Merger Fund's counsel Abbey Spanier.

28. Notwithstanding the fact that the U.S. litigation has taken multiple turns, Ms. Abrams asserts that "[d]epending upon how long the defendants require to deliver responding materials, and depending on whether Judge Buchwald requires oral argument, the certification motion could be completed by September 2011." *See* Abrams Affid. ¶ 40. If by "completion" of the certification motion she means that there will be a final ruling as to whether the U.S. action is certified by that date, this is extremely implausible.

29. To begin with the obvious, September 2011 is four months from the date of the writing of the Abrams Affidavit. When the Southern District ruled on the last attempt at certification in *U.S. IMAX IV*, the motion for class certification was filed on April 22, 2010, *see U.S. IMAX IV*, 272 F.R.D. 138, 141, n.1, but the Southern District's opinion was not filed until December 20, 2011, almost exactly eight months later and thus twice the time that Ms. Abrams apparently predicts will be needed to resolve an as-yet-unfiled certification motion by the Merger Fund.

30. Two of Ms. Abrams's qualifiers also seem unlikely to resolve themselves in favor of a speedy resolution of the U.S. certification motion. First, although I have not had the pleasure of appearing before Judge Buchwald of the Southern District, I am familiar with U.S. federal court practice in general. It seems to me unlikely in the extreme that a U.S. District Judge who has authored at least five very careful opinions in this matter would attempt to dispose of a motion of the significance of the one contemplated by Ms.

Abrams without oral argument. More crucially, however, it seems a certainty that Ms. Abrams, Abbey Spanier and the Merger Fund can expect a spirited defense by the U.S. defendants against the efforts to certify the class. As *U.S. IMAX III* demonstrated, having once been appointed lead plaintiff does not guarantee that status forever.

31. But more importantly, as *U.S. IMAX IV* showed, the preliminary findings of adequacy and typicality for achieving the status as lead plaintiff are far from certain to survive the more searching inquiry that comes with attempted class certification. *See also U.S. IMAX I*, 240 F.R.D. at 94 (at the stage of appointing lead plaintiffs "only a preliminary showing of typicality and adequacy is required."). The sprawling time period alleged in the U.S. action – a span of almost four and a half years from February 27, 2003 to July 20, 2007 – may ultimately prove to be its Achilles heel, or at least highly problematic for the Merger Fund's efforts to certify it. In *U.S. IMAX V*, 2011 U.S. Dist. LEXIS 41709 at *23, n.8, the Merger Fund's competitor for the lead plaintiff position pointed out that the Merger Fund only bought IMAX shares after February 17, 2006, when IMAX issued a press release touting its 2005 financial results and claiming that it had completed 14 theatre systems in the fourth quarter of 2005. *See also U.S. IMAX III*, 272 F.R.D. at 142 (noting significance of February 17, 2006 press release). While the Southern District in *U.S. IMAX V* dismissed this timing issue as being insufficient to deprive the Merger Fund of its status as lead plaintiff, that opinion opens up a line of attack similar to the one that sunk Snow Capital's attempt at certification in *U.S. IMAX IV*. Recall that the period of the U.S. action dates back nearly three years prior to the Merger Fund's entry into the market for IMAX stock and alleges misleading filings dating as far back as those covering fiscal year 2002. *See U.S. IMAX II*, 587 F. Supp. 2d 473-75.

32. Herein lies a potential problem for the Merger Fund's anticipated certification motion. It

is virtually certain that the U.S. defendants will argue that the Merger Fund is conflicted regarding the pre-February 17, 2006 events. It is in the interest of the class – or at least the class members who entered the market for IMAX stock early in the U.S. class period – to play up the significance of those earlier filings. But it is in the Merger Fund's individual interest to downplay the significance of those earlier filings and play up the significance of the February 17, 2006 press release as the true bait that hooked investors before the cascade of events beginning on August 9, 2006 depressed the stock.[22] Thus, the U.S. defendants surely will argue, the Merger Fund is not a typical and adequate representative of the class. It is impossible to predict whether this argument will succeed, but it certainly will be made now that the roadmap has been drawn in the *U.S. IMAX V* opinion. At the very least, this issue is likely to delay resolution of the as-yet-unfiled certification motion. The U.S. defendants will undoubtedly seek to do substantial discovery to determine whether they have a factual basis for making such an argument.[23]

33. Worse yet from the standpoint of the prospect of a speedy resolution of the promised U.S. certification motion, the U.S. defendants will have yet another substantial, fact-intensive argument against certification.[24] In *U.S. IMAX V*, the Merger Fund's competitor for the

---

22 It is true irony that it actually would be in the Merger Fund's interest to *de facto* turn the U.S. action into a class action that resembles the class proceeding in this action with a period that begins on February 17, 2006. The proof issues would be greatly simplified and the Merger Fund and other post-February 17, 2006 class members would not have to share in any recovery with those who acquired IMAX stock in the preceding three years. Of course, the U.S. class members who bought stock in the preceding three years would be less than enthusiastic about such a result.

23 The Merger Fund may be able to take steps to counteract this argument. One possible strategy would be to divide the action into two or more subclasses that would litigate the question of whether the filings and other statements of IMAX in various time frames give rise to a claim under the U.S. Exchange Act. However, if the U.S. action is divided into subclasses, appropriate representative parties will have to be identified for each subclass and the Merger Fund obviously cannot represent any subclass that involves the pre-February 17, 2006 time period. While this may ultimately save the U.S. action, it will obviously delay it as additional representative parties are sought, amended pleadings are drawn up and the like.

24 The U.S. defendants might well raise two other issues, though in my opinion they are less substantial and less likely to cause the Merger Fund difficulty in its attempt to certify the class. First, as the Southern District noted in *U.S. IMAX V*, the Merger Fund did not technically meet the PSLRA's requirements for becoming a lead plaintiff as it did not apply for this status when the U.S. action was first filed in 2006. The

lead plaintiff role argued that the Merger Fund pursued an arbitrage strategy that was indifferent to the stock price and thus the Merger Fund would never be able to prove loss causation. The Southern District rejected this argument (in the preliminary sense of ruling that the Merger Fund was not the lead plaintiff), citing to a number of other U.S. District Court cases and opining that the Merger Fund should not be disqualified because it was sophisticated. That line of reasoning is likely to be tested intensely at certification. A factual record would need to be developed as to whether the Merger Fund did indeed pursue such a strategy and as to that strategy's relationship to loss causation. Notwithstanding the Southern District's citation to other trial court cases involving arbitrage-based attacks on proving loss causation, it cited to no controlling Second Circuit or U.S. Supreme Court cases. The Southern District's various opinions thus far on proof of loss causation surely have been influenced by the Second Circuit's decision in *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2nd Cir. 2008) which places the full burden on the defendants to rebut at the certification stage the presumption of loss causation in an efficient market. However, that very question of the role of proof of loss causation to certification motions is the subject of the pending U.S. Supreme Court case of *Archdiocese of Milwaukee Supporting Fund, Inc., v. Halliburton Co.*, 597 F.3d 330, 338 (5th Cir. 2011), *cert. granted sub. Nom., Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 380 (2010). If the U.S. Supreme Court's forthcoming decision in *Halliburton*

---

Southern District essentially used equitable principles to ignore that problem by reasoning that the fall of Westchester Capital and then Snow Capital as lead plaintiffs should reopen the bidding, so to speak. It is conceivable that the U.S defendants could use this technical defect in the Merger Fund's status as lead plaintiff to argue that it is not an adequate representative under Federal Rule of Civil Procedure 23 In my opinion, this argument is unlikely to succeed as the U.S. defendants will not be able to point to any prejudice to them in excusing the Merger Fund from this requirement. The only parties aggrieved by this decision are potential competitors for the lead plaintiff status and ironically the Merger Fund's principal competitor had the same problem. In *U.S. IMAX V*, the Merger Fund's principal competitor also raised the argument that the Merger Fund's assignment of its interests to Westchester Capital and then the reassignment of those interests to the Merger Fund violated New York's "anti-champerty" statute thereby disqualifying the Merger Fund from pursuing its interests In my opinion, the Southern District quite rightly rejected this argument given that the Merger Fund is attempting to pursue beneficial interests that it originally owned.

were to differ from the Second Circuit's approach, the proverbial deck could be shuffled (again) in the U.S. action, forcing the Southern District to re-examine its earlier decisions. Obviously it is impossible to predict the success of the U.S. defendants' likely line of argument, but they will surely press it and rightly demand further factual development, particularly to create a record for the likely appeal discussed in the following paragraph.

34. The final potential complication for the Merger Fund is that Federal Rule of Civil Procedure 23(f) gives the losing party to a certification motion an opportunity to seek an interlocutory appeal. The discretion to accept the appeal rests with the relevant United States Court of Appeals, which here – of course – is the Second Circuit. No matter which way the Southern District decides the certification motion, it seems nearly certain that the losing side will seek an appeal. Moreover, under the Second Circuit's test for accepting such appeals, each side would have a reasonable argument for the appeal being allowed if it loses. If the Merger Fund were to lose, it would have a viable argument that "the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable."[25] *See In re Sumitomo Copper Litig.*, 262 F.3d 134, 139 (2nd Cir. 2001). If the U.S. defendants were to lose, they will surely argue that "that the certification order implicates a legal question about which there is a compelling need for immediate resolution." *Id.*; *see also Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2nd Cir. 2004) (allowing Rule 23(f) appeal to resolve the question of whether the fraud-on-the-market theory can be extended to the statements of a research analyst). An obvious potentially important legal question would be whether the Second

25 Of course the alternative to not making the argument that a denial of certification effectively terminates the litigation would be to take another run at certification before the Southern District, possibly by dividing the U.S. action into subclasses with their own lead plaintiffs and counsel. It is impossible to predict how long that process would delay matters before the Southern District, but the delay would be substantial.

Circuit's *Salomon Analyst Metromedia* opinion on the role of proof of loss causation at the certification stage survives the Supreme Court's forthcoming decision in *Halliburton*. Of course, it is impossible to venture any certain prediction as to whether the almost-inevitable appeal will be allowed and, if allowed, how it will be resolved. But what is clear is that the possibility of further significant delay is palpable.

35. As noted above, it took the Southern District eight months to reject the last certification motion. In the best case for Abbey Spanier, the District Court would take approximately the same amount of time to rule in favor of the Merger Fund and the Second Circuit would refuse the appeal of the U.S. defendants, which would take us to approximately January 2012. However, the time required for the Southern District to rule on the certification motion may well be considerably elongated if the U.S. defendants insist (as they likely will) on doing substantial discovery as to the Merger Fund's investment strategies and the degree to which the Merger Fund's relatively late entry into the market for IMAX stock puts it at odds with earlier-entering class members.

36. Thus, in my opinion, the more likely scenarios drag out the certification issue before the Southern District well past the early part of 2012. If substantial additional discovery is needed before the Southern District rules, and if the Second Circuit allows an appeal of the certification motion, the matter will remain unresolved at least well into 2013 and more likely in 2014 or even 2015. Consider, for example, that in the pending *Halliburton* case, the trial court denied certification on November 4, 2008. *See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 2008 U.S. Dist. Lexis 89598 (N.D. Tex.). The Fifth Circuit affirmed the decision February 12, 2010, approximately 16 months later. *See Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co*, 597 F.3d 330 (5th Cir. 2010). The certification issue still awaits resolution by the U.S.

Supreme Court. But even if we ignore the admittedly rare event of the U.S. Supreme Court granting certiorari, and if we assume (optimistically from Abbey Spanier's point of view) that the Southern District rules on the certification motion in January of 2012, the 16 months for the U.S. Court of Appeals to review the case would take us to the summer of 2013. The Southern District's circuit appears to move more slowly. In *In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474 (2nd Cir. 2008), the Second Circuit released its opinion in a Rule 23(f) appeal on September 30, 2008, approximately 27 months after the Southern District certified the class on June 20, 2006, and then proceeded to remand the case to the Southern District to revisit the certification issue. That time period of 27 months would take us to at least the early part of 2014 and, if the appeal resulted in a similar remand, would leave the matter without a clear resolution of the certification issue even at that late date. The defendants in both this action and the U.S. action have thus far vigorously resisted certification. They have succeeded once already in the U.S. action, and *U.S. IMAX V* gives them a roadmap to make plausible arguments against a bid by the Merger Fund to certify the U.S. action. The U.S. defendants may gain further ammunition if the forthcoming Supreme Court decision in *Halliburton* adopts a more defense-friendly stance than the Second Circuit's current test. Accepting Ms. Abrams's invitation to delay the Notice Program until there is final resolution of certification of the U.S. action is a recipe for putting this action into the freezer for the indefinite future. As noted above, further delay of the Notice Program will substantially prejudice the rights of the Ontario-action-only and potential-overlap class members.

## V. Conclusion

37. For the foregoing reasons, I conclude that the Notice Program as currently proposed meets U.S. due process standards, but can be strengthened even further with the

clarifying statements suggested above. Because the Notice Program meets U.S. due process standards, a judgment of this Court with respect to the potential-overlap class members would have preclusive effect in the U.S. It is my opinion that final resolution of the certification issue in the U.S. action will occur well beyond the September 2011 date suggested by Ms. Abrams. I also conclude that further delay of the Notice Program in this action will frustrate the interests of justice.

38. Siskinds LLP has directed my attention to, and I acknowledge, my duties under Rule 4.1 of the Rules of Civil Procedure (Ontario) (a) to provide opinion evidence that is fair, objective and non-partisan; (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and (c) to provide such additional assistance as the Court may reasonably require to determine a matter in issue. I also acknowledge that these duties prevail over any obligation owed by me to the party by whom or on whose behalf I have been engaged.

**SWORN OR AFFIRMED** before me at the City of Sarasota, in the State of Florida, in the United States, this 31st day of May, 2011.

A Commissioner, etc.

Patrick J. Borchers

TINISHA GRAHAM
NOTARY PUBLIC
STATE OF FLORIDA
Comm# DD997794
Expires 6/2/2014

This is the Exhibit "A" mentioned and referred to in the Affidavit of Patrick J. Borchers, sworn before me in the City of Sarasota, Florida, in the U.S.A., this 31st day of May, 2011.

A Commissioner, etc.

TINISHA GRAHAM
NOTARY PUBLIC
STATE OF FLORIDA
Comm# DD997794
Expires 6/2/2014

# EXHIBIT A

# PATRICK J. BORCHERS

**Home**
19264 Shirley St.
Omaha, NE 68130
402-778-0654
402-850-4969 (mobile)

**Office**
Creighton University
2500 California Plaza
Omaha, NE 68178
402-280-4076
borchers@creighton.edu

## Employment

| | |
|---|---|
| 2007-present | Vice President for Academic Affairs, Professor of Law and Adjunct Professor of Philosophy, Creighton University |
| | Law Courses: Conflict of Laws, Federal Courts<br>Philosophy Course: Philosophy of Law |
| 1999-2007 | Dean and Professor, School of Law, Creighton University |
| | Courses: Civil Procedure, Conflict of Laws |
| 1996-99 | Associate Dean for Academic Affairs, Albany Law School of Union University |
| 1993-96 | Associate Dean for Student Affairs, Albany Law School of Union University |
| 1990-99 | Professor of Law, Albany Law School of Union University (Assistant Professor 1990-93; Associate Professor 1993-95; Professor 1995-99) |
| | Courses: Conflict of Laws, Administrative Law, Civil Procedure, Complex Federal Litigation, New York Administrative Law and Policy, Transnational Litigation, International Commercial Arbitration |
| June, 1996 | Secrétaire rédacteur, Conférence de La Haye de Droit International Privé |
| 1987-90 | Litigation Associate, Downey, Brand, Seymour & Rohwer, Sacramento, California |
| 1986-87 | Law Clerk, Hon. Anthony M. Kennedy, United States Court of Appeals for the Ninth Circuit, Sacramento, California |
| Summer, 1986 | Summer Associate, Downey, Brand, Seymour & Rohwer, Sacramento, California |

| | |
|---|---|
| Summer, 1985 | Summer Associate, Paul, Hastings, Janofsky & Walker, Los Angeles, California |
| Summer, 1984 | Research Assistant, Professor Edward H. Rabin, University of California, Davis, School of Law |

## Books

HAY, BORCHERS & SYMEONIDES, CONFLICT OF LAWS (5th ed. West 2010; 4th ed. West 2004; 3rd ed. West 2000 and supplements; 1995 supplement to 2nd ed., editions prior to 5th also with Scoles)

HAY, WEINTRAUB & BORCHERS, CONFLICT OF LAWS: CASES AND MATERIALS (13th ed. Foundation 2009 and 2010 supplement; 12th ed. Foundation 2004 and 2006-08 supplements; 11th ed. Foundation 2000 and 2001-03 supplements; 1997-99 supplements to10th ed.)

COMPARATIVE CONFLICT OF LAWS: CONVENTIONS, REGULATIONS AND CODES (Foundation Press 2009)(co-edited with Hay and Weintraub).

BORCHERS, KELLY, MORENO, WITMER, WUNSCH & PEARLSTEIN, REPORT ON THE RESOLUTION OF OUTSTANDING PROPERTY CLAIMS BETWEEN CUBA AND THE UNITED STATES (Creighton Univ. Press 2007)(Executive Summary reprinted at 41 CREIGHTON LAW REVIEW 207 (2008))

SIEGEL & BORCHERS, CONFLICTS IN A NUTSHELL (3rd ed. West 2005)

INTERNATIONAL CONFLICT OF LAWS FOR THE THIRD MILLENNIUM: ESSAYS IN HONOR OF FRIEDRICH K. JUENGER (Transnational Publishers 2001)(co-edited with Joachim Zekoll)

BORCHERS & MARKELL, NEW YORK STATE ADMINISTRATIVE PROCEDURE AND PRACTICE (2d ed. West 1998 & supplements; 1st ed. West 1995)

## Book Chapters

*Flexibility and Predictability: The Emergence of Near-Universal Choice of Law Principles,* in BALANCING OF INTERESTS: LIBER AMICORUM PETER HAY (RASMUSSEN-BONNE, FREER, L⟨KE & WEITNAUER eds. 2005)

*Losing the Battle, Winning the War: Juenger's Critique of Interest Analysis*, in CHOICE OF LAW AND MULTISTATE JUSTICE (FRIEDRICH K. JUENGER, Spec. ed. 2005)

*Interstate Recognition of Non-Traditional Marriages* in SAME-SEX MARRIAGE AND SAME-SEX UNIONS: A DEBATE (WARDLE, STRASSER, DUNCAN & COOLIDGE eds. 2003)

*Jurisdiction to Adjudicate Revisited* in LAW AND JUSTICE IN A MULTISTATE WORLD: ESSAYS IN HONOR OF ARTHUR VON MEHREN (SYMEONIDES & NAFZIGER eds. 2002)

*Introduction to Administrative Law* in NEW YORK STATE MANUAL FOR ADMINISTRATIVE LAW JUDGES AND HEARING OFFICERS (2002)

*A Look Forward, A Look Back: Juenger's First Major Conflicts Article* in INTERNATIONAL CONFLICT OF LAWS FOR THE THIRD MILLENNIUM: ESSAYS IN HONOR OF FRIEDRICH K. JUENGER (2001)

*Administrative Law* in GENERAL PRACTICE IN NEW YORK (OSTERTAG & BENSON ed.1998)(with David Markell)

*The Triumph of Substance over Rules of Choice in International Commercial Transactions: From the Lex Mercatoria to Modern Standards* in INTRODUCTION TO TRANSNATIONAL LEGAL TRANSACTIONS (RAISCH ed. 1995)

**Law Review Publications**

*The Emergence of Quasi Rules in U.S. Conflicts Law,* __ YEARBOOK OF PRIVATE INT'L LAW __ (2011).

*The Real Risks of Forum Shopping: A Dissenting Opinion from* Shady Grove, 44 CREIGHTON LAW REVIEW 29 (2010).

*Punitive Damages, Forum Shopping and the Conflict of Laws,* 70 LOUISIANA LAW REVIEW 529 (2010).

*The Conflict of Laws and* Boumediene v. Bush, 42 CREIGHTON LAW REVIEW 1 (2008)

*The Coming Collision:* Romer *and State Defense of Marriage Acts,* 2008 B.Y.U. LAW REVIEW 1635

*Categorical Exceptions to Party Autonomy in Private International Law*, 82 TULANE LAW REVIEW 1645 (2008)

Jones v. Flowers*: An Essay on a Unified Theory of Procedural Due Process,* 40 CREIGHTON LAW REVIEW 343 (2007)

*Nebraska Choice of Law: A Synthesis,* 39 CREIGHTON LAW REVIEW 1 (2005)

*The Essential Irrelevance of the Full Faith and Credit Clause to the Same-Sex Marriage Debate,* 38 CREIGHTON LAW REVIEW 353 (2005)

*Internet Libel: The Consequences of a Non-Rule Approach to Jurisdiction*, 98 NORTHWESTERN UNIVERSITY LAW REVIEW 473 (2004)

*Tort and Contract Jurisdiction via the Internet: The "Minimum Contacts" Test and the Brussels Regulation Compared*, 50 NETHERLANDS INTERNATIONAL LAW JOURNAL 401 (2003)

*Budgets*, 35 UNIVERSITY OF TOLEDO LAW REVIEW 19 (2003)

*The Incredible Shrinking Hague Evidence Convention*, 38 TEXAS JOURNAL OF INTERNATIONAL LAW 75 (2002)

*The Problem with General Jurisdiction*, 2001 UNIVERSITY OF CHICAGO LAW FORUM 119

*Ten Things They Don't Teach You in Dean School*, 31 UNIVERSITY OF TOLEDO LAW REVIEW 567 (2000)

*Louisiana's Conflicts Codification: Some Empirical Observations Regarding Decisional Predictability*, 60 LOUISIANA LAW REVIEW 1061 (2000)

*Choice of Law In Federal Courts: A Reply*, 8 BRANDEIS LAW JOURNAL 159 (2000)

*Empiricism and Theory in Conflicts Law*, 75 INDIANA LAW JOURNAL 509 (2000)

*Annual Survey of New York Law: Conflict of Laws*, 49 SYRACUSE LAW REVIEW 333 (1999)

Baker v. General Motors: *Implications for Interjurisdictional Recognition of Non-Traditional Marriages*, 32 CREIGHTON LAW REVIEW 147 (1998)

*Judgments Conventions and Minimum Contacts*, 61 ALBANY LAW REVIEW 1161 (1998)

*A Few Little Issues for the Hague Judgments Negotiations*, 24 BROOKLYN JOURNAL OF INTERNATIONAL LAW 157 (1998)

*Choice of Law Relative to Security Interests and Other Liens in International Bankruptcies*, 46 AMERICAN JOURNAL OF COMPARATIVE LAW Supp. 165 (1998)(United States Report for the 15th Congress of the International Academy of Comparative Law)

*Courts and the Second Conflicts Restatement: Some Observations and an Empirical Note*, 56 MARYLAND LAW REVIEW 1232 (1997)

*Back to the Past: Anti-Pragmatism in American Conflicts Law*, 48 MERCER LAW REVIEW 721 (1997)

*International Criminal Tribunals -- A Jurisprudential Thought*, 60 ALBANY LAW REVIEW 653 (1997)

Pennoyer's *Limited Legacy: A Reply to Professor Oakley*, 29 U.C. DAVIS LAW REVIEW 115 (1995)

*The Return of Territorialism To New York's Conflicts Law*: Padula v. Lilarn Properties Corp., 58 ALBANY LAW REVIEW 775 (1995)

*Conference on Jurisdiction, Justice, and Choice of Law for the Twenty-First Century*, 29 NEW ENGLAND LAW REVIEW 517 (1995)(various contributions)

*Jurisdictional Pragmatism*: International Shoe's *Half-Buried Legacy*, 28 U.C. DAVIS LAW REVIEW 561 (1995)

*The Internationalization of Contractual Conflicts Law*, 28 VANDERBILT JOURNAL OF TRANSNATIONAL LAW 421 (1995)

*Choice of Law in the American Courts in 1992: Observations and Reflections*, 42 AMERICAN JOURNAL OF COMPARATIVE LAW 125 (1994)

*The Origins of Diversity Jurisdiction, the Rise of Legal Positivism, and a Brave New World for* Erie *and* Klaxon, 72 TEXAS LAW REVIEW 79 (1993), *reprinted in part in* CIVIL PROCEDURE ANTHOLOGY 220-33 (LEVINE, DOERNBERG & NELKEN ed.1998)

*New York Choice of Law: Weaving the Tangled Strands*, 57 ALBANY LAW REVIEW 93 (1993)

*Conflicts Pragmatism*, 56 ALBANY LAW REVIEW 883 (1993), *reprinted in part in* A CONFLICT-OF-LAWS ANTHOLOGY 148-50 (SHREVE ed. 1997)

*The Choice-of-Law Revolution: An Empirical Study*, 49 WASHINGTON & LEE LAW REVIEW 357 (1992)

*Comparing Personal Jurisdiction in the United States and the European Community: Lessons for American Reform*, 40 AMERICAN JOURNAL OF COMPARATIVE LAW 121 (1992)

*Forum Selection Agreements in the Federal Courts After* Carnival Cruise*: A Proposal for Congressional Reform*, 67 WASHINGTON LAW REVIEW 55 (1992)

*The Death of the Constitutional Law of Personal Jurisdiction: From* Pennoyer *to* Burnham *and Back Again*, 24 U.C. DAVIS LAW REVIEW 19 (1990), *reprinted in part in* A CIVIL PROCEDURE ANTHOLOGY 69-80 (LEVINE, DOERNBERG & NELKEN ed. 1998)

*California Local Initiatives and Referenda: An Argument for Keeping the Progressive Flame Burning*, 21 PACIFIC LAW JOURNAL 119 (1989)

*Taming the New Breed of Nuclear Free Zone Ordinances: Statutory and Constitutional Infirmities in Local Procurement Ordinances Blacklisting the Producers of Nuclear Weapons Components*, 40 HASTINGS LAW JOURNAL 87 (1988), *reprinted in*, 25 YEARBOOK OF PROCUREMENT ARTICLES 771 (1988)(with Dauer)

**Book Reviews, Forewords and Tributes**

*Foreword to* Shady Grove *Symposium,* 44 CREIGHTON LAW REVIEW 1 (2010)

*Foreword to Issue One*, 41 CREIGHTON LAW REVIEW 1 (2008)

*Middle Ground?,* 24 CONSTITUTIONAL COMMENTARY 265 (2007) (reviewing KOPPLEMAN, SAME SEX, DIFFERENT STATES: WHEN SAME-SEX MARRIAGES CROSS STATE LINES)

*100 Years of Educating for Service and Justice*, 38 CREIGHTON LAW REVIEW vii (2005)

*Book Review*, 38 CREIGHTON LAW REVIEW 995 (2005)(reviewing VON MEHREN, THEORY AND PRACTICE OF ADJUDICATORY AUTHORITY IN PRIVATE INTERNATIONAL LAW: A COMPARATIVE STUDY OF THE DOCTRINE, POLICIES AND PRACTICES OF COMMON- AND CIVIL-LAW SYSTEMS)

*Tribute to Dean Lawrence Raful,* 37 CREIGHTON LAW REVIEW 829 (2004)

*Tribute to Professor Barbara Green*, 35 CREIGHTON LAW REVIEW 1 (2001)

*Book Review*, 44 AMERICAN JOURNAL OF COMPARATIVE LAW 387 (1996)(reviewing REIMANN, CONFLICT OF LAWS IN WESTERN EUROPE: A GUIDE THROUGH THE JUNGLE)

*Book Review*, 90 AMERICAN JOURNAL OF INTERNATIONAL LAW 587 (1996)(reviewing PARK, INTERNATIONAL FORUM SELECTION)

*Professor Brilmayer and the Holy Grail*, 1991 WISCONSIN LAW REVIEW 465 (reviewing BRILMAYER, CONFLICT OF LAWS: FOUNDATIONS AND FUTURE DIRECTIONS)

**Other Legal Publications**

*The Strange Attack on Administrative Rules*, 2 GOVERNMENT, LAW AND POLICY JOURNAL 42 (2000)

Croson: *Five Years Later* in MAYOR'S OFFICE PROGRAM MATERIALS (N.Y.C. Mayor's Office of Contracts ed. April 7, 1993)

*Croson in 1992: New Cases, New Issues*, in MAKING MINORITY AND WOMEN BUSINESS PROGRAMS WORK IN GOVERNMENT CONTRACTS (ABA ed. 1992)

*Croson in 1991: Preference Programs Make a Comeback*, in MAKING MINORITY AND WOMEN BUSINESS PROGRAMS WORK IN GOVERNMENT CONTRACTS (ABA ed. 1991)

*Making Findings of Fact and Preparing a Decision in New York Administrative Adjudication*, 11 JOURNAL OF THE NATIONAL ASSOCIATION OF ADMINISTRATIVE LAW JUDGES 85 (1991)

*MBE Preference Programs in Public Contracts*: Richmond v. Croson *Revisited*, 1 CONSTRUCTION BUSINESS REVIEW 21 (March/April 1991)

Croson: *A Look Forward, A Look Back*, in MINORITY AND WOMEN BUSINESS PROGRAMS REVISITED: PUBLIC CONTRACTING IN THE 1990'S (ABA ed. 1990)

*New Limits and Practical Guidelines After* City of Richmond v. J.A. Croson, in PUBLIC CONTRACTS AND MINORITY BUSINESS PROGRAMS (ABA ed. 1989)(with Kennedy and Eisenhammer)

*Update*, 24 PUBLIC CONTRACT NEWSLETTER 10 (1988)

**Awards & Honors**

Nebraska Bar Foundation, Outstanding Legal Educator Award (2010)

Inaugural Cohort, Ignatian Colleagues Program (2010)

Nebraska State Bar Association, Award of Special Merit for Advancing the Legal Profession, Administration of Justice, and the Public Interest (2009)

Elected Creighton Chapter of the Society, XI NU (2009) (National Society devoted to preserving and promoting the French language and culture)

Elected Alpha, Sigma, Nu (Jesuit Honor Society) (2008)

Recognized (with Judy Borchers and Mary Meyer) for Excellence in High School Mock Trial Coaching, Nebraska Bar Foundation (2007, 2010)

Elected Nebraska Bar Foundation Fellow (2006) and American Law Institute (2000)

Robert M. Spire Award for Public Service, given by the Omaha Bar Association (2003)

Co-Winner, Kelley Award, given by Creighton University, for collaborative educational programming (2000)

Winner (with Markell), Annual Award for Scholarship, presented by the American Bar Association, Section on Administrative Law and Regulatory Policy (for first edition of NEW YORK STATE ADMINISTRATIVE PROCEDURE AND PRACTICE) (1995)

Cited for Excellence in Professional Achievement by the U.C. Davis Alumni Association (1995)
Recipient, Albany Law School "Friend of the Class" Award (1993 and 1999)

Named by THE NATIONAL JURIST as one of the United States' top teaching law professors (Oct./Nov. 1993)

## Education

| | |
|---|---|
| Law School | J.D., 1986, University of California, Davis<br>Class Rank: Top 2%<br>Managing Editor, U.C. DAVIS LAW REVIEW<br>Order of the Coif |
| Undergraduate | B.S., 1983 (Physics), University of Notre Dame, Cum Laude<br>Notre Dame Rhodes Scholar Nominee |

## Professional Memberships

Bar Admissions and related: Nebraska, New York and California (inactive status since 1994); some affiliated federal courts; Omaha Bar Association Executive Council (2001-2004); District of Nebraska Federal Practice Advisory Committee (2001-2007); Nebraska Continuing Legal Education, Inc., Board member (1999-2001); American Inns of Court, Omaha Chapter (1999-present).

Other: Co-Director, Albany-Tulane Summer School at McGill University (1997-99); AALS Sections on Conflicts (Executive Committee 1993-94, 1998-2000; Chair 1997-98); Federal Courts (Executive Committee 1991-92); Board of Editors, American Journal of Comparative Law; Board of Directors, American Society of Comparative Law (1992-1999)

## Community Involvement

Elected Douglas County, Nebraska SID Board 498 (2009-11)

Co-Chair, Mayor Fahey's Task Force on Public Safety (2006-07)

Board Member, Catholic Charities of Omaha (2004-present)

Board Member, Notre Dame Club of Omaha (2002-06)

Leadership Omaha, Omaha Chamber of Commerce, Class 23 (2000-01)

Volunteer tutor in mathematics, Boystown (2002-present) and Omaha Street School (2000-01)

Town of Guilderland, NY, YMCA Task Force (1997)

Attorney Coach, Skutt Catholic High School Mock Trial (2003-present); Omaha Parochial Athletic League Volleyball (2002-2003) and Catholic Youth League Soccer (2005-2009); Pine Bush Little League, Guilderland, NY (1991-97, 1999); St. Madeleine Sophie Catholic Church (Guilderland, NY), Intra-Parish Basketball League (1993-96).

Member, Advisory Council and Drafting Subcommittee, Youth Courts of the Capital District, Inc. (1993-94)

**Personal**

Married to Judy Borchers; father of Tara Marie Borchers Schneider, Adam Christopher Borchers, Ryan Francis Borchers, Erin Leigh Borchers and Kyle Andrew Borchers