UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB)<br>ECF Case |

## DECLARATION OF PROFESSOR POONAM PURI

I, Poonam Puri, declare as follows:

1. Annexed to this declaration is true and correct copy my report entitled Report of Professor Poonam Puri.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: Pisticci, Italy
July 1, 2011.

Poonam Puri

# REPORT OF PROFESSOR POONAM PURI


**A. QUALIFICATIONS AND BACKGROUND ... 2**

**B. CLASS PROCEEDINGS IN ONTARIO, CANADA ... 4**

1. BACKGROUND ON THE CLASS PROCEEDINGS ACT, 1992 (ONTARIO) ... 4
2. CERTIFICATION ... 5
   *2.1 The Pleadings Must Disclose a Cause of Action ... 6*
   *2.2 There Must be an Identifiable Class ... 6*
   *2.3 There must be Common Issues ... 8*
   *2.4 A Class Action is the Preferable Procedure ... 9*
   *2.5 The Representative Plaintiff must be Appropriate ... 13*
3. PROCEDURAL AND STATUTORY SAFEGUARDS IN ONTARIO CLASS PROCEEDINGS ... 15
   *3.1 Increased Judicial Involvement ... 15*
   *3.2 Notice ... 16*
   *3.3 Opt Out Rights and Class Member Ability to Pursue Individual Claims ... 17*
   *3.4 Limitation Period ... 18*
   *3.5 Evidence at the Certification Motion ... 18*
   *3.6 The Use of Juries ... 19*
   *3.7 Pretrial Discovery ... 20*
   *3.8 Evidence at Trial ... 22*
   *3.9 Settlement, Discontinuance or Abandonment of a Class Action ... 23*
   *3.10 Objecting to Settlement ... 24*
   *3.11 Procedures to Allocate Recovery Among all Class Members ... 24*
   *3.12 Remedies For Enforcement Of Judgments ... 25*
   *3.13 Framework for Appellate Review ... 26*
   *3.14 Contingency Fee Arrangements in Ontario ... 26*
   *3.15 Cost Regime in Ontario ... 27*
   *3.16 Judicial Independence ... 28*
4. CERTIFICATION OF A GLOBAL CLASS INCLUDING CANADIAN AND FOREIGN PLAINTIFFS ... 28
   *4.1 Ontario Court's Inherent Power to Certify a Global Class Action ... 28*
   *4.2 Certifying an Ontario Class Action with U.S. Investors ... 31*
   *4.3 U.S. Law May Apply to U.S. Investors ... 31*
   *4.4 Procedural Mechanisms Available to U.S. Investors ... 31*

**C. SUBSTANTIVE SECURITIES LAWS IN ONTARIO, CANADA ... 31**

1. STATUTORY SCHEME ... 32
   *1.1 Background ... 32*
   *1.2 Leave of the Court ... 33*
   *1.3 Liability for Documentary Misrepresentation ... 34*
      1.3.1 Elements required to Establish Liability ... 35
         1.3.1.1 Actions against Responsible Issuers ... 35
         1.3.1.2 Actions against Directors ... 35
         1.3.1.3 Actions against Officers ... 36
         1.3.1.4 Actions against Experts ... 36
      1.3.2 Defenses ... 37
      1.3.3 Damages ... 39
2. COMMON LAW ... 40
   *2.1 Conspiracy ... 41*
   *2.2 Negligent Misrepresentation ... 42*
   *2.3 Fraudulent Misrepresentation ... 43*
   *2.4 Damages ... 44*

**EXHIBIT A ... 45**

**EXHIBIT B ... 76**

## A. QUALIFICATIONS AND BACKGROUND

1. I am an Associate Professor of Law with tenure at Osgoode Hall Law School of York University and Co-Director of the Hennick Centre for Business and Law, in Toronto, Ontario. I was appointed to the faculty of Osgoode Hall Law School in 1997 and received tenure in 2002. My teaching and research expertise lies in securities law, corporate law, corporate governance and corporate and white collar crime. As of July 1, 2011, I will assume the role of Associate Dean, Research, Graduate Studies, Institutional Relations at Osgoode Hall Law School.

2. I am also Head of Research and Policy at the Capital Markets Institute (CMI), Rotman School of Management, University of Toronto.[1] My role at the CMI involves developing, organizing and executing a research plan and strategy for the CMI.

3. As part of the CMI, I was co-research director for the Task Force to Modernize Securities Legislation (TFMSL) in 2005-2006. The TFMSL was established by the Investment Dealers Association of Canada (IDA) in June 2005. It had a mandate to make recommendations to maintain a dynamic, fair, efficient and competitive capital market in Canada. Among the research papers I designed and oversaw were those concerning (i) enhancing investor protection; (ii) maintaining a competitive capital market in Canada; and (iii) strengthening market credibility and integrity. Five of the papers focused on issues dealing with enforcement. In addition to directing the overall research agenda, I co-authored one of the enforcement studies.[2]

4. Also as a part of the CMI, I was co-research director for the Expert Panel on Securities Regulation (the Expert Panel). The Expert Panel was announced by the federal Minister of Finance in February 2008 to provide advice on the best way forward to improve securities regulation in Canada. In addition to directing the overall research program, I authored one paper on enforcement.[3]

5. At the CMI, I have also written two other studies on the topic of enforcement: A National Enforcement Agency for Canada (2008) and Enforcement Effectiveness in the Canadian Capital Markets (2005). At the CMI, I have organized and spoken at several significant conferences and roundtables on the topic of enforcement.

6. My teaching and research at Osgoode Hall Law School, as well as my work with the CMI, calls upon my in-depth knowledge of the legal and regulatory framework relating to Canadian securities laws, including public and private enforcement mechanisms. My work also requires me to be conversant with the interdisciplinary

[1] The CMI was established in 1998 through a donation from the Toronto Stock Exchange to the University of Toronto. See CMI website for more details. Online: CMI <http://www.rotman.utoronto.ca/cmi/>.
[2] P. Puri & M. Condon, "The Role of Compliance in Securities Regulatory Enforcement", online: (2006) 6 Task Force to Modernize Securities Legislation in Canada 1 <http://www.tfmsl.ca/#>.
[3] P. Puri, "A Model for Common Enforcement in Canada: The Canadian Capital Markets Enforcement Agency and the Canadian Securities Hearing Tribunal" (2009), Expert Panel on Securities Regulation.

scholarly literature and policy studies on Canadian capital markets and their regulation.

7. From 2006-2008, I was President of the Canadian Law and Economics Association and from 2004-2006, I was Vice-President of the Association.

8. I have provided independent policy advice on issues relating to capital markets regulation, the regulation of business, and corporate governance to governmental bodies, regulators and policy makers in Canada and internationally, including the Ontario Securities Commission, Industry Canada, the Canadian Senate, and the International Finance Corporation of the World Bank.

9. In 2002, I prepared a study for the Ontario Securities Commission on the costs and benefits of the Multi-Jurisdictional Disclosure System (MJDS) between Canadian securities regulators and the U.S. Securities and Exchange Commission, and the impact of the Sarbanes-Oxley Act of 2002 on this mutual recognition agreement. My study, co-authored with Professor Anindya Sen, assisted in achieving consensus among Canadian securities regulators on the importance of conforming Canadian rules with the Sarbanes-Oxley Act, by quantifying the cost savings of MJDS to Canadian companies and by highlighting that the underlying premise of MJDS – a mutual recognition system – would be threatened if Canadian rules diverged significantly from U.S. rules without good reason.

10. In 2003, I was commissioned to write one of the research studies for the Wise Persons Committee (WPC) entitled "Local and Regional Interests in the Debate on Optimal Securities Regulatory Structure". The WPC was established by the Minister of Finance of Canada in 2003 to provide an independent assessment of the securities regulatory structure which would best serve Canada's interests.

11. Attached as Exhibit "A" is a copy of my current curriculum vitae, which sets out my background and qualifications in greater detail.

12. Attached as Exhibit "B" is a list of matters for which I have provided an expert opinion on securities regulation and/or securities class actions.

13. Unless otherwise stated, I have personal knowledge of the matters set forth below.

## B. Class Proceedings in Ontario, Canada

14. Below, I summarize the principles, laws and rules for class actions under the *Class Proceedings Act, 1992* (Ontario) (the "*OCPA*")[4] and the relevant *Rules of Civil Procedure, 1990* (Ontario) (the "*OROCP*"),[5] including the due process protections that are provided for, and the adequate protection accorded to foreign class members[6] or potential class members under the class proceedings legal framework in Ontario.

### 1. Background on the Class Proceedings Act, 1992 (Ontario)

15. In 1982, the Ontario Law Reform Commission (the "*OLRC Report*") recommended legislative reform to allow class proceedings in the province of Ontario.[7] The Report noted that the objectives of such reform would include promoting judicial economy and efficiency, providing better access to the court system to plaintiffs who claim to be aggrieved by wrongs that are susceptible to being effectively addressed by class proceedings, and modifying and/or deterring the behavior of those found responsible for those wrongs.[8]

16. In 1990, the Attorney General's Advisory Committee on Class Actions Reform released a report ("*AG Report*") that also recommended class proceedings legislation to achieve the goals outlined by the OLRC discussed above in paragraph 15.[9] The Advisory Committee also prepared a draft Bill for consideration.[10]

17. The *OCPA* was enacted on January 1, 1993.[11] Ontario was the first common law province in Canada to provide for class proceedings legislation.[12]

---

[4] *Class Proceedings Act*, S.O. 1992, c. 6 [*OCPA*].
[5] *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194 [*OROCP*].
[6] To be accorded such protection, the foreign class members must meet the prerequisite that the action is appropriately grounded in jurisdiction in relation to the real and substantial connection test and the principles of order and fairness (as discussed more fully in paras. 136-145 below).
[7] Ontario Law Reform Commission, *Report on Class Actions* (Toronto: Queen's Printer, 1982), Vol. 1, at 117 [*OLRC Report*].
[8] *Ibid.* These goals are regularly invoked by Canadian courts in construing class action legislation. See *Western Canadian Shopping Centres Inc. v. Dutton*, [2001] 2 S.C.R. 534 at paras. 27-29 [*Western Canadian Shopping Centres*]; *Hollick v. Toronto (City)*, [2001] S.C.R. 158 at paras. 14-16 [*Hollick*]. See also Michael A. Eizenga *et al.*, *Class Action Law and Practice*, looseleaf 2d ed. (Markham, Ontario: LexisNexis Canada Inc., 2008) at para. 1.5.
[9] Ontario, Ministry of the Attorney General, Policy Development Division, Report of the Attorney General's Advisory Committee on Class Action Reform (Toronto: Queen's Printer, February 1990) [*AG Report*]
[10] Eizenga *et al.*, *supra* note 8 at para. 1.10.
[11] *OCPA*, *supra* note 4.
[12] *Class Proceedings Act*, R.S.B.C. 1996, c. 50. See also Eizenga *et al.*, *supra* note 8 at para 1.12.

18. The *OCPA* allows for an action to be brought in a representative capacity by one or more individuals in the proposed class who seeks to be named as the representative plaintiff on behalf of him/herself and other members of the class.[13]

19. The *OCPA* follows a fairly conventional structure that is based to a significant extent on class action legislation in the United States. As one commentator noted, Canadian class action legislation "has developed over years of experience and refinement in the United States."[14] Professor Watson wrote that "Canada has developed a vigorous class action regime" and "[t]he Canadian criteria for certification of a proceeding as a class action are relatively undemanding."[15]

20. In order for a class action to proceed, a court must approve of the class action as the appropriate mechanism for advancing the issues that are common to the class.[16] Professor Watson states that "[t]he procedures provided by the legislation in each of the three provinces [including Ontario] are structurally similar to those prescribed by Rule 23 of the U.S. Federal Rules of Civil Procedure, although in certain respects the Canadian legislation is more liberal in facilitating class actions than its American counterparts."[17]

**2. Certification**

21. After commencing a proposed class action, the plaintiffs must bring a motion to have their action certified as a class action. "The certification motion is intended to screen claims … at least in part to protect the defendant from being unjustifiably embroiled in complex and costly litigation."[18]

22. The *OCPA* instructs courts to certify a plaintiffs' class action if the following five criteria are satisfied:[19]

(a) the pleadings disclose a cause of action;
(b) there is an identifiable class of two or more persons who would be represented by the representative plaintiff;
(c) the claims or defenses of the class members raise common issues;
(d) a class proceeding would be the preferable procedure for the resolution of the common issues; and
(e) there is a representative plaintiff who,
 (i) would fairly and adequately represent the interests of the class,

---

[13] *OCPA*, *supra* note 4, s. 2(1). See Eizenga *et al.*, *supra* note 8, at para. 2.1.
[14] Ward K. Branch, *Class Actions in Canada*, looseleaf (Aurora: Canada Law Book, 2008) para. 4.10 (as of February 2009) [*Branch*].
[15] Gary D. Watson, "Class Actions: The Canadian Experience" (2001) 11 Duke Journal of Comparative & International Law 269 at 269, 273 [*Watson*].
[16] Branch, *supra* note 14 para. 4.20.
[17] Watson, *supra* note 15 at 9.
[18] *Robertson v. Thomson Corp.* [1999] O.J. No. 908 43 O.R. (3d) 389 at para. 4 (Gen. Div.).
[19] *OCPA*, *supra* note 4, s. 5(1). See Also Branch, *supra* note 14, at para. 4.20.

(ii) has produced a plan for the proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding, and
(iii) does not have, on the common issues for the class, an interest in conflict with the interests of other class members.

Each criteria is discussed below.

***2.1 The Pleadings Must Disclose a Cause of Action***

23. The first requirement for certification is that the pleadings disclose a cause of action.[20] This is a gate-keeping requirement that attempts to ensure that actions which are clearly frivolous are weeded out.[21]

24. The Supreme Court of Canada has articulated a "plain and obvious" test to determine if the class action pleadings disclose a cause of action.[22] The plain and obvious test is the same test that is used to determine if an individual claim should be dismissed on the basis that the pleading discloses no cause of action.

25. To determine if the "plain and obvious" test has been met, the court assumes that the facts in the statement of claim are true, and can be proven by the plaintiff. The potential of the defendant to present a strong defense does not act as a bar to meeting the "plain and obvious" test.

26. The "plain and obvious" threshold that the plaintiff must meet is a low one. The Supreme Court of Canada has adopted the English jurisprudence that it is low so as to avoid a plaintiff from being "driven from the judgment seat."[23] Similarly, Mr. Justice Winkler (as he then was)[24] stated that "the court should err on the side of protecting people who have right of access to the courts."[25]

***2.2 There Must be an Identifiable Class***

27. The second requirement for certification is that there should be an identifiable class.[26] The Supreme Court of Canada has stated that "[c]lass definition is critical because it identifies the individuals entitled to notice, entitled to relief (if relief is awarded), and bound by the judgment." The class definition is particularly important in Ontario, which is an opt-out jurisdiction, meaning that an individual will be considered a

---

[20] *OCPA*, *supra* note 4, s. 5(1)(a).
[21] Branch, *supra* note 14 at para 4.40. See also Eizenga *et al.*, *supra* note 8 at para. 3.9.
[22] Eizenga *et al.*, *supra* note 8 at para 3.9. See also *Western Canadian Shopping Centres*, *supra* note 8 at para. 45. See also *Hollick*, *supra* note 8 at para. 25.
[23] *Western Canada Shopping Centres*, *ibid.*
[24] Chief Justice Warren Winkler, B.A., LL.B., LL.M. was appointed Chief Justice of Ontario in June 2007, following 14 years as a trial judge of the Superior Court of Justice of Ontario.
[25] *Edwards v. Law Society of Upper Canada*, [1995] O.J. No. 2900, 36 C.P.C. (3d) 116 at para. 3 (Gen. Div.).
[26] *OCPA*, *supra* note 4, s. 5(1)(b).

member of the class if he or she meets the definition and does not take the steps necessary to opt out of the class.[27] The opt-out feature of Ontario class actions is discussed later.

28. The Supreme Court of Canada has stated that the class must be capable of clear definition at the outset of the litigation, and that the definition should state objective criteria by which members of the class can be identified. While it is not necessary that every class member be named or known, the Supreme Court of Canada has clearly stated that any particular person's claim to membership in the class must be determinable by stated, objective criteria.[28]

29. Similarly, the class definition cannot be dependent on the merits of the case, and is not always strictly restricted to those who have valid claims.[29] With respect to class definition, Canadian courts have quoted American sources with approval to expand upon the Canadian jurisprudence. In *Bywater v. Toronto Transit Commission*,[30] Mr. Justice Winkler (as he then was) quoted from the *American Manual for Complex Litigation*,[31] published by the American Judicial Institute:

> ... Definitions ... should avoid criteria that are subjective (e.g. a plaintiff's state of mind) or that depend upon the merits (e.g. persons who were discriminated against). Such definitions frustrate efforts to identify class members, contravene the policy against considering the merits of a claim in deciding whether to certify a class, and create potential problems of manageability.

30. Mr. Justice Winkler also quoted from the American text *Newberg on Class Actions*, for the following statement:[32]

> Care should be taken to define the class in objective terms capable of membership ascertainment when appropriate, without regard to the merits of the claim or the seeking of particular relief.

---

[27] *Ibid.*, s. 9.
[28] *Western Canadian Shopping Centres, supra* note 8 at para. 38. See also Eizenga *et al.*, *supra* note 8 at para. 3.31. See also *Hollick, supra* note 8 at para. 17.
[29] See *Dumoulin v. Ontario*, [2005] O.J. No 3961 at para. 13 (Sup. Ct.), supp. reasons [2006] O.J. No. 1233 (Sup. Ct.). See also *Hollick, supra* note 8 at para. 17, which states that "[w]hether a given person is a member of the class can be determined without reference to the merits of the action."
[30] *Bywater v. Toronto Transit Commission*, [1998] O.J. No. 4913, 27 C.P.C. (4th) 172 at para. 11 (Gen. Div.).
[31] *Manual for Complex Litigation*, 3d ed. (Washington, D.C.: Federal Judicial Center, 1995) at 217.
[32] Herbert Newberg & Alba Conte, *Newberg on Class Actions*, looseleaf 4th ed. (Thomson/West Publishing), ch 6 at § 6:14.

31. In requiring an identifiable class, a concern is that if a class is defined too broadly, the efficient resolution of common issues, a key rationale of class action proceedings, may be diluted.

32. The *OCPA* requires that there be an identifiable class of two or more persons that would be represented by the representative plaintiff.[33] Each party must also provide information, in affidavit form, to the court as to their best information on the number of members in the proposed class.[34] The *OCPA* requires a minimum of two members in the class, in contrast to *U.S. Federal Rule of Civil Procedure 23* ("US Federal Rule 23"), which requires that the class be "so numerous that joinder of all members is impractical."[35] Nonetheless, certified class proceedings in Canada have generally, if not always, involved large numbers of people.[36]

33. The class period chosen has an impact on the manageability of the litigation. In a recent Ontario carriage motion decision, Justice Perell was to decide which of two law firms would have carriage of a securities class action suit against Timminco Limited.[37] One of the law firms, Siskinds, chose a class period of 16 months (which included purchasers of shares before and after Timminco had made public announcements withdrawing its misrepresentations).[38] The other law firm, Kim Orr, chose a class period which was half as long (7 months) and started the class period later and ended it sooner.[39] Justice Perell stated that the substantially longer class period chosen by Siskinds creates challenges to the plaintiffs' theory of liability, as well as "such matters as class definition, commonality, and preferable procedure".[40]

34. As well, the class definition and class size also have an impact on whether the class proceeding is the preferable procedure, another requirement for successful certification, which is discussed below.[41] The Ontario Court of Appeal has also noted that there may be an interrelationship between the identifiable class and the requirement for common issues, also discussed below.[42]

### *2.3 There must be Common Issues*

35. The third requirement for certification is the existence of common issues.[43] The rationale for needing common issues in class proceedings is to allow common

---

[33] *OCPA*, *supra* note 4, s. 5(1)(b).
[34] *Ibid*, s. 5(3)
[35] *Federal Rules of Civil Procedure*, 4 U.S.C.A. § 23.
[36] Eizenga *et al.*, *supra* note 8 at paras. 3.59 and 3.63.
[37] *Sharma v. Timminco Ltd.*, [2009] O.J. No. 4511, 99 O.R. (3d) 260 (Sup. Ct.).
[38] *Ibid.* at paras. 63, 94.
[39] *Ibid.* at paras. 62, 66.
[40] *Ibid.* at paras. 93-94.
[41] *Lau v. Bayview Landmark Inc.*, [1999] O.J. No. 4060, 40 C.P.C. (4th) 301 at para. 26 (Sup. Ct.).
[42] *Cloud v. Canada (Attorney General)*, [2004] O.J. No. 4924, 73 O.R. (3d) 401 at para. 48 (C.A.) [*Cloud*].
[43] *OCPA*, *supra* note 4, s. 5 (1)(c).

concerns to be pursued in common litigation, thereby enhancing the efficiency of the litigation process, judicial economy and access to the courts.[44]

36. The *OLRC Report* stated that the test for determining whether common issues exist should not be too stringent or onerous. It further stated that the common issues requirement should be sufficient to ensure that every certified class action will provide for certain economies or provide access to the judicial system by those with small claims.[45]

37. Section 1 of the *OCPA* defines common issues as common but not necessarily identical issues of fact or issues of law.[46] The Supreme Court of Canada has stated that there must be issues of fact or law that are common to all class members, such that success for one class member means success for all on those issues.[47]

38. While issues need not be identical in order to satisfy the commonality test, the Supreme Court of Canada has stated that "class members' claims must share a substantial common ingredient to justify a class action."[48] An issue may be regarded as a substantial ingredient in the claim even if it makes up a limited aspect of the liability question and even though many individual issues may remain to be decided after its resolution.[49]

39. The Ontario Court of Appeal has described the common issues requirement as a "low bar."[50] While the statute refers to common issues in the plural form, the Ontario Court of Appeal has established that a single common issue will satisfy the requirement of commonality.[51]

40. It is expected that individual issues may remain to be resolved at the conclusion of the common issues trial.[52] Common issues need not determine the issue of liability.[53]

***2.4 A Class Action is the Preferable Procedure***

41. The fourth requirement in the *OCPA* is that a class action is the preferable procedure.[54] The *OCPA* states that a class proceeding may be certified if it "would be the preferable procedure for the resolution of the common issues."[55] Some

---

[44] Eizenga *et al., supra* note 8 at para. 3.66.
[45] *OLRC Report, supra* note 7 at 345-346.
[46] *OCPA*, *supra* note 4, s. 1.
[47] See *Western Canadian Shopping Centres, supra* note 7.
[48] *Ibid.* at para. 39.
[49] *Cloud, supra* note 42 at para. 53.
[50] *Ibid.* at para. 52. See also Eizenga *et al., supra* note 8 at para. 3.77.
[51] Eizenga *et al., supra* note 8 at para. 3.78. See also *Cloud, supra* note 42 at para. 53.
[52] *OCPA*, *supra* note 4, s. 11. See also Eizenga *et al., supra* note 8 at para. 3.73.
[53] *Endean v. Canadian Red Cross Society*, [1997] B.C.J. No. 1209, 148 D.L.R. (4th) 158 at para. 35 (Sup. Ct.); reversed on other grounds [1998] B.C.J. No. 724, 157 D.L.R. (4th) 465 (C.A.).
[54] *OCPA*, *supra* note 4, s. 5(1)(d).
[55] *Ibid.*

commentators have interpreted the case law as suggesting that certification is often granted or denied on the basis of the court's analysis of preferability.[56]

42. The preferable procedure requirement in Ontario is summarized in the following principles from *Pearson v. Inco Ltd.*:[57]

> a) The preferability requirement has two concepts at its core: first, whether the class action would be a fair, efficient and manageable method of advancing the claim; second, whether the class action would be preferable to other reasonably available means of resolving the claims of class members.
>
> b) The analysis must keep in mind the three principle advantages of class actions: judicial economy, access to justice, and behaviour modification.
>
> c) This determination requires an examination of the common issues in their context, taking into account the importance of the common issues in relation to the claim as a whole.
>
> d) The preferability requirement can be met even where there are substantial individual issues; the common issues need not predominate over the individual issues.

43. Again, the common issues trial does not need to resolve all of the matters in the litigation or all of the issues regarding liability. A resolution of the common issues through a class proceeding may be followed by hearings of individual issues in relation to liability and/or individual damage assessments.[58]

44. The Supreme Court of Canada has noted that the drafters of the legislation rejected requiring that common issues "predominate" over the individual issues, as is provided for in the American federal class action rule.[59]

45. Eizenga *et al.*, state that "on the basis of the wording of the statutes, Ontario offers the most liberal approach to class actions while the United States offers an approach which is somewhat more restrictive."[60]

46. In *Bendall v. McGhan Medical Corp.*, the first certified class proceeding in Ontario, the American class action experience was surveyed in great detail. The decision

---

[56] Eizenga *et al.*, *supra* note 8 at para. 3.100.
[57] *Pearson v. Inco Ltd.*, [2005] O.J. No. 4918, 261 D.L.R. (4th) 629 at para. 67 (C.A.) [*Pearson*].
[58] Eizenga *et al.*, *supra* note 8 at para. 3.102.
[59] *Hollick, supra* note 8 at paras. 29-30.
[60] Eizenga *et al.*, *supra* note 8 at para. 3.120.

distinguished the "predominance" requirement in US Federal Rule 23 from the Ontario regime:[61]

> While the American cases are helpful as a reflection of a 30-year history of class actions one must not lose sight of vital differences. Predominant issue is not a factor in our Act. It is critical under Federal Rule 23. The Ontario legislature had the benefit of a draft bill prepared by the Law Reform Commission after lengthy study and reflection on the American history of class actions. Ontario chose to emphasize the common issues.

47. Similar to the other requirements for certification, the preferability test is grounded in the rationales underlying class proceedings legislation, including facilitating access to the courts, maximizing judicial economy, and modifying the behavior of those who have committed wrongs that can be addressed in class proceedings.

48. Class actions provide access to justice by allowing an aggregation of individual claims which would not be economically feasible on an individual basis. Viewed in this way, the cost of litigation is a factor in determining whether a class action is a preferable procedure. Where the costs associated with an individual pursuing an action are prohibitive or pose a significant financial burden, courts are more likely to view a class action as the preferable procedure, because it will allow for the fixed cost of litigation to be spread out amongst all the members of the class.[62]

49. Judicial economy is also a factor in determining whether a class action is the preferable procedure, because the courts wish to prevent separate actions from covering the same ground and/or achieving inconsistent results.

50. The underlying rationale of modifying the behavior of those who commit wrongs can be achieved in class proceedings by subjecting wrongdoers to the possibility of a class action suit where otherwise individuals may not have been willing to litigate for small amounts of recovery. This rationale is increasingly being referred to by the courts as a persuasive rationale for class certification.[63]

51. The damages claimed by each putative class member will also be a factor in determining whether a class action is a preferable procedure. Given the rationale of providing aggrieved claimants with access to justice, a class action is more likely to

---

[61] *Bendall v. McGhan Medical Corp.*, [1993] O.J. No. 1948, 14 O.R. (3d) 734 at para. 61 (Gen. Div.) [*Bendall*].

[62] See *Nantais v. Telectronics Proprietary (Canada) Ltd.*, [1995] O.J. No. 2592, 25 O.R. (3d) 331 at para. 93 (Gen. Div.), leave to appeal to Div. Ct. refused, [1995] O.J. No. 3069, 25 O.R. (3d) 331 at para. 8 (Div. Ct.) [*Nantais*].

[63] See *Peter v. Medtronic Inc.*, [2008] O.J. No. 1916 at para. 4 (Div. Ct.). See also Eizenga *et al., supra* note 8 at para. 3.106.

be preferable and therefore certified where there are many claims for small amounts, so that individual claims would be unlikely to be pursued.[64]

52. A requirement to allocate fault among more than one defendant does not necessarily mean that the class action is not preferable.[65]

53. The preferability analysis allows the court to determine the nature and extent of alternative means to adjudicate the dispute. The *AG Report* selected the word "preferable" over "reasonable" or "superior" because "it was thought that the word 'preferable' would best draw the court into a consideration of whether or not the class proceeding is a fair, efficient and manageable method of advancing the claim. The class proceeding should be preferable in the sense of "preferable to other procedures such as joinder, test cases, consolidation and so on."[66]

54. The requirement for a plan of litigation is also relevant to the preferability requirement for certification,[67] discussed below in paragraphs 65 to 66.

55. As an added protection to plaintiffs, the *OCPA* sets out a list of factors which individually are not sufficient for refusing to certify a class proceeding. These factors include:[68]

    1. The relief claimed includes a claim for damages that would require individual assessment after determination of the common issues.
    2. The relief claimed relates to separate contracts involving different class members.
    3. Different remedies are sought for different class members.
    4. The number of class members or the identity of each class member is not known.
    5. The class includes a subclass whose members have claims or defenses that raise common issues not shared by all class members.

56. While the existence of one of these factors cannot be the sole basis for the denial of certification, the presence of two or more factors may render a class action the less preferable method for proceeding than alternative methods.[69]

---

[64] Eizenga *et al., supra* note 8 at para. 3.111.
[65] Eizenga *et al., supra* note 8 at para 3.140.
[66] *AG Report, supra* note 9 at 32.
[67] *Healey v. Lakeridge Health Corp.*, [2006] O.J. No. 4277, 38 C.P.C. (6th) 145 at para. 110 (Sup. Ct.).
[68] *OCPA*, *supra* note 4, s. 6.
[69] *Abdool v. Anaheim Management Ltd.*, [1995] O.J. No. 16, 21 O.R. (3d) 453 at para. 123 (Div. Ct.) [*Abdool*]; *Mouhteros v. DeVry Canada Inc.*, [1998] O.J. No. 2786, 41 O.R. (3d) 63 at para. 29 (Gen. Div.).

***2.5 The Representative Plaintiff must be Appropriate***

57. Fifth, the class proceedings legislation contains requirements in relation to the adequacy of the representative plaintiff. The representative plaintiff plays an important role in ensuring that class member interests are pursued with vigour.

58. The statute requires that the representative plaintiff:[70]

a. Will fairly and adequately represent the interests of the class;
b. Has produced a plan of proceeding that sets out a workable method of advancing the proceeding on behalf of the class and of notifying class members of the proceeding; and
c. Does not have, on the common issues for the class, an interest in conflict with the interests of other class members.

59. The pleading for a proposed class proceeding should contain sufficient particularity regarding the representative plaintiff's cause of action, including his/her individual facts relating to liability and damages. Particularity is not required for other class members.[71]

60. A representative plaintiff in a proposed class action must have a cause of action against each named defendant.[72] A proposed class action may therefore have several representative plaintiffs. In addition, on motion, courts have allowed additional representative plaintiffs to be added to a class action.[73]

61. In interpreting the first part of the test for the adequacy of the representative plaintiff, a putative class member whose interests differ from those of others in the class should not be the representative plaintiff. The test has also been articulated as whether the proposed representative plaintiff can "vigorously and capably prosecute the interests of the class."[74]

62. Courts do exercise some flexibility in approving the representative plaintiff. For example, in *Abdool v. Anaheim Management Ltd.*, the proposed representative plaintiff could have been viewed as a more sophisticated investor than others in the class, and therefore inappropriate as a representative plaintiff. Nonetheless, the Ontario Divisional Court confirmed Mr. Justice Montgomery of the Ontario Court (General Division)'s view that this did not preclude the proposed designee from acting as the representative plaintiff, on the basis that the representative plaintiff need not have typical experience with other plaintiffs, so long as the representative does

---

[70] *OCPA*, *supra* note 4, s. 5(1)(e).
[71] Eizenga *et al., supra* note 8 at para. 3.162. See also *Blatt Holdings Ltd. v. Traders General Insurance Co.*, [2001] O.J. No. 949 at paras. 22, 39, 42 (Sup. Ct.).
[72] *Hughes v. Sunbeam Corp. (Canada) Ltd.*, [2002] O.J. No. 3457, 61 O.R. (3d) 433 at para. 15 (C.A.).
[73] *Veley v. CGU Insurance Co. of Canada*, [2004] O.J. No. 143 at para. 13 (Sup. Ct.).
[74] *Western Canadian Shopping Centres, supra* note 8 at para. 41.

not have a conflict of interest and is someone who will fairly and adequately advance the class claims.[75]

63. The case law requires that a representative plaintiff have an adequate understanding of the legal process and the issues in litigation. A representative should have a general understanding of the class action mechanism and be able to properly instruct legal counsel.[76]

64. The adequacy of the proposed representative plaintiff's counsel is another important consideration in determining whether the representative plaintiff is adequate. Eizenga *et al.* note that "courts in the United States have made it clear that 'adequacy of counsel' is a key factor in determining whether the proposed representative plaintiff is adequate." While the Ontario class proceeding legislation does not refer to the suitability of the proposed class counsel, Canadian courts will consider, in their assessment of the ability of the proposed representative plaintiff to fairly and adequately represent the interests of the class, the competence of class counsel.[77] The rationale for the court's scrutiny of counsel that has been selected by the plaintiff is that upon certification, the court effectively imposes the selection of that counsel onto the members of the class.[78]

65. The *OCPA* requires the representative plaintiff to prepare a litigation plan of proceeding.[79] The purpose of this plan is to (i) assist the court in determining whether a class proceeding is the preferable procedure; and (ii) allow the court to determine whether the litigation itself is manageable (not just for the common issues trial, but for the entirety of the litigation.)[80]

66. The litigation plan can be modified, expanded, or "fine-tuned" as the class action progresses. The development of the plan is often a collaborative effort between the plaintiff and defendant, with the court playing a supervisory role.[81] The Ontario Court of Appeal takes a flexible approach to the litigation plan at the certification stage, viewing it as a work in progress that will undoubtedly have to be amended.[82] In some cases, the courts have permitted plaintiffs to submit revised litigation plans after finding the existing plan insufficient to meet the requirements of the *OCPA*.[83]

---

[75] *Abdool, supra* note 69 at 465. See also *A.L. v. Ontario (Minister of Community and Social Services)*, [2005] O.J. No. 1924 at para. 22 (Div. Ct.). But see *Sutherland v. Canadian Red Cross Society*, [1994] O.J. No. 315, 17 O.R. (3d) 645 at para. 38 (Gen. Div.) for a different approach to the appropriateness of a proposed representative plaintiff.
[76] *Tiboni v. Merck Frosst Canada Ltd.*, [2008] O.J. No. 2996 at para. 113 (Sup. Ct.). See also Eizenga *et al.*, *supra* note 8 at para. 3.170.
[77] *Western Canadian Shopping Centres, supra* note 8 at para. 41.
[78] *Ward-Price v. Mariners Haven Inc.*, [2004] O.J. No. 2308, 71 O.R. (3d) 664 at paras. 14-15 (Sup. Ct.).
[79] *OCPA*, *supra* note 4, s. 5(1)(e)(ii).
[80] *Carom v. Bre-X Minerals Ltd.*, [1999] O.J. No. 1662, 44 O.R. (3d) 173 at para. 99 (Sup. Ct.) [*Carom*].
[81] Eizenga *et al., supra* note 8 at para. 3.179.
[82] *Cloud, supra* note 42 at para. 95.
[83] *Ibid.*

## 3. Procedural and Statutory Safeguards in Ontario Class Proceedings

67. The *OCPA* and common law in Ontario provide parties to the litigation with several procedural safeguards to ensure that their interests are protected. The following safeguards are discussed below:

3.1 Increased Judicial Involvement
3.2 Notice
3.3 Opt Out Rights and Class Member Ability to Pursue Individual Claims
3.4 Limitation Period
3.5 Evidence at the Certification Motion
3.6 The Use of Juries
3.7 Pretrial Discovery
3.8 Evidence at Trial
3.9 Settlement, Discontinuance or Abandonment of a Class Action
3.10 Objecting to Settlement
3.11 Procedures to Allocate Recovery Among all Class Members
3.12 Remedies For Enforcement Of Judgments
3.13 Framework for Appellate Review
3.14 Contingency Fee in Ontario
3.15 Cost Regime in Ontario
3.16 Judicial Independence

### *3.1 Increased Judicial Involvement*

68. The *OCPA* requires "an active degree" of judicial involvement before the trial. This is evidenced by the following dicta:[84]

> ... the feature which most distinguishes a class proceeding from a traditional proceeding is the degree and extent of case management and supervision exercised by the court pursuant to the Act. These are to ensure that the interests of absent class members are protected and that the efficiencies central to the purpose of the Act are indeed realized. The Act is replete with provisions or "judicial tools", which enable the court to assume a pro-active and continuing role in the litigation, as it progresses to the final determination ...

69. In addition, the Supreme Court of Canada has affirmed that procedural complexities must be addressed on a case-by-case basis with a flexible and liberal approach aimed at balancing fairness and efficiency.[85]

---

[84] *Smith v. Canadian Tire Acceptance Ltd.*, [1995] O.J. No. 327, 22 O.R. (3d) 433 at para. 41 (Gen. Div.).
[85] *Western Canadian Shopping Centres*, *supra* note 8 at para. 51.

70. In Ontario, courts may make any order considered appropriate with respect to the conduct of a class action to ensure fairness and efficiency.[86]

### *3.2 Notice*

71. Notice to class members is an important component of the protections in the class proceedings framework. The purpose of the notice provisions is to maximize the potential for class members' participation, to maximize efficiency in the conduct of the litigation and to ensure fairness to absentee class members.[87]

72. The *OCPA* requires that notice be provided to class members at various stages in the course of a class action. These notices are aimed at informing them of their rights and of the steps that they must take to participate in or exclude themselves from the proceedings.

73. When certification is granted, the *OCPA* requires that class members be notified of the existence and nature of the class action and their right to opt out of it.[88] The *OCPA* specifies the content of such notice.[89] In addition, the *OCPA* also provides the court with discretion to provide class members with additional notice of developments in the class action proceeding.[90] Finally, when common issues have been decided in favour of the class, the *OCPA* requires notice to be provided to class members if their participation is required for the determination of individual issues.[91]

74. The form and contents of the notice of certification must be approved by the court.[92] This is to ensure that absent class member interests are protected. In making its notice order, the legislation provides that the court shall consider:[93]

    a. The cost of giving the notice;
    b. The nature of the relief sought;
    c. The size of the individual claims of class members;
    d. The number of class members;
    e. The place of residences of class members; and
    f. Any other relevant matter.

75. The legislation provides the court with significant discretion in determining how notice will be given. The court may order that notice be given personally, by mail, by

---

[86] *OCPA*, *supra* note 4, ss. 12-13.
[87] See Michael G. Cochrane, *Class Actions: A Guide to the Class Proceedings Act, 1992* (Aurora, Ontario: Canada Law Book,1993).
[88] *OCPA*, *supra* note 4, s. 17.
[89] *Ibid.*, s. 17(6).
[90] *Ibid.*, s. 19.
[91] *Ibid.*, s. 18.
[92] *Ibid.*, s. 20.
[93] *Ibid.*, s. 17(3).

advertisement, or publishing a leaflet, for example.[94] In addition, the court has the discretion to order different notice for different class members.[95]

76. In some cases, the names of all class members may be available to either the plaintiff or defendant, and the courts may require defendants or third parties to provide the names and last known addresses of class members, which assists in providing notice at reasonable expense.[96]

77. The legislation provides that the form and contents of notice where individual participation is required must include the following information, unless the court orders otherwise:[97]

(a) a statement that common issues have been determined in favour of the class;
(b) a statement that class members may be entitled to individual relief;
(c) a description of the steps to be taken to establish an individual claim;
(d) a statement that failure on the part of a class member to take those steps will result in the member not being entitled to assert an individual claim except with leave of the court;
(e) an address to which class members may direct inquiries about the proceeding; and
(f) any other information that the court considers appropriate

78. An Ontario court may make any order it considers appropriate as to the costs of any notice ordered,[98] including ordering a defendant to pay the cost of identifying and notifying class members.[99]

### *3.3 Opt Out Rights and Class Member Ability to Pursue Individual Claims*

79. The *OCPA* allows potential class members to opt-out from membership in the class and avoid the consequences of the proceeding.[100] Individuals who do not opt-out of a class proceeding are bound by the judgment on the common issues.

80. As discussed in paragraph 73, the notice after certification to class members will specify how class members may exercise their right to opt-out of the class and the time period within which this must be exercised.

81. The statute provides that a class member who opts out of the class proceeding is not bound by the determination of the common issues.[101]

---

[94] *Ibid.*, s. 17(4). See also Eizenga *et al., supra* note 8 at para. 5.64.
[95] *Ibid.*, s. 17(5).
[96] *Markle v. Toronto (City)*, [2004] O.J. No. 3024 at para. 6 (Sup. Ct.). See also Eizenga *et al., supra* note 8 at para. 5.66.
[97] *Ibid.*, s. 18(3).
[98] *Ibid.*, s. 22(1).
[99] *Directright Cartage Ltd. v. London Life Insurance Co.*, [2001] O.J. No. 4073 at para. 59 (Sup. Ct.).
[100] *OCPA*, *supra* note 4, s. 9.
[101] *Ibid.*, s. 27(2)(a).

### *3.4 Limitation Period*

82. Ordinarily, the basic limitation period in Ontario to bring forth a cause of action is two years from the date of discovery of injury, loss, or damage.[102]

83. The *OCPA* suspends the running of a limitation period applicable to a cause of action asserted in the class action for all class members.[103] The suspension comes into effect on the day that the proposed class action is commenced.

84. In *Smith v. Inco,*[104] the Court held that the limitation period starts to run when the majority of class members knew or ought to have known of the material facts.

### *3.5 Evidence at the Certification Motion*

85. The evidence admitted at the certification motion is governed by Rule 39 of the *OROCP*.[105] Evidence is generally provided by affidavits.[106] The parties may cross-examine on the opposing parties' affidavits filed for the certification motion, subject to the court controlling the nature and extent to the cross-examination.[107] In the absence of affidavit evidence, the plaintiff may examine a party as a witness on a pending motion.[108] The transcript of that cross-examination may then be made available at the hearing. Attendance of a person to be examined may be compelled similar to a witness at a trial.[109] The *OCPA* provides discretion and flexibility to the court to determine how the litigation should be conducted. The court can make such orders as it deems appropriate regarding the conduct of the class proceeding to allow for a fair and expeditious determination.[110]

86. Expert evidence is permitted and common at the certification stage. The court plays the role of a "gatekeeper" in respect to the admissibility of expert evidence in a certification motion as it does for trials.[111] However, the investigation and testing required to provide a basis for a preliminary opinion will be subjected to less scrutiny at the certification stage than at trial.[112]

87. It is neither necessary nor desirable for the court to weigh conflicting evidence as to the merits at the certification stage. The question at this stage is whether the suit is

---

[102] *Limitations Act*, S.O. 2002, c. 24, s. 4.
[103] *OCPA*, *supra* note 4, s. 28(1).
[104] *Smith v. Inco,* 2010 ONSC 3790 at paras. 116-119.
[105] *OROCP*, *supra* note 5, Rule 39.
[106] *Ibid.*, Rule 39.01.
[107] *Caputo v. Imperial Tobacco Ltd.*, [2003] O.J. No. 2269, 33 C.P.C. (5th) 214 at paras. 56-57 (Sup. Ct.).
[108] *OROCP*, *supra* note 5, Rule 39.03(1).
[109] *Ibid.*, Rule 39.03(5).
[110] *OCPA*, *supra* note 4, ss. 12.
[111] *Griffin v. Dell Canada Inc.*, [2009] O.J. No. 418 at para. 76 (Sup. Ct.).
[112] *Ibid.*

appropriately pursued as a class action and not whether the claim is likely to succeed, focusing on the form of the action rather than an assessment of the merits.[113]

### *3.6 The Use of Juries*

88. The *CJA* specifically prohibits the use of jury trials in the following matters:[114]

1. Injunction or mandatory order.
2. Partition or sale of real property.
3. Relief in proceedings referred to in the Schedule to section 21.8.
4. Dissolution of a partnership or taking of partnership or other accounts.
5. Foreclosure or redemption of a mortgage.
6. Sale and distribution of the proceeds of property subject to any lien or charge.
7. Execution of a trust.
8. Rectification, setting aside or cancellation of a deed or other written instrument.
9. Specific performance of a contract.
10. Declaratory relief.
11. Other equitable relief.
12. Relief against a municipality.

89. Where not prohibited, a party may serve a Jury Notice or submit a motion for a court to order that the issues of fact be tried or the damages assessed, or both, by a jury.[115] While the *CJA* provides no guidance to the manner in which judges should exercise their discretion to dispense with a jury, the Ontario Court of Appeal recently stated that:[116]

> It is settled law that the right to trial by jury in a civil case is a substantive right and should not be interfered with without just cause or cogent reasons
>
> . . .
>
> A party moving to strike a jury bears the onus of showing that there are features in the legal or factual issues to be resolved, in the evidence, or in the conduct of the trial which merit the discharge of the jury. In the end, a court must decide whether the moving party has shown that justice to the parties will be better served by the discharge of the jury.

90. While there is no statutory bar to the use of juries in class proceeding trials, they have not been employed to date. This is likely because of the constitutional guarantee of

---

[113] *2038724 Ontario Ltd. v. Quizno's Canada Restaurant Corp.*, [2009] O.J. No. 1874 at para. 74 (Div. Ct.). See also *Hollick, supra* note 8 at paras. 16, 25.
[114] *Courts of Justice Act*, R.S.O. 1990, c. C-43, s. 108(2) [*CJA*].
[115] *Ibid.*, s. 108(1)-(3).
[116] *Cowles v. Balac*, [2006] O.J. No. 4177, 83 O.R. (3d) 660 at paras. 36-37 (C.A.).

judicial independence (see paragraphs 131 to 135) and the high level of confidence the public has in judges to provide reasonable, efficient and consistent outcomes.

### *3.7 Pretrial Discovery*

91. Examination for discovery which takes place after the certification motion and before the trial is governed by Rules 30-33 of the *OROCP*.[117] Rule 30 requires the parties to disclose a list of all documents (an "Affidavit of Documents") relating to the matter at issue that are or have been in its possession, control or power.[118] When the parties deliver their Affidavit of Documents, they also generally deliver the documents. However, a party can serve another party a request to inspect listed documents, unless privilege is claimed in respect of a document.[119] In addition, the court may order disclosure of all relevant documents in the possession, control or power of a party's subsidiary or affiliated corporation or a corporation controlled, directly or indirectly, by the party.[120]

92. The *OROCP* broadly define "documents" so as to include photographs, videotape and computer-stored data and information.[121]

93. Under the *OROCP*, affidavits of documents are exchanged after the close of pleadings. The affidavit must describe documents to be produced, documents no longer in possession and documents over which privilege is claimed (and the basis for the privilege).[122] The affidavit also states that the party has never had possession, control or power over documents not disclosed.

94. There is a continuing disclosure obligation on each party to correct any omissions in the original Affidavit of Documents and to produce newly acquired non-privileged documents.[123]

95. The court may order the production of documents from non-parties where it is shown that the document is relevant and that it would be inequitable to allow the party to proceed to trial without access to the document.[124]

96. The court may make such order as is just to deal with situations where a party attempts to use at trial a relevant document that was not disclosed or produced.[125]

---

[117] *OROCP*, *supra* note 5, Rules 30-33.
[118] *Ibid.*, Rule 30.03(1).
[119] *Ibid.*, Rule 30.04(1).
[120] *Ibid.*, Rule 30.02(4).
[121] *Ibid.*, Rule 30.01(1).
[122] *Ibid.*, Rule 30.03(2).
[123] *Ibid.*, Rule 30.07.
[124] *Ibid.*, Rule 30.10.
[125] *Ibid.*, Rule 30.08(1).

97. An examination for discovery (i.e., pretrial depositions) may be taken orally or by written question and answers and a party may only be subjected to both forms of examination with leave of the court.[126]

98. Parties have the right to examine any party adverse in interest,[127] and non-parties with leave.[128]

99. Where a corporation may be examined for discovery, the examining party may examine an officer, director or employee of the corporation. This is subject to the court's discretion to order that a replacement or additional officer, director or employee be examined.[129]

100. The finding, opinions or conclusions of an expert retained by a party are discoverable subject to litigation privilege or the discoverable party undertaking not to call the expert as a witness at trial.[130]

101. Parties that are examined are under a continuous obligation to provide updates in writing to all other parties if information disclosed is incomplete or incorrect when made or subsequent to the examination for discovery.[131]

102. Discovery in a class proceeding in Ontario is conducted in the same way as it would be in an individual proceeding.[132] The general rules of court apply to the discovery of parties in class proceedings. The defendant has the right to examine for discovery the representative plaintiff, without the need to obtain leave of the court. Leave of the court must be obtained to discover other class members.[133] The court will consider the following factors in determining whether to grant leave:[134]

a. The stage of the class proceeding and the issues to be determined at that stage;
b. The presence of subclasses;
c. Whether the discovery is necessary in view of the claims or defenses of the party seeking leave;
d. The approximate monetary value of individual claims;
e. Whether discovery would result in oppression or undue annoyance, burden or expense for the class members sought to be discovered; and
f. Any other matters the court considered relevant.

---

[126] *Ibid.*, Rule 31.02(1).
[127] *Ibid.*, Rule 31.03(1).
[128] *Ibid.*, Rule 31.10(1).
[129] *Ibid.*, Rule 31.03(2).
[130] *Ibid.*, Rule 31.06(3).
[131] *Ibid.*, Rule 31.09(1)-(2).
[132] *OCPA*, *supra* note 4, s. 15(1).
[133] *Ibid.*, s. 15(2).
[134] *Ibid.*, s. 15(3).

103. The court can manage the discovery process and limit the discovery of a person or document where the time required to discover would be unreasonable, the expense unjustified, or where there would be undue prejudice or interference with the orderly progression of the action.[135]

### *3.8 Evidence at Trial*

104. Evidence at trial (common issues and individual issues) is governed by Rule 53 of the *OROCP*.[136] These rules are in addition to the common law of evidence and the Ontario *Evidence Act*.[137]

105. Affidavit evidence may be used at trial only with leave of the court.[138]

106. The rules allow the court to compel attendance at trial by issuing a summons to witness.[139]

107. Adverse parties may also be called as witness. This includes directors, officers, and employees of the adverse party.[140] Where a witness appears unwilling or unable to give responsive answers, judges have the discretion to allow leading questions.[141]

108. A party calling an expert witness must serve the other side with a copy of the expert's report and qualifications at least 90 days before trial.[142] An expert report that merely responds to the other party's expert may be served 60 days before trial.[143]

109. Under the common law in Canada, each witness called is subject to cross-examination by opposing counsel.[144] The general rule is that cross-examination is not limited to matters raised during examination-in-chief.[145] The main limitations on the scope of cross examination at trial are relevance, questions to which the answers would be inadmissible during examination-in-chief and the judge's discretion to limit questions based on their probative value being outweighed by their prejudicial effect.[146]

---

[135] *OROCP*, *supra* note 5, Rule 29.2.03(1).
[136] *Ibid.*, Rule 53.
[137] *Evidence Act*, R.S.O. 1990, c. E-23.
[138] *OROCP*, *supra* note 5, Rule 53.02.
[139] *Ibid.*, Rule 53.04(1).
[140] *Ibid.*, Rule 53.07(1).
[141] *Ibid.*, Rule 53.01(4).
[142] *Ibid.*, Rule 53.03(1).
[143] *Ibid.*, Rule 53.03(2).
[144] Steven Lubet, *Modern Trial Advocacy Canada* (National Institute for Trial Advocacy, 2000) at 80.
[145] *Ibid.*
[146] *Ibid.*

### *3.9 Settlement, Discontinuance or Abandonment of a Class Action*

110. When a class action is settled, discontinued, or abandoned, the *OCPA* requires that court approval be obtained.[147] This requirement protects the interests of absent class members and prevents collusion between a representative plaintiff and a defendant. Even prior to certification, an action commenced under the *OCPA* cannot be settled, discontinued, or abandoned without the approval of the court.[148]

111. In approving the settlement, the court determines whether the settlement is fair, reasonable and in the best interests of the class as a whole.[149] The following factors are weighed by Ontario courts when determining whether a settlement is fair and reasonable:[150]

> (a) likelihood of recovery or likelihood of success;
> (b) amount and nature of discovery, evidence or investigation;
> (c) settlement terms and conditions;
> (d) recommendation and experience of counsel;
> (e) future expense and likely duration of litigation and risk;
> (f) recommendation of neutral parties;
> (g) number of objectors and nature of objections;
> (h) the presence of good faith, arm's length bargaining and the absence of collusions; and
> (i) information conveying to the court the dynamics of and the positions taken by the parties during the negotiations.

112. In Ontario, courts may require formal notice be given to class members in advance of the settlement hearing.[151] The form and content of such notice is left to the discretion of the court.

113. While courts will not rewrite the terms of a settlement agreement, a judge may flag "areas of concern" and allow the certification motion to be brought back for reconsideration after the parties address those concerns.[152]

114. In the event a representative plaintiff wishes to no longer pursue a class proceeding, court approval must be obtained for discontinuance or abandonment of a

---

[147] *OCPA*, *supra* note 4, s. 29(1)-(2).
[148] *Ibid.*
[149] *Dabbs v. Sun Life Assurance Co. of Canada*, [1998] O.J. No. 3622 at para. 4 (C.A.) [*Dabbs – C.A.*].
[150] *Dabbs v. Sun Life Assurance Co. of Canada*, [1998] O.J. No. 1598 at para. 13 (Gen. Div.) [*Dabbs – Gen. Div.*] and [1998] O.J. No. 2811 (Gen. Div.), aff'd *ibid.*, leave to appeal to S.C.C. refused [1998] S.C.C.A. No. 372; *Parsons v. Canadian Red Cross Society*, [1999] O.J. No. 3572 at paras. 71-72 (Sup. Ct.).
[151] *OCPA*, *supra* note 4, s. 29(4).
[152] *Dabbs – Gen. Div.*, *supra* note 149 at para. 10.

class proceeding commenced under the *OCPA* or certified as a class proceedings under the *OCPA*.[153] In granting this motion, class counsel must provide sufficient evidence to establish that the motion "will not give rise to prejudice, or unfairness, to other members of the class on whose behalf the action was commenced."[154]

### *3.10 Objecting to Settlement*

115. Objectors to a proposed settlement may be granted leave to participate in the settlement approval hearing motion and put forth evidence as to why the proposed settlement is neither reasonable nor in the best interests of class members.[155]

### *3.11 Procedures to Allocate Recovery Among all Class Members*

116. The Courts are provided with broad discretion to direct the process of distribution of amounts owing to the class members.[156] Defendants may be required to make payments directly to class members. Alternatively, the court may require a third party to undertake the necessary distribution.[157] Regardless of the method of distribution selected by the court, the court must supervise the distribution.

117. The notice requirement is scrutinized carefully by Canadian courts in the context of national, cross-border and multi-national settlements. In *Parsons v. McDonald's Restaurants of Canada Ltd.*, the common defendant in both Ontario and U.S. class actions attempted to enforce the release provisions of a U.S. settlement (which appeared to release world-wide claims) in order to dismiss a class proceeding in Ontario. The settlement provided that notice to Canadian customers was to be given in Maclean's magazine and three Quebec newspapers. The Ontario court concluded on the facts of that case that it would be "substantially unjust" to find that Canadian members of the putative class had received "adequate notice of the proceedings and their rights to opt out."[158]

118. Similarly, in *Canada Post Corporation v. Lépine*, the common defendant in parallel class proceedings in Ontario and Quebec sought to have an Ontario judgment recognized in Quebec. The Supreme Court of Canada emphasized the importance of protection for the rights and interests of Quebec class members through the notice procedure and stated in this case they were inadequate because "the Ontario notice did not properly explain the impact of the judgment certifying the class proceedings on Quebec members of the national class."[159]

---

[153] *OCPA*, *supra* note 4, s. 29(1).
[154] *Karabodgan v. Regent Holidays Limited*, unreported (10 October 2002), Toronto 37641 CP.
[155] See *OCPA*, *supra* note 4, ss. 12, 14(2).
[156] *Ibid.*, s. 26.
[157] *Ibid.*, s. 26(7)-(9).
[158] *Parsons v. McDonald's Restaurants of Canada Ltd.*, [2004] O.J. No. 83 at para. 58 (Sup. Ct.).
[159] *Canada Post Corporation v. Lépine*, [2009] O.J. No. 549 at paras. 42-46.

### *3.12 Remedies For Enforcement Of Judgments*

119. Established procedures exist to enforce court orders or judgments arising out of civil proceedings in Ontario. Enforcement is carried out by a sheriff .[160] Once an Ontario court renders a judgment, the procedures to have that judgment enforced are set out in the *OROCP*. An order for payment or recovery of money can be enforced by at least four processes in Ontario[161] including: a writ of seizure and sale[162], garnishment[163], a writ of sequestration[164] and the appointment of a receiver. Each of these processes is described below.

120. A judgment creditor is entitled to the issue of a writ of seizure and sale upon filing with the registrar. This is a court order that enables a sheriff to seize the judgment debtor's assets and sell them. It is available without leave.[165] The judgment creditor must then file documents with the sheriff to obtain a form which directs the sheriff to enforce the writ.[166]

121. A judgment creditor may also enforce an order for the payment or recovery of money by garnishment of debts payable by other persons to the judgment debtor.[167] The rule contains a process whereby the creditor obtains a notice of garnishment by the registrar. [168] The registrar will then send a copy of each notice of garnishment to the sheriff of the county in which the debtor resides or, if the debtor resides outside Ontario, to the sheriff of the county in which the proceeding was commenced.[169] The creditor is then obligated to serve the order for garnishment on both the debtor and the garnishee.[170] Once the creditor has received its monies, the creditor must serve a notice of termination of garnishment on both the garnishee and the sheriff.[171]

122. If the above two remedies are ineffective[172], the judgment creditor has a third remedy, known as a Writ of Sequestration[173]. It directs a sheriff to take possession of (real and/or personal) property against the debtor and to collect any income from that property until the debtor complies with the order. This remedy is only available only when issued with leave of court on motion.[174]

---

[160] *CJA*, *supra* note 113, s. 141.
[161] *OROCP*, *supra* note 5, Rule 60.02.
[162] *Ibid.*, Rule 60.07.
[163] *Ibid.*, Rule 60.08.
[164] *Ibid.*, Rule 60.09.
[165] *Ibid.*, Rule 60.07(1).
[166] *Ibid.*, Rule 60.07(13).
[167] *Ibid.*, Rule 60.08. The enforcement of this rule falls under subsection 17. The creditor can make a motion to the court to have an order against garnishee for payment.
[168] *Ibid.*, Rule 60.08(4).
[169] *Ibid.*, Rule 60.08(6).
[170] *Ibid.*, Rule 60.08(7).
[171] *Ibid.*, Rule 60.08(20).
[172] *Ibid.*, Rule 60.09(2).
[173] *Ibid.*, Rule 60.09.
[174] *Ibid.*, Rule 60.09(4).

### *3.13 Framework for Appellate Review*

123. The *OCPA* establishes a specific framework for appeals of certification orders and of trial judgments on common and individual issues.[175] The *OROCP* and Ontario's *Courts of Justice Act, 1990* (the "*CJA*") govern the general process for appeals in Ontario. However, the Ontario Court of Appeal has held that the specific statutory rights of appeal granted in the *OCPA* take precedence over principles of general application.[176]

124. The *OCPA* provides (with respect to a plaintiffs' proposed class action) that the plaintiff has the right to appeal an order *refusing* certification (or an order decertifying a previously certified proceeding) to the Divisional Court (the intermediate appellate court in Ontario).[177] In contrast, the defendant must seek leave to appeal an order *granting* certification to the Divisional Court as provided for in the *OROCP*.[178]

125. The decisions of an experienced class action judge on a certification motion are entitled for most purposes to a high level of deference by appellate courts.[179]

126. In Ontario, a defendant may attempt to stay an ongoing action pending an appeal of the certification decision, but courts are wary of such stays on the basis that they may frustrate the goal of access to justice underlying the *OCPA*.[180]

127. A party has a right to appeal a trial judgment on the common issues in a class proceeding to the Ontario Court of Appeal (the final provincial appellate court).[181] A party also has a right to appeal an order on an aggregate assessment of damages.[182] A further and final appeal from a decision of the Ontario Court of Appeal can only be made to the Supreme Court of Canada, with leave.

### *3.14 Contingency Fee Arrangements in Ontario*

128. The *OCPA* expressly permits and regulates contingency fee agreements for class proceedings to enable plaintiffs of modest means, or with modest claims, to have full access to the justice system.[183] In addition, class counsel may indemnify a representative plaintiff against adverse cost awards. Such arrangements have been found to be acceptable for policy reasons.[184] Likewise, third party financing

---

[175] *OCPA, supra* note 4, s. 30.
[176] *Dabbs – C.A., supra* note 149 at para. 14.
[177] *OCPA, supra* note 4, s. 30(1).
[178] *Ibid.*, s. 30(2).
[179] *Pearson, supra* note 57 at para. 43. See also *Cloud, supra* note 42 at para. 39.
[180] Eizenga *et al., supra* note 8 at para. 10.4.
[181] *OCPA, supra* note 4, s. 30(3).
[182] *Ibid.*
[183] *Ibid.*, s. 33(1).
[184] *Holmes v. London Life Insurance Co.*, [2007] O.J. No. 158 at para. 2 (Sup. Ct.).

arrangements have been found not to be contrary to public policy.[185] The ability of a court to approve third party financing arrangements derives from a court's inherent jurisdiction to control its process and a court can bind a class to such an agreement even before the proceeding has been certified and thus before there is a class. [186]

### *3.15 Cost Regime in Ontario*

129. While Ontario generally follows the English rule of fee shifting, under which the party who loses pays a portion of the other party's attorney's fees, the *OCPA* adopts a modified two-way cost rule. Section 31(1) of the *OCPA* provides discretion to the court in shielding a representative plaintiff from cost liability if: (i) the proceeding is a test case, (ii) raises a novel point of law, or (iii) involves a matter of public interest.[187] In addition, under the *CJA*, courts have broad discretion to vary cost awards.[188]

130. While the courts have traditionally adopted a very liberal approach to the three factors for denying costs against plaintiffs, recent case law suggests this is changing. For instance, in *Williams v. Mutual Life Assurance Co. of Canada,*[189] the Court shielded the losing plaintiff from an adverse costs award despite the fact that none of the three factors noted above was satisfied. However, the Supreme Court of Canada in *Kerr v. Danier Leather Inc*[190] declined to shield a wealthy representative plaintiff from a substantial adverse cost award. Similarly, the Ontario Court of Appeal in *Ruffolo v. Sun Life Assurance Co. of Canada* held that the presence of one or more of the three factors may be insufficient to justify withholding costs from the successful defendant.[191] This interpretation of section 31(1) of the *OCPA* was also recently confirmed in *Fresco v. Canadian Imperial Bank of Commerce.*[192]

131. Class counsel have an obligation to advise a potential representative plaintiff of the possibility of adverse costs to enable him/her to make an informed decision on whether to act as representative plaintiff in the proposed action. If class counsel fails to do so, they can be held responsible for costs personally.[193]

---

[185] *Metzler Investment GMBH v. Gildan Activewear Inc.*, [2009] O.J. No. 3315 at para. 62 (Sup. Ct.); *Hobsbwan v. ATCO Gas and Pipelines Ltd.* (unreported, May 14, 2009, Court File No. 0101-04999, Alta. Q.B.)
[186] *Dugal v. Manulife Financial Corp.*, 2011 ONSC 1785 at paras. 12 and 16-17..
[187] *OCPA, supra* note 4, s. 31(1).
[188] *CJA, supra* note 114, s. 131.
[189] *Williams v. Mutual Life Assurance Co. of Canada*, [2001] O.J. No. 445 (Sup. Ct.).
[190] *Kerr v. Danier Leather Inc.*, [2007] 3 S.C.R. 331.
[191] *Ruffolo v. Sun Life Assurance Co. of Canada*, [2009] O.J. No. 1322 at para. 35 (C.A.).
[192] *Fresco v. Canadian Imperial Bank of Commerce*, [2010] O.J. No. 746 at paras. 9-13 (Sup. Ct.).
[193] *Attis v. Canada*, 2010 O.J. 129 (Sup. Ct.) at paras.89-90.

### *3.16 Judicial Independence*

132. The Supreme Court of Canada describes judicial independence as "the freedom to render decisions solely on the requirements of law and justice."[194] Further, "[t]he general test for the presence or absence of independence consists in asking whether a reasonable person who is fully informed of all the circumstances would consider whether that a particular court enjoyed the necessary independence status."[195] Thus judicial independence includes the need for actual independence and also conditions required to give rise to the perception of independence.

133. The Supreme Court of Canada's *Provincial Judges Reference*[196] is the leading opinion on the independence and impartiality of judges. In this case the court established judicial independence as a constitutional principle. There are three components of judicial independence: security of tenure, financial security and administrative independence.[197]

134. The principle of security of tenure guarantees that judges can only be removed for failing to perform judicial duties, not for political reasons.[198]

135. The second component of judicial independence is the need for financial security. The *Provincial Judges Reference* established that independent compensation commissions are required to help set salaries free of political manipulation.[199] This ensures that the judiciary does not negotiate remunerations directly with the executive or legislative branches of government.[200]

136. The third component of judicial independence calls for administrative independence, that is, the court system must have control over administrative decisions that bear directly and immediately on the exercise of judicial functions.[201] This includes the assignment of judges, sitting of the court, and court lists.[202]

## <u>4. Certification of a Global Class including Canadian and Foreign Plaintiffs</u>

### *4.1 Ontario Court's Inherent Power to Certify a Global Class Action*

137. Where there is a real and substantial connection and the principles of order and fairness have been met,[203] the Ontario Superior Court of Justice has the inherent

---

[194] *British Columbia v. Imperial Tobacco Canada Ltd.*, [2005] 2 S.C.R. 473 at para. 45.
[195] *Mackin v. New Brunswick (Minister of Finance)*, [2002] 1 S.C.R. 405 at para. 38 [*Mackin*].
[196] *The Provincial Judges Reference*, [1997] 3 S.C.R. 3 [*The Provincial Judges Reference*].
[197] *Ibid.* at para. 118.
[198] *Mackin, supra* note 195 at paras. 42-43.
[199] *The Provincial Judges Reference, supra* note 193 at para. 166.
[200] *The Provincial Judges Reference, supra* note 193 at para. 170.
[201] *The Provincial Judges Reference, supra* note 193 at para. 117.
[202] *Ibid.*
[203] See paras. 137-149 below.

power and jurisdiction to certify a global class that includes potential class members resident both in Canada and outside of Canada (e.g., Canadian shareholders who purchased securities on the TSX and foreign shareholders who purchased securities on a foreign exchange).

138. The power and jurisdiction of the Superior Court of Justice is set out generally in the *CJA* as follows:[204]

> The Superior Court of Justice has all the jurisdiction, power and authority historically exercised by courts of common law and equity in England and Ontario.

139. Ontario courts have extended their jurisdiction in civil matters, including class proceedings, across provincial borders.[205] In fact, Ontario courts are more accepting of an expansive approach to jurisdiction where there is a "real and substantial connection" and "a commonality of interest between non-resident class members and those who are resident in the forum and whose causes of action have sufficiently real and substantial connections to it to ground jurisdiction over their claims."[206]

140. National class actions have been certified in several Ontario cases.[207] In *Nantais v. Telectronics Proprietary (Canada) Ltd.*, the class action was certified because of the "modern need to deal nationally with problems". Choice of law problems and interprovincial sovereignty were addressed and overcome in that case.[208]

141. Mr. Justice Winkler (as he was then) in *Carom v. Bre-X Minerals Ltd.* provided a review of the legal basis for certifying non-resident classes on the basis that when the principles enunciated in *Morguard Investments Ltd. v. De Savoye*[209] are applied to the *OCPA*, the certification of the non-resident class can be permitted.[210] In *Carom,* the defendants attempted to use the fact that the *OCPA* makes no mention of non-resident plaintiffs as a basis for arguing that it cannot apply to non-Ontario residents. In rejecting this argument, Mr. Justice Winkler (as he was then) stated, "[t]o the contrary, the absence of a provision limiting its application to Ontario residents permits the inclusion of any person with a right of action, regardless of the location of his or her residence, in the class, subject to [constitutional considerations] ..."[211] Extra-territorial application of legislation is permitted where the enacting province has a "real and substantial connection with the subject matter of the action and it accords with order and fairness to assume jurisdiction."[212]

---

[204] *CJA, supra* note 114, s. 11(2).
[205] *Baxter v. Canada (Attorney General)*, [2005] O.J. No. 2165 (Sup. Ct.).
[206] *McCutcheon v. The Cash Store Inc.*, [2006] O.J. No. 1860 at paras. 49-50 (Sup. Ct.).
[207] *Nantais, supra* note 62; *Carom, supra* note 80; *Wilson v. Servier Canada Inc. et al.*, [2000] O.J. No. 3392, 50 O.R. (3d) 219 (Sup. Ct.).
[208] Eizenga *et al., supra* note 8 at para. 4.28.
[209] *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077.
[210] Eizenga *et al., supra* note 8 at para. 4.30.
[211] *Carom v. Bre-X Minerals Ltd.*, [1999] O.J. No. 281 at para. 20 (Gen. Div.).
[212] *Ibid.* at para. 33.

142. "[W]ithout any detailed analysis of jurisdictional issues", Ontario courts have certified class actions comprised of international class members.[213] In addition, the concept of inter-jurisdictional class actions has been accepted implicitly by the Ontario Court of Appeal in the context of the recognition and enforcement of a foreign judgment.[214] In fact, there is jurisprudence from the Supreme Court of Canada authorizing an Alberta class proceeding comprising foreign investors.[215]

143. The court certified an international class for settlement purposes in *Mondor v. Fisherman*.[216] The plaintiffs brought a class action on behalf of Canadian investors who purchased/acquired shares in YBM in the secondary market which resulted in a loss. In fact, the motion to certify the class action was based on two class proceedings, both under the *OCPA* on behalf of all persons in Canada who purchased the shares. YBM was an Alberta corporation with a head office in Newtown, Pennsylvania. There was a class action commenced by American shareholders in the United States District Court,[217] which had been stayed upon motion by the defendants in that action on the basis of comity. In *Mondor,* Mr. Justice Cumming stated:

> The proposed representative plaintiffs in the two Canadian class actions bring a motion … to approve the settlement … The agreement to settle includes a disposition of other YBM-related litigation in Ontario and the United States … The jurisdiction of this court is not contested. Indeed, Judge Clarence C. Newcomer in *Paraschos, supra,* held that because Canada has greater interest than the United States in the subject matter, the American action should be dismissed, "in deference to Canadian law and the Canadian courts on the basis of international comity."[218]

[213] *Silver v. Imax Corp.*, [2009] O.J. No. 5585 at para. 124 (Sup. Ct.) (Leave to appeal to Div. Ct. refused 2011 ONSC 1035. Imax's avenues for appeal of the certification ruling have been exhausted and the case now proceeds to trial.)[*Silver v. Imax – Certification*]. See also *Bendall, supra* note 61 (breast implant case – no territorial limitation on class members); *Robertson v. Thomson Corp., supra* note 18 (class comprised of creators and/or copyright in and to certain works published in Canadian print media); *Brimner v. Via Rail Canada Inc.*, [2002] O.J. No. 2747, 50 O.R. (3d) 114 (Sup. Ct.) (class comprised of all persons travelling on a Windsor-Toronto train). See also Charles M. Wright & Andrea DeKay, "Issues in Cross Border Class Action Litigation" (Toronto: The Second Annual Class Action Symposium, Osgoode Hall Continuing Legal Education, September 2002).

[214] *Currie v. McDonald's Restaurants of Canada Ltd.*, [2005] O.J. No. 506 at para. 15 (C.A.).

[215] See *Western Canadian Shopping Centres, supra* note 8.

[216] *Mondor v. Fisherman*, [2002] O.J. No. 1855 (Sup. Ct.) [*Mondor*].

[217] *Paraschos v. YBM Magnex International Inc.* (2000), 130 F.Supp.2d 642 (U.S. Dist. Ct. E.D. Penn.) [*Paraschos*].

[218] *Mondor, supra* note 216, [2002] O.J. No. 1855 at paras. 11-12 (Sup. Ct.).

### *4.2 Certifying an Ontario Class Action with U.S. Investors*

144. There are two recent conflicting decisions in Ontario on the issue of whether U.S. investors who purchased their shares in the U.S. should be certified as members in an Ontario class action.

145. The Court i*n McKenna v. Gammon Gold Inc.* considered and refused to extend a class action to include investors who purchased securities outside of Canada."[219] The Court use*d Van Breda v. Village Resorts Ltd.* as a foundation for its decision and stated that order and fairness is an analytical tool that is linked to the real and substantial connection test.[220]

146. In contrast, in *Silver v. Imax - Certification*, the Court certified a global class action in Ontario including both Canadian and U.S. investors who purchased shares on the TSX and NASDAQ.[223] The Court noted that the claims of non-resident class members may be subject to different laws,[224] but held that conflict of laws issues need not be resolved at the certification stage and the appropriate approach is to "wait and see" how they develop.[225]

### *4.3 U.S. Law May Apply to U.S. Investors*

147. The court in the Canadian Action may apply U.S. law to the claims of U.S. investors and the Court in *Silver v. Imax – Certification* held that such differences in law can be dealt with by adjusting the common issues or recognizing subclasses.[226]

### *4.4 Procedural Mechanisms Available to U.S. Investors*

148. The U.S. members of the class in the Canadian Action have available to them procedural mechanisms to raise concerns they may have regarding the proceedings. The OCPA allows a class member to bring a motion before the court regarding the conduct of the class proceeding.[227] In addition, the court, to ensure the fair and adequate representation of the interests of the class or any subclass, may, at any time, allow one or more class members to participate in the proceedings.[228]

## C. SUBSTANTIVE SECURITIES LAWS IN ONTARIO, CANADA

149. The plaintiffs in the Canadian Action ("Canadian Plaintiffs") allege a number of securities claims against IMAX and some individual defendants based principally on

[219] *McKenna v. Gammon Gold Inc.*, [2010] O.J. No. 1057 at para.116 (Sup. Ct.) [*Gammon Gold*].
[220] *Ibid.* at para. 93. See also *Van Breda v. Village Resorts Ltd.*, [2010] O.J. No. 402 at para. 98 (C.A.).
[223] *Silver v. Imax – Certification*, *supra* note 213.
[224] *Ibid.* at para. 164.
[225] *Ibid.*
[226] *Ibid.*
[227] *OCPA*, *supra* note 4, s. 12.
[228] *Ibid*, s. 14(1).

"the statement explicitly and/or implicitly contained in the February [17, 2006] Press Release and expressly repeated in the Form 10-K and Annual Report [for the fiscal year ended December 31, 2005], that IMAX's revenue for the 2005 fiscal year were prepared and reported in accordance with GAAP and that such revenues met or exceeded the earnings guidance previously issued" (the "Representation").[231] They allege that the Representation "was materially false and/or materially misleading when made."[232]

150. The Canadian Plaintiffs assert both statutory and common law causes of action. This section addresses the substantive Canadian securities laws, with specific emphasis on the claims asserted by the plaintiffs in the Canadian Action.[233]

**<u>1. Statutory Scheme</u>**

***1.1 Background***

151. The Ontario *Securities Act, 1990* (the "*OSA*")[234] states that the purposes of securities regulation in Canada include: ensuring investor protection, promoting efficient capital markets and maintaining public confidence in the capital markets.[235] Full, fair and complete disclosure is the cornerstone of securities regulation in Canada.

152. The *OSA*, as amended, contains a statutory regime for civil liability for continuous disclosure violations. These provisions provide for liability against a range of defendants for breaches of the obligations set out below.

153. Investors have a right of action against a range of potential defendants when they purchase (or sell) securities from third parties in the secondary market in the event of an uncorrected misrepresentation made by or on behalf of a responsible issuer in its disclosure documents or in public oral statements; or a responsible issuer's failure to make timely disclosure of a material change.

154. In contrast to the common law requirements for a cause of action based on negligent misrepresentations, the statutory civil liability provisions expressly state that the investor need not prove reliance on the alleged misrepresentations.[236]

[231] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim para. 1(y).
[232] *Ibid.* at paras. 25, 40.
[233] Feb. 27, 2007 Notice of Motion at para. 1(h).
[234] *Securities Act*, R.S.O. 1990, c. S-5 [*OSA*].
[235] *Ibid.*, s.1.1.
[236] *Ibid.*, s. 138.3(1); Stikeman Elliott LLP, *Litigation Unleashed A Guide to Ontario's Secondary Market Liability Regime* (Toronto: 2005) at 3-4 [*Securities Litigation Unleashed*].

### *1.2 Leave of the Court*

155. A potential plaintiff can commence a proceeding under Part 23.1 of the *OSA* only with leave of the court. The court will grant leave if it is satisfied that: the action is being brought in good faith and there is a reasonable possibility that the proposed causes of action will be resolved in favour of the plaintiff.[237]

156. A motion for leave of the court to initiate the statutory secondary market civil liability action is independent and separate from a plaintiff's motion for class certification. However, there is nothing prohibiting both the motion for leave and the certification motion from being heard at the same time.

157. The first Canadian decision on the leave requirement under s. 138.8 of the *OSA* sets a relatively low threshold.[238] In *Silver v. Imax – s. 138*, Justice van Rensburg granted leave to pursue a statutory misrepresentation claim and issued a companion decision, *Silver v. Imax – Certification*, to certify that proceeding as a global class action.[239]

158. The Court in *Silver v. Imax – s. 138* held that good faith must be established by the plaintiffs on the balance of probabilities.[240] The Court also held that the words "reasonable possibility" must be interpreted in the ordinary and grammatical sense that the legislature has given them.[241] That is, "possible … does not have to be more likely than not to occur, and may in fact be unlikely or improbable."[242] In addition, the word "reasonable" denotes that there must be more than a *de minimis* possibility of success at trial.[243]

159. The Court in *Silver v. Imax – s. 138* held that the Canadian Plaintiffs met the test for leave against defendants IMAX, Gelfond, Wechsler, Joyce and proposed defendants Braun, Copland, Girvan, Leebron and Gamble. The motion for leave with respect to proposed defendants Utay and Fuchs was dismissed as it could not be held that the plaintiffs had a reasonable possibility of success in claims against these individuals.[244]

160. The *OSA* leave requirement requires affidavit evidence from the plaintiffs and from each defendant regarding the material facts they will rely on at the motionso that the judge can engage in a preliminary analysis of the merits of the case. A defendant

---

[237] *OSA*, *ibid.*, s. 138.8(1).
[238] *Silver v. Imax Corp.*, [2009] O.J. No. 5573 at para. 25 (Sup. Ct.) [*Silver v Imax – s. 138*], leave to appeal to Div. Ct. refused 2011 ONSC 1035.
[239] *Ibid.*; *Silver v. Imax – Certification*, *supra* note 213.
[240] *Silver v. Imax – s. 138*, *supra* note 238,. at para. 295.
[241] *Ibid.* at para. 319.
[242] *Ibid.* at para. 320.
[243] *Ibid.* at para. 324.
[244] *Ibid.* at paras. 24, 426.

opposing a plaintiff's leave motion may do so without filing any material.[245] The court can award costs against an unsuccessful plaintiff. In addition, the court must approve any settlement or other resolution of an action under these provisions.[246]

***1.3 Liability for Documentary Misrepresentation***

161. The requirements for attaching liability to the range of defendants under the statutory scheme vary depending on whether the misrepresentation is a misrepresentation in a document or a public oral misrepresentation. This affidavit focuses on documentary misrepresentations because that is the sole basis for the Canadian Plaintiffs' allegations.[247]

162. The term document is defined extremely broadly in the statute to not only include any written communication, including electronic communications, that is required to be filed (or is voluntarily filed) with the Ontario Securities Commission ("OSC"), a government or government agency under corporate or securities law, or a stock exchange or similar marketplace, but also any other written communication which could reasonably be expected to affect the market price or value of the security of the issuer.[248] The latter phrase could encompass press releases, material on websites and marketing materials.

163. A core document includes a document filed with the securities regulator as required by securities laws, including a prospectus, a take-over bid circular, an issuer bid circular, a directors' circular, a rights offering circular, management's discussion and analysis, an annual information form, an information or proxy circular, annual financial statements, interim financial statements and most material change reports.[249]

164. In relation to core documents, documentary misrepresentation takes place when a responsible issuer,[250] an influential person,[251] or their agent releases a document which contains a misrepresentation.

165. With regards to non-core documents, documentary misrepresentation is actionable when a person or company knew, at the time that the document was released, that the document contained the misrepresentation, deliberately avoided acquiring knowledge that the document contained the misrepresentation, or was guilty of gross misconduct

---

[245] *Ainslie v. CV Technologies Inc.*, [2009] O.J. No. 730 at para. 10 (Sup. Ct.). See also *Dobbie v. Arctic Glacier Income Fund et al*, 2011 ONSC 25 at paras 95-97.
[246] *OSA*, *supra* note 234, s. 138.10.
[247] See Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at para. 4 ("The Representation and such misstatements were made in, among other documents, the Annual Report, the Form 10-K, the February Press Release and the two IMAX press releases dated March 9, 2006.").
[248] *OSA*, *supra* note 234, s. 138.1.
[249] Securities Litigation Unleashed, *supra* note 236 at 10.
[250] See definition of "responsible issuer" in *OSA*, *supra* note 234, s. 138.1.
[251] See definition of "influential person" in *ibid.*, s. 138.1.

in connection with the release of the document that contained the misrepresentation.[252]

166. Anyone who buys or sells an issuer's securities between the release of the document and the public correction of the misrepresentation has a cause of action. This cause of action is available even if the misrepresentation did not influence the investor's decision to buy or sell as the case may be.[253] As such, an investor need not prove reliance.

167. Who the investor can sue, that is, the potential class of defendants depends on *who* released the document containing the misrepresentation.

168. Where the document was released by the responsible issuer or its agent, the investor can sue the responsible issuer, all of its directors at the time of the release, and any officers who authorized, permitted or acquiesced in the release. The investor can also sue each influential person and each director or officer of that influential person who knowingly influenced the responsible issuer or its agent to release the document or knowingly influenced a director/officer of the responsible issuer to authorize, permit or acquiesce in the release of the document.

*1.3.1 Elements required to Establish Liability*

169. An investor must establish several elements to establish liability, depending on the type of potential defendant and the nature of the claim.

*1.3.1.1 Actions against Responsible Issuers*

170. The Canadian Plaintiffs seek to hold IMAX liable as the responsible issuer for releasing "core documents" that contained the Representation.[254]

171. If a responsible issuer makes a misrepresentation in a core document or fails to make timely disclosure of a material change, investors who acquired or disposed of securities during the relevant period have a right of action against the responsible issuer, subject to available statutory defenses.[255]

*1.3.1.2 Actions against Directors*

172. In addition, the Canadian plaintiffs seek to hold a number of directors liable, including two of the Individual Defendants, Bradley Wechsler and Richard Gelfond.[256]

[252] *Ibid.*, s. 138.4(1).
[253] Securities Litigation Unleashed, *supra* note 236 at 6.
[254] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at paras. 77-78.
[255] *OSA*, *supra* note 234, s. 138.3(1)(a). For each of the actions listed in 1.3.8.1-1.3.8.4, the relevant period is the time between when the document was released and when the misrepresentation contained in the document was publicly corrected.
[256] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at para. 79.

173. If the document containing the misrepresentation was released by the responsible issuer, then investors who acquired or disposed of securities during the relevant period have a right of action against the directors of the responsible issuer at the time that the core document was released, subject to available statutory defenses.[257]

174. If the document containing the misrepresentation was released by an influential person, then investors who acquired or disposed of securities during the relevant period have a right of action against the directors of the responsible issuer who authorized, permitted or acquiesced in the release of the core document, subject to available statutory defenses.[258]

*1.3.1.3 Actions against Officers*

175. The Canadian Plaintiffs also allege that all of the Individual Defendants (defined as Gelfond, Wechsler, and Francis Joyce) and Kathryn Gamble are officers that are liable for the actionable core documents since they each "authorized, permitted and/or acquiesced in the release of those documents" containing the Representation,[259] and that each signed the Form 10-K.[260] They also allege that each of the Individual Defendants either acted knowingly, "deliberately avoided acquiring knowledge," or were "guilty of gross misconduct" in connection with the alleged misrepresentations.[261]

176. If the document containing the misrepresentation was released by the responsible issuer, then investors who acquired or disposed of securities during the relevant period have a right of action against the officers of the responsible issuer who authorized, permitted or acquiesced in the release of the document, subject to available statutory defenses.[262]

177. If the document containing the misrepresentation was released by an influential person, then investors who acquired or disposed of securities during the relevant period have a right of action against the officers of the responsible issuer who authorized, permitted or acquiesced in the release of the document, subject to available statutory defenses.[263]

*1.3.1.4 Actions against Experts*

178. If the document containing the misrepresentation was released by the responsible issuer, then investors who acquired or disposed of securities during the relevant period have a right of action against an expert where: (i) the misrepresentation is also

[257] *OSA*, *supra* note 234, s. 138.3(1)(b).
[258] *Ibid.*, s. 138.3(1).
[259] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at para. 80. See also id. at paras. 24, 28, 39, 43.
[260] *Ibid.* at para. 29.
[261] *Ibid.* at para. 80.
[262] *OSA*, *supra* note 234, s. 138.3(1).
[263] *Ibid.*, s. 138.3(1).

contained in a report, statement or opinion made by the expert, (ii) the document includes, summarizes or quotes from the report, statement or opinion of the expert, and (iii) if the document was released by a person or company other than the expert, the expert consented in writing to the use of the report, statement or opinion in the document, subject to available statutory defenses.[264]

179. The legislation defines an expert as "a person or company whose profession gives authority to a statement made in a professional capacity by the person or company including, without limitation, an accountant, actuary, appraiser, auditor, engineer, financial analyst, geologist or lawyer, but not including an entity that is an approved rating organization for the purposes of National Instrument 44-101 of the Canadian Securities Administrators.[265]

*1.3.2 Defenses*

180. The statutory framework also provides for a number of defenses that may limit liability or limit damages in some contexts. The liability defenses include:[266]

a) a reasonable investigation defense,
b) a defense regarding properly qualified forward-looking information,
c) a defense that the plaintiff knew of the material change or misrepresentation,
d) a defense that the material change was confidentially disclosed to the OSC;
e) a defense that reasonable reliance was placed on an expert;
f) a defense that corrective action was taken;
g) a defense that there was reasonable reliance on representations contained in a third party's public disclosure filings.

181. IMAX and the Individual Defendants (and the other proposed defendants) have advanced two of the above statutory defenses to defeat the reasonable possibility criterion at the leave motion: (a) the reasonable investigation defense; and (b) the defense that reasonable reliance was placed on an expert.[267]

182. The reasonable investigation defense requires the defendants to prove that it conducted (or caused to be conducted) a reasonable investigation and that it had no reasonable grounds to believe that the document contained the misrepresentation.[268] It thus places the burden of proof on the defendants. Courts determine the reasonableness of an investigation based on a number of factors set out in the *OSA*. These factors include:[269]

a) the nature of the responsible issuer;

[264] *Ibid.*, s. 138.3(1).
[265] *Ibid.*, s. 138.1.
[266] Securities Litigation Unleashed, *supra* note 236 at 4.
[267] Dec. 15, 2008 Factum of the Defendants and the Proposed Defendants.
[268] *OSA*, *supra* note 234, s. 138.4(6).
[269] *Ibid.*, s. 138.4(7).

b) the knowledge, experience and function of the person or company;
c) the office held, if the person was an officer;
d) the presence or absence of another relationship with the responsible issuer, if the person was a director;
e) the existence, if any, and the nature of any system designed to ensure that the responsible issuer meets its continuous disclosure obligations;
f) the reasonableness of reliance by the person or company on the responsible issuer's disclosure compliance system and on the responsible issuer's officers, employees and others whose duties would in the ordinary course have given them knowledge of the relevant facts;
g) the period within which disclosure was required to be made under the applicable law;
h) in respect of a report, statement or opinion of an expert, any professional standards applicable to the expert;
i) the extent to which the person or company knew, or should reasonably have known, the content and medium of dissemination of the document or public oral statement;
j) in the case of a misrepresentation, the role and responsibility of the person or company in the preparation and release of the document, in the making of the public oral statement containing the misrepresentation or in the ascertaining of the facts contained in that document or public oral statement; and
k) in the case of a failure to make timely disclosure, the role and responsibility of the person or company involved in a decision not to disclose the material change.

183. In *Silver v. Imax – s. 138*, the Court indicated that a defendant resisting a leave motion on the basis of a reasonable investigation defense must produce evidence in support of such a defense that would foreclose the plaintiff's reasonable possibility of success at trial.[270]

184. The Court also concluded that the common law business judgement rule does not apply to the reasonable investigation defense in relation to the continuous disclosure obligations under the *OSA*.[271]

[270] *Silver v. Imax – s. 138, supra* note 238 at para. 333.
[271] *Ibid.* at paras. 370-376; *Kerr v. Danier Leather Inc., supra* note 190 at para. 58.

185. The other defense asserted by the responding parties in the leave motion was reliance on a report, statement or opinion made by an expert [PwC].[272] The defense is not available to the expert on whom reliance was placed. This defense is not available for defendants: who knew or had reasonable grounds to believe that there was a misrepresentation in the statement made on the authority of the expert; if the disclosure did not "fairly represent" the expert's report, statement or opinion; if the information was used without the written consent of the expert; or if the misrepresentation did not include, summarize or quote from an expert's report, statement or opinion.[273]

*1.3.3 Damages*

186. The Canadian Plaintiffs seek "damages calculated in accordance with § 138.5 of the Securities Act" against the issuer, its officers and its directors.[274]

187. The statute provides a formula for calculating damages that an investor can receive under the statutory scheme. The statute also provides for proportionate liability for defendants in certain instances and in other instances, requires the defendant to pay the full amount to the investor. Finally, a cap on damages is provided for the issuer, and also for some classes of other defendants in certain circumstances. Each of these issues is commented on below.

188. The statute sets out a formula for investors who paid too much upon acquisition and as well as another formula for investors who received too little upon sale during the period of an uncorrected misrepresentation or failure to disclose a material change.[275] Damages are based on the investor's actual loss or, alternatively, an objective test that has been set out in the statute. For example, damages in the context of an acquiring investor paying too much are determined by reference to the investor's actual loss based on the investor's purchase price less the actual disposition price. The more objective test in the statute would take the investor's purchase price less a benchmark price which the statute sets as the trading price during the ten day trading period immediately following the correction of the misrepresentation or failure to disclose a material change.

189. The statute generally provides for proportionate liability (as opposed to joint and several liability) such that each defendant is responsible for paying only that portion or percentage of the plaintiff's aggregate damages for which the court finds the defendant responsible.[276] However, any defendant (other than the responsible issuer) who knowingly authorized, permitted or acquiesced in the making of a misrepresentation is liable to pay the whole amount of damages to the plaintiff and

---

[272] *OSA*, *supra* note 234, s. 138.4(11).
[273] *Ibid.*; Securities Litigation Unleashed, *supra* note 236 at 16.
[274] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at paras. 2(f)-(h), 82.
[275] *OSA*, *supra* note 234, s. 138.5.
[276] *Ibid.*, s. 138.6(1).

such defendants are jointly and severally liable for the whole amount owing to the plaintiff.[277]

190. The total extent of damages that can be recovered will depend on whether knowledge on the part of the defendant(s) can be established. Where there is no knowledge on the part of the defendant, the liability caps are as follows:[278]

a) Responsible issuer or influential person (organization) – greater of $1 million and 5% of their market capitalization
b) Directors and officers of responsible issuers and influential persons (individuals) – greater of $25,000 and 50% of prior 12 months compensation from the relevant party
c) Directors and officers of an influential person – greater of $25,000 and 50% of prior 12 months compensation received from influential person
d) Persons who made public oral statements as agents that attracted liability – greater of $25,000 or 50% of the prior 12 months compensation
e) Experts – greater of $1,000,000 and prior 12 months revenues received from issuer.

191. Where the investor can establish knowledge of the misrepresentation or the failure to make timely disclosure of a material change by a defendant (other than the responsible issuer), there are no caps on recovery by the investor.[279]

## 2. Common Law

192. The causes of action and remedies available to investors under the Ontario Securities Act are *in addition* to remedies available under the common law.[280] The statutory provisions discussed above also do not prevent an investor from using any other basis that might be available under the common law or any other statutory scheme, such as the Canadian oppression remedy available under corporate law statutes.[281]

193. The Canadian Plaintiffs also assert common law causes of action sounding in "conspiracy; [and] negligent and reckless misrepresentation."[282]

---

[277] *Ibid.*, s. 138.6(2)-(3).
[278] See definition of "liability limit" in *ibid.*, s. 138.1.
[279] *Ibid.*, s. 138.7(2).
[280] *Ibid.*, s. 138.13: The right of action for damages and the defenses to an action under section 138.3 are in addition to, and without derogation from, any other rights or defenses the plaintiff or defendant may have in an action brought otherwise than under this Part.
[281] See *BCE Inc. v. 1976 Debentureholders*, [2008] 3 S.C.R. 560; *Peoples Department Stores Inc. v. Wise*, [2004] 3 S.C.R. 461, 244 D.L.R. (4th) 564.
[282] Feb. 27, 2007 Notice of Motion at para. 1(h).

194. There is no requirement to obtain the leave of the court to issue an action in the common law torts of negligence, conspiracy, negligent and reckless misrepresentation.

*2.1 Conspiracy*

195. The Canadian Plaintiffs allege that IMAX and the Individual Defendants "knowingly and intentionally" engaged in a conspiracy in which they, among other things, "wrongfully, unlawfully, maliciously and lacking bona fides, agreed together ... [to] overstate revenues and net earnings."[283]

196. The Supreme Court of Canada has affirmed two possible bases on which a claim on the tort of conspiracy may be advanced:[284]

> (1) whether the means used by the defendants are lawful or unlawful, the predominant purpose of the defendants' conduct is to cause injury to the plaintiff; or,
>
> (2) where the conduct of the defendants is unlawful, the conduct is directed towards the plaintiff (alone or together with others), and the defendants should know in the circumstances that injury to the plaintiff is likely to and does result.

197. In addition, the Ontario Court of Appeal has detailed the requirements of a proper plea of the tort of conspiracy:[285]

> The statement of claim should describe who the several parties are and their relationship with each other. It should allege the agreement between the defendants to conspire, and state precisely what the purpose or what were the objects of the alleged conspiracy, and it must then proceed to set forth, with clarity and precision, the overt acts which are alleged to have been done by each of the alleged conspirators in pursuance and in furtherance of the conspiracy; and lastly, it must allege the injury and damage occasioned to the plaintiff thereby.

---

[283] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at paras. 52-56.

[284] *Canada Cement LaFarge Ltd. v. British Columbia Lightweight Aggregate Ltd.*, [1983] 1 S.C.R. 452, 145 D.L.R. (3d) 385 at 471-72.

[285] *Normart Management Ltd. v. West Hill Redevelopment Co.*, [1998] O.J. No. 391, 37 O.R. (3d) 97 at para. 21 (C.A.).

### *2.2 Negligent Misrepresentation*

198. The Canadian Plaintiffs allege that IMAX and the Individual Defendants each breached their duty of care to prospective investors in the secondary market because, among other things, "they knew or reasonably ought to have known that the documents contained the Representation which was false," "they failed to maintain appropriate internal policies, controls and procedures to ensure that the financial statements adequately and fairly presented the financial position of IMAX," and "they failed to comply with the principles of GAAP."[286]

199. The five elements of the tort of negligent misrepresentation were laid out in the leading Supreme Court of Canada case *Queen v. Cognos Inc.* as follows:[287]

(1) the existence of a duty of care based on a special relationship between the representor and the representee;
(2) that the representation in question was untrue, inaccurate or misleading;
(3) the representor must have acted negligently in making the misrepresentation;
(4) the representee must have relied, in a reasonable manner, on the negligent misrepresentation; and
(5) the reliance must have been detrimental to the representee in the sense that damages resulted:

200. The two part test in *Anns v. Merton London Borough Council*, is used to establish a duty of care in the context of negligence claims, including negligent misrepresentation.[288] The first branch of the test determines whether a *prima facie* duty of care is owed and the second branch considers whether that duty is negated for policy reasons.[289]

201. In *Hercules Management Ltd. v. Ernst & Young*, the Supreme Court confirmed that actual reliance was a requirement for the tort of negligent misrepresentation in Canada.[290] Ontario has rejected the American "fraud on the market" theory as a means of meeting the requirement of actual reliance.[291]

202. Recent Ontario certification decisions are divided on whether individual reliance must be proven at trial. In *McCann v. CP Ships Ltd.*, the Court held that the case law on the issue of reliance is "in a state of evolution and the court, in certain circumstances, is prepared to relax the otherwise strict requirement to establish individual reliance."[292] The Court allowed the plaintiff to plead that individual reliance need not be proven by every class member in order to proceed.[293] Similar

[286] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at paras. 63-66.
[287] *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87 at para. 33.
[288] *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165 at para. 19.
[289] *Ibid.*
[290] *Ibid.* at para. 18.
[291] *Ibid.* at paras. 39-40.
[292] *McCann v. CP Ships Ltd.*, [2009] O.J. No. 5182 at para. 59 [*McCann*].
[293] *Ibid.* at paras. 59-61.

reasoning was adopted in the *Silver v. Imax – Certification* decision which held that direct individual reliance is an issue that can be left for argument at trial.[294] However, the Court in *Gammon Gold* rejected the conclusions reached in *McCann* and *Silver v. Imax – Certification*, emphasizing the necessity of proving individual reliance as a condition to establishing negligent misrepresentation.[295] In a recent decision on this issue, the Court in *Dobbie v. Arctic Glacier Income Fund et al.* found that while the type and number of alleged misrepresentations in a particular case could in certain circumstances overwhelm the common issues and make negligent misrepresentation not suitable to be resolved as a class proceeding, when alleged misrepresentations are consistent and repetitive they can essentially be treated as one and can be readily managed as a common issue.[296]

***2.3 Fraudulent Misrepresentation***

203. The Canadian Plaintiffs allege that IMAX and the Individual Defendants knew that "investors would rely upon the Representation in making their decisions to purchase IMAX securities," and that they "made the Representation negligently, or, alternatively, recklessly, caring not whether it was true or false."[297]

204. The elements of a claim for fraudulent (or reckless) misrepresentation were enunciated by the Supreme Court of Canada in *Parna v. G. & S. Properties Ltd.* as follows:[298]

> [A fraudulent misrepresentation is] a false representation of fact, made with a knowledge of its falsehood, or recklessly, without belief in its truth, with the intention that it should be acted upon by the complaining party, and actually inducing him to act upon it.

205. The requirement for actual inducement has been strictly interpreted by courts in Ontario.

206. In Ontario, it has been held that the claim for reckless misrepresentation requires the plaintiffs to prove at trial that there have been representations of fact by each of the defendants upon which they relied.[299] In addition, "recklessness" is defined as "without caring whether it was true or not."[300] In contrast to establishing a duty of care in a claim for negligent misrepresentation, there is no policy concern of indeterminate liability in a claim for fraudulent misrepresentation.[301]

---

[294] *Silver v. Imax – Certification, supra* note 213 at para. 75.
[295] *Gammon Gold, supra* note 219 at paras. 43-44, 159-161.
[296] *Dobbie v. Arctic Glacier Income Fund et al, supra* note 245 at para. 227.
[297] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at paras. 67-75.
[298] *Parna v. G. & S. Properties Ltd.* (1970), 15 D.L.R. (3d) 336 (S.C.C.) at 344.
[299] *Canadian Imperial Bank of Commerce v. Deloitte & Touche*, [2003] O.J. No. 2069 (Div. Ct.).
[300] *Ibid.* at para. 20. See also *Gregory v. Jolley*, [2001] O.J. No. 2313, 54 O.R. (3d) 481 at para. 15 (C.A.).
[301] *Silver v. Imax – Certification, supra* note 213 at para. 79.

### *2.4 Damages*

207. The Canadian Plaintiffs seek "special damages, general damages" and other damages "in the sum of $200 million or such other sum as this court finds appropriate," and also seek "punitive damages in the amount of $10 million," as well as pre- and post-judgment interest and costs.[302]

208. In the award of damages at common law, the principle of *restitutio in integrum* applies, which means that the plaintiff should be made whole. This is achieved by the courts awarding a sum of money that will put the plaintiff in the position as though the wrong had not been committed.[303] If a plaintiff is able to prove the elements of the tort alleged then damages will be assessed on this basis, generally without a cap. This is in contrast to the limits imposed in some instances of the statutory scheme.[304]

209. In certain contexts, courts have awarded plaintiffs punitive damages to punish egregious conduct and to promote respect for the rule of law.[305] "Punitive damages…are designed to punish. In this, they constitute an exception to the general common law rule that damages are to compensate the injured …"[306]

210. Under the common law, defendants may be held jointly and severally liable for assessment of damages. Joint and several liability permits plaintiffs to execute a judgment against any one of multiple defendants.[307] While the court may apportion the responsibility of the plaintiff's damages among the defendants, this apportionment does not affect the plaintiff who may still seek 100 percent of the judgment against any of the defendants.[308]

---

[302] Dec. 9, 2008 Proposed Draft Fresh Statement of Claim at para. 2(i), (j), (l), (m).
[303] Jamie Cassels & Elizabeth Adjin-Tettey, *Remedies: The Law of Damages*, 2d ed. (Toronto: Irwin Law, 2008) at 14 [Cassels & Adjin-Tettey].
[304] See e.g. definition of "liability limit" in *OSA*, *supra* note 228, s. 128.1.
[305] Cassels & Adjin-Tettey, *supra* note 297.
[306] *Vorvis. v. Insurance Corp. of British Columbia,* [1989] 1 S.C.R. 1085 at para. 16.
[307] Philip H. Osborne, *The Law of Torts* (Toronto: Irwin Law, 2003) at 61.
[308] *Ibid.* at 62.

# EXHIBIT A

**POONAM PURI**
**Associate Professor of Law**
**Osgoode Hall Law School, York University**
**4700 Keele Street, Toronto, ON**
ppuri@osgoode.yorku.ca
**416.736.5542/416.417.2177**

BIOGRAPHY

Poonam Puri is one of Canada's most respected scholars and commentators on issues of corporate law, securities law, corporate governance, and corporate and white-collar crime.

Appointed to York University's Osgoode Hall Law School in 1997, and a recipient of its Teaching Excellence Award in 1999 and 2009, Puri is a prolific scholar who has co-authored or edited three books and written numerous articles or reports. She has an LL.B. degree (JD equivalent) from the University of Toronto, where she was the Silver Medalist in her 1995 graduating law class, and she holds a Master of Laws (LLM) degree from Harvard Law School.

Her work is academically rigorous as well as firmly grounded in the real-time of policy-making. It is for this reason that governments and regulators in Canada and internationally, including Industry Canada, the Ontario Securities Commission (OSC), the Canadian Senate, the Wise Persons Committee on Securities Regulation and the International Finance Corporation of the World Bank, have sought her expertise.

In 2008, she was appointed as one of two research directors of the Canadian Ministry of Finance's Expert Panel on Securities Regulation, which sought input on the best way to develop and implement a common securities regulator and model Common Securities Act for Canada. In 2005, she was co-research director of the Task Force to Modernize Securities Legislation and also served as a member of the OSC's Investor Advisory Committee from 2005 to 2007. She was President of the Canadian Law and Economics Association from 2006-2008.

Professor Puri is a 2005 recipient of Canada's Top 40 under 40™ award, a 2008 recipient of the Indo-Canada Chamber of Commerce Female Professional of the Year Award, and a 2010 recipient of the Award of Professional Excellence from the Canadian Association of South Asian Lawyers and the Lawyer of the Year from the South Asian Bar Association of Toronto In 2008, she was also appointed to the board of directors of the Greater Toronto Airports Authority, and is current chair of it's corporate governance and nominating committee She has served on the board of directors of the Ontario Association of Food Banks, and is an inaugural member of the University of Toronto President's International Advisory Council.

## Education

**1997** **HARVARD LAW SCHOOL**
LL.M.

**1995** **UNIVERSITY OF TORONTO, FACULTY OF LAW**
LL.B.

**1990-92** **UNIVERSITY OF TORONTO, UNIVERSITY COLLEGE**
Bachelor of Commerce Program

## Academic and Professional Positions

### *Current Academic Appointments*

**1997-present** **OSGOODE HALL LAW SCHOOL, YORK UNIVERSITY**
- *Associate Dean, Research, Graduate Studies, and Institutional Relations* (as of July 1, 2011)
- *Associate Professor of Law* (with tenure) (2002 – present)
- *Assistant Professor of Law* (tenure-track) (1997-2002)

**2008-present** **HENNICK CENTRE FOR BUSINESS AND LAW, OSGOODE HALL LAW SCHOOL AND THE SCHULICH SCHOOL OF BUSINESS, YORK UNIVERSITY**
- *Co-Director* (2009-present)
- *Associate Director* (2008-2009)

**2007-present** **CAPITAL MARKETS INSTITUTE ROTMAN SCHOOL OF MANAGEMENT, UNIVERSITY OF TORONTO**
- *Head of Research and Policy*

### *Visiting Professorships*

**January 2007** **UNIVERSITY OF WESTERN ONTARIO, FACULTY OF LAW**
- *Visiting Professor and Torys Fellow*

**2006-2007** **ROTMAN SCHOOL OF MANAGEMENT, UNIVERSITY OF TORONTO**
- *Visiting Professor of Law*

**2000-2001** **CORNELL LAW SCHOOL**
- *Visiting Assistant Professor of Law and Fulbright Scholar*

***Professional Appointments***

**2009-2011** **LAW COMMISSION OF ONTARIO**

- *Scholar in Residence for Project on Joint and Several Liability*
  Designed research program on liability for professionals under the *Ontario Business Corporations Act*; Organized a multi-stakeholder consultation process including government, professional bodies, industry groups and retail investors on key issues; Produced consultation document for stakeholder input; Produced final report entitled "*Joint and Several Liability Consultation Paper*," April 2010.

**2008-2009** **EXPERT PANEL ON SECURITIES REGULATION, MINISTRY OF FINANCE (CANADA)**

- *Co-Research Director*
  Designed and executed a research strategy and plan to further the Expert Panel's mandate to create a Canadian securities commission; Managed budget and research team of internationally recognized scholars; Managed relationships with key stakeholder groups; Expert Panel's work resulted in creation of the Canadian Securities Transition Team to negotiate with the provinces towards a Canadian Securities Commission.

**2008-2009** **CD HOWE INSTITUTE**

- *Independent Researcher*
  Designed and researched a report (double-blind peer-reviewed) on governance and pension funds, entitled "*A Matter of Voice: The Case for Abolishing the 30 percent Rule for Pension Fund Investments.*"

**2007** **INDUSTRY CANADA, CORPORATIONS CANADA**

- *Independent Researcher*
  Conducted an empirical analysis of the *Canada Business Corporations Act* and the *Not-For-Profit Corporations Act* to assess their regulatory burden on users. Report entitled *"A Regulatory Burden Analysis of the Canadian Business Corporations Act and the Not-For-Profit Corporations Act."*

**2006** **INDUSTRY CANADA, CORPORATIONS CANADA**

- *Independent Researcher*
  Examined the case law history regarding the current CBCA part VII provisions and the prevailing methods of transferring securities, and compared them to general corporate law rationales. Produced paper with Professor Gil Lan of the Ted Rogers School of Management at Ryerson University, entitled "*Who Needs Paper Anymore?*

*Rationalizing an Allocation of Government Responsibility for the Transfer of Securities.*"

**2005-2007** **INVESTOR ADVISORY COMMITTEE, ONTARIO SECURITIES COMMISSION**

- *Inaugural Member*
  Provided input and advice to the OSC on issues relating to retail investors in the Ontario capital markets.

**2005-2006** **TASK FORCE TO MODERNIZE SECURITIES REGULATION**

- *Co-Research Director*
  Designed and oversaw a research agenda for the Task Force, involving 30 research papers and over 40 leading international law and finance academics from Canada, the U.S., the U.K., and Australia; Managed a research budget of $2 million and the production and dissemination of over 2000 pages of important research on securities markets to inform the Task Force's mandate and recommendations; Research and Task Force Recommendations have resulted in change in important areas of capital markets regulation in Canada.

**2006** **FRASER INSTITUTE**

- *Independent Researcher*
  Designed and produced a research report (double-blind peer-reviewed) on the role of self-regulation in the accounting industries in Canada and the United States. Paper served as a foundational piece in the reform of the governance of the Canadian Public Accountability Board (co-authored with Adam Pritchard).

**2004** **INDUSTRY CANADA, CORPORATIONS CANADA**

- *Independent Researcher*
  Analyzed the appropriate allocation of responsibility between corporate law and securities law regulators for topics including: corporate governance, takeover bids, insider trading, and shareholder communications and prepared report on same. Report circulated by Industry Canada to provincial counterparts as basis for discussion for rationalization.

**2004** **INTERNATIONAL FINANCE CORPORATION, WORLD BANK GROUP**

- *Independent Consultant*
  Provided legal and regulatory expertise in respect of developing the local bond market in Nigeria; reviewed existing laws and regulations of relevant government bodies and provided concrete recommendations for reform. (with M. Gilroy).

**2003** **WISE PERSONS COMMITTEE (WPC), MINISTRY OF FINANCE, GOVERNMENT OF CANADA**

- *Independent Researcher*
  Prepared report on local and regional interests in the debate on optimal securities regulatory structure for Canada for the Federally appointed Wise Persons Committee.

**2003** **INDUSTRY CANADA, CORPORATIONS CANADA**, Toronto

- *Independent Researcher*
  Prepared a report on the policy objectives of good corporate law, the role of mandatory and enabling rules in corporate law and related reform to the *Canada Business Corporations Act*.

**2003** **ONTARIO SECURITIES COMMISSION**, Toronto

- *Independent Researcher*
  Prepared cost-benefit analysis on the multi-jurisdictional disclosure system (MJDS) with the United States Securities and Exchange Commission (SEC) and the Impact of the *Sarbanes-Oxley Act* on the same (co-authored with A. Sen).

**1997** **PAUL WEISS RIFKIND WHARTON & GARRISON**, New York

- *Summer Associate*
  Represented issuers and underwriters on domestic and international securities offerings, and merger and acquisition transactions.

**1996-1997** **HARVARD LAW SCHOOL**

- *Research Associate to Professor Philip Wellons for the Program on International Financial Systems*
  Conducted research for a study on integration of stock markets in southern Africa commissioned by the U.S. Agency for International Development.

**1995-1997** **CANADIAN BUSINESS LAW JOURNAL**, Toronto

- *Fellow*
  Conducted research for paper on commercial reorganizations under the Canadian *Bankruptcy and Insolvency Act.*

**1995-1996** **TORY TORY DESLAURIERS & BINNINGTON,** Toronto

- *Articling Student*
  Performed legal work in the corporate, litigation, tax and insolvency departments.

**1993-1995** **UNIVERSITY OF TORONTO, FACULTY OF LAW**, Toronto

- *Research Assistant to Former Dean and University Professor Martin Friedland*

Conducted research for report entitled, *A Place Apart: Judicial Independence and Accountability in Canada,* commissioned by the Canadian Judicial Council.

**1990-1993** **ONTARIO TITLE SEARCH SERVICES,** Toronto
- *Title-searcher*
  Conducted real property title searches and closings.

## Editorial and Other Appointments and Memberships

**2011-present** **OSGOODE HALL LAW JOURNAL SPECIAL ISSUE: INDIA-CANADA TRANSNATIONAL GOVERNANCE,** Toronto
- *Guest Editor* (with Lisa Philipps and François Tanguay-Renaud) (forthcoming)

**2003-2008** **CANADIAN LAW AND ECONOMICS ASSOCIATION,** Toronto
- *President* (September 2006 – 2008)
- *Vice-President* (September 2004-September 2006)
- *Member of Executive* (May 2003 – September 2004)

**2001-2002** **OSGOODE HALL LAW JOURNAL,** Toronto
- *Book Review Editor*

**1998-2002** **BANKING AND FINANCE LAW REVIEW,** Toronto
- *Book Review Editor* (1998-1999; 2001-2002)

**CANADIAN ASSOCIATION OF LAW TEACHERS**
- *Member*

**CANADIAN LAW AND SOCIETY ASSOCIATION**
- *Member*

**AMERICAN LAW AND ECONOMICS ASSOCIATION**
- *Member*

**AMERICAN LAW AND SOCIETY ASSOCIATION**
- *Member*

## Professional Qualifications

**1999** Admitted to the Law Society of Upper Canada

## Awards

### *Professional & Community Recognition*

1. Female Lawyer of the Year, South Asian Bar Association of Toronto (SABA) (2010)
2. Award of Professional Excellence, Canadian Association of South Asian Lawyers (CASAL) (2010)
3. Indo-Canada Chamber of Commerce Female Professional of the Year (2008)
4. Canada's Top 40 under 40 Award (2005)
5. Arbour Award, University of Toronto's highest award for alumni volunteers (2004)

### *Teaching Awards*

1. Recipient, Legal and Literary Society of Osgoode Hall Law School Award for Excellence in Teaching (2009)
2. Nominee, University-Wide Teaching Award, York University (2001)
3. Recipient, Legal and Literary Society of Osgoode Hall Law School Award for Excellence in Teaching (1999)

### *Academic Awards and Scholarships*

1. Rhodes Scholarship Finalist (2000)
2. W.P.M. Kennedy Silver Medalist for Ranking Second in the Graduating Class, University of Toronto Faculty of Law (1995)
3. Gordon Cressy Student Leadership Award in Recognition of Academic Excellence and Extra-Curricular Involvement, University of Toronto (1995)
4. Davies, Ward and Beck Prize for Ranking First in Second Year, University of Toronto Faculty of Law (1994)
5. Carswell Prize for Ranking First in Second Year, University of Toronto Faculty of Law (1994)
6. Russell Baker Prize for Ranking First in Commercial Law Subjects, University of Toronto Faculty of Law (1994)
7. Gowling, Strathy and Henderson Prize for Ranking First in Bankruptcy and Insolvency Law, University of Toronto Faculty of Law (1994)
8. Borden & Elliot Prize for Academic Excellence in First Year, University of Toronto Faculty of Law (1993)
9. Michael John Eccles Prize for Ranking First in Criminal Law and Procedure, University of Toronto Faculty of Law (1993)
10. Reuben Wells Leonard Scholarship in the Humanities, University College, University of Toronto (1992)
11. Ernst & Young Scholarship for Ranking First in Accounting, University of Toronto (1991)

12. Reuben Wells Leonard Scholarship in the Humanities, University College, University of Toronto (1991)
13. Dr. John Knowles Collin Scholarship in the Social Sciences, University of Toronto (1991)
14. Honourable Ray Lawson Scholarship in Commerce and Finance, University of Toronto (1991)
15. Faculty Scholar in Recognition of Academic Excellence, University of Toronto (1991)
16. Special University College Admission Scholarship, University College, University of Toronto (1990)

## Research Awards and Grants (Selected)

1. Recipient, Walter L. Gordon Research Fellowship, York University (2010). Awarded to a distinguished scholar at York University in recognition of outstanding research. Completing book entitled "*Financial Markets in Crisis: ABCP, the Made in Canada Solution and the Future of Canadian Capital Markets.*" (Value: Full release from teaching duties 2010-2011)
2. Law Foundation of Ontario Grant (2010). Principal Investigator. Completing book entitled "*Financial Markets in Crisis: ABCP, the Made in Canada Solution and the Future of Canadian Capital Markets.*" (Value: $5,000)
3. SSHRC Conference/Workshop Grant (2010). Co-Investigator with Lisa Philipps and François Tanguay-Renaud (Value: $25,000)
4. SSHRC MBF Grant (2008). Co-Investigator with Peer Zumbansen (Principal Investigator), and Cynthia Williams (Illinois) (Value: $168,000)
5. Harry Arthurs Fellowship (2002-2010). (Value: $3,000)
6. SSHRC Travel Grant (2007). For Conference on Convergence in Corporate Governance, Kyushu University, Fukuoka, Japan (Value: $1,200)
7. Small SSHRC Grant (2006). Project entitled "A Rational Allocation of Responsibility between Corporate Law and Securities Law (Value: $1,200)
8. Fraser Institute (2005), Co-Investigator with Adam Pritchard. Project entitled "The Regulation of Public Accounting in Canada and the US" (Value: $16,000)
9. Centre for Innovation, University of Toronto Faculty of Law Research Grant (2004). Project entitled "Enhancement of the Business Associations Course" (Value: $4,000)
10. Capital Markets Institute, University of Toronto (2004). Project entitled "Enforcement of Securities Law and Criminal Laws in the Capital Markets Context" (Value: $12,000)
11. Borden Ladner Gervais (BLG) Fellowship (2004). Project entitled "Competition and Convergence in Canadian Corporate Governance" (Value: $10,000)
12. Osgoode Hall Law School Research Fellowship (2004). (Value: $15,000 and one term teaching release)
13. Government of Canada, Ministry of Finance, Wise Persons Committee (2003). Project entitled "Local and Regional Interests in the Debate on Optimal Securities Regulatory Structure" (Value: $30,000)

14. Schulich School of Business Program on Financial Services & Public Policy (2003), Co-Investigator with Stephanie Ben-Ishai. Project entitled "Effective Governance of Family Controlled Corporations in Canada" (Value: $60,000)
15. SSHRC Standard Grant (2002), Co-Investigator with Janne Chung and Linda Thorne. Project entitled "Auditor Liability" (Value: $75,329)
16. Centre for Innovation, University of Toronto Faculty of Law Research Grant (1999), Principal Investigator. Project entitled ""Lawyers as Incubators of Innovation in the New Economy" (Value: $10,000)
17. Fulbright Fellowship (1999). Project entitled "A North American Market for Lawyers" (Value: $22,500)
18. SSHRC Travel Grant (1999). For presentation of a paper entitled, "Corporate Law in its Political and Social Context" at the Inaugural Conference, Global Alliance for Justice Education, December 9-13, 1999, Trivundrum, Kerela, India (Value: $1500)

## Research Contributions and Scholarship (Selected)

### *Research Volumes*

1. *Expert Panel on Securities Regulation*, appointed by the Ministry of Finance (Ottawa: 2008) (co-research director, with Paul Halpern) (7 research studies, over 500 pages). Available at http://www.expertpanel.ca/eng/reports/index.html.

2. *Task Force to Modernize Securities Regulation,* (Toronto: 2005-2006) (co-research director, with Paul Halpern) (7 volumes, over 30 research papers, over 2000 pages). Available at http://www.tfmsl.ca/

### *Books (Authored Books/Edited Books)*

3. *Financial Markets in Crisis: ABCP, the Made in Canada Solution and the Future of Canadian Capital Markets* (Toronto: University of Toronto Press, expected 2011) (work in progress) (with Paul Halpern and Caroline Cakebread)

4. *Cases and Materials on the Law of Partnerships and Business Organizations in Canada* (Toronto: Carswell, 5th edition, expected 2011) (with Aaron Dhir, Ron Daniels, Ian Lee, Edward Iaccobucci, Jeffrey MacIntosh, Edward Waitzer and Jacob Ziegel)

5. *Corporate Governance and Securities Regulation post-Enron* (Toronto: Butterworths, 2004) (with Jeffrey Larsen)

6. *Cases and Materials on the Law of Partnerships and Business Organizations in Canada* (Toronto: Carswell, 4th edition, 2004) (with Doug Harris, Ron Daniels, Ian Lee, Edward Iaccobucci, Jeffrey MacIntosh, and Jacob Ziegel)

7. *Canadian Companies Guide to the Sarbanes-Oxley Act* (Toronto: Butterworths, 2004) (with Leslie McCallum)

***Book Chapters (Chapters in Books)***

8. *Proportionate Liability under the CBCA in the Context of Recent Corporate Governance Reform: Canadian Auditors in the Wrong Place at the Wrong Time?"* (with S.Ben-Ishai) Chapter in P.Puri & J. Larsen, editors, *Corporate Governance and Securities Regulation in the 21st Century* (Toronto: Butterworths, 2004)

9. *Introduction to Debates on Corporate Governance*, Introductory chapter in P. Puri and J. Larsen, editors, *Corporate Governance and Securities Regulation in the 21st Century* (Toronto: Butterworths, 2004)

10. *Clean Dealing: The Governance and Organizational Structure of the Investment Dealers Association,* Chapter in Queen's Law School 2003 Annual Business Law Symposium on Conflicts of Interest in Capital Market Structures, (Toronto: Carswell, 2004)

11. *Converging Numbers: Harmonization of Accounting Standards with the context of the Role of the Auditor in Corporate Governance*, Chapter in Queen's Law School 2001 Annual Business Law Symposium on the Impact of Globalization (Toronto: Carswell, 2002)

12. *Canadian Business Bankruptcy*, Chapter in Theodore Eisenberg (editor), *Treatise on Debtor-Creditor Law*, (Mathew Bender, 2001)

***Articles***

13. "Public Disclosure and Global Sustainable Development in the Banking Industry: The Equator Principles" (2011) (work-in-progress)

14. "Contemporary Corporate Law, the Need for Interdisciplinarity, and a Case Study of the Hennick Centre for Business and Law" (2011) (work-in-progress)

15. "The Future of Stakeholder Interests in Corporate Governance" (2010) 48:3 Canadian Business Law Journal 427-445

16. "Auditor liability to third parties after Sarbanes-Oxley: An international comparison of regulatory and legal reforms" (2010) 19:1 Journal of International

Accounting, Auditing and Taxation 66-78 (with Janne Chung, Jonathan Farrar and Linda Thorne)

17. "Canadian Pension Funds: Investments and Role in the Capital Markets and Corporate Governance" (2010) 25:2 Banking and Finance Law Review 247-294 (with Palladam Vasudev)

18. "Legal Origins, Investor Protection, and Canada" (2009) 2009:6 Brigham Young University Law Review 1671-1699

19. "Reflections on the Recommendations of the Task Force to Modernize Securities Regulation in Canada: A Retail Investor Perspective" (2008) 46:2 Canadian Business Law Journal 199-232 (with Paul Halpern)

20. "Who Needs Paper Anymore? Rationalizing an Allocation of Government Responsibility for the Transfer of Securities" (2007) 23:1 Banking & Finance Law Review 1-49 (with Gil Lan)

21. "Canada Steps Up - Task Force to Modernize Securities Legislation in Canada: recommendations and discussion" (2007) 2:2 Capital Markets Law Journal 191-221 (with Paul Halpern)

22. "Will Canada Step Up? Improving Enforcement in the Canadian Capital Markets" (2007) 20:1 Canadian Investment Review 53-54

23. "Dual Class Shares: An Historical Analysis" (2006) 29:1 Dalhousie Law Journal 117-157 (with Stephanie Ben-Ishai)

24. "The Canadian Oppression Remedy Judicially Considered: 1995-2001" (2004) 30:1 Queen's Law Journal 79-113 (with Stephanie Ben-Ishai)

25. "Proportionate Liability under the CBCA in the Context of Recent Corporate Governance Reform: Canadian Auditors in the Wrong Place at the Wrong Time?" (2003) 39:1 Canadian Business Law Journal 36-51 (with Stephanie Ben-Ishai)

26. "Employees as Corporate Stakeholders" (2002) 8 Journal of Corporate Citizenship 49-61 (with Tuvia Borok)

27. "Sentencing the Criminal Corporation" (2001) 39 Osgoode Hall Law Journal 611-653

28. "Taking Stock of Taking Stock" (2001) 87:1 Cornell Law Review 99-157

29. "Judgment Proofing the Profession" (2001) 15:1 Georgetown Journal of Legal Ethics 1-28

30. "The Promise of Certainty in the Law of Pre-Incorporation Contracts" (2001) 80:3 Canadian Bar Review 1051-1064

31. "Financing of Litigation by Third-Party Investors: A Share of Justice?" (1998) 36:3 Osgoode Hall Law Journal 515-566

***Commissioned Independent Research Reports (Selected)***

32. "Joint and Several Liability under the Ontario Business Corporations Act" Report Commissioned by the Law Commission of Ontario (Primary Researcher) (May 2011)

33. "A Model for Common Enforcement in Canada: The Canadian Capital Markets Enforcement Agency and the Canadian Securities Hearing Tribunal" Report Commissioned by the Expert Panel on Securities Regulation (Hockin Panel) (February 2008)

34. "National Enforcement Structures for the Canadian Capital Markets" Report Commissioned by the Capital Markets Institute (October 2008)

35. "A National Enforcement Agency for Canada" Report Commissioned by the Capital Markets Institute (June 2008)

36. "Pension Funds: Trends in Asset Allocation and Role in Capital Markets, Corporate Governance and Regulatory Policy" Ontario Expert Commission on Pensions (January 2008)

37. "The Canada Not-for-profit Corporations Act: A Critical Analysis of Its Regulatory Burden" Report Commissioned by Industry Canada (October 2007)

38. "The Canadian Business Corporations Act: A Critical Analysis of its Regulatory Burden" Report Commissioned by Industry Canada (September 2007)

39. "The Role of Compliance in Securities Enforcement" Report Commissioned by the Task Force to Modernize Securities Legislation in Canada, sponsored by the IDA (with Mary Condon) (June 2006)

40. "Enforcement Effectiveness in the Canadian Capital Markets" Report Commissioned by the Capital Markets Institute (December 2005)

41. "The Transfer of Securities Provisions in the CBCA" Report Commissioned by the Government of Canada, Industry Canada (January 2004)

42. "The Regulation of Public Accounting and Standard Setting under a Common Securities Regulator" Report Commissioned by CGA Canada (February 2007)

43. "A Study in Comparative Self-Regulation: The Regulation of Public Auditing in Canada and the U.S." Report Commissioned by the Fraser Institute (with Adam Pritchard) (February 2006)

44. "Enforcement in the Canadian Capital Markets: A Policy Analysis" Report Commissioned by the Capital Markets Institute (June 2005)

45. "A Policy and Technical Analysis of Various Corporate Governance Proposals" Report Commissioned by the Senate of Canada (April 2005)

46. "A Rational Allocation of Responsibility Between Corporate & Securities Laws in Canada" Report Commissioned by the Government of Canada, Industry Canada (2004)

47. "The Hallmarks of Good Corporate Law: A Performance Evaluation of the Canadian Business Corporations Act" Report Commissioned by the Government of Canada, Industry Canada (2004)

48. "Developing Bond Markets: Regulatory and Market Challenges in Nigeria" Report Commissioned by the International Finance Corporation of the World Bank Group, and funded by the Canadian International Development Agency (with Malcolm Gilroy) (July 2004)

49. "The Role of Local and Regional Interests in the Design of Optimal Securities Regulatory Structure for Canada" Report Commissioned by the Government of Canada, Ministry of Finance, Wise Persons Committee on Securities Regulation (January 2004)

50. "A Cost Benefit Analysis of the Multi-Jurisdictional Disclosure System between Canada and the U.S." Report Commissioned by the Ontario Securities Commission (with A. Sen) (June 2003)

51. "Competition and Fragmentation: Stock Exchanges in Canada" (on file with Program on International Financial Systems, Harvard Law School) (1997)

## Dissemination in the Media

### *Op-Eds*

1. "It's Time to Abolish the 30-Per-cent Rule" (16 December 2009) *The Globe and Mail* A 25.

2. "Judges Require Better Corporate Crime Education" (10 November 2004) *National Post* FP 12.

3. "Case Keeps Growing for a National Securities Regulator" (3 December 2010) *The Lawyers Weekly.*

## *Columns*

**2010-present LISTED MAGAZINE**

- *Writer, Law and Governance Views Column*

1. "There oughta be a rule: The growing use of poison pills to delay or fend off hostile bidders is testing the limits of Canada's outdated policies on takeovers. It's time regulators caught up' (Winter 2010/2011)
2. "The power of one: A spring Supreme Court date remains, but Canada is firmly – and finally – on track for the creation of a national regulator"(Fall 2010)
3. "Recipe for Success: Strong companies need strong boards more than ever. Follow these steps and you'll be well on the way" (Summer 2010)

## Invited Conferences, Lectures, Public Addresses and Speeches (Selected)

1. *Varieties of Liberalism Session*, Discussant, London Centre for Corporate Governance and Ethics, Birbeck, University of London, London, England, June 29, 2011

2. *Advancing Equity – The Focus on Gender*, Panelist, Convention of the Indian Diaspora in North America, PBD Canada 2011, Toronto, Ontario, June 10, 2011

3. "The Regulatory Burden of Corporate Law", Presenting paper at Regulating Entrepreneurs Session, Law and Society Association Annual Meeting, San Francisco, California, June 3, 2011

4. *New Corporate Governance: U.S. Federal Law and Federalism Session*, Chair and Commentator, Law and Society Association Annual Meeting, San Francisco, California, June 3, 2011

5. *Shareholder Democracy: Good, Bad or Unimportant?*, Moderator and Commentator, Institutional Investor Education Foundation Breakfast Roundtable, Toronto, Ontario, May 26, 2011

6. "Contemporary Corporate Law and the Need for Interdisciplinarity", Paper presented at Developing an Integrated Research Agenda in Entrepreneurship and Law, Research and Pedagogical Trends in Entrepreneurial Education at the University of Windsor Faculty of Law and Odette School of Business, Windsor, Ontario, May 11-12, 2011

7. "Regulation of Financial Markets in Canada – Legal Perspectives", Presentation to a delegation of the Central Committee of the Communist Party of China at the Rotman Executive Program, Toronto, Ontario, April 20, 2011

8. "Corporate Governance in the Post-Crisis Era", Presentation to the Board of Directors of Enersource Corporation, Presentation to the Board of Directors, Toronto, Ontario, April 19, 2011

9. "The Pushes and Pulls of Corporate Governance: Through the Lens of the Financial Crisis of 2007-8-9", Paper presented at Jindal-Osgoode Joint Workshop on Transnational Governance, Delhi, India, March 13-14, 2011

10. "Whose Job is Governance: A Comparative Analysis in the Post-Crisis Era", Paper presented and Keynote address at 1st International Conference on Accounting and Finance, Financial Control and Governance, T. A. Pai Management Institute (TAPMI), Manipal, India, March 6, 2011

11. *Post-Magna Dual Class Share Conference*, Chair and Moderator, Capital Markets Institute, Rotman School of Business, Toronto, Ontario, February 15, 2011

12. "Legal Origins, Investor Protection, and Canada", Paper presented at the Economic Analysis of the Law Workshop University of British Columbia Faculty of Law, Vancouver, British Columbia, February 7, 2011

13. *Feminist Corporate Law Roundtable*, Roundtable speaker and participant, University of British Columbia Faculty of Law, Vancouver, British Columbia, February 7, 2011

14. "Corporate Governance Best Practices", Presentation to the Board of Directors of the Toronto Community Housing Corporation, Osgoode Professional Development, Toronto, Ontario, February 1, 2011

15. Hearings on Bill S-206, *An Act to establish gender parity on the board of directors of certain corporations, financial institutions and parent Crown corporations*, Presentation before the Standing Senate Committee on Banking, Trade and Commerce, Ottawa, Ontario, December 9, 2010

16. "After the Financial Crisis: Game-Changers for the Corporation", Presentation at TEDxYorku2010, Toronto, Ontario, November 6, 2010. Available at http://www.youtube.com/watch?v=RxSVdHekKbM

17. *Accessing India: A Focus on Foreign Direct Investment and Mining,* Roundtable Chair and Moderator, Hennick Centre for Business and Law, Toronto, Ontario, October 27, 2010

18. "Corporate Governance Pushes and Pulls: The Role of the Board of Directors", Paper presented at Global North and Global South Perspectives on Transnational Governance: An Indian-Canadian Conversation, Joint Workshop of Osgoode Hall Law School & Jindal Global Law School, Toronto, Ontario, October 25-27, 2010

19. "The Equator Principles, Corporate Governance and the Financial Crisis" Paper presented at the First Annual Private Transnational Regulation: Constitutional Foundations and Governance Design Conference, University College Dublin, Dublin, Ireland, June 16, 2010

20. "The Capital Markets Perspective on a Common Securities Regulator" Paper presented at the Osgoode Constitutional Cases Conference, Toronto, Ontario, April 16, 2010

21. "Corporate Governance and Effective Boards", Presentation to the Board of Directors of the Toronto Community Housing Corporation, Osgoode Professional Development, Toronto, Ontario, April 7, 2010

22. *Gender Diversity in Canada's Boardrooms and C-Suites: Exploring the Business Case and Reform Strategies,* Chair of Panel, Hennick Centre for Business and Law, Toronto, Ontario, March 11, 2010

23. "The Regulatory Framework: The Board's Roles, Responsibility and Conduct" and "Committees: Roles and Responsibilities", Chair of Panel and paper presented to The Advanced Legal Guide to Advising the Public Company Board of Directors, Hennick Centre for Business and Law and Osgoode Professional Development, Toronto, Ontario, February 18, 2010

24. *Entrepreneurship, Innovation and Commercialization of Intellectual Property*, Chair of Panel, IP Osgoode and Hennick Centre for Business and Law 2010 Conference, Toronto, Ontario February 11, 2010

25. *Roundtable Consultation on Corporate Social Reporting and Disclosure,* Co-Moderator, Hennick Centre for Business and Law, Toronto, Ontario, December 7, 2009

26. *Overview of Liability Issues and Models under the Ontario Business Corporations Act*, Head of Research Project and Roundtable Participant, Law Commission of Ontario and Hennick Centre Consultation on Joint and Several Liability Project, Toronto, Ontario, October 28, 2009

27. *Critical Issues Facing MNEs and SMEs*, Roundtable Participant, York Leadership Roundtable: Accelerating from the New to the Next Economy: Recovery Starts Here, York University and York Region, Toronto, Ontario, October 20, 2009

28. *Roundtable Discussion on Canadian Securities Regulator*, Chair and Moderator, Capital Markets Institute and Canadian Securities Transition Team, Toronto, Ontario, October 27, 2009

29. *Annual Meeting,* Chaired Panel on Corporate Governance, Canadian Law and Economics Association, Toronto, Ontario, October 2, 2009

30. *Roundtable on Corporate Sustainability Reporting*, Co-Moderator, Ontario Securities Commission, Toronto, Ontario, September 18, 2009

31. "The Duties of Directors Under Corporate Law", Presentation to Canadian Society of Corporate Secretaries, 11th Annual Conference on Corporate Governance, Toronto, Ontario, August 26, 2009

32. "Critical Issues and Challenges in Securities Regulation," Presentation to the Chinese Securities Commission, Beijing, China, August 4, 2009

33. "The Financial Crisis, Economic Governance and Environmental Sustainability," Presentation to the Chinese Academy of Social Science, Beijing, China, August 4, 2009

34. *Securities Regulation in Context: Critical Issues and Challenges*, Keynote Speaker and presentation to The Ontario Securities Commission Investigation Training Course, Kempenfelt, Barrie, Ontario, June 8, 2009

35. "Canadian Business Law and the Regulation of Risk", Presentation to a delegation of the Central Committee of the Communist Party of China at the Rotman Executive Program, Toronto, Ontario, May 28, 2009

36. *A National Enforcement Agency for Canada*, Panelist, Capital Markets Institute Conference on Research from the Expert Panel: Implications and Next Steps, Toronto, Ontario, May 20, 2009

37. *Leaders Roundtable on the Proposed Amendments to the Canadian Securities Administrators Corporate Governance Guidelines*, Institute for Corporate Directors (ICD), Rapporteur and discussant, (with Carol Hansell and Peter Dey), Toronto, Ontario, May 1, 2009

38. *The Commercialization of Intellectual Property Conference*, Co-Chair and Chair of Panel on *Business Cases for Innovation*, (with Pina D'Agostino and Ed Waitzer), Toronto, Ontario, March 20, 2009

39. "The Implications of the BCE Decision for Corporate Governance and Directors Duties", Presentation at conference entitled Emerging Issues in Directors' and

Officers' Liability: Advising Clients in Recessionary Times, Law Society of Upper Canada, Toronto, Ontario, February 27, 2009

40. "Legal Origins, Investor Protection and the Case of Canada", Presentation to Brigham Young University Law Review Symposium: Evaluating Legal Origins Theory, Provo, Utah, February 6, 2009

41. "The Role of Committees of Boards of Director", Presentation on Advising Boards of Directors of Public Companies, Osgoode Professional Development, Toronto, Ontario, January 19, 2009

42. "The Statutory Framework for Directors and Officers Duties and The Role of Committees of Boards", Presentation on Advising Boards of Directors of Public Companies, Osgoode Professional Development, Toronto, Ontario, January 18, 2009

43. *White Collar Crime Symposium*, Roundtable Participant, RCMP and Canadian Police College, Ottawa, December 10, 2008

44. *Governance and Pension Fund Investment Regulation*, Presentation at the C.D. Howe Institute, Toronto, Ontario, December 5, 2008

45. *Good Governance and the Regulation of Pension Fund Investments*, speaker at the University of British Columbia Calgary Lunchtime Speaker Series, Calgary, Alberta, November 21, 2008

46. *The Good Regulator*, Keynote Speaker, The Canadian Network of National Associations of Regulators (CNNAR) Conference, Toronto, Ontario, November 3, 2008

47. *Critical Policy and Regulatory Issues facing the Mutual Fund Industry*, Presentation at the Investment Funds Invitational Forum, Landgon Hall, Cambridge, Ontario, October 22-24, 2008

48. *Annual Meeting*, Chaired Panel on Corporate Governance, Canadian Law and Economics Association, Toronto, Ontario, September 27, 2008

49. "The Legal Regulation of Pension Funds and the 30% Rule", Paper presented at the CD Howe Institute's Pension Papers Advisory Group Meeting, Toronto, Ontario, June 20, 2008

50. "Enforcement Effectiveness and Structural Reforms to Enforcement Institutions", Presentation to the Canadian Coalition for Good Governance Annual General Meeting, Toronto, Ontario, June 17, 2008

51. "Rules versus Principles in the Regulation of Pension Funds", Presentation to the International Centre for Pension Management (ICPM) Annual Conference, Toronto, Ontario, June 3, 2008

52. "A National Enforcement Agency for Canada", Presentation at a Conference entitled, Advancing the Enforcement Agenda: What is the Solution?, Capital Markets Institute, Toronto, Ontario, May 2, 2008

53. "Setting the Stage", opening remarks at Conference entitled *Managing the Increasing Risks of Advising the Board of Directors*, Osgoode Professional Development, Toronto, Ontario, April 17, 2008

54. "The Opportunities and Challenges of Principles Based Regulation in Securities Regulation", Presentation to the Expert Panel on Securities Regulation, Ottawa, Ontario, March 31, 2008

55. *Capital Markets Institute Roundtable on Enforcement*, Chair, Toronto, Ontario, February 29, 2008

56. "The Future of Securities Regulation in Canada", Presentation at Fraser Milner Casgrain, Toronto, Ontario, February 7, 2008

57. *Roundtable on Enforcement Issues in the Canadian Capital Markets*, Chair, Capital Markets Institute, (with Paul Halpern), Toronto, Ontario, January 31, 2008

58. "The Challenge for Securities Regulation and Enforcement in the Canadian Capital Markets", University of Western Ontario Faculty of Law Faculty Seminar, London, Ontario, January 2008

59. "Reflections on the Task Force to Modernize Securities Regulation: A Retail Investor Perspective", Paper presented at the 37th Annual Workshop on Commercial and Consumer Law, University of Toronto Faculty of Law, (with Paul Halpern), Toronto, Ontario, October 19, 2007

60. *A Common Securities Regulator for Canada*, Panelist, Peer to Peer Roundtable Debate with the Hon. Minister of Finance Jim Flaherty and Purdy Crawford, Toronto, Ontario, October 18, 2007

61. "The Role of Compliance in Securities Enforcement", Presentation at the Capital Markets Institute Conference on Enforcement, Toronto, Ontario, June 2007

62. "A Response to the Convergence Debate: A Canadian Perspective", Presentation at Conference on Convergence in Corporate Governance, (with Stephanie Ben-Ishai), Kyushu University, Fukuoka, Japan, February 2007

63. "A Focus on Enforcement", Presentation to *IMET/RCMP Investigators*, (with Paul Halpern), Toronto, Ontario, June 5, 2006

64. "Models for Accounting and Auditing Standard Setting under a Common Securities Regulator", Presentation to Executive of CGA Canada, Toronto, Ontario, December 1, 2006

65. "The Role of Compliance in Securities Regulatory Enforcement", Panelist, Capital Markets Institute Roundtable, (with Mary Condon), Toronto, Ontario, February 3, 2006

66. *True Characteristics of Canada's Markets*, Chair of Roundtable, Capital Markets Institute, Toronto, Ontario February 7, 2006

67. *Insurance for Misinformation in the Capital Markets*, Chair of Roundtable, Capital Markets Institute, Toronto, Ontario February 8, 2006

68. *Disclosure Issues and Issuer/Investor Balance in Securities Regulation*, Chair of Roundtable, Capital Markets Institute, Toronto, Ontario, February 10, 2006

69. "Governance Issues associated with Income Trusts: The Role of the Market and the Role of Regulators", Presentation at the International Young Lawyers Conference on Income Trusts, Toronto, Ontario, October 28-29, 2005

70. "Peoples and Other Recent Developments: Directors' and Officer's Liability", Paper presented at the Law Society of Upper Canada Conference, Toronto, Ontario, October 24, 2005

71. "Of Competition and Convergence: Can a Distinctive Regime Survive of Canadian Corporate Governance Last", Paper presented at Unfolding the New Agenda, Comparative Research in Law and Political Economy Conference on the Corporate Governance Matrix, Toronto, Ontario, October 20-21, 2005

72. "A View from the Ivory Tower: Academics Opine on our Industry", Presentation at Investment Funds Invitational Forum, Landgon Hall, Cambridge, Ontario, October 17-19, 2005

73. "The Supreme Court of Canada's Decision in Peoples v. Wise: Effects and Implications", presented at the Law Society of Upper Canada Conference on Directors and Officers Liability, Toronto, Ontario, October 24, 2005

74. "Canada's Corporate Governance and International Regulatory Competition", Paper presented at the Corporate Law, Securities Regulation and the Pressure of Convergence, Comparative Research in Law and Political Economy Network Conference on The Corporate Governance Matrix, Toronto, Ontario, September 29-30, 2005

75. *Corporate Governance Session I and Session II*, Chair, Canadian Law and Economics Association Annual Meeting, Toronto, Ontario, September 23-24, 2005

76. "Critical Issues in the Canadian Capital Markets", Presentation to the Task Force to Modernize Securities Regulation, Toronto, Ontario, September 8, 2005

77. "Enforcement Effectiveness in the Canadian Capital Markets: Policies, Principles and Practices", Presentation at the Business Law at the Border Conference at the University of Windsor Faculty of Law, Canadian-American Research Centre for Law and Policy, Windsor, Ontario, June 3-4, 2005

78. "Enforcement Effectiveness in the Canadian Capital Markets", Paper presented at Capital Markets Institute, Toronto, Ontario, June 17, 2005

79. *Harry W. Arthurs Symposium*, Chair and Moderator, Toronto, Ontario, May 5, 2005

80. "Regulatory Policies, Pyramids and Principles: Enforcement in the Canadian Capital Markets", Presentation to the University of Windsor Faculty of Law, Faculty Seminar, Windsor, Ontario, February 14, 2005

81. "Enforcement Effectiveness in the Canadian Capital Markets", Paper presented at the Capital Markets Institute, Toronto, Ontario, December 8, 2004

82. "The Passport Model to Securities Regulation in Canada: The Role of Local and Regional Issues", Paper presented at the Capital Markets Institute, Toronto, Ontario, November 2004

83. "The Governance of Income Trusts", Presentation at the Annual Consumer and Commercial Law Workshop, University of British Columbia, Vancouver, British Columbia, October 22-23, 2004

84. "Effective Governance of Family Controlled Corporations in Canada: A Behavioural and Structural Analysis", Paper presented to the Canadian Law and Economics Association, Toronto, Ontario, September 17-18, 2004

85. "Dual Class Share Structures, the Role of the Regulator and the Role of the Judiciary", Paper presented to the University of New Delhi Faculty of Law, New Delhi, India, August 15, 2004

86. "Dual Class Share Structures and Global Competitive Advantage: Evidence from Canada", Paper presented at the International Conference on Creating Global Competitive Advantage, Udaipur, India, August 7-8, 2004

87. "The Role of Local and Regional Interests in Designing the Optimal Securities Regulatory Structure", Paper presented at the Capital Markets Institute, Toronto, Ontario, February 2004

88. "Incubating Socially Responsible Behaviour in Small and Medium Sized Enterprises", Paper presented at the Conference on SMEs and CSR, Centre for Social Markets, Calcutta India, November 2003

89. "Clean Dealing: Governance and Conflicts of Interest at the Investment Dealers' Association", Paper presented at Queens Annual Business Law Symposium, Kingston, Ontario, October 2003

90. "Factors Influencing Auditors' Negligence in Canada", Paper presented at American Accounting Association's Annual Meeting, Hawaii, August 3-6, 2003

91. *Sarbanes-Oxley Act and Auditor Independence,* Participant, Roundtable at the Capital Markets Institute, Toronto, Ontario, November 2002

92. "The Role of Gatekeepers to Securities Markets in Preventing Managerial Misconduct", Paper presented at the Conference on Corporate Governance: Crisis and Reform, Osgoode Hall Law School, Toronto, Ontario, November 6, 2002

93. "Winners and Losers: Amendments to the Canadian Business Corporations Act", Paper presented at the 33rd Annual Consumer and Commercial Law Workshop, University of Toronto, Faculty of Law, Toronto, Ontario, October 18-19, 2002

94. "Empirical Analysis of the Oppression Remedy", Paper presented at the Canadian Law and Economics Association's Annual Meeting, Toronto, Ontario, September 28, 2002

95. "The Role of the Auditor in Corporate Governance," Paper presented at the Canadian and American Law and Society Annual Meetings, Vancouver, British Columbia, July 2002

96. Hearings on Bill C-284, *Corporate Criminal Responsibility*, Presentation before the Standing Committee on Justice and Human Rights, Ottawa, Ontario, May 2002

97. "The Role of the Auditor in Corporate Governance", Paper presented at City University of Hong Kong, Hong Kong, SAR, March 2002

100. "The Role of the Auditor in Corporate Governance", Paper presented at the National University of Hong Kong, Hong Kong, SAR, March 2002

101. "The Role of the Auditor in Corporate Governance", Paper presented at the University of Delhi National Law Centre, Karol Bagh, New Delhi, India, March 2002

102. "The Role of the Auditor in Corporate Governance", Paper presented at the Annual Queens Law Symposium, Kingston, Ontario, November 16-17, 2001

103. "Taking Stock of Lawyers Taking Stock as Legal Fees", Paper presented at the Canadian Law and Economics Association's Annual Meeting, Toronto, Ontario, September 28-29, 2001

104. *Empirical Studies in Corporate Governance and Securities Regulation*, Chair of Panel, Canadian Law and Economics Association's Annual Meeting, Toronto, Ontario, September 28-29, 2001

105. *Securities Regulation*, Chair of Panel, Canadian Law and Economics Association's Annual Meeting, Toronto, September 28-29, 2001

106. "Taking Stock of Lawyers Taking Stock as Legal Fees", Paper presented at the Law and Society Association's Annual Meeting, Budapest Hungary, July 2001

107. "Taking Stock of Lawyers Taking Stock as Legal Fees", Paper presented at W.G. Hart Workshop, Institute for Advanced Legal Studies, University of London, London, England, June 2001

108. "Taking Stock of Lawyers Taking Stock as Legal Fees", Paper presented at the Meeting of the Canadian Association of Law Teachers, Quebec City, Quebec, May 2001

109. "The Death of Liability in the Law Firm: A Critical Analysis of Limited Liability Partnerships in Canada", Paper presented at the Cornell Law School Feminism and Legal Theory Workshop entitled Corporations, Capitalism and Feminism: Policy and Protest, Ithaca, New York, April 20, 2001

110. "Gatekeepers, Advisors and Investors: An Analysis of Lawyers Accepting Equity in Their Clients as Compensation for Legal Services", Paper presented at Case Western Reserve University School of Law, Cleveland, Ohio, March 8, 2001

111. "Gatekeepers, Advisors and Investors: An Analysis of Lawyers Accepting Equity in Their Clients as Compensation for Legal Services", Paper presented at Cornell Law School, Ithaca, New York, February 16, 2001

112. *Beyond Public Choice*, Chair of Panel, Conference at Cornell Law School, Ithaca, New York, February 8-9, 2001

113. *Empirical Studies of the Legal System,* Chair of Panel, Canadian Law and Economics Association Annual Meeting, Toronto, Ontario, September 22-23, 2000

114. "An Empirical Analysis of the Costs and Benefits of Secured Credit: Evidence from Canada", Paper presented at the American Law and Society Association's Annual Meeting in Miami, Florida, May 2000

115. "Corporate Law in its Political and Social Context", Paper presented at a panel on Law, Social Justice and Development, at the Inaugural Conference, Global Alliance for Justice Education, Trivundrum, Kerela, India, December 9-13, 1999

116. "The Death of Liability in the Law Firm", Paper presented to Rutgers University School of Law, New Brunswick, New Jersey, November 3, 1999

117. "The Death of Liability in the Law Firm: a Critical Analysis of Limited Liability Partnerships", Paper presented at the Canadian Law and Economics Association Annual Meeting, Toronto, Ontario, September 25, 1999

118. *Financial Regulation*, Chair of Panel, Canadian Law and Economics Association's Annual Meeting, Toronto, Ontario, September 25, 1999

119. "Limiting The Liability Of Professionals: a Critical Social, Legal And Economic Analysis Of Limited Liability Partnerships", Paper presented at the American Law and Society Association's Annual Meeting in Chicago, Illinois, May 29, 1999

120. "The Death Of Liability In The Professional Firm: a Critical Social, Legal And Economic Analysis Of Limited Liability Partnerships", Paper presented at the Canadian Law and Society Association's Annual Meeting, University of Sherbrooke, Sherbrooke, Quebec, June 7, 1999

121. "The Death of Liability in the Law Firm", Paper presented at the Osgoode Hall Law School Faculty Seminar Series, Toronto, Ontario, June 2, 1999

122. "Institutional Investor Activism and Shareholder Activism in Canada and the U.S.", Paper presented at the Schulich School of Business, York University, Toronto, Ontario, April 28, 1999

123. "Institutional Investor Activism and Shareholder Activism: Canadian and U.S. Experiences", Paper presented at the Rotman School of Management, University of Toronto, Toronto, Ontario, January 25, 1999

124. "Financing of Litigation by Third Party Investors: A Share of Justice?", Paper presented at the University of Montreal Faculty de Droit, Montreal, Quebec, December 7, 1998

125. "Investor Financing of Class Actions", Paper presented at Administration of Justice: Class Actions Seminar at Osgoode Hall Law School, Toronto, Ontario, November 25, 1998

126. "Financing of Litigation by Third Party Investors: A Share of Justice?", Paper presented at 28th Annual Consumer and Commercial Law Workshop at the University of Toronto, Faculty of Law, Toronto, Ontario, October 16, 1998

127. "The Costs of Justice: A Comparison of Legal Aid in Canada and South Africa", Paper presented to members of the Justice Committee of the South African Parliament, visiting Osgoode Hall Law School, Toronto, Ontario, January 1998

128. "Does Canada Need a National Securities Commission?", Paper presented at Osgoode Hall Law School, Toronto, Ontario, February 1997

**Other Public Lectures and Addresses (Selected)**

1. The Business Law Curriculum at Osgoode Hall, Osgoode Hall Open House for Prospective Students, Winter 2008

2. The Business Law Curriculum at Osgoode Hall, Panellist at Options Fair for Upper Year Courses, Hosted by the Office of Student Services at Osgoode Hall, March 28, 2005

3. Careers in the Financial Markets, Chair and Moderator, Osgoode Hall Law School, Career Services Office, February 16, 2005

4. The Practice of Corporate Law in New York, presented at Osgoode Hall Law School, York University, September 2, 1999

5. Demystifying the First Year Law School Experience, presented at the First Year Orientation Program, Osgoode Hall Law School, York University, August 30, 1999

6. The Practice of Corporate Law in New York, presented at Osgoode Hall Law School, York University, September 1998

7. Careers in Law, presented at the First Year Orientation Program, University of Toronto, Faculty of Law, September 1998

8. Law, Law School, Race and Gender, presented at the High School Minority Outreach Program, University of Toronto, Faculty of Law, March 1998

9. Succeeding at Law School presented at the First Year Orientation Program, University of Toronto, Faculty of Law, September 1997

## Conferences, Roundtables and Events Organized (Selected)

1. *Post-Magna Dual Class Share Conference* (Capital Markets Institute) (February 15, 2011) (with Paul Halpern and Christine Campney)

2. *Accessing India: A focus on Foreign Direct Investment and Mining Roundtable* (Hennick Centre for Business and Law) (October 27, 2010) (with Ed Waitzer, James Darroch and Elizabeth Saati)

3. *Global North and Global South Perspectives on Transnational Governance: An Indian-Canadian Conversation* (Joint workshop between Osgoode Hall Law School and Jindal Global Law School) (October 25-27, 2010) (with Lisa Philipps and François Tanguay-Renaud)

4. *Davies Fund for Business and Law* (Hennick Centre for Business and Law) (October 19, 2010), Keynote speaker H. Rodgin Cohen. (with Ed Waitzer, James Darroch and Elizabeth Saati)

5. *Davies Fund for Business and Law* (Hennick Centre for Business and Law) (March 17, 2010), Keynote speaker Ben W. Heineman Jr. (with Ed Waitzer, James Darroch and Archana Sridhar)

6. *Gender Diversity in Canada's Boardrooms and C-Suites: Exploring the Business Case and Reform Strategies* (Hennick Centre for Business and Law) (March 11, 2010) (with Ed Waitzer and Archana Sridhar)

7. *The Advanced Legal Guide to Advising the Public Company Board of Directors* (Osgoode Professional Development and Hennick Centre for Business and Law) (February 18-19, 2010) (with Ed Waitzer and Myrsini Rovos)

8. *Entrepreneurship, Innovation and Commercialization of Intellectual Property Conference* (IP Osgoode and Hennick Centre for Business and Law) (February 11, 2010) (with Ed Waitzer, Pina D'Agostino and Archana Sridhar)

9. *Too Big to Save? How to Fix the U.S. Financial System* (Chair and moderator), Keynote speaker Bob Pozen, (Capital Markets Institute) (January 18, 2010) (with Paul Halpern and Christine Campney)

10. *Corporate Social Performance: Reporting Roundtable* (Hennick Centre for Business and Law) (December 7, 2009) (with Ed Waitzer, Archana Sridhar and Kevin Ranney)

11. *Canada's National Securities Regulator: Constitutional Issues and Updates* (Hennick Centre for Business and Law) (November 12, 2009) (with Ed Waitzer and Archana Sridhar)

12. *Roundtable on Joint and Several Liability for Financial Professionals* (Law Commission of Ontario and Hennick Centre for Business and Law) (October 28, 2009) (with Ed Waitzer and Patricia Hughes)

13. *Roundtable Discussion on Canadian Securities Regulator* (Capital Markets Institute) (October 27, 2009) (with Paul Halpern)

14. *Hennick Centre Open House* (Hennick Centre for Business and Law) (October 7, 2009) (with Ed Waitzer, James Darroch and Archana Sridhar)

15. *OSC Consultation on Environmental and Corporate Governance Reporting* (Hennick Centre for Business and Law) (September 18, 2009) (with Ed Waitzer, Jo-Anne Matear and James Turner)

16. *The Future of Credit Rating Agencies: Regulation and Accountability* (Capital Markets Institute) (June 25, 2009) (with Paul Halpern and Christine Campney)

17. *Expert Panel – A New Approach to Financial Regulation: Steps to Implementation* (Capital Markets Institute) (May 20, 2009) (with Paul Halpern and Christine Campney)

18. *Leaders Roundtable on the Proposed Amendments to the Canadian Securities Administrators Corporate Governance Guidelines* (Institute for Corporate Directors) (May 1, 2009) (with Carol Hansell and Peter Dey)

19. *Fair Value: Moving it Forward* (Capital Markets Institute) (April 23, 2009) (with Paul Halpern and Christine Campney)

20. *Leaders in Business and Law – Global Trends, The Emerging Economies and New Opportunities* (Hennick Centre for Business and Law) (February 26, 2009) (Keynote speaker: Hari Panday)

21. *ABCP Crisis Resolution and Impact on Capital Markets* (Capital Markets Institute) (January 21, 2009) (with Paul Halpern, Christine Campney and Judie Thom)

22. *The Advanced Legal Guide to Advising the Public Company Board of Directors* (Osgoode Professional Development and Hennick Centre for Business and Law) (January 19, 2009) (with Ed Waitzer and Myrsini Rovos)

23. *The Statutory Framework for Directors and Officers Duties and the Role of Committees of Boards* (Osgoode Professional Development) (January 18, 2009) (with Ed Waitzer)

24. *Advancing the Enforcement Agenda, Part 2: What is the Solution?* (Capital Markets Institute) (May 2, 2008) (with Paul Halpern and Judie Thom)

25. *Enforcement Roundtable on Adjudication* (Capital Markets Institute) (February 29, 2008) (with Paul Halpern and Judie Thom)

26. *Enforcement Roundtable on Prosecution* (Capital Markets Institute) (February 15, 2008) (with Paul Halpern and Judie Thom)

27. *Enforcement Roundtable on Investigation* (Capital Markets Institute) (January 31, 2008) (with Paul Halpern and Judie Thom)

28. *Advancing the Enforcement Agenda Part 1: What's the Problem?* (Capital Markets Institute) (June 27, 2007) (with Paul Halpern and Judie Thom)

29. *Roundtable on Kerr v. Danier* (Capital Markets Institute) (November 2006) (with Paul Halpern and Atanaska Novakova)

30. *Advising the Public Company Board of Directors* (Osgoode Professional Development) (October 2, 2006) (with Carol Hansell)

31. *Inaugural Osgoode Course Design Institute* (Osgoode Hall Law School) (May 2006) (Patrick Monahan, Stephanie Ben-Ishai and Colleen Hanycz)

32. *Disclosure Issues and Issuer/Investor Balance in Securities Regulation* (Capital Markets Institute) (February 10, 2006) (with Paul Halpern)

33. *Insurance for Misinformation in the Capital Markets* (Capital Markets Institute) (February 8, 2006) (with Paul Halpern and Atanaska Novakova)

34. *True Characteristics of Canada's Markets* (Capital Markets Institute) (February 7, 2006) (with Paul Halpern and Atanaska Novakova)

35. *New Approaches to Enforcement*, Chair and Moderator (Capital Markets Institute) (February 2006) (with Paul Halpern and Atanaska Novakova)

36. *The LSE's AIM vs. TSX Venture Exchange* (Capital Markets Institute) (February 2006) (with Paul Halpern and Atanaska Novakova)

37. *Importing the E-World into Canadian Securities Regulation* (Capital Markets Institute) (February 2006) (with Paul Halpern and Atanaska Novakova)

38. *New Products and Emerging Risks* (Capital Markets Institute) (February 2006) (with Paul Halpern and Atanaska Novakova)

39. *Corporate Governance: Crisis and Reform* (Osgoode Professional Development) (November 6, 2002) (with Carol Hansell, John Turner and Bill Braithwaite)

40. *Workshop on Corporations and Capitalism*, (Osgoode Hall Law School, Co-sponsored by Cornell Law School and University of British Columbia Faculty of Law (September 2002) (with Mary Condon, Martha Fineman and Jannis Sarra)

41. *Canadian Association of Law Teachers Meeting* (Canadian Association of Law Teachers) (May-June 2002) (as a member of the Executive Board of the Association)

42. *Canadian Law and Economics Association's Annual Meeting* (Canadian Law and Economics Association) (September 2001) (as a member of the Executive Board of the Association)

43. *Conference on Lending Transactions* (Osgoode Professional Development) (September 29, 1999) (with Celia Rhea)

**Service to the Larger Community**

**2010-present MOUNT SINAI HOSPITAL**

- *Member, Board of Governors;*
- *Member, Resources and Planning Committee;*
  Responsible for overseeing matters relating to planning and resourcing and providing advice and recommendations to management and the board.

**2010-present NATIONAL STATISTICS COUNCIL OF CANADA**

- *Member*
  Providing advice on priorities for the Country's statistical system to assist in the Council's mandate of providing the Chief Statistician of Canada

**2008-present GREATER TORONTO AIRPORT AUTHORITY (Toronto Pearson)**

- *Member, Board of Directors;*
- *Chair, Nominating Committee (2010-present)*
- *Chair, Governance Committee (2010-present)*
- *Member, Nominating Committee (2009-2010)*
- *Member, Environment, Health and Safety Committee (2008-2010)*

**2008-2010 ONTARIO ASSOCIATION OF FOOD BANKS**

- *Member, Board of Directors*
- *Member, Executive Committee of Board*
- *Member, Community Advisory Board*

**2003-present PRESIDENT'S INTERNATIONAL ADVISORY COUNCIL (PIAC), UNIVERSITY OF TORONTO**

- *Inaugural Member*
  Provide strategic advice and input to President Birgineau, Interim President Iacobucci and President Naylor on opportunities and challenges facing the University.

**1999-present CANADIAN LAW AND ECONOMICS ASSOCIATION**

- *President (2006-2008)*
- *Vice-President (2004-2006)*
- *Secretary (2002-2004)*
- *Member of Executive (other years)*

**2001-2002 CANADIAN ASSOCIATION OF LAW TEACHERS**

- *Member, Executive Committee*

**1997-2002 UNIVERSITY OF TORONTO ALUMNI ASSOCIATION**

- *Member, Board of Directors*
- *Chair, Special Projects Committee*
- *Member, Finance Committee*

**1996-1997 LAW SCHOOL COUNCIL, HARVARD LAW SCHOOL**

- *Student Representative*

**1995-1996 ACADEMIC BOARD OF THE GOVERNING COUNCIL, UNIVERSITY OF TORONTO**

- *Alumni Representative*

**1994-1995 UNIVERSITY OF TORONTO SEXUAL HARRASSMENT HEARING PANEL**

- *Student Representative*

**1994-1995 GRADITUDE CAMPAIGN, UNIVERISTY OF TORONTO FACULTY OF LAW**

- Co-Chair: Organized graduating class gift to law school.

**1992-1994 THE VARSITY NEWSPAPER, UNIVERSITY OF TORONTO'S OFFICIAL STUDENT NEWSPAPER**

- *Chair, Board of Directors (1993-1994)*
- *Member, Board of Directors (1992-1993)*

**1992-1993 DOWNTOWN LEGAL SERVICES, UNIVERSITY OF TORONTO FACULTY OF LAW'S LEGAL AID CLINIC**

- *Caseworker*

## EXHIBIT B

1. Expert witness affidavit for Fischer *et al.* v. IG Investment Management Ltd., CI Mutual Funds Inc., Franklin Templeton Investments Corp., AGF Funds Inc. and AIC Limited (Court file no. 06-CV-307599CP)(Ontario Superior Court of Justice) Proceeding under the *Class Proceedings Act*, 1992.

2. Expert witness affidavit for Allen v. Aspen Group Resources Corporation, Jack E. Wheeler, James E. Hogue, Wayne T. Egan, Anne Holland, Randall B. Kahn, Lenard Briscoe, Peter Lucas, Lane Gorman Trubitt L.L.P. and Weirfoulds LLP (Court File No. 02-CV-241587CP) (Ontario Superior Court of Justice) Proceeding under the *Class Proceedings Act* 1992.

3. Expert witness affidavit for: In the Matter of the Securities Act (R.S.O. 1990, c. s.5, as amended) and Watt Carmichael Inc., Roger D. Rowan, Harry J. Carmichael and G. Michael Mckenney and the Attorney General of Ontario (Intervener)

4. Expert witness affidavit for In re IMAX Securities Litigation (Court File No. 06 Civ 6128(NRB) (United States District Court, S.D. New York).

5. Expert witness affidavit for Potash Corp. v. BHP Billiton (Court File No.1:10-cv-06024)(United States District Court, E.D. Illinois).