UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | Master File No. 06 Civ. 6128 (NRB) |

**DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**PORTIONS REDACTED**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100
Facsimile: (214) 698-3400

**ATTORNEYS FOR DEFENDANT PRICEWATERHOUSECOOPERS LLP, AN ONTARIO LIMITED LIABILITY PARTNERSHIP**

**THIS MEMORANDUM CONTAINS CONFIDENTIAL INFORMATION. PURSUANT TO ¶ 7 OF THE STIPLUATION AND ORDER GOVERNING CONFIDENTIAL MATERIAL, ENTERED NOVEMBER 3, 2008, PORTIONS OF THE ELECTRONICALLY-FILED MEMORANDUM HAVE BEEN REDACTED AND AN UNREDACTED COPY HAS BEEN FILED WITH THE COURT UNDER SEAL**

**PORTIONS REDACTED**

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ....... 1

II. ARGUMENT ....... 2

A. Standards Applicable to Class Certification ....... 2

B. Class Certification Must Be Denied Because PwC-Canada Can Rebut the Fraud-on-the-Market Presumption for Pre-February 17, 2006 Purchasers by the Absence of a Measureable Adverse Impact on Imax's Stock Price on any Possible Corrective Disclosure Date ....... 4

1. PwC-Canada May Rebut the Fraud-on-the-Market Presumption by Showing the Lack of a Statistically Significant Price Movement at the Time of the Alleged Curative Disclosure ....... 4

2. The Court Has Determined That August 9, 2006 Is Not a Corrective Disclosure Date for Potential Class Members Who Purchased IMAX Stock Before February 17, 2006 ....... 7

3. The Lack of a Significant, Negative Price Change Following Any Disclosure Potentially Curative of Pre-February 2006 Misstatements Rebuts the Fraud-on-the-Market Presumption ....... 9

C. The Class Cannot Be Certified Because of the Significant Differences Between the Factual and Legal Bases for Recovery Between Pre- and Post-February 2006 Purchasers ....... 13

1. The Merger Fund Cannot Adequately Represent Pre-February 2006 Purchasers ....... 13

2. Common Issues Do Not Predominate Over Individual Issues as Between the Two Groups of Purchasers ....... 16

3. The Class Does Not Meet the Rule 23(a)(2) Commonality Requirement ....... 17

D. Class Certification Must Be Denied Because PwC-Canada Can Rebut the Fraud-on-the-Market Presumption as the Alleged Accounting Errors Did Not Materially Impact the Price of IMAX Stock. ....... 18

**PORTIONS REDACTED**

III. CONCLUSION ........................................................................................................ 19

**PORTIONS REDACTED**

## TABLE OF AUTHORITIES

**Page**

### CASES

*Basic v. Levinson*,
485 U.S. 224 (1988) ........ 4, 5

*Deutschman v. Beneficial Corp.*,
132 F.R.D. 359 (D. Del. 1990) ........ 16

*Dura Pharm., Inc. v. Brudo*,
544 U.S. 336 (2005) ........ 8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S.__, No. 09-1403, 2011 WL 2175208 (June 6, 2011) ........ 6

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ........ 3

*Hevesi v. Citigroup, Inc.*,
366 F.3d 70 (2d. Cir. 2004) ........ 13

*In re Am. Int'l Group, Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y.) ........ passim

*In re DVI, Inc. Sec. Litig.*,
639 F.3d 623 (3d Cir. 2011) ........ 6, 10

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008, as amended January 16, 2009) ........ 3

*In re IMAX Sec. Litig.*,
272 F.R.D. 138 (S.D.N.Y. 2010) ........ passim

*In re IMAX Sec. Litig.*,
587 F. Supp. 2d 471 (S.D.N.Y. 2008) ........ 14, 15

*In re Initial Pub. Offering Sec. Litig.*,
471 F.3d 24 (2d Cir. 2006) ........ passim

*In re Moody's Corp. Sec. Litig.*,
No. 07-civ-8375, 2011 U.S. Dist. LEXIS 36023 (S.D.N.Y. Mar. 31, 2011) ........ 5, 6, 10

*In re Omnicon Group, Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) ........ 11

**PORTIONS REDACTED**

*In re Sadia SA Sec. Litig.*,
269 F.R.D. 298 (S.D.N.Y. 2010) .......... 5, 18

*In re Solomon Analyst Metromedia Litig.*,
544 F.3d 474 (2d. Cir. 2008).......... passim

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001).......... 13

*In re Vivendi Universal S.A. Sec. Litig.*,
242 F.R.D. 76 (S.D.N.Y. 2007) .......... 17

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005).......... 11

*N. River Ins. Co. v. Philadelphia Reinsurance Corp.*,
63 F.3d 160 (2d Cir. 1995).......... 8, 9

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
272 F.R.D. 160 (S.D.N.Y. 2011) .......... 16

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
546 F.3d 196 (2d Cir. 2008).......... 3

*UFCW Local 1776 v. Eli Lily & Co.*,
620 F.3d 121 (2d Cir. 2010).......... 16

*Wal-Mart Stores, Inc. v. Dukes*,
563 U.S. __, No. 10-277, 2011 WL 2437013 (June 20, 2011) .......... 17, 18

**RULES**

Fed. R. Civ. P. 23 .......... passim

**PORTIONS REDACTED**

Defendant PricewaterhouseCoopers LLP, an Ontario limited liability partnership, ("PwC-Canada") respectfully submits this memorandum of law in opposition to Plaintiff's Motion for Class Certification.[1]

## I. INTRODUCTION

Lead Plaintiff, The Merger Fund ("Plaintiff"), has moved for certification of a securities fraud class action pursuant to Rule 23(b)(3) against defendants PwC-Canada and against IMAX Corporation ("IMAX") and certain of its present and former officers (collectively, the "IMAX Defendants").

Plaintiff asks this Court to squeeze into the class action mechanism factually and legally distinct claims held by two different groups of purchasers of IMAX stock: those who purchased before February 17, 2006 and those who purchased on or after that date. Each group of purchasers relied on a fundamentally different set of alleged misrepresentations, involving the application of different accounting principles, raising distinct issues of scienter, and, as this Court has already determined, involving different corrective disclosure dates. The uniqueness of these entirely distinct categories of claims defeats class certification in a number of ways.

First, PwC-Canada can rebut the class-wide presumption of reliance for pre-February 17, 2006 purchasers by establishing the absence of a material, adverse price impact in the value of IMAX stock upon the disclosure of information claimed by Plaintiff to be curative of the alleged pre-February 17, 2006 misrepresentations. Without the fraud-on-the-market presumption, individual issues of reliance will predominate over common questions, and the class cannot be certified under Rule 23(b)(3).

---

[1] The IMAX Defendants have filed a separate opposition to Plaintiff's Motion for Class Certification (the "IMAX Opp."). PwC-Canada hereby joins in and incorporates the IMAX Opp. in all respects.

**PORTIONS REDACTED**

Second, Plaintiff's own individual claim, which is not based upon statements made before February 17, 2006, creates a conflict of interest with the earlier group of purchasers. This economic conflict, combined with the factually and legally distinct nature of the pre-February 2006 claims, results in Plaintiff being unable to establish the adequate representation prong of Rule 23(a)(4).

Third, common issues do not predominate over individual issues due to the factually and legally distinct nature of each set of claims. Put differently, the class claims are not susceptible to common proof due to the unique aspects of the claims of purchasers of IMAX stock on or after February 17, 2006 that in no way relate to claims of earlier purchasers. As such, Plaintiff cannot establish the predominance requirement of Rule 23(b)(3). For similar reasons, the class cannot satisfy the commonality test under Rule 23(a)(2).

Independent of the distinct nature of the claims between the two groups of purchasers, the class cannot be certified because PwC-Canada can rebut the class-wide presumption of reliance because the alleged accounting errors did not materially impact the value of IMAX stock.

## II. ARGUMENT

### A. Standards Applicable to Class Certification

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006) ("*In re IPO*").[2] Rule 23(a) states that a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the

[2] Unless otherwise indicated, all emphasis is added and all internal quotations and citations omitted.

**PORTIONS REDACTED**

representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). A party seeking class certification must also satisfy at least one of the subparts of Rule 23(b). Plaintiff seeks certification here under Rule 23(b)(3), which requires a plaintiff to show "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

On a motion for class certification, a plaintiff bears the burden of producing sufficient admissible evidence, beyond the mere allegations in the complaint, to demonstrate that it satisfies all of the requirements of class certification under Rule 23. *See In re IPO*, 471 F.3d at 41 ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006). It is insufficient for a plaintiff merely to make "some showing" that the requirements of Rule 23 have been satisfied. *In re IPO*, 471 F.3d at 42. Rather, a plaintiff must prove by a preponderance of the evidence that the requirements of Rule 23 have been met. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008, as amended January 16, 2009).

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met." *In re IPO*, 471 F.3d at 27. "Such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *Id.* at 41. A district court's ruling on class certification must be the result of a "definitive assessment

**PORTIONS REDACTED**

of Rule 23 requirements, notwithstanding their overlap with merits issues." *Id*. "[T]he fact that a Rule 23 requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met." *Id*. at 27.

### B. Class Certification Must Be Denied Because PwC-Canada Can Rebut the Fraud-on-the-Market Presumption for Pre-February 17, 2006 Purchasers by the Absence of a Measureable Adverse Impact on Imax's Stock Price on any Possible Corrective Disclosure Date

#### 1. PwC-Canada May Rebut the Fraud-on-the-Market Presumption by Showing the Lack of a Statistically Significant Price Movement at the Time of the Alleged Curative Disclosure

To satisfy Rule 23(b)(3)'s predominance requirement, a plaintiff in a Rule 10b-5 class action must establish class-wide reliance through the fraud-on-the-market presumption outlined by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988). *In re IPO*, 471 F.3d at 43 ("Without the *Basic* presumption, individual questions of reliance would predominate over common questions."). Under Second Circuit law, the presumption applies where a defendant has "(1) publicly made (2) a material misrepresentation (3) about a stock that traded on an impersonal, well-developed (i.e., efficient) market . . . ." *In re Solomon Analyst Metromedia Litig.*, 544 F.3d 474, 481 (2d. Cir. 2008) ("*In re Solomon*").[3]

The defendant can rebut the presumption at the class certification stage by showing that "the allegedly false or misleading material statements did *not* measurably impact the market price of the security." *Id.* at 486, n.9 (emphasis in original). *See also id.* at 483-84, 485 (similar). As the Second Circuit explained in *In re Solomon*, such rebuttal evidence is consistent with *Basic's* teaching that "any showing that *severs the link* between the alleged misrepresentation and . . . the price . . . will be sufficient to rebut the presumption of reliance."

---

[3] Plaintiff also must show that he traded between the time the alleged misrepresentation was made and the time that the "truth" was revealed. *Id.* at 481, n.4.

**PORTIONS REDACTED**

*Id.* at 484 (quoting *Basic*, 485 U.S. at 248) (emphasis in original). *See also In re Sadia SA Sec. Litig.*, 269 F.R.D. 298, 307 (S.D.N.Y. 2010) ("One way to 'sever the link' is to demonstrate that the alleged misrepresentations were immaterial because they did not lead to a distortion in price.")

The defendant, therefore, may rebut the presumption of reliance by showing that the alleged misrepresentation did not impact the price of the security at the time it was made *or* at the time the "truth" was revealed to the market, commonly known as a corrective or curative disclosure. *In re Am. Int'l Group, Inc. Sec. Litig.*, 265 F.R.D. 157, 182 (S.D.N.Y.) ("*In re AIG*") (holding that in an efficient market, "the absence of a price decline on the day a fraud was disclosed will strongly indicate that there was also no price increase on the day the fraud occurred"); *In re Moody's Corp. Sec. Litig.*, No. 07-civ-8375, 2011 U.S. Dist. LEXIS 36023, at *24 (S.D.N.Y. Mar. 31, 2011) ("[A] showing that there was no price decrease when the misrepresentations were disclosed is evidence that the stock price was not artificially inflated by the introduction of the misrepresentation in the market.")

A common device used to determine whether a material negative stock price movement occurred is an "event study" performed by an expert in financial economics. *In re AIG,* 265 F.R.D. at 182. An event study identifies firm-specific price movements – as opposed to broad economic or industry-specific factors – and measures whether such price movements are "statistically significant," meaning likely due to new, material, firm-specific information reaching the market. *Id.* *See also* Expert Report of Professor Christopher M. James ("James Rpt.") at ¶¶ 13-22 (Dkt. # 99). A stock price movement is statistically significant for purposes of class certification if it can be established at the 95% confidence level. *See In re AIG*, 265 F.R.D. at 187-88 (holding that a 95% confidence level is required to show a measurable price impact).

**PORTIONS REDACTED**

If a stock does not have a statistically significant decline when the "truth" is revealed to the market, then the fraud-on-the-market presumption is rebutted and, therefore, Rule 23(b)(3)'s predominance requirement is not satisfied. *In re AIG,* 265 F.R.D. at 187-88; *In re Moody's*, 2011 U.S. Dist. LEXIS 36023, at *36.

Nothing in the Supreme Court's recent decision in *Erica P. John Fund, Inc. v. Halliburton Co.* disturbs the Second Circuit's holding in *In re Solomon* or how the courts in this district have applied that decision. The court's holding in *Halliburton* was narrow, merely overturning the Fifth Circuit's requirement that "securities fraud plaintiffs must prove loss causation" as part of their initial burden to invoke the fraud-on-the-market presumption. 563 U.S.__, No. 09-1403, 2011 WL 2175208, at *4 (June 6, 2011). The court specifically declined to address "how or when [the *Basic* presumption] may be rebutted" and expressed "no view[]" concerning how "price impact" fits into such a framework. *Id.* at *8, *7. Simply put, *In re Solomon* remains the law in this circuit.

Indeed, *Halliburton* favorably cites *In re Solomon* as correctly rejecting the Fifth Circuit's requirement that plaintiffs prove loss causation at the class certification stage. *Id.* at *4. Similarly, in *In re AIG*, the trial court rejected the Fifth Circuit's approach while still allowing presentation of rebuttal evidence of the lack of price impact at the time of the corrective disclosure. *In re AIG*, 265 F.R.D. at 181. Evidence of the lack of price impact is consistent with *Halliburton* in that such evidence shows that the alleged misstatements were not material, *see In re Solomon*, 544 F.3d at 483-84, which is an element required to invoke the presumption and self-evidently a "fact[] surrounding the investor's decision to engage in the transaction." *Halliburton*, 2011 WL 2175208, at * 6. The Third Circuit's analog to *In re Solomon*, also cited favorably in *Halliburton*, agrees. *Id.* at *4 (citing *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 638

**PORTIONS REDACTED**

(3d Cir. 2011) where the Third Circuit held that "[i]n an otherwise efficient market, the failure of a corrective disclosure to affect the market price may . . . serve as a rebuttal to the presumption of reliance because it renders the misstatement immaterial as a matter of law").

### 2. The Court Has Determined That August 9, 2006 Is Not a Corrective Disclosure Date for Potential Class Members Who Purchased IMAX Stock Before February 17, 2006

In its previous ruling denying former Lead Plaintiff Snow Capital Investment Partners, L.P.'s ("Snow Capital") motion for class certification, the Court determined that IMAX's August 9, 2006 press release was not a corrective disclosure for purchasers who acquired IMAX stock *before* February 17, 2006. *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 154 (S.D.N.Y. 2010). Snow Capital had purchased all of its IMAX stock before February 2006 and had sold its stock on August 10, 2006. *Id.* at 148. Because Snow Capital sold prior to a disclosure that corrected the earlier alleged misstatements that it had relied on when it purchased IMAX stock, the Court concluded that Snow Capital could not establish loss causation and, therefore, could not serve as class representative. *Id.* at 155.

After a thorough analysis of the content and the market's understanding of IMAX's August 9 Press Release, the Court concluded that it was not "a corrective disclosure of alleged misstatements made prior to IMAX's release of its fourth quarter [2005] financials" on February 17, 2006. *Id.* at 150. Specifically, the August 9 Press Release "was not a corrective disclosure for alleged misstatements beyond those that fall within both the temporal (Q4 2005 and later) and topical (the application of MEA accounting described in the announcement) limitations of the disclosure itself." *Id.* at 149. *See also id.* at 154. The press release did not reveal the "truth" concerning the alleged misstatements made prior to February 2006, none of which involved the application of multiple element arrangement accounting. *Id.* at 143-45, 149-54. In other words,

**PORTIONS REDACTED**

pre-February 17, 2006 purchasers must identify some other disclosure that they can claim revealed the relevant "truth" to the market.

Not only is Plaintiff's attempt to reargue the scope of the August 9 Press Release an implicit acknowledgment that later corrective disclosures do not exist, it also flies in the face of the law of the case. Memo. at 7-9 (Dkt. # 173). "[E]xtraordinary circumstances" that might warrant review of the Court's settled decision do not exist. *N. River Ins. Co. v. Philadelphia Reinsurance Corp.*, 63 F.3d 160, 164 (2d Cir. 1995) (holding that prior rulings should not be disturbed unless "the initial decision was clearly erroneous" or there has been a "fundamental change in the governing law"). The Court need not retread well-worn ground by re-evaluating the language of August 9 Press Release or considering substantially similar evidence from third-party analysts. Memo. at 8-9. [redacted]

At its core, Plaintiff's effort merely recasts arguments previously rejected by this Court.[5] Nothing raised by Plaintiff warrants disturbing the Court's conclusion that "[i]n our view, the

---

[redacted]

[5] The Court, in fact, rejected similar arguments made by Snow Capital in the last round of class certification briefing. *Compare* Memo. at 8 ("[A] reasonable investor could assume
[Footnote continued on next page]

**PORTIONS REDACTED**

August 9, 2006 disclosure revealed an investigation into IMAX's accounting for the fourth quarter of 2005 and the second quarter of 2006 – not earlier periods." *In re IMAX*, 272 F.R.D. at 154 (discussing how the Court's conclusion was based on language of the disclosure, the understanding of the analyst community regarding the disclosure, and the evolution of IMAX's accounting policy). Plaintiff's request to reopen this fully litigated issue, thereby wasting precious judicial and party resources, is wholly without merit. *See N. River Ins. Co.*, 63 F.3d at 164 ("Mere doubt is not enough to open the point for full consideration.")

### 3. The Lack of a Significant, Negative Price Change Following Any Disclosure Potentially Curative of Pre-February 2006 Misstatements Rebuts the Fraud-on-the-Market Presumption

As the Court has determined, IMAX's August 9, 2006 Press Release only revealed the allegedly fraudulent misstatements between February 17 and August 9, 2006. This partial disclosure, therefore, is legally irrelevant for purchasers of IMAX stock before February 17, 2006. For earlier purchasers to assert a claim, there must be some additional corrective disclosure that reveals the complete "truth" as to the earlier alleged misstatements. Because, as to those possible dates, PwC-Canada can establish the absence of an adverse, statistically significant price impact, it can rebut the fraud-on-the-market presumption for purchasers of IMAX stock before February 17, 2006. As a result, individualized issues of reliance predominate over common questions, and the class cannot be certified.

---

[Footnote continued from previous page]

that the 'including' language suggests that the SEC inquiry was not so limited.") *with In re Imax*, 272 F.R.D. at 150-51 ("Snow Capital does not cite to one analyst report that stated that the investigation might extend to pre-4Q 2005 financials, either within fiscal year 2005, or earlier."). [redacted]

**PORTIONS REDACTED**

In the Complaint, Plaintiff alleges a number of additional disclosure days after August 9, 2006; however, the first potential curative disclosure included for investors who purchased shares prior to February 17, 2006 that is associated with a negative stock price movement is March 29, 2007. *See* Compl. ¶ 127 (Dkt. # 46). On that date, IMAX issued a press release announcing that it had again delayed filing its 2006 Form-10K to conduct an "expanded review" of revenue recognition for theater systems into "previous periods." McKenney Decl. Exh. B.

Professor Christopher M. James determined, by conducting an event study, that the negative stock price movement following that announcement was not statistically significant. James Rept. at ¶¶ 47, 49. Plaintiff's own expert for market efficiency, Michael A. Marek, *confirmed* Professor James's analysis. In support of his conclusion that IMAX's stock traded in an efficient market, Mr. Marek conducted an event study that also determined that the price impact from the March 29 Press Release was statistically insignificant. Declaration of Michael E. Marek ("Marek Decl."), Exh. N at 25 (Dkt. # 175). Just like Professor James, Mr. Marek determined that the company-specific stock price movement on March 29 failed to exceed the benchmark for statistical significance at the 95% level. *Id.* at ¶ 77, Exh. N. at 25. [redacted]

The lack of significant, negative price reaction following the March 29 press release supports the conclusion that the market viewed the earlier statements potentially corrected by the release as immaterial. *See In re AIG*, 265 F.R.D. at 182; *In re: Moody's*, 2011 U.S. Dist. LEXIS 36023, at *24; *In re DVI*, 639 F.3d at 638. [redacted]

**PORTIONS REDACTED**

[redacted]

The lack of a statistically significant adverse stock price reaction to the March 29 Press Release is not surprising because the alleged "truth" that IMAX's financial statements for earlier periods were in error had been revealed earlier. *See In re Omnicon Group, Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (a disclosure is not curative if it does not reveal new, material information to the market); *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (a corrective disclosure must reveal the falsity of the prior misstatement). On March 16, 2007, before the markets opened, IMAX stated that its audited financial statements issued during the class period could not be relied upon. McKenney Decl. Exh. C. Thus, the disclosure of an expanded investigation into theater system installations from earlier periods in the March 29 Press Release "added nothing to the public's knowledge" concerning the propriety of IMAX's accounting policies in earlier years because IMAX had already publicly disavowed reliance on those earlier financial statements two weeks before. *In re Omnicon*, 597 F.3d at 512.

Plaintiff, however, does not allege any market reaction to the March 16 Press Release. Nor could it, given that IMAX's closing stock price on March 15, 2007 on the NYSE was $4.99 per share, and the stock closed on March 16, 2007 at $5.00 per share. McKenney Decl. Exh. D.[6]

Subsequently, IMAX's July 20 Press Release announced the completion of the company's restatement. McKenney Decl. Exh. E. As the relevant "truth" as to the scope of the restatement had been revealed previously, the July 20 Press Release was not a corrective disclosure but merely a republication of what the market already knew except, perhaps, for *when*

---

6 Plaintiff's expert Michael Marek confirms the lack of price impact on March 16 as well. Marek Decl., Exh. N. at 25.

**PORTIONS REDACTED**

the uncertainty surrounding the restatement would be resolved.[7] Further, the firm-specific stock price *increase* of 10% on that date rebuts the class-wide presumption of reliance as to the alleged pre-February 2006 misstatements. *See* James Rpt. at ¶ 159 (discussing event study on that date). *See also In re AIG*, 265 F.R.D. at 182 (S.D.N.Y.) ("*In re AIG*") ("[T]he absence of a price decline on the day a fraud was disclosed will strongly indicate that there was also no price increase on the day the fraud occurred."). [redacted]

Thus, whether measured by the March 29, March 16 or July 20 Press Release, PwC-Canada has rebutted the fraud-on-the-market presumption by showing the lack of a statistically significant impact on the price of IMAX's stock upon disclosure of the "truth" regarding IMAX's accounting for its earlier theater system installations and PwC-Canada's related audit opinions. *See In re Solomon*, 544 F.3d at 483-84; *In re AIG*, 265 F.R.D at 188. [redacted] Accordingly, as individual issues of reliance for pre-February 17, 2006 purchasers predominate over common questions, the class cannot be certified. *See In re IPO*, 471 F.3d. at 43 ("Without the *Basic* presumption, individual questions of reliance would predominate over common questions.")

---

[7] Professor James concluded that post August 9, 2006 all corrective disclosure dates identified in the Complaint are *not* corrective disclosure dates, because either they did not reveal new information or they did not have a material adverse impact on IMAX's stock price. James Rpt. at ¶¶ 45-50.

**PORTIONS REDACTED**

### C. The Class Cannot Be Certified Because of the Significant Differences Between the Factual and Legal Bases for Recovery Between Pre- and Post-February 2006 Purchasers

#### 1. The Merger Fund Cannot Adequately Represent Pre-February 2006 Purchasers

Rule 23(a)(4) provides that, to obtain class certification, a plaintiff must show that "the representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). This rule requires courts to inquire whether the proposed class representative's "interests are antagonistic to the interest of other members of the class." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 142 (2d Cir. 2001). The conflict must be "fundamental" and not "speculative." *Id.* at 145. Such an impermissible conflict exists here, where a purchaser of IMAX securities who bought all of its shares after the February 17, 2006 Press Release and sold prior to any disclosure curative of alleged pre-February 17, 2006 misstatements – such as Plaintiff – seeks to represent the class of earlier purchasers whose claims rest on fundamentally different factual and legal bases.

Indeed, the Court has correctly described this case as one where "the central allegation involves financial results *in a single quarter*." *In re IMAX*, 272 F.R.D. at 152 (emphasis in original). Plaintiff bought its shares of IMAX stock shortly after the announcement of that quarter's results in the February 17 Press Release and the subsequent 2005 10-K filed on March 9. *See* Abrams Aff., Exh. A. Plaintiff held its shares through the alleged August 9, 2006 corrective disclosure, relating to the fourth quarter of 2005 (and later) and to MEA accounting for theater system installations, but sold prior to any disclosure potentially curative of pre-February 2006 misstatements. *Id.* While PwC-Canada recognizes that the law in this circuit does not *generally* require a class representative to "have standing to sue on every claim," *Hevesi*

**PORTIONS REDACTED**

*v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d. Cir. 2004), the unique circumstances of this litigation make such a "pure" purchaser as Plaintiff an inadequate representative.

Plaintiff has an economic incentive to inflate the value of the misstatements attributable to the application of MEA accounting to theater installations in Q4 2005 and Q2 2006 and to minimize the inflationary impact of earlier misstatements, because it cannot recover for losses associated with those earlier alleged misstatements.[8] This conflict is exacerbated by the fact that Plaintiff's burden for proving its own individual claim will be exceedingly difficult.[9] The Court has already identified the difficulty that Plaintiff will have in establishing that PwC-Canada, an accounting firm, acted with the requisite scienter. *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (describing the "no audit at all" standard for establishing accountant scienter as "demanding"). Plaintiff will also face a substantial obstacle in proving loss causation relating to the August 9, 2006 Press Release. The primary cause of the stock price decline following that release was the announcement of IMAX's failure to find a buyer for the company (the prior announcement of efforts to sell the company had led merger arbitrageurs, such as Plaintiff, to bid up the stock price dramatically in anticipation of a successful sale or merger). James Rpt. at ¶¶ 90-92, ¶¶ 96-99. The overwhelming focus on the "no-buyer" announcement by

---

8 This is yet another reason why Plaintiff seeks to reargue the scope of the August 9 Press Release to broaden its application to the alleged misstatements made earlier in the proposed class period. *See, supra* Section II.B.2.

9 "[T]he fact that a Rule 23 requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met." *In re IPO*, 471 F.3d at 27. Accordingly, when a proposed class representative's ability to succeed on the merits of its own individual claim fosters a conflict with absent class members a preliminary inquiry – but not final determination – of the merits is appropriate. *See also Wal-Mart Stores, Inc. v. Dukes*, 563 U.S. __, No. 10-277, 2011 WL 2437013, at *7 (June 20, 2011) (confirming that a merits inquiry is relevant where there is overlap with Rule 23 requirements).

**PORTIONS REDACTED**

the analyst community supports this conclusion. *Id.* at ¶¶ 101-106. In fact, Professor James has already opined that Plaintiff will be unable to establish loss causation based on the August 9, 2006 release. *Id.* at ¶¶ 81-145.

Burdened by the difficulties of its own individual claim and the economic incentive to maximize its own losses, Plaintiff will have no incentive to pursue claims for pre-February 2006 purchasers, whose claims involve completely different – and more difficult – factual and legal issues. The Court has already recognized that only a tiny portion of IMAX shares purchased between February 23, 2003 and February 17, 2006 were held through August 9, 2006 and/or July 20, 2007. *In re IMAX*, 272 F.R.D. at 155, n.73. Moreover, each element of Rule 10b-5 involves different proof as between the two groups of purchasers. With regard to materiality, only one theater from 2002 and two theaters in 2004 shifted fiscal years in the restatement; this alone may be an insurmountable barrier to establishing materiality. *Id.* at 151, n.56. *See also, supra* Section II.B.3 (discussing how event studies and analyst commentary indicate that the market viewed pre-2005 financial statements as immaterial). These earlier theaters involved the application of an entirely different (non-MEA) accounting policy and did not concern the timing of screen installations; as such, they implicate different theories of scienter. *In re IMAX*, 587 F. Supp. 2d at 482 (discussing how the different accounting policies impact issue of scienter). Plaintiff also faces substantial questions concerning market efficiency in these earlier periods; its own expert on the subject relied only on aggregate data for the entire class period.[10] And, of course, pre-February 17, 2006 purchasers have a different alleged corrective disclosure date and

---

10 *See generally* Marek Decl. For a more detailed analysis of the deficiencies of Mr. Marek's report with regard to establishing market efficiency early in the proposed class period, *see* IMAX Opp. at 20-21.

unique loss causation issues, which Plaintiff has no incentive to pursue because it sold its shares prior to any relevant alleged corrective disclosure.

Thus, Plaintiff's difficulties in establishing its individual claim, combined with its economic incentive to maximize losses attributable to the August 9, 2006 disclosures, create a fundamental and non-speculative conflict of interest with pre-February 2006 claimants, whose claims are based on entirely different factual and legal theories. *Cf. Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 383 (D. Del. 1990) (subclasses appropriate when proof necessary to establish claims of purchasers after a certain date would vary significantly from that of those who purchased prior to that date). It is not idle speculation that, if pre-February 17, 2006 purchasers were included a single class, their claims would not be vigorously pursued by Plaintiff and would be lost forever by an adverse judgment. As such, Plaintiff cannot adequately represent the class, and certification must be denied.

### 2. Common Issues Do Not Predominate Over Individual Issues as Between the Two Groups of Purchasers

The completely distinct legal and factual bases for recovery asserted by the two distinct groups of purchasers provides an independent reason to deny class certification for lack of predominance under Rule 23(b)(3). As explained immediately above, the proof needed to establish each element of a violation of Rule 10b-5 varies between each group of purchasers. Under these circumstances, it cannot be said "that resolution of some of the legal or factual questions that qualify *each class member's case* as a genuine controversy can be achieved through generalized proof." *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 168 (S.D.N.Y. 2011) (citing *UFCW Local 1776 v. Eli Lily & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)).

**PORTIONS REDACTED**

Purchasers of IMAX stock before February 17, 2006 face an entirely different set of factual and legal issues when compared to the later purchasers of IMAX stock. For example, only the latter group of purchasers implicates issues concerning the application of MEA accounting to IMAX theater system installations in Q4 2005 and Q2 2006, related issues of scienter, and issues of loss causation on August 9 and 10, 2006. Those issues – which surround the "the central allegation" in this case – are not common to the entire proposed class. *In re IMAX*, 272 F.R.D. at 152. Pre-February 17, 2006 purchasers do not require this evidence to maintain their claims. Thus, this is not a case where "all plaintiffs will rely on the same or substantially similar documents, statements, and legal theories to prove the defendants' liability." *In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 90 (S.D.N.Y. 2007). Purchasers who acquired IMAX stock on or after February 17, 2006 cannot establish their claims with proof common to the entire class. As such, individualized issues predominate, and the class cannot be certified.

**3. The Class Does Not Meet the Rule 23(a)(2) Commonality Requirement**

The commonality prong of Rule 23(a)(2) "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Dukes*, 2011 WL 2437013, at *7. As the Supreme Court recently held in *Dukes*, "this does not mean merely that they have all suffered a violation of the same provision of law." *Id.* Rather, the "claims must depend on a common contention" that "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiff cannot satisfy this burden. The legal and factual differences between the two groups of purchasers, discussed above, preclude the existence of any such "common contention." If Plaintiff eventually establishes that PwC-Canada violated Rule 10b-5 for its 2005 audit

opinion as to IMAX's application of MEA accounting to theater installation systems, that determination would in no way resolve "any issue that is central to the validity" of claims based on the earlier alleged misstatements. *Id.*

**D. Class Certification Must Be Denied Because PwC-Canada Can Rebut the Fraud-on-the-Market Presumption as the Alleged Accounting Errors Did Not Materially Impact the Price of IMAX Stock.**

Independent of the distinct factual and legal bases for each set of purchasers' claims, PwC-Canada can rebut the presumption of reliance because the alleged accounting errors did not materially impact the price of IMAX stock. *See In re Solomon*, 544 F.3d at 484 (holding that any evidence that "severs the link between the alleged misrepresentation and . . . the price . . . will be sufficient to rebut the presumption of reliance); *In re Sadia*, 269 F.R.D. at 307 (one way to "sever the link" is to show that the "alleged misrepresentation were immaterial because they did not lead to a distortion in price").

Professor James affirmatively shows that the alleged accounting errors were immaterial because they did not impact actual cash flows. James Rpt. at ¶¶ 23-44. Because a company's stock price is equal to the discounted present value of all expected future cash flows, the timing of when to recognize those earnings for accounting purposes would not impact the value of IMAX's stock price. *Id.* at ¶ 24 ("Financial economics research confirms that only changes in future cash flows and not changes in *accounting* earnings can affect a company's equity value."). IMAX's expert, Lucy Allen, concurs with Professor James' analysis as to the materiality of the alleged accounting errors and conclusion that accounting issues that do not change cash flows do not have a material effect on the economic value of a company. *See* Allen Rpt. at ¶¶ 12-29.

Illustrating the substantial difference between cash flows and accounting earnings, analysts did not view IMAX's restatement as significant because it only shifted *accounting earnings* among different time periods and did not materially affect IMAX's flows from theater

**PORTIONS REDACTED**

system installations. James Rpt. at ¶¶ 36-44; Allen Rpt. at ¶¶ 30-39. Because the alleged accounting errors did not materially impact cash flows (and, therefore, the underlying value of IMAX stock), PwC-Canada has successfully rebutted the fraud-on-the-market presumption, and individual questions of reliance predominate over common issues.[11]

## III. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Class Certification should be denied. Alternatively, should the Court grant Plaintiff's Motion, the Court should certify only a class that excludes purchasers of IMAX securities who bought before February 17, 2006 or after August 9, 2006.

---

[11] *See also* IMAX Opp. at 12-16 for further discussion of this issue.

**PORTIONS REDACTED**

Dated: July 1, 2011

Respectfully Submitted,

By: /s/ M. Byron Wilder
M. Byron Wilder

Jennifer L. Conn (JC-5753)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

M. Byron Wilder (admitted *pro hac vice*)
John Franklin Guild (admitted *pro hac vice*)
Jason C. McKenney (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 698-3400

**ATTORNEYS FOR DEFENDANT PRICEWATERHOUSECOOPERS LLP, AN ONTARIO LIMITED LIABILITY PARTNERSHIP**

**PORTIONS REDACTED**

**CERTIFICATE OF SERVICE**

I, Jason C. McKenney, hereby certify that a true and correct copy of the foregoing was sent via overnight mail and electronic mail on July 1, 2011 to the following counsel of record:

Arthur N. Abbey
Jill S. Abrams
Richard B. Margolies
ABBEY SPANIER RODD & ABRAMS LLP
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

Lewis J. Liman
David Oliwenstein
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2550
Facsimile: (212) 225-3999

/s/ Jason C. McKenney
Jason C. McKenney