**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

# REPLY MEMORANDUM OF LAW IN SUPPORT OF THE MERGER FUND'S MOTION FOR CLASS CERTIFICATION

**ABBEY SPANIER RODD & ABRAMS, LLP**
Arthur N. Abbey, Esq.
aabbey@abbeyspanier.com
Jill S. Abrams, Esq.
jabrams@abbeyspanier.com
Richard B. Margolies, Esq.
rmargolies@abbeyspanier.com
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

*Lead Counsel for Lead Plaintiff and Proposed Class Representative The Merger Fund*

August 3, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ........................................................................ 1

I. Defendants Have Failed to Rebut the Fraud on the Market Presumption ................ 2

A. Defendants Have Failed to Show a Lack of Price Impact ................................ 4

B. The Market for IMAX's Common Stock was Efficient.................................... 8

II. The Court Should Reject Defendants' Efforts to Shorten the Class Period and Find That The Merger Fund Cannot Represent All Class Members .......... 10

III. The U.S. Class Action is the Superior Method of Adjudication.......................... 14

CONCLUSION................................................................................................ 19

# TABLE OF AUTHORITIES

**Cases** **Page**

*Basic v. Levinson*,
485 U.S. 224 (1988) ... 2, 4, 7

*Brinco Mining Ltd. v. Fed. Ins. Co.*,
552 F. Supp. 1233 (D.D.C. 1982) ... 17

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ... 9

*Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*,
Civ. No. 06- 3800 (GEB),
2007 WL 1726565 (D.N.J. June 13, 2007) ... 16

*Collette v. Cartier Partners Secs. Inc.*,
[2005] B.C.J. No. 769, 2005 B.C.S.C. 501 ... 16

*DeMarco v. National Collector's Mint, Inc.*,
229 F.R.D.73 (S.D.N.Y. 2005) ... 10

*DeYoung v. Beddome*,
707 F. Supp. 132 (S.D.N.Y. 1989) ... 17

*Erica P. John Fund, Inc. v. Halliburton*,
563 U.S.__, No. 09-1403, 2011 LEXIS 4181 June 6, 2011) ... 1, 2, 3, 4

*Fleeger v. Clarkson Co. Ltd.*,
86 F.R.D. 388 (N.D. Tex. 1980) ... 17

*Fogarozzo v. Lehman Brosa., Inc.*,
263 F.R.D. 90 (2009) ... 11

*In re IMAX Securities Litig.*,
272 F.R.D. 138 (S.D.N.Y. 2010) ... passim

*In re Alstom SA Secs.Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ... 13

*In re AM. Int'l Group, Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010) ... 2, 3, 13, 14

*In re Flag Telecom*,
245 F.R.D. 147 (S.D.N.Y. 2007) ... 13

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ... 8, 14

*In re Omnicom*,
597 F.3d 501 (2d Cir. 2010)........................................................................................3, 8

*In re Sadia, S.A. Secs. Litig.*,
269 F.R.D. 298 (S.D.N.Y. 2010)..................................................................................3, 7

*In re Veeco Instruments, Inc.Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006)......................................................................................10

*Legroux v. Pitre*,
[2008] O.J. No. 443, 2008 On.C. LEXIS 747 (Fed. 11, 2008, Ont. Sup. Ct.)..............16

*McKenna v. Gammon Gold Inc.*,
[2010] O.J. No. 1057. 2010 ON.C. LEXIS 1325 (March 16, 2010, Sup. Ct. J.)..........18

*Paraschos v. YBM Magnex Int'l, Inc.*,
130 F. Supp. 2d 642 (E.D. Pa. 2000)..............................................................................16

*SEC v. Stanard*,
2009 U.S. Dist. LEXIS 6068 (S.D.N.Y. Jan. 27, 2009)......................................................5

*Silver v. IMAX Corp.*,
[2010] O.J. No. 656 2011 On.C LEXIS 981 (Feb. 14, 2011, Sup. Ct. J.)........14, 17, 18

*Teamsters Local 445 Freight Div. Pension Fund v. Bomabardier*,
546 F. 3d 196 (2d Cir. 2008)...............................................................................................9

*UCFW Local 1776 v. Eli Lily & Co.*,
620 F. 3d 121 (2d Cir. 2010)..............................................................................................13

*VictoriaTea.com, Inc. v. Cott Beverages Canada*,
239 F. Supp. 2d 377 (S.D.N.Y. 2003)................................................................................17

**Rules**

Fed. R. Civ. P. 23.....................................................................................................passim

**Statutes**

Ontario Courts of Justice Act §108(2)(10).........................................................................16

**Other Authorities**

7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1764 (3d. ed. 2008)...........................................................................11

Professor Janet Walker's 2010 Report for Session II-C-Civil Procedure *Class Proceedings in Canada* to the 18th International Congress on Comparative Law.......15

Lead Plaintiff, The Merger Fund ("TMF"), respectfully submits this reply memorandum in response to the briefs of PriceWaterhouseCoopers ("PWC") and the IMAX Corporation Defendants ("IMAX") (the "Defendants") in opposition to class certification, and in further support of its motion for class certification.[1]

## PRELIMINARY STATEMENT

Defendants argue that they have rebutted the fraud on the market presumption due to lack of "price impact" and "price decline" such that TMF cannot satisfy Rule 23(b)(3)'s predominance test; that the pre-February 17, 2006 market for IMAX stock was inefficient; that differences between class members who purchased their IMAX shares before and after February 17, 2006 preclude certification for the full Class Period; and that Rule 23(b)'s superiority requirement cannot be satisfied due to the pending Canadian Action.

Defendants are wrong on all counts. First, they have failed to rebut the presumption of reliance by a preponderance of evidence. Plaintiffs have shown, including via their experts Michael A. Marek ("Marek") and Dr. John D. Finnerty ("Finnerty"), respectively, that the market for IMAX's common stock was efficient throughout the entire Class Period and that, based on empirical data (as opposed to the mere speculation by IMAX's expert, unsupported by data), there is price impact. Price decline, an argument that relates to loss causation, cannot be considered under the Supreme Court's decision in *Erica P. John Fund, Inc. v. Halliburton*, 563 U.S.__, No. 09-1403, 2011 LEXIS 4181 June 6, 2011) ("*Halliburton*"). However, because it was raised by Defendants, out of an abundance of caution, Dr. Finnerty has addressed the subject and

[1] With the Court's permission, TMF has submitted this single 20 page brief in lieu of two 10 page briefs.

demonstrated the statistically significant reaction in IMAX's stock price on disclosure of previously undisclosed material information.

TMF has identified several issues common to pre- and post-February 17, 2007 Class Members that predominate over any individual issues and which support its application for representative status.

Finally, the IMAX defendants, whose argument that the Canadian Action is superior to the U.S. action was previously rejected by this Court, have again failed to establish that the Canadian action is superior for a variety of reasons, including that Canadian plaintiffs do not have the right to a jury trial in civil actions.

For all of these reasons, the Class should be certified in all respects and TMF should be appointed its representative.

## I. <u>Defendants Have Failed to Rebut the Fraud on the Market Presumption</u>

The *Halliburton* court opined that, in order to invoke the *Basic v. Levinson*, 485 U.S. 224, 247(1988) rebuttable presumption of reliance (or "transaction causation"), plaintiffs need only show that "the alleged misrepresentations were publicly known..., that the stock traded in an efficient market, and that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" (citations omitted) *Halliburton*, at *13. *Halliburton* rejected the notion that a plaintiff must prove loss causation because it "addresses a matter different from whether an investor relied on a misrepresentation, presumably or otherwise, when buying or selling a stock." *Id.* at *14. "Price impact" relates only to "whether the alleged misrepresentations affected the market price in the first place" Id. at *17. [2] Thus, a

[2] PWC cites *In re AM. Int'l Group, Inc. Sec. Litig.*, 265 F.R.D. 157, 182 (S.D.N.Y. 2010)("*AIG*") and *In re Moody's Corp. Sec. Litig.*, No.07-civ-8375, 2011 U.S. Dist. LEXIS 36023, at *24 (S.D.N.Y. 2011)(which

defendant may sever the link between the prices paid and the alleged misrepresentations by showing that the alleged misrepresentations were immaterial because they did not lead to a price distortion at the time of the plaintiff's purchase, i.e. that there was no price impact. *In re Sadia, S.A. Secs. Litig.*, 269 F.R.D. 298, 307 (S.D.N.Y. 2010). Defendants' argument here that "price decline" can also be used to sever the link must be rejected. Price decline is not the same as price impact. Price decline looks at the impact of the misrepresentation on the stock price at the time of disclosure rather than at the time of purchase, and is therefore a component of loss causation. *Halliburton,* at *13. *See also In re Omnicom*, 597 F.3d 501, 509-10(2d Cir. 2010) (where the Second Circuit distinguished loss causation from transaction causation which it defined as "whether the particular plaintiff…relied upon—or is irrefutably presumed to have relied upon-the misrepresentation" and [l]ike reliance…refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities") (citations omitted). To rebut the fraud on the market presumption, Defendants must prove, "by a preponderance of the evidence, that there would have been *no* impact on price as a result of the failure to disclose information." (emphasis included). *Sadia*, 269 F.R.D. at 316. They have failed to do so.

---

relied on *AIG*) to argue that it may rebut the presumption of reliance by showing a lack of price decline (meaning that the alleged misrepresentation did not impact the price of the security at the time of the curative disclosure). PWC Br. at 5 and 10. However, each of those cases was decided before *Halliburton.* Under *Halliburton*, any analysis of IMAX's stock price decline, which is an element of loss causation, is irrelevant at the class certification stage and should not be considered by this Court. ("The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place.") *Halliburton*, at *16. Thus, Defendants' contention that the stock price movements on August 9, 2006, March 29, 2007 and July 20, 2007 were statistically insignificant should not be considered because they relate to loss causation. Out of an abundance of caution, in addition to addressing price impact, Dr. Finnerty's August 3, 2011 Declaration responds to Allen's price decline analysis and criticisms of his report, and the loss causation opinions expressed by PWC's expert, Professor Christopher James ("Janes"). Dr, Finnerty concluded that the decline in IMAX's stock price on the disclosure dates were statistically significant. Finnerty Dec. ¶¶35-46 (regarding August 9), ¶¶47-54 (regarding March 29), ¶¶55-68 (regarding July 20) and ¶¶69-108(responding to specific issues raised by Allen).

### A. Defendants Have Failed to Show a Lack of Price Impact

The IMAX Defendants have submitted the Declaration of Lucy P. Allen ("Allen" and "Allen Dec.") to show that there was no "price impact" or "price decline"[3] that resulted from the alleged misrepresentations.[4] Her price impact assignment focused on "what *would have* happened" if accurate financial information "had been reported" during the period from February 23, 2003 until August 9. Allen Dec. ¶6. But her declaration, which is not supported by any financial analysis (for example, no daily stock price evaluation incorporating the restated financials or an event study to analyze the actual impact on IMAX's price) ignores what actually *did* happen. Finnerty ¶3. IMAX touted installations, revenue and earnings therefrom to the investing public throughout the class period. Yet, Ms. Allen's analysis conveniently side-steps those facts and instead, cites the lack of price movement in IMAX's common stock on the belated June 2007 statement that 2002-2006 revenue would be restated, months or years after the misrepresentations were made, and well past the time of the August 9, 2006, March 29, 2007 and July 20, 2007 statements that conveyed related disclosures.

Allen's argument that IMAX's stock price was unaffected by its restatement makes no sense because it implies that the timing of IMAX's revenues does not matter to investors (whether revenues are reported a quarter later, a year later, or even further in the

[3] Defendants attempt to argue that they can sever the link by demonstrating lack of price impact at the time of the misrepresentation (as contemplated by *Basic*) or at the time of disclosure. PWC Br.6, 9-12; IMAX Br.15-17. The latter improperly blurs the distinction between "price impact" (which relates to severing the link in the fraud on the market context) and "price decline" (which is only properly considered in the context of loss causation). As support, PWC argues that because *Halliburton* referred to *In re DVI , Inc. Secs. Litig.*, 639 F.3d 623 (3d. Cir. 2011) (PWC Br. at 6-7) in its opinion, it implicitly approved of DVI considering price decline on class certification. But that ignores the fact that *DVI* was cited favorably in *Halliburton* as a case which eschewed the requirement of proof of loss causation on class certification, after the DVI defendant contended "that plaintiffs must prove loss causation at the class certification stage in order to invoke the fraud-on-the-market presumption of reliance." * *DVI*, 639 F.3d at 636.

[4] Her price decline assignment focused on whether the disclosure of prior problems with the revenue recognition of theater systems was the cause of the price decline during the period from August 9, 2006 to July 20, 2007.Allen Dec. ¶6.

future), nor do the timing of the earnings recognized from those revenues, or the timing of the installations (which the Company highlighted in its quarterly releases and the stock analysts repeated in their reports). Finnerty Dec.¶4. If these items did not matter, then why did the Company and the analysts give them so much prominence? *Id.*

Ms. Allen's analysis suffers from, among other things, a logical flaw. Finnerty Dec.¶5. She argues that when the intention to restate revenue for fiscal years 2002-2006 was first announced on June 21, 2007, there was no significant stock price reaction and therefore, if IMAX had properly reported its revenue each quarter in the past, there would been no difference in IMAX's share price at the time of each quarterly announcement. Allen Dec. ¶8. Making a vague statement about retroactively adjusting historical revenue and earnings for an entire four-year period is not the same as actually reporting a different (i.e., corrected) quarterly figure each quarter during the four year period. *Id.* Those quarterly figures affect investors' and stock analysts' expectations as they are reported. Corrected information reported ex post cannot change those expectations because they are old news. *Id.* As the court opined in *SEC v. Stanard*, 2009 U.S. Dist. LEXIS 6068, 06 Civ. 7736 (GEL) (S.D.N.Y. Jan. 27, 2009), in which the defendants also restated company financials:

> …the failure of the market to react to the retrospective correction of …financial statements in 2005 is of little significance in evaluating the materiality of the false statements when made…Unlike a restatement that reveals that illusory profits claimed in past years never existed—which would be expected, if material to the ongoing value of the company—a disclosure that genuine earnings had been shifted from one quarter to another several years earlier would not affect the perceived value of the company as of the time of the disclosure. The lack of market movement in 2005 says nothing about the materiality of significant misstatements of earnings at the time they were made.

Ms. Allen has now submitted two reports, but has not provided a single

supporting event study, nor does she offer any bases for her criticism or opinions. Finnerty Dec. ¶6. Concluding that "there *would have* been no impact on IMAX's stock price" if the Company had used the proper accounting treatment of theater system installation revenue recognition, Ms. Allen says that "according to finance theory", the only type of information that affects stock price in an efficient market[5] is information that changes the expected value of future cash flows, and since the undisclosed information would not have affected cash flows, there "should not have been" a price impact if IMAX had initially announced its restated revenues. Allen Dec.¶¶6, 8. This statement oversimplifies the connection between share price and expected future cash flows because information that affects the market's assessment of future profitability impacts the share price. Finnerty Dec. ¶¶8-9.[6]

Unlike the Finnerty Declaration, Ms. Allen's declaration is not supported by empirical evidence, and the empirical evidence contradicts her price impact conclusion. Finnerty Dec. ¶¶ 18-23. For example, while Allen says the analysts focused on metrics such theater signings rather than installations (notwithstanding that installations drive revenues and earnings), Finnerty refutes her report by showing, inter alia: instances in which IMAX's stock price decreased on IMAX's reported signings and increased on installations; that the analyst reports are inconsistent with her conclusion; and that James's event study is consistent with Finnerty's event study in showing that IMAX's price reacted in a statistically significant manner to the metrics on which Finnerty focuses. Finnerty Dec. ¶¶19-23, 31; *see also* James Rpt., Ex. 4 (9.98% abnormal return

[5] While the IMAX Defendants attempt to argue that the pre-February 17, 2006 market was inefficient (IMAX Br. at 20-21), Allen relies on the efficiency of the market. Allen Rpt.¶8.

[6] A recent article by two of Ms. Allen's NERA colleagues explains the important connection between share price and expected earnings, Finnerty Dec.¶10, as do other authoritative sources. *Id.* at ¶¶11-13.

on Feb. 16, 2007 on announcement of favorable installation numbers).[7] Like the defendants in *In re Sadia, S.A. Secs. Litig.*, 269 F.R.D. 298, 315 (S.D.N.Y. 2010), Allen has failed to present evidence "specific to this case" and has instead argued that the subject misstatements "could not have not have" artificially inflated the security price. *Id.* at 314-15. As Dr. Finnerty makes plain, neither Allen nor James has provided evidence to support their contention that the misrepresentations did not impact IMAX's price. Finnerty Dec.¶¶24-35.

Defendants' theory that IMAX's retroactive restatement had no effect on its future cash flow or other operational impact (James Rpt. ¶¶ 25, 28; Allen Dec. ¶¶ 26-27) ignores: 1) the effect on the Company of the perceived riskiness of achieving those cash flows; and 2) the way the Company marketed itself to the investing public.

Stock prices decline on the disclosure of information that reduces a company's expected future cash flows, and thus causes its cost of capital to increase (which reflects the risk of attaining expected cash flows and the rate or return investors require as a result of that risk), or both. Finnerty Dec.¶¶24-34. Both Allen and James have conceded, as they must, that these risks affect stock price. Finnerty Dec.¶¶30; Allen Dec. ¶¶25 and fn.2; James Rpt. ¶¶139, 141.

During the Class Period, IMAX publicly touted the number of its theater system installations and accompanying income and, as it ultimately disclosed, a total of 16 installations, with a revenue impact of $25.4 million were reported too early and shifted between quarters and 14 installations, with a revenue impact of $27.1 million, shifted between fiscal years. Consolidated and Amended Class Action Complaint at ¶61 ("C.

[7] The *Basic* court rejected the notion of "[r]equiring a plaintiff to show a speculative state of facts." *Basic*, 485 U.S. at 245.

¶_"). IMAX's improper revenue recognition created the appearance that its financial condition and business were healthier than they were. With systems revenue comprising the single largest component of IMAX's reported revenue, it was, as its Co-CEOs said, "one of the two most important metrics of our growth." *Id.*at ¶63. That metric was highlighted in quarterly investor information, e.g. Finnerty Dec. ¶7[8], ¶31(report of no installations for 2006 third quarter resulted in abnormal -29.61% return which market commentators attributed to the "weak report"), but that material information is ignored by Defendants who have chosen to focus on the theoretical retroactive effect on the stock price of different cash flows.

Defendants are unable to show the lack of price impact by a preponderance of the evidence, and are therefore unable to sever the link between the prices paid and the alleged misrepresentations.

**B. <u>The Market for IMAX's Common Stock was Efficient</u>**

On October 30, 2008, Mr. Marek submitted a declaration in connection with the initial motion for class certification in which he concluded, after performing the requisite analyses, that the market for IMAX stock was efficient for the entire Class Period.[9] However, to address specific assertions by IMAX as to the inefficiency of the market

---

[8] IMAX concedes that the SEC announcement and attendant fears "was a negative factor affecting IMAX stock price", but says those fears were unfounded given that the SEC and OSC have "closed their investigations without taking any action". IMAX Br. at 16, fn 13. Of course, that statement ignores IMAX's admitted restatement and change in revenue recognition accounting in the face of those reviews. C. ¶145. IMAX erroneously cites *Lentell v. Merrill Lynch & Co., Inc.*, 396 F. 3d 161, 173 (2d Cir.2005) and *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F. 3d 501, 514 (2d Cir. 2010), both loss causation decisions, in support of the argument that there is no evidence that there would have been any impact on IMAX if the proper revenue recognition was applied. Its citation to *Omnicom* to argue that investors cannot recover for concerns over undisclosed problems also ignores the court's determination that there was "no allegation that investors were ever told that improper accounting had in fact occurred..." *Omicom*, at 514.

[9] James, did not contest market efficiency. He testified to his assumption that IMAX was trading in an efficient market and "didn't see any evidence...contrary to that view." James Tr. 10:7-17.

during the period before February 17, 20016 ("Sub-Period"), TMF has submitted the July 27, 2011 Marek Declaration ("Marek Dec."), in which he analyzed each of the market efficiency factors discussed in *Cammer v. Bloom,* 711 F. Supp. 1264, 1285-87 (D.N.J. 1989) for the Sub-Period, together with three additional factors sometimes considered by the courts. While there is no requirement that each of the requirements be met, since they are all indicia of efficiency, the "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price... is the essence of an efficient market and the foundation for the fraud on the market theory". *Cammer,* at 1287; Marek Dec.¶69. Marek determined that the cause and effect relationship, as well as the other indicia of efficiency exist here. Marek Dec.¶¶4, 87. Based on this analysis and Plaintiff's opening submission, TMF has established that the market for IMAX common stock is "informationally efficient." *Teamsters Local 445 Freight Div. Pension Fund v. Bomabardier*, 546 F. 3d 196,199n.4 (2d Cir. 2008)[10]

The following portions of the Marek Declaration respond to the specific points raised by IMAX. IMAX Br. 20-21:

·**IMAX was Reviewed by Investment Professionals.** (Marek Dec. ¶¶30-33) In addition to the analysts that covered IMAX and which are identified by Marek several other firms such as Moody's and Standard & Poors issued reports on IMAX, and the Company hosted regular conference calls for analysts and investors in conjunction with the release of its quarterly financial results and made numerous presentations at investment analyst and industry conferences identified by Marek. Marek Dec. ¶¶31-32.

[10] As the Marek Declaration makes plain, his 2008 analyses and declaration related *solely* to market efficiency during the Class Period. July Marek Dec.¶¶85-86. Thus, PWC's reference to Marek's original declaration as confirming James's analysis of the statistical insignificance of IMAX's March 29, 2007 press release is misleading. In fact, James's statistical results confirm Finnerty's conclusions (James's Report and the Finnerty declaration submitted in support of TMF's opening brief both addressed loss causation) that IMAX's abnormal stock returns on August 9, 2006, March 29, 2007 and July 20, 2007 are statistically significant at better than 1%, meaning there is less than a 1% chance these returns occurred by chance. Finnerty Dec.¶35 and James Rpt.¶¶ 82, 147,159 and Ex. 4. And, while Defendants claim otherwise, James *did* find the March 29 disclosure significant until he improperly applied the Sidak adjustment. Finnerty Dec. ¶35, fn.64.

·**Bid-Asked Spread Was Narrow.** (Marek Dec.¶¶62-65)
Marek analyzed the bid-asked spread for the whole Sub-Period which was narrow and low compared to the DJIA. Marek Dec.¶¶ 64-65.

·**IMAX Stock was Widely Held.** (Marek Dec. ¶¶51-61)
By early in the Sub-Period (July 2003) public stock ownership was just under 90% and remained at that level for the balance, and there were hundreds of registered owners and likely thousands of beneficial owners. Marek Dec.¶¶54-55.

·**IMAX Traded Through Numerous Market Makers.** (Marek Dec.¶¶ 34-42)
There were 24 market makers during the Sub-Class each of which accounted for at least 1% or more of the NASDAQ activity in IMAX stock. Marek Dec.¶¶40.

·**IMAX was Actively Traded.** (Marek Dec.¶¶ 24-29)
IMAx's reported weekly turnover during the Sub-Period was 5.05% or 2, 033,256 shares. Marek Dec.¶28.

· **Marek's Event Study Establishes Efficiency for the Sub-Period.** (Marek Dec.¶¶ 66-84)
The market for IMAX stock was efficient in absorbing disclosure of Company-specific information during the Sub-Period. Marek Dec.¶¶ 66-84.

## II. The Court Should Reject Defendants' Efforts to Shorten the Class Period and Find That the Merger Fund Cannot Represent All Class Members

Whether considered from a commonality or predominance perspective, there is no basis on which to exclude pre-February stock purchasers from the Class, or to find that TMF cannot represent members of the entire class. There are issues common to shareholders who purchased both before and after February 17, 2006 which predominate over individual issues and TMF has an interest in establishing the facts with respect to those issues. "The commonality requirement has been applied permissively in the context of securities fraud litigation." *In re Veeco Instruments, Inc.Sec. Litig.*, 235 F.R.D. 220, 238 (S.D.N.Y. 2006) "It is not necessary that all of the questions raised by arguments are identical; it is sufficient if a single common issue is shared by the class." *DeMarco v. National Collector's Mint, Inc.*, 229 F.R.D.73, 80 (S.D.N.Y. 2005) Those

common issues may be factual or legal under Rule 23(a)(2).

This Court previously opined that "...the claims in this case all involve alleged fraud relating to IMAX's recognition of theater system revenue, and thus there is a common thread throughout the allegations in the Complaint." *In re IMAX Sec. Litig.*, 272 F.R.D. 138,153 (S.D.N.Y. 2010) ("*IMAX*"). Commonality does not require that all class members' claims and arguments are identical. *Fogarozzo v. Lehman Brosa., Inc.*, 263 F.R.D. 90, 96 (2009). "To the extent that 'co-extensive' suggests that the representatives' claims must be substantially identical to these of the class members, it is too demanding a standard," 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1764 (3d. ed. 2008).

Defendants contend that the Class Period should end on August 9, 2006, or alternatively, that TMF cannot represent purchasers in the pre-February 17, 2006 period based on the Court's ruling that the August 9, 2006 announcement of the SEC investigation related to multiple element accounting ("MEA"). IMAX also argues that pre-February 17, 2006 purchasers cannot demonstrate loss causation because the August 9, 2006[11] press release was not a corrective disclosure for them. Whether or not that is true,[12] the March 29, 2007 and July 20, 2007 are statistically significant corrective disclosures that would be considered at trial, Finnerty Dec. ¶¶ 35-58 and which pre- and post February 17, 2007 Class members have an interest in demonstrating.

---

[11] PWC, at fn. 5, cites Finnerty testimony to say the market did not view the August 9 announcement as pertaining to prior period installations, but no such testimony is found there.

[12] PWC's assertion that TMF cannot explain how the correspondence between the SEC and IMAX about the focus of the SEC investigation (referred to in TMF's opening brief) "could serve as the basis for a corrective disclosure" misses the point. PWC Br. at 8, fn.4. TMF was merely suggesting that such correspondence indicated the existence of wider and common accounting issues. Because the letters were not previously before the Court, it was unable to fully evaluate the issue in context.

While the March 29 press release did not disclose revenues for any period, it did say that IMAX was broadening its review of the Company's revenue recognition, primarily in light of comments it received from the SEC and OSC and that, as a result, it "may determine that it is necessary to restate additional items beyond the previously identified items, resulting in a material drop in IMAX's stock price." C. ¶127. Since the Company first disclosed its restated financials for the entire Class Period on July 27, 2007, that restatement will be necessary proof at trial for all Class Members (no matter when they purchased or sold their stock) to show: that IMAX's financial statements were misrepresented at the time they were made by virtue of their improper revenue recognition; the number of theater systems actually installed versus misreported; and the amount of the related overstatement.

While Defendants attempt to deflect the focus from its proper place, this case involves a restatement based on improper revenue recognition for theater systems. The faulty accounting began with IMAX's 2002 financial statements and continued until the July 20, 2007 restatement. At trial, TMF will address a number of common issues which include: IMAX's accounting for theater system installations beginning in 2002; how the accounting treatment changed and the reasons for the changes; the misleading nature of IMAX's disclosures with respect thereto; the IMAX Defendants' responsibility for, and PWC's complicity in the publication of financial statements that flunked GAAP; PWC's failure to conduct GAAS audits; internal control problems and whether the defendants committed a fraud on the market.[13] Whether Defendants made particular material

[13] PWC argues that TMF will face a "substantial obstacle in proving loss causation regarding the August 9, 2006 press release, attributing the "primary cause of that day's stock decline to IMAX's the failure to find a buyer. PWC Br. 14 This loss causation argument is inappropriate on class certification, but lest silence be mistaken for the lack of a response, Dr. Finnerty has made clear that when the Company announced it was

statements and acted with the requisite scienter in improperly accounting for the theater system installations over a period of several years certainly involves common facts and law. *AIG,* 265 F.R.D. 157, 167-68 (S.D.N.Y. 2010).

Given the above-described common questions, it makes little sense to have these claims litigated separately. As a result, "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof…" *UCFW Local 1776 v. Eli Lily & Co.*, 620 F. 3d 121, 131 (2d Cir. 2010). That is true because even if the claims of pre and post -February purchasers are not identical, they do overlap. There are both pre and post-February 17, 2007 class members who have an interest in proving the subsequently- disclosed material information.

In *AIG*, a multiple fraud case, the court rejected the defendants' request to deny the lead plaintiffs' representative status or divide the case into sub-classes based on intra-class conflict and lack of predominance (for lack of a common course of conduct) arguments. As support, it cited *In re Flag Telecom*, 245 F.R.D. 147 (S.D.N.Y. 2007), in which the court found no class conflict or predominance issue, despite the fact that the alleged prospectus fraud preceded the alleged accounting fraud, the frauds were based on different causes of action, involved the dissemination of "distinct categories of misinformation and were not contemporaneous…". The *AIG* court also cited *In re Alstom SA Secs.Litig.*, 253 F.R.D. 266 (S.D.N.Y. 2008) in which the two frauds alleged "did not

---

looking for a buyer, its stock price increased by only 9.51%, leading to the conclusion that the 40.67% drop on August 9 could not have been related only to that news, particularly given that it was not the only negative news that day. Finnerty Dec.¶¶ 76-79.

occur simultaneously and involved entirely different segments of Alstom's business." *AIG,* 265 F.R.D. at 171, 173-74.

Defendants' reason for excluding in-and-out shareholders is that they purportedly suffered no damages. But damages are not considered on class certification and are nowhere mentioned in Rule 23. *In re Merrill Lynch Tyco Research Sec. Litig.,* 249 F.R.D. 124,131 (S.D.N.Y. 2008) ("Differences in the damages sustained by individual class members does not...defeat class certification.") (citation and internal quotation marks omitted)

**III. The U.S. Class Action is the Superior Method of Adjudication**

Despite this Court's earlier rejection of the same argument, IMAX contends that Rule 23(b)'s superiority requirement cannot be met because this class action is not "superior" to *Silver v. IMAX Corp.*, [2010]O.J. No. 656 2011 On.C LEXIS 981 (Feb. 14, 2011, Sup. Ct. J.) (the "Canadian Action"). (IMAX Br. at 3-12). *See IMAX,* 272 F.R.D. at 158-59 (declining to deny class certification on superiority grounds). IMAX's arguments should be rejected again. Even if this Court agrees that it is appropriate to compare the U.S. and Canadian actions, the U.S. action is plainly superior for the resolution of the U.S. Class's claims.

While IMAX attempts to persuade this Court that the Canadian Action provides U.S. shareholders with "adequate procedural protections" and the "same rights as they would have in this Court" (IMAX Br. 4-5), those arguments are not persuasive. As this Court observed, "a class action in a foreign jurisdiction, applying that jurisdiction's securities laws....is not a 'superior' way of adjudicating plaintiffs' claims against that party for alleged violations of U.S. securities laws...". *IMAX,* at 159. The July 1, 2011

Report of Professor Poonam Puri submitted by IMAX, ("Puri Rpt.") confirms that the Canadian Action asserts solely Canadian statutory and common law causes of action. *Id.* at ¶150. Given that all of the securities in this action, and at least 85 percent of the securities in the Canadian Action, were sold in the U.S. on the NASDAQ and that "application of the U.S. securities law was clearly contemplated by both the Company and its investors", *IMAX,* at 159, the U.S. is the superior jurisdiction for the litigation. Although this case and the Canadian Action are similar in that they address IMAX's improper revenue recognition accounting practices, they are far from identical. *See IMAX,* at 158-59. ("We decline to deny certification on these grounds because, amongst other reasons, PWC is not a named defendant in the Canadian class action [and] the consolidated complaint here alleges a significantly longer class period…").[14]

It is disingenuous for IMAX to argue that the Canadian Action "affords similar procedural protections" as U.S. courts, when even its own expert admits that it is unlikely that the Canadian Action will be tried before a jury. Puri Rpt. ¶90 ("While there is no statutory bar to the use of juries in class proceedings trials, they have not been employed to date."). Professor Janet Walker's 2010 Report for Session II-C-Civil Procedure *Class Proceedings in Canada* to the 18th International Congress on Comparative Law, annexed as Ex. A to the Affidavit of Jill S. Abrams ("Abrams Aff."), confirms that litigants in Canada are not entitled to the right to jury trial:

> Jury trials in civil matters are not a right for litigants in Canada, and they rarely occur. Moreover, it is rare for a class proceeding to go to trial. Accordingly, it would be very unlikely that there would be a jury trial in a

[14] IMAX attempts to discount PWC's absence as a defendant in the Canadian Action by arguing that the Canadian plaintiffs made a "strategic decision" not to name PWC as a defendant. (IMAX Br. at 10). Whether or not that is true, the Ontario Action cannot be a superior vehicle for adjudicating claims against a defendant that is not even named in that suit.

> class proceeding. Furthermore, one of the reasons that requests for jury trials may be denied is that the matters in issue are too complex to be determined by a jury.

*See also*, *Collette v. Cartier Partners Secs. Inc.*, [2005] B.C.J. No. 769, 2005 B.C.S.C. 501, at [7](court struck jury notice in this class action regarding mortgage investments because the issues were too complex)(Abrams Aff. B); *Legroux v. Pitre,* [2008] O.J. No. 443, 2008 On.C. LEXIS 747 (Fed. 11, 2008, Ont. Sup. Ct.), aff'd O.J. No. 4505, 2009 On.C. LEXIS 4217 (Oct. 27, 2009, Ont. App. Ct.) (decision to strike jury notice on basis of complexity does not violate Canadian Charter of Rights and Freedoms and no right to jury trial in civil proceedings). Under Section 108 of the Canadian Courts of Justice Act, there are circumstances in which a jury trial is expressly prohibited, including where declaratory relief is claimed. Courts of Justice Act §108(2)(10)(Abrams Aff., Ex. C). In their most recent Statement of Claims, the plaintiffs in the Canadian Action have claimed a variety of forms of declaratory relief. Abrams Aff. Ex. D.

The Canadian Action also provides less protection for U.S. class members because, unlike the U.S. securities laws, the Ontario Securities Act sets damage caps. Puri Rpt. ¶186-191. In the case of an issuer of securities, the cap is the greater of 5% of its market capitalization or $1 million. *See* Puri Rpt ¶191(a).

Certainly, the right to a trial by jury and the absence of damage caps here afford the Class far better procedural protections than the Canadian Action.[15]

---

[15] IMAX cites several cases, in support of its position that Canadian courts provide an adequate forum for resolution of securities claims. These cases are easily distinguishable from the facts in this case. For example, in *Canada Life Assurance Co. v. Converium Ruckversicherung (Deutschland) AG*, Civ. No. 06- 3800 (GEB), 2007 WL 1726565, at *8-9 (D.N.J. June 13, 2007), which was a non-securities, non-class action arbitration of a reinsurance dispute, the court, at the motion to dismiss stage, stayed the U.S. action because a parallel Canadian action already "involve[d] the same parties and the same issues." *Id.* at *8. In *Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642, 645 (E.D. Pa. 2000), the court granted the defendant's motion to dismiss on grounds of international comity because the U.S. securities fraud action pertained to "Canadian registered securities, brought by a purported class of investors who are virtually all

Recognizing that this Court has already declined to deny certification on superiority grounds, IMAX argues that the opinion no longer applies (IMAX Br. at 9), relying on the decision by Justice Corbett in *Silver v. IMAX Corp.*, [2010] O.J. No. 656, 2011 ON.C LEXIS 981 (February 14, 2011, Sup. Ct. J.) who denied IMAX's motion for leave to appeal the certification of the global class. IMAX argues that Justice Corbett's decision means that there is no longer any question that U.S. purchasers of IMAX stock will have a remedy through a class action lawsuit. To the contrary, Justice Corbett agreed with the lower court's "wait and see" approach to revisit the decision to certify a global class. *See Silver v. IMAX Corp.*, [2010] O.J. No. 656, 2011 ON.C LEXIS 981 (February 14, 2011, Sup. Ct. J.) ("van Rensburg J. was alive to issues of judicial comity and conflict of laws when certifying a global class. Her Honour specifically noted that some issues arising from certification of a global class would have to be addressed as proceedings unfold in both Canada and the United States.")

Because the Canadian Action does not: (1) assert the U.S. securities law claims; (2) seek relief against all Defendants named here; (3) include the entire Class Period; or (4) provide Class members with the same procedural protections as a U.S. court, the Canadian Action is not a superior vehicle for adjudicating the controversy.

---

Canadian, against predominantly Canadian defendants, concerning a Canadian corporation whose stock was sold only on Canadian stock exchanges."); *Fleeger v. Clarkson Co. Ltd.*, 86 F.R.D. 388, 390-94 (N.D. Tex. 1980)(court dismissed a U.S. derivative lawsuit based on international comity, when a plaintiff tried to challenge a settlement agreement entered into by a Canadian receiver for a Canadian company in bankruptcy, after the settlement had been approved by a Canadian court); *DeYoung v. Beddome*, 707 F. Supp. 132, 135 (S.D.N.Y. 1989)(the court dismissed plaintiffs' Section 14(a) claim against defendants on grounds of comity because they sought to challenge the fairness of a transaction which had previously been approved by Canadian government authorities and by a Canadian court as fair.); *VictoriaTea.com, Inc. v. Cott Beverages Canada*, 239 F. Supp. 2d 377, 382 (S.D.N.Y. 2003) (an individual breach of contract action that the court dismissed on forum non conveniens grounds because all essential aspects of the formulation, negotiation and performance of the agreement that were the "core" of the dispute occurred in Canada.); *Brinco Mining Ltd. v. Fed. Ins. Co.*, 552 F. Supp. 1233, 1238-40 (D.D.C. 1982)(defendant's motion to dismiss insurance coverage lawsuit was granted in light of similar lawsuit brought by plaintiff three years prior to the present suit and the fact that the plaintiff was "seeking to use this Court's jurisdiction to circumvent proceedings it instituted *in its own country.*" ).

The decision in *Silver* to certify a global class conflicts with more recent authority in Canada. *See McKenna v. Gammon Gold Inc.*, [2010] O.J. No. 1057. 2010 ON.C. LEXIS 1325 (March 16, 2010, Sup. Ct. J.); Puri Rpt. ¶145 (noting that the court in *McKenna* "considered and refused to extend a class action to include investors who purchased securities outside of Canada.") Puri Rpt. ¶145. In *McKenna*, the plaintiff moved to certify a global class of shareholders who had acquired securities that were traded on the Toronto Stock Exchange and the AMEX, pursuant to a prospectus or in the secondary market. In declining to certify a global class, the *McKenna* court held that "[it is not appropriate to include within the Class those persons who purchased securities from the [defendant] underwriters of their agents outside of Canada. The acquisition of those securities in a jurisdiction outside Canada would not give rise to a reasonable expectation that the acquiror's rights would be determined by a court in Canada." On appeal, Justice Sachs later determined that Justice Strathy did not err in his decision not to certify a global class because,

> ....there was evidence before the motion judge that proceedings had been commenced in the United States. In fact, in those proceedings the plaintiffs were requesting a jury trial. This evidence supports the motion judge's conclusion that in this case, people who bought their shares in another country would not reasonably expect their rights in respect of the purchase of those securities to be determined in an Ontario court.

*McKenna v Gammon Gold, Inc.*, 2010 O.J. No. 3138; 2010 On.C. LEXIS 2846 (July 21, 2010, Div. Ct.).[16] Thus, Canadian law with respect to the certification of global classes appears to be uncertain.

---

[16] On May 2, 2011, TMF asked the Canadian court to delay the distribution of its class notice until certification is decided by this Court. It is TMF's understanding that the motion will be heard on August 15, 2011.

## CONCLUSION

For the reasons set forth herein and in the opening memorandum of law, Lead Plaintiff respectfully requests that the Court enter an order certifying the Class, appointing it as class representative and appointing Abbey Spanier as counsel for the Class.

Dated: August 3, 2011

ABBEY SPANIER RODD & ABRAMS, LLP

Arthur N. Abbey
Jill S. Abrams
Richard M. Margolies
212 East 39th Street
New York, NY 10016
212-889-3700
aabbey@abbeyspanier.com
jabrams@abbeyspanier.com
rmargolies@abbeyspanier.com

*Lead Counsel for Lead Plaintiff*
*The Merger Fund*