UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re IMAX CORPORATION SECURITIES LITIGATION | Civil Action No. 1:06-cv-06128-NRB |
| | CLASS ACTION |
| This Document Relates To: ALL ACTIONS. | |

# REPLY DECLARATION OF JOHN D. FINNERTY, Ph. D. IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

I, John D. Finnerty, declare pursuant to 28 U.S.C. § 1746, as follows:

## I. Assignment and Summary of Opinion

1. I submitted a loss causation declaration in this matter on June 3, 2011 ("Finnerty Declaration") in which I provided the bases for my opinion that changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes.[1] I understand that based on the U.S. Supreme Court's June 6, 2011 decision in *Erica P. John Fund, Inc. v. Halliburton Co.*, a

[1] Finnerty Declaration ¶ 9. In connection with this matter, I previously submitted the Declaration of John D. Finnerty, Ph.D. in Support of Lead Plaintiff's Motion for Class Certification, In re IMAX Corporation Securities Litigation, Civil Action No. 1:06-cv-06128-NRB, U.S. District Court SDNY, dated July 30, 2010 ("Finnerty 2010 Declaration").

plaintiff need not prove loss causation on class certification. However, the defendants in this matter have since re-submitted the February 23. 2009 Expert Report of Professor Christopher M. James ("James Report") and have submitted the July 1, 2011 Report of Lucy P. Allen ("Allen Report").[2] As a result, Lead Counsel for The Merger Fund, Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier") has asked me to respond to the James and Allen Reports with respect to: 1) the price impact issues; and 2) the issues raised on loss causation (of which price decline is a part), out of an abundance of caution, and to show that my analyses were correct.

2. It is my opinion that the conclusions set forth in the James Report and the Allen Report regarding price impact, loss causation (including price decline), and questioning the opinions I expressed in the Finnerty Declaration are fundamentally flawed and do not change any of my opinions. Appendix A lists the documents I considered in coming to my opinions responding to the James Report and the Allen Report.

## II. The Allen Report's "Price Impact Analysis" Is Speculative, Unsupported, and Unreliable

3. Ms. Allen states that she conducted a "price impact analysis" to determine "whether there would have been a price difference if the revised revenues for theater systems had been announced instead of the reported revenues."[3, 4] Her

---

[2] Ms. Allen previously submitted a report in this matter executed on June 10, 2010 ("Allen 2010 Report").

[3] Allen Report ¶ 6. Although Ms. Allen focuses on the price impact of revised revenues, earnings also were revised downward by the restatement. *See* Exhibit 1.

report makes the incredible argument, which is not supported by even the slightest financial analysis, that if IMAX had reported its revenue correctly each quarter during the Class Period, that is, as eventually restated in July 2007, IMAX's Class Period share prices would have been no different in this but-for world from the actual daily share prices that prevailed throughout the entire Class Period.[5] While acknowledging that the timing of theater system installations – and thus revenue recognition and earnings – would have changed,[6] she states that none of these changes would have mattered to investors or securities analysts. Ms. Allen reached this conclusion without so much as a single pro forma financial statement or daily stock price valuation analysis incorporating the restated financial results, and without conducting an event study to analyze the actual impact of information on IMAX's stock price.

**A. The Price Impact Analysis Makes No Sense As a Matter of Economics**

4. The Allen Report's argument concerning the lack of any price impact from correcting IMAX's improper revenue recognition makes no sense as a matter of economics because it implies that the timing of IMAX's revenues does not matter to investors (whether revenues are reported a quarter later, a year later, or even years later) nor do the timing of the earnings recognized from those revenues or the

---

[4] The James Report does not address this question directly.

[5] *Ibid.*, e.g., ¶ 11.

[6] Consequently, Ms. Allen recognizes an important component of the alleged fraud because IMAX's misleading statements concerning its theater installations deluded the market into believing that IMAX had completed more theater installations than it actually had and thus could recognize more revenue and earnings than it otherwise could.

timing of the Company's theater installations matter – even though the Company highlighted the number of installations in its quarterly earnings releases and, likewise, the stock analysts who followed IMAX repeated the quarterly installation figures in their follow-on reports.[7] If these items didn't matter, then why did the Company and the securities analysts give them so much prominence?

5. The Allen Report's argument concerning the lack of any price impact due to the revenue recognition accounting also has a logical flaw. Ms. Allen argues that when the intention to restate 2002-2006 for revenue recognition was first announced June 21, 2007, there was not a significant stock price reaction.[8] She then infers that if IMAX had properly reported its revenue each quarter in the past, there would not have been any difference in IMAX's share price at the time of each quarterly announcement.[9] Making a general statement about adjusting historical revenue and earnings for an entire five-year period is not the same as actually reporting a different (i.e., corrected) quarterly figure each quarter during the five-year period. Those quarterly figures will affect investors' and stock analysts' expectations as they are reported, at least in part, because they show a trend in the company's performance. Corrected information reported ex post

[7] *See, e.g., Reuters*, "UPDATE 1-Imax second-quarter earnings fall in line," July 31, 2003 (12:33 pm); *National Post*, "Investors cheer Imax theatre deals: Earnings beat forecast," October 29, 2004; *PR Newswire*, "IMAX Expects to Meet or Exceed Full Year 2005 Guidance; Company Completes Record Number of Installations in 4Q; 2006 Film Slate Strongest in IMAX History," February 17, 2006 (7:00 am); Research Associates, "Raising Rating on Higher New Theater Contracts," July 31, 2003; Roth Capital Partners, "3Q04 Tops Estimates, Management Guides to 35% Earnings Growth in FY05," October 29, 2004; and Susquehanna Financial Group, "Finally, Seeing the Momentum," February 21, 2006.

[8] Allen Report ¶ 72, pp. 44-45.

[9] *Ibid.*

cannot change any of those prior expectations because they are old news. The flaw in Ms. Allen's logic is that she is assuming that the ex ante impact of the new information (which we cannot observe) must be the same as the ex post impact of the same information which we can observe, but only years later.[10] Even if the corrected quarterly financial information for the historical periods were reported on June 21, 2007 (and, of course, it was not), it was still too late to change investors' expectations as of those prior dates. It might affect investors' expectations for the period following June 21, but the lack of specificity in the June 21 announcement makes even that possibility very unlikely, at least until the restated financial statements were released.

6. If one were ever going to support the Allen Report's zero-price-impact theory, one would have to prepare a full set of restated financial statements (income statement, balance sheet, and cash flow statement) for each of the affected quarters, compare the relevant financial metrics at least as of each quarterly reporting date, and then explain why the change in the financial metrics *for each reporting date* would be of no consequence to the market *at the time* this different information was disclosed. The Allen Report never even attempts to do this analysis, presumably because Ms. Allen realizes that it could not possibly support her theory. As shown in Exhibit 1, the restatements had a very significant impact on IMAX's annual earnings per share – and presumably on the earnings per share for many of the

[10] Ms. Allen also fails to consider that the stock price did not change on June 21, 2007 because it already reflected the likelihood that the time period of the restatement would expand. *PR Newswire,* "IMAX to delay filing of 2006 10-K," March 29, 2007 (7:30 a.m.).

quarters within this five-year period.[11] Quarterly financial results do matter, and it is wholly unrealistic to argue that changing the reporting of quarterly revenue with all its consequent effects on the quarterly financial statements would not affect IMAX's share price any time during the five-year period.

7. Because the number of installations was a material determinant of the amount of revenue and earnings reported in each quarter,[12] information about theater systems installations was material to investors. Consequently, IMAX's stock price was artificially inflated during the Class Period by investors' belief in the accuracy of the number of theater systems installed, as reported, and the concomitant revenue and earnings.

### B. The Allen Report Oversimplifies the Relationship Between the Price of a Share of Common Stock and the Issuer's Expected Future Cash Flows

8. The Allen Report states that "[i]n an efficient market, the *only* information that affects the stock price is information that changes the expected value of future cash flows [emphasis added]."[13] This statement oversimplifies the connection between a company's share price and its expected future cash flows. The standard share price valuation formula found in corporate finance textbooks states that the price of a share of common stock is equal to the present value of the stream of expected

[11] IMAX did not disclose the quarterly restated financials for much of the Class Period.

[12] During the Class Period, theater systems revenue comprised the single largest component of IMAX's total reported revenues: 54.31% in 2002; 63.60% in 2003; 63.66% in 2004; 67.45% for 2005; 46.03% for 1Q06; and 57.86% for 2Q06. *See* IMAX Corp. Forms 10-K for the fiscal years ended 2002-2005 & Forms 10-Q for the quarterly periods ended March 31, 2006 and June 30, 2006.

[13] Allen Report ¶ 8.

future cash dividends.[14] Cash dividends are paid out of free cash flow but companies typically determine how much cash to distribute as dividends on their common shares with reference to the company's earnings per share.[15] What ultimately matters is the profitability of the company's operations and the profitability of the alternative uses for the company's cash, such as capital investment and building working capital, because the company's profitability determines how much operating cash flow will be available and the alternative uses for the operating cash flow will determine how much free cash flow will be left over for distribution in cash to the company's shareholders as dividends. For this fundamental reason, finance textbooks typically point out that the price of a share of a company's common stock can be expressed as the sum of (a) the capitalized value of the company's current earnings per share plus (b) the net present value per share of the company's growth opportunities.[16] Thus, while at one level common stock value depends entirely on the cash flows the company will distribute to its shareholders as cash dividends and the required return on such cash flows, at the more fundamental level, a company's future profitability ultimately determines how much income the company has available to distribute in cash as dividends. Therefore, financial theory teaches that the connection between share

[14] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 9th ed., McGraw-Hill, New York, 2008, chapter 5 and especially pp. 88, 90.

[15] *Ibid.*, ch.17.

[16] *Ibid.*, pp. 98-102. This section of the book is labeled, "The Link Between Stock Price and Earnings Per Share."

price and earnings per share is the fundamental relationship that must be analyzed to assess a company's dividend-paying capacity.[17]

9. Not just cash dividends, but changes in cash dividends, i.e., the timing of the cash dividends, also matter. Numerous studies have documented that share prices react to the information signals conveyed by dividend changes. The rationale is that investors interpret dividend changes as indicators of changes in the profitability of the company's business.[18] Thus, while it is true that information that affects the expectations concerning the company's future cash flows, and in particular cash dividends, affects the company's share price, it is more correct to say that it is information that affects the market's assessment of the future profitability of the company's business that ultimately has the greater impact on the company's share price. But to say that information that affects expectations regarding the company's future cash flows is the *only* information that affects the company's stock price oversimplifies the value relationship. In particular, an accounting change that affects the market's perception of the future profitability of a company's business, such as improperly accelerating revenue and related earnings over several quarters, can affect its share price, for example, by enabling the company to appear to meet securities analysts' earnings forecasts when in reality it hasn't or by inflating the company's apparent rate of revenue growth.

---

[17] *Ibid.*, pp. 98-102. If the Allen Report were correct, then securities analysts would only need to furnish cash flow per share forecasts. However, it is easy to verify that the one metric on which securities analysts almost universally focus their attention is earnings per share.

[18] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 9th ed., McGraw-Hill, New York, 2008, pp. 447-449. One of the earliest papers that documented this signaling effect is Healy, P. and K. Palepu, "Earnings Information Conveyed by Dividend Initiations and Omissions," *Journal of Financial Economics* 21 (September 1988), pp. 149-175.

10. A recent article by two of Ms. Allen's NERA colleagues, Esther Bruegger and Frederick C. Dunbar entitled "Estimating Financial Fraud Damages with Response Coefficients" explains the important connection between a company's share price and its expected cash flows operating through the company's expected earnings (internal citations to supporting academic literature omitted):[19]

> Expected distributions to equity holders depend on expected cash flow which, in turn, should bear a long-run relationship to expected earnings of a company. Therefore, according to this model of stock price formation, in an efficient market, stock price is an unbiased estimate of the value of the stock based on all public information of future earnings. It is therefore not surprising that the stock price generally reacts very little or not at all when a company announces earnings in line with the current market expectations. Alternatively, stock prices have been found to react significantly to unexpected earnings numbers, or "earnings surprises." The reason is that investors adjust their expectations of future earnings in the direction of the surprise.

11. There are numerous academic papers that relate share prices directly to earnings, to the book value of the stock, and to other operating variables that relate to the company's profitability.[20] One of the most famous papers on dividends shows that under certain assumptions, one can express the share price equivalently as (a) the present value of the expected cash flow per share or (b) the present value of the expected earnings per share or (c) the present value of the expected dividends per

---

[19] Bruegger, Esther and Frederick C. Dunbar, "Estimating Financial Fraud Damages with Response Coefficients," Iowa College of Law, *Journal of Corporation Law* 35 (Fall 2009), pp. 32-33.

[20] Easton , Peter D. and Trevor S. Harris, "Earnings as an Explanatory Variable for Returns," *Journal of Accounting Research* 29 (Spring 1991), pp. 19-36; Ohlson, James A., "Earnings, Book Values, and Dividends in Equity Valuation," *Contemporary Accounting Research* 11 (Spring 1995), pp. 661-687; and Collins, Daniel W., Edward L. Maydew, and Ira S. Weiss, "Changes in the Value-Relevance of Earnings and Book Values Over the Past Forty Years," *Journal of Accounting and Economics* 24 (December 1997), pp. 39-67.

share.[21] This so-called "dividend irrelevance" paper also points out that dividend changes can have a separate effect on value based on their information content, or signaling value.[22] The point is, a company's share price is determined more fundamentally by more than just expected cash dividends per share.

12. For example, the Bruegger and Dunbar article cited above explains that academic studies have quantified the relationship between a company's earnings surprise and the change in its stock price by estimating what are known as *earnings response coefficients*.[23] There is a rich literature on earnings response coefficients, which ties share price reactions to the size of earnings surprises and to the factors responsible for those surprises.[24] Interestingly, these articles refer to *earnings* response coefficients, not *cash flow* response coefficients. If the Allen Report were correct that *only* expected cash flows matter, then the focus of this literature would be on cash flow, not earnings, surprises.

13. Academic research thus demonstrates that changes in earnings, especially when they are unexpected, affect a company's share price. This impact of a difference in earnings has relevance for the impact of the restatement of IMAX's financial statements. The Allen Report asserts that the curative disclosures of IMAX's prior

[21] Miller, Merton H. and Franco Modigliani, "Dividend Policy, Growth, and the Valuation of Shares," *Journal of Business* 34 (October 1961), pp. 411-433.

[22] *Ibid.*, p. 430.

[23] Bruegger, Esther and Frederick C. Dunbar, "Estimating Financial Fraud Damages with Response Coefficients," Iowa College of Law, *Journal of Corporation Law* 35 (Fall 2009), p. 33.

[24] *See* Kothari, S.P., "Capital Markets Research in Accounting," *Journal of Accounting and Economics* 31 (2001), pp. 123-143, and Bruegger, Esther and Frederick C. Dunbar, "Estimating Financial Fraud Damages with Response Coefficients," Iowa College of Law, *Journal of Corporation Law* 35 (Fall 2009), pp. 45-66, for two reviews of this literature.

problems with revenue recognition accounting should not have affected IMAX's share price at the time of the disclosures "nor should there have been a price impact if IMAX's revised revenues had originally been announced instead of the reported revenues" because "there was no material restatement of IMAX's past cash flows."[25] However, the restatement materially changed IMAX's earnings.

14. Exhibit 1 shows the impact of the portion of the overall restatement on IMAX's net income and earnings per share attributable to IMAX's improper revenue recognition accounting for the theater systems installations, each year during the Class Period. In particular, this exhibit shows that IMAX should have reported lower theater systems net income and earnings per share when it reported financial results for fiscal year 2002 on February 27, 2003, the first day of the Class Period, as well as for fiscal years 2004 and 2005. Moreover, Exhibit 1 illustrates the effect of the restatements on IMAX's earnings surprises because the "Per Share Difference" column also reflects the difference between the earnings surprise that occurred and the earnings surprise that would have occurred had the restated numbers been reported originally.

15. Moreover, the Allen Report glosses over: 1) the fact that cash flow timing is very important in the share price calculation because of the time value of money; and 2) the fact that the discount rate used to reduce the future stream of cash flows to a present value is also very important to the present value calculation. The Allen Report overlooks these fundamental valuation relationships when it argues that changing IMAX's revenue recognition policy would not have changed IMAX's

[25] Allen Report ¶ 8.

share price at any time during the Class Period, while at the same time acknowledging that the restatement would indeed change the timing of IMAX's cash flows.[26] For example, the Allen Report states that "[t]here was no material restatement of IMAX's past cash flows and no evidence that this shift in timing would change the expected value of future cash flows."[27]

16. The Allen Report acknowledges that the timing of IMAX's cash flows would be different under the restatement. It tries to argue that notwithstanding these changes, IMAX's share price would not have changed on any of the relevant dates because the changes in the cash flows were not 'material.'[28] But the Allen Report never defines 'material' and never indicates whether it is applying this test to each quarterly period cash flow separately or to the Class Period cash flow taken as a whole. In fact, there was no restatement of cash flows by IMAX's outside auditors, and the Allen Report does not furnish any restated cash flow figures. So the Allen Report's assertion that the curative disclosures should not have had any impact on IMAX's share price if IMAX's restated revenues had originally been announced instead of the reported revenues is pure speculation.[29]

17. The Allen Report never even addresses the issue concerning the riskiness of IMAX's expected future cash flows. For example, IMAX's revenue would have been lower in the third quarter 2005 without the application of MEA accounting, as

---

[26] Allen Report ¶ 8.

[27] *Ibid.*

[28] *Ibid.*

[29] *Ibid.*

the lower chart on page 12 of the Allen Report indicates, had IMAX applied the correct (i.e., restated) accounting. Investors' perception of IMAX's growth prospects would have been more pessimistic and their perception of the riskiness of IMAX's stock would also have been more pessimistic upon the release of that financial information versus the originally reported revenue. Likewise, without the acceleration of revenue from future quarters into the fourth quarter 2005, IMAX's prospects would have appeared less robust at the time it reported fourth quarter 2005 results. Since investors generally perceive future revenues, earnings, and cash flow as riskier than current period revenues, earnings, and cash flow because of their greater uncertainty, artificially accelerating revenue and earnings from theater installations into the fourth quarter 2005 made IMAX's theater systems installations, and thus revenue, earnings, and cash flow appear less risky than they actually were and effectively inflated IMAX's share price. Thus, if the restated figures had been timely reported, investors would have applied a higher discount rate, resulting in a lower share price on each earnings reporting date (based on the restated figures), than they did in response to the originally reported financial results.

**C. The Empirical Evidence Contradicts the Allen Report's Price Impact Analysis**

18. Even though she fails to conduct an event study or otherwise analyze IMAX's actual stock price movements, Ms. Allen claims that she found "no *empirical* evidence that had IMAX reported the revised revenues in place of those reported during the alleged misstatement period, there would have been a price impact

[emphasis added]."[30] In fact, the empirical evidence she ignores contradicts her conclusion.

19. Ms. Allen's conclusion rests principally on her theoretical analysis of the revenue recognition issues addressed above and her finding that "rather than focusing on theater systems revenue to value the company, [the analysts that followed IMAX] focused instead on other metrics such as theater signings."[31] If reported revenues and earnings – which are driven by the number of theater installations recognized in a reporting period – were not relevant to the market's valuation of IMAX during the Class Period, then one would expect to find that the Company's stock price did not react to announcements related to these metrics. Instead, the statistical results from Professor James's event study (confirmed by my event study analysis) demonstrate that IMAX's stock price reacted in a statistically significant manner to the Company's reports regarding these metrics throughout the Class Period.

20. For example, on February 17, 2006, IMAX preannounced its financial results for the fiscal year 2005, saying it expects to meet or exceed its full-year diluted earnings per share guidance in the range of $0.35 to $0.38, of which one market commentator stated: "That's quite a feat, given that for the first three quarters of the year, Imax's diluted share earnings totaled 11 cents."[32] Following the announcement, a Susquehanna Financial Group securities analyst noted that IMAX announced that it had installed "a record 14 theater systems in Q4" and stated:

[30] *Ibid.* ¶ 9.

[31] *Ibid.*

[32] *Dow Jones News Service*, "Imax Expects To Meet Or Exceed 2005 Guidance," February 17, 2006 (6:45 a.m.).

"This news was viewed favorably, as the timing of theater system installations has become a major concern for some investors."[33] James Report Exhibit 4 shows that the stock's abnormal return was 9.98% on this date and is significant at better than the 1% level, meaning there is less than a 1% chance that this abnormal return happened by mere chance.[34]

21. Importantly, IMAX's stock price increased on February 17, 2006 even though the Company only reported "eight signings in 4Q05 [which] represents a decline from double digit levels in the previous five quarters."[35] Consequently, the stock price reaction to IMAX's financial results announcement on February 17, 2006 furnishes direct empirical evidence that contradicts Ms. Allen's supposition that the number of theater signings IMAX reported was a more important metric to the market price than reported earnings and the number of theater installations. By ignoring the importance to market participants of the number of theater installations, Ms. Allen ignores that inflating the number of theater installations inflated IMAX's share price by creating the impression that IMAX's theater installation business was growing faster than it actually was.

22. Similarly, for example, on November 10, 2003,[36] May 6, 2004,[37] and November 3, 2005,[38] IMAX announced increased signings, installations that were flat if not

[33] Susquehanna Financial Group, "Finally, Seeing the Momentum," February 21, 2006.

[34] My event study finds that IMAX stock's abnormal return on February 17, 2006 was 10.20% and is significant at better than the 1% level.

[35] Soleil, "Correction: Strong 2005 Bodes Well for Further Growth," February 17, 2006.

[36] *Dow Jones Business News*, "Imax Touts 'Matrix' Results; Stock Falls on Loss Outlook," November 10, 2003 (11:14 am) & *Canada NewsWire*, "IMAX Corporation Reports Third Quarter Results," November

lower, and lower-than-expected revenues and earnings, yet James Report Exhibit 4 shows that its stock price declined on each of these dates and that the abnormal returns were statistically significant at better than the 5% level.[39] These examples provide powerful empirical evidence that, had the revised lower revenues, earnings, and number of installations for theater systems been announced during the Class Period instead of the reported revenues, earnings, and number of installations, IMAX's stock price would have declined.

23. In addition, as I demonstrate in the Finnerty Declaration and discuss in further detail below, disclosures related to the restatements caused a statistically significant decline in IMAX's stock price. These results provide strong empirical evidence that had these disclosures occurred earlier, IMAX's stock price would have declined earlier, further undermining Ms. Allen's conclusion based on her "price impact analysis."

---

10, 2003 (7:35 am). The *Dow Jones Business News* article quotes IMAX co-CEO Rich Gelfond as stating that IMAX's earnings expectations for fiscal 2004 are based on IMAX theater system installations.

[37] *Reuters*, "UPDATE 2-Imax stock drops as it posts loss, revenues slip," May 6, 2004 (6:32 pm) & *Canada NewsWire*, "IMAX Corporation Reports First Quarter Results," May 6, 2004 (8:02 am). The *Reuters* article quotes from an equity analyst at Soleil: "The fact that we're looking at a company that's installing 20-25 theaters a year. [sic] It means that each theater installation is important."

[38] *Reuters*, "UPDATE 2-Imax results disappoint, stock falls 11 pct," November 3, 2005 (7:12 am). The article states that "Imax executives said the scheduled delivery of three theater systems had been delayed" and that "Imax was on track to 'hit or possibly exceed' its target of signing contracts for 40 to 45 systems this year."

[39] My event study finds that IMAX stock's abnormal returns on November 10, 2003, May 6, 2004 and November 3, 2005 were -8.68%, -7.66%, and -11.27%, respectively, and are significant at better than the 5% level.

## III. Professor James's and Ms. Allen's Theoretical Analyses of IMAX's Revenue Recognition Issues Ignore the Impact of the Alleged Fraud on the Riskiness of IMAX's Common Stock

24. Professor James claims that, based on financial economics research, "[a]s IMAX's restatement had no material impact on the Company's future cash flows, it would not be expected to affect the Company's valuation in a significant way."[40] Similarly, Ms. Allen states that "[e]mpirical finance research has found that … when cash flows and accounting changes diverge, it is only the change in cash flows, not accounting numbers, that matters to investors" and claims that IMAX's "restatement did not materially affect historical cash flows, and there is no indication that it would materially affect expectations of future cash."[41] As demonstrated by their claims, Professor James and Ms. Allen focus solely on the effect of IMAX's restatement on its expected future cash flows and ignore the effect of the restatement on the Company's perceived riskiness of achieving those cash flows. IMAX's revenue recognition accounting issues would increase the riskiness of an investment in IMAX's stock, and this increase in risk would be impounded into IMAX's cost of equity capital, which is the discount rate investors would use to discount the stream of expected future dividends to value IMAX's stock.

25. As a matter of economics, a company's stock price reflects the company's expected future cash flows discounted to a present value at the appropriate cost of

[40] James Report ¶¶ 25 & 28.

[41] Allen Report ¶¶ 26-27.

capital.[42] A company's cost of capital reflects the rate of return investors in the stock require to compensate them for the riskiness of an investment in the firm's stock. The cost of capital reflects both the risk of attaining the cash flows expected to be generated by the company's operations and the rate of return investors require in light of the inherent variability of the company's cash flows. The more uncertain the stock's future cash flows, the greater the risk and consequently the higher the investor's required rate of return, and therefore, the greater the company's cost of capital.[43]

26. Hence, a company's stock price would be expected to decline upon the disclosure of information that either reduces the firm's expected future cash flows or causes the company's cost of capital to increase, or both. A recent study finds that corporate misconduct leads to an increase in risk as measured either by stock return volatility or by the dispersion of stock analysts' forecasts.[44] The change in perceived risk is consistently greater when the misconduct involves a related-party offense, that is, an offense involving insider shareholders or other parties that are related in some way to the corporation committing the misconduct, such as securities fraud.[45] The misconduct also results in a loss of shareholder wealth due

---

[42] *See* Ross, Stephen, Randolph Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed., McGraw-Hill, New York, 2005, p. 112.

[43] *Ibid.*, pp. 284-287, 602.

[44] Murphy, Deborah L., Ronald E. Shrieves, and Samuel L. Tibbs, "Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk," *Journal of Financial and Quantitative Analysis*, 44, 2009, pp. 55-83.

[45] *Ibid.*, p. 82.

to the corporation's reputational loss owing to the misconduct.[46] The announcement of a Securities and Exchange Commission ("SEC") inquiry concerning revenue recognition accounting would thus be expected to increase the perceived riskiness of IMAX's stock, resulting in a higher required rate of return and a lower price for IMAX's shares, a point that Professor James and Ms. Allen both entirely ignore.

27. Studies have also shown that restatements often have an effect on both the firm's estimated cash flows and its cost of capital.[47] In particular, these studies show that restatements cause an increase in the company's cost of capital, which leads to a decline in the value of the company's stock.[48] This increase in a firm's cost of capital is consistent with restatements increasing uncertainty about the company's future profitability and at the same time raising concerns about the credibility and competence of the company's managers.[49]

28. Moreover, restatements involving revenue recognition issues – as in IMAX's case – can have a greater effect on a company's stock price than other types of restatements. In particular, one study finds that more pronounced stock price

---

[46] *Ibid.*

[47] *See,* Hribar, Paul and Nicole T. Jenkins, "The Effect of Accounting Restatements on Earnings Revisions and the Estimated Cost of Capital," *Review of Accounting Studies*, 9, 2004, pp. 337-356, and Kravert, Todd and Terry Shevlin, "Accounting Restatements and Information Risk," *Review of Accounting Studies*, 15, 2010, pp. 264-294.

[48] *Ibid.*

[49] Hribar and Jenkins (2004), p. 339, and Kravert and Shevlin (2010), p. 265.

declines and larger bid-ask spreads are observed for firms that restate due to revenue recognition issues.[50]

29. Therefore, assuming *arguendo* that IMAX's total expected future cash flows were not affected by the restatement, the Company's stock price still could have declined due to an increase in its cost of capital as a direct result of its announcements related to its revenue recognition issues.

30. There is reason to believe that IMAX's revenue recognition issues increased the perceived riskiness of its expected future cash flows and thus increased the Company's cost of capital. For example, the outcome of the SEC inquiry disclosed on August 9, 2006 was then unknown, which likely caused uncertainty regarding a potential escalation of the investigation, potential fines, or other negative effects on expected future cash flows. This uncertainty was highlighted by analysts, who described the effect of the SEC's inquiries on IMAX's stock price using terms such as "material risk," "investor scepticism," "cloud," and "overhang."[51] Indeed, Ms. Allen states that the "riskiness of achieving" cash flows affects a stock's price "via the discount factor,"[52] and Professor James acknowledges that information related to Plaintiff's allegations caused "increased risks incumbent on the company" and "uncertainty."[53] However, in their theoretical analyses, both ignore any effect that IMAX's restatement-related announcements could have had

---

[50] Anderson, Kirsten L. and Teri L. Yohn, "The Effect of 10-K Restatements on Firm Value, Information Asymmetries, and Investors' Reliance on Earnings," Working Paper, Georgetown University, 2002.

[51] *See* below ¶ 38.

[52] Allen Report, p. 25 & Note 22.

[53] James Report ¶¶ 139 & 141.

on investors' perception of the stock's riskiness. The fact that Professor James and Ms. Allen recognize that IMAX's stock price changed following announcements related to the Company's revenue recognition issues and restatement undermines their theoretical arguments that the stock price was unaffected by these announcements.

31. Professor James and Ms. Allen are incorrect that the timing of IMAX's revenue recognition on installations had no effect on the Company's stock price. They ignore, for example, the effect that the restated financial results in the third quarter of 2006 would have had on IMAX's stock price on November 9, 2006. After the market closed on November 8, 2006, the Company announced, among other things, its financial results for the third quarter of 2006, disclosing that "primarily because it did not install any theater systems in the third quarter ended September 30, 2006, it incurred a net loss of $0.30 per diluted share for the three month period" compared to net earnings of $0.05 for the 2005 third quarter, with total revenues of $20.7 million vs. $33.4 million in the prior year.[54] The abnormal return on November 9, 2006, the following trading day, was -29.61%, which is statistically significant.[55] Market commentators attributed the stock price decline to the "weak report."[56] However, the restated numbers were substantially better for this quarter, with a net loss of $0.14 per diluted share on revenues of $31.0

[54] *PR Newswire*, "IMAX Corporation Reports Third Quarter Financial Results: - Pursuing Key Initiatives Designed to Grow Business and Shareholder Value over Long Term -," November 8, 2006 (4:30 p.m.).

[55] James Report ¶ 55.

[56] *Reuters News*, "UPDATE 2-Imax shares plunge after 3rd-quarter loss," November 8, 2006 (4:40 p.m.).

million.[57] Had the restated numbers been reported instead, it is likely that the decline in IMAX's stock price on November 9, 2006 would not have been as severe.

32. In addition, Professor James and Ms. Allen are incorrect that the restatements would not affect IMAX's cash flows. An SEC inquiry is distracting to management, which can reduce operating efficiency and reduce profitability and cash flow. Second, responding to the SEC and Ontario Securities Commission ("OSC") inquiries required IMAX to incur substantial accounting and legal expenses to investigate and respond to the questions raised by regulators.[58] Third, IMAX had two covenant violations because of its failure to file timely financial statements, one involving its bank loan agreement and the other involving its 9 5/8% Senior Notes due 2010, for which it incurred costs to seek and obtain waivers.[59] Fourth, there can be significant indirect costs resulting from a restatement, which can lead to lower cash flows in the future. A recent study finds that loans initiated after a restatement have significantly greater loan spreads and shorter maturities, are more likely to require collateral, and are also more likely to have tighter covenant restrictions.[60] It also finds that the increase in loan spread is significantly greater when fraud is involved and concludes that banks impose

[57] IMAX Form 10-K for the fiscal year ended December 31, 2006, p. 137.

[58] IMAX Form 10-K for the fiscal year ended December 31, 2007, p. 57.

[59] *Ibid.*, pp. 57, 70.

[60] Graham, John R., Si Li, and Jiaping Qiu, "Corporate Misreporting and Bank Loan Contracting," *Journal of Financial Economics*, 89, 2008, pp. 44-61.

tighter covenant restrictions to address the risk and information problems caused by the restatement.[61]

33. Even if IMAX's total cash flow and its total revenue had not changed, their timing did change because of IMAX's revenue recognition accounting problems. Altering the timing of a company's revenue can affect securities analysts' projections of the Company's future revenue growth rate, which can in turn affect the stock's market price. Improperly accelerating revenue from a later period can also lead to an overstatement of the value of the company when the company's equity is valued as a multiple of its revenue. Stock appraisers often base their company valuations on a multiple of company revenue.[62]

34. It is my opinion that the increase in the perceived riskiness of IMAX's stock, the cost of dealing with the SEC and OSC inquiries, and the change in investors' assessments of IMAX's growth prospects from its theater systems installations all contributed to the significant stock price changes in response to IMAX's announcements regarding its revenue recognition accounting on August 9-10, 2006, March 29, 2007, and July 20, 2007. Likewise, IMAX's improper revenue recognition inflated IMAX's stock price because the Company overstated revenues and earnings as a result of over-reporting its theater systems installations.

[61] *Ibid.*, p. 44.

[62] Damodaran, Aswath, *Investment Valuation*, 2nd ed., Wiley, New York, 2002, pp. 543-565.

## IV. Professor James's and Ms. Allen's Analysis of Loss Causation and the Reasons for IMAX's Stock Price Decline Are Incorrect

35. In the Finnerty Declaration, I performed an event study analysis to determine whether the changes in IMAX's common stock price on August 10, 2006, March 29, 2007, and July 20, 2007 were statistically significant.[63] The statistical results from the event study presented in the James Report confirm my conclusion that IMAX's abnormal stock returns on these dates are statistically significant at better than the 1% level, which means there is less than a 1% chance that these abnormal returns happened by mere chance.[64] Ms. Allen does not report the results of an event study analysis in her report and provides no statistical basis for her any of her conclusions.[65] In particular, her theoretical "price impact analysis" is fundamentally flawed because it ignores IMAX's actual stock price movements; as explained further in § II.C. above, the statistical results of Professor James's event study – which I confirmed with my event study analysis – contradict her conclusion.

36. Also in the Finnerty Declaration, I performed a loss causation analysis to determine whether the statistically significant changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 could be attributed to the disclosures of the alleged fraud.[66] My analysis of the effects of IMAX's

---

[63] Finnerty Declaration ¶ 11.

[64] James Report ¶¶ 82, 147 & 159 *and* James Report Exhibit 4. As explained below ¶¶ 49-50, Professor James's claim that the statistical results of his own event study should be adjusted by the "Sidak adjustment" to cause the abnormal return on March 29, 2007 to be statistically insignificant is incorrect.

[65] The same observations also apply to the Allen 2010 Report.

[66] Finnerty Declaration ¶¶ 22-40.

disclosures on these dates regarding its revenue recognition accounting policy and its reported theater systems installations, revenue, and earnings stands in stark contrast to those found in the James Report and the Allen Report, both of which purportedly found no stock price loss attributable to the alleged fraud.

**A. IMAX's August 9-10, 2006 Stock Price Decline**

37. It is my opinion that the statistically significant -40.67% abnormal return on August 10, 2006 was substantially caused by the disclosures in IMAX's press release issued just after the close of trading on August 9, 2006 that were related to Plaintiff's allegations. The bases for my opinion are: (a) the fact that 75% of the total stock price decline between the market close (at 4:00 p.m.) on August 9, 2006 and the market close on August 10, 2006 occurred *before* the 4:30 p.m. conference call on August 9, 2006 began (during which many of the disclosures occurred that Professor James and Ms. Allen claim caused IMAX's stock price to decline), (b) market commentators specifically attributed the decline in IMAX's stock price largely to the disclosure of the SEC inquiry, (c) securities analysts reacted negatively to the disclosure of the SEC inquiry, (d) other negative information disclosed on August 9, 2006, in particular, IMAX's failure to find a buyer, is likely related to Plaintiff's allegations, (e) the remaining disclosures on August 9, 2006 likely had a positive effect on IMAX's stock price, especially since IMAX's revenue and earnings beat analysts' forecasts, and (f) the fact that there is less than a 1% chance that the -40.67% abnormal return happened by mere chance.[67]

---

[67] *Ibid.* ¶ 25.

38. While Professor James and Ms. Allen admit that the disclosure of the SEC inquiry had adverse consequences for IMAX's stock price, they claim that the "overhang" related to this disclosure was not due to the revenue recognition accounting issues.[68] This assertion is clearly incorrect. Had the revenue recognition issues not occurred, there would have been no SEC inquiry in the U.S. (or OSC inquiry in Canada) into these issues and thus no consequent stock price reaction caused by the announcement of the SEC inquiry.

39. As I explained in the Finnerty Declaration, IMAX's August 9, 2006 press release disclosed, among other things, that IMAX had failed to find any buyers of the Company at a valuation sought by the Board.[69, 70] This disclosure may not be a completely unrelated event as Professor James and Ms. Allen claim. As they illustrate, the news that the Company had failed in its search for a buyer at an acceptable price was regarded negatively by market participants and contributed to IMAX's stock price decline on August 9, 2006 and August 10, 2006. What both Professor James and Ms. Allen fail to consider is the possibility that the accounting issues were a contributing factor in IMAX's failure to find a buyer as Plaintiff

[68] James Report ¶ 136 and Allen Report ¶ 66.

[69] Finnerty Declaration ¶ 17.

[70] As explained below ¶ 78, the entire -40.67% abnormal return on August 10, 2006 cannot be attributed entirely to the announcement that IMAX could not find a buyer who was willing to pay a price that its board would find acceptable.

alleges in the Complaint.[71] In other words, the same issues that attracted the attention of the SEC and the OSC likely would have concerned a potential buyer.[72]

40. During the securities analyst conference call following IMAX's press release on August 9, 2006, co-CEO Rich Gelfond stated that the first inquiry from the SEC was received in late June, during the period when the Company was searching for a buyer. Even though Mr. Gelfond responded to a question from a securities analyst by stating that "we don't believe it impacted the [sale] process,"[73] market participants were skeptical. An article published in *The Wall Street Journal,* subtitled "Why Some Companies Go Unsold in Merger Boom," states that "many of the would-be sellers are plagued with vulnerable business models or regulatory problems" and points out that "on the same day Imax said it hadn't found a buyer, the company announced that the Securities and Exchange Commission and Canadian authorities were looking into how the company recognized revenue."[74] An article published in the *National Post* on April 9, 2007 explicitly linked the accounting concerns to the failure to find a buyer:

---

[71] Consolidated Amended Class Action Complaint, In Re IMAX Corporation Securities Litigation, 06 CIV. 6128 (NRB), U.S.D.C., Southern District of New York, October 2, 2007, ¶ 122.

[72] Professor James and Ms. Allen acknowledge that IMAX's stock price declined following the Company's announcement after the market closed on December 15, 2006 that it would no longer pursue a sale or merger. James Report ¶¶ 63-64 and Allen Report ¶ 73. The abnormal return on December 18, 2006, the next trade day, is a statistically significant -8.30%. James Report ¶ 63. To the extent that IMAX's decision to abandon its search for a buyer was caused by its revenue recognition issues, then – contrary to Professor James's and Ms. Allen's claims – this decline in the Company's stock price also is directly related to Plaintiff's allegations.

[73] *Voxant FD (Fair Disclosure) Wire*, "Q2 2006 IMAX Corporation Earnings Conference Call - Final," August 9, 2006.

[74] *The Wall Street Journal*, "Long & Short: 'Buy My Company, Please'; Why Some Companies Go Unsold in Merger Boom," August 23, 2006.

> Anthony Scilipoti, executive vice-president of Veritas Investment Research in Toronto ... says Imax should be tucked into a larger conglomerate, but predicts that will not happen until there is compelling evidence that the books are squeaky clean.
>
> Accounting concerns are not new for Imax. Analysts have been raising red flags for more than a decade about the company's lease-style accounting and the lag between signing contracts and installing theater systems. But this time around, the accounting questions came as prospective purchasers of the company, rumoured to have included Sony Corp. and private equity fund Elevation Partners, got a look at the books. It is also the first time the most powerful regulator in the United States has asked questions.[75, 76]

41. In addition, Ms. Allen opines that "[n]ews stories attributed a dramatic fall in the stock price in 2000 (from $27 to $4) largely to the fact that IMAX's search for a buyer was unsuccessful."[77] In contrast, Professor James opines that "after a precipitous stock price decline in the midst of an industry downturn, the Company took itself off the market."[78] Indeed, *Reuters News* reported that "[a]nalysts said the stock is being affected by poor performances in its industry where overextended big exhibitors are going belly up or struggling to stay afloat in the U.S."[79] In a profit warning that caused a substantial decline in the Company's stock price, IMAX management stated: "The financial state of the commercial exhibition industry and the North American multiplex operators in particular

[75] *National Post*, "'Red Flags' at Imax," April 9, 2007.

[76] Ms. Allen attempts to criticize this article by stating that "the article was published on April 9, 2007, eight months after the August 9, 2006 announcement, and the focus of the article was a potential future sale of IMAX," but the article clearly discusses the August 9, 2006 announcement because it mentions the first time the SEC asked questions. Allen Report ¶ 84.

[77] *Ibid.* ¶ 54.

[78] James Report ¶ 7.

[79] *Reuters News*, "Imax stock continues decline on industry woes," September 27, 2000 (12:41 p.m.).

continues to worsen and impact our delivery schedules."[80] IMAX also stated that its stock price decline "may have been caused in part by the recent involvement in its stock by several short sellers in Canada" and that it "believes the short positions may be related in part to misleading reports, including an article in today's Globe and Mail, that the Company received a letter from the Ontario Securities Commission (OSC)."[81] Ms. Allen quotes an article which states: "Taking down the for-sale sign is hard on a company's reputation as investors, competitors and customers all may wonder what's wrong with the business that it couldn't find a match."[82] But she ignores that while there was substantial industry-related negative news in 2000 that can explain why IMAX could not find a match at that time, the principal concurrent negative news in the August 9, 2006 press release is related to Plaintiff's allegations.

42. Regarding the earnings results announced in the August 9, 2006 press release, neither Professor James nor Ms. Allen suggests that the second quarter 2006 results caused the stock price to decline. Professor James even notes that reported earnings were a penny above stock analysts' expectations.[83] My own review of securities analyst commentary confirms that the financial results were viewed as positive news. For example, an analyst at Janco Partners wrote "IMAX reported Q2 earnings of $0.08 and revenues of $41.4 million for Q2, at the high end of the

---

[80] *Reuters News*, "Imax investors head for exits after profit warning," October 12, 2000 (12:18 p.m.).

[81] *PR Newswire*, "Imax Corporation Announcement," September 28, 2000 (1:55 p.m.).

[82] Allen Report ¶ 53.

[83] James Report ¶ 123.

guided range .... ([S]o much for the good news),"[84] thereby signifying that the only good news announced was the revenue and earnings result.

43. To explain the decline in IMAX's stock price from the market close on August 9, 2006 through the market close on August 10, 2006, Professor James points to all of the information disclosed in the press release and the later conference call, stating numerous times that it is "difficult" if not "impossible" to "isolate the impact of these disclosures."[85] However, in arriving at this conclusion, Professor James – as well as Ms. Allen – failed to analyze intra-day trading data. As shown in Finnerty Declaration Exhibit 2, most of the decline in IMAX's stock price in after-hours trading on August 9, 2006 occurred within minutes following the Company's announcement but prior to the conference call with stock analysts. Thus, it is possible to distinguish the collective price effect of the disclosures made in the press release (e.g., the SEC inquiry) from the price effect of the disclosures made during the conference call (i.e., the change in strategy to emphasize joint ventures, the rollout of a digital format, and the resulting retraction of guidance).

44. Another possibility not considered by Professor James and Ms. Allen is that the announcements made during the 4:30 p.m. conference call were interrelated with the other announcements made before the call. Several market participants commented that the strategy change was in response to the failure to find a buyer of the Company. For example, *Dow Jones Newswires* reported: "If Imax Corp.

[84] Janco Partners, Inc. Equity Research, "No Buyout, No Guidance, New Business Model," August 10, 2006.

[85] James Report, e.g., ¶ 145.

has to go it alone, then it has to make some changes in order to speed up the expansion of its theater network, its co-chief executives – and largest shareholders – told investors Wednesday."[86]

45. Moreover, analysts following IMAX viewed the joint venture and digital models positively in the medium- and long-term despite higher costs near-term. For example, an analyst at Roth Capital Partners stated: "We have consistently held that [the JV] route was a more viable and more favorable route to expanding the Imax circuit and maximizing the leverage in the Company's new DMR/MPX model."[87] Another analyst wrote: "We believe that the JV model is likely to prove lucrative to IMAX over the medium term .... IMAX should continue to be able to deliver positive earnings per share in the first year of offering a JV optional sales model, due to the robust backlog and our expectation of continued signings, based on the sales/lease model, worldwide."[88] Professor James concedes that his review of analyst commentary indicates that "analysts were generally positive about the long-term effects of the digital model."[89] In fact, Ms. Allen provides a lengthy quote from a corporate valuation textbook which suggests that the announcement

[86] *Dow Jones Newswires*, "IMAX Dn 38% On News Of Informal SEC Inquiry, Strategic Process Update," August 10, 2006 (9:33 AM).

[87] Roth Capital Partners, "No Deal: Suitors Back Away, Weak Box Office Cools Near-Term Interest," August 10, 2006.

[88] Paradigm Capital, "Focus on Understanding JV Model," August 25, 2006.

[89] James Report ¶ 114.

of new R&D spending has a positive effect on a company's stock price, "despite the associated decline in current earnings."[90]

46. Additionally, IMAX officials stated that potential buyers gave a "pretty hefty endorsement of both [the joint venture and digital rollout] items." [91] During the conference call, co-CEO Brad Weschler stated that "in our interaction with financial buyers [and] private equity investors … there was a lot of excitement about the notion of getting the network built as rapidly as possible, which is the JV component. There was also a lot of excitement about a quick transition to digital …."[92]

**B. March 29, 2007 Stock Price Decline**

47. It is my opinion that the statistically significant -6.45% abnormal return on March 29, 2007 was caused by IMAX's announcement before the market opened that it was further delaying the filing of its 2006 10-K and corresponding Canadian filings and broadening its review of its revenue recognition accounting to include additional years in response to comments received from the SEC and OSC, and that, because of the filing delay, the Company was in default of a debt covenant and expected to receive a notice of delisting from the NASDAQ Stock Market. The bases for my opinion are (a) the fact that IMAX's stock price opened substantially below its closing price on the prior day and remained below this level

---

[90] Allen Report ¶ 26.

[91] *Voxant FD (Fair Disclosure) Wire*, "Q2 2006 IMAX Corporation Earnings Conference Call - Final," August 9, 2006.

[92] *Ibid.*

throughout the trading day, (b) the attribution in press articles and securities analyst reports of the decline to the news and its relation to the Company's revenue recognition issues, (c) the absence of any other significant news announcements concerning IMAX on this day, and (d) the fact that there is less than a 1% chance that the -6.45% abnormal return happened by mere chance.[93]

48. Although the statistical results of his event study demonstrate that the IMAX abnormal return on March 29, 2007 is statistically significant at better than the 1% level,[94] Professor James performs what he claims to be "a customary adjustment for independent tests" by applying "the Sidak adjustment" to jointly test multiple events because "the likelihood of finding statistical significance is greater when multiple events are tested independently than when they are tested jointly."[95] In other words, he manipulated the results of his statistical analysis to reduce the likelihood of finding statistical significance by treating multiple disclosures as one event, rather than as independent events. Not surprisingly, he concludes that the abnormal return on March 29, 2007 "no longer met the threshold for statistical significance under the Sidak adjustment."[96]

49. I am not aware of any court that has ever accepted this methodology in connection with a securities fraud matter. Moreover, as I discuss in detail in a published article, "no adjustment for multiple comparisons is required for securities fraud

---

[93] Finnerty Declaration ¶ 31.

[94] James Report ¶ 147 & James Report Exhibit 4.

[95] *Ibid.* ¶ 49.

[96] *Ibid.*

event studies when each of a series of fraud-related news disclosures is properly evaluated separately from all the other news disclosure events under consideration."[97] Each curative disclosure event, by definition, must convey new information to avoid merely being a repetition of old news (and thus not curative), which an efficient market will have already impounded into the company's share price. One typically identifies the candidate curative disclosure dates based on an economic analysis of the information disclosed on each date to identify those dates on which new economically significant information is disclosed. The abnormal return for each date that passes this screen is then tested separately for statistical significance.

50. The Sidak adjustment is inappropriate here because I followed the procedure described above with the assistance of Compass Lexecon. I evaluated the allegedly fraud-related IMAX news disclosures separately and then tested for statistical significance. Consequently, no adjustment for multiple comparisons is required because each date was tested separately based on its unique curative disclosure. I conclude, as Professor James's own event study finds, that the abnormal IMAX stock price return on March 29, 2007 is statistically significant at better than the 1% level.

51. The March 29, 2007 disclosure and its ramifications were a direct result of IMAX's revenue recognition accounting errors and the attendant SEC and OSC

[97] Finnerty, John D., "A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, 21, 2009, pp. 55-62.

inquiries. Neither Professor James nor Ms. Allen cite to any other reason for the decline in the Company's stock price on March 29, 2007.

52. In fact, Professor James cites similar press and analyst commentary on March 29, 2007 and concedes that "IMAX's stock price fell on the news that the filing delay would result in IMAX being in default of its financial reporting covenants, that IMAX would need to seek consent from its bondholders, and on IMAX's announcement that it expected to receive a delisting notice from the NASDAQ."[98] He cites at length the same securities analyst report that I do, but fails to reference the clear language at the beginning of the report regarding the implications of the disclosure that I quote above.[99]

53. Ignoring this commentary, Professor James claims that "IMAX's announcement of its filing delay did not provide additional information about IMAX's financial restatement over and above its previous related disclosures," specifically in a press release the Company issued on March 16, 2007.[100] But he acknowledges that the March 16, 2007 press release disclosed that the Company "would need to restate its financials for the past six years to account for errors *unrelated* to revenue recognition policies" (emphasis added)[101] and disregards that (a) the stated length of the postponement was only 15 days;[102] (b) the March 29, 2007 press release

[98] James Report ¶¶ 152-154 & 156.

[99] *Ibid.* ¶ 153.

[100] *Ibid.* ¶¶ 149 & 151.

[101] *Ibid.* ¶ 149.

[102] *PR Newswire*, "IMAX to delay filing of 2006 10-K; Company is evaluating an estimated $2.5 million of identified accounting errors that occurred between 2001-2006; Company also announces 7 installs and 9

disclosed that IMAX had determined to broaden its review of its financial statements to address issues related to comments received from the SEC and OSC and that IMAX might determine that it is necessary to restate additional items beyond the previously identified errors; and (c) the further filing delay was for an indefinite period beyond the March 31, 2007 deadlines under SEC rules and Canadian provincial securities laws, the repercussions of which included a debt covenant default and a potential delisting.[103, 104] Thus, the March 29, 2007 press release addresses information that was *not* the subject of the March 16, 2007 press release – material information that is directly related to the subject matter of this lawsuit.

54. Similarly, Ms. Allen states that "analysts viewed the further delay of the filing of the 10-K and the impact of the delay as negative factors" but incongruously concludes that "[w]e find that any price movements on this date was not caused by

signings for fourth quarter," March 16, 2007. In addition, while Professor James notes in James Report ¶ 149 that the March 16, 2007 press release resulted in a stock price increase that was not statistically significant, he fails to mention that in the same press release the Company also announced news that it considered positive: "it had installed 7 theater systems in the fourth quarter of 2006, signed deals for 9 theater systems in the period and finished 2006 with approximately $27 million in cash and short-term investments." *Ibid.*

[103] *PR Newswire*, "IMAX to delay filing of 2006 10-K," March 29, 2007 (7:30 a.m.).

[104] Professor James states that on April 9, 2007, a "significant holder of IMAX's 9.625% [i.e., 9 5/8%] Senior Notes due 2010" disclosed that it had engaged a law firm "to continue organizing 'opposition to IMAX's consent solicitation seeking waiver of certain reporting defaults' as well as a related amendment of the bond indenture," but claims that this announcement and its associated statistically significant abnormal IMAX stock return of -10.38% "was tied to non-allegation related information." James Report ¶ 72-74. However, because this disclosure stems from the March 29, 2007 disclosure and thus is directly related to Plaintiff's allegations, Professor James's claim is incorrect. He further states that on April 13, 2007, IMAX stock had a statistically significant abnormal return of 9.79% following the Company's announcement that it had received consent from a majority of noteholders of its 9 5/8% Senior Notes due 2010 to extend the deadline to file its Annual Report on Form 10-K for fiscal year 2006 and all other reports, but again claims that this news was not related to Plaintiff's allegations. *Ibid.* ¶¶ 78-79. However, because this disclosure stems from the March 29, 2007 disclosure and thus is directly related to Plaintiff's allegations, Professor James's claim is incorrect.

the curative disclosure of revenue recognition issues."[105] As explained in §§ II & III above, Ms. Allen's theoretical analysis of the supposed lack of any impact of the revenue recognition issues on IMAX's stock price is incorrect because it ignores basic finance theory.

**C. IMAX's July 20, 2007 Stock Price Increase**

55. It is my opinion that IMAX's announcement on July 20, 2007 of its completed restatement was a substantial cause of the statistically significant 10.68% abnormal return on that day. The bases for my opinion are (a) the fact that IMAX's stock price opened substantially above its closing price on the prior day and remained above this level throughout the trading day, (b) the attribution in press articles and securities analyst reports of the increase to the IMAX announcement and its relation to the Company's revenue recognition accounting issues, and (c) the fact that there is less than a 1% chance that the 10.68% abnormal return happened by mere chance.[106]

56. Professor James agrees that the restatement was a substantial cause of the stock price increase on July 20, 2007. He mentions no other positive news released on that day, stating that:

> IMAX's financial restatement was viewed positively as it (1) affirmed that the revenue restatement was small and only shifted revenues across different time periods and (2) likely decreased some of the uncertainties surrounding IMAX's stock. There were also multiple negative news items on this day, including management's emphasis that IMAX's transition to joint venture

[105] Allen Report ¶ 72, pp. 42-43.

[106] Finnerty Declaration ¶ 36.

> deals and digital technology would negatively impact near-term results.[107]

He regards other information announced on July 20, 2007 as "both negative and mixed in nature," including information that "the SEC and OSC inquiries were ongoing."[108] He also affirms that "there was mixed commentary on this day related to IMAX's fiscal year 2006 and first quarter 2007 earnings" and that "it is unclear whether [IMAX's quarterly loss] information was viewed positively or negatively by the market."[109]

57. Professor James claims that "[a]s IMAX's stock price increased significantly on July 20, 2007, Plaintiffs [sic] cannot tie the Company's stock price movement to any economic loss suffered by IMAX's shareholders due to the alleged misrepresentations."[110] However, the fact that the abnormal return on IMAX's stock was positive and statistically significant following the Company's announcement of its restated financials demonstrates that the stock price had declined significantly earlier in response to prior restatement-related announcements occasioned by the alleged fraud.

58. Ms. Allen's failure to analyze actual stock price movements appears to have led to her confusion over the price impact of the July 20, 2007 disclosure. She states: "We find there was no price *decline* caused by the curative disclosure of prior problems of revenue recognition of theater systems," [emphasis added] even

---

[107] James Report ¶ 160.

[108] *Ibid.* ¶ 162.

[109] *Ibid.* ¶¶ 160 & 164.

[110] *Ibid.* ¶ 160.

though the Finnerty Declaration clearly shows that IMAX's stock price increased significantly following this disclosure and, as shown in the prior paragraph above, Professor James agrees.[111] Again, Ms. Allen provides no explanation for the price movement other than IMAX's announcement of the completed restatement which, contrary to her conclusion from her "price impact analysis," demonstrates that the restated revenues and earnings were material to the market as a matter of economics.

## V. The Allen Report's Criticisms of the Finnerty Declaration's Event Study Analysis and the Conclusions Drawn from It Are Misguided[112]

59. What is truly remarkable about the Allen Report's criticism of the Finnerty Declaration's event study analysis is that the Allen Report contains no event study. Nor did the Allen 2010 Report contain an event study. If correcting the asserted flaws in the Finnerty Declaration's event study would have changed any of my conclusions, then presumably Ms. Allen would have done her own event study. But she did not.

### A. The Allen Report's Criticism of the Finnerty Declaration's Use of the Fama-French Three-Factor Model Is Unfounded

60. The Allen Report's criticism of the Finnerty Declaration's choice of the Fama-French Three-Factor Model for the event study analysis is misguided. I calculated the expected return of IMAX's common stock by applying the widely accepted

[111] Allen Report ¶ 72, p. 46, and Finnerty Declaration ¶¶ 21, 37-38, & Exhibit 4.

[112] Professor James does not criticize the Finnerty Declaration in the James Report.

Fama-French Three-Factor Model.[113] Eugene Fama and Kenneth French developed what is now known as the Fama-French Three-Factor Model in 1993.[114] The Fama-French Three-Factor Model "has become widely known and adapted."[115] For example, Morningstar's *Cost of Capital Yearbook*, a highly respected source of rate of return information, uses the Fama-French Three-Factor Model, among other analytical approaches, to calculate the cost of equity capital for firms in various industries.[116]

61. The Allen Report criticizes my choice of the Fama-French Three-Factor Model because nine years ago I applied the Capital Asset Pricing Model ("CAPM") in performing an event study analysis in the Jennifer Convertibles matter.[117] The Fama-French Three-Factor Model is really just an extended version of the CAPM because it has the same market factor term as the CAPM but adds two factors, (a) the difference between the return on small-firm stocks and the return on large-firm

---

[113] Fama, Eugene F. and Kenneth R. French, "Common Risk Factors in the Returns on Stocks and Bonds," *Journal of Financial Economics*, 33 (1993), pp. 3-56.

[114] *Ibid.*

[115] Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 4th ed., Wohl Publishing, Morristown, NJ, 2011, p. 191.

[116] Morningstar, *Cost of Capital 2007 Yearbook*, 2007, p. 23.

[117] The deposition transcript quotes me as saying that "I have always used the Fama-French model." Deposition of John D. Finnerty, June 17, 2011, p. 20. I have corrected the deposition transcript, because I was either misquoted or misspoke, to read "I always use the Fama-French model." I began regularly using the Fama-French Three-Factor Model around 2007 after it had become customary among financial economists to use it in event studies. I incorporated a discussion of the Fama-French Three-Factor Model in my corporate finance textbook around the same time. Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 3rd ed., Prentice Hall, Upper Saddle River, NJ, 2007, pp. 178-179. Prior to the switch, I used the CAPM, as in the Jennifer Convertibles matter, which the Allen Report cites.

stocks and (b) the difference between the return on high-book-to-market-ratio stocks and the return on low-book-to-market-ratio stocks, which research suggests are risk factors that are related to company profitability but which the simple CAPM omits.[118] Accordingly, the Fama-French Three-Factor Model is a significant improvement on the (unadjusted) CAPM because it prices the risks associated with small firm size and financial distress, as reflected in the stock's book-to-market ratio.[119]

62. I used the Fama-French Three-Factor Model to perform my event study in connection with preparing both the Finnerty Declaration and the Finnerty 2010 Declaration. In particular, I used the Fama-French Three-Factor Model to verify the results of the event study conducted by Professor James in connection with preparing my Finnerty 2010 Declaration.[120] My event study and Professor James's event study both used well-accepted, though different, stock return models, and I found that both models produced consistent statistical results (before taking into account Professor James's misguided application of the Sidak adjustment – see above ¶¶ 49-50). As I explained in the Finnerty 2010 Declaration, based on a decision by Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), counsel for the then lead plaintiff Snow Capital Investment Partners, L.P.'s motion for class certification, to try to minimize the areas of disagreement between plaintiffs' and

---

[118] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 9th ed., McGraw-Hill, New York, 2008, pp. 225-227.

[119] Emery, Douglas R., John D. Finnerty, and John D. Stowe, *Corporate Financial Management*, 4th ed., Wohl Publishing, Morristown, NJ, 2011, p. 192.

[120] Finnerty 2010 Declaration note 1.

defendants' experts, I was directed to use the results of Professor James's event study in my analysis of the three curative disclosure dates I analyzed (exclusive of the Sidak adjustment, which I believe is inappropriate for the reasons explained above ¶¶ 49-50).[121]

63. I applied the Fama-French Three-Factor Model to investigate the impact of IMAX's curative disclosures during the portion of the Class Period extending from August 10, 2006 through July 30, 2007.[122] I used the period extending from August 10, 2005 through August 9, 2006, which is the one-year period prior to the portion of the Class Period I investigated for the impact of the curative disclosures regarding the alleged fraud, as the comparison period for fitting the event study regression model.

64. The Allen Report criticizes my choice of comparison period. While I usually select as the comparison period the one-year period just prior to the start of the class period, I chose as the comparison period in this case the one-year period prior to the period of investigation for loss causation, rather than immediately prior to the start of the Class Period on February 27, 2003, because more than three years had elapsed between the start of the Class Period and the start of the chosen period

[121] *Ibid.* ¶ 12.

[122] I testified during my deposition that I had applied the event study methodology to the entire Class Period. Deposition of John D. Finnerty, June 17, 2011, pp. 73-75. It is my normal practice when I am asked to examine market efficiency and loss causation to run the event study for the entire class period in order to investigate and assess the stock market's reaction to news events each day during the class period. In this matter, I was not asked to examine market efficiency. Nevertheless, I had asked Compass Lexecon, which was assisting me, to run the event study for the entire Class Period in connection with preparing the Finnerty 2010 Declaration. It was not necessary to repeat that analysis for the Finnerty Declaration. That event study analysis was not turned over to the defendants because counsel directed me to turn over only those event study results on which I relied for my analysis of the three curative disclosure dates I analyzed in the Finnerty Declaration.

of investigation. This period predates the three curative disclosure dates I investigated and is thus not affected by the disclosure of the alleged fraud because, according to the Complaint, the truth only began to emerge August 9, 2006.[123] Changes in the Company's business can occur during such an extended period, as happened in the case of IMAX during the Class Period, which can make the much earlier comparison period no longer suitable for parameter estimation and therefore bias the event study analysis.[124] For example, the Company altered its business strategy in 2002 to include the distribution of Hollywood event films based on technology it introduced in that year; by the end of 2004, the implementation of this change in strategy appeared successful.[125] Moreover, my analysis of the Company's stock volatility revealed that the volatility of the Company's stock decreased during the Class Period. Because the start of the Class Period predates the start of the period of investigation by three and a half years, IMAX implemented a change in its business strategy during the Class Period, and the

[123] Complaint ¶ 115.

[124] Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, eds., *Litigation Services Handbook*, 3rd ed., Wiley, New York, 2001, ch.19, discusses the advisability of choosing a contemporaneous comparison period. Also, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, March 1997, pp. 13-39 describes the most common comparison period choice as the period prior to the event window, which in the Finnerty Declaration began following the market close on August 9, 2006.

[125] *Compare* IMAX Form 10-K for the fiscal year ended December 31, 2002 at 4 ("To increase the demand for IMAX theater systems, the Company is *currently working to position* the IMAX theater network as a new window for Hollywood event films.") *with* IMAX Form 10-K for the fiscal year ended December 31, 2004 at 4 ("To increase the demand for IMAX theater systems, the Company *has positioned* the IMAX theater network as a new distribution platform for Hollywood event, or blockbuster films.") [emphasis added].

volatility of IMAX's stock changed, I decided it was appropriate to depart from my customary practice.

65. After analyzing the daily returns to IMAX stock during the one-year period prior to the start of the period of investigation and after examining the volatility of IMAX's common stock during this period, I concluded that choosing a one-year comparison period just prior to the start of the period of investigation would avoid the statistical bias that might result from using a much earlier period when the Company's business was different and its stock volatility was higher and chose the period between August 10, 2005 and August 9, 2006 as the comparison period. I determined that using this comparison period would not introduce an element of bias even though it lies within the Class Period.

66. I modified the Fama-French Three-Factor Model to include the returns of an entertainment industry index to take into account the sensitivity of IMAX's stock price to movements in other entertainment companies' stock prices. Controlling for industry factors that can affect the price of a company's stock is appropriate in an event study, as several articles in the academic and professional literature have previously noted.[126] Indeed, academic research has pointed out the importance of

---

[126] Tabak, David I. and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in Weil, Roman L., Michael J. Wagner, and Peter B. Frank, eds., *Litigation Services Handbook,* 3rd ed., Wiley, New York, 2001, ch. 19. *See* also Alexander, Janet C., "The Value of Bad News," *UCLA Law Review*, Vol. 41, August , 1994, pp. 1421-1469; Macey, Jonathan R., Geoffrey P. Miller, Mark L. Mitchell, and Jeffry M. Netter, "Lessons from Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson," 77 *Virginia Law Review Association* 1017 (August 1991), pp. 1021-1028; MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35, March 1997, pp. 13-39; Mitchell, Mark L. and Jeffry M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49, February 1994, pp. 545-590; and Cornell, Bradford and R. Gregory Morgan, "Using Finance Theory To Measure Damages In Fraud On The Market Cases," *UCLA Law Review,* Vol. 37, June, 1990, pp. 883-923.

making sure that estimates of returns to investors on securities are free of bias when using a market model, such as the CAPM or the Fama-French Three-Factor Model, to conduct an empirical study.[127]

67. To avoid the bias that would result from using a standard stock index that includes IMAX, I created a market-weighted custom index (the "Custom Index") consisting of the stock returns of all the members of the Bloomberg Hollywood Reporter Index that were in the index throughout the Class Period, excluding IMAX.[128] This sample included a total of 33 firms. The regression formula for my Modified Fama-French Three-Factor Model is:

$$R_i - R_f = \alpha + \beta(R_m - R_f) + s\ SMB + h\ HML + i\ Custom\,Index + e \quad \text{(Equation 1)}$$

68. In its opinion on loss causation in *Dura*, the Supreme Court noted that a stock price decline is not necessarily related to an earlier misrepresentation (or omission) and could be the result of "changed economic circumstances," "new industry-specific

---

[127] Bartholdy, Jan and Paula Peare, "Unbiased Estimation of Expected Return Using CAPM," *International Review of Financial Analysis*, 2003, pp. 69-81. The article specifically mentions the CAPM but its analysis applies equally to the Fama-French Three-Factor Model because that model is really just an extended version of the CAPM. Referring to Equation 1 below, the CAPM can be interpreted as the Fama-French Three-Factor Model without the SMB and HML terms. *See* Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 9th ed., McGraw-Hill, New York, 2008, pp. 225-227.

[128] IMAX compared its stock price performance to the Bloomberg Hollywood Reporter Index in its Form 10-K for the fiscal year ended December 31, 2006 on page 30. I excluded stocks that did not have return data available in the Center for Research in Security Prices (CRSP) database for the entire Class Period. The companies included in the Custom Index are Acme Communications Inc., Belo Corp., Blockbuster Inc., British Sky Broadcasting Group PLC, Cablevision Systems Corp., CBS Corp., Charter Communications Inc., Clear Channel Communications Inc., Comcast Corp., DISH Network Corp., Electronic Arts Inc., Emmis Communications Corp., EW Scripps Co., Gannett Co. Inc., General Electric Co., Grupo Televisa SA, Hearst-Argyle Television Inc., IAC/InterActive Corp., ION Media Networks Inc., Lions Gate Entertainment Corp., News Corp., RealNetworks Inc., Sinclair Broadcasting Group Inc., Sirius XM Radio Inc., Sony Corp., Time Warner Inc., TiVo Inc., Tribune Co., The Walt Disney Co., Westwood One Inc., XM Satellite Radio Holdings Inc., Yahoo Inc., and Young Broadcasting Inc.

facts," or new "firm-specific facts."[129] Accordingly, in evaluating whether the August 9-10, 2006, March 29, 2007, and July 20, 2007 disclosures about IMAX were firm-specific, fraud-related, and a substantial cause of IMAX's stock price declines on those dates, I applied the Modified Fama-French Three-Factor Model, which controls for the potential impact of general economic conditions on the price of IMAX's stock, as captured by the $R_m - R_f$, *SMB*, and *HML* terms in the model, and the potential impact of industry-specific factors on the price of IMAX's stock, as captured by the *Custom Index* term in the model. I then analyzed the impact of the company-specific factors on IMAX's common stock abnormal returns on August 9-10, 2006, March 29, 2007, and July 20, 2007, as well as the disclosures themselves for each date, in the Finnerty Declaration.

**B. The Allen Report's Criticism of the Allegedly Poorly Defined Fraud Analyzed in the Finnerty Declaration Is Misguided**

69. The Allen Report criticizes the Finnerty Declaration for allegedly failing to define clearly the fraud on which I based my loss causation analysis.[130] It asserts that the Finnerty Declaration "describes the alleged fraud as 'disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized'" but then claims that I defined the fraud differently during my deposition in this matter and cites to pages 52 and 53 of my deposition testimony.[131] The alleged

---

[129] *Dura*, 544 U.S. at 342-43.

[130] The alleged fraud is supposedly "not well defined." Allen Report ¶ 78.

[131] *Ibid.* ¶¶ 78-79.

fraud is described in detail in the Complaint. It involves alleged material misstatements and omissions, not mere "disclosures," and nothing in my report suggests otherwise.

70. The alleged fraud described at length in the Complaint is the very fraud on which I based my loss causation analysis in both my Finnerty 2010 Declaration and my Finnerty Declaration.[132] In the Finnerty Declaration, I stated that I performed the loss causation analysis to determine whether the statistically significant changes in IMAX's common stock price on the three dates analyzed could be attributed to disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized.[133] This analysis involves examining the results of my event study in the light of all available Company news and intra-day stock price movements on the relevant dates to determine whether any confounding news might account for part or even all of the price changes. In particular, I reviewed IMAX's press releases, its management's securities analyst conference calls, press articles, and securities analyst commentary around the three curative disclosure dates, August 9-10, 2006, March 29, 2007, and July 20, 2007, to look for information related to IMAX's revenue recognition accounting.

71. As the basis for its criticism, the Allen Report cites my response to the deposition question whether the alleged fraud that I analyzed in the Finnerty Declaration is the

[132] Complaint ¶¶ 60-114 and 208.

[133] Finnerty Declaration ¶ 22.

134

> Q. Is it correct that the alleged fraud that you analyzed in your report is the misreporting of revenue related to theatre system installations?
>
> A. No, I don't think it's quite that narrow. [Finnerty Deposition, p. 52]

72. Counsel's question does not accurately reflect the alleged fraud as pled in the Complaint. According to paragraph 60 of the Complaint, "[i]n knowing or reckless disregard of the truth, Defendants issued and/or participated in the issuance of materially false and misleading statements about IMAX's theatre system installations, revenue recognition policy, revenue and earnings to the investing public during the Class Period." The allegedly materially false and misleading statements are described in paragraphs 61 through 114 of the Complaint. Counsel's question makes no mention of IMAX's materially false and misleading statements, its improper revenue recognition policy, or its misreporting of earnings.

73. Paragraph 61 of the Complaint elaborates: "During the Class Period, the Defendants manipulated the Company's financial statements, in violation of GAAP, by improperly recognizing revenue for various elements of its theatre systems installation transactions." Counsel's question makes no mention of generally accepted accounting principles ("GAAP"). In addition, paragraph 208 of the Complaint further states, "Defendants knew or recklessly disregarded that

[134] Allen Report ¶ 78.

IMAX's public statements, as identified herein, failed to disclose material information concerning IMAX's revenue recognition policies, internal controls and/or disclosure controls." Counsel's question makes no mention of internal controls or disclosure controls. Thus, my answer to counsel's question regarding the nature of the alleged fraud is accurate, and Ms. Allen's characterization of my answer is not.

**C. The Allen Report Misconstrues the Relationship between the Alleged Fraud and the SEC Inquiry into IMAX's Revenue Recognition Accounting**

74. The Allen Report argues that the Finnerty Declaration "assumes that the overhang of the SEC inquiry is part of the alleged fraud."[135] That assertion is incorrect. The SEC inquiry was a *direct consequence* of the alleged fraud, as even a cursory reading of the August 9, 2006 IMAX press release and the subsequent stock analysts' reports would make abundantly clear.

75. The Finnerty Declaration noted that on August 9, 2006, just after the market closed, IMAX issued a press release announcing (a) second quarter financial results, (b) an informal inquiry from the SEC regarding "the Company's timing of revenue recognition, including its application of multiple element arrangement accounting …", (c) a material weakness in internal controls related to revenue recognition in its 2006 second quarter, and (d) failure to find any buyers of the Company at a valuation sought by the Board.[136] It also noted that approximately half an hour later, at 4:30 p.m., the Company hosted a conference call with analysts

[135] *Ibid.* ¶ 81.

[136] Finnerty Declaration ¶ 17, citing *PR Newswire*, IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives --," August 9, 2006 (4:01 p.m.).

and investors.[137] According to a transcript of the call, IMAX officials discussed the above disclosures and also announced that the Company was (a) focusing on a more aggressive rollout of its joint venture initiative, (b) accelerating introduction of its Digital Projection product, and (c) retracting all guidance for the year as a result.[138] The abnormal return on August 9-10, 2006 (i.e., from the market close on August 9, 2006 through the market close on August 10, 2006) was -40.67%.[139]

76. The Finnerty Declaration stated my opinion that the statistically significant -40.67% abnormal return on August 9-10, 2006 was *substantially caused* (emphasis added) by the disclosures in IMAX's press release issued just after the close of trading on August 9, 2006 that were related to Plaintiff's fraud allegations.[140] It provided the following bases for that opinion: (a) the fact that 75% of the total stock price decline between the market close (at 4:00 p.m.) on August 9, 2006 and the market close on August 10, 2006 occurred *before* the 4:30 p.m. conference call on August 9, 2006 began,[141] (b) market commentators specifically attributed the decline in IMAX's stock price largely to the disclosure

---

[137] *PR Newswire*, "IMAX Corporation announces new time for quarterly conference call, August 9, 2006 (7:00 a.m.), stating that "its conference call to discuss second quarter 2006 results originally scheduled for 8:30 AM ET has been postponed until 4:30 PM ET."

[138] *Voxant FD (Fair Disclosure) Wire*, "Q2 2006 IMAX Corporation Earnings Conference Call - Final," August 9, 2006.

[139] Finnerty Declaration ¶ 17.

[140] *Ibid.* ¶ 24.

[141] IMAX's closing prices on NASDAQ were $9.63 and $5.73 on August 9 and 10, 2006, respectively, a decline of $3.90. Source: ©201003 CRSP®, Center for Research in Security Prices. Graduate School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu. According to the NYSE TAQ database, IMAX's stock price as of 4:30 pm on August 9, 2006 was $6.70, a decline of $2.93 from the close. $2.93 is 75.1% of $3.90.

of the SEC inquiry, (c) securities analysts reacted negatively to the disclosure of the SEC inquiry, (d) other negative information disclosed on August 9, 2006, in particular, IMAX's failure to find a buyer, is likely related to Plaintiff's allegations, (e) the remaining disclosures on August 9, 2006 likely had a positive effect on IMAX's stock price, especially since IMAX's revenue and earnings beat stock analysts' forecasts, and (f) the fact that there is less than a 1% chance that the -40.67% abnormal return happened by mere chance.[142]

77. The -40.67% abnormal decrease from the market close on August 9, 2006 to the market close on August 10, 2006 is substantially greater in magnitude than the 9.51% IMAX share price increase that occurred when IMAX previously announced on March 9, 2006 that it was looking for a buyer.[143] Consequently, the abnormal decline on August 10, 2006 cannot be attributed entirely to the announcement that the Company could not find a buyer who was willing to pay a price that its board would find acceptable. At most, 23.38% (= 9.51% / 40.67%) of the decrease could be attributed to the announcement regarding only the failure to find a buyer, which as I noted above, might actually be tied back to the alleged fraud.

78. The Finnerty Declaration noted that market commentators specifically attributed the stock price decline largely to the disclosure of the SEC investigation.[144] It further noted that after IMAX's announcements and conference call, several

---

[142]Finnerty Declaration ¶ 25.

[143] *PR Newswire,* "Imax to explore strategic alternatives," March 9, 2006. My event study shows that the abnormal return on March 9, 2006 was statistically significant at better than the 1% level.

[144] Finnerty Declaration ¶ 27.

securities analysts lowered their ratings on the Company's stock, citing the SEC inquiry.[145] In addition, securities analysts following IMAX at Paradigm Capital also remarked that the disclosures in the press release had adversely affected the credibility of management.[146] I believe that these reactions to IMAX's disclosure of the SEC inquiry support my opinion that the adverse negative market reaction to the new information disclosed in IMAX's August 9, 2006 press release and analyst conference call a half hour later was a direct consequence of the alleged material misstatements and omissions regarding IMAX's revenue recognition accounting policy for its theater system installations, which were implied by the disclosure of the SEC inquiry in the August 9 press release, because the SEC inquiry concerns the very revenue recognition accounting policy that is at the heart of the alleged fraud.

**D. The Allen Report's Assertion that IMAX's Common Stock Was Affected by an Overhang Generated by the SEC Inquiry Unrelated to the Revenue Recognition Issues Is Speculative and Unavailing**

79. The Allen Report admits that IMAX's common stock price was adversely affected by the disclosure of the SEC inquiry.[147] While admitting that the disclosure of the SEC inquiry had adverse consequences for IMAX's stock price, Ms. Allen nevertheless claims that the 'overhang' related to this disclosure was not due to the revenue recognition accounting issues: "We find that the overhang generated by the SEC inquiry was not due to the revenue recognition issues themselves but to

[145] *Ibid.* ¶ 28.

[146] *Ibid.* ¶ 30.

[147] Allen Report ¶ 81.

the fear of some other problem being uncovered."[148] The Allen Report speculates regarding the effect of the SEC inquiry without providing any evidence or other support while ignoring all the evidence that links the adverse stock market impact of the SEC inquiry directly to IMAX's revenue recognition policy.

80. The Allen Report's unsupported assertions concerning the purported overhang are entirely speculative and clearly incorrect. Had the revenue recognition issues not arisen, there would have been no SEC inquiry, and no OSC inquiry either, into these revenue recognition accounting issues and thus no consequent stock price reaction caused by the announcement of the twin inquiries. While the outcome of these inquiries was uncertain during the Class Period, the impact of their announcement on IMAX's common stock price damaged IMAX's shareholders, who suffered an economically significant decline in shareholder wealth as a direct consequence of the revenue recognition accounting issues that triggered these inquiries and that lie at the heart of the alleged fraud as plead in the Complaint.

**E. The Allen Report Mischaracterizes How the Finnerty Declaration Treated the New Information Concerning IMAX's Failed Attempt to Find a Buyer**

81. The Allen Report states that the Finnerty Declaration "assumes the failed sale was related to the alleged fraud."[149] This is incorrect because it overstates what I clearly stated in the Finnerty Declaration. I also stated explicitly during my

[148] *Ibid.* ¶ 81.

[149] *Ibid.*, p. 50. The quote is taken from the header for section B on page 50 of the Allen Report. The Allen Report tones down the criticism in the text that immediately follows the header by asserting only that "Dr. Finnerty...*seems to* include the assumption that the failed sale is part of the alleged fraud" before quoting what the Finnerty Declaration actually said. It is but one example of the numerous blatant mischaracterizations of the Finnerty Declaration in the Allen Report.

deposition that I was not making any such assumption but Ms. Allen chose to ignore my testimony:[150]

> Q. Is that an assumption of yours that you are making, that the SEC inquiry is related to the inability to find a buyer?
>
> A. No. It's based on the – first of all, what I read in the analyst reports, where the analysts, at least one of them, says that buyer wants clean books.

82. I clearly stated in the Finnerty Declaration that my opinion that the -40.67% abnormal return on August 9-10, 2006 was "substantially caused by the disclosures in IMAX's press release issued just after the close of trading on August 9, 2006 that were related to Plaintiff's allegations" is based in part on my opinion that "(d) other negative information disclosed on August 9, 2006, in particular, IMAX's failure to find a buyer, is *likely* related to Plaintiff's allegations [emphasis added]."[151]

83. The Allen Report thus misrepresents my conclusion when it states that "Dr. Finnerty's conclusion that the price decline on August 9, 2006 was substantially caused by the alleged fraud rests on the assumption that the failed sale was part of the alleged fraud."[152] I did not make such a strong assumption, and nowhere have I said that my conclusion regarding loss causation on August 9, 2006 rests on such an assumption. On the contrary, for the reasons explained below, it is my opinion that it is reasonable to believe that there is a connection between the revenue

---

[150] Deposition of John D. Finnerty, June 17, 2011, p. 239.

[151] Finnerty Declaration ¶ 25.

[152] Allen Report ¶ 86.

recognition accounting issues and IMAX's failure to find a buyer, both of which were announced on August 9, 2006. If such a connection exists, then the disclosure of IMAX's failure to find a buyer would explain *part* of the market's sharp negative response to IMAX's curative disclosure on August 9, 2006 relating to the alleged fraud.

84. In the Finnerty 2010 Declaration in responding to the defendants' expert reports and above ¶¶ 39-41, I explain the reasons why I believe that it is reasonable to think that there is a connection between the SEC inquiry concerning IMAX's revenue recognition accounting policy that is at the heart of the alleged fraud and IMAX's failure to find a buyer.[153] I did not repeat that explanation in the Finnerty Declaration because I was not responding to defendants' experts in that declaration. However, I also explained these reasons when I was asked about them during my deposition testimony in this matter.[154]

85. The simultaneity of the announcement that IMAX could not find a buyer at a price acceptable to the IMAX board of directors and the disclosure of the SEC and the OSC inquiries may just be a coincidence. However, as I explained during my deposition in this matter, based on my experience as an investment banker selling companies, buyers want clean books in order to be able to rely on the company's financial statements to value the company and to avoid the risks implicit in a potential accounting fraud.[155] Discovery in this matter will ultimately reveal the

[153] Finnerty 2010 Declaration ¶¶ 27-29.

[154] Deposition of John D. Finnerty, June 17, 2011, pp. 239, 249-251.

[155] *Ibid.*, pp. 249-251.

extent of the connection between the SEC inquiry into IMAX's revenue recognition accounting issues and IMAX's failure to find a buyer, but the quotations furnished above ¶ 40 indicate that at least some market participants also suspected this connection at the time of the August 9, 2006 twin disclosures.

86. Thus, IMAX's disclosure that it had not found a buyer may not be completely unrelated to the alleged fraud. The news that the Company had failed in its search for a buyer willing to pay an acceptable price was regarded negatively by market participants and would accordingly have contributed to IMAX's stock price decline on August 9, 2006 and August 10, 2006. To the extent that the alleged fraud, and in particular, the SEC inquiry, reduced the likelihood that IMAX would find a buyer and this failure was responsible for a portion of the drop in IMAX's share price on August 9-10, 2006, the resulting loss of shareholder wealth is properly attributable to the alleged fraud.[156]

### F. The Allen Report Mischaracterizes the Finnerty Declaration's Method of Choosing the Three Curative Disclosure Dates It Analyzed

87. As I testified during my deposition in this matter, I performed an event study with the assistance of Compass Lexecon to investigate the responsiveness of IMAX's common stock price to the Company's announcements during the entire Class Period in connection with preparing my Finnerty 2010 Declaration.[157] I testified that it is my customary practice to consider every day in the Class Period when

---

[156] If it is subsequently determined that IMAX's failure to find a buyer is unrelated to the alleged fraud, then the effect of this failure can be subtracted from the overall abnormal return on August 9-10, 2006, for example, by subtracting the run-up in IMAX's share price that occurred when it previously announced that it was putting itself up for sale.

[157] Deposition of John D. Finnerty, June 17, 2011, pp. 48-49.

conducting an event study.[158] I asked Compass Lexecon to assist me in conducting the event study for the Finnerty 2010 Declaration, including reviewing IMAX's press releases, IMAX management's securities analyst conference calls, Company regulatory filings, news articles, securities analyst reports, and other relevant disclosure documents for each of the potential curative disclosure dates identified in the Complaint. We looked at all of the disclosure events listed in the Complaint, thoroughly researched when the market first reacted to each disclosure to identify what information released on each disclosure date was really new to the market, and used the event study to determine the statistical significance of the market's reaction to each announcement.[159] This is the same approach I typically follow when I am asked to prepare a declaration in support of the lead plaintiff's motion for class certification in connection with a securities fraud matter.[160]

88. As I also testified, Robbins Geller asked me to focus on only those disclosure dates that we found through the event study had stock market reactions to the new information related to IMAX's alleged fraud that were statistically significant at the 5% level. We found that three disclosure events met this statistical criterion. After reviewing the nature of the news disclosures and the results of the event study analysis with Robbins Geller, we agreed on August 9-10, 2006, March 29,

[158] *Ibid.*, pp. 48-49.

[159] *Ibid.*, pp. 48-49.

[160] This analytical approach systematically considers all the disclosure dates in the Complaint and reduces the set of disclosure dates to those on which economically significant information related to the alleged fraud was released to the market and on which the stock market reaction to this new information was statistically significant. It is therefore both scientific and unbiased.

2007, and July 20, 2007 as the curative disclosure dates that I should analyze in the Finnerty 2010 Declaration.[161]

89. For the Finnerty Declaration, Abbey Spanier gave me the same assignment with respect to analyzing the potential curative disclosure dates.[162] Because my assignment did not change in connection with preparing the Finnerty Declaration, it was not necessary to ask Compass Lexecon to redo my event study or to redo completely the review of the potential curative disclosure dates. We had already performed the work necessary to select the relevant disclosure dates in connection with preparing the Finnerty 2010 Declaration. After reviewing the event study results with Abbey Spanier, we agreed that I should again look only at the same three disclosure dates I analyzed in the Finnerty 2010 Declaration. In performing this work, I relied upon the results of my own event study in connection with my Finnerty Declaration because I was informed by Abbey Spanier that counsel for defendant PricewaterhouseCoopers had not notified Abbey Spanier whether it would resubmit Professor James's report or submit a new report.

90. The Allen Report puts forth an illustration of potential bias in choosing curative disclosure dates that is not in any way related to the methodology I employed in selecting the three curative disclosure dates I analyzed in the Finnerty Declaration.[163] In the hypothetical example, 1) there are 20 partial disclosure dates, 2) the fraud was nevertheless not material and not responsible for any loss

[161] Deposition of John D. Finnerty, June 17, 2011, p. 45.

[162] For the Finnerty 2010 Declaration, I was also asked to respond to the James Report and to the Allen 2010 Report as those documents related to the three curative disclosures.

[163] Allen Report ¶ 89.

on any of those dates, and 3) counsel supposedly selected one date in some unspecified manner.

91. This hypothetical example does not fit the facts of this case. The curative disclosure dates specified in the Complaint were not randomly chosen. Each date was analyzed based on the nature of the information that was publicly disclosed. Counsel did not pick the three dates I analyzed; I have described above the analytical manner in which the three dates were chosen. In particular, there were three curative disclosure dates on each of which I found that economically significant information related to the alleged fraud was revealed and on which I found that the stock market's reaction to the new fraud-related information was statistically significant.

### G. The Allen Report's Criticism of the Finnerty Declaration's Consideration of Confounding News Is Misguided

92. The Allen Report asserts that the Finnerty Declaration concludes that the abnormal return on IMAX's stock on August 9-10, 2006, March 29, 2007, and July 20, 2007 was *caused* (emphasis added) by the disclosures related to Plaintiff's allegations.[164] The Allen Report misstates my opinion. It is my opinion that changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were *directly related to and substantially caused* (emphasis added) by disclosures regarding IMAX's revenue recognition accounting policy,

[164] *Ibid.* ¶ 90.

and in particular, when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes.[165]

93. The Allen Report criticizes the Finnerty Declaration for supposedly not attempting to separate the impact of the confounding news on the change in IMAX's common stock price on the three disclosure dates I analyzed.[166] As I testified during my deposition in this matter, I enumerated and assessed all the items of confounding news that I believed could potentially be economically significant with the assistance Compass Lexecon.[167] As I also testified, I did not attempt to parse out the separate stock market impact of each confounding news item because I was not asked to do this; I expect to perform this quantification at the damages stage of the litigation.[168]

94. I explained in the Finnerty Declaration, as I had in the Finnerty 2010 Declaration, that I evaluated each confounding news item with the assistance of Compass Lexecon to determine which news items really conveyed economically significant new information.[169] In connection with both the Finnerty 2010 Declaration and the Finnerty Declaration, I personally read each of the stock analyst reports issued

[165] Finnerty Declaration ¶¶ 9 & 41.

[166] Allen Report ¶¶ 90-91.

[167] Deposition of John D. Finnerty, June 17, 2011, pp. 182-183.

[168] *Ibid.*, pp. 82, 181-182. I have been advised by counsel that quantitatively parsing out the separate impact of each confounding news item is unnecessary at the class certification stage.

[169] *Ibid.*, pp. 22-23, 34-35, 38-39, 81.

around each of the three curative disclosure dates I analyzed to determine how the market interpreted the new information disclosed on each disclosure date.[170]

95. Second, the Allen Report criticizes the Finnerty Declaration's analysis of the trading in IMAX's common stock after the close of normal trading on August 9, 2006 between the issuance of the August 9, 2006 press release at about 4:00 pm and IMAX's follow-up securities analyst conference call at 4:30 pm.[171] I testified during my deposition in this matter that I relied upon the conclusion in Michael Marek's expert report in this matter (the "Marek Report") that the market for IMAX's common stock was efficient during the Class Period.[172] I therefore did not test for market efficiency during any portion of the Class Period. As I testified, I did check whether the sharp drop in IMAX's stock price between 4:00 pm and 4:30 pm on August 9, 2006 could be explained by market or industry factors and concluded that the drop was almost entirely caused by IMAX-specific news, rather than market or industry factors. Exhibit 2 demonstrates that IMAX stock substantially underperformed all 33 other firms in the Bloomberg Hollywood Reporter Index during this one-half-hour window.

96. I did not test the market for IMAX's common stock during the half-hour period following 4:00 pm on August 9 for market efficiency. However, I have no reason to think that the market for IMAX's stock suddenly became inefficient at 4:00 pm that day, especially in light of the nature of the information released and the sharp

---

[170] *Ibid.*, pp. 182-183.

[171] Allen Report ¶¶ 92-93.

[172] Deposition of John D. Finnerty, June 17, 2011, p. 76.

reaction to IMAX's news release. One indicator of market efficiency is trading volume. Between 4:00 pm and 4:30 pm on August 9, 2006, the trading volume of 1.3 million shares was more than 2 ½ times the average *daily* trading volume for IMAX's stock in the prior 30 trading days, which demonstrates that numerous market participants had an opportunity to, and did, trade IMAX's common stock in this short period of time.

97. A recent study analyzes the efficiency of the markets for stocks in after-hours trading and finds that while trading volume is generally lower during the after-hours relative to the regular trading hours, trading after the market close and before the market open the next day is heightened on days when quarterly earnings announcements occur outside of the normal trading hours.[173] The study also finds that a significant portion of the price change occurs immediately after the earnings release when the release occurs after the market closes and before the market opens the next day.[174] It concludes that market prices in after-normal-hours trading show a relatively large degree of informational efficiency when the market during normal trading hours is efficient.[175]

98. In any case, if the after-normal-trading-hours market for IMAX's common stock were inefficient, then I would expect that a price overreaction would be just as likely as a price underreaction. If the market had overreacted to the August 9,

---

[173] Jiang, Christine X., Tanakorn Likitapiwat, and Thomas H. McInish "Information Content of Earnings Announcements: Evidence from After Hours Trading," Unpublished Working Paper, The University of Memphis, October 2010.

[174] *Ibid.*

[175] *Ibid.*

2006 news release, then I would expect the market to correct this error no later than early the next morning after the start of normal trading hours (9:30 am Eastern standard time) because the Marek Report demonstrates the efficiency of the market for IMAX's common stock, at least during normal trading hours.[176] However, as shown in Finnerty Declaration Exhibit 2, the TAQ data reveal no such reversal.

99. If the after-normal-trading-hours market for IMAX's stock underreacted because of this purported inefficiency, then I would also expect the underreaction to be corrected the next day. In any case, because I measure the stock market's reaction to the August 9, 2006 disclosures between the close of the market on August 9, 2006 and the close on August 10, 2006 and fully adjust for both market and industry factors during this period in my event study, the -40.67% abnormal return I calculated would be unaffected by this alleged inefficiency, if it exists at all, and my conclusion is therefore likewise unaffected.

100. To address Ms. Allen's concerns, I analyzed the change in IMAX's stock price between 4:00 pm and 4:30 pm on August 9, 2006 using my Modified Fama-French Three-Factor Model. I find that the abnormal return was -31.97% and is statistically significant at better than the 1% level, which means there is less than a 1% chance that this abnormal return happened by mere chance.[177]

---

[176] Declaration of Michael Marek, In re IMAX Corporation Securities Litigation, United States District Court, S.D. New York, July 27, 2011.

[177] Exhibit 3.

101. The Allen Report claims that I "appeared to question the validity of the TAQ data" during my deposition testimony in this matter.[178] The TAQ database lists every trade (and quote) for every stock it tracks, and thus provides intra-day trading data. I did not question the validity of the TAQ data; I noted that reporting conventions vary somewhat outside the normal trading hours.[179] Academic research has furnished empirical evidence that the TAQ database is a reliable source of market prices for after-normal-hours trades.[180]

### H. The Allen Report's Criticisms of My Conclusions Regarding the Impact of IMAX's Alleged Accounting Fraud Based on a 9-Year-Old Draft of an Expert Report in an Unrelated Matter Are Logically Flawed, Unreliable, and Unavailing

102. The Allen Report tries to use a 9-year-old draft of my expert report in the Jennifer Convertibles securities fraud matter to challenge my conclusions in this matter regarding the impact of IMAX's alleged accounting fraud.[181] But nowhere in her report does Ms. Allen compare the accounting allegations in the two matters. Not one to let the facts get in the way of a good story, Ms. Allen simply notes, "Similarly to the IMAX case, Jennifer Convertibles involved a change in accounting that caused the company to change its earnings."[182]

---

[178] Allen Report ¶ 94.

[179] Deposition of John D. Finnerty, June 17, 2011, p. 206.

[180] Barclay, Michael J. Barclay and Terrence Hendershott, "A Comparison of Trading and Non-Trading Mechanisms for Price Discovery," *Journal of Empirical Finance* 15 (December 2008), pp. 839-849.

[181] Allen Report ¶¶ 109-112. Inexplicably, the Allen Report quotes from a draft report dated June 3, 2002 and not the final report.

[182] *Ibid.* ¶ 109.

103. The IMAX matter is about revenue recognition accounting, as the Allen Report repeatedly recognizes, but it was *not* the main issue in the Jennifer Convertibles matter. The Jennifer Convertibles accounting issue concerned the consolidation of previously off-balance-sheet limited partnerships, which had incurred operating losses.

104. Jennifer Convertibles had begun an off-balance-sheet licensing arrangement in 1991, which securities analysts viewed as a favorable form of financing and which allowed Jennifer Convertibles to shift major operating expenses to its licensees while benefiting from significant royalty income.[183] Jennifer Convertibles changed its outside auditor from BDO Seidman ("Seidman") to KPMG Peat Marwick ("KPMG") in September 1994.[184] KPMG advised Jennifer Convertibles in November 1994 that it would have to change its method of accounting for its licensees so as to consolidate the operating losses of certain limited partnership licensees.[185]

105. Jennifer Convertibles announced on December 2, 1994 after normal trading hours that it had asked Seidman to review its audit for 1993 in light of KPMG's recommended accounting change. At the same time, Jennifer Convertibles announced that the filing of its 1994 Form 10-K would be delayed at least several weeks, that the company expected to report a significant loss for 1994, that the accounting change recommended by KPMG might negatively affect future

[183] Draft Expert Report of John D. Finnerty, in In re Jennifer Convertibles Securities Litigation, United States District Court, E.D. New York, No. CV-94-5570 (DRH), June 3, 2002, ¶ 13.

[184] *Ibid.* ¶ 14.

[185] *Ibid.* ¶ 16.

earnings, that the licensing program might be changed, and that a report of an independent committee of Jennifer Convertibles's Board of Directors had determined that management might have engaged in self-dealing or other related breaches of fiduciary duty.[186] The market had a significant negative reaction to this announcement on both December 2 and 5, 1994.[187] However, the market did not react significantly when it was later announced that Seidman had withdrawn its opinion on Jennifer Convertibles's 1993 financial statements.[188]

106. The Jennifer Convertibles securities fraud matter involved the announcement by Jennifer Convertibles of its former outside auditor's (Seidman) review of its prior audit of Jennifer Convertibles's financial statements for a single year, not an SEC and OSC inquiry. I concluded that the announcement lacked economic significance because the review involved the same accounting issue that Jennifer Convertibles's new outside auditor (KPMG) had already decided required a change in Jennifer Convertibles's accounting to consolidate some previously off-balance-sheet limited partnerships, the review had previously been publicly announced without triggering a negative stock market reaction, the Seidman review would only affect the prior fiscal year, the prior year's review would have no effect on Jennifer Convertibles's current or future financial results, and the announcement

---

[186] *Ibid.* ¶ 17.

[187] *Ibid.* ¶ 22.

[188] *Ibid.* ¶ 24.

did not convey any new information.[189] All accounting frauds are not the same. The Allen Report's failure even to mention the difference in accounting issues, let alone compare their very different accounting and financial impact, should invalidate its criticism.

107. I wrote in my draft report in the Jennifer Convertibles matter and testified at my deposition in this matter that "the market sees through pure accounting changes."[190] I cited the example of the switch from first-in-first-out (FIFO) to last-in-first-out (LIFO) accounting.[191] However, the IMAX matter, by Ms. Allen's own admission, is *not* about pure accounting changes; quarterly revenue, earnings, and cash flow did change when IMAX's financial statements were restated. The reported number of installations also was affected and should have been different. For example, the Allen Report states, "Similarly, for IMAX, the restatements of revenues of theater systems resulted only in quarterly shifting of past revenues, did not materially [in her view] affect historical cash flows., and there is no indication it would materially affect expectations of future cash…"[192] By the Allen Report's own admission, IMAX's quarterly revenue, earnings, and cash flow *did* change during the Class Period.

---

[189] Deposition of John D. Finnerty, June 17, 2011, pp. 317-318, and Draft Expert Report of John D. Finnerty, in In re Jennifer Convertibles Securities Litigation, United States District Court, E.D. New York, No. CV-94-5570 (DRH), June 3, 2002, ¶¶ 25-31.

[190] Deposition of John D. Finnerty, June 17, 2011, pp. 309, 313.

[191] *Ibid.*, p. 308.

[192] Allen Report ¶ 111.

108. As I testified during my deposition in this matter, a change in accounting method can affect a company's stock price when it "changes perception of profitability or changes perception of growth."[193] Further, changes in accounting methods and procedures that have economically significant implications, as for example, when earnings changes act as a signaling mechanism or if they otherwise convey new information about the company's business, can affect a company's share price.[194] Nothing I wrote or said in connection with my work in the Jennifer Convertibles matter is in any way inconsistent with these important potential implications of a change in accounting methods.

### I. Overall Response to the Allen Report's Criticisms of the Finnerty Declaration

109. Nothing in the Allen Report leads me to change any of the opinions I expressed in the Finnerty Declaration, and in particular, my opinion that the changes in IMAX's common stock price on each of the three curative disclosure dates, August 9-10, 2006, March 29, 2007, and July 20, 2007, were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes.

## VI. Conclusion

110. It is my opinion that the conclusions set forth in the James Report and the Allen Report regarding price impact, loss causation (including price decline), and

---

[193] Deposition of John D. Finnerty, June 17, 2011, p. 307.

[194] *Ibid.*, p. 316.

questioning my opinions in this matter are fundamentally flawed and do not change the opinions I previously expressed. My opinions are based on the event study I performed, the results of which were confirmed by the statistical results of Professor James's own event study, as well as my analysis of other company news and intra-day stock price movements on these dates, my review of IMAX's and its management's disclosures, press articles, and securities analyst commentary around these dates, and my review of the James Report and the Allen Report, all as described in the Finnerty Declaration and the preceding paragraphs of this reply declaration.

111. My analysis is based on the materials I have reviewed to date. I reserve the right to amend my opinion and file a supplemental declaration in this matter should I obtain any other significant information that leads me to change any of the opinions expressed in this declaration. To the extent this matter is adjourned for any reason, I further reserve the right to supplement this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed: August 3, 2011

John D. Finnerty, Ph.D.