UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S MOTON FOR FINAL APPROVAL OF THE SETTLEMENT WITH DEFENDANTS, PROPOSED PLAN OF ALLOCATION, FINAL CERTIFICATION AND FOR AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

Arthur N. Abbey
Karin E. Fisch
Richard B. Margolies
ABBEY SPANIER RODD
& ABRAMS, LLP
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700

*Lead Counsel*

Dated: June 7, 2012

**TABLE OF CONTENTS**


TABLE OF AUTHORITIES .......... iv

INTRODUCTION .......... 1

PRELIMINARY STATEMENT .......... 1

I. SUMMARY OF THE SETTLEMENT .......... 4

A. Litigation with the Defendants .......... 4

B. The Proposed Settlement .......... 4

II. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE .......... 6

A. Standards for Approval of a Class Action Settlement .......... 6

B. Application of the *Grinnell* Factors Supports Approval of the Settlement .......... 8

1. The Complexity, Expense And Likely Duration Of The Litigation Support Approval Of The Settlement .......... 8

2. The Reaction Of The Class To The Settlement .......... 10

3. The Stage Of The Proceedings And The Amount Of Discovery Completed Support Approval Of The Settlement .......... 15

4. The Risks of Establishing Liability Support Approval Of The Settlement .......... 17

5. The Risks of Establishing Damages Support Approval Of The Settlement .......... 18

6. The Risks of Maintaining the Class Action Through Trial Support Approval Of The Settlement .......... 20

7. The Ability Of The Defendants To Withstand A Greater Judgment .......... 20

8. The Range of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And All The Attendant Risks of Litigation Support Approval Of The Settlement .......... 21

C. The Proposed Settlement is Procedurally Fair .......... 22

III. CLASS CERTIFICATION FOR SETTLEMENT PURPOSES IS APPROPRIATE UNDER FEDERAL RULE OF CIVIL PROCEDURE 23 ........ 23

A. The Requirements under Rule 23(a) ........ 24

1. Numerosity ........ 24

2. Commonality ........ 25

3. Typicality ........ 27

4. Adequacy of Representation ........ 28

B. The Requirements of Rule 23(b) Are Satisfied ........ 29

1. Common Questions of Law and Fact Predominate ........ 29

2. A Class Action is the Superior Method of Adjudication ........ 30

IV. THE NOTICE PROGRAM MEETS THE REQUIREMENTS OF DUE PROCESS AND RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE ........ 31

V. THE PLAN OF ALLOCATION IS REASONABLE, FAIR AND EQUITABLE ........ 32

VI. THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE ........ 33

A. The Legal Standards Governing the Award of Attorneys' Fees ........ 34

B. Application of the *Goldberger* Factors Justifies an Award of the Percentage Fee Requested ........ 36

1. The Time and Labor Expended ........ 37

2. The Magnitude and Complexities of the Litigation ........ 37

3. The Risk of the Litigation Support the Requested Fee ........ 37

4. The Quality of Representation ........ 38

5. The Requested Fee in Relation to the Settlement ........ 39

6. Public Policy Considerations Support the Requested Fee ........ 40

B. A Lodestar Cross-Check Confirms the Reasonableness of the Requested Attorneys' Fee ........ 40

VII. LEAD PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFITS OBTAINED FOR THE CLASS ........ 41

CONCLUSION ........ 42

## TABLE OF AUTHORITIES

**CASES** **PAGE**


*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 23, 24, 29

*Banyai v. Mazur*,
2007 U.S. Dist. LEXIS 22342 (S.D.N.Y. Mar. 27, 2007) .......... 22

*Boeing Co. v. Van Gemert*,
444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) .......... 34

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 n.14 (1981) .......... 17

*City of Detroit v. Grinnell Corp.*,
495 F.2d 448 (2d Cir. 1974) .......... passim

*Collins v. Olin Corp.*,
No. 03-CV-945 (CFD), U.S. Dist. LEXIS 39862 (D. Conn. Apr. 21, 2010) .......... 8

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir.1995) .......... 25

*County of Suffolk v. Long Island Lighting Co.*,
907 F.2d 1295 (2d Cir. 1990) .......... 7

*Cross v. 21st Century Holding Co.*,
No. 00 Cir. 4333 (MBM), 2004 U.S. Dist. LEXIS 2283 (S.D.N.Y. Feb. 11, 2004) .......... 27

*Duncan v. Unity Life & Accident Ins. Ass'n*,
No. 00 Civ. 7261, 2003 U.S. Dist. LEXIS 6559 (S.D.N.Y. Apr. 18, 2003) .......... 23

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir.), *cert. denied*, 474 U.S. 946 (1985) .......... 30

*Fox v. Cheminova, Inc.*,
213 F.R.D. 113 (E.D.N.Y. 2003) .......... 26

*Goldberger v. Integrated Res., Inc.*,
209 F.3d 43 (2d Cir. 2000) .......... 36

*Green v. Wolf Corp.*,
406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969) ............ 30

*Hicks*,
2005 U.S. Dist. LEXIS 24890 ............ 40

*Hnot v. Willis Group Holdings, Ltd.*,
241 F.R.D. 204 (S.D.N.Y. 2007) ............ 24

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
No. 03 MDL 1529 (LMM), 2006 U.S. Dist. LEXIS 84621 (S.D.N.Y. Nov. 16, 2006) ..... 34, 38

*In re Am. Bank Note Holographics, Inc.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001) ............ 10, 32, 36, 38

*In re Blech Sec. Litig.*,
187 F.R.D. 97 (S.D.N.Y. 1999) ............ 24

*In re Bristol-Myers Squibb Sec. Litig.*,
361 F. Supp. 2d 229 (S.D.N.Y. 2005) ............ 37

*In re Drexel Burnham Lambert Group, Inc.*,
960 F.2d 285 (2d Cir. 1992) ............ 27, 28

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
No. 05 Civ 10240 (CM), 2007 U.S. Dist. LEXIS 57918 (S.D.N.Y. Jul. 27, 2007) ........... passim

*In re Flag Telecom Holdings Ltd. Sec. Litig.*,
Master File No. 02-CV-3400 (CM)(PED), 2010 U.S. Dist. LEXIS 119702
(S.D.N.Y. Nov. 5, 2010) ............ 41

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) ............ 6, 20

*In re Gilat Satellite Networks, Ltd.*,
No. CV-02-1510 (CPS), 2007 U.S. Dist. LEXIS 29062 (E.D.N.Y. Apr. 19, 2007) ............ 8

*In re Global Crossing Sec. & ERISA Litig.*,
225 F.R.D. 436 (S.D.N.Y. 2004) ............ 7, 35, 37, 41

*In re IMAX Sec. Litig.*,
272 F.R.D. 138 (S.D.N.Y. 2010) ............ 25

*In re Initial Public Offering Securities Litigation*,
471 F.3d 24, 35 (2d Cir. 2006) ........ 23

*In re Lloyd's Am. Trust Fund Litig.*,
No. 96 Civ. 1262, 2002 U.S. Dist. LEXIS 22663 (S.D.N.Y. Nov. 26, 2002),
*aff'd by Adams v. Rose*, 2003 WL 21982207 (2d Cir. 2003) ........ 18, 35

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
233 F.R.D. 306 (E.D.N.Y. 2006) ........ 8

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
No. 04 Civ 8144 (CM), 2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. Dec. 23, 2009) ........ passim

*In re McDonnell Douglas Equip. Leasing Fee Litig.*,
842 F. Supp. 733 (S.D.N.Y. 1994) ........ 41

*In re Merrill Lynch Tyco Research Sec. Litig.*,
249 F.R.D. 124 (S.D.N.Y. 2008) ........ 38, 40

*In re Monster Worldwide, Inc. Sec. Litig.*,
No. 07-CV-02237 (JSR), 2008 U.S. Dist. LEXIS 122149 (S.D.N.Y. Nov. 24, 2008) ........ 5, 39

*In re NASDAQ Market- Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ........ 22, 24

*In re Nortel Networks Corp. Sec. Litig.*,
2003 U.S. Dist. LEXIS 15702 (S.D.N.Y. Sept. 8, 2003) ........ 23

*In re Omnicom Group, Inc. Sec. Litig.*,
No. 02 Civ. 4483, 2007 U.S. Dist. LEXIS 31963 (S.D.N.Y. Apr. 30, 2007) ........ 25

*In re PaineWebber Ltd. P'Ships Litig.*,
171 F.R.D. 104 (S.D.N.Y. 1997) ........ 17, 22, 33

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
163 F.R.D. 200 (S.D.N.Y.1995) ........ 29

*In re Rite-Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005) ........ 36

*In re Safety-Kleen Corp. Bondholders Litig.*,
No. 3:00-1145-17, 2004 WL 3115870 (D.S.C. Nov. 1, 2004) ........ 20

*In re Scor Holding (Switz.) AG Litig.*,
537 F. Supp. 2d 556 (S.D.N.Y. 2008) ........ 28

*In re Sony SXRD Rear Projection Television Class Action Litig.*,
No. 06 Civ. 5173 (RPP), 2008 U.S. Dist. LEXIS 36093 (S.D.N.Y. May 1, 2008) ........ 20

*In re Sumitomo Copper Litig.*,
189 F.R.D. 274 (S.D.N.Y. 1999) ........ 8

*In re Telik, Inc. Sec. Litig.*,
576 F. Supp. 2d 570, 587 (S.D.N.Y. 2008) ........ passim

*In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*,
724 F. Supp. 160 (S.D.N.Y. 1989) ........ 36

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85629 (S.D.N.Y. Nov. 7, 2007) ........ 21

*In re Vivendi Universal, S.A. Sec. Litig.*,
242 F.R.D. 76 (S.D.N.Y. 2007) ........ 25

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985) ........ 17

*Joel A. v. Giuliani*,
218 F.3d 132 (2d Cir. 2000) ........ 15

*Maley v. Del Global Techs. Corp.*,
186 F. Supp. 2d 358, 362-63 (S.D.N.Y.) ........ 10, 18, 36, 38, 39

*Marisol A. v. Giuliani*,
185 F.R.D. 152 (S.D.N.Y. 1999) ........ 15, 25

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997) ........ 26, 27

*McAnaney v. Astoria Fin. Corp.*,
No. 04-CV-1101 (JFB)(WDW), 2011 U.S. Dist. LEXIS 114768 (E.D.N.Y. Feb. 11, 2011) ... 10

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ........ 41

*Moore v. Paine Webber, Inc.*,
306 F.3d 1247 (2d Cir. 2002) ........ 29

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
711 F.2d 1136 (2d Cir. 1983)........................................................................................ 41

*Newman v. Stein*,
464 F.2d 689 (2d Cir. 1972).......................................................................................... 21

*Reynolds v. Repsol YPF, S.A.*,
Civil Action No. 1:06-cv-00733-DAB, 2008 U.S. Dist. LEXIS 106541
(S.D.N.Y May 7, 2008)............................................................................................. 5, 39

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993).......................................................................................... 24

*Strougo v. Bassini*,
258 F. Supp. 2d 254 (S.D.N.Y. 2003)...................................................................... 18, 35

*TBK Partners, Ltd. v. W. Union Corp.*,
675 F.2d 456 (2d Cir. 1982)............................................................................................ 7

*Teachers' Ret. Sys. of Louisiana. v. ACLN Ltd.*,
No. 01 Civ. 11814 (LAP), 2004 U.S. Dist. LEXIS 25927 (S.D.N.Y. Dec. 27, 2004)............. 25

*Thompson v. Metro. Life Ins. Co.*,
216 F.R.D. 55 (S.D.N.Y. 2003) ...................................................................................... 23

*Trustees v. Greenough*,
105 U.S. 527 (1882)...................................................................................................... 34

*Wal-MartStores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005)................................................................................ 6, 7, 8, 35

*Weinberger v. Kendrick*,
698 F.2d 61 (2d Cir. 1982)............................................................................................ 23

*White v. First Am. Registry, Inc.*,
2007 U.S. Dist. LEXIS 18401 (S.D.N.Y. Mar. 7, 2007) ............................................... 7, 22

**STATUTES**

15 U.S.C. § 78u-4(a)(6) .................................................................................................. 36

**OTHER AUTHORITIES**

*Manual for Complex Litigation*, Third, § 30.42 (1995).......................................................... 8

**RULES**

Fed. R. Civ. P. 23(b)(3) .......... 29

Fed. R. Civ. P. 23(e)(2) .......... 6

## INTRODUCTION[1]

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiff The Merger Fund ("Lead Plaintiff"), on behalf of itself and the Settlement Class, respectfully submits this memorandum of law, together with the accompanying Declaration of Arthur N. Abbey in Support of Lead Plaintiff's Motion for Final Approval of the Settlement With Defendants, Proposed Plan Of Allocation, Final Certification, and Award of Attorneys' Fees And Reimbursement of Expenses (the "Abbey Decl.") and Affidavit of Paul Mulholland of Strategic Claims Services ("SCS"), dated June 7, 2012 (the "Mulholland Aff."), for: (i) final approval of a $12,000,000 all-cash settlement (the "Settlement") of the Lead Plaintiff's claims against defendants IMAX Corporation ("IMAX" or the "Company"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble (the "Individual Defendants") and PricewaterhouseCoopers LLP, an Ontario Limited Liability Partnership ("PWC-Canada") (collectively the "Defendants"); (ii) final certification of the Class for settlement purposes; (iii) approval of Lead Plaintiff's proposed plan of allocation of the proceeds of the Settlement (the "Plan of Allocation"); and (iv) an award of attorneys' fees and reimbursement of expenses.

## PRELIMINARY STATEMENT

The proposed Settlement is the product and culmination of over five years of hard-fought litigation, which included an extensive investigation into the claims, preparation of a complaint and amended complaint, dispositive motions, three rounds of class certification briefing, extensive consultation with experts in areas requiring specialized knowledge, and the review and

[1] Unless otherwise stated herein, all capitalized terms shall have the same meaning as set forth in the Amended Stipulation and Agreement of Settlement between Lead Plaintiff and the Settling Defendants, dated March 20, 2012 (the "Settlement Agreement" or "Amended Stipulation").

analysis of a substantial volume of documents during discovery as well as extensive arm's-length negotiations between the parties.

Lead Plaintiff and Lead Counsel succeeded in recovering $12 million from the Defendants and believe that the Settlement represents an outstanding achievement in light of the risks of continued litigation, including the risks of establishing liability against the Defendants. The Settlement was reached at a time when Lead Plaintiff and Lead Counsel had developed a thorough understanding of the strengths and weaknesses of the claims and defenses in the Litigation. This understanding was based upon Lead Counsel's extensive investigation into the facts underlying the claims; their review of documents produced in the Litigation; their extensive consultation with experts and consultants; and the prolonged settlement negotiations.

Given the risks Lead Plaintiff faced in proceeding with the Litigation, the results achieved through this Settlement warrant approval. As set forth below and in the Abbey Declaration, potential obstacles to obtaining a successful result included a potential denial of Lead Plaintiff's motion for class certification that was pending at the time of the parties' agreement, and possible resulting appeals, the possibility of an adverse ruling on summary judgment, or at trial, and the risk of a limited recovery or no recovery at all. This Settlement was arrived at by a well-informed Lead Plaintiff and Lead Counsel, only after years of litigation and arms' length settlement negotiations.

On March 28, 2012, the Court issued an Amended Order Preliminary Approving Final Settlement and Providing for Notice ("Amended Preliminary Approval Order"). The Amended Preliminary Approval Order certified the Settlement Class for settlement purposes only;

approved the Amended Stipulation; set a final fairness hearing date for June 14, 2012 and approved the form of Notice to be disseminated to Class members. D.E. 203.

In accordance with the Amended Preliminary Approval Order, on April 26, 2012, SCS posted English and French copies of the Notice, Summary Notice, Proof of Claim and Release form, the Stipulation, and the Complaint, on a website at www.imaxussettlement.com. Mulholland Aff. at ¶5. Also pursuant to the Amended Preliminary Approval Order, on April 26, 2012, SCS published the Court-approved Summary Notice of the Settlement in the national editions of *The Wall Street Journal, The New York Times, The Globe* and *Mail,* and *La Presse* (in French). *Id.* at ¶6. The Notice informed Class members that the deadline for persons to exclude themselves from the Settlement was set for no later than June 4, 2012. *Id.* ¶2, Ex. A. The Notice also informed Class members that Lead Counsel would apply to the Court for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) thereof, and reimbursement of expenses of no greater than $1.75 million. *Id.* The Notice provides that objections to any aspect of the Settlement or the application for attorneys' fees and reimbursement of expenses were to be filed by June 4, 2012. *Id.* Although 87,934 Notice and Proof of Claim forms have been mailed to prospective Class members, only one Class member has objected to the Settlement and only four Class members have sought exclusion from the Class. *See* Abbey Dec., ¶¶4, 102, 116 and 155.

Now, Lead Plaintiff requests that the Court determine that the Settlement is fair, reasonable and adequate, approve final certification of the Settlement Class and enter a final judgment dismissing all claims against the Defendants.

# I. SUMMARY OF THE SETTLEMENT

## A. Litigation with the Defendants

A detailed review of the Litigation, factual background, procedural history and settlement negotiations is set forth in detail in the accompanying Abbey Decl., at ¶¶8-77 and will not be repeated here.

## B. The Proposed Settlement

The following is a summary of the principal terms of the Settlement.

Through vigorous efforts, Lead Plaintiff has achieved a Settlement on behalf of a Settlement Class of "all persons and entities who purchased or otherwise acquired IMAX shares on the NASDAQ from February 27, 2003 through July 20, 2007 (the "Class Period"), inclusive, excluding the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either current officers and/or directors of any Defendant, or who served as officers and directors of any Defendant at any time during the Class Period." The Settlement Amount, $12,000,000, has been deposited by the Defendants into an interest-bearing escrow account. The Settlement will be used to pay Class members, and also to pay taxes, administrative costs, including the costs of notice, and for attorneys' fees and expenses. None of this $12,000,000 plus interest will revert to Defendants. In exchange for the $12,000,000 cash payment, the parties will release each other from any and all claims related to the Litigation and will dismiss the Litigation with prejudice. If the Court approves the Settlement, the Canadian Order becomes final and unappealable and any objections or appeals that may be filed in opposition to the Settlement are overruled or otherwise resolved, the Settlement Fund, together with any interest earned thereon, less any administrative expenses,

attorneys' fee and expense award, and less any escrow expenses and taxes incurred will be distributed to the Settlement Class Members consistent with the Plan of Allocation.

Lead Counsel and other plaintiffs' counsel request a fee of 25% (or $3,000,000) of the $12,000,000 Settlement Fund and reimbursement of expenses of $1,677,838.02, plus interest on such amounts at the same rate earned by the Settlement Fund. The fee [not the expenses] represents a significant discount to plaintiffs' counsel's lodestar. The fee request is consistent with precedent in this Circuit. *See, e.g., In re Monster Worldwide, Inc. Sec. Litig.*, No. 07-CV-02237 (JSR), 2008 U.S. Dist. LEXIS 122149 (S.D.N.Y. Nov. 24, 2008) (approving fee award of $25% of $11,875,000 settlement fund); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 587 (S.D.N.Y. 2008) (approving fee award of 25% of $5 million settlement fund); *Reynolds v. Repsol YPF, S.A.*, Civil Action No. 1:06-cv-00733-DAB, 2008 U.S. Dist. LEXIS 106541, at *3 (S.D.N.Y May 7, 2008) (awarding 25% of $8 million settlement fund and noting that "courts throughout [the Second] Circuit regularly award fees of 25% to 30% or more of the total recovery under the percentage-of-the-fund method.").

The immediate and certain recovery obtained for the Class - an all cash recovery of $12,000,000 - was achieved through the skill and efforts of Lead Counsel and other plaintiffs' counsel. Lead Counsel and other plaintiffs' counsel's efforts to date have been without compensation and the fee has been wholly contingent upon the result achieved. Further, the Settlement remains conditioned upon the occurrence of certain events in a parallel action proceeding in Canada, as detailed below. Lead Counsel will likely continue to expend effort and to incur costs to monitor and participate in the Canadian Action. As detailed herein and in the

Abbey Declaration, Lead Counsel believe that the settlement is a highly favorable result for the Class.

The Notice, which is posted on the settlement website, explains that the parties will release each other from any and all claims related to the Litigation. The Notice states, in relevant part, "If you are a Settlement Class Member, and you do not exclude yourself from the Settlement, you remain in the Class, and that means that if the Settlement is approved, you, on behalf of yourself, your heirs, executors, administrators, successors and assigns and any Persons you represent, will release all 'Released Claims,' including participation in the Canadian Action, and including all 'Unknown Claims,' against all 'Released Parties.'"

## II. THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A. Standards for Approval of a Class Action Settlement

Under Rule 23(e) of the Federal Rules of Civil Procedure, a class action settlement must be approved by the Court. A settlement should be approved if the Court finds it "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 160 (S.D.N.Y. 2011). "A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005).

"The standards governing approval of class action settlements are well-established in this Circuit." *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, No. 05 Civ 10240 (CM), 2007 U.S. Dist. LEXIS 57918, at *12 (S.D.N.Y. Jul. 27, 2007) (*citing City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974)). In *Grinnell*, the Second Circuit held that the following factors should be considered in evaluating a class action settlement:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463 (internal citations omitted); *see also Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1323-24 (2d Cir. 1990); *In re Telik, Inc.*, 576 F. Supp. 2d at 575 ("Courts in this Circuit examine the fairness, adequacy and reasonableness of a class action settlement according to the '*Grinnell* factors'"). Where a settlement is found to be fair and reasonable, the Second Circuit has held that "class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Wal-Mart Stores,* 396 F.3d at *107 (*quoting TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)).

"In finding that a settlement is fair, reasonable and adequate, not every factor must weigh in favor of settlement, 'rather the court should consider the totality of these factors in light of the particular circumstances.'" *Id.* at 575 (*quoting In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted)). In deciding whether to approve a settlement, a court "should not attempt to approximate a litigated determination of the merits of the case lest the process of determining whether to approve a settlement simply substitute one complex, time consuming and expensive litigation for another." *White v. First Am. Registry, Inc.*, No. 04 Civ. 1611 (LAK), 2007 U.S. Dist. LEXIS 18401, at *7 (S.D.N.Y. Mar. 7, 2007). Moreover, "a presumption of fairness, adequacy, and reasonableness may attach if the Court

finds that arm's length negotiations took place between experienced counsel after a period of meaningful discovery." *Collins v. Olin Corp.*, No. 03-CV-945 (CFD), 2010 U.S. Dist. LEXIS 39862, at *9-10 (D. Conn. Apr. 21, 2010) (*citing Wal-Mart Stores, Inc.*, 396 3d at 116; *Manual for Complex Litigation*, Third, § 30.42 (1995)).

### B. Application of the *Grinnell* Factors Supports Approval of the Settlement

The Settlement satisfies the *Grinnell* criteria for approval of a class action settlement.

#### 1. The Complexity, Expense And Likely Duration Of The Litigation Support Approval Of The Settlement

"In evaluating the settlement of a securities class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain." *In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *14-15 (*quoting In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999)). Courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute," *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS), 2007 U.S. Dist. LEXIS 29062, at *36 (E.D.N.Y. Apr. 19, 2007), and that "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006) (citations omitted). As detailed in the Abbey Declaration, this complexity, difficulty and uncertainty is certainly present with respect to the claims in this case. *See* Abbey Decl. ¶¶109-114, 128.

This Action is complex by any standard. It arises from allegations that Defendants' public statements during the Class Period were materially false and misleading because they failed to disclose, among other things, that IMAX had recognized revenue on theater systems

before installation of the system was complete, in contravention of U.S. generally accepted accounting rules, and in violation of its own accounting policies. Plaintiffs also alleged that IMAX's auditor, PwC-Canada, was also responsible for the material misinformation disseminated to the investing public during the Class Period. Lead Plaintiff bore the burden of proving the existence of false and misleading statements, scienter, materiality, loss causation, damages and all elements of a claim of securities fraud. The Litigation was also rendered complex by a parallel class action lawsuit filed in the Ontario Superior Court of Justice in Canada (the "Canadian Court") alleging, based on substantially identical facts to those alleged in this Litigation, that IMAX improperly recognized revenue on theater systems (the "Canadian Action"). *Id.* at ¶¶11, 58-66, 71-73, 75.

Lead Plaintiff would have to overcome numerous hurdles in order to achieve a litigated verdict against the Defendants in this Litigation. Any trial against the Defendants would have involved dozens of witnesses and hundreds of exhibits. *Id.* at ¶112. Should the case have proceeded to trial, Lead Plaintiff expected the entire trial to take several months. *Id.* Moreover, whatever the outcome of trial, appeal certainly would have been taken to the Second Circuit and perhaps even to the United States Supreme Court. *Id.* All of the foregoing would have extended the case, thus delaying the ability of the Class to recover for years, if at all, while being extremely expensive for the parties. *Id.* Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial and appeals, as well as the associated expense. *Id.*

The subject matter involved in this case also added to the complexity of the litigation. At the time the Settlement was reached, Lead Counsel had expended significant efforts in

investigating the claims, reviewing a vast number of documents produced during discovery and consulting extensively with experts in a broad range of subject areas, including economics, finance, valuation, accounting and auditing principles. Abbey Dec. ¶¶32, 78, 109-114, 134. In addition, the multiple defenses to liability and damages that Defendants had asserted in their motions to dismiss and the issues raised in their opposition to Lead Plaintiff's motion for class certification would also have added to the complexity of the case.

In contrast to this complex, lengthy, and uncertain litigation, the Settlement provides immediate, significant and certain recoveries for Class members. Accordingly, this factor supports approval of the Settlement.

### 2. **The Reaction Of The Class To The Settlement**

Reaction of the Class to a settlement is "perhaps the most significant factor to be weighed in considering its adequacy." *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 425 (S.D.N.Y. 2001); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 362-63 (S.D.N.Y. 2002) ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy"); *McAnaney v. Astoria Fin. Corp.*, No. 04-CV-1101 (JFB)(WDW), 2011 U.S. Dist. LEXIS 114768, at *18-19 (E.D.N.Y. Feb. 11, 2011) ("A favorable reception by the class constitutes 'strong evidence' of the fairness of a proposed settlement and supports judicial approval.")

Pursuant to the Court's March 28, 2012 Order, approximately 87,934 copies of the Notice and Proof of Claim forms were mailed by the Court-authorized claims administrator, SCS, to potential Class members (Mulholland Aff. ¶8) and Summary Notice was published on April 26, 2012, in the national editions of *The Wall Street Journal, The New York Times, The Globe and*

*Mail*, *La Presse* (in French) as well as electronically in French-Canadian over Marketwire and in English over Globe Newswire. *Id.* ¶6. The Notice informed Class members of their right to object to the proposed Settlement and of the procedures for doing so. In response to the Notice program detailed above, there has been only one objection to the Settlement and only four Settlement Class Members have sought exclusion from Settlement participation. *Id.* ¶10.

On June 6, 2012, Lead Counsel received the only objection registered against the proposed Settlement. Objector Mr. Skip Ames indicates in his June 4, 2012 letter to the Court that he has discussed various aspects of the proposed Settlement with lawyers from Siskinds, LLP, counsel for plaintiffs in the Canadian Action. Mr. Ames also appends to his letter various documents apparently obtained from Siskinds. Prior to sending his objection to the Court and counsel for the parties, Mr. Ames never contacted any counsel in the U.S. Action to discuss his concerns or ask any questions regarding the proposed Settlement.

As Mr. Ames correctly notes, to the extent that he or any other Class member believes that their rights are better protected by participating in the Canadian Action or that their claims have a greater chance of success on the merits in Canada, they are free to opt out of the proposed Settlement and remain a member of the certified Canadian Class. While Mr. Ames asserts that the Canadian Action may not be able to be "pursued economically," he fails to explain that assertion. At the time that Siskinds commenced the Canadian Action, the complaints that now comprise the consolidated U.S. Action had all been filed. Thus, when Siskinds filed its client's original complaint in Canada, the U.S. Action was already pending and there certainly was no assurance that a global class would be certified in Canada (and in fact no global class previously had ever been certified in Canada in any securities class action). Siskinds was willing to take the

risk that it would not be litigating on behalf of NASDAQ investors at the time it filed the Canadian Action and there is no reason to believe that Siskinds, which has now been appointed to represent the interests of its client and the certified class, would abandon its duties simply because the Canadian Action may become smaller. There had been no indication to date that plaintiffs in the Canadian Action intend to "abandon their claims for much less compensation than they might otherwise be able to obtain" as Mr. Ames suggests in the event that the proposed Settlement is approved.

Further, if Mr. Ames and Siskinds seriously believe that their case has a greater probability of success on the merits in Canada, then it follows that their claims, although smaller, are arguably worth more than the equivalent claims in the United States. Thus, to the extent that Mr. Ames' objections are not addressed to his satisfaction, he is encouraged to exclude himself and participate in the Canadian Action, an option that is available to all members of the U.S. Class.

Mr. Ames' primary concern appears to be with the proposed Plan of Allocation. As discussed in the Abbey Declaration, Lead Counsel consulted with more than one expert with respect to the issues of loss causation and damages. Abbey Decl. at ¶¶78, 103, 134. These discussions, which continued throughout the course of the litigation, were the basis for the Plan of Allocation. Based on the advice of damages experts, Lead Plaintiff and Lead Counsel determined for the purposes of calculated an Authorized Claimant's losses, the artificial inflation per share during the period between February 27, 2003 and August 9, 2006 would be $3.90. Our expert also opined that there were no damages for IMAX shareholders between the period of August 10, 2006 and July 20, 2007 (the date of the Restatement) because on the day of the

restatement, IMAX's stock price actually went up. Mr. Ames has made no showing that the opinions of Lead Plaintiff's experts are flawed in any way, let alone irrational or unreasonable. To the extent that experts retained in the Canadian Action disagree with the experts retained in the U.S., any such disagreement only serves to highlight that complex securities class actions often hinge upon a "battle of the experts" and there is no guarantee that a jury would agree with plaintiffs' retained experts, defendants' retained experts or either. As previously noted, Defendants' expert estimated that there were little or no damages at all during the relevant period. Thus, Mr. Ames' assertions illustrate the risks involved in proceeding to litigate and mitigate in favor of approval of the proposed Settlement.

Mr. Ames' concern with the Plan of Allocation also undermines his objection to plaintiffs' request for reimbursement of expenses. The Notice provided potential class members with the maximum amount of expenses to be sought by counsel. The details and breakdown of the $1,677,838.02 in expenses actually being sought are appended to the Abbey Declaration as Exhibit E. As highlighted by Mr. Ames' submission of two separate expert affidavits provided to him by Siskinds, the retention of experts was crucial to the prosecution of this case and, as a result, expert costs comprise the bulk of the costs for which plaintiffs seek reimbursement. Lead Plaintiff retained outside investigators and an accounting expert, each of whom provided invaluable assistance to Lead Counsel in drafting the allegations of the Complaint and understanding the complicated accounting issues attendant thereto. At the class certification and mediation stages, plaintiffs worked with several experts who opined with respect to loss causation and damages. Lead Counsel and Robbins Geller worked to minimize duplication of effort and expense when preparing their respective motions for class certification and utilized the

same experts to that end when appropriate. Finally, Lead Plaintiff retained Canadian counsel to assist them in understanding the issues presented by the certification of the global class in Canada and to ensure that the interests of Lead Plaintiff and the class it sought to represent were not being compromised in any way in the litigation of the Canadian Action. Lead Counsel endeavored at all times to limit its participation in the Canadian Action so as to minimize cost to the Class. However, under the circumstances, Lead Counsel had no choice but to, and must continue to, monitor the proceedings in Canada and will continue to incur costs even after the Settlement Hearing for which it will not be compensated. Mr. Ames will be provided with a copy of all papers submitted in support of the settlement and fee application.

Again, if Mr. Ames believes he will be better served in the Canadian Action because the Plan of Allocation is allegedly unfair or his claims are stronger in Canada, Lead Counsel will be pleased to honor an exclusion request from him, assuming that Defendants agree. A full copy of Lead Plaintiff's submission to the Court will be sent to Mr. Ames by overnight mail. As established therein, a request for 25% of the settlement fund as attorneys' fees is well within the range of percentage fees awarded by Courts in the Second Circuit. A lodestar cross-check, where counsel here are seeking a negative multiplier, confirms the fairness of the fee request and all expenses sought were necessarily incurred given the circumstances of this particular Action.

Given that the Settlement Class consists of many sophisticated investors, the fact that there has been only one objection and four opt outs is strong evidence of the fairness and adequacy of the Settlement and further supports approval of the Settlement.

### 3. The Stage Of The Proceedings And The Amount Of Discovery Completed Support Approval Of The Settlement

Courts should also consider the stage of the proceedings and the amount of discovery in evaluating a proposed settlement. The purpose of considering the stage of the proceedings is to ensure that the factual record is sufficient to support an informed judgment as to the adequacy of the settlement proposal. *Marisol A. v. Giuliani*, 185 F.R.D. 152, 163 (S.D.N.Y. 1999), *aff'd. sub nom*, *Joel A. v. Giuliani*, 218 F.3d 132 (2d Cir. 2000).

The Settlement was reached after nearly four years of litigation that included an extensive investigation, substantial motion practice, consultation with multiple experts and discovery. Lead Counsel had a firm grasp of the strengths and weaknesses of the case when negotiating and evaluating the proposed Settlement. As explained in the Abbey Decl., ¶¶8-77, the procedural history in this case provides strong support for the Settlement.

Lead Counsel conducted an extensive investigation prior to the filing of the first consolidated complaint, which included, among other things, the review and analysis of information obtained from numerous public sources including, SEC filings by IMAX, securities analysts reports about the Company, Company press releases, periodic Earnings Conference Calls held by the Company, media reports about the Company and documents from the Canadian Action. Abbey Decl., ¶14. Lead Counsel's investigation also encompassed extensive consultation with experts and the use of investigators to locate and interview former IMAX and PwC employees. *Id.*

After the filing of the Consolidated Amended Class Action Complaint (the "Complaint"), on October 2, 2007, the Defendants moved to dismiss the Complaint. Abbey Decl. ¶¶14-16.

Thus, Lead Counsel also became familiar with Defendants' defenses through the extensive briefing on the motions to dismiss as well as the oral argument held before the Court on August 5, 2008. Abbey Decl. ¶¶14-18. Throughout all stages of the Litigation, Lead Counsel worked extensively with experts to help understand the strengths and weaknesses of the claims in the case and to estimate possible recoverable damages under various scenarios. *Id.* ¶¶78-79, 134, 154. Lead Counsel's understanding of the strengths and weakness of the case was also enhanced by the prolonged and vigorous settlement negotiations, which included preparation of detailed mediation statements, presentations by the Defendants, and by Lead Counsel's consideration of the Defendants' arguments during mediations and settlement negotiations.

Lead Plaintiff also had the benefit of the review of a substantial volume of documents produced by the Defendants during discovery. Abbey Decl. ¶¶32, 34. In connection with this discovery, Lead Counsel obtained, reviewed, and/or analyzed thousands of pages of documents and transcripts of the testimony of the Individual Defendants and 11 other individuals conducted by the Securities and Exchange Commission and 11 transcripts of depositions conducted by the plaintiffs in the Canadian Action which included the testimony of a member of defendant PwC-Canada. *Id.* ¶78. After the parties preliminarily agreed to the terms of a settlement, Lead Counsel also conducted confirmatory discovery which supported Lead Counsel's belief that the Settlement is fair, reasonable and adequate. *Id.* ¶¶70, 78.

Thus, Lead Plaintiff entered into the Settlement only after achieving a thorough understanding of the case. At the time the parties were conducting discovery and in serious settlement negotiations, the Court had not yet ruled on Lead Plaintiff's motion for class certification. In all events, the timing of the settlement negotiations allowed Lead Plaintiff to

assess fully the risks that it might face in establishing its claims at the summary judgment and trial stages. Therefore, Lead Counsel's decision to enter into this Settlement was made with knowledge of the facts and circumstances underlying Lead Plaintiff's claims and the strengths and weaknesses of those claims. Unquestionably, therefore, the parties had "a clear view of the strengths and weaknesses of their cases." *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985). That counsel has made an informed decision on the merits of the proposed Settlement militates in favor of approving them. *See In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997).

### 4. The Risks of Establishing Liability Support Approval Of The Settlement

In analyzing the parties' risks of establishing liability, the Court does not "[need to] decide the merits of the case or resolve unsettled legal questions." *Marisol A.*, 185 F.R.D. at 164 (*citing Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)). Instead, the Court must weigh the likelihood of success by the plaintiff against the relief offered by the settlement. *Id.*

As described in detail in the Abbey Dec., at ¶¶145-147, proving Defendants' liability was far from assured. While the Class was prepared to go to trial against all of the Defendants, and Lead Counsel were confident in the merits of their case, they recognize that a trial is a risky proposition and that the Class may not have prevailed on all or any of its claims. Each of the Defendants was ready to defend its conduct at trial, presenting several defenses. For example, the Defendants would continue to argue that they lacked *scienter*, they did not commit fraud, that IMAX's restatement was a result of accounting mistakes, and that their conduct did not cause the value of IMAX stock to decrease. Moreover, IMAX and the Individual Defendants would argue

that they relied in good faith on the Company's auditor PwC-Canada. The risks involved in succeeding at trial against PwC-Canada were also significant. PwC would continue to argue that it could not be liable under Section 10(b) for misstatements made by others; plaintiffs could not prove that PwC-Canada's Audit Opinions were false when issued; plaintiffs could not prove that PwC's actions were reckless. While Lead Plaintiff believes it had a strong case, Lead Plaintiff also believes that the Defendants' defenses would have created uncertainty as to its ability to win at trial or after appeals.

### 5. The Risks of Establishing Damages Support Approval Of The Settlement

While Lead Plaintiff believes that it could prove substantial damages at trial, it remains cognizant of the fact that "[a] jury could be swayed by experts for the Defendants, who [c]ould minimize the amount of Plaintiffs' losses." *Maley*, 186 F. Supp. 2d at 365. *See also Strougo v. Bassini*, 258 F. Supp. 2d 254, 259 (S.D.N.Y. 2003); *In re Lloyd's Am. Trust Fund Litig.*, No. 96 Civ. 1262 (RWS), 2002 U.S. Dist. LEXIS 22663, at *61-62 (S.D.N.Y. Nov. 26, 2002), *aff'd by Adams v. Rose*, No. 03-7011, 2003 WL 21982207 (2d Cir. Aug. 20, 2003).

Lead Plaintiff recognized that it faced serious risks in proving damages Abbey Decl. ¶81. Throughout the Litigation, the Defendants argued that plaintiffs would be unable to establish loss causation because IMAX's August 9, 2006 stock price decline was not caused by the Company's press release announcement that it was responding to an informal SEC inquiry regarding revenue recognized for theater systems in the fourth quarter of 2005. *Id.* Instead, in the same August release, IMAX had announced that it failed to find a buyer or strategic partner --- news that was more likely to have caused the stock price to drop. Moreover, the Defendants argued that that

August disclosure simply reaffirmed that IMAX believed that its accounting was in accordance with GAAP and appropriate. *Id.* Another risk was the fact that after IMAX announced the Restatement, its stock price actually increased. *Id.* The Defendants were prepared to offer expert testimony to a jury showing that the changes in revenue recognition as a result of the Restatement could not have caused the drop in stock price. Specifically, they would have argued that the movement of a theater installation from one period to another did not affect the Company's cash flows. *Id.*

Lead Plaintiff and their economic consultants believe that the damages arising from the alleged malfeasance in the Litigation, depending on the methodology used, are as high as $91 million. Abbey Decl. ¶127. This estimate results from the use of a damage model under which it was presumed that the proper measure of recoverable damages included the majority of IMAX's stock price drop that occurred when the Company disclosed information that corrected alleged prior false and misleading statements. *Id.* This figure also assumes that the Court and a jury would make every factual finding in the Class's favor. *Id.* Defendants have generated damage models based upon recent Supreme Court decisions which show damages as low as approximately $5 million. *Id.*

All of these disputes would be subject to expert testimony, *Daubert* challenges, summary judgment and trial, and, therefore, it is impossible to predict with certainty which arguments would find favor with the Court and the jury. As a result, in a trial or through a summary judgment motion, the Class could recover substantially less than the amount of the Settlement or nothing.

Consequently, while Lead Plaintiff believes that its claims are meritorious, the fairness and reasonableness of the proposed Settlement in light of the risks, burdens and uncertainties of continued litigation are manifest.

### 6. **The Risks of Maintaining the Class Action Through Trial Support Approval Of The Settlement**

The risks of maintaining the Litigation as a class action through trial also support approval of the Settlement. In connection with the parties' efforts to obtain Court approval of the Settlement (and the Releases contemplated thereby), the Defendants have stipulated to class certification for settlement purposes only. However, in the absence of the proposed Settlement, Lead Plaintiff could have expected a very different result if this case had proceeded beyond the motions to dismiss. *See* Abbey Decl., at ¶124. Lead Plaintiff faced the possibility that this case would be found to be unsuitable to proceed on a class basis. Defendants could have argued, for example, that the case should not be certified as a class action because Lead Plaintiff could not establish loss causation. Accordingly, there could have been no assurance that, in absence of this Settlement, the Litigation could have been maintained as a class action through trial. The Settlement avoids any uncertainty with respect to these issues.

### 7. **The Ability Of The Defendants To Withstand A Greater Judgment**

Lead Plaintiff recognizes that it is likely that the Defendants could have withstood a judgment greater than $12 million. Abbey Decl., ¶125. However, Courts in this Circuit have held that "where, as here, the other *Grinnell* factors weigh in favor of approval, this factor alone does not suggest the settlement is unfair." *In re Giant Interactive Grp.*, 279 F.R.D. at 162 (*citing In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008

U.S. Dist. LEXIS 36093, at *23-24 (S.D.N.Y. May 1, 2008); *In re Global Crossing*, 225 F.R.D. at 460 (defendant's ability to pay is much less important than other factors, especially where "the other *Grinnell* factors weigh heavily in favor of settlement approval."); *In re Telik*, 576 F. Supp. 2d at 580 ("[T]his factor alone does not prevent the Court from approving the Settlement where the other *Grinnell* factors are satisfied."). Under these circumstances, the Defendants' ability to pay should not be a factor in the Settlement, and does not weigh either for or against approval. *In re Telik*, 576 F. Supp. 2d at 580.

**8. The Range of Reasonableness Of The Settlement Fund In Light Of The Best Possible Recovery And All The Attendant Risks of Litigation Support Approval Of The Settlement**

Courts agree that the determination of a "reasonable" settlement "is not susceptible of a mathematical equation yielding a particularized sum." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ 8144 (CM), 2009 U.S. Dist. LEXIS 120953, at *23-24 (S.D.N.Y. Dec. 23, 2009) (citing cases). Rather, "in any case there is a range of reasonableness with respect to a settlement." *Id.* at *24 (*citing Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). As the Second Circuit stated, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. The Second Circuit further explained that, "[i]n fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2.

Lead Plaintiff submits that the Settlement is well within the range of reasonableness in light of the best possible recovery and all the attendant risks of litigation. Abbey Decl. at ¶¶18-

129. Here, an immediate recovery totaling $12,000,000, when balanced against the risks of further litigation, is by any measure an excellent result. Accordingly, the eighth and ninth *Grinnell* factors support approval of the Settlement.[2]

**C. The Proposed Settlement is Procedurally Fair**

"In addition to ensuring the substantive fairness of the settlement through full consideration of the *Grinnell* factors, the Court must also 'ensure that the settlement is not the product of collusion.'" *In re Global Crossing*, 225 F.R.D. at 461 (*quoting In re NASDAQ Market- Makers Antitrust Litig.*, 187 F.R.D. 465, 474 (S.D.N.Y. 1998)). However, "[a]s long as the integrity of the negotiating process is ensured by the Court, it is assumed that the forces of self-interest and vigorous advocacy will of their own accord produce the best possible result for all sides." *Banyai v. Mazur*, No. 00 Civ. 9806 (SHS), 2007 U.S. Dist. LEXIS 22342, at *38 (S.D.N.Y. Mar. 27, 2007) (approving settlement reached after months of good faith, arms-length negotiations) (*quoting In re PaineWebber*, 171 F.R.D. at 132).

As set forth in the accompanying Abbey Declaration, Lead Counsel entered into this Settlement after extensive arm's-length negotiations. Abbey Decl., ¶92. Where, as here, the "settlement is the result of arm's length negotiations conducted by experienced counsel after adequate discovery … then it is entitled to '[a] strong initial presumption of fairness.'" *In re Global Crossing*, 225 F.R.D. at 461 (citation omitted); *see White,* 2007 U.S. Dist. LEXIS 18401,

---

2 The recommendations of Lead Plaintiff, a sophisticated institutional investor, also strongly support a finding that the Settlement is fair. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 U.S. Dist. LEXIS 85629, at *17-18 (S.D.N.Y. Nov. 7, 2007) (Settlements that are reached "under the supervision and with the endorsement of a sophisticated institutional investor" are "entitled to an even greater presumption of reasonableness."); *see also In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *12-13.

at *6. There is no reason to doubt that the Settlement is procedurally fair.

## III. CLASS CERTIFICATION FOR SETTLEMENT PURPOSES IS APPROPRIATE UNDER FEDERAL RULE OF CIVIL PROCEDURE 23

The Amended Preliminary Approval Order appropriately certified the Class pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. Amended Preliminary Approval Order, at ¶1. In the Amended Preliminary Approval Order, the Court recognized, for purposes of Settlement, that the requirements for Rule 23 have been satisfied, including that: (a) the number of Settlement Class Members is so numerous that joinder of all members thereof is impractical; (b) there are questions of law and fact common to the Settlement Class; (c) the claims of the proposed Lead Plaintiff are typical of the claims of the Settlement Class it seeks to represent; (d) the proposed Lead Plaintiff will fairly and adequately represent the interests of the Settlement Class; (e) Lead Counsel have fairly and adequately represented the interests of the Settlement Class; (f) questions of law and fact common to Settlement Class Members predominate over any questions affecting only individual Settlement Class Members; and (g) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Id.*

The Second Circuit "has long acknowledged the propriety of certifying a class solely for purposes of a class action settlement." *In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *35 (*citing Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982)). The Supreme Court has confirmed the viability of such certifications. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-22 (1997); *see also, e.g., Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 60-61 (S.D.N.Y. 2003) (certifying class for settlement purposes); *Duncan v. Unity Life & Accident Ins. Ass'n*, No. 00 Civ. 7261 (RLC), 2003 U.S. Dist. LEXIS 6559, at *10-11 (S.D.N.Y. Apr. 18, 2003) (same).

In analyzing the class certification requirements, the Second Circuit "has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation and has explicitly noted its preference for class certification in securities cases." *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 U.S. Dist. LEXIS 15702, at *5 (S.D.N.Y. Sept. 8, 2003) (citations omitted). In *In re Initial Public Offering Securities Litigation*, 471 F.3d 24, 35 (2d Cir. 2006) the Second Circuit held that a district court must continue to refrain from making "a merits inquiry unrelated to a specific Rule 23 . . . requirement" in evaluating whether to certify a class. *Id.*; *see Hnot v. Willis Grp. Holdings, Ltd.*, 241 F.R.D. 204, 208 (S.D.N.Y. 2007). Whether certified for settlement or litigation purposes, a class must meet each of the four requirements of Rule 23(a) and at least one of the three requirements of Rule 23(b). *See In re Marsh & McLennan*, 2009 U.S. Dist. LEXIS 120953, at *27-28. At the same time, however, a district court "[c]onfronted with a request for settlement-only class certification, ... need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (internal citation omitted). Class certification is appropriate here for settlement purposes because the Litigation meets the requirements of both Rule 23(a) and Rule 23(b).

### A. The Requirements under Rule 23(a)

#### 1. Numerosity

Certification under Rule 23(a)(1) is appropriate where a class has so many members that joinder of all members would be "impracticable." *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Impracticable does not mean impossible, but simply difficult or inconvenient. *Global Crossing*, 225 F.R.D. at 451; *see also In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D.

493, 508-09 (S.D.N.Y. 1996). "Precise quantification of the class members is not necessary because the court may make common sense assumptions to support a finding of numerosity." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999). "Numerosity is generally presumed when a class consists of forty or more members." *In re Marsh & McLennan,* 2009 U.S. Dist. LEXIS 120953, at *28 (*citing Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Moreover, "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (*quoting Teachers' Ret. Sys. of Louisiana. v. ACLN Ltd.*, No. 01 Civ. 11814 (LAP), 2004 U.S. Dist. LEXIS 25927, at *10 (S.D.N.Y. Dec. 27, 2004)).

This Court has already recognized that the requirements of numerosity have been satisfied in this action. *See In re IMAX Sec. Litig.*, 272 F.R.D. 138, 146 (S.D.N.Y. 2010). Throughout the Class Period, IMAX's common stock was actively traded on the NASDAQ in a well-developed and efficient market. There are over 40 million shares of IMAX common stock issued and outstanding and, during the Class Period, there were hundreds of millions of shares of IMAX common stock traded. Approximately 84 percent of those shares were traded on the NASDAQ. Accordingly, Rule 23(a)(1)'s numerosity requirement is satisfied.

**2. Commonality**

Rule 23(a)(2)'s requirement of common factual or legal questions is not demanding and does not require an identity of claims or facts among class members; instead, "[t]he commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Marisol*

*A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). Commonality does not demand that every question of law or fact be common to every class member, but instead merely requires that the claims arise from a common nucleus of operative facts. *In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483 (RRC), 2007 U.S. Dist. LEXIS 31963, at *11 (S.D.N.Y. Apr. 30, 2007) (internal quotations and citations omitted); *Vivendi*, 242 F.R.D. at 84 (stating that commonality requirement is applied "permissively" in securities litigation). "This requirement is satisfied as long as the class shares at least one common question of law or fact." *Fox v. Cheminova, Inc.*, 213 F.R.D. 113, 126 (E.D.N.Y. 2003) (citation omitted). Commonality exists when proposed class members challenge the same conduct of the defendants. *Id.* (*citing Marisol A.*, 126 F.3d at 377).

Here, this Court has already determined that the requirements of commonality have been satisfied. *IMAX*, 272 F.R.D. at 147. Among these questions are: (a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether the SEC filings, press releases, reports and other public statements made by Defendants and disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information; (c) whether and to what extent the Company's financial statements failed to comply with generally accepted accounting principles during the Class Period; (d) whether PwC's audits of the Company's financial statements during the Class Period were conducted in accordance with generally accepted auditing standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB"); (e) whether the market price of the Company's common stock during the Class Period was artificially inflated due to the materially misleading statements issued by Defendants; (f) whether Defendants acted with scienter in failing

to inform investors of material facts and in issuing false and misleading financial statements; (g) whether reliance may be presumed pursuant to the fraud-on-the-market theory; and (h) whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, what is the proper measure of damages.

Accordingly, there are common questions of law and fact sufficient to satisfy Rule 23(a)(2).

**3. Typicality**

Typicality "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Marisol A.*, 126 F.3d at 376 (*quoting In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)). "Typicality is satisfied if the claims of the class representatives arise from the same set of events or conduct and if the claims are based upon the same legal theory as those of the other members of the class." *Cheminova*, 213 F.R.D at 126 (*citing In re Drexel Burnham*, 960 F.2d at 291); *see also Cross v. 21st Century Holding Co.*, No. 00 Cir. 4333 (MBM), 2004 U.S. Dist. LEXIS 2283, at *4-5 (S.D.N.Y. Feb. 11, 2004). Typicality does not require that the class representative have identical claims to all other class members. *Cheminova*, 213 F.R.D at 127. "[D]ifferences in damages are not a bar to typicality." *Id.* "Factual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan,* 2009 U.S. Dist. LEXIS 120953, at *32 (citations omitted).

Here, Lead Plaintiff's claims in this matter are typical of those of other Class members. All Class members faced the same alleged injury flowing from the Defendants' alleged misconduct of disseminating allegedly false and misleading information during the Class Period. Lead Plaintiff stands in the same position as do other investors who acquired IMAX common shares during the Class period. The market prices of IMAX stock reflected uniform, public statements, made in press releases and SEC filings that Lead Plaintiff has alleged contained material misrepresentations concerning IMAX's revenue recognition practices. Lead Plaintiff's claims and the claims of the Class members arise out of the same conduct by Defendants, are based on the same legal theories and focus on precisely the same misstatements and omissions from the same documents. *In re Scor Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 570-71 (S.D.N.Y. 2008) (plaintiffs' securities fraud claims were typical where all claims arose from "the same course of events, namely, the alleged series of misleading or fraudulent statements made by the Defendants, and the subsequent effect of those statements on the market for" the company's stock, and all potential class members' claims were based on the same legal theories under Sections 10(b) of the Exchange Act). As a result, it is respectfully submitted that Lead Plaintiff meets the typicality requirement.

**4. Adequacy of Representation**

Courts consider two factors in measuring adequacy of representation under Rule 23(a)(4): (1) whether the claims of the lead plaintiffs conflict with those of the class; and (2) whether the lead plaintiffs' counsel is qualified, experienced and generally able to conduct the litigation. *In re Marsh & McLennan,* 2009 U.S. Dist. LEXIS 120953, at *33 (*citing In re Drexel Burnham*, 960 F.2d at 291). Here, Lead Plaintiff suffered the same type of alleged damages arising out of

the Defendants' conduct. As a result, there are no conflicts of interest between the Lead Plaintiff and the other Class members. Lead Plaintiff has also retained counsel with significant securities class action litigation experience. Counsel for Lead Plaintiff have vigorously pursued this action to a favorable resolution. Accordingly, the Class has been adequately represented.

### B. The Requirements of Rule 23(b) Are Satisfied

Lastly, under Rule 23(b)(3), questions of law and fact common to the class must predominate over individual questions and a class action must be superior to other available methods for the fair and efficient adjudication of this matter. For the purposes of effectuating the Settlement, the Class meets both requirements.

#### 1. Common Questions of Law and Fact Predominate

"Class-wide issues predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). "Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the class, common questions are held to predominate over individual questions." *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 206 (S.D.N.Y. 1995) (internal quotation omitted). Accordingly, as the Supreme Court has noted, "Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625.

As set forth above, with the exception of the total amount of each Class member's damages, common questions of law and fact predominate in this litigation. That is, there is no

difference between the questions of law and fact specific to each Class member and the Class as a whole.

### 2. A Class Action is the Superior Method of Adjudication

"The superiority prong of Fed. R. Civ. P. 23(b)(3) requires that a class action be the most favored form of litigation, according to the facts." *Cheminova*, 213 F.R.D. at 130. Class actions are a particularly appropriate and desirable means to resolve claims based on securities laws. *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985), *cert. denied*, 474 U.S. 946 (1985). Superiority is readily found where, as here, "the alternatives [to a class action] are either no recourse for thousands of stockholders ... or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969)

Here, to require individual members of the Class to bring multiple actions against the Defendants would result in an enormous duplication of judicial effort and expense. This is especially true in this case as the number of Class members is estimated to be in the thousands. *See Cheminova*, 213 F.R.D. at 130 (stating that "the larger the class, the more judicial resources would be saved by proceeding as a class action," and finding that judicial economy was served by having the claims of about 300 lobster-men proceed as a class action). Furthermore, since the claims of the Class members are virtually identical, "the less sense it makes to litigate repetitious individual actions." *Id.* at 130 (citation omitted). In addition, if a class is not certified than the incentive for individual investors to seek redress for their injuries is practically extinguished due to the cost of prosecuting a complex securities action. Finally, even if some individual investors were to prosecute their own action, the risk of inconsistent rulings and disparate results is

substantial. Lead Plaintiff respectfully submit that because of the foregoing, questions of law and fact common to the class predominate over individual questions and a class action is superior to other available methods for a fair and efficient adjudication of this matter.

For all of the foregoing reasons, the Court should certify the Class for settlement purposes only, and appoint Lead Plaintiff and Lead Counsel to represent the Class.

## IV. THE NOTICE PROGRAM MEETS THE REQUIREMENTS OF DUE PROCESS AND RULE 23 OF THE FEDERAL RULES OF CIVIL PROCEDURE

The Court approved the notice procedures by its March 28, 2012 Amended Preliminary Approval Order. D.E. 203. Lead Plaintiff has now completed the comprehensive Notice program set forth in the Amended Stipulation and in the Amended Preliminary Approval Order.

The Notice program was tailored to reach as many Class members as possible. As described in the Mulholland Affidavit, beginning on April 23, 2012, SCS provided notice to the Class by mailing the Notice of Proposed Settlement of Class Action (the "Notice"), along with a Proof of Claim and Release Form (collectively the "Claim Package") to all individuals and organizations identified on the records of IMAX's transfer agent, Computershare. *See* Mulholland Aff. at ¶4. These records reflect persons and entities that owned or purchased common stock of IMAX for their own account or for their clients' account(s) during the Class Period. *Id.* In addition, SCS mailed a Claim Package to all brokerage companies, banks and trust companies contained in its mailing list. *Id.* This master list consists of the 1,087 largest banks and brokerage companies ("Nominee Account Holders"), and 726 mutual funds, insurance companies, pension funds, and money managers ("Institutional Groups"), which may have traded IMAX's common stock in their clients' or their own accounts during the Class Period. *Id.* As of

June 6, 2012, SCS mailed 87,934 copies of the Notice and Proof of Claim to potential Class members. Mulholland Aff. at ¶8. An additional 85,695 Notice Claim Forms were requested by the Nominee Account Holders and Institutional Groups and other individuals. *Id.*

The Notice informed Class members of the Settlement and that a hearing (the "Fairness Hearing") would be held at 10:30 A.M. on Thursday, June 14, 2012, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007-1312. Mulholland Aff., Ex. A. It stated that at the Fairness Hearing the Court would consider whether the Settlement is fair, reasonable and adequate and in the best interests of the Class. *Id.*

On April 26, 2012, Summary Notice of the Settlement was published in the national editions of *The Wall Street Journal, The New York Times, The National Post*, *The Globe and Mail*, and in French-Canadian in *La Presse* as well as electronically published in French-Canadian over Marketwire and in English over Globe Newswire. Mulholland Aff. at ¶6. A copy of the Notice (and all relevant settlement-related materials) was also posted on the Internet at www.imaxussettlement.com. *Id.* at ¶5.

Accordingly, plaintiffs submit that the Notice program fully satisfies the requirements of due process, the PSLRA and Rule 23.

## V. THE PLAN OF ALLOCATION IS REASONABLE, FAIR AND EQUITABLE

Assessment of the adequacy of a plan of allocation of settlement proceeds in a class action under Rule 23 is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair, reasonable and adequate. *In re Am. Bank Note*, 127 F. Supp. 2d at 429-30 (approving settlement plan of allocation because, among other things, "the opinion of experienced and informed counsel is entitled to considerable weight"). "'When formulated by

competent and experienced counsel,' a plan for allocation of net settlement proceeds 'need have only a reasonable, rational basis.'" *In re Telik*, 576 F. Supp. 2d at 580 (*quoting In re Global Crossing*, 225 F.R.D. at 462)). Numerous courts have affirmed that "a plan of allocation need not be perfect." *In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *32 (citing cases). "In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel." *Id.* (*citing In re PaineWebber*, 171 F.R.D. at 133) (additional citations omitted). Courts also consider the class' reaction to a plan of allocation. *Id.* at *33-34 (approving plan where no class member objected).

The proposed Plan of Allocation was developed by Lead Counsel after consultation with a damages expert. Abbey Decl. at ¶132. The proposed Plan of Allocation is fully described at the end of the Notice and will fairly allocate the proceeds of the Settlement among Class members and is based on Lead Counsel's judgment about certain liability and damage issues required to reach an equitable result. The Plan of Allocation meets the standards of rationality and reasonableness. Lead Counsel believes that the Plan of Allocation will result in a fair distribution of the available proceeds among class members who file timely, valid claims. Moreover, as noted previously, only one Class member has raised any objection to the Plan of Allocation, which is a further supporting factor for the Court's approval of the proposed Plan of Allocation.

## VI. THE REQUESTED ATTORNEYS' FEES ARE FAIR AND REASONABLE

The Notice informed Class members that Lead Counsel would apply for an award of attorneys' fees not to exceed 25% of the Settlement Fund, as well as reimbursement of expenses incurred and advanced by Lead Counsel and other litigating counsel in prosecuting this Litigation of no greater than $1.75 million (plus interest on such amounts at the same rate earned by the

Settlement Fund). The deadline for objecting to the attorneys' fee request was June 4, 2012. Lead Counsel is applying for fees in the amount of $3 million, or 25% of the Settlement Fund. This 25% fee constitutes a 43% discount to the combined lodestar of Lead Counsel and other plaintiffs' counsel. The total fee sought is less than the lodestar of Lead Counsel alone. Furthermore, because the Settlement is conditioned upon further proceedings in Canada, the lodestar of Lead Counsel will continue to increase even after the Settlement Hearing.

While in excess of 87,934 Settlement Notices have been mailed and publication occurred in the national editions of *The Wall Street Journal, The New York Times, The National Post*, *The Globe and Mail*, and in French-Canadian in *La Presse*, as well as electronically published in French-Canadian over Marketwire and in English over Globe Newswire, there has been only one objection to the fee request. The fact that only one objection has been filed provides a clear indication that the majority of Settlement Class members believe the requested fee is fair and reasonable under the circumstances. Indeed, the Settlement was achieved through the skill, creativity, perseverance and hard work of Lead Counsel.

### A. The Legal Standards Governing the Award of Attorneys' Fees

Pursuant to the "equitable" or "common fund" doctrine, established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527, 532-33 (1882), attorneys who create a common fund to be shared by a class are entitled to an award of fees and expenses from that fund as compensation for their work. *In re Telik*, 576 F. Supp. 2d at 584-85. The Supreme Court has recognized that a lawyer who recovers a common fund for the benefit of persons other than his client is entitled to a reasonable attorney's fee from the fund as a whole. *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Fees and expenses are paid from the common fund so that all

class members contribute equally toward the costs associated with litigation pursued on their behalf. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) (the common fund doctrine "prevents unjust enrichment of those benefiting from a lawsuit without contributing to its cost").

Courts traditionally have used two methods to calculate reasonable attorneys' fees in common fund cases: the "percentage method" and the "lodestar method." *Goldberger*, 209 F.3d at 47-48. The percentage method is the simpler method of the two and involves awarding counsel a percentage of the recovery as a fee. *Id.* The lodestar method requires the Court to scrutinize the fee petition to ascertain the number of hours reasonably billed, then multiply that figure by an appropriate hourly rate. *Id.* District courts may use both methods when approving attorneys' fees. *Id.* at 50. "The Second Circuit encourages using the lodestar method only as a cross-check for the percentage method." *In re Marsh & McLennan*, 2009 U.S. Dist. LEXIS 120953, at *43 (*citing Goldberger*, 209 F.3d at 50; *Strougo*, 258 F. Supp. 2d at 263).

In expressly approving the percentage method, the Second Circuit reasoned that the lodestar method is difficult to apply and wastes judicial resources. *Wal-Mart Stores,* 396 F.3d at 121. Indeed, the percentage approach "aligns the class members' and class counsel's interests and moreover 'provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *In re Global Crossing*, 225 F.R.D. at 466 (*quoting In re Lloyd's*, 2002 U.S. Dist. LEXIS 22663, at *74).

"The percentage method continues to be the trend of district courts in this Circuit and has been expressly adopted in the vast majority of circuits." *In re Marsh & McLennan*, 2009 U.S. Dist. LEXIS 120953, at *43 (*citing In re Telik*, 576 F. Supp. 2d at 586 n.6 (collecting cases)).

Moreover, the PSLRA, which applies to securities class actions such as this, states that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a *reasonable percentage* of the amount" recovered for the Class. 15 U.S.C. § 78u-4(a)(6) (emphasis added). Courts have concluded that, by drafting the PSLRA in this manner, Congress expressed a preference for the percentage method as opposed to the lodestar method for determining attorneys' fees in securities class actions. *See Maley*, 186 F. Supp. 2d at 370; *In re Am. Bank Note*, 127 F. Supp. 2d at 430.

Consistent with this trend, Lead Counsel asks the Court to award attorneys' fees based on a reasonable percentage of the fund.

### B. Application of the *Goldberger* Factors Justifies an Award of the Percentage Fee Requested

Second Circuit jurisprudence has established six factors a reviewing court should consider in evaluating what constitutes a reasonable fee:

(1) the time and labor expended by counsel;
(2) the magnitude and complexities of the litigation;
(3) the risk of the litigation;
(4) the quality of representation;
(5) the requested fee in relation to the settlement; and
(6) public policy considerations.

*Goldberger*, 209 F.3d at 50 (*quoting In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig.*, 724 F. Supp. 160, 163 (S.D.N.Y. 1989) (summarizing *Grinnell*)). The *Goldberger* factors "need not be applied in a formulaic way" because each case is different "and in certain cases, one factor may outweigh the rest." *In re Rite-Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005). "What constitutes a reasonable fee is properly committed to the sound discretion of the district

court." *Goldberger*, 209 F.3d at 47. The Court must explain its reasons for approving the attorneys' fees award, providing an adequate and sufficient basis for review.

Consideration of these six factors demonstrates that the fee requested by Lead Counsel is reasonable.

**1. The Time and Labor Expended**

Lead Counsel have devoted a significant amount of time to litigating this case. From the inception of this case, Lead Counsel and other plaintiffs' counsel has spent over 9,950 hours in prosecuting this case on behalf of the Settlement Class for an aggregate lodestar of approximately $5.2 million and have incurred $1,677,838.02 in expenses.

The effort expended by Lead Counsel was extensive and will continue. Lead Counsel's activities in connection with these proceedings demonstrate a vast and energetic commitment. As discussed herein and in the Abbey Declaration, Lead Counsel believe this commitment and these activities were responsible for the superior result achieved here for the Class.

**2. The Magnitude and Complexities of the Litigation**

A securities fraud class action's magnitude and complexity must be evaluated in comparison to similarly complex cases. *See In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005). Shareholder class actions are notoriously complex and difficult to prove. The magnitude of the litigation has been conclusively addressed in the Abbey Decl. at ¶¶109-114.

**3. The Risk of the Litigation Support the Requested Fee**

The Second Circuit "has identified the risk of success as perhaps the foremost factor to be considered in determining" reasonable attorneys' fees. *In re Global Crossing,* 225 F.R.D. at 467

(internal quotation marks and citations omitted); *In re Telik*, 576 F. Supp. 2d at 592 ("Courts have repeatedly recognized 'that the risk of the litigation' is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions."). Courts in this Circuit have long recognized that the risk associated with a case bears heavily upon the determination of an appropriate fee award. *See In re Am. Bank Note*, 127 F. Supp. 2d at 432-33 ("[It is] appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award."). The real and many risks this litigation presented is explained in detail in the Abbey Decl. at ¶¶119-124.

**4. The Quality of Representation**

The fourth *Goldberger* factor is the "quality of representation" delivered in the litigation. *Goldberger*, 209 F.3d at 50. To evaluate the "quality of representation," courts in the Second Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 141 (S.D.N.Y. 2008).

Lead Counsel have a long history of being actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. Such experience in the field allowed Lead Counsel to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them. As one Court in this district has recognized, Lead Counsel are "well known and experienced in class action litigation...[and] the quality of their work is, of course, best shown in the results they have achieved here: an all cash settlement of just under $455 million." *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MDL 1529 (LMM), 2006 U.S. Dist. LEXIS 84621, at *14-15 (S.D.N.Y. Nov. 16, 2006).

The quality and vigor of opposing counsel is also significant in considering the quality of services rendered by plaintiffs' counsel, as measured by the result achieved. *Maley*, 186 F. Supp. 2d at 373. Defendants here were represented by very skilled and highly respected counsel with well-deserved reputations for vigorous advocacy in the defense of complex civil cases such as this. Consequently, Defendants, through their counsel, zealously fought Lead Plaintiff's claims at every turn. Defendants' counsel filed motions to dismiss the Complaint, filed opposition briefing to Lead Plaintiff's motion for class certification and were fully prepared to litigate this case through trial and appeals.

The quality of Lead Counsel's representation of Lead Plaintiff and the Class, as measured by the results achieved, counsel's standing and prior experience, and the quality of the opposition, all strongly support the reasonableness of the fee request.

**5. The Requested Fee in Relation to the Settlement**

The fee requested in this case, 25% of the proposed Settlement, or a 43% discount to Lead Counsel's lodestar, is reasonable and falls in line with fees awarded in comparable actions in this Circuit. *See, e.g., Maley*, 186 F. Supp. 2d at 370 ("Courts in this Circuit have awarded fees ranging from 15% to 50% of the settlement fund."; awarding 33 1/3% fee on fund valued at $11.5 million in securities class actions); *In re Monster Worldwide*, 2008 U.S. Dist. LEXIS 122149 (approving fee award of $25% of $11,875,000 settlement fund); *In re Telik,* 576 F. Supp. 2d at 587 (approving fee award of 25% of $5 million settlement fund); *Reynolds,* 2008 U.S. Dist. LEXIS 106541, at *3 (awarding 25% of $8 million settlement fund and noting that "courts throughout [the Second] Circuit regularly award fees of 25% to 30% or more of the total recovery under the percentage-of-the-fund method.").

### 6. Public Policy Considerations Support the Requested Fee

Public policy is the sixth factor a court considers in determining the reasonableness of a fee request. *See Goldberger*, 209 F.3d at 50. Courts in the Second Circuit have held that "[p]ublic policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *In re Merrill Lynch*, 249 F.R.D. at 141-42 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.") (citation omitted). *See also Hicks*, 2005 U.S. Dist. LEXIS 24890, at *27 ("To make certain that the public is represented by talented and experienced trial counsel, the remuneration should be both fair and rewarding").

Lead Counsel's willingness to assume these risks resulted in a substantial benefit to the Class. If this important public policy is to be carried out, the Court should award fees that adequately compensate Lead Counsel, taking into account the enormous risks undertaken by each firm, with a clear view of the economics of the situation. Public policy considerations favor the granting of the fee application.

## B. A Lodestar Cross-Check Confirms the Reasonableness of the Requested Attorneys' Fee

In *Goldberger*, the Second Circuit held that even in cases in which the percentage method is chosen, "documentation of hours" remains "a [useful] 'cross-check' on the reasonableness of the requested percentage." 209 F.3d at 50. "[W]here used as a mere cross-check, [however], the hours documented by counsel need not be exhaustively scrutinized by the district court....Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the

case...." *Id.* (citation omitted). As detailed by the Abbey Decl. (¶141), Lead Counsel's fee for work performed in this case, charged at current hourly rates[10], results in a lodestar of $5,247,083.75. The requested fee therefore is a discount to the lodestar of Lead Counsel alone. When combined with the lodestar reported by other firms that participated in litigating the claims asserted, the fee requested represented a 43% discount to lodestar. A multiplier usually "represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Global Crossing*, 225 F.R.D. at 468. Here, counsel seeks none.

## VII. LEAD COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFITS OBTAINED FOR THE CLASS

"It is well accepted that counsel who create a common fund are entitled to the reimbursement of expenses that they advanced to a class." *In re Flag Telecom Holdings Ltd. Sec. Litig.*, Master File No. 02-CV-3400 (CM)(PED), 2010 U.S. Dist. LEXIS 119702, at *86 (S.D.N.Y. Nov. 5, 2010). "'Courts in the Second Circuit normally grant expense requests in common fund cases as a matter of course.'" *In re EVCI*, 2007 U.S. Dist LEXIS 57918, at *57 (*quoting In re McDonnell Douglas Equip. Leasing Fee Litig.*, 842 F. Supp. 733, 746 (S.D.N.Y. 1994)).

10 "[T]he Supreme Court and other courts have held that the use of current rates is proper since such rates more adequately compensate for inflation and loss of use of funds." *In re EVCI*, 2007 U.S. Dist. LEXIS 57918, at *54-55 n.6 (*citing Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services were provided within two to three years of fee application)).

The Notice informed Class members that Lead Counsel would seek reimbursement of no greater than $1.75 million, plus interest, for their expenses incurred in the prosecution of the Litigation. Only one objection to that request has been raised. The litigation expenses incurred here were well within the norm for a large and complex securities litigation and reflect the costs necessary to research the complex issues presented and to retain experts crucial to Lead Plaintiff's ability to plead and prove the claims asserted. These costs do not include the expenses of the Claims Administrator associated with providing Court ordered notice to the Class and administering claims.

Lead Counsel have carefully reviewed these expenses and determined that the requested expenses were necessary litigation expenses, reasonably incurred, reasonably related to the interests of the members of the Class, and adequately documented. Lead Counsel will also continue to incur expenses in connection with the administration of the Settlement and participation in the Canadian Action. Lead Counsel will not be compensated for these future expense, rendering the present request even more reasonable. Lead Counsel's application for reimbursement of expenses of $1,677,838.02 should be granted.

## CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court approve the Settlement and Plan of Allocation, to certify the Class for settlement purposes, and to award the requested fees and expenses.

Dated: June 7, 2012

Respectfully submitted,

ABBEY SPANIER RODD & ABRAMS, LLP

By: /s Arthur N. Abbey
Arthur N. Abbey
Karin E. Fisch
Richard B. Margolies
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191

*Lead Counsel*