UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

**DECLARATION OF ARTHUR N. ABBEY IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF THE SETTLEMENT WITH DEFENDANTS, PROPOSED PLAN OF ALLOCATION, FINAL CERTIFICATION AND AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

## I.    INTRODUCTION

1.     I, Arthur N. Abbey, of the law firm of Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier" or "Lead Counsel"), am actively involved in the prosecution of the above-captioned class action (hereinafter, the "Litigation"), and familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my active supervision of and participation in all material aspects of the Litigation.  I submit this declaration in support of: (a) final approval of the cash settlement reached between and among Court-appointed Lead Plaintiff The Merger Fund ("TMF" or "Lead Plaintiff"), and defendants IMAX Corporation ("IMAX" or the "Company"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble (the "Individual Defendants") and PricewaterhouseCoopers LLP, an Ontario Limited Liability Partnership ("PwC-Canada") (collectively the "Defendants") for $12,000,000 (the "Settlement"); (b) approval of Lead Plaintiff's proposed plan of allocation of the Settlement proceeds ("Plan of Allocation"); (c) final certification of the Class[1]; and  (d) approval of Lead Plaintiff's application for awards of attorneys' fees and reimbursement of expenses.

---

[1]    The Class consists of "all persons and entities who purchased or otherwise acquired IMAX shares on the NASDAQ from February 27, 2003 through July 20, 2007 (the "Class Period"), inclusive, excluding the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either current officers and/or directors

2.     This Court, having overseen the Litigation for more than five years, is familiar with the underlying claims and defenses and the complex factual and legal issues presented. Accordingly, this declaration does not seek to detail each and every event that occurred during the Litigation. Rather, it provides highlights of the events leading to the Settlement and the bases upon which Lead Plaintiff and Lead Counsel recommend its approval.

3.     Lead Plaintiff and Lead Counsel believe that the Settlement represents a fair, reasonable, and adequate compromise of the pending claims against the Defendants considering both the conventional risks of establishing liability and damages, and the special risks associated with the difficult accounting issues out of which this litigation arose.

4.     The reaction of the Class to the Settlement has been overwhelmingly positive, providing evidence of its fairness.  As discussed in more detail below, the Court-appointed claims administrator, Strategic Claims Services, ("SCS") has sent the Notice of Proposed Settlement of Class Action (the "Notice"), along with a Proof of Claim and Release form (collectively the "Claim Package") to 87,934 potential Class members. 85,695 Claim Packages were also requested by and sent to Nominee Account Holders and Institutional Groups and other individuals. To date, there has been only one objection to the Settlement and only four individuals have chosen to opt out of the Settlement.

5.     Lead Counsel and other counsel have prosecuted the Litigation on a wholly contingent basis and have advanced or incurred all litigation expenses.  Counsel have not received any compensation for their efforts in connection with the Settlement and have expended over 9,950 hours of time and incurred approximately $5,247,083.75 in lodestar; nor have they been reimbursed for their current expenses of $1,677,838.02.

---

of any Defendant, or who served as officers and directors of any Defendant at any time during the Class Period."

2

6.     The fee application for 25% (or $3,000,000) of the $12,000,000 in Settlement consideration recovered is fair both to the Class and Lead Counsel and also warrants the Court's approval. The percentage fee request is within the range of percentages frequently awarded in these types of actions, and is entirely justified in light of the benefits conferred on the Class, the risks undertaken, the quality of representation, the nature and extent of legal services performed and the lodestar incurred. Plaintiffs' counsel seek no multiplier, but rather a significant discount, to their combined lodestar – a request that is on the conservative end of the fee award spectrum, far from a windfall and is fair.

7.     Lead Counsel also seeks approval of the reimbursement of expenses of $1,677,838.02. These expenses have been reasonably and necessarily incurred in prosecuting this complex securities action over the course of more than five years.

## II.     THE LITIGATION

### A.     Background, Appointment Of Westchester And Lead Counsel, And IMAX's Restatement

8.     Defendant IMAX, together with its wholly-owned subsidiaries, is one of the world's leading entertainment and technology companies which specializes in large-format and three-dimensional ("3D") motion-picture systems. It is also engaged in the production, digital re-mastering and distribution of IMAX films, the operation of IMAX theaters and the provision of support for IMAX theaters and the IMAX theater network.

9.     On August 9, 2006, IMAX announced that it was in the process of responding to an informal inquiry from the Securities and Exchange Commission ("SEC") concerning the timing of revenue recognition, and specifically, its application of multiple element arrangement accounting to revenue derived from theater system sales and leases. This disclosure severely

impacted the value of IMAX's stock which dropped by approximately 40% following the announcement.

10.    Following the announcement of the SEC's investigation, from August 11, 2006 through September 18, 2006, eight lawsuits were filed (the "Actions")[2] against all or certain of the Defendants in the United States District Court for the Southern District of New York alleging that IMAX made material misrepresentations and omissions regarding revenue recognition for theater systems in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 77t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

11.    This Litigation was not the only class action triggered by the disclosure of IMAX's revenue recognition issues. On September 20, 2006, following the filings of the Actions, another class action lawsuit captioned *Silver v. IMAX Corp.*, Court File No. CV-06-3257-00, was filed in the Ontario Superior Court of Justice, Canada (the "Canadian Action") against the IMAX Defendants (and other individuals) alleging, based on substantially identical facts to those alleged in the Actions, that, during the time period from February 17, 2006 through August 9, 2006 (the "Canadian Class Period"), IMAX made material misrepresentations and omissions regarding revenue recognition for theater systems.

12.    Pursuant to a January 17, 2007 Order of the Court, the Actions were consolidated, the Court appointed Westchester Capital Management, Inc. ("Westchester") (the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund

---

[2]    The docket numbers of the Actions are as follows:   06 Civ. 6128 (NRB), 06 Civ. 6235 (NRB), 06 Civ. 6313 (NRB), 06 Civ. 6349 (NRB), 06 Civ. 6449 (NRB), 06 Civ. 6693 (NRB), 06 Civ. 7057 (NRB) and 06 Civ. 7162 (NRB).

VL and SphinX Merger Arbitrage Fund) as lead plaintiff and further approved the appointment of the law firm of Abbey Spanier Rodd & Abrams, LLP as lead counsel for the class.

13.   In response to investigations by the SEC and Ontario Securities Commission ('OSC") into IMAX's revenue recognition for its theater systems, on July 20, 2007, the Company filed its Form 10-K for the fiscal year ending December 31, 2006, which included a restatement of its financial results for fiscal years 2002 through the first three quarters of 2006 (the "Restatement").  Acknowledging that "errors had occurred in its prior accounting for theatre systems," IMAX "revised its policy with regard to revenue recognition for theatre systems" and "restated its financial results in accordance with the revised policy."  The restatement of IMAX's theater systems revenue had the effect of shifting revenue from the period in which it had been originally reported to subsequent periods. In total, 16 installation transactions representing $25.4 million in revenue shifted between quarters in their originally reported years, and 14 installation transactions representing $27.1 million in revenue shifted between fiscal years.

**B.      Consolidated Amended Class Action Complaint And Defendants' Motions to Dismiss**

14.   After Westchester was appointed lead plaintiff, Lead Counsel pursued an extensive investigation to prepare the Consolidated Amended Class Action Complaint (the "Complaint"). Lead Counsel utilized investigators to locate and interview former IMAX and PwC-Canada employees who might reasonably be expected to have relevant knowledge concerning matters at issue in the case.  The investigation also included analysis and review of, among other things, information obtained from numerous public sources including, SEC filings by IMAX, securities analysts reports about the Company, Company press releases, periodic Earnings Conference Calls held by the Company, media reports about the Company and documents from the Canadian

Action. Lead Counsel's investigation also entailed extensive consultation with experts regarding the accounting issues relevant to the Restatement.

15.    On October 2, 2007, Westchester filed the Complaint asserting claims on behalf of all persons who purchased IMAX securities on the NASDAQ from February 27, 2003 through July 20, 2007. The Complaint alleged that Defendants violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 by issuing materially false and misleading statements concerning IMAX's accounting for theater system revenue.   Specifically, the Complaint focused on the Restatement and alleged that throughout the Class Period, the Company prematurely and wrongly accelerated its revenue recognition on theater system sales by circumventing accounting principles and its own stated revenue recognition policy, thereby materially overstating the Company's publicly reported quarterly and annual earnings and revenue.   The Complaint also alleged that PwC-Canada violated accounting principles and generally accepted auditing standards by issuing several unqualified opinions with respect to IMAX's Class Period year-end financial statements.

16.    On December 10, 2007, the IMAX Defendants and PwC-Canada each filed motions to dismiss the Complaint on numerous grounds.   The IMAX Defendants argued, among other things, that the Complaint should be dismissed because: (a) it failed adequately to allege *scienter*, (b) the IMAX Defendants did not commit fraud; (c) IMAX's restatement was a result of accounting mistakes; (d) the Individual Defendants had no motive to commit fraud; and (e) plaintiffs failed to adequately allege loss causation (emphasizing that IMAX's stock price decline was the result of other factors, including the inability of IMAX to find a buyer after a lengthy search, the announcement of a new business model involving joint ventures, considerable uncertainty surrounding the company, and the SEC's investigation).   Defendant PwC-Canada

argued, among other things, that the Complaint should be dismissed because: (a) it could not be liable under Section 10(b) for misstatements made by others; (b) plaintiffs had failed to plead that PwC-Canada's Audit Opinions were false when issued; (c) plaintiffs' allegations failed to satisfy the Second Circuit's stringent "recklessness" standard applicable to auditors; and (d) plaintiffs failed to adequately plead loss causation.

17.   On January 22, 2008, Westchester filed its opposition to Defendants' motions to dismiss. Defendants filed their reply briefing on February 11, 2008.

18.   On August 5, 2008, the Court heard oral argument on the Defendants' motions to dismiss the Complaint.

19.   On August 12, 2008, the Court requested that the parties file supplemental submissions on the pending motions to dismiss the Complaint. The Court's August 12, 2008 letter requested that all parties "list each allegedly misrepresentative statement and the corresponding allegation and record evidence indicating the falsity of that statement." The Court also requested that IMAX "provide record support for counsel's representation at oral argument that the purpose of restating revenue for fiscal years 2002-2004 was not to correct a previous misstatement or accounting error, and moreover, the complaint does not allege the falsity of any statements made during that time period." The Defendants and Westchester submitted supplemental briefing on August 18, 2008. After full briefing on the motion, and after receiving the parties' supplemental submissions, on September 15, 2008, the Court denied Defendants' motions to dismiss. *See In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471 (S.D.N.Y. 2008).

### C.   Discovery, Westchester's Motion For Class Certification, Mediation And The Second Circuit Decides *Huff*

20.   Shortly after the Court's September 15, 2008 Order, the parties agreed that merits discovery should proceed in tandem with class certification proceedings.

21.   On October 6, 2008, the IMAX Defendants and PwC-Canada each respectively filed their Answer to the Complaint.

22.   On October 23, 2008, the parties entered into a Stipulation and Order governing the exchange of confidential material, which was so ordered by the Court on November 3, 2008.

23.   On October 31, 2008, Westchester filed plaintiffs' first motion for class certification, which was accompanied by the Declaration of Michael A. Marek.  The Marek Declaration discussed the efficiency of the market for IMAX common stock during the Class Period.  The motion requested the Court appoint Westchester and The Steelworkers Pension Trust ("Steelworkers") as class representatives for the Class.

24.   On November 10, 2008, counsel for the IMAX Defendants served Defendants' First Request for Production of Documents.

25.   On November 11, 2008, Lead Counsel served Plaintiffs' First Request for the Production of Documents to IMAX and the Individual Defendants and Plaintiffs' First Request for the Production of Documents to Defendant PwC-Canada.

26.   On November 19, 2008, Judge Buchwald entered the parties proposed scheduling order and a discovery schedule with regard to Westchester's Motion for Class Certification.

27.   On December 1, 2008, pursuant to Rule 26(a)(1), the parties exchanged Initial Disclosures.

28.   Although discovery had only recently been commenced, in an effort to explore whether the Litigation could be resolved at an early stage, on December 2, 2008, Lead Counsel, on behalf of Westchester, and counsel for the Defendants participated in a mediation session with the Honorable E. Leo Milonas.  Prior to the mediation, the parties exchanged confidential mediation statements.  As a result of their very different views of the strengths and weaknesses

of the case, the parties were unable to make any settlement progress and Westchester continued to aggressively prepare its case.

29.   On December 10, 2008, Westchester and Steelworkers served their written responses and objections to Defendants' document requests and produced documents on a rolling basis thereafter.

30.   On December 4, 2008, Plaintiffs' counsel issued third-party subpoenas to Allen & Company LLC, UBS Investment Bank and StoneTurn Group, LLP.

31.   Starting in January 2009, the parties commenced class certification related discovery. The Defendants took the depositions of: (i) Roy Behren, the 30(b)(6) corporate designee of Westchester on January 21, 2009; (ii) Michael Marek (who was retained by Westchester to opine on the efficiency of the market for IMAX common stock during the Class Period) on January 23, 2008; and (iii) Eric J. Green, CFA of Penn Capital Management (Steelworkers invested through Penn Capital which had complete discretion over its individual investments) on February 12, 2009.

32.   IMAX and the Individual Defendants began producing documents to Westchester on January 14, 2009.   At that time, Defendants produced approximately 150,000 pages of documents.   Lead Counsel immediately began to undertake an exhaustive analysis of the documents produced by Defendants which included among other things, discussions regarding accounting rules and IMAX's revenue recognition practices and policies, questions and comments from the SEC and OSC relating to IMAX's periodic filings and revenue recognition practices, correspondence between the SEC, OSC and IMAX, internal IMAX memos (including investigations of allegations of improper revenue recognition), draft press releases and SEC filings, letters and memos between PwC-Canada and IMAX, handwritten notes, analyst reports,

earnings call transcripts, IMAX audit committee presentation material, e-mails relating to IMAX theater installations, revenue recognition summaries for IMAX theater systems, theater installation reports and spreadsheets, minutes of the meetings of the IMAX Audit Committee, control files for IMAX theaters, investor relation files, minutes of IMAX's Board of Directors meetings, purchase and sale agreements (including amended agreements), IMAX's internal revenue recognition policies, certificates of acceptance, training checklists, analysis of theater installations, theater progress/guidance reports, lease agreements and installation close-out reports.

33.   Once document review commenced, Westchester was able to better distill the relevant facts and focus on certain key issues. On February 11, 2009, Westchester served plaintiffs first set of interrogatories to Defendants, to which the IMAX Defendants objected and responded on March 13, 2009.

34.   Defendant PwC-Canada began producing documents to Westchester on February 11, 2009. At that time, PwC-Canada produced approximately 12,000 pages of documents. Lead Counsel immediately began to review that document production which consisted of PwC's external audit work papers pertaining to its year-end audits of IMAX's 2002-2004 financial statements.

35.   On December 3, 2008, the Second Circuit decided *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), holding that an investment adviser that did not actually purchase the securities at issue lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact.

36.   Relying on the Second Circuit's decision in *Huff*, on February 18, 2009, Snow Capital Investment Partners, L.P. ("Snow Capital") requested a pre-motion conference in

connection with its anticipated motion for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff.

37.   On February 23, 2009, Defendants filed oppositions to Westchester's motion for class certification. As part of their briefing, the IMAX Defendants submitted two expert declarations from Professor Ponam Puri and Lucy P. Allen, an affidavit from Edward Macneil (IMAX's Senior Vice President of Finance) and argued, among other things, that the case should not proceed as a class action because: (a) a class action was not "superior" under Fed. R. Civ. P. 23(b)(3); (b) Westchester and Steelworks were not adequate class representatives and their claims were not typical; (c) the Class Period should extend no later than August 9, 2006; (d) class certification should be denied for purchasers of IMAX stock prior to February 17, 2006; (e) the class should not include in-and-out shareholders. As part of its briefing, PWC-Canada submitted a declaration of Christopher M. James and argued, among other things, that the case should not proceed as a class action because: (a) Westchester lacked Article III standing and therefore could not satisfy the typicality requirement; (b) plaintiffs failed to prove that common issues predominate over individual issues; (c) foreign purchasers of shares traded on a foreign exchange must be excluded from the Class because the Court did not have subject matter jurisdiction over such claims.

38.   On March 4, 2009, Lead Counsel served Plaintiffs' Second Request for the Production of Documents to IMAX and the Individual Defendants and Plaintiffs' Second Request for the Production of Documents to Defendant PwC-Canada.

39.   On March 13, 2009, the Court denied without prejudice Westchester's motion for class certification pending resolution of Snow Capital's anticipated motion for reconsideration of the Court's January 17, 2007 Order.

40. On April 3, 2009, Snow Capital moved for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff. Westchester filed its opposition on April 24, 2009 and Snow Capital replied on May 1, 2009.

41. On June 29, 2009, the Court determined that under *Huff*, Westchester, an investment advisor, lacked Article III standing and granted Snow Capital's motion and appointed it lead plaintiff and its counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as lead counsel.

42. On July 14, 2009, Westchester filed a Petition for Writ of Mandamus with the United States Court of Appeals for the Second Circuit seeking reversal of the Court's June 29, 2009 Order. Robbins Geller filed an answer to Westchester's Petition on July 31, 2009. Westchester filed a reply brief in support of its Petition on August 14, 2009. Westchester's Petition was denied by the Second Circuit on October 1, 2009.

### D. Snow Capital's Motion For Class Certification Is Denied, The Merger Fund Is Appointed Lead Plaintiff And Abbey Spanier Is Reappointed Lead Counsel

43. On April 22, 2010, Snow Capital filed a renewed motion for class certification, which was substantially similar to Westchester's original motion. On June 10, 2010, the Defendants filed oppositions to Snow Capital's class certification motion. Snow Capital filed its reply in further support of the motion on July 30, 2010. The Court did not hear oral argument on the motion.

44. In effort to resolve the Litigation, on July 16, 2010, Robbins Geller, on behalf of Snow Capital, and counsel for the Defendants participated in a mediation session with the Honorable Daniel Weinstein (Ret.), Judge for the Superior Court of California

45. On November 17, 2010, Robbins Geller issued third-party subpoenas to several entities that had expressed an interest in acquiring IMAX (including JPMorgan Chase & Co., Oak Hill Capital Management, LLC, Quadrangle Capital Partners, LP, Veritas Capital Management, LLC, Elevation Partners, LP, Francisco Partners Management, LLC, ARBY Partners, LLC, DLJ Merchant Banking Partners, L.P., and CJ CGV Co. Ltd).

46. On December 20, 2010, this Court issued a Memorandum and Order that denied Snow Capital's motion for class certification, held that this case could not proceed with Snow Capital as class representative, and directed that new applications for lead plaintiff be filed. In its Order, the Court found that it could not certify a class with Snow Capital as the class representative because Snow Capital, which purchased its IMAX shares before the Company's release of its fourth quarter 2005 financial results, and sold prior to an August 9, 2006 curative disclosure of misrepresentation associated therewith, could not establish loss causation. *In re IMAX Sec. Litig*, 272 F.R.D. 138 (S.D.N.Y. 2010). The Court opined that the August 9, 2006 announcement was not a corrective disclosure for misstatements "beyond those that fall within both the temporal (4Q2005 and later) and topical (the application of MEA accounting described in the announcement) limitations of the disclosure itself," *Id.* at 149, and thus could not be a corrective disclosure for Snow Capital which bought its shares before the announcement of the 2005 fourth quarter results and had sold all of its stock by August 10, 2006. *Id.* at 154. The Court also found that Snow Capital was unable to "establish loss causation -- and at a minimum, is subject to unique defenses which may threaten to become the focus of the litigation (and which would not be the focus of the litigation for class members who either purchased shares after February 17, 2006, or who purchased prior to February 17, 2006 and held through a subsequent alleged corrective disclosure..."). *Id.* at 155.

13

47.   On January 10, 2011, TMF, one of the funds managed by Westchester, moved to be appointed lead plaintiff for the class.   On January 12, 2011, Ironworkers St. Louis District Counsel Pension Fund ("Ironworkers") also moved to be appointed lead plaintiff for the class. After opposition and reply briefing, on April 14, 2011, the Court issued an Order naming TMF as lead plaintiff and re-appointing Abbey Spanier Rodd & Abrams, LLP as lead counsel for the Class.

### E.   Discovery and Lead Plaintiff's Motion for Class Certification

48.   As soon as TMF was appointed lead plaintiff, the parties expeditiously recommenced discovery and worked together to set a schedule for a renewed motion for class certification.   Lead Counsel also worked with Robbins Geller who provided Lead Counsel with certain work product that it developed during its time as lead counsel in order to ensure a smooth transition and to avoid duplication of effort.

49.   On April 22, 2011, counsel for IMAX and the Individual Defendants served Defendants' First Request for Production of Documents to TMF.   Although the requests were substantially similar to the individual requests directed at former lead plaintiff Westchester, Defendants requested additional documents from TMF. TMF served its written responses and objections to Defendants' document requests on May 24, 2011 and produced documents on a rolling basis thereafter.

50.   On April 26, 2011, during a case conference, the Court requested that the parties meet and confer and provide the Court with a proposed scheduling order. After the parties met and conferred, the proposed scheduling order was submitted to the Court on May 26, 2001 and "so ordered" on June 6, 2011.

51.   On June 3, 2011, Lead Plaintiff filed its motion for class certification, which was supported by the Declarations of Michael Marek and John D. Finnerty, Ph.D (plaintiff's loss causation expert).  Dr. Finnerty was asked by Lead Plaintiff and Lead Counsel to conduct an "event study" and opine on whether changes in the price of IMAX common stock on various dates from August 9, 2006 through July 20, 2007 were directly related to and caused by certain disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes.

52.   On June 10, 2011, counsel for IMAX and the Individual Defendants served Defendants' Second Request for Production of Documents to TMF.

53.   On June 17, 2011, Defendants took the deposition of John D. Finnerty, Ph.D.

54.   On July 1, 2011, the IMAX Defendants and PwC-Canada each filed opposition briefing to Lead Plaintiff's motion for class certification.  As part of their opposition briefing, the IMAX Defendants submitted a report from Lucy P. Allen (defendant's loss causation expert) and the expert report of Professor Poonam Puri (describing laws in Canada and claims in the Canadian Action) and argued, among other things, that the case should not proceed as a class action because: (a) a U.S. class action is not "superior" to the previously certified global class action in Canada; (b) Defendants had rebutted the presumption of reliance; (c) the Class should not include any shareholders who purchased IMAX common stock prior to February 17, 2006; (d) the Class should exclude in-and-out shareholders; (e) the Class Period should end on August 11, 2006.  As part of its opposition briefing, PwC-Canada argued, among other things, that the case should not proceed as a class action because: (a) it could rebut the fraud-on-the-market presumption for pre-February 17, 2006 purchasers by the absence of a measurable impact on

IMAX's stock price on any possible corrective disclosure date; (b) of significant differences between the factual and legal bases for recovery between pre-and-post February 2006 purchasers; and (c) it could rebut the fraud-on-the-market presumption as the alleged accounting errors did not materially impact the price of IMAX stock.

55.    On June 22, 2011, TMF served its first set of interrogatories to Defendants, to which Defendants objected and responded on July 22, 2011.

56.    On July 13, 2011, TMF served its Second Request for Production of Documents to the IMAX Defendants, to which they objected and responded on July 18, 2011.  The response included the production of documents from their expert Lucy Allen.

57.    On August 3, 2011, Lead Plaintiff filed its reply in further support of its motion for class certification, which included Declarations of John D. Finnerty, Ph.D. and Michael A. Marek in support thereof.  Lead Plaintiff responded to the Defendants' opposition to class certification by arguing, among other things, that: (a) Defendants had failed to rebut the fraud on the market presumption; (b) the Court should reject Defendant's arguments to shorten the Class Period and to find that TMF could not represent all class members; and (c) the U.S. Class Action was the superior method of adjudication of plaintiffs' claims.

F.    **Significant Action Taken By Lead Counsel
       Regarding The Canadian Action**

58.    After the filing of the Canadian Action, Lead Counsel in this Litigation recognized the importance of monitoring that litigation because the proposed classes in the United States and in Canada overlapped.

59.    On December 14, 2009, the Canadian Court certified the Canadian Action on behalf of investors worldwide who purchased IMAX securities on or after February 17, 2006 and held some or all of those securities on August 9, 2006 (the "Canadian Class"). *See Silver v. IMAX*

*Corporation*, [2009] O.J. No. 5585, 2009 ON.C. LEXIS 4847 (December 14, 2009, Sup. Ct. J.). At the time, the Canadian order certifying a "global class" of IMAX investors was unprecedented in Canadian class action procedure.

60.   Following the resolution of the Defendants' subsequent motion for leave to appeal the certification of a global Canadian Class, on April 26, 2011, the plaintiffs in the Canadian Action moved for an order approving the form and timing of the notice of certification in Canada.

61.   On May 2, 2011, Lead Counsel was informed by the IMAX Defendants that the Canadian Court would address the form of notice to be provided to the class in the Canadian Action.   That day, Lead Counsel sent a letter to the Canadian Court expressing concerns about the form of notice.   Specifically, Lead Counsel was concerned because the form of notice that the Canadian plaintiffs sought to have approved on May 3, 2011 contained no reference to the existence of the U.S. Action or to a number of other important relevant facts.   The proposed Canadian notice had the potential to cause prejudice to and/or confusion among members of the putative class in this Litigation. Lead Counsel suggested that the issuance of the notice in the Canadian Action be deferred until class certification was decided in the U.S. Action.   The next day, Lead Counsel advised the Canadian Court of its intention to move to intervene in the Canadian Action.

62.   In order to properly intervene in the Canadian Action, Lead Plaintiff and Lead Counsel determined that it was in the best interest of the Class to retain the Canadian law firm of Bennett Jones LLP.   On May 13, 2011, Lead Plaintiff moved to intervene in the Canadian Action in order to express opinions regarding the proposed notice to be disseminated in the Canadian Action.

63.   Canadian class counsel vigorously opposed the request of TMF to participate in the notice approval process.   On May 31, 2011, counsel for the plaintiffs in the Canadian Action submitted its motion record in response to Lead Plaintiff's motion to intervene.   Further motion materials continued to be served and filed thereafter.   As part of the parties briefing, the Canadian plaintiffs and TMF filed extensive evidence on U.S. law.   In particular, the Canadian plaintiffs filed two affidavits by Professor Patrick Borchers and TMF filed two affidavits by Professor Geoffrey P. Miller. The expert affidavits of Professors Miller and Borchers addressed, among other things, the recognition and treatment likely to be given by U.S. courts to the proposed Canadian notice of certification. The affidavits also focused on the U.S. law governing overlapping class proceedings and the associated legal requirements for notices of certification. In relation to Lead Counsel's affidavits in support of intervention, Canadian plaintiff's counsel conducted a cross-examination of Lead Counsel in this Action on June 28, 2011.

64.   The intervention motion and the motion to approve the proposed notice were argued before the Canadian Court on September 9 and 13, 2011, and further requests were made by the Canadian Court on January 12, 2012.

65.   On March 28, 2012, the Canadian Court issued an order granting TMF's motion to intervene in the Canadian Action under section 14 of the Class Proceedings Act, 1992 ("CPA"), finding that TMF "... had an important perspective to bring to the court, as the lead plaintiff in parallel proceedings in another jurisdiction." The Canadian Court specifically recognized the valuable contributions made by TMF in addressing the novel issues arising on the Notice Motion. As a result of TMF's participation in the Canadian Action, the Court was able to weigh all relevant considerations and to formulate the best possible notice for class members in the Canadian Action.

66.   Lead Counsel's active participation in the Canadian Action exemplifies how counsel diligently strived to protect the Class's interests.

## III.   THE SETTLEMENT

67.   Shortly after the appointment of TMF as Lead Plaintiff, Lead Counsel and Defendants' Counsel re-commenced settlement discussions.  Between April 2011 and November 2011, the parties met numerous times, both in person and via conference call, in an effort to negotiate a settlement.

68.   A variety of issues surfaced that complicated and prolonged the settlement discussions.  However, after difficult and lengthy negotiations, Lead Plaintiff and the Defendants finally reached an understanding on the basic terms of the Settlement, which resulted in the parties executing a Memorandum of Understanding on November 2, 2011 (the "MOU") to settle the Litigation.

69.   On December 6, 2011, the Parties entered into a stipulation in which Lead Plaintiff agreed to withdraw its motion for class certification in light of the proposed settlement of the Litigation.  The Parties agreed that if any condition to the settlement were not satisfied, Lead Plaintiff would have the right to re-file its motion upon five days written notice to Defendants and that consistent with Judge Buchwald's ruling, Defendants would be permitted to take the deposition of Dr. John Finnerty regarding his class certification reply declaration and file a sur-reply brief with respect thereto.

70.   After entering into the Stipulation, Lead Counsel sent a letter to the Defendants seeking certain confirmatory discovery.  In January 2012, the Defendants responded to Lead Counsel's confirmatory requests, which included, among other things, the production of additional documents.

71.    After several weeks of negotiating and exchanging drafts of the final stipulation of settlement and the related documents, on January 26, 2012, Lead Plaintiff and the Defendants executed a Stipulation and Agreement of Settlement Between Settlement Class Members and IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, creating a Settlement Fund of $12,000,000 in cash for the benefit of the Class.[3]  The entire settlement amount (after deduction of Court-approved costs and attorneys' fees) will be distributed to Class members who timely submit valid Proofs of Claim.  Payments to eligible claimants in the Settlement will be made only if and when the Canadian Order (explained below) becomes final and unappealable, this Court approves the Settlement, after any and all U.S. appeals are resolved, and after the claims processing procedure is complete.

72.    On January 26, 2012, Lead Plaintiff filed its Memorandum of Law in Support of its Motion for Preliminary Approval of Class Action Settlement, Conditional Class Certification and Approval of Notice Plan.   Those materials were provided to Siskinds LLP ("Siskinds"), plaintiffs' counsel in the Canadian Action.

73.    On January 31, 2012, while the preliminary approval motion was still pending, Canadian counsel for TMF received a letter from Siskinds providing several comments on the proposed notice and summary notice. Lead Counsel, together with counsel for the Defendants were considering Siskinds' proposed revisions when the Court preliminarily approved the settlement on February 1, 2012.   On February 7, 2012, the parties to the Litigation agreed to amend the U.S. notice to accommodate and address some of Siskinds' concerns.

---

[3]    As provided in paragraph 11 of the Stipulation, the $12 million already has been deposited in an interest bearing escrow account.

74. On March 12, 2012 and again on March 20, 2012, the parties amended the Stipulation and exhibits thereto.

75. On March 16, 2012 (revised on May 7, 2012), the IMAX Defendants made a motion for a final Order from the Canadian Court excluding from the definition of the Canadian Class all persons who do not opt out of the U.S. Settlement, if and when the settlement is approved by final Order of the U.S. Court (the "Canadian Order").[4] That motion is currently scheduled to be argued before the Canadian Court from June 25 to June 27, 2012.

76. On March 26, 2012, Lead Plaintiff filed its Motion for an Amended Order Granting Preliminary Approval of Class Action Settlement, Conditional Class Certification and Approval of Notice Plan.

77. On March 28, 2012, the Court granted preliminary approval of the Settlement, conditionally certified the Class for purposes of effectuating the Settlement, and approved, *inter alia*, the Notice of Pendency and Settlement of Class Action to be sent to all potential Class members in connection with the proposed Settlement (the "Amended Preliminary Approval Order").

78. Lead Plaintiffs and Lead Counsel endorse and support the Settlement. This endorsement is based on Lead Counsel's extensive investigation of the allegations pertaining to each defendant in the Litigation, the alleged damages suffered by the Class and the defenses asserted by the Defendants. Lead Counsel have reviewed and analyzed hundreds of thousands of pages of documents produced by Defendants, reviewed the transcripts of the testimony of the

---

[4]   Attached hereto as Exhibit A is a copy of the May 7, 2012 Revised Motion Record to Amend the Class Definition submitted by counsel for the Defendants in the Canadian Action. Attached hereto as Exhibit B is a copy of the May 9, 2012 Affidavit of Michael G. Robb, counsel for the plaintiffs in the Canadian Action and Plaintiffs' Responding Motion Record to Amend the Class Definition. Attached hereto as Exhibit C is a copy of the May 30, 2012 Reply Motion Record submitted by counsel for the Defendants in the Canadian Action.

Individual Defendants and 11 other individuals conducted by the Securities and Exchange Commission and transcripts of depositions conducted by the plaintiffs in the Canadian Action which included the testimony of a member of defendant PwC-Canada; conducted confirmatory discovery and consulted extensively with several experts and consultants while investigating and prosecuting the case, including experts and consultants in the fields of economics, finance, valuation, accounting and auditing principles.

79.   The discovery obtained from Defendants enabled Lead Counsel to assess the strengths and weaknesses of the case, and to sufficiently inform themselves of the facts necessary to evaluate the prospects for settlement.  Lead Counsel's investigation revealed that proving that the Defendants acted with *scienter* in preparing IMAX's financial statements would entail significant risks.  As a preliminary matter, as this Court recognized at the motion to dismiss stage, the primary accounting issue in this case (i.e. multiple element accounting) is highly complex and applying the accounting literature is often a subjective process.  Having the benefit of substantial testimony and documentary evidence adduced in the SEC and Canadian regulatory proceedings, Lead Counsel discovered that many of the witnesses from IMAX and PwC-Canada believed that IMAX had properly applied accounting rules and had recognized revenue on theater systems in good faith after carefully considering relevant accounting literature.  There is also an abundance of evidence that IMAX relied in good faith on its auditor PwC in applying multiple element accounting to its theater systems.  Proving *scienter* to a jury would also be difficult because none of the Individual Defendants sold any of their IMAX stock during the class period.  Although Judge Buchwald had rejected Defendants' scienter argument at the motion to dismiss stage, there could be no certainty that this Court on summary judgment, or a jury at trial, would find that Lead Plaintiff had adequately proven *scienter*.

80.    The applicable accounting rules which were at the heart of this case, were highly complex.  As a result, Lead Counsel recognized that it faced a difficult hurdle in proving that the Defendants committed securities fraud. Defendants argued throughout the Litigation that the Restatement was simply a result of an accounting error.  In addition, the IMAX Defendants has a persuasive defense in that they relied on the advice of defendant PwC.

81.    Lead Plaintiff also recognized that it faced serious challenges in proving damages. Throughout the Litigation, Defendants argued that plaintiffs would be unable to establish loss causation because IMAX's August 9, 2006 stock price decline was not caused by the Company's press release announcement that it was responding to an informal SEC inquiry regarding revenue recognized for theater systems in the fourth quarter of 2005. Instead, in the same August release, IMAX had announced that it failed to find a buyer or strategic partner --- news that Defendants asserted was more likely to have caused the stock price to drop. Moreover, Defendants argued that the August disclosure simply reaffirmed that IMAX believed that its accounting was in accordance with GAAP and appropriate. Another hurdle was the fact that after IMAX ultimately announced the details of the Restatement, its stock price actually increased. The Defendants were also prepared to offer expert testimony to a jury showing that the changes in revenue recognition as a result of the Restatement could not have caused the drop in IMAX's stock price. Specifically, they argued that the movement of a theater installation from one period to another did not affect the Company's cash flows.

## IV.    THE CLASS SHOULD BE FINALLY CERTIFIED FOR SETTLEMENT PURPOSES

82.    The Court's Order Preliminarily Approving Final Settlement and Providing for Notice preliminarily approved a Class for settlement purposes defined as "all persons and entities who purchased or otherwise acquired IMAX shares on the NASDAQ from February 27, 2003

through July 20, 2007 (the "Class Period"), inclusive, excluding the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either current officers and/or directors of any Defendant, or who served as officers and directors of any Defendant at any time during the Class Period."

83.    As discussed herein, the Class amply satisfies the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3), and warrants final certification by the Court for the purpose of effectuating the Settlement.

### A.    The Class Satisfies the Requirements of Rule 23(a)

84.    Under Rule 23(a), class certification is appropriate where:

> (1)    the class is so numerous that joinder of all members is impracticable,
> (2)    there are questions of law or fact common to the class,
> (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
> (4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).   The settlement Class in this Litigation easily satisfies each of the foregoing requirements.

### 1.    Numerosity

85.    The numerosity requirement is liberally applied in securities fraud cases and is generally satisfied where the class is so large, and class members are so geographically dispersed, that joinder of absent class members is impracticable. Plaintiffs need not show that joinder is impossible; impracticability of joinder will suffice.  This Court has already determined that the requirements of numerosity have been satisfied in this action. *See IMAX*, 272 F.R.D. at 146 (S.D.N.Y. 2010).  Throughout the Class Period, IMAX's common stock was actively traded on the NASDAQ in a well-developed and efficient market. Lead Plaintiff believes there are, at a

minimum, thousands of members of the Class. There are over 40 million shares of IMAX common stock issued and outstanding and, during the Class Period, there were hundreds of millions of shares of IMAX common stock traded. Approximately 84 percent of those shares were traded on the NASDAQ. Thus, the Class manifestly satisfies the requirements of Rule 23(a)(1).

### 2.    Commonality

86.    Rule 23(a)(2) requires that there be common questions of law or fact, not that every question be identical or common. This criterion is satisfied where there is even one single issue common to all members of the Class, and therefore it is easily met in this case.

87.    Here, this Court has already determined that the requirements of commonality have been satisfied. *IMAX*, 272 F.R.D. at 147. Among these questions are: a) whether the federal securities laws were violated by Defendants' acts as alleged herein; (b) whether the SEC filings, press releases, reports and other public statements made by Defendants and disseminated to the investing public during the Class Period contained material misstatements or omitted to state material information; (c) whether and to what extent the Company's financial statements failed to comply with generally accepted accounting principles during the Class Period; (d) whether PwC-Canada's audits of the Company's financial statements during the Class Period were conducted in accordance with generally accepted auditing standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB"); (e) whether the market price of the Company's common stock during the Class Period was artificially inflated due to the materially misleading statements issued by Defendants; (f) whether Defendants acted with scienter in failing to inform investors of material facts and in issuing false and misleading financial statements; (g) whether reliance may be presumed pursuant to the fraud-on-the-market

rule; and (h) whether the members of the Class have sustained damages as a result of the misconduct complained of herein, and if so, what is the proper measure of damages.

### 3.    Typicality

88.   The typicality requirement set forth in Rule 23(a)(3) requires an inquiry into whether the Lead Plaintiff's claims are based upon a legal theory that differs from that upon which the claims of other Class members are based. "Typical" does not mean identical. Instead, the questions of law and fact merely need to arise out of the same legal or remedial theory.

89.   Lead Plaintiff stands in the same position as do other investors who acquired IMAX common shares during the Class period. The market prices of IMAX stock reflected uniform, public statements, made in press releases and SEC filings that Lead Plaintiff has alleged contained material misrepresentations concerning IMAX's revenue recognition practices. Lead Plaintiff's claims and the claims of the Class members arise out of the same conduct by Defendants, are based on the same legal theories and focus on precisely the same misstatements and omissions from the same documents, thus satisfying Rule 23(a)(3).

### 4.    Adequacy of Representation

90.   The adequacy requirement under Rule 23(a)(4) is designed to ensure that absent class members' interests are fully protected, while serving to uncover conflicts of interest between lead plaintiffs and a class. Demonstrating that the lead plaintiffs adequately represent the class requires a showing that: (1) their interests are sufficiently aligned with those of the absent class members; and (2) their counsel is qualified to serve the interests of the entire class.

91.   Here, there are no conflicts between the Lead Plaintiff and the other Class members. Lead Plaintiff's and other Class members' rights to relief depend upon demonstrating that Defendants violated the federal securities laws by making misleading statements and omissions

of material facts that artificially inflated the value of IMAX stock during the Class Period.   Thus, all Class members' interests are well aligned.

92.   Lead Plaintiff has fairly and adequately protected the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.   Lead Plaintiff has no interests antagonistic to or in conflict with those of the other Class members it seeks to represent. Furthermore, the Settlement is the product of arduous, protracted and  arm's-length negotiations with eminently qualified defense counsel.

**B.   Predominance of Common Questions and Superiority of the Class Action to Other Methods of Adjudication**

93.   Rule 23(b)(3) authorizes class certification where: (1) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.   Both of these circumstances are present with respect to the settlement Class.

**1.   Common Legal And Factual Questions**

94.   Here, Lead Plaintiff alleged that Defendants made (or caused to be made) false and misleading statements and concealed material facts, artificially inflating the value of IMAX stock.   Proof of the same alleged misrepresentations and concealments would be crucial to all Class members' claims. Moreover, the evidence needed to prove the claims of all Class members would be substantially the same.   Central issues therefore predominate over any individual issues that theoretically might exist in the Litigation.

**2.    Superiority of the Class Action to Other Methods
of Adjudicating Plaintiffs' Claims**

95.    When confronted with a request for settlement-only class certification, it is largely

unnecessary for a District Court to inquire whether the case, if tried, would present intractable

management problems. Nevertheless, absent class action treatment, the expense of individual

litigation of the claims presented in this Litigation would likely prevent Class members from

obtaining any recovery of their losses.  Where, as here, each Class member suffered harm, but

the possibility and amount of individual recovery may not be sufficient to make individual

litigation worthwhile, a class action is the superior method for addressing these claims.

96.    Based on the factors set forth above, the Class satisfies the requirements of Fed. R.

Civ. P. 23(a) and 23(b)(3), warranting final certification by the Court.

**C.    Notice To The Settlement Class Meets
The Requirements of Due Process And
Rule 23 Of The Federal Rules Of Civil Procedure**

97.    On March 28, 2012, the Court granted preliminary approval of the Settlement,

conditionally certified the Class for purposes of effectuating the Settlement, and approved, *inter*

*alia*, the Notice of Pendency and Settlement of Class Action to be sent to all potential Class

members in connection with the proposed Settlement.

98.    Pursuant to the Amended Preliminary Approval Order, and at the direction of Lead

Counsel, beginning on April 23, 2012, the Court-appointed claims administrator, SCS, provided

notice to the Class by mailing the Notice of Pendency and Proposed Settlement of U.S. Class

Action ("Notice") and the Proof of Claim and Release form ("Proof of Claim")(together the

"Claims Package"). *See* Affidavit of Paul Mulholland, Managing Director of SCS, dated June 6,

2012 (the "Mulholland Aff.") at ¶8.  As of June 2012, SCS mailed 87,934 copies of the Claims

Package to potential Class members.  *Id.*  SCS mailed 426 Notice forms to individuals and

organizations from the shareholders' list provided by IMAX. *Id.* An additional 85,695 Claims Packages were requested by the Nominee Account Holders and Institutional Groups and other individuals. *Id.*

99.   The Notice informed Class members of the Settlement and that a hearing (the "Fairness Hearing") would be held at 10:00 A.M. on Monday, June 14, 2012, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007-1312. Mulholland Aff., Ex. A. The Notice also stated that at the Fairness Hearing the Court would consider whether the Settlement is fair, reasonable and adequate and in the best interests of the Class. *Id.*

100.   In accordance with the Amended Preliminary Approval Order, on April 26, 2012, SCS posted English and French copies of the Notice, Summary Notice, Proof of Claim forms, the Stipulation, and the Complaint, on a website at www.imaxussettlement.com. Mulholland Aff. at ¶5. Also pursuant to the Preliminary Approval Order, on April 26, 2012, SCS published the Court-approved Summary Notice of the Settlement in the national editions of *The Wall Street Journal, The New York Times, The Globe and Mail*, and *La Presse* (in French). *Id.* at ¶6.

101.   The Notice informed Class members that the deadline for persons to exclude themselves from the Settlement was set for no later than June 4, 2012. Mulholland Aff. Ex. A, ¶10. The Notice also informed Class members that Lead Counsel would apply to the Court for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) thereof, and reimbursement of expenses of no greater than $1.75 million. *Id. at* Ex. A. The Notice provides that objections to any aspect of the Settlement or the application for attorneys' fees and reimbursement of expenses were to be filed by June 4, 2012. *Id.*

102. Class members had until June 4, 2012 to object to the Settlement of the Litigation. That day has now passed. There has been only one objection to the Settlement. *Id. at* ¶10. That objection is addressed in detail on Lead Plaintiff's memorandum of law in support of the Settlement.

103. Pursuant to Rule 23(e)(3), a party seeking approval of a proposed settlement must file a statement identifying any agreement made in connection with the proposal. *See* Fed. R. Civ. P. 23(e)(3). In accordance with Paragraph 16 of the Amended Stipulation, on January 26, 2012 the parties entered into an agreement, sometimes referred to as a "blow" provision, providing that in the event more than a certain number of shares opted out of the class, the Defendants would have the right to terminate the Settlement. That provision has not been triggered.

## V.   THE SETTLEMENT IS SUBSTANTIVELY FAIR, REASONABLE AND ADEQUATE, AND WARRANTS APPROVAL

104. Lead Plaintiff believes they it could well have prevailed on the merits of its claims against the Defendants. Defendants were just as adamant that Lead Plaintiff would fail. Having considered the foregoing, and evaluating Defendants' defenses, it is the informed judgment of Lead Counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement before this Court is fair, reasonable and adequate, and in the best interests of the Class.

105. Lead Plaintiff estimates that the average recovery per share of IMAX common stock under the Settlement will be $0.454 per share before the deduction of attorneys' fees, costs and expenses, as approved by the Court. As set forth above, by the time the parties agreed to the Settlement, Lead Plaintiff had a comprehensive understanding of the merits of the Class's claims, of the Defendants' defenses and of the risks Lead Plaintiff and the Class faced. Although

those risks and those defenses were substantial, Lead Counsel were prepared to continue prosecuting the case. Lead Counsel's evident willingness to continue prosecuting the case, our reputation and record as attorneys who successfully have taken complex securities class action cases to the jury, and our demonstrated ability in this Litigation, placed us in a strong position to resolve this case favorably for the Class.

106. The Settlement is all cash and will be distributed to the Class upon completion of the claims process and entry of Judgment which is conditioned upon the Canadian Order becoming final and unappealable, as opposed to the delay that would occur if the case were to proceed to trial. No amount of money will ever revert to the Defendants.

107. Lead Counsel believes that the proposed Settlement is clearly fair, adequate in the best interests of the Class, and deserves this Court's approval. In coming to this conclusion, Lead Plaintiff and Lead Counsel considered, among other things:

- The amount of the Settlement, both absolutely and relative to possible provable damages;

- The expense and length of continued proceedings necessary to prosecute the Litigation against the Defendants through trial and appeals;

- The uncertain outcome and the risk of any litigation, especially in complex litigation such as this Litigation, as well as the difficulties and delays inherent in any such litigation; and

- The likelihood of prevailing on class certification, summary judgment and trial.

108. Lead Counsel believes the proposed Settlement more than satisfies the relevant criteria for final approval and should be approved in all respects.

### A.    Complexity, Expense and Duration of the Litigation

109.    As described herein, this Litigation raised complex issues in both establishing liability and damages and would have required an extensive amount of time to prosecute, with

the continued risk of Lead Plaintiff losing altogether, on summary judgment, at trial, or even on appeal. While Lead Plaintiff believed that the case would ultimately be granted class action status, it could not ignore that there were significant obstacles to class certification. Despite the extensive amount of investigation and discovery undertaken thus far, Lead Plaintiff likely would also have conducted further document discovery, taken depositions, and designated experts. In addition, anticipated motions for summary judgment would have to be briefed and argued, a pretrial order would have to be prepared, and proposed jury instructions would have to be submitted. Finally, motions *in limine* would have to be filed and argued, followed by a trial.

110.    The accounting and damage issues raised in this case were difficult and highly complex. Continuing to prosecute the claims against the Defendants would require a jury to make findings on sophisticated financial matters such as the accuracy of IMAX's financial statements and violations of GAAP and GAAS, as well as factual issues such as *scienter*. In so doing, the jury would have had to sift through complex documentary evidence and witness testimony. More difficult for a jury would be assessing the interpretation of difficult accounting rules and competing claims by the parties' experts, who would have proffered a tremendous number of studies and opinions about the causes of the declines in the prices of IMAX stock.

111.    The Litigation was also rendered complex by the existence of the parallel Canadian Action and the need for Lead Plaintiff to closely monitor and intervene in those proceedings. After becoming aware that the form of notice being proposed in the Canadian Action had the potential to cause prejudice to and/or confusion among members of the putative class in the U.S. Action, Lead Plaintiff, in an effort to address its concerns, sought leave to participate in the Canadian Action. On March 28, 2012 the Court granted Lead Plaintiff's motion for leave under section 14 of the Class Proceedings Act, 1992 ("CPA"), finding that TMF

"... had an important perspective to bring to the court, as the lead plaintiff in parallel proceedings in another jurisdiction."

112.    The parties have spent more than five years litigating this case, during which time counsel for Lead Plaintiff reviewed thousands of pages of documents and transcripts of depositions and litigated motions to dismiss before they reached the proposed Settlement. Any trial against the Defendants would have involved dozens of witnesses and hundreds of exhibits. Should the case have proceeded to trial, Lead Plaintiff expected the entire trial to take several months. Moreover, whatever the outcome of trial, appeal certainly would have been taken to the Second Circuit and perhaps even to the United States Supreme Court. All of the foregoing would have extended the case, thus delaying the ability of the Class to recover for years, if at all, while being extremely expensive for the parties.   Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial and appeals, as well as the associated expense.

113.    In short, continuing to litigate against the Defendants would mean a sharp and certain rise in litigation costs without any corresponding certainty for a sharp (or any) rise in recovery. On the contrary, continuing litigation could have resulted in a lesser recovery or in no recovery at all. And even were the ultimate outcome favorable to Lead Plaintiff, at best, years of further delay would be virtually guaranteed. A favorable verdict for plaintiffs at trial could be overturned by the Court or through appeals.

114.    Given the complexity of the difficult issues presented by the Litigation, the impossibility of predicting their resolution, the substantial and guaranteed further expenditures of time and money and Court resources were this case to proceed against the Defendants with no

certainty of ultimately producing a recovery equal to or better than that achieved now by this Settlement, Lead Plaintiff submits that this Settlement should be approved.

### B.    Class Reaction to the Settlement

115.    Since April 24, 2012, 87,934 Claim Packages have been sent to Class members and an additional 85,695 sent to Nominee Account Holders, Institutional Groups and other individuals. *See* Mulholland Aff., at ¶8. Additionally, on April 26, 2012 Summary Notice of the Settlement was published in the national edition of *The Wall Street Journal, The New York Times, The Globe and Mail,* and *La Presse* (in French). *Id.* at ¶6. Both the Notice and Summary Notice also advised Class members of their rights to exclude themselves by submitting a written request to the Claims Administrator postmarked no later than June 4, 2012. *Id.* at Ex. A. Both the Notice and Summary Notice also advised Class members of their rights to object to the Settlement. *Id.* SCS maintained toll-free telephone systems to answer any inquiries from potential Class members as well as a website, www.imaxussettlement.com, providing information about the Litigation and the Settlement and allowing potential Class members to view and to access/use the Settlement Notice, Summary Notice, Proof of Claim and Complaint. *Id.* at ¶5. A link to the www.imaxussettlement.com website was also placed on both SCS's and Lead Counsel's website. *Id.*

116.    The reaction of the Class to the Settlement has been extremely positive. In fact as of the date of this filing, there has been only one objection to the Settlement. Mulholland Aff.., ¶10. The fact that there has been only one objection by the Class here evidences that the Settlement is fair, reasonable and adequate.

### C.    Stage of Proceedings

117.    At the time the parties agreed to the Settlement, the Litigation had been ongoing

for more than five years. The parties had fully briefed the lengthy and complex motions to dismiss and motion for class certification described above; the Court had rendered its September 15, 2008 decision concerning the Defendants' motions to dismiss; and Lead Counsel had conducted extensive investigation and discovery. In addition, by the time the parties agreed to the Settlement, the SEC had concluded its investigation of IMAX's revenue recognition issues without commencing any enforcement action.

118.   Accordingly, at the time the parties agreed to the Settlement they were fully versed as to the strengths and weaknesses of the claims and defenses. The investigation and discovery conducted by Lead Counsel enabled them to evaluate the relative merits of each side's case, to understand the issues and risks that the Class would face at trial, and to determine that the proposed Settlement was in the best interests of the Class. The parties, with full knowledge of the strengths and weaknesses of their respective cases and that of their adversaries, agreed to the Settlement, and given the stage of proceedings reached, the Settlement should be approved.

### D.    The Risks of Continued Litigation

119.   After reviewing thousands of pages of documents and transcripts and conducting an extensive investigation, Lead Plaintiff recognized the risk of prevailing at trial against the Defendants. The outcome of the claims against the Defendants was uncertain, and whether those or any claims against the Defendants ultimately would survive summary judgment and trial was an open question.

120.   To establish liability for federal securities fraud under §10(b) and Rule 10b-5, Lead Plaintiff would need to show that the Defendants (1) made misstatements or omissions of material fact, (2) with *scienter*, (3) in connection with the purchase or sale of securities, (4) upon which class members relied, and (5) that the class members' reliance was the proximate cause of

its injury.  Since the enactment of the PSLRA, securities class actions have become substantially more risky and difficult for plaintiffs.

121.   In addition to risks regarding liability, Lead Plaintiff faced significant risks with respect to proof of damages.  The Defendants would surely have challenged Lead Plaintiff's damage claims in the context of motions for summary judgment and/or at trial.  Lead Counsel and counsel for the Defendants had extensive discussions concerning damages during the course of settlement negotiations that confirmed the parties' polarized views on this issue.

122.   Under Section 10(b) of the Exchange Act, plaintiffs must prove "loss causation," *i.e.*, the damages recoverable are limited to the amount of stock price inflation caused by defendants' misleading statements and omissions.  In this Litigation, the amount of damages Lead Plaintiff legally could prove would have been seriously disputed.  It became apparent in the settlement discussions that the parties differed greatly as to whether, and to what extent, the decline in the market price of IMAX stock was related to the allegedly misleading statements and omissions, or simply resulted from the news that IMAX would not be sold.  Thus, the Defendants likely would have argued that Lead Plaintiff had failed to establish loss causation under Rule 10b-5 and thus could not prove damages.

123.   The determination of loss causation and damages is a complex and uncertain process, typically involving conflicting expert opinions and testimony.  The reaction of a jury to such contradictory expert testimony is highly unpredictable.  Expert testimony on damages could rest on many assumptions, any one of which could be rejected by a jury as speculative or unreliable.  Conceivably, a jury could disagree substantially with any damage presentation proffered by Lead Plaintiff.   Accordingly, proving damages involved substantial risk.

### E.    The Risks of Maintaining a Class Action Through Trial

124.    In connection with the parties' efforts to obtain Court approval of the Settlement (and the Releases contemplated thereby), the Defendants have stipulated to class certification for settlement purposes only.  However, in the absence of the proposed Settlement, Lead Plaintiff could have expected a very different result if this case had proceeded beyond the motions to dismiss.  At the time of the Settlement, the Court had not yet certified a class.  As described above, the IMAX Defendants argued that the case should not proceed as a class action because: (a) a U.S. class action is not "superior" to the previously certified global class action in Canada; (b) Defendants had rebutted the presumption of reliance; (c) the Class should not include any shareholders who purchased IMAX common stock prior to February 17, 2006; (d) the Class should exclude in-and-out shareholders; and (e) the Class Period should end on August 11, 2006. Defendant PwC-Canada also argued that the case should not proceed as a class action because: (a) it could rebut the fraud-on-the-market presumption for pre-February 17, 2006 purchasers by the absence of a measurable impact on IMAX's stock price on any possible corrective disclosure date; (b) of significant differences between the factual and legal bases for recovery between pre-and-post February 2006 purchasers; and (c) it could rebut the fraud-on-the-market presumption as the alleged accounting errors did not materially impact the price of IMAX stock.  Thus, there was a possibility that the Defendants could have defeated class certification on numerous grounds.  There could have been no assurance that, in absence of this Settlement, the Litigation could have been maintained as a class action through trial.

### F.    The Ability of Defendants to Withstand a Greater Judgment

125.    Defendants have the resources to withstand a judgment in an amount greater than that recovered by the Settlement.  However, "the fact that a defendant is able to pay more than it

offers in settlement does not, standing alone, indicate that the settlement is unreasonable or inadequate." *In re PaineWebber Ltd. P'Ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997), *aff'd*, 117 F.3d 721 (2d Cir. 1997).

### G.   The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and Attendant Risk of Litigation

126.   Lead Plaintiff believes that the Settlement is reasonable in light of the best possible recoveries and the attendant risks of litigation. The recovery provided by the Settlement is within, if not well above, the range of reasonable recovery.

127.   Lead Plaintiff, Lead Counsel along with their economic consultants believe that the damages arising from the alleged malfeasance in the Litigation, depending on the methodology used, are as high as $91 million. This amount results from the use of a damage model under which it was presumed that the proper measure of recoverable damages included the majority of IMAX's stock price drop that occurred when the Company disclosed information that corrected alleged prior false and misleading statements. This figure also assumes that the Court and a jury would make every factual finding in the Class's favor. Defendants have generated damage models showing damages based upon recent Supreme Court decisions which show damages as low as approximately $5 million.

128.   Here, a recovery totaling $12,000,000 for claims that are not certain of success, where the Court has not yet ruled on several of the issues raised by the Defendants relating to class certification, along with uncertainty as to Lead Plaintiff's ability to win at trial or after appeals, is by any measure an excellent result.

129.   The Settlement, is within the range of reasonableness and is unquestionably better than another possibility -- no recovery at all -- and, analyzed in connection with the factors

discussed above, the Settlement provide a substantial immediate benefit that clearly outweighs the risks of continued litigation.

130.    After Lead Plaintiff reached agreement with the Defendants as to the proposed Settlement, Lead Counsel consulted and worked extensively with our damages expert to formulate a fair and reasonable plan to distribute the Settlement Fund to the Class (the "Plan of Allocation"). The proposed Plan of Allocation, set forth at the end of the Notice (Mulholland Aff., Ex. A, Appendix I), will fairly allocate the proceeds of the Settlement among Class members and are based on Lead Counsel's judgment about certain liability and damage issues required to reach an equitable result.

131.    The objective of the proposed Plan of Allocation is to equitably distribute the net proceeds of the Settlement to those members of the Settlement Class who suffered losses as a result of the alleged misrepresentations and omissions. The Plan of Allocation allocates the Settlement Fund to Class Members eligible for recovery pursuant to the Settlement who submit valid and timely Proof of Claim and Release forms ("Authorized Claimants"). To the extent an Authorized Claimant had a gain from his, her, or its overall transactions in IMAX common stock during the Class Period, the value of the recognized loss will be zero. To the extent that a Claimant suffered an overall loss on his, her, or its overall transactions in IMAX common stock during the Class Period, but that loss was less than the recognized loss calculated, then the recognized loss shall be limited to the amount of the actual loss. There shall be no recognized loss on short sales of IMAX common stock during the Class Period; however, any recognized gains with respect to short sales shall be offset against recognized losses on other transactions.

132.    Under the Plan of Allocation, the Recognized Loss of each Authorized Claimant shall be calculated according to the formula provided in Appendix I to the Notice. Following the

Company's partial disclosure of its improper accounting practices and SEC inquiry on August 9, 2006, the price of IMAX shares crashed, falling by 40.4%, or $3.90, from $9.63 per share to a closing price of $5.73 per share on the following trading day. Accordingly, based on the advice of our damages expert, Lead Plaintiff and Lead Counsel determined for the purposes of calculated an Authorized Claimant's losses, the artificial inflation per share during the period between February 27, 2003 and August 9, 2006 would be $3.90. Our expert also recommended that there was no damages for IMAX shareholders between the period of August 10, 2006 and July 20, 2007 (the date of the Restatement) because on the day of the restatement, IMAX' stock closed up $0.45 from the previous day's closing.

133.    It is the opinion of Lead Counsel that the Plan of Allocation is fair, reasonable and adequate to the Settlement Class.

## VI.   COUNSEL'S    APPLICATION    FOR    ATTORNEYS'    FEES    AND REIMBURSEMENT OF EXPENSES ARE REASONABLE AND SHOULD BE APPROVED

134.    The work undertaken by Lead Counsel in prosecuting this case and arriving at this Settlement in the face of substantial risks has been time-consuming and challenging. This Litigation settled only after Lead Counsel overcame multiple legal and factual challenges to the claims asserted. To do so, Lead Counsel conducted an extensive investigation into the underlying facts; researched and prepared a detailed amended complaint; successfully overcame Defendants' motions to dismiss; consulted extensively with experts and consultants; conducted discovery; engaged in hard-fought settlement negotiations with experienced defense counsel; and obtained, reviewed and analyzed thousands of pages of documents and deposition testimony. For the extensive efforts expended on behalf of the Class, Lead Counsel are applying on behalf of itself and other plaintiffs' counsel for fees and reimbursement of expenses.

135.   The Notice mailed to all Class members informed them that Lead Counsel would apply for award of attorneys' fees not to exceed 25% of the Settlement Fund, as well as reimbursement of expenses of no greater than $1.75 million incurred and advanced by Lead Counsel and other counsel in prosecuting this Litigation.

136.   Lead Counsel is applying for fees of 25% of the $12,000,000 million Settlement Fund.   The request represented a significant discount to the lodestar of plaintiffs' counsel, in circumstances where a multiplier would ordinarily be justified.   Lead Counsel also seeks reimbursement of out-of-pocket litigation expenses of $1,677,838.02.   A breakdown of Lead Counsel's out-of-pocket litigation expenses is appended hereto as Exhibit D.

137.   Robbins Geller is applying for fees as part of Lead Counsel's overall fee request of 25% of the $12,000,000 million Settlement Fund. *See* Declaration of Sam Rudman in Support of Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses. Ex. E. Robbins Geller also seeks reimbursement of out-of-pocket litigation expenses of $636,813.49. *Id.*

138.   Berger & Montague, P.C. is applying for fees as part of Lead Counsel's overall fee request of 25% of the $12,000,000 million Settlement Fund. *See* Declaration of Sherrie R. Savett in Support of Application for Award of Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of Berger & Montague. P.C.. Ex. F. Berger & Montague also seeks reimbursement of out-of-pocket litigation expenses of $6,123.59. *Id.*

139.   Cohen Milstein Sellers & Toll PLLC, is applying for fees as part of Lead Counsel's overall fee request of 25% of the $12,000,000 million Settlement Fund. *See* Declaration of Steven J. Toll in Support of Application for Award of Attorneys' Fees and

Reimbursement of Expenses.  Ex. G.  Cohen Milstein also seeks reimbursement of out-of-pocket litigation expenses of $2,325.59. *Id.*

140.    To summarize, Lead Counsel and other plaintiffs' counsel in prosecuting this Litigation expended a total of 9,952.45 hours resulting in a lodestar of $5,247,083.75.   Lead Counsel and other plaintiffs' counsel also underwrote expenses of $1,677,838.02 during this period, all of which was at risk in this Litigation.  Because the Canadian Action remains pending, it is likely that Lead Counsel will expend additional time and incur additional expense in seeing this Settlement, if approved, to its conclusion.

141.    Attached hereto as Exhibit D, is a Lodestar table that sets forth the identity and level of each Lead Counsel attorney and paraprofessional who worked on this Litigation since inception, their current billing rates and the number of hours each devoted to this Litigation.  The hourly rates have been approved in judicial settlement hearings and are consistent with rates approved in this Circuit and others in many securities class action cases.

142.    Attached hereto as Exhibit D, is a breakdown of the $1,032,575.35 of expenses incurred by Lead Counsel alone during the course of prosecuting this complex litigation.  These expenses are a necessary part of the litigation and were essential to enable Lead Counsel to achieve the results now before the Court.

143.    Under *Goldberger*, district courts have broad discretion to determine reasonableness pursuant to the following six factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations. Standard practice in the Second Circuit is to award fees on a percentage of

recovery basis analyzing these six factors. Each is discussed separately below. Lodestar then is used as a double-check to avoid windfalls.

### 1. Time and Labor Expended by Counsel

144.   As indicated above, in prosecuting this Litigation, Lead Counsel and other plaintiffs' counsel expended 9,952.45 hours resulting in a lodestar of $5,247.083.75. Lead Counsel and other plaintiffs' counsel also collectively underwrote expenses of $1,677,838.02 during this period, all of which was at risk in this litigation.

### 2. Magnitude and Complexities of the Litigation

145.   The magnitude and complexity of this Litigation is demonstrated above. There is no question that had the Settlement not been reached, the factual and legal questions at issue would continue to be the subject of lengthy, complex and highly adversarial litigation. Numerous issues would be involved in proving liability, damages and loss causation, as set forth above. These factors confirm the magnitude of the challenge.

### 3. Risks of the Litigation

146.   The risks of this litigation are also clear. As referred to above, Lead Plaintiff faced significant risks with respect to numerous issues relating to liability and damages. This included pleading and proving *scienter*, pleading and proving primary §10(b) liability, and proving loss causation. Presenting these issues to a jury would have involved enormous risk. Success on each of these issues was far from assured. All of these issues presented potential obstacles to securing a recovery for the Class absent the Settlement.

147.   In addition to the risks to the Class on the merits, there was substantial risk of a jury verdict for the Defendants, or of judgment for Lead Plaintiff and an appellate reversal, any of which would have left the Class and Lead Counsel without any payment whatsoever. It is

commonplace for plaintiffs' counsel across the nation to have expended thousands of hours in various class actions and stockholder derivative cases and to have received nothing for their diligence and expertise in litigating those cases through motion practice, pretrial discovery and trial.[5]

### 4.    Quality of the Representation

148.    Lead Counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions.  Our experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them. We believe that our reputations as attorneys who will zealously carry a meritorious case through the trial and appellate levels as well as our demonstrated ability to vigorously develop the evidence in this case placed us in a strong position in settlement negotiations with the Defendants.

149.    The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of opposing counsel. Lead Plaintiff was opposed in this case by very skilled and highly-respected counsel. The Defendants here were represented by lawyers from Cleary Gottlieb Steen & Hamilton LLP and Gibson, Dunn & Crutcher LLP. These prominent defense firms spared no effort or expense in the defense of their clients. In the face of this knowledgeable and formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade the Defendants to settle on terms that are favorable to the Settlement Class.

---

[5]    *See, e.g., Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222 (S.D.N.Y. 1990) (judgment for defendants after bench trial), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Robbins v. Kroger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997), *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990); *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472 (S.D.N.Y. 1988), *aff'd*, 875 F.2d 404 (2d Cir. 1989); *Landy v. Amsterdam*, 815 F.2d 925 (3rd Cir. 1987); *Spielman v. Gen. Host Corp.*, 402 F. Supp. 190 (S.D.N.Y. 1975), *aff'd*, 538 F.2d 39 (2d Cir. 1976).

### 5.   Requested Fee in Relation to the Settlement

150.   As also set forth in the accompanying memorandum of law, the requested fee of 25% falls in the middle range of practice and precedent in this Circuit, where district courts have often awarded fees in amounts between 20% and 33% of common funds obtained and multiples of three times lodestar in securities class action cases, and fits squarely within the range of class action recoveries of this size.

151.   The fee requested in this case, 25% of the proposed Settlement, or a 43% discount to counsel's lodestar, is reasonable in light of the extensive efforts and risks faced over the course of more than five years of litigation and is well within the range of fees awarded in this Circuit. *See, e.g., In re Monster Worldwide, Inc. Sec. Litig.*, No. 07-CV-02237 (JSR), 2008 U.S. Dist. LEXIS 122149 (S.D.N.Y. Nov. 24, 2008) (approving fee award of $25% of $11,875,000 settlement fund); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 587 (S.D.N.Y. 2008) (approving fee award of 25% of $5 million settlement fund); *Reynolds v. Repsol YPF, S.A.*, Civil Action No. 1:06-cv-00733-DAB, 2008 U.S. Dist. LEXIS 106541, at *3 (S.D.N.Y May 7, 2008) (awarding 25% of $8 million settlement fund and noting that "courts throughout [the Second] Circuit regularly award fees of 25% to 30% or more of the total recovery under the percentage-of-the-fund method."). Consideration of the relevant factors confirms that the requested fee is fair and reasonable and, as such, should be approved.

### 6.   Public Policy Considerations

152.   "A strong public policy concern exists for rewarding firms for bringing successful securities litigation." *In re Ashanti Goldfields Sec. Litig.*, C.A. No. CV-00-717 (DGT), 2005 U.S. Dist. LEXIS 28431, at *14 (E.D.N.Y. Nov. 15, 2005); *see also In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 236 (S.D.N.Y. 2005) ("[P]ublic policy supports granting attorneys

fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC."); *Basic Inc. v. Levinson*, 485 U.S. 224, 230-31 (1988) (the federal securities laws are remedial in nature, and the courts must encourage private lawsuits to effectuate their purpose of protecting investors).

## H.   The Requested Reimbursement of Litigation Expenses

153.   Lead Counsel and other plaintiffs' counsel are also requesting reimbursement of their out-of-pocket expenses necessarily incurred and advanced by them in the prosecution of the Litigation in the amount of $1,677,838.02.

154.   Lead Counsel believe these expenses were reasonably and necessarily incurred and were, in fact, critical to Lead Plaintiff's ability to obtain the recovery here. A large portion of these expenses includes the substantial fees of the experts whose services were required in the successful prosecution and resolution of this case. Lead Plaintiff relied on Michael A Marek, of Financial Markets Analysis, LLC who provided damage analysis and supplied a declaration to the Court to discuss the efficiency of the market of IMAX common stock during the Class Period. Lead Plaintiff and the Class also benefited from the expertise of Dr. Finnerty, Managing Principal of Finnerty Economic Consulting, LLC and Director of the MS in Finance Program at Fordham University. Dr. Finnerty was asked to conduct an "event study" and opine on whether changes in the price of IMAX common stock on various dates during the Class Period were directly related to and caused by certain disclosures regarding IMAX's revenue recognition accounting policy, and when the revenues and earnings related to its theater systems installations were recognized for financial reporting purposes. Dr. Finnerty was supported by the work of Compass Lexecon, a consulting expert specializing in damages and forensic accounting. Lead Plaintiff and the Class also benefited from the expertise of Harris Devor, CPA of Schechtman

Marks Devour PC, who provided advice on the difficult accounting issues in this Litigation and detailed analysis of the Restatement.

155.   In addition, the Notice provided to the members of the Class informed them that Lead Counsel would seek reimbursement of their expenses incurred in the prosecution of the Litigation of no greater than $1.75 million.  As explained above, only one member of the Class has raised an objection to that request, which we believe is improper.

## VII.   CONCLUSION

156.   For the reasons set forth above and in the accompanying memorandum, Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are fair, reasonable and adequate and should be approved; final certification of the Class should be approved; that the application for an award of attorneys' fees and reimbursement of expenses is also fair and reasonable, and should be granted.

I declare under the penalty of perjury under the laws of the State of New York that the foregoing is true and correct.  Executed this 7th day of June 2012, in New York, New York.

_____
Arthur N. Abbey

Sworn to before me this 7th
day of June 2012.

_____
Notary Public

SUSAN LEE
Notary Public, State of New York
No. 01LE6074695
Qualified in Queens County
Commission Expires May 20, 20 14

47