# EXHIBIT A
# (PART 2)

182. Furthermore, as mentioned above, since 2002, an entity's management has been required under Rule 302 of the Sarbanes-Oxley Act to provide certifications relating to the company's internal control over financial reporting. Additionally, section 404 of the Sarbanes-Oxley Act requires an entity's management to assess and report on the effectiveness of the company's internal control over financial reporting, as described in PCAOB AS 2. In its Forms 10-K, IMAX's management concluded that the Company maintained effective internal controls over financial reporting. In 2006, however, the Company admitted, by way of restatement of its 2002 through third quarter 2006 financial statements, that its internal controls over financial reporting were *not effective*, particularly surrounding the Company's internal controls related to revenue recognition.

183. IMAX management's failure to identify such control deficiencies (i.e., material weaknesses) existing at the company prior to 2006 rendered management's *Annual Reports on Internal Controls over Financial Reporting* materially false and misleading. Additionally, management's failure to identify and/or report such control deficiencies existing at the company prior to 2006, particularly relating to its internal controls surrounding recognition of revenue from the improper "identification of deliverables and their aggregation into units of accounting" contributed to the Company's issuance of materially false and misleading financial statements through the third quarter of 2006 in violation of GAAP.

## PRICEWATERHOUSECOOPERS' VIOLATIONS OF GAAS

184. PWC served as the Company's auditor before, during and after the Class Period. PWC was required to perform its audits of IMAX's consolidated financial statements in conformity with the standards of the PCAOB, which adopted all of the GAAS that had previously been issued by the AICPA. The auditing standards issued and adopted by the

PCAOB, together with the auditing standards issued by the AICPA, are encompassed by and referred to herein as GAAS.

185. PWC issued unqualified audit opinions dated February 14, 2003, February 27, 2004, March 10, 2005 and March 9, 2006, relating to its audits of IMAX's consolidated financial statements for the years ended December 31, 2002 through 2005. PWC's audit opinions stated that the financial statements were presented fairly in accordance with GAAP and that PWC's audit had been performed in accordance with GAAS and the standards of the PCAOB.

186. GAAS represent the guidelines by which an audit must be planned and performed. The general, fieldwork, and reporting standards approved and adopted by the membership of the American Institute of Certified Public Accountants ("AICPA"), as amended by the Auditing Standards Board ("ASB"), and which must be followed throughout all audits, are as follows:

*General Standards*

> 1. The audit is to be performed by a person or persons having adequate technical training and proficiency as an auditor.
>
> 2. In all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors.
>
> 3. Due professional care is to be exercised in the performance of the audit and the preparation of the report.

*Standards of Field Work*

> 1. The work is to be adequately planned and assistants, if any, are to be properly supervised.
>
> 2. A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed.

> 3. Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.

*Standards of Reporting*

> 1. The report shall state whether the financial statements are presented in accordance with generally accepted accounting principles (GAAP).
>
> 2. The report shall identify those circumstances in which such principles have not been consistently observed in the current period in relation to the preceding period.
>
> 3. Informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report.
>
> 4. The report shall contain either an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an overall opinion cannot be expressed, the reasons therefore [sic] should be stated. In all cases where an auditor's name is associated with financial statements, the report should contain a clear-cut indication of the character of the auditor's work, if any, and the degree of responsibility the auditor is taking. (AU § 150.02)

187. IMAX's consolidated financial statements for the years-ended December 31, 2002, December 31, 2004, December 31, 2005, and the first three quarters of 2006 were materially false and misleading as a result of prematurely recognized revenue relating to certain components of its theater system installations. PWC's opinion that IMAX's consolidated financial statements complied with GAAP and that its audits complied with GAAS and the standards of the PCAOB were materially false and misleading when issued.

188. As the auditor of a public company, PWC was required by GAAS to understand IMAX's business and the industry that the Company operated in. GAAS, specifically AU § 311, *Planning and Supervision* ("AU § 311"), states, in relevant part:

> The auditor should obtain a knowledge of matters that relate to the nature of the entity's business, its organization, and its operating characteristics. Such matters include, for example, the type of business, types of products and services, capital structure, related parties, locations, and production, distribution, and compensation methods...(¶.07)

Furthermore, AU 311 states the following:

> Knowledge of an entity's business is ordinarily obtained through experience with the entity or its industry and inquiry of personnel of the entity...(¶.08)

189. As described herein, IMAX's theater systems represented the largest contributor to IMAX's reported revenues and earnings during the Class Period. As such, PWC was required under GAAS to understand the method by which theater systems revenue was recognized, and to satisfy themselves that the proper accounting principles were being applied for such revenue recognition. In violation of GAAS, PWC failed to exercise due professional care, properly plan the audit, obtain sufficient competent evidential matter, properly assess the internal controls, and either properly consider the risk of fraud or properly incorporate its consideration of the risk of fraud into its audit procedures in its audit of the Company's December 31, 2002 through December 31, 2005 consolidated financial statements.

**Due Professional Care**

190. The third general standard requires auditors to exercise due professional care in the performance of the audit and the preparation of the report. (AU § 150.02, AU § 230.01) The standard of due care also states, in relevant part:

> Due professional care requires the auditor to exercise *professional skepticism*. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor uses the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]

> Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.]
>
> The auditor neither assumes that management is dishonest nor assumes unquestioned honesty. In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest. [Paragraph added, effective for audits of financial statements for periods ending on or after December 15, 1997, by Statement on Auditing Standards No. 82.] (AU § 230.07 – .09)

**Planning An Audit**

191. As previously discussed, AU § 311 requires an auditor to obtain an understanding of the entity's business and its transactions. Furthermore, AU § 311 requires an auditor to obtain a level of knowledge that will enable him/her to properly plan an audit. AU § 311 states, in relevant part:

> The auditor should obtain a level of knowledge of the entity's business that will enable him to plan and perform his audit in accordance with generally accepted auditing standards. That level of knowledge should enable him to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements. The level of knowledge customarily possessed by management relating to managing the entity's business is substantially greater than that which is obtained by the auditor in performing his audit. Knowledge of the entity's business helps the auditor in:
>
> a) Identifying areas that may need special consideration.
> b) Assessing conditions under which accounting data are produced, processed, reviewed, and accumulated within the organization.
> c) Evaluating the reasonableness of estimates, such as valuation of inventories, depreciation, allowance for doubtful accounts, and percentage of completion of long-term contracts.
> d) Evaluating the reasonable of management representations.
> e) Making judgments about the appropriateness of the accounting principles applied and the adequacy of disclosures. (¶.06)(Emphasis added)(Footnotes omitted)

192. PWC recklessly disregarded the Company's business operations and its improper application of multiple element arrangement accounting to theater system installations, in violation of GAAS and the standards of the PCAOB.

**Evidential Matter**

193. Further, AU § 326: *Evidential Matter*, requires that the auditor "...obtain sufficient competent evidential matter to provide him or her with a reasonable basis for forming an opinion." (AU § 326.22; AU § 150.02) The standard further states, in relevant part:

> ...The independent auditor should be thorough in his or her search for evidential matter and unbiased in its evaluation. In designing audit procedures to obtain competent evidential matter, *he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles...* In developing his or her opinion, the auditor should consider relevant evidential matter regardless of whether it appears to corroborate or to contradict the assertions in the financial statements. To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion. (AU § 326.25)(Emphasis added)(Footnotes removed)

**Consideration of Fraud**

194. Furthermore, AU § 316, Consideration of Fraud in a Financial Statement Audit, reiterates AU § 110,:

> The auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud... (AU 316.01, AU § 110.02) (Footnote omitted)

195. AU § 316 states the following regarding the importance of exercising professional skepticism:

> Due professional care requires the auditor to exercise professional skepticism. See section 230, *Due Professional Care in the Performance of Work*, paragraphs .07 through .09 . Because of the characteristics of fraud, the auditor's exercise of professional skepticism is important when considering the risk of material misstatement due to fraud. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of audit evidence. The auditor should conduct the engagement with a mindset that recognizes the possibility that a material misstatement due to fraud could be present, regardless of any past experience with the entity and regardless of the auditor's belief about management's honesty and integrity. Furthermore, professional skepticism requires an ongoing questioning of whether the information and evidence obtained suggests that a material misstatement due to fraud has occurred. In exercising professional skepticism in gathering and evaluating evidence, the auditor should not be satisfied with less-than-persuasive evidence because of a belief that management is honest. (AU § 316.13)

196. AU § 316 requires an auditor to consider whether fraud risk factors exist during the course of its audit procedures. (AU § 316.32) The appendix to AU § 316 provides an auditor with numerous examples of fraud risk factors to be considered during the course of an audit, including:

- Excessive pressure exists for management to meet the requirements or expectations of third parties due to the following:
  - Perceived or real adverse effects of reporting poor financial results on significant pending transactions, such as business combinations or contract awards

* * * * *

- Excessive interest by management in maintaining or increasing the entity's stock price or earnings trend

197. Furthermore, PWC failed to appropriately consider management's selection and application of significant accounting principles when performing its audit procedures in violation of AU § 316. Specifically, AU § 316 states, in relevant part:

> Judgments about the risk of material misstatement due to fraud have an overall effect on how the audit is conducted in the following ways:

***

> *Accounting principles.* The auditor should consider management's selection and application of significant accounting principles, particularly those related to subjective measurements and complex transactions. In this respect, the auditor may have a greater concern about whether the accounting principles selected and policies adopted are being applied in an inappropriate manner to create a material misstatement of the financial statements. In developing judgments about the quality of such principles..., the auditor should consider whether their collective application indicates a bias that may create such a material misstatement of the financial statements. (AU § 316.50)

198. As previously discussed, the Company utilized aggressive and inappropriate revenue recognition policies on the non-screen elements of certain theater systems prior to the installation of the screen and completion of the theater, thereby resulting in unearned revenue. Such aggressive and inappropriate revenue recognition policies were used to inflate the price of the Company's stock as a result of Defendants' desire to sell the company. PWC either failed to properly consider the risk of fraud relating to the perceived or adverse affects of reporting poor financial results on future transactions, such as business combinations, as well as management's interest to maintain or increase its stock price or earnings trend, or failed to properly incorporate its consideration of the risk of fraud into its audit procedures surrounding the Company's revenue recognition policies, in violation of AU § 316.

**Failure to Properly Assess Internal Controls**

199. GAAS requires an auditor to obtain an understanding of an entity's internal controls as part of its audit procedures. Specifically, the second standard of field work required by AU § 150, *Generally Accepted Auditing Standards* ("AU 150"), provides that:

> A sufficient understanding of internal control is to be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed. (AU 150.02)

200. Additionally, as mentioned above, beginning in 2004, auditors were required by section 404 of the Sarbanes-Oxley Act and the PCAOB to perform an audit of, and provide separate opinions on, the internal control over financial reporting in conjunction with its audit of a company's financial statements. PCAOB AS 2, describes the responsibilities of the auditor relating to a Company's internal controls, in relevant part:

> Section 404(a) of the Sarbanes-Oxley Act requires the management of a public company to assess the effectiveness of the company's internal control over financial reporting as of the end of the company's most recent fiscal year and to include in the company's annual report to shareholders management's conclusion, as a result of that assessment, about whether the company's internal control is effective...
>
> Section 404(b) of the Act requires the company's auditor to attest to and report on the assessment made by the company's management. (AS 2, Section B)
>
> ***
>
> ...the integrated audit results in two separate audit objectives: to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting and to express an opinion on whether the financial statements are fairly stated. (AS 2, Section E)

201. Furthermore, AS 2 describes the auditor's objective in performing an audit of internal control over financial reporting, in relevant part:

> The auditor's objective in an audit of internal control over financial reporting is to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting... Maintaining effective internal control over financial reporting means that no material weaknesses exist; therefore, the objective of the audit of internal control over financial reporting is to obtain reasonable assurance that no material weaknesses exist as of the date specified in management's assessment. (AS 2)

202. In IMAX's 2004 and 2005 Forms 10-K, PWC concurred with IMAX management's conclusions that the Company maintained effective internal controls over financial reporting. In 2006, however, the Company admitted, by way of restatement of its 2002

through third quarter 2006 financial statements, that its internal controls over financial reporting were *not effective*, and PWC concurred with that assessment. In its 2006 Form 10-K, IMAX's *Management's Annual Report On Internal Control Over Financial Reporting* stated that "...internal control over financial reporting was *not effective* as of December 31, 2006 due to the material weaknesses identified", particularly surrounding the Company's internal controls related to revenue recognition.

203. PWC's failure to identify such control deficiencies (i.e., material weaknesses) existing at the company prior to 2006, and failure to properly assess and report on management's assessment of internal controls, was in violation of GAAS, specifically AU § 150 and AS 2, as described above. Additionally, PWC's failure to identify such control deficiencies existing at the Company prior to 2006, particularly relating to its internal controls surrounding recognition of revenue from the improper "identification of deliverables and their aggregation into units of accounting" contributed to the Company's issuance of materially false and misleading financial statements through the third quarter of 2006 in violation of GAAP.

## NO STATUTORY SAFE HARBOR

204. The statutory safe harbor provided for forward looking statements under certain circumstances does not apply to any of the false statements pleaded herein because none of those statements are "forward-looking" statements nor were they identified as "forward-looking statements" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in any purportedly forward-looking statements accompany those statements. In the alternative, to the extent that the Defendants successfully argue that the statutory safe harbor does apply to any statements pleaded herein which are deemed to be forward-looking, Defendants are liable for those false forward-looking

statements because at the time each of those statements was made, the speaker actually knew that those forward-looking statements were false and/or the statements were authorized and/or approved by an executive officer of IMAX who actually knew that the statements were false when made.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

205. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

206. This Count is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5 promulgated thereunder, on behalf of Plaintiffs and members of the proposed Class, who were damaged thereby.

207. As alleged herein, throughout the Class Period, Defendants, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mail, knowingly or recklessly engaged and participated in a continuous course of conduct to disseminate materially false and misleading information and to conceal adverse material information about IMAX, including the truth about the Company's revenue recognition procedures, as specified herein. Defendants knowingly or recklessly employed devices, schemes and artifices to defraud Plaintiffs and the proposed Class, while in possession of material, adverse non-public information, and engaged in acts, practices and a course of conduct that included the knowing and reckless making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about IMAX not misleading. Defendants' materially false and

misleading statements were made in connection with the purchase or sale of IMAX's common stock.

208. Defendants knew or recklessly disregarded that IMAX's public statements, as identified herein, failed to disclosed material information concerning IMAX's revenue recognition policies, internal controls and /or disclosure controls. Defendants knew or recklessly disregarded that the public statements complained of herein were materially false and misleading for the reasons alleged herein.

209. Defendants had the ability to, and did, cause the complained of public statements to contain material misstatements and omissions of material facts, as alleged herein.

210. Defendants acted with scienter, in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the truth about IMAX's finances and operations, even though the truth was available to them.

**As to the Individual Defendants**

211. The Individual Defendants were directors and officers of IMAX and, therefore, were directly responsible for the material omissions and false and misleading statements disseminated to the public through financial statements, Quarterly Earnings Conference Calls, press releases, news reports, and filings with the SEC which they prepared, reviewed and/or signed. They also signed Sarbanes-Oxley certifications falsely attesting to the adequacy of the Company's internal and disclosure controls. As the Chief Financial Officer, Joyce had direct responsibility for the preparation of the Company's financial statements, Annual Reports on Form 10-K, Forms 10-Q and budgets. Gamble, as Chief Accounting Officer, oversaw the accounting function. According to Confidential Source No. 7 who worked in IMAX's Canadian

headquarters during the second and third quarters of 2006 as an Accounts Receivable Analyst, the Accounting Department included the Director of Finance, revenue recognition personnel, financial analysts, the Accounts Receivable Supervisor and staff, the treasury function and the Controller. Based on her oversight of these functions, Gamble, like Gelfond, Wechsler and Joyce, had access to all of the material information relating to the Company's revenue recognition for theater systems.

212. One of the key aspects of the job of the Co-CEOs was to assess the Company's business and prospects. The 2006 10-K, at page 41, identified several of the factors Wechsler and Gelfond used to make that assessment, including the signing of new theater systems arrangements, revenue, gross margins from the Company's operating segments, earnings from operations, the success of strategic initiatives such as the securing of new film projects and the progress of the Company's development of a digital projector and related technologies. It was the responsibility of Joyce, as the Chief Financial Officer, and Gamble, as the Chief Accounting Officer, to help insure that theater systems installs were accurately reflected on the Company's books and records and accurately reported to the investing public.

213. During the Class Period, Joyce and Gamble received a portion of their annual compensation in the form of bonuses under the Management Incentive Plan. Bonuses were awarded to Joyce and Gamble under this plan if the Company achieved annual operating objectives targets and their personal performance.

214. The Company's Class Period Schedules 14A say that Gelfond's and Wechsler Class compensation was assessed based on certain quantitative and qualitative factors, including corporate financial results and the realization of business plan objectives (e.g. budgeted profit and loss) related to the Company's performance for the year.

215. The following table, which sets forth the compensation paid or granted by the Corporation to Gelfond, Wechsler and Joyce (Gamble's compensation is not publicly disclosed) during the Class Period, demonstrates the substantial portion of their yearly compensation represented by incentive pay related to Company performance, providing incentive to maintain IMAX's revenues and earnings at as a high level as possible:

| Name | Year ended December 31 | Salary ($) | Bonus ($) | Restricted Stock Awards ($) | Securities Under Options Granted | All other compensation ($) |
|---|---|---|---|---|---|---|
| Bradley J. Wechsler Co-Chairman and Co-Chief Executive Officer | 2006 | 500,000 | 50,000 | -- | --[6] | 34,429 |
| | 2005 | 500,000 | 250,000 | -- | -- | 6,514 |
| | 2004 | 500,000 | 750,000 | -- | 450,000 | 4,460 |
| | 2003 | 500,000 | 750,000 | -- | -- | 4,270 |
| | 2002 | 500,000 | 750,000 | -- | 700,000 | 4,077 |
| | | | | | | |
| Richard L. Gelfond Co-Chairman and Co-Chief Executive Officer | 2006 | 500,000 | 150,000 | -- | -- | 34,640 |
| | 2005 | 500,000 | 250,000 | -- | -- | 6,514 |
| | 2004 | 500,000 | 750,000 | -- | 450,000 | 4,460 |
| | 2003 | 500,000 | 750,000 | -- | -- | 4,414 |
| | 2002 | 500,000 | 750,000 | -- | 700,000 | 4,077 |
| | | | | | | |
| Francis T. Joyce (CFO 2001-9/12/2006) | 2006 | 222,962 | N/A | N/A | N/A | 4,652 |
| | 2005 | 310,000 | 70,000 | -- | 50,000 | 6,514 |
| | 2004 | 306,192 | 116,000 | -- | -- | 4,652 |
| | 2003 | 291,673 | 90,000 | -- | 66,000 | 4,414 |
| | 2002 | 275,000 | 84,219 | -- | -- | 3,692 |

[6] On March 10, 2006, the Co–CEOs were each granted 75,000 options to purchase Common Shares, which options were subsequently cancelled by the Company on June 13, 2007 for no consideration.

As to Defendants Gelfond and Wechsler

216. Gelfond and Wechsler had the motive and opportunity to commit the wrongful acts alleged herein. To effectuate a sale or merger of IMAX, and obtain the highest price possible, it was critical that the valuation of the Company remained elevated. While management and the Board shared an interest in obtaining the most dollars possible, Gelfond and Wechsler had a financial stake in the outcome that others did not by virtue of their stock ownership and change of control agreements.

217. Defendants Gelfond and Wechsler knew they would gain concrete benefits and a substantial profit in the event of a change in control of the Company. Based on a provision contained in their original employment agreements, dated March 1, 1994, both Gelfond and Wechsler were each entitled to receive, upon a sale of the Company, a cash bonus in an amount equal to the product of (a) 0.375% and (b) the amount by which the sale or liquidation transaction imputes an equity value in excess of Cdn. $150,000,000 to the common shares originally issued by the Company (on a fully diluted basis but excluding the common shares issued upon the conversion of the Class B convertible preferred shares of the Company formerly outstanding which were converted into common shares on June 16, 1994 and the common shares issuable upon the exercise of warrants owned by each of Messrs. Gelfond and Wechsler).

218. According to documents filed as exhibits 10.8 and 10.14 to the Company's 2005 Form 10-K, on March 8, 2006, just one day before IMAX officially announced that it was for sale, the employment agreements of Gelfond and Wechsler were amended. The amended employment agreements provided further compensation to Gelfond and Wechsler in the event of a change of control of the Company. The employment agreements were described in IMAX's August 10, 2007 Schedule 14A as follows :

> The 2006 Amendments provided that each of the Co-CEOs would be paid a base salary of $500,000 for 2006 and be considered for a bonus payable in 2007 based upon performance to December 31, 2006, with a guaranteed bonus of $750,000 paid for 2006 in the event of a change of control of the Company.

219. According to IMAX's Schedule 14A, filed with the SEC on March 9, 2006, Gelfond's and Wechsler's pension plan was amended to pay them out, in full, upon a change of control of the Company:

> The Company has a U.S. defined benefit pension plan covering its two Co-Chief Executive Officers. The plan provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings during the 120 months proceeding retirement. Under the original terms of the plan, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. The benefits were 50% vested as of the plan initiation date. The vesting percentage increases on a straight-line basis from inception until age 55. The vesting percentage of a member whose employment terminates other than by voluntary retirement shall be 100%. Also, upon the occurrence of a change of control of the Company prior to termination of a member's employment, the vesting percentage shall become 100%. The Company intends to use the proceeds of life insurance policies taken on its Co-Chief Executive Officers to be applied towards the benefits due and payable under the plan, although there can be no assurance that the Company will ultimately do so. *On March 8, 2006, the Company and the Co-Chief Executives negotiated an amendment to the plan. Under the terms of the plan amendment, the cost of living adjustment and surviving spouse benefits previously owed to the Co-Chief Executive Officers are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and benefit payments are accelerated and paid out upon the occurrence of certain events, including a change of control of the Company. The Company currently estimates that the annual benefits upon retirement will be approximately $1.0 million for each of the Co-Chief Executive Officers, subject to the amended cost of living adjustment and surviving spouse benefits.* (Emphasis added).

220. The Company's August 10, 2007 Schedule 14A also explained that:

> If there had been a change of control and either Mr. Gelfond's or Mr. Wechsler's employment had been terminated involuntarily as at December

> 31, 2006, they would have been entitled to receive estimated lump sum payments of $21,186,570 and $20,417,834, respectively.
>
> ***
>
> If there had been a change of control and either Mr. Gelfond or Mr. Wechsler had elected voluntary retirement as at December 31, 2006, they would have been entitled to receive estimated payments of $16,173,742 and $18,949,834 respectively under the SERP.

221. The modifications to Gelfond's and Wechsler's employment agreements and pension plans were negotiated and made one day before the Company announced that it was being put up for sale. It was Gelfond's and Wechsler's goal to sell the Company at a price which was inflated by the fraud as described herein and reap the benefits of the change of control provision they negotiated. Ultimately, the Company was unable to find an investor willing to purchase or merge with the Company at a price IMAX deemed acceptable.

**As to PWC**

222. As the auditor of a public company, PWC has the responsibility to understand the subject company's business. As described herein, IMAX's theater systems represented the single largest contributor to IMAX's revenues and earnings during the Class Period. As such, before issuing an unqualified clean opinion on IMAX'S financial statements, PWC had a duty to understand the method by which theater systems revenue was recognized, and to satisfy itself that proper accounting principles were being applied for the recognition of revenue. PWC also had the obligation to do a sufficient investigation before opining on the adequacy of IMAX's internal controls.

223. PWC has been IMAX's auditor for approximately 20 years and performed numerous quarterly reviews and annual audits of the Company. PWC performed an integrated audit of the Company's consolidated financial statements and its internal controls over financial

reporting. PWC was regularly consulted by IMAX management and accounting issues and financial statements were always reviewed and opinions provided by PWC before the Company's financial statements were publicly disclosed. Included in the subjects discussed between IMAX management and PWC was IMAX's revenue recognition policy and the application of multiple element accounting to IMAX's theater systems. The Company's approach to revenue recognition was an ongoing subject of review by PWC, and PWC provided advice to management with respect to revenue recognition for theater systems. PWC approved the revenue recognition policies described publicly by IMAX and the reflection thereof in the Company's financial statements.

224. PWC and IMAX management discussed the application of EITF 00-21 and SAB 104 at or about the time they became effective and PWC provided advice on IMAX's application thereof. Given the nature of PWC's access to internal IMAX books and records and PWC's knowledge of the true nature of the theater systems (i.e. that they operated as a single System Deliverable) PWC knew or recklessly disregarded that: multiple element accounting could not properly be applied to IMAX's theater systems; was not properly being applied; that the Company's disclosures with respect to its revenue recognition for theater systems was materially misleading; and that the clean audit opinions PWC issued on IMAX's financial statements were materially misleading.

225. This is particularly true given PWC's knowledge or reckless disregard that the Company separately accounted for the following units of accounting for a typical theater system revenue arrangement: (a) the projection system, sound system and related equipment (excluding the screen) and the supervision of installation of these components; (b) the screen and the

supervision for the installation of the same; (c) maintenance services; and (d) projectionist training. A reasonable reader of IMAX's public disclosures was not alerted to any of these facts.

226. As part of its Report of Independent Registered Public Accounting Firm issued with respect to its yearly audits of IMAX during the Class Period and included in the Company's Forms 10-K, PWC represented that, in its opinion, IMAX's consolidated financial statements presented fairly, in all material respects, the financial condition of IMAX and its subsidiaries. The Restatement shows such representations to be untrue.

227. PWC also audited management's assessment of IMAX's internal controls over financial reporting, and its yearly Reports issued during the Class Period stated that PWC agreed with IMAX management that the Company "maintained effective internal control over financial reporting". However, those representations are belied by PWC's Report accompanying the Restatement, which states that such internal controls were not in place. PWC either knew or recklessly disregarded that fact when it performed its annual audits of IMAX, during which it was to have evaluated "management's assessment, testing and evaluating the design and operational effectiveness of internal control".

**<u>As to All Defendants</u>**

228. During the Class Period, as detailed herein, Defendants engaged in actions which deceived the market for IMAX common stock and a course of conduct that artificially inflated the price of IMAX common stock and operated as a fraud or deceit on purchasers of IMAX common stock by misrepresenting the Company's operating condition and financial results. Defendants achieved this by making the materially misleading statements set forth hereinabove.

229. As a result of the deceptive practices, common schemes and artifices, and false and misleading statements and material omissions alleged herein, the price of IMAX common

stock was artificially inflated during the Class Period. The August 9, 2006 announcement of the SEC investigation and its subject matter partially disclosed what the Company's misrepresentation had concealed from the market and began to reveal what the July 20, 2007 disclosure confirmed.

230. In ignorance of the false and misleading statements, the material omissions and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiffs and members of the proposed Class relied on the integrity of the market in IMAX common stock, and/or the statements complained of herein, when purchasing IMAX common stock. Had Plaintiffs and members of the proposed Class known the truth, they would not have purchased IMAX common stock or would not have purchased them at the artificially inflated prices that were paid.

231. As a result of their purchases of IMAX common stock at fraudulently inflated prices, Plaintiffs and members of the proposed Class suffered substantial damages in an amount to be proven at trial.

232. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated as a fraud and deceit upon Plaintiffs and members of the proposed Class in connection with their purchases of IMAX common stock.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

233. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

234. This Count is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t, on behalf of Plaintiffs and all members of the proposed Class who was damaged thereby.

235. As alleged herein, the Individual Defendants acted as controlling persons of IMAX within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions and the key roles each played in the Company's management, and active participation in, the Company's day-to-day operations including its financial reporting and accounting functions, each of them had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs allege are false and misleading. The Individual Defendants prepared and/or were provided with, or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

236. By virtue of their direct and supervisory involvement in the day-to-day operations of IMAX, the Individual Defendants are presumed to have had the power to control or influence the particular transactions giving rise to the violations of federal law as alleged herein, and exercised the same.

229. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act 15 U.S.C. §78t. As a direct and proximate result of the wrongful conduct, Plaintiffs and the other members of the proposed Classed suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## DEMAND FOR JURY TRIAL

230. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. determining that this action is a proper class action, designating Westchester Capital Management, Inc. as class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating his counsel as counsel for the Class;

B. awarding compensatory damages in favor of Plaintiffs and the other members of the proposed Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. awarding rescission in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

D. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. such other and further relief as is just and proper.

Dated: October 2, 2007

**ABBEY SPANIER RODD & ABRAMS, LLP**

By: ______________________
Arthur N. Abbey, Esq. (AA-8074)
Jill S. Abrams, Esq. (JA-1578)
Richard B. Margolies (RM-9311)
212 East 39th Street
New York, NY 10016
Tel.: 212-889-3700
Fax: 212-684-5191

*Counsel for Lead Plaintiff Westchester Capital Management*

**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Tel: 1-800-424-6690
Fax: 215-875-4604

*Counsel for The Steelworkers Pension Trust*

# EXHIBIT B

This is Exhibit 6 referred to in the affidavit of Carolyn Prozeau sworn before me, this 7 day of May 2012

A COMMISSIONER FOR TAKING AFFIDAVITS

Court file # CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

EN

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

and

IMAX CORPORATION, RICHARD L GELFOND, BRADLEY J WECHSLER and FRANCIS T JOYCE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

## STATEMENT OF CLAIM

TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiffs The claim made against you is set out in the following pages

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiffs' lawyers or, where the plaintiffs do not have a lawyer, serve it on the plaintiffs, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days If you are served outside Canada and the United States of America, the period is sixty days

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure This will entitle you to ten more days within which to serve and file your statement of defence

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE

Date September 20, 2006

Issued by R. SCOZZARI
Registrar

Address of Court Office
7755 Hurontario Street
Brampton ON L6W 4T6

TO
IMAX CORPORATION
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO
RICHARD L GELFOND
1120-5th Avenue
Apt 11A
New York, NY 10128

AND TO
BRADLEY J WECHSLER
784 Park Avenue
Apt 7B
New York, NY 10021

AND TO
FRANCIS T JOYCE
110 East 59th Street
Suite 2100
New York, NY 10022

## CLAIM

### DEFINITIONS

1 The following definitions apply for the purpose of this statement of claim

(a) "*Act*" means the *Securities Act*, R S O 1990 c S 5, as amended,

(b) "**Annual Report**" means **Imax's** annual report for the year ended December 31, 2005, which contained **Imax**'s management's discussion and analysis and audited annual financial statements for the same period,

(c) "*CJA*" means the *Courts of Justice Act*, R S O 1990, c C 43, as amended,

(d) "**Class**" or "**Class Members**" means all persons, other than **Excluded Persons**, who acquired securities of **Imax** during the **Class Period**, or such other definition as may be approved by the court,

(e) "**Class Period**" means the period from and including February 17, 2006 to and including the close of the financial markets on August 9, 2006,

(f) "**Cliff**" means the plaintiff, Cliff Cohen,

(g) "*CPA*" means the *Class Proceedings Act, 1992*, S O 1992 c 6, as amended,

(h) "**Excluded Persons**" means **Imax's** subsidiaries, officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any member of the **Individual Defendants'** and the **Proposed Defendants'** families and any entity in which any of them has or had any interest,

(i) "**February Press Release**" means the press release dated and released on February 17, 2006 by **Imax**,

(j) "**Form 10-K**" means **Imax's** Form 10-K for the fiscal year ended December 31, 2005, which was required to be filed with the **SEC** under *the United States Securities and Exchange Act of 1934*, and which included the **Annual Report**,

(k) "**GAAP**" means generally accepted accounting principles,

(l) **"Gelfond"** means the defendant, Richard L Gelfond,

(m) **"Imax"** means the defendant, Imax Corporation,

(n) **"Individual Defendants"** means the defendants, **Gelfond, Joyce** and **Wechsler,**

(o) **"Joyce"** means the defendant, Francis T Joyce,

(p) **"NASDAQ"** means the electronic screen-based equity securities market that is based in New York, New York,

(q) **"Neil"** means the plaintiff, Neil Silver,

(r) **"OSC"** means the Ontario Securities Commission, the regulator of the capital markets in Ontario,

(s) **"Proposed Defendants"** means Neil S Braun, Kenneth G Copland, Michael Fuchs, Garth M Girvan, David W Leebron and Marc A Utay, each of whom was a member of **Imax's** Board of Directors at all material times, and Kathryn A Gamble, who was **Imax's** Vice-President, Finance and Controller at all material times,

(t) **"Representation"** means the statement explicitly and/or implicitly contained in the **February Press Release** and expressly repeated in the **Form 10-K** and **Annual Report**, that **Imax's** revenue for the 2005 fiscal year were reported in accordance with **GAAP** and that such revenues met or exceeded the earnings guidance previously issued by **Imax**,

(u) **"SEC"** means the Securities and Exchange Commission, the principal regulator of the United States capital markets,

(v) **"SEDAR"** means the system for electronic document analysis and retrieval of the Canadian securities administrators,

(w) **"TSX"** means the Toronto Stock Exchange, and

(x) **"Wechsler"** means the defendant, Bradley J Wechsler

2 NEIL and CLIFF claim on their own behalf and on behalf of the other Class Members

(a) an order pursuant to the *CPA* certifying this action as a class proceeding and appointing Neil and Cliff as the representative plaintiffs,

(b) a declaration that the defendants made the Representation, and that the Representation was untrue, inaccurate and misleading when made,

(c) a declaration that the defendants made the Representation negligently or alternatively, recklessly, caring not whether it was true or false,

(d) a declaration that the defendants conspired each with the other, and with persons unknown, to deceive Neil, Cliff and the other Class Members for the purposes of maintaining and increasing the price of the Imax shares,

(e) a declaration that Imax is vicariously liable for the acts and/or omissions of the Individual Defendants,

(f) leave to amend this statement of claim to assert the causes of action pursuant to s 138 3 of the *Act* and to add the Proposed Defendants as defendants in the action,

(g) special damages, general damages, and the costs of administering the plan of distribution of the recovery in this action in the sum of $200 million or such other sum as this court finds appropriate at the trial of the common issues or at a reference or references,

(h) punitive damages in the amount of $10 million,

(i) an order directing a reference or giving such other directions as may be necessary to determine issues not determined in the trial of the common issues,

(j) prejudgment interest and postjudgment interest, compounded, or pursuant to ss 128 and 129 of the *CJA*,

(k) costs of this action on a substantial indemnity basis or in an amount that provides full indemnity plus, pursuant to s 26(9) of the *CPA*, the costs of notice and of administering the plan of distribution of the recovery in this action plus applicable taxes, and

(l) such further and other relief as to this Honourable Court seems just

**THE NATURE OF THE ACTION**

3 Imax is a publicly-traded company Its shares trade on the TSX and the NASDAQ under the symbols IMX TO and IMAX, respectively

4 Throughout the Class Period, Imax and the Individual Defendants made the Representation The Representation was made in, among other documents, the Annual Report, the February Press Release and the two Imax press releases dated March 9, 2006

5 Neil and Cliff seek damages in an amount equal to the losses they and the other Class Members suffered as a result of purchasing Imax securities during the Class Period

**THE PLAINTIFFS**

6 Neil resides in the City of Windsor, in the Province of Ontario Neil continues to hold the 1000 shares of Imax he purchased on the TSX Particulars of his purchases follow

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| July 31, 2006 | 500 | Purchase | $11 87 | $5961 10 |
| August 9, 2006 | 500 | Purchase | $10 84 | $5446 10 |

7 Cliff resides in the City of Toronto, in the Province of Ontario Cliff sold the 300 shares of Imax he purchased on the TSX after the Class Period Cliff lost $1968 Particulars of his trades follow

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| August 1, 2006 | 300 | Purchase | $12 03 | $3638 |
| August 28, 2006 | 300 | Sale | $5 47 | $1670 |

**THE DEFENDANTS**

8 Imax is a corporation incorporated pursuant to the laws of Canada It is headquartered in Mississauga, Ontario, but it also has offices in New York, New York Imax is a reporting issuer in British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, Quebec, New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland

9 Gelfond was at all material times, and continues to be, the Co-Chairman of Imax's Board of Directors, and its Co-Chief Executive Officer Gelfond is a significant shareholder in Imax

10 Wechsler was at all material times, and continues to be, the Co-Chief Executive Officer of Imax and a member of its Board of Directors Wechsler is a significant shareholder in Imax

11 Joyce was at all material times Imax's Chief Financial Officer He resigned from that position on August 21, 2006 Joyce is a significant shareholder in Imax

12 By virtue of their positions as senior officers and/or directors of Imax, the Individual Defendants had actual, implied or apparent authority to act and speak on Imax's behalf prior to and during the Class Period

**IMAX'S BUSINESS**

13 Imax was founded in Toronto in 1967 Since then, it has carried on business in the large-format film industry as a manufacturer of specialty projection and sound systems and a significant producer and distributor of 15/70-format films for large-format theatres around the world

14 A large part of Imax's revenues come from the sale, lease and installation of theatre systems, which include multiple technical elements, including specialized projection equipment, specialty screens, theater automation control systems and film handling equipment Each of these elements, while technically distinct, is essential to the functionality of the end product that Imax contracts to deliver to its customers Without each of those elements, Imax's customers do not have the use of the product that Imax has contracted to deliver

15 Imax also derives revenues from the licensing of related film products to the IMAX theatre network, post-production services for large-format films and from its owned and operated theatre operations Imax conducts business from its headquarters in Mississauga, Ontario and its offices in New York, New York

**IMAX'S DISCLOSURE OBLIGATIONS**

16 Imax is a reporting issuer in Ontario and as such, is required to file and deliver to its shareholders audited, annual, comparative financial statements prepared in

accordance with GAAP Pursuant to s 78 of the *Act*, these statements must be filed with the OSC and delivered each year within 140 days of the end of the year to which the statements relate

17 Pursuant to s 77 of the *Act*, Imax is required to file with SEDAR and deliver to its shareholders quarterly interim financial statements prepared in accordance with GAAP These statements must include a comparative statement to the corresponding period in the previous year

**THE BACKGROUND**

18 On March 10, 2005, Imax published a press release in which it estimated that its 2005 earnings, calculated in accordance with GAAP, would be $0 35 to $0 38 per share, an increase from its earlier estimates of $0 32 per share

19 In November 2005, Imax reported its financial results for the third quarter of fiscal 2005 The results did not meet the expectations of Imax's then current and potential security-holders, and the price of Imax shares declined accordingly The poor financial results arose in part from Imax's inability to install its high-tech cinemas on a timely basis The financial results disclosed that Imax had only installed seven new systems during that quarter, which was less than had been anticipated

THE RELEASE OF THE MISLEADING REPRESENTATION

*THE FEBRUARY PRESS RELEASE*

20 On February 17, 2006, Imax issued the February Press Release and filed it with SEDAR and the SEC

21 In the February Press Release, Imax announced that

(a) it expected to meet or exceed its previously issued guidance of $0 35-$0 38 US in net earnings per share for fiscal 2005, and

(b) it had successfully completed 14 theatre system installations in the fourth quarter of 2005, and that the installation of those systems *"underlines the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues "*

22 Each of the Individual Defendants authorized, permitted and/or acquiesced in the publication of the February Press Release

23 The February Press Release was materially false and/or materially misleading when made Imax's statement that it expected to meet or exceed 2005 earnings guidance was premised upon its recognition of revenue in relation to ten theatre installations that were not scheduled to open until the first or second quarter of 2006, seven of which were not even completed until 2006 As alleged more particularly below, the practice of recognizing revenue in relation to those unopened and uncompleted theatre installations violated GAAP and failed to fairly present the financial performance of Imax

24 On the day the February Press Release was issued, Imax's share price increased by 9% Imax's share price continued to rise dramatically after the February Press Release was issued On March 8, 2006, at the close of the financial markets, Imax's share price closed at $11 00 CDN and $9 50 USD on the TSX and NASDAQ, respectively, an increase of 20% and 21 5% from February 16, 2006

*THE ANNUAL REPORT*

25 On March 9, 2006, Imax issued its Annual Report On or about March 9, 2006, in accordance with its obligation pursuant to s 78 of the *Act*, Imax filed its Form 10-K with SEDAR and the SEC

26 The Individual Defendants signed the Form 10-K certifying that the Annual Report contained therein presented fairly, in all material respects, Imax's financial condition and results of operations

27 Imax claimed in the Annual Report that it had exceeded its 2005 financial guidance In particular, Imax stated that it had

(a) revenue of $49,310,000 for the fourth quarter of fiscal 2005,

(b) revenue of $144,930,000 for the fiscal year 2005,

(c) diluted net earnings of $0 29 per share for the fourth quarter of fiscal 2005 (a purported increase of 54% compared to the same period in the previous fiscal year),

(d) diluted net earnings of $0 40 per share for fiscal 2005 (a purported increase of 62% compared to the previous fiscal year), and

(e) revenues from Imax systems of $97,753,000

28 The management's discussion and analysis contained in the Annual Report also stated that Imax had installed ten theatre systems in 2005 and that the theatres were scheduled to open in the first and second quarters of 2006 These ten theatre systems were among fourteen reported in revenue for 2005 It further stated that these systems were not included in either the open theatre network base or Imax's backlog figures The Annual Report described Imax's sales backlog as follows

> The Company lists signed contracts for theatre system sales and sale-type leases as sales backlog prior to the time of revenue recognition *Sales backlog represents the total value of all signed system sales and lease agreements that are expected to be recognized as revenue in the future* and includes initial rental fees along with the present value of contractual minimum rents due over the lease term, but excludes maintenance revenues as well as rents in excess of contractual minimums that might be received in the future [Emphasis added ]

29 For accounting purposes, Imax treats its sales and installations of theatres as "multiple element arrangements" The financial statements and management's discussion and analysis contained in the Annual Report included the following statement as to Imax s revenue recognition practices

> The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions
>
> When the elements of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value Revenue allocated to an individual element is

recognized when revenue recognition criteria for that element is met

[ ]

The Company recognizes revenue from sales and sales type leases when the installation of the respective theatre system element is substantially complete and all of the following criteria are met persuasive evidence of an agreement exists, the price is fixed or determinable, and collection is reasonably assured

30 GAAP defines multiple element arrangements and specifies when revenue may be recognized in respect of such arrangements Revenue arising from multiple element arrangements can only be recognized when

(a) revenue arrangements with multiple deliverables can be divided into separate units of accounting,

(b) persuasive evidence of an arrangement exists,

(c) the risks and rewards of ownership have been transferred to the buyer of the goods,

(d) delivery has occurred or services have been rendered,

(e) the seller's price to the buyer is fixed or determinable, and

(f) collection is reasonably assured

31 GAAP provides that revenue arrangements with multiple deliverables can be divided into separate units of accounting where

(a) the delivered element has value to the customer without the undelivered element such that it could be sold by or generate revenue for the customer without the undelivered element,

(b) where the undelivered element is not essential to the function of the delivered element,

(c) there is objective and reliable evidence of the fair value of the undelivered item or items, and,

(d) if the arrangement includes a general right of return of the delivered item, the delivery or performance of the undelivered item is probable and substantially within the control of the vendor

32 If, under the foregoing rules, revenue may be recognized in relation to delivered elements, GAAP also requires the supplier to consider whether the value of the delivered elements allocable to the delivered item(s) is contingent upon the delivery of additional items, or meeting other specified performance conditions

33 The Individual Defendants' certifications and the revenue statements and figures contained in the Annual Report were false and/or materially misleading In violation of GAAP, Imax had improperly recognized revenue in the fourth quarter of fiscal 2005 on ten theatre installations in theatres that did not open in that quarter and, in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Insofar as Imax sold complete theatre systems, which comprised separate but integrated components, revenues should not have been recorded until the completion of each system Imax's application of multiple element revenue accounting did not fairly present Imax's 2005 financial results and was not consistent with prior years' accounting practices The application of multiple element revenue accounting resulted in overstated revenues, gross earnings, net earnings, retained earnings and earnings per share as report in Imax's 2005 annual financial statements

*THE MARCH 9, 2006 PRESS RELEASES*

34 On March 9, 2006, in conjunction with the release of the Annual Report, the defendants issued and filed a press release with SEDAR and the SEC

35 The March 9, 2006 press release repeated the materially false and/or materially misleading financial results reported in the February Press Release and in the Annual Report In particular, the March 9, 2006 press release repeated Imax's artificially inflated 2005 earnings per share of US$0 40

36 In addition, Gelfond and Wechsler stated in the March 9, 2006 press release that they "*believe our performance in 2005 demonstrates the increasing acceptance of Imax as a commercial destination for mainstream entertainment*"

37 The foregoing statements were false and or materially misleading when made, inasmuch as Imax's "*performance in 2005*" had been materially overstated due to the improper recognition of revenues in violation of GAAP

38 On March 9, 2006, Imax issued a second press release announcing that

(a) its board of directors had begun a process to "*explore strategic alternatives to enhance shareholder value*," including the sale or merger of the company with another entity offering strategic opportunities for growth,

(b) it had retained Allen & Company and UBS Investment Bank as financial advisors in this process, and

(c) Gelfond and Wechsler thought that as a result of "*solid fiscal 2005 results and compelling growth opportunities*" it was an ideal time to explore options

39 The second March 9, 2006 press release was false and/or materially misleading, inasmuch as Imax's "*solid fiscal 2005 results*" had been materially overstated due to the improper recognition of revenues in violation of GAAP

40 On March 9, 2006, Imax's share price closed on the TSX at $11 94 CDN and $10 35 USD on the NASDAQ, an 8% increase Imax's share price increased in the following days On March 13, 2006, Imax's share price closed on the TSX at $12 56 CDN and $10 85 USD on the NASDAQ, a 14% and 19% increase, respectively, from March 8, 2006

**THE TRUTH IS REVEALED**

41 On August 9, 2006, after the financial markets closed, Imax issued a press release announcing for the first time that

(a) it was in the process of responding to an informal inquiry from the SEC regarding its revenue recognition practices, including its application of multiple element arrangement revenue accounting to the sale of theatre systems,

(b) it had been unsuccessful to date in its efforts to find an acquirer or merger partner, and

(c) it had identified a material weakness in its internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of fiscal 2006, resulting in a negative adjustment of $0 8 million to its consolidated statement of operations for second quarter of fiscal 2006

42 The August 9, 2006 press release also revealed that under Imax's multiple element arrangement accounting, revenues associated with different elements of a theatre system contract are segregated and can be recognized in different periods That press release also stated that Imax had

> *recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of system was deferred until the final screen was installed " Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006 and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006 The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed*

43 The August 9, 2006 press release was filed with SEDAR and the SEC

44 On August 10, 2006, as a result of the announcement in the August 9, 2006 press release, the price of Imax's shares plummeted and closed at $6 44 CDN on the TSX and $5 73 USD on the NASDAQ, a drop of 40 2% and 40 5%, respectively, from the previous day

**THE SUBSEQUENT EVENTS**

45 On August 21, 2006, Imax issued a press release announcing that Joyce was resigning from his position as Chief Financial Officer of Imax in order "*to pursue other professional opportunities*"

46 The average closing price of Imax's shares over the ten trading days following the issuance of the August 9, 2006 press release was $6 25 CDN on the TSX

and $5 58 USD on the NASDAQ This constituted a decrease of 41% and 42%, respectively, from the closing price of Imax shares on August 9, 2006

THE CONSPIRACY

47 From on or about October 1, 2005 to on or about August 9, 2006, at Mississauga, Ontario, New York, New York and elsewhere, Imax, its servants and agents and the Individual Defendants, wrongfully, unlawfully, maliciously and lacking bona fides, agreed together, the one with the other and with persons unknown to, among other things, overstate the revenues and net earnings of Imax for the fourth quarter and fiscal year ended on December 31, 2005

48 Some, but not all of the defendants' predominant purposes, concerns and motivation were to

(a) attract an acquirer or merger partner,

(b) inflate the price of Imax's shares,

(c) obtain an artificially high purchase price of Imax, and

(d) increase the value of their own holdings in Imax

49 In furtherance of the conspiracy, the following are some, but not all of the acts carried out by the defendants, or some of them

(a) they recognized revenue in the fourth quarter of 2005 on ten theatre systems even though sufficient and appropriate evidence did not exist that such systems had been substantially installed as operational Imax facilities, that Imax had fulfilled its obligations as vendor or that revenues had been "earned" in accordance with GAAP,

(b) they inappropriately implemented revenue recognition procedures that allowed Imax to segregate revenues from different elements of an Imax theatre system, and recognize those revenues in different quarters, even though the customer transactions were not suited to such accounting treatment,

(c) they deviated from GAAP in the preparation of the financial statements,

(d) they deviated from the accounting principle of consistency in the preparation of financial statements,

(e) they authorized statements, announcements, press releases, filings and other public documents containing the Representation,

(f) they permitted Imax and the Individual Defendants to make the Representation which was false,

(g) they made, or failed to take any steps to prevent Imax from making, the Representation in statements, announcements, press releases, filings and other public documents,

(h) they made, or caused Imax to make, announcements about its revenue and net earnings when they knew there was no reasonable foundation, in fact, for these net earnings,

(i) they falsely stated that Imax had revenue of $49,310,000 for the fourth quarter of the fiscal year ended 2005,

(j) they falsely stated that Imax had revenue of $144,930,000 for the fiscal year ended 2005,

(k) they prepared and issued the February Press Release falsely stating that it expected to meet or exceed 2005 earnings guidance,

(l) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's revenue was $49,310,000 for the fourth quarter of fiscal 2005, and

(m) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's net earning was $0 29 per share for the fourth quarter of fiscal 2005 and $0 40 per share for the fiscal year 2005

50 The conspiracy was unlawful because the defendants knowingly and intentionally overstated the revenue and net earnings of Imax and in doing so violated

the *Act* and similar regulatory legislation in other jurisdictions and the reporting requirements of the TSX and the NASDAQ

51 The conspiracy was directed towards Neil, Cliff and the other Class Members The defendants knew in the circumstances that the conspiracy would, and it did, cause loss to Neil, Cliff and the Class Members

THE EFFICIENT MARKETS

52 The price of Imax's publicly-traded securities is directly impacted by Imax's periodic disclosures regarding its business and affairs The defendants were at all material times aware of the effect of Imax's disclosures upon the price of its publicly-traded securities

53 The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases, each of which contained the Representation, were filed with SEDAR, the SEC, the TSX and NASDAQ and thereby became immediately available to and were reproduced for inspection by the Class Members, the public and the financial press through the internet and financial publications

54 Imax routinely transmitted the documents referred to in paragraph 49 above to the financial press and certain prospective and actual security-holders of Imax

55 Imax regularly communicated with the public investors via established market-communication mechanisms, including through regular disseminations of press releases on newswire services in Canada and the United States The price of Imax's publicly-traded securities were directly impacted each time Imax communicated to public investors

56 Imax was the subject of analysts reports that incorporated the material elements of the documents referred to in paragraph 53 above, with the effect that any recommendation in such reports was based, in whole or in part, upon material over-statements of Imax's financial results Each analyst report written about Imax and released to the public directly impacted the price of Imax's publicly-traded securities

57 Imax securities were and are traded on the TSX and the NASDAQ, both of which are highly efficient and automated markets that promptly incorporate into the price of Imax's shares all material information disseminated to the public, including the documents referred to in paragraph 53 above, by Imax and/or its officers, directors and employees

**NEGLIGENCE**

58 Imax and the Individual Defendants owed a duty to Neil, Cliff and the Class Members, at law and under the provisions of the *Act*, to disseminate promptly, or to ensure the prompt dissemination of complete and accurate statements regarding Imax's business and affairs, and promptly to correct previously-issued, materially

inaccurate information, so that the price of Imax's publicly-traded securities was based upon complete and accurate information

59 The reasonable standard of care expected in the circumstances required the defendants to act fairly, reasonably, honestly, candidly and in the best interests of Neil, Cliff and the other Class Members

60 The defendants failed to meet the standard of care required for the reasons particularized in the following paragraphs

61 The defendants were negligent in that

(a) they failed to exercise the degree of care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances as required by law,

(b) they signed the Form 10-K and the Annual Report when they knew or reasonably ought to have known that the documents contained the Representation which was false,

(c) they authorized statements, announcements, press releases, filings and other public documents containing the Representation,

(d) they failed to maintain appropriate internal policies and procedures to ensure that the financial statements adequately and fairly presented the financial position of Imax,

(e) they knew or ought to have known that the 2006 reported revenue, gross earnings, net earnings, retained earnings and earnings per share of Imax were not fairly stated,

(f) they failed to properly consider all available information and reports respecting the revenue and net earnings of Imax, and

(g) they failed to comply with the principles of GAAP, such as the following

(i) interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements,

(ii) financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions,

(iii) financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources,

(iv) financial reporting should provide information about an enterprise's financial performance during a period,

(v) completeness, meaning that relevant information necessary to ensure the fair presentation of underlying events and conditions is provided,

(vi) consistency in the application of financial accounting and reporting policies,

(vii) financial reporting should be reliable in that it represents what it purports to represent, and

(viii) conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered

**NEGLIGENT AND FRAUDULENT MISREPRESENTATION**

62 The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases were prepared, in part, for the purpose of attracting investment and with the intention that members of the investing public would rely upon the documents in making the decision to purchase Imax securities

63 Each of the documents referred to in paragraph 62 above contained the Representation The Representation was untrue, inaccurate and misleading

64 The defendants knew that by making the Representation, the price of Imax's publicly-traded securities would rise and remain at artificially high levels and that investors would rely upon the Representation in making their decisions to purchase Imax shares

65 Imax made the Representation by issuing the

(a) February Press Release,

(b) Form 10-K,

(c) Annual Report, and

(d) March 9, 2006 press releases

66 The Individual Defendants made the Representation by

(a) authorizing, permitting and/or acquiescing in the February Press Release,

(b) authorizing, permitting and/or acquiescing in and signing the Form 10-K,

(c) authorizing, permitting and/or acquiescing in the Annual Report, and

(d) authorizing, permitting and/or acquiescing in the March 9, 2006 press releases

67 The defendants made the Representation negligently or, alternatively, recklessly, caring not whether it was true or false, intending that Neil, Cliff and the other Class Members would rely upon it, which they did to their detriment by purchasing Imax securities during the Class Period and holding the securities beyond the Class Period

68 Neil, Cliff and each other Class Members relied upon the Representation when he, she or it purchased Imax securities

69 Neil, Cliff and each other Class Member suffered damages and loss, as particularized below, as a result of relying on the Representation and purchasing the Imax shares

**DAMAGES**

70 Neil, Cliff and the other Class Members have suffered damages Had Imax's financial position been fairly disclosed, Neil, Cliff and the other Class members would not have purchased Imax securities at the price paid, or alternatively, at all

71 Neil, Cliff and the other Class Members are also entitled to recover, as damages or costs in accordance with the *CPA*, the costs of administering the plan to distribute the recovery in this action

**VICARIOUS LIABILITY OF IMAX**

72 Imax is vicariously liable for the acts and omissions of the Individual Defendants, the Proposed Defendants and its employees who are particularized in this statement of claim

73 The acts or omissions particularized and alleged in this statement of claim to have been done by Imax were authorized, ordered and done by the Individual Defendants, the Proposed Defendants and Imax's other agents, employees and representatives while engaged in the management, direction, control and transaction of its business affairs and are, therefore, acts and omissions for which Imax is vicariously liable

74 At all material times, the Individual Defendants were officers and/or directors of Imax As their actions are independently tortious, they are personally liable for same to Neil, Cliff and the other Class Members Furthermore, Imax is vicariously liable for the acts and omissions of the Individual Defendants as particularized herein

**PART XXIII 1 OF THE SECURITIES ACT**

75 Neil and Cliff intend to immediately deliver a notice of motion seeking leave under s 138 8(1) of the *Act* to amend this statement of claim to add the Proposed Defendants as defendants and plead the causes of action set out in s 138 3 of the *Act*

**PUNITIVE DAMAGES**

76 Neil and Cliff plead that the defendants' conduct was high-handed, outrageous, reckless, wanton, entirely without care, deliberate, callous, disgraceful, willful, in intentional disregard of their rights, indifferent to the consequences and

motivated by economic considerations Such conduct renders the defendants liable to pay punitive damages

**THE LEGISLATION**

77 Neil and Cliff plead and rely upon the *Act*, the *CJA* and the *CPA*, all as amended

**PLACE OF TRIAL**

78 Neil and Cliff propose that this action be tried in the City of Mississauga, in the Province of Ontario

**SERVICE**

79 This originating process may be served without court order outside Ontario because the action is

(a) in respect of a tort committed in Ontario (rule 17 02(g)),

(b) in respect of damages sustained in Ontario arising from a tort or breach of contract however committed (rule 17 02(h)),

(c) against a person outside Ontario who is a necessary and proper party to this proceeding properly brought against another person served in Ontario (rule 17 02(o)), and

(d) against a person carrying on business in Ontario (rule 17 02(p))

September 20, 2006

SUTTS, STROSBERG LLP
Lawyers
600 - 251 Goyeau Street
Windsor, ON N9A 6V4

HARVEY T STROSBERG, Q C
LSUC Number 12640O
PATRICIA A SPEIGHT
LSUC Number 26380C
JAY STROSBERG
LSUC Number 47288F

Tel 519 561 6285
Fax 866 316 5308

SISKINDS LLP
Barristers & Solicitors
680 Waterloo Street
P O Box 2520
London, ON N6A 3V8

CHARLES M WRIGHT
LSUC Number 36599Q
A DIMITRI LASCARIS
LSUC Number 50074A
MICHAEL G ROBB
LSUC Number 45787G

Tel 519 672 2121
Fax 519 672 6065

Solicitors for the plaintiffs

421081

SILVER et al vs IMAX CORPORATION et al

Plaintiffs Defendants

Court File No CV-06-3257-00

ONTARIO
SUPERIOR COURT OF JUSTICE

PROCEEDINGS COMMENCED AT BRAMPTON

**STATEMENT OF CLAIM**

**SUTTS, STROSBERG LLP**
Lawyers
600 Westcourt Place
251 Goyeau Street
Windsor ON N9A 6V4

**HARVEY T. STROSBERG, QC**
**LSUC# 12640O**
Tel (519) 258-9333
Fax (519) 258-9527
SOLICITORS FOR THE PLAINTIFFS

FILE 48-093-000
REF HTS/sw

# EXHIBIT C

Amended this ...12... day of ...DECEMBER
2011

Pursuant to the order of the Honourable
JUSTICE VAN RENSBURG

Dated this ...14... day of ...DECEMBER
2009.

Per: ..............................

Court File No.: CV-06-3257-00

*ONTARIO*
SUPERIOR COURT OF JUSTICE

BETWEEN

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

This is Exhibit...C...referred to in the affidavit of...Carolyn Pioveson... sworn before me, this...7... day of...May...20..12..

A COMMISSIONER FOR TAKING AFFIDAVITS

and

IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE, NEIL S. BRAUN, KENNETH G. COPLAND, GARTH M. GIRVAN, DAVID W. LEEBRON and KATHRYN A. GAMBLE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**FRESH STATEMENT OF CLAIM**

TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiffs. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiffs' lawyers or, where the plaintiffs do not have a lawyer, serve it on the plaintiffs, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario.

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your statement of defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date: September 20, 2006

Issued by: "R. SCOZZARI"
Registrar

Address of Court Office:
7755 Hurontario Street
Brampton, ON L6W 4T6

TO:
IMAX CORPORATION
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
RICHARD L. GELFOND
1120-5th Avenue, Apt. 11A
New York, NY 10128

AND TO:
BRADLEY J. WECHSLER
784 Park Avenue, Apt. 7B
New York, NY 10021

AND TO:
FRANCIS T. JOYCE
110 East 59th Street, Suite 2100
New York, NY 10022

AND TO:
NEIL S. BRAUN
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

AND TO:
KENNETH G. COPLAND
c/o Imax Corporation
525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
KATHRYN A. GAMBLE
c/o Imax Corporation
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
GARTH M. GIRVAN
c/o Imax Corporation
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO:
DAVID W. LEEBRON
c/o Imax Corporation
110 East 59th Street, Suite 2100
New York, NY 10022

# CLAIM

## DEFINITIONS

1. The following definitions apply for the purpose of this statement of claim:

(a) **"Annual Report"** means **Imax's** annual report for the year ended December 31, 2005, which contained **Imax** management's discussion and analysis and audited annual financial statements for the same period;

(b) **"Braun"** means the defendant, Neil S. Braun;

(c) **"*CJA*"** means the *Courts of Justice Act*, R.S.O. 1990, c. C.43, as amended;

(d) **"Class"** or **"Class Members"** means all persons, other than **Excluded Persons**, who acquired securities of **Imax** during the **Class Period** and who held some or all of those securities at the close of trading on the **TSX** and **NASDAQ** on August 9, 2006, or such other definition as may be approved by the court;

(e) **"Class Period"** means the period from and including the opening of trading on the **TSX** and **NASDAQ** on February 17, 2006 to and including the close of trading on the **TSX** and **NASDAQ** on August 9, 2006;

(f) **"Cliff"** means the plaintiff, Cliff Cohen;

(g) **"Copland"** means the defendant, Kenneth G. Copland;

(h) **"*CPA*"** means the *Class Proceedings Act, 1992*, S.O. 1992, c. 6, as amended;

(i) **"Earning Press Release"** means the press release dated and released on March 9, 2006;

(j) **"EITF 0021"** means Emerging Issues Task Force of the Financial Accounting Standards Board Issue No. 0021 titled *Revenue Arrangements with Multiple Deliverables*;

(k) **"*Exchange Act*"** means the United States *Securities and Exchange Act of 1934*;

(l) "**Excluded Persons**" means **Imax's** subsidiaries, affiliates, officers, directors, senior employees, legal representatives, heirs, predecessors, successors and assigns, and any member of the defendants' families and any entity in which any of them has or had during the **Class Period** any legal or de facto controlling interest;

(m) "**FASB**" means the United States Financial Accounting Standards Board;

(n) "**February Press Release**" means the press release dated and released on February 17, 2006 by **Imax**;

(o) "**Form 10-K**" means **Imax's** Form 10-K for the fiscal year ending December 31, 2005, which was required to be filed with the **SEC** under the ***Exchange Act***, and which included the **Annual Report**;

(p) "**GAAP**" means United States generally accepted accounting principles;

(q) "**Gamble**" means the defendant, Kathryn A. Gamble;

(r) "**Gelfond**" means the defendant, Richard L. Gelfond;

(s) "**Girvan**" means the defendant, Garth M. Girvan;

(t) "**Imax**" means the defendant, Imax Corporation;

(u) "**Individual Defendants**" means **Gelfond, Wechsler and Joyce**;

(v) "**Joyce**" means the defendant, Francis T. Joyce;

(w) "**Leebron**" means the defendant, David W. Leebron;

(x) "**Lister**" means Robert D. Lister, **Imax's** General Counsel;

(y) "**NASDAQ**" means the electronic screen-based equity securities market that is based in New York, New York;

(z) "**Neil**" means the plaintiff, Neil Silver;

(aa) "**OSC**" means the Ontario Securities Commission, the regulator of the capital markets in Ontario;

(bb) "**PWC**" means PricewaterhouseCoopers LLP;

(cc) "**RAMD**" means revenue accounting for multiple deliverables;

(dd) "**Representation**" means the statement explicitly and/or implicitly contained in the **February Press Release** and expressly repeated in the **Form 10-K** and **Annual Report**, that **Imax's** revenue for the 2005 fiscal year were prepared and reported in accordance with **GAAP** and that such revenues met or exceeded the earnings guidance previously issued by **Imax**;

(ee) "**SAB 101**" means **SEC's** Staff Accounting Bulletin 101;

(ff) "**SAB 104**" means **SEC's** Staff Accounting Bulletin 104;

(gg) "**SEC**" means the Securities and Exchange Commission, the principal regulator of the United States capital markets;

(hh) "***Securities Act***" means the *Securities Act*, R.S.O. 1990 c. S.5, as amended;

(ii) "**SEDAR**" means the system for electronic document analysis and retrieval used for electronically filing most securities related information with the Canadian Securities Administrators;

(jj) "**SFAC No. 5**" means Statement of Financial Accounting Concepts No. 5;

(kk) "**Strategic Alternatives Press Release**" means the press release dated and released on March 9, 2006;

(ll) "**TSX**" means the Toronto Stock Exchange; and

(mm) "**Wechsler**" means the defendant, Bradley J. Wechsler.

2. NEIL and CLIFF claim on their own behalf and on behalf of the other Class Members:

(a) a declaration that Imax and the Individual Defendants made the Representation and the other misstatements alleged herein, which is a misrepresentation;

(b) a declaration that Imax and the Individual Defendants made the misrepresentation negligently or alternatively, recklessly, caring not whether it was true or false;

(c) a declaration that Imax and the Individual Defendants conspired each with the other, and with persons unknown, to deceive the Class Members for the purposes of maintaining and increasing the price of the Imax shares;

(d) a declaration that Imax is vicariously liable for the acts and/or omissions of the Individual Defendants;

(e) a declaration that the Defendants are liable pursuant to s. 138.3(1) of the *Securities Act*;

(f) a declaration that Imax, Wechsler, Gelfond, Braun, Copland, Girvan and Leebron are liable to the Class Members for damages calculated in accordance with ss. 138.5 and 138.7(1) of the *Securities Act*;

(g) a declaration that Wechsler, Gelfond, Joyce and Gamble permitted or acquiesced in the release of documents referred to below that contained a misrepresentation and are therefore liable to the Class Members for damages calculated in accordance with ss. 138.5 and 138.7(2) of the *Securities Act*;

(h) special damages, general damages, and the costs of administering the plan of distribution of the recovery in this action in the sum of $200 million or such other sum as this court finds appropriate at the trial of the common issues or at a reference or references;

(i) punitive damages in the amount of $10 million;

(j) an order directing a reference or giving such other directions as may be necessary to determine issues not determined in the trial of the common issues;

(k) prejudgment interest and postjudgment interest, compounded, or pursuant to ss. 128 and 129 of the *CJA*;

(l) costs of this action on a substantial indemnity basis or in an amount that provides full indemnity plus, pursuant to s. 26(9) of the *CPA*, the costs of notice and of administering the plan of distribution of the recovery in this action plus applicable taxes; and

(m) such further and other relief as to this Honourable Court seems just.

THE NATURE OF THE ACTION

3. Imax is a publicly-traded company. Its shares trade on the TSX and the NASDAQ under the symbols IMX.TO and IMAX, respectively.

4. Throughout the Class Period, the defendants made the Representation and the other misstatements alleged herein. The Representation was made in, among other documents, the Annual Report, the Form 10-K, the February Press Release and the two Imax press releases dated March 9, 2006.

5. Neil and Cliff seek damages in an amount equal to the losses they and the other Class Members suffered as a result of purchasing or acquiring Imax securities during the Class Period, or alternatively, at their election, damages calculated in accordance with Part XXIII.1 of the *Securities Act*.

THE PLAINTIFFS

6. Neil resides in the City of Windsor, in the Province of Ontario. Neil purchased and continues to hold the 1000 shares of Imax he purchased on the TSX. Particulars of his purchases follow:

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| July 31, 2006 | 500 | Purchase | $11.87 | $5961.10 |
| August 9, 2006 | 500 | Purchase | $10.84 | $5446.10 |

7. Cliff resides in the City of Toronto, in the Province of Ontario. After the Class Period, Cliff sold the 300 shares of Imax he purchased on the TSX. Cliff lost $1968. Particulars of his trades follow:

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| August 1, 2006 | 300 | Purchase | $12.03 | $3638.00 |
| August 28, 2006 | 300 | Sale | $5.47 | $1670.00 |

**THE DEFENDANTS**

8. Imax is a corporation incorporated pursuant to the laws of Canada. It is headquartered in Mississauga, Ontario, but it also has offices in New York, New York. Imax is a reporting issuer in British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, Quebec, New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland.

9. At the material times, Gelfond was the Co-Chairman of Imax's Board of Directors, and its Co-Chief Executive Officer. At the material times, Gelfond held a significant number of Imax's securities.

10. At the material times, Wechsler was the Co-Chief Executive Officer of Imax and a member of its Board of Directors. At all material times, Wechsler held a significant number of Imax's securities.

11. At the material times, Braun, Copland, Girvan and Leebron:

(a) were members of Imax's Board of Directors; and

(b) each held a significant number of Imax's securities.

12. At the material times, Joyce:

(a) was the Chief Financial Officer of Imax (a position from which he resigned on August 21, 2006); and

(b) held a significant number of Imax's securities.

13. At the material times, Gamble:

(a) was Vice President, Finance and Comptroller of Imax; and

(b) held a significant number of Imax's securities.

14. By virtue of their positions as senior officers and/or directors of Imax, the Individual Defendants had actual, implied or apparent authority to act and speak on Imax's behalf prior to and during the Class Period.

**IMAX'S DISCLOSURE OBLIGATIONS**

15. Imax is a responsible issuer in Ontario and as such, is required to file and deliver to its shareholders audited, annual, comparative financial statements. Because Imax is traded on the NASDAQ, it is subject to the *Exchange Act*, which requires that Imax's annual financial statements be prepared in accordance with GAAP.

16. Pursuant to s. 77 of the *Securities Act*, Imax is required to file with SEDAR and deliver to its shareholders, quarterly interim financial statements. These

statements must include a comparative statement to the corresponding period in the previous year. Pursuant to s. 78 of the *Securities Act*, these statements must be filed with the OSC and delivered each year within 140 days of the end of the year to which the statements relate. Because Imax is traded on the NASDAQ, it is subject to the *Exchange Act*, which requires that Imax's interim financial statements be prepared in accordance with GAAP.

**OVERVIEW OF IMAX'S BUSINESS**

17. Imax describes itself as one of the world's leading entertainment technology companies, specializing in large format and 3D film presentations. Its principal business is the design, manufacture, sale and lease of projection systems based on proprietary and patented technology. Imax theatre systems combine advanced, high resolution projection systems, sound systems and screens as large as eight stories high that extend to the edge of a viewer's peripheral vision to create an immersive audio-visual experience marketed as "The Imax Experience".

18. Imax markets its large-format systems as a unique movie-going experience. Virtually every aspect of an Imax theater system is unique and proprietary. Imax has developed and patented and markets the following theater system components: (1) the camera; (2) the projector; (3) the screen; (4) the sound system; and (5) the physical layout of the theater. Each component is specifically designed to work as a unit to produce the "Imax Experience", an immersion of the spectator in the movie by the use

of sight and sound. Imax 3D systems are designed to further heighten the immersive effect of the Imax system.

19. A large part of Imax's revenues comes from the sale, lease and installation of theatre systems, which include multiple technical elements, including specialized projection equipment, specialty screens, theater automation control systems and film handling equipment. Each of these elements, while technically distinct, is essential to the functionality of the end product that Imax contracts to deliver to its customers. Without each of those elements, Imax's customers do not have the use of the product that Imax has contracted to deliver.

20. The sale and lease of theatre systems is Imax's most important source of revenue. In the years between 2001 and 2005, prior to the restatement described below, revenue from theatre systems accounted for between 55% and 67% of Imax's reported revenue.

21. Imax typically provides its theatre systems to customers on a long-term lease basis, generally with initial lease terms of 10-20 years. Lease agreements typically provide for three major sources of revenue: initial payments, ongoing rental payments, and maintenance fees. Initial payments vary depending on the type and location of the system, and are generally paid to the company in installments commencing on the signing of the agreement. Ongoing rental payments are paid monthly over the term of

the contract, commencing after system installation and are generally equal to the greater of a fixed minimum amount per annum and a percentage of box office receipts.

22. Imax also derives revenues from the licensing of related film products to the IMAX theatre network, post-production services for large-format films and from its owned and operated theatre operations.

23. Imax conducts business from its headquarters in Mississauga, Ontario and its offices in New York, New York.

THE IMAX THEATRE SYSTEM

24. Under Imax's lease agreements, Imax's customers generally contracted to acquire a "System", which was defined in those agreements to consist of:

(a) a Projection System (sometimes referred to as the "Unit");

(b) a Sound System;

(c) a Screen; and

(d) a Glasses Cleaning Machine.

25. Imax's contracts with its customers generally also required Imax to fine tune and align the projection and sound systems, and to train the customer's staff in the operation of the Imax equipment at the time of installation.

26. The Projection Systems included a projector, lamphouse, lens, projector transporter base, control panel and other ancillary equipment.

27. The Sound Systems included a sound source, amplification equipment, speakers and other ancillary equipment.

28. The Screen Systems included a "high gain coated non-depolarizing perforated vinyl screen sheet" and a supporting structure for the screen sheet. "Perforated" refers to numerous tiny holes in the screen sheet which allow sound from the speakers behind the screen to pass through the screen. "High gain" refers to the fact that the silver screen reflects a high proportion of the light projected on it back to the viewer. "Coated" refers to the proprietary silver paint used to achieve the "high gain". "Non-depolarizing" refers to the properties of the silver screen which tend not to scatter the light projected on it (which is polarized as it leaves the projector).

29. Imax's 3D theatre systems cannot be operated commercially without a silver screen sheet, as opposed to the white screen sheet used in 2D theatre systems.

30. Generally, Imax's lease contracts also oblige Imax to supply and install a glasses cleaning machine to clean the special eyeglasses used to view the 3D films shown by the Imax system.

THE RELEVANT ACCOUNTING STANDARDS

31. During and after the Class Period, Imax claimed to prepare its financial statements in accordance with GAAP. In general, GAAP stresses the importance of revenue as a measure used to evaluate an entity's performance. Recognition of revenue in the appropriate period is important because the amount of revenue generated by an enterprise during the period is an important indicator of the level of the enterprise's activity. This information assists the users of financial statements in assessing the enterprises' performance.

32. In order to measure the performance of an entity as consistently and accurately as possible, accounting principles concern themselves with identifying the "complete business cycle" associated with particular revenues, on the premise that revenues should be recognized when they are realized or realizable, and when they have been earned, generally by way of the revenue producing entity having done what it is being paid to do.

33. Generally, GAAP permits the recognition of revenue when each of the following conditions are met:

(a) persuasive evidence of an arrangement exists;

(b) delivery has occurred or services have been rendered;

(c) the seller's price to the buyer is fixed or determinable; and

(d) collectability is reasonably assured.

34. GAAP provides that revenue should not be recognized until the product is delivered to the customer. Where a product is composed of elements that are interdependent and only operate when installed together, delivery does not occur until *all* elements are installed and operating cohesively.

35. GAAP emphasizes the importance of the timing of revenue recognition. It is a central principle of GAAP that earnings and revenue should be attributed to the period in which they are earned. Where transactions straddle reporting periods, GAAP advocates skepticism in assessing the prospects that uncompleted portions will be concluded successfully. Partially completed transactions bridging reporting periods warrant careful examination to determine when they are completed.

36. In some circumstances, GAAP permits sale arrangements involving the delivery or performance of multiple components at different times to be broken down into separate units of accounting and recognized in revenue when the respective unit is delivered. This is known as revenue accounting for multiple deliverables, or RAMD.

37. In 2003, the Emerging Issues Task Force of the Financial Accounting Standards Board adopted Issue No. 0021, *Revenue Arrangements with Multiple Deliverables*. EITF 0021 was designed to provide guidance on the circumstances in which it is appropriate to divide an arrangement into multiple units of accounting such

that revenue attributable to those various elements might be recognized in differing reporting periods.

38. EITF 0021 provides that in order to divide an arrangement into multiple units of accounting:

(a) the delivered item must have value to the customer on a standalone basis;

(b) there must be objective and reliable evidence of the fair value of the undelivered item; and

(c) if the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) must be considered probable and substantially in control of the vendor.

39. EITF 0021 is subordinate to higher level accounting literature, including SAB 104 of the staff of the SEC and SFAC No. 5 of FASB.

40. Under SAB 104 and SFAC No. 5, revenues may not be recognized until they are:

(a) realized and realizable; and

(b) earned.

41. Further, under SAB 104, revenue is realized or realizable and earned when:

(a) persuasive evidence of an arrangement exists;

(b) delivery has occurred or services have been rendered;

(c) the seller's price to the buyer is fixed or determinable; and

(d) collectability is reasonably assured.

42. Further, under SAB 104, in order for revenue to be realized or realizable and earned, "any remaining obligations of the vendor must be inconsequential and perfunctory." A remaining obligation is not inconsequential or perfunctory if the undelivered component is essential to the functionality of the delivered component(s). Further, in order for delivery to have occurred, the customer must have received the rewards of ownership of the products specified in the sales agreement.

IMAX'S HISTORICAL REVENUE RECOGNITION PRACTICES

43. Prior to 2000, Imax represented that it recognized revenue on its theatre systems "upon delivery of the system" to the customer.

44. In 2000, Imax announced that it was revising its revenue recognition policy to accord with SAB 101. Thereafter, Imax recognized revenue related to the sale and lease of theatre systems at the time when the theatre system "installation is complete". That change in accounting resulted in Imax taking a US$54.5 million charge against its earnings in its financial statements for the year 2000.

45. In its 2000 10-K, Imax stated that it recognized revenue on theatre system sales and leases when "installation is complete".

46. In its 2001 10-K, Imax stated that it recognized revenue on theatre system sales and leases when, among other things, the "installation process is complete" and the "installation of the theatre system is complete".

47. In Imax's Annual Report for 2002, Imax reported that it recognized revenue when "the installation process is complete" and "upon installation of the theatre system".

48. In 2003, Imax reported that it recognized revenue on the sale or lease of a theatre system "at the time of installation" and "upon installation of the theatre system". Although EITF 0021 came into effect on July 1, 2003, Imax's 2003 10-K makes no mention of the application of EITF 0021 to theatre system sales or leases.

49. In 2004, Imax reported in its Annual Report that it recognized revenue on the sale or lease of a theatre system "at the time of installation" and "upon installation of the theatre system". Although the 2004 10-K does mention revenue recognition on "Multiple Element Arrangements", it appears to do so only in relation to film licenses and settlement revenue (occasions on which Imax negotiates the termination of an agreement with a customer who is unable to proceed with the installation of a contracted theatre).

50. In each of the year 2001-2004 Annual Reports, Imax disclosed that revenue recognition was also subject to the following conditions:

(a) persuasive evidence of an agreement exists,

(b) the price is fixed or determinable; and

(c) collection is reasonably assured.

IMAX'S INTERNAL ACCOUNTING POLICY DOCUMENTS

51. In December of 2004, Imax created an internal document titled "Policy No. 19: Revenue – Systems". That document provided as follows:

> The Company recognizes revenues from sales-type leases upon installation of the theatre system. Revenue associated with a sales-type lease is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.

52. Policy No. 19: Revenue – Systems does not reference EITF 0021 or the possibility of accounting for Imax theatre systems as arrangements with multiple deliverables.

53. A document titled "Policy No. 19-B Revenue - System Sales", dated December 1, 2004, described Imax's revenue recognition policy with respect to revenue recognition for sales of theatre systems as follows:

> Revenue from sales of theatre systems is recognized when all of the following criteria are met: persuasive evidence of an agreement exists, the price is fixed or determinable; title passes to the customer, installation of the system is complete; and collection is reasonably assured.
>
> In determining that installation is complete for purposes of recognizing revenue for sales of Imax theatre systems, the Company requires that the following criteria be met:

- Imax technology department concludes that the installation is complete, meeting full working standards according to contract provisions and system specifications.
- All substantial issues which were raised by the client and which Imax acknowledges and is in agreement with have been resolved.
- The installed theatre system complies with all material terms of the contract, including the installation of the:
    - Projection unit;
    - Sound system;
    - Screen system; and
    - 3D glasses system and cleaning system.

54. Although Policy No. 19-B listed other "U.S. GAAP and SEC References" such as SAB 101, it did not refer to EITF 0021 and it does not contemplate the possibility of accounting for Imax theatre systems as arrangements with multiple deliverables.

55. In November 2005, Imax revisited certain of these policies in a document titled "Policy 19-A Revenue - System Leases", dated November 16, 2005, the stated purpose of which was as follows:

> This Policy establishes the Company's position on the revenue recognition applicable to leases signed by the Company with its customers.

56. Imax's Policy 19-A summarized Imax's policy for the timing of revenue recognition as follows:

> The Company recognizes revenues from sales-type leases upon installation of the theatre system. Revenue associated with a sales-type lease is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.