# EXHIBIT A
# (PART 3)

57. Although Policy 19-A listed various other accounting documents as sources for "Definitions" and "U.S. GAAP and SEC References", it did not refer to EITF 0021 nor did it mention the possibility of accounting for Imax theatre systems as arrangements with multiple deliverables.

58. On December 1, 2005, Gamble prepared a memorandum to Joyce entitled "Revenue recognition policy compliance". The memorandum described Imax's revenue recognition policy as follows:

> The Company recognizes revenue from sales-type leases upon installation of the theatre system when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed and determinable; and collection is reasonably assured.

59. The memorandum also describes guidelines for determining whether installation of a particular theatre installation is "complete", including installation of the projection system, sound system, screen system, and 3D glasses system and cleaning system.

60. The December 1, 2005 memorandum authored by Gamble does not mention EITF 0021 or the possibility of accounting for Imax theatre system sales as arrangements with multiple elements.

61. In December 2005, in the course of what purported to be a detailed review of Imax's revenue recognition policies arising from allegations of premature revenue recognition in relation to the Delhi, India installation in Q3/05, Imax's general

counsel determined that Policy 19-B appeared to have a number of inaccuracies, making it inconsistent with Imax's actual policy articulated in its public filings. Imax's general counsel identified those inaccuracies as follows:

(a) a requirement that installation is deemed to have been "complete" to recognize revenue, when Company policy – and the language of the Certificate of Acceptance that the client signs calls for "substantial completion"

(b) a requirement that an "installed theatre system" include a "screen system," when company policy and practice suggests only the screen frame is a material part of the system agreement, not the actual screen skin; and

(c) a requirement that an installed theatre system include a "3D glasses system and cleaning system" when Company policy and practice suggest these are perfunctory or routine items not a material part of the system agreement.

62. The memorandum was described areas in which Imax's written revenue recognition policy diverged from its actual policy and practice. The memorandum contains no reference to EITF 0021 or the possibility that theatre system installations may be accounted for as arrangements with multiple deliverables.

63. In response to Lister's memorandum, Imax prepared and circulated new "Revenue Recognition Guidelines". This new guideline, provided among other things, as follows:

> Imax Corporation (the "Company") recognizes revenue when the theatre system installation process is substantially complete and all of the following criteria have been met:
> - Persuasive evidence of an arrangement exists
> - Delivery has occurred and services have been rendered;
> - The sellers price to the buyer is fixed or determinable; and
> - Collectability is reasonably assured.

64. The guidelines were meant to provide guidance apparently intended to assist Imax employees and executives to determine whether an installation is "substantially complete" in particular circumstances.

65. Imax's position through and including the third quarter of fiscal 2005 was that it should only recognize revenue on theatre systems sales and leases upon installation of the entire theatre system, including the screen.

66. Imax did not consider the application of EITF 0021 to any theatre system installation prior to the fourth quarter of fiscal 2005. This is evidenced by the SEC Division of Corporate Finance's letter addressed to Imax's Interim CFO dated September 20, 2006:

> Confirm that you are now accounting for these [theatre system sales and lease] arrangements pursuant to EITF 0021, Revenue Arrangements for Multiple Deliverables and, as we do not see similar disclosure in your 2004 10-K, <u>tell us the period in fiscal 2005 when you changed your revenue recognition policy.</u> [<u>emphasis</u> added]

67. As described below, Imax's sudden change of accounting policies coincided with the company retaining advisors and consultants in preparation for exploring various strategic alternatives, including a possible sale of the company to an acquirer.

IMAX EXPLORES "STRATEGIC ALTERNATIVES"

68. In the spring of 2005, Imax's board of directors decided to explore various strategic alternatives, including a possible sale or merger of the company. Imax did disclose this fact to the public until March 2006.

69. In April 2005, Imax's board of directors met with representatives of two investment banks, UBS and Allen & Co., to discuss the exploration of strategic alternatives.

70. In July 2005, Imax executed retainers with both UBS and Allen & Co. for advice on a potential sale, merger, or other capital transaction.

71. In mid-2005, Imax received the first of four or five "unsolicited" proposals received by Imax prior to the beginning of the Class Period.

72. Imax's management and board of directors knew that reporting stronger financial results, including increased revenues, as well as an increased number of theatre system installations compared to previous periods, would be a positive factor that would make Imax more attractive to a potential acquirer or merger partner and thus increase the price that such partner was willing to pay for Imax.

73. Despite their knowledge about the importance of Imax's financial results to the sale or merger process, over nearly 11 months from the time that Imax first

consulted with its investment bankers, Imax's management failed to advise PwC that it was contemplating such a transaction. PwC was first apprised of this fact in March 2006, following their completion of the audit of the company's 2005 financial statements despite the fact that Wechsler, Gelfond, Joyce and Copland, each of whom was aware of Imax's plans to explore strategic alternatives, were directly in contact with PwC throughout that period.

74. In late 2005, when Wechsler and Gelfond met with PwC to discuss the Company's business strategy and goals from a broad perspective, and to assist in the design of PwC's audit, they failed to disclose the prospect of a sale or merger of Imax.

75. On February 23, 2006, UBS and Allen & Company, made a presentation to Imax's Board of Directors wherein they presented a plan to market Imax to potential investors and provided guidance to Imax as to the value that might be obtained in any transaction. Although the specifics of that guidance have not been disclosed, the guidance provided indicated that offers exceeding the then current market price of Imax might be anticipated.

76. A number of the defendants stood to profit significantly from the sale of Imax, particularly in the event that Imax was sold at a premium to the trading price of its shares. Specifically:

(a) Wechsler owned (jointly and on his own) 2,682,800 shares and 1,150,000 options to purchase Imax shares;

(b) Gelfond owned roughly 2 million shares and options to purchase Imax shares; and

(c) Francis Joyce owned approximately 150,000 options to purchase Imax shares.

**THE DELHI POST AND THE SUBSEQUENT INVESTIGATION**

77. On about November 10, 2005, an unidentified person posted the "Delhi Post" on a Yahoo! Finance internet page related to Imax. The Yahoo! Finance internet page related to Imax was a publicly accessible internet forum where persons interested in Imax's business and trading in its securities posted information and opinions about the company, its performance and its prospects. The contents of the Delhi Post, which was entitled "SEC To Investigate Fraud at Imax", were emailed anonymously to Wechsler and Gelfond.

78. The Delhi Post stated:

> I remember shipping to warehouses and back to storage at the end of quarters when customers wouldn't pick up there (sic) system to make company numbers. Now there (sic) at it again. In order to reach its numbers what (sic) it told its analysts they are now faking installations before quarter ends pressuring with money and contracts for customers to sign install documents for the auditors and then going back after quarter end to really do the work. If you do not believe me ask someone in Delhi India to visit the theatre Imax has counted as installed in the third quarter. I was told its (sic) still not finished without a screen and water and permanent wiring and Imax people are still there working to install it in a still unfinished building. It was in its boxes on October 1. (sic) I understand. The next place I send this note is to the papers and the stock exchange officials. I was also told Imax is signing contracts for theatres that it knows will never open or no money paid and is not reducing them from its numbers of future theatres to be built. Expenses are now being hidden to the new year because it is scared it won't make its

> numbers again!!! He said there (sic) now paying customers to fake installs and sign documents for auditors in far off countries only away from auditors. I know they did it before and would do it again. They hid it last time when things fell apart and had large losses which hid the faked deliveries and signings with bad companies. They just think its employees are stupid and will keep their mouth shut so to keep there (sic) jobs. We are actually good and honest and hard working and we care passionately for what we do and the company. Its (sic) not only about money for the employees. Every day I hear more and will tell it all at the end of each month so keep posted. If I don't tell all the people who run this company will ruin this wonderful Canadian company.

79. During the fourth quarter of 2005, Imax was pressuring customers with money and contracts to sign installation documents, and returning to the customers' sites to complete the installations after the end of the relevant reporting period in order to meet the earnings guidance it had given to the market, and the theatre purported to have been installed in Delhi in the third quarter of 2005 was not in fact complete by the end of that quarter.

80. Upon receipt of the Delhi Post, Wechsler and Gelfond referred the matter to the Audit Committee. The Audit Committee then tasked Lister, and Jeffrey Vance, a chartered accountant and member of Imax's internal finance department, to investigate. Both Lister and Mr. Vance prepared written reports.

81. Lister was asked to investigate the allegations contained in the Delhi Post, to report to the board of directors and the Audit Committee concerning his conclusions and to make recommendations arising out of his investigation. He was advised by Girvan and Copland to focus his attention on whether:

(a) there was anything "fake" or misleading about the Q3 2005 Delhi installation;

(b) there were any clients placed into backlog despite Imax knowing they would never open theatres;

(c) expenses were being hidden; and

(d) any installations recognized in 2005 were achieved by paying customers to fake installs and sign documents for auditors.

82. Lister prepared a report dated December 7, 2005 in which he summarized the investigation he conducted, his factual findings, and stated his conclusions on the above issues.

83. In his report, Lister found that at the end of the third quarter of fiscal 2005, the Delhi theatre was not complete for purposes of opening, the final screen had not been erected, the screen frame was erected on scaffolding, the projection room was incomplete and the heating and power connections were only temporary. Despite all of the foregoing, he concluded that all revenue allocable to the Delhi theatre installation was properly recognized in revenue third quarter of fiscal 2005.

84. Lister noted certain deficiencies in Imax's written revenue recognition policies and recommended that "improvements" be made to Policy 19-B in order to reflect Imax's existing practices. The policy was revised in accordance with Lister's recommendations. Lister did not mention or refer to multiple element accounting or EITF 0021.

85. Mr. Vance, who was an internal auditor and head of Imax's Sarbanes Oxley program, was asked by the Audit Committee to conduct a separate investigation into the financial accounting issues arising from the allegations in the Delhi Post.

86. Mr. Vance prepared a report, dated December 7, 2005, in which he "Summarized Findings in Relation to the Investigation of Allegations made on Yahoo! Bulletin Board". Mr. Vance divided his report into three sections, each relating to a particular allegation made in the Delhi Post:

(a) theatres prematurely considered installed for revenue recognition purposes;

(b) contracts in backlog that will never be realized; and

(c) 2005 expenses concealed to be booked in 2006.

87. With respect to all of these allegations, Mr. Vance's review was limited to Imax's own documents. He neither visited the Delhi theatre, nor did he ask anyone else to do so. He did not speak to any non-Imax personnel, including the customer leasing the Delhi theatre and he did not ask anyone else to do so. There is no suggestion that Mr. Vance's went beyond Imax's internal documentation in his attempt to ascertain whether theatres had been declared installed prematurely.

88. Mr. Vance's review of those documents revealed that although all of the theatres he looked at had signed customer acceptances within the quarter in which they were recognized in revenue, eight of 21 of those theatres did not open in the quarter in which they were declared installed. Of those eight, six had "installation issues noted on

the installation close-out summary, high estimated costs to complete, or both". He noted with respect to the Delhi theatre that the projection system required rewiring, as it had been installed on a temporary basis, the Glasses Cleaning Machine was not installed, the 3D screen was not yet installed, some speaker cables needed to be rerun, and the system would need to be partially disassembled and reinstalled, because the theatre was not fully complete when it was commissioned.

89. Mr. Vance's report also contained a summary of "Key US GAAP Literature/Guidance". In particular, Mr. Vance's report states:

> EITF 0021 provides guidance on when revenue can be recognized when there are multiple revenue generating activities. Specifically to Imax, EITF 0021 rules that the manufacture and installation of the projection/sound/screen system is linked, and revenue can only be recognized upon installation.

90. Although Mr. Vance does not appear to render his own conclusion as to whether the theatre installation he scrutinized were appropriately recognized into revenue, his report does raise the specter of what would transpire were PwC to disagree with management's decision to recognize all revenue allocable to incomplete theatre installations in the quarter in which they were partially completed:

> Final determination of appropriateness of GAAP interpretation rests with PricewaterhouseCoopers LLP, the Company's external auditors. A contrary interpretation from PwC would result in quarterly restatement, as well as have implications to the Company's ongoing Sarbanes-Oxley compliance project. [emphasis added]

91. PwC was asked to review the findings of these investigations and to confirm its original view that the Delhi theatre was appropriately recognized in revenue in the third quarter of fiscal 2005. It did so, based upon the reports produced by Lister and Mr. Vance. PwC did not do its own investigation into the allegations made in the Delhi Post. It simply reviewed the accounting position taken based on the factual information provided to it by Imax.

92. All of the members of Imax's Audit Committee accepted the reports provided by Lister and Mr. Vance without questioning the scope of their investigations.

93. Imax did not provide a copy of the Delhi Post to the SEC until June 26, 2006, approximately one week after Imax's receipt of an initial inquiry letter from the SEC's Division of Enforcement.

**THEATRE INSTALLATIONS IN THE FOURTH QUARTER OF 2005**

94. Because Imax recognized revenue on the sale and lease of theatre systems when theatre systems were installed, Imax would fall below budget if installations were not completed according to schedule. Imax's management understood this and, accordingly, carefully monitored the progress of installations. In the fourth quarter of fiscal 2005, budget updates received by Imax management directly translated theatre installations into revenue and earnings per share.

95. Imax's senior management, including Gelfond and Wechsler, monitored the status of pending theatre installations regularly. In particular, they received frequent email updates from Mark Welton, the head of Business Affairs, on the status of various installations that were identified as potentially recognizable in revenue in the quarter. In fourth quarter of fiscal 2005, the purpose of receiving that information was to inform Gelfond and Wechsler as to whether Imax was going to meet its budget for the quarter and for fiscal 2005, and thus the earnings guidance it had provided to investors and analysts in respect of that period.

96. Senior management also received updates from Imax's finance department that specifically identified the impact on Imax's financial statements that would result from the revenue attributable to particular installations falling to later periods, and how those results compared to Imax's earnings guidance to investors. Those updates also compared Imax's most up-to-date forecasts to the earnings guidance Imax had given.

97. The updates circulated in the fourth quarter of fiscal 2005 indicated that, in order for Imax to make its budgeted numbers for 2005, it needed to install almost as many theatres in fourth quarter of fiscal 2005as it had in the first three quarters of 2005 combined.

98. The email updates transmitted to Wechsler, Gelfond and Joyce regularly updated the co-CEOs and the CFO with the latest information on the status of particular

installations and the issues faced in getting them installed by quarter-end, and outlined the steps that were being taken to ensure that they were in fact installed by quarter-end. With respect to each theatre to which these emails referred, the amount of gross margin that Imax could expect to recognize on its 2005 financial statements was specified.

99. The emails set out inducements that Imax offered to its clients in order for them to confirm that theatres had been "installed". Specifically, the emails document that:

(a) Imax's legal department was asked to review the contracts relating to installations at Dongguan South China Mall and Dongguan Dome to determine whether Imax had any legal leverage, because these installations were "extremely needed for Q4";

(b) $25,000 was offered for "marketing of launch of theatre" in Kazan, Russia, which prompted the client to respond that it would do "everything in one's power for installation the (sic) equipment in December, 2005";

(c) $50,000 was offered to the operators of the McMinnville theatre as "marketing launch contribution" coincident with the client's communicating that it would be able to get the theatre ready for "your [Imax's] December 31 timeline";

(d) Imax's client in relation to a then-unsigned agreement to install a theatre in Winnipeg understood that "we [Imax] need it done";

(e) Imax was "pushing [its] client extremely hard including threatening default if client does not go forward... offered client $25k towards opening launch of theatre" in relation to a potential installation at Interlomas, Mexico; and

(f) Imax had "offered to provide subtitling system for $9K and per Rich [Gelfond] have agreed to ensure all DMR films distributed in China would be distributed to" the client installing the Beijing/Shanghai United Cinema theatre.

100. Lister's memorandum referred to above notes that the incentives mentioned above, in relation to Interlomas, Kazan, and Portland (McMinnville), were expressly offered for the purpose of incenting clients to "accept" installations before the end of fiscal 2005.

101. By the end of the fourth quarter of fiscal 2005, Imax had entered into a series of undocumented agreements to provide various benefits to its clients in exchange for the clients' agreements to accept an installation prior to December 31, 2005. At the insistence of Imax's auditors, these agreements were formalized after December 31, 2005. In particular, Imax entered the following amending agreements with existing customers in the fourth quarter of fiscal 2005:

(a) a letter agreement dated October 25, 2005 with Shanghai United Cinema Line Co., Ltd, in relation to a theatre to be installed in Beijing, extends the customer's last two payments to October 28, 2005 (from March 15, 2005 and September 15, 2005), and states that "Imax requires the system to be installed" by December 30, 2005;

(b) an agreement titled "Amending Agreement No. 1" between Imax and Lark International Multimedia Limited, in relation to a theatre to be installed in Hong Kong, extended the date of Imax's outstanding initial payments, totalling $720,000, from October 15, 2005 and December 15, 2005 to June 1, 2006, extinguished the client's obligation to provide Imax with a letter of credit in respect of its obligations, imposed an obligation on Imax to pay the client $39,490 as "theatre closing compensation" by January 31, 2006, and required Imax to supervise the re-installation of the system at its own cost at another location at a later date;

(c) an agreement titled "Amending Agreement No. 2" between Imax and Suvar-Kazan Company Ltd. dated October 12, 2005, in relation to a theatre to be installed at Kazan, Russia, deferred the client's last two initial payment installments, and incorporated an obligation on both parties to "use their respective best efforts to ensure that the installation and commissioning of the system in the Theatre is complete by no later than December 31, 2005";

(d) an agreement titled "Amending Agreement No. 4" between Imax and Suvar-Kazan Company Ltd., dated December 31, 2005, deferred the client's final payment of $180,000 to April 30, 2006 (from the earlier of the date the system installed or February 28, 2006), and imposed on Imax an obligation to pay US$31,000 in "marketing support" to assist the client with the launch of the theatre;

(e) an agreement titled "Amending Agreement No. 2" between Imax Corporation and Evergreen Vintage Aircraft Inc., in respect of the McMinnville, Oregon installation, deferred the client's final initial payment of $340,000 from September 30, 2005 to April 1, 2006, and imposed on Imax an obligation to pay US$50,000 in "marketing support" to the client; and

(f) an agreement titled "Amending Agreement No. 2" between Imax Corporation and Jafif Penhos Elias dated November 29, 2005, in respect of a theatre to be installed at Interlomas, Mexico, deferred the client's final two initial payments from the delivery date and the acceptance date of the system to February 28, 2006 and June 1, 2006, respectively, and imposed on both parties an obligations to "use their respective best efforts to install the system in the Theatre by no later than December 23, 2005".

102. The only purpose for entering into these agreements from Imax's perspective was to secure its clients' agreement to accept the installation of the theatres they had contracted by purchase by the end of the fourth quarter of 2005 so that Imax could include them in revenue for that quarter. Imax was insistent on calling the installation of these theatres "complete" despite the incomplete state of many of those theatres and the premises into which they had been installed.

103. The email reports transmitted to Wechsler, Gelfond and Joyce identified each of the above installations as installs "with issues" in the fourth quarter of fiscal 2005. However, with respect to a number of the installations where clients to "accepted" installation before the end of the fourth quarter of fiscal 2005:

(a) no initial payments came due on the completion of the installation of those theatres; and

(b) no monthly rent stream became payable by the client on the installation of the theatres.

104. The circumstances surrounding some of the theatre installations Imax originally claimed to have "completed" in the fourth quarter of fiscal 2005 follow.

***Hong Kong Lark***

105. The fourth quarter of fiscal 2005 installation for Lark International Multimedia Limited at Hong Kong was performed pursuant to an original agreement dated December 22, 2004, as amended by an amending agreement dated December 31, 2005.

106. The original agreement required the final two installments of the purchase price of the first system under the agreement to be paid as follows:

(a) US$610,000 on the earlier of the delivery date (no later than October 15, 2005) and October 15, 2005; and

(b) US$110,000 on the earlier of the date the theatre opens to the public, and December 15, 2005.

107. The Amending Agreement extended those payment obligations such that both amounts became payable on June 1, 2006. As such, no purchase price payment was contractually dependant on the installation of the theatre system.

108. The ongoing payments under these agreements were to be calculated based in part on theatre admissions. In addition, the obligation to make those payments appears to begin with the execution of the agreement itself, rather than with the installation. As such, no cash flow arising from monthly payments appears to have been triggered by the installation of this theatre.

109. Neither of these agreements appear to oblige the client to accept or permit installation by any particular deadline. Rather, the agreement appears to oblige Imax to install the system but only after the theatre is completed and ready for the installation of the system.

110. The theatre was not ready for full installation of the system as the theatre was too dirty to install the screen as of December 19, 2005. Furthermore, the client had no intention of opening this theatre to the public in 2005. Imax had to agree to compensate the client for being closed over Christmas in order to fit the theatre for the installation of the Imax system.

***Kazan, Russia***

111. The payment obligations outstanding in respect of the Kazan, Russia theatre in the fourth quarter of fiscal 2005 were as follows:

(a) pursuant to an amending agreement, dated October 12, 2005, the customer was required to make initial payments of

(i) US$720,000 no later than October 25, 2005; and

(ii) US$180,000 on February 28, 2006; and

(b) pursuant to a further amending agreement dated December 31, 2005, the obligation to pay the US$180,000 installment was deferred to April 30, 2006.

112. Thus, no purchase price installment was contractually dependent on the installation of the Kazan theatre in the fourth quarter of fiscal 2005.

113. The client's ongoing payment obligations were calculated as a percentage of admissions revenue for the theatre, less a fixed credit on which no such periodic amounts were payable. As such, the installation itself of the theatre in the fourth quarter of fiscal 2005 triggered no new revenue or cash flow. Imax would begin receiving periodic payments when the client began selling tickets and earning revenue on the theatre.

114. The theatre into which the Imax system was "installed" had no acoustical treatment, no seats, no doors, and the projection room into which the projector was put had no ceiling, no finishes, and no HVAC at the time that the system was supposedly installed. This theatre did not open until October 20, 2006, after Imax installers had made a second trip to complete the installation.

115. In the fourth quarter of fiscal 2005, Imax and the Kazan lessee executed Amending Agreement No. 2, which obliges both Imax and the client to make best efforts to accept or permit installation by December 31, 2005. Prior to that amendment,

however, the original agreement obliges Imax to install the system, but only after the theatre is completed and ready for the installation of the system. It does not impose a deadline on the client for installation of the theatre.

116. Notably, the terms of the final amending agreement appear to have been under negotiation well into 2006, when there was still dialogue between Imax and the client concerning the amount of the marketing incentive to be provided by Imax. The client's position in that dialogue appears to be that it had done a significant service for Imax by taking steps to have the theatre system cleared through customs quickly, failing which the installation would have been substantially delayed, and thus not installed in the fourth quarter of fiscal 2005.

117. There was no legitimate business purpose for Imax to push for the "completion" of this installation in the fourth quarter of fiscal 2005. Imax's only purpose in doing so was so that it could claim the associated revenue in the fourth quarter of fiscal 2005.

***McMinnville, Oregon***

118. The agreements governing the installation of the theatre system to be installed at McMinnville Oregon required the following initial payments:

(a) amending Agreement No. 1 dated February 8, 2005 provided that the client would make the following payments:

    (i) US$595,000 on the earlier of the Delivery Date (projected to be August 20, 2005) and August 20, 2005; and

(ii) US$340,000 on the earlier of the Date of Acceptance and September 30, 2005;

(b) by further amending agreement dated December 31, 2005, the client's final initial payment of US$340,000 was extended to April 1, 2006.

119. No purchase price installment payment was triggered by the completion of the installation in the fourth quarter of fiscal 2005.

120. The client's ongoing payment obligations ("Additional Rent") was triggered by the "Date of Acceptance", which, according to the latest amendment of the agreement, was the earlier of the date on which the parties agree the theatre is installed and operational, with all training and tuning complete and September 30, 2005.

121. No contractual obligation to make payments was triggered on the completion of the installation of the theatre.

122. None of the agreements governing Imax's relationship with this client appears to oblige the client to accept or permit installation by any particular deadline. Rather, the agreement appears to oblige Imax to install the system, but only after the theatre is completed and ready for the installation of the system.

123. When the McMinnville theatre was purportedly installed, the installation, to the extent it was done, was done with temporary electrical hookups. The training of projectionists was deferred because the installation occurred too far in advance of the

public opening for the theatre for the training to be useful. Final alignment of the system could not be completed because there was too much interference in the theatre from scaffolding and building equipment. It was intended that, when the screen sheet was hung for the purposes of "completing" the installation, it would be immediately taken down, because it was sure to be damaged or destroyed as construction of the theatre itself was completed. The theatre did not open to the public until April 14, 2007.

124. There was no legitimate business imperative from either the client or Imax to have this theatre installed in the fourth quarter of fiscal 2005. Imax's management wanted only to be able to claim that the conditions for revenue recognition had been fulfilled.

*Interlomas, Mexico*

125. At the beginning of the fourth quarter of fiscal 2005, the agreements governing the installation of this theatre required the following initial payment installments:

(a) US$145,000 on the Delivery Date (August 15, 2005, or such other date as agreed by the parties) ; and

(b) US$290,000 on the Date of Acceptance (the earlier of the date on which the parties agree the installation is complete, the date the theatre opens to the public, and October 15, 2005).

126. In an amending agreement reached on November 29, 2005, Imax agreed to extend the client's final initial payment obligations as follows:

(a) US$145,000 payable by February 28, 2006; and

(b) US$290,000 payable by June 1, 2006.

127. In that same agreement, the parties agreed:

(a) that Imax would provide the client with a $25,000 in "marketing support";

(b) that the client would no longer be required to post a letter of credit in respect of any initial payments; and

(c) to use their best efforts to install the Imax system in the theatre by no later than December 22, 2005.

128. Imax agreed to extend payment obligations, provide the "marketing support" and abandon the requirement for a letter of credit in exchange for the client's agreement to attempt to install the theatre before the end of the fourth quarter of fiscal 2005. On these terms, no payment of initial rent was triggered by the installation of the theatre.

129. The additional rent obligation in this agreement was based in part on the client's box office receipts. The client's obligation to pay additional rent arose from the "Date of Acceptance", defined in the last agreement that refers to it as the earlier of the date the theatre is installed, the date the theatre opens to the public, and October 15, 2005. As such, the obligation to make additional rent payments was not contractually dependent on the installation of the theatre system in the fourth quarter of fiscal 2005.

130. Prior to the November 29, 2005 agreement, there were no particular time constraints placed on either party to either install or accept installation of the theatre system, subject to the following. Imax was required to install the system in the client's theatre only once the client's theatre was "complete" and "ready for the installation of the System with all required services for the System". The client had the option of requesting early installation, in which case Imax had the discretion (but not the obligation) to begin installation prior to the completion of the theatre.

131. At the time the theatre was installed, there were no finishes on the walls or floors of the projection room, and no finishes or seats in the theatre itself. The final 3D screen sheet was not installed. Training of the client's projectionists was deferred to a date closer to the opening of the theatre, which did not occur until July 7, 2006.

132. The only purpose in installing the theatre in the fourth quarter of fiscal 2005 was to enable Imax to claim that the conditions for revenue recognition had been fulfilled in that quarter.

**SUMMARY OF CONCESSIONS MADE BY IMAX**

133. The written iterations of the agreements referred to above served no legitimate business purpose for Imax.

134. With respect to the "marketing support" payments required by certain of these amending agreements, Imax stated in its June 20, 2007 response letter to the SEC:

> The Company considers marketing credits to be a reduction in the overall arrangement consideration, as the Company does not receive any identifiable benefits in exchange for these types of incentives.

**THE FISCAL 2005 AUDIT PROCESS**

135. In January 2006, Imax management attempted to persuade PwC that it would be appropriate for Imax to recognize in the fourth quarter of fiscal 2005 all of the revenue allocable to the sale or lease of the 14 theatre systems it claimed to have installed in that quarter.

136. Imax took that position despite the fact that the final screens for seven of those 14 theatres were not installed at the end of 2005. In addition, there remained numerous other unfulfilled obligations.

137. With respect to the Beijing/Shanghai United Cinema installation:

(a) image testing remained to be completed;

(b) the sound system remained to be tuned; and

(c) projectionist training remained to be completed.

138. With respect to the Hong Kong Lark installation:

(a) the system was to be uninstalled and reinstalled entirely at another location, as the location to which it had been installed was for demonstration purposes only;

(b) optical alignment of the projector remained to be completed;

(c) the CTRU matrix required final positioning;

(d) the projector lamp light levels required to be set;

(e) the sound system required final tuning;

(f) the speakers remained to be aimed;

(g) screen sheet remained to be tensioned; and

(h) the glasses cleaning machine remained to be installed.

139. With respect to the McMinnville/Portland installation:

(a) projectionist training remained to be completed;

(b) 3D offset and alignment remained to be completed due to building materials and equipment in the theatre; and

(c) the sound system tuning was deferred, as the theatre construction was incomplete.

140. With respect to the Kazan, Russia installation:

(a) the projector and 3D alignment remained to be completed;

(b) projectionist training remained to be completed;

(c) the polarizers remained to be installed;

(d) the rear speakers remained to be hung;

(e) all speakers remained to be aimed;

(f) the sound system remained to be tuned; and

(g) the glasses cleaning machine still to be installed.

141. With respect to the Interlomas, Mexico installation:

(d) the 3D alignment and masking was not complete;

(e) projectionist training was not complete;

(f) rear speakers were not hung;

(g) audio system remained to be tuned;

(h) all speakers remained to be aimed; and

(i) glass cleaning machine remained to be installed.

142. With respect to the Lodz, Poland installation:

(a) final image setup remained to be completed;

(b) final sound system tuning remained to be completed; glasses cleaning machine to be installed; and

(c) projectionist training remained outstanding.

143. The Beijing Film & Radio Museum theatre was the seventh theatre at which the screen had not been installed as of December 31, 2005.

144. At the beginning of the audit of the 2005 financial statements, Imax's management took the position that the installations of these theatres were "complete", that the remaining obligations were "perfunctory and inconsequential", and that all of the revenue associated with the sale or lease of these 14 theatres should be recognized in the fourth quarter of fiscal 2005.

145. Internally, Mr. Vance raised serious questions about how the facts surrounding these installations might be perceived. For example,

(a) Mr. Vance pointed out that SAB 104 precludes recognition of revenue where the product is delivered for demonstration purposes (as was the case for the Hong Kong Lark installation recognized in Q4/05). He

wondered how Imax would justify recognizing revenue in those circumstances. He also pointed out that the compensation Imax had agreed to pay the Hong Kong client was not a normal Imax business practice, and appeared to be an incentive to get the system in a temporary location for revenue recognition purposes;

(b) he queried whether the fact that, even in early 2006, the screen at Kazan was not expected to be installed before March, 2006 violated the "reasonable period of time" concept built into SAB 104, as well as the basis for the marketing support payment paid to this client. In particular, it was his view that this payment raised the prospect of the customer falsely signing the customer acceptance, since no payment turned on the execution of the acceptance;

(c) on the McMinnville, Oregon installation, he questioned the five month waiting period between installation and the finishing of the outstanding obligations in the context of SAB 104, and queried what evidence existed to support the existence of "Amending Agreement No. 2" made as of December 31, 2005; and

(d) on the Manila, Philippines installation, he queried whether the outstanding payment obligations were contingent in any way on Imax's completion of its work in January, 2006, and why the opening of the theatre was not scheduled until March if everything was in fact completed. He also noted a high number of budgeted hours to complete outstanding tasks, and queried the materiality of the outstanding hours.

146. Upon learning of management's initial position, PwC asked management for an explanation of its position. Upon consideration of the nature of the obligations remaining to be fulfilled by Imax in relation to numerous of the fourth quarter of fiscal 2005 installations, PwC decided that it could not accept Imax's position that the remaining obligations were perfunctory and inconsequential.

147. Ultimately, management persuaded PwC, with strenuous effort, to approve a less aggressive accounting treatment than recognition in the fourth quarter of fiscal 2005 of all revenues allocable to the sale/lease of the theatres "installed" in the

quarter. The less aggressive accounting treatment was RAMD, which would require Imax to defer to later periods a limited portion of the revenues allocable to the sale/lease of those theatres. PwC's concurrence, however, was achieved only after the provision of incomplete information to PwC.

PWC WAS NOT FULLY INFORMED

148. PWC initially provided a clean audit opinion in respect of Imax's 2005 financial statements, but it did so without the benefit of all relevant facts.

149. PWC explicitly advised Imax, through the chair of its Audit Committee that PWC needed to be made apprised of, and to understand, all of the outstanding obligations remaining with respect to each of the theatre installations Imax proposed to take into revenue in Q4/05.

150. PWC became aware of a number of facts after the completion of the 2005 audit that might have impacted its opinion regarding revenue recognition for theatre installations in Q4/05. She testified that some or all of the theatre installations in Q4/05 for example:

(a) that at the theatre in Kazan, Russia, it was "snowing in the theatre", and the temperature was below zero; and

(b) a potential side letter relating to the Lark, Hong Kong installation which relieved the client from having to make its ongoing lease payments until the theatre had been reinstalled at a second location.

151. PWC became aware of the obligations set out above in the course of reviewing the data collected in the course of the Imax's restatement of its financial statements in 2007.

152. PwC has since effectively rescinded its audit opinion on the 2005 10-K.

153. The extent to which the defendants are entitled to rely upon PwC must be considered in light of the stated parameters of the Imax-PwC relationship. In particular, Imax agreed that:

> The Company's management is responsible for the financial statements and information referred to above including establishing and maintaining an effective system of internal control over financial reporting. In this regard, management is responsible for establishing policies and procedures that pertain to the maintenance of accounting records, the authorization of receipts and disbursements, the safeguarding of assets, the proper recording of transactions in the accounting records, and for reporting financial information in conformity with accounting principles generally accepted in Canada and/or the United States of America.

154. Further, in its "Management Representation Letter" in respect of the 2005 audit, Gelfond, Wecshler, Joyce and Gamble represented to PwC, on Imax's behalf, that:

> We confirm that we are responsible for the fair presentation in the consolidated financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles, for establishing and maintaining effective internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting based on criteria established in *Internal Control – Integrated Framework* issued by the COSO.
>
> [...]

> We confirm, to the best of our reasonable knowledge and belief, as of March 9, the date of your report, the following all (sic) representations made to you during your audit(s):
>
> 1. The consolidated financial statements referred to above are fairly presented in conformity with accounting principles
>
> 2. We have made available to you all:
>    a. Financial records and related data.
>
> [...]
>
> 4. There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.
>
> 66. For a sales-type lease or a direct sale, we have consistently recognized revenue when: persuasive evidence of an arrangement exists (signed lease agreement); the price is fixed or determinable; for sales type leases, the lease term commences; for sales transactions, title passes; collection is reasonably assured; and installation of the theatre system is complete. As criteria for completion of installation, the Company requires the following to be complete: the technology department has confirmed that the installation has been completed in accordance with the terms of the contract, significant issues raised by the customer, that Imax management is in agreement with, have been satisfactorily resolved; and the installed system complies with all material terms of the contract.

**THE RELEASE OF THE MISLEADING REPRESENTATION**

***THE FEBRUARY PRESS RELEASE***

155. On February 17, 2006, prior to the completion of PwC's audit of Imax's financial statements, Imax issued the February Press Release and filed it with SEDAR and the SEC:

> Imax Corp. announced today that, reflecting the strong tone and momentum of its business, it expects to meet or exceed the full year 2005 guidance it provided investors of $0.35-$0.38 in net earnings per share on a fully diluted basis.

> During the fourth quarter the Company completed 14 theatre installations, which is a record for a single quarter, and consistent with the guidance the Company provided. As a result, the Company installed a total of 34 theatre systems for the full year versus 21 for 2004. The Company also expects to report revenues approximately in the guided range of $145-150 million for all of 2005.
>
> These results are based on preliminary financial data and subject to the final closing of the Company's books and records. "Imax's momentum and growth potential is building," said Imax Co-Chairmen and Co-CEOs Richard L. Gelfond and Bradley J. Wechsler. "Imax set aggressive goals for theatre signings, film performance, installations, and financial results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the Imax network, an expansion that should continue to grow our recurring revenues."
>
> Imax also announced that in addition to completing 14 theatre installations, the Company signed deals for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40-45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.
>
> "In addition to delivering on our financial and operational goals, we continued to deliver on our strategy of positioning Imax as a profitable release window for Hollywood films, providing the Company with a strong platform with which to fulfill its long term potential," Gelfond and Wechsler continued. "We are very excited to enter 2006 with our strongest film slate ever, with five IMAX DMR titles already secured for day and date release, and *Deep Sea 3D* set for release in March. With the probable addition of another title in the fourth quarter of 2006, we expect to have a film release every six to eight weeks in 2006, which we believe, should be a major factor in driving theatre sales as well as recurring revenues.

156. The plaintiffs allege that the February Press Release was false and/or materially misleading in that:

(a) Imax had not "completed" 14 theatre installations in Q4/05;

(b) Imax did not install 34 theatre systems in 2005;

(c) Imax would not achieve its 2005 guidance of 0.35-$0.38 in EPS;

(d) Imax had not generated revenues of $140-$150 million for 2005.

157. Each of the Individual Defendants and Gamble authorized, permitted and/or acquiesced in the publication of the February Press Release and thereby participated in the making of the Representation contained therein.

158. On the day the February Press Release was issued, Imax's share price increased by 9%. Imax's share price continued to rise dramatically after the February Press Release was issued. On March 8, 2006, at the close of the financial markets, Imax's share price closed at $11.00 CDN and $9.50 USD on the TSX and NASDAQ, respectively, an increase of 20% and 21.5% from February 16, 2006.

***THE ANNUAL REPORT AND THE PRESS RELEASES***

159. On March 9, 2006, Imax issued two press releases, as well as its Form 10-K. The Form 10-K and the two press releases were filed with SEDAR and with the SEC. In the Form 10-K, Imax stated that:

(a) it had installed 10 theatre systems in 2005 that were scheduled to open in the first and second quarters of 2006;

(b) it had earned revenue of US$144.9 million, of which US$97.8 million was attributable to theatre system sales and leases;

(c) it had "recognized revenue on 38 theatre systems which qualified as either sales or sales type leases in 2005 versus 22 theatre systems in 2004";

(d) the Company's management had assessed the effectiveness of its internal controls over financial reporting, as at December 31, 2005, and had concluded that such internal control over financial reporting was effective as of that date. Additionally, based on the company's assessment, the Company determined that there were no material weaknesses in its internal control over financial reporting as of December 31, 2005; and

(e) its financial statements had been prepared in accordance with U.S. GAAP.

160. Imax's first press release on March 9, 2006 - the Earnings Press Release - incorporated the misrepresentations contained in the Form 10-K, and made the following additional misrepresentations:

> - Company exceeds guidance and expectations for 2005, reporting net earnings of $0.40 per share, versus guidance of $0.35-$0.40 per share.
>
> [...]
>
> Company completes record number of theatre installations in the fourth quarter with 14, and a total of 34 theatre installations for the full year.
>
> Imax Corporation today reported net earnings of $0.40 per diluted share for the year ended December 31, 2005. This compares to net earnings of $0.26 per diluted share reported for the year ended December 31, 2004, an increase of 62%.
>
> For the three months ended December 31, 2005, the Company reported net earnings of $0.29 per diluted share, compared to net earnings of $0.19 per diluted share reported for the three months ended December 31, 2004, an increase of 54%.
>
> "Our 2005 results clearly reflect that Imax's commercial strategy is working and that the momentum in our business is continuing to grow," said Imax Co-Chief Executive Officers Richard J. Gelfond and Bradley J. Wechsler. "We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of Imax as a commercial destination for mainstream entertainment. We

> believe our steadily improving financial performance shows that our strategy and The Imax Experience® have been embraced by consumers, major studios and leading film exhibitors around the world.
>
> [...]
>
> The Company installed a record 14 theatre systems in the fourth quarter.
>
> [...]
>
> For the year ended December 31, 2005, the Company's total revenues were $144.9 million, as compared to $136.0 million reported for the prior year. Systems revenue was $97.8 million versus $86.6 million in the prior year. The Company recognized revenue on 38 theatre systems which qualified as either sales or sales-type leases in the fiscal 2005 (sic), versus 22 in 2004.
>
> [...]
>
> For the three months ended December 31, 2005, the Company's total revenues were $49.3 million, as compared to $47.5 million reported for the prior year period. Systems revenue was $35.1 million versus $28.8 million in the prior year period. The Company recognized revenue on 18 theatre systems which qualified as either sales or sales type leases in the fourth quarter of 2005, compared to nine in 2004.

161. The Earnings Press Release also attached Imax's Condensed Consolidated Statements of Earnings for both 2005 and the fourth quarter of fiscal 2005, and Consolidated Balance Sheets as at December 31, 2005.

162. The financial results reported by Imax in the Form 10-K and in the Earnings Press Release were a function of the revenue recognition policy applied in the Form 10-K to theatre system sales and leases, which was markedly different in its terms from that disclosed in previous years, and inadequately disclosed. The Form 10-K

contained the following language relating to revenue recognition on theatre system sales and lease transactions:

> The Company's system sales and lease transactions typically involve the delivery of several products and services including the projector, projection screen, sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When the elements of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognize when revenue recognition criteria for that element is met.
>
> [...]
>
> The Company recognizes revenue from sales and sales type leases when the installation of the respective theatre system element is substantially complete and all of the following criteria are met: persuasive evidence of an agreement exists, the price is fixed or determinable, and collection is reasonably assured.

163. As described above, this revenue recognition policy represented a marked departure from the policy Imax had previously disclosed, which was that revenue was recognized on theatre systems sales and leases at the time of installation, or when installation was complete. The effect of this departure was that Imax recognized revenue in 2005 relating to 10 theatre systems it would not have been able to recognize had it followed the revenue recognition policy that it had disclosed in prior years.

164. Imax's application of RAMD did not accord with GAAP. It was not appropriate for Imax to treat the final screen elements of the theatre systems as separate units of accounting. In order to apply RAMD, it was necessary to first establish that a

revenue arrangement has "multiple deliverables". Imax's theatre system was a single deliverable because:

(a) the components that Imax delivered prior to the end of the fourth quarter of fiscal 2005, namely the projector and sound system, did not have value to Imax's customers on a stand-alone basis;

(b) the clients in question contracted to acquire a complete 3D Imax theatre system, and could not operate those theatres without the silver screens; their purpose in contracting to acquire an Imax theatre system was not to sell the system's components on a piecemeal basis, nor to generate revenue by operating the system's components separately and independently from each other (which in any case they could not do). Rather, they sought to operate an Imax theatre, and to generate revenue and profits by offering the unique Imax experience to movie-goers;

(c) prior to the end of the fourth quarter of fiscal 2005, no Imax customer had ever operated a 3D system commercially with the temporary, white screen that Imax had used to test seven incomplete theatre systems in the fourth quarter of fiscal 2005;

(d) Imax's contracts with its customers do not assign value to individual system components;

(e) Imax claims in its 2005 10-K that its primary line of business is the sale and lease of theatre systems;

(f) prior to the end of Q4/05, Imax customers had purchased silver screens on a stand-alone basis on only three occasions, in all cases as replacements for existing Imax theatres, and there is no evidence that any customer had purchased projectors and sound systems on a stand-alone basis; and

(g) there is no real secondary market for Imax theatre system components. As such, it cannot be said that there is objective and reliable evidence of the fair value of the components that had been installed at the end of the fourth quarter of fiscal 2005.

165. The application of RAMD to Imax's theatre system sales and leases resulted in revenues being reported by Imax before those revenues had been earned, with the result that Imax prematurely recognized revenue on theatre system sales and leases

in the fourth quarter of fiscal 2005. Until Imax completed the installation of a theatre, including testing and acceptance by the customer, the basic requirements for revenue recognition in accordance with GAAP had not been fulfilled.

166. Imax's adoption of RAMD for fiscal 2005 was a change in accounting policy that itself ought to have been disclosed. Whatever the date on which Imax purported to have adopted EITF 0021, Imax failed to disclose the application of RAMD to theatre system sales and leases prior to the Form 10-K, and even within the Form 10-K, did not adequately disclose the import of its application to theatre system sales and leases.

167. In its Earnings Press Release and Form 10-K, Imax neither disclosed that it had recognized revenue on systems with respect to which installation was not complete, nor did it disclose that it had deferred revenue relating to the screen elements of those seven theatres because the installations of those screen elements were not complete. Instead, it simply indicated that it was recognizing revenue on 38 theatre systems. The Earnings Press Release and Form 10-K was, therefore, materially false and misleading.

168. The Individual Defendants signed the Form 10-K certifying that the Annual Report contained therein presented fairly, in all material respects, Imax's financial condition and results of operations and thereby participated in the making of the Representation and other misstatements contained therein.

169. Each of the Individual Defendants and Gamble authorized, permitted and/or acquiesced in the publication of the Earnings Press Release and thereby participated in the making of the Representation and other misstatements contained therein.

**THE STRATEGIC ALTERNATIVES PRESS RELEASE**

170. Both the Earnings Press Release, and a second March 9, 2009 press release issued by Imax - the Strategic Alternatives Press Release - contained a statement by Imax that it intended to explore a possible sale or merger of the company. The Strategic Alternatives Press Release stated as follows:

> Imax Corporation today announced that its Board of Directors has decided to begin a process to explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business with another entity offering to strategic opportunities for growth. The company has retained Allen & Company and UBS Investment Bank as financial advisors in this process.
>
> "In order to fully realize the growth potential in both the Imax brand and the business we have built to date, we are evaluating strategic alternatives in order to expand our scale and maximize value for our shareholders. We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. We think this interest, coupled with our solid fiscal 2005 results and compelling growth opportunities, makes this an ideal time to explore our options," said Imax Co-Chairmen and Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler.

171. The Strategic Alternatives Press Release repeated the materially false and/or materially misleading financial results reported in the Earnings Press Release, in

the Annual Report and the Form 10-k. In particular, the Strategic Alternatives Press Release repeated Imax's artificially inflated 2005 earnings per share of US$0.40.

172. In addition, Gelfond and Wechsler stated in the Strategic Alternatives Release that they "*believe our performance in 2005 demonstrates the increasing acceptance of Imax as a commercial destination for mainstream entertainment.*"

173. The foregoing statements were false and or materially misleading when made, inasmuch as Imax's "*performance in 2005*" had been materially overstated due to the improper recognition of revenues in violation of GAAP.

174. Each of the Individual Defendants and Gamble authorized, permitted and/or acquiesced in the publication of the Strategic Alternatives Press Release and thereby participated in the making of the Representation and other misstatements contained therein.

175. In the period following the March 9, 2006 announcement, Imax's financial advisers prepared a package to be delivered to potential acquirers, containing non-confidential, non-proprietary information. From the group of persons who received that package, a smaller group of approximately 40 or 50 potential investors expressed interest, signed a confidentiality agreement and received a Confidential Information Memorandum on Imax.

176. Of the forty to fifty potential investors who expressed an interest, approximately 12 made "non-binding expressions of interest" in or around early May 2006. Most of those interested parties undertook a preliminary due diligence process beginning in mid-May. Some of those parties brought accounting advisors with them to the due diligence sessions and specifically sought to speak to Imax's auditors. Others wished to discuss Imax's accounting with Joyce and other finance staff.

177. A representative of at least one potential investor took the steps necessary to actually review PwC's working papers in relation to Imax, which contained, among other things, the Delhi Post. That potential acquirer asked PwC specific questions about Imax's revenue recognition policy.

178. Ultimately, the process came down to approximately three potential acquirers in July and early August. These parties made conditional offers, subject to due diligence, but by early August 2006, it had become apparent to Imax's Board of Directors that the interest expressed was not going to translate into a deal at the price that the Board was seeking.

**THE EFFECT OF THE REPRESENTATION OF IMAX'S SHARE PRICE**

179. On March 9, 2006, Imax's share price closed on the TSX at $11.94 CDN and US$10.35 on the NASDAQ, an 8% increase from the previous day's closing price. Imax's share price increased further in the following days. On March 13, 2006, Imax's

share price closed on the TSX at $12.56 CDN and US$10.85 on the NASDAQ, a 14% increase from March 8, 2006.

**THE SEC INQUIRY LETTER**

180. On June 20, 2006, Imax received a letter from the SEC. The letter followed a telephone conversation between an SEC representative and Lister. In the letter, the SEC advised that it wished to conduct separate telephone interviews with Joyce and Ed MacNeil, to discuss the following:

> the Company's revenue recognition policies and practices, whether there were any changes to those policies and practices in the fourth quarter of 2005, and, if so, what was the nature of those changes and the reason(s) for them.

181. The telephone interviews requested by the SEC were conducted in or about the first half of July 2006. The June 20 letter was also provided to the 12 investors who remained interested in acquiring Imax at the time it was received, although its receipt was not disclosed to the Plaintiffs and Class Members until August 9, 2006.

**THE TRUTH IS REVEALED**

182. On August 9, 2006, Imax issued a press release which stated, in part, as follows:

> [...]
>
> Separately, the Company provided an update regarding its exploration of strategic alternatives, including the possible sale or merger of the company. On March 9, the Company

announced it had retained Allen & Company and UBS to explore strategic alternatives. Today, the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently no buyers who have indicated a willingness to acquire the Company at a valuation sought by the Board of Directors. Because interest remains from several parties at a lower valuation, however, the Board has authorized the Company's bankers to explore these opportunities. This process is ongoing.

"While we are surprised that the high level of interest we initially saw has yet to result in a partnership or acquisition, we are committed to fully exploring all options open to the Company, including those offers that did not meet the Board's original valuation parameters," said Imax Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "We remain committed to ensuring that any transaction is strategically or financially compelling and delivers the most value possible to our shareholders.

[...]

The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an Imax theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors, PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.

183. The August 9, 2006 Press Release thus disclosed for the first time that:

(a) the final screens of 7 of the 14 theatres recognized in revenue in Q4/05 were not installed by the end of Q4/05, and thus the related installations were not "complete" at quarter-end;

(b) Imax had applied RAMD in order to recognize revenue in Q4/05 relating to the delivered components of incomplete installations; and

(c) the SEC had made an informal inquiry into the timing of Imax's revenue recognition, and its use of RAMD in relation to theatre system installations.

184. The August 9, 2006 Press Release also disclosed that the Company had not succeeded in finding a buyer at the price sought by the board of directors, but also disclosed that efforts to sell the company continued.

185. Imax's improper revenue recognition practices were a material cause or contributor to the board of directors' failure to secure an acquirer at the desired price because:

(a) at least one potential investor had access to all of PwC's working papers, which included the Delhi Post and the details of PwC's review of the investigation of that transaction; and

(b) the June 20, 2006 letter from the SEC was provided to the 10 or 12 parties who engaged in the due diligence process as a precursor to a potential acquisition of Imax.

186. Following issuance of the August 9, 2006 Press Release, the trading price of Imax's securities declined precipitously. On August 9, 2006, the closing price for Imax's securities was US$9.63 on the NASDAQ and C$10.77 on the TSX. On August

10, Imax's securities closed at US$5.73 on the NASDAQ and C$6.44 on the TSX, representing a single day decline of approximately 40%. Over the next 10 trading days, Imax's stock closed at between US$4.85 and US$6.05 on the NASDAQ, and between C$5.43 and $6.51 on the TSX.

187. The decrease in Imax's share price after August 9, 2006 occurred as a result of the announcement by Imax in the August 9, 2006 press release that it had recognized revenue in the fourth quarter of 2005 in relation to 10 theatre systems that did not open during that quarter, and that it had applied multiple element arrangement accounting to the revenue arising from those systems. The plaintiffs allege that such revenue recognition practices were in violation of GAAP and materially overstated Imax's revenues, diluted net earnings per share and revenues from Imax systems for the fourth quarter of 2005 and for the 2005 fiscal year.

**THE RESTATEMENT**

188. Imax ultimately restated its financial statements for the years between 2002 and 2005, including the Form 10-K.

189. Imax also revised its revenue recognition policy such that the projector, sound system, screen system, glasses cleaning machine and the initial services associated with the theatre system would be treated as a single deliverable and a single unit of accounting. The effect of these and the other changes to Imax's revenue

recognition policy was essentially a reversion to Imax's pre-2005 policy, that revenue would be recognized on installation of the entire theatre system.

190. These changes resulted in revenue relating to 14 theatre system installations being moved to later periods. Most significantly, in 2005, 10 installations on which revenue was recognized in the 2005 10-K were moved to later years – 8 to 2006, and two to subsequent periods. All 10 of those theatres were installations the revenue for which was originally recognized in the fourth quarter of fiscal 2005.

191. The result was that Imax's EPS for 2005 went from $0.40, as reported in the February 17 Press Release, the Earnings Press Release and the Form 10-K, to US$0.20 following the restatement. Further, the 2006 10-K contained an admission that the application of RAMD in the 2005 10-K was an "error" under GAAP.

192. Imax advised the OSC that there were 10 theatres in respect of which revenues were deferred to later periods because each had outstanding obligations as of December 31, 2005 as follows:

(a) Revenue relating to Dongguan S&T was deferred because there was no signed acceptance and projectionist training was not complete;

(b) Revenue relating to Lark Hong Kong was deferred until after the reinstallation of the theatre in 2007;

(c) Revenue relating to Winnipeg was deferred because there was no signed acceptance of projectionist training;

(d) Revenue relating to Beijing Radio, Film & TV was deferred because of lack of acceptance of projectionist training and pending installation of the screen;

(e) Revenue relating to Manila was deferred because of lack of acceptance of projectionist training and pending installation of the screen;

(f) Revenue relating to Lodz, Poland was deferred because of lack of signed acceptance of projectionist training, and pending installation of the screen;

(g) Revenue relating to Beijing SUC was deferred because of pending installation of the screen;

(h) Revenue relating to Interlomas was deferred because of lack of acceptance of projectionist training, and pending installation of the screen;

(i) Revenue relating to Kazan, Russia was deferred because of lack of signed acceptance of projectionist training and pending installation of the screen; and

(j) Revenue relating to McMinnville was deferred because of lack of acceptance of projectionist training, and pending installation of the screen.

**THE CONSPIRACY**

193. From on or about October 1, 2005 to on or about August 9, 2006, at Mississauga, Ontario, New York, New York and elsewhere, Imax, Gelfond, Wechsler and Joyce, wrongfully, unlawfully, maliciously and lacking bona fides, agreed together, the one with the other and with persons unknown, to, among other things, overstate the revenues and net earnings of Imax for the fourth quarter and fiscal year ending on December 31, 2005.

194. Some, but not all of Imax's, Gelfond's, Wechsler's and Joyce's predominant purposes, concerns and motivation were to:

(a) cause damage to the plaintiffs and the Class Members;

(b) attract an acquirer or merger partner;

(c) inflate the price of Imax's shares;

(d) obtain an artificially high purchase price of Imax;

(e) increase the value of their own holdings in Imax; and

(f) induce the plaintiffs and Class Members to purchase Imax shares.

195. In furtherance of the conspiracy, the following are some, but not all of the acts carried out or caused to be carried out by Imax, Gelfond, Wechsler and Joyce, or some of them:

(a) they recognized revenue in the fourth quarter of 2005 on ten theatre systems even though sufficient and appropriate evidence did not exist that such systems had been substantially installed as operational Imax facilities, that Imax had fulfilled its obligations as vendor or that revenues had been "earned" in accordance with GAAP;

(b) they chose not to comply with their own internal revenue recognition policies or the policies they had previously disclosed in their disclosure documents;

(c) they chose to represent to the Plaintiffs and Class Members, among others, that a number of theatre installations partially completed in the fourth quarter of 2005 had in fact been completed by the end of that period, knowing that the actual completion of those installations was a necessary milestone in order to recognize the revenue associated with those theatres;

(d) they inappropriately implemented revenue recognition procedures that allowed Imax to segregate revenues from different elements of an Imax theatre system, and recognize those revenues in different quarters, even though the customer transactions were not suited to such accounting treatment;

(e) they deviated from GAAP in the preparation of the financial statements;

(f) they deviated from the accounting principle of consistency in the preparation of financial statements;

(g) they authorized statements, announcements, press releases, filings and other public documents containing the Representation;

(h) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when the location was not fit for installation;

(i) they engaged in a pattern of categorizing Imax theatre systems as being installed in circumstances when essential components of the Imax system were absent;

(j) they permitted Imax and the Individual Defendants to make the Representation which was false;

(k) they made, or failed to take any steps to prevent Imax from making the Representation in statements, announcements, press releases, filings and other public documents;

(l) they made, or caused Imax to make, announcements about its revenue and net earnings when they knew there was no reasonable foundation, in fact, for these net earnings;

(m) they falsely stated that Imax had revenue of US$49,310,000 for the fourth quarter of the fiscal year ended 2005;

(n) they falsely stated that Imax had revenue of US$144,930,000 for the fiscal year ended 2005;

(o) they prepared and issued the February Press Release falsely stating that it expected to meet or exceed 2005 earnings guidance;

(p) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's revenue was US$49,310,000 for the fourth quarter of fiscal 2005; and

(q) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's net earning was US$0.29 per share for the fourth quarter of fiscal 2005 and US$0.40 per share for the fiscal year 2005.

196. The conspiracy was unlawful because Imax, Gelfond, Wechsler and Joyce knowingly and intentionally overstated the revenue and net earnings of Imax and

in doing so violated ss.77(1) and 78(1) of the *Securities Act* and similar regulatory legislation in other jurisdictions, including ss.12, 13 and 18 of the *Exchange Act*, and the reporting requirements of the NASDAQ and the TSX, including Part IV(F) of the TSX Company Manual and Rule 4 -201 of the TSX Rule Book.

197. The conspiracy was directed towards Neil, Cliff and the other Class Members. Imax, Gelfond, Wechsler and Joyce knew in the circumstances that the conspiracy would, and it did, cause loss to Neil, Cliff and the Class Members.

**THE RELATIONSHIP BETWEEN FINANCIAL RESULTS AND PRICE**

198. The price of Imax's publicly-traded securities was directly affected by the periodic disclosures regarding Imax's financial results. Imax and the Individual Defendants were at all material times aware of the effect of Imax's disclosures about its financial results upon the price of its publicly-traded securities.

199. The February Press Release, the Form 10-K, the Annual Report, the March 9, 2006 press releases, each of which contained the Representation, were filed with SEDAR, the TSX and the NASDAQ and thereby became immediately available to, were reproduced for inspection by and were used by the Class Members, the public, financial analysts and the financial press through the internet and financial publications.

200. Imax and the Individual Defendants routinely transmitted the documents referred to above to the financial press, financial analysts and certain prospective and actual holders of the Imax securities.

201. Imax and the Individual Defendants regularly communicated with the public investors and financial analysts via established market-communication mechanisms, including through regular dissemination of press releases on newswire services in Canada and the United States. The price of Imax's publicly-traded securities were directly affected each time Imax and the Individual Defendants communicated new, material information about its financial results to the public.

202. Imax was the subject of analysts' reports that incorporated the material financial information in the documents referred to above, with the effect that any recommendation in such reports during the Class Period were based, in whole or in part, upon material over-statements of Imax's financial results.

203. Imax's securities were traded on the TSX and NASDAQ, which are efficient and automated markets. The price at which Imax securities traded on the TSX and NASDAQ incorporated material information about Imax's financial results which was disseminated to the public through the documents referred to above, distributed by Imax and the Individual Defendants as well as by other means.

NEGLIGENT AND RECKLESS MISREPRESENTATION

204. The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases were prepared, in part, for the purpose of attracting investment and with the intention that members of the investing public would rely upon the documents in making the decision to purchase Imax securities.

205. Each of the documents referred to in paragraph 204 above contained the Representation. The Representation was untrue, inaccurate and misleading.

206. Imax and the Individual Defendants knew that by making the Representation, the price of Imax's publicly-traded securities would rise and remain at artificially high levels and that investors would rely upon the Representation in making their decisions to purchase Imax shares.

207. Imax made the Representation by issuing the:

(a) February Press Release;

(b) Form 10-K;

(c) Annual Report;

(d) Earnings Press Release; and

(e) Strategic Alternatives Press Release.

208. The Individual Defendants made the Representation by authorizing, permitting and/or acquiescing in:

(a) the February Press Release; and

(b) signing the Form 10-K, the Annual Report and the Earnings Press Release and the Strategic Alternatives Press Release.

209. Imax and the Individual Defendants made the Representation negligently or, alternatively, recklessly, caring not whether it was true or false, intending that Neil, Cliff and the other Class Members would rely upon it, which they did to their detriment by purchasing Imax securities during the Class Period and holding the securities beyond the Class Period.

210. Neil relied upon the Representation by reading and relying upon the documents referred to in paragraph 207 above, which contained the Representation. Cliff relied upon the Representation by reading the Form 10-K and an article published by the Globe and Mail dated February 17, 2006 which stated that *"Imax Corp. jumped 83 cents or 9.13 per cent to 9.92. Large screen movie maker said Friday it expects to meet or beat its 2005 earnings forecase between 35 and 38 cents a share after a record number of installations in the fourth quarter. In the quarter, the company completed 14 theatre installations."* Cliff also understood and relied on the fact that in preparing its financial statements, Imax was required to follow the applicable rules of accounting, in this, GAAP.

211. Given the relationship as pleaded between Imax's financial results and its publicly-traded securities, Neil, Cliff and each other Class Member also relied upon the Representation by the act of purchasing or acquired Imax securities.

212. Neil, Cliff and each other Class Member suffered damages and loss, as particularized below, as a result of relying on the Representation and purchasing the Imax shares.

**PART XXIII.1 OF THE *SECURITIES ACT***

213. The plaintiffs plead and rely on Part XXIII.1 of the *Securities Act*.

214. Imax is a responsible issuer as defined in the *Securities Act*.

215. During the Class Period, Imax issued, released and filed with SEDAR the February Press Release and the Earnings Press Release and the Strategic Alternatives Press Release, which are not core documents as defined in the *Securities Act*.

216. During the Class Period, Imax issued, released and filed with SEDAR the Annual Report and the Form 10-K, which are core documents as defined in the *Securities Act*.

217. Each of the documents referred to above contained the Representation and other misstatements, which is a misrepresentation as defined in the *Securities Act*.

218. During the period between the time when the documents referred to above were released and the time when the misrepresentation contained in the documents was publicly corrected, Wechsler, Gelfond, Braun, Copland, Girvan and Leebron were directors of Imax.

219. During the period between the time when the documents referred to above were released and the time when the misrepresentation contained in the documents was publicly corrected, Wechsler, Gelfond, Joyce and Gamble were officers of Imax. Each of Wechsler, Gelfond, Joyce and Gamble authorized, permitted or acquiesced in the release of the documents referred to above and they:

(a) knew, at the time that those documents were released that they contained the Representation; or

(b) at or before the time those documents were released, they deliberately avoided acquiring knowledge that the documents contained the Representation; or

(c) were, through action or failure to act, guilty of gross misconduct in connection with the release of those documents.

220. Neil, Cliff and the Class Members acquired Imax shares during the period between the time when the documents referred to above were released and the time when the misrepresentation contained in the document was publicly corrected. Neil, Cliff and the Class Members therefore have a statutory right of action for damages against the defendants, as particularized below.

221. Neil, Cliff and the Class Members assert the following rights of action contained in Part XXIII.1 of the *Securities Act*:

(a) s. 138.3(1)(a) against Imax;

(b) s. 138.3(1)(b) against Wechsler, Gelfond, Braun, Copland, Girvan and Leebron; and

(c) s. 138.3(1)(c) against Wechsler, Gelfond, Joyce and Gamble.

222. Neil, Cliff and the Class Members are entitled to have damages assessed against Imax, Braun, Coplan, Girvan and Leebron in accordance with ss. 138.5 and 138.7(1) of the *Securities Act*.

223. Neil, Cliff and the Class Members are entitled to have damages assessed against Gelfond, Wechsler, Joyce and Gamble in accordance with ss. 138.5 and 138.7(2) of the *Securities Act*.

**DAMAGES**

224. As a result of the conduct of the defendants as pleaded, Neil, Cliff and each Class Member suffered loss and damage, and the defendants or any one or more of them are liable to pay damages to them and to the other Class Members.

225. At the conclusion of the trial of the common issues, Neil and Cliff reserve their right to elect to have damages assessed in accordance with the *Securities Act* or in accordance with the common law.

226. Neil, Cliff and the other Class Members are also entitled to recover, as damages or costs in accordance with the *CPA*, the costs of administering the plan to distribute the recovery in this action.

**VICARIOUS LIABILITY OF IMAX**

227. Imax is vicariously liable for the acts and omissions of the Individual Defendants.

228. The acts or omissions particularized and alleged in this fresh statement of claim to have been done by Imax were authorized, ordered and done by the Individual Defendants and Imax's other agents, employees and representatives while engaged in the management, direction, control and transaction of its business affairs and are, therefore, acts and omissions for which Imax is vicariously liable.

229. At all material times, the Individual Defendants were officers and/or directors of Imax. As their actions are independently tortious, they are personally liable for same to Neil, Cliff and the other Class Members.

**PUNITIVE DAMAGES**

230. Neil and Cliff plead that the conduct of Imax and the Individual Defendants' was high-handed, outrageous, reckless, wanton, entirely without care,

deliberate, callous, disgraceful, willful, in intentional disregard of their rights, indifferent to the consequences and motivated by economic considerations. Such conduct renders them liable to pay punitive damages.

**THE LEGISLATION**

231. Neil and Cliff plead and rely upon the *Securities Act*, the *CJA* and the *CPA*.

**PLACE OF TRIAL**

232. Neil and Cliff propose that this action be tried in the City of Brampton, in the Province of Ontario.

**SERVICE**

233. This originating process may be served without court order outside Ontario because the action is:

(a) in respect of a tort committed in Ontario (rule 17.02(g));

(b) in respect of damages sustained in Ontario arising from a tort or breach of contract however committed (rule 17.02(h));

(c) against a person outside Ontario who is a necessary and proper party to this proceeding properly brought against another person served in Ontario (rule 17.02(o)); and

(d) against a person carrying on business in Ontario (rule 17.02(p)).

September 20, 2006

**SUTTS, STROSBERG LLP**
Lawyers
600 - 251 Goyeau Street
Windsor, ON N9A 6V4

HARVEY T. STROSBERG, Q.C.
LSUC Number: 12640O
PATRICIA A. SPEIGHT
LSUC Number: 26380C
JAY STROSBERG
LSUC Number: 47288F

Tel: 519.561.6285
Fax: 866.316.5308

**SISKINDS LLP**
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8

CHARLES M. WRIGHT
LSUC Number: 36599Q
A. DIMITRI LASCARIS
LSUC Number: 50074A
MICHAEL G. ROBB
LSUC Number: 45787G

Tel: 519.672.2121
Fax: 519.672.6065

Lawyers for the plaintiffs

920865.v12

| SILVER et al.<br>Plaintiff | and | IMAX CORPORATION et al.<br>Defendants | Court File No.: CV-06-3257-00 |
|---|---|---|---|

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Brampton

Proceeding Under the *Class Proceedings Act, 1992*

**FRESH STATEMENT OF CLAIM**

Sutts, Strosberg LLP
Lawyers
600-251 Goyeau Street
Windsor, ON N9A 6V4

William V. Sasso LSUC# 45467L
Tel: (519) 561-6222
Fax: (519) 561-6203

Jay Strosberg LSUC# 47288F
Tel: (519) 561-6285
Fax: (519) 561-6203

Siskinds LLP
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8

Charles M. Wright LSUC#: 36599Q
A. Dimitri Lascaris LSUC#: 50074A
Michael G. Robb LSUC#: 45787G

Tel: (519) 672-2121
Fax: (519) 672-6065

Solicitors for the Plaintiffs

# EXHIBIT D

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(Commenced at Brampton)

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and -

IMAX CORPORATION,
RICHARD L. GELFOND, BRADLEY J. WECHSLER
FRANCIS T. JOYCE, NEIL S. BRAUN,
KENNETH G. COPLAND, GARTH M. GIRVAN,
DAVID W. LEEBRON, and KATHRYN A. GAMBLE

**Defendants**

Proceeding under the *Class Proceedings Act, 1992*

# STATEMENT OF DEFENCE

1. The Defendants admit the allegations contained in paragraphs 3, 8, 15, 17-19, 33, 43-44, 78 and 80 of the Fresh Statement of Claim ("the Claim").

2. The Defendants have no knowledge in respect of the allegations contained in paragraphs 6 and 7 of the Claim.

3. Save as is expressly admitted, the Defendants deny all other allegations made in the Fresh Statement of Claim. In addition, the Defendants deny that the Plaintiffs and the Class are entitled to any of the relief claimed in paragraph 2 of the Claim.

This is Exhibit D referred to in the affidavit of Carolyn Piovesan sworn before me, this 7 day of May 2012

A COMMISSIONER FOR TAKING AFFIDAVITS

**The Defendants**

4. IMAX Corporation ("IMAX") is a public company, listed in Canada on the TSX and in the United States on NASDAQ. The overwhelming majority of its shareholders during the Class period purchased their IMAX shares on the NASDAQ and are residents of the United States. Neither representative Plaintiff in this matter purchased his shares on the NASDAQ or is resident in the United States.

5. As a reporting issuer in both Canada and the United States, IMAX files annual reports (Forms 10-K) in the United States pursuant to the *Securities and Exchange Act* of 1934 ("*the Securities and Exchange Act*"). IMAX is also a reporting issuer in Ontario pursuant to the Ontario *Securities Act* and files its public disclosure on SEDAR. IMAX relies upon its various Form 10-K filings for a true and complete description of how it describes its business.

6. The individual Defendants were, at material times, officers and/or Directors of IMAX Corporation.

**The Business of IMAX**

7. IMAX is an entertainment technology company, specializing in digital and film based motion picture technologies and large format film presentations, including both nature-style documentaries and Hollywood releases. IMAX admits the allegation in paragraph 17 that it has described itself as one of the world's leading entertainment technology companies specializing in large format and 3D presentations.

8. IMAX's principal business is the design, manufacture, sale and lease of theatre systems based on proprietary and patented technology for large format theatres. IMAX generally does not own individual theatres. Instead, the Company sells, leases or enters into joint ventures with third parties who assume responsibility for building and operating the theatre. As of December 31, 2006, there were 284 theatres with IMAX technology operating in 40 countries.

9. IMAX theatre systems either include a unique rolling loop film format projector or a proprietary new digital projector, each of which offers superior image quality. The systems also include a digital sound system that delivers up to 12,000 watts and a screen with a proprietary 3D coating technology as well as 3D glasses cleaning equipment. Screens in IMAX theatres are as large as 100 feet or more wide and 8 stories tall. The Company believes that they are the largest cinema screens in the world. IMAX screens extend to the edge of a viewer's peripheral vision to create immersive experiences which, when combined with the Company's superior sound system components, make audiences feel as though they are part of the onscreen action.

10. As part of the contract for an IMAX theatre system, the Company advises the customer on theatre design, supervises the installation of the theatre system equipment and provides training in using the equipment. IMAX's contractual obligations related to the installation are complete once IMAX fulfills these various responsibilities. The theatre owners are responsible for theatre building construction, any necessary improvements, the installation of the theatre components and the marketing and programming of the theatre. The theatre owners generally agree to construct the theatre on a schedule which provides for delivery of the theatre system on agreed upon dates.

11. IMAX's typical contract also included trademark licence rights which commence on execution of the agreement. Each of the theatre system components (the projector, the sound system and the screen), the theatre design support, the supervision of installation, the projectionist training and the trademark rights were all elements of a typical IMAX system arrangement.

12. Contracts for a theatre system generally had 10 to 20 year initial terms and were typically renewable by the customer for one or more terms of 5 or 10 years duration. Although each individual contract may differ, under the terms of the typical lease agreement, the title to the theatre system equipment (including the projector, the sound system and the projection screen) remained with IMAX. Where theatre systems were provided on a long-term lease basis, IMAX had the right to remove the equipment for non-payment or other defaults by the customer. Lease agreements were generally not cancellable by the customer unless IMAX failed to perform its obligations.

13. IMAX also entered into sale agreements with certain customers. Under a typical sale agreement, the title of the theatre system passed to the customer. However, in certain circumstances, IMAX retained title or a security interest in the equipment until the customer had made all payments required under the agreement.

14. The typical lease or sales agreement provided for three sources of cash flow to IMAX:

(a) initial fees;

(b) ongoing fixed minimums and contingent fees; and,

(c) ongoing maintenance and extended warranty fees.

15. The initial fees were generally received when the contract was executed, when the equipment was shipped, and when customer acceptance was received. Ongoing fixed minimums and contingent fees and ongoing maintenance and extended warranty fees were generally received over the term of the contract and were usually adjusted annually based on the changes in the local consumer price index. The ongoing fixed minimums and contingent fees provided for a fee which was the greater of a fixed amount or a certain percentage of the theatre box office once the theatre is open and operational.

**Revenue Recognition Principles**

16. Cash received from initial fees in advance of installation was recorded by IMAX as deferred revenue. At the time of signing, the associated costs of manufacturing the theatre system were recorded as inventory. At the time of installation, the deferred revenue was recognized in income and the inventory costs were fully expensed.

17. The actual timing of installation of the theatre system was dependent, in part, on the timing of the construction of the customer's theatre. Therefore, while revenue for theatre systems was generally predictable on a long term basis, it could vary from year to year and quarter to quarter depending upon the actual timing of construction and the timing of installation of specific theatre systems. In each annual report between 1997 and 2006, IMAX publicly disclosed this risk in the following language:

> "that the Company's operating results and cash flow can vary substantially from quarter to quarter to quarter and could increase the volatility of its share price."

18. At all material times, the Company's approach to revenue recognition was the subject of review and audit by its auditors, PricewaterhouseCoopers ("PwC"). PwC advised on the various

revenue recognition policies adopted by IMAX and ultimately approved of the revenue recognition policy described in IMAX's public disclosure. PwC also audited and approved of the treatment of revenue recognition as reflected in the audited financial statements of IMAX as they were publically disclosed.

19. Prior to the year 2000, revenues from theatre system sales and leases which transferred substantially all of the benefits and risks of ownership to the customer were recognized on the completed contract method (that is, upon delivery of the theatre system). Revenues included initial advance payments and contracted minimum payments discounted to their present value. Initial advance payments were generally received in advance of deliveries and were recorded by IMAX as deferred revenue. The associated costs of those theatre systems were recorded as inventories and systems under construction. Upon delivery of the theatre system the deferred revenue and deferred costs, net of residual value at the end of the lease term, were recognized in earnings.

20. SEC Staff Accounting Bulletin ("SAB") No. 101 Revenue Recognition and Financial Statements ("SAB 101") was issued in 1999 to provide specific and comprehensive guidance on revenue recognition. IMAX applied SAB 101 beginning in 2000 and began recognizing revenue upon installation, rather than delivery of the theatre system. SAB 101 was updated in 2004 and an expanded version was released as SAB 104 at that time.

21. SAB 101 provides that a Company should recognize revenue with respect to the sale of equipment when "it is realized or realizable and earned". SAB 101 noted four criteria to be met for this determination:

(a) persuasive evidence of an arrangement exists;

(b) delivery has occurred or services have been rendered;

(c) the seller's price to the buyer is fixed or determinable; and,

(d) collectability is reasonably assured.

22. With respect to the second criterion, SAB 101 provided that a seller should substantially complete the terms specified in the arrangement in order for delivery or performance to have occurred. When making a determination of whether contract terms are deemed substantially complete, only inconsequential or perfunctory obligations of the seller should remain incomplete for revenue to be earned.

23. While SAB 101 provided limited guidance for accounting for arrangements with multiple deliverables or elements, it did not provide guidance on whether an arrangement itself had multiple elements. As such, in May of 2003, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") released the Consensus Opinion on issue no. EITF 00-21; Revenue Arrangement With Multiple Deliverables ("EITF 00-21"), which was intended to provide guidance on whether arrangements consisted of one, or more than one, unit of accounting.

24. EITF 00-21 provides specific guidance on multiple element arrangement accounting ("MEA accounting"). Under the guidance, for an arrangement with multiple deliverables, a deliverable item should be considered a separate unit of accounting if all of the following criteria are met:

(a) The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context

of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s).

(b) There is objective and reliable evidence of the fair value of the undelivered item(s).

(c) If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.

25. EITF 00-21 does not address when the criteria for revenue recognition are met. That issue is determined under SAB 101. Therefore, in applying these various accounting policies, the first step is to determine whether the deliverable is within the scope of EITF 00-21. If the deliverable is within the scope of the EITF 00-21, then the revenue recognition process is to determine under that policy whether an arrangement consists of one or more units of accounting. The second step is to consider SAB 104, which updated SAB 101, for guidance as to each individual unit of accounting to determine whether that one unit meets revenue recognition criteria. After applying SAB 104 to that element, the relative fair value of each individual unit is either recognized or deferred.

26. The term deliverable is not explicitly defined in EITF 00-21. The determination of what is a "deliverable" requires the application of judgment and can be influenced by a number of facts and circumstances. IMAX's public disclosure expressly noted that accounting policies, rules and guidelines were highly complex and subject, in many cases, to subjective judgment.

27. EITF 00-21 was released in May of 2003 and IMAX began applying it in July of 2003. In its 2004 annual report, IMAX addressed the issue of multiple element arrangements as follows:

> "On occasion, the Company will include film licenses or **other specified elements** as part of system sales or lease agreements. When separate prices are listed in a multiple element arrangement, these prices may not be indicative of the fair values of those elements because the prices of the difference components of the arrangements may be modified through negotiation although the aggregate consideration may not. Revenues under these arrangements are allocated based upon the estimated relative fair value of each element." **[Emphasis added]**

28. In its 2005 annual report, IMAX further described its revenue recognition in its annual report and notes to the consolidated financial statement as follows:

> "The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When **the elements** of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an **individual element** is recognized when revenue recognition criteria for that element is met." **[Emphasis added]**

29. The Company also expanded its wording of how it recognized revenue:

> The Company recognizes revenue from sales types leases when the installation of a respective theatre system **element** is substantially complete and all of the following criteria are met: **[Emphasis added]**
>
> (a) persuasive evidence of an agreement exists;
>
> (b) the price is fixed or determinable; and,
>
> (c) collection is reasonably assured.

30. When EITF 00-21 and SAB 104 became effective, IMAX took advice from its auditors, PwC, on the application of that guidance to its business and followed the advice given. IMAX therefore denies the interpretation of EITF 00-21 and SAB 104 set forth in paragraphs 39 to 42 of the Claim. By its explicit terms, SAB 104 requires issuers to consider the units of accounting under EITF 00-21 first to determine the appropriate units of accounting, and only after that determination to apply the SAB 101/104 revenue recognition criteria to each unit of accounting. The Plaintiffs have misstated the accounting effect of EITF 00-21 and SAB 101/104 in their Claim.

31. A typical IMAX system includes components consisting of specialized theatre projection equipment, advanced sound systems, screens, theatre automation control systems and film handling equipment. In addition to the equipment components, theatre arrangements usually included services such as the supervision of the installation, training of the theatre projectionist personnel, advice on theatre design and maintenance services. The components of these theatre systems were always disclosed within the business section of the Company's 10-K.

32. Accordingly, for the purposes of EITF 00-21, IMAX separately accounted for the following units of accounting in a typical theatre system revenue arrangement:

(a) the projection system, sound system and related equipment (excluding the screen) and the supervision of installation of these components were treated as one unit of accounting for convenience as these components and related services are delivered and installed within a short period of time of each other;

(b) the screen and the supervision for the installation of the same;

(c) the maintenance services;

(d) projectionist training (the Company considered this element as immaterial for separate accounting); and,

(e) film licenses.

33. IMAX adopted MEA, as did all companies reporting under GAAP, as of July 2003 and applied it where appropriate thereafter. Initially, this occurred principally in respect of film accounting and film licensing. No facts or circumstances existed in either 2003 or 2004 with respect to the elements of theatre system installation which in the judgment of the Company or its auditors, required the application of MEA to those systems. In those years, each installation of a projector sound system and screen was completed by IMAX in the same quarter. Therefore, IMAX recognized all revenue related to those particular installations within those quarters. PwC gave an unqualified or clean opinion in respect of the audited financial statements for those years.

34. In 2005, in two incidences, IMAX faced different facts and circumstances, arising out of its expansion into international markets. In Q1 2005 in Poznan, Poland and in Q3 2005 in Delhi, India, IMAX delivered all of the component parts of its system to the theatre and tested the systems to make sure that they were operable. In each case, the projector and sound system was tested on a two dimensional screen installed for that purpose on a temporary basis. Both operated according to specifications. Also, in both theatres, the owner/operator delivered to IMAX a certificate of acceptance prior to the end of the quarter, certifying "the substantial completion of the IMAX ...System installation". In both theatres, however, to protect the IMAX silver screen (the screen used to show IMAX 3D movies) from damage due to the customer's ongoing construction, IMAX installed only a white screen and left the silver screen to be

installed at a later date. In each instance, IMAX concluded, in its unaudited quarterly financial statement as reviewed by PwC, that it should recognize all of the revenue for the installation in that quarter (Q1 2005 for Poznan, and Q3 2005 for Delhi). PwC reviewed these two accounting decisions during 2005 and issued a clean audit opinion despite the fact that the silver screens were not yet in place at quarter end for those particular theatres.

**The Delhi Post**

35. In the last quarter of 2005, due diligence on revenue recognition was undertaken by IMAX due to the so-called "Delhi Post".

36. The Delhi Post was published on a Yahoo Finance Internet Page by an unidentified person on November 10, 2005. This anonymous posting was entitled "SEC To Investigate Fraud at IMAX". This statement appears to have been false. To the knowledge of IMAX, there was no investigation of IMAX by the SEC in respect of any matter involving IMAX in November 2005. IMAX admits that the Delhi Post is accurately quoted in paragraph 78 of the Claim.

37. Also on November 10, 2005, the Delhi Post was e-mailed anonymously to the Defendants Wechsler and Gelfond, then the co-CEOs of IMAX. The anonymous e-mail was also "faked" to state the IMAX was the subject of an SEC investigation for fraud when it was not. There was no evidence then, and there is no evidence now, that the content of this anonymous posting was true. IMAX pleads that anonymous postings of this sort are placed on the internet so that unfounded rumours concerning public companies might be used to affect the stock price to the benefit of the poster.

38. Notwithstanding the unreliable character of the Delhi Post, Mr. Wechsler and Mr. Gelfond immediately notified the General Counsel of IMAX and the Chair of the Audit Committee, the Defendant Kenneth Copland, of the Post. Steps were also immediately taken to advise members of the Board of Directors, PwC, and the Company's outside counsel of the Post. The General Counsel thereafter conducted an investigation of the Post from which the two CEO's were excluded. General Counsel reported on his investigation of the Post to the Board of Directors.

39. In addition, the Audit Committee, through Mr. Copland, directed Jeffrey Vance, a member of the IMAX Finance Department, to independently assess the Company's internal accounting functions in light of the Post. Mr. Vance was directed to undertake this investigation as part of the Company's Sarbanes-Oxley obligations to undertake an annual internal accounting review.

40. PwC reviewed the Post, the contract in issue, the report of the IMAX installer, the customer's Certificate of Acceptance, and other documents relevant to the Delhi installation. PwC considered all of this material and did not object to IMAX's decision to recognize revenue in Q3 2005 for the Delhi installation.

41. In due course, the General Counsel reported to the Board of Directors and Mr. Vance reported to the Audit Committee. The Defendants plead that the reports of the General Counsel and of Mr. Vance speak for themselves. The defendants do not admit or accept the characterization of the activities giving rise to those reports or the content of the reports contained in paragraphs 79 to 93 of the Claim.

42. As a result of these investigations, the Board of Directors concluded that there was no evidence of fraud or wrong doing as alleged in the Delhi Post. Both the Board of Directors and PwC concluded that revenue had been properly recognized for the Delhi installation in Q3 2005.

43. However, as a consequence of the investigation undertaken by IMAX, two recommendations were made:

(a) That the Company amend the language of its revenue recognition policy to more accurately reflect its actual procedure in practice and the requirements of GAAP to assess the degree of completion of its installations for accounting purposes; and,

(b) That the Company enhance the scope and detail of the written documentation to be provided to PwC for the 2005 year end audit to support its revenue recognition determinations for various installations.

44. These recommendations gave rise to the drafting of Policy 19-A Revenue-System Leases dated November 16, 2005. IMAX relies upon Policy 19-A for the true and accurate statement of its contents. Likewise, IMAX relies upon Policy 19-B for the true and accurate statement of its contents. The Defendants do not admit or accept the characterization of those policies set out in paragraph 51 to 57, 61 and 62 of the Claim.

45. In any event these policies were entirely consistent with the application of EITF 00-21. At all material times, PwC was aware of the internal revenue recognition policies of IMAX and how they intersected with EITF 00-21. As pled in paragraphs 25 and 30 of this Statement of Defence, a judgment about revenue recognition occurs after EITF 00-21 has been applied and a

judgment has been made about whether there are separate units of accounting. It is unsurprising that revenue recognition policies of the Company do not refer to EITF 00-21.

46. The investigations undertaken by the General Counsel and the Audit Committee led directly to the enhanced collection of documentation during the preparation of the financial statements for 2005. There was enhanced scrutiny of revenue recognition with respect to Q4 2005 installations (including by PwC) because those investigations were undertaken in November and December of 2005.

47. IMAX pleads that the response of the CEOs, the Board and the Audit Committee to the anonymous and demonstrably false Internet posting was thorough and met or exceeded all reasonable standards of corporate governance and due diligence.

**The Q4 2005 Installations**

48. IMAX admits that it monitored the progress of installations in Q4 2005, just as it did in all quarters. However, it denies the characterization of this monitoring process as set forth in paragraphs 94 to 134 of the Claim.

49. The department within IMAX which was responsible for supervising theatre system installation was "Theatre Operations" under the direction of Mark Welton. Mr. Welton provided periodic e-mail reports summarizing the status of Q4 installations that were then in the process of being completed. Senior management and the finance department of IMAX would receive reports from Mr. Welton.

50. Upon receipt of these reports, the finance department would collect documents and related information concerning each installation. The finance department verified the status of

each installation so that it could then make a judgment on the appropriate accounting treatment. When that package of documentation was completed and when a judgment on the appropriate accounting treatment was reached, that package together with a summary memorandum was delivered to PwC in respect of each installation.

51. The actual construction of a theatre and the timing of the installation of theatre equipment was in the hands of the theatre owner. Often, starting in approximately 2005, these theatres were in foreign locations geographically distant from IMAX. Installation depended, in part, upon the particular progress that owners had made in completing the construction of their theatres. In certain circumstances, these customers had entered into agreements that required their IMAX theatre system installation to be completed by IMAX in Q4 2005. In other cases, there was no deadline for completion but the customer had consented to and budgeted for installation to occur in Q4 2005. In some of these cases, the theatre owners had encountered difficulties during the construction phase resulting in unforeseen delays in theatre completion.

52. Where appropriate, IMAX still worked with those customers to complete installations as originally scheduled. In some cases, the Company offered incentives for customers to complete installations on schedule. IMAX pleads that such incentives are ordinary business decisions that were in the best interests of IMAX and its shareholders. IMAX further pleads that it required documentary evidence from its customers demonstrating that these incentives would actually be used for their intended purposes.

53. For that reason, IMAX had a practice, which it continued in Q4 2005, that it would offer appropriate incentives to customers, occasionally in the form of marketing allowances, so that theatre systems were installed and theatre structures was completed as budgeted.

54. In the cases of Lark, Kazan and McMinnville, IMAX extended the payment schedule for those installations into the year 2006. In the case of Lark, the existing theatre had to be closed to renovate and install the IMAX theatre system. Therefore, it was agreed that IMAX would compensate the customer for the short period of its lost business operations at the end of Q4 2005.

55. In the cases of McMinnville, Kazan and Interlomas, IMAX agreed to provide a marketing allowance to the customers to assist with the opening of the Theatre. The net effect of these accommodations was to encourage the theatre owners to complete construction and open their theatres as early as possible. The opening of an IMAX theatre boosted name recognition for IMAX and promoted the brand among other potential theatre operators. It also advanced the date when film revenue would be received by IMAX.

56. In each case, the incentives offered to customers in Q4 2005 were all disclosed to PwC. In December of 2005, before some of the incentive agreements were even completed, IMAX specifically advised PwC that such discussions with theatre owners were underway. After the close of Q4 2005, every incentive agreement was documented in writing with signatures from the client and IMAX, along with executed Certificates of Acceptance. All were provided to PwC. PwC was aware that several of the documented agreements were not executed until after the close of Q4 2005.

57. IMAX pleads that the deficiencies in construction noted in the Claim in respect of Lark (Hong Kong), Kazan, McMinnville and Interlomas were documented in memoranda and supporting documents prepared by IMAX finance staff in early 2006 and submitted to PwC.

58. In fact, IMAX pleads that the deficiencies alleged in the Claim at paragraphs 105 through to paragraph 134 are excerpted from the very documents IMAX management provided to PwC during the 2005 audit. Accordingly, IMAX pleads that PwC was fully aware of the facts and circumstances when they suggested the application of multiple element accounting to these installations. It was these IMAX Finance Department memos that caused PwC to suggest MEA accounting. PwC suggested to management that it consider the application of MEA accounting so that only revenue for the projector and sound system (which were installed) should be recognized.

59. IMAX denies that Mr. Vance raised serious questions about the facts and circumstances surrounding these installations as alleged in paragraph 145 of the Claim. To the contrary, Mr. Vance's review of these installations was part of IMAX's internal audit and due diligence. As requested by management, he was highlighting issues to be appropriately addressed before management submitted its documentation to PwC and the Audit Committee.

60. All of the customers in issue signed Certificates of Acceptance for their theatre systems. PwC reviewed the agreements, the Certificates of Acceptance and supporting documentation during its audit for 2005, and in some cases independently sought confirmation directly from the customers concerning the installations. In fact, PwC had confirmations sent directly to fully half of the owners of theatres that had received installations but had not yet opened, asking the customers to confirm a number of facts directly with PwC, including key terms of the agreement, the date of acceptance and the dates of all amending agreements.

61. IMAX therefore pleads that PwC had appropriate information to confirm its judgment, and the judgment of management, concerning the application of MEA accounting to those installations.

**The PwC Audit**

62. In December of 2005, IMAX had discussions with PwC regarding the audit procedures which management would follow to prepare the audited financial statements for that year. The Company planned to release its 2005 annual report in March of 2006. That report would be filed with the SEC as part a mandatory Form 10-K. At that time, management disclosed to PwC that negotiations were under way with some customers to amend their contracts during the installation process. It was agreed that any such agreements, once concluded, would be reduced to writing by IMAX and the customer, for review by PwC.

63. Thereafter, appropriate documents to support revenue recognition for each installation were collected. When the supporting documentation was assembled, it was reviewed by appropriate personnel in the finance department of IMAX. These packages were later reviewed by the controller, Kathryn Gamble, who requested any additional materials required to fully document the status of each installation.

64. Ms. Gamble, and the Chief Financial Officer ("CFO") Mr. Joyce, read and prepared written summaries containing the accounting analysis for each of the 14 installations for which the Company proposed to recognize revenue in Q4 2005. IMAX management initially proposed that it would recognize all of the revenue on 14 installations for Q4 2005, notwithstanding that the silver screen had not been installed in 7 of those theatres. Management's initial judgment was that the screens were inconsequential and perfunctory, because, among other things, the

value of the uninstalled components (such as the silver screen) paled in comparison to the installed elements. Specifically, on a theatre system installation with a value of approximately $1.5 million, the IMAX screen accounts for between $100,000 and $125,000 of revenue. The remainder of the value of the theatre system resides in the projector, the sound system, and the glasses cleaning machine, as to which IMAX's obligations were substantially complete. Accordingly, management concluded that pursuant to GAAP, all of the revenue in respect of those installations should be recognized in Q4 2005.

65. PwC reviewed these summaries and asked for further materials to be provided to them. IMAX prepared detailed memoranda in respect of each installation for those theatres that would not open before the year end, setting out the installation status and referencing any contract documents (including amendments) setting out all outstanding obligations. IMAX management also prepared assessments of the remaining work required for each installation by hour and cost. Management calculated, on a percentage basis, the required time and expense to complete the installation against the overall installation expense.

66. PwC reviewed all of the memoranda and supporting documentation and, in addition, undertook its own independent review and investigation in respect of these installations. As a result of this review, PwC recommended against IMAX management's proposal to recognize all revenue on the 14 subject installations. However, PwC did not recommend that all revenue in respect of these theatre systems be deferred to a later period. Rather, PwC recommended that IMAX record the revenue associated with the projection and sound systems which were fully installed, and defer recognition of the screen system, even though in most cases, the screen had already been delivered and was awaiting installation.

67. Specifically, after reviewing IMAX management's analysis, PwC recommended the following:

(a) For 6 installations that had opened in the quarter, full revenue recognition was appropriate because the remaining elements were inconsequential;

(b) For 7 installations that had not opened, the screen element should be deferred to a later period; and,

(c) For 1 installation, that the revenue associated with the client's option to relocate the theatre be deferred to a later period.

68. The result of this recommendation by PwC was that IMAX would recognize less revenue in Q4 2005 and for 2005 as a whole than IMAX management had proposed when it submitted its own analysis to PwC.

69. After receiving the advice of PwC, IMAX management re-visited its analysis and determined that the screen component of the arrangement was a separate unit of accounting. The reasons for this were as follows:

(a) The screen had stand-alone value to the customer.

(b) There was objective and reliable evidence of the fair value of the screen.

(c) The Company's arrangements generally did not include a right of return.

70. The contracts IMAX had with its customers generally did not provide separate amounts for each of the components of an IMAX theatre. However, the fair value of the screen and other elements deferred as of the end of Q4 2005 and not recognized as revenue amounted to

$767,000.00. This deferral represented the fair value of the seven screens not fully installed by year end, plus the value of some other elements.

71. Fair value of the screen element was determined based on effective and reliable evidence which included arms-length commercial pricing for the purchase of the screen directly from the screen manufacturer and suppliers with no discounts. An additional fair value element was added for the costs related to the supervision of installation, again based on arms-length pricing with no discount.

72. The amount allocated to the delivered elements was the total fixed arrangement consideration (excluding any amount that may be contingent on future box office performance of the individual theatres) less the amounts allocated to the undelivered elements (the screen). It was the view of IMAX management, supported by PwC, that this methodology was consistent with the guidance provided in paragraph 2 of EITF 00-21.

73. Management's reconsideration of its initial revenue recognition's decision occurred because PwC had advised management that, given that the screen was not fully installed, it was PwC's opinion that the Company had not properly assessed the specific facts and circumstances of those installations in the fourth quarter against the guidance in EITF 00-21. PwC advised management that the guidance in the EITF 00-21 was mandatory and it applied to any arrangement with multiple elements to it. PwC advised management that it should review the arrangement by that guidance.

74. PwC advised the Company that the projector and sound system installation should be evaluated based on principles of SAB 104, given the application of EITF 00-21. Based upon this advice, the Company concluded that when the screen elements were deferred, any remaining

obligations related to the projector and sound system were immaterial or inconsequential or perfunctory. Therefore, revenue in respect of those deliverables (projector and sound system) should properly be recognized in Q4 2005. After receiving PwC's advice, the Finance Department then prepared new memoranda supporting revenue recognition in respect of these elements of the theatre system.

75. Draft financial statements were then presented to the Audit Committee of IMAX at meetings on March 1, 2006. Presentations were made by IMAX Finance Staff and PwC. After discussions with the presenters, the Audit Committee approved the proposal with respect to revenue recognition and the draft 2005 financial statements as prepared. Importantly, PwC advised the Audit Committee that the application of EITF 00-21 to the transaction was not a change in accounting policy, but the application of an existing policy to new or unique facts and circumstances.

76. The Defendants therefore deny the allegation in paragraph 147 of the Claim that "management persuaded PwC" with "strenuous effort" to approve its accounting treatment. To the contrary, it was PwC that first suggested the application of MEA to IMAX's theatre systems. Management followed the advice of PwC, as did the Audit Committee. in approving the application of MEA accounting to the theatre systems in Q4 2005.

77. The draft financial statements were then presented to the Board of Directors of IMAX on March 8, 2008 by the finance department, PwC and by the Head of the Audit Committee. After discussion, the Board approved the release of the 2005 audited financial statements.

78. In PwC's opinion, the consolidated financial statements for 2005 presented fairly, in all material respects, the financial position of IMAX and its subsidiary, and the results of their

operations and their cash flows, and their conformity with US GAAP. In addition, PwC confirmed that the financial statement schedules presented fairly, in all material respects, the information set forth therein in conjunction with related consolidated financial statements.

79. PwC also confirmed management's assessment that IMAX maintained effective internal control over financial reporting based upon the applicable third party standard. However, PwC and management also evaluated, for Sarbanes-Oxley purposes, management's inability to arrive at a proper accounting conclusion for Q4 2005 without the significant involvement of PwC. This resulted in PwC reporting a significant deficiency to the Audit Committee related to management's initial evaluation of the 2005 Q4 system arrangements under US GAAP.

80. IMAX pleads that all of the Defendants and PwC honestly arrived at their accounting judgments in respect of the 2005 financial statements of IMAX. The documents prepared, collected and reviewed by management and PwC, as well as the draft financial statements presented to the Audit Committee, were the product of careful, professional and competent due diligence by all those involved, including PwC.

81. PwC had been the auditors of IMAX for many years and were very familiar with all aspects of IMAX's business. PwC knew, or ought to have known, that management would provide them with whatever documents PwC required in order to give appropriate advice and to give its audit opinion. The Defendants therefore deny the allegations in paragraphs 148 to 152 of the Claim to the effect that PwC later became aware of facts that "might have impacted its opinion" regarding revenue recognition. PwC had full access to management and to IMAX documents during the 2005 audit period. PwC was provided with all appropriate documentation and conducted its testing of management judgments as it saw fit uninfluenced by management.

PwC rendered its opinion upon the information provided by IMAX without requesting further documents though it was fully aware of the fact that some theatres were not fully constructed and not open.

**The February 17, 2006 Press Release**

82. On February 17, 2006, IMAX issued a press release which it later filed on SEDAR and with the SEC concerning its expected Q4 2005 financial results, and its expected revenues for the year 2005. IMAX relies upon the February 17, 2006 press release as filed for a true and accurate statement of its contents.

**83.** IMAX denies that the press release was false and/or misleading, as alleged in paragraph 156 of the Claim. IMAX pleads that the Plaintiffs have mischaracterized the press release. The press release clearly disclosed that IMAX was announcing an expectation of results, and not its final results. The press release noted that it was based on preliminary financial data, and that it was subject to the final closing of the Company's books and records. This press release was accompanied by a safe harbour notice which clearly disclosed that the press release contained forward-looking financial information that was based on management assumptions and existing information and involved certain risks and uncertainties which could cause actual results to differ materially.

**The March 9, 2006 Press Release and Form 10-K**

84. On March 9, 2006, IMAX filed its Form 10-K for the year 2005, and issued a press release concerning its financial results. IMAX relies upon the Form 10-K and the March 9, 2006 press release for a true and accurate statement of its contents.

85. IMAX denies that the press release of March 9, 2006 in its Form 10-K was materially false or misleading in any respect, or as alleged in paragraph 167 of the Claim. IMAX further denies the allegation in paragraph 166 of the Claim that its application of MEA accounting to the theatre systems installed in Q4 2005 was a change in accounting policy, or that it failed to disclose such change. IMAX had applied MEA to its theatre system sales for installations in Q4 2005 in accordance with EITF 00-21, SAB 104 and the advice of PwC. The March 9th press release and the filed Form 10-K accurately disclosed the IMAX financial statements, as audited by PwC, on that date.

**Allegations under the Ontario *Securities Act***

86. As to the allegations regarding the 2005 financial statements, the Defendants who signed the Form 10-K certified that those statements presented fairly in all material respects IMAX's financial conditions and results of operations in the honest belief that they did so after undertaking the appropriate due diligence and reasonable investigations, as set out above. In particular, the Defendants rely upon: the internal investigations undertaken in November and December of 2005 in respect of the Delhi Post; the due diligence of management in reviewing Q4 2005 installations; the suggestion management received from PwC in respect of MEA accounting on the deferral of the screen component of revenue; the advice of PwC to the Audit Committee that there was no change in accounting policy; and the independent investigations of PwC with respect to management's judgment on the accounting treatment for the installations in Q4 2005.

87. The Defendants plead that they conducted a reasonable investigation in respect of the referenced press releases and financial statements for 2005. The Defendants plead and rely upon section 138.4(6) of the Ontario *Securities Act.*

88. The Defendants further plead that they are not liable with respect to any misrepresentation contained in the 2005 financial statements. Those statements were accompanied by an opinion from PwC which the Company was entitled to publish in its Form 10-K that the statements complied with GAAP. In that respect, the Defendants rely upon section 138.4(11) of the *Securities Act.*

89. As to the allegations regarding the 2006 press releases, which are non-core documents, the Defendants Wechsler, Gelfond, Joyce and Gamble plead that they had no knowledge of any misrepresentation within the meaning of s. 138.4(1) when the press releases were issued. For the same reason, those Defendants plead that the Plaintiffs cannot recover damages above the statutory cap, pursuant to s.138.7(2) of the *Securities Act.*

90. In respect of the particular loss alleged at the close of the Class period on August 9, 2006, the Defendants plead that the changes in the market price of the securities were unrelated to the alleged misrepresentations in the press releases and financial results for 2005 of IMAX. The Defendants plead and rely upon section 138.5(3) of the *Securities Act.*

91. The Defendants plead that the liability limits set out in Section 138.1 of the *Securities Act* apply to all the statutory claims advanced by the Plaintiffs.

92. The Defendants plead that the action under Part XXIII.1, which was commenced with the filing of the Claim on December 12, 2011, arising out of the statements made by IMAX on

February 17 and March 9, 2006, is statute-barred in its entirety. The Defendants plead and rely upon section 138.14 of the *Securities Act*.

**The March 9, 2006 Press Release: Strategic Alternatives**

93. In early 2005, IMAX was made aware of the interest of several prospective buyers. After this unsolicited approach, IMAX retained external investment banking advisors. The possibility of a change of control transaction was discussed by IMAX management in July of 2005. Thereafter, nothing of substance occurred for the balance of 2005. There was therefore nothing to discuss with PwC or with any other external advisor during the 2005 audit period.

94. IMAX pleads that the retention of investment bankers in respect of an unsolicited approach to a public company is an ordinary course business decision and does not mean that any transaction is likely or will even be explored.

95. However, in early March of 2006, the Board of Directors of IMAX did decide to explore the possibility of a strategic transaction, and accordingly, a public announcement to that effect was made in a second press release of March 9, 2006.

96. The Defendants deny the allegations concerning strategic alternatives set out in paragraphs 68 to 76 of the Claim. There was no linkage between the prospect of exploring strategic alternatives, and either the preparation of the 2005 financial statements or the audit of those financial statements by PwC. PwC was aware of the March 9, 2006 press release that IMAX would be exploring strategic alternatives, and did not raise any issue about the substance

or timing of that press release in relation to PwC's audit of the 2005 financial statements. Indeed, PwC noted in its report to the Audit Committee concerning the 2005 audit the following:

> "Management provided us with access to all records, documents and other required information and management gave us its full co-operation throughout the year and kept us informed of important transactions and events."

97. PwC was in regular communication with the Audit Committee in 2005 and 2006 and never expressed a desire to modify that statement in light of the March 9, 2006 disclosure concerning IMAX's decision to explore strategic alternatives. In any event, the March 9, 2006 press release that IMAX had begun a process to explore strategic alternatives was accompanied by a statement that there could be no assurance that this exploration of strategic alternatives would result in a sale or merger of the company.

98. Notwithstanding the disclosure that there was no assurance concerning the success of the strategic alternative process, the volume of trading in IMAX shares on the NASDAQ increased from an average of approximately 465,000 shares over the previous 10 days to approximately 7,623,700 shares on March 9, 2006. The price of IMAX shares on the NASDAQ increased from $9.50 per share on March 8, 2006 to an average of $10.45 for the following 10 trading days.

99. On August 9, 2006, IMAX reported that while it had received significant interest from multiple parties in its exploration of strategic alternatives, its view was that there were no buyers who had indicated a willingness to acquire the company at a valuation that would be supported by the Board of Directors.

**The SEC Letter**

100. In the same press release, IMAX disclosed that it was in the process of responding to an informal inquiry from the SEC regarding the Company's timing of revenue recognition, including its application of MEA accounting and its revenue recognition for theatre systems. The Company stated that it believed its application of MEA accounting was, and has always been, in accordance with US GAAP and that the Company's position was supported by its auditors, PwC.

101. The SEC Division of Corporate Finance letter of September 20, 2006 is not, as alleged in paragraph 66 of the Claim, confirmation that IMAX did not consider the application of EITF 00-21 to any theatre system installation prior to the fourth quarter of fiscal 2005.

102. IMAX responded to the SEC letter of September 20, 2006, as follows:

> "Application of EITF 0021 to the Company
>
> The Company currently accounts for multiple elements in its revenue arrangement by reference to EITF 0021, SAB 104 and SFAS 13, as applicable. EITF 0021 was applicable to arrangements entered into in fiscal periods beginning after June 15, 2003. Accordingly, the Company applied EITF for periods beginning **July 1, 2003**. Prior to that date, the Company applied the multiple element arrangement guidance in SAB 101. **[Emphasis Added]**
>
> ...
> as described in the Company's accounting policies in the years prior to 2005, the guidance in EITF 0021 effective for periods beginning after July 1, 2003 has been applied to those arrangements that included deliverables in addition to the equipment and maintenance components [see note 2(m) of the 2004 Form 10-K].

103. There was therefore no sudden change of accounting policy as alleged in paragraph 67 of the Claim. Multiple element accounting was applied by IMAX on and after July 1, 2003 and

was completely unrelated to any possible sale of the Company.

**The July 2007 Re-statement**

104. SAB Statement of Financial Accounting Standards no. 154: Accounting Changes and Error Corrections ("SFAS 154") was issued in May 2005 and provides guidance on the accounting for reporting of accounting changes and error corrections. An issuer must report any errors in financial statements through a re-statement under SFAS 154.

105. In July of 2007, IMAX determined that it had made errors in its past financial statements related to revenue recognition of theatre systems. In a July 20, 2007 10-K, IMAX disclosed that it had made "certain errors related to revenue recognition resulting from the Company's review of its theatre system arrangements over the past five years in response to comments received from the Staff of both the SEC and the OSC which indicated insufficient analysis of various sales and lease transactions and the accounting effect of contractual provisions within them".

106. Accordingly, on July 20, 2007, IMAX restated its financial statements and also retroactively applied its revenue recognition policy to theatre system installations for fiscal year 2002 through the third quarter of fiscal year 2006. Consistent with SFAS 154, the IMAX restatement consisted of two separate and distinct components with regard to the restated theatre system revenue:

(a) The correction to MEA accounting under EITF 00-21 (treating the entire theatre system as a single component rather than as multiple elements), was considered a correction of an error that required the restatement of IMAX's financials; and

(b) IMAX's changes to its revenue recognition policy based on the suggestions of the SEC (to record revenue only upon new objective criteria) separately required the restatement of certain transactions in the IMAX financials.

107. There were nine theatre systems in the fiscal year 2005 and one in 2006 for which IMAX had installed and tested the projection and sound system for a theatre, but the installation of the 3D silver screen was not completed in the same quarter; seven of these were in the fourth quarter of 2005. For each of these theatre systems, IMAX ultimately concluded that it incorrectly interpreted SAB 104 or MEA accounting pursuant to EITF 00-21. IMAX corrected the errors in its earlier financial statements for each of these ten theatres by moving the revenue for each of these theatres to the quarter in which the 3d silver screen was finally installed and all administrative requirements were also complete.

108. There were two theatres in the first three quarters of 2005 in which the 3D silver screen was not installed within the quarter, when restated the associated revenue was shifted to the next quarter in 2005:

| **Theatre Location** | **Originally Recognized** | **Moved To** |
|---|---|---|
| Poznan, Poland | Q1 2005 | Q2 2005 |
| AEZ – Delhi, India | Q3 2005 | Q4 2005 |

109. There was seven theatres in the fourth quarter of 2005 in which the 3D silver screen was not installed within the quarter; when restated the associated revenue shifted out of fiscal year 2005 to a future fiscal period:

| Theatre Location | Originally Recognized | Move To | Reason for restating revenue |
|---|---|---|---|
| Beijing Radio, Film & TV | Q4 2005 | Q1 2006 | Silver screen was installed and unqualified customer acceptance occurred in Q1 2006 |
| Lodz, Poland | Q4 2005 | Q2 2006 | Silver screen was installed in March 2006; Customer provided for projectionist training independent of IMAX but IMAX could not locate documentation evidencing that training had been performed and accepted; recognition moved to opening date in Q2 2006 |
| Kazan, Russia | Q4 2005 | Q4 2006 | The silver screen was installed in Q4 2006; recognition moved accordingly |
| Beijing SUC | Q4 2005 | Q2 2006 | Installation was completed (including silver screen) in 2005, but IMAX agreed, as a courtesy, to provide a larger screen; recognition moved to Q2 2006 when larger screen was installed |
| Santa Fe/ Interlomas | Q4 2005 | Q3 2006 | Silver screen was installed in Q2 2006; IMAX could not locate documentation evidencing that training had been performed and accepted; recognition moved to public opening in Q3 2006 |
| Manila, Philippines | Q4 2005 | Q2 2006 | Silver screen was installed in Q1 2006; IMAX could not locate documentation evidencing that training was accepted by the customer; recognition moved to public opening in Q2 2006 |
| McMinnville Oregon | Q4 2005 | Q2 2007 | Silver screen was installed in Q4 2006; IMAX could not locate documentation evidencing that training had been accepted by the customer; recognition was moved |

| | | | |
|---|---|---|---|
| | | | to public opening in Q2 2007 |

110. There was one theatre in the second quarter of 2006 in which the 3D silver screen was not installed within the quarter; when restated, the associated revenue was shifted to the next quarter in 2006.

| Theatre Location | Originally Recognized | Move To | Reason for restating revenue |
|---|---|---|---|
| Colleyville, Texas | Q2 2006 | Q3 2006 | The silver screen was installed in Q3 2006; recognition moved accordingly |

111. The ten theatres itemized herein are the only theatres for which IMAX did not complete the installation of the 3D silver screen prior to the end of the fiscal quarter in which it installed the projection and sound system.

**The Allegations at Common Law**

112. As to the allegations of negligent and reckless misrepresentation, the Defendants plead that there is no duty of care, at common law, owed by IMAX as a public issuer and/or by its directors and officers, through IMAX's public filings and related press releases, to all potential investors in the secondary marketplace.

113. Further, the Defendants deny that any of the Plaintiffs or the other Class members actually detrimentally relied upon the pleaded misrepresentations, if proven, in acquiring or holding their shares in IMAX during the Class Period.

114. The two Plaintiffs have specifically admitted, under oath, that they purchased their IMAX shares for reasons that were completely unrelated to any representation contained in its relevant press releases and financial statements.

115. The Defendants deny the allegations in paragraphs 198 – 203 of the Claim attempting to link IMAX's public disclosure to "efficient market pricing". The Defendants put the Plaintiffs to the strict proof thereof.

116. As to the allegations of individual liability, the named personal Defendants deny that any of the acts or omissions alleged in the Claim are independently tortious, or actionable under any statute, and they deny that they are in any way personally liable to the Plaintiffs or other Class members.

117. The Defendants further deny that IMAX is vicariously liable as alleged in paragraph 228 of the Claim, or that the individual Defendants.

118. As to the allegation of conspiracy, the Defendants Gelfond, Wechsler, and Joyce put the Plaintiffs to the strict proof thereof. At all material times, those Defendants acted honestly and in good faith and in the best interests of IMAX and its shareholders. Their decisions with respect to the recognition of revenue in Q4 2005 were made in reliance upon: the judgment of IMAX management; the policies and procedures that management followed; the advice of PwC; the audit by PwC; the review of the financial statements by the Audit Committee; and the approval of those financial statements by the Board of Directors.

119. These Defendants deny all of the itemized allegations of conspiracy set out in paragraph 195 of the Claim and put the Plaintiffs to the strict proof thereof. Messrs. Gelfond, Wechsler and

Joyce did not breach sections 77(1) and 78(1) of the *Securities Act* as alleged, or of sections 12, 13 and 18 of the *Securities Exchange Act* as alleged, or the reporting requirements of the NASDAQ and the TSX.

120. The conduct of the Defendants was, at all material times, undertaken honestly and in good faith and in the best interests of IMAX and its shareholders, including the Class members. The conduct of the individual Defendants was careful, professional and prudent, and met appropriate standards of corporate governance and due diligence. None of the conduct of the Defendants was of a character that would qualify for an award of punitive damages. That unsubstantiated allegation should attract an award of full indemnity costs against the Plaintiffs.

121. The Defendants deny that any damages can be assessed in this action on an aggregated basis for the Class as a whole, or any part of it.

122. In any event, the Plaintiffs and Class Members have failed to act properly and reasonably to mitigate any damages they may have suffered.

**Application of Foreign Law and Available Remedy**

123. Approximately 85% of the IMAX shares acquired by the Class were sold in the United States (on the NASDAQ) rather than on the TSX. In respect of those NASDAQ purchases, the application of U.S. Securities law was clearly contemplated by both IMAX and its investors. Moreover, most of the Class Members who purchased on the NASDAQ are residents of the United States or other jurisdictions outside Ontario, and their alleged losses were suffered exclusively in the United States or other jurisdictions outside Ontario.

124. Those Class Members, who purchased their shares on the NASDAQ, had an available remedy through Class Actions commenced in the United States as early as August 11, 2006. Those actions were eventually consolidated into a single proceeding in the United States District Court for the Southern District of New York ("In re IMAX Securities Litigation") which seeks damages on their behalf, based on the same IMAX statements pleaded in this action, but under SEC Rule 10b-5 and the United States *Securities and Exchange Act of 1934*.

125. The Class in this action makes a claim founded on a construction of the Ontario *Securities Act*, and particularly Part XXIII.1 thereof. The imposition of that statutory cause of action, by those Class Members, on the Defendants to this action, including individual Defendants resident in the United States, arising out of share purchases on a foreign exchange, to claim damages allegedly sustained in that foreign jurisdiction, is contrary to the interpretative presumptions of constitutionality, intraterritoriality, and compliance with international law and comity. In the alternative, the *Securities Act*, including Part XXIII.1, is constitutionally inapplicable to those Class Members in this case by reason of the territorial limits on provincial jurisdiction imposed under the Constitution of Canada, as defined under the *Constitution Act*, 1982.

126. The Defendants further plead that Ontario conflict of laws principles identify the relevant governing law for any tort claim by each individual Class Member to be the *lex loci delicti*, that is, the governing law for those allegations by those persons is the jurisdiction in which the alleged tort was completed.

127. The Defendants request that this Honourable Court dismiss this action, with costs.

February 16, 2012

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. 416-601-7998

Dana M. Peebles LSUC #30820V
Tel. 416-601-7839
Fax 416-868-0673

**Solicitors for the Defendants**

TO:

**Sutts, Strosberg LLP**
600 Wescourt Place
251 Goyeau Street
Windsor, ON N9A 6V4

Jay Strosberg
Tel: 519-561-6285
Fax: 866-316-5308

**Co-solicitors for the Plaintiffs**

AND TO:

**Siskinds LLP**
680 Waterloo Street
P. O. Box 2520
London, ON N6A 3V8

A. Dimitri Lascaris
Michael Robb
Tel: 519-672-2121
Fax: 519-672-6065

**Co-solicitors for the Plaintiffs**

BETWEEN:

MARVIN NEIL SILVER, *et al.* - and - IMAX CORPORATION, *et al.* Court File No. CV-06-3257-00

**Plaintiffs** **Defendants**

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

Proceeding Commenced at Brampton

**STATEMENT OF DEFENCE**

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. (416) 601-7998

Dana M. Peebles LSUC #30820V
Tel. (416) 601-7839
Fax (416) 868-0673

**Lawyers for the Defendants**

#11145990