# EXHIBIT A
# (PART 8)

# A-1

**EXHIBIT B**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

**NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF U.S. CLASS ACTION**

This Notice has been sent to you pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Southern District of New York (the "U.S. Court").

This Notice provides you with important information in connection with the resolution (the "Settlement") of certain claims in a class action lawsuit, brought in the United States, by a Class of purchasers ("Plaintiffs" or the "Class", as described in further detail below) of securities issued by IMAX Corporation ("IMAX" or the "Company"). The Settlement resolves Plaintiffs' claims against IMAX, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, an Ontario Limited Liability Partnership ("PwC-Canada") (the "Settling Defendants"). This U.S. class action is known as *In re IMAX Securities Litigation*, Civil Action No. 1:06-cv-06128 (the "U.S. Action"). Your rights will be affected by this Notice and the Settlement that it describes, so you should read this Notice carefully.

If you purchased or otherwise acquired IMAX shares on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive (the "Class Period"), you may be entitled to receive a payment from this Settlement.

**The U.S. Court will hold a Fairness Hearing at 10:30 a.m. on June 14, 2012 at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007-1312. At this hearing the U.S. Court will consider whether the Settlement is fair, reasonable and adequate and in the best interests of the Class.**

*A United States federal court authorized this Notice. This is not a solicitation from a lawyer.*

**Cet Avis vous a été envoyé car vous avez possiblement droit à une indemnisation en vertu du règlement d'un recours collectif intenté aux États-Unis par un Groupe constitué d'acheteurs d'actions émises par IMAX Corporation. Vous pourriez aussi être un membre du groupe dans une action similaire contre IMAX Corporation intentée au Canada. Vous pouvez obtenir une traduction anglaise du présent Avis en contactant le "Strategic Claims Services" dont les informations sont à la p. 13 de cet Avis.**

- The Settlement resolves certain claims asserted pursuant to the United States federal securities laws in a class action against the Defendants for damages incurred by the Class in connection with their transactions in IMAX shares. The Settlement consists of twelve million dollars ($12,000,000) in cash (the "Settlement Fund"). The recovery is explained in greater detail below.

- The law firm of Abbey Spanier Rodd & Abrams, LLP ("Lead Counsel") will apply to the Court for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) thereof, and reimbursement of expenses of no greater than $__ million (plus interest on such amounts at the same rate earned by the Settlement Fund) or an average of $__ per share of stock. Lead Counsel and other plaintiffs' counsel have litigated the U.S. Action for five years on a contingent fee basis, and have advanced all the expenses of litigation without reimbursement, with the expectation that if they were successful in recovering money for the Class, they would receive fees and be reimbursed for their expenses from the Settlement Fund, as is customary in this type of litigation.

- If you purchased IMAX securities on the NASDAQ on or after February 17, 2006 and held some or all of those securities on August 9, 2006 (the "Canadian Class Period"), then you are a member of the certified class (the "Canadian Class") in another class action based on substantially similar allegations to those alleged in this case against the IMAX Defendants and others in Ontario Canada (the "Canadian Action" - as described further below). The IMAX Defendants have made a motion for a final Order from the Canadian Court in the Canadian Action seeking to exclude, from the definition of the Canadian Class, all persons who do not opt out of this Settlement, if and when the settlement is approved by final Order of the U.S. Court (the "Canadian Order"). If the Canadian Order is entered and becomes final, you will not be permitted to recover in both cases and if you do not exclude yourself from the U.S. Action, you will automatically be deemed to be a member of the Class in the U.S. Action, and therefore excluded from the Canadian Class in the Canadian Action. For members of the Canadian Class, a detailed description of the Canadian Action as well as details regarding how to exclude yourself from this action (and thereby participate in the Canadian Action) are contained below.

- Your legal rights are affected whether you act or don't act, so please read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A PROOF OF CLAIM AND RELEASE FORM** | This is the only way to be eligible to receive any portion of the Settlement Fund. If you are a member of the Canadian Class and the Canadian Order is entered and becomes final, you cannot participate in that lawsuit if you submitted a Proof of Claim and Release Form in the U.S. Action (or if you did not opt out of the U.S. Action). |
| **EXCLUDE YOURSELF** | This is the only option that allows you to ever file or be part of another lawsuit against the Defendants about the Released Claims. You will not receive any portion of the recovery from the Settlement Fund if you select this option. The requirements to exclude yourself are described below. If you exclude yourself from the U.S. Action and you purchased and held IMAX securities during the Canadian Class Period, you will remain a member of the |

| | |
|---|---|
| | class in the Canadian Action, as described below. Contact information for counsel to the Canadian Class can be found on page 16 of this Notice. |
| **OBJECT BUT REMAIN IN THE SETTLEMENT** | Write to the U.S. Court about why you don't like the Settlement. You may object to the Settlement. The requirements to object are described below. |
| **GO TO A FAIRNESS HEARING** | The Fairness Hearing is open to the public. You may ask in writing to speak to the U.S. Court at the hearing about the fairness of the Settlement. If the Court approves the Settlement, you will be bound by the U.S. Court's Judgment (as it applies to your claim) whether or not you submit a Proof of Claim and Release form or receive any money from the Settlement. |
| **DO NOTHING** | Receive no payment. Give up your right to file your own or participate in any other lawsuit (including the Canadian Action) against the Defendants concerning the claims asserted by the Class. If you are a member of the Canadian Class and the Canadian Order is entered and becomes final, you must affirmatively have excluded yourself from the U.S. Action to be eligible to recover in the Canadian Action. |

- Your rights and options as well as the deadlines to exercise them are explained further in this Notice.

- The U.S. Court in charge of this case still has to decide whether to approve the Settlement. Payments to eligible claimants in the Settlement will be made only if and when the Canadian Order (defined below) becomes final and unappealable, the U.S. Court approves the Settlement, after any and all U.S. appeals are resolved, and after the claims processing procedure is complete.

**Statement of Plaintiffs' Recovery**

Lead Plaintiff (defined in question __ on page __) estimates that approximately ___ million shares of IMAX stock were purchased and/or acquired during the period from February 27, 2003 and July 20, 2007, inclusive, and that purchasers of those shares were damaged as a result of the purported acts or omissions alleged in the Consolidated Amended Class Action Complaint dated October 2, 2007 (the "Complaint"). Lead Plaintiff estimates that the average recovery per share of IMAX common stock under the Settlement will be $___ per share before the deduction of attorneys' fees, costs and expenses, as approved by the Court. The actual recovery per damaged share will depend on a variety of factors, including: (1) the number of claims filed; (2) when members of the Class ("Settlement Class Members") purchased or acquired their shares during the Class Period; (3) whether Settlement Class Members sold their IMAX shares during the Class Period or held their shares past the end of the Class Period; (4) administrative costs, including the costs of notice; (5) the number of Settlement Class Members who decide to exclude themselves from the Settlement; and (6) the amount awarded by the U.S. Court for attorneys' fees, costs and expenses. Distributions to Class Members will be made based on the Plan of Allocation set forth at the end of this Notice.

**Background of the U.S. Action and the Parallel Canadian Class Action**

The Judge presiding over this case is the Honorable Naomi Reice Buchwald of the United States District Court for the Southern District of New York. From August 11, 2006 through September 18, 2006, eight lawsuits were filed against all or certain of the Defendants in the United States District Court for the Southern District of New York, alleging that IMAX made material misrepresentations and omissions regarding revenue recognition for theater systems in violation of the federal securities laws between February 27, 2003 through July 20, 2007 (the "U.S. Class Period"). The people who brought the lawsuits are called plaintiffs, and the persons and entities they sued are called defendants.

On September 20, 2006, a lawsuit was filed in the Ontario Superior Court of Justice in Canada (the "Canadian Court") alleging, based on substantially identical facts to those alleged in the eight U.S. actions, that IMAX improperly recognized revenue on theater systems (the "Canadian Action"). The Canadian Action is known as *Silver v. IMAX Corp.*, Court File No. CV-06-3257-00. (Ontario Superior Court of Justice, Canada). The Judge presiding over this case is the Honourable Madam Justice van Rensburg of the Canadian Court. The IMAX Defendants estimate that approximately 83.9 percent of the shares of IMAX securities at issue in the Canadian Action were purchased on the NASDAQ and those members of the Canadian Class who purchased IMAX securities on the NASDAQ are also members of the U.S. Class.

There are differences between the U.S. Action and the Canadian Action. For example, while the Class Period in this U.S. Action runs from February 27, 2003, through July 20, 2007 (more than four years) the class period in the Canadian Action runs from February 17, 2006, through August 9, 2006 (less than six months). The U.S. Action includes PwC-Canada as a defendant, but the Canadian Action does not. The Canadian Action includes four Directors of IMAX (Neil S. Braun, Kenneth G. Copland, Garth M. Girvan and David W. Leebron) who are not Defendants in the U.S. Action. The U.S. Action seeks relief for violations of the U.S. securities laws. The Canadian Action asserts claims under the Canadian securities laws.

Pursuant to a January 17, 2007 Order of the U.S. Court, the eight U.S. actions were consolidated, and the U.S. Court appointed Westchester Capital Management, Inc. (the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL and SphinX Merger Arbitrage Fund) as lead plaintiff and further approved the appointment of the law firm of Abbey Spanier Rodd & Abrams, LLP as lead counsel for the class.

On October 2, 2007, Westchester filed a Consolidated Amended Class Action Complaint against Defendants in the U.S. Court In their Complaint, plaintiffs alleged that Defendants' public statements during the U.S. Class Period were materially false and misleading because they failed to disclose, among other things, that IMAX had recognized revenue on theater systems before installation of the system was complete, in contravention of U.S. generally accepted accounting rules, and in violation of its own accounting policies. Plaintiffs also alleged that IMAX's auditor, PwC-Canada was also responsible for the material misinformation disseminated to the investing public during the U.S. Class Period. Plaintiffs allege that Defendants' actions artificially inflated the price of IMAX stock during the U.S. Class Period and that once the truth was disclosed, the price of IMAX's stock declined, injuring the Class.

On December 10, 2007, the IMAX Defendants and PwC-Canada each separately filed motions to dismiss the Complaint on numerous grounds. On January 22, 2008, Westchester filed

Case 1:06-cv-06128-NRB Document 203-8 Filed 03/28/12 Page 18 of 47

its opposition to Defendants' motions to dismiss. Defendants filed their reply briefing on February 11, 2008.

On September 15, 2008, after supplemental submissions and oral argument, the Defendants' motions to dismiss were denied by the Court. Thereafter, Westchester commenced discovery, which included the production and review of hundreds of thousands of pages of documents and transcripts of depositions.

On October 31, 2008, Westchester filed Plaintiffs' first motion for class certification.

On December 3, 2008, the Second Circuit decided *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), holding that an investment adviser that did not directly purchase the securities at issue lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact. Relying on the Second Circuit's decision in *Huff*, on February 18, 2009, Snow Capital Investment Partners, L.P. ("Snow Capital") requested a pre-motion conference in connection with its anticipated motion for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff.

On February 23, 2009, the Defendants filed oppositions to Westchester's motion for class certification. On March 13, 2009, the Court denied without prejudice Westchester's motion for class certification pending resolution of Snow Capital's anticipated motion for reconsideration of the Court's January 17, 2007 Order.

On April 3, 2009, Snow Capital moved for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff. Westchester filed its opposition on April 24, 2009 and Snow Capital replied on May 1, 2009. On June 29, 2009, the Court determined that under *Huff*, Westchester, an investment advisor, lacked standing and granted Snow Capital's motion and appointed it lead plaintiff and its counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel.

On December 14, 2009, the Canadian Court certified the Canadian Action on behalf of investors worldwide who purchased IMAX securities on or after February 17, 2006 and held some or all of those securities on August 9, 2006. *See Silver v. IMAX Corporation*, [2009] O.J. No. 5585, 2009 ON.C. LEXIS 4847 (December 14, 2009, Sup. Ct. J.).

On April 22, 2010, Snow Capital filed its motion for class certification. On June 10, 2010, the Defendants filed oppositions to Snow Capital's class certification motion. Snow Capital filed its reply in further support of the motion on July 30, 2010. The Court did not hear oral argument on the motion. On December 20, 2010, this Court issued a Memorandum and Order that denied Snow's motion for class certification, held that this case could not proceed with Snow Capital as class representative, and directed that new applications to be named lead plaintiff be filed.

On April 14, 2011, the Court issued an Order naming The Merger Fund (the "Lead Plaintiff") as lead plaintiff and re-appointing Abbey Spanier Rodd & Abrams, LLP as lead counsel.

Between April 2011 and November 2011, the parties met numerous times, both in person and via conference call, in an effort to negotiate a settlement of the U.S. Action. As a result of such efforts, on November 2, 2011, Lead Plaintiff and the Defendants were able to reach an agreement that led to the Settlement, which is separately set forth in greater detail in the

Stipulation and Agreement of Settlement, dated January 26, 2012, as amended on March 20, 2012 (the "Stipulation").

After the U.S. Court preliminarily approved this Settlement on March__, 2012, the IMAX Defendants made a motion for a final Order from the Canadian Court in the Canadian Action seeking to exclude, from the definition of the Canadian Class, all persons who do not opt out of this Settlement, if and when the settlement is approved by final Order of the U.S. Court (the "Canadian Order"). That motion is currently scheduled to be argued before the Canadian Court from June 25 to June 27, 2012.

## The Circumstances of the Settlement

The Defendants and the Lead Plaintiff disagree as to the probable outcome of the U.S. Action with respect to liability. While the Lead Plaintiff was prepared to try this case against Defendants, and Lead Counsel were confident in the merits of their case, they recognize that a trial is inherently risky and that the Class may not have prevailed on any or all of its claims. Moreover, each of the Defendants believe that the Complaint lacks merit and had this Stipulation not been reached would have continued to vigorously defend against Lead Plaintiff's claims and present significant defenses thereto. While Lead Plaintiff believes that it had a strong case, Lead Plaintiff also believes that Defendants' defenses would have created uncertainty as to Lead Plaintiff's ability to win at trial or after appeals.

The Defendants and the Lead Plaintiff also disagree as to the probable outcome of the U.S. Action with respect to damages. Lead Plaintiff and their economic consultants believe that the damages arising from the alleged malfeasance in the U.S. Action, depending on the methodology used, are as high as $91 million. This amount results from the use of a damage model under which it was presumed that the proper measure of recoverable damages included the majority of IMAX's stock price drop that occurred when the Company disclosed information that corrected alleged prior false and misleading statements. This figure also assumes that the Court and a jury would make every factual finding in the Class's favor. Defendants have generated damage models showing damages based upon recent Supreme Court decisions which show damages as low as approximately $5 million.

Contrary to Lead Plaintiff's position, Defendants have argued, among other things, that they did not commit fraud, that IMAX's restatement was a result of accounting mistakes, and that their conduct did not cause the value of IMAX stock to decrease. As such, the decline was the result of other factors, including the inability of IMAX to find a buyer after a lengthy search, the announcement of a new business model involving joint ventures, considerable uncertainty surrounding the company, and an SEC investigation. Defendants have also argued that Lead Plaintiff will not be able to demonstrate that any purchasers prior to February 17, 2006 suffered a loss and that Lead Plaintiff will be unable to disentangle any stock drop attributable to the statements alleged to have been false or misleading and will therefore not be able to establish damages.

The Defendants and Lead Plaintiff also disagree as to whether the Court would have granted Lead Plaintiff's motion to certify this case as a class action. Although Lead Plaintiff withdrew its class certification motion in light of the Settlement, Defendants had opposed Lead Plaintiff's motion on the grounds that the U.S. Action is not superior to the previously certified global class action in Canada and that Defendants have rebutted the presumption of reliance set

forth in the Supreme Court case *Basic v. Levinson*, 485 U.S. 224 (1988), by demonstrating that the alleged misrepresentations did not impact the price of IMAX securities. Defendants also argued that even if a class is certified, it should not include any shareholders who purchased prior to February 17, 2006.

These disputes would be subject to expert testimony at summary judgment and trial, and, therefore, it is impossible to predict with certainty which arguments would find favor with the Court and the jury. As a result, in a trial or through a summary judgment motion, the U.S. Class could recover substantially less than the amount of the Settlement or nothing. Lead Counsel has recommended the Settlement because it believes that the Settlement provides a substantial recovery to the U.S. Class and believes that the U.S. Class might have obtained a lesser recovery or nothing at all if the Class had gone to trial and through inevitable appeals.

It is important to recognize, that the entry of Judgment and therefore the distribution of the Settlement funds in this case may be delayed because the Settlement is conditioned upon the Canadian Order becoming final and unappealable.

**Further Information**

Further information regarding this Settlement may be obtained by contacting: *In re IMAX Corporation Securities Litigation,* Civil Action No. 06 CIV. 6128 (NRB): Lead Counsel, Arthur N. Abbey, Karin E. Fisch and Richard B. Margolies, Abbey Spanier Rodd & Abrams, LLP, 212 East 39th Street, New York, NY 10016.

**WHAT THIS NOTICE CONTAINS**


| | | Page |
|---|---|---|
| A. | WHY DID I RECEIVE THIS NOTICE PACKAGE? | 8-9 |
| B. | WHAT IS A CLASS ACTION? | 9 |
| C. | HOW DO I KNOW IF I AM A SETTLEMENT CLASS MEMBER AND CAN BE PART OF THE SETTLEMENT? | 9 |
| D. | ARE THERE EXCEPTIONS TO BEING INCLUDED IN THE CLASS? | 9 |
| E. | I'M STILL NOT SURE I AM INCLUDED | 10 |
| F. | WHAT DOES THE SETTLEMENT PROVIDE? | 10 |
| G. | HOW MUCH WILL MY PAYMENT BE IN THE SETTLEMENT? | 10 |
| H. | HOW CAN I RECEIVE A PAYMENT IN THE SETTLEMENT? | 10-11 |

I. WHEN WILL I RECEIVE MY PAYMENT IN THE SETTLEMENT? .......... 11

J. WHAT AM I GIVING UP TO RECEIVE A PAYMENT IN THE SETTLEMENT? .......... 11-13

K. HOW DO I EXCLUDE MYSELF FROM THE SETTLEMENT? .......... 13-14

L. IF I DON'T EXCLUDE MYSELF, CAN I SUE THE SETTLING DEFENDANTS FOR THE SAME THING LATER? .......... 14

M. IF I EXCLUDE MYSELF, CAN I OBTAIN A PAYMENT FROM THE SETTLEMENT? .......... 14

N. DO I HAVE A LAWYER IN THIS CASE? .......... 14

O. HOW WILL THE LAWYERS BE PAID? .......... 14

P. HOW DO I NOTIFY THE COURT THAT I DON'T LIKE THE SETTLEMENT? .......... 15

Q. WHAT IS THE DIFFERENCE BETWEEN OBJECTING AND REQUESTING EXCLUSION? .......... 16

R. WHEN AND WHERE WILL THE U.S. COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT? .......... 16

S. DO I HAVE TO ANSWER QUESTIONS AT THE FAIRNESS HEARING? .......... 16

T. MAY I SPEAK AT THE FAIRNESS HEARING? .......... 16-17

U. WHAT WILL HAPPEN IF I DO NOTHING AT ALL? .......... 17

V. ARE THERE MORE DETAILS ABOUT THE SETTLEMENT AND THE CANADIAN ACTION? .......... 17

W. WHAT ARE MY RIGHTS AND OBLIGATIONS AS A SECURITIES BROKER OR NOMINEE? .......... 18

## BASIC INFORMATION

### A. WHY DID I RECEIVE THIS NOTICE PACKAGE?

The U.S. Court authorized this Notice to be sent to you because you or someone in your family may have purchased or acquired IMAX shares on the NASDAQ from February 27, 2003 through

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 22 of 47

July 20, 2007, inclusive. If the description above applies to you or someone in your family, you have a right to know about the proposed Settlement of the U.S. Action against the Defendants and about all of your options before the U.S. Court decides whether to approve the Settlement. If the Canadian Order becomes final and unappealable and the U.S. Court approves the Settlement, and any objections or appeals that may be filed in opposition to the Settlement are overruled or otherwise resolved, then Strategic Claims Services (the "Administrator") will distribute the payments that the Settlement permits. This notice package explains the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

THE U.S. COURT HAS DIRECTED THAT NOTICE SHOULD BE GIVEN TO ALL CLASS MEMBERS TO INFORM THEM OF THE U.S. ACTION, THE CANADIAN ACTION AND THEIR RIGHTS. THE SENDING OF THIS NOTICE IS NOT AN EXPRESSION BY THE U.S. COURT OR THE PARTIES TO THE U.S. ACTION OF ANY OPINION AS TO THE MERITS OF ANY CLAIM OR DEFENSE OR THE LIKELIHOOD OF RECOVERY BY THE CLASS. NOTICE IS BEING PROVIDED SO THAT ALL CLASS MEMBERS MAY MAKE A DECISION AS TO WHAT STEPS, IF ANY, THEY WISH TO TAKE AS THIS MATTER PROCEEDS. NOTICE IS BEING SENT TO YOU BECAUSE RECORDS INDICATE THAT YOU MAY BE A CLASS MEMBER.

## B. WHAT IS A CLASS ACTION?

In a class action, one or more people and/or entities called a lead plaintiff sues on behalf of people and/or entities that have similar claims. All these people and/or entities are referred to as a class or individually as class members. One court resolves the issues for all class members, except for those who exclude themselves from the class.

## C. HOW DO I KNOW IF I AM A SETTLEMENT CLASS MEMBER AND CAN BE PART OF THE SETTLEMENT?

To see if you will receive a payment from the Settlement, you first need to know if you are a Class Member. The U.S. Action alleges that everyone who fits the following description is a Class Member: *all persons and entities who purchased or otherwise acquired IMAX shares on the NASDAQ from February 27, 2003 through July 20, 2007, inclusive.*

## D. ARE THERE EXCEPTIONS TO BEING INCLUDED IN THE CLASS?

Excluded from the Settlement Class are the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either current officers and/or directors of any Defendant, or who served as officers and directors of any Defendant at any time during the Class Period.

## E. I'M STILL NOT SURE I AM INCLUDED.

If you are still not sure whether you are included in the U.S. Action, you can ask for free help. You can call Strategic Claims Services at 1-866-274-4004 or visit www.______________ for more information. Or you can fill out and return the claim form attached hereto, to see if you qualify.

## F. WHAT DOES THE SETTLEMENT PROVIDE?

The Settlement consists of twelve million dollars ($12,000,000) in cash, plus interest. The Settlement will be used to pay Class Members, and also for the payment of taxes, administrative costs, including the costs of notice, and for attorneys' fees and expenses.

## G. HOW MUCH WILL MY PAYMENT BE IN THE SETTLEMENT?

If you are entitled to a payment, your share of the Settlement Fund will depend on a variety of factors, including the number of valid claim forms that Class Members submit, how many Settlement Class Members choose to exclude themselves from the class, how many shares of IMAX stock you purchased or otherwise acquired, and when you bought, acquired and sold your IMAX stock. The Plan of Allocation is included at the end of this Notice.

The Administrator, will distribute the Settlement Fund according to the Plan of Allocation described at the end of this Notice after the Canadian Order has become final and unappealable, the deadline for submission of Proof of Claim and Release forms has passed and all claims have been processed. The Administrator will process your claim and advise you if your claim does not satisfy the requirements approved by the U.S. Court. The Administrator will calculate your payment, if any, based upon the date you purchased or acquired IMAX stock, the losses you suffered as a result thereof and the type of claim you have.

By following the Plan of Allocation at the end of this Notice, you can calculate your "Recognized Claim." Your recovery will depend on the size of your Recognized Claim as it relates to the size of the Recognized Claims of all Class Members who file a claim form.

## H. HOW CAN I RECEIVE A PAYMENT IN THE SETTLEMENT?

To qualify for payment you must submit the Proof of Claim and Release form enclosed with this Notice. You may also obtain a claim form on the Internet at www.___________. Read the instructions carefully, fill out the form, include all the documents the form asks for, sign it and mail it postmarked no later than ______________. If you have any questions, or need assistance, call 1-866-274-4004, and someone will either answer your questions, or help you to complete the Proof of Claim and Release form.

The Administrator will advise Class Members if their claims are deficient and are rejected. Any Class Member who receives a deficiency letter or a rejection letter and who fails to submit documentation sufficient to remedy the deficiency or reason for rejection within the time prescribed herein shall have their claim deemed finally rejected. The Administrator shall advise Class Members in writing that their claims have been finally rejected. Class Members have thirty (30) days from the date of such final rejection letter to write to the Administrator stating the reasons that their claims should not be rejected, in which case the claim shall be submitted to the Court as a disputed claim. Notice of any hearing on such rejected claims shall be provided to all Class Members whose claims are rejected or disputed.

## I. WHEN WILL I RECEIVE MY PAYMENT IN THE SETTLEMENT?

The U.S. Court will hold a hearing on June 14, 2010, at 10:30 a.m., to decide whether to approve the Settlement. Even if Judge Buchwald approves the Settlement, it could take more than two years before the Settlement Fund is distributed to the Class Members. One reason that the Settlement distribution could be delayed is if Class Members object to any aspect of the Settlement and are not satisfied by the resolution of that objection by the U.S. Court. That Class Member could then appeal the U.S. Court's decision. In addition, it is always uncertain whether an appeal will be resolved in favor of a settlement, and resolving any such appeals or objections can take time. Another reason that the Settlement distribution could be delayed is that the Settlement is conditioned on the entry of the Canadian Order becoming final and unappealable. Finally, it may take more than two years for the Settlement Fund to be distributed because once the Settlement has been approved and any appeals are resolved, the Administrator must process all of the Proof of Claim and Release forms. The processing, by itself, is a very complicated process and will take many months.

## J. WHAT AM I GIVING UP TO RECEIVE A PAYMENT IN THE SETTLEMENT?

If you are a Settlement Class Member, and you do not exclude yourself from the Settlement, you remain in the Class, and that means that if the Settlement is approved, you, on behalf of yourself, your heirs, executors, administrators, successors and assigns and any Persons you represent, will release all "Released Claims," including participation in the Canadian Action, and including all "Unknown Claims," against all "Released Parties."

*The following release applies to the Settlement (as more fully set forth in the Stipulation).*

"Released Claims" means:

(i) with respect to the Released Parties: the release by Lead Plaintiff and all Class Members of all claims that were alleged in the U.S. Action, or the Canadian Action, or that could have been alleged in the U.S. Action, the Canadian Action, or any other proceeding, manner of action, actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, damages, judgments and demands in law, contract, trust or equity, domestic or foreign, including claims under U.S. securities laws, U.S. federal laws, U.S. state laws, U.S. common law, Canadian securities laws, Canadian federal and provincial laws, and Canadian common law, and the laws of any other

jurisdiction relating to transactions in IMAX securities during the Settlement Class Period or the subject matter and facts relating to the U.S. Action, including any acts, failures to act, omissions, misrepresentations, statements, misstatements, facts, events, transactions, occurrences or other subject matter set forth, alleged, embraced, encompassed or otherwise referred to in or related to the U.S. Action.

(ii) the claims that are to be released also include Unknown Claims and claims arising under the laws of any jurisdiction, including, without limitation, in the United States and in Canada, and Lead Plaintiff and all Class Members will waive and relinquish to the fullest extent possible any state, federal or foreign law defenses concerning the release of Unknown Claims. Defendants shall release Lead Plaintiff, all Class Members, and Lead Counsel, from any claims relating to the institution, prosecution, and settlement of the U.S. Action.

"Released Parties" means:

(i) with respect to the Defendants: the Defendants, their respective present and former parents, subsidiaries, divisions, affiliates, and any PricewaterhouseCoopers member firm, the present and former employees, members, partners, principals, managers, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Defendant Releasees"), and any Person or entity which is or was related to or affiliated with any Defendant Releasee or in which any Defendant Releasee has or had a controlling interest and the present and former employees, members, partners, principals, managers, officers, directors, attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them (all, with the Defendant Releasees, the "Defendant Released Parties").

(ii) with respect to Plaintiffs: the Lead Plaintiff and all other Class Members, their respective present and former parents, subsidiaries, divisions and affiliates, the present and former employees, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Plaintiff Releasees"), and any Person or entity in which any Plaintiff Releasee has or had a controlling interest or which is or was related to or affiliated with any Plaintiff Releasee.

"Unknown Claims" means:

(i) any Released Claims that Lead Plaintiff or any Class Member does not know of or suspect to exist in his, her or its favor at the time of the release of the Defendant Released Parties which, if known by him, her or it might have affected his, her or its Settlement with and release of the Defendant Released Parties, or might have affected his, her or its decision not to object to this Settlement or not to exclude himself, herself or itself from the Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date, the Lead Plaintiff shall expressly waive, and each of the Class Members shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, the provisions, rights and benefits of California Civil Code § 1542 and any provisions, rights and benefits conferred by any law of any state or territory

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 28 of 47

of the United States or principle of common law which is similar, comparable or equivalent to California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

(ii) Lead Plaintiff and Class Members may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Released Claims, but Lead Plaintiff shall expressly, and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiff acknowledges, and the Class Members shall be deemed to have acknowledged, and by operation of the Judgment shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

## K. HOW DO I EXCLUDE MYSELF FROM THE SETTLEMENT?

To exclude yourself from the Settlement, you must send a letter by mail saying that you want to be excluded from the *In re IMAX Corporation Securities Litigation*, Civil Action No. 06 CIV. 6128 (NRB) Settlement. To be excluded, you must include your name, address, telephone number, information concerning the quantity of IMAX stock held at the close of business on October 17, 2007, all of your purchase(s) and sale(s) of such stock from February 27, 2003 through and including October 17, 2007, the dates of purchase (or other acquisition) and sale of the IMAX stock, the price paid or received in all purchases and sales excluding commissions and fees, and your signature. No request for exclusion will be considered valid unless all information described in the preceding sentence is included in the request. Any exclusion request must be postmarked or hand delivered to the address below by no later than __________:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

You can't exclude yourself on the telephone. You also can't exclude yourself by e-mail (unless you have made prior written arrangements with the Administrator).

If you properly ask to be excluded, you will not receive any settlement payment and you cannot object to the Settlement from which you exclude yourself. You will also not be legally bound by

anything that happens in the U.S. Action, and may be able to sue the Defendants concerning the claims being released in the Settlement in a separate action or remain a member of the Canadian Action. If you properly exclude yourself from the U.S. Action, and you purchased and held IMAX securities during the Canadian Class Period, you will remain a member of the class in the Canadian Action.

## L. IF I DON'T EXCLUDE MYSELF, CAN I SUE THE SETTLING DEFENDANTS FOR THE SAME THING LATER?

No. If you do not exclude yourself from the Settlement, you cannot bring any of the Released Claims (including participating in the Canadian Action should the Canadian Order be entered and become final) against any Released Parties in the Settlement. Remember, the exclusion deadline is ____________________.

## M. IF I EXCLUDE MYSELF, CAN I OBTAIN A PAYMENT FROM THE SETTLEMENT?

No. If you exclude yourself from the Settlement, you cannot receive any payment from the Settlement. In that case, do not send in a Proof of Claim and Release form to ask for any payment.

## N. DO I HAVE A LAWYER IN THIS CASE?

The U.S. Court appointed the law firm of Abbey Spanier Rodd & Abrams, LLP, 212 East 39th Street, New York, NY 10016, as Lead Counsel to represent Class Members in this U.S. Action. You will not be charged for these lawyers, other than amounts those firms are awarded by the Court from the Settlement Fund. If you want to be represented by another lawyer, you may hire one at your own expense.

## O. HOW WILL THE LAWYERS BE PAID?

The lawyers who acted as counsel for the Class during the course of the litigation will apply to the U.S. Court for an award of attorneys' fees from the Settlement Fund. Lead Counsel will apply for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) of the Settlement and reimbursement of expenses of no greater than $____, plus interest on such amounts at the same rate earned by the Settlement Fund. This is the equivalent of an average of $____ per share of IMAX stock. Lead Counsel and other plaintiff's counsel have litigated the U.S. Action for five years on a contingent fee basis and have advanced the expenses of litigation with the expectation that if they were successful in recovering money for the Class, they would receive fees and be reimbursed for their expenses from the Settlement Fund, as is customary in this type of litigation.

**P. HOW DO I NOTIFY THE COURT THAT I DON'T LIKE THE SETTLEMENT?**

You can tell the U.S. Court that you don't agree with the Settlement, the Plan of Allocation or Lead Counsel's request for attorneys' fees and reimbursement of expenses. If you are a Class Member you can object to the Settlement if you don't like any part of it. If you object to the Settlement, you can present reasons in writing why you think the U.S. Court should not approve the Settlement, the Plan of Allocation or Lead Counsel's request for attorneys' fees or expenses. The U.S. Court will consider your views. To object, you must send a letter saying that you are a Class Member in *In re IMAX Corporation Securities Litigation*, Civil Action No. 06 CIV. 6128 (NRB) and that you object to the Settlement, or any aspect of the Settlement. You must include your name, address, telephone number, information concerning the quantity of IMAX stock held at the close of business on October 17, 2007, all of your purchase(s) and sale(s) of such stock from February 27, 2003 through and including October 17, 2007, the dates of purchase (or other acquisition) and sale of the IMAX stock, the price paid or received in all purchases and sales excluding commissions and fees, and your signature. No objection will be considered valid unless all information described in the preceding sentence is included in the request. Any objection must be postmarked or hand delivered and filed with the Clerk of the U.S. Court no later than _____________ with copies to the addresses below:

**COURT**
Clerk of the Court
United States District Court for the Southern District of New York
Attn: *In re IMAX Corporation Securities Litigation*, Civil Action No. 06 CIV. 6128 (NRB)
500 Pearl Street
New York, NY 10007-1312

**LEAD COUNSEL**
Arthur N. Abbey
Karin E. Fisch
Richard B. Margolies
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016

**DEFENDANTS' COUNSEL**
Lewis J. Liman
David Oliwenstein
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

M. Byron Wilder
Jason C. McKenney
Gibson Dunn & Crutcher, LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201

Jennifer L. Conn
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166

If the U.S. Court rejects or modifies the Plan of Allocation and/or the amount of attorneys' fees or expenses requested, the U.S. Court may still approve the Settlement.

**Q. WHAT IS THE DIFFERENCE BETWEEN OBJECTING AND REQUESTING EXCLUSION?**

Objecting is simply telling the U.S. Court that you don't like something about the Settlement. You can object only if you stay in the U.S. Class. If you object to the Settlement you will be bound by the Settlement, and all the terms of the Stipulation including the terms of the Judgment to be entered in the U.S. Action and the releases provided therein. Excluding yourself means telling the Court that you don't want to be part of the U.S. Class. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you. With respect to the Settlement, you can either object or exclude yourself, but you cannot do both. If you properly exclude yourself from the U.S. Action, and you purchased IMAX stock between February 17, 2006, through August 9, 2006, you will remain a member of the class in the Canadian Action.

**R. WHEN AND WHERE WILL THE U.S. COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT?**

The U.S. Court will hold a Fairness Hearing at 10:30 a.m. on June 14, 2012, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007-1312. At this hearing the U.S. Court will consider whether the Settlement is fair, reasonable and adequate and in the best interests of the U.S. Class. If there are objections, the U.S. Court will consider them. Judge Buchwald will listen to people who have asked in writing to speak at the hearing. The U.S. Court may also decide how much to award Lead Counsel and other counsel for attorneys' fees and expenses and whether to approve the Plan of Allocation. At or after the hearing, the U.S. Court will decide whether to approve the Settlement, the Plan of Allocation and an Award of Attorneys' fees and expenses. We do not know how long it will take the U.S. Court to make these decisions.

**S. DO I HAVE TO ANSWER QUESTIONS AT THE FAIRNESS HEARING?**

No. Lead Counsel and Defendants' Counsel will attempt to answer questions Judge Buchwald may have. But you are welcome to come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time, the U.S. Court will consider it. You may also pay your own lawyer to attend but it is not necessary.

**T. MAY I SPEAK AT THE FAIRNESS HEARING?**

You may ask the U.S. Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *In re IMAX Corporation Securities Litigation*". Be sure to include your name, address, telephone number and signature.

Your Notice of Intention to Appear must be postmarked no later than ____________, and be sent to the Clerk of Court, Lead Counsel and Defendants' Counsel, at the addresses on page __, in question __. You cannot speak at the hearing if you exclude yourself.

## U. WHAT WILL HAPPEN IF I DO NOTHING AT ALL?

If you fail to file a timely Proof of Claim and Release in response to this Notice, you'll get no money from this Settlement. If you fail to exclude yourself, you will nevertheless release the Released Parties from the Released Claims in the Settlement, even if you do not file a Proof of Claim and Release. If you fail to exclude yourself and the Canadian Order is entered and becomes final, you will remain a member of the Class in the U.S. Action, and you cannot participate in the Canadian Action, which will be a Released Claim.

## V. ARE THERE MORE DETAILS ABOUT THE SETTLEMENT AND THE CANADIAN ACTION?

This Notice summarizes the proposed Settlement. More details are contained in the Settlement Agreement itself. You can obtain a copy of the Stipulation of Settlement by writing to Lead Counsel at the addresses set forth below, or by visiting www.__________ or www.abbeyspanier.com. Also available on the website are the Proof of Claim and Release, this Notice and documents relating to the Canadian Action.

If you have questions about the U.S. Action or the Settlement you may write Lead Counsel at the addresses set forth below or call them toll free at 1-800-889-3701 or call the Administrator at 1-866-274-4004 toll free; or visit the websites referenced above, where you will find a link to the Administrator's website containing answers to common questions about the Settlement and a claim form, plus other information to help you determine whether you are a Class Member, and whether you are eligible for a payment.

ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
ATTN: IMAX Settlement

If you have questions about the Canadian Action, you may write or contact counsel for the Canadian Class at the address set forth below, or call their clerk, Nicole Young, toll free at 1-800-461-6166 (ext. 2380); or email Ms. Young at nicole.young@siskinds.com; or visit www.classaction.ca.

Nicole Young
SISKINDS, LLP
680 Waterloo Street
London, Ontario, Canada

**DO NOT CONTACT THE COURT**

## W. WHAT ARE MY RIGHTS AND OBLIGATIONS AS A SECURITIES BROKER OR NOMINEE?

SPECIAL NOTICE TO SECURITIES BROKERS AND OTHER NOMINEES

If you purchased or otherwise acquired IMAX shares on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive, for the beneficial interest of a person or organization other than yourself, the Court has directed that, WITHIN TEN (10) BUSINESS DAYS OF YOUR RECEIPT OF THIS NOTICE, you must either (1) provide the Administrator the name and last known address of each person or organization for whom or for which you purchased or otherwise acquired such shares during the Class Period, preferably on computer-generated mailing labels or, electronically, in MS Word or WordPerfect files (label size Avery # 5162), or in an MS Excel data table setting forth (a) title/registration, (b) street address, and (c) city/state/zip or (2) request additional copies of this Notice package (which will be provided to you free of charge) and within seven (7) days mail the Notice package form directly to the beneficial owners of the IMAX stock. If you choose to follow alternative procedure (2), the Court has directed that, upon such mailing, you send a statement to the Administrator confirming that the mailing was made as directed. You are entitled to reimbursement from the Settlement Fund of your reasonable expenses actually incurred in connection with the foregoing, including reimbursement of postage expense and the cost of ascertaining the names and addresses of the beneficial owners. Those expenses will be paid after your request and submission of appropriate supporting documentation. All communications concerning the foregoing should be addressed to the Administrator:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

APPENDIX I

## PLAN OF ALLOCATION OF THE SETTLEMENT FUND AMONG CLASS MEMBERS

The Settlement Fund will be distributed to Class Members eligible for recovery pursuant to the Settlement who submit valid and timely Proof of Claim and Release forms ("Authorized Claimants") in connection with the Plan of Allocation described below. "Class Members" means persons who purchased IMAX shares on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive, excluding the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either a current officer and/or director of any Defendant, or who served as an officer or director of any Defendant at any time during the Class Period, who does not submit a timely and valid request for exclusion from the Settlement. The Plan of Allocation provides that you will be eligible to participate in the distribution of the Settlement Fund only if you have a net loss on all transactions in IMAX stock purchased during the Class Period. The Plan of Allocation will be submitted to the Court for its approval at the Fairness Hearing, but will be considered by the Court separately from the Settlement itself.

A purchase or sale of IMAX common stock shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, devise, or operation of law of IMAX common stock during the Class Period shall not be deemed a purchase or sale of IMAX common stock for the calculation of an Authorized Claimant's recognized loss, nor shall it be deemed an assignment of any claim relating to the purchase of such shares unless specifically provided in the instrument of gift or assignment. The receipt of IMAX common stock during the Class Period in exchange for securities of any other corporation or entity shall not be deemed a purchase or sale of IMAX common stock.

To the extent an Authorized Claimant had a gain from his, her, or its overall transactions in IMAX common stock during the Class Period, the value of the recognized loss will be zero. To the extent that a Claimant suffered an overall loss on his, her, or its overall transactions in IMAX common stock during the Class Period, but that loss was less than the recognized loss calculated above, then the recognized loss shall be limited to the amount of the actual loss. There shall be no recognized loss on short sales of IMAX common stock during the Class Period; however, any recognized gains with respect to short sales shall be offset against recognized losses on other transactions.

The Recognized Loss of each Authorized Claimant shall be calculated according to the following formula:

A. For shares held at the end of trading on October 17, 2007, the Recognized Loss shall be that number of shares multiplied by the lesser of:

(1) the applicable purchase date artificial inflation per share figure, as found in Table A; or

(2) the difference between the purchase price per share and $4.42.[1]

[1] Pursuant to Section 21(D)(e)(1) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that

B. For shares sold between February 27, 2003 and July 19, 2007, inclusive, the Recognized Loss shall be that number of shares multiplied by the lesser of:

(1) the applicable purchase artificial inflation per share figure less the applicable sales date artificial inflation per share figure, as found in Table A; or

(2) the difference between the purchase price per share and the sales price.

C. For shares sold between July 20, 2007 and October 17, 2007, the Recognized Loss shall be the lesser of:

(1) the applicable purchase date artificial inflation per share figure, as found in Table A; or

(2) the difference between the purchase price per share and the average closing price of IMAX common stock between July 20, 2007 and the date of sale.[2]

**Table A**

| Purchase or Sale Date Range | Artificial Inflation Per Share |
|---|---|
| 02/27/2003 - 08/09/2006 | $3.90 |
| 08/10/2006 - 07/20/2007 | $0.00 |

security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated." $4.42 was the mean closing price of IMAX Corporation common stock on NASDAQ during the 90-day period beginning on July 20, 2007 and ending on October 17, 2007.

[2] Pursuant to Section 21(D)(e)(2) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."

A-2

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

## PROOF OF CLAIM AND RELEASE

**IF YOU PURCHASED OR OTHWERWISE ACQUIRED IMAX CORPORATION ("IMAX") SHARES ON THE NASDAQ BETWEEN FEBRUARY 27, 2003, AND JULY 20, 2007, INCLUSIVE, YOU MAY BE ELIGIBLE TO RECEIVE A PAYMENT IN THE PROPOSED U.S. CLASS ACTION SETTLEMENT WITH IMAX, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE, KATHRYN A. GAMBLE AND PRICEWATERHOUSECOOPERS LLP.**

IN ORDER TO RECEIVE ANY PAYMENTS TO WHICH YOU MAY BE ENTITLED AS A CLASS MEMBER, YOU MUST COMPLETE AND SIGN THIS PROOF OF CLAIM AND RELEASE FORM AND MAIL IT PREPAID, FIRST-CLASS MAIL, POSTMARKED NO LATER THAN ____________, 2012, TO THE FOLLOWING ADDRESS:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

IF YOU FAIL TO SUBMIT YOUR PROOF OF CLAIM AND RELEASE FORM ON OR BEFORE ______________, 2012, YOUR CLAIM MAY BE REJECTED AND YOU MAY BE PRECLUDED FROM RECEIVING ANY MONEY FROM THE SETTLEMENT.

A Proof of Claim and Release form will be deemed submitted when postmarked or, if submitted other than by first-class mail, on the date actually received by the Claims Administrator.

## I. IDENTITY OF CLAIMANT

Enter the name(s) of the beneficial purchaser(s) or acquirer(s) of IMAX stock; if the stock was held jointly in two or more names, all names must be shown, and all joint owners must sign the Proof of Claim. If some stock were held in one name (e.g., John Smith) and some in joint names (e.g., John and Mary Smith, JT), you must file separate Proof of Claim forms; all these represent different ownerships. A claimant whose IMAX shares were held in a custodial account under the Uniform Gifts to Minors Act ("UGMA") may file in his/her own name, if he/she is now of age. In this event, the former

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 36 of 47

custodian does not have to sign the Proof of Claim. UGMA Custodians should identify themselves as follows: (e.g., John Smith, Custodian for Jack Smith UGMA). Corporate officers or partners filing for a claimant corporation or partnership should file in the name of such entity, and sign their names and titles on the signature page. Executors, Trustees, Administrators, and the like should file in the name of the beneficial owner/seller, and sign their names and titles on the signature page.

**Name of Claimant(s):**

Name: ______________________________

Name: ______________________________

Address: ______________________________

Address: ______________________________

City: ______________ State: ___ Zip Code: ________ - ______

Country: ______________

_Individual _Corporation _Estate _Other (Specify)

_____ _____ - _____
Area Code Telephone No. (Day)

_____ _____ - _____
Area Code Telephone No. (Evening)

_____ _____ - _____
Area Code Telephone No. (Fax)

______________________________
Email Address

## II. STATEMENT OF CLAIM

### A. INSTRUCTIONS

I. If you require additional space, use copies of this page or pages in the same format as below (you may copy pages). Sign and print your name and your Social Security or Employer Identification Number on each additional page.

1. **You MUST enclose copies of confirmation slips, monthly statements and/or other documents evidencing each purchase, acquisition, sale or holdings reported on this Proof of Claim form. IF ANY SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES FROM YOUR BROKER. THESE DOCUMENTS ARE NECESSARY TO PROVE AND PROCESS YOUR CLAIM. FAILURE TO SUBMIT SUCH DOCUMENTS MAY RESULT IN REJECTION OF YOUR CLAIM.**
2. All references to purchase and sale dates relate to trade dates, not settlement dates.
3. The amount of the settlement proceeds to which you are entitled, if any, will be calculated pursuant to the proposed Plan of Allocation contained in the Notice, or such other plan as may be approved by the Court.
4. If you have acquired any IMAX common stock by gift, inheritance or operation of law, you are to report this transaction as if you acquired the stock on the same date as the person or entity who initially purchased the security.
5. A Proof of Claim and Release form will be deemed submitted when postmarked or, if sent other than by first-class mail, on the date actually received by the Claims Administrator.

**IF YOU NEED MORE ROOM, USE COPIES OF THIS PAGE OR PAGES IN THE SAME FORMAT AS BELOW.**

PLEASE FILL IN EACH SECTION, WRITING "NONE" WHERE APPROPRIATE.

## III. COMMON STOCK

A. **IMAX COMMON STOCK OWNED** as of the close of business on February 26, 2003:

____________________

B. **IMAX COMMON STOCK PURCHASED** during the period from February 27, 2003, through the close of business on October 17, 2007:

| Total Purchase Price (exclude commissions and fees) | Purchase Price Per Share (exclude commissions and fees) | Number of Shares Purchased | Trade Date(s) of Purchase (List Chronologically) Month / Day / Year |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

C. **IMAX COMMON STOCK SOLD** during the period from February 27, 2003, through the close of business on October 17, 2007:

| Total Sale Price (exclude commissions and fees) | Selling Price Per Share (exclude commissions and fees) | Number of Shares Sold | Trade Date(s) of Sale (List Chronologically) Month / Day / Year |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

D. **IMAX COMMON STOCK OWNED** as of the close of business on October 17, 2007:

____________________

## IV. PROOF OF CLAIM

By submitting this Proof of Claim, I (we) state that I (we) believe in good faith that: (a) I am (we are) a member of the Class as defined in the Notice, or am (are) acting for such person; (b) I (we) have read and understood the contents of the Notice; (c) I am (we are) not, and am (are) not acting for, IMAX, any defendant, any entity in which any defendant has a controlling interest, or the legal representative, heir, successor or assign of IMAX or any other individual defendant; (d) Neither I (we), nor any joint owners of the IMAX shares at issue, has filed an effective Request for Exclusion seeking to be excluded from the Settlement; (e) I am (we are) entitled to receive a share of the Settlement Fund; (f) I (we) desire to participate in the Settlement described in the Notice; and (g) I (we) have enclosed photocopies of the stockbroker confirmation slips or broker account statements, an authorized statement from the broker containing the transactional information found in a broker confirmation slip, or other documents adequately evidencing each purchase and sale listed below in support of my (our) claimed loss.

## V. SUPPORTING DOCUMENTS

Claimants must enclose copies of confirmation slips, monthly statements and/or other documents evidencing each purchase, acquisition, sale or holdings reported on this Proof of Claim form. **IF ANY SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES FROM YOUR BROKER. FAILURE TO SUBMIT SUCH DOCUMENTS MAY RESULT IN DISALLOWANCE OF YOUR CLAIM. DO NOT SEND ORIGINALS.**

## VI. VERIFICATION OF CLAIM(S)

I (we) understand that the information contained in this Proof of Claim is subject to such verification as the Court may direct and I (we) agree to cooperate in any such verification. I (we) further agree and understand that if the proposed Settlement is approved by the Court and becomes effective, all claims or matters against the Released Parties described in the Release below, which have been or could have been asserted relating in any way to the subject matter of the litigation, will be released and discharged forever. I (we) further agree to submit to the jurisdiction of the United States District Court for the Southern District of New York.

## VII. SUBSTITUTE FORM W-9

### REQUEST FOR TAXPAYER IDENTIFICATION NUMBER

Enter your taxpayer identification number below. For most individuals, this is your social security number. The Internal Revenue Service requires your taxpayer identification number. Failure to furnish your correct taxpayer identification number may result in withholding of a portion of any distribution otherwise payable with respect to your claim. UGMA Custodians should use the minor's social security number.

Social Security Number: ___-__-____ OR Employer Identification Number: __-_______
(for individuals) (for estates, trusts, corporations, etc.)

## VIII. RELEASE AND COVENANT NOT TO SUE

If the Settlement is approved, you, on behalf of yourself, your heirs, executors, administrators, successors and assigns and any Persons you represent, will release all "Released Claims," including all "Unknown Claims," against all "Released Parties." If you purchased IMAX securities on the NASDAQ on or after February 17, 2006 and held some or all of those securities on August 9, 2006, then you are also a member of the certified class in a class action against IMAX Corporation and others in Ontario Canada (the "Canadian Action"). The Canadian Action will be a Released Claim, and the defendants in the Canadian Action will be Released Parties.

*The following release applies to the Settlement (as more fully set forth in the Stipulation).*

"Released Claims" means

(i) with respect to the Released Parties: the release by Lead Plaintiff and all Class Members of all claims that were alleged in the U.S. Action or the Canadian Action, or that could have been alleged in the U.S. Action or the Canadian Action, any other proceeding, manner of action, actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, damages, judgments and demands in law, contract, trust or equity, domestic or foreign, including claims under the U.S. securities laws, U.S. federal laws, U.S. state laws, U.S. common law, Canadian securities laws, Canadian federal and provincial laws, and Canadian common law, and the laws of any other jurisdiction relating to transactions in IMAX securities during the Settlement Class Period or the subject matter and facts relating to the U.S. Action, including any acts, failures to act, omissions, misrepresentations, statements, misstatements, facts, events, transactions, occurrences or other subject matter set forth, alleged, embraced, encompassed or otherwise referred to in or related to the U.S. Action.

(ii) the claims that are to be released also include Unknown Claims and claims arising under the laws of any jurisdiction, including, without limitation, in the United States and in Canada, and Lead

Plaintiff and all Class Members will waive and relinquish to the fullest extent possible any state, federal or foreign law defenses concerning the release of Unknown Claims. Defendants shall release Lead Plaintiff, all Class Members, and Lead Counsel, from any claims relating to the institution, prosecution, and settlement of the U.S. Action.

"Released Parties" means:

(i) with respect to the Defendants: the Defendants, their respective present and former parents, subsidiaries, divisions, affiliates, and any PricewaterhouseCoopers member firm, the present and former employees, members, partners, principals, managers, officers, directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Defendant Releasees"), and any Person or entity which is or was related to or affiliated with any Defendant Releasee or in which any Defendant Releasee has or had a controlling interest and the present and former employees, members, partners, principals, managers, officers and directors, attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them (all, with the Defendant Releasees, the "Defendant Released Parties").

(ii) with respect to Plaintiffs: the Lead Plaintiff and all other Class Members, their respective present and former parents, subsidiaries, divisions and affiliates, the present and former employees, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Plaintiff Releasees"), and any Person or entity in which any Plaintiff Releasee has or had a controlling interest or which is or was related to or affiliated with any Plaintiff Releasee.

"Unknown Claims" means:

(i) any Released Claims that Lead Plaintiff or any Class Member does not know of or suspect to exist in his, her or its favor at the time of the release of the Defendant Released Parties which, if known by him, her or it might have affected his, her or its Settlement with and release of the Defendant Released Parties, or might have affected his, her or its decision not to object to this Settlement or not to exclude himself, herself or itself from the Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date, the Lead Plaintiff shall expressly waive, and each of the Class Members shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, the provisions, rights and benefits of California Civil Code § 1542 and any provisions, rights and benefits conferred by any law of any state or territory of the United States or principle of common law which is similar, comparable or equivalent to California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

(ii) Lead Plaintiff and Class Members may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Released Claims, but Lead Plaintiff shall expressly, and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiff acknowledges, and the Class Members shall be deemed to have acknowledged, and by operation of the Judgment shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 40 of 47

In the event the Settlement is not finally approved or the Settlement is terminated, all Releases will be null and void.

## IX. CERTIFICATION

UNDER THE PENALTIES OF PERJURY, I (WE) CERTIFY THAT ALL OF THE INFORMATION PROVIDED ON THIS FORM IS TRUE, CORRECT AND COMPLETE. I (We) certify that I am (we are) NOT subject to backup withholding under the provisions of Section 3406(a)(1)(C) of the Internal Revenue Code. If I am (we are) signing on behalf of someone else, I (we) hereby certify and warrant that I am (we are) authorized to make this Proof of Claim and Release. I (we) hereby certify and warrant that I (we) have not previously sold, transferred, assigned or granted any interest in any of the claims released hereby (as set forth at paragraph V above) to any other person or entity.

NOTE: If you have been notified by the Internal Revenue Service that you are subject to backup withholding, please strike out the word "NOT" in the Certification above.

________________________________________

Date Signature of Claimant

________________________________________

Date Signature of Joint-Owner Claimant (if any)

If the claimant is other than an individual, or if the claimant is not the person completing and signing this form, the following must also be provided:

________________________________________

Print Name of Person Signing Capacity of Person Signing (Executor, President, etc.)

Address of Person Signing

Street:________________________________________

Street:________________________________________

City:________________ State:___ Zip Code:_______ ____ ____ - _____
Area Code Telephone Number

You are urged to make and retain a copy of the Proof of Claim and Release and all documents that you submit.

**THIS PROOF OF CLAIM AND RELEASE MUST BE SUBMITTED BY PREPAID FIRST CLASS MAIL POSTMARKED NO LATER THAN ________, 2012 OR BE OTHERWISE RECEIVED BY THAT DATE BY:**

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
info@strategicclaims.net

For more information:

Toll Free: 1-866-274-4004

For overnight delivery:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services

600 North Jackson Street - Suite 3
Media, PA 19063
info@strategicclaims.net

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063

JOHN DOE
123 EVERGREEN TERRACE
SPRINGFIELD, USA 123456

# FIRST-CLASS MAIL

**IMPORTANT LEGAL NOTICE**

**X. ACCURATE CLAIMS PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.**

**THANK YOU FOR YOUR PATIENCE.**

**Reminder Checklist:**

1. Please sign the release and declaration on page 4.

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 42 of 47

2. Remember to attach supporting documentation.
3. Do not send original or copies of stock certificates.
4. Keep a copy of your claim form for your records.
5. If you desire an acknowledement of receipt of your claim form, please sent it Certified Mail, Return Receipt Requested.
6. If you move, please send us your new address.

You only need to return pages 1, 4, and others relevant to the securities you are claiming.

# A-3

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 44 of 47

**EXHIBIT D**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

**SUMMARY NOTICE OF PROPOSED SETTLEMENT OF U.S. CLASS ACTION**

**IF YOU PURCHASED OR OTHERWISE ACQUIRED IMAX CORPORATION ("IMAX") SHARES BETWEEN FEBRUARY 27, 2003, AND JULY 20, 2007, INCLUSIVE (THE "CLASS PERIOD"), YOU ARE A MEMBER OF A CLASS (THE "CLASS") AND MAY BE ENTITLED TO RECEIVE A PAYMENT OF A PROPOSED U.S. CLASS ACTION SETTLEMENT.**

Please read this notice carefully and in its entirety. Your rights may be affected by the proposed settlement (the "Settlement") described in this notice. A hearing will be held with respect to the proposed Settlement on June 14, 2012 at 10:30 a.m. before the Honorable Naomi Reice Buchwald in the United States District Court for the Southern District of New York, in courtroom 21A, at the United States Courthouse, 500 Pearl Street, New York, New York 10007-1312.

The Settlement resolves certain claims asserted in a United States class action (the "U.S. Action") against IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, an Ontario Limited Liability Partnership (the "Defendants").

The Settlement consists of twelve million dollars ($12,000,000) in cash (the "Settlement Amount").

The purpose of the hearing is to determine whether the proposed Settlement with the Defendants, pursuant to which the Defendants will pay the above amount into a Settlement Fund in exchange for a release of claims against them, should be approved by the Court as fair, reasonable, adequate and in the best interests of the Class. At the hearing, the Court will also consider whether judgment should be entered dismissing all claims in the litigation against the Defendants with prejudice, plans of allocation to distribute the proceeds of the Settlement, a request by Lead Counsel for attorneys' fees in an amount up to 25 percent of the Settlement Fund and reimbursement of expenses in an amount not to exceed $______, and any other matters that may properly be brought before the Court in connection with the Settlement.

A description of the Settlement and the rights of the Class with respect to the Settlement, along with a proof of claim and release form, are contained in the notice of pendency and proposed Settlement of the U.S. Action (the "Notice"), which has been mailed to all identifiable potential Settlement class members. If you are a member of the Class, you may be entitled to share in the distribution of the Settlement Fund by filing a proof of claim and release form no later than ________, 2012. You also have the right to exclude yourself from the Settlement or object to the proposed Settlement or the other matters to be considered by the Court at the hearing, in accordance with the procedures described in the Notice.

To exclude yourself from the Class, you must submit a written request for exclusion in accordance with the instructions set forth in the Notice that is received or postmarked no later than ________, 2012. If you are a member of the Class and do not exclude yourself from the Class AND do not submit a proper proof of claim and release form, you will not share in the Settlement Fund but you will be bound by the order and final judgment of the Court entered into with respect to the Settlement.

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 46 of 47

In addition, if you purchased IMAX securities on or after February 17, 2006 and held some or all of those securities on August 9, 2006, then you are also a member of the certified class in another class action against IMAX Corporation and others, in Ontario, Canada (the "Canadian Action"). If you exclude yourself from the U.S. Action, you will remain a member of the class in the Canadian Action The IMAX Defendants have made a motion for a final order from the Canadian court in the Canadian Action seeking to exclude from the definition of the Canadian class, all persons who do not opt out of this Settlement, if and when the Settlement is approved by final Order of the U.S. Court. If that motion is granted, the Settlement is approved by a final Order, and you do not opt out of the U.S. Action, you will be excluded from participating in the Canadian Action.

Any objections to the Settlement, the plan of allocation, or lead counsel's request for attorneys' fees and reimbursement of expenses must be filed with the Court and served on counsel for the parties in accordance with the instructions set forth in the Notice, such that they are received or postmarked no later than ________, 2012.

If you did not receive a copy of the Notice by mail, you may obtain a copy and a proof of claim and release form, or other information about the U.S. Action or the Canadian Action, by writing to the following address, calling the following telephone number, or on the internet at:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net
www.________.com

If you would like additional information regarding the U.S. Action, you may contact lead counsel in the U.S. Action at the addresses set forth below, or call them toll free at 1-800-889-370, or visit their website at www.__________ or www.abbeyspanier.com.

ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
ATTN: IMAX Settlement

If you would like additional information regarding the Canadian Action, you may write or contact lead counsel in the Canadian Action at the address set forth below, or call their clerk, Nicole Young, toll free at 1-800-461-6166 (ext. 2380); or email Ms. Young at nicole.young@siskinds.com; or visit www.classaction.ca.

Nicole Young
SISKINDS, LLP
680 Waterloo Street
London, Ontario, Canada

Please do not call the clerk of the Court or Judge Buchwald for information.

Dated: ________________, 2012

/S/
Clerk of the Court
United States District Court
Southern District of New York

# EXHIBIT N

This is Exhibit M referred to in the affidavit of Carolyn Provesan sworn before me, this 7 day of May 20 12

A COMMISSIONER FOR TAKING AFFIDAVITS

mccarthy tetrault

McCarthy Tétrault LLP
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto ON M5K 1E6
Canada
Tel: 416-362-1812
Fax: 416-868-0673

**Dana M. Peebles**
Direct Line: 416-601-7839
Email: dpeebles@mccarthy.ca

March 30, 2012

**Via Electronic Mail**

The Honourable Madam Justice
Katherine M. van Rensburg
Superior Court of Justice
7755 Hurontario Street
6th Floor
Brampton ON L6W 4T1

Your Honour:

**Re: Silver et al v. Imax Corporation et al**
**Court File No. CV-06-3257-00**

We have been provided, by the parties to the action in the Southern District of New York, with a copy of an Amended Order Preliminarily Approving Final Settlement and Providing for Notice, filed on March 28, 2012, which references an Amended Stipulation of Settlement, dated March 20, 2012. We have provided copies of each document to counsel for the Plaintiffs, and we attach copies for Your Honour. Hard copies will follow by mail.

The Amended Order provides for the Fairness Hearing to proceed on June 14, 2012. The timing of that Fairness Hearing does not change the relationship between the two Actions.

If the Order sought at the Fairness Hearing is granted, then, pursuant to paras. 8-9 of the Amended Stipulation, the final Judgment from the U.S. Court (and so the Settlement in the U.S. Action) will remain conditional upon the issuance of a final and unappealable Order of the Canadian Court which will give preclusive effect to that final Judgment.

Yours very truly,

Dana M. Peebles
/hvh

c: R. Paul Steep
c. A. Dimitri Lascaris / Michael G. Robb/Daniel E. H. Bach (Siskinds LLP – for Plaintiffs)
c. Jay Strosberg/William V. Sasso (Sutts Strosberg LLP – for Plaintiffs)

11330197

**Peebles, Dana M.**

**From:** Peebles, Dana M.
**Sent:** Friday, March 30, 2012 5:51 PM
**To:** 'McHady, Sherry (JUD)'
**Cc:** dimitri.lascaris@siskinds.com; Jay Strosberg; Michael G. Robb; Steep, R. Paul
**Subject:** RE: Silver v. IMAX letter (1 of 2)
**Attachments:** [Untitled].pdf; pdf.pdf

Dear Ms McHady
Please find enclosed a letter for Her Honour Justice van Rensburg, dated March 30, 2012, in the above-noted case.
We will send a hard copy of the letter and its enclosures, to follow.
As the second attachment is quite long, I am sending it separately, in a second email.
Kind regards.

mccarthy tetrault

**Dana M. Peebles**
Partner - Litigation
T: 416.601.7839

McCarthy Tétrault LLP
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto ON M5K 1E6

**PLEASE,** think of the environment before printing this message.

McCarthy Tétrault LLP
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto ON M5K 1E6
Canada
Tel: 416-362-1812
Fax: 416-868-0673

**R. Paul Steep**
Direct Line: 416-601-7998
Email: psteep@mccarthy.ca

mccarthy tetrault

May 3, 2012

**Via Electronic Mail** **With Prejudice**

Mr. Dimitri Lascaris
Siskinds LLP
680 Waterloo St.
PO Box 2520, Stn. B
London ON N6A 3V8

Dear Mr. Lascaris:

**Re: Imax Corporation, et al. ats Silver, et al.**

As the Defendants have advised you at several points in the past, they are prepared to resolve the Ontario Action with a benefit to its Class members outside of the U.S. Action Settlement Class equivalent to the compensation offered to those persons through the settlement which is before the Judge in the U.S. Action for approval.

You have had the U.S. Action settlement materials for some time, and we have not heard from you with respect to settlement.

Accordingly, we enclose an Offer to Settle, at a quantum which we believe to be equivalent to the US $12 million sum in the U.S. Action settlement. (Since that settlement is premised on costs being paid out of that sum, while this Offer is exclusive of costs, this Offer in fact provides superior benefits to this Class.)

You will see that this Offer is made with prejudice, and we expressly state here, as well as in the Offer itself, that this Offer is made outside of Rule 49, and that we reserve the right to disclose it to Her Honour, whether or not accepted.

We are available for discussion, at your convenience.

Yours very truly,

R. Paul Steep

c. Jay Strosberg (Sutts Strosberg LLP)

*This is Exhibit* N *referred to in the affidavit of* Carolyn Piovesan *sworn before me, this* 7 *day of* May *20*12

A COMMISSIONER FOR TAKING AFFIDAVITS

*DOCS #11426210*

**Peebles, Dana M.**

**From:** Peebles, Dana M.
**Sent:** Thursday, May 3, 2012 5:03 PM
**To:** 'A. Dimitri Lascaris'; Jay Strosberg
**Cc:** Steep, R. Paul; Michael G. Robb
**Subject:** IMAX - Offer to Settle
**Attachments:** Letter dated May 3 2012 enclosing Offer.pdf; [Untitled].pdf

Gentlemen, here is an Offer to Settle, along the lines of the US settlement, for your review.
Kind regards
dana

mccarthy tétrault

**Dana M. Peebles**
Partner - Litigation
T: 416.601.7839

McCarthy Tétrault LLP
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto ON M5K 1E6

**PLEASE** think of the environment before printing this message.

Court File No. CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
(Commenced at Brampton)

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and -

IMAX CORPORATION,
RICHARD L. GELFOND, BRADLEY J. WECHSLER
FRANCIS T. JOYCE, NEIL S. BRAUN, KENNETH G. COPLAND, GARTH M. GIRVAN,
DAVID W. LEEBRON, and KATHRYN A. GAMBLE

**Defendants**

Proceeding under the *Class Proceedings Act, 1992*

**OFFER TO SETTLE of the Defendants**
**dated May 3, 2012**

**WHEREAS:**

A. The Defendant IMAX Corporation ("IMAX") is a public company, with its securities traded on both the NASDAQ and the TSX.

B. In 2006, lawsuits were commenced against IMAX and some of its executives, in both Canada (this lawsuit – "the Ontario Action") and in the United States (after consolidation, *In Re IMAX Securities Litigation* - "the U.S. Action"), alleging that IMAX improperly reported its financial results for 2005.

C. In December 2009, the Ontario Action was certified as a class proceeding on behalf of all persons (except certain "Excluded Persons") who acquired securities in IMAX from

February 17 through August 9, 2006, on either the TSX or the NASDAQ, and held securities on August 9, 2006 ("the Ontario Action Class"). That certification decision is now final.

D. In November 2011, the Lead Plaintiff in the U.S. Action (The Merger Group) entered into a settlement agreement with the defendants in the U.S. Action, for the benefit, on certain terms, of all persons (except certain "Excluded Persons") who acquired securities in IMAX from February 27, 2003 through July 20, 2007 on the NASDAQ only ("the U.S. Settlement Class").

E. On February 1, 2012, the District Court Judge for the U.S. Action (Judge Buchwald) granted an Order which: gave preliminary Court approval to the proposed settlement; directed that notice be given to the proposed U.S. Settlement Class of a hearing (a "Fairness Hearing") to determine whether that Court will issue a final certification and settlement Order ("the Final U.S. Order"); and defined an opt-out period and objector process to precede that Fairness Hearing.

F. The Final U.S. Order, if and when issued, will provide for the payment of $12 million dollars for the settlement of all claims of all U.S. Settlement Class members who do not validly opt out of the U.S. Action, arising out of the laws of any jurisdiction.

G. It is estimated that approximately 83.9 percent of the shares of IMAX securities at issue in the Ontario Action were purchased on the NASDAQ; therefore, a majority of the members of the Ontario Action Class – those who purchased on the NASDAQ - are also members of the proposed U.S. Settlement Class.

H. The parties to the U.S. Action have stipulated that the U.S. Action will not be completed until a final Order is issued in the Ontario Action amending the definition of the Class in the Ontario Action to exclude those members of the U.S. Settlement Class who do not validly opt out of a settlement in the U.S. Action represented by the Final U.S. Order (the "Ontario Amendment Order").

**THE DEFENDANTS THEREFORE OFFER TO SETTLE** this Ontario Action with a payment, after the Ontario Amendment Order and the Final U.S. Order each become final and unappealable, and after Ontario Court approval of this Offer, on the following terms:

1. The Defendants will pay to the members of the Ontario Action Class, as amended by the Ontario Amendment Order (being only eligible TSX purchasers, and those eligible NASDAQ purchasers who validly opt out of the U.S. Action), on terms to be settled between the parties, the sum of $U.S. 1.33 million, inclusive of interest;

2. The Defendants will not oppose the Plaintiffs' motion for a settlement certification Order;

3. The Plaintiffs will consent to a term of that Order dismissing this Action on a with prejudice basis;

4. The Plaintiffs will provide a Release binding on all members of the Ontario Action Class, as amended, who do not validly opt out of this settlement, on terms acceptable to the Defendants;

5. The Plaintiffs may move for an award of costs in this Action in addition to the settlement sum as they see fit, and the Defendants reserve the right to oppose such a motion;

6. This Offer remains open until 12:00 noon, two calendar days prior to the scheduled date of the motion of the Defendants to the Ontario Court to amend the definition of the Ontario Action Class (to exclude those persons who are also members of the U.S. Settlement Class and who do not validly opt out of the settlement in the U.S. Action), unless this Offer is

withdrawn by telephone or electronic message to any counsel for the Plaintiffs by the solicitors for the Defendants before that date; and

7. This Offer is made with prejudice. It is not governed by Rule 49 of the Ontario Rules of Civil Procedure. It is intended to be disclosed to the Court, at the discretion of the Defendants, even if it is not accepted.

May 3, 2012

**McCarthy Tétrault LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto ON M5K 1E6

R. Paul Steep LSUC#: 21869L
Tel: 416-601-7998

Dana M. Peebles LSUC#: 30820V
Tel: 416-601-7839
Fax: 416-868-0673

**Lawyers for the Defendants**

TO: **Sutts, Strosberg LLP**
600 Wescourt Place
251 Goyeau Street
Windsor, ON N9A 6V4

Jay Strosberg
Tel: 519-561-6285
Fax: 866-316-5308

**Co-solicitors for the Plaintiffs**

AND TO: **Siskinds LLP**
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8

A. Dimitri Lascaris
Michael Robb
Tel: 519-672-2121
Fax: 519-672-6065

**Co-solicitors for the Plaintiffs**

MARVIN NEIL SILVER et al - and - IMAX CORPORATION et al Court File No: CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at BRAMPTON

**OFFER TO SETTLE of the Defendants**
**- dated May 3, 2012 -**

**McCarthy Tétrault LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto ON M5K 1E6

R. Paul Steep LSUC#: 21869L
Tel: 416-601-7998

Dana M. Peebles LSUC#: 30820V
Tel: 416-601-7839
Fax: 416-868-0673

**Lawyers for the Defendants,**
**IMAX Corporation**

11151133

BETWEEN:

MARVIN NEIL SILVER, *et al* - and - IMAX CORPORATION, *et al*

Court File No. CV-06-3257-00

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

Proceeding Commenced at Brampton

**AFFIDAVIT of Carolyn Piovesan**
sworn this 7th day of May, 2012

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. (416) 601-7998

Dana M. Peebles LSUC #30820V
Tel. (416) 601-7839
Fax (416) 868-0673

**Solicitors for the Moving Parties, the Defendants**

#11394104

# TAB 3

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(Commenced at Brampton)

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and -

IMAX CORPORATION,
RICHARD L. GELFOND, BRADLEY J. WECHSLER
and FRANCIS T. JOYCE, NEIL S. BRAUN,
KENNETH G. COPLAND, GARTH M. GIRVAN,
DAVID W. LEEBRON, and KATHRYN A. GAMBLE

**Defendants**

Proceeding under the *Class Proceedings Act, 1992*

# AFFIDAVIT of John C. Coffee, Jr.

(sworn March 12, 2012)

I, John C. Coffee, Jr., of the City of New York, in the State of New York, MAKE OATH AND SAY:

1. I am providing an Opinion in support of the motion of the Defendants. My relevant curriculum vitae is attached to my Opinion.

2. A list of materials that I relied upon for purposes of preparing my Opinion is included in the text of my Opinion.

3. A copy of my acknowledgement of expert duty form, pursuant to Rule 53 of the Ontario *Rules of Procedure*, is attached at Exhibit "A" to this Affidavit.

4. A copy of my Opinion is attached as Exhibit "B" to this Affidavit.

5. I make this Affidavit in respect of the motion of the Defendants for an Order amending the definition of the Class in this certified class action, and for no improper purpose.

SWORN BEFORE ME )
at the City of Vancouver, )
this 12 day of March, 2012. )

A Notary Public in and for the Province of British Columbia

JOHN C. COFFEE, JR.

ALEXANDRA COCKS
*Barrister & Solicitor*
McCarthy Tétrault LLP
1300 - 777 DUNSMUIR STREET
VANCOUVER, B.C. V7Y 1K2
Tel: (604) 643-7199

BETWEEN:

MARVIN NEIL SILVER, *et al.*
**Plaintiffs**

- and -

IMAX CORPORATION, *et al.*
**Defendants**

Court File No. CV-06-3257-00

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

Proceeding Commenced at Brampton

**AFFIDAVIT of John C. Coffee, Jr.**
- Sworn March 12, 2012 -

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. (416) 601-7998

Dana M. Peebles LSUC #30820V
Tel. (416) 601-7839
Fax (416) 868-0673

**Lawyers for the Defendants**

#11182914

# EXHIBIT A

This is Exhibit "A" referred in the affidavit of
JOHN C. COFFEE, JR. sworn before me

March 12, 2012

A Notary Public in and for the Province of
British Columbia

ALEXANDRA COCKS
*Barrister & Solicitor*
McCarthy Tétrault LLP
1300 - 777 DUNSMUIR STREET
VANCOUVER, B.C. V7Y 1K2
Tel: (604) 643-7199

2

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(Commenced at Brampton)

B E T W E E N:

MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and -

IMAX CORPORATION,
RICHARD L. GELFOND, BRADLEY J. WECHSLER
and FRANCIS T. JOYCE, NEIL S. BRAUN,
KENNETH G. COPLAND, GARTH M. GIRVAN,
DAVID W. LEEBRON, and KATHRYN A. GAMBLE

**Defendants**

Proceeding under the *Class Proceedings Act, 1992*

**ACKNOWLEDGMENT of Expert's Duty**

JCC

1. My name is John Collins Coffee, Jr. I live in ~~New York City~~ Maplewood, New Jersey, in the State of New ~~York~~ Jersey.

2. I have been engaged by or on behalf of the lawyers for the Defendants to provide evidence in relation to the above-noted court proceeding.

3. I acknowledge that it is my duty to provide evidence in relation to this proceeding as follows:

   (a) to provide opinion evidence that is fair, objective and non-partisan;

   (b) to provide opinion evidence that is related only to matters that are within my area of expertise; and

   (c) to provide such additional assistance as the Court may reasonably require, to determine a matter in issue.

4. I acknowledge that the duty referred to above prevails over any obligation which I may owe to any party by whom or on whose behalf I am engaged.

March 12, 2012

John C. Coffee Jr
John C. Coffee, Jr.

BETWEEN:

MARVIN NEIL SILVER, *et al.* **Plaintiffs** - and - IMAX CORPORATION, *et al.* **Defendants** Court File No. CV-06-3257-00

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

Proceeding Commenced at Brampton

**Acknowledgment of Expert's Duty of John C. Coffee, Jr.**

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. (416) 601-7998

Dana M. Peebles LSUC #30820V
Tel. (416) 601-7839
Fax (416) 868-0673

**Lawyers for the Defendants**

#11182940

# EXHIBIT B

This is Exhibit "B" referred in the affidavit of
JOHN C. COFFEE, JR. sworn before me

March 12, 2012

A Notary Public in and for the Province of
British Columbia

EXPERT REPORT OF PROFESSOR JOHN C. COFFEE, JR.

## I. INTRODUCTION

1. I submit this report as an expert retained by counsel for IMAX Corporation in connection with parallel and substantially overlapping class actions now pending in the Superior Court of Justice in Ontario (Silver v. IMAX Corporation, CV-06-03257-00 (the "Ontario Action")) and in the United States District Court for the Southern District of New York (In re IMAX Corporation Securities Litigation, 06 Civ. 6128 (NRB) (the "U.S. Action")). After nearly six years of discovery and motion practice, the U.S. Action has now reached the point at which a settlement appears imminent.

2. But here a problem has arisen. Although settlements are universally viewed as an appropriate and desirable way to resolve litigation and to conserve judicial resources, the U.S. Action cannot settle as a practical matter without further action by this Court. Thus, the IMAX defendants in the Ontario Action are requesting this Court to redefine the scope of the Ontario Action so as to resolve, upon the settlement of the U.S. Action, the current overlap between the two classes in the two Actions. The purpose of this report is essentially to explain why such action is necessary and appropriate because, as it will explain, (1) the pendency of overlapping cross-border securities class actions would otherwise largely preclude any realistic settlement that is not a global settlement, and (2) basic principles of comity require that a court that is considering a settlement on one side of a border should not be effectively deprived of its jurisdiction by the pendency of an action on the other side of the same border. This is a two-sided problem, which could equally well effectively bar a settlement in Canada if a Canadian court were the first court to receive and consider a class action settlement and a class action covering the same class were pending in the U.S. As discussed below, a recent spike in cross-

 6

border securities class actions necessitates than an integrated resolution be found for this problem in order to minimize cross-border conflicts and potential friction.

3. In this regard, I have reviewed the Memorandum of Understanding, dated November 2, 2011, between Lead Plaintiff's Counsel and Counsel for the Defendants in the U.S. Action (the "MOU"), the Stipulation and Agreement of Settlement Between the U.S. Action Settlement Class Members and IMAX Corporation, Richard Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble, and PricewaterhouseCoopers LLP, dated January 26, 2012 (the "Settlement Agreement"), and the Order Preliminarily Approving Final Settlement and Providing for Notice, dated January 31, 2012, of United States District Court Judge Naomi Reice Buchwald (the "Order"), which collectively describe the process and procedures by which the parties to the U.S. Action expect to resolve that litigation.[1] The United States District Court will consider the proposed settlement of the U.S. Action on the terms indicated in the MOU, the Settlement Agreement, and the Order, but a precondition to the final approval of that settlement is a redefinition of the class in the Ontario Action that reduces the overlap between the two actions. As discussed below, I consider this precondition an essential precaution on defendants' part.

4. Focusing on this problem of overlapping, cross-border class actions, this report reaches four basic conclusions:

(1) the standard procedures for the approval of a class action settlement in U.S. federal courts, which are well-developed, protective, and have been applied to thousands of class action settlements, are being followed in this case; these procedures provide notice and an opportunity to opt out to class members and require judicial approval of the

[1] I have been advised that the parties to the Settlement are preparing an amended stipulation of settlement, which proposes certain minor changes to the timing of certain procedures.

fairness of any proposed settlement;

(2) in the normal settlement process, there is a reciprocal exchange (with each side obtaining something that it needs); basically, plaintiff class members obtain the right to receive compensation, while the defendants obtain certainty through the extinguishment of their potentially greater liability if the case had gone to trial. But, uniquely in the cross-border context, defendants may be placed at risk of giving up something for nothing, because, although defendants may pay substantial compensation in an initial settlement in one jurisdiction, overlapping class members will still retain the option to litigate and recover in another forum; to the extent that defendants face such an illusory settlement and cannot obtain certainty, they are deterred from settling;

(3) because defendants need to obtain certainty to settle, the procedures outlined in the MOU and the Settlement Agreement to eliminate the overlap between the two actions are necessary, as otherwise defendants would gain little from a settlement and would face the risk of a "second bite at the apple" in the Ontario Action;

(4) the settlement procedures jointly proposed by counsel in the U.S. Action do not contemplate (and will not produce) any suspicious "race to judgment" that will preclude litigation in Ontario; nor are such "races to judgment" likely in the cross-border context (as recent experience has shown); ultimately the proposed settlement procedures enable both actions to proceed and to afford a means by which all current class members in the Ontario Action can remain in that Action if they so choose; and

(5) the determination of which class action a class member will recover under cannot be sensibly delayed until the claims settlement stage (i.e., when claims are actually filed in the U.S. Action) because such a procedure would expose defendants to

the unacceptable risk that they would have to fund two settlements covering the same class members; this will lead to an inflated recovery even if no class member recovers twice.

5. At this point, the real practical problem comes into focus. What most prevents the settlement of overlapping cross-border class actions is not the prospect of double recovery because some class members file claims against both funds (although this is in fact a real problem). Rather, the greater obstacle to settlement is that no rational defendant will be willing to settle under a procedure that gives those class members who are currently covered by both classes the right to claim compensation under the U.S. Action, while also reserving the right to share under a potentially higher judgment (or settlement) later obtained in the Ontario Action. If the class members in the Ontario Action who purchased on Nasdaq were allowed to remain in both classes, the defendants could be required to fund two overlapping resolutions on both sides of the border (either two settlements, or the present settlement in the U.S. Action and a later judgment in the Ontario Action). As a practical matter, defendants will not be able to reclaim any amounts deposited in the U.S. Action, because reversions of the settlement fund to the defendant are generally precluded. Thus, any amount deposited in the settlement fund will instead be allocated fully among whichever class members do claim under that settlement. As discussed below, the consequence for a defendant of having to fund two settlements that overlap is that it would likely make a substantial overpayment that could not be recovered, even though no individual class member actually received a double recovery. Thus, unless the class in the Ontario Action is redefined in its scope to exclude those covered by the U.S. Action, defendants would be compelled to pay an inflated recovery. This obstacle effectively discourages the settlement of either Action, until it is removed.

6. Contemporaneous securities class actions have increasingly come to overlap across the U.S./Canadian border. As of December 31, 2011, there were 45 active Canadian securities class actions, seeking claims totaling CAN $24.5 billion, and 15 new such class actions were filed in 2011.[2] Also, in 2011, five Canadian-domiciled companies were named as defendants in six securities class actions filed in the U.S., up from only three in each of 2009 and 2010.[3] Since 1997, Canadian-domiciled companies have been named as defendants in 74 U.S. securities class actions, of which 21 (or 28%) have also had parallel class actions in Canada. This pace is increasing, because since the end of 2005 (when the Bill 198 amendments to the Ontario Securities Act took effect), 46% of the 26 U.S. filings against Canadian-domiciled companies also had parallel class actions in Canada.[4] Moreover, these cases seem to encounter difficulties in settling. Of all the Bill 198 cases filed since the end of 2005 (when that Act became effective), only 10 have settled (and one has been dismissed).[5]

7. This slow pace may be attributable to the special problems in reaching cross-border settlements discussed in this report. Accordingly, it is in the interests of courts on both sides of the border to seek to find ways to encourage settlements to proceed. But the settlement process will not work well if either of two outcomes are possible: (1) the most intransigent plaintiff's attorney in such cross-border litigation can "name his price" and insist on a more inflated settlement than defendants would otherwise accept, or (2) defendants can "race to judgment," using the first settlement to extinguish all other class action claims. The proposed settlement procedure in this case, however, has been crafted to avoid both of these dangers. In

---

[2] See Bradley A. Hays and Mark L. Berenblut, "Trends in Canadian Securities Class Actions: 2011 Update" (NERA, January 21, 2012) at p. 1.
[3] Id. at 6. These 2011 cases included actions against SMART Technologies, Research in Motion, Fairfax Financial, Agnico-Eagle Mines, and Oilsands Quest, Inc.
[4] Id.
[5] Id. at 1.

effect, the proposed settlement steers a middle course that avoids any race to judgment and gives the overlapping class members the choice as to which Action they will remain in, but it also denies any veto power over all settlements to a counsel unwilling to settle.

8. A brief roadmap of my report may be useful. My experience and qualifications in the field of complex litigation and securities law are set forth in Appendix A to this report. Part II discusses the normal procedures for approval of a class action in the United States, which are being carefully followed in this case. Part III then examines how the basic logic of settlements is distorted by overlapping classes in the cross-border context (with the result that serious issues of international comity can arise). Essentially, these problems arise if class members can be a member of a settlement class in one jurisdiction, while retaining the right to litigate under a parallel action in another jurisdiction. That is exactly what is likely to occur in the instant litigation unless the overlap between the two classes is eliminated. Next, Part IV examines more specifically why overlapping cross-border class actions are likely to result in inflated recoveries and why requiring each class member to sign a release as a condition of receiving compensation under one settlement does little (if anything) to solve this problem. Part V surveys how other recent cross-border overlapping actions have been resolved in order to show that "races to judgment" are unlikely; realistically, the danger is not that a settlement in one jurisdiction will preclude an action in another jurisdiction from proceeding, but that overlapping class actions may prevent settlements and thus delay recovery and injure class members. Part VI offers my conclusions.

## II. U.S. PROCEDURES FOR APPROVAL OF A CLASS ACTION SETTLEMENT

9. Securities class action settlements are an everyday event in U.S. federal courts, and surveys have found that at any given time some 2,400 or more securities class actions may be pending in U.S. federal courts.[6] Although I do not have current statistics, securities class actions have long accounted for somewhere between 45% and 50% of all U.S. class actions in federal court.[7] As a result, U.S. courts have considerable experience in this area.

10. More importantly, the U.S. Supreme Court has repeatedly held that the approval of a class action settlement must comply with the requirements of the Due Process Clause of the U.S. Constitution. Thus, in Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-812 (1985), it specifically held that if a state wished to bind absent class members in a class action, it must provide certain minimum procedural due process protections. Specifically, it held:

> "The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[8]

Then, it added:

> "Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt-out' or 'request for exclusion' form to the Court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members."[9]

---

[6] The last census of total class actions pending in U.S. federal courts was published by the Administrative Office of the U.S. Courts in 2004 and showed 2,480 securities class actions pending as of September 30, 2004. See Admin. Office of the U.S. Courts, Judicial Business of the United States Courts, Table X-4 at pp. 400-03 (2004). This number does not reflect the consolidation of class actions by the Judicial Panel on Multi-District Litigation.
[7] See Coffee, Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534, 1539 (2006) (analyzing above data).
[8] Id. at 812.
[9] Id.

 12

11. To implement these Due Process requirements – notice, a right to opt out, and adequate representation –, the settlement of a class action the U.S. will proceed through an essentially three step approval process, involving preliminary approval, class certification, and final approval. These procedures are well-settled, and have been the subject of numerous judicial decisions intended to protect the rights of class members.

**Stage One: Preliminary Approval**

12. Once class counsel have drafted the definitive settlement agreement, they present it to the District Court, along with a proposed notice to class members, in a motion for preliminary approval of the settlement. In granting preliminary approval, the District Court (i) determines on a preliminary basis that the settlement is fair and reasonable, (ii) approves the language of the notice, and (iii) directs the means by which this notice is to be distributed and published. In general, the focus of this stage is on whether the proposed settlement is "reasonable in light of (1) the best possible recovery and (2) all the attendant risks of the litigation." See City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974). Because notice has not yet been disseminated at this preliminary approval stage, objectors are generally not present at this preliminary approval stage, but they can make a motion to vacate preliminary approval.

13. At the preliminary approval stage, the Court will give close attention to the notice sent to class members, which will disclose the pendency of other actions (such as the Ontario Action) and explain that class members may choose between the two by opting out of the U.S. Action. Generally, the plaintiff's class counsel will also disclose in this notice the maximum fee award that it will be seeking from the court.

14. I understand that United States District Judge Naomi Reice Buchwald granted preliminary approval of the settlement in the U.S. Action, preliminarily certified the

settlement class, approved the proposed notices, and directed that notice be published in the Wall Street Journal, and the New York Times, and three Canadian newspapers (The National Post, The Globe and Mail, and La Presse). Websites will also be used to provide notice. Judge Buchwald's order also sets forth her preliminary conclusion that the settlement of the U.S. Action is reasonable in light of the best possible recovery and the attendant risks of further litigation. I am advised by counsel to IMAX that the parties have revised the notice to reflect comments received from plaintiff's counsel in the Ontario Action.

**Stage Two: Class Certification**

15. On the hearing date specified in the notice to the class in the U.S. Action, the Court will address whether the U.S. Action can be finally certified under Rule 23 of the Federal Rules of Civil Procedure. Rule 23(a) provides that a class action may be maintained only if

> "(1) the class is so numerous that joinder of all class members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class."

See Fed. R. Civ. P. 23(a)(1)-(4). In addition to satisfying Rule 23(a), a class action must satisfy one of the three alternative provisions under Rule 23(b). Securities class actions almost invariably seek certification under Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." See Fed. R. Civ. P. 23(b)(3).

16. In determining whether the requirements of Rule 23 have been satisfied, the Second Circuit has instructed its district courts (which include the Southern District) that:

> "(1) a district court may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established . . .; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a merits issue that is identical to a Rule 23 requirement; . . . and (5) a district court has ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure that a class certification motion does not become a pretext for a partial trial of the merits."

See In re IPO Secs. Litig., 471 F.3d 24, 41 (2d Cir. 2006). The Second Circuit summarized its rule by stating:

> "[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." Id. at 41.

Objectors have the right to challenge at this stage whether the requirements of Rule 23(a) and 23(b) have been satisfied.

**Stage Three: Approval of the Settlement**

17. Rule 23(e) of the Federal Rules of Civil Procedure requires that the settlement of a class action must be approved by the district court. In the Second Circuit, the district court must find that the settlement is "fair, adequate, and reasonable and not a product of collusion." See Joel A. v. Giuliani, 218 F.3d 132, 138 (2d Cir. 2000). This determination will be made at a "fairness hearing" at which the court should consider both "the settlement's terms and the negotiating process leading to the settlement." See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005).

18. In making this determination, courts generally consider what are referred to as the Grinnell factors. See City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir.

1974). These factors are: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class; (3) the stage of the proceedings and discovery completed; (4) the risks of establishing liability; (5) the risks of proving damages; (6) the risks of maintaining a class action through trial; (7) the ability of the defendants to withstand greater judgment; (8) the range of reasonableness in the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund in light of the attendant risks of litigation.

19. It would be premature to predict how these factors will be assessed in this case. But this is an action that has already been litigated in the U.S. for a considerable period, and courts in the Second Circuit expressly favor settlement. See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116-17 (2d Cir. 2006). Also, the Manual for Complex Litigation (Third), which sets forth generally recognized standards for all federal courts, states:

> "A presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery."

See Federal Judicial Center, Manual for Complex Litigation (Third), Section 30.42 (1995).

20. All class members in the U.S. Action can object to class certification, the approval of the settlement, and the proposed fee award. They and their counsel can present witnesses and, in the court's discretion, obtain reasonable discovery. They can also appeal the district court's decision if the court certifies the class and approves the settlement. On appeal, the Second Circuit reviews certification on an abuse of discretion standard. See In re Nassau County Strip Search Cases, 461 F.3d 219, 224 (2d Cir. 2006).

## III. SETTLEMENTS AND CERTAINTY

21. In both Canada and the United States, settlements are favored for a variety of reasons: (1) they expedite the receipt of compensation; (2) they conserve judicial resources; (3) they avoid an all-or-nothing gamble on a trial, which may result in risk-averse claimants ultimately receiving nothing; and (4) they permit the parties to negotiate a better, more precise and nuanced outcome, reflecting the strengths and weaknesses of each side's position, than a jury or other factfinder could achieve, because the latter inherently know less about the case than the parties.

22. For all these reasons, U.S. courts have recognized the need to permit broad settlements "in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important element in his willingness to settle." See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 106 (2d Cir. 2005); TBK Partners Ltd. v. Western Union Corp., 675 F.2d 456, 460 (2d Cir. 1982). Although the settlement in the U.S. Action is in no sense broad or unusual, this settlement, without an amendment to the definition of the class in the Ontario Action, will not be able to achieve the key objective of any settlement to the defendant: limiting its future liability to all of the claimants covered by the final order in the U.S. Action. Thus, defendants are denied the certainty that they normally expect (and receive) in return for their payment of compensation.

23. Normally, defendants achieve that certainty in class actions through the exercise (or expiration) of the right to opt out possessed by each class member. If class members do not opt out of the class action by a specific date set by the court approving the settlement, they are bound by that settlement, and defendants thereby achieve certainty. But that is not necessarily the case here. Here, the class members who do not opt out of the U.S. Action will (absent the

proposed redefinition of the class) remain members of the Ontario Action. Thus, they can obtain compensation under the Ontario Action, possibly years later, notwithstanding their failure to opt out of the U.S. Action. The result is both to (i) deny defendants the certainty that is their motivation for entering into a settlement, and (ii) tie the hands of the U.S. court so that it cannot achieve the desired resolution negotiated by the parties.

24. In sum, under normal circumstances, settlements exchange compensation for certainty and a limitation of the defendants' liability. Yet, in this case, such a limitation will not occur, and defendants have little ability to estimate the magnitude of the risk they face, which depends on choices that class members will make in the future. Defendants can certainly accept the ability of class members to opt out (because this provides only a temporary and short-term uncertainty and usually defendants have the right under the settlement agreement to call the settlement off if the opt out rate exceeds their expectations). However, the balance of advantage in complex litigation is fundamentally altered to defendants' disadvantage if defendants can be compelled to face longer term uncertainty. Further, in the normal case, when class members opt out, they effectively spurn the offered compensation under the class action settlement. In contrast, when classes overlap, class members who do not opt out receive an option for a defined period to choose between compensation under the settlement or compensation under the later resolution of the second action. As a result, defendants cannot know whether a substantial percentage (or even the majority) of the overlapping class members in the U.S. Action might at some later point decide to claim instead under the Ontario Action. In such a world, the defendants are asked to fund a settlement (which they cannot recover), even though they do not know whether they are reducing their potential liability in creating that fund by 90%, 75%, 50%,

or some much smaller percentage. Such uncertainty discourages settlements and deprives the U.S. court of its ability to resolve the litigation.

## IV. THE PROBLEMS IN RESOLVING PARALLEL CROSS-BORDER CLASS ACTIONS

25. This section will focus on why cross-border class actions present special procedural problems. Although the U.S. has long experience with class actions and has often seen parallel (and even "dueling") class actions, these problems are much easier to resolve when only U.S. law and jurisdiction are involved. If multiple class actions are filed in different U.S. federal courts, a party can seek to have them consolidated by the Judicial Panel on Multidistrict Litigation, which will assign one federal judge to coordinate and resolve all discovery issues and pre-trial motions.[10] If cases are filed in federal and state court in the United States, the defendants can generally (but not always) remove the state actions to federal court under the Class Action Fairness Act ("CAFA"). But when actions are in different countries, such consolidation is not possible.

26. Partly because of these perceived difficulties, the MOU conditions the settlement of the U.S. Action on both (i) "final judicial approval of the Settlement from the United State District Court for the Southern District of New York," and (ii) "an order from the Canadian Court amending the definition of the Canadian class to exclude all members of the Settlement Class" (i.e., those persons who purchased on Nasdaq during the class period who have not opted out from the Settlement Class)." See MOU at paragraph 1. Obviously, the justification for such an order is that it will end the overlap between the two Actions, but only at the point when the U.S. Action's resolution has been found to be fair and reasonable. Of course, those who are dissatisfied for any reason with the outcome in the U.S. Action can opt out and

[10] See 28 U.S.C. § 1407 (authorizing panel to consolidate litigation for most pretrial purposes).

pursue their claims elsewhere (either in the U.S. or Canada). Indeed, by opting out, they will automatically remain a member of the class in the Ontario Action without the need for any affirmative election on their part.

27. Why is it critical that the overlap between the two classes be ended? The answer is on three levels. First and most simply, ending the overlap ensures that no class member can receive a double recovery by claiming against both settlement funds (i.e., both in the U.S. and Canada). Here, I anticipate that the reply will be made by plaintiff's counsel in the Ontario Action that such a double recovery can equally well be precluded at a later stage if the recovery in the U.S. Action is made conditional on each claimant executing an individual release as a condition of receiving any payment. But such a delayed resolution is imperfect and creates a variety of problems, as next discussed.

28. One problem is that D&O insurers will be resistant to funding an initial settlement if the same dispute can be relitigated in Canada. Typically, securities class action settlements are primarily funded in the United States by the D&O insurer.[11] These insurers understandably want certainty before they will approve a settlement agreement. They need to know that in funding a settlement of the claims of the purchasers on Nasdaq they have achieved a final resolution of those claims (subject, of course, to opt outs) and will not face a "second bite at the apple" in an additional class action involving the same issues and an overlapping class period. Such a prospect of additional potential liability may cause them to resist funding the settlement.

---

[11] One well-known study of securities class actions found that 68.2% of the settlement was paid by the insurer and 31.4% by the corporate defendant and the balance (0.4%) by other defendants. See Frederick C. Dunbar et al., NERA Econ Consulting, "Recent Trends III: What Explains Settlements in Shareholder Class Actions?" at 9 (1995). For other studies finding that 96% of all securities class actions settle within the D&O insurance policy's limits, see Coffee, Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534, 1550-51 (2006).

29. Next, if defendants must secure individual releases from every class member, this is a time consuming and costly process, which operates on an individual-by-individual basis. Moreover, there could always be disputes (Was a particular release validly signed? Was it forged?) that could lead a claimant to seek later recovery in the Ontario Action on the assertion that the claimant had not waived its rights in the U.S. Action. This assessment is not a speculative inference, but rests on solid evidence. In a recent case study of the settlement of a Canadian securities class action (which overlapped with a parallel U.S. action), the authors described the problems faced by the settlement Administrator:

> "1. duplicate claims
>
> It soon became clear to the Administrator during the proof of claim process that it was in receipt of numerous duplicate claims, particularly on behalf of institutional shareholders. Claims were made not only by shareholders, but also by the agents/brokers, trustees, claimants, or companies (in circumstances in which they were filing on behalf of the company pension plan)."

See Lisa Munro, "Canada: YBM Case Study: Anatomy of A Securities Class Action Settlement," at p. 10 (LERNERS, January 16, 2012). The Administrator also found extensive co-mingling of shares and inadequate proof of shareholder status. As a result, it was forced to rely on affidavit evidence from the shareholder. This is exactly the position that defendants do not want to be placed in, because it could enable some shareholders to elect under both Actions and would entail unnecessary expenses in verifying each claimant's status.

30. Even if all these disputes can be resolved (and that is doubtful), there remains the fact that class members receive an option and can play an arbitrage-like game, seeking to determine which action will produce the higher recovery for them. Plaintiff's counsel in the rival actions may seek to solicit class members to decide one way or the other.

31. Overshadowing all these problems is the greatest problem with overlapping classes: to settle both actions defendants must create two settlement funds in the U.S. and Canada. Because reversions of the unclaimed settlement to the defendants are no longer employed in U.S. class action settlements (and for good reason[12]), the creation of two different settlement funds (or a settlement fund in the U.S. and a judgment in Canada) means that the money deposited in these funds cannot be recovered, even if only a few class members file for recovery. This makes overpayment highly likely, even if no individual class member receives a double recovery from both funds. Moreover, this problem of dual settlement funds is in no respect solved or even addressed by requiring class members to sign releases when they submit their claims for payment. That technique does not change the fact that there will be two settlement funds that each will be exhausted.

32. To illustrate this point, assume that the two classes wholly overlapped and that the Ontario Action eventually results in a settlement or judgment for the same amount ($12 million). Now assume further that 50% of all the eligible Nasdaq purchasers filed timely claims in the U.S. Action, while the other 50% of eligible Nasdaq purchasers file claims in the Ontario Action. (Of course, many class members will not file in either action. Commentators have pointed out that even relatively sophisticated institutional investors often fail to file, thereby "leaving money on the table,"[13] and such apathy is even more likely in the case of individual investors). Because there is no reversion of the unclaimed funds, the class members who file in

[12] If any portion of the settlement can revert to the defendant, the defendant has a strong interest in making the notice and filing process so complex and opaque that few claimants will file, thereby maximizing its reversion. The result is to create illusory settlements that are not paid out. My understanding is that such "claims made" (or reversionary) settlements are also discouraged in Canada.

[13] See James D. Cox and Randall S. Thomas, Leaving Money on the Table: Do Institutional Investors Fail to File Claims in Securities Class Actions?, 80 Wash. U. L. Q. 855 2002 (finding that even mutual funds and other sophisticated financial institutions often forego the opportunity to file claims in securities class action settlements). Retail investors are even more unlikely to file. Estimates have placed the amount not claimed in U.S. securities class actions at over $1 billion per year. Where there is no reversion, the unclaimed amount goes to the other investors who did file claims.

the first settlement will share the entire amount in that fund, possibly receiving a 100% recovery of their losses (or even more). In the second action (here, the Ontario Action), the different claimants who file claims will also deplete that entire fund. The bottom line outcome then is that defendants would be compelled to pay two settlements of $12 million (for a total cost of $24 million), even if they believe the arm's length settlement value of the claims in the two overlapping class actions is only $12 million. Similarly, if defendants agree to a $12 million settlement in the U.S. and are thereafter taken to trial in Ontario with a hypothetical judgment of $12 million being recovered, the defendants are subjected to double recovery (without any class member necessarily receiving a recovery in both cases). This prospect makes it foolish for defendants to settle in the U.S. Action because that earlier settlement would be an illusory settlement that did not cap their liability to the overlapping members of these two classes. Faced with this two-front war, defendants cannot settle – unless the class definition in the second action is adjusted to eliminate the overlap, or a global settlement is reached.

33. Although global settlements are desirable, if defendants in such a two front war involving highly overlapping class actions need to settle on a global basis or not at all, the result is to increase the leverage of an intransigent plaintiff's counsel who may wish to hold out for an otherwise unrealistic higher recovery. Inherently, holdouts have power, and in this context a plaintiff's counsel in one action can effectively block settlement in the other action because defendants will fear that will have to pay a double recovery. Unless the two actions can be separated with the overlap being minimized, defendants effectively have only two unsatisfactory choices: (1) to settle globally with both plaintiffs' counsel (possibly at an unreasonable price because of the greatly enhanced leverage given to plaintiff's counsel), or (2) to settle the U.S. Action and seek to plead it as a defense to the Ontario Action. This latter course

is, however, fraught with some risk and legal uncertainty (and, as later discussed, few, if any, defendants appear to have opted for it). If defendants did settle the U.S. Action and then sought to plead it as a defense in Ontario, it is at least conceivable that the Ontario court might refuse to accord res judicata effect to the settlement on any of several possible grounds.[14] If so, the defendants would have made a $12 million dollar investment that failed to achieve their purpose of resolving all the claims of the class members bound by the settlement of the U.S. Action.

34. All courts recognize the value of settlements. If settlements are discouraged, the time, effort, and efficiency of a judicial system is impaired. But the problems outlined above present a significant barrier to the achievement of honest, arm's-length settlements, because the defendants must reasonably fear overpaying when the first settlement fund will not fully discharge their liability to all claimants covered by it. Thus, any response from plaintiff's counsel that no single plaintiff can receive a double recovery wholly misses the mark. The real problem is that the claimants will have access to two funds for the same asserted liability and will likely exhaust both.

35. Nor is the answer to permit reversion of the unclaimed settlement fund in the U.S. Action to the defendants. This would create a dangerous conflict of interest (and U.S. courts will simply resist any such practice). The better and more effective answer is to redefine the class in the Ontario Action so that it does not overlap with the U.S. Action.

36. The approach proposed in the MOU and the Settlement Agreement of redefining the class definition in the Ontario Action to exclude on a contingent basis all members of the Settlement Class is the exact opposite of the "race to judgment" that has sometimes been

[14] For example, in Currie v. McDonald's Restaurants of Canada Ltd., [2005] O.J. No. 506, the Ontario Court of Appeals did deny res judicata effect to a U.S. class settlement where it found that Canadian class members were not given adequate notice of the U.S. class action. Although the instant case is distinguishable from Currie, the risk is always present that a procedural error may be found (or at least asserted).

seen in the United States when two (or more) overlapping class actions are in competition. In such cases, defendants may seek to settle one class cheaply and use it to preclude the other class action(s) on res judicata grounds. At its worst, this process may degenerate into what is known as a "reverse auction" with defendants soliciting competing plaintiffs' class counsel in different actions to settle cheaply in order to bar their rivals, in effect playing plaintiff's counsel off against each other.[15] But that is not what is being proposed here, because under the proposed redefinition of the two classes, the U.S. Action will not bar or preclude the Ontario Action. This solution avoids both the extremes of the "reverse auction" and that of effectively empowering one plaintiff's counsel so that it may obtain an unreasonable recovery or bar all other settlements.

## V: Recent Experience With Cross-Border Securities Class Actions

37. The foregoing assessment that cross-border class actions face unique difficulties in achieving settlement has been confirmed by others. In the above-noted review of the YBM class action (written only weeks ago), the author observes:

> "If the class action has a multi-jurisdictional element, the settlement may dissolve automatically if the parties are unable to obtain 'global peace,' that is, a resolution of all litigation throughout the world. Defendants will undoubtedly want a settlement which achieves 'global peace.'"

See Lisa Munro, "Canada: YBM Case Study: Anatomy of a Securities Class Action Settlement," at p. 9. (LERNERS, January 12, 2012). Defendants in this case are indeed seeking a form of "global peace" through a mechanism that respects international comity and does not allow one holdout to preclude all settlements.

---

[15] For a full definition of the "reverse auction," see Reynolds v. Beneficial National Bank, 288 F.3d 277, 282 (7th Cir. 2002) (describing it as "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant"). As Judge Posner notes in this opinion, the term "reverse auction" was originally coined by me. See Coffee, Class Action Accountability: Reconciling Exit, Voice and Loyalty in Representative Litigation, 100 Colum. L. Rev. 370, 392 (2000).

38. The bottom line is that defendants in cross-border litigation will want global peace with all overlapping class members, but they may be unable or unwilling to buy it at the highest price set by any of the plaintiff's counsel. Here, the choice before this Court is whether to delay all settlements in this litigation or to permit recovery to be paid and distributed to class members in the U.S. Action. Such a settlement has no cost or downside for the class members in the Ontario Action, which will continue and be unimpaired.

39. In the letter to this Court, dated December 21, 2011, counsel for the plaintiffs in the Ontario Action listed five securities class actions in which there have been joint approval by both Canadian and U.S. courts: Metzler Investment GmbH v. Gildan Activewear Inc., 2011 ONSC 1146; Canadian Commercial Workers Industry Pension Plan v. Royal Group Technologies Ltd., [2007] OJ No. 3686; Frohlinger v. Nortel Networks Corp., [2007] OJ No. 148; Canadian Commercial Workers Industry Pension Plan v. Biovail Corporation, Unreported (24 September 2008), London 48172CP (Sup. Ct.); and O'Neil v. SunOpta, Inc., 2010 ONSC 2735. In most of these cases (as here), the litigation was brought first in the United States. But in none of these cases was a settlement concluded and approved in the U.S. without there having been a parallel settlement that had been negotiated and agreed to in Canada.

40. This pattern confirms the central point that this report has now repeatedly made: it is infeasible to settle exclusively in the United States so long as the defendant would be exposed to a trial on the same claims in an overlapping class action in Canada. Moreover, in none of these cases has there been any evidence of a "race to judgment" by defendants seeking to exploit a cheap settlement. In this cross-border context, that today appears to be a phantom fear.

41. Global settlements do occur, but if only global settlements can occur that gives undue leverage to holdouts. That is undesirable, both in terms of fairness to defendants and

even class members (whose eventual recovery may be delayed). The incentive for plaintiff's attorneys in one of two parallel class actions to hold out in order to exploit their leverage also injures international comity because it deprives the first court of the opportunity to resolve its litigation through settlement.

## VI. CONXCLUSION

42. The fundamental issue in cross-border litigation is whether the existence of a parallel action in one jurisdiction can stall or prevent a settlement in another jurisdiction. From the perspective of international comity, that seems highly undesirable. As this report has hopefully made clear, defendants in overlapping cross-border class actions cannot today reasonably settle a class action in one jurisdiction when they will remain exposed to a "second bite at the apple" in another jurisdiction. Those recent cross-border class action settlements that have occurred have been interrelated. Thus, an intransigent plaintiff's counsel can potentially prevent a global settlement in order to profit from its blocking position.

43. A Canadian court has every right to be concerned if the settlement of a U.S. action would preclude the continued litigation of the parallel action in Canada. But that is not the case here, where the U.S. Action will be subject to opt out rights and every eligible opt out will automatically remain in the Ontario Action.

44. Thus, from the perspective of international comity, the settling parties in the U.S. Action have in my judgment proposed the best course of action: to permit the U.S. Action to settle without precluding or impeding the Ontario Action. This is the sensible middle course that neither holds one action hostage to the other nor allows the first settlement to block other actions.

Respectfully submitted,

John C. Coffee, Jr.

## Appendix A

Qualifications

1. I am the Adolf A. Berle Professor of Law at Columbia University Law School, where I have taught since 1980, and am a member of the Bars of the State of New York and the District of Columbia. I am also a Fellow of the American Academy of Arts and Sciences, a Life Fellow of the American Bar Foundation, and a member of, and former Reporter for, the American Law Institute. I have also been a Visiting Professor of Law at Harvard Law School, Stanford Law School, the University of Virginia Law School, and the University of Michigan Law School. I have also lectured as a visiting professor at both Osgoode Hall Law School and the University of Toronto Law School and will be teaching a course this Spring as the Fasten Visiting Scholar at the University of British Columbia in Vancouver. I began my academic career teaching at Georgetown University Law School from 1976 to 1980. Prior to that, I practiced law with the firm of Cravath, Swaine & Moore in New York City from 1970 to 1976. I am a 1969 graduate of Yale Law School.

2. In my professional work as a scholar of corporate governance and securities law, I have served as a member of the Legal Advisory Committee to the New York Stock Exchange ("NYSE"), the Legal Advisory Board of the National Association of Securities Dealers ("NASD"), the self-regulatory body that formerly owned and operated Nasdaq, the Economic Advisory Board to Nasdaq, the Subcouncil on Capital Markets of the United States Competitiveness Policy Council (a. U.S. governmental agency), and the Market Regulation Committee of the NASD (which is a disciplinary committee). I have also served as a member of the U.S. Securities and Exchange Commission ("SEC") Advisory Committee on the Capital Formation and Regulatory Processes, which recommended certain changes in the rules and

procedures applicable to public offerings of securities, which were largely adopted by the SEC in 2005, and I currently serve as a member of the strategic advisory committee to the Public Company Accounting Oversight Board ("PCAOB"), a body created by the Sarbanes-Oxley Act to oversee the auditing profession.

3. Although I do not purport to have similar expertise in Canadian securities laws, I have served as a member of Canada's Task Force on Modernizing Securities Regulation. I was the only non-Canadian member of this Task Force, which was formed in 2005 to study and recommend ways to make Canada's capital markets more competitive and efficient. The Task Force met regularly for nearly two years; I attended meetings in a variety of Canadian cities and heard testimony from, and discussed issues with, representatives of virtually every significant body or interest group involved in the Canadian capital markets. Our Task Force's multi-volume report in 2006 has received much attention and gave me a unique vantage point from which to view the interrelationships of the U.S. and Canadian capital markets.

4. As a law professor, one of my principal academic interests has been the class action, with a special focus on the management of the large class action. In particular, I have long been a specialist on the topic of securities litigation in the United States. When the Private Securities Litigation Reform Act ("PSLRA") was drafted and before Congress in 1995, the White House's Office of General Counsel retained me as a special advisor, and President Clinton specifically referred to my opinion letter to him in his public statements about the legislation. Overall, I have testified before Congressional Committees (both of the House and Senate) on issues involving securities markets and securities litigation on probably twenty or more occasions (in particular with regard to the PSLRA in 1995, the Sarbanes–Oxley Act of 2002, and the Dodd-Frank Act of 2010).

5. I have also served as the Reporter for Litigation Remedies to the American Law Institute in connection with its decade-long effort to codify in a Restatement –like format the common law of fiduciary duties for corporate officers and directors. See American Law Institute, Principles Of Corporate Governance: Analysis and Recommendations (1992). I have also testified before the Chinese Securities Regulatory Commission in Beijing, the Australian Securities and Investments Commission in Melbourne, Australia, and the Securities and Exchange Commission in Washington, D.C.

6. For the past fifteen years, I have been the opening lecturer at the annual ABA National Institute on Class Actions, and my annual survey of class action developments for this Institute is regularly published by the Bureau of National Affairs ("BNA"). I have also written extensively about class actions, including both securities, mass torts, and other varieties of class actions.

7. I am the co-author of Coffee and Sale, Securities Regulation: Cases and Materials (Foundation Press 11th ed. 2009), the oldest and first casebook in the securities field. I have also co-authored a Corporations law casebook that focuses extensively on securities litigation. See Choper, Coffee and Gilson, Cases and Materials On Corporations (Aspen Law and Business 7th ed. 2008) and have written an introductory text on business law with Professor William Klein that has been widely used in U.S. law schools. See Klein and Coffee, Business Organization And Finance (Foundation Press 10th ed. 2007).

8. I have also repeatedly testified as an expert witness in securities fraud and similar class actions, for the SEC in civil cases, and for the Department of Justice in criminal cases. See United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991) (upholding admissibility of my testimony). A list of my writings is included in my resume, which is attached as Exhibit B. I

have also testified in Canadian proceedings as an expert on U.S. securities law, including most recently in October of 2011 in an arbitration conducted under the B.C. International Arbitration Act before Mr. Edward J. Waitzer, a former chair of the Ontario Securities Commission.

## Appendix B

John Collins Coffee, Jr.
320 Wyoming Avenue
Maplewood, New Jersey 07040

**POSITION:** Adolf A. Berle Professor of Law, Columbia University Law School
Director, Center on Corporate Governance, Columbia University Law School

**EDUCATION:** Amherst College 1966 B.A. (*magna cum laude*) Bond Fifteen (highest fifteen ranking seniors); Phi Beta Kappa

**LAW SCHOOLS:** Yale Law School 1969, LL.B; New York University Law School, 1976 LL.M (in Taxation).

**OCCUPATIONAL HISTORY:** Columbia Law School 1980 - present; Berle Chair since 1986

Harvard Law School 2001 -- Joseph H. Flom Visiting Professor of Law, Fall 2001

Stanford Law School - Visiting Professor, Spring 1987

Virginia Law School - Visiting Professor, Fall 1979

Michigan Law School - Visiting Professor, Summer 1979

Georgetown University Law School - Professor and Associate Professor, 1976-1980

Cravath, Swaine and Moore - Associate, 1970-1976

Reginald Heber Smith Fellowship, 1969-1970

**SPECIALIZATIONS:** My academic and teaching specialties include corporate and securities law, corporate governance, class actions and complex litigation, criminal law, and white collar crime.

**OTHER ACTIVITIES and HONORS:**

1. Fellow, American Academy of Arts and Sciences

2. Order of the Coif Visiting Lecturer for 2005 (each year Order of the Coif selects one visiting lecturer to speak at a series of law schools)

3. Reporter (for Litigation Remedies), American Law Institute, PRINCIPLES OF CORPORATE GOVERNANCE AND STRUCTURE (1980-1993: Final Draft 1993)

4. Donald Cressey Award for Lifetime Achievement (awarded by the ACFE in 2011)

5. Member, Advisory Council, Public Company Accounting Oversight Board (PCAOB) (2007- )

6. Fellow, European Corporate Governance Institute

7. Clarendon Lectures (Oxford University 2006)

8. Anton Phillips Chair, University of Tilburg (2005-2006)

9. Reporter, American Bar Association, MINIMUM STANDARDS FOR CRIMINAL JUSTICE (2nd ed. 1980)

10. Member, Advisory Committee on Capital Formation and Regulatory Processes, Securities and Exchange Commission (1995-1996)

11. Member, Legal Advisory Committee to the Board of Directors, New York Stock Exchange (1992-1995) (currently,emeritus member)

12. Member, Legal Advisory Board, National Association of Securities Dealers (NASD) (1996-2000)

13. Member, Economic Advisory Board, Nasdaq (2001-2004)

14. Member, Market Practices Committee, NASD Regulation, Inc. (1997-2000)

15. Member, Subcouncil on Capital Allocation, United States Competitiveness Policy Council (created by Omnibus Trade and Competitiveness Act of 1988) (1993-1995)

16. Member, Standing Committee on Law and Justice, Commission on Behavioral and Social Sciences and Education, National Research Council (elected to 1990-1994 term)

17. Member, National Academy of Sciences Panel on Research on Sentencing (1979-1982)

18. General Counsel, American Economic Association (1992-1998)

19. Life Fellow, American Bar Foundation

20. Member, American Law Institute

21. Chairperson, Section on Business Associations, Association of American Law Schools (AALS) (1981-1982)

22. Chairperson, Audit and Investment Policy Committee, AALS (1992-1994) and former member, Nominating Committee, AALS (1990-1991)

23. Chairperson, Committee on Sections, AALS (1984-1985)

24. Board of Editors, M&A and Corporate Governance Law Reporter

25. Board of Contributing Editors, American Lawyer Newspaper Group

26. Columnist on Corporate and Securities Law, New York Law Journal

27. Businesswatch Columnist, National Law Journal

28. Member, Special Committee on Mergers, Acquisitions and Corporate Control, Contests (1996- ), and former member, Committee on Corporate Laws (1994-1995), Committee on Securities Regulation (1991-1994) and Committee on Corporate Laws (1983-1985), Association of the Bar of the City of New York

29. Member, Executive Committee, Securities Regulation Institute (1992-2002) (currently, member, Board of Advisors).

30. Chairperson, Appointments Committee, Columbia Law School (1987-1990)

31. Chair, ALI-ABA National Institute on Corporate Governance (1995-2005)

32. Frequent Panelist at PLI, ABA,, ALI-ABA, SEC and other Seminars and Institutes and have testified before Congress on approximately eight occasions.

33. In 1998, in 2001, and again in 2006, Professor Coffee was listed by the National Law Journal as one of its "100 Most Influential Lawyers" in the United States.

**BOOKS, AND CASEBOOKS**

1. Coffee, GATEKEEPERS: The Professions and Corporate Governance (Oxford University Press 2006)

2. Choper, Coffee and Gilson, CASES AND MATERIALS ON CORPORATIONS, (Little Brown & Co.) (7th ed. 2007)

3. Coffee and Sale, CASES AND MATERIALS ON SECURITIES REGULATION (11th ed. 2009) (formerly, Jennings, Marsh, Coffee and Seligman)

4. Reporter, ABA MINIMUM STANDARDS FOR CRIMINAL JUSTICE (2d ed. 1980) (Chapter 18)

5. Klein and Coffee, BUSINESS ORGANIZATION AND FINANCE (10th ed. 2007)

6. Coffee, Lowenstein and Rose-Ackerman, KNIGHTS RAIDERS AND TARGETS: The Impact of The Hostile Takeover (Oxford University Press, 1988)

**LAW REVIEW ARTICLES:** (in reverse chronological order)

1. Coffee, Systemic Risk After Dodd-Frank: Contingent Capital And the Need for Regulatory Strategies, 111 Colum. L. Rev. 795 (2011).

2. Coffee, Ratings Reform: The Good, The Bad, and The Ugly, 1 Harv. Bus. L. Rev. _ (2011).

3. Coffee, Litigation Governance: Taking Accountability Seriously, 110 Colum. L. Rev. 288 (2010).

4. Coffee and Sale, Redesigning the SEC: Does the Treasury Have A Better Idea?, 95 Va. L. Rev. 707 (2009).

5. Coffee, Law and the Market: The Impact of Enforcement, 156 U. Penn. L. Rev. 299 (2007).

6. Coffee, Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534 (2006).

7. Coffee, Can Lawyers Wear Blinders?: Gatekeepers and Third Party Opinions, 84 Texas L. Rev. 59 (2005).

8. Coffee, A Theory of Corporate Scandals: Why the U.S. and Europe are Different, 21 Oxford Review of Economic Policy 198 (2005).

9. Coffee, Causation by Presumption? Why the Supreme Court Should Reject Phantom Losses and Reverse Broudo, 60 Bus. Law. 533 (2005).

10. Coffee, Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms, 84 B.U. L. Rev. 301 (2004).

11. Coffee, What Caused Enron?: A Capsule Social and Economic History of the 1990s, 89 Cornell L. Rev. 269 (2004).

12. Coffee, The Attorney As Gatekeeper: An Agenda for the SEC, 103 Colum. L. Rev. 1293 (2003).

13. Coffee, Racing Towards the Top?: The Impact of Cross-Listings and

36

Stock Market Competition on International Corporate Governance, 102 Colum L. Rev. 1757 (2002).

14. Coffee, Understanding Enron: "It's About the Gatekeepers, Stupid", 57 Bus. Law. 1403 (2002).

15. Coffee, Law and Regulatory Competition: Can They Co-Exist? 80 Texas L. Rev. 1657 (2002).

16. Coffee, The Rise of Dispersed Ownership: The Roles of Law and the State in the Separation of Ownership and Control, 111 Yale L. J. 1 (2001).

17. Coffee, Do Norms Matter? A Cross-Country Evaluation, 149 U. Pa. L. Rev. 2151 (2001).

18. Coffee, Class Action Accountability: Reconciling Exit, Voice and Loyalty in Representative Litigation, 100 Colum. L. Rev.370 (2000).

19. Coffee, Privatization and Corporate Governance: The Lessons from Securities Market Failure, 25 J. Corp. L. 1 (1999).

20. Coffee, The Future as History: The Prospects for Global Convergence in Corporate Governance and its Implications, 93 Nw. U. L. Rev. 641 (1999).

21. Coffee, Modern Mail Fraud: The Restoration of the Public/Private Distinction, 35 Amer. Crim. L. Rev. 427 (1998).

22. Coffee, Brave New World?: The Impact(s) of the Internet on Modern Securities Regulation, 52 Bus. Law. 1195 (1997).

23. Coffee, The Bylaw, Battlefield: Can Institutions Change the Outcome of Corporate Control Contests, 51 U. Miami L. Rev. 605 (1997).

24. Coffee, Transfers of Corporate Control and the Triggering Thesis: Can Delaware Law Encourage Efficient Transactions While Chilling Inefficient Ones?, 21 Del. J. Corp. L. 359 (1996).

25. Coffee, The Future of the Private Securities Litigation Reform Act of 1995: or Why the Fat Lady Has Not Yet Sung, 51 Bus. Law. 975 (1996).

26. Coffee, Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995).

27. Coffee, Competition versus Consolidation: The Significance of Organizational Structure in Financial and Securities Regulation, 50 Bus. Law. 447 (1995).

28. Black and Coffee, Hail Britannia?: Institutional Investor Behavior Under Limited Regulation, 92 Mich. L. Rev. 1997 (1994) (with Bernard Black).

29. Coffee, The SEC and the Institutional Investor: A Half-Time Report, 15 Cardozo Law Review 837 (1994).

30. Coffee, New Myths and Old Realities: The American Law Institute Faces the Derivative Action, 48 Bus. Law. 1407 (1993).

31. Coffee, Paradigms Lost: The Blurring of the Criminal and Civil Law Models--And What Can Be Done About It, 101 Yale L.J. 1875 (1992).

32. Coffee, Liquidity Versus Control: The Institutional Investor as Corporate Monitor, 91 Colum. L. Rev. 1277 (1991).

33. Coffee and Klein, Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations, 58 U. Chi. L. Rev. 1207 (1991).

34. Coffee, Does "Unlawful" Mean "Criminal"? Reflections on the Disappearing Tort/Crime Distinction in American Law, 71 B.U.L. Rev. 193 (1991).

35. Coffee, Unstable Coalitions: Corporate Governance as a Multi-Player Game, 78 Geo. L.J. 1495 (1990).

36. Coffee, The Mandatory/Enabling Balance in Corporate Law: An Essay on the Judical Role, 89 Columbia. L. Rev. 1618 (1989).

37. Coffee, Hush!: The Criminal Law Status of Confidential Business Information After McNally and Carpenter and the Enduring Problem of Overcriminalization, 26 Amer. Crim. L. Rev. 121 (1989).

38. Coffee, The Uncertain Case for Takeover Reform: An Essay on Stockholders Stakeholders and Bust-ups, 1988 Wisc. L. Rev. 435.

39. Coffee, The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action, 54 U. Chi. L. Rev. 877 (1987).

40. Coffee, Rethinking the Class Action: A Policy Primer on Reform, 62 Ind. L. Rev. 625 (1987).

41. Coffee, Shareholders Versus Managers: The Strain in the Corporate Web, 85 Michigan L. Rev. 1 (1986).

42. Coffee, Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions, 86 Colum. L. Rev. 669 (1986).

43. Coffee, The Future of Corporate Federalism, 8 Cardozo L. Rev. 759 (1987).

44. Coffee, The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation, 48 Law and Contemporary Problems 5 (1985).

45. Coffee, Partial Justice: Balancing Fairness and Efficiency in Partial Bids, 3 Companies and Securities Law Review 216 (Australian Law Review).

46. Coffee, Litigation and Corporate Governance: An Essay on Steering Between Scylla and Charybdis, 52 Geo. Wash. L. Rev. 789 (1985).

47. Coffee, Market Failure and the Economic Case for a Mandatory Disclosure System, 70 Va. L. Rev. 717 (1984).

48. Coffee, Regulating the Market for Corporate Control: A Critical Assessment of the Tender Offer's Role in Corporate Governance, 84 Colum. L. Rev. 1145 (1984).

49. Coffee, Rescuing the Private Attorney General: Why the Model of the Lawyer As Bounty Hunter is Not Working, 42 Maryland Law Review 215 (1983).

50. Coffee, The Metastasis of Mail Fraud: The Continuing Story of the Evolution of a White Collar Crime, 21 Am. Crim. L. Rev. 1 (1983).

51. Coffee and Schwartz, The Survival of the Derivative Suit: An Evaluation and a Proposal Legislative Reform, 81 Colum. L. Rev. 261 (1981).

52. Coffee, "No Soul To Damn; No Body Kick," An Unscandalized Inquiry into the Problem of Corporate Punishment, 79 Mich. L. Rev. 386 (1981).

53. Coffee, "Twisting Slowly In the Wind": A Search for Constitutional Limits on Coercion of the Criminal Defendant, 1980 Supreme Court Review 211 (1981).

54. Coffee, From Tort to Crime: Some Reflections on the Criminalization of Fiduciary Breaches and the Problematic Line Between Law and Ethics, 19 Am. Crim. L. Rev. 117 (1981).

55. Coffee, Beyond the Shut-Eyed Sentry: Toward a Theoretical View of Corporate Misconduct and an Effective Legal Response, 62 Va. L. Rev. 1099 (1977).

56. Coffee, The Repressed Issues in Sentencing: Accountability, Predictability and Equality in the Era of the Sentencing Commission, 66 Geo. L.J. 975 (1978).

57. Coffee, The Future of Sentencing Reform, 73 Mich. L. Rev. 1361 (1975).

58. Coffee, Making the Punishment Fit the Corporation: The Problems of Finding an Optimal Corporate Criminal Sanction, 1 N. Ill. L. Rev. 1 (1980).

59. Coffee, Privacy versus Parens Patriae, 57 Cornell L. Review 571 (1972).

## ENDOWED LECTURES

Professor Coffee served as the Order of the Coif Visiting Lecturer in 2005 and has delivered annual endowed lectures at numerous American and foreign law schools. He has also served as a Distinguished Visiting Scholar at the University of Toronto Law School and Osgoode Hall Law School, and taught as a visiting professor at the University of Tokyo and the University of Sydney. He has also given numerous faculty workshops at other law schools in the United States, Europe and Asia.

BETWEEN:

MARVIN NEIL SILVER *et al.*
Plaintiffs

and

IMAX CORPORATION *et al.*
Defendants

Court File No: CV-06-3257-00

**Double Click on mouse to Add space for Third Party**

**Double Click on mouse to Add more space to parties line**

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Brampton

**Revised MOTION RECORD**
- Motion to Amend the Class Definition -

**McCarthy Tétrault LLP**
Toronto Dominion Bank Tower
Suite 5300, P.O. Box 48
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel: 416-601-7998

Dana M. Peebles LSUC #30820V
Tel: 416-601-7839
Fax: 416-868-0673

**Solicitors for the Defendants, the Moving Parties**

#11282124v2