# EXHIBIT B
# (PART 1)

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

- and –

IMAX CORPORATION, RICHARD L. GELFOND
BRADLEY J. WECHSLER, FRANCIS J. JOYCE, NEIL S. BRAUN
KENNETH G. COPLAND, GARTH M. GIRVAN, DAVID W. LEEBRON
and KATHRYN A. GAMBLE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**PLAINTIFFS' RESPONDING MOTION RECORD**
**TO AMEND THE CLASS DEFINITION**
**(RETURNABLE JULY 30 – AUGUST 2, 2012)**
**VOLUME 1 OF 3**

**Siskinds** LLP
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8

A. Dimitri Lascaris (LSUC #: 50074A)
Tel: (519) 660-7844
Fax: (519) 672-6065

**Sutts Strosberg** LLP
Lawyers
600-251 Goyeau Street
Windsor, ON N9A 6V4

Harvey T. Strosberg (LSUC#: 12640O)
Jay Strosberg (LSUC #: 47288F)
Tel: (519) 561-6285
Fax: (866) 316-5308

Lawyers for the Plaintiffs

**TO:** **McCarthy Tetrault LLP**
Barristers and Solicitors
Suite 4700, Toronto Dominion Bank Tower
Toronto Dominion Center
Toronto, ON M5K 1E6

R. Paul Steep
Dana Peebles
Tel: (416) 601-7998
Fax: (416) 868-0673

Lawyers for the Defendants

# INDEX

# INDEX


| | TAB | Page Number |
|---|---|---|
| **VOLUME 1** | | |
| Affidavit of Michael G. Robb, sworn May 9, 2012 | 1 | 1 |
| Exhibit "A" – Statement of Claim, issued September 20, 2006 | A | 21 |
| Exhibit "B" – 2006 Annual Report | B | 36 |
| Exhibit "C" – Email and Amended Statement of Defence | C | 383 |
| Exhibit "D"- *Kaplan v Gelfond*, 240 FRD 88 | D | 464 |
| Exhibit "E" – *In re IMAX Securities Litigation*, 587 F. Supp. 2d 471 | E | 475 |
| Exhibit "F" – *In re IMAX Securities Litigation*, 2009 U.S. Dist. LEXIS 58219 | F | 491 |
| Exhibit "G" – *In re IMAX Securities Litigation*, 272 FRD 138 | G | 499 |
| Exhibit "H" – *In re IMAX Securities Litigation*, 2011 U.S. Dist. LEXIS 41709 | H | 526 |
| Exhibit "I" – *Morrison v National Australia Bank*, 130 S Ct 2869 | I | 538 |
| Exhibit "J" – PACER Docket Report | J | 565 |
| Exhibit "K-1" – Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class Certification | K-1 | 599 |
| Exhibit "K-2" - Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Snow Capital Investment Partners, L.P.'s Motion for Class Certification | K-2 | 636 |
| Exhibit "K-3" – Defendant PricewaterhouseCoopers LLP's, an Ontario Limited Liability Partnership, Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification | K-3 | 669 |
| Exhibit "L-1" – Report of Lucy P. Allen, dated February 23, 2009 | L-1 | 695 |

| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "L-2" – Report of Professor Punam Puri, dated February 23, 2009 | L-2 | 738 |
| **VOLUME 2** | | |
| Exhibit "M" – Litigation Plan, dated February 22, 2007 | M | 796 |
| Exhibit "N" – Letter from Paul Steep, dated November 3, 2011 | N | 812 |
| Exhibit "O" – Email from Sandy Allan and attachments, dated January 27, 2012 | O | 813 |
| Exhibit "P" – Email from Dana Peebles, dated March 30, 2012 | P | 964 |
| Exhibit "Q" – Merger's motion for an amended motion, dated March 26, 2012 | Q | 1012 |
| Exhibit "R-1" – Letter from Mr. Lascaris to Defendants' counsel, dated January 31, 2012 | R-1 | 1014 |
| Exhibit "R-2" – Letter from Mr. Peebles, dated February 1, 2012 | R-2 | 1020 |
| Exhibit "R-3" – Letter from Mr. Leon, dated February 3, 2012 | R-3 | 1022 |
| Exhibit "R-4" – Letter from Mr. Lascaris to Merger Fund, dated February 7, 2012 | R-4 | 1023 |
| Exhibit "R-5" – Letter from Mr. Leon, dated February 8, 2012 | R-5 | 1024 |
| Exhibit "R-6" – Letter from Mr. Lascaris to Richard Margolies, dated February 9, 2012 | R-6 | 1025 |
| Exhibit "S-1" – Revenue-Systems, dated December 1, 2004 | S-1 | 1026 |
| Exhibit "S-2" – Revenue-System Leases, dated December 1, 2004 | S-2 | 1029 |
| Exhibit "S-3" – Revenue-System Sales, dated December 1, 2004 | S-3 | 1031 |
| Exhibit "S-4" – Memorandum, dated December 1, 2005 | S-4 | 1033 |
| Exhibit "S-5" – Memorandum, dated December 7 2005 | S-5 | 1036 |
| Exhibit "S-6" – Presentation, dated December 7, 2005 | S-6 | 1042 |
| Exhibit "S-7" – Report on Installations | S-7 | 1051 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "S-8" – Emails sent by Mark Welton in Q4 2005 and January 2006 | S-8 | 1073 |
| Exhibit "S-9" – Letter from IMAX to the Securities Exchange Commission, dated June 20, 2007 | S-9 | 1095 |
| Exhibit "S-10" - Exhibit "U-33" – notes, undated, titled: Lark and Kazan | S-10 | 1113 |
| Exhibit "S-11" - Exhibit "U-36" - notes, undated, titled "McMinnville, Manila and Winnipeg" | S-11 | 1114 |
| Exhibit "S-12" - minutes of a Meeting of the Board of Directors of Imax Corporation, held on March 8, 2006 | S-12 | 1115 |
| Exhibit "T-1" – Excerpts from the transcript of Lisa Coulman, taken January 31, 2008 | T-1 | 1120 |
| Exhibit "T-2" – Excerpts from the transcript of Bradley J. Wechsler, taken February 28, 2008 | T-2 | 1123 |
| Exhibit "T-3" – Excerpts from the transcript of Neil Braun, taken February 28, 2008 | T-3 | 1125 |
| Exhibit "U-1" - email dated December 17, 2001, from Marnie Hamilton to Kathryn Gamble, et al. | U-1 | 1126 |
| Exhibit "U-2" - email dated June 19, 2004, from Jim Patterson to Marnie Hamilton | U-2 | 1128 |
| Exhibit "U-3" - report dated November 5, 2004, titled "Research Report, Imax Corporation (IMAX) | U-3 | 1130 |
| Exhibit "U-4" - email dated January 9, 2005, from Mark Welton to Loron Orris, et al. | U-4 | 1142 |
| Exhibit "U-5" - Presentation dated February 2005, titled "Imax Corporation, Discussion Materials | U-5 | 1144 |
| Exhibit "U-6" - email dated March 30, 2005, from Ilidio Coito to Rafal Rybski, et al. | U-6 | 1221 |
| Exhibit "U-7" - email dated April 5, 2005, from Frank Joyce to Bill O'Malley | U-7 | 1225 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-8" - email dated July 12, 2005, from Gary Harbison to Don Kane, et al. | U-8 | 1228 |
| Exhibit "U-9" - email dated July 12, 2005, from Mark Welton to Brad Wechsler, et al. | U-9 | 1230 |
| Exhibit "U-10" - email dated July 24, 2005, from Mark Welton to Richard Wooland, et al. | U-10 | 1232 |
| Exhibit "U-11" - email dated November 3, 2005, from Mark Welton to Don Kane, et al. | U-11 | 1234 |
| Exhibit "U-12" - email dated November 14, 2005, from Don Savant to Huang Ke, et al. | U-12 | 1235 |
| Exhibit "U-13" - email dated December 8, 2005, from Mark Welton to Don Kane | U-13 | 1237 |
| Exhibit "U-14" - email dated December 21, 2005, from Glenn Pederson to Don Kane | U-14 | 1238 |
| Exhibit "U-15" - email dated December 22, 2005, from Mark Welton to Larry O'Reilly, et al. | U-15 | 1239 |
| Exhibit "U-16" - email dated December 31, 2005, from Ilidio Coito to Don Kane | U-16 | 1241 |
| Exhibit "U-17" - Memorandum dated January 16, 2006, titled "Q3 installation of Delhi (AEZ)" | U-17 | 1242 |
| Exhibit "U-18" - email dated January 19, 2006, from Don Kane to Ilidio Coito | U-18 | 1243 |
| Exhibit "U-19" - email dated January 19, 2006, from Ilidio Coito to Lac Nguyen, et al. | U-19 | 1245 |
| Exhibit "U-20" - email dated January 27, 2006, from Mark Welton to Don Kane, et al. | U-20 | 1247 |
| Exhibit "U-21" - email dated January 30, 2006, from Don Kane to Ilidio Coito, et al. | U-21 | 1248 |
| Exhibit "U-22" - email dated February 21, 2006, from Jeffrey Vance to Frank Joyce, et al. | U-22 | 1251 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-23" - presentation dated March 1, 2006, titled "Auditor's Preliminary Report to the Audit Committee for the year ended December 31, 2005" | U-23 | 1252 |
| Exhibit "U-24" - list dated March 7, 2006, titled "Proposed Media Strategy" | U-24 | 1279 |
| Exhibit "U-25" - email dated May 10, 2006, from Rafa Rybski to Ilidio Coito | U-25 | 1280 |
| Exhibit "U-26" - email dated May 17, 2006, from Kathryn Gamble to Edward MacNeil, et al. | U-26 | 1281 |
| Exhibit "U-27" - email dated June 2, 2006, from Mark Welton to Bill O'Malley, et al. | U-27 | 1284 |
| Exhibit "U-28" - email dated June 21, 2006, from Huang Ke to Richard Wooland, et al. | U-28 | 1287 |
| Exhibit "U-29" - chronology dated January 2005 through September 1, 2006, titled "Question 10: General Chronology" | U-29 | 1288 |
| **VOLUME 3** | | |
| Exhibit "U-30" - letter dated July 2, 2007, from Edward MacNeil to Angela Crane (SEC) | U-30 | 1293 |
| Exhibit "U-31" - presentation dated July 19, 2007, titled "Imax Corporation, Q4 2006 Review Package to the Audit Committee" | U-31 | 1319 |
| Exhibit "U-32" - notes, undated, titled "PWC Current Position" | U-32 | 1342 |
| Exhibit "U-33" - notes, undated, titled "Beijing Radio and Film and Beijing SUC" | U-33 | 1343 |
| Exhibit "U-34" - chart, undated, titled "Information Request" | U-34 | 1345 |
| Exhibit "U-35" - email dated August 2, 2005 from John Schreiner to Mark Welton | U-35 | 1378 |
| Exhibit "U-36" - email dated September 7, 2005 from James A. Skinner to kino@suvar.ru | U-36 | 1379 |
| Exhibit "U-37" - email dated October 4, 2005 from John Schreiner to Ilidio Coito | U-37 | 1381 |

| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-38" - email dated October 4, 2005 from Mark Welton to Brad Wechsler | U-38 | 1382 |
| Exhibit "U-39" - email dated October 7, 2005 from Mark Welton to Ilidio Coito | U-39 | 1405 |
| Exhibit "U-40" - email dated October 7, 2005 from Ilidio Coito to Mark Welton | U-40 | 1407 |
| Exhibit "U-41" - email dated October 7, 2005 from Bill O'Malley to Mark Welton | U-41 | 1408 |
| Exhibit "U-42" - email dated October 26, 2005 from Ilidio Coito to kino@suvar.ru and aleksashin@inbox.ru | U-42 | 1409 |
| Exhibit "U-43" - email dated October 26, 2005 from John Schreiner to Ilidio Coito | U-43 | 1411 |
| Exhibit "U-44" - email dated October 27, 2005 from Ilidio Coito to John Schreiner and Mark Welton | U-44 | 1415 |
| Exhibit "U-45" - email dated November 28, 2005 from Ilidio Coito to Kinoplex Suvar | U-45 | 1419 |
| Exhibit "U-46" - email dated December 14, 2005 from Mark Welton to Karen Dinsmore | U-46 | 1422 |
| Exhibit "U-47" - email dated December 20, 2005 from Don Kane to David Brower | U-47 | 1428 |
| Exhibit "U-48" - email dated December 22, 2005 from Larry T. O'Reilly to Mark Welton | U-48 | 1429 |
| Exhibit "U-49" - email dated December 22, 2005 from Larry T. O'Reilly to Rich Gelfond and Brad Wechsler | U-49 | 1431 |
| Exhibit "U-50" - undated email to Ilidio Coito and copied to John Schreiner | U-50 | 1436 |
| Exhibit "U-51" - email dated January 19, 2006 from Ilidio Coito to John Schreiner | U-51 | 1439 |
| Exhibit "U-52" - email dated January 23, 2006 from Don Kane to David Brower | U-52 | 1440 |
| Exhibit "U-53" - email dated January 30, 2006 from John Schreiner to Mark Welton | U-53 | 1441 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-54" - email dated January 30, 2006 from Mark Welton to John Schreiner | U-54 | 1442 |
| Exhibit "U-55" - email dated April 18, 2006 from John Schreiner to Ilidio Coito | U-55 | 1445 |
| Exhibit "U-56" - email dated May 12, 2006 from Ilidio Coito to Kinoplex Suvar | U-56 | 1448 |
| Exhibit "U-57" - email dated May 18, 2006 from Ilidio Coito to Kinoplex Suvar | U-57 | 1449 |
| Exhibit "U-58" - email dated May 26, 2006 from Kinoplex Suvar to Ilidio Coito | U-58 | 1450 |
| Exhibit "U-59" - email dated May 30, 2006 from Larry T. O'Reilly to Eric Jacques | U-59 | 1451 |
| Exhibit "U-60" - email dated June 8, 2006 from John Schreiner to Ilidio Coito | U-60 | 1453 |
| Exhibit "U-61" - email dated July 12, 2006 from Ilidio Coito to Kinoplex Suvar | U-61 | 1456 |
| Exhibit "U-62" - email dated July 14, 2006 from John Schreiner to Kinoplex Suvar | U-62 | 1458 |
| Exhibit "V" – Financial Statements, released April 27, 2012 | V | 1459 |
| Exhibit "W-1" – US Settlement Notice | W-1 | 1526 |
| Exhibit "W-2" – Canadian Certification Notice | W-2 | 1456 |
| Affidavit of Frank C. Torchio, sworn May 9, 2012 | 2 | 1549 |
| Exhibit "A" – Resume | A | 1574 |
| Exhibit "B" – Price Decline Used for IMAX Common Stock Damages | B | 1583 |
| Exhibit "C" - Artificial Inflation Apportionment from February 27, 2003 to August 9, 2006 | C | 1585 |
| Exhibit "D" - IMAX Reported Daily Volume and Closing Price from February 27, 2003 to November 7, 2006 | D | 1589 |
| Exhibit "E" - IMAX Reported and Adjusted Volume for | E | 1611 |

INDEX


| | TAB | Page Number |
|---|---|---|
| Multi-Trader Model from February 27, 2003 to November 7, 2006 .......... | | |
| Exhibit "F" - IMAX Float for Multi-Trader Model from February 27, 2003 to November 7, 2006 .......... | F | 1635 |
| Exhibit "G-1" - Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for U.S. Damage Period...... | G-1 | 1657 |
| Exhibit "G-2" - Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for U.S. Damage Period and OSA Limitation for Canadian Damage Period .......... | G-2 | 1659 |
| Exhibit "G-3" - Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for NASDAQ Purchasers and OSA Limitation for TSX Purchasers .......... | G-3 | 1661 |
| Exhibit "H" - Calculation of IMAX Prejudgment Interest (US$ in millions) .......... | H | 1663 |
| Exhibit "I" - IMAX Common Stock Price from February 27, 2003 to August 9, 2006 and Summary of IMAX Damages ($US)... | I | 1665 |
| Exhibit "J" - Estimated Damages for IMAX Common Stock Purchased on the NASDAQ from February 27, 2003 to August 9, 2006 and Estimated Recovery Ratio in the U.S. Proceeding Applicable to the Canadian Damage Period .......... | J | 1667 |
| Exhibit "K" - Liability Limit for IMAX ($C) .......... | K | 1670 |

# TAB 1

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

- and –

IMAX CORPORATION, RICHARD L. GELFOND
BRADLEY J. WECHSLER, FRANCIS J. JOYCE, NEIL S. BRAUN
KENNETH G. COPLAND, GARTH M. GIRVAN, DAVID W. LEEBRON
and KATHRYN A. GAMBLE

Defendants

Proceeding under the *Class Proceedings Act*, 1992

**AFFIDAVIT OF MICHAEL G. ROBB**
**(sworn May 9, 2012)**

I, Michael G. Robb, of the City of London, in the County of Middlesex, MAKE OATH AND SAY:

1. I am a partner with Siskinds LLP ("Siskinds"), which is, with Sutts, Strosberg LLP ("Sutts, Strosberg" along with Siskinds, "Class Counsel"), co-counsel to the plaintiffs in this action (the "Plaintiffs"). I have been actively involved in the litigation of this matter from the outset. As such, I have the knowledge to which I depose herein. Where that knowledge is based on information obtained from others, I have so indicated below. I believe all of the information stated herein to be true.

2. Where, in this affidavit, I use the terms "we", "us", "our" or their derivatives, I am referring to the members of Siskinds (primarily myself and Dimitri Lascaris) and Sutts,

Strosberg (primarily William Sasso and Jay Strosberg) who have been primarily responsible for the prosecution of this action.

3. I swear this affidavit in opposition to the Defendants' motion to exclude from the class that was certified by this Court's order, dated December 14, 2009 (the "Carve-out Motion"), all persons who are bound by a final judgment approving the proposed settlement in *In re IMAX Corporation Securities Litigation*, Civil Action No.1:06-cv-06128.

## CHRONOLOGY OF THE CANADIAN ACTION

4. On September 20, 2006, the Plaintiffs commenced this action. A copy of the statement of claim issued that day is attached hereto as **Exhibit "A."**

5. On November 28, 2006, we served a notice of motion in support of the Plaintiffs' motion for leave (the "Leave Motion") to pursue the cause of action under Part XXIII.1 of the Ontario *Securities Act* (the "*OSA*").

6. On February 28, 2007, we served the Plaintiffs' motion record in support of their Leave Motion, and also in support of their certification motion ("Certification Motion") under the *Class Proceedings Act, 1992* (the "*CPA*").

7. On July 20, 2007, Imax released its Annual Report for 2006. In that document, Imax revised its revenue recognition policy such that revenue associated with theatre installations that were not complete in the fourth quarter of 2005 was deferred to later periods. As a result, Imax's net earnings for that period fell from approximately US$16.5 million to approximately US$7.8 million. A copy of Imax's Annual Report for 2006 is attached as **Exhibit "B"**.

8. On or around September 11, 2007, the Defendants served motion materials responding to the Plaintiffs' Leave and Certification Motions. The responding motion record contained, among other things, affidavits from each of Wechsler, Gelfond, Joyce, Braun, Copland, Fuchs, Girvan, Leebron, Utay and Gamble.

9. On September 18, 2007, the Plaintiffs delivered a Reply Motion Record.

10. In January 2008, the Plaintiffs delivered a supplementary motion record containing some more recent disclosures from Imax and other evidence that had come to our attention since the delivery of our earlier materials.

11. On January 31, 2008, we conducted an examination of a witness on the pending motions under rule 39.03. The witness was Lisa Coulman, the PwC partner who had been in charge of the audit of Imax's financial statements for 2005.

12. Between February 18 and March 7, 2008, we conducted cross-examinations of each of the 10 individual Defendants, as well as Denise Martin, whose affidavit was proffered by the Defendants on certain economic issues raised by the motion. In those cross-examinations, the Defendants gave certain undertakings to provide answers to a number of questions asked, but refused to answer a number of other questions. Consequently, on April 15, 2008, we argued a full day refusals motion before Justice van Rensburg.

13. Justice van Rensburg delivered her reasons for decision on the refusals motion on May 6, 2008. Those reasons are reported at [2008] OJ No 1844. The result was an order that the Defendants provide answers to a significant number of the questions in issue.

14. Following the release of the decision on the refusals motion, the Defendants served a motion for leave to appeal. That motion for leave to appeal was argued on July 7, 2008.

On July 10, 2008, Justice Langdon released his decision dismissing the motion for leave to appeal. Justice Langdon's decision is reported at [2008] OJ No 2751.

15. Following that decision, the Defendants provided responses to the questions ordered to be answered on the refusals motion. Many of those answers were provided in September 2008, and included new documents not previously produced.

16. We conducted additional cross examinations of Wechsler (October 1, 2008), Gelfond (October 3, 2008), Gamble (October 9, 2008), Joyce (October 2, 2008) and Dr. Martin (the Defendants' expert economist), on October 6, 2008.

17. The hearing of the Leave Motion concluded on December 19, 2008.

18. The reasons for decision on the Leave and Certification Motions were released on December 14, 2009. They resulted in three separate orders – an order dismissing in part the Rule 21 motion, an order granting the Certification Motion, and an order granting the Leave Motion (the "Leave Order").

19. The matter then proceeded to a motion for leave to appeal on all three orders before the Honourable Justice Corbett on July 9, 2010. Justice Corbett released his reasons for dismissing the motion for leave to appeal on February 14, 2011. Those reasons are reported at [2011] OJ no 656.

20. On February 16, 2012, the Defendants herein served an Amended Statement of Defence (though not marked as such). The only substantive change was the addition of paragraph 92, which asserts that the Plaintiffs' claim under Part XXIII.1 is barred by section 138.14 of the *OSA* following the Court of Appeal's reasons in *Sharma v. Timminco*, reported at

2012 ONCA 107. A copy of the email by which the Amended Statement of Defence was delivered is attached hereto as **Exhibit "C."**

**THE U.S. LITIGATION**

21. Imax is the subject of litigation in the United States, styled *In re IMAX Corporation Securities Litigation* and bearing court file number 06-cv-06128 (the "U.S. Litigation") which is in excess of five and a half years old. That action proposes a class period from February 27, 2003 to July 20, 2007, inclusive.

22. By reasons dated January 18, 2007, Abbey Spanier Rodd & Abrams, LLP ("Abbey") was appointed lead counsel on behalf of the first lead plaintiff, Westchester Capital. A copy of the decision appointing Abbey is attached hereto as **Exhibit "D"** which was retrieved from Westlaw.

23. The defendants in the U.S. Litigation (the "U.S. Defendants") then moved to dismiss the U.S. Litigation. By a decision rendered on September 16, 2008, that motion was dismissed. Attached hereto as **Exhibit "E"** is a copy of the opinion on that motion to dismiss which was retrieved from Westlaw.

24. Another putative member of the proposed U.S. class, Snow Capital, subsequently moved to disqualify Westchester, arguing that Westchester "lacked Article III standing at the time this litigation commenced" because it had no losses at law (Westchester conceded that it had no such losses). In reasons dated June 29, 2009, the U.S. Court found that Westchester "faces unique legal issues that other class members do not," and disqualified Westchester, appointing Snow Capital in its stead. A copy of that decision is attached hereto as **Exhibit "F"** which was retrieved from Lexis.

25. Snow Capital then moved for certification however, Snow Capital had sold all of its shares prior to many of the alleged corrective disclosures. As a result, in reasons released December 20, 2010 (a year after this Court released its certification reasons), certification of the U.S. Litigation was denied. A copy of that decision is attached hereto as **Exhibit "G"** which was retrieved from Westlaw.

26. On April 14, 2011, The Merger Fund ("Merger") was appointed lead plaintiff in the U.S. Litigation, replacing Snow Capital, and Abbey Spanier was reappointed lead plaintiff's counsel. A copy of that decision is attached hereto as **Exhibit "H"** which was retrieved from Lexis.

27. Originally, the U.S. Litigation sought certification of a global class. Following the commencement of the U.S. Litigation, the United States Supreme Court rendered its decision in *Morrison v. National Australia Bank*, and therein held in essence that the application of the U.S. civil liability regime for securities fraud (Rule 10b-5) does not apply to transactions occurring over a non-U.S. stock exchange. A copy of *Morrison* is attached hereto as **Exhibit "I"** which was retrieved from Westlaw.

28. Attached hereto as **Exhibit "J"** is a copy of the docket report for the U.S. Litigation, retrieved from Public Access to Court Electronic Records ("PACER"), an electronic public access service that allows users to obtain case and docket information from federal appellate, district and bankruptcy courts. The docket was retrieved on May 2, 2012.

29. In opposing the certification, the defendants in the U.S. Litigation filed Memorandums of Law (the "Memoranda") in which they argued, among other things, that, if any class period is certified in the U.S. Litigation, the class period should not commence prior to

the release in February 2006 of Imax's results for the year ended December 31, 2005. They argued in particular that Imax's revenues for 2002-2004 were restated for completely different reasons than revenues for fiscal years 2005 and 2006, and that the Complaint contained no allegations of scienter with respect to the overstatement of revenues for 2002-2004. Copies of these Memoranda are attached hereto as **Exhibits "K-1", "K-2"** and **"K-3"**.

30. In opposition to certification, the defendants in the U.S. Litigation also filed reports by Lucy P. Allen and Professor Poonam Puri. Copies of these reports are attached hereto as **Exhibits "L-1"** and **"L-2"**.

**THE U.S. SETTLEMENT DISCUSSIONS**

31. Based on statements made in the Amended Stipulation and Agreement of Settlement Between Settlement Class Members and Imax Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PriceWaterhouseCoopers LLP (the "Amended Stipulation"), I understand that settlement negotiations took place between Merger and the Defendants between April 2011 and November 2011.

32. We were not aware of any such negotiations until we learned of those negotiations on September 9, 2011, when counsel for Merger disclosed them to this Court during a hearing of Merger's motion for intervention.

33. We were not invited to participate in those negotiations despite the fact that our clients have been willing to participate in settlement negotiations throughout this matter. Indeed, Mr. Lascaris advises me that, promptly upon learning on September 9, 2011 of the

settlement negotiations between Merger and the Defendants, he advised counsel to the Defendants that we were prepared to participate in such negotiations on behalf of the Class.

34. I also note that all versions of the litigation plan proposed by the Plaintiffs in this action have stated that "[t]he plaintiffs will participate in mediation before a mutually acceptable mediator if the defendants are prepared to do so." A copy of the litigation plan, dated February 22, 2007, is attached hereto as **Exhibit "M."**

35. The Amended Stipulation, which was filed with the U.S. Court, states in clause BB that "from time to time, [U.S. Plaintiff's] Counsel...and Canadian Lead Counsel have made demands on Defendants, separately or globally, to settle the actions." However, we never authorized Merger or the Defendants to disclose to the Courts or to the public that we had communicated settlement offers to the Defendants.

36. A first mediation was held in this matter on December 2, 2008, and involved counsel for the Defendants in the United States and Canada, Canadian Class Counsel and then-lead plaintiffs' counsel in the U.S. Litigation, Abbey. That mediation failed.

37. Then, in early 2009, the Defendants approached us to explore settlement at a time when there was a question as to whether Westchester Capital would remain the lead plaintiff in the U.S. Litigation. This led to negotiations between us and the Defendants' Canadian and U.S. counsel in April 2009, which took place without the participation of U.S. Plaintiff's counsel, and without the assistance of a mediator. In those negotiations, the Defendants insisted upon negotiating within a range which we considered too low. The negotiations failed.

38. A second mediation took place on July 16, 2010 and involved counsel for the Defendants in the United States and Canada, Canadian Class Counsel and then-lead plaintiffs' counsel in the U.S. Litigation, Robbins Geller. That mediation also failed.

39. We learned of the proposed settlement (the "U.S. Settlement") by fax sent by R. Paul Steep, counsel to the Defendants on November 3, 2011. A copy of that letter is attached hereto as **Exhibit "N"**.

40. By email dated January 27, 2012, we were provided with copies of the U.S. Settlement documents, namely (i) the Motion For Preliminary Approval Of Class Action Settlement, Conditional Class Certification And Approval Of Notice Plan; (ii) Merger's memorandum of law in support of that motion; and (iii) the Stipulation and Agreement of Settlement Between Settlement Class Members and IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, with exhibits attached thereto. A copy of that email is attached hereto as **Exhibit "O"** along with its attachments. Pursuant to these documents, the Carve-out Motion was to precede the fairness hearing in the United States.

41. By email dated March 30, 2012, Mr. Peebles informed us that the U.S. Court had amended its order and the "Fairness Hearing has been scheduled for June 14." A copy of that email is attached hereto as **Exhibit "P"**. I understand, based on my review of the docket, that the amendment was made at the request of Merger. Attached hereto as **Exhibit "Q"** is a copy of Merger's motion for an amended ~~motion~~ order dated March 26, 2012.

NGR

**CORRESPONDENCE WITH DEFENCE COUNSEL AND COUNSEL TO THE U.S. PLAINTIFF**

42. On January 31, 2012, Mr. Lascaris sent a letter to counsel for the Defendants and counsel for Merger. A copy of that letter is attached hereto as **Exhibit "R-1."** That letter has been partially redacted to account for communications that were potentially without prejudice.

43. On February 1, 2012, we received a letter in response from Dana Peebles, counsel to the Defendants. A copy of that letter is attached hereto as **Exhibit "R-2."** On February 3, we received a letter in response from Jeffrey Leon, counsel to Merger. A copy of that letter is attached hereto as **Exhibit "R-3."**

44. On February 7, 2012 Mr. Lascaris sent letter to counsel for Merger. A copy of that letter is attached hereto as **Exhibit "R-4."** On February 8, 2012, we received a letter in response from Mr. Leon. A copy of that letter is attached hereto as **Exhibit "R-5."**

45. On February 9, 2012, Mr. Lascaris sent a letter to Richard Margolies, U.S. counsel to Merger. A copy of the February 9 letter is attached hereto as **Exhibit "R-6."** A copy of the letter attached hereto as Exhibit "R-1" was an attachment to the letter to Mr. Margolies. We have never received a response from Mr. Margolies.

46. To date, we have not been provided by either Merger, the Defendants or any other party any of the following items, all of which were requested in Mr. Lascaris' letter of January 31, 2012 (Exhibit "R-1"): the documents requested in the last sentence of paragraph 1 of that letter, and the information and documents requested in paragraphs 2, 3, 4, 5, 6, 7 and 9 of that letter.

**DOCUMENTS RELEVANT TO THE ALLEGATIONS IN THE LITIGATION**

47. As discussed above, many documents were produced by the Defendants as a result of the refusals motion held in May 2008. Those documents included:

(a) three accounting policies, dated December 1, 2004, titled "Revenue – Systems," "Revenue-System Leases" and "Revenue - System Sales" and attached hereto as **Exhibits "S-1," "S-2"** and **"S-3"**;

(b) a memorandum dated December 1, 2005 authored by Kathryn Gamble, a copy of which is attached hereto as **Exhibit "S-4"**;

(c) a memorandum dated December 7, 2005 authored by Robert D. Lister, Imax's general counsel, a copy of which is attached hereto as **Exhibit "S-5"**;

(d) a presentation dated December 7, 2005 authored by Jeffrey Vance, a copy of which is attached hereto as **Exhibit "S-6"**;

(e) a Report on Installations provided by Business Affairs Unit, a copy of which is attached hereto as **Exhibit "S-7"**;

(f) various emails sent by Mark Welton in Q4 2005 and January 2006, copies of which are attached hereto as **Exhibit "S-8"**;

(g) a letter from IMAX to the Securities Exchange Commission dated June 20, 2007, a copy of which is attached hereto as **Exhibit "S-9"**;

(h) notes, undated, titled: Lark and Kazan, attached hereto as **Exhibit "S-10"**;

(i) notes, undated, titled "McMinnville, Manila and Winnipeg," attached hereto as **Exhibit "S-11"**; and

(j) minutes of a Meeting of the Board of Directors of Imax Corporation, held on March 8, 2006, attached hereto as **Exhibit "S-12"**;

48. A portion of the transcript of the examination of Lisa Coulman, taken January 31, 2008, is attached hereto as **Exhibit "T-1."**

49. A portion of the transcript of the examination of Bradley J. Wechsler, taken February 28, 2008, is attached hereto as **Exhibit "T-2."**

50. Certain answers to undertakings given in the examination of Neil Braun, held February 28, 2008, are attached hereto as **Exhibit "T-3."**

51. Additionally, we received 21,329 documents from the Defendants on March 30, 2012. We received an index to those documents on April 11, 2012. We understand that these 21,329 documents were all produced to Merger prior to execution of the Stipulation of Settlement.

52. To date, we have not received affidavits of documents from any Defendant other than Imax. We received Imax's affidavit of documents, which was sworn by G. Mary Ruby, the Chief Administrative Officer and Corporate Secretary of Imax, on May 9, 2012.

53. The following documents, which we did not have access to prior to the leave motion, are included in the 21,329 documents produced to us by Imax on March 30, 2012:

(a) an email, dated December 17, 2001, from Marnie Hamilton to Kathryn Gamble, et al., attached hereto as **Exhibit "U-1"**;

(b) an email, dated June 19, 2004, from Jim Patterson to Marnie Hamilton, attached hereto as **Exhibit "U-2"**;

(c) a report, dated November 5, 2004, titled "Research Report, Imax Corporation (IMAX)," attached hereto as **Exhibit "U-3"**;

(d) an email, dated January 9, 2005, from Mark Welton to Loron Orris, et al., attached hereto as **Exhibit "U-4"**;

(e) a Presentation, dated February 2005, titled "Imax Corporation, Discussion Materials," attached hereto as **Exhibit "U-5"**;

(f) an email, dated March 30, 2005, from Ilidio Coito to Rafal Rybski, et al., attached hereto as **Exhibit "U-6"**;

(g) an email, dated April 5, 2005, from Frank Joyce to Bill O'Malley, attached hereto as **Exhibit "U-7"**;

(h) an email, dated July 12, 2005, from Gary Harbison to Don Kane, et al., attached hereto as **Exhibit "U-8"**;

(i) an email, dated July 12, 2005, from Mark Welton to Brad Wechsler, et al., attached hereto as **Exhibit "U-9"**;

(j) an email, dated July 24, 2005, from Mark Welton to Richard Wooland, et al., attached hereto as **Exhibit "U-10"**;

(k) an email, dated November 3, 2005, from Mark Welton to Don Kane, et al., attached hereto as **Exhibit "U-11"**;

(l) an email, dated November 14, 2005, from Don Savant to Huang Ke, et al., attached hereto as **Exhibit "U-12"**;

(m) an email, dated December 8, 2005, from Mark Welton to Don Kane, attached hereto as **Exhibit "U-13"**;

(n) an email, dated December 21, 2005, from Glenn Pederson to Don Kane, attached hereto as **Exhibit "U-14"**;

(o) an email, dated December 22, 2005, from Mark Welton to Larry O'Reilly, et al., attached hereto as **Exhibit "U-15"**;

(p) an email, dated December 31, 2005, from Ilidio Coito to Don Kane, attached hereto as **Exhibit "U-16"**;

(q) a Memorandum, dated January 16, 2006, titled "Q3 installation of Delhi (AEZ)," attached hereto as **Exhibit "U-17"**;

(r) an email, dated January 19, 2006, from Don Kane to Ilidio Coito, attached hereto as **Exhibit "U-18"**;

(s) an email, dated January 19, 2006, from Ilidio Coito to Lac Nguyen, et al., attached hereto as **Exhibit "U-19"**;

(t) an email, dated January 27, 2006, from Mark Welton to Don Kane, et al., attached hereto as **Exhibit "U-20"**;

(u) an email, dated January 30, 2006, from Don Kane to Ilidio Coito, et al., attached hereto as **Exhibit "U-21"**;

(v) an email, dated February 21, 2006, from Jeffrey Vance to Frank Joyce, et al., attached hereto as **Exhibit "U-22"**;

(w) a presentation, dated March 1, 2006, titled "Auditor's Preliminary Report to the Audit Committee for the year ended December 31, 2005," attached hereto as **Exhibit "U-23"**;

(x) a list, dated March 7, 2006, titled "Proposed Media Strategy," attached hereto as **Exhibit "U-24"**;

(y) an email, dated May 10, 2006, from Rafa Rybski to Ilidio Coito, attached hereto as **Exhibit "U-25"**;

(z) an email, dated May 17, 2006, from Kathryn Gamble to Edward MacNeil, et al., attached hereto as **Exhibit "U-26"**;

(aa) an email, dated June 2, 2006, from Mark Welton to Bill O'Malley, et al., attached hereto as **Exhibit "U-27"**;

(bb) an email, dated June 21, 2006, from Huang Ke to Richard Wooland, et al., attached hereto as **Exhibit "U-28"**;

(cc) a chronology, dated January 2005 through September 1, 2006, titled "Question 10: General Chronology," attached hereto as **Exhibit "U-29"**;

(dd) a letter, dated July 2, 2007, from Edward MacNeil to Angela Crane (SEC), with attachments, attached hereto as **Exhibit "U-30"**;

(ee) a presentation, dated July 19, 2007, titled "Imax Corporation, Q4 2006 Review Package to the Audit Committee," attached hereto as **Exhibit "U-31"**;

(ff) notes, undated, titled "PWC Current Position," attached hereto as **Exhibit "U-32"**;

(gg) notes, undated, titled "Beijing Radio and Film and Beijing SUC," attached hereto as **Exhibit "U-33"**;

(hh) a chart, undated, titled "Information Request," attached hereto as **Exhibit "U-34"**;

(ii) An email dated August 2, 2005 from John Schreiner to Mark Welton, attached hereto as **Exhibit "U-35"**;

(jj) An email dated September 7, 2005 from James A. Skinner to kino@suvar.ru, attached hereto as **Exhibit "U-36"**;

(kk) An email dated October 4, 2005 from John Schreiner to Ilidio Coito, attached hereto as **Exhibit "U-37"**;

(ll) An email dated October 4, 2005 from Mark Welton to Brad Wechsler and others, attached hereto as **Exhibit "U-38"**;

(mm) An email dated October 7, 2005 from Mark Welton to Ilidio Coito, attached hereto as **Exhibit "U-39"**;

(nn) An email dated October 7, 2005 from Ilidio Coito to Mark Welton, attached hereto as **Exhibit "U-40"**;

(oo) An email dated October 7, 2005 from Bill O'Malley to Mark Welton, attached hereto as **Exhibit "U-41"**;

(pp) An email dated October 26, 2005 from Ilidio Coito to kino@suvar.ru and aleksashin@inbox.ru, attached hereto as **Exhibit "U-42"**;

(qq) An email dated October 26, 2005 from John Schreiner to Ilidio Coito, attached hereto as **Exhibit "U-43"**;

(rr) An email dated October 27, 2005 from Ilidio Coito to John Schreiner and Mark Welton, attached hereto as **Exhibit "U-44"**;

(ss) An email dated November 28, 2005 from Ilidio Coito to Kinoplex Suvar, attached hereto as **Exhibit "U-45"**;

(tt) An email dated December 14, 2005 from Mark Welton to Karen Dinsmore, attached hereto as **Exhibit "U-46"**;

(uu) An email dated December 20, 2005 from Don Kane to David Brower, attached hereto as **Exhibit "U-47"**;

(vv) An email dated December 22, 2005 from Larry T. O'Reilly to Mark Welton, attached hereto as **Exhibit "U-48"**;

(ww) An email dated December 22, 2005 from Larry T. O'Reilly to Rich Gelfond and Brad Wechsler, attached hereto as **Exhibit "U-49"**;

(xx) An undated email to Ilidio Coito and copied to John Schreiner, attached hereto as **Exhibit "U-50"**;

(yy) An email dated January 19, 2006 from Ilidio Coito to John Schreiner, attached hereto as **Exhibit "U-51"**;

(zz) An email dated January 23, 2006 from Don Kane to David Brower, attached hereto as **Exhibit "U-52"**;

(aaa) An email dated January 30, 2006 from John Schreiner to Mark Welton, attached hereto as **Exhibit "U-53"**;

(bbb) An email dated January 30, 2006 from Mark Welton to John Schreiner, attached hereto as **Exhibit "U-54"**;

(ccc) An email dated April 18, 2006 from John Schreiner to Ilidio Coito, attached hereto as **Exhibit "U-55"**;

(ddd) An email dated May 12, 2006 from Ilidio Coito to Kinoplex Suvar, attached hereto as **Exhibit "U-56"**;

(eee) An email dated May 18, 2006 from Ilidio Coito to Kinoplex Suvar, attached hereto as **Exhibit "U-57"**;

(fff) An email dated May 26, 2006 from Kinoplex Suvar to Ilidio Coito, attached hereto as **Exhibit "U-58"**;

(ggg) An email dated May 30, 2006 from Larry T. O'Reilly to Eric Jacques, attached hereto as **Exhibit "U-59"**; MGR

(hhh) An email dated June 11, 2006 from John Schreiner to Ilidio Coito, attached hereto as **Exhibit "U-60"**;

(iii)An email dated July 12, 2006 from Ilidio Coito to Kinoplex Suvar, attached hereto as **Exhibit "U-61"**; and

(jjj)An email dated July 14, 2006 from John Schreiner to Kinoplex Suvar, attached hereto as **Exhibit "U-62"**.

**IMAX'S INSURANCE AND FINANCIAL POSITION**

54. Imax described its insurance coverage in the Proxy Circular dated March 9, 2006 :

> As contemplated under Section 124 of the Canada Business Corporations Act, the Company has acquired insurance coverage with a yearly limit of $70,000,000 in respect of potential claims against its directors and officers and in respect of losses for which the Company may be required or permitted by law to indemnify such directors and officers. The insurance, in respect of which a $863,953 yearly premium was paid by the Company, includes a $100,000 deductible for each claim under the policy other than claims made under U.S. securities law as to which a deductible of $500,000 applies

55. We have requested copies of Imax's insurance policies responsive to this litigation. We understand that copies will be provided shortly.

56. Imax released its latest financial statements on April 27, 2012. A copy of those financial reports are attached hereto as **Exhibit "V"**.

**CLASS NOTICE**

57. I am informed by Nicole Young, a clerk at Siskinds, that she advised the Defendants on April 24 that the notice in this action would run in media outlets on April 27. Counsel for the Defendants did not advise Ms. Young when they would run notice regarding the U.S. Settlement.

58. On April 26, 2012, notice of the U.S. Settlement ran in media outlets. A copy of that notice is attached hereto as **Exhibit "W-1."** A copy of the notice in this action is attached as **Exhibit "W-2."**

SWORN BEFORE ME at the City of London, in the County of Middlesex, on May 9, 2012.

Commissioner for Taking Affidavits

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Michael G. Robb

# EXHIBIT A

This is Exhibit "A" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

[illegible]

000021

Court file # CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**

BETWEEN

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

and

IMAX CORPORATION, RICHARD L GELFOND, BRADLEY J WECHSLER and FRANCIS T JOYCE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**STATEMENT OF CLAIM**

TO THE DEFENDANTS

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiffs The claim made against you is set out in the following pages

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a statement of defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the plaintiffs' lawyers or, where the plaintiffs do not have a lawyer, serve it on the plaintiffs, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this statement of claim is served on you, if you are served in Ontario

If you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your statement of defence is forty days If you are served outside Canada and the United States of America, the period is sixty days

Instead of serving and filing a statement of defence, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure This will entitle you to ten more days within which to serve and file your statement of defence

000021A



IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE

Date September 20, 2006

Issued by R. SCOZZARI
Registrar

Address of Court Office
7755 Hurontario Street
Brampton ON L6W 4T6

TO
IMAX CORPORATION
2525 Speakman Drive
Mississauga, ON L5K 1B1

AND TO
RICHARD L GELFOND
1120-5th Avenue
Apt 11A
New York, NY 10128

AND TO
BRADLEY J WECHSLER
784 Park Avenue
Apt 7B
New York, NY 10021

AND TO
FRANCIS T JOYCE
110 East 59th Street
Suite 2100
New York, NY 10022

## CLAIM

**DEFINITIONS**

1 The following definitions apply for the purpose of this statement of claim

(a) "*Act*" means the *Securities Act*, R S O 1990 c S 5, as amended,

(b) "**Annual Report**" means **Imax's** annual report for the year ended December 31, 2005, which contained **Imax's** management's discussion and analysis and audited annual financial statements for the same period,

(c) "*CJA*" means the *Courts of Justice Act*, R S O 1990, c C 43, as amended,

(d) "**Class**" or "**Class Members**" means all persons, other than **Excluded Persons**, who acquired securities of **Imax** during the **Class Period**, or such other definition as may be approved by the court,

(e) "**Class Period**" means the period from and including February 17, 2006 to and including the close of the financial markets on August 9, 2006,

(f) "**Cliff**" means the plaintiff, Cliff Cohen,

(g) "*CPA*" means the *Class Proceedings Act, 1992*, S O 1992 c 6, as amended,

(h) "**Excluded Persons**" means **Imax's** subsidiaries, officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any member of the **Individual Defendants'** and the **Proposed Defendants'** families and any entity in which any of them has or had any interest,

(i) "**February Press Release**" means the press release dated and released on February 17, 2006 by **Imax**,

(j) "**Form 10-K**" means **Imax's** Form 10-K for the fiscal year ended December 31, 2005, which was required to be filed with the **SEC** under *the United States Securities and Exchange Act of 1934*, and which included the **Annual Report**,

(k) "**GAAP**" means generally accepted accounting principles,

(l) **"Gelfond"** means the defendant, Richard L Gelfond,

(m) **"Imax"** means the defendant, Imax Corporation,

(n) **"Individual Defendants"** means the defendants, **Gelfond, Joyce** and **Wechsler**,

(o) **"Joyce"** means the defendant, Francis T Joyce,

(p) **"NASDAQ"** means the electronic screen-based equity securities market that is based in New York, New York,

(q) **"Neil"** means the plaintiff, Neil Silver,

(r) **"OSC"** means the Ontario Securities Commission, the regulator of the capital markets in Ontario,

(s) **"Proposed Defendants"** means Neil S Braun, Kenneth G Copland, Michael Fuchs, Garth M Girvan, David W Leebron and Marc A Utay, each of whom was a member of **Imax's** Board of Directors at all material times, and Kathryn A Gamble, who was **Imax's** Vice-President, Finance and Controller at all material times,

(t) **"Representation"** means the statement explicitly and/or implicitly contained in the **February Press Release** and expressly repeated in the **Form 10-K** and **Annual Report**, that **Imax's** revenue for the 2005 fiscal year were reported in accordance with **GAAP** and that such revenues met or exceeded the earnings guidance previously issued by **Imax**,

(u) **"SEC"** means the Securities and Exchange Commission, the principal regulator of the United States capital markets,

(v) **"SEDAR"** means the system for electronic document analysis and retrieval of the Canadian securities administrators,

(w) **"TSX"** means the Toronto Stock Exchange, and

(x) **"Wechsler"** means the defendant, Bradley J Wechsler

2 NEIL and CLIFF claim on their own behalf and on behalf of the other Class Members

(a) an order pursuant to the *CPA* certifying this action as a class proceeding and appointing Neil and Cliff as the representative plaintiffs,

(b) a declaration that the defendants made the Representation, and that the Representation was untrue, inaccurate and misleading when made,

(c) a declaration that the defendants made the Representation negligently or alternatively, recklessly, caring not whether it was true or false,

(d) a declaration that the defendants conspired each with the other, and with persons unknown, to deceive Neil, Cliff and the other Class Members for the purposes of maintaining and increasing the price of the Imax shares,

(e) a declaration that Imax is vicariously liable for the acts and/or omissions of the Individual Defendants,

(f) leave to amend this statement of claim to assert the causes of action pursuant to s 138 3 of the *Act* and to add the Proposed Defendants as defendants in the action,

(g) special damages, general damages, and the costs of administering the plan of distribution of the recovery in this action in the sum of $200 million or such other sum as this court finds appropriate at the trial of the common issues or at a reference or references,

(h) punitive damages in the amount of $10 million,

(i) an order directing a reference or giving such other directions as may be necessary to determine issues not determined in the trial of the common issues,

(j) prejudgment interest and postjudgment interest, compounded, or pursuant to ss 128 and 129 of the *CJA*,

(k) costs of this action on a substantial indemnity basis or in an amount that provides full indemnity plus, pursuant to s 26(9) of the *CPA*, the costs of notice and of administering the plan of distribution of the recovery in this action plus applicable taxes, and

(l) such further and other relief as to this Honourable Court seems just

**THE NATURE OF THE ACTION**

3 Imax is a publicly-traded company Its shares trade on the TSX and the NASDAQ under the symbols IMX TO and IMAX, respectively

4 Throughout the Class Period, Imax and the Individual Defendants made the Representation The Representation was made in, among other documents, the Annual Report, the February Press Release and the two Imax press releases dated March 9, 2006

5 Neil and Cliff seek damages in an amount equal to the losses they and the other Class Members suffered as a result of purchasing Imax securities during the Class Period

THE PLAINTIFFS

6 Neil resides in the City of Windsor, in the Province of Ontario Neil continues to hold the 1000 shares of Imax he purchased on the TSX Particulars of his purchases follow

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| July 31, 2006 | 500 | Purchase | $11 87 | $5961 10 |
| August 9, 2006 | 500 | Purchase | $10 84 | $5446 10 |

7 Cliff resides in the City of Toronto, in the Province of Ontario Cliff sold the 300 shares of Imax he purchased on the TSX after the Class Period Cliff lost $1968 Particulars of his trades follow

| Date | Number of Shares | Purchase/Sale | Cost per Share | Total Cost/Proceeds |
|---|---|---|---|---|
| August 1, 2006 | 300 | Purchase | $12 03 | $3638 |
| August 28, 2006 | 300 | Sale | $5 47 | $1670 |

**THE DEFENDANTS**

8 Imax is a corporation incorporated pursuant to the laws of Canada It is headquartered in Mississauga, Ontario, but it also has offices in New York, New York Imax is a reporting issuer in British Columbia, Alberta, Saskatchewan, Manitoba, Ontario, Quebec, New Brunswick, Nova Scotia, Prince Edward Island, and Newfoundland

9 Gelfond was at all material times, and continues to be, the Co-Chairman of Imax's Board of Directors, and its Co-Chief Executive Officer Gelfond is a significant shareholder in Imax

10 Wechsler was at all material times, and continues to be, the Co-Chief Executive Officer of Imax and a member of its Board of Directors Wechsler is a significant shareholder in Imax

11 Joyce was at all material times Imax's Chief Financial Officer He resigned from that position on August 21, 2006 Joyce is a significant shareholder in Imax

12 By virtue of their positions as senior officers and/or directors of Imax, the Individual Defendants had actual, implied or apparent authority to act and speak on Imax's behalf prior to and during the Class Period

000024A



IMAX'S BUSINESS

13 Imax was founded in Toronto in 1967 Since then, it has carried on business in the large-format film industry as a manufacturer of specialty projection and sound systems and a significant producer and distributor of 15/70-format films for large-format theatres around the world

14 A large part of Imax's revenues come from the sale, lease and installation of theatre systems, which include multiple technical elements, including specialized projection equipment, specialty screens, theater automation control systems and film handling equipment Each of these elements, while technically distinct, is essential to the functionality of the end product that Imax contracts to deliver to its customers Without each of those elements, Imax's customers do not have the use of the product that Imax has contracted to deliver

15 Imax also derives revenues from the licensing of related film products to the IMAX theatre network, post-production services for large-format films and from its owned and operated theatre operations Imax conducts business from its headquarters in Mississauga, Ontario and its offices in New York, New York

IMAX'S DISCLOSURE OBLIGATIONS

16 Imax is a reporting issuer in Ontario and as such, is required to file and deliver to its shareholders audited, annual, comparative financial statements prepared in

accordance with GAAP Pursuant to s 78 of the *Act*, these statements must be filed with the OSC and delivered each year within 140 days of the end of the year to which the statements relate

17 Pursuant to s 77 of the *Act*, Imax is required to file with SEDAR and deliver to its shareholders quarterly interim financial statements prepared in accordance with GAAP These statements must include a comparative statement to the corresponding period in the previous year

**THE BACKGROUND**

18 On March 10, 2005, Imax published a press release in which it estimated that its 2005 earnings, calculated in accordance with GAAP, would be $0 35 to $0 38 per share, an increase from its earlier estimates of $0 32 per share

19 In November 2005, Imax reported its financial results for the third quarter of fiscal 2005 The results did not meet the expectations of Imax's then current and potential security-holders, and the price of Imax shares declined accordingly The poor financial results arose in part from Imax's inability to install its high-tech cinemas on a timely basis The financial results disclosed that Imax had only installed seven new systems during that quarter, which was less than had been anticipated

**THE RELEASE OF THE MISLEADING REPRESENTATION**

*THE FEBRUARY PRESS RELEASE*

20 On February 17, 2006, Imax issued the February Press Release and filed it with SEDAR and the SEC

21 In the February Press Release, Imax announced that

(a) it expected to meet or exceed its previously issued guidance of $0 35-$0 38 US in net earnings per share for fiscal 2005, and

(b) it had successfully completed 14 theatre system installations in the fourth quarter of 2005, and that the installation of those systems *"underlines the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues "*

22 Each of the Individual Defendants authorized, permitted and/or acquiesced in the publication of the February Press Release

23 The February Press Release was materially false and/or materially misleading when made Imax's statement that it expected to meet or exceed 2005 earnings guidance was premised upon its recognition of revenue in relation to ten theatre installations that were not scheduled to open until the first or second quarter of 2006, seven of which were not even completed until 2006 As alleged more particularly below, the practice of recognizing revenue in relation to those unopened and uncompleted theatre installations violated GAAP and failed to fairly present the financial performance of Imax

24 On the day the February Press Release was issued, Imax's share price increased by 9% Imax's share price continued to rise dramatically after the February Press Release was issued On March 8, 2006, at the close of the financial markets, Imax's share price closed at $11 00 CDN and $9 50 USD on the TSX and NASDAQ, respectively, an increase of 20% and 21 5% from February 16, 2006

*THE ANNUAL REPORT*

25 On March 9, 2006, Imax issued its Annual Report On or about March 9, 2006, in accordance with its obligation pursuant to s 78 of the *Act*, Imax filed its Form 10-K with SEDAR and the SEC

26 The Individual Defendants signed the Form 10-K certifying that the Annual Report contained therein presented fairly, in all material respects, Imax's financial condition and results of operations

27 Imax claimed in the Annual Report that it had exceeded its 2005 financial guidance In particular, Imax stated that it had

(a) revenue of $49,310,000 for the fourth quarter of fiscal 2005,

(b) revenue of $144,930,000 for the fiscal year 2005,

(c) diluted net earnings of $0 29 per share for the fourth quarter of fiscal 2005 (a purported increase of 54% compared to the same period in the previous fiscal year),

(d) diluted net earnings of $0 40 per share for fiscal 2005 (a purported increase of 62% compared to the previous fiscal year), and

(e) revenues from Imax systems of $97,753,000

28 The management's discussion and analysis contained in the Annual Report also stated that Imax had installed ten theatre systems in 2005 and that the theatres were scheduled to open in the first and second quarters of 2006 These ten theatre systems were among fourteen reported in revenue for 2005 It further stated that these systems were not included in either the open theatre network base or Imax's backlog figures The Annual Report described Imax's sales backlog as follows

> The Company lists signed contracts for theatre system sales and sale-type leases as sales backlog prior to the time of revenue recognition *Sales backlog represents the total value of all signed system sales and lease agreements that are expected to be recognized as revenue in the future* and includes initial rental fees along with the present value of contractual minimum rents due over the lease term, but excludes maintenance revenues as well as rents in excess of contractual minimums that might be received in the future [Emphasis added ]

29 For accounting purposes, Imax treats its sales and installations of theatres as "multiple element arrangements" The financial statements and management's discussion and analysis contained in the Annual Report included the following statement as to Imax s revenue recognition practices

> The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions
>
> When the elements of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value Revenue allocated to an individual element is

fair value Revenue allocated to an individual element is

recognized when revenue recognition criteria for that element is met

[ ]

The Company recognizes revenue from sales and sales type leases when the installation of the respective theatre system element is substantially complete and all of the following criteria are met persuasive evidence of an agreement exists, the price is fixed or determinable, and collection is reasonably assured

30 GAAP defines multiple element arrangements and specifies when revenue may be recognized in respect of such arrangements Revenue arising from multiple element arrangements can only be recognized when

(a) revenue arrangements with multiple deliverables can be divided into separate units of accounting,

(b) persuasive evidence of an arrangement exists,

(c) the risks and rewards of ownership have been transferred to the buyer of the goods,

(d) delivery has occurred or services have been rendered,

(e) the seller's price to the buyer is fixed or determinable, and

(f) collection is reasonably assured

31 GAAP provides that revenue arrangements with multiple deliverables can be divided into separate units of accounting where

(a) the delivered element has value to the customer without the undelivered element such that it could be sold by or generate revenue for the customer without the undelivered element,

(b) where the undelivered element is not essential to the function of the delivered element,

(c) there is objective and reliable evidence of the fair value of the undelivered item or items, and,

(d) if the arrangement includes a general right of return of the delivered item, the delivery or performance of the undelivered item is probable and substantially within the control of the vendor

32 If, under the foregoing rules, revenue may be recognized in relation to delivered elements, GAAP also requires the supplier to consider whether the value of the delivered elements allocable to the delivered item(s) is contingent upon the delivery of additional items, or meeting other specified performance conditions

33 The Individual Defendants' certifications and the revenue statements and figures contained in the Annual Report were false and/or materially misleading In violation of GAAP, Imax had improperly recognized revenue in the fourth quarter of fiscal 2005 on ten theatre installations in theatres that did not open in that quarter and, in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed Insofar as Imax sold complete theatre systems, which comprised separate but integrated components, revenues should not have been recorded until the completion of each system Imax's application of multiple element revenue accounting did not fairly present Imax's 2005 financial results and was not consistent with prior years' accounting practices The application of multiple element revenue accounting resulted in overstated revenues, gross earnings, net earnings, retained earnings and earnings per share as report in Imax's 2005 annual financial statements

*THE MARCH 9, 2006 PRESS RELEASES*

34 On March 9, 2006, in conjunction with the release of the Annual Report, the defendants issued and filed a press release with SEDAR and the SEC

35 The March 9, 2006 press release repeated the materially false and/or materially misleading financial results reported in the February Press Release and in the Annual Report In particular, the March 9, 2006 press release repeated Imax's artificially inflated 2005 earnings per share of US$0 40

36 In addition, Gelfond and Wechsler stated in the March 9, 2006 press release that they "*believe our performance in 2005 demonstrates the increasing acceptance of Imax as a commercial destination for mainstream entertainment*"

37 The foregoing statements were false and or materially misleading when made, inasmuch as Imax's "*performance in 2005*" had been materially overstated due to the improper recognition of revenues in violation of GAAP

38 On March 9, 2006, Imax issued a second press release announcing that

(a) its board of directors had begun a process to "*explore strategic alternatives to enhance shareholder value*," including the sale or merger of the company with another entity offering strategic opportunities for growth,

(b) it had retained Allen & Company and UBS Investment Bank as financial advisors in this process, and

(c) Gelfond and Wechsler thought that as a result of "*solid fiscal 2005 results and compelling growth opportunities*" it was an ideal time to explore options

39 The second March 9, 2006 press release was false and/or materially misleading, inasmuch as Imax's "*solid fiscal 2005 results*" had been materially overstated due to the improper recognition of revenues in violation of GAAP

40 On March 9, 2006, Imax's share price closed on the TSX at $11 94 CDN and $10 35 USD on the NASDAQ, an 8% increase Imax's share price increased in the following days On March 13, 2006, Imax's share price closed on the TSX at $12 56 CDN and $10 85 USD on the NASDAQ, a 14% and 19% increase, respectively, from March 8, 2006

**THE TRUTH IS REVEALED**

41 On August 9, 2006, after the financial markets closed, Imax issued a press release announcing for the first time that

(a) it was in the process of responding to an informal inquiry from the SEC regarding its revenue recognition practices, including its application of multiple element arrangement revenue accounting to the sale of theatre systems,

(b) it had been unsuccessful to date in its efforts to find an acquirer or merger partner, and

(c) it had identified a material weakness in its internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of fiscal 2006, resulting in a negative adjustment of $0 8 million to its consolidated statement of operations for second quarter of fiscal 2006

42 The August 9, 2006 press release also revealed that under Imax's multiple element arrangement accounting, revenues associated with different elements of a theatre system contract are segregated and can be recognized in different periods That press release also stated that Imax had

> *recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of system was deferred until the final screen was installed " Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006 and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006 The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed*

43 The August 9, 2006 press release was filed with SEDAR and the SEC

44 On August 10, 2006, as a result of the announcement in the August 9, 2006 press release, the price of Imax's shares plummeted and closed at $6 44 CDN on the TSX and $5 73 USD on the NASDAQ, a drop of 40 2% and 40 5%, respectively, from the previous day

**THE SUBSEQUENT EVENTS**

45 On August 21, 2006, Imax issued a press release announcing that Joyce was resigning from his position as Chief Financial Officer of Imax in order "*to pursue other professional opportunities*"

46 The average closing price of Imax's shares over the ten trading days following the issuance of the August 9, 2006 press release was $6 25 CDN on the TSX

following the issuance of the August 9, 2006 press release was $6 25 CDN on the TSX

and $5 58 USD on the NASDAQ This constituted a decrease of 41% and 42%, respectively, from the closing price of Imax shares on August 9, 2006

**THE CONSPIRACY**

47 From on or about October 1, 2005 to on or about August 9, 2006, at Mississauga, Ontario, New York, New York and elsewhere, Imax, its servants and agents and the Individual Defendants, wrongfully, unlawfully, maliciously and lacking bona fides, agreed together, the one with the other and with persons unknown to, among other things, overstate the revenues and net earnings of Imax for the fourth quarter and fiscal year ended on December 31, 2005

48 Some, but not all of the defendants' predominant purposes, concerns and motivation were to

(a) attract an acquirer or merger partner,

(b) inflate the price of Imax's shares,

(c) obtain an artificially high purchase price of Imax, and

(d) increase the value of their own holdings in Imax

49 In furtherance of the conspiracy, the following are some, but not all of the acts carried out by the defendants, or some of them

(a) they recognized revenue in the fourth quarter of 2005 on ten theatre systems even though sufficient and appropriate evidence did not exist that such systems had been substantially installed as operational Imax facilities, that Imax had fulfilled its obligations as vendor or that revenues had been "earned" in accordance with GAAP,

(b) they inappropriately implemented revenue recognition procedures that allowed Imax to segregate revenues from different elements of an Imax theatre system, and recognize those revenues in different quarters, even though the customer transactions were not suited to such accounting treatment,

(c) they deviated from GAAP in the preparation of the financial statements,

(d) they deviated from the accounting principle of consistency in the preparation of financial statements,

(e) they authorized statements, announcements, press releases, filings and other public documents containing the Representation,

(f) they permitted Imax and the Individual Defendants to make the Representation which was false,

(g) they made, or failed to take any steps to prevent Imax from making, the Representation in statements, announcements, press releases, filings and other public documents,

(h) they made, or caused Imax to make, announcements about its revenue and net earnings when they knew there was no reasonable foundation, in fact, for these net earnings,

(i) they falsely stated that Imax had revenue of $49,310,000 for the fourth quarter of the fiscal year ended 2005,

(j) they falsely stated that Imax had revenue of $144,930,000 for the fiscal year ended 2005,

(k) they prepared and issued the February Press Release falsely stating that it expected to meet or exceed 2005 earnings guidance,

(l) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's revenue was $49,310,000 for the fourth quarter of fiscal 2005, and

(m) they prepared and issued the Form 10-K and the Annual Report falsely stating that Imax's net earning was $0.29 per share for the fourth quarter of fiscal 2005 and $0.40 per share for the fiscal year 2005

50 The conspiracy was unlawful because the defendants knowingly and intentionally overstated the revenue and net earnings of Imax and in doing so violated

the *Act* and similar regulatory legislation in other jurisdictions and the reporting requirements of the TSX and the NASDAQ

51 The conspiracy was directed towards Neil, Cliff and the other Class Members The defendants knew in the circumstances that the conspiracy would, and it did, cause loss to Neil, Cliff and the Class Members

**THE EFFICIENT MARKETS**

52 The price of Imax's publicly-traded securities is directly impacted by Imax's periodic disclosures regarding its business and affairs The defendants were at all material times aware of the effect of Imax's disclosures upon the price of its publicly-traded securities

53 The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases, each of which contained the Representation, were filed with SEDAR, the SEC, the TSX and NASDAQ and thereby became immediately available to and were reproduced for inspection by the Class Members, the public and the financial press through the internet and financial publications

54 Imax routinely transmitted the documents referred to in paragraph 49 above to the financial press and certain prospective and actual security-holders of Imax

55 Imax regularly communicated with the public investors via established market-communication mechanisms, including through regular disseminations of press releases on newswire services in Canada and the United States The price of Imax's publicly-traded securities were directly impacted each time Imax communicated to public investors

56 Imax was the subject of analysts reports that incorporated the material elements of the documents referred to in paragraph 53 above, with the effect that any recommendation in such reports was based, in whole or in part, upon material over-statements of Imax's financial results Each analyst report written about Imax and released to the public directly impacted the price of Imax's publicly-traded securities

57 Imax securities were and are traded on the TSX and the NASDAQ, both of which are highly efficient and automated markets that promptly incorporate into the price of Imax's shares all material information disseminated to the public, including the documents referred to in paragraph 53 above, by Imax and/or its officers, directors and employees

**NEGLIGENCE**

58 Imax and the Individual Defendants owed a duty to Neil, Cliff and the Class Members, at law and under the provisions of the *Act*, to disseminate promptly, or to ensure the prompt dissemination of complete and accurate statements regarding Imax's business and affairs, and promptly to correct previously-issued, materially

inaccurate information, so that the price of Imax's publicly-traded securities was based upon complete and accurate information

59 The reasonable standard of care expected in the circumstances required the defendants to act fairly, reasonably, honestly, candidly and in the best interests of Neil, Cliff and the other Class Members

60 The defendants failed to meet the standard of care required for the reasons particularized in the following paragraphs

61 The defendants were negligent in that

(a) they failed to exercise the degree of care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances as required by law,

(b) they signed the Form 10-K and the Annual Report when they knew or reasonably ought to have known that the documents contained the Representation which was false,

(c) they authorized statements, announcements, press releases, filings and other public documents containing the Representation,

(d) they failed to maintain appropriate internal policies and procedures to ensure that the financial statements adequately and fairly presented the financial position of Imax,

(e) they knew or ought to have known that the 2006 reported revenue, gross earnings, net earnings, retained earnings and earnings per share of Imax were not fairly stated,

(f) they failed to properly consider all available information and reports respecting the revenue and net earnings of Imax, and

(g) they failed to comply with the principles of GAAP, such as the following

(i) interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements,

(ii) financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions,

(iii) financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources,

(iv) financial reporting should provide information about an enterprise's financial performance during a period,

(v) completeness, meaning that relevant information necessary to ensure the fair presentation of underlying events and conditions is provided,

(vi) consistency in the application of financial accounting and reporting policies,

(vii) financial reporting should be reliable in that it represents what it purports to represent, and

(viii) conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered

**NEGLIGENT AND FRAUDULENT MISREPRESENTATION**

62 The February Press Release, the Form 10-K, the Annual Report and the March 9, 2006 press releases were prepared, in part, for the purpose of attracting investment and with the intention that members of the investing public would rely upon the documents in making the decision to purchase Imax securities

63 Each of the documents referred to in paragraph 62 above contained the Representation The Representation was untrue, inaccurate and misleading

64 The defendants knew that by making the Representation, the price of Imax's publicly-traded securities would rise and remain at artificially high levels and that investors would rely upon the Representation in making their decisions to purchase Imax shares

65 Imax made the Representation by issuing the

(a) February Press Release,

(b) Form 10-K,

(c) Annual Report, and

(d) March 9, 2006 press releases

66 The Individual Defendants made the Representation by

(a) authorizing, permitting and/or acquiescing in the February Press Release,

(b) authorizing, permitting and/or acquiescing in and signing the Form 10-K,

(c) authorizing, permitting and/or acquiescing in the Annual Report, and

(d) authorizing, permitting and/or acquiescing in the March 9, 2006 press releases

67 The defendants made the Representation negligently or, alternatively, recklessly, caring not whether it was true or false, intending that Neil, Cliff and the other Class Members would rely upon it, which they did to their detriment by purchasing Imax securities during the Class Period and holding the securities beyond the Class Period

securities during the Class Period and holding the securities beyond the Class Period

68 Neil, Cliff and each other Class Members relied upon the Representation when he, she or it purchased Imax securities

69 Neil, Cliff and each other Class Member suffered damages and loss, as particularized below, as a result of relying on the Representation and purchasing the Imax shares

**DAMAGES**

70 Neil, Cliff and the other Class Members have suffered damages Had Imax's financial position been fairly disclosed, Neil, Cliff and the other Class members would not have purchased Imax securities at the price paid, or alternatively, at all

71 Neil, Cliff and the other Class Members are also entitled to recover, as damages or costs in accordance with the *CPA*, the costs of administering the plan to distribute the recovery in this action

**VICARIOUS LIABILITY OF IMAX**

72 Imax is vicariously liable for the acts and omissions of the Individual Defendants, the Proposed Defendants and its employees who are particularized in this statement of claim

73 The acts or omissions particularized and alleged in this statement of claim to have been done by Imax were authorized, ordered and done by the Individual Defendants, the Proposed Defendants and Imax's other agents, employees and representatives while engaged in the management, direction, control and transaction of its business affairs and are, therefore, acts and omissions for which Imax is vicariously liable

74 At all material times, the Individual Defendants were officers and/or directors of Imax As their actions are independently tortious, they are personally liable for same to Neil, Cliff and the other Class Members Furthermore, Imax is vicariously liable for the acts and omissions of the Individual Defendants as particularized herein

**PART XXIII 1 OF THE SECURITIES ACT**

75 Neil and Cliff intend to immediately deliver a notice of motion seeking leave under s 138 8(1) of the *Act* to amend this statement of claim to add the Proposed Defendants as defendants and plead the causes of action set out in s 138 3 of the *Act*

**PUNITIVE DAMAGES**

76 Neil and Cliff plead that the defendants' conduct was high-handed, outrageous, reckless, wanton, entirely without care, deliberate, callous, disgraceful, willful, in intentional disregard of their rights, indifferent to the consequences and

motivated by economic considerations Such conduct renders the defendants liable to pay punitive damages

**THE LEGISLATION**

77 Neil and Cliff plead and rely upon the *Act*, the *CJA* and the *CPA*, all as amended

**PLACE OF TRIAL**

78 Neil and Cliff propose that this action be tried in the City of Mississauga, in the Province of Ontario

**SERVICE**

79 This originating process may be served without court order outside Ontario because the action is

(a) in respect of a tort committed in Ontario (rule 17 02(g)),

(b) in respect of damages sustained in Ontario arising from a tort or breach of contract however committed (rule 17 02(h)),

(c) against a person outside Ontario who is a necessary and proper party to this proceeding properly brought against another person served in Ontario (rule 17 02(o)), and

(d) against a person carrying on business in Ontario (rule 17 02(p))

September 20, 2006

SUTTS, STROSBERG LLP
Lawyers
600 - 251 Goyeau Street
Windsor, ON N9A 6V4

HARVEY T STROSBERG, Q C
LSUC Number 12640O
PATRICIA A SPEIGHT
LSUC Number 26380C
JAY STROSBERG
LSUC Number 47288F

Tel 519 561 6285
Fax 866 316 5308

SISKINDS LLP
Barristers & Solicitors
680 Waterloo Street
P O Box 2520
London, ON N6A 3V8

CHARLES M WRIGHT
LSUC Number 36599Q
A DIMITRI LASCARIS
LSUC Number 50074A
MICHAEL G ROBB
LSUC Number 45787G

Tel 519 672 2121
Fax 519 672 6065

Solicitors for the plaintiffs

000035

SILVER et al vs IMAX CORPORATION et al

Plaintiffs Defendants

Court File No CV-06-3257-3L

**ONTARIO**
**SUPERIOR COURT OF JUSTICE** CE

PROCEEDINGS COMMENCED AT BRAMPTON AMPT

**STATEMENT OF CLAIM**

**SUTTS, STROSBERG LLP**
Lawyers
600 Westcourt Place
251 Goyeau Street
Windsor ON N9A 6V4

**HARVEY T. STROSBERG, QC**
LSUC# 12640O
Tel (519) 258-9333
Fax (519) 258-9527
SOLICITORS FOR THE PLAINTIFFS

FILE 48-093-000
REF HTS/sw

# EXHIBIT B

This is Exhibit "B" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

# FORM 10-K

(Mark One)
☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934** **For the fiscal year ended December 31, 2006**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file Number 0-24216**

# IMAX Corporation
*(Exact name of registrant as specified in its charter)*

**Canada** *(State or other jurisdiction of incorporation or organization)*
**98-0140269** *(I.R.S. Employer Identification Number)*

**2525 Speakman Drive, Mississauga, Ontario, Canada** *(Address of principal executive offices)*
**L5K 1B1** *(Postal Code)*

*Registrant's telephone number, including area code:* **(905) 403-6500**

*Securities registered pursuant to Section 12(b) of the Act:*

| Title of each class | Name of exchange on which registered |
|---|---|
| Common Shares, no par value | The NASDAQ Stock Market LLC |

*Securities registered pursuant to Section 12(g) of the Act:*

**None**
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☐ No ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12B-2 of the Exchange Act
Large Accelerated Filer ☐ Accelerated Filer ☒ Non-Accelerate Filer ☐

Indicate by check mark whether the registrant is a shell Company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the common shares of the registrant held by non-affiliates of the registrant, computed by reference to the last sale price of such shares as of the close of trading on June 30, 2006 was $330.23 million (36,051,314 common shares times $9.16).

As of June 30, 2007, there were 40,288,074, common shares of the registrant outstanding.

# IMAX CORPORATION

## EXPLANATORY NOTE TO ANNUAL REPORT ON FORM 10-K

IMAX Corporation together with its wholly-owned subsidiaries (the "Company") previously announced its intention to restate its consolidated financial statements for the years ended December 31, 2002, 2003, 2004 and 2005, and the first nine months of 2006.

The consolidated statements of operations, shareholders' equity (deficit) and cash flows for the years ended December 31, 2005 and 2004, and the consolidated balance sheet as of December 31, 2005, including the applicable notes, contained in this Annual Report on Form 10-K, have been restated. The Company has also included in this report restated unaudited consolidated financial information for each of the first three quarters of 2006 and each of the quarters of 2005. The Company has also included in this report restated summary and selected financial information for the years ended December 31, 2003 and 2002.

For a description of the restatements, see note 4 to the accompanying audited consolidated financial statements in Item 8, Item 6. Selected Financial Data and "Restatement of Previously Issued Financial Statements" and "Material Weaknesses" in Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation contained in this Annual Report on Form 10-K.

# IMAX CORPORATION

**Annual Report on Form 10-K**

**December 31, 2006**

**Table of Contents**


| | | Page |
|---|---|---|
| **PART I** | | |
| Item 1 | Business | 5 |
| Item 1A | Risk Factors | 15 |
| Item 1B | Unresolved Staff Comments | 26 |
| Item 2 | Properties | 27 |
| Item 3 | Legal Proceedings | 27 |
| Item 4 | Submission of Matters to a Vote of Security Holders | 28 |
| **PART II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 29 |
| Item 6 | Selected Financial Data | 32 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 41 |
| Item 7A | Quantitative and Qualitative Disclosures about Market Risk | 68 |
| Item 8 | Financial Statements and Supplementary Data | 69 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 146 |
| Item 9A | Controls and Procedures | 146 |
| Item 9B | Other Information | 150 |
| **PART III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 151 |
| Item 11 | Executive Compensation | 154 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 166 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 168 |
| Item 14 | Principal Accounting Fees and Services | 169 |
| **PART IV** | | |
| Item 15 | Exhibits, Financial Statement Schedules | 170 |
| Signatures | | 174 |

## IMAX CORPORATION

### EXCHANGE RATE DATA

Unless otherwise indicated, all dollar amounts in this document are expressed in United States ("U.S.") dollars. The following table sets forth, for the periods indicated, certain exchange rates based on the noon buying rate in the City of New York for cable transfers in foreign currencies as certified for customs purposes by the Federal Reserve Bank of New York (the "Noon Buying Rate"). Such rates quoted are the number of U.S. dollars per one Canadian dollar and are the inverse of rates quoted by the Federal Reserve Bank of New York for Canadian dollars per U.S. $1.00. The average exchange rate is based on the average of the exchange rates on the last day of each month during such periods. The Noon Buying Rate on December 31, 2006 was U.S. $0.8582.

| | Years ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2003 | 2002 |
| Exchange rate at end of period | 0.8582 | 0.8579 | 0.8310 | 0.7738 | 0.6329 |
| Average exchange rate during period | 0.8818 | 0.8254 | 0.7682 | 0.7139 | 0.6368 |
| High exchange rate during period | 0.9100 | 0.8690 | 0.8493 | 0.7738 | 0.6619 |
| Low exchange rate during period | 0.8528 | 0.7872 | 0.7158 | 0.6349 | 0.6200 |

### SPECIAL NOTE REGARDING FORWARD-LOOKING INFORMATION

Certain statements included in this annual report may constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, references to future capital expenditures (including the amount and nature thereof), business and technology strategies and measures to implement strategies, competitive strengths, goals, expansion and growth of business, operations and technology, plans and references to the future success of IMAX Corporation together with its wholly-owned subsidiaries (the "Company") and expectations regarding the Company's future operating results. These forward-looking statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances. However, whether actual results and developments will conform with the expectations and predictions of the Company is subject to a number of risks and uncertainties, including, but not limited to, general economic, market or business conditions; the opportunities (or lack thereof) that may be presented to and pursued by the Company; competitive actions by other companies; U.S. or Canadian regulatory inquiries; conditions in the in-home and out-of-home entertainment industries; changes in laws or regulations; conditions, changes and developments in the commercial exhibition industry; the acceptance of the Company's new technologies (including in particular its transition to digital projection technology); risks associated with investments and operations in foreign jurisdictions and any future international expansion, including those related to economic, political and regulatory policies of local governments and laws and policies of the United States and Canada; the potential impact of increased competition in the markets the Company operates within; and other factors, many of which are beyond the control of the Company. Consequently, all of the forward-looking statements made in this annual report are qualified by these cautionary statements, and actual results or anticipated developments by the Company may not be realized, and even if substantially realized, may not have the expected consequences to, or effects on, the Company. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking information, whether as a result of new information, future events or otherwise.

---

IMAX®, IMAX® Dome, IMAX® 3D, IMAX® 3D Dome, *The* IMAX *Experience*®, *An* IMAX *Experience*®, IMAX DMR®, DMR®, IMAX MPX®, IMAX think big® and think big® are trademarks and trade names of the Company or its subsidiaries that are registered or otherwise protected under laws of various jurisdictions.

# IMAX CORPORATION

## PART I

### Item 1. Business

### GENERAL

IMAX Corporation, together with its wholly-owned subsidiaries (the "Company"), is one of the world's leading entertainment technology companies, specializing in digital and film-based motion picture technologies and large-format two-dimensional ("2D") and three-dimensional ("3D") film presentations. The Company's principal business is the design, manufacture, sale and lease of theater systems based on proprietary and patented technology for large-format, 15-perforation film frame, 70mm format ("15/70-format") theaters, including commercial theaters, museums and science centers, and destination entertainment sites. The majority of these theaters are operated by third parties. The Company generally does not own IMAX theaters, but licenses the use of its trademarks along with the sale or lease of its equipment. The Company refers to all theaters using the IMAX theater system as "IMAX Theaters".

The Company is also engaged in the production, digital re-mastering, post-production and distribution of 15/70-format films, the operation of IMAX theaters and the provision of services in support of IMAX theaters and the IMAX theater network.

The Company believes the IMAX theater network is the most extensive large-format theater network in the world with 284 theaters operating in 40 countries as of December 31, 2006. Of these 284 theaters, 166 are located in commercial locations, such as multiplex complexes, and 118 of them are currently located in institutional locations, such as museums and science centers. While the Company's roots are in the institutional market, the Company believes that the commercial market is potentially significantly larger. To increase the demand for IMAX theater systems, the Company has positioned the IMAX theater network as a new distribution platform for Hollywood blockbuster films. To this end, the Company has developed a technology that allows conventional 35mm movies to be digitally converted to its 15/70-format, has introduced lower cost theater systems designed for multiplex owners, is continuing to build strong relationships with Hollywood studios and commercial exhibition companies and is developing a new digital projector which it believes will result in even more Hollywood features being released to the IMAX network.

IMAX theater systems combine advanced, high-resolution projectors with film handling equipment and automated theater control systems, sound system components and screen components as large as eight stories high (approximately 80 feet) that extend to the edge of a viewer's peripheral vision to create immersive audio-visual experiences. As a result, audiences feel as if they are a part of the on-screen action in a way that is more intense and exciting than in traditional theaters. In addition, the Company's IMAX 3D theater systems combine the same theater systems with 3D images that further increase the audience's feeling of immersion in the film.

In 2002, the Company introduced a technology that can digitally convert live-action 35mm films to its 15/70-format at a modest incremental cost, while meeting the Company's high standards of image and sound quality. The Company believes that this proprietary system, known as IMAX DMR (Digital Re-Mastering), has positioned IMAX theaters as a new release window or distribution platform for Hollywood's biggest event films. As of December 31, 2006, the Company, along with its studio partners, had released 18 IMAX DMR films since 2002. In 2006, the Company released seven films converted through the IMAX DMR process contemporaneous with the releases of the films to conventional 35mm theaters, and released one film co-produced by the Company exclusively for IMAX theaters.

In 2003, the Company introduced IMAX MPX, a new theater system designed specifically for use by commercial multiplex operators. The IMAX MPX system, which is highly automated, was designed to reduce the capital and operating costs required to run an IMAX theater while still offering consumers the image and sound quality of the trademarked experience viewers derive from IMAX theaters known as "*The* IMAX *Experience*". During 2006, the Company signed agreements for 22 IMAX MPX theater systems with North American and international commercial theater exhibitors. Four of the 22 signed IMAX MPX theater system agreements were conditional and such rights to the conditions have now lapsed.

The Company is in the process of developing a digitally-based IMAX projector which would operate without the need for analog film prints. The Company anticipates that its digital projector, which will be targeted to a large portion of its commercial multiplex operators as a replacement for the IMAX MPX projector, will be available for production and sale by early 2009.

# IMAX CORPORATION

**Item 1. Business** (cont'd)

**GENERAL** (cont'd)

The Company's goal is to create a digital product that provides a differentiated experience to moviegoers that is consistent with what they have come to expect from the IMAX brand. The Company believes that transitioning from a film-based platform to a digital platform for a large portion of its customer base is compelling for a number of reasons. The savings to the studios as a result of eliminating film prints are considerable, as the typical cost of an IMAX film print ranges from $22.5 thousand per 2D print to $45 thousand per 3D print. Removing those costs will significantly increase the profit of an IMAX release for a studio which, the Company believes, provides more incentive for studios to release their films to IMAX theaters. The Company similarly believes that economics change favorably for its exhibition clients as a result of a digital transition, since lower print costs and the increased programming flexibility that digital delivery provides should allow theaters to program three to four additional IMAX DMR films per year, thereby increasing both customer choice and total box-office revenue. Finally, digital transmission allows for the opportunity to show attractive alternate programming, such as live events like the Super Bowl or World Cup, in the immersive environment of an IMAX theater.

The Company was formed in March 1994 as a result of an amalgamation between WGIM Acquisition Corp. and the former IMAX Corporation ("Predecessor IMAX"). Predecessor IMAX was incorporated in 1967.

**PRODUCT LINES**

The Company is the pioneer and leader in the large-format film industry, and believes it is the largest designer and manufacturer of specialty projection and sound system components, and a significant producer and distributor of 15/70-format films, for large-format theaters around the world. The Company's theater systems include a specialized IMAX projector, advanced sound systems and specialty screens. The Company derives its revenues from IMAX theater systems (the sale and lease of, and provision of services related to, its theater systems to large-format theaters, including joint revenue sharing arrangements), films (production and digital re-mastering of films, the distribution of film products to the IMAX theater network, post-production services for large-format films), theater operations (owning, operating, managing or participating in the profits of IMAX theaters) and other activities, which include the sale of after market parts and camera rentals. Segmented information is provided in note 22 to the accompanying audited consolidated financial statements contained in Item 8.

**IMAX Theater Systems**

The Company's primary products are its large-format theater systems. IMAX theater systems traditionally include a unique rolling loop 15/70-format projector that offers superior image quality and stability and a digital theater control system; a 6-channel, digital sound system delivering up to 12,000 watts; a screen with a proprietary coating technology; and, if applicable, 3D glasses cleaning equipment. As part of the arrangement to sell or lease its theater systems, the Company provides extensive advice on theater planning and design and supervision of installation services. Theater systems are also leased or sold with a license for the use of the world famous IMAX brand. The Company primarily offers its theater systems in four configurations: the GT projection system for the largest IMAX theaters; the SR system for smaller theaters; the Company's newest introduction, the IMAX MPX system, which is targeted for multiplex complexes; and a fourth category of theater systems featuring heavily curved and tilted screens that are used in dome shaped theaters. The GT, SR and IMAX MPX systems are "flat" screens that have a minimum of curvature and tilt and can exhibit both 2D and 3D films, while the screen components in dome shaped theaters are generally 2D only and are popular with the Company's institutional clients. The Company is also currently developing a digital projector.

Screens in IMAX theaters are as large as one hundred or more feet wide and eight stories tall and the Company believes they are the largest cinema screens in the world. Unlike standard cinema screens, IMAX screens extend to the edge of a viewer's peripheral vision to create immersive experiences which, when combined with the Company's superior sound system components, make audiences feel as if they are a part of the on-screen action in a way that is more intense and exciting than in traditional theaters, a critical part of *The* IMAX *Experience*. The Company's IMAX 3D theaters further increase the audience's feeling of immersion in the film by bringing images off the screen. All IMAX theaters, with the exception of dome configurations, have a steeply inclined floor to provide each audience member with a clear view of the screen. IMAX holds patents on the geometrical design of an IMAX theater.

The Company's projectors utilize the largest commercially available film format (15-perforation film frame, 70mm), which is nearly 10 times larger than conventional film (4-perforation film frame, 35mm) and therefore able to project significantly more detail on a larger screen. The Company believes its projectors, which utilize the Company's rolling loop technology, are unsurpassed in their ability to project film with maximum steadiness and clarity with minimal film wear while substantially enhancing the quality of the projected image. As a result, the Company's projectors deliver a higher level of clarity, detail and brightness compared to conventional movies and competing film or digitally-based projectors.

## IMAX CORPORATION

**Item 1. Business** (cont'd)

**PRODUCT LINES** (cont'd)

**IMAX Theater Systems** (cont'd)

To complement the film technology and viewing experience, IMAX provides unique digital sound system components. The sound system components are among the most advanced in the industry and help to heighten the sense of realism of a 15/70-format film. IMAX sound system components are specifically designed for IMAX theaters and are an important competitive advantage. The Company believes it is a world leader in the design and manufacture of digital sound system components for applications including traditional movie theaters, auditoriums and IMAX theaters.

***Theater System Sales or Leases.*** The Company's arrangements for theater system equipment involve either a lease or sale. As part of the arrangement for an IMAX theater system, the Company also advises the customer on theater design, supervises the installation of the theater systems and provides projectionists with training in using the equipment. Theater owners or operators are responsible for providing the theater location, the design and construction of the theater building, the installation of the system components and any other necessary improvements, as well as the marketing and programming at the theater. The supervision of installation requires that the equipment also be put through a complete functional start-up and test procedure to ensure proper operation. The Company's typical arrangement also includes the trademark license rights which commence on execution of the agreement and generally have terms of 10 to 20 years that may be renewed. The theater system equipment, theater design support, supervision of installation, projectionist training and trademark rights are all elements of what the Company considers the "System Deliverable". For a separate fee, the Company provides ongoing maintenance and extended warranty services for the theater system.

Leases generally have 10 to 20-year initial terms and are typically renewable by the customer for one or more additional 10-year term. Under the terms of the typical lease agreement, the title to the theater system equipment (including the projector, the sound system and the projection screen) remains with the Company. The Company has the right to remove the equipment for non-payment or other defaults by the customer. The contracts are generally not cancelable by the customer unless the Company fails to perform its obligations. The Company also enters into sale agreements with its customers. Under a sales arrangement, the title to the theater system remains with the customer, however in certain instances, the Company retains title or a security interest in the equipment until the customer has made all payments required under the agreement. Recently the Company has entered into a number of joint revenue sharing arrangements, where the Company receives a portion of a theater's box-office and concession revenue in exchange for placing a theater system at the theater operator's venue. Under these arrangements, the Company receives no up-front fee and the Company retains title to the theater system. The Company has stated that it will increasingly look to enter into such arrangements in the future, although the specific customer and location will be important considerations in whether to do so. The Company believes that its joint revenue sharing arrangements represent an effective way for it to deploy capital, add incremental theater growth and realize the benefits of network economics more quickly. The Company believes that by its contributing the theater system, with the exhibitor responsible for the theater retrofit costs, it significantly lowers the capital cost for exhibitors to deploy an IMAX theater, which, in turn, expands the IMAX network more rapidly and provides the Company with an increasingly significant portion of the IMAX box office from its licensed theaters, as well as a continuing portion of the IMAX DMR film revenue from the film studio. The Company's contracts are generally denominated in U.S. dollars, except in Canada, Japan and parts of Europe, where contracts are sometimes denominated in local currency.

The typical lease or sales arrangement provides for three major sources of cash flows for the Company: (i) initial fees; (ii) ongoing minimum fixed and contingent fees and (iii) ongoing maintenance and extended warranty fees. Initial fees generally are received over the period of time from the date the arrangement is executed to the date the equipment is installed and customer acceptance has been received. However, in certain cases the payments of the initial fee may be scheduled over a period after the equipment is installed and customer acceptance has been received. Ongoing minimum fixed and contingent fees and ongoing maintenance and extended warranty fees are generally received over the life of the arrangement and are usually adjusted annually based on changes in the local consumer price index. The ongoing minimum fixed and contingent fees generally provide for a fee which is the greater of a fixed amount or a certain percentage of the theater box-office. The terms of each arrangement vary according to the configuration of the theater system provided and the geographic location of the customer.

***Sales Backlog.*** Signed contracts for theater systems are listed as sales backlog prior to the time of revenue recognition. The value of sales backlog represents the total value of all signed theater system sales and sales-type lease agreements that are expected to be recognized as revenue in the future. Sales backlog includes initial fees along with the present value of contractual fixed minimum fees due over the term, but excludes contingent fees in excess of contractual minimums and maintenance and extended warranty fees that might be received in the future. Sales backlog does not include any anticipated revenues from theaters in which the Company has an equity-interest, joint profit or revenue sharing arrangements, agreements covered by letters of intent or conditional sale or lease commitments.

# IMAX CORPORATION

**Item 1. Business** (cont'd)

**PRODUCT LINES** (cont'd)

**IMAX Theater Systems** (cont'd)

The following chart shows the number of the Company's theater systems by configuration, opened theater network base and backlog as of December 31:

**2006**

| | 2D System | 2D Theater Network Base | 2D Backlog | 3D System | 3D Theater Network Base | 3D Backlog |
|---|---|---|---|---|---|---|
| Flat Screen | IMAX | 41 | — | IMAX 3D GT | 85 | 12 |
| | | | | IMAX 3D SR | 51 | 11 |
| | | | | IMAX MPX | 32 | 49 |
| Dome Screen | IMAX Dome | 69 | 2 | IMAX 3D Dome | 6 | — |
| | | | | **Total** | 284 | 74 |

**2005**

| | 2D System | 2D Theater Network Base | 2D Backlog | 3D System | 3D Theater Network Base | 3D Backlog |
|---|---|---|---|---|---|---|
| Flat Screen | IMAX | 45 | — | IMAX 3D GT | 77 | 16 |
| | | | | IMAX 3D SR | 48 | 13 |
| | | | | IMAX MPX | 21 | 42 |
| Dome Screen | IMAX Dome | 68 | 2 | IMAX 3D Dome | 7 | — |
| | | | | **Total** | 266 | 73 |

**IMAX *and* IMAX *Dome Systems.*** IMAX and IMAX Dome systems make up approximately 39% of the Company's opened theater base. IMAX theaters, with a flat screen, were introduced in 1970, while IMAX Dome theaters, which are designed for tilted dome screens, were introduced in 1973. There have been several significant proprietary and patented enhancements to these systems since their introduction.

**IMAX *3D GT and* IMAX *3D SR Systems.*** IMAX 3D theaters utilize a flat screen 3D system, which produces realistic three-dimensional images on an IMAX screen. The Company believes that the IMAX 3D theater systems offer consumers one of the most realistic 3D experiences available today. To create the 3D effect, the audience uses either polarized or electronic glasses that separate the left-eye and right-eye images. The IMAX 3D projectors can project both 2D and 3D films, allowing theater owners the flexibility to exhibit either type of film. The Company will provide upgrades to existing theaters which have 2D IMAX theater systems, to IMAX 3D theater systems. Since the introduction of IMAX 3D technology, the Company has upgraded 18 theaters.

In 1997, the Company launched a smaller IMAX 3D system called IMAX 3D SR, a patented theater system configuration that combines a proprietary theater design, a more automated projector and specialized sound system components to replicate the experience of a larger IMAX 3D theater in a smaller space.

**Item 1. Business** (cont'd)

**PRODUCT LINES** (cont'd)

**IMAX Theater Systems** (cont'd)

IMAX *MPX.* In 2003, the Company launched its new large-format theater system designed specifically for use in multiplex theaters. Known as IMAX MPX, this system projects 15/70-format film onto screens which are curved and tilted forward to further immerse the audience. An IMAX MPX theater system utilizes the Company's next generation proprietary digital sound system components, capable of multi-channel uncompressed studio quality digital audio. The projector is capable of playing both 2D and 3D films, and installs into a standard 35mm projection booth. The IMAX MPX system can be installed as part of a newly-constructed multiplex, as an add-on to an existing multiplex or as a retrofit of one or two existing stadium seat auditoriums within a multiplex. With lower capital and operating costs, the IMAX MPX is designed to improve a multiplex owner's financial returns and allow for the installation of IMAX theater systems in markets that might previously not have been able to support one. The Company has signed 84 agreements for IMAX MPX theater systems since its introduction, nine of which were installed in 2006. Five of the 84 signed agreements were for conditional deals where the conditions have since lapsed.

IMAX *Digital.* The Company is in the process of developing a digitally-based IMAX projector designed to deliver 2D and 3D presentations with the high image quality and immersiveness that are consistent with the IMAX brand, without the need for analog prints. The Company holds numerous digital patents and relationships with key manufacturers and suppliers in digital technology. The Company has patents, applications and licenses encompassing, among other things, a method for synchronizing digital data, a method of generating stereoscopic (3D) imaging data from a 2D source, a process for digitally re-mastering 35mm films into 15/70-format, a method for increasing the dynamic range and contrast of projectors, a method for invisibly seaming or superimposing images from multiple projectors and other inventions relating to digital projectors. The Company anticipates that its digital projector, which will be targeted to a large portion of its commercial theater base, will be available for production and sale by early 2009. The Company's goal is to create a digital product that provides a differentiated experience to moviegoers that is consistent with what they have come to expect from the IMAX brand. The Company believes that transitioning from a film-based platform to a digital platform for a large portion of its customer base is compelling for a number of reasons. The savings to the studios as a result of eliminating film prints are considerable, as the typical cost of an IMAX film print ranges from $22.5 thousand per 2D print to $45 thousand per 3D print. Removing those costs will significantly increase the profit of an IMAX release for a studio which, the Company believes, provides more incentive for studios to release their films to IMAX theaters. The Company similarly believes that economics change favorably for its exhibition clients as a result of a digital transition, since lower print costs and the increased programming flexibility that digital delivery provides should allow theaters to program three to four additional IMAX DMR films per year, thereby increasing both customer choice and total box-office revenue. Finally, digital transmission allows for the opportunity to show attractive alternate programming, such as live events like the Super Bowl or World Cup, in the immersive environment of an IMAX theater.

**Films**

***Film Production and Digital Re-mastering (IMAX DMR)***

Films produced by the Company are typically financed through third parties, whereby the Company will generally receive a film production fee in exchange for producing the film and will be a distributor of the film. The ownership rights to such films may be held by the film sponsors, the film investors and/or the Company. In the past, the Company often internally financed film production, but has moved to a model utilizing third-party funding for the large-format films it produces and distributes.

In 2002, the Company developed technology that makes it possible for 35mm live-action film to be digitally transformed into IMAX's 15/70-format at a cost of roughly $1.0 - $2.0 million per film. This proprietary system, known as IMAX DMR, has opened the IMAX theater network up to film releases from Hollywood's broad library of films. In a typical IMAX DMR film arrangement, the Company will absorb its costs for the IMAX DMR re-mastering and then recoup this cost from a percentage of the gross box-office receipts of the film, which will generally range from 10-15%. The Company may also have certain distribution rights to the 15/70-format films produced using its IMAX DMR technology.

**Item 1. Business** (cont'd)

**PRODUCT LINES** (cont'd)

**Films** (cont'd)

***Film Production and Digital Re-Mastering (IMAX DMR)*** (cont'd)

The IMAX DMR process involves the following:

- scanning, at the highest resolution possible, each individual frame of the 35mm film and converting it into a digital image;
- optimizing the image using proprietary image enhancement tools;
- analyzing the information contained within a 35mm frame format and enhancing the digital image using techniques such as sharpening, color correction, grain removal and the elimination of unsteadiness and removal of unwanted artifacts; and
- recording the enhanced digital image onto 15/70-format film.

The first IMAX DMR film, *Apollo 13: The* IMAX *Experience*, produced in conjunction with Universal Pictures and Imagine Entertainment, was released in September 2002. Since the release of that film, the Company has released an additional 17 IMAX DMR films.

The highly automated IMAX DMR system typically allows the re-mastering process to meet aggressive film production schedules. The Company is continuing to improve the length of time it takes to reformat a film with its IMAX DMR technology. *Apollo 13: The* IMAX *Experience*, released in 2002, was re-mastered in 16 weeks, while *300: The* IMAX *Experience*, released in March 2007, was re-mastered in approximately ten days. The IMAX DMR conversion of simultaneous, or "day-and-date", releases are done in parallel with the movie's filming and editing, which is necessary for the simultaneous release of an IMAX DMR film with the domestic release to conventional theaters.

The Company demonstrated its ability to convert computer generated animation to IMAX 3D with the 1999 release of *Cyberworld*, the 2004 release of the full length CGI feature, *The Polar Express: The* IMAX *3D Experience* and the release of three CGI 3D features in 2005-2006. In addition, the Company has developed a proprietary technology to convert live action 2D 35mm movies to IMAX 3D films, which the Company believes can offer significant potential benefits to the Company, studios and the IMAX theater network, and which was used to convert scenes from 2D to 3D in the film *Superman Returns: An* IMAX *3D Experience* in 2006, and *Harry Potter and the Order of the Phoenix: An* IMAX *3D Experience*, released in July 2007.

For IMAX DMR releases, the original soundtrack of the 35mm film is also re-mastered for IMAX's five or six-channel digital sound system components. Unlike conventional theater sound systems, IMAX sound system components are uncompressed, full fidelity and use proprietary loudspeaker systems and surround sound that ensure every theater seat is in a good listening position.

In 2006, the Company released seven films converted through the IMAX DMR process contemporaneously with the releases of the films to conventional 35mm theaters, and released one film, *Deep Sea 3D,* co-produced by the Company and made exclusively for IMAX theaters.

On March 3, 2006, IMAX and Warner Bros. Pictures ("WB") released *Deep Sea 3D*. This was shortly followed by the release on March 17, 2006 of *V for Vendetta: The* IMAX *Experience* by the Company and WB. On May 12, 2006, the Company and WB released *Poseidon: The* IMAX *Experience*. On June 28, 2006, the Company and WB released *Superman Returns: An* IMAX *3D Experience*, an IMAX DMR version of one of the year's top grossing Hollywood films, to the IMAX theater network. On July 28, 2006, the Company and WB released *The Ant Bully: An* IMAX *3D Experience*. On September 29, 2006, the Company and Sony Pictures released *Open Season: An* IMAX *3D Experience*. On November 17, 2006, the Company and WB released *Happy Feet: The* IMAX *Experience*. On December 22, 2006, the Company and Twentieth Century Fox released the IMAX DMR version of the hit film *Night at the Museum* to IMAX theaters.

The Company believes that these releases have positioned IMAX theaters as a separate distribution platform for Hollywood films, similar to the type created when Hollywood studios began including the pay TV and home video media as release windows for their films.

**Item 1. Business** (cont'd)

**PRODUCT LINES** (cont'd)

**Films** (cont'd)

***Film Production and Digital Re-Mastering (IMAX DMR)*** (cont'd)

In 2007, the Company has thus far released three IMAX DMR films to IMAX theaters contemporaneously with the releases of the films to conventional 35mm theaters. In March 2007, the Company and WB released *300: The* IMAX *Experience*. In May 2007, the Company and Sony's Columbia Pictures released *Spider-Man 3: The* IMAX *Experience*. In July 2007, the Company, in conjunction with WB, released *Harry Potter and the Order of the Phoenix: An* IMAX *3D Experience*. This will be WB's fifth film release based on the popular Harry Potter book series. In November 2007, the Company in conjunction with Paramount Pictures, Shangri-La Entertainment and WB will release *Beowulf: An* IMAX *3D Experience*. The Company has announced that it will release an IMAX DMR version of *The Dark Knight: The* IMAX *Experience*, the next installment of WB's highly-popular Batman franchise, in July 2008, and that, in conjunction with WB, it has commenced production on a third original IMAX 3D co-production for the release to IMAX theaters in 2009 of a sequel to *Deep Sea 3D*.

***Film Distribution***

The Company is a significant distributor of 15/70-format films. The Company generally distributes films which it has produced or for which it has acquired distribution rights from independent producers. As a distributor, the Company receives a fixed fee and/or a percentage of the theater box-office receipts.

The library of 15/70-format films includes Hollywood event films converted into 15/70-format through IMAX DMR technology, such as the 2006 (and 2007) hit *Night at the Museum: The* IMAX *Experience*, and the 2004 (and 2005) hit *The Polar Express: The* IMAX *3D Experience*, along with general entertainment and educational films on subjects such as space, wildlife, music, history and natural wonders. The library consisted of 254 films at the end of 2006, of which the Company had distribution rights to 52 such films. 15/70-format films that have been successfully released by the Company include *Deep Sea 3D*, which was released by the Company and WB in March 2006 and has grossed more than $29.5 million to the end of 2006, *SPACE STATION*, which was released in April 2002 and has grossed over $93.2 million to the end of 2006, *T-REX: Back to the Cretaceous*, which was released by the Company in 1998 and has grossed over $95.0 million to the end of 2006 and *Fantasia 2000: The* IMAX *Experience*, which was released by the Company and Buena Vista Pictures Distribution, a unit of The Walt Disney Company, in 2000, and has grossed over $80.4 million to the end of 2006. 15/70-format films have significantly longer exhibition periods than conventional 35mm films and many of the films in the large-format library have remained popular for many decades including the films *To Fly!* (1976), *Grand Canyon - The Hidden Secrets* (1984) and *The Dream Is Alive* (1985).

***Film Post-Production***

David Keighley Productions 70MM Inc., a wholly-owned subsidiary of the Company, provides film post-production and quality control services for 15/70-format films (whether produced internally or externally), and digital post-production services.

***Theater Operations***

The Company has seven owned and operated theaters. In addition, the Company has entered into commercial arrangements with two theaters resulting in the sharing of profits and losses. The Company also provides management services to two theaters.

***Other***

**Cameras**

The Company rents 2D and 3D 15/70-format analog cameras and provides technical and post-production services to third-party producers for a fee. The Company has developed state-of-the-art patented dual and single filmstrip 3D cameras which are among the most advanced motion picture cameras in the world and are the only 3D cameras of their kind. The IMAX 3D camera simultaneously shoots left-eye and right-eye images and its compact size allows filmmakers access to a variety of locations, such as underwater or aboard aircraft. The Company maintains cameras and other film equipment to support third-party producers and also offers production advice and technical assistance to filmmakers.

## IMAX CORPORATION

**Item 1. Business** (cont'd)

### MARKETING AND CUSTOMERS

The Company markets its theater systems through a direct sales force and marketing staff located in offices in Canada, the United States, Europe, and Asia. In addition, the Company has agreements with consultants, business brokers and real estate professionals to locate potential customers and theater sites for the Company on a commission basis.

The commercial theater segment of the Company's theater network is now its largest segment, with a total of 166 theaters opened as of December 31, 2006. The Company's institutional customers include science and natural history museums, zoos, aquaria and other educational and cultural centers. The Company also sells or leases its theater systems to theme parks, tourist destination sites, fairs and expositions. At December 31, 2006, approximately 37% of all opened IMAX theaters were in locations outside of North America. The following table outlines the breakdown of the theater network by geographic location as at December 31:

| | 2006 Theater Network Base | 2005 Theater Network Base |
|---|---|---|
| United States | 139 | 134 |
| Canada | 23 | 22 |
| Mexico | 16 | 13 |
| Europe | 48 | 47 |
| Japan | 13 | 14 |
| Rest of World | 45 | 36 |
| Total | 284 | 266 |

For information on revenue breakdown by geographic area, see note 22 to the accompanying audited consolidated financial statements in Item 8. No one customer represents more than 5% of the Company's opened base of theaters. The Company has no dependence upon a single customer, the loss of which would have a material adverse effect on the Company.

### INDUSTRY AND COMPETITION

The Company competes with a number of manufacturers of large-format film projectors. Most of these competitors utilize smaller film formats, including 8-perforation film frame 70mm and 10-perforation film frame 70mm formats, which the Company believes deliver an image that is inferior to *The* IMAX *Experience*. The IMAX theater network and the number of 15/70-format films to which the Company has distribution rights are substantially larger than those of its 15/70-format competitors, and IMAX DMR reformatted films are available exclusively to the IMAX theater network. The Company's customers generally consider a number of criteria when selecting a large-format theater including quality, reputation, brand-name recognition, configuration of system components, features, price and service. The Company believes that its competitive strengths include the value of the IMAX brand name, the quality and historic up-time of IMAX theater systems, the return on investment of an IMAX theater, the number and quality of 15/70-format films that it distributes, the quality of the sound system components included with the IMAX theater, the availability of Hollywood event films to IMAX theaters through IMAX DMR technology and the level of the Company's service and maintenance and extended warranty efforts. Virtually all of the best performing large-format theaters in the world are IMAX theaters.

In 2003, the Company introduced the IMAX MPX, a new theater system designed specifically for use in multiplex auditoriums. The IMAX MPX system is designed to reduce the capital and operating costs required to run an IMAX theater while still offering consumers the image and sound quality of *The* IMAX *Experience*.

The motion picture industry is in the early stages of transitioning from film projection to digital projection, and the Company itself is developing a digitally-based projector. In recent years, a number of companies have introduced digital 3D projection technology and a small number of Hollywood features have been exhibited in 3D using these technologies. The Company believes that its many competitive strengths, including the IMAX® brand name, the quality and immersiveness of *The* IMAX *Experience*, its IMAX DMR technology and its patented theater geometry, significantly differentiate the Company's 3D presentations from any other 3D presentations.

**Item 1. Business (cont'd)**

**THE IMAX BRAND**

The IMAX brand is world famous and stands for immersive family entertainment that combines stunning images of exceptional quality and clarity on screens up to one hundred feet wide and eight stories tall with the Company's proprietary 6-channel digital sound system components and unique theater designs. The Company's research shows that the IMAX brand is a significant factor in a consumer's decision to go to an IMAX theater, and that movie-goers are willing to travel significantly farther and pay more to see films in IMAX's immersive format. In addition, the Company believes that its significant brand loyalty among consumers provides it with a strong, sustainable position in the exhibition industry. The IMAX brand name cuts across geographic and demographic boundaries.

Historically, the Company's brand identity was grounded in its educational film presentations to families around the world. With an increasing number of IMAX theaters based in multiplexes and with a recent history of commercially successful large-format films such as *The Polar Express: The* IMAX *3D Experience, Harry Potter and The Goblet of Fire: The* IMAX *Experience, Batman Begins: The* IMAX *Experience, Superman Returns: An* IMAX *3D Experience, Happy Feet: The* IMAX *Experience* and *Night at the Museum: The* IMAX *Experience*, the Company is rapidly increasing its presence in commercial settings. The Company believes the strength of the IMAX brand will be an asset as it continues to establish IMAX theaters as a new and desirable release window for Hollywood films.

**RESEARCH AND DEVELOPMENT**

The Company believes that it is one of the world's leading entertainment technology companies with significant in-house proprietary expertise in digital and film based projection and sound system component design, engineering and imaging technology, particularly in 3D. The Company believes that the motion picture industry will be affected by the development of digital technologies, particularly in the areas of content creation (image capture), post-production (editing and special effects), digital re-mastering (such as IMAX DMR), distribution and display. The Company has made significant investments in digital technologies, including the development of a proprietary, patent-pending technology to digitally enhance image resolution and quality of 35mm motion picture films, the conversion of monoscopic (2D) to stereoscopic (3D) images and the creation of an IMAX digital projector prototype, and holds a number of patents, patents pending and other intellectual property rights in these areas. In addition, the Company holds numerous digital patents and relationships with key manufacturers and suppliers in digital technology. The Company is in the process of developing a digitally-based projector which would operate without the need for analog film prints. The Company anticipates that its digital projector, which will be targeted to a large portion of its commercial theater customer base, will be available for production and sale by early 2009.

The IMAX DMR technology converts a conventional 35mm frame into its digital form at a very high resolution. The proprietary system recreates a pristine form of the original photography. The Company believes the proprietary process makes the images sharper than the original and the completed re-mastered film, now nearly 10 times larger than the original, is transferred onto the Company's 15/70 film format. Each film's original soundtrack is also recreated and upgraded to Company standards. Through its research and development program, the Company continues to refine and enhance the capabilities of this technology.

A key to the performance and reliability of the IMAX projector is the Company's unique "rolling loop" film movement. The rolling loop advances the film horizontally in a smooth, wave-like motion, which enhances the stability of the image and greatly reduces wear of the film.

Several of the underlying technologies and resulting products and system components of the Company are covered by patents or patent applications. Other underlying technologies are available to competitors, in part because of the expiration of certain patents owned by the Company. The Company, however, has successfully obtained patent protection covering several of its significant improvements made to such technologies. The Company plans to continue to fund research and development activity in areas considered important to the Company's continued commercial success.

For 2006, 2005 and 2004, the Company recorded research and development expenses of $3.6 million, $3.2 million and $4.0 million, respectively.

As of December 31, 2006, 35 of the Company's employees were connected with research and development projects.

# IMAX CORPORATION

**Item 1. Business** (cont'd)

## MANUFACTURING AND SERVICE

### Projector Component Manufacturing

The Company assembles the projector of its large-format theater systems at its Corporate Headquarters and Technology Center in Mississauga, Canada (near Toronto). A majority of the parts and sub-assemblies for this component are purchased from outside vendors. The Company develops and designs all the key elements for the proprietary technology involved in this component. Fabrication of parts and sub-assemblies is subcontracted to a group of carefully pre-qualified suppliers. Manufacture and supply contracts are signed for the delivery of the component on an order-by-order basis. The Company has developed long-term relationships with a number of significant suppliers, and the Company believes its existing suppliers will continue to supply quality products in quantities sufficient to satisfy its needs. The Company inspects all parts and sub-assemblies, completes the final assembly and then subjects the projector to comprehensive testing individually and as a system prior to shipment. In 2006, these projectors had operating availability based on scheduled shows of approximately 99.8%.

### Sound System Component Manufacturing

The Company develops, designs and assembles the key elements of its theater sound system component. The standard IMAX theater sound system component comprises parts from a variety of sources with approximately 50% of the materials of each sound system attributable to proprietary parts provided under original equipment manufacturers agreements with outside vendors. These proprietary parts include custom loudspeaker enclosures and horns and specialized amplifiers, signal processing and control equipment. The Company inspects all parts and sub-assemblies, completes the final assembly and then subjects the sound system component to comprehensive testing individually and as a system prior to shipment.

### Screen and Other Components

The Company purchases its screen component and glasses cleaning equipment from third parties. The standard screen system component is comprised of a projection screen treated with a proprietary coating and a frame to hang the projection screen. The glasses cleaning machine is a stand-alone unit that is connected to the theater's water and electrical supply to automate the cleaning of 3D glasses.

### Maintenance and Extended Warranty Services

The Company also provides ongoing maintenance and extended warranty services to IMAX theater systems. These arrangements are usually for a separate fee; however, the Company often includes free service in the initial year of an arrangement. The maintenance and extended warranty arrangements include service, maintenance and replacement parts for theater systems.

To support the IMAX theater network, the Company has personnel stationed in major markets who provide periodic and emergency maintenance and extended warranty services on existing theater systems throughout the world. The Company provides various levels of maintenance and warranty services which are priced accordingly. Under full service programs, Company personnel typically visit each theater every three months to provide preventative maintenance, cleaning and inspection services and emergency visits to resolve problems and issues with the theater system. Under some arrangements, customers can elect to participate in a service partnership program whereby the Company trains a customer's technician to carry out certain aspects of maintenance. Under such shared maintenance arrangements, the Company participates in certain of the customer's maintenance checks each year, provides for a specified number of emergency visits and provides spare parts as necessary.

## PATENTS AND TRADEMARKS

The Company's inventions cover various aspects of its proprietary technology and many of these inventions are protected by Letters of Patent or applications filed throughout the world, most significantly in the United States, Canada, Belgium, Japan, France, Germany and the United Kingdom. The subject matter covered by these patents, applications and other licenses encompasses theater design and geometry, electronic circuitry and mechanisms employed in film projectors and projection equipment (including 3D projection equipment), a method for synchronizing digital data, a method of generating stereoscopic (3D) imaging data from a 2D source, a process for digitally re-mastering 35mm films into 15/70-format, a method for increasing the dynamic range and contrast of projectors, a method for visibly seaming or superimposing images from multiple projectors and other inventions relating to digital projectors. The Company has been diligent in the protection of its proprietary interests.

# IMAX CORPORATION

**Item 1. Business** (cont'd)

**PATENTS AND TRADEMARKS** (cont'd)

The Company currently holds or licenses 46 patents, has 7 patents pending in the United States and has corresponding patents or filed applications in many countries throughout the world. While the Company considers its patents to be important to the overall conduct of its business, it does not consider any particular patent essential to its operations. Certain of the Company's patents in the United States, Canada and Japan for improvements to the IMAX projection system components expire between 2009 and 2024.

The Company owns or otherwise has rights to trademarks and trade names used in conjunction with the sale of its products, systems and services. The following trademarks are considered significant in terms of the current and contemplated operations of the Company: IMAX®, *The* IMAX *Experience*®, *An* IMAX *Experience*®, IMAX DMR®, IMAX® 3D, IMAX® Dome, IMAX MPX®, IMAX think big® and think big®. These trademarks are widely protected by registration or common law throughout the world. The Company also owns the service mark IMAX THEATRE™.

**EMPLOYEES**

As of December 31, 2006, the Company had 345 employees, not including hourly employees at Company owned and operated theaters.

**AVAILABLE INFORMATION**

The Company makes available free of charge its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K as soon as reasonably practicable after such filings have been made with the United States Securities and Exchange Commission (the "SEC"). Reports may be obtained through the Company's website at www.imax.com or by calling the Company's Investor Relations Department at 212-821-0100.

**Item 1A. Risk Factors**

If any of the risks described below occurs, the Company's business, operating results and financial condition could be materially adversely affected.

The risks described below are not the only ones the Company faces. Additional risks not presently known to the Company or that it deems immaterial, may also impair its business or operations.

**RISKS RELATED TO THE RESTATEMENTS AND RELATED MATTERS**

**The Company is subject to ongoing informal inquiries by regulatory authorities in the U.S. and Canada and it cannot predict the timing of developments and outcomes in these matters.**

The Company is the subject of informal inquiries by the SEC and the Ontario Securities Commission (the "OSC"); these inquiries focus on the Company's accounting policies and related matters. The Company cannot predict when these inquiries will be completed, the further timing of any other developments in connection with the inquiries, or the results or outcomes of these inquiries.

Expenses incurred in connection with these informal inquiries (which include substantial fees of lawyers and other professional advisors) and potential obligations to indemnify officers and directors who could, at a future date, be parties to such actions, continue to adversely affect the Company's cash position and profitability.

The informal inquiries may adversely affect the Company's ability to obtain, and/or increase the cost of obtaining, directors and officers' liability insurance, which could have a material adverse affect on the Company's business, results of operations and financial condition. It may also adversely affect the course of the pending litigation against the Company. The Company is currently defending a consolidated class-action lawsuit in the U.S. and a class-action lawsuit in Ontario (see "Legal Proceedings" in Item 3). Negative developments or outcomes in the informal inquiries could have an adverse affect on the Company's defense of lawsuits. Finally, the SEC and/or OSC could impose sanctions and/or fines on the Company in connection with the aforementioned inquiries. The indenture governing the Company's 9.625% Senior Notes due 2010 (the "Senior Notes") contains a covenant requiring the timely filing of its financial statements with regulatory agencies. Although upon filing this 10-K and the Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2007, the Company will cure its default of this covenant, further changes to the Company's accounting policies and/or additional restatements could result in the failure of the Company to meet these deadlines and cause the holders of its Senior Notes to accelerate payment. In addition, these informal investigations could divert attention of the Company's management and other personnel for significant periods of time.

**Item 1A. Risk Factors** (cont'd)

**RISKS RELATED TO THE RESTATEMENTS AND RELATED MATTERS** (cont'd)

**Resolution of the Company's unresolved SEC and OSC staff comments and informal SEC and OSC enforcement division inquiries may result in a further change in accounting, and in particular, revenue recognition policies.**

In 2006 and 2007, the staff of the SEC and OSC sent comment letters to the Company raising questions as to the Company's revenue recognition policies and other areas, including the Company's recognition of theater system components at different points in time. The comments also raised questions regarding the Company's accounting for settlement income, receivable provisions and certain transactions with Digital Projection International. In addition, the Company was asked to enhance its disclosures in this Annual Report on Form 10-K, particularly in the area of revenue recognition policies. As noted in notes 2(n) and 4 to the accompanying audited consolidated financial statements in Item 8, the Company revised its revenue recognition policy for theater systems and has restated its financial statements for prior periods to reflect the correction of revenue recognition and other errors. The Company is continuing to discuss these issues with the SEC and OSC. It is possible that such discussions could result in a further restatement of the Company's financial statements and amendments to this report or prior Annual Reports and Quarterly Reports, filed on Form 10-K and Form 10-Q, respectively.

**The Company is subject to lawsuits that could divert its resources and result in the payment of significant damages and other remedies.**

The Company's industry is characterized by frequent claims and related litigation regarding breach of contract and related issues. The Company is subject to a number of legal proceedings and claims that arise in the ordinary course of its business. In addition, the Company is engaged as a defendant in several class action lawsuits filed by certain shareholders of the Company. The Company cannot assure that it will succeed in defending any claims, that judgments will not be entered against it with respect to any litigation or that reserves the Company may set aside will be adequate to cover any such judgments. If any of these actions or proceedings against the Company is successful, it may be subject to significant damages awards. In addition, the Company is the plaintiff in a number of lawsuits in which it seeks the recovery of substantial payments. The Company is incurring significant legal fees in prosecuting and defending its lawsuits, and it may not ultimately prevail in such lawsuits or be able to collect on such judgments if it does.

Although the Company's directors and officers liability insurance is deemed to provide coverage for the class-action lawsuits the Company is defending (see "Legal Proceedings" in Item 3), the damages in such lawsuits could be significant. Additionally, the defense of these claims (as with the defense or prosecution of all of the Company's litigation) could divert the attention of the Company's management and other personnel for significant periods of time.

The Company has been the subject of anti-trust complaints and investigations in the past and may be sued or investigated on similar grounds in the future.

**Item 1A. Risk Factors** (cont'd)

RISKS RELATED TO THE RESTATEMENTS AND RELATED MATTERS (cont'd)

**The Company has identified a number of material weaknesses related to its internal controls over financial reporting. These material weaknesses could continue to impact the Company's ability to report its financial results accurately and in a timely manner.**

Over the course of the year-end audit, the Company identified a number of material weaknesses in the Company's internal control over financial reporting. In addition, management assessed the effectiveness of its internal control over financial reporting as at December 31, 2006 and concluded that its internal control over financial reporting was not effective.

The following material weaknesses have been identified and included in the Company's assessment:

- the Company did not maintain adequate controls, including period-end controls, over the analysis and review of revenue recognition for sales and lease transactions in accordance with U.S. GAAP;
- the Company did not maintain effective controls, including period-end controls, over accounting for film transactions in accordance with U.S. GAAP;
- the Company did not maintain effective controls, including period-end controls, over the accounting for contract origination costs in accordance with U.S. GAAP;
- the Company did not maintain adequate controls over the complete and accurate recording of postretirement benefits other than pensions in accordance with U.S. GAAP;
- the Company did not maintain effective controls over the intraperiod allocation of the provision for income taxes in accordance with U.S. GAAP;
- the Company did not maintain adequate controls over the lines of communication between operational departments and the Finance Department related to revenue recognition for sales and lease transactions; and
- the Company did not maintain adequate controls over the timely communication between departments of information relating to developing issues that may impact the Company's financial reporting.

After considering these weaknesses, the Company's Co-Chief Executive Officers ("Co-CEOs") and Chief Financial Officer ("CFO") have also concluded that the Company's disclosure controls and procedures were not effective to provide reasonable assurance that information required to be disclosed in the reports the Company submits is recorded, processed, summarized and reported appropriately.

The Company is in the process of implementing remedial measures and compensating procedures to address these material weaknesses. These material weaknesses, if left unaddressed, could result in accounting errors such as those underlying this restatement, which could adversely impact the accuracy and timing of future reports and filings the Company makes with the SEC and OSC. In addition, the Company expects that implementation of remedial measures and full remediation of its material weaknesses, internal control over financial reporting and its disclosure controls and procedures will take time given a need to implement one comprehensive remediation plan with a well defined set of objectives and agreed upon timelines. The Company expects that its management will continue to devote significant time to the remedial measures necessary to improve its process and procedures, which could be time consuming and may disrupt the Company's business.

**Continued negative publicity has affected and may continue to adversely affect the Company's business and the market price of its publicly traded common shares.**

The Company has been the subject of continuing negative publicity in part as a result of the ongoing informal SEC and OSC inquiries and its delay in filing financial statements, which included a restatement of prior results. This delay additionally caused Company management to be subject to a cease trade order imposed by Canadian provincial securities regulators, and resulted in the Company receiving delisting notices from the Nasdaq, although the Nasdaq subsequently granted the Company an extension of time to come in compliance with exchange listing requirements and the Company expects both the U.S. and Canadian trading issues to be resolved due to its filing this annual report and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007. The negative publicity the Company has received has contributed to declines in the prices of its publicly traded common shares. In addition, this negative publicity has and may continue to have an effect on the terms under which some customers and suppliers are willing to continue to do business with the Company and could adversely affect its financial performance or financial condition. Continuing negative publicity could continue to have an adverse effect on the business and the market price of the Company's publicly traded securities.

# IMAX CORPORATION

**Item 1A. Risk Factors** (cont'd)

**RISKS RELATED TO THE COMPANY'S FINANCIAL PERFORMANCE OR CONDITION**

**The Company is highly leveraged, and this impairs its ability to obtain financing and limits cash flow available for its operations.**

The Company is highly leveraged. As at December 31, 2006, its total long-term indebtedness was $160.0 million. At December 31, 2006, the Company's shareholders' deficit was $52.1 million. The Company's high leverage has important possible consequences. It may:

- make it more difficult for the Company to satisfy its financial obligations;
- limit its ability to obtain additional financing for working capital, capital expenditures (such as joint revenue sharing arrangements), acquisitions or general corporate purposes;
- require the Company to dedicate all or a substantial portion of its cash flow from operations to the payment of principal and interest on its indebtedness, resulting in less cash available for its operations and other purposes;
- impede the Company's research and development initiatives, including its development of a digitally-based projector;
- limit its ability to rapidly adjust to changing market conditions; and
- increase its vulnerability to downturns in its business or in general economic conditions.

The Company's ability to satisfy its obligations and to reduce its total debt depends on its future operating performance. The Company's future operating performance is subject to many factors, including economic, financial and competitive factors, which may be beyond its control. As a result, it may not be able to generate sufficient cash flow, and future financings may not be available to provide sufficient net proceeds, to meet these obligations or to execute its business strategy successfully.

**The Company may still be able to incur more indebtedness, which could further exacerbate the risks associated with its existing indebtedness.**

The Company may be able to incur substantial additional indebtedness in the future. Although the agreements governing the indebtedness contain restrictions on the incurrence of additional indebtedness, debt incurred in compliance with these restrictions could be substantial. If additional indebtedness is added to its current indebtedness levels, the related risks that the Company faces would be magnified.

**The Company may not generate cash flow sufficient to service all of its obligations.**

The Company's ability to make payments on and to refinance its indebtedness and to fund its operations, working capital and capital expenditures, depends on its ability to generate cash in the future. The Company's cash flow is subject to general economic, industry, financial, competitive, technological, operating, regulatory and other factors, many of which are beyond its control. The Company's business may not generate cash flow in an amount sufficient to enable it to repay its indebtedness or to fund its other liquidity needs.

**Item 1A. Risk Factors** (cont'd)

**RISKS RELATED TO THE COMPANY'S FINANCIAL PERFORMANCE OR CONDITION** (cont'd)

**The agreements governing the Company's indebtedness contain significant restrictions that limit its operating and financial flexibility.**

The indenture governing the Company's indebtedness including the agreement governing its credit facility contains covenants that, among other things, limit its ability to:

- incur additional indebtedness;
- pay dividends and make distributions;
- repurchase stock;
- make certain investments;
- transfer or sell assets;
- create liens;
- enter into transactions with affiliates;
- issue or sell stock of subsidiaries;
- create dividend or other payment restrictions affecting restricted subsidiaries; and
- merge, consolidate, amalgamate or sell all or substantially all of its assets to another person.

In addition, the Company's agreement governing its credit facility contains a covenant requiring the Company to maintain a certain level of adjusted earnings before interest, taxes, depreciation and amortization and other defined adjustments over the prior twelve months for two consecutive quarters. All of these covenants and restrictions may limit the Company's ability to execute its business strategy. Moreover, if operating results fall below current levels, the Company may be unable to comply with these covenants. If that occurs, the Company's credit facility lender could demand re-payment of any outstanding indebtedness. In addition, under the terms of the Credit Facility, the Company has to comply with several reporting requirements including the delivery of audited consolidated financial statements within 120 days of the end of the fiscal year.

In March 2007, the Company delayed the filing of its Annual Report on Form 10-K for the year ended December 31, 2006 beyond the filing deadline in order to restate financial statements for certain periods during the fiscal years 2002 - 2006. On March 27, 2007, the Credit Facility lender waived the requirement for the company to deliver audited consolidated financial statements within 120 days of the fiscal year ended December 31, 2006, provided such statements and documents were delivered on or before June 30, 2007. On June 27, 2007, the Credit Facility lender agreed that an event of default would not be deemed to have occurred unless the Company's 10-K filing does not occur by July 31, 2007 or upon the occurrence and continuance of an event of default under the Company's Indenture governing its Senior Notes which, has not been cured within the applicable grace period.

The Company's agreements governing its senior note indebtedness contain a covenant requiring the timely filing of its quarterly and annual results with regulatory agencies. Failure to meet these deadlines could result in holders of the Senior Notes demanding payment. The filing delay of the Company's Annual Report on Form 10-K for the year ended December 31, 2006 resulted in the Company being in default of a financial reporting covenant under the indenture dated as of December 4, 2003, and as thereafter amended and supplemented, governing the Company's Senior Notes due 2010 (the "Indenture").

On April 16, 2007 the Company completed a consent solicitation, receiving consents from holders of approximate 60% aggregate principal amount of the Senior Notes (the "Consenting Holders") to execute a ninth supplemental indenture (the "Supplemental Indenture") to the Indenture with the Guarantors named therein and U.S. Bank National Association. The Supplemental Indenture waived any defaults existing at such time arising from a failure by the Company to comply with the Indenture's reporting covenant requiring that annual and quarterly financial statements are filed with the trustee within 15 days of the required public company filing deadlines, and extended until May 31, 2007, or at the Company's election until June 30, 2007 (the "Covenant Reversion Date"), the date by which the Company's failure to comply with the reporting covenant shall constitute a default, or be the basis for an event of default under the Indenture. The Company paid consent fees of $1.0 million to the Consenting Holders. On May 30, 2007, the Company provided notice to the holders of the Senior Notes of its election to extend the Covenant Reversion Date to June 30, 2007. The Company paid additional consent fees of $0.5 million to the Consenting Holders. Because the Company did not file its Annual Report on Form 10-K for the year ended December 31, 2006 and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 by June 30, 2007, it was in default of the reporting covenant under the Indenture on July 1, 2007, and received notice of such default on July 2, 2007. The Company will cure such default under the Indenture, which provides for a 30-day cure period for defaults under the reporting covenant, by filing this 10-K and the first quarter 2007 10-Q by the end of the 30-day cure period.

**Item 1A. Risk Factors** (cont'd)

**RISKS RELATED TO THE COMPANY'S FINANCIAL PERFORMANCE OR CONDITION** (cont'd)

**Certain bankruptcy and insolvency laws may impair a creditor's ability to enforce remedies in an insolvency.**

The Company is incorporated under the laws of Canada, and substantially all of its assets are located in Canada. Under bankruptcy laws in the United States, courts typically have jurisdiction over a debtor's property, wherever located, including property situated in other countries. There can be no assurance, however, that courts outside the United States would recognize the U.S. bankruptcy court's jurisdiction. Accordingly, difficulties may arise in administering a U.S. bankruptcy case involving a Canadian company like the Company with property located outside the United States, and any orders or judgments of a bankruptcy court in the United States may not be enforceable in Canada against the Company.

The rights of a creditor to enforce remedies may be significantly impaired by the restructuring provisions of applicable Canadian federal bankruptcy, insolvency and other restructuring legislation if the benefit of such legislation is sought with respect to the Company. For example, both the Bankruptcy and Insolvency Act (Canada) and the Companies' Creditors Arrangement Act (Canada) contain provisions enabling an "insolvent person" to obtain a stay of proceeding as against its creditors and others and to prepare and file a proposal for consideration by all or some of its creditors to be voted on by the various classes of its creditors. Moreover, this legislation permits, in certain circumstances, an insolvent debtor to retain possession and administration of its property, even though it may be in default under the applicable debt instrument.

**The Company's stock price has historically been volatile and further declines in market price may negatively impact its ability to raise capital, issue debt, and retain employees.**

The stock markets have experienced extreme price fluctuations that have affected the market price and trading volumes of many technology companies in particular, with potential consequential negative effects on the trading of securities of those companies. A major decline in the capital markets generally, or an adjustment in the market price or trading volumes of the Company's publicly traded securities, may negatively impact its ability to raise capital, issue debt, secure customer business or retain employees. These factors, as well as general economic and geopolitical conditions, may have a material adverse effect on the market price of the Company's publicly traded securities.

**The Company's theater system revenue can vary significantly from its cash flows under theater system sales or lease agreements.**

The Company's theater systems revenue can vary significantly from the associated cash flows. The Company generally provides financing to customers for theater systems on a long-term basis through long-term leases or notes receivables. The terms of leases or notes receivable are typically 10 to 20 years. The Company's agreements typically provide for three major sources of cash flow related to theater systems:

- initial fees, which are paid in installments generally commencing upon the signing of the agreement until installation of the theater systems;
- ongoing fees, which are paid monthly after all theater systems have been installed and are generally equal to the greater of a fixed minimum amount per annum and a percentage of box-office receipts; and
- ongoing annual maintenance and extended warranty fees, which are generally payable commencing in the second year of theater operations.

Initial fees generally make up a majority of cash received for a theater arrangement.

For sales and sales-type leases, the revenue recorded is generally equal to the sum of initial fees and the present value of minimum ongoing fees due under the agreement. Cash received from initial fees in advance of meeting the revenue recognition criteria for the theater systems is recorded as deferred revenue. Contingent fees are recognized as they are reported by the theaters after annual minimum fixed fees are exceeded.

Leases that do not transfer substantially all of the benefits and risks of ownership to the customer are classified as operating leases. For these leases, initial fees and minimum fixed ongoing fees are recognized as revenue on a straight-line basis over the lease term. Contingent fees are recognized as they are reported by the theaters after annual minimum fixed fees are exceeded.

**Item 1A. Risk Factors** (cont'd)

## RISKS RELATED TO THE COMPANY'S BUSINESS

**There is collection risk associated with sale or lease arrangement payments to be received over the terms of the Company's theater system agreements.**

The Company is dependent in part on the viability of its customers for collections under long-term lease or sales financing arrangements. The Company cannot assure that exhibitors or other operators will not experience financial difficulties in the future. The Company may not collect all of its contracted future payments under either lease or sales financing arrangements. The Company's revenue can vary significantly from its cash flows under theater systems sale or lease agreements, and there is collection risk associated with future payments to be received over the terms of its arrangements.

**The Company may not convert all of its backlog into revenue and cash flows.**

The Company lists signed contracts for theater systems sales or sales-type leases for which revenue has not been recognized as sales backlog prior to the time of revenue recognition. Sales backlog represents the total value of all signed theater system sale or lease agreements that are expected to be recognized as revenue in the future and includes initial fees along with the present value of fixed minimum ongoing fees due over the term, but excludes contingent fees in excess of fixed minimum ongoing fees that might be received in the future and maintenance and extended warranty fees. Notwithstanding the legal obligation to do so, all of the Company's customers with which it has signed contracts may not accept delivery of theater systems that are included in the Company's backlog. This could adversely affect the Company's future revenues and cash flows. In addition, customers with theater system obligations in backlog sometimes request that the Company agree to modify or reduce such obligations. The Company has in the past, under certain circumstances, restructured backlog obligations of certain customers.

**The Company depends on commercial movie exhibitors to purchase or lease its IMAX theater systems and to provide additional revenues and venues in which to exhibit its IMAX DMR films.**

A number of the Company's commercial exhibition customers emerged from bankruptcy protection in recent years. The Company is unable to predict if or when they or other exhibitors will purchase or lease or continue to purchase or lease IMAX theater systems from the Company or whether other commercial movie exhibitors will experience significant financial difficulties in the future. If exhibitors choose to reduce their levels of expansion or decide not to purchase or lease IMAX theater systems for their existing or new theaters, the Company's revenues would not increase at an anticipated rate and motion picture studios may be less willing to reformat Hollywood 35mm films into the Company's 15/70 film format for exhibition in commercial IMAX theaters. As a result, the Company's future revenues and cash flows could be adversely affected.

**Item 1A. Risk Factors** (cont'd)

**RISKS RELATED TO THE COMPANY'S BUSINESS** (cont'd)

**The Company's operating results and cash flow can vary substantially from quarter to quarter and could increase the volatility of its share price.**

The Company's operating results and cash flow can fluctuate substantially from quarter to quarter. In particular, fluctuations in theater system installations can materially affect operating results. Factors that have affected the Company's operating results and cash flow in the past, and are likely to affect its operating results and cash flow in the future include, among other things:

- the timing of signing and installation of new theater systems;
- demand for, and acceptance of, its products and services;
- revenue recognition of sales and sales-type leases;
- classification of leases as sales-type versus operating leases;
- volume of orders received and that can be fulfilled in the quarter;
- the level of its sales backlog;
- the timing and commercial success of films produced and distributed by the Company and others;
- the signing of film distribution agreements;
- the financial performance of IMAX theaters operated by the Company's customers and by the Company;
- the financial difficulties, including bankruptcies, faced by customers, particularly customers in the commercial exhibition industry;
- the magnitude and timing of spending in relation to the Company's research and development efforts; and
- the number and timing of joint revenue sharing arrangement installations, related capital expenditures and timing of related cash receipts.

Most of the Company's operating expenses are fixed in the short term. The Company may be unable to rapidly adjust its spending to compensate for any unexpected sales shortfall, which would harm quarterly operating results. The results of any quarterly period are not necessarily indicative of its results for any other quarter or for a full fiscal year.

**The Company may not be able to generate profits in the future.**

The Company may not be able to generate profits in any future period. If the Company does not generate profits in future periods, it may be unable to finance the operations of its business or meet its debt obligations.

**The success of the IMAX theater network is directly related to the availability and success of 15/70-format films, particularly IMAX DMR films.**

An important factor affecting the growth and success of the IMAX theater network is the availability of 15/70-format films. The Company produces only a small number of 15/70-format films and, as a result, the Company relies principally on 15/70-format films produced by third party filmmakers and studios, particularly Hollywood features converted from 35mm format using the Company's IMAX DMR technology. There are no guarantees that these filmmakers and studios will continue to release 15/70 or IMAX DMR films, or that the 15/70-format films they produce will be commercially successful.

**The Company's revenues from existing customers are derived in part from financial reporting provided by its customers, which may be inaccurate or incomplete, resulting in lost or delayed revenues.**

A portion of the Company's payments under lease or sales arrangements and its film license fees are based upon financial reporting provided by its customers. If such reporting is inaccurate, incomplete or withheld, the Company's ability to invoice and receive the proper amount from its customers in a timely fashion will be impaired. The Company's contractual audits of IMAX theaters may not rectify payments lost or delayed as a result of customers not fulfilling their contractual requirements with respect to financial reporting.

**Item 1A. Risk Factors** (cont'd)

**RISKS RELATED TO THE COMPANY'S BUSINESS** (cont'd)

**The Company conducts business internationally which exposes it to uncertainties and risks that could negatively affect its operations and sales.**

A significant portion of the Company's sales are made to customers located outside the United States and Canada. Approximately 36%, 42% and 41% of its revenues were derived outside of the United States and Canada in 2006, 2005 and 2004, respectively. The Company expects its international operations to continue to account for a significant portion of its revenues in the future and plan to expand into new markets in the future. The Company does not have significant experience in operating in certain foreign countries and are subject to the risks associated with operating in those countries. The Company currently has theater systems arrangements projected in countries where economies have been unstable in recent years. The economies of other foreign countries important to the Company's operations could also suffer slower economic growth or instability in the future. The following are among the risks that could negatively affect the Company's operations and sales in foreign markets:

- new restrictions on access to markets;
- unusual or burdensome foreign laws or regulatory requirements or unexpected changes to those laws or requirements;
- fluctuations in the value of foreign currency versus the U.S. dollar and potential currency devaluations;
- new tariffs, trade protection measures, import or export licensing requirements, trade embargoes and other trade barriers;
- imposition of foreign exchange controls in such foreign jurisdictions;
- dependence on foreign distributors and their sales channels;
- difficulties in staffing and managing foreign operations;
- adverse changes in monetary and/or tax policies;
- poor recognition of intellectual property rights;
- inflation;
- requirements to provide performance bonds and letters of credit to international customers to secure system component deliveries; and
- political, economic and social instability in foreign countries.

**The Company faces risks in connection with the continued expansion of its business in China and other parts of Asia.**

The first IMAX theater system in a theater in China was installed in December 2001 and 17 additional IMAX theater systems are scheduled to be installed in China by 2009. China is now the Company's second largest market. However, the geopolitical instability of the region comprising China, Taiwan, North Korea and South Korea could result in economic embargoes, disruptions in shipping or even military hostilities, which could interfere with both the fulfillment of the Company's existing contracts and its pursuit of additional contracts in China.

## IMAX CORPORATION

**Item 1A. Risk Factors** (cont'd)

RISKS RELATED TO THE COMPANY'S BUSINESS (cont'd)

**The introduction of new products and technologies and changes in the way the Company's competitors operate could harm the Company's business.**

The out-of-home entertainment industry is very competitive, and the Company faces a number of challenges. The Company competes with other large-format film projector manufacturers as well as, less directly, conventional motion picture exhibitors. In addition to existing competitors, the Company may also face competition in the future from companies in the entertainment industry with new technologies and/or substantially greater capital resources. The Company also faces competition from a number of alternative motion picture distribution channels such as home video, pay-per-view, video-on-demand, DVD, and syndicated and broadcast television. The Company also competes for the public's leisure time and disposable income with other forms of entertainment, including sporting events, concerts, live theater and restaurants.

Furthermore, the out-of-home entertainment industry in general is undergoing significant changes. Primarily due to technological developments and changing consumer tastes, numerous companies are developing, and are expected to continue to develop, new entertainment products for the out-of-home entertainment industry, which may compete directly with the Company's products. Competitors may design products which are more attractive to the consumer and/or more cost effective than the Company's and may make its products less competitive. The products that the Company is currently developing may never be attractive to consumers or be competitive. As a result of this competition, the Company could lose market share as demand for its products declines, which could seriously harm its business and operating results.

The motion picture exhibition industry is in the early stages of conversion from film based media to electronic based media. The Company is similarly developing a digital projector that can be utilized in IMAX theaters, and is expected to be available for production and sale by early 2009. There are no guarantees this product will be successful (see below).

**There is a technology risk associated with the Company's development of a digitally-based projector.**

The Company is in the process of developing a digital projector that will ultimately supplant and replace its film-based projector for a large portion of its commercial theater customer base. There are numerous risks associated with this transition. The Company may fail to develop a digital projector that meets its high standards for image quality, resulting in the need for additional research and development to develop a projector that does. The digital projector developed by the Company may not be attractive to consumers or be competitive. Competitors may design digitally-based projectors which are more attractive to the consumer, available earlier than the Company's and/or more cost effective than the Company's, and may make the Company's film and/or digital projectors less competitive. As a result of this competition, the Company could lose market share as demand for its products declines, which could seriously harm its business and operating results. In addition, the need for additional research and development and/or for capital to finance replacement of certain theater systems and associated conversion costs could require the Company to raise additional capital, which capital may not be available to the Company on attractive terms, or at all. In addition, as the roll-out of the Company's digital projectors approaches, prospective customers may delay their purchase or lease of film-based projectors, which could have a material adverse effect on the Company's financial position and results of operations. Finally, the Company's theater system arrangements are increasingly including provisions allowing for customer to upgrade from film-based systems to digital systems, when available. The accounting impact of such provisions may include the deferral of some or all of the revenue (though not the cash) associated with the arrangement beyond the point of the full installation and customer acceptance of the film-based system. Such deferral could result in a significant increase in the Company's deferred revenue accounts and a significant decrease in the Company's reported profits prior to the delivery of the digital upgrade. The Company currently expects that its digital projectors will become available by early 2009.

**An economic downturn could materially affect the Company's business by reducing demand for IMAX theater systems and revenue generated from box-office sales.**

The Company depends on the sale and lease of IMAX theater systems to commercial movie exhibitors to generate a significant portion of its revenues. Most of the Company's agreements provide for additional revenues based on a percentage of theater box-office receipts when attendance at an IMAX theater exceeds a minimum threshold. The Company's joint revenue sharing arrangements provide it with a portion of the box-office from the customer's IMAX theaters. Commercial movie exhibitors generate revenues from consumer attendance at their theaters, which are subject to general political, social and economic conditions and the willingness of consumers to spend discretionary money at movie theaters. If there is a prolonged economic downturn, commercial movie exhibitors could be less willing to invest capital in new theaters resulting in a decline in demand for new IMAX theater systems. In addition, any decline in attendance at commercial IMAX theaters will reduce the additional revenues the Company generates from a percentage of theater box-office receipts or under its joint revenue sharing arrangements. Institutional exhibitors may also experience a decline in attendance given general political, social and economic conditions, which may result in reduced revenues generated from receipts attributed to IMAX theaters at such institutions and reduced film license fees.

**Item 1A. Risk Factors** (cont'd)

RISKS RELATED TO THE COMPANY'S BUSINESS (cont'd)

**The Company may experience adverse effects due to exchange rate fluctuations.**

A substantial portion of the Company's revenues are denominated in U.S. dollars, while a substantial portion of its expenses are denominated in Canadian dollars. The Company also generates revenues in Euros and Japanese Yen. The Company may enter into forward contracts to hedge its exposure to exchange rate fluctuations. However, the Company's strategy may not be successful in reducing its exposure to these fluctuations. Any material increase in the value of the Canadian dollar in relation to the U.S. dollar compared to historic levels could have a material adverse effect on its operating results.

**The Company is subject to impairment losses on its film assets.**

The Company amortizes its film assets, including IMAX DMR costs capitalized, using the individual film forecast method, whereby the costs of film assets are amortized and participation costs are accrued for each film in the ratio of revenues earned in the current period to management's estimate of total revenues ultimately expected to be received for that title. Management regularly reviews, and revises when necessary, its estimates of ultimate revenues on a title-by-title basis, which may result in a change in the rate of amortization of the film assets and write-downs or impairments to film assets. Results of operations in future years depend upon the amortization of the Company's film assets and may be significantly affected by periodic adjustments in amortization rates.

**If the Company's goodwill or long lived assets become impaired the Company may be required to record a significant charge to earnings.**

Under U.S. GAAP, the Company reviews its long lived assets for impairment when events or changes in circumstances indicate the carrying value may not be recoverable. Goodwill is required to be tested for impairment annually or when events or changes in circumstances indicate an impairment test is required. Factors that may be considered a change in circumstances include (but are not limited to) a decline in stock price and market capitalization, future cash flows, and slower growth rates in the Company's industry. The Company may be required to record a significant charge to earnings in its financial statements during the period in which any impairment of its goodwill or long lived assets is determined.

**Changes in accounting and changes in management's estimates may affect the Company's reported earnings and operating income.**

U.S. GAAP and accompanying accounting pronouncements, implementation guidelines and interpretations for many aspects of the Company's business, such as revenue recognition, film accounting, accounting for pensions, accounting for income taxes, and treatment of goodwill or long lived assets, are highly complex and involve many subjective judgments. Changes in these rules, their interpretation, management's estimates, or changes in the Company's products or business could significantly change its reported future earnings and operating income and could add significant volatility to those measures, without a comparable underlying change in cash flow from operations. See "Critical Accounting Policies" in Item 7.

**The Company relies on its key personnel, and the loss of one or more of those personnel could harm its ability to carry out its business strategy.**

The Company's operations and prospects depend in large part on the performance and continued service of its senior management team. The Company may not find qualified replacements for any of these individuals if their services are no longer available. The loss of the services of one or more members of the Company's senior management team could adversely affect its ability to effectively pursue its business strategy.

Item 1A. Risk Factors (cont'd)

RISKS RELATED TO THE COMPANY'S BUSINESS (cont'd)

**The Company's ability to adequately protect its intellectual property is limited, and competitors may misappropriate its technology, which could weaken its competitive position.**

The Company depends on its proprietary knowledge regarding IMAX theater systems and film technology. The Company relies principally upon a combination of copyright, trademark, patent and trade secret laws, restrictions on disclosures and contractual provisions to protect its proprietary and intellectual property rights. These laws and procedures may not be adequate to prevent unauthorized parties from attempting to copy or otherwise obtain the Company's processes and technology or deter others from developing similar processes or technology, which could weaken the Company's competitive position. The protection provided to the Company's proprietary technology by the laws of foreign jurisdictions may not protect it as fully as the laws of Canada or the United States. Some of the underlying technologies of the Company's products and system components are not covered by patents or patent applications.

The Company has patents issued and patent applications pending, including those covering its digital projector and digital conversion technology. The Company's patents are filed in the United States often with corresponding patents or filed applications in other jurisdictions, such as Canada, Belgium, Japan, France, Germany and the United Kingdom. The patents may not be issued or provide the Company with any competitive advantages. The patent applications may also be challenged by third parties. Several of the Company's issued patents in the United States, Canada and Japan for improvements to IMAX projectors, IMAX 3D Dome and sound system components expire between 2009 and 2024. Any claims or litigation initiated by the Company to protect its proprietary technology could be time consuming, costly and divert the attention of its technical and management resources.

**Because the Company is incorporated in Canada, it may be difficult for plaintiffs to enforce against the Company liabilities based solely upon U.S. federal securities laws.**

The Company is incorporated under the federal laws of Canada, some of its directors and officers are residents of Canada and a substantial portion of its assets and the assets of such directors and officers are located outside the United States. As a result, it may be difficult for United States' plaintiffs to effect service within the United States upon those directors or officers who are not residents of the United States, or to realize against them or the Company in the United States upon judgments of courts of the United States predicated upon the civil liability under the United States federal securities laws. In addition, it may be difficult for plaintiffs to bring an original action outside of the United States against the Company to enforce liabilities based solely on U.S. federal securities laws.

**Item 1B. Unresolved Staff Comments**

The Company received comments from the Staff of the Division of Corporation Finance of the SEC in a letter dated September 20, 2006 with respect to the Company's Annual Report on Form 10-K for the year ended December 31, 2005, and Quarterly Report on Form 10-Q for the quarter ended June 30, 2006. The Company responded to these comments in December 2006. In a letter dated February 12, 2007, the SEC sent the Company additional comments, particularly in the area of its revenue recognition policies and disclosures. The Company responded to the majority of these comments in letters dated June 20, 2007 and July 2, 2007. The Company has also received comments from the OSC dated November 20, 2006, to which the Company responded on January 19, 2007. The Company has received further comments from the OSC relating to the Company's revenue recognition policies and disclosures in letters dated February 27, 2007, April 9, 2007 and June 27, 2007. The Company has not yet responded to these comments. The Company has considered the SEC and OSC comments in the preparation of this annual report. As discussed in "Risk Factors" in Item 1A, the Company continues to discuss these areas with the SEC and OSC. It is possible further comments may arise as a result of these discussions.

# IMAX CORPORATION

**Item 2. Properties**

The Company's principal executive offices are located in Mississauga, Ontario, Canada, New York, New York and Santa Monica, California. The Company's principal facilities are as follows:

| | Operation | Own/Lease | Expiration |
|---|---|---|---|
| Mississauga, Ontario[1] | Headquarters, Administrative, Assembly and Research and Development | Own | N/A |
| New York, New York | Executive | Lease | 2014 |
| Santa Monica, California | Sales, Marketing, Film Production and Post-Production | Lease | 2012 |
| Shanghai, China | Sales and Marketing | Lease | 2009 |
| Tokyo, Japan | Sales, Marketing, Maintenance and Theater Design | Lease | 2008 |

(1) This facility is subject to a charge in favor of Wachovia Capital Finance Corporation (Canada) in connection with a secured revolving credit facility (see note 14 to the accompanying audited consolidated financial statements in Item 8).

**Item 3. Legal Proceedings**

In March 2005, the Company, together with Three-Dimensional Media Group, Ltd. ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement. On March 10, 2006, the Company and In-Three entered into a settlement agreement settling the dispute between the Company and In-Three. On June 12, 2006, the U.S. District Court for the Central District of California, Western Division, entered a stay in the proceedings against In-Three pending the arbitration of disputes between the Company and 3DMG. Arbitration was initiated by the Company against 3DMG on May 15, 2006 before the International Centre for Dispute Resolution in New York, alleging breaches of the license and consulting agreements between the Company and 3DMG. On June 15, 2006, 3DMG filed an answer denying any breaches and asserting counterclaims that the Company breached the parties' license agreement. On June 21, 2007, the Arbitration Panel unanimously denied 3DMG's Motion for Summary Judgment filed on April 11, 2007 concerning the Company's claims and 3DMG's counterclaims. An evidentiary hearing on liability issues has been set for September 2007 with further proceedings on damages issues to be scheduled if and when necessary. The Company will continue to pursue its claims vigorously and believes that all allegations made by 3DMG are without merit. The Company further believes that the amount of loss, if any, suffered in connection with the counterclaims would not have a material impact on the financial position or operations of the Company, although no assurance can be given with respect to the ultimate outcome of the arbitration.

In January 2004, the Company and IMAX Theater Services Ltd., a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3.7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company. In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17.8 million in damages as a result of E-Citi's breach of a September 2000 lease agreement. The arbitration hearing on both claims took place in November 2005. On February 1, 2006, the ICC issued an award on liability finding unanimously in the Company's favor on all claims. The ICC hearings to determine the amount of damages to be awarded to the Company took place in July 2006, and a further hearing took place on December 2006. The ICC panel has not yet rendered its decision with respect to damages and no amount has yet been recorded for these damages.

In June 2004, Robots of Mars, Inc. ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract. Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages. The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration.

## IMAX CORPORATION

**Item 3. Legal Proceedings** (cont'd)

The Company and certain of its officers and directors were named as defendants in eight purported class action lawsuits filed between August 11, 2006 and September 18, 2006, alleging violations of U.S. federal securities laws. These eight actions were filed in the U.S. District Court for the Southern District of New York. The lawsuits, brought on behalf of shareholders who purchased the Company's common stock between October 28, 2004 and August 9, 2006, allege primarily that the defendants engaged in securities fraud by disseminating materially false and misleading statements during the class period regarding the Company's revenue recognition of theater system installations, and failing to disclose material information concerning the Company's revenue recognition practices. These lawsuits seek unspecified compensatory damages, costs, and expenses. On January 18, 2007, the Court consolidated all eight class action lawsuits and appointed Westchester Capital Management, Inc. as the lead plaintiff and Abbey Spanier Rodd Abrams & Paradis LLP as lead plaintiff's counsel. On April 26, 2007, the lead plaintiff and the Company entered into a stipulation extending the time in which the lead plaintiff must file a consolidated amended complaint until sixty days after the Company files this Annual Report on Form 10-K. The lawsuit is at a very early stage and as a result the Company is not able to estimate a potential loss exposure. The Company believes the allegations made against it in the complaints are meritless and will vigorously defend the matter, although no assurances can be given with respect to the outcome of such proceedings. The Company's directors and officers insurance policy provides for reimbursement for costs and expenses incurred in connection with this lawsuit as well as potential damages awarded, if any, subject to certain policy limits.

A class action lawsuit was filed on September 20, 2006 in the Ontario Superior Court of Justice against the Company and certain of its officers and directors, alleging violations of Canadian securities laws. This lawsuit was brought on behalf of shareholders who acquired the Company's securities between February 17, 2006 and August 9, 2006. The lawsuit is in a very early stage and seeks unspecified compensatory and punitive damages, as well as costs and expenses. As a result, the Company is unable to estimate a potential loss exposure. The Company believes the allegations made against it in the statement of claim are meritless and will vigorously defend the matter, although no assurance can be given with respect to the ultimate outcome of such proceedings. The Company's directors and officers insurance policy provides for reimbursement for costs and expenses incurred in connection with this lawsuit as well as potential damages awarded, if any, subject to certain policy limits.

On May 10, 2007, Catalyst Fund Limited Partnership II, a holder of Senior Notes, filed a complaint against the Company in the Supreme Court of the State of New York, New York County alleging common law fraud, challenging the consent solicitation through which the Company requested and obtained a waiver of any and all defaults arising from a failure to comply with the reporting covenant under the indenture governing the Senior Notes, and seeking a declaration that the consent solicitation was legally ineffective due to alleged misstatements made by the Company. The complaint further seeks a declaration that the Company has defaulted on its reporting obligations under the indenture as a result of its failure to timely file its annual and quarterly reports, and the Company's stated expectation that it will restate certain of the financial statements it filed during the 2001 through 2006 time period. The litigation is at a preliminary stage and as a result, the Company is not able to estimate a potential loss exposure. On June 29, 2007, the Company moved to dismiss the complaint in its entirety. The Company believes the complaint is entirely without merit and intends to vigorously defend the case, although no assurances can be given with respect to the outcome of such proceedings.

On June 19, 2007, the Ontario Superior Court of Justice granted the Company's application to call its Annual General Meeting between June 30, 2007 and September 30, 2007.

In addition to the matters described above, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings.

**Item 4. Submission of Matters to a Vote of Security Holders**

There were no matters submitted to a vote of the security holders during the quarter ended December 31, 2006.

# IMAX CORPORATION

## PART II

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities**

The Company's common shares are listed for trading under the trading symbol "IMAX" on the NASDAQ Global Market ("NASDAQ"). The common shares are also listed on the Toronto Stock Exchange ("TSX") under the trading symbol "IMX". The following table sets forth the range of high and low sales prices per share for the common shares on NASDAQ and the TSX.

| | U.S. Dollars | |
|---|---|---|
| | High | Low |
| **NASDAQ** | | |
| Year ended December 31, 2006 | | |
| Fourth quarter | $ 5.20 | $ 3.32 |
| Third quarter | $ 10.92 | $ 4.43 |
| Second quarter | $ 10.38 | $ 8.17 |
| First quarter | $ 10.95 | $ 7.14 |
| Year ended December 31, 2005 | | |
| Fourth quarter | $ 10.50 | $ 6.98 |
| Third quarter | $ 11.10 | $ 9.00 |
| Second quarter | $ 10.84 | $ 7.62 |
| First quarter | $ 12.45 | $ 7.64 |

| | Canadian Dollars | |
|---|---|---|
| | High | Low |
| **TSX** | | |
| Year ended December 31, 2006 | | |
| Fourth quarter | $ 5.90 | $ 3.78 |
| Third quarter | $ 12.50 | $ 4.91 |
| Second quarter | $ 12.10 | $ 9.11 |
| First quarter | $ 12.72 | $ 8.27 |
| Year ended December 31, 2005 | | |
| Fourth quarter | $ 12.42 | $ 8.02 |
| Third quarter | $ 13.48 | $ 10.70 |
| Second quarter | $ 13.49 | $ 9.60 |
| First quarter | $ 15.49 | $ 9.39 |

As of June 30, 2007, the Company had approximately 340 registered holders of record of the Company's common shares.

The Company has not paid within the last three fiscal years, and has no current plans to pay, cash dividends on its common shares. The payment of dividends by the Company is subject to certain restrictions under the terms of the Company's indebtedness (see notes 12 and 14 to the accompanying audited financial statements in Item 8 and "Liquidity and Capital Resources" in Item 7). The payment of any future dividends will be determined by the Board of Directors in light of conditions then existing, including the Company's financial condition and requirements, future prospects, restrictions in financing agreements, business conditions and other factors deemed relevant by the Board of Directors.

# IMAX CORPORATION

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities** (cont'd)

**Equity Compensation Plans**

The following table sets forth information regarding the Company's Equity Compensation Plan as of December 31, 2006:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 5,100,995 | $ 7.12 | 1,873,662 |
| Equity compensation plans not approved by security holders | nil | nil | nil |
| Total | 5,100,995 | $ 7.12 | 1,873,662 |

**Performance Graph**

The following graph compares the total cumulative shareholder return for $100 invested (assumes that all dividends were reinvested) in common shares of the Company against the cumulative total return of the NASDAQ Composite Index, the S&P/TSX Composite Index and the Bloomberg Hollywood Reporter Index on December 31, 2001 to the end of the most recently completed fiscal year.




| | 31-Dec-01 | 31-Dec-02 | 31-Dec-03 | 31-Dec-04 | 31-Dec-05 | 31-Dec-06 |
|---|---|---|---|---|---|---|
| IMAX | 100 | 200 | 391.58 | 408.42 | 349.50 | 186.14 |
| Nasdaq | 100 | 68.81 | 103.79 | 112.93 | 115.49 | 127.41 |
| S&P/TSX Composite | 100 | 88.26 | 136.75 | 168.07 | 215.39 | 252.69 |
| Bloomberg Hollywood Reporter | 100 | 75.75 | 103.42 | 105.02 | 97.04 | 103.9 |

## CERTAIN INCOME TAX CONSIDERATIONS

**United States Federal Income Tax Considerations**

The following discussion is a general summary of the material U.S. federal income tax consequences of the ownership and disposition of the common shares by a U.S. Holder (a "U.S. Holder"). A U.S. Holder generally means a holder of common shares that is an individual resident of the United States or a United States corporation. This discussion does not discuss all aspects of U.S. federal income taxation that may be relevant to investors subject to special treatment under U.S. federal income tax law (including, for example, owners of 10.0% or more of the voting shares of the Company).

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities (cont'd)**

CERTAIN INCOME TAX CONSIDERATIONS (cont'd)

**United States Federal Income Tax Considerations** (cont'd)

*Distributions on Common Shares*

In general, distributions (without reduction for Canadian withholding taxes) paid by the Company with respect to the common shares will be taxed to a U.S. Holder as dividend income to the extent that such distributions do not exceed the current and accumulated earnings and profits of the Company (as determined for U.S. federal income tax purposes). Subject to certain limitations, dividends paid to non-corporate U.S. Holders may be eligible for a reduced rate of taxation as long as the Company is considered to be a "qualified foreign corporation". A qualified foreign corporation includes a foreign corporation that is eligible for the benefits of an income tax treaty with the United States. The amount of a distribution that exceeds the earnings and profits of the Company will be treated first as a non-taxable return of capital to the extent of the U.S. Holder's tax basis in the common shares and thereafter as taxable capital gain. Corporate holders generally will not be allowed a deduction for dividends received in respect of distributions on common shares. Subject to the limitations set forth in the U.S. Internal Revenue Code, as modified by the U.S.-Canada Income Tax Treaty, U.S. Holders may elect to claim a foreign tax credit against their U.S. federal income tax liability for Canadian income tax withheld from dividends. Alternatively, U.S. Holders may claim a deduction for such amounts of Canadian tax withheld.

*Disposition of Common Shares*

Upon the sale or other disposition of common shares, a U.S. Holder generally will recognize capital gain or loss equal to the difference between the amount realized on the sale and such holder's tax basis in the common shares. Gain or loss upon the disposition of the common shares will be long-term if, at the time of the disposition, the common shares have been held for more than one year. The deduction of capital losses is subject to limitations for U.S. federal income tax purposes.

**Canadian Federal Income Tax Considerations**

This summary is applicable to a holder or prospective purchaser of common shares who is not (and is not deemed to be) resident in Canada, does not (and is not deemed to) use or hold the common shares in, or in the course of, carrying on a business in Canada, and is not an insurer that carries on an insurance business in Canada and elsewhere.

This summary is based on the current provisions of the *Income Tax Act* (Canada), the regulations thereunder, all specific proposals to amend such Act and regulations publicly announced by or on behalf of the Minister of Finance (Canada) prior to the date hereof and the Company's understanding of the administrative and assessing practices published in writing by the Canada Revenue Agency. This summary does not otherwise take into account any change in law or administrative practice, whether by judicial, governmental, legislative or administrative action, nor does it take into account provincial, territorial or foreign income tax consequences, which may vary from the Canadian federal income tax considerations described herein.

This summary is of a general nature only and it is not intended to be, nor should it be construed to be, legal or tax advice to any holder of the common shares and no representation with respect to Canadian federal income tax consequences to any holder of common shares is made herein. Accordingly, prospective purchasers and holders of the common shares should consult their own tax advisers with respect to their individual circumstances.

*Dividends on Common Shares*

Canadian withholding tax at a rate of 25.0% (subject to reduction under the provisions of any relevant tax treaty) will be payable on dividends paid or credited to a holder of common shares outside of Canada. Under the Canada-U.S. Income Tax Convention (1980), the withholding tax rate is generally reduced to 15.0% for a holder entitled to the benefits of the treaty (or 5.0% if the holder is a corporation that owns at least 10.0% of the common shares).

*Capital Gains and Losses*

Subject to the provisions of any relevant tax treaty, capital gains realized by a holder on the disposition or deemed disposition of common shares held as capital property will not be subject to Canadian tax unless the common shares are taxable Canadian property (as defined in the *Income Tax Act* (Canada)), in which case the capital gains will be subject to Canadian tax at rates which will approximate those payable by a Canadian resident. Common shares will not be taxable Canadian property to a holder provided that, at the time of the disposition or deemed disposition, the common shares are listed on a prescribed stock exchange (which currently includes the TSX) unless such holder, persons with whom such holder did not deal at arm's length or such holder together with all such persons, owned 25.0% or more of the issued shares of any class or series of shares of the Company at any time within the 60 month period immediately preceding such time. Under the Canada-U.S. Income Tax Treaty, a holder entitled to the benefits of the treaty and to whom the common shares are taxable Canadian property will not be subject to Canadian tax on the disposition or deemed disposition of the common shares unless at the time of disposition or deemed disposition, the value of the common shares is derived principally from real property situated in Canada.

# IMAX CORPORATION

**Item 6. Selected Financial Data**

*(In thousands of U.S. dollars, except per share amounts)*

The selected financial data set forth below is derived from the consolidated financial information of the Company. The financial information has been prepared in accordance with U.S. GAAP. All financial information referred to herein is expressed in U.S. dollars unless otherwise noted.

As explained in note 4 to the audited consolidated financial statements included in Item 8, the Company has identified certain errors related to: (a) revenue recognition, resulting from the Company's review of its theater system arrangements over the past 5 years in response to comments received from the staff of both the SEC and OSC, which indicated insufficient analysis of various sales and lease transactions and the accounting effect of certain contractual provisions within them; and, misallocations of consideration to elements within certain multiple element arrangements; (b) capitalization of costs into inventory and films assets and amortization of film assets in accordance with Statement of Position 00-2, "Accounting by Producers or Distributors of Films" ("SOP 00-2"); (c) income tax liabilities resulting from failure to make certain tax elections on a timely basis and (d) certain other items described under Other Adjustments in this item. In addition, in the preparation of the consolidated financial statements, the Company recorded other adjustments related to prior periods' unadjusted differences that had been deemed not to be material and adjustments related to prior periods recorded through 2002 opening retained earnings. The consolidated financial statements for the prior periods presented have been restated to reflect these error corrections under U.S. GAAP. A summary description of the more significant items resulting in the restatement are as follows:

i. The Company's revenue recognition policy has been revised to: a) treat the theater system equipment (including the projector, sound system, screen system and, if applicable, 3D glasses cleaning machine) and certain initial services associated with the theater system equipment as a single deliverable and as a single unit of accounting, b) require specific delivery and performance conditions be met; and c) require specific customer acceptance requirements be met. These revisions impact the timing of when the Company recognizes revenue from theater system sales and leases and resulted in revenue related to 14 transactions being moved to later years (revenue and net earnings impact of $27.1 million and $14.0 million, respectively). As a consequence, revenue and net earnings of $5.1 million and $3.0 million, respectively, related to three transactions has been deferred to be recognized in years subsequent to 2006. The most significant impact was in 2005, where revenue for 10 installations was moved to later years (revenue and net earnings impact of $17.5 million and $9.7 million, respectively). Eight installations were moved to 2006 (with a revenue and net earnings impact of $14.1 million and $7.5 million, respectively) and two installations (with a revenue and net earnings impact of $3.4 million and $2.2 million, respectively) were moved to 2007.

   An additional 16 transactions (revenue and net earnings impact of $25.4 million and $14.1 million, respectively) moved between quarters in the year they were originally reported. These adjustments have been included in the restated "Quarterly Financial Data (Unaudited)" presented on page 132.

   Other adjustments related to theater systems include the misallocation of consideration to elements within certain multiple element arrangements, reclassification of certain transactions from sales to sales-type leases and from sales-type leases to operating leases given remaining lien rights or non-standard contractual provisions, inappropriate deferral and allocation of revenue to elements, and improperly recognized finance income on certain transactions. These adjustments resulted in a net decrease of income of $1.9 million for the period 2002 through 2006.

ii. Adjustments for inventory costs, film and income tax accounting and the impact of prior periods' unadjusted differences resulted in a net decrease of income of $4.6 million for periods prior to 2006 including a net decrease of income of $0.8 million in periods prior to 2002, $3.1 million of these timing adjustments increased income in 2006 with the remaining $1.5 million to increase income in 2007 and thereafter.