# EXHIBIT B
# (PART 2)

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**4. Restatement of Previously Issued Financial Statements** (cont'd)

The following table presents the impact of the restatement on the Company's previously issued consolidated statement of operations for the year ended December 31, 2005:

| | As Previously Reported[1] | Revenue Recognition-Theater Systems | Revenue Recognition-Other | Inventory Costs | Film Accounting | Branch Level Interest Taxes | Other Adjustments | As Restated |
|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | |
| Equipment and product sales | $ 61,077 | $ (11,099) | $ 750 | $ — | $ — | $ — | $ — | $ 50,728 |
| Services | 58,084 | (14) | 832 | — | (547) | — | — | 58,355 |
| Rentals | 6,819 | — | 497 | — | — | — | — | 7,316 |
| Finance income | 4,632 | (115) | 88 | — | — | — | — | 4,605 |
| Other revenues | 14,318 | — | — | — | — | — | — | 14,318 |
| | 144,930 | (11,228) | 2,167 | | (547) | | | 135,322 |
| **Costs of goods sold, services and rentals** | | | | | | | | |
| Equipment and product sales | 28,977 | (4,261) | 996 | (506) | — | — | 10 | 25,216 |
| Services | 41,656 | 3 | 27 | — | 2,212 | — | 71 | 43,969 |
| Rentals | 2,216 | — | 244 | — | — | — | — | 2,460 |
| Other costs of goods sold | 143 | — | (1) | — | — | — | — | 142 |
| | 72,992 | (4,258) | 1,266 | (506) | 2,212 | — | 81 | 71,787 |
| **Gross margin** | 71,938 | (6,970) | 901 | 506 | (2,759) | | (81) | 63,535 |
| Selling, general and administrative expenses | 37,287 | 22 | — | 211 | — | — | 32 | 37,552 |
| Research and development | 3,264 | (40) | — | — | — | — | — | 3,224 |
| Amortization of intangibles | 911 | — | — | — | — | — | — | 911 |
| Receivable provisions net of (recoveries) | (859) | (150) | — | — | — | — | — | (1,009) |
| Asset impairments | 13 | — | — | — | — | — | — | 13 |
| **Earnings from operations** | 31,322 | (6,802) | 901 | 295 | (2,759) | | (113) | 22,844 |
| Interest income | 1,004 | — | — | — | — | — | — | 1,004 |
| Interest expense | (16,773) | — | — | — | — | (102) | — | (16,875) |
| **Earnings (loss) from continuing operations before income taxes** | 15,553 | (6,802) | 901 | 295 | (2,759) | (102) | (113) | 6,973 |
| Recovery of (provision for) income taxes | (934) | — | — | — | — | (196) | — | (1,130) |
| **Net earnings (loss) from continuing operations** | 14,619 | (6,802) | 901 | 295 | (2,759) | (298) | (113) | 5,843 |
| Net earnings from discontinued operations | 1,979 | — | — | — | — | — | — | 1,979 |
| **Net earnings (loss)** | $ 16,598 | $ (6,802) | $ 901 | $ 295 | $ (2,759) | $ (298) | $ (113) | $ 7,822 |
| **Earnings (loss) per share** | | | | | | | | |
| Earnings (loss) per share – basic: | | | | | | | | |
| Net earnings (loss) from continuing operations | $ 0.37 | $ (0.17) | $ 0.02 | $ 0.01 | $ (0.07) | $ (0.01) | $ — | $ 0.15 |
| Net earnings from discontinued operations | $ 0.05 | $ — | $ — | $ — | $ — | $ — | $ — | $ 0.05 |
| Net (loss) earnings | $ 0.42 | $ (0.17) | $ 0.02 | $ 0.01 | $ (0.07) | $ (0.01) | $ — | $ 0.20 |
| Earnings (loss) per share – diluted: | | | | | | | | |
| Net earnings (loss) from continuing operations | $ 0.35 | $ (0.16) | $ 0.02 | $ 0.01 | $ (0.07) | $ (0.01) | $ | $ 0.14 |
| Net earnings from discontinued operations | $ 0.05 | $ — | $ — | $ — | $ — | $ — | $ — | $ 0.05 |
| Net earnings (loss) | $ 0.40 | $ (0.16) | $ 0.02 | $ 0.01 | $ (0.07) | $ (0.01) | $ — | $ 0.19 |

(1) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**4. Restatement of Previously Issued Financial Statements** (cont'd)

The following table presents the impact of the restatement on the Company's previously issued consolidated statement of operations for the year ended December 31, 2004:

| | As Previously Reported[(1)] | Revenue Recognition-Theater Systems | Revenue Recognition-Other | Inventory Costs | Film Accounting | Branch Level Interest Taxes | Other Adjustments | As Restated |
|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | |
| Equipment and product sales | $ 48,107 | $ (2,898) | $ (917) | $ — | $ — | $ — | $ (233) | $ 44,059 |
| Services | 59,175 | (34) | 624 | — | (161) | — | — | 59,604 |
| Rentals | 5,585 | — | 672 | — | — | — | — | 6,257 |
| Finance income | 3,991 | (61) | 98 | — | — | — | — | 4,028 |
| Other revenues | 19,122 | — | (729) | — | — | — | — | 18,393 |
| | 135,980 | (2,993) | (252) | — | (161) | — | (233) | 132,341 |
| **Costs of goods sold, services and rentals** | | | | | | | | |
| Equipment and product sales | 20,870 | (1,501) | 29 | (2) | — | — | (42) | 19,354 |
| Services | 45,501 | 1 | (9) | — | (479) | — | 210 | 45,224 |
| Rentals | 3,222 | — | 284 | — | — | — | (323) | 3,183 |
| Other costs of goods sold | 469 | — | — | — | — | — | — | 469 |
| | 70,062 | (1,500) | 304 | (2) | (479) | — | (155) | 68,230 |
| **Gross margin** | 65,918 | (1,493) | (556) | 2 | 318 | — | (78) | 64,111 |
| Selling, general and administrative expenses | 36,066 | 31 | — | 229 | — | — | 31 | 36,357 |
| Research and development | 3,995 | 39 | — | — | — | — | — | 4,034 |
| Amortization of intangibles | 719 | — | — | — | — | — | — | 719 |
| Receivable provisions net of (recoveries) | (1,487) | (1) | — | — | — | — | — | (1,488) |
| Asset impairments | 848 | — | — | — | — | — | — | 848 |
| **Earnings from operations** | 25,777 | (1,562) | (556) | (227) | 318 | — | (109) | 23,641 |
| Interest income | 756 | — | — | — | — | — | — | 756 |
| Interest expense | (16,853) | — | — | — | — | (90) | (128) | (17,071) |
| Loss on retirement of notes | (784) | — | — | — | — | — | — | (784) |
| Recovery of long-term investments | 293 | — | — | — | — | — | — | 293 |
| **Earnings (loss) from continuing operations before income taxes** | 9,189 | (1,562) | (556) | (227) | 318 | (90) | (237) | 6,835 |
| Recovery of (provision for) income taxes | 255 | — | — | — | — | (186) | — | 69 |
| **Net earnings (loss) from continuing operations** | 9,444 | (1,562) | (556) | (227) | 318 | (276) | (237) | 6,904 |
| Net earnings from discontinued operations | 800 | — | — | — | — | — | — | 800 |
| **Net earnings (loss)** | $ 10,244 | $ (1,562) | $ (556) | $ (227) | $ 318 | $ (276) | $ (237) | $ 7,704 |
| **Earnings (loss) per share** | | | | | | | | |
| Earnings (loss) per share – basic: | | | | | | | | |
| Net earnings (loss) from continuing operations | $ 0.24 | $ (0.04) | $ (0.01) | $ — | $ 0.01 | $ (0.01) | $ (0.01) | $ 0.18 |
| Net earnings from discontinued operations | $ 0.02 | $ — | $ — | $ — | $ — | $ — | $ — | $ 0.02 |
| Net (loss) earnings | $ 0.26 | $ (0.04) | $ (0.01) | $ — | $ 0.01 | $ (0.01) | $ (0.01) | $ 0.20 |
| Earnings (loss) per share – diluted: | | | | | | | | |
| Net earnings (loss) from continuing operations | $ 0.24 | $ (0.04) | $ (0.01) | $ — | $ 0.01 | $ (0.01) | $ (0.02) | $ 0.17 |
| Net earnings from discontinued operations | $ 0.02 | $ — | $ — | $ — | $ — | $ — | $ — | $ 0.02 |
| Net earnings (loss) | $ 0.26 | $ (0.04) | $ (0.01) | $ — | $ 0.01 | $ (0.01) | $ (0.02) | $ 0.19 |

(1) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

## 5. Financing Receivables

### (a) General Terms of Lease Arrangements

A substantial majority of the Company's leases are classified as sales-type leases. Certain arrangements that are legal sales are also classified as sales-type leases as certain clauses within the arrangements limit transfer of title or provides the Company with conditional rights to the system. The customer's rights under the Company's lease arrangements are described in note 2 (n). The Company classifies its lease arrangements at inception of the arrangement to determine whether they are sales-type leases or operating leases. Under the Company's lease arrangement, the customer has the ability and the right to operate the hardware components or direct others to operate them in a manner determined by the customer. The Company's lease terms are typically non-cancellable for 10 to 20 years with renewal provisions. Except for those sales arrangements that are classified as sales-type leases, the Company's leases generally do not contain an automatic transfer of title at the end of the lease term. The Company's lease arrangements do not contain a guarantee of residual value at the end of the lease term. The customer is required to pay for executory costs such as insurance and taxes and is required to pay the Company for maintenance and extended warranty generally after the first year of the lease. The customer is responsible for obtaining insurance coverage for the theater systems commencing on the date specified in the arrangement's shipping terms and ending on the date the theater systems are delivered back to the Company.

### (b) Net Carrying Value of Financing Receivables

Financing receivables, consisting of net investment in leases and receivables from the financed sale of its theater systems, are as follows:

| | As at December 31, 2006 | 2005 As restated |
|---|---|---|
| Gross minimum lease amounts receivable | $ 89,343 | $ 87,522 |
| Residual value of equipment | 368 | 632 |
| Unearned finance income | (31,182) | (32,030) |
| Present value of minimum lease amounts receivable | 58,529 | 56,124 |
| Accumulated allowance for uncollectible amounts | (2,445) | (2,768) |
| Net investment in leases | 56,084 | 53,356 |
| | | |
| Gross receivables from financed sales | 14,268 | 13,318 |
| Unearned income | (4,474) | (3,837) |
| Present value of financed sale receivables | 9,794 | 9,481 |
| Total financing receivables | $ 65,878 | $ 62,837 |
| | | |
| Present value of financed sale receivables due within one year | $ 1,886 | $ 1,718 |
| Present value of financed sale receivables due after one year | $ 7,908 | $ 7,763 |

In 2006 the financed sale receivables had a weighted average effective interest rate of 8.3% (2005 - 7.7%).

### (c) Contingent Rents

Revenues from equipment and product sales and revenues from rentals include the following contingent rent amounts, from sales-type and operating leases and joint revenue sharing arrangements, respectively, for the years ended December 31:

| | 2006 | 2005 As restated | 2004 As restated |
|---|---|---|---|
| Sales-type leases | $ 873 | $ 1,234 | $ 847 |
| Operating leases | 1,817 | 4,353 | 4,739 |
| Joint revenue sharing arrangements | 1,107 | 666 | — |
| | $ 3,797 | $ 6,253 | $ 5,586 |

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**5. Financing Receivables (cont'd)**

**(d) Future Minimum Rental Payments**

Future minimum rental payments receivable from operating and sales-type leases at December 31, 2006, for each of the next five years are as follows:

| | Operating Leases | Sales-Type Leases |
|---|---|---|
| 2007 | $ 1,341 | $ 9,215 |
| 2008 | 1,355 | 8,500 |
| 2009 | 1,411 | 8,302 |
| 2010 | 1,320 | 8,221 |
| 2011 | 1,280 | 8,161 |
| Thereafter | 6,251 | 43,737 |
| Total | $ 12,958 | $ 86,136 |

**6. Inventories**

| | As at December 31, | |
|---|---|---|
| | 2006 | 2005 As restated |
| Raw materials | $ 11,504 | $ 10,464 |
| Work-in-process | 2,677 | 3,200 |
| Finished goods | 12,732 | 15,303 |
| | $ 26,913 | $ 28,967 |

**7. Film Assets**

| | As at December 31, | |
|---|---|---|
| | 2006 | 2005 As restated |
| Completed and released films, net of accumulated amortization | $ 1,050 | $ 1,377 |
| Films in production | 40 | 142 |
| Development costs | 145 | 189 |
| | $ 1,235 | $ 1,708 |

All unamortized film costs, as at December 31, 2006, for released films are expected to be amortized within four years from December 31, 2006. The amount of participation payments to third parties related to these films that the Company expects to pay during 2007 is $4.2 million.

**8. Property, Plant and Equipment**

| | As at December 31, 2006 | | |
|---|---|---|---|
| | Cost | Accumulated Depreciation | Net book value |
| Equipment leased or held for use or rental | | | |
| Theater system components(1) | $ 30,384 | $ 22,624 | $ 7,760 |
| Camera equipment | 5,954 | 5,924 | 30 |
| | 36,338 | 28,548 | 7,790 |
| Assets under construction | 10 | — | 10 |
| Other property, plant and equipment | | | |
| Land | 1,593 | — | 1,593 |
| Buildings | 14,723 | 6,899 | 7,824 |
| Office and production equipment(2) | 24,560 | 21,496 | 3,064 |
| Leasehold improvements | 8,144 | 4,036 | 4,108 |
| | 49,020 | 32,431 | 16,589 |
| | $ 85,368 | $ 60,979 | $ 24,389 |

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**8. Property, Plant and Equipment** (cont'd)

| | As at December 31, 2005 | | |
|---|---|---|---|
| | Cost<br>As restated | Accumulated Depreciation<br>As restated | Net book value<br>As restated |
| Equipment leased or held for use or rental | | | |
| Theater system components[1] | $ 31,522 | $ 22,218 | $ 9,304 |
| Camera equipment | 5,955 | 5,892 | 63 |
| | 37,477 | 28,110 | 9,367 |
| Other property, plant and equipment | | | |
| Land | 1,593 | — | 1,593 |
| Buildings | 14,723 | 6,397 | 8,326 |
| Office and production equipment[2] | 24,975 | 21,642 | 3,333 |
| Leasehold improvements | 8,126 | 3,382 | 4,744 |
| | 49,417 | 31,421 | 17,996 |
| | $ 86,894 | $ 59,531 | $ 27,363 |

(1) Included in theater system components are assets with costs of $26.4 million (2005 - $27.8 million) and accumulated depreciation of $20.1 million (2005 - $20.0 million) that are leased to customers under operating leases and joint revenue sharing arrangements.
(2) Included in office and production equipment are assets under capital lease with costs of $1.4 million (2005 - $0.9 million) and accumulated depreciation of $0.9 million (2005 - $0.6 million).

**9. Other Assets**

| | As at December 31, | |
|---|---|---|
| | 2006 | 2005<br>As restated |
| Cash surrender value of life insurance policies | $ 4,255 | $ 3,349 |
| Deferred charges on debt financing | 3,719 | 4,635 |
| Commissions and other deferred selling expenses | 2,391 | 2,516 |
| Pension asset, representing unrecognized prior service costs | — | 3,634 |
| | $ 10,365 | $ 14,134 |

**10. Income Taxes**

(a) Earnings (loss) from continuing operations before income taxes by tax jurisdiction, for the years ended December 31, are comprised of the following:

| | 2006 | 2005<br>As restated | 2004<br>As restated |
|---|---|---|---|
| Canada | $ (14,802) | $ 6,520 | $ 3,715 |
| United States | 2,556 | 543 | 2,820 |
| Other | 152 | (90) | 300 |
| | $ (12,094) | $ 6,973 | $ 6,835 |

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**10. Income Taxes** (cont'd)

(b) The (provision for) recovery of income taxes related to income from continuing operations, for the year ended December 31, is comprised of the following:

| | 2006 | 2005 As restated | 2004 As restated |
|---|---|---|---|
| Current: | | | |
| Canada | $ (299) | $ (1,130) | $ (1,006) |
| Foreign | (1) | — | (68) |
| | (300) | (1,130) | (1,074) |
| Deferred: | | | |
| Canada | (5,918) | 52 | 1,143 |
| Foreign | — | (52) | — |
| | (5,918) | — | 1,143 |
| | $ (6,218) | $ (1,130) | $ 69 |

(c) The (provision for) recovery of income taxes from continuing operations differs from the amount that would have resulted by applying the combined Canadian federal and provincial statutory income tax rates to earnings (losses), for the years ended December 31, due to the following:

| | 2006 | 2005 As restated | 2004 As restated |
|---|---|---|---|
| Income tax recovery (provision for) at combined statutory rates | $ 4,233 | $ (2,522) | $ (2,469) |
| Adjustments resulting from: | | | |
| Non-taxable portion of capital gains and losses | — | — | (1,358) |
| Non-deductible interest and penalties | (31) | (137) | 20 |
| Non-deductible stock option expense | (328) | (102) | (66) |
| Other non-deductible items | (89) | (144) | (46) |
| Decrease (increase) in valuation allowance | (7,807) | 488 | 3,335 |
| Large corporations tax and other taxes | — | (248) | (467) |
| Income tax at different rates in foreign and other provincial jurisdictions | (535) | (8) | (17) |
| Carryforward (utilization) of investment and other tax credits (non-refundable) | (153) | 202 | 1,183 |
| Tax recoveries through loss and tax credit carrybacks | 7 | 158 | 808 |
| Effect of legislated tax rate (reductions) increases | (2,350) | — | — |
| Changes to deferred tax assets and liabilities resulting from audit and other tax return adjustments | 856 | 987 | (944) |
| Other | (21) | 196 | 90 |
| (Provision for) recovery of income taxes, as reported | $ (6,218) | $ (1,130) | $ 69 |

**10. Income Taxes** (cont'd)

(d) The net deferred income tax asset, at December 31, is comprised of the following:

| | 2006 | 2005 As restated |
|---|---|---|
| Net operating loss and capital loss carryforwards | $ 15,505 | $ 15,014 |
| Investment tax credit and other tax credit carryforwards | 2,457 | 2,519 |
| Write-downs of other assets | 833 | 2,545 |
| Excess tax over accounting basis in property, plant and equipment and inventories | 38,213 | 41,639 |
| Accrued pension liability | 7,676 | 8,164 |
| Other accrued reserves | 1,763 | 1,401 |
| Other | 8 | 8 |
| Total deferred income tax assets | 66,455 | 71,290 |
| Income recognition on net investment in leases | (14,462) | (21,534) |
| | 51,993 | 49,756 |
| Valuation allowance | (51,993) | (43,585) |
| Net deferred income tax asset | $ — | $ 6,171 |

(e) Estimated net operating loss carryforwards and estimated tax credit carryforwards expire as follows:

| | Investment tax credits and other tax credit carryforwards | Net operating loss carryforwards |
|---|---|---|
| 2007 | $ — | $ — |
| 2008 | 554 | 417 |
| 2009 | 583 | 23 |
| 2010 | 158 | 56 |
| 2011 | 218 | 7 |
| Thereafter | 1,682 | 42,201 |
| | $ 3,195 | $ 42,704 |

Estimated net operating loss carryforwards can be carried forward to reduce taxable income through to 2026. Estimated capital loss carryforwards amount to $14.0 million as at December 31, 2006 and can be carried forward indefinitely to reduce capital gains. Investment tax credits and other tax credits can be carried forward to reduce income taxes payable through to 2026.

## 11. Other Intangible Assets

| | As at December 31, 2006 | | |
|---|---|---|---|
| | Cost | Accumulated amortization | Net book value |
| Patents and trademarks | $ 5,550 | $ 3,084 | $ 2,466 |
| Intellectual property rights | 100 | 19 | 81 |
| Other | 250 | 250 | — |
| | $ 5,900 | $ 3,353 | $ 2,547 |

| | As at December 31, 2005 | | |
|---|---|---|---|
| | Cost | Accumulated amortization | Net book value |
| Patents and trademarks | $ 5,238 | $ 2,628 | $ 2,610 |
| Intellectual property rights | 100 | 9 | 91 |
| Other | 250 | 250 | — |
| | $ 5,588 | $ 2,887 | $ 2,701 |

The Company expects to amortize approximately $0.5 million of other intangible assets for each of the next 5 years. Fully amortized other intangible assets are still in use by the Company.

## 12. Senior Notes due 2010

In December 2003, the Company completed a private placement of $160.0 million principal amount of 9.625% Senior Notes due December 1, 2010 (the "Unregistered Senior Notes") to a group of initial purchasers. In November 2004, the Company completed an exchange offer wherein $159.0 million of the Company's Unregistered Senior Notes were exchanged for Senior Notes registered under the Securities Act of 1933, as amended (the "Registered Senior Notes"). Apart from the fact that the Registered Senior Notes have been registered under the Securities Act, the Unregistered Senior Notes and the Registered Senior Notes are substantially identical and are referred to herein as the "Senior Notes".

The Senior Notes bear interest at a rate of 9.625% per annum and are unsecured obligations that rank equally with any of the Company's existing and future senior indebtedness and senior to all of the Company's existing and future subordinated indebtedness. The payment of principal, premium, if any and interest on the Senior Notes is unconditionally guaranteed, jointly and severally, by certain of the Company's wholly-owned subsidiaries. The Senior Notes are subject to redemption for cash by the Company, in whole or in part, at any time on or after December 1, 2007, at redemption prices expressed as percentages of the principal amount for each 12-month period commencing December 1 of the years indicated: 2007 - 104.813%; 2008 - 102.406%; 2009 and thereafter - 100.000%, together with accrued and unpaid interest thereon to the redemption date. If certain changes were to result in the imposition of withholding taxes under Canadian law, the Senior Notes are subject to redemption at the Company's option, in whole but not in part, at a redemption price of 100% of the principal amount thereof plus accrued and unpaid interest to the date of redemption. In the event of a change in control, the Company will be required to make an offer to repurchase the Senior Notes at a purchase price equal to 101% of the principal amount thereof plus accrued and unpaid interest to the date of repurchase. In addition, prior to December 1, 2006, under certain conditions, the Company could have redeemed up to 35% of the Senior Notes with the proceeds of certain equity offerings at 109.625% of the principal amount thereof together with accrued and unpaid interest thereon to the date of redemption.

The terms of the Company's Senior Notes impose certain restrictions on its operating and financing activities, including certain restrictions on the Company's ability to: incur certain additional indebtedness; make certain distributions or certain other restricted payments; grant liens; create certain dividend and other payment restrictions affecting the Company's subsidiaries; sell certain assets or merge with or into other companies; and enter into certain transactions with affiliates.

As at December 31, 2006, the Company had outstanding $159.0 million (2005 - $159.0 million) aggregate principal of Registered Senior Notes and $1.0 million (2005 - $1.0 million) aggregate principal of Unregistered Senior Notes.

The terms of the Company's Senior Notes require that annual and quarterly financial statements are filed with the Trustee within 15 days of the required public company filing deadlines. If these financial reporting covenants are breached then this is considered an event of default under the terms of the Senior Notes and the Company has 30 days to cure this default, after which the Senior Notes become due and payable.

**12. Senior Notes due 2010 (cont'd)**

In March 2007, the Company delayed the filing of its Annual Report on Form 10-K for the year ended December 31, 2006 beyond the required public company filing deadline due to the discovery of certain accounting errors, broadened its accounting review to include certain other accounting matters based on comments received by the Company from the SEC and OSC, and ultimately restated financial statements for certain periods. The filing delay resulted in the Company being in default of a financial reporting covenant under the indenture dated as of December 4, 2003, and as thereafter amended and supplemented, governing the Company's Senior Notes due 2010 (the "Indenture").

On April 16, 2007 the Company completed a consent solicitation, receiving consents from holders of approximate 60% aggregate principal amount of the Senior Notes (the "Consenting Holders") to execute a ninth supplemental indenture (the "Supplemental Indenture") to the Indenture with the Guarantors named therein and U.S. Bank National Association. The Supplemental Indenture waived any defaults existing at such time arising from a failure by the Company to comply with the Indenture's reporting covenant requiring that annual and quarterly financial statements are filed with the trustee within 15 days of the required public company filing deadlines, and extended until May 31, 2007, or at the Company's election until June 30, 2007 (the "Covenant Reversion Date"), the date by which the Company's failure to comply with the reporting covenant shall constitute a default, or be the basis for an event of default under the Indenture. The Company paid consent fees of $1.0 million to the Consenting Holders. On May 30, 2007, the Company provided notice to the holders of the Senior Notes of its election to extend the Covenant Reversion Date to June 30, 2007. The Company paid additional consent fees of $0.5 million to the Consenting Holders. Because the Company did not file its Annual Report on Form 10-K for the year ended December 31, 2006 and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2007 by June 30, 2007, it was in default of the reporting covenant under the Indenture on July 1, 2007, and received notice of such default on July 2, 2007. The Company expects to cure such default under the Indenture, which provides for a 30-day cure period for defaults under the reporting covenant, by filing this 10-K and the first quarter 2007 10-Q by the end of the 30-day cure period.

**13. Old Senior Notes due 2005**

In December 1998, the Company issued $200.0 million of Senior Notes due December 1, 2005 bearing interest at a rate of 7.875% per annum (the "Old Senior Notes").

During 2003, the Company retired an aggregate of $47.2 million principal amount of the Old Senior Notes and completed a tender offer and consent solicitation for its remaining $152.8 million of the Old Senior Notes. In December 2003, $123.6 million in principal of the Old Senior Notes were redeemed pursuant to the tender offer. Notice of Redemption for all remaining outstanding Old Senior Notes was delivered on December 4, 2003 and the remaining $29.2 million of outstanding Old Senior Notes were redeemed on January 2, 2004. A loss of $0.8 million related to the retirement was recorded in 2004.

Interest expense on the Old Senior Notes amounted to less than $0.1 million in 2004.

**14. Credit Facility**

On February 6, 2004, the Company entered into a Loan Agreement for a secured revolving credit facility as amended on June 30, 2005 and as further amended by the Second Amendment to the Loan Agreement which was entered into with effect from May 16, 2006 (the "Credit Facility"). The Credit Facility is a revolving credit facility expiring on October 31, 2009 with an optional one-year renewal thereafter contingent upon approval by the lender, permitting maximum aggregate borrowings of $40.0 million, subject to a borrowing base calculation which includes the Company's financing receivables, operating leases, finished goods inventory and capital assets with certain reserve requirements and deductions for outstanding letters of credit. As at December 31, 2006, the Company's current borrowing capacity under such calculation is $23.6 million after deduction for outstanding letters of credit of $9.4 million. The Credit Facility bears interest at the applicable prime rate per annum or LIBOR plus a margin as specified therein per annum and is collateralized by a first priority security interest in all of the current and future assets of the Company. The Credit Facility contains typical affirmative and negative covenants, including covenants that restrict the Company's ability to: incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales; incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions. In addition, the Credit Facility agreement contains customary events of default, including upon an acquisition or a change of control that may have a material adverse effect on the Company or a guarantor. The Credit Facility also requires the Company to maintain, over a period of time, a minimum level of cash collections and a minimum level of adjusted earnings before interest, taxes, depreciation and amortization including film asset amortization, stock and other non-cash compensation, write downs (recoveries), and asset impairment charges, and other non-cash uses of funds calculated on a trailing four quarter basis, of not less than $20.0 million.

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**14. Credit Facility** (cont'd)

Under the terms of the Credit Facility, the Company has to comply with several reporting requirements including the delivery of audited consolidated financial statements within 120 days of the end of the fiscal year.

In March 2007, the Company delayed the filing of its Annual Report on Form 10-K for the year ended December 31, 2006 beyond the filing deadline in order to restate financial statements for certain periods during the fiscal years 2002 - 2006. On March 27, 2007, the Credit Facility lender waived the requirement for the Company to deliver audited consolidated financial statements within 120 days of the end of the fiscal year ended December 31, 2006, provided such statements and documents were delivered on or before June 30, 2007. On June 27, 2007, the Credit Facility lender agreed that an event of default would not be deemed to have occurred unless the Company's 10-K filing does not occur by July 31, 2007 or upon the occurrence and continuance of an event of default under the Company's Indenture governing its Senior Notes, which has not been cured within the applicable grace period.

**15. Commitments**

(a) The Company's lease commitments consist of rent and equipment under operating leases. The Company accounts for any incentives provided over the term of the lease. Total minimum annual rental payments to be made by the Company under operating leases are as follows:

| | |
|---|---|
| 2007 | $ 5,824 |
| 2008 | 5,651 |
| 2009 | 5,511 |
| 2010 | 5,656 |
| 2011 | 5,793 |
| Thereafter | 14,293 |
| | $ 42,728 |

Rent expense was $5.1 million for 2006 (2005 - $4.8 million, 2004 - $4.5 million), net of sublease rental of $0.7 million (2005 - $0.6 million, 2004 - $0.6 million).

(b) As at December 31, 2006, the Company has letters of credit of $9.4 million outstanding under the Company's credit facility arrangement (see note 14). In addition, as at December 31, 2006, the Company has Performance Security Guarantees of $0.6 million outstanding that have been guaranteed through Export Development Canada. As of December 31, 2005, the Company had letters of credit of $7.6 million outstanding, which had been collateralized by cash deposits.

(c) The Company compensates its sales force with both fixed and variable compensation. Commissions on the sale or lease of the Company's theater systems are payable in graduated amounts from the time of collection of the customer's first payment to the Company up to the collection of the customer's last initial payment. At December 31, 2006, $0.3 million (2005 - $0.4 million, 2004 - $0.2 million) of commissions will be payable in future periods if the Company collects its initial payments as anticipated.

**16. Contingencies and Guarantees**

The Company is involved in lawsuits, claims, and proceedings, including those identified below, which arise in the ordinary course of business. In accordance with Statements of Financial Accounting Standards No. 5, "Accounting for Contingencies", the Company will make a provision for a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. The Company believes it has adequate provisions for any such matters. The Company reviews these provisions in conjunction with any related provisions on assets related to the claims at least quarterly and adjusts these provisions to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other pertinent information related to the case. Should developments in any of these matters outlined below cause a change in the Company's determination as to an unfavorable outcome and result in the need to recognize a material provision, or, should any of these matters result in a final adverse judgment or be settled for significant amounts, they could have a material adverse effect on the Company's results of operations, cash flows, and financial position in the period or periods in which such a change in determination, settlement or judgment occurs.

The Company expenses legal costs relating to its lawsuits, claims and proceedings as incurred.

**16. Contingencies and Guarantees** (cont'd)

(a) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd. ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement. On March 10, 2006, the Company and In-Three entered into a settlement agreement settling the dispute between the Company and In-Three. On June 12, 2006, the U.S. District Court for the Central District of California, Western Division, entered a stay in the proceedings against In-Three pending the arbitration of disputes between the Company and 3DMG. Arbitration was initiated by the Company against 3DMG on May 15, 2006 before the International Centre for Dispute Resolution in New York, alleging breaches of the license and consulting agreements between the Company and 3DMG. On June 15, 2006, 3DMG filed an answer denying any breaches and asserting counterclaims that the Company breached the parties' license agreement. On June 21, 2007, the Arbitration Panel unanimously denied 3DMG's Motion for Summary Judgment filed on April 11, 2007 concerning the Company's claims and 3DMG's counterclaims. An evidentiary hearing on liability issues has been set for September 2007 with further proceedings on damages issues to be scheduled if and when necessary. The Company will continue to pursue its claims vigorously and believes that all allegations made by 3DMG are without merit. The Company further believes that the amount of loss, if any, suffered in connection with the counterclaims would not have a material impact on the financial position or operations of the Company, although no assurance can be given with respect to the ultimate outcome of the arbitration.

(b) In January 2004, the Company and IMAX Theater Services Ltd., a subsidiary of the Company, commenced an arbitration seeking damages of approximately $3.7 million before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company. In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-CITI Entertainment (I) PVT Limited ("E-Citi"), seeking $17.8 million in damages as a result of E-Citi's breach of a September 2000 lease agreement. The arbitration hearing on both claims took place in November 2005. On February 1, 2006, the ICC issued an award on liability finding unanimously in the Company's favor on all claims. The ICC hearings to determine the amount of damages to be awarded to the Company took place in July 2006, and a further hearing took place on December 2006. The ICC panel has not yet rendered its decision with respect to damages and no amount has yet been recorded for these damages.

(c) In June 2004, Robots of Mars, Inc. ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to an arbitration provision in a 1994 film production agreement between Robots' predecessor-in-interest and a subsidiary of the Company, asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with contract. Robots is seeking an accounting of the Company's revenues and an award of all sums alleged to be due to Robots under the production agreement, as well as punitive damages. The Company intends to vigorously defend the arbitration proceeding and believes the amount of the loss, if any, that may be suffered in connection with this proceeding will not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of such arbitration.

(d) The Company and certain of its officers and directors were named as defendants in eight purported class action lawsuits filed between August 11, 2006 and September 18, 2006, alleging violations of U.S. federal securities laws. These eight actions were filed in the U.S. District Court for the Southern District of New York. The lawsuits, brought on behalf of shareholders who purchased the Company's common stock between October 28, 2004 and August 9, 2006, allege primarily that the defendants engaged in securities fraud by disseminating materially false and misleading statements during the class period regarding the Company's revenue recognition of theater system installations, and failing to disclose material information concerning the Company's revenue recognition practices. These lawsuits seek unspecified compensatory damages, costs, and expenses. On January 18, 2007, the Court consolidated all eight class action lawsuits and appointed Westchester Capital Management, Inc. as the lead plaintiff and Abbey Spanier Rodd Abrams & Paradis LLP as lead plaintiff's counsel. On April 26, 2007, the lead plaintiff and the Company entered into a stipulation extending the time in which the lead plaintiff must file a consolidated amended complaint until sixty days after the Company files this Annual Report on Form 10-K. The lawsuit is at a very early stage and as a result the Company is not able to estimate a potential loss exposure. The Company believes the allegations made against it in the complaints are meritless and will vigorously defend the matter, although no assurances can be given with respect to the outcome of such proceedings. The Company's directors and officers insurance policy provides for reimbursement for costs and expenses incurred in connection with this lawsuit as well as potential damages awarded, if any, subject to certain policy limits.

**16. Contingencies and Guarantees** (cont'd)

(e) A class action lawsuit was filed on September 20, 2006 in the Ontario Superior Court of Justice against the Company and certain of its officers and directors, alleging violations of Canadian securities laws. This lawsuit was brought on behalf of shareholders who acquired the Company's securities between February 17, 2006 and August 9, 2006. The lawsuit is in a very early stage and seeks unspecified compensatory and punitive damages, as well as costs and expenses. As a result, the Company is unable to estimate a potential loss exposure. The Company believes the allegations made against it in the statement of claim are meritless and will vigorously defend the matter, although no assurance can be given with respect to the ultimate outcome of such proceedings. The Company's directors and officers insurance policy provides for reimbursement for costs and expenses incurred in connection with this lawsuit as well as potential damages awarded, if any, subject to certain policy limits.

(f) On May 10, 2007, Catalyst Fund Limited Partnership II, a holder of Senior Notes, filed a complaint against the Company in the Supreme Court of the State of New York, New York County alleging common law fraud, challenging the consent solicitation through which the Company requested and obtained a waiver of any and all defaults arising from a failure to comply with the reporting covenant under the indenture governing the Senior Notes, and seeking a declaration that the consent solicitation was legally ineffective due to alleged misstatements made by the Company. The complaint further seeks a declaration that the Company has defaulted on its reporting obligations under the indenture as a result of its failure to timely file its annual and quarterly reports, and the Company's stated expectation that it will restate certain of the financial statements it filed during the 2001 through 2006 time period. The litigation is at a preliminary stage and as a result, the Company is not able to estimate a potential loss exposure. On June 29, 2007, the Company moved to dismiss the complaint in its entirety. The Company believes this lawsuit is entirely without merit and plans to defend it vigorously, although no assurances can be given with respect to the outcome of such proceedings.

(g) In addition to the matters described above, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings.

(h) In the normal course of business, the Company enters into agreements that may contain features that meet the FIN 45 definition of a guarantee. FIN 45 defines a guarantee to be a contract (including an indemnity) that contingently requires the Company to make payments (either in cash, financial instruments, other assets, shares of its stock or provision of services) to a third party based on (a) changes in an underlying interest rate, foreign exchange rate, equity or commodity instrument, index or other variable, that is related to an asset, a liability or an equity security of the counterparty, (b) failure of another party to perform under an obligating agreement or (c) failure of another third party to pay its indebtedness when due.

**Financial Guarantees**

The Company has provided no significant financial guarantees to third parties.

**Product Warranties**

The following summarizes the accrual for product warranties that was recorded as part of accrued liabilities in the consolidated balance sheets as of December 31:

| | 2006 | 2005 |
|---|---|---|
| Balance at the beginning of the year | $ 119 | $ 39 |
| Payments | (154) | (46) |
| Warranties issued | 38 | 155 |
| Revisions | 35 | (29) |
| Balance at the end of the year | $ 38 | $ 119 |

## 16. Contingencies and Guarantees (cont'd)

### Director/Officer Indemnifications

The Company's General By-law contains an indemnification of its directors/officers, former directors/officers and persons who have acted at its request to be a director/officer of an entity in which the Company is a shareholder or creditor, to indemnify them, to the extent permitted by the *Canada Business Corporations Act*, against expenses (including legal fees), judgments, fines and any amount actually and reasonably incurred by them in connection with any action, suit or proceeding in which the directors and/or officers are sued as a result of their service, if they acted honestly and in good faith with a view to the best interests of the Company. The nature of the indemnification prevents the Company from making a reasonable estimate of the maximum potential amount it could be required to pay to counterparties. The Company has purchased directors' and officers' liability insurance. No amount has been accrued in the consolidated balance sheet as of December 31, 2006, with respect to this indemnity.

### Other Indemnification Agreements

In the normal course of the Company's operations, it provides indemnifications to counterparties in transactions such as: theater system lease and sale agreements and the supervision of installation or servicing of the theater systems; film production, exhibition and distribution agreements; real property lease agreements; and employment agreements. These indemnification agreements require the Company to compensate the counterparties for costs incurred as a result of litigation claims that may be suffered by the counterparty as a consequence of the transaction or the Company's breach or non-performance under these agreements. While the terms of these indemnification agreements vary based upon the contract, they normally extend for the life of the agreements. A small number of agreements do not provide for any limit on the maximum potential amount of indemnification, however virtually all of the Company's system lease and sale agreements limit such maximum potential liability to the purchase price of the system. The fact that the maximum potential amount of indemnification required by the Company is not specified in some cases prevents the Company from making a reasonable estimate of the maximum potential amount it could be required to pay to counterparties. Historically, the Company has not made any significant payments under such indemnifications and no amount has been accrued in the accompanying consolidated financial statements with respect to the contingent aspect of these indemnities.

## 17. Capital Stock

### (a) Authorized

The authorized capital of the Company consists of an unlimited number of common shares.

The following is a summary of the rights, privileges, restrictions and conditions of the common shares.

#### Common Shares

The holders of common shares are entitled to receive dividends if, as and when declared by the directors of the Company, subject to the rights of the holders of any other class of shares of the Company entitled to receive dividends in priority to the common shares.

The holders of the common shares are entitled to one vote for each common share held at all meetings of the shareholders.

### (b) Changes during the Period

In 2006, the Company issued 72,032 (2005 - 685,706) common shares pursuant to the exercise of stock options for cash proceeds of $0.3 million (2005 - $3.6 million).

### (c) Stock-Based Compensation

The Company has three stock-based compensation plans that are described below. The compensation costs charged to the statement of operations for these plans were $0.9 million, $0.1 million, $0.2 million for 2006, 2005 and 2004, respectively. No income tax benefit is recorded in the consolidated statement of operations for these costs.

**17. Capital Stock (cont'd)**

**(c) Stock-Based Compensation (cont'd)**

**Stock Option Plan**

The Company's Stock Option Plan, which is shareholder approved, permits the grant of options to employees, directors and consultants.

As at December 31, 2006, the Company has reserved a total of 6,974,657 (2005 - 7,046,689) common shares for future issuance under the Stock Option Plan, of which options in respect of 5,100,995 common shares are outstanding at December 31, 2006. Options are generally granted with an exercise price equal to the market value of the Company's stock at the grant date. The options generally vest between one and five years and expire 10 years or less from the date granted. The Plan provides that vesting will be accelerated if there is a change of control, as defined in the plan. At December 31, 2006, options in respect of 4,474,425 common shares were vested and exercisable.

The following table summarizes certain information in respect of option activity under the Stock Option Plan:

| | Number of shares | | | Weighted average exercise price per share | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | 2004 | 2006 | 2005 | 2004 |
| Options outstanding, beginning of year | 5,262,824 | 5,593,101 | 5,677,806 | $ 7.16 | $ 6.82 | $ 11.11 |
| Granted | 136,654 | 410,366 | 1,633,486 | 8.14 | 9.59 | 5.53 |
| Exercised | (72,032) | (685,706) | (145,206) | 3.96 | 5.30 | 3.89 |
| Forfeited | (87,768) | (23,535) | (81,451) | 8.01 | 6.77 | 15.68 |
| Expired | (35,600) | (3,000) | (186,400) | 16.08 | 24.50 | 14.40 |
| Cancelled | (103,083) | (28,402) | (1,305,134) | 8.90 | 20.70 | 22.55 |
| Options outstanding, end of year | 5,100,995 | 5,262,824 | 5,593,101 | 7.12 | 7.16 | 6.82 |
| Options exercisable, end of year | 4,474,425 | 4,284,508 | 3,759,236 | 7.07 | 7.14 | 7.32 |

In 2006, the Company cancelled 103,083 stock options from its Stock Option Plan (2005 - 28,402, 2004 - 1,305,134) surrendered by Company employees for $nil consideration. Compensation cost recognized up to the cancellation date was not reversed for the options cancelled. As at December 31, 2006, 4,954,174 options are fully vested or are expected to vest with a weighted average exercise price of $7.10, aggregate intrinsic value of $0.4 million and weighted average remaining contractual life of 4.5 years. As at December 31, 2006, options that are exercisable have an intrinsic value of $0.4 million and a weighted average remaining contractual life of 1.9 years. The intrinsic value of options exercised in 2006 was $0.5 (2005 - $3.4 million, 2004 - $0.6 million).

Not included in the table above are 547,786 options granted during the year ended December 31, 2006 (2005 - 241,500) that the Company determined in the fourth quarter of 2006, exceeded, by approximately 1.6%, certain cap limits for grants set by its Stock Option Plan. These options were granted with a weighted average exercise price of $10.39 (2005 - $9.59). Of these options, during 2006, 37,000 options with a weighted average exercise price of $9.89 were forfeited (2005 - nil) and 3,000 with a weighted average exercise price of $9.59 were cancelled for no consideration (2005 - nil). The number of these options outstanding as at December 31, 2006 was 749,286 (2005 – 241,500) with a weighted average exercise price of $10.69 (2005 - $9.59). The number of these options exercisable as at December 31, 2006 was 63,792 (2005 – nil) with a weighted average exercise price of $9.89 (2005 – nil). As the Company intended to settle the obligations for a significant number of these options in cash, these options have been treated as liability-based awards as at December 31, 2006 with an amount of $0.3 included in accrued liabilities. 20,750 of such options were forfeited in May 2007, 195,286 of such options were voluntarily surrendered by the Co-CEOs and members of the Board of Directors for no consideration in June 2007; and 533,250 of such options were settled for cash in June 2007 in an amount of $0.5 million. Compensation cost recognized up to the cancellation date was not reversed for the options cancelled.

**17. Capital Stock (cont'd)**

**(c) Stock-Based Compensation (cont'd)**

**Restricted Common Shares**

Under the terms of certain employment agreements dated July 12, 2000, the Company is required to issue either 160,000 restricted common shares for no consideration or pay their cash equivalent. The restricted shares are required to be issued, or payment of their cash equivalent, upon request by the employees at any time. The aggregate intrinsic value of the awards outstanding is $0.6 million. The Company accounts for the obligation as a liability, which is classified within accrued liabilities. The Company has recorded a recovery of $0.5 million for the year ended December 31, 2006 (2005 - $0.2 million recovery, 2004 - $0.1 million expense), due to the changes in the Company's stock price during the period.

**Options and Warrants Granted to Non-Employees**

In 2006, an aggregate of 76,654 (2005 - 53,340, 2004 - 53,340) options to purchase the Company's common shares with an average exercise price of $7.79 (2005 - $9.74, 2004 - $6.09) were issued to certain advisors and strategic partners of the Company. The options have a maximum contractual life of seven years. Certain of these options vest immediately and the remainder upon the occurrence of certain events. These options were granted under the Stock Option Plan. As at December 31, 2006, non-employee options outstanding amounted to 116,659 options (2005 - 40,005) with a weighted-average exercise price of $8.54 (2005 - $9.96). 106,659 options (2005 - 40,005) were exercisable with an average weighted exercise price of $8.50 (2005 - $9.96) and the vested options have an aggregate intrinsic value of less than $0.1 million. The Company has calculated the fair value of these options to non-employees to be $0.3 million (2005 - $0.3 million, 2004 - $0.2 million), utilizing a Binomial option-pricing model with the following underlying assumptions for the year ended December 31:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Average risk-free interest rate | 4.82% | 4.06% | 3.40% |
| Contractual option life | 5 years | 5 years | 5 years |
| Average expected volatility | 60% | 62% | 62% |
| Dividend yield | 0% | 0% | 0% |

In 2006, the Company has recorded a charge of $0.3 million (2005 - $0.3 million, 2004 - $0.2 million) to film cost of sales related to the non-employee stock options.

During 2003, 550,000 warrants were issued with a weighted average exercise price of $6.06 . During 2005, 80,872 common shares were issued upon exercise of 200,000 warrants with no additional cash consideration. All remaining warrants have expired. Upon exercise of warrants in 2005, $1.1 million representing the fair value of the original warrants issued was transferred to capital stock from other equity to reflect the value of the shares issued within capital stock.

**(d) Earnings per Share**

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 As restated | 2004 As restated |
| Net earnings (loss) from continuing operations applicable to common shareholders | $ (18,312) | $ 5,843 | $ 6,904 |
| *Weighted average number of common shares:* | | | |
| Issued and outstanding, beginning of year | 40,213,542 | 39,446,964 | 39,301,758 |
| Weighted average number of shares issued during the year | 56,684 | 452,206 | 15,289 |
| Weighted average number of shares used in computing basic earnings per share | 40,270,226 | 39,899,170 | 39,317,047 |
| Assumed exercise of stock options and warrants, net of shares assumed | — | 2,119,712 | 662,805 |
| Weighted average number of shares used in computing diluted earnings per share | 40,270,226 | 42,018,882 | 39,979,852 |

The calculation of diluted loss per share for 2006 excludes 1,292,427 common shares (2005 - nil, 2004 - nil) issuable upon exercise of stock options as the impact of these exercises would be anti-dilutive.

## 18. Consolidated Statements of Operations Supplemental Information

(a) Included in other revenues for 2006 are the following types of settlement arrangements: $0.3 million related to IMAX MPX conversion arrangements (2005 - $0.6 million, 2004 - $5.2 million); $nil related to consensual buyouts for uninstalled theater systems (2005 - $11.7 million, 2004 - $12.4 million); $nil related to termination of agreements after customer default (2005 - $2.0 million, 2004 - $0.8 million). In aggregate: 2006 - $0.3 million, 2005 - $14.3 million, 2004 - $18.4 million.

(b) Included in selling, general and administrative expenses for 2006 is $0.2 million (2005 - $0.6 million loss, 2004 - $0.4 million gain) for net foreign exchange gains related to the translation of foreign currency denominated monetary assets, liabilities and integrated subsidiaries.

(c) In 2004, the Company recorded a gain of $0.4 million from the sale of its equity investment in Mainframe Entertainment, Inc. ("MFE"). During 2004, the Company also recorded a charge of $0.1 million related to the writedown of an investment.

## 19. Receivable Provisions (Recoveries), Net

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 As restated | 2004 As restated |
| Accounts receivable provisions (recoveries), net | $ 1,389 | $ 144 | $ (860) |
| Financing receivable provisions (recoveries), net[(1)] | (323) | (1,153) | (628) |
| Receivable provisions (recoveries), net | $ 1,066 | $ (1,009) | $ (1,488) |

(1) For the year ended December 31, 2006, the Company recorded a recovery of previously provided amounts of $0.3 million (2005 - $1.1 million, 2004 - $0.6 million) as the collectibility uncertainty associated with certain leases was resolved by amendment or settlement of the leases or other resolving conditions.

## 20. Asset Impairments

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 As restated | 2004 As restated |
| Asset impairments | | | |
| Property, plant and equipment | $ 1,006 | $ 13 | $ 848 |
| Financing receivables | 67 | — | — |
| Total | $ 1,073 | $ 13 | $ 848 |

During 2006, the Company recorded asset impairment charges of $1.1 million (2005 - $nil, 2004 - $0.8 million) consisting of asset impairment charges of $0.1 million relating to an owned and operated theater and $1.0 million relating to property, plant and equipment upon the determination that certain assets were no longer in use by the Company or that the expected future use would be significantly reduced as a result of the Company's current business plans. In addition, during 2006 the Company revised its estimate on the realizability of its residual values on certain of its sales-type leases and charged $0.1 million to asset impairment. An asset impairment charge of $0.8 million was recorded in 2004 due to lower volumes relating to 2D Camera rentals. The expected future cash flows of these assets did not support their recoverability.

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**21. Consolidated Statements of Cash Flows**

(a) Changes in other non-cash operating assets and liabilities are comprised of the following:

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 As restated | 2004 As restated |
| Decrease (increase) in: | | | |
| Accounts receivable | $ (8,643) | $ (2,695) | $ (2,643) |
| Financing receivables | (2,463) | (506) | (3,281) |
| Inventories | 57 | (1,850) | (245) |
| Prepaid expenses | 200 | (1,103) | (627) |
| Commissions and other deferred selling expenses | 125 | (736) | (23) |
| Increase (decrease) in: | | | |
| Accounts payable | 3,955 | 1,644 | 44 |
| Accrued liabilities | 3,675 | (7,686) | 4,949 |
| Deferred revenue | (3,146) | (2,133) | (9,975) |
| | $ (6,240) | $ (15,065) | $ (11,801) |

(b) Cash payments made during the year on account of:

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| Income taxes | $ 1,525 | $ 952 | $ 1,741 |
| Interest | $ 15,860 | $ 15,548 | $ 15,836 |

(c) Depreciation and amortization are comprised of the following:

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 As restated | 2004 As restated |
| Film assets | $ 10,357 | $ 6,872 | $ 5,280 |
| Property, plant and equipment | 4,682 | 5,340 | 6,482 |
| Other assets | 75 | 1,297 | 1,340 |
| Other intangible assets | 602 | 911 | 719 |
| Deferred financing costs | 1,109 | 1,209 | 1,239 |
| | $ 16,825 | $ 15,629 | $ 15,060 |

(d) Write-downs (recoveries) are comprised of the following:

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 As restated | 2004 As restated |
| Accounts receivable | $ 1,389 | $ 144 | $ (860) |
| Financing receivables | (256) | (1,153) | (628) |
| Inventories | 1,322 | — | — |
| Property, plant and equipment | 1,006 | 13 | 853 |
| Other assets | — | — | (293) |
| | $ 3,461 | $ (996) | $ (928) |

Of the $3.5 million write-down (2005 - $0.9 million recovery, 2004 - $0.9 million recovery), $1.3 million (2005 - $nil, 2004 - $nil) is recorded in costs of equipment and product sales, and $1.1 million (2005 - $1.0 million recovery, 2004 - $1.5 million recovery) is recorded in receivables provisions, net of recoveries.

**22. Segmented and Other Information**

The Company has six reportable segments identified by category of product sold or service provided: IMAX systems; film production and IMAX DMR; film distribution; film post-production; theater operations; and other. The IMAX systems segment designs, manufactures, sells or leases and maintains IMAX theater projection system equipment. The film production and IMAX DMR segment produces films and performs film re-mastering services. The film distribution segment distributes films for which the Company has distribution rights. The film post-production segment provides film post-production and film print services. The theater operations segment owns and operates certain IMAX theaters. The other segment includes camera rentals and other miscellaneous items. The accounting policies of the segments are the same as those described in note 2. The Company has revised its segment information in the current year. The prior years' information has been restated to conform to the current presentation.

Transactions between the film production and IMAX DMR segment and the film post-production segment are valued at exchange value. Inter-segment profits are eliminated upon consolidation, as well as for the disclosures below.

Transactions between the other segments are not significant.

The Company's Chief Operating Decision Makers ("CODM"), as defined in Statement of Financial Accounting Standards No. 131, "Disclosures about Segments of an Enterprise and Related Information" ("SFAS 131"), assess segment performance based on segment revenues and gross margins. Selling, general and administrative expenses, research and development costs, amortization of intangibles, receivables provisions (recoveries), interest revenue, interest expense and tax provision (recovery) are not allocated to the segments.

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

22. Segmented and Other Information (cont'd)

(a) Operating Segments

| | Years ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 As restated | 2004 As restated |
| **Revenue** | | | |
| IMAX systems | $ 72,075 | $ 88,626 | $ 83,354 |
| Films | | | |
| Production and IMAX DMR | 14,580 | 8,942 | 7,692 |
| Distribution | 15,094 | 11,807 | 13,371 |
| Post-production | 6,652 | 5,220 | 6,635 |
| Theater operations | 16,884 | 17,498 | 17,415 |
| Other | 3,985 | 3,229 | 3,874 |
| Total | $ 129,270 | $ 135,322 | $ 132,341 |
| **Gross margins** | | | |
| IMAX systems | $ 40,109 | $ 55,100 | $ 57,720 |
| Films | | | |
| Production and IMAX DMR | 2,292 | 494 | (1,272) |
| Distribution | 5,282 | 3,939 | 4,876 |
| Post-production | 2,618 | 1,564 | 1,034 |
| Theater operations | 1,978 | 1,555 | 2,266 |
| Other | 315 | 883 | (513) |
| Total | $ 52,594 | $ 63,535 | $ 64,111 |
| **Asset impairments** | | | |
| IMAX systems | $ 1,029 | $ 13 | $ — |
| Theater operations | 44 | — | — |
| Other | — | — | 848 |
| Total | $ 1,073 | $ 13 | $ 848 |
| **Depreciation and amortization** | | | |
| IMAX systems | $ 4,216 | $ 5,668 | $ 6,147 |
| Films | | | |
| Production and IMAX DMR | 10,861 | 8,376 | 6,582 |
| Distribution | 953 | 740 | 1,278 |
| Post-production | 616 | 682 | 754 |
| Theater operations | 179 | 163 | 138 |
| Other | — | — | 161 |
| Total | $ 16,825 | $ 15,629 | $ 15,060 |
| **Write-downs (recoveries)** | | | |
| IMAX systems | $ 3,557 | $ (996) | $ (1,487) |
| Films | | | |
| Post-production | (140) | — | — |
| Theater operations | 44 | — | — |
| Other | — | — | 848 |
| Corporate | — | — | (289) |
| Total | $ 3,461 | $ (996) | $ (928) |

# IMAX CORPORATION
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**22. Segmented and Other Information** (cont'd)

**(a) Operating Segments** (cont'd)

| | Years ended December 31, | | |
|---|---|---|---|
| **Purchase of long-lived assets** | 2006 | 2005 As restated | 2004 As restated |
| IMAX systems | $ 1,120 | $ 847 | $ 564 |
| Films | | | |
| Production and IMAX DMR | 400 | 303 | 202 |
| Distribution | 80 | 61 | 40 |
| Post-production | 41 | 193 | 10 |
| Theater operations | 344 | 193 | 123 |
| Total | $ 1,985 | $ 1,597 | $ 939 |

| | As at December 31, | |
|---|---|---|
| **Assets** | 2006 | 2005 As restated |
| IMAX systems | $ 177,369 | $ 196,392 |
| Films | | |
| Production and IMAX DMR | 26,367 | 19,888 |
| Distribution | 6,628 | 8,742 |
| Post-production | 9,169 | 7,334 |
| Theater operations | 3,841 | 5,395 |
| Other | 3,667 | 1,400 |
| Total | $ 227,041 | $ 239,151 |

Goodwill is wholly allocated to the IMAX systems segment.

**(b) Geographic Information**

Revenue by geographic area is based on the location of the theater.

| | Years ended December 31, | | |
|---|---|---|---|
| **Revenue** | 2006 | 2005 As restated | 2004 As restated |
| Canada | $ 9,585 | $ 5,798 | $ 7,414 |
| United States | 73,097 | 72,852 | 70,030 |
| Europe | 18,468 | 24,377 | 23,288 |
| Asia | 14,063 | 13,501 | 18,585 |
| Mexico | 8,418 | 7,408 | 3,869 |
| Rest of World | 5,639 | 11,386 | 9,155 |
| Total | $ 129,270 | $ 135,322 | $ 132,341 |

No single country in the Rest of the World, Europe or Asia classifications comprises more than 6% of total revenue.

| | As at December 31, | |
|---|---|---|
| **Long-lived assets** | 2006 | 2005 As restated |
| Canada | $ 13,382 | $ 14,153 |
| United States | 8,959 | 10,637 |
| Europe | 1,020 | 1,738 |
| Rest of World | 1,028 | 835 |
| Total | $ 24,389 | $ 27,363 |

Long- lived assets are comprised of the Company's tangible property, plant and equipment.

## 23. Financial Instruments

The Company maintains cash and cash equivalents with various major financial institutions. The Company's cash is invested with highly rated financial institutions.

The Company is exposed to market risk from changes in foreign currency rates. A majority portion of the Company's revenues is denominated in U.S. dollars while a substantial portion of its costs and expenses is denominated in Canadian dollars. A portion of the net U.S. dollar cash flows of the Company is periodically converted to Canadian dollars to fund Canadian dollar expenses through the spot market. In Japan, the Company has ongoing operating expenses related to its operations. Net Japanese yen cash flows are converted to U.S. dollars generally through the spot markets. The Company also has cash receipts under leases denominated in Japanese yen and Euros which are converted to U.S. dollars generally through the spot market. As at December 31, 2006, no foreign currency forward contracts are outstanding. The Company does not use financial instruments for trading or other speculative purposes.

The carrying values of the Company's cash and cash equivalents, short-term investments, accounts receivable, financing receivables due within one year, accounts payable and certain accrued liabilities approximate fair values due to the short-term maturity of these instruments. The Company's other financial instruments at December 31 are comprised of the following:

| | 2006 | | 2005 | |
|---|---|---|---|---|
| | Carrying amount | Estimated fair value | Carrying amount | Estimated fair value |
| | | | As restated | As restated |
| Senior Notes due 2010 | $ 160,000 | $ 139,200 | $ 160,000 | $ 166,400 |
| Financed sale receivables | $ 7,908 | $ 8,035 | $ 7,763 | $ 8,060 |

The estimated fair values of the Senior Notes due 2010 are estimated based on traded prices as at December 31, 2006 and long-term receivables are estimated based on discounting at currently available interest rates as at December 31, 2006, for loans with similar terms.

The Company's accounts receivables and financing receivables are subject to credit risk. The Company's accounts receivables and financing receivables are concentrated with the theater exhibition industry and filmed entertainment industry.

To minimize the Company's credit risk, the Company retains title to underlying theater systems leased, performs initial and ongoing credit evaluations of its customers and makes ongoing provisions for its estimate of potentially uncollectible amounts. The Company believes it has adequately provided for related exposures surrounding receivables and contractual commitments.

## 24. Employee Pensions and Postretirement Benefits

### (a) Defined Benefit Pension Plan

The Company has an unfunded U.S. defined benefit pension plan, the SERP, covering its two Co-CEOs. The SERP provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings during the 120 months preceding retirement.

**24. Employee Pensions and Postretirement Benefits** (cont'd)

**(a) Defined Benefit Pension Plan** (cont'd)

Under the original terms of the SERP, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. On March 8, 2006, the Company and the Co-CEOs negotiated an amendment to the SERP which reduced the related pension expense to the Company. Under the terms of the SERP amendment, to reduce ongoing costs to the Company, the cost of living adjustment and surviving spouse benefits previously owed to the Co-CEOs are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company. The amendment resulted in reduction of the accrued pension liability by $6.2 million, a reduction in other assets of $3.4 million and a past services credit of $2.8 million. The benefits were 50% vested as of July 2000, the SERP initiation date. The vesting percentage increases on a straight-line basis from inception until age 55. The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon a change in control shall be 100%. As of December 31, 2006, one of the Co-CEO's benefits were 100% vested while the other Co-CEO's benefits were approximately 82% vested.

Effective March 1, 2006, the Company changed the form of benefit payment. A Co-CEO who retires prior to August 1, 2010 will receive benefits in the form of monthly annuity payments until the earlier of a change of control or August 1, 2010 at which time the Co-CEO shall receive the remaining benefits in the form of a lump sum payment. A Co-CEO who retires on or after August 1, 2010 shall receive benefits in the form of a lump sum payment.

The following assumptions were used in determining the obligation and cost status of the Company's SERP at the plan measurement dates of December 31:

| | 2006 | 2005 |
|---|---|---|
| Discount rate | 5.18% | 5.50% |
| Lump sum interest rate: | | |
| First 20 years | 5.70% | N/A |
| Thereafter | 4.75% | N/A |
| Cost of living adjustment on benefits | 1.20% | 2.40% |
| Rate of increase in qualifying compensation levels | 0% | 0% |

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**24. Employee Pensions and Postretirement Benefits** (cont'd)

**(a) Defined Benefit Pension Plan** (cont'd)

The amounts accrued for the SERP are determined as follows:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Projected benefit obligation: | | | |
| Obligation, beginning of year | $ 31,064 | $ 25,900 | $ 20,086 |
| Service cost | 1,548 | 2,416 | 2,063 |
| Interest cost | 1,252 | 1,559 | 1,267 |
| Amendment | (5,891) | — | — |
| Actuarial loss (gain) | (1,864) | 1,189 | 2,484 |
| Obligation, end of year | $ 26,109 | $ 31,064 | $ 25,900 |
| Unfunded status: | | | |
| Obligation, end of year | $ 26,109 | $ 31,064 | $ 25,900 |
| Unrecognized prior service cost | — | (3,634) | (5,032) |
| Unrecognized actuarial gain (loss) | — | (2,773) | (1,584) |
| Net amount recognized | $ 26,109 | $ 24,657 | $ 19,284 |

In addition, included in accrued liabilities, is a minimum pension liability of $nil (2005 - $6.4 million), representing unrecognized prior service costs and unrecognized actuarial gains or losses.

| | Pension Benefits | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| Accrued benefits cost | $ (26,109) | $ (31,064) | $ (25,900) |
| Other assets | — | 3,634 | 5,032 |
| Accumulated other comprehensive income | — | 2,773 | 1,584 |
| Net amount recognized | $ (26,109) | $ (24,657) | $ (19,284) |

The following table provides disclosure of pension expense for the SERP for the year ended December 31:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Service cost | $ 1,548 | $ 2,416 | $ 2,063 |
| Interest cost | 1,252 | 1,559 | 1,267 |
| Amortization of prior service cost (credit) | (557) | 1,398 | 1,398 |
| Pension expense | $ 2,243 | $ 5,373 | $ 4,728 |

The accumulated benefit obligation for the SERP was $26.1 million at December 31, 2006 (2005 - $31.1 million).

**24. Employee Pensions and Postretirement Benefits** (cont'd)

**(a) Defined Benefit Pension Plan** (cont'd)

At December 31, 2006, the following amounts were included in accumulated other comprehensive income and will be recognized as components of net periodic benefit cost in future periods:

| | 2006 | 2005(1) | 2004(1) |
|---|---|---|---|
| Minimum pension liability | $ — | $ 2,773 | $ 1,584 |
| Prior service (credits) costs | (1,699) | — | — |
| Unrecognized actuarial loss | 909 | — | — |
| | $ (790) | $ 2,773 | $ 1,584 |

(1) Prior service costs of $3.6 million and $5.0 million were included in other assets at December 31, 2005 and 2004, respectively. The unrecognized actuarial loss for the years ended December 2005 and 2004 represents the portion of the additional minimum liability in excess of unrecognized prior service costs recognized as other assets.

No contributions are expected to be made for the SERP during 2007. The Company expects prior services credits of $0.9 million to be recognized as a component of net periodic benefit cost in 2007.

The following benefit payments are expected to be made as per the current SERP assumptions and the terms of the SERP in each of the next five years, and in the aggregate:

| | |
|---|---|
| 2007 | $ — |
| 2008 | 1,007 |
| 2009 | 1,016 |
| 2010 | 31,894(1) |
| 2011 | — |
| 2012 to 2016 | — |
| | $ 33,917 |

(1) Each of the Co-CEOs shall receive a lump sum payment in 2010 provided he retires prior to August 1, 2010. The SERP assumptions include the payment of a lump sum payment.

At the time the Company established the SERP, it also took out life insurance policies on its two Co-CEOs with coverage amounts of $21.5 million in aggregate to which the Company is the beneficiary. The Company intends to use the cash surrender value proceeds of life insurance policies taken on its Co-CEOs to be applied towards the benefits due and payable under the SERP, although there can be no assurance that the Company will ultimately do so. At December 31, 2006, the cash surrender value of the insurance policies is $4.3 million (2005 - $3.3 million) and has been included in other assets.

**(b) Defined Contribution Pension Plan**

The Company also maintains defined contribution pension plans for its employees, including its executive officers. The Company makes contributions to these plans on behalf of employees in an amount up to 5% of their base salary subject to certain prescribed maximums. During 2006, the Company contributed and expensed an aggregate of $0.8 million (2005 - $0.6 million, 2004 - $0.5 million) to its Canadian plan and an aggregate of $0.7 million (2005 - $0.2 million, 2004 - $0.1 million) to its defined contribution employee pension plan under Section 401(k) of the U.S. Internal Revenue Code.

**(c) Postretirement Benefits**

The Company has an unfunded postretirement plan covering its two Co-CEOs. The plan provides that the Company will maintain health benefits for the Co-CEOs until they become eligible for medicare and, thereafter, the Company will provide Medicare supplement coverage as selected by the Co-CEO.

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**24. Employee Pensions and Postretirement Benefits** (cont'd)

**(c) Postretirement Benefits** (cont'd)

The amounts accrued for the plan are determined as follows:

| | 2006 | 2005 As restated |
|---|---|---|
| Benefit obligation – opening | $ 366 | $ 333 |
| Interest cost | 9 | 33 |
| Obligation, end of year | $ 375 | $ 366 |

The following details the net cost components, all related to continuing operations, and underlying assumptions of postretirement benefits other than pensions for the years ended December 31:

| | 2006 | 2005 As restated | 2004 As restated |
|---|---|---|---|
| Postretirement benefit cost: | | | |
| Interest cost | $ 9 | $ 33 | $ 31 |
| Net postretirement benefit cost | $ 9 | $ 33 | $ 31 |

Weighted average assumptions used to determine the benefit obligation as of December 31:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Discount rate | 5.75% | 5.50% | 5.75% |

Weighted average assumptions used to determine the net postretirement benefit cost for the years ended December 31:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Discount rate | 5.5% | 5.75% | 6.0% |

The following benefit payments are expected to be made as per the current plan assumptions in each of the next five years:

| | | |
|---|---|---|
| 2007 | $ | — |
| 2008 | $ | — |
| 2009 | $ | — |
| 2010 | $ | 28 |
| 2011 | $ | 31 |

**25. Impact of Recently Issued Accounting Pronouncements**

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (an interpretation of FASB Statement No. 109) ("FIN 48"). This interpretation prescribes a more likely than not recognition threshold and a measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. FIN 48 also provided guidance on derecognition of a tax position, classification of a liability for unrecognized tax benefits, accounting or interest and penalties, accounting in interim periods, and expanded income tax disclosures. FIN 48 was effective for the Company on January 1, 2007. The cumulative effect of the change in accounting principle to be recorded in the first quarter of 2007 upon adoption of FIN 48 is an increase to the tax liability of $2.1 million and a charge to opening deficit.

**25. Impact of Recently Issued Accounting Pronouncements** (cont'd)

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements", which is effective for fiscal years beginning after November 15, 2007 and for interim periods within those years. This statement defines fair value, establishes a framework for measuring fair value and expands the related disclosure requirements. The Company is currently evaluating the potential impact of this statement.

In February 2007, the FASB issued Statement of Financial Accounting Standards No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities — Including an Amendment of FASB Statements No. 115" ("SFAS 159"). SFAS 159 allows the irrevocable election of fair value as the initial and subsequent measurement attribute for certain financial assets and liabilities and other items on an instrument-by-instrument basis. Changes in fair value would be reflected in earnings as they occur. The objective of SFAS 159 is to improve financial reporting by providing entities with the opportunity to mitigate volatility in reported earnings caused by measuring related assets and liabilities differently without having to apply complex hedge accounting provisions. SFAS 159 is effective as of the beginning of the first fiscal year beginning after November 15, 2007. The Company is currently evaluating if it will elect the fair value option for any of its eligible financial instruments and other items.

**26. Discontinued Operations**

**(a) Miami Theater LLC**

On December 23, 2003, the Company closed its owned and operated Miami IMAX theater. The Company completed its abandonment of assets and removal of its projection system from the theater in the first quarter of 2004, with no financial impact. The Company was involved in an arbitration proceeding with the landlord of the theater with respect to the amount owing to the landlord by the Company for lease and guarantee obligations. The amount of loss to the Company was estimated at between \$0.9 million and \$2.3 million for which the Company accrued \$0.9 million. Prior to 2006, the Company paid out \$0.8 million, with an additional \$0.1 million paid in 2006. On January 5, 2007, as a result of a settlement negotiated between both parties, the Company paid out an additional \$0.8 million, extinguishing its obligations to the landlord. This final payment of \$0.8 million was accrued by the Company in 2006.

**(b) Digital Projection International**

On December 29, 2005, the Company and a previously wholly-owned subsidiary, Digital Projection International ("DPI"), entered into an agreement to settle its loan agreements in exchange for a payment of \$3.5 million. During 2006 and 2005, the Company recognized \$2.3 million and \$1.2 million, respectively, in income from discontinued operations as a result of this settlement.

**(c) Consolidated Statement of Operations for Miami Theater and DPI**

The net earnings from discontinued operations summarized in the Consolidated Statements of Operations, for the years ended December 31, was comprised of the following:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Settlement of DPI loans[(1)] | $ 2,300 | $ 1,979 | $ 800 |
| Loss from Miami Theater LLC (net of tax recovery of $nil) | (875) | — | — |
| Net earnings from discontinued operations | $ 1,425 | $ 1,979 | $ 800 |

(1) Net of income tax provision of $nil in 2006 (2005 - $nil, 2004 - $nil). Since the deferred tax asset relating to the original loss from discontinued operations was fully allowed for through the valuation allowance, any future recoveries relating to the repayment of this outstanding debt are not tax effected.

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**26. Discontinued Operations** (cont'd)

**(d) Consolidated Statements of Cash Flows for Miami Theater and DPI**

The increase in cash and cash equivalents provided by discontinued operations summarized in the Consolidated Statements of Cash Flows, for the years ended December 31, was comprised of the following:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Increase in cash and cash equivalents provided by investing activities from DPI | $ 3,493 | $ 786 | $ 800 |
| Decrease in cash and cash equivalents used in operating activities from Miami Theater | (100) | — | — |
| Increase in cash and cash equivalents provided by discontinued operations | $ 3,393 | $ 786 | $ 800 |

**27. Asset Retirement Obligations**

The Company has accrued costs related to obligations in respect of required reversion costs for its owned and operated theaters under long-term real estate leases which will become due in the future. The Company does not have any legal restrictions with respect to settling any of these long-term leases. A reconciliation of the Company's liability in respect of required reversion costs is shown below:

| | 2006 | 2005 | 2004 |
|---|---|---|---|
| Beginning balance, January 1 | $ 254 | $ 227 | $ 204 |
| Accretion expense | 25 | 27 | 23 |
| Reduction in asset retirement obligation due to lease renegotiation | (27) | — | — |
| Ending balance, December 31 | $ 252 | $ 254 | $ 227 |

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

## 28. Supplemental Consolidating Financial Information

The Company's Senior Notes (see note 12) are unconditionally guaranteed, jointly and severally, by specific wholly-owned subsidiaries of the Company (the "Guarantor Subsidiaries"). The main Guarantor Subsidiaries are David Keighley Productions 70MM Inc., Sonics Associates Inc., and the subsidiaries that own and operate certain theaters. These guarantees are full and unconditional. The information under the column headed "Non-Guarantor Subsidiaries" relates to the following subsidiaries of the Company: IMAX Japan Inc. and IMAX B.V., (the "Non-Guarantor Subsidiaries") which have not provided any guarantees of the Senior Notes.

Investments in subsidiaries are accounted for by the equity method for purposes of the supplemental consolidating financial data. Some subsidiaries may be unable to pay dividends due to negative working capital.

Supplemental Consolidating Balance Sheets as at December 31, 2006:

| | IMAX Corporation | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Adjustments and Eliminations | Consolidated Total |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 16,402 | $ 8,556 | $ 165 | $ — | $ 25,123 |
| Short-term investments | 2,115 | — | — | — | 2,115 |
| Accounts receivable | 23,902 | 1,866 | 249 | — | 26,017 |
| Financing receivables | 63,831 | 2,047 | — | — | 65,878 |
| Inventories | 26,592 | 237 | 84 | — | 26,913 |
| Prepaid expenses | 3,098 | 312 | 22 | — | 3,432 |
| Intercompany receivables | 26,045 | 36,181 | 11,164 | (73,390) | — |
| Film assets | 1,235 | — | — | — | 1,235 |
| Property, plant and equipment | 23,162 | 1,212 | 15 | — | 24,389 |
| Other assets | 10,365 | — | — | — | 10,365 |
| Deferred income taxes | — | — | — | — | — |
| Goodwill | 39,027 | — | — | — | 39,027 |
| Other intangible assets | 2,547 | — | — | — | 2,547 |
| Investments in subsidiaries | 33,978 | — | — | (33,978) | — |
| Total assets | $ 272,299 | $ 50,411 | $ 11,699 | $ (107,368) | $ 227,041 |
| **Liabilities** | | | | | |
| Accounts payable | $ 4,259 | $ 7,164 | $ 3 | $ — | $ 11,426 |
| Accrued liabilities | 47,993 | 2,850 | 209 | — | 51,052 |
| Intercompany payables | 60,049 | 35,601 | 6,306 | (101,956) | — |
| Deferred revenue | 52,754 | 3,818 | 122 | — | 56,694 |
| Senior Notes due 2010 | 160,000 | — | — | — | 160,000 |
| Total liabilities | 325,055 | 49,433 | 6,640 | (101,956) | 279,172 |
| **Shareholders' deficit** | | | | | |
| Capital stock | 122,024 | — | 117 | (117) | 122,024 |
| Other equity | 1,903 | 46,960 | — | (45,926) | 2,937 |
| Deficit | (178,479) | (45,368) | 4,942 | 40,631 | (178,274) |
| Accumulated other comprehensive income (loss) | 1,796 | (614) | — | — | 1,182 |
| Total shareholders' equity (deficit) | $ (52,756) | $ 978 | $ 5,059 | $ (5,412) | $ (52,131) |
| Total liabilities and shareholders' equity (deficit) | $ 272,299 | $ 50,411 | $ 11,699 | $ (107,368) | $ 227,041 |

In certain Guarantor Subsidiaries, accumulated losses have exceeded the original investment balance. As a result of applying equity accounting, the parent company has consequently reduced intercompany receivable balances with respect to these Guarantor Subsidiaries in the amounts of $29.0 million.

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**28. Supplemental Consolidating Financial Information** (cont'd)

Supplemental Consolidating Balance Sheets as at December 31, 2005:

| | IMAX Corporation As restated | Guarantor Subsidiaries As restated | Non-Guarantor Subsidiaries As restated | Adjustments and Eliminations As restated | Consolidated Total As restated |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 17,402 | $ 6,728 | $ 194 | $ — | $ 24,324 |
| Short-term investments | 8,171 | — | — | — | 8,171 |
| Accounts receivable | 17,867 | 1,957 | 292 | — | 20,116 |
| Financing receivables | 60,695 | 2,142 | — | — | 62,837 |
| Inventories | 28,646 | 239 | 82 | — | 28,967 |
| Prepaid expenses | 2,969 | 576 | 87 | — | 3,632 |
| Intercompany receivables | 14,345 | 31,935 | 11,042 | (57,322) | — |
| Film assets | 1,708 | — | — | — | 1,708 |
| Property, plant and equipment | 25,986 | 1,374 | 3 | — | 27,363 |
| Other assets | 14,134 | — | — | — | 14,134 |
| Deferred income taxes | 6,171 | — | — | — | 6,171 |
| Goodwill | 39,027 | — | — | — | 39,027 |
| Other intangible assets | 2,701 | — | — | — | 2,701 |
| Investments in subsidiaries | 31,836 | — | — | (31,836) | — |
| Total assets | $ 271,658 | $ 44,951 | $ 11,700 | $ (89,158) | $ 239,151 |
| **Liabilities** | | | | | |
| Accounts payable | $ 5,451 | $ 2,017 | $ 3 | $ — | $ 7,471 |
| Accrued liabilities | 49,611 | 1,965 | 179 | — | 51,755 |
| Intercompany payables | 42,766 | 36,088 | 6,466 | (85,320) | — |
| Deferred revenue | 54,370 | 5,330 | 140 | — | 59,840 |
| Senior Notes due 2010 | 160,000 | — | — | — | 160,000 |
| Total liabilities | 312,198 | 45,400 | 6,788 | (85,320) | 279,066 |
| **Shareholder's deficit** | | | | | |
| Capital stock | 121,736 | — | 117 | (117) | 121,736 |
| Other equity | 830 | 46,960 | — | (45,926) | 1,864 |
| Deficit | (161,592) | (46,795) | 4,795 | 42,205 | (161,387) |
| Accumulated other comprehensive (loss) | (1,514) | (614) | — | — | (2,128) |
| Total shareholders' equity (deficit) | $ (40,540) | $ (449) | $ 4,912 | $ (3,838) | $ (39,915) |
| Total liabilities & shareholders' equity (deficit) | $ 271,658 | $ 44,951 | $ 11,700 | $ (89,158) | $ 239,151 |

In certain Guarantor Subsidiaries, accumulated losses have exceeded the original investment balance. As a result of applying equity accounting, the parent company has consequently reduced intercompany receivable balances with respect to these Guarantor Subsidiaries in the amounts of $28.4 million.

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**28. Supplemental Consolidating Financial Information** (cont'd)

Supplemental Consolidating Statements of Operations for the year ended December 31, 2006:

| | IMAX Corporation | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Adjustments and Eliminations | Consolidated Total |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Equipment and product sales | $ 49,388 | $ 1,300 | $ 34 | $ (1,256) | $ 49,466 |
| Services | 46,578 | 25,071 | 688 | (3,419) | 68,918 |
| Rentals | 5,098 | 218 | 28 | — | 5,344 |
| Finance income | 5,025 | 217 | — | — | 5,242 |
| Other revenues | 300 | — | — | — | 300 |
| | 106,389 | 26,806 | 750 | (4,675) | 129,270 |
| **Cost of goods sold, services and rentals** | | | | | |
| Equipment and product sales | 25,759 | 1,235 | 12 | (998) | 26,008 |
| Services | 29,814 | 22,410 | 309 | (3,677) | 48,856 |
| Rentals | 1,812 | — | — | — | 1,812 |
| | 57,385 | 23,645 | 321 | (4,675) | 76,676 |
| **Gross margin** | 49,004 | 3,161 | 429 | — | 52,594 |
| Selling, general and administrative expenses | 41,507 | 821 | 281 | — | 42,609 |
| Research and development | 3,615 | — | — | — | 3,615 |
| Amortization of intangibles | 602 | — | — | — | 602 |
| Loss (income) from equity-accounted investees | (1,774) | — | — | 1,774 | — |
| Receivable provisions net of (recoveries) | 1,294 | (228) | — | — | 1,066 |
| Asset impairments | 1,029 | 44 | — | — | 1,073 |
| **Earnings (loss) from operations** | 2,731 | 2,524 | 148 | (1,774) | 3,629 |
| Interest income | 1,036 | — | — | — | 1,036 |
| Interest expense | (16,758) | (1) | — | — | (16,759) |
| **Earnings (loss) from continuing operations before income taxes** | (12,991) | 2,523 | 148 | (1,774) | (12,094) |
| Provision for income taxes | (6,196) | (21) | (1) | — | (6,218) |
| **Net earnings (loss) from continuing operations** | (19,187) | 2,502 | 147 | (1,774) | (18,312) |
| Net earnings (loss) from discontinued operations | 2,300 | (875) | — | — | 1,425 |
| **Net earnings (loss)** | $ (16,887) | $ 1,627 | $ 147 | $ (1,774) | $ (16,887) |

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**28. Supplemental Consolidating Financial Information** (cont'd)

Supplemental Consolidating Statements of Operations for the year ended December 31, 2005:

| | IMAX Corporation | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Adjustments and Eliminations | Consolidated Total |
|---|---|---|---|---|---|
| | As restated | As restated | As restated | As restated | As restated |
| **Revenues** | | | | | |
| Equipment and product sales | $ 50,581 | $ 1,474 | $ 62 | $ (1,389) | $ 50,728 |
| Services | 36,233 | 23,833 | 797 | (2,508) | 58,355 |
| Rentals | 7,157 | 129 | 30 | — | 7,316 |
| Finance income | 4,388 | 217 | — | — | 4,605 |
| Other revenues | 14,318 | — | — | — | 14,318 |
| | 112,677 | 25,653 | 889 | (3,897) | 135,322 |
| **Cost of goods sold, services and rentals** | | | | | |
| Equipment and product sales | 25,157 | 1,337 | 5 | (1,283) | 25,216 |
| Services | 24,125 | 22,046 | 412 | (2,614) | 43,969 |
| Rentals | 2,460 | — | — | — | 2,460 |
| Other costs of goods sold | 142 | — | — | — | 142 |
| | 51,884 | 23,383 | 417 | (3,897) | 71,787 |
| **Gross margin** | 60,793 | 2,270 | 472 | — | 63,535 |
| Selling, general and administrative expenses | 36,103 | 883 | 566 | — | 37,552 |
| Research and development | 3,224 | — | — | — | 3,224 |
| Amortization of intangibles | 911 | — | — | — | 911 |
| Loss (income) from equity-accounted investees | (238) | — | — | 238 | — |
| Receivable provisions net of (recoveries) | (1,986) | 977 | — | — | (1,009) |
| Asset impairments | 13 | — | — | — | 13 |
| **Earnings (loss) from operations** | 22,766 | 410 | (94) | (238) | 22,844 |
| Interest income | 1,002 | — | 2 | — | 1,004 |
| Interest expense | (16,875) | — | — | — | (16,875) |
| **Earnings (loss) from continuing operations before income taxes** | 6,893 | 410 | (92) | (238) | 6,973 |
| Provision for income taxes | (1,050) | (79) | (1) | — | (1,130) |
| **Net earnings (loss) from continuing operations** | 5,843 | 331 | (93) | (238) | 5,843 |
| Net earnings from discontinued operations | 1,979 | — | — | — | 1,979 |
| **Net earnings (loss)** | $ 7,822 | $ 331 | $ (93) | $ (238) | $ 7,822 |

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**28. Supplemental Consolidating Financial Information** (cont'd)

Supplemental Consolidating Statements of Operations for the year ended December 31, 2004:

| | IMAX Corporation<br>As restated | Guarantor Subsidiaries<br>As restated | Non-Guarantor Subsidiaries<br>As restated | Adjustments and Eliminations<br>As restated | Consolidated Total<br>As restated |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Equipment and product sales | $ 43,375 | $ 2,138 | $ 121 | $ (1,575) | $ 44,059 |
| Services | 36,038 | 25,744 | 967 | (3,145) | 59,604 |
| Rentals | 6,086 | 100 | 71 | — | 6,257 |
| Finance income | 3,808 | 219 | 1 | — | 4,028 |
| Other revenues | 18,393 | — | — | — | 18,393 |
| | 107,700 | 28,201 | 1,160 | (4,720) | 132,341 |
| **Cost of goods, services and rentals** | | | | | |
| Equipment and product sales | 19,361 | 1,552 | 112 | (1,671) | 19,354 |
| Services | 24,423 | 23,514 | 336 | (3,049) | 45,224 |
| Rentals | 3,183 | — | — | — | 3,183 |
| Other costs of goods sold | 469 | — | — | — | 469 |
| | 47,436 | 25,066 | 448 | (4,720) | 68,230 |
| **Gross margin** | 60,264 | 3,135 | 712 | — | 64,111 |
| Selling, general and administrative expenses | 35,262 | 745 | 350 | — | 36,357 |
| Research and development | 4,034 | — | — | — | 4,034 |
| Amortization of intangibles | 719 | — | — | — | 719 |
| Loss (income) from equity-accounted investees | (3,324) | — | — | 3,324 | — |
| Receivable provisions net of (recoveries) | (763) | (757) | 32 | — | (1,488) |
| Restructuring cost and asset impairments | 848 | — | — | — | 848 |
| **Earnings (loss) from operations** | 23,488 | 3,147 | 330 | (3,324) | 23,641 |
| Interest income | 756 | — | — | — | 756 |
| Interest expense | (16,987) | (54) | (30) | — | (17,071) |
| Loss on retirement of notes | (784) | — | — | — | (784) |
| Recovery on long-term investments | 293 | — | — | — | 293 |
| **Earnings (loss) from continuing operations before income taxes** | 6,766 | 3,093 | 300 | (3,324) | 6,835 |
| Recovery of (provision for) income taxes | 137 | — | (68) | — | 69 |
| **Net earnings (loss) from continuing operations** | 6,903 | 3,093 | 232 | (3;324) | 6,904 |
| Net earnings from discontinued operations | 800 | — | — | — | 800 |
| **Net earnings (loss)** | $ 7,703 | $ 3,093 | $ 232 | $ (3,324) | $ 7,704 |

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**28. Supplemental Consolidating Financial Information (cont'd)**

Supplemental Consolidating Statements of Cash Flows for the year ended December 31, 2006:

| | IMAX Corporation | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Adjustments and Eliminations | Consolidated Total |
|---|---|---|---|---|---|
| **Cash provided by (used in):** | | | | | |
| **Operating Activities** | | | | | |
| Net earnings (loss) | $ (16,887) | $ 1,627 | $ 147 | $ (1,774) | $ (16,887) |
| Net (earnings) loss from discontinued operations | (2,300) | 875 | — | — | (1,425) |
| Items not involving cash: | | | | | |
| Depreciation and amortization | 16,314 | 508 | 3 | — | 16,825 |
| Write-downs (recoveries) | 3,645 | (184) | — | — | 3,461 |
| Loss (income) from equity-accounted investees | (1,774) | — | — | 1,774 | — |
| Change in deferred income taxes | 5,918 | — | — | — | 5,918 |
| Stock and other non-cash compensation | 2,885 | — | — | — | 2,885 |
| Non-cash foreign exchange (gain) | (150) | — | — | — | (150) |
| Interest on short-term investments | (340) | — | — | — | (340) |
| Investment in film assets | (9,884) | — | — | — | (9,884) |
| Changes in other non-cash operating assets and liabilities | (5,573) | (515) | (152) | — | (6,240) |
| Net cash (used in) provided by operating activities | (8,146) | 2,311 | (2) | — | (5,837) |
| **Investing Activities** | | | | | |
| Purchases of short-term investments | (20,897) | — | — | — | (20,897) |
| Proceeds from maturities of short-term investments | 27,293 | — | — | — | 27,293 |
| Purchase of property, plant and equipment | (1,585) | (385) | (15) | — | (1,985) |
| Acquisition of other assets | (940) | — | — | — | (940) |
| Acquisition of other intangible assets | (448) | — | — | — | (448) |
| Net cash provided by (used in) investing activities | 3,423 | (385) | (15) | — | 3,023 |
| **Financing Activities** | | | | | |
| Common shares issued | 286 | — | — | — | 286 |
| Net cash provided by financing activities | 286 | — | — | — | 286 |
| Effects of exchange rate changes on cash | (56) | 2 | (12) | — | (66) |
| **Increase (decrease) in cash and cash equivalents from continuing operations** | (4,493) | 1,928 | (29) | — | (2,594) |
| Increase (decrease) in cash and cash equivalents from discontinued operations | 3,493 | (100) | — | — | 3,393 |
| **Increase (decrease) in cash and cash equivalents, during the year** | (1,000) | 1,828 | (29) | — | 799 |
| Cash and cash equivalents, beginning of year | 17,402 | 6,728 | 194 | — | 24,324 |
| **Cash and cash equivalents, end of year** | $ 16,402 | $ 8,556 | $ 165 | $ — | $ 25,123 |

**IMAX CORPORATION**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**In accordance with United States Generally Accepted Accounting Principles**
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**28. Supplemental Consolidating Financial Information** (cont'd)

Supplemental Consolidating Statements of Cash Flows for the year ended December 31, 2005:

| | IMAX Corporation | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Adjustments and Eliminations | Consolidated Total |
|---|---|---|---|---|---|
| | As restated | As restated | As restated | As restated | As restated |
| **Cash provided by (used in):** | | | | | |
| **Operating Activities** | | | | | |
| Net earnings (loss) | $ 7,822 | $ 331 | $ (93) | $ (238) | $ 7,822 |
| Net (earnings) from discontinued operations | (1,979) | — | — | — | (1,979) |
| Items not involving cash: | | | | | |
| Depreciation and amortization | 15,094 | 532 | 3 | — | 15,629 |
| Write-downs (recoveries) | (1,973) | 977 | — | — | (996) |
| Loss (income) from equity-accounted investees | (238) | — | — | 238 | — |
| Change in deferred income taxes | (67) | 67 | — | — | — |
| Loss on retirement of notes | | | | | |
| Stock and other non-cash compensation | 4,108 | — | — | — | 4,108 |
| Non-cash foreign exchange loss | 286 | — | — | — | 286 |
| Interest on short-term investments | (353) | — | — | — | (353) |
| Investment in film assets | (7,665) | — | — | — | (7,665) |
| Changes in other non-cash operating assets and liabilities | (15,286) | 127 | 94 | — | (15,065) |
| Net cash (used in) provided by operating activities | (251) | 2,034 | 4 | — | 1,787 |
| **Investing Activities** | | | | | |
| Purchases of short-term investments | (31,276) | — | — | — | (31,276) |
| Proceeds from maturities of short-term investments | 23,458 | — | — | — | 23,458 |
| Purchase of property, plant and equipment | (1,213) | (379) | (5) | — | (1,597) |
| Acquisition of other assets | (750) | — | — | — | (750) |
| Acquisition of other intangible assets | (552) | — | — | — | (552) |
| Net cash used in investing activities | (10,333) | (379) | (5) | — | (10,717) |
| **Financing Activities** | | | | | |
| Common shares issued | 3,633 | — | — | — | 3,633 |
| Net cash provided by financing activities | 3,633 | — | — | — | 3,633 |
| Effects of exchange rate changes on cash | (116) | 15 | (28) | — | (129) |
| **Increase (decrease) in cash and cash equivalents from continuing operations** | (7,067) | 1,670 | (29) | — | (5,426) |
| Increase in cash and cash equivalents from discontinued operations | 786 | — | — | — | 786 |
| **Increase (decrease) in cash and cash equivalents, during the year** | (6,281) | 1,670 | (29) | — | (4,640) |
| Cash and cash equivalents, beginning of year | 23,683 | 5,058 | 223 | — | 28,964 |
| **Cash and cash equivalents, end of year** | $ 17,402 | $ 6,728 | $ 194 | $ — | $ 24,324 |

IMAX CORPORATION
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
In accordance with United States Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars, unless otherwise stated)*

**28. Supplemental Consolidating Financial Information** (cont'd)

Supplemental Consolidating Statements of Cash Flows for the year ended December 31, 2004:

| | IMAX Corporation As restated | Guarantor Subsidiaries As restated | Non-Guarantor Subsidiaries As restated | Adjustments and Eliminations As restated | Consolidated Total As restated |
|---|---|---|---|---|---|
| **Cash provided by (used in):** | | | | | |
| **Operating Activities** | | | | | |
| Net earnings (loss) | $ 7,704 | $ 3,093 | $ 231 | $ (3,324) | $ 7,704 |
| Net (earnings) from discontinued operations | (800) | — | — | — | (800) |
| Items not involving cash: | | | | | |
| Depreciation and amortization | 14,527 | 531 | 2 | — | 15,060 |
| Write-downs (recoveries) | (203) | (757) | 32 | — | (928) |
| Loss (income) from equity-accounted investees | (3,324) | — | — | 3,324 | — |
| Change in deferred income taxes | (1,127) | (16) | — | — | (1,143) |
| Loss on retirement of notes | 784 | — | — | — | 784 |
| Stock and other non-cash compensation | 3,598 | — | — | — | 3,598 |
| Non-cash foreign exchange (gain) | (573) | — | — | — | (573) |
| Premium on repayment of notes | (576) | — | — | — | (576) |
| Investment in film assets | (6,083) | 1,207 | — | — | (4,876) |
| Changes in restricted cash | 4,961 | — | — | — | 4,961 |
| Changes in other non-cash operating assets and liabilities | (6,976) | (4,501) | (324) | — | (11,801) |
| Net cash provided by (used in) operating activities | 11,912 | (443) | (59) | — | 11,410 |
| **Investing Activities** | | | | | |
| Purchase of property, plant and equipment | (180) | (140) | — | — | (320) |
| Acquisition of other assets | (1,043) | — | — | — | (1,043) |
| Acquisition of other intangible assets | (391) | — | — | — | (391) |
| Recovery on long-term investments | 393 | — | — | — | 393 |
| Net cash used in investing activities | (1,221) | (140) | — | — | (1,361) |
| **Financing Activities** | | | | | |
| Repayment of Old Senior Notes due 2005 | (29,234) | — | — | — | (29,234) |
| Financing costs related to Senior Notes due 2010 | (535) | — | — | — | (535) |
| Common shares issued | 558 | — | — | — | 558 |
| Net cash used in financing activities | (29,211) | — | — | — | (29,211) |
| Effects of exchange rate changes on cash | 92 | (55) | 7 | — | 44 |
| **Decrease in cash and cash equivalents from continuing operations** | (18,428) | (638) | (52) | — | (19,118) |
| Increase in cash and cash equivalents from discontinued operations | 800 | — | — | — | 800 |
| **Decrease in cash and cash equivalents, during the year** | (17,628) | (638) | (52) | — | (18,318) |
| Cash and cash equivalents, beginning of year | 41,311 | 5,696 | 275 | — | 47,282 |
| **Cash and cash equivalents, end of year** | $ 23,683 | $ 5,058 | $ 223 | $ — | $ 28,964 |

**29. Summary of Significant Differences Between Generally Accepted Accounting Principles (GAAP) in the United States and Canada**

The accounting principles followed by the Company conform with U.S. GAAP. Significant differences affecting the Company between U.S. GAAP and Canadian GAAP are summarized below.

**(a) Fixed Asset Impairments**

The amount of fixed asset impairments under U.S. GAAP are calculated based on a discounted future cash flow basis. Under Canadian GAAP, prior to January 1, 2002, the amount of impairments were calculated based on an undiscounted future cash flow basis. Any differences resulted in higher depreciation for the remaining useful life of the assets.

**(b) Stock-Based Compensation**

Under U.S. GAAP, prior to January 1, 2006, the Company accounted for stock-based compensation under the intrinsic value method set out in APB 25 and has made pro forma disclosures of net earnings (loss) and earnings (loss) per share as if the methodology prescribed by SFAS 123 had been adopted. Under Canadian GAAP, the Company adopted the fair value provisions of CICA Section 3870, "Stock-based Compensation and Other Stock-based Payments" ("CICA Section 3870"), effective January 1, 2003. As of this date, stock options granted to employees or directors are recorded as an expense in the consolidated statement of operations and credited to other equity.

Effective January 1, 2006, under U.S. GAAP, the Company adopted SFAS 123R using the modified prospective transition method. The Company's consolidated financial statements as of December 31, 2006 reflect the impact of SFAS 123R. In accordance with the modified prospective transition method, the Company's consolidated financial statements for prior periods have not been restated to reflect, and do not include, the impact of SFAS 123R. There were no differences between stock-based compensation expense recognized by the Company under SFAS 123R and under CICA Section 3870 for the year ended December 31,2006.

**(c) Pension Asset and Liability**

Effective December 31, 2006, under U.S. GAAP, the Company adopted SFAS 158 which resulted in an increase of $0.8 million, net of income tax of $0.3 million, to accumulated other comprehensive income, representing unrecognized prior service credits of $0.8 million. Under Canadian GAAP, the unrecognized net losses, prior service credits and the corresponding amounts in accumulated other comprehensive income are not recorded.

As at December 31, 2005, under U.S. GAAP, included in accrued liabilities is a minimum pension liability of $6.4 million representing unrecognized prior service costs and unrecognized actuarial gains or losses. An amount of $3.6 million at December 31, 2005 was included in other assets, representing unrecognized prior service costs. Under U.S. GAAP, an amount $2.8 million as at December 31, 2005 is recorded against accumulated other comprehensive income, resulting from an unrecognized actuarial loss. Under Canadian GAAP, the minimum pension liability, and the corresponding amounts included in other assets and accumulated other comprehensive income are not recorded.

**(d) Correction of Errors**

As described in note 4, the Company has restated its 2004 and 2005 financial statements for certain errors. The 2004 and 2005 Reconciliation to Canadian GAAP has also been restated for the same items as described in note 4.

**29. Summary of Significant Differences Between Generally Accepted Accounting Principles (GAAP) in the United States and Canada (cont'd)**

**Reconciliation to Canadian GAAP**

***Consolidated Statements of Operations***

The following is a reconciliation of net earnings (loss) reflecting the differences between U.S. and Canadian GAAP for the year ended December 31:

| | 2006 | 2005 As restated[(1)] | 2004 As restated[(1)] |
|---|---|---|---|
| Net earnings (loss) in accordance with U.S. GAAP | $ (16,887) | $ 7,822 | $ 7,704 |
| Depreciation of property, plant and equipment[a] | — | — | (852) |
| Stock-based compensation[b] | — | (2,216) | (1,438) |
| Net earnings (loss) in accordance with Canadian GAAP | $ (16,887) | $ 5,606 | $ 5,414 |
| Earnings per share (note 17): | | | |
| Earnings (loss) per share – basic: | | | |
| Net earnings (loss) from continuing operations | $ (0.46) | $ 0.09 | $ 0.12 |
| Net earnings from discontinued operations | $ 0.04 | $ 0.05 | $ 0.02 |
| Net earnings (loss) | $ (0.42) | $ 0.14 | $ 0.14 |
| Earnings (loss) per share – diluted: | | | |
| Net earnings (loss) from continuing operations | $ (0.46) | $ 0.09 | $ 0.12 |
| Net earnings from discontinued operations | $ 0.04 | $ 0.05 | $ 0.02 |
| Net earnings (loss) | $ (0.42) | $ 0.14 | $ 0.14 |

***Consolidated Shareholders' Equity (Deficit)***

The following is a reconciliation of shareholders' equity (deficit) reflecting the difference between Canadian and U.S. GAAP as at December 31:

| | 2006 | 2005 As restated[(1)] |
|---|---|---|
| Shareholders' equity (deficit) in accordance with U.S. GAAP | $ (52,131) | $ (39,915) |
| Unrecognized actuarial (loss) gain[c] | (889) | 2,773 |
| Prior service credits[c] | 1,679 | — |
| Shareholders' equity (deficit) in accordance with Canadian GAAP | $ (51,341) | $ (37,142) |

(1) The corrections of error set out in note 4 for U.S. GAAP are also correction of errors for Canadian GAAP and there are not any material differences between Canadian and U.S. GAAP related to these corrections. Accordingly, the information in this note has been restated to reflect the same adjustments as outlined in note 4 to these consolidated financial statements.

************

IMAX CORPORATION

## QUARTERLY FINANCIAL DATA (UNAUDITED)

The following financial data presents the impact of the Company's restatement of its previous issued consolidated statements of operations and cash flows for each of the quarters ended March 31, 2006; June 30, 2006; September 30, 2006; March 31, 2005; June 30, 2005; September 30, 2005; and December 31, 2005 (refer to note 4 to the accompanying consolidated financial statements for a description of the nature of the adjustments). The quarter ended December 31, 2006 has not been previously reported.

The Company believes that all adjustments necessary for a fair presentation of the results for the periods presented have been made. These amounts have been restated to reflect the correction of errors identified in the Company's restatement.

Certain previously reported figures have been reclassified to conform with the presentation adopted in the current year. Specifically, commissions and other deferred selling costs have been reclassified from finished goods and work in process inventory to other assets and accrued liabilities. Also, billed receivables and related provisions have been reclassified from accounts receivable to financing receivables.

### Consolidated Balance Sheets

*(In thousands of U.S. dollars)*

The following tables summarize the adjustments to the consolidated balance sheets (refer to note 4 to the accompanying consolidated financial statements for a description of the nature of the adjustments).

| | March 31, 2006 | | June 30, 2006 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| **Assets** | | | | | | |
| Cash and cash equivalents | $ 22,023 | $ 22,023 | $ 21,574 | $ 21,574 | $ 22,001 | $ 22,001 |
| Short-term investments | 8,257 | 8,257 | 8,351 | 8,351 | 4,219 | 4,219 |
| Accounts receivable | 19,864 | 17,345 | 23,782 | 20,721 | 29,576 | 26,451 |
| Financing receivables | 66,799 | 62,977 | 68,887 | 65,912 | 65,045 | 65,702 |
| Inventories | 26,254 | 31,315 | 24,455 | 29,402 | 27,866 | 29,952 |
| Prepaid expenses | 3,996 | 4,268 | 4,159 | 4,602 | 4,389 | 4,679 |
| Film assets | 3,578 | 1,848 | 4,597 | 3,255 | 2,946 | 1,629 |
| Property, plant and equipment | 25,777 | 26,338 | 25,797 | 26,337 | 25,619 | 26,137 |
| Other assets | 9,833 | 10,513 | 9,955 | 10,559 | 10,267 | 10,594 |
| Deferred income taxes | 7,558 | 7,558 | 7,775 | 7,775 | 6,171 | 6,171 |
| Goodwill | 39,027 | 39,027 | 39,027 | 39,027 | 39,027 | 39,027 |
| Other intangible assets | 2,600 | 2,600 | 2,686 | 2,686 | 2,619 | 2,619 |
| Total assets | $ 235,566 | $ 234,069 | $ 241,045 | $ 240,201 | $ 239,745 | $ 239,181 |
| **Liabilities** | | | | | | |
| Accounts payable | $ 5,586 | $ 5,874 | $ 7,024 | $ 7,090 | $ 9,469 | $ 9,534 |
| Accrued liabilities | 47,982 | 48,366 | 48,116 | 47,897 | 51,808 | 52,826 |
| Deferred revenue | 47,487 | 60,107 | 47,147 | 63,151 | 51,258 | 60,514 |
| Senior Notes due 2010 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 |
| Total liabilities | 261,055 | 274,347 | 262,287 | 278,138 | 272,535 | 282,874 |
| **Shareholders' deficit** | | | | | | |
| Capital stock | 121,928 | 121,990 | 121,960 | 122,022 | 121,960 | 122,022 |
| Other equity | 2,127 | 2,233 | 2,808 | 2,914 | 3,249 | 2,746 |
| Deficit | (150,168) | (165,125) | (146,634) | (163,497) | (158,623) | (169,085) |
| Accumulated other comprehensive income (loss) | 624 | 624 | 624 | 624 | 624 | 624 |
| Total shareholders' deficit | (25,489) | (40,278) | (21,242) | (37,937) | (32,790) | (43,693) |
| Total liabilities and shareholders' deficit | $ 235,566 | $ 234,069 | $ 241,045 | $ 240,201 | $ 239,745 | $ 239,181 |

# IMAX CORPORATION

## QUARTERLY FINANCIAL DATA (UNAUDITED) (cont'd)

**Consolidated Balance Sheets (cont'd)**

*(In thousands of U.S. dollars)*

| | March 31, 2005 | | June 30, 2005 | | September 30, 2005 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| **Assets** | | | | | | |
| Cash and cash equivalents | $ 14,779 | $ 14,779 | $ 18,825 | $ 18,825 | $ 22,052 | $ 22,052 |
| Short-term investments | 15,018 | 15,018 | 15,143 | 15,143 | 12,232 | 12,232 |
| Accounts receivable | 20,916 | 17,948 | 19,888 | 17,182 | 17,673 | 15,399 |
| Financing receivables | 61,037 | 60,589 | 61,962 | 62,649 | 64,894 | 64,140 |
| Inventories | 24,771 | 28,416 | 25,702 | 28,017 | 26,520 | 30,141 |
| Prepaid expenses | 3,004 | 3,292 | 2,934 | 3,238 | 5,121 | 5,797 |
| Film assets | 1,552 | 1,586 | 2,644 | 2,676 | 2,832 | 733 |
| Property, plant and equipment | 28,226 | 29,995 | 27,843 | 28,897 | 28,258 | 29,248 |
| Other assets | 14,439 | 15,151 | 14,202 | 14,758 | 13,988 | 14,915 |
| Deferred income taxes | 6,311 | 6,311 | 6,454 | 6,454 | 6,470 | 6,470 |
| Goodwill | 39,027 | 39,027 | 39,027 | 39,027 | 39,027 | 39,027 |
| Other intangible assets | 3,070 | 3,070 | 3,033 | 3,033 | 2,991 | 2,991 |
| Total assets | $ 232,150 | $ 235,182 | $ 237,657 | $ 239,899 | $ 242,058 | $ 243,145 |
| **Liabilities** | | | | | | |
| Accounts payable | $ 7,023 | $ 7,023 | $ 6,491 | $ 6,491 | $ 6,821 | $ 7,154 |
| Accrued liabilities | 50,800 | 50,567 | 52,533 | 52,779 | 52,337 | 52,741 |
| Deferred revenue | 54,162 | 68,980 | 56,501 | 66,779 | 57,246 | 70,874 |
| Senior Notes due 2010 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 | 160,000 |
| Total liabilities | 271,985 | 286,570 | 275,525 | 286,049 | 276,404 | 290,769 |
| **Shareholders' Deficit** | | | | | | |
| Capital stock | 118,887 | 118,951 | 119,846 | 119,908 | 121,260 | 121,323 |
| Other equity | 1,966 | 2,072 | 1,863 | 1,969 | 1,691 | 1,797 |
| Deficit | (159,749) | (171,472) | (158,638) | (167,088) | (156,358) | (169,805) |
| Accumulated other comprehensive (loss) | (939) | (939) | (939) | (939) | (939) | (939) |
| Total shareholders' deficit | (39,835) | (51,388) | (37,868) | (46,150) | (34,346) | (47,624) |
| Total liabilities and shareholders' deficit | $ 232,150 | $ 235,182 | $ 237,657 | $ 239,899 | $ 242,058 | $ 243,145 |

# IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED)** (cont'd)

**Consolidated Statements of Operations (Unaudited)**

*(In thousands of U.S. dollars, except per share amounts)*

The following tables summarize the adjustments to net earnings (loss) (refer to note 4 to the accompanying consolidated financial statements for a description of the nature of the adjustments).

| | Three months ended March 31, 2006 | | Three months ended March 31, 2005 | |
|---|---|---|---|---|
| | As Previously Reported [(1)] | As Restated | As Previously Reported [(1)] | As Restated |
| **Revenues** | | | | |
| Equipment and product sales | $ 4,679 | $ 7,820 | $ 9,731 | $ 3,699 |
| Services | 13,708 | 13,434 | 12,293 | 12,472 |
| Rentals | 854 | 899 | 1,230 | 1,399 |
| Finance income | 1,177 | 1,112 | 1,014 | 1,007 |
| Other revenues | — | — | 7,100 | 7,100 |
| | 20,418 | 23,265 | 31,368 | 25,677 |
| **Costs of goods sold, services and rentals** | | | | |
| Equipment and product sales | 3,121 | 4,206 | 4,703 | 2,436 |
| Services | 10,828 | 10,617 | 9,909 | 9,955 |
| Rentals | 444 | 465 | 603 | 675 |
| Other costs of goods sold | — | — | 8 | 8 |
| | 14,393 | 15,288 | 15,223 | 13,074 |
| **Gross margin** | 6,025 | 7,977 | 16,145 | 12,603 |
| Selling, general and administrative expenses | 10,505 | 10,553 | 10,243 | 10,302 |
| Research and development | 915 | 915 | 653 | 653 |
| Amortization of intangibles | 192 | 192 | 157 | 157 |
| Receivable provisions net of recoveries | 143 | 143 | 212 | 62 |
| **Earnings (loss) from operations** | (5,730) | (3,826) | 4,880 | 1,429 |
| Interest income | 253 | 253 | 214 | 214 |
| Interest expense | (4,174) | (4,157) | (4,197) | (4,203) |
| **Earnings (loss) from continuing operations before income taxes** | (9,651) | (7,730) | 897 | (2,560) |
| Recovery of (provision) income taxes | 1,530 | 1,692 | 59 | 59 |
| **Net earnings (loss) from continuing operations** | (8,121) | (6,038) | 956 | (2,501) |
| Net earnings from discontinued operations | 2,300 | 2,300 | 240 | 240 |
| **Net earnings (loss)** | $ (5,821) | $ (3,738) | $ 1,196 | $ (2,261) |
| **Earnings (loss) per share** | | | | |
| Earnings (loss) per share – basic: | | | | |
| Net earnings (loss) from continuing operations | $ (0.20) | $ (0.15) | $ 0.02 | $ (0.07) |
| Net earnings from discontinued operations | $ 0.06 | $ 0.06 | $ 0.01 | $ 0.01 |
| Net (loss) earnings | $ (0.14) | $ (0.09) | $ 0.03 | $ (0.06) |
| Earnings (loss) per share – diluted: | | | | |
| Net earnings (loss) from continuing operations | $ (0.20) | $ (0.15) | $ 0.02 | $ (0.07) |
| Net earnings from discontinued operations | $ 0.06 | $ 0.06 | $ 0.01 | $ 0.01 |
| Net earnings (loss) | $ (0.14) | $ (0.09) | $ 0.03 | $ (0.06) |

(1) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

# IMAX CORPORATION

## QUARTERLY FINANCIAL DATA (UNAUDITED) (cont'd)

**Consolidated Statements of Operations (Unaudited) (cont'd)**

*(In thousands of U.S. dollars, except per share amounts)*

| | Three months ended June 30, 2006 | | Six months ended June 30, 2006 | |
|---|---|---|---|---|
| | As Previously Reported [(1)] | As Restated | As Previously Reported [(1)] | As Restated |
| **Revenues** | | | | |
| Equipment and product sales | $ 18,548 | $ 15,358 | $ 23,227 | $ 23,178 |
| Services | 19,837 | 19,708 | 33,545 | 33,142 |
| Rentals | 1,354 | 1,416 | 2,208 | 2,315 |
| Finance income | 1,659 | 1,627 | 2,836 | 2,739 |
| | 41,398 | 38,109 | 61,816 | 61,374 |
| **Costs of goods sold, services and rentals** | | | | |
| Equipment and product sales | 9,413 | 8,910 | 12,534 | 13,116 |
| Services | 13,685 | 13,050 | 24,514 | 23,667 |
| Rentals | 440 | 461 | 883 | 926 |
| | 23,538 | 22,421 | 37,931 | 37,709 |
| **Gross margin** | 17,860 | 15,688 | 23,885 | 23,665 |
| Selling, general and administrative expenses | 9,451 | 9,554 | 19,956 | 20,107 |
| Research and development | 664 | 664 | 1,579 | 1,579 |
| Amortization of intangibles | 132 | 132 | 324 | 324 |
| Receivable provisions net of (recoveries) | (252) | (252) | (109) | (109) |
| **Earnings from operations** | 7,865 | 5,590 | 2,135 | 1,764 |
| Interest income | 280 | 280 | 533 | 533 |
| Interest expense | (4,231) | (4,242) | (8,405) | (8,399) |
| **Earnings (loss) from continuing operations before income taxes** | 3,914 | 1,628 | (5,737) | (6,102) |
| Recovery of (provision for) income taxes | (380) | 2 | 1,150 | 1,694 |
| **Net earnings (loss) from continuing operations** | 3,534 | 1,630 | (4,587) | (4,408) |
| Net earnings from discontinued operations | — | — | 2,300 | 2,300 |
| **Net earnings (loss)** | $ 3,534 | $ 1,630 | $ (2,287) | $ (2,108) |
| **Earnings (loss) per share** | | | | |
| Earnings (loss) per share – basic: | | | | |
| Net earnings (loss) from continuing operations | $ 0.09 | $ 0.04 | $ (0.11) | $ (0.10) |
| Net earnings from discontinued operations | $ — | $ — | $ 0.05 | $ 0.05 |
| Net (loss) earnings | $ 0.09 | $ 0.04 | $ (0.06) | $ (0.05) |
| Earnings (loss) per share – diluted: | | | | |
| Net earnings (loss) from continuing operations | $ 0.08 | $ 0.04 | $ (0.11) | $ (0.10) |
| Net earnings from discontinued operations | $ — | $ — | $ 0.05 | $ 0.05 |
| Net earnings (loss) | $ 0.08 | $ 0.04 | $ (0.06) | $ (0.05) |

(1) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED)** (cont'd)

**Consolidated Statements of Operations (Unaudited)** (cont'd)

*(In thousands of U.S. dollars, except per share amounts)*

| | Three months ended June 30, 2005 | | Six months ended June 30, 2005 | |
|---|---|---|---|---|
| | As Previously Reported [1] | As Restated | As Previously Reported [1] | As Restated |
| **Revenues** | | | | |
| Equipment and product sales | $ 10,895 | $ 16,541 | $ 20,626 | $ 20,240 |
| Services | 13,105 | 13,274 | 25,398 | 25,746 |
| Rentals | 1,795 | 1,926 | 3,025 | 3,325 |
| Finance income | 1,139 | 1,128 | 2,153 | 2,135 |
| Other revenues | 3,944 | 3,945 | 11,044 | 11,045 |
| | 30,878 | 36,814 | 62,246 | 62,491 |
| **Costs of goods sold, services and rentals** | | | | |
| Equipment and product sales | 5,294 | 7,849 | 9,996 | 10,285 |
| Services | 9,071 | 9,081 | 18,980 | 19,036 |
| Rentals | 550 | 624 | 1,154 | 1,299 |
| Other costs of goods sold | 94 | 94 | 102 | 102 |
| | 15,009 | 17,648 | 30,232 | 30,722 |
| **Gross margin** | 15,869 | 19,166 | 32,014 | 31,769 |
| Selling, general and administrative expenses | 9,812 | 9,864 | 20,055 | 20,166 |
| Research and development | 886 | 846 | 1,539 | 1,499 |
| Amortization of intangibles | 160 | 160 | 317 | 317 |
| Receivable provisions net of (recoveries) | (370) | (371) | (158) | (309) |
| **Earnings from operations** | 5,381 | 8,667 | 10,261 | 10,096 |
| Interest income | 284 | 284 | 498 | 498 |
| Interest expense | (4,202) | (4,213) | (8,399) | (8,416) |
| **Earnings (loss) from continuing operations before income taxes** | 1,463 | 4,738 | 2,360 | 2,178 |
| Recovery of (provision for) income taxes | (538) | (538) | (479) | (479) |
| **Net earnings from continuing operations** | 925 | 4,200 | 1,881 | 1,699 |
| Net earnings from discontinued operations | 186 | 186 | 426 | 426 |
| **Net earnings** | $ 1,111 | $ 4,386 | $ 2,307 | $ 2,125 |
| **Earnings per share** | | | | |
| Earnings per share – basic: | | | | |
| Net earnings from continuing operations | $ 0.02 | $ 0.10 | $ 0.05 | $ 0.04 |
| Net earnings from discontinued operations | $ 0.01 | $ 0.01 | $ 0.01 | $ 0.01 |
| Net earnings | $ 0.03 | $ 0.11 | $ 0.06 | $ 0.05 |
| Earnings per share – diluted: | | | | |
| Net earnings from continuing operations | $ 0.02 | $ 0.10 | $ 0.05 | $ 0.04 |
| Net earnings from discontinued operations | $ 0.01 | $ 0.01 | $ 0.01 | $ 0.01 |
| Net earnings | $ 0.03 | $ 0.11 | $ 0.06 | $ 0.05 |

(1) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

## IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED) (cont'd)**

**Consolidated Statements of Operations (Unaudited) (cont'd)**

*(In thousands of U.S. dollars, except per share amounts)*

| | Three months ended September 30, 2006 | | Nine months ended September 30, 2006 | |
|---|---|---|---|---|
| | As Previously Reported[(1)] | As Restated | As Previously Reported[(1)] | As Restated |
| **Revenues** | | | | |
| Equipment and product sales | $ 1,987 | $ 11,816 | $ 25,214 | $ 34,994 |
| Services | 16,002 | 16,349 | 49,548 | 49,491 |
| Rentals | 1,486 | 1,550 | 3,693 | 3,865 |
| Finance income | 1,251 | 1,252 | 4,087 | 3,991 |
| | 20,726 | 30,967 | 82,542 | 92,341 |
| **Costs of goods sold, services and rentals** | | | | |
| Equipment and product sales | 1,649 | 5,755 | 14,184 | 18,871 |
| Services | 12,458 | 12,500 | 36,971 | 36,167 |
| Rentals | 430 | 452 | 1,313 | 1,378 |
| | 14,537 | 18,707 | 52,468 | 56,416 |
| **Gross margin** | 6,189 | 12,260 | 30,074 | 35,925 |
| Selling, general and administrative expenses | 9,998 | 9,866 | 29,954 | 29,973 |
| Research and development | 878 | 878 | 2,457 | 2,457 |
| Amortization of intangibles | 132 | 132 | 456 | 456 |
| Receivable provisions net of (recoveries) | 359 | 359 | 250 | 250 |
| **Earnings (loss) from operations** | (5,178) | 1,025 | (3,043) | 2,789 |
| Interest income | 227 | 227 | 760 | 760 |
| Interest expense | (4,379) | (4,181) | (12,784) | (12,580) |
| **Loss from continuing operations before income taxes** | (9,330) | (2,929) | (15,067) | (9,031) |
| Recovery of (provision for) income taxes | (1,784) | (1,784) | (634) | (90) |
| **Net loss from continuing operations** | (11,114) | (4,713) | (15,701) | (9,121) |
| Net earnings (loss) from discontinued operations | (875) | (875) | 1,425 | 1,425 |
| **Net loss** | $ (11,989) | $ (5,588) | $ (14,276) | $ (7,696) |
| **Earnings (loss) per share** | | | | |
| Earnings (loss) per share – basic: | | | | |
| Net earnings (loss) from continuing operations | $ (0.28) | $ (0.12) | $ (0.39) | $ (0.23) |
| Net earnings from discontinued operations | $ (0.02) | $ (0.02) | $ 0.04 | $ 0.04 |
| Net (loss) earnings | $ (0.30) | $ (0.14) | $ (0.35) | $ (0.19) |
| Earnings (loss) per share – diluted: | | | | |
| Net earnings (loss) from continuing operations | $ (0.28) | $ (0.12) | $ (0.39) | $ (0.23) |
| Net earnings from discontinued operations | $ (0.02) | $ (0.02) | $ 0.04 | $ 0.04 |
| Net earnings (loss) | $ (0.30) | $ (0.14) | $ (0.35) | $ (0.19) |

(1) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

# IMAX CORPORATION

## QUARTERLY FINANCIAL DATA (UNAUDITED) (cont'd)

## Consolidated Statements of Operations (Unaudited) (cont'd)

*(In thousands of U.S. dollars, except per share amounts)*

| | Three months ended September 30, 2005 | | Nine months ended September 30, 2005 | |
|---|---|---|---|---|
| | As Previously Reported(1) | As Restated | As Previously Reported(1) | As Restated |
| **Revenues** | | | | |
| Equipment and product sales | $ 11,507 | $ 6,894 | $ 32,133 | $ 27,134 |
| Services | 15,912 | 15,673 | 41,310 | 41,419 |
| Rentals | 2,371 | 2,482 | 5,395 | 5,807 |
| Finance income | 1,233 | 1,233 | 3,386 | 3,368 |
| Other revenues | 2,351 | 2,351 | 13,396 | 13,396 |
| | 33,374 | 28,633 | 95,620 | 91,124 |
| **Costs of goods sold, services and rentals** | | | | |
| Equipment and product sales | 5,662 | 3,423 | 15,658 | 13,708 |
| Services | 11,318 | 13,390 | 30,298 | 32,426 |
| Rentals | 580 | 643 | 1,733 | 1,942 |
| Other costs of goods sold | 40 | 40 | 143 | 142 |
| | 17,600 | 17,496 | 47,832 | 48,218 |
| **Gross margin** | 15,774 | 11,137 | 47,788 | 42,906 |
| Selling, general and administrative expenses | 8,966 | 9,058 | 29,021 | 29,224 |
| Research and development | 890 | 890 | 2,429 | 2,389 |
| Amortization of intangibles | 164 | 164 | 481 | 481 |
| Receivable provisions net of (recoveries) | (310) | (310) | (468) | (619) |
| **Earnings from operations** | 6,064 | 1,335 | 16,325 | 11,431 |
| Interest income | 243 | 243 | 741 | 741 |
| Interest expense | (4,185) | (4,257) | (12,584) | (12,673) |
| **Earnings from continuing operations before income taxes** | 2,122 | (2,679) | 4,482 | (501) |
| Recovery of (provision for) income taxes | (202) | (398) | (681) | (877) |
| **Net earnings from continuing operations** | 1,920 | (3,077) | 3,801 | (1,378) |
| Net earnings from discontinued operations | 360 | 360 | 786 | 786 |
| **Net earnings (loss)** | $ 2,280 | $ (2,717) | $ 4,587 | $ (592) |
| **Earnings (loss) per share** | | | | |
| Earnings (loss) per share – basic: | | | | |
| Net earnings (loss) from continuing operations | $ 0.05 | $ (0.08) | $ 0.10 | $ (0.03) |
| Net earnings from discontinued operations | $ 0.01 | $ 0.01 | $ 0.02 | $ 0.02 |
| Net (loss) earnings | $ 0.06 | $ (0.07) | $ 0.12 | $ (0.01) |
| Earnings (loss) per share – diluted: | | | | |
| Net earnings (loss) from continuing operations | $ 0.04 | $ (0.08) | $ 0.09 | $ (0.03) |
| Net earnings from discontinued operations | $ 0.01 | $ 0.01 | $ 0.02 | $ 0.02 |
| Net earnings (loss) | $ 0.05 | $ (0.07) | $ 0.11 | $ (0.01) |

(1) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

# IMAX CORPORATION

## QUARTERLY FINANCIAL DATA (UNAUDITED) (cont'd)

## Consolidated Statements of Operations (Unaudited) (cont'd)

*(In thousands of U.S. dollars, except per share amounts)*

| | Three months ended December 31, 2006(1) | Three months ended December 31, 2005(2) As Previously Reported(3) | Three months ended December 31, 2005(2) As Restated |
|---|---|---|---|
| **Revenues** | | | |
| Equipment and product sales | $ 14,472 | $ 28,944 | $ 23,594 |
| Services | 19,427 | 16,774 | 16,936 |
| Rentals | 1,479 | 1,424 | 1,509 |
| Finance income | 1,251 | 1,246 | 1,237 |
| Other revenues | 300 | 922 | 922 |
| | 36,929 | 49,310 | 44,198 |
| **Costs of goods sold, services and rentals** | | | |
| Equipment and product sales | 7,137 | 13,319 | 11,508 |
| Services | 12,689 | 11,358 | 11,543 |
| Rentals | 434 | 483 | 518 |
| | 20,260 | 25,160 | 23,569 |
| **Gross margin** | 16,669 | 24,150 | 20,629 |
| Selling, general and administrative expenses | 12,636 | 8,266 | 8,328 |
| Research and development | 1,158 | 835 | 835 |
| Amortization of intangibles | 146 | 430 | 430 |
| Receivable provisions net of (recoveries) | 816 | (391) | (390) |
| Asset impairments | 1,073 | 13 | 13 |
| **Earnings from operations** | 840 | 14,997 | 11,413 |
| Interest income | 276 | 263 | 263 |
| Interest expense | (4,179) | (4,189) | (4,202) |
| **Earnings from continuing operations before income taxes** | (3,063) | 11,071 | 7,474 |
| Recovery of (provision for) income taxes | (6,128) | (253) | (253) |
| **Net earnings (loss) from continuing operations** | (9,191) | 10,818 | 7,221 |
| Net earnings from discontinued operations | — | 1,193 | 1,193 |
| **Net earnings (loss)** | $ (9,191) | $ 12,011 | $ 8,414 |
| **Earnings (loss) per share** | | | |
| Earnings (loss) per share – basic: | | | |
| Net earnings (loss) from continuing operations | $ (0.23) | $ 0.27 | $ 0.18 |
| Net earnings from discontinued operations | $ — | $ 0.03 | $ 0.03 |
| Net (loss) earnings | $ (0.23) | $ 0.30 | $ 0.21 |
| Earnings (loss) per share – diluted: | | | |
| Net earnings (loss) from continuing operations | $ (0.23) | $ 0.26 | $ 0.17 |
| Net earnings from discontinued operations | $ — | $ 0.03 | $ 0.03 |
| Net earnings (loss) | $ (0.23) | $ 0.29 | $ 0.20 |

(1) The fourth quarter ended December 31, 2006 had not previously been reported.

(2) Previously reported with Unaudited Quarterly Financial Data section of the 2005 Annual Report on Form 10-K.

(3) The Company has changed the presentation of revenues and cost of goods sold, services and rentals to conform to the presentation requirements specified in Regulation S-X of the Securities Exchange Act of 1934.

IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED)** (cont'd)

**Consolidated Statements of Cash Flows (Unaudited)**

*(In thousands of U.S. dollars)*

The following tables summarize the adjustments to the consolidated statements of cash flows (refer to note 4 to the accompanying consolidated financial statements for a description of the nature of the adjustments).

| | Three months ended March 31, 2006 | | Six months ended June 30, 2006 | | Nine months ended September 30, 2006 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Cash provided by (used in): | | | | | | |
| **Operating Activities** | | | | | | |
| Net earnings (loss) | $ (5,821) | $ (3,738) | $ (2,287) | $ (2,108) | $ (14,276) | $ (7,696) |
| Net (earnings) from discontinued operations | (2,300) | (2,300) | (2,300) | (2,300) | (1,425) | (1,425) |
| Items not involving cash: | | | | | | |
| Depreciation and amortization | 3,901 | 3,390 | 8,761 | 7,608 | 13,888 | 12,682 |
| Write-downs (recoveries) | 143 | 143 | (109) | (109) | 250 | 250 |
| Change in deferred income taxes | (1,387) | (1,387) | (1,604) | (1,604) | — | — |
| Stock and other non-cash compensation | 1,603 | 1,605 | 2,549 | 2,554 | 2,730 | 2,128 |
| Non-cash foreign exchange (gain) | (29) | (29) | (436) | (405) | (383) | (353) |
| Interest on short-term investments | (85) | (85) | (179) | (179) | (281) | (281) |
| Investment in film assets | (2,292) | (1,651) | (6,613) | (5,696) | (8,699) | (7,733) |
| Changes in other non-cash operating assets and liabilities | 718 | (1,590) | (2,466) | (2,616) | 1,295 | (4,922) |
| Net cash (used in) operating activities | (5,549) | (5,642) | (4,684) | (4,855) | (6,901) | (7,350) |
| **Investing Activities** | | | | | | |
| Purchases of short-term investments | (4,098) | (4,098) | (10,322) | (10,322) | (14,506) | (14,506) |
| Proceeds from maturities of short-term investments | 4,097 | 4,097 | 10,321 | 10,321 | 18,739 | 18,739 |
| Purchase of property, plant and equipment | (92) | (92) | (739) | (739) | (1,712) | (1,712) |
| Acquisition of other assets | (280) | (187) | (737) | (566) | (1,202) | (753) |
| Acquisition of other intangible assets | (91) | (91) | (309) | (309) | (374) | (374) |
| Net cash provided by (used in) investing activities | (464) | (371) | (1,786) | (1,615) | 945 | 1,394 |
| **Financing Activities** | | | | | | |
| Common shares issued | 254 | 254 | 286 | 286 | 286 | 286 |
| Net cash provided by financing activities | 254 | 254 | 286 | 286 | 286 | 286 |
| Effects of exchange rate changes on cash | (35) | (35) | (59) | (59) | (46) | (46) |
| **Decrease in cash and cash equivalents from continuing operations** | (5,794) | (5,794) | (6,243) | (6,243) | (5,716) | (5,716) |
| Increase in cash and cash equivalents from discontinued operations | 3,493 | 3,493 | 3,493 | 3,493 | 3,393 | 3,393 |
| **Increase (decrease) in cash and cash equivalents, during the year** | (2,301) | (2,301) | (2,750) | (2,750) | (2,323) | (2,323) |
| **Cash and cash equivalents, beginning of year** | 24,324 | 24,324 | 24,324 | 24,324 | 24,324 | 24,324 |
| **Cash and cash equivalents, end of year** | $ 22,023 | $ 22,023 | $ 21,574 | $ 21,574 | $ 22,001 | $ 22,001 |

IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED)** (cont'd)

**Consolidated Statements of Cash Flows (Unaudited)** (cont'd)

*(In thousands of U.S. dollars)*

| | Three months ended March 31, 2005 | | Six months ended June 30, 2005 | | Nine months ended September 30, 2005 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Cash provided by (used in): | | | | | | |
| **Operating Activities** | | | | | | |
| Net earnings (loss) | $ 1,196 | $ (2,261) | $ 2,307 | $ 2,125 | $ 4,587 | $ (592) |
| Net (earnings) from discontinued operations | (240) | (240) | (426) | (426) | (786) | (786) |
| Items not involving cash: | | | | | | |
| Depreciation and amortization | 3,584 | 3,717 | 7,249 | 7,454 | 11,490 | 11,537 |
| Write-downs (recoveries) | 212 | 62 | (158) | (308) | (468) | (618) |
| Change in deferred income taxes | (140) | (140) | (283) | (283) | (299) | (299) |
| Stock and other non-cash compensation | 1,231 | 1,233 | 2,406 | 2,417 | 3,554 | 3,573 |
| Non-cash foreign exchange (gain) loss | 201 | 197 | 515 | 502 | 167 | 191 |
| Interest on short-term investments | (23) | — | (150) | — | (250) | (250) |
| Investment in film assets | (2,151) | (2,151) | (4,795) | (4,795) | (7,315) | (4,984) |
| Changes in other non-cash operating assets and liabilities | (3,906) | (302) | (3,035) | (2,935) | (7,587) | (4,337) |
| Net cash provided by operating activities | (36) | 115 | 3,630 | 3,751 | 3,093 | 3,435 |
| **Investing Activities** | | | | | | |
| Purchases of short-term investments | (14,995) | (15,018) | (23,118) | (15,143) | (27,157) | (27,157) |
| Proceeds from maturities of short-term investments | — | — | 8,125 | — | 15,175 | 15,175 |
| Purchase of property, plant and equipment | (271) | (271) | (467) | (467) | (1,194) | (1,194) |
| Acquisition of other assets | (53) | (187) | (397) | (374) | (214) | (562) |
| Acquisition of other intangible assets | (167) | (167) | (290) | (290) | (412) | (412) |
| Net cash provided by (used in) investing activities | (15,486) | (15,643) | (16,147) | (16,274) | (13,802) | (14,150) |
| **Financing Activities** | | | | | | |
| Financing costs related to Senior Notes due 2010 | (1) | (1) | | | | |
| Common shares issued | 1,267 | 1,273 | 2,052 | 2,058 | 3,219 | 3,225 |
| Net cash provided by financing activities | 1,266 | 1,272 | 2,052 | 2,058 | 3,219 | 3,225 |
| Effects of exchange rate changes on cash | 71 | 71 | 90 | 90 | 149 | 149 |
| **Decrease in cash and cash equivalents from continuing operations** | (14,185) | (14,185) | (10,375) | (10,375) | (7,341) | (7,341) |
| Increase in cash and cash equivalents from discontinued operations | — | — | 236 | 236 | 429 | 429 |
| **Decrease in cash and cash equivalents, during the year** | (14,185) | (14,185) | (10,139) | (10,139) | (6,912) | (6,912) |
| **Cash and cash equivalents, beginning of year** | 28,964 | 28,964 | 28,964 | 28,964 | 28,964 | 28,964 |
| **Cash and cash equivalents, end of year** | $ 14,779 | $ 14,779 | $ 18,825 | $ 18,825 | $ 22,052 | $ 22,052 |

IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED)** (cont'd)

**Supplemental Information (Unaudited)**

*(In thousands of U.S. dollars)*

**a. Segmented Information**

The Company has six reportable segments: IMAX systems, film production and IMAX DMR, film distribution, film post-production, theater operations, and other.

| | Three months ended March 31, 2006 | | Six months ended June 30, 2006 | | Nine months ended September 30, 2006 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| **Revenue** | | | | | | |
| IMAX systems | $ 9,398 | $ 12,763 | $ 33,350 | $ 33,852 | $ 40,669 | $ 51,371 |
| Films | | | | | | |
| Production and IMAX DMR | 1,615 | 1,097 | 5,736 | 5,160 | 9,173 | 8,563 |
| Distribution | 3,424 | 3,424 | 8,432 | 8,063 | 11,991 | 11,622 |
| Post-production | 1,482 | 1,482 | 4,524 | 4,524 | 5,199 | 5,273 |
| Theater operations | 3,657 | 3,657 | 7,708 | 7,708 | 12,434 | 12,435 |
| Other | 842 | 842 | 2,066 | 2,067 | 3,076 | 3,077 |
| Total | $ 20,418 | $ 23,265 | $ 61,816 | $ 61,374 | $ 82,542 | $ 92,431 |
| **Gross Margins** | | | | | | |
| IMAX systems | $ 5,085 | $ 7,345 | $ 18,503 | $ 18,381 | $ 22,518 | $ 28,467 |
| Films | | | | | | |
| Production and IMAX DMR | (236) | (538) | 1,028 | 706 | 428 | (214) |
| Distribution | 550 | 544 | 1,880 | 2,104 | 2,971 | 3,441 |
| Post-production | 429 | 429 | 1,438 | 1,438 | 2,313 | 2,386 |
| Theater operations | 306 | 306 | 1,174 | 1,174 | 1,631 | 1,632 |
| Other | (109) | (109) | (138) | (138) | 213 | 213 |
| Total | $ 6,025 | $ 7,977 | $ 23,885 | $ 23,665 | $ 30,074 | $ 35,925 |

| | Three months ended March 31, 2005 | | Six months ended June 30, 2005 | | Nine months ended September 30, 2005 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| **Revenue** | | | | | | |
| IMAX systems | $ 22,113 | $ 16,388 | $ 42,421 | $ 42,675 | $ 62,657 | $ 58,580 |
| Films | | | | | | |
| Production and IMAX DMR | 1,539 | 1,510 | 3,050 | 2,990 | 6,351 | 5,958 |
| Distribution | 2,055 | 2,118 | 4,718 | 4,766 | 8,002 | 7,975 |
| Post-production | 1,353 | 1,353 | 2,480 | 2,480 | 3,942 | 3,942 |
| Theater operations | 3,816 | 3,816 | 8,014 | 8,014 | 12,325 | 12,325 |
| Other | 492 | 492 | 1,563 | 1,566 | 2,343 | 2,344 |
| Total | $ 31,368 | $ 25,677 | $ 62,246 | $ 62,491 | $ 95,620 | $ 91,124 |
| **Gross Margins** | | | | | | |
| IMAX systems | $ 15,050 | $ 11,467 | $ 28,204 | $ 27,954 | $ 40,759 | $ 38,355 |
| Films | | | | | | |
| Production and IMAX DMR | (613) | (658) | (979) | (1,056) | (318) | (645) |
| Distribution | 1,313 | 1,398 | 2,843 | 2,921 | 4,786 | 2,635 |
| Post-production | 176 | 176 | 891 | 891 | 1,057 | 1,056 |
| Theater operations | 11 | 11 | 430 | 430 | 667 | 667 |
| Other | 208 | 209 | 625 | 629 | 837 | 838 |
| Total | $ 16,145 | $ 12,603 | $ 32,014 | $ 31,769 | $ 47,788 | $ 42,906 |

IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED) (cont'd)**

**Supplemental Information (Unaudited) (cont'd)**

*(In thousands of U.S. dollars)*

**b. Financing Receivables**

| | March 31, 2006 | | June 30, 2006 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Gross minimum lease amounts receivable | $ 85,471 | $ 85,679 | $ 86,659 | $ 87,809 | $ 83,483 | $ 88,162 |
| Residual value of equipment | 597 | 594 | 563 | 557 | 496 | 493 |
| Unearned finance income | (32,185) | (30,306) | (31,307) | (30,126) | (30,302) | (30,790) |
| Present value of minimum lease amounts receivable | 53,883 | 55,967 | 55,915 | 58,240 | 53,677 | 57,865 |
| Accumulated allowance for uncollectible amounts | (1,478) | (3,169) | (995) | (2,629) | (995) | (2,608) |
| Net investment in leases | 52,405 | 52,798 | 54,920 | 55,611 | 52,682 | 55,257 |
| Gross receivables from financed sales | 19,554 | 13,838 | 19,834 | 15,030 | 17,984 | 15,114 |
| Unearned income | (5,160) | (3,659) | (5,867) | (4,729) | (5,621) | (4,669) |
| Present value of financed sale receivables | 14,394 | 10,179 | 13,967 | 10,301 | 12,363 | 10,445 |
| Total financing receivables | $ 66,799 | $ 62,977 | $ 68,887 | $ 65,912 | $ 65,045 | $ 65,702 |

| | March 31, 2005 | | June 30, 2005 | | September 30, 2005 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Gross minimum lease amounts receivable | $ 100,788 | $ 99,181 | $ 95,529 | $ 99,427 | $ 90,728 | $ 94,913 |
| Residual value of equipment | 643 | 635 | 645 | 633 | 645 | 643 |
| Unearned finance income | (41,500) | (38,353) | (37,713) | (38,059) | (34,114) | (34,532) |
| Present value of minimum lease amounts receivable | 59,931 | 61,463 | 58,461 | 62,001 | 57,259 | 61,024 |
| Accumulated allowance for uncollectible amounts | (4,385) | (6,497) | (3,467) | (5,751) | (2,704) | (4,809) |
| Net investment in leases | 55,546 | 54,966 | 54,994 | 56,250 | 54,555 | 56,215 |
| Gross receivables from financed sales | 8,420 | 8,942 | 10,821 | 9,742 | 14,780 | 11,421 |
| Unearned income | (2,929) | (3,319) | (3,853) | (3,343) | (4,246) | (3,496) |
| Provision on receivable | — | — | — | — | (195) | — |
| Present value of financed sale receivables | 5,491 | 5,623 | 6,968 | 6,399 | 10,339 | 7,925 |
| Total financing receivables | $ 61,037 | $ 60,589 | $ 61,962 | $ 62,649 | $ 64,894 | $ 64,140 |

## IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED)** (cont'd)

**Supplemental Information (Unaudited)** (cont'd)

*(In thousands of U.S. dollars)*

**c. Inventories**

| | March 31, 2006 | | June 30, 2006 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Raw materials | $ 10,570 | $ 10,570 | $ 11,837 | $ 11,836 | $ 13,000 | $ 13,000 |
| Work-in-process | 4,258 | 3,542 | 4,380 | 3,644 | 4,904 | 3,966 |
| Finished goods | 11,426 | 17,203 | 8,238 | 13,922 | 9,962 | 12,986 |
| | $ 26,254 | $ 31,315 | $ 24,455 | $ 29,402 | $ 27,866 | $ 29,952 |

| | March 31, 2005 | | June 30, 2005 | | September 30, 2005 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Raw materials | $ 7,780 | $ 7,784 | $ 8,698 | $ 8,701 | $ 9,557 | $ 9,561 |
| Work-in-process | 4,958 | 4,697 | 4,917 | 4,396 | 5,812 | 5,534 |
| Finished goods | 12,033 | 15,935 | 12,087 | 14,920 | 11,151 | 15,046 |
| | $ 24,771 | $ 28,416 | $ 25,702 | $ 28,017 | $ 26,520 | $ 30,141 |

**d. Film Assets**

| | March 31, 2006 | | June 30, 2006 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Completed and released films, net of accumulated amortization | $ 3,227 | $ 1,427 | $ 4,287 | $ 2,891 | $ 2,756 | $ 1,422 |
| Films in production | — | 70 | 138 | 191 | — | 17 |
| Development costs | 351 | 351 | 172 | 173 | 190 | 190 |
| | $ 3,578 | $ 1,848 | $ 4,597 | $ 3,255 | $ 2,946 | $ 1,629 |

| | March 31, 2005 | | June 30, 2005 | | September 30, 2005 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Completed and released films, net of accumulated amortization | $ 794 | $ 641 | $ 1,695 | $ 1,573 | $ 2,679 | $ 494 |
| Films in production | — | 186 | 870 | 1,024 | 63 | 149 |
| Development costs | 758 | 759 | 79 | 79 | 90 | 90 |
| | $ 1,552 | $ 1,586 | $ 2,644 | $ 2,676 | $ 2,832 | $ 733 |

# IMAX CORPORATION

**QUARTERLY FINANCIAL DATA (UNAUDITED)** (cont'd)

**Supplemental Information (Unaudited)** (cont'd)

*(In thousands of U.S. dollars)*

**e. Reconciliation from U.S. GAAP to Canadian GAAP**

The following is a reconciliation of the net earnings (loss) between U.S. GAAP and Canadian GAAP and earnings per share data under Canadian GAAP for the three months ended:

| | March 31, 2006 | | June 30, 2006 | | September 30, 2006 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Net earnings (loss) in accordance with U.S. GAAP | $ (5,821) | $ (3,738) | $ 3,534 | $ 1,630 | $ (11,989) | $ (5,588) |
| Stock-based compensation[b] | — | — | — | — | — | — |
| Net earnings (loss) in accordance with Canadian GAAP | $ (5,821) | $ (3,738) | $ 3,534 | $ 1,630 | $ (11,989) | $ (5,588) |
| Earnings per share (note 17): | | | | | | |
| Earnings (loss) per share – basic: | | | | | | |
| Net earnings (loss) from continuing operations | $ (0.20) | $ (0.15) | $ 0.09 | $ 0.04 | $ (0.28) | $ (0.12) |
| Net earnings from discontinued operations | $ 0.06 | $ 0.06 | $ — | $ — | $ (0.02) | $ (0.02) |
| Net earnings (loss) | $ (0.14) | $ (0.09) | $ 0.09 | $ 0.04 | $ (0.30) | $ (0.14) |
| Earnings (loss) per share – diluted: | | | | | | |
| Net earnings (loss) from continuing operations | $ (0.20) | $ (0.15) | $ 0.08 | $ 0.04 | $ (0.28) | $ (0.12) |
| Net earnings from discontinued operations | $ 0.06 | $ 0.06 | $ — | $ — | $ (0.02) | $ (0.02) |
| Net earnings (loss) | $ (0.14) | $ (0.09) | $ 0.08 | $ 0.04 | $ (0.30) | $ (0.14) |

| | March 31, 2005 | | June 30, 2005 | | September 30, 2005 | |
|---|---|---|---|---|---|---|
| | As Previously Reported | As Restated | As Previously Reported | As Restated | As Previously Reported | As Restated |
| Net earnings (loss) in accordance with U.S. GAAP | $ 1,196 | $ (2,261) | $ 1,111 | $ 4,386 | $ 2,280 | $ (2,717) |
| Stock-based compensation[b] | (529) | (529) | (653) | (653) | (552) | (552) |
| Net earnings (loss) in accordance with Canadian GAAP | $ 667 | $ (2,790) | $ 458 | $ 3,733 | $ 1,728 | $ (3,269) |
| Earnings per share (note 17): | | | | | | |
| Earnings (loss) per share – basic: | | | | | | |
| Net earnings (loss) from continuing operations | $ 0.01 | $ (0.08) | $ 0.01 | $ 0.09 | $ 0.03 | $ (0.09) |
| Net earnings from discontinued operations | $ 0.01 | $ 0.01 | $ — | $ — | $ 0.01 | $ 0.01 |
| Net earnings (loss) | $ 0.02 | $ (0.07) | $ 0.01 | $ 0.09 | $ 0.04 | $ (0.08) |
| Earnings (loss) per share – diluted: | | | | | | |
| Net earnings (loss) from continuing operations | $ 0.01 | $ (0.08) | $ 0.01 | $ 0.09 | $ 0.03 | $ (0.09) |
| Net earnings from discontinued operations | $ 0.01 | $ 0.01 | $ — | $ — | $ 0.01 | $ 0.01 |
| Net earnings (loss) | $ 0.02 | $ (0.07) | $ 0.01 | $ 0.09 | $ 0.04 | $ (0.08) |

# IMAX CORPORATION

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

None

**Item 9A. Controls and Procedures**

## EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

The Company maintains disclosure controls and procedures designed to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time periods and that such information is accumulated and communicated to management, including the Co-CEOs and CFO, to allow timely discussions regarding required disclosure. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives.

The Company's management, with the participation of its Co-CEOs and its CFO have evaluated the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) or 15d-15(e)) as of December 31, 2006. Based on that evaluation and because of the identification of certain material weaknesses in the Company's internal control over financial reporting, as discussed in Management's Annual Report on Internal Control over Financial Reporting below, the Co-CEOs and the CFO have concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2006

## BACKGROUND

In March 2007, the Company announced that it would delay the filing of this annual report and its quarterly report on Form 10-Q for the quarter ended March 31, 2007 due to the discovery of certain accounting errors, mostly in the area of film accounting and inventory capitalization.

The Company subsequently broadened its accounting review to include certain other accounting matters, based on comments the Company received from the SEC and OSC. In connection with this review, the Company has identified certain errors related to: (a) revenue recognition resulting from the Company's review of its theater system arrangements over the past 5 years in response to the aforementioned comments, which indicated insufficient analysis of various sales and lease transactions and the accounting effect of certain contractual provisions within them; and misallocations of consideration to elements within certain multiple element arrangements; (b) capitalization of costs into inventory and films assets and amortization of film assets in accordance with SOP 00-2; (c) income tax liabilities resulting from failure to make certain tax elections on a timely basis and (d) certain other items described under Other Adjustments in note 4 of the accompanying audited consolidated financial statements in Item 8. The consolidated financial statements for the prior periods presented have been restated to reflect these error corrections under U.S. GAAP. (The more significant items resulting in the restatement are described more fully in both Item 6 and note 4 of the accompanying audited consolidated financial statements in Item 8.)

These errors were identified during the Company's accounting review and in conjunction with the Company's year-end audit. Over the course of such audit, the Company and its independent auditors identified a number of material weaknesses in the Company's internal control over financial reporting, as discussed more fully below.

During the Company's accounting review, it concluded its policy for revenue recognition on theater systems should be revised to treat all components of the theater system (including the projector, sound system, and screen system and, if applicable, 3D glasses cleaning machine), theater design support, supervision of installation, projectionist training and the use of the IMAX brand as a single deliverable and a single unit of accounting. In addition, the Company revised its policy to require (i) the projector, sound system and screen system be installed and be in full working condition, the 3D glasses cleaning machine, if applicable, be delivered and the projectionist training be completed and (ii) the written customer acceptance thereon be received, or public opening of the theater take place, before revenue can be recognized. For additional information regarding the revised revenue recognition policy, see note 2 of the accompanying audited consolidated financial statements in Item 8.

## MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING

Management is responsible for establishing and maintaining adequate internal control over financial reporting for the Company.

Management has used the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") framework in Internal Control-Integrated Framework to assess the effectiveness of the Company's internal control over financial reporting.

**Item 9A. Controls and Procedures** (cont'd)

**MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING** (cont'd)

Based on this assessment, management has concluded that such internal control over financial reporting was not effective as of December 31, 2006 due to the material weaknesses identified and discussed below.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim consolidated financial statements will not be prevented or detected. The following material weaknesses have been identified and included in management's assessment as of December 31, 2006:

*Application of U.S. GAAP*

Five of the Company's material weaknesses relate to controls over the analysis and review of certain transactions to be able to correctly apply U.S. GAAP to record those transactions. The financial impact of these material weaknesses on the Company's restated financial results was principally related to the analysis and review of transactions which were complex or nonstandard. These material weaknesses are:

1. The Company did not maintain adequate controls, including period-end controls, over the analysis and review of revenue recognition for sales and lease transactions in accordance with U.S. GAAP. Specifically, effective controls were not maintained to correctly assess the identification of deliverables and their aggregation into units of accounting and in certain cases the point when certain units of accounting were substantially complete to allow for revenue recognition on a theater system.

   After reviewing its revenue recognition policy in conjunction with the announced review of its theater system arrangements over the past 5 years in response to comments received from the staff of both the SEC and the OSC, the Company concluded that it had incorrectly assessed the determination of deliverables in its theater systems arrangements. The term "deliverables" is not explicitly defined in any accounting literature. The determination of a deliverable requires significant judgment and can be influenced by the terms of the arrangement between a vendor and its customer, the customer's perspective of the deliverables, the interaction of the separate elements that could make up a single deliverable and other facts and circumstances unique to a transaction.

   In addition, in connection with its review of system sale and lease transactions during the period 2002 through 2006, the Company identified additional errors resulting from ineffective controls relating to the following, among others:

   - Based on an analysis of fair values of elements within arrangements, the Company determined that fair value previously allocated in certain multiple element arrangements was not appropriate and has adjusted these amounts.
   - The existence of certain non-standard contractual provisions resulted in: the reclassification of certain sales arrangements to sales-type lease transactions for accounting purposes when the customer was not granted title to the system until all payments were made, and certain sales-type leases to operating leases given substantially all of the benefits and risks of ownership had not passed to the customer; and the timing of recognition of the minimum annual payments under certain arrangements.
   - Settlement revenue was recognized on a MPX upgrade which was conditional upon the Company meeting certain conditions which were ultimately not met during the year. The Company has deferred the amount of settlement revenue awaiting installation of an alternate theatre system configuration.
   - Finance income continued to be recognized when the related financing receivables were impaired. The Company has revised its procedures and discontinued the recognition of finance income until the impairment issues were resolved.

# IMAX CORPORATION

**Item 9A. Controls and Procedures** (cont'd)

**MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING** (cont'd)

2. The Company did not maintain effective controls, including period-end controls, over accounting for film transactions in accordance with U.S. GAAP. Specifically, effective controls were not maintained related to the classification and accurate recording of marketing and advertising costs of co-produced film productions, production fees on co-produced films and the application of the individual-film forecast computation method to film assets, participation liabilities and deferred production fees.

   The Company determined that it had misclassified certain costs incurred in respect of co-produced film productions between 2004 and 2006. Marketing and advertising costs were co-mingled with film production costs, and both were capitalized to film assets and subsequently amortized into the income statement over the estimated total ultimate revenues associated with the film productions. Film exploitation costs, which include marketing and advertising costs, as defined in SOP 00-2, "Accounting by Producers or Distributors of Films", should be expensed in the period incurred and not capitalized to film assets. In addition, certain costs were accrued by the Company prior to being incurred. These costs have been moved to the period in which they were incurred. On certain co-produced film productions the Company received production fees which should have been deferred and recognized over the estimated ultimate revenues. These production fees were previously recognized when production of the film was complete. The Company also determined that it had not correctly applied the individual-film-forecast computation method when it amortized its film assets and deferred production fees and accrued its participation liabilities for the periods between 2002 and 2006. SOP 00-2 requires changes in estimates of ultimate revenues used in the individual-film-forecast computation method to be adjusted prospectively from the beginning of the year of the change. The Company had applied changes in estimates on a retroactive basis from the original release date. In addition, the Company adjusted its amortization of prepaid print costs. A related material weakness was previously identified in the Company's June 30, 2006, Form 10-Q filing, and had not yet been remediated as at December 31, 2006.

3. The Company did not maintain effective controls, including period-end controls, over the accounting for contract origination costs in accordance with U.S. GAAP. Specifically, effective controls were not maintained related to the classification of fees paid to a professional services firm.

   During the period from 2001 to 2006, the Company paid certain fees to a professional services firm to assist the Company in identifying sales opportunities and provide assistance in negotiating and concluding contracts in the developing Asian market. These fees were capitalized and allocated to theater systems inventory for various Asian customers. The Company has determined that these fees were promotional and selling expenses which should have been expensed as incurred as the costs were not direct and incremental costs to a contract.

4. The Company did not maintain adequate controls over the complete and accurate recording of postretirement benefits other than pensions in accordance with U.S. GAAP. Specifically, effective controls were not maintained over the complete identification of all relevant contractual provisions within its executive employment contracts. During the preparation of executive compensation information for the 2006 Annual Report on Form 10-K, the Company determined that the two Co-CEOs were entitled to postretirement health benefits since 2000 for which the obligation had not been included in the prior financial statements as required under SFAS No. 106, "Employer's Accounting for Postretirement Benefits Other than Pensions".

   Each of the control deficiencies referred to above contributed to the restatement to the Company's consolidated financial statements for the years ended December 31, 2002 through 2005, its consolidated financial statements for each of the quarters in the year ended December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30 and September 30, 2006, and an audit adjustment to the Company's 2006 annual consolidated financial statements, affecting principally revenues, costs of goods sold, selling, general, and administrative expenses, accounts receivable, financing receivables, inventories, prepaid expenses, film assets, fixed assets, other assets, accounts payable, accrued liabilities and deferred revenue, and related disclosures including postretirement benefits.

5. The Company did not maintain effective controls over the intraperiod allocation of the provision for income taxes in accordance with U.S. GAAP. Specifically, effective controls were not in place such that the tax provisions were appropriately allocated to continuing operations, discontinued operations, and accumulated other comprehensive income. This control deficiency resulted in an audit adjustment to the Company's 2006 annual consolidated financial statements, affecting the provisions for income taxes, net earnings from discontinued operations, and accumulated other comprehensive income.

**Item 9A. Controls and Procedures** (cont'd)

**MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING** (cont'd)

*Cross-departmental Communication*

Two of the Company's material weaknesses relate to controls over the lines of communication between different departments. These material weaknesses are:

6. The Company did not maintain adequate controls over the lines of communication between operational departments and the Finance Department related to revenue recognition for sales and lease transactions. Specifically, effective controls were not maintained to raise on a timely basis certain issues relating to observations of the installation process, any remaining installation or operating obligations, and concessions on contractual terms that may impact the accuracy and timing of revenue recognition. This control deficiency contributed to the restatement to the Company's consolidated financial statements for the years ended December 31, 2002 through 2005, its consolidated financial statements for each of the quarters in the year ended December 31, 2005 and its consolidated financial statements for each of the quarters ended March 31, June 30 and September 30, 2006, and audit adjustments to the Company's 2006 annual consolidated financial statements, affecting principally revenues, costs of goods sold, selling, general, and administrative expenses, financing receivables, inventories, prepaid expenses, fixed assets, other assets, accounts payable, accrued liabilities and deferred revenue, and related disclosures.

7. The Company did not maintain adequate controls over the timely communication between departments of information relating to developing issues that may impact the Company's financial reporting. Specifically, effective controls were not maintained over the status of a review of cap limits under the Company's Stock Option Plan that affected the recording and related disclosure of stock-based compensation benefits. In October 2006, the Company initiated an internal review and involved external legal counsel to review the definitions within the Stock Option Plan and the various stock exchanges upon which the Company's shares are issued to determine whether or not certain grants had, by definition, exceeded certain cap limits under its Stock Option Plan. Although analysis was still ongoing, this issue should have been communicated to the Finance Department while financial statements were being prepared for the September 30, 2006, Form 10-Q filing. This control deficiency contributed to a restatement of the Company's September 30, 2006 financial statements, affecting accrued liabilities, other equity and selling, general and administrative expenses, and related disclosures.

In addition to the restatements and audit adjustments referred to above, each of these control deficiencies above could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim financial statements that would not be prevented or detected. Management determined that each of these control deficiencies discussed above constitutes a material weakness at December 31, 2006.

PricewaterhouseCoopers LLP, which has audited the Company's consolidated financial statements for the year ended December 31, 2006, has also audited management's assessment of the Company's internal control over financial reporting under Auditing Standard No. 2 of the Public Company Accounting Oversight Board. See Report of Independent Registered Public Accounting Firm on pages 70 to 72.

**REMEDIATION PLAN**

The Company's management, including the Co-CEOs and CFO, are committed to remediating its material weaknesses in internal control over financial reporting by enhancing existing controls and introducing new controls in all necessary areas. The smooth functioning of the Company's finance area is of the highest priority for the Company's management. Remediation activities will include the following specifics:

The Company will strengthen U.S. GAAP awareness throughout all levels of the Finance Department to help prevent material misstatements. The objective of strengthening U.S. GAAP awareness is to enable personnel throughout all levels of the Finance department to recognize complex or atypical situations in the day-to-day operations which may require further analysis. Management is currently considering various ways of meeting this objective effectively.

**Item 9A. Controls and Procedures** (cont'd)

MANAGEMENT'S ANNUAL REPORT ON INTERNAL CONTROL OVER FINANCIAL REPORTING (cont'd)

The Company will enhance cross-functional communications to assist in preventing material misstatements. The objective of enhancing cross-functional communications is to provide an effective forum through which all relevant information pertaining to transactions could be sought by, and communicated to, the Finance Department for consideration of accounting implications. Management is currently considering various ways of meeting this objective most effectively and efficiently.

The Company has revised its revenue recognition policy in the second quarter of 2007. The Company will enhance its controls in this area by documenting a detailed analysis for all sales and lease transactions to help ensure that the timing of revenue recognition is appropriate, and that all contractual provisions have been sufficiently considered in determining the timing and amounts of revenues to be recognized. As well, to assist in detecting material misstatements, the Company will enhance its period-end reviews of sales and lease transactions to specifically consider whether the accounting for these transactions is in accordance with U.S. GAAP.

The Company will enhance its controls in accounting for film transactions. To assist in preventing material misstatements, the Company will enhance its review of new film transactions for complexities that may impact the accounting for the transaction and treatment within the film's ultimate model. As well, to assist in detecting material misstatements, the Company will enhance its period-end reviews of film accounting to specifically consider whether revenues and costs are being treated in accordance with SOP 00-2.

The Company will enhance its controls in accounting for costs related to inventory. To assist in preventing material misstatements, the Company will develop guidelines regarding the nature of costs that could be capitalized to inventory with appropriate references to U.S. GAAP, which would be distributed to personnel involved with inventory costs. As well, to assist in detecting material misstatements, the Company will enhance its period-end reviews of the inventory balances to specifically consider whether the nature of the costs that comprise inventory balances are in accordance with U.S. GAAP.

The Company will enhance its controls to capture all postretirement benefits other than pensions included within executive employment contracts. Management is currently considering various ways of meeting this objective efficiently and effectively.

The Company will enhance its controls in accounting for intraperiod allocations of income taxes. Management is currently considering various ways of meeting this objective effectively.

The Company's management, including the Co-CEOs and CFO, is committed to implementing its remediation plan as soon as practicable.

CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING

There were no changes in the Company's internal control over financial reporting that occurred during the quarter ended December 31, 2006 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Item 9B. Other Information**

None

# IMAX CORPORATION

## PART III

### Item 10. Directors, Executive Officers and Corporate Governance

**DIRECTORS**

**Richard L. Gelfond**, 52, has been Co-Chairman of the Company since June 1999 and Co-Chief Executive Officer since May 1996. From March 1994 to June 1999, Mr. Gelfond served as Vice Chairman of the Company. Mr. Gelfond serves as Chairman of the Board of Trustees of the Stony Brook Foundation, Inc., affiliated with Stony Brook University, and is on the Board of Directors for Brookhaven Science Associates, the management company of Brookhaven National Laboratories. He is also Vice Chairman of the New York Historical Society and a Member of the Motion Picture Academy of Arts & Science. Mr. Gelfond served as the Chairman of the Columbia Shuttle Memorial Trust Steering Committee, which was established in co-operation with NASA to support the families of the seven crew members of the STS-107 mission of the Space Shuttle Columbia, which came to a tragic end on February 1, 2003.

**Bradley J. Wechsler**, 55, has been Co-Chief Executive Officer of the Company with Mr. Gelfond since May 1996. From March 1994 to June 1999, Mr. Wechsler served as Chairman of the Company and has served as Co-Chairman with Mr. Gelfond since June 1999. Mr. Wechsler serves on the boards of NYU Hospital, where he is a Vice Chairman and member of the Executive Committee, the American Museum of the Moving Image, Math for America, the Ethical Culture Fieldston Schools and Apollo Investment Corporation. Mr. Wechsler is also a Member of the Motion Picture Academy of Arts & Science.

**Neil S. Braun**, 54, has been a director of the Company since June 2003, has been President, Distribution & Marketing of Starz Media since it acquired IDT Entertainment in August 2006. Mr. Braun previously served as President, Feature Films and Television of IDT Entertainment since January 2005 and the President of Vanguard Animation, LLC since 2001. He was the President of Vast Video Inc. prior to this and was President of iCast Corporation, a wholly-owned subsidiary of CMGI, Inc., during 1999. From 1994 to 1998, Mr. Braun was President of NBC Television Network. Mr. Braun also sits on the Share our Strength and Westhampton Beach Performing Arts Center boards of directors and is a member of the University of Pennsylvania School of Arts and Sciences Board of Overseers, all non-profit organizations. Mr. Braun serves as a member of the Company's Audit Committee.

**Kenneth G. Copland**, 69, has been a director of the Company since June 1999, is the Chairman of KGC Ltd. Mr. Copland was the Vice-Chairman of BMO Nesbitt Burns Inc. from 1994 to May 2001. Mr. Copland is a director of the Investment Dealers Association of Canada. Mr. Copland serves as the Chairman of the Company's Audit Committee and was a member of the Special Committee. Mr. Copland is a Canadian citizen.

**Garth M. Girvan**, 58, has been a director of the Company since March 1994, is a partner of McCarthy Tétrault, a Canadian law firm. Mr. Girvan serves as the Chairman of the Compensation Committee and served as the Chairman of the Special Committee. Mr. Girvan serves as a member of the Company's Option Committee and Governance Committee. Mr. Girvan is a Canadian citizen.

**David Leebron**, 52, has been a director of the Company since September 2003, has been the President of Rice University since July 1, 2004. Prior to July 1, 2004, Mr. Leebron served as dean and the Lucy G. Moses Professor of Law at Columbia University School of Law since 1996 and Professor of Law since 1989. Mr. Leebron is a member of the American Bar Association and on the Council on Foreign Relations. Mr. Leebron is also a member of the Great Houston Partnership Board of Directors; the Harvard Law School Visiting Committee, the Jacobs University Bremen Board of Governors, the National Security Higher Education Advisory Board and the War Powers Commission (ex-officio). Mr. Leebron serves as Chairman of the Company's Corporate Governance Committee and serves as a member of the Company's Audit Committee.

**Marc A. Utay**, 47, has been a director of the Company since May 1996, has been the Managing Partner of Clarion Capital Partners, a private equity investment firm, since November 1999. Prior to joining Clarion, Mr. Utay was a Managing Director of Wasserstein Perella & Co. Inc. and a member of Wasserstein Perella's Policy Committee. Mr. Utay was co-head of Wasserstein Perella's Leveraged Finance, Retailing and Media, Telecommunication and Entertainment groups. Until December 2002, Mr. Utay was also a Senior Advisor to Dresdner Kleinwort Wasserstein. Mr. Utay is a director of P&F Industries, Inc. Mr. Utay serves as Chairman of the Company's Option Committee and as a member of the Corporate Governance Committee. Mr Utay was a member of the Special Committee.

# IMAX CORPORATION

**Item 10. Directors, Executive Officers and Corporate Governance** (cont'd)

**EXECUTIVE OFFICERS**

**Richard L. Gelfond**, 52, has been Co-Chairman of the Company since June 1999 and Co-Chief Executive Officer since May 1996. From March 1994 to June 1999, Mr. Gelfond served as Vice Chairman of the Company. Mr. Gelfond serves as Chairman of the Board of Trustees of the Stony Brook Foundation, Inc., affiliated with Stony Brook University, and is on the Board of Directors for Brookhaven Science Associates, the management company of Brookhaven National Laboratories. He is also Vice Chairman of the New York Historical Society and a Member of the Motion Picture Academy of Arts & Science. Mr. Gelfond served as the Chairman of the Columbia Shuttle Memorial Trust Steering Committee, which was established in co-operation with NASA to support the families of the seven crew members of the STS-107 mission of the Space Shuttle Columbia, which came to a tragic end on February 1, 2003.

**Bradley J. Wechsler**, 55, has been Co-Chief Executive Officer of the Company with Mr. Gelfond since May 1996. From March 1994 to June 1999, Mr. Wechsler served as Chairman of the Company and has served as Co-Chairman with Mr. Gelfond since June 1999. Mr. Wechsler serves on the boards of NYU Hospital, where he is a Vice Chairman and member of the Executive Committee, the American Museum of the Moving Image, Math for America, the Ethical Culture, Fieldston Schools and Apollo Investment Corporation. Mr. Wechsler is also a Member of the Motion Picture Academy of Arts & Science.

**Edward MacNeil**, 42, joined the Company in April 1994 as Director, Taxation & Treasury and was appointed Chief Financial Officer in September 2006, on an interim basis. From October 1999 to August 2001, Mr. MacNeil held the position of Director and Senior Vice President of Digital Projection Limited, a former subsidiary of the Company. From September 2001 to September 2006, Mr. MacNeil held the position of Vice President Finance, Tax and Special Projects. Prior to joining the Company, Mr. MacNeil was a Taxation Manager at PricewaterhouseCoopers. Mr. MacNeil is a member of the Canadian Institute of Chartered Accountants.

**Greg Foster**, 44, joined the Company in March 2001 as President, Filmed Entertainment and was appointed Chairman & President, Filmed Entertainment in September 2004. Prior to joining the Company, Mr. Foster was Executive Vice-President of Production at MGM/UA. Prior to that, Mr. Foster held other senior positions including Senior Vice-President of Motion Picture Marketing Research during his 15 years at MGM/UA. In 1999, Mr. Foster founded uMogul, a financial services company and held the position of Chairman, Co-Founder and President.

**Robert D. Lister**, 38, joined the Company in May 1999 as Senior Vice President, Legal Affairs and General Counsel, and was appointed Executive Vice President, Business & Legal Affairs, Corporate Communications and General Counsel in January 2006. Previous to that, Mr. Lister was Executive Vice President, Legal and Business Affairs and General Counsel, a position he held since May 2001. Prior to joining the Company, Mr. Lister was Vice President, General Counsel and Secretary of Clearview Cinemas, a film exhibitor, from March 1998 until his employment with the Company. Prior to that, Mr. Lister served as Associate General Counsel of Merit Behavioral Care Corporation, a behavioral healthcare company, from March 1996 through March 1998. Mr. Lister serves on the board of Giant Screen Theater Association. Mr. Lister is a member of the New York State Bar Association.

**Brian Bonnick**, 50, joined the Company in January 1999 as Vice President, Research & Development and was appointed Executive Vice President, Technology in June 2006. Previous to that, Mr. Bonnick held the position of Senior Vice President, Technology, a position he held since August 2001. Prior to joining the Company, Mr. Bonnick was Vice President, Engineering and Operations for Electrohome Corporation. Prior to that Mr. Bonnick was Vice President and General Manager at TSB International Inc., a telecommunications company. Mr. Bonnick is registered as a professional engineer by the Association of Professional Engineers of Ontario.

**David B. Keighley**, 59, joined the Company in February 1988, was appointed Executive Vice President of the Company in July 2007. Previous to that, Mr. Keighley held the position of Senior Vice President, a position he held since July 1997. Mr. Keighley is President of David Keighley Productions 70MM Inc., a subsidiary of the Company. Mr. Keighley is responsible for motion picture and digital post-production and image quality assurance.

**Larry O'Reilly**, 44, joined the Company in March 1994 as the Sales Manager, Film Distribution and was appointed Executive Vice President, Theater Development in September 2004. Mr. O'Reilly has held various positions within the Company including Manager, Business Development: Film; Director, Strategic Partnerships; Director, Commercial Marketing: The Americas; Vice President, Sales, The Americas; and Senior Vice President, Theater Development & Film Distribution.

# IMAX CORPORATION

**Item 10. Directors, Executive Officers and Corporate Governance** (cont'd)

**EXECUTIVE OFFICERS** (cont'd)

**Joseph Sparacio**, 47, joined the Company in May 2007 as Executive Vice President, Finance. Mr. Sparacio is expected to assume the duties of Chief Financial Officer after the filing of the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2007. Prior to joining the Company, Mr. Sparacio served as Senior Vice President and Chief Financial Officer for the programming company iN Demand L.L.C. from June 2002 until his employment with the Company. From 1998 to 2002, Mr. Sparacio served as Vice President of Finance and Controller for Loews Cineplex Entertainment Corporation. From 1994 to 1998, Mr. Sparacio served as Vice President, Finance and Controller of Loews Theater Management Corp., and from 1990 to 1994, he served as Controller. Prior to joining Loews, Mr. Sparacio spent eight years with Ernst & Young. Mr. Sparacio is a certified public accountant and is a member of the American Institute of Certified Public Accountants and the New York State Society of Certified Public Accountants.

**Mark Welton**, 44, joined the Company in July 1997 as Director, Business Affairs and was appointed Executive Vice President, Corporate and Digital Development & Theater Operations in April 2007. From September 2001 to October 2003, Mr. Welton held the position of Senior Vice President, Business Affairs, and from October 2003 to June 2006, Mr. Welton held the position of Senior Vice President, Theater Operations and from June 2006 to April 2007 held the position of Executive Vice President, Theater Operations & General Manager, Digital. Prior to joining the Company Mr. Welton was an associate lawyer at the law firm Stikeman, Elliot from 1994 until his employment with the Company.

**G. Mary Ruby**, 49, joined the Company in October 1987 as Associate General Counsel and was appointed Senior Vice President, Legal Affairs in July 2001. Effective May 25, 2007, Ms. Ruby has also assumed the role of Senior Vice President Human Resources and Administration, on an interim basis. Ms. Ruby held the position of General Counsel of the Company from February 1989 to February 1997. Ms. Ruby is also Deputy General Counsel and acts as Corporate Secretary to the Board of Directors. In November 2004, Ms. Ruby was appointed by the Company's Audit Committee as Chief Compliance Officer, responsible for oversight of the Company's Whistle Blower Program. Ms. Ruby is a member of the Ontario Bar Association. Ms. Ruby is a Governor and Chairperson of the Governance Committee of Branksome Hall.

**Jeffrey Vance**, 36, joined the Company in October 2004 as Manager, Business Operations and was appointed Co-Controller in November 2006. Previous to that, Mr. Vance held the position of Director, Finance and Treasurer. Prior to joining the Company, Mr. Vance was employed in the Audit and Business Advisory Division at Arthur Andersen LLP from 1994 to 2002, most recently as Audit Manager, and was the Assistant Director, Financial Administration at FedEx Trade Networks Transport and Brokerage (Canada) Inc. from 2002 to 2003 and Eastern Region Controller and Manager of Administration at Comstock Canada Ltd. from 2003 to 2004. Mr. Vance is a Chartered Accountant.

**Vigna Vivekanand**, 37, joined the Company in January 1999 as Director, Finance and was appointed Co-Controller in November 2006. Prior to joining the Company, Mr. Vivekanand was an Audit Senior with KPMG, and before that a Senior Financial Analyst with Omega Digital Data and a Business Analyst at Toronto Dominion Bank. Mr. Vivekanand is a Chartered Accountant.

**MANAGEMENT CEASE TRADE ORDER**

On April 3, 2007 certain directors, senior officers and certain former employees were prohibited from trading in the securities of the Company pursuant to management cease trade orders issued by the OSC and certain other provincial securities regulators in connection with the delay in filing of the certain of the Company's financial statements. These orders are still in effect.

**SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE**

Section 16(a) of the Securities Exchange Act of 1934, requires the Company's directors and executive officers and persons who own more than 10% of a registered class of the Company's equity securities (collectively, the "Reporting Persons") to file reports of ownership on Form 3 and changes in ownership on Form 4 or Form 5 with the SEC. The Reporting Persons are also required by the Securities Exchange Act of 1934 to furnish the Company with copies of all Section 16(a) reports they file. Based solely upon review of Forms 3 and 4 (and amendments thereto) received from or written representations by the Reporting Persons, in respect of the fiscal year ended December 31, 2006, the Company believes that no Section 16(a) reports were not timely filed.

# IMAX CORPORATION

**Item 11. Executive Compensation** (cont'd)

**COMPENSATION DISCUSSION AND ANALYSIS** (cont'd)

**Long-Term Incentive Compensation**

The Company's long-term incentive compensation for certain employees, including the Named Executive Officers, is provided through grants of stock options. The Company has a stock option plan (the "Stock Option Plan") under which the Company may grant options to officers, employees, consultants and eligible directors (the "Participants") to purchase common shares on terms that may be determined.

The Stock Option Plan received shareholder approval and is administered by the Board of Directors. The Board of Directors has delegated the responsibility of administering the Stock Option Plan to the Option Committee. The Option Committee is currently composed of Messrs. Utay and Girvan, both Independent Directors. The Option Committee is responsible for performing the functions required of it under the Stock Option Plan, including the grant of options to Participants under the Stock Option Plan, from time to time, subject to guidelines determined by the Company's human resources department and the Compensation Committee.

The number of stock options granted is determined by a competitive compensation analysis and is based on each individual's salary range and responsibility. All awards of stock options are made at the fair market value of the Company's common shares on the date of the grant. Any options will generally be exercisable for a maximum period of 10 years from the date of grant, subject to earlier termination if the Participant's employment, consulting arrangement or term of office with the Company terminates. The Board of Directors or the Option Committee determines vesting requirements. If a Participant's employment, consulting arrangement or term of office with the Company terminates for any reason, any options which have not vested will generally be surrendered for cancellation without any consideration being paid therefore.

If the Participant's employment, consulting arrangement or term of office is terminated without cause or by reason of such Participant's resignation, death or permanent disability, the Participant (or the Participant's estate) will generally be entitled to exercise the Participant's vested options for a period thereafter. If the Participant's employment, consulting arrangement or term of office is terminated for cause, such Participant's vested options will be surrendered for cancellation. All options granted will immediately vest and become fully exercisable upon a change of control and the occurrence of other stated events. If the Participant is a party to an employment agreement with the Company or any of its subsidiaries and breaches any of the restrictive covenants in such agreement, such Participant will be required to surrender all unexercised options for cancellation without any consideration being paid therefore and will be obligated to pay to the Company an amount equal to the aggregate profit realized by such Participant with respect to any prior option exercises. In determining the number of options to grant to the Named Executive Officers, consideration was given to information about stock option grants to executive officers in comparable companies of similar revenue, size and market segment or industry. In addition, consideration is given to the number of options granted to the Company's other executive officers. The Option Committee approves annual awards of stock options to executive officers. Eligible newly hired or promoted executives receive their award of stock options as soon as practicable following their hire or promotion. Beginning on January 1, 2006, the Company began accounting for stock-based payments including its Stock Option Plan in accordance with the requirements of Financial Accounting Standards No.123R, "Share-Based Payment" ("SFAS 123R").

**Stock Appreciation Rights**

The Company may from time to time grant stock appreciation rights ("SARs") to certain Named Executive Officers. The SARs entitle recipients to receive in cash from the Company any increase in the fair market value of the common shares of the Company from the fair market value thereof on the date of grant to the date of exercise of the SARs. The Company shall have the right but not the obligation to cancel at any time all, or from time to time any part, of the SARs and to replace the cancelled SARs with stock options, or in the Company's discretion, restricted shares.

**Item 11. Executive Compensation** (cont'd)

**COMPENSATION DISCUSSION AND ANALYSIS** (cont'd)

**Retirement and Pension Plans**

The Company has an unfunded U.S. defined benefit pension plan covering its two Co-CEOs, the Supplemental Executive Retirement Plan (the "SERP"). The SERP provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings during the 120 months preceding retirement.

Under the original terms of the SERP, once benefit payments begin, the benefit is indexed annually to the cost of living and further provides for 100% continuance for life to the surviving spouse. On March 8, 2006, the Company and the Co-CEOs negotiated an amendment to the SERP effective January 1, 2006 which reduced the related pension expense to the Company. The Company was represented by the Independent Directors, who retained Mercer Human Resources Consulting ("Mercer") and outside legal counsel to advise them on certain analyses regarding the SERP. Under the terms of the SERP amendment, to reduce ongoing costs to the Company, the cost of living adjustment and surviving spouse benefits previously owed to the Co-CEOs are each reduced by 50%, subject to a recoupment of a percentage of such benefits upon a change of control of the Company, and the net present value of the reduced pension benefit payments is accelerated and paid out upon a change of control of the Company. The amendment resulted in a credit to accumulated other comprehensive income of $2.8 million, a reduction of other assets of $3.4 million, and a reduction in accrued liabilities of $6.2 million. The benefits were 50% vested as of July 2000, the SERP initiation date. The benefits were 50% vested as of July 2000, the SERP initiation date. The vesting percentage increases on a straight-line basis from inception until age 55. The vesting percentage of a member whose employment terminates other than by voluntary retirement or upon a change in control shall be 100%. As of December 31, 2006, one of the Co-CEO's benefits were 100% vested while the other Co-CEO's benefits were approximately 82% vested.

A Co-CEO who retires prior to August 1, 2010 will receive benefits in the form of monthly annuity payments until the earlier of a change of control or August 1, 2010 at which time the Co-CEO shall receive remaining benefits in the form of a lump sum payment. A Co-CEO who retires on or after August 1, 2010 shall receive benefits in the form of a lump sum payment.

The Company maintains defined contribution pension plans for its employees, including its Named Executive Officers. The Company makes contributions to these pension plans on behalf of employees in an amount up to 5% of their base salary, subject to certain prescribed maximums. During the fiscal year ended December 31, 2006, the Company contributed an aggregate of $11,229 to the Company's Canadian defined contribution plan on behalf of Mr. MacNeil and an aggregate of $26,400 to the Company's defined contribution employee pension plan under Section 401(k) of the U.S. Internal Revenue Code on behalf of Messrs. Gelfond, Wechsler, Joyce, Foster, Lister and Keighley.

**Other Personal Benefits and Perquisites**

The Company provides Named Executive Officers with other personal benefits and perquisites that the Company believes are reasonable and consistent with its overall compensation program to better enable the Company to attract and retain superior employees for key positions. The Company periodically reviews the levels of other personal benefits and perquisites provided to Named Executive Officers to ensure competitiveness and value to employees.

The Named Executive Officers are provided use of company automobiles, or car allowances, and participation in the retirement and pension plans described above.

The Named Executive Officers are entitled to receive a cash payment upon the executive's death through the Company's life insurance policies. In the event of the executive's death prior to actual retirement at age 65, the executive's designated beneficiaries would be entitled to receive a lump sum payment amount equal to one or two times his or her base salary, subject to prescribed maximums.

Attributed costs to the Company of the personal benefits and perquisites described above for the Named Executive Officers for the fiscal year ended December 31, 2006, are reported in the "All Other Compensation" column of the "Summary Compensation Table" below.

**Change of Control Severance Agreements**

The Company has entered into change of control severance agreements with certain key employees, including certain of the Named Executive Officers. The change of control severance agreements are designed to promote stability and continuity of senior management. Information regarding these agreements for the Named Executive Officers is provided below in "Employment Agreements and Potential Payments upon Termination or Change-in-Control".

# IMAX CORPORATION

**Item 11. Executive Compensation** (cont'd)

**COMPENSATION DISCUSSION AND ANALYSIS** (cont'd)

**Compensation Committee Report**

The Board of Directors has reviewed and discussed the Company's Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K with management. Based on this review and discussion, the Board of Directors recommended that the Compensation Discussion and Analysis be included in this Annual Report on Form 10-K.

The foregoing Compensation Committee Report, dated July 20, 2007, has been furnished by Messrs. Girvan (Chairman of the Compensation Committee), Braun, Copland, Leebron and Utay, all independent members of the Board of Directors, acting as the Compensation Committee.

**SUMMARY COMPENSATION TABLE**

The table below sets forth, for the period indicated, the compensation paid or granted by the Company to the individuals who served during 2006 as Chief Executive Officers, Chief Financial Officers and the three most highly compensated executive officers of the Company, other than the Chief Executive Officers and the Chief Financial Officers, who were serving as executive officers as of December 31, 2006 (collectively, the "Named Executive Officers").

| Name and Principal Position of Named Executive Officer | Year ended December 31 | Salary ($) | Bonus ($) | Option Awards ($) | Change in Pension Value ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Richard L. Gelfond<br>Co-Chairman & Co-Chief Executive Officer | 2006 | 500,000 | 150,000(1) | (2) | (3) | 34,640(4) | 684,640 |
| Bradley J. Wechsler<br>Co-Chairman & Co-Chief Executive Officer | 2006 | 500,000 | 150,000(1) | (2) | (5) | 39,429(6) | 689,429 |
| Francis T. Joyce (7)<br>Chief Financial Officer | 2006 | 222,962 | n/a | n/a | n/a | 4,652(8) | 227,614 |
| Edward MacNeil (9)<br>Chief Financial Officer | 2006 | 225,000(10) | 45,000(1) | n/a | n/a | 27,920(11) | 297,920 |
| Greg Foster<br>Chairman & President, Filmed Entertainment | 2006 | 658,846 | 375,000(1) | (2) | n/a | 201,060(12) | 1,234,906 |
| Robert D. Lister<br>Executive Vice President, Business and Legal Affairs, Corporate Communications & General Counsel | 2006 | 364,783 | 150,000(1) | (2) | n/a | 90,584(13) | 605,367 |
| David B. Keighley<br>Executive Vice President & President, David Keighley Productions 70MM Inc. | 2006 | 320,758 | 245,000 | (2) | n/a | 10,135(14) | 575,893 |

(1) These amounts are paid under annual incentive arrangements that the Company has with each of the Named Executive Officers, as detailed below in "Employment Agreements and Potential Payments upon Termination or Change-in-Control".

(2) Not included are options awarded to the Named Executive Officer in 2006 which were subsequently cancelled by the Company.

(3) The actuarial present value of the Named Executive Officer's accumulated benefit under the Supplemental Executive Retirement Plan at December 31, 2006 decreased by $1,370,911, as compared to December 21, 2005.

**Item 11. Executive Compensation** (cont'd)

**SUMMARY COMPENSATION TABLE** (cont'd)

(4) This amount reflects (i) $360 for the payment by the Company of life insurance premiums on the life Mr. Gelfond, (ii) $4,400 for contributions to the Company's defined contribution pension plans, and (iii) $29,880 for personal use of Company provided automobile.

(5) The actuarial present value of the Named Executive Officer's accumulated benefit under the Supplemental Executive Retirement Plan at December 31, 2006 decreased by $2,697,286, as compared to December 21, 2005.

(6) This amount reflects (i) $360 for the payment by the Company of life insurance premiums on the life of Mr. Wechsler, (ii) $4,400 for contributions to the Company's defined contribution pension plans, and (iii) $34,669 for personal use of Company provided automobile.

(7) During the fiscal year ended December 31, 2006, Mr. Joyce served as Chief Financial Officer from January 1 to September 12.

(8) This amount reflects (i) $252 for the payment by the Company of life insurance premiums on the life of Mr. Joyce, and (ii) $4,400 for contributions to the Company's defined contribution pension plans. Perquisites and other personal benefits for Mr. Joyce did not exceed $10,000.

(9) During the fiscal year ended December 31, 2006, Mr. MacNeil served as Chief Financial Officer from September 12 to December 31.

(10) Mr. MacNeil's salary compensation was earned in Canadian dollars. The Canadian compensation values have been converted to and reported in U.S. dollars using the Bank of Canada noon rate for the last day of the month preceding an actual payment date.

(11) This amount reflects (i) $670 for the payment by the Company of life insurance premiums on the life of Mr. MacNeil, (ii) $11,229 for contributions to the Company's defined contribution pension plans, (iii) $9,989 for allowance for personal automobile use and (iv) $6,032 for extraordinary personal travel expenses incurred at the request of the Company.

(12) This amount reflects (i) $3,160 for the payment by the Company of life insurance premiums on the life of Mr. Foster, (ii) $4,400 for contributions to the Company's defined contribution pension plans, and (iii) $193,500 for consideration of the cancellation of options granted in 2006. Perquisites and other personal benefits for Mr. Foster did not exceed $10,000.

(13) This amount reflects (i) $360 for the payment by the Company of life insurance premiums on the life of Mr. Lister, (ii) $4,400 for contributions to the Company's defined contribution pension plans, (iii) $18,011 for personal use of Company provided automobile, (iv) $9,313 for extraordinary personal travel expenses incurred at the request of the Company, and (v) $58,500 for consideration of the cancellation of options granted in 2006.

(14) This amount reflects (i) $360 for the payment by the Company of life insurance premiums on the life of Mr. Keighley, (ii) $4,400 for contributions to the Company's defined contribution pension plans, (iii) 5,375 for consideration of the cancellation of options granted in 2006. Perquisites and other personal benefits for Mr. Keighley did not exceed $10,000.

**GRANTS OF PLAN-BASED AWARDS**

During the fiscal year ended December 31, 2006, stock option grants were made to certain Named Executive Officers which were subsequently cancelled by the Company.

# IMAX CORPORATION

**Item 11. Executive Compensation** (cont'd)

**OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END**

The following table sets forth information relating to unexercised options for each Named Executive Officer outstanding as of December 31, 2006:

| | Option Awards | | | |
|---|---|---|---|---|
| **Name** | **Number of Securities Underlying Unexercised Options (#) Exercisable** | **Number of Securities Underlying Unexercised Options (#) Unexercisable (1)** | **Option Exercise Price ($)** | **Option Expiration Date** |
| Richard L. Gelfond | 100,000 | Nil | 3.51 | February 28, 2009 |
| | 532,000 | Nil | 4.85 | April 23, 2012 |
| | 68,000 | Nil | 7.00 | June 5, 2012 |
| | 450,000 | Nil | 5.24 | June 3, 2014 |
| Bradley J. Wechsler | 100,000 | Nil | 3.51 | February 28, 2009 |
| | 532,000 | Nil | 4.85 | April 23, 2012 |
| | 68,000 | Nil | 7.00 | June 5, 2012 |
| | 450,000 | Nil | 5.24 | June 3, 2014 |
| Francis T. Joyce | 40,000 | Nil | 2.75 | May 15, 2008 |
| Edward MacNeil | 4,000 | Nil | 3.04 | April 16, 2008 |
| | 8,250 | Nil | 7.45 | August 14, 2010 |
| | 2,500 | 7,500 (2) | 5.59 | June 24, 2011 |
| Greg Foster | 17,500 | Nil | 3.41 | March 19, 2011 |
| | 25,000 | Nil | 2.99 | February 11, 2009 |
| | 75,000 | Nil | 3.98 | March 19, 2009 |
| | 100,000 | Nil | 4.83 | September 6, 2009 |
| | 50,000 | Nil | 4.60 | March 18, 2010 |
| | 50,000 | Nil | 6.89 | November 1, 2011 |
| | 50,000 | 50,000 (3) | 6.89 | November 1, 2011 |
| Robert D. Lister | 35,000 | Nil | 3.04 | April 16, 2008 |
| | 25,000 | Nil | 2.99 | February 11, 2009 |
| | 15,000 | | 4.15 | August 15, 2009 |
| | 51,250 | | 7.45 | August 14, 2010 |
| | 13,750 | 41,250 (4) | 5.59 | June 24, 2011 |
| David B. Keighley | 5,000 | | 7.45 | August 14, 2010 |
| | 2,250 | 11,250 (5) | 5.59 | June 24, 2011 |

All stock options in the "Outstanding Equity Awards" Table were granted under the Stock Option Plan as described above in "Compensation Discussion and Analysis – Long-Term Incentive Compensation".

(1) Not included are options granted in 2005 and 2006 that were subsequently cancelled by the Company.

(2) 2,000 of these options vest on June 24, 2007; 2,500 on June 24, 2008; and 3,000 on June 24, 2009.

(3) These options vest on November 1, 2007.

(4) 11,000 of these options vest on June 24, 2007; 13,750 on June 24, 2008; and 16,500 on June 24, 2009.

(5) 3,000 of theses options vest on June 24, 2007; 3,750 on June 24, 2008; and 4,500 on June 24, 2009.

# IMAX CORPORATION

**Item 11. Executive Compensation (cont'd)**

**OPTIONS EXERCISED**

None of the Named Executive Officers exercised stock options during the fiscal year ended December 31, 2006.

**PENSION BENEFITS**

The following table sets forth information relating to each defined benefit pension plan that provides for payments or other benefits at, following, or in connection with retirement, as of December 31, 2006:

| Name | Plan Name | Number of Years of Credited Service (#) | Present Value of Accumulated Benefits ($) | Payments During Last Fiscal Year ($) |
|---|---|---|---|---|
| Richard L. Gelfond | Supplemental Executive Retirement Plan | 5.5 | 10,867,346 | Nil |
| Bradley J. Wechsler | Supplemental Executive Retirement Plan | 5.5 | 16,155,482 | Nil |

Further descriptions of the Supplemental Executive Retirement Plan, the SERP and the Company's defined contribution plans are summarized above in "Compensation Discussion and Analysis - Retirement and Pension Plans".

**EMPLOYMENT AGREEMENTS AND POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE-IN-CONTROL**

**Messrs. Gelfond and Wechsler**

On November 3, 1998, the Company entered into renewal employment agreements (the "1998 Agreements") with each of Messrs. Gelfond and Wechsler, the Co-CEOs. Under the 1998 Agreements, each of the Co-CEOs is to perform such services with respect to the Company's business as may be reasonably requested from time to time by the Board of Directors and which are consistent with his position as Co-CEO. In addition, the Company is to use its best efforts to cause the Co-CEOs to be elected to the Board of Directors. In addition, a provision contained in their original employment agreements, dated March 1, 1994, was continued, whereby each of the Co-CEOs is also entitled to receive, upon a sale of the Company, a cash bonus ("Sale Bonus") in an amount equal to the product of (a) 0.375% and (b) the amount by which the sale or liquidation transaction imputes an equity value in excess of Canadian $150,000,000 to the common shares originally issued by the Company (on a fully diluted basis but excluding the common shares issued upon the conversion of the Class B convertible preferred shares of the Company formerly outstanding which were converted into common shares on June 16, 1994 and the common shares issuable upon the exercise of warrants owned by each of Messrs. Gelfond and Wechsler). Under the 1998 Agreements, the Company is to equalize the Co-CEOs to the taxes which each of the Co-CEOs would have paid had he earned his employment compensation and paid taxes thereon solely in the United States. The employment agreements also contain non-competition provisions.

On July 12, 2000, the Company entered into amendments to the employment agreements of the Co-CEOs (the "2000 Amendments"). Pursuant to the 2000 Amendments, the Co-CEOs were each granted 180,000 restricted shares which, in the event that regulatory or shareholder approval is not obtained, are deemed phantom stock, all of which are fully vested. 80,000 of the phantom stock granted to each Co-CEOs remain outstanding. Under the 2000 Amendments, the Company agreed to create a defined benefit plan, to provide retirement benefits for the Co-CEOs, see "Compensation Discussion and Analysis – Retirement and Pension Plans" above for a description of the Supplemental Executive Retirement Plan, the SERP. The Company agreed to maintain health benefits for the Co-CEOs until they become eligible for Medicare and, thereafter, the Company will provide Medicare supplement coverage as selected by the Co-CEO. The 2000 Amendments further provide for the extension of the Co-CEOs' non-competition covenants to four years beyond termination of employment and for the agreement by the Co-CEOs to consult with the Company for three years following the end of their employment with the Company.

# IMAX CORPORATION

**Item 11. Executive Compensation** (cont'd)

EMPLOYMENT AGREEMENTS AND POTENTIAL PAYMENTS UPON TERMINATION OR CHANGE-IN-CONTROL (cont'd)

**Mr. Lister** (cont'd)

On April 4, 2001, the Company entered into an amendment to the employment agreement with Mr. Lister. The amendment provided that if Mr. Lister's employment is terminated without cause prior to the end of the employment term, or his agreement is not renewed, the Company must continue to pay Mr. Lister his annual salary, target bonus and benefits for the greater of the remainder of his employment term and twelve months, subject to mitigation by Mr. Lister.

On January 1, 2004, the Company entered into an amendment to the employment agreement with Mr. Lister, under which Mr. Lister's employment term was extended until June 30, 2006. The amendment provided for an annual salary of $275,000, subject to an annual review.

On February 14, 2006, the Company entered into an amendment to the employment agreement with Mr. Lister, under which Mr. Lister's employment term was extended until January 1, 2008. The amendment provided for an annual salary of $365,700 and, effective January 1, 2007, an annual salary of $402,270. Pursuant to the amendment, Mr. Lister was granted 50,000 options to purchase common shares on February 20, 2006, which options were subsequently cancelled by the Company on June 13, 2007 for an aggregate consideration of $58,500. The amendment provided that if Mr. Lister's employment is terminated without cause prior to the end of the employment term, or if his agreement is not renewed, the Company must continue to pay Mr. Lister his annual salary, target bonus and benefits for the greater of the remainder of his employment term and either 12 or 18 months, depending upon whether there was a change in control. The amendment also provided that upon the occurrence of certain events Mr. Lister shall have no obligation to mitigate payments made to him upon the termination of his employment or re-renewal of his agreement.

On October 5, 2006, the Company entered into an amendment to the employment agreement with Mr. Lister providing for a retention bonus of $150,000 if Mr. Lister is not terminated for cause and does not resign prior to December 31, 2007. In addition, the amendment provides for severance, including annual salary, target bonus and benefits, to be payable to Mr. Lister upon his departure after the occurrence of certain events, including the failure of the current Co-CEOs to continue in their positions and/or a change in control of the Company, provided that Mr. Lister remains with the Company for a defined period thereafter. The restrictive covenants, including confidentiality and non-competition provisions, of Mr. Lister's existing employment agreement remain in force.

If Mr. Lister's employment had been terminated without cause as of December 31, 2006, he would have been entitled to receive an estimated payment of $860,416. This amount includes salary, bonus, perquisites and provision of benefits (all subject to mitigation under certain circumstances), in either the form of continuance or lump sum at the election of the Company.

If there had been a change of control as of December 31, 2006, Mr. Lister would have received a payment of $150,000 in connection with a retention bonus.

If there had been a change of control and Mr. Lister's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive an estimated payment of $1,368,872. This amount includes salary, bonus, a special bonus, retention bonus, perquisites and provision of benefits and a payment obligation in connection with the cancellation of certain stock options.

**Mr. Keighley**

On July 15, 1997, the Company, David Keighley Productions 70MM Inc. (formerly 70MM Inc.) ("DKP/70MM"), a wholly-owned subsidiary of the Company and David B. Keighley entered into an employment agreement (the "1997 Agreement"). The agreement was for a five-year term and provided for an annual base salary, annual bonus and additional bonus of 10% of any excess of DKP/70MM audited profit before taxes over an enumerated pre-tax profit threshold. Under the agreement, Mr. Keighley has agreed to restrictive covenants, including confidentiality and non-competition covenants. The agreement provides that the employment of Mr. Keighley may be terminated at any time for cause or without cause. The 1997 Agreement terminated on July 15, 2002, however Mr. Keighley has continued to be employed by the Company.

If Mr. Keighley's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive a payment of $1,616 in connection with the cancellation of certain stock options, together with such other compensation which Mr. Keighley might be entitled to under applicable law.

If there had been a change of control and Mr. Keighley's employment had been terminated without cause as at December 31, 2006, he would have been entitled to receive a payment of $21,535 in connection with the a payment obligation in connection with the cancellation of certain stock options, together with such other compensation which Mr. Keighley might be entitled to under applicable law.

**Item 11. Executive Compensation** (cont'd)

**COMPENSATION OF DIRECTORS**

Directors are reimbursed for expenses incurred in attending meetings of the Board of Directors and Committees of the Board of Directors. In addition, the independent members of the Board of Directors of the Company receive Cdn. $20,000 per year (or may elect to receive options to purchase common shares of the Company in lieu of this payment) plus Cdn. $1,500 for each meeting of the Board attended in person or by telephone and Cdn. $1,200 for each Committee of the Board meeting attended in person or by telephone. The Chairman of the Audit Committee receives Cdn. $8,000 per year. In addition, each of the directors who are not also employees of the Company are granted options annually to purchase 8,000 common shares, in accordance with the Stock Option Plan, at an exercise price equal to the market value of the common shares of the Company on the date of grant which vest on the date of grant and expire on the earlier of the date which is two years after the termination of the optionee's service as a director of the Company or seven years after the date of the grant. This policy has been reviewed by the Corporate Governance Committee at which time the Committee reviewed director compensation data for companies of a comparable size. This data was compiled by the Company's management from public sources and was reported to the Committee. Using such information, the Committee formulated a recommendation to the Board of Directors and the final decision was made by the Board of Directors.

The following table sets forth information relating to the compensation of the directors for the fiscal year ended December 31, 2006:

| Name | Fees Earned or Paid in Cash ($) (1) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Neil S. Braun | 39,197 | (2) | Nil | 39,197 |
| Kenneth G. Copland | 62,125 (3) | (2) | Nil | 62,125 |
| Michael Fuchs | 1,318 | (2) | Nil | 1,318 |
| Garth M. Girvan | 74,466 (3) | (2) | Nil | 74,466 |
| David W. Leebron | 18,448 | (2) | Nil | 18,448 |
| Marc A. Utay | 55,880 (3) | (2) | Nil | 55,880 |

(1) Meeting Fees are generally earned in Canadian dollars. The Canadian compensation values have been converted to and reported in U.S. dollars using the Bank of Canada noon rate for the last day of the month preceding an actual payment date.

(2) Not included are options awarded to directors in 2006 which were subsequently cancelled by the Company.

(3) The fees earned by the director include a one-time fee for participation on the Special Committee during 2006.

**COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION**

During 2006, Mr. Girvan served as Chairman of the Compensation Committee. Messrs. Braun, Copland, Girvan, Leebron and Utay, all of the non-management/independent members of the Board of Directors, performed the functions of the Compensation Committee and participated in the deliberations concerning the Co-CEOs compensation in respect of 2006.

The law firm of McCarthy Tétrault, of which Mr. Girvan is a senior partner, provided legal services to the Company on several matters in 2006 and is expected to provide legal services in 2007.

Mr. Utay is the Managing Partner of Clarion Capital Partners, LLC, which leases office space from the Company for an annual rent of approximately $120,000.

During the fiscal year ended December 31, 2006, no executive officer of the Company served on compensation committees or boards of directors of any other entities that had or have had one or more of its executive officers serving as a member of the Company's Compensation Committee or Board of Directors.

# IMAX CORPORATION

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

### EQUITY COMPENSATION PLANS

The following table sets forth information regarding the Company's Equity Compensation Plan as of December 31, 2006:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | 5,100,995 | $7.12 | 1,873,662 |
| Equity compensation plans not approved by security holders | nil | nil | nil |
| Total | 5,100,995 | $7.12 | 1,873,662 |

### SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS

The Company is not aware of any persons who as of June 30, 2007, beneficially owned or exercised control or direction over more than 5% of the Company's common shares except:

| Name and Address of Beneficial Owner of Common Shares | Amount and Nature of Beneficial Ownership of Common Shares [1] | Percent of Outstanding Common Shares [2] |
|---|---|---|
| **Richard L. Gelfond**<br>Suite 2100, 110 East 59th Street, New York, New York | 2,722,900 [3] | 6.6 % |
| **Bradley J. Wechsler**<br>Suite 2100, 110 East 59th Street, New York, New York | 2,682,800 [4] | 6.5 % |
| **Douglas Group**<br>Kevin and Michelle Douglas<br>James E. Douglas, III<br>Douglas Family Trust<br>James & Jean Douglas Irrevocable Descendants' Trust<br>125 E. Sir Francis Drake Blvd., Suite 400, Larkspur, CA 94939 | 4,200,000 [5] | 10.4 % |
| **Manulife Financial Corporation Group**<br>John Hancock Advisers, LLC<br>MFC Global Investment Management (U.S.), LLC<br>200 Bloor Street, East, Toronto, Ontario Canada M4W 1E5 | 2,595,900 [6] | 6.4 % |
| **First Wilshire Securities Management, Inc.**<br>1224 East Green Street, Suite 200, Pasadena, CA 91106 | 2,153,903 [7] | 5.3 % |

# IMAX CORPORATION

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters** (cont'd)

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS** (cont'd)

Statements as to securities beneficially owned by the above-mentioned beneficial owners, or as to securities over which they exercise control or direction, are based upon information obtained from such beneficial owners and from records available to the Company.

(1) Includes number of common shares owned at June 30, 2007 and common shares as to which each individual had at June 30, 2007, the right to acquire beneficial ownership through the exercise of vested options plus options that vest within 60 days of that date.

(2) Based on dividing the number of common shares beneficially owned by such person by 40,288,074 common shares outstanding as of June 30, 2007, adjusted for shares issuable through the exercise of vested options, held by such person, plus options, held by such person, that vest within 60 days of that date.

(3) Included in the amount shown are 1,150,000 common shares as to which Mr. Gelfond had the right to acquire beneficial ownership as of June 30, 2007, through the exercise of options.

(4) Included in the amount shown are 1,150,000 common shares as to which Mr. Wechsler had the right to acquire beneficial ownership as of June 30, 2007, through the exercise of options.

(5) Based on information contained in a Form 4, dated April 24, 2007, filed jointly by Kevin Douglas, Douglas Family Trust, James E. Douglas, III, and the James & Jean Douglas Irrevocable Descendants' Trust.

(6) Based on information contained in a Schedule 13G, dated February 6, 2007, filed by jointly by Manulife Financial Corporation, John Hancock Advisers. LLC and MFC Global Investment Management (U.S.), LLC.

(7) Based on information contained in a Schedule 13G, dated February 14, 2007, filed by First Wilshire Securities Management, Inc.

**SECURITY OWNERSHIP OF MANAGEMENT**

The following table sets forth information with respect to the beneficial ownership of the Company's common shares as of June 30, 2007 or as otherwise indicated in the notes below, including (i) all directors and the Named Executive Officers, individually, and (iii) all directors and executive officers as a group:

| Name of Beneficial Owner of Common Shares | Amount and Nature of Beneficial Ownership of Common Shares | Percent of Outstanding Common Shares |
|---|---|---|
| Richard L. Gelfond | 2,722,900 (1) | 6.6 % |
| Bradley J. Wechsler | 2,682,800 (2) | 6.5 % |
| Neil S. Braun | 24,000 (3) | * |
| Kenneth G. Copland | 83,865 (4) | * |
| Garth M. Girvan | 87,636 (5) | * |
| David W. Leebron | 25,892 (6) | * |
| Marc A. Utay | 1,336,065 (7) | 3.3 % |
| Francis T. Joyce | 47,500 (8) | * |
| Edward MacNeil | 16,750 (9) | * |
| Greg Foster | 383,500 (10) | * |
| Robert D. Lister | 160,000 (11) | * |
| David B. Keighley | 10,650 (12) | * |
| All directors and executive officers as a group (18 persons) | 7,789,884 (13) | 17.8 % |

* less than 1%

Statements as to securities beneficially owned by directors and by executive officers, or as to securities, over which they exercise control or direction, are based upon information obtained from such directors and executive officers and from records available to the Company.

The amount of common shares listed includes the number of common shares owned at June 30, 2007 and common shares to which each individual had at June 30, 2007 the right to acquire beneficial ownership through the exercise of vested options plus options that vest within 60 days of that date.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters** (cont'd)

**SECURITY OWNERSHIP OF MANAGEMENT** (cont'd)

The percent of outstanding common shares is based on dividing the number of common shares beneficially owned by the individual by 40,288,074 common shares outstanding as of June 30, 2007 adjusted for shares issuable through the exercise of vested options held by such person, plus options held by such person that vest within 60 days of that date.

(1) Included in the amount shown are 1,150,000 common shares which Mr. Gelfond had the right to acquire beneficial ownership through the exercise of options.

(2) Included in the amount shown are 1,150,000 common shares which Mr. Wechsler had the right to acquire beneficial ownership through the exercise of options.

(3) Included in the amount shown are 24,000 common shares which Mr. Braun had the right to acquire beneficial ownership through the exercise of options.

(4) Included in the amount shown are 73,865 common shares which Mr. Copland had the right to acquire beneficial ownership through the exercise of options.

(5) Included in the amount shown are 61,738 common shares which Mr. Girvan had the right to acquire beneficial ownership through the exercise of options.

(6) Included in the amount shown are 24,592 common shares which Mr. Leebron had the right to acquire beneficial ownership through the exercise of options.

(7) Included in the amount shown are 90,000 common shares that are pledged as security and 211,738 common shares which Mr. Utay had the right to acquire beneficial ownership through the exercise of options.

(8) Included in the amount shown are 40,000 common shares which Mr. Joyce had the right to acquire beneficial ownership through the exercise of options.

(9) Included in the amount shown are 16,750 common shares which Mr. MacNeil had the right to acquire beneficial ownership through the exercise of options.

(10) Included in the amount shown are 367,500 common shares which Mr. Foster had the right to acquire beneficial ownership through the exercise of options.

(11) Included in the amount shown are 151,000 common shares which Mr. Lister had the right to acquire beneficial ownership through the exercise of options.

(12) Included in the amount shown are 10,250 common shares which Mr. Keighley had the right to acquire beneficial ownership through the exercise of options.

(13) Included in the amount shown are 3,475,124 common shares as to which all directors and executive officers as a group had the right to acquire beneficial ownership through the exercise of options.

**Item 13. Certain Relationships and Related Transactions and Director Independence**

**CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS**

No director or executive officer of the Company, or any security holder of record as of the date of this Annual Report on Form 10-K who owned, of record or to the Company's knowledge, more than 5% of the Company's outstanding common shares, or any member of such person's immediate family, had any material interest, direct or indirect, in any transaction during the last fiscal year, or since the commencement of the current fiscal year, in any completed or proposed transaction except for the following:

The law firm of McCarthy Tétrault, of which Mr. Girvan is a senior partner, provided legal services to the Company on several matters in 2006 and is expected to provide legal services in 2007.

Mr. Utay is the Managing Partner of Clarion Capital Partners, LLC, which leases office space from the Company for an annual rent of approximately $120,000.

Patricia Keighley is the spouse of David Keighley who is an executive officer of the Company. Ms. Keighley has been employed as the Vice President and General Manager of David Keighley Productions 70MM Inc., a subsidiary of the Company, since February 1988. Ms. Keighley received compensation of approximately $142,664 in 2006.

**Item 13. Certain Relationships and Related Transactions and Director Independence** (cont'd)

REVIEW, APPROVAL OR RATIFICATION OF TRANSACTIONS WITH RELATED PERSONS

On a regular basis, the Company requires its directors, nominees for director, and executive officers to identify to the Board of Directors, transactions and/or relationships which could constitute a transaction with a related person as defined in Regulation S-K 404(a). For any potential transaction in which a director, executive officer or related person would have a material interest, such transaction is reviewed, in advance, by the Company's General Counsel and Chief Compliance Officer to ensure compliance with the Company's Code of Ethics and to evaluate the disclosure requirements under Regulation S-K 404(a). In addition, in the event any transaction or agreement occurs in respect of which a director or executive officer has a material interest, the director or executive officer must recuse himself from voting on that matter and remove himself from the meeting while the transaction at issue is being considered by the Board of Directors. The minutes of the Board of Directors' meeting would reflect the nature of the interest disclosed and the fact of the recusal.

DIRECTOR INDEPENDENCE

A director is determined to be independent when he or she meets the requirements of Rule 4200(a)(15) of the NASDAQ Marketplace Rules and Section 1.4 of Multilateral Instrument 52-110 (an "Independent Director"). The following five board members are Independent Directors: Messrs. Braun, Copland, Girvan, Leebron and Utay. The remaining directors, Messrs. Gelfond and Wechsler, are executives of the Company. All members of the Compensation Committee and Audit Committee are considered "independent" under such committee's independence standards.

**Item 14. Principal Accounting Fees and Services**

AUDIT FEES

For professional services rendered by PWC for the audit of the Company's financial statements, audit of internal control over financial reporting, and review of the quarterly financial statements included in the Company's Form 10-Ks and 10-Qs and services that are normally provided by the accountant in connection with statutory and regulatory filings or engagements in respect of the fiscal year ended December 31, 2006, PWC billed the Company $2,751,522 (2005 - $1,174,942).

AUDIT-RELATED FEES

For professional services rendered by PWC for assurance and related services that are reasonably related to the performance of the audit or review of financial statements and which includes consultations concerning financial accounting and reporting standards and review of regulatory matters in respect of the fiscal year ended December 31, 2006, PWC billed the Company $390,739 (2005 - $51,920).

TAX FEES

For professional services rendered by PWC for tax compliance, tax advice and tax planning in respect of the fiscal year ended December 31, 2006, PWC billed the Company $35,226 (2005 - $99,706).

ALL OTHER FEES

PWC did not bill the Company for services rendered in respect of the fiscal year ended December 31, 2006 (2005 – nil), other than the services described above.

AUDIT COMMITTEE'S PRE-APPROVAL POLICIES AND PROCEDURES

Section 10A(i)(1) of the Securities Exchange Act of 1934 and related SEC rules require that all auditing and permissible non-audit services to be performed by a company's principal accountants be approved in advance by the Audit Committee of the Board of Directors, subject to a de minimis exception set forth in the SEC rules (the "De Minimis Exception"). Pursuant to Section 10A(i)(3) of the Securities Exchange Act of 1934 and related SEC rules, the Audit Committee has established procedures by which the Chairman of the Audit Committee may pre-approve such services provided the pre-approval is detailed as to the particular service or category of services to be rendered and the Chairman reports the details of the services to the full Audit Committee at its next regularly scheduled meeting. None of the audit-related or non-audit services described above were performed pursuant to the De Minimis Exception.

# IMAX CORPORATION

## PART IV

**Item 15. Exhibits and Financial Statement Schedules**

(a)(1) **Financial Statements**

The consolidated financial statements filed as part of this Report are included under Item 8 in Part II.

Report of Independent Registered Public Accounting Firm, which covers both the financial statements and financial statement schedule in (a)(2), is included under Item 8 in Part II.

(a)(2) **Financial Statement Schedules**

Financial statement schedule for each year in the three-year period ended December 31, 2006.

**II. Valuation and Qualifying Accounts.**

(a)(3) **Exhibits**

The Items listed as Exhibits 10.1 to 10.21 relate to management contracts or compensatory plans or arrangements.

| Exhibit No. | Description |
|---|---|
| 3.1 | Articles of Amendment of IMAX Corporation, dated June 25, 2004. Incorporated by reference to Exhibit 3.2 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2004 (File No. 000-24216). |
| 3.2 | By-Law No.1 of IMAX Corporation enacted on June 3, 2004. Incorporated by reference to Exhibit 3.3 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2004 (File No. 000-24216). |
| *4.1 | Shareholders' Agreement, dated as of January 3, 1994, among WGIM Acquisition Corporation, the Selling Shareholders as defined therein, Wasserstein Perella Partners, L.P., Wasserstein Perella Offshore Partners, L.P., Bradley J. Wechsler, Richard L. Gelfond and Douglas Trumbull (the "Selling Shareholders' Agreement"). |
| *4.2 | Amendment, dated as of March 1, 1994, to the Selling Shareholders' Agreement. |
| *4.3 | Registration Rights Agreement, dated as of February 9, 1999, by and among IMAX Corporation, Wasserstein Perella Partners, L.P., Wasserstein Perella Offshore Partners, L.P., WPPN Inc., the Michael J. Biondi Voting Trust, Bradley J. Wechsler and Richard L. Gelfond. |
| 4.4 | Indenture, dated as of April 9, 1996, between IMAX Corporation and Chemical Bank, as Trustee, related to the issue of the 5.75% Convertible Subordinated Notes due April 1, 2003. Incorporated by reference to Exhibit 4.3 to Amendment No.1 to IMAX Corporation's Registration Statement on Form F-3 (File No. 333-5212). |
| 4.5 | Indenture, dated as of December 4, 1998, between IMAX Corporation and U.S. Bank Trust, N.A., as Trustee, related to the issue of the 7.875% Senior Notes due December 1, 2005. Incorporated by reference to IMAX Corporation's Exhibit 4.9 to Form 10-K for the year ended December 31, 1998 (File No. 000-24216). |
| 4.6 | Registration Rights Agreement, dated as of December 4, 2003, by and among IMAX Corporation, the Guarantors (as defined therein), Credit Suisse First Boston LLC, Jefferies & Company, Inc., Wachovia Capital Markets, LLC and U.S. Bancorp Piper Jaffray Inc., relating to the issuance of 9.625% Senior Notes due 2010. Incorporated by reference to Exhibit 4.2 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 4.7 | Indenture, dated as of December 4, 2003, by and among IMAX Corporation, the Guarantors (as defined therein) and U.S. Bank National Association, as Trustee, related to the issue of the 9.625% Senior Notes due December 1, 2010. Incorporated by reference to Exhibit 4.3 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 4.8 | Supplemental Indenture, dated as of April 1, 2004, among IMAX Corporation, the Existing Guarantors (as defined therein), the Guaranteeing Subsidiaries (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.8 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |

# IMAX CORPORATION

**Item 15. Exhibits, Financial Statement Schedules** (cont'd)

(a)(3) **Exhibits** (cont'd)

| Exhibit No. | Description |
|---|---|
| 4.9 | Second Supplemental Indenture, dated as of July 14, 2004, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.9 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 4.10 | Fourth Supplemental Indenture, dated April 10, 2006, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Guaranteeing Subsidiaries (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.10 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2006 (File No. 000-24216). |
| 4.11 | Fifth Supplemental Indenture, dated June 19, 2006, among IMAX Corporation, the Existing Guarantors (as defined therein), First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantor named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. Incorporated by reference to Exhibit 4.11 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2006 (File No. 000-24216). |
| * 4.12 | Sixth Supplemental Indenture, dated as of November 9, 2006, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. |
| * 4.13 | Seventh Supplemental Indenture, dated as of January 29, 2007, among IMAX Corporation, the Existing Guarantors (as defined therein), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. |
| *4.14 | Eighth Supplemental Indenture, dated as of March 26, 2007, among IMAX Corporation, the Existing Guarantors (as defined there in), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Seventh Supplemental Guarantors named in the Seventh Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. |
| *4.15 | Consent and Forbearance Agreement, dated April 2, 2007, by and between IMAX Corporation and Plainfield Special Situations Master Fund Limited. |
| *4.16 | Ninth Supplemental Indenture, dated as of April 16, 2007, among IMAX Corporation, the Existing Guarantors (as defined there in), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Seventh Supplemental Guarantors named in the Seventh Supplemental Indenture, the Eighth Supplemental Guarantors named in the Eighth Supplemental Indenture and U.S. Bank National Association, as trustee under the Indenture. |

## IMAX CORPORATION

**Item 15. Exhibits, Financial Statement Schedules** (cont'd)

(a)(3) **Exhibits** (cont'd)

| Exhibit No. | Description |
|---|---|
| *4.17 | Tenth Supplemental Indenture, dated as of March 30, 2007, among IMAX Corporation, the Existing Guarantors (as defined there in), the First Supplemental Guarantors named in the Supplemental Indenture, the Second Supplemental Guarantors named in the Second Supplemental Indenture, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture, the Sixth Supplemental Guarantors named in the Sixth Supplemental Indenture, the Seventh Supplemental Guarantors named in the Seventh Supplemental Indenture, the Eighth Supplemental Guarantors named in the Eighth Supplemental Indenture, the Ninth Supplemental Guarantors named in the Ninth Supplemental Indenture, the Guaranteeing Subsidiary (as defined therein) and U.S. Bank National Association, as trustee under the Indenture. |
| 10.1 | Stock Option Plan of IMAX Corporation, dated August 12, 2004. Incorporated by reference to Exhibit 10.1 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2004 (File No. 000-24216). |
| *10.2 | IMAX Corporation Supplemental Executive Retirement Plan, as amended and restated as of January 1, 2006. |
| *10.3 | Employment Agreement, dated July 1, 1998, between IMAX Corporation and Bradley J. Wechsler. |
| *10.4 | Amended Employment Agreement, dated July 12, 2000, between IMAX Corporation and Bradley J. Wechsler. |
| 10.5 | Amended Employment Agreement, dated March 8, 2006, between IMAX Corporation and Bradley J. Wechsler. Incorporated by reference to Exhibit 10.8 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 10.6 | Amended Employment Agreement, dated February 15, 2007, between IMAX Corporation and Bradley, J. Wechsler. Incorporated by reference to Exhibit 10.31 to IMAX Corporation's Form 8-K dated February 16, 2007 (File No. 000-24216. |
| *10.7 | Employment Agreement, dated July 1, 1998, between IMAX Corporation and Richard L. Gelfond. |
| *10.8 | Amended Employment Agreement, dated July 12, 2000, between IMAX Corporation and Richard L. Gelfond. |
| 10.9 | Amended Employment Agreement, dated March 8, 2006, between IMAX Corporation and Richard L. Gelfond. Incorporated by reference to Exhibit 10.14 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 10.10 | Amended Employment Agreement, dated February 15, 2007, between IMAX Corporation and Richard L. Gelfond. Incorporated by reference to Exhibit 10.30 to IMAX Corporation's Form 8-K dated February 16, 2007 (File No. 000-24216). |
| 10.11 | Employment Agreement, dated March 9, 2006, between IMAX Corporation and Greg Foster. Incorporated by reference to Exhibit 10.18 to IMAX Corporation's Form 10-K for the year ended December 31, 2005 (File No. 000-24216). |
| 10.12 | Employment Agreement, dated May 9, 2001, between IMAX Corporation and Francis T. Joyce. Incorporated by reference to Exhibit 10.3 to IMAX Corporation's Form 10-K for the year ended December 31, 2002 (File No. 000-24216). |
| 10.13 | Amended Employment Agreement, dated May 14, 2003, between IMAX Corporation and Francis T. Joyce. Incorporated by reference to Exhibit 10.16 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2003 (File No. 000-24216). |
| 10.14 | Employment Agreement, dated May 17, 1999, between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.14 to IMAX Corporation's Form 10-K for the year ended December 31, 2002 (File No. 000-24216). |

**Item 15. Exhibits, Financial Statement Schedules** (cont'd)

(a)(3) **Exhibits** (cont'd)

| Exhibit No. | Description |
|---|---|
| *10.15 | Letter Agreement, dated August 21, 2000 between IMAX Corporation and Robert D. Lister. |
| 10.16 | Amended Employment Agreement, dated April 4, 2001 between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.15 to IMAX Corporation's Form 10-K for the fiscal year ended December 31, 2002 (File No. 000-24216). |
| 10.17 | Amended Employment Agreement, dated January 1, 2004, between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.17 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 10.18 | Third Amending Agreement, dated February 14, 2006, between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.21 to IMAX Corporation's Form 8-K dated February 20, 2006 (File No. 000-24216). |
| 10.19 | Fourth Amending Agreement, dated October 5, 2006, between IMAX Corporation and Robert D. Lister. Incorporated by reference to Exhibit 10.28 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2006 (File No. 000-24216). |
| 10.20 | Summary of Employment Arrangement, dated November 6, 2006, between IMAX Corporation and Edward MacNeil. Incorporated by reference to Exhibit 10.29 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2006 (File No. 000-24216). |
| 10.21 | Statement of Directors' Compensation, dated August 11, 2005. Incorporated by reference to Exhibit 10.20 to IMAX Corporation's Form 10-Q for the quarter ended September 30, 2005 (File No. 000-24216). |
| 10.22 | Loan Agreement, dated as of February 6, 2004 by and between Congress Financial Corporation (Canada) and IMAX Corporation. Incorporated by reference to Exhibit 10.22 to IMAX Corporation's Registration Statement on Form S-4 (File No. 333-113141). |
| 10.23 | First Amendment to the Loan Agreement, dated June 30, 2005, between Congress Financial Corporation (Canada) and IMAX Corporation. Incorporated by reference to Exhibit 10.22 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2005 (File No. 000-24216). |
| 10.24 | Second Amendment to the Loan Agreement, as of and with effect May 16, 2006, between IMAX Corporation and Wachovia Capital Finance Corporation (Canada) (formerly, Congress Financial Corporation (Canada)). Incorporated by reference to Exhibit 10.27 to IMAX Corporation's Form 10-Q for the quarter ended June 30, 2006 (File No. 000-24216). |
| *21 | Subsidiaries of IMAX Corporation. |
| *23 | Consent of PricewaterhouseCoopers LLP. |
| *24 | Power of Attorney of certain directors. |
| *31.1 | Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated July 20, 2007, by Bradley J. Wechsler. |
| *31.2 | Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated July 20, 2007, by Richard L. Gelfond. |
| *31.3 | Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002, dated July 20, 2007, by Edward MacNeil. |
| *32.1 | Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated July 20, 2007, by Bradley J. Wechsler. |
| *32.2 | Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated July 20, 2007, by Richard L. Gelfond. |
| *32.3 | Certification Pursuant to Section 906 of the Sarbanes - Oxley Act of 2002, dated July 20, 2007, by Edward MacNeil. |

* Filed herewith

# IMAX CORPORATION

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

IMAX CORPORATION

By /s/ EDWARD MACNEIL
Edward MacNeil
Chief Financial Officer

Date: July 20, 2007

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated on March 16, 2007.

/s/ BRADLEY J. WECHSLER
Bradley J. Wechsler
Director and
Co-Chief Executive Officer
(Principal Executive Officer)

/s/ RICHARD L. GELFOND
Richard L. Gelfond
Director and
Co-Chief Executive Officer
(Principal Executive Officer)

/s/ EDWARD MACNEIL
Edward MacNeil
Chief Financial Officer
(Principal Financial Officer)

/s/ JEFFREY VANCE
Jeffrey Vance
Co-Controller
(Principal Accounting Officer)

/s/ VIGNA VIVEKANAND
Vigna Vivekanand
Co-Controller
(Principal Accounting Officer)

NEIL S. BRAUN*
Neil S. Braun
Director

KENNETH G. COPLAND*
Kenneth G. Copland
Director

GARTH M. GIRVAN*
Garth M. Girvan
Director

DAVID W. LEEBRON*
David W. Leebron
Director

MARC A. UTAY*
Marc A. Utay
Director

By * /s/ EDWARD MACNEIL
Edward MacNeil (as attorney-in-fact)