# EXHIBIT B
# (PART 3)

# IMAX CORPORATION
## Schedule II
## Valuation and Qualifying Accounts
*(In thousands of U.S. dollars)*

| | Balance at beginning of year | Additions / (recoveries) charged to expenses | Other additions / (deductions) | Balance at end of year |
|---|---|---|---|---|
| **Allowance for net investment in leases** | | | | |
| Year ended December 31, 2004 – as restated | $ 6,743 | $ (628) | $ — | $ 6,115 |
| Year ended December 31, 2005 – as restated | $ 6,115 | $ (1,153) | $ (2,194)(1) | $ 2,768 |
| Year ended December 31, 2006 | $ 2,768 | $ (323) | $ — | $ 2,445 |
| **Allowance for doubtful accounts receivable** | | | | |
| Year ended December 31, 2004 – as restated | $ 7,278 | $ (860) | $ (841)(1) | $ 5,577 |
| Year ended December 31, 2005 – as restated | $ 5,577 | $ 144 | $ (3,248)(1) | $ 2,473 |
| Year ended December 31, 2006 | $ 2,473 | $ 1,389 | $ (609)(1) | $ 3,253 |
| **Deferred income tax valuation allowance** | | | | |
| Year ended December 31, 2004 – as restated | $ 47,408 | $ (3,335) | $ — | $ 44,073 |
| Year ended December 31, 2005 – as restated | $ 44,073 | $ (488) | $ — | $ 43,585 |
| Year ended December 31, 2006 | $ 43,585 | $ 8,408 | $ — | $ 51,993 |
| **Provision for loans receivable** | | | | |
| Year ended December 31, 2004 | $ 11,900 | $ (800) | $ — | $ 11,100 |
| Year ended December 31, 2005 | $ 11,100 | $ (1,699) | $ (9,401)(2) | $ — |
| Year ended December 31, 2006 | $ — | $ — | $ — | $ — |

(1) Deduction amounts represent write-offs of amounts previously charged to the provision.

(2) Loans were settled on December 29, 2005 in exchange for payments received in the first quarter of 2006.

**IMAX CORPORATION**
EXHIBIT 4.1

SHAREHOLDERS' AGREEMENT

SHAREHOLDERS' AGREEMENT, dated as of January 3, 1994, by and among WGIM Acquisition Corporation, a corporation organized under the laws of Canada (the "Company"), the persons listed as "Selling Shareholders" on the signature pages hereof (collectively, the "Selling Shareholders"), Wasserstein Perella Partners, L.P., a Delaware limited partnership, Wasserstein Perella Offshore Partners, L.P., a Delaware limited partnership (the two immediately preceding parties referred to herein collectively as "WP"), Bradley J. Wechsler ("Wechsler"), Richard L. Gelfond ("Gelfond" and, together with Wechsler, the "GW Shareholders") and Douglas Trumbull ("Trumbull"); the Selling Shareholders and Trumbull being collectively referred to herein as the "Original Shareholders"; the Selling Shareholders, the GW Shareholders, Trumbull and WP sometimes being collectively referred to herein as the "Shareholders".

W I T N E S S E T H:

WHEREAS, the Company has entered into a Share Purchase Agreement dated as of the date hereof (the "Acquisition Agreement") with the Selling Shareholders pursuant to which the Company has agreed, subject to the terms and conditions thereof, to purchase all of the outstanding shares of common stock of Imax Corporation, a corporation organized under the laws of Canada ("Imax") (the "Acquisition") from the Selling Shareholders;

WHEREAS, upon the Closing (as defined in the Acquisition Agreement), each of Gelfond and Wechsler will be the registered holder and beneficial owner of an aggregate of 323,728 common shares of the Company (the "Common Stock") and warrants (the "GW Warrants") to purchase 143,879 shares of Common Stock;

WHEREAS, upon the Closing, WP will be the registered holder and beneficial owner of 240,000 Class A Preferred Shares ("Class A Preferred Shares") of the Company and warrants ("Warrants") to purchase 3,107,786 shares of Common Stock;

WHEREAS, upon the Closing, each Selling Shareholder will be the registered holder and beneficial owner of such number of Class B Convertible Preferred Shares ("Class B

Preferred Shares") of the Company and of such number of Class C Preferred Shares ("Class C Preferred Shares" which, together with Class A Preferred Shares and Class D Preferred Shares, are referred to collectively herein as the "Preferred Stock" of the Company), in each case set forth opposite such shareholder's name on Schedule A hereto;

WHEREAS, Trumbull has entered into an Agreement (the "Agreement") to sell all the shares of the Trumbull Company, Inc., a Delaware corporation ("TCI") to the Company in return for 60,000 Class D Preferred Shares ("Class D Preferred Shares") of the Company and employee stock options ("Options") to purchase 129,491 shares of Common Stock.

WHEREAS, the Shareholders desire to enter into an agreement to provide for certain restrictions on the transferability of Shares (as hereinafter defined) held by the Original Shareholders, pursuant to which the Original Shareholders are granted registration rights with respect to their Shares in the manner and for the purposes specified herein, and to provide for certain other matters, all as set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

Section 1. Definitions

The terms set forth below shall have following definitions:

"Acquisition" has the meaning set forth in the Recitals hereto.

"Acquisition Agreement" has the meaning set forth in the Recitals hereto.

"Act" means the Securities Act of 1933, as amended.

"Advice" has the meaning set forth in Section 4(b) hereof.

"Affiliate" of any Person means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such Person. A Person shall be deemed to "control" (including the correlative meanings, the terms "controlling", "controlled by", and "under common control with") another Person if the controlling Person possesses, directly or indirectly, the

power to direct or cause the direction of the management or policies, of the controlled Person, whether through ownership of voting securities, by contract or otherwise.

"Class A Preferred Shares" has the meaning set forth in the Recitals hereto.

"Class B Preferred Shares" has the meaning set forth in the Recitals hereto.

"Class C Preferred Shares" has the meaning set forth in the Recitals hereto.

"Class D Preferred Shares" has the meaning set forth in the Recitals hereto.

"Closing" has the meaning set forth in the Recitals hereto.

"Come Along Notice" has the meaning set forth in Section 2(e) hereof.

"Commission" has the meaning set forth in Section 4(b) hereof.

"Common Stock" has the meaning set forth in the Recitals hereto.

"Company" has the meaning set forth in the introductory paragraph hereto; provided that, after the effectiveness of the amalgamation referred to in Section 3, all references herein to the "Company" shall refer to the new corporation formed by such amalgamation.

"Exchange Act" has the meaning set forth in Section 4(e) hereof.

"GW Warrants" has the meaning set forth in the Recitals hereto.

"Imax" has the meaning set forth in the Recitals hereto.

"Inspectors" has the meaning set forth in Section 4(b) hereof.

"NASD" has the meaning set forth in Section 4(b) hereof.

"Original Shareholders" has the meaning set forth in the introductory paragraph hereto.

"Person" means any individual, corporation, partnership, joint venture, trust, unincorporated or governmental organization or any agency or political subdivision thereof.

"Piggyback Registration" has the meaning set forth in Section 4(a) hereof.

"Preferred Stock" has the meaning set forth in the Recitals hereto.

"Proposed Registration" has the meaning set forth in Section 4(a) hereof.

"Prospective Transferee" has the meaning set forth in Section 2(d) hereof.

"Records" has the meaning set forth in Section 4(b) hereof.

"Registration Expenses" has the meaning set forth in Section 4(d) hereof.

"Registrable Securities" means the shares of Common Stock issuable upon conversion of the Class B Preferred Shares, but with respect to any such share, only so long as such share continues to be a Restricted Security.

"Restricted Security" means a share of Common Stock or a share of Preferred Stock (or a share of Common Stock issuable upon conversion of Preferred Stock) until such time as such share (i) has been effectively registered under the Act and disposed of in accordance with the registration statement covering it, (ii) has been sold publicly pursuant to Rule 144 (or any similar provision then in force) under the Act, or (iii) has been otherwise transferred and the Company has delivered a new certificate or other evidence of ownership for it not subject to any legal or other restriction and not being a legend restricting its transfer without registration or an exemption therefrom.

"Second Anniversary" means the second anniversary of the Closing.

"Shares" means the Preferred Stock, the Warrants, the GW Warrants, and the Common Stock, including the Common Stock issuable upon conversion of the Class B Preferred Shares and upon exercise of the Warrants, as the context requires.

"Shareholders" has the meaning set forth in the introductory paragraph hereto.

"Subsidiary" means any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the Board of Directors of their equivalents of such Person shall, at the time as of which any determination is being made, be owned by the Company, either directly or through Subsidiaries.

"Take-Along Notice" has the meaning set forth in Section 2(d) hereof.

"transfer" has the meaning set forth in Section 2(a) hereof.

"Warrants" has the meaning set forth in the Recitals hereto.

"WP" has the meaning set forth in the introductory paragraph hereto.

Section 2. Restrictions on Transfers of Shares and Rights of Co-Sale; Financial Statements.

(a) Restrictions on Transfers of Shares. No transfer, sale, assignment, pledge or other hypothecation or disposition, voluntary or involuntary (each, a "transfer"), of Shares held by an Original Shareholder shall be valid unless the terms and conditions of this Agreement shall have been complied with. Any attempted transfer in violation of the terms and conditions of this Agreement shall be *ab initio* void.

(b) Legends. (i) The Company shall be entitled to affix to each certificate evidencing Shares held by an Original Shareholder a legend in substantially the following form:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO REGISTRATION OF TRANSFER OF SUCH SECURITIES WILL BE MADE ON THE BOOKS OF THE ISSUER UNLESS SUCH TRANSFER IS MADE IN CONNECTION WITH AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT OR SUCH ACT DOES NOT APPLY.

THE SECURITIES EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AS SET

FORTH IN A SHAREHOLDERS' AGREEMENT, DATED AS OF JANUARY 3, 1994, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF THE ISSUER. NO REGISTRATION OF TRANSFER OF SUCH SECURITIES WILL BE MADE ON THE BOOKS OF THE ISSUER UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH."

(ii) In the event that any Shares held by an Original Shareholder shall cease to be Restricted Securities, the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such Shares without the first paragraph of the legend required by Section 2(b)(i) endorsed thereon. In the event that any Shares shall cease to be subject to the restrictions on transfer set forth in this Agreement, the Company shall, upon the written request of the holder thereof, issue to such holder a new certificate evidencing such Shares without the second paragraph of the legend required by Section 2(b)(i).

(c) Certain Restrictions on Transfer. Each Original Shareholder agrees that he will not, directly or indirectly, make or solicit any transfer of any Share held by such Shareholder other than (i) any transfer to a person (A) by will or the laws of descent and distribution or (B) by transfer of any kind for tax or estate planning purposes, provided, however, that such transferee is (I) the issue or spouse of an Original Shareholder, (II) a company controlled by any combination of an Original Shareholder, the issue or the spouse of an Original Shareholder (provided that such company continues to be so controlled), or (III) any trust established for the benefit of an Original Shareholder, the issue or the spouse of an Original Shareholder, or any combination thereof; (ii) any transfer that is made in compliance with the procedures, and subject to the limitations, set forth in Sections 2(d) and 2(e); (iii) any transfer pursuant to an effective registration statement under the Act or under Rule 144 under the Act (or any similar or successor rule). Notwithstanding the foregoing, except as otherwise expressly provided in this Agreement, all transfers permitted by the foregoing clause (i) shall be subject to, and shall not be made other than in compliance with, the provisions of Section 2(f).

(d) Take-Along Right. If any of WP, Gelfond or Wechsler, as the case may be, proposes to sell or transfer any of their Shares (other than Preferred Stock) in one or more related transactions which will result in a sale or transfer by WP, Gelfond or Wechsler, as the case may be, of a majority of the aggregate number of Shares held by such parties, then WP, Gelfond or Wechsler, as the case may be, shall

promptly give written notice thereof (a "Take-Along Notice") to the Original Shareholders at least 30 days prior to the closing of such sale or transfer. The Take-Along Notice shall specify the precise number of Shares or percentage of holdings to be sold or transferred and shall describe in reasonable detail the proposed sale or transfer including, without limitation, the name and address of the prospective purchaser or transferee of the Shares (such purchaser or transferee and any other purchaser or transferee of the Shares permitted under this Agreement being a "Prospective Transferee"), the number of and type of the Shares to be sold or transferred, the proposed amount and form of the conditions of payment thereof offered by the Prospective Transferee, that the Prospective Transferee has been informed of the take-along right in this Section 2(d) and has agreed to purchase Shares in accordance with the terms hereof and any other material terms or conditions of the sale or transfer. Each Original Shareholder shall have the right, exercisable upon written notice (the "Acceptance Notice") delivered to WP, Gelfond or Wechsler, as the case may be, within 15 days after such receipt of the Take-Along Notice, to participate in such sale or transfer on the same terms and conditions as set forth in the Take-Along Notice. The Acceptance Notice shall state that such Original Shareholder wishes to transfer Shares to the Prospective Transferee on the terms described in the Take-Along Notice, and shall state the number of Shares thereof that such Original Shareholder wishes to include in the proposed transfer. If such Original Shareholder has delivered a timely Acceptance Notice it shall have the right to sell a number of Shares equal to the product obtained by multiplying (i) the aggregate number of Shares covered by the Take-Along Notice by (ii) a fraction the numerator of which is the number of Shares owned by the Original Shareholders at the time of the sale or transfer and the denominator of which is the number of Shares owned by WP, the GW Shareholders and the Original Shareholders at the time of such sale or transfer. For purposes of this Section 2(d), the number of Shares owned by a party shall be the number of shares of Common Stock owned by such party assuming that such party exercises all of its exchange, conversion and subscription and similar rights with respect to all securities of the Company.

(e) Come-Along Right. If any of WP, Gelfond or Wechsler, as the case may be, determines to transfer all of their Shares in one or more related transactions which will result in a transfer by WP, Gelfond or Wechsler, as the case may be, of a majority of the aggregate number of Shares held by such parties, and it wishes to require the Original Shareholders to sell their Shares in such sale, then WP, Gelfond or Wechsler, as the case may be, shall give written notice thereof (the "Come-Along Notice") to the Original

Shareholders, at least 20 days prior to such transfer. Such notice shall describe in reasonable detail the proposed transfer by WP, Gelfond or Wechsler, as the case may be, including, without limitation, the name and address of the Prospective Transferee, the number and type of the Shares proposed to be transferred, the proposed amount and form of the consideration to be paid and the terms and conditions of payment thereof offered by the Prospective Transferee and any other material terms or conditions of the transfer. Each Original Shareholder shall be required to sell all of his Shares to such third party or parties concurrently with the sale by WP, Gelfond or Wechsler, as the case may be, of its Shares, on the terms and conditions approved by WP, Gelfond or Wechsler, as the case may be, subject to the consideration per Share to be received by such Original Shareholder being identical to the consideration per Share being received by WP, Gelfond or Wechsler, as the case may be.

(f) Transferees to Execute Agreement. Each Original Shareholder agrees that it will not directly or indirectly make any transfer of any Shares held by such Original Shareholder, unless, prior to the consummation of any such transfer, the Prospective Transferee (i) executes and delivers to the Company an agreement, in form and substance satisfactory to the Company, whereby such Prospective Transferee confirms that, with respect to the Shares that are the subject of such transfer, it shall be deemed to be an "Original Shareholder" for the purposes of this Agreement and agrees to be bound by all the terms of this Agreement and (ii) unless the Company otherwise agrees in writing, delivers to the Company an opinion of counsel, satisfactory in form and substance to the Company, to the effect that the agreement referred to above that is delivered by such Prospective Transferee is a legal, valid and binding obligation of such Prospective Transferee enforceable against such Prospective Transferee in accordance with its terms. Upon the execution and delivery by such Prospective Transferee of the agreement referred to in clause (i) of the next preceding sentence and, if required, the delivery of the opinion of counsel referred to in clause (ii) of the next preceding sentence, such Prospective Transferee shall be deemed an "Original Shareholder" for the purposes of this Agreement, and shall have the rights and be subject to the obligations of an Original Shareholder hereunder with respect to the Shares transferred to such Prospective Transferee. Notwithstanding the foregoing, the provisions of this Section 2(f) shall not apply to transfers of Shares made pursuant to Section 2(c)(ii) or (iii) hereof.

(g) Financial Statements. The Company will furnish to the Shareholders, contemporaneously with holders of the

Company's debt securities, audited consolidated financial statements of the Company, including a balance sheet, income statement, statement of surplus and statement of changes in financial position, together with notes thereto and setting forth the corresponding figures of the previous year in comparative form.

Section 3. Amalgamation. Each party hereto acknowledges that, immediately following the Closing, Imax, a wholly-owned subsidiary of the Company, will amalgamate with the Company, pursuant to which, among other things, all Shares shall be Shares of the corporation continuing following such amalgamation. Each party hereto agrees to vote all Shares, if any, held by such party entitled to a vote thereon, in favour of such amalgamation and to cause its respective directors to vote in favor of such amalgamation. From and after such amalgamation, all references herein to the "Company" shall refer to the new corporation continuing following such amalgamation.

Section 4. Registration Rights.

(a) Piggyback Registration Rights.

(1) Right to Piggyback. Subject to the last sentence of this paragraph (1), whenever the Company proposes to register any shares of Common Stock under the Act at any time after the Second Anniversary, other than (A) a registration statement on Form S-4 or S-8 (or any successor forms or comparable foreign forms) or filed in connection with an exchange offer or (B) an offering of securities solely to the Company's existing shareholders (a "Proposed Registration"), and the registration form to be used may be used for the registration of the Registrable Securities (a "Piggyback Registration"), the Company will give prompt written notice to each Original Shareholder of its intention to effect such a registration and will, subject to Section 4(a)(2) hereof, include in such Piggyback Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein from each Original Shareholder within 15 days after receipt of the Company's notice, provided that if, at any time after giving written notice of its intention to register any shares of Common Stock and prior to the effective date of the registration statement filed in connection with such registration, the Company shall determine for any reason not to register or to delay registration of such shares, the Company may, at its election, give written notice of such determination to each holder of Registrable Securities and, thereupon, (1) in the case of a determination not to register, shall be relieved of its obligation to register any

Registrable Securities in connection with such registration, and (2) in the case of delay in registering, shall be permitted to delay registering any Registrable Securities for the same period as the delay in registering such other shares. Except as may otherwise be provided in this Agreement, Registrable Securities with respect to which such request for registration has been received will be registered by the Company and offered to the public pursuant to this Section 4 on the same terms and subject to the same conditions applicable to similar securities of the Company included in the Proposed Registration. No Original Shareholder will be entitled to include Registrable Securities pursuant to this Section 4(a) (1) in a registration statement relating to the initial public offering of shares of Common Stock (or securities exchangeable or exercisable for or convertible into Common Stock, or the Common Stock underlying such exchangeable or convertible securities).

If the Company proposes, in conjunction with a Piggyback Registration, to file a prospectus with any Canadian securities regulatory authority or otherwise to qualify the shares of Common Stock for distribution in any province of Canada (a "Canadian Offering"), the Original Shareholders shall be entitled to participate in such Canadian Offering to the same extent and on the same terms and conditions (before, during and after the Canadian Offering), mutatis mutandis, as they are entitled to participate in the Piggyback Registration under this Agreement.

(2) Priority of Piggyback Registrations. If the managing underwriter or underwriters advise the Company that in its or their opinion the number or type of securities proposed to be sold in a registration statement exceeds the number or type which can be sold in such offering (a) at a price reasonably related to the then current market value of such securities, or (b) without otherwise materially and adversely affecting the entire offering, then the Company will include in such registration the number or type of Registrable Securities which, in the opinion of such underwriter or underwriters, can be sold as follows without having the adverse effect referred to above: (i) first, all the securities that the Company proposed to sell for its own account or is required to register on behalf of any third party exercising demand registration rights and (ii) second, to the extent that the number of securities described in clause (i) above is less than the number of securities that the Company has been advised can be sold in such offering without the adverse effect referred to above, the Registrable Securities which have been requested to be included in such registration under this Section 4(a) and all shares of Common Stock requested to be included by third parties exercising

rights similar to those granted in this Section 4(a), on a pro rata basis (which shall be based on the number of shares of Common Stock then owned by each holder of Registrable Securities and each such other party, assuming exercise by them of all exchange, conversion, subscription and similar rights with respect to all securities of the Company).

(b) Registration Procedures. With respect to any Piggyback Registration, the Company will, as expeditiously as practicable:

(1) prepare and file with the Securities and Exchange Commission (the "Commission") a registration statement which includes the Registrable Securities and use all reasonable efforts to cause such registration statement to become effective;

(2) prepare and file with the Commission such amendments and post-effective amendments to the registration statement as may be necessary to keep the registration statement effective for a period of not less than 90 days (or such shorter period which will terminate when all Registrable Securities covered by such registration statement have been sold or withdrawn) cause the prospectus to be supplemented by any required prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 under the Act; and comply with the provisions of the Act applicable to it with respect to the disposition of all securities covered by such registration statement during the applicable period in accordance with intended methods of disposition by the sellers thereof set forth in such registration statement or supplement to the prospectus;

(3) furnish to any holder of Registrable Securities included in such registration statement and the underwriter or underwriters, if any, without charge, at least one confirmed copy of the registration statement and any post-effective amendment thereto, upon request, and such number of copies of the prospectus (including each preliminary prospectus) and any amendments or supplements thereto, and any documents incorporated by reference therein, as such holder or underwriter may request in order to facilitate the disposition of the Registrable Securities being sold by such holder (it being understood that the Company consents to the use of the prospectus and any amendment or supplement thereto by each holder holding Registrable Securities covered by the registration statement and the underwriter or underwriters, if any, in connection with the offering and

sale of the Registrable Securities covered by the prospectus or any amendment or supplement thereto);

(4) notify each holder of Registrable Securities included in such registration statement, at any time when a prospectus relating thereto is required to be delivered under the Act, when the Company becomes aware of the occurrence of any event as a result of which the prospectus included in such registration statement (as then in effect) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements therein (in the case of the prospectus or any preliminary prospectus, in light of the circumstances under which they were made) not misleading and, as promptly as practicable at the request of such holder, prepare and file with the Commission and furnish a supplement or amendment to such prospectus so that, as thereafter delivered to the purchasers of such Registrable Securities, such prospectus will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading;

(5) use all reasonable efforts to cause all Registrable Securities included in such registration statement to be listed on each securities exchange on which the Common Stock is then listed, if any;

(6) make every reasonable effort to obtain the withdrawal of any order suspending the effectiveness of the registration statement at the earliest possible moment;

(7) on or prior to the date on which the registration statement is declared effective, use all reasonable efforts to register or qualify, and cooperate with the holders of Registrable Securities included in such registration statement, the underwriter or underwriters, if any, and their counsel, in connection with the registration or qualification of the Registrable Securities covered by the registration statement for offer and sale under the securities or blue sky laws of each state and other jurisdiction as any such holder or underwriter reasonably requests in writing, to use all reasonable efforts to keep each such registration or qualification effective, including through new filings, or amendments or renewals, during the period such registration statement is required to be kept effective and to do any and all other acts or things necessary or advisable to enable the disposition in all such

jurisdictions of the Registrable Securities covered by the applicable registration statement; provided, that the Company will not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to general service of process in any such jurisdiction where it is not then so subject;

(8) cooperate with the holders of Registrable Securities covered by the registration statement and the managing underwriter or underwriters, if any, to facilitate the timely preparation and delivery of certificates (not bearing any restrictive legends) representing securities to be sold under the registration statement, and enable such securities to be in such denominations and registered in such names as the managing underwriter or underwriters, if any, or such holders may request;

(9) use all reasonable efforts to cause the Registrable Securities covered by the registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the seller or sellers thereof or the underwriter or underwriters, if any, to consummate the disposition of such securities;

(10) enter into such customary agreements (including, without limitation, an underwriting agreement in customary form) and take all such other actions as the holders of a majority of the Registrable Securities being sold or the underwriters retained by the holders participating in an underwritten public offering, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities;

(11) make available for inspection by any holder of Registrable Securities included in such registration statement, any underwriter participating in any disposition pursuant to such registration statement, and any attorney, accountant or other agent retained by any such seller or underwriter (collectively, the "Inspectors") all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records") as shall be reasonably necessary to enable the Inspectors to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided that Records which the Company determines, in good faith, to be

confidential and which it notifies the Inspectors are confidential shall not be disclosed to the Inspectors;

(12) use all reasonable efforts to obtain a "cold comfort" letter from the Company's independent public accountants and an opinion of outside counsel to the Company, each in customary form and covering matters of the type customarily covered by "cold comfort" letters or opinions of counsel; and

(13) cooperate with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the National Association of Securities Dealers, Inc. (the "NASD").

Each holder of Registrable Securities, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 4(b)(4) will forthwith discontinue disposition of the Registrable Securities until such holder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 4(b)(4) or until it is advised in writing (the "Advice") by the Company that the use of the prospectus may be resumed and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Company, such holder will, or will request the managing underwriter or underwriters, if any, to deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice. In the event the Company shall give any such notice, the time periods mentioned in Section 4(b)(2) shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by each registration statement shall have received the copies of the supplemented or amended prospectus contemplated by Section 4(b)(4) or the Advice.

(c) Holdback Arrangements.

(1) Restrictions on Public Sale by Holders of Registrable Securities. To the extent not inconsistent with applicable law, each holder whose Registrable Securities are included in an underwritten registration statement agrees not to effect any public sale or

distribution of the securities being registered or a similar security of the Company, or any securities convertible into or exchangeable or exercisable for such securities, including a sale pursuant to Rule 144 under the Act, during the 14 days prior to, and during the 30-day period beginning on, the effective date of such registration statement, if and to the extent requested by the managing underwriter or underwriters of such underwritten public offering, other than pursuant to such underwritten public offering.

(2) Restrictions on Public Sale by the Company and Others. The Company, WP, each of Gelfond and Wechsler and each Original Shareholder agree (i) not to effect any public sale or distribution of any securities similar to those being registered, or any securities convertible into or exchangeable or exercisable for such securities (other than any such sale or distribution of such securities pursuant to registration of such securities on Form S-4 or S-8 or any successor forms or comparable foreign forms or any such sale or distribution of such securities in connection with any merger, amalgamation or consolidation involving the Company or a Subsidiary or the acquisition by the Company or a Subsidiary of the capital equity or substantially all of the assets of any other Person) during the 14 days prior to, and during the 30-day period beginning on, the effective date of any registration statement except as part of such registration statement; and (ii) that any agreement entered into after the date of this Agreement pursuant to which the Company issues or agrees to issue any privately placed securities shall contain a provision under which holders of such securities agree not to effect any public sale or distribution of any such securities during the periods described in (i) above, in each case including a sale pursuant to Rule 144 (or any similar provision then in force) under the Act (except as part of any such registration, if permitted) provided, however, that the provisions of this Section 4(c)(2) shall not prevent the conversion or exchange of any securities pursuant to their terms into or for other securities.

(3) Other Registrations. If the Company has previously filed a registration statement with respect to any of its Registrable Securities, and if such previous registration has not been withdrawn or abandoned, the Company will not file or cause to be effected any other registration of any of its Registrable Securities under the Act (except on Form S-4 or S-8 or any successor forms or comparable foreign forms) whether on its own behalf or at the request of any holder or holders of Registrable Securities, until a period of at least six months has

elapsed from the effective date of such previous registration.

(d) Registration Expenses. All of the costs and expenses of each registration hereunder, including, without limitation, all registration and filing fees, all fees and expenses associated with filings required to be made with the NASD (including, if applicable, the fees and expenses of any "qualified independent underwriter" as such term is defined in Schedule E of the By-laws of the NASD, and of its counsel) as may be required by the rules and regulations of the NASD, fees and expenses of compliance with securities or blue sky laws of any jurisdiction (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities), printing expenses, messenger and delivery expenses, internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange, and fees and disbursements of counsel for the Company and its independent certified public accountants (including the expenses of any special audit or comfort letters required by or incident to such performance) securities act liability insurance (if the Company elects to obtain such insurance), the fees and expenses of any special experts retained by the Company in connection with such registration, fees and expenses of other persons retained by the Company (but not including any underwriting fees, discounts or commissions attributable to the sale of Registrable Securities or fees or expenses of counsel for holders of Registrable Securities, all of which shall be for the account of such holders) (all such expenses being herein called "Registration Expenses"), will be borne by the Company.

(e) Indemnification; Contribution.

(1) Indemnification by the Company. The Company agrees to indemnify and hold harmless each selling holder of Registrable Securities, its officers, directors, agents, employees, partners and Affiliates and each Person, if any, who controls such selling holder within the meaning of Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus

relating to the Registrable Securities or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, liabilities or expenses arise out of, or are based upon, any such untrue statement or omission based upon information with respect to such selling holder furnished in writing to the Company by such selling holder expressly for use therein. The Company also agrees to indemnify any underwriters of the Registrable Securities, their officers, directors, agents, employees, partners and Affiliates and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the selling holders provided in this Section 4(e).

(2) Conduct of Indemnification Proceedings. If any action or proceeding (including any governmental investigation) shall be brought or asserted against any selling holder (or any of its officers, directors, agents, employees, partners or Affiliates) or any Person controlling any such selling holder in respect of which indemnity may be sought from the Company, the Company shall be permitted, unless in the reasonable judgment of such indemnified party a conflict of interest may exist between such indemnified party and the Company with respect to such claim, to assume the defense thereof, including the employment of counsel reasonably satisfactory to such selling holder, and shall assume the payment of all expenses. Whether or not such defense is assumed by the Company, the Company shall not be liable for any settlement of any such action or proceeding effected without its written consent. The Company will not consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such claim or litigation. If the Company is not entitled to, or elects not to, assume the defense of a claim, it will not be obligated to pay the fees and expenses of more than one counsel with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the Company shall be obligated to pay the fees and expenses of such additional counsel or counsels. Any selling holder

entitled to indemnification hereunder agrees to give prompt written notice to the Company after the receipt by such selling holder of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which such selling holder will claim indemnification or contribution pursuant to this Agreement.

(3) Indemnification by Holders of Registrable Securities. Each selling holder of Registrable Securities agrees to indemnify and hold harmless the Company, its officers, directors, agents, employees, partners and Affiliates, and each Person, if any, who controls the Company within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to the selling holders of Registrable Securities, but only with respect to information furnished in writing by such selling holder with respect to such selling holder expressly for use in any registration statement or prospectus relating to the Registrable Securities which contained a material misstatement of fact or omission of a material fact, or any amendment or supplement thereto, or any preliminary prospectus. In case any action or proceeding shall be brought against the Company or its officers, directors, agents, employees, partners or Affiliates, or any such controlling Person, in respect of which indemnity may be sought against any selling holder, such selling holder shall have the rights and duties given to the Company, and the Company or its officers, directors, agents, employees, partners or Affiliates, or such controlling Person shall have the rights and duties given to such selling holders by Section 4(e)(2).

Each selling holder of Registrable Securities also agrees to indemnify and hold harmless underwriters of the Registrable Securities, their officers, directors, agents, employees, partners and Affiliates, and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the Company provided in this Section 4(e)(3).

(4) Contribution. If the indemnification provided for in this Section 4(e) is unavailable to the Company, the selling holders or the underwriters in respect of any losses, claims, damages, liabilities or judgments referred to herein, then each such indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities and

judgments in such proportion as is appropriate to reflect the relative fault of the indemnifying parties and indemnified parties in connection with such statements or omissions which resulted in such losses, claims, damages, liabilities or judgments, as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified parties shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement of omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 4(e)(4) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable consideration referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or judgments referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 4(e)(4), no underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission, and no selling holder shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities of such selling holder were offered to the public exceeds the amount of any damages which such selling holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(f) Participation in Underwritten Registrations. No holder of Registrable Securities may participate in

any underwritten registration hereunder unless such holder (i) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the holders as provided herein and (ii) completes and executes all questionnaires, powers of attorneys, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and these registration rights.

(g) Participation under Rule 144. The Company covenants that it will file any reports required to be filed by it under the Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder (or, if the Company is not required to file such reports, it will, upon the request of any holder of Registrable Securities, make publicly available other information so long as necessary to permit sales under Rule 144 under the Act) and that it will take such further action as the holders of Registrable Securities may reasonably request, all to the extent required from time to time to enable the holders of Registrable Securities to sell Registrable Securities without registration under the Act within the limitation of the exemption provided by Rule 144, as it may be amended from time to time (or any similar rule or regulation hereafter adopted by the Commission).

(h) Termination. This Section 4 shall continue in full force and effect until none of the Shares are Registrable Securities, except that paragraph (e) shall survive any termination of this Section 4.

Section 5. Miscellaneous.

(a) Effectiveness. The provisions of this Agreement shall be effective as of the Closing Date (as defined in the Acquisition Agreement).

(b) Termination. The provision of Section 2(c) shall terminate on the Second Anniversary. The provisions of Section 2(d) and 2(e) shall terminate on the tenth anniversary of the Closing. The provisions of Section 2(a) and (b) and Section 3 shall survive indefinitely. The provisions of Section 4 shall terminate as provided in Section 4(h).

(c) Entire Agreement. This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written of the parties.

(d) Amendments, etc. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(e) Severability. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in full force and effect and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(f) Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(g) Notices. All communications provided for under this Agreement shall be in writing and shall be delivered by hand or by first-class regular mail, postage prepaid, to the following addresses, or such other addresses as shall be given by notice delivered hereunder, and shall be deemed to have been given on the day of personal delivery thereof or the third business day after such mailing:

If to WP, to:

Wasserstein Perella & Co., Inc.
31 West 52nd Street
26th Floor
New York, New York 10019
Attention: W. Townsend Ziebold

Wasserstein Perella Partners, L.P.
31 West 52nd Street
26th Floor
New York, New York 10019
Attention: W. Townsend Ziebold

Wasserstein Perella Offshore Partners, L.P
31 West 52nd Street
26th Floor
New York, New York 10019
Attention: W. Townsend Ziebold

with a copy to:

Shea & Gould
1251 Avenue of the Americas
New York, New York 10020
Attention: Richard L. Smithline, Esq.

If to Gelfond or Wechsler, to:

Bradley J. Wechsler
88 East Middle Patent Road
Bedford, New York 10506

and

Richard L. Gelfond
4 Cheviot Road
Southampton, New York 11968

with a copy to:

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Attention: Peter D. Lyons, Esq.

If to the Company, to:

IMAX Corporation
John Davison
45 Charles Street
Toronto, Ontario M4Y1N1

If to Trumbull, to:

The Trumbull Company, Inc.
P.O. Box 847
Riverview Road
Lenox, Massachusetts 01240
Attention: Douglas Trumbull

with a copy to:

Douglas Trumbull
P.O. Box 55
Southfield, Massachusetts 01259

If to a Selling Shareholder, to the address set forth in Exhibit A for such Shareholder,

or to such other Persons or at such other addresses as shall be furnished by any such party by like notice given to the other parties of this Agreement.

(h) Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the Province of Ontario and to laws of Canada applicable therein.

(i) Benefit; Successors and Assigns. Except as otherwise provided herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that this Agreement shall not inure to the benefit of any Prospective Transferee unless such Prospective Transferee shall have complied with the terms of Section 2(f). No Original Shareholder may assign any of its rights hereunder to any Person other than a transferee that has complied with the requirements of Section 2(f) in all respects to the extent required thereby. Nothing in this Agreement either express or implied is intended to confer on any person other than the parties hereto and their respective successors and permitted assigns, any rights, remedies or obligations under or by reason of this Agreement.

(j) Injunctive Relief. Each party recognizes that in the event such party fails to perform, observe or discharge any of such party's obligations or liabilities under this Agreement, no remedy at law will provide adequate relief to the injured parties, and agree that the injured parties shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without being required to post a bond or other security.

(k) Limitation of Liability. No personal liability or responsibility of either GW Shareholder shall at any time be enforceable against either GW Shareholder on account of any representation, warranty, undertaking, covenant or agreement made by it hereunder, either express or implied, all such personal liability, if any, being expressly waived by each party to this Agreement and by all Persons claiming by, through or under any such party, provided that any party to this Agreement making claim hereunder may realize upon the Securities held by each GW Shareholder for satisfaction of the same.

(l) Execution in Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the day and year first above written.

WGIM ACQUISITION CORPORATION

By /s/ Bradley J. Wechsler

Name: Bradley J. Wechsler
Title: President

WASSERSTEIN PERELLA PARTNERS, L.P.
By Wasserstein Perella Management Partners, Inc.
its general partner

By
Name:
Title:

WASSERSTEIN PERELLA OFFSHORE PARTNERS, L.P.
By Wasserstein Perella Management Partners, Inc.
its general partner

By
Name:
Title:

/s/ Richard L. Gelfond
Richard L. Gelfond

/s/ Bradley J. Wechsler
Bradley J. Wechsler

/s/ Douglas Trumbull
Douglas Trumbull

Jonathan Barker by * as attorney-in-fact
Jonathan Barker

Nancy Bell by * as attorney-in-fact
Nancy Bell

Gregory J. Breen by * as attorney-in-fact
Gregory J. Breen

C.W. Breukelman by * as attorney-in-fact
C.W. Breukelman

David Breukelman by * as attorney-in-fact
David Breukelman

| | | | |
|---|---|---|---|
| Elaine Breukelman | by | * Elaine Breukelman | as attorney-in-fact |
| Marion Breukelman | by | * Marion Breukelman | as attorney-in-fact |
| Tanya Breukelman | by | * Tanya Breukelman | as attorney-in-fact |
| W.A. Breukelman | by | * W.A. Breukelman | as attorney-in-fact |
| Canmont Investment Corp. Ltd. | by | * Canmont Investment Corp. Ltd. | as attorney-in-fact |
| James B. Cawthon, Jr. | by | * James B. Cawthon, Jr. | as attorney-in-fact |
| Elizabeth Chaplin | by | * Elizabeth Chaplin | as attorney-in-fact |
| Diana Chaplin | by | * Diana Chaplin | as attorney-in-fact |
| Gordon Chaplin | by | * Gordon Chaplin | as attorney-in-fact |
| 434786 Ontario Limited | by | * 434786 Ontario Limited | as attorney-in-fact |
| 434787 Ontario Limited | by | * 434787 Ontario Limited | as attorney-in-fact |
| James D. Chaplin | by | * James D. Chaplin | as attorney-in-fact |
| Janet Chaplin | by | * Janet Chaplin | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Richard Chaplin | by | * <br> Richard Chaplin | as attorney-in-fact |
| Charlford Investments Inc. | by | * <br> Charlford Investments Inc. | as attorney-in-fact |
| Ann Cochren | by | * <br> Ann Cochren | as attorney-in-fact |
| Doug Daymond | by | * <br> Doug Daymond | as attorney-in-fact |
| Stewart Daymond | by | * <br> Stewart Daymond | as attorney-in-fact |
| Daedalus Investments Ltd. | by | * <br> Daedalus Investments Ltd. | as attorney-in-fact |
| John M. Davison | by | * <br> John M. Davison | as attorney-in-fact |
| Executronics Limited | by | * <br> Executronics Limited | as attorney-in-fact |
| Allison Ferguson | by | * <br> Allison Ferguson | as attorney-in-fact |
| Betty Ferguson | by | * <br> Betty Ferguson | as attorney-in-fact |
| Graeme Ferguson | by | * <br> Graeme Ferguson | as attorney-in-fact |
| Munro Ferguson | by | * <br> Munro Ferguson | as attorney-in-fact |
| Joan Fisk | by | * <br> Joan Fisk | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Forden Investments Ltd. | by | * <br> Forden Investments Ltd. | as attorney-in-fact |
| Nancy Garrett | by | * <br> Nancy Garrett | as attorney-in-fact |
| Michael A. Gibbon | by | * <br> Michael A. Gibbon | as attorney-in-fact |
| Graeholdings Ltd. | by | * <br> Graeholdings Ltd. | as attorney-in-fact |
| Jano Holdings Inc. | by | * <br> Jono Holdings Inc. | as attorney-in-fact |
| David Bedford Keighley | by | * <br> David Bedford Keighley | as attorney-in-fact |
| Patricia Anne Keighley | by | * <br> Patricia Anne Keighley | as attorney-in-fact |
| Barbara Kerr | by | * <br> Barbara Kerr | as attorney-in-fact |
| Robert Kerr | by | * <br> Robert Kerr | as attorney-in-fact |
| Janet Kroitor | by | * <br> Janet Kroitor | as attorney-in-fact |
| Paul Kroitor | by | * <br> Paul Kroitor | as attorney-in-fact |
| Roman Kroitor | by | * <br> Roman Kroitor | as attorney-in-fact |
| Stephanie Kroitor | by | * <br> Stephanie Kroitor | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Tanya Kroitor | by | * <br> Tanya Kroitor | as attorney-in-fact |
| Yvanna Kroitor | by | * <br> Yvanna Kroitor | as attorney-in-fact |
| Karen Kucera | by | * <br> Karen Kucera | as attorney-in-fact |
| Ian Maxwell | by | * <br> Ian Maxwell | as attorney-in-fact |
| Lynn A. McCroskey | by | * <br> Lynn A. McCroskey | as attorney-in-fact |
| Andre Picard | by | * <br> Andre Picard | as attorney-in-fact |
| Jennifer H. Rae | by | * <br> Jennifer H. Rae | as attorney-in-fact |
| G. Mary Ruby | by | * <br> G. Mary Ruby | as attorney-in-fact |
| Scocam Investment Corp. | by | * <br> Scocam Investment Corp. | as attorney-in-fact |
| Sero Sed Serio Inc. | by | * <br> Sero Sed Serio Inc. | as attorney-in-fact |
| James Scott Shaw | by | * <br> James Scott Shaw | as attorney-in-fact |
| William C. Shaw | by | * <br> William C. Shaw | as attorney-in-fact |
| Alexandra Shea | by | * | as attorney-in-fact |

Alexandra Shea

| | | |
|---|---|---|
| Stephen Low Productions Inc. | by | ______*______ as attorney-in-fact<br>Stephen Low Productions Inc. |
| Martha Turner | by | ______*______ as attorney-in-fact<br>Martha Turner |
| Alvis P. Wales, Jr. | by | ______*______ as attorney-in-fact<br>Alvis P. Wales, Jr. |
| Robert Andrew Warnock | by | ______*______ as attorney-in-fact<br>Robert Andrew Warnock |
| James Warnock | by | ______*______ as attorney-in-fact<br>James Warnock |
| Anne D. Watkinson | by | ______*______ as attorney-in-fact<br>Anne D. Watkinson |

* William A. Breukelman, by signing his name hereto, does hereby sign this Shareholders Agreement on behalf of each of the Selling Shareholders after whose typed names asterisks appear pursuant to a power of attorney duly executed by each such Selling Shareholder.

By /s/ William A. Breukelman
Attorney-in-fact

/s/ William A. Breukelman
William A. Breukelman

000240

Schedule A

| Selling Shareholder | Associated Group B Seller | Class B Convertible Preferred Shares | Class C Preferred Shares |
|---|---|---|---|
| Jonathan Barker | | 1,448 | 290 |
| Nancy Bell | | 666 | 133 |
| Gregory J. Breen | | 1,448 | 290 |
| C.W. Breukelman | | 1,293 | 259 |
| David Breukelman | | 376 | 75 |
| Elaine Breukelman | | 376 | 75 |
| Marion E. Breukelman | | 376 | 75 |
| Tanya Breukelman | | 376 | 75 |
| W. A. Breukelman | Executronics Limited | 1,546 | 309 |
| Canmont Investment Corp. Ltd. | | 1,940 | 388 |
| James B. Cawthon, Jr. | | 290 | 58 |
| Elizabeth Chaplin | | 405 | 81 |
| Diana Chaplin | | 405 | 81 |
| 434786 Ontario Limited | | 579 | 116 |
| 434787 Ontario Limited | | 5,417 | 1,083 |
| James D. Chaplin | 434787 Ontario Limited | 41 | 8 |
| Janet Chaplin | | 405 | 81 |
| Richard Chaplin | | 405 | 81 |
| Charlford Investments Inc. | | 985 | 197 |
| Ann Cochren | | 434 | 87 |
| Doug Daymond | | 145 | 29 |
| Daedalus Investments Ltd. | | 5,174 | 1,035 |
| John M. Davison | | 1,086 | 217 |
| Executronics Limited | | 19,961 | 3,992 |
| Allison Ferguson | | 1,361 | 272 |
| Betty Ferguson | | 16,912 | 3,382 |
| Graeme Ferguson | Graeholdings Ltd. | 1,059 | 212 |
| Munro Ferguson | | 1,361 | 272 |
| Joan Fisk | | 695 | 139 |
| Forden Investments Ltd. | | 956 | 191 |
| Nancy Garrett | | 550 | 110 |
| Michael A. Gibbon | | 1,014 | 203 |
| Graeholdings Ltd. | | 22,635 | 4,527 |
| Janro Holdings Inc. | | 16,668 | 3,334 |
| David Bedford Keighley | | 413 | 83 |
| Patricia Anne Keighley | | 413 | 83 |
| Barbara Kerr | | 666 | 133 |
| Robert Kerr | Sero Sed Serio Inc. | 1,332 | 266 |
| Janet Kroitor | Janro Holdings Inc. | 1,484 | 297 |
| Paul Kroitor | | 681 | 136 |
| Roman Kroitor | Janro Holdings Inc. | 1,149 | 230 |
| Stephanie Kroitor | | 681 | 136 |
| Tanya Kroitor | | 681 | 136 |
| Yvanna Kroitor | | 681 | 136 |



| Original Shareholder | Associated Group B Seller | Class B Convertible Preferred Shares | Class C Preferred Shares |
|---|---|---|---|
| Karen Kucera | | 666 | 133 |

000241

| | | | |
|---|---|---|---|
| Ian Maxwell | | 290 | 58 |
| Lynn A. McCroskey | | 290 | 58 |
| Andre Picard | | 64 | 13 |
| Jennifer H. Rae | | 290 | 58 |
| G. Mary Ruby | | 507 | 101 |
| Scocam Investment Corp. | | 19,842 | 3,968 |
| Sero Sed Serio Inc. | | 22,564 | 4,513 |
| James Scott Shaw | | 666 | 133 |
| William C. Shaw | Scocam Investment Corporation | 1,332 | 266 |
| Alexander Shea | | 681 | 136 |
| Stephen Low Productions Inc. | | 579 | 116 |
| Martha Turner | | 290 | 58 |
| Alvis F. Wales, Jr. | | 290 | 58 |
| Andrew Warnock | | 463 | 93 |
| James Warnock | | 463 | 93 |
| Anne D. Watkinson | | 290 | 58 |

Names and Addresses of Selling Shareholders



| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Jonathan Barker | 28 Neville Park Boulevard<br>TORONTO, Ontario<br>M4E 3P6 |
| Nancy Bell | 178 Edgemont Street S.<br>HAMILTON, Ontario<br>L8K 2H9 |
| Gregory J. Breen | 64 Greencroft Crescent<br>UNIONVILLE, Ontario<br>L3R 3Y5 |
| C.W. Breukelman | 4104 Burkeridge Place<br>WEST VANCOUVER, British Columbia<br>V7V 3M9 |
| David Breukelman | 4138 Perivale Road<br>MISSISSAUGA, Ontario<br>L5C 3V6 |
| Elaine Breukelman | 1801 Stonepath Crescent<br>MISSISSAUGA, Ontario<br>L4X 1Y1 |
| Marion E. Breukelman | 46 Miranda Avenue<br>TORONTO, Ontario<br>M6E 4G4 |
| Tanya Breukelman | 1801 Stonepath Crescent<br>MISSISSAUGA, Ontario<br>L4X 1Y1 |
| W. A. Breukelman | 1801 Stonepath Crescent<br>MISSISSAUGA, Ontario<br>L4X 1Y1 |
| Canmont Investment Corp. Ltd. | 18A Hazelton Avenue<br>Apt 406 East<br>TORONTO, Ontario<br>M5R 2E2 |
| James B. Cawthon, Jr. | 600 Stratton Court<br>BIRMINGHAM, Alabama<br>35209 |
| Diana Chaplin | c/o Mrs. Janet Young<br>2743 West First Avenue<br>VANCOUVER, British Columbia<br>V6K 1H2 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Elizabeth Chaplin | Sea to Sky Real Estate Ltd.<br>P.O. Box 1500<br>4202 Village Square<br>WHISTLER VILLAGE, British Columbia<br>V0N 1B0 |
| James D. Chaplin | R.R. # 4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Janet Chaplin | 58 Blair Road<br>CAMBRIDGE, Ontario<br>N1S 2J1 |
| Richard Chaplin | R.R. # 4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Charlford Investments Inc. | Suite 1055<br>Place du Canada<br>MONTREAL, Quebec<br>H3B 2N2 |
| Ann Cochren | 13 Cumminsville Road<br>Box 7<br>MILLGROVE, Ontario<br>L0R 1V0 |
| Daedalus Investments Ltd. | c/o Sontair Limited<br>2450 Derry Road East, Hanger # 9<br>MISSISSAUGA, Ontario<br>L5S 1B2 |
| John M. Davison | 64 Hanna Road<br>TORONTO, Ontario<br>M4G 3N1 |
| Doug Daymond | R. R. # 22<br>CAMBRIDGE, Ontario<br>N3C 2V2 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Executronics Limited | c/o 38 Isabella Street<br>TORONTO, Ontario<br>M4Y 1N1<br><br>Attention: W.A. Breukelman |
| Allison Ferguson | R.R. # 2<br>PUSLINCH, Ontario<br>N0B 2J0 |
| Betty Ferguson | R.R. # 2<br>PUSLINCH, Ontario<br>N0B 2J0 |
| Graeme Ferguson | R.R. # 1 Norway Point<br>BAYSVILLE, Ontario<br>P0B 1A0 |
| Munro Ferguson | 4622 Esplanade Avenue<br>MONTREAL, Quebec<br>H2T 2Y5 |
| Joan Fisk | 50 Charles Street<br>CAMBRIDGE, Ontario<br>N1S 2W8 |
| Forden Investments Ltd. | Suite 1055<br>Place du Canada<br>MONTREAL, Quebec<br>H3B 2N2 |
| Nancy Ellen Garrett | 50 Charles Street<br>CAMBRIDGE, Ontario<br>N1S 2W8 |
| Michael A. Gibbon | 1430 Monk's Passage<br>OAKVILLE, Ontario<br>L6M 1J5 |
| Graeholdings Ltd. | R.R. # 1 Norway Point<br>BAYSVILLE, Ontario<br>P0B 1A0 |
| Janro Holdings Inc. | 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| David Bedford Keighley | 7 McCarty Crescent<br>MARKHAM, Ontario<br>L3P 4R4 |
| Patricia Anne Keighley | 7 McCarty Crescent<br>MARKHAM, Ontario<br>L3P 4R4 |
| Barbara Kerr | 55A Avenue Road<br>Apartment 412<br>TORONTO, Ontario<br>M5R 2G3 |
| Robert Kerr | 55A Avenue Road<br>Apartment 412<br>TORONTO, Ontario<br>M5R 2G3 |
| Janet Kroitor | 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Paul Kroitor | c/o 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Roman Kroitor | 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Stephanie Kroitor | 255 Chemin de la Rouge<br>R.R. # 3<br>ARUNDEL, Quebec<br>J0T 1A0 |
| Tanya Kroitor | R.R. # 2<br>PUSLINCH, Ontario<br>N0B 2J0 |
| Yvanna Kroitor | 198 Arlington Avenue<br>Apartment # 2<br>OTTAWA, Ontario<br>K1R 5S9 |
| Karen Kucera | 7 Joycelyn Drive<br>STREETSVILLE, Ontario<br>L5M 1T5 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Ian Maxwell | 233 Vance Drive<br>OAKVILLE, Ontario<br>L6L 3K9 |
| Lynn A. McCroskey | 4912 Brandywood Drive<br>BIRMINGHAM, Alabama<br>35223 |
| Andre Picard | 2496 Route 125<br>NOTRE-DAME-DE-LA-MERCI, Quebec<br>J0T 2A0 |
| Jennifer H. Rae | 470 Wellesley Street East<br>TORONTO, Ontario<br>M4X 1H9 |
| G. Mary Ruby | 113 Inglewood Drive<br>TORONTO, Ontario<br>M4T 1H6 |
| Scocam Investment Corp. | 300 West River Road<br>R.R. #4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Sero Sed Serio Inc. | 55A Avenue Road<br>Apartment 412<br>TORONTO, Ontario<br>M5R 2G3<br><br>ATTENTION: Robert Kerr |
| James Scott Shaw | 2418 Glenwood School Drive<br>Unit 42<br>BURLINGTON, Ontario<br>L7R 3S2 |
| William C. Shaw | 300 West River Road<br>R.R. #4<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Alexander Shea | 1217 Northshore Drive<br>SUDBURY, Ontario<br>P3B 1E7 |

| NAMES OF SELLERS | ADDRESSES |
|---|---|
| Stephen Low Productions Inc. | 1015 Lakeshore Drive<br>DORVAL, Quebec<br>H9S 2C9<br><br>ATTENTION: Stephen Low |
| Martha Turner | R.R. # 4<br>7 Taylor Court<br>CAMBRIDGE, Ontario<br>N1R 5S5 |
| Alvis F. Wales, Jr. | 4933 Stone Mill Road<br>BIRMINGHAM, Alabama<br>35223 |
| Andrew Warnock | 180 Salisbury Avenue<br>CAMBRIDGE, Ontario<br>N1S 1K4 |
| James Warnock | 31 Brant Road North<br>CAMBRIDGE, Ontario<br>N1S 2W3 |
| Anne D. Watkinson | 22 Southport Street<br>Apartment # 123<br>TORONTO, Ontario<br>M6S 4Y9 |
| 434786 Ontario Limited | Gordon Chaplin<br>Canadian General-Tower Ltd.<br>52 Middleton Street<br>CAMBRIDGE, Ontario<br>N1R 5T6 |
| 434787 Ontario Limited | James D. Chaplin<br>Canadian General-Tower Ltd.<br>52 Middleton Street<br>CAMBRIDGE, Ontario<br>N1R 5T6 |

# IMAX CORPORATION
## Exhibit 4.2

[EXECUTION COPY]

AMENDMENT TO SHAREHOLDERS' AGREEMENT
(SELLING SHAREHOLDERS)

March 1, 1994

To the Parties Named on
the Signature Pages Hereto

Gentlemen:

We refer to the Shareholders Agreement dated as of January 3, 1994 (the "Shareholders Agreement") among the undersigned and you. Unless otherwise defined herein, the terms defined in the Shareholders Agreement shall be used herein as therein defined.

The parties desire to amend the Shareholders Agreement as provided herein. Accordingly, it is hereby agreed by you and us that the second and third recitals of the Shareholders Agreement are, effective as of the date first above written, hereby amended and restated in their entirety to read as follows:

> WHEREAS, upon the Closing (as defined in the Acquisition Agreement), each of Gelfond and Wechsler will be the registered holder and beneficial owner of an aggregate of 387,945 common shares of the Company (the "Common Stock") and warrants (the "GW Warrants") to purchase 143, 879 shares of Common Stock;
>
> WHEREAS, upon the Closing, WP and certain of its partners and affiliates will be the registered holders and beneficial owners of an aggregate of 225,000 Class A Preferred Shares ("Class A Preferred Shares") of the Company and warrants ("Warrants") to purchase an aggregate of 3,562,060 shares of Common Stock;

On an after the effective date of this letter amendment, each reference in the Shareholders Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Shareholders Agreement shall mean and be a reference to the Shareholders Agreement as amended by this letter amendment. The Shareholders Agreement, as amended by this letter amendment, is and shall continue to be in full force and effect and is hereby in all respects ratified and confirmed.

If you agree to the terms and provisions hereof, please evidence such agreement by executing and returning a counterpart of this letter amendment to the undersigned.

This letter amendment may be executed and delivered (including by facsimile transmission) in any number of counterparts and by and combination of the parties hereto in separate counterparts, each of which counterparts shall be an original and all of which taken together shall constitute one and the same instrument.

Very truly yours,

WGIM ACQUISITION CORPORATION

By /s/ Peter D. Lyons
Name: Peter D. Lyons
Title: Vice President and Assistant Secretary

Agreed as of the date first above written:

/s/ Richard L. Gelfond
Richard L. Gelfond

/s/ Bradley J. Wechsler
Bradley J. Wechsler

/s/ Douglas Trumbull
Douglas Trumbull

WASSERSTEIN PERELLA PARTNERS, L.P.

By WASSERSTEIN PERELLA MANAGEMENT PARTNERS, INC., its general partner

By W. Townsend Ziebold
Name: W. Townsend Ziebold
Title: Attorney-in-Fact

WASSERSTEIN PERELLA OFFSHORE PARTNERS, L.P.

By WASSERSTEIN PERELLA MANAGEMENT
PARTNERS, INC., its general partner

By /s/ W. Townsend Ziebold
Name: W. Townsend Ziebold
Title: Attorney-in-Fact

Jonathan Barker by ______*______ as attorney-in-fact
Jonathan Barker

Nancy Bell by ______*______ as attorney-in-fact
Nancy Bell

Gregory J. Breen by ______*______ as attorney-in-fact
Gregory J. Breen

C.W. Breukelman by ______*______ as attorney-in-fact
C.W. Breukelman

David Breukelman by ______*______ as attorney-in-fact
David Breukelman

Elaine Breukelman by ______*______ as attorney-in-fact
Elaine Breukelman

Marion Breukelman by ______*______ as attorney-in-fact
Marion Brueukelman

Tanya Breukelman by ______*______ as attorney-in-fact
Tanya Breukelman

| | | |
|---|---|---|
| W.A. Breukelman | by_____*_____ W.A. Breukelman | as attorney-in-fact |
| Canmont Investment Corp. Ltd. | by_____*_____ Canmont Investment Corp. Ltd. | as attorney-in-fact |
| James B. Cawthon, Jr. | by_____*_____ James B. Cawthon, Jr. | as attorney-in-fact |
| Elizabeth Chaplin | by_____*_____ Elizabeth Chaplin | as attorney-in-fact |
| Diana Chaplin | by_____*_____ Diana Chaplin | as attorney-in-fact |
| Gordon Chaplin | by_____*_____ Gordon Chaplin | as attorney-in-fact |
| 434786 Ontario Limited | by_____*_____ 434786 Ontario Limited | as attorney-in-fact |
| 434787 Ontario Limited | by_____*_____ 434787 Ontario Limited | as attorney-in-fact |
| James D. Chaplin | by_____*_____ James D. Chaplin | as attorney-in-fact |
| Janet Chaplin | by_____*_____ Janet Chaplin | as attorney-in-fact |
| Richard Chaplin | by_____*_____ Richard Chaplin | as attorney-in-fact |

Charlford Investments Inc. by________*________ as attorney-in-fact
Charlford Investments Inc.

Ann Cochren by________*________ as attorney-in-fact
Ann Cochren

Doug Daymond by________*________ as attorney-in-fact
Doug Daymond

Stewart Daymond by________*________ as attorney-in-fact
Stewart Daymond

Daedalus Investments Ltd. by________*________ as attorney-in-fact
Daedalus Investments Ltd.

John M. Davison by________*________ as attorney-in-fact
John M. Davison

Executronics Limited by________*________ as attorney-in-fact
Executronics Limited

Allison Ferguson by________*________ as attorney-in-fact
Allison Ferguson

Betty Ferguson by________*________ as attorney-in-fact
Betty Ferguson

Graeme Ferguson by________*________ as attorney-in-fact
Graeme Ferguson

Munro Ferguson by________*________ as attorney-in-fact
Munro Ferguson

| | | |
|---|---|---|
| Joan Fisk | by_____________*_____________ Joan Fisk | as attorney-in-fact |
| Forden Investments Ltd. | by_____________*_____________ Forden Investments Ltd. | as attorney-in-fact |
| Nancy Garrett | by_____________*_____________ Nancy Garrett | as attorney-in-fact |
| Michael A. Gibbon | by_____________*_____________ Michael A. Gibbon | as attorney-in-fact |
| Graeholdings Ltd. | by_____________*_____________ Graeholdings Ltd. | as attorney-in-fact |
| Jano Holdings Inc. | by_____________*_____________ Jano Holdings Inc. | as attorney-in-fact |
| David Bedford Keighley | by_____________*_____________ David Bedford Keighley | as attorney-in-fact |
| Patricia Anne Keighley | by_____________*_____________ Patricia Anne Keighley | as attorney-in-fact |
| Barbara Kerr | by_____________*_____________ Barbara Kerr | as attorney-in-fact |
| Robert Kerr | by_____________*_____________ Robert Kerr | as attorney-in-fact |
| Janet Kroitor | by_____________*_____________ Janet Kroitor | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Paul Kroitor | by ___ * ___<br>Paul Kroitor | as attorney-in-fact |
| Roman Kroitor | by ___ * ___<br>Roman Kroitor | as attorney-in-fact |
| Stephanie Kroitor | by ___ * ___<br>Stephanie Kroitor | as attorney-in-fact |
| Tanya Kroitor | by ___ * ___<br>Tanya Kroitor | as attorney-in-fact |
| Yvanna Kroitor | by ___ * ___<br>Yvanna Kroitor | as attorney-in-fact |
| Karen Kurcera | by ___ * ___<br>Karen Kurcera | as attorney-in-fact |
| Ian Maxwell | by ___ * ___<br>Ian Maxwell | as attorney-in-fact |
| Lynn A. McCroskey | by ___ * ___<br>Lynn A. McCroskey | as attorney-in-fact |
| Andre Picard | by ___ * ___<br>Andre Picard | as attorney-in-fact |
| Jennifer H. Rae | by ___ * ___<br>Jennifer H. Rae | as attorney-in-fact |
| G. Mary Ruby | by ___ * ___<br>G. Mary Ruby | as attorney-in-fact |

| | | | |
|---|---|---|---|
| Scocam Investment Corp. | by_______*_______ Scocam Investment Corp. | as attorney-in-fact |
| Sero Sed Serio Inc. | by_______*_______ Sero Sed Serio Inc. | as attorney-in-fact |
| James Scott Shaw | by_______*_______ James Scott Shaw | as attorney-in-fact |
| William C. Shaw | by_______*_______ William C. Shaw | as attorney-in-fact |
| Alexandra Shea | by_______*_______ Alexandra Shea | as attorney-in-fact |
| Stephen Low Productions Inc. | by_______*_______ Stephen Low Productions Inc. | as attorney-in-fact |
| Martha Turner | by_______*_______ Martha Turner | as attorney-in-fact |
| Alvis P. Wales, Jr. | by_______*_______ Alvis P. Wales, Jr. | as attorney-in-fact |
| Robert Andrew Warnock | by_______*_______ Robert Andrew Warnock | as attorney-in-fact |
| James Warnock | by_______*_______ James Warnock | as attorney-in-fact |

Anne D. Watkinson by __________________*__________________ as attorney-in-fact
Anne D. Watkinson

________________________________

* William A. Breukelman, by signing his name hereto, does hereby sign this letter amendment on behalf of each of the Selling Shareholders after whose typed names asterisks appear pursuant to a power of attorney duly executed by each such Selling Shareholder.

By /s/ William A. Breukelman
Attorney-in-fact

By /s/ William A. Breukelman
William A. Breukelman

**IMAX CORPORATION**

**EXHIBIT 4.3**

EXECUTION COPY

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT (this "Agreement"), dated as of February 9, 1999, by and among Imax Corporation, a corporation organized under the laws of Canada (the "Company"), Wasserstein Perella Partners, L.P., a Delaware limited partnership ("WPLP"), Wasserstein Perella Offshore Partners, L.P., a Delaware limited partnership ("WPOP"), WPPN, Inc., a Delaware corporation ("WPPN"), the Michael J. Biondi Voting Trust (together with WPLP, WPOP and WPPN, "WP"), Bradley J. Wechsler ("Wechsler") and Richard L. Gelfond ("Gelfond" and, together with Wechsler, the "GW Shareholders").

WITNESSETH:

WHEREAS, WP is the beneficial holder of common shares of the Company ("Common Shares");

WHEREAS, the GW Shareholders are the beneficial holders of Common Shares and options to purchase Common Shares ("Options"); and

WHEREAS, contemporaneously herewith, the parties are entering into a Second Amended and Restated Shareholders' Agreement (the "1999 Shareholders' Agreement") and the parties are entering into an Amended and Restated Standstill Agreement (the "1999 Standstill Agreement").

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Section 1. Definitions.

The terms set forth below shall have the following definitions:

"1999 Shareholders' Agreement" has the meaning set forth in the Recitals hereto.

"1999 Standstill Agreement" has the meaning set forth in the Recitals hereto.

"Advice" has the meaning set forth in Section 3(c) hereof.

"Affiliate" of any Person means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such

Person, and, in the case of a Person who is a natural person, such natural person's family, including any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, and shall include adoptive relationships, and any personal representatives. A Person shall be deemed to "control" (including the correlative meanings, the terms "controlling", "controlled by", and "under common control with") another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of the controlled Person, whether through ownership of voting securities, by contract or otherwise.

"Best Efforts" shall mean an undertaking by a party to perform or satisfy an obligation or duty or otherwise act in a manner reasonably calculated to obtain the intended result by action not disproportionate, unreasonably burdensome or otherwise unreasonable under the circumstances; provided, that the foregoing shall not include efforts which require the performing party to, among other things, expend any funds in an amount disproportionate, unreasonably burdensome or otherwise unreasonable under the circumstances or to institute litigation.

"Business Day" means a day of the year other than a day on which banks are authorized or obligated to be closed in New York, New York.

"Canadian Offering" has the meaning set forth in Section 3(a)(1) hereof.

"Commission" has the meaning set forth in Section 3(b)(1) hereof.

"Common Shares" has the meaning set forth in the Recitals hereto.

"Company" has the meaning set forth in the introductory paragraph hereto.

"Demand Notice" has the meaning set forth in Section 3(b)(1) hereof.

"Demand Registration" has the meaning set forth in Section 3(b)(1) hereof.

"Exchange Act" has the meaning set forth in Section 3(f)(1) hereof.

"Gelfond" has the meaning set forth in the introductory paragraph hereto.

"GW Shareholders" has the meaning set forth in the introductory paragraph hereto.

"Inspectors" has the meaning set forth in Section 3(c)(14) hereof.

"IPO Closing" means the closing of the Company's initial public offering of Common Shares.

"IPO Shares" means the Liquidation Shares and the Common Shares, including Common Shares subject to Options and warrants, beneficially owned by the parties on the date of the IPO Closing, subject to adjustment to reflect any stock dividend, stock split, reverse stock split, recapitalization or other similar transaction after the date of the IPO Closing.

"Liquidation Notice" has the meaning set forth in Section 2(c).

"Liquidation Shares" has the meaning set forth in the 1999 Shareholders' Agreement.

"Majority Amount" has the meaning set forth in Section 3(a) hereof.

"NASD" means the National Association of Securities Dealers, Inc.

"Note Purchase Agreement" means the Note Purchase Agreement, dated as of January 3, 1994, by and among WPOP, WPLP and the Company, as amended.

"Options" has the meaning set forth in the Recitals hereto.

"Person" means any individual, corporation, partnership, joint venture, trust, unincorporated or governmental organization or any agency or political subdivision thereof.

"Piggyback Registration" has the meaning set forth in Section 3(a) hereof.

"Proposed Registration" has the meaning set forth in Section 3(a) hereof.

"Records" has the meaning set forth in Section 3(c) hereof.

"Registrable Securities" means the Common Shares (including the Common Shares issuable upon exercise of options and all WP Shares), but with respect to any such Common Share, only so long as such Common Share continues to be a Restricted Security or the holder of such share is an Affiliate of the Company.

"Registration Expenses" has the meaning set forth in Section 3(e) hereof.

"Restricted Security" means a Common Share, (or a Common Share issuable upon exercise of an Option) until such time as such Common Share or Option (i) has been effectively registered under the Securities Act or qualified for distribution in Canada pursuant to Canadian law in circumstances exempt under the Securities Act or when the Securities Act does not apply and disposed of in accordance with the registration statement or prospectus, as the case may be, covering it, (ii) has been sold publicly pursuant to Rule 144 under the Securities Act (or any similar provision in force, including any similar provision under the Securities Act or under any relevant Canadian law), or

offering of the Registrable Securities to be sold in such offering; and promptly make all required filings of such prospectus supplement or post-effective amendment;

(9) as promptly as practicable after filing with the Commission of any document which is incorporated by reference into a registration statement, deliver a copy of such document to each holder of Registrable Securities covered by such registration statement;

(10) on or prior to the date on which the registration statement is declared effective, use its Best Efforts to register or qualify, and cooperate with the holders of Registrable Securities included in such registration statement, the underwriter or underwriters, if any, and their counsel, in connection with the registration or qualification of the Registrable Securities covered by the registration statement for offer and sale under the securities or blue sky laws of each state and other jurisdiction as any such holder or underwriter reasonably requests in writing, to use its best efforts to keep each such registration or qualification effective, including through new filings, or amendments or renewals, during the period such registration statement is required to be kept effective and to do any and all other acts or things necessary or advisable to enable the disposition in all such jurisdictions of the Registrable Securities covered by the applicable registration statement; provided that the Company will not be required to qualify generally to do business in any jurisdiction where it is not then so qualified or to take any action which would subject it to general service of process in any such jurisdiction where it is not then so subject;

(11) cooperate with the holders of Registrable Securities covered by the registration statement and the managing underwriter or underwriters, if any, to facilitate the timely preparation and delivery of certificates (not bearing any restrictive legends) representing securities to be sold under the registration statement, and enable such securities to be in such denominations and registered in such names as the managing underwriter or underwriters, if any, or such holders may request;

(12) use its Best Efforts to cause the Registrable Securities covered by the registration statement to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the seller or sellers thereof or the underwriter or underwriters, if any, to consummate the disposition of such securities;

(13) enter into such customary agreements (including, without limitation, an underwriting agreement in customary form) and take all such other actions (A) WP (after consultation with the GW Shareholders), if such registration is a Demand Registration being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders (after consultation with WP) if such registration is a Demand Registration being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) or (B) do not apply, WP so long as WP is a participant in such underwritten offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange,

conversion and subscription rights with respect to all securities of the Company then held by it) than any other holder or (D) if the foregoing clauses (A), (B) and (C) do not apply, the holders of a Majority Amount of each type of the Registrable Securities being sold or the underwriters retained by the holders participating in an underwritten public offering, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities;

(14) make available for inspection by any holder of Registrable Securities included in such registration statement, any underwriter participating in any disposition pursuant to such registration statement, and any attorney, accountant or other agent retained by any such seller or underwriter (collectively, the "Inspectors"), all financial and other records, pertinent corporate documents and properties of the Company (collectively, the "Records") as shall be reasonably necessary to enable the Inspectors to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information reasonably requested by any such Inspector in connection with such registration statement; provided that Records which the Company determines, in good faith, to be confidential and which it notifies the Inspectors are confidential shall not be disclosed to the Inspectors unless (i) the disclosure of such Records is necessary to avoid or correct a misstatement or omission in the registration statement or (ii) the release of such records is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; provided further, however, that any decision not to disclose information pursuant to clause (i) shall be made after consultation with counsel for the Company and counsel for such Inspectors; and each holder of Registrable Securities included in such registration statement agrees that it will, upon learning that disclosure of such Records is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at the Company's expense to undertake appropriate action to prevent disclosure of the Records deemed confidential;

(15) use its Best Efforts to obtain a cold comfort letter from the Company's independent public accountants and an opinion of outside counsel to the Company, each in customary form and covering such matters of the type customarily covered by cold comfort letters or opinions of counsel, as the case may be, as (A) WP, if such registration is a Demand Registration being made at the request of WP pursuant to Section 3(b), (B) the GW Shareholders, if such registration is a Demand Registration being made at the request of the GW Shareholders pursuant to Section 3(b), (C) if the foregoing clauses (A) and (B) do not apply, WP so long as WP is a participant in such underwritten Offering and either (i) holds at least 75% of the IPO Shares held by it at the time of the IPO Closing or (ii) holds more of the Securities (in each case assuming exercise of all exchange, conversion and subscription rights with respect to all securities of the Company then held by it) than any other holder or (D) if the foregoing clauses (A), (B) and (C) do not apply, the holders of a Majority Amount of each type of the Registrable Securities being sold reasonably request;

(16) cooperate with each seller of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the NASD; and

(17) use its reasonable efforts to take all other steps necessary to effect the registration of the Registrable Securities contemplated hereby.

Each holder of Registrable Securities, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(c)(4) will forthwith discontinue disposition of the Registrable Securities until such holder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(c)(4) or until it is advised in writing (the "Advice") by the Company that the use of the prospectus may be resumed and has received copies of any additional or supplemental filings which are incorporated by reference in the prospectus, and, if so directed by the Company, such holder will, or will request the managing underwriter or underwriters, if any, to deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice. In the event the Company shall give any such notice, the time periods mentioned in Section 3(c)(2) shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by each registration statement shall have received the copies of the supplemented or amended prospectus contemplated by Section 3(c)(4) or the Advice.

(d) Holdback Arrangements.

(1) Restrictions on Public Sale by Holders of Registrable Securities. To the extent not inconsistent with applicable law, each holder whose Registrable Securities are included in an underwritten registration statement agrees not to effect any public sale or distribution of the securities being registered or a similar security of the Company, or any securities convertible into or exchangeable or exercisable for such securities, including a sale pursuant to Rule 144 under the Securities Act, during the 14 days prior to, and during the 30-day period beginning on, the effective date of such registration statement, if and to the extent requested by the managing underwriter or underwriters of such underwritten public offering, other than pursuant to such underwritten public offering.

(2) Restrictions on Public Sale by the Company and Others. The Company and the Shareholders agree (i) not to effect any public sale or distribution of any securities similar to those being registered, or any securities convertible into or exchangeable or exercisable for such securities (other than any such sale or distribution of such securities pursuant to registration of such securities on Form S-4 or S-8 or any successor forms or comparable foreign forms or any such sale or distribution of such securities in connection with any merger or consolidation involving the Company or a Subsidiary or the acquisition by the Company or a Subsidiary of the capital equity or substantially all of the assets of any other Person), during the 14 days prior to, and during the 30-day period beginning on, the effective date of any registration statement except as part of such registration statement; and (ii) that any agreement entered into after the date of

this Agreement pursuant to which the Company issues or agrees to issue any privately placed securities shall contain a provision under which holders of such securities agree not to effect any public sale or distribution of any such securities during the periods described in (i) above, in each case including a sale pursuant to Rule 144 (or any similar provision then in force) under the Securities Act (except as part of any such registration, if permitted); provided, however, that the provisions of this Section 3(d)(2) shall not prevent the conversion or exchange of any securities pursuant to their terms into or for other securities.

(3) Other Registrations. If the Company has previously filed a registration statement with respect to any of its Registrable Securities, and if such previous registration has not been withdrawn or abandoned, the Company will not file or cause to be effected any other registration of any of its Registrable Securities under the Securities Act (except on Form S-4 or S-8 or any successor forms or comparable foreign forms), whether on its own behalf or at the request of any holder or holders of Registrable Securities, until a period of at least six months has elapsed from the effective date of such previous registration (provided that in the case of a Demand Registration such period shall commence on the date the Company is first served the Notice and shall continue until at least six months have elapsed from the effective date of such Demand Registration).

(e) Registration Expenses. All of the costs and expenses of each registration hereunder, including, without limitation, all registration and filing fees, all fees and expenses associated with filings required to be made with the NASD (including, if applicable, the fees and expenses of any "qualified independent underwriter" as such term is defined in Schedule E of the By-laws of the NASD, and of its counsel), as may be required by the rules and regulations of the NASD, fees and expenses of compliance with securities or blue sky laws of any jurisdiction (including reasonable fees and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities), printing expenses, messenger and delivery expenses, the Company's internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the fees and expenses incurred in connection with the listing of the securities to be registered on any securities exchange, and fees and disbursements of counsel for the Company and its independent certified public accountants (including the expenses of any special audit or comfort letters required by or incident to such performance), Securities Act liability insurance (if the Company elects to obtain such insurance), the fees and expenses of any special experts retained by the Company in connection with such registration, fees and expenses of other persons retained by the Company, reasonable fees and expenses of one counsel for the holders of the Registrable Securities in connection with each registration hereunder (but not including any underwriting fees, discounts or commissions attributable to the sale of Registrable Securities which shall be for the account of such holders) and any reasonable out-of-pocket expenses of the holders of the Registrable Securities (or agents who manage their accounts) (all such expenses being herein called "Registration Expenses"), will be borne by the Company.

(f) Indemnification; Contribution.

(1) Indemnification by the Company. The Company agrees to indemnify

and hold harmless each selling holder of Registrable Securities, its officers, directors, agents, employees, partners and Affiliates and each Person, if any, who controls such selling holder within the meaning of Section 15 of the Securities Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages, liabilities and expenses (including reasonable costs of investigation) arising out of or based upon any untrue statement or alleged untrue statement of a material fact contained in any registration statement or prospectus relating to the Registrable Securities or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as such losses, claims, damages, liabilities or expenses arise out of, or are based upon, any such untrue statement or omission based upon information with respect to such selling holder furnished in writing to the Company by such selling holder expressly for use therein. The Company also agrees to indemnify any underwriters of the Registrable Securities, their officers, directors, agents, employees, partners and Affiliates and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the selling holders provided in this Section 3(f).

(2) Conduct of Indemnification Proceedings. If any action or proceeding (including any governmental investigation) shall be brought or asserted against any selling holder (or any of its officers, directors, agents, employees, partners or Affiliates) or any Person controlling any such selling holder in respect of which indemnity may be sought from the Company, the Company shall be permitted, unless in the reasonable judgment of such indemnified party a conflict of interest may exist between such indemnified party and the Company with respect to such claim, to assume the defense thereof, including the employment of counsel reasonably satisfactory to such selling holder, and shall assume the payment of all expenses. Whether or not such defense is assumed by the Company, the Company shall not be liable for any settlement of any such action or proceeding effected without its written consent (but such consent will not be unreasonably withheld). The Company will not consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect of such claim or litigation. If the Company is not entitled to, or elects not to, assume the defense of a claim, it will not be obligated to pay the fees and expenses of more than one counsel with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim, in which event the Company shall be obligated to pay the fees and expenses of such additional counsel or counsels. Any selling holder entitled to indemnification hereunder agrees to give prompt written notice to the Company after the receipt by such selling holder of any written notice of the commencement of any action, suit, proceeding or investigation or threat thereof made in writing for which such selling holder will claim indemnification or contribution pursuant to this Agreement.

(3) Indemnification by Holders of Registrable Securities. Each selling holder of Registrable Securities agrees to indemnify and hold harmless the Company, its officers, directors, agents, employees, partners and Affiliates, and each Person, if any, who controls the

Company within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the foregoing indemnity from the Company to the selling holders of Registrable Securities, but only with respect to information furnished in writing by such selling holder with respect to such selling holder expressly for use in any registration statement or prospectus relating to the Registrable Securities which contained a material misstatement of fact or omission of a material fact, or any amendment or supplement thereto, or any preliminary prospectus. In no event shall the liability of any selling holder hereunder be greater in amount than the dollar amount of the proceeds received by such selling holder upon the sale of the Registrable Securities giving rise to such indemnification obligation. In case any action or proceeding shall be brought against the Company or its officers, directors, agents, employees, partners or Affiliates, or any such controlling Person, in respect of which indemnity may be sought against any selling holder, such selling holder shall have the rights and duties given to the Company, and the Company or its officers, directors, agents, employees, partners or Affiliates, or such controlling Person shall have the rights and duties given to such selling holders by Section 3(f)(2). Each selling holder of Registrable Securities also agrees to indemnify and hold harmless underwriters of the Registrable Securities, their officers, directors, agents, employees, partners and Affiliates, and each Person who controls such underwriters on substantially the same basis as that of the indemnification of the Company provided in this Section 3(f)(3).

(4) Contribution. If the indemnification provided for in this Section 3(f) is unavailable to the Company, the selling holders or the underwriters in respect of any losses, claims, damages, liabilities or judgments referred to herein, then each such indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages, liabilities and judgements in such proportion as is appropriate to reflect the relative fault of the indemnifying parties and indemnified parties in connection with such statements or omissions which resulted in such losses, claims, damages, liabilities or judgments, as well as any other relevant equitable considerations. The relative fault of such indemnifying party and indemnified parties shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 3(f)(4) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable consideration referred to in the immediately preceding paragraph. The amount paid or payable by an indemnified party as a result of the losses, claims, damages, liabilities, or, judgments referred to in the immediately preceding paragraph shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this Section 3(f)(4), no underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which

such underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission, and no selling holder shall be required to contribute any amount in excess of the amount by which the total price at which the Registrable Securities of such selling holder were offered to the public exceeds the amount of any damages which such selling holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(g) Participation in Underwritten Registrations. No holder of Registrable Securities may participate in any underwritten registration hereunder unless such holder (a) agrees to sell its securities on the basis provided in any underwriting arrangements approved by the holders as provided herein and (b) completes and executes all questionnaires, powers of attorneys, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements and these registration rights.

(h) Rule 144 Etc. The Company covenants that it will file any reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the Commission thereunder (or, if the Company is not required to file such reports, it will, upon the request of any holder of Registrable Securities, make publicly available other information so long as necessary to permit sales under Rule 144, Rule 144A and Regulation S under the Securities Act) that it will take such further action as the holders of Registrable Securities may reasonably request, all to the extent required from time to time to enable the holders of Registrable Securities to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (a) Rule 144, Rule 144A or Regulation S under the Securities Act, as such Rules or such Regulation may be amended from time to time, or (b) any similar rule or regulation hereafter adopted by the Commission.

(i) Other Registration Rights. The Company will not grant any Person any demand or piggyback registration rights with respect to its securities other than registration rights that would not be inconsistent with the terms of this Section 3. The Company will not have the right to piggyback on any Demand Registration and the Company will not grant any registration rights that would permit any Person the right to piggyback on any Demand Registration.

(j) Termination. This Section 3 shall continue in full force and effect until none of the Securities are Registrable Securities, except that paragraph (f) shall survive any termination of this Section 3.

Section 4. Miscellaneous.

(a) Stop Transfer Order. The Company may enter a stop transfer order with the transfer agent or agents of voting securities against the transfer of voting securities except in compliance with the requirements of this Agreement. The Company agrees to remove promptly any stop transfer order with respect to certificates for any voting securities that are no longer subject to the restrictions contained in this Agreement.

(b) Binding Effect. Unless otherwise provided herein, the provisions of this Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective successors, assigns and transferees.

(c) Entire Agreement. This Agreement, together with the 1999 Shareholders' Agreement and the 1999 Standstill Agreement, represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations and discussions, whether oral or written, of the parties, including, without limitation, the Amended and Restated Shareholders' Agreement, dated as of June 16, 1994, among WP, the GW Shareholders and the Company.

(d) Amendments, Etc. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

(e) Severability. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in full force and effect and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(f) Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(g) Notices. All communications provided for under this Agreement shall be in writing and shall be delivered by hand, by telecopy, telegram or telex, or by mail (registered or certified mail, postage prepaid, return receipt requested) to the following addresses, or such other addresses as shall be given by notice delivered hereunder, and shall be deemed to have been given on the day of such hand delivery thereof or the third business day after such mailing:

If to WPLP, WPOP, WPPN or
the Michael J. Biondi Voting Trust, to such party:

c/o Wasserstein Perella Management Partners, Inc.
31 West 52nd Street
26th Floor

New York, New York 10019
Telecopier: (212) 969-7836
Attention: W. Townsend Ziebold

with a copy to:

Stikeman, Elliott
Suite 5300
Commerce Court West
Toronto, Ontario
M5L1B9
Telecopier: (416) 947-0866
Attention: Marvin Yontef/Mihkel Voore

and a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
919 Third Avenue
New York, NY 10022
Telecopier: (212) 735-2000
Attention: Robert Chilstrom/Avinash Ganatra

If to Wechsler, to:

Bradley J. Wechsler
88 East Middle Patent Road
Bedford, New York 10506

with a copy to:

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Telecopier: (212) 848-7179
Attention: Peter D. Lyons

If to Gelfond, to:

Richard L. Gelfond
2 Squabble Lane
Southampton, New York 11969

with a copy to:

Shearman & Sterling

599 Lexington Avenue
New York, New York 10022
Telecopier: (212) 848-7179
Attention: Peter D. Lyons

If to the Company, to:

Imax Corporation
110 East 59th Street
Suite 2100
New York, New York 10022
Telecopier: (212) 371-5510
Attention: Chief Executive Officer

With a copy to:

Imax Corporation
2525 Speakman Drive
Mississauga, Ontario
L5K 1B1 Canada
Telecopier: (905) 403-6468
Attention: Corporate Secretary

and a copy to:

McCarthy Tétrault
Suite 4700
Toronto Dominion Bank Tower
Toronto Dominion Centre
Toronto, Ontario
M5K 1E6 Canada
Telecopier: (416) 868-0673
Attention: Garth M. Girvan

and a copy to:

Shearman & Sterling
599 Lexington Avenue
New York, New York 10022
Telecopier: (212) 848-7179
Attention: Peter D. Lyons

or to such other Persons or at such other addresses as shall be furnished by any such party by like notice given to the other parties of this Agreement.

(h) Governing Law; Submission to Jurisdiction. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws. Each of the parties hereto hereby irrevocably consents to personal jurisdiction and venue in any court of the State of New York or any Federal court sitting in the Southern District of New York for the purposes of any suit, action or other proceeding arising out of this Agreement or any of the agreements or transactions contemplated hereby, which is brought by or against such party, and hereby agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in any such court. Each of the parties hereto hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party at its address set forth above, such service to become effective ten (10) days after such mailing. ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR ACTION ARISING OUT OF THIS AGREEMENT OR CONDUCT IN CONNECTION WITH THIS AGREEMENT IS HEREBY WAIVED.

(i) Injunctive Relief. The Company and the Shareholders recognize that in the event they fail to perform, observe or discharge any of their respective obligations or liabilities under this Agreement, no remedy at law will provide adequate relief to the injured parties, and agree that the injured parties shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages and without being required to post a bond or other security.

(j) Termination. This Agreement shall terminate if at any time WP ceases to own at least 10% of the IPO Shares owned by them at the time of the IPO Closing, except that (i) the provisions of Section 2(c) shall terminate on April 1, 2001 and (ii) the provisions of Section 3 hereof shall terminate as provided in Section 3(j), except as otherwise provided therein.

(k) Limitation of Liability. No personal liability or responsibility of either GW Shareholder or any partner or shareholder of WP shall at any time be enforceable against either GW Shareholder or any partner or shareholder of WP on account of any representation, warranty, undertaking, covenant or agreement made by it hereunder, either express or implied, all such

personal liability, if any, being expressly waived by each party to this Agreement and by all Persons claiming by, through or under any such party, provided that any party to this Agreement making claim hereunder may realize upon the Securities held by either the GW Shareholder and each partner or shareholder of WP at such time for satisfaction of the same.

(l) Execution in Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the day and year first above written.

WASSERSTEIN PERELLA PARTNERS, L.P.

By WASSERSTEIN PERELLA MANAGEMENT CK PARTNERS, INC., its General Partner

By: /s/ W. Townsend Ziebold
Name: W. Townsend Ziebold
Title: Vice President

WASSERSTEIN PERELLA OFFSHORE PARTNERS, L.P.

By WASSERSTEIN PERELLA MANAGEMENT CK PARTNERS, INC., its General Partner

By: /s/ W. Townsend Ziebold
Name: W. Townsend Ziebold
Title: Vice President

WPPN, INC.

By: /s/ James C. Kingsbury
Name: James C. Kingsbury
Title: Treasurer and Secretary

MICHAEL J. BIONDI VOTING TRUST

By: /s/ James C. Kingsbury
Name: James C. Kingsbury
Title: Attorney-in-Fact

/s/ Richard L. Gelfond
Richard L. Gelfond

/s/ BradleyJ. Wechsler
Bradley J. Wechsler

IMAX CORPORATION

By: /s/ John M. Davison
Name: John M. Davison
Title: Director

By: /s/ Garth M. Girvan
Name: Garth M. Girvan
Title: Director

# IMAX CORPORATION
Exhibit 4.12

## SIXTH SUPPLEMENTAL INDENTURE

Sixth Supplemental Indenture (this "Sixth Supplemental Indenture"), dated as of November 9, 2006 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantors named in the Fifth Supplemental Indenture referred to below, Walking Bones Pictures Ltd. (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

W I T N E S S E T H

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), and as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture") providing for the issuance of 9⅝% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sanddle Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Sixth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms*. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee*. The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN*. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS SIXTH SUPPLEMENTAL INDENTURE.

4. *Counterparts*. The parties may sign any number of copies of this Sixth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings*. The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Sixth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Guaranteeing Subsidiary:**

**Walking Bones Pictures Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By: *"Raymond S. Haverstock"*
Name: Raymond S. Haverstock
Title: Vice President

# IMAX CORPORATION

Exhibit 4.13

## SEVENTH SUPPLEMENTAL INDENTURE

Seventh Supplemental Indenture (this "Seventh Supplemental Indenture"), dated as of January 29, 2007 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, Raining Arrows Productions Ltd. (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), and as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006, among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture") providing for the issuance of 9⅝% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Seventh Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms*. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee*. The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee

or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS SEVENTH SUPPLEMENTAL INDENTURE.

4. *Counterparts*. The parties may sign any number of copies of this Seventh Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings*. The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Seventh Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By ______________________
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

**Walking Bones Pictures Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President, Finance

**Guaranteeing Subsidiary:**

**Raining Arrows Productions Ltd.**

By *"G. Mary Ruby"*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil"*
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By *"Raymond S. Haverstock"*
Name: Raymond S. Haverstock
Title: Vice President

IMAX CORPORATION

Exhibit 4.14

EIGHTH SUPPLEMENTAL INDENTURE

Eighth Supplemental Indenture (this "Eighth Supplemental Indenture"), dated as of March 26, 2007 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, the Seventh Supplemental Guarantor named in the Seventh Supplemental Indenture referred to below, Coral Sea Films Ltd. (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006, among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), and as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007, among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows

Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture") providing for the issuance of 9⅝% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation Inc., one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Eighth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms*. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee*. The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS EIGHTH SUPPLEMENTAL INDENTURE.

4. *Counterparts.* The parties may sign any number of copies of this Eighth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings.* The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Eighth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

**Walking Bones Pictures Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Seventh Supplemental Guarantor:**

**Raining Arrows Productions Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Guaranteeing Subsidiary:**

**Coral Sea Films Ltd.**

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By *"Raymond S. Haverstock"*
Name: Raymond S. Haverstock
Title: Vice President

**IMAX CORPORATION**
**Exhibit 4.15**

**CONSENT AND FORBEARANCE AGREEMENT**

This Agreement (this "Agreement") is made and entered into as of April 2, 2007, by and between IMAX corporation, a Canadian corporation (the "Company"), and Plainfield Special Situations Master Fund Limited, a Cayman Islands corporation ("Plainfield").

WHEREAS, the Company issued its 9⅝% Senior Notes due 2010 (the "Notes") pursuant to the Indenture, dated as of December 4, 2003, among the Company, the Guarantors named therein (the "Guarantors") and U.S. Bank National Association, as trustee (the "Trustee"), as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Guarantors named therein, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Guarantors named therein, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, and Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture"), as further amended by the Eighth Supplemental Indenture dated as of March 26, 2007 among the Company, the Guarantors named therein, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, Coral Sea Films Ltd. and the Trustee (such Indenture, as so amended, the "Indenture"); and

WHEREAS, Plainfield currently holds $53.685 million aggregate principal amount of Notes (the "Plainfield Notes") and desires to provide consents to the Proposed Amendment (defined below) with respect to the Plainfield Notes, subject to the terms and conditions set forth herein; and

WHEREAS, this Agreement sets forth the terms on which the Plainfield has agreed (i) to provide consents to the Proposed Amendment with respect to the Plainfield Notes and (ii) to forbear from taking certain actions;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1. The Consent Solicitation. The Company shall commence, promptly after the date hereof (but not later than April 6, 2007), a solicitation (the "Solicitation") of consents (the "Consents") of those holders of record (the "Holders") as of the close of business on March 28, 2007 (the "Record Date"), as reflected in the records of the Trustee, to the waiver under (the "Waiver"), and to certain proposed amendments to (the "Proposed Amendment"), the Indenture. The Proposed Amendment will provide that any failure of the Company to comply with Section 1019 of the Indenture (the "Reporting Covenant") or §314 of the Trust Indenture Act, as amended, during the period beginning on March 30, 2007 and ending at 5:30 p.m., New York City time, on (i) May 31, 2007 or (ii) if the Company elects to extend such date, June 30, 2007 (the "Covenant Reversion Date"), shall not constitute a Default under the Indenture or be the basis for any Event of Default under the Indenture. A Consent will also constitute Waiver of any and all Defaults and Events of Default arising from a failure to comply with the Reporting Covenant prior to the effective time of the Proposed Amendment (the "Effective Time"). On the business day following the expiration date of the Solicitation (the "Expiration Date"), or as promptly as practicable thereafter, the Company will pay to each Holder that provides and does not revoke its Consent prior to the Expiration Date $10.00 for each $1,000 in principal amount of the Notes to which such Consent relates. If the Company elects to extend the Covenant Reversion Date to June 30, 2007, promptly following notice of such election, the Company will pay to each Holder that provides and does not revoke its Consent prior to the Expiration Date an additional $5.00 for each $1,000 in principal amount of the Notes to which such Consent relates.

2. Agreement to Forebear. Plainfield hereby agrees that until the Covenant Reversion Date:

(a) it shall not, and shall not permit any of its affiliates to, or direct, solicit or encourage any other person to, exercise, or seek to exercise, whether individually or jointly with any other holder of Notes (the "Noteholders"), any rights or remedies, including any rights under Article V of the Indenture, that Noteholders or the Trustee may have under the Indenture or otherwise in connection with any Default or Event of Default (each as defined in the Indenture) that relate to the Company failing to comply with the Reporting Covenant and further agrees not to take, or permit any of its affiliates, or direct, solicit or encourage any other person, to take, any action, including the giving of any notice, under any other debt agreement or instrument of the Company that would be inconsistent with the foregoing agreements had such action been taken under the Indenture. Plainfield also agrees to the rescission of any declaration of acceleration which may be made by the Trustee or any Noteholders with respect to such Defaults or Events of Default that relate to the Company failing to comply with the Reporting Covenant during the term of this Agreement; and

(b) it shall not to take, or permit any of its affiliates, or direct, solicit or encourage any other person, to take, any action, that would be inconsistent with the consummation of the Solicitation.

3. Agreement to Consent. Promptly following commencement of the Solicitation, Plainfield will Consent (and shall cause its nominee to Consent) to the Proposed Amendment and Waiver with respect to the Plainfield Notes and any Additional Notes (defined below) in accordance with the consent solicitation statement and the related consent form to be prepared by the Company in connection with the Solicitation, each as may be amended and supplemented from time to time, and not revoke such Consent.

4. Certain Conditions. The obligations of Plainfield under this Agreement are conditioned upon the representations and warranties of the Company contained herein being true and correct in all material respects as of the date hereof and the obligations of the Company under this Agreement are conditioned upon the representations and warranties of Plainfield contained herein being true and correct in all material respects as of the date hereof.

5. Representations of Plainfield . Plainfield represents and warrants to the Company as follows:

(a) Plainfield has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to perform its obligations under this Agreement.

(b) The execution and delivery of this Agreement have been duly and validly authorized, and all necessary action has been taken to make this Agreement a legal, valid and binding obligation of Plainfield, enforceable in accordance with its terms.

(c) Plainfield (together with its affiliates) owns of record and/or beneficially, and/or has investment authority or discretion with respect to, the Plainfield Notes, (ii) as of the Record Date, owned of record and/or beneficially, and/or had investment authority or discretion with respect to, the Plainfield Notes, and (iii) such aggregate principal amount of Notes constitutes all of the Notes so owned or controlled by Plainfield and its affiliates as of the date hereof.

(d) Plainfield owns the Plainfield Notes free and clear of all claims, Liens, title defects and objections of any kind and nature whatsoever.

(e) This Agreement represents the only agreement or arrangement between the Company, on the one hand, and Plainfield on the other hand, with respect to the Solicitation.

6. Representations of the Company. The Company represents and warrants to Plainfield as follows:

(a) The Company has all requisite corporate, power and authority to enter into this Agreement and to carry out the transactions contemplated hereby, and to perform its obligations under this Agreement.

(b) The execution and delivery of this Agreement have been duly and validly authorized, and all necessary action has been taken to make this Agreement a legal, valid and binding obligation of the Company, enforceable in accordance with its terms.

(c) As of the date hereof, the Company is not aware of any Defaults or Events of Defaults (each as defined in the Indenture) other than arising as a result of the Company's failure to comply with the Reporting Covenant.

7. Additional Notes Subject. Nothing in this Agreement shall be deemed to limit or restrict the ability or right of Plainfield from acquiring any additional Notes (the "Additional Notes") from and after the issuance of the press release referenced in Section 9 of this Agreement; provided, however, that in the event that Plainfield acquires any Additional Notes after such time and prior to the Effective Time, such Additional Notes shall immediately upon acquisition, and without further action on the part of the Company or Plainfield, become subject to the terms and conditions of this Agreement. Plainfield shall as promptly as practicable notify the Company of any such acquisition, and Plainfield agrees to execute and deliver within five (5) business days of the closing of such acquisition any additional documents that the

Company shall request to evidence that such Additional Notes are subject to the provisions of this Agreement as of the date of acquisition.

8. No Transfer. Except as set forth below, Plainfield agrees, without the prior written consent of the Company, not to sell, transfer, assign or otherwise dispose of any Notes, including any Additional Notes, on or prior to the Effective Time, unless the transferee accepts such Notes subject to the terms of this Agreement. In the event that Plainfield transfers Notes on or prior to the Effective Time, such transferee shall comply with and be subject to the terms of this Agreement, including but not limited to, Plainfield's obligations to consent to the Proposed Amendment and the Waiver and not revoke such consent, and as a condition precedent to the transfer, execute a signature page hereto upon which it shall become a party hereto. Any sale, transfer, assignment, or other disposition of any Notes in violation of this Section shall be void ab initio. Concurrently with any such transfer, Plainfield shall notify the Company pursuant to the notice provisions contained in Section 12 hereof, in writing, of such transfer and promptly thereafter provide the executed documents as provided for in this section.

9. Other Agreements of the Company. The Company will issue a press release or press releases announcing its intention to conduct the Solicitation, promptly after the date hereof; and will file or furnish such press release to the SEC on Form 8-K promptly thereafter, which Form 8-K will include as an exhibit this Agreement.

10. Termination of Agreement. (a) This Agreement may be terminated by the Company or Plainfield by notice by the Company or Plainfield, as applicable, to the other, (i) upon the material breach by the non-terminating party of any of the representations, warranties or covenants in this Agreement and (ii) at any time from and after May 1, 2007 in the event that the Effective Time has not occurred on or prior thereto.

(b) None of the representations, warranties and agreements contained herein shall survive the termination of this Agreement or the Effective Time, unless the termination pursuant to (a)(ii) above is being challenged by one of the parties hereto and specific performance is being pursued pursuant to Section 14 below.

11. Amendments and Waivers. This Agreement may not be modified, amended, or supplemented or any provision herein waived without the prior written consent of the Company and Plainfield.

12. Notices. All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth herein, or to such other address as a party may designate by written notice hereunder, and shall be either (i) delivered by hand, (ii) made by facsimile transmission, (iii) sent by overnight courier, or (iv) sent by registered or certified mail, return receipt requested, postage prepaid.

If to the Company, to:

IMAX Corporation
2525 Speakman Drive
Mississauga, Ontario
Canada, L5K 1B1
Attn: General Counsel

With a copy to:

Shearman & Sterling LLP
Commerce Court West
Suite 4495, P.O. Box 247
Toronto, Ontario
Canada, M5L 1E8
Attn: Jason Lehner

If to Plainfield, to:

Plainfield Special Situations Master Fund Limited
c/o Plainfield Asset Management LLC
55 Railroad Avenue, Plaza Level
Greenwich, CT 06830
Attn: Thomas X. Fritsch

All notices, requests, consents and other communications hereunder shall be deemed to be received (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party, set forth herein, (ii) if made by facsimile transmission, at the time that the receipt thereof has been acknowledged by electronic confirmation or otherwise, (iii) if sent by overnight courier, on the next business day following the day such written notice is delivered to the courier service, or (iv) if sent by registered or certified mail, return receipt requested, postage prepaid, on the third business day following the day such mailing is mailed.

13. Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions. By its execution and delivery of this Agreement, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York. By execution and delivery of this Agreement, each of the parties hereto irrevocably accepts and submits itself to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.

14. Specific Performance. It is understood and agreed by each of the parties hereto that any breach of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and accordingly, and the parties hereto agree that in addition to any other remedies, each party shall be entitled to enforce the terms of this Agreement by a decree of specific performance or injunctive relief without the necessity of proving the inadequacy of money damages as a remedy or posting a bond or other security, not to be unreasonably withheld.

15. Headings. The headings of the sections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

16. Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors, administrators and representatives.

17. Entire Agreement. This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersedes all other prior negotiations, agreements, and understandings, whether written or oral, among the parties with respect to the subject matter of this Agreement.

18. Counterparts. This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.

19. No Third-Party Beneficiaries. This Agreement shall be solely for the benefit of the parties hereto and no other person or entity shall be a third-party beneficiary of this Agreement.

20. Severability. Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction, shall, as to that jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement or affecting the validity or enforceability of any of the terms or provisions of this Agreement in any other jurisdiction. If any provision of this Agreement is so broad as to be unenforceable, the provision shall be interpreted to be only so broad as is enforceable.

21. Public Announcements. Without the prior written consent of the Company, Plainfield shall not issue and shall instruct its officers, directors, affiliates, associates, employees, investment bankers, attorneys and other advisers or representatives not to issue, any press release to a non-affiliated third party with regard to this Agreement or any of the transactions contemplated herein, except to the extent disclosure may be required by applicable law or stock exchange or inter-dealer quotation system rules applicable to a party (subject to giving the Company written notice of the intention to make such disclosure prior to such disclosure) or except to the extent such information has already been publicly disclosed by a non-affiliated person. The Company shall not mention Plainfield in any press release, public announcement or SEC filing without the prior written consent of Plainfield.

22. Certain Terms. The term "affiliate" as used hereunder shall mean with respect to a specified person or entity, a person or entity that directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, the person or entity specified.

BEFORE EXECUTING THIS AGREEMENT, PLAINFIELD SHOULD CONSULT WITH ITS TAX AND LEGAL ADVISORS REGARDING THE CONSEQUENCES OF THE SOLICITATION.

*The balance of this page has been intentionally left blank.*

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

**COMPANY:** **IMAX CORPORATION**

By: *"Bradley J. Wechsler*
Name: Bradley J. Wechsler
Title: Co-Chief Executive Officer

**PLAINFIELD:** **PLAINFIELD SPECIAL SITUATIONS MASTER FUND LIMITED**

By: *"Thomas X. Fritsch"*
Name: Thomas X. Fritsch
Title: Authorized Individual

IMAX CORPORATION

**Exhibit 4.16**

**NINTH SUPPLEMENTAL INDENTURE**

Ninth Supplemental Indenture (this "Ninth Supplemental Indenture"), dated as of 12:01 p.m. April 16, 2007 (the "Effective Time") among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, the Seventh Supplemental Guarantor named in the Seventh Supplemental Indenture referred to below, the Eighth Supplemental Guarantor named in the Eighth Supplemental Indenture referred to below and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture"), and as further amended by the Eighth Supplemental Indenture dated as of March 26, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, Coral Sea Films Ltd. (the "Eighth

Supplemental Guarantor") and the Trustee (the "Eighth Supplemental Indenture") providing for the issuance of 9⅝% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation, one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors.

WHEREAS, Section 902 of the Indenture provides that, with the consent of the Holders of not less than a majority in principal amount of the Outstanding Securities, the Company and the Trustee may, subject to certain enumerated exceptions, enter into an indenture supplemental to the Indenture for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Indenture or of modifying in any manner the rights of the Holders under the Indenture;

WHEREAS, Section 513 of the Indenture provides that prior to the declaration of acceleration of the maturity of the Securities, the Holders of a majority in aggregate principal amount of the Outstanding Securities may waive on behalf of all Holders any default, except with respect to certain enumerated defaults, and upon any such waiver, such default shall cease to exist and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of the Indenture;

WHEREAS, pursuant to the Company's Consent Solicitation Statement dated April 3, 2007 and the accompanying Consent Form, the Company has obtained the written consent of the Holders of not less than a majority in principal amount of the Outstanding Securities to the amendments to the Indenture and to the waiver of Defaults and Events of Default under the Indenture as set forth herein.

WHEREAS, the Board of Directors of the Company has by Board Resolution dated April 13, 2007 authorized the execution and delivery of this Ninth Supplemental Indenture;

WHEREAS, pursuant to Section 902 of the Indenture, the Trustee is authorized to execute and deliver this Ninth Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Company and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

ARTICLE 1
AMENDMENTS TO THE INDENTURE

1. *Amendment to Section 101.* Section 101 of the Indenture is hereby amended by inserting the following terms:

"Covenant Reversion Date" means 5:30 p.m., New York City time, on (1) May 31, 2007 or (2) if the Company elects to extend such date by giving notice of such extension to Holders of Outstanding Securities prior to May 31, 2007 in the manner set forth in Section 106, June 30, 2007; provided that the Company shall promptly pay the Additional Consent Fee (as defined in the Solicitation Documents) in accordance with the Solicitation Documents.

"Solicitation Documents" means the Consent Solicitation Statement dated as of April 3, 2007 and the related Consent Form."

2. *Amendment to Section 501.* Section 501 of the Indenture is hereby amended by inserting the following sentence at the end of such Section:

"Notwithstanding any of the foregoing, any failure of the Company to comply with Section 1019 of this Indenture or §314 of the Trust Indenture Act during the period beginning on March 30, 2007 and ending on the Covenant Reversion Date shall not constitute a failure to comply with Section 1019 or otherwise constitute a Default or be the basis of an Event of Default."

ARTICLE 2
WAIVER

1. *Waiver.* Any past Default or Event of Default arising from the Company's failure to comply with Section 1019 of the Indenture is hereby waived in accordance with Section 513 of the Indenture.

ARTICLE 3
EFFECTIVENESS

1. *Effectiveness.* This Ninth Supplemental Indenture is effective as of the Effective Time.

ARTICLE 4
MISCELLANEOUS

1. *Capitalized Terms.* Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Indenture Ratified.*. Except as otherwise provided herein, the Indenture is in all respects ratified and confirmed, and all of the terms, provisions and conditions thereof shall be and remain in full force and effect.

3. *Successors and Assigns.* All covenants and agreements in this Ninth Supplemental Indenture by the Company and the Trustee shall bind its successors and assigns, whether so expressed or not.

4. *Separability Clause.* In case any provision in this Ninth Supplemental Indenture shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

5. *Benefits of Indenture.* Nothing in this Ninth Supplemental Indenture, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Holders of Securities, any benefit or any legal or equitable right, remedy or claim under this Indenture.

6. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS NINTH SUPPLEMENTAL INDENTURE.

7. *Counterparts.* The parties may sign any number of copies of this Ninth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

8. *Effect of Headings.* The Article and Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Ninth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

**Acorn Rain Productions Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

**Walking Bones Pictures Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President, Finance

**Seventh Supplemental Guarantor:**

**Raining Arrows Productions Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President, Finance

**Eighth Supplemental Guarantor:**

**Coral Sea Films Ltd.**

By /s/ G. Mary Ruby
Name: G. Mary Ruby
Title: Secretary

By /s/ Edward MacNeil
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By: /s/ Raymond S. Haverstock
Name: Raymond S. Haverstock
Title: Vice President