# EXHIBIT B
# (PART 4)

**IMAX CORPORATION**

**Exhibit 4.17**

## TENTH SUPPLEMENTAL INDENTURE

Tenth Supplemental Indenture (this "Tenth Supplemental Indenture"), dated as of May 30, 2007 among IMAX Corporation, a corporation incorporated under the federal laws of Canada (the "Company"), the Guarantors named in the Indenture referred to below (the "Existing Guarantors"), the First Supplemental Guarantors named in the Supplemental Indenture referred to below, the Second Supplemental Guarantor named in the Second Supplemental Indenture referred to below, the Fourth Supplemental Guarantors named in the Fourth Supplemental Indenture referred to below, the Fifth Supplemental Guarantor named in the Fifth Supplemental Indenture referred to below, the Sixth Supplemental Guarantor named in the Sixth Supplemental Indenture referred to below, the Seventh Supplemental Guarantor named in the Seventh Supplemental Indenture referred to below, the Eighth Supplemental Guarantor named in the Eighth Supplemental Indenture referred to below, IMAX International Sales Corporation (the "Guaranteeing Subsidiary") and U.S. Bank National Association, as trustee under the Indenture referred to below (the "Trustee").

WITNESSETH

WHEREAS, the Company and the Existing Guarantors have heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 4, 2003, as amended by the First Supplemental Indenture dated as of April 1, 2004 among the Company, the Existing Guarantors, 3D Sea II Ltd. and Taurus-Littrow Productions Inc. (the "First Supplemental Guarantors") and the Trustee (the "First Supplemental Indenture"), as further amended by the Second Supplemental Indenture dated as of July 14, 2004 among the Company, the Existing Guarantors, the First Supplemental Guarantors and Big Engine Films Inc. (the "Second Supplemental Guarantor") and the Trustee (the "Second Supplemental Indenture"), as further amended by the Third Supplemental Indenture dated as of February 2, 2005 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor and Automation Productions Ltd. (the "Third Supplemental Guarantor") and the Trustee (the "Third Supplemental Indenture"), as further amended by the Fourth Supplemental Indenture dated as of April 10, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, Conversion Films Ltd., Feathered Films Ltd. and Great Ant Productions Ltd. (the "Fourth Supplemental Guarantors") and the Trustee (the "Fourth Supplemental Indenture"), as further amended by the Fifth Supplemental Indenture dated as of June 19, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, Acorn Rain Productions Ltd. (the "Fifth Supplemental Guarantor") and the Trustee (the "Fifth Supplemental Indenture"), as further amended by the Sixth Supplemental Indenture dated as of November 9, 2006 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, Walking Bones Pictures Ltd. (the "Sixth Supplemental Guarantor") and the Trustee (the "Sixth Supplemental Indenture"), as further amended by the Seventh Supplemental Indenture dated as of January 29, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, Raining Arrows

Productions Ltd. (the "Seventh Supplemental Guarantor") and the Trustee (the "Seventh Supplemental Indenture"), as further amended by the Eighth Supplemental Indenture dated as of March 26, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, Coral Sea Films Ltd. (the "Eighth Supplemental Guarantor") and the Trustee (the "Eighth Supplemental Indenture"), and as further amended by the Ninth Supplemental Indenture dated as of April 16, 2007 among the Company, the Existing Guarantors, the First Supplemental Guarantors, the Second Supplemental Guarantor, the Fourth Supplemental Guarantors, the Fifth Supplemental Guarantor, the Sixth Supplemental Guarantor, the Seventh Supplemental Guarantor, the Eighth Supplemental Guarantor and the Trustee (the "Ninth Supplemental Indenture") providing for the issuance of 9⅝% Senior Notes due 2010 (the "Securities");

WHEREAS, IMAX Sandde Animation Inc., one of the Existing Guarantors, was dissolved on February 8, 2005, and the Third Supplemental Guarantor was dissolved on December 31, 2005 and each are therefore no longer Guarantors;

WHEREAS, the Indenture provides that under certain circumstances each Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which any newly-acquired or created Guarantor shall unconditionally guarantee all of the Company's obligations under the Securities and the Indenture on the terms and conditions set forth herein (the "Subsidiary Guarantee"); and

WHEREAS, pursuant to Section 901 of the Indenture, the Trustee is authorized to execute and deliver this Tenth Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Guaranteeing Subsidiary and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders of the Securities as follows:

1. *Capitalized Terms*. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2. *Agreement to Guarantee*. The Guaranteeing Subsidiary irrevocably and unconditionally guarantees the Guarantee Obligations, which include (i) the due and punctual payment of the principal of, premium, if any, and interest and Special Interest, if any, on the Securities, whether at maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise, the due and punctual payment of interest on the overdue principal and premium, if any, and (to the extent permitted by law) interest on any interest on the Securities, and payment of expenses, and the due and punctual performance of all other obligations of the Company, to the Holders or the Trustee all in accordance with the terms set forth in Article XIII of the Indenture, and (ii) in case of any extension of time of payment or renewal of any Securities or any such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration, redemption, upon a Change of Control Offer, upon an Asset Sale Offer or otherwise.

The obligations of the Guaranteeing Subsidiary to the Holders and to the Trustee pursuant to this Subsidiary Guarantee and the Indenture are expressly set forth in Article XIII of the

Indenture and reference is hereby made to such Indenture for the precise terms of this Subsidiary Guarantee.

No past, present or future director, officer, partner, manager, employee, incorporator or stockholder (direct or indirect) of the Guaranteeing Subsidiary (or any such successor entity), as such, shall have any liability for any obligations of such Guaranteeing Subsidiary under this Subsidiary Guarantee or the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation, except in their capacity as an obligor or Guarantor of the Securities in accordance with the Indenture.

This is a continuing Guarantee and shall remain in full force and effect and shall be binding upon the Guaranteeing Subsidiary and its successors and assigns until full and final payment of all of the Company's obligations under the Securities and Indenture or until released in accordance with the Indenture and shall inure to the benefit of the successors and assigns of the Trustee and the Holders, and, in the event of any transfer or assignment of rights by any Holder or the Trustee, the rights and privileges herein conferred upon that party shall automatically extend to and be vested in such transferee or assignee, all subject to the terms and conditions hereof. This is a Guarantee of payment and not of collectibility.

The obligations of the Guaranteeing Subsidiary under its Subsidiary Guarantee shall be limited to the extent necessary to insure that it does not constitute a fraudulent conveyance under applicable law.

THE TERMS OF ARTICLE XIII OF THE INDENTURE ARE INCORPORATED HEREIN BY REFERENCE.

3. *NEW YORK LAW TO GOVERN.* THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS TENTH SUPPLEMENTAL INDENTURE.

4. *Counterparts.* The parties may sign any number of copies of this Tenth Supplemental Indenture. Each signed copy shall be an original, but all of them together represent the same agreement.

5. *Effect of Headings.* The Section headings herein are for convenience only and shall not affect the construction hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Tenth Supplemental Indenture to be duly executed and attested, all as of the date first above written.

IMAX Corporation

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Sr. Vice President, Legal Affairs, Deputy General Counsel and Corporate Secretary

By ____________________
Name: Edward MacNeil
Title: Chief Financial Officer

**Existing Guarantors:**

David Keighley Productions 70MM Inc.
IMAX II U.S.A. Inc.
IMAX Chicago Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
IMAX Minnesota Holding Co.
IMAX Rhode Island Limited Partnership
By its General Partner
IMAX Providence General Partner Co.
IMAX Scribe Inc.
IMAX Space Ltd.
IMAX Theatre Holding Co.
IMAX Theatre Holdings (OEI) Inc.
IMAX Theatre Management Company
IMAX Theatre Services Ltd.
IMAX U.S.A. Inc.
Miami Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Nyack Theatre LLC
By its Managing Member
IMAX Theatre Holding (Nyack I) Co.
Parker Pictures Ltd.
Ridefilm Corporation
Sacramento Theatre LLC
By its Managing Member
IMAX Theatre Holding (California I) Co.
Sonics Associates, Inc.
Starboard Theatres Ltd.
Tantus Films Ltd.

1329507 Ontario Inc.
924689 Ontario Inc.
IMAX (Titanica) Ltd.
IMAX (Titanic) Inc.
IMAX Music Ltd.
IMAX Film Holding Co.
IMAX Indianapolis LLC
IMAX Providence General Partner Co.
IMAX Providence Limited Partner Co.
IMAX Theatre Holding (California I) Co.
IMAX Theatre Holding (California II) Co.
IMAX Theatre Holding (Nyack I) Co.
IMAX Theatre Holding (Nyack II) Co.
IMAX Theatre Management (Scottsdale), Inc.
Strategic Sponsorship Corporation
Tantus II Films Ltd.
RPM Pictures Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**First Supplemental Guarantors:**

Taurus-Littrow Productions Inc.
3D Sea II Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Second Supplemental Guarantor:**

Big Engine Films Inc.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fourth Supplemental Guarantors:**

Conversion Films Ltd.
Feathered Films Ltd.
Great Ant Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Fifth Supplemental Guarantor:**

Acorn Rain Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Sixth Supplemental Guarantor:**

Walking Bones Pictures Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President

**Seventh Supplemental Guarantor:**

Raining Arrows Productions Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Eighth Supplemental Guarantor:**

Coral Sea Films Ltd.

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Guaranteeing Subsidiary:**

IMAX International Sales Corporation

By *"G. Mary Ruby*
Name: G. Mary Ruby
Title: Secretary

By *"Edward MacNeil*
Name: Edward MacNeil
Title: Vice President, Finance

**Trustee:**

U.S. Bank National Association,
As Trustee

By: *"Raymond S. Haverstock"*
Name: Raymond S. Haverstock
Title: Vice President

# IMAX CORPORATION

## Exhibit 10.2

**IMAX CORPORATION**
**SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN**
As amended and Restated as of January 1, 2006

# IMAX CORPORATION

## SUPPLEMENTAL EXECUTIVE RETIREMENT PLAN

## ARTICLE I

## Definitions

For purposes of this IMAX Corporation Supplemental Executive Retirement Plan, the following words and phrases shall have the following meanings.

1.1 "Actuarial Equivalent" and "Actuarially Equal" mean a benefit of equal actuarial value to another benefit determined by using the following actuarial assumptions:

(a) Interest

The lesser of (x) 7% or (y) the interest rate used by the Pension Benefit Guaranty Corporation as of the first day of the Plan year in which falls the Annuity Starting Date to value a benefit upon termination of an insufficient trusteed single-employer plan.

(b) Mortality

The UP-1984 Mortality Table.

(c) Cost of Living

As of any Annuity Starting Date, a fraction, not less than one, the numerator of which shall be the Cost-of-Living Index for the October immediately preceding such Annuity Starting Date and the denominator of which shall be the Cost of Living Index for the immediately preceding October.

1.2 "Affiliate" means any partnership, association, corporation, trust, limited liability company or other business entity directly or indirectly controlling, controlled by or under common control with the Company.

1.3 "Annuity Starting Date" means the day specified in Article III hereof.

1.4 "Benefit" means (i) with respect to a Participating Executive, the benefit earned by such Participating Executive under the Plan, including without limitation, the spousal benefit described in Section 3.6 and (ii) with respect to a Surviving Spouse, the benefit to which such Surviving Spouse is entitled under Section 3.6 of the Plan.

1.5 "Cause" shall have the meaning ascribed to such term under the Participating Executive's employment agreement with the Company dated July 1, 1998, as extended on July 12, 2000.

1.6 "Change in Control" shall have the meaning ascribed to such term under the Participating Executive's employment agreement with the Company dated July 1, 1998, as extended on July 12, 2000, provided that for purposes of Article III of the Plan only, a Change in Control will not have been deemed to have occurred unless such circumstances would constitute a change in control as defined by Section 409A of the Code.

1.7 "Code" means the Internal Revenue Code of 1986, as amended.

1.8 "Company" means IMAX Corporation and any successor thereto.

1.9 "Cost-of-Living Adjustment" means an adjustment to the Monthly Annuity , effective as of each January 1 following the Annuity Starting Date with respect to such Monthly Annuity, and continuing for as long as such Benefit continues to be payable, such that the amount of the monthly payment in respect of such Benefit shall be adjusted by adding 50% of the product of (i) the amount of such monthly payment as in effect immediately prior to such January 1 by (ii) a fraction, not less than one, the numerator of which shall be the Cost-of-Living Index for the October immediately preceding such Annuity Starting Date and the denominator of which shall be the Cost of Living Index for the immediately preceding October; provided, however, that with respect to the adjustment on the first January 1 following the Annuity Starting Date for each Benefit, the fraction described in the preceding clause (ii) shall be further multiplied by a fraction, the numerator of which is the number of full months from the applicable Annuity Starting Date through such January 1 and the denominator of which is twelve.

1.10 "Cost-of-Living Index" means the Consumer Price Index for All Urban Consumers (CPI-U) All Items Unadjusted published by the Bureau of Labor Statistics of the United States Department of Labor. In the event such Index ceases to be published, the Company and each Participating Executive (or upon the death of a Participating Executive, such Participating Executive's Surviving Spouse) shall agree on a comparable index to be used with respect to the Benefit of such Participating Executive or Surviving Spouse.

1.11 "Deferred Retirement" means a Termination of Employment after the Participating Executive's Normal Retirement Date other than by reason of death, Disability, or by the Company for Cause.

1.12 "Disability Retirement" means a Termination of Employment due to a "disability" entitling the Participating Executive to benefits under the long-term disability policy of the Company in which he is entitled to participate. If there is no such policy, then "disability" means a physical or mental condition which a physician selected by the Company determines has prevented the Participating Executive from substantially performing his responsibilities for the Company for a period of at least 180 consecutive days.

1.13 "Final Average Compensation" means the Participating Executive's average annual compensation from the Company and its Affiliates determined by considering the sixty (60) consecutive months which afford the highest such average during the Participating Executive's employment by the Company and its Affiliates. For this calculation, compensation shall include only base salary and regular annual bonus, including amounts deferred as before tax contributions to plans maintained under Sections 401(k) or 125 of the Code. Compensation does

not include the value of any awards under any long-term incentive plan, any benefits in the nature of severance pay, or any amounts of additional W-2 income representing taxable employee benefits and employer payments of additional withholding (commonly referred to as "grossed up" compensation). Final Average Compensation is determined without regard to transfers between or among the Company and any Affiliate.

1.14 "Involuntary Retirement" means a Termination of Employment that is directed by the Company or its Affiliates and is involuntary on the part of the Participating Executive prior to the Participating Executive's Normal Retirement Date for any reason other than for Cause or by reason of Disability Retirement or death.

1.15 "Lump Sum Payment" means, with respect to any Benefit, a payment which is the Actuarial Equivalent of all, or the remaining portion, of such Benefit (including, for a Participating Executive, the survivor portion of the Benefit earned by him), which payment shall serve to discharge any and all obligations of the Company to provide such Benefit. For purposes of clarity, (x) the value of a Participant's Benefit shall be determined at the Participant's Annuity Starting Date and shall not be redetermined thereafter (including following the death of the Participant) and (y) the Lump Sum Payment shall reflect the projected Cost-of-Living Adjustment.

1.16 "Monthly Annuity" means a monthly annuity payable for the life of the Participating Executive with a survivor benefit payable for the life of the Participating Executive's Surviving Spouse in monthly amounts initially equal to 50% of the amount payable to the Participating Executive immediately prior to his death (determined without regard to Section 3.3(c) hereof), such amounts to be adjusted to reflect the Cost of Living Adjustment.

1.17 "Normal Retirement" means a Termination of Employment on the Participating Executive's Normal Retirement Date other than by reason of death, Disability, or by the Company for Cause.

1.18 "Normal Retirement Date" means, with respect to each Participating Executive, the first day of the calendar month coincident with or next following such Participating Executive's 55th birthday.

1.19 "Participating Executive" means a key employee of the Company or any of its Affiliates who has been designated as a participant by the Company as provided in Section 2.1 hereof.

1.20 "Plan" means the IMAX Corporation Supplemental Executive Retirement Plan, as it may be amended from time to time.

1.21 "Rabbi Trust" means a trust in form and substance as agreed by the Company and the Participating Executives.

1.22 "Surviving Spouse" means the person to whom a Participating Executive is married on the earlier of the date of his death or his Annuity Starting Date. A spouse of a Participating Executive shall not be considered a Surviving Spouse if, at the time that spouse's right to a Benefit otherwise would be determined, it is established to the satisfaction of the

Committee that (a) the spouse cannot be located; or (b) the Participating Executive is legally separated or the Participating Executive has been abandoned (as determined in accordance with the local law) and the Participating Executive has a court order to such effect.

1.23 "Termination of Employment" means circumstances which would constitute a "separation from service" with the Company and its Affiliates for purposes of Section 409A of the Code. In the case of Disability Retirement, Termination of Employment shall be deemed to occur (i) upon the commencement of disability payments under the Company's long-term disability policy or (ii) upon the determination described in Section 1.12 hereof, as the case may be.

1.24 "Vesting Percentage" shall have the same meaning ascribed to it in Section 4.1 hereof.

1.25 "Voluntary Retirement" means a Termination of Employment that is directed by such Participating Executive and is voluntary on the part of the Participating Executive prior to his Normal Retirement Date other than by reason of his death or Disability.

## ARTICLE II

## Participants

2.1 Designation of Participating Executives.

The Company, in its sole discretion, shall designate those key employees of the Company or its Affiliates who are eligible to participate in the Plan.

2.2 Effectiveness.

The designation of an employee as a Participating Executive shall be effective from the date of such designation. A Participating Executive shall cease to be a Participating Executive (a) upon his death, (b) upon the payment of his entire nonforfeitable Benefit under the Plan or (c) upon his Termination of Employment for Cause.

## ARTICLE III

## Benefits

3.1 Normal Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Normal Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Normal Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive

the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Normal Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Normal Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be his Normal Retirement Date.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.2 Deferred Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Deferred Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him initially equal to the product of (i) 75% of his Final Average Compensation, and (ii) a fraction, not less than one, the numerator of which shall be the Cost-of-Living Index for the month that is two months prior to the Participating Executive's Annuity Starting Date and the denominator of which shall be the Cost-of-Living Index for the month that is two months prior to the month in which occurs the Participating Executive's Normal Retirement Date, and payments to his Surviving Spouse as set forth herein. Such annual payments shall be adjusted after the Annuity Starting Date by the Cost of Living Adjustment. If the Participating Executive's Deferred Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Deferred Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Deferred Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.3. Disability Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Disability Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment, and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Disability Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Disability Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Disability Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) The amount of the payments payable pursuant to Section 3.3(a) shall be reduced on an after-tax basis by the Actuarially Equivalent value of the benefit payable to a Participating Executive pursuant to any disability insurance policy maintained by the Company or its Affiliates.

(d) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.4 Involuntary Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Involuntary Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment, and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Involuntary

Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Involuntary Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Involuntary Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.5 Voluntary Retirement.

(a) Subject to Section 3.8 and 3.9 herein, upon Voluntary Retirement, a Participating Executive will be entitled to receive a Benefit that has a value that is Actuarially Equal to the value of a Monthly Annuity providing annual payments to him equal to the product of (x) his Vesting Percentage and (y) 75% of his Final Average Compensation increased to reflect the Cost-of-Living Adjustment, and payments to his Surviving Spouse as set forth herein. If the Participating Executive's Voluntary Retirement occurs prior to August 1, 2010, then the Benefit shall be paid in monthly installments, each of which shall be equal to the amount of the Monthly Annuity payments, until the earlier of (i) a Change in Control or (ii) August 1, 2010, at which time the Participating Executive shall receive the Lump Sum Payment that has an Actuarially Equivalent value to the excess, if any, of (i) the value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date over (ii) the value, adjusted for interest at the rate of 7% per annum, of such installment payments previously paid, provided that, if a Change in Control occurs after the Participating Executive's Voluntary Retirement and prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed to the Participating Executive on January 2, 2007. If the Participating Executive's Voluntary Retirement occurs on or after August 1, 2010, then the Benefit shall be paid in its entirety as a Lump Sum Payment the value of which is Actuarially Equal to the value of the Benefit earned by such Participating Executive.

(b) The Participating Executive's Annuity Starting Date shall be the first day of the month following the effective date of his Termination of Employment.

(c) Upon the death of the Participating Executive, the Participating Executive's Surviving Spouse will be entitled to receive a Benefit as specified in Section 3.6 herein.

3.6 Death Benefit.

(a) The Surviving Spouse of a Participating Executive who dies while an employee of the Company or its Affiliates shall be entitled to receive a Benefit that has an Actuarially Equivalent value to the Monthly Annuity earned by such Participating Executive (including the survivor portion thereof) determined as if the Participating Executive had a Termination of Employment (treated as set forth in the following sentence) on the day preceding the date of his death (and determined without regard to the Participating Executive's actual death). For purposes of clarity, such Benefit shall be Actuarially Equivalent to the 50% joint and survivor annuity that constitutes the Monthly Annuity, determined as if the Participating Executive had a Termination of Employment on the day preceding the date of his death. If the Participating Executive's death occurs on or prior to his Normal Retirement Date, then such Termination of Employment shall be treated as if it was a Normal Retirement and otherwise such Termination of Employment shall be treated as if it was a Deferred Retirement.

(b) The Surviving Spouse of a Participating Executive who dies after a Termination of Employment and prior to the Participating Executive having received a Lump Sum Payment of his entire Benefit shall be entitled to receive a Benefit that has a value equal to the excess, if any, of (i) the Actuarially Equivalent value of the Monthly Annuity earned by such Participating Executive (including the survivor portion thereof) determined as of his Annuity Starting Date (and determined without regard to the Participating Executive's actual death) over (ii) the value, adjusted for interest at the rate of 7% per annum, of the payments made pursuant to the Plan to the Participating Executive during his life.

(c) The benefits payable under this Section 3.6 shall be paid in the form of a Lump Sum Payment payable as soon as practicable, but not more than 30 days following, the Participating Executive's death.

3.7 Termination of Employment Due to Cause.

Upon a Participating Executive's Termination of Employment by the Company or its Affiliates for Cause prior to a Change in Control, the Participating Executive (and his Surviving Spouse) shall forfeit any and all Benefits to which he may have been entitled, whether or not vested.

3.8 Change in Control

(a) Notwithstanding anything to the contrary herein, in the event of a Change in Control coincident with or prior to the Participating Executive's Termination of Employment, the Participating Executive shall be entitled to receive a Benefit (payable in the form of a Lump Sum Payment as set forth below) that has an Actuarially Equivalent value to the sum of (i) the Actuarially Equivalent value of the Benefit earned by such Participating Executive (including the survivor portion thereof) determined as if the Participating Executive had a Termination of Employment (treated as set forth in the following sentence) on the date of the Change in Control

(the "Adjusted Amount") and (ii) the Actuarially Equivalent value of 60% of the excess of the Prior Amount (as defined below) over the Adjusted Amount. If the Change in Control occurs on or prior to the Participating Executive's Normal Retirement Date, then such Termination of Employment shall be treated as if it was a Normal Retirement and if the Change in Control occurs after the Participating Executive's Normal Retirement Date then such Termination of Employment shall be treated as if it was a Deferred Retirement. For purposes of this paragraph, the term "Prior Amount" means the Adjusted Amount determined by replacing "50%" in the definition of the term "Monthly Annuity" herein with "100%" and by replacing "50%" in the definition of the term "Cost-of-Living Adjustment" herein with "100%." The Benefit shall be payable in the form of an Actuarially Equivalent Lump Sum Payment on the date of the Change in Control, provided that, if the Change in Control occurs prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed on January 2, 2007.

(b) Subject to Section 3.7 hereof, in the event of a Change in Control after the Participating Executive's Termination of Employment and prior to January 1, 2016, the Participating Executive (or if the Change in Control occurs after the Participating Executive's death, the Participating Executive's Surviving Spouse or her heirs or assigns) shall be entitled to receive an amount that is Actuarially Equivalent to the product of (x) amount determined under clause (ii) of paragraph (a) above, with the Prior Amount and Adjusted Amount determined as of the date of the Change in Control but based on the date of the Participating Executive's actual Termination of Employment and (y) the Participating Executive's Vesting Percentage. Such amount shall be payable in an Actuarially Equivalent Lump Sum Payment on the date of the Change in Control, provided that, if the Change in Control occurs prior to January 1, 2007, then (x) on the date of the consummation of the Change in Control, the Lump Sum Payment will be deposited into a Rabbi Trust and (y) the amount held in the Rabbi Trust will be distributed on January 2, 2007. The amount payable pursuant to this paragraph 3.8(b) shall be in addition to, and not in lieu of, any other amount payable under the Plan.

3.9 Section 409A Six Month Rule

Notwithstanding anything herein to the contrary, to the extent required by Section 409A(a)(2)(B) of the Code, in event that a Participating Executive is a "specified employee" within the meaning of such Section any distribution hereunder resulting from a Termination of Employment that is required to be made prior to six months following such Termination of Employment shall instead be made deferred and paid on the first day of the seventh month following such Termination of Employment, in which case the Participating Executive shall be entitled to receive interest on the deferred amount credited at the applicable federal rate for short-term obligations (determined pursuant to Section 7872 of the Code in effect as of the date of such Termination of Employment).

## ARTICLE IV

### Vesting

4.1 Vesting Percentage.

(a) The Vesting Percentage of a Participating Executive who undergoes a Termination of Employment other than by reason of Voluntary Retirement shall be 100%.

(b) The Vesting Percentage of a Participating Executive whose employment terminates by Voluntary Retirement shall be the sum of (i) 50% plus (ii) the product of (x) a fraction (not to exceed one), the numerator of which is the Participating Executive's number of whole years of service for the Company or its Affiliates from the date such Participating Executive became a Participating Executive in the Plan to the date of his Termination of Employment, and the denominator of which is the number of whole years from the date such Participating Executive became a Participating Executive in the Plan to such Participating Executive's Normal Retirement Date and (y) 50%; provided, that the Vesting Percentage shall be 100% if the Participating Executive's Termination of Employment occurs after the occurrence of a Change in Control.

## ARTICLE V

### Plan Administration

5.1 Amendment and Termination.

The Plan may be amended with respect to a Participating Executive only by an instrument in writing signed by such Participating Executive and the Company.

5.2 Funding.

The Company shall be solely responsible for the payment of such Participating Executive's or Surviving Spouse's Benefit. The Plan shall be unfunded. Benefits under the Plan shall be paid from the general assets of the Company and each Participating Executive's and Surviving Spouse's rights against the Company shall be those of an unsecured general creditor.

5.3 Benefits Not Assignable.

Benefits provided under the Plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process.

5.4 Plan Not a Contract of Employment.

The Plan is not a contract of employment, and the terms of employment of any Participating Executive shall not be affected in any way by the Plan or related instruments except as specifically provided in the Plan or such related instruments. The establishment of the Plan shall not be construed as conferring any legal rights upon any Participating Executive for a

continuation of employment, nor shall it interfere with the right of the Company to discharge any employee and to treat him without regard to the effect which such treatment might have upon him as a Participating Executive. Each Participating Executive and all persons who may have or claim any right by reason of his participation shall be bound by the terms of the Plan and all agreements entered into pursuant thereto.

5.5 Construction.

(a) The Plan is intended to qualify as a plan maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees as referred to in Section 201(2) of the Employee Retirement Income Security Act of 1974, as amended, and its terms shall be interpreted accordingly. Otherwise, the laws of the State of New York shall control the interpretation and performance of the terms of the Plan.

(b) If any provision of the Plan, or the application of any such provision to any person or circumstances, shall be invalid under any federal or state law, neither the application of such provision to persons or circumstances other than those as to which such provision is invalid nor any other provisions of the Plan shall be affected thereby.

(c) The headings and subheadings in the Plan have been inserted for convenience of reference only, and are to be ignored in any construction of the provisions thereof.

(d) The Plan is intended not to give rise to tax under Section 409A of the Code. In the event that the Company and a Participating Executive determine that any provision of the Plan would be expected to give rise to tax under Section 409A, then the Plan shall be construed (as to such Participating Executive) in a manner that the Company and such Participating Executive agree would avoid such tax, or the Plan shall be amended in a manner and to the extent that the Company and such Participating Executive agree is necessary to avoid such tax.

5.6 Taxes.

The Company shall not be responsible for the tax consequences under federal, state or local law of any election made by any Participating Executive under the Plan. All payments under the Plan shall be subject to withholding and reporting requirements to the extent applicable law requires.

**IMAX CORPORATION**

*"Garth M. Girvan"*
By: Garth M. Girvan
Title: Director
Date: May 4, 2007

# IMAX CORPORATION
## Exhibit 10.3

EMPLOYMENT AGREEMENT dated and effective as of July 1, 1998 (the "Agreement"), between IMAX CORPORATION, a corporation organized under the laws of Canada ("Imax"), and BRADLEY J. WECHSLER (the "Executive").

WHEREAS, the Executive is currently the Chairman and Co-Chief Executive Officer of Imax and is employed pursuant to an Employment Agreement dated as of January 1, 1997, (the "1997 Agreement"); and

WHEREAS, the Imax Board of Directors (the "Board") has approved revised terms of employment, effective July 1, 1998, on August 26, 1998; and

WHEREAS, Imax wishes to enter into this Agreement to engage the Executive to continue to provide services to Imax, and the Executive wishes to be so engaged, pursuant to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. Employment. (a) Imax hereby employs the Executive, and the Executive hereby agrees to serve in accordance with the terms and conditions hereof.

(b) The Executive's continued employment as Co-Chief Executive Officer under this Agreement shall commence effective July 1, 1998, and shall continue until June 30, 2001 (the "Employment Term").

(c) During the Employment Term, the Executive shall perform such services with respect to Imax's business as may be reasonably requested from time to time by the Board and which are consistent with the Executive's status and the function performed by individuals holding a similar position with similarly situated companies, and agrees to act in accordance with the written instructions of the Board. It is anticipated that such services shall be performed primarily within the United States.

(d) The Executive shall devote that portion of his business time that is necessary to perform the services reasonably required of him hereunder, which portion shall constitute a significant majority of his business time. The Executive agrees that during the Employment Term (i) he will use reasonable efforts to resolve any conflicting

engagements and (ii) he will remain actively involved in Imax's business.

(e) As compensation for the services to be performed by the Executive hereunder during the Employment Term, the Executive shall be entitled to receive a base salary ("Base Salary") of U.S. $500,000 per annum, payable no less frequently than monthly in accordance with Imax's payroll practices.

(f) In addition to the Base Salary, the Executive shall be eligible to participate during the Employment Term in the annual incentive bonus plan adopted by the Board. The Executive shall be paid a bonus in respect of each of 1998, 1999, 2000 and the period January 1, 2001 to June 30, 2001 at a level of U.S. $605,000, U.S. $500,000, U.S. $500,000, and U.S. $250,000 (subject to adjustment as described below), respectively, (the "Standard"). Based on certain qualitative and quantitative measures determined by the CEO Advisors (as defined in Imax's Articles of Incorporation), for so long as Imax continues to have CEO Advisors, and the Compensation Committee (the "Committee") of the Board, as set forth below, the Committee shall determine the actual bonus paid, which shall be a multiple of the Standard ranging from 0.0x - 2.0 x, provided, however, that the multiple shall be at least 1.0x if Imax's reported earnings per share (EPS) for the year (excluding any extraordinary charges approved by the Board), or the six months ended June 30, 2001, as the case may be, meet the approved budget target (except that, if in the sole discretion of the Committee, the achievement EPS target was at the expense of, or to the material detriment of, other(s) of the qualitative and quantitative measures set forth below, then such minimum shall not apply).

Among the various factors the Committee shall consider in determining the bonus to be paid for 1998, and, subject to amendment from year to year by the Committee, after good faith consultation with the Executive, for 1999, 2000 and 2001, are: (i) the actual financial performance of Imax versus the approved budget for EBITDA, EPS, revenue growth, and/or other financial targets; and (ii) the Committee shall also take into account other qualitative factors including (in no order of importance): (A) progress in theater signings, (B) development of an enhanced management team, (C) improved performance of the Ridefilm division (for 1998 only), (D) further advancement of Imax's film strategy, (E) progress in "owned and operated" strategy (this factor to have diminishing weighting beyond 1998, as Imax's "owned and operated" emphasis refocuses on theatre joint ventures with conventional cinema operators), (F) brand development, (G) continued growth of the business, and (H) other performance related issues including, but not limited to, other goals established in the budget process approved by the Board.

The bonus for 1998, 1999 and 2000 shall be paid within 50 days of the applicable year-end, and for the period January 1, 2001 to June 30, 2001 within 50 days of June 30, 2001.

(g) Pursuant to the 1997 Agreement, at the beginning of each of 1997 and 1998, Imax granted the Executive the right to receive 30,000 common shares (on a post-split basis) of Imax (the "Restricted Stock"), or, if such Restricted Stock may not be issued without shareholder approval, the 1997 Agreement provided it shall be issued as "phantom stock". The Executive has the right to request the Restricted Stock granted on January 1, 1997 and January 1, 1998 be issued to him (or, if "phantom stock" is utilized, have payment made to him in an amount equal to the fair market value of such number of common shares of Imax on the date of such request), at any time after January 1, 1998 and January 1, 1999, respectively. It is hereby agreed that one half (i.e. 15,000) of such Restricted Stock / "phantom stock" for 1998 shall be cancelled forthwith, and that the Executive shall continue to have the right to the 30,000 Restricted Stock / "phantom stock" that have vested, and the remaining 15,000 Restricted Stock / "phantom stock" that shall vest on January 1, 1999. The Restricted Stock / "phantom stock" shall be adjusted for stock splits and other similar events. Imax agrees to indemnify the Executive, on an after-tax basis, for any income taxes imposed by any taxing authority and resulting from any taxable benefits to the Executive with respect to the Restricted Stock / "phantom stock" which arises prior to the date of any such request (it being understood that this indemnity relates to the timing of the payment of such taxes and not the ultimate tax payable). Any request for payment with respect to "phantom stock" must be made on or before December 31, 2009, after which date such "phantom stock" shall lapse. The provisions of this Section 1(g) shall survive any termination of this Agreement.

(h) *Stock Options – Grant & Vesting.* The Executive has been granted effective August 26, 1998, in accordance with the terms of the Imax Stock Option Plan (the "SOP"), 378,000 options to purchase common shares, and effective January 1, 1999 shall be granted a further 400,000 options, as follows:

| Number of Options | Grant Date | Exercise Price | Vesting Date |
|---|---|---|---|
| 111,333 | August 26, 1998 | $22.38 | August 26, 1998 |
| 100,000 | August 26, 1998 | $22.38 | January 1, 1999 |
| 166,667* | August 26, 1998 | $22.38 | January 1, 1999 |
| 266,667* | January 1, 2000 | to be determined | January 1, 2000 |
| 133,333* | January 1, 2000 | to be determined | January 1, 2001 |
| 778,000 | | | |

* These options are subject to Imax obtaining any required regulatory and shareholder approvals.

The exercise price of all options granted on August 26, 1998 in accordance with the SOP is U.S. $22.38, and all such options shall expire on August 25, 2008. The exercise price of all options to be granted on January 1, 2000 shall be determined in accordance with the SOP, and all such options shall expire on December 31, 2009. Should any required

regulatory or shareholder approvals with respect to the granting of the 566,667 options subject thereto not be obtained by Imax, Imax shall make such adjustments to the Executive's compensation hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received. The provisions of this Section 1(h) shall survive any termination of this Agreement.

All of the Executive's stock options shall be adjusted for stock splits and other similar events after the effective date hereof and shall contain other terms no less favorable to the Executive than the management stock options of Imax's other senior level executives.

*Resignation / Termination.* If the Executive shall voluntarily resign prior to the end of the Employment Term, (i) all unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately upon such resignation, and (ii) all vested options shall remain exercisable for the duration of their original term.

If (i) the employment of the Executive is not continued after the end of the Employment Term, (ii) the Executive is terminated by Imax without "Cause" (as defined below), or (iii) the Executive suffers a "Permanent Disability" (as defined in the SOP), or dies: all options granted on or before August 26, 1998 shall remain exercisable for the duration of their original term.

*Change of Control.* Upon a "change of control" of Imax (i.e. any person or persons acting in concert acquiring greater than 50% of the outstanding common shares of Imax, whether by direct or indirect acquisition or as a result of a merger or reorganization), the vesting of the options granted on August 26, 1998 and/or January 1, 1999 shall be accelerated as follows:

| Change of Control Period | % of Options Subject to Accelerated Vesting |
|---|---|
| On or Prior to December 31, 1998 | 12.5% of options scheduled to vest on January 1, 1999 |
| January 1, 1999 to June 30, 1999 | 25% of options scheduled to vest on January 1, 2000 * |
| July 1, 1999 to December 31, 1999 | 50% of options scheduled to vest on January 1, 2000 * |
| January 1, 2000 to June 30, 2000 | 25% of options scheduled to vest on January 1, 2001 |
| July 1, 2000 to December 31, 2000 | 50% of options scheduled to vest on January 1, 2001 |

* If a "change of control" occurs prior to the grant of such options on January 1, 2000, stock appreciation rights ("SARs") equivalent in number to the options subject to accelerated vesting shall be granted, with a reference price of U.S. $22.38, and an expiry date of December 31, 2009. The SARs shall be treated, in connection with a "change of control", in the same manner as if they were options (i.e. a cash offer for all shares and

options would trigger a payout of the SARs; a "rollover" of options would result in the continuation of the SARs, reflecting the relevant exchange ratio and with reference to the price of the substituted shares).

*Miscellaneous.* If the Executive is terminated with "Cause", the Executive's unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately, and all of the Executive's vested options must be exercised within 90 days of termination, after which date they shall be cancelled. "Cause" for purposes of this Section 1(g) only means any willful and material violation by the Executive of any law or regulation applicable to the business of Imax or one of its subsidiaries, or the Executive's conviction of a felony, or any willful perpetration by the Executive of a common law fraud. Imax's remedy for a "breach of restrictive covenants" shall be the specific enforcement thereof, and not the application of Section 14 of the SOP; and Imax shall be entitled to seek any other legal and equitable remedies it may have against the Executive. In the event of any conflict between the provisions of this Agreement and the provisions of the SOP, the provisions of this Agreement shall prevail.

(i) The Executive shall, during the Employment Term, be eligible to receive employee benefits at a level not less than those established by Imax for, or made available to, its other key employees.

(j) Imax agrees to reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in the performance of his obligations under this Agreement for which documentation reasonably satisfactory to Imax is provided, including expenses relating to the Executive's travel to, and performance of duties in, Toronto, Canada.

(k) Any amounts payable to the Executive under this Agreement shall be subject to applicable withholding taxes, and such other deductions as may be required under applicable law.

2. Restrictions on Competitive Employment. During the term of the Executive's employment hereunder, absent Imax's prior written approval, the Executive shall not (as principal, agent, employee, consultant or otherwise), directly or indirectly, engage in activities with, or render services to, any business engaged or about to become engaged in the business of producing or distributing projection and sound systems or films for large screen theaters or designing or supplying motion simulation theaters or producing or distributing films for movie rides (collectively, "Competitive Business"); provided, however, that, notwithstanding the foregoing, the Executive may (i) have equity interests in companies engaged in a Competitive Business so long as he is not employed by and does not consult with such companies in areas related to the

Competitive Business, (ii) render consulting services to or be employed by a company engaged in a Competitive Business so long as he is not employed in, or rendering services related to, the Competitive Business of such company or (iii) perform usual investment banking services for a company engaged in a Competitive Business.

3. Confidentiality. The Executive covenants and agrees with Imax that he will not at any time, except in performance of his obligations to Imax hereunder or with the prior written consent of Imax, directly or indirectly, disclose any secret or confidential information that he may learn or has learned by reason of his association with Imax or any of its subsidiaries. The term "confidential information" includes information not previously disclosed to the public or to the trade by Imax's management, or otherwise in the public domain, with respect to Imax's or any of its subsidiaries' products, facilities, applications and methods, trade secrets and other intellectual property, systems, procedures, manuals, confidential reports, product price lists, customer lists, technical information, financial information, business plans, prospects or opportunities, but shall exclude any information which (i) is or becomes available to the public or is generally known in the industry or industries in which Imax operates other than as a result of disclosure by the Executive in violation of his agreements under this Section 3 or (ii) the Executive is required to disclose under any applicable laws, regulations or directives of any government agency, tribunal or authority having jurisdiction in the matter or under the subpoena or other process of law.

4. Assignment. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by the Executive without the prior written consent of Imax. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by Imax without the prior written consent of the Executive, except that Imax may assign this Agreement or any such right, interest or obligation to an affiliate of Imax without consent of the Executive; provided, however, that no such assignment shall relieve Imax of any of its obligations hereunder.

5. Indemnification. (a) Imax shall hold the Executive harmless and indemnify the Executive, to the fullest extent permitted by applicable law, against any and all liabilities (and all expenses related thereto) incurred by the Executive as a result of, or in connection with, the services provided under this Agreement; provided, however, that such indemnification shall not apply with respect to any action taken by the Executive that (i) is contrary to the written instructions of the Board or (ii) constitutes gross negligence or willful misconduct. Imax shall maintain a director and officer's liability insurance policy covering the Executive and containing customary terms and conditions.

(b) Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any income taxes imposed by

Revenue Canada, the United States Federal government or any state or local taxing authority in Canada or the United States (collectively, "Taxes") with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such Taxes exceed the amount of Taxes that would have been imposed on such amounts had all of the services performed by the Executive under this Agreement been performed within the United States. Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any penalties or interest that are imposed on the Executive by Revenue Canada, the United States Federal government or any state or local taxing authority in Canada or the United States as a result of Imax's failure to properly withhold any tax with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such penalties or interest are not attributable to the failure of the Executive to file any required tax returns or pay any required taxes or any other willful act or omission of the Executive.

6. Binding Effect. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto, any successors to or permitted assigns of the parties hereto.

7. Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and either delivered in person or sent by first class certified or registered mail, postage prepaid, to the parties at the following address (or to such other address or addresses as either party shall have designated in writing to the other party hereto:)

(a) if to Imax:

2525 Speakman Drive
Mississauga, Ontario, Canada
L5K 1B1
Attention: General Counsel

(b) if to the Executive:

784 Park Avenue, Apt 7B
New York, NY, 10028

8. Severability; Waiver. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such provision nor the validity of any other provision of this Agreement shall in any way be affected thereby. Failure to insist upon strict compliance with any term, covenant or condition hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

9. Injunctive Relief. Without intending to limit the remedies available to Imax or the Executive, as the case may be, in the event of a breach or threatened breach of any of the covenants contained in this Agreement, Imax or the Executive, as the case my be, shall be entitled to seek such injunctive relief as may be required specifically to enforce any such covenant.

10. Miscellaneous. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and, from the effective date hereof, supersedes and terminates all prior agreements, oral and written, between the parties hereto with respect to the subject matter hereof. Notwithstanding the preceding sentence, nothing in this Agreement shall abrogate the Executive's entitlement to (i) the 45,000 (post-split) Restricted Stock / "phantom stock" granted pursuant to Section 1(g) of the 1997 Agreement, as reduced from 60,000 (post-split) pursuant to Section 1(g) of this Agreement, (ii) the 40,000 options (for 80,000 post-split shares) granted January 2, 1997 and the 80,000 options (for 80,000 post-split shares) granted January 2, 1998, or (iii) the Special Bonus (as defined in Section 1(g) of the Employment Agreement between Imax and the Executive dated as of March 1, 1994) payable after a sale of Imax or upon the exercise of the Executive's liquidation rights. Further, for so long as the Executive is the Co-CEO, Imax shall continue to use its best efforts to cause the Executive to be elected to the Board and, for so long as Imax continues to have CEO Advisors, to the designation as a CEO Advisor under Imax's by-laws, provided that nothing in this sentence shall abrogate any rights the Executive may have pursuant to any other agreement. This Agreement may be modified or amended only by an instrument in writing signed by both parties hereto. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Imax and the Executive have duly executed and delivered this Agreement, as of the day and year first above written, on this 3rd day of November, 1998.

IMAX CORPORATION

By: *"Garth M. Girvan"*

Garth M. Girvan
Director

By: *"John M. Davison"*

John M. Davison
Executive Vice President, Operations
and Chief Financial Officer

EXECUTIVE

*"Bradley J. Wechsler* *l.s.*
BRADLEY J. WECHSLER

# IMAX CORPORATION

Exhibit 10.4

Amended Employment Agreement

Imax (the "Company") and Executive subject to Section 5(e) here, agree to cancel the last year of the term of employment of the Executive's employment agreement dated July 1, 1998 ("Original Employment Contract") and extend the employment term for three additional years with the new term from July 1, 2000 to June 30, 2003 (the "Amended Contract") on the same terms and conditions as set out in the Original Employment Contract, except as specified below. Terms used herein and not defined herein shall have the meanings assigned to them in the Original Employment Contract.

1. Cash Compensation – As set out in the Original Employment Contract.

2. Additional Option Grants – The Company agrees to issue Executive 800,000 ten-year options at a strike price equal to the closing price on the day the Board approves this agreement. Except as provided below, options will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.

3. Restricted Stock Grant – The Company agrees to issue 180,000 restricted shares (or their Phantom Stock equivalent) to Executive on the day the Board approves this agreement. Except as provided below, restricted stock will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.

4. Should any required regulatory or shareholder approvals with respect to the granting of the options or restricted stock not be obtained by the Company, the Company shall make such adjustments to the Executive's compensation hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received.

5. Change of Control Provisions

   (a) In the event of a Change of Control (without regard of any subsequent event) there will be accelerated vesting of the Executive's stock options and restricted stock.

   (b) In the event of a Change Of Control and subsequent termination (or constructive termination) of the Executive there will be an acceleration (without any discount to present value) of the cash component of Executive's compensation under the Amended Contract (and the Original Employment Agreement if the renewal term has not yet commenced) equal to the number of years left on the Executive's

agreements (including a fraction thereof) times the total cash compensation of the Executive for the full (i.e., 12 month) fiscal year preceding termination.

(c) If there is a Change of Control by way of stock merger the options will vest (as set out in 5(a) directly above) and be converted at the stock merger conversion ratio into options of the acquiring company (if it is public) or a cash-out of the options (if it is not public).

(d) A change of control is defined as any person or persons acting in concert acquiring beneficial ownership of greater than 50% of the outstanding common shares of the Company, whether by direct or indirect acquisition or as a result of a merger or reorganization or a sale of all or substantially all of the Company's assets and will not include sale of the WP block to one or more third parties.

(e) If there is no Change of Control by 12/31/00, the contract extension component of this Amended Contract shall become void but the options and restricted stock grants included in this Amended Contract become fully vested upon the earlier of a Change of Control subsequent to 12/31/00, termination, non-renewal, constructive termination or 6/30/01. In addition, if there is no change of Control by 12/31/00, the term of the Original Employment Agreement shall be reinstated whereby Executive shall continue to render services to Company until 6/30/01.

6. Voluntary Resignation, Termination, Etc.

(a) If the Executive shall voluntarily resign, all unvested options and restricted stock shall be cancelled immediately and all vested options shall remain exercisable for the duration of their original term.

(b) If the Executive shall be terminated without cause all unvested stock options, restricted stock and cash compensation (salary and bonus without any discount to present value as described in section 5(b) above) shall immediately vest and become due.

(c) If the Executive shall be terminated for Cause all unvested options and unvested restricted stock (including those granted pursuant to previous employment agreements between Company and Executive) shall be cancelled immediately and all of the Executive's options and restricted stock must be exercised within 90 days of termination, after which date they shall be cancelled.

7. Retirement and Long Term Health Coverage

(a) The Company agrees to create a retirement plan for the Executive as set out in Exhibit 1.

(b) Company agrees to maintain retiree health benefits for Executive upon termination of the Executive's employment equal to the benefits provided for active employees until the Executive becomes eligible for Medicare and, thereafter, Medicare supplement coverage selected by Executive.

8. Restrictions on Competitive Employment – As agreed upon in the Original Employment Contract; however, the term of the Non-Compete shall be extended to four (4) years beyond termination of employment.

9. Consultancy – At the end of Executive's employment (for whatever reason), Executive agrees to consult with Company for a period of three years on such issues and items as requested by Company, including but not limited to theater signings, management issues, film strategy issues, technological issues and/or issues with respect to management transition subject to the Executive's other commitments.

10. Incorporation by Reference – All clauses in the Original Employment Contract will remain in full force and effect unless specifically amended in this agreement. In the event of any conflict between the Original Employment Contract and the Amended Contract, the Amended Contract shall prevail.

11. Arbitration – All disputes under this agreement shall be subject to binding arbitration under the AAA rules and Company shall be required to cover Executive's legal costs and the cost of arbitration.

12. Long Form Agreement – Until such time as this agreement is superceded by a long form agreement, it will represent the binding agreement for both parties.

| Bradley J. Wechsler | Imax Corporation |
| --- | --- |
| *"Bradley J. Wechsler"* | *"Garth M. Girvan"* |
| | By: Garth M. Girvan |

7/12/00
Date

**EXHIBIT 1**

SERP Benefit Summary
Brad Wechsler
Imax Corporation

Retirement Age – Age 55

SERP Benefit – Retirement and Survivor Benefits

Retirement Benefit – 73.5% of final five-year average full cash compensation (including bonus)

Survivor Benefit – 100% of Retirement Benefit

Death Benefit – Survivor Benefit

Disability Benefit – SERP Benefit

Severance Benefits –

Change of Control - SERP Benefit

Termination – SERP Benefit

Resignation – SERP Benefit, according to the
Following Vesting Schedule:
50% vested, plus 50% spread over the
remaining working years to age 55

For Cause – Loss of Benefits

Cost of Living Adjustment – Applies to the Retirement and Survivor Benefits
At a rate according to the published Cost of Living Tables
(For illustrative purposes at 3.0% per annum)

# IMAX CORPORATION
## Exhibit 10.7

EMPLOYMENT AGREEMENT dated and effective as of July 1, 1998 (the "Agreement"), between IMAX CORPORATION, a corporation organized under the laws of Canada ("Imax"), and RICHARD L. GELFOND (the "Executive").

WHEREAS, the Executive is currently the Vice-Chairman and Co-Chief Executive Officer of Imax and is employed pursuant to an Employment Agreement dated as of January 1, 1997, (the "1997 Agreement"); and

WHEREAS, the Imax Board of Directors (the "Board") has approved revised terms of employment, effective July 1, 1998, on August 26, 1998; and

WHEREAS, Imax wishes to enter into this Agreement to engage the Executive to continue to provide services to Imax, and the Executive wishes to be so engaged, pursuant to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

1. <u>Employment.</u> (a) Imax hereby employs the Executive, and the Executive hereby agrees to serve in accordance with the terms and conditions hereof.

(b) The Executive's continued employment as Co-Chief Executive Officer under this Agreement shall commence effective July 1, 1998, and shall continue until June 30, 2001 (the "Employment Term").

(c) During the Employment Term, the Executive shall perform such services with respect to Imax's business as may be reasonably requested from time to time by the Board and which are consistent with the Executive's status and the function performed by individuals holding a similar position with similarly situated companies, and agrees to act in accordance with the written instructions of the Board. It is anticipated that such services shall be performed primarily within the United States.

(d) The Executive shall devote that portion of his business time that is necessary to perform the services reasonably required of him hereunder, which portion shall constitute a significant majority of his business time. The Executive agrees that during the Employment Term (i) he will use reasonable efforts to resolve any conflicting

engagements and (ii) he will remain actively involved in Imax's business.

(e) As compensation for the services to be performed by the Executive hereunder during the Employment Term, the Executive shall be entitled to receive a base salary ("Base Salary") of U.S. $500,000 per annum, payable no less frequently than monthly in accordance with Imax's payroll practices.

(f) In addition to the Base Salary, the Executive shall be eligible to participate during the Employment Term in the annual incentive bonus plan adopted by the Board. The Executive shall be paid a bonus in respect of each of 1998, 1999, 2000 and the period January 1, 2001 to June 30, 2001 at a level of U.S. $605,000, U.S. $500,000, U.S. $500,000, and U.S. $250,000 (subject to adjustment as described below), respectively, (the "Standard"). Based on certain qualitative and quantitative measures determined by the CEO Advisors (as defined in Imax's Articles of Incorporation), for so long as Imax continues to have CEO Advisors, and the Compensation Committee (the "Committee") of the Board, as set forth below, the Committee shall determine the actual bonus paid, which shall be a multiple of the Standard ranging from 0.0x - 2.0 x, provided, however, that the multiple shall be at least 1.0x if Imax's reported earnings per share (EPS) for the year (excluding any extraordinary charges approved by the Board), or the six months ended June 30, 2001, as the case may be, meet the approved budget target (except that, if in the sole discretion of the Committee, the achievement EPS target was at the expense of, or to the material detriment of, other(s) of the qualitative and quantitative measures set forth below, then such minimum shall not apply).

Among the various factors the Committee shall consider in determining the bonus to be paid for 1998, and, subject to amendment from year to year by the Committee, after good faith consultation with the Executive, for 1999, 2000 and 2001, are: (i) the actual financial performance of Imax versus the approved budget for EBITDA, EPS, revenue growth, and/or other financial targets; and (ii) the Committee shall also take into account other qualitative factors including (in no order of importance): (A) progress in theater signings, (B) development of an enhanced management team, (C) improved performance of the Ridefilm division (for 1998 only), (D) further advancement of Imax's film strategy, (E) progress in "owned and operated" strategy (this factor to have diminishing weighting beyond 1998, as Imax's "owned and operated" emphasis refocuses on theatre joint ventures with conventional cinema operators), (F) brand development, (G) continued growth of the business, and (H) other performance related issues including, but not limited to, other goals established in the budget process approved by the Board.

The bonus for 1998, 1999 and 2000 shall be paid within 50 days of the applicable year-end, and for the period January 1, 2001 to June 30, 2001 within 50 days of June 30, 2001.

(g) Pursuant to the 1997 Agreement, at the beginning of each of 1997 and 1998, Imax granted the Executive the right to receive 30,000 common shares (on a post-split basis) of Imax (the "Restricted Stock"), or, if such Restricted Stock may not be issued without shareholder approval, the 1997 Agreement provided it shall be issued as "phantom stock". The Executive has the right to request the Restricted Stock granted on January 1, 1997 and January 1, 1998 be issued to him (or, if "phantom stock" is utilized, have payment made to him in an amount equal to the fair market value of such number of common shares of Imax on the date of such request), at any time after January 1, 1998 and January 1, 1999, respectively. It is hereby agreed that one half (i.e. 15,000) of such Restricted Stock / "phantom stock" for 1998 shall be cancelled forthwith, and that the Executive shall continue to have the right to the 30,000 Restricted Stock / "phantom stock" that have vested, and the remaining 15,000 Restricted Stock / "phantom stock" that shall vest on January 1, 1999. The Restricted Stock / "phantom stock" shall be adjusted for stock splits and other similar events. Imax agrees to indemnify the Executive, on an after-tax basis, for any income taxes imposed by any taxing authority and resulting from any taxable benefits to the Executive with respect to the Restricted Stock / "phantom stock" which arises prior to the date of any such request (it being understood that this indemnity relates to the timing of the payment of such taxes and not the ultimate tax payable). Any request for payment with respect to "phantom stock" must be made on or before December 31, 2009, after which date such "phantom stock" shall lapse. The provisions of this Section 1(g) shall survive any termination of this Agreement.

(h) *Stock Options – Grant & Vesting.* The Executive has been granted effective August 26, 1998, in accordance with the terms of the Imax Stock Option Plan (the "SOP"), 378,000 options to purchase common shares, and effective January 1, 1999 shall be granted a further 400,000 options, as follows:

| Number of Options | Grant Date | Exercise Price | Vesting Date |
|---|---|---|---|
| 111,333 | August 26, 1998 | $22.38 | August 26, 1998 |
| 100,000 | August 26, 1998 | $22.38 | January 1, 1999 |
| 166,667* | August 26, 1998 | $22.38 | January 1, 1999 |
| 266,667* | January 1, 2000 | to be determined | January 1, 2000 |
| 133,333* | January 1, 2000 | to be determined | January 1, 2001 |
| 778,000 | | | |

* These options are subject to Imax obtaining any required regulatory and shareholder approvals.

The exercise price of all options granted on August 26, 1998 in accordance with the SOP is U.S. $22.38, and all such options shall expire on August 25, 2008. The exercise price of all options to be granted on January 1, 2000 shall be determined in accordance with the SOP, and all such options shall expire on December 31, 2009. Should any required

regulatory or shareholder approvals with respect to the granting of the 566,667 options subject thereto not be obtained by Imax, Imax shall make such adjustments to the Executive's compensation hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received. The provisions of this Section 1(h) shall survive any termination of this Agreement.

All of the Executive's stock options shall be adjusted for stock splits and other similar events after the effective date hereof and shall contain other terms no less favorable to the Executive than the management stock options of Imax's other senior level executives.

*Resignation / Termination.* If the Executive shall voluntarily resign prior to the end of the Employment Term, (i) all unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately upon such resignation, and (ii) all vested options shall remain exercisable for the duration of their original term.

If (i) the employment of the Executive is not continued after the end of the Employment Term, (ii) the Executive is terminated by Imax without "Cause" (as defined below), or (iii) the Executive suffers a "Permanent Disability" (as defined in the SOP), or dies: all options granted on or before August 26, 1998 shall remain exercisable for the duration of their original term.

*Change of Control.* Upon a "change of control" of Imax (i.e. any person or persons acting in concert acquiring greater than 50% of the outstanding common shares of Imax, whether by direct or indirect acquisition or as a result of a merger or reorganization), the vesting of the options granted on August 26, 1998 and/or January 1, 1999 shall be accelerated as follows:

| Change of Control Period | % of Options Subject to Accelerated Vesting |
|---|---|
| On or Prior to December 31, 1998 | 12.5% of options scheduled to vest on January 1, 1999 |
| January 1, 1999 to June 30, 1999 | 25% of options scheduled to vest on January 1, 2000 * |
| July 1, 1999 to December 31, 1999 | 50% of options scheduled to vest on January 1, 2000 * |
| January 1, 2000 to June 30, 2000 | 25% of options scheduled to vest on January 1, 2001 |
| July 1, 2000 to December 31, 2000 | 50% of options scheduled to vest on January 1, 2001 |

* If a "change of control" occurs prior to the grant of such options on January 1, 2000, stock appreciation rights ("SARs") equivalent in number to the options subject to accelerated vesting shall be granted, with a reference price of U.S. $22.38, and an expiry date of December 31, 2009. The SARs shall be treated, in connection with a "change of control", in the same manner as if they were options (i.e. a cash offer for all shares and

options would trigger a payout of the SARs; a "rollover" of options would result in the continuation of the SARs, reflecting the relevant exchange ratio and with reference to the price of the substituted shares).

*Miscellaneous.* If the Executive is terminated with "Cause", the Executive's unvested options (including those granted pursuant to previous employment agreements between Imax and the Executive) shall be cancelled immediately, and all of the Executive's vested options must be exercised within 90 days of termination, after which date they shall be cancelled. "Cause" for purposes of this Section 1(g) only means any willful and material violation by the Executive of any law or regulation applicable to the business of Imax or one of its subsidiaries, or the Executive's conviction of a felony, or any willful perpetration by the Executive of a common law fraud. Imax's remedy for a "breach of restrictive covenants" shall be the specific enforcement thereof, and not the application of Section 14 of the SOP; and Imax shall be entitled to seek any other legal and equitable remedies it may have against the Executive. In the event of any conflict between the provisions of this Agreement and the provisions of the SOP, the provisions of this Agreement shall prevail.

(i) The Executive shall, during the Employment Term, be eligible to receive employee benefits at a level not less than those established by Imax for, or made available to, its other key employees.

(j) Imax agrees to reimburse the Executive for all reasonable out-of-pocket expenses incurred by the Executive in the performance of his obligations under this Agreement for which documentation reasonably satisfactory to Imax is provided, including expenses relating to the Executive's travel to, and performance of duties in, Toronto, Canada.

(k) Any amounts payable to the Executive under this Agreement shall be subject to applicable withholding taxes, and such other deductions as may be required under applicable law.

2. <u>Restrictions on Competitive Employment.</u> During the term of the Executive's employment hereunder, absent Imax's prior written approval, the Executive shall not (as principal, agent, employee, consultant or otherwise), directly or indirectly, engage in activities with, or render services to, any business engaged or about to become engaged in the business of producing or distributing projection and sound systems or films for large screen theaters or designing or supplying motion simulation theaters or producing or distributing films for movie rides (collectively, "<u>Competitive Business</u>"); <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, the Executive may (i) have equity interests in companies engaged in a Competitive Business so long as he is not employed by and does not consult with such companies in areas related to the

Competitive Business, (ii) render consulting services to or be employed by a company engaged in a Competitive Business so long as he is not employed in, or rendering services related to, the Competitive Business of such company or (iii) perform usual investment banking services for a company engaged in a Competitive Business.

3. Confidentiality. The Executive covenants and agrees with Imax that he will not at any time, except in performance of his obligations to Imax hereunder or with the prior written consent of Imax, directly or indirectly, disclose any secret or confidential information that he may learn or has learned by reason of his association with Imax or any of its subsidiaries. The term "confidential information" includes information not previously disclosed to the public or to the trade by Imax's management, or otherwise in the public domain, with respect to Imax's or any of its subsidiaries' products, facilities, applications and methods, trade secrets and other intellectual property, systems, procedures, manuals, confidential reports, product price lists, customer lists, technical information, financial information, business plans, prospects or opportunities, but shall exclude any information which (i) is or becomes available to the public or is generally known in the industry or industries in which Imax operates other than as a result of disclosure by the Executive in violation of his agreements under this Section 3 or (ii) the Executive is required to disclose under any applicable laws, regulations or directives of any government agency, tribunal or authority having jurisdiction in the matter or under the subpoena or other process of law.

4. Assignment. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by the Executive without the prior written consent of Imax. Neither this Agreement nor any right, interest or obligation hereunder shall be assignable by Imax without the prior written consent of the Executive, except that Imax may assign this Agreement or any such right, interest or obligation to an affiliate of Imax without consent of the Executive; provided, however, that no such assignment shall relieve Imax of any of its obligations hereunder.

5. Indemnification. (a) Imax shall hold the Executive harmless and indemnify the Executive, to the fullest extent permitted by applicable law, against any and all liabilities (and all expenses related thereto) incurred by the Executive as a result of, or in connection with, the services provided under this Agreement; provided, however, that such indemnification shall not apply with respect to any action taken by the Executive that (i) is contrary to the written instructions of the Board or (ii) constitutes gross negligence or willful misconduct. Imax shall maintain a director and officer's liability insurance policy covering the Executive and containing customary terms and conditions.

(b) Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any income taxes imposed by

Revenue Canada, the United States Federal government or any state or local taxing authority in Canada or the United States (collectively, "Taxes") with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such Taxes exceed the amount of Taxes that would have been imposed on such amounts had all of the services performed by the Executive under this Agreement been performed within the United States. Imax shall hold the Executive harmless and indemnify the Executive, on an after-tax basis, against the amount of any penalties or interest that are imposed on the Executive by Revenue Canada, the United States Federal government or any state or local taxing authority in Canada or the United States as a result of Imax's failure to properly withhold any tax with respect to any amounts payable to the Executive under Section 1 of this Agreement, to the extent such penalties or interest are not attributable to the failure of the Executive to file any required tax returns or pay any required taxes or any other willful act or omission of the Executive.

6. Binding Effect. This Agreement shall inure to the benefit of, and be binding upon, the parties hereto, any successors to or permitted assigns of the parties hereto.

7. Notices. Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and either delivered in person or sent by first class certified or registered mail, postage prepaid, to the parties at the following address (or to such other address or addresses as either party shall have designated in writing to the other party hereto:)

(a) if to Imax:

2525 Speakman Drive
Mississauga, Ontario, Canada
L5K 1B1
Attention: General Counsel

(b) if to the Executive:

975 Park Avenue, Apt 6B
New York, NY, 10028

8. Severability; Waiver. If any provision of this Agreement shall be determined to be invalid, illegal or unenforceable in whole or in part, neither the validity of the remaining part of such provision nor the validity of any other provision of this Agreement shall in any way be affected thereby. Failure to insist upon strict compliance with any term, covenant or condition hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times.

9. Injunctive Relief. Without intending to limit the remedies available to Imax or the Executive, as the case may be, in the event of a breach or threatened breach of any of the covenants contained in this Agreement, Imax or the Executive, as the case my be, shall be entitled to seek such injunctive relief as may be required specifically to enforce any such covenant.

10. Miscellaneous. This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and, from the effective date hereof, supersedes and terminates all prior agreements, oral and written, between the parties hereto with respect to the subject matter hereof. Notwithstanding the preceding sentence, nothing in this Agreement shall abrogate the Executive's entitlement to (i) the 45,000 (post-split) Restricted Stock / "phantom stock" granted pursuant to Section 1(g) of the 1997 Agreement, as reduced from 60,000 (post-split) pursuant to Section 1(g) of this Agreement, (ii) the 40,000 options (for 80,000 post-split shares) granted January 2, 1997 and the 80,000 options (for 80,000 post-split shares) granted January 2, 1998, or (iii) the Special Bonus (as defined in Section 1(g) of the Employment Agreement between Imax and the Executive dated as of March 1, 1994) payable after a sale of Imax or upon the exercise of the Executive's liquidation rights. Further, for so long as the Executive is the Co-CEO, Imax shall continue to use its best efforts to cause the Executive to be elected to the Board and, for so long as Imax continues to have CEO Advisors, to the designation as a CEO Advisor under Imax's by-laws, provided that nothing in this sentence shall abrogate any rights the Executive may have pursuant to any other agreement. This Agreement may be modified or amended only by an instrument in writing signed by both parties hereto. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

11. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein without regard to principles of conflicts of laws.

IN WITNESS WHEREOF, Imax and the Executive have duly executed and delivered this Agreement, as of the day and year first above written, on this 3rd day of November, 1998.

IMAX CORPORATION

By: *"Garth M. Girvan"*

Garth M. Girvan
Director

By: *"John M. Davison*

John M. Davison
Executive Vice President, Operations
and Chief Financial Officer

EXECUTIVE

*"Richard L. Gelfond"* *l.s.*
RICHARD L. GELFOND

# IMAX CORPORATION

Exhibit 10.8

Amended Employment Agreement

Imax (the "Company") and Executive, subject to Section 5(e) hereof, agree to cancel the last year of the term of employment of the Executive's employment agreement dated July 1, 1998 ("Original Employment Contract") and extend the employment term for three additional years with the new term from July 1, 2000 to June 30, 2003 (the "Amended Contract") on the same terms and conditions as set out in the Original Employment Contract, except as specified below. Terms used herein and not defined shall have the meanings assigned to them in the Original Employment Contract.

1. Case Compensation – As set out in the Original Employment Contract.

2. Additional Option Grants – The Company agrees to issue Executive 800,000 ten-year options at a strike price equal to the closing price on the day the Board approves this agreement. Except as provided below, options will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.

3. Restricted Stock Grant – The Company agrees to issue 180,000 restricted shares (or their Phantom Stock equivalent) to Executive on the day the Board approves this agreement. Except, as provided below, restricted stock will vest 1/3 on January 1, 2001, 1/3 on July 1, 2001, and 1/3 on July 1, 2002.

4. Should any required regulatory or shareholder approvals with respect to the granting of the options or restricted stock not be obtained by the Company, the Company shall make such adjustments to the Executive's compensation, hereunder as will put the Executive in the same after-tax financial position as he would have been if such approvals had been received.

5. Change of Control Provisions

   (a) In the event of a Change of Control (without regard to any subsequent event) there will be accelerated vesting of the Executive's stock options and restricted stock.

   (b) In the event of a Change of Control and subsequent termination (or constructive termination) of the Executive there will be an acceleration (without any discount to present value) of the cash component of Executive's compensation under the Amended Contract (and the Original Employment Agreement if the renewal term has not yet commenced) equal to the number of years left on the Executive's agreements (including a fraction thereof) times the total cash compensation of the Executive for the full (i.e., 12 month) fiscal year preceding termination.



[New York #835746 v1]

(c) If there is a Change of Control by way of stock merger the options will vest (as set out in 5(a) directly above) and be converted at the stock merger conversion ratio into options of the acquiring company (if it is public) or a cash-out of the options (if it is not public).

(d) A change of control is defined as any person or persons acting in concert acquiring beneficial ownership of greater than 50% of the outstanding common shares of the Company, whether by direct or indirect acquisition or as a result of a merger or reorganization or a sale of all or substantially all of the Company's assets and will not include sale of the WP block to one or more third parties..

(e) If there is no Change of Control by 12/31/00, the contract extension component of this Amended Contract shall become void but the options and restricted stock grants included in this Amended Contract become fully vested upon the earlier of a Change of Control subsequent to 12/31/00, termination, non-renewal, constructive termination or 6/30/01. In addition, of there is no Change of Control by 12/31/00, the term of the Original Employment Agreement shall be reinstated whereby Executive shall continue to render services to Company until 6/30/01.

6. Voluntary Resignation, Termination, Etc.

(a) If the Executive shall voluntarily resign, all unvested options and restricted stock shall be cancelled immediately and all vested options shall remain exercisable for the duration of their original term.

(b) If the Executive shall be terminated without cause all unvested stock options, restricted stock and cash compensation (salary and bonus without any discount to present value as described in section 5(b) above) shall immediately vest and become due.

(c) If the Executive shall be terminated for Cause all unvested options and unvested restricted stock (including those granted pursuant to previous employment agreements between Company and Executive) shall be cancelled immediately and all of the Executive's options and restricted stock must be exercised within 90 days of termination, after which date they shall be cancelled.

7. Retirement and Long Term Health Coverage

(a) The Company agrees to create a retirement plan for the Executive as set out in Exhibit 1.

(b) Company agrees to maintain retiree health benefits for Executive upon termination of the Executive's employment equal to the benefits provided for active employees until the Executive becomes eligible for Medicare and, thereafter, Medicare supplement coverage selected by Executive.

8. Restrictions on Competitive Employment – As agreed upon in the Original Employment Contract; however, the term of the Non-Compete shall be extended to four (4) years beyond termination of employment.

9. Consultancy – At the end of Executive's employment (for whatever reason), Executive agrees to consult with Company for a period of three years on such issues and items as requested by Company, including but not limited to theatre signings, management issues, film strategy issues, technological issues and/or issues with respect to management transition subject to the Executive's other commitments.

10. Incorporation by Reference – All clauses in the Original Employment Contract will remain in full force and effect unless specifically amended in this agreement. In the event of any conflict between the Original Employment Contract and the Amended Contract, the Amended Contract shall prevail.

11. Arbitration – All disputes under this agreement shall be subject to binding arbitration under the AAA Rules and Company shall be required to cover Executive's legal costs and the cost of arbitration.

12. Long Form Agreement – Until such time as this agreement is superceded by a long form agreement, it will represent the binding agreement for both parties.

Richard L. Gelfond

*"Richard L. Gelfond"*

Imax Corporation

*"Garth M. Girvan"*
By: Garth M. Girvan

7/12/00
Date



[New York #835746 v1]

**EXHIBIT 1**

SERP Benefit Summary
Richard Gelfond
Imax Corporation

Retirement Age – Age 55

SERP Benefit – Retirement and Survivor Benefits

Retirement Benefit – 76.5% of final five-year average full cash compensation (including bonus)

Survivor Benefit – 100% of Retirement Benefit

Death Benefit – Survivor Benefit

Disability Benefit – SERP Benefit

Severance Benefits –

Change of Control – SERP Benefit

Termination – SERP Benefit

Registration – SERP Benefit, according to the following Vesting Schedule;
50% vested, plus 50% spread over the remaining working years to age 55

For Cause – Loss of benefits

Cost of Living Adjustment – Applies to the Retirement and Survivor Benefits
At a rate according to the published Cost of Living Tables
(For illustrative purposes at 3.0% per annum)

# IMAX CORPORATION
## Exhibit 10.15

IMAX CORPORATION
2525 Speakman Drive, Sheridan Park
Mississauga, Ontario, Canada L5K 1B1

| | |
|---|---|
| To: | Robert D. Lister |
| From: | Rich Gelfond and Brad Wechsler |
| Date: | August 21, 2000 |

As we discussed a few weeks back, among our top priorities as we go through the process of evaluating potential strategic options for the Company is the retention of our key members. Toward this end, we are providing our most valuable employees with incentives to remain with the Company during this process and to be committed to, and focused on, advancing the business and supporting our continued operations. Thus, the Company is pleased to provide you the following package of incentive payments and benefits, on and subject to the terms and conditions set forth below. Please read these terms and feel free to call us or Mary Sullivan with any questions you may have.

**2000 Bonus:** We are committing that the Company's management bonus plan will be honored this year and bonuses for the calendar year 2000 will be paid in accordance with past practice. If there is a Change of Control of the Company during 2000, we will ensure that any successor commits to honoring the management bonus plan for your calendar year 2000 bonus.

**Retention Bonus:** You shall be eligible to receive a retention bonus of up to a total of US$215,000, based upon the following terms: (a) On July 1, 2001, you shall receive US$107,500, provided that you have not resigned from the Company or been terminated For Cause prior thereto, regardless of whether there has been a Transaction; (b) if there is a Transaction, and you are terminated Without Cause after July 1, 2001, but within two (2) years of the completion of the Transaction, you shall receive (in addition to the July 1 payment) an additional US$107,500; (c) if there is a Transaction and you are terminated Without Cause prior to July 1, 2001, you shall receive (in lieu of the July 1 payment) US$215,000.

**Severance:** If a Transaction occurs and you are terminated Without Cause by the Company within two (2) years after the completion of the Transaction, you will be entitled to a severance benefit at least equal to six (6) months of your base salary (at the time of such termination). This benefit will be payable, at the Company's option, in either a lump sum or by salary continuation in accordance with the Company's normal payroll procedures. This payment shall be in addition to any bonus that may be payable to you pursuant to the preceding paragraph. In the event you are entitled to other benefits in the nature of severance, whether under contract or law, the severance benefit payable under this paragraph shall be offset by the amount of such other severance benefits.

The Company will require any successor to expressly assume and agree to perform the obligations under this letter agreement.

Please make sure you have read the above and the attached terms and conditions and indicate your agreement with all of such terms and conditions by executing this letter agreement in the space provided below and returning it to Mary Sullivan.

Sincerely,

IMAX Corporation

*"Bradley J. Wechsler"*

By: Bradley J. Wechsler
Title: Co-Chief Executive Officer

Agreed to and accepted,
this 23rd day of August 2000:

*"Robert D. Lister"*
Robert D. Lister

**Terms and Conditions of Retention Incentive Package**

Definitions:

For purposes of this letter agreement, a **"Change of Control"** of the Company will be deemed to occur if (a) (i) there is a sale of more than 50% of the assets of the Company to a third party (other than to a person or group including Brad Wechsler or Rich Gelfond); or (ii) any person or group (other than a person or group including Brad Wechsler or Rich Gelfond) acquires 50% or more of the voting power of the outstanding stock of the Company or the shareholders of the Company immediately prior to any corporate transaction cease to own at least 50% of the voting power of the outstanding stock of the surviving entity (any of the above, a **"Transaction"**); and (b) immediately after the Transaction is completed, Brad Wechsler and Rich Gelfond either (i) are no longer co-CEOs of the Company or (ii) do not have the power to determine your year-end bonus for calendar year 2000.

For purposes of this letter agreement, termination **"Without Cause"** shall mean termination of your employment for any reason or no reason, including by virtue of the Company's decision not to renew or extend your employment agreement, other than For Cause

For purposes of this letter agreement, termination **"For Cause"** shall have the same meaning as defined in your employment agreement, and shall include as further grounds your breaching of the confidentiality provision of this letter agreement.

Legal Terms and Conditions:

The payments and benefits referred to herein are one-time-only payments and benefits, applicable to just one (1) Transaction and not to any subsequent such event.

The terms of this letter agreement are strictly confidential. Your disclosure of these terms to any other person (aside from your immediate family, your legal or other financial advisors or as required by law) shall subject you to the revocation of any or all of the payments and benefits provided herein, at the sole discretion of the Company.

This letter agreement, together with your employment agreement, shall constitute the entire agreement between the parties hereto with respect to the subject matter of benefits in connection with a Change of Control or Transaction, and all promises, representations, understandings, arrangements and prior arrangements relating to such subject matter are merged and superseded by such agreements.

Any payments made under this letter agreement shall be subject to all applicable federal, state, city or other taxes required under relevant law.

This letter agreement shall be binding on and inure to the benefit of the Company and its successors and permitted assigns. This agreement shall also be binding on and inure to the benefit of you and your heirs, executors, administrators and legal representatives.

# IMAX CORPORATION
## Exhibit 21
### Subsidiaries of IMAX Corporation

Significant and other major subsidiary companies of the Registrant, as at December 31, 2006, comprise of the following:

| Name of Subsidiary | Jurisdiction of Organization | Percentage held by Registrant |
|---|---|---|
| 3D Sea II Ltd. | Ontario | 100% |
| Acorn Rain Productions Ltd. | Canada | 100% |
| Big Engine Films Inc. | Delaware | 100% |
| Conversion Films Ltd. | Canada | 100% |
| David Keighley Productions 70MM Inc. | Delaware | 100% |
| Feathered Films Ltd. | Canada | 100% |
| Great Ant Productions Ltd. | Canada | 100% |
| IMAX (Netherlands) B.V. | Netherlands | 100% |
| IMAX Chicago Theatre LLC | Delaware | 100% |
| IMAX II U.S.A. Inc. | Delaware | 100% |
| IMAX Indianapolis LLC | Indiana | 100% |
| IMAX Japan Inc. | Japan | 100% |
| IMAX Minnesota Holding Co. | Delaware | 100% |
| IMAX Rhode Island Limited Partnership | Rhode Island | 100% |
| IMAX Scribe Inc. | Delaware | 100% |
| IMAX Space Ltd. | Ontario | 100% |
| IMAX Theatre Holding Co. | Delaware | 100% |
| IMAX Theatre Holdings (OEI) Inc. | Delaware | 100% |
| IMAX Theatre Management Company | Delaware | 100% |
| IMAX Theatre Services Ltd. | Ontario | 100% |
| IMAX U.S.A. Inc. | Delaware | 100% |
| Miami Theatre LLC | Delaware | 100% |
| Nyack Theatre LLC | New York | 100% |
| Parker Pictures Ltd. (formerly Mitey Cinema Inc.) | Ontario | 100% |
| Ridefilm Corporation | Delaware | 100% |
| RPM Pictures Ltd. | Ontario | 100% |
| Sacramento Theatre LLC | Delaware | 100% |
| Sonics Associates, Inc. | Alabama | 100% |
| Starboard Theatres Ltd. | Canada | 100% |
| Tantus Films Ltd. | Canada | 100% |
| Tantus II Films Ltd. | Ontario | 100% |
| Taurus-Littrow Productions Inc. | Delaware | 100% |
| Walking Bones Pictures Ltd. | Canada | 100% |

# IMAX CORPORATION
## Exhibit 23

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in (i) the Registration Statements on Form S-8 (No. 333-2076; No. 333-5720; No. 333-30970; No. 333-44412), (ii) the Post-Effective Amendment No.1 to Form S-8 (No. 333-5720) as amended, and (iii) Registration Statement on Form S-8 (No. 333-134811) of IMAX Corporation of our report dated July 20, 2007, relating to the financial statements, financial statement schedules, management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

PricewaterhouseCoopers LLP
Toronto, Ontario
July 20, 2007

# POWER OF ATTORNEY

Each of the persons whose signature appears below hereby constitutes and appoints Edward MacNeil and Robert D. Lister, and each of them severally, as his true and lawful attorney or attorneys with power of substitution and re-substitution to sign in his name, place and stead in any and all such capacities the 10-K, including the French language version thereof, and any and all amendments thereto and documents in connection therewith, and to file the same with the United States Securities Exchange Commission (the "SEC") and such other regulatory authorities as may be required, each of said attorneys to have power to act with and without the other, and to have full power and authority to do and perform, in the name and on behalf of each of the directors of the Corporation, every act whatsoever which such attorneys, or either of them, may deem necessary of desirable to be done in connection therewith as fully and to all intent and purposes as such directors of the Corporation might or could do in person.

Dated this 20th day of July, 2007

| Signature | Title |
|---|---|
| *"Richard L. Gelfond"*<br>Richard L. Gelfond | Co-Chairman and Co-Chief Executive Officer<br>(Principal Executive Officer) |
| *"Bradley J. Wechsler"*<br>Bradley J. Wechsler | Co-Chairman and Co-Chief Executive Officer<br>(Principal Executive Officer) |
| *"Neil S. Braun"*<br>Neil S. Braun | Director |
| *"Kenneth G. Copland"*<br>Kenneth G. Copland | Director |
| *"Garth M. Girvan"*<br>Garth M. Girvan | Director |
| *"David W. Leebron"*<br>David W. Leebron | Director |
| *"Marc A. Utay"*<br>Marc A. Utay | Director |
| *"Edward MacNeil"*<br>Edward MacNeil | Chief Financial Officer<br>(Principal Financial Officer) |
| *"Jeffrey Vance"*<br>Jeffrey Vance | Co- Controller<br>(Principal Accounting Officer) |
| *"Vigna Vivekanand"*<br>Vigna Vivekanand | Co- Controller<br>(Principal Accounting Officer) |

# IMAX CORPORATION
Exhibit 31.1

**Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002**

I, Bradley J. Wechsler, Co- Chief Executive Officer of IMAX Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation; and

   (d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 20, 2007

By: *"Bradley J. Wechsler"*
Name: Bradley J. Wechsler
Title Co-Chief Executive Officer

# IMAX CORPORATION
Exhibit 31.2

**Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002**

I, Richard L. Gelfond, Co- Chief Executive Officer of IMAX Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation; and

   (d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 20, 2007

By: *"Richard L. Gelfond"*
Name: Richard L. Gelfond
Title Co-Chief Executive Officer

# IMAX CORPORATION
## Exhibit 31.3

**Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002**

I, Edward MacNeil, Chief Financial Officer of IMAX Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of the registrant, IMAX Corporation;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal controls over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this annual report based on such evaluation; and

   (d) Disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: July 20, 2007

By: *"Edward MacNeil"*
Name: Edward MacNeil
Title Chief Financial Officer

# IMAX CORPORATION

Exhibit 32.1

## CERTIFICATIONS

**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Bradley J. Wechsler, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2006 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 20, 2007

*"Bradley J. Wechsler"*
Bradley J. Wechsler
Co-Chief Executive Officer

# IMAX CORPORATION
Exhibit 32.2

## CERTIFICATIONS
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Richard L. Gelfond, Co-Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2006 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 20, 2007

*"Richard L. Gelfond"*
Richard L. Gelfond
Co-Chief Executive Officer

# IMAX CORPORATION
Exhibit 32.3

## CERTIFICATIONS
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Edward MacNeil, Chief Financial Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Annual Report on Form 10-K for the year ended December 31, 2006 (the "Form 10-K") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-K fairly presents, in all material respects, the financial condition and results of operations of the Company.

Dated: July 20, 2007

*"Edward MacNeil"*
Edward MacNeil
Chief Financial Officer

# EXHIBIT C

This is Exhibit "C" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**From:** Peebles, Dana M. [DPEEBLES@MCCARTHY.CA]
**Sent:** Thursday, February 16, 2012 4:27 PM
**To:** Michael G. Robb
**Cc:** A. Dimitri Lascaris; HoakenE@bennettjones.com; Steep, R. Paul; jay@strosbergco.com; Daniel Bach
**Subject:** RE: Silver v. IMAX: Defense
**Attachments:** DOCS-#11145990-v12-Statement_Defence_Feb_16_2012_(IMAX).DOC; DOCS-#11145990-vdoc-Statement_Defence_Feb_16_2012_(IMAX).DOC

Gentlemen, here is a minimally amended Statement of Defence, with a black-lined version, for ease of reference. There were a couple of spelling mistakes, but we have made only one substantive addition, at para. 92, to plead the OSA limitation defense.

Kind regards,
dana

mccarthy tetrault

**Dana M. Peebles**
Partner - Litigation
T: 416.601.7839

McCarthy Tétrault LLP
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto ON M5K 1E6

PLEASE, think of the environment before printing this message.

This e-mail may contain information that is privileged, confidential and/or exempt from disclosure. No waiver whatsoever is intended by sending this e-mail which is intended only for the named recipient(s). Unauthorized use, dissemination or copying is prohibited. If you receive this email in error, please notify the sender and destroy all copies of this e-mail. Our privacy policy is available at www.mccarthy.ca.

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
(Commenced at Brampton)

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and -

IMAX CORPORATION,
RICHARD L. GELFOND, BRADLEY J. WECHSLER
FRANCIS T. JOYCE, NEIL S. BRAUN,
KENNETH G. COPLAND, GARTH M. GIRVAN,
DAVID W. LEEBRON, and KATHRYN A. GAMBLE

**Defendants**

Proceeding under the *Class Proceedings Act, 1992*

# STATEMENT OF DEFENCE

1. The Defendants admit the allegations contained in paragraphs 3, 8, 15, 17-19, 33, 43-44, 78 and 80 of the Fresh Statement of Claim ("the Claim").

2. The Defendants have no knowledge in respect of the allegations contained in paragraphs 6 and 7 of the Claim.

3. Save as is expressly admitted, the Defendants deny all other allegations made in the Fresh Statement of Claim. In addition, the Defendants deny that the Plaintiffs and the Class are entitled to any of the relief claimed in paragraph 2 of the Claim.

**The Defendants**

4. IMAX Corporation ("IMAX") is a public company, listed in Canada on the TSX and in the United States on NASDAQ. The overwhelming majority of its shareholders during the Class period purchased their IMAX shares on the NASDAQ and are residents of the United States. Neither representative Plaintiff in this matter purchased his shares on the NASDAQ or is resident in the United States.

5. As a reporting issuer in both Canada and the United States, IMAX files annual reports (Forms 10-K) in the United States pursuant to the *Securities and Exchange Act* of 1934 ("*the Securities and Exchange Act*"). IMAX is also a reporting issuer in Ontario pursuant to the Ontario *Securities Act* and files its public disclosure on SEDAR. IMAX relies upon its various Form 10-K filings for a true and complete description of how it describes its business.

6. The individual Defendants were, at material times, officers and/or Directors of IMAX Corporation.

**The Business of IMAX**

7. IMAX is an entertainment technology company, specializing in digital and film based motion picture technologies and large format film presentations, including both nature-style documentaries and Hollywood releases. IMAX admits the allegation in paragraph 17 that it has described itself as one of the world's leading entertainment technology companies specializing in large format and 3D presentations.

8. IMAX's principal business is the design, manufacture, sale and lease of theatre systems based on proprietary and patented technology for large format theatres. IMAX generally does not own individual theatres. Instead, the Company sells, leases or enters into joint ventures with third parties who assume responsibility for building and operating the theatre. As of December 31, 2006, there were 284 theatres with IMAX technology operating in 40 countries.

9. IMAX theatre systems either include a unique rolling loop film format projector or a proprietary new digital projector, each of which offers superior image quality. The systems also include a digital sound system that delivers up to 12,000 watts and a screen with a proprietary 3D coating technology as well as 3D glasses cleaning equipment. Screens in IMAX theatres are as large as 100 feet or more wide and 8 stories tall. The Company believes that they are the largest cinema screens in the world. IMAX screens extend to the edge of a viewer's peripheral vision to create immersive experiences which, when combined with the Company's superior sound system components, make audiences feel as though they are part of the onscreen action.

10. As part of the contract for an IMAX theatre system, the Company advises the customer on theatre design, supervises the installation of the theatre system equipment and provides training in using the equipment. IMAX's contractual obligations related to the installation are complete once IMAX fulfills these various responsibilities. The theatre owners are responsible for theatre building construction, any necessary improvements, the installation of the theatre components and the marketing and programming of the theatre. The theatre owners generally agree to construct the theatre on a schedule which provides for delivery of the theatre system on agreed upon dates.

11. IMAX's typical contract also included trademark licence rights which commence on execution of the agreement. Each of the theatre system components (the projector, the sound system and the screen), the theatre design support, the supervision of installation, the projectionist training and the trademark rights were all elements of a typical IMAX system arrangement.

12. Contracts for a theatre system generally had 10 to 20 year initial terms and were typically renewable by the customer for one or more terms of 5 or 10 years duration. Although each individual contract may differ, under the terms of the typical lease agreement, the title to the theatre system equipment (including the projector, the sound system and the projection screen) remained with IMAX. Where theatre systems were provided on a long-term lease basis, IMAX had the right to remove the equipment for non-payment or other defaults by the customer. Lease agreements were generally not cancellable by the customer unless IMAX failed to perform its obligations.

13. IMAX also entered into sale agreements with certain customers. Under a typical sale agreement, the title of the theatre system passed to the customer. However, in certain circumstances, IMAX retained title or a security interest in the equipment until the customer had made all payments required under the agreement.

14. The typical lease or sales agreement provided for three sources of cash flow to IMAX:

(a) initial fees;

(b) ongoing fixed minimums and contingent fees; and,

(c) ongoing maintenance and extended warranty fees.

15. The initial fees were generally received when the contract was executed, when the equipment was shipped, and when customer acceptance was received. Ongoing fixed minimums and contingent fees and ongoing maintenance and extended warranty fees were generally received over the term of the contract and were usually adjusted annually based on the changes in the local consumer price index. The ongoing fixed minimums and contingent fees provided for a fee which was the greater of a fixed amount or a certain percentage of the theatre box office once the theatre is open and operational.

**Revenue Recognition Principles**

16. Cash received from initial fees in advance of installation was recorded by IMAX as deferred revenue. At the time of signing, the associated costs of manufacturing the theatre system were recorded as inventory. At the time of installation, the deferred revenue was recognized in income and the inventory costs were fully expensed.

17. The actual timing of installation of the theatre system was dependent, in part, on the timing of the construction of the customer's theatre. Therefore, while revenue for theatre systems was generally predictable on a long term basis, it could vary from year to year and quarter to quarter depending upon the actual timing of construction and the timing of installation of specific theatre systems. In each annual report between 1997 and 2006, IMAX publicly disclosed this risk in the following language:

> "that the Company's operating results and cash flow can vary substantially from quarter to quarter to quarter and could increase the volatility of its share price."

18. At all material times, the Company's approach to revenue recognition was the subject of review and audit by its auditors, PricewaterhouseCoopers ("PwC"). PwC advised on the various

revenue recognition policies adopted by IMAX and ultimately approved of the revenue recognition policy described in IMAX's public disclosure. PwC also audited and approved of the treatment of revenue recognition as reflected in the audited financial statements of IMAX as they were publically disclosed.

19. Prior to the year 2000, revenues from theatre system sales and leases which transferred substantially all of the benefits and risks of ownership to the customer were recognized on the completed contract method (that is, upon delivery of the theatre system). Revenues included initial advance payments and contracted minimum payments discounted to their present value. Initial advance payments were generally received in advance of deliveries and were recorded by IMAX as deferred revenue. The associated costs of those theatre systems were recorded as inventories and systems under construction. Upon delivery of the theatre system the deferred revenue and deferred costs, net of residual value at the end of the lease term, were recognized in earnings.

20. SEC Staff Accounting Bulletin ("SAB") No. 101 Revenue Recognition and Financial Statements ("SAB 101") was issued in 1999 to provide specific and comprehensive guidance on revenue recognition. IMAX applied SAB 101 beginning in 2000 and began recognizing revenue upon installation, rather than delivery of the theatre system. SAB 101 was updated in 2004 and an expanded version was released as SAB 104 at that time.

21. SAB 101 provides that a Company should recognize revenue with respect to the sale of equipment when "it is realized or realizable and earned". SAB 101 noted four criteria to be met for this determination:

(a) persuasive evidence of an arrangement exists;

(b) delivery has occurred or services have been rendered;

(c) the seller's price to the buyer is fixed or determinable; and,

(d) collectability is reasonably assured.

22. With respect to the second criterion, SAB 101 provided that a seller should substantially complete the terms specified in the arrangement in order for delivery or performance to have occurred. When making a determination of whether contract terms are deemed substantially complete, only inconsequential or perfunctory obligations of the seller should remain incomplete for revenue to be earned.

23. While SAB 101 provided limited guidance for accounting for arrangements with multiple deliverables or elements, it did not provide guidance on whether an arrangement itself had multiple elements. As such, in May of 2003, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") released the Consensus Opinion on issue no. EITF 00-21; Revenue Arrangement With Multiple Deliverables ("EITF 00-21"), which was intended to provide guidance on whether arrangements consisted of one, or more than one, unit of accounting.

24. EITF 00-21 provides specific guidance on multiple element arrangement accounting ("MEA accounting"). Under the guidance, for an arrangement with multiple deliverables, a deliverable item should be considered a separate unit of accounting if all of the following criteria are met:

(a) The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context

of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s).

(b) There is objective and reliable evidence of the fair value of the undelivered item(s).

(c) If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.

25. EITF 00-21 does not address when the criteria for revenue recognition are met. That issue is determined under SAB 101. Therefore, in applying these various accounting policies, the first step is to determine whether the deliverable is within the scope of EITF 00-21. If the deliverable is within the scope of the EITF 00-21, then the revenue recognition process is to determine under that policy whether an arrangement consists of one or more units of accounting. The second step is to consider SAB 104, which updated SAB 101, for guidance as to each individual unit of accounting to determine whether that one unit meets revenue recognition criteria. After applying SAB 104 to that element, the relative fair value of each individual unit is either recognized or deferred.

26. The term deliverable is not explicitly defined in EITF 00-21. The determination of what is a "deliverable" requires the application of judgment and can be influenced by a number of facts and circumstances. IMAX's public disclosure expressly noted that accounting policies, rules and guidelines were highly complex and subject, in many cases, to subjective judgment.

27. EITF 00-21 was released in May of 2003 and IMAX began applying it in July of 2003. In its 2004 annual report, IMAX addressed the issue of multiple element arrangements as follows:

> "On occasion, the Company will include film licenses or **other specified elements** as part of system sales or lease agreements. When separate prices are listed in a multiple element arrangement, these prices may not be indicative of the fair values of those elements because the prices of the difference components of the arrangements may be modified through negotiation although the aggregate consideration may not. Revenues under these arrangements are allocated based upon the estimated relative fair value of each element." **[Emphasis added]**

28. In its 2005 annual report, IMAX further described its revenue recognition in its annual report and notes to the consolidated financial statement as follows:

> "The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When **the elements** of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an **individual element** is recognized when revenue recognition criteria for that element is met." **[Emphasis added]**

29. The Company also expanded its wording of how it recognized revenue:

> The Company recognizes revenue from sales types leases when the installation of a respective theatre system **element** is substantially complete and all of the following criteria are met: **[Emphasis added]**
>
> (a) persuasive evidence of an agreement exists;
>
> (b) the price is fixed or determinable; and,
>
> (c) collection is reasonably assured.

30. When EITF 00-21 and SAB 104 became effective, IMAX took advice from its auditors, PwC, on the application of that guidance to its business and followed the advice given. IMAX therefore denies the interpretation of EITF 00-21 and SAB 104 set forth in paragraphs 39 to 42 of the Claim. By its explicit terms, SAB 104 requires issuers to consider the units of accounting under EITF 00-21 first to determine the appropriate units of accounting, and only after that determination to apply the SAB 101/104 revenue recognition criteria to each unit of accounting. The Plaintiffs have misstated the accounting effect of EITF 00-21 and SAB 101/104 in their Claim.

31. A typical IMAX system includes components consisting of specialized theatre projection equipment, advanced sound systems, screens, theatre automation control systems and film handling equipment. In addition to the equipment components, theatre arrangements usually included services such as the supervision of the installation, training of the theatre projectionist personnel, advice on theatre design and maintenance services. The components of these theatre systems were always disclosed within the business section of the Company's 10-K.

32. Accordingly, for the purposes of EITF 00-21, IMAX separately accounted for the following units of accounting in a typical theatre system revenue arrangement:

(a) the projection system, sound system and related equipment (excluding the screen) and the supervision of installation of these components were treated as one unit of accounting for convenience as these components and related services are delivered and installed within a short period of time of each other;

(b) the screen and the supervision for the installation of the same;

(c) the maintenance services;

(d) projectionist training (the Company considered this element as immaterial for separate accounting); and,

(e) film licenses.

33. IMAX adopted MEA, as did all companies reporting under GAAP, as of July 2003 and applied it where appropriate thereafter. Initially, this occurred principally in respect of film accounting and film licensing. No facts or circumstances existed in either 2003 or 2004 with respect to the elements of theatre system installation which in the judgment of the Company or its auditors, required the application of MEA to those systems. In those years, each installation of a projector sound system and screen was completed by IMAX in the same quarter. Therefore, IMAX recognized all revenue related to those particular installations within those quarters. PwC gave an unqualified or clean opinion in respect of the audited financial statements for those years.

34. In 2005, in two incidences, IMAX faced different facts and circumstances, arising out of its expansion into international markets. In Q1 2005 in Poznan, Poland and in Q3 2005 in Delhi, India, IMAX delivered all of the component parts of its system to the theatre and tested the systems to make sure that they were operable. In each case, the projector and sound system was tested on a two dimensional screen installed for that purpose on a temporary basis. Both operated according to specifications. Also, in both theatres, the owner/operator delivered to IMAX a certificate of acceptance prior to the end of the quarter, certifying "the substantial completion of the IMAX …System installation". In both theatres, however, to protect the IMAX silver screen (the screen used to show IMAX 3D movies) from damage due to the customer's ongoing construction, IMAX installed only a white screen and left the silver screen to be

installed at a later date. In each instance, IMAX concluded, in its unaudited quarterly financial statement as reviewed by PwC, that it should recognize all of the revenue for the installation in that quarter (Q1 2005 for Poznan, and Q3 2005 for Delhi). PwC reviewed these two accounting decisions during 2005 and issued a clean audit opinion despite the fact that the silver screens were not yet in place at quarter end for those particular theatres.

**The Delhi Post**

35. In the last quarter of 2005, due diligence on revenue recognition was undertaken by IMAX due to the so-called "Delhi Post".

36. The Delhi Post was published on a Yahoo Finance Internet Page by an unidentified person on November 10, 2005. This anonymous posting was entitled "SEC To Investigate Fraud at IMAX". This statement appears to have been false. To the knowledge of IMAX, there was no investigation of IMAX by the SEC in respect of any matter involving IMAX in November 2005. IMAX admits that the Delhi Post is accurately quoted in paragraph 78 of the Claim.

37. Also on November 10, 2005, the Delhi Post was e-mailed anonymously to the Defendants Wechsler and Gelfond, then the co-CEOs of IMAX. The anonymous e-mail was also "faked" to state the IMAX was the subject of an SEC investigation for fraud when it was not. There was no evidence then, and there is no evidence now, that the content of this anonymous posting was true. IMAX pleads that anonymous postings of this sort are placed on the internet so that unfounded rumours concerning public companies might be used to affect the stock price to the benefit of the poster.

38. Notwithstanding the unreliable character of the Delhi Post, Mr. Wechsler and Mr. Gelfond immediately notified the General Counsel of IMAX and the Chair of the Audit Committee, the Defendant Kenneth Copland, of the Post. Steps were also immediately taken to advise members of the Board of Directors, PwC, and the Company's outside counsel of the Post. The General Counsel thereafter conducted an investigation of the Post from which the two CEO's were excluded. General Counsel reported on his investigation of the Post to the Board of Directors.

39. In addition, the Audit Committee, through Mr. Copland, directed Jeffrey Vance, a member of the IMAX Finance Department, to independently assess the Company's internal accounting functions in light of the Post. Mr. Vance was directed to undertake this investigation as part of the Company's Sarbanes-Oxley obligations to undertake an annual internal accounting review.

40. PwC reviewed the Post, the contract in issue, the report of the IMAX installer, the customer's Certificate of Acceptance, and other documents relevant to the Delhi installation. PwC considered all of this material and did not object to IMAX's decision to recognize revenue in Q3 2005 for the Delhi installation.

41. In due course, the General Counsel reported to the Board of Directors and Mr. Vance reported to the Audit Committee. The Defendants plead that the reports of the General Counsel and of Mr. Vance speak for themselves. The defendants do not admit or accept the characterization of the activities giving rise to those reports or the content of the reports contained in paragraphs 79 to 93 of the Claim.

42. As a result of these investigations, the Board of Directors concluded that there was no evidence of fraud or wrong doing as alleged in the Delhi Post. Both the Board of Directors and PwC concluded that revenue had been properly recognized for the Delhi installation in Q3 2005.

43. However, as a consequence of the investigation undertaken by IMAX, two recommendations were made:

(a) That the Company amend the language of its revenue recognition policy to more accurately reflect its actual procedure in practice and the requirements of GAAP to assess the degree of completion of its installations for accounting purposes; and,

(b) That the Company enhance the scope and detail of the written documentation to be provided to PwC for the 2005 year end audit to support its revenue recognition determinations for various installations.

44. These recommendations gave rise to the drafting of Policy 19-A Revenue-System Leases dated November 16, 2005. IMAX relies upon Policy 19-A for the true and accurate statement of its contents. Likewise, IMAX relies upon Policy 19-B for the true and accurate statement of its contents. The Defendants do not admit or accept the characterization of those policies set out in paragraph 51 to 57, 61 and 62 of the Claim.

45. In any event these policies were entirely consistent with the application of EITF 00-21. At all material times, PwC was aware of the internal revenue recognition policies of IMAX and how they intersected with EITF 00-21. As pled in paragraphs 25 and 30 of this Statement of Defence, a judgment about revenue recognition occurs after EITF 00-21 has been applied and a

judgment has been made about whether there are separate units of accounting. It is unsurprising that revenue recognition policies of the Company do not refer to EITF 00-21.

46. The investigations undertaken by the General Counsel and the Audit Committee led directly to the enhanced collection of documentation during the preparation of the financial statements for 2005. There was enhanced scrutiny of revenue recognition with respect to Q4 2005 installations (including by PwC) because those investigations were undertaken in November and December of 2005.

47. IMAX pleads that the response of the CEOs, the Board and the Audit Committee to the anonymous and demonstrably false Internet posting was thorough and met or exceeded all reasonable standards of corporate governance and due diligence.

**The Q4 2005 Installations**

48. IMAX admits that it monitored the progress of installations in Q4 2005, just as it did in all quarters. However, it denies the characterization of this monitoring process as set forth in paragraphs 94 to 134 of the Claim.

49. The department within IMAX which was responsible for supervising theatre system installation was "Theatre Operations" under the direction of Mark Welton. Mr. Welton provided periodic e-mail reports summarizing the status of Q4 installations that were then in the process of being completed. Senior management and the finance department of IMAX would receive reports from Mr. Welton.

50. Upon receipt of these reports, the finance department would collect documents and related information concerning each installation. The finance department verified the status of

each installation so that it could then make a judgment on the appropriate accounting treatment. When that package of documentation was completed and when a judgment on the appropriate accounting treatment was reached, that package together with a summary memorandum was delivered to PwC in respect of each installation.

51. The actual construction of a theatre and the timing of the installation of theatre equipment was in the hands of the theatre owner. Often, starting in approximately 2005, these theatres were in foreign locations geographically distant from IMAX. Installation depended, in part, upon the particular progress that owners had made in completing the construction of their theatres. In certain circumstances, these customers had entered into agreements that required their IMAX theatre system installation to be completed by IMAX in Q4 2005. In other cases, there was no deadline for completion but the customer had consented to and budgeted for installation to occur in Q4 2005. In some of these cases, the theatre owners had encountered difficulties during the construction phase resulting in unforeseen delays in theatre completion.

52. Where appropriate, IMAX still worked with those customers to complete installations as originally scheduled. In some cases, the Company offered incentives for customers to complete installations on schedule. IMAX pleads that such incentives are ordinary business decisions that were in the best interests of IMAX and its shareholders. IMAX further pleads that it required documentary evidence from its customers demonstrating that these incentives would actually be used for their intended purposes.

53. For that reason, IMAX had a practice, which it continued in Q4 2005, that it would offer appropriate incentives to customers, occasionally in the form of marketing allowances, so that theatre systems were installed and theatre structures was completed as budgeted.

54. In the cases of Lark, Kazan and McMinnville, IMAX extended the payment schedule for those installations into the year 2006. In the case of Lark, the existing theatre had to be closed to renovate and install the IMAX theatre system. Therefore, it was agreed that IMAX would compensate the customer for the short period of its lost business operations at the end of Q4 2005.

55. In the cases of McMinnville, Kazan and Interlomas, IMAX agreed to provide a marketing allowance to the customers to assist with the opening of the Theatre. The net effect of these accommodations was to encourage the theatre owners to complete construction and open their theatres as early as possible. The opening of an IMAX theatre boosted name recognition for IMAX and promoted the brand among other potential theatre operators. It also advanced the date when film revenue would be received by IMAX.

56. In each case, the incentives offered to customers in Q4 2005 were all disclosed to PwC. In December of 2005, before some of the incentive agreements were even completed, IMAX specifically advised PwC that such discussions with theatre owners were underway. After the close of Q4 2005, every incentive agreement was documented in writing with signatures from the client and IMAX, along with executed Certificates of Acceptance. All were provided to PwC. PwC was aware that several of the documented agreements were not executed until after the close of Q4 2005.

57. IMAX pleads that the deficiencies in construction noted in the Claim in respect of Lark (Hong Kong), Kazan, McMinnville and Interlomas were documented in memoranda and supporting documents prepared by IMAX finance staff in early 2006 and submitted to PwC.

58. In fact, IMAX pleads that the deficiencies alleged in the Claim at paragraphs 105 through to paragraph 134 are excerpted from the very documents IMAX management provided to PwC during the 2005 audit. Accordingly, IMAX pleads that PwC was fully aware of the facts and circumstances when they suggested the application of multiple element accounting to these installations. It was these IMAX Finance Department memos that caused PwC to suggest MEA accounting. PwC suggested to management that it consider the application of MEA accounting so that only revenue for the projector and sound system (which were installed) should be recognized.

59. IMAX denies that Mr. Vance raised serious questions about the facts and circumstances surrounding these installations as alleged in paragraph 145 of the Claim. To the contrary, Mr. Vance's review of these installations was part of IMAX's internal audit and due diligence. As requested by management, he was highlighting issues to be appropriately addressed before management submitted its documentation to PwC and the Audit Committee.

60. All of the customers in issue signed Certificates of Acceptance for their theatre systems. PwC reviewed the agreements, the Certificates of Acceptance and supporting documentation during its audit for 2005, and in some cases independently sought confirmation directly from the customers concerning the installations. In fact, PwC had confirmations sent directly to fully half of the owners of theatres that had received installations but had not yet opened, asking the customers to confirm a number of facts directly with PwC, including key terms of the agreement, the date of acceptance and the dates of all amending agreements.

61. IMAX therefore pleads that PwC had appropriate information to confirm its judgment, and the judgment of management, concerning the application of MEA accounting to those installations.

**The PwC Audit**

62. In December of 2005, IMAX had discussions with PwC regarding the audit procedures which management would follow to prepare the audited financial statements for that year. The Company planned to release its 2005 annual report in March of 2006.. That report would be filed with the SEC as part a mandatory Form 10-K. At that time, management disclosed to PwC that negotiations were under way with some customers to amend their contracts during the installation process. It was agreed that any such agreements, once concluded, would be reduced to writing by IMAX and the customer, for review by PwC.

63. Thereafter, appropriate documents to support revenue recognition for each installation were collected. When the supporting documentation was assembled, it was reviewed by appropriate personnel in the finance department of IMAX. These packages were later reviewed by the controller, Kathryn Gamble, who requested any additional materials required to fully document the status of each installation.

64. Ms. Gamble, and the Chief Financial Officer ("CFO") Mr. Joyce, read and prepared written summaries containing the accounting analysis for each of the 14 installations for which the Company proposed to recognize revenue in Q4 2005. IMAX management initially proposed that it would recognize all of the revenue on 14 installations for Q4 2005, notwithstanding that the silver screen had not been installed in 7 of those theatres. Management's initial judgment was that the screens were inconsequential and perfunctory, because, among other things, the

value of the uninstalled components (such as the silver screen) paled in comparison to the installed elements. Specifically, on a theatre system installation with a value of approximately $1.5 million, the IMAX screen accounts for between $100,000 and $125,000 of revenue. The remainder of the value of the theatre system resides in the projector, the sound system, and the glasses cleaning machine, as to which IMAX's obligations were substantially complete. Accordingly, management concluded that pursuant to GAAP, all of the revenue in respect of those installations should be recognized in Q4 2005.

65. PwC reviewed these summaries and asked for further materials to be provided to them. IMAX prepared detailed memoranda in respect of each installation for those theatres that would not open before the year end, setting out the installation status and referencing any contract documents (including amendments) setting out all outstanding obligations. IMAX management also prepared assessments of the remaining work required for each installation by hour and cost. Management calculated, on a percentage basis, the required time and expense to complete the installation against the overall installation expense.

66. PwC reviewed all of the memoranda and supporting documentation and, in addition, undertook its own independent review and investigation in respect of these installations. As a result of this review, PwC recommended against IMAX management's proposal to recognize all revenue on the 14 subject installations. However, PwC did not recommend that all revenue in respect of these theatre systems be deferred to a later period. Rather, PwC recommended that IMAX record the revenue associated with the projection and sound systems which were fully installed, and defer recognition of the screen system, even though in most cases, the screen had already been delivered and was awaiting installation.

67. Specifically, after reviewing IMAX management's analysis, PwC recommended the following:

(a) For 6 installations that had opened in the quarter, full revenue recognition was appropriate because the remaining elements were inconsequential;

(b) For 7 installations that had not opened, the screen element should be deferred to a later period; and,

(c) For 1 installation, that the revenue associated with the client's option to relocate the theatre be deferred to a later period.

68. The result of this recommendation by PwC was that IMAX would recognize less revenue in Q4 2005 and for 2005 as a whole than IMAX management had proposed when it submitted its own analysis to PwC.

69. After receiving the advice of PwC, IMAX management re-visited its analysis and determined that the screen component of the arrangement was a separate unit of accounting. The reasons for this were as follows:

(a) The screen had stand-alone value to the customer.

(b) There was objective and reliable evidence of the fair value of the screen.

(c) The Company's arrangements generally did not include a right of return.

70. The contracts IMAX had with its customers generally did not provide separate amounts for each of the components of an IMAX theatre. However, the fair value of the screen and other elements deferred as of the end of Q4 2005 and not recognized as revenue amounted to

$767,000.00. This deferral represented the fair value of the seven screens not fully installed by year end, plus the value of some other elements.

71. Fair value of the screen element was determined based on effective and reliable evidence which included arms-length commercial pricing for the purchase of the screen directly from the screen manufacturer and suppliers with no discounts. An additional fair value element was added for the costs related to the supervision of installation, again based on arms-length pricing with no discount.

72. The amount allocated to the delivered elements was the total fixed arrangement consideration (excluding any amount that may be contingent on future box office performance of the individual theatres) less the amounts allocated to the undelivered elements (the screen). It was the view of IMAX management, supported by PwC, that this methodology was consistent with the guidance provided in paragraph 2 of EITF 00-21.

73. Management's reconsideration of its initial revenue recognition's decision occurred because PwC had advised management that, given that the screen was not fully installed, it was PwC's opinion that the Company had not properly assessed the specific facts and circumstances of those installations in the fourth quarter against the guidance in EITF 00-21. PwC advised management that the guidance in the EITF 00-21 was mandatory and it applied to any arrangement with multiple elements to it. PwC advised management that it should review the arrangement by that guidance.

74. PwC advised the Company that the projector and sound system installation should be evaluated based on principles of SAB 104, given the application of EITF 00-21. Based upon this advice, the Company concluded that when the screen elements were deferred, any remaining

obligations related to the projector and sound system were immaterial or inconsequential or perfunctory. Therefore, revenue in respect of those deliverables (projector and sound system) should properly be recognized in Q4 2005. After receiving PwC's advice, the Finance Department then prepared new memoranda supporting revenue recognition in respect of these elements of the theatre system.

75. Draft financial statements were then presented to the Audit Committee of IMAX at meetings on March 1, 2006. Presentations were made by IMAX Finance Staff and PwC. After discussions with the presenters, the Audit Committee approved the proposal with respect to revenue recognition and the draft 2005 financial statements as prepared. Importantly, PwC advised the Audit Committee that the application of EITF 00-21 to the transaction was not a change in accounting policy, but the application of an existing policy to new or unique facts and circumstances.

76. The Defendants therefore deny the allegation in paragraph 147 of the Claim that "management persuaded PwC" with "strenuous effort" to approve its accounting treatment. To the contrary, it was PwC that first suggested the application of MEA to IMAX's theatre systems. Management followed the advice of PwC, as did the Audit Committee. in approving the application of MEA accounting to the theatre systems in Q4 2005.

77. The draft financial statements were then presented to the Board of Directors of IMAX on March 8, 2008 by the finance department, PwC and by the Head of the Audit Committee. After discussion, the Board approved the release of the 2005 audited financial statements.

78. In PwC's opinion, the consolidated financial statements for 2005 presented fairly, in all material respects, the financial position of IMAX and its subsidiary, and the results of their

operations and their cash flows, and their conformity with US GAAP. In addition, PwC confirmed that the financial statement schedules presented fairly, in all material respects, the information set forth therein in conjunction with related consolidated financial statements.

79. PwC also confirmed management's assessment that IMAX maintained effective internal control over financial reporting based upon the applicable third party standard. However, PwC and management also evaluated, for Sarbanes-Oxley purposes, management's inability to arrive at a proper accounting conclusion for Q4 2005 without the significant involvement of PwC. This resulted in PwC reporting a significant deficiency to the Audit Committee related to management's initial evaluation of the 2005 Q4 system arrangements under US GAAP.

80. IMAX pleads that all of the Defendants and PwC honestly arrived at their accounting judgments in respect of the 2005 financial statements of IMAX. The documents prepared, collected and reviewed by management and PwC, as well as the draft financial statements presented to the Audit Committee, were the product of careful, professional and competent due diligence by all those involved, including PwC.

81. PwC had been the auditors of IMAX for many years and were very familiar with all aspects of IMAX's business. PwC knew, or ought to have known, that management would provide them with whatever documents PwC required in order to give appropriate advice and to give its audit opinion. The Defendants therefore deny the allegations in paragraphs 148 to 152 of the Claim to the effect that PwC later became aware of facts that "might have impacted its opinion" regarding revenue recognition. PwC had full access to management and to IMAX documents during the 2005 audit period. PwC was provided with all appropriate documentation and conducted its testing of management judgments as it saw fit uninfluenced by management.

PwC rendered its opinion upon the information provided by IMAX without requesting further documents though it was fully aware of the fact that some theatres were not fully constructed and not open.

**The February 17, 2006 Press Release**

82. On February 17, 2006, IMAX issued a press release which it later filed on SEDAR and with the SEC concerning its expected Q4 2005 financial results, and its expected revenues for the year 2005. IMAX relies upon the February 17, 2006 press release as filed for a true and accurate statement of its contents.

83. IMAX denies that the press release was false and/or misleading, as alleged in paragraph 156 of the Claim. IMAX pleads that the Plaintiffs have mischaracterized the press release. The press release clearly disclosed that IMAX was announcing an expectation of results, and not its final results. The press release noted that it was based on preliminary financial data, and that it was subject to the final closing of the Company's books and records. This press release was accompanied by a safe harbour notice which clearly disclosed that the press release contained forward-looking financial information that was based on management assumptions and existing information and involved certain risks and uncertainties which could cause actual results to differ materially.

**The March 9, 2006 Press Release and Form 10-K**

84. On March 9, 2006, IMAX filed its Form 10-K for the year 2005, and issued a press release concerning its financial results. IMAX relies upon the Form 10-K and the March 9, 2006 press release for a true and accurate statement of its contents.

85. IMAX denies that the press release of March 9, 2006 in its Form 10-K was materially false or misleading in any respect, or as alleged in paragraph 167 of the Claim. IMAX further denies the allegation in paragraph 166 of the Claim that its application of MEA accounting to the theatre systems installed in Q4 2005 was a change in accounting policy, or that it failed to disclose such change. IMAX had applied MEA to its theatre system sales for installations in Q4 2005 in accordance with EITF 00-21, SAB 104 and the advice of PwC. The March 9th press release and the filed Form 10-K accurately disclosed the IMAX financial statements, as audited by PwC, on that date.

**Allegations under the Ontario *Securities Act***

86. As to the allegations regarding the 2005 financial statements, the Defendants who signed the Form 10-K certified that those statements presented fairly in all material respects IMAX's financial conditions and results of operations in the honest belief that they did so after undertaking the appropriate due diligence and reasonable investigations, as set out above. In particular, the Defendants rely upon: the internal investigations undertaken in November and December of 2005 in respect of the Delhi Post; the due diligence of management in reviewing Q4 2005 installations; the suggestion management received from PwC in respect of MEA accounting on the deferral of the screen component of revenue; the advice of PwC to the Audit Committee that there was no change in accounting policy; and the independent investigations of PwC with respect to management's judgment on the accounting treatment for the installations in Q4 2005.

87. The Defendants plead that they conducted a reasonable investigation in respect of the referenced press releases and financial statements for 2005. The Defendants plead and rely upon section 138.4(6) of the Ontario *Securities Act*.

88. The Defendants further plead that they are not liable with respect to any misrepresentation contained in the 2005 financial statements. Those statements were accompanied by an opinion from PwC which the Company was entitled to publish in its Form 10-K that the statements complied with GAAP. In that respect, the Defendants rely upon section 138.4(11) of the *Securities Act*.

89. As to the allegations regarding the 2006 press releases, which are non-core documents, the Defendants Wechsler, Gelfond, Joyce and Gamble plead that they had no knowledge of any misrepresentation within the meaning of s. 138.4(1) when the press releases were issued. For the same reason, those Defendants plead that the Plaintiffs cannot recover damages above the statutory cap, pursuant to s.138.7(2) of the *Securities Act*.

90. In respect of the particular loss alleged at the close of the Class period on August 9, 2006, the Defendants plead that the changes in the market price of the securities were unrelated to the alleged misrepresentations in the press releases and financial results for 2005 of IMAX. The Defendants plead and rely upon section 138.5(3) of the *Securities Act*.

91. The Defendants plead that the liability limits set out in Section 138.1 of the *Securities Act* apply to all the statutory claims advanced by the Plaintiffs.

92. The Defendants plead that the action under Part XXIII.1, which was commenced with the filing of the Claim on December 12, 2011, arising out of the statements made by IMAX on

February 17 and March 9, 2006, is statute-barred in its entirety. The Defendants plead and rely upon section 138.14 of the *Securities Act*.

**The March 9, 2006 Press Release: Strategic Alternatives**

93. In early 2005, IMAX was made aware of the interest of several prospective buyers. After this unsolicited approach, IMAX retained external investment banking advisors. The possibility of a change of control transaction was discussed by IMAX management in July of 2005. Thereafter, nothing of substance occurred for the balance of 2005. There was therefore nothing to discuss with PwC or with any other external advisor during the 2005 audit period.

94. IMAX pleads that the retention of investment bankers in respect of an unsolicited approach to a public company is an ordinary course business decision and does not mean that any transaction is likely or will even be explored.

95. However, in early March of 2006, the Board of Directors of IMAX did decide to explore the possibility of a strategic transaction, and accordingly, a public announcement to that effect was made in a second press release of March 9, 2006.

96. The Defendants deny the allegations concerning strategic alternatives set out in paragraphs 68 to 76 of the Claim. There was no linkage between the prospect of exploring strategic alternatives, and either the preparation of the 2005 financial statements or the audit of those financial statements by PwC. PwC was aware of the March 9, 2006 press release that IMAX would be exploring strategic alternatives, and did not raise any issue about the substance

or timing of that press release in relation to PwC's audit of the 2005 financial statements. Indeed, PwC noted in its report to the Audit Committee concerning the 2005 audit the following:

> "Management provided us with access to all records, documents and other required information and management gave us its full co-operation throughout the year and kept us informed of important transactions and events."

97. PwC was in regular communication with the Audit Committee in 2005 and 2006 and never expressed a desire to modify that statement in light of the March 9, 2006 disclosure concerning IMAX's decision to explore strategic alternatives. In any event, the March 9, 2006 press release that IMAX had begun a process to explore strategic alternatives was accompanied by a statement that there could be no assurance that this exploration of strategic alternatives would result in a sale or merger of the company.

98. Notwithstanding the disclosure that there was no assurance concerning the success of the strategic alternative process, the volume of trading in IMAX shares on the NASDAQ increased from an average of approximately 465,000 shares over the previous 10 days to approximately 7,623,700 shares on March 9, 2006. The price of IMAX shares on the NASDAQ increased from $9.50 per share on March 8, 2006 to an average of $10.45 for the following 10 trading days.

99. On August 9, 2006, IMAX reported that while it had received significant interest from multiple parties in its exploration of strategic alternatives, its view was that there were no buyers who had indicated a willingness to acquire the company at a valuation that would be supported by the Board of Directors.

**The SEC Letter**

100. In the same press release, IMAX disclosed that it was in the process of responding to an informal inquiry from the SEC regarding the Company's timing of revenue recognition, including its application of MEA accounting and its revenue recognition for theatre systems. The Company stated that it believed its application of MEA accounting was, and has always been, in accordance with US GAAP and that the Company's position was supported by its auditors, PwC.

101. The SEC Division of Corporate Finance letter of September 20, 2006 is not, as alleged in paragraph 66 of the Claim, confirmation that IMAX did not consider the application of EITF 00-21 to any theatre system installation prior to the fourth quarter of fiscal 2005.

102. IMAX responded to the SEC letter of September 20, 2006, as follows:

> "Application of EITF 0021 to the Company
>
> The Company currently accounts for multiple elements in its revenue arrangement by reference to EITF 0021, SAB 104 and SFAS 13, as applicable. EITF 0021 was applicable to arrangements entered into in fiscal periods beginning after June 15, 2003. Accordingly, the Company applied EITF for periods beginning **July 1, 2003.** Prior to that date, the Company applied the multiple element arrangement guidance in SAB 101. **[Emphasis Added]**
>
> ...
>
> as described in the Company's accounting policies in the years prior to 2005, the guidance in EITF 0021 effective for periods beginning after July 1, 2003 has been applied to those arrangements that included deliverables in addition to the equipment and maintenance components [see note 2(m) of the 2004 Form 10-K].

103. There was therefore no sudden change of accounting policy as alleged in paragraph 67 of the Claim. Multiple element accounting was applied by IMAX on and after July 1, 2003 and

was completely unrelated to any possible sale of the Company.

**The July 2007 Re-statement**

104. SAB Statement of Financial Accounting Standards no. 154: Accounting Changes and Error Corrections ("SFAS 154") was issued in May 2005 and provides guidance on the accounting for reporting of accounting changes and error corrections. An issuer must report any errors in financial statements through a re-statement under SFAS 154.

105. In July of 2007, IMAX determined that it had made errors in its past financial statements related to revenue recognition of theatre systems. In a July 20, 2007 10-K, IMAX disclosed that it had made "certain errors related to revenue recognition resulting from the Company's review of its theatre system arrangements over the past five years in response to comments received from the Staff of both the SEC and the OSC which indicated insufficient analysis of various sales and lease transactions and the accounting effect of contractual provisions within them".

106. Accordingly, on July 20, 2007, IMAX restated its financial statements and also retroactively applied its revenue recognition policy to theatre system installations for fiscal year 2002 through the third quarter of fiscal year 2006. Consistent with SFAS 154, the IMAX restatement consisted of two separate and distinct components with regard to the restated theatre system revenue:

(a) The correction to MEA accounting under EITF 00-21 (treating the entire theatre system as a single component rather than as multiple elements), was considered a correction of an error that required the restatement of IMAX's financials; and

(b) IMAX's changes to its revenue recognition policy based on the suggestions of the SEC (to record revenue only upon new objective criteria) separately required the restatement of certain transactions in the IMAX financials.

107. There were nine theatre systems in the fiscal year 2005 and one in 2006 for which IMAX had installed and tested the projection and sound system for a theatre, but the installation of the 3D silver screen was not completed in the same quarter; seven of these were in the fourth quarter of 2005. For each of these theatre systems, IMAX ultimately concluded that it incorrectly interpreted SAB 104 or MEA accounting pursuant to EITF 00-21. IMAX corrected the errors in its earlier financial statements for each of these ten theatres by moving the revenue for each of these theatres to the quarter in which the 3d silver screen was finally installed and all administrative requirements were also complete.

108. There were two theatres in the first three quarters of 2005 in which the 3D silver screen was not installed within the quarter, when restated the associated revenue was shifted to the next quarter in 2005:

| **Theatre Location** | **Originally Recognized** | **Moved To** |
|---|---|---|
| Poznan, Poland | Q1 2005 | Q2 2005 |
| AEZ – Delhi, India | Q3 2005 | Q4 2005 |

109. There was seven theatres in the fourth quarter of 2005 in which the 3D silver screen was not installed within the quarter; when restated the associated revenue shifted out of fiscal year 2005 to a future fiscal period:

| Theatre Location | Originally Recognized | Move To | Reason for restating revenue |
|---|---|---|---|
| Beijing Radio, Film & TV | Q4 2005 | Q1 2006 | Silver screen was installed and unqualified customer acceptance occurred in Q1 2006 |
| Lodz, Poland | Q4 2005 | Q2 2006 | Silver screen was installed in March 2006; Customer provided for projectionist training independent of IMAX but IMAX could not locate documentation evidencing that training had been performed and accepted; recognition moved to opening date in Q2 2006 |
| Kazan, Russia | Q4 2005 | Q4 2006 | The silver screen was installed in Q4 2006; recognition moved accordingly |
| Beijing SUC | Q4 2005 | Q2 2006 | Installation was completed (including silver screen) in 2005, but IMAX agreed, as a courtesy, to provide a larger screen; recognition moved to Q2 2006 when larger screen was installed |
| Santa Fe/ Interlomas | Q4 2005 | Q3 2006 | Silver screen was installed in Q2 2006; IMAX could not locate documentation evidencing that training had been performed and accepted; recognition moved to public opening in Q3 2006 |
| Manila, Philippines | Q4 2005 | Q2 2006 | Silver screen was installed in Q1 2006; IMAX could not locate documentation evidencing that training was accepted by the customer; recognition moved to public opening in Q2 2006 |
| McMinnville Oregon | Q4 2005 | Q2 2007 | Silver screen was installed in Q4 2006; IMAX could not locate documentation evidencing that training had been accepted by the customer; recognition was moved |

| | | | |
|---|---|---|---|
| | | | to public opening in Q2 2007 |

110. There was one theatre in the second quarter of 2006 in which the 3D silver screen was not installed within the quarter; when restated, the associated revenue was shifted to the next quarter in 2006.

| **Theatre Location** | **Originally Recognized** | **Move To** | **Reason for restating revenue** |
|---|---|---|---|
| Colleyville, Texas | Q2 2006 | Q3 2006 | The silver screen was installed in Q3 2006; recognition moved accordingly |

111. The ten theatres itemized herein are the only theatres for which IMAX did not complete the installation of the 3D silver screen prior to the end of the fiscal quarter in which it installed the projection and sound system.

**The Allegations at Common Law**

112. As to the allegations of negligent and reckless misrepresentation, the Defendants plead that there is no duty of care, at common law, owed by IMAX as a public issuer and/or by its directors and officers, through IMAX's public filings and related press releases, to all potential investors in the secondary marketplace.

113. Further, the Defendants deny that any of the Plaintiffs or the other Class members actually detrimentally relied upon the pleaded misrepresentations, if proven, in acquiring or holding their shares in IMAX during the Class Period.

114. The two Plaintiffs have specifically admitted, under oath, that they purchased their IMAX shares for reasons that were completely unrelated to any representation contained in its relevant press releases and financial statements.

115. The Defendants deny the allegations in paragraphs 198 – 203 of the Claim attempting to link IMAX's public disclosure to "efficient market pricing". The Defendants put the Plaintiffs to the strict proof thereof.

116. As to the allegations of individual liability, the named personal Defendants deny that any of the acts or omissions alleged in the Claim are independently tortious, or actionable under any statute, and they deny that they are in any way personally liable to the Plaintiffs or other Class members.

117. The Defendants further deny that IMAX is vicariously liable as alleged in paragraph 228 of the Claim, or that the individual Defendants.

118. As to the allegation of conspiracy, the Defendants Gelfond, Wechsler, and Joyce put the Plaintiffs to the strict proof thereof. At all material times, those Defendants acted honestly and in good faith and in the best interests of IMAX and its shareholders. Their decisions with respect to the recognition of revenue in Q4 2005 were made in reliance upon: the judgment of IMAX management; the policies and procedures that management followed; the advice of PwC; the audit by PwC; the review of the financial statements by the Audit Committee; and the approval of those financial statements by the Board of Directors.

119. These Defendants deny all of the itemized allegations of conspiracy set out in paragraph 195 of the Claim and put the Plaintiffs to the strict proof thereof. Messrs. Gelfond, Wechsler and

Joyce did not breach sections 77(1) and 78(1) of the *Securities Act* as alleged, or of sections 12, 13 and 18 of the *Securities Exchange Act* as alleged, or the reporting requirements of the NASDAQ and the TSX.

120. The conduct of the Defendants was, at all material times, undertaken honestly and in good faith and in the best interests of IMAX and its shareholders, including the Class members. The conduct of the individual Defendants was careful, professional and prudent, and met appropriate standards of corporate governance and due diligence. None of the conduct of the Defendants was of a character that would qualify for an award of punitive damages. That unsubstantiated allegation should attract an award of full indemnity costs against the Plaintiffs.

121. The Defendants deny that any damages can be assessed in this action on an aggregated basis for the Class as a whole, or any part of it.

122. In any event, the Plaintiffs and Class Members have failed to act properly and reasonably to mitigate any damages they may have suffered.

**Application of Foreign Law and Available Remedy**

123. Approximately 85% of the IMAX shares acquired by the Class were sold in the United States (on the NASDAQ) rather than on the TSX. In respect of those NASDAQ purchases, the application of U.S. Securities law was clearly contemplated by both IMAX and its investors. Moreover, most of the Class Members who purchased on the NASDAQ are residents of the United States or other jurisdictions outside Ontario, and their alleged losses were suffered exclusively in the United States or other jurisdictions outside Ontario.

124. Those Class Members, who purchased their shares on the NASDAQ, had an available remedy through Class Actions commenced in the United States as early as August 11, 2006. Those actions were eventually consolidated into a single proceeding in the United States District Court for the Southern District of New York ("In re IMAX Securities Litigation") which seeks damages on their behalf, based on the same IMAX statements pleaded in this action, but under SEC Rule 10b-5 and the United States *Securities and Exchange Act of 1934*.

125. The Class in this action makes a claim founded on a construction of the Ontario *Securities Act*, and particularly Part XXIII.1 thereof. The imposition of that statutory cause of action, by those Class Members, on the Defendants to this action, including individual Defendants resident in the United States, arising out of share purchases on a foreign exchange, to claim damages allegedly sustained in that foreign jurisdiction, is contrary to the interpretative presumptions of constitutionality, intraterritoriality, and compliance with international law and comity. In the alternative, the *Securities Act*, including Part XXIII.1, is constitutionally inapplicable to those Class Members in this case by reason of the territorial limits on provincial jurisdiction imposed under the Constitution of Canada, as defined under the *Constitution Act*, 1982.

126. The Defendants further plead that Ontario conflict of laws principles identify the relevant governing law for any tort claim by each individual Class Member to be the *lex loci delicti*, that is, the governing law for those allegations by those persons is the jurisdiction in which the alleged tort was completed.

127. The Defendants request that this Honourable Court dismiss this action, with costs.

February 16, 2012

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. 416-601-7998

Dana M. Peebles LSUC #30820V
Tel. 416-601-7839
Fax 416-868-0673

**Solicitors for the Defendants**

TO:

**Sutts, Strosberg LLP**
600 Wescourt Place
251 Goyeau Street
Windsor, ON N9A 6V4

Jay Strosberg
Tel: 519-561-6285
Fax: 866-316-5308

**Co-solicitors for the Plaintiffs**

AND TO:

**Siskinds LLP**
680 Waterloo Street
P. O. Box 2520
London, ON N6A 3V8

A. Dimitri Lascaris
Michael Robb
Tel: 519-672-2121
Fax: 519-672-6065

**Co-solicitors for the Plaintiffs**