# EXHIBIT B
# (PART 5)

000422

BETWEEN:

MARVIN NEIL SILVER, *et al.* **Plaintiffs** - and - IMAX CORPORATION, *et al.* **Defendants** Court File No. CV-06-3257-00

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

Proceeding Commenced at Brampton

**STATEMENT OF DEFENCE**

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. (416) 601-7998

Dana M. Peebles LSUC #30820V
Tel. (416) 601-7839
Fax (416) 868-0673

**Lawyers for the Defendants**

#11145990

Court File No. CV-06-3257-00

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
(Commenced at Brampton)

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and -

IMAX CORPORATION,
RICHARD L. GELFOND, BRADLEY J. WECHSLER
~~and~~ FRANCIS T. JOYCE, NEIL S. BRAUN,
KENNETH G. COPLAND, GARTH M. GIRVAN,
DAVID W. LEEBRON, and KATHRYN A. GAMBLE

**Defendants**

Proceeding under the *Class Proceedings Act, 1992*

# STATEMENT OF DEFENCE

1. The Defendants admit the allegations contained in paragraphs 3, 8, 15, 17-19, 33, 43-44, 78 and 80 of the Fresh Statement of Claim ("the Claim").

2. The Defendants have no knowledge in respect of the allegations contained in paragraphs 6 and 7 of the ~~Statement of~~ Claim.

3. Save as is expressly admitted, the Defendants deny all other allegations made in the Fresh Statement of Claim. In addition, the Defendants deny that the Plaintiffs and the Class are entitled to any of the relief claimed in paragraph 2 of the ~~Statement of~~ Claim.

**The Defendants**

4. IMAX Corporation ("IMAX") is a public company, listed in Canada on the TSX and in the United States on NASDAQ. The overwhelming majority of its shareholders during the Class period purchased their IMAX shares on the NASDAQ and are residents of the United States. Neither representative Plaintiff in this matter purchased his shares on the NASDAQ or is resident in the United States.

5. As a reporting issuer in both Canada and the United States, IMAX files annual reports (Forms 10-K) in the United States pursuant to the *Securities and Exchange Act* of 1934 ("*the Securities and Exchange Act*"). IMAX is also a reporting issuer in Ontario pursuant to the Ontario *Securities Act* and files its public disclosure on SEDAR. IMAX relies upon its various Form 10-K filings for a true and complete description of how it describes its business.

6. The individual Defendants were, at material times, officers and/or Directors of IMAX Corporation.

**The Business of IMAX**

7. IMAX is an entertainment technology company, specializing in digital and film based motion picture technologies and large format film presentations, including both nature-style documentaries and Hollywood releases. IMAX admits the allegation in paragraph 17 that it has described itself as one of the world's leading entertainment technology companies specializing in large format and 3D presentations.

8. IMAX's principal business is the design, manufacture, sale and lease of theatre systems based on proprietary and patented technology for large format theatres. IMAX generally does not own individual theatres. Instead, the Company sells, leases or enters into joint ventures with third parties who assume responsibility for building and operating the theatre. As of December 31, 2006, there were 284 theatres with IMAX technology operating in 40 countries.

9. IMAX theatre systems either include a unique rolling loop film format projector or a proprietary new digital projector, each of which offers superior image quality. The systems also include a digital sound system that delivers up to 12,000 watts and a screen with a proprietary 3D coating technology as well as 3D glasses cleaning equipment. Screens in IMAX theatres are as large as 100 feet or more wide and 8 stories tall. The Company believes that they are the largest cinema screens in the world. IMAX screens extend to the edge of a viewer's peripheral vision to create immersive experiences which, when combined with the Company's superior sound system components, make audiences feel as though they are part of the onscreen action.

10. As part of the contract for an IMAX theatre system, the Company advises the customer on theatre design, supervises the installation of the theatre system equipment and provides training in using the equipment. IMAX's contractual obligations related to the installation are complete once IMAX fulfills these various responsibilities. The theatre owners are responsible for theatre building construction, any necessary improvements, the installation of the theatre components and the marketing and programming of the theatre. The theatre owners generally agree to construct the theatre on a schedule which provides for delivery of the theatre system on agreed upon dates.

11. IMAX's typical contract also included trademark licence rights which commence on execution of the agreement. Each of the theatre system components (the projector, the sound system and the screen), the theatre design support, the supervision of installation, the projectionist training and the trademark rights were all elements of a typical IMAX system arrangement.

12. Contracts for a theatre system generally had 10 to 20 year initial terms and were typically renewable by the customer for one or more terms of 5 or 10 years duration. Although each individual contract may differ, under the terms of the typical lease agreement, the title to the theatre system equipment (including the projector, the sound system and the projection screen) remained with IMAX. Where theatre systems were provided on a long-term lease basis, IMAX had the right to remove the equipment for non-payment or other defaults by the customer. Lease agreements were generally not cancellable by the customer unless IMAX failed to perform its obligations.

13. IMAX also entered into sale agreements with certain customers. Under a typical sale agreement, the title of the theatre system passed to the customer. However, in certain circumstances, IMAX retained title or a security interest in the equipment until the customer had made all payments required under the agreement.

14. The typical lease or sales agreement provided for three sources of cash flow to IMAX:

(a) initial fees;

(b) ongoing fixed minimums and contingent fees; and,

(c) ongoing maintenance and extended warranty fees.

15. The initial fees were generally received when the contract was executed, when the equipment was shipped, and when customer acceptance was received. Ongoing fixed minimums and contingent fees and ongoing maintenance and extended warranty fees were generally received over the term of the contract and were usually adjusted annually based on the changes in the local consumer price index. The ongoing fixed minimums and contingent fees provided for a fee which was the greater of a fixed amount or a certain percentage of the theatre box office once the theatre is open and operational.

**Revenue Recognition Principles**

16. Cash received from initial fees in advance of installation was recorded by IMAX as deferred revenue. At the time of signing, the associated costs of manufacturing the theatre system were recorded as inventory. At the time of installation, the deferred revenue was recognized in income and the inventory costs were fully expensed.

17. The actual timing of installation of the theatre system was dependent, in part, on the timing of the construction of the customer's theatre. Therefore, while revenue for theatre systems was generally predictable on a long term basis, it could vary from year to year and quarter to quarter depending upon the actual timing of construction and the timing of installation of specific theatre systems. In each annual report between 1997 and 2006, IMAX publicly disclosed this risk in the following language:

> "that the Company's operating results and cash flow can vary substantially from quarter to quarter to quarter and could increase the volatility of its share price."

18. At all material times, the Company's approach to revenue recognition was the subject of review and audit by its auditors, PricewaterhouseCoopers ("PwC"). PwC advised on the various

revenue recognition policies adopted by IMAX and ultimately approved of the revenue recognition policy described in IMAX's public disclosure. PwC also audited and approved of the treatment of revenue recognition as reflected in the audited financial statements of IMAX as they were publically disclosed.

19. Prior to the year 2000, revenues from theatre system sales and leases which transferred substantially all of the benefits and risks of ownership to the customer were recognized on the completed contract method (that is, upon delivery of the theatre system). Revenues included initial advance payments and contracted minimum payments discounted to their present value. Initial advance payments were generally received in advance of deliveries and were recorded by IMAX as deferred revenue. The associated costs of those theatre systems were recorded as inventories and systems under construction. Upon delivery of the theatre system the deferred revenue and deferred costs, net of residual value at the end of the lease term, were recognized in earnings.

20. SEC Staff Accounting Bulletin ("SAB") No. 101 Revenue Recognition and Financial Statements ("SAB 101") was issued in 1999 to provide specific and comprehensive guidance on revenue recognition. IMAX applied SAB 101 beginning in 2000 and began recognizing revenue upon installation, rather than delivery of the theatre system. SAB 101 was updated in 2004 and an expanded version was released as SAB 104 at that time.

21. SAB 101 provides that a Company should recognize revenue with respect to the sale of equipment when "it is realized or realizable and earned". SAB 101 noted four criteria to be met for this determination:

(a) persuasive evidence of an arrangement exists;

(b) delivery has occurred or services have been rendered;

(c) the seller's price to the buyer is fixed or determinable; and,

(d) collectability is reasonably assured.

22. With respect to the second criterion, SAB 101 provided that a seller should substantially complete the terms specified in the arrangement in order for delivery or performance to have occurred. When making a determination of whether contract terms are deemed substantially complete, only inconsequential or perfunctory obligations of the seller should remain incomplete for revenue to be earned.

23. While SAB 101 provided limited guidance for accounting for arrangements with multiple deliverables or elements, it did not provide guidance on whether an arrangement itself had multiple elements. As such, in May of 2003, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") released the Consensus Opinion on issue no. EITF 00-21; Revenue Arrangement With Multiple Deliverables ("EITF 00-21"), which was intended to provide guidance on whether arrangements consisted of one, or more than one, unit of accounting.

24. EITF 00-21 provides specific guidance on multiple element arrangement accounting ("MEA accounting"). Under the guidance, for an arrangement with multiple deliverables, a deliverable item should be considered a separate unit of accounting if all of the following criteria are met:

(a) The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context

of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s).

(b) There is objective and reliable evidence of the fair value of the undelivered item(s).

(c) If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.

25. EITF 00-21 does not address when the criteria for revenue recognition are met. That issue is determined under SAB 101. Therefore, in applying these various accounting policies, the first step is to determine whether the deliverable is within the scope of EITF 00-21. If the deliverable is within the scope of the EITF 00-21, then the revenue recognition process is to determine under that policy whether an arrangement consists of one or more units of accounting. The second step is to consider SAB 104, which updated SAB 101, for guidance as to each individual unit of accounting to determine whether that one unit meets revenue recognition criteria. After applying SAB 104 to that element, the relative fair value of each individual unit is either recognized or deferred.

26. The term deliverable is not explicitly defined in EITF 00-21. The determination of what is a "deliverable" requires the application of judgment and can be influenced by a number of facts and circumstances. IMAX's public disclosure expressly noted that accounting policies, rules and guidelines were highly complex and subject, in many cases, to subjective judgment.

27. EITF 00-21 was released in May of 2003 and IMAX began applying it in July of 2003. In its 2004 annual report, IMAX addressed the issue of multiple element arrangements as follows:

> "On occasion, the Company will include film licenses or **other specified elements** as part of system sales or lease agreements. When separate prices are listed in a multiple element arrangement, these prices may not be indicative of the fair values of those elements because the prices of the difference components of the arrangements may be modified through negotiation although the aggregate consideration may not. Revenues under these arrangements are allocated based upon the estimated relative fair value of each element." **[Emphasis added]**

28. In its 2005 annual report, IMAX further described its revenue recognition in its annual report and notes to the consolidated financial statement as follows:

> "The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theatre personnel, and advice on theatre design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.
>
> When **the elements** of theatre systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an **individual element** is recognized when revenue recognition criteria for that element is met." **[Emphasis added]**

29. The Company also expanded its wording of how it recognized revenue:

> The Company recognizes revenue from sales types leases when the installation of a respective theatre system **element** is substantially complete and all of the following criteria are met: **[Emphasis added]**
>
> (a) persuasive evidence of an agreement exists;
>
> (b) the price is fixed or determinable; and,
>
> (c) collection is reasonably assured.

30. When EITF 00-21 and SAB 104 became effective, IMAX took advice from its auditors, PwC, on the application of that guidance to its business and followed the advice given. IMAX therefore denies the interpretation of EITF 00-21 and SAB 104 set forth in paragraphs 39 to 42 of the ~~Statement of~~ Claim. By its explicit terms, SAB 104 requires issuers to consider the units of accounting under EITF 00-21 first to determine the appropriate units of accounting, and only after that determination to apply the SAB 101/104 revenue recognition criteria to each unit of accounting. The Plaintiffs have misstated the accounting effect of EITF 00-21 and SAB 101/104 in their ~~Statement of~~ Claim.

31. A typical IMAX system includes components consisting of specialized theatre projection equipment, advanced sound systems, screens, theatre automation control systems and film handling equipment. In addition to the equipment components, theatre arrangements usually included services such as the supervision of the installation, training of the theatre projectionist personnel, advice on theatre design and maintenance services. The components of these theatre systems were always disclosed within the business section of the Company's 10-K.

32. Accordingly, for the purposes of EITF 00-21, IMAX separately accounted for the following units of accounting in a typical theatre system revenue arrangement:

(a) the projection system, sound system and related equipment (excluding the screen) and the supervision of installation of these components were treated as one unit of accounting for convenience as these components and related services are delivered and installed within a short period of time of each other;

(b) the screen and the supervision for the installation of the same;

(c) the maintenance services;

(d) projectionist training (the Company considered this element as immaterial for separate accounting); and,

(e) film licenses.

33. IMAX adopted MEA, as did all companies reporting under GAAP, as of July 2003 and applied it where appropriate thereafter. Initially, this occurred principally in respect of film accounting and film licensing. No facts or circumstances existed in either 2003 or 2004 with respect to the elements of theatre system installation which in the judgment of the Company or its auditors, required the application of MEA to those systems. In those years, each installation of a projector sound system and screen was completed by IMAX in the same quarter. Therefore, IMAX recognized all revenue related to those particular installations within those quarters. PwC gave an unqualified or clean opinion in respect of the audited financial statements for those years.

34. In 2005, in two incidences, IMAX faced different facts and circumstances, arising out of its expansion into international markets. In Q1 2005 in Poznan, Poland and in Q3 2005 in Delhi, India, IMAX delivered all of the component parts of its system to the theatre and tested the systems to make sure that they were operable. In each case, the projector and sound system was tested on a two dimensional screen installed for that purpose on a temporary basis. Both operated according to specifications. Also, in both theatres, the owner/operator delivered to IMAX a certificate of acceptance prior to the end of the quarter, certifying "the substantial completion of the IMAX ...System installation". In both theatres, however, to protect the IMAX silver screen (the screen used to show IMAX 3D movies) from damage due to the customer's ongoing construction, IMAX installed only a white screen and left the silver screen to be

installed at a later date. In each instance, IMAX concluded, in its unaudited quarterly financial statement as reviewed by PwC, that it should recognize all of the revenue for the installation in that quarter (Q1 2005 for Poznan, and Q3 2005 for Delhi). PwC reviewed these two accounting decisions during 2005 and issued a clean audit opinion despite the fact that the silver screens were not yet in place at quarter end for those particular theatres.

**The Delhi Post**

35. In the last quarter of 2005, due diligence on revenue recognition was undertaken by IMAX due to the so-called "Delhi Post".

36. The Delhi Post was published on a Yahoo Finance Internet Page by an unidentified person on November 10, 2005. This anonymous posting was entitled "SEC To Investigate Fraud at IMAX". This statement appears to have been false. To the knowledge of IMAX, there was no investigation of IMAX by the SEC in respect of any matter involving IMAX in November 2005. IMAX admits that the Delhi Post is accurately quoted in paragraph 78 of the ~~Statement of~~ Claim.

37. Also on November 10, 2005, the Delhi Post was e-mailed anonymously to the Defendants Wechsler and Gelfond, then the co-CEOs of IMAX. The anonymous e-mail was also "faked" to state the IMAX was the subject of an SEC investigation for fraud when it was not. There was no evidence then, and there is no evidence now, that the content of this anonymous posting was true. IMAX pleads that anonymous postings of this sort are placed on the internet so that unfounded rumours concerning public companies might be used to affect the stock price to the benefit of the poster.

38. Notwithstanding the unreliable character of the Delhi Post, Mr. Wechsler and Mr. Gelfond immediately notified the General Counsel of IMAX and the Chair of the Audit Committee, the Defendant Kenneth Copland, of the Post. Steps were also immediately taken to advise members of the Board of Directors, PwC, and the Company's outside counsel of the Post. The General Counsel thereafter conducted an investigation of the Post from which the two CEO's were excluded. General Counsel reported on his investigation of the Post to the Board of Directors.

39. In addition, the Audit Committee, through Mr. Copland, directed Jeffrey Vance, a member of the IMAX Finance Department, to independently assess the Company's internal accounting functions in light of the Post. Mr. Vance was directed to undertake this investigation as part of the Company's Sarbanes-Oxley obligations to undertake an annual internal accounting review.

40. PwC reviewed the Post, the contract in issue, the report of the IMAX installer, the customer's Certificate of Acceptance, and other documents relevant to the Delhi installation. PwC considered all of this material and did not object to IMAX's decision to recognize revenue in Q3 2005 for the Delhi installation.

41. In due course, the General Counsel reported to the Board of Directors and Mr. Vance reported to the Audit Committee. The Defendants plead that the reports of the General Counsel and of Mr. Vance speak for themselves. The defendants do not admit or accept the characterization of the activities giving rise to those reports or the content of the reports contained in paragraphs 79 to 93 of the ~~Statement of~~ Claim.

42. As a result of these investigations, the Board of Directors concluded that there was no evidence of fraud or wrong doing as alleged in the Delhi Post. Both the Board of Directors and PwC concluded that revenue had been properly recognized for the Delhi installation in Q3 2005.

43. However, as a consequence of the investigation undertaken by IMAX, two recommendations were made:

(a) That the Company amend the language of its revenue recognition policy to more accurately reflect its actual procedure in practice and the requirements of GAAP to assess the degree of completion of its installations for accounting purposes; and,

(b) That the Company enhance the scope and detail of the written documentation to be provided to PwC for the 2005 year end audit to support its revenue recognition determinations for various installations.

44. These recommendations gave rise to the drafting of Policy 19-A Revenue-System Leases dated November 16, 2005. IMAX relies upon Policy 19-A for the true and accurate statement of its contents. Likewise, IMAX relies upon Policy 19-B for the true and accurate statement of its contents. The Defendants do not admit or accept the characterization of those policies set out in paragraph 51 to 57, 61 and 62 of the ~~Statement of~~ Claim.

45. In any event these policies were entirely consistent with the application of EITF 00-21. At all material times, PwC was aware of the internal revenue recognition policies of IMAX and how they intersected with EITF 00-21. As pled in paragraphs 25 and 30 of this Statement of Defence, a judgment about revenue recognition occurs after EITF 00-21 has been applied and a

judgment has been made about whether there are separate units of accounting. It is unsurprising that revenue recognition policies of the Company do not refer to EITF 00-21.

46. The investigations undertaken by the General Counsel and the Audit Committee led directly to the enhanced collection of documentation during the preparation of the financial statements for 2005. There was enhanced scrutiny of revenue recognition with respect to Q4 2005 installations (including by PwC) because those investigations were undertaken in November and December of 2005.

47. IMAX pleads that the response of the CEOs, the Board and the Audit Committee to the anonymous and demonstrably false Internet posting was thorough and met or exceeded all reasonable standards of corporate governance and due diligence.

**The Q4 2005 Installations**

48. IMAX admits that it monitored the progress of installations in Q4 2005, just as it did in all quarters. However, it denies the characterization of this monitoring process as set forth in paragraphs 94 to 134 of the ~~Statement of~~ Claim.

49. The department within IMAX which was responsible for supervising theatre system installation was "Theatre Operations" under the direction of Mark Welton. Mr. Welton provided periodic e-mail reports summarizing the status of Q4 installations that were then in the process of being completed. Senior management and the finance department of IMAX would receive reports from Mr. Welton.

50. Upon receipt of these reports, the finance department would collect documents and related information concerning each installation. The finance department verified the status of

each installation so that it could then make a judgment on the appropriate accounting treatment. When that package of documentation was completed and when a judgment on the appropriate accounting treatment was reached, that package together with a summary memorandum was delivered to PwC in respect of each installation.

51. The actual construction of a theatre and the timing of the installation of theatre equipment was in the hands of the theatre owner. Often, starting in approximately 2005, these theatres were in foreign locations geographically distant from IMAX. Installation depended, in part, upon the particular progress that owners had made in completing the construction of their theatres. In certain circumstances, these customers had entered into agreements that required their IMAX theatre system installation to be completed by IMAX in Q4 2005. In other cases, there was no deadline for completion but the customer had consented to and budgeted for installation to occur in Q4 2005. In some of these cases, the theatre owners had encountered difficulties during the construction phase resulting in unforeseen delays in theatre completion.

52. Where appropriate, IMAX still worked with those customers to complete installations as originally scheduled. In some cases, the Company offered incentives for customers to complete installations on schedule. IMAX pleads that such incentives are ordinary business decisions that were in the best interests of IMAX and its shareholders. IMAX further pleads that it required documentary evidence from its customers demonstrating that these incentives would actually be used for their intended purposes.

53. For that reason, IMAX had a practice, which it continued in Q4 2005, that it would offer appropriate incentives to customers, occasionally in the form of marketing allowances, so that theatre systems were installed and theatre structures was completed as budgeted.

54. In the cases of Lark, Kazan and McMinnville, IMAX extended the payment schedule for those installations into the year 2006. In the case of Lark, the existing theatre had to be closed to renovate and install the IMAX theatre system. Therefore, it was agreed that IMAX would compensate the customer for the short period of its lost business operations at the end of Q4 2005.

55. In the cases of McMinnville, Kazan and Interlomas, IMAX agreed to provide a marketing allowance to the customers to assist with the opening of the Theatre. The net effect of these accommodations was to encourage the theatre owners to complete construction and open their theatres as early as possible. The opening of an IMAX theatre boosted name recognition for IMAX and promoted the brand among other potential theatre operators. It also advanced the date when film revenue would be received by IMAX.

56. In each case, the incentives offered to customers in Q4 2005 were all disclosed to PwC. In December of 2005, before some of the incentive agreements were even completed, IMAX specifically advised PwC that such discussions with theatre owners were underway. After the close of Q4 2005, every incentive agreement was documented in writing with signatures from the client and IMAX, along with executed Certificates of Acceptance. All were provided to PwC. PwC was aware that several of the documented agreements were not executed until after the close of Q4 2005.

57. IMAX pleads that the deficiencies in construction noted in the ~~Statement of~~ Claim in respect of Lark (Hong Kong), Kazan, McMinnville and Interlomas were documented in memoranda and supporting documents prepared by IMAX finance staff in early 2006 and submitted to PwC.

58. In fact, IMAX pleads that the deficiencies alleged in the ~~Statement of~~ Claim at paragraphs 105 through to paragraph 134 are excerpted from the very documents IMAX management provided to PwC during the 2005 audit. Accordingly, IMAX pleads that PwC was fully aware of the facts and circumstances when they suggested the application of multiple element accounting to these installations. It was these IMAX Finance Department memos that caused PwC to suggest MEA accounting. PwC suggested to management that it consider the application of MEA accounting so that only revenue for the projector and sound system (which were installed) should be recognized.

59. IMAX denies that Mr. Vance raised serious questions about the facts and circumstances surrounding these installations as alleged in paragraph 145 of the ~~Statement of~~ Claim. To the contrary, Mr. Vance's review of these installations was part of IMAX's internal audit and due diligence. As requested by management, he was highlighting issues to be appropriately addressed before management submitted its documentation to PwC and the Audit Committee.

60. All of the customers in issue signed Certificates of Acceptance for their theatre systems. PwC reviewed the agreements, the Certificates of Acceptance and supporting documentation during its audit for 2005, and in some cases independently sought confirmation directly from the customers concerning the installations. In fact, PwC had confirmations sent directly to fully half of the owners of theatres that had received installations but had not yet opened, asking the customers to confirm a number of facts directly with PwC, including key terms of the agreement, the date of acceptance and the dates of all amending agreements.

61. IMAX therefore pleads that PwC had appropriate information to confirm its judgment, and the judgment of management, concerning the application of MEA accounting to those installations.

**The PwC Audit**

62. In December of 2005, IMAX had discussions with PwC regarding the audit procedures which management would follow to prepare the audited financial statements for that year. The Company planned to release its 2005 annual report in March of 2006. That report would be filed with the SEC as part a mandatory Form 10-K. At that time, management disclosed to PwC that negotiations were under way with some customers to amend their contracts during the installation process. It was agreed that any such agreements, once concluded, would be reduced to writing by IMAX and the customer, for review by PwC.

63. Thereafter, appropriate documents to support revenue recognition for each installation were collected. When the supporting documentation was assembled, it was reviewed by appropriate personnel in the finance department of IMAX. These packages were later reviewed by the controller, Kathryn Gamble, who requested any additional materials required to fully document the status of each installation.

64. Ms. Gamble, and the Chief Financial Officer ("CFO") Mr. Joyce, read and prepared written summaries containing the accounting analysis for each of the 14 installations for which the Company proposed to recognize revenue in Q4 2005. IMAX management initially proposed that it would recognize all of the revenue on 14 installations for Q4 2005, notwithstanding that the silver screen had not been installed in 7 of those theatres. Management's initial judgment was that the screens were inconsequential and perfunctory, because, among other things, the

value of the uninstalled components (such as the silver screen) paled in comparison to the installed elements. Specifically, on a theatre system installation with a value of approximately $1.5 million, the IMAX screen accounts for between $100,000 and $125,000 of revenue. The remainder of the value of the theatre system resides in the projector, the sound system, and the glasses cleaning machine, as to which IMAX's obligations were substantially complete. Accordingly, management concluded that pursuant to GAAP, all of the revenue in respect of those installations should be recognized in Q4 2005.

65. PwC reviewed these summaries and asked for further materials to be provided to them. IMAX prepared detailed memoranda in respect of each installation for those theatres that would not open before the year end, setting out the installation status and referencing any contract documents (including amendments) setting out all outstanding obligations. IMAX management also prepared assessments of the remaining work required for each installation by hour and cost. Management calculated, on a percentage basis, the required time and expense to complete the installation against the overall installation expense.

66. PwC reviewed all of the memoranda and supporting documentation and, in addition, undertook its own independent review and investigation in respect of these installations. As a result of this review, PwC recommended against IMAX management's proposal to recognize all revenue on the 14 subject installations. However, PwC did not recommend that all revenue in respect of these theatre systems be deferred to a later period. Rather, PwC recommended that IMAX record the revenue associated with the projection and sound systems which were fully installed, and defer recognition of the screen system, even though in most cases, the screen had already been delivered and was awaiting installation.

67. Specifically, after reviewing IMAX management's analysis, PwC recommended the following:

(a) For 6 installations that had opened in the quarter, full revenue recognition was appropriate because the remaining elements were inconsequential;

(b) For 7 installations that had not opened, the screen element should be deferred to a later period; and,

(c) For 1 installation, that the revenue associated with the client's option to relocate the theatre be deferred to a later period.

68. The result of this recommendation by PwC was that IMAX would recognize less revenue in Q4 2005 and for 2005 as a whole than IMAX management had proposed when it submitted its own analysis to PwC.

69. After receiving the advice of PwC, IMAX management re-visited its analysis and determined that the screen component of the arrangement was a separate unit of accounting. The reasons for this were as follows:

(a) The screen had stand-alone value to the customer.

(b) There was objective and reliable evidence of the fair value of the screen.

(c) The Company's arrangements generally did not include a right of return.

70. The contracts IMAX had with its customers generally did not provide separate amounts for each of the components of an IMAX theatre. However, the fair value of the screen and other elements deferred as of the end of Q4 2005 and not recognized as revenue amounted to

$767,000.00. This deferral represented the fair value of the seven screens not fully installed by year end, plus the value of some other elements.

71. Fair value of the screen element was determined based on effective and reliable evidence which included arms-length commercial pricing for the purchase of the screen directly from the screen manufacturer and suppliers with no discounts. An additional fair value element was added for the costs related to the supervision of installation, again based on arms-length pricing with no discount.

72. The amount allocated to the delivered elements was the total fixed arrangement consideration (excluding any amount that may be contingent on future box office performance of the individual theatres) less the amounts allocated to the undelivered elements (the screen). It was the view of IMAX management, supported by PwC, that this methodology was consistent with the guidance provided in paragraph 2 of EITF 00-21.

73. Management's reconsideration of its initial revenue recognition's decision occurred because PwC had advised management that, given that the screen was not fully installed, it was PwC's opinion that the Company had not properly assessed the specific facts and circumstances of those installations in the fourth quarter against the guidance in EITF 00-21. PwC advised management that the guidance in the EITF 00-21 was mandatory and it applied to any arrangement with multiple elements to it. PwC advised management that it should review the arrangement by that guidance.

74. PwC advised the Company that the projector and sound system installation should be evaluated based on principles of SAB 104, given the application of EITF 00-21. Based upon this advice, the Company concluded that when the screen elements were deferred, any remaining

obligations related to the projector and sound system were immaterial or inconsequential or perfunctory. Therefore, revenue in respect of those deliverables (projector and sound system) should properly be recognized in Q4 2005. After receiving PwC's advice, the Finance Department then prepared new memoranda supporting revenue recognition in respect of these elements of the theatre system.

75. Draft financial statements were then presented to the Audit Committee of IMAX at meetings on March 1, 2006. Presentations were made by IMAX Finance Staff and PwC. After discussions with the presenters, the Audit Committee approved the proposal with respect to revenue recognition and the draft 2005 financial statements as prepared. Importantly, PwC advised the Audit Committee that the application of EITF 00-21 to the transaction was not a change in accounting policy, but the application of an existing policy to new or unique facts and circumstances.

76. The Defendants therefore deny the allegation in paragraph 147 of the ~~Statement of~~ Claim that "management persuaded PwC" with "strenuous effort" to approve its accounting treatment. To the contrary, it was PwC that first suggested the application of MEA to IMAX's theatre systems. Management followed the advice of PwC, as did the Audit Committee. in approving the application of MEA accounting to the theatre systems in Q4 2005.

77. The draft financial statements were then presented to the Board of Directors of IMAX on March 8, 2008 by the finance department, PwC and by the Head of the Audit Committee. After discussion, the Board approved the release of the 2005 audited financial statements.

78. In PwC's opinion, the consolidated financial statements for 2005 presented fairly, in all material respects, the financial position of IMAX and its subsidiary, and the results of their

operations and their cash flows, and their conformity with US GAAP. In addition, PwC confirmed that the financial statement schedules presented fairly, in all material respects, the information set forth therein in conjunction with related consolidated financial statements.

79. PwC also confirmed management's assessment that IMAX maintained effective internal control over financial reporting based upon the applicable third party standard. However, PwC and management also evaluated, for Sarbanes-Oxley purposes, management's inability to arrive at a proper accounting conclusion for Q4 2005 without the significant involvement of PwC. This resulted in PwC reporting a significant deficiency to the Audit Committee related to management's initial evaluation of the 2005 Q4 system arrangements under US GAAP.

80. IMAX pleads that all of the Defendants and PwC honestly arrived at their accounting judgments in respect of the 2005 financial statements of IMAX. The documents prepared, collected and reviewed by management and PwC, as well as the draft financial statements presented to the Audit Committee, were the product of careful, professional and competent due diligence by all those involved, including PwC.

81. PwC had been the auditors of IMAX for many years and were very familiar with all aspects of IMAX's business. PwC knew, or ought to have known, that management would provide them with whatever documents PwC required in order to give appropriate advice and to give its audit opinion. The Defendants therefore deny the allegations in paragraphs 148 to 152 of the ~~Statement of~~ Claim to the effect that PwC later became aware of facts that "might have impacted its opinion" regarding revenue recognition. PwC had full access to management and to IMAX documents during the 2005 audit period. PwC was provided with all appropriate documentation and conducted its testing of management judgments as it saw fit uninfluenced by

management. PwC rendered its opinion upon the information provided by IMAX without requesting further documents though it was fully aware of the fact that some theatres were not fully constructed and not open.

**The February 17, 2006 Press Release**

82. On February 17, 2006, IMAX issued a press release which it later filed on SEDAR and with the SEC concerning its expected Q4 2005 financial results, and its expected revenues for the year 2005. IMAX relies upon the February 17, 2006 press release as filed for a true and accurate statement of its contents.

83. IMAX denies that the press release was false and/or misleading, as alleged in paragraph 156 of the ~~Statement of~~ Claim. IMAX pleads that the Plaintiffs have mischaracterized the press release. The press release clearly disclosed that IMAX was announcing an expectation of results, and not its final results. The press release noted that it was based on preliminary financial data, and that it was subject to the final closing of the Company's books and records. This press release was accompanied by a safe harbour notice which clearly disclosed that the press release contained forward-looking financial information that was based on management assumptions and existing information and involved certain risks and uncertainties which could cause actual results to differ materially.

**The March 9, 2006 Press Release and Form 10-K**

84. On March 9, 2006, IMAX filed its Form 10-K for the year 2005, and issued a press release concerning its financial results. IMAX relies upon the Form 10-K and the March 9, 2006 press release for a true and accurate statement of its contents.

85. IMAX denies that the press release of March 9, 2006 in its Form 10-K was materially false or misleading in any respect, or as alleged in paragraph 167 of the ~~Statement of~~ Claim. IMAX further denies the allegation in paragraph 166 of the ~~Statement of~~ Claim that its application of MEA accounting to the theatre systems installed in Q4 2005 was a change in accounting policy, or that it failed to disclose such change. IMAX had applied MEA to its theatre system sales for installations in Q4 2005 in accordance with EITF 00-21, SAB 104 and the advice of PwC. The March 9th press release and the filed Form 10-K accurately disclosed the IMAX financial statements, as audited by PwC, on that date.

**Allegations under the Ontario *Securities Act***

86. As to the allegations regarding the 2005 financial statements, the Defendants who signed the Form 10-K certified that those statements presented fairly in all material respects IMAX's financial conditions and results of operations in the honest belief that they did so after undertaking the appropriate due diligence and reasonable investigations, as set out above. In particular, the Defendants rely upon: the internal investigations undertaken in November and December of 2005 in respect of the Delhi Post; the due diligence of management in reviewing Q4 2005 installations; the suggestion management received from PwC in respect of MEA accounting on the deferral of the screen component of revenue; the advice of PwC to the Audit Committee that there was no change in accounting policy; and the independent investigations of PwC with respect to management's judgment on the accounting treatment for the installations in Q4 2005.

87. The Defendants plead that they conducted a reasonable investigation in respect of the referenced press releases and financial statements for 2005. The Defendants plead and rely upon section 138.4(6) of the Ontario *Securities Act*.

88. The Defendants further plead that they are not liable with respect to any misrepresentation contained in the 2005 financial statements. Those statements were accompanied by an opinion from PwC which the Company was entitled to publish in its Form 10-K that the statements complied with GAAP. In that respect, the Defendants rely upon section 138.4(11) of the *Securities Act*.

89. As to the allegations regarding the 2006 press releases, which are non-core documents, the Defendants Wechsler, Gelfond, Joyce and Gamble plead that they had no knowledge of any misrepresentation within the meaning of s. 138.4(1) when the press releases were issued. For the same reason, those Defendants plead that the Plaintiffs cannot recover damages above the statutory cap, pursuant to s.138.7(2) of the *Securities Act*.

90. In respect of the particular loss alleged at the close of the Class period on August 9, 2006, the Defendants plead that the changes in the market price of the securities were unrelated to the alleged misrepresentations in the press releases and financial results for 2005 of IMAX. The Defendants plead and rely upon section 138.5(3) of the *Securities Act*.

91. The Defendants plead that the liability limits set out in Section 138.1 of the *Securities Act* apply to all the statutory claims advanced by the Plaintiffs.

92. The Defendants plead that the action under Part XXIII.1, which was commenced with the filing of the Claim on December 12, 2011, arising out of the statements made by IMAX on

February 17 and March 9, 2006, is statute-barred in its entirety. The Defendants plead and rely upon section 138.14 of the *Securities Act.*

**The March 9, 2006 Press Release: Strategic Alternatives**

93. ~~92.~~ In early 2005, IMAX was made aware of the interest of several prospective buyers. After this unsolicited approach, IMAX retained external investment banking advisors. The possibility of a change of control transaction was discussed by IMAX management in July of 2005. Thereafter, nothing of substance occurred for the balance of 2005. There was therefore nothing to discuss with PwC or with any other external advisor during the 2005 audit period.

94. ~~93.~~ IMAX pleads that the retention of investment bankers in respect of an unsolicited approach to a public company is an ordinary course business decision and does not mean that any transaction is likely or will even be explored.

95. ~~94.~~ However, in early March of 2006, the Board of Directors of IMAX did decide to explore the possibility of a strategic transaction, and accordingly, a public announcement to that effect was made in a second press release of March 9, 2006.

96. ~~95.~~ The Defendants deny the allegations concerning strategic alternatives set out in paragraphs 68 to 76 of the ~~Statement of~~ Claim. There was no linkage between the prospect of exploring strategic alternatives, and either the preparation of the 2005 financial statements or the audit of those financial statements by PwC. PwC was aware of the March 9, 2006 press release that IMAX would be exploring strategic alternatives, and did not raise any issue about the substance or timing of that press release in relation to PwC's audit of the 2005 financial

statements. Indeed, PwC noted in its report to the Audit Committee concerning the 2005 audit the following:

> "Management provided us with access to all records, documents and other required information and management gave us its full co-operation throughout the year and kept us informed of important transactions and events."

97. ~~96.~~ PwC was in regular communication with the Audit Committee in 2005 and 2006 and never expressed a desire to modify that statement in light of the March 9, 2006 disclosure concerning IMAX's decision to explore strategic alternatives. In any event, the March 9, 2006 press release that IMAX had begun a process to explore strategic alternatives was accompanied by a statement that there could be no assurance that this exploration of strategic alternatives would result in a sale or merger of the company.

98. ~~97.~~ Notwithstanding the disclosure that there was no assurance concerning the success of the strategic alternative process, the volume of trading in IMAX shares on the NASDAQ increased from an average of approximately 465,000 shares over the previous 10 days to approximately 7,623,700 shares on March 9, 2006. The price of IMAX shares on the NASDAQ increased from $9.50 per share on March 8, 2006 to an average of $10.45 for the following 10 trading days.

99. ~~98.~~ On August 9, 2006, IMAX reported that while it had received significant interest from multiple parties in its exploration of strategic alternatives, its view was that there were no buyers who had indicated a willingness to acquire the company at a valuation that would be supported by the Board of Directors.

**The SEC Letter**

100. ~~99.~~ In the same press release, IMAX disclosed that it was in the process of responding to an informal inquiry from the SEC regarding the Company's timing of revenue recognition, including its application of MEA accounting and its revenue recognition for theatre systems. The Company stated that it believed its application of MEA accounting was, and has always been, in accordance with US GAAP and that the Company's position was supported by its auditors, PwC.

101. ~~100.~~ The SEC Division of Corporate Finance letter of September 20, 2006 is not, as alleged in paragraph 66 of the ~~Statement of~~ Claim, confirmation that IMAX did not consider the application of EITF 00-21 to any theatre system installation prior to the fourth quarter of fiscal 2005.

102. ~~101.~~ IMAX responded to the SEC letter of September 20, 2006, as follows:

> "Application of EITF 0021 to the Company
>
> The Company currently accounts for multiple elements in its revenue arrangement by reference to EITF 0021, SAB 104 and SFAS 13, as applicable. EITF 0021 was applicable to arrangements entered into in fiscal periods beginning after June 15, 2003. Accordingly, the Company applied EITF for periods beginning **July 1, 2003**. Prior to that date, the Company applied the multiple element arrangement guidance in SAB 101. **[Emphasis Added]**
>
> ...
>
> as described in the Company's accounting policies in the years prior to 2005, the guidance in EITF 0021 effective for periods beginning after July 1, 2003 has been applied to those arrangements that included deliverables in addition to the equipment and maintenance components [see note 2(m) of the 2004 Form 10-K].

103. ~~102.~~ There was therefore no sudden change of accounting policy as alleged in paragraph 67 of the ~~Statement of~~ Claim. Multiple element accounting was applied by IMAX on and after July 1, 2003 and was completely unrelated to any possible sale of the Company.

**The July 2007 Re-statement**

104. ~~103.~~ SAB Statement of Financial Accounting Standards no. 154: Accounting Changes and Error Corrections ("SFAS 154") was issued in May 2005 and provides guidance on the accounting for reporting of accounting changes and error corrections. An issuer must report any errors in financial statements through a re-statement under SFAS 154.

105. ~~104.~~ In July of 2007, IMAX determined that it had made errors in its past financial statements related to revenue recognition of theatre systems. In a July 20, 2007 10-K, IMAX disclosed that it had made "certain errors related to revenue recognition resulting from the Company's review of its theatre system arrangements over the past five years in response to comments received from the Staff of both the SEC and the OSC which indicated insufficient analysis of various sales and lease transactions and the accounting effect of contractual provisions within them".

106. ~~105.~~ Accordingly, on July 20, 2007, IMAX restated its financial statements and also retroactively applied its revenue recognition policy to theatre system installations for fiscal year 2002 through the third quarter of fiscal year 2006. Consistent with SFAS 154, the IMAX restatement consisted of two separate and distinct components with regard to the restated theatre system revenue:

(a) The correction to MEA accounting under EITF 00-21 (treating the entire theatre system as a single component rather than as multiple elements), was considered a correction of an error that required the restatement of IMAX's financials; and

(b) IMAX's changes to its revenue recognition policy based on the suggestions of the SEC (to record revenue only upon new objective criteria) separately required the restatement of certain transactions in the IMAX financials.

107. ~~106.~~ There were nine theatre systems in the fiscal year 2005 and one in 2006 for which IMAX had installed and tested the projection and sound system for a theatre, but the installation of the 3D silver screen was not completed in the same quarter; seven of these were in the fourth quarter of 2005. For each of these theatre systems, IMAX ultimately concluded that it incorrectly interpreted SAB 104 or MEA accounting pursuant to EITF 00-21. IMAX corrected the errors in its earlier financial statements for each of these ten theatres by moving the revenue for each of these theatres to the quarter in which the 3d silver screen was finally installed and all administrative requirements were also complete.

108. ~~107.~~ There were two theatres in the first three quarters of 2005 in which the 3D silver screen was not installed within the quarter, when restated the associated revenue was shifted to the next quarter in 2005:

| **Theatre Location** | **Originally Recognized** | **Moved To** |
|---|---|---|
| Poznan, Poland | Q1 2005 | Q2 2005 |
| AEZ – Delhi, India | Q3 2005 | Q4 2005 |

109. ~~108.~~ There was seven theatres in the fourth quarter of 2005 in which the 3D silver screen was not installed within the quarter; when restated the associated revenue shifted out of fiscal year 2005 to a future fiscal period:

| **Theatre Location** | **Originally Recognized** | **Move To** | **Reason for restating revenue** |
|---|---|---|---|
| Beijing Radio, Film & TV | Q4 2005 | Q1 2006 | Silver screen was installed and unqualified customer acceptance occurred in Q1 2006 |
| Lodz, Poland | Q4 2005 | Q2 2006 | Silver screen was installed in March 2006; Customer provided for projectionist training independent of IMAX but IMAX could not locate documentation evidencing that training had been performed and accepted; recognition moved to opening date in Q2 2006 |
| Kazan, Russia | Q4 2005 | Q4 2006 | The silver screen was installed in Q4 2006; recognition moved accordingly |
| Beijing SUC | Q4 2005 | Q2 2006 | Installation was completed (including silver screen) in 2005, but IMAX agreed, as a courtesy, to provide a larger screen; recognition moved to Q2 2006 when larger screen was installed |
| Santa Fe/ Interlomas | Q4 2005 | Q3 2006 | Silver screen was installed in Q2 2006; IMAX could not locate documentation evidencing that training had been performed and accepted; recognition moved to public opening in Q3 2006 |
| Manila, Philippines | Q4 2005 | Q2 2006 | Silver screen was installed in Q1 2006; IMAX could not locate documentation evidencing that training was accepted by the customer; recognition moved to |

| | | | |
|---|---|---|---|
| | | | public opening in Q2 2006 |
| McMinnville Oregon | Q4 2005 | Q2 2007 | Silver screen was installed in Q4 2006; IMAX could not locate documentation evidencing that training had been accepted by the customer; recognition was moved to public opening in Q2 2007 |

110. ~~109.~~ There was one theatre in the second quarter of 2006 in which the 3D silver screen was not installed within the quarter; when restated, the associated revenue was shifted to the next quarter in 2006.

| Theatre Location | Originally Recognized | Move To | Reason for restating revenue |
|---|---|---|---|
| Colleyville, Texas | Q2 2006 | Q3 2006 | The silver screen was installed in Q3 2006; recognition moved accordingly |

111. ~~110.~~ The ten theatres itemized herein are the only theatres for which IMAX did not complete the installation of the 3D silver screen prior to the end of the fiscal quarter in which it installed the projection and sound system.

**The Allegations at Common Law**

112. ~~111.~~ As to the allegations of negligent and reckless misrepresentation, the Defendants plead that there is no duty of care, at common law, owed by ~~a~~ IMAX as a public issuer and/or by its directors and officers, through IMAX's public filings and related press releases, to all potential investors in the secondary marketplace.

113. ~~112.~~ Further, the Defendants deny that any of the Plaintiffs or the other Class members actually detrimentally relied upon the pleaded misrepresentations, if proven, in acquiring or holding their shares in IMAX during the Class Period.

114. ~~113.~~ The two Plaintiffs have specifically admitted, under oath, that they purchased their IMAX shares for reasons that were completely unrelated to any representation contained in its relevant press releases and financial statements.

115. ~~114.~~ The Defendants deny the allegations in paragraphs 198 – 203 of the ~~Statement of~~ Claim attempting to link IMAX's public disclosure to "efficient market pricing". The Defendants put the Plaintiffs to the strict proof thereof.

116. ~~115.~~ As to the allegations of individual liability, the named personal Defendants deny that any of the acts or omissions alleged in the ~~Statement of~~ Claim are independently tortious, or actionable under any statute, and they deny that they are in any way personally liable to the Plaintiffs or other Class members.

117. ~~116.~~ The Defendants further deny that IMAX is vicariously liable as alleged in paragraph 228 of the ~~Statement of~~ Claim, or that the individual Defendants.

118. ~~117.~~ As to the allegation of conspiracy, the Defendants Gelfond, Wechsler, and Joyce put the Plaintiffs to the strict proof thereof. At all material times, those Defendants acted honestly and in good faith and in the best interests of IMAX and its shareholders. Their decisions with respect to the recognition of revenue in Q4 2005 were made in reliance upon: the judgment of IMAX management; the policies and procedures that management followed; the advice of

PwC; the audit by PwC; the review of the financial statements by the Audit Committee; and the approval of those financial statements by the Board of Directors.

119. ~~118.~~ These Defendants deny all of the itemized allegations of conspiracy set out in paragraph 195 of the ~~Statement of~~ Claim and put the Plaintiffs to the strict proof thereof. Messrs. Gelfond, Wechsler and Joyce did not breach sections 77(1) and 78(1) of the *Securities Act* as alleged, or of sections 12, 13 and 18 of the *Securities Exchange Act* as alleged, or the reporting requirements of the NASDAQ and the TSX.

120. ~~119.~~ The conduct of the Defendants was, at all material times, undertaken honestly and in good faith and in the best interests of IMAX and its shareholders, including the Class members. The conduct of the individual Defendants was careful, professional and prudent, and met appropriate standards of corporate governance and due diligence. None of the conduct of the Defendants was of a character that would qualify for an award of punitive damages. That unsubstantiated allegation should attract an award of full indemnity costs against the Plaintiffs.

121. ~~120.~~ The Defendants deny that any damages can be assessed in this action on an aggregated basis for the Class as a whole, or any part of it.

122. ~~121.~~ In any event, the Plaintiffs and Class Members have failed to act properly and reasonably to mitigate any damages they may have suffered.

**Application of Foreign Law and Available Remedy**

123. ~~122.~~ Approximately 85% of the IMAX shares acquired by the Class were sold in the United States (on the NASDAQ) rather than on the TSX. In respect of those NASDAQ purchases, the application of U.S. Securities law was clearly contemplated by both IMAX and its

investors. Moreover, most of the Class Members who purchased on the NASDAQ are residents of the United States or other jurisdictions outside Ontario, and their alleged losses were suffered exclusively in the United States or other jurisdictions outside Ontario.

124. ~~123.~~ Those Class Members, who purchased their shares on the NASDAQ, had an available remedy through Class Actions commenced in the United States as early as August 11, 2006. Those actions were eventually consolidated into a single proceeding in the United States District Court for the Southern District of New York ("In re IMAX Securities Litigation") which seeks damages on their behalf, based on the same IMAX statements pleaded in this action, but under SEC Rule 10b-5 and the United States *Securities and Exchange Act of 1934*.

125. ~~124.~~ The Class in this action makes a claim founded on a construction of the Ontario *Securities Act*, and particularly Part XXIII.1 thereof. The imposition of that statutory cause of action, by those Class Members, on the Defendants to this action, including individual Defendants resident in the United States, arising out of share purchases on a foreign exchange, to claim damages allegedly sustained in that foreign jurisdiction, is contrary to the interpretative presumptions of constitutionality, intraterritoriality, and compliance with international law and comity. In the alternative, the *Securities Act*, including Part XXIII.1, is constitutionally inapplicable to those Class Members in this case by reason of the territorial limits on provincial jurisdiction imposed under the Constitution of Canada, as defined under the *Constitution Act*, 1982.

126. ~~125.~~ The Defendants further plead that Ontario conflict of laws ~~priniciples~~principles identify the relevant governing law for any tort claim by each individual Class Member to be the

*lex loci delicti*, that is, the governing law for those allegations by those persons is the jurisdiction in which the alleged tort was completed.

127. ~~126.~~ The Defendants request that this Honourable Court dismiss this action, with costs.

February ~~6,~~ 16, 2012

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. 416-601-7998

Dana M. Peebles LSUC #30820V
Tel. 416-601-7839
Fax 416-868-0673

**Solicitors for the Defendants**

TO: **Sutts, Strosberg LLP**
600 Wescourt Place
251 Goyeau Street
Windsor, ON N9A 6V4

Jay Strosberg
Tel: 519-561-6285
Fax: 866-316-5308

**Co-solicitors for the Plaintiffs**

AND TO: **Siskinds LLP**
680 Waterloo Street
P. O. Box 2520
London, ON N6A 3V8

A. Dimitri Lascaris
Michael Robb

Tel: 519-672-2121
Fax: 519-672-6065

**Co-solicitors for the Plaintiffs**

000462

BETWEEN:

MARVIN NEIL SILVER, *et al.* **Plaintiffs** - and - IMAX CORPORATION, *et al.* **Defendants** Court File No. CV-06-3257-00

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

Proceeding Commenced at Brampton

**STATEMENT OF DEFENCE**

**McCarthy Tétrault LLP**
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto, ON M5K 1E6

R. Paul Steep LSUC #21869L
Tel. (416) 601-7998

Dana M. Peebles LSUC #30820V
Tel. (416) 601-7839
Fax (416) 868-0673

**Lawyers for the Defendants**

#11145990

Document comparison by Workshare Professional on Thursday, February 16, 2012 4:23:41 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS/11145990/10 |
| Description | DOCS-#11145990-v10-Statement.Defence.Feb.16.2012_(IMAX) |
| Document 2 ID | PowerDocs://DOCS/11145990/12 |
| Description | DOCS-#11145990-v12-Statement.Defence.Feb.16.2012_(IMAX) |
| Rendering set | MTStandard |

| Legend: | |
|---|---|
| Insertion | |
| ~~Deletion~~ | |
| ~~*Moved from*~~ | |
| *Moved to* | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 9 |
| Deletions | 63 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 72 |

# EXHIBIT D

This is Exhibit "D" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Related Westlaw Journal Article

United States District Court,
S.D. New York.
Motti KAPLAN, individually and on behalf of all others similarly situated, Plaintiff,
v.
Richard L. GELFOND, Bradley J. Wechsler, Francis T. Joyce, and IMAX Corporation, Defendants.
Santiago Guzman, individually and on behalf of all others similarly situated, Plaintiff,
v.
IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, and Francis T. Joyce, Defendants.
Eric S. Bergen, individually and on behalf of all others similarly situated, Plaintiff,
v.
Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and IMAX Corporation, Defendants.
Michael J. LaRosa, individually and on behalf of all others similarly situated, Plaintiff,
v.
IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, and Francis T. Joyce, Defendants.
Robert Feeney, individually and on behalf of all others similarly situated, Plaintiff,
v.
IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, and Francis T. Joyce, Defendants.
Floyd Reynolds, individually and on behalf of all others similarly situated, Plaintiff,
v.
IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, and Francis T. Joyce, Defendants.
Anthony Caiafa, individually and on behalf of all others similarly situated, Plaintiff,
v.
IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, and Francis T. Joyce, Defendants.
Robert B. Gray, individually and on behalf of all others similarly situated, Plaintiff,
v.
IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, and Francis T. Joyce, Defendants.

Nos. 06 Civ. 6128(NRB), 06 Civ. 6235(NRB), 06 Civ. 6313(NRB), 06 Civ. 6349(NRB), 06 Civ. 6449(NRB), 06 Civ. 6693(NRB), 06 Civ. 7057(NRB), 06 Civ. 7162(NRB).
Jan. 18, 2007.

**Background:** Eight groups of investors brought putative class actions against entertainment corporation, alleging securities fraud. Investor groups separately moved to consolidate actions, to be appointed as lead plaintiff, and to designate their lawyers as lead counsel.

**Holdings:** The District Court, Buchwald, J., held that:
(1) consolidation of actions was appropriate;
(2) group with largest financial interest would be properly appointed lead plaintiff; and
(3) lead plaintiff met typicality and adequacy requirements under federal rules.

Motions granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A ⚷8**

170A Federal Civil Procedure
170AI In General
170AI(A) In General
170Ak8 k. Consolidation of actions. Most Cited Cases
(Formerly 170Ak8.1)

District court has broad discretion to determine whether to consolidate actions, and in making such determination, it is to consider whether judicial economy favors consolidation. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⚷8**

170A Federal Civil Procedure

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

170AI In General
170AI(A) In General
170Ak8 k. Consolidation of actions. Most Cited Cases
(Formerly 170Ak8.1)

When court is presented with securities actions in which complaints are based on same public statements and reports, consolidation is appropriate if actions present common questions of law and fact and if parties will not be prejudiced. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⚿8**

170A Federal Civil Procedure
170AI In General
170AI(A) In General
170Ak8 k. Consolidation of actions. Most Cited Cases
(Formerly 170Ak8.1)

Consolidation of actions was appropriate as to putative class actions brought by eight groups of investors against entertainment corporation, alleging securities fraud; groups relied on common pattern in allegations that statements to investing public misrepresented or omitted material facts about financial status of corporation, and shared common legal question whether corporation's misrepresentations violated federal securities laws. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⚿8**

170A Federal Civil Procedure
170AI In General
170AI(A) In General
170Ak8 k. Consolidation of actions. Most Cited Cases
(Formerly 170Ak8.1)

Differences in causes of action, defendants, or class period do not render consolidation of class actions inappropriate if cases present sufficiently common questions of fact and law, and differences do not outweigh interests of judicial economy served by consolidation. Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⚿187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

Investor group with largest financial interest would be properly appointed lead plaintiff as to consolidated putative class actions brought by eight groups of investors against entertainment corporation, alleging securities fraud; group had largest amount of net funds expended on corporation's stock, and its approximate losses were more than seven times those of nearest competitor using "first in, first out" analysis. Private Securities Litigation Reform Act of 1995, § 101(a)(3)(B)(i), 15 U.S.C.A. § 78u–4(a)(3)(B)(i).

**[6] Federal Civil Procedure 170A ⚿164**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak164 k. Representation of class; typicality. Most Cited Cases

Typicality threshold for class certification is satisfied where claims arise from same conduct from which other class members' claims and injuries arise. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⚿187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

Investor group, as appointed lead plaintiff, met typicality and adequacy requirements under federal rules as to consolidated class actions brought by in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

vestors against entertainment corporation, alleging securities fraud; both group and other members of class claimed to have been injured by overvaluation of corporation's stock, underlying conduct from which class members' claims arose was same, and group had retained competent and experienced counsel. Private Securities Litigation Reform Act of 1995, § 101(a)(3)(B)(i), 15 U.S.C.A. § 78u–4(a)(3)(B)(i); Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[8] Federal Civil Procedure 170A ⚷164**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak164 k. Representation of class; typicality. Most Cited Cases

Adequacy requirement for class certification is satisfied where: (1) class counsel is qualified, experienced, and generally able to conduct litigation; (2) there is no conflict between proposed lead plaintiff and members of class; and (3) proposed lead plaintiff has sufficient interest in outcome of case to ensure vigorous advocacy. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ⚷187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

Presumption that appointed lead plaintiff in securities fraud class action is most adequate may be rebutted if there is evidence that it will not fairly and adequately protect interests of class, or is subject to unique defenses that render it incapable of adequately representing class. Private Securities Litigation Reform Act of 1995, § 101(a)(3)(B)(iii)(II), 15 U.S.C.A. § 78u–4(a)(3)(B)(iii)(II).

***89** Nancy Kaboolian, Abbey, Spanier, Rodd, Abrams & Paradis, LLP, New York, NY, for Plaintiff Motti Kaplan and Movant Westchester Capital Management, Inc.

Evan J. Smith, Brodsky & Smith, L.L.C., Mineola, NY, for Plaintiff Santiago Guzman and Movant IMAX Investor Group.

***90** Robert I. Harwood, Samuel Kenneth Rosen, Wechsler Harwood LLP, New York, NY, for Plaintiff Eric Bergen and Movant Y Lu.

Ronen Sarraf, Sarraf Gentile, LLP, New York, NY, for Plaintiff Michael J. LaRosa and Movant Jay M. Spritzler.

Brian Philip Murray, Murray, Frank & Sailer, LLP, New York, NY, for Plaintiff Robert Feeney.

Jonathan K. Levine, Girard Gibbs & De Bartolomeo, LLP, San Francisco, CA, for Plaintiff Floyd Reynolds and Robert Lieblang.

Jack Gerald Fruchter, Lawrence Donald Levit, Abraham, Fruchter & Twersky, L.L.P., New York, NY, for Plaintiff Anthony Caiafa.

Catherine A. Torell, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY, for Plaintiff Robert B. Gray and Movants Gary and Marlene Creagh.

David Avi Rosenfeld, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins, LLP(LIs), Melville, NY, for Movant Snow Capital Investment Partners, L.P.

Christopher J. Keller, Labaton Rudoff & Sucharow LLP, New York, NY, for Movant Steelworkers Pension Trust.

Lewis Liman, Cleary, Gottlieb, Steen & Hamilton LLP, New York, NY, for Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, and Francis T. Joyce.

## MEMORANDUM AND ORDER

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

BUCHWALD, District Judge.

This matter involves eight related cases brought against the IMAX Corporation ("IMAX"), a Canadian company, and three of its high level executives,[FN1] on behalf of a purported class of investors who purchased IMAX stock during the class period.[FN2] Seven sets of investors each filed motions to consolidate the actions, to be appointed as lead plaintiff, and to designate their lawyers as lead counsel. These include: (1) Westchester Capital Management, Inc. ("Westchester Capital"), acting as the investment advisor for five different investment funds[FN3] ("five funds"); (2) Snow Capital Investment Partners, L.P. ("Snow Capital"); (3) the Steelworkers Pension Trust ("Steelworkers Pension"); (4) Y Lu; (5) Paul Witt, Gerald Nash, Michael Pemberton, and Stacey Shehorn (collectively, the "IMAX Investor Group"); and (7) Jay M. Spritzler.[FN4] For the reasons set forth below, we consolidate the above-captioned actions pursuant to Fed. R. Civ. Proc. 42(a), appoint Westchester Capital as lead plaintiff, and designate the law firm of Abbey Spanier Rodd Abrams & Paradis, LLP, as lead counsel.

FN1. Richard Gelfond has served as co-chief executive officer since May of 1996, and co-chairman of IMAX since June of 1996. Bradley J. Wechsler has served as co-chief executive officer with Gelfond since May of 1996. Francis T. Joyce has served as IMAX's chief financial officer since 2001.

FN2. Seven of the eight plaintiffs (Eric Bergen, Robert Gray, Santiago Guzman, Robert Feeney, Motti Kaplan, Michael LaRosa, and Floyd Reynolds), along with movants Westchester Capital Management, Y Lu, and Jay Spritzler, specify the class period to begin on February 17, 2006 and end on August 9, 2006. Plaintiff Anthony Caiafa and movants Snow Capital Investments, Robert Lieblang, Steelworkers Pension, Gary and Marlene Creagh, and IMAX Investor Group specify the class period to begin on October 28, 2004 and end on August 9, 2006. We will address the issue of differing class periods below.

FN3. These five funds are GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL, and SphinX Merger Arbitrage Fund. *See* Declaration of Roy Behren (Nov. 2, 2006) ("Behren Decl.") ¶ 2

FN4. We note that Gary and Marlene Creagh have since withdrawn their motion.

## *DISCUSSION*

### I. Consolidation of the Actions

[1][2] Rule 42(a) of the Federal Rules of Civil Procedure provides as follows:

> When actions involving a common question of law and fact are pending before the court, it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated;***91** and it may make such orders concerning proceedings therein as may tend to avoid unnecessary cost or delay.

Under Rule 42(a), we have broad discretion to determine whether to consolidate actions, and in making this determination, we are to consider whether judicial economy favors consolidation. *See Johnson v. Celotex Corp.,* 899 F.2d 1281, 1285 (2d Cir.1990), *cert. denied* 498 U.S. 920, 111 S.Ct. 297, 112 L.Ed.2d 250 (1990). When a court is presented with securities actions in which the complaints are based on the same "public statements and reports," consolidation is appropriate if the actions present common questions of law and fact and if the parties will not be prejudiced. *Werner v. Satterlee, Stephens, Burke & Burke,* 797 F.Supp. 1196, 1211 (S.D.N.Y.1992) (consolidation in securities actions appropriate in cases where complaints are based on "overlap[ping]" public statements and reports and where there are common questions of law and fact). However, "each case in which it may appear to be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

desirable to consolidate complaints in different actions must be evaluated on its own facts with close attention to whether the anticipated benefits of a consolidated complaint outweigh potential prejudice to the parties." *Id.* (quoting *Katz v. Realty Equities Corp.*, 521 F.2d 1354, 1360 (2d Cir.1975) ).

Here, all plaintiffs and movants allege that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder, by issuing public statements and reports which misrepresented the financial standing of IMAX. All plaintiffs and movants also agree that the relevant class period ended on August 9, 2006. *See supra* note 2. On that day, IMAX announced: (1) that the SEC was investigating the timing of its revenue recognition practice, which segregated and recognized revenue in different financial quarters; (2) that it had uncovered a material weakness in its accounting which affected revenues; and (3) that a previously announced potential sale of the company was not progressing. This news precipitated a drop in the price of IMAX stock. *See, e.g., Kaplan v. Gelfond,* No. 06 Civ. 6128, Class Action Complaint for Violation of Federal Securities Laws ¶¶ 23–48. However, there is disagreement as to when the class period began, thus resulting in two different class periods alleged by the plaintiffs and the movants. The shorter of the two alleged class periods, which is relied upon by seven complaints and three of the seven movants, starts on February 17, 2006, when IMAX announced its anticipated 2005 financial results in a press release. Between February 17, 2006 and August 9, 2007, IMAX made several additional public announcements about the well-being of the company, which resulted in a rise in the price of IMAX stock. The longer alleged class period, found in one of the eight complaints and relied upon by four of the seven movants, starts on October 28, 2004, sixteen months prior to the specified start of the shorter period. The parties who allege this period claim that the series of IMAX misrepresentations began with an October 28, 2004 press release, in which IMAX reported its third quarter 2004 financial results. *See, e.g., Caiafa v. IMAX Corp.*, No. 06 Civ. 7057, Complaint for Violation of the Federal Securities Laws ¶¶ 18–31.

[3] Despite the different start dates for the class period, we believe that consolidation is appropriate here. At the outset, we note that all the movants support consolidation and that no party objects, a consideration which weighs heavily against the potential for prejudice. *See, e.g., Olsen v. New York Community Bancorp, Inc.*, 233 F.R.D. 101, 104–105 (E.D.N.Y.2005) ("[I]t is apparent that no party will suffer prejudice from consolidation, a fact confirmed by the complete absence of any opposition thereto."). However, since consolidation issues directly involve the court's supervision of these litigations, we nevertheless address how the parties' disagreement regarding the appropriate start date for the period class period affects our Rule 42(a) analysis.

[4] Differences in causes of action, defendants, or the class period do not render consolidation inappropriate if the cases present sufficiently common questions of fact and law, and the differences do not outweigh the interests of judicial economy served by consolidation. *See, e.g., Pinkowitz v. Elan Corp.*, Nos. 02 Civ. 862(WK) et al., 2002 WL 1822118, at *3–4 (S.D.N.Y. July 29, 2002). In ***92** this case, the difference in start dates results in parties' reliance upon different financial statements in their pleadings. Of course, to the extent that the class periods overlap, the factual allegations overlap. However, even for the non-overlapping period, all plaintiffs and movants rely on a common pattern in their allegations: that defendants' statements to the investing public misrepresented or omitted to state material facts about the financial status of IMAX. Further, these matters share a common legal question: whether defendants' misrepresentations violated federal securities laws. In other words, the actions are all "securities fraud claims that arise from a common course of conduct. The dates on which the misrepresentations occurred do not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

change their nature." *In re Cendant Corp. Lit.*, 182 F.R.D. 476, 478 (D.N.J.1998) (noting that "[c]ourts which have addressed the issue have held that differing class periods alone will not defeat consolidation or create a conflict"); *see also In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d. 286, 293 (E.D.N.Y.1998) (consolidating actions alleging violations of section 10(b) and 20(a) under Securities Exchange Act of 1934, despite the fact that one of the four complaints specified a class period which began before and ended during the class period alleged in the other three complaints); *Dolan v. Axis Capital Holdings Ltd.*, Nos. 04 Civ. 8564(RJH) et al., 2005 WL 883008, at *2 (S.D.N.Y. Apr.13, 2005) (finding consolidation of cases with "similar or overlapping claims" under Section 10(b) and 20(a) of the Securities and Exchange Act of 1934, along with Rule 10b–5, appropriate pursuant to Rule 42(a) despite different but "coextensive" class periods).

Given the overlapping questions of law and fact presented in the cases before us, litigating a multitude of separate actions would only ensure the duplication of effort amongst parties and the needless expenditure of judicial resources. Thus, in light of the "well recognized" principle that the "consolidation of stockholders' suits often benefits both the courts and the parties by expediting pretrial proceedings, avoiding duplication of discovery, and minimizing costs," *In re Olsten Sec. Litig.*, 3 F.Supp.2d at 293–94, we find it appropriate to consolidate these actions under Rule 42(a). Finally, we note that the filing of a consolidated complaint, *see, e.g., Olsen*, 233 F.R.D. at 104–105, and the determination of class certification each offer opportunities to resolve remaining issues concerning the differing class periods.

**II. The PSLRA**

The PSLRA provides that a court "shall appoint as lead plaintiff the member ... of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members": in other words, the "most adequate plaintiff." 15 U.S.C. § 78u–4(a)(3)(B)(i). This decision is to be made "as soon as practicable after [the decision to consolidate] is rendered." *Id.* § 78u–4(a)(3)(B)(ii).

In addition, the PSLRA establishes a rebuttable presumption regarding the appointment of the lead plaintiff. A plaintiff is presumed to be the most adequate plaintiff if it: (1) has either filed the complaint or made a motion in response to the publication of notice; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. *Id.* § 78u–4(a)(3)(B)(iii)(I). This presumption may be rebutted by proof that the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class" or instead is subject to "unique defenses" that render the plaintiff incapable of adequately representing the class. *Id.* § 78u–4(a)(3)(B)(iii)(II). After the appointment of the most adequate plaintiff, that plaintiff shall retain counsel to represent the class, subject to court approval. *Id.* § 78u–4(a)(3)(B)(v).

**III. The Proposed Lead Plaintiffs**

**A. The Presumptive Lead Plaintiff**

**1. Timely Complaints and Motions**

All seven of the class members seeking appointment as lead plaintiff meet the first requirement: namely, they have filed complaints and/or submitted motions for lead plaintiff status in a timely manner. Accordingly,***93** we look to the second requirement to determine the presumptive lead plaintiff: that the movant have the largest financial interest in the action.

**2. Largest Financial Interest**

The PSLRA is not explicit as to what method courts are to use in determining which plaintiff has the largest financial interest in the relief sought by the class. This omission has caused disputes over the appropriate method for calculating the largest

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

financial interest among potential lead plaintiffs. However, in making this assessment, many courts have looked to four factors, first set forth in *Lax v. First Merchants Acceptance Corp.,* Nos. 97 Civ. 2715 et al., 1997 WL 461036 (N.D.Ill. Aug.11, 1997):(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered. *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. LaBranche & Co.,* 229 F.R.D. 395, 404 (S.D.N.Y.2004) (adopting the four-factor " *Lax* test"); *In re eSpeed, Inc. Sec. Litig.,* 232 F.R.D. 95, 100 (S.D.N.Y.2005) (relying on *Lax* test factors). Although courts have differed on how much weight to assign to each of the *Lax* factors, we, as have other courts, shall place the most emphasis on the last of the four factors: the approximate loss suffered by the movant. *See Weiss v. Friedman, Billings, Ramsey Group, Inc.,* No. 05 Civ. 4617(RJH), 2006 WL 197036, at *3 (S.D.N.Y. Jan.25, 2006) ("The amount of financial loss is the most significant of [the *Lax* test] elements") (quoting *In re Vicuron Pharm. Inc. Sec. Litig.,* 225 F.R.D. 508, 510–11 (E.D.Pa.2004)); *see also Takara Trust v. Molex Inc.,* 229 F.R.D. 577, 579 (N.D.Ill.2005) (in determining the largest financial interest, "most courts simply determine which potential lead plaintiff has suffered the greatest total losses"); *In re Bally Total Fitness Sec. Litig.,* No. 04 Civ. 4697, 2005 WL 627960, at *4 (N.D.Ill. Mar. 15, 2005).

[5] As set forth by the movants in their papers, it would appear that Westchester Capital has the largest financial interest in this case, followed by Snow Capital.[FN5] We note, to begin, that Westchester Capital and Snow Capital rely upon different class periods. Westchester Capital used the later start date of February 17, 2006, whereas Snow Capital used the earlier start date of October 28, 2004. For the purposes of this analysis, we use the longer class period with the earlier start date. We do so because the result under both potential class periods is the same for Westchester Capital.[FN6] *See* Memorandum of Points and Authorities in Support of Westchester Capital Management Inc.'s Motion ("Westchester Capital Mem. Supp.") at 9. The total number of shares purchased by Westchester Capital over the class period is 1,538,087 shares. *Id.* Since Westchester Capital sold 872,950 shares over the course of the class period, the net number of shares purchased by Westchester Capital is 710,137. *See* Declaration of Nancy Kaboolian in Support of Westchester Capital *94 Management, Inc.'s Motion ("Kaboolian Decl."), Ex. C at 2. Westchester Capital spent $15,887,557.30 to purchase IMAX shares and received $8,748,283.61 from the sale of IMAX shares over the course of the class period, which results in $7,139,273.69 in net funds expended on IMAX stock. *See id.* Its approximate losses equal $3,623,551.79, using FIFO, or "first in, first out" analysis.[FN7] Westchester Capital Mem. Supp. at 9; *see also* Kaboolian Decl., Ex. C at 6. By comparison, since Snow Capital made no sales of its IMAX stock during the class period, it purchased 150,000 total shares of IMAX stock, resulting in $1,357,050.00 funds expended. *See* Decl. Rosenfeld, Ex. A, B. Snow Capital's losses, using FIFO, are approximately $481,327.03. *Id.* This comparison reveals that Westchester Capital has a greater financial interest than Snow Capital in the litigation at hand, as measured by each of the *Lax* test factors.

FN5. An examination of the other movants' papers reveals that Westchester Capital and Snow Capital purchased significantly more shares of IMAX stock and sustained significantly greater losses than any of the other movants during the class period. *See* Declaration of Samuel K. Rosen in Support of Motion [on Behalf of Y Lu], Ex. B; Memorandum of Law in Support of Mo-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion for Consolidation, Appointment of [Jay Spritzler as] Lead Plaintiff, and Approval of Selection of Co–Lead Counsel, at 10; Declaration of Douglas M. Risen in Support of Motion by the Steelworkers Pension Trust, Ex. A; Memorandum of Law in Support of the Motion of Robert Lieblang for Consolidation, Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, at 8; Declaration of Evan J. Smith in Support of the Motion of the IMAX Investor Group, Ex. A.

FN6. We note that Snow Capital purchased all of its shares of IMAX prior to February 17, 2006, and sold all of its shares on August 10, 2006. *See* Declaration of David A. Rosenfeld in Support of Snow Capital Investment Partners, L.P.'s Motion, ("Decl.Rosenfeld"), Ex. B. Thus, had we relied upon the shorter class period in our *Lax* factor analysis, Snow Capital would have purchased zero shares during the period, and consequently would not have had any losses.

FN7. FIFO, or "first in, first out," is a method of accounting where stocks which were acquired first are assumed to be sold first for the purpose of loss calculations. Another frequently employed method to assess losses for purposes of the *Lax* test is LIFO, or "last in, first out," where those stocks which were acquired most recently are assumed to be sold first. Many courts have stated a preference for LIFO over FIFO in securities cases, since the inflation of stock prices over the course of the class period may have resulted in gains accrued to plaintiffs. As a result, FIFO may overstate actual losses suffered by stockholders, whereas LIFO takes into account these gains. *See In re eSpeed,* 232 F.R.D. at 101. Here, at this stage, we use FIFO, as the parties have not provided enough information to conduct a LIFO analysis.

**3. Rule 23**

Finally, we turn to the third requirement for the presumptive lead plaintiff; namely, that the plaintiff meet the requirements of Rule 23 of the Federal Rules of Civil Procedure. As this Court has previously noted, "typicality and adequacy of representation are the only provisions [of Rule 23] relevant to the determination of lead plaintiff under the PSLRA." *Shi v. Sina Corp.,* Nos. 05 Civ. 2154(NRB) et al., 2005 WL 1561438, at *2 (S.D.N.Y. July 1, 2005) (quoting *In re Oxford Health Plans, Inc. Sec. Litig.,* 182 F.R.D. 42, 49 (S.D.N.Y.1998)). Further, at this stage of litigation, only a preliminary showing of typicality and adequacy is required. *In re eSpeed, Inc. Sec. Litig.,* 232 F.R.D. at 102.

[6][7] The typicality threshold is satisfied "where the claims arise from the same conduct from which the other class members' claims and injuries arise." *Id.* As discussed above in the context of consolidation, both Westchester Capital and other members of the class claim to have been injured by the overvaluation of IMAX stock. The underlying conduct from which the class members' claims arise is the same: alleged misrepresentations on the part of the defendants as to the company's worth. Thus, Westchester Capital meets the typicality requirements under Rule 23 for the purposes of qualification for lead plaintiff.

[8] The adequacy requirement is satisfied where: (1) class counsel is qualified, experienced, and generally able to conduct the litigation; (2) there is no conflict between the proposed lead plaintiff and the members of the class; and (3) the proposed lead plaintiff has a sufficient interest in the outcome of the case to ensure vigorous advocacy. *See id.; Shi,* 2005 WL 1561438, at *2. Westchester Capital has retained competent and experienced counsel, and its significant financial interest should ensure vigorous advocacy on behalf of the class. Further, there is no reason to believe that Westchester Capital has interests that are adverse to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

those of the class members. Accordingly, Westchester Capital is entitled to the most adequate plaintiff presumption.

**B. The Rebuttal Evidence and Standing**

[9] As noted above, the presumption that Westchester Capital is the most adequate plaintiff may be rebutted if there is evidence that it will not fairly and adequately protect the interests of the class, or is subject to unique defenses that render it incapable of adequately representing the class. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II). Here, Snow Capital argues that Westchester Capital should be disqualified from consideration as most adequate plaintiff. Specifically, Snow Capital ***95** argues that Westchester Capital was acting as an investment advisor, not purchasing the IMAX shares for its own account, as Snow Capital did, and thus Westchester Capital has no financial interest in the case and lacks standing to sue. *See* Snow Capital Investment Partners, L.P.'s Opposition to Competing Motions for Appointment as Lead Plaintiff ("Snow Capital Opp.") at 1–2.

Courts have found standing for an investment advisor if it is authorized to act as attorney-in-fact with unrestricted decision making authority for the funds at issue. In such instances, courts have considered the investment advisor to be the "purchaser" under federal securities laws, with standing to sue in its own name.[FN8] *See Weinberg v. Atlas Air Worldwide Holdings, Inc.,* 216 F.R.D. 248, 255 (S.D.N.Y.2003) (concluding that investment advisor who was also attorney-in-fact for clients with unrestricted decision making authority and who had otherwise satisfied requirements under PSLRA for presumptive lead plaintiff had standing to pursue securities claims on behalf of investors); *In re eSpeed, Inc. Sec. Litig.,* 232 F.R.D. at 98 ("In order for an investment advisor to attain standing on behalf of investors[,] the transactions in question must have been executed as if by a single person. Moreover, the advisor must be the attorney in fact for his clients, and he must be granted both unrestricted decision-making authority and the specific right to recover on behalf of his clients."); *Olsen,* 233 F.R.D. at 107 (same).

FN8. It is true, as Snow Capital points out, that this Court has previously found an investment advisor to lack standing for the reasons set forth here by Snow Capital. *See In re Turkcell Iletisim Hizmetler, A.S. Securities Litigation,* 209 F.R.D. 353, 358 (S.D.N.Y.2002). However, we were careful to note in *Turkcell* that the investment advisor at issue was not an attorney-in-fact for the investors, which distinguishes the situation in *Turkcell* from other cases in which investment advisors were found to have standing. *See id.* (citing *Smith v. Suprema Specialties,* 206 F.Supp.2d 627, 634–35 (D.N.J.2002)). Thus, our decision in *Turkcell* is not at odds with our conclusion here: if Westchester Capital is an attorney-in-fact for the five funds which suffered losses from IMAX stock, it has standing to sue and to serve as lead plaintiff.

Snow Capital further asserts that Westchester Capital has not demonstrated that it has the authority to sue on behalf of the five funds, nor to serve as lead plaintiff in their stead. Other courts have relied on declarations stating that the investment manager or adviser was the attorney-in-fact with the authorization to bring suit to recover investment losses. *See, e.g., Weinberg,* 216 F.R.D. at 255 (citing *EZRA Charitable Trust v. Rent–Way, Inc.,* 136 F.Supp.2d 435, 441 (W.D.Pa.2001)). Here, Westchester Capital has submitted a sworn declaration from Roy Behren, its Chief Compliance Officer, stating that Westchester Capital is attorney-in-fact for the five funds, and further that it is "authorized to undertake all acts on behalf of [the five funds], including the right to commence legal action on their behalf[,] which includes the right to seek to serve as lead plaintiff in an action brought pursuant to the federal securities laws on their behalf." Behren Decl. ¶¶ 1, 3. On the basis of this rep-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

resentation, and given that Snow Capital's proffer to the contrary is inconclusive at best,[FN9] we conclude that the five funds have appointed Westchester Capital as attorney-in-fact, with the capacity to sue on behalf of the funds. Accordingly, Westchester Capital has standing to sue to recover the losses that its investors allegedly sustained due to IMAX's misrepresentations. Since there is no evidence in the record that suggests either that Westchester Capital would not fairly and adequately protect the interests of the *96 class, or that it is subject to any unique defenses, the presumption that Westchester Capital should serve as lead plaintiff is not rebutted.

FN9. To support its assertion, Snow Capital submits selected pages of the Form N–1A/A, Registration Statement of an Open–End Management Investment Company for Merger Fund VL, one of the five funds, filed with the Securities Exchange Commission on July 23, 2003. *See* Snow Capital Investment Partners, L.P.'s Reply Memorandum in Further Support of its Motion for Appointment as Lead Plaintiff, Approval of its Selection of Lead Counsel and for Consolidation of Related Actions ("Snow Capital Reply"), Ex. A, B. Although this submission includes EX–99D, the Advisory Agreement, Snow Capital did not include EX–99H, which is the Power of Attorney section of the Statement. Retrieval of the complete document reveals that the Merger Fund VL designated Frederick W. Green, the President of Westchester Capital, as attorney-in-fact and agent. *See* Registration Statement of an Open–End Management Investment Company, Ex–99H, *available at* http:// www. sec. gov/ Archives/ edgar/ data/1208133/0000894189 03001004/0000894189 –03–001004 –index.htm.

**IV. Lead Counsel**

As noted above, the PSLRA directs the lead plaintiff to select and retain counsel to represent the class, subject to the Court's approval. 15 U.S.C. § 78u–4(a)(3)(B)(v). Westchester Capital has accordingly selected the law firm of Abbey Spanier Rodd Abrams & Paradis LLP to serve as lead counsel. After reviewing the firm's resume, we see no reason why the firm should not represent the class. Accordingly, we approve Westchester Capital's selection of Abbey Spanier to serve as lead counsel.

***CONCLUSION***

For the aforementioned reasons, we hereby order: (1) that the above-captioned actions be consolidated for all purposes pursuant to Fed.R.Civ.P. 42(a), under the following caption: *In re IMAX Corporation Securities Litigation,* Master File No. 06 Civ. 6128; (2) that class member Westchester Capital is appointed to serve as lead plaintiff in the consolidated action, pursuant to section 21D(a)(3)(B)(iii) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u–4(a)(3)(B), as amended by the Private Securities Litigation Act of 1995; (3) that the law firm of Abbey Spanier Rodd Abrams & Paradis LLP is appointed to serve as lead counsel for the class in the consolidated action, pursuant to section 21D(a)(3)(B)(v) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u–4 –a(3)(B), as amended by the Private Securities Litigation Act of 1995; and (4) within 20 days, lead plaintiff and lead counsel shall submit to this Court any proposed order that would further facilitate their representation of the class.

Accordingly, all motions by competing movants are hereby denied.

**IT IS SO ORDERED.**

Related Westlaw Journal Article(Back to Top)19 NO. 2 Andrews Ent. Indus. Litig. Rep. 1217 NO. 8 Andrews M & A Litig. Rep. 12
S.D.N.Y.,2007.
Kaplan v. Gelfond
240 F.R.D. 88

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT E

This is Exhibit "E" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires August 8, 2014

United States District Court,
S.D. New York.
In re IMAX SECURITIES LITIGATION.

Master File No. 06 Civ. 6128(NRB).
Sept. 16, 2008.

**Background:** Investor groups brought separate securities fraud class actions against corporation engaged in specialty cinema business, individual officers, and corporation's auditor, alleging improper acceleration of revenue and consequent artificial inflation of stock price. The District Court consolidated actions on investors' motions, 240 F.R.D. 88, Naomi Reice Buchwald, J. Defendants moved to dismiss.

**Holdings:** The District Court held that:
(1) investors failed to state motive-and-opportunity-based scienter element against two officers; but
(2) investors stated recklessness-based scienter element against company and individual officers;
(3) investors also stated recklessness-based scienter element against auditor;
(4) investors stated loss causation element.

Motions denied.

West Headnotes

**[1] Securities Regulation 349B 60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

Requisite intent to satisfy Private Securities Litigation Reform Act's (PSLRA) scienter requirement may be established either: (1) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[2] Securities Regulation 349B 60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

In determining whether pleaded facts in securities fraud complaint give rise to required "strong" inference of scienter, court must take into account plausible opposing inferences; in order for inference of scienter to be strong, reasonable person would deem it cogent and at least as compelling as any opposing inference one could draw from facts alleged. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[3] Securities Regulation 349B 60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

In order to state scienter element of securities fraud claim based on motive and opportunity, plaintiff must allege concrete benefits that could be realized by one or more of false statements and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

wrongful disclosures alleged; motives generally possessed by most corporate directors and officers are insufficient. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[4] Securities Regulation 349B ⟹60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

Investors failed to state motive-and-opportunity-based scienter element of securities fraud claim against officers of company engaged in specialty cinema business, by alleging that officers were motivated to inflate company's stock price because of incentive compensation and change-of-control payout provisions in their employment contracts; incentives owing to contract provisions could be imputed to most, if not all, corporate executives, and benefits from change-of-control provisions remained speculative at time officers negotiated them, since change of control was not imminent. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[5] Securities Regulation 349B ⟹60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

In order to state scienter element of securities fraud claim based on recklessness or conscious misbehavior, plaintiff must allege defendants' knowledge of facts contradicting their public statements, their failure to review information that they were obligated to monitor, or their ignorance of clear and obvious signs of fraud. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[6] Securities Regulation 349B ⟹60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

Investors stated recklessness-based scienter element of securities fraud claim against company engaged in specialty cinema business, and individual executives, by alleging that defendants had improperly accelerated revenue by engaging in multiple element accounting for segregated individual components of theater systems rather than recognizing revenue only on completed installations; theater system revenue made crucial contribution to company as going concern, and executives allegedly understood relevant accounting rules and were informed of progress of installations yet engaged in increasingly aggressive accounting that violated both Generally Accepted Accounting Principles (GAAP) and company's own arguably more conservative policies. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[7] Securities Regulation 349B ⟹60.45(3)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.43 Grounds of and Defenses to Liability
349Bk60.45 Scienter, Intent, Knowledge, Negligence or Recklessness
349Bk60.45(3) k. Accountants,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Attorneys, Underwriters and Brokers. Most Cited Cases

Auditor's failure to identify problems with company's internal controls and accounting practices does not constitute reckless conduct sufficient to give rise to scienter element required for § 10(b) liability. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[8] Securities Regulation 349B ⚿60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

Allegations of Generally Accepted Accounting Principles (GAAP) violations, without corresponding fraudulent intent, are insufficient to state scienter element of § 10(b) securities fraud claim against independent accountant; recklessness, approximating actual intent to aid in fraud being perpetrated by audited company, must be shown. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[9] Securities Regulation 349B ⚿60.51(2)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.51 In General
349Bk60.51(2) k. Scienter. Most Cited Cases

Investors stated recklessness-based scienter element of securities fraud claim against auditor for company engaged in specialty cinema business by alleging that auditor had been extensively involved in process by which company's allegedly improper revenue recognition method, involving multiple element accounting for segregated individual components of theater systems, had developed and evolved; auditor allegedly had regularly consulted with company management on accounting issues yet had participated in formulating recognition method that violated both Generally Accepted Accounting Principles (GAAP) and company's own arguably more conservative policies. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

**[10] Securities Regulation 349B ⚿60.47**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.43 Grounds of and Defenses to Liability
349Bk60.47 k. Causation; Existence of Injury. Most Cited Cases

Investors stated loss causation element of securities fraud claim against company engaged in specialty cinema business, arising from company's allegedly improper use of multiple element accounting for segregated individual components of theater systems; Securities and Exchange Commission (SEC) inquiry of company related directly to its application of multiple element accounting, and culminated in company's restatement of earnings and revenues that was followed by company's shares trading at discount to their price on previous day. Securities Exchange Act of 1934, §§ 10(b), 21D(b)(2), 15 U.S.C.A. §§ 78j(b), 78u–4(b)(2); 17 C.F.R. § 240.10b–5.

***473** Arthur N. Abbey, Jill S. Abrams, Richard B. Margolies, Grace E. Parasmo, Abbey Spanier Rodd & Abrams, LLP, New York, NY, for Plaintiffs.

Lewis J. Liman, Cleary Gottlieb Steen & Hamilton LLP, New York, NY, for IMAX Defendants.

Jennifer L. Conn, M. Byron Wilder, Gibson, Dunn

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

& Crutcher LLP, New York, NY, for PricewaterhouseCoopers LLP.

### MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiffs brought this securities fraud class action under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5, on behalf of all persons and entities who purchased or acquired common stock in IMAX Corporation ("IMAX" or the "Company") between February 27, 2003 and July 20, 2007 (the "class period"). The consolidated amended class action complaint (the "complaint") alleges that the defendants, IMAX, Richard L. Gelfond ("Gelfond"), Bradley J. Wechsler ("Wechsler"),*474 Francis T. Joyce ("Joyce"), Kathryn A. Gamble ("Gamble" and collectively, the "IMAX defendants"), and Pricewaterhouse Coopers LLP ("PWC"), issued materially false and misleading statements concerning IMAX's accounting of theater system revenue. This opinion addresses the IMAX defendants' and PWC's motions to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated herein, both motions are DENIED.

### BACKGROUND[FN1]

FN1. The following facts have been drawn from the Consolidated Amended Class Action Complaint ("Compl."), the declarations of James C. Clark ("Clark Decl.") and Jennifer L. Conn ("Conn Decl.") in support of defendants' motions to dismiss the complaint.

IMAX is an entertainment technology company specializing in the design and manufacture of large-format, two and three-dimensional theater systems.[FN2] An IMAX theater system traditionally consists of: an advanced, high-resolution projection system, a digital sound system, a screen with proprietary coating technology, a digital theater control system, and extensive theater planning, design and installation services.[FN3]

FN2. Clark Ex. C at 5–6.

FN3. Clark Ex. C at 6.

Although IMAX marketed several product and service lines during the class period, such as the production and distribution of films and film products and the operation and management of IMAX theaters, the majority of IMAX's revenue was derived from the sale and lease of theater systems to third-party owners of large-format theaters.[FN4] Throughout the class period, IMAX reported relatively strong, upward-trending financial results: 16 theater system installations ("installs") and $71 million revenue for fiscal year 2002; 21 installs and $75.8 million revenue for 2003; 22 installs and $86.6 million revenue for 2004; and 39 installs and $97.7 million revenue for 2005.[FN5] On March 9, 2006, IMAX filed its Form 10–K for the fiscal year ending December 31, 2005 ("2005 10–K"), which described a "record" 14 theater system installations and $35.1 million revenue in the fourth quarter.[FN6] A press release issued on the same day revealed that IMAX's Board of Directors was exploring several avenues for maximizing shareholder value, including such strategic alternatives as a sale of the company or a merger with another entity.[FN7]

FN4. Clark Ex. C at 6; Compl. ¶ 62.

FN5. Compl. ¶¶ 71, 79, 87, 107.

FN6. Compl. ¶¶ 102, 107.

FN7. Compl. ¶¶ 104.

On August 9, 2006, IMAX announced that it was in the process of responding to an informal inquiry from the SEC concerning the timing of revenue recognition, and specifically, its application of multiple element arrangement accounting to revenue derived from theater system sales and leases.[FN8] Management also disclosed that discussions with potential buyers and strategic partners had

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

faltered.[FN9] By the time of the closing bell on the following day, the price of IMAX shares had fallen from $9.63 to $5.73.[FN10]

FN8. Compl. ¶¶ 115–116.

FN9. Compl. ¶¶ 121–122.

FN10. Compl. ¶¶ 115, 119.

Eleven months later, on July 20, 2007, IMAX filed its Form 10–K for the fiscal year ending December 31, 2006 ("2006 10–K"), which included a restatement of its financial results for fiscal years 2002 through the first three quarters of 2006. As disclosed in the 2006 Form 10–K:

> ***475** ... the Company revised its policy to require that (i) the projector, sound system and screen system be installed and are in full working condition, the 3D glasses machine, if applicable, be delivered and projectionist training be completed, and (ii) written customer acceptance thereon received, or the public opening of the theater take place, before revenue can be recognized. [FN11]

FN11. Compl. ¶ 145.

Acknowledging that "errors had occurred in its prior accounting for theatre systems," IMAX "revised its policy with regard to revenue recognition for theatre systems" and "restated its financial results in accordance with the revised policy." [FN12] The restatement of IMAX's theater systems revenue had the effect of shifting revenue from the period in which it had been originally reported to subsequent periods. In total, 16 installation transactions representing $25.4 million in revenue shifted between quarters in their originally reported years, and 14 installation transactions representing $27.1 million in revenue shifted between fiscal years. [FN13] The first of these consolidated actions followed shortly after IMAX released its restated financial results.

FN12. Compl. ¶ 139.

FN13. Compl. ¶ 139. According to the 2006 10–K: "Two transactions which were originally recorded in 2004 (revenue and net earnings impact of $3.0 million and $1.6 million, respectively) were moved to 2005 and 2006. Eight transactions which were originally recorded in 2005 (revenue and net earnings impact of $14.1 million and $7.5 million, respectively) were moved to 2006 and two transactions which were originally recorded in 2005 were moved to 2007 (revenue and net earnings impact of $3.4 million and $2.2 million, respectively). In addition, one transaction recorded in 2002 was moved to 2005 (revenue and net earnings impact of $4.9 million and $2.1 million, respectively) and one transaction recorded in 2006 was moved to 2007 (revenue and net earnings impact of $1.7 million and $0.6 million, respectively)." 2006 10–K at 91.

The complaint alleges that, "beginning in fiscal year 2002, and continuing throughout the Class Period, the Company improperly segregated the individual components of the [theater system] and recognized revenue on such individual components separately, thereby improperly accelerating its revenue recognition on the theater systems." [FN14] The treatment of theater system revenue in this manner allegedly violated both Generally Accepted Accounting Principles ("GAAP") and IMAX's stated revenue recognition policy.[FN15] We briefly review the accounting standards at play in this case as well as the various revisions to IMAX's revenue recognition policy before turning to the merits of the defendants' motions.

FN14. Compl. ¶¶ 40, 47, 54, 58; *see also id.* ¶ 187 ("IMAX's consolidated financial statements for the years-ended December 31, 2002, December 31, 2004, December 31, 2005, and the first three quarters of 2006 were materially false and misleading as a result of prematurely recognized rev-

enue relating to certain components of its theater system installations.").

FN15. Compl. ¶ 40 ("Throughout the Class Period, IMAX publicly stated that revenue from theater systems sales and sales-type leases was recognized upon installation of the theater system.... IMAX improperly accelerated its revenue recognition on theater systems and concomitantly, reported earnings thereon, when only certain elements of its systems were installed ...").

**The Relevant Accounting Principles**

In December 1999, the SEC published Staff Accounting Bulletin No. 101 ("SAB 101"), which sets forth the general principle that revenue should not be recognized until it is "realized or realizable and earned," or, in other words, when: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred or services have been rendered; (iii) the seller's price to ***476** the buyer is fixed or determinable; and (iv) collectibility is reasonably assured.[FN16] "Delivery," according to SAB 101, occurs when the seller has "substantially complete[d] or fulfill[ed] the terms specified in the arrangement."[FN17]

FN16. Clark Ex. D at 3; Compl. ¶ 44.

FN17. Clark Ex. D at 7–8. Similarly, Statement of Financial Accounting Concepts No. 5 ("FASCON 5") provides that revenue "recognition involves consideration of two factors (a) being realized or realizable and (b) being earned .... [R]evenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." Compl. ¶ 45.

Although SAB 101 provided specific criteria for *when* revenue may be recognized, it did not directly address the precedent question of *what* is the unit of accounting—a complicated issue in arrangements involving multiple elements. The extent of SAB 101's guidance in this regard is found in the interpretive response to one of the hypothetical questions meant to illustrate the application of revenue recognition principles:

> If an arrangement ... requires the delivery or performance of multiple deliverables, or "elements," the delivery of an individual element is considered not to have occurred if there are undelivered elements that are essential to the functionality of the delivered element because the customer does not have the full use of the delivered element.[FN18] Thus, the SEC's framework for revenue recognition required the deferral of theater system revenue until: (i) each element essential to the functionality of the theater system had been "delivered," and (ii) IMAX's obligations with respect to these elements were substantially complete.[FN19] IMAX allegedly recognized revenue on individual components without awaiting delivery of certain elements that were, according to plaintiffs, "required before the system was substantially complete and functional."[FN20]

FN18. Clark Ex. D at 7–8; *see also* Compl. ¶ 142; United States Securities and Exchange Commission, Office of the Chief Accountant: Staff Accounting Bulletin No. 101: Revenue Recognition in Financial Statements—Frequently Asked Questions and Answers, http:// www. sec. gov/ info/ accountants/ sabl 01 faq. htm (last visited September 4, 2008) ("SAB 101 does not modify existing practice in accounting for multiple-element arrangements .... [T]he staff has stated that it will not object to a method that includes the following conditions": (i) "[t]o be considered a separate element, the product or service in question represents a separate earnings process"; (ii) "[r]evenue is allocated among the elements based on the fair value of the elements"; (iii) "[i]f an undelivered element is essential to the functionality of a delivered element, no revenue allocated to the delivered

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

element is recognized until that undelivered element is delivered.").

FN19. Compl. ¶¶ 46–47, 175.

FN20. Compl. ¶ 47.

In May 2003, the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB") attempted to resolve any uncertainty surrounding the applicable GAAP standards for determining when arrangements containing multiple revenue-generating elements must be treated as separate units of accounting. EITF 00–21, issued on that date, provided:

> In an arrangement with multiple deliverables, the delivered item(s) should be considered a separate unit of accounting if all of the following criteria are met:
>
> a. The delivered item(s) has value to the customer on a standalone basis. That item (s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of *477 a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable (s).
>
> b. There is objective and reliable evidence of the fair value of the undelivered item(s).
>
> c. If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor.[FN21]

FN21. Clark Decl. Ex. A at 7. SAB 104 provided guidance on when revenue could be recognized on each element: "A seller should substantially complete or fulfill the terms specified in the arrangement related to the unit of accounting at issue in order for delivery or performance to have occurred." Clark Decl. Ex. L at 35.

Plaintiffs contend that these criteria never could have been satisfied as to IMAX's theater systems because (i) customers paid for the theater systems in installments, with the payment schedule calibrated to the progress of the delivery and installation of the entire system, and not its individual components; (ii) the theater components were either the property of IMAX or licensed by IMAX, and thus, buyers were unable to resell the components on the market; and (iii) the IMAX components were not independently saleable because they are only compatible with one another.[FN22]

FN22. Compl. ¶ 54.

**Evolution of IMAX's Theater System Accounting Policy**

IMAX's stated revenue recognition policy with respect to theater systems has undergone substantial revision since 1999.

Prior to January 1, 2000, theater system revenue was recognized "on the completed contract method (that is, upon delivery of the system)."[FN23] IMAX revised this policy in response to the promulgation of SAB 101 and, for fiscal years 2000 through 2003, stated that revenue would be recognized "at the time of the theater installation."[FN24] In 2004, after the EITF had issued its guidance on multiple element arrangements, IMAX disclosed that "[t]he Company recognizes revenues from sales and sales-type leases *generally* upon installation of the theater system."[FN25] Under a section titled "Multiple Element Arrangements," IMAX's Form 10–K for the fiscal year ending December 31, 2004, filed March 11, 2005 ("2004 10–K") further described how the policy had evolved such that revenue could be recorded on separate elements of the theater system under certain limited circumstances:

FN23. Compl. ¶ 41.

FN24. Compl. ¶¶ 42–44; *see also* IMAX

10–K405 for fiscal year ending December 31, 2000, filed April 2, 2001 ("2000 10–K") at 15, 30, 31; IMAX 10–K405 for fiscal year ending December 31, 2001, filed March 25, 2002 ("2001 10–K") at 17, 36, 58; IMAX 10–K/A for fiscal year ending December 31, 2002, filed February 27, 2004 ("2002 10–K") at 21, 44; IMAX 10–K/A for fiscal year ending December 31, 2003, filed September 13, 2004 ("2003 10–K") at 20, 24, 50.

FN25. 2004 10–K at 25 (emphasis added). The 2004 10–K omits the "generally" qualifier later in the filing, however. *See* 2004 10–K at 53 ("The Company recognizes revenues from sales-type leases upon installation of the theater system when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.").

On occasion, the Company will include film licenses or other specified elements as part of system sales or lease agreements.... Revenues under these arrangements are allocated based upon the estimated relative fair values of each element. FN26 Thus, for this period through *478 2004, IMAX's stated accounting policy generally required all components of a "theater system" FN27 to be installed before revenue was recognized, regardless of whether one or more of those components could be considered "perfunctory or inconsequential" or non-essential to the functionality of the system.

FN26. Compl. ¶ 51.

FN27. From the beginning of the class period through 2005, IMAX defined the term "theater system" in its 10–Ks to "include specialized projection equipment, advanced sound systems, specialty screens, theater automation control systems and film handling equipment." *See* 2002 10–K at 5; 2003 10–K at 5; 2004 10–K at 5; Clark Decl. Ex. B at 5. The 2006 10–K states, "The Company theater systems include a specialized IMAX projector, advanced sound systems and specialty screens." 2006 10–K at 6.

According to its Form 10–K for the fiscal year ending December 31, 2005, filed March 9, 2006 ("2005 10–K"), IMAX expanded its approach to multiple element accounting that year and began recognizing revenue "when the installation of the respective theater system *element* [was] substantially complete." FN28 As the 2005 10–K explained:

FN28. 2005 10–K at 34 (emphasis added).

The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as part of these transactions.

When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met. FN29

FN29. 2005 10–K at 34, 64; Compl. ¶ 55. Notably, the 2005 10–K also states, "Theater systems leases that transfer substantially all of the benefits and risks of ownership to customers are classified as sales-type leases. Revenue from sales-type leases is recorded at the time installation is complete and other revenue recognition conditions are satisfied." *Id.* at 16.

Notwithstanding the fact that IMAX's stated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

understanding of the relevant unit of accounting appears to have drifted over time, from an initial focus on "theater systems" in 2000, 2001, 2002, 2003 and 2004 to "theater system elements" in 2005, plaintiffs insist that the application of multiple element accounting to theater systems at any point during the class period (including 2005) was contrary to the manner in which the company disclosed it was treating revenue derived from theater system sales and sale-type leases.[FN30]

FN30. Compl. ¶¶ 40, 42, 51–55.

## DISCUSSION

### I. Legal Standards

In considering the defendants' 12(b)(6) motion to dismiss, we accept as true the facts alleged in the amended complaint, *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995), and draw all reasonable inferences in favor of plaintiffs. *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004). Although the complaint "does not need detailed factual allegations" to survive a motion to dismiss, a "formulaic recitation of the elements of a cause of action" cannot suffice. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). At a minimum, plaintiffs must plead the facts underlying the claims sufficiently "to raise the right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* For *479 purposes of a 12(b)(6) motion, the amended complaint "is deemed to include any written instrument attached to it as an exhibit," "statements or documents incorporated in it by reference," and any other document that is "integral" to the allegations. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002).

### II. Analysis

#### A. Scienter

[1][2] The PSLRA requires plaintiffs asserting securities fraud claims to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *See* 15 U.S.C. § 78u–4(b)(2). The requisite intent may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995). Moreover, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007). For an inference of scienter to be strong, "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* [FN31]

FN31. The failure to allege adequately the requisite state of mind of an officer or director named as an individual defendant does not necessarily compel the dismissal of like claims against the corporation. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,* 531 F.3d 190, 195 (2d Cir.2008). To sustain a securities fraud claim against a corporate defendant, plaintiffs may plead facts creating "a strong inference that *someone*," other than a named defendant, "whose intent could be imputed to the corporation acted with the requisite scienter." *Id.* (emphasis added).

Plaintiffs have alleged that: (i) Gelfond and Wechsler were motivated to inflate fraudulently the share price of IMAX because of the incentive compensation and change-of-control payout provisions in their employment agreements; and (ii) all defendants were, at the very least, reckless in not knowing that theater system revenue was being recognized prematurely because they had knowledge of or access to adverse facts that rendered the representations regarding IMAX's core operations false and misleading. Notably, plaintiffs have not sug-

gested that the motive and opportunity prong applies to PWC and rely solely on allegations of recklessness. We review the sufficiency of these allegations *seriatim.*

**1. Motive and Opportunity**

[3] The motive-and-opportunity prong of scienter, which as noted above applies only to Gelfond and Wechsler, requires allegations of "concrete benefits that could be realized by one or more of the false statements and wrongful disclosures alleged." *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir.2000); *see also Rothman v. Gregor,* 220 F.3d 81, 93 (2d Cir.2000). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001).

[4] The motives ascribed to Gelfond and Wechsler are inadequate to plead scienter to the requisite level of specificity. It is well established that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated." *Acito,* 47 F.3d at 54; *see also Rombach v. Chang,* 355 F.3d 164, 177 (2d Cir.2004). *480 The mere fact that an individual defendant's executive compensation is dependent on stock value or entails some other performance-based component cannot, by itself, support an inference of scienter. *See, e.g., Acito,* 47 F.3d at 54; *Greene v. Hanover Direct, Inc.,* No. 06 Civ. 13308(NRB), 2007 WL 4224372, at *4 (S.D.N.Y. Nov. 19, 2007). Nor can plaintiffs establish motive by simply pointing to the lucrative change-of-control provisions in Gelfond and Wechsler's employment agreements. *See No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 945–46 (9th Cir.2003) (rejecting the "golden parachute" argument); *In re Stone & Webster, Inc., Sec. Litig.,* 414 F.3d 187, 201 n. 9 (1st Cir.2005) ("[W]e agree with the district court that ... [the] change-in-control agreements did not provide a strong motive to engage in fraud."); *see also Kalnit,* 264 F.3d at 139 (holding insufficient the allegation that "significant change of control payments ... would be jeopardized if it became known that" the defendants were engaged in fraud). Incentives such as these may be imputed to most, if not all, corporate executives, and upholding their sufficiency would vitiate the purpose of the heightened pleading standards applicable to allegations of securities fraud. *See id.*

Plaintiffs make much of the fact that Gelfond and Wechsler negotiated new change-of-control agreements on or about March 8, 2006, when IMAX declared its intent to "explore strategic alternatives," such as a merger or acquisition.[FN32] The increased payout provisions and incentive bonuses under the revised agreements allegedly created a powerful motive to "inflate the 2005 financials in a last ditch effort to make the Company more appealing to an acquirer."[FN33] As a threshold matter, we see no reason why the amended change-of-control agreements would save plaintiffs' allegations from the ordinary rule that a desire to maintain or increase executive compensation, imputable to all corporate officers, is insufficient. While we would hesitate to find the allegations of motive sufficient even if the complaint had alleged that an acquisition was not just probable, but imminent, the fact that IMAX was merely in the exploratory phase of pursuing an acquisition only highlights the speculative and conclusory nature of any concrete benefit that could have been realized by the Gelfond and Wechsler. *See, e.g., Kalnit,* 264 F.3d at 139–40 (rejecting avoidance of personal liability as "too speculative and conclusory" an alleged motive to support scienter). Moreover, plaintiffs acknowledge that, at the time IMAX was seeking to be acquired, Gelfond and Wechsler were not in a position to falsify IMAX's financial results for fiscal years 2002 through 2004 and the first three quarters of 2005 and thus, the alleged motive "supports the [allegations of fraud occurring only in the] latter part of the Class Period."[FN34] The asserted motivation—the increased payouts resulting from a change of control—is considerably

weakened by the suggestion that the defendants were engaged in fraudulent practices for the duration of the class period but developed a motive to commit the fraud only in early 2005. Finally, even assuming that the timing of such an agreement may be relevant to evaluating whether the two individual defendants had the requisite motive, plaintiffs have conveniently omitted any mention of the fact that Gelfond and ***481** Wechsler's prior employment contracts expired on December 31, 2005, and thus were subject to renegotiation when IMAX was seeking to be acquired.[FN35]

FN32. Compl. ¶¶ 104, 220.

FN33. Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss ("Pl. Opp.") at 41.

FN34. Pl. Opp. at 40 n. 25.

FN35. Clark Ex. K at 11.

**2. Conscious Disregard or Recklessness**

[5] A securities fraud claim predicated upon recklessness or conscious misbehavior must allege the defendants' knowledge of facts contradicting their public statements, their failure to review information that they were obligated to monitor, or their ignorance of clear and obvious signs of fraud. *See Novak,* 216 F.3d at 308. In each case, the burden remains on the plaintiff to set forth the specific reports, information or other indicia of fraud that rendered the defendants' conduct "highly unreasonable, representing an extreme departure from the standards of ordinary care." *In re Sotheby's Holdings, Inc.,* No. 00 Civ. 1041(DLC), 2000 WL 1234601, at *6 (S.D.N.Y. Aug. 31, 2000); *see also Novak,* 216 F.3d at 309; *Kalnit,* 264 F.3d at 142.

**a. The IMAX Defendants**

[6] Although the question is a close one, we believe that, with respect to the IMAX defendants, the complaint fairly pleads an inference of scienter based on recklessness or conscious disregard that is at least as compelling as the most compelling opposing inference—namely that IMAX violated its own accounting policy by mistake and the application of multiple element accounting to theater system revenue was a considered judgment, reflecting the advice of PWC after open consultations.

The IMAX defendants undoubtedly appreciated that theater system revenue was of singular importance to the financial well-being and market perception of the Company. Theater system revenue was the single largest component of total revenue recognized during fiscal years 2002 through 2005, and, thus, represented one of the "most important metrics" of IMAX's growth.[FN36] The installation of a single theater system had a "significant impact" on IMAX's quarterly financial results, contributing up to $.03 to IMAX's net earnings per share.[FN37] IMAX reported the number of installs and executed installation contracts ("backlogs") on a quarterly and annual basis, and repeatedly highlighted the number of installs and backlogs as a barometer of its financial health.[FN38] In fact, the July 2007 restatement of theater system revenue reduced IMAX's 2005 originally reported net earnings by forty-seven percent (47%).[FN39]

FN36. Compl. ¶¶ 62, 64–91, 95–100, 102, 105–114.

FN37. Compl. ¶ 63.

FN38. Compl. ¶¶ 39, 62.

FN39. Pl. Opp. 18; Compl. ¶ 146.

Plaintiffs also have alleged that IMAX executives had specific knowledge of the progress of each theater system installation. IMAX apparently had employees at each installation site who would report back to senior executives on its status.[FN40] Reports containing schedules for theater installations were sent by the Finance Department to the attendees of a weekly meeting held at IMAX's Canadian headquarters, the purpose of which was to discuss theater openings and address the timeliness of the projects.[FN41] The complaint further alleges

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that monthly sales reports detailing the number of theater systems installations were circulated via e-mail.[FN42]

FN40. Compl. ¶¶ 91–92.

FN41. Compl. ¶¶ 93–94.

FN42. Compl. ¶¶ 67, 93–94.

***482** The complaint suggests that the IMAX defendants had a sophisticated understanding of the relevant accounting principles, yet employed aggressive (and on at least one occasion, questionable) tactics to meet their revenue targets. According to the complaint, IMAX executives appreciated the distinction between "physical installs" and "revenue recognition installs," the former being installations in the lay sense and the latter being the "installation" of a theater system element that would permit the revenue associated with the element to be recognized.[FN43] As discussed *supra,* IMAX's disclosed policy toward the accounting treatment of theater system revenue became increasingly aggressive during the six years preceding the restatement. Moreover, the complaint alleges that, in the second quarter of 2006, an IMAX executive asked a theater owner to accept a projector, reel unit and sound system, notwithstanding the fact that construction issues were going to delay the theater's completion, "because IMAX had planned on recognizing revenue in the second quarter and still wished to do so."[FN44] In the fourth quarter of 2005, according to the complaint, IMAX allegedly installed equipment in a theater without a roof but later removed the equipment so that it could be stored in a warehouse pending completion of the theater, but IMAX recorded revenue on the installation nonetheless.[FN45]

FN43. Compl. ¶ 99.

FN44. Compl. ¶ 117.

FN45. Compl. ¶ 118.

Moreover, the allegation that IMAX was recognizing revenue on theater system elements in 2002 and 2004, when its stated policy was to await the installation of the entire theater system, is troublesome. Although the defendants maintain that IMAX's stated policy was simply to apply GAAP, and thus, an alleged violation of corporate accounting policy adds nothing to the analysis, the 2002 10–K and 2004 10–K expressly provide that revenue would be recognized "upon installation of the theater system."[FN46] Regardless of whether certain "theater system" elements were perfunctory or whether the application of multiple element accounting to theater system revenue was proper under GAAP, IMAX's 10–Ks could be read to create an obligation to abide by a more conservative accounting policy.

FN46. 2002 10–K at 44; 2004 10–K at 25, 53. At oral argument on the instant motions, counsel for the IMAX defendants suggested that the rationale for restating the 2002 and 2004 revenue figures was two-fold: (i) to create comparable revenue data for fiscal years 2002 through 2005; and (ii) to correct for the premature recognition of revenue on certain transactions where ambiguity existed as to whether IMAX's obligations were substantially complete and only perfunctory or inconsequential steps remained. *See* August 5, 2008 Oral Argument Transcript at 25:2–30:3. Setting aside the fact that the latter explanation may be consistent with plaintiffs' allegation that some portion of the 2002 and 2004 revenue was recognized on the pre-defined elements of a theater system, the IMAX defendants have been unable to adduce record evidence in support of their counsel's assertion. *See* IMAX Defendants' Supplemental Response at 7–9.

If this were merely a GAAP violation case, we might have been persuaded that the complaint fails to allege scienter with respect to the IMAX defend-

ants because the applicable accounting rules appear to be highly complex and to involve subjective judgments and because of the complaint's allegations about the participation of PWC, which could provide a basis for a reliance argument by IMAX. FN47 *See, e.g.,* ***483***In re Bristol–Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 565 (S.D.N.Y.2004) ("While in this case the applicable accounting principle might be simple ... the application of that principle to the facts is complex."). Indeed, the violations alleged here are far more technical than those in other cases where the defendants faced civil liability for the premature recognition of revenue in contravention of GAAP. *See, e.g., In re Raytheon Sec. Litig.*, 157 F.Supp.2d 131, 139–40 (D.Mass.2001) (backdated contracts); *In re Veeco Instruments, Inc., Sec. Litig.*, 235 F.R.D. 220, 233 (S.D.N.Y.2006) (high level accounting official told to book revenue and "bury" adjustments); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 638 (E.D.Va.2000) (revenue recorded on unexecuted contracts); *see also In re AOL Time Warner, Inc. Sec. and ERISA Litig.*, 381 F.Supp.2d 192, 240 (S.D.N.Y.2004) (stock sales combined with numerous GAAP and GAAS violations). However, plaintiffs also have pleaded (i) the crucial contribution of theater system revenue to IMAX as a going concern; (ii) the IMAX defendants' understanding of the relevant accounting rules, their application to the facts before us, and the ramifications of selecting certain interpretations of the rules over others; (iii) the existence of extensive documentation indicating the progress of theater system installations and the IMAX defendants' knowledge of, or access to, those documents; (iv) the increasingly aggressive accounting of theater system revenue; (v) the failure of the IMAX defendants to conform the financial results to IMAX's own publicly disclosed accounting policy, which, for fiscal years 2002 through 2004, was arguably distinct from the applicable GAAP rules; and (vi) at least one alleged transaction that, even assuming the IMAX defendants' interpretation of SAB 101 and EITF 00–21 was correct at the time, appears to subvert the purpose of the applicable accounting rules. We therefore find that plaintiffs have adequately pleaded scienter with respect to the IMAX defendants.

FN47. Clark Decl. Ex. B at 21.

**b. PWC**

[7][8] The standard for pleading auditor scienter is demanding. "[T]he failure ... to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." *In re Doral Fin. Corp. Sec. Litig.*, 563 F.Supp.2d 461, 464–66 (S.D.N.Y. July 7, 2008) (quoting *Novak*, 216 F.3d at 309). Likewise, allegations of GAAP violations "without corresponding fraudulent intent" are insufficient to state a securities fraud claim against an independent accountant. *Rothman*, 220 F.3d at 98; *In re Doral*, 2008 WL 2636864, at *2. Rather, the recklessness required to a hold a non-fiduciary accountant liable for fraud "must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *Rothman*, 220 F.3d at 98. Put another way, a plaintiff must allege that the "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 385 (S.D.N.Y.2007) (quoting *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 657 (S.D.N.Y.2007) ).

A complaint might reach this "no audit at all" threshold by alleging that the auditor disregarded specific "red flags" that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *See, e.g., In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F.Supp.2d 192, 240 n. 51 (S.D.N.Y.2004) (quoting ***484***In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1333 (M.D.Fla.2002)). Alternatively, allegations of particularly large frauds might go far toward creating a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

compelling inference of auditor scienter based on recklessness even where actual knowledge of the fraud by the defendant auditor is not alleged. *See, e.g., In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288(DLC), 2003 U.S. Dist. LEXIS 10863, at *22–*23, 2003 WL 21488087 (S.D.N.Y. June 25, 2003) (involving a $3.3 billion fraud). However, under this framework, merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient. *See Rothman,* 220 F.3d at 98; *see also In re aaiPharma Inc. Sec. Litig.,* 521 F.Supp.2d 507, 513 (E.D.N.C.2007) (rejecting the theory that an auditor's access to information could support an inference of scienter, noting that "merely because a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library").

[9] In arguing that they have adequately pleaded recklessness, plaintiffs here point to their allegations (i) that PWC violated GAAP and Generally Accepted Auditing Standards [FN48]; (ii) that PWC had unfettered access to internal IMAX reports [FN49] and press releases [FN50] containing detailed information regarding the progress of theater system installations; and (iii) that IMAX's "approach to revenue recognition was an ongoing subject of review by PWC, and PWC provided advice to management with respect to revenue recognition for theater systems." [FN51]

FN48. Compl. ¶¶ 202–203.

FN49. Compl. ¶¶ 91–93.

FN50. Compl. ¶ 39.

FN51. Compl. ¶¶ 223–24.

The first of these allegations, as explained above, would not itself be sufficient for plaintiffs to survive a motion to dismiss with respect to PWC. Indeed, plaintiffs' claims against PWC would fail if not for IMAX's alleged decision to set forth and subsequently violate in 2002 and 2004 an accounting policy arguably more conservative than required under GAAP. Further, merely alleging that PWC had access to documents that would have revealed accounting violations would make this case quite similar to *Rothman,* which involved a Section 10(b) claim against a computer software company and its accounting firm for allegedly failing to expense the company's royalty advances after it became clear that the capitalized value of those advances was significantly overstated. Plaintiffs there alleged GAAP violations and that the defendant accounting firm recklessly disregarded product sales data that would have "made clear" the overvaluations. However, the Second Circuit found that an accountant would have been able to detect the overstatements only if it was aware that most software sales occurred within the first year of a particular program's release. *Rothman,* 220 F.3d at 98. Because plaintiffs in *Rothman* did not allege facts that would support the inference that the defendant accounting firm knew of this sales pattern, the Second Circuit concluded that plaintiffs had not sufficiently pleaded scienter with respect to the accountants. *Id.*

The feature that distinguishes this case from *Rothman* is plaintiffs' allegation that PWC was extensively involved in the process by which IMAX's revenue recognition policy developed and evolved during the class period. In addition to claiming that IMAX's "approach to revenue was an ongoing subject of review by PWC," plaintiffs allege that "PWC was regularly consulted by IMAX management and accounting issues and financial ***485** statements were always reviewed and opinions provided by PWC before the Company's financial statements were publicly disclosed," and that "[i]ncluded in the subjects discussed between IMAX management and PWC was IMAX's revenue recognition policy and the application of multiple element accounting to IMAX's theater systems." [FN52] As such, PWC was not a typical outside auditor like the defendant accounting firm in *Rothman,* but instead was actively advising IMAX and participating in the crafting of its theater installation ac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

counting policy—a policy that had, as noted above, significant consequences for how IMAX's financial health was publicly portrayed.

FN52. Compl. ¶ 223.

As a result, although nowhere in plaintiffs' 114–page complaint do they allege that PWC actually reviewed any of the various documents tracking theater installation that could have revealed if IMAX was violating its own accounting policy, we find the inference that PWC reviewed such documentation and thus was reckless in not detecting the alleged violations strong enough for the case against PWC to proceed for now. If, however, discovery reveals that PWC's involvement in the development of IMAX's accounting policy was not so extensive as alleged, this inference of scienter will weaken substantially, leaving plaintiffs with allegations that, while perhaps suggesting negligence or even gross negligence by PWC, do not indicate recklessness or conscious misbehavior. Obviously, this discussion of PWC's potential liability is limited to the scienter issue that has been raised in this motion.

**B. Loss Causation**

[10] Under the PSLRA, plaintiffs have "the burden of proving" that the defendant's misrepresentations "caused the loss" for which they seek recovery. 15 U.S.C. §§ 78u–4 (b)(4). The so-called "loss causation" element of a securities fraud claim is sufficiently pleaded when the complaint provides "notice of what the relevant economic loss might be" and "what the causal connection might be between that loss" and the alleged misrepresentations. *See Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346–47, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *see also Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 172 (2d Cir.2005) (describing loss causation as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff"). The essence of loss causation is the notion that the alleged "misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173; *see also ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 107 (2d Cir.2007) (noting that loss must be "caused by the materialization of the risk concealed by the fraudulent statement"). Accordingly, the complaint must allege that the "market reacted negatively to a corrective begin[ning] to leak out." *Dura,* 544 U.S. at 342, 125 S.Ct. 1627. The SEC inquiry related directly to the misrepresentations alleged in this case—the application of multiple element accounting to theater system revenue—and culminated in the restatement of IMAX's earnings and revenues for fiscal years 2002 through 2005. After the announcement, IMAX shares traded at a discount to their price on the previous day, reflecting, in part, the probability and magnitude of a restatement of previously reported revenue. Although "the truth here was revealed not in a neat and tidy single disclosure," *In re Tommy Hilfiger, Securities Litigation,* No. 04 Civ. 7678(RO), 2007 U.S. Dist. LEXIS 55088, at *8 (S.D.N.Y. July 20, 2007), it is sufficient that the SEC's informal inquiry and subsequent***486** discussions with IMAX concerned the subject matter of the alleged fraud and eventually led to a restatement. *Id.; see also In re Bradley Pharms., Inc. Sec. Litig.,* 421 F.Supp.2d 822, 829 (D.N.J.2006); *Brumbaugh v. Wave Sys. Corp.,* 416 F.Supp.2d 239, 255–56 (D.Mass.2006). And, of course, IMAX's denial of accounting irregularities was irrelevant once the SEC inquiry had alerted the market to their possibility. *Compare In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 297 (S.D.N.Y.2006) ("[D]espite [the] specific denial, the market understood by the end of the putative class period what it did not before ....") *with Davidoff v. Farina,* 04 Civ. 7617(NRB), 2005 U.S. Dist. LEXIS 17638, at *52, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) (noting that the public statement contained no indication of whether previously reported results were false).

As to the defendants' suggestion that the stock drop was precipitated by the contemporaneous announcement of the Board's inability to attract a suitable merger or acquisition proposal, and not the in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

formal inquiry by the SEC, we find—regardless of the plausibility of the argument—that the issue is inappropriate for resolution at this time. To survive a motion to dismiss, a plaintiff need only provide "some indication of the loss and the causal connection [he or she] has in mind." *Dura,* 544 U.S. at 346–47, 125 S.Ct. 1627. Accordingly, the defendants will be entitled to interpose their defense of intervening facts, such as the fact of the failed merger and acquisition discussions, at trial.

***CONCLUSION***

For the reasons stated above, the motions to dismiss are DENIED. The defendants shall answer the complaint within twenty (20) days of the date of this opinion.

S.D.N.Y.,2008.
In re IMAX Securities Litigation
587 F.Supp.2d 471

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT F

This is Exhibit "F" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**In re IMAX SECURITIES LITIGATION**

**Master File 06 Civ. 6128 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2009 U.S. Dist. LEXIS 58219**

**June 29, 2009, Decided**
**June 29, 2009, Filed**

**SUBSEQUENT HISTORY:** Class certification denied by In re IMAX Sec. Litig., 2010 U.S. Dist. LEXIS 135341 (S.D.N.Y., Dec. 20, 2010)

**PRIOR HISTORY:** In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 2008 U.S. Dist. LEXIS 74460 (S.D.N.Y., 2008)

**CORE TERMS:** class members, reconsideration, class certification, assignment of claims, class action, financial interest, appointed, adequacy, largest, cure, Memorandum of Law, typicality, confer, lead counsel, standing to sue, legal issues, injury-in-fact, infringement, assignee, law firm, securities fraud, investment advisor, client funds, setting forth, copyright infringement, shareholders, designated, discovery, assignor, replace

**COUNSEL:** [*1] For Westchester Capital Management Inc., Lead Plaintiff: Jill Sharyn Abrams, Richard Barry Margolies, LEAD ATTORNEY, Arthur N. Abbey, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY.

For Motti Kaplan, Individually, Motti Kaplan, and on behalf of all others similarly situated, Plaintiffs: Nancy Kaboolian, LEAD ATTORNEY, Arthur N. Abbey, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY.

For Santiago Guzman, individually and on behalf of all others similarly situated, Eric S. Bergen, individually and on behalf of all others similarly situated, Michael LaRosa, individually and on behalf of all others similarly situated, Robert Feeney, Floyd Reynolds, individually and on behalf of all others similarly situated, Anthony Caiafa, individually and on behalf of all others similarly situated, Robert B. Gray, individually and on behalf of all others similarly situated, Consolidated Plaintiffs: Arthur N. Abbey, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY.

For Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Imax Corporation, Kathryn A. Gamble, Defendants: Lewis J. Liman, LEAD ATTORNEY, Cleary Gottlieb Steen & Hamilton, LLP(NYC), New York, NY.

For PricewaterhouseCoopers [*2] LLP, Defendant: Jennifer Laurie Conn, Gibson, Dunn & Crutcher LLP (NYC), New York, NY; M. Cory Nelson, M. Byron Wilder, Samantha Ferris, PRO HAC VICE, Gibson, Dunn & Crutcher LLP, Dallas, TX.

For Gary Creagh, Marlene Creagh, Movants: Catherine A. Torell, Cohen, Milstein, Sellers & Toll, P.L.L.C., New York, NY.

For IMAX Investor Group, Movant: Evan J. Smith, LEAD ATTORNEY, Brodsky & Smith, L.L.C., Mineola, NY.

For Snow Capital Investment Partners, L.P., Movant: David Avi Rosenfeld, Mark Samuel Reich, Coughlin Stoia Geller Rudman & Robbins, LLP (LI), Melville, NY.

For Steelworkers Pension Trust, Movant: Christopher J. Keller, LEAD ATTORNEY, Labaton Sucharow, LLP, New York, NY; Phyllis Maza Parker, Russell David Paul, Berger & Montague, PC, Philadelphia, PA.

For Michael LaRosa, Jay M. Spritzler, Interested Parties: Ronen Sarraf, LEAD ATTORNEY, Sarraf Gentile, LLP, New York, NY.

For Robert Lieblang, Interested Party: Jonathan K. Levine, Girard Gibbs LLP, San Francisco, CA.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

By Memorandum and Order dated January 17, 2007 (the "January 2007 Order"), we appointed [*3] Westchester Capital Management, Inc. ("Westchester Capital") lead plaintiff in this securities class action. Plaintiff Snow Capital Investment Partners, L.P. ("Snow Capital"), which also sought to be lead plaintiff at that time, now moves for reconsideration of the January 2007 Order, arguing that under the Second Circuit's reasoning in its recent decision of *W.R. Huff Asset Mgmt. v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), Westchester Capital lacks Article III standing because it did not suffer an injury-in-fact. For the reasons set forth below, Snow Capital's motion for reconsideration is granted and it is appointed lead plaintiff in this matter, and the law firm Coughlin Stoia Geller Rudman & Robbins LLP is designated as lead counsel.

**BACKGROUND**

This is a securities fraud class action under Sections 10(b) and 20(1) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 brought on behalf of all persons who purchased or acquired common stock in IMAX Corporation ("IMAX") between February 27, 2003 and July 20, 2007. In essence, plaintiffs allege that IMAX, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble **[*4]** and PricewaterhouseCoopers LLP issued materially false and misleading statements concerning IMAX's accounting of revenue from the sale of movie theater systems.

The Private Securities Litigation Reform Act ("PSLRA") provides that a court "shall appoint as lead plaintiff the member . . . of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members" -- in other words, the "most adequate plaintiff." 15 U.S.C. § 78u-4(a)(3)(B)(i). In our January 2007 Order, we appointed Westchester Capital as lead plaintiff and Abbey Spanier Rodd & Abrams, LLP as lead counsel after concluding that Westchester Capital -- suing as attorney-in-fact for five of its client investment funds -- had the largest financial interest in the case and that it satisfied the requirements for lead plaintiff set forth in Rule 23 of the Federal Rules of Civil Procedure. *Kaplan v. Gelfond*, 240 F.R.D. 88, 96 (S.D.N.Y. 2007). We also observed at that time that Snow Capital had the second largest financial interest. Defendants then made a motion to dismiss, which we denied on September 16, 2008. The parties subsequently began discovery pertaining to **[*5]** plaintiffs' substantive claims and their pending motion for class certification, which was filed on November 3, 2008.

On December 3, 2008, the Second Circuit issued *Huff*, a federal securities fraud case in which an investment advisor to institutional investors sued on behalf of certain of its clients. The defendant in that case challenged Huff's Article III standing, and the district court denied the motion. On appeal, the Second Circuit explained that because Huff had "not alleged in its complaint that it suffered any injury . . . the dispositive question is whether Huff, as the named plaintiff, can demonstrate an 'injury-in-fact' through some other means, such as the assignment of claims." *Huff*, 549 F.3d at 107. The Court of Appeals determined that, under the Supreme Court's holding in *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008), "the minimum requirement for injury-in-fact is that the plaintiff have legal title to, or a property interest in, the claim." *Huff*, 549 F.3d at 108. As such, while an "assignee who holds legal title to an injured party's claim has constitutional standing to pursue the claim, even if the assignee has agreed to remit all proceeds **[*6]** from the litigation to the assignor," *id.* at 107, a "mere power-of-attorney . . . does not confer standing to sue in the holder's own right because a power-of attorney does not confer an ownership interest in the claim," *id.* at 108.

Following the Second Circuit's decision in *Huff*, Westchester Capital executed assignments of claim with its client investment funds on whose behalf it is suing, assigning "all rights, legal title tender and interest in the Funds' claims for damages, demands, or causes of action relating to IMAX." (*See* April 3, 2009 Declaration of David A. Rosenfeld In Support of Snow Capital's Motion for Reconsideration of this Court's January 17, 2007 Order Appointing Westchester Capital Management, Inc. at Lead Plaintiff Ex. C.) In spite of these assignments, on February 18, 2009 Snow Capital submitted a pre-motion letter to the Court pursuant to the Court's individual practices arguing that Westchester Capital lacks Article III standing based on the Second Circuit's reasoning in *Huff*. Because *Huff* appeared to raise genuine questions about whether Westchester Capital is the most adequate class member to serve as lead plaintiff, we denied the pending motion for class certification **[*7]** without prejudice and set an expedited briefing schedule for Snow Capital's motion for reconsideration of our January 2007 Order.

**DISCUSSION**

**I. Westchester Capital's Adequacy as Lead Plaintiff**

Courts have a "continuing duty to monitor whether lead plaintiffs are capable of adequately protecting the interests of the class members." *In re NYSE Specialist Sec. Litig.*, 240 F.R.D. 128, 133 (S.D.N.Y. 2007) (internal quotation marks omitted). As such, despite the absence of explicit authorization under the PSLRA or Rule 23, courts have the "ability to consider motions to disqualify, remove, withdraw, substitute, and add lead plaintiffs throughout the litigation of a securities class action." *Id.*

In support of its motion for reconsideration here, Snow Capital refers us to *In re SLM Corp. Securities Litigation*, Master File No. 08 Civ. 1029(WHP), 258 F.R.D. 112, 2009 U.S. Dist. LEXIS 35401, 2009 WL 969934 (S.D.N.Y. Apr. 1, 2009). In that securities class action, like in this case, Westchester Capital had been serving as lead plaintiff, suing on behalf of two of its client funds. Based on *Huff*, Judge Pauley selected a new lead plaintiff to replace Westchester Capital, despite Westchester Capital's attempt to cure its lack of standing by obtaining [*8] assignments of claim. In setting forth his decision, Judge Pauley explained:

> *Huff* now makes clear that Westchester Capital did not have Article III standing at the time this Court appointed it lead plaintiff. In addition, the majority of courts to allow an assignment of claims after the onset of litigation do so only where plaintiff had constitutional standing on another claim. That is not the situation here. Therefore, Westchester Capital no longer satisfies the adequacy or typicality requirement [of Rule 23] -- it faces unique legal issues that other class members do not. Even if this Court held that the assignment was sufficient to cure the lack of standing, the Court of Appeals could hold otherwise. That uncertainty requires this Court to proceed with caution.

2009 U.S. Dist. LEXIS 35401, [WL]*4. [1]

1 On April 16, 2009, Westchester Capital moved pursuant to Rule 5 of the Federal Rules of Appellate Procedure for leave to appeal Judge Pauley's order. On June 18, 2009, the Court of Appeals issued an order stating that it was construing Westchester Capital's motion as a petition for writ of mandamus and that the case would be assigned to a new panel in the ordinary course.

Westchester Capital does not dispute that [*9] it lacked Article III standing at the time this litigation commenced, but instead argues -- as it did in *In re SLM Corp.* -- that any defect in its standing can be cured through the assignments of claim it subsequently executed with its client funds. However, as Judge Pauley noted, "[t]o the extent courts allow assignment of a claim after litigation commences, the plaintiff generally has Article III standing on at least one other claim at the time the action was filed." *In re SLM Corp.*, 2009 U.S. Dist. LEXIS 35401, 2009 WL 969934, at *3 (collecting cases); *see also Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997) (holding that where plaintiff brought action on behalf of itself and certain of its shareholders, district court should have allowed substitution of shareholders with respect to their own claims because plaintiff did not have standing on those claims). [2]

2 Westchester Capital cites to two copyright infringement cases where the district court did permit assignments after the outset of the litigation even where the plaintiffs did not have Article III standing on another claim. (*See* Westchester Capital Management, Inc.'s Memorandum of Law in Opposition to Snow Capital Investment **[*10]** Partners, L.P.'s Motion for Reconsideration of this Court's January 17, 2007 Order Appointing Westchester Capital Management, Inc. as Lead Plaintiff ("Opp.") at 16 (citing *Wade Williams Distribution, Inc. v. Am. Broad. Co.*, No. 00 Civ. 5002, 2005 U.S. Dist. LEXIS 5730 (LMM), 2005 WL 774275, at *4 (S.D.N.Y. Apr. 5, 2005); *Intimo, Inc. v. Briefly Stated, Inc.*, 948 F. Supp. 315, 317-19 (S.D.N.Y. 1996)).) However, we agree with Judge Pauley that "copyright infringement is an entirely different judicial landscape because an assignee has standing to sue for infringement that occurs after the assignment of rights to the copyright, but the assignor retains standing to sue for pre-assignment infringement unless the assignment explicitly 'confer[s] the right to a claim for prior infringement.'" *In re SLM*, 2009 U.S. Dist. LEXIS 35401, 2009 WL 969934, at *3 (quoting *Intimo*, 948 F. Supp. at 317). Moreover, neither of these cases was a class action.

In any case, even were we to conclude that Westchester Capital's lack of standing has been addressed through the assignments of claim, we are still required to consider whether it satisfies the typicality and adequacy requirements of Rule 23. In evaluating a prospective lead plaintiff's typicality, we must **[*11]** consider whether that plaintiff has suffered the same injuries as other class members as a result of the same conduct by defendants and has claims based on the same legal issues. *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). With respect to the adequacy prong, we must consider whether the lead plaintiff's claims conflict with those of the class and whether class counsel is qualified and able to conduct the litigation. *See In re SLM*, 2009 U.S. Dist. LEXIS 35401, 2009 WL 969934, at *3.

We agree with Judge Pauley that irrespective of whether the assignments of claim cure Westchester Capital's deficient Article III standing, Westchester Capital now "faces unique legal issues that other class members do not." 2009 U.S. Dist. LEXIS 35401 at *4. Were we to permit it to continue as lead plaintiff, it is possible that these issues could ultimately severely prejudice the class, either at the class certification stage or on some subsequent appeal. [3] There seems little reason for us to subject the class members to such a risk. Accordingly, Snow Capital's motion for reconsideration is granted, and we proceed to the question of which other class member should replace Westchester Capital as lead plaintiff. [4]

3 We note **[*12]** that defendants' oppositions to Westchester Capital's motion for class certification both attacked Westchester Capital for lack of standing in light of *Huff*. (*See* Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class Certification ("IMAX Class Cert. Opp.") at 12-14; Defendant PricewaterhouseCoopers LLP's, An Ontario Limited Liability Partnership, Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification at 4-6.)

4 Westchester Capital cites to three other *post-Huff* cases where courts have held that assignments of claim could cure Article III standing issues. *See In re Adelphia Commc'ns Corp. Sec. Litig.*, No. 03 MDL 1529(LMM), 2009 U.S. Dist. LEXIS 48509, 2009 WL 1490599, at

*5 (May 21, 2009) (following the Second Circuit's remand in *Huff*, ordering that Huff's clients be substituted as plaintiffs pursuant to Rules 17(a) and 15); *In re Vivendi Univ., S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 584-85 (S.D.N.Y. 2009) (permitting real parties in interest to ratify plaintiffs' lawsuit or substitute for plaintiffs pursuant to Rule 17(a)); *Northstar Fin. Advisors, Inc. v. Schwab Invs.*, 609 F. Supp. 2d 938, 942 (N.D. Cal. 2009) **[*13]** (finding that assignment of claims would cure standing deficiency). However, as Snow Capital notes, none of these cases involves a *lead plaintiff* in a class action subject to the requirements of Rule 23.

**II. Appointment of a New Lead Plaintiff**

Our January 2007 Order sets forth the general legal framework for selecting a lead plaintiff under the PSLRA. Essentially, a plaintiff is presumed to be the most adequate plaintiff if it: (1) has either filed a complaint or made a motion in response to the publication of notice; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). We concluded at that time that all prospective lead plaintiffs had satisfied the first of these requirements. *Kaplan*, 240 F.R.D. at 92-93.

With regard to the second prong, we determined that using the longest of the class periods alleged prior to consolidation (October 28, 2004 to August 9, 2006), Snow Capital had the largest financial interest in the case after Westchester Capital, and that Snow Capital (and Westchester Capital) "purchased significantly more shares of IMAX stock and sustained significantly **[*14]** greater losses than any of the other movants." *Id.* at 93 n.5. However, Steelworkers Pension Trust ("Steelworkers"), in its brief submitted in opposition to the instant motion, suggests that under the class period now alleged in the operative Consolidated Amended Class Action Complaint (February 27, 2003 to July 20, 2007, the "operative class period"), "Snow Capital may even have a gain in the operative Class Period which would negate its own standing to pursue the Class' claims." (Response of Steelworkers Pension Trust to Snow Capital Management's Motion for Reconsideration of the Court's Lead Plaintiff Order Dated January 17, 2007 at 7 n.5.)

When, in response to this suggestion, we asked Steelworkers and Snow Capital what each of their losses was during the operative class period, Snow Capital's counsel represented that Snow Capital's total loss was the same under the operative class period as it had originally asserted -- $ 481,327. (June 23, 2009 Letter from David A. Rosenfeld, Esq.) Steelworkers reported that its losses during the operative class period were $ 366,732 -- down from the $ 428,445 loss it claimed in its original motion to be appointed lead plaintiff. [5] (June 23, 2009 **[*15]** Letter from Douglas M. Risen, Esq.) As such, it appears that both under the longest of the class periods alleged at the time of our January 2007 Order and under the operative class period, Snow Capital has suffered the greatest loss.

5 In a subsequent letter, counsel for Steelworkers argued that "Snow Capital has still not proffered an iota of evidence to support its assertion that its financial interest of $ 481,327 for the original class period 'remains unchanged.'" (June 24, 2009 Letter from Douglas M. Risen, Esq.) However, Steelworkers has given us no reason to disbelieve Snow Capital's counsel's representations to the Court on this point.

Finally, we reach the question of whether Snow Capital satisfies Rule 23's typicality and adequacy requirements, as set forth above. Both Westchester Capital and Steelworkers contend that (in the event we find that Westchester Capital cannot continue as lead plaintiff), Steelworkers -- and not Snow Capital -- should serve as lead plaintiff because Steelworkers' counsel "assisted in the preparation of the Complaint, has been involved in the class certification proceedings, and Steelworkers and its investment advisor have both produced documents and [*16] been deposed. Steelworkers has a solid working knowledge of this case and it would be better prepared to enter the litigation at this time." (Opp. at 22.)

We find this argument unpersuasive and see no reason to disregard the PSLRA's presumption that the class member with the largest financial interest should serve as lead plaintiff. Here, that class member is Snow Capital. [6] We likewise see no reason why Snow Capital's experienced law firm, Coughlin Stoia Geller Rudman & Robbins LLP, should not represent the class.

6 Indeed, Steelworkers' adequacy is apparently a point of dispute. In their class certification opposition, defendants argued that at Steelworkers' deposition, the representative was not knowledgeable about the class action and that "[e]ven the simplest questions to Steelworkers elicited a string of 'I don't know' or 'I'm not sure.'" (Reply Memorandum of Law in Further Support of Snow Capital Investment Partners, L.P.'s Motion for Reconsideration of This Court's January 17, 2007 Order Appointing Westchester Capital Management, Inc. as Lead Plaintiff, and in Response to the Opposition of Westchester Capital Management, Inc. at 10 (citing IMAX Class Cert. Opp. at 26).)

**CONCLUSION**

For [*17] the reasons stated above, Snow Capital's motion for reconsideration is granted and it is appointed lead plaintiff in this matter, and the law firm Coughlin Stoia Geller Rudman & Robbins LLP is designated as lead counsel. Within ten (10) days, counsel for lead plaintiff and defendants should confer and submit a joint status letter setting forth how and on what schedule they intend to proceed with class certification and substantive discovery in this matter.

Dated: New York, New York

June 29, 2009

/s/ Naomi Reice Buchwald

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

---- End of Request ----
Email Request: Current Document: 1
Time Of Request: Tuesday, May 08, 2012 14:46:31

# EXHIBIT G

This is Exhibit "G" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires August 8, 2014

United States District Court,
S.D. New York.
In re IMAX SECURITIES LITIGATION.

No. 06 Civ. 6128 (NRB).
Dec. 22, 2010.

**Background:** Securities fraud class action was initiated on behalf of all persons who purchased or acquired common stock in entertainment technology corporation that specialized in digital and film-based motion picture technologies and largeformat film presentations, alleging that corporation and accounting firm issued materially false and misleading statements concerning corporation's accounting of theater system revenue. Lead plaintiff moved for class certification, certification of class representative, and appointment of class counsel.

**Holdings:** The District Court, Naomi Reice Buchwald, J., held that:
(1) proposed class met numerosity requirement;
(2) proposed class met commonality requirement;
(3) proposed representative failed to meet typicality requirement; and
(4) proposed representative failed to show it was adequate representative.

Motion denied.

West Headnotes

**[1] Federal Civil Procedure 170A ⚿171**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak171 k. In general; certification in general. Most Cited Cases

A district court can only certify a class action if, after a rigorous analysis, it is satisfied that the requirements of the rule governing class certification have been met. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⚿171**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak171 k. In general; certification in general. Most Cited Cases

**Federal Civil Procedure 170A ⚿174**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak174 k. Consideration of merits. Most Cited Cases

The court's obligation to conduct a rigorous analysis of whether the requirements of the rule governing class certification have been met is not lessened by overlap between a rule requirement and a merits issue, even a merits issue that is identical with a rule requirement. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⚿172**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)2 Proceedings
170Ak172 k. Evidence; pleadings and supplementary material. Most Cited Cases

The preponderance of the evidence standard applies to evidence proffered to establish requirements of the rule governing class certification. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⚿163**

170A Federal Civil Procedure
170AII Parties

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

170AII(D) Class Actions
170AII(D)1 In General
170Ak163 k. Impracticability of joining all members of class; numerosity. Most Cited Cases

The numerosity requirement in the rule governing class certification does not mandate that joinder of all parties be impossible, only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A 🔑187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement of the rule governing class certification may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A 🔑187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

In securities fraud cases, for class certification purposes, numerosity is presumed when a class consists of forty members or more. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A 🔑187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

Proposed class in securities fraud action against entertainment technology corporation that specialized in digital and film-based motion picture technologies and largeformat film presentations and accounting firm met numerosity requirement for class certification purposes; proposed class amply exceeded 40 members, corporation had at least 40 million shares outstanding and traded on stock exchange during proposed class period, and hundreds of millions of corporation's shares were traded on stock exchange during proposed class period. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**[8] Federal Civil Procedure 170A 🔑165**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases

The commonality requirement for class certification is met if plaintiffs' grievances share a common question of law or of fact. Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[9] Federal Civil Procedure 170A 🔑187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

Proposed class of all persons who purchased or acquired common stock in entertainment technology corporation that specialized in digital and film-based motion picture technologies and large-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

format film presentations met commonality requirement for class certification in securities fraud action against corporation and accounting firm; there were common questions of law and of fact, including whether statements issued during class period were materially false and misleading when issued, whether corporation's financial statements failed to comply with Generally Accepted Accounting Principles (GAAP) during class period, and whether firm's audits of corporation's financial statements during class period were conducted in accordance with Generally Accepted Auditing Standards (GAAS). Fed.Rules Civ.Proc.Rule 23(a)(2), 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⚿164**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak164 k. Representation of class; typicality. Most Cited Cases

In order to be named a class representative, a plaintiff must show, by a preponderance of the evidence, that its claims are typical of the claims of the class, and that it is not subject to any unique defenses which threaten to become the focus of the litigation. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A ⚿187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

Proposed class representative in securities fraud class action initiated on behalf of all persons who purchased or acquired common stock in entertainment technology corporation that specialized in digital and film-based motion picture technologies and largeformat film presentations was unable to establish loss causation required for claim under § 10(b) of Securities Exchange Act, and thus failed to meet typicality requirement of rule governing class certification; proposed representative made final stock purchase before announcement of corporation's financials, and sold shares shortly after disclosure that corporation was responding to informal inquiry from Securities and Exchange Commission (SEC) concerning timing of revenue recognition and its application of multiple element arrangement (MEA) accounting derived from theater system sales and leases. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.; Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[12] Federal Civil Procedure 170A ⚿164**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak164 k. Representation of class; typicality. Most Cited Cases

A plaintiff fails to meet typicality requirement of rule governing class certification if its claims are subject to unique defenses which threaten to become the focus of the litigation. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A ⚿103.7**

170A Federal Civil Procedure
170AII Parties
170AII(A) In General
170Ak103.7 k. Class actions. Most Cited Cases

**Federal Civil Procedure 170A ⚿164**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak164 k. Representation of class; typicality. Most Cited Cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

A plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

**[14] Securities Regulation 349B ⚷60.18**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
349Bk60.18 k. In general. Most Cited Cases

In order to plead a violation of § 10(b) of the Securities Exchange Act, a plaintiff must allege (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[15] Securities Regulation 349B ⚷60.47**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.43 Grounds of and Defenses to Liability
349Bk60.47 k. Causation; existence of injury. Most Cited Cases

To establish loss causation, for purposes of a securities fraud claim, a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Securities Exchange Act of 1934, § 21D(b)(4), 15 U.S.C.A. § 78u–4(b)(4).

**[16] Securities Regulation 349B ⚷60.53**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.50 Pleading
349Bk60.53 k. Misrepresentation. Most Cited Cases

The loss causation element of a securities fraud claim is sufficiently pleaded when the complaint provides notice of what the relevant economic loss might be and what the causal connection might be between that loss and the alleged misrepresentations; thus, the complaint must allege that the market reacted negatively to a corrective beginning to leak out. Securities Exchange Act of 1934, § 21D(b)(4), 15 U.S.C.A. § 78u–4(b)(4).

**[17] Securities Regulation 349B ⚷60.47**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.43 Grounds of and Defenses to Liability
349Bk60.47 k. Causation; existence of injury. Most Cited Cases

While a disclosure of a government investigation may be sufficient to adequately plead loss causation, for purposes of a securities fraud claim under § 10(b), a corrective disclosure for the purposes of loss causation should place investors on notice of the type of specific fraudulent accounting practices that plaintiffs allege. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

**[18] Federal Civil Procedure 170A ⚷187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Proposed class representative in securities fraud class action initiated on behalf of all persons who purchased or acquired common stock in entertainment technology corporation that specialized in digital and film-based motion picture technologies and largeformat film presentations failed to show that it was adequate representative for proposed class; proposed representative served as stock broker for class counsel, and class counsel and representative had close business and personal relationship. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[19] Federal Civil Procedure 170A ⚷164**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak164 k. Representation of class; typicality. Most Cited Cases

A key element in the determination of whether a plaintiff's interests are antagonistic to those of other members of the class, as required for class representative status, is the relationship between the class representative and class counsel. Fed.Rules Civ.Proc.Rule 23(a)(4), 28 U.S.C.A.

**[20] Federal Civil Procedure 170A ⚷165**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)1 In General
170Ak165 k. Common interest in subject matter, questions and relief; damages issues. Most Cited Cases

The predominance requirement under rule governing class certification is satisfied if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**[21] Securities Regulation 349B ⚷60.48(3)**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.43 Grounds of and Defenses to Liability
349Bk60.48 Reliance
349Bk60.48(3) k. Fraud on the market. Most Cited Cases

Loss causation need not be proven by a preponderance of the evidence in order to trigger the fraud on the market presumption at the class certification stage. Fed.Rules Civ.Proc.Rule 23(b), 28 U.S.C.A.

**[22] Federal Civil Procedure 170A ⚷187**

170A Federal Civil Procedure
170AII Parties
170AII(D) Class Actions
170AII(D)3 Particular Classes Represented
170Ak187 k. Stockholders, investors, and depositors. Most Cited Cases

Class action certified in Canada against entertainment technology corporation that specialized in digital and film-based motion picture technologies and largeformat film presentations was not superior way of adjudicating claims under United States securities laws against corporation and accounting firm, for purposes of certification of class; Canadian action did not include accounting firm, Canadian action would apply Canada's securities laws, first complaint in Canada was filed after first complaint in United States, and proposed class period in action was significantly longer than what was certified in Canadian class action. Fed.Rules Civ.Proc.Rule 23(b), 28 U.S.C.A.; Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

***141 MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

This is a securities fraud class action under Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b–5,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

17 C.F.R. § 240.10b–5, brought on behalf of all persons who purchased or acquired common stock in IMAX Corporation ("IMAX" or "the Company") on the NASDAQ between February 27, 2003 and July 27, 2007 ("the Class Period").[FN1] Plaintiffs allege that the defendants, IMAX, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble (collectively, the "IMAX defendants"), and PricewaterhouseCoopers LLP ("PWC") (collectively, the "defendants"), issued materially false and misleading statements concerning IMAX's accounting of theater system revenue. On September 16, 2008, we denied defendants' motions to dismiss plaintiffs' Consolidated Class Action Complaint ("Complaint"). *In re IMAX Sec. Litig.*, 587 F.Supp.2d 471 (S.D.N.Y.2008). Familiarity with that opinion is assumed.

FN1. In its motion for class certification, filed on April 22, 2010, Lead Plaintiff Snow Capital Investment Partners, L.P. ("Snow Capital" or "Lead Plaintiff") proposed a Class that included all those who acquired IMAX stock during the proposed Class Period (i.e., not just those who acquired IMAX stock on the NASDAQ). *See* Memorandum of Law in Support of Plaintiff's Motion for Class Certification ("Pl. Mem.") at 1 n. 1. On June 24, 2010, the U.S. Supreme Court decided *Morrison v. National Australia Bank Ltd.*, —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), adopting a "transactional" test for determining whether a plaintiff has a claim under § 10(b). Under *Morrison*, the relevant question is "whether the purchase or sale [of the security] is made in the United States, or involves a security listed on a domestic exchange...." *Id.* at 2886. In light of *Morrison*, Snow submitted a revised definition of the proposed Class that only includes those who purchased IMAX shares on the NASDAQ, and thus excludes those who purchased IMAX securities on the Toronto Stock Exchange. Reply Memorandum of Law in Further Support of Plaintiff's Motion for Class Certification ("Pl. Reply Mem.") at 1 n. 3.

By Memorandum and Order dated June 29, 2009, we appointed Snow Capital lead plaintiff in this class action.[FN2] Snow Capital ***142** now moves for an order (1) certifying this action as a class action on behalf of those who acquired the common stock of IMAX on the NASDAQ during the Class Period, (2) certifying it as Class Representative, and (3) appointing Robbins Geller as class counsel.[FN3] For the following reasons, Snow Capital's motion is DENIED.

FN2. Snow Capital is the second lead plaintiff in this case. After we originally appointed Westchester Capital Management, Inc. ("Westchester Capital") lead plaintiff on January 17, 2007, the Second Circuit decided *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir.2008), holding that an investment advisor lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact. Relying on *Huff*, Snow Capital moved for reconsideration of our Order appointing Westchester Capital lead plaintiff. On June 29, 2009, we granted Snow Capital's motion for reconsideration, appointed it lead plaintiff, and designated Robbins Geller Rudman & Dowd LLP ("Robbins Geller") lead counsel. *In re IMAX Sec. Litig.*, 2009 WL 1905033 (S.D.N.Y. June 29, 2009). Snow Capital then filed the present motion for class certification.

FN3. Robbins Geller was previously known as Coughlin Stoia Geller Rudman & Robbins LLP. The firm's name change was effective March 31, 2010. *See* Pl. Mem. at 11 n. 10.

**BACKGROUND**

IMAX is an entertainment technology company