# EXHIBIT B
# (PART 6)

specializing in digital and film-based motion picture technologies and large-format film presentations.[FN4] The Company's main business is the design, manufacture, sale and lease of theater systems.[FN5] As of December 31, 2006, the IMAX theater network included 284 theaters operating in 40 countries.[FN6]

FN4. Affidavit of Edward Macneil ("Macneil Aff."), ¶ 6.

FN5. *Id.*

FN6. *Id.*

The majority of IMAX's revenue during the class period was derived from the sale and lease of theater systems to third-party owners of large-format theaters.[FN7] Throughout the class period, IMAX reported upward-trending financial results: 16 theater system installations ("installs") and $71 million revenue for fiscal year 2002; 21 installs and $75.8 million revenue for 2003; 22 installs and $86.6 million revenue for 2004; and 39 installs and $99.7 million revenue for 2005.[FN8]

FN7. *See* Compl. ¶ 62.

FN8. *Id.* ¶¶ 71, 79, 87, 107.

On February 17, 2006, IMAX issued a press release announcing its 2005 financials and reporting that the Company had completed 14 theater system installations during the fourth quarter of 2005.[FN9] On March 9, 2006, IMAX filed its Form 10–K for fiscal year 2005 ("2005 10–K"), describing a "record" 14 theater system installations and $35.1 million revenue in the fourth quarter.[FN10]

FN9. *Id.* ¶ 100.

FN10. *Id.* ¶¶ 102, 107.

Five months later, on August 9, 2006, IMAX announced that it was responding to an informal inquiry from the Securities and Exchange Commission ("SEC") concerning the timing of revenue recognition and, specifically, its application of multiple element arrangement ("MEA") accounting derived from theater system sales and leases.[FN11] The August 9th press release included the following information concerning the SEC investigation and the Company's accounting of theater revenue:

FN11. *Id.* ¶¶ 115–16.

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting to its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed. The Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors,*143 PricewaterhouseCoopers LLP. This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period. The Company is cooperating in this inquiry.[FN12]

FN12. *Id.* ¶ 115; Declaration of James D.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Matthews in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class Certification ("Matthews Decl."), Ex. F.

In addition to disclosing the SEC investigation, the August 9th announcement stated that the Company's discussions with potential buyers and strategic partners had faltered.[FN13] The following day, the price of IMAX shares fell from $9.63 to $5.73.[FN14]

FN13. Matthews Decl., Ex. F.

FN14. *Id.* ¶¶ 115, 119.

On March 29, 2007, IMAX announced that, based on comments it had received from the SEC and the Ontario Securities Commission, it was expanding its review, "primarily in connection with its revenue recognition for certain theater system installations in previous periods, including the fourth quarter of 2005." [FN15] Because of this "expanded review," IMAX stated that it "may determine that it is necessary to restate additional items beyond the previously identified errors."[FN16]

FN15. *Id.* ¶ 127.

FN16. *Id.*

Four months later, on July 20, 2007, IMAX filed its Form 10–K for fiscal year 2006 ("2006 10–K"), which included a restatement of its financial results for fiscal years 2002 through the first three quarters of 2006. The 2006 10–K stated:

> [T]he Company revised its policy to require that (i) the projector, sound system and screen system be installed and are in fully working condition, the 3D glasses cleaning machine, if applicable, be delivered and projectionist training be completed, and (ii) written customer acceptance thereon received, or the public opening of the theater take place, before revenue can be recognized.[FN17]

FN17. *Id.* ¶ 145.

The press release announcing the restatement also described the Company's previous method of revenue accounting:

> Under the former method for recording revenues under multiple element arrangement accounting, as reflected in the Company's 2005 10–K, the Company recognized revenue when the projector and sound system were installed and deferred revenue recognition of components deemed to be separate deliverables until their subsequent installation, such as the screen.... After extensive review and consideration, the Company determined that the screen, 3–D glasses cleaning machine and initial services including projectionist training should be considered one single deliverable. In addition, the Company will now require receipt of a signed acceptance from each client before recognizing revenue upon the opening of the theatre.[FN18]

FN18. *Id.* ¶ 139.

As a result of the restatement of theater system revenue, 16 installation transactions representing $25.4 million in revenue shifted between quarters in their originally reported years, and 14 installation transactions representing $27.1 million in revenue shifted between fiscal years.[FN19] Of the 14 transactions for which revenue shifted between fiscal years, one was originally recorded as revenue in fiscal year 2002, two were recorded in fiscal year 2004, ten in fiscal year 2005, and one in fiscal year 2006.[FN20]

FN19. *Id.*

FN20. 2006 10–K at 91.

The essence of plaintiffs' Complaint is that, throughout the class period, the IMAX defendants

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

issued materially false and misleading statements concerning IMAX's accounting of theater system revenue:

> Throughout the Class Period, IMAX publicly stated that revenue from theater systems sales and sales-type leases was recognized upon installation of the theater system. However, as the Company was *144 ultimately forced to disclose, this was not the case .... In order to meets its earnings targets, IMAX improperly accelerated its revenue recognition on theater systems and concomitantly, reported earnings thereon, when only certain elements of its systems were installed .... This piecemeal revenue recognition violated GAAP ....[FN21]

FN21. Compl. ¶ 40.

With regard to PWC, the Complaint alleges that PWC's audit opinions, issued in connection with IMAX's 10–Ks for 2002 through 2005 were materially misleading[FN22], and that:

FN22. *Id.* ¶ 124.

> Because PWC failed to conduct an audit in accordance with [Generally Accepted Auditing Standards ("GAAS") ] and [Public Company Accounting Oversight Board ("PCAOB") ] standards, and issued clean opinions on IMAX's 2002–2005 financial statements, it is also responsible for the material misinformation disseminated to the investing public during the Class Period.[FN23]

FN23. *Id.* ¶ 149.

**Relevant Accounting Principles and IMAX's Theater System Accounting Policy**

IMAX's publicly stated revenue recognition policy evolved significantly since 1999. To some extent, the changes in IMAX's policy reflected changes in the relevant accounting standards governing revenue recognition.[FN24]

FN24. For a more detailed summary of the evolution of IMAX's theater system accounting policy, as well as a discussion of the relevant accounting principles, see *In re IMAX Sec. Litig.*, 587 F.Supp.2d at 475–78.

**1. Pre–2000**

Before January 1, 2000, IMAX recognized theater system revenue "on the completed contract method (that is, upon delivery of the system)."[FN25]

FN25. Compl. ¶ 41.

**2. Fiscal Years 2000–2003**

From fiscal year 2000 through 2003, IMAX stated that revenue would be recognized "at the time of the theater installation."[FN26] This revenue recognition policy was in response to the SEC Staff Accounting Bulletin No. 101 ("SAB 101"), which stated that revenue should not be recognized until it is "realized or realizable and earned," which generally occurs when: (1) persuasive evidence of an agreement exists, (2) delivery has occurred or services have been rendered, (3) the seller's price to the buyer is fixed or determinable, and (4) collectability is reasonably assured.[FN27] As we previously noted, "although SAB 101 provided specific criteria for *when* revenue may be recognized, it did not directly address the precedent question of *what* is the unit of accounting—a complicated issue in arrangements involving multiple elements."[FN28]

FN26. *Id.* ¶¶ 42–44; *see also* IMAX 10–K405 for fiscal year ending December 31, 2000, filed April 2, 2001 ("2000 10–K") at 15, 30, 31; IMAX 10–K405 for fiscal year ending December 31, 2001, filed March 25, 2002 ("2001 10–K") at 17, 36, 58; IMAX 10–K/A for fiscal year ending December 31, 2002, filed February 27, 2004 ("2002 10–K") at 21, 44; IMAX 10–K/A for fiscal year ending December 31, 2003, filed September 13, 2004 ("2003 10–K") at 20, 24, 50.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN27. *See* Macneill Aff., Ex. A, at 3. In addition to SAB 101, Statement of Financial Accounting Concepts No. 5 ("FASCON 5") provides that revenue "recognition involves consideration of two factors (a) being realized or realizable and (b) being earned .... [R]evenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." Compl. ¶ 45.

FN28. *In re IMAX Sec. Litig.*, 587 F.Supp.2d at 476.

**3. Fiscal Year 2004**

In its Form 10–K for fiscal year 2004, filed March 11, 2005, IMAX disclosed that "[t]he Company recognizes revenues from sales and sales-type leases generally upon installation of the theater-system." FN29 In a section titled "Multiple Element Arrangements," IMAX stated that "[o]n occasion, the Company will include film licenses or other specified elements as part of system sales or lease agreements .... Revenues under these arrangements ***145** are allocated based upon the estimated relative fair values of each element." FN30

FN29. 2004 10–K at 25.

FN30. Compl. ¶ 51.

IMAX's accounting policy for fiscal year 2004 in part reflected new guidance on revenue recognition from the Emerging Issues Task Force ("EITF") of the Financial Accounting Standards Board ("FASB"). In May 2003, the EITF issued EITF 00–21, which states that "[i]n an arrangement with multiple deliverables, the delivered item(s) should be considered a separate unit of accounting if all of the following criteria are met:

(a) The delivered item(s) has value to the customer on a standalone basis. That item(s) has value on a standalone basis if it is sold separately by any vendor or the customer could resell the delivered item(s) on a standalone basis. In the context of a customer's ability to resell the delivered item(s), the Task Force observed that this criterion does not require the existence of an observable market for that deliverable(s);

(b) There is objective and reliable evidence of the fair value of the undelivered item(s);

(c) If the arrangement includes a general right of return relative to the delivered item, delivery or performance of the undelivered item(s) is considered probable and substantially in the control of the vendor. FN31

FN31. See Macneill Aff., Ex. B, at 7.

While EITF 00–21 addressed the question of *what* should constitute a separate unit of accounting, it explicitly did not address the determination of *when* the criteria for revenue recognition are met—the question considered in SAB 101. FN32

FN32. See *Id.*, Ex. B, at 2. (EITF 00–21 "does not address when the criteria for revenue recognition are met.").

**4. Fiscal Year 2005**

IMAX disclosed a more expansive application of multiple element accounting in its 2005 Form 10–K, filed on March 9, 2006. As stated in the Form 10–K, the Company recognized revenue "when the installation of the respective theater system element [was] substantially complete." FN33 The 2005 Form 10–K further stated:

FN33. 2005 10–K at 34.

The Company's system sales and lease transactions typically involve the delivery of several products and services, including the projector, projection screen and sound system, supervision of installation, training of theater personnel, and advice on theater design and custom assemblies. In addition, on occasion, the Company will include film licenses or other specified elements as

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

part of these transactions.

When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognized when revenue recognition criteria for that element is met.FN34

FN34. *Id.* at 34, 64.

As we previously observed, "IMAX's stated understanding of the relevant unit of accounting appears to have drifted over time, from an initial focus on 'theater systems' in 2000, 2001, 2002, 2003, and 2004, to 'theater system elements' in 2005." *In re IMAX Sec. Litig.,* 587 F.Supp.2d at 478.

**DISCUSSION**

**I. Legal Standards**

[1][2] In order to qualify for certification as a class action, a proposed class must meet the requirements of Federal Rule of Civil Procedure 23(a) —numerosity, commonality, typicality, and adequacy—and one of the subsections of Rule 23(b). *See In re Salomon Analyst Metromedia Litig.,* 544 F.3d 474, 478 (2d Cir.2008). A district court can only certify a class action if, "after a rigorous analysis," it is satisfied that the Rule 23 requirements have been met. *In re Initial Pub. Offerings Sec. Litig.,* ("*In re IPO* "), 471 F.3d 24, 33 (2d Cir.2006) (internal quotation ***146** marks omitted). The court's obligation to conduct a rigorous analysis of whether the Rule 23 requirements have been met "is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement." *Id.* at 41. " *In re IPO* makes clear that courts may resolve contested factual issues where necessary to decide on class certification." *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 228 (2d Cir.2008) (quotation and citation omitted).

[3] Snow Capital brings this motion for class certification under Rule 23(b)(3), which requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 201–02 (2d Cir.2008).

**II. Analysis**

**a. Rule 23(a) Requirements**

**1. Numerosity**

[4][5][6] In order to meet Rule 23(a)(1)'s numerosity requirement, a plaintiff must establish that the proposed "class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC,* 504 F.3d 229, 244–45 (2d Cir.2007). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.,* 242 F.R.D. 76, 84 (S.D.N.Y.2007) (internal quotations and citation omitted). Numerosity is presumed when a class consists of forty members or more. *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995).

[7] Given that the proposed Class amply exceeds forty members, IMAX had at least 40 million shares outstanding and traded on the NASDAQ during the proposed Class Period, hundreds of millions of IMAX shares were traded on the NASDAQ during the proposed Class Period, and defendants have not challenged numerosity, it is clear that the pro-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

posed class satisfies Rule 23(a)(1)'s numerosity requirement.FN35

FN35. *See* Pl. Mem. at 5–6.

**2. Commonality**

[8] Rule 23(a)(2) requires that a plaintiff establish that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The "commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Cent. States Se. & Sw. Areas Health & Welfare Fund,* 504 F.3d at 245. It "tend[s] to merge" with the Rule 23(a)(3) requirement of typicality, discussed below, because "both serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

[9] Snow Capital asserts that there are a number of common questions of law and of fact, including, but not limited to whether defendants' statements issued during the Class Period were materially false and misleading when issued, whether IMAX's financial statements failed to comply with GAAP during the Class Period, and whether PWC's audits of IMAX's financial statements during the Class Period were conducted in accordance with GAAS.FN36 While defendants do not appear to challenge the commonality requirement in their papers, a number of their *147 arguments concerning typicality, addressed below, also touch upon commonality. However, in light of the multiple common questions of law and of fact, and the fact that defendants have not challenged the commonality requirement, we find that Rule 23(a)(2)'s commonality requirement has been satisfied.

FN36. *See* Pl. Mem. at 7–8.

**3. Typicality**

[10] In order to be named Class Representative, Snow Capital must show, by a preponderance of the evidence, that its claims are typical of the claims of the class, and that it is "not subject to any unique defenses which threaten to become the focus of the litigation." *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 40 (2d Cir.2009) (internal quotation omitted).

In *In re Flag Telecom Holdings,* 574 F.3d at 37–41, the Second Circuit considered whether an "in-and-out" trader, who sold his stock prior to an alleged corrective disclosure, could be named a class representative. Rejecting the district court's finding that it was "conceivable" that the in-and-out trader could prove loss causation, the Second Circuit stated that "the district court's 'conceivable' standard of proof does not satisfy the preponderance of the evidence standard set forth in *In re IPO* and its progeny." *Id.* at 38. The Court stated that whether or not the proposed class representative could show loss causation was "relevant to Rule 23(a)" because the district court "was required to find by a preponderance of the evidence that [the proposed class representative] is both an adequate and typical representative of the class and not subject to any unique defenses which threaten to become the focus of the litigation." *Id.* at 39–40 (internal quotation omitted).

[11][12][13] Defendants argue that Snow Capital cannot satisfy Rule 23(a)(3)'s typicality requirement because, amongst other reasons, it cannot establish loss causation.FN37 While defendants present some of their loss causation arguments in the context of Rule 23(a)'s typicality requirement, and others in the context of Article III standing FN38, we need not necessarily find that Snow Capital lacks standing to bring a claim in its individual capacity in order for it to be an atypical lead plaintiff. Rather, a plaintiff fails to meet Rule 23(a)'s typicality requirement if its claims are "subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000). However, "[i]t is axiomatic that a putative class

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class.". *In re Merrill Lynch & Co. Research Reports Secs. Litig.*, 272 F.Supp.2d 243, 255 (S.D.N.Y.2003) Furthermore, "[a] plaintiff, including one who is seeking to act as class representative, must have individual standing to assert the claims in the complaint against each defendant being sued by him." *Ramos v. Patrician Equities Corp.*, 765 F.Supp. 1196, 1199 (S.D.N.Y.1991). For the reasons discussed below, we find that, at a minimum, Snow Capital is subject to unique defenses and thus cannot satisfy Rule 23(a)'s typicality requirement.

FN37. IMAX Mem. at 17–18.

FN38. *Id.* at 7 (arguing that Snow Capital sold prior to a potential curative disclosure and thus lacks standing); *id.* at 17–18 (arguing that Snow Capital cannot show loss causation and thus is "not a typical investor").

[14] In order to plead a violation of § 10(b) of the Securities Exchange Act, a plaintiff must allege (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005).

[15][16] Under the Private Securities Litigation Reform Act, plaintiffs have "the burden of proving" that the defendant's misrepresentations "caused the loss" for which they seek recovery. 15 U.S.C. § 78u–4(b)(4). "[T]o establish loss causation, 'a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.,* that the misstatement or omission concealed something ***148** from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir.2005) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001)). The loss causation element of a securities fraud claim is sufficiently pleaded when the complaint provides "notice of what the relevant economic loss might be" and "what the causal connection might be between that loss" and the alleged misrepresentations. *See Dura,* 544 U.S. at 346–47, 125 S.Ct. 1627; *see also In re Salomon Analyst Metromedia Litig.,* 544 F.3d 474, 478 n. 1 (2d Cir.2008) (loss causation is "a causal connection between the material misrepresentation and the loss"); *Lentell,* 396 F.3d at 172 (2d Cir.2005) (describing loss causation as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff") (internal citation omitted). Thus, the complaint must allege that the "market reacted negatively to a corrective begin[ning] to leak out." *Dura,* 544 U.S. at 342, 125 S.Ct. 1627.

While we previously held that the Complaint adequately pleads loss causation for a putative class of plaintiffs, *In re IMAX Sec. Litig.,* 587 F.Supp.2d at 485–86, we were not presented with the question, and thus did not address, whether Snow Capital can adequately plead loss causation in its individual capacity. Defendants argue that Snow Capital cannot show loss causation because

> [Snow Capital] purchased IMAX stock on three dates, each prior to the close of IMAX's fourth quarter of 2005: December 14, 2004 (40,000 shares), October 3, 2005 (35,000), and November 3, 2005 (75,000); and only sold on two dates: February 7, 2005 (10,000) and August 10, 2006 (150,000 and extinguishing its IMAX position). The Complaint seeks damages based on IMAX's stock price drop following alleged corrective disclosures beginning in August 2006 and continuing until July 2007. However, IMAX's August 9, 2006 disclosure only related to theater systems recognized in or after the fourth quarter of 2005, and thus cannot have been a corrective disclosure for Snow, who purchased all of its IMAX stock before IMAX's financials for the fourth quarter of 2005 were released on February 17, 2006.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Moreover, Snow sold its entire remaining interest in IMAX on August 10, 2006—before any statements alleged to be curative in the Complaint were made regarding the alleged misrepresentations upon which Snow could have relied for its purchase of IMAX stock. Thus, Snow cannot establish loss causation.[FN39]

FN39. Letter from IMAX defendants to the Court (Aug. 2, 2010), at 2 (emphasis removed). *See also* Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Snow Capital Investment Partners, L.P.'s Motion for Class Certification ("IMAX Mem."), at 17–18; Matthews Decl., Ex. D.

It must be recognized that defendants' argument is grounded on the proposition that IMAX's August 9, 2006 disclosure only related to theater systems recognized in or after the fourth quarter of 2005, and thus cannot be a corrective disclosure for Snow Capital. Therefore, we turn to the issue of the scope of the August 9, 2006 disclosure.

***August 9, 2006 Disclosure***

The August 9th disclosure of the SEC investigation addressed IMAX's application of MEA accounting in the fourth quarter of 2005 and second quarter of 2006, an application that differed from IMAX's revenue recognition policy in earlier fiscal years, and that was described differently in IMAX's 2005 10–K. *See supra.* While the August 9th disclosure stated that the SEC was conducting an informal inquiry "regarding the Company's timing of revenue recognition," the announcement, issued in the third quarter of 2006, *only* mentioned theater systems installed in the fourth quarter of 2005, and second quarter of 2006:

> The Company recognized revenue in the fourth quarter of 2005 on 10 theater installations in theaters which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed.... The value ***149** associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed.... This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006, where revenue associated with the screen element has been deferred to a future period.[FN40]

FN40. Compl. ¶ 115; Matthews Decl., Ex. F.

As discussed below, no pre-fiscal year 2005 theater system for which revenue was ultimately restated involved the recognition of revenue for a theater in which the screen element had not been installed, or was caused by a misapplication of the accounting principles under EITF–0021.[FN41]

FN41. Macneil Aff. at ¶ 34.

Furthermore, the August 9th disclosure's description of IMAX's MEA accounting policy was consistent with the more expansive application of the accounting policy first disclosed in the Company's 2005 10–K. The disclosure stated that "[u]nder multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods."[FN42] As we noted above, this application of the Company's revenue recognition policy differed from that which was both applied and disclosed in earlier fiscal years.

FN42. *See* 2005 10–K at 64 ("When the elements of theater systems meet the criteria for treatment as separate units of accounting, the Company generally allocates revenue to each element based on its relative fair value. Revenue allocated to an individual element is recognized when rev-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

enue recognition criteria for that element is met.").

[17] While a disclosure of a government investigation may be sufficient to adequately plead loss causation (*see In re Take–Two Interactive Sec. Litig.,* 551 F.Supp.2d 247, 286–87 (S.D.N.Y.2008); *Police and Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.,* 645 F.Supp.2d 210, 230 (S.D.N.Y.2009)), a corrective disclosure for the purposes of loss causation should place investors on notice of the "type of specific fraudulent accounting practices that [p]laintiffs allege." *SafeNet,* 645 F.Supp.2d at 231. Here, while the disclosure of the SEC investigation specifically addressed IMAX's MEA accounting policy that was applied in 4Q 2005, and disclosed in the Company's 2005 10–K, it did not address, or suggest an investigation into, IMAX's accounting practices in earlier periods.

We find that the August 9th announcement's specificity with regard to the subject of the SEC investigation, identification of a particular number of theater systems for which, and fiscal quarters in which, revenue was recognized under the application of the accounting policy at issue, and description of an application of MEA accounting that focused on the timing of revenue recognition as it relates to the installation of the screen element of a theater system, all suggest that the announcement was not a corrective disclosure for alleged misstatements beyond those that fall within both the temporal (4Q 2005 and later) and topical (the application of MEA accounting described in the announcement) limitations of the disclosure itself. This interpretation is supported by the market's understanding of the announcement, as evidenced by analyst reports issued the following day:

• "The specific instance in question relates to the Company's 4Q05 revenues." *Roth Capital Partners,* August 10, 2006.[FN43]

FN43. Declaration of Lucy P. Allen ("Allen Decl."), at 29.

• "The SEC has initiated an informal inquiry about the timing of revenue recognition and use of multiple element arrangement accounting associated with 10 theatre installations recognized in 4Q05." *Soleil Securities,* August 10, 2006.[FN44]

FN44. *Id.*

• "Late Wednesday, the company said it is responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the timing of revenue recognition. The concern involves revenue recognized during the fourth quarter of 2005 for 10 Imax installations in theaters that did not open in that quarter." *The Canadian Press,* August 10, 2006.[FN45]

FN45. *Id.*

***150** • A potential restatement of IMAX's financials "might move some revenue from prior quarters into more recent quarters throughout FY 06." *Merriman Curhan Ford,* August 10, 2006.[FN46]

FN46. *Id.* at 24.

***Snow Capital's Arguments***

Snow Capital presents seven arguments in response to defendants' loss causation position. We consider each in turn.

First, Snow Capital argues that the August 9th disclosure put it "on notice of problems and potential problems that convinced [Richard Snow, the founder and president of Snow Capital] to sell Snow Capital's IMAX securities the following day."[FN47] Snow Capital quotes from the deposition of Richard Snow, in which he testified about the factors that led to his decision to sell the remaining portions of Snow Capital's holding of IMAX stock on August 10, 2006:

FN47. Pl. Reply Mem. at 13.

From my experience, management had lost credibility. What I was specifically concerned about

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

is they had a great deal of debt on the balance sheet, and I was concerned that it would be possible that maybe, with the inquiry, they somehow could have some sort of a technical loan default which would have endangered the company's ability to ultimately reap the benefits of their purported optimistic future, so I exited the position. FN48

FN48. Pl. Reply Mem. at 13 (quoting Millkey Decl., Ex. 1 at 90:8–20).

Mr. Snow's testimony does not support Snow Capital's argument that the August 9th announcement was a corrective disclosure of alleged misstatements made prior to IMAX's release of its fourth quarter financials. The fact that Snow believed that IMAX might have had a technical loan default, and that it had lost credibility and might not be able to reap the benefits of its optimistic future, has little bearing on whether the August 9th announcement revealed a misstatement or omission upon which Snow relied when purchasing IMAX stock. FN49 The conclusion of Lead Plaintiff's expert economist, John D. Finnerty, that "securities analysts following IMAX ... also remarked that the disclosures in the [August 9, 2006] press release had adversely affected the credibility of management," FN50 is similarly unavailing.

FN49. In response to additional questions about whether he knew, on August 10, 2006, that there were mistakes in IMAX's financials for 2004 and earlier years, Mr. Snow testified that he "assumed [there were problems] based on, if they had a revenue recognition problem, then the work I had previously done, the assumptions could no longer be relied upon .... I can't speak specifically to 2004, but, clearly, there had been—at that point, without knowing the amount, that there had been a mismatching of revenue, that it was not in the correct period and some revenue had the opportunity and maybe an inconsistent basis to have been pulled forward .... I assumed that ... all of those time periods were not correct." Millkey Decl., Ex. 1 at 92:5–25. For the reasons stated above, we disagree that IMAX's August 9th disclosure was an indication that all pre-fiscal year 2005 financials may have been incorrect.

FN50. *Id.* at 13 (quoting Declaration of John D. Finnerty, Ph.D., In Support of Lead Plaintiff's Motion for Class Certification ("Finnerty Decl."), ¶ 25).

Second, Snow Capital contends that the August 9th announcement raised a cloud of uncertainty that the SEC's investigation might extend back to revenue recognition problems before the fourth quarter of 2005. Snow Capital cites an analyst report that, after the August 9th announcement, described the "risk of a prolonged inquiry or a potential escalation as reason enough to avoid the stock for now." FN51 While the announcement of an SEC investigation inevitably raises some questions about its length and/or scope, in this case we do not view such general questions as evidence of "the relevant truth begin [ning] to leak out." *Dura,* 544 U.S. at 342, 125 S.Ct. 1627. The August 9th announcement specifically addressed IMAX's revenue recognition practices for theaters in the fourth quarter of 2005 (and the second quarter of 2006), and, as described above, analysts focused on that aspect of the announcement. Snow Capital does not cite to one analyst report that stated that the investigation might extend to ***151** pre–4Q 2005 financials, either within fiscal year 2005, or earlier. Furthermore, Snow Capital's argument about a fear of a potential expansion of the SEC investigation appears to implicitly acknowledge that the market viewed the August 9, 2006 disclosure as an announcement of an SEC investigation that was limited in its temporal scope.

FN51. *Id.* at 13–14.

Third, Snow Capital argues that the prospect that the SEC investigation disclosed in the August

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

9th announcement would extend to revenue recognition problems in earlier periods was borne out by the fact that IMAX's ultimate restatement extended back to 2002.[FN52] This argument fails to show loss causation for two reasons.

FN52. Pl. Reply Mem. at 13.

In the first instance, the fact that IMAX restated its financials almost a year after the August 9th disclosure does not affect either what the disclosure said or how it was interpreted at the time. *See, e.g., In re Take–Two Interactive Sec. Litig.,* 551 F.Supp.2d at 285 ("the pertinent inquiry [for loss causation purposes] trains on the most plausible understanding of a given disclosure *at the time it was made*" ) (emphasis added); *see also Lentell,* 396 F.3d at 173 (to show loss causation, plaintiff must allege that "the misstatement or omission concealed something from the market that, *when disclosed,* negatively affected the value of the security") (emphasis added). As discussed above, the most plausible understanding of the August 9th disclosure was that the SEC's investigation focused on IMAX's financial accounting in the fourth quarter of 2005 (and later).

Moreover, on March 29, 2007, IMAX announced that, based on comments it had received from the SEC and the Ontario Securities Commission, it was expanding its review, "primarily in connection with its revenue recognition for certain theater system installations in previous periods, including the fourth quarter of 2005." [FN53] Because of this "expanded review," IMAX stated that it "may determine that it is necessary to restate additional items beyond the previously identified errors." [FN54] Ultimately, the restatements for fiscal years 2002 and 2004 were prompted by different applications of accounting practices than those that caused the restatements in fiscal years 2005 and 2006. The theater system revenue that was shifted from fiscal years 2005 and 2006 primarily involved theater systems in which revenue was recognized before a screen had been fully installed.[FN55] IMAX's revenue recognition policy for the seven theater systems in fiscal year 2005 for which revenue on an uninstalled screen was deferred involved a misapplication of EITF 00–21, which addresses the question of the question of *what* should constitute a separate unit of accounting. None of the shifted revenue in fiscal years 2002 or 2004 involved revenue recognition related to the timing of screen installations, or was caused by a misapplication of EITF 00–21.[FN56] We note the reasons for the restatements in July 2007 not because they are determinative of our loss causation analysis—as stated above, they are not. But rather, we observe that none of the three pre-fiscal year 2005 theater systems for which revenue was restated involved the particular application of the accounting policy that was at the core of IMAX's MEA accounting in fiscal year 2005, was largely responsible for the Company's "record" results in the fourth quarter of 2005 and, most significantly, was the subject of IMAX's August 9, 2006 press release disclosing the SEC investigation.

FN53. Compl. ¶ 127.

FN54. *Id.*

FN55. *See* Macneil Aff. at ¶¶ 38–40 (providing reasons for restating revenue for each theater system in fiscal years 2005 and 2006).

FN56. In 2002, revenue was shifted for one theater system which a customer purchased for private events, but that did not open to the general public until 2005. No certificate of acceptance was located, and thus revenue recognition was moved to the opening date. Macneil Aff. at ¶ 44. In 2004, revenue was shifted for two theater systems: first, a customer encountered an issue with a projector after installation was complete, and thus revenue recognition was shifted to when the issues were resolved and when an amendment was signed reducing the price; and second, a customer exercised a relocation and rein-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

stallation provision and thus recognition was moved to the quarter of reinstallation. *Id.* at 46.

Fourth, Snow Capital argues that a plaintiff need not establish loss causation on a *152 motion to certify a class, and that it is sufficient for plaintiffs to establish that loss causation can be shown on a class-wide basis. FN57 However, as Snow Capital itself notes, its argument about establishing loss causation on a motion to certify a class is directed to the question of predominance under Rule 23(b)—not a proposed lead plaintiff's typicality, adequacy, or standing. FN58 *Cf. In re Flag Telecom Holdings,* 574 F.3d at 39–40 (whether proposed class representative can show loss causation is relevant for Rule 23(a)'s typicality and adequacy requirements, and does not implicate the predominance analysis under Rule 23(b)). None of the cases that Snow Capital cites address the here-relevant questions of whether a class can be certified with a proposed class representative who may lack standing to bring a claim under § 10(b) in its individual capacity, or may, at a minimum, be subject to unique defenses. FN59 If Snow Capital is atypical, or lacks standing, it cannot be designated class representative, irrespective of any predominance analysis. FN60

FN57. Pl. Reply Mem. at 14, 16–19.

FN58. *See Id.* at 18, n. 19.

FN59. *See In re Initial Pub. Offering Sec. Litig.,* 260 F.R.D. 81, 106 n. 214 (S.D.N.Y.2009) (approving proposed settlement where defendants stipulated to class certification, and considering loss causation in the context of Rule 23(b) predominance); *In re Salomon Analyst Metromedia Litig.,* 544 F.3d 474, 478 n. 1 (2d Cir.2008) (addressing loss causation in context of Rule 23(b) predominance analysis); *Darquea v. Jarden Corp.,* No 06 Civ. 722 (CLB), 2008 WL 622811, at *4 (S.D.N.Y.2008) (same); *In re Alstom SA Sec. Litig.,* 253 F.R.D. 266, 279 (S.D.N.Y.2008) (addressing loss causation in context of Rule 23(b) predominance analysis, after a separate determination of lead plaintiff's standing).

FN60. Here, we find *In re Impax Labs., Inc. Sec. Litig.,* 2008 WL 1766943 (N.D.Cal. Apr. 17, 2008) instructive. In *Impax Labs,* the lead plaintiff in a securities fraud class action purchased all of its shares in defendant Impax before Impax made an alleged misstatement concerning its financial results in the first quarter of 2004. The lead plaintiff then sold all of its shares *after* Impax issued a disclosure that the court found only addressed the second quarter of 2004, and *before* there was any corrective disclosure concerning Impax's first quarter financial statements. The court thus found that the lead plaintiff lacked standing because it could not demonstrate that it suffered an injury in fact. *Impax Labs.,* 2008 WL 1766943, at *7.

Fifth, Snow Capital argues that where a plaintiff alleges that losses were the result of a sustained course of conduct, a "class need not be represented by an investor who purchased at each point during the class period." FN61 While we agree with this general proposition, it does not apply to the situation at bar. The cases cited by Snow Capital generally address the question of whether a proposed class representative who purchased his stock before the end of a class period can represent subsequent purchases within the class FN62 —not whether a proposed class representative either lacks standing to bring a claim in its individual capacity, or is subject to unique defenses on loss causation grounds. *Cf. Impax Labs.,* 2008 WL 1766943, at *7 (case law holding that lead plaintiff can represent a class regardless of the timing of its individual transactions does not apply when lead plaintiff cannot demonstrate individual standing). None of the cases that Snow Capital cites involve a situation compar-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

able to that with which we are faced here: a Complaint in which the central allegation involves financial results *in a single quarter;* a proposed class representative who made his final purchase of shares *prior to the announcement of financial results in that quarter;* an alleged corrective disclosure that specifically discloses an SEC investigation into financial results *in that quarter* (and later); and an alleged accounting fraud that ***153** evolved in significant ways—especially when viewed in the context of the August 9th disclosure—throughout the proposed class period.

FN61. Pl. Reply Mem. at 10.

FN62. *In re Vivendi Universal, S.A.,* 242 F.R.D. 76, 87 (S.D.N.Y.2007) (class can be represented by plaintiff who purchased shares prior to close of the class period); *Nicholas v. Poughkeepsie Sav. Bank/FSB,* No.90 Civ. 1607(RWS), 1990 WL 145154, at *5–6 (S.D.N.Y. Sept. 27 1990) (same). Snow Capital also cites *In re CitiGroup Inc. Bond Litig.,* 2010 WL 2772439, at *14 (S.D.N.Y. July 12, 2010), which held that named plaintiffs who purchased securities in only some of 48 offerings had standing to represent other purchasers where all purchasers "suffered from the same alleged injury." In that case, the court found that purchasers suffered from the "same alleged injury" where actionable statements or omissions in an initial "shelf registration statement" were incorporated in all subsequent registration statements. Snow Capital cannot make a similar claim with respect to alleged actionable misstatements in IMAX's financials and other statements.

In this context, we disagree that the alleged fraud was the standard "sustained course of conduct," or "common scheme to defraud," FN63 to the limited extent that those terms are generally used to justify the appointment of a class representative who purchased prior to the end of the class period. Clearly, the claims in this case all involve alleged fraud relating to IMAX's recognition of theater system revenue, and thus there is a common thread throughout the allegations in the Complaint. But the application of IMAX's revenue recognition policy changed throughout the class period, and the first corrective disclosure addressed alleged misstatements issued after Snow's purchases. Snow Capital claims that because it "purchased IMAX securities during the Class Period," its "claims are, therefore, not only similar to those of the other members of the Class; they are virtually identical." FN64 This conclusion assumes that which a proposed class representative must prove.

FN63. Pl. Reply Mem. at 10.

FN64. Pl. Mem. at 9.

We recognize that Snow Capital is likely not the only potential class member whose final purchase was prior to the February 17, 2006 announcement and who sold shortly after the August 9th disclosure and thus, in that respect, its claims are not completely "unique." Nevertheless, under *In re Flag Telecom Holdings* we find it appropriate to consider whether certain loss causation defenses—including those that may apply to more potential class members than just Snow Capital—may, at a minimum, threaten to become the focus of this litigation. The proposed class representative in *In re Flag Telecom Holdings* was certainly not the only "in and out" shareholder in the class, and the Second Circuit ultimately excluded all in and out traders from the definition of the class. Here, it is worth noting that in seven of the eight complaints originally filed in this action, the class period began on February 17, 2006 and thus would not have even included Snow Capital. FN65 Of the seven movants who sought to be named lead plaintiff, only Snow Capital's claims appear to raise these particular loss causation issues. Five of the six other movants purchased shares after IMAX announced its 4Q 2005 financials on February 17, 2006. FN66

FN65. *Kaplan v. Gelfond,* 240 F.R.D. 88,

91 (S.D.N.Y.2007). Seven of those eight complaints proposed a class period from February 17, 2006 through August 9, 2006. The eighth complaint proposed a class period of October 28, 2004 through August 9, 2006. As we noted at the time, "had we relied upon the shorter class period ... Snow Capital would have purchased zero shares during the period, and consequently would not have had any losses." *Id.* at 93 n. 6.

FN66. *See Id.* at 90 n. 2; Dkt. No. 7, Ex. B, at 3–6, Dkt. No. 12, Ex. A, at 5–9, Dkt. No. 22 at 10–13, Dkt. No. 26, Attachment A, at 3–4. The sixth movant, Steelworkers Pension Trust, purchased its shares before August 9, 2006, but it is unclear when it sold. *See* Dkt. No. 18 at 4.

Sixth, Snow Capital argues that it has established loss causation through the declaration of its expert, John D. Finnerty.[FN67] But Dr. Finnerty's declaration adds little to the question of whether the August 9th announcement served as a corrective disclosure for Snow Capital, which bought all of its shares prior to the February 17th announcement of the fourth quarter 2005 financials. Dr. Finnerty devotes much of his loss causation analysis to the question of whether the August 10th drop in IMAX's stock price can be attributed to the disclosure of the alleged fraud (as opposed to the disclosure of other negative information in the August 9th announcement),[FN68] and concludes that the August 10th drop "was substantially caused by the disclosures in IMAX's press release issued just after the close of trading on August 9, 2006 that were related to plaintiff's allegations."[FN69] Thus, Dr. Finnerty's analysis supports the argument that there is a class of IMAX purchasers for whom the August 9th announcement served as a corrective disclosure—something we already held when we ***154** denied defendants' motion to dismiss the Complaint. *See In re IMAX Sec. Litig.*, 587 F.Supp.2d at 485–86.

FN67. Pl. Reply Mem. at 14.

FN68. *See* Finnerty Decl., ¶¶ 27–34.

FN69. *Id.* at ¶ 9.

Seventh, in a June 14, 2010 letter submission to the Court, Snow Capital argues that the defendants' loss causation argument "has already been considered and rejected by the Court."[FN70] We disagree. In our opinion denying defendants' motion to dismiss the Complaint, we held that "the SEC inquiry related directly to the misrepresentations alleged in this case-the application of multiple element accounting to theater system revenue-and *culminated* in the restatement of IMAX's earnings and revenues for fiscal years 2002 through 2005." *In re IMAX Sec. Litig.*, 587 F.Supp.2d at 486 (emphasis added). As discussed above, the fact that the SEC investigation ultimately culminated in a restatement dating back to fiscal year 2002 does not change what the August 9, 2006 disclosure actually revealed at the time.[FN71]

FN70. *See* Snow Capital's June 14, 2010 Ltr., at 3.

FN71. Furthermore, we were presented with different loss causation issues at the motion to dismiss stage, including (1) whether the disclosure of the SEC investigation was a corrective disclosure for loss causation purposes; (2) whether IMAX's denial of accounting irregularities negated loss causation; (3) whether an increase in stock price following IMAX's restatement on July 2007 negated loss causation; and, more broadly, (4) how the set of alleged corrective disclosures, viewed together, affected the loss causation analysis. *See In re IMAX Sec. Litig.*, 587 F.Supp.2d at 485. None of these issues affect the present analysis: (1) we have already held that the announcement of the SEC investigation can be a partial disclosure of an alleged fraud—the relevant issue now is whether it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

partially disclosed fraud committed prior to Snow Capital's purchases; (2) as we previously held, "IMAX's denial of accounting irregularities was irrelevant once the SEC inquiry had alerted the market to their possibility" (*Id.*)—IMAX's denial plays no role in the present loss causation analysis; (3) while our previous opinion did not address whether the July 20, 2007 restatement was a corrective disclosure, that restatement has no impact on Snow Capital, which sold all of its IMAX shares almost a year earlier; and (4) our finding that "the truth here was revealed not in a neat and tidy single disclosure" (*Id.* (quoting *In re Tommy Hilfiger, Sec. Litig.*, 2007 U.S. Dist. LEXIS 55088, at *8, 2007 WL 5581705, at *3 (S.D.N.Y. July 20, 2007))) again does not impact the question of whether the August 9th announcement—the only alleged corrective disclosure for Snow Capital—was a partial corrective disclosure for alleged fraud prior to the fourth quarter of 2005. *Cf. SafeNet,* 645 F.Supp.2d at 230 n. 6 (noting that cases in which loss causation is found based on a series of disclosing events are not directly on point when loss causation is alleged based on a single disclosure of a government investigation).

In our view, the August 9, 2006 disclosure revealed an investigation into IMAX's accounting for the fourth quarter of 2005 and the second quarter of 2006—not earlier periods. This view is supported by: (1) the text of the disclosure; (2) the most plausible understanding of the disclosure at the time it was made, as evidenced by both the defendants' statements concerning its accounting policies *before* the disclosure, and analyst reports issued *after* the disclosure; and (3) the fact that IMAX's application of its MEA accounting policy in fiscal year 2005 differed from its application of accounting policies in earlier years and that the new application of the 2005 policy was the subject of the August 9, 2006 announcement disclosing the *SEC* investigation.

Furthermore, even if we were to view the August 9th disclosure as corrective of alleged misstatements issued by IMAX throughout fiscal year 2005 (and thus prior to Snow Capital's final purchase), which we do not, Snow Capital would still not be able to show loss causation against PWC, whose alleged misstatements prior to Snow Capital's final purchase were in its audit opinions issued in connection with IMAX's 10–Ks for 2002 through 2004.[FN72] The August 9th announcement, which only mentioned theater installations in the fourth quarter of 2005 and second quarter of 2006, and which focused on an *155 application of MEA accounting that was not applied prior to 2005, is not a corrective disclosure for statements issued by PWC in connection with IMAX's 2004 10–K. *See Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP,* 475 F.3d 824, 842–43 (7th Cir.2007) (no loss causation where alleged corrective disclosure revealed misstatements in company's financial statements for years *after* plaintiff's acquisition of stock, but not for financial statement upon which plaintiff allegedly relied).

FN72. In addition to alleging misstatements in PWC's audit opinion, the Complaint also alleges that PWC "is ... responsible for the material misinformation disseminated to the investing public during the Class period." Compl. ¶ 149. PWC cannot be liable under § 10(b) for the alleged misstatements made by the IMAX defendants that were not attributed to it at the time of their issuance (*Lattanzio v. Deloitte & Touche,* 476 F.3d 147, 153 (2d Cir.2007) ("to state a § 10(b) claim against an issuer's accountant, a plaintiff must allege a misstatement that is attributed to the accountant 'at the time of its dissemination' ...." (quoting *Wright v. Ernst & Young,* 152 F.3d 169, 175 (2d Cir.1998)))), and the Complaint does not make such an

allegation of attribution.

In sum, because we find that Snow Capital cannot establish loss causation—and, at a minimum, is subject to unique defenses which may threaten to become the focus of the litigation (and which would not be the focus of the litigation for class members who either purchased shares after February 17, 2006, or who purchased prior to February 17, 2006 and held through a subsequent alleged corrective disclosure [FN73])—we cannot certify a class with it as class representative.

FN73. The IMAX defendants rely on the expert report of Lucy P. Allen to argue that "few investors who held IMAX stock on August 9, 2006 ... purchased their stock prior to February 17." IMAX Mem. at 16. In her report, Allen examined public data on institutional trading of IMAX shares and concluded that only 7% of institutional investors who purchased IMAX stock between 4Q 2004 and 4Q 2005, as Snow Capital did, held their stock through 3Q 2006. Allen Decl. at 32. As Snow Capital rightly points out, Allen's analysis is incomplete because it fails to consider either (1) individual trading data (according to Allen, institutional investors held between 60% and 76% of IMAX's float (shares outstanding less insider holdings) from 4Q 2004 through 4Q 2005 (Allen Decl. at 31)), or (2) daily trading data (Allen relied on quarter-end trading data (*See id.* at 31–32.)). *See* Pl. Reply Mem. at 10. While we agree with Snow Capital's criticisms, we note that in the previous round of briefing on class certification, Allen submitted a different expert report that did review institutional and individual trading data, as well as daily trading data. Declaration of Lucy P. Allen, Feb. 23, 2009, at 27. In that report, Allen found that 12% of all IMAX shares purchased on the NASDAQ between February 23, 2003 (the start of the class period) and February 17, 2006 were retained through August 9, 2006; 6% of the pre-February 17, 2006 shares were retained through July 20, 2007, when IMAX issued its restatement. *Id.* at 28–29. Purchasers of the 88% of pre-February 17, 2006 shares that were sold prior to the August 9, 2006 disclosure are "in and out" shareholders who sold prior to an alleged corrective disclosure.

#### 4. Adequacy

[18] Because a proposed class representative must satisfy all of the Rule 23(a) requirements (and one of the Rule 23(b) requirements), it is not necessary that we consider the remaining requirements for certification. Nevertheless, we find as an independent ground to deny class representative status that Snow Capital has also failed to show, by a preponderance of the evidence, that it is an adequate representative for the proposed class.

In evaluating whether a proposed class representative has met rule 23(a)(4)'s adequacy requirement, we consider whether "1) plaintiff's interests are antagonistic to the interest of other members of the class, and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In Re Flag Telecom Holdings,* 574 F.3d at 35 (internal quotation omitted).

[19] A key element in the determination of whether a plaintiff's interests are antagonistic to those of other members of the class is the relationship between the class representative and class counsel. *See, e.g. In re Discovery Zone Sec. Litig.,* 169 F.R.D. 104, 109 (N.D.Ill.1996) ( "[e]ven where the named plaintiff does not expect to share directly in the attorneys' fees, his business relationship with counsel may leave him more interested in maximizing the return to his counsel than in aggressively presenting the proposed class' action") (internal quotation marks omitted); *Jaroslawicz v. Safety Kleen Corp.,* 151 F.R.D. 324, 328–30 (N.D.Ill.1993) (certification denied where plaintiff's interest in the goodwill of his counsel creates a con-

flict of interest); 5 James W.M. Moore et al., *Moore's Federal Practice,* § 23.25[2][b][vi] (3d ed.) ("a conflict ... may exist if the class representative stands to benefit directly or indirectly from the goodwill of class counsel created through the class action"). The rationale behind cases in which class certification has been denied because of the relationship between the class representative and class counsel is clear: courts are concerned that "when a class representative is closely ***156** associated with class counsel, he or she may permit a settlement less favorable to the interests of absent class members." *In re Discovery Zone Sec. Litig.,* 169 F.R.D. at 108.

When we appointed Snow Capital lead plaintiff in this class action, we also appointed its counsel, Robbins Geller, lead counsel.[FN74] Little did we know, because it was never disclosed to this Court, that Snow Capital was also represented by another attorney, Alfred G. Yates, Jr. Even to this day, Yates has not filed a notice of appearance, despite have a retainer agreement with Snow.

FN74. *In re IMAX Sec. Litig.,* 2009 WL 1905033 (S.D.N.Y.2009), at *4.

The following facts about the relationship between Snow and Yates, and Yates' role in the present litigation, are taken from Snow's deposition, and the engagement letter between Snow Capital, Yates, and Robbins Geller for representation in this case: (1) Snow and Yates have been neighbors and friends for between 20 and 25 years [FN75]; (2) Yates has been one of Snow Capital's clients for six or seven years [FN76]; (3) Snow Capital manages a significant amount of Yates' money [FN77]; (4) Snow Capital receives approximately $10,000 to $12,000 a year in fees from Yates [FN78]; (5) Yates is one of approximately two or three dozen "house accounts" at Snow Capital that, according to Snow, "are just people that have come in almost like—kind of like friends, family" [FN79]; (6) Yates is also representing Snow in the other securities litigation in which Snow is lead plaintiff [FN80]; (7) Yates has "over the years ... inquired about ... securities that [Snow] may or may not have owned and if [Snow] would be interested in possibly being considered—if [he]'d be interested in being a lead plaintiff." [FN81] (8) Snow Capital's engagement letter for legal representation by both Yates and Robbins Geller in the present litigation is on Yates' letterhead, and is only signed by Yates [FN82]; (9) The engagement letter states that if Snow Capital is "designated as a lead plaintiff and we are designated class counsel for the class, we will pursue the claims on a class wide basis" [FN83]; (10) There is apparently no separate engagement letter for Robbins Geller.

FN75. Matthews Decl., Ex. A at 39.

FN76. *Id.*

FN77. *Id.*

FN78. *Id.*

FN79. *Id.* at 40.

FN80. *Id.*

FN81. *Id.* at 47.

FN82. Matthews Decl., Ex. C.

FN83. *Id.*

Snow Capital's relationship with Yates raises substantial concerns about its ability to adequately represent absent class members. Snow Capital tries to distinguish the line of cases in which courts have declined to certify a class based on similar claims of inadequate representation by claiming that "in each there was a pre-existing financial relationship between the lead plaintiff and lead counsel concerning the sharing of legal fees by serving as co-counsel or working at the same firm .... [h]ere, by contrast, the unequivocal evidence is that there is no such relationship that would place Lead Plaintiff's financial interests above those of the proposed Class." [FN84] Snow Capital's reading of the case law is too narrow. The concern is not limited

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

to relationships between attorneys working at the same firm, but rather is rooted in a "fear that a class representative who is *closely associated* with the class attorney would allow settlement on terms less favorable to the interests of absent class members." *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 91 (7th Cir.1977) (emphasis added).[FN85] In *In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 109 (N.D.Ill.1996), the court found that proposed class representatives who served as their counsels' stock brokers were inadequate because the "sufficiently close business relationships ... create a possible conflict of interest." The court noted *157 that the "*possibility* of receiving more investment business from class counsel" provided the plaintiffs with "more incentive to maximize fees for the attorneys than to ensure adequate recovery for the class." *Id.* (emphasis added). Emphasizing that the appearance of impropriety was the "primary factor mandating judicial inquiry," the court noted that it was not suggesting that the class representatives and counsel "would turn appearance into reality." *Id.* But, given that there was "a wealth of disinterested investors who could serve as class representatives ... the Court deem[ed] it proper to eliminate any possible conflict of interest between the named plaintiffs and the class." *Id.*

FN84. Pl. Reply Mem. at 5–6.

FN85. In *Susman*, the Seventh Circuit prohibited a lead plaintiff from being named class representative because it rented office space from the law firm seeking to be named class counsel. *Susman*, 561 F.2d at 95.

Faced with a similar concern about the appearance of impropriety, and a similarly large pool of disinterested investors who could serve as class representatives, we too find it appropriate to eliminate any possible conflict between the class representative and the class. We do not suggest that Snow Capital's representation would in fact be inadequate—but the possibility of inadequacy and the appearance of impropriety are sufficient for us to deny certification of a class with Snow Capital as its representative.[FN86]

FN86. Snow Capital argues that Snow and Yates had "no discussions ... about the possibility of Yates' investing any fee he receives through Snow Capital," and thus that defendants' arguments are "pure speculation with no basis in evidence." Pl. Reply Mem. at 5. We disagree: the close business and personal relationship between Snow and Yates, and the incentives for Snow to receive additional investments from Yates, as well as goodwill, are sufficient to warrant a finding of inadequacy under the circumstances of this case. We find that this is particularly so in light of lead plaintiff's failure to disclose the role of Yates in this litigation.

Snow Capital argues that Robbins Geller has utilized Yates in a manner that "is entirely in keeping with this Court's Order dated February 7, 2007 (Dkt. No. 42), authorizing the original lead counsel in this case to 'direct the preparation for the trial of this matter and to delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort."[FN87] We disagree. This Court did not authorize a personal lawyer to a plaintiff. There is no need for a lawyer in Pittsburgh, which has no relation to this case beyond being the hometown of Snow.[FN88]

FN87. Pl. Reply Mem. at 4.

FN88. We also find troubling Snow Capital's failure to disclose its retention of Yates until now. While we do not question that Robbins Geller has prosecuted this case vigorously since its appointment as lead counsel by this Court, or its contention that it alone has exercised the responsibilities of lead counsel, we note that the relationship between Snow and Yates, and Yates'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

role in this litigation, is one that should have been brought to the attention of the Court at an earlier stage.

**b. Rule 23(b) Requirements**

Because a plaintiff must satisfy all of the Rule 23(a) requirements in order for a class to be certified, we need not consider the Rule 23(b) requirements. Nevertheless, in order to streamline potential future submissions in this action, we advise the parties of our views on some of the arguments that have been raised concerning Rule 23(b)(3)'s predominance and superiority requirements.

**1. Predominance**

[20] In order to be certified as a Rule 23(b)(3) class action, plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). The predominance requirement is satisfied "if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." *Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108–09 (2d Cir.2007) (internal quotation marks omitted).

Defendants' primary challenge to the predominance requirement is that lead plaintiff cannot benefit from the fraud-on-the-market presumption of reliance (the presumption that investors relied on misrepresentations when the market for securities is open and developed) (*see* *158*Basic, Inc. v. Levinson*, 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)) because it has not shown loss causation by a preponderance of the evidence. Relying on the Fifth Circuit's decision in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir.2007), defendants contend that in order to "trigger" the fraud-on-the-market presumption, a plaintiff must show loss causation by a preponderance of the evidence.[FN89] Defendants argue that the Circuit's recent decisions in *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir.2006), *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir.2008), and *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir.2009) suggest that it "would likely adopt the preponderance of the evidence standard" for establishing loss causation in order to trigger the fraud on the market presumption at the class certification stage.[FN90] In *In re Initial Pub. Offerings*, 471 F.3d at 41, the Second Circuit held that a district court's "obligation to make [Rule 23] determinations is not lessened by overlap between a Rule 23 requirement and a merits issue." In *Teamsters Local*, 546 F.3d at 202, the Second Circuit held that "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." And in *In re Flag Telecom Holdings*, 574 F.3d at 39–40, which we discussed above, the Second Circuit applied the preponderance of the evidence standard in holding that an in-and-out trader could not be lead plaintiff because it could not show loss causation. The Court, however, noted that its analysis did not implicate the issue of whether a plaintiff need show loss causation by a preponderance of the evidence at the class certification stage in order to satisfy Rule 23(b)'s predominance requirement. *See id.* at 39.

FN89. Defendant PricewaterhouseCoopers LLP's, An Ontario Limited Liability Partnership, Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification ("PWC Mem."), at 10–12.

FN90. *Id.* at 12.

[21] While the above cases certainly reflect a shift toward greater consideration of the merits at the class certification stage, we agree with the other courts in this district that have considered this issue and held that loss causation need not be proven by a preponderance of the evidence in order to trigger the fraud on the market presumption at the class certification stage. *See, e.g., In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157, 181 (S.D.N.Y.2010); *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118–19

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(S.D.N.Y.2008).

Defendants' other argument with regard to predominance is that common issues do not predominate between those who purchased prior to February 17, 2006 and those who purchased between February 17, 2006 and August 9, 2006.[FN91] While this argument might be more appropriately directed toward the commonality inquiry under Rule 23(a)(2), our holding that Snow Capital cannot be class representative negates the need to address this argument at this time.

FN91. IMAX Mem. at 25.

**2. Superiority**

Under Rule 23(b)(3)'s superiority requirement, plaintiffs must show that:

> a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to this inquiry include: (A) class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties in managing a class action. Fed.R.Civ.P. 23(b)(3).

[22] The IMAX defendants argue that plaintiffs cannot meet Rule 23(b)'s superiority requirement because this class action is not "superior" to the class action that has already been certified in Canada.[FN92] We decline to deny certification on these grounds because, amongst other reasons, PWC is not a named defendant in the Canadian class action, the consolidated complaint here alleges a significantly longer class period, the class as currently defined only includes purchasers*159 on the NASDAQ (and thus excludes purchases of IMAX stock on the Toronto Stock Exchange), and the IMAX defendants have requested leave to appeal the certification of the global class in Canada [FN93]—an issue that is the subject of conflicting decisions in Ontario.[FN94] At bottom, a class action in a foreign jurisdiction, applying that jurisdiction's securities laws, to which a named defendant in the United States action is not a party, in which the first complaint in the foreign jurisdiction was filed after the first complaint in this case, is not a "superior" way of adjudicating plaintiffs' claims against that party for alleged violations of U.S. securities laws—claims which we already have upheld against defendants' motions to dismiss. While the IMAX defendants state that we have "already recognized the exceedingly high burden the plaintiffs face in a case against PWC,"[FN95] any such burden does not affect our superiority analysis.[FN96]

FN92. *Id.* at 18–24.

FN93. *See* Millkey Decl., Ex. 10.

FN94. As Professor Poonam Puri, IMAX's expert on Canadian law, stated, there are currently "conflicting decisions in Ontario on the issue of whether U.S. investors who purchased their shares in the U.S. should be certified as members in an Ontario class action." Declaration of Professor Poonam Puri, ¶ 142.

FN95. IMAX Mem. at 25.

FN96. While PWC has not asserted its own "superiority" argument, it has incorporated the arguments of the IMAX defendants. PWC Mem. at 1 n. 1. We do not see how PWC can claim that the Canadian class action, to which it is not a party, is a superior method of adjudicating any claims against it.

Defendants cite to a number of cases to support their argument that the Canadian class action is superior. None of these cases involve a situation in which a class was not certified because a court, applying Rule 23(b), found that it was not "superior"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

to a different class action in a foreign country.[FN97] Defendants' reliance on *Paraschos v. YBM Magnex Int'l.,* 130 F.Supp.2d 642, 646 (E.D.Pa.2000), highlights some of the problems with their superiority argument. In *Paraschos,* the court originally allowed plaintiffs to maintain their securities class action but ultimately reversed course, finding that it was "apparent that this is a securities fraud action pertaining to Canadian registered securities, brought by a purported class of investors who are virtually all Canadian, against predominantly Canadian defendants, concerning a Canadian corporation whose stock was sold only on Canadian stock exchanges." The court further noted that "application of United States securities laws were not contemplated by [defendant corporation] or its investors." *Id.* at 647. In contrast, here we are faced with a case where all of the securities in this action, and at least 85 percent of the securities in the Canadian action[FN98], were sold in the United States (on the NASDAQ), and application of the U.S. securities law was clearly contemplated by both the Company and its investors.

FN97. We note that the IMAX defendants' brief was submitted prior to the Supreme Court's decision in *Morrison v. National Australia Bank, Ltd.,* ––– U.S. ––––, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010), and prior to lead plaintiff's revision of the proposed class to only include purchasers on the NASDAQ. Thus, while much of the IMAX defendants argument opposes the possibility of "certified overlapping global classes," *see, e.g.,* IMAX Mem. at 21, any class certified by this Court would not lead to "overlapping global classes," but rather would only include those purchasers in the United States.

FN98. *See* Pl. Reply Mem. at 23.

Furthermore, the proposed class period in this action is significantly longer than that which has been certified in the Canadian class action.[FN99] Defendants argue that this difference is "irrelevant" and contend that "there are ample reasons why the Canadian plaintiffs would have chosen not to allege a class period earlier than February 17, 2006 or later than August 9, 2006".[FN100] Whatever potentially meritorious reasons the Canadian plaintiffs had for choosing their class period, ***160** we disagree with defendants that the substantial difference in class periods is irrelevant to the determination of whether this class action satisfies Rule 23's superiority requirement.

FN99. Because we cannot certify a class, we decline to address defendants' remaining arguments concerning the scope of a proposed class at this time. However, we note that, with regard to in and out shareholders who purchased prior to August 9, 2006, the Complaint does not allege that any information available prior to the August 9, 2006 disclosure "exposed the public to the truth about [defendants'] misstatements." *In re Flag Telecom Holdings,* 574 F.3d at 41.

FN100. IMAX Mem. at 23.

## CONCLUSION

Because we find that Snow Capital cannot be named class representative, the motion for class certification is denied. All applications to be appointed lead plaintiff must be filed within twenty-one (21) days.

S.D.N.Y.,2010.
In re IMAX Securities Litigation
272 F.R.D. 138, Fed. Sec. L. Rep. P 95,997

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT H

This is Exhibit "H" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**In re IMAX SECURITIES LITIGATION**

**06 Civ. 6128 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2011 U.S. Dist. LEXIS 41709**

**April 14, 2011, Decided**
**April 15, 2011, Filed**

**PRIOR HISTORY:** In re IMAX Sec. Litig., 272 F.R.D. 138, 2010 U.S. Dist. LEXIS 135341 (S.D.N.Y., 2010)

**CORE TERMS:** merger, lead counsel, champerty, anti-champerty, reassignment, financial interest, appointment, notice, class certification, largest, movant, legal rights, appointed, arbitrage--, co-lead, class representative, acquisition, implicate, assigned, assignor, investor's, stranger, lawsuit, acquire, involvement, Mem of Law, class action, legal claims, application process, received notice

**COUNSEL:** [*1] For Westchester Capital Management Inc., Lead Plaintiff: Jill Sharyn Abrams, Richard Barry Margolies, LEAD ATTORNEYS, Arthur N. Abbey, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY.

For Snow Capital Investment Partners, L.P., Lead Plaintiff: Mark Samuel Reich, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY.

For The Merger Fund, Lead Plaintiff: Jill Sharyn Abrams, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY.

For Motti Kaplan, Individually, Motti Kaplan, and on behalf of all others similarly situated, Plaintiffs: Nancy Kaboolian, LEAD ATTORNEY, Arthur N. Abbey, Abbey Spanier Rodd Abrams & Paradis, LLP, New York, NY.

For Santiago Guzman, individually and on behalf of all others similarly situated, Eric S. Bergen, individually and on behalf of all others similarly situated, Michael LaRosa, individually and on behalf of all others similarly situated, Robert Feeney, Floyd Reynolds, individually and on behalf of all others similarly situated, Anthony Caiafa, individually and on behalf of all others similarly situated, Robert B. Gray, individually and on behalf of all others similarly situated, Consolidated Plaintiffs: Arthur N. Abbey, Abbey Spanier Rodd Abrams & Paradis, [*2] LLP, New York, NY.

For Gary Creagh, Marlene Creagh, Movants: Catherine A. Torell, Cohen Milstein Sellers & Toll P.L.L.C., New York, NY.

For IMAX Investor Group, Movant: Evan J. Smith, LEAD ATTORNEY, Brodsky & Smith, L.L.C., Mineola, NY.

For Snow Capital Investment Partners, L.P., Movant: David Avi Rosenfeld, Mark Samuel Reich, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY.

For Steelworkers Pension Trust, Movant: Christopher J. Keller, LEAD ATTORNEY, Labaton Sucharow, LLP, New York, NY; Phyllis Maza Parker, Russell David Paul, Berger & Montague, P.C., Philadelphia, PA.

For Ironworkers St. Louis District Council Pension Fund, Movant: Robert M. Rothman, LEAD ATTORNEY, Robbins Geller Rudman & Dowd LLP(LI), Melville, NY.

For Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Imax Corporation, Kathryn A. Gamble, Defendants: Lewis J. Liman, LEAD ATTORNEY, Cleary Gottlieb Steen & Hamilton, LLP(NYC), New York, NY.

For PricewaterhouseCoopers LLP, Defendant: Jennifer Laurie Conn, Gibson, Dunn & Crutcher, LLP (NY), New York, NY; John Franklin Guild, M. Cory Nelson, M. Byron Wilder, Samantha Ferris, PRO HAC VICE, Gibson, Dunn & Crutcher LLP, Dallas, TX.

For Michael LaRosa, Jay M. Spritzler, **[*3]** Interested Parties: Ronen Sarraf, LEAD ATTORNEY, Sarraf Gentile, LLP, New York, NY.

For Robert Lieblang, Interested Party: Jonathan K. Levine, Girard Gibbs LLP, San Francisco, CA.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

By Memorandum and Order dated December 20, 2010, we denied former lead plaintiff Snow Capital Investment Partners, L.P.'s ("Snow Capital") motion for class certification and directed the filing of motions by any entity seeking to be named new lead plaintiff in this securities class action. Presently before the Court are motions from The Merger Fund and Ironworkers St. Louis District Counsel Pension Fund ("Ironworkers") to be named lead plaintiff. For the reasons set forth below, The Merger Fund is named lead plaintiff and its counsel. Abbey Spanier Rodd & Abrams LLP ("Abbey Spanier"), is named lead counsel.

**BACKGROUND**

This is the third time that this Court has been presented with a motion to select a lead plaintiff in this five-year old securities class action. Familiarity with this Court's prior orders and opinions in this case are assumed, and we do not repeat them here. **[*4]** The procedural background relevant for the present motions is as follows:

o On January 17, 2007 we named Westchester Capital Management, Inc. ("Westchester") lead plaintiff, and its counsel, Abbey Spanier, lead counsel.

o On December 3, 2008, the Second Circuit decided W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100 (2d Cir. 2008), holding that an investment adviser lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact.

o On January 17, 2009, Westchester entered into an Assignment Agreement with The Merger Fund (and other funds for which Westchester served as an investment advisor), under which The Merger Fund assigned to Westchester "all rights, legal title and interest in its claims relating to IMAX securities." See Dkt. No. 109, Ex. C.

o Relying on the Second Circuit's decision in Huff, on April 3, 2009, Snow Capital moved for reconsideration of our January 17, 2007 Order appointing Westchester lead plaintiff.

o On June 29, 2009, we granted Snow Capital's motion for reconsideration and appointed it lead plaintiff and it is counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller") **[*5]** lead counsel.

o On December 20, 2010 we denied Snow Capital's motion for class certification, held that this case could not proceed with Snow Capital as class representative, and directed that new applications to be named lead plaintiff be filed within twenty-one days.

o On January 5, 2011, Westchester reassigned its interest in its legal claims against IMAX back to The Merger Fund. See Decl. of Richard B. Margolies in Support of The Merger Fund's Reply Mem. of Law to Ironworkers St. Louis District Counsel Pension Fund's Opp'n to its Mot. for Appointment of Lead Pl. and Lead Counsel ("Margolies Reply Decl."), Ex. A. [1]

o On January 10, 2011, The Merger Fund filed its motion to be named lead plaintiff, and for Abbey Spanier to be named lead counsel.

o On January 12, 2011, Ironworkers filed its competing motion to be named lead plaintiff, and for Robbins Geller to be named lead counsel.

1 Westchester Capital Management, LLC, which acquired substantially all of the business and assets of Westchester on December 31, 2010, was the assignor in the January 5, 2011 agreement. See Margolies Reply Decl., Ex A.

**DISCUSSION**

Our previous orders in this case have set forth the legal framework for selecting **[*6]** a lead plaintiff under the Private Securities Litigation Reform Act ("PSLRA"). See, e.g., In re IMAX Sec. Litig., 2009 U.S. Dist. LEXIS 58219, 2009 WL 1905033, at *3 (S.D.N.Y. 2009). As we have stated, a plaintiff is presumed to be the most adequate plaintiff if it: (1) has either filed a complaint or made a motion in response to the publication of notice; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. Id. (citing 15 U.S.C. § 78u-4(a) (3)(B)(iii)(I)).

**I. Filing Requirement**

With regard to the first requirement, both The Merger Fund and Ironworkers have filed motions in response to this Court's December 20, 2010 Order. While The Merger Fund's motion was filed on

January 10, 2011, twenty-one days after the December 20, 2010 Order was dated, and Ironworkers' motion was filed on January 12, 2011, twenty-one days after the December 20, 2010 was docketed, we consider both motions timely.

We recognize that while both The Merger Fund and Ironworkers filed timely motions in response to the December 20, 2010 Order, neither moved to be named lead plaintiff in response to the initial notice of pendency filed [*7] in this action in 2006. Thus, both appear not to be in compliance with 15 U.S.C. § 78u-4(a) (3) (B) (iii) (I) (aa), which requires that a potential lead plaintiff either file a complaint or make a motion to serve as lead plaintiff within sixty days of having received notice of the suit. Nevertheless, under the circumstances of this case in which we denied the second lead plaintiff's motion for class certification and there was no other lead plaintiff, we determined that the best course of action was to re-open the lead plaintiff application process for a twenty-one day period.

There is support for allowing a plaintiff who did not seek lead plaintiff status at the outset to seek such status after the withdrawal of the original lead plaintiff. Indeed, courts have re-opened the application process in situations where lead plaintiffs have withdrawn (see, e.g., Order on Pending Motions, In re HealthSouth Sec. Litig., Civ-03-BE-1500-S (N.D. Ala. Dec. 1, 2004); In re Neopharm, Inc. Sec. Litig., 02 C 2967, 2004 U.S. Dist. LEXIS 5814, 2004 WL 742084, at *2-3 (N.D. Ill. Apr. 7, 2004)), and granted a motion to substitute a new lead plaintiff who did not file an application within sixty days of the original notice of pendency. [*8] In re Initial Pub. Offering Sec. Litig., 214 F.R.D. 117, 120 (S.D.N.Y. 2003). In In re Initial Pub. Offering Sec. Litig., a court in this district considered any movant timely who either (a) filed a complaint, (b) moved to be appointed lead plaintiff in response to the initial notice of pendency, or (c) moved to be appointed lead plaintiff within sixty days of the withdrawal of the previous lead plaintiff. 214 F.R.D. at 120. The court noted that while there was a "colorable argument" that the entire lead plaintiff process should have been re-opened, it was unnecessary in that case because all putative class members were given notice of the opportunity to move to be named lead plaintiff when the original notice was published, and none did so. Id. at 120, n.5. Here, unlike in In re Initial Pub. Offering Sec. Litig., there were a number of movants who sought to be named lead plaintiff when the original notice was published. See Kaplan v. Gelfond, 240 F.R.D. 88, 90 (S.D.N.Y. 2007). To the extent that any of the original movants (who have not withdrawn their applications or previously been removed by this Court) sought to be named lead plaintiff at this stage of the litigation, they received [*9] notice of this Court's December 20, 2010 Order, but did not submit an application. In any event, The Merger Fund's claimed losses far exceed the losses of any of the original movants who could have renewed an application at this time. Thus, even if we were to consider the remaining movants from the first lead plaintiff application process, The Merger Fund, for the reasons discussed below, would still be named lead plaintiff.

**II. Largest Financial Interest**

With regard to the financial interest requirement, there is no dispute that The Merger Fund has a significantly greater financial interest in the relief sought by the class: The Merger Fund claims losses of between $3,254,827.20 and $3,633,937 during the Class Period (February 27, 2003 through July 20, 2007) (Mem. of Law in Support of The Merger Fund's Mot. to be Appointed Lead Pl. and for Approval of Lead Counsel ("The Merger Fund Mem.") at 6) and Ironworkers claims losses of $65,297.21 (Mem. of Law in Support of Ironworkers St. Louis District Counsel Pension Fund's Mot. For Appointment of Lead Pl. and Lead Counsel ("Ironworkers Mem.") at 7).[2]

2 The Merger Fund argues that Ironworkers' claimed losses of $65,297.21 should be reduced [*10] pursuant to this Court's loss causation analysis in its December 20, 2010 opinion. See The Merger Fund's Mem. of Law in Opp'n to Ironworkers St. Louis District Pension Fund's Mot. for Appointment of Lead Pl. and Lead Counsel ("The Merger Fund Opp'n") at 2, n.l. For purposes of the present motions, it is sufficient to find that, under any analysis, The Merger Fund's financial interest substantially exceeds that of Ironworkers. Ironworkers has not suggested otherwise.

**III. Rule 23 Analysis**

We thus turn to the third inquiry, namely whether the proposed lead plaintiff satisfies Rule 23's typicality and adequacy requirements. Here, Ironworkers argues that The Merger Fund is subject to two unique defenses that prevent it from serving as lead plaintiff. First, Ironworkers argues that The Merger Fund's reassignment of its legal claims subjects it to a unique defense because the reassignment violates New York's anti-champerty statute, N.Y. Jud. Ct. Acts Law § 489(1). Mem. of Law in Opp'n to The Merger Fund's Mot. for Appointment of Lead Pl. and Lead Counsel ("Ironworkers Opp'n Mem.") at 4-5. Second, Ironworkers contends that "The Merger Fund's purchases and sales of IMAX common stock were pursuant [*11] to a merger arbitrage investment strategy, and were not influenced by the misleading statements at the heart of this action." Id. at 1. [3] We consider each argument in turn.

3 Ironworkers also argues that because The Merger Fund previously assigned its causes of action against IMAX to Westchester, it "is not even entitled to assert claims against IMAX on its own behalf, much less to act as lead plaintiff on behalf of a proposed class of investors." Ironworkers Opp'n at 1. Ironworkers appears to have advanced this argument prior to having received notice of Westchester's reassignment of its claims against IMAX back to The Merger Fund. See id. at 3 ("The Merger Fund has failed to produce any documentation indicating that . . . it has regained legal title to its claims against IMAX.")

**A. Anti-Champerty**

New York's anti-champerty statute provides, in relevant part:

> [N]o corporation or association . . . shall . . . take an assignment of . . . a . . . thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon . . . . Any corporation or association violating the provisions of this section shall be liable to a fine of not more than five [*12] thousand dollars; any person or co-partnership, violating the provisions of this section, and any officer, trustee, director, agent or employee of any . . . co-partnership, corporation or association violating this section who, directly or indirectly, engages or assists in such violation, is guilty of a misdemeanor.

N.Y. Jud. Ct. Acts Law § 489(1). Ironworkers contends that The Merger Fund's reassignment of its legal rights to its claims against IMAX "appears to [be] in violation of § 489," and thus that The Merger Fund could be subject to misdemeanor criminal liability under the statute. Ironworkers Opp'n Mem. at 5. As a result, Ironworkers claims, The Merger Fund is subject to a unique defense. We disagree. An analysis of the history of New York's anti-champerty law, the courts' consistently

narrow interpretation of that law, and, most significantly, the circumstances of the reassignment in this case all lead to the conclusion that The Merger Fund's reassignment of its legal claims does not implicate the anti-champerty statute and does not subject it to a unique defense that could threaten to become the focus of this litigation.

**1. Background on the Statute**

In order to assess Ironworkers' [*13] champerty argument, it is useful to consider the history of the doctrine, as explained by the New York Court of Appeals:

> The "champerty" concept is based on a type of French feudal tenure in land, a "champart," in which the fee for use of the land was neither in money nor ordinary service in kind. The tenant-by-champart was a partial owner of the land bound to share any rents and profits with the grantor, but the grantor took the risk that the crops might fail and that there would be no return. Anyone who then obtained a legal interest in that grant of land would also take a share of the profits in champart.
>
> "Champerty," as a term of art, grew out of this practice to describe the medieval situation where someone bought an interest in a claim under litigation, agreeing to bear the expenses but also to share the benefits if the suit succeeded. The most important litigation of that era was over land, and a person who bought lawsuits could acquire a partial interest in landed estates -- an estimable power play. The taint on the process arose because the purchase price was usually far below the value of the potential land acquisition--a transaction suffused with speculation related to the "sin" [*14] of usury and its concomitant legal prohibitions. The champerty transaction, however, evaded the strict prohibitive laws involving usury.
>
> Even as the feudal system faded, English law retained the word "champart" as a metaphor to indicate a disapproval of lawsuits brought "for part of the profits" of the action. Because lawyers were usually the instruments of such practices, "champertors [were] nearly always lawyers."
>
> Indeed, early New York cases indicate that the prohibition of champerty was limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs, which, at the time, included attorneys' fees. Consistent with this limited purpose, New York's early statutory prohibitions against champerty, found in the Revised Statutes and then in the Code of Civil Procedure, were specifically addressed to lawyers. However, in 1907, the prohibitions were extended to nonlawyers and corporations.

Bluebird Partners, L.P. v. First Fid. Bank, N.A., 94 N.Y.2d 726, 733-34, 731 N.E.2d 581, 709 N.Y.S.2d 865 (N.Y. 2000)(internal citations omitted).

In light of this historical background, New York courts have consistently emphasized that the anti-champerty doctrine [*15] should be applied narrowly. In a recent analysis of the champerty statute, the New York Court of Appeals observed that "[t]he doctrine of champerty developed to prevent or curtail the commercialization of or trading in litigation," and stated that "the prohibition of champerty has always been limited in scope and largely directed toward preventing attorneys from filing suit merely as a vehicle for obtaining costs." Trust for the Certification of Merrill Lynch Mortg. Investors, Inc. v. Love Funding Corp., 13 N.Y.3d 190, 198, 890 N.Y.S.2d 377, 918 N.E.2d 889, 893 (N.Y. 2009). See also Richbell Info. Servs., Inc. v. Jupiter Partners, 280 A.D.2d 208, 215, 723 N.Y.S.2d 134, 139 (N.Y. App. Div. 1st Dep't 2001) ("The courts historically have interpreted the proscription of § 489 as a narrow one.").

Addressing the question of whether a party's purchase of the rights to bring a lawsuit in order to collect damages for losses on a debt instrument in which the purchaser held a preexisting proprietary interest violated the anti-champerty law, the Court of Appeals in Love Funding Corp. held that the statute "does not apply when the purpose of an assignment is the collection of a legitimate claim." [*16] Id., 13 N.Y.3d at 201, 890 N.Y.S.2d 377, 918 N.E.2d at 889. Rather, "if a party acquires a debt instrument for the purpose of enforcing it-that is not champerty simply because the party intends to do so by litigation." Id., 13 N.Y.3d at 200, 890 N.Y.S.2d 377, 918 N.E.2d at 889. The Court of Appeals further emphasized the distinction between acquiring a right in order to make money from litigating it and acquiring a right in order to enforce it, with the former acquisition be-

ing the kind that implicates the anti-champerty statute. See id., 13 N.Y.3d at 200, 890 N.Y.S.2d 377, 918 N.E.2d at 894. The court explained that "[t]he champerty statutes are directed at preventing the 'strife, discord and harassment' that would be likely to ensue 'from permitting attorneys and corporations to purchase claims for the purpose of bringing actions thereon.'" Id., 13 N.Y.3d at 199, 918 N.E.2d at 893 (quoting Fairchild Hiller Corp. v. McDonnell Douglas Corp., 28 N.Y.2d 325, 329, 321 N.Y.S.2d 857, 270 N.E.2d 691 (N.Y. 1971)). "In short, the champerty statute does not apply when the purpose of an assignment is the collection of a legitimate claim. What the statute prohibits, as the Appellate Division **[*17]** stated over a century ago, 'is the purchase of claims with the intent and for the purposes of bringing an action that [the purchaser] may involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up . . . in [an] effort to secure costs." Id., 13 N.Y.3d at 201, 918 N.E.2d at 895 (quoting Wightman v. Catlin, 113 A.D. 24, 28, 98 N.Y.S. 1071, 37 Civ. Proc. R. 105 (N.Y. App. Div. 2d Dep't 1906)).

In light of the history and purpose of the anti-champerty statute, courts have often looked to the relationship between the assignor and assignee when considering whether an assignment falls within the statute's purview. For example, in Empresa Cubana Exportadora De Azucar y Sus Derivados v. Lamborn & Co., Inc., 652 F.2d 231, 236 (2d Cir. 1981), the Second Circuit stated that where an assignment had been "made between two closely affiliated business enterprises, both of which had been parties to the transaction upon which suit was brought," New York courts would not apply the anti-champerty statute. See also Sygma Photo News, Inc. v. Global Int'l Inc., 616 F.Supp. 1153, 1157 (S.D.N.Y. 1985) (defining champerty as a "bargain between a stranger and a party to a lawsuit by which the **[*18]** stranger pursues the party's claim in consideration of receiving part of any judgment proceeds")(quoting Alexander v. Unification Church of America, 634 F.2d 673, 677 n.5 (2d Cir. 1980); American Hemisphere Marine Agencies, Inc. v. Kreis, 244 N.Y.S.2d 602, 603, 40 Misc.2d 1090, 1091 (Sup.Ct.N.Y.Cty. 1963) ("[I]t is uncontradicted that plaintiff and its assignor are interrelated corporations, and it is clear that plaintiff itself was involved in the transactions alleged from the very beginning. In such circumstance, the assignment was not in the purview of Section 275 of the Penal Law (predecessor of current section 489).").

**2. The Reassignment To The Merger Fund**

Under the circumstances of the reassignment at issue in this case, we find that The Merger Fund's reassignment of its legal rights to it claims against IMAX is not one that implicates New York's anti-champerty statute, and does not subject it to unique defenses that may threaten to become the focus on the litigation.

As a preliminary matter, both the relationship between The Merger Fund and Westchester and the history of this litigation strongly counsel against an application of champerty principles. When Westchester originally **[*19]** applied to be lead plaintiff in 2006, it did so on behalf of The Merger Fund (and other funds). See Margolies Reply Decl., Ex. C. At that time, Westchester served as The Merger Fund's investment advisor and controlled all investments made in the Fund. See id., Ex. D at ¶ 2. After the Second Circuit's decision in Huff, The Merger Fund assigned its rights to Westchester in an attempt to allow Westchester to continue as the lead plaintiff in this case. The Merger Fund Opp'n at 3. While that attempt was ultimately unsuccessful, there can be no serious argument (and Ironworkers does not suggest) that the reassignment was the "acquisition of a cause of action by a stranger to the underlying dispute." Richbell Info. Servs., 280 A.D.2d 208, 723 N.Y.S.2d 134, 139 (N.Y. App. Div. 2001) (quoting Jamaica Pub. Serv. Co. v. La Interamericana Compania De Seguros Generales, S.A., 262 A.D.2d 73, 693 N.Y.S.2d 6,7 (N.Y. App. Div. 1999)). Here, the Merger Fund

is certainly not a "stranger[] to the dispute merely speculating on the suit." Id. Rather, it has been involved in this suit from the beginning.

Furthermore, it is undisputed that The Merger Fund had a legitimate claim against IMAX prior to the onset [*20] of this litigation. [4] The reacquisition of its legal rights to those claims does not suggest a "commercialization of litigation" or involve the bringing of a claim to "involve parties in costs and annoyance, where such claims would not be prosecuted if not stirred up . . . in [an] effort to secure costs." Love Funding Corp., 13 N.Y.3d at 199, 918 N.E.2d at 893. Applying the New York Court of Appeals' recent opinion emphasizing the "difference between one who acquires a right in order to make money from litigating it and one who acquires a right in order to enforce it," it is apparent that, under the circumstances of this case, The Merger Fund's reacquisition falls within the latter category and thus is beyond the scope of the champerty statute. Indeed, it would be an odd result if the reacquisition of a legal right that had been assigned to an assignee for the express purpose of seeking to maintain a claim on behalf of the assignor were to violate a statute designed to curtail the commercialization of litigation.

4 In addition, it is clear that The Fund had Article III standing at the time this action was commenced--a factor that we considered when deciding that Westchester should not [*21] remain lead plaintiff in spite of its acquisition of the legal rights to The Merger Fund's claims against IMAX. See In re IMAX Sec. Litig. 06 Civ. 6128 (NRB), 2009 U.S. Dist. LEXIS 58219, 2009 WL 1905033, at *2-3 (S.D.N.Y. June 29, 2009); see also In re SLM Corp. Sec. Litig., 08 Civ. 1029 (WHP), 258 F.R.D. 112, 2009 WL 969934, at *3 (S.D.N.Y. Apr. 1, 2009).

Thus, in light of the purpose of New York's anti-champerty statute, New York courts' interpretation of that statute, and the circumstances of the reassignment at issue in this case, we find that The Merger Fund's reassignment does not implicate the anti-champerty statute and does not subject it to a unique defense that could threaten to become the focus on this litigation. [5]

5 Furthermore, we note that in all three cases cited by Ironworkers in support of its champerty argument, the courts found that the assignments did not violate the anti-champerty statute.

**B. The Merger Fund's Investment Strategies**

Ironworkers contends that The Merger Fund is subject to a second unique defense because it utilized a merger arbitrage investment strategy. Ironworkers Opp'n at 5-6. Similar arguments concerning sophisticated investment strategies have been rejected by a number of courts, and we reject [*22] the contention here. See, e.g., Burch v. SLM Corp., 08 Civ. 2463 (WHP), 2008 U.S. Dist. LEXIS 55423, 2008 WL 2945348 (S.D.N.Y. July 23, 2008) (rejecting argument that merger arbitrage strategy rendered lead plaintiff (Westchester) atypical); In re Flag Telecom Holdings, Ltd. Sec. Litig., 245 F.R.D. 147, 164 (S.D.N.Y. 2007), aff'd in relevant part, 574 F.3d 29 (2d Cir. 2009) ("[I[t is well-established that an investor's sophistication does not preclude him from relying on the integrity of the market and asserting the fraud-on-the-market presumption."); In re Initial Pub. Offering Sec. Litig., 227 F.R.D. 65, 109 (S.D.N.Y. 2004) (stating, in the context of Rule 23(b)'s pre-

dominance analysis, that "[i]t can be stated without fear of gainsay that the shareholders of every large, publicly traded corporation includes [sic] institutional investors, short-sellers, arbitragers, etc. The fact that these traders have divergent motivations in purchasing shares should not defeat the fraud-on-the-market presumption absent convincing proof that price played no part whatsoever in their decision making.")(quoting Moskowitz v. Lopp, 128 F.R.D. 624, 630-31 (E.D. Pa. 1989)).

Ironworkers further argues that The Merger Fund is subject **[*23]** to a unique defense because its merger arbitrage investment strategy relies on the proposition that the market is inefficient. To support its argument, Ironworkers cites to the testimony of Roy Behren, the portfolio manager of The Merger Fund, taken during a deposition in connection with Westchester's motion for class certification in this case. A review of that testimony, which is subject to a protective order, leads to the conclusion that The Merger Fund's investment strategy was both sophisticated and based upon merger arbitrage--but was not "reliant upon the proposition that the market is inefficient," as Ironworkers claims. Ironworkers Opp'n Mem. at 6. In sum, Ironworkers has not shown that The Merger Fund's investment strategy subjects it to unique defenses and thus has not rebutted the presumption that The Merger Fund should be named lead plaintiff. [6]

6 Separately, Ironworkers contends that it is better able to represent the entire class because it purchased IMAX stock both before and after February 17, 2006, whereas The Merger Fund only purchased stock after that date. Ironworkers Reply Mem. at 4. While our December 20, 2010 opinion held that Snow Capital could not be class representative **[*24]** because its purchased all of its shares prior to February 17, 2006 and sold all of its shares prior to August 9, 2006 (and thus could not show loss causation), we did not hold that a lead plaintiff must purchase shares throughout a class period. That is not the law in this Circuit. See, e.g., Hevesi v. Citigroup Inc., 366 F.3d 70, 82 (2d Cir. 2004) ("[B]ecause the PSLRA mandates that courts must choose a party who has, among other things, the largest financial state in the outcome of the case, it is inevitable that, in some cases, lead plaintiff will not have standing to sue on every claim."). See also id. ("Moreover, the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

**IV. Co-Lead Plaintiffs**

Ironworkers argues that if it is not named sole lead plaintiff, it should be named co-lead plaintiff with The Merger Fund (and Abbey Spanier and Robbins Geller should be named co-lead counsel). Ironworkers argues that, due to the length of time that this case has been pending, this Court should appoint Ironworkers as co-lead plaintiff "in the interests of 'stability'" and in order to avoid further delay. Ironworkers Reply Mem. **[*25]** at 6. Having found that The Merger Fund is not subject to unique defenses that threaten to become the focus of this litigation, we see no benefit to naming Ironworkers, which has not been involved in any aspect of this five-year old case, co-lead plaintiff.

**V. Lead Counsel**

The PSLRA directs the lead plaintiff to select and retain counsel to represent the class, subject to the Court's approval. 15 U.S.C. §78u-4(a)(3)(B)(v). We approve of The Merger Fund's selection of the law firm of Abbey Spanier, which previously served as lead counsel for Westchester in this litigation, and whose familiarity with this case will benefit the class members.

Recognizing the unlikelihood of Ironworkers' appointment as lead plaintiff, Robbins Geller has argued that, even if Ironworkers is not named lead plaintiff, Robbins Geller should continue to serve as class counsel or, at a minimum, as co-class counsel. The essence of Robbins Geller's argument is that it should remain as counsel because it has invested significant time and expense in the prosecution of this case, and thus that its continued involvement will benefit the class. Ironworkers Mem. at 11. Even though The Merger Fund has selected Abbey Spanier **[*26]** as its counsel, Robbins Geller emphasizes that, under the PSLRA, a lead plaintiff's selection of lead counsel is subject to court approval. Id. Under the unique circumstances of this case, Robbins Geller contends, the class is best suited by its continued involvement.

It is certainly true that a lead plaintiff's selection of lead counsel is subject to the court's approval. Nevertheless, the "court should generally employ a deferential standard in reviewing the lead plaintiff's choices." In re Smith Barney Transfer Agent Litig., 05 Civ. 7538 (WHP), 2006 U.S. Dist. LEXIS 19728, 2006 WL 991003, at *6 (S.D.N.Y. Apr. 17, 2006) (internal quotation marks and citation omitted). While Robbins Geller cites to a number of cases that recite the general proposition that the appointment of lead counsel is within the court's discretion, none of those cases support the proposition that Robbins Geller should remain as counsel at this stage of the litigation, after its previous motion to be named class counsel was denied, and now that a new lead plaintiff has been named. [7]

7 See In re Cree, Inc., Sec. Litig., 219 F.R.D. 369, 372 (M.D.N.C. 2003) (approving a lead plaintiff's choice of lead counsel, and holding that multiple lead plaintiffs **[*27]** were not necessary); In re Lucent Techs. Inc. Sec. Litig., 221 F.Supp.2d 472, 489 (D.N.J. 2001) (holding that lead co-counsel should be selected through a sealed bid auction); In re Milestone Scientific Sec. Litig., 183 F.R.D. 404, 419 (D.N.J. 1998) (rejecting an application for the appointment of multiple lead counsel).

At the same time that it emphasizes this Court's discretion to name lead counsel, Robbins Geller contends that "[t]he Second Circuit has refused to permit class plaintiffs to substitute counsel," and thus that Robbins Geller should remain lead counsel. Ironworkers Mem. at 12. But, again, none of the cases Robbins Geller cites apply to the circumstances of this case. For example, Robbins Geller relies on Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072 (2d Cir. 1995), in which the Second Circuit upheld a district court's denial of a motion brought by class representatives to discharge class counsel after a proposed settlement had been reached. Id. at 1076. The Second Circuit agreed with the district court's "characterization of [the class representatives] attempt to discharge class counsel as a 'hasty' move 'on the eve of the Settlement Hearing.'" Id. at 1079. **[*28]** The facts and procedural posture in Maywalt are hardly comparable to those presently before this Court. Indeed, if the designation of new lead counsel were impermissible, Robbins Geller would never have been named lead counsel in this case. Rather, when this Court granted Snow Capital's motion for reconsideration and named it lead plaintiff, it would have ordered that Abbey Spanier remain lead counsel. That, of course, did not happen. [8]

8 In its brief, The Merger Fund cites to a recent decision from the Central District of California, Maine State Ret. Sys. v. Countrywide Fin. Corp., No. 10 Civ. 00302 (C.D. Cal. May 14,

2010), in which the court denied the motion of a group of institutional investors to be named lead plaintiff in a federal securities class action because they did not have the largest financial interest in the case. Even though those lead plaintiffs, who were represented by Robbins Geller, had spent over two years prosecuting the case in state court (before it was dismissed for lack of subject matter jurisdiction), and, as the court recognized "a considerable number of attorney hours [had] been expanded by counsel," the court held that the movant with the largest financial [*29] interest should be named lead plaintiff, and its selected counsel lead counsel. Id. at 11. While Maine State Ret. Sys. addressed the question of whether a party's prior experience with a case rebutted the presumption that the party with the largest financial interest should be named counsel (and not the question of whether lead counsel should remain on a case regardless of who the named lead plaintiff is), we find the court's analysis instructive and note that the court in that case appointed as lead counsel a firm that presumably did not have the familiarity with the case that Abbey Spanier has here.

We do not doubt that Robbins Geller has invested significant time and effort into the prosecution of this case. However, in light of the long history of this case, The Merger Fund and Abbey Spanier's prior involvement in this case, the fact that this Court just denied a motion for class certification in which Robbins Geller was moving to be named class counsel and, not insignificantly, the reasoning underlying our denial of the motion for class certification, which was critical of Robbins Geller, we find that the best interests of the class will be met through the appointment of a sole [*30] lead plaintiff, The Merger Fund, and a sole lead counsel, Abbey Spanier, both of whom have already had significant involvement with this case. Robbins Geller can provide Abbey Spanier with its work product accumulated in this case and, ultimately, if the case ever does reach a successful result for the class, Robbins Geller can make a fee application to this Court at the appropriate time.

**CONCLUSION**

For the reasons set forth above, The Merger Fund is named lead plaintiff and Abbey Spanier Rodd & Abrams LLP is named lead counsel. The parties are directed to appear for a conference on April 26, 2011 at 4:15 p.m at the United States Courthouse, 500 Pearl Street, New York, New York, in Courtroom 21A.

Dated: New York, New York

April 14, 2011

/s/ Naomi Reice Buchwald

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE

---- End of Request ----
Email Request: Current Document: 1
Time Of Request: Tuesday, May 08, 2012 14:47:05

# EXHIBIT I

This is Exhibit "I" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Supreme Court of the United States
Robert MORRISON, et al., Petitioners,
v.
NATIONAL AUSTRALIA BANK LTD. et al.

No. 08–1191.
Argued March 29, 2010.
Decided June 24, 2010.

**Background:** Foreign investors brought putative class action against Australian banking corporation, alleging securities fraud as to foreign transactions. The United States District Court for the Southern District of New York, Barbara S. Jones, J., 2006 WL 3844465, dismissed action, and investors appealed. The Second Circuit Court of Appeals, B.D. Parker, Jr., Circuit Judge, 547 F.3d 167, affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held that:
(1) canon or presumption that federal law is not meant to have extraterritorial effect is applicable in all cases, whenever party seeks to give any federal legislation extraterritorial effect, including cases arising under the Securities Exchange Act;
(2) definition of "interstate commerce" in the Securities Exchange Act, to expressly include "trade, commerce, transportation, or communication between any foreign country and any State," was insufficient to rebut presumption against extraterritorial application;
(3) section of the Securities Exchange Act indicating that its provisions would not apply "to any person insofar as he transacts business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the Securities and Exchange Commission "to prevent evasion" of the Act was apparently directed at actions abroad that might conceal a domestic violation, and was insufficient to rebut presumption against extraterritorial application;
(4) anti-fraud provision of the Securities Exchange Act did not apply extraterritorially to provide cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges; and
(5) it is only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) of the Securities Exchange Act applies; abrogating *Schoenbaum v. Firstbrook*, 405 F.2d 200; *In re CP Ships Ltd. Securities Litigation*, 578 F.3d 1306; *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409; *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326; *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974; *IIT v. Vencap, Ltd.*, 519 F.2d 1001; *SEC v. Berger*, 322 F.3d 187; *Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118; *Interbrew v. Edperbrascan Corp.*, 23 F.Supp.2d 425; *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118; *IIT v. Cornfeld*, 619 F.2d 909; *SEC v. Kasser*, 548 F.2d 109; *Grunenthal GmbH v. Hotz*, 712 F.2d 421; *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659; *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27.

Affirmed.

Justice Sotomayor took no part in consideration or decision.

Justice Breyer, concurred in part and concurred in judgment and filed opinion.

Justice Stevens concurred in judgment and filed opinion, in which Justice Ginsburg joined.

West Headnotes

**[1] Securities Regulation 349B 67.11**

349B Securities Regulation
349BI Federal Regulation

349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Extraterritorial reach of § 10(b) of the Securities Exchange Act, and whether it provided cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges, was question as to whether these foreign plaintiffs could state claim for which relief could be granted, that was appropriately raised by motion to dismiss for failure to state cause of action, and not question going to court's subject matter jurisdiction; abrogating *Schoenbaum v. Firstbrook,* 405 F.2d 200; *In re CP Ships Ltd. Securities Litigation,* 578 F.3d 1306; *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules Civ.Proc.Rule 12(b)(1, 6), 28 U.S.C.A.

**[2] Federal Courts 170B ⚷3.1**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk3 Jurisdiction in General; Nature and Source
170Bk3.1 k. In general. Most Cited Cases

Subject matter jurisdiction refers to tribunal's power to hear case.

**[3] International Law 221 ⚷7**

221 International Law
221k7 k. Extraterritorial rights and jurisdiction. Most Cited Cases

It is longstanding principle of American law that federal legislation, unless contrary intent appears, is meant to apply only within territorial jurisdiction of United States; however, this principle represents canon of construction, or presumption about statute's meaning, rather than limit upon Congress's power to legislate, which rests on perception that Congress ordinarily legislates with respect to domestic, not foreign, matters.

**[4] International Law 221 ⚷7**

221 International Law
221k7 k. Extraterritorial rights and jurisdiction. Most Cited Cases

Unless it is affirmative intention of Congress clearly expressed to give statute extraterritorial effect, court must presume that statute is primarily concerned with domestic conditions.

**[5] International Law 221 ⚷7**

221 International Law
221k7 k. Extraterritorial rights and jurisdiction. Most Cited Cases

Canon or presumption that federal law is not meant to have extraterritorial effect applies regardless of whether there is risk of conflict between American statute and foreign law.

**[6] International Law 221 ⚷7**

221 International Law
221k7 k. Extraterritorial rights and jurisdiction. Most Cited Cases

When statute gives no clear indication of extraterritorial application, it has none.

**[7] Securities Regulation 349B ⚷67.10**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.10 k. In general. Most Cited Cases

Canon or presumption that federal law is not meant to have extraterritorial effect is applicable in all cases, whenever party seeks to give any federal legislation extraterritorial effect, including cases arising under the Securities Exchange Act; abrogating *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326; *Bersch v. Drexel Firestone,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc.*, 519 F.2d 974; *IIT v. Vencap, Ltd.*, 519 F.2d 1001; *SEC v. Berger*, 322 F.3d 187; *Itoba Ltd. v. Lep Group PLC*, 54 F.3d 118; *Interbrew v. Edperbrascan Corp.*, 23 F.Supp.2d 425; *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118; *IIT v. Cornfeld*, 619 F.2d 909; *SEC v. Kasser*, 548 F.2d 109; *Grunenthal GmbH v. Hotz*, 712 F.2d 421; *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659; *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

**[8] Action 13 ⚷3**

13 Action
13I Grounds and Conditions Precedent
13k3 k. Statutory rights of action. Most Cited Cases

**Securities Regulation 349B ⚷60.34**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.34 k. Existence of private cause of action. Most Cited Cases

While implied private cause of action under § 10(b) of the Securities Exchange Act and Rule 10b–5 is judicial creation, whose contours have been defined by courts, when it comes to scope of conduct prohibited by Rule 10b–5 and § 10(b), the text of statute controls. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.; 17 C.F.R. § 240.10b–5.

**[9] Securities Regulation 349B ⚷60.10**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)7 Fraud and Manipulation
349Bk60.10 k. In general. Most Cited Cases

Rule 10b–5 was promulgated under § 10(b) of the Securities Exchange Act, and does not extend beyond conduct encompassed by § 10(b)'s prohibition. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.; 17 C.F.R. § 240.10b–5.

**[10] Securities Regulation 349B ⚷67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Definition of "interstate commerce" in the Securities Exchange Act, to expressly include "trade, commerce, transportation, or communication between any foreign country and any State," was insufficient to rebut presumption against extraterritorial application of the Act to provide cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. Securities Exchange Act of 1934, § 3(a)(17), 15 U.S.C.A. § 78c(a)(17).

**[11] Securities Regulation 349B ⚷67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Fleeting reference by Congress, when describing purpose of the Securities Exchange Act, to dissemination and quotation abroad of prices of securities traded in domestic exchanges and markets did not overcome presumption against extraterritorial application of the Act to provide cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[12] Securities Regulation 349B ⟾67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Section of the Securities Exchange Act indicating that its provisions would not apply "to any person insofar as he transacts business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the Securities and Exchange Commission "to prevent evasion" of the Act was apparently directed at actions abroad that might conceal a domestic violation, or that might cause what would otherwise be a domestic violation to escape on technicality and was insufficient to rebut presumption against extraterritorial application of the Act to provide cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. Securities Exchange Act of 1934, § 30(b), 15 U.S.C.A. § 78dd(b).

**[13] International Law 221 ⟾7**

221 International Law
221k7 k. Extraterritorial rights and jurisdiction. Most Cited Cases

That statutory language can possibly be interpreted to apply extraterritorially does not override presumption against extraterritoriality.

**[14] International Law 221 ⟾7**

221 International Law
221k7 k. Extraterritorial rights and jurisdiction. Most Cited Cases

When statute provides for some extraterritorial application, presumption against extraterritoriality operates to limit that provision to its terms.

**[15] Securities Regulation 349B ⟾67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Anti-fraud provision of the Securities Exchange Act did not apply extraterritorially to provide cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[16] Securities Regulation 349B ⟾67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Focus of anti-fraud provision of the Securities Exchange Act, for purpose of deciding whether application of provision to transaction in question would be a prohibited extraterritorial application, is not upon place where deception originated, but on purchases and sales of securities in the United States: purchase-and-sale transactions are the objects of statute's solicitude, as it is those transactions that statute seeks to regulate, and it is parties or prospective parties to those transactions that statute seeks to protect. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[17] Securities Regulation 349B ⟾67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

It is only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) of the Securities Exchange Act applies. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[18] Securities Regulation 349B ⚷67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Securities Exchange Act does not reach conduct in the United States affecting exchanges or transactions abroad. Securities Exchange Act of 1934, § 1 et seq., 15 U.S.C.A. § 78a et seq.

**[19] Securities Regulation 349B ⚷67.11**

349B Securities Regulation
349BI Federal Regulation
349BI(C) Trading and Markets
349BI(C)8 Foreign Transactions or Securities
349Bk67.11 k. Transactions with foreigners or in foreign countries. Most Cited Cases

Mere fact that trans-national securities fraud involves significant conduct in United States that is material to the fraud's success is insufficient to bring such fraud within scope of § 10(b) of the Securities Exchange Act. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**[20] Statutes 361 ⚷176**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k176 k. Judicial authority and duty. Most Cited Cases

It is court's function to give statute the effect its language suggests, however modest that may be, not to extend it to admirable purposes it might be used to achieve.

**[21] Statutes 361 ⚷219(1)**

361 Statutes
361VI Construction and Operation
361VI(A) General Rules of Construction
361k213 Extrinsic Aids to Construction
361k219 Executive Construction
361k219(1) k. In general. Most Cited Cases

Court need accept only those agency interpretations of statutes that are reasonable in light of principles of construction that courts normally employ.

**[22] Securities Regulation 349B ⚷89**

349B Securities Regulation
349BI Federal Regulation
349BI(D) Securities and Exchange Commission and Proceedings
349Bk89 k. Scope of review. Most Cited Cases

Supreme Court did not have to extend any deference to Securities and Exchange Commission (SEC) decisions dealing with reach of antifraud provision of the Securities Exchange Act to securities transactions outside the United States, where the SEC did not purport to be providing its own interpretation of provision but relied on decisions of federal courts that the Supreme Court disapproved. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b).

**2872 Syllabus* FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

In 1998, respondent National Australia Bank (National), a foreign bank whose "ordinary shares" are not traded on any exchange in this country, purchased respondent***2873** HomeSide Lending, a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

company headquartered in Florida that was in the business of servicing mortgages—seeing to collection of the monthly payments, etc. In 2001, National had to write down the value of HomeSide's assets, causing National's share prices to fall. Petitioners, Australians who purchased National's shares before the write-downs, sued respondents—National, HomeSide, and officers of both companies—in Federal District Court for violation of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 and SEC Rule 10b–5. They claimed that HomeSide and its officers had manipulated financial models to make the company's mortgage-servicing rights appear more valuable than they really were; and that National and its chief executive officer were aware of this deception. Respondents moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The District Court granted the former motion, finding no jurisdiction because the domestic acts were, at most, a link in a securities fraud that concluded abroad. The Second Circuit affirmed.

Held:

1. The Second Circuit erred in considering § 10(b)'s extraterritorial reach to raise a question of subject-matter jurisdiction, thus allowing dismissal under Rule 12(b)(1). What conduct § 10(b) reaches is a merits question, while subject-matter jurisdiction "refers to a tribunal's power to hear a case." *Union Pacific R. Co. v. Brotherhood of Locomotive Engineers and Trainmen Gen. Comm. of Adjustment, Central Region,* 558 U.S. ——, ——, 130 S.Ct. 584, 175 L.Ed.2d 428 (internal quotation marks omitted). The District Court had jurisdiction under 15 U.S.C. § 78aa to adjudicate the § 10(b) question. However, it is unnecessary to remand in view of that error because the same analysis justifies dismissal under Rule 12(b)(6). Pp. 2876 – 2877.

2. Section 10(b) does not provide a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges. Pp. 2877 – 2888.

(a) It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 *(Aramco).* When a statute gives no clear indication of an extraterritorial application, it has none. Nonetheless, the Second Circuit believed the Exchange Act's silence about § 10(b)'s extraterritorial application permitted the court to "discern" whether Congress would have wanted the statute to apply. This disregard of the presumption against extraterritoriality has occurred over many decades in many courts of appeals and has produced a collection of tests for divining congressional intent that are complex in formulation and unpredictable in application. The results demonstrate the wisdom of the presumption against extraterritoriality. Rather than guess anew in each case, this Court applies the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects. Pp. 2877 – 2887.

(b) Because Rule 10b–5 was promulgated under § 10(b), it "does not extend beyond conduct encompassed by § 10(b)'s prohibition." *United States v. O'Hagan,* 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724. Thus, if § 10(b) is not extraterritorial, neither is Rule 10b–5. On its face, § 10(b) contains nothing to suggest that it applies abroad. Contrary to the argument of petitioners and the Solicitor ***2874** General, a general reference to foreign commerce in the definition of "interstate commerce," see 15 U.S.C. § 78c(a)(17), does not defeat the presumption against extraterritoriality, *Aramco, supra,* at 251, 111 S.Ct. 1227. Nor does a fleeting reference, in § 78b(2)'s description of the Exchange Act's purposes, to the dissemination and quotation abroad of prices of domestically traded securities. Nor does Exchange Act § 30(b), which says that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Act does not apply "to any person insofar as he transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the SEC "to prevent ... evasion of [the Act]." This would be an odd way of indicating that the Act always has extraterritorial application; the Commission's enabling regulations preventing "evasion" seem directed at actions abroad that might conceal a domestic violation. The argument of petitioners and the Solicitor General also fails to account for § 30(a), which explicitly provides for a specific extraterritorial application. That provision would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges—and its limitation of that application to securities of domestic issuers would be inoperative. There being no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, it does not. Pp. 2881 – 2883.

(c) The domestic activity in this case—Florida is where HomeSide and its executives engaged in the alleged deceptive conduct and where some misleading public statements were made—does not mean petitioners only seek domestic application of the Act. It is a rare case of prohibited extraterritorial application that lacks *all* contact with United States territory. In *Aramco,* for example, where the plaintiff had been hired in Houston and was an American citizen, see 499 U.S., at 247, 111 S.Ct. 1227, this Court concluded that the "focus" of congressional concern in Title VII of the Civil Rights Act of 1964 was neither that territorial event nor that relationship, but domestic employment. Applying that analysis here: The Exchange Act's focus is not on the place where the deception originated, but on purchases and sales of securities in the United States. Section 10(b) applies only to transactions in securities listed on domestic exchanges and domestic transactions in other securities. The primacy of the domestic exchange is suggested by the Exchange Act's prologue, see 48 Stat. 881, and by the fact that the Act's registration requirements apply only to securities listed on national securities exchanges, § 78*l* (a). This focus is also strongly confirmed by § 30(a) and (b). Moreover, the Court rejects the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad for the same reason that *Aramco* rejected overseas application of Title VII: The probability of incompatibility with other countries' laws is so obvious that if Congress intended such foreign application "it would have addressed the subject of conflicts with foreign laws and procedures." 499 U.S., at 256, 111 S.Ct. 1227. Neither the Government nor petitioners provide any textual support for their proposed alternative test, which would find a violation where the fraud involves significant and material conduct in the United States. Pp. 2883 – 2888.

547 F.3d 167, affirmed.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, THOMAS, and ALITO, JJ., joined. BREYER, J., filed an opinion concurring in part and concurring in the judgment. STEVENS, J., filed an opinion concurring in the judgment, in which *2875 GINSBURG, J., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.
Thomas A. Dubbs, for petitioners.

George T. Conway, III, for respondents.

Matthew D. Roberts, for the United States as amicus curiae, by special leave of the Court, supporting respondents.

Eric Seiler, Friedman Kaplan Seiler & Adelman LLP, New York, NY, A. Graham Allen, Rogers Towers, P.A., Jacksonville, FL, George T. Conway, III, Counsel of Record, John F. Lynch, Carrie M. Reilly, Wachtell, Lipton, Rosen & Katz, New York, NY, for Respondents.

Samuel Issacharoff, New York, NY, Thomas A. Dubbs, Counsel of Record, James W. Johnson, Richard W. Joffe, Barry M. Okun, Labaton Sucharow LLP, New York, NY, for petitioners.

© 2012 Thomas Reuters. No Claim to Orig. US Gov. Works.

130 S.Ct. 2869, 177 L.Ed.2d 535, 78 BNA USLW 4700, Fed. Sec. L. Rep. P 95,776, 76 Fed.R.Serv.3d 1330, RICO Bus.Disp.Guide 11,932, 10 Cal. Daily Op. Serv. 7918, 2010 Daily Journal D.A.R. 9676, 22 Fla. L. Weekly Fed. S 575

**(Cite as: 130 S.Ct. 2869)**

For U.S. Supreme Court Briefs, see:2010 WL 265632 (Pet.Brief)2010 WL 665167 (Resp.Brief)2010 WL 1045698 (Reply.Brief)2010 WL 1024841 (Resp.Supp.Brief)

Justice SCALIA delivered the opinion of the Court.

We decide whether § 10(b) of the Securities Exchange Act of 1934 provides a cause of action to foreign plaintiffs suing foreign and American defendants for misconduct in connection with securities traded on foreign exchanges.

I

Respondent National Australia Bank Limited (National) was, during the relevant time, the largest bank in Australia. Its Ordinary Shares—what in America would be called "common stock"—are traded on the Australian Stock Exchange Limited and on other foreign securities exchanges, but not on any exchange in the United States. There are listed on the New York Stock Exchange, however, National's American Depositary Receipts (ADRs), which represent the right to receive a specified number of National's Ordinary Shares. 547 F.3d 167, 168, and n. 1 (C.A.2 2008).

The complaint alleges the following facts, which we accept as true. In February 1998, National bought respondent HomeSide Lending, Inc., a mortgage servicing company headquartered in Florida. HomeSide's business was to receive fees for servicing mortgages (essentially the administrative tasks associated with collecting mortgage payments, see J. Rosenberg, Dictionary of Banking and Financial Services 600 (2d ed.1985)). The rights to receive those fees, so-called mortgage-servicing rights, can provide a valuable income stream. See 2 The New Palgrave Dictionary of Money and Finance 817 (P. Newman, M. Milgate, & J. Eatwell eds.1992). How valuable each of the rights is depends, in part, on the likelihood that the mortgage to which it applies will be fully repaid before it is due, terminating the need for servicing. HomeSide calculated the present value of its mortgage-servicing rights by using valuation models designed to take this likelihood into account. It recorded the value of its assets, and the numbers appeared in National's financial statements.

From 1998 until 2001, National's annual reports and other public documents touted the success of HomeSide's business, and respondents Frank Cicutto (National's managing director and chief executive officer), Kevin Race (HomeSide's chief operating officer), and Hugh Harris (HomeSide's chief executive officer) did the same in public statements. But on July 5, 2001, National announced that it was writing ***2876** down the value of HomeSide's assets by $450 million; and then again on September 3, by another $1.75 billion. The prices of both Ordinary Shares and ADRs slumped. After downplaying the July write-down, National explained the September write-down as the result of a failure to anticipate the lowering of prevailing interest rates (lower interest rates lead to more refinancings, *i.e.,* more early repayments of mortgages), other mistaken assumptions in the financial models, and the loss of goodwill. According to the complaint, however, HomeSide, Race, Harris, and another HomeSide senior executive who is also a respondent here had manipulated HomeSide's financial models to make the rates of early repayment unrealistically low in order to cause the mortgage-servicing rights to appear more valuable than they really were. The complaint also alleges that National and Cicutto were aware of this deception by July 2000, but did nothing about it.

As relevant here, petitioners Russell Leslie Owen and Brian and Geraldine Silverlock, all Australians, purchased National's Ordinary Shares in 2000 and 2001, before the write-downs.[FN1] They sued National, HomeSide, Cicutto, and the three HomeSide executives in the United States District Court for the Southern District of New York for alleged violations of §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934, 48 Stat. 891, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b–5, 17 CFR § 240.10b–5 (2009), promulgated pursuant to § 10(b).[FN2] They sought to represent a class of foreign purchasers of National's Ordinary Shares

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

130 S.Ct. 2869, 177 L.Ed.2d 535, 78 BNA USLW 4700, Fed. Sec. L. Rep. P 95,776, 76 Fed.R.Serv.3d 1330, RICO Bus.Disp.Guide 11,932, 10 Cal. Daily Op. Serv. 7918, 2010 Daily Journal D.A.R. 9676, 22 Fla. L. Weekly Fed. S 575
**(Cite as: 130 S.Ct. 2869)**

during a specified period up to the September write-down. 547 F.3d, at 169.

FN1. Robert Morrison, an American investor in National's ADRs, also brought suit, but his claims were dismissed by the District Court because he failed to allege damages. *In re National Australia Bank Securities Litigation,* No. 03 Civ. 6537(BSJ), 2006 WL 3844465, *9 (S.D.N.Y., Oct.25, 2006). Petitioners did not appeal that decision, 547 F.3d 167, 170, n. 3 (C.A.2 2008) (case below), and it is not before us. Inexplicably, Morrison continued to be listed as a petitioner in the Court of Appeals and here.

FN2. The relevant text of § 10(b) and SEC Rule 10b–5 are set forth later in this opinion. Section 20(a), 48 Stat. 899, provides:

> "Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

Liability under § 20(a) is obviously derivative of liability under some other provision of the Exchange Act; § 10(b) is the only basis petitioners asserted.

Respondents moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). The District Court granted the motion on the former ground, finding no jurisdiction because the acts in this country were, "at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad." *In re National Australia Bank Securities Litigation,* No. 03 Civ. 6537(BSJ), 2006 WL 3844465, *8 (S.D.N.Y., Oct.25, 2006). The Court of Appeals for the Second Circuit affirmed on similar grounds. The acts performed in the United States did not "compris[e] the heart of the alleged fraud." 547 F.3d, at 175–176. We granted certiorari, 558 U.S. ——, 130 S.Ct. 783, — L.Ed.2d —— (2009).

## II

[1] Before addressing the question presented, we must correct a threshold ***2877** error in the Second Circuit's analysis. It considered the extraterritorial reach of § 10(b) to raise a question of subject-matter jurisdiction, wherefore it affirmed the District Court's dismissal under Rule 12(b)(1). See 547 F.3d, at 177. In this regard it was following Circuit precedent, see *Schoenbaum v. Firstbrook,* 405 F.2d 200, 208, modified on other grounds en banc, 405 F.2d 215 (1968). The Second Circuit is hardly alone in taking this position, see, *e.g., In re CP Ships Ltd. Securities Litigation,* 578 F.3d 1306, 1313 (C.A.11 2009); *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 421 (C.A.8 1979).

[2] But to ask what conduct § 10(b) reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, "refers to a tribunal's ' "power to hear a case." ' " *Union Pacific R. Co. v. Locomotive Engineers and Trainmen Gen. Comm. of Adjustment, Central Region,* 558 U.S. ——, ——, 130 S.Ct. 584, 596, 175 L.Ed.2d 428 (2009) (quoting *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006), in turn quoting *United States v. Cotton,* 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). It presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief. See *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946). The District Court here had jurisdiction under 15 U.S.C. § 78aa [FN3] to adjudicate the question whether § 10(b) applies to Nation-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

al's conduct.

FN3. Section 78aa provides:

> "The district courts of the United States ... shall have exclusive jurisdiction of violations of [the Exchange Act] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder."

In view of this error, which the parties do not dispute, petitioners ask us to remand. We think that unnecessary. Since nothing in the analysis of the courts below turned on the mistake, a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion. As we have done before in situations like this, see, *e.g., Romero v. International Terminal Operating Co.,* 358 U.S. 354, 359, 381–384, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), we proceed to address whether petitioners' allegations state a claim.

III

A

[3][4][5][6] It is a "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) *(Aramco)* (quoting *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate, see *Blackmer v. United States,* 284 U.S. 421, 437, 52 S.Ct. 252, 76 L.Ed. 375 (1932). It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters. *Smith v. United States,* 507 U.S. 197, 204, n. 5, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993). Thus, "unless there is the affirmative intention of the Congress clearly expressed" to give a statute extraterritorial effect, "we must presume it is primarily concerned with domestic conditions." *Aramco, supra,* at 248, 111 S.Ct. 1227 (internal quotation marks omitted). The canon or presumption applies regardless of whether there is *2878 a risk of conflict between the American statute and a foreign law, see *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 173–174, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993). When a statute gives no clear indication of an extraterritorial application, it has none.

[7] Despite this principle of interpretation, long and often recited in our opinions, the Second Circuit believed that, because the Exchange Act is silent as to the extraterritorial application of § 10(b), it was left to the court to "discern" whether Congress would have wanted the statute to apply. See 547 F.3d, at 170 (internal quotation marks omitted). This disregard of the presumption against extraterritoriality did not originate with the Court of Appeals panel in this case. It has been repeated over many decades by various courts of appeals in determining the application of the Exchange Act, and § 10(b) in particular, to fraudulent schemes that involve conduct and effects abroad. That has produced a collection of tests for divining what Congress would have wanted, complex in formulation and unpredictable in application.

As of 1967, district courts at least in the Southern District of New York had consistently concluded that, by reason of the presumption against extraterritoriality, § 10(b) did not apply when the stock transactions underlying the violation occurred abroad. See *Schoenbaum v. Firstbrook,* 268 F.Supp. 385, 392 (1967) (citing *Ferraoli v. Cantor,* CCH Fed. Sec. L. Rep. ¶ 91615 (SDNY 1965) and *Kook v. Crang,* 182 F.Supp. 388, 390 (S.D.N.Y.1960)). *Schoenbaum* involved the sale in Canada of the treasury shares of a Canadian corporation whose publicly traded shares (but not, of course, its treasury shares) were listed on both the American Stock Exchange and the Toronto Stock Exchange. Invoking the presumption against extraterritoriality, the court held that § 10(b) was inapplicable (though it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

incorrectly viewed the defect as jurisdictional). 268 F.Supp., at 391–392, 393–394. The decision in *Schoenbaum* was reversed, however, by a Second Circuit opinion which held that "neither the usual presumption against extraterritorial application of legislation nor the specific language of [§ ]30(b) show Congressional intent to preclude application of the Exchange Act to transactions regarding stocks traded in the United States which are effected outside the United States ... ." *Schoenbaum,* 405 F.2d, at 206. It sufficed to apply § 10(b) that, although the transactions in treasury shares took place in Canada, they affected the value of the common shares publicly traded in the United States. See *id.,* at 208–209. Application of § 10(b), the Second Circuit found, was "necessary to protect American investors," *id.,* at 206.

The Second Circuit took another step with *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (1972), which involved an American company that had been fraudulently induced to buy securities in England. There, unlike in *Schoenbaum,* some of the deceptive conduct had occurred in the United States but the corporation whose securities were traded (abroad) was not listed on any domestic exchange. *Leasco* said that the presumption against extraterritoriality apples only to matters over which the United States would not have prescriptive jurisdiction, 468 F.2d, at 1334. Congress had prescriptive jurisdiction to regulate the deceptive conduct in this country, the language of the Act could be read to cover that conduct, and the court concluded that "if Congress had thought about the point," it would have wanted § 10(b) to apply. *Id.,* at 1334–1337.

With *Schoenbaum* and *Leasco* on the books, the Second Circuit had excised the *2879 presumption against extraterritoriality from the jurisprudence of § 10(b) and replaced it with the inquiry whether it would be reasonable (and hence what Congress would have wanted) to apply the statute to a given situation. As long as there was prescriptive jurisdiction to regulate, the Second Circuit explained, whether to apply § 10(b) even to "predominantly foreign" transactions became a matter of whether a court thought Congress "wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries." *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974, 985 (1975); see also *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1017–1018 (C.A.2 1975).

The Second Circuit had thus established that application of § 10(b) could be premised upon either some effect on American securities markets or investors *(Schoenbaum)* or significant conduct in the United States *(Leasco).* It later formalized these two applications into (1) an "effects test," "whether the wrongful conduct had a substantial effect in the United States or upon United States citizens," and (2) a "conduct test," "whether the wrongful conduct occurred in the United States." *SEC v. Berger,* 322 F.3d 187, 192–193 (C.A.2 2003). These became the north star of the Second Circuit's § 10(b) jurisprudence, pointing the way to what Congress would have wished. Indeed, the Second Circuit declined to keep its two tests distinct on the ground that "an admixture or combination of the two often gives a better picture of whether there is sufficient United States involvement to justify the exercise of jurisdiction by an American court." *Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 122 (1995). The Second Circuit never put forward a textual or even extratextual basis for these tests. As early as *Bersch,* it confessed that "if we were asked to point to language in the statutes, or even in the legislative history, that compelled these conclusions, we would be unable to respond," 519 F.2d, at 993.

As they developed, these tests were not easy to administer. The conduct test was held to apply differently depending on whether the harmed investors were Americans or foreigners: When the alleged damages consisted of losses to American investors abroad, it was enough that acts "of material importance" performed in the United States "significantly contributed" to that result; whereas those acts must

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

130 S.Ct. 2869, 177 L.Ed.2d 535, 78 BNA USLW 4700, Fed. Sec. L. Rep. P 95,776, 76 Fed.R.Serv.3d 1330, RICO Bus.Disp.Guide 11,932, 10 Cal. Daily Op. Serv. 7918, 2010 Daily Journal D.A.R. 9676, 22 Fla. L. Weekly Fed. S 575

**(Cite as: 130 S.Ct. 2869)**

have "directly caused" the result when losses to foreigners abroad were at issue. See *Bersch,* 519 F.2d, at 993. And "merely preparatory activities in the United States" did not suffice "to trigger application of the securities laws for injury to foreigners located abroad." *Id.,* at 992. This required the court to distinguish between mere preparation and using the United States as a "base" for fraudulent activities in other countries. *Vencap, supra,* at 1017–1018. But merely satisfying the conduct test was sometimes insufficient without " 'some additional factor tipping the scales' " in favor of the application of American law. *Interbrew v. Edperbrascan Corp.,* 23 F.Supp.2d 425, 432 (S.D.N.Y.1998) (quoting *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 129 (C.A.2 1998)). District courts have noted the difficulty of applying such vague formulations. See, *e.g., In re Alstom SA,* 406 F.Supp.2d 346, 366–385 (S.D.N.Y.2005). There is no more damning indictment of the "conduct" and "effects" tests than the Second Circuit's own declaration that "the presence or absence of any single factor which was considered significant in other cases ... is not necessarily dispositive in future cases." *IIT v. Cornfeld,* 619 F.2d 909, 918 (1980) (internal quotation marks omitted).

***2880** Other Circuits embraced the Second Circuit's approach, though not its precise application. Like the Second Circuit, they described their decisions regarding the extraterritorial application of § 10(b) as essentially resolving matters of policy. See, *e.g., SEC v. Kasser,* 548 F.2d 109, 116 (C.A.3 1977); *Continental Grain,* 592 F.2d, at 421–422; *Grunenthal GmbH v. Hotz,* 712 F.2d 421, 424–425 (C.A.9 1983); *Kauthar SDN BHD v. Sternberg,* 149 F.3d 659, 667 (C.A.7 1998). While applying the same fundamental methodology of balancing interests and arriving at what seemed the best policy, they produced a proliferation of vaguely related variations on the "conduct" and "effects" tests. As described in a leading Seventh Circuit opinion: "Although the circuits ... seem to agree that there are some transnational situations to which the antifraud provisions of the securities laws are applicable, agreement appears to end at that point." FN4 *Id.,* at 665. See also *id.,* at 665–667 (describing the approaches of the various Circuits and adopting yet another variation).

FN4. The principal concurrence (see *post,* p. 2888 (STEVENS, J., concurring in judgment) (hereinafter concurrence)) disputes this characterization, launching into a Homeric simile which takes as its point of departure (and mistakes for praise rather than condemnation) then-Justice Rehnquist's statement in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) that "[w]hen we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn." *Post,* at 2889. The concurrence seemingly believes that the Courts of Appeals have carefully trimmed and sculpted this "judicial oak" into a cohesive canopy, under the watchful eye of Judge Henry Friendly, the "master arborist," *ibid.* See *post,* at 2889 – 2890. Even if one thinks that the "conduct" and "effects" tests are numbered among Judge Friendly's many fine contributions to the law, his successors, though perhaps under the impression that they nurture the same mighty oak, are in reality tending each its own botanically distinct tree. It is telling that the concurrence never attempts its own synthesis of the various balancing tests the Circuits have adopted.

At least one Court of Appeals has criticized this line of cases and the interpretive assumption that underlies it. In *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 32 (1987) (Bork, J.), the District of Columbia Circuit observed that rather than courts' "divining what 'Congress would have wished' if it had addressed the problem[, a] more natural inquiry might be what jurisdiction Congress

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

in fact thought about and conferred." Although tempted to apply the presumption against extraterritoriality and be done with it, see *id.*, at 31–32, that court deferred to the Second Circuit because of its "preeminence in the field of securities law," *id.*, at 32. See also *Robinson v. TCI/US West Communications Inc.*, 117 F.3d 900, 906–907 (C.A.5 1997) (expressing agreement with *Zoelsch*'s criticism of the emphasis on policy considerations in some of the cases).

Commentators have criticized the unpredictable and inconsistent application of § 10(b) to transnational cases. See, *e.g.*, Choi & Silberman, Transnational Litigation and Global Securities Class–Action Lawsuits, 2009 Wis. L.Rev. 465, 467–468; Chang, Multinational Enforcement of U.S. Securities Laws: The Need for the Clear and Restrained Scope of Extraterritorial Subject–Matter Jurisdiction, 9 Fordham J. Corp. & Fin. L. 89, 106–108, 115–116 (2004); Langevoort, *Schoenbaum* Revisited: Limiting the Scope of Antifraud Protection in an Internationalized Securities Marketplace, 55 Law & Contemp. Probs. 241, 244–248 (1992). Some have challenged the premise underlying the Courts of Appeals' approach, namely that Congress did not consider the extraterritorial application of § 10(b) (thereby leaving it open to the courts, supposedly, to determine what Congress would have wanted). ***2881** See, *e.g.*, Sachs, The International Reach of Rule 10b–5: The Myth of Congressional Silence, 28 Colum. J. Transnat'l L. 677 (1990) (arguing that Congress considered, but rejected, applying the Exchange Act to transactions abroad). Others, more fundamentally, have noted that using congressional silence as a justification for judge-made rules violates the traditional principle that silence means no extraterritorial application. See, *e.g.*, Note, Let There Be Fraud (Abroad): A Proposal for A New U.S. Jurisprudence with Regard to the Extraterritorial Application of the Anti–Fraud Provisions of the 1933 and 1934 Securities Acts, 28 Law & Pol'y Int'l Bus. 477, 492–493 (1997).

[8] The criticisms seem to us justified. The results of judicial-speculation-made-law—divining what Congress would have wanted if it had thought of the situation before the court—demonstrate the wisdom of the presumption against extraterritoriality. Rather than guess anew in each case, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects.[FN5]

FN5. The concurrence urges us to cast aside our inhibitions and join in the judicial lawmaking, because "[t]his entire area of law is replete with judge-made rules," *post*, at 2889. It is doubtless true that, because the implied private cause of action under § 10(b) and Rule 10b–5 is a thing of our own creation, we have also defined its contours. See, *e.g.*, *Blue Chip Stamps, supra*. But when it comes to "the scope of [the] conduct prohibited by [Rule 10b–5 and] § 10(b), the text of the statute controls our decision." *Central Bankof Denver, N.A. v. First Interstate Bank of Denver, N. A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). It is only with respect to the additional "elements of the 10b–5 private liability scheme" that we "have had 'to infer how the 1934 Congress would have addressed the issue[s] had the 10b–5 action been included as an express provision in the 1934 Act.' " *Ibid.* (quoting *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286, 294, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993)).

B

[9] Rule 10b–5, the regulation under which petitioners have brought suit,[FN6] was promulgated under § 10(b), and "does not extend beyond conduct encompassed by § 10(b)'s prohibition." *United States v. O'Hagan*, 521 U.S. 642, 651, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). Therefore, if § 10(b) is not extraterritorial, neither is Rule 10b–5.

FN6. Rule 10b–5 makes it unlawful:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

130 S.Ct. 2869, 177 L.Ed.2d 535, 78 BNA USLW 4700, Fed. Sec. L. Rep. P 95,776, 76 Fed.R.Serv.3d 1330, RICO Bus.Disp.Guide 11,932, 10 Cal. Daily Op. Serv. 7918, 2010 Daily Journal D.A.R. 9676, 22 Fla. L. Weekly Fed. S 575
**(Cite as: 130 S.Ct. 2869)**

"for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security." 17 CFR § 240.10b–5 (2009).

The Second Circuit considered petitioners' appeal to raise only a claim under Rule 10b–5(b), since it found their claims under subsections (a) and (c) to be forfeited. 547 F.3d, at 176, n. 7. We do likewise.

On its face, § 10(b) contains nothing to suggest it applies abroad:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, ... any manipulative or deceptive device or contrivance in contravention*2882 of such rules and regulations as the [Securities and Exchange] Commission may prescribe ... ." 15 U.S.C. 78j(b).

Petitioners and the Solicitor General contend, however, that three things indicate that § 10(b) or the Exchange Act in general has at least some extraterritorial application.

[10] First, they point to the definition of "interstate commerce," a term used in § 10(b), which includes "trade, commerce, transportation, or communication ... between any foreign country and any State." 15 U.S.C. § 78c(a)(17). But "we have repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *Aramco*, 499 U.S., at 251, 111 S.Ct. 1227; see *id.*, at 251–252, 111 S.Ct. 1227 (discussing cases). The general reference to foreign commerce in the definition of "interstate commerce" does not defeat the presumption against extraterritoriality. FN7

FN7. This conclusion does not render meaningless the inclusion of "trade, commerce, transportation, or communication ... between any foreign country and any State" in the definition of "interstate commerce." 15 U.S.C. § 78c(a)(17). For example, an issuer based abroad, whose executives approve the publication in the United States of misleading information affecting the price of the issuer's securities traded on the New York Stock Exchange, probably will make use of some instrumentality of "communication ... between [a] foreign country and [a] State."

[11] Petitioners and the Solicitor General next point out that Congress, in describing the purposes of the Exchange Act, observed that the "prices established and offered in such transactions are generally disseminated and quoted throughout the United States and foreign countries." 15 U.S.C. § 78b(2). The antecedent of "such transactions," however, is found in the first sentence of the section, which declares that "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

national public interest." § 78b. Nothing suggests that this *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets. The fleeting reference to the dissemination and quotation abroad of the prices of securities traded in domestic exchanges and markets cannot overcome the presumption against extraterritoriality.

[12] Finally, there is § 30(b) of the Exchange Act, 15 U.S.C. § 78dd(b), which *does* mention the Act's extraterritorial application: "The provisions of [the Exchange Act] or of any rule or regulation thereunder shall not apply to any person insofar as he transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the Securities and Exchange Commission "to prevent ... evasion of [the Act]." (The parties have pointed us to no regulation promulgated pursuant to § 30(b).) The Solicitor General argues that "[this] exemption would have no function if the Act did not apply in the first instance to securities transactions that occur abroad." Brief for United States as *Amicus Curiae* 14.

[13] We are not convinced. In the first place, it would be odd for Congress to indicate the extraterritorial application of the whole Exchange Act by means of a provision imposing a condition precedent to its application abroad. And if the whole Act applied abroad, why would the Commission's enabling regulations be limited to those preventing "evasion" of the Act, rather than all those preventing "violation"? The provision seems to us directed at actions abroad that might conceal a ***2883** domestic violation, or might cause what would otherwise be a domestic violation to escape on a technicality. At most, the Solicitor General's proposed inference is possible; but possible interpretations of statutory language do not override the presumption against extraterritoriality. See *Aramco, supra,* at 253, 111 S.Ct. 1227.

[14] The Solicitor General also fails to account for § 30(a), which reads in relevant part as follows:

"It shall be unlawful for any broker or dealer ... to make use of the mails or of any means or instrumentality of interstate commerce for the purpose of effecting on an exchange not within or subject to the jurisdiction of the United States, any transaction in any security the issuer of which is a resident of, or is organized under the laws of, or has its principal place of business in, a place within or subject to the jurisdiction of the United States, in contravention of such rules and regulations as the Commission may prescribe...." 15 U.S.C. § 78dd(a).

Subsection 30(a) contains what § 10(b) lacks: a clear statement of extraterritorial effect. Its explicit provision for a specific extraterritorial application would be quite superfluous if the rest of the Exchange Act already applied to transactions on foreign exchanges—and its limitation of that application to securities of domestic issuers would be inoperative. Even if that were not true, when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms. See *Microsoft Corp. v. AT & T Corp.,* 550 U.S. 437, 455–456, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007). No one claims that § 30(a) applies here.

The concurrence claims we have impermissibly narrowed the inquiry in evaluating whether a statute applies abroad, citing for that point the dissent in *Aramco,* see *post,* at 2891. But we do not say, as the concurrence seems to think, that the presumption against extraterritoriality is a "clear statement rule," *ibid.,* if by that is meant a requirement that a statute say "this law applies abroad." Assuredly context can be consulted as well. But whatever sources of statutory meaning one consults to give "the most faithful reading" of the text, *post,* at 2892, there is no clear indication of extraterritoriality here. The concurrence does not even try to refute that conclusion, but merely puts forward the same (at best) uncertain indications relied upon by petitioners and the Solicitor General. As the opinion *for the Court* in *Aramco* (which we prefer to the dissent) shows,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

130 S.Ct. 2869, 177 L.Ed.2d 535, 78 BNA USLW 4700, Fed. Sec. L. Rep. P 95,776, 76 Fed.R.Serv.3d 1330, RICO Bus.Disp.Guide 11,932, 10 Cal. Daily Op. Serv. 7918, 2010 Daily Journal D.A.R. 9676, 22 Fla. L. Weekly Fed. S 575
**(Cite as: 130 S.Ct. 2869)**

those uncertain indications do not suffice.[FN8]

FN8. The concurrence notes that, post-*Aramco,* Congress provided explicitly for extraterritorial application of Title VII, the statute at issue in *Aramco*. *Post,* at 2891, n. 6. All this shows is that Congress knows how to give a statute explicit extraterritorial effect—and how to limit that effect to particular applications, which is what the cited amendment did. See Civil Rights Act of 1991, § 109, 105 Stat. 1077.

[15] In short, there is no affirmative indication in the Exchange Act that § 10(b) applies extraterritorially, and we therefore conclude that it does not.

IV

A

Petitioners argue that the conclusion that § 10(b) does not apply extraterritorially does not resolve this case. They contend that they seek no more than domestic application anyway, since Florida is where HomeSide and its senior executives engaged in the deceptive conduct of manipulating HomeSide's financial models; their ***2884** complaint also alleged that Race and Hughes made misleading public statements there. This is less an answer to the presumption against extraterritorial application than it is an assertion—a quite valid assertion—that that presumption here (as often) is not self-evidently dispositive, but its application requires further analysis. For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States. But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case. The concurrence seems to imagine just such a timid sentinel, see *post,* at 2892, but our cases are to the contrary. In *Aramco,* for example, the Title VII plaintiff had been hired in Houston, and was an American citizen. See 499 U.S., at 247, 111 S.Ct. 1227. The Court concluded, however, that neither that territorial event nor that relationship was the "focus" of congressional concern, *id.,* at 255, 111 S.Ct. 1227, but rather domestic employment. See also *Foley Bros.,* 336 U.S., at 283, 285–286, 69 S.Ct. 575.

[16][17] Applying the same mode of analysis here, we think that the focus of the Exchange Act is not upon the place where the deception originated, but upon purchases and sales of securities in the United States. Section 10(b) does not punish deceptive conduct, but only deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). See *SEC v. Zandford,* 535 U.S. 813, 820, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). Those purchase-and-sale transactions are the objects of the statute's solicitude. It is those transactions that the statute seeks to "regulate," see *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); it is parties or prospective parties to those transactions that the statute seeks to "protec[t]," *id.,* at 10, 92 S.Ct. 165. See also *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). And it is in our view only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, to which § 10(b) applies.[FN9]

FN9. The concurrence seems to think this test has little to do with our conclusion in Part III, *supra,* that § 10(b) does not apply extraterritorially. See *post,* at 2894 – 2895. That is not so. If § 10(b) did apply abroad, we would not need to determine which transnational frauds it applied to; it would apply to all of them (barring some other limitation). Thus, although it is true, as we have said, that our threshold conclusion that § 10(b) has no extraterritorial effect does not resolve this case, it is a necessary first step in the analysis.

The concurrence also makes the curious criticism that our evaluation of where a putative violation occurs is based on the

text of § 10(b) rather than the doctrine in the Courts of Appeals. *Post,* at 2888 – 2889. Although it concedes that our test is textually plausible, *post,* at 2888, it does not (and cannot) make the same claim for the Court–of–Appeals doctrine it endorses. That is enough to make our test the better one.

The primacy of the domestic exchange is suggested by the very prologue of the Exchange Act, which sets forth as its object "[t]o provide for the regulation of securities exchanges ... operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges ... ." 48 Stat. 881. We know of no one who thought that the Act was intended to "regulat[e]" *foreign* securities exchanges—or indeed who even believed that under established principles of international law Congress had the power to do so. The ***2885** Act's registration requirements apply only to securities listed on national securities exchanges. 15 U.S.C. § 78*l* (a).

With regard to securities *not* registered on domestic exchanges, the exclusive focus on *domestic* purchases and sales FN10 is strongly confirmed by § 30(a) and (b), discussed earlier. The former extends the normal scope of the Exchange Act's prohibitions to acts effecting, in violation of rules prescribed by the Commission, a "transaction" in a United States security "on an exchange not within or subject to the jurisdiction of the United States." § 78dd(a). And the latter specifies that the Act does not apply to "any person insofar as he transacts a business in securities without the jurisdiction of the United States," unless he does so in violation of regulations promulgated by the Commission "to prevent evasion [of the Act]." § 78dd(b). Under both provisions it is the foreign location of the *transaction* that establishes (or reflects the presumption of) the Act's inapplicability, absent regulations by the Commission.

FN10. That is in our view the meaning which the presumption against extraterritorial application requires for the words "purchase or sale, of ... any security not so registered" in § 10(b)'s phrase "in connection with the purchase or sale of any security registered on a national securities exchange *or any security not so registered* " (emphasis added). Even without the presumption against extraterritorial application, the only alternative to that reading makes nonsense of the phrase, causing it to cover all purchases and sales of registered securities, and all purchases and sales of nonregistered securities—a thought which, if intended, would surely have been expressed by the simpler phrase "all purchases and sales of securities."

The same focus on domestic transactions is evident in the Securities Act of 1933, 48 Stat. 74, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading. See *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164, 170–171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). That legislation makes it unlawful to sell a security, through a prospectus or otherwise, making use of "any means or instruments of transportation or communication in interstate commerce or of the mails," unless a registration statement is in effect. 15 U.S.C. § 77e(a)(1). The Commission has interpreted that requirement "not to include ... sales that occur outside the United States." 17 CFR § 230.901 (2009).

[18] Finally, we reject the notion that the Exchange Act reaches conduct in this country affecting exchanges or transactions abroad for the same reason that *Aramco* rejected overseas application of Title VII to all domestically concluded employment contracts or all employment contracts with American employers: The probability of incompatibility with the applicable laws of other countries is so obvious that if Congress intended such foreign application "it would have addressed the subject of conflicts with foreign laws and procedures." 499 U.S.,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

at 256, 111 S.Ct. 1227. Like the United States, foreign countries regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction. And the regulation of other countries often differs from ours as to what constitutes fraud, what disclosures must be made, what damages are recoverable, what discovery is available in litigation, what individual actions may be joined in a single suit, what attorney's fees are recoverable, and many other matters. See, *e.g.*, Brief for United Kingdom of Great Britain and Northern Ireland as *Amicus Curiae* 16–21. The Commonwealth of Australia, the United Kingdom of Great Britain and Northern Ireland, and the Republic of France have ***2886** filed *amicus* briefs in this case. So have (separately or jointly) such international and foreign organizations as the International Chamber of Commerce, the Swiss Bankers Association, the Federation of German Industries, the French Business Confederation, the Institute of International Bankers, the European Banking Federation, the Australian Bankers' Association, and the Association Francaise des Entreprises Privées. They all complain of the interference with foreign securities regulation that application of § 10(b) abroad would produce, and urge the adoption of a clear test that will avoid that consequence. The transactional test we have adopted—whether the purchase or sale is made in the United States, or involves a security listed on a domestic exchange—meets that requirement.

B

[19][20] The Solicitor General suggests a different test, which petitioners also endorse: "[A] transnational securities fraud violates [§ ] 10(b) when the fraud involves significant conduct in the United States that is material to the fraud's success." Brief for United States as *Amicus Curiae* 16; see Brief for Petitioners 26. Neither the Solicitor General nor petitioners provide any textual support for this test. The Solicitor General sets forth a number of purposes such a test would serve: achieving a high standard of business ethics in the securities industry, ensuring honest securities markets and thereby promoting investor confidence, and preventing the United States from becoming a "Barbary Coast" for malefactors perpetrating frauds in foreign markets. Brief for United States as *Amicus Curiae* 16–17. But it provides no textual support for the last of these purposes, or for the first two as applied to the foreign securities industry and securities markets abroad. It is our function to give the statute the effect its language suggests, however modest that may be; not to extend it to admirable purposes it might be used to achieve.

If, moreover, one is to be attracted by the desirable consequences of the "significant and material conduct" test, one should also be repulsed by its adverse consequences. While there is no reason to believe that the United States has become the Barbary Coast for those perpetrating frauds on foreign securities markets, some fear that it has become the Shangri–La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets. See Brief for Infineon Technologies AG as *Amicus Curiae* 1–2, 22–25; Brief for European Aeronautic Defence & Space Co. N.V. et al. as *Amici Curiae* 2–4; Brief for Securities Industry and Financial Markets Association et al. as *Amici Curiae* 10–16; Coffee, Securities Policeman to the World? The Cost of Global Class Actions, N.Y.L.J. 5 (2008); S. Grant & D. Zilka, The Current Role of Foreign Investors in Federal Securities Class Actions, PLI Corporate Law and Practice Handbook Series, PLI Order No. 11072, pp. 15–16 (Sept.-Oct.2007); Buxbaum, Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict, 46 Colum. J. Transnat'l L. 14, 38–41 (2007).

As case support for the "significant and material conduct" test, the Solicitor General relies primarily on *Pasquantino v. United States,* 544 U.S. 349, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005).[FN11] In that case we ***2887** concluded that the wire-fraud statute, 18 U.S.C. § 1343 (2009 ed., Supp. II), was violated by defendants who ordered liquor over the phone from a store in Maryland with the intent to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

smuggle it into Canada and deprive the Canadian Government of revenue. 544 U.S., at 353, 371, 125 S.Ct. 1766. Section 1343 prohibits "any scheme or artifice to defraud,"—fraud *simpliciter,* without any requirement that it be "in connection with" any particular transaction or event. The *Pasquantino* Court said that the petitioners' "offense was complete the moment they executed the scheme inside the United States," and that it was "[t]his domestic element of petitioners' conduct [that] the Government is punishing." 544 U.S., at 371, 125 S.Ct. 1766. Section 10(b), by contrast, punishes not all acts of deception, but only such acts "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." Not deception alone, but deception with respect to certain purchases or sales is necessary for a violation of the statute.

FN11. Discussed in Brief for United States as *Amicus Curiae* 22–23. The Solicitor General also cites, without description, a number of antitrust cases to support the proposition that domestic conduct with consequences abroad can be covered even by a statute that does not apply extraterritorially: *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); *Thomsen v. Cayser,* 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917); *United States v. Pacific & Arctic R. & Nav. Co.,* 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742 (1913). These are no longer of relevance to the point (if they ever were), since *Continental Ore* overruled the holding of *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 357, 29 S.Ct. 511, 53 L.Ed. 826 (1909), that the antitrust laws do not apply extraterritorially. See *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp. Int'l,* 493 U.S. 400, 407–408, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990). Moreover, the pre-*Continental Ore* cases all involved conspiracies to restrain trade in the United States, see *Sisal Sales, supra,* at 274–276, 47 S.Ct. 592; *Thomsen, supra,* at 88, 37 S.Ct. 353; *Pacific & Arctic,supra,* at 105–106, 33 S.Ct. 443. And although a final case cited by the Solicitor General, *Steele v. Bulova Watch Co.,* 344 U.S. 280, 287–288, 73 S.Ct. 252, 97 L.Ed. 319 (1952), might be read to permit application of a nonextraterritorial statute whenever conduct in the United States contributes to a violation abroad, we have since read it as interpreting the statute at issue—the Lanham Act—to have extraterritorial effect, *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 252, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (quoting 15 U.S.C. § 1127).

The Solicitor General points out that the "significant and material conduct" test is in accord with prevailing notions of international comity. If so, that proves that *if* the United States asserted prescriptive jurisdiction pursuant to the "significant and material conduct" test it would not violate customary international law; but it in no way tends to prove that that is what Congress has done.

[21][22] Finally, the Solicitor General argues that the Commission has adopted an interpretation similar to the "significant and material conduct" test, and that we should defer to that. In the two adjudications the Solicitor General cites, however, the Commission did not purport to be providing its own interpretation of the statute, but relied on decisions of federal courts—mainly Court of Appeals decisions that in turn relied on the *Schoenbaum* and *Leasco* decisions of the Second Circuit that we discussed earlier. See *In re United Securities Clearing Corp.,* 52 S.E.C. 92, 95, n. 14, 96, n. 16 (1994); *In re Robert F. Lynch,* Exchange Act Release No. 11737, 8 S.E.C. Docket 75, 77, n. 15 (1975). We need "accept only those agency interpretations that are reasonable in light of the principles of construc-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion courts normally employ." *Aramco,* 499 U.S., at 260, 111 S.Ct. 1227 (SCALIA, J., concurring in part and concurring in judgment). Since the Commission's interpretations relied on cases we disapprove, which ignored or discarded ***2888** the presumption against extraterritoriality, we owe them no deference.

* * *

Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States. This case involves no securities listed on a domestic exchange, and all aspects of the purchases complained of by those petitioners who still have live claims occurred outside the United States. Petitioners have therefore failed to state a claim on which relief can be granted. We affirm the dismissal of petitioners' complaint on this ground.

*It is so ordered.*

Justice SOTOMAYOR took no part in the consideration or decision of this case.

Justice BREYER, concurring in part and concurring in the judgment.

Section 10(b) of the Securities Exchange Act of 1934 applies to fraud "in connection with" two categories of transactions: (1) "the purchase or sale of any security registered on a national securities exchange" or (2) "the purchase or sale of ... any security not so registered." 15 U.S.C. § 78j(b). In this case, the purchased securities are listed only on a few foreign exchanges, none of which has registered with the Securities and Exchange Commission as a "national securities exchange." See § 78f. The first category therefore does not apply. Further, the relevant purchases of these unregistered securities took place entirely in Australia and involved only Australian investors. And in accordance with the presumption against extraterritoriality, I do not read the second category to include such transactions. Thus, while state law or other federal fraud statutes, see, *e.g.,* 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), may apply to the fraudulent activity alleged here to have occurred in the United States, I believe that § 10(b) does not. This case does not require us to consider other circumstances.

To the extent the Court's opinion is consistent with these views, I join it.

Justice STEVENS, with whom Justice GINSBURG joins, concurring in the judgment.

While I agree that petitioners have failed to state a claim on which relief can be granted, my reasoning differs from the Court's. I would adhere to the general approach that has been the law in the Second Circuit, and most of the rest of the country, for nearly four decades.

I

Today the Court announces a new "transactional test," *ante,* at 2886, for defining the reach of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 CFR § 240.10b–5(b) (2009): Henceforth, those provisions will extend only to "transactions in securities listed on domestic exchanges ... and domestic transactions in other securities," *ante,* at 2884. If one confines one's gaze to the statutory text, the Court's conclusion is a plausible one. But the federal courts have been construing § 10(b) in a different manner for a long time, and the Court's textual analysis is not nearly so compelling, in my view, as to warrant the abandonment of their doctrine.

The text and history of § 10(b) are famously opaque on the question of when, exactly, transnational securities frauds fall within the statute's compass. As those types of frauds became more common in the latter half of the 20th century, the ***2889** federal courts were increasingly called upon to wrestle with that question. The Court of Appeals for the Second Circuit, located in the Nation's financial center, led the effort. Beginning in earnest with *Schoenbaum v. Firstbrook,* 405 F.2d 200, rev'd on rehearing on other grounds, 405 F.2d 215 (1968) (en banc), that court strove, over an extended series

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of cases, to "discern" under what circumstances "Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to [transnational] transactions," 547 F.3d 167, 170 (2008) (internal quotation marks omitted). Relying on opinions by Judge Henry Friendly,[FN1] the Second Circuit eventually settled on a conduct-and-effects test. This test asks "(1) whether the wrongful conduct occurred in the Unites States, and (2) whether the wrongful conduct had a substantial effect in the United States or upon United States citizens." *Id.*, at 171. Numerous cases flesh out the proper application of each prong.

FN1. See, *e.g., IIT, Int'l Inv. Trust v. Cornfeld,* 619 F.2d 909 (C.A.2 1980); *IIT v. Vencap, Ltd.,* 519 F.2d 1001 (C.A.2 1975); *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (C.A.2 1975); *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (C.A.2 1972).

The Second Circuit's test became the "north star" of § 10(b) jurisprudence, *ante,* at 2879, not just regionally but nationally as well. With minor variations, other courts converged on the same basic approach.[FN2] See Brief for United States as *Amicus Curiae* 15 ("The courts have uniformly agreed that Section 10(b) can apply to a transnational securities fraud either when fraudulent conduct has effects in the United States or when sufficient conduct relevant to the fraud occurs in the United States"); see also 1 Restatement (Third) of Foreign Relations Law of the United States § 416 (1986) (setting forth conduct-and-effects test). Neither Congress nor the Securities Exchange Commission (Commission) acted to change the law. To the contrary, the Commission largely adopted the Second Circuit's position in its own adjudications. See *ante,* at 2887 – 2888.

FN2. I acknowledge that the Courts of Appeals have differed in their applications of the conduct-and-effects test, with the consequence that their respective rulings are not perfectly "cohesive." *Ante,* at 2880, n. 4. It is nevertheless significant that the other Courts of Appeals, along with the other branches of Government, have "embraced the Second Circuit's approach," *ante,* at 2880. If this Court were to do likewise, as I would have us do, the lower courts would of course cohere even more tightly around the Second Circuit's rule.

In light of this history, the Court's critique of the decision below for applying "judge-made rules" is quite misplaced. *Ante,* at 2881. This entire area of law is replete with judge-made rules, which give concrete meaning to Congress' general commands.[FN3] "When we deal with private actions under Rule 10b–5," then-Justice Rehnquist wrote many years ago, "we deal with a judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The " 'Mother Court' " of securities law tended to that oak. ***2890***Id.*, at 762, 95 S.Ct. 1917 (Blackmun, J., dissenting) (describing the Second Circuit). One of our greatest jurists—the judge who, "without a doubt, did more to shape the law of securities regulation than any [other] in the country"[FN4]—was its master arborist.

FN3. It is true that "when it comes to 'the scope of [the] conduct prohibited by [Rule 10b–5 and] § 10(b), the text of the statute [has] control[led] our decision[s].' " *Ante,* at 2881, n. 5 (quoting *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N. A.,* 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); some brackets in original). The problem, when it comes to transnational securities frauds, is that the text of the statute does not provide a great deal of control. As with any broadly phrased, longstanding statute, courts have had to fill in the gaps.

FN4. Loss, In Memoriam: Henry J. Friendly, 99 Harv. L.Rev. 1722, 1723

(1986).

The development of § 10(b) law was hardly an instance of judicial usurpation. Congress invited an expansive role for judicial elaboration when it crafted such an open-ended statute in 1934. And both Congress and the Commission subsequently affirmed that role when they left intact the relevant statutory and regulatory language, respectively, throughout all the years that followed. See Brief for Alecta pensionsförsäkring, ömsesidigt et al. as *Amici Curiae* 31–33; cf. *Musick, Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286, 294, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993) (inferring from recent legislation Congress' desire to "acknowledg[e]" the 10b–5 action without "entangling" itself in the precise formulation thereof). Unlike certain other domains of securities law, this is "a case in which Congress has enacted a regulatory statute and then has accepted, over a long period of time, broad judicial authority to define substantive standards of conduct and liability," and much else besides. *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 163, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).

This Court has not shied away from acknowledging that authority. We have consistently confirmed that, in applying § 10(b) and Rule 10b–5, courts may need "to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance." *Blue Chip,* 421 U.S., at 737, 95 S.Ct. 1917. And we have unanimously "recogniz[ed] a judicial authority to shape ... the 10b–5 cause of action," for that is a task "Congress has left to us." *Musick, Peeler,* 508 U.S., at 293, 294, 113 S.Ct. 2085; see also *id.,* at 292, 113 S.Ct. 2085 (noting with approval that "federal courts have accepted and exercised the principal responsibility for the continuing elaboration of the scope of the 10b–5 right and the definition of the duties it imposes"). Indeed, we have unanimously endorsed the Second Circuit's basic interpretive approach to § 10(b)—ridiculed by the Court today—of striving to "divin[e] what Congress would have wanted," *ante,* at 2881.[FN5] "Our task," we have said, is "to attempt to infer how the 1934 Congress would have addressed the issue." *Musick, Peeler,* 508 U.S., at 294, 113 S.Ct. 2085.

FN5. Even as the Court repeatedly declined to grant certiorari on cases raising the issue, individual Justices went further and endorsed the Second Circuit's basic approach to determining the transnational reach of § 10(b). See, *e.g., Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 529–530, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) (Douglas, J., joined by Brennan, White, and Marshall, JJ., dissenting) ("It has been recognized that the 1934 Act, including the protections of Rule 10b–5, applies when foreign defendants have defrauded American investors, particularly when ... they have profited by virtue of proscribed conduct within our boundaries. This is true even when the defendant is organized under the laws of a foreign country, is conducting much of its activity outside the United States, and is therefore governed largely by foreign law" (citing, *inter alia, Leasco,* 468 F.2d, at 1334–1339, and *Schoenbaum v. Firstbrook,* 405 F.2d 200, rev'd on rehearing on other grounds, 405 F.2d 215 (C.A.2 1968) (en banc))).

Thus, while the Court devotes a considerable amount of attention to the development of the case law, *ante,* at 2877 – 2880, it draws the wrong conclusions. The Second Circuit refined its test over several decades and dozens of cases, with the tacit approval of Congress and the Commission ***2891** and with the general assent of its sister Circuits. That history is a reason we should give additional weight to the Second Circuit's "judge-made" doctrine, not a reason to denigrate it. "The longstanding acceptance by the courts, coupled with Congress' failure to reject [its] reasonable interpretation of the wording of § 10(b), ... argues significantly in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

favor of acceptance of the [Second Circuit] rule by this Court." *Blue Chip,* 421 U.S., at 733, 95 S.Ct. 1917.

II

The Court's other main critique of the Second Circuit's approach—apart from what the Court views as its excessive reliance on functional considerations and reconstructed congressional intent—is that the Second Circuit has "disregard[ed]" the presumption against extraterritoriality. *Ante,* at 2877. It is the Court, however, that misapplies the presumption, in two main respects.

First, the Court seeks to transform the presumption from a flexible rule of thumb into something more like a clear statement rule. We have been here before. In the case on which the Court primarily relies, *EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) *(Aramco),* Chief Justice Rehnquist's majority opinion included a sentence that appeared to make the same move. See *id.,* at 258, 111 S.Ct. 1227 ("Congress' awareness of the need to make a clear statement that a statute applies overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute"). Justice Marshall, in dissent, vigorously objected. See *id.,* at 261, 111 S.Ct. 1227 ("[C]ontrary to what one would conclude from the majority's analysis, this canon is *not* a 'clear statement' rule, the application of which relieves a court of the duty to give effect to all available indicia of the legislative will").

Yet even *Aramco*—surely the most extreme application of the presumption against extraterritoriality in my time on the Court [FN6]—contained numerous passages suggesting that the presumption may be overcome without a clear directive. See *id.,* at 248–255, 111 S.Ct. 1227 (majority opinion) (repeatedly identifying congressional "intent" as the touchstone of the presumption). And our cases both before and after *Aramco* make perfectly clear that the Court continues to give effect to "*all available evidence* about the meaning" of a provision when considering its extraterritorial application, lest we defy Congress' will. *Sale v. Haitian Centers Council, Inc.,* 509 U.S. 155, 177, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993) (emphasis added). [FN7] *2892 Contrary to Justice SCALIA's personal view of statutory interpretation, that evidence legitimately encompasses more than the enacted text. Hence, while the Court's dictum that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none," *ante,* at 2877, makes for a nice catchphrase, the point is overstated. The presumption against extraterritoriality can be useful as a theory of congressional purpose, a tool for managing international conflict, a background norm, a tiebreaker. It does not relieve courts of their duty to give statutes the most faithful reading possible.

FN6. And also one of the most short lived. See Civil Rights Act of 1991, § 109, 105 Stat. 1077 (repudiating *Aramco*).

FN7. See also, *e.g., Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (declining to apply presumption in assessing question of Sherman Act extraterritoriality); *Smith v. United States,* 507 U.S. 197, 201–204, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (opinion for the Court by Rehnquist, C.J.) (considering presumption "[l]astly," to resolve "any lingering doubt," after considering structure, legislative history, and judicial interpretations of Federal Tort Claims Act); cf. *Sale,* 509 U.S., at 188, 113 S.Ct. 2549 (stating that presumption "has special force when we are construing treaty and statutory provisions that," unlike § 10(b), "may involve foreign and military affairs for which the President has unique responsibility"); Dodge, Understanding the Presumption Against Extraterritoriality, 16 Berkeley J. Int'l L. 85, 110 (1998) (explaining that lower courts "have been unanimous in concluding that the presumption against extraterritoriality is not a clear

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

statement rule"). The Court also relies on *Microsoft Corp. v. AT & T Corp.,* 550 U.S. 437, 455–456, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007). *Ante,* at 2883. Yet *Microsoft* 's articulation of the presumption is a far cry from the Court's rigid theory. "As a principle of general application," *Microsoft* innocuously observed, "we have stated that courts should 'assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws.' " 550 U.S., at 455, 127 S.Ct. 1746 (quoting *F. Hoffmann–La Roche Ltd. v. Empagran S. A.,* 542 U.S. 155, 164, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004)).

Second, and more fundamentally, the Court errs in suggesting that the presumption against extraterritoriality is fatal to the Second Circuit's test. For even if the presumption really were a clear statement (or "clear indication," *ante,* at 2877, 2883) rule, it would have only marginal relevance to this case.

It is true, of course, that "this Court ordinarily construes ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations," *F. Hoffmann–La Roche Ltd. v. Empagran S. A.,* 542 U.S. 155, 164, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004), and that, absent contrary evidence, we presume "Congress is primarily concerned with domestic conditions," *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949). Accordingly, the presumption against extraterritoriality "provides a sound basis for concluding that Section 10(b) does not apply when a securities fraud with no effects in the United States is hatched and executed entirely outside this country." Brief for United States as *Amicus Curiae* 22. But that is just about all it provides a sound basis for concluding. And the conclusion is not very illuminating, because no party to the litigation disputes it. No one contends that § 10(b) applies to wholly foreign frauds.

Rather, the real question in this case is how much, and what kinds of, *domestic* contacts are sufficient to trigger application of § 10(b).[FN8] In developing its conduct-and-effects test, the Second Circuit endeavored to derive a solution from the Exchange Act's text, structure, history, and purpose. Judge Friendly and his colleagues were well aware that United States courts "cannot and should not expend [their] resources resolving cases that do not affect Americans or involve fraud emanating from America." 547 F.3d, at 175; see also *id.,* at 171 (overriding concern is " 'whether there is sufficient United States involvement' " (quoting *Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 122 (C.A.2 1995))).

FN8. Cf. Dodge, 16 Berkeley J. Int'l L., at 88, n. 25 (regardless whether one frames question as "whether the presumption against extraterritoriality should apply [or] whether the regulation is extraterritorial," "one must ultimately grapple with the basic issue of what connection to the United States is sufficient to justify the assumption that Congress would want its laws to be applied").

The question just stated does not admit of an easy answer. The text of the Exchange Act indicates that § 10(b) extends to at least some activities with an international component, but, again, it is not pellucid as to which ones.[FN9] The Second Circuit*2893 draws the line as follows: § 10(b) extends to transnational frauds "only when substantial acts in furtherance of the fraud were committed within the United States," *SEC v. Berger,* 322 F.3d 187, 193 (C.A.2 2003) (internal quotation marks omitted), or when the fraud was " 'intended to produce' " and did produce " 'detrimental effects within' " the United States, *Schoenbaum,* 405 F.2d, at 206.[FN10]

FN9. By its terms, § 10(b) regulates "interstate commerce," 15 U.S.C. § 78j, which the Exchange Act defines to include "trade, commerce, transportation, or communication ... between any foreign country

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and any State, or between any State and any place or ship outside thereof." § 78c(a)(17). Other provisions of the Exchange Act make clear that Congress contemplated some amount of transnational application. See, *e.g.*, § 78b(2) (stating, in explaining necessity for regulation, that "[t]he prices established and offered in [securities] transactions are generally disseminated and quoted throughout the United States and foreign countries and constitute a basis for determining and establishing the prices at which securities are bought and sold"); § 78dd(b) (exempting from regulation foreign parties "*unless*" they transact business in securities "in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate to prevent the evasion of this chapter" (emphasis added)); see also *Schoenbaum,* 405 F.2d, at 206–208 (reviewing statutory text and legislative history). The Court finds these textual references insufficient to overcome the presumption against extraterritoriality, *ante,* at 2881 – 2883, but as explained in the main text, that finding rests upon the Court's misapplication of the presumption.

FN10. The Government submits that a "transnational securities fraud violates Section 10(b) if significant conduct material to the fraud's success occurs in the United States." Brief for United States as *Amicus Curiae* 6. I understand the Government's submission to be largely a repackaging of the "conduct" prong of the Second Circuit's test. The Government expresses no view on that test's "effects" prong, as the decision below considered only respondents' conduct. See *id.,* at 15, n. 2; 547 F.3d 167, 171 (C.A.2 2008).

This approach is consistent with the understanding shared by most scholars that Congress, in passing the Exchange Act, "expected U.S. securities laws to apply to certain international transactions or conduct." Buxbaum, Multinational Class Actions Under Federal Securities Law: Managing Jurisdictional Conflict, 46 Colum. J. Transnat'l L. 14, 19 (2007); see also *Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1336 (C.A.2 1972) (Friendly, J.) (detailing evidence that Congress "meant § 10(b) to protect against fraud in the sale or purchase of securities whether or not these were traded on organized United States markets"). It is also consistent with the traditional understanding, regnant in the 1930's as it is now, that the presumption against extraterritoriality does not apply "when the conduct [at issue] occurs within the United States," and has lesser force when "the failure to extend the scope of the statute to a foreign setting will result in adverse effects within the United States." *Environmental Defense Fund, Inc. v. Massey,* 986 F.2d 528, 531 (C.A.D.C.1993); accord, Restatement (Second) of Foreign Relations Law of the United States § 38 (1964–1965); cf. *Small v. United States,* 544 U.S. 385, 400, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005) (THOMAS, J., joined by SCALIA and KENNEDY, JJ., dissenting) (presumption against extraterritoriality "lend[s] no support" to a "rule restricting a federal statute from reaching conduct *within U.S. borders*"); *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 705, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (presumption against extraterritoriality not controlling "[s]ince the activities of the defendants had an impact within the United States and upon its foreign trade"). And it strikes a reasonable balance between the goals of "preventing the export of fraud from America," protecting shareholders, enhancing investor confidence, *2894 and deterring corporate misconduct, on the one hand, and conserving United States resources and limiting conflict with foreign law, on the other.[FN11] 547 F.3d, at 175.

FN11. Given its focus on "domestic conditions," *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

130 S.Ct. 2869, 177 L.Ed.2d 535, 78 BNA USLW 4700, Fed. Sec. L. Rep. P 95,776, 76 Fed.R.Serv.3d 1330, RICO Bus.Disp.Guide 11,932, 10 Cal. Daily Op. Serv. 7918, 2010 Daily Journal D.A.R. 9676, 22 Fla. L. Weekly Fed. S 575
(Cite as: 130 S.Ct. 2869)

(1949), I expect that virtually all " 'foreign-cubed' " actions—actions in which "(1) *foreign* plaintiffs [are] suing (2) a *foreign* issuer in an American court for violations of American securities laws based on securities transactions in (3) *foreign* countries," 547 F.3d, at 172—would fail the Second Circuit's test. As they generally should. Under these circumstances, the odds of the fraud having a substantial connection to the United States are low. In recognition of the Exchange Act's focus on American investors and the novelty of foreign-cubed lawsuits, and in the interest of promoting clarity, it might have been appropriate to incorporate one bright line into the Second Circuit's test, by categorically excluding such lawsuits from § 10(b)'s ambit.

Thus, while § 10(b) may not give any "clear indication" on its face as to how it should apply to transnational securities frauds, *ante,* at 2877, 2883, it does give strong clues that it should cover at least some of them, see n. 9, *supra*. And in my view, the Second Circuit has done the best job of discerning what sorts of transnational frauds Congress meant in 1934—and still means today—to regulate. I do not take issue with the Court for beginning its inquiry with the statutory text, rather than the doctrine in the Courts of Appeals. Cf. *ante,* at 2884, n. 9. I take issue with the Court for beginning *and ending* its inquiry with the statutory text, when the text does not speak with geographic precision, and for dismissing the long pedigree of, and the persuasive account of congressional intent embodied in, the Second Circuit's rule.

Repudiating the Second Circuit's approach in its entirety, the Court establishes a novel rule that will foreclose private parties from bringing § 10(b) actions whenever the relevant securities were purchased or sold abroad and are not listed on a domestic exchange.[FN12] The real motor of the Court's opinion, it seems, is not the presumption against extraterritoriality but rather the Court's belief that transactions on domestic exchanges are "the focus of the Exchange Act" and "the objects of [its] solicitude." *Ante,* at 2883, 2884. In reality, however, it is the "public interest" and "the interests of investors" that are the objects of the statute's solicitude. *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 125 (C.A.2 1998) (citing H.R.Rep. No. 1838, 73d Cong., 2d Sess., 32–33 (1934)); see also *Basic Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("The 1934 Act was designed to protect investors against manipulation of stock prices" (citing S.Rep. No. 792, 73d Cong., 2d Sess., 1–5 (1934)); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("The 1934 Act was intended principally to protect investors ... "); S.Rep. No. 1455, 73d Cong., 2d Sess., 68 (1934) ("The Securities Exchange Act of 1934 aims to protect the interests of ***2895** the public against the predatory operations of directors, officers, and principal stockholders of corporations ... "). And while the clarity and simplicity of the Court's test may have some salutary consequences, like all bright-line rules it also has drawbacks.

FN12. The Court's opinion does not, however, foreclose the Commission from bringing enforcement actions in additional circumstances, as no issue concerning the Commission's authority is presented by this case. The Commission's enforcement proceedings not only differ from private § 10(b) actions in numerous potentially relevant respects, see Brief for United States as *Amicus Curiae* 12–13, but they also pose a lesser threat to international comity, *id.,* at 26–27; cf. *Empagran,* 542 U.S., at 171, 124 S.Ct. 2359 (" '[P]rivate plaintiffs often are unwilling to exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government' " (quoting Griffin, Extraterritoriality in U.S. and EU Antitrust Enforcement, 67 Anti-

trust L.J. 159, 194 (1999); alteration in original)).

Imagine, for example, an American investor who buys shares in a company listed only on an overseas exchange. That company has a major American subsidiary with executives based in New York City; and it was in New York City that the executives masterminded and implemented a massive deception which artificially inflated the stock price—and which will, upon its disclosure, cause the price to plummet. Or, imagine that those same executives go knocking on doors in Manhattan and convince an unsophisticated retiree, on the basis of material misrepresentations, to invest her life savings in the company's doomed securities. Both of these investors would, under the Court's new test, be barred from seeking relief under § 10(b).

The oddity of that result should give pause. For in walling off such individuals from § 10(b), the Court narrows the provision's reach to a degree that would surprise and alarm generations of American investors—and, I am convinced, the Congress that passed the Exchange Act. Indeed, the Court's rule turns § 10(b) jurisprudence (and the presumption against extraterritoriality) on its head, by withdrawing the statute's application from cases in which there is *both* substantial wrongful conduct that occurred in the United States *and* a substantial injurious effect on United States markets and citizens.

III

In my judgment, if petitioners' allegations of fraudulent misconduct that took place in Florida are true, then respondents may have violated § 10(b), and could potentially be held accountable in an enforcement proceeding brought by the Commission. But it does not follow that shareholders who have failed to allege that the bulk or the heart of the fraud occurred in the United States, or that the fraud had an adverse impact on American investors or markets, may maintain a private action to recover damages they suffered abroad. Some cases involving foreign securities transactions have extensive links to, and ramifications for, this country; this case has Australia written all over it. Accordingly, for essentially the reasons stated in the Court of Appeals' opinion, I would affirm its judgment.

The Court instead elects to upend a significant area of securities law based on a plausible, but hardly decisive, construction of the statutory text. In so doing, it pays short shrift to the United States' interest in remedying frauds that transpire on American soil or harm American citizens, as well as to the accumulated wisdom and experience of the lower courts. I happen to agree with the result the Court reaches in this case. But "I respectfully dissent," once again, "from the Court's continuing campaign to render the private cause of action under § 10(b) toothless." *Stoneridge,* 552 U.S., at 175, 128 S.Ct. 761 (STEVENS, J., dissenting).

U.S.,2010.
Morrison v. National Australia Bank Ltd.
130 S.Ct. 2869, 177 L.Ed.2d 535, 78 BNA USLW 4700, Fed. Sec. L. Rep. P 95,776, 76 Fed.R.Serv.3d 1330, RICO Bus.Disp.Guide 11,932, 10 Cal. Daily Op. Serv. 7918, 2010 Daily Journal D.A.R. 9676, 22 Fla. L. Weekly Fed. S 575

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.