# EXHIBIT B
# (PART 8)

These concerns are heightened in the context of securities class actions. The Private Securities Litigation Reform Act of 1995 ("PSLRA") has an "emphatic command" that "competent plaintiffs, rather than lawyers, direct [the litigation]." Berger, 257 F.3d at 484; see also Sina Corp., 2005 WL 1561438, at *1; Hevesi v. Citigroup Inc., 366 F.3d 70, 83 n.13 (2d Cir. 2003).[4] Congress perceived that "class counsel too frequently controlled securities class actions leading to various abuses" and the PSLRA was thus designed so that the court would "designate the best representative [who] should retain the class counsel, rather than the attorney selecting the plaintiff." 7A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure ("WMK") § 1766 (3d ed. 2008). The PSLRA's theory is that a "sophisticated investor would be motivated to act like a 'real' client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price." Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009) ("Iron Workers"); see also Shiring v. Tier Technologies, Inc., 244 F.R.D. 307, 316 (E.D. Va. 2007) (denying certification in part because plaintiff had "abdicated" his supervisory role in contravention of the PSLRA); In re Cendant Corp. Litig., 264 F.3d 201, 265 (3d Cir. 2001); In re Quintus Sec. Litig., 201 F.R.D. 475, 482 (N.D. Cal. 2001) ("plaintiff that does not negotiate a reasonable fee arrangement [not] adequate representative").

Snow's application violates the above precepts, each of which, individually, is sufficient to preclude class certification.

Further, Snow is unable to serve as class representative because he lacks standing. The face of the Complaint establishes that Snow has not suffered a loss as a result of an alleged

---

4 Defendants did not have standing to challenge Snow's adequacy and typicality at the lead plaintiff stage and, accordingly, the court's appointment of Snow as lead plaintiff "does not prejudice defendants' capacity to contest plaintiff's adequacy on a motion for class certification." See Koppel v. 4987 Corp., Nos. 96 Civ. 7570, 97 Civ. 1754 (RLC), 1999 WL 608783, at *8 (S.D.N.Y. Aug. 11, 1999); In re Deutsche Bank AG Sec. Litig., No. 09 Civ. 1714 (DAB), 2009 WL 4277202, at *3 (S.D.N.Y. Nov. 23, 2009).

misrepresentation. Snow sold all of his IMAX stock much prior to March 29, 2007, the only potential curative disclosure date alleged in the complaint for investors, like Snow, that purchased before February 17, 2006. See Compl. ¶ 127; infra at 17-18, 24. Thus, Snow lacks Article III standing. Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Capital Inc., No. 05 Civ. 1898 (SAS), 2005 WL 2148919, at *3 (S.D.N.Y. Sept. 06, 2005) ("A putative class representative lacks standing to bring a claim if it did not suffer the injury that gives rise to that claim."). Accordingly, this case may not be certified as a class action with Snow as representative. See id. at *4 ("If the named plaintiffs have no cause of action in their own right, their complaint must be dismissed, even though the facts set forth in the complaint may show that others might have a valid claim."); Ramos v. Patrician Equities Corp., 765 F. Supp. 1196, 1199 (S.D.N.Y. 1991).

**A. Snow's Interests Are Antagonistic To Those Of The Class**

"[T]he best way for the court to assess a potential lead plaintiff's adequacy is to consider the manner in which he has retained counsel and negotiated an attorney's fee for the class." In re Quintus, 201 F.R.D. at 482. In October 2006, Snow represented he "ha[d] selected [Robbins Geller's predecessor] to represent it and the class." See Mem. of Law, Oct. 10, 2006 at 3 ("Pl. 2006 Br."). At deposition, however,

. There is apparently no separate engagement letter for Robbins Geller.

CONFIDENTIAL
FILED UNDER SEAL

Snow's reticence is telling.

Snow did not hire as a result of any beauty contest or competitive bidding contest.

See Weisman, 78 F.R.D. at 671.

[5] participation in this litigation is also a component of this conflict. As one court has recognized, "[an] attorney whose fees will depend upon the outcome of the case and who is also a class member or closely related to a class member cannot serve the interests of the class with the same unswerving devotion as an attorney who has no interest other than representing the class members." Zylstra v. Safeway Stores, Inc., 578 F.2d 102, 104 (5th Cir. 1978).

Snow's choice of and his lack of candor with the Court either at the lead plaintiff stage or at the class certification stage alone should disqualify Snow from acting as class representative; only the IMAX Defendants' diligence uncovered this issue. See, e.g., Jaroslawicz, 151 F.R.D. at 330 n.2; Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998); see also Karnuth v. Rodale, Inc., No. Civ. A. 03-742, 2005 WL 747251 at *3 (E.D. Pa. Mar. 30, 2005) (certification may be denied if credibility issues are "even arguably present"). Moreover, under the PSLRA, plaintiff's choice of class counsel is subject to court approval. See 15 U.S.C. § 77z-1(B)(iii) (2010). Snow's deception thus usurped the "court's discretion . . . to approve or disapprove [plaintiff's] choice of counsel when necessary to protect the interests of the plaintiff class." H. Rep. at 734; S. Rep. at 690-91.[6]

Even had he disclosed the issue to the Court, "the possibility that plaintiff may benefit when his attorneys benefit – either directly by receiving future business from [class counsel] or indirectly by helping a business associate at the expense of the class – casts doubt on whether plaintiff will fairly and adequately protect the interests of the class" and is sufficient to preclude certification.[7] Shields v. Wash. BanCorp., Civ. A. No. 90-1101 (RCC), 1991 WL 221940, at *2 (D.D.C. Oct. 10, 1991); Iron Workers, 616 F. Supp. 2d at 464 (holding that

---

[6] Of course, it was precisely this concern that the PSLRA was enacted to address. Congress specifically targeted "[p]rofessional plaintiffs who . . . permit lawyers readily to file abusive securities class action lawsuits" and who "often receive compensation in the form of bounty payments or bonuses." H.R. Conf. Rep. 104-369, 1995 U.S.C.C.A.N. 730, 731 (Nov. 28, 1995) ("H. Rep."). The PSLRA was also directed against an environment in which it is "easy for lawyers to find individuals willing to . . . fil[e] a class action lawsuit," S. Rep. 104-98, 1995 U.S.C.C.A.N. 679, 691 (June 19, 1995) (emphasis added), which is why Congress, with the PSLRA, "expect[ed] that the plaintiff will choose counsel" rather than, as is the case here, "counsel choosing the plaintiff." H. Rep. at 734; see also Iron Workers, 616 F. Supp. 2d. at 464 (PSLRA enacted to avoid "lawyer-driven" litigation).

[7] The court cannot cure Snow's defect by directing that Snow not use as his counsel.

The question is not but Snow. See Iron Workers, 616 F. Supp. 2d at 466 (class representative must assure that it receives disinterested advice).

putative lead plaintiff was inadequate based on its preexisting financial arrangement with counsel); Jaroslawicz, 151 F.R.D. at 328-30 (denying certification where a plaintiff's "interest in the goodwill of [his lawyers] creates a conflict of interest which disqualifies [him] from serving as class representative"); 5 James W.M. Moore et al., Moore's Federal Practice § 23.25[2][b][vi] (3d ed. 2010) ("a conflict . . . may exist if the class representative stands to benefit directly or indirectly from the goodwill of class counsel created through the class action").

Here, as in those cases, "the financial interests of [Snow] and of the class are not coextensive." Susman v. Lincoln Am. Corp., 561 F.2d 86, 92 (7th Cir. 1977). The class' interests are in the maximum recovery at the minimum cost. Because counsel fees and costs would come from any fund generated by a judgment or settlement, everything else being equal, the less money that the class has to pay for representation, the greater recovery it will receive. See Court Awarded Attorney Fees, 108 F.R.D. 237, 241 (Oct. 8, 1985). As the representative of the absent class members, Snow would be responsible for "carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price." Iron Workers, 616 F. Supp. 2d at 464 (citation omitted); see also Ballan v. Upjohn Co., 159 F.R.D. 473, 486 (W.D. Mich. 1993) (representative should "consider[] the potential cost to the class arising from [litigation decisions]"); Rolex, 136 F.R.D. at 664 (representative must "check the otherwise unfettered discretion of counsel . . . with respect to the economic consequences of the suit.") (citation omitted).

, however, Snow has an interest in "maximizing the 'return' to his counsel" even if that comes out of the pockets of the other class members. Susman, 561 F.2d at 95; . Snow acknowledges that he is one of "hundreds, if not thousands, of members of the proposed Class," Mem. of L., Apr. 22,

2010 ("Snow Br."), at 6. "[P]laintiff's potential recovery in this case is insignificant compared to the likely amount of attorney's fees which would be generated if the case does go forward as a class action." Shields, 1991 WL 221940, at *2; see also Susman, 561 F.2d at 92. The individual charge to Snow himself would be minimal in absolute numbers, but Snow stands to gain in reputation and "good will," factors the courts have found preclude certification. Jaroslawicz, 151 F.R.D. at 328. He also stands to gain in a more tangible way:

(revenue that would be at risk were Snow to take too adversarial a stance toward his client) and

. Under these circumstances, a long line of cases holds that the representative is not adequate. See Susman, 561 F.2d at 93; Shields, 1991 WL 221940, at *2; Iron Workers, 616 F. Supp. 2d at 464; Jaroslawicz,151 F.R.D. at 329-30; In re Quintus, 201 F.R.D. at 481-82.

. That is not a sufficient answer. The choices that counsel make affect the likelihood and size of any recovery, the outcome of a trial or settlement, and the cost of litigation. Even assuming a settlement, the Court's role will be limited to determining post-hoc whether it is fair and adequate and whether plaintiff's counsel's application for fees and costs "is reasonable under the circumstances." MBA v. World Airways, Inc., No. 09-0008-CV, 2010 WL 807724, at *3 (2d Cir. Mar. 10, 2010). Under Rule 23 and the PSLRA, however, it is the class representative – and not the Court – that can and must continuously (and not just at the conclusion) monitor the litigation to ensure that counsel's decisions achieve the

best recovery at the lowest cost. Iron Workers, 616 F. Supp. 2d at 464. If there exists any doubt that the class representative has the interest or ability to discharge those duties, no class should be certified. See, e.g., Susman, 561 F.2d at 95; see also Jaroslawicz, 151 F.R.D. at 329.[8]

**B. Snow Has Failed To Vigorously Prosecute The Class Claims**

Snow's motion is defective, even apart from his conflict of interest, because he has shown neither the interest nor the ability to "monitor[] counsel's performance," Iron Workers, 616 F. Supp. 2d at 464, "check the otherwise unfettered discretion of counsel in prosecuting the suit," In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008), or "protect the interests of the class against the possibly competing interests of the attorneys." Maywalt, 67 F.3d at 1078; see also Saylor v. Lindsley, 456 F.2d 896, 900 (2d Cir. 1972) (plaintiff must be more than the "key to the courthouse door dispensable once entry has been effected"); Iron Workers, 616 F. Supp. 2d. at 463 (PSLRA was intended "to curtail the vice of . . . lawsuits that . . . were initiated and controlled by the lawyers and appeared to be litigated more for their benefit than for the benefit of the shareholders.").

Snow's first activities in this lawsuit have not been auspicious. He filed a false certification with his first application to be lead plaintiff,[9] stating incorrectly that purchases of IMAX stock on December 14, 2004, October 3, 2005, and November 3, 2005 and sales of that stock (all for a loss) on August 10, 2006 constituted all of his "transaction(s) in [IMAX] during the class period," Ex. D (Plaintiff's Corrected Certification of Named Plaintiff Pursuant to

[8] Snow has not taken "precautions to ensure that [it] will not benefit from attorney's fees" nor would such precautions be sufficient. Susman, 561 F.2d at 93. "The factor mandating judicial inquiry is the appearance of impropriety inherent in plaintiff's role as representative of class members' interests vis-à-vis plaintiff's business associate's desire to maximize recovery of attorney's fees from an equitable fund . . . for the benefit of the class." Id.

[9] Snow was not the Court's initial choice to be lead plaintiff. Eight individual plaintiffs filed complaints against the IMAX Defendants between August 11, 2006 and September 13, 2006. See Mem. and Order, Jan. 18, 2007, at 3. Snow did not file a complaint (indeed, he has never filed a complaint). This Court appointed Westchester Capital Management, Inc. ("Westchester Capital"), and not Snow, as lead plaintiff. On June 29, 2009, after Snow filed a motion for reconsideration, the Court appointed him lead plaintiff.

Federal Sec. L., Apr. 29, 2010), and then argued he had losses of $481,327, "the largest financial interest in the relief sought by the class." See Pl. 2006 Br. at 3-4. On this basis, Snow argued that he "satisfie[d] the PSLRA's prerequisite of having the largest financial interest and is presumptively the most adequate plaintiff to represent the class." Id. at 4. However, he omitted a purchase and sale within the class period (at a price that the Complaint alleges to be inflated) that netted Snow a profit of approximately $33,500; he also listed prices that were inaccurate, cumulatively overstating his losses by approximately $45,000 (almost 10% of his claim). See

[10]

Snow disclaimed any intent to deceive the Court but, by his own account, he was reckless. In preparing his certification, Snow simply looked at one document – a brokerage statement from the middle of the class period (dated December 30, 2005) – saw that there were transactions on three dates, and recorded those transactions. He did not look at any other brokerage statements (even though he knew that the December 30 statement would not reflect sales that occurred prior to that month) or even look at the trade confirmations for the three trades reflected on the December 30, 2005 statement – a glaring omission that would have required him only to , and would have quickly revealed the missing trades. Even though Snow averages trades per day, and thus would have had fewer than a half-dozen confirmations to look at each day, Snow testified that

[10] Snow's counsel highlighted the size of Snow's losses in his motion for reconsideration. They stated that Snow "represents the next largest financial interest" and "no opposition was ever filed questioning the size of Snow's financial interest." Mem. Supp. Snow's Mot. for Recons., Apr. 3, 2009, at 11-12. When Steelworkers Pension Trust did question the size of Snow's financial interest, counsel had the temerity to expressly reaffirm its claimed losses. See June 23, 2009 Rosenfeld letter to the Court; Reply Mem. Further Supp. Snow's Mot. for Recons., June 23, 2009, at 3 (accusing Steelworkers of "baseless speculation" and reaffirming that "Snow's financial interest ($481,327) remains unchanged"). Not once before the Court ruled did Snow mention that those figures, and the certification that supported them, were false.

. Snow knew of the error by June 2009, , but did not submit a corrected certification until April 29, 2010, see Ex. D; .

Snow did not show any greater care in his second certification. In that one-page six-paragraph document, he incorrectly stated that he authorized the filing of the Complaint.[11]

. Even then, how could Snow have made this mistake? He must have just blindly and cavalierly relied on counsel.

Snow's false statements do not end there. He stated in his reply memorandum in opposition to Steelworkers' motion for appointment as lead plaintiff that "Snow Capital and its counsel have been closely monitoring this litigation," but . Compare Reply Mem., June 23, 2009, at 4 with

. Only three weeks later, his counsel admitted that they were not in possession of such information. Ex. E (Mark S. Reich Letter). Snow also was directed by the Court to coordinate discovery with Westchester, but .

The Court need not determine whether Snow acted with intent in making these misstatements and failing to disclose the role of . A class representative is a fiduciary and thus must demonstrate honesty, "diligence," "conscientiousness and other . . . personal qualities." Shiring, 244 F.R.D. at 315. If Snow cannot spend the few minutes necessary to ensure the accuracy of his own representations about such basic matters as his trades and his authorization

---

11 In fact, the Complaint was filed on October 2, 2007, after the Court appointed Westchester Capital as lead plaintiff, and at a time when

of the Complaint, what is there to assure he will spend the time and exercise the care to ensure that he, "rather than [] counsel, is in control of the litigation" on behalf of the absent class members? Id. at 316; In re Safeguard Scientifics, 216 F.R.D. 577, 583 n.4 (E.D. Pa. 2003) (plaintiff's failure to include all trades in its certification had a "potential and likely adverse effect on the putative class' interests"); Iron Workers, 616 F. Supp. 2d. at 464.[12]

Indeed, it is evident that to date Snow has not monitored counsel. Even after he was appointed lead plaintiff, Snow still did not (a)

; (b)

; (c)

; (d)

; or

(e)

### C. Snow Is An Atypical Investor

"[C]lass certification is inappropriate where a putative representative is subject to unique defense which threaten to become the focus of the litigation," and there is a "danger that absent class members will suffer if their representative is preoccupied with [such] defenses." Baffa, 222 F.3d at 59-60 (citations omitted) (cited in In re Flag Telecom, 574 F.3d at 40). See also Koos v. First Nat'l Bank, 496 F.2d 1162, 1164 (7th Cir. 1974) (plaintiff improper representative "[w]here it is predictable that a major focus of the litigation will be on an [issue] unique to [it].''); Rolex, 136 F.R.D. at 664.

12 See also Kline v. Wolf, 702 F.2d 400, 403 (2d Cir. 1983) (upholding denial of class certification because plaintiffs' testimony on a critical issue subject to attack); Darvin v. Int'l Harvester, Co., 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (credibility issues arising from plaintiff's deposition "could become the focus [of] unique defenses at trial, to the detriment of the class"). Cf. Savino, 164 F.3d at 87.

Snow is an atypical class member because he purchased his IMAX shares prior to the representations at the heart of this case, did not rely on the alleged misrepresentations pled in the Complaint as to even the prior class period, and did not rely on the efficiency of the market. Any of these factors – without any of the questions regarding adequacy – precludes class certification. Together, they demonstrate the very danger to absent class members if a named plaintiff is "preoccupied with defenses unique [to him]." Zemel Family Trust v. Philips Int'l Realty Corp., 205 F.R.D. 434, 436 (S.D.N.Y. 2002).

1. Snow Purchased Prior To The Central Alleged Misrepresentations

The central allegation in this case is that, in Q4 2005, IMAX violated GAAP in its application of multiple element arrangement accounting ("MEA") to theater system installations, and recorded such revenue in its annual earnings release on February 17, 2006 and its Form 10-K on March 9, 2006. See, e.g., Compl. ¶¶ 100-03, 116-18. Plaintiff alleges that IMAX's stock price dropped dramatically on August 10, 2006 when IMAX announced that it faced an SEC investigation related to MEA application in Q4 2005. Compl. ¶ 115.[13]

However, Snow is atypical of the class. MEA-related issues dominate for the overwhelming majority of the class, i.e. purchasers of IMAX stock after February 17, 2006, Allen Rpt. at 30-32, but Snow's purchases predate February 17, 2006. In fact, few investors who held IMAX stock on August 9, 2006 – at the time of the alleged first corrective disclosure – purchased their stock prior to February 17. See id. (7% of the institutional investors that purchased IMAX stock in the fourth quarters of 2004 and 2005 – as Snow did – compared to 50% of those who purchased in the first quarter of 2006, held through the third quarter of 2006).

Snow's time of purchase also makes his interests diametrically opposed to those of most class members. It is in Snow's interest to establish that IMAX stock was inflated as

[13] Attached to the Declaration of Lucy Allen, Ph.D, dated June 10, 2010.

much as possible by the pre-February 16, 2006 statements (when he made his purchases) and not by the post-February 16, 2006 statements. The interests of the vast majority of the class are the opposite since they purchased after February 17, 2006. See Allen Rpt. at 30-33;[14] see also WMK § 1768 (plaintiff "cannot adequately protect the class if [his] interests are antagonistic to or in conflict with the objectives of those being represented"); Kline, 702 F.2d at 402 (even the potential for a unique defense defeats class certification).

2. Snow Did Not Rely On The Alleged Misrepresentation

The Complaint alleges that the "reasonable reader of the 2004 10-K is led to believe that multiple element accounting was being applied in only . . . limited circumstances." Compl. ¶ 52. Snow did not have that understanding – he testified that,

.[15] Such material contradictions between Snow's position and the allegations in the complaint make him an inadequate representative. See Savino, 164 F.3d at 87 (upholding denial of certification where plaintiff's deposition contradicted a significant complaint allegation).

Further, Snow seeks damages based on the stock price drop following the alleged corrective disclosures beginning in August 2006 and continuing until July 2007. See Compl. ¶ 229. However, the August 9 disclosure only related to theater systems recognized in or after the fourth quarter of 2005, Ex. F (IMAX Corp. Press Release Aug. 9, 2006), and thus cannot have been a corrective disclosure for Snow and others who purchased stock before February 17, 2006, when the financials for the fourth quarter of 2005 were released. See also Allen Rpt. at

---

14 See also PwC Opp. at 6-7.
15 On examination by his counsel,

28-30. Thus, Snow is not a typical investor. See In re Omnicom Group, Inc. Sec. Litig., 597 F.3d 501, 513 (2d Cir. 2010) (appellant failed to show a price decline where the purported corrective disclosure did not include any new information regarding the alleged fraud); Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 (2d Cir. 2005). Snow also sold on August 10, 2006 – prior to a corrective disclosure relating to any IMAX financials issued before it purchased and, thus, cannot establish loss causation. See id.; Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342-43 (2005) (absence of corrective disclosure fatal to plaintiff's claim).

3. Snow Did Not Rely On Market Efficiency

Snow is also atypical because he invests based on

, the central premise upon which class reliance is based. Compare with Compl. ¶¶ 27-30.

.[16] This characteristic alone precludes certification. See Rocco v. Nam Tai Electronics, Inc., 245 F.R.D. 131, 136 (S.D.N.Y. 2007) (representative atypical who relied "not on the market, but on his own assessment of the value of the stock.").[17]

## III. SNOW'S CLASS ACTION IS NOT "SUPERIOR" TO THE ALREADY-CERTIFIED SECURITIES CLASS ACTION IN CANADA

Under Rule 23(b)(3), an opt-out class may only be certified where "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). Where an opt-out class action would be either more (1) unfair or (2) inefficient than some other method for adjudicating the dispute, class

---

[16] On examination by his counsel, Snow testified that

[17] See also Safeguard, 216 F.R.D. at 583 (rejecting class representative who did not rely on market efficiency); In re Harcourt Brace Jovanovich, Inc. Sec. Litig., 838 F. Supp. 109, 113 (S.D.N.Y. 1993) ("[a] named plaintiff who is subject to an arguable defense of non-reliance on the market has been held subject to a unique defense, and therefore, atypical of the class under Rule 23(a)(3)."); PwC Opp. at 4-6, 11-13.

certification should be denied. See Teamsters II, 546 F.3d at 202. In determining whether the superiority requirement is satisfied, the Court must consider, inter alia: (i) the extent to which class members have an interest in prosecuting their claims individually; (ii) litigation already pending by or against members of the class; (iii) the desirability of concentrating the claim in a particular forum; and (iv) potential difficulties in the management of a class. Fed. R. Civ. P. 23(b)(3)(A)-(D). Snow expressly concedes that "[i]t is unquestionable that the parties (and this Court) have an interest in this litigation proceeding in a single forum." Snow Br. at 25. If his motion were granted, however, that interest would be undermined.

**A. There Is Already A Certified Canadian Class Action**

On September 20, 2006, long before a motion for class certification was filed here, two Canadian shareholders who purchased after February 17, 2006 sued IMAX and its officers and directors, in Ontario Superior Court, on behalf of purchasers of IMAX stock from February 17 to August 9, 2006, alleging nearly identical claims of misrepresentations and fraud pursuant to the Ontario Securities Act ("OSA") and Canadian common law. Ex. H (Silver v. IMAX Corp., No. CV-06 3257-00, [2009] O.J. No. 5585 (S.C.J.), Statement of Claim, Sept. 20, 2006). See Report of Professor Poonam Puri, Feb. 23, 2009 ("Puri Rpt.") ¶¶ 145-46, 166-73, 182, 189, 191, 194, 199, 203 (describing claims and allegations in that action).[18]

On December 14, 2009, over IMAX's objection, the Ontario Superior Court certified a global class of investors who purchased IMAX stock between February 17, 2006 and August 9, 2006. See Canada Decision. The Court noted: "a global class, would serve judicial economy by permitting common issues to be determined on a single occasion, thereby avoiding duplication of fact-finding and legal analysis, as well as the potential for inconsistent results if

[18] Attached to the Declaration of Professor Poonam Puri, dated June ___, 2010.

litigation were pursued ... in various jurisdictions." Id. at ¶ 216 (emphasis added).[19] The IMAX Defendants disagree with that decision, and have taken all necessary steps to appeal it. As long as there is a global class action pending in Canada, however, no class should be certified here.

**B. The U.S. Class Action Is Not Superior**

Snow does not even attempt to show that a United States class action is "superior" to the Canadian global class action "for fairly and efficiently adjudicating the controversy."

There could be no claim that Canadian action is "inferior." Courts in this District have expressly concluded that "Ontario, Canada is an adequate forum to try class actions based on violations of federal securities laws." In re Royal Group Techs. Sec. Litig., No. 04 Civ. 9809 (HB), 2005 WL 3105341, at *2 (S.D.N.Y. Nov. 21, 2005); see also DeYoung v. Beddome, 707 F. Supp. 132, 137 (S.D.N.Y. 1989). Canadian plaintiffs seek relief similar to that sought here and will have to satisfy a standard lesser than the scienter required here. See Puri Rpt. ¶¶ 145-206 (overview of Canadian securities laws). The plaintiffs representing the absent members there have been prosecuting their lawsuit aggressively; they have received documents and taken the testimony of ten witnesses (including IMAX's two co-CEOs, its then CFO, the head of its Audit Committee, and the relevant PwC audit partner). And, unlike this Court, see PwC Opp. at 20-22, the Ontario Superior Court has held that it can grant full relief to a global class.[20] See Canada Decision.

Class actions are warranted because they "eliminate[] the possibility of repetitious litigation." Eisen, 391 F.2d at 560. Where "litigation concerning the controversy [has] already

---

[19] Although IMAX has sought leave to appeal this decision, the Canadian plaintiffs have opposed that application and the appellate court has not yet ruled. See Puri Rpt. at n. 219. Should their motion for leave to appeal be granted, the IMAX Defendants would be prepared to provide the Court with all papers associated with the appeal.

[20] In any event, the possibility that less favorable substantive law will be applied in the foreign forum is relevant only when the "remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981).

[been] commenced by . . . members of the class," that justification no longer is present. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 616 (1997); see also Lewis Tree Serv., Inc. v. Lucent Tech. Inc., 211 F.R.D. 228, 230 n.2 (S.D.N.Y. 2002) (class action not superior where class has already been certified in another case); Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 107 (10th Cir. 1971); Swergold v. Lifetime Corp, No. 93 Civ. 4877 (RPP), 1993 WL 512905, at *4 (S.D.N.Y. Dec. 3, 1993) (court has discretion to "promote judicial efficiency" by refusing to permit two litigants to "engage in needless duplicative efforts"). Cf. In re Prudential Ins. Co. of Am. Sales Practice Litig., 261 F.3d 355, 370 (3rd Cir. 2001) (upholding district court's prohibition of class members from pursuing duplicative class actions). Certification of a second class would create the problems Rule 23 was designed to avoid: "unnecessary litigation and duplicative fees,[21] . . . delay, . . . complicated problems of judicial coordination . . ., disparate verdicts . . ., and . . . unequal distribution of [recovery] funds." WMK § 1798.1.

To identify only a few of the issues created by dual overlapping certified classes:

- Discovery limitations. This Court has the authority and responsibility under Fed. R. Civ. P. 23(d), 26(b)(iii) to "prescribe measures to prevent undue repetition or complication in presenting evidence or argument" and to enter a protective order to prevent "undue burden or expense." Canadian law has similar provisions but applies them differently. Puri Rpt. ¶¶ 84, 102. Dual class actions would undermine those rules, as the losing party in one jurisdiction would have the right (and duty) to seek discovery denied to it in the first.

- Overlapping judgments. A judgment in a Rule 23(b)(3) class action is binding on all except those who opt out. See, e.g., Mitchell v. Metro. Life Ins. Co., No. 03-Civ-10294 (WHP), 2004 WL 2439704, at *1 (S.D.N.Y. Nov. 2, 2004). Canada has a similar rule. Puri Rpt. ¶ 27. The courts would need to coordinate notices of the class action (with additional expense and burden). If, as is customary, there are few opt outs in each jurisdiction, then the certification of a second class action would give rise to the risk of an unseemly manipulation of court schedules – as each set of plaintiffs' lawyers presumably would try to get to judgment first (thereby precluding the second action).[22]

[21] See Glauser v. Evci Career Colleges Holding Corp., 236 F.R.D. 184, 190 (S.D.N.Y. 2006) ("[T]he class is best served by having one Lead Plaintiff and one Lead Counsel to minimize legal fees.").

[22] If a court rules in favor of defendants, the plaintiffs seemingly would have the opposite interest – to delay entry of judgment to avoid preclusion. In either event, there would be a duplication of judicial effort.

- Settlement. Once a class is certified in the United States, the "claims, issues [and] defenses" of class members "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Canada applies a similar rule – though it has a different standard of fairness. Puri Rpt. ¶¶ 109-14. Thus, even if the Canadian plaintiffs, the judge, and the defendants all believe that a settlement is fair under Canadian standards, those parties could not settle without obtaining the additional approval of the U.S. court. By the same token and seemingly contrary to Rule 23, this Court could not effectively approve a settlement of the class claims here without making it conditional upon the approval of the Canadian court (after satisfaction of all appeals).

These issues might be managed with enough judicial ingenuity and resources. Defendants are not aware, however, of any other case in which courts in two countries have certified overlapping global classes on the same claim. And, there is no reason to do so here. Cf. Landis v. N. Am. Co., 299 U.S. 248, 254 (1936) (holding that courts may stay proceedings in deference to foreign action even if parties and issues are not identical). If Snow does not desire to participate in the Canadian class, he can opt out. If he participates and then objects to a settlement, he can make his objection there. This court should not now enter an order the only effect of which may be to delay resolution by creating two competing sets of litigation.

**C. U.S. Courts Have Found That Canada Provides An Adequate Forum For Relief**

Courts in two related contexts have held that Canadian courts provide an adequate forum for resolution of securities claims. Those precedents support denial of the motion here.

First, courts have stayed or dismissed litigation filed in U.S. courts in deference to parallel "previously filed Canad[ian] action[s]." See Canada Life Assurance Co. v. Converium Ruckversicherung, No. 06-Civ-3800 (GEB), 2007 WL 1726565, at * 6 (D.N.J. June 13, 2007) (stay granted to avoid duplicative litigation, in light of Canadian suit being filed first and the substantive similarities between U.S. and Canadian law); Paraschos v. YBM Magnex Int'l, 130 F. Supp. 2d 642, 646 (E.D. Pa. 2000) (dismissing on comity grounds U.S. class action which "mirror[ed] the same securities fraud . . . by virtually the same proposed class" in Canada).

Second, courts have not hesitated to stay or dismiss an action based on forum non conveniens where – as here – there is related litigation in Canada, the parties and issues are virtually identical, the relief is adequate, the Canadian action is further along, and the defendant is a Canadian corporation. See VictoriaTea.com, Inc. v. Cott Beverages, Canada, 239 F. Supp. 2d 377 (S.D.N.Y. 2003). Courts have recognized that "Canadian law provides causes of action that are the same in all significant respects as those available under [U.S.] law." DeYoung, 707 F. Supp. at 137; Paraschos, 130 F. Supp. 2d at 647; Fleeger v. Clarkson Co. Ltd., 86 F.R.D. 388, 392-93 (N.D. Tex. 1980).[23] None of the absent class members have chosen the U.S. as a forum – at least two would rather litigate in Canada. This Court should not presume that the remainder wish to litigate in the U.S. in a class action where they will be represented by Snow.

**D. It Is Irrelevant That The U.S. Action Names PwC And Has A Longer Class Period**

There are two differences between this action and the Canadian action: the Canadian plaintiffs chose not to name PwC and to allege a different class period. A U.S. lead plaintiff has the prerogative under the PSLRA to "decide what claims to assert" on the class' behalf and what not to assert. In re Bank of Am. Corp. Sec. Deriv. & ERISA Litig., No. 09 MDL 2058 (DC), 2010 WL 1438980, at *2 (S.D.N.Y. Apr. 9, 2010); In re Lehman Bros. Sec. & ERISA Litig., No. 09 MD 2017 (LAK), 2010 WL 1566860, at *1 (S.D.N.Y. Apr. 21, 2010) (rejecting plaintiffs' attempt to assert additional claims as undermining lead plaintiff's authority). The fact that a Canadian plaintiff has exercised this prerogative does not make its action inferior.

First, there are ample reasons why the Canadian plaintiffs would have chosen not to allege a class period earlier than February 17, 2006 or later than August 9, 2006. There is no reason to believe any substantial number of persons who purchased prior to February 2006 still

[23] Moreover, the Canadian court can apply U.S. law. Howe v. Goldcorp Invs. Ltd., 946 F.2d 944, 952 (1st Cir. 1991); see Canada Decision at ¶ 220.

held after August 9. See Allen Rpt. at 30-33.[24] There is also significant reason to doubt that any pre-February 2006 purchaser who did hold would have suffered damages and thus have a claim for relief. IMAX's August 9, 2006 release announced that the Company was responding to an informal SEC inquiry regarding revenue recognized for theater systems in the fourth quarter of 2005 and was followed by a 40.4% drop in stock price. On that basis, this Court found sufficient allegations of loss causation – with respect to purchasers who relied on the statements that were the subject of the corrective disclosures. In re IMAX Sec. Litig., 587 F. Supp. 2d 471, 482-83 (S.D.N.Y. 2008) ("IMAX"). The August 9 release, however, did not make any statements with respect to pre-2005 financials. Indeed, it stated the "Company believes its application of the above accounting policy is, and has historically been, in accordance with GAAP, and the Company's position is supported by its auditors [PwC]." Ex. F; see In re Omnicom, 597 F. 3d at 513 (purported disclosure did not include any new information regarding the alleged fraud); Lentell, 396 F.3d at 175 (neither the alleged fraudulent statement nor corrective disclosure caused the loss).

Further, Snow faces substantial questions regarding market efficiency prior to February 2006. Plaintiff's expert relied on aggregate data including the period from February 2006 through July 2007 but admitted that the fact that a market may have been efficient at one point does not mean that it was efficient earlier. See Ex. I (Marek Dep. Tr.) at 219:16-21. Notably, Marek's event study – perhaps the most important test of market efficiency – did not look at whether the market was efficient during the earlier part of the class period. Id. at 181:4-5. Finally, the allegations related to the 2002-2004 IMAX 10-Ks are significantly different from the allegations related to the 2005 10-K. See IMAX, 587 F. Supp. 2d at 482-83 (drawing a

24 Canadian plaintiffs' decision to plead a class period ending on August 9, 2006 was sound. Indeed, originally, all plaintiffs and movants for lead plaintiff in the U.S. action "agree[d] that the relevant class period ended on August 9, 2006." Kaplan v. Gelfond, 240 F.R.D. 88, 91 (S.D.N.Y. 2007).

distinction between 2002–2004 and 2005–2006 financial statements).[25] Snow cannot satisfy Rule 23 even with respect to the pre-February 2006 class. The fact that he has tacked those claims on to a class already certified in Canada does not permit him to represent such purchasers.

Second, this Court has already recognized the exceedingly high burden the plaintiffs face in a case against PwC. See IMAX, 587 F. Supp. 2d at 483-85. The Canadian plaintiffs did not need to take on that burden to avoid being labeled inferior. Under both Canadian statutory and common law, each defendant can be jointly and severally liable for proven losses, regardless of the presence of PwC. See Puri Rpt. ¶¶ 183-87, 203-06. The case law clearly holds that relief available in Canada is adequate. See supra at pp. 20, 23. It is irrelevant that the U.S. plaintiff would spread that relief by naming PwC whereas the Canadian plaintiffs have focused their fire on the IMAX Defendants.

## IV. THE CLASS CAN NOT BE CERTIFIED AS PLED

Even assuming that Snow satisfied the other elements of Rule 23, common issues do not predominate between the persons who purchased prior to February 17, 2006 and those who purchased between February 17, 2006 and August 9, 2006. Thus, Snow cannot bring this action on behalf of those who purchased after February 17, 2006. See, e.g., Charron v. Pinnacle Group NY LLC, No. 07 Civ. 6313 (CM), 2010 WL 1752501 (S.D.N.Y. Apr. 27, 2010).[26]

---

[25] E.g., this Court recognized that the scienter allegation with respect to the two periods are distinct. See id.

[26] Plaintiff acknowledges – as he must – that the majority of the revenue restated came from 2005. See Compl. ¶¶ 144, 146, 147; see also Snow Tr. at 76:12-24 (conceding that misstatements on or after February 17, 2006 are irrelevant to the issues faced by him and others who purchased before that date). For 2002, the Restatement shifted only one theater (out of 16 originally recognized) into a later period; thus, an investor who purchased before IMAX's 2003 10-K was filed must show that this single installation was material. No theater system revenue was shifted in 2003 and thus an investor who purchased before the 2004 10-K was filed in March 2005 (the period that includes Snows' initial purchase of 50,000 shares) must show that this same single installation in 2002 was material out of the total mix of information. For 2004, the only allegation is that the 2004 10-K was misleading in "fail[ing] to disclose that it was actually applying [MEA] inappropriately." Compl. ¶ 52. Given that no installation revenue from 2002-2004 was restated because of MEA errors, see MacNeil Aff. ¶ 47, materiality would be a significant part of any case regarding the pre-2005 financial statements. See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 197 (2d Cir. 2009) (materiality is "a fact-specific inquiry").

**CONCLUSION**

For the foregoing reasons and those in PwC's opposition, the IMAX Defendants respectfully request that this Court deny Plaintiff's Motion for Class Certification or, in the alternative, limit the class period to February 17, 2006 through August 9, 2006.

Dated: New York, New York
June 10, 2010

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: ______________________
Lewis J. Liman

One Liberty Plaza, New York, New York 10006
(212) 225-2000
Attorneys for IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble

# EXHIBIT K-3

This is Exhibit "K-3" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | Master File No. 06 Civ. 6128 (NRB) |

**DEFENDANT PRICEWATERHOUSECOOPERS LLP'S, AN ONTARIO LIMITED LIABILITY PARTNERSHIP, MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

**PORTIONS REDACTED**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100
Facsimile: (214) 698-3400

**ATTORNEYS FOR DEFENDANT PRICEWATERHOUSECOOPERS LLP, AN ONTARIO LIMITED LIABILITY PARTNERSHIP**

THIS MEMORANDUM CONTAINS CONFIDENTIAL INFORMATION. PURSUANT TO ¶ 7 OF THE STIPLUATION AND ORDER GOVERNING CONFIDENTIAL MATERIAL, ENTERED NOVEMBER 3, 2008, PORTIONS OF THE ELECTRONICALLY-FILED MEMORANDUM HAVE BEEN REDACTED AND AN UNREDACTED COPY HAS BEEN FILED WITH THE COURT UNDER SEAL

PORTIONS REDACTED

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT .....1

II. ARGUMENT .....2

A. Standards Applicable To Class Certification .....2

B. Class Certification Should Be Denied Because Snow Capital Does Not Satisfy The Typicality And Adequacy Requirements Of Rule 23(a) .....4

1. Because Snow Capital Is Subject To A Unique Defense, Snow Capital's Claims Are Atypical Under Rule 23(a)(3) And Snow Capital Cannot Adequately Represent The Proposed Class .....4

2. Snow Capital Cannot Satisfy The Adequacy Requirements Of Rule 23(a)(4) Because Its Economic Interests Conflict With Those Of Absent Class Members .....5

a. Snow Capital's Economic Interests With Respect To Its Individual Claim Impermissibly Conflict With Those Of Absent Class Members .....6

b. Snow Capital's Relationship With Its Counsel Creates An Impermissible Economic Interest That Conflicts With Those Of Absent Class Members .....7

3. Snow Capital Cannot Satisfy The Adequacy Requirements Of Rule 23(a)(4) Because It Has Failed To Vigorously Prosecute The Class Claims .....9

C. Class Certification Must Be Denied Because Snow Capital Fails To Prove That Common Issues Predominate Over Individual Issues As Required By Rule 23(b)(3) .....10

1. Because Snow Capital Seeks To Establish Predominance By The Fraud-on-the-Market Presumption, It Must Make A Showing of Loss Causation By A Preponderance Of All Admissible Evidence At The Class Certification Stage .....10

2. Snow Capital Is Not Entitled To The Fraud-on-the-Market Presumption Of Reliance Because It Fails To Make The Requisite Showing Of Loss Causation .....12

D. If The Court Grants Certification, The Class Period Should Extend No Later Than August 9, 2006. .....17

E. If The Court Grants Certification, In-and-Out Shareholders Who Bought Prior To August 9, 2006 Should Be Excluded From The Class Because They Cannot Prove Loss Causation As A Matter Of Law .....18

F. If The Court Grants Certification, Foreign Purchasers Of Shares Traded On A Foreign Exchange Must Be Excluded From The Class Because The Court Does Not Have Subject Matter Jurisdiction Over Such Claims .....19

III. CONCLUSION .....20

**PORTIONS REDACTED**

## TABLE OF AUTHORITIES

### CASES

*Alaska Elec. Pension Fund v. Pharmacia, Corp.*, No. 03-1513 (AET), 2007 WL 276150 (D.N.J. Jan. 25, 2007) .......... 17
*Alfadda v. Fenn*, 935 F.2d 475 (2d Cir. 1991) .......... 19
*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) .......... 5, 6
*Baffa v. Donaldson*, 222 F.3d 52 (2d Cir. N.Y. 2000) .......... 4
*Basic v. Levinson*, 485 U.S. 224 (1988) .......... 5, 10, 11
*Berger v. Compaq Computer Corp.*, 257 F.3d 475 (5th Cir. 2001) .......... 7, 9
*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005) .......... passim
*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006) .......... 3
*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176 (2d Cir. 1990) .......... 4
*Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 8917, 1997 WL 621111 (S.D.N.Y. Oct. 6, 1997) .......... 5
*In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157 (S.D.N.Y. 2010) .......... 12
*In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266 (S.D.N.Y. 2006) .......... 14
*In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29 (2d Cir. 2009) .......... 11, 12, 18
*In re Gaming Lottery Sec. Litig.*, 58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999) .......... 20
*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008, as amended January 16, 2009) .......... 3
*In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298 (S.D.N.Y. 2005) .......... 11, 15
*In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006) .......... passim
*In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855, 2003 WL 22077464 (S.D.N.Y. Sept. 8, 2003) .......... 19
*In re Quintus Sec. Litig.*, 201 F.R.D. 475 (N.D. Cal. 2001) .......... 8
*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001) .......... 5, 7
*In re Williams Sec. Litig.*, 558 F.3d 1130 (10th Cir. 2009) .......... 15
*In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69 (E.D.N.Y. 2008) .......... 18
*Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization*, 616 F. Supp. 2d 461 (S.D.N.Y. 2009) .......... 8, 10
*Itoba Ltd., v. LEP Group, PLC*, 54 F.3d 118, (2d Cir. 1995) .......... 19
*Jaroslawicz v. Safety Kleen Corp.*, 151 F.R.D. 324 (N.D. Ill. 1993) .......... 8
*Kaplan v. Gelfond*, 240 F.R.D. 88 (S.D.N.Y. 2007) .......... 17
*Landry v. Price Waterhouse*, 123 F.R.D. 474 (S.D.N.Y. 1989) .......... 5
*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) .......... 11
*Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161 (2d Cir. 2005) .......... 13, 18
*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000) .......... 19
*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2d Cir. 1995) .......... 9
*Morrison v. Nat'l Australia Bank, Ltd.*, 547 F.3d 176 (2d Cir. 2008) .......... 20
*Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105 (S.D.N.Y. 1993) .......... 19
*Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007) .......... 10, 11
*Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 163 F.R.D. 658 (D. Or. 1991) .......... 9
*Shields v. Washington BanCorp.*, No. 90-1101, 1991 WL 221940 (D.D.C. Oct. 10, 1991) .......... 7, 8

PORTIONS REDACTED

*Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307 (E.D. Va. 2007) .......... 10
*Susman v. Lincoln Am. Corp.*, 561 F.2d 86 (7th Cir. 1977) .......... 8
*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir. 2008) .......... 3, 10, 11, 12
*Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466 (S.D.N.Y. 1983) .......... 5

## RULES

Federal Rule of Civil Procedure 23 .......... 1, 3, 4, 6

**PORTIONS REDACTED**

Defendant PricewaterhouseCoopers LLP ("PwC-Canada"), an Ontario limited liability partnership, respectfully submits this memorandum of law in opposition to Plaintiff's Motion for Class Certification.[1]

## I. PRELIMINARY STATEMENT

Lead Plaintiff Snow Capital Investment Partners, L.P. ("Snow Capital") seeks the Court's certification of a single class of "those persons who acquired the common stock of defendant IMAX Corporation ("IMAX or the "Company") between February 27, 2003 and July 20, 2007, inclusive (the "Class Period"), and were damaged thereby." (Dkt. 125 at p. 1.) As the party seeking class certification, Snow Capital has the burden of demonstrating by a preponderance of the evidence that it meets all of the requirements of Federal Rule of Civil Procedure 23 ("Rule 23").

Snow Capital has failed to meet its Rule 23 burden. First, Snow Capital does not satisfy the typicality and adequacy requirements of Rule 23(a) because (i) Snow Capital is atypical and cannot adequately represent the proposed class because Snow Capital is subject to a unique defense based on its investment strategy; (ii) Snow Capital, due to the timing of its purchases of IMAX stock, has an economic incentive to minimize the impact of the majority of alleged misstatements, creating an intra-class conflict that renders Snow Capital an inadequate class representative; (iii) Snow Capital's relationship with its counsel, Al Yates, creates an impressible economic interest that conflicts with those of the absent class members; and (iv) Snow Capital has failed to monitor and vigorously prosecute this class action.

Second, Snow Capital cannot establish that common issues predominate over individual issues under Rule 23(b). Although Snow Capital seeks to establish the reliance element of its

---

[1] Defendants IMAX Corporation ("IMAX"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble (collectively, the "IMAX Defendants") have filed a separate opposition to Plaintiffs' Motion for Class Certification (the "IMAX Opp."). PwC-Canada hereby joins in and incorporates the IMAX Opp. in all respects.

PORTIONS REDACTED

claims under Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)") through the "fraud-on-the-market" presumption, it cannot do so because Snow Capital has not established the causal link between the alleged misstatements and their alleged losses by a preponderance of the evidence.

Third, if certification is granted, the class period should end no later than August 9, 2006 because the curative disclosure alleged by Snow Capital was made on that date and, indeed, Snow Capital sold all its IMAX stock the following day.

Fourth, if certification is granted, in-and-out shareholders who bought and sold prior to August 9, 2006 should be excluded because such shareholders will not be able to show loss causation as a matter of law because of the absence of any alleged corrective disclosure prior to August 9, 2006.

Finally, if certification is granted, foreign purchasers of IMAX stock traded on the Toronto Stock Exchange (the "TSE") should be excluded from the class because the Court does not have subject matter jurisdiction over those claims.

## II. ARGUMENT

### A. Standards Applicable To Class Certification

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006) ("*In re IPO*").[2] Rule 23(a) states that a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect

[2] Unless otherwise indicated, all emphasis is added and all internal quotations and citations omitted.

the interests of the class." Fed. R. Civ. P. 23(a). A party seeking class certification must also satisfy at least one of the subparts of Rule 23(b). Snow Capital seeks certification here under Rule 23(b)(3) which requires a plaintiff to show "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

On a motion for class certification, a plaintiff bears the burden of producing sufficient admissible evidence, beyond the mere allegations in the complaint, to demonstrate that it satisfies all of the requirements of class certification under Rule 23. *See In re IPO*, 471 F.3d at 41 ("[T]he district judge must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met."); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 140 (S.D.N.Y. 2006). It is insufficient for a plaintiff merely to make "some showing" that the requirements of Rule 23 have been satisfied. *In re IPO*, 471 F.3d at 42. Rather, a plaintiff must prove by a preponderance of the evidence that the requirements of Rule 23 have been met. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008, as amended January 16, 2009).

"[A] district judge may not certify a class without making a ruling that each Rule 23 requirement is met." *In re IPO*, 471 F.3d at 27. "Such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." *Id.* at 41. A district court's ruling on class certification must be the result of a "definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues." *Id.* "[T]he fact that a Rule 23

requirement might overlap with an issue on the merits does not avoid the court's obligation to make a ruling as to whether the requirement is met." *Id.* at 27.

**B. Class Certification Should Be Denied Because Snow Capital Does Not Satisfy The Typicality And Adequacy Requirements Of Rule 23(a)**

**1. Because Snow Capital Is Subject To A Unique Defense, Snow Capital's Claims Are Atypical Under Rule 23(a)(3) And Snow Capital Cannot Adequately Represent The Proposed Class**

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement of Rule 23(a)(3) is not satisfied, and therefore class certification is inappropriate, "where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Baffa v. Donaldson*, 222 F.3d 52, 59 (2d Cir. N.Y. 2000) (citing *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

Snow Capital's distinctive investment strategy gives rise to a unique defense, thus defeating typicality. [redacted]

[3] Unless otherwise indicated, references to Exhibits ("Exh.") refer to Exhibits to the Lunn Decl.

PORTIONS REDACTED

In other words, Snow Capital relied on the belief that the market for IMAX stock *did not* correctly incorporate information about the stock and that Snow Capital could profit from that market *inefficiency*. *See Basic v. Levinson*, 485 U.S. 224, 248 (1988) ("Any showing that severs the link between the alleged misrepresentation and . . . [plaintiff's] decision to trade at a fair market price will be sufficient to rebut the presumption of reliance.").[4] Further, Snow Capital's stance that the market is inefficient will color any argument that it makes that the market for IMAX stock immediately absorbs all public information – an argument that will need to be asserted on behalf of less sophisticated class members who intend to rely on the fraud-on-the-market presumption of reliance available under *Basic*.

This unique defense against Snow Capital, and the time Snow Capital will need to devote to attempting to rebut it, "may have the ultimate effect of prejudicing members of the proposed class." *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466, 1471 (S.D.N.Y. 1983). Because a unique defense makes Snow Capital's claims atypical under Rule 23(a) and prevents Snow Capital from adequately representing the remainder of the class, Snow Capital cannot serve as class representative.

**2. Snow Capital Cannot Satisfy The Adequacy Requirements Of Rule 23(a)(4) Because Its Economic Interests Conflict With Those Of Absent Class Members**

Rule 23(a)(4) provides that, to obtain class certification, a plaintiff must show that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This rule requires courts to inquire whether the proposed class representative's interests "are antagonistic to the interest of other members of the class." *In re Visa Check/MasterMoney*

4 "The defendant need not show at the certification stage that the unique defense will prevail, only that it is meritorious enough to require the plaintiff to 'devote considerable time to rebut the unique defense.'" *Hallet v. Li & Fung, Ltd.*, No. 95 Civ. 8917, 1997 WL 621111 at *3 (S.D.N.Y. Oct. 6, 1997) (*quoting Landry v. Price Waterhouse*, 123 F.R.D. 474, 476 (S.D.N.Y. 1989)).

**PORTIONS REDACTED**

*Antitrust Litig.*, 280 F.3d 124, 142 (2d Cir. 2001) (citing *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997)).

a. **Snow Capital's Economic Interests With Respect To Its Individual Claim Impermissibly Conflict With Those Of Absent Class Members**

Snow Capital alleges in the Complaint that, as a result of inflation caused by the alleged misrepresentations, the purported class members purchased stock at artificially high prices. (Dkt. 46 at ¶ 230.) At the damages stage, Snow Capital will be required to show the inflationary impact of each of the alleged misstatements—and will only be able to recover damages for artificial inflation that was incorporated into the stock price at the time of purchase. *See generally Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-43 (2005).

Snow Capital purchased all of its IMAX stock between December 14, 2004 and November 3, 2005. (Exh. B to the Lunn Dec. (Corrected Certificate of Named Plaintiff).) Snow Capital, therefore, will only be able to recover for damages suffered as a result of alleged misstatements made before November 3, 2005. Thus, Snow Capital has a strong incentive to pursue a legal strategy that maximizes the inflationary impact of pre-November 3, 2005 statements and minimizes the impact of post-November 3, 2005 statements. The Complaint, however, focuses heavily on the alleged misstatements regarding IMAX's *2005* financial results – which were not announced until February 17, 2006.[5] (Dkt. 46 at ¶¶ 95-114.)

Because of Snow Capital's economic interests, its best legal strategy would be to downplay these later, but proportionally significant, alleged misrepresentations – embracing a weaker strategy for class members who purchased IMAX stock after February 17, 2006. Such economic conflicts

---

[5] Snow Capital seeks certification of a class of "all persons and entities who purchased or otherwise acquired IMAX common stock from February 27, 2003 through July 20, 2007." (Dkt. 125 at 2.) Such proposed class would necessarily include persons who purchased after November 3, 2005 and who, unlike Snow Capital, would be able to recover damages, if any, for artificial inflation as a result of post-November 3, 2005 alleged misstatements..

are at the heart of the intraclass conflict problem described by *Amchem* and its progeny -- "their anticipated recoveries depend on and are maximized by different theories and economic assumptions; those theories and assumptions are incompatible or (at best) incoherent when advanced at once; there are winners and losers in the class; and the distribution of those competing interests creates a problem that cannot be resolved by subclass representatives." *In re Visa Check/MasterMoney*, 280 F.3d at 158 (Jacobs, J. dissenting). Therefore, Snow Capital does not satisfy the adequacy requirements of Rule 23(a) and cannot be appointed as a class representative.

**b. Snow Capital's Relationship With Its Counsel Creates An Impermissible Economic Interest That Conflicts With Those Of Absent Class Members**

The Private Securities Reform Act of 1995 (the "PSLRA") demands that "competent plaintiffs, rather than lawyers, direct" a securities class action. *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 484 (5th Cir. 2001). "[T]he possibility that plaintiff may benefit when his attorneys benefit—either directly by receiving business from [its counsel] or indirectly by helping a business associate at the expense of the class—casts doubts on whether plaintiff will fairly and adequately protect the interests of the class." *Shields v. Washington BanCorp.*, No. 90-1101, 1991 WL 221940, at *2 (D.D.C. Oct. 10, 1991).[6]

In October 2006, Snow Capital represented to this Court that it "ha[d] selected [Robbins Geller's predecessor firm] to represent it and the class." (Dkt. 14 at 3.) [redacted]

[6] *See also* IMAX Opp. at pp. 7-12.

**PORTIONS REDACTED**

[redacted]

Snow Capital's selection of Mr. Yates as counsel creates an impermissible conflict with the interest of other members of the class, [redacted] The class' interests are in maximizing recovery while minimizing costs; Richard Snow, however, as Mr. Yates business associate and friend, has an interest in "maximizing the return to his counsel," even if that comes out of the pockets of the other class members. *Susman v. Lincoln Am. Corp.*, 561 F.2d 86, 95 (7th Cir. 1977). Under such circumstances, Snow Capital is not an adequate class representative and the motion to certify should be denied. *See Susman*, 561 F.2d at 93; *Shields*, 1991 WL 221940, at *2; *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization*, 616 F. Supp. 2d 461, 464 (S.D.N.Y. 2009); *Jaroslawicz v. Safety Kleen Corp.*, 151 F.R.D. 324, 329-30 (N.D. Ill. 1993); *In re Quintus Sec. Litig.*, 201 F.R.D. 475, 481-82 (N.D. Cal. 2001).

**PORTIONS REDACTED**

### 3. Snow Capital Cannot Satisfy The Adequacy Requirements Of Rule 23(a)(4) Because It Has Failed To Vigorously Prosecute The Class Claims

A court should deny class certification "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995); *see also Rolex Employees Ret. Trust v. Mentor Graphics Corp.*, 163 F.R.D. 658, 665 (D. Or. 1991) (plaintiff "must check the otherwise unfettered discretion of counsel in prosecuting the suit"); *Berger*, 257 F.3d at 484; *Jaroslawicz*, 151 F.R.D. at 328 (class representative must "vigorously pursue the litigation").

Here, Snow Capital has not been monitoring the progress of this case, has not been vigorously prosecuting this case and has effectively abdicated its fiduciary role in this litigation to its counsel, Al Yates and Robbins Geller, from the very start of this litigation.[7] [redacted]

---

[7] *See also* IMAX Opp. at pp. 12-15.

PORTIONS REDACTED

[redacted]

Three weeks later, and only after defendants requested the identifying information, counsel for Snow Capital admitted that they did not have the information. (Ex. D (Reich May 26, 2010 Letter).) Given that Snow Capital has demonstrated that it has neither the interest or ability to "monitor counsel's performance," *Iron Workers*, 616 F.Supp.2d at 464, Snow Capital is an inadequate class representative and its motion to certify should be denied. *See Shiring v. Tier Technologies, Inc.*, 244 F.R.D. 307, 316 (E.D. Va. 2007) (denying class certification in part because plaintiff "effectively abdicated his supervisory role . . . in contravention of the PSLRA's stated goals.").

**C. Class Certification Must Be Denied Because Snow Capital Fails To Prove That Common Issues Predominate Over Individual Issues As Required By Rule 23(b)(3)**

**1. Because Snow Capital Seeks To Establish Predominance By The Fraud-on-the-Market Presumption, It Must Make A Showing of Loss Causation By A Preponderance Of All Admissible Evidence At The Class Certification Stage**

To satisfy the predominance requirement of Rule 23(b)(3), Plaintiffs seek to rely on the "fraud-on-the-market" presumption of reliance set forth in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). The fraud-on-the-market theory creates a presumption that investors purchased stock in reliance on the integrity of the market, thus establishing reliance as a common issue as contemplated by Rule 23(b)(3). As the Fifth Circuit recently explained in *Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 266 (5th Cir. 2007), a lead plaintiff is required to demonstrate loss causation, by a preponderance of the evidence, at the class certification stage before it can "trigger" the fraud-on-the-market presumption. Because the Fifth Circuit opinion in *Oscar* is based directly on the Supreme Court's ruling in *Basic* and is consistent with the principles set forth by the Second Circuit in *In re IPO* and *Teamsters Local*, *Oscar* is persuasive and should be followed here.

PORTIONS REDACTED

In *Oscar*, the Fifth Circuit held that loss causation is "a fraud on the market prerequisite" that "must be established at the class certification stage by a preponderance of all admissible evidence." 487 F.3d at 266, 269. This is because loss causation provides "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007). To establish loss causation, a securities fraud plaintiff must prove a direct causal connection between the alleged misrepresentation and the decline in the company's share price. *Dura Pharm.*, 544 U.S. at 341-43. Where the alleged misrepresentation is a false opinion, plaintiffs must prove that a corrective disclosure, and not some other contemporaneously released information, revealed the truth and resulted in the decline of the company's share price. *See In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005) ("*In re IPO II*").

In holding that loss causation must be proven by a preponderance of the evidence at the class certification stage, the Fifth Circuit relied on the Supreme Court's holding in *Basic* that the fraud-on-the-market presumption could be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff." *Oscar*, 487 F.3d at 265 (*quoting Basic*, 485 U.S. at 248). Specifically, the presumption would be rebutted if Defendants "could show . . . that the market price would not have been affected by their misrepresentations." *Oscar*, 487 F.3d at 265. Thus, where, as here, Snow Capital cannot establish that its losses were caused by any alleged misstatement by PwC-Canada, the *Basic* link is severed and the fraud-on-the-market presumption is rebutted. Because "Rule 23 mandates a complete analysis of fraud-on-the-market indicators" and a showing of loss causation is a prerequisite to the fraud-on-the-market theory, the Fifth Circuit held that plaintiffs must prove loss causation by a preponderance of the evidence at the class certification stage. *Id.* at 267.

**PORTIONS REDACTED**

The Fifth Circuit's holding in *Oscar* is consistent with the Second Circuit's holdings in *In re IPO*, 471 F.3d at 41-42, *Teamsters Local*, 46 F.3d at 202, and *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 39-40 (2d Cir. 2009), and is persuasive. Although recent decisions in the U.S. District Court for the Southern District of New York have rejected the reasoning of *Oscar* as non-binding precedent,[8] the Second Circuit itself has not addressed the issue of whether loss causation must be established by a preponderance of the evidence at the class certification stage to trigger the fraud-on-the-market presumption. However, in line with *Oscar*, the Second Circuit specifically rejected the notion that inquiry into a merits-related issue, such as loss causation, would be inappropriate at the class certification stage. *In re IPO*, 471 F.3d at 41. The Second Circuit's recent trend towards higher scrutiny at the class certification stage, as reflected in *In re IPO* and *Teamsters Local*, suggests that the Second Circuit would find the reasoning in *Oscar* persuasive and would likely adopt the preponderance of the evidence standard once presented with the opportunity to consider the issue. Furthermore, having now held, in *In re Flag Telecom*, 574 at 39-40, that a plaintiff must make a showing of loss causation, by a preponderance of the evidence, to establish typicality and adequacy of the class representative at the class certification stage, it stands to reason that the Second Circuit will require this same standard when it squarely addresses the loss causation requirement for predominance under Rule 23(b)(3).

### 2. Snow Capital Is Not Entitled To The Fraud-on-the-Market Presumption Of Reliance Because It Fails To Make The Requisite Showing Of Loss Causation

Here, Snow Capital cannot invoke *Basic's* fraud-on-the-market presumption because they have failed to establish loss causation by a preponderance of the evidence. Snow Capital does not

---

8 In addition, all such opinions, as of the time of this filing, except for *In re AIG, Inc. Sec. Litig.*, 265 F.R.D. 157 (S.D.N.Y. 2010), were issued prior to the Second Circuit's ruling in *Teamsters Local* and *In re Flag Telecom*, both of which cemented the "preponderance of the evidence" standard at the class certification stage.

PORTIONS REDACTED

provide any evidence demonstrating that the price declines occurring on the alleged corrective disclosure dates resulted from the revelation of fraud as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other [non-litigation related] events." *Dura Pharm.*, 544 U.S. at 343. In addition to Snow Capital's lack of evidence supporting loss causation, the analysis of PwC-Canada's expert, Professor Christopher James, confirms that Snow Capital cannot demonstrate that any of the alleged losses were caused by misstatements attributable to PwC-Canada. (*See* Exh. A ("James Report") to Dkt. 99.)

The only statements made by PwC-Canada that Snow Capital alleges were false and misleading were contained within PwC-Canada's audit opinions on IMAX's year-end financial statements for the years ended December 31, 2002-2005 (the "Audit Opinions"). (*See* Dkt. 46 at ¶¶ 187, 226-227.) Thus, to establish loss causation for class certification purposes, Snow Capital must prove, by a preponderance of the evidence, that (1) the Audit Opinions were false when made and that falsity was concealed from the market; (ii) it purchased IMAX stock after such statements were made, (iii) the falsity of the statements was revealed to the market; and (iv) the disclosure negatively affected the price of the stock. *See Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161, 173 (2d Cir. 2005)

In the Complaint, Snow Capital alleges nineteen corrective disclosure dates. (Dkt. 46 at ¶¶ 115-139; *see also* James Report at ¶ 45.) Of those, only seven are associated with significant company-specific stock price movement. (James Report at ¶ 46.) Of those seven, four do not contain new information that would correct alleged prior misrepresentations by PwC-Canada. (James Report at ¶ 46, 51-80.) Thus, only three alleged corrective disclosure dates remain that may contain new information that may have corrected alleged misrepresentations by PwC-Canada: the

PORTIONS REDACTED

August 9, 2006 Press Release by IMAX ("August 9 Press Release")[9], the March 29, 2007 Press Release by IMAX ("March 29 Press Release"),[10] and the July 20, 2007 press release by IMAX (the "July 20 Press Release.").[11]

The August 9 Press Release is not a corrective disclosure because it did not reveal the truth of any alleged misstatements attributable to PwC-Canada, as required by *Dura*. *See In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 296 (S.D.N.Y. 2006) ("[I]t is axiomatic that a concealed fact cannot cause a decrease in the value of a stock before the concealment is made public."). The press release expressly stated, with respect to the application of multiple element accounting to theater system installations: "the Company believes its application of the above [multiple-element] accounting policy is, and has historically been, in accordance with GAAP and the Company's position is supported by its auditors." (August 9 Press Release at p. 2.) In addition, there is plenty of other negative, company-specific information contained in the August 9 Press Release to explain the decrease in IMAX's stock price following the release: (1) IMAX's announcement that no one was willing to buy the company at the valuation sought by the Board of Directors; (2) IMAX's decision to focus on potential joint ventures; (3) IMAX's decision to focus on its conversion to digital technology; (4) IMAX's retraction of its guidance for the remainder of 2006; (5) IMAX's announcement that the SEC had commenced an investigation of the company; and (6) IMAX's announcement of financial results for the 2nd Quarter of 2006 and its retraction of guidance as to future earnings. (*Id.* at pp. 1-2.)

[redacted]

9 Exhibit E to the Lunn Dec.
10 Exhibit F to the Lunn Dec.
11 Exhibit G to the Lunn Dec.

**PORTIONS REDACTED**

[redacted] In contrast, Professor James' analysis suggests that the other bad news, specifically the "no-buyer" announcement, was largely responsible for the price decline following the August 9, 2006 (James Report at ¶ 106),[13] but concludes that separating the effects of each negative announcement may well be impossible (James Report at ¶ 145). It is Snow Capital, not Defendants, who bears the burden of proving that the correction of alleged misrepresentation, and not "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events" was responsible for all or a significant portion of the decline in price. *Dura Pharm.*, 544 U.S. at 343; *In re IPO II*, 399 F. Supp. 2d at 307; *see also In re Williams Sec. Litig.*, 558 F.3d 1130, 1137 (10th Cir. 2009) ("The plaintiff bears the burden of showing that his losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price. Without showing a causal connection that specifically links losses to misrepresentations, he cannot succeed."). Having provided no analysis regarding the allocation of the price decline among the multiple announcements contained in the August 9 Press Release, Snow Capital has not met that burden.

In addition, neither the March 29 Press Release nor the July 20 Press Release were a corrective disclosure. Both were released by IMAX *after* the "truth" that IMAX's historical financial statements were in error had been revealed to the market. On March 16, 2007, before the markets opened, IMAX disclosed that its prior audited financial statements were in error and,

---

12 [redacted]

13 "The announcement that IMAX had not found a buyer at the desired valuation level was viewed very negatively by the market, which was expecting a converse announcement, namely the announcement of a potential buyer . . . . Correspondingly, the lack of a buyer announcement and announcement that IMAX would search for buyers at a lower price negatively impacted market expectations and likely triggered the majority of the stock price decline on August 10, 2006."

**PORTIONS REDACTED**

therefore, revealed to the market that the Audit Opinions on those financial statements were false when issued. (Exhibit I to the Lunn Dec.) Snow Capital, however, does not allege any market reaction to the March 16 Press Release That is not surprising, given that IMAX's closing stock price on March 15, 2007 on the NYSE was $4.99 per share and the stock closed on March 16, 2007 at $5.00 per share. (Exhibit J to the Lunn Dec. (Lexis Nexis Historical Quotes).) Subsequently, the March 29 Press Release announced a delay in filing the restatement, but did not provide additional information about IMAX's restatement beyond that provided in the March 16 Press Release. (James Report at ¶ 157.) Rather, that announcement was made in compliance with Ontario requirements that companies update investors every two weeks on the status of their filing delays. (James Report at ¶ 151.) The July 20 Press Release announced the completion of the restatement.[14] Because the relevant "truth" had been revealed on March 16, 2007, the July 20 Press Release was not a corrective disclosure but merely a republication of what the market already knew.

Because Snow Capital provides no evidence that the losses following the August 9 Press Release are, in whole or in part, attributable to the alleged misstatements of PwC-Canada, and because the "truth" was already disseminated in the market prior to the March 29 and July 20 Press Releases, Snow Capital has not met its burden of proving loss causation by a preponderance of the evidence. Therefore, Snow Capital is not entitled to the fraud-on-the-market presumption of reliance and the motion for class certification should be denied. *See, e.g., In re IPO*, 471 F.3d at 43 ("Without the *Basic* presumption, individual questions of reliance would predominate over common questions. ")

---

14 Not surprisingly, IMAX's stock price actually increased in response to the July 20 Press Release – an indication that the market had expected the restatement to have a larger impact on IMAX's future cash flows than, in fact, it had. (James Report at ¶ 160.)

PORTIONS REDACTED

### D. If The Court Grants Certification, The Class Period Should Extend No Later Than August 9, 2006.

Even if a class is certified, the class period should end no later than August 9, 2006. On that date IMAX announced its second quarter earnings. In that same announcement, IMAX disclosed that it had not found a merger partner at the desired valuation and that it was in the process of responding to an informal SEC inquiry regarding revenue recognition, "including [IMAX's] application of multiple element arrangement accounting in its revenue recognition for theatre systems." (Aug. 9 Press Release.) IMAX further disclosed that it believed its revenue recognition was in accordance with GAAP and that PwC-Canada supported that position.[15] (*Id.*) After this announcement, IMAX's stock price fell by $3.90, or approximately 40%.

As a result, those who purchased IMAX shares after August 9, 2006 cannot allege any damages, and, even if they could, issues of loss causation would predominate over any common questions. Originally, all plaintiffs and movants for lead plaintiff "agree[d] that the relevant class period ended on August 9, 2006." *Kaplan v. Gelfond*, 240 F.R.D. 88, 91 (S.D.N.Y. 2007). Only later did Snow Capital allege a longer class period ending on July 20, 2007. (Dkt. 46 at ¶ 21.) It is well established that in a securities class action, the class period may not extend after curative information has been revealed. *Alaska Elec. Pension Fund v. Pharmacia, Corp.*, No. 03-1513 (RET), 2007 WL 276150, at *3 (D.N.J. Jan. 25, 2007) ("Curative information retracts or dispels the alleged misinformation, or puts the investor on inquiry notice of the alleged fraud, making further reliance on the original statements by investors unreasonable.").

---

15 IMAX went on to specify that its application of MEA accounting was related to theater systems installed in 2005 and 2006: "The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenue associated with the screen element of the system was deferred until the final screen was installed . . . . This accounting policy has similarly been applied to one theatre installation in the second quarter of 2006." (Aug. 9 Press Release)

PORTIONS REDACTED

In the Complaint, Snow Capital does not identify a single corrective disclosure that occurred after August 9, 2006 *and* caused a drop in IMAX's share price—because there is none. After IMAX's July 20, 2007 restatement (the "Restatement"), the price of IMAX shares increased from $4.40 at close on July 19, 20007 to $4.85 at close on July 20, 2007 and then to $4.98 at close on July 23, 2007, the next trading day. (Exh. J to the Lunn Dec.) Therefore, if a class is certified, the class period should not extend beyond August 9, 2006.[16]

**E. If The Court Grants Certification, In-and-Out Shareholders Who Bought Prior To August 9, 2006 Should Be Excluded From The Class Because They Cannot Prove Loss Causation As A Matter Of Law**

As the class is currently pled, it could be read to include in-and-out shareholders who bought and sold prior to August 9, 2006. The first corrective disclosure alleged by Plaintiff is the IMAX press release of August 9, 2006. Thus, purchasers who bought and sold before August 9, 2006 – even if they suffered a loss – did not hold over any corrective disclosure pled in the Complaint and therefore there is no allegation in the Complaint that such shareholders suffered a loss *as a result* of any alleged misrepresentation. For such shareholders, any alleged price inflation built into the stock price at the time of purchase was still present at the time of sale.. Consequently, class members who sold prior to August 9, 2006 will not be able to show loss causation as a matter of law because the absence of a prior corrective disclosure pled in the Complaint is fatal to a plaintiff's claim. *See Dura*, 544 U.S. at 342-43; *Lentell*, 396 F.3d at 175. Nor does Snow Capital allege that information available before August 9, 2006 "exposed the public to the truth about [the alleged] misstatements." *In re Flag Telecom*, 574 F.3d at 41. Thus, the in-and-out shareholders should be excluded from the class.

---

16 At a minimum, the class period certainly should not extend past August 11, 2006, when the first complaint was filed in this action. *See In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 196 (E.D.N.Y. 2008).

### F. If The Court Grants Certification, Foreign Purchasers Of Shares Traded On A Foreign Exchange Must Be Excluded From The Class Because The Court Does Not Have Subject Matter Jurisdiction Over Such Claims

The Securities Exchange Act, under which Snow Capital brings this case, is silent as to its territorial application. Therefore, "courts have developed two tests for determining subject matter jurisdiction over foreign transactions." *Nathan Gordon Trust v. Northgate Exploration, Ltd.*, 148 F.R.D. 105, 108 (S.D.N.Y. 1993). Under the conduct test, "a federal court has subject matter jurisdiction if: (1) the defendant's activities in the United States were more than 'merely preparatory' to a securities fraud conducted elsewhere . . . and (2) these activities or culpable failures to act within the United States 'directly caused' the claimed losses." *Itoba Ltd., v. LEP Group, PLC*, 54 F.3d 118, 122 (2d Cir. 1995). Under the effects test, a federal court has subject matter jurisdiction over a foreign transaction "where illegal activity abroad causes a 'substantial effect' within the United States." *Nathan Gordon Trust*, 148 F.R.D. at 108 (*quoting Alfadda v. Fenn*, 935 F.2d 475, 478 (2d Cir. 1991)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

Here, the activities forming the basis of the claims asserted in the Complaint satisfy neither the conduct nor effects test for subject matter jurisdiction over a foreign transaction. In the Motion for Certification, Snow Capital provides no legal of factual support for the inclusion of foreign purchasers who purchased IMAX shares on the TSE. Although a handful of courts have certified securities class actions whose class members included foreign purchasers, such cases were predicated on fraudulent transactions with U.S. customers or U.S. acquisitions,[17] neither of which

---

[17] In *In re Nortel Networks Corp. Sec. Litig.*, the Court found subject matter jurisdiction existed over the foreign transactions based on allegations that "[d]efendants were extending vendor financing to **numerous U.S. customers** that defendants knew to be uncreditworthy, so as to artificially inflate the Company's revenues." No. 01 Civ. 1855, 2003 WL 22077464 at *8

[Footnote continued on next page]

PORTIONS REDACTED

are alleged here. Rather, the allegations in the Complaint focus on IMAX's revenue recognition on worldwide theater installations. The alleged misstatements—the release of financial results and related press releases—were all issued from the headquarters of IMAX in Ontario. PwC-Canada conducted the bulk of its audit work at IMAX's Ontario headquarters and at its own offices in Toronto so essentially all of its activities were extra-territorial as well. As in *Morrison v. Nat'l Australia Bank, Ltd.*, the alleged "actions taken and actions not taken" by IMAX and PwC-Canada and the Individual Defendants outside of the United States are "significantly more central to the [allegations] and more directly responsible for the harm to investors" than any activity that occurred in the United States. 547 F.3d 167, 176 (2d Cir. 2008).[18]

Thus, Snow Capital has not met and cannot meet its burden to prove subject matter jurisdiction over the foreign transactions and this Court should exclude foreign purchasers who purchased IMAX securities on the TSE from any certified class.

## III. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Class Certification should be denied in its entirety. Alternatively, should the Court grant Plaintiff's Motion in whole or in part, the Court should certify a class that excludes foreign purchasers of IMAX securities on the Toronto Securities Exchange and a class period ending on August 9, 2006.

---

[Footnote continued from previous page]
(S.D.N.Y. Sept. 8, 2003). In *In re Gaming Lottery Sec. Litig.*, the Court certified a class including foreign purchasers because the allegations in the complaint "revolve[d] around [defendant's] **acquisition of United States companies** [and]. . . its activities within [the U.S.] borders are the very factual predicates of fraud which lie at the heart of plaintiffs' case." 58 F. Supp. 2d 62, 74 (S.D.N.Y. 1999).

18 Indeed, a purported class action against IMAX and certain of its officers and directors, brought by Canadian purchasers of IMAX stock, is pending in Ontario. PwC-Canada respectfully requests that the Court take judicial notice of the pendency of that action, *Silver v. IMAX Corporation, et al.*, Case No. CV-06-3257-000, in the Superior Court of Justice in Ontario.

**PORTIONS REDACTED**

Dated: June 10, 2010

Respectfully Submitted,

By: /s/ Samantha A. Lunn
Samantha A. Lunn

Jennifer L. Conn (JC-5753)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

M. Byron Wilder (admitted *pro hac vice*)
Samantha A. Lunn (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201
Telephone: (214) 698-3100
Facsimile: (214) 698-3400

**ATTORNEYS FOR DEFENDANT PRICEWATERHOUSECOOPERS LLP, AN ONTARIO LIMITED LIABILITY PARTNERSHIP**

100884351_1.DOC

PORTIONS REDACTED

## CERTIFICATE OF SERVICE

I, Samantha A. Lunn, hereby certify that a true and correct copy of the foregoing was sent via this Court's CM/ECF system on June 10, 2010 to the following counsel of record:

Samuel H. Rudman
Robert M. Rothman
David A. Rosenfeld
Mark S. Reich
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

Lewis J. Liman
James D. Mathews
David Oliwenstein
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2550
Facsimile: (212) 225-3999

/s/ Samantha A. Lunn
Samantha A. Lunn

# EXHIBIT L-1

This is Exhibit "L-1" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB)<br>ECF Case |

**DECLARATION OF LUCY P. ALLEN**

I, Lucy P. Allen, declare as follows:

1. Annexed to this declaration is a true and correct copy my report entitled the Report of Lucy P. Allen.

I declare under penalty of perjury that the foregoing is true and correct.

Executed: New York, New York
February 23, 2008.

Lucy P. Allen

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

# REPORT OF LUCY P. ALLEN

February 23, 2009

## CONTENTS

I. Scope of Assignment ....1

II. Qualifications and Remuneration ....1
A. Qualifications ....1
B. Remuneration ....2

III. Materials Considered ....2

IV. Summary of Price Decline and Revenue Recognition Issue ....3

V. Analysis of the Price Decline ....4
A. Summary of the price movement between August 9, 2006 and July 20, 2007 ....4
B. Negative news released on August 9, 2006 ....5
C. The market reacted negatively to the announcement that IMAX had found no buyers ....6
1. IMAX stock price had risen substantially in expectation of takeover ....6
2. Market had been anticipating search before formal announcement ....6
3. Intervening indications were made to the market that the search was proceeding well ....8
4. Extensive negative commentary regarding the lack of success in search for buyer followed August 9, 2006 announcement ....9
5. Failed auction can be worse than no suitor ....10
6. IMAX stock price had fallen dramatically in 2000 after announcement of failure of prior attempt to sell ....11
D. The market reacted negatively to the announcement of a new business model based on joint ventures ....13
E. The uncertainty surrounding IMAX increased ....14
F. The SEC investigation and the possibility that the SEC investigation could expand to other issues, rather than the revenue recognition issues themselves, was a negative factor on the stock price ....15
G. Between August 10, 2006 and the end of the alleged class period, other negative developments affected IMAX's stock price ....16

VI. Analysis of the Revenue Recognition Issue ....17
A. Summary of the revenue recognition issue ....17
B. There was no material restatement of IMAX's cash flows ....19
C. In an efficient market, only cash matters ....19
D. We found no evidence that the change in accounting caused analysts to change their understanding of the past or future business of IMAX ....21
E. Analysts reiterate that the restatement has no material cash impact ....22
F. The net shift of revenues across years did not substantially change the revenue pattern ..24
G. Theater signings provided reliable information about future cash flows and the prospects of the company ....26

VII. Analysis of the IMAX Shares Purchased During the Alleged Class Period and Retained Through August 9, 2006 or July 20, 2007 ....................27

## I. Scope of Assignment

We were asked by counsel for IMAX Corporation ("IMAX") to analyze whether the cause for IMAX's stock price decline between August 9, 2006, the first alleged curative disclosure, and July 20, 2007, the end of the alleged class period was disclosure of revenue recognition problems with IMAX's theater systems. We were asked to focus in particular on the price movements following August 9, 2006, the first alleged curative disclosure, as well as price movements following other curative disclosures as alleged in the Consolidated Amended Class Action Complaint.

In addition, we were asked to estimate the percent of shares purchased by the alleged class members that were held through August 9, 2006 and, alternatively, held through July 20, 2007. In particular, we were asked to estimate the percent of shares purchased during the following four periods that were retained through August 9, 2006 and July 20, 2007:

1) February 27, 2003 – March 7, 2003,

2) March 8, 2003 – March 15, 2004,

3) March 16, 2004 – March 11, 2005, and

4) March 12, 2005 – February 17, 2006.

## II. Qualifications and Remuneration

### A. Qualifications

I am a Senior Vice President of NERA Economic Consulting ("NERA"), a firm with about 600 consulting economists who operate out of more than 20 offices worldwide. I am a member of NERA's Securities and Finance Practice, which dates from the early 1970s and employs a research staff of about two hundred professionals with economics, finance and mathematics degrees. The practice counts as its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

I have a B.A. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale

University. Prior to joining NERA, I was an Economist for both President Bush's and President Clinton's Council of Economic Advisers. In my 14 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on the stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

### B. Remuneration

NERA is being compensated for time spent by staff members at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $615 per hour.

## III. Materials Considered

In preparing this report, we considered the following documents and data:

1. Consolidated Amended Class Action Complaint;
2. Memorandum of Law in Support of Plaintiffs' Motion for Class Certification;
3. Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Motion to Dismiss;
4. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss The Consolidated Class Action Complaint;
5. Memorandum of Law in Further Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Motion to Dismiss;
6. Letter from Jill S. Abrams to Judge Buchwald dated August 18, 2008 with attachments (Plaintiffs' Supplemental Submission);
7. Affirmation of Jill S. Abrams with exhibits dated October 31, 2008;
8. Declaration of Michael A. Marek dated October 30, 2008;
9. Transcript of the Hearing on August 5, 2008;

10. Defendants Imax Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Supplemental Submission in Response to the Court's Letter Dated August 13, 2008;

11. Memorandum and Order dated September 15, 2008;

12. Fax from Omar A. Khan, Law Clerk to the Hon. Naomi Reice Buchwald, with questions from the Court to Arthur N. Abbey, Nancy Kaboolian, Lewis Liman, and Jennifer L. Conn, with enclosure dated August 12, 2008;

13. Stock price and trading volume data for IMAX and market indices from FactSet Research Systems, Inc.;

14. IMAX filings with the Securities and Exchange Commission ("SEC");

15. Data on holdings of IMAX institutional holdings from Thomson Financial ShareWorld;

16. Data on IMAX insider transactions from Thomson Research;

17. IMAX short interest data from Bloomberg L.P.;

18. News articles and press releases relating to IMAX from Factiva and Bloomberg L.P.;

19. Analyst reports covering IMAX;

20. Conference call transcripts; and

21. Academic literature on securities and finance.

## IV. Summary of Price Decline and Revenue Recognition Issue

We reviewed IMAX's stock price movement, as well as market commentary, analyst reports and other publicly available information about the company and its industry during the alleged class period. We found that the disclosure of revenue recognition problems related to IMAX's theater systems was not the cause of the IMAX's stock price decline during the alleged class period or following the alleged curative disclosures, including the alleged disclosure on August 9, 2006. We found no evidence that these revenue recognition issues caused a material change in the analysts' view of IMAX's past or future business. Instead, we found substantial other negative news that was likely impacting IMAX stock price over this time period, including a failed sale of the company, a shift to a new and risky business model and a retraction of

guidance by the company.

## V. Analysis of the Price Decline

### A. Summary of the price movement between August 9, 2006 and July 20, 2007

Plaintiffs allege a class period beginning on February 27, 2003 and ending on July 20, 2007.[1] It is our understanding that Plaintiffs allege the following curative disclosures.

- August 9, 2006 – IMAX announced that it "was under investigation by the SEC regarding its timing of revenue recognition, including its application of multiple element arrangement accounting to its theater systems." [Complaint ¶115].[2]
  On August 10, IMAX's stock price declined from $9.63 to $5.73.[3]

- November 8, 2006 – IMAX's "press release said that 'primarily because it did not install any theaters' in the quarter, it incurred a $.30 per diluted share net loss" [Complaint ¶124].
  On November 9, IMAX's stock price declined from $4.84 to $3.39.

- March 29, 2007 – IMAX announced that it "determined to broaden its review to address certain issues [...] 'primarily in connection with its revenue recognition for certain theater system installations.'" [Complaint ¶127].
  On March 29, IMAX's stock price declined from $5.37 to $5.04.

- July 5, 2007 – IMAX "revis[ed] its accounting policy with regard to revenue recognition for theatre systems" [Complaint ¶138].
  On July 6, IMAX's stock price increased from $4.25 to $4.26.

- July 20, 2007 – IMAX "announced that it had completed its restatement of its financial results covering 2002 through 2005, and the first three quarters of 2006" [Complaint ¶139].[4]
  On July 20, IMAX's stock price increased from $4.40 to $4.85.

---

1 Consolidated Amended Class Action Complaint ¶21.

2 IMAX also announced that it had to date failed to find a buyer at the price sought by the Board, that it was changing its business strategy and that it was no longer providing guidance. PR Newswire, 8/9/2006 4:01 pm, IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives. And Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call.*

3 Price movements following the alleged disclosure dates listed in this section are measured from the closing day trading price prior to the announcement.

4 Portions of the 10-K form filed on July 20, 2007 were amended by the form 10-K/A filed on November 6, 2007.

**IMAX Corporation**
**Alleged curative disclosures**
**November 27, 2002 to October 22, 2007**




Notes and Sources:
Data from FactSet Research Systems, Inc. Price and volume data are split-adjusted.
Alleged curative disclosures dates and descriptions from the Consolidated Amended Class Action Complaint.

## B. Negative news released on August 9, 2006

On August 9, 2006, just after the market closed, IMAX issued a press release titled "IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives."[5] Half an hour later, IMAX had a conference call with analysts detailing the announcement.[6] The press release and the conference call contained substantial new information that the market viewed as negative. The new negative news announced by IMAX included the following:

- The company announced that its 5 month search for a buyer had been unsuccessful.

> Today the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently **no buyers who have indicated a willingness to acquire the Company** at a valuation sought by the

[5] PR Newswire, 8/9/2006 4:01 pm, *IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives.*

[6] Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call.* Time of conference call based on above-mentioned PR Newswire, 8/9/2006 4:01 pm press release.

Board of Directors. [PR Newswire, 8/9/2006, emphasis added]

- The company planned to start a new business model based on joint ventures that the market viewed as risky and lacking in visibility.

  **Significant business model shifts.** As would have been done had the company gone private, management announced that it would **seek more joint venture theater deals going forward**. [...]
  We would recommend moving completely to the sidelines until more clarity can be gained regarding the revenue and expense level trends following the shift to the new business model and when the benefits from this shift are likely to be realized. For these reasons, we are lowering our rating on IMAX to Sell from Buy. [Merriman Curhan Ford, 8/10/2006, emphasis in original]

- The company announced an informal SEC investigation.

  The Company indicated that it is in the process of responding to an **informal inquiry from the U.S. Securities and Exchange Commission** regarding the Company's timing of **revenue recognition**, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. [PR Newswire, 8/9/2006, emphasis added]

- The company announced that it was no longer giving guidance and was retracting its prior guidance.

  [W]e are **retracting all guidance** for the year. [IMAX conference call, 8/9/2006, emphasis added] [7]

## C. The market reacted negatively to the announcement that IMAX had found no buyers

### 1. IMAX stock price had risen substantially in expectation of takeover

On March 9, 2006, IMAX publicly announced that it was looking for a buyer by telling the market that it had decided to "explore strategic alternatives."[8] On the day of the announcement, the stock price rose 9% from $9.50 to $10.35.

### 2. Market had been anticipating search before formal announcement

The market had been anticipating the search even before the formal announcement. For

7 IMAX conference call transcripts on 8/9/2006 from Voxant FD (Fair Disclosure) Wire.

8 PR Newswire, 3/9/2006, 7:00 am, *IMAX to explore strategic alternatives*.

example,

> Shares of Imax Corp. (IMX.TO) climbed nearly 8 percent on Friday after the big-screen movie theater systems maker was cited as a potential takeover target in a BusinessWeek article. [Reuters News, 2/4/2005]

> Following a very good financial year, the Toronto, Canada-based Imax Corp. is considering putting itself up for sale. [Video Age International, 3/1/2006]

The market commentary in the months preceding August 9, 2006 indicated that IMAX's stock was driven by the expectation that a buyer would acquire the company at a premium. For example,

> [W]e believe IMAX shares will now **trade primarily based on buy-out speculation**, given management's announcement that it has retained investment bankers to explore "strategic opportunities." [SunTrust Robinson Humphrey, 3/9/2006, emphasis added]

> We have viewed IMAX as a glamour cyclical stock, with investor focus on new theater signings and event film releases in the DMR format as opposed to near-term fundamentals. The proposal of a potential transaction involving the sale, merger, partnership, or capital infusion of the company has given many investors further positive sentiment about IMAX's equity. The stock's valuation now **includes a speculation premium**, which may or may not prove judicious. [Harris Nesbitt, 3/10/2006, emphasis added]

> Concurrent with the reporting of its 2005 results on March 9, 2006, Imax announced it had hired two investment banks to explore strategic alternatives to "enhance shareholder value, including...the sale or merger of the business with another entity offering strategic opportunities for growth." After a review of its 2005 10-K, we believe Imax *requires* a partner with access to capital in order to grow its business. For the following reasons, we believe Imax's business fundamentals might be weaker than 2004 and 2005 earnings results otherwise suggest. Further, without access to capital that would allow Imax to offer a new installation proposition to commercial-theater operators (one that reduces upfront capital commitments from theater operators and shifts a meaningful portion of the risk of the business model to Imax), we think **fundamentals cannot sustain a stock price that has appreciated nearly 50% thus far in 2006.** In our opinion, the stock has migrated from a "glamour cyclical" to a **speculative/arbitrage driven price.** [Harris Nesbitt, 3/16/2006, emphasis added]

> While we are still uncertain as to why the company is pursuing this initiative, we believe this process can help increase shareholder value in a shorter time frame than the market would likely have granted through the prolonged execution of its strategy. As a result, we believe the **stock price will now be dictated by the**

> **outcome of this process...** [Susquehanna Financial Group, 3/10/2006, emphasis added]

**IMAX Corporation**
**News stories on IMAX search for buyers**
**November 27, 2002 to October 22, 2007**




**Notes and Sources:**
Data from FactSet Research Systems, Inc. Price and volume data are split-adjusted.
News stories from Factiva.

## 3. Intervening indications were made to the market that the search was proceeding well

Between March 9, 2006 and August 9, 2006, it was indicated to the market on several occasions that IMAX's search for a buyer was proceeding well. For example,

> We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. [PR Newswire, 3/9/2006]

> We have been very pleased with the amount of interest we have seen to date and how the process is proceeding to date. We just entered the second round and are pleased to be evaluating proposals from a broad range of interested parties. [PR Newswire, 5/9/2006]

Imax Corp., the giant movie screen maker that has put itself on the auction block, is getting closer to tying the knot with a big-money partner. [The Globe and Mail, 5/29/2006]

4. **Extensive negative commentary regarding the lack of success in search for buyer followed August 9, 2006 announcement**

IMAX's announcement on August 9, 2006, five months after the formal announcement of the sale process, that the search to date had not been successful and no buyer had been found at the valuation sought by the Board was regarded as surprising negative news. The market commentary on IMAX's failure to find a buyer was negative and extensive. For example,

Shares of Imax Corp. **sank in after-hours trading** Wednesday, **after the Canadian movie company said it has not found any suitable buyers** since announcing in March it was exploring "strategic alternatives." [Associated Press Newswires, 8/9/2006, emphasis added]

Imax Corp. **shocked investors** yesterday, saying it was **unable to find a buyer** after a five-month auction. [National Post, 8/10/2006, emphasis added]

**IMAX FALLS AS BIDS COME IN TOO CHEAP** Movie chain Imax Corp. gave its shareholders a workout worthy of the big screen yesterday after it announced that offers for the company - including one from rocker Bono's private equity firm - were too cheap. Imax stock **jumped as high as $10.24 early in the day as speculators bet the company would announce a deal.** After ending the regular trading day down more than 2 percent, **shares were hammered in after-hours falling as low as $6.15 as investors scrambled to cut their losses.** [New York Post, 8/10/2006, emphasis added]

Although overall Q2 results were strong, **IMAX's failure to secure an acceptable offer** during its ongoing exploration of strategic alternatives **sent the stock down more than 35% in after-hours trading.** [Susquehanna Financial Group, 8/10/2006, emphasis added]

Sale Falls Apart; Downgrade To Underperform. [Piper Jaffray, 8/10/2006]

No Deal: Suitors Back Away, Weak Box Office Cools Near-Term Interest. [Roth Capital Partners, 8/10/2006]

Judging by the market reaction to yesterday's press release, the quarter's results were obviously less important than the status negotiations between Imax management and the Company's reported suitors. After five months of negotiations, we believed that **anything less than a named buyer on a straightforward stock or stock-and-cash acquisition of IMAX shares (at a premium) would be interpreted negatively by investors. It was.** [Roth Capital

Partners, 8/10/2006, emphasis added]

Lack of interested buyers at a price higher than $300 million **damages investor sentiment, reduces market valuation of the Company**, and poses questions about capital funding for growth. [BMO Capital Markets, 8/10/2006, emphasis added]

In a flood of downgrades on Imax stock, analysts **primarily focused on the company's inability to find a buyer** after five months of negotiations with a dozen potential suitors. They also noted weak box-office performance for films like Poseidon and The Ant Bully, which is slowing demand for new theatres, and a joint-venture strategy involving revenue sharing with theatre operators that will cut profit in upcoming quarters. [National Post, 8/11/2006, emphasis added]

**CATALYSTS FOR DOWNGRADE:**
**We are downgrading shares of IMAX** from Market Perform to Underperform **based on the following catalysts**: 1) visibility on fundamentals is limited; 2) **sale of company was misguided**; 3) new signings have slowed; 4) poor performance of recent films; 5) reduced earnings expectations for CY06/CY07; 6) vast change to strategy presents execution risk; and 7) IMAX may not be able to meet capital requirements necessary to develop and launch new digital IMAX systems. [Piper Jaffray, 8/10/2006, emphasis added]

**5. Failed auction can be worse than no suitor**

The inability of the company to find buyers after an extensive search was considered by some to be more negative than not having had unsolicited offers of acquisition initially. On this point, a Wall Street Journal article covering several companies that had failed to find a buyer (including IMAX) stated:

Alas as companies are finding out in droves, **the stock price craters if the auction comes up empty**. Better to be resolutely single than publicly rejected. [The Wall Street Journal, 08/23/2006, emphasis added]

A similar comment had been made after the March 9, 2006 announcement that IMAX was up for sale.

A company will often disclose that it's looking at options such as a sale if there is concern that the details may leak, or that some shareholders may have a better idea than others that the company could be sold. [...] "From a legal perspective, disclosing is always the easy answer, but boards have to weigh all the negative impacts from disclosure, and there are so many," said Sharon Geraghty, a mergers and acquisitions lawyer at Torys in Toronto. "It's disruptive to their business, to their employees, to their customers, to their suppliers. It can be devastating."

> Once the disclosure is made that a company is seeking strategic alternatives and the stock pops in anticipation (Imax jumped 8.6% yesterday) the pressure is on to make something happen. **Taking down the for-sale sign is hard on a company's reputation as investors, competitors and customers all may wonder what's wrong with the business that it couldn't find a match. And investors can be furious when the stock gives up those gains. "It is very damaging,"** Ms. Geraghty said. **"Imagine also what happens the next time you look for a buyer, because now the whole world knows you tried to sell and failed."** [National Post, 3/10/2006, emphasis added]

### 6. IMAX stock price had fallen dramatically in 2000 after announcement of failure of prior attempt to sell

The 2006 attempt to find a buyer was not IMAX's first attempt. The company had tried to find a buyer in 2000. News stories attributed a dramatic fall in the stock price in 2000 (from $27 to $4) largely to the fact that IMAX's search for a buyer was unsuccessful. For example, in 2000, the Canadian newspaper, The Globe and Mail reported that [9]

> **Uncertainty over the future sale of Imax has led to a 40-per-cent decline** in the value of the company's share this month. [The Globe and Mail, 9/28/2000, emphasis added]

On October 11, 2000, IMAX reported that its earnings were falling short of analysts' estimates and that "**it cannot predict** how the uncertainty in the commercial exhibition market or its earnings outlook will impact **the ultimate outcome of the process [of searching for a buyer].**"[10] IMAX stock declined 70% the following day. On October 13, 2000, The Globe and Mail reported

> Imax Corp. shares lost nearly three-quarters of their value yesterday after an unexpected profit warning sparked **fears about the giant film screen company's search for a buyer.** [The Globe and Mail, 10/13/2000, emphasis added]

---

[9] Similarly, a New York Post article on the same day reported that "Shares in the large movie screen producer dropped to a 52-week low yesterday - extending its 30 percent dive of the past week and a half - as the company continued to feel the effect of a bad bruising of the theater-chain business and a **string of reports claiming a buyer cannot be found.**"

[10] PR Newswire, 10/11/2000, *IMAX Corporation Announcement*, emphasis added.

**IMAX Stock Price**
**January 3, 2000 to October 22, 2007**




**Notes and Sources:**
Data from FactSet Research Systems, Inc. Price data are split-adjusted.

In August 2006, market commentary indicated that another failure by IMAX to find a buyer had a negative impact on investor's confidence in management.

> Yesterday's announcements have clearly **damaged management's credibility**, in our view. Since this is **not the first time** management has failed to consummate a sale of the company and it has not created terminal shareholder value now, we think it will take considerable time to rebuild credibility. [BMO Capital Markets, 8/10/2006, emphasis added]

> Although fundamental momentum has been strong over the last few years, we believe **investor confidence is likely to be significantly reduced** by yesterday's announcement about **another unsuccessful sales process**, especially in what is generally perceived to be a healthy M&A environment. [Susquehanna Financial Group, 8/10/2006, emphasis added]

### D. The market reacted negatively to the announcement of a new business model based on joint ventures

On August 9, 2006 the company announced a substantial change in its strategic direction. Specifically, it announced that it would focus its business development model on entering into joint ventures with exhibitors.[11]

Under IMAX's traditional sales-type lease agreement, exhibitors who wanted to use IMAX projection systems for their theaters had pay IMAX in advance to obtain the systems under a sales-type lease and pay IMAX other sums, including a percentage of their movie sales, as long as they operated under the IMAX brand. Under the joint venture model, IMAX would contribute the projection system and cost of installation, and then recoup its investment with a bigger share of the movie sales.

Many of the analysts viewed the transition to the new joint venture based model as difficult, requiring more capital than IMAX had available, generating insufficient funds to make the company attractive to investors and increasing the overall uncertainty surrounding the company.

> Since management revealed that no buyers offered an acceptable price for IMAX and that the company was embarking on a **new strategy** with its existing resources, we believe **the fundamental picture has changed so vastly** that **investor interest in the stock will be muted** at best even after it's plummeted some 40% from Wednesday's closing price. [BMO Capital Markets, 8/10/2006, emphasis added]

> **Significant business model shifts.** As would have been done had the company gone private, management announced that it would seek more joint venture theater deals going forward. […]
> We would recommend moving completely to the sidelines until more clarity can be gained regarding the revenue and expense level trends following the shift to the new business model and when the benefits from this shift are likely to be realized. For these reasons, we are lowering our rating on IMAX to Sell from Buy. [Merriman Curhan Ford, 8/10/2006, emphasis in original]

> The stated strategy of forming joint ventures to relieve theater operators from the large upfront cost of an Imax system is, in our view, going to **require greater financial resources than the company has presently**, especially if it wishes to grow at a rate that might draw investor interest. The joint venture structure **limits**

---

[11] Voxant FD (Fair Disclosure) Wire, 8/9/2006, *Q2 2006 IMAX Corporation Earnings Conference Call.*

**first- and second-year earnings**, which in our view is **not as enticing to public shareholders.** [...] [W]e think it is likely the company will have to renegotiate terms given the **dramatic shift in company strategy** and what will likely be a prolonged cash conversion cycle under the new joint-venture strategy. [BMO Capital Markets, 8/10/2006, emphasis added]

Despite the strength in Q2 results, we are **lowering our full-year revenue estimate** by $6 million to $154 million (+6% Y/Y), **mostly due to the potential near-term impact from JV-structured deals**, and to a lesser degree, the underperformance of *The Ant Bully*. [Susquehanna Financial Group, 8/10/2006, emphasis added]

## E. The uncertainty surrounding IMAX increased

On August 9, 2006 the uncertainty regarding the future of IMAX increased substantially. Stock prices are negatively affected by increased uncertainty.[12] The uncertainty increased not only because of the new strategic direction focused on joint ventures but also because the company announced that it was retracting all guidance for the year and declining to answer questions about the value of the company.

[ANALYST ASKS]: But I mean, is there any way you guys -- **I don't really understand fully why you're getting out of the guidance business**, particularly in light of the potential end of the sales process here. Why are you guys, **if you have all these numbers, why don't you put them out and tell the market** where you think your numbers should come out?
[IMAX MANAGEMENT]: Because I think the answer is, we don't know how quick the uptake is going to be in JVs. We don't know what impact the JV business will have on existing sale [leap] business. We don't have fully nailed down the accounting charges related to the digital transition. So, I think in light of those moving pieces, it just doesn't make sense to do that.
[...]
[ANALYST ASKS]: ...**in terms of** going back to, or at least, you know, **continuing to work with some of the bidders that have come in at lower** prices, floor **valuations than what you originally wanted, is that an indication that you think the company is worth less now,** or you're less optimistic in terms of if you stayed a publicly traded company that the value would be, you know, more realized, you remaining public, as vs. taking a lower offer to go private?

---

12 See, for example, Richard A. Brealey and Stewart Myers, *Principles of Corporate Finance*, McGraw Hill, 5th ed., 1996. See Section VI.C below on the determinants of the stock price in an efficient market.

[IMAX MANAGEMENT]: ...**I don't think we want to** comment **on value at this point.** [IMAX conference call,[13] 8/9/2006, emphasis added]

**Too Many Uncertainties on the Horizon; Lowering Rating to Sell from Buy**
[...]in the near term we believe IMAX shares are likely to remain under significant pressure (the shares were trading around $6.00 after the market close last night) due to the uncertainties surrounding 1) the near-term impact of management's decision to switch to more of a joint venture theater model; 2) the expense and revenue deferment associated with the acceleration of a digital system rollout; 3) the slowdown in theater signings due to recent box office underperformance; 4) the inquiry by the SEC regarding the company's revenue recognition methods; and 5) the disappointing results from management's efforts to sell the company. [Merriman Curhan Ford, 8/10/2006, emphasis in original]

Uncertainty continued to be a focus of negative analyst commentary later on during the alleged class period.

We believe the **uncertainty** of IMAX's delayed 2006-10K and 1Q07 filings are **overhanging the shares** and **offsetting any of the benefits** of what we believe are **the improving underlying strength in the Company's core business.** [Soleil Securities Group, 5/21/2007, emphasis added]

## F. The SEC investigation and the possibility that the SEC investigation could expand to other issues, rather than the revenue recognition issues themselves, was a negative factor on the stock price

Fear of the possibility that the SEC's informal investigation could expand to other issues was considered a negative factor on the stock price.

The SEC inquiries into revenue recognition only reinforce some investor skepticism over the company's accounting practices (whether right or wrong). At the very least, we see the **risk of a prolonged inquiry or a potential escalation** as reason enough to **avoid** the stock for now. [BMO Capital Markets, 8/10/2006, emphasis added]

IMAX is cooperating fully with the SEC inquiry, and any adverse findings would not affect the company's cash flows, although it could result in a restatement of prior-period GAAP operating results. We do not expect that this will have a material adverse impact on the creditworthiness of the company but **remain**

[13] IMAX conference call transcripts on 8/9/2006 as per Voxant FD (Fair Disclosure) Wire.

> **cautious** regarding the matter, as any investigation of this nature **carries material risk.** [Friedman Billings Ramsey, 8/10/2006, emphasis added]

The overhang generated by the SEC inquiry was not due to the revenue recognition issues themselves but to the fear of some other problem being uncovered. The overhang was reported to continue even after the restatement addressing the revenue recognition issues.

> Although IMAX conferred with the regulators during the review process, the **SEC and OSC inquiries remain ongoing,** which is likely to **remain an overhang** on IMAX shares. [Susquehanna Financial Group, 7/20/2007, emphasis added]

> The **inquiries continue** and, in our view, **represent a significant risk** to shareholders via restatements, sanctions, or fines. [BMO Capital Markets, 7/24/2007, emphasis added]

## G. Between August 10, 2006 and the end of the alleged class period, other negative developments affected IMAX's stock price

Between August 10, 2006 and the end of the alleged class period on July 20, 2007, other negative information contributed to negative price pressure according to analysts:

- Weak box office – weak box office results for IMAX movies, including *The Ant Bully*; [14]
- Delays in signings – there were reported delays in signings for new theater systems; [15]
- Fewer than expected installations – only one system was installed in the third quarter of 2006 and the slippage of backlog was more pervasive than expected; [16]
- Losing technological ground – IMAX was reported to be losing technological ground as its projectors were rapidly becoming obsolete in a market increasingly focused on digital projectors; [17]

[14] "We believe that poorer-than-anticipated box office results from all but one of the IMAX movies released this year has had a negative impact not only on overall system signing trends, but also on theater operators' desire to rush open theaters for which they have already contracted to open (which may account for some of the installation slippage in 3Q and 4Q)." [Merriman Curhan Ford, 11/10/2006]. "Film revenues were soft at $8M due to poor box office performance of Ant Bully." [Piper Jaffray, 11/9/2006]

[15] Merriman Curhan Ford, 11/10/2006; Roth Capital Partners, 11/15/2006.

[16] "Only one system was installed in the quarter and slippage of backlog is far more pervasive than we had expected." [BMO Capital Markets, 11/9/2006]

[17] "In our view, the company is losing technological ground and doesn't possess the capital to grow its business."[BMO Capital Markets, 12/18/2006]

- No buyout revenues – on November 8, 2006, IMAX announced that it had no revenues associated with consensual buyouts, a high margin item for IMAX;[18]

- Increasing SG&A expenses – news that sale, general and administrative expenses were increasing were reported through the alleged disclosure period;[19]

- Buyer sought at lower valuation – on November 8, 2006 IMAX announced that it was now searching for a buyer at a lower valuation;[20]

- Search for buyer ended – on December 15, 2006 IMAX announced that it had abandoned its search for a buyer;[21]

- Delay of 10-K filing – on March 16, 2007 IMAX announced that it would delay the filing of its Form 10-K for fiscal 2006 beyond the filing deadline; [22]

- Further delay of 10-K filing – on March 29, 2007 IMAX announced that it would further delay the filing of its Form 10-K for fiscal 2006 and the filing under Canadian securities law; [23] and

- Fear of delisting – on April 9, 2007 IMAX announced that it had received a letter from the Nasdaq stock exchange saying that its shares could be delisted. [24]

Although we found that these issues (along with the ones mentioned above including the lack of a buyer) may have had a negative impact on the stock price movement from August 9, 2006 through July 20, 2007, the end of alleged class period, we did not find that the revenue recognition issues themselves were the cause of the price decline during this period.

## VI. Analysis of the Revenue Recognition Issue

### A. Summary of the revenue recognition issue

Prior to fiscal year 2000, theater system revenue was recognized upon delivery of the

---

18 "Other operating highlights in the quarter: [...] Zero lease buyout/change revenues (part of Systems) vs. $2.4 million in 3Q05." [Roth Capital Partners, 11/15/2006]. "high-margin consensual lease buyout" [Harris Nesbitt 5/9/2006]

19 See, for example, Susquehanna Financial Group, 8/10/2006; Piper Jaffray 11/9/2006; and Susquehanna Financial Group 3/13/2007.

20 PR Newswire, 11/8/2006, *IMAX Corporation Reports Third Quarter Financial Results; - Pursuing Key Initiatives Designed to Grow Business and Shareholder Value over Long Term.*

21 PR Newswire, 12/15/2006, *IMAX Corporation announcement*

22 Dow Jones News Service, 3/16/2007, *Imax: Errors Not Related To Theater System Rev Recognition.*

23 PR Newswire, 3/29/2007, *IMAX to delay filing of 2006 10-K.*

24 Reuters, 4/9/2007, *Imax says shares could be delisted from Nasdaq.*

system.[25] For the fiscal years 2000 through 2003, IMAX stated that revenue would be recognized at the time of the theater installation.[26] In fiscal year 2004, IMAX stated that the company recognized revenues on sales and sales-type leases generally upon installation of the theater system; it also disclosed that revenues could be recorded on separate elements in certain circumstances.[27] In fiscal year 2005, IMAX stated that it recognized revenue when the installation of the respective theater system element was substantially complete.[28]

In its July 20, 2007 press release the company stated that:[29]

> Under the former method for recording revenues under multiple element arrangement accounting, as reflected in the Company's 2005 10-K, the Company recognized revenue when the projector and sound system were installed and deferred revenue recognition of components deemed to be separate deliverables until their subsequent installation, such as the screen.

During its review of its accounting policies the company determined that:[30]

> the screen, 3-D glasses cleaning machine and initial services including projectionist training should be considered one single deliverable. In addition, the Company will now require receipt of a signed acceptance from each client before recognizing revenue, in the absence of which the Company will recognize revenue upon the opening of the theatre. Consequently, the Company concluded that errors occurred in its prior accounting for theatre systems, has revised its policy with regard to revenue recognition for theatre systems, and restated its financial results in accordance with the revised policy.

---

[25] Memorandum and Order dated September 15, 2008, pp. 8-9.

[26] Memorandum and Order dated September 15, 2008, p. 9.

[27] Memorandum and Order dated September 15, 2008, p. 9.

[28] Memorandum and Order dated September 15, 2008, p. 10.

[29] PR Newswire, 7/20/2007, *IMAX Corporation reports 2006 and first quarter 2007 financial results;* ...

[30] PR Newswire, 7/20/2007, *IMAX Corporation reports 2006 and first quarter 2007 financial results [...].* Additionally, in its form 10-K filed on July 20, 2007, IMAX states at p. 82: "the revenue allocated to the System Deliverable is recognized when the lease term commences, which the Company deems to be when all of the following conditions have been met: (i) the projector, sound system and screen system have been installed and are in full working condition, (ii) the 3D glasses cleaning machine, if applicable, has been delivered, (iii) projectionist training has been completed and (iv) the earlier of (a) receipt of the written customer acceptance certifying the completion of installation and run-in testing of the equipment and the completion of projectionist training or (b) public opening of the theater, provided collectibility is reasonably assured."

## B. There was no material restatement of IMAX's cash flows

Yearly cash flows were not restated.[31] The restatement did not materially affect historical cash flows, and there is no indication it would materially affect expectations of future cash.

The cash that the company received over time from its installations of theater systems was not changed by the restatement; that means that investors had been correctly informed all along about the timing with which the company received the cash in exchange for its theater systems. The revenue recognition system applied by IMAX before the restatement was a system that essentially distributed the cash IMAX expected to receive from the theater systems across fiscal years, while the revenue recognition system adopted by IMAX for the restatement started with *the same* cash and distributed it across fiscal years somewhat differently. Because both revenue recognition schemes distributed the very same cash, the change as a result of the restatement did not impact the cash.

## C. In an efficient market, only cash matters

Finance theory tells us that in an efficient market, the price of a stock reflects the market's expectation of the discounted value of future cash flows.[32] The only information that affects the stock price is information that affects the expectation of the discounted value of future cash flows. That is, the cash flows themselves and the riskiness of achieving them are ultimately the only factors affecting the stock price.[33]

Empirical finance research has found that, as the theory of efficient markets predicts, when cash flows and accounting changes diverge, it is only the change in cash flows, not accounting numbers, that matters to the investors. For example Bradford Cornell's book, *Corporate Valuation*, discusses the empirical findings as follows: [34]

> The argument that "only [future] cash [flow] matters" has more than theoretical backing; it is also supported by extensive research. This research focuses on listed

---

[31] Yearly "net cash provided by (used in) operating activities" were not restated. See 2006 10-K p. 93. Also compare 2006 10-K p. 75 with 2005 10-K p. 59 and 2004 10-K p. 48.

[32] See, for example, Richard A. Brealey and Stewart Myers, *Principles of Corporate Finance*, McGraw Hill, 5th ed., 1996.

[33] The riskiness of the cash flows affects the stock price via the discount factor. See, for example, Richard A. Brealey and Stewart Myers, *Principles of Corporate Finance*, McGraw Hill, 5th ed., 1996.

[34] Bradford Cornell, *Corporate Valuation* (New York: McGraw-Hill, 1993), p. 104-106, 108.

companies for which it is possible to conduct direct tests of the relation between value and various measures of income, including cash flow and accounting earnings[...] The results of these tests overwhelmingly support the view that corporate value is based on cash flow. When cash flow and earnings diverge, changes in value are associated with changes in cash flow, not changes in earnings. Though the literature is too extensive to review here, summaries of a few studies are presented to illustrate the general nature of the findings.

A 1975 study by Sunder examines the LIFO and FIFO inventory accounting decision discussed previously. Sunder notes that if value is based on cash flow, the stock prices of companies switching from FIFO to LIFO should rise, while the stock prices of companies switching from LIFO to FIFO should drop. Conversely, Sunder observes, if value is based on earnings, the reverse should be true. Consistent with the cash flow theory, Sunder finds that on average, the stock prices of companies switching to LIFO rise, net of general market movements, and that the stock prices of those companies switching to FIFO fall. [...]

A 1985 study by the Office of the Chief Economist of the Securities and Exchange Commission (SEC) speaks not only to the question of earnings versus cash flow but also the question of "market myopia." Some critics argue that security markets are myopic in the sense that they focus on current earnings and cash flow and, as a result, discount future cash flow more sharply than the present value relation implies. To test the myopia hypothesis, the SEC study examined the stock price reaction to announcements of new research and development projects by 62 companies. Increased research and development reduces both current earnings and current cash flow because R&D expenditures are expensed. Nonetheless, if managers are rational, the present value of the expected long-run cash inflows produced by the research should exceed current R&D expenses. Thus, the cash flow valuation model predicts that stock prices should rise, on average, when new R&D spending is announced, despite the associated decline in current earnings. (The stock price will not necessarily rise in response to every announcement of new R&D spending because the market may disagree with management and conclude that some projects are dogs.) This is exactly what the SEC study finds. The average stock price reaction to the announcement of new R&D projects by the 62 companies is significantly positive. Similar results are reported by McConnell and Muscarella and also Woolridge, who find that announcements of long-term strategic investments, which reduce current earnings, are associated with rising stock prices.[...]

It is worth noting that these studies also provide support for the view that markets are efficient and rationally price securities. ...[E]conomic theory predicts that investor value is derived from cash flow. If market prices reflected some other measure of income, such as accounting earnings rather than cash flow, that would be evidence that the market was inefficient.

## D. We found no evidence that the change in accounting caused analysts to change their understanding of the past or future business of IMAX

We found no evidence that the chance in accounting of revenue for the theater systems caused the analysts or other market participants to change their understanding of the past or future business of IMAX. For example, after the SEC's informal investigation was announced, the analysts described their understanding of the revenue recognition issue but made no mention that the accounting issue would cause them to rethink their prior understanding of how the business of IMAX worked, how cash flowed into IMAX, or how it would flow in the future.

> IMAX has received an informal inquiry from the SEC regarding its revenue recognition practices, mostly associated the revenues generated from 10 theater installations in 4Q05. For those installations, the company utilized multiple element arrangement accounting, where the revenues associated with different elements of a particular installation are segregated and recognized when each particular piece is completed. This leads to some revenues being recognized earlier than others. Although management would not elaborate on the SEC's focus with respect to the application of that accounting, we believe it would entail the company's recognition of any of the revenues associated with an installation that is not entirely complete — where the SEC might want IMAX to defer all of the revenues (no matter how they are segregated) until all can be recognized at once. So, even though this would have **no impact on the company's historical cash generation,** it might move some revenues from prior quarters into more recent quarters throughout FY06. [Merriman Curhan Ford, 8/10/2006, emphasis added]

> In yesterday's press release, Imax also announced it had been notified by the SEC of a potential accounting irregularity related to "multiple-element accounting" for theater systems. [...] We **expect this issue to be resolved with little to no material overall financial impact.** [Roth Capital Partners, 8/10/2006, emphasis added]

> The SEC has launched an informal inquiry into IMAX's accounting practices regarding multiple element arrangement accounting in its revenue recognition for theatre systems. [...] IMAX is cooperating fully with the SEC inquiry, and **any adverse findings would not affect the company's cash flows,** although it could result in a restatement of prior-period GAAP operating results. We **do not expect that this will have a material adverse impact on the creditworthiness of the company** but remain cautious regarding the matter, as any investigation of this nature carries material risk. [Friedman Billings Ramsey, 8/10/2006, emphasis added]

> IMAX's revenue recognition policy has long been controversial but we feel that this issue is minor compared to the other elements at hand. [Janco Partners, 8/10/2006]

Similarly, after the restatement of revenue, the analysts described the restatement, but we found no evidence that the magnitude of the restatement or any of the particulars of the restatement caused analysts to change their understanding of the past or future business of IMAX, or its expected cash flows.

> Due to the changes in the company's revenue recognition policy, numerous quarterly and annual restatements were completed, which mostly moved revenue and income forward from prior periods. [...] For the most part, the company took a more conservative approach with the revenue recognition of its theatre installations. Specifically, instead of attempting to separate some of the elements of the installation and recognize the associated revenue separately (sometimes in different periods), the company will now hold off on the recognition of the installation's revenue until all elements — focusing on the screen and glasses cleaning machines and customer training — have been completed. In the review process, the company reviewed the installations associated with 127 theatres between 2002 and 2006 and adjusted the revenue recognition of those installations accordingly.
> For 1Q07, IMAX reported revenues of $27.2 million, EBITDA of $2.4 million and a net loss from continuing operations of ($0.12), which compared to our estimates of $24.5 million in revenues, $3.1 million in EBITDA, and a net loss per share from continuing operations of ($0.11).
> **Fundamentals Have Remained Strong Throughout the Delay**. Even though IMAX has not been reporting full quarterly results and did not file its 10-K and 10-Q in a timely fashion earlier this year, it has been clearly visible from our channel checks and from the company's various press releases that the fundamentals (signings, installs and box office results) have remained strong. [Merriman Curhan Ford, 7/23/2007, emphasis in original]

> As a result of the adoption of this new revenue recognition policy, IMAX has restated its historical results for the last few years. Although IMAX has shifted more than $27 million between fiscal years and over $25 million of revenue between quarters in the same year, we believe the size of IMAX's earnings restatements **does not appear to be overly significant**, particularly given that overstatements on the revenue side totaled approximately $10.4 million in aggregate from 2002 through 2005, and overstatements on the cost side totaled approximately $4 million in aggregate from 2002 through 3Q06. [...] **Neutral Factor**. [Susquehanna Financial Group, 7/20/2007, emphasis added]

## E. Analysts reiterate that the restatement has no material cash impact

Analysts did not expect the revenue recognition issues to have a material cash impact on IMAX. They maintained this expectation from the time when the SEC investigation was first announced until the restatements were actually made. When the restatements were filed, analysts

reiterated that they had no material cash effect.

> IMAX is cooperating fully with the SEC inquiry, and **any adverse findings would not affect the company's cash flows,** although it could result in a restatement of prior-period GAAP operating results. [Friedman Billings Ramsey, 8/10/2006, emphasis added]

> ... the company utilized multiple element arrangement accounting, where the revenues associated with different elements of a particular installation are segregated and recognized when each particular piece is completed. This leads to some revenues being recognized earlier than others. Although management would not elaborate on the SEC's focus with respect to the application of that accounting, we believe it would entail the company's recognition of any of the revenues associated with an installation that is not entirely complete — where **the SEC might want IMAX to defer all of the revenues** (no matter how they are segregated) until all can be recognized at once. **So, even though this would have no impact on the company's historical cash generation, it might move some revenues from prior quarters into more recent quarters throughout FY06.** [Merriman Curhan Ford, 8/10/2006, emphasis added]

> **Potential Restatement Likely Has No Cash Impact [...]**
> IMAX expects to make some restatements once the expanded review is completed. We believe this would essentially result in the shift of revenue that was originally recognized in 4Q05 into 1Q06. In our opinion, the more important barometer of IMAX's future business is: 1) the current performance of its film slate (300 currently, Spiderman3 and Harry Potter 5 upcoming), 2) new theater signings and 3) installations. Moreover, the Company does not believe that a potential restatement "would have any impact on its previously reported or existing cash accounts". [Soleil Securities, 3/30/2007, emphasis added]

> **Importantly, there is likely no cash impact** if IMAX restates previous period results (specifically 4Q05 and 1Q06). [Soleil Securities, 4/10/2007, emphasis added]

> The Company believes it will satisfy SEC comments about its accounting review of 2002-2006 revenue recognition by revising its accounting treatment... We do **not anticipate a significant cash impact from these revisions** and believe that the filings will enable the shares to begin to reflect the outperformance of the IMAX film slate (with 300, Spider-Man, and Harry Potter, which opens next week day-and-date in IMAX with about 20 minutes of episodic 3D content). [Soleil Securities, 7/6/2007, emphasis added]

> There was **little - if any - cash impact from the Company's restatement.** Most of the restatement involved the timing of revenue previously recognized, and much of the revenue that was reversed has been recognized in subsequent quarters or will be recognized in future quarters. [Soleil Securities, 7/25/2007, emphasis

added]

**[R]estatements to cash flow were not material** [BMO Capital Markets, 7/24/2007, emphasis added]

## F. The net shift of revenues across years did not substantially change the revenue pattern

As noted above, the restatement did not affect the company's cash flows – it only affected the timing with which certain cash payments were reflected on the company's income statement. More specifically, the restatement shifted certain revenues that had initially been recorded in a given quarter to a subsequent quarter. In the majority of cases, revenues were shifted forward between 90 to 180 days.[35] Below, we chart the impact of the restatement on the annual and quarterly revenues.[36] We find the restatements did not substantially change the revenue pattern.

[35] PR Newswire, 6/29/2007, *IMAX announces that it plans to file financial statements shortly; Company does not intend to seek any further extensions.*

[36] The charts compare the revenues "as previously reported" with the revenues "as restated." The revenues as restated account both for effect of the theater systems restatement and for the effect of the other items restated.

**Impact of the Restatement on Annual Revenues**
**(Years 2002 through 2006)**




**Notes and Sources:**
Data from 2006 10K, filed July 20, 2007.
Year 2006 "Revenues as Restated" based on restatements for Q1-Q3 and actuals for Q4.

**Impact of the Restatement on Quarterly Revenues**
**(Q1 2005 through Q4 2006)**




**Notes and Sources:**
Data from 2006 10K, filed July 20, 2007.
"Revenues as Restated" for Q4 2006 based on actuals for Q4 2006.

## G. Theater signings provided reliable information about future cash flows and the prospects of the company

Throughout the alleged class period, theater signings provided important information to the market about IMAX's expected future cash flows. Signings revealed the "pipeline" of theater systems the company had sold or leased. Additionally, the signings corresponded to the time in which (under most circumstances) IMAX began to receive cash for a particular theater system.[37] The number of signings was available to investors throughout the alleged class period and was not restated. The following are examples of the importance accorded to signings by the analysts.

> **In our opinion, theater system signings is a better metric for measuring the ongoing health of IMAX's business, as installations and revenue (and subsequently, earnings) are highly susceptible to timing issues, whereas signings more closely reflect the current state of affairs.** [Susquehanna Financial Group 2/21/2006, emphasis added]

> While IMAX has demonstrated strong momentum in theatre signings, we believe much of this positive news is reflected in the valuation. [Merrill Lynch, 7/11/2005]

> The stock has enjoyed a "glamour cyclical" type valuation, **being valued primarily on theater signings** and film release announcements. In our opinion, the stock has now moved to a speculative valuation based on new, unidentified, and non-quantifiable strategic alternatives. [Harris Nesbitt, 3/16/2006, emphasis added]

> 4Q Earnings Preview [...] **Recent signings likely to be the focal point.** [Susquehanna Financial Group, 3/13/2007, emphasis added]

> We believe the more important factor, however, is the **outlook for future business.** The underlying momentum in the Company's business is strong, in our view, **as is shown by the nine new theaters the Company has signed in 1Q07,** the dramatic outperformance of 300 in IMAX theaters, the upcoming film slate, and the 'buzz' at Showest about IMAX. [Soleil Securities, 3/16/2007, emphasis added]

> "The **positive outlook** [in credit rating] **reflects solid system signings** in the first quarter and good box office performance of IMAX films this year, which could **lead to new system signings,**" said Standard & Poor's credit analyst Tulip Lim.

---

[37] IMAX Corporation Form 10K for the period ending 12/31/2006, p. 20: "initial fees, which are paid in installments generally commencing upon the signing of the agreement until installation of the theater systems."

[Market News Publishing, 7/25/2007, emphasis added]

## VII. Analysis of the IMAX Shares Purchased During the Alleged Class Period and Retained Through August 9, 2006 or July 20, 2007

We estimated the percent of shares purchased by the alleged class members that were held through August 9, 2006. Specifically, we estimated the percent of shares that were purchased during each of the four periods (1) February 27, 2003 – March 7, 2003, (2) March 8, 2003 – March 15, 2004, (3) March 16, 2004 – March 11, 2005, and (4) March 12, 2005 – February 17, 2006 and held through August 9, 2006.

IMAX common shares were traded on both Nasdaq and the Toronto Stock Exchange ("TSX"), with the majority of trades being on the Nasdaq. We estimated the shares retained based on trading data from Nasdaq alone and alternatively from Nasdaq and TSX combined.

The number of shares purchased in any period was calculated based on the volume of IMAX shares traded on a daily basis. Adjustments were made to this volume to exclude the following: 1) market makers' participation; 2) IMAX's insider transactions; 3) IMAX's short covers estimated from monthly short interest by prorating according to daily trading volume; and 4) intraday trading. Intraday trades are transactions in which the shares are bought and sold on the same day. The number of shares purchased in a given period that were retained through a given date was estimated separately for institutional investors and non-institutional investors. For institutional investors LIFO (last-in first-out) was assumed.[38] For non-institutional investors, investors' activity rate was applied based on NERA's Multi-Sector, Multi-Trader Model.[39]

Our results for each of the four periods are summarized below and detailed in Exhibits 1 and 2. The overall percentage of shares purchased during *any* of the four periods and retained through August 9, 2006 was estimated to be 12% based on shares traded on Nasdaq alone and 10% from Nasdaq and TSX combined.

---

[38] Institutional transactions are estimated from institutional holdings obtained from SEC Forms 13-F.

[39] "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," Marcia Kramer Mayer, National Economic Research Associates, Inc., October 1, 2000.

**Shares Retained Through August 9, 2006**

| | % Shares Retained | |
|---|---|---|
| **Purchase Period** | **Nasdaq** | **Nasdaq and TSX** |
| (1) | (2) | (3) |
| 2/27/2003 - 3/7/2003 | 1% | 1% |
| 3/8/2003 - 3/15/2004 | 3% | 2% |
| 3/16/2004 - 3/11/2005 | 10% | 8% |
| 3/12/2005 - 2/17/2006 | 25% | 21% |
| 2/27/2003 - 2/17/2006 | 12% | 10% |

We also estimated the percent of shares that were purchased during each of the four periods and held through July 20, 2007. Our results are summarized below and detailed in Exhibits 3 and 4. The overall percentage of shares purchased during *any* of the four periods and retained through July 20, 2007 was estimated to be 6% based on shares traded on Nasdaq alone and 5% from Nasdaq and TSX combined.

**Shares Retained Through July 20, 2007**

| Purchase Period | % Shares Retained | |
|---|---|---|
| | Nasdaq | Nasdaq and TSX |
| (1) | (2) | (3) |
| 2/27/2003 - 3/7/2003 | 1% | 1% |
| 3/8/2003 - 3/15/2004 | 2% | 1% |
| 3/16/2004 - 3/11/2005 | 4% | 3% |
| 3/12/2005 - 2/17/2006 | 13% | 11% |
| 2/27/2003 - 2/17/2006 | 6% | 5% |

NERA
Economic Consulting

# Appendix A

## Lucy P. Allen

Senior Vice President
National Economic Research Associates, Inc.
1166 Avenue of the Americas, 28th Floor
New York, New York 10036
212 345 5913
lucy.allen@nera.com

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present

**National Economic Research Associates, Inc.**
Senior Vice President. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Vice President.
Senior Consultant.

1992-1993

**Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988
1983-1984

**Ayers, Whitmore & Company (General Management Consultants)**
Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.

Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.
Marketing plan to increase international market share for major accounting firm.

Summer 1985 — **WNET/Channel Thirteen, Strategic Planning Department**
Associate. Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983 — **Arthur Andersen & Company**
Consultant. Designed, programmed and installed management information systems. Participated in redesign/conversion of New York State's accounting system. Developed municipal bond fund management system, successfully marketed to brokers. Participated in President's Private Sector Survey on Cost Control (Grace Commission). Designed customized tracking and accounting system for shipping company.

## Teaching

1989- 1992 — **Teaching Fellow, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications, Speeches and Conference Papers

"Class Certification: Beyond Market Efficiency" presented at the 11th Annual Finance, Law and Economics Securities Litigation Seminar, sponsored by National Economic Research Associates, Aspen, Colorado, 2008.

"Emerging Economies and Product Recall -- Are the Claims Coming?" presented at *The International Reinsurance Summit 2008*, Hamilton, Bermuda, 2008.

"Recent Trends in Securities Litigation" presented at *Strategies, Calculations & Insurance in Complex Business Litigation*, hosted by the Directors Roundtable, New York, New York, 2008.

"The Current Landscape" presented at *Mealey's Product Recall Liability Conference: Made in China and Beyond*, Washington, DC, 2007.

"China Product Recalls: What's at Stake and What's Next" presented at *China Product Recalls*, sponsored by National Economic Research Associates, New York, New York, 2007.

"Damages and Loss Causation in Shareholder Class Actions after *Dura*" presented at *Securities Litigation: Emerging Trends in Enforcement and Winning Litigation Strategies* hosted by the International Quality & Productivity Center, New York, New York, 2006.

"Damages per Share in Shareholder Class Actions after *Dura*," presented at the 9th Annual Finance, Law and Economics Securities Litigation Seminar, sponsored by National Economic Research Associates, Deer Valley, Utah, 2006.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), *The International Comparative Legal Guide to Product Liability*, 2006.

"*Loss Causation*," presented at the 7th Annual Finance, Law and Economics Securities Litigation Seminar, sponsored by National Economic Research Associates, Beaver Creek, Colorado, 2004.

"Recent Trends in Securities Class Action Litigation," presented at The Class Action Litigation Summit program, *Class Action in the Securities Industry*, Washington, D.C., 2003.

"Product Liability Claims Estimation – Four Steps, Four Myths" presented at Standard & Poor's Seminar, New York, New York, 2001.

"How Bad Can It Be? The Economics of Damages and Settlements in Shareholder Class Actions," *Balancing Disclosure and Litigation Risks for Public Companies (Or Soon-To-Be Public Companies)* seminar sponsored by Alston & Bird LLP and RR Donnelley Financial, Nashville, Tennessee, 2000.

"Securities Litigation Reform: Problems and Progress," *Viewpoint*, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," *Class Actions & Derivative Suits*, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," *Regulation*, Winter 1997, pp. 6-7 (co-authored).

"Adverse Selection in the Market for Used Construction Equipment," presented at the NBER Conference on Research in Income and Wealth, Federal Reserve Board, June 1992.

## Expert Reports, Depositions & Testimony (4 years)

Testimony, Deposition Testimony and Declaration before the United States Bankruptcy Court for the Northern District of New York, *In re Barbara C. Lawrence*, 2008.

Deposition Testimony and Expert Report before the United States District Court for the Eastern District of Louisiana in *Elizabeth Bolton Hassinger et al. v. JP Morgan Chase and Company*, 2008.

Deposition Testimony and Expert Report before the United States District Court for the Northern District of Georgia, Atlanta Division in *Lucy Graetz Kish, on behalf of herself and all others similarly situated v. SunTrust Bank and SunTrust Banks, Inc.*, 2008.

Deposition Testimony and Declaration before the United States District Court for the Central District of California Western Division in *Vincent Alvidres, Individually and on Behalf of All Others Similarly Situated v. Countrywide Financial Corporation, et al.*, 2008.

Declaration before the United States District Court for the Eastern District of Michigan Southern Division, *In re ProQuest Company Securities Litigation,* 2008.

Supplemental Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *The Archdiocese of Milwaukee Supporting Fund, Inc., et al. v. Halliburton Company, et al.*, 2008.

Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *The Archdiocese of Milwaukee Supporting Fund, Inc., et al. v. Halliburton Company, et al.*, 2007.

Declaration before the United States District Court for the Northern District of California, San Francisco Division in *Prena Smajlaj et al. v. Brocade Communications Systems, Inc., et al.*, 2007.

Third Expert Witness Statement before the High Court of Justice Chancery Division – Companies Court, *In the Matters of Sovereign Marine & General Insurance Company Limited, et al. (the Scheme Companies) and In the Matter of The Companies Act 1985*, 2007.

Declaration before the United States District Court for the Northern District of Georgia Atlanta Division, *In re Mirant Corporation Securities Litigation*, 2007.

Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas in *Jerry Ryan, on Behalf of Himself and All Others Similarly Situated vs. Flowserve Corporation, et al.*, 2007.

Expert Report and Opposition Report before the United States District Court for the Southern District of New York, *In re WRT Energy Securities Litigation*, 2006.

Deposition Testimony before the Supreme Court of the State of New York for the County of New York in *Pharma Consult Inc., et al., v. Nutrition Technologies L.L.C., et al.*, 2006.

Declaration before the United States District Court for the Middle District of Tennessee Nashville Division in *Jeffrey H, Winokur, et al. v. Direct General Corporation, et al.*, 2006.

Second Expert Witness Statement before the High Court of Justice Chancery Division – Companies Court, *In the Matters of Sovereign Marine & General Insurance Company Limited, et al. (the Scheme Companies) and In the Matter of The Companies Act 1985*, 2006.

Expert Witness Statement before the High Court of Justice Chancery Division – Companies Court, *In the Matters of Sovereign Marine & General Insurance Company Limited, et al. (the Scheme Companies) and In the Matter of The Companies Act 1985*, 2006.

Expert Report before the United States District Court for the District of Delaware in *Stuart Tinney v. Geneseo Communications, Inc., et al.*, 2006.

Declaration before the Superior Court of the State of California for the County of San Diego in *Richard P. Allocco, et al. v. Stephen P. Gardner, et al.*, 2006.

Declaration before the Superior Court of the State of California for the County of San Diego in *Peregrine Litigation Trust v. KPMG LLP, et al.*, 2006.

Testimony, Deposition Testimony and Expert Report before the American Arbitration Association, 2005.

Expert Report before the United States District Court for the Eastern District of New York in *City of New York v. Beretta U.S.A. Corp., et al.*, 2005.

Expert Report and Deposition Testimony before the United States District Court for the Eastern District of New York in *Jaquione Johnson against Bryco Arms, et al.* and *Joan Truman Smith against Bryco Arms, et al.*, 2005.

Affidavit before the United States District Court for the Middle District of Florida in *Jack Hirsch, et al. v. PSS World Medical, Inc., et al.*, 2005.

Declaration and Deposition Testimony before the United States District Court for the Northern District of Georgia, *In re BellSouth Corporation ERISA Litigation*, 2005.

Expert Report and Deposition Testimony before the United States District Court for the Southern District of New York in *re Globalstar Securities Litigation*, 2005.

Expert Report before the United States District Court for the Middle District of Florida in *Jack Hirsch et al. v. PSS World Medical, Inc., et al.*, 2005.

February 2009

**Exhibit 1**
**Shares Retained Through August 9, 2006**
**Based on shares traded on the Nasdaq**

| | Non-Institutional Investors | | | Institutional Investors | | | All Investors | | |
|---|---|---|---|---|---|---|---|---|---|
| Purchase Period | Purchased | Retained | % Retained | Purchased | Retained | % Retained | Purchased | Retained | % Retained |
| (1) | (2) | (3) | (4) [= (3) / (2)] | (5) | (6) | (7) [= (6) / (5)] | (8) [= (2) + (5)] | (9) [= (3) + (6)] | (10) [= (9) / (8)] |
| 2/27/2003 - 3/7/2003 | 280,055 | 6,307 | 2% | 223,085 | 240 | 0% | 503,140 | 6,547 | 1% |
| 3/8/2003 - 3/15/2004 | 34,425,030 | 1,394,081 | 4% | 27,632,940 | 561,668 | 2% | 62,057,970 | 1,955,749 | 3% |
| 3/16/2004 - 3/11/2005 | 34,981,447 | 2,355,273 | 7% | 26,102,782 | 3,555,944 | 14% | 61,084,228 | 5,911,217 | 10% |
| 3/12/2005 - 2/17/2006 | 30,529,323 | 5,404,651 | 18% | 25,686,638 | 8,562,585 | 33% | 56,215,961 | 13,967,236 | 25% |
| 2/27/2003 - 2/17/2006 | 100,215,855 | 9,160,312 | 9% | 79,645,445 | 12,680,437 | 16% | 179,861,300 | 21,840,749 | 12% |

Notes and Sources:

Trading volume from Factset Research Systems, Inc; shares outstanding from SEC Filings; short interest from Bloomberg LP; insider trading and holdings from Thomson Research and SEC Filings respectively; and institutional holdings data from Thomson Financial Shareworld.

Table excludes shares traded or held by market makers, short sellers, insiders, and intraday traders.

Nasdaq trading volume is adjusted for market makers participation rate of 54.76% based on "Dealer Participation on The New York Stock Exchange and Nasdaq," Fernando Avalos and Marcia Kramer Mayer, National Economic Research Associates, Inc., May 1, 2002.

The adjustment for non-institutional trading volume is based on an updated version of the estimate in "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," Marcia Kramer Mayer, National Economic Research Associates, Inc., October 1, 2000. (32.86% for intraday trading, 31.65% for high activity investors initial ownership, 80.9% for high activity purchases and 9.15 for high/low relative sale rate)

Analysis assumes LIFO (last-in first-out) for shares purchased by institutional investors.

**Exhibit 2**
**Shares Retained Through August 9, 2006**
**Based on shares traded on the Nasdaq and Toronto Stock Exchange**

| | Non-Institutional Investors | | | Institutional Investors | | | All Investors | | |
|---|---|---|---|---|---|---|---|---|---|
| Purchase Period | Purchased | Retained | % Retained | Purchased | Retained | % Retained | Purchased | Retained | % Retained |
| (1) | (2) | (3) | (4) [= (3) / (2)] | (5) | (6) | (7) [= (6) / (5)] | (8) [= (2) + (5)] | (9) [= (3) + (6)] | (10) [= (9) / (8)] |
| 2/27/2003 - 3/7/2003 | 650,174 | 8,947 | 1% | 251,339 | 0 | 0% | 901,513 | 8,947 | 1% |
| 3/8/2003 - 3/15/2004 | 43,134,599 | 1,111,443 | 3% | 27,539,332 | 566,356 | 2% | 70,673,930 | 1,677,799 | 2% |
| 3/16/2004 - 3/11/2005 | 46,618,453 | 2,299,889 | 5% | 26,177,372 | 3,609,495 | 14% | 72,795,825 | 5,909,385 | 8% |
| 3/12/2005 - 2/17/2006 | 40,220,461 | 5,262,108 | 13% | 25,455,210 | 8,501,304 | 33% | 65,675,671 | 13,763,413 | 21% |
| 2/27/2003 - 2/17/2006 | 130,623,686 | 8,682,387 | 7% | 79,423,253 | 12,677,156 | 16% | 210,046,939 | 21,359,544 | 10% |

Notes and Sources:

Trading volume from Factset Research Systems, Inc; shares outstanding from SEC Filings; short interest from Bloomberg LP; insider trading and holdings from Thomson Research and SEC Filings respectively; and institutional holdings data from Thomson Financial Shareworld.

Table excludes shares traded or held by market makers, short sellers, insiders, and intraday traders.

Nasdaq trading volume is adjusted for market makers participation rate of 54.76% based on "Dealer Participation on The New York Stock Exchange and Nasdaq," Fernando Avalos and Marcia Kramer Mayer, National Economic Research Associates, Inc., May 1, 2002.

The adjustment for non-institutional trading volume is based on an updated version of the estimate in "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," Marcia Kramer Mayer, National Economic Research Associates, Inc., October 1, 2000. (32.86% for intraday trading, 31.65% for high activity investors initial ownership, 80.9% for high activity purchases and 9.15 for high/low relative sale rate)

Analysis assumes LIFO (last-in first-out) for shares purchased by institutional investors.

**Exhibit 3**
**Shares Retained Through July 20, 2007**
**Based on shares traded on the Nasdaq**

| | Non-Institutional Investors | | | Institutional Investors | | | All Investors | | |
|---|---|---|---|---|---|---|---|---|---|
| **Purchase Period** | **Purchased** | **Retained** | **% Retained** | **Purchased** | **Retained** | **% Retained** | **Purchased** | **Retained** | **% Retained** |
| (1) | (2) | (3) | (4) [= (3) / (2)] | (5) | (6) | (7) [= (6) / (5)] | (8) [= (2) + (5)] | (9) [= (3) + (6)] | (10) [= (9) / (8)] |
| 2/27/2003 - 3/7/2003 | 280,055 | 4,937 | 2% | 223,085 | 0 | 0% | 503,140 | 4,937 | 1% |
| 3/8/2003 - 3/15/2004 | 34,425,030 | 1,091,377 | 3% | 27,632,940 | 223,231 | 1% | 62,057,970 | 1,314,608 | 2% |
| 3/16/2004 - 3/11/2005 | 34,981,447 | 1,840,806 | 5% | 26,102,782 | 661,810 | 3% | 61,084,228 | 2,502,617 | 4% |
| 3/12/2005 - 2/17/2006 | 30,529,323 | 3,239,058 | 11% | 25,686,638 | 3,808,651 | 15% | 56,215,961 | 7,047,709 | 13% |
| 2/27/2003 - 2/17/2006 | 100,215,855 | 6,176,179 | 6% | 79,645,445 | 4,693,692 | 6% | 179,861,300 | 10,869,871 | 6% |

Notes and Sources:

Trading volume from Factset Research Systems, Inc; shares outstanding from SEC Filings; short interest from Bloomberg LP; insider trading and holdings from Thomson Research and SEC Filings respectively; and institutional holdings data from Thomson Financial Shareworld.

Table excludes shares traded or held by market makers, short sellers, insiders, and intraday traders.

Nasdaq trading volume is adjusted for market makers participation rate of 54.76% based on "Dealer Participation on The New York Stock Exchange and Nasdaq," Fernando Avalos and Marcia Kramer Mayer, National Economic Research Associates, Inc., May 1, 2002.

The adjustment for non-institutional trading volume is based on an updated version of the estimate in "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," Marcia Kramer Mayer, National Economic Research Associates, Inc., October 1, 2000. (32.86% for intraday trading, 31.65% for high activity investors initial ownership, 80.9% for high activity purchases and 9.15 for high/low relative sale rate)

Analysis assumes LIFO (last-in first-out) for shares purchased by institutional investors.

**Exhibit 4**
**Shares Retained Through July 20, 2007**
**Based on shares traded on the Nasdaq and Toronto Stock Exchange**

| | Non-Institutional Investors | | | Institutional Investors | | | All Investors | | |
|---|---|---|---|---|---|---|---|---|---|
| Purchase Period | Purchased | Retained | % Retained | Purchased | Retained | % Retained | Purchased | Retained | % Retained |
| (1) | (2) | (3) | (4) [= (3) / (2)] | (5) | (6) | (7) [= (6) / (5)] | (8) [= (2) + (5)] | (9) [= (3) + (6)] | (10) [= (9) / (8)] |
| 2/27/2003 - 3/7/2003 | 650,174 | 6,379 | 1% | 251,339 | 0 | 0% | 901,513 | 6,379 | 1% |
| 3/8/2003 - 3/15/2004 | 43,134,599 | 792,435 | 2% | 27,539,332 | 222,100 | 1% | 70,673,930 | 1,014,535 | 1% |
| 3/16/2004 - 3/11/2005 | 46,618,453 | 1,639,418 | 4% | 26,177,372 | 670,432 | 3% | 72,795,825 | 2,309,851 | 3% |
| 3/12/2005 - 2/17/2006 | 40,220,461 | 3,257,190 | 8% | 25,455,210 | 3,740,153 | 15% | 65,675,671 | 6,997,343 | 11% |
| 2/27/2003 - 2/17/2006 | 130,623,686 | 5,695,422 | 4% | 79,423,253 | 4,632,685 | 6% | 210,046,939 | 10,328,107 | 5% |

**Notes and Sources:**

Trading volume from Factset Research Systems, Inc; shares outstanding from SEC Filings; short interest from Bloomberg LP; insider trading and holdings from Thomson Research and SEC Filings respectively; and institutional holdings data from Thomson Financial Shareworld.

Table excludes shares traded or held by market makers, short sellers, insiders, and intraday traders.

Nasdaq trading volume is adjusted for market makers participation rate of 54.76% based on "Dealer Participation on The New York Stock Exchange and Nasdaq," Fernando Avalos and Marcia Kramer Mayer, National Economic Research Associates, Inc., May 1, 2002.

The adjustment for non-institutional trading volume is based on an updated version of the estimate in "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," Marcia Kramer Mayer, National Economic Research Associates, Inc., October 1, 2000. (32.86% for intraday trading, 31.65% for high activity investors initial ownership, 80.9% for high activity purchases and 9.15 for high/low relative sale rate)

Analysis assumes LIFO (last-in first-out) for shares purchased by institutional investors.