# EXHIBIT B
# (PART 12)

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 13 of 47


A-1

Case 1:06-cv-06128-NRB Document 203 Filed 05/28/12 Page 14 of 47

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

## NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF U.S. CLASS ACTION

This Notice has been sent to you pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Southern District of New York (the "U.S. Court").

This Notice provides you with important information in connection with the resolution (the "Settlement") of certain claims in a class action lawsuit, brought in the United States, by a Class of purchasers ("Plaintiffs" or the "Class", as described in further detail below) of securities issued by IMAX Corporation ("IMAX" or the "Company"). The Settlement resolves Plaintiffs' claims against IMAX, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, an Ontario Limited Liability Partnership ("PwC-Canada") (the "Settling Defendants"). This U.S. class action is known as *In re IMAX Securities Litigation,* Civil Action No. 1:06-cv-06128 (the "U.S. Action"). Your rights will be affected by this Notice and the Settlement that it describes, so you should read this Notice carefully.

If you purchased or otherwise acquired IMAX shares on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive (the "Class Period"), you may be entitled to receive a payment from this Settlement.

**The U.S. Court will hold a Fairness Hearing at 10:30 a.m. on June 14, 2012 at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007-1312. At this hearing the U.S. Court will consider whether the Settlement is fair, reasonable and adequate and in the best interests of the Class.**

*A United States federal court authorized this Notice. This is not a solicitation from a lawyer.*

**Cet Avis vous a été envoyé car vous avez possiblement droit à une indemnisation en vertu du règlement d'un recours collectif intenté aux États-Unis par un Groupe constitué d'acheteurs d'actions émises par IMAX Corporation. Vous pourriez aussi être un membre du groupe dans une action similaire contre IMAX Corporation intentée au Canada. Vous pouvez obtenir une traduction anglaise du présent Avis en contactant le "Strategic Claims Services" dont les informations sont à la p. 13 de cet Avis.**

- The Settlement resolves certain claims asserted pursuant to the United States federal securities laws in a class action against the Defendants for damages incurred by the Class in connection with their transactions in IMAX shares. The Settlement consists of twelve million dollars ($12,000,000) in cash (the "Settlement Fund"). The recovery is explained in greater detail below.

- The law firm of Abbey Spanier Rodd & Abrams, LLP ("Lead Counsel") will apply to the Court for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) thereof, and reimbursement of expenses of no greater than $__ million (plus interest on such amounts at the same rate earned by the Settlement Fund) or an average of $__ per share of stock. Lead Counsel and other plaintiffs' counsel have litigated the U.S. Action for five years on a contingent fee basis, and have advanced all the expenses of litigation without reimbursement, with the expectation that if they were successful in recovering money for the Class, they would receive fees and be reimbursed for their expenses from the Settlement Fund, as is customary in this type of litigation.

- If you purchased IMAX securities on the NASDAQ on or after February 17, 2006 and held some or all of those securities on August 9, 2006 (the "Canadian Class Period"), then you are a member of the certified class (the "Canadian Class") in another class action based on substantially similar allegations to those alleged in this case against the IMAX Defendants and others in Ontario Canada (the "Canadian Action" - as described further below). The IMAX Defendants have made a motion for a final Order from the Canadian Court in the Canadian Action seeking to exclude, from the definition of the Canadian Class, all persons who do not opt out of this Settlement, if and when the settlement is approved by final Order of the U.S. Court (the "Canadian Order"). If the Canadian Order is entered and becomes final, you will not be permitted to recover in both cases and if you do not exclude yourself from the U.S. Action, you will automatically be deemed to be a member of the Class in the U.S. Action, and therefore excluded from the Canadian Class in the Canadian Action. For members of the Canadian Class, a detailed description of the Canadian Action as well as details regarding how to exclude yourself from this action (and thereby participate in the Canadian Action) are contained below.

- Your legal rights are affected whether you act or don't act, so please read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| **SUBMIT A PROOF OF CLAIM AND RELEASE FORM** | This is the only way to be eligible to receive any portion of the Settlement Fund. If you are a member of the Canadian Class and the Canadian Order is entered and becomes final, you cannot participate in that lawsuit if you submitted a Proof of Claim and Release Form in the U.S. Action (or if you did not opt out of the U.S. Action). |
| **EXCLUDE YOURSELF** | This is the only option that allows you to ever file or be part of another lawsuit against the Defendants about the Released Claims. You will not receive any portion of the recovery from the Settlement Fund if you select this option. The requirements to exclude yourself are described below. If you exclude yourself from the U.S. Action and you purchased and held IMAX securities during the Canadian Class Period, you will remain a member of the |

| | |
|---|---|
| | class in the Canadian Action, as described below. Contact information for counsel to the Canadian Class can be found on page 16 of this Notice. |
| **OBJECT BUT REMAIN IN THE SETTLEMENT** | Write to the U.S. Court about why you don't like the Settlement. You may object to the Settlement. The requirements to object are described below. |
| **GO TO A FAIRNESS HEARING** | The Fairness Hearing is open to the public. You may ask in writing to speak to the U.S. Court at the hearing about the fairness of the Settlement. If the Court approves the Settlement, you will be bound by the U.S. Court's Judgment (as it applies to your claim) whether or not you submit a Proof of Claim and Release form or receive any money from the Settlement. |
| **DO NOTHING** | Receive no payment. Give up your right to file your own or participate in any other lawsuit (including the Canadian Action) against the Defendants concerning the claims asserted by the Class. If you are a member of the Canadian Class and the Canadian Order is entered and becomes final, you must affirmatively have excluded yourself from the U.S. Action to be eligible to recover in the Canadian Action. |

- Your rights and options as well as the deadlines to exercise them are explained further in this Notice.

- The U.S. Court in charge of this case still has to decide whether to approve the Settlement. Payments to eligible claimants in the Settlement will be made only if and when the Canadian Order (defined below) becomes final and unappealable, the U.S. Court approves the Settlement, after any and all U.S. appeals are resolved, and after the claims processing procedure is complete.

**Statement of Plaintiffs' Recovery**

Lead Plaintiff (defined in question __ on page __) estimates that approximately ___ million shares of IMAX stock were purchased and/or acquired during the period from February 27, 2003 and July 20, 2007, inclusive, and that purchasers of those shares were damaged as a result of the purported acts or omissions alleged in the Consolidated Amended Class Action Complaint dated October 2, 2007 (the "Complaint"). Lead Plaintiff estimates that the average recovery per share of IMAX common stock under the Settlement will be $___ per share before the deduction of attorneys' fees, costs and expenses, as approved by the Court. The actual recovery per damaged share will depend on a variety of factors, including: (1) the number of claims filed; (2) when members of the Class ("Settlement Class Members") purchased or acquired their shares during the Class Period; (3) whether Settlement Class Members sold their IMAX shares during the Class Period or held their shares past the end of the Class Period; (4) administrative costs, including the costs of notice; (5) the number of Settlement Class Members who decide to exclude themselves from the Settlement; and (6) the amount awarded by the U.S. Court for attorneys' fees, costs and expenses. Distributions to Class Members will be made based on the Plan of Allocation set forth at the end of this Notice.

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 17 of 47

**Background of the U.S. Action and the Parallel Canadian Class Action**

The Judge presiding over this case is the Honorable Naomi Reice Buchwald of the United States District Court for the Southern District of New York. From August 11, 2006 through September 18, 2006, eight lawsuits were filed against all or certain of the Defendants in the United States District Court for the Southern District of New York, alleging that IMAX made material misrepresentations and omissions regarding revenue recognition for theater systems in violation of the federal securities laws between February 27, 2003 through July 20, 2007 (the "U.S. Class Period"). The people who brought the lawsuits are called plaintiffs, and the persons and entities they sued are called defendants.

On September 20, 2006, a lawsuit was filed in the Ontario Superior Court of Justice in Canada (the "Canadian Court") alleging, based on substantially identical facts to those alleged in the eight U.S. actions, that IMAX improperly recognized revenue on theater systems (the "Canadian Action"). The Canadian Action is known as *Silver v. IMAX Corp.*, Court File No. CV-06-3257-00. (Ontario Superior Court of Justice, Canada). The Judge presiding over this case is the Honourable Madam Justice van Rensburg of the Canadian Court. The IMAX Defendants estimate that approximately 83.9 percent of the shares of IMAX securities at issue in the Canadian Action were purchased on the NASDAQ and those members of the Canadian Class who purchased IMAX securities on the NASDAQ are also members of the U.S. Class.

There are differences between the U.S. Action and the Canadian Action. For example, while the Class Period in this U.S. Action runs from February 27, 2003, through July 20, 2007 (more than four years) the class period in the Canadian Action runs from February 17, 2006, through August 9, 2006 (less than six months). The U.S. Action includes PwC-Canada as a defendant, but the Canadian Action does not. The Canadian Action includes four Directors of IMAX (Neil S. Braun, Kenneth G. Copland, Garth M. Girvan and David W. Leebron) who are not Defendants in the U.S. Action. The U.S. Action seeks relief for violations of the U.S. securities laws. The Canadian Action asserts claims under the Canadian securities laws.

Pursuant to a January 17, 2007 Order of the U.S. Court, the eight U.S. actions were consolidated, and the U.S. Court appointed Westchester Capital Management, Inc. (the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL and SphinX Merger Arbitrage Fund) as lead plaintiff and further approved the appointment of the law firm of Abbey Spanier Rodd & Abrams, LLP as lead counsel for the class.

On October 2, 2007, Westchester filed a Consolidated Amended Class Action Complaint against Defendants in the U.S. Court In their Complaint, plaintiffs alleged that Defendants' public statements during the U.S. Class Period were materially false and misleading because they failed to disclose, among other things, that IMAX had recognized revenue on theater systems before installation of the system was complete, in contravention of U.S. generally accepted accounting rules, and in violation of its own accounting policies. Plaintiffs also alleged that IMAX's auditor, PwC-Canada was also responsible for the material misinformation disseminated to the investing public during the U.S. Class Period. Plaintiffs allege that Defendants' actions artificially inflated the price of IMAX stock during the U.S. Class Period and that once the truth was disclosed, the price of IMAX's stock declined, injuring the Class.

On December 10, 2007, the IMAX Defendants and PwC-Canada each separately filed motions to dismiss the Complaint on numerous grounds. On January 22, 2008, Westchester filed

its opposition to Defendants' motions to dismiss. Defendants filed their reply briefing on February 11, 2008.

On September 15, 2008, after supplemental submissions and oral argument, the Defendants' motions to dismiss were denied by the Court. Thereafter, Westchester commenced discovery, which included the production and review of hundreds of thousands of pages of documents and transcripts of depositions.

On October 31, 2008, Westchester filed Plaintiffs' first motion for class certification.

On December 3, 2008, the Second Circuit decided *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), holding that an investment adviser that did not directly purchase the securities at issue lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact. Relying on the Second Circuit's decision in *Huff*, on February 18, 2009, Snow Capital Investment Partners, L.P. ("Snow Capital") requested a pre-motion conference in connection with its anticipated motion for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff.

On February 23, 2009, the Defendants filed oppositions to Westchester's motion for class certification. On March 13, 2009, the Court denied without prejudice Westchester's motion for class certification pending resolution of Snow Capital's anticipated motion for reconsideration of the Court's January 17, 2007 Order.

On April 3, 2009, Snow Capital moved for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff. Westchester filed its opposition on April 24, 2009 and Snow Capital replied on May 1, 2009. On June 29, 2009, the Court determined that under *Huff*, Westchester, an investment advisor, lacked standing and granted Snow Capital's motion and appointed it lead plaintiff and its counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel.

On December 14, 2009, the Canadian Court certified the Canadian Action on behalf of investors worldwide who purchased IMAX securities on or after February 17, 2006 and held some or all of those securities on August 9, 2006. *See Silver v. IMAX Corporation*, [2009] O.J. No. 5585, 2009 ON.C. LEXIS 4847 (December 14, 2009, Sup. Ct. J.).

On April 22, 2010, Snow Capital filed its motion for class certification. On June 10, 2010, the Defendants filed oppositions to Snow Capital's class certification motion. Snow Capital filed its reply in further support of the motion on July 30, 2010. The Court did not hear oral argument on the motion. On December 20, 2010, this Court issued a Memorandum and Order that denied Snow's motion for class certification, held that this case could not proceed with Snow Capital as class representative, and directed that new applications to be named lead plaintiff be filed.

On April 14, 2011, the Court issued an Order naming The Merger Fund (the "Lead Plaintiff") as lead plaintiff and re-appointing Abbey Spanier Rodd & Abrams, LLP as lead counsel.

Between April 2011 and November 2011, the parties met numerous times, both in person and via conference call, in an effort to negotiate a settlement of the U.S. Action. As a result of such efforts, on November 2, 2011, Lead Plaintiff and the Defendants were able to reach an agreement that led to the Settlement, which is separately set forth in greater detail in the

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 19 of 47


Stipulation and Agreement of Settlement, dated January 26, 2012, as amended on March 20, 2012 (the "Stipulation").

After the U.S. Court preliminarily approved this Settlement on March__, 2012, the IMAX Defendants made a motion for a final Order from the Canadian Court in the Canadian Action seeking to exclude, from the definition of the Canadian Class, all persons who do not opt out of this Settlement, if and when the settlement is approved by final Order of the U.S. Court (the "Canadian Order"). That motion is currently scheduled to be argued before the Canadian Court from June 25 to June 27, 2012.

## The Circumstances of the Settlement

The Defendants and the Lead Plaintiff disagree as to the probable outcome of the U.S. Action with respect to liability. While the Lead Plaintiff was prepared to try this case against Defendants, and Lead Counsel were confident in the merits of their case, they recognize that a trial is inherently risky and that the Class may not have prevailed on any or all of its claims. Moreover, each of the Defendants believe that the Complaint lacks merit and had this Stipulation not been reached would have continued to vigorously defend against Lead Plaintiff's claims and present significant defenses thereto. While Lead Plaintiff believes that it had a strong case, Lead Plaintiff also believes that Defendants' defenses would have created uncertainty as to Lead Plaintiff's ability to win at trial or after appeals.

The Defendants and the Lead Plaintiff also disagree as to the probable outcome of the U.S. Action with respect to damages. Lead Plaintiff and their economic consultants believe that the damages arising from the alleged malfeasance in the U.S. Action, depending on the methodology used, are as high as $91 million. This amount results from the use of a damage model under which it was presumed that the proper measure of recoverable damages included the majority of IMAX's stock price drop that occurred when the Company disclosed information that corrected alleged prior false and misleading statements. This figure also assumes that the Court and a jury would make every factual finding in the Class's favor. Defendants have generated damage models showing damages based upon recent Supreme Court decisions which show damages as low as approximately $5 million.

Contrary to Lead Plaintiff's position, Defendants have argued, among other things, that they did not commit fraud, that IMAX's restatement was a result of accounting mistakes, and that their conduct did not cause the value of IMAX stock to decrease. As such, the decline was the result of other factors, including the inability of IMAX to find a buyer after a lengthy search, the announcement of a new business model involving joint ventures, considerable uncertainty surrounding the company, and an SEC investigation. Defendants have also argued that Lead Plaintiff will not be able to demonstrate that any purchasers prior to February 17, 2006 suffered a loss and that Lead Plaintiff will be unable to disentangle any stock drop attributable to the statements alleged to have been false or misleading and will therefore not be able to establish damages.

The Defendants and Lead Plaintiff also disagree as to whether the Court would have granted Lead Plaintiff's motion to certify this case as a class action. Although Lead Plaintiff withdrew its class certification motion in light of the Settlement, Defendants had opposed Lead Plaintiff's motion on the grounds that the U.S. Action is not superior to the previously certified global class action in Canada and that Defendants have rebutted the presumption of reliance set

forth in the Supreme Court case *Basic v. Levinson*, 485 U.S. 224 (1988), by demonstrating that the alleged misrepresentations did not impact the price of IMAX securities. Defendants also argued that even if a class is certified, it should not include any shareholders who purchased prior to February 17, 2006.

These disputes would be subject to expert testimony at summary judgment and trial, and, therefore, it is impossible to predict with certainty which arguments would find favor with the Court and the jury. As a result, in a trial or through a summary judgment motion, the U.S. Class could recover substantially less than the amount of the Settlement or nothing. Lead Counsel has recommended the Settlement because it believes that the Settlement provides a substantial recovery to the U.S. Class and believes that the U.S. Class might have obtained a lesser recovery or nothing at all if the Class had gone to trial and through inevitable appeals.

It is important to recognize, that the entry of Judgment and therefore the distribution of the Settlement funds in this case may be delayed because the Settlement is conditioned upon the Canadian Order becoming final and unappealable.

**Further Information**

Further information regarding this Settlement may be obtained by contacting: *In re IMAX Corporation Securities Litigation,* Civil Action No. 06 CIV. 6128 (NRB): Lead Counsel, Arthur N. Abbey, Karin E. Fisch and Richard B. Margolies, Abbey Spanier Rodd & Abrams, LLP, 212 East 39th Street, New York, NY 10016.

**WHAT THIS NOTICE CONTAINS**

**Page**

A. WHY DID I RECEIVE THIS NOTICE PACKAGE? .......... 8-9

B. WHAT IS A CLASS ACTION? .......... 9

C. HOW DO I KNOW IF I AM A SETTLEMENT CLASS MEMBER AND CAN BE PART OF THE SETTLEMENT? .......... 9

D. ARE THERE EXCEPTIONS TO BEING INCLUDED IN THE CLASS? .......... 9

E. I'M STILL NOT SURE I AM INCLUDED .......... 10

F. WHAT DOES THE SETTLEMENT PROVIDE? .......... 10

G. HOW MUCH WILL MY PAYMENT BE IN THE SETTLEMENT? .......... 10

H. HOW CAN I RECEIVE A PAYMENT IN THE SETTLEMENT? .......... 10-11

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 21 of 47 

I. WHEN WILL I RECEIVE MY PAYMENT IN THE SETTLEMENT? .......... 11

J. WHAT AM I GIVING UP TO RECEIVE A PAYMENT IN THE SETTLEMENT? .......... 11-13

K. HOW DO I EXCLUDE MYSELF FROM THE SETTLEMENT? .......... 13-14

L. IF I DON'T EXCLUDE MYSELF, CAN I SUE THE SETTLING DEFENDANTS FOR THE SAME THING LATER? .......... 14

M. IF I EXCLUDE MYSELF, CAN I OBTAIN A PAYMENT FROM THE SETTLEMENT? .......... 14

N. DO I HAVE A LAWYER IN THIS CASE? .......... 14

O. HOW WILL THE LAWYERS BE PAID? .......... 14

P. HOW DO I NOTIFY THE COURT THAT I DON'T LIKE THE SETTLEMENT? .......... 15

Q. WHAT IS THE DIFFERENCE BETWEEN OBJECTING AND REQUESTING EXCLUSION? .......... 16

R. WHEN AND WHERE WILL THE U.S. COURT DECIDE WHETHER TO APPROVE THE SETTLEMENT? .......... 16

S. DO I HAVE TO ANSWER QUESTIONS AT THE FAIRNESS HEARING? .......... 16

T. MAY I SPEAK AT THE FAIRNESS HEARING? .......... 16-17

U. WHAT WILL HAPPEN IF I DO NOTHING AT ALL? .......... 17

V. ARE THERE MORE DETAILS ABOUT THE SETTLEMENT AND THE CANADIAN ACTION? .......... 17

W. WHAT ARE MY RIGHTS AND OBLIGATIONS AS A SECURITIES BROKER OR NOMINEE? .......... 18

## BASIC INFORMATION

**A. WHY DID I RECEIVE THIS NOTICE PACKAGE?**

The U.S. Court authorized this Notice to be sent to you because you or someone in your family may have purchased or acquired IMAX shares on the NASDAQ from February 27, 2003 through

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 22 of 47

July 20, 2007, inclusive. If the description above applies to you or someone in your family, you have a right to know about the proposed Settlement of the U.S. Action against the Defendants and about all of your options before the U.S. Court decides whether to approve the Settlement. If the Canadian Order becomes final and unappealable and the U.S. Court approves the Settlement, and any objections or appeals that may be filed in opposition to the Settlement are overruled or otherwise resolved, then Strategic Claims Services (the "Administrator") will distribute the payments that the Settlement permits. This notice package explains the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

THE U.S. COURT HAS DIRECTED THAT NOTICE SHOULD BE GIVEN TO ALL CLASS MEMBERS TO INFORM THEM OF THE U.S. ACTION, THE CANADIAN ACTION AND THEIR RIGHTS. THE SENDING OF THIS NOTICE IS NOT AN EXPRESSION BY THE U.S. COURT OR THE PARTIES TO THE U.S. ACTION OF ANY OPINION AS TO THE MERITS OF ANY CLAIM OR DEFENSE OR THE LIKELIHOOD OF RECOVERY BY THE CLASS. NOTICE IS BEING PROVIDED SO THAT ALL CLASS MEMBERS MAY MAKE A DECISION AS TO WHAT STEPS, IF ANY, THEY WISH TO TAKE AS THIS MATTER PROCEEDS. NOTICE IS BEING SENT TO YOU BECAUSE RECORDS INDICATE THAT YOU MAY BE A CLASS MEMBER.

## B. WHAT IS A CLASS ACTION?

In a class action, one or more people and/or entities called a lead plaintiff sues on behalf of people and/or entities that have similar claims. All these people and/or entities are referred to as a class or individually as class members. One court resolves the issues for all class members, except for those who exclude themselves from the class.

## C. HOW DO I KNOW IF I AM A SETTLEMENT CLASS MEMBER AND CAN BE PART OF THE SETTLEMENT?

To see if you will receive a payment from the Settlement, you first need to know if you are a Class Member. The U.S. Action alleges that everyone who fits the following description is a Class Member: *all persons and entities who purchased or otherwise acquired IMAX shares on the NASDAQ from February 27, 2003 through July 20, 2007, inclusive.*

## D. ARE THERE EXCEPTIONS TO BEING INCLUDED IN THE CLASS?

Excluded from the Settlement Class are the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either current officers and/or directors of any Defendant, or who served as officers and directors of any Defendant at any time during the Class Period.

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 23 of 47

| E. | I'M STILL NOT SURE I AM INCLUDED. |
|---|---|

If you are still not sure whether you are included in the U.S. Action, you can ask for free help. You can call Strategic Claims Services at 1-866-274-4004 or visit www.______________ for more information. Or you can fill out and return the claim form attached hereto, to see if you qualify.

| F. | WHAT DOES THE SETTLEMENT PROVIDE? |
|---|---|

The Settlement consists of twelve million dollars ($12,000,000) in cash, plus interest. The Settlement will be used to pay Class Members, and also for the payment of taxes, administrative costs, including the costs of notice, and for attorneys' fees and expenses.

| G. | HOW MUCH WILL MY PAYMENT BE IN THE SETTLEMENT? |
|---|---|

If you are entitled to a payment, your share of the Settlement Fund will depend on a variety of factors, including the number of valid claim forms that Class Members submit, how many Settlement Class Members choose to exclude themselves from the class, how many shares of IMAX stock you purchased or otherwise acquired, and when you bought, acquired and sold your IMAX stock. The Plan of Allocation is included at the end of this Notice.

The Administrator, will distribute the Settlement Fund according to the Plan of Allocation described at the end of this Notice after the Canadian Order has become final and unappealable, the deadline for submission of Proof of Claim and Release forms has passed and all claims have been processed. The Administrator will process your claim and advise you if your claim does not satisfy the requirements approved by the U.S. Court. The Administrator will calculate your payment, if any, based upon the date you purchased or acquired IMAX stock, the losses you suffered as a result thereof and the type of claim you have.

By following the Plan of Allocation at the end of this Notice, you can calculate your "Recognized Claim." Your recovery will depend on the size of your Recognized Claim as it relates to the size of the Recognized Claims of all Class Members who file a claim form.

| H. | HOW CAN I RECEIVE A PAYMENT IN THE SETTLEMENT? |
|---|---|

To qualify for payment you must submit the Proof of Claim and Release form enclosed with this Notice. You may also obtain a claim form on the Internet at www.___________. Read the instructions carefully, fill out the form, include all the documents the form asks for, sign it and mail it postmarked no later than ______________. If you have any questions, or need assistance, call 1-866-274-4004, and someone will either answer your questions, or help you to complete the Proof of Claim and Release form.

The Administrator will advise Class Members if their claims are deficient and are rejected. Any Class Member who receives a deficiency letter or a rejection letter and who fails to submit documentation sufficient to remedy the deficiency or reason for rejection within the time prescribed herein shall have their claim deemed finally rejected. The Administrator shall advise Class Members in writing that their claims have been finally rejected. Class Members have thirty (30) days from the date of such final rejection letter to write to the Administrator stating the reasons that their claims should not be rejected, in which case the claim shall be submitted to the Court as a disputed claim. Notice of any hearing on such rejected claims shall be provided to all Class Members whose claims are rejected or disputed.

## I. WHEN WILL I RECEIVE MY PAYMENT IN THE SETTLEMENT?

The U.S. Court will hold a hearing on June 14, 2010, at 10:30 a.m., to decide whether to approve the Settlement. Even if Judge Buchwald approves the Settlement, it could take more than two years before the Settlement Fund is distributed to the Class Members. One reason that the Settlement distribution could be delayed is if Class Members object to any aspect of the Settlement and are not satisfied by the resolution of that objection by the U.S. Court. That Class Member could then appeal the U.S. Court's decision. In addition, it is always uncertain whether an appeal will be resolved in favor of a settlement, and resolving any such appeals or objections can take time. Another reason that the Settlement distribution could be delayed is that the Settlement is conditioned on the entry of the Canadian Order becoming final and unappealable. Finally, it may take more than two years for the Settlement Fund to be distributed because once the Settlement has been approved and any appeals are resolved, the Administrator must process all of the Proof of Claim and Release forms. The processing, by itself, is a very complicated process and will take many months.

## J. WHAT AM I GIVING UP TO RECEIVE A PAYMENT IN THE SETTLEMENT?

If you are a Settlement Class Member, and you do not exclude yourself from the Settlement, you remain in the Class, and that means that if the Settlement is approved, you, on behalf of yourself, your heirs, executors, administrators, successors and assigns and any Persons you represent, will release all "Released Claims," including participation in the Canadian Action, and including all "Unknown Claims," against all "Released Parties."

*The following release applies to the Settlement (as more fully set forth in the Stipulation).*

"Released Claims" means:

(i) with respect to the Released Parties: the release by Lead Plaintiff and all Class Members of all claims that were alleged in the U.S. Action, or the Canadian Action, or that could have been alleged in the U.S. Action, the Canadian Action, or any other proceeding, manner of action, actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, damages, judgments and demands in law, contract, trust or equity, domestic or foreign, including claims under U.S. securities laws, U.S. federal laws, U.S. state laws, U.S. common law, Canadian securities laws, Canadian federal and provincial laws, and Canadian common law, and the laws of any other

jurisdiction relating to transactions in IMAX securities during the Settlement Class Period or the subject matter and facts relating to the U.S. Action, including any acts, failures to act, omissions, misrepresentations, statements, misstatements, facts, events, transactions, occurrences or other subject matter set forth, alleged, embraced, encompassed or otherwise referred to in or related to the U.S. Action.

(ii) the claims that are to be released also include Unknown Claims and claims arising under the laws of any jurisdiction, including, without limitation, in the United States and in Canada, and Lead Plaintiff and all Class Members will waive and relinquish to the fullest extent possible any state, federal or foreign law defenses concerning the release of Unknown Claims. Defendants shall release Lead Plaintiff, all Class Members, and Lead Counsel, from any claims relating to the institution, prosecution, and settlement of the U.S. Action.

"Released Parties" means:

(i) with respect to the Defendants: the Defendants, their respective present and former parents, subsidiaries, divisions, affiliates, and any PricewaterhouseCoopers member firm, the present and former employees, members, partners, principals, managers, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Defendant Releasees"), and any Person or entity which is or was related to or affiliated with any Defendant Releasee or in which any Defendant Releasee has or had a controlling interest and the present and former employees, members, partners, principals, managers, officers, directors, attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them (all, with the Defendant Releasees, the "Defendant Released Parties").

(ii) with respect to Plaintiffs: the Lead Plaintiff and all other Class Members, their respective present and former parents, subsidiaries, divisions and affiliates, the present and former employees, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Plaintiff Releasees"), and any Person or entity in which any Plaintiff Releasee has or had a controlling interest or which is or was related to or affiliated with any Plaintiff Releasee.

"Unknown Claims" means:

(i) any Released Claims that Lead Plaintiff or any Class Member does not know of or suspect to exist in his, her or its favor at the time of the release of the Defendant Released Parties which, if known by him, her or it might have affected his, her or its Settlement with and release of the Defendant Released Parties, or might have affected his, her or its decision not to object to this Settlement or not to exclude himself, herself or itself from the Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date, the Lead Plaintiff shall expressly waive, and each of the Class Members shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, the provisions, rights and benefits of California Civil Code § 1542 and any provisions, rights and benefits conferred by any law of any state or territory

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 26 of 47

of the United States or principle of common law which is similar, comparable or equivalent to California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

(ii) Lead Plaintiff and Class Members may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Released Claims, but Lead Plaintiff shall expressly, and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiff acknowledges, and the Class Members shall be deemed to have acknowledged, and by operation of the Judgment shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

## K. HOW DO I EXCLUDE MYSELF FROM THE SETTLEMENT?

To exclude yourself from the Settlement, you must send a letter by mail saying that you want to be excluded from the *In re IMAX Corporation Securities Litigation*, Civil Action No. 06 CIV. 6128 (NRB) Settlement. To be excluded, you must include your name, address, telephone number, information concerning the quantity of IMAX stock held at the close of business on October 17, 2007, all of your purchase(s) and sale(s) of such stock from February 27, 2003 through and including October 17, 2007, the dates of purchase (or other acquisition) and sale of the IMAX stock, the price paid or received in all purchases and sales excluding commissions and fees, and your signature. No request for exclusion will be considered valid unless all information described in the preceding sentence is included in the request. Any exclusion request must be postmarked or hand delivered to the address below by no later than __________:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

You can't exclude yourself on the telephone. You also can't exclude yourself by e-mail (unless you have made prior written arrangements with the Administrator).

If you properly ask to be excluded, you will not receive any settlement payment and you cannot object to the Settlement from which you exclude yourself. You will also not be legally bound by

anything that happens in the U.S. Action, and may be able to sue the Defendants concerning the claims being released in the Settlement in a separate action or remain a member of the Canadian Action. If you properly exclude yourself from the U.S. Action, and you purchased and held IMAX securities during the Canadian Class Period, you will remain a member of the class in the Canadian Action.

## L. IF I DON'T EXCLUDE MYSELF, CAN I SUE THE SETTLING DEFENDANTS FOR THE SAME THING LATER?

No. If you do not exclude yourself from the Settlement, you cannot bring any of the Released Claims (including participating in the Canadian Action should the Canadian Order be entered and become final) against any Released Parties in the Settlement. Remember, the exclusion deadline is ____________________.

## M. IF I EXCLUDE MYSELF, CAN I OBTAIN A PAYMENT FROM THE SETTLEMENT?

No. If you exclude yourself from the Settlement, you cannot receive any payment from the Settlement. In that case, do not send in a Proof of Claim and Release form to ask for any payment.

## N. DO I HAVE A LAWYER IN THIS CASE?

The U.S. Court appointed the law firm of Abbey Spanier Rodd & Abrams, LLP, 212 East 39th Street, New York, NY 10016, as Lead Counsel to represent Class Members in this U.S. Action. You will not be charged for these lawyers, other than amounts those firms are awarded by the Court from the Settlement Fund. If you want to be represented by another lawyer, you may hire one at your own expense.

## O. HOW WILL THE LAWYERS BE PAID?

The lawyers who acted as counsel for the Class during the course of the litigation will apply to the U.S. Court for an award of attorneys' fees from the Settlement Fund. Lead Counsel will apply for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) of the Settlement and reimbursement of expenses of no greater than $____, plus interest on such amounts at the same rate earned by the Settlement Fund. This is the equivalent of an average of $____ per share of IMAX stock. Lead Counsel and other plaintiff's counsel have litigated the U.S. Action for five years on a contingent fee basis and have advanced the expenses of litigation with the expectation that if they were successful in recovering money for the Class, they would receive fees and be reimbursed for their expenses from the Settlement Fund, as is customary in this type of litigation.

Case 1:06-cv-06128-NRB Document 203 Filed 08/28/12 Page 34 of 47


A-2

**EXHIBIT C**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

## PROOF OF CLAIM AND RELEASE

**IF YOU PURCHASED OR OTHWERWISE ACQUIRED IMAX CORPORATION ("IMAX") SHARES ON THE NASDAQ BETWEEN FEBRUARY 27, 2003, AND JULY 20, 2007, INCLUSIVE, YOU MAY BE ELIGIBLE TO RECEIVE A PAYMENT IN THE PROPOSED U.S. CLASS ACTION SETTLEMENT WITH IMAX, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE, KATHRYN A. GAMBLE AND PRICEWATERHOUSECOOPERS LLP.**

IN ORDER TO RECEIVE ANY PAYMENTS TO WHICH YOU MAY BE ENTITLED AS A CLASS MEMBER, YOU MUST COMPLETE AND SIGN THIS PROOF OF CLAIM AND RELEASE FORM AND MAIL IT PREPAID, FIRST-CLASS MAIL, POSTMARKED NO LATER THAN ____________, 2012, TO THE FOLLOWING ADDRESS:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

IF YOU FAIL TO SUBMIT YOUR PROOF OF CLAIM AND RELEASE FORM ON OR BEFORE ________________, 2012, YOUR CLAIM MAY BE REJECTED AND YOU MAY BE PRECLUDED FROM RECEIVING ANY MONEY FROM THE SETTLEMENT.

A Proof of Claim and Release form will be deemed submitted when postmarked or, if submitted other than by first-class mail, on the date actually received by the Claims Administrator.

## I. IDENTITY OF CLAIMANT

Enter the name(s) of the beneficial purchaser(s) or acquirer(s) of IMAX stock; if the stock was held jointly in two or more names, all names must be shown, and all joint owners must sign the Proof of Claim. If some stock were held in one name (e.g., John Smith) and some in joint names (e.g., John and Mary Smith, JT), you must file separate Proof of Claim forms; all these represent different ownerships. A claimant whose IMAX shares were held in a custodial account under the Uniform Gifts to Minors Act ("UGMA") may file in his/her own name, if he/she is now of age. In this event, the former

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 36 of 47

custodian does not have to sign the Proof of Claim. UGMA Custodians should identify themselves as follows: (e.g., John Smith, Custodian for Jack Smith UGMA). Corporate officers or partners filing for a claimant corporation or partnership should file in the name of such entity, and sign their names and titles on the signature page. Executors, Trustees, Administrators, and the like should file in the name of the beneficial owner/seller, and sign their names and titles on the signature page.

**Name of Claimant(s):**

Name: ______________________________

Name: ______________________________

Address: ______________________________

Address: ______________________________

City: ____________ State: ___ Zip Code: ________ - ______

Country: ____________

_Individual _Corporation _Estate _Other (Specify)

_____ _____ - _____
Area Code Telephone No. (Day)

_____ _____ - _____
Area Code Telephone No. (Evening)

_____ _____ - _____
Area Code Telephone No. (Fax)

______________________________
Email Address

## II. STATEMENT OF CLAIM

### A. INSTRUCTIONS

I. If you require additional space, use copies of this page or pages in the same format as below (you may copy pages). Sign and print your name and your Social Security or Employer Identification Number on each additional page.

1. **You MUST enclose copies of confirmation slips, monthly statements and/or other documents evidencing each purchase, acquisition, sale or holdings reported on this Proof of Claim form. IF ANY SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES FROM YOUR BROKER. THESE DOCUMENTS ARE NECESSARY TO PROVE AND PROCESS YOUR CLAIM. FAILURE TO SUBMIT SUCH DOCUMENTS MAY RESULT IN REJECTION OF YOUR CLAIM.**
2. All references to purchase and sale dates relate to trade dates, not settlement dates.
3. The amount of the settlement proceeds to which you are entitled, if any, will be calculated pursuant to the proposed Plan of Allocation contained in the Notice, or such other plan as may be approved by the Court.
4. If you have acquired any IMAX common stock by gift, inheritance or operation of law, you are to report this transaction as if you acquired the stock on the same date as the person or entity who initially purchased the security.
5. A Proof of Claim and Release form will be deemed submitted when postmarked or, if sent other than by first-class mail, on the date actually received by the Claims Administrator.

**IF YOU NEED MORE ROOM, USE COPIES OF THIS PAGE OR PAGES IN THE SAME FORMAT AS BELOW.**

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 37 of 47

PLEASE FILL IN EACH SECTION, WRITING "NONE" WHERE APPROPRIATE.

## III. COMMON STOCK

A. **IMAX COMMON STOCK OWNED** as of the close of business on February 26, 2003:

____________________

B. **IMAX COMMON STOCK PURCHASED** during the period from February 27, 2003, through the close of business on October 17, 2007:

| Total Purchase Price (exclude commissions and fees) | Purchase Price Per Share (exclude commissions and fees) | Number of Shares Purchased | Trade Date(s) of Purchase (List Chronologically) Month / Day / Year |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

C. **IMAX COMMON STOCK SOLD** during the period from February 27, 2003, through the close of business on October 17, 2007:

| Total Sale Price (exclude commissions and fees) | Selling Price Per Share (exclude commissions and fees) | Number of Shares Sold | Trade Date(s) of Sale (List Chronologically) Month / Day / Year |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

D. **IMAX COMMON STOCK OWNED** as of the close of business on October 17, 2007:

____________________

## IV. PROOF OF CLAIM

By submitting this Proof of Claim, I (we) state that I (we) believe in good faith that: (a) I am (we are) a member of the Class as defined in the Notice, or am (are) acting for such person; (b) I (we) have read and understood the contents of the Notice; (c) I am (we are) not, and am (are) not acting for, IMAX, any defendant, any entity in which any defendant has a controlling interest, or the legal representative, heir, successor or assign of IMAX or any other individual defendant; (d) Neither I (we), nor any joint owners of the IMAX shares at issue, has filed an effective Request for Exclusion seeking to be excluded from the Settlement; (e) I am (we are) entitled to receive a share of the Settlement Fund; (f) I (we) desire to participate in the Settlement described in the Notice; and (g) I (we) have enclosed photocopies of the stockbroker confirmation slips or broker account statements, an authorized statement from the broker containing the transactional information found in a broker confirmation slip, or other documents adequately evidencing each purchase and sale listed below in support of my (our) claimed loss.

## V. SUPPORTING DOCUMENTS

In the event the Settlement is not finally approved or the Settlement is terminated, all Releases will be null and void.

## IX. CERTIFICATION

UNDER THE PENALTIES OF PERJURY, I (WE) CERTIFY THAT ALL OF THE INFORMATION PROVIDED ON THIS FORM IS TRUE, CORRECT AND COMPLETE. I (We) certify that I am (we are) NOT subject to backup withholding under the provisions of Section 3406(a)(1)(C) of the Internal Revenue Code. If I am (we are) signing on behalf of someone else, I (we) hereby certify and warrant that I am (we are) authorized to make this Proof of Claim and Release. I (we) hereby certify and warrant that I (we) have not previously sold, transferred, assigned or granted any interest in any of the claims released hereby (as set forth at paragraph V above) to any other person or entity.
NOTE: If you have been notified by the Internal Revenue Service that you are subject to backup withholding, please strike out the word "NOT" in the Certification above.

______________________________

Date Signature of Claimant

______________________________

Date Signature of Joint-Owner Claimant (if any)

If the claimant is other than an individual, or if the claimant is not the person completing and signing this form, the following must also be provided:

______________________________

Print Name of Person Signing Capacity of Person Signing (Executor, President, etc.)
Address of Person Signing

Street:______________________________

Street:______________________________

City:______________ State:___ Zip Code:_______ ____ ____ - _____
Area Code Telephone Number

You are urged to make and retain a copy of the Proof of Claim and Release and all documents that you submit.

**THIS PROOF OF CLAIM AND RELEASE MUST BE SUBMITTED BY PREPAID FIRST CLASS MAIL POSTMARKED NO LATER THAN ________, 2012 OR BE OTHERWISE RECEIVED BY THAT DATE BY:**

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
info@strategicclaims.net

For more information:

Toll Free: 1-866-274-4004

For overnight delivery:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 41 of 47

600 North Jackson Street - Suite 3
Media, PA 19063
info@strategicclaims.net

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063

JOHN DOE
123 EVERGREEN TERRACE
SPRINGFIELD, USA 123456

**FIRST-CLASS MAIL**

**IMPORTANT LEGAL NOTICE**

**X. <u>ACCURATE CLAIMS PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.</u>**

**THANK YOU FOR YOUR PATIENCE.**

**Reminder Checklist:**

1. Please sign the release and declaration on page 4.

2. Remember to attach supporting documentation.
3. Do not send original or copies of stock certificates.
4. Keep a copy of your claim form for your records.
5. If you desire an acknowledement of receipt of your claim form, please sent it Certified Mail, Return Receipt Requested.
6. If you move, please send us your new address.

You only need to return pages 1, 4, and others relevant to the securities you are claiming.

# A-3

EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

**SUMMARY NOTICE OF PROPOSED SETTLEMENT OF U.S. CLASS ACTION**

**IF YOU PURCHASED OR OTHERWISE ACQUIRED IMAX CORPORATION ("IMAX") SHARES BETWEEN FEBRUARY 27, 2003, AND JULY 20, 2007, INCLUSIVE (THE "CLASS PERIOD"), YOU ARE A MEMBER OF A CLASS (THE "CLASS") AND MAY BE ENTITLED TO RECEIVE A PAYMENT OF A PROPOSED U.S. CLASS ACTION SETTLEMENT.**

Please read this notice carefully and in its entirety. Your rights may be affected by the proposed settlement (the "Settlement") described in this notice. A hearing will be held with respect to the proposed Settlement on June 14, 2012 at 10:30 a.m. before the Honorable Naomi Reice Buchwald in the United States District Court for the Southern District of New York, in courtroom 21A, at the United States Courthouse, 500 Pearl Street, New York, New York 10007-1312.

The Settlement resolves certain claims asserted in a United States class action (the "U.S. Action") against IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, an Ontario Limited Liability Partnership (the "Defendants").

The Settlement consists of twelve million dollars ($12,000,000) in cash (the "Settlement Amount").

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 45 of 47

The purpose of the hearing is to determine whether the proposed Settlement with the Defendants, pursuant to which the Defendants will pay the above amount into a Settlement Fund in exchange for a release of claims against them, should be approved by the Court as fair, reasonable, adequate and in the best interests of the Class. At the hearing, the Court will also consider whether judgment should be entered dismissing all claims in the litigation against the Defendants with prejudice, plans of allocation to distribute the proceeds of the Settlement, a request by Lead Counsel for attorneys' fees in an amount up to 25 percent of the Settlement Fund and reimbursement of expenses in an amount not to exceed $______, and any other matters that may properly be brought before the Court in connection with the Settlement.

A description of the Settlement and the rights of the Class with respect to the Settlement, along with a proof of claim and release form, are contained in the notice of pendency and proposed Settlement of the U.S. Action (the "Notice"), which has been mailed to all identifiable potential Settlement class members. If you are a member of the Class, you may be entitled to share in the distribution of the Settlement Fund by filing a proof of claim and release form no later than _________, 2012. You also have the right to exclude yourself from the Settlement or object to the proposed Settlement or the other matters to be considered by the Court at the hearing, in accordance with the procedures described in the Notice.

To exclude yourself from the Class, you must submit a written request for exclusion in accordance with the instructions set forth in the Notice that is received or postmarked no later than _________, 2012. If you are a member of the Class and do not exclude yourself from the Class AND do not submit a proper proof of claim and release form, you will not share in the Settlement Fund but you will be bound by the order and final judgment of the Court entered into with respect to the Settlement.

Case 1:06-cv-06128-NRB Document 203 Filed 05/28/12 Page 46 of 47

In addition, if you purchased IMAX securities on or after February 17, 2006 and held some or all of those securities on August 9, 2006, then you are also a member of the certified class in another class action against IMAX Corporation and others, in Ontario, Canada (the "Canadian Action"). If you exclude yourself from the U.S. Action, you will remain a member of the class in the Canadian Action. The IMAX Defendants have made a motion for a final order from the Canadian court in the Canadian Action seeking to exclude from the definition of the Canadian class, all persons who do not opt out of this Settlement, if and when the Settlement is approved by final Order of the U.S. Court. If that motion is granted, the Settlement is approved by a final Order, and you do not opt out of the U.S. Action, you will be excluded from participating in the Canadian Action.

Any objections to the Settlement, the plan of allocation, or lead counsel's request for attorneys' fees and reimbursement of expenses must be filed with the Court and served on counsel for the parties in accordance with the instructions set forth in the Notice, such that they are received or postmarked no later than _________, 2012.

If you did not receive a copy of the Notice by mail, you may obtain a copy and a proof of claim and release form, or other information about the U.S. Action or the Canadian Action, by writing to the following address, calling the following telephone number, or on the internet at:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street - Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net
www._________.com

If you would like additional information regarding the U.S. Action, you may contact lead counsel in the U.S. Action at the addresses set forth below, or call them toll free at 1-800-889-370, or visit their website at www.__________ or www.abbeyspanier.com.

Case 1:06-cv-06128-NRB Document 203 Filed 03/28/12 Page 47 of 47

ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
ATTN: IMAX Settlement

If you would like additional information regarding the Canadian Action, you may write or contact lead counsel in the Canadian Action at the address set forth below, or call their clerk, Nicole Young, toll free at 1-800-461-6166 (ext. 2380); or email Ms. Young at nicole.young@siskinds.com; or visit www.classaction.ca.

Nicole Young
SISKINDS, LLP
680 Waterloo Street
London, Ontario, Canada

Please do not call the clerk of the Court or Judge Buchwald for information.

Dated: ________________, 2012

/S/
Clerk of the Court
United States District Court
Southern District of New York

# EXHIBIT Q

This is Exhibit "Q" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a [illegible]
Province of Ontario, while a [illegible]
Expires: August 8, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

**LEAD PLAINTIFF'S MOTION FOR AN AMENDED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, CONDITIONAL CLASS CERTIFICATION AND APPROVAL OF NOTICE PLAN**

Lead Plaintiff, by and through its undersigned counsel, hereby moves this Court for entry of an Amended Order granting preliminary approval of the proposed settlement as set forth in the Amended Stipulation and Agreement of Settlement Between Settlement Class Members and Imax Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP dated March 20, 2012 (the "Amended Stipulation"), and other relief pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

Through the [Proposed] Amended Order Preliminarily Approving Final Settlement and Providing For Notice (the "Amended Preliminary Approval Order"), Lead Plaintiff seeks a hearing on June 14, 2012, at 10:30 a.m. to determine whether the proposed settlement, on the terms and conditions provided in the Amended Stipulation, should be approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. The Amended Preliminary Approval Order also conditionally certifies the class, and sets forth the procedure whereby notice to class members is provided, and whereby class members who wish to be excluded from the class or object to the proposed settlement may do so.

WHEREFORE, for the reasons stated above, and for the reasons stated in Lead Plaintiff's January 26, 2012 memorandum of law and in the accompanying Amending Stipulation (with exhibits) which is attached to the Declaration of Richard B. Margolies in Support of Lead

Plaintiff's Motion For an Amended Order Granting Preliminary Approval of Class Action Settlement, Conditional Class Certification and Approval of Notice Plan, Lead Plaintiff respectfully requests that the Court enter the Amended Preliminary Approval Order, a proposed version of which is attached as Exhibit A to the Amended Stipulation.

Dated: March 26, 2012

Respectfully submitted,

ABBEY SPANIER RODD & ABRAMS, LLP

By: /s/ Richard B. Margolies

Arthur N. Abbey
aabbey@abbeyspanier.com
Karin E. Fisch
kfisch@abbeyspanier.com
Richard B. Margolies
rmargolies@abbeyspanier.com
212 East 39th Street
New York, NY 10016
(212) 889-3700

*Counsel for Lead Plaintiff*

# EXHIBIT R-1

This is Exhibit "R-1" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

680 Waterloo Street, London, ON N6A 3V8

SISKINDS | THE LAW FIRM

EMAIL dimitri.lascaris@siskinds.com

FILE NO. 810931/AL/al

**Delivered By Email**

January 31, 2012

Paul Steep
Dana Peebles
McCarthy Tetrault LLP
Suite 4700, Toronto Dominion Bank Tower
Toronto-Dominion Centre
Toronto, ON M5K 1E6

Jeffrey S. Leon
Eric Hoaken
Bennett Jones LLP
3400 One First Canadian Place
P.O. Box 130
Toronto ON M5X 1A4

Dear Sirs:

**Re: Imax Securities Class Actions**

I write in relation to the motion of The Merger Fund ("Merger") for preliminary approval of the proposed settlement of the U.S. Action.

Be advised that, based upon the information currently available to us, we regard the proposed terms for settling the claims of persons who purchased Imax shares over the NASDAQ during the Ontario class period (the "Ontario NASDAQ Claimants") to be inadequate, unfair and unreasonable.

Accordingly, it is our clients' current intention to oppose vigorously any attempt by your clients to obtain an order which excludes from the Ontario class any Ontario NASDAQ Claimants. Our clients may take other steps to ensure that the claims of such persons are not settled for inadequate consideration.

Having said that, we invite your clients to share with us the basis of Merger's determination that the proposed settlement terms constitute adequate, fair and reasonable compensation for the Ontario NASDAQ Claimants. If and when full disclosure of the basis of that

680 Waterloo Street, London, ON N6A 3V8

SISKINDS | THE LAW FIRM

determination has been made to us, our clients may be prepared to re-evaluate the adequacy of the U.S. settlement.

In particular, we ask that you promptly disclose the following to us:

1. According to the Stipulation of Settlement in the U.S. Action (the "Stipulation") filed in the SDNY in support of Merger's motion for preliminary approval of the U.S. settlement (the "Preliminary Approval Motion"), the decision to settle the U.S. Action for US$12 million was based in substantial part on the fact that "Lead Counsel reviewed and analyzed hundreds of thousands of pages of documents produced by Defendants, reviewed the transcripts of the testimony of the Individual Defendants and 11 other individuals conducted by the Securities and Exchange Commission and 11 transcripts of depositions conducted by the plaintiffs in the Canadian Action which included the testimony of a member of defendant PwC-Canada; conducted confirmatory discovery and consulted extensively with experts retained to advise on the issues pertinent to Lead Plaintiff's claims in the U.S. Action, including accounting issues and the damages that Lead Plaintiff would seek to prove at a trial." Please provide to us all of the documents referenced in the preceding sentence, including any written reports or estimates of class damages received by Merger's counsel in regard to damages, so that we may better understand the basis upon which Merger determined US$12 million to be adequate compensation for the members of the putative U.S. class.

2. The proposed Notice of Pendency filed in support of the Preliminary Approval Motion states that "Lead Plaintiff and their economic consultants believe that the damages arising from the alleged malfeasance in the U.S. Action, depending on the methodology used, are as high as $91 million." We note, however, that, on p. 49 of the Mediation Statement submitted by former Lead Plaintiff Snow Capital Investment Partners L.P. ("Snow Capital") in connection with the mediation held on July 16, 2010, Snow Capital estimated class damages to be approximately REDACTED As far as we can tell, this fact has not been disclosed to the SDNY or to the members of the putative U.S. Class. Accordingly, please advise whether it is your clients' intention to disclose this fact to the SDNY and to the members of the putative U.S. Class. If that is not their intention, please explain why your clients do not intend to make that disclosure. REDACTED

3. The Notice of Pendency states that the class damages estimate of $91 million "results from the use of a damage model under which it was presumed that the proper measure of recoverable damages included ***the majority*** of IMAX's stock price drop that occurred when the Company disclosed information that corrected alleged prior false

680 Waterloo Street, London, ON N6A 3V8

SISKINDS THE LAW FIRM

and misleading statements." [Emphasis added.] Please disclose to us what proportion of that stock price drop is presumed under that damages model to have occurred as a result of the corrective information then disclosed.

4. The materials filed by Merger in support of the Preliminary Approval Motion reference a mediation held before Judge Milonas on December 2, 2008. Please provide to us a copy of the mediation statement provided to Judge Milonas by former Lead Plaintiff Westchester Capital ("Westchester"). Additionally, please provide to us any written estimate of class damages that Westchester Capital provided to Judge Milonas in connection with that mediation.

5. The Stipulation states that "from time to time, Lead Counsel, Robbins Geller, and Canadian Lead Counsel have made demands on Defendants, separately or globally, to settle the actions." As a preliminary matter, we note that we never authorized you to disclose publicly that our clients made settlement demands on the Defendants. If you believe that you had the authority to make such a disclosure, then please explain the basis of your belief. In addition, we believe that this partial disclosure, standing alone, is misleading. It is equally if not more pertinent to the SDNY's consideration of the fairness of the U.S. settlement that, when a question arose as to whether Westchester Capital should remain lead plaintiff following the Second Circuit's decision in *Huff*, the Defendants approached us and sought to persuade our clients to settle the class claims without the involvement of Westchester Capital or its counsel, and that our clients, after having received what they deemed to be an inadequate offer of settlement from the Defendants, refused to settle those claims. Is it your clients' intention to disclose these facts to the SDNY?

6. The Stipulation makes reference to the "First Supplemental Agreement" and the "Second Supplemental Agreement." Please provide us with copies of these agreements.

7. Please provide us with your estimate of the proportion of the net settlement fund that will be paid to Ontario NASDAQ Claimants assuming that there is a 100% claims rate, and please explain to us how you arrived at that estimate. In particular, please disclose whether any expert has provided your clients or their counsel with an estimate or analysis of the proportion of the net settlement fund that will be paid to Ontario NASDAQ Claimants. If that analysis or estimate is in writing, then please provide us with a copy of that analysis or estimate. If that analysis or estimate was given orally, then please provide us with a reasonably detailed summary of the estimate or analysis.

680 Waterloo Street, London, ON N6A 3V8

SISKINDS | THE LAW FIRM

8. Clause FF of the Stipulation states that the Imax Defendants intend to continue to vigorously defend the Canadian Action "[i]n the absence of a settlement demand from Canadian lead counsel on substantially the same terms as the Settlement which provides substantially the same compensation for those members of the Canadian Class who do not participate in the Settlement." Please advise us what your clients would consider to be a settlement demand "which provides substantially the same compensation for those members of the Canadian Class who do not participate in the Settlement."

9. Please advise us of the total amount of the insurance coverage that remains unexhausted.

10. The Notice of Pendency filed in support of the Preliminary Approval Motion does not disclose Merger's estimate of the damages per share or the amount of damaged shares. Please explain why this information is not included in the Notice of Pendency at this time, and please disclose to us Merger's estimate of the damages per share and the amount of damaged shares.

Should your clients refuse to disclose any of the above information, please explain the basis of the refusal and provide to us as much information as your clients are prepared to disclose.

In addition to the foregoing, we are troubled by the following aspects of the proposed notice program in the U.S. Action. Please note that the following comments on that notice program are not intended to be exhaustive.

On page 16 of the 19-page Notice of Pendency, under the heading "ARE THERE MORE DETAILS ABOUT THE SETTLEMENT AND THE CANADIAN ACTION," members of the putative U.S. class who have questions about the Canadian Action are invited in the first instance to call Abbey Spanier. This section provides a toll-free number for Abbey Spanier, and then sets out that firm's name in capital letters. After Abbey Spanier's toll-free number, name and address are set forth, there is a single sentence suggesting that putative class members who "have more questions about the Canadian Action" "write or contact counsel for the Canadian Class at Siskinds, LLP, 680 Waterloo Street, London, Ontario, Canada, 519-672-2121 or Siskinds.com." The plain implication of this language is that putative class members having questions about the Canadian Action should first contact Abbey Spanier, and should contact Canadian class counsel only if they continue to have questions after speaking to Abbey Spanier.

680 Waterloo Street, London, ON N6A 3V8

SISKINDS THE LAW FIRM

However, there can be no serious question that the counsel who are best qualified to answer questions in regard to the Canadian Action are the Ontario lawyers who were appointed to prosecute that action by a Canadian Court over two years ago. Indeed, it is wholly inappropriate that class members be directed or prodded to address such questions in the first instance to Abbey Spanier, whose attorneys are not qualified to practice in this jurisdiction, and whose attorneys have played no role in the prosecution of the Canadian Action.

Accordingly, the Notice of Pendency should state that the first lawyers to whom putative class members should pose questions regarding the Canadian Action are the lawyers of Siskinds LLP. Moreover, the name of our firm should be set forth in upper case, and the toll-free number of my clerk, Nicole Young, should be provided, as should Ms. Young's name and email address. The toll-free number for Ms. Young is 1 (800) 461-6166 (ext. 2380), and her email address is nicole.young@siskinds.com. Finally, the Notice of Pendency sets forth the address of our firm's general website, but not of our class actions website. The precise web address that should be set forth in the Notice of Pendency is www.classaction.ca.

Further, and as Abbey Spanier well knows, it is likely that numerous members of the putative class will not read the lengthy Notice of Pendency in its entirety. The fact that there is a certified action in a neighbouring jurisdiction, the substantive and procedural laws of which are substantially different from those governing the U.S. Action, is highly material to the decision whether or not to opt out of the U.S. Action. Therefore, the section explaining where class members can obtain further information in regard to the Canadian Action should appear near the front of the Notice of Pendency, on p. 2 in the box to the left of "Exclude Yourself," and should not be buried near the end of so lengthy a notice.

Finally, the summary notice attached as Exhibit D to the Stipulation makes no reference to Canadian class counsel and invites persons seeking more information about the Canadian Action to call the claims administrator. Again, Court-appointed class counsel in the Canadian Action are far better qualified than an American claims administrator to provide class members with information regarding the Canadian Action. Accordingly, the summary notice should direct persons seeking such information to contact our firm, and should provide the information about our firm and Ms. Young that is specified above.

680 Waterloo Street, London, ON N6A 3V8

SISKINDS THE LAW FIRM

Please advise us no later than February 10, 2012 whether your clients will adopt the changes to the proposed summary notice and Notice of Pendency described above. If your clients refuse to adopt any of those changes, please explain the basis of the refusal. Unless we have received confirmation by February 10, 2012 that those changes will be adopted, we intend to write to Judge Buchwald to request those changes, and will advise her of your position in regard thereto.

Yours truly,

Siskinds LLP

Per:

A. Dimitri Lascaris
Class Actions

AL/al

cc. Michael Robb / Daniel Bach
William Sasso / Jay Strosberg

# EXHIBIT R-2

This is Exhibit "R-2" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

McCarthy Tétrault LLP
Box 48, Suite 5300
Toronto Dominion Bank Tower
Toronto ON M5K 1E6
Canada
Tel: 416-362-1812
Fax: 416-868-0673

Dana M. Peebles
Direct Line: 416-601-7839
Email: dpeebles@mccarthy.ca

mccarthy tetrault

February 1, 2012

**Via Facsimile**

Mr. Dimitri Lascaris/Mr. Michael G. Robb
Siskinds LLP
680 Waterloo St.
PO Box 2520, Stn. B
London ON N6A 3V8

Dear Sirs:

**Re: Silver et al v. Imax Corporation et al**

On January 27, on behalf of the IMAX Defendants in the Ontario Action, we provided to Justice van Rensburg, and to you, the materials filed by the parties to the US Action with Judge Buchwald, to request an Order in the US Action for preliminary approval of the settlement agreement in that matter, as set out in the filed Stipulation of Settlement and related documentation (including draft versions of short and long-form Notices).

Your letter of January 31 raises a number of points about those materials. I am responding on behalf of the IMAX Defendants in the Ontario Action to your letter, in three parts: i. to your comments regarding the draft Notices filed with Judge Buchwald; ii. to your questions directed to the decision made by the Lead Plaintiff in the US Action to settle that case on the terms defined in the Stipulation; and iii. to your questions directed to our clients as Defendants in the Ontario Action.

<u>The draft Notices in the US Action</u>

First, as to the comments on the draft Notices filed in the US Action, we have considered those comments, and have given our views to counsel for the IMAX defendants in the US Action (Cleary Gottlieb). We will advise you if changes are proposed to the draft Notices now before Judge Buchwald, by the counsel in the US Action (Cleary Gottlieb, and Abbey Spanier for the US Lead Plaintiff, and counsel to the defendant PwC-Canada).

<u>The U.S. Lead Plaintiff's Decision to Settle</u>

Second, as to your questions regarding the fairness and adequacy of the settlement in the US Action, those questions should be directed to counsel for the parties to that action. Your questions are not properly put to our office (as counsel to the IMAX Defendants in the Ontario Action) or to Bennett Jones (as counsel to The Merger Group for the purpose of its involvement in the Ontario Plaintiffs' motion for an Order to approve notice in the Ontario Action). Those questions - defined in your letter as relevant to your clients' intention to "re-evaluate the

mccarthy
tetrault



adequacy of the U.S. settlement" – are relevant, if at all, only within the US Action, where the US judge will evaluate fairness and adequacy, and so US counsel can determine whether you are entitled to the information you request. Those requests do not fall within the Ontario Action.

The IMAX Defendants in the Ontario Action

Third, you directed three questions to the IMAX Defendants in this action:

a. As to the fact that the Ontario Plaintiffs have made settlement offers in this case [your question 5], we believe that we were entitled to disclose that fact to the counsel for the IMAX defendants in the US Action, and it was then included in the Stipulation. We understand, and agree, that there is no intention on the part of the parties to the US action to convey any details of settlement discussions in the Ontario Action for the purposes of the evaluation by Judge Buchwald of the fairness of the terms of settlement of the US Action in the filed Stipulation.

b. As to the request for a detailed Offer to Settle in the Ontario Action [your question 8], we have of course made the offer to you to resolve this case, with substantially the same compensation as in the US Action, for those members of the Ontario Action Class that fall outside the class for which settlement is proposed for approval in the US Action. If you are prepared to accept such an Offer for a reduced Ontario Action Class, please advise us, and we will discuss more detailed terms. In the alternative, we will provide you with a detailed formal Offer to Settle to that effect shortly.

c. As to your request for disclosure of the remaining insurance coverage available to our clients in the Ontario Action, we are contacting the relevant insurers, and will advise you of our position shortly.

We are available to discuss these points with you are your convenience.

Yours very truly,

Dana M. Peebles
hvh

e-c: Eric R. Hoaken/Jeff Leon (Bennett Jones LLP)

# EXHIBIT R-3

This is Exhibit "R-3" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Bennett Jones

Bennett Jones LLP
3400 One First Canadian Place, PO Box 130
Toronto, Ontario, Canada M5X 1A4
Tel: 416.863.1200 Fax: 416.863.1716

**Jeffrey S. Leon**
Partner
Direct Line: 416.777.7472
e-mail: leonj@bennettjones.com
Our File No.: 67719.1

February 3, 2012

**Delivered by Fax (519) 672-6065**

Mr. Dimitri Lascaris
Mr. Michael G. Robb
Siskinds LLP
680 Waterloo St.
PO Box 2520, Stn. B
London, ON N6A 3V8.

Dear Dimitri and Mike:

**Re: Silver, et al. v. IMAX Corporation, et al.; The Merger Fund (Proposed Intervenor)**

Thank you for your letter of January 31, 2012. I have forwarded your letter to Mr. Richard Margolies at Abbey Spanier Rodd & Abrams LLP.

As Mr. Peebles indicated in his letter to you of February 1, 2012, the issue of changes to the draft notices in the U.S. action is a matter for U.S. counsel. We have discussed this with Mr. Margolies and anticipate being in a position to advise you of any changes to the current draft notices in short order.

Further, your questions relating to the settlement of the U.S. action should not be directed to us. They can only be directed to Abbey Spanier. Mr. Margolies has confirmed that you can contact him by email at rmargolies@abbeyspanier.com or by telephone at (212) 889-3700.

We obviously are not in a position to comment on the other matters raised in your letter.

Yours truly,

Jeffrey S. Leon

JSL/mdir

cc: Paul R. Steep
Dana M. Peebles
Eric Hoaken
Richard B. Margolies

WSLegal\067719\00001\7520682v1

# EXHIBIT R-4

This is Exhibit "R-4" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

680 Waterloo Street, London, ON N6A 3V8

SISKINDS THE LAW FIRM

EMAIL dimitri.lascaris@siskinds.com

FILE NO. 810931/AL/al

**Delivered By Email**

February 7, 2012

Jeffrey S. Leon
Bennett Jones LLP
3400 One First Canadian Place
P.O. Box 130
Toronto ON M5X 1A4

Dear Mr. Leon:

**Re: Imax Securities Class Actions**

I write in response to your letter of February 3. We do not agree with your position that the questions posed are matters only for Abbey Spanier. The questions posed and issues raised are relevant both to the class proceedings in Ontario and New York. Your firm undertook to keep the Ontario Court appraised of developments in the United States and you represent the Merger Fund; our correspondence is properly addressed to you. Indeed it is strange that you would suggest that the proper course was for us to have contacted your client directly.

You have no doubt provided a copy of my letter to your clients' U.S. counsel, and I see no reason for me to have to write to them separately simply to repeat what I have already stated in the letter you have provided to them. Please advise when we can expect a written reply.

Yours truly,

Siskinds LLP

for:

Per:
A. Dimitri Lascaris
Class Actions

AL/al

cc. Michael Robb / Daniel Bach
William Sasso / Jay Strosberg

# EXHIBIT R-5

This is Exhibit "R-5" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**Bennett Jones**

Bennett Jones LLP
3400 One First Canadian Place, PO Box 130
Toronto, Ontario, Canada M5X 1A4
Tel: 416.863.1200 Fax: 416.863.1716

Jeffrey S. Leon
Partner
Direct Line: 416.777.7472
e-mail: leonj@bennettjones.com

February 8, 2012

**Via Email to Dimitri.lascaris@siskinds.com**

Mr. A. Dimitri Lascaris
Siskinds LLP
680 Waterloo Street
London, ON N6A 3V8

Dear Dimitri:

**Re: Silver v. IMAX Corporation et al**
**Court file no. CV-06-3257-00**

I have your letter of February 7. I have set out my position, there is nothing remotely "strange" about it, and it has not changed. First, I did not suggest you contact The Merger Fund directly. I suggested you contact U.S. Lead Counsel, Abbey Spanier. Second, the fairness of the U.S. settlement is a matter for the U.S. Court. It is not otherwise relevant to the Canadian proceedings. Third, I do not have access to the information you seek, I am not authorized to have such information and I am not in a position to determine whether you are entitled to any such information. I directed you to the lawyers who can make that determination and, if appropriate provide information. Finally, an undertaking was given to the Court, not to you, to keep it apprised of developments. This undertaking has been and will continue to be honoured.

Yours truly,

**BENNETT JONES LLP**

for Jeffrey S. Leon

JSL/dea

c: Michael Robb / Daniel E.H. Bach, Siskinds LLP
William Sasso / Jay Strosberg, Sutts, Strosberg LLP
Eric R. Hoaken, Bennett Jones LLP

# EXHIBIT R-6

This is Exhibit "R-6" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

680 Waterloo Street, London, ON N6A 3V8

SISKINDS THE LAW FIRM

EMAIL dimitri.lascaris@siskinds.com

FILE NO. 810931/AL/ny

**Delivered By Email**

February 9, 2012

Abbey Spainer Rodd & Abrams LLP
Attn: Richard Margolies
212 East 39th Street
New York, NY 10016

Dear Mr. Margolies:

**Re: Imax Securities Class Actions**

Attached please find a copy of a letter which I recently sent to your client's Canadian counsel. I am sure that you already have a copy but your client's Canadian counsel seems to consider it important that I provide you with another. I look forward to hearing from you.

Yours truly,

Siskinds LLP

Per: Per:

A. Dimitri Lascaris
Class Actions

AL/ny

Attachment
cc.

Michael Robb & Daniel Bach – Siskinds LLP
Jeff Leon & Eric Hoaken – Bennett Jones
William Sasso & Jay Strosberg – Sutts Strosberg LLP

# EXHIBIT S-1

This is Exhibit "S-1" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

001026

DEF-UT-44(a)-1

Revenue - Systems

Policy No. 19

Date: 12/01/04

Revision #: 1.0

Page 1 of 3

**Purpose:**

This Policy establishes the Company's position with regards to the recording of revenue-systems...

**Revision History:**

| Date | Revision Number | |
|---|---|---|
| 12/01/04 | 1.0 | New document |

**Policy:**
*Revenue – Systems*

Theater system leases that transfer substantially all of the benefits and risks of ownership to customers are classified as sales-type leases as a result of meeting the criteria established by FASB Statement of Financial Accounting Standards No. 13, "Accounting for Leases" ("FAS 13"). When revenue is recognized, the initial rental fees due under the contract, along with the present value of minimum ongoing rental payments, are recorded as revenues for the period, and the related projector costs including installation expenses are recorded as cost of goods and services. Additional ongoing rentals in excess of minimums are recognized as revenue when reported by the theater operator, provided that collection is reasonably assured.

The Company recognizes revenues from sales-type leases upon installation of the theater system. Revenue associated with a sales-type lease is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.

The timing of installation of the theater system is largely dependent on the timing of the construction of the customer's theater. Therefore, while revenue for theater systems is generally predictable on a long-term basis, it can vary from quarter to quarter or year to year depending on the timing of installation.

The Company monitors the performance of the theaters to which it has leased equipment. When facts and circumstances indicate that it may need to change the terms of a lease which had previously been recorded as a sales-type lease, the Company evaluates the likely outcome of such negotiations. A provision is recorded against the net investment in leases if the Company believes that it is probable that the negotiation will result in a reduction in the minimum lease payments such that the lease will be reclassified as an operating lease. The provision is equal to the excess of the carrying value of the net investment in lease over the fair value of the equipment.

In the ordinary course of its business, the Company will from time to time determine that a provision it had previously taken against the net investment in leases in connection with a customer's lease agreement should be reversed due to a change in the circumstances that led to the original provision.

If the Company and a lessee agree to change the terms of the lease, other than by renewing the lease or extending its terms, management evaluates whether the new agreement would be classified as a sales-type lease or an operating lease under the provisions of FAS 13. Any adjustments which result from a change in

classification from a sales-type lease to an operating lease are reported as a charge to income during the period the change occurs.

In the normal course of its business, the Company each year will have customers who, for a number of reasons including the inability to obtain certain consents, approvals or financing, are unable to proceed with theater construction. In these instances, where customers of the Company are not in compliance with the terms of their leases for theater systems not yet installed, the leases are in default. There is typically deferred revenue associated with these leases, representing initial lease payments collected prior to the default. These initial lease payments are recognized as revenue when the Company exercises its rights to terminate the lease and the Company is released legally and/or by virtue of an agreement with the customer from its obligations under the lease arrangement. When settlements are received, the Company will allocate the total settlement to each of the elements based on their relative fair value.

*Operating leases of theater systems*

Leases that do not transfer substantially all of the benefits and risks of ownership to the customer are classified as operating leases. For these leases, initial rental fees and minimum lease payments are recognized as revenue on a straight-line basis over the lease term. Additional rentals in excess of minimum annual amounts are recognized as revenue when reported by theater operators, provided that collection is reasonably assured.

*Sales-type leases of theater systems*

Theater system leases that transfer substantially all of the benefits and risks of ownership to customers are classified as sales-type leases as a result of meeting the criteria established by FASB Statement of Financial Accounting Standards No. 13, "Accounting for Leases" ("FAS 13"). When revenue is recognized, the initial rental fees due under the contract, along with the present value of minimum ongoing rental payments, are recorded as revenues for the period, and the related theater system costs including installation expenses are recorded as cost of goods and services. Additional ongoing rentals in excess of minimums are recognized as revenue when reported by the theater operator, provided that collection is reasonably assured.

The Company recognizes revenues from sales-type leases upon installation of the theater system when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.

Cash installments of initial rents received in advance of the time at which revenue is recognized are recorded as deferred revenue. Costs incurred in constructing the theater systems not yet recognized as revenue are included in inventories.

If the Company and a lessee agree to change the terms of the lease, other than by renewing the lease or extending its terms, management evaluates whether the new agreement would be classified as a sales-type lease or an operating lease under the provisions of FAS 13. Any adjustments which result from a change in classification from a sales-type lease to an operating lease are recorded as a charge to earnings during the period in which the change occurs.

In the normal course of its business, the Company each year will have customers who, for a number of reasons including the inability to obtain certain consents, approvals or financing, are unable to proceed with theater construction. In these instances, where customers of the Company are not in compliance with the terms of their leases for theater systems not yet installed, the leases are in default. There is typically deferred revenue associated with these leases, representing initial lease payments collected prior to the default. These initial lease payments are recognized as revenue when the Company exercises its rights to terminate the lease and the Company is released legally or by virtue of an agreement with the customer from its obligations under the lease arrangement.

*Operating leases of theater systems*

Leases that do not transfer substantially all of the benefits and risks of ownership to the customer are classified as operating leases. For these leases, initial rental fees and minimum lease payments are recognized as revenue on a straight-line basis over the lease term. Additional rentals in excess of minimum



 

annual amounts are recognized as revenue when the contracted portions of theater admissions due to the Company reported by theater operators exceed the minimum amounts, provided that collection is reasonably assured.

*Sales of theater systems*

Revenue from sales of theater systems is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; title passes to the customer; installation of the system is complete; and collection is reasonably assured.

In the normal course of its business, the Company each year will have customers who, for a number of reasons including the inability to obtain certain consents, approvals or financing, are unable to proceed with theater construction. Once the determination is made that the customer will not proceed with installation, the lease agreement with the customer is generally terminated. Upon the Company being released from its future obligations under the agreement, the initial lease payments that the customer previously made to the Company are recognized as revenue.

**Definitions:**
Not applicable.

**U.S. GAAP and SEC References**

# EXHIBIT S-2

This is Exhibit "S-2" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

001029

DEF-UT-44(b)-1

**Revenue – System Leases**

**Policy No. ~~20~~ 19-A**

**Date: 12/01/04**

**Revision #: 1.0**

**Page 1 of 2**

**Purpose:**

This Policy establishes the Company's position on the revenue recognition applicable to leases signed by the Company with its customers.

**Revision History:**

| Date | Revision Number | |
|---|---|---|
| 12/01/04 | 1.0 | New document |

**Policy:**

***Operating leases of theater systems***

Leases that do not transfer substantially all of the benefits and risks of ownership to the customer are classified as operating leases. For these leases, initial rental fees and minimum lease payments are recognized as revenue on a straight-line basis over the lease term. Additional rentals in excess of minimum annual amounts are recognized as revenue when reported by theater operators, provided that collection is reasonably assured.

***Sales-type leases of theater systems***

Theater system leases that transfer substantially all of the benefits and risks of ownership to customers are classified as sales-type leases as a result of meeting the criteria established by FASB Statement of Financial Accounting Standards No. 13, "Accounting for Leases" ("FAS 13"). When revenue is recognized, the initial rental fees due under the contract, along with the present value of minimum ongoing rental payments, are recorded as revenues for the period, and the related theater system costs including installation expenses are recorded as cost of goods and services. Additional ongoing rentals in excess of minimums are recognized as revenue when reported by the theater operator, provided that collection is reasonably assured.

The Company recognizes revenues from sales-type leases upon installation of the theater system when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured.

Cash installments of initial rents received in advance of the time at which revenue is recognized are recorded as deferred revenue. Costs incurred in constructing the theater systems not yet recognized as revenue are included in inventories.

If the Company and a lessee agree to change the terms of the lease, other than by renewing the lease or extending its terms, management evaluates whether the new agreement would be

classified as a sales-type lease or an operating lease under the provisions of FAS 13. Any adjustments which result from a change in classification from a sales-type lease to an operating lease are recorded as a charge to earnings during the period in which the change occurs.

In the normal course of its business, the Company each year will have customers who, for a number of reasons including the inability to obtain certain consents, approvals or financing, are unable to proceed with theater construction. In these instances, where customers of the Company are not in compliance with the terms of their leases for theater systems not yet installed, the leases are in default. There is typically deferred revenue associated with these leases, representing initial lease payments collected prior to the default. These initial lease payments are recognized as revenue when the Company exercises its rights to terminate the lease and the Company is released legally or by virtue of an agreement with the customer from its obligations under the lease arrangement.

**Definitions:**
EITF 01-08, Determining Whether an Arrangement Contains a Lease
FAS 13, Accounting for Leases

**U.S. GAAP and SEC References**
FAS 13, Accounting for Leases
EITF 98-9, Accounting for Contingent Rent
SAB No. 101, Revenue Recognition Financial Statements
Regulation S-X, Rule 5-03

# EXHIBIT S-3

This is Exhibit "S-3" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**Revenue – System Sales**

**Policy No. 20-B** 19
**Date: 12/01/04**
**Revision #: 1.0**
**Page 1 of 2**

**Purpose:**

This Policy establishes the Company's position on the revenue recognition applicable to system sales contracts signed by the Company with customers.

**Revision History:**

| Date | Revision Number | |
|---|---|---|
| 12/01/04 | 1.0 | New document |

**Policy:**

*Sales of theater systems*

Revenue from sales of theater systems is recognized when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; title passes to the customer; installation of the system is complete; and collection is reasonably assured.

In determining that installation is complete for purposes of recognizing revenue for sales of IMAX theatre systems, the Company requires that the following criteria be met:

- IMAX technology department concludes that the installation is complete, meeting full working standards according to contract provisions and system specifications.
- All substantial issues which were raised by the client and which IMAX acknowledges and is in agreement with have been resolved.
- The installed theatre system complies with all material terms of the contract including the installation of the:
  - Projection unit;
  - Sound system;
  - Screen system; and,
  - 3D glasses system and cleaning system.

**Definitions:**
Not applicable.

**U.S. GAAP and SEC References**
SAB 101, Revenue Recognition in Financial Statements
APB 21, Interest on Receivables and Payables

# EXHIBIT S-4

This is Exhibit "S-4" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

DEF-UT-151-1

IMAX®

## IMAX CORPORATION

## MEMORANDUM

TO: Frank

FROM: Kathryn

DATE: December 1, 2005

RE: Revenue recognition policy compliance

---

**A) Revenue recognition policy disclosed in the 10-Q and 10-K:**

"The Company recognizes revenues from sales-type leases upon installation of the theater system when all of the following criteria are met: persuasive evidence of an agreement exists; the price is fixed or determinable; and collection is reasonably assured."

**Evidence of compliance:**

All sales and leases are supported by a contract signed by two officers and the contract includes the pricing terms and conditions. Collectibility is reviewed at the end of each quarter through the quarter-end accounts receivable bad debt review which in addition to your final review includes Khal, Mark Welton and myself.

**B) Accounting Policy Binder —Revenue Recognition**

Beginning in 2002, management developed further guidelines to assist with the evaluation of whether a system was installed. On an annual basis, as part of the update of the accounting policy manual, management reviews the policy.

Management has numerous procedures and controls in place to ensure these guidelines were adhered to. For example:

**Guideline–#1**

In determining that installation is complete for purposes of recognizing revenue for sales-type leases and sales of IMAX theatre systems, management requires that the following criteria be met:

- IMAX technology department concludes that the installation is complete, meeting full working standards according to contract provisions and system specifications.

**Evidence:** This is evidenced for each installation with the completion of the **"Theatre system installation close-out report"** signed by the commissioner, the project manager and the Director. These reports highlight outstanding installation issues or concerns. These reports are reviewed by Marnie and discrepancies reported to myself for evaluation. Any items of concerns are immediately addressed with yourself as the example in the Q3 installation of AEZ.

**Guideline--#2**

- All substantial issues which were raised by the client and which IMAX acknowledges and is in agreement with have been resolved.

**Evidence:** This is evidenced by the **"Certificate of Acceptance"** that is signed off by the customer indicating that IMAX has met the terms of the agreement.

**Guideline--#3**

- The installed theatre system complies with all material terms of the contract including the installation of the:

  - ✓ Projection Unit;
  - ✓ Sound system;
  - ✓ Screen system; and,
  - ✓ 3D glasses system and cleaning system.

**Evidence:** This is evidenced by the **"Theatre system installation close-out report"** signed by the commissioner, the project manager and the Director. The commissioner typically completes a detailed report that may outline the following:

- ✓ Theatre Profile
- ✓ Summary of outstanding issues
- ✓ Audio system checklist
- ✓ Presentation quality

The report is reviewed and signed off by all three IMAX employees, the commissioner, the project manager, and the Director, evidencing their consensus on the installation. Here are the specific representations made by these individuals included in the **"Theatre system installation close-out report"**:

- ✓ IMAX Theatre Development Technology department concludes that the installation of the IMAX theatre system is substantially complete, meeting full working standards according to the terms of Schedule A of the Agreement.

- ✓ Any substantial installation or operational issues have been resolved.

- ✓ The installed theatre system complies with all of the terms of the technical schedules attached to the contract.

**Other comments:**

Marnie continues to be very diligent at highlighting any concerns she may have read within the "summary of outstanding issues" for each installation. In the past, outstanding items such as the glass cleaning machine or the use of a white sheet were evaluated and deemed inconsequential to the overall installation.

# EXHIBIT S-5

This is Exhibit "S-5" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

IMAX®

IMAX CORPORATION
110 E. 59 Street, Suite 2100
New York, NY 10022
Asst. Pam Brown 212.821.0164
Rlister@imax.com

Tel: 212.821.0142
Fax: 212.371.7584

SUBJECT TO SOLICITOR CLIENT PRIVLEDGE

# Memorandum

**TO:** IMAX CORPORATION AUDIT COMMITTEE

**FROM:** ROBERT D. LISTER, EXECUTIVE VICE PRESIDENT & GENERAL COUNSEL

**CC:** GARY GIRVAN, MARY RUBY & JEFFREY VANCE

**DATE:** DECEMBER 7, 2005

**SUBJECT:** REPORT ON MESSAGE BOARD INVESTIGATION

---

## I. Executive Summary

After a fulsome investigation into allegations of accounting fraud by the Company, raised in an anonymous posting on Yahoo! Finance's Investment Message Boards (the "Posting"), I have reached the following conclusions:

(a) There is no evidence of any kind, written or verbal, that either supports, suggests or implies that the Company is "faking installations," "signing contracts for theatres that it knows will never open," "hid[ing] [expenses]," "paying customers to fake installs and sign documents for auditors," or planning, contemplating or intending to do any of the above.[1]

(b) The Company's internal controls and reporting structure appear well-designed to discover these types of accounting fraud should they have occurred; and

(c) The Company's internal accounting manual's "Policy 19-B," relating to revenue recognition applicable to system sales contracts is not articulated properly given the Company's actual policy, as disclosed in its public reporting based upon the criteria established by the relevant Financial Accounting Standards and Staff Accounting Bulletins.

[1] These are the express allegations in the Posting, reiterated verbatim in an email addressed to the U.S. Securities & Exchange Commission and copied to the Company's co-CEO's.

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00002

## II. Introduction

On November 10, 2006, a person identified by the tag "fraudattackers" posted the Posting on the Yahoo! Finance Message Board relating to IMAX stock. (The Posting is attached hereto as Exhibit "A'). The contents of the Posting were copied into an email addressed to "sec.gov" and copied to Brad Wechsler and Rich Gelfond.

Early the next morning, Brad called me on vacation in Florida and asked that I immediately look into the allegations. Brad alerted Rich and Frank Joyce to the Posting and the fact that I was looking into it, and scheduled a call with Ken Copland later in the day to brief Ken. I conducted a cursory investigation that day, speaking to individuals involved in the Company's installations. I also spoke with outside counsel, who confirmed that our bringing the Posting to the attention of Ken and investigating its contents was an appropriate course of action.

On the call with Ken later in the day, he stated that notifying the Audit Committee and PriceWaterhouseCoopers was a good idea, so calls were set up with both entities for the next business day, November 14. On those calls, it was agreed that I would lead a full investigation into the allegations under the general guidelines of the Company's Whistleblower Policy and a mandate outlined by Ken and Gary Girvan, and report my findings to the Audit Committee. On November 15, I met with Ken and Gary, who agreed that the investigation should focus on whether: (a) there was anything "fake" or misleading about the 9/05 Dehli installation; (b) there were any clients placed into backlog despite IMAX knowing they would never open theatres; (c) expenses were being "hid[den]" and (d) any of 2005's recognized installations were achieved by "paying customers to fake installs and sign documents for auditors."

### (a) Was there anything "fake" or misleading about the 9/05 Dehli installation?

My conclusion is no. While the theatre in which the system was installed was clearly not completed for purposes of opening, this fact – as well as very thorough descriptions of the condition of the theatre – was detailed in the System Installation Summary (the "Summary"), part of the client's Certificate of Acceptance of the installation (attached hereto as Exhibit "B"). The Summary mentions each material facet of the theatre that was not complete (power, finishings, weldings), so there was a high level of transparency regarding the condition of the theatre (a prominent allegation in the Posting), eliminating any concern that individuals at any level were attempting to mislead anyone regarding such condition.

My interviews with the individuals involved (Eric Jacques, VP, Theatre Development Technology, Mark Welton, SVP, Theatre Operations, Edward MacNeil, VP, Finance and Richard Wooland, Project Manager, Asia) are consistent with the Summary. The individuals confirmed the condition of the theatre as represented in the Summary. They also confirmed that the projection booth was substantially complete, the unit was installed, a screen frame and temporary screen were erected on the scaffolding, using temporary power and cooling sources, and an image was projected onto that screen.

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00003

The Certificate of Acceptance (attaching the Summary) was signed by the client indicating that the installation was substantially completed, the system was accepted and no substantial outstanding issues remained unresolved.

All of these facts are consistent with an installation taking place, and inconsistent with the fraudulent recognition of that installation.

**(b) Has the Company knowingly inserted into its backlog clients who it knows will not open theatres?**

My conclusion is no. Of the 72 systems in backlog, 69 of them (96%) appear to be with clients committed to opening systems as evidenced not just by their contracts with IMAX, but by their meeting historical payment schedules (where relevant) and other material terms of such contracts.

Of the 3 systems ((i) St. Petersburg (EPOS), (ii) Innovative #1 (Bangalore), (iii) Innovative #2 (Bangalore)) where the Company believes clients will not open theatres, there is no evidence that the Company believed this upon signing. It is only after the signing and inclusion in backlog of these systems, when the clients couldn't or wouldn't commit to make payments pursuant to their contracts, that it became doubtful that the theatres would be opened. The reason the systems remain in backlog is because, despite requests to remove these systems from backlog from the Business Affairs Department, the Legal Department has insisted they remain so as not to suggest, for potential litigation purposes, that the Company considers the contracts to be non-binding agreements.[2]

**(c) Has the Company "hid[den]" 2005 expenses to inflate earnings?**

This allegation lacks any specifics and is difficult to investigate, a difficulty heightened by the fact that the Company accrues expenses in the period they are incurred; when they are paid has no relevance to income.

While there is no evidence to support the bald allegation that 2005 expenses are being "hid[den]," it is possible that such conduct, if taking place, would not be fully detectable until 2006, when expenses "hid[den]" in 2005 would begin to show up. Hence, while Jeff Vance has analyzed financial reports for signs of improper expense (and found none), as recommended in Section V, some degree of added scrutiny is recommended during next year's audit with regard to this issue (though it is noted that no specifics of any kind relating to this allegation were cited in the Posting).

**(d) Were any of 2005's recognized installations achieved by "paying customers to fake installs and sign documents for auditors?"**

My conclusion is no. Jeff Vance has looked in some detail at each of these installations, while I have spoken with individuals involved and had Mary review each 2005 client agreement. No 2005 agreement contains any hint that either a side agreement or understanding existed with regard to any additional financial or other consideration that would be given for an installation, or any other atypical provision. None of the payment

[2] A recommendation for removing these 3 systems from backlog is included in Section V.

FOIA CONFIDENTIAL TREATMENT REQUESTED
IX 00004

schedules, or accounts payable data reviewed suggests any unusual activity with regard to a payment to a client or other third party. Mark Welton expressed confidence that cashflow statements and other regular reporting schedules would identify any such unusual payment. Eric Jacques expressed confidence that he would, by definition, be aware of any proposed or actual payment made to the client by an installation staff person, as he would have to approve any such request for payment. While it would potentially be more difficult to track a bribe made personally by an installation or Sales representative of the Company, such a bribe would be difficult to fathom, as installation staff are non-commissioned, and Sales staff are paid commission based on signings, not installations. Richard Wooland, a project manager for the Asia region, noted that while there was often pressure to complete installations by quarter-end, this manifested itself more in terms of tired employees working overtime in challenging environments as opposed to any untoward conduct. Richard was adamant that he has never seen nor heard of financial impropriety of any kind, a view shared by Eric and Mark.

While there are current deals in discussion where the Company has offered financial incentives for clients to install systems by dates prior to year-end, such incentives are fully transparent, documented and provided for as expense items in deal margin analyses.[3]

## III. IMAX's Accounting Manual

While not directly related to the allegations made in the Posting, in the course of my investigation, I read certain provisions of IMAX's internal accounting manual and came across Policy #19-B ("19B"), which purports to deal with revenue recognition in connection with system sales. (Policy 19-B is attached as Exhibit "C").

19B is meant to reflect the Company's policy of recognizing revenue from system installations, pursuant to SAB 101 & 104, but appears to have a small number of inaccuracies, making it not wholly consistent with the Company's actual policy – which is articulated in its public filings.

Those inaccuracies/inconsistencies are: (i) a requirement that system installation is deemed to have been "complete" to recognize revenue, when Company policy – and the language of the Certificate of Acceptance that the client signs – calls for "substantial completion" of such installation[4]; (ii) a requirement that an "installed theatre system" include a "Screen system," when Company policy and practice suggests only the screen frame is a material part of the system agreement, not the actual screen skin; and (iii) a requirement that an "installed theatre system" include a "3D glasses system and cleaning system" when Company policy and practice suggest these are perfunctory or routine items not a material part of the system agreement.

---

[3] The deals currently in negotiation where incentives have been offered to clients are: (i) Interlomas ($25k theatre marketing assistance); (ii) Kazan (same); (iii) Portland ($50k construction/overtime assistance); and (iv) Lodz (deferral of $500k payment installment obligation to 2006).

[4] This change was apparently made in a new version of 19B which was circulated internally by the Controller recently but not yet formally incorporated into 19B.

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00005



Confidential IMAX-US020848

Recommendations on how to address these inaccuracies/inconsistencies are contained in Section V.

## IV. Analysis of the Posting

I have deliberately avoided a very detailed search for clues as to who may have written the Posting as I did not believe it germane to this investigation, a view endorsed by Ken and Gary. However, a few points have come to my attention during the course of the investigation into its allegations that lead me to a preliminary conclusion that the individual who posted it is not an employee of the Company:

- The title of the Posting is "SEC TO INVESTIGATE FRAUD AT IMAX," which is (aside from being untrue) a posting more consistent with one who seeks to place a cloud over the Company's stock or fortunes than one who is honestly whistle-blowing;

- The Posting was not brought through the Company's automated whistleblower procedure, despite the procedure being well publicized;

- When an email was sent to the individual (in "Reply" to the email sent to sec.gov) on behalf of Ken, seeking specific information to help investigate the allegations, there was no reply. Again, this is inconsistent with an honest whistleblower who wants to see corrective action taken;

- Similarly, the individual has not followed up on the promise in the Posting that he/she "hear[s] more and will tell it at the end of the month so keep posted." Again, a statement like this, particularly when not followed up, is more consistent with one seeking to raise doubts about the Company than seeking redress;

- Much of the language employed, such as "the people who run this company will ruin this wonderful Canadian company" is noticeably heavy-handed; and

- The timing and language of the Posting are either highly coincidental or, in fact, related to a bitter arbitration the Company is having with an Indian client who defaulted on a 6-system theatre deal. The language and tone of the Posting is disturbingly similar to that employed by this litigant in a proceeding begun just days after the Posting was made.

## V. Recommendations

As noted above, my investigation has led me to conclude that there is no evidence of any kind suggesting that the Company has engaged in any fraudulent or wrongful conduct along the lines alleged in the Posting. There is nothing I could find suggesting in any way that IMAX officials "fake[d]" the Dehli installation, "pa[id] customers to fake installs and sign documents for auditors," placed into backlog theatre systems that they knew would not open, or "hid" expenses to inflate earnings.

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00006

Notwithstanding the above, I have come across a few issues where I recommend small improvements to existing policy or procedure:

1) Despite the lack of specifics regarding the allegation that expenses from 2005 were "hid[den]," I recommend that the pending audit early next year include a few additional tests designed to identify any 2006 accrued expenses that could have been incurred in 2005;

2) Despite Legal concern that removal of questionable client contracts from backlog could create some incremental litigation risk, I recommend that such contracts be removed going forward, with notes to the file confirming the Company still considers such contracts fully binding, but does not want the investment community to believe that the systems under such contracts are likely to be installed; and

3) 19B needs revision to make it consistent with the Company's actual (disclosed) revenue-recognition policy. This is a task that should be delegated to the Company's Finance Department, working in conjunction with the auditors.

# EXHIBIT S-6

This is Exhibit "S-6" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Confidential

Presentation to the IMAX Corporation Audit Committee
Summarized Findings in Relation to the Investigation of Allegations Made on Yahoo! Bulletin Board
December 7, 2005

Jeffrey Vance, CA- Manager, Business Operations, IMAX Corporation

DEF-UT-145-1

Confidential

Table of Contents

Allegation #1- Theatres prematurely considered installed for revenue recognition purposes 2

Allegation #2 - Backlog contains contracts that will never be realized 5

Allegation #3 - 2005 expenses concealed and to be booked in 2006 6

Appendix A: Revenue Recognition 7

Confidential

**Allegation #1**
**Theatres prematurely considered installed for revenue recognition purposes**

**Procedures:**

1. Reviewed installation reports for all theatres in 2005 and identified installation issues and outstanding items
2. Identified installations in 2005 that were recognized near quarter-ends and were not open by quarter-end
3. Reviewed actual opening dates of theatres identified in #2
4. Reviewed customer acceptance certificates for all theatres identified in #2 noting the acceptance had an operational date in the quarter where revenue was recognized
5. Reviewed total installation cost at recognition date to the total estimated installation cost for the system
6. Reviewed installation labour and inquired as to the nature of significant labour expenditures post-recognition date

**Summarized Findings:**

1. All theatres had signed customer acceptance certificates with operational dates specified in the quarter of revenue recognition

2. Eight of twenty-one system installations were recognized in a quarter preceding their opening date. Two of these installations had no installation issues reported. Of these, six had installation issues noted on the installation close-out summary, high estimated costs to complete, or both. These six installations, and the rationale for their selection for further inquiry were:

   -Toulouse, France (Q1) : High estimated cost to complete existed
   -Poznan, Poland (Q1) : Reference to a QTRU power supply coil to be replaced, high estimated cost to complete existed
   -Istanbul, Turkey (Q2) : References to the Glasses Cleaning Machine being installed on 7/11, sync issues between the projector and the soundtrack, and high estimated cost to complete existed
   -Nanjing, China (Q3) : Reference to transformer not installed at 9/29
   -Cuernavaca, Mexico (Q3) : References to a crack in a field flattener lens, field flatteners not operating correctly, whining platters, replacement screen, and the Glasses Cleaning Machine operational 10/13
   -Delhi, India (Q3) : References to the projection system requiring rewiring as entries made on a temporary basis, the Glasses Cleaning Machine not being installed, the 3D screen not installed, the CH3 speaker cable to be rerun, a trackball to be replaced, and a reference on the cost analysis that time would be required for partial disassemble and reinstall as theatre was not fully complete at time of commissioning

DEF-UT-145-3



IMAX-US000634

Confidential

3. For the six installations noted above, an analysis of labour expenditures post-recognition date was performed to determine the magnitude of any work remaining to be performed that was related to the installation. Findings were as follows:

Toulouse ($21k of $43k spent after 3/31)

-Approximately $4k (9% of total installation labour) related to the building of relays into the facility's fire alarm system
-The remaining $17k related to administration, warranty issues, travel time and training

Poznan ($28k of $48k spent after 3/31)

-Approximately $4k (9%) directly related to removing the 2D white screen and hanging the 3D silver screen, aligning the projector and remasking the screen
-The remaining $24k related to administration, travel time, training, and the provision of upgrades to bring the MPX projector up to current specifications that exceeded those in the contract

Istanbul ($10k of $53k spent after 6/30)

-Approximately $3k (6%) related to the installation of the Glasses Cleaning Machine and rectifying sync issues.
-The remaining $7k related to operator training

Nanjing

-Flat fee installation contracted to Entertainment Services for $85k
-Transformer installed prior to 9/30

Cuernavaca ($21k of $58k spent after 9/30)

-The entire $21k related to training, a warranty claim on a vendor-supplied part, travel time and administration

Confidential

Delhi ($35k of $97k spent after 9/30)

-Hourly rate contract for installation with Entertainment Services
-Approximately $6k (6%) related to the re-powering, re-testing and re-tuning due to the system being dormant during the client's completion of internal finishings
-Approximately $7k related to down-time while Entertainment Services waited for client labourers to clear the work site
-The remaining $22k related to Entertainment Services' attendance at the gala opening and training of operators

**Observations:**

- Interpretation of the above findings should be done in conjunction with Appendix A: Revenue Recognition
- Final determination of appropriateness of GAAP interpretation rests with PricewaterhouseCoopers LLP, the Company's external auditors. A contrary interpretation from PWC could result in quarterly restatement, as well as have implications to the Company's ongoing Sarbanes-Oxley compliance project.

**Management's Response:**

1. For each contract spanning a quarter-end in 2005, as well as on a go-forward basis for all installations spanning quarter or year-ends, the CFO and VP Finance, Controller will document their judgment of what is perfunctory in the context of each installation.
2. Policy 19B from the Accounting Manual is in the process of being amended to reflect the important role of management's judgment with respect to revenue recognition and the determination of the point of substantial completion. A draft revision has been circulated to PricewaterhouseCoopers LLP.



DEF-UT-145-5

IMAX-US000636

Confidential

[redacted]

**Allegation #3**
**2005 expenses concealed and to be booked in 2006**

**Procedures:**

1. Reviewed September 30, 2005 and October 31, 2005 balance sheets to determine whether improper capitalization of expenses had occurred
2. Reviewed the Company's internal controls over capitalization of expenses to ensure the controls were designed and operating effectively
3. Reviewed the Company's internal controls over booking of accounts payable transactions to ensure that expenses incurred in 2005 are properly accrued at year-end
4. Due to the nature of the allegation, no further procedures were performed as of this date

**Summarized findings:**

1. The review of the balance sheets as at September 30, 2005 and October 31, 2005 did not reveal any evidence that capitalized expenses were improperly treated
2. The Company's internal controls over capitalization of expenses and expense transaction recording have successfully passed the 2004 Sarbanes-Oxley process from both a design effectiveness and operating effectiveness standpoint. Work to date on the 2005 process has not revealed any indication that this will change for 2005

**Observations:**

- As part of the 2005 audit of the financial statements, the external auditors are required to perform a search for unrecorded liabilities as at December 31, 2005 spanning from January 1, 2006 to the date of signing of the audit opinion

DEF-UT-145-7

Confidential

## Appendix A: Revenue Recognition

**Key US GAAP Literature/Guidance**

FAS 5

Concept Statement 5 states that "an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues".

SAB 104

SAB 104 deals with when it is appropriate for companies to recognize revenue in varying circumstances.

EITF 00-21

EITF 00-21 provides guidance on when revenue can be recognized when there are multiple revenue generating activities. Specifically to IMAX, EITF 00-21 rules that the manufacture and installation of the projection/sound/screen system is linked, and revenue can only be recognized upon installation.

**Timing of Revenue Recognition**

General Overview

Revenue is generally recognized when all of the following criteria are met:

1. persuasive evidence of an arrangement exists
2. delivery has occurred or services have been rendered
3. the seller's price to the buyer is fixed or determinable, and
4. collectibility is reasonably assured.

Items #1, #3 and #4 are met since signed contracts that outline price and delivery dates exist for all customers and customers have paid installments on their upfront rents by delivery and installation dates.

Item #2 is open to some interpretation since it involves interpretation of "services have been rendered".

DEF-UT-145-8



IMAX-US000638

Confidential

Delivery has occurred or services have been rendered

SAB 104 identifies some key elements of what constitutes delivery and rendered services. Those relevant to IMAX are:

- the customer has taken title and assumed the risks and rewards of ownership of the products specified in the sales agreement
- objective demonstration of the satisfaction of any contractual acceptance provisions, whether through a formal customer acceptance sign-off or not
- any remaining performance obligations are inconsequential or perfunctory

*Inconsequential or perfunctory performance obligations*

"A seller should substantially complete or fulfill the terms specified in the arrangement related to the unit of accounting at issue in order for delivery or performance to have occurred". SAB104 defines "substantially complete" as "...only inconsequential or perfunctory actions may remain incomplete...".

Inconsequential or perfunctory actions are defined as:

- those that would not result in the customer receiving a refund or rejecting the delivered products or services performed to date
- those for which a demonstrated history of completing the remaining tasks in a timely and estimable manner and with reliably estimated costs exist
- those for which the skills or equipment required are not specialized and are readily available in the marketplace
- those for which the cost of completing the obligation, or the fair value of that obligation, is insignificant in relation to the contract fee, gross profit, and operating income allocable to the contract
- those for which the period before the remaining obligation will be extinguished is short
- for which the timing of payment of a portion of the sales price is not coincident with completing performance of the remaining activity

SAB 104 stipulates that judgments relating to substantial completion be applied consistently.

Confidential

MARVIN NEIL SILVER et al. Plaintiffs and IMAX CORPORATION et al. Defendants

Court File No: CV-06-3257-00

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Brampton

CROSS-EXAMINATION
PRODUCTION BRIEF #2

**McCarthy Tétrault LLP**
Suite 5300, Toronto Dominion Bank Tower
Toronto ON M5K 1E6

**R. Paul Steep** LSUC#: 21869L
Tel: 416 601-7998

**Dana M. Peebles** LSUC#: 30820V
Tel: 416 601-7839
Fax: 416 868-0673

**Lucas Lung** LSUC#: 52595C
Tel: 416 601-8048

**Solicitors for the Defendants and the proposed Defendants**

#4236819

001050