# EXHIBIT B
# (PART 13)

# EXHIBIT S-7

This is Exhibit "S-7" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**IMAX Corporation**
**2005 9&3F STL Margin**
($000's)

DEF-UT-76(a)-1

| | System | 9&3F Qtr1 | 9&3F Qtr2 | 9&3F Qtr3 | 9&3F Qtr4 | 9&3F Full Year | 4&6F Qtr1 | 4&6F Qtr2 | 4&6F Qtr3 | 4&6F Qtr4 | 4&6F Full Year | Better/(Worse) Qtr1 | Better/(Worse) Qtr2 | Better/(Worse) Qtr3 | Better/(Worse) Qtr4 | Better/(Worse) Full Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Veracruz, Mexico | 3D SR | 460 | - | - | - | 460 | 460 | - | - | - | 460 | - | - | - | - | - |
| IT#6-Poznan | 3D GT | 1,593 | - | - | - | 1,593 | 1,593 | - | - | - | 1,593 | - | - | - | - | - |
| Yelmo-Malaga | MPX | 869 | - | - | - | 869 | 869 | - | - | - | 869 | - | - | - | - | - |
| Toulouse, France | 3D SR | 1,090 | - | - | - | 1,090 | 1,090 | - | - | - | 1,090 | - | - | - | - | - |
| Cinepolis#2-Monterrey | 3D SR | 812 | - | - | - | 812 | 812 | - | - | - | 812 | - | - | - | - | - |
| Des Moines, Iowa | 2D GT Dome | - | 1,351 | - | - | 1,351 | - | 1,351 | - | - | 1,351 | - | - | - | - | - |
| Guadalajara | 3D SR | - | 571 | - | - | 571 | - | 571 | - | - | 571 | - | - | - | - | - |
| Dubai, Garden Shopping Mall, Nakheel | MPX | - | 866 | - | - | 866 | - | 866 | - | - | 866 | - | - | - | - | - |
| Istanbul | MPX | - | 895 | - | - | 885 | - | 885 | - | - | 885 | - | - | - | - | - |
| Cinemark-Pittsburg, PA | MPX | - | 469 | - | - | 469 | - | 469 | - | - | 469 | - | - | - | - | - |
| AEZ | MPX | - | - | 523 | - | 523 | - | - | 900 | - | 900 | - | - | (377) | - | (377) |
| Milan Europlex | MPX | - | - | - | - | - | - | - | - | 905 | 905 | - | - | - | (905) | (905) |
| Lusimodo-Lisbon | MPX | - | - | - | - | - | - | - | 905 | - | 905 | - | - | (905) | - | (905) |
| Chihuahua, Mexico (unsigned) | 3D SR | - | - | - | 1,308 | 1,308 | - | - | - | - | - | - | - | - | 1,308 | 1,308 |
| Winnipeg (unsigned) | 3D GT Upgrade | - | - | - | 915 | 915 | - | - | - | - | - | - | - | - | 915 | 915 |
| National Amusements -Ann Arbor | MPX | - | - | - | - | - | - | - | 715 | - | 715 | - | - | (715) | - | (715) |
| Beijing, China | 3D GT | - | - | - | 918 | 918 | - | - | - | 917 | 917 | - | - | - | 1 | 1 |
| Buenos Aires. | 3D GT | - | - | - | - | - | - | - | - | 527 | 527 | - | - | - | (527) | (527) |
| Dongguan, China | 3D GT | - | - | - | 984 | 984 | - | - | - | 997 | 997 | - | - | - | (13) | (13) |
| Guatemala City | 3D SR | - | - | - | - | - | - | - | - | 868 | 868 | - | - | - | (868) | (868) |
| Hong Kong #1 | MPX | - | - | - | 865 | 865 | - | - | - | 879 | 879 | - | - | - | (14) | (14) |
| Incheon | MPX | - | - | - | 918 | 918 | - | - | - | 901 | 901 | - | - | - | 18 | 18 |
| Interlomas, Mexico | 3D SR | - | - | - | 855 | 855 | - | - | - | 836 | 836 | - | - | - | 20 | 20 |
| Kazan | MPX | - | - | - | 1,036 | 1,036 | - | - | - | 1,107 | 1,107 | - | - | - | (71) | (71) |
| Kennedy Space Center - Original | 3D GT Upgrade | - | - | 1,634 | - | 1,634 | - | - | 1,705 | - | 1,705 | - | - | (70) | - | (70) |
| Lodz, Poland (IT #8) | 3D GT | - | - | - | 1,205 | 1,205 | - | - | 1,240 | - | 1,240 | - | - | (1,240) | 1,205 | (35) |
| Madison | MPX | - | - | - | 961 | 961 | - | - | - | 969 | 969 | - | - | - | (8) | (8) |
| Manila Theatre | 3D GT | - | - | - | 1,286 | 1,286 | - | - | - | 1,309 | 1,309 | - | - | - | (24) | (24) |
| McMinnville. | 3D SR | - | - | - | 1,472 | 1,472 | - | - | - | 1,471 | 1,471 | - | - | - | 0 | 0 |
| Nanjing, China | 2D SR Dome | - | - | 423 | - | 423 | - | - | 400 | - | 400 | - | - | 23 | - | 23 |
| Salt Lake City | 3D GT | - | - | 1,023 | - | 1,023 | - | - | 947 | - | 947 | - | - | 76 | - | 76 |
| Science & Tech Museum, Dong Guan | 3D GT | - | - | - | 644 | 644 | - | - | - | 665 | 665 | - | - | - | (21) | (21) |
| Joungsan | MPX | - | - | - | 809 | 809 | - | - | - | 901 | 901 | - | - | - | 8 | 8 |
| Shanghai United Cinema #1 | MPX | - | - | - | 646 | 646 | - | - | 660 | - | 660 | - | - | (660) | 646 | (13) |
| Sofia-IT #9 | 3D GT | - | - | - | - | - | - | - | - | 1,448 | 1,448 | - | - | - | (1,448) | (1,448) |
| St. Louis County | MPX | - | - | - | 987 | 987 | - | - | 997 | - | 997 | - | - | (997) | 987 | (10) |
| Cinemax | MPX | - | - | 1,120 | - | 1,120 | - | - | 1,170 | - | 1,170 | - | - | (50) | - | (50) |
| Ilsan | MPX | - | - | - | - | - | - | - | - | 901 | 901 | - | - | - | (901) | (901) |
| Kansas City Zoo (as upgrade) | 3D GT Upgrade | - | - | - | 716 | 716 | - | - | - | - | - | - | - | - | 716 | 716 |
| **Subtotal : Revenue Installs** | | 4,823 | 4,152 | 4,724 | 16,625 | 30,325 | 4,823 | 4,152 | 3,640 | 15,602 | 34,217 | - | - | (4,316) | 1,024 | (3,892) |
| **# of Revenue Installs** | | 5 | 5 | 5 | 17 | 32 | 5 | 5 | 10 | 16 | 36 | - | - | (5) | 1 | (4) |
| Amsterdam | MPX | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - | - |
| Olathe | MPX | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - |
| Phoenix | MPX | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - | - |
| Sterling Heights | MPX | - | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - |
| Columbus | MPX | - | - | 0 | - | - | - | - | 0 | - | - | - | - | - | - | - |
| TBD | MPX | - | - | - | - | - | - | - | 0 | - | - | - | - | (0) | - | (0) |
| **Subtotal: Joint Ventures** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **# JV Installs** | | 1 | 2 | 2 | - | 5 | 1 | 2 | 3 | - | 6 | - | - | (1) | - | (1) |
| **Subtotal : Installs** | | 4,823 | 4,152 | 4,724 | 16,625 | 30,325 | 4,823 | 4,152 | 3,640 | 15,602 | 34,217 | - | - | (4,316) | 1,024 | (3,892) |
| **# of Installs** | | 6 | 7 | 7 | 17 | 37 | 6 | 7 | 13 | 16 | 42 | - | - | (6) | 1 | (6) |
| New Rochelle, NY (Regal #3) | | - | 286 | - | - | 286 | - | 286 | - | - | 286 | - | - | - | - | - |
| Gwinnet (Mall of Georgia-Regal #5) | | - | 255 | - | - | 255 | - | 255 | - | - | 255 | - | - | - | - | - |
| Bangkok, Thailand (Cinema+) | | - | 407 | - | - | 407 | - | 407 | - | - | 407 | - | - | - | - | - |
| Quebec City Naturalium | | - | 221 | - | - | 221 | - | 221 | - | - | 221 | - | - | - | - | - |
| Kennedy Space Centre Galaxy 3D | | - | - | 1,604 | - | 1,604 | - | - | 1,457 | - | 1,457 | - | - | 147 | - | 147 |
| Kansas City Zoo (as Sale of existing) | | - | - | - | - | - | - | - | 448 | - | 448 | - | - | (448) | - | (448) |
| **Subtotal: Sales of Existing Theatres** | | - | 1,169 | 1,604 | - | 2,773 | - | 1,169 | 1,905 | - | 3,074 | - | - | (301) | - | (301) |
| **# of Sales of Existing Theatres** | | - | 4 | 1 | - | 5 | - | 4 | 2 | - | 6 | - | - | (1) | - | (1) |
| **Subtotal: Installs & Sales of Existing Theatres** | | 4,823 | 5,322 | 6,328 | 16,625 | 33,098 | 4,823 | 5,322 | 11,545 | 15,602 | 37,292 | - | - | (5,217) | 1,024 | (4,193) |
| **# Installs & Sales of Existing Theatres** | | 6 | 11 | 8 | 17 | 42 | 6 | 11 | 15 | 16 | 48 | - | - | (7) | 1 | (6) |

001051

**IMAX Corporation**
**2005 9&3F STL Margin**
($000's)

DEF-UT-76(a)-2

| System | 9&3F Qtr1 | 9&3F Qtr2 | 9&3F Qtr3 | 9&3F Qtr4 | 9&3F Full Year | 6&6F Qtr1 | 6&6F Qtr2 | 6&6F Qtr3 | 6&6F Qtr4 | 6&6F Full Year | Better/(Worse) Qtr1 | Better/(Worse) Qtr2 | Better/(Worse) Qtr3 | Better/(Worse) Qtr4 | Better/(Worse) Full Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UCI #3 | 6,500 | - | - | - | 6,500 | 6,500 | - | - | - | 6,500 | - | - | - | - | - |
| Seville Discovery Pavilion | 400 | - | - | - | 402 | 400 | - | - | - | 400 | - | - | - | - | 2 |
| Chennai, India | 200 | - | - | - | 200 | 200 | - | - | - | 200 | - | - | - | - | - |
| Orlando Muvico 1 | - | 1,845 | - | - | 1,845 | - | 1,845 | - | - | 1,845 | - | - | - | - | - |
| Madurai #3 | - | 1,249 | - | - | 1,249 | - | 1,249 | - | - | 1,249 | - | - | - | - | - |
| Tel-Aviv, Epic #4 | - | 757 | - | - | 757 | - | 757 | - | - | 757 | - | - | - | - | - |
| Bruhl Phantasialand | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| #1, E-City, India | - | - | - | 885 | 885 | - | - | - | 1,500 | 1,500 | - | - | - | (615) | (615) |
| Shanghai, Village/Golden | - | - | 1,176 | - | 1,176 | - | - | 1,176 | - | 1,176 | - | - | - | - | - |
| Camden, BJ #4 | - | - | 541 | - | 541 | - | - | - | - | - | - | - | 541 | - | 541 |
| Quito, Ecuador | - | - | 400 | - | 400 | - | - | - | - | - | - | - | 400 | - | 400 |
| Santiago, Chile (7404) | - | - | 109 | - | 109 | - | - | - | - | - | - | - | 109 | - | 108 |
| Investkino | - | - | 50 | - | 50 | - | - | - | - | - | - | - | 50 | - | 50 |
| Chongqing #2 | - | - | - | 150 | 150 | - | - | - | - | - | - | - | - | 150 | 150 |
| Settlements | 7,100 | 3,851 | 2,276 | 1,035 | 14,264 | 7,100 | 3,851 | 1,176 | 1,500 | 13,626 | - | - | 1,100 | (465) | 638 |
| # of Settlements | 2 | 3 | 5 | 2 | 13 | 3 | 3 | 1 | 1 | 8 | - | - | 4 | 1 | 5 |
| **Grand Total Recognitions & Settlements** | 11,923 | 9,172 | 8,603 | 17,660 | 47,362 | 11,923 | 9,172 | 12,720 | 17,102 | 50,918 | - | - | (4,117) | 559 | (3,556) |
| Absorption | (406) | 82 | (130) | (72) | (528) | (406) | 82 | 168 | 111 | (45) | - | - | (298) | (183) | (480) |
| Commissions | 37 | (4) | 5 | - | 37 | 37 | (4) | - | - | 33 | - | - | 5 | - | 6 |
| F/X hedging | (25) | 40 | (37) | - | (22) | (25) | 40 | - | - | 15 | - | - | (37) | - | (37) |
| Theatre de-installation costs | (29) | (9) | (51) | (76) | (165) | (29) | (8) | (6) | (6) | (50) | - | - | (45) | (70) | (115) |
| Production Support | (157) | (184) | (215) | (139) | (705) | (157) | (194) | (222) | (206) | (778) | - | - | 7 | 67 | 73 |
| Inventory Adjustments | (7) | 10 | 28 | (9) | 22 | (7) | 10 | (6) | (6) | (8) | - | - | 34 | (3) | 31 |
| Rework | (13) | (55) | (10) | (40) | (118) | (13) | (55) | (43) | (40) | (151) | - | - | 33 | - | 33 |
| Relocate Montpelier | 1 | (147) | (59) | - | (205) | 1 | (147) | - | - | (146) | - | - | (59) | - | (59) |
| Dead theatre projects | (0) | (2) | (13) | (6) | (21) | (0) | (2) | (5) | (5) | (13) | - | - | (8) | (1) | (9) |
| Returned Systems | - | (195) | (59) | - | (254) | - | (195) | (140) | (30) | (365) | - | - | 81 | 30 | 111 |
| All other | 87 | (84) | (152) | - | (152) | 87 | (84) | - | - | 3 | - | - | (152) | - | (155) |
| Other | (511) | (558) | (693) | (343) | (2,107) | (511) | (558) | (254) | (183) | (1,506) | - | - | (439) | (160) | (601) |
| **Grand Total-STL Margin** | 11,412 | 8,615 | 7,911 | 17,318 | 45,255 | 11,412 | 8,615 | 12,466 | 16,919 | 49,412 | - | - | (4,556) | 399 | (4,157) |

001052

2:17 PM 8/7/2008

001053

# IMAX Corporation
## Q3 Forecast with Potential Opportunities

DEF-UT-76(a)-3

| | Q4 Forecast | | | FY Forecast | | |
|---|---|---|---|---|---|---|
| | $000's | | EPS | $000's | | EPS |
| **Official Q3 Re-forecast (9+3F)** | 10,251 | $ | 0.24 | 14,837.14 | $ | 0.35 |
| **QTD performance versus forecast** | - | $ | - | - | $ | - |
| **Possible items for inclusion*** | | | | | | |
| Donguan falls to 2006 | (886) | $ | (0.02) | (886) | $ | (0.02) |
| **Sub-total installs** | **(886)** | **$** | **(0.02)** | **(886)** | **$** | **(0.02)** |
| **Sales/Settlements** | | | | | | |
| Regal -Low Case | 990 | $ | 0.02 | 990 | $ | 0.02 |
| **Sub-total sales/settlements** | **990** | **$** | **0.02** | **990** | **$** | **0.02** |
| **Total installs/sales/settlements** | **104** | **$** | **0.00** | **104** | **$** | **0.00** |
| **Revised fcst with all changes** | **10,355** | **$** | **0.24** | **14,941** (rounding) | **$** | **0.35** |
| **Better/(Worse)** | **104** | **$** | **0.002** | **104** | **$** | **0.002** |
| **Guidance** | | | | | | **$0.35 - $0.38** |
| **Opportunities/Risk (after tax impact)** | | | | | | |
| Mandate G&A reduction to Q3 level | (450) | $ | (0.01) | (450) | $ | (0.01) |
| Legal fees | - | $ | - | - | $ | - |
| Regal sale -Hi Case *(50/50)* | 2,250 | $ | 0.05 | 2,250 | $ | 0.05 |
| Regal Sale - Low Case *(50/50)* | (990) | $ | (0.02) | (990) | $ | (0.02) |
| Lark #2 *(20/80)* | 540 | $ | 0.01 | 540 | $ | 0.01 |
| Deep Sea 3d Q4 marketing | 273 | $ | 0.01 | 273 | $ | 0.01 |
| HDTV rights | 270 | $ | 0.01 | 270 | $ | 0.01 |
| Theatre ops potential performance pick up | 144 | $ | 0.00 | 144 | $ | 0.00 |
| Redding #1 | 810 | $ | 0.02 | 810 | $ | 0.02 |
| Redding #2 | 810 | $ | 0.02 | 810 | $ | 0.02 |
| Buchwald settlement | 1,080 | $ | 0.03 | 1,080 | $ | 0.03 |
| Hammons (Provision Reversal) *(95/5)* | 293 | $ | 0.01 | 293 | $ | 0.01 |
| Chihauha - unsigned *(25/75)* | (1,177) | $ | (0.03) | (1,177) | $ | (0.03) |
| Winnipeg - unsigned *(75/25)* | (824) | $ | (0.02) | (824) | $ | (0.02) |
| Kazan - construction issues *(50/50)* | (933) | $ | (0.02) | (933) | $ | (0.02) |
| Lodz - client/developer construction dispute *(50/50)* | (1,084) | $ | (0.03) | (1,084) | $ | (0.03) |
| McMinnville - construction issues *(50/50)* | (1,325) | $ | (0.03) | (1,325) | $ | (0.03) |
| Hong Kong - no site *(75/25)* | (778) | $ | (0.02) | (778) | $ | (0.02) |
| SUC - no site *(50/50)* | (582) | $ | (0.01) | (582) | $ | (0.01) |
| E-Citi - unsigned | (797) | $ | (0.02) | (797) | $ | (0.02) |
| Kansas City Zoo - unsigned *(10/90)* | (644) | $ | (0.02) | (644) | $ | (0.02) |
| Beijing *(75/25)* | (827) | $ | (0.02) | (827) | $ | (0.02) |
| Interlomas *(50/50)* | (770) | $ | (0.02) | (770) | $ | (0.02) |
| | **(4,710)** | **$** | **(0.11)** | **(4,710)** | **$** | **(0.11)** |

* All items are tax effected using a 10% tax rate

11:21 AM 8/25/2008
Q4 Estimate 11.07.06

DEF-UT-76(a)-4

**IMAX Corporation**
**Installs and Settlements - Q4**
**($000's)**

| | System | Latest Estimate Q4 | Q3 Re-forecast (9+3F) Q4 | B/(W) Q4 |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | 1,308 | 1,308 | - |
| Winnipeg *(not signed)* | 3D GT Upgrade | 915 | 915 | - |
| **Subtotal : Not signed or optioned** | | 2,223 | 2,223 | - |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,286 | 1,286 | - |
| McMinnville. | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 644 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 987 | - |
| Kansas City Zoo (as upgrade) | 3D GT Upgrade | 716 | 716 | - |
| **Subtotal : Signed** | | 13,418 | 14,402 | (984) |
| **Subtotal : Revenue Installs** | | 15,641 | 16,625 | (984) |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | 15,641 | 16,625 | (984) |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 3 | 3 | - |
| | 3D GT Upgrade | 2 | 2 | - |
| | 3D GT | 4 | 5 | (1) |
| | # Installs | 16 | 17 | (1) |
| **Sales of Existing Theatres** | | | | |
| Kansas City Zoo *(not signed)* | | - | - | - |
| Regal *(not signed)* | | 1,100 | - | 1,100 |
| **Subtotal: Sales of Existing Theatres** | | 1,100 | - | - |
| **# of Sales of Existing Theatres** | | 1 | - | 1 |
| **Subtotal: Recognitions** | | 16,741 | 16,625 | 116 |
| **# Recognitions** | | 17 | 17 | - |
| **Settlements** | | | | |
| E-Citi *(not signed)* | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| **Subtotal: Settlements** | | 1,035 | 1,035 | - |
| **Total Recognitions & Settlements** | | 17,776 | 17,660 | 116 |

11:21 AM8/25/2008
Q4 Estimate 11.07.05

001054

## Q3 Forecast with Potential Opportunities

DEF-UT-76(a)-5 001055

| | Q4 Forecast $000's | | EPS | FY Forecast $000's | | EPS |
|---|---|---|---|---|---|---|
| Official Q3 Re-forecast (9+3F) | 10,251 | $ | 0.24 | 14,837 | $ | 0.35 |
| QTD performance versus forecast | - | $ | - | - | $ | - |
| **Possible items for inclusion*** | | | | | | |
| Donguan falls to 2006 | (886) | $ | (0.02) | (886) | $ | (0.02) |
| **Sub-total installs** | (886) | $ | (0.02) | (886) | $ | (0.02) |
| **Sales/Settlements** | | | | | | |
| Regal -Low Case | 990 | $ | 0.02 | 990 | $ | 0.02 |
| **Sub-total sales/settlements** | 990 | $ | 0.02 | 990 | $ | 0.02 |
| **Total installs/sales/settlements** | 104 | $ | 0.00 | 104 | $ | 0.00 |
| **Revised fcst with all changes** | 10,355 | $ | 0.24 | 14,941 | $ | 0.35 |
| **Better/(Worse)** | 104 | $ | 0.002 | 104 | $ | 0.002 |
| **Guidance** | | | | | | $0.35 - $0.38 |
| **Opportunities/Risk (Pre-tax)** | | | | | | |
| Mandate G&A reduction to Q3 level | (500) | $ | (0.01) | (500) | $ | (0.01) |
| Regal Sale - Low Case *(50/50)* | (1,100) | $ | (0.03) | (1,100) | $ | (0.03) |
| Chihauha - unsigned *(25/75)* | (1,308) | $ | (0.03) | (1,308) | $ | (0.03) |
| Winnipeg - unsigned *(75/25)* | (915) | $ | (0.02) | (915) | $ | (0.02) |
| Kazan - construction issues *(50/50)* | (1,036) | $ | (0.02) | (1,036) | $ | (0.02) |
| Lodz - client/developer construction dispute *(50/50)* | (1,205) | $ | (0.03) | (1,205) | $ | (0.03) |
| McMinnville - construction issues *(50/50)* | (1,472) | $ | (0.03) | (1,472) | $ | (0.03) |
| Hong Kong - no site *(75/25)* | (865) | $ | (0.02) | (865) | $ | (0.02) |
| SUC - no site *(50/50)* | (646) | $ | (0.02) | (646) | $ | (0.02) |
| E-Citi - unsigned | (885) | $ | (0.02) | (885) | $ | (0.02) |
| Kansas City Zoo - unsigned *(10/90)* | (716) | $ | (0.02) | (716) | $ | (0.02) |
| Beijing *(75/25)* | (918) | $ | (0.02) | (918) | $ | (0.02) |
| Interlomas *(50/50)* | (855) | $ | (0.02) | (855) | $ | (0.02) |
| Regal sale -Hi Case -(2.5M less 1.1M included above) *(50/50)* | 1,400 | $ | 0.03 | 1,400 | $ | 0.03 |
| Lark #2 *(20/80)* | 600 | $ | 0.01 | 600 | $ | 0.01 |
| Deep Sea 3d Q4 marketing | 303 | $ | 0.01 | 303 | $ | 0.01 |
| HDTV rights | 300 | $ | 0.01 | 300 | $ | 0.01 |
| Theatre ops potential performance pick up | 160 | $ | 0.00 | 160 | $ | 0.00 |
| Redding #1 | 900 | $ | 0.02 | 900 | $ | 0.02 |
| Redding #2 | 900 | $ | 0.02 | 900 | $ | 0.02 |
| Buchwald settlement (1.3M Gross less 0.2M receivables) | 1,100 | $ | 0.03 | 1,100 | $ | 0.03 |
| Hammons (Provision Reversal) *(95/5)* | 325 | $ | 0.01 | 325 | $ | 0.01 |
| HP4 and PEX at 30M in Q4 | 823 | $ | 0.02 | 823 | $ | 0.02 |
| E-Citi -higher than deferred revenue | 885 | $ | 0.02 | 885 | $ | 0.02 |
| | (4,726) | $ | (0.11) | (4,726) | $ | (0.11) |

**Key:**
Black font - included in estimate
Green font - not included in estimate

* All items in estimate above are tax effected using a 10% tax rate

2:21 PM 8/7/2008
Q4 Estimate 11.09.05

**IMAX Corporation**
**Installs and Settlements - Q4**
($000's)

DEF-UT-76(a)-6

| | System | Latest Estimate Q4 | Q3 Re-forecast (9+3F) Q4 | B/(W) Q4 |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | 1,308 | 1,308 | - |
| Winnipeg *(not signed)* | 3D GT Upgrade | 915 | 915 | - |
| **Subtotal : Not signed or optioned** | | 2,223 | 2,223 | - |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,286 | 1,286 | - |
| McMinnville. | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 644 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 987 | - |
| Kansas City Zoo (as upgrade) | 3D GT Upgrade | 716 | 716 | - |
| **Subtotal : Signed** | | 13,418 | 14,402 | (984) |
| **Subtotal : Revenue Installs** | | 15,641 | 16,625 | (984) |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | 15,641 | 16,625 | (984) |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 3 | 3 | - |
| | 3D GT Upgrade | 2 | 2 | - |
| | 3D GT | 4 | 5 | (1) |
| | # Installs | 16 | 17 | (1) |
| **Sales of Existing Theatres** | | | | |
| Kansas City Zoo *(not signed)* | | - | - | - |
| Regal *(not signed)* | | 1,100 | - | 1,100 |
| **Subtotal; Sales of Existing Theatres** | | 1,100 | - | - |
| **# of Sales of Existing Theatres** | | 1 | - | 1 |
| **Subtotal; Recognitions** | | 16,741 | 16,625 | 116 |
| **# Recognitions** | | 17 | 17 | - |
| **Settlements** | | | | |
| E-City *(not signed)* | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| **Subtotal: Settlements** | | 1,035 | 1,035 | - |
| **Total Recognitions & Settlements** | | 17,776 | 17,660 | 116 |

001056

2:21 PM8/7/2008
Q4 Estimate 11.09.05

# Q3 Forecast with Potential Opportunities

DEF-UT-76(a)-7
001057

| | Q4 Forecast $000's | Q4 Forecast EPS | FY Forecast $000's | FY Forecast EPS |
|---|---|---|---|---|
| Official Q3 Re-forecast (9+3F) | 10,251 | $ 0.24 | 14,837 | $ 0.35 |
| QTD performance versus forecast | 414 | $ 0.01 | 414 | $ 0.01 |
| **Possible items for inclusion*** | | | | |
| Donguan falls to 2006 | (886) | $ (0.02) | (886) | $ (0.02) |
| Chihuahua falls out | (1,177) | $ (0.03) | (1,177) | $ (0.03) |
| Kansas City Zoo falls out | (644) | $ (0.02) | (644) | $ (0.02) |
| **Sub-total installs** | (2,707) | $ (0.06) | (2,707) | $ (0.06) |
| **Sales/Settlements** | | | | |
| Regal -Low Case | 990 | $ 0.02 | 990 | $ 0.02 |
| **Sub-total sales/settlements** | 990 | $ 0.02 | 990 | $ 0.02 |
| **Total installs/sales/settlements** | (1,717) | $ (0.04) | (1,717) | $ (0.04) |
| **Revised fcst with all changes** | 8,948 | $ 0.21 | 13,534 | $ 0.32 |
| **Better/(Worse)** | (1,303) | $ (0.031) | (1,303) | $ (0.031) |
| **Guidance** | | | | $0.35 - $0.38 |
| **Opportunities/Risk (Pre-tax)** | | | | |
| Mandate G&A reduction to Q3 level | (500) | $ (0.01) | (500) | $ (0.01) |
| Regal Sale - Low Case *(50/50)* | (1,100) | $ (0.03) | (1,100) | $ (0.03) |
| Winnipeg - unsigned *(75/25)* | (915) | $ (0.02) | (915) | $ (0.02) |
| E-Citi - unsigned | (885) | $ (0.02) | (885) | $ (0.02) |
| Kazan - construction issues *(50/50)* | (1,036) | $ (0.02) | (1,036) | $ (0.02) |
| McMinnville - construction issues *(50/50)* | (1,472) | $ (0.03) | (1,472) | $ (0.03) |
| SUC - no site *(50/50)* | (646) | $ (0.02) | (646) | $ (0.02) |
| Donguan S&T Dome *(50/50)* | (644) | $ (0.02) | (644) | $ (0.02) |
| Interlomas *(75/25)* | (855) | $ (0.02) | (855) | $ (0.02) |
| Lodz - client/developer construction dispute *(75/25)* | (1,205) | $ (0.03) | (1,205) | $ (0.03) |
| Hong Kong - has site approval now *(75/25)* | (865) | $ (0.02) | (865) | $ (0.02) |
| Beijing -construction delay *(95/5)* | (918) | $ (0.02) | (918) | $ (0.02) |
| Manilla -construction delay *(95/5)* | (1,286) | $ (0.03) | (1,286) | $ (0.03) |
| Regal sale -Hi Case -(2.5M less 1.1M included above) *(50/50)* | 1,400 | $ 0.03 | 1,400 | $ 0.03 |
| Lark #2 *(20/80)* | 600 | $ 0.01 | 600 | $ 0.01 |
| Deep Sea 3d Q4 marketing | 303 | $ 0.01 | 303 | $ 0.01 |
| HDTV rights | 300 | $ 0.01 | 300 | $ 0.01 |
| Theatre ops potential performance pick up | 160 | $ 0.00 | 160 | $ 0.00 |
| Redding #1 | 900 | $ 0.02 | 900 | $ 0.02 |
| Redding #2 | 900 | $ 0.02 | 900 | $ 0.02 |
| Buchwald settlement (1.3M Gross less 0.2M receivables) | 1,100 | $ 0.03 | 1,100 | $ 0.03 |
| Hammons (Provision Reversal) *(95/5)* | 325 | $ 0.01 | 325 | $ 0.01 |
| HP4 and PEX at 30M in Q4 | 823 | $ 0.02 | 823 | $ 0.02 |
| E-Citi -higher than deferred revenue | 885 | $ 0.02 | 885 | $ 0.02 |
| | (4,632) | $ (0.11) | (4,632) | $ (0.11) |

**Key:**
Black font - included in estimate
Green font - not included in estimate

* All items in estimate above are tax effected using a 10% tax rate

2:22 PM 8/7/2008
Q4 Estimate 11.18.05

**IMAX Corporation** DEF-UT-76(a)-8

**Installs and Settlements - Q4**

($000's)

| | System | Latest Estimate Q4 | Q3 Re-forecast (9+3F) Q4 | B/(W) Q4 |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | - | 1,308 | (1,308) |
| Winnipeg *(not signed)* | 3D GT Upgrade | 915 | 915 | - |
| **Subtotal : Not signed or optioned** | | 915 | 2,223 | (1,308) |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,288 | 1,288 | - |
| McMinnville. | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 644 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 987 | - |
| Kansas City Zoo (as upgrade) | 3D Upgrade | - | 716 | (716) |
| **Subtotal : Signed** | | 12,702 | 14,402 | (1,700) |
| **Subtotal : Revenue Installs** | | 13,617 | 16,625 | (3,008) |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | 13,617 | 16,625 | (3,008) |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 2 | 3 | (1) |
| | 3D GT Upgrade | 1 | 2 | (1) |
| | 3D GT | 4 | 5 | (1) |
| | # Installs | 14 | 17 | (3) |
| **Sales of Existing Theatres** | | | | |
| Kansas City Zoo *(not signed)* | | - | - | - |
| Regal *(not signed)* | | 1,100 | - | 1,100 |
| **Subtotal: Sales of Existing Theatres** | | 1,100 | - | 1,100 |
| **# of Sales of Existing Theatres** | | 1 | - | 1 |
| **Subtotal: Recognitions** | | 14,717 | 16,625 | (1,908) |
| **# Recognitions** | | 15 | 17 | (2) |
| **Settlements** | | | | |
| E-Citi *(not signed)* | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| **Subtotal: Settlements** | | 1,035 | 1,035 | - |
| **Total Recognitions & Settlements** | | 15,752 | 17,660 | (1,908) |

001058

2:22 PM8/7/2008
Q4 Estimate 11.18.05

001059

DEF-UT-76(a)-9

## IMAX Corporation
## Q3 Forecast with Potential Opportunities

| | Q4 Forecast $000's | Q4 Forecast EPS | | FY Forecast $000's | FY Forecast EPS | |
|---|---|---|---|---|---|---|
| **Official Q3 Re-forecast (9+3F)** | 10,251 | $ | 0.24 | 14,837 | $ | 0.35 |
| **QTD performance versus forecast** | 218 | $ | 0.01 | 218 | $ | 0.01 |
| **Possible items for inclusion*** | | | | | | |
| Donguan falls to 2006 | (886) | $ | (0.02) | (886) | $ | (0.02) |
| Chihuahua falls out | (1,177) | $ | (0.03) | (1,177) | $ | (0.03) |
| Kansas City Zoo upgrade not happening | (644) | $ | (0.02) | (644) | $ | (0.02) |
| **Sub-total installs** | (2,707) | $ | (0.06) | (2,707) | $ | (0.06) |
| **Sales/Settlements** | | | | | | |
| Kansas City Zoo sale of existing theatre | 248 | $ | 0.01 | 248 | $ | 0.01 |
| Vienna | 135 | $ | 0.00 | 135 | $ | 0.00 |
| **Sub-total sales/settlements** | 383 | $ | 0.01 | 383 | $ | 0.01 |
| **Total installs/sales/settlements** | (2,325) | $ | (0.05) | (2,325) | $ | (0.05) |
| Hammons (Provision Reversal) | 293 | $ | 0.01 | 293 | $ | 0.01 |
| Kodak Rebate | 177 | $ | 0.00 | 177 | $ | 0.00 |
| **Sub-total -All Other** | 470 | $ | 0.01 | 470 | $ | 0.01 |
| **Revised fcst with all changes** | 8,614 | $ | 0.20 | 13,200 | $ | 0.31 |
| **Better/(Worse)** | (1,637) | $ | (0.039) | (1,637) | $ | (0.039) |
| **Guidance** | | | | | | $0.35 - $0.38 |
| **Opportunities/Risk (Pre-tax)** | | | | | | |
| Mandate G&A reduction to Q3 level | (500) | $ | (0.01) | (500) | $ | (0.01) |
| Regal Sale - Low Case *(50/50)* | (1,100) | $ | (0.03) | (1,100) | $ | (0.03) |
| Winnipeg - unsigned *(75/25)* | (915) | $ | (0.02) | (915) | $ | (0.02) |
| E-Citi - unsigned | (885) | $ | (0.02) | (885) | $ | (0.02) |
| Kazan - construction issues *(50/50)* | (1,036) | $ | (0.02) | (1,036) | $ | (0.02) |
| McMinnville - construction issues *(50/50)* | (1,472) | $ | (0.03) | (1,472) | $ | (0.03) |
| SUC - site confirmed *(75/25)* | (646) | $ | (0.02) | (646) | $ | (0.02) |
| Donguan S&T Dome *(50/50)* | (644) | $ | (0.02) | (644) | $ | (0.02) |
| Interlomas *(75/25)* | (855) | $ | (0.02) | (855) | $ | (0.02) |
| Lodz - client now has building *(50/50)* | (1,205) | $ | (0.03) | (1,205) | $ | (0.03) |
| Regal -Low Case | 1,100 | $ | 0.03 | 1,100 | $ | 0.03 |
| Regal sale -Hi Case -(2.5M less 1.1M included above) *(50/50)* | 1,400 | $ | 0.03 | 1,400 | $ | 0.03 |
| ~~Lark #2 (20/80)~~ | ~~600~~ | ~~$~~ | ~~0.01~~ | ~~600~~ | ~~$~~ | ~~0.01~~ |
| Deep Sea 3d Q4 marketing | 303 | $ | 0.01 | 303 | $ | 0.01 |
| HDTV rights (low probability) | 300 | $ | 0.01 | 300 | $ | 0.01 |
| California Sales Tax appeal refund (could fall to 2006) | 300 | $ | 0.01 | 300 | $ | 0.01 |
| Theatre ops potential performance pick up (excl Oct results) | 103 | $ | 0.00 | 103 | $ | 0.00 |
| Redding #1 | 900 | $ | 0.02 | 900 | $ | 0.02 |
| ~~Redding #2~~ | ~~900~~ | ~~$~~ | ~~0.02~~ | ~~900~~ | ~~$~~ | ~~0.02~~ |
| Buchwald settlement (1.3M Gross less 0.6M receivables) | 676 | $ | 0.02 | 676 | $ | 0.02 |
| HP4 and PEX at 30M in Q4 | 823 | $ | 0.02 | 823 | $ | 0.02 |
| E-Citi -higher than deferred revenue | 885 | $ | 0.02 | 885 | $ | 0.02 |
| | (2,469) | $ | (0.06) | (2,469) | $ | (0.06) |

**Key:**
Black font - included in estimate
Blue font -changed since prior version
Green font - not included in estimate

Note: Opportunities with strike through above are not going to happen per MW.

* All items in estimate above are tax effected using a 10% tax rate

11:23 AM 8/25/2008
Q4 Estimate 11.21.05

**IMAX Corporation** DEF-UT-76(a)-10
**Installs and Settlements - Q4**
($000's)

| | System | Latest Estimate Q4 | Q3 Re-forecast (9+3F) Q4 | B/(W) Q4 |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | - | 1,308 | (1,308) |
| Winnipeg *(not signed)* | 3D GT Upgrade | 915 | 915 | - |
| Kansas City Zoo (as upgrade) *(not signed)* | 3D GT Upgrade | - | 716 | (716) |
| **Subtotal : Not signed or optioned** | | 915 | 2,939 | (2,024) |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,286 | 1,286 | - |
| McMinnville. | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 644 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 987 | - |
| **Subtotal : Signed** | | 12,702 | 13,686 | (984) |
| **Subtotal : Revenue Installs** | | 13,617 | 16,625 | (3,008) |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | 13,617 | 16,625 | (3,008) |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 2 | 3 | (1) |
| | 3D GT Upgrade | 1 | 2 | (1) |
| | 3D GT | 4 | 5 | (1) |
| | **# Installs** | 14 | 17 | (3) |
| **Sales of Existing Theatres** | | | | |
| Kansas City Zoo *(not signed)* | | 275 | - | 275 |
| Regal *(not signed)* | | - | - | - |
| **Subtotal: Sales of Existing Theatres** | | 275 | - | 275 |
| **# of Sales of Existing Theatres** | | 1 | - | 1 |
| **Subtotal: Recognitions** | | 13,892 | 16,625 | (2,733) |
| **# Recognitions** | | 15 | 17 | (2) |
| **Settlements** | | | | |
| E-Citi *(not signed)* | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| Vienna | | 150 | - | 150 |
| **Subtotal: Settlements** | | 1,185 | 1,035 | 150 |
| **Total Recognitions & Settlements** | | 15,077 | 17,660 | (2,583) |

11:23 AM8/25/2008
Q4 Estimate 11.21.05

001060

001061

DEF-UT-76(a)-11

## IMAX Corporation
## Q3 Forecast with Potential Opportunities

| | Q4 Forecast $000's | | Q4 Forecast EPS | FY Forecast $000's | | FY Forecast EPS |
|---|---|---|---|---|---|---|
| Official Q3 Re-forecast (9+3F) | 10,251 | $ | 0.24 | 14,837 | $ | 0.35 |
| QTD performance versus forecast | 218 | $ | 0.01 | 218 | $ | 0.01 |
| **Possible items for inclusion*** | | | | | | |
| Donguan falls to 2006 | (886) | $ | (0.02) | (886) | $ | (0.02) |
| Chihuahua falls out | (1,177) | $ | (0.03) | (1,177) | $ | (0.03) |
| Kansas City Zoo upgrade not happening | (644) | $ | (0.02) | (644) | $ | (0.02) |
| **Sub-total installs** | (2,707) | $ | (0.06) | (2,707) | $ | (0.06) |
| **Sales/Settlements** | | | | | | |
| Kansas City Zoo sale of existing theatre | 248 | $ | 0.01 | 248 | $ | 0.01 |
| Vienna | 135 | $ | 0.00 | 135 | $ | 0.00 |
| **Sub-total sales/settlements** | 383 | $ | 0.01 | 383 | $ | 0.01 |
| **Total installs/sales/settlements** | (2,325) | $ | (0.05) | (2,325) | $ | (0.05) |
| Hammons (Provision Reversal) | 293 | $ | 0.01 | 293 | $ | 0.01 |
| **Sub-total -All Other** | 293 | $ | 0.01 | 293 | $ | 0.01 |
| **Revised fcst with all changes** | 8,437 | $ | 0.20 | 13,023 | $ | 0.31 |
| **Better/(Worse)** | (1,814) | $ | (0.043) | (1,814) | $ | (0.043) |
| **Guidance** | | | | | | $0.35 - $0.38 |
| **Opportunities/Risk (Pre-tax)** | | | | | | |
| Mandate G&A reduction to Q3 level | (500) | $ | (0.01) | (500) | $ | (0.01) |
| Winnipeg - unsigned *(75/25)* | (915) | $ | (0.02) | (915) | $ | (0.02) |
| E-Citi - unsigned | (885) | $ | (0.02) | (885) | $ | (0.02) |
| Kazan - construction issues *(50/50)* | (1,036) | $ | (0.02) | (1,036) | $ | (0.02) |
| McMinnville - construction issues *(50/50)* | (1,472) | $ | (0.03) | (1,472) | $ | (0.03) |
| SUC - site confirmed *(75/25)* | (646) | $ | (0.02) | (646) | $ | (0.02) |
| Donguan S&T Dome *(50/50)* | (644) | $ | (0.02) | (644) | $ | (0.02) |
| Interlomas *(75/25)* | (855) | $ | (0.02) | (855) | $ | (0.02) |
| Lodz - client now has building *(50/50)* | (1,205) | $ | (0.03) | (1,205) | $ | (0.03) |
| Regal -Low Case | 1,100 | $ | 0.03 | 1,100 | $ | 0.03 |
| Regal sale -Hi Case -(2.5M less 1.1M included above) *(50/50)* | 1,400 | $ | 0.03 | 1,400 | $ | 0.03 |
| ~~Lark #2 (20/80)~~ | ~~600~~ | ~~$~~ | ~~0.01~~ | ~~600~~ | ~~$~~ | ~~0.01~~ |
| Deep Sea 3d Q4 marketing | 303 | $ | 0.01 | 303 | $ | 0.01 |
| HDTV rights (low probability) | 300 | $ | 0.01 | 300 | $ | 0.01 |
| California Sales Tax appeal refund (could fall to 2006) | 300 | $ | 0.01 | 300 | $ | 0.01 |
| Theatre ops potential performance pick up (excl Oct results) | 103 | $ | 0.00 | 103 | $ | 0.00 |
| Redding #1 | 900 | $ | 0.02 | 900 | $ | 0.02 |
| ~~Redding #2~~ | ~~900~~ | ~~$~~ | ~~0.02~~ | ~~900~~ | ~~$~~ | ~~0.02~~ |
| Buchwald settlement (1.3M Gross less 0.6M receivables) | 676 | $ | 0.02 | 676 | $ | 0.02 |
| HP4 and PEX at 30M in Q4 | 823 | $ | 0.02 | 823 | $ | 0.02 |
| E-Citi -higher than deferred revenue | 885 | $ | 0.02 | 885 | $ | 0.02 |
| | (1,369) | $ | (0.03) | (1,369) | $ | (0.03) |

**Key:**
Black font - included in estimate
Blue font - changed since prior version
Green font - not included in estimate

Note: Opportunities with strike through above are not going to happen per MW.

* All items in estimate above are tax effected using a 10% tax rate

11:24 AM 8/25/2008
Q4 Estimate 11.22.05

**IMAX Corporation**
**Installs and Settlements - Q4**
**($000's)**

DEF-UT-76(a)-12

| | System | Latest Estimate Q4 | Q3 Re-forecast (9+3F) Q4 | B/(W) Q4 |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | - | 1,308 | (1,308) |
| Winnipeg *(not signed)* | 3D GT Upgrade | 915 | 915 | - |
| Kansas City Zoo (as upgrade) *(not signed)* | 3D GT Upgrade | - | 716 | (716) |
| **Subtotal : Not signed or optioned** | | 915 | 2,939 | (2,024) |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,286 | 1,286 | - |
| McMinnville. | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 844 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 887 | - |
| **Subtotal : Signed** | | 12,702 | 13,686 | (984) |
| **Subtotal : Revenue Installs** | | 13,617 | 16,625 | (3,008) |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | 13,617 | 16,625 | (3,008) |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 2 | 3 | (1) |
| | 3D GT Upgrade | 1 | 2 | (1) |
| | 3D GT | 4 | 5 | (1) |
| | # Installs | 14 | 17 | (3) |
| **Sales of Existing Theatres** | | | | |
| Kansas City Zoo *(not signed)* | | 275 | - | 275 |
| Regal *(not signed)* | | - | - | - |
| **Subtotal: Sales of Existing Theatres** | | 275 | - | 275 |
| **# of Sales of Existing Theatres** | | 1 | - | 1 |
| **Subtotal: Recognitions** | | 13,892 | 16,625 | (2,733) |
| **# Recognitions** | | 15 | 17 | (2) |
| **Settlements** | | | | |
| E-Citi *(not signed)* | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| Vienna | | 150 | - | 150 |
| **Subtotal: Settlements** | | 1,185 | 1,035 | 150 |
| **Total Recognitions & Settlements** | | 15,077 | 17,660 | (2,583) |

001062

11:24 AM8/25/2008
Q4 Estimate 11.22.05

001063

# IMAX Corporation
## Q3 Forecast with Potential Opportunities

DEF-UT-76(a)-13

| | Q4 Forecast $000's | | Q4 Forecast EPS | FY Forecast $000's | | FY Forecast EPS | |
|---|---|---|---|---|---|---|---|
| Official Q3 Re-forecast (9+3F) | 10,251 | $ | 0.24 | 14,837 | $ | 0.35 | |
| QTD performance versus forecast | 218 | $ | 0.01 | 218 | $ | 0.01 | |
| Possible items for inclusion* | | | | | | | |
| Donguan falls to 2006 | (886) | $ | (0.02) | (886) | $ | (0.02) | |
| Chihuahua falls out | (1,177) | $ | (0.03) | (1,177) | $ | (0.03) | |
| Kansas City Zoo upgrade not happening | (644) | $ | (0.02) | (644) | $ | (0.02) | |
| **Sub-total installs** | (2,707) | $ | (0.06) | (2,707) | $ | (0.06) | |
| Sales/Settlements | | | | | | | |
| Kansas City Zoo sale of existing theatre | 248 | $ | 0.01 | 248 | $ | 0.01 | Kansas City out |
| Vienna | 135 | $ | 0.00 | 135 | $ | 0.00 | |
| **Sub-total sales/settlements** | 383 | $ | 0.01 | 383 | $ | 0.01 | |
| Total installs/sales/settlements | (2,325) | $ | (0.05) | (2,325) | $ | (0.05) | |
| Hammons (Provision Reversal) | 293 | $ | 0.01 | 293 | $ | 0.01 | |
| **Sub-total -All Other** | 293 | $ | 0.01 | 293 | $ | 0.01 | |
| Revised fcst with all changes | 8,437 | $ | 0.20 | 13,023 | $ | 0.31 | |
| Better/(Worse) | (1,814) | $ | (0.043) | (1,814) | $ | (0.043) | |
| **Guidance** | | | | $0.35 - $0.38 | | | |
| Opportunities/Risk (Pre-tax) | | | | | | | |
| Mandate G&A reduction to Q3 level | (500) | $ | (0.01) | (500) | $ | (0.01) | Kansas City out |
| Winnipeg - unsigned *(75/25)* | (915) | $ | (0.02) | (915) | $ | (0.02) | |
| E-Citi - unsigned | (885) | $ | (0.02) | (885) | $ | (0.02) | |
| Kazan - construction issues *(50/50)* | (1,036) | $ | (0.02) | (1,036) | $ | (0.02) | |
| McMinnville - construction issues *(50/50)* | (1,472) | $ | (0.03) | (1,472) | $ | (0.03) | |
| SUC - site confirmed *(75/25)* | (646) | $ | (0.02) | (646) | $ | (0.02) | No risk |
| Donguan S&T Dome *(50/50)* | (644) | $ | (0.02) | (644) | $ | (0.02) | 75/25 |
| Interlomas *(75/25)* | (855) | $ | (0.02) | (855) | $ | (0.02) | 75/25 |
| Lodz - client now has building *(50/50)* | (1,205) | $ | (0.03) | (1,205) | $ | (0.03) | 90/10 |
| Regal -Low Case | 1,100 | $ | 0.03 | 1,100 | $ | 0.03 | |
| Regal sale -Hi Case -(2.5M less 1.1M included above) *(50/50)* | 1,400 | $ | 0.03 | 1,400 | $ | 0.03 | $2.7M high case |
| ~~Lark #2 (20/80)~~ | ~~600~~ | ~~$~~ | ~~0.01~~ | ~~600~~ | ~~$~~ | ~~0.01~~ | |
| Deep Sea 3d Q4 marketing | 303 | $ | 0.01 | 303 | $ | 0.01 | |
| HDTV rights (low probability) | 300 | $ | 0.01 | 300 | $ | 0.01 | |
| California Sales Tax appeal refund (could fall to 2006) | 300 | $ | 0.01 | 300 | $ | 0.01 | |
| Theatre ops potential performance pick up (excl Oct results) | 103 | $ | 0.00 | 103 | $ | 0.00 | |
| Redding #1 | 900 | $ | 0.02 | 900 | $ | 0.02 | Out |
| ~~Redding #2~~ | ~~900~~ | ~~$~~ | ~~0.02~~ | ~~900~~ | ~~$~~ | ~~0.02~~ | |
| Buchwald settlement (1.3M Gross less 0.6M receivables) | 676 | $ | 0.02 | 676 | $ | 0.02 | Out |
| HP4 and PEX at 30M in Q4 | 823 | $ | 0.02 | 823 | $ | 0.02 | |
| E-Citi -higher than deferred revenue | 885 | $ | 0.02 | 885 | $ | 0.02 | |
| | (1,369) | $ | (0.03) | (1,369) | $ | (0.03) | |

Key:
Black font - included in estimate
Blue font -changed since prior version
Green font - not included in estimate

Note: Opportunities with strike through above are not going to happen per MW.

* All items in estimate above are tax effected using a 10% tax rate

11:24 AM 8/25/2008
Q4 Estimate 12.06.05

**IMAX Corporation**
**Installs and Settlements - Q4**
**($000's)**

DEF-UT-76(a)-14

| | System | Latest Estimate Q4 | Q3 Re-forecast (9+3F) Q4 | B/(W) Q4 |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | - | 1,308 | (1,308) |
| Winnipeg *(not signed)* | 3D GT Upgrade | 915 | 915 | - |
| Kansas City Zoo (as upgrade) *(not signed)* | 3D GT Upgrade | - | 716 | (716) |
| **Subtotal : Not signed or optioned** | | 915 | 2,939 | (2,024) |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,286 | 1,286 | - |
| McMinnville, | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 644 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 987 | - |
| **Subtotal : Signed** | | 12,702 | 13,686 | (984) |
| **Subtotal : Revenue Installs** | | 13,617 | 16,625 | (3,008) |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | 13,617 | 16,625 | (3,008) |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 2 | 3 | (1) |
| | 3D GT Upgrade | 1 | 2 | (1) |
| | 3D GT | 4 | 5 | (1) |
| | # Installs | 14 | 17 | (3) |
| **Sales of Existing Theatres** | | | | |
| Kansas City Zoo *(not signed)* | | 275 | - | 275 |
| Regal *(not signed)* | | - | - | - |
| **Subtotal: Sales of Existing Theatres** | | 275 | - | 275 |
| **# of Sales of Existing Theatres** | | 1 | - | 1 |
| **Subtotal: Recognitions** | | 13,892 | 16,625 | (2,733) |
| **# Recognitions** | | 15 | 17 | (2) |
| **Settlements** | | | | |
| E-Citi *(not signed)* | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| Vienna | | 150 | - | 150 |
| **Subtotal: Settlements** | | 1,185 | 1,035 | 150 |
| **Total Recognitions & Settlements** | | 15,077 | 17,660 | (2,583) |

11:24 AM8/25/2008
Q4 Estimate 12.06.05

001064

**IMAX Corporation** 001065

**Q3 Forecast with Potential Opportunities** DEF-UT-76(a)-15

| | Q4 Forecast $000's | Q4 Forecast EPS | FY Forecast $000's | FY Forecast EPS | |
|---|---|---|---|---|---|
| Official Q3 Re-forecast (9+3F) | 10,251 | $ 0.24 | 14,837 | $ 0.35 | |
| QTD performance versus forecast | 118 | $ 0.00 | 118 | $ 0.00 | |
| Possible items for inclusion* | | | | | |
| Donguan falls to 2006 | (886) | $ (0.02) | (886) | $ (0.02) | |
| Chihuahua falls out | (1,177) | $ (0.03) | (1,177) | $ (0.03) | |
| Kansas City Zoo upgrade not happening | (644) | $ (0.02) | (644) | $ (0.02) | |
| Sub-total installs | (2,707) | $ (0.06) | (2,707) | $ (0.06) | |
| Sales/Settlements | | | | | |
| Vienna | 117 | $ 0.00 | 117 | $ 0.00 | |
| Sub-total sales/settlements | 117 | $ 0.00 | 117 | $ 0.00 | |
| Total installs/sales/settlements | (2,590) | $ (0.06) | (2,590) | $ (0.06) | |
| Hammons (Provision Reversal) | 293 | $ 0.01 | 293 | $ 0.01 | |
| Sub-total -All Other | 293 | $ 0.01 | 293 | $ 0.01 | |
| Revised fcst with all changes | 8,071 | $ 0.19 | 12,657 | $ 0.30 | |
| Better/(Worse) | (2,180) | $ (0.051) | (2,180) | $ (0.051) | |
| Guidance | | | | $0.35 - $0.38 | |
| Opportunities/Risk (Pre-tax) | | | | | |
| Mandate G&A reduction to Q3 level | (500) | $ (0.01) | (500) | $ (0.01) | |
| Kazan - construction issues *(90/10)* | (1,036) | $ (0.02) | (1,036) | $ (0.02) | |
| Lodz (75/25) | (1,205) | $ (0.03) | (1,205) | $ (0.03) | |
| McMinnville - construction issues *(90/10)* | (1,472) | $ (0.03) | (1,472) | $ (0.03) | |
| Regal sale -Hi Case (50/50) | 2,700 | $ 0.06 | 2,700 | $ 0.06 | |
| ~~Lark #2 (20/80)~~ | ~~600~~ | ~~$ 0.01~~ | ~~600~~ | ~~$ 0.01~~ | |
| Deep Sea 3d Q4 marketing | 303 | $ 0.01 | 303 | $ 0.01 | |
| ~~HDTV rights (low probability)~~ | ~~300~~ | ~~$ 0.01~~ | ~~300~~ | ~~$ 0.01~~ | |
| California Sales Tax appeal refund (could fall to 2006) | 300 | $ 0.01 | 300 | $ 0.01 | |
| Theatre ops potential performance pick up (excl Oct results) | 103 | $ 0.00 | 103 | $ 0.00 | |
| ~~Redding #1~~ | ~~900~~ | ~~$ 0.02~~ | ~~900~~ | ~~$ 0.02~~ | Out |
| ~~Redding #2~~ | ~~900~~ | ~~$ 0.02~~ | ~~900~~ | ~~$ 0.02~~ | |
| ~~Buchwald settlement (1.3M Gross less 0.6M receivables)~~ | ~~676~~ | ~~$ 0.02~~ | ~~676~~ | ~~$ 0.02~~ | Out |
| HP4 and PEX at 30M in Q4 | 823 | $ 0.02 | 823 | $ 0.02 | |
| ~~E-Citi - higher than deferred revenue~~ | ~~885~~ | ~~$ 0.02~~ | ~~885~~ | ~~$ 0.02~~ | |
| | 15 | $ 0.00 | 15 | $ 0.00 | |

Key:
Black font - included in estimate
Blue font -changed since prior version
Green font - not included in estimate

Note: Opportunities with strike through above are not going to happen per MW.

* All items in estimate above are tax effected using a 10% tax rate

11:25 AM 8/25/2008
Q4 Estimate 12.19.05

**IMAX Corporation**
**Installs and Settlements - Q4**
($000's)

DEF-UT-76(a)-16

| | System | Latest Estimate Q4 | Q3 Re-forecast (9+3F) Q4 | B/(W) Q4 |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | - | 1,308 | (1,308) |
| Winnipeg | 3D GT Upgrade | 915 | 915 | - |
| Kansas City Zoo (as upgrade) *(not signed)* | 3D GT Upgrade | - | 716 | (716) |
| **Subtotal : Not signed or optioned** | | 915 | 2,939 | (2,024) |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,286 | 1,286 | - |
| McMinnville, | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 644 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 987 | - |
| **Subtotal : Signed** | | 12,702 | 13,686 | (984) |
| **Subtotal : Revenue Installs** | | 13,617 | 16,625 | (3,008) |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | 13,617 | 16,625 | (3,008) |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 2 | 3 | (1) |
| | 3D GT Upgrade | 1 | 2 | (1) |
| | 3D GT | 4 | 5 | (1) |
| | **# Installs** | 14 | 17 | (3) |
| **Sales of Existing Theatres** | | | | |
| Regal *(not signed)* | | - | - | - |
| **Subtotal: Sales of Existing Theatres** | | - | - | - |
| **# of Sales of Existing Theatres** | | - | - | - |
| **Subtotal: Recognitions** | | 13,617 | 16,625 | (3,008) |
| **# Recognitions** | | 14 | 17 | (3) |
| **Settlements** | | | | |
| E-Citi | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| Vienna | | 130 | - | 130 |
| **Subtotal: Settlements** | | 1,165 | 1,035 | 130 |
| **Total Recognitions & Settlements** | | 14,783 | 17,660 | (2,878) |

001066

11:25 AM8/25/2008
Q4 Estimate 12.19.05

## IMAX Corporation
## Q3 Forecast with Potential Opportunities
## Excluding December Actuals

| | Q4 Forecast | | | FY Forecast | | |
|---|---|---|---|---|---|---|
| | Revenue | Net Inc | EPS | Revenue | Net Inc | EPS |
| Official Q3 Re-forecast (9+3F) | 51,175 | 10,251 | $ 0.24 | 146,795 | 14,837 | $ 0.35 |
| QTD performance versus forecast | 326 | 172 | $ 0.00 | 326 | 172 | $ 0.00 |
| Possible Items for Inclusion* | | | | | | |
| Donguan falls to 2006 | (2,340) | (886) | $ (0.02) | (2,340) | (886) | $ (0.02) |
| Chihuahua falls out | (2,138) | (1,177) | $ (0.03) | (2,138) | (1,177) | $ (0.03) |
| Kansas City Zoo upgrade not happening | (1,200) | (644) | $ (0.02) | (1,200) | (644) | $ (0.02) |
| **Sub-total installs** | (5,678) | (2,707) | $ (0.06) | (5,678) | (2,707) | $ (0.06) |
| **Sales/Settlements** | | | | | | |
| Regal Sale | 3,941 | 2,168 | $ 0.05 | 3,941 | 2,168 | $ 0.05 |
| Vienna | 130 | 117 | $ 0.00 | 130 | 117 | $ 0.00 |
| **Sub-total sales/settlements** | 4,071 | 2,286 | $ 0.05 | 4,071 | 2,286 | $ 0.05 |
| **Install cost overruns** | - | (200) | $ (0.00) | - | (200) | $ (0.00) |
| **Total installs/sales/settlements** | (1,607) | (622) | $ (0.01) | (1,607) | (622) | $ (0.01) |
| HP4 performance | 400 | 233 | $ 0.01 | 400 | 233 | $ 0.01 |
| PEX Performance | (66) | (30) | $ (0.00) | (66) | (30) | $ (0.00) |
| **Sub-total film** | 333 | 203 | $ 0.00 | 333 | 203 | $ 0.00 |
| Inventory adjustments | - | (182) | $ (0.00) | - | (182) | $ (0.00) |
| December phantom stock impact | - | 238 | $ 0.01 | - | 238 | $ 0.01 |
| Hammons (provision reversal) | - | 293 | $ 0.01 | - | 293 | $ 0.01 |
| **Other** | - | 349 | $ 0.01 | - | 349 | $ 0.01 |
| **Revised fcst with all changes** | 50,228 | 10,354 | $ 0.25 | 145,847 | 14,939 | $ 0.36 |
| **Better/(Worse)** | (948) | 102 | $ 0.002 | (948) | 102 | $ 0.002 |
| **Guidance** | | | | | | $0.35 - $0.38 |
| Opportunities/Risk (Pre-tax) | | | | | | |
| SUC/Beijing - potential sign off issue | (2,373) | (918) | $ (0.02) | (2,373) | (918) | $ (0.02) |
| Mandated G&A reduction in forecast | - | (500) | $ (0.01) | - | (500) | $ (0.01) |
| DPI Q4 payment pending - included in above resul | - | (365) | $ (0.01) | - | (365) | $ (0.01) |
| California Sales Tax refund - in discussions w/PW( | - | 300 | $ 0.01 | - | 300 | $ 0.01 |
| Auditor adjustments | - | - | $ - | - | - | $ - |
| | (2,373) | (1,483) | $ (0.04) | (2,373) | (1,483) | $ (0.04) |

* All items in estimate above are tax effected using a 10% tax rate

001068

DEF-UT-76(a)-18

## IMAX Corporation
## Installs and Settlements - Q4
($000's)

| | System | Estimate | 9+3F | B/(W) |
|---|---|---|---|---|
| **Revenue Installs** | | | | |
| **Not signed or optioned:** | | | | |
| Chihuahua, Mexico *(not signed)* | 3D SR | - | 1,308 | (1,308) |
| Winnipeg | 3D GT Upgrade | 915 | 915 | - |
| Kansas City Zoo (as upgrade) *(not signed)* | 3D GT Upgrade | - | 716 | (716) |
| **Subtotal : Not signed or optioned** | | **915** | **2,939** | **(2,024)** |
| **Signed :** | | | | |
| Beijing, China | 3D GT | 918 | 918 | - |
| Dongguan, China | 3D GT | - | 984 | (984) |
| Hong Kong #1 | MPX | 865 | 865 | - |
| Incheon | MPX | 918 | 918 | - |
| Interlomas, Mexico | 3D SR | 855 | 855 | - |
| Kazan | MPX | 1,036 | 1,036 | - |
| Lodz, Poland (IT #8) | 3D GT | 1,205 | 1,205 | - |
| Madison | MPX | 961 | 961 | - |
| Manila Theatre | 3D GT | 1,286 | 1,286 | - |
| McMinnville. | 3D SR | 1,472 | 1,472 | - |
| Science & Tech Museum, Dong Guan | 3D GT | 644 | 644 | - |
| Joungsan | MPX | 909 | 909 | - |
| Shanghai United Cinema #1 | MPX | 646 | 646 | - |
| St. Louis County | MPX | 987 | 987 | - |
| **Subtotal : Signed** | | **12,702** | **13,686** | **(984)** |
| **Subtotal : Revenue Installs** | | **13,617** | **16,625** | **(3,008)** |
| **Joint ventures** | | | | |
| **Subtotal: Joint Ventures** | | - | - | - |
| **Subtotal : Installs** | | **13,617** | **16,625** | **(3,008)** |
| | MPX | 7 | 7 | - |
| | 2D SR Dome | - | - | - |
| | 3D SR | 2 | 3 | (1) |
| | 3D GT Upgrade | 1 | 2 | (1) |
| | 3D GT | 4 | 5 | (1) |
| | **# Installs** | **14** | **17** | **(3)** |
| **Sales of Existing Theatres** | | | | |
| Regal | | 2,500 | - | 2,500 |
| **Subtotal: Sales of Existing Theatres** | | **2,500** | - | **2,500** |
| **# of Sales of Existing Theatres** | | **1** | - | **1** |
| **Subtotal: Recognitions** | | **16,117** | **16,625** | **(508)** |
| **# Recognitions** | | **15** | **17** | **(2)** |
| **Settlements** | | | | |
| E-Citi | | 885 | 885 | - |
| Chongquing #2 | | 150 | 150 | - |
| Vienna | | 130 | - | 130 |
| **Subtotal: Settlements** | | **1,165** | **1,035** | **130** |
| **Total Recognitions & Settlements** | | **17,283** | **17,660** | **(378)** |

11:26 AM8/25/2008
Q4 Estimate 01.03.06

001069
DEF-UT-76(a)-19

# IMAX Corporation
## Q3 Forecast with Potential Opportunities
## Excluding December Actuals

| | Q4 Forecast | | | FY Forecast | | |
|---|---|---|---|---|---|---|
| | Revenue | Net Inc | EPS | Revenue | Net Inc | EPS |
| Official Q3 Re-forecast (9+3F) | 51,175 | 10,251 | $ 0.24 | 146,795 | 14,837 | $ 0.35 |
| QTD performance versus forecast | 326 | 172 | $ 0.00 | 326 | 172 | $ 0.00 |
| **Possible items for inclusion*** | | | | | | |
| Donguan falls to 2006 | (2,340) | (886) | $ (0.02) | (2,340) | (886) | $ (0.02) |
| Chihuahua falls out | (2,138) | (1,177) | $ (0.03) | (2,138) | (1,177) | $ (0.03) |
| Kansas City Zoo upgrade not happening | (1,200) | (644) | $ (0.02) | (1,200) | (644) | $ (0.02) |
| Sub-total installs | (5,678) | (2,707) | $ (0.06) | (5,678) | (2,707) | $ (0.06) |
| Sales/Settlements | | | | | | |
| Regal Sale | 3,941 | 2,168 | $ 0.05 | 3,941 | 2,168 | $ 0.05 |
| Vienna | 130 | 117 | $ 0.00 | 130 | 117 | $ 0.00 |
| Sub-total sales/settlements | 4,071 | 2,286 | $ 0.05 | 4,071 | 2,286 | $ 0.05 |
| Install cost overruns | - | (180) | $ (0.00) | - | (180) | $ (0.00) |
| Total installs/sales/settlements | (1,607) | (602) | $ (0.01) | (1,607) | (602) | $ (0.01) |
| HP4 performance | 400 | 233 | $ 0.01 | 400 | 233 | $ 0.01 |
| PEX Performance | (66) | (30) | $ (0.00) | (66) | (30) | $ (0.00) |
| Sub-total film | 333 | 203 | $ 0.00 | 333 | 203 | $ 0.00 |
| Inventory adjustments | - | (182) | $ (0.00) | - | (182) | $ (0.00) |
| December phantom stock impact | - | 215 | $ 0.01 | - | 215 | $ 0.01 |
| Nuremburg (see related upside below) | - | (315) | $ (0.01) | - | (315) | $ (0.01) |
| DPI - Last payment of 3 year note | - | (379) | $ (0.01) | - | (379) | $ (0.01) |
| DPI - first payment of amended agreement | - | 1,200 | $ 0.03 | - | 1,200 | $ 0.03 |
| Hammons (provision reversal) | - | 293 | $ 0.01 | - | 293 | $ 0.01 |
| Other | - | 831 | $ 0.02 | - | 831 | $ 0.02 |
| Revised fcst with all changes | 50,228 | 10,856 | $ 0.26 | 145,847 | 15,442 | $ 0.37 |
| Better/(Worse) | (948) | 605 | $ 0.014 | (948) | 605 | $ 0.014 |
| Guidance | | | | | | $0.35 - $0.38 |
| **Opportunities/Risk (Pre-tax)** | | | | | | |
| SUC/Beijing - potential sign off issue | (2,373) | (918) | $ (0.02) | (2,373) | (918) | $ (0.02) |
| Mandated G&A reduction in forecast | - | (500) | $ (0.01) | - | (500) | $ (0.01) |
| California Sales Tax refund - in discussions w/PWC | - | 300 | $ 0.01 | - | 300 | $ 0.01 |
| Nuremburg | - | 210 | $ 0.01 | - | 210 | $ 0.00 |
| Buchwald (A/R exposure only) | - | (400) | $ (0.01) | - | (400) | $ (0.01) |
| Legal fees (early estimate pending) | - | - | $ - | - | - | $ - |
| Film distribution (early estimate pending) | - | - | $ - | - | - | $ - |
| Auditor adjustments | - | - | $ - | - | - | $ - |
| | (2,373) | (1,308) | $ (0.03) | (2,373) | (1,308) | $ (0.03) |

Blue font indicates changes from last submission

* All items in estimate above are tax effected using a 10% tax rate

11:28 AM 8/25/2008
Q4 Estimate 01.05.06

001070

**IMAX Corporation Consolidated** DEF-UT-76(a)-20

| | Qtr1 Actual | Qtr2 Actual | Qtr3 Actual | Qtr4 Est. | Full Year Est. |
|---|---|---|---|---|---|
| STL Revenue | 15,841,626 | 13,304,532 | 12,838,182 | 29,446,332 | 71,430,671 |
| Sound Systems Revenue | 305,551 | 205,285 | 262,760 | 121,455 | 895,051 |
| Finance Income Revenue | 1,013,766 | 1,138,955 | 1,232,913 | 1,247,457 | 4,633,091 |
| Operating Leases Revenue | 1,387,910 | 1,584,567 | 2,296,235 | 1,357,520 | 6,626,231 |
| Rent Revenue | 34,063 | 469,325 | 50,421 | 425,625 | 979,434 |
| Maintenance Revenue | 3,529,789 | 3,605,684 | 3,555,191 | 3,605,294 | 14,295,958 |
| **Systems Revenue** | **22,112,705** | **20,308,346** | **20,235,703** | **36,203,683** | **98,860,436** |
| Film Production and Development Revenue | 52,103 | 88,832 | 331,719 | 174,089 | 646,742 |
| Film Distribution Revenue | 2,054,619 | 2,663,329 | 3,283,631 | 3,392,901 | 11,394,480 |
| Film Post-Production Revenue | 1,352,651 | 1,127,439 | 1,462,126 | 1,541,414 | 5,483,629 |
| DMR Film Revenue | 1,487,666 | 1,421,685 | 2,968,806 | 3,030,557 | 8,908,714 |
| **Films Revenue** | **4,947,039** | **5,301,284** | **8,046,281** | **8,138,961** | **26,433,565** |
| **Theatre Operations Revenue** | **3,816,107** | **4,198,029** | **4,310,561** | **4,944,184** | **17,268,881** |
| Camera Revenue | 139,109 | 368,880 | 228,745 | 145,359 | 882,093 |
| Ridefilm Revenue | - | - | - | - | - |
| Other Revenues | 352,594 | 702,123 | 551,689 | 795,414 | 2,401,820 |
| **Other Revenue** | **491,703** | **1,071,003** | **780,434** | **940,773** | **3,283,913** |
| **Total Revenue** | **31,367,554** | **30,878,663** | **33,372,978** | **50,227,600** | **145,846,795** |
| STL Margin | 11,411,961 | 8,614,734 | 7,910,575 | 16,453,582 | 44,390,852 |
| Sound Systems Margin | 205,740 | 145,395 | (120) | 40,357 | 391,372 |
| Finance Income Margin | 1,013,766 | 1,138,955 | 1,232,913 | 1,247,457 | 4,633,091 |
| Operating Leases Margin | 944,659 | 1,154,312 | 1,837,800 | 289,937 | 4,226,709 |
| Rent Margin | (23,715) | 365,841 | (14,865) | 409,368 | 736,629 |
| Maintenance Margin | 1,497,097 | 1,735,584 | 1,587,955 | 1,671,859 | 6,492,495 |
| **Systems Margin** | **15,049,509** | **13,154,820** | **12,554,259** | **20,112,561** | **60,871,149** |
| Film Production and Development Margin | (356,609) | (109,110) | 53,339 | 56,503 | (355,877) |
| Film Distribution Margin | 1,313,029 | 1,529,881 | 1,943,089 | 852,553 | 5,638,552 |
| Film Post-Production Margin | 175,979 | 714,640 | 166,076 | 298,164 | 1,354,859 |
| DMR Film Margin | (257,365) | (255,479) | 606,882 | 1,090,678 | 1,184,716 |
| **Films Margin** | **875,034** | **1,879,932** | **2,769,385** | **2,297,899** | **7,822,250** |
| **Theatre Operations Margin** | **11,320** | **418,588** | **236,866** | **782,107** | **1,448,880** |
| Camera Margin | (20,733) | 248,819 | 107,251 | 53,812 | 389,148 |
| Ridefilm Margin | - | - | - | - | - |
| Other Other Margin | 229,045 | 167,729 | 105,059 | 11,877 | 513,710 |
| **Other Margin** | **208,312** | **416,548** | **212,309** | **65,689** | **902,858** |
| **Gross Margin** | **16,144,174** | **15,869,888** | **15,772,819** | **23,258,257** | **71,045,137** |
| Selling, General and Administrative Expenses | 10,241,233 | 9,813,493 | 8,966,284 | 8,354,117 | 37,375,128 |
| Research and Development | 652,856 | 885,746 | 890,187 | 1,036,316 | 3,465,105 |
| Amortization of Intangibles | 157,268 | 160,208 | 164,010 | 169,414 | 650,899 |
| Loss (Income) from Equity-Accounted Investees | - | - | - | - | - |
| Receivable Provisions (Recoveries), Net | 212,349 | (370,583) | (309,700) | (958,054) | (1,425,989) |
| Restructuring Costs and Asset Impairments (Recoveries) | - | - | - | - | - |
| **Earnings (Loss) from Operations** | **4,880,469** | **5,381,023** | **6,062,038** | **14,656,464** | **30,979,994** |
| Interest Income | 214,425 | 283,494 | 243,511 | 249,172 | 990,602 |
| Interest Expense | (4,197,330) | (4,201,635) | (4,184,959) | (4,176,915) | (16,760,839) |
| Gain (Loss) on Retirement of Notes | - | - | - | - | - |
| Recovery on (Impairment of) Long-Term Investments | - | - | - | - | - |
| **Earnings (Loss) from Continuing Operations before Tax** | **897,564** | **1,462,881** | **2,120,591** | **10,728,721** | **15,209,757** |
| Provision for (Recovery of) Income Taxes | (58,574) | 537,844 | 202,158 | 1,072,453 | 1,753,881 |
| **Net Earnings (Loss) from Continuing Operations** | **956,137** | **925,038** | **1,918,433** | **9,656,268** | **13,455,876** |
| Net Earnings (Loss) from Discontinued Operations | 240,319 | 185,865 | 360,001 | 1,200,000 | 1,986,184 |
| Cumulative Effect of Changes in Accounting Principles | - | - | - | - | - |
| Extraordinary Gain (Loss) | - | - | - | - | - |
| **Net Earnings (Loss)** | **1,196,456** | **1,110,903** | **2,278,434** | **10,856,268** | **15,442,060** |
| Continuing ops per fully diluted share | $ 0.02 | $ 0.02 | $ 0.05 | $ 0.23 | $ 0.32 |
| Net earnings per fully diluted share | $ 0.03 | $ 0.03 | $ 0.05 | $ 0.26 | $ 0.37 |
| # fully diluted shares (000's) | 41,920 | 41,941 | 42,218 | 41,997 | 42,019 |

Q4 Estimate 01.05.06
11:26 AM 8/25/2006

001071

DEF-UT-76(a)-21

**IMAX Corporation**
**Q3 Forecast with Potential Opportunities**
**Excluding December Actuals**

| | Q4 Forecast Revenue | Q4 Forecast Net Inc | | Q4 Forecast EPS | FY Forecast Revenue | FY Forecast Net Inc | | FY Forecast EPS |
|---|---|---|---|---|---|---|---|---|
| Official Q3 Re-forecast (9+3F) | 51,175 | 10,251 | $ | 0.24 | 146,795 | 14,837 | $ | 0.35 |
| QTD performance versus forecast | 326 | 172 | $ | 0.00 | 326 | 172 | $ | 0.00 |
| Possible items for inclusion* | | | | | | | | |
| Donguan falls to 2006 | (2,340) | (886) | $ | (0.02) | (2,340) | (886) | $ | (0.02) |
| Chihuahua falls out | (2,138) | (1,177) | $ | (0.03) | (2,138) | (1,177) | $ | (0.03) |
| Kansas City Zoo upgrade not happening | (1,200) | (644) | $ | (0.02) | (1,200) | (644) | $ | (0.02) |
| Sub-total installs | (5,678) | (2,707) | $ | (0.06) | (5,678) | (2,707) | $ | (0.06) |
| Sales/Settlements | | | | | | | | |
| Regal Sale | 3,941 | 2,168 | $ | 0.05 | 3,941 | 2,168 | $ | 0.05 |
| Vienna | 130 | 117 | $ | 0.00 | 130 | 117 | $ | 0.00 |
| Sub-total sales/settlements | 4,071 | 2,286 | $ | 0.05 | 4,071 | 2,286 | $ | 0.05 |
| Install cost overruns | - | (180) | $ | (0.00) | - | (180) | $ | (0.00) |
| Total installs/sales/settlements | (1,607) | (602) | $ | (0.01) | (1,607) | (602) | $ | (0.01) |
| Additional Rent - December vs forecast | 294 | 265 | $ | 0.01 | 294 | 265 | $ | 0.01 |
| December film distribution estimate | 479 | 172 | $ | 0.00 | 479 | 172 | $ | 0.00 |
| Technicolr rebate | 167 | 150 | $ | 0.00 | 167 | 150 | $ | 0.00 |
| HP4 performance | 400 | 233 | $ | 0.01 | 400 | 233 | $ | 0.01 |
| PEX Performance | (66) | (30) | $ | (0.00) | (66) | (30) | $ | (0.00) |
| Sub-total film | 979 | 526 | $ | 0.01 | 979 | 526 | $ | 0.01 |
| Inventory adjustments | - | (182) | $ | (0.00) | - | (182) | $ | (0.00) |
| Legal fees December variance | - | - | $ | - | - | - | $ | - |
| December phantom stock impact | - | 215 | $ | 0.01 | - | 215 | $ | 0.01 |
| Nuremburg (see related upside below) | - | (315) | $ | (0.01) | - | (315) | $ | (0.01) |
| DPI - Last payment of 3 year note | - | (379) | $ | (0.01) | - | (379) | $ | (0.01) |
| DPI - first payment of amended agreement | - | 1,200 | $ | 0.03 | - | 1,200 | $ | 0.03 |
| Hammons (provision reversal) | - | 293 | $ | 0.01 | - | 293 | $ | 0.01 |
| Other | - | 831 | $ | 0.02 | - | 831 | $ | 0.02 |
| Revised fcst with all changes | 51,167 | 11,443 | $ | 0.27 | 146,787 | 16,029 | $ | 0.38 |
| Better/(Worse) | (8) | 1,192 | $ | 0.028 | (8) | 1,192 | $ | 0.028 |
| Guidance | | | | | | | | $0.35 - $0.38 |
| Opportunities/Risk (Pre-tax) | | | | | | | | |
| SUC/Beijing | (2,373) | (918) | $ | (0.02) | (2,373) | (918) | $ | (0.02) |
| Mandated G&A reduction in forecast | - | (500) | $ | (0.01) | - | (500) | $ | (0.01) |
| California Sales Tax refund - in discussions w/PWC | - | 300 | $ | 0.01 | - | 300 | $ | 0.01 |
| Nuremburg | - | 210 | $ | 0.01 | - | 210 | $ | 0.00 |
| Buchwald (A/R exposure only) | - | (400) | $ | (0.01) | - | (400) | $ | (0.01) |
| Auditor adjustments | - | - | $ | - | - | - | $ | - |
| | (2,373) | (1,308) | $ | (0.03) | (2,373) | (1,308) | $ | (0.03) |

Blue font indicates changes from last submission

* All items in estimate above are tax effected using a 10% tax rate

11:27 AM 8/25/2008
Q4 Estimate 01.11.06

001072

IMAX Corporation Consolidated

DEF-UT-76(a)-22

| | Qtr1 Actual | Qtr2 Actual | Qtr3 Actual | Qtr4 Est. | Full Year Est. |
|---|---|---|---|---|---|
| STL Revenue | 15,841,626 | 13,304,532 | 12,838,182 | 29,446,332 | 71,430,671 |
| Sound Systems Revenue | 305,551 | 205,285 | 262,760 | 121,455 | 895,051 |
| Finance Income Revenue | 1,013,766 | 1,138,955 | 1,232,913 | 1,247,457 | 4,633,091 |
| Operating Leases Revenue | 1,387,910 | 1,584,567 | 2,296,235 | 1,651,520 | 6,920,231 |
| Rent Revenue | 34,063 | 469,325 | 50,421 | 425,625 | 979,434 |
| Maintenance Revenue | 3,529,789 | 3,605,684 | 3,555,191 | 3,605,294 | 14,295,958 |
| **Systems Revenue** | 22,112,705 | 20,308,346 | 20,235,703 | 36,497,683 | 99,154,436 |
| Film Production and Development Revenue | 52,103 | 88,832 | 331,719 | 174,089 | 646,742 |
| Film Distribution Revenue | 2,054,619 | 2,663,329 | 3,283,631 | 3,871,608 | 11,873,187 |
| Film Post-Production Revenue | 1,352,651 | 1,127,439 | 1,462,126 | 1,708,414 | 5,650,629 |
| DMR Film Revenue | 1,487,666 | 1,421,685 | 2,968,806 | 3,030,557 | 8,908,714 |
| **Films Revenue** | 4,947,039 | 5,301,284 | 8,046,281 | 8,784,668 | 27,079,272 |
| **Theatre Operations Revenue** | 3,816,107 | 4,198,029 | 4,310,561 | 4,944,184 | 17,268,881 |
| Camera Revenue | 139,109 | 368,880 | 228,745 | 145,359 | 882,093 |
| Ridefilm Revenue | - | - | - | - | - |
| Other Revenues | 352,594 | 702,123 | 551,689 | 795,414 | 2,401,820 |
| **Other Revenue** | 491,703 | 1,071,003 | 780,434 | 940,773 | 3,283,913 |
| **Total Revenue** | 31,367,554 | 30,878,663 | 33,372,978 | 51,167,307 | 146,786,502 |
| STL Margin | 11,411,961 | 8,614,734 | 7,910,575 | 16,453,582 | 44,390,852 |
| Sound Systems Margin | 205,740 | 145,395 | (120) | 40,357 | 391,372 |
| Finance Income Margin | 1,013,766 | 1,138,955 | 1,232,913 | 1,247,457 | 4,633,091 |
| Operating Leases Margin | 944,659 | 1,154,312 | 1,837,800 | 583,937 | 4,520,709 |
| Rent Margin | (23,715) | 365,841 | (14,865) | 409,368 | 736,629 |
| Maintenance Margin | 1,497,097 | 1,735,584 | 1,587,955 | 1,671,859 | 6,492,495 |
| **Systems Margin** | 15,049,509 | 13,154,820 | 12,554,259 | 20,406,561 | 61,165,149 |
| Film Production and Development Margin | (366,609) | (109,110) | 53,339 | 56,503 | (355,877) |
| Film Distribution Margin | 1,313,029 | 1,529,881 | 1,943,089 | 1,043,901 | 5,829,900 |
| Film Post-Production Margin | 175,979 | 714,640 | 166,076 | 465,164 | 1,521,859 |
| DMR Film Margin | (267,365) | (255,479) | 606,882 | 1,090,678 | 1,184,716 |
| **Films Margin** | 875,034 | 1,879,932 | 2,769,385 | 2,656,247 | 8,180,598 |
| **Theatre Operations Margin** | 11,320 | 418,588 | 236,866 | 782,107 | 1,448,880 |
| Camera Margin | (20,733) | 248,819 | 107,251 | 53,812 | 389,148 |
| Ridefilm Margin | - | - | - | - | - |
| Other Other Margin | 229,045 | 167,729 | 105,059 | 11,877 | 513,710 |
| **Other Margin** | 208,312 | 416,548 | 212,309 | 65,689 | 902,858 |
| **Gross Margin** | 16,144,174 | 15,869,888 | 15,772,819 | 23,910,605 | 71,697,485 |
| Selling, General and Administrative Expenses | 10,241,233 | 9,813,493 | 8,966,284 | 8,354,117 | 37,375,128 |
| Research and Development | 652,856 | 885,746 | 890,187 | 1,036,316 | 3,465,105 |
| Amortization of Intangibles | 157,268 | 160,208 | 164,010 | 169,414 | 650,899 |
| Loss (Income) from Equity-Accounted Investees | - | - | - | - | - |
| Receivable Provisions (Recoveries), Net | 212,349 | (370,583) | (309,700) | (958,054) | (1,425,989) |
| Restructuring Costs and Asset Impairments (Recoveries) | - | - | - | - | - |
| **Earnings (Loss) from Operations** | 4,880,469 | 5,381,023 | 6,062,038 | 15,308,812 | 31,632,342 |
| Interest Income | 214,425 | 283,494 | 243,511 | 249,172 | 990,602 |
| Interest Expense | (4,197,330) | (4,201,635) | (4,184,959) | (4,176,915) | (16,760,839) |
| Gain (Loss) on Retirement of Notes | - | - | - | - | - |
| Recovery on (Impairment of) Long-Term Investments | - | - | - | - | - |
| **Earnings (Loss) from Continuing Operations before Tax** | 897,564 | 1,462,881 | 2,120,591 | 11,381,069 | 15,862,105 |
| Provision for (Recovery of) Income Taxes | (58,574) | 537,844 | 202,158 | 1,137,688 | 1,819,116 |
| **Net Earnings (Loss) from Continuing Operations** | 956,137 | 925,038 | 1,918,433 | 10,243,381 | 14,042,989 |
| Net Earnings (Loss) from Discontinued Operations | 240,319 | 185,865 | 360,001 | 1,200,000 | 1,986,184 |
| Cumulative Effect of Changes in Accounting Principles | - | - | - | - | - |
| Extraordinary Gain (Loss) | - | - | - | - | - |
| **Net Earnings (Loss)** | 1,196,456 | 1,110,903 | 2,278,434 | 11,443,381 | 16,029,174 |
| Continuing ops per fully diluted share | $ 0.02 | $ 0.02 | $ 0.05 | $ 0.24 | $ 0.33 |
| Net earnings per fully diluted share | $ 0.03 | $ 0.03 | $ 0.05 | $ 0.27 | $ 0.38 |
| # fully diluted shares (000's) | 41,920 | 41,941 | 42,218 | 41,997 | 42,019 |

Q4 Estimate 01.11.06
11:27 AM 8/25/2006

# EXHIBIT S-8

This is Exhibit "S-8" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

001073

DEF-UT-76(b)-1

**From:** Mark Welton
**Sent:** Tuesday, October 04, 2005 9 30 07 AM
**To:** Brad Wechsler; fjoyce@imax.com, rgelfond@imax com, lo'reilly@imax com
**CC:** Bill O'Malley; rlister@imax.com, emacneil@imax com
**Subject:** Q4 Installs as per our latest Forecast

Below is an update of the installs for Q4 and action list.

1 Installs with no issues - Wehrenberg ($997K), Madison ($969K), Beijing ($917K), Cheil (Jongjang and Incheon, $1.802M), Manila ($1 3M), Interlomas ($836K) This total of $6 8M should be in the bag unless something unforseen happens. Welton to monitor with Kane

2.Construction Issues with Installs - Lodz ($1 24M) - IT and Mall developer still in dispute regarding construction of multiplex Welton to follow up this week, Dongguan South China Mall ($997K) - working at a snail's pace, to get our Asia team involved, Dongguan Dome ($665K)- again, construction is delayed, need to push client again Mcminnville $1 471M - no urgency by client, construction behind schedule Guatemala, client indicates that site will not be ready for year end, visiting site on Oct 15 This totals $5 241M

3.Sign and Installs - we have six scheduled for $4 4M, including two unnamed deals and Europlex, Buenos Aires (National), Lusimondo and National (Ann Arbor). Larry's team to follow up, note the construction supervisor in BAires has indicated that they would not be in position to install by end of December

4 No site - Hong Kong $879K, Jacques visiting them next week SUC ($660K) - trying to finalise the UME site

001074

DEF-UT-76(b)-2

**From:** Mark Welton
**Sent:** Wednesday, October 26, 2005 9:30:31 AM
**To:** Brad Wechsler; rgelfond@imax.com
**Subject:** Re: Q4 Budgeted Installs

**Attachments:** Doc Link.htm

Appears to be heading in the right direction.
----- Forwarded by Mark Welton/Imax on 10/26/2005 09 29 AM -----

Don Savant
10/26/2005 03 11 AM

To Mark Welton/Imax@Imax
cc, dberman@imax.com, Glenn Pedersen/CAN/Imax@Imax, hke@imax com, Ilidio Coito/Imax@Imax, John Schreiner/Imax@Imax, KYuan@imax.com, Richard Wooland/Imax@Imax
Subject Re Q4 Budgeted Installs.

Received a positive news from UA on HK They are willing to install at City Gate per our letter, but need to check with the developer first as they have only a management contract at that site.

Mark Welton
10/24/2005 01 46 PM

To dsavant@imax.com, hke@imax.com, KYuan@imax.com, John Schreiner, dberman@imax.com, Glenn Pedersen/CAN/Imax@Imax, Richard Wooland/Imax@Imax, Ilidio Coito/Imax@Imax
cc
Subject Q4 Budgeted Installs.

Please update me tonight. My call with NY is at 10 30 tomorrow
----- Forwarded by Mark Welton/Imax on 10/24/2005 04 46 PM -----
Mark Welton
10/06/2005 04 52 PM
To dsavant@imax.com, hke@imax.com, KYuan@imax com, John Schreiner, dberman@imax.com, Glenn Pedersen/CAN/Imax@Imax, Richard Wooland/Imax@Imax, Ilidio Coito/Imax@Imax cc
Subject Q4 Budgeted Installs.

John, we also need to ensure kazan as it is in our budget.
----- Forwarded by Mark Welton/Imax on 10/06/2005 04 51 PM -----
Mark Welton
10/06/2005 12 35 PM
To dsavant@imax.com, hke@imax com, KYuan@imax.com, John Schreiner, dberman@imax.com, Glenn Pedersen/CAN/Imax@Imax, rwooland@imax.com
cc lo'reilly@imax com, Don Kane/Imax@Imax, Eric Jacques/Imax@Imax Subject Q4 Budgeted Installs.

The following are confirmed budgeted installs for Q4 for your market and suggested plans.

1 Beijing ($917K), Cheil (Jongjang (spelling?) and Incheon, $1.802M), Manila ($1 3M), my understanding is that these installs do not have install issues and will happen

2 Dongguan South China Mall ($997K) and Dongguan Dome ($665K) - Don, as per your email, we have asked Legal to review the contract to determine any leverage These are extremely needed for q4 Berman is also available to assist and fly out immediately to discuss with client, Richard, where are we from our last contract

3 Hong Kong $879K, SUC ($660K) - both of these are also confirmed as q4 installs, what can we do corporately to assist. Eric, where are we on the design.

With these in, we are still looking for 5 to 6 sign and installs, as you can see, this is why these are important Don, lets chat tonight or tomorrow morning

<<...>>

001076

DEF-UT-76(b)-4

**From:** Mark Welton
**Sent:** Monday, October 31, 2005 11:48:52 AM
**To:** rgelfond@imax.com; Brad Wechsler; fjoyce@imax.com; rlister@imax.com; lo'reilly@imax.com
**CC:** Bill O'Malley
**Subject:** Q4 Install Update and summary per latest forecast

1.Installs with no issues - Wehrenberg (St Louis County) ($997K), Madison ($969K), Beijing ($917K), Cheil (Jongjang and Inchcon, $1.802M), Manila ($1.3M), Interlomas ($836K), Dongguan Dome ($644K ). These installs continue to appear certain with the clients being committed to installs.

2.Installs where client is behind on construction but committed to installing.

a.Kazan ($1.036M) - behind on construction, we have offered $25K for marketing of launch of theatre, client confirmed the following today, Company □+Suvar □) Kazan□, Ltd, express one's thanks for support and comprehension in the decision of a question concerning installation of projection system IMAX MPX in Kazan city.
Also we are very grateful on the occasion of your offer for granting a bonus for acquisition of equipment. We inform you that our Company will do everything in one's power for installation the equipment in December, 2005.
b.SUC ($646K)- client has signed deal with us committing install and with UME to JV the theatre, timing to complete will be the only the issue due to retrofit of projection room on second floor.

c.Mcminnville Portland ($1.4M)- although it did not appear after site visit last week that it would be completed, client confirmed the following today by email, In discussions with SI grace (contractor) yesterday the expressed their ability to get the theater portion ready for your Dec 31 timeline (minimum delivery standards)
We will be confirming early next week.
Structure changes will not be affecting projector booth or theater □) the majority will be on the □&office□8 side of building As per Rich, $50K offered as marketing launch contribution.

d.Hong Kong ($864K) - client onside with install, confirming with Landlord to complete this year

3.Unsigned Deals,

a.Winnipeg ($915K)- install can be done quick, client understands that we need it done and he is going for approvals

b.Chihuahua ($1.3M) - client speaking with government this week, alot of work needed to get theatre ready

c.KCity ($716K) - 50/50, client reviewing our proposal for upgrade.

4. Installs not happening - Guatemala City, already out of forecast. Dongguan South China Mall ($984K), client told us this week that install will not happen.

Finally, note construction Issues continue with Lodz, client says he will try and get it installed and I will look at film packages to see what we can do. Still 50/50 but I am worried.

Confidential Treatment Requested by IMAX Corporation

IX_WELTON01861

001077

DEF-UT-76(b)-5

Possibilities - Regal offer sent out, margin in the range of $$3M to $1.1M, re. even if they did not buy the royalties, we possibly could sell for the deferred revenue on the books less the book value.

001078

DEF-UT-76(b)-7

b.Chihuahua ($1.3M) - NEED UPDATE FROM SALES, I AM CONCERNED ABOUT THIS ONE, alot of work needed to get theatre ready

c.KCity ($716K) - UNLIKELY, GOES TO BOARD NEXT WEEK, HOWEVER, THEY FEEL THEY NEED FUNDING BEFORE MOVING FORWARD WHICH WOULD NOT BE DONE IN TIME DUE TO PUBLIC ENTITY.

4. Installs not happening - Guatemala City, already out of forecast. Dongguan South China Mall ($984K), client told us this week that install will not happen.

Finally, note construction Issues continue with Lodz, client says he will try and get it installed and I will look at film packages to see what we can do. Still 50/50 but I am worried.

Possibilities - Regal offer sent out, margin in the range of $$3M to $1.1M, ie. even if they did not buy the royalties, we possibly could sell for the deferred revenue on the books less the book value.

001079

DEF-UT-76(b)-8

**From:** Mark Welton
**Sent:** Thursday, November 17, 2005 3:51 PM
**To:** rlister@imax.com; Brad Wechsler, rgelfond@imax com, fjoyce@imax com
**Cc:** Bill O'Malley, emacneil@imax.com
**Subject:** Q4 Installs Update

---

**Update as of November 14.**

**1.Installs with no issues - Wehrenberg (St Louis County) ($997K), Madison (Fitchburg) ($969K), Cheil (Jongjang and Incheon, $1.802M),** THESE INSTALLS SHOULD BE 100% CERTAIN

**2.Installs with construction delays - Beijing ($917K)** projection room has no walls, however, Director General of Beijing Municipal Bureau of Radio and TV, and had a meeting this morning with Mr. Zhong and the contractor. He was updated on the issues and instructed the contractor to speed up. Although behind in construction, he wants the imax theatre open on Dec 28

**Manila ($1.3M). This project is behind, however, they announced yesterday that the public raising of the screen would be Dec 22.**

THE ABOVE INSTALLS CONTINUE TO BE ACHIEVABLE AND RATE THEM AT 95%.

**3.Installs where client is significantly behind construction but committed to installing.**

**a.Interlomas ($836K),** Client has agreed to push for install, projection booth is in place, Client to receive the system on Nov 28 and receive the building next week THIS IS 75% ACHIEVABLE.

**b.Lodz ($1.4M) - client waiting to get building from contractor, client committed and says 95% certain, I** WOULD SAY 75% ACHIEVABLE

**4.Installs with major construction needed to complete building or Dome.**

**a.Dongguan Dome ($644K ) - install to begin Nov 14, system install not an issue, it is dome installation, to pay spitz $30K extra to get dome in place. However, the client is not working on Dome as of yet.** THIS IS 50% to 75% ACHIEVABLE.

**b.Kazan ($1.036M)** - behind on construction but client making great headway on building, completely depend if they can get the walls up and projection booth finished. Client is committed. ALOT OF WORK, I RATE THIS 50% to 75%.

**c.Portland($1.4M)** - again substantial delay, contractor now appears to be trying to get theatre ready although install dates still not agreed. **50% to 75% ACHIEVABLE.**

**The above 3 could happen but also as construction beyond our control, they may not happen. We continue to follow up.**

THE FOLLOWING HAVE **signed deals have not been confirmed as of yet and as a result, difficult to predict.**

**5.Backlog deals not committed**

**I.SUG- still not signed off on installation, worried that UME will not be able to provide theatre ready for install, 50%** ACHIEVABLE

b.Hong Kong - no confirmation from client on City gate project, to hear this week, now two weeks late, easy install but need client to agree.

6.Unsigned Deals,

a.Winnipeg ($915K)- CLIENT HAS CONSULTANT DOING PROPOSAL FOR BOARD, TO SUBMIT NOV 30 FOR INSTALL ON DEC 10, CLIENT WANTS IT TO HAPPEN BUT WILL DEPEND ON CONSULTANT. THIS SHOULD BE 75% ACHIEVABLE.

b.Chihuahua ($1.3M) - DUE TO GOVERNMENT and being in Mexico, UNLIKELY TO HAPPEN THIS YEAR

c.KCity ($716K) - UNLIKELY, GOES TO BOARD THIS WEEK, HOWEVER, THEY FEEL THEY NEED FUNDING BEFORE MOVING FORWARD WHICH WOULD NOT BE DONE IN TIME DUE TO PUBLIC ENTITY. WE HAVE OFFERED BOTH SALE AND 3D UPGRADE.

I WOULD PREDICT THAT 6 B AND C WILL NOT HAPPEN AT THIS POINT.

**Possibilities - Regal, Reading, M Beach.**

001081

DEF-UT-76(b)-10

**From:** Mark Welton
**Sent:** Monday, November 28, 2005 2:11 PM
**To:** Brad Wechsler, rgelfond@imax.com, rlister@imax com, fjoyce@imax com, Bill O'Malley
**Subject:**

---

Update as of November 28.

1.Completed Installs - Wehrenberg (St Louis County) ($997K), and Cheil (Jongjang and Incheon, $1.802M).

2.Installs with no issues at this time - Madison (Fitchburg) ($969K), 100% achievable.

3.Installs with construction delays - Beijing ($917K) NO POWER YET AT THE THEATRE AND SCREEN FRAME STILL ON BOAT, TO ARRIVE DEC 14, PROJECTION SYSTEM INSTALLED. Real issues here at Imax with systems being shipped, lost parts etc. It is our fault that screen frame is still on boat. This is 90% achievable.

Manila ($1.3M). This project is behind, however, they announced that the public raising of the screen would be Dec 22. SCREEN FRAME NOW CLEARED. This is 90% achievable.

3.Installs where client is significantly behind construction but committed to installing.

a.Interlomas ($836K), Client has agreed to push for install, 2nd floor of projection booth still not in place, Client has received the system. Installation meeting on Wednesday. THIS IS 75% ACHIEVABLE.

b.Lodz ($1.4M) - client waiting to get building from contractor, client committed and says 95% certain, I WOULD SAY 75% ACHIEVABLE

c.Portland($1.4M) - again substantial delay, contractor now appears to be trying to get theatre ready, system shipping today. 50% to 75% ACHIEVABLE.

d.SUC- installation now begun, major issue is raising of screen as client wants it installed after December. Also, client not assisting in install. We are now on site looking at different alternatives for screen raising.

4.Installs with major construction needed to complete building or Dome.

a.Kazan ($1.036M) - behind on construction but client working quickly on building, completely depend if they can get the walls up and projection booth finished. Client is committed. ALOT OF WORK, I RATE THIS 50% as client communicated today that installation will be difficult. We continue to push the client.

b Dongguan Dome ($644K ) - this install is in serious trouble due to dome installation. Client continues to be way behind on theatre construction. We continue to push but are worried about the Dome installation. THIS IS 50% ACHIEVABLE.

c.Hong Kong ($865)- found major issue with bulkhead over screen, if we can address, this will move to 90%, right now at 50% until issue resolved.

6.Unsigned Deals,

001082

DEF-UT-76(b)-11

a.Winnipeg ($915K)- CLIENT HAS CONSULTANT DOING PROPOSAL FOR BOARD, TO SUBMIT NOV 30 FOR INSTALL ON DEC 10, CLIENT WANTS IT TO HAPPEN BUT WILL DEPEND ON CONSULTANT. THIS SHOULD BE 75% ACHIEVABLE.

b.KCity ($275K) - trying to sell them the 2D system, goes to board on Nov 30.

Possibilities - Regal, Reading

**From:** Mark Welton
**Sent:** Tuesday, December 6, 2005 1 18 PM
**To:** Brad Wechsler; rgelfond@imax com; fjoyce@imax com; rlister@imax com; Bill O'Malley, Kathryn A Gamble, emacneil@imax.com
**Subject:** Install Update as of Dec 5.

---

Re Portland, the contractor team is continuing to proceed with a Dec install with a site meeting tomorrow and therefore we have more confidence for the insall.

----- Forwarded by Mark Welton/Imax on 12/06/2005 12:53 PM -----

Mark Welton
12/06/2005 10:21 AM

To: Brad Wechsler/Imax@Imax, rgelfond@imax com, fjoyce@imax.com, rlister@imax.com, Bill O'Malley/USA/Imax@Imax
cc:
Subject: Install Update as of Dec 5

**Update as of Dec 5.**

**The major installation risks for the quarter are as follows due to the fact that the buildings are not complete.**

1.Kazan ($1.036M) - Truck with system stopped at boarder and in a two day wait to get thru. Client behind on construction, install to begin on Dec 15, client working on building, and walls of projection booth. Theatre still needs alot of work. 50%

2 Interlomas ($836K), Client has agreed to push for install, 2nd floor of projection booth still not in place, Client has received the system. Installation to begin tomorrow, theatre still in sad shape. 50%

3.Portland ($1.4M) - again substantial delay, contractor moving slowly, system has arrived, theatre projection room still an issue. **Speaking with contractor and client tomorrow. Uncertain at this time.**

4.Lodz ($1.4M) - conduits need to be laid and screen will be taken back down once system tested. Power could be temporary. Finishes will not be completed, opening in March, This still should happen and rate this at 85%

**The remaining installations are continuing with the following issues, however, they are moving in the the right direction.**

**1.Completed Installs - Wehrenberg (St Louis County) ($997K), and Cheil (Jongjang and Incheon, $1.802M),** just fyi, screen sheet not meeting fire code issues in Korea, client's responsibility to replace at sometime,

**2.Installs with no issues at this time - Madison (Fitchburg) ($969K), 100% achievable.**

**3.Installs with construction delays - Beijing ($917K)** NO POWER YET AT THE THEATRE AND SCREEN FRAME STILL ON BOAT, TO ARRIVE DEC 10, PROJECTION SYSTEM INSTALLED. **Real issues here at Imax with systems being shipped, lost parts etc. It is our fault that screen frame is still on boat. This is 95% achievable.**

**Manila ($1.3M). This project is behind, however, they announced that the public raising of the screen would be Dec 22.** SCREEN FRAME NOW CLEARED. **This is 100% achievable.**

SUC- installation now begun, the screen will be raised on the 12th and brought back down as the client will finish its run of King kong before opening the Imax.This is 95% achievable

Hong Kong ($865)- found major issue with bulkhead over screen, however, system will be installed and theatre used as demonstration theatre. It will not open to public. 95% achievable.

Dongguan Dome ($644K ) - dome install has begun with aim of completing by end of year. 75% achievable

Winnipeg - finance committe approval on Thursday. Board agreement in principle with deal.

Possibilities - Regal,

001085

DEF-UT-76(b)-14

| | |
|---|---|
| **From:** | Mark Welton |
| **Sent:** | Tuesday, December 6, 2005 10:21 AM |
| **To:** | Brad Wechsler; rgelfond@imax.com; fjoyce@imax.com, rlister@imax.com; Bill O'Malley |
| **Subject:** | Install Update as of Dec 5. |

**Update as of Dec 5.**

**The major installation risks for the quarter are as follows due to the fact that the buildings are not complete.**

**1.Kazan ($1.036M)** - Truck with system stopped at boarder and in a two day wait to get thru. Client behind on construction, install to begin on Dec 15, client working on building, and walls of projection booth. Theatre still needs alot of work. 50%

**2.Interlomas ($836K),** Client has agreed to push for install, 2nd floor of projection booth still not in place, Client has received the system. Installation to begin tomorrow, theatre still in sad shape. 50%

**3.Portland($1.4M)** - again substantial delay, contractor moving slowly, system has arrived, theatre projection room still an issue. **Speaking with contractor and client tomorrow. Uncertain at this time.**

**4.Lodz ($1.4M)** - conduits need to be laid and screen will be taken back down once system tested. Power could be temporary. Finishes will not be completed, opening in March. This still should happen and rate this at 85%

**The remaining installations are continuing with the following issues, however, they are moving in the the right direction.**

**1.Completed Installs** - **Wehrenberg (St Louis County)** ($997K), and **Cheil (Jongjang and Incheon, $1.802M),** just fyi, screen sheet not meeting fire code issues in Korea. client's responsibility to replace at sometime.

**2.Installs with no issues at this time - Madison (Fitchburg) ($969K). 100% achievable.**

**3.Installs with construction delays - Beijing ($917K)** NO POWER YET AT THE THEATRE AND SCREEN FRAME STILL ON BOAT, TO ARRIVE DEC 10, PROJECTION SYSTEM INSTALLED. **Real issues here at Imax with systems being shipped, lost parts etc. It is our fault that screen frame is still on boat. This is 95% achievable.**

**Manila ($1.3M). This project is behind, however, they announced that the public raising of the screen would be Dec 22. SCREEN FRAME NOW CLEARED. This is 100% achievable.**

**SUC- installation now begun, the screen will be raised on the 12th and brought back down as the client will finish its run of King kong before opening the Imax.This is 95% achievable**

**Hong Kong ($865)- found major issue with bulkhead over screen, however, system will be installed and theatre used as demonstration theatre. It will not open to public. 95% achievable.**

**Dongguan Dome ($644K ) - dome install has begun with aim of completing by end of year. 75% achievable**

**Winnipeg - finance committe approval on Thursday. Board agreement in principle with deal.**

will be taken back down once system tested. Power could be temporary. Finishes will not be completed, opening in March. This still should happen and rate this at 85%.

1.Completed Installs - Wehrenberg (St Louis County) ($997K), and Cheil (Jongjang and Incheon, $1.802M), just fyi, screen sheet not meeting fire code issues in Korea, client's responsibility to replace at sometime.

**2.Installs with no issues at this time** - Madison (Fitchburg) ($969K), Beijing ($917K), Manila ($1.3M), **Winnipeg ($1M),Install has begun,**Dongguan Dome ($644K ) **100% achievable.**

**SUC - We are planning on pulling up the screen overnight Monday night and running the complete system on Tuesday day.**

- **Commissioning is planned for Tuesday**
- **We hope to be complete Tuesday night and then the IMAX screen will be removed and the theatre prepared for their 35mm launch on the 15th.**
- **While our screen is up we want to take light readings with it hanging vertical and then also when it is tilted. We are trying to determine if we can use their existing screen frame for the final location of the screen. This will eliminate the need to modify their masking system which will save them significant time and costs.**
- **We do not expect to have the final screen sheet available for installation until the last week of January, but will be complete in time for the Chinese New Year Jan. 29th.**

001091

DEF-UT-76(b)-20

**From:** Mark Welton
**Sent:** Monday, December 19, 2005 12 01 PM
**To:** Brad Wechsler, rgelfond@imax.com, fjoyce@imax.com, emacneil@imax com, rlister@imax.com; Kathryn A Gamble, Bill O'Malley; mhamilton@imax.com
**Subject:**

---

Update as of Dec 19. To me today, only Hong Kong appears to be at risk with a small risk for kazan. See below.

1.Hong Kong ($865)- client has started on the retrofit today. We will agree to provide the client compensation for being shut down over Christmas. Theatre will be used as demonstration theatre. STILL A RISK AS CLIENT WILL NEED TO WORK QUICKLY TO ENSURE THEATRE IS COMPLETE FOR COMMISSIONING.

Although the following 4 buildings are not complete, it appears that these systems will be commissioned however, power will most likely be temporary and screens will be brought back down after testing.

1.Kazan ($1.036M) - SYSTEM HAS ARRIVED. REAL ISSUE WILL BE THAT THE SYSTEM HAS ALL THE PARTS AND SYSTEM WORKS. IF THAT IS THE CASE SYSTEM WILL BE COMMISSIONED. 2D SCREEN WILL BE PUT UP. 3D SCREEN HAS BEEN PAINTED AND PUT ON BOAT ON THURSDAY.

2.Interlomas ($836K), GOING WELL, 2D SCREEN PUT UP TODAY, SYSTEM WILL BE COMMISSIONED, 3D SCREEN WILL GO UP IN NEW YEAR.

3.Portland($1.4M) - GOING SLOWLY BUT SYSTEM SHOULD BE COMMISSIONED WITH 2D SCREEN.

4.Lodz ($1.4M) - WE ARE ON SITE AGAIN, SCREEN TO BE DELIVERED TODAY. 2D SCREEN TO BE PUT UP PRIOR TO YEAR END.

1.Completed Installs - Wehrenberg (St Louis County) ($897K), and Cheil (Jongjang and Incheon, $1.802M), just fyi, screen sheet not meeting fire code issues in Korea, client's responsibility to replace at sometime.

2.Installs with no issues at this time - Madison (Fitchburg) ($969K), Beijing ($917K) 3D SCREEN PUT UP BUT PAINTED IN NEW YEAR AS THEATRE TO DIRTY FOR 3D SCREEN, Manila ($1.3M) SAME AS BEIJING, PAINTED IN NEW YEAR, Winnipeg ($1M),Dongguan Dome ($644K ) 100% achievable.

SUC - COMPLETED BUT SCREEN TAKEN DOWN DUE TO PAINT ISSUES, WILL PUT UP NEW SCREEN IN NEW YEAR, CLIENT STILL NOT SIGNED OFF DUE TO THE SCREEN BUT I HAVE TOLD THEM THAT THEY CAN NOTE THIS ON ACCEPTANCE

James zion deal not coming together as quickly with the owners, thus 2005 install will not happen.

001092

DEF-UT-76(b)-21

**From:** Neil Robbins <nrobbins@entservices.com.au>
**Sent:** Tuesday, December 20, 2005 11 30 AM
**To:** <rgelfond@imax.com>
**Subject:** fourth quarter sign off (Asia)

---

Hi rich
the Australian team is doing three of the fourth quarter theater openings in Asia for you
and I thought I would just give you a quick update on the progress.

Manila
The building is a little behind schedule but the theatre itself is running film and the certificate of acceptance was signed on the 20th of December

Beijing China film Museum
They are in last-minute frantic cleaning and finishing for their VIP shows on the 29th of December certificate of acceptance will be signed on the 23rd of December

Donggong Dome
They are the most behind but are working night and day. the dome will only be finished on the 25th of December and the certificate of acceptance will be signed on the 28th of December and opened a public as soon as practically possible

Have a merry Christmas

Neil Robbins
regional manager
IMAX technical services

001093
DEF-UT-76(b)-22

**From:** Mark Welton
**Sent:** Saturday, December 31, 2005 2:52 PM
**To:** Rob Lister <rlister@imax.com>; Rich Gelfond <rgelfond@imax com>, Frank Joyce <fjoyce@imax.com>
**Subject:** Fw· Update/Leafs

---

All complete, need to collect Acceptance Certificate for SUC next week.

---

Mark Welton

From: Don Kane
Sent. 12/31/2005 02.24 PM
To: Mark Welton/Imax@Imax
Cc: "Eric Jacques" <ejacques@imax com>
Subject: Re: Update/Leafs

All done and signed. That's all of them except SUC signed doc
Happy New Year.
Don

From: Mark Welton
Sent: 12/31/2005 01:08 PM
To: Don Kane/Imax@Imax
Subject: Re· Update/Leafs

Anything wrong with Portland

---

Mark Welton

From Don Kane
Sent: 12/31/2005 12:38 PM
To: Mark Welton/Imax@Imax
Subject: Re: Update/Leafs

Got Hong Kong. Portland going down to the wire. Wil let you know later today.

From· Mark Welton
Sent· 12/31/2005 11.09 AM
To: Don Kane/Imax@Imax

001094

DEF-UT-76(b)-23

Subject: Re: Update/Leafs

Did we make Hong kong and portland

---

Mark Welton

From: Don Kane
Sent: 12/30/2005 10:10 AM
To: Mark Welton/Imax@Imax
Subject: Update/Leafs

Hong Kong running.
Lodz is firing up the system, John has soem problems and working on them. Same with McMinnville.

We may be able to get a Gondola suite at ACC. $7700CDN for 42 people including food and soft drinks There is a bartender to purchase drinks The gondolas are much higher up than a box, but we can get more people in.
Possibly Jan 14 (Phoenix) and Jan 26 (Buffalo) may be available.
Let me know and I will book it
Don

# EXHIBIT S-9

This is Exhibit "S-9" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

IMAX®

Ms. Angela Crane
Branch Chief
Division of Corporation Finance
Securities and Exchange Commission
Washington, D.C. 20549
USA

June 20, 2007

Re: IMAX Corporation
Form 10-K for the Fiscal Year Ended December 31, 2005 (the "Form 10-K"), and
Form 10-Q for the Fiscal Quarter Ended September 30, 2006 (the "Form 10-Q")
File No. 000-24216

Dear Ms. Crane:

We refer to the comment letter dated February 12, 2007 from the staff (the "Staff") of the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "Commission") concerning the above-captioned filings by IMAX Corporation ("IMAX" or the "Company").

IMAX acknowledges that it is responsible for the adequacy and accuracy of the disclosure in the filings and that Staff comments or changes to disclosure in response to Staff comments do not foreclose the Commission from taking any action with respect to the filings. IMAX also acknowledges that it may not assert Staff comments as a defense in any proceeding initiated by the Commission or any person under the federal securities laws of the United States.

The Company has considered the Staff's comments, reviewed the accounting literature related to revenue recognition, consulted with its auditors and outside advisors and performed an extensive review of its arrangements and has concluded that it should change its accounting policy for revenue recognition. The principal changes are to (a) treat the theater system equipment (including the projection system, sound system, screen and 3D glasses cleaning system) and certain services as a single deliverable and a single unit of accounting and (b) require signed customer acceptance prior to revenue recognition. In the Company's Annual Report on Form 10-K (the "2006 Form 10-K"), the Company intends to restate its financial statements for the years ended December 31, 2004 and 2005, its selected financial data for the four years ended December 31, 2002, 2003, 2004 and 2005, and its quarterly financial data for the seven quarters ended September 30, 2006 to reflect this new policy. A more complete executive summary of the change in policy and the new policy itself are attached as Exhibit 1. The Company's responses in this letter should be read in conjunction with this Exhibit.

The Company believes that its change in accounting policy addresses a significant number of the Staff's comments in the February 12 letter and we have not sought to specifically respond to those portions of the comments that we believe have been addressed by the change in policy.

**IMAX CORPORATION**
2525 Speakman Drive
Mississauga, Ontario
Canada L5K 1B1
t 905.403.6500 f 905.403.6450
www.imax.com

Should the Staff desire further responses to those portions of the comments or any other comments, we will, of course, supplement our response.

For ease of reference, we have set forth a verbatim reproduction of your comments, followed by our response. IMAX will include revised disclosures in future filings where appropriate. Unless otherwise indicated, all dollar amounts are expressed in U.S. dollars.

*Form 10-K for the Fiscal Year Ended December 31, 2005*
*Management's Discussion and Analysis, page*
*Sales Backlog, page 32*

1. *Please refer to prior comment 1. We note that you enter into joint box-office sharing arrangements, where you receive a large portion of a theater's box office revenue in exchange for contributing the systems components to the theater. If material, revise revenue recognition in future filings to disclose.*

There have been only a few occasions in the past where the Company has entered into an arrangement where the equipment is placed in a theatre solely in exchange for a share of the theatre's box office revenues. The aggregate amount of revenues in 2005 reported by the Company (within rental revenues) was $666,000. These revenues were generated from five arrangements where the equipment was installed in 2005. These amounts were not material in 2005 in comparison to total revenues.

In the Company's 2006 Form 10-K and in future filings, the Company will revise its accounting policy note in the financial statements to include disclosure of its policy relating to joint box-office sharing arrangements and if material the amounts of revenue from this source.

*Note 2, Summary of Significant Accounting Policies, page 61*
*(n) Revenue Recognition, page 64*

2. *Please refer to prior comments 6 and 7. FASB Concept Statement 5, footnote 1, defines the earnings process and notes that "earnings in this sense is a technical term that refers to the activities that give rise to the revenue – purchasing, manufacturing, selling, rendering service, delivering goods, allowing others to use enterprise assets, the occurrence of an event specified in a contract, and so forth" [emphasis added]. Paragraph 83(b) states "revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." We note from your response that you consider the following theater components, (i) projection and sound system; (ii) screen system; and (iii) glass cleaning system to be separate deliverables under EITF 00-21. Explain why the theater system is not your deliverable, since that is what you are contractually obligated to deliver.*

As noted above, the Company has considered the Staff's comments, reviewed the accounting literature related to revenue recognition, consulted with its auditors and its

other advisors and performed an extensive review of its arrangements for its theatre systems. Based on this review, the Company has concluded that generally the deliverables for consideration under EITF 00-21 should be changed to the following:

| TYPICAL DELIVERABLES |
|---|
| • Projection system, sound system, screen system, glasses cleaning machine, theatre design support, supervision of installation, projectionist training and trademark rights (the "System Deliverable") |
| • 3D Glasses |
| • Initial maintenance services |
| • Separately priced maintenance and extended warranty services |
| • Film licenses |

Please see Exhibit 1, Revenue Recognition on Typical Theatre Systems Arrangements, for the Company's new accounting policy. Section 1 of the Company's new policy covers the identification of deliverables in a typical IMAX arrangement. Exhibit 1 also includes an executive summary that reconciles the old accounting policy to the new accounting policy.

3. *Notwithstanding the above, we note that you consider the theater components to be separate deliverables since you believe each meets the criteria outlined in paragraph 9 EITF 00-21. Please address the following:*

- *Tell us whether the customer is legally precluded from reselling the system under the terms of the contract. If so, please explain how the criterion discussed in paragraph 9.a of the EITF 00-21, which states "the customer could resell the delivered items(s) on a standalone basis" is met.*
- *If the customer is able to resell the system to a third party, discuss whether the subsequent buyer would have viable installation alternatives other than from IMAX. Refer to Example 6 of the Appendix to EITF 00-21.*
- *We note that your performance depends on the performance of others, such as the customer and sub-contractors. Specifically, we note that you cannot commence installation of the system until all facility construction and services as called for in the contact are substantially complete. Explain how the criteria in paragraph 9.c of EITF 00-21, which states, "performance of the undelivered items is considered probable and substantially in control of the vendor", would be met if your performance depends on the interior theater space being completed by others.*

- *Tell us whether you ship components to designated storage sites if the theater interior is not complete. If so, explain how you recognize revenue for these components stored at off-site storage facilities.*
- *We may have additional comments after reviewing your response.*

The Company believes the change in the typical deliverables noted in the response to comment 2 addresses this comment. Accordingly, we have limited our response to this comment to those matters noted in the comment that are not fully addressed by the new policy.

The Company's arrangements with its customers generally permit the customer to sell or sub-lease the equipment, subject to a right of first refusal in favor of the Company. The arrangements also generally prohibit the customer from moving the equipment without the Company's consent.

The customer (or any subsequent purchaser or lessee) is responsible for arranging the physical installation of the equipment. The Company only supervises the installation and is not responsible for the physical installation of the equipment. If the customer were to resell the system to a third party, there are third party vendors with sufficient knowledge and experience to provide a level of installation services comparable to the Company.

The customer often needs to complete other items after the Company's criteria for revenue recognition have been satisfied and before the theatre can open. These may include certain final fits and finishes in the theatre. None of these items are obligations of the Company. These items do not affect the performance or functionality of the theatre system that has been installed and accepted by the customer.

The Company typically ships components to the customer's theatre or a site designated by the customer. Since January 1, 2000, the Company has recognized revenue upon installation except in the very limited situations where the Company is released from further obligations (including its obligation to supervise installation) after delivery.

4. *Regarding your lease agreements, we note that since you believe SFAS 13 is "silent as to whether multiple pieces of equipment covered by a single master lease agreement should be viewed separately or bundled together or viewed as one lease for purpose of recognition, you follow the guidance in EITF 00-21. However, we note that in paragraph 4 of EITF 00-21 the taskforce acknowledged that SFAS 13 represents a "higher-level authoritative literature". This is further clarified in footnote 3 to paragraph 4.a (ii) of EITF 00-21, which states that leased assets are required to be accounted for separately under the guidance of SFAS 13 and indicates that the guidance in SFAS 13 would be applied to separate any non-SFAS 13 deliverables, such as maintenance, etc., from the leased equipment and to allocate the related arrangement consideration to those deliverable. Further we note that the EITF specifically indicated that EITF 00-21 would only be applied to further separate any non-SFAS 13 deliverables and to allocate the related arrangement consideration.*

- *Tell us how you considered the guidance in paragraph 4, including footnote 3, in reaching your conclusion.*
- *As we note from your sample contract that you have contracted to lease equipment, inclusive of a projector, sound system, a screen and 3-D glasses cleaning machine, explain to us why you would not account for the leased equipment deliverable pursuant to the guidance in paragraphs 17 or 19 of SFAS 13, as applicable.*
- *Further, as we note that the arrangement does not include real estate, tell why you believe the guidance in paragraph 27 would be applicable.*

Under the Company's new accounting policy all the theatre equipment (including certain other obligations) comprise a single deliverable. Further, the Company has decided to treat all of the equipment in a lease arrangement as a single unit of accounting.

While under SFAS 13 each piece of equipment could be considered separate leased property and a separate unit of accounting, the Company has concluded that it would be more appropriate to view all of the equipment as a single unit of accounting for the same reasons as outlined in section 1 of the policy attached as Exhibit I. Prior to installation by the customer of the equipment, the customer has not obtained the ability to substantively use the theater projector system.

Except as noted in our previous response of December 12, 2006, the Company does follow the guidance in paragraph 17 and 19 of SFAS 13 for accounting applicable to sales-type leases and operating leases, respectively.

5. *Please refer to prior comment 14. We note that the sample contract, provided as an exhibit, includes a definition of "Date of Acceptance" as "the earlier of (a) the date on which IMAX certifies to Client and Client is in agreement (which agreement will not be unreasonably withheld or delayed) that the training of personnel, installation and run-in testing of the System is complete; (b) the date on which the Theater is opened to the public; and (c) a specified date agreed to by the Company and the customer." We also note that you document the acceptance by the customer of the theater components, but you do not consider this to be a "substantive" acceptance procedure for purposes of determining the revenue recognition point of the various system components. Please address the following:*

   - *Explain your client acceptance process and the documents that record the acceptance by the customer. Explain when these are obtained and how they impact your revenue recognition. For the 14 theater systems where revenue was recognized in December 2005, please tell us the specific date of acceptance by the customer.*
   - *We note that you obtain letters of credit from customers for some of the initial rent that provides for payment upon presentation of a standard commercial*

*invoice and/or other documents obtained form the customer. Please explain when you invoice the customer and tell us what "other documents" are provided to the customer. For example, tell us if you are required to present a customer acceptance certificate to obtain the funds from the bank.*

- *Tell us your consideration of the guidance in Question 1 of SAB Topic 13.A.3b which states, "the delivery criterion would generally be satisfied... unless product performance may reasonably be different under the customer's testing conditions specified by the acceptance provisions."*
- *Tell us whether the customer has the right to terminate the contract or to demand a refund if the customer-specified conditions are not met. We assume that these clauses are legally enforceable. Please advise us.*

The Company's new accounting policy provides that revenue will be recognized on the equipment only when (i) the installation of such equipment is substantially complete (as defined under the policy) and (ii) the earlier of: (a) receipt of written customer acceptance or (b) public opening of the theatre. The Company believes this change addresses the comments raised by the Staff. Accordingly, the Company has limited its response to this comment to those matter noted in the comment that are not fully addressed by the new policy.

The signed customer acceptance generally takes the form of a standard form (see Exhibit 2). The Company's staff performing the supervision of installation will request that the customer sign the Customer Acceptance Form upon completion of the installation. When the form is not signed when the Company's representatives leave the customer site, our Business Affairs representatives will follow up and obtain the customer acceptance as soon as possible after the equipment installation has been completed. Revenue will not be recognized until customer acceptance is received or if the customer acceptance certificate is not received, the Company will use the public opening date of the theatre as the date of implicit acceptance by the customer.

For the 14 theatres with respect to which revenue was recognized in fourth quarter of fiscal 2005, the specific customer acceptance dates are outlined in Exhibit 3.

The Company invoices customers in accordance with the contractual payment terms. Generally speaking, (a) these invoices for the initial payments are sent on various dates between execution of the arrangement and the date of acceptance, although, in certain cases, payments and invoicing may be scheduled after installation and acceptance, and (b) the Company provides only a standard commercial invoice to the customer when payments are due under the arrangement. This standard commercial invoice is also provided to the bank in order to draw upon the letter of credit. Generally, the Company is not required to provide a Certification of Acceptance to draw upon the letter of credit unless the letter of credit is drawn before the date specified in the arrangement.

The Company's revenue arrangements do not include a right of return by the customer in the absence of a material breach or default by the Company. A customer may receive a refund in the case of a material breach by the Company of the arrangement. Such a

breach has not occurred in the last five years. Once any of the equipment components have been installed, the customer is not entitled to return the delivered item(s). Further, the Company's contracts with customers generally require that the customer take delivery of the contracted items. Historically, the Company has been successful in enforcing these provisions either by specific performance or by a return of the equipment without refund.

6. *We also note that the equipment components are "thoroughly" tested at your facility before delivery to ensure each component will meet the company defined equipment specifications upon delivery and installation by the customer. Please address the following:*

- *Explain to what extent you are able to duplicate a customer's specific environment in your pre-shipment environment. For example, explain if you create a testing chamber to the exact dimension as the customer's theater.*
- *Tell us how you test the equipment prior to shipment to ensure that it will be successfully integrated at the customer's location and operate in the customer's environment.*
- *Explain what portion of the contract fee is contingent upon a successful installation.*
- *Explain why you believe functional testing is inconsequential or perfunctory if testing appears to be essential to the functionality of all components together and in the finished theater environment.*
- *We note in Section 4.01(a) of the sample contract, that a portion of the initial rent is due upon "the earlier of the Date of Acceptance and X". Tell us your consideration of Question 3 of SAB 13 Topic 13A.3c which states, "if it is determined that the undelivered service is not essential to the functionality of the delivered product but a portion of the contract fee is not payable until the undelivered product but a portion of the contract fee is not payable until the undelivered service is delivered, the staff would not consider the obligation to be inconsequential or perfunctory."*
- *Also, tell us your consideration of the guidance in Question 2 of SAB Topic 13.A.3b which states, "if an arrangement includes customer acceptance criteria or specifications that cannot be effectively <u>tested</u> before delivery or installation at the customer's site, the staff believes that revenue recognition should be deferred until it can be demonstrated that the criteria are met. This situation usually will exist when equipment performance can vary based on how the equipment works in combination with the customer's other equipment, software or environmental conditions."*

The Company believes that its change in accounting policy related to customer acceptance addresses this comment. Accordingly, we have limited our response to this comment to those matters noted in the comment that are not fully addressed by the new policy.

The Company's projection systems typically are not custom designs for particular theatres or applications. Customers generally select a standard model of projection

system and are required to construct or modify a theatre based on Company-specified design criteria to ensure that the system selected will function based on Company specifications.

The Company's equipment generally does not interact with other customer equipment or software. Environmental conditions in which the system is to operate are also specified by the Company and outlined in the arrangements.

The Company's systems are fully tested at its manufacturing facility in Mississauga, Canada. The components are tested both individually and as a system. These tests are performed in environments that are representative of a typical projection system booth at a theatre. It is not necessary to test in a chamber of the exact dimensions as the customer's theatre to ensure the components and system will function to specification.

None of the initial payments or minimum payments are contractually contingent on successful installation. However, in certain cases, the Company has modified certain initial payments to coincide with the expected installation date of the screen.

Under the Company's new accounting policy (see section 4(d) of Exhibit 1), installation of the equipment requires that the equipment also be put through a complete function start-up and test procedure to ensure proper operation upon connection to the theatre's services. All components of the System Deliverable are to be tested individually and as a system. As noted in the Company's new policy, certain fine tuning and calibration may not be completed at the date the equipment is fully installed and operational. The Company has concluded these generally will be inconsequential and perfunctory. The reasons for these conclusions are set out in the policy.

7. *In this regard, we note that where IMAX has delayed installation, the Agreement provides for two remedies; (i) termination of the Agreement, upon which IMAX must remove the system and refund monies to the customer, and (ii) the customer can perform the unperformed material obligations and IMAX would reimburse the customer for its costs of doing so. Please discuss in greater detail this general right of return when installation is not performed to the satisfaction of the customer. Given the contractual provision, please explain in greater detail why you believe the price is fixed and determinable and the earning process is complete prior to the full installation and calibration of the theater system. In your response explain how this is consistent with the guidance provided in Question 5 of SAB Topic 13.A.3b.*

The Company notes that delays in installation almost always result from delays on the part of the customer rather than the Company. Delays typically relate to the customer's inability to complete the theatre to the point where installation of the components can commence.

As indicated above in the response to comment 2 and more fully described in Exhibit 1, the Company has changed its revenue recognition policy. As discussed above in the response to comment 5, the Company's new policy provides that revenue will be recognized on the System Deliverable unit of accounting only when (i) the installation of the equipment is substantially complete (as defined in the policy) and (ii) the earlier of: (a) receipt of written customer acceptance or (b) public opening of the theatre.

In relation to your comments on rights of return, see response to your comment 5. See page A-12 of Exhibit 1 for a discussion of why the Company considers certain items such as fine tuning of the sound system and final calibration to be inconsequential and perfunctory.

8. *We note that the customer has several rights under an IMAX system arrangement as set forth in the sample contract provided. Specifically, we note that the customer's rights may include indemnity on installation and maintenance services provided by the Company. We also note that the indemnity provisions require you to be liable in instances that may arise from the installation or maintenance of the system components. Tell us what rights are available to the customer under the indemnity provision. For example, discuss whether you are required to take back the equipment if installation is not successful. It appears that the provision should be disclosed pursuant to FIN 45.*

Under the indemnity provisions noted in the Staff's comment, the Company's only obligation is to replace or repair defective parts and to maintain or repair the equipment under a maintenance agreement. Based on the Company's new policy requiring the equipment be in full working condition before revenue is recognized on the equipment, the Company's remaining obligations related to the equipment would be warranty and maintenance. For a description of the items that would be subject to warranty see page A-12 of Exhibit 1 of the Company's new accounting policy. An appropriate accrual for warranty is recorded by the Company in accordance with SFAS 5 for known defects and issues upon recognition of any revenue. Subsequent to revenue recognition, the Company will accrue a provision for warranty costs when defects or issues arise where it is probable that a loss will occur and the amount of the loss can be reasonably estimated.

The Company's maintenance agreements are essentially maintenance and extended warranty agreements that are accounted for in accordance with FTB 90-1. Except as outlined in the response to comment 5, the Company is not required to take back the equipment if installation is not successful.

The Company will provide disclosures pursuant to FIN 45 in its financial statements to be included in its 2006 Form 10-K and future filings.

9. *Please refer to prior comment 6. We note there may be circumstances when your arrangements include distinctive provisions that are not standard. Please tell us about any material non-standard provisions offered to customers.*

In connection with the Company reviewing all system arrangements during the period 2002 through 2006, the Company has identified certain material non-standard clauses which it is reviewing in the context of its effect on the accounting for these arrangements.

At the date of this letter, this review is still ongoing. Upon completion of this review the Company will respond to this question in the form of an addendum to the Company's response.

10. *We note for DMR film revenue that you receive a fixed fee or variable fee based on a percentage of the customer's box office revenue. Please quantify the amount of revenue recorded in fiscal year 2005 and 2006 for these arrangements. Also explain when expenses under a fixed fee arrangement are recognized. Finally, tell us when you recognize a loss under these arrangements.*

The amounts of DMR film revenue recognized in 2005 and for the nine months ended 2006 were $8.85 million and $8.5 million, respectively. All these fees were variable fees based on a percentage of the customer's box office revenue.

Under the Company's accounting policy, the costs of digitally re-mastered films where the copyright is owned by a third party are accounted for similar to a film right in accordance with SOP 00-2. The costs are capitalized and amortized using the individual film forecast method in the same ratio that current gross revenues bear to anticipated ultimate revenues from the re-mastered film.

The recoverability of the DMR film costs is dependent on the commercial acceptance of the films. If events or circumstances indicate that the fair value of a film is less than the unamortized film costs, the asset is written down to its fair value. The Company determines fair value of its films using a discounted cash flow model. This policy is consistent with the method for recognizing impairment for films under SOP 00-2.

11. *Please revise future filings to disclose your revenue recognition policy for revenues included in "theater operations."*

The Company will disclose its revenue recognition policy for revenues included in "theatre operations" in its financial statements to be included in its 2006 Form 10-K and future filings.

12. *Please refer to prior comment 7. According to your response, you did not follow your stated accounting policy for the first three quarters of 2005, by not separately accounting for theater components. Please address the following:*

- *Confirm that you retrospectively reviewed all periods since adoption of EITF 00-21 to ensure all deliveries and installs occurred in the same quarter. For example, we note the disclosure on page 7 of your Form 10-K, that as of*

*December 31, 2004 you had three theater systems installed, but not included in the 2004 table.*

- *Discuss how you considered the guidance in SFAS 154 when evaluating whether this represented an error in previously issued financial statements and how it should be corrected.*

In connection with the change in its accounting policy, the Company is reviewing all arrangements that include System Deliverables during the period 2002 through 2006 to ensure compliance with the new policy. At the date of this letter, this review is still ongoing. The guidance under SFAS 154 will be followed and appropriate disclosures will be included in the Company's financial statements to be filed in the 2006 Form 10-K and future filings.

13. *We note you retrospectively reviewed all installations in the first three quarters of 2005 and noted two occasions where screen components were not "substantially complete" in the same quarter. Please explain what remained to be completed on the two screen components. Tell us whether revenue was recognized for the other theater system components, and if so, please quantify.*

Under the Company's new accounting policy the treatment of the two occasions on which screen components were not "substantially complete" in the same quarter as the system was installed during the first three quarters of 2005 will be restated. As indicated above in the response to comment 12, the Company's review of past installations in this regard is ongoing.

On the two occasions noted in the comment, the screen membrane had been delivered and was on site and the screen frame had been installed, but the screen membrane had not yet been installed by the customer-hired installers. Irrespective of the screen not having been fully installed, all equipment revenue was recognized on these installations in Q1 and Q3 respectively, amounting to $2.2 million and $1.64 million in Q1 and Q3, respectively.

Under the Company's new accounting policy, revenue from these two installations will instead be recognized in the quarter in which the screen was installed.

14. *Please refer to prior comment 11. We note that you offer incentives such as marketing credits or films to induce the customer to commence timely installation of the component systems.*

- *Quantify the amount of incentives given for all periods presented.*
- *Explain how your accounting for these incentives as a reduction of revenue complies with paragraph 10 of EITF 01-09, which states, "free products or service delivered at the time of sale of another product or service should be classified as cost of sales."*

In the past, the Company has offered marketing credits to customers by either allowing the customer to reduce the amount of a payment under the arrangement, or by providing a refund to the customer for the credit amount. The Company considers marketing credits to be a reduction in the overall arrangement consideration, as the Company does not receive any identifiable benefits in exchange for these types of incentives. In certain instances, the Company requires evidence that the customer used the amounts for marketing before providing the credit.

The film rights and prints that have been provided to the customers in these situations have been for films that are in the Company's film library and for which the Company has previously entered into separately priced third party licenses. These rights are provided either as part of the original arrangement or through modifications to the original arrangement prior to the recognition of revenue under the arrangement.

EITF 01-09, paragraph 7, indicates that free or significantly discounted products or services in a prior or current transaction are multiple deliverable transactions within the scope of EITF 00-21. Therefore the Company has treated these film incentives as a separate unit of accounting under its new revenue recognition policy. As such, the Company believes that these film incentives are scoped out of EITF 01-09.

The amount of incentives on a fair value basis for the years ended December 31, 2003, 2004 and 2005 and the nine months ended 2006 is $127,000, $213,000, $506,000 and $25,000 respectively.

*Sales-Type Leases of Theater Systems, page 64*

*15. Please refer to prior comment 9. We note that the company determined upon further review of the accounting, that in certain circumstances the accounting was not in compliance with U.S. GAAP, but determined the amounts were not material for restatement. For each error, please provide the following:*

- *Describe how you previously accounted for the item, if at all, and contrast that with the accounting required under U.S. GAAP.*
- *Quantify, on a gross basis, the adjustment that is required under U.S. GAAP to correct each error.*
- *Confirm that your materiality assessment takes into consideration any waived adjustments for any of the periods in which the errors occurred.*
- *Describe clearly any assumptions you make in allocating amounts to the different periods and explain why these allocations are appropriate.*
- *Explain why the "recognition point" for certain of your component systems has not occurred.*

As noted in the Company's response to the Staff's prior comment 9, the NIL in the Company's financial statements included in its 2005 Form 10-K includes amounts related to the screen that had yet to be installed. As a result of the Company's new revenue

recognition policy, the screen will be recognized as revenue at the same point in time as the other pieces of equipment.

As noted in the Company's response to the Staff's prior comment 9, certain future payments were excluded from the NIL. In conjunction with the restatement, the Company will include within NIL and financed receivables all unpaid amounts.

The Company also noted in its response to the Staff's prior comment 9 that certain warranty items were not accrued in certain prior periods. Under the Company's new accounting policy, warranty costs will be accrued as applicable.

In connection with the implementation of its new revenue recognition policy and its ongoing review of all system installations during the period 2002 through 2006, the Company will ensure amounts are appropriately classified or recognized as applicable.

16. *We note that you recorded gains of $1.7 million and $3.8 million in fiscal years 2004 and 2003 for the "impact from change in payment terms" of leases. Describe for us the payment terms that changed and explain how you determined the amount and period in which to record the gain. Explain where the gain is recorded in your financial statements. Cite the literature on which you relied.*

In 2000 and 2001, the Company had recorded significant valuation allowances against its receivables (NIL's, financing receivables and accounts receivables). These provisions were required as a number of the Company's customers were under financial distress and/or involved in bankruptcy proceedings. During 2003 and 2004, the Company was able to obtain signed amendments to its arrangements with a number of its customers whereby minimum ongoing payments were adjusted down and customers were released from certain obligations. As a result of these amendments, the customer's ability to pay was improved and the Company determined that the collectibility issues had been resolved. As noted in our previous response of December 12, 2006 (under comment 11), in 2003 and 2004, the Company recorded in the income statement $3.8 million and $1.7 million, respectively, of which $3.8 million and $1.1 million, respectively, represent reversals of valuation allowances originally recorded against receivables. The remaining amount in 2004 represents settlement income and has been included in the IMAX systems revenue line. The Company relied on the provisions of SFAS 13 and SFAS 5 in recording the reversal of the valuation allowances.

17. *Please refer to your response to prior comment 12. Individually quantify the impact on the financial statements for the following: (i) consensual buyouts; (ii) lease agreements in default and (iii) upgrade to MPX systems for all periods presented. The following additional comments refer to the MPX system upgrades:*

- *Describe to us the material terms of the agreement, when a customer upgrades to the MPX system, including the date you sign the original agreement, the date you record the termination and the date you sign the new*

*agreement; any consideration exchanged and the termination provisions or expiration date. Discuss any side agreements or mutual understandings not documented in the agreement.*

- o *Provide us with the journal entries showing us how the lease was originally recorded, how it was termination and how the new lease was recorded.*
- o *Discuss any sales incentives given to customers who upgrade. Explain if the customers receive any of their initial payment back after agreeing to upgrade to the MPX System.*
- o *Tell us how you met the conditions for extinguishment of a liability outlined in paragraph 16 of SFAS 140, especially since you were not released by the court or the creditors.*

Exhibit 4 outlines the individual impact on the Company's 2003, 2004 and 2005 financial statements for (i) consensual buyouts, (ii) lease agreements in default and (iii) upgrades to MPX systems.

Exhibit 5 details the items requested pursuant to bullet one of the comment above. The Company has included in the Exhibit five transactions which represent 82% of the amounts reported in each period. The Company's other arrangements are similar to the five for which the Company has provided details.

To illustrate the journal entries for these transactions, we have provided the entries that would apply to a MPX upgrade for Epic Entertainment Ltd. #4 listed in Exhibits 4 and 5.

| | | DR | CR |
|---|---|---|---|
| Mar 27, 1998 | Cash<br>Deferred revenue 3DGT<br>Record receipt of first installment for 3DGT | $523,000 | $523,000 |
| Dec 30, 1998 | Cash<br>Deferred revenue 3DGT<br>Record receipt of second installment for 3DGT | $1,046,000 | $1,046,000 |
| Dec 1, 1999 | Cash<br>Deferred revenue 3DGT<br>Record receipt of third installment for 3DGT | $784,000 | $784,000 |
| Mar 1, 2000 | Cash<br>Deferred revenue 3DGT<br>Record receipt of fourth installment for 3DGT | $261,500 | $261,500 |
| Mar 19, 2004 | Deferred revenue 3DGT<br>Revenue<br>Record termination of 3DGT lease per agreed upon termination amount | $1,615,000 | $1,615,000 |
| Mar 19, 2004 | Deferred revenue 3DGT<br>Deferred revenue MPX<br>Transfer deferred revenue to MPX obligation | $1,000,000 | $1,000,000 |

The Company considers a number of factors in determining when an agreement related to the 3DSR and 3DGT equipment is terminated and a new arrangement is entered into for a MPX system:

- o While both arrangements relate to projection systems, the nature, size and functionality of the 3DSR and 3DGT projector systems and the MPX system are different. The MPX system is significantly smaller than the 3DSR and 3DGT systems and was designed for use specifically in existing multiplex theatres, meaning

that a stand-alone, separately specified and constructed theatre is not required. The MPX system was designed based on new non-mechanical technologies, as compared to the older, more mechanical 3DSR and GT systems. The operating costs of the MPX systems are also significantly lower than the 3DSR and GT systems. Accordingly, the Company does not consider the new arrangement to be for the same or substantially the same asset.

- o The fair values of the equipment under the original arrangement (fair values range from $2.3 million to $3.6 million as of the date of the original lease signings) and the MPX systems under the new arrangement (fair values range from $1.4 million to $1.5 million as of the date of this letter) are substantially different. The fair values for the MPX systems noted above are derived from sales of MPX systems where no other deliverables, concessions or terminations were involved.

- o When the arrangement involved leases, the Company also compared the economics of the transactions to assess whether the arrangement was significantly different. The present value of the cash flows required under the original lease using the implicit rate in that lease and the present value of cash flows required under the new lease using the implicit rate under the old lease were substantially different. If the present values under each of the leases differed by more than 10%, the Company considered the old lease to be terminated. The Company based this analysis on literature similar to the accounting for the modification or exchange of debt instruments (EITF 96-19).

Based on the above factors, the Company concluded that the arrangements were substantially different such that the old arrangement was terminated. In the five arrangements for which the Company has provided additional details, the Company obtained amendments to its arrangements under which the customer agreed not to receive the 3DSR or 3DGT equipment, to terminate the existing arrangement, to release the Company from its obligations to provide the 3DSR and 3DGT equipment, and agreed to purchase the MPX system under the new terms and conditions set out in the amendment to the original arrangements. The amendments include the new initial payments and minimum continuing payments required for the MPX equipment and the amount of the termination payment. Based on these terms set out in the contract, the Company considered its original obligation to provide the 3DSR or 3DGT equipment to be extinguished as the Company is legally released by the customer. The customer does not receive a refund of any of their initial payments back after agreeing to upgrade to the MPX system. Accordingly, the Company believes it has met the requirements under SFAS 140 to de-recognize the deferred revenue as the Company has been relieved by the debtor as the debtor has agreed to receive an asset with a fair value less than the debtor has paid the Company, and the debtor has agreed not to require the Company to refund any amount in excess of the fair value of the new equipment.

*__Note 26. Discontinued Operations, page 89__*

*18. Please refer to prior comment 23. We note the 1.2 million of the settlement was received shortly __after__ year-end, but was recorded as a gain in fiscal year 2005.*

*Please explain why recording the gain in fiscal year 2005 was appropriate. Tell us how your accounting complies with paragraph 17 of SFAS 5, regarding gain contingencies.*

As noted in the Company's response to the Staff's prior comment 23, the Company recorded $1.2 million of the $3.5 million settlement arrangement entered into between the Company and Digital Projection International ("DPI") in the fourth quarter of 2005. As detailed in the Company's previous response, this settlement was for the original $12.7 million loan receivable that was part of the original disposition of DPI in December 2001. In 2001, the Company used the guidance in SAB Topic 5E to conclude that the financial impact of the disposition associated with the loan receivable could not be realized until major uncertainties as to ultimate realization of the note receivable were removed. For the year ended December 31, 2005, the Company determined that there was sufficient evidence to eliminate any uncertainty as to ultimate realization of the $1.2 million, which was received shortly after period end, but before the filing of the Company's 2005 Annual Report on Form 10-K. By the time the 2005 financial statements were prepared, it was clear that a portion of the receivable was collectible (as it had been received), and it is considered appropriate to consider the subsequent event period in this assessment. While the Company referred to the $1.2M as a gain the amount was a reversal of a note receivable provision. Accordingly when collectibility was reasonably assured the Company reversed the allowance. The Company considers this to be a reversal of a loss contingency and not a gain contingency in accordance with paragraph 17 of SFAS 5.

***Form 10-Q for the period ended September 30, 2006***
***Management Discussion and Analysis, page 34***
***Outlook, page 42***

19. *We note that customers will substitute traditional theater systems with digital technology in the near future. With a view toward clearer disclosure, please discuss the trend toward digital technology and the anticipated impact on your results of operations. Discuss when you anticipate your digital operations will become profitable and the subsequent impact on your traditional theater systems. Explain if your contracts with customers require you to upgrade the customer's theater to digital technology. We reference the discussion on page 42.*

The Company will include additional disclosures with respect to the trend towards digital technology and its anticipated impact on the Company's results of operations in the Managements Discussion and Analysis in its 2006 Form 10-K and future filings.

In the previously reported periods, the Company did not have any instances where it was legally obligated to upgrade the customer's theatre to digital technology. However, in certain arrangements the Company has provided an option for the customer to purchase a digital system for a "to be negotiated" price.

20. *We note that you recognized the sale of three used theaters systems in the first nine months of 2006 and nine used systems in 2005. Please address the following:*

- *Described the events and circumstances that caused you to have used theater systems in your inventory.*
- *Provide us with the amount of revenue recorded from the sale of these used theater systems in the periods presented.*
- *Tell us whether these systems are sold at lower margins than new products and, if so, explain how the sale of these systems impact profit margins.*

The Company has added used projection systems to its inventory typically as a direct result of the return of equipment when customers' theatres close. Theatre closings have occurred for a number of reasons, including: (a) customers not renewing their original leases at the end of the lease term (at this point the Company would remove the equipment from the theatre), and (b) customers who experience financial difficulty and are forced to close their theatre in advance of reaching the end of term of their arrangements. Where the customer does not intend to continue operating the system and the customer is in payment default, the Company will typically repossess the equipment from the theatre.

The amount of revenues recorded from the sale of used theater systems in 2003, 2004, 2005 and for the nine months ended 2006 was nil, $1.2 million, $7.46 million, and $2.04 million respectively. These amounts included the sale of used theater systems from inventory as well as transactions for the buyout of the residual in a lease (as customers typically do not have a purchase right or bargain purchase options).

The sale of these used systems does impact system profit margins. Where customers buy out the residual in a lease the margins as a percentage of revenues are generally much higher than normal systems margins on new product sales as there is minimal costs associated with the sale of the used system in this situation. When the customer purchases a used projection system from inventory, the margins are normally lower than that of a new projection system of the same model.

The Company will disclose the impact of the sale of used theater systems from inventory versus a residual lease buyout in future filings.

* * * * * * * * * * * * * * *

Should you require clarification or have any further questions, please contact me at (905) 403-6571. The Company stands ready to assist the Staff in any way possible in connection with the matters addressed in this letter.

Thank you,

Edward MacNeil
Chief Financial Officer

cc: Kevin Kuhar, Staff Accountant, Division of Corporation Finance, Securities and Exchange Commission

Jodie Hancock, Senior Accountant, Corporate Finance Branch, Ontario Securities Commission
PricewaterhouseCoopers, LLP
Robert Lister, IMAX
Members of Audit Committee

# EXHIBIT S-10

This is Exhibit "S-10" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Lark:

SAB 104 p. 15 states that even if title for product has transferred to the buyer, there are certain characteristics that preclude recognizing revenue. One of these is [p. 18 #4] "Product is delivered for demonstration purposes." Given that IMAX has also granted the right to move this system to a different location, how does the Company refute the argument that this is not a permanent installation and that therefore the revenue recognition should not be allowed until Lark's intentions for this theatre are fully known?

Also, IMAX agreed to compensate Lark for the closure of the existing theatre to install the IMAX system. This is not a normal business practice for IMAX. What response does the Company have to the suggestion that the $39k was an incentive to get the system in a temporary location in 2005 since the original site would not be ready in time?

What is the basis of June 2006 as the date for the final up-front payment?

Kazan:

Final screen installation to be performed in March 2006, upon completion of the theatre build. Does this violate the concept of "reasonable period of time" as contemplated in SAB 104?

What was the basis for the amendment providing $31k in marketing support? This has not been a normal business practice in prior periods.

What does the customer lose by signing the customer acceptance on December 31, 2005? The final upfront payment is not linked to customer acceptance. The screen was en-route. If the screen was damaged en-route prior to arrival at nearest ocean port, who would be responsible for replacement? Conversely, what what does the customer gain? Does the customer have a working system at this point?

# EXHIBIT S-11

This is Exhibit "S-11" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

McMinnville

How does the Company rationalize the 5 month waiting period between "installation" and "finishing"? Does this violate the "time required to finish" sentiment of SAB104? Also, how does this transaction differ from a "bill and hold" type of transaction?

The memo makes reference to Amending Agreement No 2 "made as of December 31, 2005". The agreement was signed in 2006. What evidence exists as of Dec. 31, 2005 of this agreement?

What was the criteria required to qualify for a marketing allowance in Q4? Were these concessions offered to all theatres? What conditions were attached to these allowances?

Manila

Was the remaining $180k at all contingent on final completion of the theatre work in mid-late January?

What was driving the March 4, 2006 targeted opening? If all was complete (as inferred from the fact that the silver screen was painted in January), why was the opening not sooner?

All the memos make note of X hours remaining to complete. In this case, 248 hrs remained on the install at December 31, 2005. How many total hours are required for a "cradle to grave" install? Is 248 hrs insignificant in comparison to the total install hours? NOTE: This question can be applied to all non-open theatres at year-end

Winnipeg

No questions

# EXHIBIT S-12

This is Exhibit "S-12" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**MINUTES** of a Meeting of the Board of Directors of **IMAX CORPORATION** held by telephone, on the 8th day of March, 2006 at the hour of 9:00 a.m. (Eastern Standard Time).

**PRESENT BY TELEPHONE**

Bradley J. Wechsler
Richard L. Gelfond
Neil S. Braun
Kenneth G. Copland
Garth M. Girvan
David W. Leebron
Marc A. Utay

**ALSO PRESENT**

G. Mary Ruby- Secretary
Robert Lister
Frank Joyce

Bradley J. Wechsler took the Chair and G. Mary Ruby acted as Secretary of the Meeting. A quorum of the directors being present and all directors either having received or waived Notice of the Meeting, the meeting was declared to be regularly constituted.

**1. REPORT ON AND APPROVAL OF 2005 FINANCIAL STATEMENTS**

Mr. Frank Joyce, the Chief Financial Officer of the Company, reviewed the 2005 Financial Statements with the Board.

**2. STOCK OPTIONS**

Mr. Wechsler reported to the Board on an issue currently under discussion with PricewaterhouseCoopers regarding the accounting treatment of the "retention stock options" to be granted to the Co-CEOs as well as to certain members of senior management in connection with the executive retention program. Mr. Wechsler requested that the Board give the Co-CEOs certain latitude to resolve this issue with PricewaterhouseCoopers so as to improve the accounting treatment of these options for the Company. The Board agreed with this approach.

**3. REPORT OF THE AUDIT COMMITTEE**

Mr. Ken Copland, Chairman of the Audit Committee reported that the statements had been reviewed in detail by the Audit Committee at its meeting on March 1, 2006 and that the Committee had unanimously recommended that they be approved by the Board.

On motion duly made and seconded and unanimously carried, the following resolution was passed:

**BE IT RESOLVED THAT:**

The Consolidated Financial Statements of the Company and the MD&A for the year ending December 31, 2005, and the auditor's reports thereon, as submitted to the Directors, be and the same are hereby approved and any two (2) Directors be and they are hereby authorized to sign the balance sheets contained in the said financial statements to evidence the approval of the Board of Directors.

## 4. EARNINGS RELEASE

The Board reviewed a draft of the Company's year end earnings and press release and had no comments.

## 5. APPROVAL OF FILING OF THE ANNUAL REPORT ON FORM 10-K

On motion duly made and seconded and unanimously carried, the following resolutions were passed:

**BE IT RESOLVED THAT:**

1. The 2005 Annual Report of the Company on Form 10-K in substantially the form of the draft Form 10-K circulated to the Board of Directors of the Company, together with the French language version thereof to be translated by Quebec counsel to the Company, together with the documents incorporated therein by reference as set out in the Form 10-K, (collectively, the "10-K"), are hereby approved for filing with the Securities and Exchange Commission of the United States of America, (the "SEC") and such other regulatory authorities as may be required, subject to such amendments, variations, additions, deletions and changes as may be authorized by a Co-Chief Executive Officer.

2. Each of the Co-Chief Executive Officers, the Chief Financial Officer, the General Counsel and the directors of the Company are authorized and directed to execute, either personally or by power of attorney, and to file the 10-K, as finalized and approved by either of the Co-Chief Executive Officers of the Company, with the SEC and with such other regulatory authorities as may be required at such time as they deem appropriate.

3. The officers and directors of the Company referred to in paragraph (2) are hereby authorized and directed to execute and file the French language versions of the 10-K, subject to receipt of favourable opinions of counsel as to the adequacy of the translation of such French language version of the 10-K.

4. Each of the directors hereby constitutes and appoints Francis T. Joyce and Robert D. Lister and each of them severally, as his true and lawful attorney or attorneys with power of substitution and re-substitution to sign in his name, place and stead in any and all such capacities the 10-K, including the French language version thereof, and any and all

amendments thereto and documents in connection therewith, and to file the same with the SEC and such other regulatory authorities as may be required, each of said attorneys to have power to act with or without the other, and to have full power and authority to do and perform, in the name and on behalf of each of the directors of the Company, every act whatsoever which such attorneys, or either of them, may deem necessary or desirable to be done in connection therewith as fully and to all intents and purposes as such director of the Company might or could do in person.

5. The proper officers of the Company are hereby authorized and directed to take all necessary and advisable steps to implement the foregoing.

## 6. CAPITAL TRANSACTION

Mr. Gelfond requested that the Board formally authorize the Company's retention of Allen & Company and UBS Investment Bank to explore positive strategic alternatives, including the sale of the Company on the basis of the discussion and presentation which had taken place at the February 23, 2006 meeting.

On motion duly made and seconded and unanimously carried, the following resolutions were passed:

**BE IT RESOLVED THAT:**

1. the Company is hereby authorized to retain Allen & Company and UBS Investment Bank to assist the Company in exploring possible strategic alternatives, including the sale of the Company on terms and conditions to be determined; and

2. any two officers or directors of the Company is authorized to do all such acts and things and to execute (whether under the corporate seal of the Company or otherwise) and deliver all such instruments, agreements and other documents as in such officers' or directors' opinion may be necessary or desirable in connection with the foregoing resolutions.

## 7. NOMINATION OF DIRECTORS AND ANNUAL GENERAL MEETING MATERIALS

**WHEREAS** in connection with the Annual Meeting of Shareholders to be held on Tuesday, April 11, 2006 at Stony Brook Manhattan, 2nd Floor, 401 Park Avenue South, New York, New York (the "Meeting") the Board must nominate directors for election as Class I Directors and approve the materials to be mailed to shareholders in connection with the Meeting;

**AND WHEREAS** Michael Fuchs has notified the Company that he will not be standing for re-election at the Meeting;

**AND WHEREAS** the Board has determined to fix the number of Directors within the minimum and maximum number permitted by the Articles of the Company at seven (7), effective immediately before election of directors at the Meeting;

**AND WHEREAS** the Articles of the Company require that any decrease in the size of the Board be apportioned among the classes in such a manner that the difference in the number of directors in any two classes shall not exceed one; and

**AND WHEREAS** Messrs. Garth M. Girvan and Kenneth G. Copland have agreed to stand for nomination as Class I Directors at the Meeting and have therefore tendered their resignations as a Class II and III Directors of the Company, respectively, effective immediately before their election as Class I Directors at the Meeting.

**NOW THEREFORE BE IT RESOLVED THAT:**

1. Messrs. Neil S. Braun, Garth M. Girvan and Kenneth G. Copland are hereby nominated for election as Class I Directors at the annual meeting of the shareholders for a term expiring in 2009;

2. The number of directors of the Company shall be fixed at seven (7), effective immediately before the election of directors at the Meeting;

3. The Notice of Meeting, Proxy Circular and Proxy Statement, and Form of Proxy, each in substantially the form submitted to the directors, together with the French versions thereof to be translated by Quebec counsel to the Company with such changes thereto as a Co-Chief Executive Officer may approve, and the mailing thereof to shareholders, are hereby approved; and

4. The proper officers of the Company are hereby authorized and directed to take all necessary and advisable steps to implement the foregoing.

**8. EXECUTIVE SESSION**

*(Messrs. Wechsler, Gelfond and Lister left the meeting)*

The Board discussed the Co-Chief Executive Officers' bonus in Executive Session. In particular, Mr. Gary Girvan, Chairman of the Compensation Committee, reported that the Company's objectives for 2005 had been met on an operating basis. He also indicated that the Co-Chief Executive Officers had provided an assessment of their achievements against the 2005 Objectives, which had been previously distributed. Based on the foregoing, the Committee recommended that a bonus of $250,000 be paid to each of the Co-Chief Executive Officers in respect of 2005.

On motion duly made and seconded and unanimously carried, the following resolution was passed:

**BE IT RESOLVED THAT:**

The recommendation of the Chairman of the Compensation Committee to the Board of Directors regarding the payment of a bonus of $250,000 to each of the Co-Chief Executive Officers of the Company in respect of the 2005 year is hereby approved.

## 9. TERMINATION OF MEETING

There being no further business, on motion duly made and seconded and unanimously carried, the Meeting was then terminated.

Chairman of the Meeting

Secretary of the Meeting

# EXHIBIT T-1

This is Exhibit "T-1" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

# VICTORY VERBATIM COURT REPORTING SERVICES

Court File No. CV-06-3257-00

ONTARIO
SUPERIOR COURT OF JUSTICE

MD/ml

B E T W E E N:

MARVIN NEIL SILVER and CLIFF COHEN
Plaintiffs

- and -

IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER and FRANCIS T. JOYCE
Defendants

------------------------

This is the Questioning under Rule 39.03 of LISA JENNIFER COULMAN, taken at the offices of HEENAN BLAIKIE, Royal Bank Plaza, South Tower, 200 Bay Street, Suite 2600, Toronto, Ontario, on the 31st day of January, 2008.

------------------------

A P P E A R A N C E S:

A. DIMITRI LASCARIS } -- for the Plaintiffs
MICHAEL ROBB }
DANA M. PEEBLES } -- for the Defendants
LUCAS LUNG }
WILLIAM PEPALL } -- for Pricewaterhouse
ROBERT OSBORNE } Coopers

# VICTORY VERBATIM COURT REPORTING SERVICES

L.J. Coulman - 106

first receive an approach or an inquiry from the SEC about its revenue recognition practices?

A. Well, my recollection is the company had been dealing with OSC inquiries for a number of months before the June period for when they were notified by the SEC. But the day we got notification of the informal investigation from the SEC was the same day that IMAX got their notification.

343. Q. What was that date?

A. It was the end of June. I don't recall the exact date. It was a Friday, that is all I remember.

344. Q. You are confident it was in June?

A. Yes.

345. Q. You are aware that management of IMAX made a decision, at some point in 2006, to seek a buyer or merger partner; is that correct?

A. Yes.

346. Q. When did you or your colleagues at PWC first become aware that that was the intention of management?

A. I became aware of it the day before they gave their press release in March of '06.

347. Q. At that point in time, the issues

L.J. Coulman - 107

surrounding revenue recognition that you had been discussing with management had not yet been resolved?

A. No, they were resolved because we had our audit committee the day before they did their press release to the public on the results.

348. Q. Did you or any other of your colleagues at PWC have direct interactions with any prospective buyers or merger partners?

A. We had direct interaction with representatives of potential buyers.

349. Q. Were those representatives financial advisors, outside financial advisors?

A. Yes, because in order for a potential buyer to come in and review an auditor's working paper, they must appoint a respective accounting firm to come in and do that. That is one of our protocols in Canada. And so, we would have had discussions with another accounting firm that was coming in to review our working papers. We also had discussions with the bankers that were representing IMAX in the transaction.

350. Q. Is it fair to say that the working papers that these potential buyers and merger partners reviewed reflected the discussions that you

L.J. Coulman - 108

had been having with IMAX management about revenue recognition issues?

A. Yes.

351. Q. Were you or your colleagues ever specifically asked, by a prospective buyer or merger partner or its representative, about revenue recognition issues?

A. Yes.

352. Q. Do you know how many prospective buyers or merger partners asked those questions, or questions related to those issues?

A. We only allowed one representative of a prospective buyer to come in to see our working papers. And that representative did ask us questions around revenue recognition to understand the company's revenue recognition policy to ensure that they understood; that was really his basis of questioning.

353. Q. Are you aware of any prospective merger partner or buyer becoming aware of the e-mail to the CEOs respecting revenue recognition on the Delhi cinema?

MR. PEEBLES: Mr. Lascaris, can you just help me on how this is relevant to your Statement of Claim?

L.J. Coulman - 109

354. MR. LASCARIS: Well, you have raised an issue about loss causation. And we are taking the position that even if you can attribute a substantial portion of the stock decline on the final day of the class period to the absence of a merger partner or purchaser that is, at least, indirectly related to the improper revenue recognition, because the absence of interest was at least partly a result of concerns on the part of buyers that there was accounting chicanery going on. So, that is the basis of my questions. Can you repeat my last question?

--- REPORTER READBACK

BY MR. LASCARIS:

355. Q. Could you please answer?

A. So, the e-mail and the work that we did around the investigation that was done by the company is retained in our files. And so, he would have seen that in the audit files that he reviewed, the individual that was the representative for the buyer.

# VICTORY VERBATIM COURT REPORTING SERVICES



MR. PEPALL: He could have seen.
THE DEPONENT: Could have. I mean it was there. I don't know if he read it specifically.

BY MR. LASCARIS:
356. Q. But to be clear, they had access...this representative had access to the e-mail?
A. The e-mail is part of our working papers. He had access to the working papers.
357. Q. Was there a data room, is that what happened?
A. No, he flew up to...he was from San Francisco. He flew up to Toronto. We gave him the '05 audit files.
358. Q. How voluminous were they? I mean, would it be like two boxes or are we talking about...
A. No, it is electronic, so it is on a computer.
359. Q. That is the only prospective buyer that you are aware of that would have had access to the e-mail?
A. Based on the fact that only one



party reviewed our working papers, my statement would be yes.
360. Q. Does the fact that this party reviewed PWC's working papers mean that this party...or suggest to you that this party attained a level of interest in the company that was beyond that of other prospective purchasers?
A. I don't know how I would know that.
361. Q. Well, you say no one else asked to see the working papers.
A. Well, first of all, we have certain protocols that parties have to abide by in order to get access to our working papers. We had a number of discussions with people around getting access to our working papers and this party was the only one that I recall that was willing to abide by our protocols.
362. Q. The discussions with other parties, did they involve a discussion of revenue recognition issues?
A. I am not allowed to have any discussions with any other parties until I get my appropriate letters that abide by my protocols. So, therefore, I had no further discussions.
363. Q. Who was the representative who



examined your working papers?
MR. PEPALL: I am not sure you can disclose that.
THE DEPONENT: I don't even remember.
MR. PEPALL: So, you can't disclose it.
364. MR. LASCARIS: Are you comfortable in your position now or do you want to think about that a little bit, because...
MR. PEPALL: For now it is easy because she doesn't recall who it is. So, I am not going to be able to tell you who it is.
365. MR. LASCARIS: But would you undertake to determine?
MR. PEPALL: I'll just have to take that under advisement. U/
366. MR. LASCARIS: Okay.
MR. PEPALL: I think the identities of people who were involved in the sale process, at least from our prospective, PWC's prospective as witness on this motion, is not something we should be disclosing.
367. MR. LASCARIS: The identity of the actual person?
MR. PEPALL: Yes.



BY MR. LASCARIS:
368. Q. Was this person an employee of a major accounting firm?
A. Yes.
369. MR. LASCARIS: What about disclosure of the firm?
MR. PEPALL: I think I can allow that; go ahead.
THE DEPONENT: I don't remember.
370. MR. LASCARIS: Would you undertake to determine the identity of the firm?
MR. PEPALL: Same position.
371. MR. LASCARIS: Under advisement?
MR. PEPALL: Yes. U/

BY MR. LASCARIS:
372. Q. You mentioned earlier, before lunch, a number of remaining obligations that came to light subsequent to PWC issuing a clean audit opinion with respect to the 2005 financials. Was there anything else that came to light subsequent to that time, PWC signing off on the financials and giving a clean audit opinion, that you consider to be relevant to your judgments about revenue recognition, but which was not known to you at that time?

# EXHIBIT T-2

This is Exhibit "T-2" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

# In The Matter Of:

*MARVIN NEIL SILVER, et al. v.*
*IMAX CORPORATION, et al.*

---

*BRADLEY J. WECHSLER*
*February 25, 2008*

---

*MERRILL LEGAL SOLUTIONS*
*25 West 45th Street - Suite 900*
*New York, NY 10036*
*PH: 212-557-7400 / FAX: 212-692-9171*

WECHSLER, BRADLEY J. - Vol. 1

Page 154

BRADLEY J. WECHSLER
14:42:29 dates right thinking exactly what happened.
14:42:31 In April we started the process.
14:42:35 In May when we were getting the 12 people that
14:42:42 stood up to the plate, so to speak, we set up a
14:42:45 special committee. Because at that point you
14:42:49 wanted interaction running more through your
14:42:52 board than through your co-CEOs.
14:43:01 By the time we do our management
14:43:03 presentations, get our non-binding offers, try
14:43:07 to turn them into deals during the month of July
14:43:12 or trying to get rid of the conditions it's
14:43:19 probably on an official basis, meaning when the
14:43:22 board sits down and sort of says, hey, we are
14:43:25 just not going to get the price we want, it was
14:43:27 probably 24 hours before we announced it, or the
14:43:31 day, one day in advance.
14:43:35 I think it was becoming
14:43:39 increasingly apparent to us, certainly by early
14:43:44 August, it was going to be hard to pull the
14:43:46 people over the finish line at a price we
14:43:48 thought was going to be acceptable.
14:43:53 Q. As you come to the bottom of the
14:43:54 inverted triangle, I have from your evidence
14:43:58 that there were 12 who made it to the second

Page 155

BRADLEY J. WECHSLER
14:44:04 bottom level and three who made it to the very
14:44:06 bottom before you came to the conclusion it
14:44:09 didn't work; is that right?
14:44:10 A. That is right. I apologize for my
14:44:12 long-windedness. You said it very succinctly.
14:44:16 Q. You were simply answering my
14:44:19 questions. It is very useful.
14:44:21 In relation to those 12 whether
14:44:23 then became three, in June you received a letter
14:44:27 from the Securities and Exchange Commission.
14:44:28 A. Yes.
14:44:29 Q. A letter of inquiry with respect to
14:44:33 your financial recording practices.
14:44:34 A. Correct.
14:44:34 Q. Did you make those 12 aware of the
14:44:37 fact you had received that letter from the
14:44:43 Securities and Exchange Commission?
14:44:43 A. Yes, I believe we did.
14:44:44 Q. Were they also given access to the
14:44:46 auditors' working papers to understand the
14:44:52 discussion about revenue recognition that we
14:44:54 touched upon during this cross-examination
14:44:55 today?
14:45:00 A. I don't want to be glib, when is

Page 156

BRADLEY J. WECHSLER
14:45:02 the last time you tried to get auditors' working
14:45:06 papers? I am sure we gave them permission to
14:45:08 speak to our auditors. I am sure they asked for
14:45:10 working papers. I would be quite surprised if
14:45:13 they ever saw the auditors' working papers. But
14:45:16 they had access to our auditors, yes.
14:45:21 Q. Did you yourself or do you know if
14:45:23 somebody else on behalf of the company spoke to
14:45:25 these 12 about the revenue recognition issues
14:45:28 IMAX had been grappling with?
14:45:36 A. We had general conversations. Now
14:45:38 I am talking about myself. We, management,
14:45:41 heads of our various departments had due
14:45:44 diligence sessions. A number of these guys
14:45:47 wanted to bore down deeper. Those were
14:45:49 conversations that basically went on with our
14:45:51 finance department. That is certainly one of
14:45:59 the issues they were interested in.
14:46:00 The other had to do with sort of
14:46:05 dealing how EBITDA works at IMAX in relation
14:46:07 between EBITDA and cash.
14:46:17 Q. Is there also an OSC letter that
14:46:21 came?
14:46:21 A. I think the OSC letter with

Page 157

BRADLEY J. WECHSLER
14:46:25 requests on revenue recognition probably
14:46:27 preceded the SEC letter. I don't remember
14:46:33 exactly when we received our first one. I
14:46:36 actually do believe we were in ongoing exchange
14:46:39 of letters with the OSC.
14:46:42 MR. STEEP: That's not right. I
14:46:43 have got to correct you. You are just going to
14:46:46 send him wrong.
14:46:48 THE WITNESS: Sorry.
14:46:48 MR. STEEP: What I have done I
14:46:51 told Michael we will get you the correspondence
14:46:53 that is triggered off June 20th letter. I have
14:46:56 it down here in New York. I had it shipped
14:46:59 down.
14:46:59 MR. ROCK: Is that the Securities
14:47:00 and Exchange Commission letter?
14:47:01 MR. STEEP: It is an SEC letter of
14:47:02 June 20th. There are after that a series of
14:47:11 corporate finance inquiries back and forth on
14:47:18 the accounting issues. Their requests, IMAX's
14:47:23 response.
14:47:24 There are a smaller number of OSC
14:47:28 corporate finance inquiries on the accounting
14:47:30 issues. But they follow the June 20th letter.

# EXHIBIT T-3

This is Exhibit "T-3" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

001125

Cross-Examination of Neil Braun, held February 28, 2008

| Q# | Page | Question | U/A/R | Answer |
|---|---|---|---|---|
| 99. | 67 | To advise whether there is a difference between the draft financial statements presented to the Audit Committee on March 1, 2006 and the financial statements released on March 9, 2006, and to produce the draft financial statements. | A | The financial statements presented to the Audit Committee on March 1, 2006 are produced at Tab 99 of Cross-Examination Production Brief #3. |
| 100. | 69 | To advise whether there were any changes to the draft 2005 10-K as a result of the March 8, 2006 Board meeting, and if there were, to identify them to the extent relevant. | U | There were no changes to the draft 2005 10-K as a result of the March 8, 2006 Board meeting. |
| 101. | 76 | To produce the minutes of all Audit Committee and Board meetings from November 10, 2005 up to and including the Board meeting where the decision was made to restate. | A | Refused. |
| 102. | 113 | To advise when the data room was established, whether any of the SEC or OSC comment letters in Exhibit 16 were placed into the data room, and if so, when. | A | The company commenced loading documents into the data room on September 16, 2005; however, the bulk of the documents were loaded from March 27, 2006 onwards. There was extensive updating and uploading through April and into May 2006. The data room was first accessed by a prospective bidder on May 8, 2006.<br><br>Bidders were provided with an opportunity to review and discuss the SEC's June 20, 2006 letter with the Company, its counsel and its auditors. |
| 103. | 123 | To advise whether there was a project manager appointed to supervise the Delhi installation in the third quarter and/or fourth quarter 2005. | U | Richard Wooland was the project manager for the Delhi installation during the third and fourth quarters of 2005. |
| 104. | 123 | If there was a project manager appointed to supervise the Delhi installation in the third quarter and/or fourth quarter 2005, to provide the name of that project manager. | R | See response to question #103, above. |

Cross-Examination of Marc Utay, held February 28, 2008

| Q# | Page | Question | U/A/R | Answer |
|---|---|---|---|---|
| 105. | 9 | To provide the dates on which Mr. Utay served on the Audit Committee. | U | Mr. Utay served on the Audit Committee from July 22, 2003 to August 14, 2003. |

# EXHIBIT U-1

This is Exhibit "U-1" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

**From:** Marnie Hamilton
**Sent:** Monday, December 17, 2001 3:08 PM
**To:** Kathryn A Gamble; Frank Joyce
**Subject:** Q4 Installations & Q1 Installations

---

I have some concerns (maybe not justified) on the dates that we recognize some of the Q4 & Q1
Installations depending upon what criteria we want to proceed with (as we will set precedent) .... I
have further technical information coming from Don Kane, however, this is a preview...

Criteria:
1. Fully installed & operational (I thought this was our policy)
2. Opened
3. Opened with further installation required (not usually material or they wouldn't have been able to open)

The deals as follows:

Q4:
1. Raleigh - opened in November; recognized in November - rec'd certificate of acceptance - no issue
2. Grand Rapids-opened in November; recognized in November - need cert of acceptance
3. Sheridan Belfast-opened in November; recognized in November - need cert of acceptance - possible
technical glitch...info to follow

4. Shanghai Scienceland-opening in December; to be recognized in December-need cert of acceptance
5. Boston New England-opened Dec 5th; to be recognized in December-need cert of acceptance
6. IT Krakow, Poland-opened Dec 12th; to be recognized in December-need cert of acceptnace (client has
2 issues..screen size (resolved) and QTRU problems (temporary solution in place that still allows the
shows to be run...the fix s/b done by the end of this week)-client won't sign off until fixed.

Q1-2002:
1. National Amusements-fully operational Dec - opening Jan 1st with B&B - need cert of acceptance - what reason
are we using for not recognizing in December
2. Nuremburg-opened Dec 14th-problem with dome-showing 3D only until fixed - need cert of acceptance - what reason
are we using for not recognizing in December
3. Long Island-fully operational in December; not opening until mid January-need cert of acceptance - what reason are
we using for not recognizing in December

Please advise your thoughts!

Marnie

# EXHIBIT U-2

This is Exhibit "U-2" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

**DANIEL GEORGE STRICKLAND, a Commissioner, etc.,**
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**From:** Jim Patterson
**Sent:** Saturday, June 19, 2004 1:13:46 AM
**To:** Marnie Hamilton
**Subject:** Re: Berjaya Commissions

**Attachments:** Doc Link.htm

OK disappointing as I did not realize this. They will open to the public in October. Can Don or Larry authorize and advance against this or (between us) am I better off to not raise it?

Marnie Hamilton
06/18/2004 09:54 AM

To: Jim Patterson/Imax@Imax
cc:

Subject: Re: Berjaya Commissions

Technically no...for example Cairo was commissioned in Jun-02 and just opened May-04 and Al Khobar was
commissioned in Nov-02 and still has not opened....although we can recognize revenue when it is commissioned,
it is not an additional opening for the network and they do not pay royalties (if applicable) until then.

Marnie

Jim Patterson
06/17/2004 10:30 PM

To: Marnie Hamilton/Imax@Imax
cc:

Subject: Re: Berjaya Commissions

My understanding was that we were commissioning it this month so we could recognize revenue. Is that no the same as opening even though pubic shows are later? What will be the timing? Thanks

Marnie Hamilton
06/17/2004 09:22 AM

To: Jim Patterson/Imax@Imax
cc:

Subject: Re: Berjaya Commissions

Jim...the final commission is based on theatre opening not installation....

Jim Patterson
06/17/2004 04:27 AM

To: Marnie Hamilton/Imax@Imax
cc:

Subject: Berjaya Commissions

I do not want to appear overly anxious but now that my advance has been fully paid off (yea) the Berjaya theatre was signed off recently so I am interested in knowing the timing of getting the final Berjaya commission payment.
Thanks.

<<...>>