# EXHIBIT B
# (PART 15)

# EXHIBIT U-6

This is Exhibit "U-6" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

Ilidio Coito
03/30/2005 03:52 PM

To: "Rafal Rybski" <r.rybski@cinema-city.pl>
cc: <nbarer@forumfilm.co.il>, "'Don Kane '" <dkane@imax.com>, "'Alex Mikalski'" <amikalski@imax.com>, Mark Welton/Imax@Imax, Marnie Hamilton/Imax@Imax
Subject: RE: Poznan, Installation

Rafal,
I understand the theatre will only be opening in May 31st, however, we agreed on the fast installation so it can be recognised in March, 1st Quarter, therefore, all you have to sign is the Certificate with the Operational date of March 31st and Opening date of May 31st. This is only to certify that the installation was done by March 31st.
As you notice on the certificate that there are two dates, one indicating that the system is installed by March 31, 05 and the other indicating that the theatre will open May 31, 05. The opening doesn't have to be precisely on that date, however, the operational date has to be done By March 31, 05.

I agree with your dates for training and do all the testing and even if you need more time we will certainly be able to increase it.

Thank you

Regards
Ilidio Coito
Project Manager

"Rafal Rybski" <r.rybski@cinema-city.pl> on 03/30/2005 03:42:11 PM

"Rafal Rybski" <r.rybski@cinema-city.pl> on 03/30/2005 03:42:11 PM

To: "'Ilidio Coito'" <icoito@imax.com>
cc: <nbarer@forumfilm.co.il>, "'Robert Kilburn'" <rkilburn@imax.com>, "'Don Kane '" <dkane@imax.com>, "'Alex Mikalski'" <amikalski@imax.com>

Subject: RE: Poznan, Installation

Ilidio hello,
I will be not able to visit Poznan this week, that's why all the time I am keeping there my technician for help. As I wrote You, system is not ready for sign Protocol of aceptance. I know that projector is working ( even with temporary compressor ), that we have white light, but this is not final installation, Sound system need to be tuned, silver screen hang, glasses cleaning machine checked with glasses and detergents, etc, etc. This "fast" installation was done for Your request and I was supprting it everyday with do all efforts to arrange all deliviers on time, but for accept it we need to make all necessery tests as always and make system running hours and hours for checking if there are any problems. This will happen definietly in May. My proposal is that IMAX instalers will come two weeks before opening, 2-3 days we need for rise and check the screen, rest of the time up to 05.06 should be take for a training, tuning and final checking of the system. I can sign protocol few days before opening when we will be sure that everything is finished.

Rgds,

==============================
Rafal Rybski
Director of Operations

Cinema City Poland Sp.z o.o.
ul. Powsinska 31
02-903 Warszawa
tel : +48 (22) 550 39 90/99
fax : +48 (22) 550 39 84
www.cinema-city.pl

Niniejsza informacja przeslana droga elektroniczna (e-mail) jest skierowana jedynie do jej adresata. E-mail ten i/lub jego zalaczniki moze zawierac informacje poufne lub/i tajne. Jezeli otrzymaliscie Panstwo niniejszy e-mail przez pomylke, prosimy o poinformowanie o tym jego nadawcy, skasowanie wszystkich kopii elektronicznych oraz zniszczenie ewentualnych wydrukow. Dziekujemy.
---------------------------------------------------------------------------
-------
This e-mail and any attachments to it are intended only for the party to whom they are addressed.
They may contain privileged and/or confidential information. If you have received this transmission in error, please notify the sender immediately and delete any digital copies and destroy any paper copies.
Thank you.

-----Original Message-----
From: Ilidio Coito [mailto:icoito@imax.com]
Sent: Wednesday, March 30, 2005 9:41 PM
To: Rafal Rybski
Cc: nbarer@forumfilm.co.il; Robert Kilburn; Don Kane ; Alex Mikalski
Subject: Re: Poznan, Installation

Dear Rafal,
When will you be able to go to Poznan. Are you able to go to Poznan on Friday.

The installation will be finished in May for the opening and I know that you are dealing with the compressor, which IMAX will pay for and it will be installed in May. The training and raising the silver screen will be done during that time as well.

Please let me know if there are any deviations on this and please understand that by you signing the Certificate document it does not

relives IMAX of any responsibility with regards to any outstanding
issues you may have.

Thank you
Regards

Ilidio Coito
Project Manager

"Rafal Rybski" <r.rybski@cinema-city.pl> on 03/30/2005 03:36:17 PM

Please respond to "Rafal Rybski" <r.rybski@cinema-city.pl>

To: "Ilidio Coito" <icoito@imax.com>
cc: nbarer@forumfilm.co.il, "Robert Kilburn" <rkilburn@imax.com>,
"Don
Kane " <dkane@imax.com>, "Alex Mikalski" <amikalski@imax.com>

Subject: Re: Poznan, Installation

Ilidio,
Becouse of other activities we will not be able to visit Poznan
tomorrow.Anyhow instalation is still not finished so protocol can not be
sign by IT.

Regards,
Rafal
________________ Oryginalna wiadomoÅ'Ä? ________________
Temat: Poznan, Installation
Autor: "Ilidio Coito" <icoito@imax.com>
Data: 30 marzec 2005 10:53:43

Dear Rafal,
I have tried to call your cell but it doesn't go through, and I also
left a message with your secretary asking if you could call me at
(905) 330 2223.

I spoke to Alex Mikalski and he is wondering at what time will you be in
Poznan tomorrow, Thursday 31st -05, to check the system and to sign off
the installation.

As per Alex the system is running and picture is on the screen. Alex
and Gerry will try to finish the Glasses cleaning Machine and finalise
the
details for you to check. We will go back in May to raise the silver
screen, install the proper Compressor and train your people and monitor
the

# EXHIBIT U-7

This is Exhibit "U-7" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

system for the grand opening on may 31st. You and I will discuss the
appropriate time to get the IMAX supervisors back in May.

Thank you for your co-operation

Regards

Ilidio Coito
Project Manager

IMAX think big
The Ultimate Movie Experience
www.imax.com
IMAX and IMAX think big are registered trademarks of IMAX Corporation

******************************* IMPORTANT NOTICE **************************
Information contained in this e-mail correspondence is confidential information intended only for the use of the individual or entity named above. Any reader of this message who is not the intended recipient of this correspondence is hereby notified that any dissemination, distribution, copying or communication of the contents of this correspondence is strictly prohibited. If this email was not addressed to you, please immediately notify us by phone in Canada at (905) 403-6500 (collects calls will be accepted) or by email at webmaster@imax.com and delete and destroy this correspondence inadvertently sent to you. Thank you.

******************************************************************************

IMAX think big
The Ultimate Movie Experience
www.imax.com

**From:** Frank Joyce
**Sent:** Tuesday, April 5, 2005 2:17 PM
**To:** Bill O'Malley
**Subject:** Re: Accelerated Installs
**Attach:** Q1 - installation variance commentary.xls

---

Bill

I know about the IT switch, and maybe about some extra costs for Yelmo, but do you understand Brians Comments.

Frank
----- Forwarded by Frank Joyce/CAN/Imax on 04/05/2005 02:15 PM -----

Mark Welton
04/05/2005 12:05 PM

To: Brian Bonnick/Imax@Imax
cc: Brad Wechsler/Imax@Imax, Frank Joyce/CAN/Imax@Imax, lo'reilly@imax.com
Subject: Re: Accelerated Installs

Brian, we should note for everyone's info that $625K savings came from a refurbished system change we made with IT International in February, thus resulting in a $625K decrease in book value. And that the savings comparison is compared to the March 21 estimate which included the additional freight charges etc.

Marnie and I are getting pretty close to final costs today which we will provide to Frank and everyone concerned.

Brian Bonnick
04/05/2005 10:35 AM

To: Brad Wechsler/Imax@Imax
cc: lo'reilly@imax.com@Imax, Frank Joyce/CAN/Imax@Imax, mwelton@imax.com
Subject: Re: Accelerated Installs

Brads question...."What amt. are we running per quarter?"

Notwithstanding Eric's comment re rushed installs... - Q1 is being forecasted at +$722,564 better than budget.

Of the 6 Q1 installs 50% are under-budget $763K and 50% are over-budget $40,065. The over-budgets, primarily due to installation costs and air freight, include Veracruz @ +$1,200; Amsterdam @ +16K and Malaga @ +23K.

Q1 details are set out in the attached.

Subsequent quarters are being forecast better than budget, with the exception of Q4 which is expected higher due to book value changes, agency fees and higher build costs for 1 SR.

---

Brian Bonnick, P.Eng.
Sr. Vice President, Technology
(Bus) 905-403-6300 (Fax) 905-403-6530
(email) bbonnick@imax.com
IMAX Corporation
2525 Speakman Drive
Mississauga, Ontario, Canada L5K 1B1

---

Larry T O'Reilly
03/30/2005 02:25 PM
To: Brad Wechsler/Imax@Imax
cc: Frank Joyce/CAN/Imax@Imax, Brian Bonnick/Imax@Imax, mwelton@imax.com@Imax Subject: Accelerated Installs

Brad,

As per your request attached are the incremental costs of installing these two sites in Q1 as opposed to Q2.

Larry
----- Forwarded by Larry T O'Reilly/Imax on 03/30/2005 02:15 PM -----
Eric Jacques
03/30/2005 02:05 PM
To: loreilly@imax.com
cc:
Subject: Accelerated Installs

As discussed, here are the additional costs associated with the accelerated installations of Poznan and Malaga to meet first quarter recognition.

Yelmo #2 Malaga
Installation - additional $51,000.00 - 5 day installation, 5 installers and return trips for training and opening in Q2 Freight - additional $13,000.00 - projector and screen had to be airfreighted to meet condensed timing.

Total additional costs: $64,000.00

IT #5 Poznan
Installation - additional $17,000.00 - accelerated installation. Refurbished on site. Freight - additional $31,000.00 - system shipped from Japan, screen airfreighted. Parts - additional $5,000.00 - On-site refurbishment.

Total additional costs: $53,000.00

ej

# EXHIBIT U-8

This is Exhibit "U-8" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**From:** Gary Harbison
**Sent:** Tuesday, July 12, 2005 12:27:17 PM
**To:** Don Kane; Robert Kilburn
**CC:** Eric Jacques
**Subject:** Dubai and Istanbul Tuning

Dubai and Istanbul MPX theatre tunings were two of the longest, most difficult and problematic MPX tunings I have experienced. Normally, if equipment works and the site is ready, It takes 2 - 3 days to tune an MPX theatre.
It took 2 weeks to tune Dubai and Istanbul. This was due to faulty equipment or total system failure, bad site conditions with work still going on in the theatre, slow or no communications between tuning software and equipment. Because the sound, projector and control systems are so heavily integrated and reliant upon each other if one component has a fault, the whole system can be disabled. In addition when someone is working on a sound system problem no one can work with or troubleshoot the projector system or visa versa. This can be crippling since the time frame for installation has been shortened. On previous systems work on the projector and sound systems or subsets of these systems could occur simultaneously when time is most precious during the commissioning phase, just before opening. I fear that we are going to start missing openings and other critical milestones such as the operational sign-off. In Istanbul, we were not fully show ready functional on the target date for sign-off. The Audio system is so integrated and signal path is so convoluted, it almost impossible to isolate individual components and follow signal path for logical trouble shooting. It is even hard to isolate such key sections as" A" and "B" chains. In Istanbul after spending days of troubleshooting and hours talking to engineering support at international roaming rates we were not any closer to an explanation or solution to our problems. I finally decided to find a work around to continue on with the tuning. I had to Isolate the DME32 from the AE2 and DT-1 and tune one channel at a time by the following Set the DME32 clock source to internal so audio could pass through. and digitally route the audio from the analog inputs through the channel being tuned processing to the analog outputs and connect to the desired channels' amplifier. I tuned each channel like this and then re-programmed the DSP back to normal operational mode when I had finished tuning. Had I not tuned using this work around a return trip would have been required. This is just one example of how we have to spend extra time and effort to get the MPX systems to work. In my opinion and most others who work in the field, the system is still not completely developed and by no means stable. Our Install Supervisors waste several hours each day and spend lots of money buying parts required to complete the system and make it function properly.
Our guys continually jump through hoops and perform miracles to make these unrealistic deadlines. Over I was able to tune these theatres and make them sound good, but it seems to be getting tougher. We are running out of lipstick to put on these pigs.

See brief explanation of problems below.

Sincerely

Gary Harbison, Senior Audio Specialist

Dubai

Capacitor lead not soldered on home made sync board caused sync problem wasted a day to track down and repair.
Looked at tach pulse on ATB scope, had large spikes on leading edge signal. Is this cable shielded and attached at one end?
A couple of cannels had LF, HF labels swapped on amp input cables found

during tuning.
Electricians had polarity swapped on a couple of channels found and corrected during tuning
Tune Up application worked fine for 2 days until Gerry did the software upgrade, then communications slowed to a crawl . It took 30 seconds to make one 1/2 dB change. This caused setting final levels, normally a 15 -30 minute task to take almost 2 1/2 hours.

Istanbul

Site not ready by a long shot.
Structural problems made hanging rear speakers troublesome and time consuming.
No digital audio passing through DME32 . CD, Monitor sub worked for 2 days then AE-2 would not even mount hard drive.
LED on active SCSI was loose could wedge something to get it to stay on but not sure if there was a problem with the terminator. No one in Engineering knew either.
Did loop back test on AE-2 TDIF to verify it was passing digital audio. It did back to itself but not to DME32 because no sync lock I think.
DME32 sync LED would go between 44.1k and 48k but would not lock.
DT-1 would give all systems green lights then some would start flashing, go out and then come back on.
I built test shows before the projector and reel units were connected and the software update performed. I suspect this may have had some to do with the problem.I discovered that the Master Audio level is set in the Matrix outputs and the sub bass level is turned down in addition to the channels. Since the sub is derived from the channels it is redundant to add further attenuation. This causes the sub to be turned down even more and appear weaker than it is. When the volume is low the sub actually needs to boosted a little to be perceived as loud enough per the Fletcher Munsing Curve theory.
Numerous electrician mistakes on speaker wiring.
Very slow communications with the DME32 via ethernet. Had to rig up numerous cross cables found at store to communicate via the serial port and use the Yamaha software to tune.
Tuned one channel at a time through the analog inputs and outputs and internal clock of the DME. Programmed back to standard configuration after tuned.

# EXHIBIT U-9

This is Exhibit "U-9" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE RAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**From:** Mark Welton
**Sent:** Tuesday, July 12, 2005 10:36:17 AM
**To:** Brad Wechsler
**CC:** Rene Steele
**Subject:** Re: Istanbul Install

**Attachments:** Doc Link.htm

We have the client's acceptance certificate and the system is now working. The installer report that the auditor reads indicates that there was a sound sync issue that has been resolved. I am sure the auditors will ask the question but we should be able to address that this was an issue that has been fixed and client signed off on June 30.

Brad Wechsler
Sent by: Rene Steele
07/11/2005 12:33 PM

To: Mark Welton/Imax@Imax
cc:
Subject: Re: Istanbul Install

Are we ok?

Brad

Mark Welton
07/05/2005 03:40 PM

To: Brad Wechsler/Imax@Imax, rgelfond@imax.com
cc: rlister@imax.com
Subject: Istanbul Install

The Istanbul was completed on June 30th, however the sound system (AE2) continues not to work. As per my email last week, we shipped over a new AE 2, however, it is stuck in customs. A picture was shown on the screen on June 30th, however, the sound was non existent. The new part is suppose to clear tomorrow. After speaking with the client on the weekend, the client signed off on acceptance, however our installers and client have noted the sound sync issues. Recognition should not be an issue, however, the larger issue is that this is the third install in June where the AE2 with the MPX sync has not worked. We had the same problems in Pittsburgh with Cinemark and in Dubai. It causes us the problem of achieving the certificate (ie I addressed with CEO of AFM and now contacting Copple of Cinemark). But the biggest problems are 1.the increased costs of replacement parts, shipping and added installers as parts are not working, 2.risk that an install will not be accepted at end of quarter, and 3. although the project managemnet team does not report to me directly, indirectly, as you are aware, I sign off on completing the install, timing, expediting shipping, sending installers etc. The project managers and installers are becoming increasingly frustrated on installs with lack of components working. I will address this last point with Mary as they are looking for some comfort from me to address with management. Once we have specifics of components, I will sit with Brian to discuss.

I will keep you updated on any auditor issues re above.

<<...>>

# EXHIBIT U-10

This is Exhibit "U-10" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

001232

Best regards,

Karl

Mark Welton"

**Mark Welton**
07/24/2005 01:03 PM

To: Richard Wooland/Imax@Imax
cc: Don Savant/Imax, "Huang Ke" <hke@imax.com>, Jacquie Johnson/Imax, Karl Yuan/Imax, "Larry O'Reilly" <lo'reilly@imax.com>, Marnie Hamilton/Imax, Don Kane/Imax, Robert Kilburn/Imax
Subject: Re: Beijing site option Re: SUC #1 TP373 MPX delivery preparation.

Richard, please handle installation only as we discussed, not the accounting and legal issues, I will handle them, that is my responsibility.

--------------------------
Mark Welton
Richard Wooland

**From:** Richard Wooland
**Sent:** 07/22/2005 10:02 PM
**To:** Mark Welton/Imax@Imax
**Cc:** Don Savant/Imax@Imax; hke@imax.com; Jacquie Johnson/Imax@Imax; Karl Yuan/Imax@Imax; lo'reilly@imax.com; Marnie Hamilton/Imax@Imax; Don Kane/Imax@Imax; Robert Kilburn/Imax@Imax
**Subject:** Re: Beijing site option Re: SUC #1 TP373 MPX delivery preparation.

We need more than 'a picture on the screen' to satisfy revenue recognition. (Maltepe?)
Mark Welton

**Mark Welton**
23/07/2005 03:03 AM

To: Karl Yuan/Imax@Imax, hke@imax.com
cc: Don Savant/Imax@Imax, Jacquie Johnson/Imax@Imax, Reza Navabi/CAN/Imax@Imax, Richard Wooland/Imax@Imax, lo'reilly@imax.com
Subject: Re: Beijing site option Re: SUC #1 TP373 MPX delivery preparation.

Karl, per Don's report to Rich last week, this install is now included in the official Q3 budget. As such we need to get this done. As you are aware, we need to show a picture on the screen for revenue recognition. Please provide us a status next week.
Karl Yuan

**Karl Yuan**
07/22/2005 03:59 AM

To: Richard Wooland/Imax@Imax
cc: Don Savant/Imax@Imax, Jacquie Johnson/Imax@Imax, Mark Welton/Imax@Imax, Reza Navabi/CAN/Imax@Imax
Subject: Re: Beijing site option Re: SUC #1 TP373 MPX delivery preparation.

003522

001233

I met the GM of UME and explained him the design of retrofit again and made him more comfortable. What his only concern is the degree of 35 mm projection throw and first one or two row audience's elevation, in which the degrees should be less than 8 and 40, that are the requirement of 5 star cinplex by the local authority, because he believe that he will play 35 mm quite much in this IMAX screen. He will have his 35 mm consultant to design the new 35 mm projection and check this and then report his boss, Mr. Wu, the owner. After that, UME will sign the contract with SUC. All above should be done in the end of next week.

Richard Wooland

**Richard Wooland**
07/21/2005 10:25 PM

To: Don Savant/Imax@Imax, Karl Yuan/Imax@Imax
cc: Mark Welton/Imax@Imax, Jacquie Johnson/Imax@Imax
Subject: Beijing site option Re: SUC #1 TP373 MPX delivery preparation.

Any news when we can expect the agreement from SUC/UME to commit to the MPX retrofit in Beijing?
----- Forwarded by Richard Wooland/Imax on 21/07/2005 10:22 PM -----

**Richard Wooland**
13/07/2005 05:58 AM

To: Jacquie Johnson/Imax@Imax
cc: Don Savant/Imax@Imax, Claire Yang/CAN/Imax@Imax, David Campbell/Imax@Imax, Don Kane/Imax@Imax, Eric Jacques/Imax@Imax, Julie Sibley/Imax@Imax, Klaus Methner/Imax@Imax, Mark Welton/Imax@Imax, Marnie Hamilton/Imax@Imax, Robert Kilburn/Imax@Imax
Subject: Beijing site option Re: SUC #1 TP373 MPX delivery preparation.

Jacquie:
Will have an answer hopefully Friday or early next week.

Our theatre design specialist is currently on site. Once we finalize the scope of works and client agrees to commit with the retrofit and shut down for 2-3 weeks then a decision would be made.
Jacquie Johnson

**Jacquie Johnson**
12/07/2005 05:51 PM

To: Richard Wooland/Imax@Imax
cc: Claire Yang/CAN/Imax@Imax, David Campbell/Imax@Imax, Don Kane/Imax@Imax, Eric Jacques/Imax@Imax, Julie Sibley/Imax@Imax, Klaus Methner/Imax@Imax, Mark Welton/Imax@Imax, Marnie Hamilton/Imax@Imax, Robert Kilburn/Imax@Imax
Subject: Re: SUC #1 TP373 MPX delivery preparation.

Richard: any word on this yet? Pls advise.
Richard Wooland

**Richard Wooland**

To: Klaus Methner/Imax@Imax, Jacquie Johnson/Imax@Imax, Claire Yang/CAN/Imax@Imax, Robert Kilburn/Imax@Imax

003523

# EXHIBIT U-11

This is Exhibit "U-11" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

From: Mark Welton on 11/03/2005 04:32 PM

To: Don Kane/Imax@Imax, Eric Jacques/Imax@Imax, Giovanni Vecchio/CAN/Imax@Imax, rwooland@imax.com, Ilidio Coito/Imax@Imax, dsavant@imax.com, KYuan@imax.com, lo'reilly@imax.com, tandrade@imax.com, John Schreiner, jathanasopoulos@imax.com, Robert Kilburn/Imax@Imax

cc:

Subject: Q4 Installs

As you know over the last 12 months we have had a few installs that were difficult at best and I know there were many concerns regarding the completion of installation. The installs at Delhi, Turkey and Eilat were done under tough conditions and there were major items not completed by our clients and certain items we delayed. We noted these items on our auditor's reports for completed installs. I just wanted to share that none of these reports where we reported deficiencies were any concerns for the auditors. we actually received very few questions. At the end of the day, the auditors do not look at opening, do not look at whether the client has installed seats etc, but whether Imax has substantially completed its system install obligations.

In conclusion, our revenue recognition policy is different from what most of us assume. I know we will have a couple of installs like that this quarter but wanted to give everyone this comfort.

And let's hope the stock price gains it's 90 cents as we actaully made the bottom range of our numbers.

# EXHIBIT U-12

This is Exhibit "U-12" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

**Don Savant**
14/11/2005 02:01 AM

To: Huang Ke/Imax@Imax
cc: Bob X Yu/Asia/Imax@Imax, David Berman/Imax@Imax, Karl Yuan/Imax@Imax, Mark Welton/Imax@Imax, Richard Wooland/Imax@Imax
Subject: Re: Beijing CFM

Mark,
This is great news. If the leaders such as Pres. Hu are informed it will open on Dec. 28, then they will work 24 hours to make it happen.. Sounds like it looks pretty good for our install and our rev rec. Huang Ke, please update us at the end the week so we can check the progress. Thanks for making the trip on short notice.
Huang Ke

**Huang Ke**
11/11/2005 05:20 AM

To: Don Savant/Imax@Imax
cc: David Berman/Imax@Imax, Mark Welton/Imax@Imax, Karl Yuan/Imax@Imax, Richard Wooland/Imax@Imax, Bob X Yu/Asia/Imax@Imax
Subject: Re: Beijing CFM

I met Mr. Zhao Dongming, Director General of Beijing Municipal Bureau of Radio and TV, and he told me that he had a meeting this morning with Mr. Zhong and the contractor. He was updated on the issues that I addressed yesterday to Mr. Zhong and instructed the contractor to speed up. Tomorrow morning I will go to the site with Mr. Zhong and will go through our installation schedule with Bob to make sure he understands and does whatever is needed to meet our requirement. Bob will also send us a technical report tonight.
The whole museum project is far behind schedule in every aspect. For our theatre, based on Bob's optimistic assessment if everything moves smoothly as in the last few days, we could move our system into the partially but critically completed projection booth on Nov. 18 and start install. Bob is a great help for the client as he directly communicates with contractor on what needs to be done to meet the deadline.
According to Mr. Zhao, the museum and the IMAX theatre MUST open on Dec. 28, which is the date fixed on the calendar of such state leaders as Hu Jingtao or Jiang Zeming.
Knowing this fact would give us some comfort.
Don, I will give you another report on their opening schedule and films.
Regards,
hk
Don Savant

**Don Savant**
2005-11-10 10:29

To: Huang Ke/Imax@Imax
cc: David Berman/Imax@Imax, Mark Welton/Imax@Imax
Subject: Re: Beijing

Huang Ke, Thanks and we look forward to your update tomorrow.
Huang Ke

**Huang Ke**
11/10/2005 01:31 AM

To: David Berman/Imax@Imax
cc: Don Savant/Imax@Imax, Mark Welton/Imax@Imax
Subject: Re: Beijing

I've talked to Mr. Zhong and Mr. Shu today and given them a summary of the issues that

hold up our installation based on the report from Bob, who's been on site for the last 4 days.
I'm flying to Beijing tomorrow and will update you on the progress.
thx, hk
David Berman

David Berman
2005-11-09 11:21

To: Huang Ke/Imax@Imax
cc: Don Savant/Imax@Imax, Mark Welton/Imax@Imax
Subject: Beijing

Huang Ke,

Mark asked me to write a letter to help push the install. Speaking with Don earlier, I learned you are going to Beijing. Can you please keep me in the loop as to the progress and when it would be appropriate to send a letter and who to send it to: Thanks.

# EXHIBIT U-13

This is Exhibit "U-13" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Mark Welton/Imax
12/08/2005 10:23 AM

To Don Kane/Imax
cc
bcc
Subject Re:

let me know
Don Kane

Don Kane
12/08/2005 10:20 AM

To: Mark Welton/Imax@Imax
cc:
Subject:

Looking at the first picture, it looks like a structural support that is not finished. I'm concerned about putting equipment on it. I will talk to Ilidio later today to cotact the client and see if they are ok with it.
Don
----- Forwarded by Don Kane/Imax on 12/08/2005 10:11 AM -----

Chris Hagg
12/08/2005 09:59 AM

To: Don Kane/Imax@Imax
cc:
Subject:

Don,

Just a couple of pictures for your amusement.

san te fe mexico 015.jpg san te fe mexico 001.jpg The first picture shows what is holding up the floor of the booth. I can't wait to put the reel unit on it.

# EXHIBIT U-14

This is Exhibit "U-14" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

A Commissioner, etc.

001238

Glenn Pedersen/CAN/Imax
12/21/2005 12:00 PM

To Don Kane/Imax@Imax
cc
bcc
Subject Re: McMinnville white screen sheet

fyi

----- Forwarded by Glenn Pedersen/CAN/Imax on 12/21/2005 11:58 AM -----

Mark Welton
12/21/2005 11:38 AM

To: Glenn Pedersen/CAN/Imax@Imax
cc: Marnie Hamilton/Imax
Subject: Re: McMinnville white screen sheet

We can take it down as we have done this previously and doing it in kazan and lodz.

---

Mark Welton
Glenn Pedersen

From: Glenn Pedersen
Sent: 12/21/2005 11:47 AM
To: Mark Welton/Imax@Imax
Cc: Marnie Hamilton/Imax@Imax
Subject: McMinnville white screen sheet

Mark,

Our installer on site has the idea that he would put up the screen sheet to run system and then bring it back down and put back into the shipping crate. Does IMAX (and the auditors of) have a preference of whether the screen has to stay up or not?

If left up it will certainly become damaged either physically by construction activity, or, just become too dirty. If we take it down we have it for possible (though not highly probable) reuse elsewhere, or, we could offer it to Evergreen as a bonus spare screen sheet.

If we elect to take it down for our re-use we would have to find storage, arrange transport.....

It just seems like a waste to leave it up.

-gp

# EXHIBIT U-15

This is Exhibit "U-15" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Mark Welton/Imax
12/22/2005 08:41 AM

To Larry T O'Reilly/Imax@Imax
cc Eric Jacques/Imax
bcc
Subject Re: Kazan

Yes, it has not been easy. Irina is very emotional, although we have provided cash and guarantees. The system is now installed and the screen 2D sheet and frame now is all that is left. The duty issue is irrelevant as they had to clear the system anyway. I do not think backing off now will smooth it over, Mostly we could offer her a little more on opening and ensure a great opening when finished.

---

Mark Welton
Larry T O'Reilly

From: Larry T O'Reilly
Sent: 12/22/2005 06:55 AM
To: "Mark Welton" <mwelton@imax.com>
Cc: Eric Jacques/Imax@Imax
Subject: Fw: Kazan

I know we need this install but the price may be severe, see point 5 below.

Larry

John Schreiner

From: John Schreiner
Sent: 12/22/2005 12:31 AM
To: Larry T O'Reilly/Imax@Imax
Cc: Don Savant/Imax@Imax
Subject: Kazan

Larry,

See point #5 about Kazan. I don't know what to say.

I was planning to meet Alex in Toronto on the 16th of January. Can you and I take him out to dinner?

Thanks,

John.
----- Forwarded by John Schreiner/Imax on 12/22/2005 05:26 AM -----



"Alex"
<caneks@rogers.com>
12/22/2005 01:39 AM

To: "John Schreiner" <JSchreiner@imax.com>
cc:
Subject:

Hi John,
I know you are still in India.How are the things?
I m going on vacation on Friday morning and will come back by 3 of January.

1. I know we are very close to sign with Lev.Its a good news!
2.You have a Imax meeting in LA in January.Should I come?
3.Konstantin paid 200000 and you should transfer %% to Larissa's account in Parex
4.Lets do differently with Olga's expense from New Year.
Imax will wire the Olga's salary and office rent every month and also will wire $3000 and I will give Olga cash and she will
send the report to Imax where the money will go.When its over Imax will send another 3000.I have some problems with cash in Moscow office.
5. I m trying to smooth the things in Kazan.Irina had heart problem 2 days ago.
You know what I think about this! They are installing the system and speakers and the building not ready! No constant power,-8C inside ,humidity and so on.They just paid about 400000 in duty!.Ilidio guaranteed that he will replace projector,speakers and so on if it wont work.Irina and all guys in Kazan hate everything about IMAX!!!
They are going to expend to another cities and I don't think they are going to deal with Imax anymore.
Also ,she is going to talk about this to another cinema owners.We are going to loose a lot of business in Russia.
Is it worth it?
Regards,
Alex

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.371 / Virus Database: 267.14.3/209 - Release Date: 12/21/2005

# EXHIBIT U-16

This is Exhibit "U-16" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**From:** Ilidio Coito
**Sent:** Saturday, December 31, 2005 3:39 AM
**To:** Don Kane
**Subject:** Santa fe
**Attach:** windows.jpg;booth.jpg;proj room wall.jpg;proj room wall - not finished.jpg;proj window.jpg

---

Don
Just a few pics of the mess down here, however, they are working towards having the booth ( finished) for our installation by Monday and the actual floor is being poured on Sunday and we can not move any equipment until the cement is cured. But we can start on the screen frame.
The Theatre had no light and couldn't take a proper picture, however, the side defining walls are not done and will not be done for now . There are two major walls that define the theatre space as a whole and the theatre walls will define the seating deck and enclose the screen to 21.3 m

Please understand that The client is totally aware of the ramifications if we could not install, therefore, they are committed to do it and Cinepolis architects are involved in giving advice, no manpower but just advice.

# EXHIBIT U-17

This is Exhibit "U-17" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law.

001242

IMAX®

LISA ALSO WANTED A MEMO ON PRAGUE, TOO. SEE HER NOTE OF TODAY

# IMAX CORPORATION

## MEMORANDUM

| | | | |
|---|---|---|---|
| TO: | Memo to File | CC: | Frank and Ed |
| FROM: | Kathryn | DATE: | January 16, 2006 |
| RE: | Q3 installation of Delhi ( AEZ) | | |

FUTURE BILLINGS. THESE AMOUNTS ARE NOT IN ARREARS.

Please find attached documentary evidence of the steps management considered during the 3rd quarter in evaluating the recognition of the New Delhi, India at September 30, 2005.

The New Delhi contract was a signed binding contract which included fixed pricing terms and conditions. In reviewing for collectibility, the entire $1.6 M purchase price was received as at the recognition date September 30, 2005. The contract also includes an amount of $245,000 which will be collected for future ~~software upgrades~~.

In addition, management considered the following:

IT IS THE CLIENT'S RESPONSIBILITY TO PROVIDE WATER & ELECTRICAL HOOK-UPS FOR THE GCM.

Management reviewed the completion of the New Delhi "Theatre system installation report" signed by the commissioner, the project manager and the project director who indicated the installation was substantially complete as at September 30, 2005. The report noted two items outstanding that were IMAX's responsibility. 1) A white screen was erected in the place of the final silver screen as the client site was not fully completed. The remaining tasks to complete the theatre site were the client responsibilities. The cost to supervise the installation of the silver screen was estimated at $20,000. 2) The glasses cleaning machine was delivered however not connected. The estimated cost to ~~connect~~ the glass cleaning machine is approximately $1,000. The New Delhi system installation and related costs were estimated at approximately $1.1M. The above 2 outstanding items were deemed inconsequential since completing these obligations were immaterial from an overall cost perspective and not essential to the functionality of the system.

~~[illegible]~~ SUPERVISE INSTALLATION OF

Management further reviewed the installation report for New Delhi that highlights any client concerns/disputes and none were noted. Also, management reviewed the New Delhi "Certificate of Acceptance" which was signed off by the customer indicating that IMAX had met the terms of the agreement at September 30, 2005.

Based on the above considerations, management concluded that the New Delhi installation was to be recognized at September 30, 2005.

F:\Word\2005\Q3\Memo--Delhi installation( AEZ).doc1

• WHAT ABOUT SILVER SCREEN DELIVERY + DATES?

# EXHIBIT U-18

This is Exhibit "U-18" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

001243

Don Kane/Imax
01/19/2006 11:57 AM

To Ilidio Coito/Imax@Imax
cc
bcc
Subject Kazan

If they are so concerned, they should get some heat in the proj room.
----- Forwarded by Don Kane/Imax on 01/19/2006 11:54 AM -----

John Schreiner
01/19/2006 07:41 AM

To: Eric Jacques/Imax@Imax
cc: Don Kane/Imax@Imax, Ilidio Coito/Imax@Imax, Mark Welton/Imax@Imax, Don Savant/Imax@Imax, Larry T O'Reilly/Imax@Imax
Subject: Kazan

Dear Eric,

Just to give you a heads up, the temperature dropped to minus 40 celcius last night in Kazan and not much has happened at the theatre since the equipment was installed on the 31st of December. As far as I understand, the walls are not complete still and there is no heating or climate control in the projection booth. The client is concerned about the equipment when time comes to start it up again. I never thought I would hear this one, but Russia has been virtually shut down the last few days due to extreme cold weather.

Regards,

John.

Mark Welton/Imax
01/19/2006 01:45 PM

To Kathryn A Gamble/CAN/Imax@Imax, mhamilton@imax.com
cc
bcc
Subject Kazan

Verbally confirmed $25K for marketing and delay last payment to opening which is usually the case in international territories.

# EXHIBIT U-19

This is Exhibit "U-19" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

001245

Ilidio Coito/Imax
01/19/2006 03:24 PM

To Lac Nguyen/CAN/Imax@Imax
cc Eric Jacques/Imax@Imax, Don Kane/Imax@Imax, Klaus Methner/Imax@Imax
bcc
Subject Re: Kazan

Hi Lac,
As per the email bellow the system in kazan has been installed and now sits in a projection booth with temperatures (-40 C) until the opening which might be April. Therefore, I would like to ask you if you foresee any potential parts that might freeze and that need to be replaced. This way we can prepare a package of potential parts and ship them ahead for the opening and final installation.

Thank you

Ilidio Coito
Project Manager

----- Forwarded by Ilidio Coito/Imax on 01/19/2006 03:16 PM -----

IMAX®

Ilidio Coito
01/19/2006 09:14 AM

To: John Schreiner/Imax@Imax
cc: Eric Jacques/Imax@Imax, Don Kane/Imax@Imax, Mark Welton/Imax@Imax, Don Savant/Imax@Imax, Larry T O'Reilly/Imax@Imax

Subject: Re: Kazan

Hi John,
During the installation, Irina had IMAX- Mark Welton sign an agreement that states that we will replace any parts that might have been damaged due to those conditions and that the system will be working 100% for the opening date. We are already considering the replacement of the Speakers and we will know for sure once we do the test once we go back for the opening.

I will follow up again with Irina reassuring her that we will be behind the system 100%, so that she can be at ease and trust IMAX.

Ilidio

From: John Schreiner on 01/19/2006 07:41 AM

From: John Schreiner on 01/19/2006 07:41 AM
To: Eric Jacques/Imax@Imax
cc: Don Kane/Imax@Imax, Ilidio Coito/Imax@Imax, Mark Welton/Imax@Imax, Don Savant/Imax@Imax, Larry T O'Reilly/Imax@Imax

Subject: Kazan

001246

Dear Eric,

Just to give you a heads up, the temperature dropped to minus 40 celcius last night in Kazan and not much has happened at the theatre since the equipment was installed on the 31st of December. As far as I understand, the walls are not complete still and there is no heating or climate control in the projection booth. The client is concerned about the equipment when time comes to start it up again. I never thought I would hear this one, but Russia has been virtually shut down the last few days due to extreme cold weather.

Regards,

John.

# EXHIBIT U-20

This is Exhibit "U-20" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Mark Welton/Imax
01/27/2006 09:53 AM

To Don Kane/Imax
cc David Berman/Imax@Imax, Don Savant/Imax@Imax, Eric Jacques/Imax@Imax, rkilburn@imax.com
bcc
Subject Re: New Delhi Screen

Let's ensure in the future we understand the timing of screens etc, we wasted a lot of money on delivering screens when the theatre was not ready.
Don Kane

Don Kane
01/27/2006 09:28 AM

To: Mark Welton/Imax@Imax
cc: David Berman/Imax@Imax, Don Savant/Imax@Imax, Eric Jacques/Imax@Imax, rkilburn@imax.com
Subject: New Delhi Screen

The screen sheet has been replaced and new one looks great. The client is very happy. They are not planning to run 3D until mid-March so I'm not sure why we had to air freight the replacement, but at least its done.
Don

# EXHIBIT U-21

This is Exhibit "U-21" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Don Kane/Imax
01/30/2006 09:37 AM

To Ilidio Coito/Imax@Imax
cc John Schreiner/Imax@Imax, Mark Welton/Imax@Imax
bcc
Subject Re: Kazan

The screen still needs to be installed, rear speakers hung and all speakers aimed.
Don
Ilidio Coito

Ilidio Coito
01/30/2006 04:09 AM

To: John Schreiner/Imax@Imax, Mark Welton/Imax, "Don Kane" <dkane@imax.com>
cc:
Subject: Re: Kazan

Hi John and Mark,
The installation is pretty much done, with the exception of changing one power panel and redo the exhaust fan because they didn't have the right stuff.
The work was done and then the equipment was closed, therefore minimal work should be required for the opening. The 25,000 dolars was the incentive to do the installation earlier and cosidered for advertising, therefore they should not look at us for payments related to installation. Therefore, they would be responsable for the installation whether last year or this.
The speakers are an issue that we will deal once our guy does the inspection, therefore they should not be asking for money on that. If we need to replace them then we will bring the others back and should be considered as replacement.
I am traveling to sofia right now but call me if you need any further information
Ilidio

Ilidio Coito
Sent from my BlackBerry Wireless Handheld
John Schreiner

```
From: John Schreiner
Sent: 01/29/2006 10:55 PM
To: Mark Welton/Imax@Imax
Cc: Ilidio Coito/Imax@Imax
Subject: Kazan
```

I am in India, but will call you in the morning when you get in.

John.

—— Forwarded by John Schreiner/Imax on 01/30/2006 03:54 AM ——



"Alex"
<caneks@rogers.com>
01/29/2006 11:40 PM

To: "'John Schreiner'" <JSchreiner@imax.com>
cc:
Subject: RE: Visit to Toronto

John,
I asked them the same question.But you gave to them 25000 as a advertising money, because they put a lot of effort to open it in December.You need to ask Ilidio,what's done by those guys and if they have to come back and redo some work.

Lets see what they tell us on Monday.
Regards,
Alex

**From:** John Schreiner [mailto:JSchreiner@imax.com]
**Sent:** Sunday, January 29, 2006 1:31 PM
**To:** Alex
**Cc:** Mark Welton
**Subject:** RE: Visit to Toronto

Alex,

I have copied Mark on this email.

1 and 2 sound fine as we could put more specific language in regarding the speakers that we will cover all replacement costs, etc should they need to be replaced.
3. I do not quite understand point #3. We provided them the US$25,000 as an incentive to help market the theatre but also to defray any additional costs. Are you suggesting that they want us to pay money for these guys to come back? I doubt they weill need to come back as all of the technical stuff will have been done. Can you elaborate exactly what he is asking for on this point?

John.

"Alex" <caneks@rogers.com>

01/29/2006 04:58 PM

To: "John Schreiner" <JSchreiner@imax.com>
cc:
Subject: RE: Visit to Toronto

Hi John,
Nobody called me.
I talked to Vadim.He said ,they are going to sign it but to change some in the agreement.
They have 3 questions:
1.31000 advertising money - no problem,they spent already 16000 and have invoices for that
2. Speakers- installation,duty,transportation and so on
3. They had few installers from Moscow ,who was making the installation in December and have to come bake in April to do it again.They came from Moscow,stayed in the hotel and worked and got paid for it and going to do it again.
Regards,
Alex

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.375 / Virus Database: 267.14.23/243 - Release Date: 1/27/2006

IMAX think big
The Ultimate Movie Experience
www.imax.com
IMAX and IMAX think big are registered trademarks of IMAX Corporation

****************************** IMPORTANT NOTICE **************************
Information contained in this e-mail correspondence is confidential information intended only for the use of the individual or entity named above. Any reader of this message who is not the intended recipient of this correspondence is hereby notified that any dissemination, distribution, copying or communication of the contents of this correspondence is strictly prohibited. If this email was not addressed to you, please immediately notify us by phone in Canada at (905) 403-6500 (collects calls will be accepted) or by email at webmaster@imax.com and delete and destroy this correspondence inadvertently sent to you. Thank you.
****************************************************************************

--
No virus found in this incoming message.
Checked by AVG Free Edition.
Version: 7.1.375 / Virus Database: 267.14.23/243 - Release Date: 1/27/2006

--
No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.1.375 / Virus Database: 267.14.23/243 - Release Date: 1/27/2006

# EXHIBIT U-22

This is Exhibit "U-22" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

**From:** Jeffrey Vance
**Sent:** Tuesday, February 21, 2006 10:39 AM
**To:** Frank Joyce; Kathryn A Gamble
**Cc:** Edward MacNeil
**Subject:** URGENT- Just got a call from Ken

---

Kathryn, I just stopped by to see you but you were on the phone. I just got off the phone with Ken, who had just spoken to the auditors for a good hour. It seems PWC has gone to him and given him a synopsis of the past month's rev rec discussions, along with some handouts, and the statement that they are considering a material weakness using the argument that if it were not for PWC suggesting multiple elements accounting, the Company would have improperly recognized revenue, therefore the process is materially flawed.

Frank, Ken mentioned that he was going to be calling you this morning. I'm going to head over to Matt and find out what exactly was said and also what was given to him to study.

Jeff

Jeffrey Vance, CA
IMAX Corporation | Manager, Business Operations
2525 Speakman Drive
Mississauga, Ontario, Canada L5K 1B1
Direct Phone: 905 403 6529
Fax: 905 403 6467
Email: jvance@imax.com

# EXHIBIT U-23

This is Exhibit "U-23" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Confidential

# IMAX Corporation

## Auditor's preliminary report to the Audit Committee

## For the year ended December 31, 2005

**Meeting Date: March 1, 2006**

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00095

PRICEWATERHOUSECOOPERS

IMAX-US020939

001252

Confidential

| Matter to be communicated | Auditor's response |
|---|---|
| **Auditor's responsibility for conducting the Audits in Accordance with PCAOB Standards** | *Engagement:*<br>We have been engaged to complete the following for the IMAX Corporation ("the Company"):<br>▪ Audit the consolidated financial statements of the Company at December 31, 2005 and for the year then ending prepared in accordance with US GAAP. The objective of our audit was to obtain reasonable, but not absolute, assurance about whether the financial statements, prepared in accordance with generally accepted accounting principles, are free from material misstatement.<br>▪ Audit the Company's internal control over financial reporting used to prepare the US GAAP statements as of December 31, 2005. The objective of an audit of internal control over financial reporting is the expression of opinions on the effectiveness of internal control over financial reporting and on management's assessment as to whether the Company maintained effective internal control over financial reporting. This audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, and testing and evaluating the design and operating effectiveness of internal control.<br><br>*Audit Approach:*<br>Our audit scope was consistent with our plan presented to the Audit Committee on April 12, 2005.<br><br>*Status of Audits:*<br>As of the writing of this report, February 23, 2006, we have not completed all the audit procedures that are required to finalize our audit opinions. We have included a list of the outstanding procedures as Appendix A to this report. We will update the committee as to the current outstanding position at the March 1st meeting as we will continue to work through the procedures over the next week. Our report will remain unsigned until the financial statements are filed with the various regulators and we will update our audit procedures through to that date. The Company is currently anticipating that the financial statements will be filed on or around March 9th. |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00096



PRICEWATERHOUSECOOPERS

IMAX-US020940

001253

Confidential

| Matter to be communicated | Auditor's response |
|---|---|
| **Significant accounting policies, including critical accounting policies and alternative treatments within generally accepted accounting principles and the auditor's judgment about the quality of accounting principles** | |
| • The *initial selection of and changes* in *significant accounting policies* or their application; methods used to account for significant unusual transactions; and effect of significant policies in controversial or emerging areas for which there is a lack of authoritative guidance or consensus. | During the year, the Company did not adopt any new accounting policies. However, the fact pattern concerning post installation obligations of installed theatre systems lead to the application of multiple elements arrangement accounting to theatre system revenues. Previously, such accounting had only been applicable to multiple elements in lease terminations and bundled contracts that included film licences. The 2005 accounting involves the application of an existing accounting standard and the Company's accounting policy to changed circumstances. It is therefore not considered a change in accounting policy. |
| • *Critical accounting policies and practices* applied by the client in its financial statements; | The Company's critical accounting policies and practices are consistent with the prior year and include: Accounting for Leases and Revenue Recognition thereon; Accounting for settlement revenue; Valuation of Long-lived assets; Accounting for taxes, including valuation allowances on deferred tax assets; Accounting for employee future benefits primarily focused on the pension plan for the Co-CEO's; Stock based compensation including the use of an adopted binomial model for the calculation of fair values; |
| • *Alternative treatments within GAAP* for accounting policies and practices related to material items, including recognition, measurement, presentation and disclosure alternatives, that have been discussed with client management during the current audit period. | During our audit, we spent a considerable amount of time reviewing the Company's support for the accounting for the 14 system installations recorded in the 4th quarter. Our focus was mainly on the post installation obligations of ten installed systems where the theatre had not opened to the public by December 31, 2005. Management considered its positions with reference to both its internal revenue recognition guideline and SAB 104 (the SEC's guidance for registrants on revenue recognition).<br><br>As part of our assessment of management's decisions in this area we considered a number of factors, including:<br>• Client acceptance sign off obtained by the Company, including any exceptions noted by the customer; |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00097



PRICEWATERHOUSECOOPERS

IMAX-US020941

001254

Confidential

| Matter to be communicated | Auditor's response |
|---|---|
| | • Installation sign-off checklists completed by IMAX installers;<br>• Concessions granted to certain customers in the 4th quarter, involving both deferral of certain contractual payments, and granting of marketing allowances;<br>• Remaining costs expected to be incurred in 2006 in relationship to the total costs of the theatre system;<br>• Items noted as remaining obligations at December 31, 2005, including the full installation or delivery of the screen, projector alignment, sound tuning, projectionist training, reinstallation obligations, and various other items.<br>• Information from in-house general counsel as to the customer's entitlement to partial refunds on potential non-fulfilment of the remaining obligations existing at December 31, 2005.<br><br>In addition we received external confirmations from the customers on a sample of five of the ten installations above.<br><br>Management concluded that all of its post-installation obligations are inconsequential or perfunctory. Accordingly, revenues on the systems were initially fully recognized by management.<br><br>Upon final review of the facts and circumstances around these transactions, we indicated to management that we believe certain of the obligations to be consequential and not perfunctory. Accordingly, the preferred accounting treatment for these installations was to first identify any elements which could be accounted for separately under multiple element accounting guidance. Any such separable elements are required to be fair valued, and, if undelivered, revenue and costs relating to these elements would be deferred until the element was delivered. For separation of elements to occur, specified criteria must be met under applicable accounting standards.<br><br>This accounting treatment has been adopted by the Company, and thus two material elements have been identified and deferred: the screen; and for one customer, a contingent obligation to reinstall the system in another location. Based on the identification of these two elements, the Company has deferred the screen system in seven of the ten installations, and the reinstallation obligation in one of the ten. This resulted in management recording an adjustment to defer revenue of $0.8 million and costs of $0.6 million resulting in gross margin impact of $0.2 million.<br><br>After the deferral of these two elements, management has concluded for the ten installations that the remaining obligations on the delivered elements are inconsequential or perfunctory, and has therefore recognized revenue on these elements. |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00098



PRICEWATERHOUSECOOPERS

IMAX-US020942

001255

Confidential

| Matter to be communicated | Auditor's response |
|---|---|
| **Significant Transactions During the Year** | The following significant transactions occurred during the year and involved the following impact on net income:<br><br>Settlement Revenue (14 transactions) $14.3 million<br>Recovery on DPI loans $ 2.0 million<br>Recovery of NIL provisions $ 0.8 million<br><br>Management's report to the Audit Committee includes further detail on the accounting for these transactions. |
| **Management judgements and accounting estimates** | In preparing the financial statements as at December 31, 2005, the following were the more significant estimates made by management:<br><br>• Allowances for uncollectibility of accounts receivable and net investment in leases<br>• Allowances for inventory obsolescence<br>• Future cash flows associated with long-lived assets and film assets, and related estimates of fair value<br>• Estimates of ultimate revenues for film assets and participation costs<br>• Fair value of goodwill<br>• Valuation allowances for uncertainty of realization of deferred income tax assets<br>• Estimates for tax exposures<br>• Estimates underlying the accounting for the Company's defined benefit pension plan<br>• Fair value of theater systems for FAS 13 lease calculations<br>• Allowances on loans receivable from Digital Projection Inc. (fully provided against)<br>• Accrued liabilities for excess space in Los Angeles office (including potential sublease income), various contingencies (including the outcome of various pending lawsuits), and various accruals at year-end, including bonuses<br><br>Management has provided the audit committee with further explanations on each estimate considered by the Company and the actual amounts recorded in the financial statements as of December 31 2005. |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00099



PRICEWATERHOUSECOOPERS

IMAX-US020943

001256

Confidential

| Matter to be communicated | Auditor's response |
|---|---|
| **Audit Adjustments** | The Company processed certain audit adjustments during our engagement. These have been noted in Appendix B. The assessment of the effect of these adjustments on the evaluation of the Company's internal control system has not yet been finalized. |
| **Other information reviewed during the Audit** | Our audit report covers only the consolidated financial statements and notes; however, we will also read the Management Discussion and Analysis (MD&A) that will be included in the 10K to ensure this information is consistent with the information appearing in the consolidated financial statements.<br><br>As part of our audit, we will also read the remaining portions of the annual report, 10K filing, the proxy circular and the Annual Information Form prior to the submissions to ensure that the information is consistent with the information appearing in the consolidated financial statements. |
| **Disagreements with management** | None noted |
| **Consultation with other accountants on accounting or auditing matters** | We are not aware of consultations with other accountants on accounting or other auditing matters. |
| **Major issues discussed with management prior to retention** | None noted |
| **Difficulties encountered in performing the audit** | Management provided us with access to all records, documents and other required information and management gave us its full cooperation throughout the year and kept us informed of important transactions and events. |
| **Internal control deficiencies**<br>*Any significant deficiencies or material weaknesses in the design or operation of internal control that came to the auditor's attention during the audit.* | Our audit work on internal controls is not yet complete as identified in the outstanding list in Appendix A. As of February 23, 2006, we have not yet received management's evaluation of deficiencies noted in its testing and management's report on its process. |
| **Fraud and illegal acts** | No illegal acts or incidents of fraud have been identified. |
| **Independence** | Our independence letter has been attached to this report under Appendix C |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00100



PRICEWATERHOUSECOOPERS

IMAX-US020944

001257

Confidential

| Matter to be communicated | Auditor's response |
|---|---|
| **Other material written communications** | |
| • Schedules of unadjusted differences | At the time of writing this report, we have no unadjusted audit differences. |
| • Disclosure Deficiencies | • Note 18g – The Company should estimate the liability on the closed end contracts, and then note that there may be amounts in addition as a small number of contracts do not have a limit, rather than saying a reasonable estimate cannot be made.<br>• Note 22 – 'Other' and 'Corporate' segments are combined in the depreciation and purchases notes and should be separately disclosed.<br>• Note 23 – Discussion of concentrations of credit risk does not disclose current concentrations of credit risk, and does not indicate any amounts for risks the customer faces.<br>• Note 14 – Disclosure should be made of the maximum available under the credit facility as at December 31, 2005.<br><br>Currently we believe that the discussions in the MD&A related to key performance indicators for systems revenue and margin need to be revised. In its discussion of the results for the year, the company refers to 'recognitions' of operating leases as having an effect on revenue and margin in the current year, and includes new operating leases in its table of system leases explaining the changes in revenue. However, operating lease revenue is recognized over the term of the lease. This discussion might imply to a reader of the MD&A that there is some sort of equivalence between the effect of sales type leases and operating leases on revenues and margin. The total increase in revenues from operating leases between 2005 and 2004 is $0.8 million, less than 1% of systems revenue. |
| • Management representation letter | The management representation letter has been attached to this report under Appendix D. |
| • Reports on observations and recommendations on internal controls | We have some observations on the internal controls tested during the 404 process. We will provide management with a report on the observations prior to its filing of Form 10-K with the regulators. |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00101



PRICEWATERHOUSECOOPERS

IMAX-US020945

001258

Confidential

**Awaiting the following information / documentation from management**

- Finalization of the bonus accrual
- Fair value analysis to support revenue recognized on 2005 lease signings
- Revised note disclosures for the following notes:
  - Discontinued operations
  - Accounting policies for multiple element arrangements
  - Litigation
  - Supplemental consolidating financial information

**Audit procedures to be completed by PwC**

- Audit procedures outstanding:
  Testing of certain manual journal entries processed during the fourth quarter
  Review of subsequent events in the post fieldwork period
  Completion of audit of 2005 tax provision
- Financial statement disclosures not yet agreed to supporting documentation:
  Tax disclosures (received 2/21)
- Third party confirmations not yet received
  5 responses to legal enquiry letters
  4 customer detail confirmations, and follow up on one confirmation
- Control procedures outstanding:
  Completion of testing of 14 controls relating to the year end close, tax processes, and budgeting process
- Finalization of partner and manager review once above procedures completed

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00104



PRICEWATERHOUSECOOPERS

IMAX-US020948

001261

Confidential

**Appendix B – List of Audit Adjustments**

The following audit adjustment was recorded by management during the course of our audit:

| | Income Overstatement (Understatement) US$ millions | Assets (Overstatement) Understatement US$ millions | Liabilities Overstatement (Understatement) US$ millions | Shareholders equity (Overstatement) Understatement US$ millions |
|---|---|---|---|---|
| Application of multiple element accounting to theatre systems revenue recognition | 0.2 | (0.8) | 0.6 | (0.2) |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00105



PRICEWATERHOUSECOOPERS

IMAX-US020949

001262

# Appendix C – Independence letter



FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00106

PRICEWATERHOUSECOOPERS

PricewaterhouseCoopers LLP
Chartered Accountants
PO Box 82
Royal Trust Tower, Suite 3000
Toronto Dominion Centre
Toronto, Ontario
Canada M5K 1G8
Telephone +1 416 863 1133
Facsimile +1 416 365 8215

February 23, 2006

To the Members of the Audit Committee of the Board of Directors of IMAX Corp.

We have been engaged to audit the consolidated financial statements of IMAX Corporation (the "Company") for the year ending December 31, 2005.

Independence Standards Board (ISB) Standard No. 1, Independence Discussions with Audit Committees, and Canadian generally accepted auditing standards, require that we communicate at least annually with you regarding all relationships between our Firm and the Company that, in our professional judgment, may reasonably be thought to bear on our independence. We have prepared the following comments to facilitate our discussion with you regarding independence matters arising since February 25, 2005, the date of our last letter.

We are not aware of any relationships between our Firm and the Company that, in our professional judgment, may reasonably be thought to bear on our independence which have occurred since February 25, 2005, the date of our last letter, through the date of this letter.

The total fees billed to the Company for audit and audit related services were US$1,620,000 and for non-audit services were US$112,000 during the period from January 1, 2005 to December 31, 2005. Appendix E to our report to the audit committee on February 23, 2006, provides an analysis of these services according to the types of services and related fiscal period.

We hereby confirm that as of the date of this letter, we are independent accountants with respect to the Company, within the meaning of the Securities Acts administered by the Securities and Exchange Commission, the requirements of the Independence Standards Board, and the Rules of Professional Conduct of the Institute of Chartered Accountants of Ontario.

This report is intended solely for the use of the Audit Committee, the Board of Directors, management, and others within the Company and should not be used for any other purposes.

We look forward to discussing with you the matters addressed in this letter as well as other matters that may be of interest to you at our upcoming meeting on March 1, 2006. We will be prepared to answer any questions you may have regarding our independence as well as other matters.

Very truly yours,

PricewaterhouseCoopers LLP

PricewaterhouseCoopers LLP

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00107

PricewaterhouseCoopers refers to the Canadian firm of PricewaterhouseCoopers LLP and the other member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity

## Appendix D – Management Representation letter

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00108



PRICEWATERHOUSECOOPERS

*Expected draft of management's representation letter*

We are providing this letter in connection with your audits of (1) the consolidated financial statements of IMAX Corporation (the "Company") as of December 31, 2005 and December 31, 2004 and for each of the three years in the period ended December 31, 2005 for the purpose of expressing an opinion as to whether such consolidated financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of IMAX Corporation in conformity with accounting principles generally accepted in the United States of America; and (2) the Company's internal control over financial reporting as of December 31, 2005 for the purpose of expressing opinions as to whether management's assessment that the Company maintained effective internal control over financial reporting is fairly stated, in all material respects, and whether the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2005, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). We confirm that we are responsible for the fair presentation in the consolidated financial statements of financial position, results of operations, and cash flows in conformity with generally accepted accounting principles, for establishing and maintaining effective internal control over financial reporting, and for performing an assessment of the effectiveness of internal control over financial reporting based on criteria established in Internal Control—Integrated Framework issued by the COSO.

Certain representations in this letter are described as being limited to those matters that are material. Items are considered material, regardless of size, if they involve an omission or misstatement of accounting information that, in the light of surrounding circumstances, makes it probable that the judgment of a reasonable person relying on the information would have been changed or influenced by the omission or misstatement.

We confirm, to the best of our knowledge and belief, as of March @@, the date of your report, the following representations made to you during your audit(s):

1. The consolidated financial statements referred to above are fairly presented in conformity with accounting principles generally accepted in the United States of America, and include all disclosures necessary for such fair presentation and disclosures otherwise required to be included therein by the laws and regulations to which the Company is subject.

2. We have made available to you all:

   a. Financial records and related data.
   b. Minutes of the meetings of stockholders, directors, and Audit or other committees of directors, and summaries of actions of recent meetings for which minutes have not yet been prepared. The most recent meetings held were: Audit Committee - @@; Board of Directors Meeting – February @@, 2006; Compensation Committee - @@; Governance Committee - @@.

FOIA CONFIDENTIAL TREATMENT REQUESTED
IX 00109

3. There have been no communications from regulatory agencies concerning noncompliance with or deficiencies in financial reporting practices in the last year, other than the comment letters from the OSC relating to the Annual Report on Form 10-K, dated March 28, 2005, May 9, 2005, June 20, 2005, and September 27, 2005

4. There are no material transactions, agreements or accounts that have not been properly recorded in the accounting records underlying the consolidated financial statements.

1. The effects of the uncorrected financial statements misstatements summarized in the accompanying schedule are immaterial, both individually and in the aggregate, to the financial statements taken as a whole.

2. We have performed an assessment of the effectiveness of the Company's internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the COSO.

3. We did not use any of your procedures performed during your audits of internal control over financial reporting or the financial statements as part of the basis for our assessment of the effectiveness of internal control over financial reporting.

4. We have concluded that the Company has maintained effective internal control over financial reporting based on criteria established in *Internal Control—Integrated Framework* issued by the COSO as of December 31, 2005.

5. We have disclosed to you all deficiencies in the design or operation of internal control over financial reporting (whether or not remediated) identified as part of our assessment of the effectiveness of internal control over financial reporting as of December 31, 2005. We have also disclosed to you which of these deficiencies we believe are significant deficiencies or material weaknesses in internal control over financial reporting.

6. The items summarized in the accompanying schedule are appropriately (1) classified as significant deficiencies or material weaknesses in internal control over financial reporting, both individually and in the aggregate; and (2) reflected as to the status of the remediation as of December 31, 2005.

7. We acknowledge our responsibility for the design and implementation of programs and controls to provide reasonable assurance that fraud is prevented and detected.

8. We have no knowledge of any fraud or suspected fraud affecting the Company involving:

   a. Senior management,
   b. Management or other employees who have significant roles in internal control over financial reporting, or
   c. Others where the fraud could have a material effect on the consolidated financial statements.

9. We have no knowledge of any allegations of fraud or suspected fraud affecting the Company received in direct communications from employees, former employees, analysts, regulators, short sellers, or others. We have no knowledge of any reasonably credible allegations of fraud

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00110

or suspected fraud affecting the entity received in other communications from employees, former employees, analysts, regulators, investors or others.

*(As to items 11, 12 and 13, we understand the term "fraud" to mean those matters described in Statement on Auditing Standards No. 99.)*

10. There have been no violations or possible violations of laws or regulations whose effects should be considered for disclosure in the consolidated financial statements or as a basis for recording a loss contingency.

11. The Company has no plans or intentions that may materially affect the carrying value or classification of assets and liabilities.

12. The following, if material, have been properly recorded or disclosed in the consolidated financial statements:

    a. Related-party transactions, including sales, purchases, loans, transfers, leasing arrangements, and guarantees, and amounts receivable from or payable to related parties. (We understand the term "related party" to include those entities described in Statement on Auditing Standards No. 45, footnote 1.)

    b. Guarantees, whether written or oral, under which the Company is contingently liable.

    c. Significant estimates and material concentrations known to management that are required to be disclosed in accordance with the AICPA's Statement of Position 94-6, *Disclosure of Certain Significant Risks and Uncertainties*. (Significant estimates are estimates at the balance sheet date that could change materially within the next year. Concentrations refer to volumes of business, revenues, available sources of supply, or markets or geographic areas for which events could occur that would significantly disrupt normal finances within the next year.)

13. The Company has satisfactory title to all owned assets, and there are no liens or encumbrances on such assets nor has any asset been pledged as collateral, except as disclosed in the consolidated financial statements.

14. The Company has complied with all aspects of contractual agreements that would have a material effect on the consolidated financial statements in the event of noncompliance.

15. Receivables recorded in the consolidated financial statements represent bona fide claims against debtors for sales or other charges arising on or before the balance sheet dates and are not subject to discount except for normal cash discounts. Receivables classified as current do not include any material amounts which are collectible after one year except as disclosed in note 4 to the consolidated financial statements. All receivables have been appropriately reduced to their estimated net realizable value.

16. Inventories recorded in the consolidated financial statements are stated at the lower of cost or market, cost being determined on an average cost basis, and due provision was made to reduce all slow-moving, obsolete, or unusable inventories to their estimated useful or scrap values.

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00111

Inventory quantities at the balance sheet dates were determined from physical counts or from the Company's perpetual inventory records, which have been adjusted on the basis of physical inventories taken by competent employees on December 15 and 16, 2005, or through direct confirmation with operators of third party warehouses. Liabilities for amounts unpaid are recorded for all items included in inventories at balance sheet dates and all quantities billed to customers at those dates are excluded from the inventory balances. from a customer site that are being stored in a third party warehouse, the Company has received confirmation from third party storage facilities concerning the existence of quantities, and the Company is satisfied as to the physical safeguarding measures in place. For systems delivered to customer sites that were not yet fully installed as of December 31, 2005, we have shipping documents evidencing arrival at client site or other destination.

17. All liabilities of the Company of which we are aware are included in the consolidated financial statements at the balance sheet dates. There are no other liabilities or gain or loss contingencies that are required to be accrued or disclosed by Financial Accounting Standards Board (FASB) Statement No. 5, *Accounting for Contingencies*, and no unasserted claims or assessments that our legal counsel has advised us are probable of assertion and required to be disclosed in accordance with that Statement.

18. The Company has appropriately reconciled its books and records (e.g., general ledger accounts) underlying the consolidated financial statements to their related supporting information (e.g., sub ledger or third-party data). All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements. There were no material unreconciled differences or material general ledger suspense account items that should have been adjusted or reclassified to another account balance. There were no material general ledger suspense account items written off to a balance sheet account, which should have been written off to an income statement account and vice versa. All consolidating entries have been properly recorded. All intracompany and intercompany accounts have been eliminated or appropriately measured and considered for disclosure in the consolidated financial statements.

19. The unaudited interim financial information has been prepared and presented in conformity with accounting principles generally accepted in the United States of America applicable to interim financial information and with Item 302(a) of Regulation S-K. The unaudited quarterly financial information for the year ended December 31, 2005 also has been prepared on a basis consistent with the corresponding interim periods in the year ended December 31, 2004 and, to the degree appropriate, with the consolidated financial statements for the years ended December 31, 2005 and December 31, 2004. The unaudited interim financial information for the three months ended December 31, 2005 and December 31, 2004 does not include any material amount of year-end adjustments that have not been disclosed or any material amounts that should have been included in earlier interim periods of the respective fiscal years.

20. We have not completed the process of evaluating the impact that will result from adopting Financial Accounting Standards Board (FASB) Statement No. 123R as discussed in Note @@ to the consolidated financial statements. The Company is therefore unable to disclose the impact that adopting FASB Statement No. 123R will have on its financial position and results of operations when such Statement is adopted.

or

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00112

We have completed the process of evaluating the impact that will result from the adoption of Financial Accounting Standards Board (FASB) Statement No. 123R as discussed in Note @@ to the consolidated financial statements. Such effects are properly disclosed in the financial statements.

21. The consolidated financial statements disclose all of the matters of which we are aware that are relevant to the Company's ability to continue as a going concern, including all significant conditions and events, mitigating factors and the Company's plans. The Company also has the intent and ability to take actions necessary to continue as a going concern. We have made available to you all relevant information on the Company's ability to continue as a going concern that could affect the consolidated financial statements, including the recoverability or classification of recorded assets or the amounts and classification of liabilities. Accordingly, the Company's consolidated financial statements are appropriately prepared on a going concern basis.

22. We assume responsibility for the findings of specialists in evaluating the pension cost and obligation associate with the defined benefit pension plan, and the fair values of stock options determined under the modified binomial model and have adequately considered the qualifications of the specialists in determining the amounts and disclosures used in the consolidated financial statements and underlying accounting records. We did not give nor cause any instructions to be given to specialists with respect to the values or amounts derived in an attempt to bias their work, and we are not otherwise aware of any matters that have had an impact on the objectivity of the specialists.

23. All material costs that have been deferred to future periods meet the definition of an asset as defined in the Statement of Financial Accounting Concepts No. 6, Elements of Financial Statements and are realizable.

24. All cash and bank accounts and all other properties and assets of the Company of which we are aware are included in the consolidated financial statements at December 31, 2005 and December 31, 2004.

25. Arrangements with financial institutions involving compensating balances or other arrangements involving restrictions on cash balances, line of credit, or similar arrangements have been properly disclosed

26. Provisions have been made for losses to be sustained in the fulfillment of, or from inability to fulfill, any sales commitments. Provisions have been made for losses to be sustained as a result of purchase commitments for inventory quantities in excess of normal requirements or at prices in excess of prevailing market prices.

27. The Company has adopted and applied the relevant provisions of FASB Interpretation No. 46 (FIN 46), Consolidation of Variable Interest Entities or FASB Interpretation No. 46R (revised December 2003) (FIN 46R), Consolidation of Variable Interest Entities, and related FASB Staff Positions (FSPs) for all variable interest entities (VIEs) in accordance with the effective dates in paragraphs 29-31 of FIN 46R and paragraph 27 of FIN 46. The Company has properly:

a. Identified variable interest(s) currently held in entities and determined whether the entity is a variable interest entity. In making this assessment, management considered whether any reconsideration events occurred.

b. Consolidated the VIEs for which the Company is the primary beneficiary. Additionally, management considered whether any reconsideration events occurred. In making its assessment, management considered related party and defacto agency relationships.

c. Complied with the disclosures requirements of FIN 46 or FIN 46R regarding VIEs that are not consolidated by the Company, but which the Company holds a significant variable interest.

28. The company has appropriately evaluated the criteria in paragraph 4h(1)-4h(4) of FASB Interpretation No. 46 (revised December 2003), Consolidation of Variable Interest Entities (FIN 46R) when assessing that Digital Projection Inc qualifies for the business scope exception and does not need to be evaluated pursuant to the requirements of FIN 46R.

29. All borrowings and financial obligations of the Company of which we are aware are included in the consolidated financial statements at December 31, 2005 and December 31, 2004, as appropriate. We have fully disclosed to you all borrowing arrangements of which we are aware.

30. The Company has not violated any covenants on its Senior Notes due 2010 or its line of credit from Congress Financial during any of the periods reported. We have fully disclosed to you all covenants and information related to how we determined our compliance with the terms of the covenants.

31. The Company reviewed the classification of the gain on extinguishment of debt, recognized in the current period and for all periods presented in the consolidated financial statements, in accordance with FAS 145, *Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections*. The Company has not classified a gain of $8.3 million related to the extinguishment of debt as an extraordinary item because that gain does not meet the criteria in APB 30, *Reporting the Results of Operations - Reporting the Effects of Disposal of a Segment of a Business, and Extraordinary, Unusual and Infrequently Occurring Events and Transactions*, for classification as an extraordinary item.

32. The Company has appropriately accounted for and disclosed the impact of all contracts entered into for the existence of financial guarantees pursuant to FIN 45, Guarantor's *Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others*. We have fully disclosed to you all such guarantees.

33. We have adopted FASB Statement No. 133, *Accounting for Derivative Instruments and Hedging Activities as amended by FASB Statement No. 138 and FASB Statement No. 149 and interpreted by Derivatives Implementation Group issues (together, "FAS 133")* as of January 1, 2001.

a. The methods and significant assumptions used to determine the fair values of financial instruments and commodity derivatives are as follows: the estimated fair value of the Senior Notes and long-term receivables is estimated based on current market rates. The methods

FOIA CONFIDENTIAL TREATMENT REQUESTED
IX 00114

and significant assumptions used result in a measure of fair value appropriate for financial statement measurement and disclosure purposes in accordance with FAS 133.

b. We have adequately disclosed each significant concentration of credit risk arising from all financial instruments whether from an individual counterparty or groups of counterparties in accordance with FASB Statement No. 107, *Disclosures about Fair Value of Financial Instruments*, as amended by FAS 133.

c. We have evaluated the contracts into which we have entered to determine whether any such contracts are in effect hybrid instruments that contain embedded derivative instruments. We have determined that we do not have any contracts which contain embedded derivative instruments.

34. The Company has reviewed tangible long-lived assets, operating lease agreements that contain return provisions that require the leased assets to be returned in the same condition that existed at lease inception (i.e., the agreement requires the removal of any leasehold improvements at the end of the lease term) and other agreements for associated asset retirement obligations (AROs), and have recognized related liabilities where required, in accordance with FASB Statement No. 143, *Accounting for Asset Retirement Obligations*. The methods and assumptions used to measure the fair value of recorded AROs are appropriate and reasonable under the circumstances and utilize the best available information.

35. Capital stock repurchase options or agreements or capital stock reserved for options, warrants, conversions, or other requirements have been properly disclosed.

36. The listings provided to you of stock-based compensation awards granted, exercised, cancelled, and forfeited during the reporting period are complete and accurate.

37. All the pertinent rights and privileges of the Company's outstanding equity securities have been properly disclosed. Transactions that occurred after December 31, 2005, but before March @@, 2006, that would have materially changed the number of common shares or potential common shares outstanding at the end of the period if the transaction had occurred prior to the end of the period have been properly disclosed.

38. We have reviewed long-lived assets to be held and used or to be disposed of by sale for impairment in accordance with FASB Statement No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets, whenever events or changes in circumstances have indicated that the carrying amount of assets might not be recoverable, and have appropriately recorded the adjustment.

We also have reviewed goodwill and indefinite-lived intangibles for impairment in accordance with FASB Statement No. 142, *Goodwill and Other Intangible Assets*, and have appropriately recorded adjustments to the carrying value of these assets based on the results of the impairment tests.

39. The Company has concluded that the Miami Theater LLC is a component of the entity with operations and cash flows that can be clearly distinguished, operationally and for financial reporting purposes from the rest of the entity, as required by FASB Statement No. 144,

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00115

*Accounting for the Impairment or Disposal of Long-Lived Assets*. The component has been disposed of in a transaction that has eliminated the component's operations and cash flows from the Company's ongoing operations, and the Company does not have any significant continuing involvement in the operations of the component following the disposal.

40. Changes in lease provisions, including renewals or extensions of the terms of the lease have been evaluated by the Company based on FAS 13, *Accounting for Leases*, par. 9, in order to determine whether the change gives rise to a new lease with a classification different from the previous classification.

41. The actuarial assumptions and methods used to measure liabilities and costs for financial accounting purposes for pension and other postretirement benefits are appropriate in the circumstances. The discount rate assumptions used in the actuarial valuation of our pension benefit obligations were determined using an acceptable methodology developed on a consistent basis and taking into account the individual characteristics of each plan, such as projected cash flow patterns and payment durations.

42. The Company is continuing to execute its restructuring plan. The consolidated financial statements include a restructuring accrual for exit costs in respect of the LA facility of $1.9 million, and involuntary termination benefits totaling $0.1 million at December 31, 2005. The Company has evaluated this accrual and determined that it is not excessive. The accruals and all significant changes, if any, from the original restructuring plan have been properly recognized, classified and disclosed in accordance with EITF 94-3, *Liability Recognition for Certain Employee Termination Benefits and Other Costs to Exit an Activity (Including Certain Costs Incurred in a Restructuring)* and SAB 100, *Restructuring and Impairment Charges*.

43. The Company has identified all nonmonetary transactions and has applied the relevant provisions of APB 29, *Accounting for Nonmonetary Transactions*, as amended by FAS 153.

44. We have reviewed the criteria for revenue recognition included in SAB 104, namely, evidence of arrangement, delivery, fixed price and collectibility are recognizing revenue in accordance with SAB 104.

45. The Company has identified all revenue arrangements involving multiple deliverables and adopted and applied the relevant provisions of EITF 00-21, *Accounting for Revenue Arrangements with Multiple Deliverables*, as of December 31, 2005 for applicable arrangements that are within the scope of EITF 00-21.

46. The Company has fully disclosed to you separate arrangements with the same entity or related parties that are entered into at or near the same time.

47. For revenue arrangements involving multiple deliverables that are within the scope of EITF 00-21, the Company has properly:

- Considered whether a deliverable(s) in an arrangement is within the scope of other existing higher-level authoritative literature and applied such literature to the extent that it provides guidance regarding whether and/or how to separate multiple-

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00116

deliverable arrangements and how to allocate value among those separate units of accounting.

- Determined whether revenue arrangements with multiple deliverables consist of more than one unit of accounting at inception of the arrangement and as each item in the arrangement is delivered.
- The Company has properly allocated non-contingent consideration to the delivered item(s) based on the aggregate fair value of the undelivered item(s) because objective and reliable evidence of fair value for all units of accounting in the arrangement is not available.

48. Pursuant to paragraphs 10-15 of FASB Statement No. 131 (FAS 131), Disclosures about Segments of an Enterprise and Related Information, including the operating results regularly reviewed by the Chief Operating Decision Makers, the Co-CEOs, management has identified following operatung segments: IMAX systems, films, individual owned and operated theatres, and Other.

49. Management has evaluated the economic characteristics and aggregation criteria of each segment and determined that the owned and operated theaters exhibit similarities in all areas noted pursuant to paragraph 17 of FAS 131, *Disclosures about Segments of an Enterprise and Related Information,* and are appropriately aggregated pursuant to that paragraph..

50. The consolidated financial statements disclose all the relevant factors used to identify the Company's reportable segments, including whether operating segments have been aggregated.

51. The Company has appropriately considered EITF 04-10 *Determining Whether to Aggregate Operating Segments That Do Not Meet the Quantitative Thresholds* with the aggregation of the owned and operated theatres. EITF 04-10 addresses issues surrounding the aggregation criteria in paragraph 17 of Statement 131 when determining whether operating segments that do not meet the quantitative thresholds may be aggregated in accordance with paragraph 19 of Statement 131.

52. The deferred tax asset valuation allowance has been determined pursuant to the provisions of FASB Statement No. 109, *Accounting for Income Taxes,* and based on the weight of the available evidence is adequate to reduce the total deferred tax asset to an amount that will, more likely than not, be realized.

53. The Company has appropriately reconciled its deferred tax asset and deferred tax liability books and records underlying the consolidated financial statements to their related supporting information. All related reconciling items considered to be material were identified and included on the reconciliations and were appropriately adjusted in the consolidated financial statements

54. The method used to determine our liabilities for potential assessments from taxing authorities has been applied on a basis consistent with that of the prior year and the resulting liabilities are supported by specifically identified income tax exposures. In cases where it is only reasonably possible that a loss has been incurred, or the amount of loss cannot be reasonably estimated, appropriate disclosures have been provided.

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00117

55. Changes to the liabilities for specific income tax exposures were recognized in the appropriate period, including the appropriate interim period, to which they relate and all individually significant changes to such liabilities have been properly disclosed in the consolidated financial statements, even if the net amount of all such changes was insignificant.

56. We have provided you with all information related to all significant income tax uncertainties of which we are aware. We have also provided you with access to all opinions and analyses that relate to positions we have taken in regard to significant income tax matters.

57. We have informed you of all customer negotiations that we are aware of that have occurred or are currently in process through to the date of this letter that may have a material impact on the net investment in lease valuations; we confirm that the sales and leasing projection equipment contracts that you requested and were provided to you are complete; we also confirm no side letters have been issued by the Company in connection with its sales and lease agreements. We confirm that for all installations recognized as revenue in the period, that as of December 31, 2005, installation is complete, meeting full working standards according to the contract provisions and system specifications, that all substantial issues which were raised by the client and which IMAX acknowledges have been resolved to the satisfaction of both parties, except where standards or issues relate to elements of the contract which have been accounted for separately using multiple element arrangement guidance.

58. Settlements/Terminations: we represent that all settlements and terminations of lease agreements and intents to lease have appropriately been recognized into revenue in the quarter. We have based this on our assessment of the probability that there will be no ongoing obligation owing to these terminated customers in the future.

59. Accounts receivable recorded in the consolidated financial statements represent bona fide claims against debtors for sales, lease transactions or other charges arising on or before the balance sheet dates and are not subject to discount except for normal cash discounts. All accounts receivable amounts have been appropriately reduced to their estimated net realizable value. Included within the financing receivables balance are long-term receivables, which have been discounted to arrive at the estimated fair value of the receivable balance at December 31, 2005. All the estimates used to develop the allowance as of December 31, 2005 and 2004 have been updated with current information through the date of this letter.

60. The net investment in leases at the period end represents only the minimum lease payments due under sales-type leases on systems that have been recognized in revenue under the Company's revenue recognition policy for sales type leases. We have reviewed the net investment in leases for impairment, applied a systematic methodology for measuring and documenting lease losses and made appropriate allowances thereon if necessary, in accordance with FASB Statement No. 13, *Accounting for Leases* and FASB Statement No. 5, *Accounting for Contingencies.* We have measured impaired leases based upon either (1) the present value of expected future cash flows from the lease discounted at the Company's borrowing rate if the theatre is not expected to close in the near future, or (2) the fair value of the underlying lease collateral if it was expected that the system would be returned to the Company in the near future. When determining the fair value of the underlying collateral the Company considered the age of the system, the projector model and the ability to redeploy the refurbished system back into the theatre network. The allowance for lease losses encompasses estimated probable losses related to specifically-

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00118

identified leases and we have considered all negotiations and potential collection issues with theatre operators. All the estimates used to develop the allowance as of December 31, 2005 have been updated with current information through the date of this letter.

61. The Company is amortizing its film assets using the individual-film-forecast method as prescribed by AICPA Statement of Position 00-2, *Accounting by Producers or Distributors of Films*. We have developed estimates of ultimate revenues for each of the films based upon information available through to the date of this letter and have used this information to calculate the amortization for the year. The estimates of ultimate revenues were also used in the discounted cash flow models developed for each film asset to determine the fair value of the film as of December 31, 2005. The discounted cash flow models have been updated for information available through the date of this letter and when the estimated fair value is less than the net book value of the film, we have appropriately written down the asset value.

62. Magnificent Desolation, Harry Potter 4, Polar Express, NASCAR and Space Station films: we represent that the estimates of ultimate revenues are the best estimates of the anticipated net future revenues for the film based on the information that we have available at the current time; we have prepared these Ultimates using a methodology which is consistent with that used to prepare Ultimates in the past; we have informed you of all negotiations of arrangements that we are aware of that have occurred or are currently in progress through to the date of this letter that may have a material impact on the accounting for the film revenues and associated costs;

63. For a sales-type lease or a direct sale, we have consistently recognized revenue when: persuasive evidence of an arrangement exists (signed lease agreement); the price is fixed or determinable; for sales-type leases, the lease term commences; for sales transactions, title passes; collection is reasonably assured; and installation of the system is complete. As criteria for completion of installation, the Company requires the following to be complete: the technology department had confirmed that the installation has been completed in accordance with the terms of the contract; significant issues raised by the customer, that Imax management is in agreement with, have been satisfactorily resolved; and the installed system complies with all the material terms of the contract.

64. For operating leases, minimum lease payments are recognized as revenue on a straight-line basis over the lease term. Additional rentals in excess of the minimum lease payments are recognized as revenue when the theater operator reports to the Company that the additional rents are owing and collection is believed to be reasonably assured.

65. When the Company and a lessee agree to change the provisions of a lease (other than renewing the lease or extending its term), we evaluate whether the new arrangement would be classified as a sales-type lease or an operating lease under FAS 13. For all amendments that have been agreed to between the Company and its lessees during the year, we have appropriately considered the accounting and disclosure impact of the new terms in accordance with FAS 13.

66. Revenue from licensing of films is recognized when a licensing arrangement exists, the film is complete and has been delivered, the license period has begun, the fee is fixed or determinable and collection is believed to be reasonably assured. Where the license fees are based on a share of the customer's revenue, the Company recognizes revenue as the customer exhibits the film, assuming that all the other revenue criteria under SAB 101 are met.

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00119

67. The amounts recorded in the supplemental consolidating financial information reflect: the parent Company's balance sheet, statement of operations and cash flows, including subsidiaries accounted for using the equity method; the combined balance sheets, statements of operations and cash flows of subsidiaries guaranteeing the subsidiaries debt; the combined balance sheets, statements of operations and cash flows of subsidiaries not guaranteeing the subsidiaries debt; and eliminating entries to arrive at the consolidated figures.

To the best of our knowledge and belief, there were no (1) events that have occurred subsequent to the balance sheet date and through the date of this letter that would require adjustment to or disclosure in the aforementioned consolidated financial statements; and (2) changes in internal control over financial reporting or other factors that might significantly affect internal control over financial reporting, including any corrective actions taken by us with regard to significant deficiencies and material weaknesses, that have occurred subsequent to December 31, 2005 and through the date of this letter.

Signed by co-CEOs, CFO and Controller

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00120



Confidential IMAX-US020964

Confidential

Appendix E - Fees

**Fees – total amounts billed in 2005 related to the following audit periods**

| | Fees relating to F'2005 (US$'000) | Fees relating to F'2004 (US$'000) |
|---|---|---|
| *Audit services:* | | |
| *Integrated Audit and quarterly reviews* | 824 | 728 |
| ***Total audit services:*** | 824 | 728 |
| *Audit-related services:* | | |
| *Pension and benefit plans* | 21 | - |
| *Consultations* | 24 | 23 |
| ***Total audit-related services fees:*** | 51 | 23 |
| | | |
| ***Total tax services:*** | 112 | - |
| | | |
| ***TOTAL*** | 987 | 751 |

FOIA CONFIDENTIAL
TREATMENT REQUESTED
IX 00121



PRICEWATERHOUSECOOPERS

IMAX-US020965

001278

# EXHIBIT U-24

This is Exhibit "U-24" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

CONFIDENTIAL

DRAFT 2 - March 7, 2006

Proposed Media Strategy

- Conduct regular earning interviews after the call (Sloane/Al to pitch):
  - Dow Jones – Andy Georgiades
  - Reuters – Susan Taylor
  - AP – Colin McClellan
  - Bloomberg – Amy P. (?)
  - Street.com – Sandy Brown
  - NYT – ?
  - Daily News – Greg Fernandez
  - LA Times – ?
  - Variety (maybe follow up with Peter Debruge)
  - Hollywood Reporter (cover during ShoWest?)

Messaging

- This is the right time to take the next step forward in our evolution as a brand and as a company, to accelerate our growth and realize the full potential IMAX to exhibitors, studios, and moviegoers around the world.
  - We have put all of the pieces in place and successfully made IMAX an integral part of the release platform for major Hollywood films
  - Our 2005 financial results demonstrate the success of these strategies.
- We have recently received several inquiries, and we think this preliminary interest shows that there is awareness of the strength and attractive qualities of the IMAX business.
  - A partner, either strategic, financial or both, makes tremendous sense at this time and could help take IMAX to the next level in any number of ways…including providing additional capital to accelerate our attractive joint venture strategy, helping us develop new technologies, and adding to our marketing reach.
  - We could, of course, continue to as a public company, and our current business momentum is evidence of our capabilities. If we don't achieve sufficient consideration for our shareholders, that may still be our path.
  - [We believe IMAX will reach its full potential sooner and with more certainty without the limitations and short term benchmarks that accompany navigating the public markets. WHIT- thoughts on this?]
- You can never predict the outcome of any M&A activity, but we believe our 2005 results and strong 2006 film slate are good indicators of IMAX's momentum and continued growth potential.
- Given IMAX's unique brand and product, we believe there are numerous potential partners that could make sense – we've cast as wide a net as possible [RESTATE?]

# EXHIBIT U-25

This is Exhibit "U-25" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

001280

Rafa· Rybski <r.rybski@cinema-city.pl> on 05/10/2006 04:48:57 AM

To: "Ilidio Coito" <icoito@imax.com>
cc:

Subject: Lodz

[IMAGE]

Ilidio hello,

I was watching screenings in Lodzand in my opinion screen sheet is in a horrible condition. I do not know what John reported to You, but as a client I can not accept this installation.

Regards,

---

Rafal Rybski

Director of Operations

[IMAGE]

Cinema City Poland Sp. z o.o.

UL Powsinska 31

02 -- 903 Warszawa

tel: +48 22 550 39 90 / 99

fax: +48 22 550 39 84

Niniejsza informacja przeslana droga elektroniczna (e-mail) jest skierowana jedynie do jej adresata. E-mail ten i/lub jego zalaczniki moze zawierac informacje poufne lub/i tajne. Jezeli otrzymaliscie Panstwo niniejszy e-mail przez pomylke, prosimy o poinformowanie o tym jego nadawcy, skasowanie wszystkich kopii elektronicznych oraz zniszczenie ewentualnych wydrukow. Dziekujemy.

---

007160

# EXHIBIT U-26

This is Exhibit "U-26" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

**From:** Kathryn A Gamble
**Sent;** Wednesday, May 17, 2006 3:11:02 PM
**To:** Edward MacNeil
**CC:** Marnie Hamilton; Frank Joyce
**Subject:** Re: System Recognition - Silver Screen issues

**Attachments:** Doc Link.htm

yes--agreed ---Marnie gives me evidence when it is installed.

Marnie--please forewarn if circumstances around the install other than the screen are not perfect.

Thanks

Edward MacNeil
05/17/2006 02:38 PM

To: Kathryn A Gamble/CAN/Imax@Imax
cc: Frank Joyce/CAN/Imax@Imax, Marnie Hamilton/Imax@Imax
Subject: Re: System Recognitions - Silver Screen issues

As long as that's the only thing that is outstanding I don't think it will be an issue. You'll have to remember to properly value and remove it from Revenue for future recognition and to make certain that its properly documented when it comes time to document the installation.

Ed..

Kathryn A Gamble
05/17/2006 02:32 PM

To: Edward MacNeil/Imax@Imax
cc: Frank Joyce/CAN/Imax@Imax, Marnie Hamilton/Imax@Imax
Subject: Re: System Recognitions - Silver Screen issues

I don't think we have a problem with PWC --if the screen is carved out the overall revenue recognition --and delivered close to client at offsite warehouse.

Do you agree?

----- Forwarded by Kathryn A Gamble/CAN/Imax on 05/17/2006 02:23 PM -----

Marnie Hamilton
05/17/2006 12:52 PM

To: Kathryn A Gamble/CAN/Imax@Imax, Edward MacNeil/Imax@Imax

cc:
Subject: Re: System Recognitions - Silver Screen issues

Kathryn...I think Frank is saying that the warehouse is okay...please confirm

Ed...FYI

Thanks
Marnie

----- Forwarded by Marnie Hamilton/Imax on 05/17/2006 12:44 PM -----

Frank Joyce
05/17/2006 12:40 PM

To: Marnie Hamilton/Imax@Imax
cc:
Subject: Re: System Recognitions - Silver Screen issues

We don't want to damage the screen so we should store it as you mention.
Kathryn or Ed should run by PWC but I think it should be similar to year end
Frank

From: Marnie Hamilton
Sent: 05/17/2006 12:41 PM
To: Frank Joyce; Kathryn Gamble
Subject: System Recognitions - Silver Screen issues

Frank/Kathryn...

The project management department needs clarification of the silver screen delivery status at time of recognition. ie...Colleyville is being installed for June 30th, however, the silver screen will not be raised as the building is not clean enough etc. A white sheet will be installed for testing of performance and we will not recognize the screen system portion of the contract. The silver sheet requires air conditioning as it will be extemely hot in Texas in July and we want to put this sheet in a climate controlled warehouse as close to the theatre as possible for the 3-4 weeks between installation and raising of the silver sheet.

I know that you were anxious to have all silver sheets on site in Q4 (prior to deducting the screen system revenue), however is this still a requirement if we are deducting the screen system revenue as long as we have delivered the screen to a warehouse (the contract is FOB our docks).

Please advise...

Thanks in advance

Marnie

<<...>>

# EXHIBIT U-27

06/02/2006 09:18 AM

To: Edward MacNeil/Imax@Imax
cc: Jim Athanasopoulos/Imax@Imax, Mark Welton/Imax@Imax, Marnie Hamilton/Imax@Imax
Subject: RE: Settlements

Correct on the settlement revenue being a margin % of contract value.

I don't think this is a flaw in the model, since, as you guys can confirm, our settlement margins in recent years have been very high (often close to pure margin). (Helped, just a bit, by $15MM from UCI with no COGS!)

Can you guys calculate a back-of-the-envelope average contract value from '01-'05?

Edward MacNeil
06/02/2006 09:20 AM

To: Rob Lister/Imax@Imax
cc: Jim Athanasopoulos/Imax@Imax, Mark Welton/Imax@Imax, Marnie Hamilton/Imax@Imax
Subject: RE: Settlements

You'll also have to multiply by the % of expected settlement revenue/margin (ie. settlement revenue or margin divided by total original contract revenue/margin) otherwise you are assuming that 9.5% of full contract value of signings in a given year is settlement revenue. Also, I believe that in the model we just assume that whatever signs, ultimately installs. I'm not close enough to the model to fully understand that but I wouls assume that's the way it was built.
Ed..

Rob Lister
06/01/2006 09:18 PM

To: Jim Athanasopoulos/Imax@Imax
cc: Edward MacNeil/Imax@Imax, Mark Welton/Imax@Imax, Marnie Hamilton/Imax@Imax
Subject: RE: Settlements

Guys:

If you look at those contracts from 2001 - 2005, 9.5% of them ended up as settlements, right?

Well, then can we calculate what the average contract value is per system for all systems signed from '01 - '05? If we get that number and then (a) multiply it by the projected number of signings in the 5-year forecast on an

annualized basis, and (b) multiply that annualized contract value number by 0.095, then we should get our run-rate of settlement revenue, shouldn't we?

-R

Jim Athanasopoulos
05/30/2006 11:27 AM

To: Mark Welton/Imax@Imax
cc: Edward MacNeil/Imax@Imax, Marnie Hamilton/Imax@Imax, Rob Lister/Imax@Imax
Subject: RE: Settlements

Mark -

If you could take a look at the enclosed - the first enclosure is an anaysis of signings going back to 1994 and what happened to these signings (installed/delivered or not installed/delivered).

The second analysis looks at the installation/delivery margin we booked each year going back to 2000 and compares it to the settlement/swap out/termination margin we booked in each resective year.

I've pulled them together based on the info Marnie/Ed has provided I was wondering if anything jumps out at you as being incorrect/incomplete or not considered.

The third analysiss we are working on is a comparison of settlement/swap out/terminationg margin we booked each year since 2000 to what we would have booked in margin if these signings actually installed.

----- Forwarded by Jim Athanasopoulos/Imax on 05/30/2006 11:22 AM -----

<<...>> <<...>> <<...>>

# EXHIBIT U-28

This is Exhibit "U-28" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

**Huang Ke**
06/21/2006 04:47 AM

To: Richard Wooland/Imax@Imax, Marnie Hamilton/Imax@Imax, Kathryn A Gamble/CAN/Imax@Imax
cc: Dolly X Shao/Imax@Imax, Jessie Chou/Imax@Imax, Julie Sibley/Imax@Imax, Karl Yuan/Imax@Imax, Karen Dinsmore/Imax@Imax, Don Savant/Imax@Imax
Subject: Re: China National Film Museum opening date?

This theatre is an unusual case. Unlike other theatres, it officially opened in a big rush on Dec. 29, 2005 to serve the political purpose of celebrating 100 years of China film industry, and then shut down for a couple of months to complete construction. However, during the shut down period, the museum still opens to receive political groups and hosts political events, and our theatre is their showcase. For example, from June 11 to 21, they received over 10,000 people in groups organized by Ministry of Radio, TV & Film. The minister has given instruction to the museum to open museum only to pre-booked groups from now, and eventually to every individual of the public on regular hours in July.
Today, I talked to the museum director again and he is still unable to give me an exact date when the museum opens to individuals on regular hours.
I explained the situation in my previous email dated May 31 with a press coverage on the opening of Dec. 29, 2005, of which Marnie should have a copy. The iron fact is **The Museum and its IMAX Theatre officially opened on Dec. 29, 2005.**
**Marnie, please tell why we don't consider this theatre as an opened one.**
Thx, hk

Richard Wooland

**Richard Wooland**
06/20/2006 02:04 PM

To: Jessie Chou/Imax@Imax, Huang Ke/Imax@Imax
cc: Karl Yuan/Imax@Imax, Dolly X Shao/Imax@Imax, Julie Sibley/Imax@Imax
Subject: China National Film Museum opening date?

Marnie and Kathryn are most anxious to know the exact day the museum will open. ("July" isn't good enough)
Would you please advise us on the latest information, thanking you in advance.

RichardW

# EXHIBIT U-29

This is Exhibit "U-29" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

## Question 10: General Chronology*

| Date | Event |
|---|---|
| January or February 2005 | IMAX Corporation ("IMAX") contacts several investment banks to discuss possible strategic transactions with third parties. IMAX provides financial and other data to some of the investment banks and requests that the banks prepare proposals and analyses for management. |
| February 2005 | UBS Securities LLC ("UBS") presents to IMAX management its M&A practice, discusses IMAX, potential interested parties, preliminary valuation and the sales process. See IMAX Corporation Discussion Materials (UBS, February 2005), [Tab 1] which is being produced by IMAX with this chronology. |
| March 2005 | Allen & Company LLC ("Allen") presents to IMAX management regarding hypothetical transaction structures, includes various analyses. See Return Summary (Allen, March 2, 2005), [Tab 2], which is being produced by IMAX with this chronology. |
| April 13, 2005 | UBS and Allen (collectively, the "Advisers") present to the IMAX Board of Directors an overview of a potential strategic transaction. See Project Indigo Presentation to the Board of Directors (Allen, April 13, 2005), [Tab 3], which is being produced by IMAX with this chronology. The IMAX Board of Directors then authorizes IMAX to enter into retention agreements with the Advisers. See July 13, 2005 and July 18, 2005 entries below. |
| April 2005 | The Advisers prepare the Project Indigo Organizational Materials, including sample due diligence and data room lists, proposed timeline and contact lists. See Project Indigo Organization Materials (April 2005), [Tab 4], which is being produced by IMAX with this chronology. |
| May 19 to July 7, 2005 | The Advisers initiate meetings (attending by the Advisers and sometimes by IMAX) with three studios -- Fox, Sony (who later brings in Providence Equity) and Warner Bros -- to discuss a range of possible strategic transactions with IMAX, including the sale of IMAX to a studio and a joint venture with a studio. For specific dates, see p. 5 of 13 in the Project Indigo Board Discussion Materials (UBS & Allen, February 23, 2006), [Tab 5], which is being produced by IMAX with this chronology. |

* This chronology represents IMAX's reconstruction of events for the time period January 2005 through September 1, 2006, as requested by the Ontario Securities Commission, prepared in the available time. Where dates are reflected, those dates are approximate dates. In certain instances, to maximize accuracy, IMAX refers the OSC to the relevant Document reflecting the event indicated in the chronology. Should IMAX determine that any of the items reflected in this chronology are inaccurate, it will correct the chronology.

Confidential

| Date | Event |
|---|---|
| July 13, 2005 | IMAX executes a formal engagement letter (synonymous with "retention agreement" in the April 13, 2005 entry above) with UBS. See Executed Engagement Letter (UBS & IMAX, July 13, 2005), [Tab 6], which is being produced by IMAX with this chronology. |
| July 18, 2005 | IMAX executes a formal engagement letter (synonymous with "retention agreement" in the April 13, 2005 entry above) with Allen. See Executed Engagement Letter (UBS & Allen, July 18, 2005), [Tab 7], which is being produced by IMAX with this chronology. |
| Second half of 2005 | Ronald O. Perelman ("Perelman") approaches IMAX with an unsolicited expression of interest in possibly acquiring IMAX through entities owned or controlled by him. Discussions take place between IMAX and Perelman's representatives and IMAX presents a business model to Perelman. |
| Late Summer and Early Fall 2005 | Informal discussions with Sony / Providence Equity and Warner Bros continue, but interest in a strategic transaction is insignificant. IMAX management decides to suspend discussion of a strategic transaction until a later date. |
| Fall 2005 | Allen arranges informal discussions between IMAX and Liberty Media, a holding company interested in purchasing IMAX but preliminary discussions do not advance. |
| Fall and Winter 2005 through early 2006 | The Advisers and IMAX prepare and revise drafts of a Confidential Information Memorandum ("CIM") for potential use should IMAX decide to pursue possible strategic alternatives. |
| February 2006 | The Managing Principal of Quadrangle Group LLC ("Quadrangle") approaches IMAX with an unsolicited expression of interest in possibly acquiring IMAX. |
| February 2006 | Goldman Sachs makes an unsolicited inquiry of IMAX regarding whether IMAX would be interested in effecting a going-private transaction. |
| February 2006 | Jeffries & Co.'s Vice Chairman makes an unsolicited inquiry of IMAX regarding whether IMAX would be interested in a potential acquisition by Time Warner, Inc. |
| February 23, 2006 | At the request of IMAX, the Advisers present to the IMAX Board of Directors an overview of the process for the public sale of IMAX. See Project Indigo Board Discussion Materials (UBS & Allen, February 23, 2006), [Tab 5], which is being produced by IMAX with this chronology. |

| Date | Event |
|---|---|
| February and March 2006 | Starbucks Corporation ("Starbucks") approaches IMAX with an unsolicited expression of interest in possibly acquiring IMAX. IMAX and Starbucks sign a confidentiality agreement and then IMAX management holds several discussions with Starbucks management, but Starbucks decides not to consummate a purchase at that time. |
| February and March 2006 | The Advisers and IMAX management take preparatory steps for a possible public auction process, including preparing a long-range financial model, a form of confidentiality agreement and bid procedures and processes, and assembling data room materials. |
| March 8, 2006 | The IMAX Board of Directors formally authorizes IMAX's retention of the Advisers to explore possible strategic alternatives, including the public sale of IMAX. No new retention agreements are executed. See the April 13, 2005 entry above. |
| March 9, 2006 | IMAX publicly announces, "the Company announced its Board of Directors has decided to begin a process to explore strategic alternatives to enhance shareholder value, including, but not limited to, the sale or merger of the business." See Press Release (March 9, 2006) at www.imax.com. |
| March through early April 2006 | The Advisers and IMAX management continue assembling data room materials. |
| March and April, 2006 | The Advisers contact interested parties, distribute the Confidential Executive Summary ("CES"), distribute and negotiate confidentiality agreements ("CA's"), and distribute the CIM:<br>114 parties contacted by Advisers;<br>81 CES's sent out;<br>64 CA's sent out; and<br>36 executed CA's received and CIM's subsequently sent out.<br>See Project Indigo Summary of Initial Indications (UBS & Allen, April 28, 2006), [Tab 8], which is being produced by IMAX with this chronology. |
| April 11, 2006 | The IMAX Board of Directors is presented with lists of entities that had been contacted, entities that entered into CA's and entities that declined interest, and a timetable for the receipt of expressions of interest. |
| April 12, 2006 | The Advisers distribute the Phase I process letter (instructions on how to submit initial indications of interest) to interested parties. |

| Date | Event |
|---|---|
| April 25-28, 2006 | The Advisers receive twelve initial indications of interest from interested parties. See April 28, 2006 entry below. |
| April 28, 2006 | Advisers send a Summary of Initial Indications and Copies of Preliminary Indications to IMAX management with an overview of the twelve initial indications of interest and hold a conference call with management to discuss these. See Project Indigo Summary of Initial Indications (UBS & Allen, April 28, 2006), [Tab 8], Copies of Preliminary Indications (April 25-28, 2006), [Tab 9], and Letter (unsigned) from ABRY Partners to Allen and UBS (April 27, 2006), [Tab 10], which are being produced by IMAX with this chronology. |
| May 8, 2006 | The Advisers distribute the Phase II process letter (explaining the bid process and how to access the data room) to interested parties, along with a DataSite User Guide and a DataSite Account Activation Form to access the data room. |
| May 11, 2006 | The IMAX Board of Directors establishes a Special Committee to consider any potential transaction. |
| May 10 – May 24, 2006 | IMAX management gives presentations to ten entities that submitted initial indications of interest. |
| May 18 thru June 2006 | The entities that submitted initial indications of interest access the data room. The Advisers coordinate unique data requests with IMAX. See Project Indigo—Data Room Summary (UBS), [Tab 11], which is being produced by IMAX with this chronology. |
| June 29, 2006 | Elevation Partners and Francisco Partners submit written Round Two (synonymous with "Phase 2") Proposals and Veritas Capital submits a "Verbal Indication." See Project Indigo Summary of Round 2 Indications (UBS & Allen, June 2006), [Tab 12], Letter from Elevation Partners to Allen and UBS (June 29, 2006), [Tab 13], and Letter from Francisco Partners to IMAX board, Allen and UBS (June 29, 2006), [Tab 14], which are being produced by IMAX with this chronology. |
| June 30, 2006 | The Advisers update the IMAX Board of Directors on the process of exploring strategic alternatives. See June 29, 2006 entry. |
| June 30 – July 31, 2006 | The Advisers coordinate data requests from Francisco Partners and Elevation Partners with IMAX management. Diligence sessions, Document exchanges and ongoing discussions take place between IMAX and each of Elevation Partners and Francisco Partners. |
| July 3, 2006 | The Advisers update the IMAX Board of Directors. The Board then discusses strategies in connection with existing interested parties and whether others should be approached to increase the pool of interested parties. The Advisers undertake to review a list of other potential parties with IMAX management prior to any such approaches being made. |

| Date | Event |
|---|---|
| August 1, 2006 | The Advisers hold a conference call with the IMAX Special Committee and IMAX management to inform them that, based upon the proposals submitted by Francisco Partners, Elevation Partners and Veritas Capital, the Advisers do not believe that a transaction can be completed with these parties at the valuation sought by IMAX. |
| August 8, 2006 | The IMAX Board of Directors reviews the status of the search for a strategic partner or buyer. IMAX management reports that no party is willing to make an offer above the then current market price, but that three potential buyers are still interested in a transaction below market price. IMAX management recommends that the public auction process be terminated, subject to ongoing discussions with the parties still considering a transaction. |
| August 9, 2006 | IMAX publicly announces, "Today the Company reported that while it received significant initial interest from multiple parties, its view is that there are presently no buyers who have indicated a willingness to acquire the Company at a valuation sought by the Board of Directors. Because interest remains from several parties at a lower valuation, however, the Board has authorized the Company's bankers to explore these opportunities. This process is ongoing.<br><br>'While we are surprised that the high level of interest we initially saw has yet to result in a partnership or acquisition, we are committed to fully exploring all options open to the Company, including those offers that did not meet the Board's original valuation parameters,' said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. 'We remain committed to ensuring that any transaction is strategically or financially compelling and delivers the most value possible to our shareholders.'" See Press Release (August 9, 2006) at www.imax.com. |

SILVER & COHEN v. IMAX CORPORATION et al. | Court File No: CV-06-3257-00

*ONTARIO*
SUPERIOR COURT OF JUSTICE

Proceeding commenced at Brampton

Proceeding under the *Class Proceedings Act*, 1992

**PLAINTIFFS' RESPONDING MOTION RECORD**
**(TO AMEND CLASS DEFINITION)**
**VOLUME 2 OF 3**

**Siskinds LLP**
Barristers & Solicitors
680 Waterloo Street
London, ON N6A 3V8

A. Dimitri Lascaris (LSUC #: 50074A)
Tel: (519) 660-7753
Fax: (519) 660-7754

**Sutts Strosberg LLP**
600-251 Goyeau Street
Windsor, ON N9A 6V4

Harvey T. Strosberg (LSUC#: 12640O)
Jay Strosberg (LSUC #: 47288F)
Tel: (519) 561-6285
Fax: (866) 316-5308

Lawyers for the Plaintiffs