# EXHIBIT B
# (PART 16)

Court File No. CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

BETWEEN:

MARVIN NEIL SILVER and CLIFF COHEN

Plaintiffs

- and –

IMAX CORPORATION, RICHARD L. GELFOND
BRADLEY J. WECHSLER, FRANCIS J. JOYCE, NEIL S. BRAUN
KENNETH G. COPLAND, GARTH M. GIRVAN, DAVID W. LEEBRON
and KATHRYN A. GAMBLE

Defendants

Proceeding under the *Class Proceedings Act, 1992*

**PLAINTIFFS' RESPONDING MOTION RECORD**
**TO AMEND THE CLASS DEFINITION**
**(RETURNABLE JULY 30 – AUGUST 2, 2012)**
**VOLUME 3 OF 3**

**Siskinds** LLP
Barristers & Solicitors
680 Waterloo Street
P.O. Box 2520
London, ON N6A 3V8

A. Dimitri Lascaris (LSUC #: 50074A)
Tel: (519) 660-7844
Fax: (519) 672-6065

**Sutts Strosberg** LLP
Lawyers
600-251 Goyeau Street
Windsor, ON N9A 6V4

Harvey T. Strosberg (LSUC#: 12640O)
Jay Strosberg (LSUC #: 47288F)
Tel: (519) 561-6285
Fax: (866) 316-5308

Lawyers for the Plaintiffs

TO: **McCarthy Tetrault LLP**
Barristers and Solicitors
Suite 4700, Toronto Dominion Bank Tower
Toronto Dominion Center
Toronto, ON M5K 1E6

R. Paul Steep
Dana Peebles
Tel: (416) 601-7998
Fax: (416) 868-0673

Lawyers for the Defendants

# INDEX

# INDEX


| | TAB | Page Number |
|---|---|---|
| **VOLUME 1** | | |
| Affidavit of Michael G. Robb, sworn May 9, 2012 | 1 | 1 |
| Exhibit "A" – Statement of Claim, issued September 20, 2006 | A | 21 |
| Exhibit "B" – 2006 Annual Report | B | 36 |
| Exhibit "C" – Email and Amended Statement of Defence | C | 383 |
| Exhibit "D"- *Kaplan v Gelfond*, 240 FRD 88 | D | 464 |
| Exhibit "E" – *In re IMAX Securities Litigation*, 587 F. Supp. 2d 471 | E | 475 |
| Exhibit "F" – *In re IMAX Securities Litigation*, 2009 U.S. Dist. LEXIS 58219 | F | 491 |
| Exhibit "G" – *In re IMAX Securities Litigation*, 272 FRD 138 | G | 499 |
| Exhibit "H" – *In re IMAX Securities Litigation*, 2011 U.S. Dist. LEXIS 41709 | H | 526 |
| Exhibit "I" – *Morrison v National Australia Bank*, 130 S Ct 2869 | I | 538 |
| Exhibit "J" – PACER Docket Report | J | 565 |
| Exhibit "K-1" – Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Plaintiffs' Motion for Class Certification | K-1 | 599 |
| Exhibit "K-2" - Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce and Kathryn A. Gamble's Opposition to Snow Capital Investment Partners, L.P.'s Motion for Class Certification | K-2 | 636 |
| Exhibit "K-3" – Defendant PricewaterhouseCoopers LLP's, an Ontario Limited Liability Partnership, Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification | K-3 | 669 |
| Exhibit "L-1" – Report of Lucy P. Allen, dated February 23, 2009 | L-1 | 695 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "L-2" – Report of Professor Punam Puri, dated February 23, 2009 | L-2 | 738 |
| **VOLUME 2** | | |
| Exhibit "M" – Litigation Plan, dated February 22, 2007 | M | 796 |
| Exhibit "N" – Letter from Paul Steep, dated November 3, 2011 | N | 812 |
| Exhibit "O" – Email from Sandy Allan and attachments, dated January 27, 2012 | O | 813 |
| Exhibit "P" – Email from Dana Peebles, dated March 30, 2012 | P | 964 |
| Exhibit "Q" – Merger's motion for an amended motion, dated March 26, 2012 | Q | 1012 |
| Exhibit "R-1" – Letter from Mr. Lascaris to Defendants' counsel, dated January 31, 2012 | R-1 | 1014 |
| Exhibit "R-2" – Letter from Mr. Peebles, dated February 1, 2012 | R-2 | 1020 |
| Exhibit "R-3" – Letter from Mr. Leon, dated February 3, 2012 | R-3 | 1022 |
| Exhibit "R-4" – Letter from Mr. Lascaris to Merger Fund, dated February 7, 2012 | R-4 | 1023 |
| Exhibit "R-5" – Letter from Mr. Leon, dated February 8, 2012 | R-5 | 1024 |
| Exhibit "R-6" – Letter from Mr. Lascaris to Richard Margolies, dated February 9, 2012 | R-6 | 1025 |
| Exhibit "S-1" – Revenue-Systems, dated December 1, 2004 | S-1 | 1026 |
| Exhibit "S-2" – Revenue-System Leases, dated December 1, 2004 | S-2 | 1029 |
| Exhibit "S-3" – Revenue-System Sales, dated December 1, 2004 | S-3 | 1031 |
| Exhibit "S-4" – Memorandum, dated December 1, 2005 | S-4 | 1033 |
| Exhibit "S-5" – Memorandum, dated December 7 2005 | S-5 | 1036 |
| Exhibit "S-6" – Presentation, dated December 7, 2005 | S-6 | 1042 |
| Exhibit "S-7" – Report on Installations | S-7 | 1051 |

## INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "S-8" – Emails sent by Mark Welton in Q4 2005 and January 2006 | S-8 | 1073 |
| Exhibit "S-9" – Letter from IMAX to the Securities Exchange Commission, dated June 20, 2007 | S-9 | 1095 |
| Exhibit "S-10" - Exhibit "U-33" – notes, undated, titled: Lark and Kazan | S-10 | 1113 |
| Exhibit "S-11" - Exhibit "U-36" - notes, undated, titled "McMinnville, Manila and Winnipeg" | S-11 | 1114 |
| Exhibit "S-12" - minutes of a Meeting of the Board of Directors of Imax Corporation, held on March 8, 2006 | S-12 | 1115 |
| Exhibit "T-1" – Excerpts from the transcript of Lisa Coulman, taken January 31, 2008 | T-1 | 1120 |
| Exhibit "T-2" – Excerpts from the transcript of Bradley J. Wechsler, taken February 28, 2008 | T-2 | 1123 |
| Exhibit "T-3" – Excerpts from the transcript of Neil Braun, taken February 28, 2008 | T-3 | 1125 |
| Exhibit "U-1" - email dated December 17, 2001, from Marnie Hamilton to Kathryn Gamble, et al | U-1 | 1126 |
| Exhibit "U-2" - email dated June 19, 2004, from Jim Patterson to Marnie Hamilton | U-2 | 1128 |
| Exhibit "U-3" - report dated November 5, 2004, titled "Research Report, Imax Corporation (IMAX) | U-3 | 1130 |
| Exhibit "U-4" - email dated January 9, 2005, from Mark Welton to Loron Orris, et al | U-4 | 1142 |
| Exhibit "U-5" - Presentation dated February 2005, titled "Imax Corporation, Discussion Materials | U-5 | 1144 |
| Exhibit "U-6" - email dated March 30, 2005, from Ilidio Coito to Rafal Rybski, et al. | U-6 | 1221 |
| Exhibit "U-7" - email dated April 5, 2005, from Frank Joyce to Bill O'Malley | U-7 | 1225 |

## INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-8" - email dated July 12, 2005, from Gary Harbison to Don Kane, et al. | U-8 | 1228 |
| Exhibit "U-9" - email dated July 12, 2005, from Mark Welton to Brad Wechsler, et al. | U-9 | 1230 |
| Exhibit "U-10" - email dated July 24, 2005, from Mark Welton to Richard Wooland, et al. | U-10 | 1232 |
| Exhibit "U-11" - email dated November 3, 2005, from Mark Welton to Don Kane, et al. | U-11 | 1234 |
| Exhibit "U-12" - email dated November 14, 2005, from Don Savant to Huang Ke, et al. | U-12 | 1235 |
| Exhibit "U-13" - email dated December 8, 2005, from Mark Welton to Don Kane | U-13 | 1237 |
| Exhibit "U-14" - email dated December 21, 2005, from Glenn Pederson to Don Kane | U-14 | 1238 |
| Exhibit "U-15" - email dated December 22, 2005, from Mark Welton to Larry O'Reilly, et al. | U-15 | 1239 |
| Exhibit "U-16" - email dated December 31, 2005, from Ilidio Coito to Don Kane | U-16 | 1241 |
| Exhibit "U-17" - Memorandum dated January 16, 2006, titled "Q3 installation of Delhi (AEZ)" | U-17 | 1242 |
| Exhibit "U-18" - email dated January 19, 2006, from Don Kane to Ilidio Coito | U-18 | 1243 |
| Exhibit "U-19" - email dated January 19, 2006, from Ilidio Coito to Lac Nguyen, et al. | U-19 | 1245 |
| Exhibit "U-20" - email dated January 27, 2006, from Mark Welton to Don Kane, et al. | U-20 | 1247 |
| Exhibit "U-21" - email dated January 30, 2006, from Don Kane to Ilidio Coito, et al. | U-21 | 1248 |
| Exhibit "U-22" - email dated February 21, 2006, from Jeffrey Vance to Frank Joyce, et al. | U-22 | 1251 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-23" - presentation dated March 1, 2006, titled "Auditor's Preliminary Report to the Audit Committee for the year ended December 31, 2005" | U-23 | 1252 |
| Exhibit "U-24" - list dated March 7, 2006, titled "Proposed Media Strategy" | U-24 | 1279 |
| Exhibit "U-25" - email dated May 10, 2006, from Rafa Rybski to Ilidio Coito | U-25 | 1280 |
| Exhibit "U-26" - email dated May 17, 2006, from Kathryn Gamble to Edward MacNeil, et al. | U-26 | 1281 |
| Exhibit "U-27" - email dated June 2, 2006, from Mark Welton to Bill O'Malley, et al. | U-27 | 1284 |
| Exhibit "U-28" - email dated June 21, 2006, from Huang Ke to Richard Wooland, et al. | U-28 | 1287 |
| Exhibit "U-29" - chronology dated January 2005 through September 1, 2006, titled "Question 10: General Chronology" | U-29 | 1288 |
| **VOLUME 3** | | |
| Exhibit "U-30" - letter dated July 2, 2007, from Edward MacNeil to Angela Crane (SEC) | U-30 | 1293 |
| Exhibit "U-31" - presentation dated July 19, 2007, titled "Imax Corporation, Q4 2006 Review Package to the Audit Committee" | U-31 | 1319 |
| Exhibit "U-32" - notes, undated, titled "PWC Current Position" | U-32 | 1342 |
| Exhibit "U-33" - notes, undated, titled "Beijing Radio and Film and Beijing SUC" | U-33 | 1343 |
| Exhibit "U-34" - chart, undated, titled "Information Request" | U-34 | 1345 |
| Exhibit "U-35" - email dated August 2, 2005 from John Schreiner to Mark Welton | U-35 | 1378 |
| Exhibit "U-36" - email dated September 7, 2005 from James A. Skinner to kino@suvar.ru | U-36 | 1379 |
| Exhibit "U-37" - email dated October 4, 2005 from John Schreiner to Ilidio Coito | U-37 | 1381 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-38" - email dated October 4, 2005 from Mark Welton to Brad Wechsler | U-38 | 1382 |
| Exhibit "U-39" - email dated October 7, 2005 from Mark Welton to Ilidio Coito | U-39 | 1405 |
| Exhibit "U-40" - email dated October 7, 2005 from Ilidio Coito to Mark Welton | U-40 | 1407 |
| Exhibit "U-41" - email dated October 7, 2005 from Bill O'Malley to Mark Welton | U-41 | 1408 |
| Exhibit "U-42" - email dated October 26, 2005 from Ilidio Coito to kino@suvar.ru and aleksashin@inbox.ru | U-42 | 1409 |
| Exhibit "U-43" - email dated October 26, 2005 from John Schreiner to Ilidio Coito | U-43 | 1411 |
| Exhibit "U-44" - email dated October 27, 2005 from Ilidio Coito to John Schreiner and Mark Welton | U-44 | 1415 |
| Exhibit "U-45" - email dated November 28, 2005 from Ilidio Coito to Kinoplex Suvar | U-45 | 1419 |
| Exhibit "U-46" - email dated December 14, 2005 from Mark Welton to Karen Dinsmore | U-46 | 1422 |
| Exhibit "U-47" - email dated December 20, 2005 from Don Kane to David Brower | U-47 | 1428 |
| Exhibit "U-48" - email dated December 22, 2005 from Larry T. O'Reilly to Mark Welton | U-48 | 1429 |
| Exhibit "U-49" - email dated December 22, 2005 from Larry T. O'Reilly to Rich Gelfond and Brad Wechsler | U-49 | 1431 |
| Exhibit "U-50" - undated email to Ilidio Coito and copied to John Schreiner | U-50 | 1436 |
| Exhibit "U-51" - email dated January 19, 2006 from Ilidio Coito to John Schreiner | U-51 | 1439 |
| Exhibit "U-52" - email dated January 23, 2006 from Don Kane to David Brower | U-52 | 1440 |
| Exhibit "U-53" - email dated January 30, 2006 from John Schreiner to Mark Welton | U-53 | 1441 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Exhibit "U-54" - email dated January 30, 2006 from Mark Welton to John Schreiner | U-54 | 1442 |
| Exhibit "U-55" - email dated April 18, 2006 from John Schreiner to Ilidio Coito | U-55 | 1445 |
| Exhibit "U-56" - email dated May 12, 2006 from Ilidio Coito to Kinoplex Suvar | U-56 | 1448 |
| Exhibit "U-57" - email dated May 18, 2006 from Ilidio Coito to Kinoplex Suvar | U-57 | 1449 |
| Exhibit "U-58" - email dated May 26, 2006 from Kinoplex Suvar to Ilidio Coito | U-58 | 1450 |
| Exhibit "U-59" - email dated May 30, 2006 from Larry T. O'Reilly to Eric Jacques | U-59 | 1451 |
| Exhibit "U-60" - email dated June 8, 2006 from John Schreiner to Ilidio Coito | U-60 | 1453 |
| Exhibit "U-61" - email dated July 12, 2006 from Ilidio Coito to Kinoplex Suvar | U-61 | 1456 |
| Exhibit "U-62" - email dated July 14, 2006 from John Schreiner to Kinoplex Suvar | U-62 | 1458 |
| Exhibit "V" – Financial Statements, released April 27, 2012 | V | 1459 |
| Exhibit "W-1" – US Settlement Notice | W-1 | 1526 |
| Exhibit "W-2" – Canadian Certification Notice | W-2 | 1456 |
| Affidavit of Frank C. Torchio, sworn May 9, 2012 | 2 | 1549 |
| Exhibit "A" – Resume | A | 1574 |
| Exhibit "B" – Price Decline Used for IMAX Common Stock Damages | B | 1583 |
| Exhibit "C" - Artificial Inflation Apportionment from February 27, 2003 to August 9, 2006 | C | 1585 |
| Exhibit "D" - IMAX Reported Daily Volume and Closing Price from February 27, 2003 to November 7, 2006 | D | 1589 |
| Exhibit "E" - IMAX Reported and Adjusted Volume for | E | 1611 |

INDEX


| INDEX | TAB | Page Number |
|---|---|---|
| Multi-Trader Model from February 27, 2003 to November 7, 2006 .......... | | |
| Exhibit "F" - IMAX Float for Multi-Trader Model from February 27, 2003 to November 7, 2006 .......... | F | 1635 |
| Exhibit "G-1" - Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for U.S. Damage Period...... | G-1 | 1657 |
| Exhibit "G-2" - Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for U.S. Damage Period and OSA Limitation for Canadian Damage Period .......... | G-2 | 1659 |
| Exhibit "G-3" - Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for NASDAQ Purchasers and OSA Limitation for TSX Purchasers .......... | G-3 | 1661 |
| Exhibit "H" - Calculation of IMAX Prejudgment Interest (US$ in millions) .......... | H | 1663 |
| Exhibit "I" - IMAX Common Stock Price from February 27, 2003 to August 9, 2006 and Summary of IMAX Damages ($US)... | I | 1665 |
| Exhibit "J" - Estimated Damages for IMAX Common Stock Purchased on the NASDAQ from February 27, 2003 to August 9, 2006 and Estimated Recovery Ratio in the U.S. Proceeding Applicable to the Canadian Damage Period .......... | J | 1667 |
| Exhibit "K" - Liability Limit for IMAX ($C) .......... | K | 1670 |

# EXHIBIT U-30

This is Exhibit "U-30" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

RECEIPT COPY

SEC MAIL PROCESSING RECEIVED JUL 02 2007 WASH, D.C. 161 SECTION

July 2, 2007

Ms. Angela Crane
Branch Chief
Division of Corporation Finance
Securities and Exchange Commission
Washington, D.C. 20549
USA

Re: IMAX Corporation (the "Company")
**Form 10-K for the Fiscal Year Ended December 31, 2005 (the "Form 10-K"), and Form 10-Q for the Fiscal Quarter Ended September 30, 2006 (the "Form 10-Q")**
**File No. 000-24216**

Dear Ms. Crane:

We would like to again express our appreciation for the time and consideration provided by the staff of the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "Staff") concerning the matters presented in the Company's letter dated June 20, 2007. The input we received from the Staff in our discussions on June 28, 2007 will be extremely constructive as we endeavor to complete the filing of our Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and our Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.

During our discussions on June 28, 2007, the Staff noted certain areas where it would require clarification or supplemental information from the Company in order to further its review. As a result, the Company has compiled the following supplemental information as an addendum to our letter of June 20, 2007.

1. Revised Revenue Recognition Policy Exhibit #1 – After careful consideration of the comments from the Staff, we have revised the Company's Revenue Recognition Policy (the "Policy"), which is attached and should replace Exhibit #1, of the original submission. Items of note are as follows:

   a) Film Licenses – we have considered the Staff's comments regarding film licenses and have revised the Policy to reflect the analysis of film licenses under EITF 00-21 , section 4(a) of Paragraph 9. We concur that the SoP 00-2 does not set out any guidance for determining separate units of accounting when film licenses are included with other products and services; SoP 00-2 only requires each film license to be considered separate. Accordingly, when we analyze revenue arrangements, we will consider whether film licenses included with System Deliverables and other deliverables are separate units of accounting. Based on

our analysis of historical transactions, we believe film licenses will be separate units of accounting. The policy expands on the reasons for that conclusion. Based on this analysis, we revised the steps included on page A-8 through A-10 in the policy.

Based on our discussion, we would also like to clarify the reference to film incentives used in Response #14. These incentives are either provided in the original arrangement or as an amendment to the original arrangement to provide an incentive for the customer to continue with the original arrangement or complete the installation on a timely basis. Generally, these incentives are free film prints for one or more films in the IMAX library or a specific price reduction on film license royalty payments. When the incentive is one or more film licenses, we consider these to be separate deliverables and typically separate units of accounting. When the arrangement is a reduction in pricing of the films, we would treat this credit as deferred revenue. When the customer obtains the film, we would recognize the amount payable by the customer plus the film credit in revenue in accordance with SoP 00-2. We trust this clarifies the accounting for film incentives.

b) Projectionist training – We have considered the Staff's comments regarding the Company's treatment of projectionist training and reviewed our prior revenue transactions. The Company has changed its perspective such that projectionist training should no longer be considered inconsequential and perfunctory. We have revised the Policy to require that projectionist training be completed prior to revenue recognition.

As a part of the review of transactions, we noted that the Company has received several Certificates of Acceptance ("CoA") that do not include the reference to training, which is different than the example of a CoA attached as Exhibit #2 to our June 20, 2007 letter. It is our view that the CoA is primarily designed to confirm that the customer is satisfied with the installation of the equipment. The Company's arrangements include specifications for the installation of the equipment; however, there are no detailed specifications for training included in the arrangements with the customer. Going forward, the Company will be revising its arrangements and acceptance procedures to simply refer to installation of the equipment and run-in testing and will look to a completed training checklist as evidence that the training service has been completed prior to revenue recognition.

As a result of including the completion of the projectionist training as a criterion for revenue recognition, 3 theater system installations will move from the year they were recognized under our previously communicated proposed Policy to a subsequent year under the attached revised Policy because the training was provided in a subsequent period.

c) Treatment of Modifications – In our discussions on June 28, 2007, the Staff commented on Section 4 (a) of the Policy, *Persuasive evidence of an arrangement must exist*, which indicates that, "on occasion, the Company may modify an arrangement to provide a price reduction or to change the payments'

due dates. A modification of this nature can be agreed to with the customer before period-end with formal drafting and execution of the legally binding amendment occurring subsequent to the period-end."

In all instances, such modifications are confirmed by correspondence (i.e. Emails, letters etc.) between the parties, confirmed by the customer and issued by those with appropriate authority to bind the Company. Such correspondence is sufficient to create a legal obligation.

This type of correspondence is used more often to document changes in payment terms as opposed to changes in pricing. We have reviewed transactions over the period 2002 – 2006 in order to determine the frequency of these modifications. Changes in the timing of payments and price reductions were agreed at or near the date of installation of the respective systems a total of 12 times and 9 times, respectively, over the period, out of a total of 127 transactions reviewed. In the 9 situations related to price reductions, in all cases except one, the final terms were ultimately consistent with the terms of the Email/letter correspondence and were signed by both parties through formal amendments by the end of the subsequent event periods. Of these 9 instances, 4 involved marketing allowances granted to the customers as an incentive for the customer to install on a timely basis, 3 instances involved purchase price reductions, 1 instance involved the reduction of future minimum rent amounts and 1 instance involved compensating the customer for $35,000 in lost revenues due to closure of the theater in order to install the IMAX theater system on a timely basis.

In all cases except one, these price reductions occurred prior to the Company recognizing any revenue. The exception was amended in the subsequent event period and was recognized in the accounting for revenue recognition of the related theater. The reductions are often an incentive for the customer to commence installation on a timely basis. For example, the Company may enter into an arrangement to sell the customer a system for initial fees of $1.5 million and ongoing minimum payments of $50,000 for ten years, representing a present value of roughly $1.8 million. In such a case, if the customer is granted a price reduction of $100,000 prior to installation, the Company would record revenue of only $1.7 million.

While these instances are not a normal occurrence, the Company's policy recognizes that these situations may occur from time to time. The Company believes that persuasive evidence of an arrangement exists in these instances at the time of revenue recognition.

d) Lease term – The Company has clarified in its Policy that, for a lease, the lease term is deemed, for accounting purposes, to commence when the equipment is installed and customer acceptance has been received. The Company has concluded that revenue for a sales-type lease will be recognized using the same conditions that are required to recognize a sale.

e) Fine tuning – As explained in the policy, the Company considers fine-tuning of the equipment to be perfunctory and inconsequential. Fine tuning does not require any changes to the specifications of the equipment. Fine tuning involves calibrating certain functions as optimizing the focus of the lenses and adjusting

sound features to meet the final acoustical environment of the theater.

The tables in Exhibits 1 and 3 that were included in the June 20, 2007 letter will be updated once the data is finalized. We will provide these as an addendum to the letter once we have compiled them.

2. **Supplemental information, Comment #17** – The Staff requested supplemental information about whether any of the settlements included in the "Terminations by Default" or "Consensual Lease Buyouts" categories on Exhibit #4 to our June 20, 2007 letter include settlements where equipment had already been installed. We provide the following additional information on the settlements categorized as "Termination by Default" and "Consensual Lease Buyouts".

Terminations by Default are situations when a customer does not meet the payment obligations under an arrangement. In these situations, the Company has the right to terminate the arrangement through default clauses included in the arrangement. The Company will terminate arrangements when it is clear the customer is not able to construct an IMAX theater and the Company wishes to pursue alternative customers in the geographic area. Under such arrangements, the Company has been able to terminate the agreements and retain the amounts paid by the customer.

Consensual Buyouts are situations in which the customer and IMAX have negotiated a settlement of the arrangement after the customer has concluded that it will no longer be able to proceed with an IMAX theater. The customer's reasons for not proceeding can include its inability to obtain building permits, requisite financing or other suitable arrangements to establish an IMAX theater. As the Company's arrangements with customers generally do not permit a refund of payments made under the contract, a customer in such instances may seek to negotiate an exit from the arrangements.

During the years 2003 -- 2006, the Company entered into settlement agreements where equipment had been previously installed on four occasions. These are the arrangements listed in Exhibit #4 under Consensual Buyouts as UCI (two systems installed), Gaumont, JQ Hammons (two systems installed) and Vienna (one system each installed); all of these transactions were Consensual Lease Buyouts. As requested by the Staff, the Company has included a summary of the UCI arrangement along with the accounting treatment for this settlement (Exhibit #6 to the amended response as set forth in this letter). In the UCI arrangement, the customer had a master arrangement to lease ten systems and had installed two systems. The customer was in arrears on its payments on one of the installed systems and was current with its payments on the other installed system, as well as its initial payments for future systems. The settlement arrangement has been described in Exhibit #6.

In addition, the Staff requested information regarding our arrangement with JQ Hammons (Exhibit #7 to the amended response as set forth in this letter). This arrangement was also listed as a Consensual Lease Buyout. In the Hammons settlement, the customer had leased multiple systems, one of which was assigned to another third party operator by Hammons, and one of which was terminated as it had reached the end of its lease term. Hammons and the Company agreed not to continue with the additional leases and settled the remaining obligations. The settlement arrangement has been described in Exhibit #7.

Exhibit #4 attached to our June 20, 2007 letter also included Shanghai Golden Village as a Consensual Buyout. The terms of this arrangement also included a MPX Upgrade. The information for the Shanghai arrangement, including the Consensual Buyout, has been provided in Exhibit #5 to the June 20, 2007 response letter.

3. **Sale of Projection Equipment** - As requested by the Staff we have attached an example of a theater system sale to BFC Media Limited System #2 (Exhibit #8 attached to this letter). In 2003, BFC Media had agreed to acquire a theater system to be installed in Moscow in September 2005. BFC Media was not able to install the system by this original deadline. In 2006, the Company determined that customer was not able to proceed with the installation on a timely basis and considered its alternatives. The Company agreed to sell the theater system to the customer without any further obligation to provide additional services. Future service obligations became the responsibility of a third party company not related to IMAX. Upon conclusion of the amended arrangement, the Company paid the service provider a fee for the services to be performed to the customer. By transferring these future service obligations to the third party, the Company terminated its obligation to the customer. Further, the Company transferred title of the equipment. As a result, the Company recognized revenue on the equipment sale.

4. **Financing Income** – During the discussion of Comment #16, the Staff asked whether the Company had continued to record financing income on arrangements with customers who were not making payments or were under financial distress. The Company has recognized the Staff's comment and has found certain instances where financing income was recognized in income after a valuation allowance had been established for the customer. However, the detailed analysis of the situation has not been completed and the Company is investigating whether some or the entire amount was also included in the provision for doubtful accounts. The Company will adjust the accounts and reclassify any amounts, as appropriate as part of the restatement process.

*************************************************

Should you require clarification or have any further questions, please contact me at (905) 403-6571. The Company stands ready to assist the Staff in any way possible in connection with the matters addressed in this letter.

Thank you,

Edward MacNeil
Chief Financial Officer

cc: Kevin Kuhar, Staff Accountant, Division of Corporation Finance, Securities and Exchange Commission
Jodie Hancock, Senior Accountant, Corporate Finance Branch, Ontario Securities Commission

PricewaterhouseCoopers LLP
Robert Lister, IMAX Corporation
Members of Audit Committee, IMAX Corporation

001299

Confidential

Exhibit 1

# IMAX Corporation

## Executive Summary of Changes in Accounting Policy on Revenue Recognition:

The Company has decided to change its accounting policy for revenue recognition on theatre systems as described in the attached policy.

The following presents the key points of the revised accounting policy for the recognition of revenue on typical theatre system arrangements with its customers with certain comparative information on the previous policy.

## Identification of Deliverables:

| Old Policy – Deliverables | New Policy – Deliverables |
|---|---|
| • Projection system, sound system, supervision of installation and trademark rights | • Projection system, sound system, screen system, glasses cleaning machine, supervision of installation, projectionist training services and trademark rights |
| • Screen system and the supervision of its installation | |
| • Glasses cleaning system | |
| • 3D glasses | • 3D glasses |
| • Initial maintenance services | • Initial maintenance services |
| • Separately priced maintenance and extended warranty services | • Separately priced maintenance and extended warranty services |
| • Film licenses | • Film licenses |
| • Training services | |

## Units of Accounting

Based on the application of guidance in EITF 00-21 (including higher level GAAP referred to in the EITF), the Company concluded
Deliverables = Units of Accounting Deliverables = Units of Accounting



IMAX-US000103

Confidential

**Exhibit 1**

## Timing of Revenue Recognition:

In both the revised and previous policy, the criteria related to persuasive evidence of an arrangement, fixed and determinable fees and collectibility are unchanged. However, the Company has expanded its guidance on assessing these criteria. The following sets out the key points relating to these three criteria:

| Persuasive evidence of arrangement |
|---|
| • Executed legal documents<br>• Evidence of modification or amendment before revenue is recognized as follows:<br>1. Changes in payment terms on completion of installation requires written evidence, however not a signed amendment<br>2. Other modifications require signed amendments |
| **Fee fixed and determinable** |
| • Arrangements specify fixed initial payments and fixed ongoing payments<br>• Arrangements include contingent payments which are recognized when reported by customer<br>• Price concessions and discounts are reductions of consideration |
| **Collectibility** |
| • Assess collectibility at signing of arrangement and again at point of recognition |



IMAX-US000104

Confidential

Exhibit 1

| Delivery of product and performance of service must be substantially complete | |
|---|---|
| OLD POLICY | NEW POLICY |
| • When installation of unit of accounting deemed substantially complete by installer<br>• When substantive issues raised by client that IMAX acknowledges have been resolved | • Installation of projector, sound system and screen system defined as full working condition, permanent service hook-ups and completion of installation close out report and checklist.<br>• Delivery of glasses cleaning machine ("GCM")<br>• Completion of projectionist training |
| • No requirement for acceptance certificate prior to revenue recognition | • Company requires receipt of acceptance on installation of equipment and run-in testing. Where not received, public opening date is implied acceptance date |
| • Any remaining obligations deemed inconsequential and perfunctory (for example):<br>o Final tuning /calibration<br>o Projectionist training<br>o Install polarizers | • Any remaining obligations deemed inconsequential and perfunctory (for example):<br>• Final tuning/calibration |
| | |



IMAX-US000105

Confidential

Exhibit 1

## Why the Change in Policy?

- Identification of deliverables requires significant judgment.
- Under prior accounting, the Company considered the following factors in identifying deliverables:
  - Illustrative examples 2 and 8 in EITF 00-21
  - Screen did not interact electronically with the other components and is manufactured by a third party supplier
  - Company has sold individual theatre system components separately
- Based on review, Company considered the customer's perspective and accordingly has considered the following factors to conclude that the equipment should be considered one deliverable:
  - The projector, sound system, screen and in the case of a 3D system, the glasses cleaning machine are typically sold together as a standard package
  - Customer's expectation is an "image on screen" as the ultimate single deliverable
  - Places more focus on qualitative characteristics of the business arrangement with customer and the marketed interdependence of the equipment versus emphasis on technical aspects of equipment and their interdependence
  - Each of three main pieces of equipment are needed to project an image on a screen and create the "IMAX Experience" within a theatre; the customer is buying the "IMAX Experience"

Confidential

Exhibit 1

**Financial Impact of the Change in Policy for Combining Equipment into a Single Deliverable and Requiring Written Receipt of Customer Acceptance (preliminary and unaudited):**

| Reported Year | Shifted to: | Theatre Installations | Estimated Financial Impact (000's) Revenues | Margin | EPS |
|---|---|---|---|---|---|
| | | | | | |
| 2003 | 2004 | 1 (1) (2) | $365 | $264 | $0.01/sh |
| 2004 | 2005 | 2 (1) | $2,900 | $1,563 | $0.04/sh |
| 2005 | 2006 | 7 (2) | $13,045 | $7,454 | $0.18/sh |
| | | | | | |
| | | | | | |

- The restatement will also include certain other revenue adjustments that are not as a result of the policy changes.
- The financial impacts are preliminary as the Company is still finalizing the review of the individual transactions in the prior four year period. The audit process has not yet been completed.
- The amounts disclosed above only reflect the impact of movements between years reported and do not capture any movements within quarters of a given reporting year.

(1) due to change in acceptance criteria
(2) due to combining equipment into a single deliverable



IMAX-IJS000107

Exhibit 1

# IMAX Corporation

## Revenue Recognition on Typical Theatre System Arrangements

### Introduction

The following document presents the IMAX Corporation ("IMAX" or "the Company") policy as it relates to the recognition of revenue on typical theatre system arrangements with its customers. The Company has drawn upon the guidance of EITF 00-21 (Revenue Arrangements with Multiple Deliverables), SAB 104 (Revenue Recognition), SFAS 13 (Accounting for Leases) and other revenue recognition guidance where applicable in determining the conclusions as presented herein This policy statement has been developed and organized after consideration and assessment of the following:

- Identification of typical arrangement deliverables
- Nature of the arrangements
- Determining the units of accounting
- Timing of revenue recognition

The recognition of revenue requires considerable judgment based on the facts and circumstances of each individual transaction. This policy communicates a list of considerations for the recognition of revenue related to the Company's typical theatre system arrangements. Each individual theatre system arrangement must be analyzed against this policy by appropriate personnel within the Finance department. Where items, elements, clauses, deliverables or circumstances in an arrangement are not contemplated in this policy, the facts and circumstances should be immediately communicated to senior finance management (Co-Controllers or Senior Vice President of Finance). Members of senior finance management will appropriately assess, address and document conclusions reached regarding revenue recognition under such facts and circumstances.

*This policy does not address the specific controls and procedures which the Company will follow in assessing the arrangements under this policy This will be separately addressed in the Company's processes and controls documentation.*

### 1) Identification of Typical Arrangement Deliverables

By way of background, the Company generally provides a combination of elements to its customers in its sale or lease arrangements. There are several different elements that can be included in a typical IMAX sale or lease arrangement including, but not limited to:

- Projection system
- Screen system
- Projectionist training
- Separately priced maintenance and extended warranty services
- Film licenses
- Trademark rights
- Sound system
- Glasses cleaning system
- Initial maintenance services
- 3D glasses
- Supervision of installation
- Theatre design support

Prior to applying any accounting guidance on recognizing revenue for the transaction, the Company must first consider what the "deliverables" are within the arrangements. Upon assessment of the deliverables, the Company can then assess whether each deliverable constitutes a separate unit of accounting or whether one or more deliverables must be combined for revenue recognition purposes under the applicable guidance including EITF 00-21

The term "deliverables" is not explicitly defined in accounting literature. EITF 00-21 makes reference to a vendor's deliverables and indicates that these are products, services or the rights to use assets; EITF 00-21



Confidential

assumes that a company has already identified its "deliverables" prior to the application of EITF 00-21. The determination of a deliverable can be influenced by the terms of the arrangement between a vendor and its customer and the customer's perspective of the deliverables, the interaction of the separate elements that could make up a single deliverable and other facts and circumstances unique to a transaction. As a result, *the determination of the deliverables in an arrangement requires significant judgment.*

It has been determined that in a typical IMAX arrangement, the deliverables would be as outlined below:

| TYPICAL DELIVERABLES |
|---|
| • Projection system, sound system, screen system, glasses cleaning machine, theatre design support, supervision of installation, projectionist training and trademark rights (the "System Deliverable") |
| • 3D Glasses |
| • Initial maintenance services |
| • Separately priced maintenance and extended warranty services |
| • Film licenses |

The Company's basis for the determination of the above deliverables is as follows:

The System Deliverable reflects the fact that there are three main pieces of equipment that create utility or the "IMAX Experience" (i.e., the projector, the sound system and screen system). In addition, theatre design support, supervision of installation and projectionist training are provided to ensure the theatre structure, installation and equipment operation meets the Company's specifications for the "IMAX Experience." The "IMAX Experience" has been well articulated in the Company's promotional materials and is fundamental to the Company's branding. The Company markets a "standard package" to a customer of the projection system, the sound system and the screen and in the case of a 3D system, the glasses cleaning machine as well. This perspective focuses on qualitative characteristics of the business relationship between the Company and the customer. The customer generally cannot select separate pieces of equipment to create a package or system. The arrangement also provides the customer with the right to use the Company's trademark. The Company does not consider this to be a separate deliverable as the trademark is inextricably linked with the projection and sound systems, and it is to be used predominantly in conjunction with the ultimate usage of the equipment components under the arrangement. The trademark has never been licensed separately apart from the equipment components on a standalone basis. As a result, the trademark is included in the System Deliverable. The trademark license typically commences on the date of execution of the arrangement by both parties.

The 3D glasses are consumable items that are required for the viewing of 3D films. Only a portion of the Company's film library is offered in 3D, and the customer can choose to acquire the 3D glasses through any of a number of vendors. The Company offers the 3D glasses to its customers as an option, which allows a customer the choice of dealing solely with one vendor. The Company does not require the customer to purchase 3D glasses from the Company. When glasses are included in the overall arrangement, the overall pricing is adjusted accordingly. Many arrangements require the customer to order glasses separately based on prices specified in the sale or lease arrangement. The delivery of the glasses is typically dictated by customer request

Initial maintenance services and separately priced maintenance and extended warranty services are provided to maintain the theatre system components. These services may also include training of technicians for the customer, which will permit the customer to elect a lower priced maintenance package from the Company. Provision of these services is ongoing and distinct from the manufacture and

installation of the theatre system components. The Company's arrangements with its customers provide for a term of initial maintenance, which typically commences once the manufacture and installation of the theatre system components is complete. The Company also enters into arrangements for ongoing maintenance, which are separately priced. The recognition of revenue related to separately priced maintenance and extended warranty services has its own separate accounting guidance (FTB-90-1), which is indicative that the services are a separate deliverable.

Film licenses, which represent the right to exhibit a film for a period of time, may be included in an arrangement to acquire or lease a theatre system. The customer may be provided a film license at no charge or a discounted price as an incentive in the arrangement. A film print is delivered and the film license term will generally commence at or after the time the equipment is installed. When customers acquire a theatre system, the customers are not obligated to license films from IMAX and there are several third party distributors of films that can distribute films to an IMAX Theatre. The provision of a film license is distinct from the manufacture and installation of the theatre system components, the provision of accessories and the provision of maintenance services. Also, the recognition of revenue related to a film license has its own separate accounting guidance (SOP 00-2), which is indicative that it is a separate deliverable.

2) <u>Nature of Arrangements</u>

The Company's arrangements with customers are prepared in legal form as either sales or lease arrangements. For accounting purposes, the Company assesses these arrangements under EITF 01-08 to determine whether the arrangement is a lease for accounting purposes.

Under arrangements structured legally as a sales agreement, there are certain instances when the customer will not be granted title to the system until the Company has received all payments specified in the arrangement (which may cover payments for a period of ten years or more). The Company uses this type of clause to ensure recovery of the equipment in the event the customer defaults on payment obligations under the arrangement Where this clause is used and the Company does not have appropriate lien rights on the equipment as security against payment obligations in the applicable jurisdiction, the Company has concluded that this clause will not factor into the delivery criteria assessment for sales and accounts for the arrangements as a sale for accounting purposes This conclusion is based on Question 3 to section 3 of SAB 104 issued by the Staff of the SEC. When the Company has lien rights in the applicable jurisdiction, the FAQ concludes that revenue cannot be recognized upon shipment or receipt of the equipment. In these instances as the customer has possession and use of the equipment, the Company evaluates the arrangement in accordance with the criteria under EITF 01-08 to determine whether the arrangement is a lease or a services arrangement. The Company expects that the majority of the arrangements with this clause will be leases that qualify as sales type leases.

For arrangements in which the equipment components are considered to be sales, the Company applies the policies and guidance noted below.

For arrangements in which the equipment components are considered to be leases, the Company follows the guidance in SFAS 13 to determine the classification of the lease. Leases classified as sales-type leases are accounted for using the policies and guidance noted below Where leases are classified as operating leases, the payments are recognized on a straight-line basis over the term of the lease in accordance with SFAS 13.

Finance income related to the net investment in lease (sales-type leases) or financed receivables (equipment sales) are recognized on an effective interest method over the term of the lease or the financing receivable.

3) <u>Determining the Units of Accounting</u>

Determining the Units of Accounting for arrangements involving the sale of equipment.

If the arrangement includes a sale of equipment as opposed to a lease of equipment, the Company applies the following steps to identify the units of accounting and the amount of consideration to be allocated:

Step 1: Under Paragraph 4(a) of EITF 00-21, initial maintenance services and separately priced maintenance and extended warranty services arrangement (FTB 90-1) is a separate unit of accounting. The remaining deliverables (System Deliverable, 3D glasses and film licenses) are subject to the criteria under Paragraph 9 of EITF 00-21.

Step 2: Upon applying the criteria in Paragraph 9 of EITF 00-21, the Company has concluded that the System Deliverable, the 3D glasses and each film license each constitute a separate unit of accounting.

Each of the criteria under Paragraph 9 has been considered to support this conclusion as follows:

9(a) Standalone Value

The Company considers itself as included in the term "any vendor". If the Company recognizes the revenue on the 3D glasses before the System Deliverable or visa-versa, the Company considers that each unit of accounting has standalone value for the following reasons:

(i) 3D glasses are sold separately to customers without the System Deliverable, particularly as the 3D glasses must be replaced frequently due to wear and tear, and glasses are available from other vendors;
(ii) The System Deliverable is sold separately without 3D glasses, particularly when the customer purchases the 3D glasses from another vendor or when a 2D projector is purchased and thus 3D glasses are not required; and
(iii) Films generally are licensed separately to customers to be exhibited at IMAX theatres. IMAX has an extensive library of films that have been produced and/or that are distributed by the Company. In addition, other distributors license films that can be exhibited using the IMAX theatre system. Customers are not obligated to acquire films from IMAX.

9(b) Objective and reliable evidence of fair value of undelivered items

For the future undelivered item, objective and reliable evidence of fair value exists for the same reasons as noted under criteria 9(a) above. The films included in a theatre system arrangement generally are films that have been released and have been sold to other customers.

9(c) General right of return for delivered items

The Company's revenue arrangements do not include a general right of return. The customer is not able to return any delivered or installed item if the Company fails to perform its remaining obligations.

Step 3: The Company will allocate the consideration in an arrangement as follows:
(a) first, an amount equal to the amounts specified in the arrangement for separately priced maintenance and extended warranty services (FTB 90-1); and
(b) the remaining amount of consideration on a relative fair value basis to (i) each film license, (ii) the System Deliverable and (iii) 3D glasses.

**Determining Units of Accounting for arrangements involving the lease of equipment**

If the arrangement includes the lease of equipment as opposed to the sale of equipment, the Company applies the following steps to identify the units of accounting and the amount of consideration to be allocated:

Step 1: The Company will separate the deliverables between lease components subject to SFAS 13 (equipment and executory costs such as maintenance), separately priced maintenance and extended



Confidential 

warranty services per FTB 90-1, each film license and the sale of 3D glasses. The separation of the lease components and separately priced maintenance and extended warranty services are based the requirements of paragraph 4 of EITF 00-21 and the separation of the film licenses and sale of 3D Glasses is based on the analysis of paragraph 9 noted above for determining the units of accounting for arrangements involving the sale of equipment.

Step 2: For the lease components under SFAS 13, the initial maintenance services will be separated from the System Deliverable as they are considered executory costs which are provided over an extended period of time (one or more years). The other upfront services (projectionist training and supervision of installation) will not be separated from the leased property because they are typically performed at the time or within a short time period of the installation of the leased property (i.e., the point at which revenue is recognized as outlined below). While under SFAS 13 each piece of equipment could be considered separate leased property and a separate unit of accounting, the Company has concluded that all of the equipment is to be considered as a single unit of accounting for the same reasons as outlined in section 1) to this policy. Prior to installation by the customer of the equipment, the customer has not obtained the ability to substantively use the theater projector system.

Step 3: The Company will allocate the consideration in the arrangement as follows:
- (a) first, an amount equal to the amounts specified in the arrangement for separately priced maintenance and extended warranty services ( FTB 90-1); and
- (b) the remaining amount of consideration on a relative fair value basis to (i) the units of accounting identified through paragraph 9 of EITF 00-21, as a whole and (ii) the lease components as whole, including initial maintenance if included in the lease arrangement.

Step 4. The Company will allocate the amount of consideration assigned to the lease components under Step 3 (b) (ii) by,
- (a) first assigning a value to initial maintenance services (as defined in Step 2). The value of the initial maintenance services will be based on the average renewal rates which approximates the Company's cost plus a reasonable profit thereon; and
- (b) the residual of the consideration to the leased property.

Step 5: The Company will allocate the amount of consideration allocated in Step 3(b)(i) to each film license and the 3D glasses on a relative fair value basis.

Based on the above analysis, the Company concluded on the following units of accounting under a typical sales or lease arrangement.

| TYPICAL UNITS OF ACCOUNTING |
|---|
| • the System Deliverable |
| • 3D Glasses |
| • Initial maintenance services |
| • Separately priced maintenance and extended warranty services |
| • Film licenses |

4) <u>Timing of Revenue Recognition</u>

This section will cover all the units of accounting noted above, except for film licenses for which the Company applies SOP 00-2. For the purpose of this analysis the Company has considered the following criteria to be applicable to all the units of accounting:

a) Persuasive evidence of an arrangement must exist;
b) The fee must be fixed and determinable; and
c) Collectibility must be reasonably assured.

With regard to the delivery of products and performance of services, the Company has evaluated this requirement based upon the nature of each unit of accounting.

a) Persuasive evidence of an arrangement must exist

The Company's customary business practice for documenting a transaction is by way of either a legally binding term sheet with no contemplated further legal document, a contract and/or a master arrangement or other appropriate legal documentation. The appropriate legal document must be executed by both parties before the point of revenue recognition for each unit of accounting.

It is the Company's customary business practice that any modifications to the terms and conditions within the original legal arrangement be documented through a legally binding amendment to the original arrangement. On occasion, the Company may modify the arrangement to provide a price reduction or to change the payments' due dates. A modification of this nature can be agreed to with the customer before period-end with formal drafting and execution of the legally binding amendment occurring subsequent to the period-end. An agreement with the customer on a modification of this nature should be evidenced through either an e-mail or a letter or other written correspondence indicating the agreement in principle of the terms. The Company would not consider these instances to be indicative of the absence of persuasive evidence of an arrangement. All other modifications to the terms and conditions of the original legal arrangement must be executed by both parties prior to the point of revenue recognition for the related unit of accounting.

b) The fee must be fixed and determinable

Revenue cannot be recognized until the amounts to be recognized are fixed and determinable. The consideration in the Company's arrangements typically consist of upfront or initial payments made before and after the final installation of the System Deliverable and ongoing payments throughout the term of the lease or over a period of time as specified in the sales agreements. The ongoing payments are calculated, usually on an annual basis, as the greater of a fixed percentage of the customer's theatre box-office receipts and a fixed minimum amount. The amounts over the fixed minimum amounts are considered contingent payments. Contingent payments are excluded from amounts determined to be fixed and determinable for purposes of revenue recognition and are recorded as reported by the customer. The contingent payments are considered to be associated with the System Deliverable.

On occasion, the Company may enter into multiple system arrangements which include price concessions or discounts as follows:

(a) In arrangements where the price per system varies based on the number of systems that are installed by the customer, the potential discount is averaged over the number of systems expected or contracted to be installed by the customer.
(b) The Company may enter into arrangements for additional systems of the same type with an existing customer. In these arrangements, the Company may offer volume purchase concessions or discounts on the additional systems ordered. The Company will average the discount over the total number of systems ordered by the customer but not yet installed.
(c) The Company may enter into arrangement with an existing customer for additional systems that are different that previously ordered by the customer. The Company will ratably allocate the discount based on the relative fair values of the systems ordered but not yet installed.

c) Collectibility

The Business Affairs department is responsible for the assessment of collectibility at the time of signing of the contract. Generally, for new customers, a review is performed, which could include evaluating credit

reports, financial statements and the performance of a background investigation. An existing customer's payment history is considered for any new arrangements with that customer.

For arrangements that contain a lease, the Company assesses the collectibility of the lease at its inception. Where collectibility is not reasonably predictable, the Company will record the lease at the point of revenue recognition thereon as an operating lease.

The Company reassesses its determination that collectibility is reasonably assured before it recognizes revenue. The assessment of collectibility in such cases is fact specific and should be evaluated for each individual transaction, with indicative factors such as whether the customer is past due or current, communications with the customer and other financial factors.

Collectibility issues that arise post-revenue recognition from conditions that did not exist at the time of recognition do not impact the recognition of revenue, with the exception of events that occur in the subsequent event period of the recognition quarter. The Company will assess any events occurring in the subsequent event period for indications that are contrary to the Company's initial assessment of collectibility.

**d) Delivery of product and performance of service must be substantially complete**

**System Deliverable Unit of Accounting:**

For the System Deliverable (which includes equipment subject to a sale or sales-type lease), the Company uses the criteria outlined in SAB 104 to determine when the point of delivery and performance of services has occurred. SFAS 13 does not define the point at which this is to occur for a lease arrangement.

Revenue for the System Deliverable (whether subject to sale or sales-type lease), can only be recognized when all of the following conditions, as further explained in detail below, have been met:

- The equipment has been delivered and/or installed;
- Projectionist training has been be completed;
- Earlier of receipt of customer acceptance on the installation and run-in testing of the equipment or public opening of the theatre.

*Installation*

Revenue will be recognized on the System Deliverable unit of accounting when the projector, sound system and screen components have been installed and the glasses cleaning machine has been delivered. The Company records revenue upon installation as the contract requires the Company to incorporate all necessary technical improvements developed by the Company to the date of installation. For arrangements classified as sales for accounting purposes (as described in section 2 of this document), revenue is not recognized until title passes except when the only rights the Company retains with respect to title are those described in Question 3 to section 3 of SAB 104 (i.e.: to enable recovery of the equipment in the event of default on payment and the Company does not have any lien rights against the equipment)

For purposes of lease accounting, revenue recognition would generally commence at the beginning of the lease term. The Company has deemed, for accounting purposes, that the beginning of the lease term is the date of final installation and acceptance of all the equipment. Prior to this point, the Company continues to be obligated to incorporate all necessary technical improvements to the projector and sound system developed by the Company.

To this end, installation of the equipment is defined as full working condition such that all hookups of services to the equipment are permanent, and meet the Company's standards for installation as more clearly defined within the Company's Theatre System Installation Close-Out Report and Installation Checklist.

Installation will also require that the equipment already thoroughly tested individually and as a system at the Company's facility, be put through a complete function start-up and test procedure to ensure proper operation upon connection to the theatre's services. This will include checking adjustments of critical components, performing any installation specific work and a full review of the installation work performed by the customer's hired installers. All components are to be tested individually and as a system.

This does not preclude the existence of warranty items that are corrected on a subsequent visit. As an example, warped platters are warranty items, unless there are insufficient non-warped platters to run the scheduled film at the time of recognition. Screen issues such as striping are generally warranty issues, unless the screen is in an unusable condition as determined by the Company's on-site installation supervisor. These warranty items, however, should not preclude the initial operation of the equipment by the customer at the customer's discretion. Where outstanding items of this nature preclude the customer from initial use or enjoyment of the equipment in the manner in which it was intended, and in compliance with the stated contractual specifications of the equipment, the installation will not be viewed as complete.

As evidence of completion of installation of the equipment, the on-site installation supervisors shall complete an IMAX Theatre System Installation Close-Out Report and Installation Checklist. This report outlines the substantial completion of the installation of the equipment and that the equipment meets the specifications identified in the arrangement and defined by the Company. The report is to be approved by the individual's supervisor or department head Any and all deficiencies in the installation are to be noted in the report along with an indication of the significance of the outstanding item or deficiency from a technical perspective. Such report is to be evaluated by Finance department personnel to assess completeness of the installation in conjunction with the above guidelines, whether deficiencies or outstanding items are inconsequential or perfunctory and the amount of necessary warranty accruals.

Projectionist training is to be completed as evidenced by appropriate documentation such as a training checklist. However, if projectionist training is not completed prior to public opening of a theatre, the Company will conclude that the customer has demonstrated the ability to operate the equipment. Where the customer has demonstrated the ability to operate the equipment, the Company believes that the customer is substantially satisfied. Accordingly, if the training is not completed by public opening of the theatre and the other conditions for revenue recognition have been met, the Company will recognize revenue on the System Deliverable and accrue any costs associated with training yet to be completed.

It should be noted that completion of installation will not require the following items to be completed:

- Installation of glasses cleaning machine at the customer's theatre as it is a relatively simple process requiring connection to the plumbing and electrical systems only and could be completed by many third-party suppliers. The Company is not responsible for the installation or supervision of installation of this piece of equipment.
- Final sound tuning of the theatre and final fine calibration of the projection system. These services are typically performed very close to the opening date of the theatre and only when all theatre interior fit and finishes, which are the customer's responsibility, are complete. The Company views these items as inconsequential and perfunctory since they are not essential to the functionality of the equipment, are performed within a short period of time of installation, are within the Company's control, not material from a cost perspective and fair value perspective and do not preclude the use of the projection system by the customer since the system has been tested no less than twice upon the installation of the projection system at the customer's facility. The Company accrues any costs associated with fine tuning when revenue is recognized.

*Acceptance*

The Company's contracts typically do not explicitly require an acceptance of the customer as acceptance can occur based on contractually defined dates within an arrangement and do not therefore require mutual consent. However, the Company's policy is that signed customer acceptance of the equipment installation and run-in testing is required. Such acceptance will be sought and received as evidence of final installation and fulfillment of the material obligations under the arrangement. It is understood that the date a

representative of the Company receives the customer acceptance form from the customer will be the date of acceptance for purposes of determining the date that the Company has substantially completed its obligations related to the System Deliverable. When an acceptance certificate is not received by the Company due to delays initiated by the customer, the Company will use the public opening date of the theatre as the date of implicit acceptance by the customer.

Other Units of Accounting:

The 3D glasses are recognized upon delivery. The arrangement's shipping terms govern the point at which delivery has occurred (i.e., FOB IMAX shipping docks, FOB destination, CIF nearest ocean port).

Initial maintenance services are recognized ratably over the period of designated free maintenance.

Separately priced maintenance and extended warranty services are recognized ratably over the period of the arrangement in accordance with FTB 90-1.

IMAX Corporation
Consensual Buyout

**EXHIBIT 6**

United Cinemas International

| Nature of Contract | Date | Description |
|---|---|---|
| Nature of the Arrangement | | In the UCI arrangement, the customer had a master arrangement to lease ten systems. The customer had installed two systems. The customer was in arrears on its payments on one of the installed systems as well as all its initial payments for future systems. IMAX commenced litigation and settlement of all amounts owing under the master lease arrangement. |
| Original Agreement | 05/25/1999 | UCI BV entered into a master lease agreement for 10 IMAX systems with the option to select either 3D GT systems with a price of approximately $2.5 million or 3D SR systems with a price of approximately $2 million. Both the SR and GT systems require the payment of yearly minimum rent of $100,000 over the 10 year term of each lease. UCI BV was to complete installation of all 10 theatre systems by 2004. Under the master lease agreement UCI and IMAX would enter into a separate lease agreement for each system at each location. |
| Amending Agreement | 12/29/1999 | 3D GT system was leased to be located in Sapporo, Japan. System is installed and operated by UCI Japan. |
| Amending Agreement | 12/29/1999 | 3D GT system was leased to be located in Manchester, UK. System is installed and operated by UCI UK. |
| Settlement Agreement (by order of Ontario Superior Court of Justice) | 12/7/2004 | At the point of settlement with UCI BV, UCI had installed two of its contracted for 10 systems. UCI UK was current on its payments under the Manchester lease arrangement. UCI Japan was in arrears for a significant amount at the time of the Settlement Agreement. IMAX had previously reserved an amount of $0.8 million against the outstanding receivables and NIL balances related to Sapporo. UCI BV had also failed to make any payments of initial rent against its outstanding obligations related to the balance of theatre systems (eight) which it had contracted to lease and install by certain dates ending in 2004. IMAX had previously commenced a litigation action to enforce its rights under the master lease arrangement. An out of court settlement was reached with UCI BV which was filed with the Ontario Superior Court of Justice.<br><br>The following terms were noted as part of the settlement:<br>• UCI shall pay $14.5 million in installments of $8 million upon execution and $6.5 million on Feb 15, 2005;<br>• Release from all obligations under the Master Agreement, except for the amendments for the UK and Japan systems; The UK system lease was assigned by UCI to a third party, Terra Firma. All obligations under the lease also transferred (UCI was current in all its payments under the lease at the time of transfer). Lease assignment approved by IMAX.<br>• For the Sapporo, Japan lease, IMAX agreed to transfer title of the screen and sound system to UCI Japan, allow for the relocation of the remaining elements of the Theater system to any theater owned and operated by UCI and waived all rights to claim any payments under the terms of the lease. UCI agreed to not use the IMAX trademark in the future without resuming payments of additional rents under the lease. |

| | | |
|---|---|---|
| Accounting Treatment | | At point of settlement the Company had the following balances in relationship to the above:<br>• Gross receivables related to Sapporo Theater - $0.45 million before valuation allowance<br>• NIL Balance related to Sapporo - $0.7 million before valuation allowance<br>• Aggregate valuation allowance of $0.8 million against both receivables and NIL balances<br><br>When the $8 million was received, $1.15 million was applied against the gross balances remaining in receivables/NIL to settle those outstanding balances, $0.8 million was recorded in the income statement as a recovery of previously recorded valuation allowance, and $6.85 million was recorded in settlement income. In 2005 when the remaining $6.5 million was received, it was recorded in settlement income. |

IMAX Corporation
Consensual Buyout

EXHIBIT 7

Hammons Theaters

| Nature of Contract | Date | Description |
|---|---|---|
| Nature of the Arrangement | | The customer, Hammonds, had originally agreed to lease several systems from IMAX under a master lease agreement. Hammonds ultimately only leased two of the originally agreed five systems. One of the systems leased by Hammonds was assigned to third parties over the period of the relationship. The second leased system was terminated as it reached the end of its original lease term without renewal. The remaining three systems which Hammonds was to lease from IMAX were terminated through mutual consent after payment of specified amounts by Hammonds to IMAX. The details behind these transactions are outlined below along with the resultant accounting treatment. |
| Master Agreement | 07/05/1995 | To lease a minimum of five IMAX 2D systems. Separate lease agreements to be entered into for each system. Initial term of lease will begin on the date IMAX receives notification together with a 30% payment and end the 10th year after installation, run-in testing and training is complete. The agreement also provided for 2 renewal terms of 10 years for additional consideration and for a 20% discount on the published price for the annual maintenance and any camera rentals. Agreement provides for exclusive rights within a certain radius of each theatre.<br><br>Pricing for systems ranged from $1.8 to $1 5 million payable over a period of 8 to 20 months Renewals required an additional payment of $0.5 million.<br><br>First system ordered for delivery in February 1996.<br><br>Systems 1 and 2 are installed in Myrtle Beach and World Golf Village in Florida. |
| Amendment No. 1 | 09/30/1999 | The remaining three systems specifications are changed to 3D SR configuration from 2D SR's.<br>No longer permitted to open IMAX Theater in Salt Lake City<br>Modified payment dates for fourth and fifth systems<br>Introduces percentage of box-office payments subject to minimum rents on the 3D SR systems<br>Sets out maintenance costs for the 3D SR systems<br>Sets out delivery dates for 3D SR Systems |
| Amendment No. 2 | 09/29/2000 | Hammonds agreed to take delivery of two systems (3 and 4) on or before September 20, 2000 and paid $1.6 million of which $1 million was allocated to system 3 and $0.6 million was allocated to system 4. Hammonds agreed to pay further $0.4 on system 4 by December 31, 2000. IMAX records the receipt of these amounts as deferred revenue relating to systems 3 and 4<br>IMAX agrees not to unreasonably withhold consent to allow |

| | | |
|---|---|---|
| | | Hammonds to transfer systems to others. Covers provisions related to proposals by Hammonds to transfer systems to other parties Modified payment schedules set out for future payments on systems 3 to 5 |
| Assignment | 05/28/2002 | Hammonds assigns the lease on one system (World Golf Village) to a third party and acknowledges IMAX has no further rights, duties or obligations to Hammonds on the system. |
| Notice of Termination | 02/20/2003 | Notice of default previously sent to Hammonds on January 13, 2003 for default of payments on systems 3 and 4. IMAX demands immediate payment of $5.1 million and return of systems delivered by IMAX but still in IMAX's inventory (as the systems were not as of yet installed). |
| Amendment No 3 | 03/24/2003 | Hammonds agrees to pay $0.6 million no later than March 25, 2003 and the lease on system 3 is terminated and equipment delivered but not yet installed is returned to IMAX. Upon payment Hammonds is released from any further obligations on system 3. Hammonds also agrees to pay $0.6 million by September 1, 2003 on system 4. Hammonds is permitted to assign lease of system 4 to a third party by December 15, 2003, subject to IMAX consent If lease not assigned by that date, lease is terminated and the uninstalled equipment is to be returned to Imax. On system 5, Hammonds agrees to a payment schedule and minimum rent commences by December 2004. If Hammonds does not assign its rights to the lease and the lease agreement is not terminated by December 15, 2003, the payment schedule will be modified. All cure periods waived by Hammonds. |
| Amendment No. 4 | 12/31/2003 | Hammonds agrees to payment schedule for $1.0 million and terminates the obligation to lease system 5. No equipment provided by IMAX. |
| Notice of Default | 11/16/2006 | Myrtle Beach system (System 1) renewed on May 4, 2006 for a second ten year term and required a payment of $0 5 million per the Master Agreement. As amounts were not paid buy Hammonds a notice of default is issued. Lease was terminated and notice of default was not pursued. The sales type lease for Myrtle Beach was at the end of its lease term and no amounts remained recorded in respect of this lease on IMAX's books at the time of default and final termination. |
| Accounting treatment | | In 2003, the Company received the payments as specified in Amendment No.3 and recognized settlement revenue for systems 3 and 4, totaling $3.1 million on the date the leases were terminated. While the equipment was delivered to a client designated storage facility, on these two systems, the equipment continued to be carried in IMAX's inventory as the systems were not installed. While the system 5 lease agreement was terminated in December 2003, the settlement revenue of $1.0 million was not recognized until 2004 when the final payment on termination was received. |

IMAX Corporation
EXHIBIT 8
Sale of Equipment Amendment to Remove Future Deliverables

BFC Media Limited System #2

| Nature of Contract | Date | Description |
|---|---|---|
| Nature of the Arrangement | | In 2003, BFC Media had agreed to acquire a theatre system to be installed in Moscow in September 2005. BFC Media was not able to install the system by this original contracted deadline. In 2006, IMAX determined that customer was not able to proceed with the installation on a timely basis and considered its alternatives, given the customer was not able to secure a site for development of the theatre. IMAX agreed to sell the theater system to the customer without any further obligation to provide additional services such as supervision of installation, run-in testing, maintenance and extended warranty services. These future service obligations became the responsibility of a third party company/installer not related to IMAX, which is capable of performing the installation supervision and maintenance of the theatre system. At the point of settlement, IMAX paid the service provider a fee for the services to be performed to the customer. By transferring these future service obligations to another party, IMAX terminated its remaining obligations the customer. Further, IMAX transferred title of the equipment to the customer. As a result, IMAX recognized revenue on the equipment sale. |
| Original Agreement | 09/30/2003 | Agreement to sell IMAX 3D MPX for purchase price of $1.3million to be paid between date of agreement and Date of Acceptance or December 1, 2005. Expected delivery on September 1, 2005 with projected opening of December 1, 2005. Ongoing payment required as a percentage of box office subject to minimum annual payments of $50,000. Annual maintenance fee of $40,000. Includes license of trademark. The agreement provided that IMAX would not open or permit to open any IMAX theater in a specified area in Moscow. |
| Amendment No. 1 | 10/10/2003 | Clarifying amendment |
| Settlement Agreement | 12/22/2006 | Original agreement is terminated. Both parties have no duties and obligations pursuant to the Original Agreement, IMAX to retain $1.3 million. Customer cannot use the trademark in connection with operating the theater system. Customer will obtain all rights, title and interest in and to the equipment and is free to operate, sell, lease or otherwise transfer the Theater System. The equipment, excluding the screen was delivered to the client's designated storage facility. IMAX warrants the system is fit for the purpose as set out in the original agreement and will be able to project presentations in large format provided that the customer maintains the equipment in an |



CONFIDENTIAL TREATMENT
REQUEST OF IMAX
CORPORATION



Confidential

| | | |
|---|---|---|
| | | appropriate storage environment and the equipment is installed by no later than December 31, 2009. IMAX bore the cost of delivery and insurance until delivered to the client's storage facility. The customer retained the exclusivity right in the original agreement. |
| Other Information | | In conjunction with the settlement arrangement, IMAX paid Entertainment Services Project Management Pty. LTD to perform all installation supervision and training obligations. The customer also entered into a separate arrangement with Entertainment Services for all installation services, ongoing maintenance services and 3D Glasses.<br><br>The screen for the system was shipped by the third party screen supplier on December 20, 2006 |
| Accounting treatment | | For the year ended December 31, 2006, the Company recognized a sale for the equipment in the amount of $1.3 million.<br><br>The cost of the screen and Entertainment Services fees were included in cost of sales in the same period revenue was recognized. |



CONFIDENTIAL TREATMENT
REQUEST OF IMAX
CORPORATION



Confidential

# EXHIBIT U-31

This is Exhibit "U-31" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

# IMAX Corporation

## Q4 2006 Review Package
## To the Audit Committee

## July 19, 2007

Prepared by Management

# Table of Contents

Restatement Summary....1
Executive Summary of Changes in Accounting Policy on Revenue Recognition....2-6
Restatement Summary – Details by Reporting Period....7
Theatre System Movements and Gross Impact....8
MD&A Analysis....9-10
Key Performance Indicators....11
Contractual Settlements....12
Other Significant and Unusual Transactions....13
Balance Sheet....14
Management's Judgments and Accounting Estimates....15
Reserves on the Balance Sheet....16
New Accounting Policies Adopted Excluding Revenue Recognition....17
Compliance with Laws and Regulations....18
Regulatory Update....19
Whistle Blower Update – Activity Report....20
CEO Expenses....21
Exhibit I - Accounting Policy – Revenue Recognition on Typical Theater System Arrangements....Attachment

# IMAX Corporation

## Restatement Summary

(Overstatement)/Understatement of Income:
($000's)

| | Net Income | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 & Prior |
|---|---|---|---|---|---|---|---|
| Restatement Items | | | | | | | |
| Revenue recognition - theatre systems, policy changes | ($3,049) | $7,422 | ($6,802) | ($1,562) | $ - | ($2,107) | $ - |
| Revenue recognition - theatre systems, other | ($1,907) | 85 | 901 | (556) | (218) | (2,198) | 79 |
| Inventory costs | ($48) | 723 | 293 | (227) | (296) | (383) | (160) |
| Film accounting | ($820) | 1,633 | (2,759) | 318 | (12) | 142 | (142) |
| Branch level interest taxes | ($60) | 747 | (297) | (276) | (234) | - | - |
| Other adjustments | ($557) | (9) | (114) | (237) | 16 | (1,305) | 1,092 |
| | ($6,441) | $10,601 | ($8,776) | ($2,540) | ($744) | ($5,851) | $869 |

## Executive Summary of Changes in Accounting Policy on Revenue Recognition:

The Company has decided to change its accounting policy for revenue recognition on theatre systems as described in the attached policy.

The following presents the key points of the revised accounting policy for the recognition of revenue on typical theatre system arrangements with its customers with certain comparative information on the previous policy.

## Identification of Deliverables:

| Old Policy – Deliverables | New Policy – Deliverables |
|---|---|
| • Projection system, sound system, supervision of installation and trademark rights | • Projection system, sound system, screen system, glasses cleaning machine, supervision of installation, projectionist training services and trademark rights |
| • Screen system and the supervision of its installation | |
| • Glasses cleaning system | |
| • 3D glasses | • 3D glasses |
| • Initial maintenance services | • Initial maintenance services |
| • Separately priced maintenance and extended warranty services | • Separately priced maintenance and extended warranty services |
| • Film licenses | • Film licenses |
| • Training services | |

## Units of Accounting

Based on the application of guidance in EITF 00-21 (including higher level GAAP referred to in the EITF), the Company concluded

Deliverables = Units of Accounting Deliverables = Units of Accounting

## Timing of Revenue Recognition:

In both the revised and previous policy, the criteria related to persuasive evidence of an arrangement, fixed and determinable fees and collectibility are unchanged. However, the Company has expanded its guidance on assessing these criteria. The following sets out the key points relating to these three criteria:

| Persuasive evidence of arrangement |
|---|
| • Executed legal documents<br>• Evidence of modification or amendment before revenue is recognized as follows:<br>1. Changes in payment terms on completion of installation requires written evidence, however not a signed amendment<br>2. Other modifications require signed amendments |
| **Fee fixed and determinable** |
| • Arrangements specify fixed initial payments and fixed ongoing payments<br>• Arrangements include contingent payments which are recognized when reported by customer<br>• Price concessions and discounts are reductions of consideration |
| **Collectibility** |
| • Assess collectibility at signing of arrangement and again at point of recognition |

| Delivery of product and performance of service must be substantially complete | |
|---|---|
| OLD POLICY | NEW POLICY |
| • When installation of unit of accounting deemed substantially complete by installer<br>• When substantive issues raised by client that IMAX acknowledges have been resolved | • Installation of projector, sound system and screen system defined as full working condition, permanent service hook-ups and completion of installation close out report and checklist<br>• Delivery of glasses cleaning machine ("GCM")<br>• Completion of projectionist training |
| • No requirement for acceptance certificate prior to revenue recognition | • Company requires receipt of acceptance on installation of equipment and run-in testing and projectionist training. Where not received, public opening date is implied acceptance date |
| • Any remaining obligations deemed inconsequential and perfunctory (for example):<br>○ Final tuning /calibration<br>○ Projectionist training<br>○ Install polarizers | • Any remaining obligations deemed inconsequential and perfunctory (for example):<br>• Final tuning/calibration |
| | |

# Why the Change in Policy?

- Identification of deliverables requires significant judgment.
- Under prior accounting, the Company considered the following factors in identifying deliverables:
  - Illustrative examples 2 and 8 in EITF 00-21
  - Screen did not interact electronically with the other components and is manufactured by a third party supplier
  - Company has sold individual theatre system components separately
- Based on review, Company considered the customer's perspective and accordingly has considered the following factors to conclude that the equipment should be considered one deliverable:
  - The projector, sound system, screen and in the case of a 3D system, the glasses cleaning machine are typically sold together as a standard package
  - Customer's expectation is an "image on screen" as the ultimate single deliverable
  - Places more focus on qualitative characteristics of the business arrangement with customer and the marketed interdependence of the equipment versus emphasis on technical aspects of equipment and their interdependence
  - Each of three main pieces of equipment are needed to project an image on a screen and create the "IMAX Experience" within a theatre; the customer is buying the "IMAX Experience"

**Financial Impact of the Change in Policy for Combining Equipment into a Single Deliverable and Requiring Written Receipt of Customer Acceptance (preliminary and unaudited):**

| Reported Year | Shifted to: | Theatre Installations | Estimated Financial Impact (000's) Revenues | Margin | EPS |
|---|---|---|---|---|---|
| | | | | | |
| 2002 | 2005 | 1 | $ 4,918 | $ 2,107 | $ 0.05 |
| 2004 | 2005 | 1 | 1,505 | 853 | 0.02 |
| 2004 | 2006 | 1 | 1,488 | 709 | 0.02 |
| 2005 | 2006 | 8 | 14,101 | 7,516 | 0.19 |
| 2005 | 2007 | 2 | 3,399 | 2,221 | 0.06 |
| 2006 | 2007 | 1 | 1,700 | 611 | 0.02 |
| | | 14 | $ 27,111 | $ 14,017 | $ 0.35/Share |

- The restatement will also include certain other revenue adjustments that are not as a result of the policy changes.
- The amounts disclosed above only reflect the impact of movements between years reported and do not capture any movements within quarters of a given reporting year.

# IMAX Corporation

## Restatement Summary
## Details by Reporting Period

### Summary of Restatement Adjustments

| ($K) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 Q1 | 2005 Q2 | 2005 Q3 | 2005 Q4 | 2005 Total | 2006 Q1 | 2006 Q2 | 2006 Q3 | 2006 Q4 | 2006 Total | Net Impact |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Original Earnings/(loss) After Tax | $ (92,947) | $ (145,114) | $ 11,972 | $ 231 | $ 10,244 | $ 1,156 | $ 1,111 | $ 2,280 | $ 12,011 | $ 16,555 | $ (5,821) | $ 3,634 | $ (11,980) | $ (13,942) | $ (27,488) | |
| Restatement adjustments | | | | | | | | | | | | | | | | |
| *Previous Reported Restatement Adjustments* | | | | | | | | | | | | | | | | |
| Film Accounting (see details in Appendix 1) | | (142) | 142 | (12) | 316 | (3) | (53) | (2,477) | (226) | (2,769) | (292) | 194 | - | 1,731 | 1,633 | $ (820) |
| Inventory Capitalization errors | | (160) | (383) | (296) | (227) | (56) | (60) | 20 | 331 | 298 | (45) | (68) | (80) | 917 | 723 | (18) |
| BLIT | | | | (234) | (276) | (6) | (11) | (268) | (12) | (297) | 179 | 371 | 197 | | 747 | (60) |
| SUDS (see details in Appendix 2) | | 1,308 | (1,270) | 67 | (205) | (53) | (18) | (10) | - | (81) | - | - | - | | - | (182) |
| | - | 1,006 | (1,611) | (475) | (391) | (118) | (132) | (2,735) | 143 | (2,842) | (159) | 497 | 117 | 2,648 | 3,103 | (1,118) |
| *Executive benefits accrual* | (192) | (24) | (35) | (51) | (31) | (8) | (9) | (8) | (5) | (33) | (3) | (2) | (2) | (2) | (9) | (375) |
| *Overissuance of stock option* | | | | | | | | | | | | | 185 | (185) | - | - |
| *Revenue restatement entries* | | | | | | | | | | | | | | | | |
| Theatre system adjustments | | | (2,107) | - | (1,562) | (3,451) | 2,991 | (2,479) | (3,854) | (6,803) | 2,137 | (2,134) | 5,946 | 1,523 | 7,422 | (3,949) |
| Other adjustments | | 79 | (2,198) | (218) | (556) | 120 | 425 | 224 | 132 | 901 | 108 | (215) | 155 | 37 | 85 | (1,907) |
| | - | 79 | (4,305) | (218) | (2,119) | (3,331) | 3,416 | (2,254) | (3,722) | (5,901) | 2,245 | (2,399) | 6,101 | 1,560 | 7,507 | (4,856) |
| Adjusted Net Earnings/(loss) | $ (93,139) | $ (144,033) | $ 6,121 | $ (513) | $ 7,704 | $ (2,261) | $ 4,386 | $ (2,717) | $ 8,414 | $ 7,822 | $ (3,738) | $ 1,650 | $ (5,588) | $ (9,491) | $ (16,887) | $ (6,441) |
| Net restatement impact | (192) | 1,064 | (5,851) | (744) | (2,540) | (3,457) | 3,275 | (4,997) | (3,597) | (8,776) | 2,083 | (1,904) | 6,401 | 4,021 | 10,601 | |
| Earnings/(loss) per share - diluted | | | | | | | | | | | | | | | | |
| Original Earnings/(loss) After Tax | $ (3.11) | $ (4.69) | $ 0.36 | $ 0.02 | $ 0.26 | $ 0.03 | $ 0.07 | $ 0.06 | $ 0.29 | $ 0.40 | $ (0.14) | $ 0.08 | $ (0.30) | $ (0.33) | $ (0.68) | |
| Net Restatement Impact | (0.01) | 0.03 | (0.18) | (0.02) | (0.05) | (0.08) | 0.03 | (0.12) | (0.09) | (0.21) | 0.05 | (0.05) | 0.16 | 0.10 | 0.26 | |
| Adjusted Earnings/(loss) After Tax | $ (3.12) | $ (4.66) | $ 0.18 | $ (0.01) | $ 0.19 | $ (0.05) | $ 0.10 | $ (0.06) | $ 0.20 | $ 0.19 | $ (0.09) | $ 0.04 | $ (0.14) | $ (0.23) | $ (0.42) | $ (0.10) |

# IMAX Corporation

## Theatre System Movements and Gross Impact

**Impact of Change in Accounting Policy/Acceptance/Training:**

Revenue/Gross margin impact

| Arrangement | Original Revenue ($K) | Original Gross Margin ($K) | 2002 | 2003 | 2004 | 2005 Q1 | 2005 Q2 | 2005 Q3 | 2005 Q4 | 2005 Total | 2006 Q1 | 2006 Q2 | 2006 Q3 | 2006 Q4 (1) | 2006 Total | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Long Island* | 0 | 0 | | | | | | | | | | | | | | |
| Al Kobar | (4,618) | (2,107) | Original | | | | | | [illegible] | [illegible] | | | | | | |
| Brampton - FP # 8 | (1,468) | (709) | | | Original | | | | | | | | | [illegible] | [illegible] | |
| Yelmo - Oviedo | (1,505) | (653) | | | Original | | [illegible] | | | [illegible] | | | | | | |
| IT#5-Poznan | (2,208) | (1,592) | | | | Original | [illegible] | | | | | | | | | |
| Toulouse | (2 270) | (1,090) | | | | Original | [illegible] | | | | | | | | | |
| Yelmo - Malaga | (1,445) | (666) | | | | Original | [illegible] | | | | | | | | | |
| AFM Istanbul | (1,440) | (695) | | | | | Original | [illegible] | | | | | | | | |
| Cinemark Pittsburg | (950) | (470) | | | | | Original | [illegible] | | | | | | | | |
| Cuernavaca Mexico | (1,776) | (1,120) | | | | | | Original | [illegible] | | | | | | | |
| KSC Upgrade | (1,977) | (1,634) | | | | | | Original | [illegible] | | | | | | | |
| Nanjing, China | (1,560) | (492) | | | | | | Original | [illegible] | | | | | | | |
| New Delhi | (1,643) | (523) | | | | | | Original | [illegible] | | | | | | | |
| Beijing Radio | (2.208) | (1,038) | | | | | | | Original | Original | [illegible] | | | | [illegible] | |
| Beijing SUC | (1,285) | (617) | | | | | | | Original | Original | | [illegible] | | | [illegible] | |
| Dongguan Science | (1 979) | (607) | | | | | | | Original | Original | [illegible] | | | | [illegible] | |
| Kazan | (1,650) | (958) | | | | | | | Original | Original | | | | [illegible] | [illegible] | |
| Lark-Hong Kong | (1,351) | (794) | | | | | | | Original | Original | | | | | | [illegible] |
| Lodz, Poland (IT #8) | (2,071) | (1,174) | | | | | | | Original | Original | | [illegible] | | | [illegible] | |
| Manila Theatre | (2,205) | (1,277) | | | | | | | Original | Original | | [illegible] | | | [illegible] | |
| McMinnville | (2,048) | (1,127) | | | | | | | Original | Original | | | | | | [illegible] |
| Santa Fe Interlomas | (1.578) | (838) | | | | | | | Original | Original | | | [illegible] | | [illegible] | |
| Winnipeg | (1.126) | (807) | | | | | | | Original | Original | [illegible] | | | | [illegible] | |
| Léon | (1,785) | (444) | | | | | | | | | Original | [illegible] | | | | |
| Colleyville | (1.387) | (882) | | | | | | | | | | Original | [illegible] | | | |
| Dongguan | (1,700) | (611) | | | | | | | | | | Original | | | Original | [illegible] |
| Guatemala | (1,680) | (695) | | | | | | | | | | Original | [illegible] | | | |
| México City, Cinepolis # 3 | (1,476) | (707) | | | | | | | | | | Original | [illegible] | | | |
| Phoenix, Arizona | (1,150) | (862) | | | | | | | | | | Original | [illegible] | | | |
| Sofia, Int'l # 6 | (2,673) | (1,850) | | | | | | | | | | Original | [illegible] | | | |
| | (52,543) | (28,141) | | | | | | | | | | | | | | |
| # of arrangements reversed | | 30 | 2 | - | 2 | 3 | 2 | 4 | 10 | 10 | 1 | 5 | - | - | 1 | - |
| # of arrangements restated | | 27 | 1 | - | - | - | 4 | 2 | 5 | 2 | 3 | 4 | 6 | 2 | 9 | 3 |
| Net system movement | | (3) | (1) | - | (2) | (3) | 2 | (2) | (5) | (8) | 2 | (2) | 6 | 2 | 8 | 3 |

* - Long Island moved from Q1 2002 to Q2 2002 for a net zero adjustment in 200[illegible]

(1) - There are two additional transactions in Q4, 2006 which have moved to Q1 and Q2, 2007 given the adoption of the new policy. These transactions have n[illegible] been formally reported on by the Company and do not form part of this restatement analysis

# IMAX Corporation

## MD&A Analysis
## For the Fourth Quarter ended December 31, 2006

| | Quarter ended December 31, 2006 | Quarter ended December 31, 2005 Restated | Variance | YTD ended December 31, 2006 | YTD ended December 31, 2005 Restated | Variance |
|---|---|---|---|---|---|---|
| Revenue | | | | | | |
| IMAX Systems | $ 20,794 | $ 30,047 | (31%) | $ 72,075 | $ 88,625 | (19%) |
| Films | 10,868 | 8,095 | 34% | 36,326 | 25,969 | 40% |
| Theater Operations | 4,449 | 5,173 | (14%) | 16,884 | 17,498 | (4%) |
| Other | 908 | 883 | 3% | 3,985 | 3,230 | 23% |
| | $ 36,929 | $ 44,198 | (16%) | $ 129,270 | $ 135,322 | (4%) |
| Cost of Goods and Services | $ 20,260 | $ 23,569 | 14% | $ 76,676 | $ 71,787 | (7%) |
| Gross Margin | $ 16,669 | $ 20,629 | (19%) | $ 52,594 | $ 63,555 | (17%) |
| | 45% | 47% | | 41% | 47% | |
| Selling, General and Administrative Expenses | $ 12,636 | $ 8,328 | (52%) | $ 42,609 | $ 37,553 | (13%) |
| Research and Development | 1,158 | 835 | (39%) | 3,615 | 3,224 | (12%) |
| Amortization of Intangibles | 146 | 430 | 66% | 602 | 911 | 34% |
| Receivable Provisions, net of (recoveries) | 816 | (390) | (309%) | 1,066 | (1,009) | (206%) |
| Asset Impairments | 1,073 | 13 | (8187%) | 1,073 | 13 | (8187%) |
| Earnings from Operations | $ 840 | $ 11,413 | (93%) | $ 3,629 | $ 22,844 | (84%) |
| Interest Income | 276 | 263 | 5% | 1,036 | 1,004 | 3% |
| Interest Expense | (4,179) | (4,202) | 1% | (16,759) | (16,875) | 1% |
| Earnings (Loss) from Continuing Operations before Tax | $ (3,063) | $ 7,474 | (141%) | $ (12,094) | $ 6,973 | (273%) |
| Provision for Income Taxes | (6,128) | (253) | (2321%) | (6,218) | (1,130) | (450%) |
| Net Earnings (Loss) from Continuing Operations | $ (9,191) | $ 7,221 | (227%) | $ (18,312) | $ 5,843 | (413%) |
| Net Earnings from Discontinued Operations | - | 1,193 | (100%) | 1,425 | 1,979 | (28%) |
| Net Earnings (Loss) | $ (9,191) | $ 8,414 | (209%) | $ (16,887) | $ 7,822 | (316%) |
| Earnings (Loss) Per Share - Basic: | | | | | | |
| Net Earnings (Loss) From Continuing Operations | $ (0.23) | $ 0.18 | | $ (0.46) | $ 0.15 | |
| Net Earnings from Discontinued Operations | $ - | $ 0.03 | | $ 0.04 | $ 0.05 | |
| Net Earnings (Loss) | $ (0.23) | $ 0.21 | | $ (0.42) | $ 0.20 | |
| Earnings (Loss) Per Share - Diluted: | | | | | | |
| Net Earnings (Loss) From Continuing Operations | $ (0.23) | $ 0.17 | | $ (0.46) | $ 0.14 | |
| Net Earnings From Discontinued Operations | $ - | $ 0.03 | | $ 0.04 | $ 0.05 | |
| Net Earnings (Loss) | $ (0.23) | $ 0.20 | | $ (0.42) | $ 0.19 | |
| Weighted Average Number Of Shares Outstanding (000's): | | | | | | |
| Basic: | 40,286 | 40,198 | | 40,270 | 39,899 | |
| Diluted: | 40,286 | 41,597 | | 40,270 | 42,019 | |

# IMAX Corporation

## MD&A Analysis
For the Fourth Quarter ended December 31, 2006

| | YTD ended December 31, | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | | | 2005 | | | | | Variance | |
| | | Revenue | | Gross Margin | GM % | | Revenue Restated | | Gross Margin Restated | GM % | Revenue | GM % |
| Number of Recognitions | | 30 | (14 Sales, 16 STLs) | | | | 30 | (18 Sales, 12 STLs) | | | - | |
| | | 1 | (Operating Lease) | | | | 5 | (Operating Leases) | | | (4) | |
| | | 31 | | | | | 35 | | | | (4) | |
| IMAX Systems | | | | | | | | | | | | |
| Sales and leases | $ | 45,260 | $ | 22,720 | 30% | $ | 60,954 | $ | 37,755 | 62% | (26%) | (12%) |
| Ongoing rent | | 11,107 | | 9,496 | 85% | | 12,783 | | 10,511 | 82% | (13%) | 3% |
| Maintenance | | 15,708 | | 7,893 | 50% | | 14,888 | | 6,834 | 46% | 6% | 4% |
| | $ | 72,075 | $ | 40,109 | 56% | $ | 88,625 | $ | 55,100 | 62% | (19%) | (6%) |
| Films | | | | | | | | | | | | |
| Film Distribution | $ | 15,094 | $ | 5,282 | 35% | $ | 11,807 | $ | 3,939 | 33% | 28% | 2% |
| Production & DMR | | 14,580 | | 2,292 | 16% | | 8,942 | | 494 | 6% | 63% | 10% |
| Post-Production | | 25,361 | | 4,725 | 19% | | 16,224 | | 2,845 | 18% | 56% | 1% |
| Post-Production Interco Elimination | | (18,709) | | (2,107) | (11%) | | (11,004) | | (1,281) | (12%) | (70%) | 1% |
| | | 6,652 | | 2,618 | 39% | | 5,220 | | 1,564 | 30% | 27% | 9% |
| | $ | 36,326 | $ | 10,192 | 28% | $ | 25,969 | $ | 5,997 | 23% | 40% | 5% |
| Theater Operations | $ | 16,884 | $ | 1,978 | 12% | $ | 17,498 | $ | 1,555 | 9% | (4%) | 3% |
| Other | | | | | | | | | | | | |
| Camera | $ | 815 | $ | 363 | 45% | $ | 872 | $ | 379 | 43% | (7%) | 2% |
| Ridefilm | | - | | - | 0% | | - | | - | 0% | 0% | 0% |
| Other | | 3,170 | | (48) | (2%) | | 2,358 | | 504 | 21% | 34% | (23%) |
| | $ | 3,985 | $ | 315 | 8% | $ | 3,230 | $ | 883 | 27% | 23% | (19%) |
| Total | | 129,270 | | 52,594 | | | 135,322 | | 63,535 | | | |

# IMAX Corporation

**Key Performance Indicators**
**For the Year Ended December 31, 2006**

| | 2006 | 2005 Restated |
|---|---|---|
| **# of Signings** | | |
| Sales and sales type leases, net of deletions from backlog (*Note*) | 29 | 39 |
| Operating leases | 1 | 6 |
| Average revenue of sales and sales type leases | $ 1.5M | $ 1.6M |
| Average margin of sales and sales type leases | $ 0.8M | $ 0.9M |
| *Note:* | | |
| *Sales deletions from backlog – expired condition period* | 4 | |
| *Average revenue of sales – expired condition period* | $1.2M | |
| *Average margin of sales expired condition period* | $0.6M | |
| **# of Systems** | | |
| New sales and sales type leases | 26 | 21 |
| Sale of existing systems | 4 | 9 |
| New operating leases | 0 | 5 |
| Operating leases – existing systems | 1 | 0 |
| Average revenue of new sales and sales type leases | $ 1.6M | $ 1.7M |
| Average margin of new sales and sales type leases | $ 0.8M | $ 0.9M |
| Average revenue on sale of existing systems | $ 0.7M | $ 1.0M |
| Average margin on sale of existing systems | $ 0.7M | $ 0.7M |
| **O&O Theatres** | | |
| Attendance | 1,568,410 | 1,601,995 |
| Average ticket price | $ 8.35 | $ 8.43 |
| EBITDA as calculated under credit facility | $ 25.8M | $ 39.5M |
| # of DMR films released | 7 | 4 |
| # of IMAX library films released | 1 (Deep Sea) | 1 (Magnificent Desolation) |
| # of open theatres in network | 284 | 266 |
| # of theatres in backlog | 74 | 73 |
| Backlog value | $ 118.4M | $ 123.0M |

# IMAX Corporation

## Contract Settlements
For the Fourth Quarter ended December 31, 2006

| Contract Settlements: | 2006 # | 2006 Value | 2005 # | 2005 Value |
|---|---|---|---|---|
| Consensual lease buyouts | 0 | 0 | 8 | $ 11.7 |
| MPX backlog upgrades (contract restructurings) | 1 | $ 0.3 | 2 | 0.6 |
| Terminations by default | 0 | 0 | 4 | 2.0 |
| Settlement revenues included in IMAX systems revenue | 1 | $ 0.3 | 14 | $ 14.3 |

| 2006 Settlements include: | |
|---|---|
| Bella - Springfield | $ 0.3 |

- Deferred income tax asset of $6.2 million written-off during Q4 2006, as management has determined that insufficient positive evidence exists to conclude that the deferred tax assets will reverse within the evaluation period.

- Amendments in March 2006 to the pension plan resulted in a pension expense of $2.2 million for Year 2006 vs a pension expense for $5.4 million for Year 2005.

- Adoption of Financing Accounting Standards No. 123 "Share-Based Payment" (FAS 123R) as of January 1, 2006, resulted in a charge of $1.1 million for the full year.

- Miami settlement resulted in the Company paying out $0.1 million to the landlord of Miami Theatre and on January 4, 2007, paying an additional $0.8 million, settling the Company's obligation to the landlord.

- L.A. exit accrual recovery of $0.3 million due to improvements in sublease rates.

- Impairment of laser recorder resulting in a charge of $0.5 million.

# IMAX Corporation

## Balance Sheet

For the Fourth Quarter ended December 31, 2006

| | December 31, 2006 | December 31, 2005 Restated |
|---|---|---|
| Cash and Cash Equivalents | 25,123 | 24,324 |
| Short Term Investments | 2,115 | 8,171 |
| Accounts Receivable | 26,017 | 20,116 |
| Financing Receivables | 65,878 | 62,837 |
| Inventories | 26,913 | 28,967 |
| Prepaid Expenses | 3,432 | 3,632 |
| Film Assets | 1,235 | 1,708 |
| Property, Plant & Equipment | 23,857 | 26,741 |
| Other Assets | 10,897 | 14,756 |
| Deferred Income Taxes | 0 | 6,171 |
| Goodwill | 39,027 | 39,027 |
| Other Intangible Assets | 2,547 | 2,701 |
| **Total Assets** | $ 227,041 | $ 239,151 |
| Accounts Payable | 11,426 | 7,471 |
| Accrued Liabilities | 51,052 | 51,755 |
| Deferred Revenue | 56,694 | 59,840 |
| Senior Notes Due 2010 | 160,000 | 160,000 |
| **Total Liabilities** | $ 279,172 | $ 279,066 |
| Capital Stock | 122,024 | 121,736 |
| Other Equity | 2,937 | 1,864 |
| Deficit | (178,274) | (161,387) |
| Accumulated Other Comprehensive Income (Loss) | 1,182 | (2,128) |
| **Shareholders' Deficit** | $ (52,131) | $ (39,915) |
| **Total Liabilities & Shareholders' Equity (Deficit)** | $ 227,041 | $ 239,151 |

**Highlights:**

1. DT write-off $6.2M
2. Payables Increase - CFI holdback (payables) approximately $3M
3. A/R Increase – studio receivables
   - WB
   - Sony
   - Fox
4. Inventories
   Finished goods - projectors

# IMAX Corporation

**Management's Judgments and Accounting Estimates**
**For the Fourth Quarter ended December 31, 2006**

**Management has made the following significant estimates:**

| Estimates where the Company has established reserves | Quantification of Reserve | |
|---|---|---|
| | Q4 - 2006 | Dec 2005 |
| Allowances for uncollectability of accounts receivable and net investment in leases | $ 5.7M | $ 4.0M |
| Allowances for inventory obsolescence | $ 0.6M | $ 0.9M |
| Valuation allowances for uncertainty of realization of deferred income tax assets | $ 52.0M | $ 38.5M |
| Allowances on loans receivable and interest from Digital Projection Inc. | - | $ 12.1M |

## Other estimates

Fair value of goodwill (Goodwill - $39.0M)
Estimates underlying the accounting for the Company's defined benefit pension plan and medical benefits (pension accrual - $26.1M, medical benefits - $0.4M)
Estimates of the residual values on projection systems (residual values - $0.4M net of $0.1M write-down relating to MPX)
Tax reserves in respect of existing taxation exposures (tax reserve - $2.0M). Large release under FIN 48 in Q1 2007 $1.4M
Accrued liabilities for excess space in Los Angeles office (accrual - $1.2M)

Estimates of ultimate revenues for film assets and participation costs
Future cash flows associated with long-lived assets and related estimates of fair value
Fair value of theatre systems for FAS 13 lease calculations
Assumptions of expected term of options and volatility for fair values of stock based compensation
Various accruals at quarter end, including bonuses, stock liability awards settled in Q2 2007 ($0.5M)

# IMAX Corporation

**Reserves on the Balance Sheet**
**For the Fourth Quarter ended December 31, 2006**

| | December 31, 2006 | | | | December 31, 2005 | |
|---|---|---|---|---|---|---|
| | Gross Value | Reserves | Book Value | % Reserved | Book Value | % Reserved |
| Financing Receivables | $68.3 | $2.4 | $65.9 | 4% | $ 62.8 | 4% |
| German Theatres | 1.4 | 1.4 | - | 100% | 0 | 100% |
| Excluding German Theatres | $66.9 | $1.0 | $65.9 | 2% | $62.8 | 2% |
| Accounts Receivable | $29.3 | $3.3 | $26.0 | 11% | $ 20.1 | 11% |
| German Theatres | 3.3 | 3.0 | 0.3 | 91% | 0.8 | 73% |
| Excluding German Theatres | $26.0 | $0.3 | $25.7 | 1% | $19.3 | 1% |
| Inventory | $27.5 | $0.6 | $26.9 | 2% | $ 29.0 | 3% |
| DPI note receivable | - | - | - | - | $ 1.2 | 91% |
| Deferred Income Taxes | $52.0 | $52.0 | - | 100% | $6.2 | 86% |

ADOPTION OF NEW ACCOUNTING POLICIES

On January 1, 2006, the Company adopted Financial Accounting Standards No. 123, "Share-Based Payment," ("FAS 123R") which requires the measurement and recognition of compensation expense for all share-based payment awards made to employees and directors for employee stock options based on estimated fair values. FAS 123R supersedes the Company's previous accounting under Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" ("APB 25") for periods beginning in fiscal 2006.

The Company adopted FAS 123R using the modified prospective transition method, which requires the application of the accounting standard as of January 1, 2006. The Company's Consolidated Financial Statements as of and for the twelve months ended December 31, 2006 reflect the impact of FAS 123R. In accordance with the modified prospective transition method, the Company's Consolidated Financial Statements for prior periods have not been restated to reflect, and do not include, the impact of FAS 123R. Stock-based compensation expense recognized under FAS 123R for the twelve months ended December 31, 2006 was $0.8 million.

The FASB also issued in September 2006 Statement of Financial Accounting Standards No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans" (an amendment of FASB Statement No. 87, 88, 106 and 132R), ("FAS 158"). This Standard requires recognition of the funded status of a benefit plan in the statement of financial position. The Standard also requires recognition in other comprehensive income certain gains and losses that arise during the period but are deferred under pension accounting rules, as well as modifies the timing of reporting and adds certain disclosures. FAS 158 provides recognition and disclosure elements to be effective as of the end of the fiscal year after December 15, 2006 and measurement elements to be effective for fiscal years ending after December 15, 2008, to align measurement dates with fiscal year ends. The Company is currently compliant with FAS 158 measurement elements at December 31, 2006. Adoption of FAS 158 has resulted in a charge of $0.8 million net of income tax of $nil to accumulated other comprehensive income, which represents unrecognized prior service credits and unrecognized net losses at December 31, 2006.

In September 2006, the SEC staff issued Staff Accounting Bulletin No. 108, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements ("SAB 108"). SAB 108 was issued in order to eliminate the diversity in practice surrounding how public companies quantify financial statement misstatements. SAB 108 requires that registrants quantify errors using both a balance sheet and income statement approach and evaluate whether either approach results in a misstated amount that, when all relevant quantitative and qualitative factors are considered, is material. SAB 108 must be implemented by the end of the Company's fiscal 2006 reporting period.

**Impact of Recently Issued Accounting Pronouncements**

In June 2006, the FASB issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (an interpretation of FASB Statement No. 109), ("FIN 48"), which clarifies the relevant criteria and approach for the recognition, de-recognition and measurement of uncertain tax positions. FIN 48 will be effective for the Company beginning January 1, 2007. The Company has assessed the effects of the provisions of FIN 48. The cumulative effect of the change in accounting principle to be recorded in the first quarter of 2007 is $2.1 million.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, "Fair Value Measurements", which is effective for fiscal years beginning after November 15, 2007 and for interim periods within those years. This statement defines fair value, establishes a framework for measuring fair value and expands the related disclosure requirements. The Company is currently evaluating the potential impact of this statement.

# IMAX Corporation

## Compliance with Laws & Regulations
For the Fourth Quarter ended December 31, 2006

| | |
|---|---|
| Statutory Pensions and Benefits (Employee RSP's and 401K Plans) | • Benefit payments made and current through June 2007.<br>• 401K return and 11K return. |
| GST Returns | • All returns current through June 2007. |
| Employee Payroll taxes and Benefits | • All employee tax withholding and filings are current through June 2007. |
| Sales and Use Tax | • Company files S&U tax returns in (35) states and five provinces. (All filings current to June 2007).<br>• California and Alabama scheduling next audit.<br>• Received predetermination from CA. In line with expectations, refund of approximately $200K. |
| Foreign Taxes (49 foreign jurisdictions) (VAT, duty & excise taxes, local foreign income tax requirements) | • Company puts onus of VAT self assessment and clearance and payment of excise tax and import duties on customer through contract.<br>• Company undertakes detailed analysis of foreign country tax requirements at the onset of doing business in every new jurisdiction (carried out by local experts - Deloittes, PwC, KPMG, E&Y).<br>• Company believes exposures are covered through Company's tax reserves, however, new FASB Interpretation No. 48 require all SEC filers to assess all uncertain tax positions that meet a more likely than not recognition standard. The adoption of FIN 48 is mandatory for the Company's 2007 fiscal year. International withholding taxes have been determined to fall within the scope of FIN 48. The Company has assessed all uncertain tax positions as at January 1, 2007. The unrecognized tax exposures related to international withholding taxes has been assessed to be $3.5 million. The cumulative effect of the change in accounting principle will be recorded as a charge against retained earnings on January 1, 2007. Additionally, the Company has implemented procedures for analyzing the unrecognized tax exposures related to international withholding taxes on a quarterly basis. |
| Income Tax Filings | • Company currently files income tax returns in 5 jurisdictions (Canada, US, Japan, Netherlands and Hong Kong).<br>• Company also files income tax returns in (40) states and the province of Ontario.<br>• All Canadian tax returns have been filed for 2005 and 2006, except for IMAX Corporation, which is expected to be filed late given the fact that the Company has not yet finalized the 2006 financial statements. Late filing of the IMAX Corporation tax return is not expected to result in significant interest and penalties as the expected tax liabilities have already been paid to the taxation authorities (i.e. the criteria on which interest and penalties is based).<br>• US consolidated and branch tax return and related state tax returns filed for 2005. It is anticipated that the 2006 returns will be filed on time (by September 15, 2007).<br>• Company carries tax reserves in respect of filing obligations and tax exposures relating to these filings and believes the reserve to be adequate in light of existing exposures and current accounting practise.<br>• Proposed accounting standard FIN 48 will change basis on which reserves will be calculated and maintained. This is expected to result in the reversal of $1.4 million of reserves directly to retained earnings upon adoption on January 1, 2007.<br>• The net cumulative effect of adopting FIN 48 has been assessed to be a $2.1 million charge against retained earnings (i.e. $3.5 million charge against retained earnings related to international withholding taxes less a reversal of reserves of $1.4 million). |

# IMAX Corporation

**Regulatory Update**
**As of June 30, 2007**

## 1. Correspondence with the Ontario Securities Commission:

| Received: | Responses: |
|---|---|
| November 20, 2006 | January 19 2007 |
| November 30, 2006 | December 19, 2006, January 2, 2007, January 29, 2007 and February 1, 2007 |
| February 27, 2007 | TBA |
| March 5, 2007 | March 20, 2007 and May 2, 2007 |
| April 9, 2007 | TBA |
| May 2, 2007 | May 8, 2007 |
| June 27, 2007 | TBA |

Three in-person meetings with OSC staff.

## 2. Correspondence with the U.S. Securities and Exchange Commission:

| Received: | Responses: |
|---|---|
| November 29, 2006 | December 8, 2006, December 11, 2006, January 4, 2007 and February 8, 2007 |
| February 12, 2007 | June 20, 2007 |
| February 26, 2007 | March 9, 2007 and March 16, 2007 |
| March 14, 2007 | TBA |

Two calls with SEC Corporate Finance regarding February 12, 2007 comment letter and responses and interaction over accounting policy.

# IMAX Corporation

## Whistle Blower Update

**For the Fourth Quarter ended December 31, 2006**

**As of July 16, 2007**

| Referral Source/Report Recipient | Incident Reference No | Date Reported | Violation Category * | Supporting Documentation | Status | Closed OR Resolved |
|---|---|---|---|---|---|---|
| EthicsPoint Hotline | | | | | | |
| Report Recipient | | | | | | |
| (a) Chief Financial Officer | | | | | | |
| (b) General Counsel | | | | | | |
| (d) SVP, Human Resources | 1 | Dec. 6, 2004 | Accounting & Finance Concerns | TEST REPORT | Closed | Dec. 6, 2004 |
| | 2 | Feb. 1, 2005 | Violation of Other Company Policies | Report | Closed | Feb. 2, 2005 |
| | 3 | Feb. 21, 2005 | Compliance with Laws | Report | Closed | Feb. 23, 2005 |
| | 4 | Feb. 21, 2005 | Fraud and Theft | Report | Closed | Feb. 21, 2005 |
| | 5 | Feb. 21, 2005 | Violation of Other Company Policies | DUPLICATE ENTRY – REFER TO INCIDENT #2 | Closed | Feb. 21, 2005 |
| | 6 | Feb. 21, 2005 | Compliance with Laws | Report | Closed | March 2, 2005 |
| | | | | | | |
| Co-CEOs | 7 | Nov. 11, 2005 | Accounting & Finance Concerns | Email to Co-CEOs, Reports of Investigation to Audit Committee (Dec. 7, 2005) and to Board (Dec. 14, 2005) | Closed | Dec. 7, 2005 |
| (c) Compliance Officer | 8 | June 24, 2006 | Conflicts of Interest | Report | Closed | Oct. 30, 2006 |
| (e) VP, Finance | | | | | | |
| Chairman of the Audit Committee | | | | | | |

* **VIOLATION CATEGORIES**

1. Accounting & Finance Concerns
2. Misuse of Company Assets
3. Compliance with Laws
4. Dealing with Public Officials
5. Conflicts of Interest
6. Insider Trading
7. Disclosure of Confidential Information
8. Internet and E-mail Policies
9. Competition and Trade Practices
10. Privacy
11. Violation of Other Company Policies (i.e. Discrimination, Harassment and Inappropriate Behavior)
12. Retaliation
13. Other Misconduct

# IMAX Corporation

**CEO Expenses**
**For the Fourth Quarter ended December 31, 2006**

| | Brad Wechsler | Rich Gelfond |
|---|---|---|
| *Travel* | | |
| Flights | 2,957 | 14,837 |
| Accomodation | 8,093 | 19,056 |
| Inflight phone/phone/rental | 595 | 1,089 |
| Car Rental/Limo Service | 919 | 3,394 |
| Meals | 3,419 | 5,814 |
| | 15,983 | 44,191 |
| *Automobile* | | |
| Lease | 3,928 | 3,716 |
| Maintenance | 433 | 115 |
| Parking | 2,080 | 1,800 |
| | 6,441 | 5,630 |
| *Other* | | |
| Donations | - | - |
| Miscellaneous | 316 | 1,058 |
| | 316 | 1,058 |
| **Total for the quarter** | **$ 22,740** | **$ 50,879** |
| *Travel Regions* | North America | North America<br>China |

# EXHIBIT U-32

This is Exhibit "U-32" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.
DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

PWC Current Position:

If the customer takes exception to <u>any</u> element of performance on the Customer Acceptance Certificate <u>and</u> can seek a refund from Imax for this element, (whether or not the element is immaterial), then all revenue recognition must be deferred until performance is complete.. Their position is not altered by whether Imax has 30 days to cure this element of performance – per contract, or whether the probability that Imax will not complete the element of performance within 30 days is 0%.

If PWC later carves out exceptions from the above, what are they and do they include such things as management judgment or materiality.

What role does a performance bond play in the facts and circumstances of Imax installs – does it push undelivered elements toward Warranty accounting.

Issue of sequential or dependant performance for Imax. When client performance must precede Imax performance, can a customer demand a refund for an element of performance that Imax could not have delivered prior to the time when the client completed their obligations. Allowing for a reasonable time between client performance and Imax performance, over a 30 day period starting from the end of the quarter to the point of cure, there may never be a time when the client is entitled to a refund.

# EXHIBIT U-33

This is Exhibit "U-33" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

Beijing Radio and Film

Fact: The remaining task was to paint the existing erected screen with a silver paint, thus making it into a 3D screen. The paint rig was on site but theatre conditions were such that the screen could not be painted.

Questions:

1. SAB 104 P. 20 paragraph 1 refers to delays in customers' production schedules in a fact pattern proscribing recognizing revenue in a situation where the customer is unable to accept the services or product provided by the seller. The interpretative response presented on P. 21 points out that the seller must not have retained any specific performance obligations such that the earnings process is not complete. How does the Company interpret the obligation remaining due to the customer not being ready to accept the Company's product of a 3D silver-painted screen?

2. What remedies are available to the customer at December 31, 2005, given that the screen does not meet the contractually specified conditions? How does the Company view the contractual obligation remaining to the customer at December 31, 2005, given that the customer is entitled to (a) compel IMAX to remediate or (b) seek external parties to complete the work and be reimbursed by IMAX for that work? How does the Company integrate this contractual fact pattern into the determination of inconsequential or perfunctory at December 31, 2005, given that SAB 104 p. 35 states in paragraph 2 of its interpretive response to question 1 that only "inconsequential or perfunctory actions may remain incomplete such that the failure to complete the actions would not result in the customer receiving a refund or rejecting the delivered products or services performed to date"?

3. SAB 104 p. 36 states in its interpretive response to Question 2 on Inconsequential or Perfunctory obligations that "a remaining performance obligation is not inconsequential or perfunctory if it is essential to the functionality of the delivered products or services". How does the Company interpret this in light of the fact that at December 31, 2005, Beijing R&F was unable to view 3D films, which was a contractual specification noted as lacking on the customer acceptance?

4. With respect to customer acceptance, how does the Company interpret the identification of a product that does not meet the specifications of the customer's order in light of SAB 104's comment on p. 25 "In those cases [referring to those cases where a seller delivers a product that does not meet the specification of the customer's order], revenue should not be recognized because a sale has not occurred." And p. 27 (c) "the staff believes that revenue should be deferred until the specifications have been objectively achieved".

5. Is the painting rig for the screen considered "specialized equipment" and does the painting require specialized skills? If so, how does the Company interpret that with respect to the list of factors presented on p. 37 of SAB 104?

Beijing SUC

Fact: Customer acceptance noted screen change required to change from contracted screen size to larger size. Existing installed screen was striped and therefore would have had to be replaced in any event. Theatre currently providing 2D film with a white screen while new screen of larger dimensions shipped.

Questions:

1. SAB 104 P. 15-16 refers to a series of characteristics of a transaction that would preclude revenue recognition. 1(e) of this list refers to the seller having "significant obligations for future performance to directly bring about resale of the product by the buyer". Granted this refers specifically to consignment goods, but how does the Company interpret the spirit of this sentiment (ie having no significant obligations remaining that would preclude the customer from culminating

its earning process) in light of the significant contractual obligation of 3D screen provision for a full and functioning system?

2. Would the Company have been compelled to replace the screen regardless of whether the customer wanted a larger one? If so, how does the Company view this against SAB 104's requirements for the satisfaction of significant contractual obligations?

3. Does the customer's request for and the Company's subsequent acceptance of a responsibility to provide a screen of a different size essentially reflect an amending agreement to the master contract as contemplated on p. 14 of SAB 104? What is the Company's view of the impact of this amendment to contract terms and satisfaction of all significant contractual obligations given that at December 31, 2005, the Company had not provided the screen that was agreed in this potentially amended contract?

4. While payment of all upfronts is indicative of a healthy business relationship and is a positive argument for collectibility, it is apparent the Company views the payments as a de facto statement of complete compliance with the terms of the contract. Is the Company free and clear of any potential default under the contract given payment of the upfronts? Also, at December 31, 2005, all upfronts were not received, therefore how does the Company tie its position at December 31, 2005 to full payment of upfronts?

# EXHIBIT U-34

This is Exhibit "U-34" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

Confidential

| | A | B | C | D |
|---|---|---|---|---|
| 1 | | | | |
| 2 | Information Request | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6–7 | Category | | Description | Reason for Request |
| 8 | Revenue - System Revenue | 1 | The timing between signing and installation of new theater systems in the past 3 years. | |
| 9 | | 2 | The reason, trend of sales-type lease(STL) tranferring to operating lease agreement in the past 3 years | |
| 10 | | 3 | Amortization schedule and detailed listings of financing receivables in the past 3 years. | |
| 11 | | 4 | General terms and agreements for sales-type lease focused on the implicit rate, contract period and the portion of upfront fee, ongoing rental fee and finance income. (Refer to Work Sheet attached herein as "contact list") | |
| 12 | | 5 | Revenue and margin analysis by product, by geographic area and product goods and service with in the System Revenue in the past 3 years. (Refer to Work Sheet attached herein as "1~4") | |
| 13 | Revenue - Film Revenue | 1 | Please distinguish DMR film revenue into processing fees and recoupments for 2003, 2004 and 2005. | In order to distinguish revenues that are recognized on a one-time basis (film processing fees) with that on a recurring basis (recoupments). |
| 14 | | 2 | Backlog for film production, film distribution (licensing), DMR films | To ask whether there is a backlog for film revenue as well. If there is, it would be most helpful in helping us understand the timing and size of future revenues and possible future cash inflows. |
| 15 | Revenue - Other Revenue | 1 | Total number of tickets sold in theaters owned and operated by the Company during year 2005, 2004 and 2003 | |
| 16 | | 2 | Average price per ticket to the theaters owned and operated by the Company during 2005, 2004 and 2003. | |
| 17 | COS | 1 | IMAX's overall agreement with CFI. | To estimate printing costs incurred for each film |
| 18 | | 2 | IMAX's overall agreement with DKP70MM. | To estimate printing costs incurred for each film |
| 19 | Research and Development | 1 | Detailed listing of Research and development cost and related projects for years ended December 31, 2005, 2004 and 2003(Please refer to Form 10-K) | |
| 20 | Account Receivables | 1 | Please reconcile A/R shown in the 'Accounts Receivable (ATB) to Blackbook Reconciliation' (Please refer to C.7.4.A) to A/R shown in 'Allowance for Doubtful Accounts Summary-December 2004 (Please refer to C.7.4.C)'. Same applies to 2005. | To reconcile the differences in A/R between two sources (10-K and C.7.4.A, C of the DDR database) |
| 21 | | 2 | What constitutes 'Others' of A/R (Please refer to C.7.4.A) | To understand the nature of the constituents of A/R. |
| 22 | | 3 | Accounting method used for computing bad debt allowance (both for upfront, theatre and others)? | To understand the calculation method of allowance of bad debts. |
| 23 | Inventory | 1 | Schedule of inventory at December 31, 2005, 2004 and 2003(Please refer to Form 10-K) | |
| 24 | | 2 | Schedule of cost of goods manufactured years ended December 31, 2005, 2004 and 2003 | |
| 25 | | 3 | The aging data of inventories at December 31, 2005, 2004 and 2003(Please refer to Form 10-K) | |
| 26 | | 4 | Purchasing policy for inventory(how and when) | |
| 27 | Fixed Assets | 1 | Detail break-down list of equipments leased | |

IMAX-US176098

001345

Confidential

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | Questionaire | | | | |
| 3 | | | | | |
| 4-5 | Category | | Description | Response | Additional Response |
| 6 | 1. Revenue - System Revenue | 1 | Is "upfront fee" interchageabley used with "initial rental fee"? The term "upfront fee" was used in IM, and "initial rental fee" was used in 10-K. | Frank Joyce mentioned during management's presentation that they are refering to the same thing. | |
| 7 | | 2 | In the "System signings" list, are the numbers of "NIL/Adjust" columns amortized to the finance income? Please provide an explaination of "NIL/Adjust" amounts in refernce to system sales and leases? (Refer to data D.1.C.1 and D.1.C.2) | NIL/Adjust represents, in case of multiple element arrangements, either PV of minimum ongoing payments or a fair value of other element delivered to clients. Net revenue is revenue after subtracting maintenance fee which is provided at free of charge for the first year of service. | |
| 8 | | 3 | a. Please provide the time delay between contract signing to system installation by type of installation/contract. b. Provide details of circumstances where contracts are cancelled subsequent to siging based on historical experience and the average rate of cancellations. | a. The time delays between contract signing to system installation depend on the each contract as well as system type that is to being installed. However, It usually takes 18 to 30 months before installing the system except for MPX which takes 3 to 4 months before installing the system. b. Circumstances where contracts are cancelled subsequent to signing are mostly caused by financial difficulties of clients or unable to obtainin approval or financing. The historical rate of cancellation is about 9.25%. IMAX will post backlog report which includes detail information of each contract entered after 1998. | |
| 9 | | 4 | What is proportion of upfront fees, monthly rental fees, finance income and maintenance fee over the total revenue recognized for sales-type leases (Refer to MD&A Item 7. revenue)? Is the "STL Revenue" in the Blackbook consist of initial rental fees only (Refer to data C.7.1.a and C.7.1.b)? | No definite answer was given for this question. The Backlog report should make this question clear. | |
| 10 | | 5 | Can you explain the correlation between the STL revenue, maintenance revenue and any other revenue, if any (Refer to data C.7.1.a and C.7.1.b). | Since all system sales or leases contracts also include maintenance service, the revenues should have direct relationship. | |
| 11 | | 6 | Is there any reason why STL margin ratio in FY2004 was the highest of the past 3 years (2004: 72.2%, 2003: 58.0% and 2005: 62.3%) and STL margin ratio in FY2005 turned to decline (Refer to data C.7.1.a and C.7.1.b)? | It is due to cancellation of contracts as well as sales of used products. | |
| 12 | | 7 | What is(are) reason(s) for drop of IMAX system revenue for 1Q of FY 2006?(2005 : 97,753 thousand $ and 2006(annualized based on 1Q 2006 actual : 37,588 thousand $)(Refer to 2006 10-Q and data C.7.1.e) | There is seasonality factor for sales. Even though contracts are entered in various times of the year, clients usually want to complete the projects by the end of the year. | |
| 13 | | 8 | What is(are) reason(s) for drop of gross margin for 1Q of FY 2006?(gross margin ratio in 2005 : 62.2% and in 1Q 2006: 54.1%)(Refer to data C.7.1.e) | Again, the explanation is related to seasonal factor. | |
| 14 | | 9 | During FY 2005 and 2004, the sales amounts for 1Q, 2Q and 3Q are more or less similar to each other, however, the sales amout for 4Q is rather high compared to those of other Qs, Does the sales of 4Q affected by seasonality factor? | Yes. Refer to answer given for 1-7 | |
| 15 | | 10 | What is the reason for dramatic increase of earnings in FY2002. Was the earnings in FY 2001 specially low for some reason?. | Write-off of inventory and AR due to downturn of exhibitors' business. | |
| 16 | | 11 | What caused the decrease of gross margin ratio of 75.2% in FY 2005 from 94.6% in FY 2003 for rent revenue(We are refering to the revenue which you classified in your black book, not ongoing payments? | Rent revenue are product specific, thus the quality of earnings depends on the products that were rented out. | |

IMAX-US176099

001346

Confidential

| | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | | | | | | | |
| 3 | | | | | | | |
| 4 5 | Link to Work Paper | Reason for Request | Person Requesting | Person Requesting | Previously Provided | Provided Herewith | To be Provided |
| 6 | | Terminology | | | | | |
| 7 | 1-2 | Sale backlog interpretation | | | | | |
| 8 | | Sale backlog interpretation | | | | | |
| 9 | 1-4 | STL revenue reconciliation | | | | | |
| 10 | 1-5 | Trend analysis | | | | | |
| 11 | 1-6 | Trend analysis | | | | | |
| 12 | 1-7 | Trend analysis | | | | | |
| 13 | 1-8 | Trend analysis | | | | | |
| 14 | 1-9 | Trend analysis | | | | | |
| 15 | 1-10 | | | | | | |
| 16 | 1-11 | | | | | | |

IMAX-US176100

001347

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M | | | | NA | | | | | | | | | | | | |
| N | | | | Notes/Status | | | | | | | | | | | | |

Confidential

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 4 5 | Category | | Description | Response | Additional Response |
| 17 | | 12 | There is difference in sales amount recognized between the "sales backlog"(quarterly siging of summay, page3) and sales amount recognized in the "black book ("Black book 2004, page 8, Black book 2005 page 8)? What is the reason for this? | You will check this. | |
| 18 | | 13 | What makes the gross margin for sound system unstable? | It is product and client specifi. | |
| 19 | | 14 | What caused continual increase in turn over rate for financial receivable? Is it due to increase in proportion of upfront fee? | You will check this, however, it seems that it is due to increase in proportion of upfront fees. | |

| | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|
| 4<br>5 | Link to Work Paper | Reason for Request | Person Requesting | Person Requesting | Previously Provided | Provided Herewith | To be Provided |
| 17 | 1-12 | | | | | | |
| 18 | 1-13 | | | | | | |
| 19 | 1-14 | | | | | | |

| | M | N |
|---|---|---|
| 4 5 | NA | Notes/Status |
| 17 | | |
| 18 | | |
| 19 | | |

Confidential

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 4<br>5 | Category | | Description | Response | Additional Response |
| 20 | 2. Revenue - Film Revenue | 1 | Please add more colour to the increase in DMR revenue in 2004 ($7.5 million) compared to 2003 (less than $0.1 million). Where was DMR processing revenue in 2003? | Most DMR revenues are made up of recompment revenue. It may be differ depending on the contract. | |
| 21 | | 2 | Confirm whether DMR recoupment fees are included in DMR revenue (2005: $8.847m). If so, what is the proportion of processing (one time fee?) to recoupment. What is the credit terms for receipts (monthly, quarterly etc)? | Most DMR revenues are made up of recompment revenue. It may be differ depending on the contract. | |
| 22 | | 3 | A risk factor noted in 10K was that certain licensing fees are received based on financial reporting by exisiting customers. What measures to date have we taken to ensure completness and accuracy of licensing fees? (Reference: Item 1A Risk factors in 10K p18) | Every 3 years or so, IMAX sends out its internal auditors to perform audits and usually results in collecting more fees. | |
| 23 | | 4 | Is film distribution revenue same as film licensing revenues? What is the fee structure of these revenues and credit terms? How are the invoice amounts calculated? | It is customer specif. It could be a fixed fee, variable fee or fixed + variable fee. | |
| 24 | | 5 | What type of revenue (film production and development, film distribution, film post-production or DMR film) does E.4.1 represent? How does the total revenue figure in E.4.1 tie in with the numbers on page 37 of the 2004 Blackbook and page 39 of the 2005 Blackbook | | |
| 25 | | 6 | For movies that are highlighted in grey, why is it that they have no revenues but yet incur cost of sales? Is it because they had absolutely no ticket sales for that movie? | The movies are released in 2006. However, the cost incurred before the release. The costs include mostly institutional marketing expenses. | |
| 26 | | 7 | For movies that are highlighted in orange, why is it that they have negative cost of sales? | The negative costs of sales are film processing rebates from CF and Kodak which is based on Volume discount and tax incentives from Canadian government. | |
| 27 | 3. Revenue - Other Revenue | 1 | According to the 10-K, net book value of equipments leased were $9,590k in 2004 and $8,784k in 2005. In contrast, revenue from operating leases was $5,902k in 2004 and $6,728k in 2005 (Black book 2005). Explain the correlation between the the amount of equipments leased and operating lease revenues, if any | Due to STL converting to operating Lease and renewal of operating leases. | |
| 28 | | 2 | According to the 10-K, 2D MSM and 3D IMAX rental revenues in 2005 increased significantly compared to 2004, from $480 thousand and $872 thousand. However, book value of camera equipment decreased from $121 thousand to $62 thousand. Explain the correlation between the amount of camera assets and the revenue from camera rentals, if any | | |
| 29 | | 3 | COS of camera revenue includes "charged time". Explain the nature of "charged time" and to whom this cost is payable. (Reference: Black book 2005, p54) | It is technician service charge collected from clients. | |
| 30 | | 4 | Explain two consecutive years of negative revenues incurred by *Famous Players Toronto (14k and 17k in 2005 and 04. P 53 of the Black book 2005)* | They have entered a profit sharing scheme, hence in case of a loss incurred by the theater, IMAX presents its revenue as negative. | |
| 31 | | 5 | Explain why revenue from some profit sharing theaters have related costs to revenue and others do not. For example, no cost is recognized for Indianapolis, in contrast to Luxor, where cost to revenue is recognized and expensed (Black book 2005, p53) | It is contract specific. For example, the contract for indianapolis has a term for monagement fee, in contrast to luxor where it has a margin sharing scheme. | |
| 32 | | 6 | Explain the nature of purchase order requisition revenues included in Other Revenue (Black book 2005, p 56) | Not the core service of IMAX, it indicates services or products that are usually purchased from outside. They are usually provided to its clients at no margin. | |
| 33 | | 7 | Please add further colour to the gross margin of "Other Revenue". Why are most items generating negaitve margins? (Black book 2005, p56) | Customers to play longer movie. | |
| 34 | | 8 | Please provide detail of cost allocation methods, revenue allocations and management fee calculation method for "Profit Sharing & Other Theaters". (Black book 2005, p53) | They are more of COS type expenses which will be later converted to Inventory and Cogs. | |
| 35 | | 9 | When is revenue from profit sharing theaters recognized? Is it settled in cash? | Contract specific, mostly accured and be paid 30~60 days after the billing. | |
| 36 | | 10 | When is revenue from management fees recognized? Is it settled in cash? How is the amount determined? | Contract specific, mostly accured and be paid 30~60 days after the billing. | |
| 37 | | 11 | When is revenue from purchase order requisition recognized? | When service or product is delivered. | |

IMAX-US176105

Confidential

| | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|
| 4 5 | Link to Work Paper | Reason for Request | Person Requesting | Person Requesting | Previously Provided | Provided Herewith | To be Provided |
| 20 | 2-1 | | | | | | |
| 21 | | To estimate correctly the cash inflows from the DMR film revenues (recoupments & Processing) | | | | | |
| 22 | | To provide confidence in the numbers given to the Company by the exhibitors. It has directly correlated with the revenue value. | | | | | |
| 23 | 2-4 | To confirm understanding of the nature of the revenues. This is because on page 65 of 10-k, film sales is divided into Film Licensing, DMR Film Revenue, and Maintenance and Other Services while sales is broken down into Film Production, Distribution & Post-Production and Digital Re-Mastering on page 40 of 10-K. | | | | | |
| 24 | 2-5 | | | | | | |
| 25 | 2-5 | | | | | | |
| 26 | 2-5 | | | | | | |
| 27 | | | | | | | |
| 28 | | | | | | | |
| 29 | | | | | | | |
| 30 | | | | | | | |
| 31 | | | | | | | |
| 32 | | | | | | | |
| 33 | | | | | | | |
| 34 | | | | | | | |
| 35 | | | | | | | |
| 36 | | | | | | | |
| 37 | | | | | | | |

IMAX-US176106

001353

001354

| | M | N |
|---|---|---|
| 4 | NA | Notes/Status |
| 5 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |
| 29 | | |
| 30 | | |
| 31 | | |
| 32 | | |
| 33 | | |
| 34 | | |
| 35 | | |
| 36 | | |
| 37 | | |

Confidential

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 4<br>5 | Category | | Description | Response | Additional Response |
| 38 | | 12 | Why is the reason for substantial decrease in revenue from Luxor in 2004? (Blackbook 2005, p.53) | Re-negotiationof contract. | |
| 39 | | 13 | Revenue from New England Aquarium seems to be diminishing year by year. Why? (Blackbook 2005, p.53 and 2004, p.50) | | |
| 40 | | 14 | Why did COS for camera rentals greatly exceed revenue from it in 2004, i.e revenue of $480k and COS of $1,288k? In contrast to 2004, revenue was greater than COS in 2005 and 2003, resulting in gross profit.(Blackbook 2005, p.54, and 2005, p51) | During 2004, not many movies required uses of IMAX movies, however, depreciation of camera still occurred. | |
| 41 | | 15 | What is the reason for a negative COS in sponsorship revenue in 2003? (Blackbook 2004, p.53) | | |
| 42 | | 16 | Please explain the reason(s) for the decrease in office costs in SG&A, which amounted to $5,470k in 2003, and decreased to $2,006k in 2005. (Blackbook 2005, p.57 and 2004, p.54) | | |
| 43 | | 17 | Corporate costs increased from $7,956k in 2003 to $11,363 in 2005. Please explain the nature of corporate costs and the reason(s) for such increase (Blackbook 2005, p.57 and 2004, p.54) | | |

| | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|
| 4 | Link to Work Paper | Reason for Request | Person Requesting | Person Requesting | Previously Provided | Provided Herewith | To be Provided |
| 5 | | | | | | | |
| 38 | 3-12 | | | | | | |
| 39 | 3-12 | | | | | | |
| 40 | 3-14 | | | | | | |
| 41 | 3-14 | | | | | | |
| 42 | 3-16 | | | | | | |
| 43 | 3-16 | | | | | | |

| | M | N |
|---|---|---|
| 4 / 5 | NA | Notes/Status |
| 38 | | |
| 39 | | |
| 40 | | |
| 41 | | |
| 42 | | |
| 43 | | |

Confidential

| | A | B | C | D | E |
|---|---|---|---|---|---|
| 4<br>5 | Category | | Description | Response | Additional Response |
| 44 | 4. SG&A | 1 | What is the nature of the item "Net allocations" in SG&A, amounting to($16,776) thousand ($15,140) thousand in year 2005 and 2004, respectively? Should such allocations be spread across other SG&A accounts? (Black book 2005, p57) | To inventory, cost of sales, manufactuirng cost | |
| 45 | | 2 | Please explain the reason(s) for the decrease in office costs in SG&A, which amounted to $5,470k in 2003, and decreased to $2,006k in 2005. (Blackbook 2005, p.57 and 2004, p.54) | | |
| 46 | | 3 | Corporate costs increased from $7,956k in 2003 to $11,363 in 2005. Please explain the nature of corporate costs and the reason(s) for such increase. (Blackbook 2005, p.57 and 2004, p.54) | | |
| 47 | 5. Account Recevables | 1 | Why is there a discrepancy between the A/R (USD 24,662,855) indicated on the Allowance for Doubtful Accounts Summary (Page 1 of C.7.4.C of the Data Room) with the A/R (USD 19,899,000) on the BS for 2004 (Page 57 of the Form 10-K)? | | |
| 48 | | 2 | What is the nature of A/R Reclass to Def Rev' (Page 2 of C.7.4.C of the Data Room)? Does it mean that A/R is reduced by that amount of deferred revenue when presenting on the F/S? | | |
| 49 | | 3 | What is nature of approved adjustment in the Allowance for Doubtful Accounts Summary (Page 1 of C.7.4.C of the Data Room)? Does it refer to a write-off of A/R ? What is the difference between Preapproved Adjustments and Proposed Adjustments? (Page 2 of C.7.4.F of the Data Room)? What is the difference between Preapproved Adjustments and Proposed Adjustments? | | |
| 50 | | 4 | Why is that the allowance for bad debt for BOURNEMOUTH IMAX THEATRE and WUERZBURG IMAX 3D GT THEATRE increased in 2004 and 2005 (Page 4-6 of C.7.4.C of the Data Room, Page 2 of C.7.4.F of the Data Room) | | |
| 51 | | 5 | What is the definition of CFI Rebate in Film Distribution? What are the nature of commissions included in cost of sales (Page 42 of the 2005 Blackbook)? Are they fees paid to the Company's employees for promoting the Company's film licensing? | | |
| 52 | 6. Inventory | 1 | Please provide analysis of inventory turn.<br>Days on hand for inventory at 2005-279days, 2004-397days (calculated by using Costs of goods and services for (IMAX systems) and inventories at December 31, 2005 and 2004) (Please refer to Form 10-K and C.7.1.a, C.7.1.b) | Most inventories are built in batch of 5 in advance of 6-8 months before actuall installation due to increase in installation close to end of the year. | |
| 53 | 7. Inventory | 2 | Please provide analysis of inventory turn.<br>Days on hand for inventory at 2005-279days, 2004-397days (calculated by using Costs of goods and services for (IMAX systems) and inventories at December 31, 2005 and 2004) (Please refer to Form 10-K and C.7.2.a□□□□□□□□□□□ | Most inventories are built in batch of 5 in advance of 6-9 months before actuall installation due to increase in installation close to end of the year. | |
| 54 | 8. Digitalization | 1 | You plan to convert analogy systems to digital systems in future customers. Can you explain the plan in detail? And how do you plan to account this (defer the recognition of revenue, provision of warrant or other treatment)? | | |

IMAX-US176111

001358

Confidential

| | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|
| 4 5 | Link to Work Paper | Reason for Request | Person Requesting | Person Requesting | Previously Provided | Provided Herewith | To be Provided |
| 44 | 4-1 | | | | | | |
| 45 | 4-1 | | | | | | |
| 46 | 4-1 | | | | | | |
| 47 | | To reconcile the differences in A/R between two sources (10-K and C.7.4.C of the DDR database) | | | | | |
| 48 | | To clarify our understanding of the Allowance for Doubtful Accounts Summary. | | | | | |
| 49 | | To clarify our understanding of the Allowance for Doubtful Accounts Summary. | | | | | |
| 50 | 5-4 | To inquire whether the Company has receivables to these two exhibitors other than those relating to STL or whether the STL receivables are increasing on a continuous basis. | | | | | |
| 51 | | To understand the breakdown of cost of sales of Film Distribution. | | | | | |
| 52 | | | | | | | |
| 53 | | | | | | | |
| 54 | | | | | | | |

| | M | N |
|---|---|---|
| 4 5 | NA | Notes/Status |
| 44 | | |
| 45 | | |
| 46 | | |
| 47 | | |
| 48 | | |
| 49 | | |
| 50 | | |
| 51 | | |
| 52 | | |
| 53 | | |
| 54 | | |

Confidential

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | Sales and Lease Revenue Analysis (1) | | | | | | | | | |
| 2 | | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | ■ IMAX Systems Revenue leadsheet | | | | | | | | | |
| 5 | | | 2003 | 2004 | 2005 | | | | | | |
| 6 | | Sales and leases | 52,269 | 63,482 | 72,552 | | | | | | |
| 7 | | Ongoing rent | | | | | | | | | |
| 8 | | Ongoing min rental am't on ops lease | 849 | 1,039 | 1,425 | | | | | | |
| 9 | | Add rent STL | 444 | 847 | 1,234 | | | | | | |
| 10 | | Add rent ops lease | 3,482 | 3,338 | 3,775 | | | | | | |
| 11 | | Finance income STL | 4,432 | 3,991 | 4,632 | | | | | | |
| 12 | | Maintenance | 14,372 | 13,873 | 14,135 | | | | | | |
| 13 | | Total | 75,848 | 86,570 | 97,753 | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | ■ Sales and lease breakdown | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | | | | | | | |
| 19 | | | Sales | | | | | | | | |
| 20 | | Sales and leases | | Sales type lease | | | | | | | |
| 21 | | | Lease | | | | | | | | |
| 22 | | | | Operating lease | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | ■ Analysis of quantity, revenue and average price per Unit | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | Sales - For example | | | | | Sales-Type Lease - For example | | | | |
| 29 | | Quantity | 2003 | 2004 | 2005 | | Quantity | 2003 | 2004 | 2005 | |
| 30 | | IMAX 2D GT | [redacted] | | | | IMAX 2D GT | [redacted] | | | |
| 31 | | A | | | | | A | | | | |
| 32 | | B | | | | | B | | | | |
| 33 | | IMAX 2D SR | | | | | IMAX 2D SR | | | | |
| 34 | | C | | | | | C | | | | |
| 35 | | IMAX 3D GT | | | | | IMAX 3D GT | | | | |
| 36 | | D | | | | | D | | | | |
| 37 | | IMAX 3D SR | | | | | IMAX 3D SR | | | | |
| 38 | | IMAX 3D MPX | | | | | IMAX 3D MPX | | | | |
| 39 | | Total | 5 | 5 | 5 | | Total | 5 | 5 | 5 | |
| 40 | | | | | | | | | | | |
| 41 | | Amount | 2003 | 2004 | 2005 | | Amount | 2003 | 2004 | 2005 | |
| 42 | | IMAX 2D GT | [redacted] | | | | IMAX 2D GT | | | | |
| 43 | | A | | | | | A | - | - | - | |
| 44 | | B | | | | | B | - | - | - | |
| 45 | | IMAX 2D SR | | | | | IMAX 2D SR | | | | |

IMAX-US176114

001361

Confidential

| | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | |
| 28 | Operating Lease - For example | | | | | | | | | | | | | | |
| 29 | Quantity | 2003 | 2004 | 2005 | | | | | | | | | | | |
| 30 | IMAX 2D GT | 1 | 1 | 1 | | | | | | | | | | | |
| 31 | A | | | | | | | | | | | | | | |
| 32 | B | | | | | | | | | | | | | | |
| 33 | IMAX 2D SR | 1 | 1 | 1 | | | | | | | | | | | |
| 34 | C | | | | | | | | | | | | | | |
| 35 | IMAX 3D GT | 1 | 1 | 1 | | | | | | | | | | | |
| 36 | D | | | | | | | | | | | | | | |
| 37 | IMAX 3D SR | 1 | 1 | 1 | | | | | | | | | | | |
| 38 | IMAX 3D MPX | 1 | 1 | 1 | | | | | | | | | | | |
| 39 | Total | 5 | 5 | 5 | | | | | | | | | | | |
| 40 | | | | | | | | | | | | | | | |
| 41 | Amount | 2003 | 2004 | 2005 | | | | | | | | | | | |
| 42 | IMAX 2D GT | | | | | | | | | | | | | | |
| 43 | A | - | - | - | | | | | | | | | | | |
| 44 | B | - | - | - | | | | | | | | | | | |
| 45 | IMAX 2D SR | | | | | | | | | | | | | | |

IMAX-US176115

001362

Confidential

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | | C | [redacted] | | | | C | - | - | - | |
| 47 | | IMAX 3D GT | | | | | IMAX 3D GT | | | | |
| 48 | | D | | | | | D | - | - | - | |
| 49 | | IMAX 3D SR | | | | | IMAX 3D SR | | | | |
| 50 | | IMAX 3D MPX | | | | | IMAX 3D MPX | | | | |
| 51 | | Total | 5 | 5 | 888 | | Total | - | - | - | |
| 52 | | | | | | | | | | | |
| 53 | | Price per unit | 2003 | 2004 | 2005 | | Price per unit | 2003 | 2004 | 2005 | |
| 54 | | IMAX 2D GT | | | | | IMAX 2D GT | | | | |
| 55 | | A | #DIV/0! | #DIV/0! | #DIV/0! | | A | #DIV/0! | #DIV/0! | #DIV/0! | |
| 56 | | B | #DIV/0! | #DIV/0! | #DIV/0! | | B | #DIV/0! | #DIV/0! | #DIV/0! | |
| 57 | | IMAX 2D SR | | | | | IMAX 2D SR | | | | |
| 58 | | C | #DIV/0! | #DIV/0! | #DIV/0! | | C | #DIV/0! | #DIV/0! | #DIV/0! | |
| 59 | | IMAX 3D GT | | | | | IMAX 3D GT | | | | |
| 60 | | D | #DIV/0! | #DIV/0! | #DIV/0! | | D | #DIV/0! | #DIV/0! | #DIV/0! | |
| 61 | | IMAX 3D SR | | | | | IMAX 3D SR | | | | |
| 62 | | IMAX 3D MPX | | | | | IMAX 3D MPX | | | | |
| 63 | | | | | | | | | | | |
| 64 | | | | | | | | | | | |

Confidential

| | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 46 | C | - | - | - | | | | | | | | | | | |
| 47 | IMAX 3D GT | | | | | | | | | | | | | | |
| 48 | D | - | - | - | | | | | | | | | | | |
| 49 | IMAX 3D SR | | | | | | | | | | | | | | |
| 50 | IMAX 3D MPX | | | | | | | | | | | | | | |
| 51 | Total | - | - | - | | | | | | | | | | | |
| 52 | | | | | | | | | | | | | | | |
| 53 | Price per unit | 2003 | 2004 | 2005 | | | | | | | | | | | |
| 54 | IMAX 2D GT | | | | | | | | | | | | | | |
| 55 | A | #DIV/0! | #DIV/0! | #DIV/0! | | | | | | | | | | | |
| 56 | B | #DIV/0! | #DIV/0! | #DIV/0! | | | | | | | | | | | |
| 57 | IMAX 2D SR | | | | | | | | | | | | | | |
| 58 | C | #DIV/0! | #DIV/0! | #DIV/0! | | | | | | | | | | | |
| 59 | IMAX 3D GT | | | | | | | | | | | | | | |
| 60 | D | #DIV/0! | #DIV/0! | #DIV/0! | | | | | | | | | | | |
| 61 | IMAX 3D SR | | | | | | | | | | | | | | |
| 62 | IMAX 3D MPX | | | | | | | | | | | | | | |
| 63 | | | | | | | | | | | | | | | |
| 64 | | | | | | | | | | | | | | | |

Confidential

| | A | B | C | D | E | F | G | H | I | J | K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 65 | | | | | | | | | | | |
| 66 | | * Analysis of quantity, revenue and average price per Unit by regions | | | | | | | | | |
| 67 | | | | | | | | | | | |
| 68 | | Canada - For example | | | | | United States - For example | | | | |
| 69 | | Quantity | 2003 | 2004 | 2005 | | Quantity | 2003 | 2004 | 2005 | |
| 70 | | IMAX 2D GT | 1 | 1 | 1 | | IMAX 2D GT | | | | |
| 71 | | A | | | | | A | | | | |
| 72 | | B | | | | | B | | | | |
| 73 | | IMAX 2D SR | 1 | 1 | 1 | | IMAX 2D SR | | | | |
| 74 | | C | | | | | C | | | | |
| 75 | | IMAX 3D GT | 1 | 1 | 1 | | IMAX 3D GT | | | | |
| 76 | | D | | | | | D | | | | |
| 77 | | IMAX 3D SR | 1 | 1 | 1 | | IMAX 3D SR | | | | |
| 78 | | IMAX 3D MPX | 1 | 1 | 1 | | IMAX 3D MPX | | | | |
| 79 | | Total | 5 | 5 | 5 | | Total | 5 | 5 | 5 | |
| 80 | | | | | | | | | | | |
| 81 | | Amount | 2003 | 2004 | 2005 | | Amount | 2003 | 2004 | 2005 | |
| 82 | | IMAX 2D GT | 1 | 1 | 400 | | IMAX 2D GT | | | 400 | |
| 83 | | A | | | | | A | | | | |
| 84 | | B | | | | | B | | | | |
| 85 | | IMAX 2D SR | 1 | 1 | | | IMAX 2D SR | | | | |
| 86 | | C | | | | | C | | | | |
| 87 | | IMAX 3D GT | 1 | 1 | 400 | | IMAX 3D GT | | | 400 | |
| 88 | | D | | | | | D | | | | |
| 89 | | IMAX 3D SR | 1 | 1 | 88 | | IMAX 3D SR | | | 88 | |
| 90 | | IMAX 3D MPX | 1 | 1 | | | IMAX 3D MPX | | | | |
| 91 | | Total | 5 | 5 | 888 | | Total | 5 | 5 | 888 | |
| 92 | | | | | | | | | | | |
| 93 | | Price per unit | 2003 | 2004 | 2005 | | Price per unit | 2003 | 2004 | 2005 | |
| 94 | | IMAX 2D GT | | | | | IMAX 2D GT | | | | |
| 95 | | A | #DIV/0! | #DIV/0! | #DIV/0! | | A | #DIV/0! | #DIV/0! | #DIV/0! | |
| 96 | | B | #DIV/0! | #DIV/0! | #DIV/0! | | B | #DIV/0! | #DIV/0! | #DIV/0! | |
| 97 | | IMAX 2D SR | | | | | IMAX 2D SR | | | | |
| 98 | | C | #DIV/0! | #DIV/0! | #DIV/0! | | C | #DIV/0! | #DIV/0! | #DIV/0! | |
| 99 | | IMAX 3D GT | | | | | IMAX 3D GT | | | | |
| 100 | | D | #DIV/0! | #DIV/0! | #DIV/0! | | D | #DIV/0! | #DIV/0! | #DIV/0! | |
| 101 | | IMAX 3D SR | | | | | IMAX 3D SR | | | | |
| 102 | | IMAX 3D MPX | | | | | IMAX 3D MPX | | | | |
| 103 | | | | | | | | | | | |
| 104 | | | | | | | | | | | |
| 105 | | | | | | | | | | | |
| 106 | | * Price Table | | | | | | | | | |

Confidential

| | L | M | N | O | P | Q | R | S | T | U | V | W | X | Y | Z |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 65 | | | | | | | | | | | | | | | |
| 66 | | | | | | | | | | | | | | | |
| 67 | | | | | | | | | | | | | | | |
| 68 | Europe - For example | | | | | Asia - For example | | | | | Rest of world - For example | | | | |
| 69 | Quantity | 2003 | 2004 | 2005 | | Quantity | 2003 | 2004 | 2005 | | Quantity | 2003 | 2004 | 2005 | |
| 70 | IMAX 2D GT | 1 | 1 | 1 | | IMAX 2D GT | 1 | 1 | 1 | | IMAX 2D GT | [illegible] | [illegible] | [illegible] | |
| 71 | A | | | | | A | | | | | A | | | | |
| 72 | B | | | | | B | | | | | B | | | | |
| 73 | IMAX 2D SR | 1 | 1 | 1 | | IMAX 2D SR | 1 | 1 | 1 | | IMAX 2D SR | [illegible] | [illegible] | [illegible] | |
| 74 | C | | | | | C | | | | | C | | | | |
| 75 | IMAX 3D GT | 1 | 1 | 1 | | IMAX 3D GT | 1 | 1 | 1 | | IMAX 3D GT | [illegible] | [illegible] | [illegible] | |
| 76 | D | | | | | D | | | | | D | | | | |
| 77 | IMAX 3D SR | 1 | 1 | 1 | | IMAX 3D SR | 1 | 1 | 1 | | IMAX 3D SR | [illegible] | [illegible] | [illegible] | |
| 78 | IMAX 3D MPX | 1 | 1 | 1 | | IMAX 3D MPX | 1 | 1 | 1 | | IMAX 3D MPX | [illegible] | [illegible] | [illegible] | |
| 79 | Total | 5 | 5 | 5 | | Total | 5 | 5 | 5 | | Total | 5 | 5 | 5 | |
| 80 | | | | | | | | | | | | | | | |
| 81 | Amount | 2003 | 2004 | 2005 | | Amount | 2003 | 2004 | 2005 | | Amount | 2003 | 2004 | 2005 | |
| 82 | IMAX 2D GT | 1 | 1 | 400 | | IMAX 2D GT | 1 | 1 | 400 | | IMAX 2D GT | [illegible] | 1 | 400 | |
| 83 | A | | | | | A | | | | | A | | | | |
| 84 | B | | | | | B | | | | | B | | | | |
| 85 | IMAX 2D SR | 1 | 1 | | | IMAX 2D SR | 1 | 1 | | | IMAX 2D SR | [illegible] | [illegible] | | |
| 86 | C | | | | | C | | | | | C | | | | |
| 87 | IMAX 3D GT | 1 | 1 | 400 | | IMAX 3D GT | 1 | 1 | 400 | | IMAX 3D GT | [illegible] | 1 | 400 | |
| 88 | D | | | | | D | | | | | D | | | | |
| 89 | IMAX 3D SR | 1 | 1 | 88 | | IMAX 3D SR | 1 | 1 | 88 | | IMAX 3D SR | [illegible] | [illegible] | 88 | |
| 90 | IMAX 3D MPX | 1 | 1 | | | IMAX 3D MPX | 1 | 1 | | | IMAX 3D MPX | [illegible] | [illegible] | | |
| 91 | Total | 5 | 5 | 888 | | Total | 5 | 5 | 888 | | Total | 5 | 5 | 888 | |
| 92 | | | | | | | | | | | | | | | |
| 93 | Price per unit | 2003 | 2004 | 2005 | | Price per unit | 2003 | 2004 | 2005 | | Price per unit | 2003 | 2004 | 2005 | |
| 94 | IMAX 2D GT | | | | | IMAX 2D GT | | | | | IMAX 2D GT | | | | |
| 95 | A | #DIV/0! | #DIV/0! | #DIV/0! | | A | #DIV/0! | #DIV/0! | #DIV/0! | | A | #DIV/0! | #DIV/0! | #DIV/0! | |
| 96 | B | #DIV/0! | #DIV/0! | #DIV/0! | | B | #DIV/0! | #DIV/0! | #DIV/0! | | B | #DIV/0! | #DIV/0! | #DIV/0! | |
| 97 | IMAX 2D SR | | | | | IMAX 2D SR | | | | | IMAX 2D SR | | | | |
| 98 | C | #DIV/0! | #DIV/0! | #DIV/0! | | C | #DIV/0! | #DIV/0! | #DIV/0! | | C | #DIV/0! | #DIV/0! | #DIV/0! | |
| 99 | IMAX 3D GT | | | | | IMAX 3D GT | | | | | IMAX 3D GT | | | | |
| 100 | D | #DIV/0! | #DIV/0! | #DIV/0! | | D | #DIV/0! | #DIV/0! | #DIV/0! | | D | #DIV/0! | #DIV/0! | #DIV/0! | |
| 101 | IMAX 3D SR | | | | | IMAX 3D SR | | | | | IMAX 3D SR | | | | |
| 102 | IMAX 3D MPX | | | | | IMAX 3D MPX | | | | | IMAX 3D MPX | | | | |
| 103 | | | | | | | | | | | | | | | |
| 104 | | | | | | | | | | | | | | | |
| 105 | | | | | | | | | | | | | | | |
| 106 | | | | | | | | | | | | | | | |

Confidential

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | | Sales and Lease Revenue Analysis (2) | | | | | | |
| 2 | | | | | | | | |
| 3 | | | | | | | | |
| 4 | | * IMAX Systems Revenue leadsheet | | | | | | |
| 5 | | | 2003 | 2004 | 2005 | | | |
| 6 | | Sales and leases | 52,269 | 63,482 | 72,552 | | | |
| 7 | | Ongoing rent | | | | | | |
| 8 | | Ongoing min rental am't on ops lease | 849 | 1,039 | 1,425 | | | |
| 9 | | Add rent STL | 444 | 847 | 1,234 | | | |
| 10 | | Add rent ops lease | 3,482 | 3,338 | 3,775 | | | |
| 11 | | Finance income STL | 4,432 | 3,991 | 4,632 | | | |
| 12 | | Maintenance | 14,372 | 13,873 | 14,135 | | | |
| 13 | | Total | 75,848 | 86,570 | 97,753 | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | * Cash flows from Sales-type Lease | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | Initial rental fees | | | | | |
| 20 | | Cash flows | ongoing rental payments | | fixed minimum amounts | | | |
| 21 | | | | | * | | | |
| 22 | | | annual maintenance fees | | additional rentals* | | | |
| 23 | | | | | | | | |
| 24 | | * Analize at Ongoing rent revenue | | | | | | |
| 25 | | | | | | | | |
| 26 | | * Analysis of quantity, revenue and average price per Unit | | | | | | |
| 27 | | | | | | | | |
| 28 | | Initial rental fees: Sales-Type Lease - For example | | | | | fixed minimum fees: Sales-Type Lease - For example | |
| 29 | | Amount | 2003 | 2004 | 2005 | | Amount | 2003 |
| 30 | | IMAX 2D GT | [redacted] | [redacted] | [redacted] | | IMAX 2D GT | [redacted] |
| 31 | | A | [redacted] | [redacted] | [redacted] | | A | [redacted] |
| 32 | | B | [redacted] | [redacted] | [redacted] | | B | [redacted] |
| 33 | | IMAX 2D SR | [redacted] | [redacted] | [redacted] | | IMAX 2D SR | [redacted] |
| 34 | | C | [redacted] | [redacted] | [redacted] | | C | [redacted] |
| 35 | | IMAX 3D GT | [redacted] | [redacted] | [redacted] | | IMAX 3D GT | [redacted] |
| 36 | | D | [redacted] | [redacted] | [redacted] | | D | [redacted] |
| 37 | | IMAX 3D SR | [redacted] | [redacted] | [redacted] | | IMAX 3D SR | [redacted] |
| 38 | | IMAX 3D MPX | [redacted] | [redacted] | [redacted] | | IMAX 3D MPX | [redacted] |
| 39 | | Total | - | - | 888 | | Total | 5 |
| 40 | | | | | | | | |
| 41 | | Price per unit | 2003 | 2004 | 2005 | | Price per unit | 2003 |
| 42 | | IMAX 2D GT | | | | | IMAX 2D GT | |
| 43 | | A | #DIV/0! | #DIV/0! | #DIV/0! | | A | #DIV/0! |
| 44 | | B | #DIV/0! | #DIV/0! | #DIV/0! | | B | #DIV/0! |
| 45 | | IMAX 2D SR | | | | | IMAX 2D SR | |

Confidential

| | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 10 | | | | | | | | | |
| 11 | | | | | | | | | |
| 12 | | | | | | | | | |
| 13 | | | | | | | | | |
| 14 | | | | | | | | | |
| 15 | | | | | | | | | |
| 16 | * Cash flows from Operating Lease | | | | | | | | |
| 17 | | | | | | | | | |
| 18 | | | | | | | | | |
| 19 | | Initial rental fees | | | | | | | |
| 20 | Cash flows | | | | fixed minimum amounts | | | | |
| 21 | | ongoing rental payments | | | | | | | |
| 22 | | | | | additional rentals* | | | | |
| 23 | | | | | | | | | |
| 24 | * Analize at Ongoing rent revenue | | | | | | | | |
| 25 | | | | | | | | | |
| 26 | | | | | | | | | |
| 27 | | | | | | | | | |
| 28 | | | | maintenance fees: Sales-Type Lease - For example | | | | | |
| 29 | 2004 | 2005 | | Amount | 2003 | 2004 | 2005 | | |
| 30 | | 400 | | IMAX 2D GT | | | 400 | | |
| 31 | | | | A | | | | | |
| 32 | | | | B | | | | | |
| 33 | | | | IMAX 2D SR | | | | | |
| 34 | | | | C | | | | | |
| 35 | | 400 | | IMAX 3D GT | | | 400 | | |
| 36 | | | | D | | | | | |
| 37 | | 88 | | IMAX 3D SR | | | 88 | | |
| 38 | | | | IMAX 3D MPX | | | | | |
| 39 | 5 | 888 | | Total | 5 | 5 | 888 | | |
| 40 | | | | | | | | | |
| 41 | 2004 | 2005 | | Price per unit | 2003 | 2004 | 2005 | | |
| 42 | | | | IMAX 2D GT | | | | | |
| 43 | #DIV/0! | #DIV/0! | | A | #DIV/0! | #DIV/0! | #DIV/0! | | |
| 44 | #DIV/0! | #DIV/0! | | B | #DIV/0! | #DIV/0! | #DIV/0! | | |
| 45 | | | | IMAX 2D SR | | | | | |

Confidential

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 46 | | C | #DIV/0! | #DIV/0! | #DIV/0! | | C | #DIV/0! |
| 47 | | IMAX 3D GT | | | | | IMAX 3D GT | |
| 48 | | D | #DIV/0! | #DIV/0! | #DIV/0! | | D | #DIV/0! |
| 49 | | IMAX 3D SR | | | | | IMAX 3D SR | |
| 50 | | IMAX 3D MPX | | | | | IMAX 3D MPX | |
| 51 | | | | | | | | |
| 52 | | | | | | | | |
| 53 | | Initial rental fees: Operating Lease - For example | | | | | fixed minimum fees: Operating Lease- For example | |
| 54 | | Amount | 2003 | 2004 | 2005 | | Amount | 2003 |
| 55 | | IMAX 2D GT | 1 | 1 | 400 | | IMAX 2D GT | 1 |
| 56 | | A | | | | | A | |
| 57 | | B | | | | | B | |
| 58 | | IMAX 2D SR | 1 | 1 | | | IMAX 2D SR | 1 |
| 59 | | C | | | | | C | |
| 60 | | IMAX 3D GT | 1 | 1 | 400 | | IMAX 3D GT | 1 |
| 61 | | D | | | | | D | |
| 62 | | IMAX 3D SR | 1 | 1 | 88 | | IMAX 3D SR | 1 |
| 63 | | IMAX 3D MPX | 1 | 1 | | | IMAX 3D MPX | 1 |
| 64 | | Total | 5 | 5 | 888 | | Total | 5 |
| 65 | | | | | | | | |
| 66 | | Price per unit | 2003 | 2004 | 2005 | | Price per unit | 2003 |
| 67 | | IMAX 2D GT | | | | | IMAX 2D GT | |
| 68 | | A | #DIV/0! | #DIV/0! | #DIV/0! | | A | #DIV/0! |
| 69 | | B | #DIV/0! | #DIV/0! | #DIV/0! | | B | #DIV/0! |
| 70 | | IMAX 2D SR | | | | | IMAX 2D SR | |
| 71 | | C | #DIV/0! | #DIV/0! | #DIV/0! | | C | #DIV/0! |
| 72 | | IMAX 3D GT | | | | | IMAX 3D GT | |
| 73 | | D | #DIV/0! | #DIV/0! | #DIV/0! | | D | #DIV/0! |
| 74 | | IMAX 3D SR | | | | | IMAX 3D SR | |
| 75 | | IMAX 3D MPX | | | | | IMAX 3D MPX | |
| 76 | | | | | | | | |
| 77 | | | | | | | | |
| 78 | | Price Table | | | | | | |

Confidential

| | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|
| 46 | #DIV/0! | #DIV/0! | | C | #DIV/0! | #DIV/0! | #DIV/0! | | |
| 47 | | | | IMAX 3D GT | | | | | |
| 48 | #DIV/0! | #DIV/0! | | D | #DIV/0! | #DIV/0! | #DIV/0! | | |
| 49 | | | | IMAX 3D SR | | | | | |
| 50 | | | | IMAX 3D MPX | | | | | |
| 51 | | | | | | | | | |
| 52 | | | | | | | | | |
| 53 | | | | | | | | | |
| 54 | 2004 | 2005 | | | | | | | |
| 55 | [redacted] | [redacted] | | | | | | | |
| 56 | [redacted] | [redacted] | | | | | | | |
| 57 | [redacted] | [redacted] | | | | | | | |
| 58 | [redacted] | [redacted] | | | | | | | |
| 59 | [redacted] | [redacted] | | | | | | | |
| 60 | [redacted] | [redacted] | | | | | | | |
| 61 | [redacted] | [redacted] | | | | | | | |
| 62 | [redacted] | [redacted] | | | | | | | |
| 63 | [redacted] | [redacted] | | | | | | | |
| 64 | 5 | 888 | | | | | | | |
| 65 | | | | | | | | | |
| 66 | 2004 | 2005 | | | | | | | |
| 67 | | | | | | | | | |
| 68 | #DIV/0! | #DIV/0! | | | | | | | |
| 69 | #DIV/0! | #DIV/0! | | | | | | | |
| 70 | | | | | | | | | |
| 71 | #DIV/0! | #DIV/0! | | | | | | | |
| 72 | | | | | | | | | |
| 73 | #DIV/0! | #DIV/0! | | | | | | | |
| 74 | | | | | | | | | |
| 75 | | | | | | | | | |
| 76 | | | | | | | | | |
| 77 | | | | | | | | | |
| 78 | | | | | | | | | |