# EXHIBIT B
# (PART 18)

# EXHIBIT U-55

This is Exhibit "U-55" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

From: John Schreiner on 04/18/2006 12:20 PM

To: Ilidio Coito/Imax@Imax

cc: Don Kane/Imax@Imax, Larry T O'Reilly/Imax@Imax, Eric Jacques/Imax@Imax, Olga Pilnikova/Asia/Imax@Imax, Don Savant/Imax@Imax

Subject: Kazan

Ilidio,

Under a separate email, I will send you photos of the site that I took yesterday at the theatre, but from my understanding, little has changed since the end of December due to the cold weather. I was met there by the guys who did the initial installation from Moscow and they toured me around the site. What I saw and what the pictures will attest to are as follows:

1. The site is a bare shell still with no heating, installation, or climate controls of any kind.
2. The Theatre itself still has many open holes to the outside allowing cold wind, moisture, snow, etc. into the theatre.
3. They have started laying down the supports for the seating deck and have other work going on, but it is still not a hub of activity as it is still pretty cold there and was forecast to snow there today.
4. The speakers are far from hermetically sealed and were never kept in anything that would pass for a climate controlled room. Remember, the theatre dropped to -45 degrees centigrade for at least a week solid during the winter and was bitterly cold throughout the remainder of the period.
5. There is a hole (probably 3x3foot) in the roof above where the speakers were left during the winter (they have been shifted slightly to allow for some of the current work that is taking place in the theatre) and while I could not see any visible signs of water damage, I can't see how they did not get wet.
6. The projection booth was mildly more encouraging as it was a little warmer (5 degrees higher than the theatre) although there was a point during the winter too when it also dropped to -45 degrees. There were a few heat lamps and I know that they had kept the room heated with gas heaters, but I think the conditions were so bad at some point that it was difficult to get gas to the site.
7. There was some water seepage into the projection booth once the snows melted as well, but I was told that the water did not get to the projector. It may have reached one of the bases of the QTRU, but it was difficult to tell.
8. Difficult to tell what shape the projector is in or sound racks are in as they are in their boxes, but my guess is that some electonics in all of the amps and projector will have some issue or another. Again, the equipment was packed up better than the speakers, but being realistic, the temperature would have been oscillating wildly over the past 4 months based on what the room looked and felt like from a temperature perspective.
9. The good news is that the glasses cleaning machine and the rectifiers/compressors are probably ok as it was in part of the projection booth where the security guys slept and it was room temperature.

Realistically, the client is not going to be opening this theatre complex until mid-August as no major works are going to be started until after the May holidays end on the 10th.

One of the consequences of the installation taking place when it did and in the conditions that it did, is that the client has lost complete faith in our ability to get the theatre to work and in our respect for the equipment itself. Kazan is a key theatre for us as it is the first theatre to launch outside of Moscow and two other chains active in the "regions" are also opening up there this year therefore it is imperative for our business to run well there. These other chains are currently on the fence with our business and have both told me that they are going to wait and see how Kazan does. I went to Kazan to push the client to demonstrate to me what she is doing in preparation for the launch of her theatre from a marketing perspective as she went radio silent, and while I do think she will do a good job when she gets going, I got the sense deep down inside she did not want to make a big marketing push until she was sure that the theatre was going to operate reliability. It is imperative to the launch of this theatre that we start demonstrating to her that we are going to ensure that this theatre is going to operate reliably. While I have told her we have never missed an opening date and sang everyone's praises, she is not going to believe it until she see's it tangibly starting to take place.

Please review the pictures and the above, then discuss them with the relevant people. My suggestions are to take the safe road as this is in Russia and it is difficult to get replacement parts in and out in a short period of time should something be problematic. For example:

1. I would start preparing to send new speakers as the paperwork will be an issue to get processed.
2. As per our discussion regarding the screen, I would have a new one sent out and the one in Helsinki sent back to North America for installation closer to home so any problems are more easily rectified.
3. As we discussed previously, I would definitely make sure there are more than enough spares of electronic parts as they have been through quite a lot of fluctuating temperatures.

If one wanted to be totally safe to ensure that this worked, the Perm equipment which will be up for installation later this year will be sitting in storage a short flight away from Kazan so that replacement parts can be easily at hand, but I will leave those decisions up to your team.

I am on Skype tonight if anybody would like to speak to me about the above.

John

If one wanted to be totally safe to ensure that this worked, the Perm equipment which will be up for installation later this year will be sitting in storage a short flight away from Kazan so that replacement parts can be easily at hand, but I will leave those decisions up to your team.

I am on Skype tonight if anybody would like to speak to me about the above.

John

# EXHIBIT U-56

This is Exhibit "U-56" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

IMAX®

Ilidio Coito
05/12/2006 10:32 AM

To: KinopleX SuvaR <kino@suvar.ru>
cc: dkane@imax.com, rkilburn@imax.com, mhamilton@imax.com, mwelton@imax.com, cbonaldi@imax.com, JSchreiner@imax.com, Olga Pilnikova/Asia/Imax@Imax

Subject: Re: IMAX theatre Kazan

Dear Irina,
Thanks for your information and we will be working towards the Aug 15th for opening and theatre .

I have received John's information and he tell me that the Roof is still open, the theatre isn't finished etc, however, I need to know when the theatre is at s stage that i could send a technician and open the system up to test it. This can only be done once most of the work is done and there are no changes of damaging the system afterwards.

I really appreciate your feed back on how is the progress with the IMAX theatre. Either through Olga Pilnikova or just a few lines to lets us know at what stage you are.

Thank you
Regards
Ilidio

kinoplex SUVAR <kino@suvar.ru> on 05/12/2006 07:53:01 AM

kinoplex SUVAR <kino@suvar.ru> on 05/12/2006 07:53:01 AM

Please respond to KinopleX SuvaR <kino@suvar.ru>

To: icoito@imax.com
cc:

Subject: IMAX theatre Kazan

Dear Ilidio,

The estimated opening date of the theatre is August, 15th (or 20th),2006.

As for the cables and other components of the system that need to be replaced, we should take into account the fact that it will take considerable time to ship all these items to Kazan and do all the paperwork required by the customs. In all probability we'll need the replacement parts by July, 15, a month before the scheduled launch.

As you know, John Schreiner visited Kazan a couple of weeks ago and took pictures of the theatre. We think you can contact him if you are interested in his assessment of the current status of the construction and getting some of the pictures. Anyway, should you need any further information regarding the theatre, we'll be happy to provide it.

Best regards,

# EXHIBIT U-57

This is Exhibit "U-57" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014

IMAX®

Ilidio Coito
05/18/2006 05:45 PM

To: KinopleX SuvaR <kino@suvar.ru>
cc: dkane@imax.com, rkilburn@imax.com

Subject: Re: IMAX theatre Kazan

Dear Irina,
I am sending the speaker cable data sheet. This cable is designed and manufactured for IMAX , therefore, you might have a hard time encountering it. I believe that it will be prudent for us to send the cable when we ship other parts that need to be replaced.

Best Regards

Ilidio Coito

Project manager.

Please respond to KinopleX SuvaR <kino@suvar.ru>

To: icoito@imax.com
cc:

Subject: IMAX theatre Kazan

Dear Ilidio,

Indeed, the theatre is not finished yet and we can't open the equipment to check it.

However we still need to settle the issue with the cables. In one of my previous messages I mentioned that most audio cables were out of order and asked whether we could replace them with new ones that fully comply with IMAX specification. We don't think you or your company's representative needs to be here to settle this matter.

Please, let us know what you think of this.

Regards,
Irina

# EXHIBIT U-58

This is Exhibit "U-58" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires: August 8, 2014


kinoplex SUVAR <kino@suvar.ru> on 05/26/2006 10:42:59 AM

Please respond to KinopleX SuvaR <kino@suvar.ru>

To: icoito@imax.com
cc:

Subject: IMAX theatre Kazan

Dear Ilidio,

We are planning to complete the works in the projection booth by June, 10th-15th. Anyway we'll let you know when they are over so that you could send your technicians to check the equipment.

We still haven't settled the issue with the cables. When do you think you'll be able to ship them? If your technicians are going to travel to Kazan on a business visa, do you think they'll be able to hand-carry the cables?

Looking forward to your response.
Irina

--
. .........,
kinoplex mailto:kino@suvar.ru

# EXHIBIT U-59

This is Exhibit "U-59" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires August 8, 2014

From: Larry T O'Reilly on 05/30/2006 02:21 PM
To: Eric Jacques/Imax@Imax
cc: Ilidio Coito/Imax@Imax

Subject: Re: Kazan Speakers

Eric,

What do you suggest that we do here, this opening is extremely important to the longer term development of the Russian marketplace?

Larry
----- Forwarded by Larry T O'Reilly/Imax on 05/30/2006 02:09 PM -----

John Schreiner
05/30/2006 01:30 PM

To: Larry T O'Reilly/Imax@Imax
cc:
bcc:
Subject: Re: Kazan Speakers

Here you go Larry - thanks for understanding my concern as I have been there and seen how the equipment was stored and placed. The hole in the roof is on top of the area of the seating deck where the speakers were kept for most of the winter as far as I understood.

Here is the note I sent in April to Ilidio describing the site:

Ilidio,

Under a separate email, I will send you photos of the site that I took yesterday at the theatre, but from my understanding, little has changed since the end of December due to the cold weather. I was met there by the guys who did the initial installation from Moscow and they toured me around the site. What I saw and what the pictures will attest to are as follows:

1. The site is a bare shell still with no heating, installation, or climate controls of any kind.
2. The Theatre itself still has many open holes to the outside allowing cold wind, moisture, snow, etc. into the theatre.
3. They have started laying down the supports for the seating deck and have other work going on, but it is still not a hub of activity as it is still pretty cold there and was forecast to snow there today.
4. The speakers are far from hermetically sealed and were never kept in anything that would pass for a climate controlled room. Remember, the theatre dropped to -45 degrees centigrade for at least a week solid during the winter and was bitterly cold throughout the remainder of the period.
5. There is a hole (probably 3x3foot) in the roof above where the speakers were left during the winter (they have been shifted slightly to allow for some of the current work that is taking place in the theatre) and while I could not see any visible signs of water damage, I can't see how they did not get wet.
6. The projection booth was mildly more encouraging as it was a little warmer (5 degrees higher than the theatre) although there was a point during the winter too when it also dropped to -45 degrees. There were a few heat lamps and I know that they had kept the room heated with gas heaters, but I think the conditions were so bad at some point that it was difficult to get gas to the site.
7. There was some water seepage into the projection booth once the snows melted as well, but I was told that the water did not get to the projector. It may have reached one of the bases of the QTRU, but it was difficult to tell.
8. Difficult to tell what shape the projector is in or sound racks are in as they are in their boxes, but my guess is that some electonics in all of the amps and projector will have some issue or another. Again, the equipment was packed up better than the speakers, but being realistic, the temperature would have been oscillating wildly over the past 4 months based on what the room looked and felt like from a temperature

perspective.
9. The good news is that the glasses cleaning machine and the rectifiers/compressors are probably ok as it was in part of the projection booth where the security guys slept and it was room temperature.

Larry T O'Reilly

Larry T O'Reilly
05/30/2006 06:22 PM

To: John Schreiner/Imax@Imax
cc: Don Savant/Imax@Imax
Subject: Re: Kazan Speakers

John,

Please resend the photos, I just scrolled through past messages and did not find anything with the Subject being "Kazan" which also had an attachment - which i would have thought you would need for photos. Once received I will review internally. I agree that this is a very important opening.

Larry

John Schreiner

John Schreiner
05/30/2006 10:31 AM

To: Larry T O'Reilly/Imax@Imax
cc: Don Savant/Imax@Imax
Subject: Kazan Speakers

Larry,

While I don't want to waste money or sound like an alarmist, I really don't agree with the latest strategy with regards to the Kazan speakers.. I can resend you the pictures that I look, but the client, myself, and their installation guys have almost no confidence that the speakers are going to be fine. They were not stored properly at all (I can't stress how embarassed I was when I walked into the theatre and saw how we left $1.5million worth of equipment) and with this being a critical theatre to the Russian market, the last thing I want is the speakers to blow one or two weeks into the run of the theatre. I know our budgets are tight, but any major failure or reliability issues early into a run can kill the theatre and harm sales massively. Can we not send these speakers to somewhere with much more access access to service/spares and replace them with new ones? It will give our client much more confidence that we care about this system and their success and if one of these blows, it is going to take us forever to get them fixed. Our client is also not going to be the most cooperative with us if there are reliability issues and will make sure everybody knows this is the case.

Sorry for harping on this, but I feel strongly about this issue.

Thanks,

John

# EXHIBIT U-60

This is Exhibit "U-60" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

From: John Schreiner on 06/11/2006 10:24 AM

To: Ilidio Coito/Imax@Imax
cc: Don Kane/Imax@Imax, Eric Jacques/Imax@Imax, James A Skinner/CAN/Imax@Imax, Larry T O'Reilly/Imax@Imax, Olga Pilnikova/Asia/Imax@Imax, Robert Kilburn/Imax@Imax

Subject: Re: IMAX theatre Kazan

Ilidio,

I will not be able to know until the end of business on Wednesday if Olga will be able to make a day trip to Kazan, but realistically the answer is most likely going to be no. We have a few deals that will require her efforts in closing for the quarter. I can ask Olga to have the client send us pictures on Tuesday as Monday is a holiday in Russia.

Regards,

John

Ilidio Coito

**Ilidio Coito**
**06/08/2006 07:46 PM**

To: John Schreiner/Imax@Imax
cc: James A Skinner/CAN/Imax@Imax, Olga Pilnikova/Asia/Imax@Imax, Don Kane/Imax@Imax, Robert Kilburn/Imax@Imax, Larry T O'Reilly/Imax@Imax, Eric Jacques/Imax@Imax
Subject: Re: IMAX theatre Kazan

John and Olga,
After talking to Don Kane, there is a possibility of sending Marco to Kazan on June 19th, however, we need to be certain that the theatre is completely finished. We also need the installation guys to be there to help connect the system. Therefore, I would like to know if it is possible for Olga to do a day trip, next week, to Kazan and take pictures of the site to tell us the progress and what stage are they at.

If the theatre is not finished then there is no point in sending Marco yet.

Thank you

Ilidio

----- Forwarded by Ilidio Coito/Imax on 06/08/2006 02:29 PM -----

IMAX®

Ilidio Coito
06/08/2006 10:16 AM

To: John Schreiner/Imax@Imax
cc: James A Skinner/CAN/Imax@Imax, Olga Pilnikova/Asia/Imax@Imax, Don Kane/Imax@Imax, Robert Kilburn/Imax@Imax

Subject: Re: IMAX theatre Kazan

Hi John,
I will be talking to Don kane shortly, but I don't think we have anybody available to send in the next two

weeks due to all the installations that we are currently going on.

I have spoken to Jim, ( the installer that did Kazan) and the schedule would be to go to Kazan on June 30th. He would be connecting all the wires again, accessing and test the system, which will take a week. Therefore, we would have 6 weeks to ship parts to Kazan. Please have in mind that we will be flying these parts and the expected time to ship and clear customs is 2 weeks, maximum 3 weeks.
If we need to ship the speakers, we will ship the horns versus the whole big speaker box, therefore, smaller volume and easier to clear customs.

John, are you going to be in Russia Soon?
I personally would like to check the site and understand how much has been done to understand if it possible to open in Aug 20th, however, it all depends of all other projects in Russia to make it worthwhile. Perm is heating up and the Architects in Moscow are now trying to understand the system.

Regards

Ilidio

From: John Schreiner on 06/08/2006 06:52 AM

From: John Schreiner on 06/08/2006 06:52 AM
To: Ilidio Coito/Imax@Imax, James A Skinner/CAN/Imax@Imax
cc: Olga Pilnikova/Asia/Imax@Imax

Subject: Re: IMAX theatre Kazan

Hi Guys,

We were just speaking to the client and the client looks like they are going to make the last payment, but he insists that we send someone over to inspect the system much sooner than July so that there is more than enough time to get parts over, clear customs, etc. This is a confidence issue from the client side as they currently are not overly confident that we are going to do a good job in getting the system up and running - we did after all install a system in a concrete shell in -35 degree weather and they think we are crazy. This is not me saying this, this is what the client says.

Therefore, can someone be sent over in the next few weeks?

Also, can another copy of the invoice be faxed/emailed over to the client as they have lost it. It would be helpful if James could also send over a confirmation that with the receipt of 149K and the receipts for marketing etc., that this satisfies the requirement for this invoice.

Regards,

John.

----- Forwarded by John Schreiner/Imax on 06/08/2006 11:36 AM -----

Ilidio Coito
06/01/2006 09:16 PM

To: KinopleX SuvaR <kino@suvar.ru>
cc: dkane@imax.com, rkilburn@imax.com, JSchreiner@imax.com, Olga Pilnikova/Asia/Imax@Imax
Subject: Re: IMAX theatre Kazan

Dear Irina,
I am starting the process to identify the parts that might need to be shipped to Kazan, however, I would like to ask a few questions:

1 - Are you going to use the same broker as previously?
2- Can the broker identify the paper work required so it will be easier for all of us to ship the parts?
3- What location is easier to clear customs/ Moscow or Helsinki?
4 -Any issues that you might think are important to help clear customs?

I would like to get Jim prepared to go to Kazan at the beginning of July so it will give us time to start up the system and then ship any parts that might need to be replaced.

Your cooperation is greatly appreciated.

Thank you
Best regards

Ilidio

Please respond to KinopleX SuvaR <kino@suvar.ru>

To: icoito@imax.com
cc:

Subject: IMAX theatre Kazan

Dear Ilidio,

Thank you for your prompt reply.
As mentioned previously, the estimated launch is August, 20th.

Regards,
Irina

# EXHIBIT U-61

This is Exhibit "U-61" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires August 8, 2014

IMAX

Ilidio Coito
07/12/2006 11:01 PM

To: KinopleX SuvaR <kino@suvar.ru>
cc: John Schreiner/Imax@Imax, Olga Pilnikova/Asia/Imax@Imax, dkane@imax.com, Robert Kilburn/Imax@Imax

Subject: Re: IMAX theatre Kazan

Dear Irina,
We are expecting the visa for Jim to be completed by the end of this week, and Jim was supposed to go next week. However, I need you to help me with your schedule and with pictures of the theatre in order for me to help you with regards of sending Jim. I believe that the right time is the first week of August, which is 6 weeks ahead of you scheduled opening.

Please understand that I need these items to be completed before Jim goes to asses and connect the system. Therefore, it is critical for you to let me know the progress of all the items indicated as follows:
- Exhaust air for the projector - connected and working. ( 1500 cfm @ 2" W.G)
- Power Panels with permanent Power.
- Projection room Closed with lockable doors
- Projection window in Place
- Theatre acoustical Panels and walls finished
- Theatre closed
- Ceiling Finished
- Seats are only required to be in approximately one week before the opening, so we can tune the theatre.

Please let me know the schedule on these items in order to schedule Jim's flight at the right time, otherwise, a premature visit can be very expensive and a waist of time and money for both parts, yourself and IMAX corporation.

The speaker cable will be shipped immediately as soon you look at the paper work and lets us know what codes are required for this type of equipment. These cables are exactly the same as what was sent with the system and with the same specs. Therefore, please let me know if it is ok or if we need to alter anything.

Thank you
Regards
Ilidio Coito
Project manager
(9050 330 2223

Kazan, Russia speaker cable.xls

kinoplex SUVAR <kino@suvar.ru> on 07/11/2006 07:34:13 AM



kinoplex SUVAR <kino@suvar.ru> on 07/11/2006 07:34:13 AM

Please respond to KinopleX SuvaR <kino@suvar.ru>
To: "Ilidio Coito" <icoito@imax.com>

cc:

Subject: IMAX theatre Kazan

Dear, Ilidio

As I mentioned in my previous message the launch of the theatre is postponed till mid-September. However, the construction is under way and we still badly need audio cables to replace the defective ones.

As you know it will take considerable time to do all paperwork and ship them to Russia, so I think it would be better to take care of this issue now.

Looking forward to your response.
Regards,
Irina

--
. .........,
kinoplex mailto:kino@suvar.ru

# EXHIBIT U-62

This is Exhibit "U-62" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

From: John Schreiner on 07/14/2006 06:29 AM

To: KinopleX SuvaR <kino@suvar.ru>
cc: Don Kane/Imax@Imax, rkilburn@imax.com, Cinzia Bonaldi/Imax@Imax, Olga Pilnikova/Asia/Imax@Imax, Jim Krimbalis/CAN/Imax@Imax, Julie Sibley/Imax@Imax, David Brower/EUR/Imax@Imax, Ilidio Coito/Imax@Imax, aleksashin@inbox.ru, Grand@suvar.ru

Subject: Kazan Project Schedule - IMPORTANT

Irina,

I hope you are doing well! I need to address something with you immediately so that IMAX can effectively work with you to make sure your launch is a success. As you know, you only have one chance to launch a business so we need to work together to make sure this is done right.

1. Launch Date - Please confirm to us in writing the exact launch date of the theatre. I have heard a number of dates with the latest being August 30th.

2. Installation schedule - As per previous emails from Ilidio, in order to test the system to see if any parts need replacing, we need to have the following in place before the system can be properly tested:

- Exhaust air for the projector - connected and working. ( 1500 cfm @ 2" W.G)
- Power Panels with permanent Power
- Projection room Closed with lockable doors
- Projection window in Place
- Theatre acoustical Panels and walls finished
- Theatre closed
- Ceiling Finished

As per your email, the above will only be completed by August 5th. There is no point for IMAX to send installation staff to Kazan until the above is completed as there will be nothing for them to do. Do you believe that this provides adequate time to install the system, test it, and have any replacement parts shipped and installed if needed if the opening date is the 30th of August? I do not believe this provides adequate time, therefore I recommend that either you expedite finishing the above well before August 5th (ie. finish it next week) otherwise you may seriously want to reconsider the August 30th date.

3. Film - You have not signed any film agreements despite numerous emails and reminders. We need time to make the prints, do the language version, and ship them to you. Please immediately resolve this issue with David Brower and find out the earliest date that you will be able to receive film prints with a Russian soundtrack, otherwise you may not have any film to run on August 30th in your theatre. In fact, I fear that it may already be too late.

4. Launch activities - Are you planning any preview screenings, press screenings, etc? Can you fill us in on these activities so that Ilidio can do his best to schedule the installation work to fit to your plans.

I apologize for this direct email, but we need to clearly have your launch and construction plans communicated to us so that we can ensure that everything is in place for when you want to open the theatre and there are currently some major issues outstanding that need to be resolved by your team.

Best Regards,

John Schreiner

# EXHIBIT V

This is Exhibit "V" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# Form 10-Q

☑ QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the quarterly period ended March 31, 2012

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission file Number 001-35066

# IMAX Corporation
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **Canada**<br>*(State or other jurisdiction of incorporation or organization)* | **98-0140269**<br>*(I.R.S. Employer Identification Number)* |
| **2525 Speakman Drive, Mississauga, Ontario, Canada**<br>*(Address of principal executive offices)* | **L5K 1B1**<br>*(Postal Code)* |

(905) 403-6500
*(Registrant's telephone number, including area code)*

N/A
*(Former name or former address, if changed since last report)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☑ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☑ Accelerated filer ☐ Non-accelerated filer ☐ (Do not check if a smaller reporting company) Smaller reporting Company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☑

Indicate the number of shares of each of the issuer's classes of common stock, as of the latest practicable date:

| Class | Outstanding as of March 31, 2012 |
|---|---|
| Common stock, no par value | 65,668,646 |

0014560

## IMAX CORPORATION

### Table of Contents

| | | Page |
|---|---|---|
| | **PART I. FINANCIAL INFORMATION** | |
| Item 1. | Financial Statements | 4 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 3. | Quantitative and Qualitative Factors about Market Risk | 60 |
| Item 4. | Controls and Procedures | 61 |
| | **PART II. OTHER INFORMATION** | |
| Item 1. | Legal Proceedings | 62 |
| Item 1A. | Risk Factors | 62 |
| Item 6. | Exhibits | 62 |
| Signatures | | 63 |

## SPECIAL NOTE REGARDING FORWARD-LOOKING INFORMATION

Certain statements included in this quarterly report may constitute "forward-looking statements" within the meaning of the United States Private Securities Litigation Reform Act of 1995. These forward-looking statements include, but are not limited to, references to future capital expenditures (including the amount and nature thereof), business and technology strategies and measures to implement strategies, competitive strengths, goals, expansion and growth of business, operations and technology, plans and references to the future success of IMAX Corporation together with its wholly-owned subsidiaries (the "Company") and expectations regarding the Company's future operating, financial and technological results. These forward-looking statements are based on certain assumptions and analyses made by the Company in light of its experience and its perception of historical trends, current conditions and expected future developments, as well as other factors it believes are appropriate in the circumstances. However, whether actual results and developments will conform with the expectations and predictions of the Company is subject to a number of risks and uncertainties, including, but not limited to, general economic, market or business conditions; including the length and severity of the current economic downturn, the opportunities (or lack thereof) that may be presented to and pursued by the Company; the performance of IMAX DMR films; competitive actions by other companies; conditions in the in-home and out-of-home entertainment industries; the signing of theater system agreements; changes in laws or regulations; conditions, changes and developments in the commercial exhibition industry; the failure to convert theater system backlog into revenue; the failure to respond to change and advancements in digital technology; risks related to new business initiatives; risks associated with investments and operations in foreign jurisdictions and any future international expansion, including those related to economic, political and regulatory policies of local governments and laws and policies of the United States and Canada; the potential impact of increased competition in the markets within which the Company operates; risks related to the Company's inability to protect the Company's intellectual property; risks related to foreign currency transactions; risks related to the Company's prior restatements and the related litigation; and other factors, many of which are beyond the control of the Company. Consequently, all of the forward-looking statements made in this annual report are qualified by these cautionary statements, and actual results or anticipated developments by the Company may not be realized, and even if substantially realized, may not have the expected consequences to, or effects on, the Company. The Company undertakes no obligation to update publicly or otherwise revise any forward-looking information, whether as a result of new information, future events or otherwise.

---

IMAX®, IMAX® Dome, IMAX® 3D, IMAX® 3D Dome, Experience It In IMAX®, *The* IMAX *Experience*®, *An* IMAX *Experience*®, *An* IMAX *3D Experience*®, IMAX DMR®, DMR®, IMAX think big® and think big® are trademarks and trade names of the Company or its subsidiaries that are registered or otherwise protected under laws of various jurisdictions.

IMAX CORPORATION

## PART I. FINANCIAL INFORMATION

**Item 1.** ***Financial Statements***

The following Condensed Consolidated Financial Statements are filed as part of this Report:


| | Page |
|---|---|
| Condensed Consolidated Balance Sheets as at March 31, 2012 and December 31, 2011 | 5 |
| Condensed Consolidated Statements of Operations for the three month periods ended March 31, 2012 and 2011 | 6 |
| Condensed Consolidated Statements of Comprehensive Income for the three month periods ended March 31, 2012 and 2011 | 7 |
| Condensed Consolidated Statements of Cash Flows for the three month periods ended March 31, 2012 and 2011 | 8 |
| Notes to Condensed Consolidated Financial Statements | 9 |

IMAX CORPORATION
CONDENSED CONSOLIDATED BALANCE SHEETS
In accordance with United States Generally Accepted Accounting Principles
*(In thousands of U.S. dollars)*
*(Unaudited)*

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents | $ 21,588 | $ 18,138 |
| Accounts receivable, net of allowance for doubtful accounts of $2,256 (December 31, 2011 — $1,840) | 45,542 | 46,659 |
| Financing receivables (notes 3 and 16(c)) | 87,516 | 86,714 |
| Inventories (note 4) | 20,541 | 19,747 |
| Prepaid expenses | 3,188 | 3,126 |
| Film assets | 3,018 | 2,388 |
| Property, plant and equipment (note 5) | 104,075 | 101,253 |
| Other assets (notes 16(d) and 16(e)) | 14,377 | 14,238 |
| Deferred income taxes (note 12(a)) | 49,285 | 50,033 |
| Goodwill | 39,027 | 39,027 |
| Other intangible assets (note 6) | 25,985 | 24,913 |
| **Total assets** | $ 414,142 | $ 406,236 |
| **Liabilities** | | |
| Bank indebtedness (note 7) | $ 55,000 | $ 55,083 |
| Accounts payable | 26,888 | 28,985 |
| Accrued and other liabilities (notes 8(a), 8(c), 9, 13(b), 15(a), 15(c) and 16(d)) | 48,961 | 54,803 |
| Deferred revenue | 80,936 | 74,458 |
| **Total liabilities** | 211,785 | 213,329 |
| **Commitments, contingencies and guarantees** (notes 8 and 9) | | |
| **Shareholders' equity** | | |
| Capital stock (note 13) common shares — no par value. Authorized — unlimited number. Issued and outstanding — 65,668,646 (December 31, 2011 — 65,052,740) | 307,235 | 303,395 |
| Other equity | 20,139 | 17,510 |
| Deficit | (123,078) | (125,666) |
| Accumulated other comprehensive loss | (1,939) | (2,332) |
| **Total shareholders' equity** | 202,357 | 192,907 |
| **Total liabilities and shareholders' equity** | $ 414,142 | $ 406,236 |

*(the accompanying notes are an integral part of these condensed consolidated financial statements)*

**IMAX CORPORATION**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS**
**In accordance with United States Generally Accepted Accounting Principles**
*(In thousands of U.S. dollars, except per share amounts)*
*(Unaudited)*

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| **Revenues** | | |
| Equipment and product sales | $ 14,379 | $ 20,231 |
| Services (note 10(c)) | 27,067 | 18,274 |
| Rentals (note 10(c)) | 12,470 | 5,051 |
| Finance income | 1,680 | 1,354 |
| Other | - | 250 |
| | 55,596 | 45,160 |
| **Costs and expenses applicable to revenues** | | |
| Equipment and product sales (note 10(a)) | 9,095 | 10,851 |
| Services (notes 10(a) and 10(c)) | 15,620 | 11,377 |
| Rentals (note 10(a)) | 4,020 | 2,266 |
| Other | - | 20 |
| | 28,735 | 24,514 |
| **Gross margin** | 26,861 | 20,646 |
| Selling, general and administrative expenses (note 10(b)) (including share-based compensation expense of $3.8 million for the three months ended March 31, 2012 (2011 - $3.9 million)) | 19,062 | 16,868 |
| Provision for arbitration award (note 9(c)) | - | 2,055 |
| Research and development | 2,630 | 1,868 |
| Amortization of intangibles | 176 | 112 |
| Receivable provisions, net of recoveries (note 11(d)) | 451 | 208 |
| **Income (loss) from operations** | 4,542 | (465) |
| Interest income | 24 | 18 |
| Interest expense | (526) | (443) |
| **Income (loss) from operations before income taxes** | 4,040 | (890) |
| (Provision for) recovery of income taxes | (993) | 309 |
| Loss from equity-accounted investments | (459) | (422) |
| **Net income (loss)** | $ 2,588 | $ (1,003) |
| **Net income (loss) per share - basic & diluted: (note 13(c))** | | |
| Net income (loss) per share from operations - basic & diluted | $ 0.04 | $ (0.02) |

*(the accompanying notes are an integral part of these condensed consolidated financial statements)*

**IMAX CORPORATION**

**CONDENSED CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

**In accordance with United States Generally Accepted Accounting Principles**

*(In thousands of U.S. dollars, except per share amounts)*

*(Unaudited)*

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Net income (loss) | $ 2,588 | $ (1,003) |
| Amortization of defined benefit plan actuarial loss (note 15(a)) | 91 | 54 |
| Unrealized gain on cash flow hedging instruments (note 16(d)) | 387 | 302 |
| Realization of cash flow hedging loss (gain) upon settlement (note 16(d)) | 49 | (258) |
| Other comprehensive income, before tax | 527 | 98 |
| Income tax expense allocated to other comprehensive income (note 12(b)) | (134) | (28) |
| Comprehensive income (loss) | $ 2,981 | $ (933) |

*(the accompanying notes are an integral part of these condensed consolidated financial statements)*

IMAX CORPORATION

CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS

In accordance with United States Generally Accepted Accounting Principles

*(In thousands of U.S. dollars)*

*(Unaudited)*

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| **Cash provided by (used in):** | | |
| **Operating Activities** | | |
| Net income (loss) | $ 2,588 | $ (1,003) |
| Adjustments to reconcile net income (loss) to cash from operations: | | |
| Depreciation and amortization (note 11(c)) | 7,466 | 5,247 |
| Write-downs, net of recoveries (note 11(d)) | 481 | 208 |
| Change in deferred income taxes | 651 | (315) |
| Stock and other non-cash compensation | 3,982 | 4,107 |
| Unrealized foreign currency exchange gain | (1,388) | (1,084) |
| Loss from equity-accounted investments | 459 | 422 |
| Gain on non-cash contribution to equity-accounted investees | - | (404) |
| Investment in film assets | (3,958) | (2,250) |
| Changes in other non-cash operating assets and liabilities (note 11(a)) | 145 | (14,494) |
| Net cash provided by (used in) operating activities | 10,426 | (9,566) |
| **Investing Activities** | | |
| Purchase of property, plant and equipment | (374) | (838) |
| Investment in joint revenue sharing equipment | (7,088) | (3,136) |
| Investment in new business ventures | (381) | - |
| Acquisition of other intangible assets | (2,568) | (232) |
| Net cash used in investing activities | (10,411) | (4,206) |
| **Financing Activities** | | |
| Increase in bank indebtedness | 4,917 | - |
| Repayment of bank indebtedness | (5,000) | - |
| Common shares issued - stock options exercised (note 13(d)) | 3,488 | 831 |
| Net cash provided by financing activities | 3,405 | 831 |
| Effects of exchange rate changes on cash | 30 | (70) |
| **Increase (decrease) in cash and cash equivalents during the period** | 3,450 | (13,011) |
| **Cash and cash equivalents, beginning of period** | 18,138 | 30,390 |
| **Cash and cash equivalents, end of period** | $ 21,588 | $ 17,379 |

*(the accompanying notes are an integral part of these condensed consolidated financial statements)*

IMAX CORPORATION
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS
In accordance with U.S. Generally Accepted Accounting Principles
*(Tabular amounts in thousands of U.S. dollars unless otherwise stated)*
*(Unaudited)*

## 1. Basis of Presentation

IMAX Corporation, together with its wholly-owned subsidiaries (the "Company"), reports its results under United States Generally Accepted Accounting Principles ("U.S. GAAP").

The condensed consolidated financial statements include the accounts of the Company together with its wholly-owned subsidiaries, except for subsidiaries which the Company has identified as variable interest entities ("VIEs") where the Company is not the primary beneficiary. The nature of the Company's business is such that the results of operations for the interim periods presented are not necessarily indicative of results to be expected for the fiscal year. In the opinion of management, the information contained herein reflects all adjustments necessary to make the results of operations for the interim periods a fair statement of such operations.

The Company has evaluated its various variable interests to determine whether they are VIEs as required by the Consolidation Topic of the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC" or "Codification"). The Company has 8 film production companies that are VIEs. For 2 of the Company's film production companies, the Company has determined that it is the primary beneficiary of these entities as the Company has the power to direct the activities of the respective VIE that most significantly impact the respective VIE's economic performance and has the obligation to absorb losses of the VIE that could potentially be significant to the respective VIE or the right to receive benefits from the respective VIE that could potentially be significant to the respective VIE. The Company continues to consolidate these entities, with no material impact on the operating results or financial condition of the Company, as these production companies have total assets and total liabilities of $nil as at March 31, 2012 (December 31, 2011 — $nil). For the other 6 film production companies which are VIEs, the Company did not consolidate these film entities since it does not have the power to direct activities and does not absorb the majority of the expected losses or expected residual returns. The Company equity accounts for these entities. As at March 31, 2012, these 6 VIEs have total assets of $12.7 million (December 31, 2011 — $12.7 million) and total liabilities of $12.7 million (December 31, 2011 — $12.7 million). Earnings of the investees included in the Company's condensed consolidated statement of operations amounted to $nil for the three months ended March 31, 2012 (2011 — $nil). The carrying value of these investments in VIEs that are not consolidated is $nil at March 31, 2012 (December 31, 2011 — $nil). A loss in value of an investment other than a temporary decline is recognized as a charge to the condensed consolidated statement of operations. The Company's exposure is $nil at March 31, 2012.

The Company accounts for investments in new business ventures using the guidance of ASC 323 "Investments – Equity Method and Joint Ventures" ("ASC 323") and ASC 320 – "Investments in Debt and Equity Securities" ("ASC 320"), as appropriate. At March 31, 2012, the equity method of accounting is being utilized for an investment with a carrying value of $4.0 million (December 31, 2011 – $4.1 million). The Company has determined it is not the primary beneficiary of this VIE, and therefore it has not been consolidated. In addition, the Company has an investment in preferred stock of another business venture of $1.5 million which meets the criteria for classification as a debt security under ASC 320 and is recorded at its fair value of $1.0 million at March 31, 2012 (December 31, 2011 – $1.0 million). This investment is classified as an available-for-sale investment. The total carrying value of investments in new business ventures at March 31, 2012 and December 31, 2011 is $5.0 million and $5.1 million, respectively and is recorded in Other Assets.

All significant intercompany accounts and transactions, including all unrealized intercompany profits on transactions with equity-accounted investees, have been eliminated.

The year-end condensed consolidated balance sheet data was derived from audited financial statements, but does not include all disclosures required by U.S. GAAP.

These interim financial statements should be read in conjunction with the consolidated financial statements included in the Company's 2011 Annual Report on Form 10-K for the year ended December 31, 2011 ("the 2011 Form 10-K") which should be consulted for a summary of the significant accounting policies utilized by the Company. These interim financial statements are prepared following accounting policies consistent with the Company's financial statements for the year ended December 31, 2011, except as noted below.

## 2. New Accounting Standards and Accounting Changes

*Changes in Accounting Policies*

In May 2011, the FASB issued ASU No. 2011-04, "Fair Value Measurement (ASC Topic 820): Amendments to Achieve Common Fair Value Measurement and Disclosure Requirements in U.S. GAAP and IFRSs" ("ASU 2011-04"). The standards set forth in ASU 2011-04 supersede most of the accounting guidance currently found in Topic 820 of the FASB's ASC. The amendments will improve comparability of fair value measurements presented and disclosed in financial statements prepared with U.S. GAAP and International Financial Reporting Standards ("IFRS"). The amendments also clarify the application of existing fair value measurement requirements. These amendments include (1) the application of the highest and best use and valuation premise concepts, (2) measuring the fair value of an instrument classified in a reporting entity's shareholders' equity and (3) disclosing quantitative information about the unobservable inputs used within the Level 3 hierarchy. For public entities, the amendments are effective for interim and annual periods beginning after December 15, 2011 on a prospective basis. Early application by public entities is not permitted. On January 1, 2012, the Company adopted the disclosure requirements amendments in ASU 2011-04 relating to Level 3 fair value measurements and accordingly, has expanded disclosures as presented in note 16(b).

*Recently Issued FASB Accounting Standard Codification Updates*

In December 2011, the FASB issued ASU No. 2011-11, "Balance Sheet - Disclosures about Offsetting Assets and Liabilities (ASC Topic 210)". The purpose of the amendment is to provide greater clarity within disclosures between entities reporting in U.S. GAAP versus IFRS that have offsetting (netting) assets and liabilities. Entities will be required to disclose both gross information and net information about both instruments and transactions eligible for offset in the statement of financial position and instruments and transactions subject to an agreement similar to a master netting arrangement. An entity is required to apply the amendments in ASU 2011-11 for annual reporting periods beginning on or after January 1, 2013 and interim periods within those annual periods. It is to be applied retrospectively for all comparative periods presented. The Company is currently evaluating the potential impact of ASU 2011-11 on its condensed consolidated financial statements.

## 3. Financing Receivables

Financing receivables, consisting of net investment in sales-type leases and receivables from financed sales of theater systems are as follows:

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Gross minimum lease payments receivable | $ 21,896 | $ 29,603 |
| Unearned finance income | (6,110) | (8,356) |
| Minimum lease payments receivable | 15,786 | 21,247 |
| Accumulated allowance for uncollectible amounts | (1,624) | (1,833) |
| Net investment in leases | 14,162 | 19,414 |
| Gross financed sales receivables | 103,996 | 95,686 |
| Unearned finance income | (30,199) | (28,070) |
| Financed sales receivables | 73,797 | 67,616 |
| Accumulated allowance for uncollectible amounts | (443) | (316) |
| Net financed sales receivables | 73,354 | 67,300 |
| Total financing receivables | $ 87,516 | $ 86,714 |
| | | |
| Net financed sales receivables due within one year | $ 9,759 | $ 8,694 |
| Net financed sales receivables due after one year | $ 63,595 | $ 58,606 |

As at March 31, 2012, the financed sale receivables had a weighted average effective interest rate of 9.0% (December 31, 2011 — 8.9%).

### 4. Inventories

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Raw materials | $ 4,869 | $ 5,803 |
| Work-in-process | 1,570 | 1,515 |
| Finished goods | 14,102 | 12,429 |
| | $ 20,541 | $ 19,747 |

At March 31, 2012, finished goods inventory for which title had passed to the customer and revenue was deferred amounted to $8.9 million (December 31, 2011 — $5.7 million).

Inventories at March 31, 2012 include provisions for excess and obsolete inventory based upon current estimates of net realizable value considering future events and conditions of $4.0 million (December 31, 2011 — $4.0 million).

### 5. Property, Plant and Equipment

| | As at March 31, 2012 | | |
|---|---|---|---|
| | Cost | Accumulated Depreciation | Net Book Value |
| Equipment leased or held for use | | | |
| Theater system components[1][2] | $ 124,611 | $ 41,961 | $ 82,650 |
| Camera equipment[5] | 6,355 | 6,108 | 247 |
| | 130,966 | 48,069 | 82,897 |
| Assets under construction[3] | 8,242 | - | 8,242 |
| Other property, plant and equipment | | | |
| Land | 1,593 | - | 1,593 |
| Buildings | 14,635 | 9,475 | 5,160 |
| Office and production equipment[4] | 29,989 | 25,466 | 4,523 |
| Leasehold improvements | 9,531 | 7,871 | 1,660 |
| | 55,748 | 42,812 | 12,936 |
| | $ 194,956 | $ 90,881 | $ 104,075 |

| | As at December 31, 2011 | | |
|---|---|---|---|
| | Cost | Accumulated Depreciation | Net Book Value |
| Equipment leased or held for use | | | |
| Theater system components[1][2] | $ 122,691 | $ 39,773 | $ 82,918 |
| Camera equipment[5] | 6,355 | 6,088 | 267 |
| | 129,046 | 45,861 | 83,185 |
| Assets under construction[3] | 4,972 | - | 4,972 |
| Other property, plant and equipment | | | |
| Land | 1,593 | - | 1,593 |
| Buildings | 14,633 | 9,352 | 5,281 |
| Office and production equipment[4] | 29,220 | 24,772 | 4,448 |
| Leasehold improvements | 9,396 | 7,622 | 1,774 |
| | 54,842 | 41,746 | 13,096 |
| | $ 188,860 | $ 87,607 | $ 101,253 |

(1) Included in theater system components are assets with costs of $18.4 million (December 31, 2011 — $18.4 million) and accumulated depreciation of $17.8 million (December 31, 2011 — $17.8 million) that are leased to customers under operating leases.

(2) Included in theater system components are assets with costs of $102.3 million (December 31, 2011 — $100.2 million) and accumulated depreciation of $21.5 million (December 31, 2011 — $19.1 million) that are used in joint revenue sharing arrangements.

(3) Included in assets under construction are components with costs of $7.0 million (December 31, 2011 — $3.7 million) that will be utilized to construct assets to be used in joint revenue sharing arrangements.

(4) Fully amortized office and production equipment is still in use by the Company.

(5) Fully amortized camera equipment still in use by the Company.

## 6. Other Intangible Assets

| | As at March 31, 2012 | | |
|---|---|---|---|
| | Cost | Accumulated Amortization | Net Book Value |
| Patents and trademarks | $ 8,035 | $ 5,384 | $ 2,651 |
| Licenses and intellectual property | 19,590 | 623 | 18,967 |
| Other | 4,367 | - | 4,367 |
| | $ 31,992 | $ 6,007 | $ 25,985 |

| | As at December 31, 2011 | | |
|---|---|---|---|
| | Cost | Accumulated Amortization | Net Book Value |
| Patents and trademarks | $ 8,014 | $ 5,304 | $ 2,710 |
| Licenses and intellectual property | 19,407 | 254 | 19,153 |
| Other | 3,050 | - | 3,050 |
| | $ 30,471 | $ 5,558 | $ 24,913 |

The Company expects to amortize approximately $1.5 million of other intangible assets for the remainder of 2012 and an average of $2.0 million for each of the next 5 years, respectively. Fully amortized other intangible assets are still in use by the Company.

During the three months ended March 31, 2012, the Company acquired $2.0 million in other intangible assets. The net book value of these other intangible assets was $2.0 million as at March 31, 2012. The weighted average amortization period for these additions was 10 years.

During the three month months ended March, 31, 2012, the Company incurred costs of less than $0.1 million to renew or extend the term of acquired other intangible assets which were recorded in selling, general and administrative expenses (2011 – less than $0.1 million).

**7. Credit Facility**

On June 2, 2011, the Company amended and restated the terms of its existing senior secured credit facility (the "Prior Credit Facility"), which had been scheduled to mature on October 31, 2013. The amended and restated facility (the "Credit Facility"), with a scheduled maturity of October 31, 2015, has a maximum borrowing capacity of $110.0 million, consisting of revolving asset-based loans of up to $50.0 million, subject to a borrowing base calculation (as described below) and including a sublimit of $20.0 million for letters of credit, and a revolving term loan of up to $60.0 million. The Prior Credit Facility had a maximum borrowing capacity of $75.0 million. Certain of the Company's subsidiaries serve as guarantors (the "Guarantors") of the Company's obligations under the Credit Facility. The Credit Facility is collateralized by a first priority security interest in substantially all of the present and future assets of the Company and the Guarantors.

The terms of the Credit Facility are set forth in the Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated June 2, 2011, among the Company, Wells Fargo Capital Finance Corporation (Canada), as agent, lender, sole lead arranger and sole bookrunner, ("Wells Fargo") and Export Development Canada, as lender ("EDC", together with Wells Fargo, the "Lenders") and in various collateral and security documents entered into by the Company and the Guarantors. Each of the Guarantors has also entered into a guarantee in respect of the Company's obligations under the Credit Facility.

The revolving asset-based portion of the Credit Facility permits maximum aggregate borrowings equal to the lesser of:
(i) $50.0 million, and
(ii) a collateral calculation based on the percentages of the book values of certain of the Company's net investment in sales-type leases, financing receivables, certain trade accounts receivable, finished goods inventory allocated to backlog contracts and the appraised values of the expected future cash flows related to operating leases and the Company's owned real property, reduced by certain accruals and accounts payable and subject to other conditions, limitations and reserve right requirements.

On June 2, 2013 any outstanding borrowings under the revolving term loan portion of the Credit Facility convert to a term loan to be repaid in accordance with the terms of the Credit Facility, any undrawn amounts under the revolving term loan are cancelled and the Company may not request any further advances under the revolving term loan.

The revolving asset-based portion of the Credit Facility bears interest, at the Company option, at (i) LIBOR plus a margin of 2.00% per annum, or (ii) Wells Fargo's prime rate plus a margin of 0.50% per annum. The revolving term loan portion of the Credit Facility also bears interest at the Company's option, at (i) LIBOR plus a margin of 2.00% per annum, or (ii) Wells Fargo's prime rate plus a margin of 0.50% per annum. Under the Prior Credit Facility, the effective interest rate for the term loan portion was 4.05% for the three months ended March 31, 2011. There was no amount drawn on the revolving portion of the Prior Credit Facility. Under the Credit Facility, the effective interest rate for the revolving term loan portion was 2.51% for the three months ended March 31, 2012. There was no amount drawn on the revolving asset-based portion of the Credit Facility.

The Credit Facility provides that the Company will be required to maintain a ratio of funded debt (as defined in the Credit Agreement) to EBITDA (as defined in the Credit Agreement) of not more than 2:1. The Company will also be required to maintain a Fixed Charge Coverage Ratio (as defined in the Credit Agreement) of not less than 1.1:1.0. At all times under the terms of the Credit Facility, the Company is required to maintain minimum Excess Availability of not less than $5.0 million and minimum Cash and Excess Availability of not less than $15.0 million. These amounts were $55.0 million and $76.6 million at March 31, 2012 respectively. The Company was in compliance with all of these requirements at March 31, 2012.

The Credit Facility contains typical affirmative and negative covenants, including covenants that limit or restrict the ability of the Company and the Guarantors to: incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales; incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions.

The Credit Facility also contains customary events of default, including upon an acquisition or change of control or upon a change in the business and assets of the Company or a Guarantor that in each case is reasonably expected to have a material adverse effect on the Company or Guarantor. If an event of default occurs and is continuing under the Credit Facility, the Lenders may, among other things, terminate their commitments and require immediate repayment of all amounts owed by the Company.

Bank indebtedness includes the following:

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Revolving Term Loan | $ 55,000 | $ 55,083 |

Total amounts drawn and available under the Credit Facility at March 31, 2012 were $55.0 million and $55.0 million, respectively (December 31, 2011 – $55.1 million and $52.0 million, respectively).

At March 31, 2012, the Company's current borrowing capacity under the revolving asset-based portion of the Credit Facility was $50.0 million after deduction for letters of credit of $nil and the minimum Excess Availability reserve of $5.0 million (December 31, 2011 — $47.1 million) and borrowing capacity under the revolving term portion of the Credit Facility was $5.0 million.

In accordance with the loan agreement, the Company is obligated to make payments on the principal of the revolving term loan as follows:

| | |
|---|---|
| 2012 (nine months remaining) | $ - |
| 2013 | - |
| 2014 | - |
| 2015 | 55,000 |
| 2016 | - |
| Thereafter | - |
| | $ 55,000 |

*Wells Fargo Foreign Exchange Facility*

Within the Credit Facility, the Company is able to purchase foreign currency forward contracts and/or other swap arrangements. The settlement risk on its foreign currency forward contracts was $nil as at March 31, 2012 as the fair value exceeded the notional value of the forward contracts. As at March 31, 2012, the Company has $45.5 million of such arrangements outstanding.

*Bank of Montreal Facility*

As at March 31, 2012, the Company has available a $10.0 million facility (December 31, 2011 — $10.0 million) with the Bank of Montreal for use solely in conjunction with the issuance of performance guarantees and letters of credit fully insured by EDC (the "Bank of Montreal Facility"). As at March 31, 2012, the Company has letters of credit and advance payment guarantees outstanding of $0.7 million (December 31, 2011 — $0.8 million) under the Bank of Montreal Facility.

**8. Commitments**

(a) The Company's lease commitments consist of rent and equipment under operating leases. The Company accounts for any incentives provided over the term of the lease. Total minimum annual rental payments to be made by the Company as at March 31, 2012 for each of the years ended December 31, are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| 2012 (nine months remaining) | $ 4,900 | $ 17 |
| 2013 | 2,811 | 20 |
| 2014 | 1,354 | - |
| 2015 | 526 | - |
| 2016 | 511 | - |
| Thereafter | 1,323 | - |
| | $ 11,425 | $ 37 |

Rent expense was $1.5 million for three months ended March 31, 2012 (2011 — $1.2 million) net of sublease rental of $nil (2011 — less than $0.1 million).

Recorded in the accrued liabilities balance as at March 31, 2012 is $3.2 million (December 31, 2011 — $3.5 million) related to accrued rent and lease inducements being recognized as an offset to rent expense over the term of the lease.

Purchase obligations under long-term supplier contracts as at March 31, 2012 were $9.7 million (December 31, 2011 — $12.9 million).

(b) As at March 31, 2012, the Company has letters of credit and advance payment guarantees secured by the Credit Facility of $nil (December 31, 2011 — $3.0 million) outstanding. As at March 31, 2012 the Company also has letters of credit outstanding of $0.7 million as compared to $0.8 million as at December 31, 2011, under the Bank of Montreal Facility.

(c) The Company compensates its sales force with both fixed and variable compensation. Commissions on the sale or lease of the Company's theater systems are payable in graduated amounts from the time of collection of the customer's first payment to the Company up to the collection of the customer's last initial payment. At March 31, 2012, $1.4 million (December 31, 2011 — $1.3 million) of commissions have been accrued and will be payable in future periods.

**9. Contingencies and Guarantees**

The Company is involved in lawsuits, claims, and proceedings, including those identified below, which arise in the ordinary course of business. In accordance with the Contingencies Topic of the FASB ASC, the Company will make a provision for a liability when it is both probable that a loss has been incurred and the amount of the loss can be reasonably estimated. The Company believes it has adequate provisions for any such matters. The Company reviews these provisions in conjunction with any related provisions on assets related to the claims at least quarterly and adjusts these provisions to reflect the impacts of negotiations, settlements, rulings, advice of legal counsel and other pertinent information related to the case. Should developments in any of these matters outlined below cause a change in the Company's determination as to an unfavorable outcome and result in the need to recognize a material provision, or, should any of these matters result in a final adverse judgment or be settled for significant amounts, they could have a material adverse effect on the Company's results of operations, cash flows, and financial position in the period or periods in which such a change in determination, settlement or judgment occurs.

The Company expenses legal costs relating to its lawsuits, claims and proceedings as incurred.

(a) In March 2005, the Company, together with Three-Dimensional Media Group, Ltd. ("3DMG"), filed a complaint in the U.S. District Court for the Central District of California, Western Division, against In-Three, Inc. ("In-Three") alleging patent infringement. On March 10, 2006, the Company and In-Three entered into a settlement agreement settling the dispute between the Company and In-Three. Despite the settlement reached between the Company and In-Three, co-plaintiff 3DMG refused to dismiss its claims against In-Three. Accordingly, the Company and In-Three moved jointly for a motion to dismiss the Company's and In-Three's claims. On August 24, 2010, the Court dismissed all of the claims pending between the Company and In-Three, thus dismissing the Company from the litigation.

On May 15, 2006, the Company initiated arbitration against 3DMG before the International Centre for Dispute Resolution in New York (the "ICDR"), alleging breaches of the license and consulting agreements between the Company and 3DMG. On June 15, 2006, 3DMG filed an answer denying any breaches and asserting counterclaims that the Company breached the parties' license agreement. On June 21, 2007, the ICDR unanimously denied 3DMG's Motion for Summary Judgment filed on April 11, 2007 concerning the Company's claims and 3DMG's counterclaims. The proceeding was suspended on May 4, 2009 due to failure of 3DMG to pay fees associated with the proceeding. The proceeding was further suspended on October 11, 2010 pending resolution of reexamination proceedings currently pending involving one of 3DMG's patents. The Company will continue to pursue its claims vigorously and believes that all allegations made by 3DMG are without merit. The Company further believes that the amount of loss, if any, suffered in connection with the counterclaims would not have a material impact on the financial position or results of operations of the Company, although no assurance can be given with respect to the ultimate outcome of the arbitration.

(b) In January 2004, the Company and IMAX Theatre Services Ltd., a subsidiary of the Company, commenced an arbitration seeking damages before the International Court of Arbitration of the International Chambers of Commerce (the "ICC") with respect to the breach by Electronic Media Limited ("EML") of its December 2000 agreement with the Company. In June 2004, the Company commenced a related arbitration before the ICC against EML's affiliate, E-City Entertainment (I) PVT Limited ("E-City"), seeking damages as a result of E-City's breach of a September 2000 lease agreement. An arbitration hearing took place in November 2005 against E-City which considered all claims by the Company. On February 1, 2006, the ICC issued an award on liability finding unanimously in the Company's favor on all claims. Further hearings took place in July 2006 and December 2006. On August 24, 2007, the ICC issued an award unanimously in favor of the Company in the amount of $9.4 million, consisting of past and future rents owed to the Company under its lease agreements, plus interest and costs. In the award, the ICC upheld the validity and enforceability of the Company's theater system contract. The Company thereafter submitted its application to the arbitration panel for interest and costs. On March 27, 2008, the arbitration panel issued a final award in favor of the Company in the amount of $11.3 million, plus an additional $2,512 each day in interest from October 1, 2007 until the date the award is paid, which the Company is seeking to enforce and collect in full. In July 2008, E-City commenced a proceeding in Mumbai, India seeking an order that the ICC award may not be recognized in India. The Company has opposed that application on a number of grounds and seeks to have the ICC award recognized in India. That Mumbai proceeding is still pending. On June 24, 2011, the Company commenced an application to the Ontario Superior Court of Justice for recognition of the final award. On December 2, 2011, the Ontario court issued an order recognizing the final award and requiring E-City to pay the Company $30,000 to cover the costs of the application. On January 18, 2012, the Company filed an application in New York State Supreme Court seeking recognition of the Ontario order in New York. On April 11, 2012, the New York court issued an order granting the Company's application.

(c) In June 2003, Robots of Mars, Inc. ("Robots") initiated an arbitration proceeding against the Company in California with the American Arbitration Association pursuant to arbitration provisions in two film production agreements entered into in 1994 and 1995 between Robots' predecessor-in-interest and a discontinued subsidiary of the Company ("Ridefilm"), asserting claims for breach of contract, fraud, breach of fiduciary duty and intentional interference with the contract. The Company discontinued its Ridefilm business through a sale of the Ridefilm business and its assets to a third party in March 2001. Robots sought an award of over $5.0 million in damages including contingent compensation that it claims was owed under two production agreements, damages for tort claims, and punitive damages. The arbitration hearings of this matter occurred in June and October 2009. The arbitrator issued a final award on March 16, 2011, awarding Robots $0.4 million in damages and $0.3 million in pre-judgment interest to date on its claim for breach of one of the Ridefilm production agreements. The arbitrator found in the Company's favor on Robots' tort claims, and awarded Robots no damages on its claim for breach of the second production agreement. Despite finding in the Company's favor on the vast majority of Robots' claims, the arbitrator awarded Robots $1.2 million in attorneys' fees and costs pursuant to the attorneys' fee provision set forth in the production agreements. Robots initiated two separate proceedings in California and in Ontario, Canada, to confirm the award. On July 13, 2011, a California district court granted Robots' petition to confirm the award, and denied the Company's petition to vacate the award. On August 18, 2011, the Company appealed the district court's denial of its petition to vacate to the United States Court of Appeals for the Ninth Circuit. On January 12, 2012, the Company, Ridefilm and Robots entered into a confidential settlement agreement, pursuant to which the parties fully and finally resolved and settled all claims between them relating to this dispute. The Company dismissed the Ninth Circuit appeal on January 27, 2012, and the parties filed their respective Notices of Abandonment of the Ontario proceedings with the court of February 17, 2012, resulting in a dismissal of those proceedings.

(d) The Company and certain of its officers and directors were named as defendants in eight purported class action lawsuits filed between August 11, 2006 and September 18, 2006, alleging violations of U.S. federal securities laws. These eight actions were filed in the U.S. District Court for the Southern District of New York. On January 18, 2007, the Court consolidated all eight class action lawsuits and appointed Westchester Capital Management, Inc. as the lead plaintiff and Abbey Spanier Rodd & Abrams, LLP as lead plaintiff's counsel. On October 2, 2007, plaintiffs filed a consolidated amended class action complaint. The amended complaint,

brought on behalf of shareholders who purchased the Company's common stock on the NASDAQ between February 27, 2003 and July 20, 2007 (the "U.S. Class"), alleges primarily that the defendants engaged in securities fraud by disseminating materially false and misleading statements during the class period regarding the Company's revenue recognition of theater system installations, and failing to disclose material information concerning the Company's revenue recognition practices. The amended complaint also added PricewaterhouseCoopers LLP, the Company's auditors, as a defendant. On April 14, 2011, the Court issued an order appointing The Merger Fund as the lead plantiff and Abbey Spanier Rodd & Abrams, LLP as lead plantiff's counsel. On November 2, 2011, the parties entered into a memorandum of understanding containing the terms and conditions of a settlement of this action. On January 26, 2012, the parties executed and filed with the Court a formal stipulation of settlement and proposed form of notice to the class, which the Court preliminarily approved on February 1, 2012. Under the terms of the settlement, members of the U.S. Class who do not opt out of the settlement will release defendants from liability for all claims that were alleged in this action or could have been alleged in this action or any other proceeding (including the Canadian Action) relating to the purchase of IMAX securities on the NASDAQ from February 27, 2003 and July 20, 2007 or the subject matter and facts relating to this action. As part of the settlement and in exchange for the release, defendants will pay $12.0 million to a settlement fund which amount will be funded by the carriers of the Company's directors and officers insurance policy and by PricewaterhouseCoopers LLP. On March 26, 2012, the parties executed and filed with the Court and amended formal stipulation of settlement and proposed form of notice to the class, which the Court preliminarily approved on March 28, 2012. The settlement is subject to final court approval and the Court will conduct a hearing on June 14, 2012 to determine whether the settlement should be granted final approval.

(e) A class action lawsuit was filed on September 20, 2006 in the Ontario Superior Court of Justice against the Company and certain of its officers and directors, alleging violations of Canadian securities laws. This lawsuit was brought on behalf of shareholders who acquired the Company's securities between February 17, 2006 and August 9, 2006. The lawsuit seeks $210.0 million in compensatory and punitive damages, as well as costs. As a result, the Company is unable to estimate a potential loss exposure at this time. For reasons released December 14, 2009, the Court granted leave to the Plaintiffs to amend their statement of claim to plead certain claims pursuant to the Securities Act (Ontario) against the Company and certain individuals and granted certification of the action as a class proceeding. These are procedural decisions, and do not contain any conclusions binding on a judge at trial as to the factual or legal merits of the claim. Leave to appeal those decisions was denied. The Company believes the allegations made against it in the statement of claim are meritless and will vigorously defend the matter, although no assurance can be given with respect to the ultimate outcome of such proceedings. The Company's directors and officers insurance policy provides for reimbursement of costs and expenses incurred in connection with this lawsuit as well as potential damages awarded, if any, subject to certain policy limits, exclusions and deductibles.

(f) In addition to the matters described above, the Company is currently involved in other legal proceedings which, in the opinion of the Company's management, will not materially affect the Company's financial position or future operating results, although no assurance can be given with respect to the ultimate outcome of any such proceedings.

(g) In the normal course of business, the Company enters into agreements that may contain features that meet the definition of a guarantee. The Guarantees Topic of the FASB ASC defines a guarantee to be a contract (including an indemnity) that contingently requires the Company to make payments (either in cash, financial instruments, other assets, shares of its stock or provision of services) to a third party based on (a) changes in an underlying interest rate, foreign exchange rate, equity or commodity instrument, index or other variable, that is related to an asset, a liability or an equity security of the counterparty, (b) failure of another party to perform under an obligating agreement or (c) failure of another third party to pay its indebtedness when due.

*Financial Guarantees*

The Company has provided no significant financial guarantees to third parties.

*Product Warranties*

The following summarizes the accrual for product warranties that was recorded as part of accrued liabilities in the condensed consolidated balance sheets:

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Balance at the beginning of period | $ 94 | $ 160 |
| Warranty redemptions | (52) | (152) |
| Warranties issued | - | 146 |
| Revisions | (18) | (60) |
| Balance at the end of period | $ 24 | $ 94 |

*Director/Officer Indemnifications*

The Company's General By-law contains an indemnification of its directors/officers, former directors/officers and persons who have acted at its request to be a director/officer of an entity in which the Company is a shareholder or creditor, to indemnify them, to the extent permitted by the *Canada Business Corporations Act*, against expenses (including legal fees), judgments, fines and any amount actually and reasonably incurred by them in connection with any action, suit or proceeding in which the directors and/or officers are sued as a result of their service, if they acted honestly and in good faith with a view to the best interests of the Company. The nature of the indemnification prevents the Company from making a reasonable estimate of the maximum potential amount it could be required to pay to counterparties. The Company has purchased directors' and officers' liability insurance. No amount has been accrued in the condensed consolidated balance sheets as at March 31, 2012 and December 31, 2011 with respect to this indemnity.

*Other Indemnification Agreements*

In the normal course of the Company's operations, the Company provides indemnifications to counterparties in transactions such as: theater system lease and sale agreements and the supervision of installation or servicing of the theater systems; film production, exhibition and distribution agreements; real property lease agreements; and employment agreements. These indemnification agreements require the Company to compensate the counterparties for costs incurred as a result of litigation claims that may be suffered by the counterparty as a consequence of the transaction or the Company's breach or non-performance under these agreements. While the terms of these indemnification agreements vary based upon the contract, they normally extend for the life of the agreements. A small number of agreements do not provide for any limit on the maximum potential amount of indemnification; however, virtually all of the Company's system lease and sale agreements limit such maximum potential liability to the purchase price of the system. The fact that the maximum potential amount of indemnification required by the Company is not specified in some cases prevents the Company from making a reasonable estimate of the maximum potential amount it could be required to pay to counterparties. Historically, the Company has not made any significant payments under such indemnifications and no amounts have been accrued in the condensed consolidated financial statements with respect to the contingent aspect of these indemnities.

**10. Condensed Consolidated Statements of Operations Supplemental Information**

*(a) Selling Expenses*

The Company defers direct selling costs such as sales commissions and other amounts related to its sale and sales-type lease arrangements until the related revenue is recognized. These costs, included in costs and expenses applicable to revenues-equipment and product sales, totaled $0.7 million for the three months ended March 31, 2012 (2011 — $0.7 million).

Film exploitation costs, including advertising and marketing, totaled $1.4 million for the three months ended March 31, 2012 (2011 — $0.6 million) and are recorded in costs and expenses applicable to revenues-services as incurred.

Commissions are recognized as costs and expenses applicable to revenues-rentals in the month they are earned. These costs totaled $0.1 million for the three months ended March 31, 2012 (2011 — $0.2 million). Direct advertising and marketing costs for each

theater are charged to costs and expenses applicable to revenues-rentals as incurred. These costs totaled $0.3 million for the three months ended March 31, 2012 (2011 — $0.3 million).

*(b) Foreign Exchange*

Included in selling, general and administrative expenses for the three months ended March 31, 2012 is a $1.4 million gain (2011 — gain of $0.6 million), for net foreign exchange gains/losses related to the translation of foreign currency denominated monetary assets and liabilities and unhedged foreign exchange contracts. See note 16(d) for additional information.

*(c) Collaborative Arrangements*

*Joint Revenue Sharing Arrangements*

In a joint revenue sharing arrangement, the Company receives a portion of a theater's box-office and concession revenues, and in some cases a small upfront or initial payment, in exchange for placing a theater system at the theater operator's venue. Under joint revenue sharing arrangements, the customer has the ability and the right to operate the hardware components or direct others to operate them in a manner determined by the customer. The Company's joint revenue sharing arrangements are typically non-cancellable for 7 to 10 years with renewal provisions. Title to equipment under joint revenue sharing arrangements does not transfer to the customer. The Company's joint revenue sharing arrangements do not contain a guarantee of residual value at the end of the term. The customer is required to pay for executory costs such as insurance and taxes and is required to pay the Company for maintenance and extended warranty throughout the term. The customer is responsible for obtaining insurance coverage for the theater systems commencing on the date specified in the arrangement's shipping terms and ending on the date the theater systems are delivered back to the Company.

The Company has signed joint revenue sharing agreements with 24 exhibitors for a total of 381 theater systems, of which 265 theaters were operating as at March 31, 2012, the terms of which are similar in nature, rights and obligations. The accounting policy for the Company's joint revenue sharing arrangements is disclosed in note 2(n) of the Company's 2011 Form 10-K.

Amounts attributable to transactions arising between the Company and its customers under joint revenue sharing arrangements are included in Rentals revenue and for the three months ended March 31, 2012 amounted to $11.7 million (2011 — $4.0 million).

*IMAX DMR*

In an IMAX DMR arrangement, the Company transforms conventional motion pictures into the Company's large screen format, allowing the release of Hollywood content to the IMAX theater network. In a typical IMAX DMR film arrangement, the Company will absorb its costs for the digital re-mastering and then recoup this cost from a percentage of the gross box-office receipts of the film, which generally range from 10-15%. The Company does not typically hold distribution rights or the copyright to these films.

For the three months ended March 31, 2012, 10 IMAX DMR films were exhibited through the IMAX theater network. The Company has entered into arrangements with film producers to convert 15 additional films which are expected to be released during the remainder of 2012, the terms of which are similar in nature, rights and obligations. The accounting policy for the Company's IMAX DMR arrangements is disclosed in note 2(n) of the Company's 2011 Form 10-K.

Amounts attributable to transactions arising between the Company and its customers under IMAX DMR arrangements are included in Services revenue and for the three months ended March 31, 2012 amounted to $13.8 million (2011 — $7.3 million).

*Co-Produced Film Arrangements*

In certain film arrangements, the Company co-produces a film with a third party whereby the third party retains the copyright and rights to the film, except that the Company obtains exclusive theatrical distribution rights to the film. Under these arrangements, both parties contribute funding to the Company's wholly-owned production company for the production of the film and for associated exploitation costs. Clauses in the film arrangements generally provide for the third party to take over the production of the film if the cost of the production exceeds its approved budget or if it appears as though the film will not be delivered on a timely basis.

The accounting policies relating to co-produced film arrangements are disclosed in notes 2(a) and 2(n) of the Company's 2011 Form 10-K.

As at March 31, 2012, the Company has 2 significant co-produced film arrangements which makes up greater than 50% of the VIE total assets and liabilities balance of $12.7 million and 2 other co-produced film arrangements, the terms of which are similar.

For the three months ended March 31, 2012, amounts totaling $0.9 million (2011 — $1.1 million) attributable to transactions between the Company and other parties involved in the production of the films have been included in cost and expenses applicable to revenues-services.

**11. Condensed Consolidated Statements of Cash Flows Supplemental Information**

(a) Changes in other non-cash operating assets and liabilities are comprised of the following:

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| Decrease (increase) in: | | |
| Accounts receivable | $ 856 | $ 8,944 |
| Financing receivables | (876) | (2,328) |
| Inventories | (3,492) | (2,745) |
| Prepaid expenses | (62) | (701) |
| Commissions and other deferred selling expenses | (180) | 88 |
| Insurance recoveries | 336 | 1,290 |
| Other assets | (531) | 612 |
| Increase (decrease) in: | | |
| Accounts payable | 1,759 | (274) |
| Accrued and other liabilities[(1)] | (4,143) | (16,948) |
| Deferred revenue | 6,478 | (2,432) |
| | $ 145 | $ (14,494) |

(1) Decrease in accrued and other liabilities for the three months ended March 31, 2012 includes payments of $0.3 million for variable stock-based compensation (2011 - $10.7 million).

(b) Cash payments made on account of:

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| Income taxes | $ 372 | $ 1,378 |
| Interest | $ 394 | $ 298 |

(c) Depreciation and amortization are comprised of the following:

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| Film assets | $ 3,304 | $ 2,696 |
| Property, plant and equipment | | |
| Joint revenue sharing arrangements | 2,371 | 1,381 |
| Other property, plant and equipment | 1,132 | 947 |
| Other intangible assets | 501 | 112 |
| Other assets | 115 | 25 |
| Deferred financing costs | 43 | 86 |
| | $ 7,466 | $ 5,247 |

(d) Write-downs, net of recoveries, are comprised of the following:

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| Accounts receivables | $ 296 | $ 120 |
| Financing receivables | 155 | 88 |
| Property, plant and equipment | 18 | - |
| Other intangible assets | 12 | - |
| Inventories | - | - |
| | $ 481 | $ 208 |

**12. Income Taxes**

*(a) Income Taxes*

The Company's effective tax rate differs from the statutory tax rate and varies from year to year primarily as a result of numerous permanent differences, investment and other tax credits, the provision for income taxes at different rates in foreign and other provincial jurisdictions, enacted statutory tax rate increases or reductions in the year, changes due to foreign exchange, changes in the Company's valuation allowance based on the Company's recoverability assessments of deferred tax assets, and favorable or unfavorable resolution of various tax examinations. During the quarter ended March 31, 2012, there was no change in the Company's estimates of the recoverability of its deferred tax assets based on an analysis of both positive and negative evidence including projected future earnings.

As at March 31, 2012, the Company had net deferred income tax assets after valuation allowance of $49.3 million (December 31, 2011 — $50.0 million). As at March 31, 2012, the Company had a gross deferred income tax asset before valuation allowance of $55.4 million (December 31, 2011 — $56.1 million), against which the Company is carrying a $6.1 million valuation allowance (December 31, 2011 — $6.1 million).

As at March 31, 2012 and December 31, 2011, the Company had total unrecognized tax benefits (including interest and penalties) of $4.6 million and $4.4 million, respectively, for international withholding taxes. All of the unrecognized tax benefits could impact the Company's effective tax rate if recognized. While the Company believes it has adequately provided for all tax positions, amounts asserted by taxing authorities could differ from the Company's accrued position. Accordingly, additional provisions on federal, state, provincial and foreign tax-related matters could be recorded in the future as revised estimates are made or the underlying matters are settled or otherwise resolved.

Consistent with its historical financial reporting, the Company has elected to classify interest and penalties related to income tax liabilities, when applicable, as part of the interest expense in its condensed consolidated statement of operations rather than income tax

expense. The Company recognized approximately less than less than $0.1 million in potential interest and penalties associated with unrecognized tax benefits for the three months ended March 31, 2012 (2011 — less than $0.1 million).

*(b) Income Tax Effect on Comprehensive Income*

The income tax (expense) benefit related to the following items included in other comprehensive income are:

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| Amortization of actuarial loss on defined benefit plan | (23) | (16) |
| Unrealized change in cash flow hedging instruments | (99) | (84) |
| Realization of cash flow hedging gains upon settlement | (12) | 72 |
| | $ (134) | $ (28) |

**13. Capital Stock**

*(a) Authorized*

*Common Shares*

The authorized capital of the Company consists of an unlimited number of common shares. The following is a summary of the rights, privileges, restrictions and conditions of the common shares.

The holders of common shares are entitled to receive dividends if, as and when declared by the directors of the Company, subject to the rights of the holders of any other class of shares of the Company entitled to receive dividends in priority to the common shares.

The holders of the common shares are entitled to one vote for each common share held at all meetings of the shareholders.

*(b) Stock-Based Compensation*

The Company has five stock-based compensation plans that are described below. The compensation costs recorded in the condensed consolidated statement of operations for these plans were $3.8 million for the three months ended March 31, 2012 (2011 — $4.0 million).

*Stock Option Plan*

The Company's Stock Option Plan, which is shareholder approved, permits the grant of options to employees, directors and consultants. The Company recorded an expense of $3.0 million for the three months ended March 31, 2012 (2011 — $2.0 million), related to grants issued to employees and directors in the plan. No income tax benefit is recorded in the condensed consolidated statement of operations for these costs.

The Company's policy is to issue new shares from treasury to satisfy stock options which are exercised.

The Company utilizes a lattice-binomial option-pricing model ("Binomial Model") to determine the fair value of stock-based payment awards. The fair value determined by the Binomial Model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to, the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors. The Binomial Model also considers the expected exercise multiple which is the multiple of exercise price to grant price at which exercises are expected to occur on average. Option-pricing models were developed for use in estimating the value of traded options that have no vesting or hedging restrictions and are fully transferable. Because the Company's employee stock options have certain characteristics that are significantly different from traded options, and because changes in the subjective assumptions can materially affect the

estimated value, in management's opinion, the Binomial Model best provides a fair measure of the fair value of the Company's employee stock options.

The weighted average fair value of all common share options, granted to employees for the three months ended March 31, 2012 at the measurement date was $7.65 per share (2011 — $9.87 per share). The following assumptions were used:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Average risk-free interest rate | 1.39% | 2.87% |
| Expected option life (in years) | 4.43 - 5.36 | 5.08 - 5.14 |
| Expected volatility | 50% | 50% |
| Annual termination probability | 8.52% - 8.76% | 8.31% - 8.49% |
| Dividend yield | 0% | 0% |

As at March 31, 2012, the Company has reserved a total of 13,133,729 (December 31, 2011 — 13,010,548) common shares for future issuance under the Stock Option Plan, of which options in respect of 8,116,782 common shares are outstanding at March 31, 2012. All awards of stock options are made at fair market value of the Company's common shares on the date of grant. The fair market value of a common share on a given date means the higher of the closing price of a common share on the grant date (or the most recent trading date if the grant date is not a trading date) on the New York Stock Exchange ("NYSE"), the Toronto Stock Exchange (the "TSX") and such national exchange, as may be designated by the Company's Board of Directors (the "Fair Market Value"). The options generally vest between one and 5 years and expire 10 years or less from the date granted. The Stock Option Plan provides that vesting will be accelerated if there is a change of control, as defined in the plan and upon certain conditions. At March 31, 2012, options in respect of 3,150,636 common shares were vested and exercisable.

The following table summarizes certain information in respect of option activity under the Stock Option Plan for the three month periods ended March 31:

| | Number of Shares | | Weighted Average Exercise Price Per Share | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Options outstanding, beginning of year | 7,200,721 | 6,743,272 | $ 14.60 | $ 10.79 |
| Granted | 1,542,117 | 979,930 | 25.14 | 31.25 |
| Exercised | (615,906) | (109,366) | 5.66 | 7.60 |
| Forfeited | (10,150) | (18,750) | 20.73 | 7.57 |
| Expired | - | - | - | - |
| Cancelled | - | - | - | - |
| Options outstanding, end of period | 8,116,782 | 7,595,086 | 17.27 | 13.49 |
| Options exercisable, end of period | 3,150,636 | 3,148,833 | 11.87 | 6.46 |

The Company did not cancel any stock options from its Stock Option Plan surrendered by Company employees during the three months ended March 31, 2012 and 2011, respectively.

As at March 31, 2012, 7,263,199 options were fully vested or are expected to vest with a weighted average exercise price of $16.66, aggregate intrinsic value of $66.7 million and weighted average remaining contractual life of 5.3 years. As at March 31, 2012, options that are exercisable have an intrinsic value of $43.0 million and a weighted average remaining contractual life of 4.3 years. The intrinsic value of options exercised in the three months ended March 31, 2012 was $10.6 million (2011 — $2.4 million).

*Options to Non-Employees*

There were no common share options issued to non-employees during the three months ended March 31, 2012. During the three months ended March 31, 2011, an aggregate of 103,944 common share options to purchase the Company's common stock with an average exercise price of $27.64 were granted to certain advisors and strategic partners of the Company. These options granted in 2011 have a maximum contractual life of 6 years and vested immediately. These options were granted under the Stock Option Plan.

As at March 31, 2012, non-employee options outstanding amounted to 117,501 options (2011 — 210,445) with a weighted average exercise price of $13.63 (2011 — $20.75). Included within the non-employee options are 15,000 options which were modified in 2011 from service based employee awards to performance based non-employee awards. 33,967 options (2011 — 103,944) were exercisable with an average weighted exercise price of $11.53 (2011 — $27.64) and the vested options have an aggregate intrinsic value of $0.4 million (2011 — $0.5 million). The weighted average fair value of options granted to non-employees during the three months ended March 31, 2011 at the measurement date was $13.75 per share, utilizing a Binomial Model with the following underlying assumptions for periods ended March 31:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Average risk-free interest rate | n/a | 2.38% |
| Contractual option life | n/a | 6 years |
| Average expected volatility | n/a | 50% |
| Dividend yield | n/a | 0% |

For the three months ended March 31, 2012, the Company recorded a charge of less than $0.1 million (2011 — $0.2 million) to cost and expenses applicable to revenues – services and selling, general and administrative expenses related to the non-employee stock options. Included in accrued liabilities is an accrual of $0.1 million for non-employee stock options granted.

*Restricted Common Shares*

There were no restricted common shares issued during the three months ended or outstanding as at March 31, 2012 and 2011.

*Stock Appreciation Rights*

There has been no stock appreciation rights ("SARs") granted since 2007. During 2007, 2,280,000 SARs with a weighted average exercise price of $6.20 per right were granted in lieu of stock options to certain Company executives. During the first quarter of 2012, 15,000 SARs were cash settled for $0.3 million (2011 — 527,500 SARs were cash settled for $10.7 million). The average exercise price for the settled SARs for the quarter ended March 31, 2012 was $6.86 (2011 — $6.86) per SAR. As at March 31, 2012, 118,000 SARs were outstanding, of which 100,000 SARs were exercisable. None of the SARs were forfeited, cancelled, or expired for the quarters ended March 31, 2012 and 2011. The SARs vesting period ranges from immediately upon granting to 5 years, with a remaining contractual life of 5.76 years as at March 31, 2012. The outstanding SARs had a weighted average fair value of $17.99 per right as at March 31, 2012 (December 31, 2011 — $12.43). The Company accounts for the obligation of these SARs as a liability (March 31, 2012 — $2.1 million; December 31, 2011 — $1.6 million), which is classified within accrued liabilities. The Company has recorded a $0.8 million expense for the three months ended March 31, 2012 (2011 — $1.8 million) to selling, general and administrative expenses related to these SARs. The following assumptions were used for measuring the fair value of the SARs:

| | As at March 31, 2012 | As at December 31, 2011 |
|---|---|---|
| Average risk-free interest rate | 1.04% | 1.09% |
| Expected option life (in years) | 1.90 - 2.65 | 3.18 - 3.46 |
| Expected volatility | 50% | 50% |
| Annual termination probability | 8.76% | 8.76% |
| Dividend yield | 0% | 0% |

*Warrants*

There were no warrants issued during the three months ended or outstanding as at March 31, 2012 and 2011.

## *(c) Income (Loss) per Share*

Reconciliations of the numerator and denominator of the basic and diluted per-share computations are comprised of the following:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Net income (loss) from continuing operations applicable to common shareholders | $ 2,588 | $ (1,003) |
| Weighted average number of common shares (000's): | | |
| Issued and outstanding, beginning of period | 65,053 | 64,146 |
| Weighted average number of shares issued during the period | 349 | 41 |
| Weighted average number of shares used in computing basic income (loss) per share | 65,402 | 64,187 |
| Assumed exercise of stock, net of shares assumed | 2,756 | - |
| Weighted average number of shares used in computing diluted income (loss) per share | 68,158 | 64,187 |

The calculation of diluted loss per share for the first quarter of 2011 excludes 4,038,198 shares that are issuable upon exercise of stock options, net of shares assumed as the impact of these exercises would be antidilutive.

## *(d) Shareholders' Equity*

The following summarizes the movement of Shareholders' Equity for the three months ended March 31, 2012:

| | |
|---|---|
| Balance as at December 31, 2011 | $ 192,907 |
| Issuance of common shares for stock options exercised | 3,488 |
| Net income | 2,588 |
| Adjustment to other equity for employee stock options granted | 2,981 |
| Adjustment to other equity for non-employee stock options granted | - |
| Adjustment to capital stock for stock options exercised | 352 |
| Adjustment to other equity for stock options exercised | (352) |
| Adjustments to accumulated other comprehensive loss to record unrealized gain from cash flow hedging instruments | 387 |
| Adjustments to accumulated other comprehensive loss to record the realization of cash flow hedging losses upon settlement | 49 |
| Adjustments to accumulated other comprehensive loss to record the amortization of actuarial loss on defined benefit plan | 91 |
| Tax effect of movement in accumulated other comprehensive loss | (134) |
| Balance as at March 31, 2012 | $ 202,357 |

### 14. Segmented Information

The Company has seven reportable segments identified by category of product sold or service provided: IMAX systems; theater system maintenance; joint revenue sharing arrangements; film production and IMAX DMR; film distribution; film post-production; and other. The IMAX systems segment designs, manufactures, sells or leases IMAX theater projection system equipment. The theater system maintenance segment maintains IMAX theater projection system equipment in the IMAX theater network. The joint revenue sharing arrangements segment provides IMAX theater projection system equipment to an exhibitor in exchange for a share of the box-office and concession revenues. The film production and IMAX DMR segment produces films and performs film re-mastering services. The film distribution segment distributes films for which the Company has distribution rights. The film post-production segment provides film post-production and film print services. The Company refers to all theaters using the IMAX theater system as "IMAX theaters." The other segment includes certain IMAX theaters that the Company owns and operates, camera rentals and other miscellaneous items. The accounting policies of the segments are the same as those described in note 2 to the audited consolidated financial statements included in the Company's 2011 Form 10-K.

The Company's Chief Operating Decision Maker ("CODM"), as defined in the Segment Reporting Topic of the FASB ASC, assesses segment performance based on segment revenues, gross margins and film performance. Selling, general and administrative expenses, research and development costs, amortization of intangibles, receivables provisions (recoveries), writedowns net of recoveries, interest income, interest expense and tax (provision) recovery are not allocated to the segments.

In the third quarter of 2011, based on the guidance of ASC Topic 280, "Segment Reporting" ("ASC 280"), the Company identified a change in reportable segments. The theater operations segment which operates certain IMAX theaters has been consolidated into the other segment as it no longer meets the quantitative threshold requirements of ASC 280 for separate disclosure. Prior year comparatives have been restated to conform to the current reportable segment presentation.

Transactions between the film production and IMAX DMR segment and the film post-production segment are valued at exchange value. Inter-segment profits are eliminated upon consolidation, as well as for the disclosures below.

Transactions between the other segments are not significant.

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| **Revenue**[1] | | |
| IMAX systems | $ 15,658 | $ 22,259 |
| Theater system maintenance | 6,847 | 5,795 |
| Joint revenue sharing arrangements | 11,698 | 4,040 |
| Films | | |
| Production and IMAX DMR | 13,838 | 7,258 |
| Distribution | 3,138 | 2,617 |
| Post-production | 2,077 | 1,624 |
| Other | 2,340 | 1,567 |
| Total | $ 55,596 | $ 45,160 |
| **Gross margins** | | |
| IMAX systems[2] | $ 7,412 | 11,735 |
| Theater system maintenance | 2,726 | 2,587 |
| Joint revenue sharing arrangements[2] | 7,937 | 2,178 |
| Films | | |
| Production and IMAX DMR[2] | 7,930 | 2,759 |
| Distribution[2] | 709 | 626 |
| Post-production | 604 | 1,689 |
| Other | (457) | (928) |
| Total | $ 26,861 | $ 20,646 |

(1) The Company's three largest customers as at March 31, 2012 collectively represent 17.6% of total revenues (2011 — 22.4%).

(2) IMAX systems include commission costs of $0.7 million for the three months ended March 31, 2012 (2011 — $0.7 million). Joint revenue sharing arrangements segment margins include advertising, marketing and commission costs of $0.4 million for the three months ended March 31, 2012 (2011 — $0.5 million). Production and DMR segment margins include marketing costs of $0.6 million for the three months ended March 31, 2012 (2011 — $0.4 million). Distribution segment margins include marketing costs of $0.8 million for the three months ended March 31, 2012 (2011 — $0.2 million).

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Assets | | |
| IMAX systems | $ 157,287 | $ 154,312 |
| Theater system maintenance | 8,796 | 13,008 |
| Joint revenue sharing arrangements | 125,767 | 120,483 |
| Films | | |
| Production and IMAX DMR | 15,253 | 16,577 |
| Distribution | 3,384 | 4,504 |
| Post-production | 3,654 | 4,185 |
| Other | 2,133 | 2,718 |
| Corporate and other non-segment specific assets | 97,868 | 90,449 |
| Total | $ 414,142 | $ 406,236 |

*Geographic Information*

Revenue by geographic area is based on the location of the customer. Revenue related to IMAX DMR is presented based upon the geographic location of the theaters that exhibit the re-mastered films. IMAX DMR revenue is generated through contractual relationships with studios and other third parties and these may not be in the same geographical location as the theater. Comparative numbers related to IMAX DMR revenue have been adjusted to conform to the current period presentation.

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| **Revenue** | | |
| Canada | $ 4,133 | $ 1,322 |
| United States | 26,600 | 21,983 |
| Russia and the CIS | 3,102 | 4,642 |
| Western Europe | 5,698 | 3,121 |
| Rest of Europe | 266 | 2,344 |
| Asia (excluding Greater China) | 4,064 | 3,081 |
| Greater China | 6,969 | 7,130 |
| Mexico | 410 | 413 |
| Rest of the World | 4,354 | 1,124 |
| Total | $ 55,596 | $ 45,160 |

No single country in the Rest of the World, Western Europe, Rest of Europe or Asia (excluding Greater China) classifications comprises more than 5% of the total revenue.

**15. Employees Pension and Postretirement Benefits**

*(a) Defined Benefit Plan*

The Company has an unfunded U.S. defined benefit pension plan (the "SERP") covering Richard L. Gelfond, Chief Executive Officer ("CEO") of the Company and Bradley J. Wechsler, Chairman of the Company's Board of Directors. The SERP provides for a lifetime retirement benefit from age 55 determined as 75% of the member's best average 60 consecutive months of earnings over the member's employment history. The benefits were 50% vested as at July 2000, the SERP initiation date. The vesting percentage increases on a straight-line basis from inception until age 55. As at March 31, 2012, the benefits of Mr. Gelfond were 100% vested. Upon a termination for cause, prior to a change of control, the executive shall forfeit any and all benefits to which such executive may have been entitled, whether or not vested.

Under the terms of the SERP, if Mr. Gelfond's employment terminated other than for cause, he is entitled to receive SERP benefits in the form of a lump sum payment. SERP benefit payments to Mr. Gelfond are subject to a deferral for six months after the termination of his employment, at which time Mr. Gelfond will be entitled to receive interest on the deferred amount credited at the applicable federal rate for short-term obligations. The term of Mr. Gelfond's current employment agreement has been extended through December 31, 2013. Under the terms of the extension, Mr. Gelfond also agreed that any compensation earned during 2011, 2012 and 2013 would not be included in calculating his entitlement under the SERP.

The amounts accrued for the SERP are determined as follows:

| | As at March 31, 2012 | As at December 31, 2011 |
|---|---|---|
| Obligation, beginning of period | $ 18,990 | $ 18,108 |
| Interest cost | 68 | 279 |
| Actuarial loss | - | 603 |
| Obligation, end of period and unfunded status | $ 19,058 | $ 18,990 |

The following table provides disclosure of pension expense for the SERP:

| | Three Months Ended March 31, 2012 | 2011 |
|---|---|---|
| Interest cost | 68 | 70 |
| Amortization of actuarial loss | 91 | 54 |
| Pension expense | $ 159 | $ 124 |

The accumulated benefit obligation for the SERP was $19.1 million at March 31, 2012 (December 31, 2011 - $19.0 million).

The following amounts were included in accumulated other comprehensive income ("AOCI") and will be recognized as components of net periodic benefit cost in future periods:

| | As at March 31, 2012 | As at December 31, 2011 |
|---|---|---|
| Unrecognized actuarial loss | $ 2,537 | $ 2,628 |

No contributions are expected to be made for the SERP during 2012. The Company expects interest costs of $0.2 million and amortization of actuarial losses of $0.3 million to be recognized as a component of net periodic benefit cost during the remainder of 2012.

The following benefit payments are expected to be made as per the current SERP assumptions and the terms of the SERP in each of the next 5 years, and in the aggregate:

| | |
|---|---|
| 2012 (nine months remaining) | $ - |
| 2013 | - |
| 2014 | 19,676 |
| 2015 | - |
| 2016 | - |
| Thereafter | - |
| | $ 19,676 |

*(b) Defined Contribution Plan*

The Company also maintains defined contribution pension plans for its employees, including its executive officers. The Company makes contributions to these plans on behalf of employees in an amount up to 5% of their base salary subject to certain prescribed maximums. During the three months ended March 31, 2012, the Company contributed and expensed an aggregate of $0.3 million (2011 — $0.2 million) to its Canadian plan and an aggregate of $0.1 million (2011 — less than $0.1 million) to its defined contribution employee pension plan under Section 401(k) of the U.S. Internal Revenue Code.

*(c) Postretirement Benefits*

The Company has an unfunded postretirement plan for Messrs. Gelfond and Wechsler. The plan provides that the Company will maintain health benefits for Messrs. Gelfond and Wechsler until they become eligible for Medicare and, thereafter, the Company will provide Medicare supplement coverage as selected by Messrs. Gelfond and Wechsler. The postretirement benefits obligation as at March 31, 2012 is $0.5 million (December 31, 2011 — $0.5 million). The Company has expensed less than $0.1 million for the three months ended March 31, 2012 (2011 — less than $0.1 million).

The following benefit payments are expected to be made as per the current plan assumptions in each of the next 5 years:

| | |
|---|---|
| 2012 (nine months remaining) | $ 15 |
| 2013 | 16 |
| 2014 | 35 |
| 2015 | 38 |
| 2016 | 42 |
| Thereafter | 378 |
| | $ 524 |

### 16. Financial Instruments

*(a) Financial Instruments*

The Company maintains cash with various major financial institutions. The Company's cash is invested with highly rated financial institutions.

The Company's accounts receivables and financing receivables are subject to credit risk. The Company's accounts receivable and financing receivables are concentrated with the theater exhibition industry and film entertainment industry. To minimize the Company's credit risk, the Company retains title to underlying theater systems leased, performs initial and ongoing credit evaluations of its customers and makes ongoing provisions for its estimate of potentially uncollectible amounts. The Company believes it has adequately provided for related exposures surrounding receivables and contractual commitments.

*(b) Fair Value Measurements*

The carrying values of the Company's cash and cash equivalents, accounts receivable, accounts payable and accrued liabilities due within one year approximate fair values due to the short-term maturity of these instruments. The Company's other financial instruments are comprised of the following:

| | As at March 31, 2012 | | As at December 31, 2011 | |
|---|---|---|---|---|
| | Carrying Amount | Estimated Fair Value | Carrying Amount | Estimated Fair Value |
| Borrowings under Credit Facility | $ (55,000) | $ (55,000) | $ (55,083) | $ (55,083) |
| Net financed sales receivable | $ 73,354 | $ 71,374 | $ 67,300 | $ 65,846 |
| Net investment in sales-type leases | $ 14,162 | $ 14,467 | $ 19,414 | $ 20,448 |
| Available-for-sale investment | $ 1,012 | $ 1,012 | $ 1,012 | $ 1,012 |
| Foreign exchange contracts — designated forwards | $ 254 | $ 254 | $ (182) | $ (182) |
| Foreign exchange contracts — non-designated forwards | $ 219 | $ 219 | $ (645) | $ (645) |

The carrying value of borrowings under the Credit Facility approximates fair value as the interest rates offered under the Credit Facility are close to March 31, 2012 and December 31, 2011 market rates for the Company for debt of the same remaining maturities (Level 2 input in accordance with the Fair Value Measurements Topic of the FASB ASC hierarchy) as at March 31, 2012 and December 31, 2011, respectively.

The estimated fair values of the net financed sales receivable and net investment in sales-type leases are estimated based on discounting future cash flows at currently available interest rates with comparable terms (Level 2 input in accordance with the Fair Value Measurements Topic of the FASB ASC hierarchy) as at March 31, 2012 and December 31, 2011, respectively.

The fair value of the Company's available-for-sale investment is determined using the present value of expected cash flows based on projected earnings and other information readily available from the business venture (Level 3 input in accordance with the Fair Value Measurements Topic of the FASB ASC hierarchy) as at March 31, 2012 and December 31, 2011, respectively. The discounted cash flow valuation technique is based on significant unobservable inputs of revenue and expense projections, appropriately risk weighted, as the investment is in a start-up entity. The significant unobservable inputs used in the fair value measurement of the Company's available-for-sale investment are long-term revenue growth and pretax operating margin. A significant increase (decrease) in any of those inputs in isolation would result in a lower or higher fair value measurement.

The fair value of foreign currency derivatives are determined using quoted prices in active markets (Level 2 input in accordance with the Fair Value Measurements Topic of the FASB ASC hierarchy) as at March 31, 2012 and December 31, 2011, respectively. These identical instruments are traded on a closed exchange.

There were no significant transfers between Level 1 and Level 2 during the three months ended March 31, 2012 or 2011. When a determination is made to classify an asset or liability within Level 3, the determination is based upon the significance of the unobservable inputs to the overall fair value measurement. The table below sets forth a summary of changes in the fair value of the Company's available-for-sale investment measured at fair value on a recurring basis using significant unobservable inputs (Level 3) during the period:

| | Available For Sale Investments |
|---|---|
| Beginning balance, January 1, 2012 | $ 1,012 |
| Transfers into/out of Level 3 | - |
| Total gains or losses (realized/unrealized) | |
| Included in earnings | - |
| Included in other comprehensive income | - |
| Purchases, issuances, sales and settlements | - |
| Ending balance, March 31, 2012 | $ 1,012 |
| The amount of total gains or losses for the period included in earnings attributable to the change in unrealized gains or losses relating to assets still held at the reporting date | $ - |

(c) *Financing Receivables*

The Company's net investment in leases and its net financed sale receivables are subject to the disclosure requirements of ASC 310 "Receivables". Due to differing risk profiles of its net investment in leases and its net financed sales receivables, the Company views its net investment in leases and its net financed sale receivables as separate classes of financing receivables. The Company does not aggregate financing receivables to assess impairment.

The Company monitors the credit quality of each customer on a frequent basis through collections and aging analyses. The Company also holds meetings monthly in order to identify credit concerns and whether a change in credit quality classification is required for the customer. A customer may improve in their credit quality classification once a substantial payment is made on overdue balances or the customer has agreed to a payment plan with the Company and payments have commenced in accordance to the payment plan. The change in credit quality indicator is dependant upon management approval.

The Company classifies its customers into three categories to indicate the credit quality worthiness of its financing receivables for internal purposes only:

Good standing – Theater continues to be in good standing with the Company as the client's payments and reporting are up-to-date.

Pre-approved transactions only – Theater operator has begun to demonstrate a delay in payments with little or no communication with the Company. All service or shipments to the theater must be reviewed and approved by management. These financing receivables are considered to be in better condition than those receivables related to theaters in the "All transactions suspended" category, but not in as good of condition as those receivables in "Good standing". Depending on the individual facts and circumstances of each customer, finance income recognition may be suspended if management believes the receivable to be impaired.

All transactions suspended – Theater is severely delinquent, non-responsive or not negotiating in good faith with the Company. Once a theater is classified as "All transactions suspended", the theater is placed on nonaccrual status and all revenue recognitions related to the theater are stopped.

The following table discloses the recorded investment in financing receivables by credit quality indicator as at March 31, 2012:

| | As at March 31, 2012 | | | As at December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Minimum Lease Payments | Financed Sales Receivables | Total | Minimum Lease Payments | Financed Sales Receivables | Total |
| In good standing | $ 10,855 | $ 61,536 | $ 72,391 | $ 15,667 | $ 55,907 | $ 71,574 |
| Pre-approved transactions | 1,781 | 11,831 | 13,612 | 3,343 | 10,990 | 14,333 |
| Transactions suspended | 3,150 | 430 | 3,580 | 2,237 | 719 | 2,956 |
| | $ 15,786 | $ 73,797 | $ 89,583 | $ 21,247 | $ 67,616 | $ 88,863 |

While recognition of finance income is suspended, payments received by a customer are applied against the outstanding balance owed. If payments are sufficient to cover any unreserved receivables, a recovery of provision taken on the billed amount, if applicable, is recorded to the extent of the residual cash received. Once the collectibility issues are resolved and the customer has returned to being in good standing, the Company will resume recognition of finance income.

The Company's investment in financing receivables on nonaccrual status as at March 31, 2012 is as follows:

| | As at March 31, 2012 | | As at December 31, 2011 | |
|---|---|---|---|---|
| | Recorded Investment | Related Allowance | Recorded Investment | Related Allowance |
| Net investment in leases | $ 4,269 | $ (1,624) | $ 4,692 | $ (1,833) |
| Net financed sales receivables | 1,347 | (443) | 1,329 | (316) |
| | $ 5,616 | $ (2,067) | $ 6,021 | $ (2,149) |

The Company considers financing receivables with aging between 60-89 days as indications of theaters with potential collection concerns. The Company will begin to focus its review on these financing receivables and increase its discussions internally and with the theater regarding payment status. Once a theater's aging exceeds 90 days, the Company's policy is to review and assess collectibility on the theater's past due accounts. Over 90 days past due is used by the Company as an indicator of potential impairment as invoices up to 90 days outstanding could be considered reasonable due to the time required for dispute resolution or for the provision of further information or supporting documentation to the customer.

The Company's aged financing receivables are as follows:

| As at March 31, 2012 | Current | 30-89 Days | 90+ Days | Billed Financing Receivables | Related Unbilled Recorded Investment | Total Recorded Investment | Related Allowances | Recorded Investment Net of Allowances |
|---|---|---|---|---|---|---|---|---|
| Net investment in leases | $ 268 | $ 282 | $ 1,625 | $ 2,175 | $ 13,611 | $ 15,786 | $ (1,624) | $ 14,162 |
| Net financed sales receivables | 966 | 722 | 1,242 | 2,930 | 70,867 | 73,797 | (443) | 73,354 |
| Total | $ 1,234 | $ 1,004 | $ 2,867 | $ 5,105 | $ 84,478 | $ 89,583 | $ (2,067) | $ 87,516 |

| As at December 31, 2011 | Current | 30-89 Days | 90+ Days | Billed Financing Receivables | Related Unbilled Recorded Investment | Total Recorded Investment | Related Allowances | Recorded Investment Net of Allowances |
|---|---|---|---|---|---|---|---|---|
| Net investment in leases | $ 350 | $ 261 | $ 1,754 | $ 2,365 | $ 18,882 | $ 21,247 | $ (1,833) | $ 19,414 |
| Net financed sales receivables | 723 | 593 | 1,029 | 2,345 | 65,270 | 67,616 | (316) | 67,300 |
| Total | $ 1,073 | $ 854 | $ 2,783 | $ 4,710 | $ 84,152 | $ 88,863 | $ (2,149) | $ 86,714 |

The Company's recorded investment in past due financing receivables for which the Company continues to accrue finance income is as follows:

| As at March 31, 2012 | Current | 30-89 Days | 90+ Days | Billed Financing Receivables | Related Unbilled Recorded Investment | Related Allowance | Recorded Investment Past Due and Accruing |
|---|---|---|---|---|---|---|---|
| Net investment in leases | $ - | $ - | $ 39 | $ 39 | $ - | $ - | $ 39 |
| Net financed sales receivables | 171 | 326 | 837 | 1,334 | 12,592 | - | 13,926 |
| Total | $ 171 | $ 326 | $ 876 | $ 1,373 | $ 12,592 | $ - | $ 13,965 |

| As at December 31, 2011 | Current | 30-89 Days | 90+ Days | Billed Financing Receivables | Related Unbilled Recorded Investment | Related Allowance | Recorded Investment Past Due and Accruing |
|---|---|---|---|---|---|---|---|
| Net investment in leases | $ 67 | $ 118 | $ 144 | $ 329 | $ 3,766 | $ - | $ 4,095 |
| Net financed sales receivables | 202 | 345 | 674 | 1,221 | 16,343 | - | 17,564 |
| Total | $ 269 | $ 463 | $ 818 | $ 1,550 | $ 20,109 | $ - | $ 21,659 |

The Company considers financing receivables to be impaired when it believes it to be probable that it will not recover the full amount of principal and interest owing under the arrangement. The Company uses its knowledge of the industry and economic trends, as well as its prior experiences to determine the amount recoverable for impaired financing receivables. The following table discloses information regarding the Company's impaired financing receivables:

| | Impaired Financing Receivables For the Three Months Ended March 31, 2012 | | | | |
|---|---|---|---|---|---|
| | Recorded Investment | Unpaid Principal | Related Allowance | Average Recorded Investment | Interest Income Recognized |
| Recorded investment for which there is a related allowance: | | | | | |
| Net financed sales receivables | 690 | 447 | (443) | 696 | - |
| Total recorded investment in impaired loans: | | | | | |
| Net financed sales receivables | $ 690 | $ 447 | $ (443) | $ 696 | $ - |

| | Impaired Financing Receivables For the Three Months Ended March 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Recorded Investment | Unpaid Principal | Related Allowance | Average Recorded Investment | Interest Income Recognized |
| Recorded investment for which there is a related allowance: | | | | | |
| Net financed sales receivables | 239 | 183 | (66) | 239 | - |
| Total recorded investment in impaired loans: | | | | | |
| Net financed sales receivables | $ 239 | $ 183 | $ (66) | $ 239 | $ - |

The Company's activity in the allowance for credit losses for the period and the Company's recorded investment in financing receivables is as follows:

| | Three Months Ended March 31, 2012 | | Three Months Ended March 31, 2011 | |
|---|---|---|---|---|
| | Net Investment in Leases | Net Financed Sales Receivables | Net Investment in Leases | Net Financed Sales Receivables |
| Allowance for credit losses: | | | | |
| Beginning balance | $ 1,833 | $ 316 | $ 4,838 | $ 66 |
| Charge-offs | (257) | - | (2,445) | - |
| Provision | 48 | 127 | 165 | - |
| Ending balance | $ 1,624 | $ 443 | $ 2,558 | $ 66 |
| Ending balance: individually evaluated for impairment | $ 1,624 | $ 443 | $ 2,558 | $ 66 |
| Financing receivables: | | | | |
| Ending balance: individually evaluated for impairment | $ 15,786 | $ 73,797 | $ 27,506 | $ 51,062 |

*(d) Foreign Exchange Risk Management*

The Company is exposed to market risk from changes in foreign currency rates. A majority portion of the Company's revenues is denominated in U.S. dollars while a substantial portion of its costs and expenses is denominated in Canadian dollars. A portion of the net U.S. dollar cash flows of the Company is periodically converted to Canadian dollars to fund Canadian dollar expenses through the spot market. In Japan, the Company has ongoing operating expenses related to its operations in Japanese yen. Net Japanese yen cash flows are converted to U.S. dollars generally through the spot market. The Company also has cash receipts under leases denominated in Chinese Renminbi, Japanese yen, Canadian dollar and Euros which are converted to U.S. dollars generally through the spot market. The Company's policy is to not use any financial instruments for trading or other speculative purposes.

The Company entered into a series of foreign currency forward contracts to manage the Company's risks associated with the volatility of foreign currencies. Certain of these foreign currency forward contracts met the criteria required for hedge accounting under the Derivatives and Hedging Topic of the FASB ASC at inception, and continue to meet hedge effectiveness tests at March 31, 2012 (the "Foreign Currency Hedges"), with settlement dates throughout 2012. In addition, at March 31, 2012, the Company held foreign currency forward contracts to manage foreign currency risk on future anticipated Canadian dollar expenditures that were not considered Foreign Currency Hedges by the Company. Foreign currency derivatives are recognized and measured in the balance sheet at fair value. Changes in the fair value (gains or losses) are recognized in the condensed consolidated statement of operations except for derivatives designated and qualifying as foreign currency hedging instruments. For foreign currency hedging instruments, the effective portion of the gain or loss in a hedge of a forecasted transaction is reported in other comprehensive income and reclassified to the condensed consolidated statement of operations when the forecasted transaction occurs. Any ineffective portion is recognized immediately in the consolidated statement of operations.

The following tabular disclosures reflect the impact that derivative instruments and hedging activities have on the Company's condensed consolidated financial statements:

Notional value foreign exchange contracts as at:

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Derivatives designated as hedging instruments: | | |
| Foreign exchange contracts - Forwards | $ 15,740 | $ 20,581 |
| Derivatives not designated as hedging instruments: | | |
| Foreign exchange contracts - Forwards | 29,791 | 67,341 |
| | $ 45,531 | $ 87,922 |

Fair value of derivatives in foreign exchange contracts as at:

| | Balance Sheet Location | March 31, 2012 | December 31, 2011 |
|---|---|---|---|
| Derivatives designated as hedging instruments: | | | |
| Foreign exchange contracts — Forwards | Other assets (Accrued liabilities) | $ 254 | $ (182) |
| Derivatives not designated as hedging instruments: | | | |
| Foreign exchange contracts — Forwards | Other assets (Accrued liabilities) | 219 | (645) |
| | | $ 473 | $ (827) |

Derivatives in Foreign Currency Hedging relationships for the three months ended March 31:

| | | 2012 | 2011 |
|---|---|---|---|
| Foreign exchange contracts - Forwards | Derivative gain recognized in OCI (effective portion) | $ 387 | $ 302 |

| | Location of derivative (loss) gain reclassified from AOCI into income (effective portion) | 2012 | 2011 |
|---|---|---|---|
| Foreign exchange contracts - Forwards | Selling, general and administrative expenses | $ (49) | $ 258 |

Non Designated Derivatives in Foreign Currency relationships for the three months ended March 31:

| | Location of derivative gain | 2012 | 2011 |
|---|---|---|---|
| Foreign exchange contracts - Forwards | Selling, general and administrative expenses | $ 1,181 | $ 628 |

*(e) Investments in New Business Ventures*

The Company accounts for investments in new business ventures using the guidance of the FASB ASC 323 and the FASB ASC 320, as appropriate. As at March 31, 2012, the equity method of accounting is being utilized for an investment with a carrying value of $4.0 million (December 31, 2011 — $4.1 million). For the three months ended March 31, 2012, gross revenues, cost of revenue and net loss for the investment were $1.0 million, $3.1 million and $4.5 million, respectively (2011 — $0.2 million, $1.4 million and $4.2 million, respectively). The Company has determined it is not the primary beneficiary of this VIE, and therefore it has not been consolidated. The difference between the Company's investment balance and the amount of underlying equity in net assets owned by the Company amounts to $1.4 million and relates to goodwill. In addition, the Company has an investment in preferred stock of another business venture of $1.5 million which meets the criteria for classification as a debt security under the FASB ASC 320 and is recorded at its fair value of $1.0 million at March 31, 2012 (December 31, 2011 — $1.0 million). This investment is classified as an available-for-sale investment. The total carrying value of investments in new business ventures at March 31, 2012 is $5.0 million (December 31, 2011 — $5.1 million) and is recorded in Other Assets.

IMAX CORPORATION

Item 2. *Management's Discussion and Analysis of Financial Condition and Results of Operations*

## OVERVIEW

IMAX Corporation, together with its wholly-owned subsidiaries (the "Company"), is one of the world's leading entertainment technology companies, specializing in motion picture technologies and presentations. The Company's principal business is the design and manufacture of premium theater systems ("IMAX theater systems") and the sale, lease or contribution to customers under revenue-sharing arrangements of IMAX theater systems. The IMAX theater systems are based on proprietary and patented technology developed over the course of the Company's 45-year history. The Company's customers who purchase, lease or otherwise acquire the IMAX theater systems are theater exhibitors that operate commercial theaters (particularly multiplexes), museums, science centers, or destination entertainment sites. The Company generally does not own IMAX theaters, but licenses the use of its trademarks along with the sale, lease or contribution of its equipment. The Company refers to all theaters using the IMAX theater system as "IMAX theaters."

The Company derives revenue principally from the sale or long-term lease of IMAX theater systems and associated maintenance and extended warranty services, the installation of IMAX theater systems under joint revenue sharing arrangements, the provision of film production and digital re-mastering services, the distribution of certain films, and the provision of post-production services, including the conversion of two-dimensional ("2D") and three-dimensional ("3D") Hollywood feature films for exhibition on IMAX theater systems around the world. The Company also derives revenue from the operation of its own theaters, camera rentals and the provision of aftermarket parts for its system components.

The Company believes the IMAX theater network is the most extensive premium theater network in the world with 643 IMAX theaters (530 commercial, 113 institutional) operating in 52 countries as at March 31, 2012. This compares to 528 IMAX theaters (408 commercial, 120 institutional) operating in 46 countries as at March 31, 2011.

Important factors that the Company's Chief Executive Officer ("CEO") Richard L. Gelfond uses in assessing the Company's business and prospects include revenue, gross margins from the Company's operating segments, the signing and financial performance of theater system arrangements (particularly its joint revenue sharing arrangements), film performance, installations, earnings from operations as adjusted for unusual items that the Company views as non-recurring, the securing of new film projects (particularly IMAX DMR films), the continuing ability to invest in and improve the Company's technology to enhance its differentiation of presentation versus other cinematic experiences, the viability of new businesses, the overall execution, reliability and consumer acceptance of *The* IMAX *Experience* and related technologies and short- and long-term cash flow projections.

The Company strives to remain at the forefront of advancements in cinema technology. Accordingly, one of the Company's key initiatives for 2012 is the development of a next-generation laser-based digital projection system. In 2011, the Company announced the completion of a deal in which it secured certain exclusive license rights to a portfolio of intellectual property in the digital cinema field owned by the Eastman Kodak Company ("Kodak"). The transaction involves rights to technology related to laser projection as well as rights in the digital cinema field to a broader range of Kodak technology. On February 7, 2012, the Company announced an agreement with Barco N.V. to co-develop a laser-based digital projection system that incorporates Kodak technology. The Company believes that these arrangements with Kodak and Barco N.V. will enable IMAX projectors to present greater brightness and clarity, a wider color gamut and deeper blacks, and consume less power and last longer than existing digital technology. The Company believes that a laser projection solution, which it plans to introduce in the second half of 2013, will allow IMAX's network to show the highest quality digital content available. During 2012, the Company also intends to re-invest in its brand with its consumer brand marketing campaign that will encompass social media, in-theater marketing and Internet advertising. Finally, the Company remains focused on growing its theater network, particularly, in key international territories such as Greater China, India, Central and South America and Western Europe.

### IMAX Systems, Theater System Maintenance and Joint Revenue Sharing Arrangements

The Company provides IMAX theater systems to customers on a sales or long-term lease basis, typically with initial terms of approximately 10 years. These agreements typically provide for three major sources of cash flows: initial fees, ongoing fees (which can include a fixed minimum amount per annum and contingent fees in excess of the minimum payments) and maintenance and extended warranty fees. The initial fees vary depending on the system configuration and location of the theater and generally are paid to the Company in installments commencing upon the signing of the agreement. Finance income is derived over the term of the sales

or sales-type lease arrangement as the unearned income on financed sales or sales-type leases is earned. Ongoing fees are paid monthly over the term of the contract, commencing after the theater system has been installed and are generally equal to the greater of a fixed minimum amount per annum or a percentage of box-office receipts. Both ongoing fees and maintenance and extended warranty fees are typically indexed to a local consumer price index.

The Company offers certain commercial clients joint revenue sharing arrangements pursuant to which the Company receives a portion of the theater's box-office receipts, concession revenue and in some cases a small upfront or initial payment in exchange for placing an IMAX theater system at the theater operator's venue.

Revenue from theater system arrangements is recognized at a different time from when cash is collected. See "Critical Accounting Policies" below for further discussion on the Company's revenue recognition policies.

**Sales Backlog and Theater Network**

The Company's sales backlog fluctuates in both number of systems and dollar value depending on the signing of new theater system arrangements from quarter to quarter, which adds to backlog, and its installation and acceptance of theater systems and the settlement of contracts, both of which reduce backlog. Sales backlog typically represents the fixed contracted revenue under signed theater system sale and lease agreements that the Company believes will be recognized as revenue upon installation and acceptance of the associated theater. Sales backlog includes initial fees along with the estimated present value of contractual ongoing fees due over the lease term, but excludes amounts allocated to maintenance and extended warranty revenues as well as fees in excess of contractual ongoing fees that may be received in the future. The value of sales backlog does not include revenue from theaters in which the Company has an equity interest, operating leases, letters of intent or long-term conditional theater commitments. Certain theater systems under joint revenue sharing arrangements carry a backlog value based on contracted upfront payments. The Company believes that the contractual obligations for theater system installations that are listed in sales backlog are valid and binding commitments.

The Company's theater signings are as follows:

| | For the Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2012 | | 2011 | |
| | Number of Systems | Dollar Value *(in millions)* | Number of Systems | Dollar Value *(in millions)* |
| Full new sales and sale-type lease arrangements | 18 (1) | $ 24.5 | 23 (1) | $ 26.9 |
| Joint revenue sharing arrangements | 5 (3) | - | 76 (3) | - |
| Total arrangements for new theaters | 23 | 24.5 | 99 | 26.9 |
| Digital upgrades under sales and sale-type lease arrangements | - (2) | - | 2 (2) | 0.9 |
| Total | 23 | $ 24.5 | 101 | $ 27.8 |

(1) Includes nil installations and 18 in backlog as at March 31, 2012 (2011 – 1 and 22, respectively).
(2) Includes nil installations and nil in backlog as at March 31, 2012 (2011 – nil and 2, respectively).
(3) Includes 1 installation and 4 in backlog as at March 31, 2012 (2011 – nil and 76, respectively). Included in the Company's first quarter of 2011 signings is an agreement for a 75-theater joint revenue sharing arrangement with Wanda Cinema Line ("Wanda"), China's top grossing cinema chain.

*Sales Backlog.* Signed contracts for theater systems are listed as sales backlog prior to the time of revenue recognition. The value of sales backlog represents the total value of all signed theater system agreements that are expected to be recognized as revenue in the future. Sales backlog includes initial fees along with the estimated present value of contractual fixed minimum fees due over the term, but excludes contingent fees in excess of contractual minimums and maintenance and extended warranty fees that might be received in the future.

The Company's sales backlog is as follows:

| | March 31, 2012 | | March 31, 2011 | |
|---|---|---|---|---|
| | Number of Systems | Dollar Value (in thousands) | Number of Systems | Dollar Value (in thousands) |
| Sales and sale-type lease arrangements | 145 (1) | $ 186,934 | 158 (1) | $ 190,972 |
| Joint revenue sharing arrangements | 116 | 20,251 | 125 | - |
| | 261 (2) | $ 207,185 | 283 (2) | $ 190,972 |

(1) Includes 1 upgrade from film-based IMAX theater systems to IMAX digital theater systems as at March 31, 2012 (2011 — 5).
(2) Reflects the minimum number of theaters arising from signed contracts in backlog.

Certain theater systems under joint revenue sharing arrangements carry a backlog value based on small contracted upfront payments with no value assigned to future performance payments. All other theater systems under joint revenue sharing arrangements carry no assigned backlog value. The value of the sales backlog does not include revenues from theaters in which the Company has an equity-interest, agreements covered by letters of intent or long-term conditional sale or lease commitments, though the systems contracted for under these arrangements is included calculating the number of systems in backlog.

The following chart shows the number of the Company's theater systems by configuration, opened theater network base and backlog as at March 31:

| | 2012 | | 2011 | |
|---|---|---|---|---|
| | Theater Network Base | Backlog | Theater Network Base | Backlog |
| Flat Screen (2D) | 24 | - | 27 | - |
| Dome Screen (2D) | 60 | - | 66 | - |
| IMAX 3D Dome (3D) | 2 | - | 3 | - |
| IMAX 3D GT (3D) | 68 (1) | 2 | 70 (2) | 2 |
| IMAX 3D SR (3D) | 27 (1) | 1 | 34 (2) | 1 |
| IMAX MPX (3D) | 3 (1) | 3 | 12 (2) | 4 |
| IMAX Digital (3D) | 459 (1) | 255 (3) | 316 (2) | 276 (3) |
| Total | 643 | 261 | 528 | 283 |

(1) During the three months ended March 31, 2012, the Company upgraded 9 film-based IMAX theater systems to IMAX digital theater systems (all sales arrangements).

(2) During the three months ended March 31, 2011, the Company upgraded 22 film-based IMAX theater systems to IMAX digital theater systems (all sales arrangements).

(3) Includes 116 and 125 theater systems as at March 31, 2012 and 2011, respectively, under joint revenue sharing arrangements.

The Company estimates that approximately 84 (excluding digital upgrades) of the 261 theater systems arrangements currently in backlog will be installed in the remaining nine months of 2012, with the remainder being installed in subsequent periods. In addition, each year the Company installs a number of systems that are signed in that same calendar year. The Company expects that additional theater system arrangements not currently in backlog will be signed and installed in 2012. The Company cautions that theater system installations slip from period to period in the course of the Company's business and such slippages remain a recurring and unpredictable part of its business.

In the normal course of its business, from time to time the Company, will have customers who, for a number of reasons, including the inability to obtain certain consents, approvals or financing, are unable to proceed with a theater system installation. Once the

determination is made that the customer will not proceed with installation, the agreement with the customer is generally terminated or amended. If the agreement is terminated, once the Company and the customer are released from all their future obligations under the agreement, all or a portion of the initial rents or fees that the customer previously made to the Company are recognized as revenue.

The following table outlines the breakdown of the theater network by type and geographic location as at March 31:

| | 2012 Theater Network Base | | | | 2011 Theater Network Base | | | |
|---|---|---|---|---|---|---|---|---|
| | Commercial Multiplex | Commercial Destination | Institutional | Total | Commercial Multiplex | Commercial Destination | Institutional | Total |
| United States | 274 | 6 | 58 | 338 | 228 | 8 | 65 | 301 |
| Canada | 27 | 2 | 7 | 36 | 17 | 2 | 7 | 26 |
| Mexico | 6 | - | 10 | 16 | 7 | - | 10 | 17 |
| Russia & the CIS | 23 | - | - | 23 | 18 | - | - | 18 |
| Western Europe | 35 | 7 | 10 | 52 | 34 | 7 | 9 | 50 |
| Rest of Europe | 10 | - | 1 | 11 | 9 | - | - | 9 |
| Japan | 13 | 2 | 4 | 19 | 9 | 2 | 6 | 17 |
| Greater China (1) | 73 | - | 18 | 91 | 26 | - | 18 | 44 |
| Rest of World | 49 | 3 | 5 | 57 | 38 | 3 | 5 | 46 |
| Total | 510 (2) | 20 | 113 | 643 | 386 (2) | 22 | 120 | 528 |

(1) Greater China includes China, Hong Kong, Taiwan and Macau.
(2) Includes 265 and 181 theater systems in operation as at March 31, 2012 and 2011, respectively, under joint revenue sharing arrangements.

The Company believes that over time its commercial multiplex theater network could grow to more than 1,500 theaters worldwide from 510 commercial multiplex IMAX theaters as of March 31, 2012. While the Company continues to grow domestically, particularly in small to mid-tier markets, it believes that the majority of its future growth will come from underpenetrated, international markets. Key international growth markets include Greater China, Russia and the Commonwealth of Independent States, Western Europe and Latin America.

**Film Production and Digital Re-Mastering (IMAX DMR)**

The Company developed a proprietary technology to digitally re-master Hollywood films into IMAX digital cinema package ("DCP") format or 15/70-format film at a modest cost incurred by the Company for exhibition in IMAX theaters. This system, known as IMAX DMR, digitally enhances the image resolution of motion picture films for projection on IMAX screens while maintaining or enhancing the visual clarity and sound quality to levels for which *The* IMAX *Experience* is known. This technology opened the IMAX theater network up to releases of Hollywood films, particularly new films which are released to IMAX theaters simultaneously with their broader domestic release. The development of this technology was key to helping the Company execute its strategy of expanding its commercial theater network by establishing IMAX theaters as a key, premium distribution platform for Hollywood films.

An IMAX film can also benefit from enhancements made by individual filmmakers exclusively for the IMAX release, including by filming select scenes with IMAX cameras to further enhance the audience's immersion in the film. Filmmakers such as Christopher Nolan and Michael Bay have used IMAX cameras to film select scenes in their films *The Dark Knight: The* IMAX *Experience* and *Transformers: Revenge of the Fallen: The* IMAX *Experience.* Most recently, filmmaker Brad Bird used IMAX cameras to film certain sequences in *Mission: Impossible – Ghost Protocol: The* IMAX *Experience*, released in December 2011. Mr. Nolan is also using IMAX cameras to film a significant number of sequences in his upcoming film, *The Dark Knight Rises: The* IMAX *Experience*, set for release in July 2012. The Company seeks to differentiate its films not only through content, but through other means as well. For example, in December 2011, *Mission: Impossible—Ghost Protocol: The* IMAX *Experience*, not only featured 30 minutes of footage shot with IMAX cameras, but it was also released 5 days earlier in North America than its wide release to conventional theaters. The Company believes that this early release strategy helps make the release of the IMAX film an event, which drives audiences' excitement and enthusiasm for a film. The Company intends to employ the early release strategy for a limited number of additional films in the future.

The original soundtrack of a movie is re-mastered for the IMAX five or six-channel digital sound systems for the IMAX DMR release. Unlike the soundtracks played in conventional theaters, IMAX re-mastered soundtracks are uncompressed and full fidelity. IMAX sound systems use proprietary loudspeaker systems and proprietary surround sound configurations that ensure every theater seat is in a good listening position.

To date, the Company has signed contracts for 15 DMR films that will play in the IMAX theater network in the remaining nine months of 2012:

- *Titanic: An* IMAX *3D Experience* (Paramount Pictures, Twentieth Century Fox, April 2012);
- *HOUBA! On the Trail of the Marsupilami: The* IMAX *Experience* (Chez WAM, Pathé Distribution, April 2012, France only release);
- *Battleship: The* IMAX *Experience* (Universal Pictures, April 2012, international only release);
- *The Avengers: An* IMAX *3D Experience* (Disney Studios, Marvel Studios, May 2012);
- *Dark Shadows: The* IMAX *Experience* (Warner Bros., May 2012);
- *Men In Black III: An* IMAX *3D Experience* (Sony Pictures, May 2012);
- *Prometheus: An* IMAX *3D Experience* (Twentieth Century Fox, June 2012);
- *Madagascar 3: Europe's Most Wanted: An* IMAX 3D *Experience* (DreamWorks Animation, June 2012, international only release);
- *The Amazing Spider-Man: An* IMAX *3D Experience* (Sony Pictures, July 2012);
- *The Dark Knight Rises: The* IMAX *Experience* (Warner Bros., July 2012);
- *Frankenweenie: An* IMAX *3D Experience* (Walt Disney Pictures, October 2012);
- *Skyfall: The* IMAX *Experience* (Sony Pictures, November 2012);
- *Gravity: An* IMAX *3D Experience* (Warner Bros., November 2012);
- *CZ12: The* IMAX *Experience* (JCE Entertainment Ltd., Huayi Brothers & Emperor Motion Pictures, December 2012, Asia only), and
- *The Hobbit: An Unexpected Journey: An IMAX 3D Experience* (Warner Bros., December 2012)

In addition, in conjunction with MacGillivray Freeman Films and Warner Bros., the Company released the IMAX original production, on April 20, 2012, *To the Arctic 3D*.

The Company remains in active negotiations with all of Hollywood's studios for additional films to fill out its short and long-term film slate and expects a similar number of IMAX DMR films to be released to the IMAX network in 2012 as in 2011.

**INTERNATIONAL ACTIVITIES**

A significant portion of the Company's revenues is made to customers located outside the United States and Canada. During the first quarter of 2012 and 2011, approximately 44.7% and 48.4%, respectively, of the Company's revenue was derived outside the United States and Canada. The Company believes that its international expansion is an important driver of future growth for the Company. In the first three months of 2012, 69.6% of the Company's 23 theater signings were for theaters in international markets. As at March 31, 2012, approximately 86.6% of IMAX theater systems arrangements in backlog were scheduled to be installed in international markets. Accordingly, the Company expects that international operations will continue to be a significant portion of the Company's revenue in the future and the Company intends to actively expand its international presence, including by expanding its number of theaters under international joint revenue sharing arrangements.

During 2011, the Company formed IMAX (China) to enable further growth in China, the Company's second-largest and fastest-growing market. As at March 31, 2012, the Company had a total of 91 theaters operating in Greater China with an additional 124 theaters in backlog that are scheduled to be installed in Greater China by 2017. The Company believes that favorable market trends in China, including government initiatives to help enable cinema screen growth and to support the film industry, present opportunities for significant additional growth. In March 2011, the Company announced a 75-theater joint revenue sharing arrangement with Wanda, China's top grossing cinema chain. This agreement with Wanda represents IMAX's first full and largest revenue-sharing arrangement in China to date. Under the terms of the arrangement, IMAX installed its digital technology in 30 of Wanda's multiplex locations in 2011 and one in the first quarter of 2012, with the remaining theaters scheduled to be rolled out in 2012, 2013 and 2014. On February 18, 2012, the U.S. and China announced the terms of an agreement to allow 14 additional IMAX or 3D format Hollywood films to be released in China, with distributors permitted to receive higher distribution fees. The Company believes this is a positive development for its business in China and elsewhere.

To support growth in international markets, the Company has sought to bolster its international film slate through international DMR opportunities, releases to select international markets and early international releases. In April 2012, *HOUBA! On the Trail of the Marsupilami: The* IMAX *Experience*, a French IMAX DMR film, was released to IMAX theaters and the Company is scheduled to release *Chinese Zodiac: An* IMAX *3D Experience*, a Chinese IMAX DMR film in December 2012. Furthermore, in 2012, the Company expects to announce additional IMAX international DMR films in both Asia and Europe. In recent years, the Company, along with its studio partners, has employed a strategy of releasing certain IMAX DMR films earlier than the films' broader release in select international markets. The Company anticipates announcing additional IMAX international early releases in the future.

During 2012, the Company intends to continue its focus increasingly on a number of its less penetrated international markets, including Latin America, Western Europe and India. On January 17, 2012, the Company announced that it had restructured its master license agreement in South America with Giencourt Investments, S.A., in order to play a more active role in that market and to accelerate the roll-out of IMAX theaters across South America. In January 2012, the Company and SPI Cinemas Private Limited, a leading player in the India entertainment industry, announced a sale agreement to install 4 digital IMAX theater systems in India.

## CRITICAL ACCOUNTING POLICIES

The Company prepares its consolidated financial statements in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP").

The preparation of these consolidated financial statements requires management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues and expenses. On an ongoing basis, management evaluates its estimates, including those related to selling prices associated with the individual elements in multiple element arrangements; residual values of leased theater systems; economic lives of leased assets; allowances for potential uncollectibility of accounts receivable, financing receivables and net investment in leases; provisions for inventory obsolescence; ultimate revenues for film assets; impairment provisions for film assets, long-lived assets and goodwill; depreciable lives of property, plant and equipment; useful lives of intangible assets; pension plan and post retirement assumptions; accruals for contingencies including tax contingencies; valuation allowances for deferred income tax assets; and, estimates of the fair value and expected exercise dates of stock-based payment awards. Management bases its estimates on historic experience, future expectations and other assumptions that are believed to be reasonable at the date of the consolidated financial statements. Actual results may differ from these estimates due to uncertainty involved in measuring, at a specific point in time, events which are continuous in nature, and differences may be material. The Company's significant accounting policies are discussed in note 2 to its audited consolidated financial statements in Item 8 of the Company's Annual Report on Form 10-K for the year ended December 31, 2011 (the "2011 Form 10-K").

The Company considers the following significant estimates, assumptions and judgments to have the most significant effect on its results:

### Revenue Recognition

The Company generates revenue from various sources as follows:

- design, manufacture, sale and lease of proprietary theater systems for IMAX theaters principally owned and operated by commercial and institutional customers located in 52 countries as at March 31, 2012;
- production, digital re-mastering, post-production and/or distribution of certain films shown throughout the IMAX theater network;
- operation of certain IMAX theaters primarily in the United States;
- provision of other services to the IMAX theater network, including ongoing maintenance and extended warranty services for IMAX theater systems; and
- other activities, which includes short-term rental of cameras and aftermarket sales of projector system components.

*Multiple Element Arrangements*

The Company's revenue arrangements with certain customers may involve multiple elements consisting of a theater system (projector, sound system, screen system and, if applicable, 3D glasses cleaning machine); services associated with the theater system including theater design support, supervision of installation, and projectionist training; a license to use of the IMAX brand; 3D glasses; maintenance and extended warranty services; and licensing of films. The Company evaluates all elements in an arrangement to determine what are considered typical deliverables for accounting purposes and which of the deliverables represent separate units of accounting based on the applicable accounting guidance in the Leases Topic of the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC" or "Codification"); the Guarantees Topic of the FASB ASC; the Entertainment – Films Topic of the FASB ASC; and the Revenue Recognition Topic of the FASB ASC. If separate units of accounting are either required under the relevant accounting standards or determined to be applicable under the Revenue Recognition Topic, the total consideration received or receivable in the arrangement is allocated based on the applicable guidance in the above noted standards.

*Theater Systems*

The Company has identified the projection system, sound system, screen system and, if applicable, 3D glasses cleaning machine, theater design support, supervision of installation, projectionist training and the use of the IMAX brand to be a single deliverable and a single unit of accounting (the "System Deliverable"). When an arrangement does not include all the elements of a System Deliverable, the elements of the System Deliverable included in the arrangement are considered by the Company to be a single deliverable and a single unit of accounting. The Company is not responsible for the physical installation of the equipment in the customer's facility; however, the Company supervises the installation by the customer. The customer has the right to use the IMAX brand from the date the Company and the customer enter into an arrangement.

The Company's System Deliverable arrangements involve either a lease or a sale of the theater system. Consideration in the Company's arrangements that are not joint revenue sharing arrangements, consists of upfront or initial payments made before and after the final installation of the theater system equipment and ongoing payments throughout the term of the lease or over a period of time, as specified in the arrangement. The ongoing payments are the greater of an annual fixed minimum amount or a certain percentage of the theater box-office. Amounts received in excess of the annual fixed minimum amounts are considered contingent payments. The Company's arrangements are non-cancellable, unless the Company fails to perform its obligations. In the absence of a material default by the Company, there is no right to any remedy for the customer under the Company's arrangements. If a material default by the Company exists, the customer has the right to terminate the arrangement and seek a refund only if the customer provides notice to the Company of a material default and only if the Company does not cure the default within a specified period.

*Sales Arrangements*

For arrangements qualifying as sales, the revenue allocated to the System Deliverable is recognized in accordance with the Revenue Recognition Topic of the FASB ASC, when all of the following conditions have been met: (i) the projector, sound system and screen system have been installed and are in full working condition, (ii) the 3D glasses cleaning machine, if applicable, has been delivered, (iii) projectionist training has been completed, and (iv) the earlier of (a) receipt of written customer acceptance certifying the completion of installation and run-in testing of the equipment and the completion of projectionist training or (b) public opening of the theater, provided there is persuasive evidence of an arrangement, the price is fixed or determinable and collectibility is reasonably assured.

The initial revenue recognized consists of the initial payments received and the present value of any future initial payments and fixed minimum ongoing payments that have been attributed to this unit of accounting. Contingent payments in excess of the fixed minimum ongoing payments are recognized when reported by theater operators, provided collectibility is reasonably assured.

The Company has also agreed, on occasion, to sell equipment under lease or at the end of a lease term. Consideration agreed to for these lease buyouts is included in revenues from equipment and product sales, when persuasive evidence of an arrangement exists, the fees are fixed or determinable, collectibility is reasonably assured and title to the theater system passes from the Company to the customer.

In a certain sales arrangement not subject to the provisions of the amended FASB ASC 605-25, "Revenue Recognition: Multiple-Element Arrangements" ("ASC 605-25"), the Company provided a customer with digital upgrades on several systems, including several specified upgrades to an as-of-yet undeveloped product. At the current period-end, the Company has not yet established the fair value of this product, and as a result, the Company cannot determine the arrangement's consideration, nor its allocation of

consideration between delivered and undelivered items. Consequently, revenue recognition has been deferred for all delivered items in the arrangement. Once the Company determines an objective and reliable fair value of the undeveloped specified upgrade, the Company will be able to calculate total arrangement consideration and consequently, the Company will be able to recognize revenue on the delivered elements of the arrangement. If the arrangement is materially modified in the future such that contract consideration becomes fixed, the arrangement in its entirety would be subject to the provisions of the amended FASB ASC 605-25 and the Company would be required to develop, absent an established selling price for the undeveloped specified upgrade, a best estimated selling price for the undeveloped specified upgrade, allocate the arrangement's consideration on a relative selling price allocation basis, and recognize revenue on the delivered elements based on that allocation.

*Lease Arrangements*

The Company uses the Leases Topic of the FASB ASC to evaluate whether an arrangement is a lease and the classification of the lease. Arrangements not within the scope of the accounting standard are accounted for either as a sales or services arrangement, as applicable.

For lease arrangements, the Company determines the classification of the lease in accordance with the Leases Topic of the FASB ASC. A lease arrangement that transfers substantially all of the benefits and risks incident to ownership of the equipment is classified as a sales-type lease based on the criteria established in the accounting standard; otherwise the lease is classified as an operating lease. Prior to commencement of the lease term for the equipment, the Company may modify certain payment terms or make concessions. If these circumstances occur, the Company reassesses the classification of the lease based on the modified terms and conditions.

For sales-type leases, the revenue allocated to the System Deliverable is recognized when the lease term commences, which the Company deems to be when all of the following conditions have been met: (i) the projector, sound system and screen system have been installed and are in full working condition, (ii) the 3D glasses cleaning machine, if applicable, has been delivered, (iii) projectionist training has been completed, and (iv) the earlier of (a) receipt of the written customer acceptance certifying the completion of installation and run-in testing of the equipment and the completion of projectionist training or (b) public opening of the theater, provided collectibility is reasonably assured.

The initial revenue recognized for sales-type leases consists of the initial payments received and the present value of future initial payments and fixed minimum ongoing payments computed at the interest rate implicit in the lease. Contingent payments in excess of the fixed minimum payments are recognized when reported by theater operators, provided collectibility is reasonably assured.

For operating leases, initial payments and fixed minimum ongoing payments are recognized as revenue on a straight-line basis over the lease term. For operating leases, the lease term is considered to commence when all of the following conditions have been met: (i) the projector, sound system and screen system have been installed and are in full working condition, (ii) the 3D glasses cleaning machine, if applicable, has been delivered, (iii) projectionist training has been completed, and (iv) the earlier of (a) receipt of the written customer acceptance certifying the completion of installation and run-in testing of the equipment and the completion of projectionist training or (b) public opening of the theater. Contingent payments in excess of fixed minimum ongoing payments are recognized as revenue when reported by theater operators, provided collectibility is reasonably assured.

Revenue from joint revenue sharing arrangements with upfront payments that qualify for classification as sales-type leases is recognized in accordance with the sales-type lease criteria discussed above. Contingent revenues from joint revenue sharing arrangements is recognized as box office results and concessions revenues are reported by the theater operator, provided collectability is reasonably assured.

Equipment and components allocated to be used in future joint revenue sharing arrangements, as well as direct labor costs and an allocation of direct production costs, are included in assets under construction until such equipment is installed and in working condition, at which time the equipment is depreciated on a straight-line basis over the lesser of the term of the joint revenue sharing arrangement and the equipment's anticipated useful life.

*Finance Income*

Finance income is recognized over the term of the lease or over the period of time specified in the sales arrangement, provided collectibility is reasonably assured. Finance income recognition ceases when the Company determines that the associated receivable is not collectible.

Finance income is suspended when the Company identifies a theater that is delinquent, non-responsive or not negotiating in good faith with the Company. Once the collectability issues are resolved the Company will resume recognition of finance income.

*Terminations, Consensual Buyouts and Concessions*

The Company enters into theater system arrangements with customers that provide for customer payment obligations prior to the scheduled installation of the theater system. During the period of time between signing and the installation of the theater system, which may extend several years, certain customers may be unable to, or elect not to, proceed with the theater system installation for a number of reasons including business considerations, or the inability to obtain certain consents, approvals or financing. Once the determination is made that the customer will not proceed with installation, the arrangement may be terminated under the default provisions of the arrangement or by mutual agreement between the Company and the customer (a "consensual buyout"). Terminations by default are situations when a customer does not meet the payment obligations under an arrangement and the Company retains the amounts paid by the customer. Under a consensual buyout, the Company and the customer agree, in writing, to a settlement and to release each other of any further obligations under the arrangement or an arbitrated settlement is reached. Any initial payments retained or additional payments received by the Company are recognized as revenue when the settlement arrangements are executed and the cash is received, respectively. These termination and consensual buyout amounts are recognized in Other revenues.

In addition, the Company could agree with customers to convert their obligations for other theater system configurations that have not yet been installed to arrangements to acquire or lease the IMAX digital theater system. The Company considers these situations to be a termination of the previous arrangement and origination of a new arrangement for the IMAX digital theater system. For all arrangements entered into or modified prior to the date of adoption of the amended FASB ASC 605-25, the Company continues to defer an amount of any initial fees received from the customer such that the aggregate of the fees deferred and the net present value of the future fixed initial and ongoing payments to be received from the customer equals the selling price of the IMAX digital theater system to be leased or acquired by the customer. Any residual portion of the initial fees received from the customer for the terminated theater system is recorded in Other revenues at the time when the obligation for the original theater system is terminated and the new theater system arrangement is signed. Under the amended FASB ASC 605-25, as described in note 2(n) to the accompanying notes to the audited consolidated financial statements, for all arrangements entered into or materially modified after the date of adoption, the total arrangement consideration to be received is allocated on a relative selling price basis to the digital upgrade and the termination of the previous theater system. The arrangement consideration allocated to the termination of the existing arrangement is recorded in Other revenues at the time when the obligation for the original theater system is terminated and the new theater system arrangement is signed.

The Company may offer certain incentives to customers to complete theater system transactions including payment concessions or free services and products such as film licenses or 3D glasses. Reductions in, and deferral of, payments are taken into account in determining the sales price either by a direct reduction in the sales price or a reduction of payments to be discounted in accordance with the Leases or Interests Topic of the FASB ASC. Free products and services are accounted for as separate units of accounting. Other consideration given by the Company to customers are accounted for in accordance with the Revenue Recognition Topic of the FASB ASC.

*Maintenance and Extended Warranty Services*

Maintenance and extended warranty services may be provided under a multiple element arrangement or as a separately priced contract. Revenues related to these services are deferred and recognized on a straight-line basis over the contract period and are recognized in Services revenues. Maintenance and extended warranty services includes maintenance of the customer's equipment and replacement parts. Under certain maintenance arrangements, maintenance services may include additional training services to the customer's technicians. All costs associated with this maintenance and extended warranty program are expensed as incurred. A loss on maintenance and extended warranty services is recognized if the expected cost of providing the services under the contracts exceeds the related deferred revenue.

*Film Production and IMAX DMR Services*

In certain film arrangements, the Company produces a film financed by third parties, whereby the third party retains the copyright and the Company obtains exclusive distribution rights. Under these arrangements, the Company is entitled to receive a fixed fee or to retain as a fee the excess of funding over cost of production (the "production fee"). The third parties receive a portion of the revenues received by the Company from distributing the film, which is charged to costs and expenses applicable to revenues-services. The

production fees are deferred, and recognized as a reduction in the cost of the film, based on the ratio of the Company's distribution revenues recognized in the current period to the ultimate distribution revenues expected from the film.

Revenue from film production services where the Company does not hold the associated distribution rights are recognized in Service revenues when performance of the contractual service is complete, provided there is persuasive evidence of an agreement, the fee is fixed or determinable and collectibility is reasonably assured.

Revenues from digitally re-mastering (IMAX DMR) films where third parties own or hold the copyrights and the rights to distribute the film are derived in the form of processing fees and recoupments calculated as a percentage of box-office receipts generated from the re-mastered films. Processing fees are recognized as Service revenues when the performance of the related re-mastering service is completed, provided there is persuasive evidence of an arrangement, the fee is fixed or determinable and collectibility is reasonably assured. Recoupments, calculated as a percentage of box-office receipts, are recognized as Services revenues when box-office receipts are reported by the third party that owns or holds the related film rights, provided collectibility is reasonably assured.

Losses on film production and IMAX DMR services are recognized as costs and expenses applicable to revenues-services in the period when it is determined that the Company's estimate of total revenues to be realized by the Company will not exceed estimated total production costs to be expended on the film production and the cost of IMAX DMR services.

*Film Distribution*

Revenue from the licensing of films is recognized in Services revenues when persuasive evidence of a licensing arrangement exists, the film has been completed and delivered, the license period has begun, the fee is fixed or determinable and collectibility is reasonably assured. When license fees are based on a percentage of box-office receipts, revenue is recognized when box-office receipts are reported by exhibitors, provided collectibility is reasonably assured.

*Film Post-Production Services*

Revenues from post-production film services are recognized in Services revenue when performance of the contracted services is complete provided there is persuasive evidence of an arrangement, the fee is fixed or determinable and collectibility is reasonably assured.

*Other*

The Company recognizes revenue in Services revenue from its owned and operated theaters resulting from box-office ticket and concession sales as tickets are sold, films are shown and upon the sale of various concessions. The sales are cash or credit card transactions with theatergoers based on fixed prices per seat or per concession item.

In addition, the Company enters into commercial arrangements with third party theater owners resulting in the sharing of profits and losses which are recognized in Service revenues when reported by such theaters. The Company also provides management services to certain theaters and recognizes revenue over the term of such services.

Revenues on camera rentals are recognized in Rental revenue over the rental period.

Revenue from the sale of 3D glasses is recognized in Equipment and product sales revenue when the 3D glasses have been delivered to the customer.

Other service revenues are recognized in Service revenues when the performance of contracted services is complete.

**Allowances for Accounts Receivable and Financing Receivables**

Allowances for doubtful accounts receivable are based on the Company's assessment of the collectibility of specific customer balances, which is based upon a review of the customer's credit worthiness, past collection history and the underlying asset value of the equipment, where applicable. Interest on overdue accounts receivable is recognized as income as the amounts are collected.

The Company monitors the performance of the theaters to which it has leased or sold theater systems which are subject to ongoing payments. When facts and circumstances indicate that there is a potential impairment in the accounts receivable, net investment in lease or a financing receivable, the Company will evaluate the potential outcome of either renegotiations involving changes in the terms of the receivable or defaults on the existing lease or financed sale agreements. The Company will record a provision if it is considered probable that the Company will be unable to collect all amounts due under the contractual terms of the arrangement or a renegotiated lease amount will cause a reclassification of the sales-type lease to an operating lease.

When the net investment in lease or the financing receivable is impaired, the Company will recognize a provision for the difference between the carrying value in the investment and the present value of expected future cash flows discounted using the effective interest rate for the net investment in the lease or the financing receivable. If the Company expects to recover the theater system, the provision is equal to the excess of the carrying value of the investment over the fair value of the equipment.

When the minimum lease payments are renegotiated and the lease continues to be classified as a sales-type lease, the reduction in payments is applied to reduce unearned finance income.

These provisions are adjusted when there is a significant change in the amount or timing of the expected future cash flows or when actual cash flows differ from cash flow previously expected.

Once a net investment in lease or financing receivable is considered impaired, the Company does not recognize interest income until the collectibility issues are resolved. When finance income is not recognized, any payments received are applied against outstanding gross minimum lease amounts receivable or gross receivables from financed sales.

**Inventories**

Inventories are carried at the lower of cost, determined on an average cost basis, and net realizable value except for raw materials, which are carried out at the lower of cost and replacement cost. Finished goods and work-in-process include the cost of raw materials, direct labor, theater design costs, and an applicable share of manufacturing overhead costs.

The costs related to theater systems under sales and sales-type lease arrangements are relieved from inventory to costs and expenses applicable to revenues-equipment and product sales when revenue recognition criteria are met. The costs related to theater systems under operating lease arrangements and joint revenue sharing arrangements are transferred from inventory to assets under construction in property, plant and equipment when allocated to a signed joint revenue sharing arrangement or when the arrangement is first classified as an operating lease.

The Company records provisions for excess and obsolete inventory based upon current estimates of future events and conditions, including the anticipated installation dates for the current backlog of theater system contracts, technological developments, signings in negotiation, growth prospects within the customers' ultimate marketplace and anticipated market acceptance of the Company's current and pending theater systems.

Finished goods inventories can contain theater systems for which title has passed to the Company's customer, under the contract, but the revenue recognition criteria as discussed above have not been met.

**Asset Impairments**

The Company performs a qualitative, and when necessary quantitative, impairment test on its goodwill on an annual basis, coincident with the year-end, as well as in quarters where events or changes in circumstances suggest that the carrying amount may not be recoverable.

Goodwill impairment is assessed at the reporting unit level by comparing the unit's carrying value, including goodwill, to the fair value of the unit. Significant estimates and judgment are involved in the impairment test. The carrying values of each unit are subject to allocations of certain assets and liabilities that the Company has applied in a systematic and rational manner. The fair value of the Company's units is assessed using a discounted cash flow model. The model is constructed using the Company's budget and long-range plan as a base.

Long-lived asset impairment testing is performed at the lowest level of an asset group at which identifiable cash flows are largely independent. In performing its review for recoverability, the Company estimates the future cash flows expected to result from the use

of the asset or asset group and its eventual disposition. If the sum of the expected future cash flows is less than the carrying amount of the asset or asset group, an impairment loss is recognized in the consolidated statement of operations. Measurement of the impairment loss is based on the excess of the carrying amount of the asset or asset group over the fair value calculated using discounted expected future cash flows.

The Company's estimates of future cash flows involve anticipating future revenue streams, which contain many assumptions that are subject to variability, as well as estimates for future cash outlays, the amounts of which, and the timing of which are both uncertain. Actual results that differ from the Company's budget and long-range plan could result in a significantly different result to an impairment test, which could impact earnings.

**Foreign Currency Translation**

Monetary assets and liabilities of the Company's operations which are denominated in currencies other than the functional currency are translated into the functional currency at the exchange rates prevailing at the end of the period. Non-monetary items are translated at historical exchange rates. Revenue and expense transactions are translated at exchange rates prevalent at the transaction date. Such exchange gains and losses are included in the determination of earnings in the period in which they arise. The Company has determined that the functional currency of all its wholly-owned subsidiaries is the United States dollar.

Foreign currency derivatives are recognized and measured in the balance sheet at fair value. Changes in the fair value (gains or losses) are recognized in the consolidated statement of operations except for derivatives designated and qualifying as foreign currency hedging instruments. For foreign currency hedging instruments, the effective portion of the gain or loss in a hedge of a forecasted transaction is reported in other comprehensive income ("OCI") and reclassified to the consolidated statement of operations when the forecasted transaction occurs. Any ineffective portion is recognized immediately in the consolidated statement of operations.

**Pension Plan and Postretirement Benefit Obligations Assumptions**

The Company's pension plan and postretirement benefit obligations and related costs are calculated using actuarial concepts, within the framework of the Compensation – Retirement Benefits Topic of the FASB ASC. A critical assumption to this accounting is the discount rate. The Company evaluates this critical assumption annually or when otherwise required to by accounting standards. Other assumptions include factors such as expected retirement date, mortality rate, rate of compensation increase, and estimates of inflation.

The discount rate enables the Company to state expected future cash payments for benefits as a present value on the measurement date. The guideline for setting this rate is a high-quality long-term corporate bond rate. A lower discount rate increases the present value of benefit obligations and increases pension expense. The Company's discount rate was determined by considering the average of pension yield curves constructed from a large population of high-quality corporate bonds. The resulting discount rate reflects the matching of plan liability cash flows to the yield curves.

The discount rate used is a key assumption in the determination of the pension benefit obligation and expense. A 1.0% change in the discount rate used could result in a $2.3 million – $2.9 million increase or decrease in the pension benefit obligation with a corresponding benefit or charge recognized in other comprehensive income in the year. A one year delay in Mr. Gelfond's retirement date would increase the discount rate by 0.4% and would result in a $0.6 million reduction in the pension benefit obligation.

**Deferred Tax Asset Valuation**

As at March 31, 2012, the Company had net deferred income tax assets of $49.3 million. The Company's management assesses realization of its deferred tax assets based on all available evidence in order to conclude whether it is more likely than not that the deferred tax assets will be realized. Available evidence considered by the Company includes, but is not limited to, the Company's historic operating results, projected future operating results, reversing temporary differences, contracted sales backlog at March 31, 2012, changing business circumstances, and the ability to realize certain deferred tax assets through loss and tax credit carry-back and carry-forward strategies.

When there is a change in circumstances that causes a change in judgment about the realizability of the deferred tax assets, the Company would adjust the applicable valuation allowance in the period when such change occurs.

### Tax Exposures

The Company is subject to ongoing tax exposures, examinations and assessments in various jurisdictions. Accordingly, the Company may incur additional tax expense based upon the outcomes of such matters. In addition, when applicable, the Company adjusts tax expense to reflect the Company's ongoing assessments of such matters which require judgment and can materially increase or decrease its effective rate as well as impact operating results. The Company provides for such exposures in accordance with Income Taxes Topic of the FASB ASC.

### Stock-Based Compensation

The Company utilizes a lattice-binomial option-pricing model (the "Binomial Model") to determine the fair value of stock-based payment awards. The fair value determined by the Binomial Model is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to, the Company's expected stock price volatility over the term of the awards, and actual and projected employee stock option exercise behaviors. The Binomial Model also considers the expected exercise multiple which is the multiple of exercise price to grant price at which exercises are expected to occur on average. Option-pricing models were developed for use in estimating the value of traded options that have no vesting or hedging restrictions and are fully transferable. Because the Company's employee stock options and stock appreciation rights ("SARs") have certain characteristics that are significantly different from traded options, and because changes in the subjective assumptions can materially affect the estimated value, in management's opinion, the Binomial Model best provides an accurate measure of the fair value of the Company's employee stock options and SARs. Although the fair value of employee stock options and SARs are determined in accordance with the Equity topic of the FASB ASC using an option-pricing model, that value may not be indicative of the fair value observed in a willing buyer/willing seller market transaction.

### Impact of Recently Issued Accounting Pronouncements

See note 2 to the accompanying condensed consolidated financial statements in Item 1 for information regarding recent changes in accounting policies and the impact of recently issued accounting pronouncements impacting the Company.

### Non-GAAP Financial Measures

In this report, the Company presents adjusted net income and adjusted net income per diluted share as supplemental measures of performance of the Company, which are not recognized under U.S. GAAP. The Company presents adjusted net income and adjusted net income per diluted share because it believes that they are important supplemental measures of its comparable controllable operating performance and it wants to ensure that its investors fully understand the impact of its variable share-based compensation, provision for arbitration award and deferred taxes on its net income. The Company presents gross margin from its joint revenue sharing arrangements segment excluding initial launch costs because it believes that it is an important supplemental measure used by management to evaluate ongoing joint revenue sharing arrangement theater performance. Management uses these measures to review operating performance on a comparable basis from period to period. However, these non-GAAP measures may not be comparable to similarly titled amounts reported by other companies. Adjusted net income and adjusted net income per diluted share should be considered in addition to, and not as a substitute for, net income and other measures of financial performance reported in accordance with U.S. GAAP.

## RESULTS OF OPERATIONS

As identified in note 14 to the accompanying condensed consolidated financial statements in Item 1, the Company has seven reportable segments identified by category of product sold or service provided: IMAX systems; theater system maintenance; joint revenue sharing arrangements; film production and IMAX DMR; film distribution; film post-production; and other. The IMAX systems segment is comprised of the design, manufacture, sale or lease IMAX theater projection system equipment. The theater system maintenance segment consists of the maintenance of IMAX theater projection system equipment in the IMAX theater network. The joint revenue sharing arrangements segment is comprised of the installation IMAX theater projection system equipment to an exhibitor in exchange for a certain percentage of box-office receipts, concession revenue and in some cases a small upfront or initial payment. The film production and IMAX DMR segment is comprised of the production of films and performance of film re-mastering services. The film distribution segment includes the distribution of films for which the Company has distribution rights. The film post-production segment includes the provision of film post-production and film print services. The other segment includes certain IMAX theaters that the Company owns and operates, camera rentals and other miscellaneous items. The accounting policies of the segments are the same as those described in note 2 to the audited consolidated financial statements included in the Company's 2011 Form 10-K.

The Company's Management's Discussion and Analysis of Financial Condition and Results of Operations have been organized and discussed with respect to the above stated segments. Management feels that a discussion and analysis based on its segments is significantly more relevant as the Company's condensed consolidated statements of operations captions combine results from several segments.

### Three Months Ended March 31, 2012 Versus Three Months Ended March 31, 2011

The Company reported net income of $2.6 million or $0.04 per basic and diluted share for the first quarter of 2012, as compared to a net loss of $1.0 million or $0.02 loss per basic and diluted share for the first quarter of 2011. Net income for the quarter includes a $0.8 million charge or $0.01 per diluted share (2011 – charge of $1.8 million or $0.03 per diluted share) for variable share-based compensation and a deferred tax provision of $0.7 million or $0.01 per diluted share (2011 – benefit of $0.3 million). In 2011, the Company recognized a one-time charge of $2.1 million ($0.03 per diluted share) due to an award arising from an arbitration proceeding brought against the Company in connection with a discontinued subsidiary, which has since been settled. Adjusted net income, which consists of net income excluding the impact of variable share-based compensation, the deferred tax provision and provision for arbitration award was $4.0 million or $0.06 per diluted share in the first quarter of 2012 as compared to adjusted net income of $2.5 million or $0.04 per diluted share for the first quarter of 2011. A reconciliation of net income, the most directly comparable U.S. GAAP measure, to adjusted net income and adjusted net income per diluted share is presented in the table below:

| | Three Months Ended March 31, 2012 | | Three Months Ended March 31, 2011 | |
|---|---|---|---|---|
| | Net Income | Diluted EPS | Net (Loss) Income | Diluted EPS |
| Reported | $ 2,588 | $ 0.04 | $ (1,003) | $ (0.02) |
| Adjustments: | | | | |
| Variable stock compensation | 782 | 0.01 | 1,803 | 0.03 |
| Deferred tax provision (benefit) | 651 | 0.01 | (315) | - |
| Provision for arbitration award | - | - | 2,055 | 0.03 |
| Adjusted | $ 4,021 | $ 0.06 | $ 2,540 | $ 0.04 |
| Weighted average diluted shares outstanding | | 68,158 | | 68,224 |