# EXHIBIT B
# (PART 19)

The following table sets forth the breakdown of revenue and gross margin by category:

| | Revenue | | Gross Margin | |
|---|---|---|---|---|
| | Three Months Ended March 31, | | Three Months Ended March 31, | |
| | 2012 | 2011 | 2012 | 2011 |
| **IMAX Systems** | | | | |
| Sales and sales-type leases(1) | $ 12,865 | $ 19,309 | $ 4,650 | $ 8,942 |
| Ongoing rent, fees, and finance income(2) | 2,793 | 2,950 | 2,762 | 2,793 |
| | 15,658 | 22,259 | 7,412 | 11,735 |
| **Theater System Maintenance** | 6,847 | 5,795 | 2,726 | 2,587 |
| **Joint Revenue Sharing Arrangements** | 11,698 | 4,040 | 7,937 | 2,178 |
| **Film** | | | | |
| Production and IMAX DMR | 13,838 | 7,258 | 7,930 | 2,759 |
| Distribution | 3,138 | 2,617 | 709 | 626 |
| Post-production | 2,077 | 1,624 | 604 | 1,689 |
| | 19,053 | 11,499 | 9,243 | 5,074 |
| **Other** | 2,340 | 1,567 | (457) | (928) |
| | $ 55,596 | $ 45,160 | $ 26,861 | $ 20,646 |

(1) Includes initial payments and the present value of fixed minimum payments from equipment, sales and sales-type lease transactions.

(2) Includes rental income from operating leases, contingent rents from operating and sales-type leases, contingent fees from sales arrangements and finance income.

*Revenues and Gross Margin*

The Company's revenues for the first quarter of 2012 increased by 23.1% to $55.6 million from $45.2 million in the same period last year due in large part to increases in revenue from the film and joint revenue sharing arrangement segments. The gross margin across all segments in the first quarter of 2012 was $26.9 million, or 48.3% of total revenue, compared to $20.6 million, or 45.7% of total revenue in the first quarter of 2011.

*IMAX Systems*

IMAX systems revenue decreased 29.7% to $15.7 million in the first quarter of 2012 as compared to $22.3 million in the first quarter of 2011, resulting primarily from the installation of fewer, full theater systems (excluding digital upgrades) under sales or sales-type leases, as compared to the prior year comparative period.

Revenue from sales and sales-type leases decreased 33.4% to $12.9 million in the first quarter of 2012 from $19.3 million in the first quarter of 2011. The Company recognized revenue on 8 full, new theater systems which qualified as either sales or sales-type leases in the first quarter of 2012, with a total value of $9.3 million, as compared to 11 in the first quarter of 2011 with a total value of $13.5 million. The Company also recognized revenue on 8 digital upgrades and one 3D GT upgrade (from a 2D GT system) in the first quarter of 2012, with a total value of $3.1 million, as compared to 14 in the first quarter of 2011 with a total value of $5.5 million. Digital upgrades have lower sales prices and gross margin than full theater system installations. The Company has decided to offer digital upgrades at lower selling prices for strategic reasons since the Company believes that digital systems increase flexibility and profitability for the Company's existing exhibition customers.

Average revenue per full, new sales and sales-type lease system was $1.2 million for the three months ended March 31, 2012, which was consistent with the $1.2 million for the three months ended March 31, 2011. Average revenue per upgrade was $0.3 million

for the three months ended March 31, 2012, as compared to $0.4 million experienced during the three months ended March 31, 2011. The breakdown in mix of sales and sales-type lease and joint revenue sharing arrangement (see discussion below) installations by theater system configuration for the first quarter of 2012 and 2011 is outlined in the table below.

| | Three Months Ended March 31, 2012 | Three Months Ended March 31, 2011 |
|---|---|---|
| Sales and Sales-type lease systems - installed and recognized | | |
| IMAX 3D GT upgrade (from a 2D GT) | 1 | - |
| IMAX digital | 16 (1) | 25 (2) |
| | 17 | 25 |
| IMAX digital upgrades - installed and deferred | 1 | 8 |
| | 18 | 33 |
| Joint revenue sharing arrangements - installed and operating | | |
| IMAX digital | 8 | 10 |
| | 26 | 43 |

(1) Includes the digital upgrade of 8 systems (all sales arrangements) from film-based to digital.
(2) Includes the digital upgrade of 14 systems (all sales arrangements) from film-based to digital.

As noted in the table above, 1 and 8 theater systems under a digital upgrade sales arrangement were installed in the three months ended March 31, 2012 and 2011, respectively, but revenue recognition was deferred. The arrangement contained provisions providing the customer with standard digital upgrades, which were installed, and a number of as-of-yet undeveloped upgrades. The Company's policy is such that once the fair value for the undeveloped upgrade is established, the Company allocates total contract consideration, including any upgrade revenues, between the delivered and undelivered elements on a relative fair value basis and recognizes the revenue allocated to the delivered elements with their associated costs. If the arrangement is materially modified in the future such that contract consideration becomes fixed, the arrangement in its entirety would be subject to the provisions of the amended ASC 605-25 and the Company would be required to develop, absent an established selling price or third party evidence of the selling price for the undeveloped specified upgrade, a best-estimate selling price for the undeveloped specified upgrade, allocate the arrangement's consideration on a relative selling price allocation basis, and recognize revenue on the delivered elements based on that allocation.

Settlement revenue was $nil for the three months ended March 31, 2012 and $0.3 million for the three months ended March 31, 2011. The amount recognized in the first quarter of 2011 related to a consensual buyout for one uninstalled theater system.

IMAX theater systems gross margin from full, new sales and sale-type leases, excluding the impact of settlements and asset impairment charges was 60.7% in the first quarter of 2012 in comparison to 64.9% in the first quarter of 2011. The Company recognized a gross margin of $nil on digital upgrades in the first quarter of 2012 in comparison to $0.9 million in the first quarter of 2011, which is a reflection of the particular systems upgraded and the costs associated with such upgrades in the respective period. In addition, in the first quarter of 2012, the Company incurred a charge of $0.7 million to enable certain theaters to play movies, such as *The Dark Knight Rises*, in either digital or analog format.

Ongoing rent revenue and finance income was $2.8 million in the first quarter of 2012 compared to $3.0 million in the first quarter of 2011. Gross margin for ongoing rent and finance income was consistent at $2.8 million in the first quarter of 2012 and 2011, respectively. Contingent fees included in this caption amounted to $0.4 million and $1.1 million in the three months ended March 31, 2012 and 2011, respectively.

*Theater System Maintenance*

Theater system maintenance revenue increased 18.2% to $6.8 million during the first quarter of 2012 as compared to $5.8 million in the first quarter of 2011. Theater system maintenance gross margin increased $0.1 million to $2.7 million in the first quarter of 2012 as compared to $2.6 million in the prior year comparative period. Maintenance revenue continues to grow as the number of theaters in the IMAX theater network grows. Maintenance margins can vary depending on the mix of theater system configurations in the theater network and the date(s) of installation and/or service.

*Joint Revenue Sharing Arrangements*

Revenue from joint revenue sharing arrangements increased 189.6% to $11.7 million in the first quarter of 2012 compared to $4.0 million in the first quarter of 2011. The Company ended the first quarter with 265 theaters operating under joint revenue sharing arrangements as compared to 181 theaters at the end of the first quarter of 2011. The increase in revenues from joint revenue sharing arrangements was largely due to stronger film performance and the increase in the number of theaters in the IMAX theater network. During the quarter, the Company installed 8 full, new theaters under joint revenue sharing arrangements, as compared to 10 full, new theaters during the prior year quarter.

The gross margin from joint revenue sharing arrangements in the first quarter of 2012 increased to $7.9 million compared to $2.2 million in the first quarter of 2011. Included in the calculation of first quarter gross margin were certain advertising, marketing and selling expenses of $0.4 million, as compared to $0.5 million incurred in the prior year period. Adjusted gross margin from joint revenue sharing arrangements, which excludes these expenses from both periods, was $8.3 million in the first quarter of 2012, compared to $2.7 million in the first quarter of 2011. A reconciliation of gross margin from the joint revenue sharing arrangement segment, the most directly comparable U.S. GAAP measure, to adjusted gross margin is presented in the table below:

| | Three Months Ended March 31, | |
|---|---|---|
| | 2012 | 2011 |
| Gross margin from joint revenue sharing arrangements | $ 7,937 | $ 2,178 |
| Add: | | |
| Advertising, marketing and selling expenses | 355 | 476 |
| Adjusted gross margin from joint revenue sharing arrangements | $ 8,292 | $ 2,654 |

*Film*

Revenues from the Company's film segments increased 65.7% to $19.1 million in the first quarter of 2012 from $11.5 million in the first quarter of 2011. Film production and IMAX DMR revenues increased 90.7% to $13.8 million in the first quarter of 2012 from $7.3 million in the first quarter of 2011. The increase in film production and IMAX DMR revenues was primarily as a result of higher gross box office generated by the films released to the IMAX network in the quarter and continued network growth. Gross box office generated by IMAX DMR films increased 95.3% to $121.7 million for the first quarter of 2012 from $62.3 million for the first quarter of 2011. Gross box office per screen for the three months ended March 30, 2012 averaged $247,600 in comparison to $174,900 in the comparable period last year. In the first quarter of 2012, gross box office was generated primarily by the exhibition of 10 films (listed below), as compared to 7 films exhibited during the first quarter of 2011:

| Three Months Ended March 31, 2012 — Films Exhibited | Three Months Ended March 31, 2011 — Films Exhibited |
|---|---|
| *Happy Feet Two: An* IMAX *3D Experience* | *TRON: Legacy: An* IMAX *3D Experience* |
| *Mission: Impossible - Ghost Protocol The* IMAX *Experience* | *The Green Hornet: An* IMAX *3D Experience* |
| *The Adventures of Tintin: The Secret of the Unicorn: An* IMAX *3D Experience* | *Tangled: An* IMAX *3D Experience* |
| *Flying Swords of Dragon Gate: An* IMAX *3D Experience* | *Sanctum: An* IMAX *3D Experience* |
| *Underworld: Awakening: An* IMAX *3D Experience* | *I Am Number Four: The* IMAX *Experience* |
| *Journey 2: The Mysterious Island: An* IMAX *3D Experience* | *Mars Needs Moms: An* IMAX *3D Experience* |
| *The Lorax: An* IMAX *3D Experience* | *Sucker Punch: The* IMAX *Experience* |
| *John Carter: An* IMAX *3D Experience* | |
| *The Hunger Games: The* IMAX *Experience* | |
| *Wrath of the Titans: An* IMAX *3D Experience* | |

Film distribution revenues increased to $3.1 million in the first quarter of 2012 from $2.6 million in the first quarter of 2011 due to higher revenues from the licensing of films in ancillary markets. The Company did not release any new, original titles in the first quarter of 2012 and 2011, respectively.

Film post-production revenues increased to $2.1 million in the first quarter of 2012 from $1.6 million in the first quarter of 2011 due primarily to an increase in third party business.

The Company's gross margin from its film segments increased in the first quarter of 2012 to $9.2 million from $5.1 million in the first quarter of 2011. Film production and IMAX DMR gross margin increased to $7.9 million in the first quarter of 2012 from $2.8 million in the first quarter of 2011, primarily due to the increase in gross box office experienced in the first quarter of 2012 as compared to the first quarter of 2011. The film distribution gross margin for the quarter was $0.7 million as compared to $0.6 million in the prior year comparative period. During the first quarter of 2012, the gross margin from post-production was $0.6 million as compared to $1.7 million in the first quarter of 2011.

*Other*

Other revenue increased to $2.3 million in the first quarter of 2012 compared to $1.6 million in the same period in 2011. Other revenue primarily includes revenue generated from the Company's theater operations, camera and rental business, after market sales of projection system parts and 3D glasses.

The gross margin from other revenue was a loss of $0.5 million in the first quarter of 2012 as compared to a loss of $0.9 million in the first quarter of 2011.

*Selling, General and Administrative Expenses*

Selling, general and administrative expenses increased to $19.1 million in the first quarter of 2012 as compared to $16.9 million in the first quarter of 2011. The $2.2 million increase experienced from the prior year comparative period was largely the result of the following:

- a $3.2 million increase in staff-related and compensation costs, including an increase in salaries and benefits of $2.7 million resulting from increased staffing (including, the impact from the establishment of the Company's wholly-owned subsidiary in China) and normal merit increases, and an increase of $0.5 million in travel and entertainment costs.

This increase was partially offset by:

- a year-over-year $0.8 million decrease due to foreign exchange. During the first quarter of 2012, the Company recorded a foreign exchange gain of $1.4 million for net foreign exchange gains/losses related to the translation of foreign currency denominated monetary assets and liabilities and unhedged foreign exchange contracts, as compared to a gain of $0.6 million in the prior year comparative period. The Company actively hedges against currency risks for cash flow budgeting purposes, especially related to movement in the Canadian dollar, given its large operation in Canada, and related operating expenses that are transacted in Canadian dollars. Since quarter-end the Canadian dollar has strengthened versus the U.S. dollar. See note 10(b) to the accompanying condensed consolidated financial statements in Item 1 for more information; and

- a $0.2 million decrease in other general corporate expenditures.

*Provision for Arbitration Award*

During 2011, the Company recorded a provision of $2.1 million regarding an award issued in connection with an arbitration proceeding brought against the Company, relating to agreements entered into in 1994 and 1995 by its former Ridefilm subsidiary, whose business the Company discontinued through a sale to a third party in March 2001. On January 12, 2012, the Company, Ridefilm and Robots of Mars, Inc. ("Robots") entered into a confidential settlement agreement, pursuant to which the parties fully and finally resolved and settled all claims between them relating to this dispute. See note 9(c) to the accompanying condensed consolidated financial statements in Item 1 for more information.

*Research and Development*

Research and development expenses increased to $2.6 million in the first quarter of 2012 compared to $1.9 million in the first of 2011. The increased research and development expenses for the three months ended March 31, 2012 compared to the prior year period are primarily attributable to ongoing enhancements to the Company's digital projection technology, including the development of the Company first laser-based digital projection system, to ensure that the Company continues to provide the highest quality, premier movie going experience available to consumers. In 2011, the Company announced that it secured certain exclusive license rights to a portfolio of intellectual property in the digital cinema field owned by Eastman Kodak Company which will support the Company's

efforts to deliver the highest-quality digital content available to the largest IMAX film-based screens. On February 7, 2012, the Company announced an agreement with Barco N.V. to jointly develop a laser-based digital projection system that incorporates Kodak technology. The Company believes that these arrangements with Kodak and Barco N.V. will enable IMAX theaters to present greater brightness and clarity, a wider color gamut and deeper blacks, and consume less power and last longer than existing digital content available.

*Receivable Provisions, Net of Recoveries*

Receivable provisions net of recoveries for accounts receivable and financing receivables amounted to a net provision of $0.5 million and $0.2 million in the first quarter of 2012 and 2011, respectively.

The Company's accounts receivables and financing receivables are subject to credit risk. These receivables are concentrated with the leading theater exhibitors and studios in the film entertainment industry. To minimize the Company's credit risk, the Company retains title to underlying theater systems that are leased, performs initial and ongoing credit evaluations of its customers and makes ongoing provisions for its estimate of potentially uncollectible amounts. Accordingly, the Company believes it has adequately protected itself against exposures relating to receivables and contractual commitments.

*Interest Income and Expense*

Interest income was less than $0.1 million in the first quarter of 2012, which was consistent with the first quarter of 2011.

Interest expense was $0.5 million in the first quarter of 2012 as compared to $0.4 million experienced in the first quarter of 2011. Included in interest expense is the amortization of deferred finance costs of less than $0.1 million in the first quarter of 2012 and $0.1 million in the first quarter of 2011. The Company's policy is to defer and amortize, over the life of the debt instrument, all the costs relating to debt financing which are paid directly to the debt provider.

*Income Taxes*

The Company's effective tax rate differs from the statutory tax rate and will vary from year to year primarily as a result of numerous permanent differences, investments and other tax credits, the provision for income taxes at different rates in foreign and other provincial jurisdictions, enacted statutory tax rate increases or reductions in the year, changes due to foreign exchange, changes in the Company's valuation allowance based on the Company's recoverability assessments of deferred tax assets, and favorable or unfavorable resolution of various tax examinations.

There was no change in the Company's estimates of the recoverability of its deferred tax assets based on an analysis of both positive and negative evidence including projected future earnings. As at March 31, 2012, the Company had a gross deferred income tax asset of $55.4 million, against which the Company is carrying a $6.1 million valuation allowance. The Company recorded an income tax provision of $1.0 million for the three months ended March 31, 2012, of which a provision of $0.1 million is related to an increase in unrecognized tax benefits. For the three months ended March 31, 2011, the Company recorded an income tax recovery of $0.3 million, of which $0.1 million was related to an increase in unrecognized tax benefits.

The Company anticipates utilizing the majority of its currently available tax attributes over the next two years.

*Equity-Accounted Investments*

The Company accounts for investments in new business ventures using the guidance of the FASB ASC 323 "Investments – Equity Method and Joint Ventures" ("ASC 323"). At March 31, 2012, the equity method of accounting is being utilized for an investment with a carrying value of $4.0 million (December 31, 2011 - $4.1 million). For the three months ended March 31, 2012, gross revenues, cost of revenue and net loss for the investment were $1.0 million, $3.1 million and $4.5 million, respectively (2011 — $0.2 million, $1.4 million, and $4.2 million, respectively). The Company has recorded its proportionate share of the net loss which amounted to $0.5 million for the first quarter of 2012 and a net loss of $0.4 million in the first quarter of 2011.

## LIQUIDITY AND CAPITAL RESOURCES

On June 2, 2011, the Company amended and restated the terms of its existing senior secured credit facility (the "Prior Credit Facility"), which had been scheduled to mature on October 31, 2013. The amended and restated facility (the "Credit Facility"), with a scheduled maturity of October 31, 2015, has a maximum borrowing capacity of $110.0 million, consisting of revolving asset-based loans of up to $50.0 million, subject to a borrowing base calculation (as described below) and including a sublimit of $20.0 million for letters of credit, and a revolving term loan of up to $60.0 million. The Prior Credit Facility had a maximum borrowing capacity of $75.0 million. Certain of the Company's subsidiaries serve as guarantors (the "Guarantors") of the Company's obligations under the Credit Facility. The Credit Facility is collateralized by a first priority security interest in substantially all of the present and future assets of the Company and the Guarantors.

The Company's indebtedness under the Credit Facility includes the following:

| | March 31, 2012 | December 31, 2011 |
|---|---|---|
| Revolving Term Loan | $ 55,000 | $ 55,083 |

As at March 31, 2012, the Company's current borrowing capacity under the revolving asset-based portion of the Credit Facility was $50.0 million after deduction for letters of credit of $nil and the minimum Excess Availability reserve of $5.0 million (December 31, 2011 – $47.1 million) and borrowing capacity under the revolving term portion of the Credit Facility was $5.0 million.

The terms of the Credit Facility are set forth in the Second Amended and Restated Credit Agreement (the "Credit Agreement"), dated June 2, 2011, among the Company, Wells Fargo Capital Finance Corporation (Canada), as agent, lender, sole lead arranger and sole bookrunner, ("Wells Fargo") and Export Development Canada, as lender ("EDC", together with Wells Fargo, the "Lenders") and in various collateral and security documents entered into by the Company and the Guarantors. Each of the Guarantors has also entered into a guarantee in respect of the Company's obligations under the Credit Facility.

The revolving asset-based portion of the Credit Facility permits maximum aggregate borrowings equal to the lesser of:

(i) $50.0 million, and

(ii) a collateral calculation based on the percentages of the book values of certain of the Company's net investment in sales-type leases, financing receivables, certain trade accounts receivable, finished goods inventory allocated to backlog contracts and the appraised values of the expected future cash flows related to operating leases and the Company's owned real property, reduced by certain accruals and accounts payable and subject to other conditions, limitations and reserve right requirements.

On June 2, 2013 any outstanding borrowings under the revolving term loan portion of the Credit Facility convert to a term loan to be repaid in accordance with the terms of the Credit Facility, any undrawn amounts under the revolving term loan are cancelled and the Company may not request any further advances under the revolving term loan.

The revolving asset-based portion of the Credit Facility bears interest, at the Company's option, at (i) LIBOR plus a margin of 2.00% per annum, or (ii) Wells Fargo's prime rate plus a margin of 0.50% per annum. The revolving term loan portion of the Credit Facility also bears interest at the Company's option, at (i) LIBOR plus a margin of 2.00% per annum, or (ii) Wells Fargo's prime rate plus a margin of 0.50% per annum. Under the Prior Credit Facility, the effective interest rate for the term loan portion was 4.05%. for the three months ended March 31, 2011. There was no amount drawn on the revolving portion of the Prior Credit Facility. Under the Credit Facility, the effective interest rate for the three months ended March 31, 2012 for the revolving term loan portion was 2.51%. There was no amount drawn on the revolving asset-based portion of the Credit Facility.

The Credit Facility provides that the Company will be required to maintain a ratio of funded debt (as defined in the Credit Agreement) to EBITDA (as defined in the Credit Agreement) of not more than 2:1. The Company will also be required to maintain a Fixed Charge Coverage Ratio (as defined in the Credit Agreement) of not less than 1.1:1.0. At all times under the terms of the Credit Facility, the Company is required to maintain minimum Excess Availability of not less than $5.0 million and minimum Cash and Excess Availability of not less than $15.0 million. The ratio of funded debt to EBITDA was 0.73:1 as at March 31, 2012, where Funded Debt (as defined in the Credit Agreement) is the sum of all obligations evidenced by notes, bonds, debentures or similar instruments and was $55.0 million. EBITDA is calculated as follows:

| **EBITDA per Credit Facility:** | | For the 3 months ended March 31, 2012 | | For the 12 months ended March 31, 2012(1) |
|---|---|---|---|---|
| *(In thousands of U.S. Dollars)* | | | | |
| Net income | $ | 2,588 | $ | 19,134 |
| Add: | | | | |
| Loss from equity accounted investments | | 459 | | 1,828 |
| Provision for income taxes | | 993 | | 10,690 |
| Interest expense, net of interest income | | 502 | | 1,847 |
| Depreciation and amortization, including film asset amortization | | 7,423 | | 27,037 |
| Write-downs net of recoveries including asset impairments and receivable provisions | | 481 | | 2,227 |
| Stock and other non-cash compensation | | 3,982 | | 12,311 |
| | $ | 16,428 | $ | 75,074 |

(1) Ratio of funded debt calculated using twelve months ended EBITDA

The Credit Facility contains typical affirmative and negative covenants, including covenants that limit or restrict the ability of the Company and the guarantors to: incur certain additional indebtedness; make certain loans, investments or guarantees; pay dividends; make certain asset sales; incur certain liens or other encumbrances; conduct certain transactions with affiliates and enter into certain corporate transactions.

The Credit Facility also contains customary events of default, including upon an acquisition or change of control or upon a change in the business and assets of the Company or a guarantor that in each case is reasonably expected to have a material adverse effect on the Company or a guarantor. If an event of default occurs and is continuing under the Credit Facility, the Lenders may, among other things, terminate their commitments and require immediate repayment of all amounts owed by the Company.

*Letters of Credit and Other Commitments*

As at March 31, 2012, the Company does not have any letters of credit and advance payment guarantees outstanding (December 31, 2011 — $3.0 million), under the Credit Facility.

The Company also has a $10.0 million facility for advance payment guarantees and letters of credit through the Bank of Montreal for use solely in conjunction with guarantees fully insured by EDC (the "Bank of Montreal Facility"). The Bank of Montreal Facility is unsecured and includes typical affirmative and negative covenants, including delivery of annual consolidated financial statements within 120 days of the end of the fiscal year. The Bank of Montreal Facility is subject to periodic annual reviews. As at March 31, 2012, the Company had letters of credit and advance payment guarantees outstanding of $0.7 million under the Bank of Montreal Facility as compared to $0.8 million as at December 31, 2011.

*Cash and Cash Equivalents*

As at March 31, 2012, the Company's principal sources of liquidity included cash and cash equivalents of $21.6 million, the Credit Facility, anticipated collection from trade accounts receivable of $45.5 million including receivables from theaters under joint revenue sharing arrangements and DMR agreements with studios, anticipated collection from financing receivables due in the next 12 months of $12.9 million and payments expected in the next 12 months on existing backlog deals. As at March 31, 2012, the Company had drawn down $nil (availability of $50.0 million) on the revolving asset-based portion of the Credit Facility, and had letters of credit and advance payment guarantees of $nil outstanding under the Credit Facility and $0.7 million under the Bank of Montreal Facility.

During the three months ended March 31, 2012, the Company's operations provided cash of $10.4 million and the Company used cash of $10.0 million to fund capital expenditures, principally to build equipment for use in joint revenue sharing arrangements, to purchase licenses and intellectual property and to purchase property, plant, and equipment. Based on management's current operating plan for 2012, the Company expects to continue to use cash to deploy additional theater systems under joint revenue sharing arrangements and DMR agreements with studios. Cash flows from joint revenue sharing arrangements are derived from the theater box office and concession revenues and the Company invested directly in the roll out of 8 new theater systems under joint revenue sharing arrangements during the three months ended March 31, 2012.

The Company believes that cash flow from operations together with existing cash and borrowing available under the Credit Facility will be sufficient to fund the Company's business operations, including its strategic initiatives relating to existing joint revenue sharing arrangements for the next 12 months.

The Company's operating cash flow will be adversely affected if management's projections of future signings for theater systems and film productions, installations and film performance are not realized. The Company forecasts its short-term liquidity requirements on a quarterly and annual basis. Since the Company's future cash flows are based on estimates and there may be factors that are outside of the Company's control (see "Risk Factors" in Item 1A in the Company's 2011 Form 10-K), there is no guarantee that the Company will continue to be able to fund its operations through cash flows from operations. Under the terms of the Company's typical sale and sales-type lease agreement, the Company receives substantial cash payments before the Company completes the performance of its obligations. Similarly, the Company receives cash payments for some of its film productions in advance of related cash expenditures.

*Operating Activities*

The Company's net cash provided by operating activities is affected by a number of factors, including the proceeds associated with new signings of theater system lease and sale agreements in the year, costs associated with contributing systems under joint revenue sharing arrangements, the box-office performance of films distributed by the Company and/or released to IMAX theaters, increases or decreases in the Company's operating expenses, including research and development, and the level of cash collections received from its customers.

Cash provided by operating activities amounted to $10.4 million for the three months ended March 31, 2012. Changes in other non-cash operating assets as compared to December 31, 2011 include: an increase of $0.9 million in financing receivables; a decrease of $0.9 million in accounts receivable; an increase of $3.5 million in inventories; an increase of $0.1 million in prepaid expenses, which primarily relates to an increase in prepaid benefits and film distribution expenses; and an increase of $0.4 million in other assets which includes a $0.3 million decrease in insurance recoveries receivable, a $0.2 million increase million in commission and agency fees, and a $0.5 million increase in other assets. Changes in other operating liabilities as compared to December 31, 2011 include: an increase in deferred revenue of $6.5 million related to backlog payments received in the current period, offset by amounts relieved from deferred revenue related to theater system installations; an increase in accounts payable of $1.8 million; and a decrease of $4.1 million in accrued liabilities including payments of $0.3 million for variable stock-based compensation expense.

Included in accrued liabilities at March 31, 2012 was $19.1 million in respect of accrued pension obligations.

*Investing Activities*

Net cash used in investing activities amounted to $10.4 million in the three months ended March 31, 2012, which includes an investment in joint revenue sharing equipment of $7.1 million, purchases of $0.4 million in property, plant and equipment, an additional investment in business ventures of $0.4 million and an increase in other intangible assets of $2.6 million.

*Financing Activities*

Net cash provided by financing activities in the three months ended March 31, 2012 amounted to $3.4 million due primarily to proceeds from the issuance of common shares from stock option exercises of $3.5 million.

*Capital Expenditures*

Capital expenditures, including the Company's investment in joint revenue sharing equipment, purchase of propert;, plant and equipment, net of sales proceeds, other intangible assets and investments in film assets were $14.0 million for the three months ended March 31, 2012 as compared to $6.5 million for the three months ended March 31, 2011.

## CONTRACTUAL OBLIGATIONS

Payments to be made by the Company under contractual obligations are as follows:

| | Payments Due by Period | | | | | | |
|---|---|---|---|---|---|---|---|
| *(In thousands of U.S. Dollars)* | Total Obligations | 2012 | 2013 | 2014 | 2015 | 2016 | Thereafter |
| Pension obligations [1] | $ 19,676 | $ - | $ - | $ 19,676 | $ - | $ - | $ - |
| Credit Facility[2] | 55,000 | - | - | - | 55,000 | | - |
| Operating lease obligations [3] | 11,425 | 4,900 | 2,811 | 1,354 | 526 | 511 | 1,323 |
| Purchase obligations [4] | 9,695 | 9,535 | 160 | - | - | - | - |
| Postretirement benefits obligations | 524 | 15 | 16 | 35 | 38 | 42 | 378 |
| Capital lease obligations [5] | 37 | 17 | 20 | - | - | - | - |
| | $ 96,357 | $ 14,467 | $ 3,007 | $ 21,065 | $ 55,564 | $ 553 | $ 1,701 |

(1) The SERP assumptions are that Mr. Gelfond will receive a lump sum payment six months after retirement at the end of the current term of his employment agreement (December 31, 2013), although Mr. Gelfond has not informed the Company that he intends to retire at that time.

(2) Interest on the Credit Facility is payable monthly in arrears based on the applicable variable rate and is not included above.

(3) The Company's total minimum annual rental payments to be made under operating leases, mostly consisting of rent at the Company's properties in New York and Santa Monica, and at the various owned and operated theaters.

(4) The Company's total payments to be made under binding commitments with suppliers and outstanding payments to be made for supplies ordered but yet to be invoiced.

(5) The Company's total minimum annual payments to be made under capital leases, mostly consisting of payments for IT hardware and various other fixed assets.

***Pension and Postretirement Obligations***

The Company has an unfunded defined benefit pension plan (the "SERP") covering Messrs. Gelfond and Wechsler. As at March 31, 2012, the Company had an unfunded and accrued projected benefit obligation of approximately $19.1 million (December 31, 2011 — $19.0 million) in respect of the SERP.

Under the terms of the SERP, if Mr. Gelfond's employment is terminated other than for cause, he is entitled to receive SERP benefits in the form of a lump sum payment. SERP benefit payments to Mr. Gelfond are subject to a deferral for six months after the termination of his employment, at which time Mr. Gelfond will be entitled to receive interest on the deferred amount credited at the applicable federal rate for short-term obligations. The term of Mr. Gelfond's current employment agreement has been extended through December 31, 2013. Under the terms of the extension, Mr. Gelfond also agreed that any compensation earned during 2012 and 2013 would not be included in calculating his entitlement under the SERP.

In July 2000, the Company agreed to maintain health benefits for Messrs. Gelfond and Wechsler upon retirement. As at March 31, 2012, the Company had an unfunded benefit obligation of $0.5 million (December 31, 2011 — $0.5 million).

## OFF-BALANCE SHEET ARRANGEMENTS

There are currently no off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on the Company's financial condition.

## Item 3. *Quantitative and Qualitative Factors about Market Risk*

The Company is exposed to market risk from foreign currency exchange rates and interest rates, which could affect operating results, financial position and cash flows. Market risk is the potential change in an instrument's value caused by, for example, fluctuations in interest and currency exchange rates. The Company's primary market risk exposure is the risk of unfavorable movements in exchange rates between the U.S. dollar and the Canadian dollar. The Company does not use financial instruments for trading or other speculative purposes.

### Foreign Exchange Rate Risk

A majority of the Company's revenue is denominated in U.S. dollars while a significant portion of its costs and expenses is denominated in Canadian dollars. A portion of the Company's net U.S. dollar cash flows is converted to Canadian dollars to fund Canadian dollar expenses through the spot market. The Company has incoming cash flows from its revenue generating theaters and ongoing operating expenses in China through its wholly-owned subsidiary IMAX Shanghai Multimedia Technology Co. Ltd. In Japan, the Company has ongoing Yen-dominated operating expenses related to its Japanese operations. Net Renminbi and Japanese Yen cash flows are converted to U.S. dollars through the spot market. The Company also has cash receipts under leases denominated in Japanese Yen, Euros and Canadian dollars.

The Company manages its exposure to foreign exchange rate risks through the Company's regular operating and financing activities and, when appropriate, through the use of derivative financial instruments. These derivative financial instruments are utilized to hedge economic exposures as well as reduce earnings and cash flow volatility resulting from shifts in market rates.

For the three months ended March 31, 2012, the Company recorded a foreign exchange gain of $1.4 million as compared to a foreign exchange gain of $0.6 million March 31, 2011, associated with the translation of foreign currency denominated monetary assets and liabilities and unhedged foreign exchange contracts.

The Company entered into a series of foreign currency forward contracts to manage the Company's risks associated with the volatility of foreign currencies with settlement dates throughout 2012. In addition, at March 31, 2012, the Company held foreign currency forward contracts to manage foreign currency risk on future anticipated Canadian dollar expenditures that were not considered foreign currency hedges by the Company. Foreign currency derivatives are recognized and measured in the balance sheet at fair value. Changes in the fair value (gains or losses) are recognized in the condensed consolidated statement of operations except for derivatives designated and qualifying as foreign currency hedging instruments. For foreign currency hedging instruments, the effective portion of the gain or loss in a hedge of a forecasted transaction is reported in other comprehensive income and reclassified to the condensed consolidated statement of operations when the forecasted transaction occurs. Any ineffective portion is recognized immediately in the condensed consolidated statement of operations. The notional value of these contracts at March 31, 2012 was $15.7 million (December 31, 2011 — $20.6 million). A gain of $0.4 million was recorded to Other Comprehensive Income with respect to the appreciation in the value of these contracts in the three months ended March 31, 2012 (2011 — gain of $0.3 million). A loss of less than $0.1 million for the three months ended March 31, 2012 (2011 — gain of $0.3 million) was reclassified from Accumulated Other Comprehensive Income to selling, general and administrative expenses. Appreciation or depreciation on forward contracts not meeting the requirements for hedge accounting in the Derivatives and Hedging Topic of the FASB Accounting Standards Codification are recorded to selling, general and administrative expenses. The notional value of forward contracts that do not qualify for hedge accounting at March 31, 2012 was $29.8 million (December 31, 2011 — $67.3 million).

For all derivative instruments, the Company is subject to counterparty credit risk to the extent that the counterparty may not meet its obligations to the Company. To manage this risk, the Company enters into derivative transactions only with major financial institutions.

At March 31, 2012, the Company's net investment in leases and working capital items denominated in Canadian dollar and Euros aggregated to $3.9 million. Assuming a 10% appreciation or depreciation in foreign currency exchange rates from the quoted foreign currency exchange rates at March 31, 2012, the potential change in the fair value of foreign currency-denominated net investment in leases and working capital items would be $0.4 million. A significant portion of the Company's selling, general, and administrative expenses are denominated in Canadian dollars. Assuming a 1% change appreciation or depreciation in foreign currency exchange rates at March 31, 2012, the potential change in the amount of selling, general, and administrative expenses would be $0.1 million for every $10.0 million in Canadian denominated expenditures.

**Interest Rate Risk Management**

The Company's earnings are also affected by changes in interest rates due to the impact those changes have on its interest income from cash, and its interest expense from variable-rate borrowings under the Credit Facility.

As at March 31, 2012, the Company borrowings under the Credit Facility were $55.0 million (December 31, 2011 — $55.1 million).

The Company's largest exposure with respect to variable rate debt comes from changes in LIBOR. The Company had variable rate debt instruments representing approximately 26.0% and 25.8% of its total liabilities as at March 31, 2012 and December 31, 2011, respectively. If interest rates available to the Company increased by 10%, the Company's interest expense would increase by approximately $0.1 million and interest income from cash would increase by approximately less than $0.1 million for the quarter ended March 31, 2012. These amounts are determined by considering the impact of the hypothetical interest rates on the Company's variable-rate debt and cash balances at March 31, 2012.

**Item 4.** ***Controls and Procedures***

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

The Company maintains disclosure controls and procedures designed to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the specified time periods and that such information is accumulated and communicated to management, including the CEO and the Chief Financial Officer ("CFO"), to allow timely discussions regarding required disclosure. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives.

The Company's management, with the participation of its CEO and its CFO, has evaluated the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) or 15d-15(e)) as at March 31, 2012 and has concluded that, as at the end of the period covered by this report, the Company's disclosure controls and procedures were adequate and effective. The Company will continue to periodically evaluate its disclosure controls and procedures and will make modifications from time to time as deemed necessary to ensure that information is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

**CHANGES IN INTERNAL CONTROL OVER FINANCIAL REPORTING**

There were no changes in the Company's internal control over financial reporting which occurred during the three months ended March 31, 2012, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

## PART II. OTHER INFORMATION

**Item 1.** ***Legal Proceedings***

See note 9 to the accompanying condensed consolidated financial statements for information regarding legal proceedings involving the Company.

**Item 1A.** ***Risk Factors***

There have been no material changes to the factors disclosed in Item 1A. Risk Factors in the Company's Annual Report on Form 10-K for the year ended December 31, 2011.

**Item 6.** ***Exhibits***

| Exhibit No. | Description |
|---|---|
| 31.1 | Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002, dated April 27, 2012, by Richard L. Gelfond. |
| 31.2 | Certification Pursuant to Section 302 of the Sarbanes — Oxley Act of 2002, dated April 27, 2012, by Joseph Sparacio. |
| 32.1 | Certification Pursuant to Section 906 of the Sarbanes — Oxley Act of 2002, dated April 27, 2012, by Richard L. Gelfond. |
| 32.2 | Certification Pursuant to Section 906 of the Sarbanes — Oxley Act of 2002, dated April 27, 2012, by Joseph Sparacio. |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

IMAX CORPORATION

Date: April 27, 2012

By: /s/ JOSEPH SPARACIO
Joseph Sparacio
Executive Vice-President & Chief Financial Officer
(Principal Financial Officer)

Date: April 27, 2012

By: /s/ JEFFREY VANCE
Jeffrey Vance
Senior Vice-President, Finance & Controller
(Principal Accounting Officer)

# IMAX CORPORATION

Exhibit 31.1

**Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002**

I, Richard L. Gelfond, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the registrant, IMAX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 27, 2012

By: /s/ Richard L. Gelfond
Name: Richard L. Gelfond
Title: Chief Executive Officer

# IMAX CORPORATION
Exhibit 31.2

**Certification Pursuant to Section 302 of the Sarbanes - Oxley Act of 2002**

I, Joseph Sparacio, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 of the registrant, IMAX Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: April 27, 2012

By: /s/ Joseph Sparacio
Name: Joseph Sparacio
Title: Executive Vice President & Chief Financial Officer

# IMAX CORPORATION
## Exhibit 32.1

**CERTIFICATIONS**
**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Richard L. Gelfond, Chief Executive Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 27, 2012

/s/ Richard L. Gelfond
Richard L. Gelfond
Chief Executive Officer

# IMAX CORPORATION

Exhibit 32.2

## CERTIFICATIONS

**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002**
**(Subsections (A) and (B) of Section 1350, Chapter 63 of Title 18, United States Code)**

Pursuant to section 906 of the Sarbanes-Oxley Act of 2002 (subsections (a) and (b) of section 1350, chapter 63 of title 18, United States Code), I, Joseph Sparacio, Executive Vice President & Chief Financial Officer of IMAX Corporation, a Canadian corporation (the "Company"), hereby certify, to my knowledge, that:

The Quarterly Report on Form 10-Q for the quarter ended March 31, 2012 (the "Form 10-Q") of the Company fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: April 27, 2012

/s/ Joseph Sparacio
Joseph Sparacio
Executive Vice President & Chief Financial Officer

# EXHIBIT W-1

This is Exhibit "W-1" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc., Province of Ontario, while a Student-at-Law. Expires August 8, 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

## NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF U.S. CLASS ACTION

This Notice has been sent to you pursuant to Rule 23 of the Federal Rules of Civil Procedure and an Order of the United States District Court for the Southern District of New York (the "U.S. Court").

This Notice provides you with important information in connection with the resolution (the "Settlement") of certain claims in a class action lawsuit, brought in the United States, by a Class of purchasers ("Plaintiffs" or the "Class", as described in further detail below) of securities issued by IMAX Corporation ("IMAX" or the "Company"). The Settlement resolves Plaintiffs' claims against IMAX, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble and PricewaterhouseCoopers LLP, an Ontario Limited Liability Partnership ("PwC-Canada") (the "Settling Defendants"). This U.S. class action is known as *In re IMAX Securities Litigation*, Civil Action No. 1:06-cv-06128 (the "U.S. Action"). Your rights will be affected by this Notice and the Settlement that it describes, so you should read this Notice carefully.

If you purchased or otherwise acquired IMAX shares on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive (the "Class Period"), you may be entitled to receive a payment from this Settlement.

**The U.S. Court will hold a Fairness Hearing at 10:30 a.m. on June 14, 2012 at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007-1312. At this hearing the U.S. Court will consider whether the Settlement is fair, reasonable and adequate and in the best interests of the Class.**

*A United States federal court authorized this Notice. This is not a solicitation from a lawyer.*

- The Settlement resolves certain claims asserted pursuant to the United States federal securities laws in a class action against the Defendants for damages incurred by the Class in connection with their transactions in IMAX shares. The Settlement consists of twelve million dollars ($12,000,000) in cash (the "Settlement Fund"). The recovery is explained in greater detail below.
- The law firm of Abbey Spanier Rodd & Abrams, LLP ("Lead Counsel") will apply to the Court for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) thereof, and reimbursement of expenses of no greater than $1.75 million (plus interest on such amounts at the same rate earned by the Settlement Fund) or an average of $0.179 per share of stock. Lead Counsel and other plaintiffs' counsel have litigated the U.S. Action for five years on a contingent fee basis, and have advanced all the expenses of litigation without reimbursement, with the expectation that if they were successful in recovering money for the Class, they would receive fees and be reimbursed for their expenses from the Settlement Fund, as is customary in this type of litigation.
- If you purchased IMAX securities on the NASDAQ on or after February 17, 2006 and held some or all of those securities on August 9, 2006 (the "Canadian Class Period"), then you are a member of the certified class (the "Canadian Class") in another class action based on substantially similar allegations to those alleged in this case against the IMAX Defendants and others in Ontario Canada (the "Canadian Action" — as described further below). The IMAX Defendants have made a motion for a final Order from the Canadian Court in the Canadian Action seeking to exclude, from the definition of the Canadian Class, all persons who do not opt out of this Settlement, if and when the settlement is approved by final Order of the U.S. Court (the "Canadian Order"). If the Canadian Order is entered and becomes final, you will not be permitted to recover in both cases and if you do not exclude yourself from the U.S. Action, you will automatically be deemed to be a member of the Class in the U.S. Action, and therefore excluded from the Canadian Class in the Canadian Action. For members of the Canadian Class, a detailed description of the Canadian Action as well as details regarding how to exclude yourself from this action (and thereby participate in the Canadian Action) are contained below.
- Your legal rights are affected whether you act or don't act, so please read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT: | |
|---|---|
| SUBMIT A PROOF OF CLAIM AND RELEASE FORM | This is the only way to be eligible to receive any portion of the Settlement Fund. If you are a member of the Canadian Class and the Canadian Order is entered and becomes final, you cannot participate in that lawsuit if you submitted a Proof of Claim and Release Form in the U.S. Action (or if you did not opt out of the U.S. Action). |
| EXCLUDE YOURSELF | This is the only option that allows you to ever file or be part of another lawsuit against the Defendants about the Released Claims. You will not receive any portion of the recovery from the Settlement Fund if you select this option. The requirements to exclude yourself are described below. If you exclude yourself from the U.S. Action and you purchased and held IMAX securities during the Canadian Class Period, you will remain a member of the class in the Canadian Action, as described below. Contact information for counsel to the Canadian Class can be found on page 10 of this Notice. |
| OBJECT BUT REMAIN IN THE SETTLEMENT | Write to the U.S. Court about why you don't like the Settlement. You may object to the Settlement. The requirements to object are described below. |
| GO TO A FAIRNESS HEARING | The Fairness Hearing is open to the public. You may ask in writing to speak to the U.S. Court at the hearing about the fairness of the Settlement. If the Court approves the Settlement, you will be bound by the U.S. Court's Judgment (as it applies to your claim) whether or not you submit a Proof of Claim and Release form or receive any money from the Settlement. |
| DO NOTHING | Receive no payment. Give up your right to file your own or participate in any other lawsuit (including the Canadian Action) against the Defendants concerning the claims asserted by the Class. If you are a member of the Canadian Class and the Canadian Order is entered and becomes final, you must affirmatively have excluded yourself from the U.S. Action to be eligible to recover in the Canadian Action. |

- Your rights and options as well as the deadlines to exercise them are explained further in this Notice.
- The U.S. Court in charge of this case still has to decide whether to approve the Settlement. Payments to eligible claimants in the Settlement will be made only if and when the Canadian Order (defined below) becomes final and unappealable, the U.S. Court approves the Settlement, after any and all U.S. appeals are resolved, and after the claims processing procedure is complete.

**Statement of Plaintiffs' Recovery**

Lead Plaintiff (defined in question B on page 5) estimates that approximately 26.45 million shares of IMAX stock were purchased and/or acquired during the period from February 27, 2003 and July 20, 2007, inclusive, and that purchasers of those shares were damaged as a result of the purported acts or omissions alleged in the Consolidated Amended Class Action Complaint dated October 2, 2007 (the "Complaint"). Lead Plaintiff estimates that the average recovery per share of IMAX common stock under the Settlement will be $0.454 per share before the deduction of attorneys' fees, costs and expenses, as approved by the Court. The actual recovery per damaged share will depend on a variety of factors, including: (1) the number of claims filed; (2) when members of the Class ("Settlement Class Members") purchased or acquired their shares during the Class Period; (3) whether Settlement Class Members sold their IMAX shares during the Class Period or held their shares past the end of the Class Period; (4) administrative costs, including the costs of notice; (5) the number of Settlement Class Members who decide to exclude themselves from the Settlement; and (6) the amount awarded by the U.S. Court for attorneys' fees, costs and expenses. Distributions to Class Members will be made based on the Plan of Allocation set forth at the end of this Notice.

**Background of the U.S. Action and the Parallel Canadian Class Action**

The Judge presiding over this case is the Honorable Naomi Reice Buchwald of the United States District Court for the Southern District of New York. From August 11, 2006 through September 18, 2006, eight lawsuits were filed against all or certain of the Defendants in the United States District Court for the Southern District of New York, alleging that IMAX made material misrepresentations and omissions regarding revenue recognition for theater systems in violation of the federal securities laws between February 27, 2003 through July 20, 2007, inclusive (the "U.S. Class Period"). The people who brought the lawsuits are called plaintiffs, and the persons and entities they sued are called defendants.

On September 20, 2006, a lawsuit was filed in the Ontario Superior Court of Justice in Canada (the "Canadian Court") alleging, based on substantially identical facts to those alleged in the eight U.S. actions, that IMAX improperly recognized revenue on theater systems (the "Canadian Action"). The Canadian Action is known as *Silver v. IMAX Corp.*, Court File No. CV-06-3257-00. (Ontario Superior Court of Justice, Canada). The Judge presiding over this case

is the Honourable Madam Justice van Rensburg of the Canadian Court. The IMAX Defendants estimate that approximately 83.9 percent of the shares of IMAX securities at issue in the Canadian Action were purchased on the NASDAQ and those members of the Canadian Class who purchased IMAX securities on the NASDAQ are also members of the U.S. Class.

There are differences between the U.S. Action and the Canadian Action. For example, while the Class Period in this U.S. Action runs from February 27, 2003, through July 20, 2007, inclusive (more than four years) the class period in the Canadian Action runs from February 17, 2006, through August 9, 2006 (less than six months). The U.S. Action includes PwC-Canada as a defendant, but the Canadian Action does not. The Canadian Action includes four Directors of IMAX (Neil S. Braun, Kenneth G. Copland, Garth M. Girvan and David W. Leebron) who are not Defendants in the U.S. Action. The U.S. Action seeks relief for violations of the U.S. securities laws. The Canadian Action asserts claims under the Canadian securities laws.

Pursuant to a January 17, 2007 Order of the U.S. Court, the eight U.S. actions were consolidated, and the U.S. Court appointed Westchester Capital Management, Inc. ("Westchester") (the investment advisor for GS Master Trust, MSS Merger Arbitrage Fund, The Merger Fund, The Merger Fund VL and SphinX Merger Arbitrage Fund) as lead plaintiff and further approved the appointment of the law firm of Abbey Spanier Rodd & Abrams, LLP as lead counsel for the class.

On October 2, 2007, Westchester filed a Consolidated Amended Class Action Complaint against Defendants in the U.S. Court. In their Complaint, Plaintiffs alleged that Defendants' public statements during the U.S. Class Period were materially false and misleading because they failed to disclose, among other things, that IMAX had recognized revenue on theater systems before installation of the system was complete, in contravention of U.S. generally accepted accounting rules, and in violation of its own accounting policies. Plaintiffs also alleged that IMAX's auditor, PwC-Canada was also responsible for the material misinformation disseminated to the investing public during the U.S. Class Period. Plaintiffs allege that Defendants' actions artificially inflated the price of IMAX stock during the U.S. Class Period and that once the truth was disclosed, the price of IMAX's stock declined, injuring the Class.

On December 10, 2007, the IMAX Defendants and PwC-Canada each separately filed motions to dismiss the Complaint on numerous grounds. On January 22, 2008, Westchester filed its opposition to Defendants' motions to dismiss. Defendants filed their reply briefing on February 11, 2008.

On September 15, 2008, after supplemental submissions and oral argument, the Defendants' motions to dismiss were denied by the Court. Thereafter, Westchester commenced discovery, which included the production and review of hundreds of thousands of pages of documents and transcripts of depositions.

On October 31, 2008, Westchester filed Plaintiffs' first motion for class certification.

On December 3, 2008, the Second Circuit decided *W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008), holding that an investment adviser that did not directly purchase the securities at issue lacked standing to bring a securities fraud claim on behalf of its clients because it did not suffer an injury in fact. Relying on the Second Circuit's decision in *Huff*, on February 18, 2009, Snow Capital Investment Partners, L.P. ("Snow Capital") requested a pre-motion conference in connection with its anticipated motion for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff.

On February 23, 2009, the Defendants filed oppositions to Westchester's motion for class certification. On March 13, 2009, the Court denied without prejudice Westchester's motion for class certification pending resolution of Snow Capital's anticipated motion for reconsideration of the Court's January 17, 2007 Order.

On April 3, 2009, Snow Capital moved for reconsideration of the Court's January 17, 2007 Order appointing Westchester lead plaintiff. Westchester filed its opposition on April 24, 2009 and Snow Capital replied on May 1, 2009. On June 29, 2009, the Court determined that under *Huff*, Westchester, an investment advisor, lacked standing and granted Snow Capital's motion and appointed it lead plaintiff and its counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel.

On December 14, 2009, the Canadian Court certified the Canadian Action on behalf of investors worldwide who purchased IMAX securities on or after February 17, 2006 and held some or all of those securities on August 9, 2006. *See Silver v. IMAX Corporation*, [2009] O.J. No. 5585, 2009 ON.C. LEXIS 4847 (December 14, 2009, Sup. Ct. J.).

On April 22, 2010, Snow Capital filed its motion for class certification. On June 10, 2010, the Defendants filed oppositions to Snow Capital's class certification motion. Snow Capital filed its reply in further support of the motion on July 30, 2010. The Court did not hear oral argument on the motion. On December 20, 2010, this Court issued a Memorandum and Order that denied Snow's motion for class certification, held that this case could not proceed with Snow Capital as class representative, and directed that new applications to be named lead plaintiff be filed.

On April 14, 2011, the Court issued an Order naming The Merger Fund (the "Lead Plaintiff") as lead plaintiff and re-appointing Abbey Spanier Rodd & Abrams, LLP as lead counsel.

Between April 2011 and November 2011, the parties met numerous times, both in person and via conference call, in an effort to negotiate a settlement of the U.S. Action. As a result of such efforts, on November 2, 2011, Lead Plaintiff and the Defendants were able to reach an agreement that led to the Settlement, which is separately set forth in greater detail in the Stipulation and Agreement of Settlement, dated January 26, 2012, as amended on March 20, 2012 (the "Stipulation").

After the U.S. Court preliminarily approved this Settlement on March 28, 2012, the IMAX Defendants made a motion for a final Order from the Canadian Court in the Canadian Action seeking to exclude, from the definition of the Canadian Class, all persons who do not opt out of this Settlement, if and when the settlement is approved by final Order of the U.S. Court (the "Canadian Order"). That motion is currently scheduled to be argued before the Canadian Court from June 25 to June 27, 2012.

**The Circumstances of the Settlement**

The Defendants and the Lead Plaintiff disagree as to the probable outcome of the U.S. Action with respect to liability. While the Lead Plaintiff was prepared to try this case against Defendants, and Lead Counsel were confident in the merits of their case, they recognize that a trial is inherently risky and that the Class may not have prevailed on any or all of its claims. Moreover, each of the Defendants believe that the Complaint lacks merit and had this Stipulation not been reached would have continued to vigorously defend against Lead Plaintiff's claims and present significant defenses thereto. While Lead Plaintiff believes that it had a strong case, Lead Plaintiff also believes that Defendants' defenses would have created uncertainty as to Lead Plaintiff's ability to win at trial or after appeals.

The Defendants and the Lead Plaintiff also disagree as to the probable outcome of the U.S. Action with respect to damages. Lead Plaintiff and their economic consultants believe that the damages arising from the alleged malfeasance in the U.S. Action, depending on the methodology used, are as high as $91 million. This amount results from the use of a damage model under which it was presumed that the proper measure of recoverable damages included the majority of IMAX's stock price drop that occurred when the Company disclosed information that corrected alleged prior false and misleading statements. This figure also assumes that the Court and a jury would make every factual finding in the Class's favor. Defendants have generated damage models showing damages based upon recent Supreme Court decisions which show damages as low as approximately $5 million.

Contrary to Lead Plaintiff's position, Defendants have argued, among other things, that they did not commit fraud, that IMAX's restatement was a result of accounting mistakes, and that their conduct did not cause the value of IMAX stock to decrease. As such, the decline was the result of other factors, including the inability of IMAX to find a buyer after a lengthy search, the announcement of a new business model involving joint ventures, considerable uncertainty surrounding the company, and an SEC investigation. Defendants have also argued that Lead Plaintiff will not be able to demonstrate that any purchasers prior to February 17, 2006 suffered a loss and that Lead Plaintiff will be unable to disentangle any stock drop attributable to the statements alleged to have been false or misleading and will therefore not be able to establish damages.

The Defendants and Lead Plaintiff also disagree as to whether the Court would have granted Lead Plaintiff's motion to certify this case as a class action. Although Lead Plaintiff withdrew its class certification motion in light of the Settlement, Defendants had opposed Lead Plaintiff's motion on the grounds that the U.S. Action is not superior to the previously certified global class action in Canada and that Defendants have rebutted the presumption of reliance set forth in the Supreme Court case *Basic v. Levinson*, 485 U.S. 224 (1988), by demonstrating that the alleged misrepresentations did not impact the price of IMAX securities. Defendants also argued that even if a class is certified, it should not include any shareholders who purchased prior to February 17, 2006.

These disputes would be subject to expert testimony at summary judgment and trial, and, therefore, it is impossible to predict with certainty which arguments would find favor with the Court and the jury. As a result, in a trial or through a summary judgment motion, the U.S. Class could recover substantially less than the amount of the Settlement or nothing. Lead Counsel has recommended the Settlement because it believes that the Settlement provides a substantial recovery to the U.S. Class and believes that the U.S. Class might have obtained a lesser recovery or nothing at all if the Class had gone to trial and through inevitable appeals.

It is important to recognize that the entry of Judgment and therefore the distribution of the Settlement funds in this case may be delayed because the Settlement is conditioned upon the Canadian Order becoming final and unappealable.

**Further Information**

Further information regarding this Settlement may be obtained by contacting: *In re IMAX Corporation Securities Litigation*, Civil Action No. 06 CIV. 6128 (NRB): Lead Counsel, Arthur N. Abbey, Karin E. Fisch and Richard B. Margolies, Abbey Spanier Rodd & Abrams, LLP, 212 East 39th Street, New York, NY 10016.

## What This Notice Contains

Page

A. Why did I receive this notice package? . . . . . 5
B. What is a class action? . . . . . 5
C. How do I know if I am a Settlement Class Member and can be part of the Settlement? . . . . . 5
D. Are there exceptions to being included in the Class? . . . . . 6
E. I'm still not sure I am included . . . . . 6
F. What does the Settlement provide? . . . . . 6
G. How much will my payment be in the Settlement? . . . . . 6
H. How can I receive a payment in the Settlement? . . . . . 6
I. When will I receive my payment in the Settlement? . . . . . 6
J. What am I giving up to receive a payment in the Settlement? . . . . . 7
K. How do I exclude myself from the Settlement? . . . . . 8
L. If I don't exclude myself, can I sue the Settling Defendants for the same thing later? . . . . . 8
M. If I exclude myself, can I obtain a payment from the Settlement? . . . . . 8
N. Do I have a lawyer in this case? . . . . . 8
O. How will the lawyers be paid? . . . . . 9
P. How do I notify the Court that I don't like the Settlement? . . . . . 9
Q. What is the difference between objecting and requesting exclusion? . . . . . 9
R. When and where will the U.S. Court decide whether to approve the Settlement? . . . . . 10
S. Do I have to answer questions at the Fairness Hearing? . . . . . 10
T. May I speak at the Fairness Hearing? . . . . . 10
U. What will happen if I do nothing at all? . . . . . 10
V. Are there more details about the Settlement and the Canadian Action? . . . . . 10
W. What are my rights and obligations as a securities broker or nominee? . . . . . 11

## Basic Information

### A. Why did I receive this notice package?

The U.S. Court authorized this Notice to be sent to you because you or someone in your family may have purchased or acquired IMAX shares on the NASDAQ from February 27, 2003 through July 20, 2007, inclusive. If the description above applies to you or someone in your family, you have a right to know about the proposed Settlement of the U.S. Action against the Defendants and about all of your options before the U.S. Court decides whether to approve the Settlement. If the Canadian Order becomes final and unappealable and the U.S. Court approves the Settlement, and any objections or appeals that may be filed in opposition to the Settlement are overruled or otherwise resolved, then Strategic Claims Services (the "Administrator") will distribute the payments that the Settlement permits. This notice package explains the lawsuit, the Settlement, your legal rights, what benefits are available, who is eligible for them, and how to get them.

THE U.S. COURT HAS DIRECTED THAT NOTICE SHOULD BE GIVEN TO ALL CLASS MEMBERS TO INFORM THEM OF THE U.S. ACTION, THE CANADIAN ACTION AND THEIR RIGHTS. THE SENDING OF THIS NOTICE IS NOT AN EXPRESSION BY THE U.S. COURT OR THE PARTIES TO THE U.S. ACTION OF ANY OPINION AS TO THE MERITS OF ANY CLAIM OR DEFENSE OR THE LIKELIHOOD OF RECOVERY BY THE CLASS. NOTICE IS BEING PROVIDED SO THAT ALL CLASS MEMBERS MAY MAKE A DECISION AS TO WHAT STEPS, IF ANY, THEY WISH TO TAKE AS THIS MATTER PROCEEDS. NOTICE IS BEING SENT TO YOU BECAUSE RECORDS INDICATE THAT YOU MAY BE A CLASS MEMBER.

### B. What is a class action?

In a class action, one or more people and/or entities called a lead plaintiff sues on behalf of people and/or entities that have similar claims. All these people and/or entities are referred to as a class or individually as class members. One court resolves the issues for all class members, except for those who exclude themselves from the class.

### C. How do I know if I am a Settlement Class Member and can be part of the Settlement?

To see if you will receive a payment from the Settlement, you first need to know if you are a Class Member. The U.S. Action alleges that everyone who fits the following description is a Class Member: *all persons and entities who purchased or otherwise acquired IMAX shares on the NASDAQ from February 27, 2003 through July 20, 2007, inclusive.*

## D. Are there exceptions to being included in the Class?

Excluded from the Settlement Class are the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either current officers and/or directors of any Defendant, or who served as officers and directors of any Defendant at any time during the Class Period.

## E. I'm still not sure I am included.

If you are still not sure whether you are included in the U.S. Action, you can ask for free help. You can call Strategic Claims Services at 1-866-274-4004 or visit www.imaxussettlement.com for more information. Or you can fill out and return the claim form attached hereto, to see if you qualify.

## F. What does the Settlement provide?

The Settlement consists of twelve million dollars ($12,000,000) in cash, plus interest. The Settlement will be used to pay Class Members, and also for the payment of taxes, administrative costs, including the costs of notice, and for attorneys' fees and expenses.

## G. How much will my payment be in the Settlement?

If you are entitled to a payment, your share of the Settlement Fund will depend on a variety of factors, including the number of valid claim forms that Class Members submit, how many Settlement Class Members choose to exclude themselves from the class, how many shares of IMAX stock you purchased or otherwise acquired, and when you bought, acquired and sold your IMAX stock. The Plan of Allocation is included at the end of this Notice.

The Administrator will distribute the Settlement Fund according to the Plan of Allocation described at the end of this Notice after the Canadian Order has become final and unappealable, the deadline for submission of Proof of Claim and Release forms has passed and all claims have been processed. The Administrator will process your claim and advise you if your claim does not satisfy the requirements approved by the U.S. Court. The Administrator will calculate your payment, if any, based upon the date you purchased or acquired IMAX stock, the losses you suffered as a result thereof and the type of claim you have.

By following the Plan of Allocation at the end of this Notice, you can calculate your "Recognized Claim." Your recovery will depend on the size of your Recognized Claim as it relates to the size of the Recognized Claims of all Class Members who file a claim form.

## H. How can I receive a payment in the Settlement?

To qualify for payment you must submit the Proof of Claim and Release form enclosed with this Notice. You may also obtain a claim form on the Internet at www.imaxussettlement.com. Read the instructions carefully, fill out the form, include all the documents the form asks for, sign it and mail it postmarked no later than October 12, 2012. If you have any questions or need assistance, call 1-866-274-4004, and someone will either answer your questions or help you to complete the Proof of Claim and Release form.

The Administrator will advise Class Members if their claims are deficient and are rejected. Any Class Member who receives a deficiency letter or a rejection letter and who fails to submit documentation sufficient to remedy the deficiency or reason for rejection within the time prescribed herein shall have their claim deemed finally rejected. The Administrator shall advise Class Members in writing that their claims have been finally rejected. Class Members have thirty (30) days from the date of such final rejection letter to write to the Administrator stating the reasons that their claims should not be rejected, in which case the claim shall be submitted to the Court as a disputed claim. Notice of any hearing on such rejected claims shall be provided to all Class Members whose claims are rejected or disputed.

## I. When will I receive my payment in the Settlement?

The U.S. Court will hold a hearing on June 14, 2012, at 10:30 a.m., to decide whether to approve the Settlement. Even if Judge Buchwald approves the Settlement, it could take more than two years before the Settlement Fund is distributed to the Class Members. One reason that the Settlement distribution could be delayed is if Class Members object to any aspect of the Settlement and are not satisfied by the resolution of that objection by the U.S. Court. That Class Member could then appeal the U.S. Court's decision. In addition, it is always uncertain whether an appeal will be resolved in favor of a settlement, and resolving any such appeals or objections can take time. Another reason that the Settlement distribution could be delayed is that the Settlement is conditioned on the Canadian Order becoming final and unappealable. Finally, it may take more than two years for the Settlement Fund to be distributed because once the Settlement has been approved and any appeals are resolved, the Administrator must process all of the Proof of Claim and Release forms. The processing, by itself, is a very complicated process and will take many months.

## J. What am I giving up to receive a payment in the Settlement?

If you are a Settlement Class Member, and you do not exclude yourself from the Settlement, you remain in the Class, and that means that if the Settlement is approved, you, on behalf of yourself, your heirs, executors, administrators, successors and assigns and any Persons you represent, will release all "Released Claims," including participation in the Canadian Action, and including all "Unknown Claims," against all "Released Parties."

*The following release applies to the Settlement (as more fully set forth in the Stipulation).*

"Released Claims" means:

(i) with respect to the Released Parties: the release by Lead Plaintiff and all Class Members of all claims that were alleged in the U.S. Action, or the Canadian Action, or that could have been alleged in the U.S. Action, the Canadian Action, or any other proceeding, manner of action, actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, damages, judgments and demands in law, contract, trust or equity, domestic or foreign, including claims under U.S. securities laws, U.S. federal laws, U.S. state laws, U.S. common law, Canadian securities laws, Canadian federal and provincial laws, and Canadian common law, and the laws of any other jurisdiction relating to transactions in IMAX securities during the Settlement Class Period or the subject matter and facts relating to the U.S. Action, including any acts, failures to act, omissions, misrepresentations, statements, misstatements, facts, events, transactions, occurrences or other subject matter set forth, alleged, embraced, encompassed or otherwise referred to in or related to the U.S. Action.

(ii) the claims that are to be released also include Unknown Claims and claims arising under the laws of any jurisdiction, including, without limitation, in the United States and in Canada, and Lead Plaintiff and all Class Members will waive and relinquish to the fullest extent possible any state, federal or foreign law defenses concerning the release of Unknown Claims. Defendants shall release Lead Plaintiff, all Class Members, and Lead Counsel, from any claims relating to the institution, prosecution, and settlement of the U.S. Action.

"Released Parties" means:

(i) with respect to the Defendants: the Defendants, their respective present and former parents, subsidiaries, divisions, affiliates, and any PricewaterhouseCoopers member firm, the present and former employees, members, partners, principals, managers, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Defendant Releasees"), and any Person or entity which is or was related to or affiliated with any Defendant Releasee or in which any Defendant Releasee has or had a controlling interest and the present and former employees, members, partners, principals, managers, officers, directors, attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them (all, with the Defendant Releasees, the "Defendant Released Parties").

(ii) with respect to Plaintiffs: the Lead Plaintiff and all other Class Members, their respective present and former parents, subsidiaries, divisions and affiliates, the present and former employees, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Plaintiff Releasees"), and any Person or entity in which any Plaintiff Releasee has or had a controlling interest or which is or was related to or affiliated with any Plaintiff Releasee.

"Unknown Claims" means:

(i) any Released Claims that Lead Plaintiff or any Class Member does not know of or suspect to exist in his, her or its favor at the time of the release of the Defendant Released Parties which, if known by him, her or it might have affected his, her or its Settlement with and release of the Defendant Released Parties, or might have affected his, her or its decision not to object to this Settlement or not to exclude himself, herself or itself from the Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date, the Lead Plaintiff shall expressly waive, and each of the Class Members shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, the provisions, rights and benefits of California Civil Code § 1542 and any provisions, rights and benefits

conferred by any law of any state or territory of the United States or principle of common law which is similar, comparable or equivalent to California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

(ii) Lead Plaintiff and Class Members may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Released Claims, but Lead Plaintiff shall expressly, and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiff acknowledges, and the Class Members shall be deemed to have acknowledged, and by operation of the Judgment shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

## K. How do I exclude myself from the Settlement?

To exclude yourself from the Settlement, you must send a letter by mail saying that you want to be excluded from the *In re IMAX Corporation Securities Litigation*, Civil Action No. 06 CIV. 6128 (NRB) Settlement. To be excluded, you must include your name, address, telephone number, information concerning the quantity of IMAX stock held at the close of business on October 17, 2007, all of your purchase(s) and sale(s) of such stock from February 27, 2003 through and including October 17, 2007, the dates of purchase (or other acquisition) and sale of the IMAX stock, the price paid or received in all purchases and sales excluding commissions and fees, and your signature. No request for exclusion will be considered valid unless all information described in the preceding sentence is included in the request. Any exclusion request must be postmarked or hand delivered to the address below by no later than June 4, 2012:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street — Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

You can't exclude yourself on the telephone or by e-mail.

If you properly ask to be excluded, you will not receive any settlement payment and you cannot object to the Settlement from which you exclude yourself. You will also not be legally bound by anything that happens in the U.S. Action, and may be able to sue the Defendants concerning the claims being released in the Settlement in a separate action or remain a member of the Canadian Action. If you properly exclude yourself from the U.S. Action, and you purchased and held IMAX securities during the Canadian Class Period, you will remain a member of the class in the Canadian Action

## L. If I don't exclude myself, can I sue the Settling Defendants for the same thing later?

No. If you do not exclude yourself from the Settlement, you cannot bring any of the Released Claims (including participating in the Canadian Action should the Canadian Order be entered and become final) against any Released Parties in the Settlement. Remember, the exclusion deadline is June 4, 2012.

## M. If I exclude myself, can I obtain a payment from the Settlement?

No. If you exclude yourself from the Settlement, you cannot receive any payment from the Settlement. In that case, do not send in a Proof of Claim and Release form to ask for any payment.

## N. Do I have a lawyer in this case?

The U.S. Court appointed the law firm of Abbey Spanier Rodd & Abrams, LLP, 212 East 39th Street, New York, NY 10016, as Lead Counsel to represent Class Members in this U.S. Action. You will not be charged for these lawyers, other than amounts those firms are awarded by the Court from the Settlement Fund. If you want to be represented by another lawyer, you may hire one at your own expense.

### O. How will the lawyers be paid?

The lawyers who acted as counsel for the Class during the course of the litigation will apply to the U.S. Court for an award of attorneys' fees from the Settlement Fund. Lead Counsel will apply for an award of attorneys' fees from the Settlement Fund not to exceed twenty-five percent (25%) of the Settlement and reimbursement of expenses of no greater than $1.75 million, plus interest on such amounts at the same rate earned by the Settlement Fund. This is the equivalent of an average of $0.179 per share of IMAX stock. Lead Counsel and other plaintiff's counsel have litigated the U.S. Action for five years on a contingent fee basis and have advanced the expenses of litigation with the expectation that if they were successful in recovering money for the Class, they would receive fees and be reimbursed for their expenses from the Settlement Fund, as is customary in this type of litigation.

### P. How do I notify the Court that I don't like the Settlement?

You can tell the U.S. Court that you don't agree with the Settlement, the Plan of Allocation, or Lead Counsel's request for attorneys' fees and reimbursement of expenses. If you are a Class Member you can object to the Settlement if you don't like any part of it. If you object to the Settlement, you can present reasons in writing why you think the U.S. Court should not approve the Settlement, the Plan of Allocation, or Lead Counsel's request for attorneys' fees or expenses. The U.S. Court will consider your views. To object, you must send a letter saying that you are a Class Member in *In re IMAX Corporation Securities Litigation*, Civil Action No. 06 CIV. 6128 (NRB) and that you object to the Settlement, or any aspect of the Settlement. You must include your name, address, telephone number, information concerning the quantity of IMAX stock held at the close of business on October 17, 2007, all of your purchase(s) and sale(s) of such stock from February 27, 2003 through and including October 17, 2007, the dates of purchase (or other acquisition) and sale of the IMAX stock, the price paid or received in all purchases and sales excluding commissions and fees, and your signature. No objection will be considered valid unless all information described in the preceding sentence is included in the request. Any objection must be postmarked or hand delivered and filed with the Clerk of the U.S. Court no later than June 4, 2012 with copies to the addresses below:

**COURT**

Clerk of the Court
United States District Court for the Southern District of New York
Attn: *In re IMAX Corporation Securities Litigation,*
Civil Action No. 06 CIV. 6128 (NRB)
500 Pearl Street
New York, NY 10007-1312

**LEAD COUNSEL**

Arthur N. Abbey
Karin E. Fisch
Richard B. Margolies
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016

**DEFENDANTS' COUNSEL**

Lewis J. Liman
David Oliwenstein
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

M. Byron Wilder
Jason C. McKenney
Gibson Dunn & Crutcher, LLP
2100 McKinney Avenue
Suite 1100
Dallas, TX 75201

Jennifer L. Conn
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166

If the U.S. Court rejects or modifies the Plan of Allocation and/or the amount of attorneys' fees or expenses requested, the U.S. Court may still approve the Settlement.

### Q. What is the difference between objecting and requesting exclusion?

Objecting is simply telling the U.S. Court that you don't like something about the Settlement. You can object only if you stay in the U.S. Class. If you object to the Settlement, you will be bound by the Settlement and all the terms of the Stipulation, including the terms of the Judgment to be entered in the U.S. Action and the releases provided therein. Excluding yourself means telling the Court that you don't want to be part of the U.S. Class. If you exclude yourself from the Settlement, you have no basis to object to the Settlement because it no longer affects you. With respect to the Settlement, you can either object or exclude yourself, but you cannot do both. If you properly exclude yourself from the U.S. Action, and you purchased IMAX stock between February 17, 2006, through August 9, 2006, you will remain a member of the class in the Canadian Action.

## R. When and where will the U.S. Court decide whether to approve the Settlement?

The U.S. Court will hold a Fairness Hearing at 10:30 a.m. on June 14, 2012, at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York, 10007-1312. At this hearing the U.S. Court will consider whether the Settlement is fair, reasonable and adequate and in the best interests of the U.S. Class. If there are objections, the U.S. Court will consider them. Judge Buchwald will listen to people who have asked in writing to speak at the hearing. The U.S. Court may also decide how much to award Lead Counsel and other counsel for attorneys' fees and expenses and whether to approve the Plan of Allocation. At or after the hearing, the U.S. Court will decide whether to approve the Settlement, the Plan of Allocation, and an Award of Attorneys' fees and expenses. We do not know how long it will take the U.S. Court to make these decisions.

## S. Do I have to answer questions at the Fairness Hearing?

No. Lead Counsel and Defendants' Counsel will attempt to answer questions Judge Buchwald may have. But you are welcome to come at your own expense. If you send an objection, you don't have to come to Court to talk about it. As long as you mailed your written objection on time, the U.S. Court will consider it. You may also pay your own lawyer to attend but it is not necessary.

## T. May I speak at the Fairness Hearing?

You may ask the U.S. Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *In re IMAX Corporation Securities Litigation*". Be sure to include your name, address, telephone number and signature. Your Notice of Intention to Appear must be postmarked no later than June 4, 2012, and be sent to the Clerk of Court, Lead Counsel and Defendants' Counsel, at the addresses on page 9, in question P. You cannot speak at the hearing if you exclude yourself.

## U. What will happen if I do nothing at all?

If you fail to file a timely Proof of Claim and Release in response to this Notice, you'll get no money from this Settlement. If you fail to exclude yourself, you will nevertheless release the Released Parties from the Released Claims in the Settlement, even if you do not file a Proof of Claim and Release. If you fail to exclude yourself and the Canadian Order is entered and becomes final, you will remain a member of the Class in the U.S. Action, and you cannot participate in the Canadian Action, which will be a Released Claim.

## V. Are there more details about the Settlement and the Canadian Action?

This Notice summarizes the proposed Settlement. More details are contained in the Settlement Agreement itself. You can obtain a copy of the Stipulation of Settlement by writing to Lead Counsel at the addresses set forth below, or by visiting www.imaxussettlement.com or www.abbeyspanier.com. Also available on the websites are the Proof of Claim and Release, this Notice, and documents relating to the Canadian Action.

If you have questions about the U.S. Action or the Settlement you may write Lead Counsel at the addresses set forth below or call them toll free at 1-800-889-3701 or call the Administrator at 1-866-274-4004 toll free; or visit the websites referenced above, where you will find a link to the Administrator's website containing answers to common questions about the Settlement and a claim form, plus other information to help you determine whether you are a Class Member, and whether you are eligible for a payment.

ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016
ATTN: IMAX Settlement

If you have questions about the Canadian Action, you may write or contact counsel for the Canadian Class at the address set forth below, or call their clerk, Nicole Young, toll free at 1-800-461-6166 (ext. 2380); or email Ms. Young at nicole.young@siskinds.com; or visit www.classaction.ca.

Nicole Young
SISKINDS, LLP
680 Waterloo Street
London, Ontario, Canada

**DO NOT CONTACT THE COURT**

## W. What are my rights and obligations as a securities broker or nominee?

SPECIAL NOTICE TO SECURITIES BROKERS AND OTHER NOMINEES

If you purchased or otherwise acquired IMAX shares on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive, for the beneficial interest of a person or organization other than yourself, the Court has directed that, WITHIN TEN (10) BUSINESS DAYS OF YOUR RECEIPT OF THIS NOTICE, you must either (1) provide the Administrator the name and last known address of each person or organization for whom or for which you purchased or otherwise acquired such shares during the Class Period, preferably on computer-generated mailing labels or, electronically, in MS Word or WordPerfect files (label size Avery # 5162), or in an MS Excel data table setting forth (a) title/registration, (b) street address, and (c) city/state/zip or (2) request additional copies of this Notice package (which will be provided to you free of charge) and within seven (7) days mail the Notice package form directly to the beneficial owners of the IMAX stock. If you choose to follow alternative procedure (2), the Court has directed that, upon such mailing, you send a statement to the Administrator confirming that the mailing was made as directed. You are entitled to reimbursement from the Settlement Fund of your reasonable expenses actually incurred in connection with the foregoing, including reimbursement of postage expense and the cost of ascertaining the names and addresses of the beneficial owners. Those expenses will be paid after your request and submission of appropriate supporting documentation. All communications concerning the foregoing should be addressed to the Administrator:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Stree — Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

# APPENDIX I

## PLAN OF ALLOCATION OF THE SETTLEMENT FUND AMONG CLASS MEMBERS

The Settlement Fund will be distributed to Class Members eligible for recovery pursuant to the Settlement who submit valid and timely Proof of Claim and Release forms ("Authorized Claimants") in connection with the Plan of Allocation described below. "Class Members" means persons or entities who purchased IMAX shares on the NASDAQ between February 27, 2003 and July 20, 2007, inclusive, excluding the Defendants in the U.S. Action and Canadian Action, members of those Defendants' immediate families, all individuals who are either a current officer and/or director of any Defendant, or who served as an officer or director of any Defendant at any time during the Class Period, who does submit a timely and valid request for exclusion from the Settlement. The Plan of Allocation provides that you will be eligible to participate in the distribution of the Settlement Fund only if you have a net loss on all transactions in IMAX stock purchased during the Class Period. The Plan of Allocation will be submitted to the Court for its approval at the Fairness Hearing, but will be considered by the Court separately from the Settlement itself.

A purchase or sale of IMAX common stock shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, devise, or operation of law of IMAX common stock during the Class Period shall not be deemed a purchase or sale of IMAX common stock for the calculation of an Authorized Claimant's recognized loss, nor shall it be deemed an assignment of any claim relating to the purchase of such shares unless specifically provided in the instrument of gift or assignment. The receipt of IMAX common stock during the Class Period in exchange for securities of any other corporation or entity shall not be deemed a purchase or sale of IMAX common stock.

To the extent an Authorized Claimant had a gain from his, her, or its overall transactions in IMAX common stock during the Class Period, the value of the recognized loss will be zero. To the extent that a Claimant suffered an overall loss on his, her, or its overall transactions in IMAX common stock during the Class Period, but that loss was less than the recognized loss calculated below, then the recognized loss shall be limited to the amount of the actual loss. There shall be no recognized loss on short sales of IMAX common stock during the Class Period; however, any recognized gains with respect to short sales shall be offset against recognized losses on other transactions.

The Recognized Loss of each Authorized Claimant shall be calculated according to the following formula:

A. For shares held at the end of trading on October 17, 2007, the Recognized Loss shall be that number of shares multiplied by the lesser of:

(1) the applicable purchase date artificial inflation per share figure, as found in Table A; or

(2) the difference between the purchase price per share and $4.42.[1]

B. For shares sold between February 27, 2003 and July 19, 2007, inclusive, the Recognized Loss shall be that number of shares multiplied by the lesser of:

(1) the applicable purchase artificial inflation per share figure less the applicable sales date artificial inflation per share figure, as found in Table A; or

(2) the difference between the purchase price per share and the sales price.

C. For shares sold between July 20, 2007 and October 17, 2007, the Recognized Loss shall be the lesser of:

(1) the applicable purchase date artificial inflation per share figure, as found in Table A; or

(2) the difference between the purchase price per share and the average closing price of IMAX common stock between July 20, 2007 and the date of sale.[2]

**Table A**

| Purchase or Sale Date Range | Artificial Inflation Per Share |
|---|---|
| 02/27/2003 - 08/09/2006 | $3.90 |
| 08/10/2006 - 07/20/2007 | $0.00 |

[1] Pursuant to Section 21(D)(e)(1) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated." $4.42 was the mean closing price of IMAX Corporation common stock on NASDAQ during the 90-day period beginning on July 20, 2007 and ending on October 17, 2007.

[2] Pursuant to Section 21(D)(e)(2) of the Private Securities Litigation Reform Act of 1995, "in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE IMAX CORPORATION SECURITIES LITIGATION | 06 CIV. 6128 (NRB) |

## PROOF OF CLAIM AND RELEASE

**IF YOU PURCHASED OR OTHERWISE ACQUIRED IMAX CORPORATION ("IMAX") SHARES ON THE NASDAQ BETWEEN FEBRUARY 27, 2003, AND JULY 20, 2007, INCLUSIVE, YOU MAY BE ELIGIBLE TO RECEIVE A PAYMENT IN THE PROPOSED U.S. CLASS ACTION SETTLEMENT WITH IMAX, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE, KATHRYN A. GAMBLE AND PRICEWATERHOUSECOOPERS LLP.**

IN ORDER TO RECEIVE ANY PAYMENTS TO WHICH YOU MAY BE ENTITLED AS A CLASS MEMBER, YOU MUST COMPLETE AND SIGN THIS PROOF OF CLAIM AND RELEASE FORM AND MAIL IT PREPAID, FIRST-CLASS MAIL, POSTMARKED NO LATER THAN OCTOBER 12, 2012, TO THE FOLLOWING ADDRESS:

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street — Suite 3
Media, PA 19063
1-866-274-4004
info@strategicclaims.net

**IF YOU FAIL TO SUBMIT YOUR PROOF OF CLAIM AND RELEASE FORM ON OR BEFORE OCTOBER 12, 2012, YOUR CLAIM MAY BE REJECTED AND YOU MAY BE PRECLUDED FROM RECEIVING ANY MONEY FROM THE SETTLEMENT.**

A Proof of Claim and Release form will be deemed submitted when postmarked or, if submitted other than by first-class mail, on the date actually received by the Claims Administrator.

### I. IDENTITY OF CLAIMANT

Enter the name(s) of the beneficial purchaser(s) or acquirer(s) of IMAX stock; if the stock was held jointly in two or more names, all names must be shown, and all joint owners must sign the Proof of Claim. If some stock were held in one name (e.g., John Smith) and some in joint names (e.g., John and Mary Smith, JT), you must file separate Proof of Claim forms; all these represent different ownerships. A claimant whose IMAX shares were held in a custodial account under the Uniform Gifts to Minors Act ("UGMA") may file in his/her own name, if he/she is now of age. In this event, the former custodian does not have to sign the Proof of Claim. UGMA Custodians should identify themselves as follows: (e.g., John Smith, Custodian for Jack Smith UGMA). Corporate officers or partners filing for a claimant corporation or partnership should file in the name of such entity, and sign their names and titles on the signature page. Executors, Trustees, Administrators, and the like should file in the name of the beneficial owner/seller, and sign their names and titles on the signature page.

**Name of Claimant(s):**

Name

Name

Address

Address

City: State: Zip Code: -

Foreign Province and Postal Code: Foreign Country:

☐ Individual ☐ Corporation ☐ Estate ☐ Other (Specify) ____________________

Area Code Telephone No. (Day) - Area Code Telephone No. (Night) - Area Code Facsimile Number -

Email Address

## II. STATEMENT OF CLAIM

### A. INSTRUCTIONS

If you require additional space, use copies of this page or pages in the same format as below (you may copy pages). Sign and print your name and your Social Security or Employer Identification Number on each additional page.

1. **You MUST enclose copies of confirmation slips, monthly statements and/or other documents evidencing each purchase, acquisition, sale or holding reported on this Proof of Claim form. IF ANY SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES FROM YOUR BROKER. THESE DOCUMENTS ARE NECESSARY TO PROVE AND PROCESS YOUR CLAIM. FAILURE TO SUBMIT SUCH DOCUMENTS MAY RESULT IN REJECTION OF YOUR CLAIM.**
2. All references to purchase and sale dates relate to trade dates, not settlement dates.
3. The amount of the settlement proceeds to which you are entitled, if any, will be calculated pursuant to the proposed Plan of Allocation contained in the Notice, or such other plan as may be approved by the Court.
4. If you have acquired any IMAX common stock by gift, inheritance or operation of law, you are to report this transaction as if you acquired the stock on the same date as the person or entity who initially purchased the security.
5. A Proof of Claim and Release form will be deemed submitted when postmarked or, if sent other than by first-class mail, on the date actually received by the Claims Administrator.

**IF YOU NEED MORE ROOM, USE COPIES OF THIS PAGE OR PAGES IN THE SAME FORMAT AS BELOW. PLEASE FILL IN EACH SECTION, WRITING "NONE" WHERE APPROPRIATE.**

## III. COMMON STOCK

A. **IMAX COMMON STOCK OWNED** as of the close of business on February 26, 2003: ____________

B. **IMAX COMMON STOCK PURCHASED** during the period from February 27, 2003, through the close of business on October 17, 2007:

| Trade Date(s) of Purchase (List Chronologically) (Month/Day/Year) | Number of Shares Purchased | Price per Share (exclude commissions and fees) | Total Purchase Price (exclude commissions and fees) |
|---|---|---|---|
| / / | | $ . | $ . |
| / / | | $ . | $ . |
| / / | | $ . | $ . |
| / / | | $ . | $ . |

C. **IMAX COMMON STOCK SOLD** during the period from February 27, 2003, through the close of business on October 17, 2007:

| Trade Date(s) of Sale (List Chronologically) (Month/Day/Year) | Number of Shares Sold | Price per Share (exclude commissions and fees) | Total Sale Price (exclude commissions and fees) |
|---|---|---|---|
| / / | | $ . | $ . |
| / / | | $ . | $ . |
| / / | | $ . | $ . |
| / / | | $ . | $ . |

D. **IMAX COMMON STOCK OWNED** as of the close of business on October 17, 2007: ____________

## IV. PROOF OF CLAIM

By submitting this Proof of Claim, I (we) state that I (we) believe in good faith that: (a) I am (we are) a member of the Class as defined in the Notice, or am (are) acting for such person; (b) I (we) have read and understood the contents of the Notice; (c) I am (we are) not, and am (are) not acting for, IMAX, any defendant, any entity in which any defendant has a controlling interest, or the legal representative, heir, successor or assign of IMAX or any other individual defendant; (d) Neither I (we), nor any joint owners of the IMAX shares at issue, has (have) filed an effective Request for Exclusion seeking to be excluded from the Settlement; (e) I am (we are) entitled to receive a share of the Settlement Fund; (f) I (we) desire to participate in the Settlement described in the Notice; and (g) I (we) have enclosed photocopies of the stockbroker confirmation slips or broker account statements, an authorized statement from the broker containing the transactional information found in a broker confirmation slip, or other documents adequately evidencing each purchase and sale listed below in support of my (our) claimed loss.

## V. SUPPORTING DOCUMENTS

Claimants must enclose copies of confirmation slips, monthly statements and/or other documents evidencing each purchase, acquisition, sale or holdings reported on this Proof of Claim form. **IF ANY SUCH DOCUMENTS ARE NOT IN YOUR POSSESSION, PLEASE OBTAIN COPIES FROM YOUR BROKER. FAILURE TO SUBMIT SUCH DOCUMENTS MAY RESULT IN DISALLOWANCE OF YOUR CLAIM. DO NOT SEND ORIGINALS.**

## VI. VERIFICATION OF CLAIM(S)

I (we) understand that the information contained in this Proof of Claim is subject to such verification as the Court may direct and I (we) agree to cooperate in any such verification. I (we) further agree and understand that if the proposed Settlement is approved by the Court and becomes effective, all claims or matters against the Released Parties described in the Release below, which have been or could have been asserted relating in any way to the subject matter of the litigation, will be released and discharged forever. I (we) further agree to submit to the jurisdiction of the United States District Court for the Southern District of New York.

## VII. SUBSTITUTE FORM W-9

### REQUEST FOR TAXPAYER IDENTIFICATION NUMBER

Enter your taxpayer identification number below. For most individuals, this is your social security number. The Internal Revenue Service requires your taxpayer identification number. Failure to furnish your correct taxpayer identification number may result in withholding of a portion of any distribution otherwise payable with respect to your claim. UGMA Custodians should use the minor's social security number.

Social Security Number (for individuals)
☐☐☐ – ☐☐ – ☐☐☐☐

OR

Taxpayer Identification Number
(for estates, trusts, corporations, etc.)
☐☐ – ☐☐☐☐☐☐☐

## VIII. RELEASE AND COVENANT NOT TO SUE

If the Settlement is approved, you, on behalf of yourself, your heirs, executors, administrators, successors and assigns and any Persons you represent, will release all "Released Claims," including all "Unknown Claims," against all "Released Parties." If you purchased IMAX securities on the NASDAQ on or after February 17, 2006 and held some or all of those securities on August 9, 2006, then you are also a member of the certified class in a class action against IMAX Corporation and others in Ontario Canada (the "Canadian Action"). The Canadian Action will be a Released Claim, and the defendants in the Canadian Action will be Released Parties.

*The following release applies to the Settlement (as more fully set forth in the Stipulation).*

"Released Claims" means

(i) with respect to the Released Parties: the release by Lead Plaintiff and all Class Members of all claims that were alleged in the U.S. Action or the Canadian Action, or that could have been alleged in the U.S. Action or the Canadian Action, any other proceeding, manner of action, actions, causes of action, suits, claims for sums of money, contracts, controversies, agreements, costs, damages, judgments and demands in law, contract, trust or equity, domestic or foreign, including claims under the U.S. securities laws, U.S. federal laws, U.S. state laws, U.S. common law, Canadian securities laws, Canadian federal and provincial laws, and Canadian common law, and the laws of any other jurisdiction relating to transactions in IMAX securities during the Settlement Class Period or the subject matter and facts relating to the U.S. Action, including any acts, failures to act, omissions,

misrepresentations, statements, misstatements, facts, events, transactions, occurrences or other subject matter set forth, alleged, embraced, encompassed or otherwise referred to in or related to the U.S. Action.

(ii) the claims that are to be released also include Unknown Claims and claims arising under the laws of any jurisdiction, including, without limitation, in the United States and in Canada, and Lead Plaintiff and all Class Members will waive and relinquish to the fullest extent possible any state, federal or foreign law defenses concerning the release of Unknown Claims. Defendants shall release Lead Plaintiff, all Class Members, and Lead Counsel, from any claims relating to the institution, prosecution, and settlement of the U.S. Action.

"Released Parties" means:

(i) with respect to the Defendants: the Defendants, their respective present and former parents, subsidiaries, divisions, affiliates, and any PricewaterhouseCoopers member firm; the present and former employees, members, partners, principals, managers, officers, directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Defendant Releasees"), and any Person or entity which is or was related to or affiliated with any Defendant Releasee or in which any Defendant Releasee has or had a controlling interest and the present and former employees, members, partners, principals, managers, officers and directors, attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them (all, with the Defendant Releasees, the "Defendant Released Parties").

(ii) with respect to Plaintiffs: the Lead Plaintiff and all other Class Members, their respective present and former parents, subsidiaries, divisions and affiliates, the present and former employees, officers and directors of each of them, the present and former attorneys, accountants, auditors, advisors, trustees, administrators, fiduciaries, consultants, representatives, insurers, and agents of each of them, and the predecessors, heirs, successors and assigns of each (together, the "Plaintiff Releasees"), and any Person or entity in which any Plaintiff Releasee has or had a controlling interest or which is or was related to or affiliated with any Plaintiff Releasee.

"Unknown Claims" means:

(i) any Released Claims that Lead Plaintiff or any Class Member does not know of or suspect to exist in his, her or its favor at the time of the release of the Defendant Released Parties which, if known by him, her or it might have affected his, her or its Settlement with and release of the Defendant Released Parties, or might have affected his, her or its decision not to object to this Settlement or not to exclude himself, herself or itself from the Class. With respect to any and all Released Claims, the Parties stipulate and agree that, upon the Effective Date, the Lead Plaintiff shall expressly waive, and each of the Class Members shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, the provisions, rights and benefits of California Civil Code § 1542 and any provisions, rights and benefits conferred by any law of any state or territory of the United States or principle of common law which is similar, comparable or equivalent to California Civil Code § 1542, which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.**

(ii) Lead Plaintiff and Class Members may hereafter discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Released Claims, but Lead Plaintiff shall expressly, and each Class Member, upon the Effective Date, shall be deemed to have, and by operation of the Judgment shall have fully, finally and forever settled and released any and all Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent, whether or not concealed or hidden, which now exist, or heretofore have existed upon any theory of law or equity now existing or coming into existence in the future, including, but not limited to, conduct which is negligent, reckless, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. Lead Plaintiff acknowledges, and the Class Members shall be deemed to have acknowledged, and by operation of the Judgment shall have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

In the event the Settlement is not finally approved or the Settlement is terminated, all Releases will be null and void.

## IX. CERTIFICATION

UNDER THE PENALTIES OF PERJURY, I (WE) CERTIFY THAT ALL OF THE INFORMATION PROVIDED ON THIS FORM IS TRUE, CORRECT AND COMPLETE. I (We) certify that I am (we are) NOT subject to backup withholding under the provisions of Section 3406(a)(1)(C) of the Internal Revenue Code. If I am (we are) signing on behalf of someone else, I (we) hereby certify and warrant that I am (we are) authorized to make this Proof of Claim and Release. I (we) hereby certify and warrant that I (we) have not previously sold, transferred, assigned or granted any interest in any of the claims released hereby (as set forth at paragraph VIII above) to any other person or entity.

NOTE: If you have been notified by the Internal Revenue Service that you are subject to backup withholding, please strike out the word "NOT" in the Certification above.

____________________ ______________________________

Date Signature of Claimant

____________________ ______________________________

Date Signature of Joint-Owner Claimant (if any)

If the claimant is other than an individual, or if the claimant is not the person completing and signing this form, the following must also be provided:

__________________________ __________________________

Print Name of Person Signing Capacity of Person Signing (Executor, President, etc.)

Address of Person Signing

Street:______________________________

Street:______________________________

City:__________________ State:_____ Zip________

☐☐☐ — ☐☐☐ — ☐☐☐☐

Area Code Telephone Number

***You are urged to make and retain a copy of the Proof of Claim and Release and all documents that you submit.***

**THIS PROOF OF CLAIM AND RELEASE MUST BE SUBMITTED BY PREPAID FIRST CLASS MAIL POSTMARKED NO LATER THAN OCTOBER 12, 2012 OR BE OTHERWISE RECEIVED BY THAT DATE BY:**

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street — Suite 3
Media, PA 19063
info@strategicclaims.net

***For more information:***

Toll Free: 1-866-274-4004

***For overnight delivery:***

In re IMAX Corporation Securities Litigation
c/o Strategic Claims Services
600 North Jackson Street — Suite 3
Media, PA 19063
info@strategicclaims.net

**ACCURATE CLAIMS PROCESSING TAKES A SIGNIFICANT AMOUNT OF TIME.**

**THANK YOU FOR YOUR PATIENCE.**

**Reminder Checklist:**

1. Please sign the release and certification on page 17.
2. Remember to attach supporting documentation.
3. Do not send originals of stock certificates.
4. Keep a copy of your claim form for your records.
5. If you desire an acknowledgement of receipt of your claim form, please send it Certified Mail, Return Receipt Requested.
6. If you move, please send us your new address.

You only need to return pages 13, 14, 15, 17, and others relevant to the securities you are claiming.

[THIS PAGE INTENTIONALLY LEFT BLANK]

*In re IMAX Corporation Securities Litigation*
c/o Strategic Claims Services
600 North Jackson Street — Suite 3
Media, PA 19063

FIRST CLASS MAIL
U.S. POSTAGE
PAID
PERMIT NO. 138
PHILADELPHIA, PA

PLEASE FORWARD

# FIRST CLASS MAIL

PLEASE FORWARD—IMPORTANT LEGAL NOTICE

# EXHIBIT W-2

This is Exhibit "W-2" mentioned and referred to in the Affidavit of Michael G. Robb, sworn before me at the City of London, in the Province of Ontario, this 9th day of May, 2012.

A Commissioner, etc.

DANIEL GEORGE STRICKLAND, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires: August 8, 2014

*Authorized by the Ontario Superior Court of Justice*
—NOTICE OF CERTIFICATION OF THE IMAX CORPORATION CLASS ACTION—
Read this notice carefully as it may affect your legal rights.

## THE CLASS ACTION

This notice is directed to all persons, other than certain persons associated with the defendants, who acquired securities of Imax Corporation ("Imax") in the period from and including the opening of trading on the Toronto Stock Exchange ("TSX") and the NASDAQ on February 17, 2006 to and including the close of trading on the Toronto Stock Exchange and NASDAQ on August 9, 2006 (the "Class Period") and who held some or all of those securities at the close of trading on August 9, 2006 (the "Class Members"):

## THE CERTIFICATION ORDER

On December 14, 2009, Justice van Rensburg of the Ontario Superior Court of Justice certified the action *Silver et al. v. Imax Corporation et al.*, court file no. CV-06-3257-00 (the "Ontario Action") as a class proceeding, and appointed Marvin Neil Silver and Cliff Cohen as the representative plaintiffs.

Certification means that the Ontario Action may proceed to trial as a class action involving, among other things, claims for damages for misrepresentation and conspiracy relating to Imax's fiscal 2005 financial results.

Certification is a preliminary procedural matter and does not involve any finding by the court that the claims, or the allegations of fact on which they are based, have any validity. The defendants deny that the claims have merit.

## LEGAL FEES

The plaintiffs and Class Counsel signed a fee agreement providing for the payment of fees, disbursements and applicable taxes, only in the event of success in the class action, to be paid out of any recovery in the class action of up to thirty-three and one third percent (33.3%) of the Recovery, plus applicable taxes, plus a proportionate share of any interest accruing on the Recovery, less the fee portion of any costs already paid in the Action to the Lawyers by the Defendants.

Class Counsel will make a motion to the court to have the fee agreement approved.

As a Class Member, you will not be required to pay any costs in the event that the class action is unsuccessful.

## THE CLASS PROCEEDINGS FUND

The plaintiffs may seek financial support from the Class Proceedings Fund. If they are awarded financial support and if the class action is successful, the Class will also pay to the Class Proceedings Fund a 10% levy of any award or settlement funds plus the amount of any financial support it paid.

## DO NOTHING IF YOU WANT TO PARTICIPATE IN THE CLASS ACTION

Class Members who want to participate in the class action are automatically included and need not do anything at this time.

**YOU MUST OPT OUT IF YOU DO NOT WANT TO PARTICIPATE IN THE CLASS ACTION**

Class Members who do not want to participate in the class action must opt out. **If you want to opt out of the class action, you must send a written, signed election, including your name, address, telephone number to:**

Sarkis Isaac
Howie & Partners LLP, Chartered Accountants
3063 Walker Road, Windsor ON N8W 3R4
Attention: IMAX Class Action
Fax: 519.250.1929
Email: sisaac@howieandpartners.com

**No Class Member will be permitted to opt out of the class action unless the election to opt out is received by Howie & Partners LLP on or before July 30, 2012 at 5:00 p.m. E.T..**

Each Class Member who does not opt out of the class action will be bound by the terms of any judgment or settlement whether favourable or not and will not be allowed to prosecute an independent action. If the class action is successful, he or she may be entitled to share in the amount of any award or settlement recovered. In order to determine if you are entitled to share in the award or settlement and the amount, if any, of your share, it may be necessary to conduct an individual determination. There may be costs payable by you if it is determined that you are not entitled to share in the award or settlement. You will have the opportunity to decide if you wish to proceed with your individual determination before it begins.

No person may opt out a minor or a mentally incapable member of the Class without permission of the court after notice to The Children's Lawyer and/or the Public Guardian and Trustee, as appropriate.

A Class Member who opts out will not be entitled to participate in the class action.

## THE U.S. ACTION

A class action has been preliminarily certified by the United States District Court for the Southern District of New York on behalf of those persons and entities who purchased or otherwise acquired Imax common stock over the NASDAQ stock exchange from February 27, 2003 to July 20, 2007. That action is styled *In re IMAX Corporation SecuritiesLitigation*, court file no: 06-cv-06128-NRB (the "U.S. Action").

**IF YOU ELECT TO REMAIN A CLASS MEMBER IN THIS ACTION, YOU WILL NOT THEREBY BE PRECLUDED FROM BEING A CLASS MEMBER IN THE U.S. ACTION.**

The procedural and substantive laws applicable to the claims asserted in the U.S. Action may differ materially from those that are applicable to the claims asserted in the Ontario Action.

If you are a Class Member who purchased Imax shares over the NASDAQ and you would like further information regarding the U.S. Action, you should contact one of the lawyers identified below under "ADDITIONAL INFORMATION" or the attorneys who are acting for the plaintiff in the U.S. Action. Those attorneys are:

Abbey Spanier Rodd & Abrams, LLP
212 East 39th Street
New York, New York 10016
Phone: 800.889.3701
Fax: 212.684.5191
Attn: Karin E. Fisch or Richard Margolies
www.abbeyspanier.com

ADDITIONAL INFORMATION

This Notice was approved by the Ontario Superior Court of Justice. The court offices will be unable to answer any questions about the matters in this Notice. The certification order and other information are available on the Imax class action web site at www.imax-classaction.com.

Questions for class counsel should be directed by email or telephone to:

Michael G. Robb
Siskinds LLP
680 Waterloo Street
London, ON N6A 3V4
Tel: 1.800.461.6166 (toll free)
Fax: 1.519.672.6065
email: michael.robb@siskinds.com

Jay Strosberg
Sutts, Strosberg LLP
600-251 Goyeau Street
Windsor, ON N9A 6V4
Tel: 1.800.216.9888 (toll free)
Fax: 1.866.316.5308 (toll free)
email: imax-classaction@strosbergco.com

**NOTICE TO BROKERAGE FIRMS:**

**Please deliver this notice by email to your clients who purchased Imax securities during the Class Period and for whom you have valid email addresses. If you have clients who purchased Imax securities during the Class Period for whom you do not have valid email addresses, please contact Class Counsel to obtain hard copies of this Notice for the purpose of mailing the Notice to those clients. The Parties will reimburse your reasonable costs incurred in delivering this notice in accordance with this request.**

**TO U.S. BROKERAGE FIRMS: If you choose not to bring this notice to the attention of your clients who purchased shares within the Class Period, please be advised that the parties to this Action will apply to the appropriate United States District Court under Section 1782 of Title 28 of the United States Code for an order allowing them to discover the identity and email and/or mailing address of your clients who purchased shares within the Class Period**

001548

SILVER & COHEN
Plaintiffs

and

IMAX CORPORATION et al.
Defendants

Court File No: CV-06-3257-00

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at Brampton

Proceeding under the *Class Proceedings Act*, 1992

**AFFIDAVIT OF MICHAEL G. ROBB**
**(Sworn May 9, 2012)**

**Siskinds LLP**
Barristers & Solicitors
680 Waterloo Street
London, ON N6A 3V8

A. Dimitri Lascaris (LSUC #: 50074A)
Tel: (519) 660-7753
Fax: (519) 660-7754

Sutts Strosberg LLP
600-251 Goyeau Street
Windsor, ON N9A 6V4

Harvey T. Strosberg (LSUC#: 12640O)
Jay Strosberg (LSUC #: 47288F)
Tel: (519) 561-6285
Fax: (866) 316-5308
Lawyers for the Plaintiffs

# TAB 2

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Court File No. CV-06-3257-00

BETWEEN:
MARVIN NEIL SILVER and CLIFF COHEN

**Plaintiffs**

- and-

IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER, FRANCIS T. JOYCE, NEIL S. BRAUN, KENNETH G. COPLAND, GARTH M. GIRVAN, DAVID W. LEEBRON and KATHRYN A. GAMBLE

**Defendants**

Proceeding commenced under the *Class Proceeding Act,* 1992

**AFFIDAVIT OF FRANK C. TORCHIO**
(sworn May 9, 2012)

---

I, Frank C. Torchio, of the City of Rochester, in the State of New York, SWEAR:

## I. INTRODUCTION AND SUMMARY OF OPINIONS

1. I have been retained by Counsel for Plaintiffs in this Action ("Counsel") to compute aggregate damages and the number of damaged shares of IMAX Corporation ("IMAX") common stock purchased on the NASDAQ and TSX Stock Exchanges during each of two different time periods.

2. The Class Period in the above-captioned matter runs from February 17, 2006 through August 9, 2006 (the "Canadian Class Period").[1] In a parallel action in the U.S., the Class Period runs from February 27, 2003 through July 20, 2007 (the "U.S. Class Period").[2]

3. Although the U.S. Complaint alleges that IMAX's share price was inflated through July 20, 2007, the end of the U.S. Class Period, according to the U.S. Notice, purchasers of IMAX common stock on NASDAQ between August 10, 2006 and July 20, 2007 are receiving no compensation in the proposed U.S. Settlement, even though any claims they may have are proposed to be released (unless they opt out of the U.S. Settlement). Therefore, for purposes of

---

[1] *See* Fresh Statement of Claim amended on December 12, 2011 (the "Claim"), p. 3. In a decision by the Ontario Superior Court of Justice, the Court certified a global class (the "Canadian Class") in this Action (the "Canadian Proceeding") consisting of: "All persons, other than the Excluded Persons, who acquired securities of IMAX [Corporation] during the Class Period on the TSX and on the NASDAQ, on or after February 17, 2006 and held some or all of those securities at the close of trading on August 9, 2006." *See* Reasons for Decision on Motion in Silver v. IMAX, 2012 ONSC 1047, March 28, 2012, ¶1, footnote excluded.

[2] In the parallel action against Defendants in the United States District Court, Southern District of New York (the "U.S. Proceeding"), the proposed class includes all persons and entities who purchased or otherwise acquired IMAX common stock from February 27, 2003 through July 20, 2007, inclusive (the "U.S. Class"). *See* Consolidated Amended Class Action Complaint, United States District Court, Southern District of New York, dated October 2, 2007 (the "U.S. Complaint"), ¶21. The U.S. Class is limited to only acquirers of IMAX common stock on NASDAQ during the U.S. Class Period. *See* Notice of Pendency and Proposed Settlement of U.S. Class Action available at www.imaxussettlement.com (the "U.S. Notice"), p. 1. On January 26, 2012, the parties in the U.S. Proceeding agreed to a settlement of US$12 million (the "U.S. Settlement"). *See* www.abbeyspanier.com.

this Affidavit, I am assuming that the U.S. plaintiffs have taken the position that IMAX common stock was not inflated between August 10, 2006 and July 20, 2007, and IMAX purchasers during this time period did not suffer damages. Accordingly, I have not performed any damages analyses between August 10, 2006 and July 20, 2007. The Damage Periods I analyze are: (i) February 17, 2006 to August 9, 2006 for the Canadian Class (the "Canadian Damage Period"); and (ii) February 27, 2003 to August 9, 2006 for the U.S. Class (the "U.S. Damage Period").

4. I computed aggregate damages and the number of damaged shares based on a multi-trader trading model. As instructed by Counsel, I computed aggregate damages based on two assumed artificial inflation scenarios in IMAX common stock during the Damage Periods: (i) 100% of the IMAX common stock price decline on August 10, 2006; and (b) 51% of the IMAX common stock price decline on August 10, 2006.[3] I have been asked by Counsel if, in my opinion, artificial inflation could be constant from the beginning of the U.S. Damage Period. Due to the nature of the alleged fraud, which is an overstatement of revenue and earnings, in my opinion, it would be appropriate to make an adjustment to artificial inflation to account for growth in the amount of the overstated revenue and earnings. For this, I used a proportionate overstatement method based on the cumulative overstatement of IMAX Theater System Earnings.[4]

---

[3] I have not been asked to analyze loss causation or materiality or to conduct an event study in this Action. For the scenario using 51% of the August 10, 2006 price decline as artificial inflation, it is my understanding that the 51% of the share price decline is based on language from the U.S. Proceeding that states: "...the proper measure of recoverable damages included the majority of IMAX's stock price drop that occurred when the Company disclosed information that corrected alleged prior false and misleading statements." I understand that Counsel has asked the parties to the U.S. Proceeding to clarify what is meant by the "majority," but that no clarification has been provided. *See* U.S. Notice, p. 4.

[4] I define the term "Theater System Earnings" as the Net earnings (loss) from Theater

5. Using a multi-trader model and 100% of the IMAX stock price decline on August 10, 2006 as the basis for the assumed artificial inflation, aggregate damages equal US$101.4 million for the U.S. Damage Period and US$93.7 million for the Canadian Damage Period. Using 51% of the IMAX stock price decline on August 10, 2006 as the basis for the assumed artificial inflation, aggregate damages equal US$55.2 million for the U.S. Damage Period and US$47.8 million for the Canadian Damage Period. The aggregate damages for the U.S. Damage Period reflect the 90-day price limitation proscribed under Section 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA Limitation").

6. It is my understanding that under Section 138.5(1) of the Ontario Securities Act ("OSA"), damages for shares purchased during a class period and held after the end of a class period are potentially limited by the price of that security following the end of a class period (the "OSA Limitation").[5] If I apply the OSA Limitation for the Canadian Damage Period, use a multi-trader model and 100% of the IMAX stock price decline on August 10, 2006 as the basis for assumed artificial inflation, aggregate damages equal US$90.4 million for the Canadian Damage Period. Changing the basis for the assumed artificial inflation to 51% of the IMAX

---

Systems identified in the IMAX 10-K filed on July 20 2007. In this SEC filing, IMAX provided a table separating the Company's restatement items in Note 4 - Restatement of Previously Issued Financial Statements. Net earnings (loss) from Theater Systems is from the table in Note 4 and the column labeled as "Revenue Recognition – Theater Systems." *See* IMAX 10-K filed on July 20 2007, pp. 95-96.

[5] It is my understanding the limitation for shares sold during the 10 trading days following the end of a class period is the price received on the sale of that security. For shares sold or held after the 10 trading days the limitation applies when a share is sold at a price below the 10-day average trading price.

common stock price decline on August 10, 2006 and applying the OSA price limitation, aggregate damages equal US$47.8 million for the Canadian Damage Period.

7. If I apply the PSLRA Limitation for the shares purchased on NASDAQ during the Canadian Damage Period, the damages during the Canadian Damage Period using 100% of the price decline on August 10, 2006 equal US$91.1 million. Damages using 51% of the price decline on August 10, 2006 remain US$47.8 million for the Canadian Damage Period.

8. At this time, I have not been asked to offer any opinions related to materiality or loss causation in this Action, and I therefore have not undertaken analyses of these issues, including an event study. I have not analyzed the amount by which the share price of IMAX was inflated by the alleged misrepresentations, nor have I sought to determine what disclosure(s) was (were) corrective of the alleged misrepresentations and omissions.

## II. QUALIFICATIONS AND COMPENSATION

9. I am the President of Forensic Economics, Inc., located in Rochester, New York. I founded Forensic Economics, Inc. in 1989. I have consulted on issues pertaining to financial valuations, regulatory economics, transfer pricing, financial-economic analysis, and analysis of the response of stock prices to public information in securities fraud lawsuits for over 20 years. Forensic Economics, Inc. historically has been retained by both plaintiffs and defendants in such cases. I have also testified in Canadian securities litigation matters.

10. I am on the adjunct faculty at the William E. Simon Graduate School of Business Administration at the University of Rochester. I have taught courses that cover topics including damages in securities litigation and valuation of businesses and securities.

11. I have testified at trials, arbitrations, and depositions. I have co-authored an article with Professor Michael Barclay about trading models used for estimating damages in securities lawsuits. The article is published in Duke University School of Law's Law and Contemporary Problems (Vol. 64, Spring-Summer 2001). I have authored another article about the proper event study analysis in securities litigation. The article is published in The Journal of Corporation Law (Volume 35:1, 2009).

12. I hold an MBA in Finance and Economics (1982) from the University of Rochester's William E. Simon Graduate School of Business Administration. I was the 1991 Rosenthal Fellow at the University of Rochester for innovative developments in applying financial economic theory. I have also been awarded the Chartered Financial Analyst (CFA®) designation and am a member of the CFA Institute. My resume is attached as Exhibit "**A.**"

13. My compensation is based on the number of hours worked on this assignment, as well as out-of pocket expenses. My hourly rate is US$500. To assist me, I used employees of Forensic Economics, Inc. who worked under my supervision and at my direction for this assignment. Forensic Economics, Inc.'s hourly rates for those employees range from US$155 to US$290.

## III. MATERIALS REVIEWED

14. In the course of my assignment in this Action, I have reviewed data and documents including: the Claim; the U.S. Complaint; the U.S. Notice; IMAX common stock market prices and volume on the NASDAQ (Bloomberg ticker: IMAX US) and the TSX (Bloomberg ticker: IMX CN); quarterly institutional holdings of IMAX common stock; IMAX's SEC filings, and

insider purchases and sales of IMAX common stock. Specific documents and information relied upon are cited in the text of this Affidavit.

## IV. AGGREGATE DAMAGES

### A. Assumed Artificial Inflation

15. Aggregate damages in securities litigation matters are generally based on an out-of-pocket measure of damages. It is generally accepted that out-of-pocket damages are defined as the price paid for the security minus the "true value" of the security on the date of purchase, *i.e.*, the value absent the effect of misrepresentations or omissions. The difference between the purchase price and true value is called "artificial inflation."

16. Thus, for shares purchased during the class period and subsequently sold during the class period ("in-and-out shares") after a corrective disclosure, damages per share can be computed as the artificial inflation at purchase minus the artificial inflation, if any, at sale. For shares purchased during the class period and held through the end of the class period ("retained shares"), damages per share equal artificial inflation at the time of purchase.[6] This is because for shares sold after the class period, no artificial inflation usually remains in the security's price because the alleged fraud has generally been fully disclosed.

17. In both the Canadian and U.S. Proceedings, it is alleged that IMAX overstated its revenues and earnings for a significant period of time. Specifically, Plaintiffs in both the Canadian and U.S. Proceedings allege that IMAX misrepresented its Theater System Earnings.[7]

---

[6] As discussed later in this Affidavit, damages may be limited by either the OSA Limitation or the PSLRA Limitation.

[7] *See e.g.* Claim, ¶187 and U.S. Complaint, ¶¶39-40.

18. It is my understanding that the U.S. Notice uses a constant $3.90 per share as its measure for losses to IMAX shareholders who bought shares of IMAX on the NASDAQ during the U.S. Damage Period based on IMAX's stock price decline on August 10, 2006.[8] I find this flat measure of losses to be inconsistent with the allegations in the U.S. Proceeding that IMAX generally increased its overstatement of revenue for Theater Systems, and therefore increased its Theater Systems Earnings throughout the U.S. Damage Period.[9] I am aware of cases where the use of increasing artificial inflation during a class period based on an accounting overstatement has been accepted by the courts.[10]

19. For this analysis, I have been asked to assume that artificial inflation is based on the constant dollar method[11] and IMAX's common stock price decline on August 10, 2006.[12] *See* Exhibit "**B**" for the IMAX stock price decline used for damages. To determine the amount of artificial inflation in IMAX's common stock price prior to August 10, 2006, I used a proportionate overstatement method based on the cumulative overstatement of IMAX Theater System Earnings. Because it is alleged that IMAX misrepresented its Theater System Earnings during both the U.S. and Canadian Class Periods, for artificial inflation prior to August 10, 2006,

---

[8] *See* Appendix I, U.S. Notice, p. 12.

[9] *See* U.S. Complaint, ¶146.

[10] For example, *see In re California Micro Securities Litigation*, 965 F. Supp. 1327 (1997) United States District Court, N.D. California, and *In re Cendant Corporation Securities Litigation*, 109 F. Supp. 2d 235 (D.N.J. 2000).

[11] The constant dollar methodology results in artificial inflation that is based on a fixed dollar per share that is generally determined from stock-price declines on days containing corrective disclosures. Here, due to the growing nature of the alleged fraud, I apportion the fixed dollar amount based on the IMAX US stock price decline on August 10, 2006 to arrive at a fixed dollar amount between earnings announcements.

[12] At the instruction of Counsel, I computed aggregate damages using artificial inflation based on 100% and 51% of the US$3.90 IMAX common share price decline on August 10, 2006.

I use the cumulative overstatement of IMAX Theater System Earnings as reported in the restated financial statements for IMAX for the years ending December 31, 2002 through December 31, 2005 and the quarter ending March 31, 2006. I calculated the cumulative overstatement of Theater System Earnings (as of the IMAX earnings announcement dates during the Damages Periods) as a percentage of the cumulative overstatement of Theater System Earnings as of May 9, 2006.[13] *See* Exhibit "**C**" for the cumulative overstatement in IMAX Theater System Earnings and the apportionment of artificial inflation from February 27, 2003 to August 9, 2006.

20. As can be seen in the chart below, there is a significant difference between the artificial inflation of a constant $3.90 per share used by the Plaintiffs in the U.S. Proceeding and the artificial inflation I used that ranged between $0.98 per share and $3.90 per share during the Damage Periods that, in my opinion, represents the growing nature of the fraud.




---

[13] The cumulative overstatement of Theater System Earnings is for the period from the IMAX earnings announcement on February 27, 2003 (the first day of the U.S. Damage Period) to the IMAX earnings announcement on May 9, 2006 (the earnings announcement date prior to August 9, 2006, the last date of the Damage Period in both the Canadian and U.S. Proceedings).

**B. Trading Models**

21. Because damages experts generally do not have access to all the trading records of investors during a class period, the number of damaged shares is estimated from total trading volume by use of a mathematical model called a "trading model." Trading models are mathematical models that estimate the portion of total trading volume during the relevant period that is retained ("retained shares") and the portion of trading volume that represents the turnover of those retained shares ("in-and-out shares").[14]

22. Trading volume cannot be directly used to compute damaged shares because trading volume will also include the turnover of shares purchased in a class period. For example, a purchase of 10 shares of stock in a class period may create 25 shares of trading volume during the class period because those shares turn over (*i.e.*, are purchased and then sold to another investor) during a class period.[15] But, in this example, only 10 shares would be damaged because that is the total number of shares that were purchased and held by some investor until after the operative price decline (assuming one disclosure). So, regardless of how many times each of the 10 shares turned over before that price decline, only 10 shares are retained and therefore potentially damaged as defined above.

---

[14] For details of the computation, *see* D. Furbush and J. Smith, "Estimating the Number of Damaged Shares in Securities Fraud Litigation: An Introduction to Stock Trading Models," *The Business Lawyer* 49, February 1994, 527-543; J. Koslow, "Estimating Aggregate Damages in Class-Action Litigation Under Rule 10b-5 for Purposes of Settlement," *Fordham Law Review* 59, 1991, 811-842; H. de Silva, N. Lo, and T. Nells, Litigation Services Handbook, 2nd Edition, ed. R. Weil, M. Wagner, and P. Frank, Chapter 44, p. 23; and C. McCann, D. Hsu, and J. Yoon, "Demystifying Stock Trading Models in Securities Class Action Lawsuits," KPMG Peat Marwick LLP, August 1997.

[15] *See* L. Harris, Trading & Exchanges, 2003, Oxford University Press, pp. 487-489.

23. The most commonly used trading model has been the proportional trading model, which contains a proportionality assumption about trading turnover or trading propensities.[16] The proportional trading model assumes that the probability of turnover for damaged shares is the same as other shares in the float, where float is generally defined as the portion of total shares outstanding that were available to trade.

24. The proportional trading model can be explained by a simple example of a three-day period for Company A, which has a total float of 1,000 shares. Assume the trading volume equals 100 shares on Day 1, 300 on Day 2, and 200 shares on Day 3. Thus, investors who held before the three-day period sold 100 shares on Day 1. On Day 2, trading volume is 300 shares, which implies that the average probability of any share in the float trading on day 2 is 30 percent (300 divided by the 1,000 share float). Thus, 30 out of the 100 shares sold on Day 1 are traded or turned over on Day 2, leaving 70 shares that did not turn over. Based on trading volume of 200 shares on Day 3, the probability of any share trading is 20 percent. Thus, 14 of the 70 shares (20%) from Day 1 that did not trade on Day 2 are sold on Day 3 and 60 of the 300 shares (20%) from Day 2 turned over on Day 3. Thus, based on the proportional trading model, 104 shares out of the total volume of 600 shares in the three-day period result from the turnover of shares during the period (44 sold on Day 1 and sold again on Days 2 and 3 and 60 shares sold on Day 2 are sold again on Day 3). 496 (600 minus 104) of the volume, therefore, represents the portion of the 1,000 share float that were purchased during the period and still held after the three-day

[16] *See* D. Furbush and J. Smith, "Estimating the Number of Damaged Shares in Securities Fraud Litigation: An Introduction to Stock Trading Models," *The Business Lawyer* 49, February 1994) 527-543; and B. Murray and E. Belfi, "The Proportionate Trading Model: Real Science or Junk Science?" *Cleveland State Law Review* 52, 2004-05, 391-412. This model is sometimes called the proportional decay model or the single trader model.

period. Additionally, 504 of the 1,000 share float held at the beginning of the three-day period are still held at the end of the three-day period.

25. Since the 1990s, the proportionality assumption has received criticism. The critics of the proportional trading model have characterized the proportionality assumption as an assumption that all investors have exactly the same propensity to trade or, alternatively, the same turnover rate. To respond to the criticism that the proportional model is not appropriate if there are investors with differing turnover rates, I have used a multi-trader model to compute damaged share volume and turnover volume for IMAX.[17]

26. Multi-trader models are similar to the proportional trading model, except that multi-trader models are not restricted by the proportionality assumption discussed earlier. Rather, multi-trader models allow the specification of differing turnover rates for different types of investors, and using multiple traders with different propensities to trade alleviates the criticisms against proportional trading models with a singular type of trader with a singular propensity to trade.

[17] Several researchers have advanced and advocated use of a multi-trader model as superior to the proportional trading model and more representative of actual trading behavior, including researchers associated with defendant-oriented firms such as NERA and Cornerstone Research. *See* W. H. Beaver and J. K. Malernee, "Estimating Damages in Securities Fraud Cases," Cornerstone Research working paper, 1990; W. H. Beaver, J. K. Malernee and M. C. Keeley, "Potential Damages Facing Auditors in Securities Fraud Cases," reprinted from: *Accountants' Liability: The Need for Fairness*, National Legal Center for the Public Interest, 1994; M. Kramer Mayer, "Best-Fit Estimation of Damaged Volume in Shareholder Class Actions: The Multi-Sector, Multi-Trader Model of Investor Behavior," National Economic Research Associates working paper, October 2000; W.M. Bassin, "A Two Trader Population Share Retention Model for Estimating Damages in Shareholder Class Action Litigations," *Stanford Journal of Law, Business & Finance* 6(1), 2000, 49-83; and J.D. Finnerty and G. Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," *Stanford Journal of Law, Business & Finance* 8, Spring 2003, 213-263.

*Volume*

27. The first step in developing inputs for a trading model is to determine investor volume. Reported volume may overstate the investor volume by the class because it includes trades by specialists on the NYSE[18] or TSX, or market makers on NASDAQ, or other middlemen who buy from one investor and sell to another. Therefore, an adjustment to reported volume is used to remove these trades. Published research suggests suitable corrections can be accomplished by reducing NYSE reported volume or reducing NASDAQ volume.[19]

28. During the U.S. and Canadian Class Periods, IMAX common stock was listed for trading on the Nasdaq National Market System (NASDAQ) and the Toronto Stock Exchange (TSX).[20] Attached as Exhibit "**D**" is IMAX's reported volume and closing prices on NASDAQ and TSX from February 27, 2003 through November 7, 2006.[21] I reduced reported volume by 27% for shares traded on NASDAQ.[22] For shares traded on the TSX, I reduced the reported volume based on the NYSE monthly specialist participation rate.[23] Next, to calculate investor

---

[18] NYSE has switched to a designated market maker system since the end of either the U.S. Class Period or the Canadian Class Period. *See* "NYSE Completes Rollout of Phase I of the Next-Generation Market Model to all its Securities," NYSE Euronext press release date November 13, 2008; "The Next Generation Model," NYSE Euronext, 2008; and "Designated Market Makers," 2009, NYSE Euronext. Source: www.nyse.com.

[19] For example, *see* F. Avalos and M. Kramer Mayer, "Dealer Participation on the New York Stock Exchange and Nasdaq," NERA working paper, May 2002; and J.F. Gould and A.W. Kleidon, "Market Maker Activity on NASDAQ: Implications for Trading Volume," *Stanford Journal of Law, Business & Finance* 1, 11-27.

[20] As noted by the Court in the Canadian Proceeding: "Approximately 85% of the securities acquired by class members in the Ontario action were purchased on the U.S. electronic stock exchange, the NASDAQ…" *See* Reasons for Decision on Motion in Silver v. IMAX, 2012 ONSC 1047, March 28, 2012, ¶2.

[21] November 7, 2006 is the last day in the 90-day period of the PSLRA Limitation.

[22] Information obtained from NASDAQ via e-mail.

[23] I use the published NYSE monthly specialist participation rate as a proxy for the TSX

purchase volume, I subtracted IMAX insider stock purchases from volume.[24] To calculate investor sales volume, I subtracted IMAX insider stock sales from volume.[25] Attached as Exhibit "**E**" is a table of reported and adjusted volume used in the multi-trader model from February 27, 2003 to November 7, 2006.

29. After adjusting the total volume to remove specialist trades and insider purchases, approximately 464.8 million shares were purchased by investors during the U.S. Damage Period and, of this amount, 53.2 million shares were purchased by investors during the Canadian Damage Period. Adjusting the total volume to remove specialist trades and insider sales yields approximately 464.7 million shares sold by investors during the U.S. Damage Period and, of this amount, 53.2 million shares were sold by investors during the Canadian Damage Period.

*Float*

30. The next step in developing the inputs required for a trading model is to estimate float. Float, which is defined as the number of shares that were available for trading and potentially damaged during the respective Damage Periods, was estimated by deducting from total shares outstanding shares held by insiders (Directors and Officers)[26] and shares held by institutional investors determined to have been held from the start of the U.S. Damage Period through each quarter of the U.S. Damage Period, which also encompasses the Canadian Damage

---

specialist participation rate, which I was unable to obtain. Source: NYSE Euronext: http://www.nyxdata.com/Data-Products/Facts-and-Figures, Market Activity, link to Specialist Activity.

[24] Source: FactSet Information Systems, Inc. During the U.S. Damage Period, insiders purchased 264,900 shares. There were no purchases by insiders during the Canadian Damage Period.

[25] Source: FactSet Information Systems, Inc. During the U.S. Damage Period, insiders sold 341,168 shares. There were no sales by insiders during the Canadian Damage Period.

[26] The Directors and Officers holdings were obtained from SEC filings.

Period.[27,28] Attached as Exhibit "F" is a table of the levels of float used in the trading model for the U.S. and Canadian Damage Periods.

*Trading Groups*

31. I used a multi-trader model to estimate the timing of purchases and sales. A multi-trader model divides the defined float into groups – shares held by traders with higher turnover rates ("active traders") and shares held by traders with lower turnover rates ("passive traders"). Daily trading volume is then apportioned across the trader groups. The fraction of daily volume that is attributed to each trader group is determined by the fraction of the float that is owned by traders in each group and their relative propensity to trade. The relative propensity to trade measures how often a share of one investor group will turn over compared to another investor group.

32. Given the assumptions about the fraction of total float held by each trader group, and the fraction of total volume attributed to each group, the multi-trader model calculates the number of the retained shares and the in-and-out shares over the U.S. and Canadian Damage Periods.

33. To determine the fraction of the float held by each trader group, and the relative trading turnover, I used annual turnover rates for investors in the float that encompass relative

[27] These are shares that I determined were held by an institution before the U.S. Damage Period began and still held by that institution through each quarter of the U.S. Damage Period. On a quarterly basis, if an institution sells shares during a class period, I deduct those shares from its holdings, which necessarily increases the float of shares available to trade.

[28] The float also increased on the dates when IMAX issued shares, privately or publicly. Source: SEC filings.

turnovers rates of up to 201.[29] This range encompasses reasonable estimates of relative turnover rates.[30]

34. Rather than subjectively assigning amounts of total float to relative turnover rates evenly, I have relied on generally accepted statistical properties of large samples of data. Specifically, it is reasonable and objective to assume that the statistical distribution for the turnover rates for IMAX investors can be described by a bell-shaped normal distribution.[31] This is a common assumption used in mathematics based on the statistical properties of large samples, which applies to the case here in which large amounts of IMAX shares were traded daily by hundreds, if not thousands of investors.[32,33] I created 51 trader groups.

---

[29] The result is generally insensitive to the mean and standard deviation of the distribution. *See* M. Barclay and F. Torchio, "A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," in *Law & Contemporary Problems* 64, Spring-Summer 2001, 105-136.

[30] *See* B. Barber and T. Odean, "Trading Is Hazardous to Your Wealth: The Common Stock Investment Performance of Individual Investors," *The Journal of Finance* 55(2), April 2000, 773-806, , Figure 1.

[31] For example, *see* Mutual fund turnover data as of December 31, 1999 published in January 2000. Source: Morningstar Principia Pro for Mutual Funds.

[32] The average daily trading volume for IMAX common stock during the U.S. Damage Period was over 650,000 shares on the NASDAQ and over 60,000 shares on the TSX. *See* Exhibit "**D.**"

[33] "There is a very intimate connection between the size of a sample, *n*, and the extent to which a sampling distribution approaches the normal form. Many sampling distributions based on large *n* can be approximated by the normal distribution even though the population distribution itself is definitely not normal. This is the extremely important principle that we will call the central limit theorem. The normal distribution is the *limiting form* for large *n* for a very large variety of sampling distributions. This is one of the most remarkable and useful principles to come out of theoretical statistics." *See* R. Winkler and W. Hays, Statistics Probability, Inference and Decision, 2nd Edition, Holt Rinehart and Winston, 1975, p. 245. According to the central limit theorem and the law of large numbers, if a finite sample is a random sample from any probability with a finite mean and finite variance, the sample's average approximately follows a normal distribution. *See* W. Greene, Econometric Analysis, 2nd Edition, Prentice Hall, 1993, p. 104.

35. Because of the potential presence of day traders for IMAX during the U.S. and Canadian Damage Periods, I have assumed that 15% of reported volume is attributable to intraday turnover of IMAX shares.[34] This parameter effectively eliminates from the distribution of investor turnover those investors who have extremely high turnover, which is generally associated with day traders.

**C. Difference in Assumption of Damages between the U.S. and Canada**

36. Although I am not an attorney, I understand, based on my experience as a damages expert in U.S. securities litigation, that, under the Rule 10b-5 liability regime, the plaintiff bears the burden of proving that a diminution in the price of a security that occurs upon the making of a corrective disclosure was caused by the correction, and not by other factors. In situations where the corrective information was accompanied by the release of material information that was not corrective, a plaintiff in a 10b-5 action would therefore bear the burden of disentangling the effects of the corrective and non-corrective information on the price of the security. Although this kind of an analysis can often be done in a reliable and scientific manner, it can also present significant challenges.

37. Counsel have advised me that, under Part XXIII.1 of the Ontario Securities Act, the price movement that occurs upon the release of a corrective statement is presumed to have been caused entirely by the corrective statement, and that the defendants bear the burden of proving that the price movement resulted wholly or partly from the release of information that was non-corrective. On the assumption that this is correct, then any difficulties involved in the

[34] *See* D. Tabak, "Intraday Trading Rates in Shareholder Class Actions," *Securities & Finance Insights*, *NERA Economic Consulting*, June 2002.

disentangling of the effects of corrective and non-corrective information would be borne by the defendants rather than the plaintiffs in an action litigated under Part XXIII.1.

38. I have been informed by Counsel that the defendants in both the U.S. and Canadian Proceedings take the position that at least some of the stock price drop that occurred following the release by IMAX of allegedly corrective information after the market close on August 9, 2006 was due to certain disclosures IMAX then made regarding the efforts of IMAX's Board to locate an acquirer of the company, and that those disclosures were not corrective of the alleged misrepresentations. Based on my understanding of the Rule 10b-5 and Part XXIII.1 liability regimes, this argument would pose considerably greater difficulty for a plaintiff under Rule 10b-5 than it would for a plaintiff under Part XXIII.1.

**D. Results**

39. Using the multi-trader model and 100% of the IMAX stock price decline on August 10, 2006 as a basis for assumed artificial inflation, aggregate damages equal US$101.4 million during the U.S. Damage Period for NASDAQ purchasers and US$93.7 million during the Canadian Damage Period (US$82.8 million for NASDAQ purchasers and US$10.9 million for TSX purchasers).[35] Using 51% of the IMAX stock price decline on August 10, 2006 as the basis for assumed artificial inflation, aggregate damages equal US$55.2 million during the U.S. Damage Period for NASDAQ purchasers and US$47.8 million during the Canadian Damage Period (US$42.2 million for NASDAQ purchasers and US$5.6 million for TSX purchasers). *See* Exhibit **"G-1."**

---

[35] All damage calculations for the U.S. Class in this Affidavit reflect the PSLRA Limitation for shares purchased on NASDAQ during the U.S. Damage Period. The 90-day average price from August 10, 2006 through November 7, 2006 is US$4.96, with the rolling average price during the 90-day period ranging from US$4.96 to US$5.89.

40. It is my understanding that under Section 138.5(1) of the OSA, damages for shares purchased during a class period and held after the end of a class period are potentially limited by the price of that security for the 10 days following the end of a class period.[36] If this OSA Limitation is applied to IMAX shares purchased on NASDAQ and TSX during the Canadian Damage Period, damages using a multi-trader model and 100% of the IMAX stock price decline on August 10, 2006 as the basis for assumed artificial inflation equal US$90.4 million during the Canadian Damage Period (US$79.8 million for NASDAQ purchasers and US$10.6 million for TSX purchasers).[37] Under the OSA Limitation and 51% of the IMAX stock price decline on August 10, 2006 as the basis for assumed artificial inflation, aggregate damages equal US$47.8 million during the Canadian Damage Period (US$42.2 million for NASDAQ purchasers and US$5.6 million for TSX purchasers).[38] *See* Exhibit "**G-2.**"

41. Applying the PSLRA Limitation to shares purchased on NASDAQ during the Canadian Damage Period and using 100% of the price decline on August 10, 2006 as the basis for assumed artificial inflation, damages in the Canadian Damage Period equal US$91.1 million (US$80.5 million for NASDAQ purchasers and US$10.6 million for TSX purchasers). Using

---

[36] For shares sold during the 10 trading days following the end of a class period, the limitation is the price received on the sale of that security. For shares sold or held after the 10 trading days the limitation applies when a share is sold at a price below the 10-day average trading price. The 10-day average trading price from August 10, 2006 through August 23, 2006 is US$5.58 per share.

[37] There is no impact for the U.S. Damage Period because I have already applied the 90-day lookback price limitation for the U.S. Damage Period.

[38] I note that the price limitations have a minimal effect on damages using 51% of the price drop on August 10, 2006. The reason for this is that the price limitation affects the damages only when the stock price on a given day minus the artificial inflation is less than the price limitation, therefore lowering damages. Using only 51% of the stock price decline on August 10, 2006 as the basis for artificial inflation reduces the level of artificial inflation, which can lower the effect of any damages limitations.

51% of the price decline on August 10, 2006 as the basis for assumed artificial inflation and applying the PSLRA Limitation to shares purchased on NASDAQ during the Canadian Damage Period, aggregate damages are US$47.8 million (US$42.2 million for NASDAQ purchasers and US$5.6 million for TSX purchasers). *See* Exhibit "**G-3.**"

42. Under Ontario law, it is my understanding that plaintiffs are entitled to claim prejudgment interest at a simple rate of 4.5% per annum, calculated from the date the cause of action arose.[39] I have been informed by Counsel that the date the cause of action arose was August 10, 2006. Based on the approximately 5.75 years that have elapsed to date since August 10, 2006 and the US$91.1 million estimate of aggregate damages, I estimate prejudgment interest in this matter to be approximately US$23.6 million. *See* Exhibit "**H**" for the calculation of prejudgment interest.

43. Attached as Exhibit "I" is a chart depicting IMAX's common stock price from February 27, 2003 to August 9, 2006, as well as showing the summary of damages for the U.S. Damage Period and the Canadian Damage Period.

44. I note that trading models cannot directly take into account possible inflationary gains that can occur when an investor has an inflationary loss on one round-trip transaction[40] and also has an inflationary gain on a separate round-trip transaction during the class period. An investor can also have an inflationary gain if he/she sold shares during a class period that were held prior to the start of a class period. Generally speaking, there will be more offsetting gains in a longer class period, such as the U.S. Class Period. Moreover, there will be more offsetting

[39] *See* Courts of Justice Act, RSO 1990, c C.43 ss. 127(2)(b) and 128(1), available at: http://www.canlii.org/en/on/laws/stat/rso-1990-c-c43/latest/.

[40] A round-trip transaction occurs when a purchase is sold (*i.e.*, in a trading model, a purchase is matched with a subsequent sale).

gains when artificial inflation increases over a class period, such as I have found to be appropriate for the U.S. Damage Period. For this Affidavit, however, I have not adjusted damages for inflationary gains.

**E. Additional Analysis**

45. Counsel has asked that I perform an analysis of the estimated recovery from the proposed U.S. Settlement for shareholders who purchased IMAX shares on NASDAQ during the U.S. Damage Period. To perform this analysis, I assumed that the artificial inflation was a flat US$3.90 per share throughout the U.S. Damage Period, the amount used in the U.S. Notice.[41] Using the multi-trader model, a constant US$3.90 per share as the basis for assumed artificial inflation, and the PSLRA Limitation, aggregate damages equal US$108.4 million during the U.S. Damage Period.

46. Of this US$108.4 million in damages, approximately 26%, or US$27.9 million, is attributable to investors who purchased IMAX shares on NASDAQ between the start of the U.S. Damage Period, February 27, 2003, and the last day before the start of the Canadian Damage Period, February 16, 2006. The remaining 74%, or US$80.5 million, is attributable to investors who purchased IMAX shares on NASDAQ during the Canadian Damage Period. *See* Exhibit "J," Panel 1.

47. If I apply these ratios to the proposed U.S. Settlement of US$12 million and assuming constant claim rates, then approximately US$3.1 million of the proposed U.S. Settlement will be claimed by investors who purchased IMAX shares on NASDAQ between the start of the U.S. Damage Period, February 27, 2003, and the last day before the start of the

[41] *See* U.S. Notice, Appendix I, p. 12.

Canadian Damage Period, February 16, 2006.[42] *See* Exhibit "J," Panel 1. The remaining US$8.9 million of the proposed U.S. Settlement will be claimed by investors who purchased IMAX shares on NASDAQ during the Canadian Damage Period.[43] The US$8.9 million recovery amount indicates that claims of investors who purchased IMAX shares on NASDAQ during the Canadian Damage Period are proposed to be settled in the U.S. Proceeding for approximately 11% of their potential damages.[44] *See* Exhibit "J," Panel 2.

48. If I apply the 11% settlement rate in the U.S. Proceeding to the estimated damages for purchasers of IMAX shares on the TSX during the Canadian Damage Period, I arrive at a recovery of US$1.2 million for purchasers of IMAX on the TSX during the Canadian Damage Period.[45] Adding this US$1.2 million to the US$8.9 million estimated recovery attributable to purchasers of IMAX shares on NASDAQ during the Canadian Damage Period equals a total estimated recovery of US$10.1 million for purchasers of IMAX shares on the TSX and NASDAQ during the Canadian Damage Period. *See* Exhibit "J," Panel 2. This US$10.1 million estimated recovery represents 11% of the US$91.1 million in estimated damages for purchasers of IMAX on the TSX and NASDAQ during the Canadian Damage Period that I calculated in Exhibit "**G-3.**"[46]

---

[42] US$3.1 million = US$12 million x 26%.
[43] US$8.9 million = US$12 million x 74%.
[44] 11% = US$8.9 million/US$80.5 million.
[45] US$1.2 million = 11% x US$10.6 million. *See* Exhibit "**G-3.**"
[46] 11% = US$10.1 million/US$ 91.1 million.

49. If I add the US$23.6 million of prejudgment interest to the US$91.1 million estimate of aggregate damages, the total estimated recovery of US$10.1 million represents 8.8% of the total estimated damages of US$114.7 million.[47] *See* Exhibit "J," Panel 2.

**F. Liability Limit**

50. I have also been asked by Counsel to put forth an estimate of the potential liability limit for IMAX. It is my understanding that, under Section 138.1 of the OSA, the liability limit is 5% of the average market capitalization of the responsible issuer for the 10 trading days prior to the alleged misrepresentation first having been made. In the Canadian Proceeding, the misrepresentation is alleged to have been first made on February 17, 2006, so the ten prior trading days are February 3, 2006 through February 16, 2006. IMAX's average market capitalization during these ten trading days was C$367.6 million, and 5% of this equals the liability limit of C$18.4 million. *See* Exhibit "K."

51. It is my understanding that discovery has not yet been completed in this Action and, accordingly, my opinions are subject to amendment or revision based upon the development of additional evidence.

[47] US$114.7 million = US$91.1 million + US$23.6 million; 8.8% = US$10.1 million / US$114.7 million.

I certify that, to the best of my knowledge and belief:

-- the statements of fact contained in this Affidavit are true and correct;

-- the reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions;

-- I have reviewed Rule 4.1 of the Ontario *Rules of Civil Procedure*, and I have prepared this Affidavit having regard to the duty described therein;

-- I have no present or prospective interest in the parties to this case, and I have no personal interest or bias with respect to the parties involved; and

-- my compensation is not contingent on an action or event resulting from the analyses, opinions or conclusions in, or the use of, this Affidavit.

5/9/2012
Date

Frank C. Torchio

Sworn to me this 9th day of
May, 2012

Notary Public

DEREK B. LAVARNWAY
Notary Public, State of New York
Qualified in Wyoming County
No. 01LA6207948
Commission Expires June 22, 2013

DEREK B. LAVARNWAY
Commission Expires June 22, 2013

**List of Exhibits**


| Exhibit | Title |
|---|---|
| A | Resume of Frank C. Torchio |
| B | Price Decline Used for IMAX Common Stock Damages (US$) |
| C | Artificial Inflation Apportionment from February 27, 2003 to August 9, 2006 |
| D | IMAX Reported Daily Volume and Closing Price from February 27, 2003 to November 7, 2006 |
| E | IMAX Reported and Adjusted Volume for Multi-Trader Model from February 27, 2003 to November 7, 2006 |
| F | IMAX Float for Multi-Trader Model from February 27, 2003 to November 7, 2006 |
| G-I | Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for U.S. Damage Period |
| G-2 | Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for U.S. Damage Period and OSA Limitation for Canadian Damage Period |
| G-3 | Estimated Damages for IMAX Common Stock during the U.S. Damage Period of February 27, 2003 to August 9, 2006 and the Canadian Damage Period of February 17, 2006 to August 9, 2006, PSLRA Limitation for NASDAQ Purchasers and OSA Limitation for TSX Purchasers |
| H | Calculation of IMAX Prejudgment Interest (US$ in millions) |
| I | IMAX Common Stock Price from February 27, 2003 to August 9, 2006 and Summary of IMAX Damages ($US) |
| J | Estimated Damages for IMAX Common Stock Purchased on the NASDAQ from February 27, 2003 to August 9, 2006 and Estimated Recovery Ratio in the U.S. Proceeding Applicable to the Canadian Damage Period |
| K | Liability Limit for IMAX ($C) |