UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

                                           Master File
In re IMAX Securities Litigation      No. 06 Civ. 6128 (NRB)

                                      **MEMORANDUM AND ORDER**

----------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

### I. Introduction

On March 28, 2012, we preliminarily certified a class for the purpose of settlement and preliminarily approved an amended settlement of this long-running securities class action against defendants IMAX Corporation ("IMAX"), Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble (the "individual defendants"), and PricewaterhouseCoopers LLP ("PwC") (collectively "defendants").  <u>See</u> Amended Order, <u>In re IMAX Corp. Sec. Litig.</u>, Master File No. 06 Civ. 6128 (S.D.N.Y. Mar. 28, 2012) (hereinafter the "Preliminary Order").  Following the provision of notice to the members of the preliminarily certified class, on June 14, 2012, we held a hearing on the motion of lead plaintiff The Merger Fund ("TMF" or "lead plaintiff") for final approval of the amended settlement and the proposed plan of allocation, final certification of the class for the purpose of settlement, and the award of attorneys' fees and reimbursement of expenses.  For the reasons stated below as

well as those reasons that we articulated at the hearing, which are incorporated here by reference, we (1) find that the notice provided to members of the class was adequate; (2) certify the class for the purpose of settlement; (3) approve the settlement; (4) approve the plan of allocation; and (5) reserve decision on the requested attorneys' fees and expenses pending further briefing on these issues from lead plaintiff's counsel Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier" or "lead plaintiff's counsel").

## II. Background[1]

### A. The Class Action

Almost six years have passed since the eight cases that were consolidated to form this class action were originally filed with this Court.  See Kaplan v. Gelfond, 240 F.R.D. 88, 90 (S.D.N.Y. 2007).  It has similarly been almost six years since the parallel class action that remains pending in Canada (the "Canadian Action") was originally filed with the Ontario

---

[1] The facts recited here are drawn from the following sources: (1) the Stipulation and Agreement Between Settlement Class Members and IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble, and PricewaterhouseCoopers LLP, dated January 26, 2012 ("Settlement"); (2) the Amended Stipulation and Agreement Between Settlement Class Members and IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, Kathryn A. Gamble, and PricewaterhouseCoopers LLP, dated March 20, 2012 ("Am. Settlement"); (3) the Preliminary Order; (4) the Declaration of Arthur N. Abbey in Support of Lead Plaintiff's Motion for Final Approval of the Settlement with Defendants, etc. ("Abbey Decl."); and (5) the Affidavit of Paul Mulholland Concerning Mailing of Notice ("Mulholland Aff.").

Superior Court.  <u>See</u> Abbey Decl. ¶ 11.[2]  During the intervening years, we have appointed three different entities as lead plaintiff, denied one motion to dismiss and two motions for class certification, and at the time that the parties entered into a memorandum of understanding ("MOU") to settle this litigation on November 2, 2011 we were preparing to decide a third motion for class certification.  <u>See</u> <u>id.</u> at ¶¶ 10-57, 68. In the course of addressing these various issues, we have previously set out the facts underlying the allegations of securities fraud in this case in multiple decisions and will not rearticulate them in detail here.  <u>See, e.g.</u>, <u>In re IMAX Sec. Litig.</u>, 272 F.R.D. 138, 142-45 (S.D.N.Y. 2010); <u>In re IMAX Sec. Litig.</u>, 587 F. Supp. 2d 471, 474-78 (S.D.N.Y. 2008).  It is enough for our present purpose to repeat the following passages:

> IMAX is an entertainment technology company specializing in digital and film-based motion picture technologies and large-format film presentations.  The Company's main business is the design, manufacture, sale and lease of theater systems.  As of December 31, 2006, the IMAX theater network included 284 theaters operating in 40 countries.
>
> The majority of IMAX's revenue [between February 27, 2003 and July 20, 2007] was derived from the sale and lease of theater systems to third-party owners of large-format theaters.  Throughout [this time period], IMAX reported upward-trending financial results: 16 theater system installations ("installs") and $71 million revenue for fiscal year 2002; 21 installs and

---

[2] The eight cases--06 Civ. 6128, 06 Civ. 6235, 06 Civ. 6313, 06 Civ. 6349, 06 Civ. 6449, 06 Civ. 6693, 06 Civ. 7057, and 06 Civ. 7162--were filed between August 11, 2006 and September 18, 2006.  The Canadian Action commenced thereafter on September 20, 2006.  Abbey Decl. ¶ 11.

$75.8 million revenue for 2003; 22 installs and $86.6 million revenue for 2004; and 39 installs and $99.7 million revenue for 2005.

On February 17, 2006, IMAX issued a press release announcing its 2005 financials and reporting that the Company had completed 14 [installs] during the fourth quarter of 2005.  On March 9, 2006, IMAX filed its Form 10-K for fiscal year 2005 ("2005 10-K"), describing a "record" 14 [installs] and $35.1 million revenue in the fourth quarter.

Five months later, on August 9, 2006, IMAX announced that it was responding to an informal inquiry from the Securities and Exchange Commission ("SEC") concerning the timing of revenue recognition and, specifically, its application of multiple element arrangement . . . accounting derived from theater system sales and leases.

. . .

In addition to disclosing the SEC investigation, the August 9th announcement stated that [IMAX]'s discussions with potential buyers and strategic partners had faltered.  The following day, the price of IMAX shares fell from $9.63 to $5.73.

On March 29, 2007, IMAX announced that, based on comments it had received from the SEC and the Ontario Securities Commission, it was expanding its [internal] review [of its accounting practices], "primarily in connection with its revenue recognition for certain theater system installations in previous periods, including the fourth quarter of 2005."  Because of this "expanded review," IMAX stated that it "may determine that it is necessary to restate additional items beyond the previously identified errors."

Four months later, on July 20, 2007, IMAX filed its Form 10-K for fiscal year 2006 . . . , which included a restatement of its financial results for fiscal years 2002 through the first three quarters of 2006.[3]

. . .

As a result of the restatement of theater system revenue, 16 installation transactions representing $25.4 million in revenue shifted between quarters in

---

[3] Following this restatement, the price of IMAX shares actually closed up $0.45.  See Abbey Decl. ¶ 132.

> their originally reported years, and 14 installation
> transactions representing $27.1 million in revenue
> shifted between fiscal years. Of the 14 transactions
> for which revenue shifted between fiscal years, one
> was originally recorded as revenue in fiscal year
> 2002, two were recorded in fiscal year 2004, ten in
> fiscal year 2005, and one in fiscal year 2006.

In re IMAX, 272 F.R.D. at 142-43 (internal footnotes omitted).

Bringing claims of securities fraud under §§ 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, the Consolidated Class Action Complaint, which was filed on October 2, 2007, essentially alleges that (i) IMAX, (ii) the individual defendants, who were among IMAX's directors and officers, and (iii) PwC, which served as IMAX's accountant, were responsible for the issuance of materially false and misleading statements concerning IMAX's recognition of revenue from theater system installations during the period from February 27, 2003 through July 20, 2007. See id. at 143-44.

### B. Discovery and Settlement Proceedings

In September 2008, following the denial of defendants' motions to dismiss, the parties agreed to engage in discovery on the merits as well as discovery related to the forthcoming class certification proceedings. Abbey Decl. ¶ 20. In January 2009, IMAX and the individual defendants produced approximately 150,000 pages of documents. Id. at ¶ 32. In February 2009, Abbey Spanier, having reviewed this production, served

interrogatories on IMAX and the individual defendants to which these defendants responded in March 2009. Id. at ¶ 33. Also in February 2009, PwC produced another approximately 12,000 pages of documents. Id. at ¶ 34. It appears that defendants made further productions over the ensuing months because both Abbey Spanier and Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), which served as lead plaintiff's counsel between June 2009 and December 2010, make reference in their submissions to the review of hundreds of thousands of pages of documents. See id. at ¶ 78 ("[l]ead [c]ounsel have reviewed and analyzed hundreds of thousands of pages of documents produced by [d]efendants"); id. at Ex. E ("Rudman Decl.") ¶ 15 (prior to the appointment of Robbins Geller as lead plaintiff's counsel in June 2009 "[d]efendants had previously produced approximately 500,000 pages of documents to plaintiffs"). In addition to the discovery that they obtained from defendants, it appears that both Abbey Spanier and Robbins Geller subpoenaed documents from third parties during the course of the litigation, some of which had previously expressed an interest in acquiring IMAX prior to August 2006. See Abbey Decl. ¶¶ 30, 45.

We understand that neither Abbey Spanier nor Robbins Geller conducted any merits depositions during this litigation. See June 14, 2012 Hr'g Tr. 5:24-6:12. However, Abbey Spanier has reviewed transcripts from interviews conducted by the SEC of the

individual defendants as well as eleven other persons and has also gained access to transcripts from depositions conducted by plaintiffs' counsel in the Canadian Action of eleven persons, including a member of PwC.  <u>See</u> Abbey Decl. ¶¶ 11, 78; Amended Settlement ¶ EE.   In addition, further confirmatory discovery was conducted in January 2012 after the parties entered into a MOU to settle on November 2, 2011.  <u>See</u> Abbey Decl. ¶¶ 70, 78.

At a number of earlier points during the litigation, the parties explored settlement.  Specifically, on December 2, 2008, Abbey Spanier participated in a mediation session with counsel for defendants presided over by the Honorable E. Leo Milonas (Ret.), formerly of the New York Supreme Court, Appellate Division.  <u>Id.</u> at ¶ 28.  As part of this mediation, the parties exchanged confidential mediation statements.  <u>Id.</u>  On July 16, 2010, Robbins Geller participated in a further mediation with counsel for defendants presided over by the Honorable Daniel Weinstein (Ret.), formerly of the California Superior Court. <u>Id.</u> at ¶ 44.  In preparation for this mediation, Robbins Geller also prepared a mediation statement.  Rudman Decl. ¶ 26.  While these earlier efforts at mediation proved unsuccessful, once Abbey Spanier was reappointed lead plaintiff's counsel in April 2011, it restarted settlement discussions with counsel for defendants that involved numerous meetings which successfully culminated in the parties entering the MOU to settle on

November 2, 2011.  See Abbey Decl. ¶ 67.  Following further negotiations and the production of confirmatory discovery, the parties entered into a settlement on January 26, 2012, which we preliminarily approved on February 1, 2012.  See id. at ¶¶ 71-73.  In response to proposed revisions from plaintiffs' counsel in the Canadian Action, the parties agreed to amend the notice proposed in connection with their settlement of the 26th and approved in this Court's Order of the 1st, changing the notice to provide inter alia fuller contact information for plaintiffs' counsel in the Canadian Action.  See id. at ¶ 73.  On March 20, 2012, the parties ultimately entered into an amended settlement, which reflected this alteration, among other changes, as well as a structural modification of the settlement terms, which is discussed immediately below.  See id. at ¶¶ 73-74.

### C. The Amended Settlement

Pursuant to the amended settlement, lead plaintiff and defendants have agreed to resolve this litigation through a cash settlement of $12,000,000.  Id. at ¶ 1.[4]  This cash settlement lies within the range of possible damages forecast by the parties, which extended as high as $91,000,000 pursuant to lead plaintiff's estimation and as low as $5,000,000 according to defendants' calculation, assuming arguendo defendants'

---

[4] The $12,000,000 has already been deposited in an escrow account where it is earning interest.  See Abbey Decl. ¶ 71 n. 3.

liability.   See id. at ¶ 127.   The proposed class on whose behalf lead plaintiff seeks to enter the amended settlement (the "settlement class" or "American Class") includes all investors that acquired the common shares of IMAX on the NASDAQ Stock Market (the "NASDAQ") from February 27, 2003 through July 20, 2007 (the "settlement class period" or "American Class Period"). Id. at ¶ 1 n. 1.   The settlement class and settlement class period differ from their analogues in the Canadian Action, which is being actively litigated on behalf of all investors that acquired IMAX's common stock on the NASDAQ or Toronto Stock Exchange on or after February 17, 2006 and held some or all of those securities on August 9, 2006 (the "Canadian Class" and the "Canadian Class Period").   See id. at ¶ 59.   In order to address the overlap between the American Class and the Canadian Class, which was previously certified in the Canadian Action on December 14, 2009, the amended settlement is conditioned on the entry of an order in the Canadian Action that excludes from the Canadian Class those investors who do not opt out of the American Class (the "Canadian Order").   See id. at ¶¶ 59, 75. We understand that counsel for IMAX and the individual defendants in the Canadian Action have filed a motion seeking to redefine the Canadian Class in this manner and that oral argument on that motion is now set to begin on July 30, 2012 in the Ontario Superior Court.   See IMAX and Individual Defs.'

Letter of June 12, 2012 1.  While the settlement contemplated entry of the Canadian Order prior to our final approval of the settlement, the amended settlement reflects a structural modification of the settlement terms insofar as it reverses this sequence of events and seeks our final approval of the settlement prior to entry of the Canadian Order.  <u>Compare</u> Settlement ¶ 5 <u>with</u> Amended Settlement ¶ 5.  The amended settlement, however, remains contingent on entry of the Canadian Order.  <u>See</u> Amended Settlement ¶ 8.  In light of this contingency, there is an unaccustomed uncertainty as to the finality of our "final" approval of the amended settlement between the parties; however, we proceed to address that settlement on the assumption that the negotiated resolution of this litigation will not be further disturbed should we approve it, as we do.

### D. The Preliminary Order and the Provision of Notice

On March 28, 2012, we preliminarily certified the settlement class for the purpose of settlement, approved the amended settlement, and approved the form and content of the notice to be provided to the members of the settlement class (the "notice").  Preliminary Order 2-3.  We further set out the procedures by which the notice was to be disseminated to the settlement class and the deadlines by which any members of the settlement class who wished to object to or be excluded from the

amended settlement must act ahead of the hearing that we set for June 14, 2012 to finally approve the amended settlement. Id. at 3-12.

In accordance with our direction, lead plaintiff's counsel retained Strategic Claims Services ("SCS") to supervise and administer the dissemination of the notice pursuant to the approved notice procedure. See Preliminary Order ¶ 5. SCS arranged for the notice to be provided via mail to 426 individuals and organizations identified on a list of shareholders provided by IMAX. See Mulholland Aff. ¶¶ 4, 8, Ex. A. In addition, SCS mailed the notice to a further 1,813 banks, brokerage companies, and institutional investors, which may have traded the common shares of IMAX in their clients' or their own accounts during the settlement class period. See id. These initial mailings were completed by April 23, 2012. Id. at ¶ 4. Following receipt of the notice, the banks, brokerage companies, and institutional investors mentioned above as well other individuals requested that an additional 85,695 copies of the notice be disseminated to possible additional members of the settlement class. Id. at ¶ 8. Thus, in total, 87,934 copies of the notice have been mailed to possible members of the settlement class. See id. ¶¶ 4, 8-9. Where a mailing was returned as undeliverable, SCS has followed up where possible to obtain updated addresses. Id. at ¶ 9. In addition to the

mailing of the notice, SCS launched a settlement website that contained the notice, among other relevant documents, and further published an approved form of summary notice through the national editions of newspapers in both the United States and Canada as well as via electronic newswires.  See id. at ¶¶ 5-6.

The hearing to address the amended settlement was held on June 14, 2012, as scheduled.  No members of the settlement class appeared.  As of that date, we were informed that only seven investors had sought to be excluded from the settlement class and only one investor, Mr. Skip Ames, had filed an objection to the amended settlement (the "objection"), which we discuss below.  See June 14, 2012 Hr'g Tr. 4:22-5:8.

### III. Discussion

### A. Adequacy of the Notice

Federal Rule of Civil Procedure 23(c)(2)(B) provides the notice that is required to be given to members of a class when it is certified pursuant to Federal Rule of Civil Procedure 23(b)(3), which is the case here.[5]  Federal Rule of Civil

---

[5] Rule 23(c)(2)(B) provides:

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice must clearly and concisely state in plain, easily understood language:
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;

Procedure 23(e)(1) in turn provides the notice that is required to be given to members of a certified class in which a settlement has been proposed for court approval, which is also the case here.[6] "Where, as here, the parties seek simultaneously to certify a settlement class and to settle a class action, the elements of Rule 23(c) notice . . . are combined with the elements of Rule 23(e) notice" and because "Rule 23(e)'s notice requirements are less specific than that of Rule 23(c)'s . . . [we] will focus on Rule 23(c)'s requirements." In re Global Crossing Sec. and ERISA Litig., 225 F.R.D. 436, 448 (S.D.N.Y. 2004) (Lynch, J.). See also Fed. R. Civ. P. 23 advisory committee's note (emphasizing "[n]otice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed simultaneously" before stating "[r]easonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B) for certification notice to a Rule 23(b)(3) class"). Where there is compliance with Rule 23(c)(2)(B), the requirements of due process are satisfied. See

---

        (v) that the court will exclude from the class any member who requests exclusion;
        (vi) the time and manner for requesting exclusion; and
        (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

FED. R. CIV. P. 23(c)(2)(B).
[6] Rule 23(e)(1) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." FED. R. CIV. P. 23(e)(1).

Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 172-174 (1974)
(discussing incorporation of due process requirements into Rule
23(c)(2)(B)'s predecessor provision).   In addition, in the
context of a securities class action settlement, the Private
Securities Litigation Reform Act of 1995 (the "PSLRA") imposes
additional notice that must be provided to members of the class.
See 15 U.S.C. § 78u-4(a)(7).[7]

We have reviewed the notice in the form in which it was
disseminated to members of the settlement class, see Mulholland
Aff. Ex. A, and also considered the procedure that we earlier
approved.   We find that the notice provided here was the best
practicable under the circumstances, that it included all of the
content necessary as a matter of law, and that it was
accordingly adequate under Rule 23, due process, and the PSLRA.

---

[7] Pursuant to the PSLRA, the notice must contain the following information as
well as a cover page summarizing it:

   (A) Statement of recovery--the amount of the settlement
   determined in the aggregate and on an average per share basis;
   (B) Statement of potential outcome of case--amount of damages per
   share recoverable if plaintiffs were to prevail on every claim.
   If the parties are unable to agree on damages, a statement
   concerning the issues on which the parties disagree;
   (C) Statement of attorneys' fees--statement of fees and costs to
   be applied for in the aggregate and on a per share basis;
   (D) Identification of lawyers' representatives--the name,
   telephone number, and address of counsel available to answer
   questions; and
   (E) Reasons for settlement--a brief statement explaining the
   reasons why the parties are proposing the settlement.

In re Indep. Energy Holdings plc Sec. Litig., 302 F. Supp. 2d 180, 184
(S.D.N.Y. 2003).

## B. Final Certification of the Settlement Class

"Certification of a settlement class 'has been recognized throughout the country as the best, most practical way to effectuate settlements involving large numbers of claims by relatively small claimants.'"   In re Giant Interactive Group, Inc. Sec. Litig., 279 F.R.D. 151, 158 (S.D.N.Y. 2011) (quoting In re Prudential Sec. Inc. Ltd. P'ships Litig., 163 F.R.D. 200, 205 (S.D.N.Y. 1995)).  See also Weinberger v. Kendrick, 698 F.2d 61, 72 (2d Cir. 1982) ("[t]emporary settlement classes have proved to be quite useful in resolving major class action disputes") (internal quotation marks omitted).  "Classes certified for settlement purposes, like all other classes, must meet the requirements of Rule 23(a) and at least one of three requirements set forth in Rule 23(b)."  In re Marsh & McLennan Cos., Inc. Sec. Litig., No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *8 (S.D.N.Y. Dec. 23, 2009).  Here, we find that the settlement class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) and accordingly certify it for the purpose of settlement.

### 1. Federal Rule of Civil Procedure 23(a)

Pursuant to Rule 23(a), certification of a class is proper where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative

parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a).

### a. Numerosity

In a previous decision, we found that the settlement class as now constituted plainly met the numerosity requirement of Rule 23(a)(1). See In re IMAX, 272 F.R.D. at 146.

### b. Commonality and Typicality

"'The commonality requirement [of Rule 23(a)(2)] is met if plaintiffs' grievances share a common question of law or of fact.'" Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC, 504 F.3d 229, 245 (2d Cir. 2007) (quoting Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (per curiam)). In turn, "[t]ypicality [pursuant to Rule 23(a)(3)] 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Id. (quoting Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001)). As the Supreme Court has observed, the commonality requirement "tend[s] to merge" with the typicality requirement because "[b]oth serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that

16

the interests of the class members will be fairly and adequately protected in their absence." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158 n.13 (1982).

Here the commonality and typicality requirements are satisfied. The settlement class, and in particular TMF as lead plaintiff, share many common questions of law and fact bearing on for example the central issues of whether defendants' public statements regarding income recognition contained material misstatements or omissions and whether defendants acted with scienter in the issuance of those statements. In a previous decision, we addressed and rejected a number of arguments against TMF's appointment as lead plaintiff on the basis of its failure to satisfy the typicality as well as adequacy requirements of Rule 23(a)(3) and (4), and we find no novel reason on the record before us to believe that TMF's claims are atypical in any manner or that it is subject to unique defenses. See In re Imax Sec. Litig., Master File No. 06 Civ. 6128, 2011 WL 1487090, at *3-7 (S.D.N.Y. April 14, 2011) (rejecting arguments that TMF's (i) successive reassignment of its claims and (ii) investment strategies did not give rise to unique defenses or undermine satisfaction of the typicality and adequacy requirements).

### c. Adequacy

"The adequacy requirement of Rule 23(a)(4) involves an inquiry as to whether: (1) the plaintiff's interests are antagonistic to the interests of the other members of the [c]lass; and (2) plaintiff's counsel are qualified, experienced, and capable of conducting the litigation." In re Giant, 279 F.R.D. at 159 (citing Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)). Here, there is no reason to believe that lead plaintiff's interests are in conflict with those of the other members of the settlement class whose claims share common questions of law and fact, and we find that lead plaintiff's counsel is qualified to litigate this case on behalf of the settlement class. We note that the achievement of the lead plaintiff and lead plaintiff's counsel in securing a well-received settlement that we approve below provides confirmation that they have met the adequacy requirement. See id. (finding satisfaction of adequacy requirement "confirmed by the lack of any opposition to this settlement (and the very small number of opt-outs), as well as the above-average recovery in this case, measured as a percentage of maximum potential recovery").

### 2. Federal Rule of Civil Procedure 23(b)(3)

In addition to meeting the four requirements of Rule 23(a), a class must also satisfy one out of the three sub-paragraphs to

Rule 23(b).   Here, lead plaintiff seeks certification of the
settlement class pursuant to Rule 23(b)(3), which requires that
a court find "that the questions of law or fact common to class
members predominate over any questions affecting only individual
members, and that a class action is superior to other available
methods for fairly and efficiently adjudicating the
controversy."  FED. R. CIV. P. 23(b)(3).[8]

### a. Predominance of Common Questions

"Class-wide issues predominate if resolution of some of the
legal or factual questions that qualify each class member's case
as a genuine controversy can be achieved through generalized
proof, and if these particular issues are more substantial than
the issues subject only to individualized proof."  Moore v.
PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).  As the
Supreme Court has observed, the requirement of predominance is
"readily met in certain cases alleging consumer or securities
fraud or violations of the antitrust laws."  Amchem Prods., Inc.
v. Windsor, 521 U.S. 591, 625 (1997).  Here, lead plaintiff
alleges that defendants' allegedly fraudulent public statements

---

[8] In undertaking these two inquiries, the following matters are among those
that Rule 23(b)(3) identifies as "pertinent":

   (A) the class members' interests in individually controlling the
   prosecution or defense of separate actions;
   (B) the extent and nature of any litigation concerning the
   controversy already begun by or against class members;
   (C) the desirability or undesirability of concentrating the
   litigation of the claims in the particular forum; and
   (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).

caused damages to the settlement class, and these allegations are sufficient to establish predominance.  See In re Global Crossing, 225 F.R.D. at 454.

### b. Superiority to Other Methods of Adjudication

The class action here is superior to the other available methods for adjudicating the controversy between the settlement class and defendants.  "The interest of the class as a whole in litigating the many common questions substantially outweighs any interest by individual members in bringing and prosecuting separate actions," which has been evidenced from the fact that only one member of the settlement class has objected to the amended settlement and only seven members of the settlement class have sought to exclude themselves from the amended settlement.  Cromer Fin. Ltd. v. Berger, 205 F.R.D. 113, 133 (S.D.N.Y. 2001) (continuing to note that "[t]o force each investor to litigate separately would risk disparate results among those seeking redress, . . . would exponentially increase the costs of litigation for all, and would be a particularly inefficient use of judicial resources").

Given the existence of the Canadian Action, it has been periodically suggested in the course of this litigation that the parallel class action proceedings to the north offer a better forum for the resolution of this general controversy.  See In re IMAX, 272 F.R.D. at 158.  Indeed, the one objection to the

amended settlement alleges the comparative attractiveness of the
Canadian Action.  See Objection 2-3.  We again "decline to deny
certification on th[is] ground[] because, amongst other
reasons," PwC is not a defendant in the Canadian Action, the
American Class Period is significantly longer than the Canadian
Class Period, and the American Class includes only purchasers on
the NASDAQ whereas the Canadian Class includes purchasers on
both the NASDAQ and Toronto Stock Exchange.  In re IMAX, 272
F.R.D. at 158-59.  As we previously stated:

> At bottom, a class action in a foreign jurisdiction,
> applying that jurisdiction's securities laws, to which
> a named defendant in the United States action is not a
> party, in which the first complaint in the foreign
> jurisdiction was filed after the first complaint in
> this case, is not a "superior" way of adjudicating
> plaintiffs' claims against that party for alleged
> violations of U.S. securities laws--claims which we
> already have upheld against defendants' motions to
> dismiss.

Id. at 159.  Moreover, there is now a further factor in play
that we find resolves any lingering doubt as to whether this
class action is superior: the American Class has secured a
certain recovery of millions of dollars against defendants
through the advocacy of lead plaintiff's counsel here whereas
the Canadian Class continues to litigate in the hope of securing
a settlement or judgment.[9]  It is no less true in the context of

---

[9]  The most recent development of which we are aware in the settlement
negotiations in the Canadian Action is that on May 3, 2012 defendants'
counsel in the Canadian Action made an offer to plaintiffs' counsel in the

securities class action litigation that a bird in hand is worth two in the bush.  Finally, to the extent that members of the American Class who are also members of the Canadian Class--it is estimated that 83.9% of the shares of IMAX involved in the Canadian Action were purchased on the NASDAQ, see Preliminary Order Ex. A-1 4--share the opinion conveyed in the one objection that the Canadian Action promises a superior alternative for them to recover their investment losses they would "presumably have excluded themselves from the settlement class."  In re Global Crossing, 225 F.R.D. at 454.  As noted earlier, there were only seven exclusion requests despite the extensive notice.

*          *          *

In light of the foregoing analysis, we find that the settlement class satisfies the requirements of Federal Rule of Civil Procedure 23(a) and (b)(3) and accordingly certify it for the purpose of settlement.

### C. Final Approval of the Amended Settlement

At the outset, we emphasize that that there is a "strong judicial policy in favor of settlements, particularly in the class action context."  In re Paine Webber Ltd. P'ships Litig., 147 F.3d 132, 138 (2d Cir. 1998).  Pursuant to Federal Rule of Civil Procedure 23(e) any settlement of this class action

---

Canadian Action to settle on terms roughly analogous to those on which the parties have reached agreement here.  See Abbey Decl. Ex. A Tab 2 ¶ 29.

requires our approval.  See FED. R. CIV. P. 23(e).  Because the amended stipulation will bind the settlement class to its terms, we can only approve it should we find that "it is fair, reasonable, and adequate."  FED. R. CIV. P. 23(e)(2).  "In undertaking this evaluation, [we] must consider 'both the [amended] settlement's terms and the negotiating process leading to settlement,' that is, [we] must review the settlement for both procedural and substantive fairness."  In re Giant, 279 F.R.D. at 160 (quoting Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 116 (2d Cir. 2005)).

### 1. Procedural Fairness

We owe a fiduciary duty to the settlement class "to ensure that the [amended] settlement is not the product of collusion." In re PaineWebber Ltd. P'ships Litig., 171 F.R.D. 104, 125 (S.D.N.Y. 1997), aff'd, 117 F.3d 721 (2d Cir. 1997) (citing In re Warner Commc'ns Sec. Litig., 798 F.2d 35, 37 (2d Cir. 1986)). With that said, "a class action settlement enjoys a 'presumption of correctness' where it is the product of arm's-length negotiations conducted by experienced, capable counsel."  In re Telik, Inc. Sec. Litig., 576 F. Supp. 2d 570, 575 (S.D.N.Y. 2008) (quoting In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 718 F. Supp. 1099, 1103 (S.D.N.Y. 1989)).  Further, "great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying

litigation." <u>In re PaineWebber</u>, 171 F.R.D. at 125 (internal quotation marks omitted).  Here, the presumption of correctness attaches because "[a]ll parties were represented throughout the [s]ettlement negotiations by able counsel experienced in class action and securities litigation." <u>In re Telik</u>, 576 F. Supp. 2d at 576.   This finding is further buttressed in light of the substantial merits-related discovery conducted in this case as well as the prior mediation sessions that, though unfruitful, took place before retired judges.  <u>See</u> <u>In re Giant</u>, 279 F.R.D. at 160 (noting extent of merits-related discovery); <u>In re Telik</u>, 576 F. Supp. 2d at 576 (noting involvement of retired judges). In the absence of evidence to rebut the presumption, we find that the amended settlement is procedurally fair.

### 2. Substantive Fairness

In the Second Circuit, district courts determine whether a proposed settlement in a class action is substantively fair through analysis of the nine factors articulated in <u>City of Detroit v. Grinnell Corp.</u>, 495 F.2d 448 (2d Cir. 1974).   These factors are:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;
> (4) the risks of establishing liability;
> (5) the risks of establishing damages;
> (6) the risks of maintaining the class action through the trial;

```
       (7) the ability of the defendants to withstand a
       greater judgment;
       (8) the range of reasonableness of the settlement fund
       in light of the best possible recovery;
       (9) the range of reasonableness of the settlement fund
       to a possible recovery in light of all the attendant
       risks of litigation.
```

Wal-Mart Stores, 396 F.3d at 117 (quoting Grinnell, 495 F.2d at

463).  "In finding that a settlement is fair, not every factor

must weigh in favor of settlement, 'rather [a] court should

consider the totality of these factors in light of the

particular circumstances.'"  In re Global Crossing, 225 F.R.D.

at 456 (quoting Thompson v. Metro. Life Ins. Co., 216 F.R.D. 55,

61 (S.D.N.Y. 2003)).  Upon consideration of these factors, we

find that the amended settlement is substantively fair.

### a. Complexity, Expense, and Likely Duration of Litigation

"[I]n evaluating the settlement of a securities class

action, federal courts, including this [c]ourt, have long

recognized that such litigation is notably difficult and

notoriously uncertain."  In re Sumitomo Copper Litig., 189

F.R.D. 274, 281 (S.D.N.Y. 1999) (internal quotation marks

omitted).  In this case, we have from the outset acknowledged

the complexity of the underlying accounting principles involved.

See In re IMAX, 587 F. Supp. 2d at 475-77.  While this

complexity does not appear extraordinary in the context of

issues that are regularly implicated in the course of securities

class action litigation, we agree with lead plaintiff's counsel

that it would materially increase the challenge as well as expense of litigating this case through trial.  See Mem. of Law in Support of Lead Plaintiff's Mot. for Final Approval of the Settlement, etc. ("Br.") 9-10; Abbey Decl. ¶ 110.  Furthermore, we agree with lead plaintiff's counsel that following a renewed class certification motion, a motion for summary judgment from one or more of the defendants would possibly precede a trial. See Abbey Decl. ¶ 9.  In short, we find that the amended settlement permits the settlement class to avoid complicated, expensive, and likely protracted litigation, probably lengthened in its cost and duration due to the parties' likely efforts to coordinate proceedings with those in the Canadian Action.

### b. Class Members' Reaction to the Amended Settlement

"It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy." Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002).  Here, only one investor objected to the amended settlement and only seven requested to opt out of the settlement class.  In light of the fact that over 87,000 notices were mailed to investors and possible members of the settlement class, this demonstration of discontent is but a whisper amidst an otherwise thundering roar of silence.

### c. Stage of Proceedings and Amount of Discovery Completed

In considering this factor, "the question is whether the parties had adequate information about their claims," In re Global Crossing, 225 F.R.D. at 458, such that their counsel can intelligently evaluate "the merits of [p]laintiffs' claims, the strengths of the defenses asserted by [d]efendants, and the value of [p]laintiffs' causes of action for purposes of settlement." Maley, 186 F. Supp. 2d at 364. The threshold necessary to render the decisions of counsel sufficiently well informed, however, is not an overly burdensome one to achieve--indeed, formal discovery need not have necessarily been undertaken yet by the parties. See In re Sony SXRD Rear Projection Television Class Action Litig., No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *7 (S.D.N.Y. May 1, 2008) (stating "[a]lthough the parties did not engage in extensive formal discovery, such efforts are not required for the [s]ettlement to be adequate, so long as the parties conducted sufficient discovery to understand their claims and negotiate settlement terms" and citing cases). This case has been pending for almost six years. During that time period, substantial merits-related discovery of both a formal and informal variety has occurred. In addition, the parties have conducted additional confirmatory discovery pending their entrance into the amended settlement. Against this history of activity, we find that lead plaintiff's

27

counsel and defendants' counsel are both able to assess the strengths and weaknesses of their respective positions.

### d. Risks of Establishing Liability

"This factor does not require [a] [c]ourt to adjudicate the disputed issues or decide unsettled questions; rather, the [c]ourt need only assess the risks of litigation against the certainty of recovery under the proposed settlement." In re Global Crossing, 224 F.R.D. at 459. See In re Austrian & German Bank Holocaust Litig., 80 F. Supp. 2d 164, 177 (S.D.N.Y. 2000) (approving proposed settlement and emphasizing "[t]he [c]ourt is impressed by the factual difficulties and legal defenses that plaintiffs face in further litigation of their claim"). We agree with lead plaintiff's counsel that significant risks would lie ahead should the litigation of this case proceed. See Br. 17-18. In particular, for reasons that we have previously noted, albeit in denying defendants' motion to dismiss, whether lead plaintiff could establish scienter on the part of IMAX, the individual defendants, and PwC is far from certain in this case involving accounting irregularities that implicated the recognition not creation of income. See In re IMAX, 587 F. Supp. 2d at 481, 485 (noting the question of whether scienter was adequately pleaded as to IMAX and the individual defendants was a "close one" and observing "[i]f . . . discovery reveals that P[w]C's involvement in the development of IMAX's accounting

policy was not so extensive as alleged" then the "inference of scienter will weaken substantially").

### e. Risks of Establishing Damages

In the context of securities class actions, "[c]alculation of damages is a 'complicated and uncertain process, typically involving conflicting expert opinion' about the difference between the purchase price and the stock's 'true' value absent the alleged fraud." In re Global Crossing, 225 F.R.D. at 459 (quoting Maley, 186 F. Supp. 2d at 365). In this case, loss causation presents a stark challenge to lead plaintiff. On August 9, 2006, IMAX disclosed (i) that the SEC was investigating its accounting practices and also (ii) that a potential acquisition or strategic partnership had not come to fruition. The timing of these twin disclosures significantly complicates the question of what, if any, amount of the resulting drop in the share price is attributable to prior allegedly misrepresentative statements regarding theater system installations and resulting revenue.[10]

### f. Risks of Maintaining Class Action Through Trial

We have not yet certified a class in this case except for the purpose of settlement. Were this case to proceed in the

---

[10] In addition, on July 20, 2007, when IMAX actually restated its financial results from multiple prior years, its share price closed up $0.45 in response to this correction. Abbey Spanier effectively now concedes that no loss to investors is attributable to the restatement, which conclusion guides its proposed plan of allocation, as discussed below. See Abbey Decl. ¶ 132.

absence of the amended settlement, even if lead plaintiff secured certification of the entire settlement class, at the next stage the possibility would remain that following additional factual development multiple sub-classes would emerge for different groups of investors.  See In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 476 (S.D.N.Y. 1998) (noting that "if insurmountable management problems were to develop at any point, class certification can be revisited at any time" pursuant to Federal Rule of Civil Procedure 23(c)(1)) (internal quotation marks omitted).

### g. Defendants' Ability to Withstand Greater Judgment

Without question, IMAX, the individual defendants, and PwC could withstand a much greater judgment against them, and this factor weighs against the fairness of the amended settlement. "But a defendant is not required to 'empty its coffers' before a settlement can be found adequate." In re Sony, 2008 WL 1956267, at *8 (quoting McBean v. City of New York, 233 F.R.D. 377, 388 (S.D.N.Y. 2006) (Lynch, J.)).  Indeed, this factor, standing alone, is not sufficient to preclude a finding of substantive fairness where the other factors weigh heavily in favor of approving a settlement.  See D'Amato v. Deutsche Bank, 236 F.3d 78, 86 (2d Cir. 2001).

### h. Amended Settlement's Range of Reasonableness in Light of Possible Recovery

"The adequacy of the amount achieved in settlement may not be judged 'in comparison with the possible recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of plaintiffs' case." In re Giant, 279 F.R.D. at 162 (internal quotation marks omitted). Instead, we must examine whether the settlement amount lies within a "range of reasonableness," which range reflects "the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." Wal-Mart, 396 F.3d at 119 (internal quotation marks omitted). We have already discussed the material weaknesses in lead plaintiff's case as well as the additional risks attendant to further litigating this class action. In light of these weaknesses and risks, we find that the settlement amount here--$12,000,000, which constitutes over 13% of the maximum damages that lead plaintiff's counsel argues are conceivably possible to prove--is within the range of reasonableness. Nor is it without precedent that settlement amounts reflecting similar (or lower) percentages of possible recoveries have been approved in other recent securities class action cases. See, e.g., In re Giant, 279 F.R.D. at 162 (finding $13,000,000 settlement amount that reflected percentage

of recovery of 16.5% was within the range of reasonableness).
See also In re China Sunergy Sec. Litig., No. 07 Civ. 7895
(DAB), 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting
"average settlement amounts in securities fraud class actions
where investors sustained losses over the past decade . . . have
ranged from 3% to 7% of the class members' estimated losses")
(internal quotation marks omitted); In re Union Carbide, 718 F.
Supp. at 1103 (noting the Second Circuit "has held that a
settlement can be approved even though the benefits amount to a
small percentage of the recovery sought" and emphasizing "[t]he
essence of settlement is compromise").

*       *       *

In light of the foregoing analysis, we find that the
amended settlement is substantively fair under the factors of
Grinnell and accordingly give it final approval.

### D. Final Approval of the Plan of Allocation

"'To warrant approval, the plan of allocation must also
meet the standards by which the settlement was scrutinized--
namely, it must be fair and adequate.'" In re WorldCom, Inc.
Sec. Litig., 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (quoting
Maley, 186 F. Supp. 2d at 344). "'When formulated by competent
and experienced counsel,' a plan for allocation of net
settlement proceeds 'need have only a reasonable, rational
basis.'" In re Telik, 576 F. Supp. 2d at 580 (quoting In re

Global Crossing, 225 F.R.D. at 462).  Such "[a] reasonable plan may consider the relative strength and values of different categories of claims."  Id.  See In re Lloyd's Am. Trust Fund Litig., No. 96 Civ. 1262 (RWS), 2002 WL 31663577, at *18 (S.D.N.Y. Nov. 26, 2002) ("[c]lass action settlement benefits may be allocated by counsel in any reasonable or rational manner because allocation formulas reflect the comparative strengths and values of different categories of the claim") (internal ellipsis and quotation marks omitted).

The proposed plan of allocation effectively divides the settlement class period into two parts.  For common shares of IMAX purchased from February 27, 2003 through August 9, 2006, the plan of allocation assigns an inflation factor per share of $3.90, which reflects the entire drop in the share price that occurred immediately following IMAX's disclosure on August 9th of the SEC's investigation into its accounting practices.  For shares of IMAX purchased from August 10, 2006 through July 20, 2007, the plan of allocation assigns no inflation factor.  See Preliminary Order Ex. A-1 19-20.  This latter assignment of value renders worthless the claims of those members of the settlement class who purchased the common stock of IMAX after the initial disclosure.  The plan of allocation reflects the advice of lead plaintiff's counsel's damages expert, who in particular "recommended that there w[ere] no damages for IMAX

33

shareholders between the period of August 10, 2006 and July 20, 2007 (the date of the [r]estatement) because on the date of the restatement, IMAX'[s] stock closed up $0.45 from the previous day's closing." Abbey Decl. ¶ 132.

We find that the proposed plan of allocation, which was devised by experienced counsel, is fair and supported by a reasonable, rational basis. The assignment of no value to the claims of investors who purchased after August 9th not unreasonably reflects what we agree would be the considerable difficulty of establishing damages during this time period. The mere fact that the lead plaintiff selects zero as the proper correction to the share price during this period of the settlement class does not alone undermine the fairness of the plan of allocation because the selection of zero seems rational here. See Buxbaum v. Deutsche Bank AG, 216 F.R.D. 72, 74-76, 78-79 (S.D.N.Y. 2003) (rejecting post-approval challenge to plan of allocation in securities class action premised on allegedly false denials of impending merger that assigned "$8.00 per share for those shares traded from October 26, 1998 through November 18, 1998; $3.91 per share for those shares traded on November 19, 1998; and $0.00 for [those] shares traded on November 20, 1998" and noting "[t]he deflationary effect declined to $3.91 per share on November 19[th] and to zero on November 20[th], because by those dates there was new

information in the marketplace indicating that there was to be
an impending merger announcement and that information drove the
price . . . back to its predeflationary levels"). Furthermore,
no member of the settlement class has objected to this aspect of
the plan of allocation.

The one objection to the amended settlement instead
criticizes the plan of allocation because it assigns a uniform
inflation value to claims arising from transactions on or before
August 9th. See Objection 1. In particular, the objection
argues that the value of common shares prior to 2005 was less
inflated, citing the opinion of an expert submitted in the
Canadian Action. See id.; Abbey Decl. Ex. B Tab 2 ("Torchio
Aff."). While we have no reason to doubt that the expert
retained by plaintiffs' counsel in the Canadian Action is as
qualified to opine on this topic as the expert retained by Abbey
Spanier here and moreover that his rationale for further
segmenting the share price inflation in the plan of allocation
is not unreasonable, see Torchio Aff. ¶¶ 18-20, it is well
established that damages calculations in securities class
actions often descend into a battle of experts. See In re
Marsh, 2009 WL 5178546, at *6 ("[o]n damages, this case would
have ended up as a classic 'battle of the experts'"). In the
context of settlement approval, however, the rationale here for
setting inflation at a constant rate throughout the entire

portion of the settlement class period that preceded the initial corrective disclosure and that was covered by subsequently restated financial results need not overwhelm in our estimation all competing theories of damages.  Instead, the rationale need only be reasonable and rational, which it is.

### E. The Requested Attorneys' Fees and Expenses

In connection with its motion for final approval of the amended settlement, Abbey Spanier also seeks an award of attorneys' fees of $3,000,000, representing 25% of the settlement amount, as well as reimbursement of expenses totaling $1,677,838.02.  See Br. 33-42.  Adding these attorney's fees and expenses, the total of $4,677,838.02 reflects almost 39% of the settlement amount.  While this figure alone gives us pause, as we explained at the hearing on June 14, 2012, we are concerned about the attorneys' hours expended and expert fees incurred by Abbey Spanier and in particular Robbins Geller given the evidentiary challenges that were obviously involved in bringing this case from the outset.  In addition, we find particularly troubling the failure of Robbins Geller to address in its application the circumstances of its prior removal as lead plaintiff's counsel, which circumstances drew into question the candor and good faith of its representations to this Court.  See In re IMAX, 272 F.R.D. at 155-57, 160; In re IMAX, 2011 WL 1487090, at *9.  In light of these concerns, we agreed with

Abbey Spanier at the hearing on the 14th that further briefing on the issue of the requested attorneys' fees and expenses is appropriate.  Accordingly, we reserve decision on the award of fees and reimbursement of expenses.

### IV. Conclusion

For the reasons stated above as well as those reasons that we articulated at the hearing, which are incorporated here by reference, we (1) find that the notice provided to members of the class was adequate; (2) certify the class for the purpose of settlement; (3) approve the settlement; (4) approve the plan of allocation; and (5) reserve decision on the requested attorneys' fees and expenses pending further briefing on these issues from lead plaintiff's counsel.


Dated:     New York, New York
           June 20, 2012

                                    NAOMI REICE BUCHWALD
                                    UNITED STATES DISTRICT JUDGE

37

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Attorneys for Lead Plaintiff The Merger Fund:
Arthur N. Abbey, Esq.
Karin E. Fisch, Esq.
Richard B. Margolies, Esq.
Abbey Spanier Rodd & Abrams, LLP
212 East 39th Street
New York, NY 10016

Attorneys for Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble:
Lewis J. Liman, Esq.
David Oliwenstein, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

Attorneys for Defendant PricewaterhouseCoopers LLP
M. Byron Wilder, Esq.
Gibson, Dunn & Crutcher LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201

Jennifer L. Conn, Esq.
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166