UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re IMAX CORPORATION SECURITIES LITIGATION | Civil Action No. 1:06-cv-06128-NRB |
| This Document Relates To: ALL ACTIONS. | DECLARATION OF ROBERT M. ROTHMAN, ESQ. IN FURTHER SUPPORT OF MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES |

ROBERT M. ROTHMAN, pursuant to 28 U.S.C. §1746, declares as follows::

## I. INTRODUCTION

1. I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). Based upon my active participation in the prosecution of this action, I have personal knowledge of the matters set forth herein and if called as a witness could and would testify competently thereto.

2. Pursuant to the Court's request at the June 14, 2012 final fairness hearing, I respectfully submit this Declaration to provide the Court with further details concerning the expenses incurred by Robbins Geller while serving as lead counsel in this action and to explain to the Court how Robbins Geller attempted to keep those expenses as low as possible under the circumstances.

3. In addition, pursuant to the concerns raised in the Court's Memorandum and Order dated June 20, 2012 (Dkt. No. 208), I will also provide the Court with additional details regarding the circumstances surrounding Robbins Geller's prior removal as lead counsel.

## II. EXPENSES PAID BY ROBBINS GELLER WHILE IT SERVED AS LEAD COUNSEL

4. As set forth in the Declaration of Samuel H. Rudman dated June 7, 2012, Robbins Geller is seeking reimbursement for $636,813.49 of expenses that it committed toward the prosecution of this action. Just as it did with attorneys' fees, Robbins Geller is not seeking reimbursement for any expenses incurred prior to the time it was appointed as lead counsel or after it no longer served as lead counsel. All of those expenses have been removed from Robbins Geller's request. The vast majority of the expenses for which Robbins Geller is seeking reimbursement, $580,010.55, were paid to two economic consulting firms that were retained as experts on behalf of the Class. Specifically, Robbins Geller paid Compass Lexecon LLC $530,336.10 and paid Finnerty Economic Consulting LLC $49,674.45. Copies of the bills from Compass Lexecon and Finnerty Economic Consulting are attached hereto as Exhibits 1 and 2, respectively.

**A. Lead Counsel Must Retain Experts in Securities Fraud Litigation**

5. As the Court is aware, expert analysis and testimony is required to prosecute a securities fraud case, especially a case such as this one that involves highly technical economic and accounting issues.

6. In order to satisfy Fed. R. Civ. P. 23(b)(3)'s predominance requirement and defeat individualized issues of reliance, a plaintiff in a securities fraud class action must invoke the fraud on the market presumption. *See Basic Inc. v. Levinson*, 485 U.S. 224, 227 (1988); *see also In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 481 (2d Cir. 2008) (citing *Stoneridge Inv. Partners LLC v. Sci. Atlanta*, 128 S. Ct. 761, 769 (2008)). As explained by the Second Circuit, the fraud on the market doctrine "creates a rebuttable presumption that (1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004) (citing *Basic*, 485 U.S. at 245-47); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 182 (S.D.N.Y. 2008).

7. For the fraud on the market presumption to apply, a plaintiff must establish that the stock traded in an efficient market. *See Erica P. John Fund, Inc. v. Haliburton Co.*, 131 S. Ct. 2179, 2185 (2011). Expert analysis and opinion is often necessary to satisfy this predicate to the fraud on the market theory.

8. Specifically, courts look to several factors that require an expert opinion when determining whether the fraud on the market presumption applies. These factors include the five so-called *Cammer* factors: (i) whether the security traded at a large average weekly volume; (ii) whether a significant number of analysts followed and reported on the security; (iii) whether the security had numerous market makers; (iv) whether the company was eligible to file SEC Form S-3; and (v) whether there are empirical facts showing a cause-and-effect relationship between unexpected

corporate events or financial information releases, and an immediate response in the security's price. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-1287 (D.N.J. 1989); *In re SCOR Holding (Switz.) AG Litig.*, 537 F. Supp. 2d 556, 574 (S.D.N.Y. 2008); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 303 n.162 (S.D.N.Y. 2005); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 107 n.323 (S.D.N.Y. 2004).

9. In addition to the five *Cammer* factors, courts also look at three expert-dependent factors enumerated in *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001) for market efficiency. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 Civ. 1898 (SAS), 2006 U.S. Dist. LEXIS 52991, at *24 (S.D.N.Y. Aug. 1, 2006). These three *Krogman* factors are: (i) the company's market capitalization; (ii) the relative size of the bid-ask spread for the security; and (iii) the company's float – *i.e.*, the degree to which shares of the security are held by the public, rather than by insiders.

**B. The Expert Analysis Required to Invoke the Fraud on the Market Presumption Is Expensive**

10. There are high costs associated with an expert analysis of the five *Cammer* factors and three *Krogman* factors. These costs, however, are not directly proportional to the damages that ultimately may be recovered in the case. Rather, the costs of the analysis is dependent on the intricacies of the market for the security at issue – not how much Class members have been damaged by any of defendants' misstatements or omissions.

11. Recognizing this fact, defendants often will seek to exploit the proportionally higher expert costs in a smaller case. Defendants understand that many plaintiffs' counsel are unwilling to advance these costs, especially on a contingency basis where there is no guarantee that they will be recouped. Defendants, therefore, seek to impose high costs on plaintiffs' counsel in the hope that they will cause a plaintiff either to dismiss the case or settle the case for less than fair value.

12. Only by having lead counsel who are willing to commit the expenses is the Class able to defeat this tactic. Robbins Geller did exactly that.

**C. Robbins Geller Retained Experts on Behalf of the Class**

13. Robbins Geller retained Compass Lexecon and Finnerty Economic Consulting as experts in this action. Compass Lexecon and Finnerty Economic Consulting are two of the top experts on issues of market efficiency. Their assistance was invaluable in positioning the case for trial or settlement.

14. Robbins Geller retained Compass Lexecon for trial preparation purposes. The retention of a trial preparation expert was necessary to provide counsel with certain opinions that would be shielded from discovery. Specifically, Fed. R. Civ. P. 26(b)(4)(D) provides: "Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specifically employed by another party . . . to prepare for trial and who is not expected to be called as a witness at trial." Thus, Compass Lexecon was able to perform certain analyses and provide related information to counsel without having to worry that the results of those analyses would be obtained by defendants.

15. As set forth in Compass Lexecon's bills attached hereto as Exhibit 1, among other things, Compass Lexecon conducted a detailed economic analysis of the market for IMAX securities. For example, Compass Lexecon conducted an event study; prepared related charts and exhibits; reviewed data concerning analysts' estimates; reviewed GAO reports on restatements; conducted research of news concerning IMAX; conducted research concerning companies included in the comparable index; reviewed analyst reports; researched earnings per share estimates; reviewed information technology growth rate estimates; researched short interest rate data; reviewed the corporate action calendar; reviewed proxy statements; reviewed annual reports; reviewed annual and quarterly earnings and revenue; reviewed cash flow data; compared revenue and earnings

restatements with SEC filings; analyzed yearly earnings and net earnings restatement; and searched databases.

16. In addition, Compass Lexecon performed the complex damage analysis that was required in this case. That analysis was made more difficult by confounding news that was released by IMAX throughout the Class Period, including news concerning IMAX's failure to find a merger partner.

17. Compass Lexecon also worked closely with Dr. John Finnerty in connection with the preparation of his expert report that was submitted to the Court.

18. Moreover, Compass Lexecon assisted counsel in the preparation for the depositions of both of defendants' experts.

19. Robbins Geller retained Dr. John Finnerty of Finnerty Economic Consulting as the testifying expert on behalf of the Class.

20. Dr. Finnerty drafted and submitted an expert report to the Court. Among other things, that report opined on whether changes in the price of IMAX common stock were directly related to and caused by certain disclosures regarding IMAX's revenue recognition and accounting policy, and in particular, when revenues and earnings related to its theater installations were recognized. Moreover, Dr. Finnerty's report responded to the reports submitted by defendants' experts. A copy of Dr. Finnerty's final report is attached as Exhibit 3.

21. So as not to duplicate efforts, Dr. Finnerty consulted with the experts from Compass Lexecon and utilized the results of their analyses to prepare his report. *See* Exhibit 3 at ¶7.

**D. Robbins Geller Attempted to Limit Expenses for the Class**

22. While prosecuting this action, Robbins Geller made every effort to minimize expenses for the Class. For example, Robbins Geller reviewed each of the invoices submitted by

experts, ensured that the work performed was necessary, and to the extent possible, negotiated with the experts to obtain discounts for the Class.

23. For example, the invoices received from Compass Lexecon actually totaled $614,336.10. However, Robbins Geller was able to negotiate $84,000 of discounts on behalf of the Class. Accordingly, Robbins Geller is seeking reimbursement for only $530,336.10 associated with Compass Lexecon expenses.

24. Robbins Geller also attempted to utilize in-house expertise when possible. This further reduced expenses for the Class. As the Court is aware, counsel seeks an award of fees equal to 25% of the settlement fund plus the reimbursement of expenses. By utilizing in-house personnel to conduct certain tasks rather than hiring outside experts to do so, the time spent on those tasks comes out of the 25% awarded for fees, rather than being tacked on to the expense request.

25. Thus, by utilizing an in-house forensic accountant to analyze the accounting for the transactions at issue in this case, Robbins Geller was able to save money for the Class.

### E. The Work Product that Robbins Geller Paid for Was Utilized by Abbey Spanier for the Benefit of the Class

26. Pursuant to the Court's direction, Robbins Geller provided Abbey Spanier with its work product. With respect to the experts, Abbey Spanier continued to utilize the services of both Compass Lexecon and Finnerty Economic Consulting to continue performing the same tasks that they had been performing for Robbins Geller. Rather than duplicate efforts or start the process anew, the experts were able to utilize the work product that Robbins Geller paid them to create.

27. For example, in connection with the June 3, 2011 motion for class certification filed by Abbey Spanier, Abbey Spanier asked Dr. Finnerty to opine on the same issues that Robbins Geller asked him to opine upon in connection with the July 30, 2010 motion for class certification filed by Robbins Geller:

| **Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated July 30, 2010 (Dkt. No. 143)** | **Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated June 3, 2011 (Dkt. No. 176)** |
|---|---|
| Robbins Geller Rudman & Dowd LLP, counsel for the plaintiffs in this matter, has asked me to opine on whether changes in the price of IMAX Corporation ("IMAX" or "Company") common stock on various dates from August 9, 2006 through July 20, 2007 were directly related to and caused by certain disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. [Dkt. 143 at ¶8] | Abbey Spanier Rodd & Abrams, LLP, counsel for the plaintiff in this matter, has asked me to opine on whether changes in the price of IMAX Corporation ("IMAX" or "Company") common stock on various dates from August 9, 2006 through July 20, 2007 were directly related to and caused by certain disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. . . . [Dkt. 176 at ¶8] |

28. Rather than incur additional expenses for the Class, Dr. Finnerty simply copied the analysis that Robbins Geller paid him to perform to reach the same opinion he previously provided:

| **Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated July 30, 2010 (Dkt. No. 143)** | **Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated June 3, 2011 (Dkt. No. 176)** |
|---|---|
| It is my opinion that. . . changes in IMAX's common stock price on August 9-10, 2006 March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. . . . [Dkt. 143 at ¶9] | It is my opinion that changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. . . . [Dkt. 176 at ¶9] |

29. Similarly, on reply, Abbey Spanier also asked Dr. Finnerty to opine on other issues that Dr. Finnerty had previously opined on for Robbins Geller:

| **Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated July 30, 2010 (Dkt. No. 143)** | **Reply Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated August 3, 2011 (Dkt. No. 192)** |
|---|---|
| Counsel also has asked me to respond to the Expert Report of Professor Christopher M. James, dated February 23, 2009 ("James Report") and to the Report of Lucy P. Allen executed on June 10, 2010 ("Allen Report") as these documents relate to the disclosures I analyze.<br>[Dkt. 143 at ¶8] | [D]efendants in this matter have since re-submitted the February 23, 2009 Expert Report of Professor Christopher M. James ("James Report") and have submitted the July 1, 2011 Report of Lucy P. Allen ("Allen Report"). As a result, Lead Counsel for The Merger Fund, Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier") has asked me to respond to the James and Allen Reports with respect to: 1) the price impact issues; and 2) the issues raised on loss causation (of which price decline is a part), out of an abundance of caution, and to show that my analyses were correct.<br>[Dkt. 192 at ¶1] |

30. Once again, rather than re-perform the same analysis, Dr. Finnerty utilized the analysis he performed for Robbins Geller to provide the same opinion:

| **Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated July 30, 2010 (Dkt. No. 143)** | **Reply Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification, dated August 3, 2011 (Dkt. No. 192)** |
|---|---|
| It is my opinion that, contrary to the conclusions contained in the James Report and the Allen Report, changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. . . .<br>[Dkt. 143 at ¶9] | Nothing in the Allen Report leads me to change any of the opinions I expressed in the Finnerty Declaration, and in particular, my opinion that changes in IMAX's common stock price on each of the three curative disclosure dates, August 9-10, 2006, March 29, 2007, and July 20, 2007, were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related it its theater systems installations were recognized for financial reporting purposes.<br>[Dkt. 192 at ¶109] |

31. In fact, to their credit, after Abbey Spanier was re-appointed lead counsel, they used all of the material that Robbins Geller paid Dr. Finnerty to prepare with the assistance of Compass Lexecon.

32. As demonstrated in the chart below, 61 of the 63 paragraphs contained in Dr. Finnerty's July 30, 2010 Declaration prepared at the request and expense of Robbins Geller were repeated – virtually verbatim – in either the June 3, 2011 or August 3, 2011 Declarations of Dr. Finnerty that were submitted by Abbey Spanier.

| 7/30/10 Decl. | 6/3/11 Decl. | 8/3/11 Decl. |
|---|---|---|
| ¶1 | ¶1 | |
| ¶2 | ¶2 | |
| ¶3 | ¶3 | |
| ¶4 | ¶4 | |
| ¶5 | ¶5 | |
| ¶6 | ¶6 | |
| ¶7 | ¶7 | |
| ¶8 | ¶8 | ¶1 |
| ¶9 | | ¶109 |
| ¶10 | ¶10 | |
| ¶11 | ¶11 | |
| ¶12 | | |
| ¶13 | ¶17 | |
| ¶14 | ¶18 | |
| ¶15 | ¶19 | |
| ¶16 | ¶20 | |
| ¶17 | ¶21 | |
| ¶18 | ¶22 | |
| ¶19 | | ¶36 |
| ¶20 | ¶25 | |
| ¶21 | ¶26 | |
| ¶22 | ¶27 | |
| ¶23 | ¶28 | |
| ¶24 | ¶29 | |
| ¶25 | ¶30 | |
| ¶26 | | ¶38 |
| ¶27 | | ¶39 |
| ¶28 | | ¶40 |
| ¶29 | | ¶41 |
| ¶30 | | ¶42 |
| ¶31 | | ¶43 |
| ¶32 | | ¶44 |
| ¶33 | | ¶45 |
| ¶34 | | ¶46 |
| ¶35 | ¶31 | |
| ¶36 | ¶32 | |
| ¶37 | ¶33 | |
| ¶38 | ¶34 | |
| ¶39 | ¶35 | |
| ¶40 | | ¶52 |
| ¶41 | | ¶53 |
| ¶42 | | ¶54 |
| ¶43 | ¶36 | |
| ¶44 | ¶37 | |
| ¶45 | ¶38 | |
| ¶46 | ¶39 | |
| ¶47 | ¶40 | |
| ¶48 | | ¶56 |
| ¶49 | | ¶57 |
| ¶50 | | ¶24 |
| ¶51 | | ¶25 |
| ¶52 | | ¶26 |
| ¶53 | | ¶27 |
| ¶54 | | ¶28 |
| ¶55 | | ¶29 |
| ¶56 | | ¶30 |
| ¶57 | | ¶30 |
| ¶58 | | ¶31 |
| ¶59 | | ¶32 |
| ¶60 | | ¶33 |
| ¶61 | | ¶39 |
| ¶62 | | |
| ¶63 | | ¶111 |

33. In addition, Robbins Geller provided Abbey Spanier with detailed chronologies and accounting analyses concerning the relevant transactions. As the Court noted at the June 14, 2012 hearing, analyzing the discovery in this case would involve the following:

> [R]eview the files of those transactions and chart the installation of the components of the systems and then to graph against that information the income recognition points and then to ask an expert to opine on the propriety of the accounting treatment.

Transcript of June 14, 2012 Hearing at 14:25-15:4.

34. Unfortunately, conducting the analysis was not as simple as pulling out a paper file and checking off when certain installation milestones were reached. Robbins Geller was provided with 479,943 pages documents produced by defendants, only a portion of which related to the installations in question. In order to conduct its analysis, Robbins Geller had to go through a painstaking process akin to putting together a jigsaw puzzle from a box containing far too many pieces.

35. After we reviewed all of the documents and segregated the ones concerning the relevant transactions, we had to determine when certain installation milestones were actually reached. Our review indicated that simply because IMAX claimed that a milestone was reached on a certain date did not make it so. Rather, we had to dig through installation documents, as well as correspondence between and among the theater owners, theater operators, IMAX, PwC and construction personnel, to determine if and when a milestone was actually reached.

36. As explained above, rather than hire an additional outside expert to help with this analysis, the expense for which would be charged to the Class, Robbins Geller utilized the services of an in-house forensic accountant, the expense for which would come out of the attorneys' fees awarded by the Court.

37. Robbins Geller compiled the results of its analysis in detailed memoranda, which provided extensive narratives about each and every aspect of the most relevant transactions, from the time the contract was negotiated and signed, through the performance of each of the milestones under the contract, to acceptance of completion by the other party. The chronologies listed the

identity of relevant witnesses and summarized each of the documents concerning that transaction, including correspondence and emails between the parties.

### F. The Costs and Expenses of Robbins Geller Should Be Reimbursed

38. Robbins Geller committed $636,813.49 in litigation expenses. As explained above, these expenses were reasonable and necessary for the prosecution of the action. Moreover, the expenses resulted in work product that was used by Abbey Spanier in its continued prosecution of the case.

## III. ROBBINS GELLER'S REMOVAL AS LEAD COUNSEL

39. By Order dated December 22, 2010 (Dkt. No. 148), the Court denied Snow Capital Investment Partners, L.P.'s ("Snow Capital") motion for class certification. In that Order, the Court noted, among other things, that Snow Capital's relationship with an attorney named Alfred Yates, who was an investor with Snow Capital and a friend of Snow Capital's principal, created the incentive for Snow Capital to receive additional investments from Mr. Yates, which the Court believed was sufficient to warrant a finding of inadequacy under the circumstances of the case. *See* Dec. 22, 2010 Order at 46, n. 86. Respectfully, the Court may have misinterpreted Mr. Yates' role in this litigation and the scope of his investment with Snow Capital.

40. The details of Robbins Geller's retention in this matter were described in the deposition transcript of Richard Snow ("Snow Transcript"), excerpts of which were previously submitted to the Court as Exhibit 1 to the Declaration of Mark T. Millkey dated July 30, 2010 (Dkt. No. 142).

41. Specifically, Snow Capital is based in Pittsburgh, Pennsylvania. In 2006, Mr. Snow became concerned that Snow Capital may have been victimized by fraud at IMAX. Mr. Snow did what most people in a similar circumstance would do: He spoke with a neighbor who is a lawyer to

discuss possible legal action. That lawyer was Mr. Yates, a local Pittsburgh attorney who concentrates his practice on securities fraud litigation.

42. Mr. Snow spoke a few times with Mr. Yates about an action against IMAX. *See* Snow Transcript at 160:25- 161:10. Mr. Snow and Mr. Yates discussed the pluses and minuses of certain firms to serve as lead counsel in the action. *See id.* at 165:9-165:16. Based on that discussion, Mr. Snow decided to retain Robbins Geller. *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 797 (S.D. Tex. 2008) ("The experience, ability, and reputation of the attorneys of [Robbins Geller] is not disputed; it is one of the most successful law firms in securities class actions, if not the preeminent one, in the country.").

43. However, while Robbins Geller would serve as lead counsel in New York, Snow Capital and all of its documents and witnesses were based in Pittsburgh. As a result, it made sense from a logistical and cost savings standpoint to have a local lawyer on the ground in Pittsburgh cover certain in-person interactions with Snow Capital.

44. By so doing, the Class did not need to incur the expenses of having Robbins Geller attorneys making multiple trips to Pittsburgh. For example, rather than have a Robbins Geller attorney travel to Pittsburgh at the expense of the Class to sit down with Snow Capital personnel to obtain and produce documents, Mr. Yates was able to do that. Similarly, Mr. Yates was able to have in-person conversations with Mr. Snow and provide him with legal documents concerning the case.

45. In hindsight, based on the Court's concerns, perhaps Mr. Yates should have entered an appearance in the action. However, due to the fact he was never going to travel to New York to actually appear in court, we did not believe a formal appearance by Mr. Yates was necessary. And based on the fact that his limited support role was taking place entirely in Pittsburgh, we did not

believe it was necessary for Mr. Yates to move for *pro hac vice* admission. If our belief was incorrect, we sincerely apologize. However, there was never any intent to deceive the Court.

46. Rather, Robbins Geller believed that utilizing a local lawyer in Pittsburgh actually complied with the Court's Order dated February 7, 2007 (Dkt. No. 42), authorizing the original lead counsel in this case to "to delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort." Delegating certain work that needed to occur in Pittsburgh to a lawyer in Pittsburgh was the most efficient way to proceed and avoided duplicative and unproductive effort.

47. By utilizing Mr. Yates in this manner, Robbins Geller was not in any way purposefully displaying a lack of candor or good faith with the Court. On the contrary, Robbins Geller was attempting to comply with the Court's order to conduct the litigation in the most efficient way possible.

48. To be sure, Mr. Yates did not perform any functions of lead counsel – all of which were performed exclusively by Robbins Geller.

49. Mr. Yates' limited role in the litigation was confirmed by Mr. Snow's deposition testimony:

> Q: And what is your understanding about what Mr. Yates is doing in connection with the prosecution of this case?
>
> A: He did some of the preliminary work, and he's part of the counsel team.
>
> Q: When you say "preliminary work," what preliminary work did Mr. Yates do?
>
> A: That, I can't recall, but Mr. Yates and myself would have had a number of conversations kind of keeping me up to date on the strategy and what's kind of going on with the case and has transmitted a number of the legal documents to me.

Snow Transcript at 153:18-154:6.

50. The Court was also concerned about an economic relationship between Mr. Yates and Snow Capital. In particular, Mr. Yates had some funds invested with Snow Capital. The Court questioned whether Snow Capital's desire for additional investments from Mr. Yates could have impacted the manner in which it fulfilled its duties as lead plaintiff. Mr. Snow, however, testified that he had no understanding or expectation about whether Mr. Yates would invest additional sums with Snow Capital. On the contrary, Mr. Snow testified that he assumed that Mr. Yates had other money managers. *See id.* at 169:25-170:7.

51. Moreover, even if Mr. Yates invested additional funds with Snow Capital, it would have had no appreciable impact on Snow Capital. Snow Capital had $3.5 billion under management. Even assuming Mr. Yates received the full $3 million of the fees requested in this case, and even if Mr. Yates was able to invest the full amount of that award with Snow Capital, it would account for 0.00086 of the funds managed by Snow Capital.[1]

52. For this reason, after Mr. Snow initially permitted Mr. Yates to invest, Mr. Snow never gave Mr. Yates' account a second thought. Indeed, Mr. Snow's testimony reveals that after the initial investment, he has had no personal involvement whatsoever with Mr. Yates' investment.

> Q: Okay. Now, have you had any discussions with Mr. Yates about putting more assets with the firm?
>
> A: No.
>
> Q: When was the last time he gave the firm more assets to manage?
>
> A: I would have no idea.

---

1 For the avoidance of doubt, Mr. Yates is not going to receive any money in connection with this case.

Q: Do you know whether, after he first [in]vested with Snow Capital, he added to the assets under management he had with Snow Capital Management?

A: To be honest, I don't know.

Q: Have you had discussions with him about adding more assets?

A: No.

Q: Has he asked you to take more assets?

A: Not me directly, no.

Q: Do you know whether he's asked any member of the firm?

A: He might have. I don't know.

*Id.* at 157:14-158:10.

53. Thus, there is no basis to believe that Snow Capital would somehow disregard its duties as a lead plaintiff or Class representative in order for Mr. Yates to invest additional funds with Snow Capital. In fact, the record demonstrates quite the opposite: Snow Capital zealously satisfied all of its duties as a lead plaintiff. At his deposition, Mr. Snow understood that it was the role of the lead plaintiff to "act as a fiduciary and to consult with and guide counsel," (*id.* at page 38:10-38:12) and was knowledgeable about the lawsuit: he identified the defendants, the Class Period, and the substance of plaintiff's allegations, and knew the contents of a critical August 9, 2006 press release issued by IMAX constituting a partial disclosure of the truth. *See id.* at 89:2-89:10; 143:5-145:25. Mr. Snow also testified about the numerous communications he had had with lead counsel Robbins Geller. *See id* at 154:7-154:14.

54. While we understand the Court's concern, we hope that this explanation puts to rest any lingering belief that Robbins Geller was anything but forthright in its representations and dealings with the Court.

## IV. CONCLUSION

55. During the time when Robbins Geller served as lead counsel, the firm worked tirelessly for the interests of the Class. Robbins Geller conducted the crucial analysis that the Court noted was necessary in this case. Robbins Geller thereafter provided that work product to Abbey Spanier. Robbins Geller also advanced vast sums of money out of its own pocket for experts. On behalf of the Class, Abbey Spanier continued to use those experts and the corresponding analysis paid for by Robbins Geller. Thus, all of the work and expenses Robbins Geller included in its fee application benefitted the Class. For the reasons set forth above, plaintiffs' counsel respectfully request that the Court award attorneys' fees and litigation expenses for their work performed for the benefit of the Class.

DATED: June 27, 2012

ROBERT M. ROTHMAN