**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re IMAX CORPORATION SECURITIES LITIGATION** | : | **Civil Action No. 1:06-cv-06128-NRB** |
| | : | **CLASS ACTION** |
| **This Document Relates To:** | : | |
| **ALL ACTIONS.** | : | |

**DECLARATION OF JOHN D. FINNERTY, Ph. D. IN SUPPORT OF LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I, John D. Finnerty, declare pursuant to 28 U.S.C. § 1746, as follows:

## I. Qualifications

1. I am a Professor of Finance and the former Director of the Master of Science in Quantitative Finance Program in the Graduate School of Business Administration at Fordham University. I was awarded early tenure in 1991, and I received the Gladys and Henry Crown Award for Faculty Excellence in 1997. I have published 13 books, including *Corporate Financial Management*, 3rd ed. (Prentice Hall, 2007), *Project Financing: Asset-Based Financial Engineering,* 2nd ed. (Wiley, 2007), and *Debt Management* (Harvard Business School Press, 2001), and more than 90 articles and professional papers with respect to corporate finance, fixed income, and business and securities valuation. I am the former editor of *Financial Management*, one of the five leading finance journals in the United States, and I am also a former editor of *FMA Online*, an online journal sponsored by the

Financial Management Association. I am also a member of the Editorial Advisory Board of the *Journal of Portfolio Management*.

2. My teaching and research deal mainly with corporate finance, investment banking, and fixed income securities valuation and portfolio management. I have previously published a paper on the calculation of damages in securities fraud cases entitled, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," which was published in the Spring 2003 issue of the *Stanford Journal of Law, Business & Finance.* I have extensive experience calculating damages in securities fraud cases.

3. I have served as the Chair of the Trustees, President, and a Director, and I am currently a Trustee, of the Eastern Finance Association, an academic finance organization. I have also served as the President and Director of the Fixed Income Analysts Society, an association of finance professionals based in New York City.

4. I am a Managing Principal at Finnerty Economic Consulting, LLC (FinnEcon®), an economic consulting firm that provides consulting and valuation services to law firms, corporations, industry associations, and government agencies. I have served as an expert in numerous cases involving financial analysis, business valuation, and due diligence, and I have provided expert testimony on a variety of financial issues in federal courts, state courts, and before arbitration panels.

5. Prior to forming FinnEcon® in 2003, I was a Managing Principal at Analysis Group, Inc., an economic consulting firm. Prior to joining Analysis Group, I was a Partner in the PricewaterhouseCoopers Financial Advisory Services Group for five

years, and previously held investment banking positions at Morgan Stanley, Lazard Frères, McFarland Dewey, and Houlihan Lokey Howard & Zukin.

6. I received a Ph.D. in Operations Research from the Naval Postgraduate School, an M.A. in Economics from Cambridge University where I was a Marshall Scholar, and a B.A. in Mathematics from Williams College. Attached as Appendix A is a true and correct copy of my current resume, which lists all publications I have written or co-authored and includes a brief description of my trial and deposition testimony within the past four years.

7. My firm is being compensated at my customary billing rate of $695 per hour for my work on this matter. My opinions are my own, and my compensation is not contingent on my findings or on the outcome of the litigation in connection with which I have prepared this declaration. Some of the analyses in this declaration have been performed by staff of Compass Lexecon working under my direction.

## II. Assignment and Summary of Opinion

8. Robbins Geller Rudman & Dowd LLP, counsel for the plaintiffs in this matter, has asked me to opine on whether changes in the price of IMAX Corporation ("IMAX" or "Company") common stock on various dates from August 9, 2006 through July 20, 2007 were directly related to and caused by certain disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. Ultimately, the Company changed its revenue recognition policy and restated its reported figures for fiscal years 2002 through 2005 and the first three quarters of 2006. Counsel also has asked me to respond to the Expert Report of Professor

Christopher M. James, dated February 23, 2009 ("James Report") and to the Report of Lucy P. Allen executed on June 10, 2010 ("Allen Report") as these documents relate to the disclosures I analyze.

9. It is my opinion that, contrary to the conclusions contained in the James Report and the Allen Report, changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized, which are discussed below.

10. Appendix B lists the documents I considered in coming to my opinions in this matter.

## III. Event Study Analysis

11. An event study is a standard analytical technique that financial economists use to determine whether a security's price reaction to a news announcement (or some other event) is statistically significant. In order to focus on the impact of the company-specific news on the price of a security, one calculates a security's abnormal return around the time of the announcement. A security's abnormal return is the difference between the security's actual return and its expected return. A firm's expected return is the return one would expect based on certain market and industry factors, which is estimated based on a financial model that includes these factors. Once one has calculated a security's abnormal returns, one can use standard statistical techniques to test whether these abnormal returns are statistically significantly different from zero.

12. For purposes of analyzing the news events and related price changes in IMAX's common stock in this matter, and to avoid arguments concerning the precise event study methodology to use in this case, I rely on the statistical results from the event study presented in the James Report, which are summarized in Exhibit 1.[1, 2] Based on these statistical results, this section of my declaration analyzes IMAX's common stock returns on August 10, 2006, March 29, 2007, and July 20, 2007.

13. On August 9, 2006, just after the market closed, IMAX issued a press release announcing (a) second quarter financial results, (b) an informal inquiry from the U.S. Securities and Exchange Commission ("SEC") regarding IMAX's revenue recognition accounting, (c) a material weakness in internal controls related to revenue recognition in its 2006 second quarter, and (d) failure to find any buyers of the Company at a valuation sought by the Board.[3] Approximately half an hour later, at 4:30 p.m., the Company hosted a conference call with analysts and investors.[4] According to a transcript of the call, IMAX officials discussed the above disclosures and also announced that the Company was (a) focusing on a more aggressive rollout of its joint venture initiative, (b) accelerating introduction

---

[1] To determine whether my opinions in this matter are unduly dependent on my choice to adopt the event study results found in the James Report, I also conducted an event study analysis using the widely accepted Fama-French Three-Factor Model, which I have used in other matters. None of my opinions in this report change if I instead rely on the statistical results from this model.

[2] Ms. Allen does not present the results of an event study in her report and thus provides no statistical basis for her conclusions.

[3] *PR Newswire*, IMAX Corporation Reports Second Quarter Financial Results; -- Provides Update on Exploration of Strategic Alternatives --," August 9, 2006 (4:01 p.m.).

[4] *PR Newswire*, "IMAX Corporation announces new time for quarterly conference call, August 9, 2006 (7:00 a.m.), stating that "its conference call to discuss second quarter 2006 results originally scheduled for 8:30 AM ET has been postponed until 4:30 PM ET."

of its Digital Projection product, and (c) retracting all guidance for the year as a result.[5] The abnormal return on August 10, 2006 (i.e., from the market close on August 9, 2006 through the market close on August 10, 2006) was -40.67%.[6] This abnormal return is significant at better than the 1% level, which means there is less than a 1% chance that this abnormal return happened by mere chance.[7]

14. On March 29, 2007, before the market opened, IMAX issued a press release announcing that "it will further delay the filing of its annual report on Form 10-K for fiscal 2006 and the corresponding filings under Canadian provincial securities laws beyond the filing deadline, in each case, of March 31, 2007."[8] The Company also stated:

> In the course of completing this restatement and the year-end audit, and in recently reviewing certain comments received from the U.S. Securities and Exchange Commission (SEC) and the Ontario Securities Commission (OSC), the Company has determined to broaden its review to address certain issues related to these comments …. As a result of this expanded review … the Company may determine that it is necessary to restate additional items beyond the previously identified errors.[9]

IMAX "also noted that the filing delay will result in the Company being in default of a financial reporting covenant under the indenture governing its Senior Notes"

---

[5] Voxant FD (Fair Disclosure) Wire, "Q2 2006 IMAX Corporation Earnings Conference Call - Final," August 9, 2006.

[6] Exhibit 1.

[7] *Ibid*.

[8] *PR Newswire*, "IMAX to delay filing of 2006 10-K," March 29, 2007 (7:30 a.m.).

[9] *Ibid*.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 7 of 58

and disclosed that it "expects to receive a notice of delisting from NASDAQ."[10] The abnormal return on March 29, 2007 was -6.45%.[11] This abnormal return is significant at better than the 1% level, which means there is less than a 1% chance that this abnormal return happened by mere chance.[12, 13]

15. On July 20, 2007, before the market opened, IMAX issued a press release containing several announcements:

- Company completes restatement of financial results for reporting periods covering 2002 through 2005 and will file Form 10-K for fiscal 2006 and Form 10-Q for the first quarter of fiscal 2007 today. Company revises accounting policy regarding revenue recognition for theatre system installations. The SEC and OSC inquiries remain ongoing.

- Company enjoys a record opening week for Harry Potter and the Order of the Phoenix … with $11.6 million in worldwide IMAX box office on 126 screens, building on the strong performance of 2007 film slate to date, including 300 … and Spider-Man 3.

- Company continues to advance its joint venture initiative, with joint venture agreements for five theatres signed since January, and multiple discussions ongoing.

---

[10] *Ibid*.

[11] Exhibit 1.

[12] *Ibid*.

[13] Professor James performs what he claims to be "a customary adjustment for independent tests" by applying "the Sidak adjustment" and concludes that the IMAX stock price decline on March 29, 2007 "no longer met the threshold for statistical significance under the Sidak adjustment." James Report ¶ 49. I am not aware of any court that has ever accepted this methodology in connection with a securities fraud matter. Moreover, as I discuss in detail in a published article, "no adjustment for multiple comparisons is required for securities fraud event studies when each of a series of fraud-related news disclosures is properly evaluated separately from all the other news disclosure events under consideration." Finnerty, John D., "A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, 21, 2009, 55-62. Because I properly evaluate the allegedly fraud-related IMAX news disclosures separately, no adjustment is required. Consequently, as Professor James's own event study finds, the abnormal IMAX stock price return on March 29, 2007 is statistically significant at better than the 1% level.

- Company remains on track to introduce its digital projection system on time and within budget.

- Company announces 13 theatre system signings in the first quarter of fiscal 2007 … and six … in the second quarter.

- Company reports 2006 and first quarter 2007 financial results.[14]

16. Also on the morning of July 20, the Company held a conference call with analysts and investors, in which co-CEO Richard Gelfond stated that "2007 is likely to be somewhat of a transitional year from a financial perspective …. [T]here will be some unique expenditures and charges …. To begin with, the SEC's and OSC's informal [investigation] relating to the Company's timing of revenue recognition continue to increase our legal and accounting fees in 2007. Second, R&D costs related to the launch of digital are also going to impact our financial results in fiscal 2007."[15] Also during the conference call, IMAX's General Counsel, Rob Lister, stated that "the Company is quite confident that it is in compliance with all of its covenants under both its indenture and under its credit facility."[16]

17. The stock's abnormal return on July 20, 2007 was 10.68%.[17] This abnormal return is significant at better than the 1% level, which means there is less than a 1% chance that this abnormal return happened by mere chance.[18]

---

[14] IMAX Press Release, "IMAX Corporation reports 2006 and first quarter 2007 financial results," July 20, 2007; *Dow Jones News Service*, "Imax Corp. 1Q Loss/Shr 12c Vs Loss 9c," July 20, 2007 (6:00 a.m.).

[15] Voxant FD (Fair Disclosure) Wire, "Q4 2006 and Q1 2007 IMAX Corporation Earnings Conference Call - Final," July 20, 2007.

[16] *Ibid*.

[17] Exhibit 1.

[18] *Ibid*.

## IV. Loss Causation

18. I performed a "loss causation" analysis to determine whether the statistically significant changes in IMAX's common stock price on the various dates analyzed above could be attributed to the disclosures of the alleged fraud. This analysis involves examining the results of the event studies described above in the light of all available company news and intra-day stock price movements on the relevant dates to determine whether other announcements might account for part or even all of the price changes. In particular, I reviewed IMAX's and its management's disclosures, press articles, and securities analyst commentary around the disclosures between August 9, 2006 and July 20, 2007 described above. I also reviewed the opinions and the support for those opinions set forth in the James Report and the Allen Report.

19. My analysis of the effects of IMAX's disclosures regarding its revenue recognition policy and its reported theater systems installations, revenue, and earnings stands in stark contrast to those found in the James Report and the Allen Report, both of which purportedly found no stock price loss attributable to the alleged fraud.

### a. IMAX's August 9-10, 2006 Stock Price Decline

20. It is my opinion that the statistically significant -40.67% abnormal return on August 10, 2006 was substantially caused by the disclosures in IMAX's press release issued just after the close of trading on August 9, 2006 that were related to Plaintiff's allegations. The bases for my opinion are: (a) the fact that 75% of the total stock price decline between the market close (at 4:00 p.m.) on August 9, 2006 and the market close on August 10, 2006 occurred *before* the 4:30 p.m. conference

call on August 9, 2006 began,[19] (b) market commentators specifically attributed the decline in IMAX's stock price largely to the disclosure of the SEC inquiry, (c) securities analysts reacted negatively to the disclosure of the SEC inquiry, (d) other negative information disclosed on August 9, 2006, in particular, IMAX's failure to find a buyer, is likely related to Plaintiff's allegations, (e) the remaining disclosures on August 9, 2006 likely had a positive effect on IMAX's stock price, especially since IMAX's revenue and earnings beat analysts' forecasts, and (f) the fact that there is less than a 1% chance that the -40.67% abnormal return happened by mere chance.

21. Exhibit 2 is a chart of IMAX's intra-day stock prices on NASDAQ from 4 p.m. on August 9, 2006 through 4 p.m. on August 10, 2006. The chart shows that the Company's stock price declined sharply immediately following the issuance of the press release at 4:01 p.m. on August 9, 2006 and remained substantially below the prior day's close throughout August 10, 2006. This trading pattern reflects the impact of the news announced in the press release.

22. Market commentators specifically attributed the stock price decline largely to the disclosure of the SEC investigation. For example, CBC News reported that "[s]hares of Imax Corp. fell by more than 40 per cent Thursday after Canada's wide-screen filmmaker announced it was being investigated by U.S regulators."[20]

---

[19] IMAX's closing prices on NASDAQ were $9.63 and $5.73 on August 9 and 10, 2006, respectively, a decline of $3.90. Source: ©201003 CRSP®, Center for Research in Security Prices. Graduate School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu. According to the NYSE TAQ database, IMAX's stock price as of 4:30 pm on August 9, 2006 was $6.70, a decline of $2.93 from the close. $2.93 is 75.1% of $3.90.

[20] *CBC News*, "Imax stock plummets on SEC investigation," August 10, 2006 (4:45 p.m.).

Another financial publication wrote that "IMAX Corp. was crushed for a 36.9% decline (at 6.07) Wednesday night after the company's better-than-expected Q2 results were overshadowed by an SEC inquiry."[21]

23. After IMAX's announcements and conference call, several securities analysts lowered their ratings on the Company's stock, citing the SEC inquiry. For example, *Reuters News* reported: "Merriman Curhan Ford & Co. downgraded Imax to a 'sell' from a 'buy' after the earnings report, in part because of the SEC inquiry. Richard Ingrassia at Roth Capital Partners cut the shares to 'sell' from 'hold', also noting the SEC inquiry, weak box office performance and the lack of a deal for the company."[22]

24. Because the size and scope of the SEC investigation was still uncertain, securities analysts warned about the "material risk" to the share price. Professor James quotes from several analysts on this topic.[23] For example, on August 10, 2006:

- Analysts at Friedman Billings Ramsey stated: "IMAX is cooperating fully with the SEC inquiry, and any adverse findings would not affect the company's cash flows, although it could result in a restatement of prior-period GAAP operating results. We do not expect that this will have a material adverse impact on the creditworthiness of the company but remain cautious regarding the matter, as any investigation of this nature carries material risk."[24]

---

[21] *Midnight Trader*, "In the Money Forecast: Stocks to Watch Thursday," August 9, 2006 (6:37 p.m.).

[22] *Reuters News*, "Imax plunges on lack of sale deal, SEC inquiry," August 10, 2006 (11:12 a.m.).

[23] James Report ¶¶ 38-39.

[24] Friedman Billings Ramsey, "2Q06 Results Top Expectations; Sale Process Losing Momentum – Maintaining Market Perform on Senior Notes," August 10, 2006. In fact, these fears were later borne out in March 2007 when the Company was required to address comments from the SEC and OSC, causing delays in filing its 2006 10-K, bond covenant defaults, and potential delisting from NASDAQ. *See infra* §IV.b.

- Analysts at BMO Capital Markets wrote: "The SEC inquiries into revenue recognition only reinforce some investor scepticism over the company's accounting practices (whether right or wrong). At the very least, we see the risk of a prolonged inquiry or a potential escalation as reason enough to avoid the stock for now."[25]

- Analysts at Merriman Curhan Ford reported: "As with most companies that receive inquiries from the SEC (especially those regarding revenue recognition issues), we believe there will likely be a cloud over the company's shares until this is resolved."[26]

- An analyst at Susquehanna Financial Group opined: "Overhang from SEC investigation …. [T]his inquiry is likely to be an overhang on the stock. Negative Factor."[27]

Professor James also quotes from securities analysts regarding the negative impact of IMAX's disclosure that the Company had identified a material weakness in the internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of 2006.[28]

25. In addition, securities analysts following IMAX at Paradigm Capital also remarked that the disclosures in the press release had adversely affected the credibility of management. For example, an analyst stated that "[m]anagement credibility has also taken a turn for the worse because of the failed buy-out and the SEC investigation."[29]

---

[25] BMO Capital Markets, "A Follow-Up to Today's Downgrade, Taking a Stab at Earnings Estimates," August 10, 2006.

[26] Merriman Curhan Ford, "No Buyers Emerge; Shifts in Business Model to Negatively Impact Near-term Results; Lowering Rating to Sell from Buy," August 10, 2006.

[27] Susquehanna Financial Group, "Too Much Uncertainty Ahead; Downgrading to Neutral," August 10, 2006.

[28] James Report ¶¶ 140 & 142-143.

[29] Paradigm Capital, "Focus on Understanding the JV Model," August 25, 2006.

26. While Professor James and Ms. Allen admit that the disclosure of the SEC inquiry had adverse consequences for IMAX's stock price, they claim that the "overhang" related to this disclosure was not due to the revenue recognition accounting issues.[30] This assertion is clearly incorrect. Had the revenue recognition issues not occurred, there would have been no SEC inquiry into these issues and thus no consequent stock price reaction caused by the announcement of the inquiry.

27. IMAX's disclosure that it had found no buyers may not be a completely unrelated event as Professor James and Ms. Allen claim. As they illustrate, the news that the Company had failed in its search for a buyer at an acceptable price was regarded negatively by market participants and contributed to IMAX's stock price decline on August 9, 2006 and August 10, 2006. What both Professor James and Ms. Allen fail to consider is the possibility that the accounting issues were a contributing factor in IMAX's failure to find a buyer as Plaintiff alleges in the Complaint.[31] In other words, the same issues that attracted the attention of the SEC and the OSC likely would have concerned a potential buyer.[32]

28. During the conference call, co-CEO Rich Gelfond stated that the first inquiry from the SEC was received in late June, during the period when the Company was

[30] E.g., James Report ¶ 136 & Allen Report at 16.

[31] Consolidated Amended Class Action Complaint, In Re IMAX Corporation Securities Litigation, 06 CIV. 6128 (NRB), U.S.D.C., Southern District of New York, October 2, 2007, ¶ 122.

[32] Professor James and Ms. Allen acknowledge that IMAX's stock price declined following the Company's announcement after the market closed on December 15, 2006 that it would no longer pursue a sale or merger. James Report ¶¶ 63-64 & Allen Report at 18. The abnormal return on December 18, 2006, the next trade day, is a statistically significant -8.30%. James Report ¶ 63. To the extent that IMAX's decision to abandon its search for a buyer was caused by its revenue recognition issues, then – contrary to Professor James's and Ms. Allen's claims – this decline in the Company's stock price also is directly related to Plaintiff's allegations.

searching for a buyer. Even though Mr. Gelfond responded to a question from a securities analyst by stating that "we don't believe it impacted the [sale] process,"[33] market participants were sceptical. An article published in *The Wall Street Journal*, subtitled "Why Some Companies Go Unsold in Merger Boom," states that "many of the would-be sellers are plagued with vulnerable business models or regulatory problems" and points out that "on the same day Imax said it hadn't found a buyer, the company announced that the Securities and Exchange Commission and Canadian authorities were looking into how the company recognized revenue."[34] An article published in the *National Post* on April 9, 2007 explicitly linked the accounting concerns to the failure to find a buyer:

> Anthony Scilipoti, executive vice-president of Veritas Investment Research in Toronto … says Imax should be tucked into a larger conglomerate, but predicts that will not happen until there is compelling evidence that the books are squeaky clean.
>
> Accounting concerns are not new for Imax. Analysts have been raising red flags for more than a decade about the company's lease-style accounting and the lag between signing contracts and installing theatre systems. But this time around, the accounting questions came as prospective purchasers of the company, rumoured to have included Sony Corp. and private equity fund Elevation Partners, got a look at the books. It is also the first time the most powerful regulator in the United States has asked questions.[35]

29. In addition, Ms. Allen opines that "[n]ews stories attributed a dramatic fall in the stock price in 2000 (from $27 to $4) largely to the fact that IMAX's search for a

---

[33] Voxant FD (Fair Disclosure) Wire, "Q2 2006 IMAX Corporation Earnings Conference Call - Final," August 9, 2006.

[34] *The Wall Street Journal*, "Long & Short: 'Buy My Company, Please'; Why Some Companies Go Unsold in Merger Boom," August 23, 2006.

[35] *National Post*, "'Red Flags' at Imax," April 9, 2007.

buyer was unsuccessful."[36] In contrast, Professor James opines that "after a precipitous stock price decline in the midst of an industry downturn, the Company took itself off the market."[37] Indeed, *Reuters News* reported that "[a]nalysts said the stock is being affected by poor performances in its industry where overextended big exhibitors are going belly up or struggling to stay afloat in the U.S."[38] In a profit warning that caused a substantial decline in the Company's stock price, IMAX management stated: "The financial state of the commercial exhibition industry and the North American multiplex operators in particular continues to worsen and impact our delivery schedules."[39] IMAX also stated that its stock price decline "may have been caused in part by the recent involvement in its stock by several short sellers in Canada" and that it "believes the short positions may be related in part to misleading reports, including an article in today's Globe and Mail, that the Company received a letter from the Ontario Securities Commission (OSC)."[40] Ms. Allen quotes an article which states: "Taking down the for-sale sign is hard on a company's reputation as investors, competitors and customers all may wonder what's wrong with the business that it couldn't find a match."[41] But, she ignores that while there was substantial industry-related

---

[36] Allen Report at 12-13.

[37] James Report ¶ 7.

[38] *Reuters News*, "Imax stock continues decline on industry woes," September 27, 2000 (12:41 p.m.).

[39] *Reuters News*, "Imax investors head for exits after profit warning," October 12, 2000 (12:18 p.m.).

[40] *Reuters News*, "Imax Corporation Announcement," September 28, 2000 (1:55 p.m.).

[41] Allen Report at 12.

negative news in 2000 that can explain why IMAX could not find a match at that time, the principal concurrent negative news in the August 9, 2006 press release is related to Plaintiff's allegations.

30. Regarding the earnings results announced in the press release, neither Professor James nor Ms. Allen suggests that the second quarter results caused the stock price to decline. Professor James even notes that reported earnings were a penny above stock analysts' expectations.[42] My own review of securities analyst commentary confirms that the financial results were viewed as positive news. For example, an analyst at Janco Partners wrote "IMAX reported Q2 earnings of $0.08 and revenues of $41.4 million for Q2, at the high end of the guided range …. ([S]o much for the good news)."[43]

31. To explain the decline in IMAX's stock price from the market close on August 9, 2006 through the market close on August 10, 2006, Professor James points to all of the information disclosed in the press release and the later conference call, stating numerous times that it is "difficult" if not "impossible" to "isolate the impact of these disclosures."[44] However, in arriving at this conclusion, Professor James – as well as Ms. Allen – fails to analyze intra-day trading data. As shown in Exhibit 2, most of the decline in IMAX's stock price in after-hours trading on August 9, 2006 occurred within minutes after the Company's announcement but prior to the

---

[42] James Report ¶ 123.

[43] Janco Partners, Inc. Equity Research, "No Buyout, No Guidance, New Business Model,"August 10, 2006.

[44] James Report, e.g., ¶ 145.

conference call with analysts. Thus, it is possible to parse out the collective price effect of the disclosures made before the earnings conference call.

32. Another possibility not considered by Professor James and Ms. Allen is that the announcements made during the 4:30 p.m. conference call – i.e., the change in strategy to emphasize joint ventures, the rollout of a digital format, and the resulting retraction of guidance – were interrelated with the other announcements made before the call. Several market participants commented that the strategy change was in response to the failure to find a buyer of the Company. For example, *Dow Jones Newswires* reported: "If Imax Corp. has to go it alone, then it has to make some changes in order to speed up the expansion of its theater network, its co-chief executives – and largest shareholders – told investors Wednesday."[45]

33. Moreover, analysts following IMAX generally viewed the joint venture and digital models positively in the medium- and long-term despite higher costs near-term. For example, an analyst at Roth Capital Partners stated: "We have consistently held that [the JV] route was a more viable and more favorable route to expanding the Imax circuit and maximizing the leverage in the Company's new DMR/MPX model."[46] Another analyst wrote: "We believe that the JV model is likely to prove lucrative to IMAX over the medium term …. IMAX should continue to be able to deliver positive earnings per share in the first year of offering a JV optional sales

---

[45] *Dow Jones Newswires*, "IMAX Dn 38% On News Of Informal SEC Inquiry, Strategic Process Update," August 10, 2006 (9:33 AM).

[46] Roth Capital Partners, "No Deal: Suitors Back Away, Weak Box Office Cools Near-Term Interest," August 10, 2006.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 18 of 58

model, due to the robust backlog and our expectation of continued signings, based on the sales/lease model, worldwide."[47] Professor James concedes that his review of analyst commentary indicates that "analysts were generally positive about the long-term effects of the digital model."[48] In fact, Ms. Allen provides a lengthy quote from a corporate valuation textbook which suggests that the announcement of new R&D spending has a positive effect on a company's stock price, "despite the associated decline in current earnings."[49]

34. Additionally, IMAX officials stated that potential buyers gave a "pretty hefty endorsement of both [the joint venture and digital rollout] items." [50] During the conference call, co-CEO Brad Weschler stated that "in our interaction with financial buyers [and] private equity investors … there was a lot of excitement about the notion of getting the network built as rapidly as possible, which is the JV component. There was also a lot of excitement about a quick transition to digital …."[51]

**b. March 29, 2007 Stock Price Decline**

35. It is my opinion that the statistically significant -6.45% abnormal return on March 29, 2007 was caused by IMAX's announcement before the market opened that it

---

[47] Paradigm Capital, "Focus on Understanding JV Model," August 25, 2006.

[48] James Report ¶ 114.

[49] Allen Report at 21.

[50] Voxant FD (Fair Disclosure) Wire, "Q2 2006 IMAX Corporation Earnings Conference Call - Final," August 9, 2006.

[51] *Ibid*.

was further delaying the filing of its 2006 10-K and corresponding Canadian filings and broadening its review of its revenue recognition accounting to include additional years in response to comments received from the SEC and OSC, and that, because of the filing delay, the Company was in default of a debt covenant and expected to receive a notice of delisting from the NASDAQ Stock Market. The bases for my opinion are (a) the fact that IMAX's stock price opened substantially below its closing price on the prior day and remained below this level throughout the trading day, (b) the attribution in press articles and securities analyst reports of the decline to the news and its relation to the Company's revenue recognition issues, (c) the absence of any other significant news announcements concerning IMAX on this day, (d) the concessions by Professor James and Ms. Allen that the IMAX stock price decline was caused by the press release, and (e) the fact that there is less than a 1% chance that the -6.45% abnormal return happened by mere chance.

36. Exhibit 3 is a chart of IMAX's intra-day stock prices on NASDAQ on March 29, 2007. The chart shows that the opening stock price on this day was substantially lower than the closing price on the prior day and that the price remained substantially below the prior day's close throughout the trading day. This trading pattern reflects the negative impact of the news announced before the market opened.

37. Market commentators confirmed that the further filing delay and the immediate consequences of that further delay caused IMAX's stock price to fall. For example, just after the market opened, *Reuters News* reported that "Imax Corp. lost

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 20 of 58

34 Canadian cents, or 5.5%, to C$5.83 after the giant-screen theatre maker said it will further delay the filing of its annual report for fiscal 2006 beyond the deadline of March 31, 2007, as it broadened its review to address issues related to revenue recognition for certain theatre systems installations."[52] The next day, March 30, 2007, *The Wall Street Journal* explicitly detailed the causes of the stock price decline:

> Imax Corp. said it needs more time to file its financial statements for 2006 and will miss the filing deadline. Shares of the Canadian big-screen movie company fell 33 cents, or 6.2%, to $5.04 in 4 p.m. Nasdaq Stock Market composite trading. Imax has been evaluating accounting errors made over a six-year period. It had hoped to be able to finish the review by today, however it broadened its review process as it has factored in comments from the U.S. [SEC] and the [OSC], which have been conducting informal inquiries into its revenue-recognition practices. The filing delay will result in Imax being in default of a financial-reporting covenant under a borrowing agreement, and the company will seek consent from bondholders to give it more time to complete its review.[53]

38. A Susquehanna Financial Group securities analyst discussed the implications of IMAX's disclosure:

> This morning, IMAX announced it will further delay the filing of its 2006 10-K beyond its previously requested 15-day extension, as it has expanded the review of its financial statements. As such, the company has not provided a timeframe in which it will file its 2006 10-K, which in addition to the lack of transparency, also raises some additional concerns (i.e., debt covenant violation, potential delisting from NASDAQ, cease trade order on the Toronto Stock Exchange, etc.). Therefore, despite our belief in the underlying potential of IMAX's JV and digital strategy, we would remain on the sidelines with this stock, at least until some of these overhangs

---

[52] *Reuters News*, "Toronto stocks rise as BCE surges on M&A report," March 29, 2007 (9:40 a.m.).

[53] *The Wall Street Journal*, "Business Brief – Imax Corp.: Additional Time Needed To File Financial Report, March 30, 2007.

> are removed and we have better visibility on the commercial acceptance of its long-term growth initiatives.[54]

39. The March 29, 2007 disclosure and its ramifications were a direct result of IMAX's revenue recognition errors and the attendant SEC and OSC inquiries. Neither Professor James nor Ms. Allen cite to any other reason for the decline in the Company's stock price on March 29, 2007.

40. In fact, Professor James cites similar press and analyst commentary on March 29, 2007 and concedes that "IMAX's stock price fell on the news that the filing delay would result in IMAX being in default of its financial reporting covenants, that IMAX would need to seek consent from its bondholders, and on IMAX's announcement that it expected to receive a delisting notice from the NASDAQ."[55] He cites at length the same securities analyst report that I do, but fails to reference the clear language at the beginning of the report regarding the implications of the disclosure that I quote above.[56]

41. Ignoring this commentary, Professor James claims that "IMAX's announcement of its filing delay did not provide additional information about IMAX's financial restatement over and above its previous related disclosures," specifically in a press release the Company issued on March 16, 2007.[57] But, he acknowledges that the March 16, 2007 press release disclosed that the Company "would need to restate its financials for the past six years to account for errors *unrelated* to revenue

---

[54] Susquehanna Financial Group, "Delaying the 10-K … Again," March 29, 2007.

[55] James Report ¶¶ 152-154 & 156.

[56] *Ibid*. ¶ 153.

[57] *Ibid*. ¶¶ 149 & 151.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 22 of 58

recognition policies" (emphasis added)[58] and disregards that (a) the stated length of the postponement was only 15 days;[59] (b) the March 29, 2007 press release disclosed that IMAX had determined to broaden its review of its financial statements to address issues related to comments received from the SEC and OSC and that IMAX might determine that it is necessary to restate additional items beyond the previously identified errors; and (c) the further filing delay was for an indefinite period beyond the March 31, 2007 deadlines under SEC rules and Canadian provincial securities laws, the repercussions of which included a debt covenant default and a potential delisting.[60, 61]

42. Similarly, Ms. Allen notes the announcement of the further filing delay among "other negative developments that affected IMAX's stock price" during the period

---

[58] *Ibid*. ¶ 149.

[59] *PR Newswire*, "IMAX to delay filing of 2006 10-K; Company is evaluating an estimated $2.5 million of identified accounting errors that occurred between 2001-2006; Company also announces 7 installs and 9 signings for fourth quarter," March 16, 2007. In addition, while Professor James notes in James Report ¶ 149 that the March 16, 2007 press release resulted in a stock price increase that was not statistically significant, he fails to mention that in the same press release the Company also announced news that it considered positive: "it had installed 7 theater systems in the fourth quarter of 2006, signed deals for 9 theater systems in the period and finished 2006 with approximately $27 million in cash and short-term investments." *Ibid*.

[60] *PR Newswire*, "IMAX to delay filing of 2006 10-K," March 29, 2007 (7:30 a.m.).

[61] Professor James states that on April 9, 2007, a "significant holder of IMAX's 9.625% [i.e., 9 5/8%] Senior Notes due 2010" disclosed that it had engaged a law firm "to continue organizing 'opposition to IMAX's consent solicitation seeking waiver of certain reporting defaults' as well as a related amendment of the bond indenture," but claims that this announcement and its associated statistically significant abnormal IMAX stock return of -10.38% "was tied to non-allegation related information." James Report ¶ 72-74. However, because this disclosure stems from the March 29, 2007 disclosure and thus is directly related to Plaintiff's allegations, Professor James's claim is incorrect. He further states that on April 13, 2007, IMAX stock had a statistically significant abnormal return of 9.79% following the Company's announcement that it had received consent from a majority of noteholders of its 9 5/8% Senior Notes due 2010 to extend the deadline to file its Annual Report on Form 10-K for fiscal year 2006 and all other reports, but again claims that this news was not related to Plaintiff's allegations. *Ibid*. ¶¶ 78-79. However, because this disclosure stems from the March 29, 2007 disclosure and thus is directly related to Plaintiff's allegations, Professor James's claim is incorrect.

from August 10, 2006 to July 20, 2007, but she provides nothing more than the blanket conclusion that "we did not find that the revenue recognition issues themselves were the cause of the price decline during this period."[62] As explained in §V below, Ms. Allen's theoretical analysis of the revenue recognition issues is incorrect because it ignores basic finance theory.

**c. IMAX's July 20, 2007 Stock Price Increase**

43. It is my opinion that IMAX's announcement on July 20, 2007 of its completed restatement was a substantial cause of the statistically significant 10.68% abnormal return on that day. The bases for my opinion are (a) the fact that IMAX's stock price opened substantially above its closing price on the prior day and remained above this level throughout the trading day, (b) the attribution in press articles and securities analyst reports of the increase to the IMAX announcement and its relation to the Company's revenue recognition accounting issues, (c) the concession by Professor James that IMAX's financial restatement was viewed positively, the reaction to the earnings information was mixed, and IMAX's multiple other disclosures that day were negative news items,[63] and (d) the fact that there is less than a 1% chance that the 10.68% abnormal return happened by mere chance.

---

[62] Allen Report at 17-18.

[63] Ms. Allen quotes from Plaintiff's complaint regarding IMAX's announcement on July 20, 2007 and notes that the Company's stock price increased on this date but does not offer any analysis or commentary regarding the cause of the stock price increase. *Ibid*. at 5. Accordingly, she does not claim directly that this specific stock price increase is unrelated to Plaintiff's allegations.

44. Exhibit 4 is a chart of IMAX's intra-day stock prices on NASDAQ on July 20, 2007. The chart shows that the opening stock price on this day was substantially above the closing price on the prior day and that the price remained substantially above the prior day's close throughout the trading day. This trading pattern reflects the positive impact of the news announced before the market opened.

45. Market commentators attributed the increase in IMAX's stock price following the press release to the news regarding the restatement. For example, *The Toronto Star* reported that "[s]hares of Imax Corp. shot up nearly 11 per cent yesterday after the operator of big-screen movie theatres posted a first-quarter loss and restated its financial results for previous years, lowering the curtain on its accounting debacle."[64]

46. Securities analysts reacted positively to the news of IMAX's restatement, 10-K and 10-Q filings, and likely compliance with its bond indenture. For example, a securities analyst at Susquehanna Financial Group stated: "In our opinion, the filing of its financial statements should be viewed positively, as the company was able to do so without (again) violating its financial reporting covenants. Positive Factor."[65] Another securities analyst at BMO Capital Markets wrote that "… the stock has shown some strength as the market has reason to think the company is back in compliance with its bond indenture."[66] In a report titled "Filing Lifts an

---

[64] *The Toronto Star*, "Imax cleanses financial slate; Big-screen company's shares soar nearly 11%, on earnings restatement," July 21, 2007.

[65] Susquehanna Financial Group, "The Numbers Are In ...," July 20, 2007.

[66] BMO Capital Markets, "Relief Rally Fueled by 10-K, 10-Q Filings; Cash Becomes Critical," July 20, 2007.

Overhang," a securities analyst at Soleil Securities Corp. stated: "With the accounting issues behind it, we believe IMAX can finally begin to benefit from the strength of its film slate this year…. We believe it's not coincidental that the Company announced a new theatre system today, now that it has finally filed. We believe many exhibitors interested in an IMAX system have probably been waiting for the Company to resolve the accounting issues before pulling the trigger."[67]

47. Securities analyst commentary following IMAX's July 20, 2007 announcement demonstrates that these analysts viewed the earnings news released on that day as neutral. For example, one commented that: "Overall, results were generally in-line with the company's previously announced expectations, though much of the focus was on the restatement of earnings, which resulted from a change in its revenue recognition policy (as it pertains to theatre system installations)."[68]

48. Professor James agrees that the restatement was a substantial cause of the stock price increase on July 20, 2007. He mentions no other positive news released on that day, stating that:

> IMAX's financial restatement was viewed positively as it (1) affirmed that the revenue restatement was small and only shifted revenues across different time periods and (2) likely decreased some of the uncertainties surrounding IMAX's stock. There were also multiple negative news items on this day, including management's emphasis that IMAX's transition to joint venture deals and digital technology would negatively impact near-term results.[69]

---

[67] Soleil Securities Corp., "Filing Lifts an Overhang," July 25, 2007.

[68] Susquehanna Financial Group, "The Numbers Are In ...," July 20, 2007.

[69] James Report ¶ 160.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 26 of 58

He regards other information announced on July 20, 2007 as "both negative and mixed in nature," including information that "the SEC and OSC inquiries were ongoing."[70] He also affirms that "there was mixed commentary on this day related to IMAX's fiscal year 2006 and first quarter 2007 earnings" and that "it is unclear whether [IMAX's quarterly loss] information was viewed positively or negatively by the market."[71]

49. Professor James claims that "[a]s IMAX's stock price increased significantly on July 20, 2007, Plaintiffs cannot tie the Company's stock price movement to any economic loss suffered by IMAX's shareholders due to the alleged misrepresentations."[72] However, the fact that the abnormal return on IMAX's stock was positive and statistically significant following the Company's announcement of its restated financials demonstrates that the stock price had declined significantly earlier in response to prior restatement-related announcements occasioned by the alleged fraud.

## V. Professor James's and Ms. Allen's Theoretical Analyses of IMAX's Revenue Recognition Issues

50. Professor James claims that based on financial economics research, "[a]s IMAX's restatement had no material impact on the Company's future cash flows, it would not be expected to affect the Company's valuation in a significant way."[73]

---

[70] *Ibid.* ¶ 162.

[71] *Ibid.* ¶¶ 160 & 164.

[72] *Ibid.* ¶ 160.

[73] *Ibid.* ¶¶ 25 & 28.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 27 of 58

Similarly, Ms. Allen states that "[e]mpirical finance research has found that … when cash flows and accounting changes diverge, it is only the change in cash flows, not accounting numbers, that matters to investors" and claims that IMAX's "restatement did not materially affect historical cash flows, and there is no indication that it would materially affect expectations of future cash."[74] As demonstrated by their claims, Professor James and Ms. Allen misleadingly focus solely on the effect of IMAX's restatement on its expected future cash flows and ignore the effect of the restatement on the Company's riskiness of achieving those cash flows as quantified by the effect of the revenue recognition accounting issues on its discount rate, or cost of capital.

51. As a matter of economics, a company's stock price reflects the company's expected future cash flows discounted to the present at the appropriate cost of capital.[75] A company's cost of capital reflects the rate of return investors in the stock require to compensate them for the stock's risk. The cost of capital reflects both the risk of attaining the cash flows expected to be generated by the company's operations and the rate of return investors expect to realize from an investment in the company's stock. The more uncertain the stock's future cash flows, the higher the investor's required rate of return, and therefore, the greater its cost of capital.[76]

52. Hence, a company's stock price is expected to decline upon the disclosure of news if the information reduces the firm's expected future cash flows or causes the

---

[74] Allen Report at 19 & 20.

[75] *E.g.*, Ross, Stephen, Randolph Westerfield, and Jeffrey Jaffe, *Corporate Finance* 7th edition, McGraw-Hill, 2005 at 112.

[76] *Ibid.* at 284-287 & 602.

company's cost of capital to increase, or both. A recent study finds that corporate misconduct leads to an increase in risk as measured either by stock return volatility or by the dispersion of stock analysts' forecasts.[77] The change in perceived risk is consistently greater when the misconduct involves a related-party offense, that is, an offense involving shareholders or other parties that are related in some way to the corporation committing the misconduct, such as securities fraud.[78] The misconduct also results in a loss of shareholder wealth due to the corporation's reputational loss owing to the misconduct.[79] The announcement of an SEC inquiry concerning revenue recognition accounting would thus be expected to increase the perceived riskiness of IMAX's stock, resulting in a higher required rate of return and a lower price for IMAX's shares, a point that Professor James and Ms. Allen both entirely ignore.

53. Studies also have shown that restatements often have an effect on both the firm's estimated cash flows and its cost of capital.[80] In particular, these studies show that restatements cause an increase in the company's cost of capital, which leads to a decline in the value of the company's stock.[81] This increase in a firm's cost of

---

[77] Murphy, Deborah L., Ronald E. Shrieves, and Samuel L. Tibbs, "Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk," *Journal of Financial and Quantitative Analysis*, 44, 2009, 55-83.

[78] *Ibid.* at 82.

[79] *Ibid*.

[80] *See, e.g.,* Hribar, Paul and Nicole T. Jenkins, "The Effect of Accounting Restatements on Earnings Revisions and the Estimated Cost of Capital," *Review of Accounting Studies*, 9, 2004, 337-356, and Kravert, Todd and Terry Shevlin, "Accounting Restatements and Information Risk," *Review of Accounting Studies*, 15, 2010, 264-294.

[81] *Ibid.*

capital is consistent with restatements increasing uncertainty about the company's future profitability and at the same time raising concerns about the credibility and competence of the company's managers.[82]

54. Moreover, restatements involving revenue recognition issues can have a greater effect on a company's stock price than other types of restatements. In particular, one study finds that more pronounced stock price declines and larger bid-ask spreads are observed for firms that restate due to revenue recognition issues.[83]

55. Therefore, assuming *arguendo* that IMAX's total expected future cash flows were not affected by the restatement, the Company's stock price still could have declined due to an increase in its cost of capital as a direct result of its announcements related to its revenue recognition issues.

56. There is reason to believe that IMAX's revenue recognition issues increased the perceived riskiness of its expected future cash flows and thus increased the Company's cost of capital. For example, the outcome of the SEC inquiry disclosed on August 9, 2006 was then unknown, which likely caused uncertainty regarding a potential escalation of the investigation, potential fines, or other negative effects on expected future cash flows. This uncertainty was highlighted by analysts, who described the effect of the SEC's inquiries on IMAX's stock price using terms such as "material risk," "investor scepticism," "cloud," and "overhang" (*see supra* ¶ 24).

---

[82] Hribar and Jenkins (2004) at 339 and Kravert and Shevlin (2010) at 265.

[83] E.g., Anderson, Kirsten L. and Teri L. Yohn, "The Effect of 10-K Restatements on Firm Value, Information Asymmetries, and Investors' Reliance on Earnings," Working Paper, Georgetown University, 2002.

57. Indeed, Ms. Allen states that the "riskiness of achieving" cash flows affects a stock's price "via the discount factor,"[84] and Professor James acknowledges that information related to Plaintiff's allegations caused "increased risks incumbent on the company" and "uncertainty."[85] However, in their theoretical analyses, both ignore any effect that IMAX's restatement-related announcements could have had on investors' perception of the stock's riskiness. The fact that Professor James and Ms. Allen recognize that IMAX's stock price changed following announcements related to the Company's revenue recognition issues and restatement undermines their theoretical arguments that the stock price was unaffected by these announcements.

58. Professor James and Ms. Allen also are incorrect that the timing of IMAX's recognition of installations had no effect on the Company's stock price. Both of these experts ignore the effect that the restated financial results in the third quarter of 2006 would have had on IMAX's stock price on November 9, 2006. After the market closed on November 8, 2006, the Company announced, among other things, its financial results for the third quarter of 2006, disclosing that "primarily because it did not install any theatre systems in the third quarter ended September 30, 2006, it incurred a net loss of $0.30 per diluted share for the three month period" compared to net earnings of $0.05 for the 2005 third quarter, with total

---

[84] Allen Report at 20 & Note 33.

[85] James Report ¶¶ 139 & 141.

revenues of $20.7 million vs. $33.4 million in the prior year.[86] The abnormal return on November 9, 2006, the following trading day, was -29.61%, which was statistically significant.[87] Market commentators attributed the stock price decline to the "weak report."[88] However, the restated numbers were substantially better for this quarter, with a net loss of $0.14 per diluted share on revenues of $31.0 million.[89] Had the restated numbers been reported instead, it is likely that the decline in IMAX's stock price on November 9, 2006 would not have been as severe.

59. In addition, Professor James and Ms. Allen are incorrect that the restatements would not affect IMAX's cash flows. An SEC inquiry is distracting to management, which can reduce operating efficiency and reduce profitability and cash flow. Second, responding to the SEC and OSC inquiries required IMAX to incur substantial accounting and legal expenses to investigate and respond to the questions raised by regulators.[90] Third, IMAX had two covenant violations because of its failure to file timely financial statements, one involving its bank loan agreement and the other involving its 9 5/8% Senior Notes due 2010, for which it incurred costs to seek and obtain waivers.[91] Fourth, there can be significant

---

[86] *PR Newswire*, "IMAX Corporation Reports Third Quarter Financial Results: - Pursuing Key Initiatives Designed to Grow Business and Shareholder Value over Long Term -," November 8, 2006 (4:30 p.m.).

[87] James Report ¶ 55.

[88] *Reuters News*, "UPDATE 2-Imax shares plunge after 3rd-quarter loss," November 8, 2006 (4:40 p.m.).

[89] IMAX Form 10-K for the fiscal year ended December 31, 2006 at 137.

[90] E.g., IMAX Form 10-K for the fiscal year ended December 31, 2007 at 57.

[91] E.g., *ibid.* at 57 & 70.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 32 of 58

indirect costs resulting from a restatement, which can lead to lower cash flows in the future. A recent study finds that loans initiated after a restatement have significantly greater loan spreads and shorter maturities, are more likely to require collateral, and are also more likely to have tighter covenant restrictions.[92] It also finds that the increase in loan spread is significantly greater when fraud is involved and concludes that banks impose tighter covenant restrictions to address the risk and information problems caused by the restatement.[93]

60. Even if IMAX's total cash flow and its total revenue had not changed, their timing did change because of IMAX's revenue recognition accounting problems. Altering the timing of a company's revenue can affect securities analysts' projections of the Company's future revenue growth rate, which can in turn affect the stock's market price. Improperly accelerating revenue from a later period can also lead to an overstatement of the value of the company when the company's equity is valued as a multiple of its revenue. Stock appraisers often base their company valuations on a multiple of company revenue.[94]

61. It is my opinion that the increase in the perceived riskiness of IMAX stock, the cost of dealing with the SEC and OSC inquiries, and the change in investors' assessments of IMAX's growth prospects all contributed to the significant stock price changes in response to IMAX's announcements regarding its revenue recognition accounting on August 9-10, 2006, March 29, 2007, and July 20, 2007,

---

[92] Graham, John R., Si Li, and Jiaping Qiu, "Corporate Misreporting and Bank Loan Contracting," *Journal of Financial Economics*, 89, 2008, 44-61.

[93] *Ibid.* at 44.

[94] E.g., Damodaran, Aswath, *Investment Valuation*, 2nd edition, Wiley, 2002, 543-565.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 33 of 58

but that the increase in the stock's perceived riskiness was the most important of the three factors.

## VI. Conclusion

62. It is my opinion that, contrary to the conclusions contained in the James Report and the Allen Report, changes in IMAX's common stock price on August 9-10, 2006, March 29, 2007, and July 20, 2007 were directly related to and substantially caused by disclosures regarding IMAX's revenue recognition accounting policy, and in particular, when the revenues and earnings related to its theater systems installations were recognized. My opinion is based on the statistical significance of the abnormal returns on these dates according to Professor James's regression analyses, my analysis of other company news and intra-day stock price movements on these dates, my review of IMAX's and its management's disclosures, press articles, and securities analyst commentary around these dates, and my review of the James Report and the Allen Report, all as described in the preceding paragraphs of this declaration. The cumulative abnormal return in IMAX's stock price following the disclosures I analyzed is -38.57%, which is significant at better than the 1% level, which means there is less than a 1% chance that this cumulative abnormal return happened by mere chance.[95]

63. My analysis is based on the materials I have reviewed to date. I reserve the right to amend my opinion and file a supplemental declaration in this matter should I obtain any other significant information that leads me to change any of the

[95] Exhibit 1.

opinions expressed in this declaration. To the extent this matter is adjourned for any reason, I further reserve the right to supplement this declaration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed: July 30, 2010

John D. Finnerty, Ph.D.

# Appendix A

## JOHN D. FINNERTY, PhD

**Professor of Finance,**
**Fordham University Graduate School of Business Administration**

**Managing Principal, Finnerty Economic Consulting, LLC**

Phone: (212) 599-1640
Fax: (212) 599-1242
finnerty@fordham.edu

One Grand Central Place, Suite 2910
60 East 42nd Street
New York, NY 10165

Dr. Finnerty is Professor of Finance and the former Director of the Master of Science in Quantitative Finance Program at Fordham University's Graduate School of Business Administration. He teaches corporate finance, investment banking, fixed income securities, fixed income portfolio management, and bankruptcy restructuring. He also specializes in business valuation, securities valuation, derivatives valuation, solvency analysis, calculation of damages, and litigation support for matters involving valuation disputes, securities fraud, solvency, fairness, breach of contract, breach of fiduciary duty, commercial disputes, and employment disputes involving the valuation of employee stock options. He has testified as an expert in valuation, broker raiding, and securities and other financial matters in federal and state court and in arbitration and mediation proceedings. He has also testified as an expert in bankruptcy court concerning the fairness of proposed plans of reorganization.

Dr. Finnerty has published thirteen books, including *Corporate Financial Management*, 3rd ed., *Project Financing: Asset-Based Financial Engineering,* 2nd ed., P*rinciples of Financial Management*, and *Debt Management*, and more than 90 articles and professional papers in corporate finance, business and securities valuation, and other areas of finance. His writings and teaching have focused on the analysis and valuation of securities, especially fixed income instruments and complex derivative products, and mortgage-backed and other asset-backed securities. Dr. Finnerty is a former editor of *Financial Management*, one of the leading academic finance journals, a former editor of *FMA Online*, and a member of the editorial advisory board of the *Journal of Portfolio Management*.

Dr. Finnerty worked for more than 20 years as an investment banker. He worked on more than 50 public and private financings, and served as financial advisor in connection with several mergers and several project financings.

Dr. Finnerty is a Trustee and a former Chair of the Trustees and a former President and Director of the Eastern Finance Association, a former President and Director of the Fixed Income Analysts Society, and. a former Director of the Financial Management Association International. He served as Vice President – Program for the 2006 annual meeting of the Eastern Finance Association. He also served as a member of FASB's Option Valuation Group in connection with the revision of FAS 123.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 36 of 98

**EDUCATION**

| | |
|---|---|
| 1977 | Ph.D. in Operations Research, Naval Postgraduate School |
| 1973 | B.A. and M.A. in Economics, Cambridge University; Marshall Scholar |
| 1971 | A.B. in Mathematics, Williams College; magna cum laude with highest honors in Mathematics; Rice Prize in Mathematics; Phi Beta Kappa |

**ACADEMIC EXPERIENCE**

| | |
|---|---|
| 1987 - Present | **Fordham University Graduate School of Business Administration, New York, NY**<br>Professor of Finance and former Director of the Master of Science in Quantitative Finance Program. Received tenure in September 1991.<br>Gladys and Henry Crown Award for Faculty Excellence, 1997. |
| 1976 - 1977 | **Naval Postgraduate School, Monterey, CA**<br>Adjunct Professor, Department of Administrative Sciences |
| 1973 - 1976 | **United States Naval Reserve**<br>Instructor, Naval Postgraduate School. Promoted to Lieutenant, USNR. |

**BUSINESS EXPERIENCE**

| | |
|---|---|
| 2003 – Present | **Finnerty Economic Consulting, LLC, New York, NY**<br>Managing Principal |
| 2001 - 2003 | **Analysis Group, Inc., New York, NY**<br>Managing Principal |
| 1997 - 2001 | **PricewaterhouseCoopers, LLP, New York, NY**<br>Partner, Financial Advisory Services Group<br>Dispute Analysis & Investigations securities litigation practice |
| 1995 - 1997 | **Houlihan Lokey Howard & Zukin, New York, NY**<br>Director |
| 1989 - 1995 | **McFarland Dewey & Co., New York, NY**<br>General Partner |
| 1986 - 1989 | **College Savings Bank, Princeton, NJ**<br>Executive Vice President, Chief Financial Officer, Treasurer, Secretary, and Director |

1982 - 1986 **Lazard Frères & Company, New York, NY**
Vice President, Corporate Finance Department

1977 - 1982 **Morgan Stanley & Co. Inc., New York, NY**
Associate, Corporate Finance Department

**PROFESSIONAL ASSOCIATIONS**

Chair of the Trustees, Eastern Finance Association (2009-2010), Trustee (2008-Present), President (2007-2008), and Director (2005-2008)

President, Fixed Income Analysts Society (2006-2007), and Director (2001-2009)

Editor, FMA Online (2001-2010)

Editor, *Financial Management* (1993-1999)

Associate Editor, *Journal of Derivatives Accounting* (2003-2005)

Associate Editor, *Journal of Applied Finance* (2000-2007)

Member, Editorial Advisory Boards, *The Financier* (1995-2003) and *Journal of Portfolio Management* (1995-Present)

Director, Financial Management Association (1991-1999, 2005-2007)

Associate Editor, *Journal of Financial Engineering* (1992-1999)

**OTHER ACTIVITIES**

Leadership Giving Co-Chair, Williams College Class of 1971

Co-chairman, New Jersey Special Gifts Program, Williams College Third Century Campaign

Member, Special Gifts Committee, New York City Area for Williams College Third Century Campaign

Vice Chairman, Williams College Class of 1971 25th Reunion Gift Committee

**AWARDS**

Marshall Scholar, 1971

Gladys and Henry Crown Award for Faculty Excellence, Fordham Business School, 1997

Best Investments Paper, Southern Finance Association, 2001

Best Corporate Finance Paper, Southern Finance Association, 2006

Bene Merenti Medal, Fordham University, 2007

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 38 of 58

## EXPERT TESTIMONY IN LAST FOUR YEARS

| ***Client*** | ***Case*** | ***Description of Testimony*** |
|---|---|---|
| Satterlee Stephens Burke & Burke<br>Law Offices of<br>Lawrence S. Leibowitz | Baird, Patrick & Co. v. Maxcor Financial et al.<br>NASD Arbitration<br>Case No. 03-07325 | Prepared an expert report concerning the lost profits damages in a broker raiding case. Testified at arbitration. |
| Kaplan & Levenson | McCabe, et al. v. Ernst & Young, LLP, et al.<br>U.S. District Court for the District of New Jersey<br>Case No. 01-CIV-5747(WHW) | Prepared an expert report and a rebuttal report concerning the damages experienced by selling shareholders in a post-merger dispute. Testified at deposition. |
| Weil, Gotshal & Manges | G-I Holdings, Inc. et al. v. Ruddles A. Bennett, Jr., et al.<br>U.S. District Court for the District of New Jersey<br>Adversary Proceeding No. 01-3066 | Prepared two expert reports concerning the financial impact of a corporate restructuring. Testified at deposition. |
| Debevoise & Plimpton | WellPoint Health Networks Inc. and UNICARE Life & Health Insurance Company v. John Hancock Life Insurance Company<br>Arbitration | Prepared an expert report concerning the financial impact of an acquisition. Testified at deposition and at arbitration. |
| Jones Day | MC Asset Recovery v. Southern Company<br>U.S. District Court for the Northern District of Georgia, Atlanta Division<br>Civil Action No. 1:06-CV-0417-BBM | Prepared an expert report concerning the satisfaction of the claims of the unsecured creditors in the bankruptcy of Mirant Corporation and testified at deposition. |
| Wollmuth Maher & Deutsch | State of Arkansas Teacher Retirement System v. Merrill Lynch, et al.<br>District Court, 193rd Judicial District, Dallas County, Texas,<br>Cause No. 04-06699 | Performed damages analysis and rendered opinions concerning the private placement agent's responsibilities and the due diligence process in connection with a securities fraud matter. Testified at deposition. |
| Labaton Sucharow & Rudoff | Richard A. Williamson v. PricewaterhouseCoopers,<br>Supreme Court of the State of New York,<br>Index No. 04-602106 | Analyzed the mispricing of convertible securities and the auditor's failure to detect it. Testified at deposition. |
| Wollmuth Maher & Deutsch | AIG Annuity Insurance Company, et al. v. Sears, Roebuck and Co.<br>District Court, 192nd Judicial District, Dallas County, Texas<br>Cause No. 04-10471 | Analyzed a corporate financial engineering transaction. Testified at deposition. |

| ***Client*** | ***Case*** | ***Description of Testimony*** |
|---|---|---|
| Riker Danzig Scherer Hyland Perretti | John M. Van Deventer et al. v. CS SCF Management Limited et al.<br>Supreme Court of the State of New York<br>Index No. 603151-03 | Valued six businesses and calculated the break-up fees owing to an investment manager due to the early termination of a management contract. Testified at deposition and at trial. |
| Internal Revenue Service | Shell Petroleum v. United States of America<br>U.S. District Court for the Southern District of Texas, Houston Division<br>Index No. H-05-2016 | Provided an expert report concerning auction preferred stock. Testified at deposition and at trial. |
| Air Line Pilots Association | ALPA and U.S. Airways<br>Grievance No. MEC 05-07-01 (Investment Banking Fee) | Testified at an arbitration hearing regarding the customary investment banking fee for an investment bank working on an airline reorganization. |
| Sidley Austin | Jack E. Salmon, Jr. v. KPMG LLP et al.<br>Arbitration | Prepared an expert report concerning lost-compensation damages. Testified at deposition and at arbitration. |
| Wolf Haldenstein Adler Freeman & Herz | Boyce v. Soundview Technology Group<br>U.S. District Court for the Southern District of New York<br>C.A. No. 03 CV 2159 (HB) | Prepared an expert report concerning damages in a breach of contract case. Testified at deposition and at trial. |
| Boies Schiller & Flexner | UBS Securities LLC and UBS Loan Finance LLC v. The Finish Line, Inc., and Genesco, Inc.<br>U.S. District Court for the Southern District of New York<br>C.A. No. 07 Civ. 10382 (LAP) | Performed a solvency analysis for a proposed leveraged acquisition. Testified at deposition. |
| Kirkland & Ellis | In Re: Calpine Corporation, et al. Calpine Corporation v. Rosetta Resources, Inc.<br>U.S. District Court for the Southern District of New York<br>Chapter 11 Case No. 05-60200 (BRL) | Performed a solvency analysis in connection with a fraudulent conveyance action. Testified at deposition. |
| Labaton Sucharow | In re American International Group, Inc. Securities Litigation<br>U.S. District Court for the Southern District of New York<br>Master File No. 04 Civ: 8141 | Performed an analysis of stock and bond market efficiency in connection with lead plaintiff's motion for class certification. Testified at deposition and at trial. |
| U.S. Department of Justice | Taxpayer v. U.S.<br>U.S. Court of Federal Claims<br>Case No. 05-26T | Prepared an expert report analyzing the business purpose of short sale transactions. Testified at deposition. |

| ***Client*** | ***Case*** | ***Description of Testimony*** |
|---|---|---|
| Wilmer Cutler Pickering Hale and Dorr | Boston Company Asset Management v. Remi Browne et al.<br>Superior Court Commonwealth of Massachusetts<br>Civil Action No. 07-3656BLS2 | Prepared an expert report calculating damages in a case alleging breach of fiduciary duty and breach of non-solicitation agreements. Testified at deposition. |
| Jaffe, Raitt, Heuer & Weiss | Oppenheimer v. Citigroup Global Markets et al.<br>NASD Arbitration<br>Case No. 03-02421 | Prepared an expert report concerning the lost profits damages in a broker raiding case. Testified at arbitration. |
| Gibbons<br>Connolly, Bove, Lodge & Hutz | Olson v. Halvorsen et al.<br>Court of Chancery of the State of Delaware<br>Civil Action No. 1884-N | Prepared an expert report, a rebuttal report, and a supplemental report concerning the value of a former partner's economic interests in a hedge fund management company under different damages theories. Testified at deposition and at trial. |
| Fisher & Phillips | RBC Dain Rauscher v. Stephens et al.<br>NYSE Arbitration<br>NYSE Docket No. 2004-016322 | Prepared an expert report concerning the lost profits damages in a broker raiding case. Testified at arbitration. |
| Debevoise & Plimpton<br>Potter Anderson & Corroon | In Re: Appraisal of Metromedia International Group, Inc.<br>Court of Chancery of the State of Delaware<br>Civil Action 3351-CC | Prepared an expert report and a rebuttal report concerning the fair value of an issue of convertible preferred stock for appraisal rights purposes. Testified at deposition and at trial. |
| Giffen & Kaminski | AmTrust Investment Services, Inc., et al. v. Charter One, et al.<br>FINRA Arbitration<br>Case No. 07-02012 | Analyzed damages for alleged breach of contract and testified at arbitration. |
| Coughlin Stoia Geller Rudman & Robbins | Roth v. Aon Corporation et al.<br>U.S. District Court for the Northern District of Illinois<br>Case No. 04-C-6835 | Prepared an expert report analyzing the efficiency of the market for the company's stock, providing an event-study analysis concerning loss causation, and calculating damages in connection with an alleged securities fraud. Testified at deposition. |
| Coughlin Stoia Geller Rudman & Robbins | Eric Silverman v. Motorola, Inc., et al.<br>U.S. District Court for the Northern District of Illinois<br>Case No. 1:07-cv-04507 | Performed an event-study analysis concerning loss causation. Testified at deposition. |
| Carrington, Coleman, Sloman &Blumenthal | Balkrishna Shagrithaya v. Max Martin<br>District Court of Dallas County, Texas, 162nd Judicial District<br>Case No. 07-15149 | Performed an analysis of the reasonableness of a corporation's retained cash and marketable securities. Testified at deposition and at trial. |
| Hangley Aronchick Segal & Pudlin | Christopher P. Thalacker v. Gerald D. Hoak<br>American Arbitration Association<br>Case No. 13 148 02714 08 | Prepared an expert report concerning hedge funds and the performance of the respondent's investment in the claimant's hedge fund. Testified at the arbitration hearing. |

| ***Client*** | ***Case*** | ***Description of Testimony*** |
|---|---|---|
| Labaton Sucharow | Richard A. Williamson, as Successor Liquidating Trustee, v. Kenneth Lipper<br>FINRA Arbitration<br>Case No. 08-03610 | Prepared an expert report concerning the damages resulting from mismarking a convertible securities portfolio over several years. Testified at arbitration. |
| Morris, Manning & Martin | ING USA Annuity and Life et al. v. J.P. Morgan Securities et al.<br>Superior Court of Fulton County, Georgia<br>Civil Action No. 2007CV134590 | Prepared an expert report and a rebuttal report concerning the adequacy of disclosure in private placement offering materials and quantifying the plaintiffs' damages. Testified at deposition. |
| Buchanan Ingersoll & Rooney | Wachovia Securities v. Frank J. Brand et al.<br>FINRA Arbitration<br>Case No. 08-01374 | Prepared an expert report calculating damages in a broker raiding case. Testified at arbitration. |
| Saul Ewing | A.G. Edwards v. Theodore Sturges et al.<br>FINRA Arbitration<br>Case. No. 07-03166 | Prepared an expert report calculating damages in a broker raiding case. Testified at arbitration. |
| Internal Revenue Service | Taxpayer v. Commissioner of Internal Revenue<br>United States Tax Court<br>Dallas, TX<br>Docket Nos. 12937-07, 12938-07, and 14880-07 | Prepared an expert report and a rebuttal expert report concerning the unreasonable expectation of profit for a tax strategy involving the short sale of Treasury bonds. Testified at trial. |
| Kaye Scholer<br>Hughes Hubbard & Reed | Adelphia Recovery Trust v. Bank of America et al.<br>U.S. District Court for the Southern District of New York<br>Case No. 05 Civ. 9050 (LMM) (RLE) | Prepared an expert report concerning the feasibility of performing solvency analyses and valuation analyses for Adelphia as of various dates based on the limited amount of information available. Testified at deposition. |
| Oppenheimer & Company | Koval v. Oppenheimer<br>FINRA Arbitration<br>Case No. 08-02468 | Rendered expert testimony regarding the collapse of the market for auction rate securities. Testified at arbitration. |
| Coughlin Stoia Geller Rudman & Robbins | City of Ann Arbor Employees' Retirement System v. Sonoco Products et al.<br>U.S. District Court for the District of South Carolina<br>Case No. 4:08-cv-02348-TLW-TER | Prepared an expert report analyzing the efficiency of the market for the company's stock and providing an event-study analysis of the significance of the stock price declines on the disclosure dates in connection with an alleged securities fraud. Testified at deposition. |
| Jones Day | Westminster Securities Corp. v. Petrocom Energy Limited et al.<br>International Center for Dispute Resolution Arbitration<br>Case No. 50 148 T 00420 08 | Prepared an expert report describing the purpose of a tail provision in a private placement agent agreement and analyzing the tail provisions in three such agreements that were at issue. Testified at arbitration. |

| ***Client*** | ***Case*** | ***Description of Testimony*** |
|---|---|---|
| Robbins Geller Rudman & Dowd | City of Hialeah Employees' Retirement System et al. v. Toll Brothers, Inc., et al.<br>U.S. District Court for the Eastern District of Pennsylvania<br>Civil Action No. 07-1513 CLASS ACTION | Prepared an expert report analyzing the efficiency of the market for the company's stock and providing an event-study analysis of loss causation. Testified at deposition. |
| Moskowitz, Mandell, Salim & Simowitz<br>Duane Morris | Trump Hotels & Casino Resorts Development Company, LLC v. Richard T. Fields, et al.<br>Circuit Court of the 17th Judicial District in and for Broward County, Florida<br>Civil Division<br>Case No. 0420291 | Prepared an expert report concerning the financial capacity of a prospective casino developer to meet its business and financial obligations in connection with a set of casino projects. Testified at deposition. |

## PUBLICATIONS

### Books

1. John D. Finnerty, An Illustrated Guide to Bond Refunding Analysis. The Financial Analysts Research Foundation, Charlottesville, VA, 1984.

2. John D. Finnerty, Corporate Financial Analysis: A Comprehensive Guide to Real-World Approaches for Financial Managers. McGraw-Hill Book Company, New York, 1986.
   a) Main Selection: Macmillan's The Executive Program
   b) Alternate Selection: Prentice-Hall's Books for Accountants

3. John D. Finnerty, Andrew J. Kalotay, and Francis X. Farrell, Jr., The Financial Manager's Guide to Evaluating Bond Refunding Opportunities. Ballinger Publishing Company, Cambridge, MA, 1988.

4. Douglas R. Emery and John D. Finnerty, Principles of Finance with Corporate Applications. West, St. Paul, MN, 1991.

5. John D. Finnerty and Martin S. Fridson, eds., The Yearbook of Fixed Income Investing 1995. Irwin Professional Publishing, Chicago, 1996.

6. John D. Finnerty, Project Financing: Asset-Based Financial Engineering. John Wiley & Sons, New York, 1996.

7. Douglas R. Emery and John D. Finnerty, Corporate Financial Management. Prentice Hall, Upper Saddle River, NJ, 1997.

8. Douglas R. Emery, John D. Finnerty, and John D. Stowe, Principles of Financial Management. Prentice Hall, Upper Saddle River, NJ, 1998.

9. John D. Finnerty and Douglas R. Emery, Debt Management. Harvard Business School Press, Boston, 2001.

10. Douglas R. Emery, John D. Finnerty, and John D. Stowe, Corporate Financial Management, 2nd ed. Prentice Hall, Upper Saddle River, NJ, 2004.

11. Douglas R. Emery, John D. Finnerty, and John D. Stowe, Corporate Financial Management, 3rd ed. Prentice Hall, Upper Saddle River, NJ, 2007.

12. Douglas R. Emery, John D. Finnerty, and John D. Stowe, Corporate Financial Management, Int. ed. Prentice Hall, Upper Saddle River, NJ, 2007.

13. John D. Finnerty, Project Financing: Asset-Based Financial Engineering, 2nd ed. John Wiley & Sons, New York, 2007.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 44 of 58

**Monographs**

1. John D. Finnerty, "The PricewaterhouseCoopers Credit Derivatives Primer," PricewaterhouseCoopers LLP, New York, 1998.

2. John D. Finnerty, "Structuring Derivative Instruments to Adjust Risk Exposure: The Arithmetic of Financial Instruments," PricewaterhouseCoopers LLP, New York, 1999.

3. John D. Finnerty, "A Comparison of Alternative Models for Valuing Employee Stock Options," Financial Executives Research Foundation, Florham Park, NJ, January 2003.

**Papers Published in Refereed Journals**

1. John D. Finnerty, "How Often Will the Firemen Get Their Sleep?," Management Science (July 1977), pp. 1169-1173.

2. John D. Finnerty, "Real Money Balances and the Firm's Production Function," Journal of Money, Credit and Banking (November 1980), pp. 666-671.

3. John D. Finnerty, "The Behavior of Electric Utility Common Stock Prices Near the Ex-Dividend Date," Financial Management (Winter 1981), pp. 59-69.

4. John D. Finnerty, "The Stock Market's Reaction to the Switch from Flow-Through to Normalization," Financial Management (Winter 1982), pp. 36-47.

5. John D. Finnerty, "Evaluating the Economics of Refunding High-Coupon Sinking-Fund Debt," Financial Management (Spring 1983), pp. 5-10.

6. John D. Finnerty, "Bank Discount, Coupon Equivalent, and Compound Yields: Comment," Financial Management (Summer 1983), pp. 40-44.

7. John D. Finnerty, "Preferred Stock Refunding Analysis: Synthesis and Extension," Financial Management (Autumn 1984), pp. 22-28.

8. John D. Finnerty, "Stock-for-Debt Swaps and Shareholder Returns," Financial Management (Autumn 1985), pp. 5-17.

9. John D. Finnerty, "Zero Coupon Bond Arbitrage: An Illustration of the Regulatory Dialectic at Work," Financial Management (Winter 1985), pp. 13-17.

10. John D. Finnerty, "Refunding Discounted Debt: A Clarifying Analysis," Journal of Financial and Quantitative Analysis (March 1986), pp. 95-106.

11. John D. Finnerty, "A Visit with Alice in Moneyland," Journal of Corporate Finance (Spring 1987), pp. 46-47.

12. John D. Finnerty, "An Analytical Framework for Evaluating Securities Innovations," Journal of Corporate Finance (Winter 1987), pp. 3-18.

13. John D. Finnerty, "Capital Budgeting and CAPM: Choosing the Market Risk Premium," Journal of Corporate Finance (Winter 1988), pp. 11-14.

14. John D. Finnerty, "Financial Engineering in Corporate Finance: An Overview," Financial Management (Winter 1988), pp. 14-33. Reprinted in Clifford W. Smith, Jr., and Charles W. Smithson, eds., The Handbook of Financial Engineering. Harper & Row, New York, 1990, ch. 3, and in Robert W. Kolb, ed., The Financial Derivatives Reader. Kolb, Miami, 1992, ch. 2.

15. John D. Finnerty, "New Issue Dividend Reinvestment Plans and the Cost of Equity Capital," Journal of Business Research (March 1989), pp. 127-139.

16. John D. Finnerty, "Measuring the Duration of a Floating-Rate Bond," Journal of Portfolio Management (Summer 1989), pp. 67-72. Reprinted in Sanjay K. Nawalkha and Donald R. Chambers, eds., Interest Rate Risk Measurement and Management. Institutional Investor Books, New York, 1999, ch. 32.

17. John D. Finnerty and Victor M. Borun, "An Analysis of Unbundled Stock Units," Global Finance Journal (Fall 1989), pp. 47-69.

18. John D. Finnerty and Michael Rose, "Arbitrage-Free Spread: A Consistent Measure of Relative Value," Journal of Portfolio Management (Spring 1991), pp. 65-77.

19. John D. Finnerty, "The Time Warner Rights Offerings: A Case Study in Financial Engineering," Journal of Financial Engineering (June 1992), pp. 38-61.

20. John D. Finnerty, "The Advance Refunding of Nonredeemable High-Coupon Corporate Debt Through In-Substance Defeasance," Journal of Financial Engineering (September 1992), pp. 150-173.

21. Douglas R. Emery and John D. Finnerty, "A Review of Recent Research Concerning Corporate Debt Provisions," Financial Markets, Institutions & Instruments (December 1992), pp. 23-39.

22. John D. Finnerty and Dean Leistikow, "College Tuition Prepayment Programs: Description, Investment Portfolio Composition, and Contract Pricing," Journal of the Midwest Finance Association (1992), pp. 165-174.

23. John D. Finnerty, "Comment: The Need to Enhance the Effectiveness of Discussants and Some Suggested Guidelines for Session Organizers and Discussants," Financial Practice and Education (Spring/Summer 1993), pp. 15-18.

24. John D. Finnerty and Dean Leistikow, "The Behavior of Equity and Debt Risk Premiums," Journal of Portfolio Management (Summer 1993), pp. 73-84.

25. John D. Finnerty, "Interpreting SIGNs," Financial Management (Summer 1993), pp. 34-47.

26. John D. Finnerty, "Indexed Sinking Fund Debentures: Valuation and Analysis," Financial Management (Summer 1993), pp. 76-93.

27. John D. Finnerty and Robert J. Kunze, "Arranging Financing for Biotechnology Ventures," Financier (May 1994), pp. 20-34.

28. John D. Finnerty, "Valuing Corporate Equity When Value Additivity May Not Hold: The Case of the Newhouse Estate Valuation," Financial Practice and Education (Spring/Summer 1994), pp. 107-115.

29. John D. Finnerty and Dean Leistikow, "The Behavior of Equity and Debt Risk Premiums": Reply to Comment, Journal of Portfolio Management (Summer 1994), pp. 101-102.

30. John D. Finnerty, "Range Floaters: Pricing a Bet on the Future Course of Short-Term Interest Rates," Financier (November 1994), pp. 20-27. Reprinted in John D. Finnerty and Martin S. Fridson, eds., The Yearbook of Fixed Income Investing 1995. Irwin Professional Publishing, Chicago, 1996, ch. 8.

31. John D. Finnerty, "Some Suggested Guidelines for Reviewers," Financial Practice and Education (Fall/Winter 1994), pp. 22-24.

32. John D. Finnerty, Iftekhar Hasan, and Yusif Simaan, "Designing an Efficient Investment Strategy for Hedging the Future Cost of a College Education," Journal of Investing (Spring 1996), pp. 47-58.

33. John D. Finnerty, "Credit Derivatives, Infrastructure Finance, and Emerging Market Risk," Financier (February 1996), pp. 64-75.

34. John D. Finnerty, "Adjusting the Binomial Model for Default Risk," Journal of Portfolio Management (Winter 1999), pp. 93-103.

35. John D. Finnerty, "The PricewaterhouseCoopers Credit Derivatives Primer: Total Return Swaps," Financier (vol. 7, 2000), pp. 66-77.

36. John D. Finnerty, "Premium Debt Swaps, Tax-Timing Arbitrage, and Debt Service Parity," Journal of Applied Finance (vol. 11, 2001), pp. 17-22.

37. John D. Finnerty and Mark S. Brown, "An Overview of Derivatives Litigation, 1994 to 2000," Fordham Journal of Corporate & Financial Law (vol.7, 2001), pp. 131-158.

38. John D. Finnerty and Dwight Grant, "Alternative Approaches to Testing Hedge Effectiveness under SFAS No. 133," Accounting Horizons (June 2002), pp. 95-108.

39. John D. Finnerty and Douglas R. Emery, "Corporate Securities Innovation: An Update," Journal of Applied Finance (Spring/Summer 2002), pp. 21-47.

40. John D. Finnerty, "Adjusting the Comparable-Company Method for Tax Differences when Valuing Privately Held "S" Corporations and LLCs," Journal of Applied Finance (Fall/Winter 2002), pp.15-30.

41. John D. Finnerty and Murray Grenville, "An Introduction to Credit Swaps," Financier (vol. 9, 2002), pp. 51-63.

42. John D. Finnerty and Murray Grenville, "An Introduction to Credit Spread Options," Financier (vol. 9, 2002), pp. 64-75.

43. John D. Finnerty and Dwight Grant, "Testing Hedge Effectiveness under SFAS 133," The CPA Journal (April 2003), pp. 40-47.

44. John D. Finnerty and George M. Pushner, "An Improved Two-Trader Model for Measuring Damages in Securities Fraud Class Actions," Stanford Journal of Law, Business & Finance (Spring 2003), pp. 213-263.

45. John D. Finnerty and Douglas R. Emery, "The Value of Corporate Control and the Comparable Company Method of Valuation," Financial Management (Spring 2004), pp. 91-99.

46. John D. Finnerty, "Exact Formulas for Pricing Bonds and Options When Interest Rate Diffusions Contain Jumps," Journal of Financial Research (Fall 2005), pp. 319-341.

47. John D. Finnerty," Extending the Black-Scholes-Merton Model to Value Employee Stock Options," Journal of Applied Finance (Fall/Winter 2005), pp. 25-54.

48. John D. Finnerty, Michael J. McAllister, and Maureen M. Chakraborty, "Calculating Damages in Broker Raiding Cases," Stanford Journal of Law, Business & Finance (Spring 2006), pp. 261-297.

49. John D. Finnerty, "Using Contingent-Claims Analysis to Value Opportunities Lost Due to Moral Hazard Risk," Journal of Risk (Spring 2006), pp. 55-83.

50. John D. Finnerty and Gautam Goswami, "Determinants of the Settlement Amount in Securities Fraud Class Action Litigation," Hastings Business Law Journal (Summer 2006), pp. 453-486.

51. John D. Finnerty and Mary Kuan, "When the Insurance Regulators Sneeze, the Hybrid Market Can Catch a Cold," Journal of Insurance Regulation (Summer 2007), pp. 87-120.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 48 of 58

52. John D. Finnerty, "A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," Journal of Forensic Economics (December 2009), pp. 55-62.

53. John D. Finnerty, Jeffrey Turner, Jack Chen, and Rachael Park, "Regulatory Uncertainty and Financial Contagion: Evidence from the Hybrid Capital Securities Market," Financial Review, forthcoming.

54. John D. Finnerty and Kishlaya Pathak, "A Review of Recent Derivatives Litigation," Fordham Journal of Corporate & Financial Law, forthcoming.

**Other Papers and Articles**

1. John D. Finnerty, "A Closer Look at Preferred Stock Financing," Public Utilities Fortnightly (November 6, 1980), pp. 41-43.

2. John D. Finnerty, "Evaluating a Stock-for-Debt Swap: The Proper Framework," Public Utilities Fortnightly (August 5, 1982), pp. 27-32.

3. John D. Finnerty, "How to Lower the Cost of Floating a New Stock Issue," Public Utilities Fortnightly (March 17, 1983), pp. 25-29.

4. John D. Finnerty, "The Pluses of Zeros," Euromoney (May 1985), p. 67.

5. John D. Finnerty, "Refunding High-Coupon Debt," Midland Corporate Finance Journal (Winter 1986), pp. 59-74.

6. John D. Finnerty, "The Case for Issuing Synthetic Convertible Bonds," Midland Corporate Finance Journal (Fall 1986), pp. 73-82. Reprinted in Clifford W. Smith, Jr., and Charles W. Smithson, eds., The Handbook of Financial Engineering. Harper & Row, New York, 1990, ch. 21.

7. John D. Finnerty, "Where is the Value Added in Securities Innovation," in John Thackray, ed., Chief Financial Officer USA 1987, SPL Associates Limited, London, 1987, pp. 202-205.

8. John D. Finnerty, "An Analysis of Tuition Prepayment Plans," in Proceedings of the Invitational Conference on College Prepayment and Savings Plans. College Entrance Examination Board, New York, 1988, pp. 25-31.

9. John D. Finnerty, "A Private Solution to a Public Problem: A Response from the Private Sector to the College Saving Crisis," in Tax Incentives for Education. United States Senate Committee on Finance, Washington, D.C., March 15, 1988, pp. 194-204.

10. John D. Finnerty, "How to Cope with Rising College Costs," Tax Management Financial Planning Journal (May 31, 1988), pp. 224-228.

11. John D. Finnerty, "Measuring the Risk Premium on the Market Portfolio," in Frank J. Fabozzi, ed., The Institutional Investor Focus on Investment Management. Ballinger, Cambridge, MA, 1989, pp. 161-167.

12. John D. Finnerty, "Measuring the Duration of Floating-Rate Debt Instruments," in Frank J. Fabozzi, ed., Advances & Innovations in the Bond and Mortgage Markets. Probus, Chicago, 1989, pp. 77-96.

13. John D. Finnerty and Herbert S. Adler, "Make Securities Innovation Work to Your Advantage," Butterworths Journal of International Banking and Financial Law (February 1992), pp. 64-67.

14. John D. Finnerty, "An Overview of Corporate Securities Innovation," Journal of Applied Corporate Finance (Winter 1992), pp. 23-39. Reprinted in Donald H. Chew, Jr., ed., The New Corporate Finance: Where Theory Meets Practice. McGraw-Hill, New York, 1993, pp. 212-228, and in Raymond H. Rupert, ed., The New Era of Investment Banking. Probus, Chicago, 1993, ch. 16.

15. John D. Finnerty, "Financial Engineering," in the New Palgrave Dictionary of Money and Finance, vol. 2. Macmillan, London, 1992, pp. 56-63.

16. John D. Finnerty, "Structures and Contracts which Reallocate Risk," in proceedings of the conference on Structured Finance: Design, Engineering & Production. Euromoney, Brussels, June 4-5, 1992, pp. 75-96.

17. John D. Finnerty, "Sources of Value Added from Structuring Asset-Backed Securities to Reduce or Reallocate Risk," in Charles Stone, Anne Zissu, and Jess Lederman, eds., The Global Asset Backed Securities Market. Probus, Chicago, 1993, ch. 3.

18. John D. Finnerty, Burton L. Raimi, and Neil R. Crowley, "Designing Securities to Qualify as Capital for Bank Regulatory Purposes," in Charles A . Stone and Anne Zissu, eds., Global Risk Based Capital Regulations: Management and Funding Strategies. Irwin Professional Publishing, Burr Ridge, IL, 1994, ch. 8.

19. Douglas R. Emery and John D. Finnerty, "Using a PERCS-for-Common Exchange Offer to Reduce the Costs of a Dividend Cut," Journal of Applied Corporate Finance (Winter 1995), pp. 77-89.

20. John D. Finnerty, "Financial Engineering as a Solution to Interest-Rate Risk Management Challenges," in Anthony G. Cornyn, Robert A. Klein, and Jess Lederman, eds., Controlling & Managing Interest-Rate Risk. New York Institute of Finance, New York, 1997, ch. 17.

21. John D. Finnerty, “Russian Settlements Will Put Credit Derivatives to the Test,” American Banker (December 4, 1998), p. 21.

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 50 of 98

22. John D. Finnerty, “Will Credit Derivatives Survive the Stress Test?” Solutions (Winter 1999), pp. 5, 8.

23. Keith R. Ugone and John D. Finnerty, “Measuring Damages in Securities Fraud Class Action Lawsuits,” CD-ROM accompanying Michael R. Young, ed., Accounting Irregularities and Financial Fraud. Harcourt Professional Publishing, New York, 2000.

24. Douglas R. Emery and John D. Finnerty, “Capital Investments,” in Burton S. Kaliski, ed., Encyclopedia of Business and Finance, vol. 1. Macmillan, New York, 2001, pp. 81-85.

25. John D. Finnerty, “Securitizing Political Risk Investment Insurance: Lessons from Past Securitizations,” in Theodore H. Moran, ed., International Political Risk Management: Exploring New Frontiers. World Bank, Washington, DC, 2001, pp. 77-147.

26. John D. Finnerty and Dwight Grant, “How to Test Hedge Effectiveness Under FAS 133,” Estratégica (April/June 2001), pp. 8-16.

27. John D. Finnerty, “Debt Innovative,” Fordham Business Magazine (Spring/Summer 2001), pp. 24-25.

28. Robert Sidorsky and John D. Finnerty, “Standing to Sue Under Rule 10b-5: A Fresh Look at the New Investment Doctrine,” Securities Regulation Law Journal (Summer 2001), pp. 113-198.

29. John M. Althoff and John D. Finnerty, “Testing Hedge Effectiveness,” in Henry A. Davis, ed., FAS 133 and the New Derivatives Accounting Landscape. Institutional Investor, New York, Fall 2001, pp. 44-51.

30. John D. Finnerty and George M. Pushner, “Meeting the New Standard for 10b-5 Class Action Damage Calculations,” Analysis Group/*Economics* Issue Brief, 2002.

31. John D. Finnerty and Heidi Donoghue, “The Trend in Corporate Financial Disclosure,” in Esmeralda O. Lyn and George J. Papaioannou, eds., Financial Services in the Evolving Global Marketplace. Hofstra University Press, New York, 2002, pp. 192-209.

32. John D. Finnerty, “How Companies Account for the Cost of Options,” Wall Street Journal, October 10, 2002, p. A15.

33. John D. Finnerty and George M. Pushner, “Rule 10b-5 vs. Section 11 Securities Fraud Class-Action Damages,” Analysis Group/*Economics* Issue Brief, 2002.

34. John D. Finnerty, “Damages Estimation After Natural Disasters,” in Jack P. Friedman, ed., Litigation Support Report Writing for Accounting, Finance, and Economic Issues. Wiley, New York, 2003.

35. John D. Finnerty, "Valuing Employee Stock Options: A Comparison of Alternative Models," FMA Online (Summer 2003).

36. John D. Finnerty, "Calculating Damages in Broker Raiding Cases," in John Siegal, Protecting Corporate IP Assets: Enforcing Restrictive Covenants in the Employment Context. Practising Law Institute, New York, 2005, pp. 111-145.

37. John D. Finnerty, "The Valuation of Venture Capital Convertible Preferred Stock When Equity Claims Are Nested," Journal of Private Equity (Winter 2008), pp. 1-20.

38. John D. Finnerty, "Securities Innovation," in Frank J. Fabozzi, ed. Handbook of Finance, vol. I. Wiley, Hoboken, NJ, 2008, pp. 61-92.

39. John D. Finnerty, "Real Options," in Frank J. Fabozzi, ed., Handbook of Finance, vol. II. Wiley, Hoboken, NJ, 2008, pp. 697-713.

40. John D. Finnerty, "Project Financing," in Hossein Bidgoli, ed. Handbook of Technology Management, vol. I. Wiley, Hoboken, NJ, 2010, pp. 601-612.

41. John D. Finnerty and Peter G. Wollmeringer, "Valuation: Application and Methodologies," in Patricia A. Etzold and Matthew J. Shelhorse, Pocket MBA: Finance for Lawyers July 2010. Practising Law Institute, New York, 2010, pp. 301-358.

**Patents**

1. Peter A. Roberts, John D. Finnerty, and Hamish W. M. Norton, "Methods and Apparatus for Restructuring Debt Obligations," United States Patent Number 4,648,038, March 3, 1987.

2. Peter A. Roberts, John D. Finnerty, and Hamish W. M. Norton, "Methods and Apparatus for Restructuring Debt Obligations," United States Patent Number 4,739,478, April 19, 1988.

3. Peter A. Roberts and John D. Finnerty, "Methods and Apparatus for Funding a Future Liability of Uncertain Cost," United States Patent Number 4,752,877, June 21, 1988.

4. Peter A. Roberts and John D. Finnerty, "Methods and Apparatus for Insuring the Funding of a Future Liability of Uncertain Cost," United States Patent Number 4,839,804, June 13, 1989.

# Appendix B

## Documents Considered

**Legal Documents:**

Consolidated Amended Class Action Complaint, in re: IMAX Corporation Securities Litigation, 06 CIV. 6128 (NRB), U.S.D.C., Southern District of New York, 10/2/2007

Memorandum of Law in Support of Plaintiffs' Motion for Class Certification in re: IMAX Corporation Securities Litigation, 4/22/2010

Notice of Motion for Class Certification in re: IMAX Corporation Securities Litigation, 04/22/2010

Defendant PricewaterhouseCoopers LLP's, an Ontario Limited Liability Partnership, Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification in re: IMAX Corporation Securities Litigation, 06/10/2010

Memorandum of Law in Support of Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce & Kathryn A. Gamble's Opposition to Plaintiffs' Snow Capital Investment Partners, L.P.'s Motion for Class Certification in re IMAX Corporation Securities Litigation, 6/10/2010

**Reports and Depositions**

Declaration of Michael A. Marek in re: IMAX Corporation Securities Litigation, 10/30/2008

Report of Christopher M. James in re: IMAX Corporation Securities Litigation, 02/23/2009

Report of Lucy P. Allen in re: IMAX Corporation Securities Litigation, 06/10/2010

Deposition of Christopher M. James in re: IMAX Corporation Securities Litigation, 07/21/2010

Deposition of Lucy P. Allen in re: IMAX Corporation Securities Litigation, 07/27/2010

**IMAX Corp. Documents and SEC Filings:**

IMAX Corp. SEC Filings

Various IMAX Corp. Press Releases and Conference Call Transcripts

**News Releases/Reports:**

Various securities analyst reports on IMAX Corp.

Various news articles on IMAX Corp.

**Books:**

Damodaran, Aswath, *Investment Valuation*, 2nd edition, Wiley, 2002.

Ross, Stephen, Randolph Westerfield, and Jeffrey Jaffe, *Corporate Finance* 7th edition, McGraw-Hill, 2005.

**Journals and Articles:**

Anderson, Kirsten L. and Teri L. Yohn, "The Effect of 10-K Restatements on Firm Value, Information Asymmetries, and Investors' Reliance on Earnings," *Working Paper, Georgetown University*, 2002.

Finnerty, John D., "A Closer Look at Correction for False Discovery Bias When Making Multiple Comparisons," *Journal of Forensic Economics*, 21(1), 2009, 55-62.

Graham, John R., Si Li, and Jiaping Qiu, "Corporate Misreporting and Bank Loan Contracting," *Journal of Financial Economics*, 89, 2008, 44-61.

Hribar, Paul and Nicole T. Jenkins, "The Effect of Accounting Restatements on Earnings Revisions and the Estimated Cost of Capital," *Review of Accounting Studies*, 9, 2004, 337-356.

Kravert, Todd and Terry Shevlin, "Accounting Restatements and Information Risk," *Review of Accounting Studies*, 15, 2010, 264-294.

Murphy, Deborah L., Ronald E. Shrieves, and Samuel L. Tibbs, "Understanding the Penalties Associated with Corporate Misconduct: An Empirical Examination of Earnings and Risk," *Journal of Financial and Quantitative Analysis*, 44, 2009, 55-83.

Tabak, David, Multiple Comparisons and the Known or Potential Error Rate, *Journal of Forensic Economics*, 19(2), 2006, pp. 231-236.

**Data Sources:**

NYSE TAQ Data

©201003 CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu

Kenneth French's Dartmouth Website, Fama/French Factors, http://mba.tuck.dartmouth.edu/pages/faculty/ken.french/data_library.html.

# Exhibit 1

## IMAX Stock Price Reactions Following Alleged Corrective Disclosures
## Based on Professor James's Event Study Analysis

| Disclosure Date | Source of Alleged Corrective Disclosure | Complaint Paragraphs | James Report Paragraphs | Allen Report Pages | IMAX Stock Return | Residual Return and *t-Statistic* | p-Value |
|---|---|---|---|---|---|---|---|
| 08/09/06 | PR Newswire, 4:01 PM;<br>Voxant FD (Fair Disclosure) Wire | 115-121 | 82-145 | 4-17, 28-29 | -40.50% | -40.67%<br>***-20.6*** | 0.00% |
| 03/29/07 | PR Newswire, 7:47 AM | 127 | 146-157 | 18 | -6.15% | -6.45%<br>***-2.85*** | 0.47% |
| 07/20/07 | PR Newswire, 6:00 AM | 139-170 | 158-168 | 4, 18-19 | 10.23% | 10.68%<br>***3.95*** | 0.01% |
| | **Total** | | | | | -38.57%<br>***-9.02*** | 0.00% |

Sources: IMAX Stock Return, Residual Return and t-Statistic from Exhibit 4 of Christopher James's Report dated 2/23/09; Complaint in re IMAX Corp. Securities Litigation dated 10/2/07; Report of Lucy Allen in re IMAX Corp. Securities Litigation dated 6/10/10; Report of Christopher James in re Imax Corp. Securities Litigation dated 2/23/09.

# Exhibit 2

## IMAX Corp.
## Intra-Day Stock Price Movements and Trading Volume
### 4 P.M. August 9, 2006 to 4 P.M. August 10, 2006




<u>Notes</u>: 1. Time is not to scale.
2. Stock price (volume) shown is the last price (sum of volume) during each one minute interval in which a trade occurs.
3. Excludes out of sequence trades, bundled trades and average price trades.

<u>Source</u>: NYSE TAQ Data; ©201003 CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu

Case 1:06-cv-06128-NRB Document 143 Filed 07/30/10 Page 56 of 58

# Exhibit 3

## IMAX Corp.
## Intra-Day Stock Price Movements and Trading Volume
## March 29, 2007




Notes: 1. Time is not to scale.
2. Stock price (volume) shown is the last price (sum of volume) during each one minute interval in which a trade occurs.
3. Excludes out of sequence trades, bundled trades and average price trades.

Source: NYSE TAQ Data; ©201003 CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu

# Exhibit 4

## IMAX Corp.
## Intra-Day Stock Price Movements and Trading Volume
## July 20, 2007




Notes: 1. Time is not to scale.
2. Stock price (volume) shown is the last price (sum of volume) during each one minute interval in which a trade occurs.
3. Excludes out of sequence trades, bundled trades and average price trades.

Source: NYSE TAQ Data; ©201003 CRSP®, Center for Research in Security Prices. Booth School of Business, The University of Chicago. Used with permission. All rights reserved. www.crsp.chicagobooth.edu

**CERTIFICATE OF SERVICE**

I, Robert M. Rothman, hereby certify that on July 30, 2010, I caused a true and correct copy of the attached:

Reply Memorandum of Law in Further Support of Plaintiff's Motion for Class Certification;

Declaration of Mark T. Millkey in Further Support of Plaintiff's Motion for Class Certification (redacted version); and

Declaration of John D. Finnerty, Ph. D. in Support of Lead Plaintiff's Motion for Class Certification

to be served electronically on all counsel registered for electronic service for this case.

*/s/ Robert M. Rothman*
Robert M. Rothman