UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE IMAX CORP. SECURITIES LITIGATION,

06 CV 6128

------------------------------x

June 14, 2012

11:03 a.m.

Before:

HON. NAOMI REICE BUCHWALD,

District Judge

APPEARANCES

ABBEY SPANIER RODD & ABRAMS, LLP
Attorneys for Plaintiffs
BY: KARIN FISCH
ARTHUR N. ABBEY
RICHARD B. MARGOLIES

ROBBINS GELLER RUDMAN & DOWD, LLP
Attorneys for Plaintiffs
BY: ROBERT ROTHMAN

GIBSON DUNN & CRUTCHER, LLP
Attorneys for PriceWaterhouseCoopers Canada
BY: JENNIFER CONN

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
Attorneys for IMAX
BY: LEWIS LIMAN
DAVID OLIWENSTEIN

(In open court)

THE DEPUTY CLERK: This is 06 Civ 6128, In Re: IMAX Corporation Securities Litigation.

Is plaintiffs' counsel present and ready to proceed?

MS. FISCH: Plaintiffs' counsel is present. Karin Fisch from Abbey Spanier. With me today are Arthur Abbey, also from Abbey Spanier, Richard Margolies, also from Abbey Spanier. They are two of the three attorneys that handled the IMAX litigation from my firm.

Also present for plaintiffs today is Rob Rothman from the Robbins Geller firm, in the event your Honor has any questions regarding the affidavit submitted by his firm in connection with the settlement of the application.

THE DEPUTY CLERK: Defense counsel present and ready to proceed?

MR. LIMAN: Yes, your Honor. Lewis Liman from Cleary Gottlieb Steen & Hamilton for the IMAX defendants. With me is my colleague, David Oliwenstein.

MS. CONN: Jennifer Conn from Gibson, Dunn & Crutcher from PriceWaterhouseCoopers Canada.

THE COURT: As everybody is aware, the application before the Court this morning is plaintiffs' motion for final approval of the settlement with the defendants, the approval of the proposed plan of allocation, final certification of the class for settlement purposes and an award of attorneys fees

and reimbursement of expenses.

Is there any person in the audience who wishes to object to this settlement?

Okay. Ms. Fisch, are you speaking?

MS. FISCH: I am, your Honor.

THE COURT: I'll give you the floor.

MS. FISCH: Thank you. Good morning, your Honor.

We are proud to be here today on behalf of the merger fund to present the settlement of the IMAX Securities Litigation to your Honor.

As your Honor has summarized, there are four issues before the Court today: Consideration of the $12 million cash settlement, consideration of the proposed plan of allocation, certification of the class for settlement purposes and consideration of plaintiffs' counsel's request for an award of attorneys fees and reimbursement of expenses.

I'll address each of those issues in turn, but we'll note that each of these four issues have been discussed in detail in the papers that were submitted in support of the settlement, both the memorandum of law and the detailed declaration of Arthur Abbey.

The settlement provides for $12 million in cash to be distributed amongst participating class members. The $12 million has already been deposited into an interest bearing escrow account. Pursuant to the preliminary approval order

that your Honor entered on March 28th of this year, notice has gone out to all class members. The notice process is detailed in the affidavit of Paul Mulholland, which was also submitted with our papers last week in support of the settlement.

The notice included an extensive mailing, publication of the notice and I believe five papers, two here in the US, three in Canada. One of the notices was translated into French Canadian for the benefit of class members who reside in Quebec, I suppose. Press releases were issued both here and in Canada. There was a dedicated website, imaxussettlement.com, and the notices and other relevant papers were posted on my firm's website. We believe that the notice given as ordered by the Court back in March was the best notice practicable under the circumstances.

The notice informed class members of the terms of the settlement, the plan of allocation, the right to exclude themselves from the US class and continue to participate in the Canadian action, the right to object to the settlement, their rights with respect to the Canadian action and the amount of plaintiffs' request for fees and an upward limit of ceiling on our request for reimbursement of expenses.

The deadline for class members to object or to exclude themselves from the settlement was June 4th. As of the time that we filed our papers in support of the settlement, we had received four exclusion requests. Since that time we have

received an additional three exclusion requests. So there are a total of seven requests for exclusion from the settlement. We have also received one objection, which I know was sent to your Honor directly. No one has appeared on behalf of the objector today, but the objections were addressed in our brief. And I will address specific points regarding the plan of allocation and the award of attorneys fees and expenses today during my presentation.

The brief contains a detailed analysis of the factors generally considered by courts within the Second Circuit under the Grinnell case. As detailed in the briefs, this case was complex. Your Honor has been presiding over this case since 2006 and is well aware of the twists and turns that the case has taken. The case was expensive and would likely have continued to be litigated for quite some time. We've already been before your Honor for over five years.

We settled the case at a time when the class certification motion was still pending. Class certification would have continued with the deposition of our expert, Dr. Finnerty. There would have been merits discovery, merits depositions, summary judgment, expert reports, more expert testimony, trial appeals. So certainly this case, had it not been settled, would have continued for quite some time.

THE COURT: Actually, that raises a question. Since your attorneys fees submissions don't reflect tasks performed,

could you tell me how many depositions, if any, were taken in this case?

MS. FISCH: There were no depositions taken in this case, your Honor. My understanding is that at the time the case was settled, class certification was proceeding and there were, in fact, depositions taken in connection with the class certification process. I know that our client, the merger fund, was deposed. I know that there were other plaintiffs who were put up as class representatives, and I believe that representatives of those particular plaintiffs were deposed. Experts were deposed in connection with the class certification process, but merits depositions had not yet taken place.

We did, however, review -- in the process of beginning merits discovery in this case, receive transcripts of depositions taken by the SEC, as well as the regulatory agency in Canada, both of which were investigating similar accounting issues with respect to IMAX. We had the benefit of reviewing all of those deposition transcripts for the purposes of confirming the fairness of the settlement. We also were given access to depositions that were taken in the Canadian action. So while there were no depositions taken here, we had access to a wealth of testimony that enabled us to assess the fairness and the reasonableness of the proposed settlement.

The second Grinnell factor is the reaction of the class to the proposed settlement. As I noted, we've had seven

requests for exclusion and only one objection. We believe that that's a positive response to a settlement of this magnitude.

In answer to your previous question as well, the third Grinnell factor is how -- were the proceedings sufficiently advanced to allow us to assess the strengths and weaknesses of our case? Again, we had a rather voluminous discovery record. Class certification was on its third round of briefing. We fully briefed a motion to dismiss at the time that we negotiated the settlement with defendants. We were well aware of what we considered to be the strengths of our case as well as defendants' defenses.

In terms of risk, which is another Grinnell factor, we believe that this was a case that could be tried but was certainly fraught with risk in terms of pleading and proving all of the elements of a 10(b) claim, including materiality, the existence of false and misleading statements, scienter. And certainly in this case loss causation was an issue that was litigated hotly and would continue to be litigated hotly. So we believe that, balanced against the risks of continued litigation, the settlement certainly represents an excellent result.

And finally, with respect to Grinnell, we believe the settlement amount is within the range of reasonableness. Our highest damage estimate from our experts was somewhere around 90 million. That was a figure that we used in negotiating with

the defendants. Certainly defendants' position was that damages in this case were zero. Under the circumstances we believe that a $12 million cash settlement merits the approval of the Court.

With respect to the plan of allocation, the standard of approval in this circuit is that the plan of allocation is rational and reasonable. Plaintiffs have worked with experts in this action since day one with respect to issues of damages and loss causation. The plan of allocation was established with the assistance of these experts and based upon the work of these experts. And the opinions of plaintiffs' experts in this case have consistently been that the price inflation in IMAX's common stock attributable to revenue recognition issues was consistent from the date of the announcement of the SEC investigation in April 2006 all the way back through the periods that were affected by the restatement.

Plaintiffs' position has always been that the issue at IMAX was one of manipulation of revenues, misapplication of accounting principles, lack of internal controls and an aggressive accelerated revenue recognition policy. So to the extent that the restatement ultimately shifted revenue from one quarter to another, we believe any quarter in which revenue was reported when it shouldn't have been, the share price of IMAX common stock was inflated.

We believe that this is a rational and reasonable way

of allocating the $12 million settlement fund. Certainly experts could disagree, and have disagreed, but I think the point here is that we are at the settlement phase. Had this case been tried, would a jury have had to find at the end of the day the amount of price inflation on every day during the class period? Perhaps. But by settling the case at this juncture we've avoided issues of that nature.

We believe that a uniform plan of allocation which recognizes a uniform inflation in stock price from 2003, which is the beginning of our class period, through 2006 is rational and reasonable. And again, out of 84,000 notices, we've only had one objection to the plan of allocation. We believe that the objector has made no showing that the way that we have chosen with our experts to allocate the settlement fund is anything but rational and reasonable.

With respect to the third issue before the Court, which is class certification, as your Honor knows, as part of the preliminary approval process, the Court conditionally certified the class and made specific findings of fact regarding the elements of Rule 23.

Here, I believe it's clear that all the elements of Rule 23 have been satisfied. The class is so numerous that joinder of all members is impracticable. There are questions of law and fact that are common to the class. The claims of the merger fund are typical of the claims of other class

members. The merger fund has fairly and adequately represented the class, vigorously pursued claims on behalf of the class and has retained attorneys who are experienced in complex securities class action litigation. Common questions predominate.

And finally, the class action under the circumstances is the superior method of adjudicating the claims that are before your Honor.

Finally, unless your Honor has any questions, I'll turn to the issue of attorneys fees and expenses. Plaintiffs are seeking a recovery out of the $12 million settlement fund. As stated in the notice, plaintiffs are seeking 25 percent of the fund, plus reimbursement of expenses. The Second Circuit generally looks to the factors set out in the *Goldberger v. Integrated Resources* case, all of which are discussed in detail in our memorandum in support of the settlement as well as in the Abbey declaration. I believe they're also addressed in the declaration submitted by the Robbins Geller firm.

The factors that the Court generally considers are the time and labor expended, the magnitude, complexity and risk of the litigation, quality of representation, the requested fee vis-a-vis the settlement amount and public policy considerations.

Here, again, counsel have worked on this case for over five years with no guarantee of success. Considerable time has

been put into the litigation by the firms who worked on behalf of plaintiffs. The case was fraught with risk, and there was certainly no risk -- there was no guarantee that there would ever be a recovery of any money in this case. The quality of representation was extremely high, and the requested fee bears a reasonable relationship to the result achieved.

As noted in our papers, counsel's lodestar, combined with the Robbins Geller firm, as well as two other firms that performed work on behalf of the class, was approximately $5.25 million. So the fee that we're seeking of 25 percent of the 12 million or $3 million is a significant discount to lodestar.

I will note that while there was time expended in this case with respect to lead plaintiff and lead counsel issues, the Robbins Geller firm has removed all of that time from its lodestar calculation, as well as time spent on class certification motions on behalf of its client. And even if you were to greatly reduce my firm's time and recognition of time spent on lead plaintiff issues, we'd still be seeking a significant discount to our lodestar of 5.25 million. We believe that the fee request is more than reasonable, whether looked at at 25 percent of the fund or with the lodestar cross check.

With respect to expenses, which are another issue that was raised by Mr. Ames, the gentleman who sent in the

objection, the notice stated that plaintiffs' counsel would be seeking up to $1.75 million in fees. We've only received the one objection from Mr. Ames. We ultimately are only seeking 1.677 million.

The expenses for which we seek recovery have been broken down in exhibits that are appended to Mr. Abbey's declaration. The bulk of the expenses are expert expenses. This case was expert intensive, both because of the complicated accounting issues that the case raised, as well as the very complicated loss causation and damage issues. I believe Robbins Geller has reported 600,000 in expert expenses and my firm has reported $850,000 in expert expenses that encompasses accounting experts, damages experts, experts on Canadian law, experts on the deference and effect that a ruling in this action may have in Canada.

It's important in these types of cases that plaintiffs are able to retain experts of the same caliber that defendants are able to retain. Defendants in these types of cases often have greater resources than plaintiffs, so it's important that we're able to retain the best in the business, which I believe that we've done here.

All of these expenses were necessary and reasonable and we believe all contributed to our ability to settle the case for the $12 million that we were able to achieve on behalf of plaintiff and the class.

In closing, I'd just like to note that, as I believe you've been informed by defense counsel, we continue to monitor the proceedings in Canada. As your Honor is aware, the finality of this settlement and the distribution of funds to the class is conditioned upon the granting of a motion in the Canadian action amending the definition of the global class so that anyone that wants to participate in the US settlement is excised from the Canadian class. The hearing on that motion is scheduled to begin on July 30th and I believe continue for two or three days.

We will continue to report to the Canadian court on the progress we've made here. And we would very much like to provide the court with your Honor's insight or wisdom as to this settlement so the Canadian Court can give it the proper deference.

Unless your Honor has any questions --

THE COURT: I'll get to it. I'll let Mr. Liman speak.

MR. LIMAN: Your Honor, I have very little to say. I agree with Ms. Fisch's presentation.

With respect to the Canadian case, and the condition in this case, she is correct that the finality of this case and the distribution of funds is conditioned upon an order in Canada limiting the class there to persons who are not members of US class or who have opted out of the US class. That's the form of the order in Canada.

With respect to the questions of the merits, as your Honor knows, IMAX settled this case without any admission of wrongdoing. We were able to reach a settlement that was acceptable to my clients. Had we not reached a settlement that was acceptable, we were prepared to continue to litigate, to litigate aggressively, and we believe that we would have had meritorious defenses.

Unless your Honor has further questions, I have nothing further to add.

THE COURT: All right. Well, I guess knowing as much as I do about this case, I have no qualms about endorsing the proposed $12 million settlement, a number which is far closer to defendants' calculation of its exposure than plaintiffs' estimate of maximum recovery.

I said in my first decision -- in my decision denying the motion to dismiss that this was a close case. And I fully recognize that the accounting issues here turn on recognition of income issues rather than the existence of income. However, while I recognize the challenges, and hence, the sophistication of the accounting issues, and the consequently related issues of scienter, the landscape of this case seems to me to be clear. In fact, if the numbers in my motion to dismiss opinion were correct or remain correct, there are only 30 transactions here to explore. And it doesn't seem to me to be overly challenging to review the files of those transactions and chart

the installation of the components of the systems and then to graph against that information the income recognition points and then to ask an expert to opine on the propriety of the accounting treatment.

And after finding the appropriate expert, one would have expected then to take the deposition of key players, which apparently never happened anyway, which leads me to have some serious questions about the fees sought and the expenses.

So let's look at fees first. I've done the math. If I add it up, Abbey Spanier's requests to that of Robbins Geller to that of the Berger firm, and I will leave out, because I can't imagine why they deserve a penny, the Cohen Millstein firm, who withdrew their motion to be lead plaintiff, that number comes up to $5.7 million roughly, which translates into 27-and-a-half percent of the settlement amount. If I add to that the expenses sought of 1.67 million, that would come up to 61 percent of the settlement amount.

It's hard not to draw the conclusion that the hours that were spent by the plaintiffs' firms were spent without regard to value or discipline or that the numbers can't be true.

So normally I would have no problem with an award of 25 percent. However, the numbers I just recited are disturbing. And there are unusual circumstances in this case which have not been addressed forthrightly in the submissions.

For example, the finding that Robbins Geller should not serve as lead counsel, which resulted in a holding ground of lead plaintiff depositions and how that impacted the necessities starting anew is not addressed. So this leads at a minimum to the question, what's the plan for dividing the $3 million? And what is the Court's role, if any, in that?

MR. ABBEY: May I respond to that?

THE COURT: Yes.

MR. ABBEY: I think that the -- recognizing what you've said is the reason that we didn't come in -- the reason -- it's the reason that we're asking for $3 million and not 5.2 or 5.7 or 6.4. We have taken into account that this case has turned out for us to be an unprofitable case. We're getting paid at 50 cents on the dollar on lodestar, let alone the fact that we have these huge out-of-pocket expenses which had to be paid.

THE COURT: I was going to talk about those a little bit.

MR. ABBEY: Those had to be paid. They were not being carried because those were people who were being deposed and they had to say that, you know -- and they were to be paid. And so you have a case where it got lawyered because there were two different firms of two different periods of time. It went on for six years. It was very rigorously litigated. As it turns out, we had made higher demands, but we realized that

case is worth less than what we originally thought it was. We had thought that perhaps there would be more to it than there was. We explored other things. It just didn't work out.

But from the standpoint of you being, the Court being concerned, I think we've acted in a most appropriate way by not coming in and saying, look, I don't -- I can't think of too many cases. There have been cases where we've got nothing, but at the end of the day here, we're getting, you know, half of our lodestar. That is a recognition that there was too much time perhaps spent in this case and that we shouldn't be paid for that time, and we're basically eating it. And I think that the $3 million will result in people getting a very low amount compared to their hourly rates.

There is no plan at this moment for how the fees would be divided. The settlement stipulation provides that it is to be divided in lead counsel's discretion. And not knowing what the award will be until the Court makes that determination, woe be it for me or anybody else to be dividing up money that we haven't even gotten at this point in time. So the answer is that is something that we will have to deal with. We think that we will be fair, but there could be a dispute that arises between counsel. Our discretion, we think, will be done in the right way, but obviously if somebody comes along and says, no, no, no, there's an abuse of discretion and you're not being fair, then there might have to be an issue. Whether it will go

to a master or whether or not the Court will to it, it depends. But to answer your question, there's been no discussion at all about how any fee, whether it's $3 million or less than $3 million would be divided.

But I would like to really focus more, at least at this moment in time, on being troubled, the Court being troubled maybe by the fee application. I don't know what else to say. The time is what it is. This case took a huge amount of time to litigate. And the end result is that here we are. It's been in a work in process now for six years. Six years we haven't been paid a penny. We've laid out a lot of money, and this is not a great result for us, frankly. I think it's a good result for the class, and the best evidence of that is out of 84,000 people, we only have one person objecting. Just one person. Maybe --

THE COURT: I guess my issue is not so much with a 25 percent award. In a global way, okay. But I am troubled by the fact that I have before me a firm that I disqualified who is still seeking -- you know, putting in a claim for $2.2 million without there being any candid discussion about how -- of whether anything they did was actually used thereafter by your firm or whether it was just money that they spent for no benefit, and candid -- we should really move to it because the other part that's in a way more troublesome are the expert numbers, because your firm seeks $867,000.

MR. ABBEY: I heard that, yes, 867,000.

THE COURT: And the Robbins Geller firm seeks two things: First, $596,000 in fees; and then they also want for their forensic analyst, who works in-house, coverage for 653 additional hours at the expense of 362,450 bucks. And that just --

MR. ABBEY: I was not aware that they were in-house, as opposed to -- all of our 850 -- all of our 850 are outside people, and they've been paid.

THE COURT: Right. And, you know, there's no addressing, because of -- did your firm actually ultimately, you know, adopt the expert report --

MR. ABBEY: We did.

THE COURT: -- of the Robbins Geller firm?

MR. ABBEY: I can't tell you whether every single part was, but we used the same experts. We didn't start again. That was underway when they were let loose and we came in and we continued with them.

I have to tell you, your Honor, that the new beachhead in class action litigation is the class motion. It becomes almost like a trial on loss causation and damages, and it requires a huge effort to do it. And the experts who are in this field charge a lot of money.

THE COURT: They sure do.

MR. ABBEY: They do. And if you want to use them --

and it wasn't like that. I mean, there was a time when under Eisen the Supreme Court said that it's a procedural motion, it's not substantive Rule 23, but now that's been eaten away in many, many instances. And basically it's almost like you have to put on a prima facie case before you can get a class certified on the merits. I mean, and the class motion should really come at the end after discovery but it comes at the beginning. And as a result, the experts wind up reading and reading and reading and putting in reports that go for pages and pages and pages. And the numbers just get out of hand. And I'm appalled in my own way about how expensive it is to do that, but that's just how it is.

I can't respond specifically to the Robbins Geller application, but there was an attorney here from that firm, and I suppose he could tell you about their in-house and how they do that. And I can't tell you whether or not --

THE COURT: I don't remember. I reread the motion to dismiss opinion last night. And I don't recall, and I -- you know, I admit it was filed almost four years ago, so I'm not going to sit here and candidly tell you that I have any memory whatsoever of the underlying briefing. I don't. But there's no discussion in this that turns on competing experts.

MR. ABBEY: That was a motion addressed to the complaint, not to the class motion.

THE COURT: Right. That's true. Okay.

MR. ABBEY: I mean, the answer is that you don't have experts --

THE COURT: Okay. Okay. I'm sorry.

MR. ABBEY: 12(b)(6) is entirely --

THE COURT: I take that back.

MR. ABBEY: Rule 23 has become the New Jersey Turnpike of litigation. I mean, it --

THE COURT: You're right. I was thinking of the wrong motion. Okay.

MR. ABBEY: You know, the reason for so long, six years -- I think the Rule 23 has been litigated for two years. I mean, it's gone on and on and on.

THE COURT: I mean, look, the reality is what happened here. You represented a client who the Second Circuit said can't be the class plaintiff.

MR. ABBEY: On technical reasons, that's right.

THE COURT: You know, I'm not saying set it up to be replaced. Of course not. I mean, the case was later, okay. I understand that.

MR. ABBEY: We didn't name --

THE COURT: They had serious issues with Robbins Geller which then had to go to yet the third round of who is the lead plaintiff. And you're right --

MR. ABBEY: Your Honor, the motion addressed to the complaint which, you know, it's in every single case because

there's a stay of discovery, and no defendant would ever answer a complaint in a class action. There's always a motion. That's not done with experts.

THE COURT: You're right. I'm sorry. I was just thinking of --

MR. ABBEY: Right. You know, your Honor, I have a suggestion for your Honor. Why don't -- because of the timetable here, you could reserve on fees and ask for more briefing. And we can move forward if your Honor -- I don't think anyone has an objection. We have one objector on --

THE COURT: As I said right up front, I don't have a problem with the class settlement amount; I guess in part because of the length of the case, the number of opinions, I'm probably more familiar with the underlying facts here than judges often are in reality when they need or are asked to approve settlements. But my concern is that, given my familiarity, the amount of hours spent by counsel just seems disproportionate to the substance of, you know, the claims.

MR. ABBEY: If we were asking to be paid in full for every one of those hours, you might say there's something wrong with that. But --

THE COURT: But you're not.

MR. ABBEY: We could have asked for a third, which some courts do. We could have asked for 30 percent. 25 percent in a case like this, given the lodestar and where it

comes out, I think --

THE COURT: The problem is --

MR. ABBEY: But even so.

THE COURT: The lodestar --

MR. ABBEY: Forget the lodestar.

THE COURT: It just seems like just such a bad measure here.

MR. ABBEY: It is a bad measure in this case because of the circumstances and -- but I think we have been, you know, in a way anticipating what your Honor might say today, and that's why we came in at $3 million. And I am appalled myself, but I don't know what to do about it over the expenses in this case. It is so high but -- and there might be some questions about whether some of them are in-house or out of house. But you could ask for more briefing and hold off on that.

THE COURT: I mean, the fact is if you add up the Robbins Geller expenses on experts, it's $1 million out of a settlement of, you know, 12 million? You know, I mean, it seems to me that the issues in the case were reasonably teed up at the outset, that everybody understood that the case involved some moderately complex, if not more than moderately complex, issues of accounting on which there were, you know, shifting sands.

MR. ABBEY: But it's more complicated than that.

THE COURT: But you also knew right at the outset

exactly what, you know, the stock price was on, you know, the relevant days.

MR. ABBEY: But let me just respond to you. If it was a perfect fact pattern with nothing else going on at IMAX, and then there's an announcement of accounting irregularities and an SEC investigation and the stock goes down, one could go back in time, figure out how long the accounting improprieties were going on and somehow attach to that an inflation factor and say that they overstate it by 10 percent, so -- if the stock is up by 10 percent.

But at the same time that that was going on, IMAX had announced that it had put itself up for sale. The stock went up. The stock went down. And on the whole question of loss causation, the defendants argued, and that's been their argument, that what caused the drop in the stock was not the disclosure of the accounting improprieties, but IMAX announced at some point in time that it wasn't going to sell itself anymore. And so there was a whole technical --

THE COURT: My only point, Mr. Abbey, is that we knew that. You knew that. I knew that at the outset. So the challenges of this case I think we're pretty clear. So that makes it hard to understand --

MR. ABBEY: Well, but --

THE COURT: -- to the investor.

MR. ABBEY: Yes, but when it comes down to the class

certification issue and what loss causation was caused by, that's where the experts have to say that the drop was due to the fraud. It wasn't due to the market. And that requires a whole different analysis in the charge for that. And, I mean, that's just what it is. And we have bills to back up all of that stuff from these guys.

And frankly, it doesn't do me any good that they get paid what they get paid. It's just coming out of -- you know, they charge a lot of money for that stuff. And there aren't too many of them that do it and do it and that the courts accept and so on and so forth. And we did use the same outside experts that Robbins Geller started with and then we finished with them. And I don't think we're even done, frankly, by the time that we were still fighting about yet another reporting. There were three or four expert reports seriatim, then there was a motion and a response with a new report, and then there had to be a response to the old report. It just seemed to take on a life of its own.

I don't know what else to say but to say that this was an expensive case to litigate. We had also -- we had expenses in Canada. We had Canadian counsel that was working up there. So when you put it all together, you add it up, and it's not my proudest moment in terms of coming in and saying this is a great result for everybody. It's a good result for the class. It's not a great result for the lawyers. And this is just --

but we have a responsibility, and I think we fulfill that responsibility by taking a huge discount in coming in at a number here that, even if you say there was a million or a million and a half dollars that should have been spent in lawyer time, or even $2 million, if the time was 5 or 6 million, and we're only ask asking for 3, half of it is going out the window either way.

THE COURT: Look, but we also have to realize when we add those, if I awarded all of the expert fees -- well, the outside experts come close to a million and a half dollars. And I've already expressed my concern that there is a Robbins Geller internal forensic accountant who, you know, claims to have spent 653 hours doing this, which then says, come on. I mean, I don't claim to be a forensic accountant, but there are only so many transactions here to look at. I mean, and these, you know, IMAX installations have only so many parts.

MR. ABBEY: Your Honor, again, what I'd like to come away with, we want to try to bring this to an end and not to have it go on. And I think that, I hope at least, that the settlement part of the case -- and it's never going to be more than $12 million. That either gets approved or doesn't. And as I say, you don't have a problem with that --

THE COURT: Well, that will be approved. And I would be normally prepared to just do it on the record, but I think it might be helpful to you to have a written opinion. So

you're going to have to wait a little bit of time.

MR. ABBEY: Right.

THE COURT: You will get it amply in advance --

MR. ABBEY: That would be great.

THE COURT: -- of the Canadian proceeding.

MR. ABBEY: How would you like to deal with the question of the expenses? Would you like more briefing on that and you can reserve? Or do you want to just decide it on the paper?

THE COURT: Well, I mean, I think that it would probably be helpful to see the bills of the experts and to see their work product, just in terms of the final reports -- I'm not interested in reading before that -- so I get some better sense of how complex their analysis is.

MR. ABBEY: Okay.

THE COURT: I think that would be useful.

MR. ABBEY: We have no problem with that.

THE COURT: I mean, I'd also ask you to explain how you wound up spending $121,000 on Lexis and West Law in this case. That seems like an awfully large number to me.

MR. ABBEY: Okay.

THE COURT: And Robbins Geller might really want to give some thought maybe now to some of the things I've said, because I'm really concerned about that.

And, frankly, let me just say something else. When I

ruled that Robbins Geller was not qualified to be lead counsel, I was fairly kind in my phraseology. I could have been much more critical. And at the moment, given what you have asked for, there is an aspect that I feel you are taking advantage of my restraint in my comments at the time. So I just want you to be aware of that.

MR. ROTHMAN: Your Honor, I apologize to you if you feel that we've taken advantage of anything. Robert Rothman from Robbins Geller.

First, with respect to what we did in the case, and our fee request, we removed all of the fees for anything done before we were lead counsel, after we were lead counsel, providing our work product to the Abbey Spanier firm and all of the fees incurred in the class certification brief. That came out to be approximately $560,000 that we removed, recognizing that your Honor probably did not appreciate the time we spent in that and probably didn't serve the best interests of the class or didn't advance the interests of the class.

With respect to the $1.7 million, what we did was exactly what your Honor earlier suggested counsel should have done, where we went through each transaction. And it wasn't as simple as just finding a paper file for each transaction. We had to comb through the 500,000 documented pages that the defendants produced, actually create the paper file for the transactions, then go through the installation process, go

through the contract and have the forensic accountant pinpoint when certain revenue should have been recognized and when it was recognized.

THE COURT: So you're telling me that lawyers were going through files to make the chart of when different parts of the IMAX installation were actually in place?

MR. ROTHMAN: They were junior associates doing that, and there was the in-house forensic accountant who was going through and doing that. And that in-house forensic accountant is not included in our expense figure. That's included in our lodestar figure.

THE COURT: Yeah, I know. That's why it's duplicative. I mean, the point is -- just let me get your submission -- the concern is that, yes, you have $362,000 from Mr. Orronica as part of your lodestar. On top of that you have $596,000 of experts. So the point is that when you add them together, you get to about a million bucks.

MR. ROTHMAN: The outside experts were focused more on the economic issues in the case, the loss causation issue, the stock market issues, the other issues about what caused the loss, whether or not it was caused by the fact that they couldn't find the buyer for IMAX or whether it was caused by other factors or the accounting misstatement or whether it was caused by the fact that the discounted cash value of the company may have changed, discounted cash flow analysis. All

of those things are what the outside experts were considering.

The in-house expert was considering the accounting issues, sitting down with the documents, rolling up his sleeve, having on one of those little accountant visors and crunching the numbers to try to figure out what was happening. And he was working with junior attorneys in doing that. That's where the majority of our time is spent. In fact, I'd say it's the overwhelming majority of the time that we put in for.

The expenses, the outside expenses we will gladly provide your Honor with the bills. With respect to the outside experts, with one of them we negotiated an $84,000 discount from the bills that they had sent to us because we also believed they were higher than they should be or higher than the class really should pay for them. And we worked very hard with the experts to get those bills down.

THE COURT: Okay. Well, I mean, I guess ultimately, if I approve the 25 percent attorneys' fee amount, your firm and Abbey Spanier are going to have some serious discussions. And I guess I've expressed, you know, my concern and the question of, you know, whether ultimately what -- you know, what you did benefited the class and was usable by Abbey Spanier afterwards. And I don't, you know, have any real information about that. I may not ever need to know that.

But as I say, I mean, I do have concern particularly about the expenses, because those come out of the settlement

amount. And you know, therefore, it isn't just 3 million if we did it. It's considerably larger than that. So to protect the interests of the class, that's something I need to know more about.

MR. ROTHMAN: Your Honor, I will add one point. With respect to the transactions that we analyzed, we prepared detailed memos 10-, 15-, 20-page each, summarizing everything your Honor said we should be doing with respect to the transactions. We provided them to Abbey Spanier. And, in fact, in connection with the mediation, we even shared the results of one of them with the defendants in our mediation statement so they could see the work we've done in tearing apart the transaction and how we were able to prove our case and would be able to prove our case.

THE COURT: Well, I guess I can't quite envision why it would take 15 pages to set out the various points of installation and compare that to the income recognition that was utilized, because there are, you know, certain accounting principles that applied. And the mechanism of each installation doesn't change. So I just find that a little, you know, hard to fully understand. But it may be, you know, you're right and my supposition is wrong.

MR. ROTHMAN: Your Honor, if I may just add one point. With respect to the documents that were produced, it wasn't as simple as the screen is installed and on this date. There were

e-mails back and forth from the theater operator to IMAX to other people saying it's kind of installed, it's not installed. And we had to go through each one of those correspondence to figure out when the milestone was actually reached. It wasn't as simple as a checkmark on a form, because IMAX may have had that form checked but the underlying documents from the theater owner didn't corroborate what IMAX had in their records.

Thank you.

MR. ABBEY: Just to sort of wind up in this area, the expenses in large part were paid to third parties or owed to third parties. There's really no incentive on the part of the plaintiffs' lawyers to overpay for that. I think that it might be helpful in the future in another case, on a question of what goes on on a Rule 23 class motion, if somehow this could be streamlined so that there weren't 50- and 60- and 70-page reports by experts on whether a case should be certified or not.

And it's turned out to become an endless game. And the defendants are certainly big players, and they understand that if they get by -- if they don't get by a motion to dismiss and get the case dismissed at the beginning, the next place to make the big fight is on the class certification, which usually follows. And very often class certification comes before merits discovery, but it takes on an entire life of its own. And the Court could streamline that and say, we're only going

to have ten-page experts and you're going to limit it in some way, but it just goes on and on and on, back and forth. And it's become a cottage industry. And it's changed from the way it used to be.

I only point it out because of -- you can see what's happened in -- maybe it doesn't get as noticed if the case is 100 or 200 million dollars, but when you get into a case where you're fighting for every single dollar, these third-party fees add up tremendously. And it's a real imposition and it's a burden. But if you don't do it, you're not going to get your class certified, and that's the situation.

So it's sort of you chase your tail here. I just point that out in the record. We'll be happy to submit backup information for the Court to view these expenses. And I appreciate very much, I think you've been very insightful. And it is an issue. The expenses here are very high for the size of this case. But it just turned out to be that way after six years. And I think we've been responsible as best as we can under the circumstances of this case.

We're mindful of -- we don't want to be criticized for looking like we're taking somebody else's money. I've worked too hard in this field for too long. And we'll do everything that we can to be responsible so that we have the respect of the Court, and in this particular instance, I hope the respect of the Canadian court as well. We've done the right thing as

best as we could for this class.

So thank you very much for your time, your Honor.

THE COURT: Okay. All right. So as I said, I would expect as soon as you can would be to your advantage. So I assume you'll give us this additional material?

MS. FISCH: As soon as possible, your Honor, no problem.

THE COURT: And we'll get to work on formalizing the approval of the settlement, okay? Very well.

(Adjourned)