UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

In re IMAX Securities Litigation

Master File
No. 06 Civ. 6128 (NRB)

**MEMORANDUM AND ORDER**

----------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

### I. Introduction

On June 20, 2012, we approved an amended settlement of this long-running securities class action but reserved decision on the requested attorneys' fees and expenses pending further briefing on these issues from lead plaintiff's counsel Abbey Spanier Rodd & Abrams, L.L.P. ("Abbey Spanier"). See In re IMAX Sec. Litig., --- F. Supp. 2d ----, Master File No. 06 Civ. 6128, 2012 WL 2359653, at *14 (S.D.N.Y. June 20, 2012). In the interim, we have received supplemental submissions bearing on attorneys' fees and expenses from Abbey Spanier and also former lead plaintiff's counsel Robbins Geller Rudman & Dowd L.L.P. ("Robbins Geller"). In its supplemented application brought on behalf of itself and Robbins Geller as well as Berger & Montague, P.C. ("Berger & Montague") and Cohen Milstein Sellers & Toll P.L.L.C. ("Cohen Milstein")--two firms which allegedly assisted in prosecuting this case--Abbey Spanier seeks an award of attorneys' fees of $3,000,000.00 and a reimbursement of

expenses of $1,719,351.32.   This is a total request of $4,719,351.32 or over 39% of the amount of $12,000,000.00 available to be paid to the settling shareholders of IMAX Corporation ("IMAX").   For the reasons stated below as well as those articulated at the hearing on the amended settlement in this case on June 14, 2012 (the "fairness hearing"), we grant 33% of the settlement amount or $3,960,000.00 (plus the interest that is currently accruing on the settlement amount held in escrow) to be divided among counsel and to be apportioned between an award of attorneys' fees and the reimbursement of expenses in such manner as lead plaintiff's counsel determines pursuant to its good-faith judgment.

## II. Background[1]

The facts underlying this case are sufficiently summarized in our recent Memorandum and Order approving the amended settlement that we need not set them out again here.   See In re IMAX, 2012 WL 2359653, at *1-5.   However, there is certain information bearing on counsel's prosecution of this case that we must detail here for the first time.   In particular, we track

---

[1] Unless otherwise specified, the facts recited here are drawn from the following sources: (1) the Amended Order Preliminarily Approving the Final Settlement and Providing for Notice ("Preliminary Order"); (2) the Declaration of Arthur N. Abbey in Support of Lead Plaintiff's Motion for Final Approval of the Settlement with Defendants, etc. ("First Abbey Decl."); (3) the Declaration of Arthur N. Abbey in Further Support of Lead Plaintiff's Motion for Reimbursement of Litigation Expenses ("Second Abbey Decl."); and (4) the Declaration of Robert M. Rothman in Further Support of Lead Plaintiff's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Second Rothman Decl.").

the entities that have served in succession as lead plaintiffs and lead plaintiffs' counsel over the preceding years and then focus on the services that counsel have rendered and the expenses that counsel have incurred during this time period.

### A. The Once and Future Lead Plaintiff's Counsel

On January 17, 2007, we consolidated eight pending actions and appointed Westchester Capital Management, Inc. ("Westchester") as lead plaintiff in the consolidated action. See Kaplan v. Gelfond, 240 F.R.D. 88, 96 (S.D.N.Y. 2007). On that same date, we appointed Abbey Spanier as lead plaintiff's counsel. See id. On February 8, 2007, we empowered Abbey Spanier as lead plaintiff's counsel, inter alia, to "delegate work responsibilities to selected counsel as may be required in such a manner as to lead to the orderly and efficient prosecution of this litigation and to avoid duplicative or unproductive effort." In re IMAX Sec. Litig., Master File No. 06 Civ. 6128, Order at 1-2 (S.D.N.Y. Feb. 7, 2007) (ECF #42). Pursuant to this authority, Abbey Spanier apparently gave certain limited responsibilities to Berger & Montague and to a much lesser extent to Cohen Milstein. See First Abbey Decl. Ex. F ¶ 4, Ex. G ¶ 2. After filing a consolidated class action complaint on October 2, 2007, Westchester and Abbey Spanier successfully opposed a motion to dismiss. See In re IMAX Sec. Litig., 587 F. Supp. 2d 471 (S.D.N.Y. 2008).

While Westchester and Abbey Spanier's ensuing motion for class certification was pending, on December 3, 2008, the Second Circuit decided W.R. Huff Asset Management v. Deloitte & Touche L.L.P., 549 F.3d 100 (2d Cir. 2008), which made it patent that Westchester lacked standing under Article III of the Constitution when we appointed it lead plaintiff because it was only suing on behalf of certain of its clients. See In re IMAX Sec. Litig., Master File No. 06 Civ. 6128 (NRB), 2009 WL 1905033, at *1-3 (S.D.N.Y. June 29, 2009) (discussing Huff and its impact on this case). Faced with renewed competition for the role of lead plaintiff's counsel in the wake of this decision, Westchester acknowledged that it originally lacked standing to serve as lead plaintiff but argued that its clients' subsequent assignment of their claims to it cured this issue. See id. at *3. However, on June 29, 2009, we held that irrespective of whether these assignments resolved the question of standing, it was indisputable that Westchester now faced unique legal issues, which fatally undermined its typicality and adequacy as a lead plaintiff vis-à-vis the other members of the proposed class of shareholders. See id. Accordingly, we removed Westchester and Abbey Spanier as lead plaintiff and lead plaintiff's counsel, respectively, and appointed Snow Capital Investment Partners, L.P. ("Snow Capital") and Robbins Geller as their replacements. See id. at *3-4.

For the approximately eighteen months between June 29, 2009 and December 20, 2010, Snow Capital served as lead plaintiff and Robbins Geller served as lead plaintiff's counsel.  However, on December 20, 2010, we denied Snow Capital's motion for class certification because we found that it was an inadequate class representative on both the grounds of typicality and adequacy. See In re IMAX Sec. Litig., 272 F.R.D. 138, 155 (S.D.N.Y. 2010) (holding on typicality and continuing to find that adequacy provided "an independent ground to deny class representative status").  In finding that Snow Capital was inadequate to serve as a class representative, we stressed the relationship between Snow Capital and Alfred G. Yates, Jr., Esq. ("Yates"), observing that when we appointed Snow Capital as lead plaintiff and Robbins Geller as lead plaintiff's counsel "[l]ittle did we know, because it was never disclosed to this Court, that Snow Capital was also represented by another attorney, [Yates]," who "has not filed a notice of appearance, despite hav[ing] a retainer agreement with [Snow Capital]." Id. at 156.  We have previously detailed the particular nature of this professional and personal relationship between Snow Capital and Yates as well as the fact that Snow Capital's retention of both Robbins Geller and Yates in this case was memorialized in an engagement letter appearing on Yates' letterhead, which Yates alone signed.  See id.  Possessing "substantial concerns" about the ability of Snow

Capital to adequately represent other shareholders in light of its relationship with Yates, we also expressed our "concern about the appearance of impropriety" and further conveyed that we were troubled by the failure of Snow Capital and Robbins Geller to disclose the role of Yates in this litigation.  Id. at 156-57.

Having solicited renewed applications to serve as lead plaintiff and lead plaintiffs' counsel, on April 14, 2011, we appointed The Merger Fund ("TMF"), one of Westchester's clients that in the interim had been reassigned its claim, as lead plaintiff and reappointed Abbey Spanier as lead plaintiff's counsel, thus bringing this securities class litigation procedurally, if not substantively, full circle back to the exact position in which it stood roughly thirty-one months before when we denied the motion to dismiss the consolidated class action complaint.  See In re IMAX Sec. Litig., Master File No. 06 Civ. 6128, 2011 WL 1487090, at *6, *9 (S.D.N.Y. Apr. 14, 2011).  In selecting TMF and Abbey Spanier, we rejected the competing application of Ironworkers St. Louis District Counsel Pension Fund and Robbins Geller.  See id. at *1.  After determining that TMF alone would serve as lead plaintiff, we further rejected Robbins Geller's suggestion that it should still serve as lead plaintiff's counsel or, at a minimum, co-lead plaintiff's counsel, despite TMF's selection of Abbey

Spanier, and we noted in explaining our rationale for this decision that we had recently criticized Robbins Geller vis-à-vis its failure to disclose the involvement of Yates. <u>See id.</u> at *8-9.

On November 2, 2011, the date on which TMF entered into a memorandum of understanding to settle this case, a third motion for class certification was fully briefed and under consideration by this Court. <u>See</u> First Abbey Decl. ¶¶ 51, 54, 57, 67-68.

### B. Fees and Expenses

In the almost six years that have passed since this case commenced, counsel have invested a remarkable amount of their own time in its litigation and frankly incurred enormous expenses relative to the settlement amount.

Abbey Spanier, which served as lead plaintiff's counsel from January 2007 to June 2009 and again from April 2011 to the present following the interregnum of Robbins Geller, reports that eighteen of its partners, associates, and paralegals have thus far expended 5,266.30 hours in prosecuting this case. <u>See</u> First Abbey Decl. Ex. D. At a weighted average billing rate per hour of over $588.00, Abbey Spanier states that its lodestar fee amount is $3,099,356.25. <u>See</u> <u>id.</u> As lead plaintiff's counsel for over three years, Abbey Spanier has been involved in all aspects of this case, engaging in discovery, drafting the

consolidated class action complaint, briefing two motions for class certification, two (successful) motions to be appointed lead plaintiff, and one motion to dismiss, negotiating settlement, and actively monitoring and through third parties participating in the parallel class action that remains pending in Canada (the "Canadian Action"). See First Abbey Decl. ¶¶ 12, 14-34, 38, 47-77. In addition to its lodestar fee amount, Abbey Spanier states that it has incurred expenses of $1,074,088.65 of which it has paid $909,233.40. See Second Abbey Decl. ¶¶ 3-4.[2] These expenses can be divided into six categories, which we list here with the percentage of the overall request for reimbursement of expenses that each service provider's invoices reflect:

1. Accounting Expert
   Shechtman Marks Devor PC $85,011.25/4.9%
2. Financial Experts
   Financial Markets Analysis, LLC $74,145.24/4.3%
   Finnerty Economic Consulting LLC $129,231.00/7.5%
   Compass Lexecon $253,107.22/14.7%
3. Canadian Action Expert & Counsel
   Professor Geoffrey Miller $25,000/1.5%
   Bennett Jones LLP $307,013.24/17.9%
4. Investigators
   Gryphon Investigators $35,367.32/2.1%
5. Legal Research
   Various Service Providers $121,675.24/7.1%

---

[2] As an aside, we note that Abbey Spanier increased its request for reimbursement of expenses by $41,513.30 following the fairness hearing at which we expressed considerable reservations over the amount of expenses for which counsel sought reimbursement. See Second Abbey Decl. ¶ 3 (explaining discovery of additional invoices that had been previously overlooked); Fairness Hr'g Tr. 30:24-25 ("I do have concern particularly about the expenses"). With that said, we in no way question the explanation for this increase that was provided by Abbey Spanier, which has always communicated with the utmost good faith and candor in its communications with the Court.

      6. Et Cetera (<u>i.e.</u> Travel, Discovery, Communication)
          Various Service Providers $43,538.00/2.5%

<u>See</u> First Abbey Decl. Ex. D; Second Abbey Decl. ¶¶ 7-31, Exs. A, C, F, G, I, K, L.

      Robbins Geller, which served as lead plaintiff's counsel from June 2009 to December 2010, reports that twenty-one of its partners, associates, counsel, and internal accountants and investigators as well as some additional number of paralegals have expended 3,757.75 hours in prosecuting this case. <u>See</u> First Abbey Decl. Ex. E ("First Rothman Decl.") ¶ 42. At a weighted average billing rate per hour of over $451.00, Robbins Geller states that its lodestar fee amount is $1,696,175.00. <u>See</u> <u>id.</u>[3] As lead plaintiff's counsel for eighteen months, Robbins Geller has been involved in many aspects of this case, engaging in discovery, briefing one motion for class certification and one (successful) motion to be appointed lead plaintiff, and negotiating settlement. <u>See</u> <u>id.</u> at ¶¶ 3, 6-11. In addition to its lodestar fee amount, Robbins Geller states that it has incurred expenses of $636,813.49, at least a substantial portion of which it appears to have paid. <u>See</u> Second Rothman Decl. ¶ 4 (referring to $580,010.55 "paid" to

---

[3] In arriving at these totals, Robbins Geller states it excluded the work that its personnel performed before and after the period during which it served as lead plaintiff's counsel and also in briefing the motion for class certification filed on behalf of Snow Capital. <u>See</u> First Rothman Decl. ¶ 39. Without these exclusions, Robbins Geller's lodestar fee amount would increase to $2,256,528.75. <u>See</u> <u>id.</u>

financial experts).[4]   These expenses can be divided into three categories, which we list here with the percentage of the overall request for reimbursement of expenses that each service provider's invoices reflect:

> 1. Financial Experts
>       Finnerty Economic Consulting LLC $49,674.45/2.9%
>       Compass Lexecon $530,336.10/30.9%
> 2. Legal Research
>       Various Service Providers $10,851.54/0.6%
> 3. Et Cetera (i.e. Travel, Discovery, Communication)
>       Various Service Providers $45,951.40/2.7%

See First Rothman Decl. ¶ 44; Second Rothman Decl. ¶¶ 4, 14-21, Exs. 1, 2.

Berger & Montague, which alleges that it assisted Abbey Spanier with the consolidated class action complaint, the motion to dismiss, one of the motions for class certification, and discovery, reports that seventeen of its partners, associates, and paralegals have expended 848.65 hours in prosecuting this case.  See First Abbey Decl. Ex. E ¶ 5.  At a weighted average billing rate per hour of over $495.00, Berger & Montague states that its lodestar fee amount is $420,565.00.  See id.  In addition, Berger & Montague states that it has incurred miscellaneous expenses of $6,123.59.  See id. at ¶ 10.

Cohen Milstein, which only alleges that it engaged in "discussion with [Abbey Spanier] regarding class issues" and

---

[4] As with its lodestar fee amount, Robbins Geller states that it excluded expenses incurred before and after the period during which it served as lead plaintiff's counsel.  See Second Rothman Decl. ¶ 4.

possibly the prospect of one of its clients serving as an additional class representative, reports that five of its partners, associates, and paralegals have expended 79.75 hours in prosecuting this case. See First Abbey Decl. Ex. F ¶ 4. At a weighted average billing rate per hour of over $388.00, Cohen Milstein states that its lodestar fee amount is $30,987.50. See id. In addition, Cohen Milstein states that it has incurred miscellaneous expenses of $2,325.59. See id. at ¶ 6.[5]

The combined fee amount lodestar of counsel is $5,247,083.75, reflecting 9,952.65 hours expended at a weighted average billing rate per hour of over $527.00. The combined expenses incurred by counsel is $1,718,351.32, of which $1,121,505.26 or 65% is attributable to accounting and financial experts and $332,013.24 or 19% is attributable to expenses related to the Canadian Action. In total, the lodestar fee amount plus expenses equal $6,966,435.07. Appreciating that this overall figure and an award of fees reflecting over 43% of the settlement of $12,000,000.00 is excessive in this case, Abbey Spanier requests an award of fees of only 25% or $3,000,000.00 in its supplemented application on behalf of counsel but still seeks reimbursement of the entire expenses incurred by counsel of $1,718,351.32, an amount disproportionate

---

[5] While we leave it to Abbey Spanier to divide the grant among counsel, it appears to us that much, if not all, of the time spent by Cohen Milstein on this case was not for the benefit of the class.

both to the settlement amount and the requested award of fees. See Second Abbey Decl. ¶¶ 3, 33.[6]

### III. Discussion

#### A. Standard of Review: Fees and Expenses

Federal Rule of Civil Procedure 23(h) provides in relevant part that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law." FED. R. CIV. P. 23(h). See also FED. R. CIV. P. 23 advisory committee's note (clarifying applicability of subdivision (h) where, as here, there is "a simultaneous proposal for class certification and settlement").

It is well established that "'[w]here an attorney succeeds in creating a common fund from which members of a class are compensated for a common injury inflicted on the class . . . the attorneys whose efforts created the fund are entitled to a reasonable fee--set by the court--to be taken from the fund.'" In re Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 136 (S.D.N.Y. 2008) (ellipsis in original) (quoting Goldberger

---

[6] As Abbey Spanier noted at the fairness hearing, the notice provided to members of the class specified that counsel were seeking an award of fees of 25% or $3,000,000.00 and up to $1,750,000.00 in reimbursement of expenses. See Fairness Hr'g Tr. 10:12-13, 11:24-12:4.  As noted in our recent Memorandum and Order approving the amended settlement, only one member of the class filed an objection to the proposed settlement terms, which, however, did criticize the amount of expenses for which counsel sought reimbursement. See Objection 2 (objecting to the "claimed expenses because they appear to be too high" and emphasizing that the requested reimbursement of expenses "constitutes about 15% of th[e] settlement" and that if the Court "award[s] 25% of the settlement as legal fees, then approximately 40% of the settlement would be consumed by . . . fees and expenses" when "there is little if any information available to me that would justify such high expenses").

v. Integrated Res., Inc., 209 F.3d 43, 47 (2d Cir. 2000)).
"What constitutes a reasonable fee is properly committed to the
sound discretion of the district court . . . and will not be
overturned absent an abuse of discretion, such as a mistake of
law or a clearly erroneous factual finding." Goldberger, 209
F.3d at 47.  In order to determine what constitutes a reasonable
fee, courts within the Second Circuit are free to adopt one of
two approaches: the percentage method or the lodestar method.
See id. at 50 ("we hold that both the lodestar and the
percentage of the fund methods are available to district judges
in calculating attorneys' fees in common fund cases").[7]  It
remains the case that adoption of "the percentage method
continues to be the trend of district courts in th[e Second]
Circuit" but that "an analysis of counsel's lodestar 'as a
"cross check" on the reasonableness of the requested
percentage'" remains common.  In re Telik, Inc. Sec. Litig., 576
F. Supp. 2d 570, 586, 588 (S.D.N.Y. 2008) (quoting Goldberger,
209 F.3d at 50).[8]  Regardless of the adopted approach, the
awarded fee must of course be reasonable when considered in
light of the following factors as set forth in Goldberger:

---

[7] "Under the percentage method, the court simply awards counsel a reasonable
percentage of the recovery as a fee. The lodestar method requires the court
to scrutinize the fee petition to ascertain the number of hours reasonably
billed, then multiply that figure by an appropriate hourly rate." Fogarazzo
v. Lehman Bros., Inc., No. 03 Civ. 5194 (SAS), 2011 WL 671745, at *2
(S.D.N.Y. Feb. 23, 2011).
[8] "Where the lodestar is 'used as a mere cross-check, the hours documented by
counsel need not be exhaustively scrutinized by the district court.'" In re
Telik, 576 F. Supp. 2d at 588 (quoting quoting Goldberger, 209 F.3d at 50).

> (1) the time and labor expended by counsel; (2) the
> magnitude and complexities of the litigation; (3) the
> risk of the litigation; (4) the quality of
> representation; (5) the requested fee in relation to
> the settlement; and (6) public policy considerations.

209 F.3d at 50 (ellipsis and internal quotation marks omitted).

It is also well established that "[c]ounsel is entitled to reimbursement from the common fund for reasonable litigation expenses." In re Merrill Lynch, 249 F.R.D. at 143. Indeed, "[c]ourts in the Second Circuit normally grant expense requests in common fund cases as a matter of course." In re EVCI Career Colleges Holding Corp. Sec. Litig., No. 05 Civ. 10240 (CM), 2007 WL 2230177, at *18 (S.D.N.Y. July 27, 2007) (internal quotation marks omitted).

While it is typical for courts to separately consider an award of fees and the reimbursement of expenses in succession in the context of approving securities class action settlements, the Private Securities Litigation Reform Act of 1995 (the "PSLRA") provides that the "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 78u-4(a)(6) (emphasis added). See also H.R. Rep. No. 104-369, at 36 (conference report on the PSLRA noting that "[t]he House and Senate heard testimony that counsel in securities class actions often receive a disproportionate share of settlement

awards" and asserting that newly enacted § 78u-4(a)(6) is intended to "limit[] the award of . . . fees and costs to counsel for a class . . . to a reasonable percentage of the amount of recovery awarded to the class"). Thus the PSLRA expressly contemplates inquiry into the reasonableness of an overall percentage reflecting a grant of both fees and expenses.

## B. A Combined Approach to Reasonableness

In this case, the amount of expenses for which counsel seeks reimbursement relative to the settlement amount as well as the requested award of fees creates a unique set of circumstances. In a typical case, reimbursed expenses reflect a small percentage of the settlement amount and a much smaller percentage of the awarded fees. See, e.g., In re Giant Interactive Group, Inc. Sec. Litig., 279 F.R.D. 151, 163-66 (S.D.N.Y. 2011) (reimbursing expenses of $263,945.54 relative to an equivalent common fund of $13 million (2%) and awarded fees of approximately $4.19 million (6%)). This appears true whether the size of the settlement amount is larger, smaller, or equal to the settlement amount here. See, e.g., In re Marsh & McLennan Cos., Inc. Sec. Litig., No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *1 (S.D.N.Y. Dec. 23, 2009) (reimbursing expenses of $8.06 million relative to a larger common fund of $400 million (2%) and awarded fees of $54 million (15%)); Fogarazzo v. Lehman Bros., Inc., No. 03 Civ. 5194 (SAS), 2011 WL 671745, at *1

(S.D.N.Y. Feb. 23, 2011) (reimbursing expenses of $211,596.69 relative to a smaller common fund of $6.75 million (3%) and awarded fees of $2.25 million (9%)); Hall v. Children's Place Retail Stores, Inc., 669 F. Supp. 2d 399, 400, 405 (S.D.N.Y. 2009) (reimbursing $297,351.86 relative to a common fund of $12 million (2.4%) and awarded fees of $1.8 million (16%)). Even in cases involving an equivalent recovery for the class where reimbursed expenses reflect a relatively larger percentage of the settlement amount and awarded fees, that percentage is still significantly less than here where counsel seek reimbursement of expenses totaling 14% of the settlement amount and 57% of their requested award of fees. See, e.g., Hicks v. Stanley, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005) (reimbursing expenses of $727,433.82 relative to a common fund of $10 million (7%) and awarded fees of $3 million (24%)). While our research has identified one case that more closely mirrors this one vis-à-vis these percentages, that case is distinguishable on a number of bases, not the least of which is that the expenses there "reflected the fact that [it] was a complex case which was litigated until a week before trial." In re Veeco Instruments Inc. Sec. Litig., No. 05 M.D.L. 01695 (CM), 2007 WL 4115808, at *1, *11 (S.D.N.Y. Nov. 7, 2007) (reimbursing expenses of $774,329.29 relative to a common fund of $5.5 million (14%) and awarded fees of $1.65 million (47%)). Thus,

we are satisfied that counsel's expenditures here relative to the recovery of the class and their own sought after compensation lie well outside of what is customary within the Southern District of New York and the Second Circuit.

In light of the fact that the incurred expenses in this case are an atypically large percentage of the settlement amount and the requested award of fees, the general mode of analysis whereby the award of fees is relatively heavily scrutinized but the reimbursement of expenses is approved as a matter of course is inappropriate here.  See, e.g., In re Merrill Lynch, 249 F.R.D. at 136-144 (analyzing an award of fees of $1.1 million for seven pages and the reimbursement of expenses of $38,139.88 for less than one page).  While pursuant to the percentage method, an award of $3,000,000.00 or 25% of the settlement amount might lie close to the upper limits of what is reasonable here, the additional reimbursement of $1,719,351.32 in expenses resulting in a grant to counsel of $4,719,351.32 or over 39% of the settlement amount is decidedly not reasonable in this case. As Arthur N. Abbey, Esq. of Abbey Spanier, acknowledged at the fairness hearing, much to his credit, the amount of expenses in this case is disturbing given weaknesses that were apparent from close to the outset of this case and that significantly dimmed the prospects for a considerable settlement amount.  See, e.g., Fairness Hr'g Tr. 23:11-13.

Particularly because the PSLRA expressly requires that we assess the overall percentage of fees and expenses for reasonableness in a securities class action, we think that selecting such an overall percentage through a combined approach to reasonableness is the most appropriate action here.  Given their comparable size, the requested award of fees and reimbursement of expenses simply cannot be considered in isolation from one another.  Based on the familiarity that we have developed with this case over the preceding years, we find that a total grant for fees and expenses of 33% of the settlement amount or $3,960,000.00 is reasonable here.  Application of the Goldberger factors, which we find are sufficiently broad in their scope to address both fees and expenses at least given the circumstances here, confirms the reasonableness of this percentage.

First, as to the time and labor expended by counsel, there is no doubt that counsel have invested themselves heavily in this case, accumulating 9,952.65 billable hours.[9]  As discussed above, their work on behalf of the class has encompassed a broad array of discovery-related tasks and motion practice as well as settlement negotiations and work on the Canadian Action, though as we discussed in our recent Memorandum and Order approving the

---

[9] To place this number in context, 9,952.65 billable hours represents one attorney billing forty hours per week to this case, every week without vacation, for close to five years.

settlement, we understand that counsel never conducted any merits depositions. See In re IMAX, 2012 WL 2359653, at *3. With that said, as is admittedly not uncommon, the requested award of fees of $3,000,000.00 actually reflects a negative multiplier in relation to counsel's lodestar fee amount of $5,247,083.75, which itself excludes certain work by Robbins Geller that we agree with counsel did not advance the interests of the class. See In re Giant, 279 F.R.D. at 163 n.5 (requested and awarded fee reflected negative multiplier of lodestar fee amount). The willingness of counsel to seek such a steep discount on their already significantly adjusted lodestar fee amount reflects what Abbey Spanier acknowledged at the fairness hearing: "that there was too much time perhaps spent in this case and that [counsel] shouldn't be paid for that time." Fairness Hr'g Tr. 17:9-11.[10]  We also note that counsel were able to benefit in this case from work performed by the Securities and Exchange Commission (the "SEC") and their counterparts in the Canadian Action. See In re IMAX, 2012 WL 2359653, at *3 (noting "Abbey Spanier has reviewed transcripts from interviews conducted by the SEC . . . and has also gained access to

---

[10] From one perspective, this admission illustrates that there is little value in performing a lodestar cross-check in this case. As Abbey Spanier agreed with us at the fairness hearing, "[i]t is a bad measure in this case because of the circumstances." Fairness Hr'g Tr. 22:11-23:11. From another perspective, the lodestar cross-check confirms given the negative multiplier that an award of fees of less than 33% or $3,960,000.00 is reasonable. See In re Veeco, 2007 WL 4115808, at *10 (finding that where counsel's "fee request amounts to a deep discount from their lodestar . . . the lodestar 'cross-check' unquestionably supports a percentage fee award of 30%").

transcripts from depositions conducted by plaintiffs' counsel in the Canadian Action"); Goldberger, 209 F.3d at 56 ("[w]hile this case may not quite be characterized as 'piggy back' in nature, counsel's performance was certainly helped enormously by the prior actions against [defendants]").

Second, as to the magnitude and complexities of the litigation, it is a common refrain that a securities class action "by its very nature, is a complex animal." Maley v. Del Global Techs. Corp., 186 F. Supp. 2d 358, 372 (S.D.N.Y. 2002). See also Fogarazzo, 2011 WL 671745, at *3 ("courts have recognized that, in general, securities actions are highly complex"). "In this case, we have from the outset acknowledged the complexity of the underlying accounting principles involved" but emphasized that "this complexity does not appear extraordinary in the context of issues that are regularly implicated in the course of securities class action litigation." In re IMAX, 2012 WL 2359653, at *10. Indeed, we have repeatedly observed that this case involves the recognition of income from a closed universe of thirty (30) theater system installation transactions. See, e.g., In re IMAX, 587 F. Supp. at 475; In re IMAX, 272 F.R.D. at 143; Fairness Hr'g Tr. 14:15-15:4.[11]

---

[11] Our assessment of the difficulty of analyzing these transactions is not altered by the supplemental submission of Robbins Geller, which describes the processes and procedures undertaken to assess these thirty (30) transactions, which still seems far from extraordinary. See Second Rothman Decl. ¶¶ 33-37.

Admittedly, an additional level of complexity was added to this case as a result of the Canadian Action, which required uncommon work from counsel and expenditures on an expert on the law of Canada as well as retention of counsel in Canada to represent the interests of the then proposed class of shareholders. However, when we strip these "Canadian" expenses from the total reimbursement sought, we are still left with $1,387,338.08 of expenses amounting to close to 12% of the settlement amount, of which $1,121,505.26 is attributable to accounting and financial experts. In explaining these expert expenses, counsel have stressed, for instance, the difficulty of establishing loss causation as a justification for the $962,348.77 in expenses tied to Finnerty Economic Consulting LLC and Compass Lexecon. See, e.g., Fairness Hr'g Tr. 12:7-10 (explaining "[t]he bulk of expenses are expert expenses" and noting "the very complicated loss causation and damages issues"). Having reviewed the relevant expert reports, however, we are not convinced that the issues of loss causation implicated in this case are so complicated. Instead it appears that the facts bearing on loss causation are simply adverse to lead plaintiff and the class. For instance, IMAX's twin disclosures on August 9, 2006 "(i) that the SEC was investigating its accounting practices and also (ii) that a potential acquisition or strategic partnership had not come to

fruition . . . significantly complicate[] the question of what, if any, amount of the resulting drop in the share price is attributable to prior allegedly misrepresentative statements regarding theater system installations and resulting revenue." In re IMAX, 2012 WL 2359653, at *12.  In the context of awarding fees and reimbursing expenses, there is a fundamental difference between the challenges presented to counsel by "bad" facts and the challenges arising for counsel from making new law.  The challenges arising from the latter merit reward.

Third, as to the risk of failing to achieve success in the litigation and thus secure compensation, "[c]ourts have repeatedly recognized that [such risk] is a pivotal factor in assessing the appropriate . . . fees to award in class actions." In re Telik, 576 F. Supp. 2d at 592.  See also In re Giant, 279 F.R.D. at 164 ("[i]n considering the risk of litigation as it pertains to fee awards, [c]ourts in th[e Second C]ircuit may consider several types of risk" of which "[t]he most salient is the attorneys' risk in accepting a case on a contingency fee"). "As with any securities case, [counsel] unquestionably assumed substantial risk having faced hurdles" in this case in particular "in the areas of . . . scienter . . . and loss causation." Hall, 669 F. Supp. 2d at 402.  However, these risks were apparent from the beginning stages of this litigation.  We highlighted the ultimate difficulties that faced the class on

scienter in a Memorandum and Order issued on September 15, 2008. See In re IMAX, 587 F. Supp. 2d at 481, 485.  As we more recently observed in reflecting on that Memorandum and Order, "this case involv[es] accounting irregularities that implicated the recognition not creation of income."  In re IMAX, 2012 WL 2359653, at *11.  Additionally, the obvious challenge regarding loss causation that we have just discussed above was in our view apparent "right at the outset" given the twin disclosures on August 9, 2006.  Fairness Hr'g Tr. 23:25-24:22 (referring to the twin disclosure and emphasizing "the challenges of this case . . . we[]re pretty clear").  The clear and present nature of these risks bears substantially on the reasonableness of a combined application for fees and expenses that represent over 39% of the settlement amount.  Based on straightforward weaknesses in the case, these plain risks and the stark challenges that they presented should have influenced counsel to moderate their investment of time and resources.

Fourth, as to the quality of representation, there is no question that Abbey Spanier, Robbins Geller, Berger & Montague, and Cohen Milstein are experienced and sophisticated counsel well-recognized as leaders in the securities class action bar and further that defendants were represented by highly competent members of the bar.  See Maley, 186 F. Supp. 2d at 373 ("[t]he quality of opposing counsel is also important in evaluating the

quality of the services rendered by [p]laintiffs' . . . [c]ounsel"). However, the experience of counsel actually cuts against them in this case.

While Abbey Spanier achieved a favorable settlement amount on behalf of the class, counsel's overall investment reflected in hours billed and expenses incurred was not justified by the strength of the case and the likely recovery. In the course of the fairness hearing, Mr. Abbey acknowledged as much, stating with characteristic candor by way of explanation for the amount of fees and expenses that "[a]s it turns out, we had made higher demands [than the settlement amount], but we realized that [this] case is worth less than what we originally thought it was [worth]. We had thought that perhaps there would be more to it than there was. We explored other things. It just didn't work out." Fairness Hr'g Tr. 16:24-17:3.[12]

Further, we clearly see in the expert expenses accumulated and billable hours accrued in this case a byproduct of Robbins Geller's conduct in what might fairly be described as the "Yates Affair." As detailed above in Part II.A, we have appointed three separate lead plaintiffs in this case. While counsel bear

---

[12] As a justification for the costs of their accounting and financial experts, counsel have emphasized that it is important "that plaintiffs are able to retain experts of the same caliber that defendants are able to retain," Fairness Hr'g Tr. 12:16-21, and conveyed their understanding "that the cost of [their] experts is in no way disproportionate to the fees charged by defendants' experts." Second Abbey Decl. ¶ 5. We do not disagree with counsel.

no responsibility for the need to replace Westchester, we do hold Robbins Geller partially responsible for the need to replace Snow Capital, which followed from the disclosure of a relationship involving Yates, Snow Capital, and Robbins Geller that Robbins Geller should have affirmatively brought to our attention over a year earlier.   In its recent submissions, Robbins Geller argues that it effectively mitigated the loss to the class stemming from the replacement of Snow Capital through provision of its work product to Abbey Spanier and exclusion of certain of its fees and expenses from the amounts sought here. See First Rothman Decl. ¶¶ 4-5; Second Rothman Decl. ¶ 26.   We disagree.   While the reappointment of Abbey Spanier minimized certain transitional costs, the time necessary for its attorneys to familiarize themselves with the developments in the case over the preceding twenty-two months, restart settlement negotiations, and brief another motion for class certification that afforded defendants a significant opportunity to raise further arguments against class certification inevitably impacted the fees accrued and expenses incurred.[13]   Though

---

[13] On this last point, as Robbins Geller illustrates, the expert report on loss causation that it submitted on behalf of Snow Capital in connection with the second motion for class certification was substantively identical to the expert report on loss causation that Abbey Spanier submitted on behalf of TMF in connection with the third motion for class certification. See Second Rothman Decl. ¶¶ 27-32.   IMAX and the individual defendants took the opportunity presented by the re-filing of this substantively identical export report to introduce further arguments against loss causation. See Second Abbey Decl. ¶¶ 15-16.   It appears that the bulk of the $382,338.22 in expenses that Abbey Spanier incurred for the services of Finnerty Economic

impossible for us to quantify given the information that is available to us, this impact should not be borne by the class in a diminishment of its recovery from the settlement amount.

Fifth, as to the requested fee and expenses relative to the settlement amount, a combined application for in excess of 39% of the settlement amount is excessive in this case and provides the data point that originally focused our attention on the set of issues addressed in this Memorandum and Order.

Finally, as to public policy considerations, we appreciate the established role of the private attorney general in combating securities fraud and understand that "to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives." In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005).

However, it is also essential that counsel measure their investment in a securities class action, both in terms of their own billable time and their incurred expenses, according to the potential settlement that is reasonably achievable. The expenses that accumulated in this case are simply excessive relative to the settlement amount that able counsel should have

---

Consulting LLC and Compass Lexecon following its reappointment as lead plaintiff's counsel followed from the need to address these further arguments that could only be advanced as a result of the replacement of Snow Capital. See Second Abbey Decl. ¶¶ 16-18, Exs. F, G.

anticipated in a relatively weak case, and counsel must share in the burden of paying for these expenses in order for their incentives and those of the class of shareholders that they represent to be properly aligned.   We do not ascribe any malfeasance to counsel in this regard and take in good faith Mr. Abbey's observation that in the course of battling over class certification "the numbers just get out of hand." Fairness Hr'g Tr. 20:10.   Still, the responsibility for properly controlling expenses belongs to counsel.

Further, in light of the divergence of interests that can more generally develop between counsel and the class in securities class actions, it is essential that courts not doubt the forthrightness of counsel.   In this case, Robbins Geller disappointed in its level of candor and based on its supplemental submission still fails to grasp the basis for our concern regarding the Yates Affair.   For reasons of public policy, the grant of fees and expenses must reflect this.

*          *          *

Balancing all of these factors and the unique considerations applicable to this case, we find that an overall grant for fees and expenses of 33% of the settlement or $3,960,000.00 is reasonable.   While we could divide this amount of $3,960,000.00 as between counsel and as between attorneys' fees and expenses, we prefer not to do so because we appreciate

27

that there is a shortfall from the total request and leave the matter with Abbey Spanier, which as lead plaintiff's counsel is best able to fairly allocate the funds.  See In re Giant, 279 F.R.D. at 166 (ordering "fees shall be allocated among . . . counsel by lead plaintiffs' counsel in any manner which, in their good faith judgment, reflects each counsel's contribution to the institution, prosecution[,] and resolution of the action").  If counsel are unable to reach an agreement with Abbey Spanier that is perceived as equitable and in accord with the observations in this Memorandum and Order, then application can be made to this Court for assistance.

### IV. Conclusion

For the reasons stated below as well as those articulated at fairness hearing, we grant 33% of the settlement amount or $3,960,000.00 (plus the interest that is currently accruing on the settlement amount held in escrow) to be divided among counsel and to be apportioned between an award of attorneys' fees and the reimbursement of expenses in such manner as lead plaintiff's counsel determines pursuant to its good-faith judgment.

Dated:    New York, New York
          August 1, 2012


                                    _____
                                    NAOMI  REICE  BUCHWALD
                                    UNITED STATES DISTRICT JUDGE


28

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Attorneys for Lead Plaintiff The Merger Fund:
Arthur N. Abbey, Esq.
Karin E. Fisch, Esq.
Richard B. Margolies, Esq.
Abbey Spanier Rodd & Abrams, L.L.P.
212 East 39th Street
New York, NY 10016

Attorneys for Defendants IMAX Corporation, Richard L. Gelfond, Bradley J. Wechsler, Francis T. Joyce, and Kathryn A. Gamble:
Lewis J. Liman, Esq.
David Oliwenstein, Esq.
Cleary Gottlieb Steen & Hamilton L.L.P.
One Liberty Plaza
New York, NY 10006

Attorneys for Defendant PricewaterhouseCoopers LLP
M. Byron Wilder, Esq.
Gibson, Dunn & Crutcher L.L.P.
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201

Jennifer L. Conn, Esq.
Gibson, Dunn & Crutcher L.L.P.
200 Park Avenue
New York, NY 10166